# EXHIBIT A

# PART 1

# MACONDO PROSPECT
# OFFSHORE DEEPWATER
# OPERATING AGREEMENT

OS-2702-OA

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054328

# TABLE OF CONTENTS

## Operating Agreement
## Outer Continental Shelf – Gulf of Mexico

**ARTICLE 1 – CONTRACT APPLICATION** ........................................................1
   1.1   **Application in General** ..................................................1
   1.2   **Application to the Contract Area** ............................1

**ARTICLE 2 – DEFINITIONS** .............................................................................2
   2.1   **Additional Testing, Logging, or Sidewall Coring**.............2
   2.2   **Affiliate** .................................................................2
   2.3   **Agreement** ............................................................2
   2.4   **Annual Operating Plan** .........................................2
   2.5   **Appraisal Operation** .............................................2
   2.6   **Appraisal Well** .......................................................3
   2.7   **Authorization for Expenditure (AFE)** ....................3
   2.8   **Complete Recoupment** .........................................3
   2.9   **Confidential Data** ..................................................3
   2.10   **Contract Area** ......................................................3
   2.11   **Costs**.....................................................................3
   2.12   **Deepen or Deepening** ........................................4
   2.13   **Deeper Drilling** ....................................................4
   2.14   **Deepest Producible Reservoir** ............................4
   2.15   **Define AFE** ...........................................................4
   2.16   **Define Stage** ........................................................4
   2.17   **Development Operation** ......................................4
   2.18   **Development Phase** .............................................4
   2.19   **Development Plan** ...............................................4
   2.20   **Development System** ...........................................5
   2.21   **Development Well** ...............................................5
   2.22   **Disproportionate Spending** ................................5
   2.23   **Election, Elect, Elects, Elected, Electing** ............5
   2.24   **Enhanced Recovery Project Team AFE** ................5
   2.25   **Execution AFE** .....................................................5
   2.26   **Execution Stage**...................................................5
   2.27   **Exploratory Operation** ........................................5
   2.28   **Exploratory Well** .................................................6
   2.29   **Export Pipelines**..................................................6
   2.30   **Facilities** .............................................................6
   2.31   **Feasibility AFE** ....................................................6
   2.32   **Feasibility Stage** .................................................6
   2.33   **Feasibility Team**...................................................7
   2.34   **Force Majeure** .....................................................7
   2.35   **HSE** ......................................................................7
   2.36   **Hydrocarbon Recoupment**..................................7
   2.37   **Hydrocarbons** .....................................................7

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054329

| | | |
|---|---|---|
| 2.38 | Joint Account | 7 |
| 2.39 | Lease | 7 |
| 2.40 | MMS | 8 |
| 2.41 | News Release | 8 |
| 2.42 | Non-Consent Operation | 8 |
| 2.43 | Non-Operating Party | 8 |
| 2.44 | Non-Participating Party | 8 |
| 2.45 | Non-Participating Interest Share | 8 |
| 2.46 | Objective Depth | 8 |
| 2.47 | OCS | 9 |
| 2.48 | Offsite Host Facilities | 9 |
| 2.49 | Operator | 9 |
| 2.50 | Overinvested Party | 9 |
| 2.51 | Participating Interest Share | 9 |
| 2.52 | Participating Party | 9 |
| 2.53 | Post-Production Project Team AFE | 10 |
| 2.54 | Producible Reservoir | 10 |
| 2.55 | Producible Well | 10 |
| 2.56 | Production System | 10 |
| 2.57 | Production Testing | 11 |
| 2.58 | Project Team | 11 |
| 2.59 | Recompletion | 11 |
| 2.60 | Selection AFE | 11 |
| 2.61 | Selection Stage | 11 |
| 2.62 | Sidetracking | 12 |
| 2.63 | Transfer of Interest | 12 |
| 2.64 | Underinvested Party | 12 |
| 2.65 | Underinvestment | 12 |
| 2.66 | Vote | 12 |
| 2.67 | Well Plan | 12 |
| 2.68 | Working Interest | 13 |
| 2.69 | Workover | 13 |
| | | |
| **ARTICLE 3 – EXHIBITS** | | 13 |
| 3.1 | Exhibits | 13 |
| | | |
| **ARTICLE 4 – SELECTION OF OPERATOR** | | 14 |
| 4.1 | Designation of the Operator | 14 |
| 4.2 | Substitute Operator | 15 |
| 4.2.1 | Substitute Operator if Operator is a Non-Participating Party | 15 |
| 4.2.2 | Substitute Operator if Operator Fails to Commence Drilling Operations | 15 |
| 4.2.3 | Circumstances Under Which the Operator Must Conduct a Non-Consent Operation | 16 |
| 4.2.4 | Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party | 16 |
| 4.2.5 | Appointment of a Substitute Operator | 17 |
| 4.2.6 | Redesignation of Operator | 17 |
| 4.3 | Resignation of Operator | 17 |

HIGHLY CONFIDENTIAL        BP-HZN-2179MDL00054330

4.4 **Removal of Operator** ..................................................................17
    4.4.1 Removal Upon Assignment ..............................................17
    4.4.2 Removal for Cause by Vote .............................................18
    4.4.3 Timing of Vote to Remove Operator ...............................18
4.5 **Selection of Successor Operator** ............................................19
4.6 **Effective Date of Resignation or Removal** ............................19
4.7 **Delivery of Property** ..................................................................19

**ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR** .........................20
5.1 **Exclusive Right to Operate** .....................................................20
5.2 **Workmanlike Conduct** ..............................................................21
5.3 **Drilling Operations** ...................................................................21
5.4 **Liens and Encumbrances** .........................................................21
5.5 **Records** .......................................................................................22
5.6 **Reports to Government Agencies** ...........................................22
5.7 **Information to Participating Parties** .......................................22
5.8 **Completed Well Information** .....................................................24
5.9 **Information to Non-Participating Parties** ................................24
5.10 **Health, Safety, and Environment:** ...........................................25

**ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN** .......25
6.1 **Basis of Charges to the Parties** .............................................25
6.2 **AFEs** ...........................................................................................25
    6.2.1 AFE Overrun Notice ........................................................26
    6.2.2 Supplemental AFEs .........................................................26
        6.2.2.1 Permitted Over-expenditures on Well Operations ...............27
        6.2.2.2 Permitted Over-expenditures on the Feasibility AFE, a Post-
            Production Project Team AFE, or an Enhanced Recovery
            Project Team AFE ....................................................28
        6.2.2.4 Permitted Over-expenditures on an Execution AFE .............28
        6.2.2.5 Permitted Over-expenditures on All Other AFEs .................28
    6.2.3 Further Operations During a Force Majeure .....................28
    6.2.4 Long Lead Well Operation AFEs ......................................29
        6.2.4.1 Approval of a Long Lead Well Operation AFE ....................29
6.3 **Security Rights** .........................................................................30
    6.4.1 Effect and Content of Annual Operating Plan ..................30
        6.4.1.1 Capital Budget .................................................31
        6.4.1.2 Expense Budget ...............................................31
        6.4.1.3 Operator Forecasts and Informational Items ......................31
    6.4.2 Submission of Draft Annual Operating Plan .....................32
    6.4.3 Review of Draft Annual Operating Plan ...........................32

**ARTICLE 7 – CONFIDENTIALITY OF DATA** .....................................33
7.1 **Confidentiality Obligation** .......................................................33
    7.1.1 Exceptions to Confidentiality ...........................................33
    7.1.2 Permitted Disclosures .....................................................33
        7.1.2.1 Operator's Permitted Disclosures .................................33
        7.1.2.2 All Parties' Permitted Disclosures ................................34
    7.1.3 Limited Releases to Offshore Scout Association ...............35

iii

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054331

|  | 7.1.4 | Continuing Confidentiality Obligation | 35 |
| **7.2** | **Ownership of Confidential Data** | | **36** |
|  | 7.2.1 | Trades of Confidential Data | 36 |
|  | 7.2.2 | Ownership of Non-Consent Data | 36 |
| **7.3** | **Access to the Lease and Rig** | | **36** |
| **7.4** | **Development of Proprietary Information and/or Technology** | | **37** |

**ARTICLE 8 – APPROVALS AND NOTICES** .......................................................... **37**

| **8.1** | **Classes of Matters** | | **37** |
|  | 8.1.1 | Voting and Electing Interest | 37 |
| **8.2** | **Voting and Election Procedures** | | **37** |
|  | 8.2.1 | Approval by Vote | 38 |
|  | 8.2.2 | Approval by Election | 38 |
| **8.3** | **Second Opportunity to Participate** | | **39** |
| **8.4** | **Participation by Fewer Than All Parties** | | **39** |
| **8.5** | **Approval by Unanimous Agreement** | | **40** |
| **8.6** | **Response Time for Notices** | | **40** |
|  | 8.6.1 | Well Proposals, Recompletions, and Workovers | 40 |
|  | 8.6.2 | Execution AFE | 41 |
|  | 8.6.3 | Other AFE Related Operations | 41 |
|  | 8.6.4 | Other Proposals | 42 |
|  | 8.6.5 | Failure to Vote or Make an Election | 42 |
|  | 8.6.6 | Suspensions of Operations and Suspensions of Production | 42 |
|  | 8.6.7 | Standby Charges | 42 |
| **8.7** | **Giving and Receiving Notices and Responses** | | **43** |
| **8.8** | **Content of Notices** | | **43** |
| **8.9** | **Designation of Representatives** | | **44** |
| **8.10** | **Meetings** | | **44** |
| **8.11** | **Obligations of Well Participation** | | **44** |

**ARTICLE 9 – NEWS RELEASES** .......................................................................... **44**

| **9.1** | **Proposal of News Releases** | | **44** |
|  | 9.1.1 | Operator's News Release | 45 |
|  | 9.1.2 | Non-Operating Party's News Release | 46 |
| **9.2** | **Emergency New Releases** | | **46** |
| **9.3** | **Mandatory News Releases** | | **46** |

**ARTICLE 10 – EXPLORATORY OPERATIONS** ...................................................... **47**

| **10.1** | **Proposal of Exploratory Wells** | | **47** |
|  | 10.1.1 | Revision of Well Plan | 47 |
|  | 10.1.2 | Automatic Revision of the Well Plan | 48 |
|  | 10.1.3 | Timely Operations | 48 |
|  | 10.1.4 | AFE Overruns and Substitute Well | 50 |
| **10.2** | **Exploratory Operations at Objective Depth** | | **51** |
|  | 10.2.1 | Response to Operator's Proposal | 52 |
|  | 10.2.2 | Response to Highest Priority Proposal | 53 |
|  | 10.2.3 | Response on Next Highest Priority Proposal | 54 |
|  | 10.2.4 | Non-Participating Parties in Exploratory Operations at Objective Depth | 54 |

iv

HIGHLY CONFIDENTIAL                                                              BP-HZN-2179MDL00054332

| | 10.2.5 | Participation in a Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth | 54 |
| 10.3 | | **Permanent Plugging and Abandonment and Cost Allocation** | **55** |
| 10.4 | | **Conclusion of Exploratory Operations** | **56** |
| | | | |
| **ARTICLE 11 – APPRAISAL OPERATIONS** | | | **56** |
| 11.1 | | **Proposal of Appraisal Wells** | **56** |
| | 11.1.1 | Revision of Well Plan | 57 |
| | 11.1.2 | Automatic Revision of the Well Plan | 57 |
| | 11.1.3 | Timely Operations | 57 |
| | 11.1.4 | AFE Overruns and Substitute Well | 58 |
| 11.2 | | **Appraisal Operations at Objective Depth** | **59** |
| | 11.2.1 | Response to Operator's Proposal | 61 |
| | 11.2.2 | Response to Highest Priority Proposal | 62 |
| | 11.2.3 | Response on Next Highest Priority Proposal | 62 |
| | 11.2.4 | Non-Participating Parties in Appraisal Operations at Objective Depth | 62 |
| | 11.2.5 | Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Initial Objective Depth | 63 |
| 11.3 | | **Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir** | **63** |
| 11.4 | | **Permanent Plugging and Abandonment and Cost Allocation** | **64** |
| 11.5 | | **Conclusion of Appraisal Operations** | **65** |
| 11.6 | | **Operations Before the Approval of the Development Plan** | **65** |
| | | | |
| **ARTICLE 12 – DEVELOPMENT PHASES** | | | **66** |
| 12.1 | | **Phased Development** | **66** |
| 12.2 | | **Feasibility Team Proposal** | **66** |
| | 12.2.1 | Feasibility AFE Approval | 68 |
| | 12.2.2 | Feasibility Team and Feasibility Stage Conclusion | 68 |
| 12.3 | | **Commencement of the Selection Stage** | **68** |
| | 12.3.1 | Proposal of a Project Team | 68 |
| | 12.3.2 | Selection AFE Approval | 70 |
| 12.4 | | **Proposal of a Development Plan** | **70** |
| | 12.4.1 | Content of the Development Plan | 71 |
| 12.5 | | **Development Plan Approval** | **74** |
| | 12.5.1 | Approval of Operator's Development Plan Submitted During its Exclusive Period | 74 |
| | 12.5.2 | Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period | 75 |
| | 12.5.3 | Approval of a Development Plan if One is Not Approved by Vote | 75 |
| | 12.5.4 | Approved Development Plan | 76 |
| 12.6 | | **Long Lead Development System AFEs** | **77** |
| 12.7 | | **Define Stage and Execution Stage** | **77** |
| | 12.7.1 | Execution AFE | 77 |
| | 12.7.2 | Approval of an Execution AFE and Commencement of the Execution Stage | 78 |
| | 12.7.3 | Minor Modifications to Development Plans | 78 |
| | 12.7.4 | Major Modifications to Development Plans | 79 |

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054333

|       | 12.7.5 | Major Modifications to Development Plans Prior to the Approval of the Execution AFE | 80 |
|       | 12.7.6 | Major Modifications to Development Plans After the Approval of the Execution AFE | 80 |
|       | 12.7.7 | Approval of Major Modifications | 81 |
|       | 12.7.8 | Termination of a Development Plan | 81 |
|       |        | 12.7.8.1 Termination Prior to Execution AFE Approval | 82 |
|       |        | 12.7.8.2 Termination After Execution AFE Approval | 82 |
|       | 12.7.9 | Timely Operations for Development Systems | 82 |
| **12.8** | **Post-Production Project Team AFEs** | | **82** |
| **12.9** | **Subsequent Development Phases** | | **83** |
|       | 12.9.1 | Proposal of a Subsequent Development Phase | 84 |
|       | 12.9.2 | Execution AFE in a Subsequent Development Phase | 84 |
| **12.10** | **Access to Existing Facilities** | | **84** |
| **12.11** | **Enhanced Recovery and/or Pressure Maintenance Program Proposals** | | **84** |

**ARTICLE 13 – DEVELOPMENT OPERATIONS** ............................................. **85**

| **13.1** | **Proposal of Development Wells and Development Operations** | | **85** |
|       | 13.1.1 | Proposal of Development Wells Included in a Development Plan | 86 |
|       |        | 13.1.1.1 Revision of Well Plan | 86 |
|       |        | 13.1.1.2 Automatic Revision of the Well Plan | 86 |
|       | 13.1.2 | Proposal of Development Operations Not Included in a Development Plan | 86 |
|       | 13.1.3 | Timely Operations | 87 |
|       | 13.1.4 | AFE Overruns and Substitute Well | 88 |
| **13.2** | **Development Operations at Objective Depth** | | **89** |
|       | 13.2.1 | Response to Operator's Proposal | 91 |
|       | 13.2.2 | Response to Highest Priority Proposal | 91 |
|       | 13.2.3 | Response on Next Highest Priority Proposal | 92 |
|       | 13.2.4 | Non-Participating Parties in Development Operations at Objective Depth | 92 |
|       | 13.2.5 | Participation in a Sidetrack or Deepening by a Non-Participating Party in a Development Well at Initial Objective Depth | 93 |
| **13.3** | **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir** | | **93** |
|       | 13.3.1 | Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir | 94 |
|       | 13.3.2 | Completion Attempts At or Above the Deepest Producible Reservoir | 95 |
| **13.4** | **Recompletions and Workovers** | | **96** |
| **13.5** | **Permanent Plugging and Abandonment and Cost Allocation** | | **96** |

**ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS** ............................ **97**

| **14.1** | **Facilities as a Part of Development Plan** | **97** |
| **14.2** | **Use of Offsite Host Facilities** | **98** |
| **14.3** | **Use of Development Systems** | **98** |
| **14.4** | **Processing Priorities** | **98** |
| **14.5** | **Approval of Additional Facilities** | **99** |
| **14.6** | **Expansion or Modification of Existing Production System** | **100** |

Exhibit A
Page 7

HIGHLY CONFIDENTIAL                                                      BP-HZN-2179MDL00054334

14.7   Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons ............................................ 100

ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION .......................... 101
15.1   Duty to Take in Kind ............................................................................. 101
15.2   Facilities to Take in Kind ....................................................................... 101
15.3   Failure to Take Oil or Condensate in Kind ............................................ 101
15.4   Gas Balancing Provision ....................................................................... 102
15.5   Expenses of Delivery in Kind ................................................................ 102

ARTICLE 16 – NON-CONSENT OPERATIONS ................................................... 102
16.1   Conduct of Non-Consent Operations ................................................... 102
        16.1.1   Costs ........................................................................................ 103
        16.1.2   Multiple Completions ............................................................... 104
16.2   Acreage Forfeiture Provisions .............................................................. 104
        16.2.1   First Exploratory Well .............................................................. 104
        16.2.2   Execution AFE .......................................................................... 105
16.3   Costs and Liabilities of Prior Operations .............................................. 106
16.4   Non-Consent Operations to Maintain Contract Area ............................ 106
        16.4.1   Acreage Forfeiture in the Entire Contract Area ........................ 107
        16.4.2   Acreage Forfeiture in a Portion of a Contract Area .................. 107
        16.4.3   Limitations on Acreage Forfeiture ........................................... 108
16.5   Percentage Hydrocarbon Recoupment for Non-Consent Operations ........ 109
        16.5.1   Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well .................................................. 109
                  16.5.1.1   Non-Consent Exploratory Operations at Objective Depth ... 109
        16.5.2   Non-Consent Appraisal Operations ......................................... 110
        16.5.3   Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs ..................................................... 110
        16.5.4   Non-Consent Development Operations ..................................... 110
        16.5.5   Non-Consent Subsequent Development System and Additional Facilities .................................................................. 110
        16.5.6   Additional Hydrocarbon Recoupment ....................................... 111
        16.5.7   Hydrocarbon Recoupment From Production ............................. 111
                  16.5.7.1   Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir 111
                  16.5.7.2   Non-Consent Development Operations in an Existing Producible Reservoir ............................................ 112
                  16.5.7.3   Non-Consent Subsequent Development Systems ............. 112
16.6   Restoration of Interests to Non-Participating Party .............................. 113
        16.6.1   Dry Hole Reversion .................................................................. 113
        16.6.2   Sidetracking or Deepening a Non-Consent Well ....................... 114
16.7   Operations From a Subsequent Non-Consent Development System ........ 114
16.8   Allocation of Development System Costs to Non-Consent Operations .... 115
        16.8.1   Investment Charges ................................................................. 115
        16.8.2   Payments ................................................................................. 117

vii

Exhibit A
Page 8

|  | 16.8.3 | Operating and Maintenance Charges | 117 |
| **16.9** | **Settlement of Underinvestments** | | **117** |
|  | 16.9.1 | Cash Settlement of Underinvestment | 118 |

**ARTICLE 17 – WITHDRAWAL FROM AGREEMENT** ........................................... 119
| **17.1** | **Right to Withdraw** | | **119** |
| **17.2** | **Response to Withdrawal Notice** | | **119** |
|  | 17.2.1 | Unanimous Withdrawal | 119 |
|  | 17.2.2 | No Additional Withdrawing Parties | 120 |
|  | 17.2.3 | Acceptance of the Withdrawing Parties' Interests | 120 |
|  | 17.2.4 | Effects of Withdrawal | 121 |
| **17.3** | **Limitation Upon and Conditions of Withdrawal** | | **121** |
|  | 17.3.1 | Prior Expenses | 121 |
|  | 17.3.2 | Confidentiality | 122 |
|  | 17.3.3 | Emergencies and Force Majeure | 122 |

**ARTICLE 18 – ABANDONMENT AND SALVAGE** ............................................. 123
| **18.1** | **Abandonment of Wells** | **123** |
| **18.2** | **Abandonment of Equipment** | **124** |
| **18.3** | **Disposal of Surplus Materiel** | **125** |
| **18.4** | **Abandonment Operations Required by Governmental Authority** | **125** |

**ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES** .................... 125
| **19.1** | **Burdens on Hydrocarbon Production** | | **125** |
|  | 19.1.1 | Subsequently Created Lease Burdens | 126 |
| **19.2** | **Payment of Rentals and Royalties** | | **126** |
|  | 19.2.1 | Non-Participation in Payments | 127 |
|  | 19.2.2 | Royalty Payments | 127 |

**ARTICLE 20 – TAXES** ................................................................... 128
| **20.1** | **Internal Revenue Provision** | | **128** |
| **20.2** | **Other Taxes and Assessments** | | **128** |
|  | 20.2.1 | Property Taxes | 128 |
|  | 20.2.2 | Production and Severance Taxes | 129 |

**ARTICLE 21 – INSURANCE AND BONDS** ................................................. 129
| **21.1** | **Insurance** | **129** |
| **21.2** | **Bonds** | **129** |

**ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS** .................................... 129
| **22.1** | **Individual Obligations** | **129** |
| **22.2** | **Notice of Claim or Lawsuit** | **130** |
| **22.3** | **Settlements** | **130** |
| **22.4** | **Defense of Claims and Lawsuits** | **130** |
| **22.5** | **Liability for Damages** | **131** |
| **22.6** | **Indemnification for Non-Consent Operations** | **131** |
| **22.7** | **Damage to Reservoir and Loss of Reserves** | **132** |
| **22.8** | **Non-Essential Personnel** | **132** |

Exhibit A
Page 9

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054336

22.9  Dispute Resolution Procedure ........................................................133

ARTICLE 23 – CONTRIBUTIONS ..................................................................133
23.1  Contributions from Third Parties ..................................................133
23.2  Methods of Obtaining Contributions.............................................134
23.3  Counteroffers..................................................................................134
23.4  Approval of Contributions .............................................................134
23.5  Cash Contributions........................................................................134
23.6  Acreage Contributions ..................................................................135
    23.6.1  Two or More Parties Own One Hundred Percent of the Acreage
            Contribution ...................................................................135
    23.6.2  Two or More Parties Own Less Than One Hundred Percent of the
            Acreage Contribution .....................................................135

ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO
PURCHASE.................................................................................................136
24.1  Transfer of Interest........................................................................136
    24.1.1  Exceptions to Transfer Notice .......................................136
    24.1.2  Effective Date of Transfer of Interest.............................136
    24.1.3  Minimum Transfer of Interest .........................................137
    24.1.4  Form of Transfer of Interest ...........................................137
    24.1.5  Warranty .........................................................................137
24.2  Preferential Right to Purchase......................................................138
    24.2.1  Notice of Proposed Transfer of Interest.........................138
    24.2.2  Exercise of Preferential Right to Purchase ....................138
    24.2.3  Transfer of Interest Not Affected by the Preferential Right to
            Purchase ........................................................................139
    24.2.4  Completion of Transfer of Interest .................................140

ARTICLE 25 – FORCE MAJEURE.................................................................140
25.1  Force Majeure ...............................................................................140

ARTICLE 26 – ADMINISTRATIVE PROVISIONS ..........................................140
26.1  Term ..............................................................................................140
26.2  Waiver ............................................................................................141
26.3  Waiver of Right to Partition............................................................141
26.4  Compliance With Laws and Regulations........................................141
    26.4.1  Applicable Law ...............................................................141
    26.4.2  Severance of Invalid Provisions .....................................142
    26.4.3  Fair and Equal Employment............................................142
26.5  Construction and Interpretation of this Agreement........................142
    26.5.1  Headings for Convenience .............................................142
    26.5.2  Article References ...........................................................143
    26.5.3  Gender and Number ........................................................143
    26.5.4  Joint Preparation ............................................................143
    26.5.5  Integrated Agreement .....................................................143
    26.5.6  Binding Effect .................................................................143
    26.5.7  Further Assurances.........................................................144
    26.5.8  Duplicate Counterpart Execution....................................144

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054337

26.5.9    Currency...........................................................................................144
26.5.10  Future References .............................................................................144
**26.6     Restricted Bidding** ..............................................................................**144**

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

x

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054338

# OPERATING AGREEMENT
# OUTER CONTINENTAL SHELF – GULF OF MEXICO

This Agreement, effective as of October 1, 2009 (the "Effective Date"), is between BP Exploration & Production Inc. ("BP") and MOEX Offshore 2007 LLC ("MOEX"), the signers of this Agreement, each referred to individually as a "Party" and collectively as the "Parties."

Whereas the Parties own one or more Leases, identified in Exhibit "A" *(Description of Leases),* and desire to explore, appraise, develop, and operate the Leases for the production of Hydrocarbons;

Now, therefore, in consideration of the premises and mutual promises in this Agreement, the Parties agree to explore, appraise, develop, and operate the Contract Area under the following provisions:

## ARTICLE 1 – CONTRACT APPLICATION

### 1.1   Application in General

This Agreement governs the rights and obligations of the Parties relating, without limitation, to the exploration, appraisal, development, operation, production, treatment, gathering, and storage of Hydrocarbons. This Agreement does not apply to the fabrication or installation of Export Pipelines.

### 1.2 Application to the Contract Area

This Agreement applies to the entire Contract Area. Unless otherwise provided in this Agreement, all the rights and obligations in and under the Leases comprising the Contract Area, all property and rights acquired pursuant to this Agreement, and all Hydrocarbons are owned by the Parties according to their respective Working Interest or Participating Interest, as applicable.

1

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054339

# ARTICLE 2 – DEFINITIONS

### 2.1    Additional Testing, Logging, or Sidewall Coring
Testing (excluding Production Testing), logging, or sidewall coring that is in addition to that approved by virtue of a previously approved well or subsequent operation.

### 2.2    Affiliate
A corporation, company, limited liability company, partnership, or other legal entity that:

(a)    is owned or controlled by a Party,

(b)    is owned or controlled by another corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party,

(c)    owns or controls a Party, or

(d)    is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

### 2.3    Agreement
This operating agreement, together with its attached Exhibits.

### 2.4    Annual Operating Plan
The operational plan and estimate of Costs for activities and operations, as described in Article 6.4 *(Annual Operating Plan)*.

### 2.5    Appraisal Operation
An operation (including, but not limited to, an operation after an Appraisal Well has reached its Objective Depth but before the attempted completion of the well) conducted under Article 11 *(Appraisal Operations)*.

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054340

**2.6   Appraisal Well**

A well proposed and drilled as an Appraisal Operation [including, but not limited to, a substitute well for an Appraisal Well abandoned under Article 11.1.4 *(AFE Overruns and Substitute Well)*].

**2.7   Authorization for Expenditure (AFE)**

A written description and Cost estimate of a proposed activity or operation accompanying a proposal for that activity or operation.

**2.8   Complete Recoupment**

The point in time when the Participating Parties have been reimbursed, through Hydrocarbon Recoupment, through Disproportionate Spending, or through a lump sum cash settlement, an amount equal to the Non-Participating Party's Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage provided in Article 16 *(Non-Consent Operations)*.

**2.9   Confidential Data**

All proprietary geophysical, geological, geochemical, drilling, or engineering data acquired or derived from operations conducted under this Agreement and all analyses, compilations, maps, models, interpretations, and other documents that reflect or incorporate that data.  The term also includes, but is not limited to:

(a)   the provisions of this Agreement, subject to Exhibit "I"; and

(b)   commercial, contractual, and financial information acquired or derived from activities or operations conducted under this Agreement;

however, the term does not include the fact that the Operator has let a contract for an activity or operation to be conducted under this Agreement.  The term excludes "Confidential Information" as that term is defined in Exhibit "G."

**2.10   Contract Area**

The OCS Leases, or portions thereof, listed on Exhibit "A."

**2.11   Costs**

The monetary amount of all expenditures (or indebtedness) incurred by the Operator and the Participating Parties in the conduct of activities and operations, determined under this Agreement.

3

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054341

### 2.12  Deepen or Deepening

An operation to drill an existing well (including sidetracking a well) deeper than the stratigraphic equivalent of the Objective Depth of any prior operation conducted in the well.

### 2.13  Deeper Drilling

The drilling of an Appraisal Well or Development Well below the Deepest Producible Reservoir in existence when the well is proposed.

### 2.14  Deepest Producible Reservoir

The deepest Producible Reservoir in existence when a drilling or Deeper Drilling proposal is made.

### 2.15  Define AFE

The AFE for the Define Stage.

### 2.16  Define Stage

The stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will (a) commence the implementation of a Development Plan, (b) complete enough of the detailed design of the Development System to enable contractors to formulate their bids on the components of the Development System, and (c) submit an Execution AFE to the Parties for their review and approval.

### 2.17  Development Operation

*An operation (including, but not limited to, a Recompletion, a Workover, the attempted completion of an Exploratory Well or an Appraisal Well, or an operation after a Development Well has reached its Objective Depth) conducted under Article 13* (Development Operations)

or under Article 11.6 *(Operations Before the Approval of the Development Plan).*

### 2.18  Development Phase

The proposals, activities, and operations associated with determining the feasibility of development and the design, fabrication or acquisition, and installation of a Development System.

### 2.19  Development Plan

The plan for a Development Phase, as described in Article 12 *(Development Phases).*

**4**

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054342

**2.20  Development System**

A Production System and its associated Facilities.

**2.21  Development Well**

A well proposed and drilled as a Development Operation [including, but not limited to, a substitute well for a Development Well abandoned under Article 13.1.4 *(AFE Overruns and Substitute Well)*].

**2.22  Disproportionate Spending**

The payment of the Costs of an activity or operation by a Participating Party in excess of its Participating Interest Share of the Costs of that activity or operation in order to settle an Underinvestment previously incurred by that Participating Party.

**2.23  Election, Elect, Elects, Elected, Electing**

A response or deemed response by a Party to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*.

**2.24  Enhanced Recovery Project Team AFE**

The AFE that is to accompany a proposal for the formation of a Project Team whose sole scope of work is the design of an enhanced recovery and/or pressure maintenance program.

**2.25  Execution AFE**

A collection of AFEs, which, according to the submitting Party's estimates, will cover all of the Costs of the Execution Stage (which do not include the Costs of Development Wells), and which shall be deemed by the Parties to have been submitted as one AFE.

**2.26  Execution Stage**

The final stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will complete the implementation of the Development Plan, implement the Execution AFE, and commence the first production of Hydrocarbons for that particular Development Phase.

**2.27  Exploratory Operation**

An operation (including, but not limited to, an operation after an Exploratory Well has reached its Objective Depth but before the attempted completion of the

5

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054343

1  well, except for Production Testing) conducted under Article 10 *(Exploratory*
2  *Operations)*.

3  **2.28  Exploratory Well**
4  A well proposed and drilled as an Exploratory Operation [including, but not
5  limited to, a substitute well for an Exploratory Well abandoned under Article
6  10.1.4 *(AFE Overruns and Substitute Well)*].

7  **2.29  Export Pipelines**
8  Pipelines to which a gathering line or lateral line downstream of the
9  Development System is connected and which are used to transport
10 Hydrocarbons or produced water to shore.

11 **2.30  Facilities**
12 Production equipment located downstream of the wellhead connections, which
13 is installed on or outside the Contract Area in order to enhance, handle, or
14 process Hydrocarbon production or transport Hydrocarbons to processing
15 facilities.  Facilities include, but are not limited to, control umbilicals, disposal
16 wells and their associated components, flowlines, and gathering lines or lateral
17 lines and their associated components that are paid for by the Joint Account.
18 Facilities exclude (1) Production Systems, (2) Export Pipelines, (3) the equipment
19 procured and utilized for an enhanced recovery and pressure maintenance
20 program described in Article 12.11 *(Enhanced Recovery and/or Pressure*
21 *Maintenance Program Proposals)*, and (4) the facilities referred to in Article 15.2
22 *(Facilities to Take in Kind)*.

23 **2.31  Feasibility AFE**
24 The AFE for the Feasibility Stage.

25 **2.32  Feasibility Stage**
26 The stage of a Development Phase during which the Operator, with the
27 assistance of the Feasibility Team, will attempt to find at least one scenario for
28 the development of Hydrocarbons, which is technologically and economically
29 feasible.

6

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054344

### 2.33  Feasibility Team

A group of employees, contractors, and/or consultants of the Participating Parties or their respective Affiliates that assists the Operator during the Feasibility Stage.

### 2.34  Force Majeure

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause, which includes, but is not limited to, a flood, storm, hurricane, loop current/eddy, or other act of God; a fire, loss of well control, oil spill, or other environmental catastrophe; a war, a civil disturbance, a terrorist act, a labor dispute, a strike, a lockout; an inability to immediately comply with a law, order, rule, or regulation; a governmental action or delay in granting necessary permits or permit approvals; and the inability to secure materials or a rig.

### 2.35  HSE

Health, safety, and environment.

### 2.36  Hydrocarbon Recoupment

An amount to be recovered by the Participating Parties from all or part of the Non-Participating Interest Share of the proceeds from the sale of future Hydrocarbon production equal to the Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage in Article 16 *(Non-Consent Operations)*.

### 2.37  Hydrocarbons

The oil, gas, and associated liquid and gaseous by-products (except helium) that may be produced from a well bore on the Contract Area.

### 2.38  Joint Account

The account maintained by the Operator under this Agreement, showing the charges paid and credits received in connection with the activities and operations conducted under this Agreement.

### 2.39  Lease

Each OCS federal oil and gas lease (or portion thereof) identified in Exhibit "A" and each oil and gas lease covering one or more OCS blocks, or portions thereof, in the Contract Area that is acquired during the term of this Agreement

7

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054345

by the Operator and the Non-Operating Parties (including substitutions for and replacements of existing Leases).

**2.40   MMS**

The Minerals Management Service, United States Department of Interior, or its successor agency.

**2.41   News Release**

A press release or other public announcement or disclosure by a Party containing a reference, either directly or by implication, to this Agreement or the activities or operations herein contemplated, including, but not limited to, any public release via print media, broadcast news, internet, extranet, public networks or service providers, and discussions with journalists.

**2.42   Non-Consent Operation**

An activity or operation proposed and approved under this Agreement in which one or more Parties, having the contractual right to do so, Elect or Vote not to participate, except when an activity or operation is approved by Vote and the approval binds all Parties.

**2.43   Non-Operating Party**

A Party other than the Operator.

**2.44   Non-Participating Party**

A Party who, having the contractual right to do so, Elects or Votes not to participate in sharing the Costs, risks, and benefits (including the rights to Hydrocarbons) of an activity or operation proposed and approved under this Agreement, except when an activity or operation is approved by Vote and the approval binds all Parties.

**2.45   Non-Participating Interest Share**

The percentage of participation in the Costs, risks, and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have had in a proposed activity or operation if all Parties had participated in that proposed activity or operation.

**2.46   Objective Depth**

For each well, the shallower of the total footage to be drilled by that well (as measured in true vertical subsea depth) or the penetration by the drill bit to the

8

Exhibit A
Page 19

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054346

base of the deepest target formation or interval in that well, as that depth or target formation or interval is stated in the AFE for the well.

**2.47   OCS**

The Outer Continental Shelf of the Gulf of Mexico.

**2.48   Offsite Host Facilities**

Production equipment that is (a) used to process or handle Hydrocarbon production and (b) owned by one or more third parties or by one or more Participating Parties in an Execution AFE (under which that production equipment is to be utilized for Hydrocarbon production), whose respective ownership interests in the production equipment are not exactly the same as their respective Participating Interest Shares in the Execution AFE.

**2.49   Operator**

The Party designated in Article 4.1 *(Designation of the Operator)*, a successor Operator selected under Article 4.5 *(Selection of Successor Operator)*, and, if applicable, a substitute Operator selected under Article 4.2 *(Substitute Operator)*.

**2.50   Overinvested Party**

A Party entitled to receive its Participating Interest Share of an Underinvestment.

**2.51   Participating Interest Share**

A Participating Party's percentage of participation in:

(a)   the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation; or,

(b)   if applicable, interests to be assigned to the Parties.

A Participating Party's percentage of participation is either the proportion, expressed as a percentage, that the Participating Party's Working Interest bears to the total Working Interests of all Participating Parties or such different basis for Cost sharing or assignment as the Participating Parties agree upon.

**2.52   Participating Party**

A Party who, having the contractual right to do so, participates in the sharing of:

9

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054347

(a) the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation; or,

(b) if applicable, the interests to be assigned to the Parties.

The term includes a Party who does not Vote to participate in a proposed activity or operation, but is nonetheless bound to participate in that proposed activity or operation if it is approved by Vote.

**2.53 Post-Production Project Team AFE**

An AFE submitted in association with the continuance of the Project Team under Article 12.8 *(Post-Production Project Team AFEs)*.

**2.54 Producible Reservoir**

An underground accumulation of Hydrocarbons (a) separate from and not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (b) into which a Producible Well has been drilled.

**2.55 Producible Well**

A well on the Contract Area that:

(a) produces Hydrocarbons;

(b) meets, according to the MMS, the "well producibility criteria" in Title 30 CFR 250.116 or any succeeding order or regulation issued by an appropriate governmental authority; or

(c) the Participating Parties in the subject well unanimously agree is a Producible Well.

**2.56 Production System**

A system or combination of systems on the Contract Area to develop, produce, store, distribute, and initiate the transportation of Hydrocarbons. The term includes:

(a) an offshore surface structure, whether fixed, compliant, or floating;

(b) a subsea structure or template designed as a guide to or to provide structural rigidity to one or more wells;

10

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054348

(c)   any combination of the items mentioned in clauses (a) and (b);

(d)   any other type of structure designed to develop and produce Hydrocarbons; and

(e)   all associated components of the items mentioned above, including, but not limited to, a drilling rig, mooring lines, and anchor piles.

Production System excludes Facilities, mobile offshore drilling units, and the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.57   Production Testing**

Operations for the controlled flow of Hydrocarbons to the surface for the purpose of measuring flow rates or flowing pressures, or gaining other subsurface data.

**2.58   Project Team**

A group of employees, contractors, and/or consultants of the Participating Parties or their respective Affiliates, who assists the Operator in carrying out the scope of work for the Selection Stage, Define Stage, and Execution Stage and the scope of work under Articles 12.8 *(Post-Production Project Team AFEs)* and 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*.

**2.59   Recompletion**

A Development Operation in a single well bore in which a completion in one Producible Reservoir is abandoned in order to attempt a completion in a different Producible Reservoir. To "Recomplete" means to conduct a Recompletion.

**2.60   Selection AFE**

The AFE for the Selection Stage.

**2.61   Selection Stage**

The stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will determine whether to:

(a)   install a Development System on the Contract Area, or

(b)   tie-back to, and utilize,

11

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054349

(i)     a Development System resulting from a previous Development Phase or

(ii)    a development system and/or facilities located outside the Contract Area

in order to produce Hydrocarbons.

**2.62   Sidetracking**

An operation to directionally control or intentionally deviate a well to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of an operation previously conducted in the well, unless the intentional deviation is done to straighten the hole, drill around junk, or overcome other mechanical difficulties. To "Sidetrack" means to conduct a Sidetracking.

**2.63   Transfer of Interest**

A conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's undivided Working Interest.

**2.64   Underinvested Party**

A Party with an Underinvestment.

**2.65   Underinvestment**

A monetary obligation incurred under this Agreement to be settled under Article 16.9 *(Settlement of Underinvestments)*.

**2.66   Vote**

As a noun, a response or deemed response by a Party to a proposal requiring approval under Article 8.2.1 *(Approval by Vote)*; as a verb, to respond to a proposal requiring approval under Article 8.2.1 *(Approval by Vote)*.

**2.67   Well Plan**

A detailed written description accompanying a proposal to drill an Exploratory Well, Appraisal Well, or Development Well, or to conduct a Workover, Recompletion, well repair, or subsequent operation at Objective Depth, which must include, at a minimum:

(a)     the surface and target bottomhole locations of the operation, if applicable;

**12**

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054350

(b)  the expected commencement date of the operation and the anticipated time necessary to conclude the operation;

(c)  the total vertical subsea depth to be drilled, along with the specified Objective Depth (and the target zones to be penetrated), if applicable;

(d)  the proposed drilling plan, if applicable, and the proposed completion plan, including the casing program and directional details, if applicable;

(e)  details of all coring, logging, and other evaluation operations to be conducted, if applicable; and

(f)  information about the drilling rig to be used, including day rates, water depth rating, and other limitations relevant to the operations to be conducted, if applicable.

**2.68  Working Interest**

The record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A"). If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A."

**2.69  Workover**

A Development Operation conducted in an existing well after the well has been completed in one or more Producible Reservoirs to restore, maintain, or improve production from one or more of those Producible Reservoirs.

## ARTICLE 3 – EXHIBITS

**3.1  Exhibits**

All references in this Agreement to "Exhibits" without further qualification mean the Exhibits listed below and attached to this Agreement. Each Exhibit is made a part of this Agreement and is incorporated into this Agreement by this reference. If any provision of an Exhibit conflicts with any provision of the body of this Agreement, the provision of the body of this Agreement shall prevail, with the exception of Exhibits "C," "D," and "G," each provision of which shall prevail over any provision of the body of this Agreement, except as provided in Article 6.2.4 *(Long Lead Well Operation AFEs)*. If any provision of Exhibit "C"

13

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054351

conflicts with any provision of Exhibit "G," the provision of Exhibit "G" shall prevail.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "D," the provision of Exhibit "C" shall prevail.

**Exhibit "A"**      Description of Leases, Working Interests of the Parties, and Representatives

**Exhibit "B"**      Insurance Provisions

**Exhibit "C"**      Accounting Procedure

**Exhibit "D"**      Gas Balancing Agreement

**Exhibit "E"**      Certification of Non-segregated Facilities

**Exhibit "F"**      Security Interest Provisions

**Exhibit "G"**      Project Team and Technology Sharing

**Exhibit "H"**      Dispute Resolution Procedure

**Exhibit "I"**      Well Data Trade and Confidentiality Agreement

~~**Exhibit "J"**      Tax Partnership~~ **INTENTIONALLY DELETED**

**Exhibit "K"**      Health, Safety and Environment

**Exhibit "L"**      Geophysical Operations Provisions

## ARTICLE 4 – SELECTION OF OPERATOR

**4.1**   **Designation of the Operator**

BP Exploration & Production Inc. is designated as the Operator of the Contract Area.  The Parties shall promptly execute and file all documents required by the MMS in connection with the designation of **BP Exploration & Production Inc.** as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed otherwise by all the Parties, the Operator shall be classified as the designated applicant for oil spill financial responsibility purposes, and each Non-Operating Party shall promptly execute the appropriate documentation reflecting that classification and promptly provide that documentation to the Operator for filing with the MMS.

HIGHLY CONFIDENTIAL                                              BP-HZN-2179MDL00054352

## 4.2   Substitute Operator

### 4.2.1   Substitute Operator if Operator is a Non-Participating Party

Except as otherwise provided in Article 4.2.3 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, if the Operator is a Non-Participating Party in a Non-Consent Operation, the Participating Parties may approve by Vote the designation of any Participating Party as the substitute Operator.  The substitute Operator shall serve as the Operator only (a) for the Non-Consent Operation (if the Non-Consent Operation is the drilling of a well, through the release of the drilling rig for that well), (b) of the Lease affected by the Non-Consent Operation, and (c) with the same authority, rights, obligations, and duties as the Operator, subject to the limitations in (a) and (b).  If a Non-Operating Party is the only Participating Party in a Non-Consent Operation, then the Non-Operating Party shall be designated as the substitute Operator for that Non-Consent Operation, with no Vote required, unless the Non-Operating Party elects not to accept the designation. A Non-Operating Party, who is a Participating Party, shall not be designated as a substitute Operator against its will. If a substitute Operator is not designated under the foregoing procedures, the Operator shall, upon the unanimous agreement of the Participating Parties, conduct the Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk under Article 16 *(Non-Consent Operations)*.  If the Participating Parties do not approve by Vote a substitute Operator to conduct the Non-Consent Operation or do not unanimously agree that the Operator shall conduct the Non-Consent Operation on behalf of the Participating Parties, then the proposal of the Non-Consent Operation shall be deemed withdrawn, with the effect as if the proposal for the Non-Consent Operation had never been proposed and approved.

### 4.2.2   Substitute Operator if Operator Fails to Commence Drilling Operations

If the Operator fails to timely commence an Exploratory Well in accordance with Article 10.1.3 *(Timely Operations)*, an Appraisal Well in accordance with Article 11.1.3 *(Timely Operations)* or a Development Well in accordance with Article 13.1.3 *(Timely Operations)*, the non-operating Participating Parties may select a substitute Operator in the

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054353

same manner as the selection of a successor Operator under Article
4.5 *(Selection of Successor Operator)*, and the substitute Operator
shall serve as the Operator only (a) for the drilling of that well through
the release of the drilling rig for that well, (b) of the Lease on which the
well is drilled, and (c) with the same authority, rights, obligations, and
duties as the Operator, subject to the limitations in (a) and (b).

**4.2.3** **Circumstances Under Which the Operator Must Conduct a Non-Consent Operation**

If:

(a)     a drilling rig is on location and the Operator becomes a Non-Participating Party (i) in a supplemental AFE pursuant to the terms
of Article 6.2.2 *(Supplemental AFEs)*, or (ii) after reaching
Objective Depth as provided in Article 10.2 *(Exploratory
Operations at Objective Depth)*, Article 11.2 *(Appraisal Operations
at Objective Depth)*, or Article 13.2 *(Development Operations at
Objective Depth)*, or

(b)     the Operator becomes a Non-Participating Party in an operation to
be conducted on or from a Development System operated by the
Operator,

the Operator, as a Non-Participating Party, shall conduct the Non-Consent Operation on behalf of the Participating Parties and at the
Participating Parties' sole Cost and risk under Article 16 *(Non-Consent
Operations)*.

**4.2.4** **Operator's Conduct of a Non-Consent Operation in Which it is a
Non-Participating Party**

When, under Article 4.2.1 *(Substitute Operator if Operator is a Non-Participating Party)* or Article 4.2.3 *(Circumstances Under Which the
Operator Must Conduct a Non-Consent Operation)*, the Operator
conducts a Non-Consent Operation in which it is a Non-Participating
Party, it shall follow the practices and standards in Article 5 *(Rights and
Duties of Operator)*. The Operator shall not be required to proceed with
the Non-Consent Operation until the Participating Parties have
advanced the Costs of the Non-Consent Operation to the Operator.

16

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054354

The Operator shall never be obligated to expend any of its own funds for the Non-Consent Operation.

### 4.2.5   Appointment of a Substitute Operator

After expiration of all applicable response periods for the Non-Consent Operation and selection of a substitute Operator, each Party shall promptly provide the substitute Operator with the appropriate MMS designation of operator forms and certification of oil spill financial responsibility forms.  The Operator and the substitute Operator shall coordinate the change of operatorship to avoid interfering with ongoing activities and operations, if any, including but not limited to, lease maintenance activities and operations.

### 4.2.6   Redesignation of Operator

Within fifteen (15) days after conclusion of the Non-Consent Operation, all Parties shall execute and provide the Operator with the appropriate MMS designation of operator forms and certification of oil spill financial responsibility forms to return operatorship to the Operator, thereby superseding the Parties' designation of the substitute Operator under Article 4.2.5 (Appointment of a Substitute Operator).

## 4.3   Resignation of Operator

Subject to Article 4.5 (Selection of Successor Operator), the Operator may resign at any time by giving written notice to the Parties, except that the Operator may not resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If the Operator ceases to own a Working Interest, the Operator automatically shall be deemed to have resigned as the Operator without any action by the Non-Operating Parties.

## 4.4   Removal of Operator

The Operator may be removed under the following circumstances:

### 4.4.1   Removal Upon Assignment

If the Operator assigns part of its Working Interest (excluding an interest assigned to an Affiliate) and the assignment reduces the Operator's Working Interest to less than the Working Interest of a Non-Operating Party, whether accomplished by one or more

<br>

17

Exhibit A
Page 28

HIGHLY CONFIDENTIAL

assignments, then the removal of the Operator requires approval by Vote.

**4.4.2**   **Removal for Cause by Vote**

Under the following circumstances, the removal of the Operator shall be approved by Vote, excluding the Vote of the Operator:

(a)   the Operator is found liable by a final judicial decision or a final decision under binding arbitration for an act of gross negligence or willful misconduct regarding the Contract Area;

(b)   the Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after receipt of written notice of the breach from a Non-Operating Party.  If the breach specified in the notice reasonably cannot be corrected within the thirty (30) day period, but the Operator within said period begins action to correct the breach and thereafter diligently carries the corrective action to completion, the Operator shall not be removed.  The Operator shall not be removed under this Article 4.4.2 if the Operator is able to prove the non-existence of the alleged breach within thirty (30) days after receipt of written notice of the alleged breach;

(c)   the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of its creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(d)   a receiver is appointed for the Operator or for substantially all of its property or affairs; or

(e)   the Operator fails to timely commence the fabrication or acquisition of the Development System in accordance with Article 12.7.9 *(Timely Operations for Development Systems)*.

**4.4.3**   **Timing of Vote to Remove Operator**

A Vote to remove the Operator for cause as provided in this Article 4.4 shall be taken within ninety (90) days after the Non-Operating Party's actual knowledge of the cause.

HIGHLY CONFIDENTIAL

### 4.5     Selection of Successor Operator

Upon the resignation or removal of the Operator, a successor Operator shall be approved by Vote, subject to this limitation on the Voting right of Operator:  if the resigned or removed Operator is not entitled to Vote, fails to Vote, or Votes only to succeed itself, then the successor Operator shall be approved by Vote after excluding the Vote of the resigned or removed Operator.  If the Operator assigns all or a part of its Working Interest, then under Article 4.3 *(Resignation of Operator)* or Article 4.4.1 *(Removal Upon Assignment)* the Party who acquired all or a part of the former Operator's Working Interest shall not be excluded from Voting for a successor Operator.  If there are only two Parties to this Agreement when the Operator resigns or is removed, then the Non-Operating Party automatically has the right, but not the obligation, to become the Operator.  If no Party is willing to become the Operator, this Agreement shall terminate under Article 26.1 *(Term)*.

### 4.6     Effective Date of Resignation or Removal

The resignation or removal of the Operator shall become effective as of 7:00 a.m. on the first day of the month following a period of ninety (90) days from, and inclusive of, the day of the Parties' receipt of the applicable notice, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and certification for oil spill financial responsibility purposes by the MMS, in which case the resignation or removal of the Operator shall become effective at 7:00 a.m. on the day immediately following MMS approval. The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities of the outgoing Operator which accrued during its tenure.   The outgoing Operator and the successor Operator may charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship, except when the change of operatorship results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of the Operator.

### 4.7     Delivery of Property

On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement; all Hydrocarbons that are not the separate property of a Party; all equipment, materials, and appurtenances purchased for the Joint Account under

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054357

this Agreement; and all books, records, and inventories relating to the Joint Account (other than those books, records, and inventories maintained by the outgoing Operator as the owner of a Working Interest). The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of the Operator that are assignable under the contracts. The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the return of, and the accounting by the outgoing Operator of, the property and the Hydrocarbons that are not the separate property of a Party. The inventory and audit shall be conducted under Exhibit "C."

## ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR

### 5.1   Exclusive Right to Operate

Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement. In performing services under this Agreement for the Non-Operating Parties, the Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except as provided in Article 8.2 *(Voting and Election Procedures)* or Article 8.5 *(Approved by Unanimous Agreement)*. The Operator is not the agent or fiduciary of the Non-Operating Parties. With the exception of any Feasibility Team or Project Team formed under this Agreement, the Operator shall select and determine the number of employees, Affiliates, contractors, and/or consultants used in conducting activities or operations under this Agreement and the hours of labor and the compensation for those employees, Affiliates, contractors, and/or consultants. All of those employees, Affiliates, contractors, and/or consultants shall be the employees, Affiliates, contractors, and/or consultants of the Operator. The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies, and personnel reasonably necessary for the Operator to conduct the activities or operations provided for in this Agreement; however, if a substitute Operator is designated to drill a well, the substitute Operator may utilize a rig, which it owns or has under contract, for the drilling of that well.

20

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054358

## 5.2 **Workmanlike Conduct**

The Operator shall timely commence and conduct all activities or operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances. **THE OPERATOR SHALL NOT BE LIABLE TO THE NON-OPERATING PARTIES FOR LOSSES SUSTAINED OR LIABILITIES INCURRED, EXCEPT AS MAY RESULT FROM OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT, THE OPERATOR SHALL CONSULT WITH THE NON-OPERATING PARTIES AND KEEP THEM INFORMED OF IMPORTANT MATTERS.** The Operator shall never be required to conduct an activity or operation under this Agreement that it, as a reasonable and prudent operator in similar circumstances, believes would be unsafe or would endanger persons, property, or the environment.

## 5.3 **Drilling Operations**

The Operator may have drilling operations conducted by qualified and responsible independent contractors who are not an Affiliate of the Operator and are employed under competitive contracts. A competitive contract is a contract, or any extension thereof (a) that was entered into within five (5) years before the commencement of drilling operations and (b), that contains terms, rates, and provisions that, when the contract was entered into, did not exceed those generally prevailing on the OCS for operations involving drilling rigs of an equivalent type, operating in similar environments and water depths, equipped to the Operator's standard conditions, and capable of drilling the proposed well or conducting other required operations within the schedule in the well AFE. The Operator may employ its own or its Affiliate's equipment, personnel, drilling rig, Workover rig, and snubbing unit in the conduct of those operations, either under Exhibit "C" or under a written agreement among the Participating Parties. If the Operator's or its Affiliate's equipment, personnel, drilling rig, Workover rig, or snubbing unit is employed in conducting operations under this Agreement, the terms, conditions, and rates for that employment shall be consistent with those currently prevailing in competitive contracts for the deepwater OCS.

## 5.4 **Liens and Encumbrances**

The Operator shall endeavor to keep the Leases, Production Systems, Facilities, and other equipment purchased for the Joint Account under this Agreement and the Hydrocarbons free from liens and encumbrances (except those provided in

21

HIGHLY CONFIDENTIAL

Exhibit "F") that might arise by reason of the activities or operations conducted under this Agreement. If a lien is placed on the Leases, Production Systems, Facilities, other equipment, or any Hydrocarbons, the Operator shall make reasonable efforts to remove the lien.

**5.5    Records**

The Operator shall keep accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C." Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times during the Operator's normal office hours under Exhibit "C." The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate. The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party. This provision does not affect a Party's audit rights under this Agreement. This provision shall also apply to each Non-Operating Party's books, accounts, and records kept to support its charges to a Project Team.

**5.6    Reports to Government Agencies**

The Operator shall make timely reports to all governmental authorities to which it has a duty to make reports and shall furnish copies of the reports to the Participating Parties. The Operator shall provide each Non-Operating Party with a copy of each notice, order, and directive received from the MMS. As soon as reasonably practicable, each Party shall give written notice to the other Parties before each meeting with government authorities of which it has notice and that affect the Contract Area.

**5.7    Information to Participating Parties**

The Operator shall, as soon as reasonably practicable and to the extent that the information has then been obtained or received by the Operator, furnish each Participating Party the following information about well operations:

(a)    a copy of each application for a permit to drill and all amendments to that application;

(b)    drilling and Workover reports, which shall include, but not be limited to, the current depth, the corresponding lithological information, data on drilling

22

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054360

fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and Hydrocarbon information, casing and cementation tallies, and estimated cumulative Costs, to be sent by facsimile or electronic transmission within eight (8) hours (exclusive of Saturdays, Sundays, and federal holidays) of well operations conducted in the preceding twenty-four (24) hour period; provided, however, the information and data set forth in this Article 5.7(b) shall be provided in "real time" if it is available to the Operator in "real time" and a Participating Party has contractual rights to utilize the "real time" system that the Operator is utilizing and has agreed to pay any incremental expenses associated with its accessing that information and data from that "real time system";

(c)   a complete report of all core data and analyses;

(d)   copies of logs and surveys as run, including all digitally recorded data;

(e)   copies of well test results, bottomhole pressure surveys, Hydrocarbon analyses, and other similar information, including PVT analyses;

(f)   copies of reports made to regulatory agencies;

(g)   forty-eight (48) hours' advance notice of logging, coring, or testing operations (or, if conditions do not permit that much advance notice, as much advance notice as is reasonably possible);

(h)   upon written request, and if sufficient quantities are available, samples of cutting and sidewall cores, marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)   copies of drilling prognoses;

(j)   if conventional cores are taken, access to the rig to inspect and evaluate said cores; and

(k)   samples of Hydrocarbons, if sufficient quantities are available, after performing routine tests.

Upon written request, the Operator shall use reasonable efforts to furnish to a requesting Participating Party any additional available information (including a

23

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054361

complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole cost and risk). The Costs of gathering and furnishing the additional available information shall be charged to the Participating Party that requested it.

**5.8    Completed Well Information**

Operator shall, as soon as reasonably practicable, furnish to each Participating Party the following information pertaining to each completed well, provided, however, the following information shall be provided in "real time" if it is available to the Operator in "real time" and a Participating Party has contractual rights to utilize the "real time" system that the Operator is utilizing and has agreed to pay any incremental expenses associated with its accessing that information from that "real time system":

(a)    monthly report of production and injection;

(b)    copies of routine reports made to regulatory agencies;

(c)    report on the status of wells not producing and not abandoned;

(d)    report on Hydrocarbons produced during Production Testing;

(e)    bottomhole pressure data and surface pressure data; and

(f)    composite of all logs run (for example, TDT, Carbon-Oxygen, Spinner Surveys, and Casing Collar).

**5.9    Information to Non-Participating Parties**

The Operator shall furnish to each Non-Participating Party:

(a)    as soon as reasonably practicable, copies of all non-confidential reports made to regulatory agencies, and

(b)    if applicable, after Complete Recoupment, the information specified in Articles 5.7 *(Information to Participating Parties)* and 5.8 *(Completed Well Information)*.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054362

### 5.10  Health, Safety, and Environment:

With the goal of achieving safe and reliable activities and operations in compliance with all applicable laws and regulations, including avoiding significant and unintended impact on (i) the health or safety of people, (ii) property, or (iii) the environment, the Operator shall, with the support and cooperation of the Non-Operators, while it conducts activities or operations under this Agreement:

(a)  design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks;

(b)  apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and

(c)  conform with locally applicable HSE related statutory requirements that may apply.

In fulfilling its duties and obligations hereunder, the Operator shall act in accordance with the provisions of Exhibit "K."

## ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN

### 6.1  Basis of Charges to the Parties

Except as otherwise provided in this Agreement, the Operator shall pay all Costs of all activities and operations under this Agreement, and each Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the Costs of these activities and operations.  All charges, credits, and accounting for expenditures shall be made under Exhibit "C." Funds received by the Operator under this Agreement may be commingled with the Operator's own funds.

### 6.2  AFEs

The Operator shall not undertake an activity or operation whose Costs are Five Hundred Thousand dollars ($500,000.00) or more, unless an AFE has been

HIGHLY CONFIDENTIAL                                                          BP-HZN-2179MDL00054363

included in a proposal for an activity or operation and the proposal has been approved by Vote, Election, or unanimous agreement, whichever is applicable, or the Operator is exercising one of its discretionary powers under this Agreement.  An approved proposal grants the Operator authority to commit or expend funds on the approved proposal for the account of the Participating Parties.  For an activity or operation whose Costs are in excess of Two Hundred Fifty Thousand dollars ($250,000.00), but less than Five Hundred Thousand dollars ($500,000.00), the Operator shall furnish the Participating Parties with an AFE for information purposes only.  Notwithstanding the foregoing, in the event of an emergency, or if in the sole discretion of the Operator a perceived emergency exists that poses an imminent threat to life, safety, property, or the environment, the Operator may immediately make those expenditures for the Joint Account as, in its opinion as a reasonable and prudent operator, are necessary to deal with the emergency, but only to the extent necessary to stabilize the situation and alleviate the imminent threat.  The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency, the action taken, and the Costs incurred.

**6.2.1   AFE Overrun Notice**

For informational purposes only, the Operator shall provide an AFE overrun notice to all the Participating Parties if it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with an original AFE will exceed the estimated total expenditures in that original AFE by more than ten percent (10%), but will not require the submission of a supplemental AFE under Article 6.2.2 (*Supplemental AFEs*).

**6.2.2   Supplemental AFEs**

Except as provided in Article 6.2.3 (*Further Operations During a Force Majeure*), if it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE or its approved supplemental AFEs will exceed the relevant permitted over-expenditure set forth below, the Operator shall promptly submit a supplemental AFE to the Participating Parties.  A supplemental AFE shall include the dollar amount of the permitted over-expenditure from the previously approved AFE as part of the dollar amount of that supplemental AFE.   Subject to Article 8.6.1 (*Well Proposals,*

26

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054364

*Recompletions, and Workovers)*, after receipt of the supplemental AFE each Participating Party has the right to make an Election as to its further participation in the approved activity or operation. If a proposed supplemental AFE is approved by Election, the Operator shall continue to conduct the approved activity or operation associated with the supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE. Any Participating Party making an Election not to participate in an approved supplemental AFE becomes a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs expended on the activity or operation exceed the permitted over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations (including plugging and abandonment) in the original AFE have been conducted at the time of its Election not to participate. A Non-Participating Party in a supplemental AFE is subject to the same Hydrocarbon Recoupment premium, Underinvestment, or acreage forfeiture provision in Article 16 *(Non-Consent Operations)* that would apply to a Party Electing or Voting not to participate in the originally approved activity or operation, except a Hydrocarbon Recoupment premium or an Underinvestment shall apply only to the Costs of the approved activity or operation not borne by the Non-Participating Party. If a supplemental AFE is not approved by Election, the Operator shall conclude the activity or operation as soon as practical, and each Participating Party will be responsible for its Participating Interest Share of the Costs of the activity or operation, including Costs in excess of the permitted over-expenditure amount.

### 6.2.2.1   Permitted Over-expenditures on Well Operations

The permitted over-expenditure for an Exploratory Operation, an Appraisal Operation, or a Development Operation is an amount equal to ten percent (10%) of the estimated total Costs in the original AFE for that operation or its approved supplemental AFEs for wells.

HIGHLY CONFIDENTIAL                                          BP-HZN-2179MDL00054365

### 6.2.2.2 Permitted Over-expenditures on the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE

The permitted over-expenditure for the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or its approved supplemental AFEs.

### 6.2.2.3 Permitted Over-expenditures on a Selection AFE or Define AFE

The permitted over-expenditure for the Selection AFE or the Define AFE is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or its approved supplemental AFEs.

### 6.2.2.4 Permitted Over-expenditures on an Execution AFE

The permitted over-expenditure for the Execution AFE is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or its approved supplemental AFEs. The "cumulative estimated total Costs in the original AFE for that activity" is the total dollar amount of the Execution AFE, its approved supplemental AFEs and all approved Long Lead Development System AFEs.

### 6.2.2.5 Permitted Over-expenditures on All Other AFEs

The permitted over-expenditure for all other AFEs is an amount equal to fifteen percent (15%) of the estimated total Costs in the original AFE for that activity or operation or its approved supplemental AFEs.

## 6.2.3 Further Operations During a Force Majeure

No Party is permitted to make an Election not to participate in further activities or operations under Article 6.2.2 *(Supplemental AFEs)* during a Force Majeure or during an emergency that poses a threat to life, safety, property, or the environment, but may make an Election not to participate in further activities or operations that are to be conducted

28

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054366

after the termination of the Force Majeure or emergency. Notwithstanding any contrary provision of this Agreement, if Costs arising as a result of Force Majeure or emergency cause the amount of an original AFE and its approved supplemental AFEs to exceed their permitted over-expenditure in Article 6.2.2 *(Supplemental AFEs)*, no supplemental AFE will be required; however, once stabilization takes place and Force Majeure or emergency expenditures are no longer being incurred, the Operator shall submit to the Participating Parties a supplemental AFE for the activities or operations that are to be conducted after termination of the Force Majeure or emergency in order for them to make an Election under Article 6.2.2 *(Supplemental AFEs)* as to their participation in those activities or operations.

### 6.2.4   Long Lead Well Operation AFEs

In addition to the Operator's right under Article 12.6 *(Long Lead Development System AFEs)* to submit Long Lead Development System AFEs for long lead-time items prior to the submission of the Execution AFE, the Operator may submit an AFE to the Parties, which will allow the Operator to make advance commitments for or purchases of equipment or services, which are commercially reasonable and necessary to facilitate the early and orderly commencement of any kind of well or well operation (including any associated tie-back Facilities) ("Long Lead Items") (a "Long Lead Well Operation AFE").

#### 6.2.4.1   Approval of a Long Lead Well Operation AFE

Each Long Lead Well Operation AFE requires the unanimous agreement of the Parties.

#### 6.2.4.2   Non-Participating Parties in the Operations Associated with the Long Lead Well Operation AFE

If a Party, who participated in a Long Lead Well Operation AFE, does not participate in an approved well or well operation, for which Long Lead Items were procured under that AFE, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Items within thirty (30) days of the approval of that well or

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054367

well operation, provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon recoupment to which it is subject as a result of that well or well operation. The Operator shall invoice the Participating Parties in that well or well operation for their proportionate share of the reimbursement under this Article 6.2.4.2 in accordance with Exhibit "C."

**6.2.4.3** **Disposition of Items Associated with the Long Lead Well Operation AFE**

Notwithstanding the provisions of Exhibit "C," the Participating Parties in an approved well or well operation for which Long Lead Items were procured shall approve by Vote the disposition of those Long Lead Items if they are not utilized for the approved well or well operation. If the disposition is approved, the disposition will be binding on all Participating Parties in that well or well operation. The disbursement of the proceeds realized from the disposition of those Long Lead Items shall take place in accordance with Exhibit "C."

**6.3** **Security Rights**

Addressed in Exhibit "F" of this Agreement and is incorporated into this Agreement by this reference.

**6.4** **Annual Operating Plan**

**6.4.1** **Effect and Content of Annual Operating Plan**

The Annual Operating Plan is for informational and planning purposes and does not obligate any Party to any course of action or expenditures or constitute a Vote, Election, or unanimous agreement to participate in any specific activity or operation. To the extent known on the date of submission of the Annual Operating Plan, the Annual Operating Plan shall include the following items, without limitation:

HIGHLY CONFIDENTIAL

### 6.4.1.1   Capital Budget

(a)  a list of proposed wells to be drilled including their anticipated order, drilling time, depths, surface and bottomhole locations, objective sands, type of well (Development, Appraisal), purpose of well (production, injection), and estimated Costs;

(b)  capital well operations listed by well, with their estimated Cost;

(c)  capital projects that have estimated gross Costs greater than three million dollars ($3,000,000.00).  The term "capital project" includes addition of new equipment and expansion or upgrades of existing equipment; and

(d)  an estimated total amount (in aggregate) for capital projects.

### 6.4.1.2   Expense Budget

(a)  expense well operations listed by well, with their estimated Cost;

(b)  expense projects that have estimated gross Costs greater than three million dollars ($3,000,000.00).  The term "expense project" includes repair, replacement, inspection, and maintenance of existing equipment;

(c)  an estimated total amount (in aggregate) for expense projects; and

(d)  estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate.  O&M expenses include the ongoing, everyday expenditures necessary to operate the field.

### 6.4.1.3   Operator Forecasts and Informational Items

(a)  production forecasts;

31

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054369

(b)    injection forecasts;

(c)    fuel gas forecasts;

(d)    scheduled or planned downtime exceeding three (3) days;

(e)    data collection programs;

(f)    Facility constraint and ullage forecast;

(g)    geochemical or geophysical survey(s) or special test(s) that might be contemplated; and

(h)    other areas deemed of significance by the Operator.

**6.4.2**    **Submission of Draft Annual Operating Plan**

Beginning in the year in which a Development Plan is approved, and in each subsequent year, the Operator shall develop and submit to the Non-Operating Parties, by July 1st, a draft Annual Operating Plan for the next calendar year. The Annual Operating Plan process will be used (a) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities and operations, (b) to review ongoing activities and operations, and (c) for the remainder of the current year and the next succeeding calendar year, to forecast and plan activities and operations and to forecast anticipated Hydrocarbon production volumes, operating expenses, and capital expenditures.

**6.4.3**    **Review of Draft Annual Operating Plan**

The Non-Operating Parties may provide suggested changes, additions, or deletions to the Annual Operating Plan to the Operator and all other Parties in writing before September 1st of each year. The Operator will then make changes that it deems necessary (if any) and submit the final Annual Operating Plan to the Non-Operating Parties no later than November 1st of each year, at which time the Annual Operating Plan is deemed adopted by all Parties.

HIGHLY CONFIDENTIAL

# ARTICLE 7 – CONFIDENTIALITY OF DATA

## 7.1   Confidentiality Obligation

Confidential Data acquired or obtained by a Party shall be kept confidential during the term of this Agreement and for an additional period of one hundred eighty (180) days after termination of this Agreement and shall not be disclosed to a third party, unless it is disclosed under Article 7.1.1 *(Exceptions to Confidentiality)* or 7.1.2 *(Permitted Disclosures)*. Each Party shall maintain the secrecy of the Confidential Data, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

### 7.1.1   Exceptions to Confidentiality

The confidentiality obligation shall not apply to Confidential Data that is:

(a) now or later becomes part of the public domain (other than as a result of a wrongful act or omission by a Party);

(b) now or later becomes available to a Party on a non-confidential basis from a source, other than a Party, that is legally permitted to disclose the item of Confidential Data;

(c) known to a Party on a non-confidential basis before disclosure of the Confidential Data to it under this Agreement or to which that Party was otherwise entitled at the time of disclosure; or

(d) independently developed by employees, Affiliates, contractors, and/or consultants of a Party who have not had access to the Confidential Data.

### 7.1.2   Permitted Disclosures
#### 7.1.2.1   Operator's Permitted Disclosures

The Operator may disclose items of Confidential Data to those third parties as may be necessary to conduct activities and operations under this Agreement, if the third parties are bound by written agreement to keep the Confidential Data secret for the period of time set forth in the Operator's service agreement with those third parties or two (2) years if a service agreement does not exist with those third parties.

33

Exhibit A
Page 44

Notwithstanding the foregoing, should the Operator disclose Confidential Data to an Affiliate, then the Affiliate shall require its Affiliate to handle, hold, and protect the Confidential Data as if it were a Party to this Agreement.

### 7.1.2.2   All Parties' Permitted Disclosures

Subject to the restriction that a third party shall be bound by written agreement not to use or disclose the Confidential Data for a period of two (2) years, except for the express purpose for which the disclosure is to be made, all Parties may disclose, in whole or in part, the Confidential Data to the following receiving parties, who may remove the Confidential Data from the custody and premises of the Party making such disclosure:

(a)   to its Affiliate;

(b)   to a bona fide, financially responsible, prospective assignee of any portion of the Party's Working Interest (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets on the OCS);

(c)   to potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of the Party and acting in a capacity where that disclosure is essential to the contractor's, consultant's, or outside legal counsel's work;

(d)   to a bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement;

(e)   to the extent required by a Lease, or by law, order, decree, regulation, or rule (including, without limitation, those of any regulatory agency, securities commission,

34

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054372

stock exchange, judicial, or administrative proceeding). If a Party is required to disclose Confidential Data under this Article 7.1.2.2(e), the Party shall promptly provide all other Parties to this Agreement written notice of those proceedings so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed;

(f)     to an entity allocating or desiring to transport, process, or purchase Hydrocarbons produced under this Agreement for the purpose of making Hydrocarbon reserve estimates or other technical evaluations or allocating Hydrocarbon products to source points;

(g)     to third parties for benchmarking studies and industry performance reviews; provided that the Confidential Data disclosed does not include competitive information or data and the studies blind the identities of the participants and the origin of the Confidential Data; and

(h)     to a contractor for the purpose of offsite storage of Confidential Data.

**7.1.3    <u>Limited Releases to Offshore Scout Association</u>**

The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

**7.1.4    <u>Continuing Confidentiality Obligation</u>**

A Party who ceases to own a Working Interest remains bound by the confidentiality and use obligations of this Agreement as to Confidential

35

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054373

Data obtained through this Agreement under Article 7.1 *(Confidentiality Obligation)*.

**7.2    Ownership of Confidential Data**

Except as otherwise provided for in this Article 7, all Confidential Data produced as a result of an activity or operation shall be the property of all Participating Parties in that activity or operation.  A Non-Participating Party has no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until Complete Recoupment has taken place.

**7.2.1    Trades of Confidential Data**

Any Participating Party may propose the exchange or trade of any Confidential Data or other similar data and information owned by a third party.   Upon approval of said exchange or trade by Vote of the Participating Parties, that approval shall bind all Participating Parties, and the Operator shall utilize the Well Data Trade and Confidentiality Agreement in Exhibit "I" in order to consummate that exchange or trade with the third party. The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to that exchange or trade.

**7.2.2    Ownership of Non-Consent Data**

After Complete Recoupment has taken place and a Non-Participating Party has become a Participating Party in an activity or operation, that Non-Participating Party shall become an owner of the Confidential Data and information resulting from that activity or operation.  Within fifteen (15) days after Complete Recoupment, the Operator shall furnish that Confidential Data and information to the former Non-Participating Party.

**7.3    Access to the Lease and Rig**

Except as provided in Article 6.3(b) *(Default)* in Exhibit "F," each Participating Party may attend meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Execution AFE as well as access to the construction sites.  Except as otherwise provided in Article 6.3(b) *(Default)* in Exhibit "F," each Participating Party shall have access to all drilling rigs, Production Systems, and Facilities to observe and inspect operations and wells in which it participates (and the pertinent records and other data).  Access by the Participating Party to a drilling rig, Production System, or

HIGHLY CONFIDENTIAL

Facility serving a Contract Area shall be scheduled through the Operator at least forty-eight (48) hours in advance (or, if conditions do not permit that much advance scheduling, with as much advance scheduling as is reasonably possible).   Each Party's access will be at reasonable times and may not unreasonably interfere with operations at the site.

### 7.4    Development of Proprietary Information and/or Technology

The ownership, use, treatment, and disclosure of proprietary information or technology, including, but not limited to, drilling technology, production technology, production systems and facilities, and their transportation and installation, pipelines, flowlines, and offshore oil and gas transportation that are charged to the Joint Account shall be handled under Exhibit "G."

# ARTICLE 8 – APPROVALS AND NOTICES

### 8.1    Classes of Matters

Action will be taken on a proposed activity or operation only after the procedures and approval requirements in this Agreement have been satisfied.   There are four general classes of activities or operations under this Agreement: (a) those requiring approval by Vote, (b) those requiring approval by Election, (c) those requiring approval by unanimous agreement, and (d) those within the discretion of the Operator.

#### 8.1.1    Voting and Electing Interest

If all Parties are entitled to make an Election or Vote, each Party has an Electing interest or a Voting interest equal to its Working Interest or its Participating Interest Share, as applicable.   If a Party does not have a right to make an Election or Vote, each of the other Parties has an Electing interest or a Voting interest, as applicable, equal to its Working Interest or its Participating Interest Share, as applicable, divided by the total Working Interest or Participating Interest, as applicable, of those Parties who have a right to make an Election or Vote.

### 8.2    Voting and Election Procedures

The Parties shall Vote or make an Election on proposals requiring a Vote or Election in the order in which those proposals are submitted, except as specified in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal*

HIGHLY CONFIDENTIAL

*Operations at Objective Depth)*, and 13.2 *(Development Operations at Objective Depth)*. Subject to Article 6.2 *(AFEs)*, after receipt of a notice properly given for an activity or operation requiring a Vote or Election, the Parties entitled to make that Vote or Election (a) may Vote or make an Election in accordance with this Article 8.2 *(Voting and Election Procedures)* and Article 8.7 *(Giving and Receiving Notices and Responses)* or (b) shall be deemed to have Voted or made an Election as provided in Article 8.6.5 *(Failure to Vote or Make an Election)*.

A Vote or Election to participate in a proposal is evidenced by a Party making a written affirmative response to the proposal or by a Party's execution of the AFE associated with the proposal. Except as otherwise provided in this Agreement, a Vote or Election not to participate in a proposal is evidenced by a Party's written negative response to the proposal, a Party's failure to make a timely written affirmative response to the proposal or to timely execute the AFE associated with the proposal, or a Party's failure to timely make a subsequent Vote or Election under Article 8.3 *(Second Opportunity to Participate)*.

**8.2.1  Approval by Vote**

Approval by Vote shall be decided by a Vote of the Parties as follows:

(a)  when one Party or two Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of one or more Parties with a Voting interest of fifty-one percent (51%) or more, or if two Parties entitled to Vote have the same Voting interest, the affirmative Vote of all Parties entitled to Vote; and

(b)  when more than two Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of two (2) or more Parties entitled to Vote with a combined Voting interest of fifty percent (50%) or more.

**8.2.2  Approval by Election**

Approval by Election shall be decided by an affirmative Election by one or more Parties, entitled to make an Election, with a combined Electing interest of ten percent (10%) or more.

38

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054376

### 8.3   Second Opportunity to Participate

Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by Vote or Election but is not approved by all of the Parties, a Party who Voted or Elected not to participate in the approved activity or operation may make a subsequent Vote or Election to participate in the approved activity or operation within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its receipt of the original Voting or Election results from the Operator. If a Party does not exercise its right to make a subsequent Vote or Election to participate, it shall become a Non-Participating Party in the approved activity or operation. If (a) all the Parties entitled to do so make an original Vote or Election or a subsequent Vote or Election to participate in a proposed activity or operation or (b) an approval by Vote is binding on all Parties, then the Operator shall commence the activity or operation in accordance with the applicable timely operations provisions of this Agreement.

### 8.4   Participation by Fewer Than All Parties

If, after the period in which a Party may make a subsequent Vote or Election to participate, there is at least one Non-Participating Party in the approved activity or operation, each Party who made an original or a subsequent Vote or Election to participate in the approved activity or operation shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its receipt of the subsequent Voting or Election results,

(a)   limit its participation in the approved activity or operation to its Working Interest share, or

(b)   agree to bear its Participating Interest Share of the approved activity or operation

by written correspondence to the Operator. Failure to submit that written correspondence shall be deemed a written correspondence under (a). If a Party, who made an original or a subsequent Vote or Election to participate in the approved activity or operation, submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or a subsequent Vote or Election to participate in the approved activity or operation do not agree to bear all of the remaining Costs of the approved activity or operation within thirty (30) days after the written correspondence period, the proposal of the approved activity or operation and all Votes and Elections in

39

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054377

regard to the approved activity or operation shall be deemed withdrawn. Once the Parties, who made an original or a subsequent Vote or Election to participate in an approved activity or operation in which there is a Non-Participating Party, agree to bear all of the Costs of the approved activity or operation, the Operator shall commence the activity or operation at the sole Cost and risk of the Participating Parties in accordance with the applicable timely operations provisions of this Agreement. Notwithstanding the foregoing, the election periods in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth)*, and 13.2 *(Development Operations at Objective Depth)* shall govern in the event of a conflict.

**8.5    Approval by Unanimous Agreement**

After receipt of a notice for a proposal that requires unanimous agreement, each Party entitled to approve (or disapprove) that activity or operation may indicate its approval or disapproval by providing a written statement in a response. Unless otherwise specifically provided, failure of a Party to make such a response is deemed its disapproval.

**8.6    Response Time for Notices**

After receipt of an AFE or notice under this Article 8, the Parties may (a) submit their Vote or (b) make an Election or (c) submit a written statement, whichever is applicable. If requested in writing by a Party entitled to (a) submit their Vote or (b) make an Election or (c) submit a written statement on an AFE or notice, the Operator shall give prompt notice of the results of those Votes, Elections or written statements to each Party entitled to (a) submit their Vote or (b) make an Election or (c) submit a written statement, as applicable. Except as otherwise provided in this Agreement, the response times for each type of proposal shall be as follows:

**8.6.1    Well Proposals, Recompletions, and Workovers**

When a well, Recompletion, or Workover is proposed, each Party entitled to Vote or make an Election or submit a written statement, whichever is applicable, has thirty (30) days after receipt of the proposal (inclusive of Saturdays, Sundays, and federal holidays) to respond to it. If a drilling rig is on location and day rate rig charges are being charged to the Joint Account and if a Party, who is entitled to do so, has proposed the immediate commencement of a substitute well

40

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054378

or a supplemental AFE to a well, or a Recompletion or Workover in or through the same well bore in which the previous operation was conducted or has submitted a supplemental AFE to a well, and if the rig that is on location is to conduct the operation or is to be utilized under the supplemental AFE, a Party entitled to Vote or make an Election or submit a written statement has forty-eight (48) hours after receipt of the proposal (inclusive of Saturdays, Sundays, and federal holidays) to respond to it. The response times for subsequent operations at Objective Depth are provided in Article 10.2 *(Exploratory Operations at Objective Depth)*, Article 11.2 *(Appraisal Operations at Objective Depth)*, and Article 13.2 *(Development Operations at Objective Depth)*.

**8.6.2**  **Execution AFE**

Each Party entitled to make an Election on an Execution AFE has one hundred twenty (120) days after the date of its receipt of the Execution AFE to make that Election.

**8.6.3**  **Other AFE Related Operations**

Except as otherwise provided in Articles 8.6.1 *(Well Proposals, Recompletions, and Workovers)*, 8.6.2 *(Execution AFE)*, and 12.7.7 *(Approval of Major Modifications)*, the response time to a proposed AFE, activity, or operation will depend upon the gross AFE amount. Response times will be as follows:

(a)  AFE of five hundred  thousand $500,000.00 or more but less than twenty million dollars $20,000,000.00; response will be made within thirty (30) days after receipt of said proposal;

(b)  AFE of twenty million dollars $20,000,000.00 or more but less than fifty million dollars $50,000,000.00; response will be made within sixty (60) days after receipt of said proposal; and

(c)  AFE of fifty million dollars $50,000,000.00 or more; response will be made within ninety (90) days after receipt of said proposal.

41

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054379

### 8.6.4   Other Proposals

For all other proposals requiring notice, and all supplemental AFEs other than those subject to Article 8.6.1 *(Well Proposals, Recompletions, and Workovers)*, each Party has thirty (30) days after receipt of the proposal to respond to it.

### 8.6.5   Failure to Vote or Make an Election

Unless otherwise specifically provided, failure of a Party to Vote or make an Election, whichever is applicable, within the period required by this Agreement is deemed to be a Vote or Election not to participate.

### 8.6.6   Suspensions of Operations and Suspensions of Production

Notwithstanding any contrary provision in Article 8.6 *(Response Time for Notices)*, if the MMS grants a Suspension of Production ("SOP"), a Suspension of Operations ("SOO"), or similar regulatory grant for all or part of the Contract Area, and if the SOP, SOO, or grant requires the commencement of an activity or operation before the expiration of the period for Voting, making an Election, or submitting a written statement, as provided in Article 8.5 *(Approval by Unanimous Agreement)* for that activity or operation, the Parties shall cast their Votes, make their Elections, or submit their written statement on the activity or operation at least ten (10) days (inclusive of Saturdays, Sundays and federal holidays) before the commencement date required in the SOO, SOP, or grant.

### 8.6.7   Standby Charges

The Participating Parties in a well or well operation conducted immediately prior to the delivery of (a) a proposal for a substitute well or a subsequent operation in a well or (b) a supplemental AFE are responsible for charges associated with the well or well operation that accrue before that delivery.   All charges, which accrue after that delivery, are the responsibility of the Participating Parties in the substitute well, subsequent operation, or supplemental AFE.  If (a) the proposal of a substitute well or subsequent operation or (b) the supplemental AFE is not approved, the Participating Parties in the well or well operation conducted immediately prior to the delivery of that

42

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054380

proposal or supplemental AFE are responsible for the charges that accrue after that delivery.

### 8.7   Giving and Receiving Notices and Responses

Except as otherwise provided in this Agreement, all notices and responses required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A."  A notice is deemed delivered only when received by the Party to whom it was directed, and the period for a Party to deliver a response begins on the date the notice is received. "Receipt" of a written notice means actual delivery of the notice to the Party's address or transmission to the facsimile number provided in Exhibit "A."  A response is deemed delivered when it is deposited in the United States mail, delivered to a courier, transmitted by facsimile transmission, or is personally delivered to a Party.

However, when a drilling rig is on location and day rate rig charges are being charged to the Joint Account, notices or responses pertaining to operations utilizing a drilling rig shall be given orally or by telephone. "Receipt" of an oral or telephone notice means actual and immediate communication to the Party to be notified. All telephone or oral notices or responses permitted by this Agreement shall be confirmed immediately thereafter by facsimile transmission. A message left on an answering machine or with an answering service or other third person is not adequate telephone or oral notice or response. If a Party is unavailable to receive a notice or response required to be given orally or by telephone, the notice or response may be delivered by facsimile transmission.

### 8.8   Content of Notices

A notice requiring a response shall indicate the appropriate response time specified in Article 8.6 *(Response Time for Notices)*. A well proposal notice shall include the type of well being proposed, (for example, Exploratory Well, Appraisal Well, or Development Well), a Well Plan, and an AFE that includes the Costs of permanently plugging and abandoning the well.  If a proposed activity or operation is subject to Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, the notice shall specify that the proposal is a Contract Area maintenance activity or operation.

43

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054381

**8.9    Designation of Representatives**

The names, addresses, and telephone and facsimile numbers of a designated representative and alternate for each Party to whom notices or responses shall be directed, are provided in Exhibit "A." The designated representative and the alternate may be changed by written notice to the other Parties.

**8.10   Meetings**

Any Party may call a meeting.  Except in an emergency, no meeting shall be called on less than five (5) days' advance notice (inclusive of Saturdays, Sundays, and federal holidays), and the notice shall include a proposed agenda.  The Operator shall be chairman of each meeting and take minutes of each meeting. Only matters included in the agenda may be considered at a meeting unless unanimously agreed to by the Parties.

**8.11   Obligations of Well Participation**

Subject to Article 6.2 *(AFEs)*, a Participating Party in an Exploratory Well, an Appraisal Well, or a Development Well is responsible for its Participating Interest Share of all necessary Costs in the original well AFE, which shall include only the Cost to drill, test (except Production Testing), and log the well to its Objective Depth, or shallower depth if applicable, and to plug and abandon the well.

# ARTICLE 9 – NEWS RELEASES

**9.1    Proposal of News Releases**

Any Party may propose for issuance a News Release about the activities or operations covered by this Agreement by submitting the text of the News Release to the Parties.  A News Release proposal requires the unanimous agreement of the Parties. The Parties shall respond to a News Release proposal within seventy-two (72) hours of their receipt of it by agreeing or disagreeing with the text of the proposed News Release, or by submitting alternative text for the News Release. If a Party submits alternative text for the News Release, the Parties shall have forty-eight (48) hours to agree or disagree with any of the proposed texts of the News Release.  If a Party fails to respond, the Party shall be deemed to have not approved any of the proposed News Releases.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054382

### 9.1.1   Operator's News Release

If the Parties do not unanimously agree to any of the texts of a proposed News Release within the time period set forth in Article 9.1 *(Proposal of News Releases)*, the Operator has the exclusive right for forty-eight (48) hours, following the last response under Article 9.1 *(Proposal of News Releases)*, to submit a News Release on the subject matter of the original proposal to the Parties in accordance with this Article 9.1.1. If the News Release pertains to a well or an operation in a well, the Operator must limit the content of the News Release to the following information:

(a)   the name of the well or operation and the water depth;

(b)   the location of the well by protraction area, block, and adjacent state;

(c)   the lease bonus paid and the lease acquisition date;

(d)   the result of a Production Test, if conducted;

(e)   the participants in, and their Working Interest in, the well or operation; and

(f)   the surrounding acreage controlled by the participants.

If the News Release does not pertain to a well or an operation in a well, it may only contain information that is not Confidential Data or Confidential Information (as defined in Exhibit "G") and does not substantially undermine the Parties' competitive advantage in the area surrounding, or trend or play pertaining to, the Contract Area. The Operator shall transmit the News Release to the Non-Operating Parties not less than seventy-two (72) hours (exclusive of Saturdays, Sundays, and federal holidays) before the time at which the Operator wishes to issue it. Any Party may have its name excluded from the News Release by notifying the Operator of that desire within forty-eight (48) hours of that Party's receipt of the News Release.

HIGHLY CONFIDENTIAL   BP-HZN-2179MDL00054383

### 9.1.2     Non-Operating Party's News Release

If the Operator does issue the News Release within forty-eight (48) hours of the termination of the seventy-two (72) hour period referred to in Article 9.1.1 *(Operator's News Release)*, any Participating Party may prepare and issue its own News Release, using the content guidelines and procedures provided in Article 9.1.1 *(Operator's News Release)*, simultaneously with or following the Operator's News Release. If the Operator does not issue the News Release within forty-eight (48) hours of the termination of the seventy-two (72) hour period referred to in Article 9.1.1 *(Operator's News Release)*, any Participating Party may prepare and issue its own News Release, using the content guidelines and procedures provided in Article 9.1.1 *(Operator's News Release)*.

## 9.2     Emergency New Releases

In an emergency involving extensive property damage, loss of human life, or other clear emergency and where there is insufficient time to obtain approval from the other Parties, the Operator may furnish factual information necessary to satisfy legitimate public interest or governmental authorities having jurisdiction. The Operator shall immediately notify the Parties of the information furnished in response to the emergency.

## 9.3     Mandatory News Releases

Each Party has the right to issue a News Release which contains information not otherwise permitted under Article 9 *(News Releases)* in order to comply with the laws, orders, rules, or regulations of the country in which its parent company is incorporated; provided, however, prior to issuing that News Release, that Party must submit, not less than seventy-two (72) hours (exclusive of Saturdays, Sundays, and federal holidays) before issuance of the News Release, the text of that News Release to the other Parties and a statement from a licensed attorney in the country, with whose laws, orders, rules, or regulations the Party is complying, verifying that the News Release (including its content) is required under those laws, orders, rules, or regulations.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054384

## ARTICLE 10 – EXPLORATORY OPERATIONS

### 10.1   Proposal of Exploratory Wells

Any Party may propose drilling an Exploratory Well within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Exploratory Well requires approval by Election.

Each Non-Participating Party in an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

#### 10.1.1   Revision of Well Plan

A revision to an approved well proposal, Well Plan, or AFE prior to the commencement of actual drilling operations on an Exploratory Well requires the unanimous agreement of the Participating Parties. In the absence of unanimous agreement on a proposed revision to the Well Plan or AFE, the Well Plan and AFE will stand as approved.  Only a major revision to an approved Well Plan or AFE will give a Non-Participating Party an additional opportunity to participate in an Exploratory Well prior to the commencement of actual drilling operations.  A revision is deemed a major revision if the Objective Depth of an Exploratory Well is changed, or the proposed bottom hole location is moved more than 1000', or both, in which case each Non-Participating Party in the well may, for a period of twenty (20) days after receipt of the revised Well Plan and revised AFE, notify the Operator in writing that it will participate in the revised Exploratory Well.  For the avoidance of doubt, any revisions to the Well Plan subsequent to the commencement of actual drilling operations shall not give any Non-Participating Party the opportunity to participate in the Exploratory Operation.

A Non-Participating Party timely submitting its participation notification under this Agreement due to a major revision in a Well Plan (a) shall become an Underinvested Party for Costs incurred on the modified Exploratory Well prior to the approved major modification and (b) with regard to that well, shall no longer be subject to Article 16 *(Non-*

47

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054385

*Consent Operations).*  The Non-Participating Party's Underinvestment obligation, resulting from its participation decision, shall be calculated as follows: actual Costs expended on that Exploratory Well multiplied by the Non-Participating Party's percentage Participating Interest Share in the modified Exploratory Well.  If the Non-Participating Party forfeited and assigned its right, title, and interest in the Contract Area by not participating in that Exploratory Well, then within thirty (30) days after the Operator's receipt of the Non-Participating Party's participation notification under this Agreement, the Participating Parties in the original Exploratory Well proposal shall assign to the Non-Participating Party one hundred percent (100%) of the Non-Participating Party's former Working Interest in the Contract Area.

### 10.1.2  <u>Automatic Revision of the Well Plan</u>

During the drilling of an Exploratory Well, the Well Plan may be revised by the Operator as is necessary for it to employ prudent oilfield practices or to conduct safe operations, and those revisions will not require the approval of the Participating Parties as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE, except as provided in Article 6.2.2 (*Supplemental AFEs*).

### 10.1.3  <u>Timely Operations</u>

Except as provided below, drilling operations on an Exploratory Well shall be commenced within one hundred eighty (180) days after the end of the period for the approval of the Exploratory Well.  If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the Exploratory Well within that one hundred eighty (180) day period, the approved Exploratory Well proposal shall be deemed withdrawn, with the effect as if the Exploratory Well had never been proposed and approved.

If a Party submits an identical Exploratory Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within ninety (90) days after the deemed withdrawal of the approved original Exploratory Well proposal and if that identical Exploratory Well proposal is approved and if the Operator

HIGHLY CONFIDENTIAL

is a Participating Party in the identical Exploratory Well proposal, the Operator shall commence drilling operations on that well within ninety (90) days after the end of the response period for that proposal. If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a drilling rig), fails to commence drilling operations on the identical Exploratory Well within that ninety (90) day period, the approved identical Exploratory Well proposal shall be deemed withdrawn, with the effect as if the identical Exploratory Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations)*. Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Exploratory Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within one hundred eighty (180) days after the end of the period for the approval of that Well.

If a Party submits an identical Exploratory Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within ninety (90) days after the deemed withdrawal of the approved original Exploratory Well proposal and if that identical Exploratory Well proposal is approved and if the Operator is not a Participating Party in the identical Exploratory Well proposal, the approved identical Exploratory Well proposal shall be deemed withdrawn, with the effect as if the identical Exploratory Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.1 *(Substitute Operator if Operator is a Non-Participating Party)*. Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Exploratory Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054387

If an approved original or identical Exploratory Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Exploratory Well, will be chargeable to the Participating Parties.   Drilling operations for an Exploratory Well under this Article 10.1.3 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Exploratory Well are undertaken.

**10.1.4** **AFE Overruns and Substitute Well**

Once an Exploratory Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)   all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs )*,

(b)   the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that, in the Operator's sole opinion, render further well operations impractical, and

(c)   the unanimous agreement of the Participating Parties to cease drilling an Exploratory Well before reaching Objective Depth.

If an Exploratory Well is abandoned due to the conditions described under Article 10.1.4(b), then any Participating Party in the abandoned Exploratory Well may, within thirty (30) days after abandonment of that Exploratory Well, propose the drilling of a substitute well for the abandoned Exploratory Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Exploratory Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Exploratory Well.   Notwithstanding any contrary provision of Article 10.4 *(Conclusion of Exploratory Operations)*, the substitute well shall be an Exploratory Well.   The Well Plan for the substitute Exploratory Well

HIGHLY CONFIDENTIAL                                                        BP-HZN-2179MDL00054388

shall be substantially the same as the Well Plan for the abandoned Exploratory Well and shall also take into account the conditions that rendered further drilling of the abandoned Exploratory Well impractical.

Each Non-Participating Party in a substitute Exploratory Well or an approved supplemental AFE for an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

## 10.2   Exploratory Operations at Objective Depth

After an Exploratory Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election on an operation proposed under this Article 10.2 of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.  The Parties entitled to make that Election are:

(a)   the Participating Parties, and

(b)   the Non-Participating Parties in the original well proposal if (1) the subsequent Exploratory Operation proposal is made at the well's Objective Depth and is for a Sidetrack or Deepening and (2) Article 16.2 *(Acreage Forfeiture Provisions)* was not applicable to the drilling of that Exploratory Well.

The Operator's proposal shall be for one of the following operations:

(a)   conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)   Sidetrack the well bore to conventionally core the formations encountered;

(c)   Deepen the well to a new Objective Depth;

51

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054389

(d)   Sidetrack the well (however, if in the Operator's sole opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth);

(e)   conduct Production Testing;

(f)   conduct other operations on the well not listed;

(g)   temporarily abandon the well; or

(h)   permanently plug and abandon the well.

If an Exploratory Well is temporarily abandoned under (g), then any additional operation in that well shall be proposed as a new well operation.  A proposal to complete an Exploratory Well that has been temporarily abandoned under clause (g) shall be deemed a Development Operation proposal.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from an Exploratory Well by the Participating Parties, then any Participating Party may make a proposal.  In that event, the procedures in this Article 10.2 shall apply to that proposal, and any reference in this Article 10.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

**10.2.1   Response to Operator's Proposal**

A Participating Party may, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 10.2 *(Exploratory Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made.  If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (inclusive of Saturdays, Sundays, and federal holidays) of their receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to

HIGHLY CONFIDENTIAL                                                    BP-HZN-2179MDL00054390

permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 10.3 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to that proposal.   If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to any Election in Article 10.2 *(Exploratory Operations at Objective Depth)*, then the response period in those articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

**10.2.2**   **<u>Response to Highest Priority Proposal</u>**

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 10.2(a) has the highest priority, and Article 10.2(h) has the lowest priority.  If different depths or locations are proposed for the same type of operation, priority shall be given to the deepest depth.  If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn.  Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 10.2 *(Exploratory Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is temporarily abandoned or permanently abandoned.

53

HIGHLY CONFIDENTIAL

### 10.2.3   <u>Response on Next Highest Priority Proposal</u>

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to either temporarily abandon or permanently plug and abandon an Exploratory Well.

### 10.2.4   <u>Non-Participating Parties in Exploratory Operations at Objective Depth</u>

A Non-Participating Party in an Exploratory Operation conducted on an Exploratory Well after it has reached its Objective Depth [except as provided for in this Article 10.2 *(Exploratory Operations at Objective Depth)*] is subject to Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)* and is relieved of the Costs and risks of that Exploratory Operation, except that a Non-Participating Party in that Exploratory Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning an Exploratory Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Exploratory Operation in which it was a Non-Participating Party.

### 10.2.5   <u>Participation in a Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth</u>

If an Exploratory Well is drilled to its initial Objective Depth and a Non-Participating Party in that Exploratory Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 10.2(c) or (d), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Exploratory Well prior to that Sidetracking or Deepening. The original Participating Parties in an Exploratory Well are Overinvested Parties in that amount.  A former Non-Participating Party in an Exploratory Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in that Exploratory Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments),* and (b) the Hydrocarbon Recoupment recoverable

HIGHLY CONFIDENTIAL

under Article 16.5.1 (*Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well*), less the amount of the Underinvestment, has been recovered by the original Participating Parties.  If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Exploratory Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**10.3   Permanent Plugging and Abandonment and Cost Allocation**

The permanent plugging and abandonment of an Exploratory Well that:

(a)   is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 10.1.4 (b),

(b)   is to be plugged under Article 10.2 (*Exploratory Operations at Objective Depth*), or

(c)   has been previously temporarily abandoned under Article 10.2 (*Exploratory Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by Vote.  Approval to plug and abandon an Exploratory Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If a proposal to plug and abandon an Exploratory Well receives approval by Vote, the approved proposal binds all Parties.   If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Exploratory Well.  If a rig is on location, a proposal to plug and abandon an Exploratory Well under either Article 10.3(a) or 10.3(b) does not receive approval by Vote, and if within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the

55

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054393

Operator may nevertheless proceed to plug and abandon that Exploratory Well, and shall give each Participating Party notice of that fact.  If the proposal to plug and abandon an Exploratory Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Exploratory Well, and shall give each Participating Party notice of that fact.

The Participating Parties in an Exploratory Well proposal shall pay all Costs of plugging and abandoning that Exploratory Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.2 *(Exploratory Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

### 10.4   Conclusion of Exploratory Operations

Except as provided in Article 10.1.4 *(AFE Overruns and Substitute Well)* after the permanent or temporary abandonment of the first Producible Well and the release of the rig from that Producible Well, Exploratory Operations conclude, and all subsequent operations in the Contract Area are either Appraisal Operations or Development Operations.

# ARTICLE 11 – APPRAISAL OPERATIONS

### 11.1   Proposal of Appraisal Wells

After the conclusion of Exploratory Operations, any Party may propose drilling an Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Appraisal Well requires approval by Election.

Each Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

56

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054394

### 11.1.1 Revision of Well Plan

Any revisions of the Well Plan or AFE for an Appraisal Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.1 *(Revision of Well Plan).*

### 11.1.2 Automatic Revision of the Well Plan

The Well Plan for an Appraisal Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Automatic Revision of the Well Plan).*

### 11.1.3 Timely Operations

Except as provided below, drilling operations on an Appraisal Well shall be commenced within one hundred eighty (180) days after the end of the period for the approval of the Appraisal Well.  If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the Appraisal Well within that one hundred eighty (180) day period, the approved Appraisal Well proposal shall be deemed withdrawn, with the effect as if the Appraisal Well had never been proposed and approved.

If a Party submits an identical Appraisal Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within ninety (90) days after the deemed withdrawal of the approved original Appraisal Well proposal and if that identical Appraisal Well proposal is approved and if the Operator is a Participating Party in the identical Appraisal Well proposal, the Operator shall commence drilling operations on that well within ninety (90) days after the end of the response period for that proposal.  If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a drilling rig), fails to commence drilling operations on the identical Appraisal Well within that ninety (90) day period, the approved identical Appraisal Well proposal shall be deemed withdrawn, with the effect as if the identical Appraisal Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations).*  Within sixty (60) days of the selection of the substitute Operator, the substitute

57

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054395

Operator shall propose the drilling of an identical Appraisal Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

If a Party submits an identical Appraisal Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within ninety (90) days after the deemed withdrawal of the approved original Appraisal Well proposal and if that identical Appraisal Well proposal is approved and if the Operator is not a Participating Party in the identical Appraisal Well proposal, the approved identical Appraisal Well proposal shall be deemed withdrawn, with the effect as if the identical Appraisal Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.1 *(Substitute Operator if Operator is a Non-Participating Party)*. Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Appraisal Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

If an approved original or identical Appraisal Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Appraisal Well, will be chargeable to the Participating Parties.  Drilling operations for an Appraisal Well under this Article 11.1.3 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Appraisal Well are undertaken.

**11.1.4**   **AFE Overruns and Substitute Well**

Once an Appraisal Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

58

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054396

(a) all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*;

(b) the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that, in the Operator's sole opinion, render further well operations impractical; and

(c) the unanimous agreement of the Participating Parties to cease drilling an Appraisal Well before reaching Objective Depth.

If an Appraisal Well is abandoned due to the conditions described under Article 11.1.4(b), then any Participating Party in the abandoned Appraisal Well may, within thirty (30) days after abandonment of that Appraisal Well, propose the drilling of a substitute well for the abandoned Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Appraisal Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Appraisal Well. Notwithstanding any contrary provision of Article 11.5 *(Conclusion of Appraisal Operations)*, the substitute well shall be an Appraisal Well. The Well Plan for the substitute Appraisal Well shall be substantially the same as the abandoned Appraisal Well's Well Plan and shall also take into account the conditions that rendered further drilling of the abandoned Appraisal Well impractical.

Each Non-Participating Party in a substitute Appraisal Well or an approved supplemental AFE for an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

## 11.2   <u>Appraisal Operations at Objective Depth</u>

After an Appraisal Well has been drilled to its Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall

59

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054397

promptly notify the Parties entitled to make an Election on an operation proposed under this Article 11.2 *(Appraisal Operations at Objective Depth)*, of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.  The Parties entitled to make that Election are:

(a)   the Participating Parties, and

(b)   the Non-Participating Parties in the original well proposal, if (1) the subsequent Appraisal Operation proposal is made at the well's Objective Depth and is for a Sidetrack or Deepening and (2) Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* was not applicable to the drilling of that Appraisal Well.

The Operator's proposal shall be for one of the following operations:

(a)   conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)   Sidetrack the well bore to core the formations encountered;

(c)   Sidetrack the well;

(d)   Deepen the well to a new Objective Depth;

(e)   conduct Production Testing;

(f)   conduct other operations on the well not listed;

(g)   temporarily abandon the well; or

(h)   permanently plug and abandon the well.

If the Appraisal Well is temporarily abandoned under (g), then any additional operation in that well shall be proposed as a new well operation.  A proposal to complete an Appraisal Well that has been temporarily abandoned under clause (g) shall be deemed a Development Operation proposal.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays)

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054398

after receipt by the Participating Parties of all logs and test results from an Appraisal Well, then any Participating Party may make a proposal. In that event, the procedures in this Article 11.2 shall apply to that proposal, and any reference in this Article 11.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 11.2.1   Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 11.2 *(Appraisal Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made. If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (inclusive of Saturdays, Sundays, and federal holidays) of its receipt of the Operator's proposal, make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon). If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*. If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 11.4 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to that proposal. If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to any Election in Article 11.2 *(Appraisal Operations at Objective Depth)*, then the response period in those articles shall be twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information from the previously approved operation, then the response periods provided above shall not begin until the Parties entitled to make an

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054399

Election have received the information from the previously approved operation.

### 11.2.2   Response to Highest Priority Proposal

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after its receipt from the Operator of a complete copy of all separate proposals, make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 11.2(a) has the highest priority, and Article 11.2(h) has the lowest priority.  If different depths or locations are proposed for the same type of operation, priority shall be given to the deepest depth.  If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn.  Once the approved operation is completed, the Parties shall follow the procedure provided in Article 11.2 *(Appraisal Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is temporarily abandoned or permanently abandoned.

### 11.2.3   Response on Next Highest Priority Proposal

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*.  This process will continue until a proposal is approved to either temporarily abandon or permanently plug and abandon an Appraisal Well.

### 11.2.4   Non-Participating Parties in Appraisal Operations at Objective Depth

A Non-Participating Party in an Appraisal Operation conducted on an Appraisal Well after it has reached its Objective Depth [except as provided for in this Article 11.2 *(Appraisal Operations at Objective Depth)*] is subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* and is relieved of the Costs and risks of that Appraisal Operation, except that a Non-Participating Party in that Appraisal Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning an Appraisal Well, less and except all Costs

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054400

of plugging and abandoning associated solely with the subsequent Appraisal Operation in which it was a Non-Participating Party.

**11.2.5** **Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Initial Objective Depth**

If an Appraisal Well is drilled to its Objective Depth and a Non-Participating Party in that Appraisal Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 11.2(c) or (d), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Appraisal Well to its Objective Depth prior to that Sidetracking or Deepening.  The original Participating Parties in that Appraisal Well are Overinvested Parties in that amount.  A former Non-Participating Party in an Appraisal Well that becomes a Participating Party in an approved Sidetracking or Deepening, remains a Non-Participating Party in the Appraisal Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*, and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.2 *(Non-Consent Appraisal Operations)* less the Underinvestment, has been recovered by the original Participating Parties.  If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Appraisal Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**11.3** **Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir**

Any Party may propose an Appraisal Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party may in writing limit its participation in the drilling of that Appraisal Well to the base of the Deepest Producible Reservoir to be penetrated by that Appraisal Well.  A Party who limits its participation in an Appraisal Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Appraisal Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for

HIGHLY CONFIDENTIAL                                           BP-HZN-2179MDL00054401

the Deeper Drilling and shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* in regard to drilling between those depths.

### 11.4 **Permanent Plugging and Abandonment and Cost Allocation**

The permanent plugging and abandonment of an Appraisal Well that:

(a) is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 11.1.4 (b),

(b) is to be plugged under Article 11.2 *(Appraisal Operations at Objective Depth)*, or

(c) has been previously temporarily abandoned under Article 11.2 *(Appraisal Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing) requires the approval of the Participating Parties by Vote. Approval to plug and abandon an Appraisal Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon an Appraisal Well receives approval by Vote, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraisal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Appraisal Well. If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.4(a) or 11.4(b) does not receive approval by Vote, and if within twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) from receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon an Appraisal Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by Vote, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact.

HIGHLY CONFIDENTIAL

The Participating Parties in an Appraisal Well proposal shall pay all Costs of plugging and abandoning that Appraisal Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 *(Appraisal Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*. The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

**11.5   Conclusion of Appraisal Operations**

Upon the earlier of:

(a)   the approval of the conclusion of Appraisal Operations by Vote; or

(b)   the point in time when no Appraisal Operation has been approved within a period of twelve (12) months from the rig release (or cessation of operations) from the previous Appraisal Operation; or

(c)   the abandonment of the third (3rd) Appraisal Well, whether permanent or temporary, and the release of the rig from that Appraisal Well (including any substitute well for that Appraisal Well)

Appraisal Operations for the ensuing Development Phase shall conclude and all subsequent operations in the Contract Area will be Development Operations for the ensuing Development Phase, including operations on temporarily abandoned Appraisal Wells, except as provided in Article 11.6 *(Operations Before the Approval of the Development Plan)*.

However, if an Appraisal Operation is being conducted at the occurrence of either (a) or (b) above, Appraisal Operations for the ensuing Development Phase shall conclude when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned.

**11.6   Operations Before the Approval of the Development Plan**

After the occurrence of (a), (b), or (c) in Article 11.5 *(Conclusion of Appraisal Operations)* but before the approval of a Development Plan for the ensuing Development Phase, any Party may propose the drilling of an additional well as a Development Well. Unless Article 16.4 *(Non-Consent Operations to Maintain Contract Area)* applies to the proposal of that well, that proposal shall require the unanimous agreement of the Parties. Any substitute well for, and all operations

65

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054403

1   at Objective Depth conducted in or through the well bore of that well shall be
2   deemed Development Operations and shall be proposed, approved, and
3   conducted accordingly.

## ARTICLE 12 – DEVELOPMENT PHASES

**12.1      Phased Development**

6   In view of the Costs and scope of developing and producing Hydrocarbons from
7   the Contract Area, the Parties may agree to undertake an initial Development
8   Phase and one or more subsequent Development Phases.   A separate
9   Development Plan shall be prepared for each Development Phase, and each
10  Development Plan shall be generated, approved, and implemented under this
11  Article 12 *(Development Phases)*.  Each Development Phase may be comprised
12  of as many as four stages – the Feasibility Stage, the Selection Stage, the Define
13  Stage, and the Execution Stage.  For each stage undertaken, subject to the
14  provisions of this Article 12 *(Development Phases)*, any Party may submit a
15  proposal and an associated AFE for the Parties' approval.  Each stage AFE shall
16  cover all of the estimated Costs to be incurred during that stage, except for the
17  Costs of drilling Wells, including those of the Feasibility Team or Project Team.

**12.2      Feasibility Team Proposal**

19  The Feasibility Stage commences upon the approval of a proposal for the
20  formation of a Feasibility Team and the Feasibility AFE.  No Party may propose
21  the formation of a Feasibility Team for a Development Phase until such time as
22  any previously formed Feasibility Team for that Development Phase has
23  terminated.  For a period of three hundred sixty (360) days from completion of
24  the first appraisal well provided that the well reaches its objective depth, the
25  Operator has the exclusive right to propose the formation of a Feasibility Team
26  and submit to the Parties a Feasibility AFE accompanied by a memorandum
27  describing in detail the anticipated scope of work to be undertaken by the
28  Feasibility Team and third party contractors and/or consultants during the
29  Feasibility Stage, the estimated type and number of staff required to complete
30  that scope of work, the estimated duration of the Feasibility Stage, and the
31  estimated Costs of the Feasibility Stage. If the Operator does not propose the
32  formation of a Feasibility Team and submit the Feasibility AFE during its

66

HIGHLY CONFIDENTIAL                                                  BP-HZN-2179MDL00054404

exclusive period, any Party may propose the formation of a Feasibility Team and submit a Feasibility AFE.

The Feasibility Team will operate under the direction of the Operator. The employees of the Operator and Non-Operators and the contractors and/or consultants, set forth in the Feasibility AFE, shall initially compose the Feasibility Team. The Operator may, from time to time, revise the membership of the Feasibility Team, at its sole discretion, as long as the revisions are necessary to accomplish the scope of work set forth in the Feasibility AFE. The Operator shall charge the Joint Account for the labor of the Feasibility Team members in the same manner in which it charges the Joint Account for the labor of the Project Team members.

Each Feasibility Team member remains an employee of its respective employer, and each employer remains responsible for its employee's salaries and benefits, as well as maintaining worker's compensation insurance for its employee. Accordingly, each employer will continue to administer the compensation, benefits, allowances, and careers of its employees on the Feasibility Team. However, Feasibility Team members will receive team assignments and general supervision from the Operator in connection with their day-to-day work. An individual on a Feasibility Team will, insofar as it is possible and consistent with the needs of his or her employer, serve on the Feasibility Team for the duration of the Feasibility Team, unless that individual is designated a temporary Feasibility Team member by his or her employer or the Operator. If a Feasibility Team member is designated a temporary Feasibility Team member by his or her employer or the Operator, that Feasibility Team member will leave the Feasibility Team upon completion of (a) the term designated by his or her employer for his or her service on the team or (b) the specific task or portion of the Feasibility Team's work assigned to that member by the Operator.

The Feasibility Team shall prepare an in-depth report containing its analyses of all of the development scenarios it considered and its findings as to the existence of at least one development scenario for a Producible Well on the Contract Area,

HIGHLY CONFIDENTIAL                              BP-HZN-2179MDL00054405

which is technologically and economically feasible, and shall present a copy of that report to each of the Participating Parties as soon as it is completed.

### 12.2.1   Feasibility AFE Approval

A Feasibility AFE requires approval by Election.

A Non-Participating Party in the Feasibility AFE is subject to Article 16.5.3 (*Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs*).

### 12.2.2   Feasibility Team and Feasibility Stage Conclusion

The Feasibility Team and the Feasibility Stage terminate immediately after (a) the Feasibility Team has (i) completed the scope of work in the Feasibility AFE and its supplemental AFEs and (ii) presented to the Participating Parties the report referred to in Article 12.2 (*Feasibility Team Proposal*) or (b) the Participating Parties Vote to terminate the Feasibility Team prior to the occurrence of both of those events.

## 12.3   Commencement of the Selection Stage

The Selection Stage commences upon the approval of the Selection AFE.

### 12.3.1   Proposal of a Project Team

If a Feasibility AFE is approved, the Operator has the exclusive right for a period of one hundred eighty (180) days from the conclusion of the Feasibility Stage to submit a Selection AFE. That AFE may call for the formation of a Project Team. It shall be accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Selection Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Selection Stage, and the estimated Costs of the Selection Stage. If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.

If a Feasibility AFE is not approved, but the drilling of one Appraisal Well into a Producible Reservoir and its permanent or temporary

HIGHLY CONFIDENTIAL

abandonment have taken place, the Operator has an exclusive right for a period of three hundred sixty (360) days from the conclusion of those operations to submit the Selection AFE. If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE. In response to any proposal made under this paragraph, a Party may propose the formation of a Feasibility Team and submit to the Parties a Feasibility AFE. A Feasibility AFE and Feasibility Team proposal under this paragraph shall take precedence over a Selection AFE proposal under this paragraph, and the Parties shall proceed as if the Feasibility AFE and Feasibility Team proposal, made under this paragraph, had been made under Article 12.2 *(Feasibility Team Proposal)*. If the Feasibility AFE and Feasibility Team proposal made under this paragraph is approved, the Participating Parties shall proceed with the Feasibility Team scope of work as if the Selection AFE proposal had not been made. If the Parties do not approve the Feasibility AFE and Feasibility Team proposal made under this paragraph, the Parties shall proceed with the Selection AFE proposal made under this paragraph as if the Feasibility AFE and Feasibility Team proposal, made under this paragraph, had not been made.

If the Selection AFE proposes the formation of a Project Team, the formation and administration of that Project Team shall be handled under Exhibit "G."

The Operator shall directly charge the Joint Account for all Costs associated with the Project Team, including those of Affiliates, for which the Operator is internally billed. The components of those Costs may include, but are not limited to:

a)   Digital Business

b)   Accounting

c)   Building Services and Building and Grounds Maintenance

d)   Human Resources

e)   Procurement

69

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054407

f)   Government and Public Affairs

g)   Health, Safety, and Environment

h)   Security

i)   Audit

j)   Tax

k)   Crisis Management

l)   Environmental Compliance

m)  Security

All other Project Team Costs shall be handled under Exhibit "C."

Non operator has the right to audit certain Affiliate charges except specific costs included in the Affiliate rate per hour for Affiliate personnel.

No Party may propose the formation of a Project Team for a Development Phase until such time as a previously formed Project Team for that Development Phase has terminated.

**12.3.2   <u>Selection AFE Approval</u>**

A Selection AFE requires approval by Election.

A Non-Participating Party in a Selection AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs).*

**12.4   <u>Proposal of a Development Plan</u>**

The Operator has the exclusive right for a period of one hundred eighty (180) days from the commencement of the Selection Stage to submit a Development Plan for the Parties' review and approval.

HIGHLY CONFIDENTIAL

### 12.4.1   <u>Content of the Development Plan</u>

A Development Plan shall contain at a minimum the following information:

(a) **Development System**:  Description of the Development System including:

  (i)   the type of Production System proposed, for example, tension leg well jacket, floating production system, including the Production System's location, configuration (number of well slots or subsea tiebacks), and production capacity;

  (ii)  the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to the interconnect with the pipeline or offtake point servicing the Contract Area;

  (iii) a projected time schedule for designing, contracting, fabricating, constructing, or otherwise acquiring, transporting, and installing the Development System;

  (iv)  the estimated date of initial Hydrocarbon production and the estimated initial daily rate of Hydrocarbon production;

  (v)   the estimated Costs (not in the form of an AFE) of the Development System;

  (vi)  all proposed hydrate or paraffin control systems or techniques, method of pressure maintenance, or enhanced recovery plan;

  (vii) a description of the proposed well completion techniques, that is, dual versus single; and

  (viii) The equipment and space on, and the weight and the buoyancy of, the Development System, which are required to make the enhanced recovery and pressure maintenance

71

HIGHLY CONFIDENTIAL                                                      BP-HZN-2179MDL00054409

plans and objectives referred to in Article 12.4.1(j)(iii)(D) possible;

(b) **Producible Reservoirs:** A description of the Hydrocarbon-bearing geological formations expected to be developed under the Development Plan along with the area and depth of sands or reservoirs to be developed by the Production System;

(c) **Recoverable Reserves and Production Profile:** An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter;

(d) **Pre-drilling Operations:** A description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost, and location of each pre-drilling operation;

(e) **Development Wells:** A description of drilling plans for all Development Wells in the Development Plan and the completion plans for all temporarily abandoned Exploratory Wells or temporarily abandoned Appraisal Wells that are to be completed and all Development Wells in the Development Plan, including an estimate of the timing, Cost, and surface and bottomhole location of each well;

(f) **Tieback Operations:** If the Development Plan requires the tieback or use of Offsite Host Facilities, a commitment from the owner of that Offsite Host Facilities to handle or process Hydrocarbons, the amount of all tariffs, processing or other fees the owner of that Offsite Host Facilities will charge the Participating Parties to handle or process Hydrocarbons, and the guaranteed capacity on the Offsite Host Facilities for the Hydrocarbons;

(g) **Define AFE:** An AFE containing the estimated Costs of the Define Stage, accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the

72

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054410

Define Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Define Stage, and the estimated Costs of the Define Stage; if a Project Team was not formed during the Selection Stage, or if the scope of work of an existing Project Team is to be extended beyond its Selection Stage scope of work, the proposing Party may submit, along with the Define AFE, a proposal for the formation (or extension, as the case may be) of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*;

(h) **Field Operating Scheme:**  A description of the field operating scheme, its method, requirements, expected frequencies of intervention, and Costs;

(i) **Field Abandonment:**  A description of field abandonment plan (if applicable);

(j) **Reservoir Plan:**  A reservoir plan that provides strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and that includes, but is not limited to:

    (i)    an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

    (ii)   the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

    (iii)  a reservoir management and depletion strategy for each Producible Reservoir addressing issues that include, but are not limited to:

        (A)  estimates of oil and gas in place;

        (B)  reservoir rock and fluid characteristics;

        (C)  depletion mechanism;

73

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054411

(D)   enhanced recovery and pressure maintenance plans and objectives;

(E)   reservoir surveillance programs (for example, cased-hole logging, static pressures) and their objectives;

(F)   well performance goals (for example, target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets);

(G)   reservoir performance goals (for example, target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals); and

(H)   other relevant information;

(k)   **Disposal Wells:**   The estimated Cost of disposal wells, if applicable;

(l)   **Hydrocarbon Transmission System:**   The type of Hydrocarbon transmission system to be made available to the Participating Parties (for example, pipeline versus barge); and

(m)   **Other Data:**   Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Development System provided for in the Development Plan.

## 12.5   Development Plan Approval

### 12.5.1   Approval of Operator's Development Plan Submitted During its Exclusive Period

The Operator has one hundred twenty (120) days from the initial submittal of a Development Plan proposal to obtain the unanimous agreement of the Parties on (a) the Development Plan submitted during its exclusive period or (b) the latest amended version of that plan which has been the result of comments by, or discussions among,

**74**

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054412

the other Parties or the Project Team, if one exists, and the Operator (the "Latest Amended Version of the Plan").

### 12.5.2 Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period

If:

(a) the Operator fails within the one hundred twenty (120) day period in Article 12.5.1 (Approval of Operator's Development Plan Submitted During its Exclusive Period) to gain the unanimous agreement of the Parties on its Development Plan or Latest Amended Version of the Plan, whichever is applicable, or

(b) the Operator fails to submit a Development Plan during its exclusive period,

any Party may submit a Development Plan and an AFE for the actual Costs it incurred in order to generate that Development Plan, and the Parties have sixty (60) days from such submittal in which to approve by Vote the Operator's Development Plan or Latest Amended Version of the Plan, whichever is applicable, or another Party's Development Plan or Latest Amended Version of the Plan, whichever is applicable, and its associated AFE. Unless otherwise unanimously agreed by the Parties, no new Development Plan may be submitted during the sixty (60) day period.

### 12.5.3 Approval of a Development Plan if One is Not Approved by Vote

If no Development Plan or Latest Amended Version of the Plan is approved by Vote during the sixty (60) day period in Article 12.5.2 (Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period), and if there is only one Development Plan or Latest Amended Version of the Plan, whichever is applicable, submitted and that Development Plan or the Latest Amended Version of the Plan, whichever is applicable, receives an affirmative Vote of at least fifty percent (50%) of the Voting interest, that Development Plan or the Latest Amended Version of the Plan, whichever is applicable, shall be deemed approved by the Parties. If there are two (2) or more Development Plans or Latest Amended Version of the Plans, whichever

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054413

is applicable, submitted and one Development Plan or the Latest Amended Version of the Plan, whichever is applicable, receives an affirmative Vote of at least fifty percent (50%) of the Voting interest and the other Development Plan or Latest Amended Version of the Plan, whichever is applicable, receives an affirmative Vote of less than fifty percent (50%) of the Voting interest, then the Development Plan or the Latest Amended Version of the Plan, whichever is applicable, receiving the affirmative Vote of at least fifty-one percent (51%) of the Voting interest shall be deemed approved by the Parties. If two competing Development Plans or Latest Amended Version of the Plans, whichever is applicable, each receive an affirmative Vote of fifty percent (50%) of the Voting interest, then the Development Plan or Latest Amended Version of the Plan, whichever is applicable, for which the Operator affirmatively Votes, shall be deemed approved.

**12.5.4**   <u>**Approved Development Plan**</u>

By unanimously agreeing or Voting to approve a Development Plan or Latest Amended Version of the Plan, whichever is applicable, or subsequently Voting to Participate in an approved Development Plan, under Article 8.3 *(Second Opportunity to Participate)*, each Participating Party in an approved Development Plan also agrees or Votes to participate in its Define AFE, the AFE referred to Article 12.5.2 *(Approval of a Development Plan After the Conclusion of the Operator's Exclusive Period)*, if applicable, and the formation of a Project Team during the Define Stage, if applicable. If the Parties do not approve a Selection AFE and do not form a Project Team during the Selection Stage and if the Operator's Development Plan or Latest Amended Version of the Plan, whichever is applicable, is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the approved plan. Upon the approval of the Development Plan or Latest Amended Version of the Plan, whichever is applicable, the Selection Stage concludes and Appraisal Operations are deemed concluded; provided, however, if an Appraisal Operation is being conducted when the Development Plan is approved, Appraisal Operations shall be deemed concluded when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned. Any Non-Participating Party in the approved

76

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054414

Development Plan's Define AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs).*

**12.6**  **Long Lead Development System AFEs**

After commencement of the Define Stage, in order to facilitate the early and orderly commencement of the Execution Stage, the Operator has the right, prior to the approval of the Execution AFE, to submit AFEs ("Long Lead Development System AFEs") for (a) the acquisition of long lead-time items for the Development System, (b) preliminary activities related to the fabrication, transportation or installation of the Development System, or (c) any other activity necessary to assist the Operator in the implementation of the Development Plan.  A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs, does not exceed one hundred million dollars ($100,000,000.00), requires approval by Vote of the Participating Parties in the Development Plan.  A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs equals or exceeds one hundred million dollars ($100,000,000.00), requires approval by the unanimous agreement of the Participating Parties in the Development Plan.  Any Non-Participating Party in a Long Lead Development System AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs).*

**12.7**  **Define Stage and Execution Stage**

The Define Stage commences upon the approval of the Development Plan.

**12.7.1**  **Execution AFE**

The Operator has an exclusive period of one hundred eighty (180) days from the commencement of the Define Stage to submit an Execution AFE, which conforms with the Development Plan approved during the Selection Stage to all Parties for approval by Election.  The Execution AFE shall not include any Cost estimates or AFEs for Development

HIGHLY CONFIDENTIAL                              BP-HZN-2179MDL00054415

Wells.  If the Operator does not submit the Execution AFE during its exclusive period, any Party may submit an Execution AFE, which conforms with the approved Development Plan, and an AFE for the actual Costs it has incurred to generate the Execution AFE.  If a Project Team was not formed during the Selection Stage or the Define Stage, the proposing Party may submit as a part of the Execution AFE a proposal for the formation of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*.

### 12.7.2   Approval of an Execution AFE and Commencement of the Execution Stage

By Electing to participate in an Execution AFE, each Participating Party in an approved Execution AFE also Elects to participate in (a) the AFE for the actual Costs incurred by the proposing Party in order to generate the approved Execution AFE, referred to in Article 12.7.1 *(Execution AFE)*, if applicable, and (b) the formation of a Project Team during the Execution Stage, if applicable.   If the actual Costs the Operator has incurred to generate an Execution AFE are not recovered as part of a Project Team's Costs and if the Operator's Execution AFE is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the Execution AFE.    The Define Stage concludes and the Execution Stage commences upon the approval of the Execution AFE.   A Non-Participating Party in the Execution AFE for the initial Development System is subject to Article 16.2 *(Acreage Forfeiture Provisions)*.

### 12.7.3   Minor Modifications to Development Plans

In implementing a Development Plan, the Operator shall advise the Participating Parties of its own progress and that of the Project Team, if one exists.  As additional information becomes available, the Operator may, prior to the installation of the Development System, make minor modifications to the Development Plan without the approval of the Participating Parties if those minor modifications are both reasonable and prudent.  For purposes of this paragraph, a minor modification is

78

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054416

(a)   a modification, which (i) is proposed prior to the commencement of the Execution Stage and does not cause the estimated Cost of the Define AFE to increase by more than twenty percent (20%) and (ii) is not a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*; or

(b)   a modification that is necessary for health, safety, or environmental reasons or regulatory requirements and does not exceed twenty percent (20%) of the dollar amount provided in 12.7.3(a), even if that modification constitutes a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*.

The "estimated Cost of the Execution AFE" is the total dollar amount of the Execution AFE and all approved Long Lead Development System AFEs. If the Operator exercises its discretionary right to make a minor modification for health, safety, or environmental reasons or regulatory requirements, the Operator shall give each Participating Party in the Development Plan written notice of that fact.  A minor modification shall not materially change the risk or timing of the Development Plan and is binding on all the Participating Parties in the Development Plan.

**12.7.4**   **Major Modifications to Development Plans**

A major modification shall be deemed to have occurred when:

(a)  the type of Production System, for example, tension leg well jacket floating production system, is to be changed; or

(b)  the number of well slots of the Production System is to be changed by at least twenty-five percent (25%); or

(c)  the type of Hydrocarbon transmission system is changed (for example, pipeline versus barge); or

(d)  the initial daily production processing capacity of the Facilities is to be changed by at least twenty-five percent (25%); or

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054417

(e)  the number of Development Wells is to be increased or decreased by at least twenty percent (20%); or

(f)  in the case of a tieback to an Offsite Host Facility or a pre-existing Development System, the gathering and pipeline system necessary to transport the Hydrocarbons from the wellheads to an Offsite Host Facility or a pre-existing Development System, as provided in the Development Plan, is to be changed.

**12.7.5**    <u>**Major Modifications to Development Plans Prior to the Approval of the Execution AFE**</u>

Whenever a major modification to a Development Plan is proposed during the Define Stage (prior to the approval of the Execution AFE), the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs).  That major modification shall require approval by unanimous agreement of the Participating Parties in the Development Plan.  If that major modification is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan.  That Non-Participating Party has the right for a period of ninety (90) days, after receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs).  If that Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with the original Development Plan (and associated AFEs).

**12.7.6**    <u>**Major Modifications to Development Plans After the Approval of the Execution AFE**</u>

Whenever a major modification to a Development Plan is proposed during the Execution Stage (after the approval of an Execution AFE) and prior to the installation of the Development System, the Operator shall furnish the Participating Parties in the Execution AFE with the proposed modification to the Development Plan (and associated AFEs).  That major modification shall require unanimous agreement of the

80

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054418

Participating Parties in the Execution AFE. If that major modification is as provided in Article 12.7.4, and is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Execution AFE. For a period of thirty (30) days after receipt of the modified Development Plan (and associated AFEs), the Non-Participating Party may notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If that Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with (a) the Execution AFE and (b) the original Development Plan (and associated AFEs) if it did not participate in that Development Plan. Within thirty (30) days of the elimination of the Underinvestment, the Participating Parties in the Execution AFE for the initial Development Phase shall deliver to that Non-Participating Party an assignment of one hundred percent (100%) of its former Working Interest in the Contract Area, the wells therein and production therefrom. If the Execution AFE was for a Subsequent Development Phase, the Non-Participating Party shall not be subject to Article 16.2 (Acreage Forfeiture Provisions) in regard to that AFE.

**12.7.7  Approval of Major Modifications**

If the major modification of the Development Plan is approved, the Development Plan (and associated AFEs) shall be deemed modified, and the Operator shall carry out the modified Development Plan. If a major modification is not approved, the Operator shall continue to implement the Development Plan as it was before the proposed major modification.

**12.7.8  Termination of a Development Plan**

A Development Plan terminates if (a) the Execution AFE for that Development Plan (or any supplemental AFE thereto) is not approved by Election, (b) the Participating Parties in the Define Stage or in the Execution AFE unanimously agree to terminate the Development Plan, or (c) the fabrication or acquisition of the Development System is not commenced within the time frame provided in Article 12.7.9 *(Timely Operations for Development Systems)*.

81

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054419

### 12.7.8.1   Termination Prior to Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated before its associated Execution AFE has been approved by Election shall be borne by the Parties who participated in the Define AFE and its supplemental AFEs, if any.

### 12.7.8.2   Termination After Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated after its associated Execution AFE has been approved by Election shall be borne by the Participating Parties in the Execution AFE and its supplemental AFEs, if any.

## 12.7.9   Timely Operations for Development Systems

The Operator shall commence or cause to be commenced the fabrication or acquisition of a Development System (a) within one hundred eighty (180) days after the end of the period for Elections of the Execution AFE or (b) ninety (90) days prior to the date the Operator is required to commence that fabrication or acquisition under an SOP or Unit Plan, whichever is earlier.  If the Operator, except for failure attributable to Force Majeure, fails to commence the fabrication or acquisition of a Development System within the applicable time period set forth above in this Article 12.7.9, the Non-Operating Parties may then select a successor Operator under Article 4.5 *(Selection of Successor Operator)*.  Within ninety (90) days of the selection of the successor Operator, the successor Operator shall commence the fabrication or acquisition of a Development System in the approved Development Plan.  The fabrication or acquisition of a Development System commences on the date the first major fabrication contract for the Development System is awarded or the date the purchase contract for a Development System is executed.

## 12.8   Post-Production Project Team AFEs

The Execution Stage concludes upon the first production of Hydrocarbons from the Development System.  At least sixty (60) days, but not more than one hundred twenty (120) days, prior to the first production of Hydrocarbons from

HIGHLY CONFIDENTIAL                                                            BP-HZN-2179MDL00054420

the Development System, the Operator may propose for approval by Vote of the continuance of the Project Team, if one exists, on such smaller scale, which is reasonable considering the scope of the work involved or the formation of the Project Team, if one does not exist, in order to assist the Operator in the drilling of additional Development Wells approved by the Parties, de-bottlenecking the Development System, ramping up Hydrocarbon production, maximizing the recovery of Hydrocarbons during the Development Phase and activities related thereto.  With its proposal, the Operator shall include an initial Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.

At least forty-five (45) days, but not more than ninety (90) days, prior to the date on which the Operator anticipates the scope of work set forth in its original proposal for the continuance or formation of the Project Team and its associated AFE and memorandum to be completed, the Operator may propose for approval by Vote of the Parties the further continuance of the Project Team to assist the Operator in reservoir management and production optimizing activities other than contemplated under Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*.  With that proposal, the Operator shall include a second Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.  The administration of the Project Team during the period that it carries out the scope of work referred to in this Article 12.8 shall be handled under Exhibit "G."  The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*.  A Non-Participating Party in either or both of the two Post-Production Project Team AFEs is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs)*.

**12.9** **Subsequent Development Phases**

At any time after the installation of the initial Development System for the initial Development Phase, any Participating Party may propose a subsequent Development Phase and the installation of a subsequent Development System. That proposal shall require approval by Vote except as provided in Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*.

HIGHLY CONFIDENTIAL

### 12.9.1 Proposal of a Subsequent Development Phase

If a subsequent Development Phase is approved, the procedures specified in this Article 12 *(Development Phases)* shall apply to the proposal of the subsequent Development Phase.

### 12.9.2 Execution AFE in a Subsequent Development Phase

Each Non-Participating Party in an Execution AFE for a subsequent Development Phase is subject to the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)*, not Article 16.2 *(Acreage Forfeiture Provisions)*. Although a Non-Participating Party in an Execution AFE for a subsequent Development Phase will retain its Working Interest in the Contract Area, that Party will only be entitled to Hydrocarbon production from the subsequent Development Phase, in which it did not participate, after it has satisfied the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)*. A Non-Participating Party in a subsequent Development Phase shall not unreasonably interfere with any activities or operations in that subsequent Development Phase. In all events, the Participating Parties in the Execution AFE for a subsequent Development Phase shall control the sequence of, and shall conduct, all activities and operations in that subsequent Development Phase.

## 12.10 Access to Existing Facilities

A Participating Party in a subsequent Development Phase may propose to access the Facilities installed for a previous Development Phase in accordance with Article 14 *(Facilities and Gathering Systems)*. The proposal shall require approval by Vote of the Participating Parties in the previous Development Phase and shall include the basic terms under which the access is to be granted. If the proposal is approved, it shall be incorporated into a formal "Facilities Use and Production Handling Agreement" and shall bind all Parties.

## 12.11 Enhanced Recovery and/or Pressure Maintenance Program Proposals

Any Party may propose the formation of a Project Team separate and apart from any Project Team already in existence for the purpose of assisting the Operator in designing an enhanced recovery and/or pressure maintenance program for a

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054422

particular Development Phase by submitting to the Parties for approval by Election an Enhanced Recovery Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*. Any Non-Participating Party in that Enhanced Recovery Project Team AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, or Enhanced Recovery Project Team AFEs)*. The formation and administration of a Project Team for an enhanced recovery and/or pressure maintenance program will be handled under Exhibit "G." The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*. After the Operator has designed the enhanced recovery and/or pressure maintenance program with the assistance of that Project Team, the Operator may submit an enhanced recovery and/or pressure maintenance program proposal and AFE to the Parties for approval by Vote. The program proposal and AFE shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs, and benefits of the proposed program and AFE. If approved, that proposal and AFE will be binding on all of the Participating Parties in the Execution AFE for that Development Phase, and the Operator shall commence the program at the Cost and risk of those Parties.

## ARTICLE 13 – DEVELOPMENT OPERATIONS

### 13.1   Proposal of Development Wells and Development Operations

It is the intent of the Parties to proceed with the development of the Contract Area under an approved Development Plan. Each Development Well shall be subject to a separate AFE unless a Development Plan calls for a number of Development Wells to be drilled together in order to set conductor casing or to be pre-drilled together prior to the installation of the Development System, in which case those wells may be included in a single AFE.

Once a Development Well has been completed and placed on production, the Participating Parties in that well must unanimously agree to allow any Party to conduct a Non-Consent Operation in that well, unless that well becomes incapable of producing in paying quantities. A proposal to conduct Development Operations in a Producible Reservoir requires the unanimous agreement of the

85

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054423

Parties, unless the proposing Party designates the Producible Reservoir as an Objective Depth or completion zone in the proposal.

**13.1.1**   **Proposal of Development Wells Included in a Development Plan**

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in a Development Plan and Execution AFE may propose drilling a Development Well that was included in the Development Plan by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Development Well that was included in the Development Plan requires approval by Election.   Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

**13.1.1.1 Revision of Well Plan**

Unless otherwise provided for in the Development Well proposal and AFE, any revisions of the Well Plan or AFE for a Development Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.1 *(Revision of Well Plan)*.

**13.1.1.2 Automatic Revision of the Well Plan**

The Well Plan for a Development Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Automatic Revision of the Well Plan)*.

**13.1.2**   **Proposal of Development Operations Not Included in a Development Plan**

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in an Execution AFE may propose drilling a Development Well that was not included in the Development Plan associated with that Execution AFE by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. The proposal shall specify that the well was not included in the Development Plan.  Each proposed Development Well that was not included in the Development Plan requires approval by Vote.  Each

86

Exhibit A
Page 97

HIGHLY CONFIDENTIAL

Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

### 13.1.3   **Timely Operations**

Except as provided below, drilling operations on a Development Well shall be commenced within one hundred twenty (120) days after the end of the period for the approval of the Development Well.  If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the Development Well within that one hundred twenty (120) day period, the approved Development Well proposal shall be deemed withdrawn, with the effect as if the Development Well had never been proposed and approved.

If a Party submits an identical Development Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within sixty (60) days after the deemed withdrawal of the approved original Development Well proposal and if that identical Development Well proposal is approved and if the Operator is a Participating Party in the identical Development Well proposal, the Operator shall commence drilling operations on that well within ninety (90) days after the end of the response period for that proposal.  If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a drilling rig), fails to commence drilling operations on the identical Development Well within that ninety (90) day period, the approved identical Development Well proposal shall be deemed withdrawn, with the effect as if the identical Development Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations)*.  Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Development Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

87

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054425

If a Party submits an identical Development Well proposal (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the Operator) within sixty (60) days after the deemed withdrawal of the approved original Development Well proposal and if that identical Development Well proposal is approved and if the Operator is not a Participating Party in the identical Development Well proposal, the approved identical Development Well proposal shall be deemed withdrawn, with the effect as if the identical Development Well proposal had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.1 *(Substitute Operator if Operator is a Non-Participating Party)*. Within sixty (60) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Development Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within ninety (90) days after the end of the period for the approval of that Well.

If an approved original or identical Development Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Well, will be chargeable to the Participating Parties.   Drilling operations for a Development Well under this Article 13.1.3 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Development Well are undertaken.

**13.1.4**   **AFE Overruns and Substitute Well**

Once a Development Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)   all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*,

(b)   the Operator encountering mechanical difficulties, excessive temperature, uncontrolled influx of subsurface water, loss of well

88

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054426

control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that render, in the Operator's sole opinion, further well operations impractical, and

(c)    the unanimous agreement of the Participating Parties to cease drilling a Development Well before reaching Objective Depth.

If a Development Well is abandoned due to the conditions described under Article 13.1.4(b), then any Participating Party in the abandoned Development Well may, within thirty (30) days after abandonment of that Development Well, propose the drilling of a substitute well for the abandoned Development Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Development Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Development Well.   The Well Plan for the substitute Development Well shall be substantially the same as the abandoned Development Well's Well Plan and shall also take into account those conditions that rendered further drilling of the abandoned Development Well impractical.

Each Non-Participating Party in a substitute Development Well or an approved supplemental AFE for a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

## 13.2   Development Operations at Objective Depth

After a Development Well has been drilled to its Objective Depth, all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment), and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to make an Election on an operation proposed under this Article 13.2, of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for

89

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054427