# EXHIBIT A

# PART 3

credited as charged without gain or loss. Any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking charges. All refurbishing costs required or necessary to return the Material to original condition or to correct handling or transportation damages and other related costs will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B"—Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Section IV, Paragraphs 2.A. and 2.B. by

[X] 75%
All refurbishing cost or reconditioning required to return the Material to Condition "B" or to correct handling or transportation damages and other related costs will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Section IV, Paragraphs 2.A. and 2.B. multiplied by

[X] 65%

Used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C"—Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Section IV, Paragraphs 2.A. and 2.B. by

[X] 50%

The cost of reconditioning shall be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D"—Other Material that is no longer suitable for its original purpose but useable for some other purpose is considered Condition "D" Material. Included under Condition "D" is also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the Parties.

(5) Condition "E"—Junk shall be priced at prevailing scrap value prices.

D. OTHER PRICING PROVISIONS

(1) Preparation Costs

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054503

Costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged in accordance with Section IV, Paragraph 2.A.

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged at the rate most recently recommended by COPAS in accordance with the methods specified in COPAS Model Form Interpretation 38. In the event communication facilities or systems serving the Joint Property

## 3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operator in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Materials, the Operator should make good faith efforts to dispose of surplus within 12 months through buy/sale agreements, trade, sale to a third party, division in-kind, or other dispositions as agreed to by the Parties.

The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Non-Operator. If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Materials.

The Operator may dispose of Condition "D" and "E" Material under procedures normally utilized by the Operator without prior approval.

## 4. SPECIAL PRICING PROVISIONS

A. PREMIUM PRICING

Whenever Material is not readily replaceable but is available only at premium pricing due to national emergencies, strikes, or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property provided notice in writing is furnished to Non-Operators of the proposed charge prior to use of such Material.

B. SHOP-MADE ITEMS

Shop-made items shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either 25% of the current price as determined in Section IV, Paragraph 2.A. or scrap value, whichever is higher, plus the cost of labor to fabricate the item.

C. MILL REJECTS

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054504

Mill rejects purchased as "limited service" casing or tubing shall be priced at 80% of K-55/J-55 price as determined in Section IV, Paragraphs 2.A. and 2.B. Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V.  INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account as defined in the most recent COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of jointly owned Controllable Material shall be made within six months following the taking of the inventory or receipt of Non-Operator inventory. Charges and credits for overages or shortages will be valued for the Joint Account based on the Condition "B" prices in effect on the date of physical inventory as determined in accordance with Section IV, Paragraph 2.A. and 2.B. unless the inventorying Parties can prove another Material condition applies.

### 1.  DIRECTED INVENTORIES

With an interval of not less than five years, physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators.

Expenses of directed inventories will be borne by the Joint Account and may include the following:

A.  Audit per diem rate for each inventory person in accordance with the auditor rates recommended by COPAS at the time the inventory is conducted

The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation. The amount of time required for this additional work may vary from inventory to inventory.

B.  Actual travel including Operator-provided transportation and Personal Expenses for the inventory team

C.  Reasonable charges for report typing and processing

The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

When directed inventories are performed, all Parties shall be governed by the results of such inventory.

### 2.  NON-DIRECTED INVENTORIES

A.  OPERATOR INVENTORIES

Periodic physical inventories that are not requested by the Non-Operator may be performed by the Operator at the Operator's discretion. The expenses of conducting such Operator inventories shall not be charged to the Joint Account.

HIGHLY CONFIDENTIAL                                              BP-HZN-2179MDL00054505

B.  NON-OPERATOR INVENTORIES

Any Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk with prior notification to the Operator of at least 90 days. Non-Operator inventory findings shall be furnished to the Operator in writing within 90 days of completing the inventory field work.

C.  OTHER INVENTORIES

Other inventories may be taken whenever there is any sale or change of interest. When possible, the selling Party should notify all other owners at least 30 days prior to the anticipated closing date. When there is a change in Operator of the Joint Property, an inventory by the former and new Operator should be taken. The expenses of conducting other inventories shall be charged to the Joint Account in accordance with Section V, Paragraph 1.


**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

HIGHLY CONFIDENTIAL                                          BP-HZN-2179MDL00054506

APPENDIX A
Attached to and Made a Part of Exhibit C – Accounting Procedure

<u>AFFILIATES</u>

1) BP Exploration and Production Technology (EPT) Group, or equivalent

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054507

APPENDIX B
Attached to and Made a Part of Exhibit C – Accounting Procedure

<u>EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR</u>

A.    Operator may, under COPAS Accounting Guideline 25 ("Allocation of Rig Related Expenditures"), charge the Joint Account an allocated portion of any drillship or rig related commissioning and/or modification costs pursuant to the provisions of Section II, Paragraph 6 above, provided such drillship or rig related commissioning and/or modification costs are not included in the drillship or rig rate charged by the drilling contractor.  Costs to be charged shall include all commissioning costs charged by the vendor and all costs (both onsite and offsite) incurred by the Operator, contractors or Affiliates to oversee the construction, modification and transportation of a rig including, but not limited to, their salaries and wages, personal expenses and support costs.

B.    Operator may charge the Joint Account an allocated portion of the cost of the Onshore Drilling Center (ODC) or equivalent.  This center is located offsite of the Joint Property with technology to plan, design, monitor, advise, and control a well or wells on a real time/on-line basis.   The center will be used for planning, designing, drilling, re-drilling, side-tracking, or deepening, and/or completing a well, plug-back or work-over operations, plugging and abandonment.  This center's costs will be charged pursuant to the provisions of Section II, Paragraph 6.   Such charges shall include, but are not limited to, the following:  facilities, communications, computers, software, system support, and ODC personnel provided by the Operator, contract services, or Affiliates.

C.   Operator may charge the Joint Account an allocated portion of the cost of the Advanced Collaborative Environment Onshore Communication Facility (ACE), or equivalent, for communicating with field operations and optimizing well performance and reducing field operating expenses on a real time/online basis.  This center's costs will be charged pursuant to the provisions of Section II, Paragraph 6 and COPAS Model Form Interpretation 44 (Field Computer and Communication Systems).  Such charges shall include, but are not limited, to the following:  facilities, communications, computers, software, system support, and ACE personnel provided by the Operator, contract services, or Affiliates.

D.   Operator may charge the Joint Account an allocated portion of the cost of the Preservation and Maintenance Facility (PMF), or equivalent.  This facility will be used to secure, preserve and maintain Gulf of Mexico non-warehouse materials for drilling and completions, wells, operations and subsea projects.  The facility's costs will be charged pursuant to the provisions of Section II, Paragraph 6.

HIGHLY CONFIDENTIAL                                                          BP-HZN-2179MDL00054508

# EXHIBIT "D"

## Gas Balancing Agreement

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

By signing the Joint Operating Agreement, to which this Exhibit "D" is attached, it is the intent of each Party to be bound by the terms and conditions of this Gas Balancing Agreement.

## GAS BALANCING AGREEMENT ("AGREEMENT")

**1.    DEFINITIONS:**    The following definitions shall apply to this gas balancing agreement (the "Agreement"):

**1.01   "Arms Length Agreement"** shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price represents market value in the Balancing Area.

**1.02   "Balancing Area"** shall mean all of the acreage and depths subject to the Joint Operating Agreement.

**1.03   "Full Share of Current Production"** shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

**1.04   "Gas"** shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

**1.05   "Joint Operating Agreement"** shall mean the offshore operating agreement to which this Exhibit "D" is attached and made a part.

**1.06   "Makeup Gas"** shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1.

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054509

**1.07** **"Mcf"** shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at sixty degrees Fahrenheit, 14.73 pounds per square inch absolute (PSIA) and having a specific gravity of 1.00.

**1.08** **"MMBtu"** shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

**1.09** **"Operator"** shall mean the individual or entity designated under the terms of the Joint Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

**1.10** **"Overproduced Party"** shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

**1.11** **"Overproduction"** shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of Gas produced from the Balancing Area.

**1.12** **"Party"** shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

**1.13** **"Percentage Interest"** shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Joint Operating Agreement.

**1.14** **"Royalty"** shall mean payments based on production of Gas from the Balancing Area to all owners of royalties.

**1.15** **"Underproduced Party"** shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

**1.16** **"Underproduction"** shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

**1.17** **"Winter Period"** shall mean the months October, November and December in one calendar year and the months of January, February and March in the succeeding calendar year.

Gas Balancing Agreement

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054510

## 2.   BALANCING AREA

**2.1**   If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in MMBtus.

**2.2**   In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area, Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area, and each Party shall receive its proportionate share of Gas from each Balancing Area (each price category).

## 3.   RIGHT OF PARTIES TO TAKE GAS

**3.1**   Each Party desiring to take Gas will notify the Operator of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement and the transportation agreement governing those volumes (provided Operator is advised in writing of the relevant terms of said transportation agreement).

**3.2**   Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

**3.3**   When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas that such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interest of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interest in the Balancing Area bears to the total Percentage Interest of such Parties.

HIGHLY CONFIDENTIAL                                   BP-HZN-2179MDL00054511

**3.4**    All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party, provided however overriding royalties, production payments or similar burdens on interests shall be paid by  each Party based on its entitlements, and not on actual takes.

**3.5**    Notwithstanding the provisions of Section 3.3, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.  "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

**3.6**    In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's full share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale less any third party compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production.  In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of ninety (90) days.   Notwithstanding the provisions of Article 3.4, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

## 4.    IN-KIND BALANCING

**4.1**    Effective the first day of any calendar month following at least thirty (30) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production

Gas Balancing Agreement

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054512

determined by multiplying fifty percent (50%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty percent (50%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

**4.2**    Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than twenty-five percent (25%) of its Full Share of Current Production for Makeup Gas during the Winter Period.

**4.3**    Notwithstanding any other provision of this Agreement, but subject to Article 7, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to one hundred percent (100%) of such Overproduced Party's Full Share of Current Production until such time as recoverable reserves are actually equal to zero, or the Underproduced Party is in balance, whichever occurs first.

## 5.    STATEMENT OF GAS BALANCES

**5.1**    The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account expressed in MMBtu's. Within thirty (30) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No. 24, as amended or supplemented hereafter.  Each Party disposing of Gas in any month, to the extent required, shall furnish or cause to be furnished to the Operator by the last day of each calendar month a statement showing the total volume of Gas from the Balancing Area sold by such Party or taken in kind for its own account during the preceding calendar month ("Volume Data"), and Operator shall be entitled to rely and act upon the Volume Data for all purposes under this Agreement.  A Party shall not utilize any Volume Data for any purpose other than implementing the terms of this Agreement.

Gas Balancing Agreement

Exhibit A
Page 186

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054513

**5.2**   If any Party fails to provide the Volume Data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide Volume Data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party in connection with the Balancing Area to obtain the Volume Data.   Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited.   All costs associated with such audit will be charged to the account of the Party failing to provide the Volume Data.

## 6.   PAYMENTS ON PRODUCTION

**6.1**   Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.   For income tax purposes the Parties shall report income on all sales made pursuant to this Agreement in accordance with Treasury Regulation Section 1.761-2(d)(3) ("the cumulative gas balancing method").

**6.2**   Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account, provided however overriding royalties, production payments or similar burdens on interests shall be paid by each Party based on its entitlements, and not on actual takes.

**6.3**   In the event that the United States Department of Interior  requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

## 7.   CASH SETTLEMENTS

**7.1**   Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Joint Operating Agreement, the termination of any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties.   Such notice shall be given to all Parties in the Balancing Area.

**7.2**   Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced

HIGHLY CONFIDENTIAL                                          BP-HZN-2179MDL00054514

Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

**7.3**    Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay the cash settlement it owes as a result of being an Overproduced Party to the Operator.   The Operator will pay to each Underproduced Party entitled to settlement the cash settlement it is owed as a result of being an Underproduced Party, accompanied by appropriate accounting detail.

**7.4**    The amount of the cash settlement the Overproduced Party must pay shall be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

**7.5**    The values used for calculating the cash settlement under Section 7.1 will be based on the proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, under an Arm's Length Agreement, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payment amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any actual third party marketing, compression, treating, gathering or transportation costs reasonably incurred directly in connection with the sale of the Overproduction.

**7.6**    To the extent the Overproduced Party did not sell Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed.   In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the "Inside F.E.R.C.'s Gas Market Report" (the "Report") monthly index price published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.   If such Report ceases to be published or discontinues to quote the above referenced price, then from the last month published until termination of production, the price of the Overproduction for this period of time shall be equal to the proceeds actually received by the Overproduced Party for sales during the month(s) of Overproduction. The cash settlement shall be based on the number of MMBTU's of the Overproduction and shall be accompanied by a statement showing volumes, BTU adjustments, and prices for each month of accrued Overproduction.   In the event the Underproduced Party has taken less than

Gas Balancing Agreement

HIGHLY CONFIDENTIAL                                                                    BP-HZN-2179MDL00054515

twenty percent (20%) of its proportionate share of cumulative Gas available for sale at cessation of production, the Overproduced Party(ies) shall be obligated to settle on only ninety percent (90%) of the Index price or the proceeds received for Gas removed from the leases(s) or unit(s), whichever is applicable. The cash settlement shall be less any Royalties, production taxes, severance taxes, and other reasonable costs associated with the transportation previously paid on the Overproduction by the Overproduced Party, and also net of any outstanding amounts related to the lease(s) or unit(s) which are owed by the Underproduced Party to the Overproduced Party.

**7.7**    Interest compounded at the rate specified in Exhibit "C" of the Joint Operating Agreement or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1, beginning the first day following the date payment is due pursuant to Section 7.3.  Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

**7.8**    In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced  Party an offer to settle its Overproduction in-kind and at such rates, quantities, time and sources as may be agreed upon by the Underproduced Party.  If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished, within sixty (60) days after the Overproduced Party's offer to settle in-kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

**8.    OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Joint Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**9.    LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

HIGHLY CONFIDENTIAL                              BP-HZN-2179MDL00054516

## 10.   AUDIT RIGHTS

Notwithstanding any provision in this Agreement or any other agreement between the Parties, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 is supplied, any Party shall have the right to audit the records of any other Party regarding the quantity of Gas, including, but not limited to, information regarding Btu-content.   Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning Gas values, including, but not limited to, information regarding prices and disposition of Gas from the Balancing Area.   Any such audit shall be conducted in accordance with the audit provisions of Exhibit "C" of the Joint Operating Agreement.   Each Party agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations.   The audit rights provided for in this Section 10 shall be in addition to those provided for in Section 5.2 of this Agreement.

## 11.   MISCELLANEOUS

**11.1**   As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, the provisions of this Agreement shall govern.

**11.2**   Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability, losses, costs, damages and claims ("Losses") arising out of any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all Losses sustained or incurred in connection therewith.

**11.3**   Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct.   Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party (other than Operator) to pay any amounts owed pursuant to the terms hereof.   Nothing herein shall be construed to deny any Party the right, from time to time, upon reasonable advance notice in writing to the Operator, to produce and take or

HIGHLY CONFIDENTIAL                                                                      BP-HZN-2179MDL00054517

deliver to its purchaser the full well stream for a reasonable period to meet the deliverability test required by its purchaser.

**11.4** This Agreement shall remain in full force and effect for as long as the Joint Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties, and their respective heirs, successors, legal representatives and assigns, if any. The Parties agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Joint Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

**11.5** Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

**11.6** This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a Party hereto, or as being a stipulation in favor of any such person or entity.

**11.7** In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations.

## 12. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT

**12.1** Subject to the provisions of Section 12.2, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

Gas Balancing Agreement

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054518

**12.2**   In the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties in such Balancing Area of such fact at least sixty (60) days prior to closing the transaction. Thereafter, any Underproduced Party has the right to a cash settlement as a condition precedent to the assignment of the Overproducing Party's assignment of its interests in the Balancing Area. To exercise this right, the Underproduced Party may demand from such Overproduced Party in writing, within thirty (30) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. If more than one Underproduced Party demands a cash settlement, such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 12, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 12 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.4 through 7.6, and, to the extent any interest is due, shall bear interest at the rate set forth in Section 7.7 . Any Underproduced Party accepting a cash settlement from an Overproduced Party shall thereby indemnify and hold the Overproduced Party harmless against any causes of action, claims, losses or other actions which may be claimed by any third party with respect to the Underproduced Party's Underproduction on which the cash settlement is based, provided that this indemnity shall not relieve the Overproduced Party from obligations associated with its failure to make payment of taxes or royalties on the Underproduced Party's Underproduction, except to the extent of cash which is owed to the royalty owner or other party entitled thereto but which is paid to the Underproduced Party.

**12.3**   The provisions of this Section 12 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of all or substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054519

**EXHIBIT "E"**

**NONDISCRIMINATION CLAUSE**

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

During the performance of this Agreement, the "contractor" (meaning and referring separately to each party hereto), agrees, unless exempt therefrom to comply with all provisions of Executive Order 11246 which are incorporated herein by reference, and (a) if contractor has more than 50 employees or contracts with another party hereto in excess of $10,000, contractor must file Standard Form 100 (EEO-1), (b) if contractor has 50 or more employees and a contract of $50,000 or more, contractor is required to develop a written "Affirmative Action Compliance Program" for each of its establishments according to the Rules and Regulations published by the United States Department of Labor in 41 CFR, Chapter 60. Further, contractor hereby certifies that it does not now and will not maintain any facilities provided for its employees in a segregated manner or permit its employees to perform their services at any location under its control where segregated facilities are maintained, as such segregated facilities are defined in Title 41, Chapter 60-1.8, Code of Federal Regulations, revised as of January 1, 1969, unless exempt therefrom. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion or national origin because of habit, local custom or otherwise. Contractor further warrants that no other law, regulation or ordinance of the United States, or any state, or any governmental authority or agency has been violated in the manufacture, procurement or sale of any good furnished, work performed or service rendered pursuant to this contract.

Unless exempt by rules, regulations or orders of the United States Secretary of Labor, issued pursuant to Section 204 of Executive Order 11246, dated September 24, 1965, during the performance of this contract, the contractor agrees as follows:

"(1)     The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national original. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause."

"(2)     The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin."

"(3)     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment."

HIGHLY CONFIDENTIAL                                                      BP-HZN-2179MDL00054520

"(4)     The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor."

"(5)     The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigating to ascertain compliance with such rules, regulations and orders."

"(6)     In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law."

"(7)     The contractor will include the provisions of paragraph (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.  The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance:  Provided, however, that in the event the contractor becomes involved in, or is result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States."

"(8)     Contractor agrees and covenants that none of its employees or employees of its subcontractors who provided services pursuant to this contract are unauthorized aliens, as defined in the Immigration, Reform and Control Act of 1986."

"(9)     Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.  A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually or annually). (1968 MAR.) (Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.)"

HIGHLY CONFIDENTIAL                                                    BP-HZN-2179MDL00054521

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

### ARTICLE 6.3 ET SEQ.
### DEEPWATER OPERATING AGREEMENT (Louisiana)

Security Rights; Default; Unpaid Charges; Carved-out Interests.

## 6.3   Security Rights.

a.    Security Rights - Properties Located Offshore Adjacent to the State of Louisiana.  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Parties herein, the Parties shall have the following security rights:

(i)    Mortgage in Favor of the Operator.  Each Non-Operating Party hereby grants to the Operator a mortgage, hypothecate, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases, (b) the oil and gas in, on, under, and that may be produced from the lands within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by each Non-Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of the Operator herein shall secure the payment of all Costs and other expenses properly charged to such Party, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If any Non-Operating Party does not pay such Costs and other expenses or perform its obligations under this Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-Operating Party's Hydrocarbon production and collect such Costs and other expenses out of the proceeds from the sale of the defaulting Non-Operating Party's share of Hydrocarbon production until the amount owed has been paid.  The Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-Operating Party's share of Hydrocarbon production.  Any purchaser of such production shall be

Page 1 of 7

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054522

entitled to rely on the Operator's statement concerning the amount of Costs and other expenses owed by the defaulting Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-Operating Party.

The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $25,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.b.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to this Agreement.

(ii)     Security Interest in Favor of the Operator.  To secure the complete and timely performance of and payment by each Non-Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement, each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Leases or the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof.  The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Leases or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054523

the Contract Area. To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers: (A) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Leases or the Contract Area, or the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar

Page 3 of 7

HIGHLY CONFIDENTIAL                                   BP-HZN-2179MDL00054524

rights and privileges that relate to or are appurtenant to the Leases or the Contract Area.

(iii)    <u>Mortgage in Favor of the Non-Operating Parties</u>.  The Operator hereby grants to each Non-Operating Party a mortgage, hypotheca, and pledge of and over all of its rights, titles, and interests in and to (a) the Leases; (b) the oil and gas in, on, under, and that my be produced from the lands within the Contract Area; and (c) all other immovable property or other property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-Operating Party herein shall secure the payment of all Costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.  If the Operator does not pay such Costs and other expenses or perform its obligations under this Agreement when due, the Non-Operating Parties shall have the additional right to notify the purchaser or purchasers of the Operator's Hydrocarbon production and collect such Costs and other expenses out of the proceeds from the sale of the Operator's share of Hydrocarbon production until the amount owed has been paid.  The Non-Operating Parties shall have the right to offset the amount owed against the proceeds from the sale of the Operator's share of Hydrocarbon production.  Any purchaser of such production shall be entitled to rely on the Non-Operating Parties' statement concerning the amount of Costs and other expenses owed by the Operator and payment made to the Non-Operating Parties by any purchaser shall be binding and conclusive as between such purchaser and the Operator.

The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $25,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against the Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and

Exhibit A
Page 198

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054525

Financing Statement (Louisiana), as such term is defined in Section 6.3.b.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to this Agreement.

(iv)    Security Interest in Favor of the Non-Operating Parties. To secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, the Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Leases or included within the Contract Area or attributable to the Leases or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Development Systems, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Leases or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Leases or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Leases or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Leases when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Leases or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Leases or the Contract Area, the oil and gas produced from or attributable to the Leases or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Leases or the Contract Area, including the following:

(1)    all of its rights, titles, and interests, whether now owned

Page 5 of 7

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054526

and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Leases or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases or the Contract Area;

(2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases or the Contract Area; and

(3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Leases or the Contract Area.

b.    Default.  If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator may give the defaulting Party notice that unless payment is made within thirty (30) days from delivery of the notice, the non-paying Party shall be in default.  A Party in default shall have no further access to the rig, Production System, Facilities, any Confidential Data or other maps, records, data, interpretations, or other information obtained in connection with activities or operations hereunder or be allowed to participate in meetings.  A Party in default shall not be entitled to Vote or to make an Election until such time as the defaulting Party is no longer in default.  The voting interest of each non-defaulting Party shall be counted in the proportion its Working Interest bears to the total non-defaulting Working Interests.  As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-Participating Party, except where such approval is binding on all Parties or Participating Parties, as applicable. In the event a Party believes that such statement of charges is incorrect, the Party shall nevertheless pay the amounts due as provided herein, and the Operator shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than sixty (60) days after receiving notice from the Party of such disputed charges.

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054527

c.     Unpaid Charges.  If any Participating Party fails to pay its share of the Costs and other expenses authorized under this Agreement within thirty (30) days after receipt of an invoice therefor or to otherwise perform any of its obligations under this Agreement when due, the Party to whom such payment is due, in order to take advantage of the provisions of this Section 6.3, shall notify the other Party by certified or registered U.S. Mail that it is in default and has thirty (30) days from the receipt of such notice to pay.  If such payment is not made timely by the non-paying Party after the issuance of such notice to pay, the Party requesting such payment may take immediate steps to diligently pursue collection of the unpaid Costs and other expenses owed by such Participating Party, to collect consequential damages as a result of the default, and to exercise the mortgage and security rights granted by this Agreement. The bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein.  In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in its favor in the manner provided by law, to exercise the Power of Sale provided for herein, if applicable, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Contract Area is located or such other states as such Party may deem appropriate.  The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and collection costs) and any amounts collected with respect to amounts owed by the nonperforming Party.  In the event there become three or more Parties to this Agreement, then if any nonperforming Party's share of Costs remains delinquent for a period of sixty (60) days, each other Participating Party shall, upon the Operator's request, pay the unpaid amount of Costs in the proportion that its Working Interest bears to the total non-defaulting Working Interests.  Each Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's mortgage and security rights to the extent of the payment made by such Participating Party.

d.     Carved-out Interests.  Any agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working Interest in the Leases or the Contract Area shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Working Interest is so encumbered does not pay its share of Costs and other expenses authorized under this Agreement, and the proceeds from the sale of its Hydrocarbon production pursuant to this Section are insufficient to pay such Costs and expenses, the security rights provided for in this Section may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Leases or the Contract Area is burdened. In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by this Section.

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054528

## EXHIBIT "G"

### PROJECT TEAM EXHIBIT
### (with Technology Sharing Provisions)

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

### SECTION 1
### DEFINITIONS

1.1   Background Technology and Information

Any Participating Party's proprietary geophysical, geochemical, drilling, engineering, or other similar technical information or technology, along with information, reports, studies, analyses, models, or similar data and documents incorporating such information, that is (a) developed, acquired, owned, or controlled by an individual Participating Party as a result of activities outside the scope of both this Exhibit and the Operating Agreement, or (b) developed, acquired, owned, or controlled by an individual Participating Party as result of activities that are within the scope of either this Exhibit or the Operating Agreement, but where such activities were conducted as a Non-Consent Operation, and (c) identified and declared as Background Technology and Information prior to its submission to the Project Team pursuant to the terms of this Exhibit.

1.2   Confidential Information

All Project Technology and Information and Background Technology and Information. Confidential Information does not include "Confidential Data", as that term is defined in the Operating Agreement. To the extent that "Confidential Data" is submitted by a Participating Party for use by the Project Team, such "Confidential Data" continues to be governed solely by the terms of the Operating Agreement.

1.3   Project Manager

The Operator's designated representative who will direct, supervise, and oversee the work of the Project Team.

1.4   Project Technology and Information

All engineering or other similar technical data, along with all information, reports, studies, analyses, models, or similar data and documents incorporating such data, that (a) are acquired or developed by the Project Team, or provided to the Project Team by one or more of the Participating Parties and (b) are charged to the Joint Account.

Integrated Project Team

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054529

1.5   Operating Agreement

That certain Operating Agreement effective October 1, 2009, between BP Exploration & Production Inc. and MOEX Offshore 2007 LLC, covering the Contract Area.

1.6   Other Terms

Except as defined in this Exhibit, capitalized terms used herein have the same meaning as defined in the Operating Agreement.

## SECTION 2
## INTEGRATED PROJECT TEAM FORMATION AND ADMINISTRATION

2.1   Formation and Staffing of the Project Team

An Project Team shall be proposed pursuant to the terms of Article 12 of the Operating Agreement. The Project Team will be composed of representatives nominated by each Participating Party. The individuals nominated for participation by the Participating Parties must have experience commensurate with the needs and objectives of the Project Team as described in the Project Team AFE and scope of work prepared in accordance with Section 3.1 of this Exhibit.

The Project Manager shall staff the Project Team from the pool of nominated representatives designated by each Participating Party; provided, however, if the Project Manager has not staffed a position from the pool of representatives, the Project Manager may request additional representatives be nominated for consideration.

These nominated representatives must be employees or contractors (as used in this Exhibit, "contractors" includes "consultants") of either the Participating Party or its Affiliates. The Project Manager must approve actual participation of any individual nominated by a Participating Party for participation on the Project Team, but such approval shall not be unreasonably withheld. In selecting team members, the Project Manager will give Participating Party or Affiliate employees preference over contractors, and contractors may not displace qualified employees as a team member. Contractors may not be placed in supervisory positions on a Project Team unless there are no employee team members available for such supervisory positions. Each Participating Party has the right, but not the obligation, to have percentage representation on the Project Team up to its respective Participating Interest Share of the total number of personnel to be assigned to the Project Team. In the event any Participating Party nominates less than its full Participating Interest Share of Project Team members or later withdraws some or all of its members, the number of Project

Integrated Project Team

Exhibit A
Page 203

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054530

Team members that the other Participating Parties are entitled to have on the Project Team will be increased proportionately.

The Project Team may utilize the resources of the Participating Parties, their Affiliates, and contractors to carry out the work of the Project Team.

Subject to Article 12.2 of the Operating Agreement, the Project Manager will determine the make-up and size of the Project Team and the qualifications of its members and must notify the Participating Parties of the initial positions that may be available on the Project Team within sixty (60) days of the formation of the Project Team. The size of the Project Team may be no larger than is reasonably necessary to accomplish the Project Team's tasks. If the Project Manager decides that an Project Team member should be replaced, the Participating Party whose representative is to be replaced must make arrangements to effect a reassignment of the member in question. That Participating Party is then entitled to nominate another person to fill the vacant position on the Project Team.

2.2     Status of Project Team Participants

Each employee Project Team member (i.e., a Project Team member who is an employee of a Participating Party or its Affiliate) remains an employee of its respective company, and each company remains responsible for their employee's salaries and benefits, as well as maintaining worker's compensation insurance on their employees. Accordingly, each employer company will continue to administer the compensation, benefits, allowances, and careers of its employees on the Project Team. However, employee Project Team members will receive team assignments and general supervision from the Project Manager in connection with their day to day work. An individual selected to the Project Team will, insofar as possible, and consistent with the needs of the individual's employer, serve on the Project Team for the duration of the Project Team, unless such individual is designated a temporary Project Team member by his or her employer or the Project Manager. Notwithstanding the above, if an Project Team member is designated a temporary Project Team member by his or her employer or the Project Manager, such Project Team member will leave the Project Team upon completion of the specific task or phase of the Project Team's work to which such member was assigned by the Project Manager.

In the event a contractor of a Participating Party or its Affiliate is an Project Team member, such Participating Party or Affiliate will remain responsible for and will administer such contractor's compensation, unless agreed otherwise by the Project Manager. The Project Manager will administer the compensation of contractors whose services are secured directly by the Project Team.

2.3     Project Manager

Integrated Project Team

Exhibit A
Page 204

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054531

The Project Team will operate under the direction of the Project Manager, who will be selected by the Operator. The Operator is responsible for ensuring that the Project Manager acts in accordance with this Exhibit and the Operating Agreement.

The Project Manager is responsible for:

a. the overall management and supervision of the Project Team work, and

b. making team assignments, and

c. determining the time and place for Project Team meetings and the location or locations where Project Team activities and work will be conducted, and

d. selecting team members from the nominations provided by the Participating Parties, and

e. determining the need for and selecting contractors to perform Integrated Project Team activities, and

f. acquiring supplies and services needed by the Project Team, and

g. instituting procedures for maintaining Confidential Information, and

h. making presentations on the work of the Project Team and associated documentation at meetings conducted under the Operating Agreement.

## 2.4 <u>Withdrawal From Project Team</u>

Any Participating Party may withdraw one or more of its representatives from the Project Team at any time; however, such a withdrawal will not cause the Project Team to terminate or otherwise affect the obligations of such withdrawing Participating Party to pay its share of the costs and expenses associated with the approved Project Team AFE and any approved supplemental AFE's thereto. Likewise, the withdrawal of one or more representatives by a Participating Party will not affect the other rights and obligations of such Participating Party under this Exhibit. In the event a Participating Party withdraws one or more representatives from a Project Team, then the Participating Parties must follow the provisions of Sub Section 2.1 for the selection of substitute Project Team members.

If all but one of the Participating Parties withdraw all their employees or contractors from participation in the Project Team, then at its sole option, the

Integrated Project Team

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054532

remaining Participating Party may either (1) allow the Project Team to continue to work under the approved Project Team AFE, and any approved supplemental AFE's thereto, with all Participating Parties remaining liable for and paying their share of Project Team costs under such AFE's or (2) terminate the Project Team. Upon such termination of the Project Team under (2) above; any further work on the Development System will be conducted pursuant to the terms of the Operating Agreement.  Any expenditure under an approved Project Team AFE, and any approved supplemental AFE's thereto, which have not been accounted for at the time the Project Team terminates will continue to be accounted for under the Project Team provisions of Exhibit "C" (Accounting Procedure).

### SECTION 3.0
### WORK SCOPE AND DURATION OF INTEGRATED PROJECT TEAM

3.1   Work Scope of the Project Team
The primary objective for forming any Project Team is to pool the talents of the Parties in preparing the Development Plan and provide each Participating Party the opportunity to have input regarding the planning, design, engineering, fabrication, transportation and installation of any Development System.  The proposal of the Development Plan (including the Initial Production System) and commitment of funds thereto shall be handled in accordance with Article 12 of the Operating Agreement.  For any project undertaken by the Project Team, the Operator shall provide: (1) a memo describing the anticipated scope of the team's work to be undertaken in reasonable detail such that the Non-Operator may make an informed decision concerning its participation in the Project Team; (2) a memo describing the type and number of staff required to complete the assignment, and (3) an AFE itemizing the Operator's estimate of the Cost of the Project Team, (4) the proposed locations where the Project Team representatives will serve, and (5) the estimated duration of the Project Team.

3.2   Reports by the Project Team
The Project Team shall review the progress of  its work with all Participating Parties at least quarterly, and present the results of any studies or planning upon their conclusion.  The time and place of the meetings of the Project Team and location for conducting Project Team activities shall be determined by the Project Manager.

3.3   Duration of the Project Team
The Project Team shall remain in place until (1) the team has completed the work described in the Project Team AFE and scoping memo, or (2) the planning, design, construction, installation and start-up phase of any Development System has been completed, or (3) Project Team work has

Integrated Project Team

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054533

been terminated by approval of the Participating Parties as a General Matter, whichever is the earlier event. Upon dissolution of the Project Team, the Operator shall conduct any further work required for the installation of the Development System. Any AFE in progress at the time of the Project Team's dissolution shall continue to be accounted for under the Project Team provisions of Exhibit "C", except as otherwise agreed.

3.4   Re-instatement of Project Team

The Project Team created for planning and designing the Initial Production System may be reinstated by the Operator to assist in further work on the Initial Production System or planning and designing any Subsequent Production System. Any reinstated Project Team shall utilize the procedures of this Exhibit, with any applicable time periods in Article 12 of the Operating Agreement running from the date of reinstatement of the Project Team.

## SECTION 4.0
## COSTS AND ADMINISTATRATION OF THE INTEGRATED PROJECT TEAM

4.1   Integrated Project Team Costs

The costs and expenses for the Project Team shall be charged to the Joint Account pursuant to Exhibit "C", (Accounting Procedures) of the Operating Agreement. Each Participating Party in the Project Team shall be responsible for its Participating Interest Share of the Project Team expenses, regardless of its level of employee or contractor participation on the Project Team.

4.1.1   Employee Charges: Each Participating Party in an Project Team shall recover the Costs of employees, including expatriates, assigned to or working under the direction of the Project Team through direct charges to the Joint Account under Exhibit "C" (Accounting Procedure) of the Operating Agreement.

4.1.2   Contractors and Consultants: The Project Manager may retain the services of such consultants and contractors as is reasonably necessary to carry out the studies and tasks assigned to the Project Team. Costs of consultants and contractors assigned to the Project Team shall be recovered by Operator through direct charges to the Joint Account under Exhibit "C" (Accounting Procedure) of the Operating Agreement. So long as the Costs of the consultant or contractor are within the scope of an approved AFE, the Project Manager's retention of consultants shall not require additional approval by the Participating Parties.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054534

**SECTION 5**
**CONFIDENTIALITY**

5.1     Obligation of Confidentiality and Restrictions on Use

Each Participating Party must maintain as confidential all Confidential Information and not disclose to any third party or use such Confidential Information, except as expressly provided hereunder, for a confidentiality period commencing on the date of execution of the Operating Agreement and extending through the earlier of (a) two (2) years following the termination of the Project team work in accordance with the terms of the Operating Agreement or (b) one (1) year following the date the Operating Agreement expires by its terms.   After expiration of the confidentiality period, the disclosing Participating Party's obligations of confidentiality and restrictions on use regarding the Confidential Information with be determined in accordance with Sub-Sections 6.4, 6.5 and 6.6.   Each Participating Party must treat the disclosure of the Confidential Information in the same manner as it treats its own similar data and information.

5.2     Exceptions

Any Participating Party may disclose Confidential Information to third parties if such disclosure is either subject to an exception to the confidentiality obligation or ceases to be confidential in nature as listed below:

a.      The provisions of Sub-Section 5.1 do not apply to Confidential Information that:

    1.      was in the public knowledge or literature at the time of development or receipt hereunder, or

    2.      was already in the receiving Participating Party's (or its Affiliate's) possession without obligation of confidentiality, at the time of development or receipt by the receiving Participating Party.

b.      The provisions of Sub-Section 5.1 cease to apply to Confidential Information that:

    1.      becomes part of the public knowledge subsequent to its development or receipt hereunder and without fault of the receiving Participating Party, or

    2.      is disclosed to the receiving Participating Party without obligation of     confidentiality by a third party having legal right to do so, or

    3.      is independently developed by or for the receiving Participating Party, or

Integrated Project Team

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054535

4.   is required to be disclosed pursuant to applicable law or order of a court of competent jurisdiction, provided the disclosing Participating Party gives the other Participating Parties notice of such disclosure prior to such disclosure.

## SECTION 6
## CONFIDENTIAL INFORMATION

6.1   Right to Receive Project Technology and Information
Each Participating Party has the right to receive all Project Technology and Information, whether such information is developed by a Participating Party, an Affiliate, or by a third party.

6.2   Right to Use Confidential Information
Subject to the obligation of confidentiality of Section 5 and the obligation of Sub-Sections 6.5 and 6.6, and subject to the patent rights of the Participating Parties, each Participating Party may use all Confidential Information, without otherwise accounting to any other Participating Party, including, subject to Sub-Section 6.3.d., use by or for a joint venture or production sharing arrangement in which a Participating Party has an ownership interest.

6.3   Right to Disclose
Subject to the foregoing, each Participating Party may disclose Confidential Information during the period of confidentiality set forth in Sub-Section 5.1 upon the following conditions:

a.   Each Participating Party may disclose and extend the rights to use Confidential Information to each of its Affiliates who accepts and agrees in writing to obligations of confidentiality and restrictions on use at least as restrictive as those set forth in this Exhibit. The rights to use and disclose provided herein are subject to whatever patents may apply.

b.   Each Participating Party and its Affiliates may disclose Confidential Information to contractors who agree in writing to hold such Confidential Information in confidence, in terms at least as restrictive as those set forth herein, and to use it only for the benefit of a Participating Party or its Affiliates.

c.   Each Participating Party and its Affiliates may disclose Confidential Information to governmental agencies and insurance companies as such Participating Parties or its Affiliates deem necessary, either in confidence or not in confidence if the Participating Party or its Affiliates has made a

Page 8 of 14

HIGHLY CONFIDENTIAL

reasonable but unsuccessful attempt to obtain a confidentiality agreement.

d.   Each Participating Party and its Affiliates may disclose Confidential Information to other members of joint ventures or production sharing arrangements, outside the Contract Area, in which the Participating Party or its Affiliates has an ownership interest, provided the other members agree in writing to hold the Confidential Information in confidence, in terms at least as restrictive as those set forth herein, and to use it only for the benefit of that joint venture or production sharing arrangement.

e.   Each Participating Party may disclose Confidential Information that is specifically related to the Contract Area to any potential purchaser of all or any portion of such Participating Party's interest therein, provided that such potential purchaser agrees in writing to hold the Confidential Information in confidence, in terms at least as restrictive as those set forth herein, and to use it only for the purposes for which it was disclosed.

f.   Each Participating Party may use Confidential Information as reasonably necessary or appropriate to file patent applications pursuant to Section 7 below. Prompt notice will be provided to the other Participating Parties of any such filing.

g.   With unanimous approval, the Participating Parties may authorize the early publication, or release from confidentiality, of any Project Technology and Information covered by this Agreement.

6.4   Rights under Copyright and Following Expiration of Confidentiality
Following the expiration of the period of confidentiality set forth in Sub-Section 5.1 above, each Participating Party may freely use and disclose the Confidential Information identified in Sub-Section 6.2 without accounting to any other Participating Party, subject only to whatever patent rights may apply to the technology and, where applicable, to the obligations of Sub-Sections 6.5 and 6.6. Subject to the obligations of confidentiality set forth in this Exhibit, each Participating Party has the right to copy, display, publish, distribute and prepare derivative works of all documents, drawings or other writings or materials created or conveyed under this Exhibit, including the rights to license, sell or otherwise transfer such rights.

6.5   Notice of Third Party Limitations

6.5.1   Notwithstanding the provisions of Sub-Sections 6.2, 6.3 and 6.4

Integrated Project Team

Exhibit A
Page 210

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054537

the Participating Parties acknowledge that Background Technology and Information may have been received from third parties under pre-existing restrictions, e.g., that the Participating Party may disclose the third party source technology or information to a co-venturer in a joint venture only under obligations of confidentiality and under the restriction that the co-venturer use the information only in connection with the joint venture. Each Participating Party must identify, in writing, any such restrictions in effect and secure the receiving Participating Party's acknowledgment prior to transmittal of such third party source technology or information. The receiving Participating Party's acknowledgement constitutes its acceptance of such obligations and restriction.

6.5.2    The Project Manager and each Participating Party soliciting work from contractors or from Affiliates must use its best efforts to secure contract terms with such contractor or Affiliate that contain applicable confidentiality terms and that support the rights of the Participating Parties consistent with the provisions of this Exhibit. Unless otherwise agreed to in writing by all Participating Parties, any contract with a contractor or an Affiliate for the acquisition or development of Project Technology and Information must, with respect to the use, disclosure and intellectual property rights as to such Project Technology and Information, grant the same rights to and impose the same obligations on each Participating Party. Furthermore, if the use, disclosure, and intellectual property rights provisions of any contract related to the acquisition or development of Project Technology and Information are inconsistent with the use, disclosure, and intellectual property rights provisions of this Exhibit, those provisions must be submitted to each Participating Party in substantially final form for review and comment not less than thirty (30) days prior to contract execution.

6.6    <u>Software</u>
During the duration of the Project Team, a Participating Party or its Affiliate may authorize the other Participating Parties to use computer software proprietary to the authorizing Participating Party.   Such proprietary software is not Project Technology and Information.  Any authorization to use such proprietary software is not a license of any rights as to the proprietary software, which rights are retained by the authorizing Participating Party.   Use of any such proprietary software is only for the purposes and duration of the Project Team; each Participating Party must destroy or return to the authorizing Participating Party all copies of any such proprietary software no later than the completion date of the Project Team's activities.   Computer software and programs that are not proprietary to one of the Participating Parties or its Affiliate, but that are developed jointly by the Project Team, are Project Technology and Information.

Integrated Project Team

Exhibit A
Page 211

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054538

6.7   <u>Identification, Declaration, and Use of Background Technology and Information</u>
Background Technology and Information must be identified and declared in writing before it is submitted to the Project Team.  The decision to identify, declare, and submit Background Technology and Information to the Project Team is at the sole and absolute discretion of the individual Participating Party possessing such technology or Information.  A Participating Party designating data as Background Technology and Information is not subject to the confidentiality obligation of this Exhibit or the Operating Agreement as to the identified Background Technology and Information.  The Project Manager is responsible for maintaining a list describing all Background Technology and Information (and its ownership).  This list will be updated from time to time as the Participating Parties submit such Background Technology and Information.

Nothing in the Operating Agreement or this Exhibit impairs the right of any owner of Background Technology and Information to use, exchange, disclose, or otherwise freely deal with its own Background Technology and Information.

## SECTION 7
## PATENTS AND PROJECT TEAM INVENTIONS

7.1   <u>Patent Assignment with Right to License and Sub-License</u>
All inventions, whether patentable or not, that (1) are conceived by contractors of the Project Team, or conceived jointly by the Participating Parties (each including its respective Affiliates) while working on the Project Team and (2) result from work that has been charged to the Joint Account, are assigned to the Operator, who may seek patent(s) on same. The Operator hereby grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license to all such inventions and patents. Such license includes the right to make, have made, use, have used, and sell apparatus, and to use and have used methods, covered by such inventions and patents, and includes the right to grant sublicenses to such inventions and patents to any third party or Affiliate on such other
terms and conditions that such Party deems appropriate, without accounting to any other Party.

7.2   <u>Patent Assignment and License with Limited Right to Sub-License</u>
Patents on inventions not covered in Sub-Section 7.1 that (1) are conceived or first reduced to practice (actual or constructive) by a Participating Party or its Affiliate, including contractors of a Participating Party or its Affiliate, and (2) result from work that has been charged to the Joint Account, will be owned by that Participating Party. The Participating Party owning any such patent hereby grants to each other Participating Party an irrevocable, non-exclusive, worldwide, royalty-free license, under all such patents and inventions, to make, have made,

Integrated Project Team

Exhibit A
Page 212

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054539

use, have used, and sell apparatus, and to use and have used methods, for such other Participating Party's own business, including any joint venture or production sharing arrangement in which such other Participating Party has the right to extend these rights to its Affiliates, and to any joint venture or production sharing arrangement in which any such Affiliates have an ownership interest, but may not otherwise sub-license any such patent.

7.3   No Other Commitment to License or Disclose
Except as expressly set forth above, nothing in this Exhibit will be deemed to require any Participating Party or Affiliate to grant any licenses under any patents to anyone.

7.4   Patent Immunity
Each Participating Party hereby grants each other Participating Party an immunity from infringement of any patent of such Participating Party provided to the other Participating Party in connection with any and all activities conducted under the Operating Agreement, including preparation of Development Plans for the Contract Area and planning, designing, engineering, fabrication, transportation, installation, and subsequent operation of any Development System for the Contract Area. This immunity applies only to those patents of a Participating Party where such Participating Party has a right to grant such immunity without accounting to any third party.

## SECTION 8
## DISCLAIMER OR WARRANTIES; RELEASE; INDEMNITIES

8.1   DISCLAIMER OF WARRANTIES
ALL INFORMATION OR TECHNOLOGY RECEIVED BY THE PARTICIPATING PARTIES HEREUNDER IS PROVIDED ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES EITHER EXPRESS OR IMPLIED AS TO THE ACCURACY, VALIDITY OR UTILITY OF SUCH INFORMATION OR THAT IT CAN BE USED WITHOUT INFRINGING ANY THIRD PARTY PATENT, COPYRIGHT OR OTHER PROPRIETARY RIGHT. WITHOUT LIMITING THE PRECEDING, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED AND EXCLUDED FROM THIS AGREEMENT. IN NO EVENT IS A PARTICIPATING PARTY CONVEYING INFORMATION OR TECHNOLOGY LIABLE FOR ANY INCIDENTIAL, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF OR RESULTING FROM THE USE OF THE INFORMATION OR TECHNOLOGY CONVEYED UNDER THIS EXHIBIT.

8.2   Releases
Each Participating Party releases the other Participating Parties from any loss, damage, claim, suit, liability, judgement, and expense that it may incur related to

Integrated Project Team

Exhibit A
Page 213

HIGHLY CONFIDENTIAL          BP-HZN-2179MDL00054540

or in connection with its use (including use by others which it authorizes) outside of the Contract Area of any information or technology exchanged under or developed pursuant to this Exhibit.

8.3   Indemnities
Each Participating Party will defend, hold harmless, and indemnify the other Participating Parties from and against any loss, damage, claim, suit, liability, judgment, and expense including attorneys fees and other costs of litigation) related to or in connection with its use (including use by others which it authorizes) outside of the Contract Area of any information or technology exchanged under or developed pursuant to this Exhibit.

## SECTION 9
## MISCELLANEOUS

9.1   Export Controls
Each Participating Party must abide by the United States Department of Commerce regulations concerning the export or re-export of United States source technical data, or the direct product thereof, to unauthorized destinations and regulations in respect of information supplied by or on behalf of any other Participating Party hereunder.

9.2   Independent Research
Nothing herein in any way restricts or impairs the right of any Participating Party to conduct its own independent research, development or design activities even though such activities may parallel or overlap the activities provided for herein. A Participating Party conducting such independent activities has no obligation arising therefrom with respect to the use or disposition of the results thereof, including but not limited to all information and data resulting therefrom.

9.3   Assignability
A third party (not currently a Party to this Agreement) who acquires a Working Interest in the Prospect Area may join the Project Team upon the approval of the Participating Parties as a General Matter.  A new Party joining the Project Team must agree, in writing, to undertake all obligations set forth for a Party under this Exhibit. Such new party will have all rights, duties and obligations under this Exhibit regarding the use of all Confidential Information exchanged or developed prior to the date it joins the Project Team and during its participation thereunder. However, patent rights received by such new Party hereunder pursuant to Section 7.0 of this Exhibit shall be limited to patents based on developments after the date such Party joins the Project Team. In the event that a Party assigns its entire interest in the Leases, the assigning Party shall have all the rights specified in this Exhibit, including patent rights and license rights thereunder, based on developments and exchanges prior to the effective date of

Integrated Project Team

Exhibit A
Page 214

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054541

such assignment and shall continue to have all obligations and duties with respect thereto as set forth in this Exhibit relating to the confidentiality, restrictions on use, patents, indemnity, and as applicable, duties to license the other Parties.

9.4 <u>Confidential Information to a Non-Participating Party</u>
Any Party that elected not to participate in a Project Team, but that receives, upon the satisfaction of the applicable non-consent provisions of Article 16.5.3 of the Operating Agreement, Confidential Information resulting from that Project Team, is subject to all obligations and duties, and has all the rights, set forth in this Exhibit with respect to confidentiality, restrictions on use, patents, licensing and sub-licensing, indemnity, and export controls.

9.5 <u>Section and Sub-Section References</u>
All references in this Exhibit to a "Section" or "Sub-Section", either in the singular or plural, mean a "Section" or "Sub-Section" of this Exhibit.

9.6 <u>Survival of Certain Provisions</u>
All provisions of this Exhibit related to the confidentiality and use of information, patents, licensing and sub-licensing, export controls, and indemnity will survive the termination of this Exhibit or the Operating Agreement or both.

9.7 <u>Development System Proposals</u>
The proposal of any Development System and commitment of funds thereto will be handled in accordance with the provisions of the Operating Agreement. The final decision on the selection of any Development System to be designed, fabricated and installed, and the election to participate in funding of that Development System, will be made in accordance with the terms and conditions of the Operating Agreement.

Integrated Project Team

Exhibit A
Page 215

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054542

EXHIBIT "H"

## DISPUTE RESOLUTION PROCEDURE

Attached to and made a part of that certain Operating Agreement dated October 1,
2009 by and between BP Exploration & Production Inc., as Operator, and MOEX
Offshore 2007 LLC, as Non-Operator

## I.    OVERVIEW

A.    *Description and Goals.*  Arbitration as used in this statement is a
procedure whereby an Arbitrator resolves any claim(s), controversy(ies) or dispute(s)
(the "Dispute") between BP Exploration & Production Inc. and MOEX Offshore 2007
LLC (hereinafter referred to singularly as "Party" and collectively as "Parties"), involving
more than $500,000.00, arising out of, relating to, or in connection with that certain
Operating Agreement effective October 1, 2009, by and between the Parties
(hereinafter "Agreement")  including the interpretation, validity, termination or breach
thereof.

(i)    *Binding.*  The arbitration process is binding on the Parties and this
arbitration is intended to be a final resolution of any Dispute between the Parties
as described above, to the same extent as a final judgment of a court of
competent jurisdiction.  Each Party hereby expressly covenants that it shall not
resort to court remedies except as provided for herein, and for preliminary relief
in aid of arbitration.

(ii)    *Violation.*  A Party shall pay all legal and court costs incurred by the
other Party in connection with the enforcement of the final resolution of any
Dispute under this Dispute Resolution Procedure, if such other Party is
successful in its enforcement efforts.   Suits, actions or proceedings in
connection with such enforcement shall be instituted in a federal court of proper
jurisdiction and pursuant to Title IX of the United States Code.  Each Party
waives any option or objection which it may now or thereafter have to the laying
of the venue in any such suit, action or proceeding and irrevocably submits to

Page 1 of 9

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054543

the jurisdiction of such court in any such suit, action or proceeding. If such court after the institution of an action hereunder should decline jurisdiction, then the action may be commenced in any court, including state courts having jurisdiction.

B.   *Duty to Negotiate.*   The Parties shall inform one another promptly following the occurrence or discovery of any item or event, which might reasonably be expected to result in a Dispute in connection with the Agreement. The Parties will attempt to resolve satisfactorily any such matters.

C.   *Notice of Unresolved Dispute.*   Should a Dispute arise which the Parties cannot resolve satisfactorily, either Party may deliver to the other Party a written notice of the Dispute with supporting documentation as to the circumstances leading to the Dispute (the "Notice of Dispute"). Unless otherwise provided herein, all such notices shall be served in accordance with the provisions of the Agreement. The Parties, within ten (10) Business Days from delivery of a Notice of Dispute, shall then each appoint a management representative ("Management Representative") who has no prior direct involvement with the subject matter of the Notice of Dispute and who is duly authorized to investigate, negotiate and settle the Dispute. For a period not to exceed ninety (90) days following the appointment of the Management Representatives, the Management Representatives for each Party shall meet and confer as often as they deem reasonably necessary, in good faith negotiations, to try to resolve the Dispute amicably.

II.   **ARBITRATION PROCESS**

A.   *Arbitration.*   If the Parties are unable to resolve the Dispute within ninety (90) days following the end of the negotiation period between the Management Representatives described in I.C., or such additional time as may be mutually agreed upon, the matter shall be submitted to arbitration in accordance with the procedures set forth below.

Exhibit A
Page 217

HIGHLY CONFIDENTIAL   BP-HZN-2179MDL00054544

B.    *Initiation of Arbitration.*    Either Party may initiate the arbitration by delivering to the other a Notice of Intention to Arbitrate.

C.    *Governing Procedures.*    Except as expressly provided herein, the arbitration shall be conducted in accordance with procedures that are mutually acceptable to the Parties, including limited depositionless discovery and the presentation of live witness testimony, subject to cross examination, at the arbitration hearing.

> (i)    *Governing Law.*    The Arbitrator shall apply the governing substantive law of the state chosen by the Parties to the Agreement.
>
> (ii)    *Location.*    The arbitration hearing shall be conducted in a location mutually agreeable to the Parties to the arbitration.

D.    *Arbitrator.*    There shall be a panel of three (3) Arbitrators, each of whom must be experienced in the oil and gas industry and knowledgeable about or specializing in the subject matter involved in the Dispute the ("Panel"). The Panel shall be chosen as follows:  within thirty (30) days after the delivery of a Notice of Intention to Arbitrate, each Party shall select one person to act as one of the three arbitrators. The two arbitrators selected by the Parties shall select a third arbitrator within thirty (30) days of their appointment. If the arbitrators selected by the Parties are unable or fail to agree on a third arbitrator within the second thirty (30) day period, or any mutually agreed upon extended period, then the Parties shall, within three (3) business days after expiration of the second thirty (30) day period or extended period, apply to the American Arbitration Association for the appointment of a third Arbitrator for or on behalf of the Parties. In such case the Arbitrator appointed by the American Arbitration Association shall meet the criteria set forth in this Section II.D. The Parties intend the involvement of the American Arbitration Association to be limited to appointing a third arbitrator in the event the arbitrators selected by the Parties are unable to do so; the Parties do not intend for the American Arbitration Association to manage the arbitration

Exhibit A
Page 218

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054545

or to participate further in the arbitration process, unless the Parties mutually agree to further participation by the Association.

(i)     *Conflicts.*   Any Arbitrator, prior to his or her appointment, shall disclose to the Parties all actual or perceived conflicts of interest and business relationships involving the Dispute or the Parties, including but not limited to, any professional or social relationships, present or past, with any Party (or its affiliates), including any Party's (or its affiliates) directors, officers, and supervisory personnel and counsel.   If an Arbitrator is appointed by the American Arbitration Association pursuant to Section II.D, any Party may challenge in writing the appointment of the Arbitrator for lack of independence, partiality, or any other cause likely to impair such Arbitrator's ability to effectively participate in the proceedings or render a fair and equitable decision.   Where such challenge is made, the American Arbitration Association shall uphold or dismiss the challenge.  In the event a challenge is upheld, the Arbitrator shall be replaced, and the replacement will be selected in the same manner as the original Arbitrator was selected.  If an Arbitrator resigns or becomes unable or unwilling to continue to serve as an Arbitrator for any reason, a replacement shall be selected in the same manner as that Arbitrator was chosen.

(ii)     *Multi-Party Arbitrations.*      When more than two Parties are involved in the Dispute ("Multi-Party Arbitration"), all Parties identifying as "Claimants" (those delivering a Notice of Intention to Arbitration under Section II.B.) shall select a single Arbitrator and all those Parties identifying as "Respondents" (those responding to a Notice of Intention to Arbitration delivered under Section II.B.) shall select a single Arbitrator.   The Arbitrator selected by the Claimant(s) and the Arbitrator selected by the Respondent(s) shall select the third Arbitrator pursuant to Section II.D. If Claimants or Respondents cannot agree as to the choice of their Arbitrator within the said thirty (30) days, they may, within three (3) business days after written notice to

HIGHLY CONFIDENTIAL                                        BP-HZN-2179MDL00054546

the other Parties, apply to the American Arbitration Association for the appointment of an Arbitrator as provided in Section II.D.

(iii)  *Management of the Arbitration.*  The Panel shall actively manage the proceedings so as to make the proceedings expeditious, economical, and less burdensome and adversarial than litigation.

E.  *Confidentiality.*  All documents, briefs, testimony, transcripts, as well as all Arbitrator decisions shall be confidential. Likewise, the views, suggestions, admissions, proposals, and other information exchanged in the arbitration are confidential and are inadmissible in any other proceeding.

F.  *Costs and Expenses.*  The Parties shall each pay all costs, fees and expenses incurred by their Party-selected Arbitrator and shall share equally all costs, fees and expenses incurred by the third Arbitrator and any other incidental costs incurred in connection with the arbitration proceeding. Each Party is solely responsible for its own attorneys' fees and expenses incurred in the Arbitration.

G.  *Submissions.*Within thirty (30) days after the selection of the Panel, each Party shall provide the Panel with a short and plain submission defining the issues to be decided and the nature of the relief that the Panel may award (the "Submission"). This Submission shall explicitly authorize the Panel to decide these issues. If the Parties are unable to reach consensus as to the issues involved, the Panel in its sole discretion shall frame the issues through a reasonable procedure. The Panel will render decisions on the specific issues established and shall fashion any remedy that the Panel deems appropriate so long as that remedy is consistent with the Parties' Submissions hereunder. Any money judgment entered by the Panel shall be payable in U.S. dollars.

H.  *Transcriptions.*  The presentations and argument at the arbitration hearing will be transcribed for the benefit of the Panel and the Parties.

Exhibit A
Page 220

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054547

I.      *Discovery.*   Commencing thirty (30) days after the receipt of the opposing Party's Submission, each Party may serve upon the other Party up to ten (10) requests for the production of documents, including sub-parts.  The requests shall be made in good faith and not be served for the purpose of delay or harassment.  Each request shall describe the type of document(s) sought and each request shall be limited to documents that are relevant to a claim or defense in the Arbitration proceeding, or reasonably calculated to lead to the discovery of admissible evidence.  The requests need not be served all at once but may be served in stages.

(i)      The Party served with a request under this provision shall provide the adverse Party with copies of the requested documents, and identify the request to which each document is responsive, within twenty (20) business days of the receipt of the request, or such longer time as may be agreed to by the Parties or set by the Panel.  If the Party served with a request objects to the production of any of the requested documents, it shall nevertheless produce within the permitted time all documents responsive to any request that is not objected to by that Party.

(ii)      A Party that is served with a request may challenge the propriety of the request within the time permitted for response by a short written objection, which shall be forwarded to the adverse Party and to the Panel.  The adverse Party shall submit its response, if any, to the objecting Party and the Panel within five (5) business days of receipt of the objection.  The Panel shall consider the request, the objection, and the response, if any, and decide whether the production shall be allowed or denied or whether the request should be modified within ten (10) days after the submission of the adverse Party's response.

J.      *Presentations.*      No later than twenty-five (25) days prior to the date that the arbitration hearing is to begin, each Party will submit to the Panel and serve on

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054548

the other Party a written position statement. The original statement of each Party shall not exceed thirty-five (35) typewritten letter-size pages. Each Party shall have the right to submit reply statements no later than fifteen (15) days prior to the date of the arbitration hearing. Such reply statements shall not exceed twenty (20) typewritten letter-size pages.

       (i)     All documents and affidavits that a Party intends to use during its presentation at the arbitration hearing shall be submitted to the Panel and served on the other Party with the position and reply statements. All demonstrative exhibits and a list of the witnesses a Party anticipates calling to present live testimony at the arbitration hearing, along with a brief summary of the witnesses expected testimony, shall be exchanged no later than ten (10) days in advance of the presentations.

       (ii)    The Panel shall determine a reasonable time and location for the presentations.

       (iii)   Each Party shall make an oral and/or documentary presentation of its position at the arbitration hearing in such order and in accordance with the time schedule established by the Panel. The Panel may question each of the presenters and/or witnesses during or following any and all presentations.

     K.    *Decision and Award.*    The Panel shall promptly (within sixty (60) days of conclusion of the presentations at the arbitration hearing or such longer period as the Parties may mutually agree) determine the claims of the Parties and render a final decision in writing. The decision shall state with specificity the findings of fact and conclusions of law on which it rests. The decision rendered by the Panel may be enforced in accordance with Section I.A.(ii), above, and may only be appealed pursuant to Section II. L. below. The decision shall be served upon each of the Parties by facsimile transmission and by overnight mail.

Exhibit A
Page 222

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054549

(i)      If applicable law allows pre-award interest, the Panel may, in its discretion, grant pre-award interest and, if so, such interest may be at commercial rates in the state chosen by the Parties pursuant to Section II.C.(i) during the relevant period. The Panel shall not award consequential, punitive, indirect or other non-compensatory damages.

(ii)      Within ten (10) days of receipt of the award either Party may submit a Motion to Modify the award. A response to the Motion to Modify shall be due within fifteen (15) days thereafter, and the Panel shall rule thereon within fifteen (15) days after receipt of the response.

(iii)      Judgment on the award may be entered in the United States District Court for the federal district within which the arbitration hearing was held at any time within one year after the decision is made. If such court after the institution of an action hereunder should decline jurisdiction, then the action may be commenced in any court, including state courts having jurisdiction.

L.      *Vacation of Award and Appeal.*    The Parties agree that an award made by the Panel may only be vacated or confirmed by a federal court of proper jurisdiction as established above. If such court after the institution of an action hereunder should decline jurisdiction, then the action may be commenced in any court, including state courts having jurisdiction. The Parties agree that an award made by the Panel may be vacated by a court only if the award was procured by or through fraud or corruption. An appeal from an order or judgment pursuant to this Section II.L. shall be instituted in a federal court of proper jurisdiction. If such court after the institution of an action hereunder should decline jurisdiction, then the action may be commenced in any court, including state courts having jurisdiction.    Each Party waives any option or objection which it may now or thereafter have to the laying of the venue of any such suit, action or proceeding and irrevocably submits to the jurisdiction of the court in any such suit, action or proceeding.    Each Party agrees that a remedy at law for a violation of this

HIGHLY CONFIDENTIAL                                                              BP-HZN-2179MDL00054550

Section II.L. may not be adequate and therefore agrees that the remedies of specific performance and injunctive relief shall be available in the event of any violation in addition to any other right or remedy at law or in equity to which any Party may be entitled.

M.     *Res Judicata.* To the extent permitted by law, any decision of the Panel shall not be *res judicata* or have any binding effect in any unrelated litigation or arbitration where any Party to this Agreement may also be a party.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054551

EXHIBIT "I"

Well Data Trade and Confidentiality Agreement

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

This Agreement ("Agreement") is made effective _____, 200_ (the "Effective Date") between BP Exploration & Production Inc. ("BP") and _____ (collectively "the _____ Parties") and _____ ("_____"), and _____ (collectively "the _____ Parties"). In this Agreement, the _____ Parties and the _____ Parties may be sometimes referred to individually as a "Party" or collectively as the "Parties."

Recitals

The _____ Parties are the owners of the well data from the *Operator's Name*, *Protraction Area Name Block #*, OCS-G _____ No. 1 Well, identified on Exhibit "A" attached to and made a part of this Agreement (the "*Insert Prospect Name* Well Data").

The _____ Parties are the owners of the well data from the *Operator's Name*, *Protraction Area Name Block #*, OCS-G _____ No. _, Well(s), identified on Exhibit "B" attached to and made a part of this Agreement (the "*Insert Prospect Name* Well Data").

The Parties have agreed to exchange all of the *Insert Prospect Name* Well Data for all of the *Insert Prospect Name* Well Data, unless otherwise specified in this agreement.

The Parties desire, by their execution of this Agreement, to set forth the terms and provisions of the well data exchange, and further desire to set forth the Parties' confidentiality obligations in regard to the well data received by each Party.

Accordingly, in consideration of the mutual advantages and benefits accruing to the Parties, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

ARTICLE I

Definitions

Affiliate:

"Affiliate," means any corporation, company, limited liability company, partnership, or other legal entity that:
- is owned or controlled by a Party, or
- is owned or controlled by any other corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party, or
- owns or controls a Party, or
- is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

Page 1 of 16

HIGHLY CONFIDENTIAL

For the purposes of this definition, ownership or control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity.

Confidential Information:

"Confidential Information" means (i) as to the _____ Parties, the *Insert Prospect Name* Well Data and any copies and reproductions thereof, and (ii) as to the _____ Parties, the *Insert Prospect Name* Well Data and any copies and reproductions thereof.

Consultant:

"Consultant" means an individual, corporation, company, limited liability company, partnership, financial analyst/institution, auditor or other legal entity that is engaged by a Party to evaluate, interpret, reprocess or make other technical studies of the well data received by that Party under the provisions of this Agreement, but shall not include one who is primarily engaged in the business of exploring for oil, gas, or other hydrocarbons.

Disclose or Disclosure:

"Disclose" or "Disclosure" means to display, show, reveal, or give access to, or permit to be viewed or accessed, the Confidential Information or any part thereof.

Transfer:

"Transfer" means a sale, assignment, trade, loan, conveyance, exchange, encumbrance, license, or other disposition of the Confidential Information.

ARTICLE 2

(Insert Prospect Name) Well Data

2.1    Grant of the *(Insert Prospect Name)* Well Data Use to the _____ Parties
       The _____ Parties grant to the _____ Parties the non-exclusive, non-transferable (except as provided herein), perpetual right to use the _____ Well Data under the terms and conditions of this Agreement.

2.2    *(Insert Prospect Name)* Well Data Ownership
       The *Insert Prospect Name* Parties represent and warrant that they hold full ownership rights in and to the _____ Well Data. The _____ Well Data is proprietary to the _____ Parties and the _____ Parties maintain all trade secret and copyright interests in such data. Except as provided herein, the _____ Parties retain the exclusive right to Disclose or Transfer the _____ Well Data to other parties at any time and under whatever terms and conditions they consider acceptable, subject to the terms of the joint operating agreement between the _____ Parties.

2.3    The _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer
       The _____ Parties agree to treat the _____ Well Data, and any copies and reproductions thereof, as confidential, agree to use the _____ Well Data only for their internal business purposes and the internal business purposes of their Affiliates, and agree not to Disclose or Transfer the _____ Well Data, except as specifically permitted under this Agreement and shall exercise the same degree of care to safeguard the _____ Well Data as they would for their own Confidential Information of a similar nature.

Page 2 of 16

HIGHLY CONFIDENTIAL                                                        BP-HZN-2179MDL00054553

2.4     Exceptions to the            Parties' Obligation of Confidentiality and Restriction on
                                     Disclosure and Transfer

A.      The _____ Parties, or each of them, may Disclose or Transfer the _____ Well Data to
        their Affiliate(s) provided that such Affiliate(s) agrees to the obligations of confidentiality and
        restrictions on Disclosure or Transfer set forth in this Agreement.

B.      The _____ Parties, or each of them, may Disclose the _____ Well Data, including
        providing copies of the _____ Well Data, to a Consultant retained by such Party ("the Disclosing
        *Insert Prospect Name* Party") to evaluate, reprocess, or interpret the _____ Well Data, provided
        that before any such Disclosure occurs, the Consultant must agree in writing that: (1) any evaluation,
        reprocessing or interpretation of the _____ Well Data is for the sole benefit of the Disclosing
        *Insert Prospect Name* Party, or its Affiliate, making the Disclosure, (2) the _____ Well Data will
        be maintained in accordance with Section 2.3 above and will not be Disclosed to any third party
        without the prior written permission of the _____ Parties, and (3) upon completion of its work, all
        copies of the _____ Well Data will be returned to the Disclosing _____ Party, or its
        Affiliate, making the Disclosure.

C.      The _____ Parties' obligation of confidentiality and restriction on Disclosure does not apply
        to the extent any portion of the _____ Well Data: (1) comes legally into the possession of the
        _____ Parties, or any of them, or the possession of an Affiliate, independent of this Agreement,
        or is legally divulged to the _____ Parties, or any of them, or an Affiliate, by a third party without
        limitation on disclosure, or (2) becomes part of the public domain through no fault or neglect of the
        _____ Parties, or any of them, or an Affiliate, or (3) must be disclosed to third parties under
        requirement of law, including, but not limited to, the regulations of the Minerals Management Service
        ("MMS") of the Department of Interior. In the event the _____ Parties are required by any rule,
        law or court order to disclose _____ Well Data, the _____ Parties shall immediately notify
        the _____ Parties and make good faith efforts to cooperate in the _____ Parties' efforts to
        obtain any injunctive or protective orders that the _____ Parties may unilaterally deem desirable
        or necessary.

2.5     Responsibility for Unauthorized Disclosure or Transfer
        The _____ Parties shall be responsible for ensuring that all persons to whom it Discloses or
        Transfers the _____ Well Data keep such Well Data confidential and not Disclose or
        Transfer such Well Data to any unauthorized person, and comply with the use restrictions set
        forth in this Agreement. No _____ Party shall be liable for any breach of this Agreement
        by any other _____ Party, and the _____ Parties agree to hold all such non-
        breaching _____ Party harmless for any breach of this Agreement by a breaching
        _____ Party.

2.6     Paleo. Samples and Preparation
        The _____ Parties agree to make reasonably available to the _____ Parties raw cutting
        samples for all depths collected in the respective borehole(s) corresponding to the _____
        Well Data. Raw cuttings should be in quantities sufficient to conduct standard preparations for
        foraminifera and nannofossil analyses. In the event that the quantity of raw cuttings are
        insufficient to conduct standard paleo analyses, the _____ Parties are each entitled to

Page 3 of 16

HIGHLY CONFIDENTIAL                                               BP-HZN-2179MDL00054554

borrow the previously prepared foraminifera wash and nannofossil slides used for the _____ Parties' paleontological analyses. After the _____ Parties have completed the biostratigraphic analyses, the _____ Parties each agree to return all previously prepared foraminifera wash and nannofossil slide materials that were borrowed. Any unused, unprocessed raw materials provided to any of the _____ Parties will be returned after sample preparation is complete. Materials and residues resulting from sample processing (foram wash, nanno slurries, etc.) will become the property of the _____ Parties. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

### 2.7    Summary Reports

The _____ Parties agree to provide original paleontologic data in digital format, where possible, and to make reasonably available to the _____ Parties paleontological and biostratigraphic interpretations equivalent to or more detailed than what is provided to the MMS. The interpretations provided by the _____ Parties will be in the form of a summary of foraminiferal and nannofossil species events or "tops" and paleoenvironmental interpretations. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

### 2.8   Conventional Core

The _____ Parties agree to make reasonably available to the _____ Parties all conventional core data taken from all depths in the wellbore(s) which is part of the _____ Well Data. The _____ Parties shall be allowed to look at the conventional core photographs, as well as, physically inspect the conventional core at _____ Labs. The _____ Parties, individually, shall be allowed up to three physical inspection(s) of the conventional core within a period of one year from the date on which the last Party has executed this Agreement. Any costs associated with viewing the conventional core shall be at the sole cost of the viewing company. The _____ Parties shall also be allowed access to thin section samples made from conventional core and rotary cores, as well as petrographic (point count) data derived from the thin sections, and scanning electron microscopy (SEM) and X-Ray diffraction (XRD) data.

(Optional)

### 2.9    Data Being Withheld From *Prospect Name/Prospect Name* Trade

It is understood and agreed to between the _____ Parties and the _____ Parties that the Conventional Core data and the Palynostratigraphic Analysis from the *Insert Prospect Name* Well will not be made a part of this data exchange.

## ARTICLE 3

### (Insert Prospect Name) Well Data

Grant of the *(Insert Prospect Name)* Well Data Use to the _____ Parties
The _____ Parties grant to the _____ Parties the non-exclusive, non-transferable (except as

Page 4 of 16

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054555

provided herein), perpetual right to use the _____ Well Data under the terms and conditions of this Agreement.

3.2     *(Insert Prospect Name)* Well Data Ownership
The *Insert Prospect Name* Parties represent and warrant that they hold full ownership rights in and to the _____ Well Data. The _____ Well Data is proprietary to the _____ Parties and the _____ Parties maintain all trade secret and copyright interests in such data. Except as provided herein, the _____ Parties retain the exclusive right to Disclose or Transfer the _____ Well Data to other parties at any time and under whatever terms and conditions they consider acceptable, subject to the terms of the joint operating agreement between the _____ Parties.

3.3     The _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer
The _____ Parties agree to treat the _____ Well Data, and any copies and reproductions thereof, as confidential, agree to use the _____ Well Data only for their internal business purposes and the internal business purposes of their Affiliates, and agree not to Disclose or Transfer the _____ Well Data, except as specifically permitted under this Agreement and shall exercise the same degree of care to safeguard the _____ Well Data as they would for their own Confidential Information of a similar nature.

3.4     Exceptions to the _____ Parties' Obligation of Confidentiality and Restriction on Disclosure and Transfer

A. The _____ Parties, or each of them, may Disclose or Transfer the _____ Well Data to their Affiliate(s) provided that such Affiliate(s) agrees to the obligations of confidentiality and restrictions on Disclosure or Transfer set forth in this Agreement.

B. The _____ Parties, or each of them, may Disclose the _____ Well Data, including providing copies of such _____ Well Data, to a Consultant retained by such Party ("the Disclosing *Insert Prospect Name* Party") to evaluate, reprocess, or interpret the _____ Well Data, provided that before any such Disclosure occurs, the Consultant must agree in writing that: (1) any evaluation, reprocessing, or interpretation of the _____ Well Data is for the sole benefit of the Disclosing _____ Party, or its Affiliate, making the Disclosure, (2) the _____ Well Data will be maintained in accordance with Section 3.3 above and will not be Disclosed to any third party without the prior written permission of the _____ Parties, and (3) upon completion of its work, all copies of the _____ Well Data will be returned to the Disclosing _____ Party, or its Affiliate, making the Disclosure.

C. The _____ Parties' obligation of confidentiality and restriction on disclosure does not apply to the extent any portion of the _____ Well Data: (1) comes legally into the possession of the _____ Parties, or any of them, or the possession of an Affiliate, independent of this Agreement, or is legally divulged to the _____ Parties, or any of them, or an Affiliate, by a third party without limitation on disclosure, or (2) becomes part of the public domain through no fault or neglect of the _____ Parties, or any of them, or an Affiliate, or (3) must be disclosed to third parties under requirement of law, including, but not limited to, the regulations of the MMS. In the event the _____ Parties are required by any rule, law or court order to disclose _____ Well Data, the _____ Parties shall immediately notify the _____ Parties and make good faith efforts to cooperate in the _____ Parties' efforts to obtain any injunctive or protective orders that the

Page 5 of 16

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054556

_____ Parties may unilaterally deem desirable or necessary.

3.5   Responsibility for Unauthorized Disclosure or Transfer
The _____ Parties shall be responsible for ensuring that all persons to whom it Discloses or Transfers the _____ Well Data keep such Well Data confidential and not Disclose or Transfer such Well Data to any unauthorized person, and comply with the use restrictions set forth in this Agreement. No _____ Party shall be liable for any breach of this Agreement by any other _____ Party, and the _____ Parties agree to hold all such non-breaching _____ Party harmless for any breach of this Agreement by a breaching _____ Party.

3.6   Paleo. Samples and Preparation
The _____ Parties agree to make reasonably available to the _____ Parties raw cutting samples for all depths collected in the respective borehole(s) corresponding to the _____ Well Data. Raw cuttings should be in quantities sufficient to conduct standard preparations for foraminifera and nannofossil analyses.  In the event that the quantity of raw cuttings are insufficient to conduct standard paleo analyses, the _____ Parties are each entitled to borrow the previously prepared foraminifera wash and nannofossil slides used for the _____ Parties paleontological analyses.  After the _____ Parties have completed the biostratigraphic analyses, the _____ Parties each agree to return all previously prepared foraminifera wash and nannofossil slide materials that were borrowed.  Any unused, unprocessed raw materials provided to any of the _____ Parties will be returned after sample preparation is complete. Materials and residues resulting from sample processing (foram wash, nanno slurries, etc.) will become the property of the _____ Parties.  All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

3.7   Summary Reports
The _____ Parties agree to provide original paleontologic data in digital format, where possible, and to make reasonably available to the _____ Parties paleontological and biostratigraphic interpretations equivalent to or more detailed than what is provided to the MMS. The interpretations provided by the _____ Parties will be in the form of a summary of foraminiferal and nannofossil species events or "tops" and paleoenvironmental interpretations. All such furnished material shall be deemed to constitute a part of the _____ Well Data for all purposes.

3.8   Conventional Core
The _____ Parties agree to make reasonably available to the _____ Parties all conventional core data taken from all depths in the wellbore(s) which is part of the _____ Well Data. The _____ Parties shall be allowed to look at the conventional core photographs, as well as, physically inspect the conventional core at _____ Labs. The _____ Parties, individually, shall be allowed up to three physical inspection(s) of the conventional core within a period of one year from the date on which the last Party has executed this Agreement. Any costs associated with viewing the conventional core shall be at the sole cost of the viewing company. The _____ Parties shall also be allowed access to thin section samples made from conventional core and rotary cores, as well as petrographic (point count) data derived from the thin sections, and scanning electron microscopy (SEM) and X-Ray diffraction (XRD) data.

Page 6 of 16

HIGHLY CONFIDENTIAL                                   BP-HZN-2179MDL00054557

(Optional)

3.8   Data Being Withheld From *Prospect Name/Prospect Name* Trade

It is understood and agreed to between the _____ Parties and the _____ Parties that the Conventional Core data and the Palynostratigraphic Analysis from the _____ Well will not be made a part of this data exchange.


## ARTICLE 4
### General Provisions

4.1   Waiver of Representations and Warranties

THE _____ WELL DATA AND THE _____ WELL DATA ARE PROVIDED "AS IS" AND EACH PARTY RECEIVING SUCH DATA ACKNOWLEDGES THAT IT IS ACCEPTING THE DATA "AS IS." SUBJECT TO ARTICLES 2.2 AND 3.2 CONTAINED HEREIN, THE RESPECTIVE OWNERS OF SUCH DATA MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR DESCRIPTION IN RESPECT THERETO AND SUCH DATA IS DELIVERED HEREUNDER WITH THE EXPLICIT UNDERSTANDING AND AGREEMENT THAT ANY ACTION A PARTY MAY TAKE BASED ON SUCH DATA RECEIVED SHALL BE AT THE PARTY'S OWN RISK AND RESPONSIBILITY AND SUCH PARTY SHALL HAVE NO CLAIM AGAINST THE OWNER OF SUCH DATA AS A CONSEQUENCE THEREOF.


4.2   Grant of Well Data under Articles 2 and 3

The well data to be granted pursuant to Articles 2 and 3 is of equal value. The Parties will identify the data to be granted, to the extent that it is not already identified in this Agreement before forty-five (45) days after the date of the first delivery of data, and the Parties will complete the grant of well data so that all Parties have received all data to be granted subject to this agreement prior to the earlier of (1) one hundred and eighty (180) days after the date of the first delivery of data, or (2) the due date, including any extensions thereof, for any Parties' tax return for the year in which data is first delivered.


4.3   Delivery of Well Data

Except for [set forth reciprocal data not now available by both Parties], within _____ (__) days from the date on which the last Party hereto has executed this Agreement, the *Insert Prospect Name* Operator shall deliver to each of the _____ Parties the _____ Well Data, and the *Insert Prospect Name* Operator shall deliver to each of the _____ Parties the _____ Well Data. The contacts for purposes of arranging for delivery and receipt of the well data are set forth below:


(INSERT PROSPECT NAME) PARTIES:          (INSERTPROSPECT NAME) PARTIES:


Each of the following items:

[set forth reciprocal data not now available by both Parties]

Page 7 of 16

HIGHLY CONFIDENTIAL          BP-HZN-2179MDL00054558

shall be delivered within _____ (__) days of the day on which the _____ Operator notifies the _____ Operator in writing that it is in possession of these items in the quantities required in this Section 4.3.

### 4.4   Term

This Agreement shall remain in effect in perpetuity, however, the confidentiality obligations and disclosure restrictions of this Agreement, as to each referenced set of well data, are effective for a period of ____ (__) years from the Effective Date of this Agreement, or until the Confidential Information becomes publicly available through the MMS, whichever event occurs first. Following expiration of such confidentiality obligations and disclosure restrictions each Party may keep and use the well data received from the other Party hereunder without such obligations or restrictions.

### 4.5   Assignment

Each Party may Transfer this Agreement to an Affiliate.  Except as otherwise provided herein, this Agreement may not be Transferred.

### 4.6   Headings for Convenience

Except for the definition headings contained in Article 1, all paragraph headings used in this Agreement are for convenience only and in no way define, limit, or describe the scope or intent of this Agreement or any part thereof; nor do the paragraph headings have any legal effect other than to aid in the reasonable interpretation of this Agreement.

### 4.7   Entire Agreement

This Agreement supersedes and replaces all oral or written communication between the Parties regarding their exchange and use of the _____ Well Data and the _____ Well Data.

### 4.8   Selection of Law

This Agreement will be construed under the laws of the State of Texas, without regard to choice of law rules of any jurisdiction.

### 4.9   Drafting of Agreement and Construction

The Parties each declare that they have contributed to the drafting of this Agreement or have had it reviewed by its counsel before signing it.  Each agrees that this Agreement has been purposefully drawn and correctly reflects the understanding of the Parties regarding the subject transaction.  In the event of a dispute between the Parties concerning the application or construction of this Agreement, the Parties agree that this Agreement will be construed fairly and reasonably and neither more strongly in favor or against any Party.

### 4.10   Waiver

A.       The rights of each Party may be exercised from time to time, by the Parties individually or jointly, and singularly or in combination with other rights.

B.       No waiver of any breach of a term, provision or condition of this Agreement by one Party shall be deemed to have been made by another Party hereto unless such waiver is in writing and

Page 8 of 16

HIGHLY CONFIDENTIAL                                                      BP-HZN-2179MDL00054559

signed by an authorized representative of such other Party. The failure of a Party to insist upon the strict performance of any term, provision or condition of this Agreement shall not be construed as a waiver or relinquishment in the future of the same or any other term, provision or condition.

### 4.11    Relationship of the Parties

This Agreement is not intended to be nor shall it be construed as a joint venture, association, partnership or other form of a business organization or agency relationship between the Parties.

### 4.12    Severability

If any term or other provision of this Agreement is determined by any court or other governmental agency of competent jurisdiction to be invalid, illegal or unenforceable, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect.

### 4.13    Equitable Relief

The Parties agree that the respective owners of the _____ Well Data and the _____ Well Data may be irreparably injured by a breach of this Agreement by a Party, and that the respective owners of such data will be entitled to seek equitable relief, including injunctive relief and specific performance, in the event of any breach of the provisions of this Agreement by a Party receiving such data. Such remedies will not be deemed to be the exclusive remedies for a breach of this Agreement, but will be in addition to all other remedies available to each respective owner of such data at law or equity.

Each Party waives the right to claim or recover incidental, consequential, indirect and punitive damages against all other Parties.

### 4.14    Counterparts

This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in counterparts, all counterparts taken together will have the same effect as if all the Parties had signed the same instrument.

### 4.15    Successors and Assigns

This Agreement shall be binding upon and inure to the benefit of the Parties, their Affiliates, and their successors and permitted assigns.

This Agreement is executed by each Party on the dates indicated below, but is effective for all purposes as of the Effective Date.

(INSERT PROSPECT NAME) PARTIES               (INSERT PROSPECT NAME) PARTIES

Page 9 of 16

Exhibit A
Page 233

HIGHLY CONFIDENTIAL

COMPANY NAME

By: _____

Title: _____

Date: _____


COMPANY NAME

By: _____

Title: _____

Date: _____


COMPANY NAME

By: _____

Title: _____

Date: _____


COMPANY NAME

By: _____

Title: _____

Date: _____


Page 10 of 16

Exhibit A
Page 234

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054561

Exhibit "A"

# Attached to and made a part of that certain Well Data Trade and Confidentiality Agreement between _____ and _____ and _____ and _____, dated effective _____, 2005.

## (Insert Prospect Name) Well Data

*Insert Prospect Name* Well Data includes all data obtained from the (1) *Insert Protraction Area Name Insert Block #* #1 _____ Prospect,      *INSERT API #___*, OCSG- _____ 1, unless specifically excluded on this Exhibit "A". The data set forth below may not be a complete list of the *Insert Prospect Name* Well Data

Data Summary

| Type | Format | File name | Depth Range |
|------|--------|-----------|-------------|
| LOGS | | | |
| LWD Digits | LAS | | |
| Prints | PDS | | |
| Wireline | | | |

Page 11 of 16

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054562

| Mud Digits | LAS | | |
|---|---|---|---|
| Image | EMF/CGM | | |
| MDT | PDF | | |
| SURVEYS | | | |
| Directional Survey | TXT | | |
| VSP/Checkshot | | | |
| REPORTS | | | |
| Show Reports | PDF | | |
| Drilling Reports | PDF | | |
| PALEO | DIGITAL | | |
| DATA | | | |
| Geochemical Data | | | |

Data Summary
Insert Protraction Area Name Block # #1 _____ Prospect
Insert API #
OCSG-_____ 1

| Type | Format | File name | Depth Range |
|---|---|---|---|
| LOGS | | | |
| LWD Digits | LAS | | |
| Images | PDS | | |
| Wireline | LAS | | |

Page 12 of 16

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054563

| | | | |
|---|---|---|---|
| Images | PDF | | |
| Mud Digits | LAS | | |
| Image | EMF/CGM | | |
| MDT | PDF PDS | | |
| SURVEYS | | | |
| Directional Survey | TXT | | |
| VSP/Checkshot | | | |
| REPORTS | | | |
| Show Reports | PDF | | |
| Drilling Reports | PDF | | All Days |
| Side Wall Core Reports | | | |
| PALEO | | | |
| DATA | | | |
| Geochemical Data | | | |

The following data will be excluded from Exhibit "A":
_____Well Core Data
Palynostratigraphic Analysis


**\*\*\*\* END OF EXHIBIT "A" \*\*\*\***

HIGHLY CONFIDENTIAL                                    BP-HZN-2179MDL00054564

Exhibit "B"

## Attached to and made a part of that certain Well Data Trade and Confidentiality Agreement between

_____

and _____ and _____ and _____,

dated effective _____, 2005.

(Insert Prospect Name) Well Data

*Insert Prospect Name* Well Data includes all data obtained from the *Insert Protraction Area Name Insert Block #* #1 OCS-G _____, unless specifically excluded on this Exhibit "B". The data set forth below may not be a complete list of the *Insert Prospect Name* Well Data

| | Data Type | | ST01 | ST02 |
|---|---|---|---|---|
| | | | CD # label in bold | |
| 1 | Daily Reports and Surveys | | CD #, CD # | |
| | Drilling Reports, Directional Surveys, Mudlogging Reports, Geologic reports, Mud reports | | | |
| 2 | LWD Digits and Graphics | BP00 - BP01 - BP02 - | CD#, CD# | CD#, CD# |
| | ARC, iSONIC, APWD, DIR End of Well Report- Schlumberger | ' to      ' MD | ' to      ' MD | ' to      ' MD |
| 3 | Mudlog Digits and Graphics | CD# | CD# | CD# |
| | Lithology, Gas Chromatograph | ' to      ' MD | ' to      ' MD | ' to      ' MD |

Page 14 of 16

Exhibit A
Page 238

HIGHLY CONFIDENTIAL                                                BP-HZN-2179MDL00054565

| | | | | |
|---|---|---|---|---|
| 4 | End of Well Report-Sperry Sun Combo, Pressure, Show logs Wireline Digits and Graphics GR, AIT, DEN, NEUT, CMR, DSI, OBMI, MDT | CD# ' to ' MD | N/A | ' to ' MD |
| 5 | Paleo Data Final Paleo Biostratigraphic Summary (Nanno and Foram) Reports | CD# ' to ' MD BP00 ' to ' MD BP02 | ' to ' MD | ' to ' MD |
| 6 | Geochemical Data Mud Gas Isotube Analysis-Isotech Headspace Gas Analysis-Baseline MDT oil and Gas Data | Isotech CD#, Baseline CD# ' to ' MD | ' to ' MD | ' to ' MD |
| 7 | MDT oil and Gas Data analysis | CD# ' to ' MD | N/A | ' MD |
| 8 | Side Wall Cores ____ Labs - cuttings & SWC | BP00 – CD#, BP02 – CD# ____ ' to _____' cuttings from BP00, ' to ' MD SWC's from BP02 | N/A | N/A |
| 9 | Seismic Walk-away VSP raw data Walk-away VSP processed image | N/A | N/A | CD# ' to ' MD |

Geochemical and Fluid Analysis Further Defined:
Original Hole
1)
2)
3)
5)
6)
7)


BP01


BP02
1)
2)

Page 15 of 16

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054566

3)
4)
5)
6)
7)

ST01
1)
2)

ST02
1)
2)
3)
4)

Baseline reports of MDT fluid geochemistry
1)
2)
3)
4)
5)

Isotech Data disk
1)
2)

Pencor and ADS oil and water reports
BP02
1)
2)
3)

ST02

The following data will be excluded from Exhibit "B":
_____Well Core Data
Palynostratigraphic Analysis

**\*\*\*\*END OF EXHIBIT "B" \*\*\*\***

Page 16 of 16

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054567

**EXHIBIT "K"**

**HEALTH, SAFETY AND ENVIRONMENT ("HSE")**

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

**Health, Safety and Environmental Management Systems**

1.   Plan Requirements for Operator: Operator shall have an effective Health, Safety & Environmental Management Plan or Plans, in accordance with API RP75, or an equivalent standard, including Operator's internal policies, for all operations conducted under the Operating Agreement to which this Exhibit is attached.

2.   Overview of Plan for Non-Operators: Upon the written request of any Non-Operator, the Operator will present to the Non-Operators, at a meeting called in accordance with the Operating Agreement, a sufficient overview of its Health, Safety and Environmental Management systems to evidence compliance with Paragraph 1 herein.

3.   Operator's HSE Performance as an Agenda Item: Upon written request, Operator's HSE performance shall be an agenda item for all meetings of the Parties where past HSE statistical performance as well as ongoing and future HSE improvement initiatives are presented and discussed.

**Health, Safety and Environmental Reporting**

4.   Operator's Obligation to Notify Non-Operators: The Operator shall notify the Non-Operators in a timely manner after any of the following incidents occur:
     (a)   well blow-out,
     (b)   a fatality associated with operators operations
     (c)   multiple serious injuries
     (d)   significant adverse reaction from authorities, media, NGO's or the general public
     (e)   cost of accidental damage exceeding US $500,000
     (f)   oil spill of more than five (5) barrels
     (g)   release of more than ten tones of a classified chemical such notification will be followed by a written report.

5.   HSE Audits: Upon request of the Non-Operators, the Operator shall provide the copies of any HSE audits conducted of the drilling operations on the subject well.

6.   Maintenance and Non-Operator's Review of HSE Statistics: HSE statistics for activities and operations conducted under the Operating Agreement will be maintained and be reported to Non-Operators on a monthly bais in a format to be

Page 1 of 2

HIGHLY CONFIDENTIAL

mutually agreed to by the Parties.  HSE statistics are defined as: Recordable Injuries, Lost Time Injuries, Lost Time Injury Frequency, Reportable Spills, Fines or Incidents of Non-compliance [all as defined by the Occupational Safety and Health Administration (OSHA), Minerals Management Service (MMS), or United States Coast Guard (USGC), whichever is applicable]. In addition to opportunities to review data through audits, Operator will, upon request, furnish HSE performance information upon the completion of the well and be amenable to a timely meeting with Non-Operators specifically to review and discuss HSE performance applicable to this Operating Agreement.

### Health, Safety and Environmental Inspections

Non-Operator's Right of Access: For purposes of conducting health, safety and environmental inspection, the Non-Operators shall have the right of access to activities and operations and shall have access to Operator's HSE files as provided for in this Operating Agreement. The notable exceptions are a) may implicate privacy issues, b) is covered by an enforceable legal privilege, or c) can otherwise be protected under laws and legal principles involving confidentiality or secrecy. Operator will cooperate fully in these health, safety and environmental inspections.

Exhibit A
Page 242

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054569

## EXHIBIT "L"

## GEOPHYSICAL OPERATIONS

Attached to and made a part of that certain Operating Agreement dated October 1, 2009 by and between BP Exploration & Production Inc., as Operator, and MOEX Offshore 2007 LLC, as Non-Operator

**1.0    Proprietary Geophysical Operations:**    For purposes of this Exhibit L, Proprietary Geophysical Operations means the acquisition and initial processing of a geophysical survey which (1) exclusively covers all or a portion of the Contract Area, (2) is conducted solely on behalf of and for the benefit of the Participating Parties in accordance with Section 1.5 of this Exhibit "L", and (3) is not a group-shoot or speculative geophysical survey, shallow hazard survey or velocity survey (or similar wellbore geophysical operation).   Any Party may propose Proprietary Geophysical Operations at any time during the term of this Agreement.   Such a proposal (i) shall include the timing, location, acquisition parameters, processing parameters, and Costs of such operations and (ii) requires approval by Election.  The Costs in the proposal shall include all tape copy, film, and reproduction costs to be allocated to each Participating Party, as well as mobilization, acquisition, and processing costs to be shared by the Participating Parties.    Proprietary Geophysical Operations are independent operations and are not Exploratory, Appraisal or Development Operations; however, they may be conducted simultaneously with Exploratory, Appraisal or Development Operations.

**1.1    Response to Proposal:**   Any other Party may, within five (5) days (exclusive of Saturdays, Sundays and federal holidays) of its receipt of a proposal for Proprietary Geophysical Operations, submit a separate proposal for Proprietary Geophysical Operations (along with the associated AFE and the plan for the operation).  If no other proposal is submitted, the Parties shall make an Election on the lone proposal submitted. If an additional proposal is submitted, then the Operator shall call a meeting of the Parties which shall be held within five (5) days of the

HIGHLY CONFIDENTIAL                    BP-HZN-2179MDL00054570

conclusion of the five (5) day period for the submission of other proposals. At such meeting the Parties shall approve by Vote on which proposal the Parties shall make their Election.

1.2 **Non-Participating Parties in Proprietary Geophysical Operations:** If a Non-Participating Party in Proprietary Geophysical Operations makes a revised Election or Vote to become a Participating Party in the Proprietary Geophysical Operations in which it originally Elected or Voted not to participate, such Non-Participating Party is an Underinvested Party subject to Article 16.5.3 *(Proprietary Geophysical Operations, Project Team AFE, Pre-Development AFEs, or Final Design AFE)*, and the Operator shall deliver the data, information and results from the Proprietary Geophysical Operations in which the Underinvested Party originally Elected or Voted not to participate to the Underinvested Party within fifteen (15) of it's the Operator's receipt of such notice.

1.3 **Conduct of Proprietary Geophysical Operations:** The Operator shall provide the Participating Parties with copies of all field data and support documentation as appropriate for all seismic data collected from the Proprietary Geophysical Operations. The Operator shall obtain all licenses and permits from all governmental agencies necessary to conduct Proprietary Geophysical Operations. The Participating Parties in Proprietary Geophysical Operations own the geophysical data derived from such Proprietary Geophysical Operations; provided, however that such ownership is limited to the field tapes, i.e., raw data and initial processed data, and does not include any re-processed or interpreted data.

1.4 **Disclosure of Data Outside the Contract Area:** In the event any geophysical data is acquired pursuant to this Article 10.5 which covers lands outside the Contract Area, a Participating Party in such data shall not be obligated to obtain permission from the other Participating Parties

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00054571

to disclose such data covering lands outside the Contract Area to third parties.

**1.5**   **Timely Operations for Geophysical Surveys:**   Actual Proprietary Geophysical Operations shall be commenced within one hundred and eighty (180) days from the conclusion of the period for approval of Proprietary Geophysical Operations.   In all events, including the occurrence of a Force Majeure, if the Operator does not commence actual Proprietary Geophysical Operations within six (6) months from the conclusion of the period for approval of Proprietary Geophysical Operations, the proposal of the Proprietary Geophysical Operations and its approval will be deemed withdrawn.   If a proposal for Proprietary Geophysical Operations is deemed withdrawn, any Costs incurred in the preparation for or in furtherance of such Proprietary Geophysical Operations will be chargeable to the Participating Parties.

**2.0**   **Group-Shoot And Speculative Seismic Surveys:**   The Operator shall coordinate the acquisition of and participation in any new group-shoot or speculative seismic surveys covering one or more of the Leases.   For such seismic data acquisitions, the acquiring Parties shall unanimously agree upon the Cost shares of the total licensing fee (rather than basing their shares on their Working Interest).

HIGHLY CONFIDENTIAL                                      BP-HZN-2179MDL00054572