UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG
     "DEEPWATER HORIZON" in the
     GULF OF MEXICO, on
     APRIL 20, 2010

THIS DOCUMENT RELATES TO:
ALL CASES

:   MDL NO. 2179
:
:
:
:
:   SECTION: J
:
:
:
:
:   JUDGE BARBIER
:   MAG. JUDGE SHUSHAN
:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   .   . . . . . . . . . . . . . . . . . . . . . . . .

**BP'S RESPONSE TO UNITED STATES GOVERNMENT'S
MOTION REGARDING CEMENT TESTING**

As the Court is aware, the United States Government has been acting, pursuant to the

Court's October 27th Order [Doc #617], as the sole custodian of the actual Halliburton

Cementing Components recovered from the *Deepwater Horizon*. As the Court is also aware, it is

ultimately for the Court to decide how this cement will be tested. The Court's October 27th

Order could not be clearer: the Macondo cement in the custody of the Government and under

control of the Court may not be used for "destructive testing" except pursuant to "further order of

the Court."

Against this backdrop, BP largely supports the testing protocol recently submitted by the

Government [Doc # 2830] and respectfully urges that it be carried out — with one

modification — as soon as possible. On this one crucial point, however, BP does find itself

seeking a modification of the Government's submission. The Government's current testing

proposal overlooks that the testing of this very limited supply material, this critical evidence,

should include testing designed to replicate the real-world conditions that the *Deepwater Horizon*

cement would have experienced when formed on the *Deepwater Horizon* rig. In particular, the

testing of this critical evidence should include a testing protocol, such as the one suggested by BP, specifically designed to determine whether the foamed cement as formed on the rig was stable.

Inexplicably, the current proposal before the Court fails to include a proposal for such testing. The current proposal would instead evaluate only whether the foamed cement could have *maintained* stability once pumped down to the bottom of the well, approximately 3.5 miles below the earth's surface. BP certainly does not dispute that the stability or instability of Halliburton's cement under "bottom-hole conditions" is an important question. But another important question is whether or not Halliburton's cement was stable as formed on the rig. Given its ultimate responsibility, pursuant to its October 27th Order, for determining what destructive testing of the Macondo cement will and will not occur, this Court should direct that a ll, critical modification to the Government's proposed testing protocol be made in order to ensure that the resulting testing represents rig conditions and down-hole conditions alike.

## BACKGROUND

This Court-directed cement testing is not the first investigative effort aimed at determining whether the Halliburton cement used on the Macondo well could possibly have been stable. To briefly summarize complex pre-history, extensive analytical testing of Halliburton's cement has previously been undertaken, not once but twice and by different two independent labs — the CSI laboratory on behalf of the investigation conducted for the BP Internal Investigation Team led by Mark Bly and the Chevron laboratory on behalf of the investigation conducted for the Presidential Commission led by former Senator Bob Graham and former EPA Director William K. Reilly. The results from both rounds of testing largely indicated that the

Macondo cement, in the Presidential Commission's words, was "likely unstable" as designed by Halliburton.

In response to those testing results, Halliburton faced the quandary of whether or not to embrace the view that its cement design was faulty. Ultimately, Halliburton decided to embrace an alternative point of view. Under this alternative view, Halliburton has contended that the two prior rounds of testing undertaken by the two different laboratories — CSI for BP and Chevron for the Presidential Commission — should not be credited. Halliburton has emphasized in this regard that those labs purportedly did not (because they could not) use "representative" cement; namely, the cement that is now under the control of this Court pursuant to its October 27th Order.

A.      History of cement samples

Due to the magnitude of the April 20, 2010, incident, BP almost immediately formed an Incident Investigation Team ("IIT") led by Mark Bly. This IIT was charged with gathering facts surrounding the accident, analyzing available information to identify possible causes, and making recommendations to enable prevention of similar accidents in the future.[1] To evaluate the effectiveness of the Halliburton cement slurry design that was used at the *Deepwater Horizon*, the IIT requested a third-party cementing lab, CSI Technologies ("CSI"), conduct a series of tests.

Although the IIT made multiple requests for samples to Halliburton, Halliburton declined to provide BP with any cement samples. Specifically, the IIT made informal requests for samples of the cementing materials used on the Macondo well in June 2010. On July 7, 2010, the IIT sent a letter to Halliburton requesting samples of the cement and additives from the same

---

[1]      *Deepwater Horizon* Accident Investigation Report at 9.

Lot/Batch used on the Macondo well.  In the event that Halliburton were unable to provide these materials, BP also requested samples from an equivalent product.  The cementing samples and additives requested by BP were as follows:

| Lafarge Class H Cement | 50 pounds |
|---|---|
| EZ FLO additive | 20 pounds |
| D-Air 3000 additive | 20 pounds |
| KCL (Potassium chloride) salt | 20 pounds |
| SSA-1 (Silica Flour) | 50 pounds |
| SSA-2 (100 Mesh) | 50 pounds |
| SA-541 additive | 20 pounds |
| ZoneSealant 2000 additive | 5 gallons |
| SCR-100L additive | 5 gallons |

On July 15, 2010, Halliburton declined to accommodate BP's request for cement samples from the *Deepwater Horizon* citing preservation orders and preservation requests by the Government and state interests.  Halliburton further responded that it had no obligation to provide BP with an "equivalent product" to what was used on the *Deepwater Horizon* project.

On July 26, 2010, having not received Halliburton's response due to a mail routing issue, the IIT renewed its request for cement and additive samples to conduct independent testing. Following receipt of Halliburton's response, on July 29, 2010, the IIT asked Halliburton to cooperate in seeking relief from the Court orders so that the IIT could test the cement.  Further, the IIT renewed its request for "equivalent products" to what was used at the Macondo well as those proprietary products were unavailable to the IIT without Halliburton's acquiescence.

Despite BP's repeated requests, Halliburton did not provide samples from the *Deepwater Horizon* project or equivalent, off-the-shelf cementing products to BP.  Further, Halliburton did not cooperate with BP to seek modification of the Court orders so that the cement samples could

be tested.  Accordingly, CSI formulated a representative slurry for its testing based upon the best information available, a formulation that Halliburton now claims is not "representative."

On August 12, 2010, the Joint Investigation Team ("JIT") having learned of the existence of physical cement samples from the *Deepwater Horizon* project, subpoenaed those samples, in addition to off-the-shelf cementing materials listed in Halliburton's post-job report.  [Dkt. 494-2].  On August 27, 2010, the Office of Inspector General for the United States Department of the Interior also issued a subpoena for "cement or cement samples … from the Block 252 Lease or the Deepwater Horizon."  [Dkt. 494-3].

After negotiation with the government entities, on October 7, 2010 Halliburton filed a motion with this Court seeking relief from the Court's preservation of evidence orders so that it could turn over the physical samples from the *Deepwater Horizon* project and some "same-lot" material that it had (collectively, the "Cementing Components").  [Dkt. 494].  Specifically, Halliburton asked the Court for permission to turn the Cementing Components over to the Government and represented to the Court that "[t]he JIT intends to solicit input from all interested parties regarding the development of a protocol for testing the Cementing Components."  [Dkt. 494-1 at 5].  Based on this representation, BP (and likely other parties) did not object to the transfer of the Cementing Components to the Government.  Halliburton also represented that it would provide the Government with additional off-the-shelf cementing compounds — the compounds it previously had declined to provide to BP.

On October 27, 2010, the Court issued an order allowing the transfer of Cementing Components from Halliburton to the Government and further ordering "that no destructive testing of the Cementing Components will be conducted without further order of the Court." [Dkt. 617].  On October 14, 2010, the Government solicited input into the cement testing

protocol from the various parties.  On November 5, 2010, BP (and presumably other parties) responded with their suggestions regarding this cement testing protocol.  *See* Exhibit A.  In its submission, BP detailed, among other things, the foam stability testing conditions that would reflect the conditions at the Macondo well.  In particular, BP proposed conducting foam stability tests to determine whether the foam was stable when formed "top hole" at 60% foam quality and after it was pumped "down hole" at 18.5% foam quality.  Halliburton, by contrast, delayed its submission for months after the November 5 deadline.

On May 24, 2011, the Government transmitted its proposed cement testing protocol to liaison counsel and asked for comments.  In its response, BP focused its efforts on addressing shortcomings in the Government's proposed protocol relating to the foam stability tests.  Specifically, BP proposed a change to the conditioning temperature for the slurry and also adding a high foam quality test (described in further detail below), citing to testimony and documents from discovery in the MDL matter.  On May 31, 2011, the Government agreed to implement the change to the test temperature but did not agree to include the additional high foam quality test.  [Dkt. 2830-7].  BP exchanged correspondence with the Government again but the parties were unable to reach accord.  [Dkts. 2830-8, 2830-9].

**B.     Other MDL parties, including BP, have not had access to Halliburton cement**

Halliburton's transfer of the Cementing Components to the Government has prejudiced BP and the other parties in the MDL matter (plaintiffs and defendants alike) because they are unable to test the physical samples from the *Deepwater Horizon*.  Neither BP nor any other party has had the opportunity to test these Cementing Components.  Moreover, if not provided with equivalent cement samples by Halliburton, neither BP nor any other party in the MDL matter will have the opportunity to test even the off-the-shelf cement materials.

BP's Incident Investigation Team hired CSI to evaluate the Halliburton-designed cement slurry.  However, CSI necessarily used a "simulated slurry" for this evaluation because Halliburton would not provide BP with off-the-shelf product.  Although CSI formulated the simulated slurry using the same Lafarge Class H cement and "the material available in the industry that most closely represented the Halliburton additives,"[2] Halliburton has since criticized CSI's use of these materials.[3]  As such, Halliburton appears poised to contend that the conclusions and testing of CSI on behalf of BP are not reliable.

In fact, a Halliburton press release has gone so far as to criticize even the cement lab testing performed by Chevron on behalf of the Presidential Commission.  The press release contends the Commission's testing similarly lacks reliability because it was done with off-the-shelf cement and additives:

> Halliburton believes that significant differences between its internal cement tests and the Commission's test results may be due to differences in the cement materials tested.  The Commission tested off-the-shelf cement and additives, whereas Halliburton tested the unique blend of cement and additives that existed on the rig at the time Halliburton's tests were conducted.  Halliburton also noted that it has been unable to provide the Commission with cement, additives and water from the rig because it is subject to a Federal Court preservation order but that these materials will soon be released to the Marine Board of Investigation.[4]

Remarkably Halliburton has put forward this criticism even though Halliburton itself provided the cement and additives for the Commission testing.  In short, attacking other parties' attempts to formulate a representative sample, Halliburton has pointed — however incredibly — to the Court-controlled Cementing Components as the only sample in the world that (in Halliburton's view) resembles what Halliburton poured into the Macondo well the day of the accident.  According to Halliburton, what this Court now controls is one of a kind.

---

[2]     May 25, 2010 Deposition of Fred Sabins (CSI president and 30(b)(6) representative) at 517-518.

[3]     May 25, 2010 Deposition of Fred Sabins at 634-635, 668-669 (examination by Halliburton).

[4]     Halliburton Press Release dated October 28, 2010.

## ANALYSIS

The decision the Court now confronts is important.  To BP's knowledge, no one, not the Government or Halliburton and certainly not BP, disputes that it is ultimately *for the Court* to decide what type of testing of the cementing components will be permitted.  The Court's October 27th Order could not be clearer:  the Macondo cement in the custody of the Government and under the control of the Court may not be used for "destructive testing" except pursuant to "further order of the Court."  The question, then, is narrow:  whether the Court should amend the testing protocol proposed by the government so that it addresses whether the foamed cement was doomed *before* it made the 3.5 mile trip down to the well bottom.

In light of Halliburton's reluctance to embrace past testing results, however seemingly authoritative they may be, BP is concerned that absent BP's recommended testing, Halliburton may be tempted to contend (albeit without a sound basis) that some unaccounted for "downhole conditions" contributed to any instability that is found in the upcoming testing, while simultaneously contending that up on the rig the cement was stable at the time it was designed, mixed, and poured.  BP therefore respectfully suggests that Halliburton's cement be tested under both "uphole" and "downhole" conditions alike.

## I.   THIS COURT-ORDERED TESTING SHOULD TAKE INTO ACCOUNT THE NEEDS OF ALL PARTIES TO THIS MDL.

As the foregoing background makes clear, the Cementing Components represent critical evidence in the MDL litigation that no litigant besides Halliburton and the Government have had access to.  There is no dispute that the proposed testing on the Cementing Components is destructive.  [Dkt. 2830 at 3].  Allowing the testing to proceed under the current proposed protocol then, would forever deny BP and other parties the opportunity to conduct alternative tests on this critical evidence.  Under these circumstances, one litigant, even the Government,

8

cannot simply dispose of the Cementing Components through destructive testing that will leave other parties without the benefit of highly relevant evidence.  In such circumstances, courts have required court approval to ensure that the benefit of testing outweighs harm to other interested parties.  *See* 10A Fed. Proc., L. Ed. § 26:662, *Testing and sampling—Destructive testing* (2011).

In order to justify the selective testing it seeks, the Government must demonstrate that the benefits of that testing outweigh the costs of foregoing the "high gas content" test urged by BP, thereby warranting depriving BP and other litigants of a critical source of evidence to aid them in their defense.  *See Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. 611, 614 (D. Md. 2006).  Where, however, "the entire piece of evidence will be consumed by testing, the balance may dictate the denial of a request for such testing" absent concerns of the parties.  *Ostrander by Ostrander v. Cone Mills, Inc.*, 119 F.R.D. 417, 419 (D. Minn. 1988).  "The overriding practical concern" in cases involving destructive testing "has been the formulation of methods for providing full discovery while preserving the rights of all parties to the litigation," including through safeguards such as ensuring that the party opposing the tests has its own opportunity to conduct testing of the sample in question.  *See Cameron v. District Court in and for First Judicial Dist.*, 565 P.2d 925, 929, 931 (Colo. 1977) (protective order permitted destructive testing of defective tire where defendant could observe testing and could still conduct similar tests with remaining sample).

Accordingly, in assessing the Government's proposed testing, the Court should consider the following factors:  (1) whether the Government's proposed testing is reasonable, necessary, and relevant in light of its statutory mandate; (2) whether BP and others will be prejudiced in their ability to present evidence at trial or in some other way; (3) whether there are any less prejudicial alternative methods of obtaining the evidence sought; and (4) whether there are

adequate safeguards to minimize prejudice to BP, particularly to BP's ability to present evidence at trial.  *See* 10A Fed. Proc., L. Ed. § 26:662, *Testing and sampling—Destructive testing* (2011) (enumerating factors to be considered in assessing request for destructive testing); *Cameron*, 565 P.2d at 931 (same).  As demonstrated below, these factors demonstrate that the Court should direct that the "high gas content" testing urged by BP be conducted — both to ensure a reasonable and appropriate investigation by the Government and to avoid unnecessary prejudice to BP and other litigants in this MDL litigation.

**II.      THE JIT'S PROPOSED TESTING IS NOT REASONABLE EVEN ON ITS OWN TERMS, IN LIGHT OF THE JIT'S STATUTORY MANDATE TO DETERMINE THE CAUSE OF THE ACCIDENT AND NEED FOR REGULATORY CHANGE.**

The JIT's statutory mandate requires it to conduct a thorough and effective investigation into the cause of the *Deepwater Horizon* spill — not just to assess compliance with existing laws and regulations.  Under Section 6301 of the United States Code, an investigative board, such as the JIT, is charged to "to decide, ***as closely as possible*** . . . the cause of the casualty" and "whether there is need for new laws or regulations, or amendment or repeal of existing laws or regulations, to prevent the recurrence of the casualty."  46 U.S.C. § 6301 (emphasis added).

By the Government's own admission, the investigative obligations of the JIT under Section 6301 are "extremely broad."   *See* Exhibit B (12/17/2010 Hearing Tr. at 39:20-22) (U.S. Attorney Sharon Smith on behalf of the JIT).  As the JIT acknowledged in a hearing last year before Judge Barbier:

> "[The JIT's statutory mandate is] both retrospectively looking at the cause of the casualty itself, and there might be multiple causes, and the statute says to determine as closely as possible. So it's not just sort of broad brushing what caused it, they are supposed to determine as closely as possible what caused this. . . .  In addition to that, they are supposed to be looking prospectively to determine whether or not whatever went wrong could be corrected in the future by the creation of new laws, by amendments to existing laws.  That would include regulations that govern every player that might have impacted what happened. . . ." *See id.* at 39:22-40:8.

Notably, the Government admits that the JIT's obligation to assess whether or not existing regulations should be changed to account for previously unaddressed concerns is just as important — if not more important — than its obligation to investigate the cause of the accident. *See id*. at 40:20-41:7.   That is because looking prospectively at whether existing laws or regulations should be changed attempts to avoid future incidents.  *See id*.

Here, the JIT cannot fulfill its statutory mandate to determine "as closely as possible" the cause of the spill or the possible need for regulatory change without conducting foam stability tests at BP's proposed "high gas content."  As BP has explained [Dkt. 2830-6 at 3], information provided by Halliburton on the foaming conditions at the Macondo well, namely the nitrogen injection rate, temperature and pressure, indicate that the foamed cement formed at the rig had a very high gas content — in excess of 60% gas by volume (or "foam quality").[5]  It is well-known that foam stability generally decreases as the foam quality increases.   If the foam cement generated at the rig were unstable, it would experience nitrogen break out immediately—before it even reached the bottom of the well 3.5 miles away.  Merely displacing the cement downhole does not create sufficient shear stress to entrain the gas back into the cement.  Hence, testing at 60% foam quality would give important information on whether the foam generated at the rig was unstable.

The Government attempts to justify its position by arguing that testing at 60% foam quality is not supported by industry standards.  *First*, as discussed above, the JIT's charge includes determining the cause of the casualty.  Whether the foamed cement failed even before

---

[5]      The April 18, 2010 Halliburton OptiCem report states that 583 standard cubic feet (scf) of Nitrogen would need to be added to each barrel of cement to form the foamed slurry. (April 18, 2010 OptiCem Report at 3.3.) Using the ideal gas law ($P_1V_1/T_1 = P_2V_2/T_2$), it can be calculated that Nitrogen was mixed at a rate of 9.40 cubic feet per barrel at the injection conditions of roughly 1,100 psi and 110°F during the injection period. Using known conversion factors, this equates to 1.56 barrels of Nitrogen per barrel of cement. The foam quality at formation is 61%, which is a foam density of around 6.52 pounds per gallon.

reaching its planned destination at the bottom of the well is central to that statutorily required determination.

*Second*, the relevant industry standard cannot be blindly followed.  By its own terms, the practice issued in July 2004 has expired.  API RP 10B-4 at Special Notes ("This publication will no longer be in effect five years after its publication date as an operative API standard…").  Even, if operative, the recommended practice itself states that "[t]hese standards are not intended to obviate the need for applying sound engineering judgment regarding when and where these standards should be utilized."  *Id.*  As BP has explained [Dkt. 830-6 at n.7], API RP 10B-4 was not drafted with the intent that it be applied to deepwater intervals.  Indeed, this recommended practice is currently undergoing revision to address the testing of foam cement for high temperature, high pressure applications (such as seen in deeper casing strings).  As such, there is no solace in API RP 10B-4.

*Third*, the Government' own testing protocol recognizes the validity of BP's high foam quality test.  Specifically, API RP 10B-4 provides two ways for preparing the foamed slurry for testing:  under Section 4.2.1.2, the known gas content is used to determine the volume of cement to blend with air; and under Section 4.2.1.3, the known foamed density is used.  Halliburton's pre-incident testing only examined cement foamed to the target density (14.5 pound per gallon ("PPG") ostensibly under Section 4.2.1.3.  Preparation of a 14.5 PPG slurry at atmospheric conditions requires only 13% foam quality.  However, under the tremendous pressures at the bottom of the well, the gas in the foamed cement is compressed and no longer has ideal characteristics.  As such, Halliburton's OptiCem program calculates that a 18.5%-19.5% foam quality is required to maintain a density of 14.5 PPG at downhole conditions.

The protocol advanced by the Government recognizes that difference between ideal and real-world conditions, and includes foam stability testing using both methods described in API RP 10B-4:  at 13% foam quality (known density) and at 18.5% foam quality (known gas content).  BP agrees that foam stability testing should be conducted at 18.5% foam quality, which is the foam quality at downhole conditions.  However, BP contends that foam stability testing should also reflect uphole conditions when the foam is generated.  As discussed above, it makes no difference whether the foam is stable at downhole conditions (although that is not in this case), if it is not stable at uphole conditions.  Similar to Government's testing at 18.5% foam quality, BP's proposed foam stability testing at 60% foam quality is sanctioned by API RP 10B-4 as testing where the foam quality or gas content is known.[6]

If the purpose of the Government's testing is to determine the cause of the *Deepwater Horizon* incident, or the need for regulatory changes in the wake of the incident, then this cement must be tested under conditions that simulate actual conditions as closely as possible.[7] Accordingly, the proposed tests should investigate not only the stability of the foamed cement at bottom hole conditions but also at formation conditions on the rig.

III.     **REQUIRING A "HIGH GAS" FOAM TEST IS NECESSARY TO AVOID PREJUDICING BP, AMONG OTHER LITIGANTS.**

As discussed above, the Government should conduct at least one foam stability test using the Cementing Components at 60% foam quality.  Based on BP's calculations, the Government should have sufficient Cementing Components to run approximately six foam stability tests. There is thus no reason why the Government should be allowed to destructively test the limited

---

[6]     Notably, the Government does not challenge BP's calculation of foam quality at uphole conditions (based on information provided by Halliburton) but only argues that such testing is not sanctioned by API RP 10B-4.

[7]     Likewise, the Government's rejection of BP's proposed high foam quality testing is at odds with its efforts to simulate the real-world conditions, including obtaining water from BP's Port Fourchon facilities—the likely source of water for mixing the cement on the *Deepwater Horizon*.  On June 22, 2011, BP facilitated this collection of water from its Port Fourchon facilities by the Government.

Cementing Components merely to confirm the tests that the Government has already completed on off-the-shelf stock. A couple of tests should verify the validity of the low-foam quality testing (reflective of bottom-hole conditions) conducted with off-the-shelf components, and at least one test should be conducted to investigate the stability of the foamed cement at formation conditions on the rig.[8] The appropriate course is to require the upcoming testing to reflect the complete picture of what happened at the well, including whether the foam was stable when formed at the *Deepwater Horizon* and whether it was stable after reaching its final destination.

The Government should also conduct BP's proposed high foam quality testing on the off-the-shelf Halliburton cementing materials. There is no contention that the Government has limited quantities of this material. Indeed, the Government all but concedes that this testing is appropriate and suggests that the Court order it to perform this testing. There should be no additional inconvenience or burden associated with requiring these tests,[9] and it would further transparency in the test results if the same independent laboratory were to perform them. Further, as explained above, BP has yet to receive off-the-shelf cement material from Halliburton for testing despite having requested this material a year ago and before the Government.[10] As such, the Court should also order the Government to conduct BP's proposed high foam-quality testing on the off-the-shelf cement materials provided by Halliburton.

---

[8] Indeed, BP suggests that none of the planned tests at a 13% foam quality are necessary because that foam quality is not representative of anything that occurred at the Macondo well. The results of that testing at 13% foam quality merely satisfies an academic exercise into whether a 14.5 PPG foam is stable in the laboratory without regard to real-world conditions.

[9] Similar to the BOP testing, BP has offered to pay for any additional cost associated with the high foam quality tests.

[10] The Government's argument that BP should conduct this testing itself ignores the fact that the Government is in sole possession of the Cementing Components and Halliburton has not provided BP with any off-the-shelf cement samples.

## CONCLUSION

For reasons explained above, the Court should approve the Government's request for destructive testing of the Cementing Components only after amending the proposed testing protocol to include BP's proposed high foam quality tests on both the Cementing Components and the off-the-shelf cement materials.

Dated:  June 24, 2011                                    Respectfully submitted,

                                                         /s/ Don K. Haycraft
                                                         Don K. Haycraft (Bar #14361)
                                                         R. Keith Jarrett (Bar #16984)
                                                         LISKOW & LEWIS
                                                         701 Poydras Street, Suite 5000
                                                         New Orleans, Louisiana 70139-5099
                                                         Telephone: (504) 581-7979
                                                         Facsimile: (504) 556-4108

                                                         and

                                                         Richard C. Godfrey, P.C.
                                                         J. Andrew Langan, P.C.
                                                         Andrew B. Bloomer, P.C.
                                                         Catherine L. Fitzpatrick
                                                         Elizabeth A. Larsen
                                                         Kirkland & Ellis LLP
                                                         300 North LaSalle Street
                                                         Chicago, IL 60654
                                                         Telephone: (312) 862-2000
                                                         Facsimile: (312) 862-2200

                                                         Robert R. Gasaway
                                                         Jeffrey B. Clark
                                                         Kirkland & Ellis LLP
                                                         655 Fifteenth Street, N.W.
                                                         Washington, D.C.  20005-5793
                                                         Telephone:  (202) 879-5000
                                                         Facsimile:  (202) 879-5200

                                                         And

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

Attorneys for BP

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of June, 2011.


_____/s/ Don K. Haycraft_____