**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re: Oil Spill by the Oil Rig                    **MDL NO. 2179**
     **"Deepwater Horizon" in the Gulf**
     **of Mexico, on April 20, 2010**          **SECTION J**

Applies to: *10-cv-2771*                            **JUDGE BARBIER**
                                         **MAGISTRATE JUDGE SHUSHAN**

<u>**ORDER**</u>

**[Regarding Objections to Depositions]**

     The deadline for the completion of fact depositions required for the preparation of experts for Phase One of the February 27, 2012 trial is July 31, 2011.  The parties were notified that they would be permitted to take the depositions of some persons after July 31, 2011, who were needed for Phase One of the February 2012 trial but were not needed for preparation of reports of experts for Phase One.[1]

     Approximately fifty persons were identified as needed for post-July 31 Phase One fact depositions.  There is no objection to about thirty-five of these witnesses.  Rec. doc. 3062 at 10-12.[2] The parties are instructed to schedule these depositions for August, September and the first half of October.  The parties object to the depositions of about fourteen witnesses.

     This order will resolve: (1) BP's objections to the depositions of Tim Allen, Tony Emerson, and Ray Fleming, sought by Cameron; (2) Halliburton's objections to the depositions of James Bement, Melissa Bergman, Karl Blanchard, Jim Brown, Jim Prestidge, Simon Turton and Anthony Badalamenti; (3) BP's objection to the deposition of Mark Mazella; and (4) its objection to the deposition of Dr. Robert Beirute.  It will not resolve the requests for the depositions of Tony Brock

---

[1]  The parties will also be commencing depositions for Phase Two of the February 27, 2011.

[2]  BP reports that it objects to two of these: Tony Brock and Neil Shaw.

and Neil Shaw.  A separate order will be issued on them.  If the Court has not accounted for all persons with objections, the parties are asked to notify the Court as promptly as possible.  The arguments of the parties were submitted by email.  The attached Appendix is a compilation of parties' arguments.

A.      <u>Allen, Emerson and Fleming</u>.

Cameron's request for the depositions is timely.  It is not clear that it is necessary that each of them be deposed.  Cameron will be permitted to depose one of the three.  It is Cameron's choice as to which one is deposed.

B.      <u>Halliburton Employees</u>.

Halliburton will not be required to produce: Melissa Bergman, Karl Blanchard, Jim Brown, Simon Turton, or Anthony Badalamenti.  It will be required to produce James Bement and Jim Prestidge.

C.      <u>Mark Mazella</u>.

BP will not be required to produce Mark Mazella.  Halliburton may request that Mazella be included as a Phase Two fact deponent.

D.      <u>Robert Beirute</u>.

BP shall produce Dr. Beirute for his deposition as a fact witness regarding his pre-incident consultation work.  He shall not be questioned about his post-incident consulting work.

New Orleans, Louisiana, this 29th day of June, 2011.

_____
**Sally Shushan**
**United States Magistrate Judge**

2

## Appendix to Order Regarding Objections to Depositions

### Tim Allen, Tony Emerson and Ray Fleming

Cameron requests the depositions of Tim Allen, Tony Emerson and Ray Fleming.  BP objects to their depositions.

### BP's Objections to the Depositions (Langam 6/10/11 at 3:30 p.m.)

Allen, Emerson and Fleming are BP employees.  They were members of the BOP group of BP's internal investigation team.  Prior to the Incident, they were not involved with the Macondo well or the *Deepwater Horizon.*  Their supervisor on the internal investigation team, Feredouin Abbassian, was already deposed on May 3 and 4, and their relevant knowledge is essentially duplicative of  Abbassian's.  Furthermore, Cameron's late notification of this deposition is unjustified, as the internal investigation team documents, including documents identifying team roles, were produced early in the discovery process, and other members of the internal investigation team were deposed as early as January 2011. Last, BP has already produced 46 witnesses, substantially more than any other party, and to produce another witness with knowledge duplicative to that of another BP deponent is completely unnecessary.

### Cameron's Response on Allen, Emmerson and Fleming (D. Beck 6/22)

First, Cameron's designation of these witnesses is timely and is in accord with the Court's scheduling orders. We identified these witnesses on May 9 in our Preliminary Witness list as "witnesses whom [Cameron] would like to depose prior to the February 27, 2012 trial." On May 27, the Court noted that Cameron had requested these witnesses and directed all parties that they could identify additional names through June 3.  In short, there is no factual or legal basis for BP's assertion that our requests are "late." Indeed, Cameron notes that BP has requested additional depositions even *after* Cameron identified Allen, Emmerson, and Fleming.

Second, the objection that these witnesses should not be deposed because their knowledge is "essentially duplicative" of Abbassian's testimony is unfounded. To our knowledge, the Court has never precluded the deposition of a witness because that witness' supervisor has testified. In terms of witnesses who collaborated on the Bly Report, there are numerous instances in which multiple individuals assigned to a particular issue have been deposed in addition to the team leaders--all without any objection from BP.

Third, any suggestion that these witnesses have no knowledge other than that possessed by Abbassian is contradicted by Abbassian's own testimony:

Q.    What were the names of the people directly underneath you?

A.    Norman Wong was looking after maintenance. Tony Emmerson was looking after testing, and also he was acting as my -- was, when I was away, and that was my, essentially right-hand man, put it that way, as a deputy team leader. Tim Allen was looking after BOP system and its performance. So anything he was involved with, BOP rating and any tests that we had to do to determine, for example, the impact of flow rate on elastomeric parts, so that was Tim Allen. And let me recall everybody. And then -- Nik Politis was looking after -- Nik Politis was reporting to Tim Allen. It was Ray Fleming who was leading the control system performance, so that is all the leaks, the performance of the parts, everything was under -- so Tim was the hardware, Tim Allen, and Ray Fleming was the control maintenance testing. Those are the four individuals. (Vol I, pp. 365-66, emphasis added)

Q.    But, again, the answer to who -- my question was focused on identifying the person who I can go to for BP and say, what did you see and why do you think that is consistent with an accumulator discharging? You don't know who that person is?

4

A.    No. Many people on my team may have the names. <u>Tony Emmerson</u> could be one individual
      who would be able to tell you the name of the individuals who actually observed the ROV,
      but more importantly the leak. (Vol II, p 701, emphasis added)

Q.    So you don't know -- so there were people on your team with more knowledge about the
      operation of the control system, is that true?

A.    I had a team of multidiscipline experts, yes.

Q.    Who would those people be that could answer the question that I just asked?

A.    <u>Ray Fleming</u>. (Vol II, p. 491, emphasis added)

Q.    On Page 157, you have a graph showing among other things Cameron shearing pressure
      BOP at surface. Do you see that?

A.    That's right here.

Q.    Do you know who on your team made those calculations?

A.    Yes, I do. <u>Tim Allen</u> was the name of the individual who did it.

Q.    Did Mr. Allen make all the -- well, there's also the calculation for BOP at seabed. Did Mr.
      Allen make that calculation as well?

A.    Using Cameron spreadsheet.

Q.    Using Cameron EB702D?

A.    Oh, yes, this was based on Cameron formulas, yes.

Q.    And was <u>Mr. Allen</u> aware of EB702D before getting involved with the BP investigation?

A.    I can't answer this question because I don't know. (Vol II, p. 708-09, emphasis added)

Q.    And that's Tab 3 in the – on the CD. Did you prepare Exhibit H? I'm sorry, Appendix H?

A.    Appendix H [the description of the Horizon BOP contained in the Bly Report] was primarily

written by a combination of <u>Tim Allen</u> and <u>Ray Fleming</u> because Tim was looking at the stack and -- pressure rating of the stack and Ray Fleming -- I have full accountability for what's in this, however. (Vol II, p. 715, emphasis added)

Fourth, while we appreciate that BP has produced more witnesses than any other party--fittingly, inasmuch as BP is the statutorily designated "responsible party" for OPA damages–that fact is utterly irrelevant to our request. Simply because other parties asked for and took depositions of multiple BP witnesses does not justify an attempt to preclude Cameron's investigation of BP witnesses knowledgeable about the BOP. Moreover, Cameron has requested only five BP depositions (and have withdrawn two of those).

<u>BP's Reply on Allen, Emmerson and Fleming</u> (Langam 6/23 at 10:29 a.m)

Allen, Fleming and Emmerson, who were supporting members of the BOP investigation for the BP Incident Investigation Team (IIT). As an initial matter, although Cameron may have submitted a request to depose these witnesses on May 3, BP produced documents and presented witnesses for deposition from the BP IIT early this year. Cameron, therefore, had ample opportunity prior to May 3 to identify and request Allen, Fleming and Emmerson for deposition. Indeed, BP presented numerous witnesses from the BP IIT in February and March of this year, and in many instances, including witnesses involved with the BOP investigation (*e.g.*, Walter Guillot), Cameron elected to ask no questions.

More significant, Allen, Fleming and Emmerson had no involvement with the *Deepwater Horizon* BOP prior to the April 20 incident, and therefore Cameron's only basis for seeking their deposition is the supporting role that these witnesses provided to the post-incident BOP investigation for the BP IIT, as the testimony cited from Abbassian indicates. As Cameron concedes, Abbassian,

the head of the IIT's BOP team, has already testified extensively regarding BP's investigation regarding the BOP, and the testimony that Cameron cites does not establish that Abbassian was unable to answer meaningful questions regarding BP's investigation or the conclusions that it reached. With respect to the testimony that Cameron cites for each proposed witness, I provide the following:

The cited Abbassian testimony indicates that Emmerson was Abbassian's deputy for the BOP investigation, but does not establish that Emmerson would know more or have any relevant information that would not be duplicative of Abbassian. Indeed, the one testimony snippet that Cameron cites only establishes that Emmerson may have information regarding the names of individuals who observed a leak during ROV intervention. If this is the primary basis for Emmerson's deposition, there are other witnesses, including Cameron's own employees, who were part of the incident response, who would have more direct access to this information than Emmerson.

The cited Abbassian testimony indicates that Fleming, who reported to Abbassian for the BOP investigation, investigated the control system performance for the *Deepwater Horizon* BOP, but once more does not establish that Fleming would know more or have any relevant information about the investigation beyond Abbassian. Cameron cites Abbassian testimony indicating that Fleming would know more about the *Deepwater Horizon* BOP control system.  But to the extent that Fleming's knowledge of the characteristics and specifications of the *Deepwater Horizon* BOP control system learned after the incident is the basis for Cameron's request, Cameron only has to request such information from its own employees, who engineered, manufactured and serviced the *Deepwater Horizon* BOP.

The cited Abbassian testimony indicates that Allen had responsibility for "looking at the BOP system and its performance" for the BOP investigation, but once more does not establish that Allen, who reported to Abbassian, would know more or have any relevant information beyond Abbassian's testimony about the investigation. Cameron cites testimony from Abbassian that Allen performed a shear calculation for the BOP investigation, but this alone does not indicate a need for his testimony. Indeed, the formula that Allen used, according to Abbassian's testimony, is from a Cameron engineering bulletin, and therefore, Cameron has full knowledge regarding it.

Although Cameron's hand-picked Abbassian testimony indicates that Allen, Fleming and Emmerson had certain roles with the BOP investigation that the BP IIT conducted, it does not set forth a compelling need for their depositions. These witnesses obtained information about the *Deepwater Horizon* BOP after the incident, and in furtherance of an investigation about which Dr. Abbassian has already ably testified. BP also has presented numerous witnesses who Cameron has had the opportunity to question about BP's knowledge of the *Deepwater Horizon* BOP, and BP will present shortly a Rule 30(b)(6) witness who will testify regarding numerous BOP-related topics, including 3 new BOP-related topics that Cameron was granted permission to add.

To conclude, given the dozens of witnesses that BP has willingly presented in this matter, and the substantial burden to BP for presenting three witnesses whose testimony is likely duplicative or of limited value, BP respectfully requests that the Court deny Cameron's request to depose Messrs. Allen, Fleming and Emmerson.

<u>Cameron's Sur-Reply</u> (D. Beck 6/23/11 at 4:25 p.m.

In its original June 10 objection to those depositions, BP claimed that (1) these individuals' knowledge was "essentially duplicative" of Feredouin Abbassian; (2) Cameron's request to depose these individuals was "late"; and (3) BP has already produced more witnesses than any other party.

In his comments above, Mr. Langan nevertheless contends that Cameron has not set forth

8

a "compelling need" for the depositions. Aside from the fact that "compelling need" is not the standard to take a deposition under the Federal Rules, Cameron believes that there *is* a compelling need to depose these individuals. According to Abbassian, Emmerson, Allen, and Fleming were each responsible for specific aspects of BP's internal investigation which led to substantial findings concerning the maintenance and performance of the Deepwater Horizon BOP. Based in whole or in part on those findings, BP has now sued Cameron seeking to hold it responsible for the BP oil spill. Under these circumstances, Cameron should be permitted to discover what these individuals know about BOPs and to test their findings.

Obviously, Cameron cannot know the full extent of these witnesses' knowledge until it takes their depositions. However, what we do know from Abbassian's deposition testimony is that their knowledge is not "essentially duplicative" to his knowledge with respect to the BP internal investigation. Moreover, from the deposition testimony of others, we know that these individuals have information relating to BOPs beyond that obtained during the BP investigation. Among other things, we know that:

Fleming had technical knowledge regarding BOPs prior to his involvement with the BP internal investigation (deposition of J. Wetherbee, at 347).

Fleming was involved in making interim recommendations concerning BOPs after April 20 (deposition of N. Wong, at 379-382).

Fleming and Emmerson were identified by the head of BP rig audit team as two of the three people involved in BP internal investigation with the most knowledge concerning BOPs (Dr. Abbassian was not one of them) (deposition of N. Wong, at 131-33).

Emmerson was the source control leader as of April 26, 2010 (deposition of R. Lynch, at 95), and he was present during and witnessed BOP intervention activities after the incident (deposition of H. Thierens, at 672-74).

Allen was involved in the preparation of an appendix to a key rig audit for the Deepwater Horizon (deposition of N. Wong, at 394-95).

BP has sued Cameron over the BOP. It should not be permitted to shield its employees with knowledge directly relevant to its claims.

HALLIBURTON EMPLOYEES

BP requests the depositions of James Bement, Melissa Bergman, Karl Blanchard, Jim Brown, Jim Prestidge, and Simon Turton.  Transocean requests the depositions of Simon Turton and Anthony Badalamenti.  Halliburton objects to their depositions.

James Bement

Halliburton reports that BP seeks the deposition of James Bement, the Vice President of Sperry, because BP thinks he has knowledge of Sperry performance issues and non-productive time on the *Deepwater Horizon*.  John Gisclair was deposed as Halliburton's primary 30(b)(6) designee for Sperry issues on March 14-15, and an additional 30(b)(6) designee, Skip Clark, is tentatively scheduled to testify regarding contractual issues between BP and Sperry. Such contractual issues would include the topics sought by BP. In his personal capacity, Bement knows nothing about issues related to the blowout, thus he lacks any information relevant to Phase One. For these reasons, Halliburton contends that Bement should not be included on the Phase One deponent list.

BP responds that as the vice-president of Sperry Drilling, Bement would have information on the mud logging services that Halliburton provided on the Deepwater Horizon.  Gisclair's deposition topics did not include Sperry Drilling's performance issues.  Further, Probert testified at his deposition that Bement would be the best person to ask about safety information on the drilling and mud logging services provided by Halliburton/Sperry Drilling.[3]  Probert also testified that

---

[3] Q. Mr. Karl Blanchard. Okay. With respect to the mud logging services, if I wanted to ask about what Halliburton expects of its employees with respect to safety and mud logging services, who would be

Bement provided him with information about Sperry Drilling for Probert's public statements on behalf of Halliburton regarding the incident.[4]  Bement has knowledge of the incident and is the proper person to offer information on Sperry's safety guidance and practices given to its mud loggers on the *Deepwater Horizon*, as well contractual issues between BP and Sperry.  As such, Bement should be included on the Phase One deponent list.

<u>Mellissa Bergman</u>

Halliburton reports that BP seeks to depose Melissa Bergman about HSE training materials, including stop work authority, and an email she authored stating that Halliburton was remotely monitoring the realtime data during the incident. Bergman's job duties include conducting training with Halliburton's HSE group, and she reports directly to Tim Probert, the Chief HSE Officer. Bergman's involvement with HSE involving process safety issues began post-incident, with the implementation of Halliburton's new HSE plan in 2011. Any information Bergman possesses regarding HSE process safety training materials therefore post-dates the incident and is not relevant to Phase One of the trial. Bergman does not have any personal knowledge regarding the Macondo incident. Further, upon inquiry, Bergman has informed regarding the email referenced in BP's deposition request, that she was merely reporting information told to her by another person. She has no personal knowledge of the monitoring of real time data before, during, or after the Incident.  For this reason, Halliburton contends that Bergman should not be included on the Phase One deponent list.

BP responds that Bergman is Halliburton's head of HSE and has responsibility for issuing

---

the best person at Halliburton to -- in a position to answer that question?
    A. That would be James Bement, who heads up the Sperry Drilling Services product line. (5-10-2011 Probert Dep. Tr. at 424: 14-23).

[4] 5-10-2011 Probert Dep Tr. at 426:2-12.

and disseminating training materials related to stop work authority.  Probert has contended that Halliburton employees only stop work when there is a "clear and present" danger to health, safety or environment.  However, he was unable to explain how training for this standard worked and testified that Bergman would have knowledge about Halliburton's stop-work training materials.[5] Halliburton contends that its employees were not required to stop the cement job unless there was a "clear and present" danger and that a cement job does not raise this type of concern.  Thus, Bergman should be included on the Phase One deponent list.

<u>Karl Blanchard</u>

Halliburton reports that BP seeks to depose Karl Blanchard because he is Halliburton's Vice President in charge of the Cementing Service Line and is Richard Vargo's direct supervisor, and also because he "would have information related to cement training and guidance materials, including on the design and testing of cement slurries."  However, Blanchard was not Vice President of the Cementing Service Line at the time of the Incident, nor did he have anything to do with Macondo. Tommy Roth served in this Vice President role during the relevant time period, and his deposition is set for June 27-28. For this reason, Halliburton contends that Blanchard should not be included on the Phase One deponent list.

BP responds that Blanchard ran the Testing and Subsea division of Halliburton before the incident, and his understanding of Halliburton services and cementing principles extends broadly. Regardless of Blanchard's actual position within the cementing service line during the time of the Macondo incident, Tim Probert testified that Blanchard would have information related to cement training materials.  The training of Halliburton personnel on cement design, testing and operations

---

[5]   Q. Okay. So let me restate the question. For Halliburton Ms. Bergman would have the responsibility for issuing those types of training materials relating to stop work authority; is that right?
A. At a high level. Then it would be disseminated down through the organization, yes. (5-9-2011 Probert Dep. Tr. at 385:16-23).

is important to the issues for the Phase One trial.  As such, Mr. Blanchard should be included on the Phase One deponent list.

<u>Jim Brown</u>

Halliburton reports that BP seeks to depose Jim Brown, Halliburton's President--Western Hemisphere. BP claims that Brown would purportedly know if any guidance was issued to Halliburton's engineers after the *Deepwater Horizon* incident. BP also notes that Brown sent a letter to employees on 10/28/10 sharing Halliburton's post-Incident investigation, and BP vaguely claims he "may have information concerning Halliburton's investigation" as a result. Jim Brown is a senior executive and Halliburton's President of Operations in the Western Hemisphere. He was not personally involved in any Halliburton internal investigation. Further, Brown did not have involvement in or responsibility for the Macondo well during Phase One events. He therefore has no first-hand knowledge of any facts that are relevant to Phase One. For these reasons, Halliburton contends that Brown should not be included on the Phase One deponent list.

BP responds that Brown is the president of operations in the Western Hemisphere, which would include Halliburton's operations in the Gulf of Mexico for the Macondo well.  Further, Tim Probert testified that Brown is the best source of information regarding the existence of technical guidance documents issued to Halliburton engineers in the Western Hemisphere.[6]  Although Halliburton claims that Brown had no involvement in any Halliburton internal investigation, Brown sent an update to all Halliburton employees regarding Halliburton's positions relating to the incident, which shows that he has knowledge of Halliburton's post-incident investigation and some

---

[6]  Q. Who is the best person to ask at Halliburton if such documents existed? Who should -- who would know?
     A. I mean, if it was issued by Mr. Brown, then Mr. Brown would be the person that would know about it. (5-10-2011 Probert Dep. Tr. at 457-58: 21-1)

13

knowledge on the facts of the incident.[7]  Brown should be included on the Phase One deponent list.

<u>Jim Prestidge</u>

Halliburton reports that BP seeks to depose Jim Prestidge because he is the Vice President of HSE and he was identified in a deposition as having information regarding the practices and standards governing Halliburton's provision of services to customers, including any process safety standards. Prestidge reports directly to Tim Probert, the Chief HSE Officer. Prestidge's involvement with HSE began post-Incident, with the implementation of Halliburton's new HSE plan in 2011. Therefore, any information he possesses in his role as Vice President of HSE, including the practices, standards and process safety standards sought by BP, post-dates the Incident and is not relevant to Phase One of the trial.  Halliburton contends that Prestidge therefore should not be included on the Phase One deponent list.

BP responds that Tim Probert stated in his deposition that Prestidge is the best person to ask regarding the new process safety protocols and strategies that have been implemented at Halliburton following the incident.  Such information is highly relevant because the person in charge of implementing changes and improvements to Halliburton's safety protocols or strategies would be able to shed light on the deficiencies in its prior practices.[8]  The process safety protocols and training of Halliburton is relevant to the actual performance of its services at the Macondo well.  As such, Mr. Prestidge's deposition should occur during Phase One discovery.

<u>Simon Turton or Anthony Badalamenti</u>

Halliburton reports that BP (and Transocean as to Badalamenti) seeks to depose either Simon

---

[7]  5-10-2011 Probert Dep. Tr. at 608-610.

[8]  Q. Right. But in terms of process safety 2011 strategy, not focused just on nonproductive time but on other issues, who would be the best person to ask whether such documents exist?
A. Mr. Prestidge, who heads up our health, safety, environmental and service within the organization. (5-10-2011 Probert Dep. Tr. at 458: 2-9).

Turton or Anthony Badalamenti because it "believe[s] they have information regarding Halliburton's post-incident cement testing and investigation." Tim Quirk, the Area Lab Manager for the Gulf of Mexico, was deposed on March 21-22. During his deposition, Quirk testified about post-Incident cement testing and investigation. Tommy Roth and Ronnie Faul will be deposed on June 27-28 and June 29-30, respectively. Both Roth and Faul are likely to provide additional information regarding post-Incident cement testing and investigation, making the testimony of Simon Turton and/or Anthony Badalamenti unnecessary for Phase One.  For these reasons, Halliburton contends that neither Turton nor Badalamenti should be included on the Phase One deponent list.

BP responds that Quirk testified that  Turton and Badalamenti asked him to conduct post-incident testing on the Macondo slurry.[9]  Quirk ran that testing and reported the results of the testing to Turton and Badalamenti.[10]  There is no evidence that Faul or Roth attended this phone conference or received the information.[11]   Turton and Badalamenti likely took further actions with the post-incident testing results, and possibly discussed the significance of the test results and the defects in the slurry design used at the Macondo well with others within Halliburton. Very few, if any, documents related to this testing and apparently no documents related to communications about the testing have been produced.  Thus the deposition of Turton and/or Badalamenti is necessary during Phase One to discover the results and communications about this post-incident testing that Halliburton conducted.

<u>Mark Mazella</u>

Halliburton requests Mazella's deposition.  It reports that he is BP's Segment Engineering

---

[9]  3-21-2011 Quirk Dep. Tr. at 92-93.

[10]  3-21-2011 Quirk Dep. Tr. at 104-105.

[11]  3-21-2011 Quirk Dep. Tr. at 91-93.

Technical Authority for Well Control.  His one day Rule 30(b)(6) deposition, revealed that he has independent knowledge regarding well control issues.  He was a key player in the relief operations and in the development of BP's flow path theory.  From his position, he should have insight about BP's perspective on well control issues and risk management.

BP objects to the deposition.  It reports that Mazzella's one-day deposition per 30(b)(6) was on the pre-incident well control topics that fall within his factual knowledge/responsibility as the BP Segment Engineering Technical Authority (SETA) for Well Control.  Also, Halliburton already asked him about flow path as part of the static kill & the relief well topics.  To the extent Halliburton feels the need to ask him more about flow path or his role in the response outside the 30b6 topics they can do so in September (or later) as part of Phase 2, where he is already on the deponent list.  BP contends that there is no need to bring him back now in the event phase.

<u>Dr. Robert Beirute</u>

Anadarko requested the deposition of Dr. Robert Beirute.  It submitted a letter, dated June 27, 2011, which will be filed in the record.  On June 22, 2011 and in response to Anadarko's first requests for the deposition, BP responded that some time ago it retained Mr. Beirute as a litigation consultant.  And so if a fact deposition based on his pre consultation work does go forward, it would have to be under the condition that he not be questioned about his consultancy relating to the litigation.  Of course, should BP have Mr. Beirute issue a report as a Rule 26 testifying expert, we are aware the Court would allow a deposition of Mr. Beirute as part of expert discovery in due course.

More generally, BP believes the Court faces some competing goals here -- the desire by all parties and the Court to keep the aggressive schedule in place versus the continuing requests by various parties for more and more fact depositions both before and after July 31. It would seem some limits should be put in place, as was the case with the original "priority" list of deponents from

16

February. And so BP does lodge an objection to this request for a fact deposition based on the large number of depositions already scheduled (and to be scheduled) for BP deponents and the marginal incremental benefit of the requested deposition.