**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico on April 20, 2010 | * | SECTION "J" |
| | * | JUDGE BARBIER |
| This Document Relates to: | * | |
| 2:10-CV-04536 | * | MAGISTRATE NO. 1 |
| | * | MAGISTRATE SHUSHAN |
| * * * * * * * * * * * * | | |

**REPLY IN SUPPORT OF ANADARKO E&P COMPANY LP'S**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.      AE&P WAS NOT A LESSEE AT THE TIME OF THE DISCHARGE AND, THEREFORE, IS NOT A "RESPONSIBLE PARTY" UNDER OPA ............................. 2

        A.      Pursuant to MMS Regulations, MMS' Approval Confirmed the Effective Date of AE&P's Assignment as April 1, 2010 ......................................... 2

        B.      The assignment did not seek to transfer OPA liability, and, therefore, 33 U.S.C. §2710(b) is inapplicable ................................................................ 5

II.      AE&P IS NOT LIABLE UNDER THE CWA .................................................. 7

        A.      The United States Cannot Rely on General Allegations to Support its Claims Against AE&P ....................................................................... 7

        B.      AE&P Was Not an Owner of an Offshore Facility at the Time of the Incident ... 10

        C.      AE&P Was Not an Operator of Any Offshore Facility at the Time of the Incident ............................................................................................. 12

        D.      AE&P is Not a Person in Charge Under the CWA ................................. 18

III.     OPA/CWA LIABILITY IS NOT AN "ACCRUED" LEASE OBLIGATION UNDER OCSLA THAT EXTENDS BEYOND THE EFFECTIVE DATE OF AN ASSIGNMENT .................................................................................. 20

IV.     THE UNITED STATES CANNOT DEFEAT A MOTION TO DISMISS BY ARGUING IT NEEDS FURTHER DISCOVERY ......................................... 23

CONCLUSION ................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................. 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ackerson v. Bean Dredging LLC*, 589 F.3d 196 (5th Cir. 2009) ........................................23

*A&D Partnership v. Equity Group, Inc.*, No. 87-3139, 1988 WL 141942
    (E.D. La. Dec. 23, 1988)........................................................................................................23

*Aero-Motive Co. v. Becker*, No. 1:99-C 2001 WL 1699191 (W.D. Mich.
    Oct. 2, 2001) ..........................................................................................................................16

*Amber Resources Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008)..........................22

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...........................................................................8

*Bank of Sacramento v. Stewart Title Guaranty Co.*, No. 09-00771,
    2010 WL 3784096 (E.D. Cal. Sept. 27, 2010)............................................................24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................8, 10

*City of Waukegan, Ill. v. National Gypsum Co.*, 560 F. Supp. 2d 636
    (N.D. Ill. 2008)......................................................................................................................16

*Coy/Superior Team v. BNFL, Inc.*, 174 F. App'x 901, 2006 WL 891046
    (6th Cir. Apr. 3, 2006) ...........................................................................................................6

*Duffy v. Ticketreserve, Inc.*, 722 F. Supp. 2d 977 (N.D. Ill. 2010)....................................24

*Ferrer v. Chevron Corp.*, 484 F.3d 776 (5th Cir. 2007) ......................................................8

*Fisher Development Co. v. Boise Cascade Corp.*, 37 F.3d 104 (3d Cir. 1994)..................5

*Flynn v. CIT Group*, 294 F. App'x 152, 2008 WL 4375928
    (5th Cir. Sept. 26, 2008)........................................................................................................8

*Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003) .............................................14

*GOM Shelf LLC v. Sun Operating Ltd. Partnership*, No. 4:06-cv-3444,
    2008 WL 901482 (S.D. Tex. Mar. 31, 2008).................................................................4

*In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201 (5th Cir. 2010).......................8

*Gulf States Manufacturers, Inc. v. NLRB*, 579 F.2d 1298 (5th Cir. 1978) .........................3

*Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400 (3d Cir. 1995)...............................5

*John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993) ...................................5

*K.C. 1986 Ltd Partnership v. Reade Manufacturing*, 472 F.3d 1009
    (8th Cir. 2007)..................................................................................................................16

*Landry v. Huthnance Drilling Co.*, 889 F.2d 1469 (5th Cir. 1989)....................................14

*Liberty Services, Inc. v. Amoco Production Co.*, No. 90-4490, 1991 WL 278673
    (E.D. La. Dec. 23, 1991) .................................................................................................4

*Litgo N.J., Inc. v. Martin*, No. 06-2891, 2010 WL 2400388
    (D.N.J. June 10, 2010) ...................................................................................................14

*Lovick v. Ritemoney Ltd.*, 378 F.3d 433 (5th Cir. 2004)....................................................8

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001).........................................................7

*Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604
    (2000)...............................................................................................................................22

*Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171
    (2d Cir. 2003).................................................................................................................17

*Noble Energy, Inc. v. Salazar*, No. 02013, 2001 WL 996776
    (D.D.C. Mar. 22, 2011)..................................................................................................21

*In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710 (E.D. La. 2010) ....................6

*Plotkin v. IP Axess Inc.*, 407 F.3d 690 (5th Cir. 2005) ......................................................8

*Puerto Rico Ports Authority v. PCI International Inc.*, 200 F. Supp. 2d 61
    (D. P.R. 2002) ................................................................................................................16

*Reddish v. J.P. Morgan Chase*, No. SA-10-CA-955-XR, 2011 WL 573413
    (W.D. Tex. Jan. 3, 2011)..................................................................................................8

*Russell v. Choicepoint Services, Inc.*, 302 F. Supp. 2d 654 (E.D. La. 2004)....................24

*Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003)...........19, 20

*Skidmore Energy, Inc. v. KPMG LLP*, No. Civ. A. 3:03CV2138-B,
    2004 WL 3019097 (N.D. Tex. Dec. 28, 2004) ...........................................................24

*Stewart v. United States*, No. H-09-2462, 2009 WL 3334366
    (S.D. Tex. Oct. 14, 2009).........................................................................................8, 10

*Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257
    (5th Cir. 2008)................................................................................................23

*United States v. Bestfoods*, 524 U.S. 51 (1998) .................................................13

*United States v. Carr*, 880 F.2d 1550 (2d Cir. 1989)........................................19

*United States v. Friedland*, 173 F. Supp. 2d 1077 (D. Colo. 2001)..................16

*United States v. Jones*, 267 F. Supp. 2d 1349 (M.D. Ga. 2003) .......................14

*United States v. Tex-Tow, Inc.,* 589 F.2d 1310 (7th Cir. 1978) .........................14

*United States v. Viking Resources, Inc.*, 607 F. Supp. 2d 808 (S.D. Tex. 2009)..............13

## FEDERAL STATUTES

33 U.S.C. §1321(a)(2)........................................................................................17

33 U.S.C. §1321(a)(6)........................................................................................13

33 U.S.C. §1321(b)(7) .......................................................................................12

33 U.S.C. §2701(26) ..........................................................................................13

33 U.S.C. §2701(32) .......................................................................................2, 13

33 U.S.C. §2710(b) ..............................................................................................5

42 U.S.C. §6903(3) ............................................................................................17

42 U.S.C. §9601(20) ..........................................................................................13

42 U.S.C. §9601(29) ..........................................................................................17

42 U.S.C. §9607(e) ..............................................................................................5

43 U.S.C. §1348(b)(2) .......................................................................................17

P.L. 101-380, §4201...........................................................................................23

P.L. 101-380, §4301...........................................................................................23

## ADMINISTRATIVE MATERIALS

30 C.F.R. §250.105 ................................................................................................. 13, 16

30 C.F.R. §250.143(a) ................................................................................................. 16

30 C.F.R. §256.62(c) ................................................................................................. 3, 6

30 C.F.R. §256.62(d) ................................................................................. 4, 20, 21, 22

30 C.F.R. §256.62(f) ................................................................................................. 4

58 Fed. Reg. 45,255 (Aug. 27, 1993) ......................................................................... 20, 21

62 Fed. Reg. 27,948 (May 22, 1997) ......................................................................... 21

**MAY IT PLEASE THE COURT:**

## INTRODUCTION

The United States alleges that Anadarko E&P Company LP ("AE&P") is liable under the Oil Pollution Act ("OPA") and Clean Water Act ("CWA") because it did not transfer its alleged interest in the lease for the Macondo Prospect prior to the Deepwater Horizon tragedy. But, consistent with the December 2009 Lease Exchange Agreement, AE&P executed an assignment of its lease interest on April 15, 2010. That assignment was approved by the Minerals Management Service ("MMS") (now Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE")), with an effective date of April 1, 2010. The arguments of the United States opposing AE&P's Motion to Dismiss are contrary to its approval of the assignment with an April 1, 2010 effective date, and contrary to the public records of BOEMRE. In fact, these records still reflect the termination of AE&P's leasehold interest as April 1, 2010.

The remainder of the arguments by the United States stem from AE&P's alleged status as a lessee or attempt to raise factual issues.[1] The factual issues are speculative, go beyond the allegations in the Complaint, and are irrelevant to the motion to dismiss. Thus, the Court should not condone a request to engage in a fishing expedition in a futile effort to defeat AE&P's motion to dismiss. The United States simply raises no valid argument to support its claims against AE&P and, therefore, the Complaint must be dismissed.

---

[1] With its Opposition to AE&P's Motion to Dismiss, the United States also filed a motion for partial summary judgment, including a list of allegedly "undisputed material facts." Despite that there are nine defendants named in the United States' Complaint and that discovery is ongoing, the United States seeks summary judgment against Anadarko Petroleum Corporation ("APC") and AE&P only. Pursuant to Pretrial Order No. 15, APC and AE&P have no obligation to respond to the motion for summary judgment or to the United States' statement of allegedly undisputed material facts at this time. APC and AE&P submit that it makes no sense for the Court to address partial motions for summary judgment at this stage of the litigation given the numerous and complex overlapping legal and factual issues common to all defendants named in the United States' Complaint.

## ARGUMENT

## I.   AE&P WAS NOT A LESSEE AT THE TIME OF THE DISCHARGE AND, THEREFORE, IS NOT A "RESPONSIBLE PARTY" UNDER OPA.

The United States seeks to hold AE&P liable under OPA as a lessee of an area in which an offshore facility was located.[2]  The United States admits that OPA liability in this case does not extend to former lessees.  The United States also admits that AE&P transferred any lease interest it held to APC, that the assignment was executed April 15, 2010, and that the effective date of the lease assignment was April 1, 2010.  In a last ditch effort to preserve its claims, the United States now seeks to nullify its own decision approving the April 1, 2010 effective date of the assignment.  It also conveniently ignores that BOEMRE continues to recognize that AE&P was no longer a leaseholder as of April 1, 2010.[3]  The United States now argues, unpersuasively, that the assignment was somehow "last-minute" and sought to "retroactively" transfer liability. US Opp'n at 9-12 [Doc. 2587-2].  These arguments are wrong.

### A.   Pursuant to MMS Regulations, MMS' Approval Confirmed the Effective Date of AE&P's Assignment as April 1, 2010.

The United States argues that AE&P, through an assignment executed April 15 *and approved by MMS*, impermissibly seeks to retroactively avoid OPA liability.  This argument fails because MMS regulations expressly recognize the parties' right to state an effective date in the assignment.  While approval by the MMS Regional Director is required for assignments, MMS

---

[2]     For offshore facilities, responsible parties include "the lessee or permittee of the area in which the facility is located . . .."  33 U.S.C. §2701(32)(C).  For purposes of this motion to dismiss, the Court does not need to determine what is the relevant offshore facility.

[3]     As recently as June 27, 2011, BOEMRE acknowledged in the context of a royalty proceeding that AE&P "assigned its 22.5 percent share of Lease OCS-G 32306 to Appellant [(APC)], effective April 1, 2010," and that "[f]rom April 1, 2010, to the present, Appellant [(APC)] has held a 25 percent share of Lease OCS-G 32306."  BOEMRE, Office of Natural Resources Revenue, Answer, IBLA No. 2010-228, at ¶¶4-5 (filed June 27, 2011) (attached hereto as Exhibit 1).

regulations provide: "Any approved assignment *shall be deemed to be effective* on the first day of the lease month following its filing in the appropriate office of the MMS, *unless at the request of the parties, an earlier date is specified in the approval.*"   30 C.F.R. §256.62(c) (emphasis added).   Agency regulations, which have the effect of law, bind the agency's interpretation of OCSLA. *Gulf States Mfrs., Inc. v. NLRB*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid.") (citations omitted).   Because the parties requested April 1, 2010 as the effective date of the transfer from AE&P to APC, and MMS approved that assignment, MMS regulations dictate that April 1, 2010 is the relevant date to determine lessee status, not the date of MMS approval.

The United States nevertheless contends that the assignment was "ineffective" until the MMS approved the assignment on April 28, 2010, and that, therefore, AE&P was still a lessee on April 20, 2010.   US Opp'n at 9-10 [Doc. 2587-2].   In support of this claim, the United States cites to the regulation that requires the Regional Director to *approve* assignments.   *Id.* at 10 (citing 30 C.F.R. §256.62(a)).   But, this provision does not dictate or affect the assignment's effective date.   As long as MMS approval is received, the regulations recognize the parties' declaration of the effective date.   The fact that approval was not given until April 28, 2010 does not change the effective date approved by MMS.   30 C.F.R. §256.62(c).   Indeed, MMS could have chosen not to approve the assignment, and understood the consequences of doing so.

By now arguing that assignments should not be considered effective until the MMS actually approves the assignment, the United States is essentially trying to have this Court re-write MMS' regulations.   Nothing in the regulations supports that result.   Instead, MMS regulations impose liability on the assignor, here AE&P, only if the assignee "fails to perform

3

any obligation under the lease . . . to the extent that the obligation accrued before the Regional Director approved the assignment."  30 C.F.R. §256.62(f); *see also id.* §256.62(d).  The United States does not allege, however, that AE&P is liable because APC has not fulfilled any obligations under the lease.

The United States cites *Liberty Services, Inc. v. Amoco Production Co.*, to contend that AE&P was still a lessee on April 20, 2010, because the assignment was not approved until April 28, 2010.  No. 90-4490, 1991 WL 278673 (E.D. La. Dec. 23, 1991).  That case, however, provides no support for the United States' argument.  In *Liberty Services*, the MMS *denied* the lease assignment was approved at all:  "Although the Amoco's assignment of its interest in the southern one-third is marked approved on its face, the MMS lease records do not show that this transaction has been approved, and the MMS has advised Amoco that the assignment has not been approved."  *Id.* at *6.  Here, on the other hand, MMS does not deny it approved the assignment, and its records reflect April 1, 2010 as the effective date.

Courts reviewing the effective date of an approved assignment have routinely held that the effective date of the assignment is the date requested rather than the date of approval.  *See, e.g.*, *GOM Shelf LLC v. Sun Operating Ltd. P'ship*, No. 4:06-cv-3444, 2008 WL 901482, at *3 (S.D. Tex. Mar. 31, 2008) (recognizing that assignment approved by MMS on October 25, 2000 with an effective date of July 8, 2000 transferred lease interests "as of July 8, 2000").[4]

---

[4]      Although the court in *GOM Shelf LLC v. Sun Operating Limited Partnership* stated, in *dicta*, that certain well decommissioning obligations of former lessees (assignors) may have accrued before the assignment occurred, that case did not address the separate issue of liability under other statutes, such as potential OPA liability for an event that had not occurred at the time of the assignment.  2008 WL 901482, at *7.

**B.      The assignment did not seek to transfer OPA liability, and, therefore, 33 U.S.C. §2710(b) is inapplicable.**

The United States also contends that the MMS-approved assignment "contravenes" the limitation in OPA Section 2710(b) that limits the ability of parties to "transfer liability imposed under this Act from a responsible party or from any person who may be liable for an incident under this Act to any other person."  US Opp'n at 10 (quoting 33 U.S.C. §2710(b)) [Doc. 2587-2].  But this provision is inapplicable here, because the assignment of the leasehold interest occurred on April 15, 2010, with an effective date of April 1, 2010, which establishes that AE&P was not liable as a responsible party in the first place.

Section 2710(b) governs attempts to "transfer liability" from an otherwise responsible party through an "indemnification, hold harmless, or similar agreement or conveyance," but nowhere addresses the timing and validity of an assignment of an interest in the lease that precedes an OPA event, even if approved after the event.  33 U.S.C. §2710(b).  The United States correctly notes that the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") contains a similar provision at 42 U.S.C. §9607(e), and that courts have interpreted this provision as prohibiting parties from using contractual provisions to transfer liability vis-à-vis the United States, "although parties may still contractually allocate the costs of environmental clean up among themselves."  US Opp'n at 11 n.6 (listing cases) [Doc. 2587-2].  The cases cited by the United States are inapposite, as they do not involve a change in *status* of interest in the applicable facility (as defined in CERCLA) and, therefore, a change in status as a potentially liable party under the statute in the first place.[5]  Indeed, as is the case here, in

---

[5]      *Cf. Hatco Corp. v. W.R. Grace & Co. Conn.,* 59 F.3d 400 (3d Cir. 1995) (interpreting an assumption agreement in CERCLA dispute between two private parties); *Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104 (3d Cir. 1994) (interpreting a release in CERCLA dispute between two private parties); *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir. 1993) (addressing direct liability under CERCLA based on corporate successorship).

*Coy/Superior Team v. BNFL, Inc.*, the Sixth Circuit recognized that the provision does not limit the transfer of *title* for purposes of determining if the party is liable: "This provision does not even make any reference to title of hazardous wastes, let alone restrict the transfer of such title as Coy/Superior claims.  It only governs *the transfer of liability* for such wastes."  174 F. App'x 901, 908, 2006 WL 891046, at *6 (6th Cir. Apr. 3, 2006) (emphasis added).

The United States also relies on *In re Petition of Settoon Towing LLC*, 722 F. Supp.2d 710 (E.D. La. 2010), which involved a state-issued lease not covered by 30 C.F.R. §256.62(c). In that case, almost eight months *after* the incident giving rise to liability, the assignor executed an assignment that contained an effective date prior to the date of the incident.  Here the assignment was executed before the incident.  Although the United States attempts to minimize this critical distinction in a footnote, US Opp'n at 11 n.7 [Doc. 2587-2], the decision in *Settoon Towing* did not turn on the fact that the assignment was approved after the incident.  *Id.*

Here, the relevant documents cited by the United States in its Complaint clearly reflect the parties always intended that AE&P would transfer its leasehold interest to APC, and AE&P did so on April 15, 2010, with an effective date of April 1, 2010.  Per MMS regulations, MMS' approval of the assignment on April 28, 2010 confirmed the transfer of interest *as of April 1, 2010*.  AE&P, therefore, was not a lessee as a matter of law on April 20th.  AE&P was not seeking to transfer any liability, as no such liability had attached in the first place.

As a last resort, the United States tries to manufacture factual issues to avoid dismissal and continue with needless discovery.  The United States argues that "[o]bviously" the closeness of the date of submission and the assignment and the date of the explosion "raise a host of questions" and that "early discovery suggests that the roles of AE&P and APC with respect to

the Macondo Well seem to be intertwined."[6]  US Opp'n at 16 [Doc. 2587-2].  Such "obvious"

questions, however, are pure speculation and are of no significance, because the dates of the

assignment, submission, and approval are not disputed.  Further, the United States does not raise

an alter ego theory in its Complaint, so the relationship between AE&P and APC, whether

intertwined or not, is not at issue here.  Moreover, the United States cites no legal basis why

these facts, even if the United States had alleged them in the Complaint, have any relevance to its

OPA claim *against AE&P*.  In fact, why the assignment was submitted to MMS in April of 2010

and the relationship between APC and AE&P are wholly irrelevant to determining whether

AE&P itself was a lessee at the time of the incident.  Under MMS regulations, the answer is that

AE&P was *not* a lessee at the time of the incident as a matter of law.

## II.     AE&P IS NOT LIABLE UNDER THE CWA.

### A.     The United States Cannot Rely on General Allegations to Support its Claims Against AE&P.

The United States asserts that the Complaint "properly sets forth specific factual

allegations sufficient to support the United States' claims that Defendant AE&P is . . . liable

under CWA Section 311(b)(7), 33 U.S.C. §1321(b)(7)."  US Opp'n at 25 [Doc. 2587-2].  But the

Complaint seeks to rely on mere conclusory statements and general allegations related to all

"defendants."  These allegations are insufficient to defeat a motion to dismiss.

The United States contends that AE&P seeks to "impose a heavy burden" by requiring

specific facts be pled concerning AE&P.  US Opp'n at 34 [Doc. 2587-2].  Although the United

States takes issue with AE&P's citation of an Eleventh Circuit case, *Magluta v. Samples*, 256

F.3d 1282 (11th Cir. 2001), *cited in* US Opp'n at 35 [Doc. 2587-2], the Supreme Court and the

---

[6]     Based on these claims, the United States apparently believes that the motion to dismiss raises factual issues surrounding the transfer of AE&P's leasehold interests to APC.  These same factual issues also implicate the United States' claims regarding liability under the CWA.

Fifth Circuit have expressly required that "sufficient factual matter" be asserted in a Complaint to state a claim. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'[C]onclusory allegations, unwarranted factual inferences, or legal conclusions'" are insufficient. *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). When assessing a motion to dismiss, only "well-pleaded factual allegations" should be considered in construing the Complaint. *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

The "bare assertions" in the Complaint are "nothing more than a formulaic recitation of the elements" of the claim and insufficient to show that "plaintiff has a facially valid . . . claim." *Reddish v. J.P. Morgan Chase*, No. SA-10-CA-955-XR, 2011 WL 573413, at *3 n.37, *6 (W.D. Tex. Jan. 3, 2011). For example, the Complaint fails to specify what factual allegations support its claim that AE&P is liable as an "owner, operator, and/or person in charge of an offshore facility." Compl. ¶72 (Case No. 10-4536, Docket No. 1) (hereinafter "Compl."). "While a complaint does not need detailed factual allegations to survive a motion to dismiss, factual allegations must support that a right to relief is neither speculative nor merely a conclusion." *Flynn v. CIT Group*, 294 F. App'x 152, 154, 2008 WL 4375928, at *2 (5th Cir. Sept. 26, 2008); *see also Stewart v. United States*, No. H-09-2462, 2009 WL 3334366, at *2 (S.D. Tex. Oct. 14, 2009) ("Even accepting all of Stewart's factual allegations as true, the court concludes that Stewart has not stated a claim that is plausible on its face. His Complaint consists only of conclusory statements and 'naked assertions devoid of further factual enhancement,' which are insufficient under the Rule 8(a)(2) standard articulated in *Iqbal and Twombly*.").

The only specific allegations related to AE&P in the Complaint are references to provisions of the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"),[7] which the United States claims supports all three of its CWA theories of liability. The United States contends that "discovery may show that Defendants acted outside the scope of the contractual terms of the agreements, or provide evidence as to how contradictory provisions in the agreements were reconciled or interpreted by the parties."  US Opp'n at 27 n.23 [Doc. 2587-2].  Again, such factual speculation cannot defeat a motion to dismiss.

The United States also relies on general allegations for both its "operator" and "person in charge" theories of liability.  US Opp'n at 27 n.22, 29-30 [Doc. 2587-2].  These consist of alleged violations of law by "each Defendant" or "Defendants."  Compl. ¶¶48-56.  Not one allegation, however, identifies specific actions that AE&P took that would render AE&P an "operator" or "person in charge."  The United States recognizes that the operator liability test under *United States v. Bestfoods* is a "fact-intensive process," US Opp'n at 26 [Doc. 2587-2], yet the Complaint is devoid of allegations to support such a claim against AE&P.  Even if the United States' general allegations regarding the conduct of "Defendants" were considered well-pleaded facts, and not mere conclusory statements, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown 'that

---

[7]     While agreeing that documents referenced in a Complaint may be considered in ruling on a motion to dismiss, the United States nonetheless contends that AE&P "selectively appended only some documents" and only certain provisions of the Operating Agreement to support the motion to dismiss. US Opp'n at 25 n.20 [Doc. 2587-2].  As all parties to this case are aware, the Operating Agreement has been submitted to the Court on several occasions, and, in any event, the United States' allegations regarding the relevant obligations of the Operating Agreement are purportedly outlined in the Complaint.  *Id.*  It is the United States that "selectively" and "inexplicably" left out any reference to the provision of the Operating Agreement naming BP as the "independent contractor" and "Operator" of the Macondo Prospect.  *Id.*  And while the United States also makes reference to the Well Participation Agreement, to which AE&P is not even a party, it does not cite to or submit the Agreement as part of its Opposition.  *Id.*

the pleader is entitled to relief.'"  *Stewart*, 2009 WL 3334366, at *1 (quoting *Twombly*, 127 S. Ct. at 1950).  Given the nature of the claims and the substantial penalties asserted against AE&P, the United States should not be permitted to evade its obligation to allege a factual basis for its claims against AE&P in the first instance.  The United States has failed in this regard, and its claims against AE&P should be dismissed.

> **B.     AE&P Was Not an Owner of an Offshore Facility at the Time of the Incident.**

In its Opposition to AE&P's motion to dismiss, the United States acknowledges that it is not seeking to hold AE&P liable as an owner based on a leasehold interest in the Macondo Prospect lease.  US Opp'n at 31 n.26 [Doc. 2587-2].  The United States also does not dispute that AE&P is not an owner of the *Deepwater Horizon.*  AE&P Mem. at 22-23 [Doc. 1861-1].  Instead, the United States claims its "focus is on the specific jointly owned equipment and materials that it alleges comprise an 'offshore facility'" and "[AE&P's] purchase of its proportionate share of the cement, casing, wellhead and related materials used to construct the portions of the Macondo Well below the blow-out preventer."[8]  US Opp'n at 30-31 [Doc. 2587-2].  There are, however, no facts alleged in the Complaint to support this argument.

The United States does not dispute that legal title is necessary to support a claim of ownership liability under the CWA.  *See* AE&P Mem. at 18-19 [Doc. 1861-1].  Rather it contends that its theory of liability is supported by the allegation that the Operating Agreement "provided for the prompt invoicing by BP [to co-holders of leasehold interests] of costs incurred *under the JOA* and prompt payment *of their agreed-upon share.*"  Compl. ¶37, *cited in* US Opp'n at 31 (emphasis added) [Doc. 2587-2].  Assuming, *arguendo*, that BP issued such invoices

---

[8]     AE&P does not admit that the well, well casings or wellhead constitute the relevant facility in this case, as the source and cause of the discharge can be attributed to the *Deepwater Horizon* and its appurtenances.

to AE&P with respect to the equipment installed in the Macondo well and that AE&P paid those invoices, neither of which is alleged in the Complaint, the United States provides no legal authority to support a claim that mere payments afford a party any property rights in such equipment to rise to the level of "owner" under the CWA.[9]   Indeed, contrary to the United States' contentions, the Operating Agreement confers no property rights, and recognizes that the lease interests were assigned pursuant to the Lease Exchange Agreement.  *See* Ratification and Joinder of Operating Agreement at 1 (Ex. 8 to U.S. Opp'n) [Doc. 2587-11].   The Lease Exchange Agreement establishes that BP *did not assign any rights to tangible property to AE&P*. *See* AE&P Mem. at 4, 19 [Doc. 1861-1].  The Court's inquiry need go no further.

Although the United States does not dispute that the Lease Exchange Agreement "may delineate the parties' respective property interests at the time that agreement is executed and approved," the United States again speculates that there may be some later event that "may effectively alter these interests."  US Opp'n at 32 [Doc. 2587-2].  Again, the United States asks the Court to go outside of the Complaint and speculate that, while it presently has none, the United States potentially could find some facts in discovery to support a theory of owner liability

---

[9]     The United States argues in its Opposition that the Operating Agreement's use of "Joint Property" in Exhibit C, which is merely an "Accounting Procedure," is somehow a sufficient allegation to contend that AE&P is an "owner" of certain equipment at the Macondo Prospect. US Opp'n at 31 n.27 [Doc. 2587-2].   Although the United States failed to identify these provisions in the Complaint, the mere fact that the parties agreed to certain accounting procedures and used the term "Joint Property," which is defined only as "the real and personal property subject to the Agreement to which this Accounting Procedure is attached," is far from probative of whether AE&P was an "owner" of tangible property that BP *expressly excluded* from its transfer of lease interest.  Operating Agreement, Ex. C at 1 (Ex. 8 to US Opp'n) [Doc. 2587-20].  Indeed, the Accounting Procedures also reference "Material," which means "personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property," recognize that "[e]quipment and facilities *owned* by the Operator" may also be charged to the Joint Account, and provide for reimbursement of costs to the Operator.  *Id.* at 1, 7 (emphasis added).  Assuming, arguendo, that AE&P made any such payments into the Joint Account, it does not follow that AE&P is an "owner" of such material.

under the CWA.  But, the only subsequent event that has any relevance is that AE&P no longer had *any* interest in the Macondo Prospect effective April 1, 2010, and certainly could not have "direct, immediate, and exclusive authority" over, or the right to "use, enjoy, and dispose of," any Joint Property under the Operating Agreement effective on that date.  US Opp'n at 32 (quoting La. C.C. 477) [Doc. 2587-2].  Thus, the United States' CWA claim against AE&P should be dismissed.

### C.     AE&P Was Not an Operator of Any Offshore Facility at the Time of the Incident.

In arguing that AE&P was an "operator" for purposes of CWA liability, the United States asks this Court to ignore that (1) the Operating Agreement provides that *all operations* were conducted by BP and its contractors, not AE&P, (2) the MMS regulations expressly mandate that in situations involving multiple lessees that a single "operator" be designated, and (3) here, the United States approved BP as that single designated operator for the Macondo Prospect.  Instead, the United States contends that AE&P's former interest in the lease and rights under the Operating Agreement are sufficient to impose "operator" liability under the CWA.  This ignores the clear terms of the statute.[10]

The CWA imposes liability on an owner, operator or person in charge of an offshore facility from which oil is discharged.  33 U.S.C. §1321(b)(7).  Nowhere does the CWA reference lessees or former lessees of mineral rights.  This can be compared to OPA, which expressly provides that lessees and, in certain circumstances not present here, former lessees under

---

[10]     In support of its motion for summary judgment against APC and AE&P, the United States, after acknowledging that the Court must look to the relevant statutory language, contends that this Court should look to OCSLA to define operator liability under the CWA.  US Opp'n at 20-25 [Doc. 2587-2].  Although the United States cites to no legal support for such a novel contention, we do not address this argument, *see supra* n.1, and the Court need not resolve this issue in the context of AE&P's Motion to Dismiss.

OCSLA are responsible parties for offshore facilities.   33 U.S.C. §2701(32)(C).   OPA also distinguishes lessees from operators.   *Id.*   Thus, an "operator" must mean something different than a mere "lessee" (even assuming AE&P was still a lessee at the time of the discharge, which it was not).

The CWA includes a similar definition of operator as CERCLA and OPA, defining an operator to be "any person . . . operating such . . . offshore facility."   33 U.S.C. §1321(a)(6); 33 U.S.C. §2701(26); 42 U.S.C. §9601(20)(A).   The Supreme Court established a test in *Bestfoods* precisely to give the term "operator" some meaning.   *United States v. Bestfoods*, 524 U.S. 51, 66 (1998).   Despite the almost verbatim definitions, the United States disputes that the standard outlined in *Bestfoods* is applicable to the CWA, and argues the Court should instead look to provisions in OCSLA to define the operator here.   US Opp'n at 26 [Doc. 2587-2] (". . . but, even if the fact-bound standards set forth in *United States v. Bestfoods, et al.*, 524 U.S. 51 (1998), are deemed to apply . . .").[11]   The United States does so despite asking the Court to look to CERCLA case law to interpret an OPA provision that allegedly is similar to one in CERCLA. US Opp'n at 11 n.6 [Doc. 2587-2].   Given the almost identical statutory language in CERCLA and the CWA, the relevant test for operator liability under the CWA is the *Bestfoods* standard. *See United States v. Viking Resources, Inc.*, 607 F. Supp. 2d 808 (S.D. Tex. 2009) (applying *Bestfoods* to determine operator liability under OPA based on similarity of definitions).

The United States then contends that, if the Court did apply *Bestfoods*, the inquiry is fact intensive and the Complaint alleges sufficient facts to support a claim of operator liability.   US Opp'n at 26-28 [Doc. 2587-2].   But, the United States does not dispute that the only "operations"

---

[11]      The United States, moreover, ignores MMS' own regulations defining "operator" under OCSLA, and that BP was designated as the sole operator pursuant to these regulations.   *See* 30 C.F.R. §§250.105, 250.143(a); *see also infra* n.14 and accompanying text.

occurring on the Macondo Prospect were the drilling activities and temporary abandonment operations occurring aboard the Deepwater Horizon, for which BP was the sole operator under the Operating Agreement.  *See* AE&P Mem. at 24-26 [Doc. 1861-1].  As AE&P explained in its motion, the documents cited in the Complaint establish that BP was an independent contractor and had the exclusive right and duty to conduct *all* activities with respect to the operations at the Macondo Prospect.  *Id.* (citing Operating Agreement at Art. 5.1).  The United States does not dispute that Fifth Circuit case law requires an allegedly liable party to have had "operational control" when an independent contractor, such as BP, is conducting the relevant operations.  *See id.* at 26 (citing *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003); *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1472 (5th Cir. 1989)); *see also Litgo N.J., Inc. v. Martin*, No. 06-2891, 2010 WL 2400388, at *23 (D.N.J. June 10, 2010) ("Operator liability requires that the party have had actual control of either day-to-day operating or policy-making decisions at the facility.") (citation omitted); *United States v. Jones*, 267 F. Supp. 2d 1349, 1355-56 (M.D. Ga. 2003) (finding officer of company was liable as an operator under OPA and CWA where he was "directly involved in the operations and the oversight of the operations of the facility where the pollution occurred, he made all of the important decisions involving the facility . . . [and] [u]ltimately everyone employed at the facility reported to" him).

The United States references general and conclusory allegations of a number of violations of environmental regulations (none under the CWA) that purportedly are "grounded in Defendant AE&P's involvement in the 'polluting enterprise.'"  US Opp'n at 27 (citing *United States v. Tex-Tow, Inc.,* 589 F.2d 1310, 1313-14 (7th Cir. 1978)) [Doc. 2587-2].[12]  Although the

---

[12]     *United States v. Tex-Tow, Inc.* does not help the United States, but, in fact, supports AE&P.  In that case, Tex-Tow operated a tank barge which was being loaded with gasoline at a dock on the Mississippi River owned and operated by Mobil Oil Company.  589 F.2d at 1312.

Complaint never alleges AE&P was an operator of the *Deepwater Horizon*, in its Opposition the United States now argues it has alleged "facts" in its Complaint to support a finding of "the significant input and influence the co-lessees held under the Joint Operating Agreement."  US Opp'n at 27 [Doc. 2587-2].  These so-called facts alleged, however, are merely recitations of provisions in the Operating Agreement that the United States argues (a) require approval of Anadarko for BP to "proceed with nondiscretionary operations in connection with the lease"; (b) require that BP provide Anadarko with "technical information"; and (c) provide a "mechanism to object to, prevent, control, address, and/or abate discharges or health and safety issues in connection with the Lease."  *Id.* n.21 (quoting Compl. ¶¶35-37) [Doc. 2587-2].  These provisions do not rise to even an inference of the level of operational control required for operator liability.  Indeed, while relying solely on provisions of the Operating Agreement to contend it has alleged sufficient "facts" to show AE&P "involvement" in the relevant decisions, the United States asserts that the Court cannot rely on the clear language of the Operating Agreement holding BP to be an independent contractor.  *Id.* at 27 n.23 [Doc. 2587-2].  The United States cannot have it both ways.

Even assuming these other Operating Agreement provisions could override BP's status as an independent contractor, they, at most, would amount to giving AE&P an opportunity to provide "input and influence" over BP.  US Opp'n at 27 [Doc. 2587-2].  But that is not the test

---

While Tex-Tow was filling the barge with gasoline the barge sank, settling on an underwater steel piling that was part of the dock structure and that punctured the hull of the barge, resulting in a discharge of 1600 gallons of gasoline into the river.  *Id.*  The Seventh Circuit found that "[a]lthough a third party may be responsible for the immediate act or omission which 'caused' the spill, Tex-Tow *was engaged in the activity or enterprise which 'caused' the spill*."  *Id.* at 1314 (emphasis added).  Because there was no third-party defense in the statute, the court found that Tex-Tow was liable for civil penalties under the CWA as the operator of the barge.  The United States' Complaint alleges that BP and/or Transocean were the operators of the *Deepwater Horizon*, **not** AE&P.  *See, e.g.,* Compl. at ¶¶38, 71, 74, 78, 85.

for operator liability.  Courts applying *Bestfoods* have recognized that some active participation

in the relevant operations is required to establish operator liability.[13]  "The dominant explication

of the language [in *Bestfoods*], adopted by the First, Second, Third, Fifth, Sixth, Seventh, Eight,

and Eleventh Circuits, has looked to actual control, seeing an 'operator' as someone actively

involved in running the facility, typically on a day-to-day, managerial basis."  *United States v.*

*Friedland*, 173 F. Supp. 2d 1077, 1094 n.4 (D. Colo. 2001) (listing cases).  In addition to the

Operating Agreement giving BP exclusive operational authority, where there are multiple lessees

MMS regulations expressly *require* that the lessees designate an "operator" that has "control or

management of the operations on the leased area."[14]  30 C.F.R. §§250.105, 250.143(a).  The

United States' arguments concerning general obligations that a lessee "maintain operations"

---

[13]     *See K.C. 1986 Ltd P'ship v. Reade Mfg.*, 472 F.3d 1009, 1020 (8th Cir. 2007) (operator
liability under CERCLA is based on authority to control and whether party "actually exercised
that authority, either by personally performing the tasks necessary to dispose of the hazardous
wastes or by directing others to perform those tasks") (quoting *United States v. Ne. Pharm. &*
*Chem. Co.*, 810 F.2d 726, 743 (8th Cir. 1986)); *City of Waukegan, Ill. v. Nat'l Gypsum Co.*, 560
F. Supp. 2d 636, 643 (N.D. Ill. 2008) (rejecting claim that authority to regulate activity
established "operator liability" and requiring "actual control," which means "substantial control
over the allegedly-polluting activities, which in turn requires 'active involvement in [those]
activities'") (quoting *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 808 (8th Cir. 1995)
(internal quotation omitted)); *Puerto Rico Ports Auth. v. PCI Int'l Inc.*, 200 F. Supp. 2d 61, 66
(D. P.R. 2002) ("The [Sixth Circuit] further states that 'before one can be considered an
'operator' for CERCLA purposes, one must perform affirmative acts.'") (quoting *United States*
*v. Township of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998)); *see also Aero-Motive Co. v. Becker*,
No. 1:99-CV-384, 2001 WL 1699191, at *5 (W.D. Mich. Oct. 2, 2001) ("Additionally, to be
considered an operator pursuant to CERCLA, a party must perform affirmative acts:  '[t]he
failure to act, even when coupled with the ability or authority to do so, cannot make an entity
into an operator.'") (quoting *Brighton*, 153 F.3d at 314).

[14]     Although the United States' Opposition states that "the regulations provide that a lessee
*may* designate an 'operator . . .,'" US Opp'n at 22 (quoting 30 C.F.R. §250.143(b)) (emphasis
added) [Doc. 2587-2], the regulations *require such designation in the case of multiple lessees*,
such as here.  30 C.F.R. §250.143(a) ("When there is more than one lessee, each lessee *must*
submit the Designation of Operator form and the Regional Supervisor *must* approve the
designation before the designated operator may begin operations on the leasehold.") (emphasis
added).  This regulation would be rendered meaningless under the United States' arguments.

ignore this regulatory scheme, which has been in place for decades, and would immediately disrupt and impair long-held contractual arrangements related to offshore oil and gas activities well beyond this case.

That affirmative action is necessary to find control is further supported by the definition of "discharge" in the CWA, which is defined as "any spilling, leaking, pumping, pouring, emitting, emptying or dumping." 33 U.S.C. §1321(a)(2). As the Second Circuit has found in interpreting similar terms under the definition of "disposal" in CERCLA,[15] these terms "have in common that they are set in motion by human agency." *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 178 (2d Cir. 2003). The Complaint contains no allegations that would give rise to even a weak inference that AE&P took any action related to or actively participated in the operations that resulted in the discharge.

Finally, the United States advances the novel and wholly unsupported argument that OSCLA, and the regulations implementing OCSLA, should be interpreted so as to make all non-operating lessees on the OCS "operators as a matter of law" under the CWA. That is nonsense. The United States asks this Court to adopt a theory that, to AE&P's knowledge, has never been adopted by any court (and the United States cites none), that conflicts with the express terms of applicable regulations *mandating* that non-operating lessees designate an operator, that conflicts with long-standing Fifth Circuit precedent concerning operators of oil and gas facilities, and that would turn decades of offshore oil and gas operations on its head. And because the OCSLA provision cited in support of this theory requires all lessees to "maintain all operations within such lease area . . . to protect *persons*, *property*, and the *environment* on the outer Continental Shelf . . .," 43 U.S.C. §1348(b)(2), *quoted in* US Opp'n at 21 (emphasis added) [Doc. 2587-2],

---

[15]   CERCLA defines "disposal" as "discharge, deposit, injection, dumping, spilling, leaking, or placing." 42 U.S.C. §6903(3), incorporated by reference in 42 U.S.C. §9601(29).

under the United States' view all non-operating lessees are apparently also subject to labor laws, wage and hour laws, and occupational health and safety laws covering persons working in the lease area.  While imaginative, this theory leads to absurd results.

In any event, the United States' "operator as a matter of law" argument is premised on AE&P's being a leaseholder at the time of the Deepwater Horizon incident.  As a result, if the Court agrees with AE&P that as a matter of law its lease transfer was effective on April 1, 2010, the government's argument necessarily fails.  If, however, the Court does not find the lease transfer was effective prior to the casualty as a matter of law, or that factual questions remain, the Court should simply deny AE&P's motion to dismiss, and the parties and the Court can address the remaining issues raised by the government's response and motion for summary judgment at an appropriate time.  This Court has not set a schedule for summary judgment motions in any of the proceedings related to the Deepwater Horizon incident, and discovery remains ongoing. The Court need not, and should not, resolve these issues without the participation of all Defendants with an interest in the issues. The government's attempt to raise such issues now, with only limited participation by the affected Defendants, should be rejected.

### D.     AE&P is Not a Person in Charge Under the CWA.

The United States also asserts it has identified sufficient "factual allegations" to support its claim that AE&P is a "person in charge" for purposes of CWA liability.  US Opp'n at 28-30 [Doc. 2587-2].   The United States attempts to rely on the same provisions of the Operating Agreement that it argues support its claim that AE&P is an operator.   Ironically, even as it identifies nearly identical allegations for both alleged theories of AE&P's liability, the United States contends that it is AE&P that seeks to "conflate operator liability with liability as a person

in charge." US Opp'n at 30 [Doc. 2587-2].[16]  In any event, again, there are simply no allegations that AE&P is responsible for the operation of a facility which could support a claim that it is a "person in charge."

The Second Circuit's decision in the *United States v. Carr* case, cited by the United States, sheds further light on what the definition of "in charge" means.  880 F.2d 1550, 1552-1554 (2d Cir. 1989).  Based on the Second Circuit's review of the legislative history of the term, it is clear that AE&P cannot have been a person "in charge" for purposes of CWA liability:  "The term 'person in charge' [was] deliberately designed to cover only supervisory personnel who have the responsibility for the particular vessel or facility . . .."  *Id.* at 1554 (quoting H.R. Conf. Rep. No. 940, 91st Cong., 2d Sess. 34 (1970), *reprinted in* 1970 U.S. Code Cong. & Admin. News 2691, 2712, 2719).  The provisions in the Operating Agreement simply do not provide AE&P with this authority.

While courts may have found that the "person in charge" is not always the person in the "best position" to detect, prevent or abate a release, it must at least have capacity to do so.  The United States' bare allegations, again merely reciting provisions in the Operating Agreement, do not establish that AE&P "occupied a position of responsibility or power."  Indeed, they stand in stark contrast to the circumstances in *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003), cited by the United States.  In that case the district court found that Tyson Chicken was liable under CERCLA Section 103, which imposes certain reporting requirements on persons in charge, as a person in charge of chicken production operations owned by other

---

[16]     The United States also states that AE&P "implies that a person in charge is typically a natural person."  US Opp'n at 30 (citing AE&P Mem. at 26-27) [Doc. 2587-2].  But, AE&P was merely citing EPA guidance that so stated, and recognized in its motion that courts have found corporations could be "persons in charge."  AE&P Mem. at 26-27 (quoting EPA Mem., *Final Guidance on the Issuance of Administrative Orders Under Section 311(c) and (e) of the Clean Water Act*, at 12 n.19 (July 1, 1997)) [Doc. 1861-1].

parties because, among other things, it was (a) involved in facility design and equipment specifications, (b) directed the growers how to build and orient the houses, how to heat, cool, ventilate the buildings, and how to illuminate the house to ensure optimum chicken growth, (c) provided exacting equipment specification and advised growers as to the proper retailers from which to purchase this equipment; (d) provided the chicks, the feed, technical support, medicine, and veterinary care for the chicks; and (e) had technical advisers, who directed the operators as to releases of ammonia and who were present at the facility on a weekly basis to be in a position to make a timely discovery of some of the releases.  *Id.* at 715-16.

The United States' allegations of mere access by AE&P to information and of an alleged "mechanism" to seek to require that BP take action are insufficient to give rise to the requisite inference that AE&P (assuming it still held a leasehold interest on April 20, 2010, which it did not), had any obligation to review data on a continuous real-time basis, let alone any ability or duty to interpret such data and take remedial action.  Critically, the Complaint does not allege that AE&P could have taken any action to prevent or abate the explosion and discharge from the *Deepwater Horizon*, or that AE&P had authority to direct the *Deepwater Horizon*.  AE&P simply had no such authority. *See, supra* at 14-16; AE&P Mem. at 24-26 [Doc. 1861-1].

## III.  OPA/CWA LIABILITY IS NOT AN "ACCRUED" LEASE OBLIGATION UNDER OCSLA THAT EXTENDS BEYOND THE EFFECTIVE DATE OF AN ASSIGNMENT.

MMS regulations provide that assignors of lease interests are "liable for all obligations that accrue under your lease before the date that the Regional Director approves your request for assignment of the record title in the lease."  30 C.F.R. §256.62(d).  The regulations also provide that the "Regional Director's approval of the assignment does not relieve you of accrued lease obligations that your assignee, or a subsequent assignee, *fails to perform*."  *Id.* (emphasis added); *see also* 58 Fed. Reg. 45,255, 45,257 (Aug. 27, 1993) ("Further, current rules at §256.62(d)

provide that assignors remain 'liable for all obligations under the lease accruing prior to the approval of the assignment.' These obligations, accrued but not yet due for performance, include those of sealing wells, removing platforms, and clearing the ocean of obstructions."). The United States contends that liability for removal costs and damages under OPA and for civil penalties under the CWA are "obligations" that accrue under a lease subject to this provision. US Opp'n at 14-15 [Doc. 2587-2]. But this provision gives MMS authority only to enforce performance of *regulatory obligations under OCSLA*, and does not relate to OPA or CWA liability for damages, costs or penalties.

As with its other arguments, not one case cited by the United States addresses OPA or CWA requirements. Indeed, the United States recognizes that 30 C.F.R. §256.62(d) references "accrued *OCSLA* regulatory obligations." US Opp'n at 13 [Doc. 2587-2] (citing *Noble Energy, Inc. v. Salazar*, No. 02013, 2001 WL 996776 (D.D.C. Mar. 22, 2011) (holding that lessee's duty under OCSLA to permanently plug and abandon an undeveloped exploratory offshore well was not discharged by the government's material breach of the lease)). These regulatory obligations include requirements with which a lessee must comply during oil and gas activities, and do not pertain to potential liability for damages, costs or penalties provided under other statutes. Section 256.62(d) itself references obligations that the assignee *fails to perform*. 30 C.F.R. §256.62(d); 58 Fed. Reg. at 45,257 ("The assignor continues to be jointly liable for the performance of these obligations with respect to wells or structures in existence and not plugged or removed at the time of the assignment."); 62 Fed. Reg. 27,948, 27,949 (May 22, 1997) (MMS has "clarifie[d] our position that an assignor of an OCS lease remains responsible for all wells and facilities that were in existence at the time the assignor assigns its interest until the wells are plugged and abandoned, the facilities are decommissioned, and the site is reclaimed.").

21

Similarly, the United States attempts to shoehorn in virtually any potential statutory liability as a lease obligation based on a phrase in the lease that provides "[t]he lease *is issued subject to the Act . . . and all other applicable statutes and regulations.*"  Lease OCS G 32306 (Ex. 2 to US Opp'n) at 2 [Doc. 2587-5], *cited in* US Opp'n at 14 (emphasis added) [Doc. 2587-2].  But, contrary to the United States' assertions, this provision does not make requirements under other statutes accrued lease obligations, but merely recognizes that other statutes may govern operations on the Outer Continental Shelf ("OCS").  Here, the United States seeks to impose liability under OPA and the CWA, two statutes which the Secretary of the Interior lacks any authority to enforce, as "lease obligations" based on cases referencing this phrase in OCS leases, claiming these cases found "that applicable environmental laws in force at the time those leases were approved were incorporated into the lease."  US Opp'n at 14 (citing *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604 (2000); *Amber Resources Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008)) [Doc. 2587-2].  But none of these cases addressed lease obligations accrued by an assignor of lease interests under 30 C.F.R. §256.62(d).

Moreover, reading the provision as broadly as the United States suggests would ignore the clear statutory language of OPA and the CWA, and would empower MMS through its regulations, not the Coast Guard and not EPA, to be the arbiter of who is liable under these statutes.  But MMS has no authority to enforce either statute.  Indeed, if OCSLA lease obligations automatically included OPA liability as the United States contends, there would be no need for OPA to identify an OCSLA lessee as a responsible party under OPA.  Nor would OPA need specific provisions on who is liable in the event of an abandoned well.  Under the United States' theory, any lessee, current or prior, would be "subject to" OPA liability, as an OCSLA lease obligation.

The United States' arguments also ignore the express CWA language providing that "owners," "operators" and "persons in charge" of an offshore facility are liable. OCSLA was enacted almost 20 years before the CWA, and if Congress intended for all OCSLA "lessees" to be liable for CWA discharges it could have easily said so. It did not. The United States' argument also ignores that when OPA was enacted, almost 40 years after OCSLA and 20 years after the CWA, Congress revised the penalty provisions of Section 311(b) of the CWA, P.L. 101-380, §§4201(a), 4301(b). While Congress included in CWA Section 311(c) a reference to OPA-defined responsible parties (which may include "lessees") with respect to recovery of certain removal costs, Congress did not expand the relevant CWA liability provisions to include "lessees." Congress left liability only to "owners," "operators," and "persons in charge."

## IV.   THE UNITED STATES CANNOT DEFEAT A MOTION TO DISMISS BY ARGUING IT NEEDS FURTHER DISCOVERY.

To avoid dismissal under Rule 12(b), the United States attempts to manufacture potential factual dispute using pure speculation or argument about what discovery might yield. The United States' argument that it needs further discovery, however, must be rejected. *See Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 263 (5th Cir. 2008) (finding discovery is not warranted to rule on motion to dismiss under Rule 12(b)(6), which is based on allegations in complaint); *see also Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009) (finding, as in motions to dismiss under Rule 12(b)(6), "discovery would not assist the Plaintiffs in defending the 12(c) motion"); *A&D P'ship v. Equity Group, Inc.*, No. 87-3139, 1988 WL 141942, at *10 (E.D. La. Dec. 23, 1988) ("Facts which might come to light during discovery and development of evidence are irrelevant to consideration of a motion to dismiss pursuant to 12(b)(6) … .") (citations omitted).

The United States is essentially asking this Court to authorize a fishing expedition, apparently recognizing it had no factual basis to bring its claims against AE&P in the first place. US Opp'n at 33-35 [Doc. 2587-2].  This Court should "not allow the Plaintiffs to conduct a 'fishing expedition' in an effort to manufacture their claims." *Skidmore Energy, Inc. v. KPMG LLP*, No. Civ. A. 3:03CV2138-B, 2004 WL 3019097, at *12 n.6 (N.D. Tex. Dec. 28, 2004) (citations omitted).  "Plaintiffs must . . . 'have some basis in fact for the action' they are bringing against the Defendants."  *Skidmore Energy, Inc.*, 2004 WL 3019097, at *12 n.6; *see also Russell v. Choicepoint Servs., Inc.*, 302 F. Supp. 2d 654, 670-71 (E.D. La. 2004).

The United States makes a last effort to keep AE&P in the case by asserting, hopefully, that "the evidence is likely to show that *APC* effectively stands in the shoes of AE&P, and therefore should be responsible for the full 25% interest in the Lease from the time BP assigned its interest in the lease to the Anadarko entities."  US Opp'n at 33 [Doc. 2587-2].  As a threshold matter, the United States did not allege alter ego liability in its Complaint.  But, more importantly, this new argument *assumes* that AE&P must be liable, and theorizes that APC will bear liability as AE&P's alter ego.  What the new argument does not do is present any factual or legal basis to deny AE&P's motion to dismiss.[17]  Whether APC is an alter ego of AE&P or not is irrelevant when AE&P is not liable for the United States' claims.  Thus, the United States claims against AE&P cannot be sustained on the basis of any new "alter ego" theory it advances.

---

[17]    *See Bank of Sacramento v. Stewart Title Guaranty Co.*, No. 09-00771, 2010 WL 3784096, at *5 (E.D. Cal. Sept. 27, 2010) ("Raising a completely new theory of liability, with only attenuated connection to the complaint, in a brief in opposition to a motion to dismiss does not grant Defendant fair notice of Plaintiffs' claims or grounds upon which is *[sic]* rests.") (citation omitted); *Duffy v. Ticketreserve, Inc.*, 722 F. Supp. 2d 977, 990 (N.D. Ill. 2010) ("A plaintiff may not supplement or amend his complaint by presenting new facts or theories in his briefing in opposition to a motion to dismiss.") (citations omitted).

The United States references "multiple private and government investigations" into the cause of the catastrophe, yet has not identified a specific fact that would render AE&P liable under OPA or the CWA.  US Opp'n at 35 [Doc. 2587-2].  Having failed to identify any such fact, the Court should not allow it to engage in a discovery fishing expedition at substantial prejudice and cost to AE&P.

## CONCLUSION

The United States merely makes conclusory and speculative allegations in an effort to keep AE&P in the case.  Its only excuse is that "[t]he United States believes it is important to preserve the full 25% share for the *Anadarko entities*, the greater share (22.5%) of which was held by AE&P, at least on paper, during the drilling, construction and other operations leading up to the Macondo well blow-out."  US Opp'n at 33 (emphasis added) [Doc. 2587-2].[18]  The United States, however, provides no explanation for how this concern has any bearing on *AE&P's* liability under OPA or the CWA, and the United States has provided *no factual or legal basis* in its Complaint.  The Complaint should be dismissed in its entirety as to AE&P.

Respectfully submitted,

BINGHAM McCUTCHEN LLP

                /s/ James J. Dragna
James J. Dragna
jim.dragna@bingham.com
Bingham McCutchen LLP
355 South Grand Avenue
Suite 4400
Los Angeles, California 90071-3106
Telephone (213) 680-6436
Facsimile (213) 680-8636

---

[18]    This concern is somewhat perplexing, given AE&P's argument that the disputed leasehold interest was transferred from AE&P to APC, as of April 1, 2010.

Ky E. Kirby
ky.kirby@bingham.com
Michael B. Wigmore
michael.wigmore@bingham.com
Sandra P. Franco
s.franco@bingham.com
Randall M. Levine
randall.levine@bingham.com
2020 K Street, NW
Washington, DC 20006-1806
Telephone (202) 373-6000
Facsimile (202) 373-6001

KUCHLER POLK SCHELL
WEINER & RICHESON, LLC

Deborah D. Kuchler, T.A. (La. Bar No. 17013)
dkuchler@kuchlerpolk.com
Janika Polk (La. Bar No. 27608)
jpolk@kuchlerpolk.com
Robert Guidry (La. Bar No. 28064)
rguidry@kuchlerpolk.com
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
Tel:  (504) 592-0691
Fax:  (504) 592-0696

Dated:  June 30, 2011

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was also electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 30th day of June, 2011.

/s/ James J. Dragna
James J. Dragna
