EXHIBIT 1

In Support of

Reply in Support of Anadarko E&P Company LP's
Motion to Dismiss

A/74422590.3



**JOHN KUNZ, ATTORNEY**
US DEPARTMENT OF THE INTERIOR
Office of Solicitor
Division of Mineral Resources, Branch
of Royalty Enforcement
755 Parfet St STE 151
Lakewood CO 80215

June 27, 2011

TO:    Office of Hearings and Appeals
       Interior Board of Land Appeals
       (703) 235-8349

       Peter J. Schaumber, Esq.
       Beveridge & Diamond PC
       (202) 789-6190

RE:    ANADARKO PETROLEUM CORP V ONRR
       IBLA NO. 2010-228
       ANSWER

Recipient, Please note: To report a problem with this fax transmission, or if you receive this transmission in error, please call 303-231-5353, ext. 665 and destroy all received documents

Case 2:10-md-02179-CJB-DPC Document 3113-1 Filed 06/30/11 Page 3 of 32

## UNITED STATES DEPARTMENT OF THE INTERIOR
## OFFICE OF HEARINGS AND APPEALS
## INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| ANADARKO PETROLEUM CORPORATION | ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | IBLA No. 2010 – 228 |
| OFFICE OF NATURAL RESOURCES REVENUE | ) ) ) | |
| Respondent. | ) ) | |

## ANSWER

Comes the Respondent, Office of Natural Resources Revenue ("ONRR"), by and through counsel, to Answer Appellant's Statement of Reasons in the above-captioned appeal.

## STATEMENT OF THE CASE

This is a case about a company which is attempting to avoid paying royalties for oil produced, removed, and sold from a federal lease. It does so despite the facts that approximately 679,000 barrels of oil were produced, removed, and sold from its lease, and that sale of this oil generated $47.3 million in proceeds for the three lessees.

This attempt to avoid a clear legal obligation is especially egregious in light of the circumstances. The oil for which Appellant owes royalties emanated from the Macondo well following a blowout and explosion which killed 11 people, sank the Mobile Offshore Drilling

Unit Deepwater Horizon, and caused a massive discharge of oil into the Gulf of Mexico. Yet Appellant argues that a narrow reading of a statutory term absolves it of responsibility to pay its share of royalties.

Appellant's core argument is that oil captured, removed, and sold from the Macondo well on Lease OCS-G 32306 does not meet the definition of "production" in the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq. ("OCSLA"). Therefore, Appellant asserts that no royalty is owed on that oil. With one exception, all other arguments made by Appellant are variations on this definition of "production" argument.[1]

As discussed below, oil captured, removed, and sold from the Macondo well on Lease OCS-G 32306 meets the definition of "production." Royalty is thus clearly due on it. Under Appellant's unduly constrained definition, Appellant would receive an inequitable windfall, at the expense of the United States, by profiting from the sale of oil without paying royalties.

Finally, the Order of August 24, 2010, directing Appellant to pay royalties and the accompanying administrative record fully explain the basis for Appellant's obligation to pay royalties. Appellant has presented a lengthy defense in its Statement of Reasons that shows that Appellant was fully informed of the basis for the Order. Under Board precedent, the Order and administrative record provide sufficient information to support the Agency's decision.

---

[1] That sole exception is Appellant's assertion that the Order and administrative record provide insufficient information to support the Agency's decision.

## RELEVANT FACTS

1. Lease OCS-G 32306 was issued on or about May 14, 2008, to BP Exploration and Production, Inc. ("BP").

2. Appellant became a co-lessee on Lease OCS-G 32306, effective October 1, 2009, by acquiring a 2.5 percent share of the lease.

3. Appellant's affiliated corporation, Anadarko Exploration and Production Company, L.P., acquired a 22.5 percent share of Lease OCS-G 32306, effective October 1, 2009.

4. Anadarko Exploration and Production Company, L.P., assigned its 22.5 percent share of Lease OCS-G 32306 to Appellant, effective April 1, 2010.

5. From April 1, 2010, to the present, Appellant has held a 25 percent share of Lease OCS-G 32306.

6. MOEX became a co-lessee on Lease OCS-G 32306, effective October 1, 2009, by acquiring a 10 percent share of the lease.

7. From October 1, 2009 to the present, MOEX has held a 10 percent share of Lease OCS-G 32306.

8. Anadarko[2] and MOEX designated BP as the operator of Lease OCS-G 32306 on December 17, 2009, and November 18, 2009, respectively.

9. On October 6, 2009, lease operator BP began drilling the Macondo well, the first and only well located on Lease OCS-G 32306, on behalf of itself, Appellant, and MOEX.

10. On April 20, 2010, a blowout and explosion occurred on the Macondo well, which caused the deaths of 11 people, the loss of the Mobile Offshore Drilling Unit Deepwater Horizon, and the discharge of federal oil and gas into the atmosphere and the Gulf of Mexico.

11. The majority of the discharged oil dispersed into the Gulf of Mexico, causing widespread environmental degradation and economic harm.

12. BP captured and removed a portion of the oil discharged from the Macondo well.[3]

13. BP captured and removed oil primarily through the "top hat" collection device, which was installed on the Macondo well on June 3, 2010.

14. Oil production that BP captured and removed by this device was conveyed by a riser pipe extending from the device to ships positioned above the Macondo well.

---

[2] Anadarko Exploration and Production Company, L.P. and Appellant - Anadarko Petroleum Corporation - each executed a separate Designation of Operator form on December 17, 2009 designating BP Exploration & Production, Inc. as the lease operator.

[3] See Exhibit 1, Report to the President: Deep Water, The Gulf Oil Disaster and the Future of Offshore Drilling, 157 - 160 (National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, January, 2011), for information on the capture of oil from the Macondo well.

4

15. These ships stored oil captured and removed from the Macondo well, and then conveyed the oil production to off-lease facilities.

16. In addition, ships owned by multiple entities captured and removed oil production by skimming it from the surface of the Gulf of Mexico and then providing it to BP for processing and sale.

17. Once conveyed to an off-lease facility, oil from the Macondo well was metered, processed, and sold.

18. A total of approximately 679,000 barrels of oil from the Macondo well were thus produced, removed, and sold.[4]

19. These 679,000 barrels of oil generated a total of approximately $47.3 million in proceeds for the lessees of Lease OCS-G 32306.

20. Approximately $11.8 million of these proceeds are attributable to Appellant.[5]

---

[4] See Exhibits 2 and 3, Affidavits of Robert Prael, May 27, 2011, for information on the amount of oil produced, removed, and sold from Lease OCS-G 32306 and the amounts of proceeds and royalties attributable to Appellant and MOEX.

[5] Appellant notes that it has refused to accept these proceeds from BP. Statement of Reasons, 5 - 6. Appellant's right to proceeds and liability for royalties stem from OCSLA, the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701 et seq. ("FOGRMA"), and the lease itself. Appellant does not forfeit its right to these proceeds nor absolve itself from liability for royalties by refusing to accept the proceeds.

21. The $47.3 million in total proceeds generated approximately $8.2 million in total royalties due and owing to the United States.

22. The amount of royalty owed by Appellant to the United States from its $11.8 million share of these proceeds is approximately $2 million.

23. On July 15, 2010, the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") issued an Order requiring BP to immediately report and pay royalties on all oil captured from the Macondo well.

24. On August 2, 2010, BP informed BOEMRE that it would pay royalties for its 65 percent share of the total proceeds.

25. On August 24, 2010, BOEMRE issued Orders to Appellant and MOEX directing them to pay royalties on their respective 25 percent and 10 percent shares of the total proceeds.

26. Appellant and MOEX began making royalty payments under protest.

27. On August 31, 2010, Appellant and MOEX filed substantively identical Notices of Appeal. This Appeal followed.

<u>DISCUSSION</u>

<u>As a co-lessee with BP and MOEX, Appellant is liable for royalties for its share of oil production</u>

<u>removed or sold from the Macondo well.</u>[6]

OCSLA provides that royalty is due on the amount or value of oil or gas "production

saved, removed, or sold" from the lease. 43 U.S.C. § 1337(a)(1)(A). This royalty obligation is

mirrored in Lease OCS-G 32306, which states that "[t]he lessee shall pay a fixed royalty as

shown on the face hereof in amount or value of production saved, removed, or sold from the

leased area." Section 6(a).[7]

The applicable regulation is similar, and at least as broad. It provides that "[a]ll oil

(except oil unavoidably lost or used on, or for the benefit of, the lease, including that oil used

off-lease for the benefit of the lease when such off-lease use is permitted by BOEMRE or BLM,

as appropriate) produced from a federal or Indian lease to which this part applies is subject to

royalty." 30 C.F.R. § 1206.150(b)(1).

BP acquired Lease OCS-G 32306 with an effective date of June 1, 2008. Both Appellant

Anadarko Petroleum Corporation and Anadarko Exploration and Production Company, L.P.

became record title holders to Lease OCS-G 32306, effective October 1, 2009. Both Appellant

and Anadarko Exploration and Production Company, L.P. designated BP as the operator of

---

[6] This appeal is focused on Appellant's liability for royalties on its share of oil produced, removed, and sold from Lease OCS-G 32306. As stated in the August 24, 2010, Order, the United States has reserved any and all rights and remedies available to it which arise from the Deepwater Horizon oil spill.

[7] Appellant has not raised a challenge that the 679,000 barrels of oil at issue in this appeal were not "saved, removed, or sold" from the lease. Statement of Reasons, 9. The imposition of royalty on all oil "saved, removed, or sold" is explicit in both the underlying statute and the lease instrument itself. 43 U.S.C. § 1337(a); Lease Section 6(a). Indeed, there is no reasonable argument contesting the fact that the oil at issue in this appeal was "removed" and "sold" from the lease.

Lease OCS-G- 32306 on or about December 17, 2009. As of April 20, 2010, when the Macondo well blew out, Appellant held a 25 percent interest in Lease OCS-G 32306.

Following the April 20, 2010 blowout of the Macondo well, BP attempted to contain the flow of oil by various means. Certain of these means resulted in the collection and measurable production of a portion of the oil flowing from the well. These means included the "top hat" device, which collected and conveyed up to 25,000 barrels of oil per day to vessels on the surface.

The oil produced by BP was conveyed to off-lease facilities, where a total of approximately 679,000 barrels was metered, processed, and sold. This oil generated a total of $47.3 million in proceeds for the three lessees. Of this amount, $11.8 million in proceeds is owed to Appellant under Appellant's 25 percent ownership interest in Lease OCS-G 32306.

In its August 24, 2010, letter ordering Appellant to pay, ONRR cited 30 U.S.C. § 1712(a) as authority to require Appellant to pay royalties on its 25 percent interest. Appellant acknowledges that "[30 U.S.C. § 1712(a)] requires lessees to pay royalty in proportion to their share of ownership interest in a lease." Statement of Reasons, 21.

But Appellant asserts that 30 U.S.C. § 1712(a) only triggers the obligation to pay royalty if royalty is due in the first instance. Statement of Reasons, 21. Appellant asserts that no royalty is due because the oil discharged "and later captured and sold by BP" does not meet the

8

definition of "production." *Id.* As discussed below, this oil does indeed meet the definition of "production."

<u>Oil produced, removed, and sold from Lease OCS-G 32306 meets the broad statutory definition of "production."</u>

OCSLA defines "production" as "those activities which take place after *the successful completion of any means for the removal of minerals*, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and work-over drilling." 43 U.S.C. § 1331(m) (emphasis added). The regulatory definition of "production" is identical to the definition in 43 U.S.C. § 1331(m). 30 CFR § 250.105.

"Ordinarily, the plain language of a statute is the most reliable indication of Congress' intent." *Geo-Energy Partners-1983 Ltd.,* 170 IBLA 99, 123 (2006). The statutory definition of "production" uses the words "the successful completion of *any means* for the removal of minerals[.]" 43 U.S.C. § 1331(m)(emphasis added). Use of the words "any means" clearly indicates Congressional intent that royalty is due regardless of how the oil is produced. "Any" is defined as "indicating a person, thing, etc., as one selected without restriction or limitation of choice, with the implication that every one is open to selection without exception . . . ." Webster's New International Dictionary, Unabridged, 1947. As the Board has noted: "deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Hiko Bell Mining & Oil Co.,* 100 IBLA 371, 377 (1988) (internal quotations omitted); Statement of Reasons, 11 - 12.

9

Given the ordinary meaning of the word "any," it is plain that Congress intended to avoid limitations on the manner by which minerals may be removed. Avoiding a limitation on the types of means of removing minerals is logical. Limiting the ability to realize royalties from a lease based on the way in which those minerals were taken would not effectuate Congress's goal of reimbursing the United States for those minerals. Such a limitation would particularly run afoul of Congress's goal in the present case, given that 679,000 barrels of oil were removed from the Macondo well using non-typical means, then sold on the lessees' behalf for $47.3 million in proceeds.

The court which has looked most closely at 43 U.S.C. § 1331(m)'s definition of "production" has found that Congress intended a broad definition. In *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1165 - 1166 (5th Cir. 1988) ("*Diamond Shamrock*"), the Fifth Circuit Court of Appeals found that the term "production" has a variety of different meanings in the oil and gas industry:

> The term "production" is used in the oil and gas industry in several different but related senses. The term can be used to refer to an abstract noun: (i) the act or process of producing. It can also refer to either of two concrete nouns: (ii) the products of an oil and gas well, or (iii) the well itself.

Here, the oil which emanated from the Macondo well clearly fits the second definition posited by the Fifth Circuit: this oil is obviously "the product[] of an oil and gas well." The first definition is also appropriate: BP engaged in "the act or process of producing" oil by using various devices to capture it as it emanated from a well which BP had drilled (and, for some of the oil, after it had reached the surface of the water).

Given the different meanings of "production," the Fifth Circuit then held that:

> Even accepting the proposition that "production" in these leases is used in the abstract noun sense, as in (i) above, this Court cannot accept the conclusion that [43 U.S.C.] § 1331(m) was intended by Congress to define production to exclude all other accepted meanings in the industry, including (ii) above, the actual products of an oil and gas well.

853 F.2d at 1166.

The court thus endorsed a broad interpretation of the term "production" which encompasses the multiple different meanings given to it by industry. It then linked "production" to a lessee's obligation to pay royalties. It wrote "royalties are not owed unless and until actual production, the severance of minerals from the formation,[8] occurs." *Diamond Shamrock*, 853 F.2d at 1165 (emphasis added). Here, it is undisputed that the minerals were severed from the formation.

These holdings in *Diamond Shamrock* were implicitly endorsed by the Board in *Murphy Exploration and Production Co.*, 148 IBLA 266, 272 - 273 (1999) ("*Murphy Exploration*"). The Board recognized "that under *Diamond Shamrock, supra*, production triggers the royalty obligation." *Id.* It noted that "[t]hat decision was based on the court's conclusion that . . . 'royalties are not owed unless and until actual production, the severance of minerals from the formation, occurs.' n2" *Id.* The Board then wrote:

---

[8] With this holding, the Fifth Circuit implicitly found a fourth meaning of the term "production": the severance of minerals from the formation. Because the Macondo well severed oil from the formation, the oil emanating from the Macondo well also constitutes "production" under this meaning.

These conclusions in turn were based on the court's determination that the term "production" could be an "abstract noun" (the act or process of producing) or either of two "concrete nouns" (the products of an oil and gas well or the well itself), and its conviction that Congress did not intend to exclude any of the industry's usages of the term when it drafted the definition of "production in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331(m)(1994). *Diamond Shamrock, supra* at 1166.

*Murphy Exploration*, 148 IBLA at 273, n2. Based on *Murphy*, the oil removed from the Macondo well meets the Board's definition of "production."

In summation, the plain language of 43 U.S.C. § 1331(m) clearly indicates that "production" is defined broadly, as encompassing "any means" for removing minerals, including the severance and subsequent capture and sale which occurred in this instance. The broad scope of this definition was confirmed by the *Diamond Shamrock* Court's finding that "production" has a variety of meanings and that Congress did not intend to exclude any of these meanings from 43 U.S.C. § 1331(m). These findings were implicitly endorsed by the Board in *Murphy Exploration*.

In contrast, Appellant urges a narrow reading of the term "production." Appellant asserts that "only oil and gas volumes derived from a successfully completed well constitute production, and in turn, are subject to royalty." Statement of Reasons, 11. Appellant bases its narrow reading on (1) the steps typically taken to complete a well and (2) the normal system for developing a lease tract embodied in the regulations and agency practice. *Id.* at 12 - 20. This regulatory system characterization envisions an orderly progression, in which a lessee obtains the necessary authorizations, drills and completes a well, then extracts oil through the well by conventional means.

12

The flaw in Appellant's narrow reading of the term "production" is perfectly illustrated by the present case. Here, large quantities of oil were severed from the formation by the drilling of the Macondo well. This oil then emanated from the Macondo well. A significant amount of this oil, 679,000 barrels, was captured by various devices. This oil was then removed from the lease, metered, processed, and sold, just like oil produced through more conventional means. Arguing that this oil is not royalty bearing because there was not the standard orderly progression ignores reality.

Appellant's attempts to distinguish *Diamond Shamrock* are also unsupportable. Appellant argues that the factual scenario at issue in *Diamond Shamrock* is different from the present case. Statement of Reasons, 27 - 28. But the Fifth Circuit's interpretation of the term "production" was not contingent upon or linked to the facts of that case. Indeed, accepting Appellant's argument would mean believing that *Diamond Shamrock's* broad definition of production applies only in the cases in which a take-or-pay contract exists and there has been no severance of minerals from the ground. There is no indication that the *Diamond Shamrock* Court intended such a narrow holding. Nor would such a narrow holding fit with the basis for the court's holding: the variety of different meanings of production in industry. Finally, such a narrow holding would ignore the "any means" language of 43 U.S.C. § 1331(m) itself and the court's conviction that "Congress did not intend to exclude any of the industry's usages of the term." *Murphy Exploration*, 148 IBLA at 273, n2 *citing Diamond Shamrock*, 853 F.2d at 1166.

13

Appellant also attempts to distinguish the Board's decision in *Chevron U.S.A. Inc.,* 110 IBLA 216 (1989). Statement of Reasons, 26 - 27. In *Chevron U.S.A.,* the Board considered a case in which gas was lost, in a blowout, prior to successful completion of a well. Because the August 24, 2010, Order to Appellant only demanded payment of royalties for oil which was captured, *Chevron U.S.A.* is not applicable to this appeal.

In *Chevron U.S.A.,* the Board first considered Chevron's argument that use of the word "produced" in a then-existing regulation limited the regulation solely to gas lost after well completion. The Board noted that "43 U.S.C. § 1334(a) (1982) did not limit the Secretary's authority to issue 30 C.F.R. 250.66 to events occurring after well completion." 110 IBLA at 221. It tied this broad Secretarial authority to the Congressional policy, stated in 43 U.S.C. § 1332(6), that operations on the Outer Continental Shelf were to be conducted in a manner "to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, etc." *Id.*

The Board did not rule on the effect of the word "produced" on royalty obligations for oil and gas emanating from a well which is not yet in a formal production status. Instead, it addressed the scope of the expanded royalty obligations provision contained in 30 U.S.C. § 1756. This ~~provision~~ provides that "[a]ny lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under this Act or any mineral leasing law." 30 U.S.C. § 1756. The Board found that 30 U.S.C. § 1756 applies to pre-completion losses. *Id.* at 222.

*Chevron U.S.A.* is clearly applicable, indeed definitive, in a case where oil and gas is lost in a blowout before all of the regulatory steps required by the leasing agency are completed because the operator fails to comply with a regulation. Thus, if ONRR issues a future order to pay royalties for lost or wasted oil and gas from the Macondo well because of a failure to comply with a regulation, 30 U.S.C. § 1756 and *Chevron U.S.A.* will necessitate a judgment in favor of the United States.

Finally, Appellant engages in an amorphous discourse about circumstances in which discharged oil may not constitute "production." Statement of Reasons, 24 - 26. Situations in which Appellant posits that royalties may not be due include on unavoidably lost or wasted volumes, volumes used for the benefit of the lease, and drainage volumes. *Id.* at 25. But none of the situations discussed by Appellant are relevant in the present case. Indeed, Appellant does not attempt to explain how these situations are relevant.

The plain language reading of 43 U.S.C. § 1331(m) shows that Congress intended a broad definition of "production." *Diamond Shamrock* likewise interprets 43 U.S.C. § 1331(m) broadly, in light of the variety of meanings which "production" can have for industry. The Board has implicitly endorsed this broad reading in *Murphy Exploration*. Finally, the need for a broad reading is perfectly illustrated by the facts of the present appeal. For these reasons, the Board should find that oil emanating from the Macondo well which was captured, removed from the lease, and sold constitutes "production" under 43 U.S.C. § 1331(m). And in turn, the Board should find that this "production" triggered Appellant's obligation to pay royalties on its share of this oil.

**The lessees would realize a multi-million dollar windfall if not required to pay royalty on oil captured, removed, and sold from Lease OCS-G 32306.**

On behalf of itself and its co-lessees Anadarko and MOEX, BP captured, removed, and sold a significant quantity of oil from Lease OCS-G 32306. Approximately 679,000 barrels of oil were produced from the Macondo well and removed to off-lease facilities, where it was metered, processed, and sold. This oil generated approximately $47.3 million in proceeds for the three lessees. Of this amount, approximately $11.8 million is attributable and owed to Appellant as part of its 25 percent interest in Lease OCS-G 32306.

As discussed above, Appellant's core argument is that oil which was captured, removed, and sold from Lease OCS-G 32306 does not constitute "production" because the Macondo well was not technically in a producing status. Statement of Reasons, 11 - 20. Under this logic, no royalty would be due on any oil captured, removed, and sold from Lease OCS-G 32306. Oil from the Macondo well is either "production" for royalty purposes or it is not "production" for royalty purposes. If it is not "production," the lessees would realize a $47.3 million windfall in royalty-free oil.

To find that the United States is not entitled to royalties on oil which its lessees have severed, captured, removed, and sold from this federal lease would result in a windfall of $8.2 million for the lessees. Appellant would realize a $2 million windfall: the amount of royalties due on Appellant's proportionate share of the proceeds. Allowing Appellant and its fellow

16

lessees to realize this windfall would be especially egregious given the human, environmental, and economic disaster caused by the blowout and subsequent discharge of oil from the Macondo well.

The Board has traditionally declined to interpret the law in a manner which allows individuals and companies to realize a windfall. *See Steve Crooks and Era Lea Crooks*, 167 IBLA 39, 46 (2005)("[H]aving received a property interest in 1985, and having become aware no later than 1987 that it was a surface interest subject to a mineral reservation in the United States, it would be to their financial advantage to have obtained the mineral royalties or other proceeds from oil and gas produced by valid Federal mineral lessees. No such windfall was contemplated or authorized by section 316 of [the Federal Land Policy and Management Act], and we will not reverse BLM for refusing to allow the statutory purpose to be so perverted."); *Mesa Petroleum Co.*, 111 IBLA 201, 203 - 204(1989)("Without an interest assessment, appellant 'would enjoy substantial profit realized by its years of appeals. Such a windfall could also create an incentive in the future for parties to unduly prolong litigation.' Thus, prior to the enactment of FOGRMA or the promulgation of the interest regulations, MMS and [the U.S. Geological] Survey had the authority to assess interest charges for the late payment of royalties")(internal citations omitted).

In keeping with these decisions, the Board should likewise refuse to allow Appellant and its co-lessees a multi-million dollar windfall in this case.

<u>ONRR's Order and record are fully sufficient to inform Appellant of its liability for royalties and to allow Appellant to challenge the decision.</u>

17

Appellant asserts that ONRR's "Order fails on its face to justify its assessment of royalty against Anadarko." Statement of Reasons, 28. Appellant argues that the Order does not explain why the oil in question is royalty-bearing or address the definition of "production," "the unique status of the corresponding discharged and captured oil volumes," or "other legal points discussed herein." Statement of Reasons, 29.

The Board has held that "parties who are affected by [an agency] decision deserve a reasoned and factual explanation of the rationale for the decision and must be given a basis for understanding it and accepting it or, alternatively, appealing and disputing it." *Nevada Division of Wildlife*, 145 IBLA 237, 247 (1998).

Contrary to Appellant's assertions, the August 24, 2010, letter ordering Appellant to pay royalties provided sufficient information to inform Appellant of the basis for the royalty demand. The Order cited "the Outer Continental Shelf Lands Act [OCSLA], 43 U.S.C. § 1337, and Lease OCS-G 32306" as the legal bases for Appellant's obligation to pay royalties. These authorities obligate Appellant to pay royalties on oil and gas "production saved, removed, or sold." They also contain various qualifications and requirements on these obligations, including OCSLA's broad definition of "production" discussed herein. 43 U.S.C. § 1331(m). The Order also cited 30 U.S.C. § 1712(a) as a legal basis for Appellant's obligation to pay royalties on its *pro rata* share.

When crafting an Order, an agency is not required to explain the different facets of applicable legal authority and apply them to the situation at hand. Doing so would turn each

18

Order into a lengthy legal brief. Furthermore, the agency is not required to anticipate or speculate on what arguments an appellant might make in a subsequent appeal. Indeed, it would be impossible for the agency to determine ahead of time what arguments an appellant may choose to make. Instead, it is sufficient that the agency inform the party of the legal and factual bases for its decision. ONRR did exactly this in its August 24, 2010, Order.

Even assuming that a gap exists in ONRR's Order or record, Appellant has failed to demonstrate prejudice to its ability to appeal. The Board addressed this issue in *Nevada Division of Wildlife*. In that case, the appellant challenged a BLM decision on the ground that it did not explain how the carrying capacity of a grazing allotment was determined. *Id.* at 246 - 247. The Board rejected the challenge because "the appeal documents [filed by the appellant] clearly reveal that the [appellant] was sufficiently cognizant of the basis for the decision to appeal and present a rebuttal of BLM's methodology." *Id.* at 247. The Board has further held that "[w]here an appellant is able to surmount any difficulty initially encountered after [the agency] fails to present an adequate explanation of the basis for its decision, presents an informed and organized appeal, and is not unduly prejudiced by [the agency]'s initial omission, no remand is necessary." *Kingston Rust Development*, 160 IBLA 234, 241 (2003).

Here, Appellant has filed a lengthy and well-crafted Statement of Reasons, which exhibits a clear understanding of the legal and factual bases for ONRR's decision. Appellant has thus "present[ed] an informed and organized appeal" to ONRR's Order and exhibited the lack of prejudice that any omission in the decision or record may have caused. *Nevada Division of Wildlife*, 145 IBLA at 247; *Kingston Rust Development*, 160 IBLA at 241.

ONRR issued an Order which apprised Appellant of the legal and factual bases for Appellant's obligation to pay royalties. The administrative record underlying that Order clearly establishes that, under the legal authorities cited in the Order, Appellant is liable for royalties as the owner of a 25 percent ownership interest in the lease. Appellant's response to this Order indicates that Appellant has not been prejudiced by any alleged omissions. Appellant's contention that the decision and record are inadequate should be rejected.

## CONCLUSION

Appellant has a clear obligation to pay royalties on its share of proceeds from oil which was produced, removed, and sold from the Macondo well. Appellant attempts to avoid its obligation by championing a narrow reading of the term "production." But Appellant ignores the plain language of the statute, judicial interpretation of that language, and the particularly appalling facts which gave rise to this appeal. The Board should hold Appellant to its obligation by affirming ONRR's August 24, 2010, Order.

Respectfully submitted this **27**th day of June, 2011.

LANCE C. WENGER, ESQ.         for
Attorney-Advisor
Office of the Solicitor
Rocky Mountain Region
755 Parfet Street, Suite 151
Lakewood, CO 80215
(303) 231 – 5353, Ext. 447
(303) 231 – 5363 (facsimile)

20

## CERTIFICATE OF SERVICE

I hereby certify that on this ___27th___ day of June, 2011, true and correct copies of the foregoing Answer were mailed, via overnight mail, to:

Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy Street
Arlington, VA  22203

Peter J. Schaumberg, Esq.
Beveridge & Diamond PC
1350 I Street, N.W.
Suite 700
Washington, DC  20005-3311

I hereby further certify that on this ___27th___ of June, 2011, true and correct copies of the foregoing Answer were faxed to:

Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy Street
Arlington, VA  22203
FAX:  703-235-8349

Peter J. Schaumberg, Esq.
Beveridge & Diamond PC
1350 I Street, N.W.
Suite 700
Washington, DC  20005-3311
FAX:  202-789-6190

iii

# Deep Water

## The Gulf Oil Disaster and the Future of Offshore Drilling

## Report to the President

National Commission on the BP Deepwater Horizon
Oil Spill and Offshore Drilling

January 2011

EXHIBIT

Admiral Allen replied that this might take some time. It was the Friday afternoon before Memorial Day weekend. But the President pushed, asking, "Can you do it next week?" Admiral Allen, put on the spot, pledged to do his best.[219]

After the meeting, Governor Jindal immediately announced that the President had "agreed that work on the first segment must begin immediately," and that the federal government would decide "within two to three days" whether the additional five segments should proceed.[220] Parish President Nungesser told a similar story to Anderson Cooper on *CNN* that evening, saying "The President committed by early next week, we will have an answer and I believe that he's going to task BP."[221]

On June 1, Admiral Allen convened a summit in New Orleans "which included members of academia [one from Louisiana State University and a second from the University of New Orleans], federal trustees, fish and wildlife service and NOAA," as well as Governor Jindal and Parish President Nungesser. Although some experts at the summit expressed concern about causing harm to the environment, the discussion focused on the berms' potential to protect marshlands.[222] The politics of the project remained close at hand: Parish President Nungesser walked out, calling the meeting a "Dog and Pony Show,"[223] only to return in time to speak at the end. Governor Jindal continued to express his frustration and pressed for approval of all six reaches covered by the Corps permit.[224] In the face of the spill and in front of the Louisiana politicians, no one directly opposed the berms, and a "preponderance of opinion" at the summit suggested the berms would be an effective response measure.[225]

That evening, following the summit, Admiral Allen and BP's Hayward had dinner together in New Orleans to discuss the berms.[226] The following afternoon, Admiral Allen gave the go-ahead to all six reaches approved by the Corps, to be funded by BP.[227] BP estimated the cost to be $360 million, double the entire amount it had spent as of early June in "helping the region respond to the oil spill."[228] The Corps pegged the cost at $424 million.[229]

Louisiana awarded contracts for the project to Shaw Group, a Baton Rouge-based engineering, construction, and environmental services firm, and C.F. Bean LLC, a dredging contractor based in Plaquemines Parish.[230] Shaw estimated that five of the six berm reaches would be completed by November 1, and that the sixth would be completed by the end of November.[231] The National Incident Command estimated that the construction time for all six reaches would be six to nine months.[232] Even if those estimates had been correct, the project would have been nowhere close to complete by the time the government expected BP to kill the Macondo well with a relief well. As it happened, all of the estimates were far too rosy. Only a fraction of the planned reaches would be finished before the spill ended, and very little oil would be captured.

## From Containment to Collection (Late May to Early July)

Following the unsuccessful top kill, BP teams in Houston met through the night of May 28 to assess the operation.[233] Some meetings occurred behind closed doors, without government participation. At one point, Herbst of MMS and Admiral Kevin Cook, who had been dispatched by Admiral Allen to be his representative in Houston, entered a meeting and stated that they had a right to be present. Apparently, government officials

had not previously insisted on joining these types of meetings, and BP personnel were surprised by the interruption.[234] The failure of the top kill marked a turning point for the government science teams, with the government significantly increasing its oversight of the containment effort.

The next morning, BP presented its analysis of why the top kill failed to stop the flow of oil. The analysis focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet. That casing was purposely fabricated with three sets of weak points, called rupture disks. During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well. If the pressure buildup was too high, it could cause the collapse of one of the two casings. The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed.

The disks could rupture in two ways. If pressure between the 16-inch casing and the production casing were too high, the rupture disks would *burst outward* before the production casing collapsed. If pressure outside the 16-inch casing were too high, the rupture disks would *collapse inward* before the casing itself collapsed.[235] Once ruptured, the disks would create small holes in the 16-inch casing, bleeding built-up pressure off into the rock. According to BP's top-kill analysis, pressures created by the initial blowout could have caused the rupture disks to collapse inward, compromising the well's integrity.[236] BP believed that the mud it had pumped down the well during the top kill could have gone out into the rock through the rupture disks, instead of staying within the well and pushing oil back down into the reservoir as intended.[237]

Collapse of the rupture disks *was* only one of BP's possible explanations for the unsuccessful top kill.[238] But the company presented it to the government as the most likely scenario.[239] Although the government science teams did not fully accept BP's analysis of what happened to the mud, they agreed that the rupture disks could have collapsed during the blowout, and that the integrity of the well had to be considered in future containment efforts.[340] In retrospect, government officials have suggested that the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per-day estimate. Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser.[241]

BP had previously said that, if the top kill failed, its next step might be to install a second BOP on top of the existing one to shut in the well.[242] But now, the company engineers viewed the possibility that the rupture disks had collapsed as a reason to discard capping the well as an option.[243] If BP shut the well in, oil and gas could flow out the rupture disks and into the rock surrounding the well in a "broach" or "underground blowout." From there, the hydrocarbons could rise through the layers of rock and flow into the ocean from many points on the sea floor. This would make containment nearly impossible, at least until the completion of a relief well. Thus, in the aftermath of the top kill, BP and the government focused on trying to collect the oil, with the relief wells still providing the most likely avenue for killing the well altogether.[244]



Transocean's huge drill ship the *Discoverer Enterprise*, its derrick towering 400 feet above the sea, and Helix's *Q4000* (foreground) sit over the gushing wellhead. Together the vessels were able to recover up to 25,000 barrels of oil per day.

*Julie Dermansky ©2010*

BP had a team ready to proceed with new collection tools almost immediately.[245] On May 29, the company and the government announced that BP would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device—the "top hat"—which would then be connected via a new riser to the *Discoverer Enterprise* above.[346] BP began installing the device on June 1, and had the top hat in place and functioning by 11:30 p.m. on June 3. Having learned from its cofferdam experience, BP injected methanol to prevent formation of hydrates. By June 8, the *Discoverer Enterprise* was collecting nearly 15,000 barrels of oil per day.

BP also developed a system to bring oil and gas to the surface through the choke line on the BOP. BP outfitted the *Q4000*, a vessel involved in the top-kill effort, with collection equipment, including an oil and gas burner imported from France. After it became operational on June 16, the *Q4000* system was able to process and burn up to 10,000 barrels of oil per day.*

On occasion, BP was overly optimistic about the percentage of the oil it could remove or collect. On June 1, Suttles said that he expected the top hat, when connected to the *Discoverer Enterprise*, to be able to collect the "vast majority" of the oil.[247] Within days, it became apparent that the top hat and *Discoverer Enterprise* were inadequate. On June 6, Hayward told the *BBC* that, with the *Q4000* in place, "we would very much hope to be containing the vast majority of the oil."[248] But when the *Q4000* came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

---

* Over the course of June and early July, BP worked on further expanding its containment system, which it asserted would eventually be able to collect up to 80,000 barrels of oil per day. BP never used the complete system, based around two freestanding risers connected to the choke and kill lines on the BOP, because it succeeded in capping the well on July 15.

It is unclear whether BP could have increased its collection capacity more rapidly than it did. BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.* One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.[249]

### Continued Conflict about Dispersant Use (May 10–July 14)

Because of the insufficient collection capacity, oil continued to flow into the Gulf. Though the subsea use of dispersants proved helpful in preventing huge surface slicks, it did not initially have the predicted effect of reducing the total volume of dispersants applied. At a May 24 press conference, EPA Administrator Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that "we can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more."[250] A Coast Guard–EPA letter and joint directive issued two days later instructed BP to "eliminate the surface application of dispersants," except in "rare cases when there may have to be an exemption."[251]

Despite this directive, surface use of dispersants continued. When surveillance aircraft spotted oil and no other method of cleaning it up was available in the area, BP would ask for an exemption from the Federal On-Scene Coordinator, who would then seek EPA's approval. The Coast Guard could not unilaterally allow the exemption; EPA had the final vote.

EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants.[252] Coast Guard responders, who viewed dispersants as a powerful tool to protect the coastline, wondered why EPA wanted to cast aside the advance planning that went into the preauthorization of surface dispersant use.[253]

These different perspectives on dispersants led to conflicts between EPA and the Coast Guard. For example, on June 7, BP requested permission to spray dispersants on several large slicks. Despite Federal-On Scene Coordinator Rear Admiral James Watson's statement that he had "determined aerial dispersant the best and only way to mitigate the pending landfall effect of the oil spotted," EPA would not approve the exemption.[254] The Coast Guard captain leading the majority of front-line operations was furious. "It would be a travesty," he wrote, "if the oil hits the beach because we did not use the tools available to fight this offshore. This responsibility needs to be placed squarely in EPA's court if it does hit the shoreline."[255] Later that day, without having received responses to its requests for additional data, EPA threatened to issue a directive "to stop the use of all dispersants."[256]

---

* Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| ANADARKO PETROLEUM CORPORATION | ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) ) | IBLA No. 2010−228 |
| OFFICE OF NATURAL RESOURCES REVENUE | ) ) ) | |
| Respondent. | ) ) | |

### AFFIDAVIT OF ROBERT PRAEL

1.  I am Robert Prael.  I am employed as the Program Manager, Financial Management, Office of Natural Resources Revenue (ONRR), an agency of the United States Department of the Interior.  My responsibilities include supervision over all activities of Financial Management.

2.  Financial Management receives reports of production and sale of federal oil and gas from federal oil and gas lessees.

3.  Based on the reports of production and sale submitted by BP Exploration & Production, Inc. for the Macondo well on Lease OCS-G 32306, a total of approximately 679,000 barrels of oil were produced, removed, and sold.

4.  These 679,000 barrels of oil generated a total of approximately $47.3 million in proceeds for the lessees of Lease OCS-G 32306.

5.  Approximately $11.8 million of these proceeds are attributable and owed to Anadarko.

**EXHIBIT**

**2**

6. The $47.3 million in total proceeds generated approximately $8.2 million in total royalties due and owing to the United States.

7. The amount of royalty owed by Anadarko to the United States from its share of these proceeds is approximately $2 million.

8. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed on this 27th day of May, 2011.

_____

Robert Prael

Program Manager, Financial Management

Office of Natural Resources Revenue

United States Department of the Interior

I hereby attest that, on this 27th day of May, 2011, in Jefferson County, Colorado, Robert Prael signed this document in my presence.

_____

Linda Lautigar

Notary Public

LINDA LAUTIGAR
NOTARY PUBLIC, STATE OF COLORADO

My Commission Expires
November 26, 2011

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

MOEX OFFSHORE 2007, LLC           )
                                  )
                Appellant,        )
                                  )
v.                                )        IBLA No. 2010 − 229
                                  )
OFFICE OF NATURAL RESOURCES       )
REVENUE                           )
                                  )
                Respondent.       )

## AFFIDAVIT OF ROBERT PRAEL

1. I am Robert Prael.  I am employed as the Program Manager, Financial Management, Office of Natural Resources Revenue (ONRR), an agency of the United States Department of the Interior.  My responsibilities include supervision over all activities of Financial Management.

2. Financial Management receives reports of production and sale of federal oil and gas from federal oil and gas lessees.

3. Based on the reports of production and sale submitted by BP Exploration & Production, Inc. for the Macondo well on Lease OCS-G 32306, a total of approximately 679,000 barrels of oil were produced, removed, and sold.

4. These 679,000 barrels of oil generated a total of approximately $47.3 million in proceeds for the lessees of Lease OCS-G 32306.

5. Approximately $4.7 million of these proceeds are attributable and owed to MOEX.



EXHIBIT

3

6. The $47.3 million in total proceeds generated approximately $8.2 million in total royalties due and owing to the United States.

7. The amount of royalty owed by MOEX to the United States from its share of these proceeds is approximately $816,000.

8. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed on this 27th day of May, 2011.

_____

Robert Prael

Program Manager, Financial Management

Office of Natural Resources Revenue

United States Department of the Interior

I hereby attest that, on this 27th day of May, 2011, in Jefferson County, Colorado, Robert Prael signed this document in my presence.

_____

Linda Lautigar

Notary Public

LINDA LAUTIGAR
NOTARY PUBLIC, STATE OF COLORADO

My Commission Expires
November 26, 2011