**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | : | MDL No. 2179 |
| Horizon" in the Gulf of Mexico, on | : | |
| April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates To: All Cases | : | JUDGE BARBIER |
| …………………………………………... | : | MAGISTRATE JUDGE SHUSHAN |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF BP'S MOTION FOR A STAY
OF PROCEEDINGS BETWEEN BP AND ANADARKO**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

PROCEDURAL HISTORY.....................................................................................................2

I.  BP Has, from the Beginning of the Parties' Disputes, Followed the Dispute
    Resolution Process Required by the Operating Agreement..................................................2

II.  BP's Forbearance from Filing MDL Claims, and Its Responses to Anadarko's
     Claims, Have Consistently Evidenced BP's Intent to Arbitrate. ........................................4

III.  Discovery by BP Against Anadarko Has Been Properly Circumscribed and Was
      Withheld Until, or Conditioned Upon, Court Orders Clarifying that the Discovery
      Would Not Violate Contractual Arbitration Restrictions. ...............................................5
      A.  Before Moving to Stay Anadarko's Claims, BP Sought No Discovery
          from Anadarko..........................................................................................5
      B.  After Filing this Motion to Stay, BP Continued to Refrain from Deposition
          Discovery against Anadarko and Expressly Conditioned Document
          Discovery on the Outcome of this Motion................................................................7
      C.  The Magistrate Judge Ruled that Discovery Between BP and Anadarko
          Related to MDL Defenses Is Not Inconsistent with the Operating
          Agreement Arbitration Clause. ...........................................................................11

IV.  Summary......................................................................................................................17

ARGUMENT .......................................................................................................................18

I.  Anadarko Should Be Judicially Estopped from Arguing that BP's Discovery
    Somehow Waived its Arbitration Rights. .......................................................................19

II.  BP's Has Not "Substantially Invoked the Judicial Process" against Anadarko
     Through Any of Its Actions in the MDL. ........................................................................20
     A.  BP's Conduct Has Been Entirely Consistent with Its Right to Arbitrate. ............20
     B.  The Fifth Circuit Refuses to Find Waiver Even When a Party Engages in
         More Discovery Than What BP Has (Conditionally) Sought from
         Anadarko.....................................................................................................23

III.  Anadarko Has Not Been Prejudiced By Any of BP's Actions. ........................................24

CONCLUSION....................................................................................................................25

## INTRODUCTION

Pursuant to the Court's Order of June 16 (Dkt. 2774), BP files this supplemental briefing in support of BP's Motion For a Stay of Proceedings Between BP and Anadarko[1] (Dkt. 2169).

Anadarko's crossclaims against BP should be stayed because they are subject to a mandatory arbitration clause in the parties' Macondo Well "Joint Operating Agreement" ("JOA").  The Court's June 16 Order "conclude[d], essentially for the reasons advanced by BP, that [the arbitration] provisions of [the] JOA constitute a 'broad' arbitration clause covering all disputes between the parties having a significant relationship to the contract."  (Dkt. 2774 at 2–3.)  However Anadarko had, for the first time in its sur-reply (its fourth brief on these issues), raised an argument that BP's right to compel arbitration had been waived.  The June 16 Order asked for further briefing on the issue of whether BP "somehow waived its right to compel arbitration by its previous conduct in this litigation."  (*Id.* at 3.)  The Court requested a "detailed and specific account . . . of any and all discovery or other actions undertaken by BP which pertain to the dispute existing between BP and Anadarko."  (*Id.*)

Accordingly, BP submits this brief, which will demonstrate that BP has consistently followed the contractual process for alternative dispute resolution; that BP has refrained from alleging claims against Anadarko in this Court; and that BP's modest discovery against Anadarko was withheld until the last possible moment under the Court's scheduling orders, and even then was prefaced with the explicit condition that no response would be required unless BP's motion for a stay was denied.  BP herein catalogues all conduct that Anadarko has or possibly could argue to have contributed to an alleged "waiver."  (*See infra* "Procedural History" Parts I - III.)  None of it, singly or in combination, comes even close to the type and volume of

---

[1]    BP's motion originally sought a stay of litigation with MOEX, but these two parties have since settled their disputes.

conduct that the Fifth Circuit has required to meet the "heavy burden" of proving waiver.  (*See infra* "Argument" Part II.)

In addition to the absence of a basis for waiver based on BP's conduct, Anadarko also cannot establish the required waiver element of prejudice.  This element would require that BP have "forc[ed] [Anadarko] to litigate an issue and later seek[] to arbitrate that same issue."  (*See infra* "Argument" Part III.)  But it is Anadarko, not BP, who has used the forum of this Court to aggressively and relentlessly pursue claims and discovery on disputes that are covered by the parties' broad arbitration clause.  In addition to showering BP with over 200 discovery requests relating to arbitrable issues and moving to compel additional responses on many of these requests, Anadarko has filed crossclaims against BP that go to the heart of the parties' arbitrable dispute.

A final, independent basis for denying Anadarko's claim of waiver is that it is premised on an argument that Anadarko contradicted in successfully moving to compel discovery against BP.  Anadarko is now contending that BP has waived its right to arbitrate by, in part, engaging in "discovery" against Anadarko.  But when pursuing its motion to compel, Anadarko denied BP's contention that discovery was incompatible with contractual arbitration rights.   Anadarko's about-face is barred by judicial estoppel.  (*See infra* "Argument" Part I.)

## PROCEDURAL HISTORY

Since shortly after the Incident and throughout the course of this litigation, BP has preserved its right to arbitrate disputes with Anadarko.  BP has not filed in this Court any claim against Anadarko, nor taken any other action or position inconsistent with its intent to arbitrate.

**I.     BP Has, from the Beginning of the Parties' Disputes, Followed the Dispute Resolution Process Required by the Operating Agreement.**

Under the Operating Agreement, Anadarko is required to pay joint interest billings

("JIBs") to reimburse BP for expenditures related to oil spills.  (Apr. 27, 2011 Boles Decl. Ex. A at 36, 163-64, 170 (Operating Agreement art. 6.1, Ex. C ¶¶ I.2–3, II.13.A).)  Upon the failure of a party to timely pay a JIB, the Operating Agreement requires the Operator to make a formal demand prior to declaring the non-paying party in default.  (*Id.* at 200 (Operating Agreement Ex. F, art. 6.3(b)).)  The JIB for May 2010 invoiced Anadarko for its share of spill-related costs.  The May JIB was sent on June 7, with payment due July 7.  Anadarko did not pay.  Anadarko sent a letter on July 7 confirming its refusal to pay its share of spill-related costs.  (Apr. 27, 2011 Boles Decl. Ex. C (July 7, 2010 letter from R. Reeves to K. Howe).)  BP responded two days later in accordance with JOA Exhibit F, Article 6.3(b), notifying Anadarko that it would be placed in default if it did not make the overdue payment within 30 days.  (Boles Decl. Ex. G (July 9, 2010 letter from K. Wardlaw to J. Bryan & R. Reeves).)  Anadarko persisted in its refusal, and BP placed Anadarko in default on August 11.  (Boles Decl. Ex. H (Aug. 11, 2010 letter from K. Howe to J. Bryan & R. Reeves).)  In the default letter, BP expressly reserved any and all rights with respect to the default.  (*Id.*)

Under the Operating Agreement's dispute-resolution procedure in JOA Exhibit H, when an event materializes that might result in a "Dispute," the parties must notify each other and "attempt to resolve satisfactorily any such matters."  (Apr. 27, 2011 Boles Decl. Ex. A at 217 (Operating Agreement Ex. H, § I.B).)  After BP notified Anadarko of its default as described above, the parties met and exchanged further correspondence outlining their respective positions and responding to others' positions.  These efforts were unsuccessful.  At that point, under the JOA dispute resolution procedure in Exhibit H, either party could deliver to the other a "Notice of Dispute."  (Apr. 27, 2011 Boles Decl. Ex. A at 217 (Operating Agreement Ex. H § I.C).)  On April 1, BP sent Anadarko such a "Notice of Dispute."  (In its initial opposition to this Motion to

Stay, Anadarko argued that BP waited too long to send this Notice, but the Fifth Circuit has ruled that a party's entitlement to a stay of litigation based on an arbitration clause does not depend on whether the party seeking the stay has initiated arbitration, but only on whether the claims are arbitrable. *See Tenneco Resins, Inc. v. Davy Int'l*, 770 F.2d 416, 419, 423 (5th Cir. 1985).) Under JOA Exhibit H the Notice of Dispute is followed by a 90-day period during which the parties may further attempt to resolve the dispute through negotiation.  (*See* Apr. 27, 2011 Boles Decl. Ex A at 217 (Operating Agreement Ex. H § I.C).)  The 90-day period is set to end July 14. After a further waiting period of 90 days, either party may formally notice the initiation of arbitration.  (Apr. 27, 2011 Boles Decl. Ex. A at 217 (Operating Agreement Ex. H § II.A).) Thus, BP has complied in all respects with the Operating Agreement and, specifically as it pertains to the disputes with Anadarko, with the dispute resolution procedure.

## II.   BP's Forbearance from Filing MDL Claims, and Its Responses to Anadarko's Claims, Have Consistently Evidenced BP's Intent to Arbitrate.

Anadarko filed its 16 crossclaims against BP on April 19, 2011.  (No. 10-2771 Dkt. 338.) BP had no obligation to respond to Anadarko's claims until June 20.  Nevertheless, BP filed a motion to stay those claims on April 27—nearly two months before it was required to do so. (Dkt. 2169.)  In its motion, BP unequivocally informed the Court that it wanted to arbitrate—not litigate—its disputes with Anadarko.  BP never filed a single claim against Anadarko in the MDL.  (This is a critical distinction between the context of this motion and BP's contention of waiver of arbitration by Transocean, who filed three complaints against BP.)

And when the time finally did arrive for BP to formally respond to Anadarko's crossclaims, BP moved to dismiss on the ground that those claims are subject to the parties' agreement to arbitrate.  (Dkt. 2944.)  BP's Motion to Dismiss did not seek a determination of

Anadarko's crossclaims on the merits; rather, BP expressly sought to dismiss Anadarko's claims "without prejudice to their later being asserted in an arbitral proceeding."  (*See* Dkt. 2944-9.)

## III. Discovery by BP Against Anadarko Has Been Properly Circumscribed and Was Withheld Until, or Conditioned Upon, Court Orders Clarifying that the Discovery Would Not Violate Contractual Arbitration Restrictions.

Throughout the MDL proceedings, BP has acted consistently with its intent to arbitrate its disputes with Anadarko.  As shown below, BP has sought only modest discovery from Anadarko, and that discovery has been expressly conditioned on the outcome of this motion, and for the most part was sought only after the Magistrate Judge ruled that discovery between BP and Anadarko could proceed so long as it related to the parties' MDL defenses.  BP should not even have to address the discovery it has sought from parties other than MOEX and Anadarko, because that discovery should have no bearing on whether BP has waived its right to arbitrate *claims by Anadarko*.  Nevertheless, because Anadarko has grasped at such discovery to put forth a waiver argument, BP has catalogued that discovery as well.  Even when such discovery is included, BP's discovery "about" Anadarko remains far below the level of litigation activity required by the Fifth Circuit to find waiver of arbitration.  (*See infra* "Argument" Part II.B.)

### A. Before Moving to Stay Anadarko's Claims, BP Sought No Discovery from Anadarko.

Before BP moved to stay Anadarko's crossclaims on April 27, BP did not notice a single Anadarko employee for deposition, depose a single Anadarko witness, serve a single request for production, or serve Anadarko with a single interrogatory or RFA.  Put simply, BP propounded no discovery against Anadarko.

Nevertheless, in past briefing, Anadarko has argued that BP took a handful of actions in the MDL *related* to Anadarko before filing for a stay.  On April 15, 2011, BP provided the names of four Anadarko employees on a "Potential Deponent List" ordered by the Magistrate

Judge.  As BP has explained in its prior briefs, this collective document, to which a number of parties contributed names, was court-ordered, preliminary, and nonbinding.  (*See* further discussion in Dkt. 2169-1 at 23-24 (BP's Combined Memo in Support of Stay Mot. and Opp. Mot. to Compel) and Dkt. 2538-2 at 8 (BP's Reply in Support of Stay Mot.).)  The "Potential Deponent List" was not, as Anadarko previously and incorrectly asserted, a "notice of [BP's] intention to depose" any witness.  (*See* Dkt. 1965-1 at 14.)  BP has, to this day, not noticed a deposition of an Anadarko witness.  In the period up to and including the filing of this Motion to Stay, BP refrained from cross-examining the only Anadarko witness deposed.  (*See* Boles Decl. Ex. L (Foster deposition).)

BP likewise served no written discovery on Anadarko.  Anadarko nevertheless suggests that BP waived arbitration by making requests related to Anadarko in discovery served by BP on other parties.  Anadarko identifies only one such request.  BP's document requests to Halliburton included a single request about conversations that Halliburton may have had with Anadarko:

| The BP Parties' Second Request for Production of Documents to Halliburton April 3, 2011 | |
| --- | --- |
| **RFP 42** | Please produce all documents discussing, reflecting or relating to communications between Halliburton and Anadarko discussing, reflecting or relating to the Macondo well. |

(Boles Decl. Ex. I (BP's Second Request for Production of Documents to Halliburton).)

Anadarko does not expressly assert, let alone explain or support, its implicit premise that the Operating Agreement's dispute resolution procedures prohibit a party from obtaining discovery that is relevant to a pending court case *from a third party*.  As is explained in Part I of the "Argument" section below, Anadarko should be judicially stopped from making such an argument, since it successfully obtained an order compelling discovery from BP on the ground that the JOA arbitration clause does *not* prohibit discovery related to MDL defenses.  And BP's single request to Halliburton related to Anadarko communications is relevant to BP defenses,

since, for example, receipt of, and acquiescence in, cementing-related communications by another deepwater-drilling company such as Anadarko, would tend to negate allegations that BP was negligent in its oversight of Halliburton.[2]

Revealing how deep it must dig to fabricate a waiver argument, Anadarko has also pointed to another single request for production served on Transocean. Unlike the request served on Halliburton, the Transocean request did not identify Anadarko in any way:

| The BP Parties' First Request for Production of Documents to the Transocean Parties March 11, 2011 | |
|---|---|
| RFP 155 | All documents relating to the Transocean Command Center initially set up in response to the *Deepwater Horizon* incident, including but not limited to documents relating to communications between the Transocean Command Center and the United States Coast Guard, the BP Command Center, or any other third party. |

(Boles Decl. Ex. J (BP's First Request for Production of Documents to Transocean Parties).)

> **B.**  **After Filing this Motion to Stay, BP Continued to Refrain from Deposition Discovery against Anadarko and Expressly Conditioned Document Discovery on the Outcome of this Motion.**

In partial response to this Motion to Stay and Anadarko's Motion to Compel Discovery, Magistrate Shushan issued a May 13 Order stating that discovery related to MDL defenses could proceed despite the arbitration clause in the JOA. (Dkt. 2358.) Prior to that date, BP noticed no depositions of Anadarko witnesses and refrained from examining Anadarko witnesses in depositions. (Boles Decl. Exs. L, M, N, O (depositions of Anadarko witnesses Foster, Chandler, O'Donnell, & Bryan).)

---

[2]   Anadarko has not, as of this writing, suggested that BP's deposition questioning of non-Anadarko witnesses before the stay motion has any bearing on the issue of waiver. Such an argument would likewise be barred by judicial estoppel, as well as by the fact that, of the six questions that BP has located that mention Anadarko, each is related to BP's defenses in this litigation. For example, BP asked a witness who facilitated Anadarko's access to real-time well data whether his role included serving as a dedicated resource to Anadarko. (Boles Decl. Ex. K (Gisclair Dep. at 487-88).) As explained above, the extent of information known to Anadarko—an experienced deepwater driller who reviewed and approved the Macondo well plan—is relevant to BP's defenses. In any event, Anadarko, as the party asserting waiver, bears the burden of proving that any deposition questioning by BP was unrelated to its defense in this litigation or otherwise inconsistent with the JOA arbitration procedures. (*See infra* "Argument" section.)

BP asked a handful of questions (a total of 10) related to Anadarko at two depositions of third parties. Once again, these questions related to BP's MDL defenses, including issues regarding the use of foam cement, and the contemporaneous knowledge about drilling operations at Macondo by an experienced deepwater driller such as Anadarko:

| Page | Michael Serio (Halliburton)<br>April 29, 2011 |
|---|---|
| 402-03 | **Q:** Let's go to Tab 14. Tab 14 is a jointly authored article about foam cement, authored by three employees of Halliburton and somebody from Anadarko. Do you see that?<br><br>**A.** Yes, sir. |
| 403 | **Q:** All right. And its titled foam cement -- foamed conventional lightweight cement slurry for ultralow density and low ECDs solves lost circulation problem across coal formations, a case history. This is actually an article about coal formations; right?<br><br>**A:** That's what it states, yes, sir. |
| 403 | **Q:** It does list in the right-hand column foam cement offers many advantages, including the following. And then it lists a bunch of advantages; right?<br><br>**A:** Yes, sir, I see that. |
| 403 | **Q:** And the good news is for the sake of time I'm not going to go through that one. I just liked it because Anadarko's on it. |

(Boles Decl. Ex. P (Serio Dep).)

| Page | Jesse Gagliano (Halliburton)<br>May 11, 2011 |
|---|---|
| 292 | **Q:** Did you know that Anadarko has a 25 percent interest in the Macondo well?<br><br>**A:** I respectfully decline to answer based on my constitutional Fifth Amendment privilege. |
| 293 | **Q:** Are you aware of the relationship between BP and Anadarko and MOEX as working interest owners of the well?<br><br>**A:** I respectfully decline to answer based on my constitutional Fifth Amendment privilege. |
| 293 | **Q:** Anadarko and MOEX, as the working interest owners, had access to all of the engineering information on this well; isn't that true?<br><br>**A:** I respectfully decline to answer based on my constitutional Fifth Amendment privilege. |

| 293 | **Q:** And Anadarko and MOEX could have requested any information about this well that they wanted from BP; isn't that correct?<br><br>**A:** I respectfully decline to answer based on my constitutional Fifth Amendment privilege. |
|---|---|
| 293-94 | **Q:** And based on your experience, don't you believe that Anadarko and MOEX should have requested more information about the Macondo well?<br><br>**A:** I respectfully decline to answer based on my constitutional Fifth Amendment privilege. |
| 294 | **Q:** Because Anadarko and MOEX had all the same information about the Macondo well that BP had, they should have taken all the same actions that BP should have taken with regard to this well?<br><br>**A:** I respectfully decline to answer based on my constitutional Fifth Amendment privilege. |

(Boles Decl. Ex. Q (Gagliano Dep.).)

BP served two discovery requests on other parties that mention Anadarko.  On April 29, BP served the same request on Transocean Inc., after it became a party to this case, that it had on the other Transocean Parties:

| **The BP Parties' First Requests for Production of Documents to Transocean Inc.**<br>**April 29, 2011** | |
|---|---|
| **RFP 155** | All documents relating to the Transocean Command Center initially set up in response to the *Deepwater Horizon* Incident, including but not limited to documents relating to communications between the Transocean Command Center and the United States Coast Guard, the BP Command Center, or any other third party. |

(Boles Decl. Ex. R (BP's First Requests for Production of Documents to Transocean Inc.).)

And it served another request on certain government entities related to Anadarko's involvement with the Macondo Well:

| **BPXP's First Set of Discovery Requests to the States of Alabama and Louisiana, the**<br>**Mexican States of Quintana Roo, Tamaulipas, and Veracruz, and Local Government**<br>**Entities**<br>**April 29, 2011** | |
|---|---|
| **RFP 34** | All documents referring or relating to Anadarko's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. |

(Boles Decl. Ex. S (BP's First Set of Discovery Requests to government entities).)

These requests were reasonably calculated to lead to admissible evidence relevant to BP's MDL defenses.   As an experienced deepwater driller, Anadarko's knowledge of, and acquiescence in, Macondo well planning and operations is relevant to allegations against BP.

Only when confronted with the Court's deadline for serving document discovery did BP serve one set of requests for production on Anadarko, and it bore a boldfaced, capitalized preamble stating that Anadarko need not respond unless and until the Court ruled that discovery between BP and Anadarko was permitted:

> **BP DOES NOT—AND DOES NOT INTEND TO—WAIVE ANY RIGHTS UNDER THE MACONDO PROSPECT DEEPWATER OPERATING AGREEMENT, INCLUDING THE ARBITRATION RIGHTS UNDER THE AGREEMENT.   BP STIPULATES THAT ANADARKO HAS NO OBLIGATION TO RESPOND TO THIS DISCOVERY UNLESS OR UNTIL THE COURT DENIES BP'S MOTION TO STAY LITIGATION.**

(Boles Decl. Ex. T at 1 (BPXP's First Requests for Production to Anadarko) (emphasis in original).)   The majority of these requests seek information on Anadarko's knowledge and approval of the actions taken at Macondo, and on Anadarko's policies and past practices as an operator in the Gulf of Mexico.   While five requests related to the arbitrable dispute between BP and Anadarko, the explicit disclaimer quoted above stated that Anadarko had no obligation to respond to these requests unless this stay motion was denied:

| RFP 61 | All documents or communications relating to or referring to JIB invoices, including all drafts and internal correspondence related to the JIB invoices. |
|---|---|
| RFP 92 | All documents that you contend support the proposition that the Anadarko Defendants are not liable for any damages related to the *Deepwater Horizon* incident and subsequent oil spill. |
| RFP 93 | All documents that question or discuss the proposition that the Anadarko Defendants are not liable for any damages related to the *Deepwater Horizon* incident and subsequent oil spill. |
| RFP 94 | All documents that you contend support the proposition that the Anadarko Defendants are not liable under the JOA to pay JIBs or otherwise to reimburse BP for costs related to the *Deepwater Horizon* incident and subsequent oil spill. |
| RFP 95 | All documents that question or otherwise discuss the proposition that the Anadarko |

| | Defendants are not liable under the JOA to pay JIBs or otherwise to reimburse BP for costs related to the *Deepwater Horizon* incident and subsequent oil spill. |
|---|---|

(*Id.*)

### C.   The Magistrate Judge Ruled that Discovery Between BP and Anadarko Related to MDL Defenses Is Not Inconsistent with the Operating Agreement Arbitration Clause.

BP's opening papers on this Motion to Stay contented that *all* discovery between BP and Anadarko was barred by the arbitration clause.  The discovery-related part of BP's motion was referred to Magistrate Judge Shushan, and she ruled that, even if Anadarko's claims against BP were arbitrable, the parties could still conduct discovery against each other related to their defenses in this MDL litigation.  Thus, no waiver can be found based on BP discovery served after that Order (nor based on BP's insistence after the Order to responses to its earlier-served conditional discovery).

Even after the Magistrate Judge's Order, BP continued to expressly condition its further written discovery on the outcome of this Court's ruling on the Motion to Stay.  Last week, faced with another scheduling deadline, BP served a set of interrogatories and a set of requests for admission on Anadarko.  As with BP's prior requests for production of documents, BP's interrogatories and requests for admission contained a boldfaced, capitalized preamble stating that Anadarko did not have to respond to the requests for admission unless BP's motion to stay Anadarko's crossclaims is denied:

> ***BY SERVING THESE REQUESTS FOR ADMISSION, BP DOES NOT—AND DOES NOT INTEND TO—WAIVE ANY RIGHTS UNDER THE OPERATING AGREEMENT, INCLUDING THE ARBITRATION RIGHTS UNDER THAT AGREEMENT, AND BP EXPLICITLY RESERVES ALL SUCH RIGHTS.  BP STIPULATES THAT ANADARKO HAS NO OBLIGATION TO RESPOND TO THE FOLLOWING REQUESTS FOR ADMISSION UNLESS AND UNTIL THE COURT DENIES BP'S MOTION TO STAY.***

(Boles Decl. Ex. U at 1 (BP's First Set of Requests for Admission to Anadarko) (emphasis in original).) As for the interrogatories, BP once again stated its intention to arbitrate, and informed Anadarko that it need not respond to any of the interrogatories if the Magistrate Judge's order is reversed:

> *BY SERVING THESE INTERROGATORIES, BP DOES NOT—AND DOES NOT INTEND TO—WAIVE ANY RIGHTS UNDER THE OPERATING AGREEMENT, INCLUDING THE ARBITRATION RIGHTS UNDER THAT AGREEMENT, AND BP EXPLICITLY RESERVES ALL SUCH RIGHTS. BP STIPULATES THAT ANADARKO SHALL HAVE NO OBLIGATION TO RESPOND TO ANY DISCOVERY REQUESTS BY BP IN THE EVENT THAT, AND AT SUCH TIME AS, THE COURT RULES THAT SUCH DISCOVERY IS INCONSISTENT WITH BP'S RIGHT TO ARBITRATE ITS DISPUTES WITH ANADARKO.*

(Boles Decl. Ex. V at 1 (BP's First Set of Interrogatories to Anadarko) (emphasis in original).) Virtually all of BP's interrogatories were targeted to obtain information regarding the drilling policies and practices of Anadarko—whose experience as an operator of deepwater wells in the Gulf of Mexico who was also kept informed of and approved the operations at the Macondo well is relevant to the claims in this litigation regarding BP's conduct. The remainder were likewise relevant to BP's MDL defenses.[3]

BP acknowledged that four of its interrogatories were not related to its MDL defenses against other parties' claims, and stipulated that Anadarko did not have to respond unless the Court denied BP's motion to stay:

> *BP HAS SERVED CERTAIN INTERROGATORIES TO PRESERVE ITS RIGHT TO OBTAIN DISCOVERY IN THE EVENT THAT THE COURT DENIES BP'S MOTION TO STAY. BP STIPULATES THAT ANADARKO HAS NO OBLIGATION TO RESPOND TO INTERROGATORY NOS. 41 THROUGH 44 UNLESS AND UNTIL THE COURT DENIES BP'S MOTION TO STAY.*

---

[3] The remaining interrogatories addressed Anadarko's internal discussions about Macondo, Anadarko's contracting with Transocean and Halliburton since the Macondo incident, and Anadarko's potential trial witnesses.

(*Id.* (footnote omitted))[4]  This time around, BP made the conscious decision to single out the specific interrogatories that went directly to the parties' arbitrable dispute, because these were served after the Magistrate Judge's order permitting MDL-related discovery.  BP had not distinguished between its MDL defense-related and non-MDL defense-related requests in its earlier set of discovery, as BP did not know at the time that discovery would ultimately be allowed between the parties on certain issues.  Again, BP expressly conditioned any obligation to respond to these requests on the outcome of this motion to stay:

| **Rog 41** | Please describe in detail all reasons you contend that you are not required to pay any potion of any Joint Interest Billing related to the Macondo Well. |
|---|---|
| **Rog 42** | Please describe in detail all ways in which you contend that BP has breached the JOA. |
| **Rog 43** | Please describe in detail all ways in which you contend BP's conduct constituted gross negligence or willful misconduct, as those terms are used in your crossclaims against BP. |
| **Rog 44** | Please describe in detail all ways in which you contend BP's conduct constituted negligence, as that term is used in your crossclaims against BP. |

(*Id.*)

Depositions of three Anadarko witnesses occurred following the Magistrate Judge's Order that MDL-defense discovery was permissible under the JOA arbitration clause.  BP did not ask questions of two of these witnesses.  (Boles Decl. Ex. W (Huch deposition).)[5]  The only Anadarko witness whom BP questioned is drilling engineer Robert Quitzau.  (*See* Boles Decl. Ex. X (Quitzau Dep. 367-443).)  A BP attorney spent 75 minutes during Mr. Quitzau's two-day deposition asking about (1) his general responsibilities (Quitzau Dep. 367**:**20-372**:**13, 387**:**10-389**:**6, 391:23-393:23), (2) Anadarko's access to information about the Macondo Well, (Quitzau

---

[4]     Due to a typographical error, BP's original stipulation inadvertently referred to Interrogatory Nos. 40 through 43.  BP served a Corrected First Set of Interrogatories on July 2, 2011, changing the interrogatory cross-reference but leaving the substance of the interrogatories unchanged.  The corrected stipulation is quoted here.

[5]     Darrell Hollek's deposition transcript is not attached as an exhibit because the confidentiality designations for his deposition have not been received as of today's filing.

Dep. 376:20-378:4, 379**:**6-380**:**14, 389:7-391:2, 398:1-402:19, 413:8-414:19, 414:21-416:18),
(3) Anadarko's knowledge about operations at the Macondo Well (Quitzau Dep. 372**:**14-373**:**20,
378**:**25-379**:**5, 391:3-22, 403:10-404:1, 404:3-405:2, 405:3-409:13, 409:14-413:6, 426:12-
429:20), (4) Anadarko's tracking of progress at the Macondo Well (Quitzau Dep. 373**:**21-
376**:**19, 380: 16-23; 393:24-397:25, 402:20-403:9), (5) Anadarko's input into and approval of
decisions at the Macondo Well (Quitzau Dep. 417:10-422:19, 423:12-425:17, 425:19-426:11,
429:22-437:14, 4437:16-439:21, 39:23-443:3), and (6) Anadarko's experiences and practices
with other wells in the Gulf of Mexico (Quitzau Dep. 380**:**25-387**:**9, 416:20-417:8).  Once again,
given Anadarko's extensive experience on other Gulf of Mexico deepwater wells, these
questions are relevant to the defense of BP's conduct at Macondo.  BP did not ask any questions
about the Joint Interest Billings, the Operating Agreement, or any other topic that is reserved for
arbitration.

And finally, since the Magistrate Judge's order, BP has asked Anadarko-related redirect
questions of two BP witnesses, for a total of 25 additional questions:

| Page | David Rainey (BP)<br>June 3, 2011 |
|---|---|
| **459** | **Q:** Now, you were asked a number of questions by Ms. Kuchler about the operating agreement, which is at Tab 14 . . . First of all, had you ever dealt with Anadarko petroleum prior to their becoming a working interest owner under this operating agreement?<br><br>**A:** Yes, I had. |
| **459** | **Q:** And what -- how far back in time? How many years had you interacted with Anadarko?<br><br>**A:** I can't remember the specifics, but I was familiar with their vice president of exploration. I can't remember the specifics of the relationship. |
| **459-60** | **Q:** Okay. Your perception of them, are they a sophisticated oil company?<br><br>**A:** I think they are very competent, yes. |

| | |
|---|---|
| **460** | **Q:** Do they seem to understand the oil business? |
| | **A:** I believe -- . . . I believe so. |
| **460** | **Q:** All right. As best as you can tell, do they seem to be aware of and familiar with the risks associated with deepwater drilling? |
| | **A:** I believe so. |
| **460** | **Q:** Did anyone from Anadarko ever come to you and say that they didn't understand the risks associated with deepwater drilling? |
| | **A:** No. |
| **460** | **Q:** Did anyone from Anadarko ever come to you and say that they were not sophisticated enough to enter into the operating agreement? |
| | **A:** No. |
| **460-61** | **Q:** Did anyone -- you were shown a page that included a well plan schematic, and it was reduced to 8 and a half by ten noncolor copy. But did anyone from Anadarko ever come to you and say that the well plan or any well plans that they received from BP lacked sufficient detail? |
| | **A:** No. |
| **461** | **Q:** Did anyone from Anadarko ever come to you and say that that well plan or any other well plan that they received from BP lacked sufficient detail for them to be able to make intelligent decisions with respect to their responsibilities under the operating agreement? |
| | **A:** No. |
| **462** | **Q:** Did anybody from Anadarko ever come to you and say that they weren't getting answers or anybody -- nobody was answering the phone when they made calls about operational or status changes? |
| | **A:** No. |
| **462** | **Q:** Did anybody come to you from Anadarko and say that they weren't getting operational updates? |
| | **A:** No. |
| **463** | **Q:** Did Anadarko ever come to you and say that they lacked the information necessary for them to support and cooperate with BP with respect to health, safety and the environment? |
| | **A:** No. |
| **464** | **Q:** Did anybody from Anadarko, to your knowledge, ever exercise that [Health, Safety and Environmental Inspections - Nonoperator's Right of Access]? |
| | **A:** Not to my knowledge. |

| 464 | **Q:** Did anybody from Anadarko ever come to you and saying -- and say that they were any way inhibited from exercising that right of access under the HSE provision of this contract?<br><br>**A:** Not to my knowledge. |
|---|---|
| 465 | **Q:** Did anybody from Anadarko ever come to you and say they are failing to get the applications for permits to drill and amendments?<br><br>**A:** No. |
| 465 | **Q:** Did anybody from Anadarko ever come to you and say they were failing to get the drilling or workover reports?<br><br>**A:** No. |
| 465 | **Q:** Did anybody from Anadarko ever say that they were failing to get the real-time information that was -- they were given access to?<br><br>**A:** No. |
| 465-66 | **Q:** Anybody from Anadarko ever say that they weren't -- come to you and say they weren't getting copies of drilling prognoses which is under Item I; copies of well test results, Item B; copies of well test results, Item E; copies of logs and surveys, Item D? Did anybody from Anadarko ever come to you and say that?<br><br>**A:** No. |
| 466 | **Q:** Anybody from Anadarko ever come to you and say that they lacked any information necessary to make intelligent decisions about their participation in the well?<br><br>**A:** No. |
| 467 | **Q:** Did anybody from Anadarko ever come to you and say that they lacked any information that they needed from BP?<br><br>**A:** No. |
| 467 | **Q:** Were you aware that: After BP informed Anadarko that it was calling total -- either "objective depth or total depth," is how the word's used -- in part for safety reasons, Anadarko encouraged BP to drill deeper?<br><br>**A:** I may have been aware at the time, but I have no memory of that now. |

(Boles Decl. Ex. Y (Rainey Dep.).)

The above topics once again go to issues relevant to BP's MDL defenses, tending to negate allegations of negligent conduct by BP given the contemporaneous knowledge and approval of those operations by an experienced deepwater driller such as Anadarko. Moreover,

as the first question shows, BP's redirect was related to questions Anadarko had already asked the witness.

| Page | Anthony Hayward (BP)<br>June 8, 2011 |
|---|---|
| **811** | **Q:** Had Anadarko given any money, as of the time you left as CEO from BP PLC, to any of the States of the Gulf Coast?<br><br>**A:** To my knowledge, Anadarko had not given any money. |
| **813** | **Q:** To your knowledge or the best of your knowledge, did Anadarko ever deploy bloom to try to -- booms to try to protect the environment from the oil spill?<br><br>**A:** No. |
| **818-19** | **Q:** To your knowledge, has Anadarko spent any money to prevent the oil from spreading in the Gulf?<br><br>**A:** Not to my knowledge. |
| **819** | **Q:** To your knowledge, has Anadarko set up a compensation fund for persons claiming losses under OPA?<br><br>**A:** Not to my knowledge. |

(Boles Decl. Ex. Z (Hayward Dep.).)

These topics are relevant to issues pertaining to the extent and cause of any economic impact of the Incident.

**IV.    Summary.**

In total, BP has:

- Filed *no* pleadings alleging claims against Anadarko;

- Noticed *no* depositions of Anadarko employees;

- Served one set of requests for production on Anadarko, which was explicitly conditioned on the outcome of this motion;

- Served one set of interrogatories on Anadarko, which was explicitly conditioned on the outcome of this motion;

- Served one set of requests for admission on Anadarko, which was explicitly conditioned on the outcome of this motion;

- Examined a single Anadarko employee, for a total of 75 minutes—out of the seven Anadarko employees who have been deposed so far—regarding issues related to BP's MDL defense;

- Served three individual requests for production on other parties related to Anadarko;

- Asked a few dozen questions at depositions of other parties related to Anadarko; and

- Identified four Anadarko witnesses on a non-binding list of potential witnesses.

## ARGUMENT

BP's conduct, viewed separately or taken as a whole, does not even present a close question of waiver of BP's arbitration rights under the law of the Fifth Circuit. BP's conduct he been consistent with its right to arbitrate, and its discovery pertaining to Anadarko was both conditioned on the outcome of this motion and, in any event, falls well within what the Fifth Circuit has deemed "minimal" in denying findings of waiver.

"There is a well-settled rule in this circuit that waiver of arbitration is not a favored finding, and there is a presumption against it." *Steel Warehouse Co., Inc. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 238 (5th Cir. 1998).[6]  Additionally, the "party claiming that another party waived the contractual right to arbitrate bears a heavy burden to establish the claim," and "any doubts thereabout must be resolved in favor of arbitration." *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 484 (5th Cir. 2002). In order for a court to find that a party has waived its rights to arbitration, the party must have "substantially invoke[d] the judicial process to the detriment or prejudice of the other party." *Nicholas v. KBR, Inc.*, 565

---

[6]    Internal citations and quotations have been omitted from this memorandum.

F.3d 904, 907 (5th Cir. 2009).  Thus, in order to show that BP has waived its rights to arbitration, Anadarko must prove two things: (1) that BP "substantially invoked the judicial process;" and (2) that Anadarko was thereby prejudiced.  Given Anadarko's heavy burden of proof, BP's minimal and defensive participation in litigation with Anadarko, its repeated conditioning of discovery on the outcome of this motion, and its consistently-expressed desire to arbitrate its dispute with Anadarko, Anadarko cannot prove either waiver element.  And there is a third, independent reason why Anadarko's contention of waiver should be denied: it is premised on the assertion that any MDL discovery is inconsistent with the JOA arbitration clause, an argument which Anadarko contradicted in successfully obtaining an order compelling discovery.

## I.     Anadarko Should Be Judicially Estopped from Arguing that BP's Discovery Somehow Waived Its Arbitration Rights.

In its motion to compel discovery responses from BP, Anadarko advocated for, and received, a ruling from the Magistrate Judge permitting discovery on issues related to the defense of claims properly pending in the MDL—even if those issues also related to arbitrable claims. (Dkt. 2358.)  In fact, Anadarko explicitly argued that the parties' right to obtain discovery from one another in this proceeding is consistent with their obligation to arbitrate disputes.  Anadarko argued that its discovery requests to BP were not "beyond the proper scope of discovery," that "discovery by and between the parties to the [Operating Agreement] is relevant to defending against the plaintiffs' claims," and that BP did not "truly believe[] that the [Operating Agreement] prohibited the parties bound by its arbitration provisions from pursuing any discovery."  (Dkt. 1965-1 at 3, 14 (emphasis in original).)  And again in its May 9, 2011 reply in support of its motion to compel, Anadarko argued that BP and Anadarko were equally entitled to discovery relating to their defenses against MDL Plaintiffs' claims notwithstanding the JOA arbitration clause.  (*See* Dkt. 2278 at 19 (BP should not "be prohibited from retaining the

discovery it has sought and obtained; rather, [Anadarko is] entitled to no less in their defense against the plaintiffs' claims.").)

Anadarko prevailed on that motion, convincing the Magistrate Judge that "[d]iscovery that is relevant to pending litigation is not barred merely because it is relevant to an arbitration proceeding."  (Dkt. 2358 (Order re Motion to Compel) at 4.)  Having sought and obtained this relief from the Court, Anadarko is judicially estopped from taking the contrary view now.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

## II. BP Has Not "Substantially Invoked the Judicial Process" against Anadarko Through Any of Its Actions in the MDL.

To waive arbitration, under the element of "invok[ing] the judicial process," the waiving party "must, at the very least, engage in some overt act in court that *evinces a desire* to resolve the arbitrable dispute through litigation rather than arbitration."  *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999).  (emphasis added).  Not only has BP never engaged in any act that would evince such a desire, but BP's actions in the MDL have consistently evinced its desire to do the exact opposite: to resolve its disputes with Anadarko in arbitration as required by the Operating Agreement.

### A. BP's Conduct Has Been Entirely Consistent with Its Right to Arbitrate.

The Fifth Circuit has made it clear that a party seeking to invoke its arbitration rights "ha[s] no duty to initiate arbitration proceedings at the inception of the controversy."  *Storey v. Shearson-American Express*, 928 F.2d 159, 163 (5th Cir. 1991).  Rather, a party may wait to invoke its arbitration rights until the other party seeks a judicial remedy for an arbitrable dispute.

*See id.*  In *Storey*, for example, the Court held that defendant timely invoked its arbitration rights by waiting until *after* the plaintiff first filed suit in district court, even though this filing occurred two years after the initial controversy.  *See id.* at 160, 163.  Likewise here, BP's duty to invoke its arbitration rights did not arise until Anadarko filed crossclaims in the MDL on April 20, 2011.  This Motion to Stay was filed the next week.  And BP had repeatedly put Anadarko on notice of BP's intent to resolve their disputes through the contract's dispute resolution provisions by its course of communications consistent with the JOA dispute process beginning in July 2010.  (*See supra* "Procedural History" Part I.)

The Fifth Circuit has explained with respect to this first element of waiver of arbitration rights "[a] party generally invokes the judicial process by initially pursuing litigation of claims then reversing course and attempting to arbitrate those claims;" accordingly, "the decision to file suit typically indicates a 'disinclination' to arbitrate."  *Nicholas v. KBR, Inc.*, 565 F.3d 904, 907-08 (5th Cir. 2009).  In *Nicholas*, the party waived its right to arbitrate by "filing suit and pursuing her claims for over ten months" before invoking arbitration.  *See id.* at 908.  But BP has not filed any claims against Anadarko in the MDL.  (*See supra* "Procedural History Part" II.)

While filing a claim in court can in some circumstances satisfy the waiver element of "invoking the judicial process" by indicating a desire to resolve an arbitrable dispute through litigation, a party who *responds* to another party's court claim by invocation in court of the defense of arbitrability reaffirms rather than waives arbitration.  *See Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co. (Pemex)*, 767 F.2d 1140, 1150-51 (5th Cir. 1985) (no waiver found where "[defendant] raised the defense of arbitration in its answer"); *Tenneco Resins, Inc. v. Davy Int'l*, 770 F.2d 416, 420 (5th Cir. 1985) (defendant's answer to the original complaint, seeking dismissal based on arbitration, put plaintiff "on notice as to [defendant's] desire to

arbitrate the matter"); *Gen. Guar. Ins. Co. v. New Orleans Gen. Agency, Inc*., 427 F.2d 924, 929, n.5 (5th Cir. 1970) ("Once the defendant, by answer, has given notice of insisting on arbitration the burden is heavy on the party seeking to prove waiver.").  BP did not even wait until its answer to Anadarko's crossclaims was due before giving notice that it was insisting on arbitration.  BP filed this Motion to Stay nearly *two months* before its answer was due.  And on the day BP's response to Anadarko's claims came due, BP again reiterated its intentions by filing a motion to dismiss based on the arbitration clause.  The Fifth Circuit has found no waiver occurred where a party seeking arbitration has allowed far more time to pass.  *See, e.g., Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 576-77 (5th Cir. 1991) (finding no waiver where defendant waited thirteen months after plaintiffs filed suit before moving for stay); *Tenneco*, 770 F.2d at 420-22 (finding no waiver where defendant waited eight months after plaintiff filed suit before moving for stay).

BP's conduct in discovery has also been consistent with its goal of arbitration.  When BP originally filed its motion to stay, it contended that the Operating Agreement barred all court discovery.  Accordingly, BP did not engage in *any* discovery against Anadarko until forced by the deadline for document requests, and then only under the condition that Anadarko need not respond unless the Court denied this Motion to Stay.  (*See supra* "Procedural History" Parts III.A–B.)  The Magistrate Judge's May 13 Order held that discovery relevant to BP's and Anadarko's MDL defenses could proceed.  Since that time, BP served some discovery, understanding the Magistrate Judge's order to be the law of the case.  (*See supra* "Procedural History" Part III.C.)  BP's reliance on the Magistrate Judge's order cannot be viewed as "evidencing a desire to resolve the arbitrable dispute through litigation rather than arbitration." *See supra Subway Equip. Leasing*, 169 F.3d at 329.

**B.      The Fifth Circuit Refuses to Find Waiver Even When a Party Engages in More Discovery Than What BP Has (Conditionally) Sought from Anadarko.**

The Fifth Circuit has held that waiver of arbitration will not be inferred "when only a minimal amount of discovery has been conducted" in the litigation.  *See Tenneco*, 770 F.2d at 421.  This "minimal" discovery safe harbor easily encompasses, indeed far exceeds, what BP has done here.  In *Tenneco*, for example, the Court found "only a minimal amount of discovery ha[d] been conducted" when, prior to moving for stay, defendant had filed an answer to plaintiff's complaint and engaged in eight months of discovery, including serving interrogatories and a request for production of documents.  770 F.2d at 420-21.  Similarly, in *American Dairy Queen Corp. v. Tantillo*, the Court found no waiver where the defendants filed a counterclaim, answered plaintiffs' interrogatories, propounded their own interrogatories, and filed a motion to compel production of discovery.  536 F. Supp. 718, 721 (M.D. La. 1982).  BP's discovery, in addition to having been conditioned on the outcome of this motion, is substantially less in extent than in these cases where the Fifth Circuit refused to find waiver.

The Fifth Circuit has repeatedly overturned district court decisions on the grounds that the amount of litigation conduct did not reach the threshold required to find waiver.  *See, e.g.*, *Walker*, 938 F.2d at 576-77, 579 (reversing waiver finding where defendant served plaintiffs with interrogatories and document requests, to which plaintiffs responded, and defendant answered plaintiff's complaint).  Here, BP's participation in MDL discovery has both fallen short of the required "waiver" volume and has been conditioned on the outcome of this motion. (*See supra* "Procedural History" Part III.)  Indeed in some Fifth Circuit cases refusing to find waiver, the party invoking arbitration rights had not only sought discovery, but had also received *responses* to those discovery requests.  *See, e.g., Walker*, 938 F.2d at 576 (reversing waiver finding for defendant even where "plaintiffs responded to [defendant's] request for documents");

*Tenneco*, 770 F.2d at 421-22 (reversing waiver finding for defendant even where defendant's "interrogatories and request for production were issued and answered").

Nor can Anadarko argue that BP's responses to Anadarko's discovery requests constitute waiver.  The Fifth Circuit has held that a party does not waive its rights to arbitration when it responds to another party's discovery requests.  *See Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 898 (5th Cir. 2005).  In *Keytrade*, the Fifth Circuit shut down such an argument, noting that defendant responding to plaintiff's discovery requests was the type of participation that "hardly constitute[d] evidence of waiver" and explained that "[the party being accused of waiver] may participate in the discovery process so long as it does not shower the opposing party with interrogatories and discovery requests."  *Id.*  (At the time BP responded to Anadarko's discovery requests on February 22, BP had not served a single set of its conditional discovery on Anadarko.)

## III.    Anadarko Has Not Been Prejudiced by Any of BP's Actions.

Anadarko's waiver argument also fails for the independent reason that Anadarko has suffered no prejudice.  For purposes of finding waiver, prejudice "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent *forces it to litigate* an issue and later seeks to arbitrate that same issue." *Subway*, 169 F.3d at 327.  To establish the prejudice required for a finding of waiver, "[t]he question is what prejudice the party opposing arbitration has suffered because of the unnecessary litigation—not what prejudice the party would suffer by going to arbitration."  *Joseph Chris Pers. Servs. Inc. v. Rossi*, 249 Fed. Appx. 988, 991 (5th 2007) (emphasis omitted).  No prejudice exists here.

BP did not "force" Anadarko to litigate any claims in the MDL.  Instead, any litigation with BP has been the result of *Anadarko's* actions: Anadarko filed crossclaims against BP on

arbitrable disputes.    Anadarko  showered  BP  with  document  requests,  interrogatories,  and requests  for  admission  related  to  these  crossclaims.    Anadarko  moved  to  compel  additional responses  to  its  discovery  requests.    And  Anadarko  aggressively  opposed  BP's  motion  to  stay litigation proceedings pending arbitration.

A party is "forced" to litigate is when the opposing party has initiated the lawsuit or brought a claim against the other party.  *See Nicholas*, 565 F.3d at 910 (finding prejudice when plaintiff "judicially pursued her claims for over ten months without mentioning the Agreement's arbitration clause or her desire for arbitration," thereby "guarantee[ing] that the district court would not rule on [defendant's] motion to compel [arbitration] until the parties had completed discovery").  Here, disputes between BP and Anadarko are being litigated in the MDL due to claims  by  Anadarko  itself,  and  other  third  parties—but  not  by  BP.    Whatever  supposed inconvenience Anadarko may have suffered is not attributable to BP.

## CONCLUSION

BP and Anadarko voluntarily agreed to resolve their disputes through arbitration, as provided in the Operating Agreement.  And since the first sign of dispute, BP has followed the dispute resolution procedures of the Agreement, making it clear to Anadarko that it intends to honor the parties' agreement.  All of BP's actions in the MDL proceedings have been consistent with  its  desire  to  arbitrate,  and  the  modest  amount  of  discovery  that  BP  has  sought  from Anadarko became operative only after the Magistrate Judge ruled that such discovery was not inconsistent with the parties' contract.  Therefore, this Court should stay proceedings between BP and Anadarko and find that BP has not waived any of its rights to arbitration.


DATE:  July 6, 2011                                    By:   /s/ Martin R. Boles

                                                                    Richard C. Godfrey, P.C.

(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000 (Tel)
312-862-2200 (Fax)

and

Martin R. Boles
(martin.boles@kirkland.com)
Kirkland & Ellis LLP
333 South Hope Street, Suite 2900
Los Angeles, CA 90071
213-680-8400 (Tel)
213-680-8500 (Fax)

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
202-662-5985

*Attorneys for BP America Inc., BP America Production Company, BP Exploration & Production Inc., and BP p.l.c.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 6th day of July 2011.

_____/s/ Martin R. Boles_____