# EXHIBIT L

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                 Reported by:

**STEVEN J. FOSTER**                    April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

---

Page 1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL   MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"  SECTION: J
IN THE GULF OF
MEXICO, ON APRIL    JUDGE BARBIER
20, 2010        MAG. JUDGE SHUSHAN



     Deposition of STEVEN J. FOSTER,
taken in the Pan American Life Center,
Bayou Room, 11th Floor, 601 Poydras Street,
New Orleans, Louisiana 70130, on Wednesday,
April 27, 2011.


APPEARANCES:


     LIEFF CABRASER HEIMANN & BERNSTEIN,
     LLP
     (By:  Steven E. Fineman, Esquire and
        Annika K. Martin, Esquire)
     250 Hudson Street 8th Floor
     New York, New York  10013-1413
        (Attorneys for PSC)
```

Page 3

```
1   APPEARANCES (continued):
2     GODWIN RONQUILLO
       (By:  Floyd R. Hartley, Jr.,
3         Esquire and Aimee L. Williams,
          Esquire)
4     1201 Elm Street
      Suite 1700
5     Dallas, Texas  75270-2041
       (Attorneys for Halliburton)
6
7
8     BECK, REDDEN & SECREST, L.L.P.
       (By:  Thomas Ganucheau, Esquire)
9     One Houston Center
      1221 McKinney Street
      Suite 4500
10    Houston, Texas  77010-2010
       (Attorneys for Cameron
11      International Corporation)
12
13    JONES, WALKER, WAECHTER,
      POITEVENT, CARRÈRE & DENÈGRE L.L.P.
14     (By:  Brett S. Venn, Esquire)
      201 St. Charles Avenue
15    New Orleans, Louisiana  70170-5100
       (Attorneys for Weatherford)
16
17
18    KIRKLAND & ELLIS LLP
       (By:  Barry E. Fields, Esquire)
19    300 North LaSalle
      Chicago, Illinois  60654
       (Attorneys for BP)
20
21
22
23
24
25
```

Page 2

```
1
2   APPEARANCES (continued):
3     KANNER & WHITELEY, L.L.C.
       (By:  David A. Pote, Esquire)
4     701 Camp Street
      New Orleans, Louisiana  70130
5      (Attorneys for the State of
        Louisiana)
6
7     BINGHAM MCCUTCHEN
       (By:  Nancy M. Wilms, Esquire and
8         Jesus "Jesse" Chavez, Esquire)
      355 South Grand Avenue
9     Suite 4400
      Los Angeles, California 90071-3106
10     (Attorneys for Anadarko
        Petroleum and MOEX Offshore
11      2007, LLC)
12
13    ANADARKO PETROLEUM CORPORATION
       (By:  Ingram Lee, Esquire)
14    1201 Lake Robbins Drive
      The Woodlands, Texas  77380-1124
15     (Attorneys for Anadarko
        Petroleum and MOEX Offshore
16      2007, LLC)
17
18    REED SMITH LLP
       (By:  John D. Shugrue, Esquire)
19    10 South Wacker Drive, 40th Floor
      Chicago, Illinois  60606-7507
20     (Attorneys for Anadarko
        Petroleum and MOEX Offshore
21      2007, LLC)
22
23
24
25
```

Page 4

```
1   APPEARANCES (continued):
2     MORGAN, LEWIS & BOCKIUS LLP
       (By:  John C. Funderburk, Esquire)
3     1000 Louisiana Street
      Suite 4000
4     Houston, Texas  77002-5006
       (Attorneys for M-I SWACO)
5
6
7     MUNGER, TOLLES & OLSON LLP
       (By:  Allen M. Katz, Esquire)
8     355 South Grand Avenue
      35th Floor
9     Los Angeles, California 90071-1560
       (Attorneys for Transocean)
10
11    PHELPS DUNBAR
       (By:  George M. Gilly, Esquire)
12    Canal Place
      365 Canal Street, Suite 2000
13    New Orleans, Louisiana  70130-6534
       (Attorneys for Transocean
14      underwriters)
15
16    WARE, JACKSON, LEE & CHAMBERS,
      L.L.P.
17     (By:  Margaret Bryant, Esquire)
      America Tower
18    2929 Allen Parkway
      Houston, Texas  77019
19     (Attorneys for Dril-Quip, Inc.)
20
21
22
23
24
25
```

1 (Pages 1 to 4)

601 Poydras Street, Suite 1720    GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 1

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                                                  Reported by:
STEVEN J. FOSTER                          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

---

Page 5

```
 1   THE VIDEOGRAPHER:
 2
 3       Mark Ancalade
 4
 5
 6
 7
 8
 9
10
11
12   REPORTED BY:
13
14
         JOSEPH R. KAISER, JR., CCR, RPR
15       Certified Court Reporter
         State of Louisiana
16
17
18       *   *   *   *   *
19
20
21
22
23
24
25
```

---

Page 7

```
 1             EXHIBITS
 2
                          Page
 3   No.
 4
 5   Exhibit 1844        26
 6
     Exhibit 1845        40
 7
 8   Exhibit 1846        48
 9
     Exhibit 1847        62
10
11   Exhibit 1848        62
12
     Exhibit 1849        115
13
14   Exhibit 1850        115
15
     Exhibit 1851        126
16
17   Exhibit 1852        126
18
     Exhibit 1853        144
19
20   Exhibit 1854        145
21
     Exhibit 1855        151
22
23       *   *   *   *   *
24
25
```

---

Page 6

```
 1        EXAMINATION INDEX
 2
 3                Page No.
 4
 5   By Mr. Fineman       12
 6
 7
     By Mr. Katz          186
 8
 9
10
11
12
13
14
15
16
17
         *   *   *   *   *
18
19
20
21
22
23
24
25
```

---

Page 8

```
 1   EXHIBITS (Continued):
 2
                          Page
 3   No.
 4
 5   Exhibit 1856        151
 6
 7   Exhibit 1857        165
 8   Exhibit 1858        193
 9
     Exhibit 1859        227
10
11
12
13
14       *   *   *   *   *
15
16
17
18
19
20
21
22
23
24
25
```

---

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 2

Page 9

DESCRIPTIVE EXHIBIT INDEX

3  Exhibit 1844 - Anadarko E&P Company
   directors/officers report

5  Exhibit 1845 - agreed 30(b)(6) deposition
   notice of Anadarko with 30(b)5 document
6  requests

7  Exhibit 1846 - form 10-K

9  Exhibit 1847 - letter dated 6/11/2010

   Exhibit 1848 - energy package policy

11 Exhibit 1849 - OCIL excess policy

13 Exhibit 1850 - letter dated 5/26/2010

15 Exhibit 1851 - Argo Re policy

17 Exhibit 1852 - letter dated 12/14/2010

18 Exhibit 1853 - Torus Insurance excess
   policy

20 Exhibit 1854 - letter dated 6/16/2010

   Exhibit 1855 - XL policy

          *  *  *  *  *

Page 11

S T I P U L A T I O N

3       It is stipulated and agreed by and
between counsel for the parties hereto that
the deposition of the aforementioned
witness is hereby being taken for all
purposes allowed under Article 1421, et
seq., of the Louisiana Code of Civil
Procedure, in accordance with law, pursuant
to notice;
        That the formalities of reading and
signing are specifically not waived;
        That the formalities of filing,
sealing, and certification are specifically
waived;
        That all objections, save those as
to the form of the question and the
responsiveness of the answer, are hereby
reserved until such time as this
deposition, or any part thereof, may be
used or sought to be used in evidence.
        JOSEPH R. KAISER, JR., CCR, RPR
Certified Court Reporter in and for
the State of Louisiana, officiated in
administering the oath to the witness.

Page 10

DESCRIPTIVE EXHIBIT INDEX (Continued):

3  Exhibit 1856 - letter dated 4/28/2010

   Exhibit 1857 - common interest and
5  confidentiality agreement

   Exhibit 1858 - contract between Anadarko
7  and Transocean Holdings dated 11/1/2005

   Exhibit 1859 - e-mail exchange

          *  *  *  *  *

Page 12

P R O C E E D I N G S

2  THE VIDEOGRAPHER:
3       This is the beginning of Tape 1
to the video deposition of Mr. Steven J.
Foster.  This deposition is being held at
601 Poydras Street in New Orleans,
Louisiana on April the 27th, 2011, the time
indicated on the video screen which is
8:34.
        This deposition is being taken
in the matter of the oil spill by the
DEEPWATER HORIZON in the Gulf of Mexico on
April 20th, 2010 in the United States
District Court, Eastern District of
Louisiana.
        STEVEN J. FOSTER,
after having been first duly sworn by
the above-mentioned Certified Court
Reporter, was examined and testified as
follows:
EXAMINATION BY MR. FINEMAN:
   Q.   Good morning, Mr. Foster.
   A.   Good morning.
   Q.   My name is Steve Fineman of the
law firm of Lieff, Cabraser, Heimann and

3 (Pages 9 to 12)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:
STEVEN J. FOSTER             April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 13

```
 1   Bernstein, on behalf of the plaintiff's
 2   steering committee.  Can you state your
 3   name for the record?
 4       A.   Steven J. Foster.
 5       Q.   Mr. Foster, have you ever been
 6   deposed before?
 7       A.   Yes.  Once.
 8       Q.   And what were the circumstances
 9   of that deposition?
10       A.   Regarding an insurance claim.
11       Q.   So you understand that during
12   today's deposition I'll be asking you some
13   questions, as will some of my colleagues.
14   And hopefully my questions will be clear
15   enough and you will be providing audible
16   answers.
17       A.   Okay.
18       Q.   During the deposition, I need
19   you to speak clearly, loudly enough for me
20   to hear you.  Is that okay?
21       A.   Yes.
22       Q.   I also need you to answer with
23   yeses or noes or narrative responses, as my
24   questions require.  Do you understand that?
25       A.   Yes, I do.
```

Page 14

```
 1       Q.   Nods of the head and the other
 2   gestures can't be taken down by the court
 3   reporter.  You understand that?
 4       A.   Yes, I do.
 5       Q.   During my questioning, it's
 6   possible that one or more lawyers will
 7   object.  That's probably because I've asked
 8   a bad question.
 9            That does not mean, unless your
10   counsel instructs you not to answer, that
11   you don't answer the question.  It's just
12   for the record.  Do you understand that?
13       A.   Yes, I do.
14       Q.   And we are also being videotaped
15   today.  You understand that?
16       A.   Yes, I do.
17       Q.   The videographer is behind me
18   and you have a microphone attached to your
19   tie and it's a good idea if you speak
20   slowly enough to make sure that it's all
21   picked up on the video.
22            Do you understand that?
23       A.   Yes, I do.
24       Q.   Mr. Foster, did you prepare for
25   today's deposition?
```

Page 15

```
 1       A.   Yes, I did.
 2       Q.   Can you describe for me
 3   generally what you did to prepare for the
 4   deposition?
 5       A.   We reviewed e-mails and
 6   insurance submissions as part of the -- and
 7   those were provided by counsel regarding
 8   the June 30th, 2009 insurance renewals.
 9       Q.   The insurance renewals, is that
10   what you said?
11       A.   Right.  Right.
12       Q.   And we'll talk about those
13   documents in a little while.
14       A.   Okay.
15       Q.   Did you look at anything else
16   besides -- well, back up, on the e-mails
17   you mentioned, were those e-mails that
18   either you had authored or you had
19   received?
20       A.   Yes.
21       Q.   And did all those e-mails
22   concern insurance related matters?
23       A.   Yes.
24       Q.   Did you review any e-mails that
25   did not concern insurance related matters?
```

Page 16

```
 1       A.   Don't remember.
 2       Q.   When you prepared for your
 3   deposition, did you meet with counsel?
 4       A.   Yes, I did.
 5       Q.   When you met with counsel in
 6   preparing for your deposition, was there
 7   anybody else present?
 8       A.   Yes.
 9       Q.   Other lawyers?
10       A.   Yes.
11       Q.   Was there anybody who was not a
12   lawyer present?
13       A.   No.
14       Q.   How much time did you spend
15   preparing for your deposition today?
16       A.   Total, maybe eight hours.
17       Q.   Did you have any discussions
18   with anybody that you work with at Anadarko
19   about your deposition today?
20       A.   Only that I'm having -- you
21   know, I'm being deposed.  That's it.
22       Q.   And who did you have that
23   conversation with?
24       A.   My boss.
25       Q.   And your boss is?
```

4 (Pages 13 to 16)

Exhibit L
Page 4

Page 17

1      A.   Bruce Busmire.
2      Q.   We'll come back to that later.
3      A.   Okay.
4      Q.   Did you do any deposition
5   practice?  In other words, were you asked
6   hypothetical questions that I might ask you
7   today and did you provide answers?
8      A.   Yes.
9      Q.   Was there a court reporter
10   present when you did that?
11      A.   No.
12      Q.   Was anybody taking notes?
13      A.   No.
14      Q.   Was there a videographer present
15   when you practiced?
16      A.   No.
17      Q.   Was there anything else you did,
18   that you haven't mentioned, to prepare for
19   today's deposition?
20      A.   No.
21      Q.   Mr. Foster, what's your
22   educational background, college degrees and
23   such?
24      A.   I have a BS in accounting.
25      Q.   And that was from where?

Page 18

1      A.   From the University of New
2   Orleans, which is now LSUNO.
3      Q.   What year was that?
4      A.   '78.
5      Q.   Since you received your degree
6   in accounting in 1978, have you received
7   any other educational degrees?
8      A.   I have, you know, a CPA license.
9      Q.   You have a professional license?
10      A.   Right.
11      Q.   When did you obtain that?
12      A.   In '79.
13      Q.   Any other educational degrees?
14      A.   No.
15      Q.   Or professional training?
16      A.   No.
17      Q.   During today's deposition it's
18   best if you wait until I finish.  That way
19   we won't talk over each other.
20      A.   All right.
21      Q.   And I'll try to do the same
22   thing for you.
23      A.   All right.
24      Q.   I take it you're not an
25   attorney?

Page 19

1      A.   Correct.
2      Q.   You are an employee of Anadarko
3   Petroleum Corporation?
4      A.   Correct.
5      Q.   What is your current title?
6      A.   Assistant treasurer risk
7   management.
8      Q.   Is that an officer level
9   position?
10      A.   Yes, it is.
11      Q.   How long have you been in that
12   position?
13      A.   Around five years.
14      Q.   And prior to being the assistant
15   treasurer risk management, did you have a
16   previous job title --
17      A.   Yes.
18      Q.   -- with Anadarko Petroleum?
19      A.   Yes.
20      Q.   Which was -- what was that?
21      A.   The title was risk manager.
22      Q.   How long were you in that
23   position?
24      A.   Eight years.
25      Q.   Okay.  And prior to that, did

Page 20

1   you hold a position with Anadarko
2   Petroleum?
3      A.   No.
4      Q.   In your position as assistant
5   treasurer risk management for Anadarko
6   Petroleum, what are your job
7   responsibilities?
8      A.   I'm in charge of the property
9   and casualty insurances, which involves the
10   insurance submissions, purchase of
11   insurance, filing claims.
12      Q.   Your title includes the phrase
13   risk management.  Does your job description
14   include any aspect of risk management other
15   than insurance?
16      A.   I assist legal in contracts in
17   making sure the insurance provisions of the
18   contracts are adequate, and to see what
19   risks we are assuming in the contract we do
20   have insurance for.
21      Q.   So is it fair to say that all of
22   your job responsibilities at Anadarko
23   Petroleum are focussed on insurance?
24      A.   Yes.
25      Q.   Do you have any responsibility

5 (Pages 17 to 20)

Exhibit L
Page 5

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                                                Reported by:
STEVEN J. FOSTER                     April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

| Page 21 | Page 23 |
|---|---|
| 1    as assistant treasurer of risk management<br>2    for evaluating legal exposure that Anadarko<br>3    Petroleum might have in a particular<br>4    matter?<br>5      A.  No.<br>6      Q.  Do you have any responsibility<br>7    in your position as assistant treasurer<br>8    risk management at Anadarko Petroleum for<br>9    determining whether the company should<br>10   borrow money from a bank or any other<br>11   source?<br>12      A.  No.<br>13      Q.  Do you have any responsibility<br>14   for lines of credit?<br>15      A.  No.<br>16      Q.  In your position as assistant<br>17   treasurer risk management, who do you<br>18   presently report to?<br>19      A.  Bruce Busmire.<br>20      Q.  And how long have you been<br>21   reporting to Mr. Busmire?<br>22      A.  Around three years.<br>23      Q.  And what is his title?<br>24      A.  VP finance and capital markets,<br>25   I think. | 1      A.  Correct.<br>2      Q.  Does your job description --<br>3   strike that.<br>4      Does your job, do your job<br>5   duties require that you make presentation<br>6   to the Anadarko Petroleum board of<br>7   directors?<br>8      A.  No.<br>9      Q.  You never have presented to the<br>10  Anadarko board of directors?<br>11     A.  No.<br>12     Q.  Is there somebody in the<br>13  Anadarko Petroleum legal department that<br>14  you report to, or communicate with on a<br>15  regular basis?<br>16    MS. WILMS:<br>17      Object as to form.<br>18    THE WITNESS:<br>19      I do not report to anybody in<br>20  legal, but I work with many of the<br>21  attorneys.<br>22  EXAMINATION BY MR. FINEMAN:<br>23     Q.  Okay.  And who is the most<br>24  senior attorney at Anadarko Petroleum that<br>25  you work with? |

| Page 22 | Page 24 |
|---|---|
| 1      Q.  And this is a direct report, you<br>2   report directly to him?<br>3      A.  Right.  Right.  Correct.<br>4      Q.  And are there people that report<br>5   to you?<br>6      A.  Yes.<br>7      Q.  Who are they?<br>8      A.  There's a Tara, Tara McCann and<br>9   a Gary Sylvester.<br>10     Q.  What are their job titles?<br>11     A.  Their titles are senior risk<br>12  analyst.<br>13     Q.  Okay.  And were they reporting<br>14  to you during the period June 2009 through<br>15  June 2010?<br>16     A.  Yes.<br>17     Q.  Okay.  Was anybody else<br>18  reporting to you during that time period?<br>19     A.  No.<br>20     Q.  And were you reporting to<br>21  anybody but Mr. Busmire during that time<br>22  period?<br>23     A.  No.<br>24     Q.  I take it you're not a member of<br>25  the Anadarko Petroleum board of directors? | 1      A.  Dave Owens.<br>2      Q.  What attorneys at Anadarko<br>3  Petroleum, if any, did you communicate with<br>4  concerning the Macondo well issues?<br>5     A.  Okay.  Can you say it again,<br>6  please?<br>7     Q.  Sure.  I'll say it again.  I'll<br>8  rephrase it.<br>9     Did you communicate with any<br>10  Anadarko Petroleum attorneys concerning the<br>11  Macondo well or the DEEPWATER HORIZON<br>12  incident?<br>13     A.  Yes.<br>14     Q.  And with whom did you<br>15  communicate?<br>16     A.  Dave Owens.  Barbara Dunbar.<br>17  Ingram Lee, Mita Desai.  And that's all I<br>18  can think about.<br>19     Q.  And those are all in-house<br>20  Anadarko Petroleum attorneys?<br>21     A.  Yes.<br>22     Q.  And did you communicate with any<br>23  outside attorneys -- at some point, did you<br>24  communicate with outside attorneys<br>25  concerning the DEEPWATER HORIZON incident? |

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 6

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                      Reported by:
STEVEN J. FOSTER              April 27, 2011   JOSEPH R. KAISER, JR., CCR, RPR

Page 25

1    A.   Yes.
2         MS. WILMS:
3         Other than deposition
4    preparation, which we talked about?
5    EXAMINATION BY MR. FINEMAN:
6    Q.   Yes.  Other than for the
7    deposition preparation.
8    A.   Yes.
9    Q.   Do you recall when that was?
10   A.   Began in May 2009.
11   Q.   May of 2009?
12   A.   Right.
13   Q.   Are you sure it's not 2010?
14   A.   I'm sorry.  Correct.  May 2010.
15   Thank you.
16   Q.   You're about to open up a
17   whole --
18        Okay.  And who was that, if you
19   can recall?
20   A.   John Shugrue at Reed Smith,
21   people at Bingham, attorneys at Bingham.
22   Q.   And your communications with
23   Anadarko Petroleum in-house or outside
24   counsel, were those communications all
25   related to insurance?

Page 26

1    A.   They were related to the Macondo
2    incident in preparation for filing a claim.
3    Q.   Okay.
4    A.   And litigation.
5    Q.   Okay.  Were you -- strike that.
6    Are you currently an employee of Anadarko
7    E&P Company?
8    A.   No.
9    Q.   Have you ever been an employee
10   of Anadarko E&P Company?
11   A.   No.
12   MR. FINEMAN:
13        So I'm going to mark this
14   document as Exhibit 1844.
15        (Whereupon, the document
16   referred to was marked as Exhibit No. 1844
17   for identification.)
18   EXAMINATION BY MR. FINEMAN:
19   Q.   There's copies here if you want
20   them.  Mr. Foster, when I introduce a
21   document, I mark each one, I'm going read
22   some numbers that are on the bottom of the
23   document.
24        It will take some time but for
25   the record I need to do it.  When I refer

Page 27

1    to these documents later I'm not going to
2    refer to the whole long number, I'm just
3    going to refer to the last digit so you can
4    find where I'm looking.  Okay?
5    A.   Okay.
6    MR. FINEMAN:
7         Is that all right, counsel?
8    MS. WILMS:
9         Yes.
10   MR. FINEMAN:
11        This is ANA MDL 000020317
12   through 20321.  And this is a document
13   produced in this litigation.  It says
14   directors/officers report, Anadarko E&P
15   Company LP as of November 4, 2010.
16   EXAMINATION BY MR. FINEMAN:
17   Q.   Do you see that, Mr. Foster?
18   A.   Yes, I do.
19   Q.   If you'll turn to the last page
20   of the document, it says Steven J. Foster,
21   assistant treasurer last elected August 20,
22   2010.  Do you see that?
23   A.   Yes, I do.
24   Q.   Does that change your view as to
25   whether or not you were an employee of

Page 28

1    Anadarko E&P Company?
2    MS. WILMS:
3         Object as to form.
4    THE WITNESS:
5         I thought by employee you meant
6    who pays me.
7    EXAMINATION BY MR. FINEMAN:
8    Q.   Okay.  Fair enough.
9         So are you presently the
10   assistant treasurer of Anadarko E&P
11   Company?
12   A.   Yes.
13   Q.   But your compensation comes from
14   Anadarko Petroleum?
15   A.   Correct.
16   Q.   And you don't receive
17   compensation from Anadarko E&P?
18   A.   Correct.
19   Q.   Okay.  What are your job
20   responsibilities as the assistant treasurer
21   of Anadarko E&P?
22   A.   To sign for bonds that we need
23   to issue in their name, if any.
24   Q.   Any other responsibilities?
25   A.   No.

7 (Pages 25 to 28)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit L
Page 7

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 29

1      Q.   Do you have any insurance
2   related responsibilities for Anadarko E&P?
3      A.   No.  But other than the
4   insurances we buy includes Anadarko Corp,
5   but the parent and all of its subs.
6      Q.   Okay.  But when you're
7   performing your functions as risk
8   management insurance related functions for
9   Anadarko Petroleum, you're performing those
10   for Anadarko Petroleum and all of its
11   subsidiaries?
12      A.   Correct.
13      Q.   Including Anadarko E&P?
14      A.   Correct.
15      Q.   So you're not doing anything
16   independent in terms of risk management or
17   insurance for Anadarko E&P?
18      A.   Correct.
19      Q.   Now, do you know how long you
20   have been in this position as assistant
21   treasurer at Anadarko E&P?
22      A.   I do not know but I assume it's
23   when I was made that title for the parent
24   company.
25      Q.   Okay.  And is there anybody you

Page 30

1   report to for Anadarko E&P that's different
2   than what you described for Anadarko
3   Petroleum?
4      A.   No.
5      Q.   Same, Mr. Busmire?
6      A.   Correct.
7      Q.   What about people reporting to
8   you?  The same people?
9      A.   Yes.
10      Q.   Are you a member of any Anadarko
11   Petroleum committee?
12      A.   Yes.
13      Q.   What committees?
14      A.   Enterprise Risk Management
15   committee.
16      Q.   Is that the only one?
17      A.   I'm a part of many other
18   committees formed as a result of, you know,
19   the BP spill involving claims and contracts
20   and there's a whole list of those.
21      Q.   We're going to come to that --
22      A.   Okay.
23      Q.   -- in a little bit.
24          With respect to the Enterprise
25   Risk Management committee, what is that?

Page 31

1      A.   That is a committee that looks
2   at enterprise wide risks for the company.
3      Q.   And you are a member of that
4   committee?
5      A.   Yes, I am.
6      Q.   And that's not specific to the
7   DEEPWATER HORIZON incident?
8      A.   No.
9      Q.   And are you the chairman of that
10   committee?
11      A.   No.
12      Q.   Who is the chairman of that
13   committee?
14      A.   It was Graham Snowden.  He left
15   and I forgot, forgot the name of the guy
16   who took his place.
17      Q.   And how often does that
18   committee meet?
19      A.   Maybe three times a year.
20      Q.   You recall whether during any
21   Enterprise Risk Management committee
22   meeting, Macondo well or the DEEPWATER
23   HORIZON incident were discussed?
24      MS. WILMS:
25          I'm going to instruct the

Page 32

1   witness not to answer that question because
2   this committee is formed and functions at
3   the direction of counsel to provide legal
4   advice to the company.
5          So while I allowed him to
6   testify generally as to its purpose and, of
7   course, the member, as far as the content
8   and what the committee discusses, I'm going
9   to instruct the witness not to answer.
10      MR. FINEMAN:
11          I'm not asking, I don't want any
12   substance of the meetings.  I just want to
13   know whether or not this committee ever
14   discussed the DEEPWATER HORIZON incident or
15   Macondo well.  Just the topic of it.
16      MS. WILMS:
17          Just answer yes or no to that
18   question.
19      THE WITNESS:
20          Yes.
21   EXAMINATION BY MR. FINEMAN:
22      Q.   Are minutes kept of the meetings
23   of the Enterprise Risk Management
24   committee?
25      A.   Yes.

8  (Pages 29 to 32)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER            April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

---

Page 33

```
 1      Q.   Okay.  And do you recall the
 2  approximate dates of meetings of the
 3  Enterprise Risk Management committee in
 4  2010?
 5      A.   No, I do not.
 6      Q.   Are there normal times,
 7  regularly scheduled times when the
 8  committee meets?
 9      A.   No.
10      Q.   Who decides when to have a
11  Enterprise Risk Management committee
12  meeting?
13      MS. WILMS:
14          Object as to form.
15      THE WITNESS:
16          The chairman.
17      EXAMINATION BY MR. FINEMAN:
18      Q.   Sir?
19      A.   The chairman.
20      Q.   Do you recall when the last
21  meeting of the Enterprise Risk Management
22  committee was?
23      A.   My best guess would be
24  two months ago.
25      Q.   Are there normal intervals
```

Page 34

```
 1  between meetings?
 2      MS. WILMS:
 3          Object as to form.
 4      THE WITNESS:
 5          Again, they meet roughly three
 6  times a year.
 7      EXAMINATION BY MR. FINEMAN:
 8      Q.   Can you tell me who else is a
 9  member of this committee?
10      A.   We have people from operations
11  in there, from legal, from treasury.  And
12  marketing.  And that's pretty much it.
13      Q.   Okay.  Is the purpose of the
14  Enterprise Risk Management committee to
15  advise management on insurance related
16  issues?
17      A.   No.
18      Q.   And what -- I'm sorry, I
19  misunderstood you then.  What is the
20  purpose of the Enterprise Risk Management
21  committee?
22      A.   It's to identify those risks
23  that could affect the company on an
24  Enterprise wide basis.
25      Q.   What kind of risks would that
```

Page 35

```
 1  be?
 2      MS. WILMS:
 3          Objection.  I'm going to
 4  instruct the witness not answer further in
 5  regards to this.
 6      EXAMINATION BY MR. FINEMAN:
 7      Q.   Other than committees that were
 8  formed specifically to deal with the
 9  DEEPWATER HORIZON incident and the
10  Enterprise Risk Management committee, were
11  you a member of any other Anadarko
12  committees, or are you a member of any
13  Anadarko committees?
14      A.   No.
15      Q.   Are you an employee or do you
16  have a title with any other Anadarko
17  company that we haven't discussed?
18      A.   I believe my title is the same
19  for all of the subs.
20      Q.   Vice-president?
21      A.   No.
22      Q.   I'm sorry.  Assistant treasurer?
23      A.   Assistant treasurer; correct.
24      Q.   Mr. Foster, could you tell me
25  what your normal course and practice is
```

Page 36

```
 1  upon receipt of correspondence, policies,
 2  memoranda, e-mail concerning -- in your
 3  job?
 4      MS. WILMS:
 5          Object as to form.
 6      EXAMINATION BY MR. FINEMAN:
 7      Q.   So in other words, when you
 8  received documents, e-mails, policies, did
 9  you -- was your normal practice to read,
10  review, take notes?
11      MS. WILMS:
12          Object as to form.
13      THE WITNESS:
14          I would read the e-mails for the
15  most part.  I may scan a policy if it
16  hasn't changed.  I mean, it varies.
17  Depending upon the type of coverage.
18      Q.   Was it your normal practice to
19  make notes about changes if you saw changes
20  in a policy?
21      MS. WILMS:
22          Object as to form.
23      THE WITNESS:
24          No.
25      EXAMINATION BY MR. FINEMAN:
```

9 (Pages 33 to 36)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER                    April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 37

1    Q.   How would you memorialize, if
2  you would, a change in a policy?
3        A.   If it's an important change,
4  there may be an e-mail from other brokers
5  saying we have improved this policy or
6  we've changed this policy.
7        Q.   Did you keep any sort of summary
8  that you prepared of policies that covered
9  Anadarko's business?
10       A.   No.
11       Q.   What was your normal -- or what
12 is your normal course of practice with
13 respect to retaining, or storing documents
14 that you receive concerning insurance?
15       A.   If it relates to an insurance
16 policy, I put them in a file.
17       Q.   And how did you organize those
18 files?
19       A.   By year.
20       Q.   By policy year?
21       A.   Right.  Correct.
22       Q.   So if you had a primary policy
23 and excess policies for a particular year,
24 would they all go into that policy period
25 year file?

Page 38

1        A.   Yes.
2        Q.   Okay.  And where did you keep
3  your copy of policies or documents related
4  to the policies?
5        A.   In my office.
6        Q.   Were policies that you received,
7  or documents relating to policies provided
8  to anybody else in the company?
9        MS. WILMS:
10           Object as to form.
11       THE WITNESS:
12           To Gary and Tara, my staff.
13 EXAMINATION BY MR. FINEMAN:
14       Q.   And can you tell me what your
15 policy was about destroying documents that
16 related to insurance policies, or did you
17 have a policy?
18       A.   After maybe five years we would
19 send them to offsite storage and the
20 company has, you know, a policy for how
21 long they're kept.
22       Q.   Okay.  At some point, were you
23 asked to assemble all of your policies, or
24 documents relating to the policies that
25 might provide coverage for the DEEPWATER

Page 39

1  HORIZON incident?
2        A.   Yes.
3        Q.   You were asked to do that by
4  counsel?
5        A.   Yes.
6        Q.   And did you provide counsel with
7  all of the documents, relevant documents in
8  your files?
9        A.   Yes.
10       Q.   I take it you were asked for all
11 of the e-mail, any and all e-mail
12 communications that you had concerning
13 DEEPWATER HORIZON incident?
14       A.   Yes.
15       MS. WILMS:
16           Object as to form.
17 EXAMINATION BY MR. FINEMAN:
18       Q.   Is that correct?
19       MS. WILMS:
20           Object as to form.
21       THE WITNESS:
22           Can you say that again?
23 EXAMINATION BY MR. FINEMAN:
24       Q.   Sure.  Were you asked for all of
25 your e-mail communications concerning the

Page 40

1  DEEPWATER HORIZON incident?
2        A.   Regarding the insurance claims,
3  yes.
4        Q.   And did you provide hard copies
5  of e-mails or do you know did somebody go
6  in and take electronically all of your
7  e-mails from your computer?
8        MS. WILMS:
9           Object as to form.
10       THE WITNESS:
11           I sent the e-mails that I had to
12 counsel.  That I went through.
13 EXAMINATION BY MR. FINEMAN:
14       Q.   To the best of your knowledge,
15 are there any documents in your possession
16 relating to the DEEPWATER HORIZON incident
17 that you have not provided to counsel?
18       A.   No.
19       MR. FINEMAN:
20           Next document we're marking as
21 1845.  It is the agreed 30(b)(6) deposition
22 notice of Anadarko with 30(b)5 document
23 requests.
24           (Whereupon, the document
25 referred to was marked as Exhibit No. 1845

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 10

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                          Reported by:
STEVEN J. FOSTER              April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 41

1  for identification.)
2  EXAMINATION BY MR. FINEMAN:
3      Q.   It's marked filed April 4, 2011.
4      MS. WILMS:
5          Counsel, did you intend to give
6  us this one, the --
7      MR. FINEMAN:
8          This was one that you all
9  circulated.
10     MS. WILMS:
11         Right.  But not with --
12     MR. FINEMAN:
13         It was filed by --
14     MS. WILMS:
15         Okay.
16     MR. FINEMAN:
17         It was greatly appreciated.
18     MS. WILMS:
19         Somebody's on the ball; that's
20  right.
21     MR. FINEMAN:
22         That's right.
23  EXAMINATION BY MR. FINEMAN:
24     Q.   Mr. Foster, have you ever seen
25  this document before?

Page 42

1      A.   Yes, I have.
2      Q.   You may have seen a version of
3  the document without the names on the
4  sides; right?
5      A.   Correct.
6      Q.   Can you look at -- there's no
7  page numbers on here, but if you look at
8  paragraph number 24 --
9      A.   Okay.
10     Q.   You're already there; aren't
11  you?
12         Is it your understanding that
13  you're here today to testify as to the
14  matters described in paragraph 24?
15     A.   Yes.
16     Q.   Okay.  And this paragraph -- I'm
17  not going to read the whole paragraph into
18  the record, but this paragraph relates to
19  Anadarko's insurance; correct?
20     A.   Correct.
21     Q.   Okay.  And insurance that may
22  provide coverage with respect to the
23  DEEPWATER HORIZON and/or the Macondo well
24  blowout, explosion, fire and/or oil spill;
25  is that correct?

Page 43

1      A.   Correct.
2      Q.   You can put that away.
3          Actually, let me ask you one
4  question.  As far as you know, are you the
5  person most knowledgeable with the company
6  to testify as to matters described in
7  paragraph 24?
8      A.   Yes.
9      Q.   Okay.  Thanks.
10         For purposes of the deposition,
11  we should -- let's agree on a definition of
12  the insurable event so I don't, we don't
13  use different language.  And I've seen it
14  reported in different places in the papers
15  here as DEEPWATER HORIZON event, Macondo
16  well loss, DEEPWATER HORIZON casualty.
17  What is the appropriate term to use?
18     A.   BP oil spill.
19     Q.   BP oil spill?
20     A.   Right.
21     Q.   Could you tell me the coverage,
22  or policy period or periods that might
23  cover the BP oil spill for Anadarko?
24     A.   The period would be from
25  June 30, 2009 through June 30, 2010, for

Page 44

1  our property and casualty insurances.
2      Q.   And can you confirm for us --
3  strike that.  Has Anadarko made claims
4  against all of the relevant insurance in
5  that period with respect to the BP oil
6  spill?
7      MS. WILMS:
8          Object as to form.
9      THE WITNESS:
10         No.  No, we have not.
11  EXAMINATION BY MR. FINEMAN:
12     Q.   Can you tell me what policies
13  that might provide insurance during that
14  time period for Anadarko for the BP oil
15  spill have you not made claims against?
16     A.   We have given notice to the
17  insurers but we have not filed a claim.
18     Q.   You haven't filed a claim
19  against any of them yet?
20     A.   Correct.
21     Q.   Has Anadarko given notice to all
22  carriers that might be able to provide
23  coverage for Anadarko for the BP oil spill
24  for the relevant time period?
25     MS. WILMS:

11 (Pages 41 to 44)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 11

Page 45

1    Object as to form.
2    THE WITNESS:
3         Yes.
4    EXAMINATION BY MR. FINEMAN:
5    Q.   And has Anadarko made -- given
6  notice to any carrier for coverage for any
7  preceding policy year?
8    A.   Preceding policy, you mean prior
9  to --
10   Q.   Prior to June 2009 to June 2010.
11   A.   No, we have not.
12   Q.   Okay.  And has Anadarko given
13  notice to any carrier for possible coverage
14  of the BP oil spill for the period
15  June 2010 through June 2011?
16   A.   No.
17   Q.   Okay.  It may seem, sound like
18  an obvious question but I need to ask you.
19       Is there a reason why Anadarko
20  has not made, not given notice to any
21  carrier for coverage, potential coverage
22  for the June 2010 through June 2011 time
23  period?
24   A.   Because we do not think those
25  policies would apply.  They are on a claims

Page 46

1  made basis.
2    Q.   I think you mentioned earlier
3  that even though Anadarko Petroleum is
4  the -- strike that.  You mentioned earlier
5  that the policies that you secured were for
6  Anadarko Petroleum and all of its
7  subsidiaries; is that correct?
8    A.   Correct.
9    Q.   So even if policies only mention
10  Anadarko Petroleum, the coverage extends to
11  all of Anadarko Petroleum subsidiaries; is
12  that correct?
13   A.   Correct.
14   Q.   Now, can you tell me what the
15  total insurance coverage available to
16  Anadarko is in connection with the BP oil
17  spill?
18       MS. WILMS:
19         Object as to form.
20  EXAMINATION BY MR. FINEMAN:
21   Q.   You can answer.
22   A.   650 million U.S. dollars.
23   Q.   Is that the total amount of
24  coverage for the policy period, or is that
25  the total amount of coverage specifically

Page 47

1  available or that might be available to
2  cover the BP oil spill claim?
3        MS. WILMS:
4          Object as to form.
5        THE WITNESS:
6          That is for our property and
7  casualty insurance program that was in
8  place at the time of the incident.
9  EXAMINATION BY MR. FINEMAN:
10   Q.   The amount of the available
11  insurance for the BP oil spill is
12  significantly less than that, though; isn't
13  that correct?
14       MS. WILMS:
15         Object as to form.
16       THE WITNESS:
17         Well, the limits in the policy
18  are stated at 650 million on a 100 percent
19  basis.
20       MR. FINEMAN:
21         I'm not trying to be difficult,
22  you're the insurance expert.  I'm just a
23  lawyer so I'm trying to figure this all
24  out.
25       (Off the record.)

Page 48

1        MR. FINEMAN:
2          We're marking as 1846 pages, the
3  cover page and then a couple pages from
4  Anadarko Petroleum's form 10-K for the year
5  ended December 31, 2010.
6          (Whereupon, the document
7  referred to was marked as Exhibit No. 1846
8  for identification.)
9  EXAMINATION BY MR. FINEMAN:
10   Q.   Mr. Foster, look at the front
11  page for me.  Do you recognize this
12  document?
13   A.   Yes, I do.
14   Q.   The cover page of the document.
15  And did I accurately state it to be the
16  cover page for 10-K for Anadarko
17  Petroleum --
18       MS. WILMS:
19         Object as to form.
20  EXAMINATION BY MR. FINEMAN:
21   Q.   -- for the year ended
22  December 31, 2010?
23       MS. WILMS:
24         Object as to form.
25       THE WITNESS:

12  (Pages 45 to 48)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 12

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                Reported by:
STEVEN J. FOSTER              April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

| Page 49 | Page 51 |
|---|---|
| 1        Yes. | 1   far is an accurate statement of the |
| 2    EXAMINATION BY MR. FINEMAN: | 2   insurance coverage? |
| 3        Q.   Okay.  If you look at the third | 3        A.   Yes. |
| 4   page of the Exhibit, which is identified as | 4        Q.   Okay. |
| 5   page 104 of the 10-K, there is a paragraph | 5        MS. WILMS: |
| 6   in the middle, it says insurance recovery. | 6             With the clarification that was |
| 7   Do you see that? | 7   added. |
| 8        A.   Yes, I do. | 8        MR. FINEMAN: |
| 9        Q.   Do you play any role in the | 9             Yes.  Less up to $60 million of |
| 10  drafting of this language? | 10  deductibles. |
| 11       A.   Yes, I do. | 11  EXAMINATION BY MR. FINEMAN: |
| 12       Q.   Okay.  Role did you play? | 12       Q.   The paragraph goes on to say, |
| 13       A.   Discuss with counsel to come up | 13  based on Anadarko's 25 percent non-operated |
| 14  with the amounts that we have in here. | 14  leasehold interest in the lease, the |
| 15       Q.   So you provided information, but | 15  company estimates its potential net |
| 16  you didn't write this? | 16  insurance coverage could total $178 |
| 17       A.   Right.  Correct. | 17  million, less deductibles of $15 million. |
| 18       Q.   I just want to walk through it | 18            Did I read that correctly? |
| 19  with you for a minute so that it helps me | 19       A.   Yes. |
| 20  understand what we have here. | 20       Q.   Can you explain that to me, that |
| 21            It says the company carries | 21  sentence? |
| 22  insurance to protect against potential | 22       A.   Because as I mentioned before, |
| 23  financial losses. | 23  the 650 million in limits is on a |
| 24            It says at the time of the | 24  100 percent basis or it says here gross |
| 25  DEEPWATER HORIZON events -- that's what | 25  basis.  This assumes that the limits would |

| Page 50 | Page 52 |
|---|---|
| 1   we're referring to here as the BP oil | 1   scale to our 25 percent interest in the |
| 2   spill; correct? | 2   lease.  So if you take this, the 710 times |
| 3        A.   Correct. | 3   25 percent and do the math. |
| 4        Q.   The company's insurance coverage | 4        Q.   You get 178,000,000 less |
| 5   applied to gross covered costs up to a | 5   deductible of $15 million? |
| 6   level of approximately $710 million, less | 6        A.   Correct. |
| 7   $60 million of deductibles. | 7        Q.   The phrase here is potential |
| 8            Do you see that? | 8   insurance coverage could -- potential net |
| 9        A.   Yes, I do. | 9   insurance coverage could total $178 |
| 10       MS. WILMS: | 10  million, less deductibles of 15 million. |
| 11            Just for clarification, it says | 11  Why the word could? |
| 12  less up to 60 million of deductibles. | 12       MS. WILMS: |
| 13       MR. FINEMAN: | 13            Object as to form. |
| 14            Did I misread it? | 14       THE WITNESS: |
| 15       MS. WILMS: | 15            Could, because we don't know if |
| 16            Just a teeny.  I think you left | 16  in this case the policy of limits will |
| 17  out the word up. | 17  scale to interest or not. |
| 18       MR. FINEMAN: | 18  EXAMINATION BY MR. FINEMAN: |
| 19            I'm sorry.  Thank you. | 19       Q.   Okay.  And under what |
| 20  EXAMINATION BY MR. FINEMAN: | 20  circumstances would they not scale to |
| 21       Q.   So this 710 less the 60, that's | 21  interest? |
| 22  where you got the 650 million? | 22       MS. WILMS: |
| 23       A.   Correct. | 23            Object as to form. |
| 24       Q.   And as far as you know, that's | 24       THE WITNESS: |
| 25  an accurate statement, what I've read so | 25            There is a section in the policy |

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit L
Page 13

Page 53

```
 1    that states the exceptions.
 2    EXAMINATION BY MR. FINEMAN:
 3       Q.   Okay. Can you remember what
 4    those are, what that exception would be?
 5       A.   I would need to look at the
 6    insurance policy.
 7       Q.   Okay. We'll look at it in a
 8    little bit.
 9            The next sentence says the
10    company has not recognized a receivable for
11    any potential recoveries in its
12    consolidated balance sheets.
13            The next sentence -- well, let's
14    start there. Did you have anything to do
15    with that sentence?
16       A.   No.
17       MS. WILMS:
18            Object as to form.
19    EXAMINATION BY MR. FINEMAN:
20       Q.   At this time -- it goes on to
21    say, at this time the recovery of these
22    amounts is not considered probable because
23    the company is not considered to have
24    incurred a probable loss under the OA or an
25    insurable loss for unpaid liabilities.
```

Page 54

```
 1            Did I read that correctly?
 2       A.   Yes.
 3       Q.   Did you have anything to do with
 4    that sentence?
 5       A.   No.
 6       MS. WILMS:
 7            Object as to form.
 8    EXAMINATION BY MR. FINEMAN:
 9       Q.   If the company -- it goes on to
10    say, if the company's current legal
11    assessment changes such that the company
12    becomes liable under the OA for DEEPWATER
13    HORIZON event-related costs and funds such
14    costs, the company is positioned to recover
15    the first $163 million of insured costs
16    under its existing insurance policy.
17            Did I read that correctly?
18       A.   Yes.
19       Q.   Can you explain to me what that
20    means, that sentence?
21       A.   That sentence says at worst case
22    if the policy limit scale to interest, we
23    would collect 163 million, net of
24    deductibles.
25       Q.   Do you have any reason to
```

Page 55

```
 1    believe that Anadarko would not be able to
 2    recover $163 million?
 3       MS. WILMS:
 4            Object as to form.
 5       THE WITNESS:
 6            In order for us to collect it,
 7    we have to file a claim. In order to file
 8    a claim, we have to have incurred and paid
 9    costs related to that. And to date that's
10    all we've paid are the legal fees.
11    EXAMINATION BY MR. FINEMAN:
12       Q.   Okay. Fair enough. And I'll
13    come back to that in a second.
14            My only question is, this
15    paragraph uses -- it says the company's
16    positioned to recover. I just don't
17    understand what that means. Can you
18    explain what that means to me?
19       A.   I wasn't involved in the
20    drafting.
21       Q.   All right. And sitting here
22    today, do you know whether or not the
23    partial interest provisions of the
24    policies, the scaling, as you've referred
25    to it, do you know whether that's going to
```

Page 56

```
 1    apply or not?
 2       MS. WILMS:
 3            Object as to form.
 4       THE WITNESS:
 5            No, I do not.
 6    EXAMINATION BY MR. FINEMAN:
 7       Q.   Under what circumstances would
 8    you learn or know whether or not the
 9    partial interest provisions will apply?
10       MS. WILMS:
11            Objection as to form.
12       THE WITNESS:
13            I would prefer to go back and
14    look at the insurance language and state
15    that, because it is what it is.
16    EXAMINATION BY MR. FINEMAN:
17       Q.   Okay.
18       A.   And so -- to do that.
19       Q.   Okay.
20       MS. WILMS:
21            We have the policies here but
22    obviously it's up to you.
23       MR. FINEMAN:
24            We'll come back to it. We'll
25    come back to it.
```

14 (Pages 53 to 56)

Exhibit L
Page 14

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                                    Reported by:
STEVEN J. FOSTER                         April 27, 2011      JOSEPH R. KAISER, JR., CCR, RPR

Page 57

```
 1    EXAMINATION BY MR. FINEMAN:
 2        Q.   The last sentence of this
 3   paragraph says the company also carries
 4   directors' and officers' insurance to cover
 5   certain risks associated with certain of
 6   the above-described legal proceedings.
 7           Did I read that correctly?
 8        A.   Yes.
 9        Q.   Does the company's directors'
10   and officers' insurance apply, as far as
11   you know, to the claims asserted in this
12   case?
13        A.   No.
14        Q.   Okay.  Why not?
15        A.   The claims asserted, it's my
16   understanding, are for bodily injury and
17   property damage.  That's not what the D&O
18   policy would cover.
19        Q.   What would the D&O policy cover?
20        A.   Shareholder suits for security
21   actions against the Ds and Os or the
22   company.
23        Q.   And has Anadarko sent notice to
24   the directors' and officers' insurance
25   carrier with respect to the claims asserted
```

Page 58

```
 1   in this litigation?
 2        MS. WILMS:
 3           Object as to form.
 4        THE WITNESS:
 5           We have given them notice of
 6   shareholder suits that have come in.
 7    EXAMINATION BY MR. FINEMAN:
 8        Q.   But not a notice with respect to
 9   claims for bodily injury, property damage,
10   economic loss?
11        A.   To my knowledge, no.
12        Q.   Okay.  Do you know the limits of
13   the directors' and officers' insurance?
14        A.   Yes.
15        Q.   And what are those limits?
16        A.   200 million.
17        Q.   And what's the policy year of
18   your directors' and officers' insurance?
19        MS. WILMS:
20           Object as to form.  What's the
21   relevancy here?
22        MR. FINEMAN:
23           Yes.  Fair enough.  Sorry.
24    EXAMINATION BY MR. FINEMAN:
25        Q.   Was the policy -- are the policy
```

Page 59

```
 1   years for your directors' and officers'
 2   insurance, does it also go June to June?
 3        A.   No.
 4        Q.   Under what?  Is it a calendar
 5   year basis?
 6        A.   September 12th, 2009 through
 7   September 12th, 2010.
 8        Q.   Okay.  Has any of the
 9   insurance -- strike that.  So for purposes
10   of this litigation, for the BP oil spill,
11   the available insurance for Anadarko is
12   somewhere between 160 and $650 million; is
13   that correct?
14        MS. WILMS:
15           Object as to form.
16        THE WITNESS:
17           Regarding this?
18    EXAMINATION BY MR. FINEMAN:
19        Q.   For the BP oil spill.
20        A.   Right.  Right.  Regarding
21   property damage, bodily injury claims and
22   pollution, correct.
23        Q.   I think the only thing we talked
24   about that is not covered by those policies
25   would be the claims in the securities
```

Page 60

```
 1   cases?
 2        A.   Correct.
 3        Q.   And at this time today, you
 4   don't know how much of that insurance, if
 5   any of it, will ultimately be paid; is that
 6   correct?
 7        A.   Correct.
 8        Q.   Has any of that insurance been
 9   used to pay defense costs?
10        MS. WILMS:
11           Object as to form.
12        THE WITNESS:
13           No.  Sorry.  No.
14    EXAMINATION BY MR. FINEMAN:
15        Q.   So as I understand it, so far
16   you've only made, submitted notices to the
17   carriers but you haven't made claims on any
18   of those policies; is that correct?
19        A.   Correct.
20        Q.   And that's why they haven't paid
21   anything; correct?
22        A.   Correct.
23        Q.   Do you presently have any
24   litigation arbitration proceedings of any
25   of the carriers that would be providing
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 15

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER          April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 61

1  this insurance we've been talking about?
2      A.  No.
3      Q.  You're all right?  You need a
4  stretch?
5      A.  No, I'm fine.  Thank you.
6      MR. FINEMAN:
7          Let's do 5 and 6 together.
8          Why don't we take a short break?
9  I'm going to put the big policy in front of
10  him.  That way he has a chance to look at
11  it.  Why don't we take a short five-minute
12  break right here?  Is that okay with
13  everybody?
14      THE VIDEOGRAPHER:
15          This is the end of Tape 1, we're
16  now off the record at 9:24.
17          (Off the record.)
18      THE VIDEOGRAPHER:
19          This is the beginning of Tape 2.
20  We're now back on the record.  The time is
21  9:35.
22  EXAMINATION BY MR. FINEMAN:
23      Q.  Mr. Foster, I'm going to put in
24  front of you two exhibits.  The first is
25  marked 847 and it's ANA MDL 000030738

Page 62

1  through 743.  And Exhibit 1848 and that's
2  ANA MDL 000030768 through 30872.
3          (Whereupon, the documents
4  referred to were marked as Exhibit No. 1847
5  and Exhibit No. 1848 for identification.)
6  EXAMINATION BY MR. FINEMAN:
7      Q.  If you can look at the 1848
8  first?
9      A.  Okay.
10      Q.  If you can just identify that
11  document for me, the whole document, not
12  just the first front page.
13      A.  Identify it by number?
14      Q.  What is it, the document?
15      MS. WILMS:
16          Do you recognize it?
17      THE WITNESS:
18          Yes.  This is our package policy
19  which covers our property, OEE coverage,
20  the third-party liability.
21  EXAMINATION BY MR. FINEMAN:
22      Q.  Speak up, sir.
23      A.  I'm sorry.  This covers our
24  property, OEE coverage which is operators
25  actual expense coverage which a component of

Page 63

1  our third-party liability coverage.
2      Q.  And is this, is this the primary
3  policy for the Anadarko coverages that
4  might apply to the BP oil spill?
5      A.  Yes.
6      Q.  And if you could look at the
7  1847, which is a June 11, 2010 letter from
8  J. Clifton Hall, III to you; correct?
9      A.  Correct.
10      Q.  Can you tell me what this is?
11  Do you recognize this and can you tell me
12  what it is?
13      A.  This is a, I believe this is a
14  reservation of rights letter that the
15  carrier has sent me.
16      Q.  Anadarko's provided notice to
17  the carrier under the energy package
18  policy; correct?
19      A.  Correct.
20      Q.  Can I ask you, when you, in your
21  general performance of your duties when you
22  give notice to a carrier, is that in
23  writing?
24      A.  Yes.
25      Q.  Is it a letter that comes from

Page 64

1  you, or is it a letter that comes from
2  somebody else in the company?
3      MS. WILMS:
4          Object as to form.
5      THE WITNESS:
6          Typically it comes from me by
7  e-mail.
8  EXAMINATION BY MR. FINEMAN:
9      Q.  By e-mail?
10      A.  (Witness nods head).
11      Q.  In this instance with respect to
12  the energy package policy, 1848, did you
13  personally send notice to the carrier?
14      A.  No.
15      Q.  Okay.  Who did?
16      A.  Our insurance broker.
17      Q.  And your insurance broker is?
18      A.  Alliant Insurance Services.
19      Q.  And they are located where?
20      A.  Houston, Texas.
21      Q.  Did you direct your broker to
22  give notice to the carriers with respect to
23  the energy package policy?
24      A.  Yes.
25      Q.  And were you copied on that

16  (Pages 61 to 64)

Page 65

```
 1   communication, on the notice?
 2        MS. WILMS:
 3            Object as to form.
 4        THE WITNESS:
 5            I don't believe I was.
 6   EXAMINATION BY MR. FINEMAN:
 7        Q.   Okay.  The reason I'm asking is
 8   because I haven't seen it in the document
 9   production.  I just want to -- I don't -- I
10   don't know anything about it.  I haven't
11   seen it.
12            Would you have a copy of that
13   notice in your file?
14        MS. WILMS:
15            Object as to form.
16        THE WITNESS:
17            A copy of which notice?
18   EXAMINATION BY MR. FINEMAN:
19        Q.   Strike that.
20            Do you have a copy in your files
21   of the notice that your broker sent to the
22   carrier with respect to the energy package
23   policy?
24        A.   No.
25        Q.   You don't have that?
```

Page 66

```
 1        A.   No.
 2        Q.   Have you ever seen that notice?
 3        A.   No.
 4        Q.   But you directed that the notice
 5   be sent; is that correct?
 6        MS. WILMS:
 7            Object as to form.
 8        THE WITNESS:
 9            Yes.
10   EXAMINATION BY MR. FINEMAN:
11        Q.   Is it your understanding that
12   the carrier for the energy package policy
13   has reserved their rights to deny coverage?
14        MS. WILMS:
15            Object as to form.
16        THE WITNESS:
17            Yes.
18   EXAMINATION BY MR. FINEMAN:
19        Q.   Do you know the reasons for that
20   reservation of rights?
21        MS. WILMS:
22            Object as to form.
23        THE WITNESS:
24            They are spelled out in this
25   letter.
```

Page 67

```
 1   EXAMINATION BY MR. FINEMAN:
 2        Q.   Let's talk about -- let's look
 3   at the letter.
 4        A.   Okay.
 5        Q.   By the way, the law firm from
 6   whom this letter comes, Westmoreland Hall,
 7   Maines & Lugrin, do you know who they
 8   represent?
 9        A.   Yes.
10        Q.   Who do they represent?
11        A.   Underwriters.
12        Q.   Okay.  And on the front page of
13   this Exhibit 1847 it says our firm
14   represents the underwriters; correct?
15        A.   Correct.
16        Q.   And who are the underwriters?
17        A.   The insurers who underwrite this
18   package policy.
19        Q.   All right.  And that's a
20   syndicate of different companies; is that
21   correct?
22        A.   Yes.  At Lloyd's of London
23   primarily.
24        Q.   For purposes of our conversation
25   should we refer to them as underwriters or
```

Page 68

```
 1   the carriers?  Interchangeable?
 2        A.   Yes.
 3        Q.   All right.  If you look at the
 4   second page of the exhibit, it's 30739.
 5   Starting at the top of the page it says
 6   generally speaking the policy -- again,
 7   what we're referring to here is
 8   Exhibit 1848 when we talk about that
 9   policy; correct?
10        A.   Correct.
11        Q.   Okay.  Provides control of well
12   coverage in the amount of $250 million for
13   (it says 100 percent interest in areas III,
14   IV and V) under Section II and Section III
15   provides excess liability coverage in the
16   amount of $150 million (again for
17   100 percent interest).
18            There is a $10 million retention
19   applicable in Section II and a $5 million
20   per occurrence retention applicable to
21   Section III.  The term of the policy is
22   from June 30, 2009 to June 30, 2010.
23            Did I read that correctly?
24        A.   Yes.
25        Q.   Does this mean that the energy
```

17 (Pages 65 to 68)

Exhibit L
Page 17

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 69

1  package policy provides a total of
2  $400 million in coverage or up to
3  $400 million in coverage?
4      A.   Yes.
5      Q.   $250 million of primary
6  insurance and $150 million of excess
7  insurance; is that correct?
8      A.   Yes.  But the primary insurance
9  is OEE coverage, control of well, and the
10  excess is third-party liability.
11      Q.   Fair enough.  Earlier we talked
12  about the $650 million in insurance that
13  might be available to address the BP oil
14  spill.  Is this 400 million of that 650
15  million?
16      MS. WILMS:
17          Object as to form.
18      THE WITNESS:
19          Yes.
20  EXAMINATION BY MR. FINEMAN:
21      Q.   Okay.  In the next section of
22  this correspondence, the underwriters, or
23  the lawyers for the underwriters refer to
24  Section II of the policy, which is control
25  of well and extra expense insurance.

Page 70

1  Correct?
2      A.   Correct.
3      Q.   Okay.  Further down in that
4  paragraph it says the common conditions of
5  Section II contain a quote partial interest
6  clause, close quote, which acts to reduce
7  coverage as to the ownership interest of
8  the insured in any particular loss.
9          It is our understanding that
10  Anadarko maintains a 25 percent working
11  interest in the Macondo Prospect,
12  Mississippi Canyon 252 Well No. 1 (GoM)
13  (the "Well") close quote.
14          Did I read that correctly?
15      A.   Yes.
16      Q.   Can you explain what's meant by
17  the partial interest clause?
18      A.   I would prefer to go and look at
19  the policy to refresh my memory.
20      Q.   Okay.  All right.  I'll come
21  back to that in a second.  We can do that
22  in a second.
23      A.   Okay.
24      Q.   I'll find it for you and we'll
25  look at it.

Page 71

1      A.   Okay.
2      Q.   But what they're doing here,
3  though, is they're putting you on notice
4  that this partial interest clause is in the
5  policy and may affect the coverage.
6          Is that what this is?
7      A.   Correct.
8      Q.   Going down in that section,
9  moving down the page you'll see that
10  there's a block of material.  It says
11  redacted.  Let me restate that.  You see
12  there's a word redacted?
13      A.   Yes.
14      Q.   With blank space?
15      A.   Yes.
16      Q.   Do you recall the subject matter
17  addressed here?
18      A.   No, I do not.
19      Q.   Do you recall receiving this
20  letter in June of 2010?
21      A.   Yes, I do.
22      Q.   And you read the letter when you
23  received it?
24      A.   I briefed it, yes.  Briefly
25  looked at it, yes.  It's pretty standard.

Page 72

1      Q.   Okay.
2          Did you personally have direct
3  communication with underwriters about the
4  contents of this letter, or is that handled
5  by your broker?
6      A.   We have not discussed the
7  contents of this letter with the
8  underwriters yet.
9      Q.   So if you look at 30740?  If you
10  go, this is under the section on the
11  Section III excess liability coverage.
12      A.   Okay.
13      Q.   Can you -- I know you started to
14  do this a moment ago -- but can you explain
15  to me the difference between the covered
16  events under the Section II part of the
17  policy and the Section III, excess
18  liability part of the policy?
19      A.   Sure.  Section II covers control
20  of the well, the cost incurred to control
21  the well, the cost incurred to restore the
22  well and/or re-drill the well if needed.
23  That would include any type of relief wells
24  that would be drilled and any pollution
25  emanating from a control of the well event.

18  (Pages 69 to 72)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 18

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER              April 27, 2011      JOSEPH R. KAISER, JR., CCR, RPR

Page 73

```
 1    That's Section II.
 2          Section III is third-party
 3    liability insurance and that covers
 4    personal injury and property damage,
 5    including from pollution.  But it's broader
 6    than that.  So it sits on top of this
 7    coverage.
 8       Q.   Right.  So is it -- my
 9    understanding of the way this works is that
10    the $250 million policy would have to be
11    exhausted before the excess $150 million
12    would apply; is that correct?
13       A.   For pollution emanating from a
14    blowout; that is correct.
15       Q.   But for the bodily injury and
16    property damage aspects that aren't covered
17    by Section II, you could, you could make a
18    claim to Section III?
19       A.   Yes.  As long as it's not
20    related to pollution emanating from a
21    control of well event.
22       Q.   Further down on this page, it's
23    after some of the redacted material, it
24    says accordingly, periodic meetings with
25    Anadarko's counsel should be scheduled so
```

Page 74

```
 1    that underwriters can be advised of status
 2    and Anadarko's strategy for handling.
 3          Do you see that?
 4       A.   Yes, I do.
 5       Q.   To your knowledge, have there
 6    been such meetings?
 7       A.   Yes.
 8       Q.   Have you participated in those
 9    meetings?
10       A.   Yes.
11       Q.   And Anadarko's counsel's present
12    at those meetings?
13       A.   Yes.
14       Q.   And have those meetings taken
15    place in, with respect -- strike that.  Has
16    the subject matter of those meetings been
17    the contents of this letter, or the
18    applicability of the Section II or Section
19    III parts of the energy package policy?
20       MS. WILMS:
21          Object as to form.
22       THE WITNESS:
23          No.
24    EXAMINATION BY MR. FINEMAN:
25       Q.   Without revealing the substance
```

Page 75

```
 1    of what has been discussed at these
 2    meetings when you've been present, can you
 3    tell me the general subject matter of the
 4    discussions?
 5       MS. WILMS:
 6          So he's just asking general
 7    subject matter only.
 8       THE WITNESS:
 9          Status and our strategy for
10    handling the litigation.
11    EXAMINATION BY MR. FINEMAN:
12       Q.   So that -- and what role did you
13    play at those meetings?  Again, don't tell
14    me what you said if counsel's present, but
15    if it was a litigation -- strike that.
16    Were they litigation strategy meetings?
17       MS. WILMS:
18          Object as to form.
19       THE WITNESS:
20          Yes.
21    EXAMINATION BY MR. FINEMAN:
22       Q.   What role did you play at the
23    meeting?
24       A.   Listening.
25       Q.   For what purpose?
```

Page 76

```
 1       MS. WILMS:
 2          Object as to form.
 3       THE WITNESS:
 4          Because that was my role, to sit
 5    and listen.
 6    EXAMINATION BY MR. FINEMAN:
 7       Q.   And just so I'm clear, these
 8    meetings did not concern whether or not
 9    underwriters would pay any money under the
10    energy package policy; is that correct?
11       A.   Correct.
12       Q.   And have there been any
13    meetings, to your knowledge, with
14    underwriters and representatives of
15    Anadarko as to whether underwriters will
16    pay under either Section II or Section III
17    with respect to the BP oil spill?
18       A.   No.
19       MS. WILMS:
20          Object as to form.
21       THE WITNESS:
22          Sorry.  No.
23    EXAMINATION BY MR. FINEMAN:
24       Q.   Are you aware of any such
25    meetings being scheduled?
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 19

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                     Reported by:
STEVEN J. FOSTER                     April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 77

```
 1      A.  No.
 2      Q.  Do you expect that at some point
 3   such a meeting will take place?
 4      MS. WILMS:
 5          Object as to form.
 6      THE WITNESS:
 7          Yes.
 8   EXAMINATION BY MR. FINEMAN:
 9      Q.  And do you have any idea when
10   that will happen?
11      MS. WILMS:
12          Same objection.  Object as to
13   form.
14      THE WITNESS:
15          No.
16   EXAMINATION BY MR. FINEMAN:
17      Q.  If you turn to 30741?  Under the
18   section summary, most of which has been
19   redacted so I can't, I don't really know
20   what the summary is.
21          But it says, it says
22   underwriters accept the facts of the
23   Macondo well incident as understood today
24   appear to present a loss under Sections II
25   and Section III of the policy as the well
```

Page 78

```
 1   is out of control.
 2          You see that?
 3      A.  Yes, I do.
 4      Q.  Can you explain what that means?
 5      MS. WILMS:
 6          Object as to form.
 7      THE WITNESS:
 8          I do not know what they intended
 9   by that.
10   EXAMINATION BY MR. FINEMAN:
11      Q.  Do you have an -- what do you
12   understand it means?
13      A.  I would understand that, that
14   they're saying as long as there's no other
15   exclusions that apply, then they are going
16   to pay.
17      Q.  But they haven't, as far as --
18   strike that.  To your knowledge, have they
19   committed to pay?
20      A.  No.
21      Q.  At what point do you expect they
22   would either decide to pay or tell you that
23   they're not paying or they're only paying a
24   portion of the policy?
25      MS. WILMS:
```

Page 79

```
 1          Object as to form.
 2      THE WITNESS:
 3          When we file a claim, which we
 4   have not done yet, that would start the
 5   process.
 6   EXAMINATION BY MR. FINEMAN:
 7      Q.  Okay.  The next sentence says
 8   underwriters have therefore instructed BC
 9   Johnson to work with Anadarko in adjusting
10   the claim.
11          Do you see that?
12      A.  Yes, I do.
13      Q.  First of all, who is BC Johnson?
14      A.  They are an insurance adjusting
15   firm that was appointed by us to help
16   gather the information related to the claim
17   in anticipation at some point filing a
18   claim.
19      Q.  I see.  And so BC Johnson, BC
20   Johnson works for Anadarko, or they work
21   for the underwriters?
22      A.  We appointed them, but they were
23   paid by the underwriters.
24      Q.  Okay.  And their job is to, as
25   it says here, adjust the claim; is that
```

Page 80

```
 1   correct?
 2      A.  Correct.
 3      Q.  And just very briefly explain to
 4   me what that means, adjust the claim.
 5      A.  They look at the costs that have
 6   been incurred in this case by BP and they
 7   break it into different buckets.  And they
 8   see which buckets apply to our policy,
 9   which buckets do not.
10      Q.  Okay.  Do you have, in your job,
11   do you have any role, did you have any role
12   in reviewing or processing any bills from
13   BP to Anadarko in connection with the well,
14   the Macondo well?
15      MS. WILMS:
16          Object as to form.
17      THE WITNESS:
18          No.
19   EXAMINATION BY MR. FINEMAN:
20      Q.  Did you participate in the
21   adjusting of the claim process, or are you
22   participating in that process?
23      A.  Yes.
24      Q.  What role are you playing?
25      A.  My role is to make sure that the
```

20  (Pages 77 to 80)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 20

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:
STEVEN J. FOSTER              April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

| Page 81 | Page 83 |
|---|---|
| 1   adjusting process is done. | 1        It will be done as in concert |
| 2        Q.   Okay.  And when did that, that | 2   with outside counsel, inside counsel, |
| 3   process started, I take it, shortly after | 3   myself, the treasurer, Bruce, who I |
| 4   June 11, 2010 when this letter was written? | 4   mentioned, the CFO and the general counsel. |
| 5        A.   No.  The process would have | 5   EXAMINATION BY MR. FINEMAN: |
| 6   started in May, right after we gave notice. | 6        Q.   Then if you go down another |
| 7        Q.   Okay.  And is that process still | 7   paragraph it says in the meantime, |
| 8   continuing today? | 8   underwriters are interested to determine |
| 9        A.   Yes. | 9   the cause of the loss.  And then the rest |
| 10        Q.   And is there a committee at | 10   of the paragraph is redacted. |
| 11   Anadarko responsible for adjusting the | 11        Do you see that? |
| 12   claim or participating in adjusting the | 12        A.   Yes, I do. |
| 13   claim? | 13        Q.   Is determining the cause of the |
| 14        A.   I am working with inside counsel | 14   loss part of the adjusting process, or is |
| 15   and outside counsel to help adjust the | 15   that something else? |
| 16   claim. | 16        MS. WILMS: |
| 17        Q.   And what kind of information -- | 17        Object as to form. |
| 18   you personally, what kind of information or | 18        THE WITNESS: |
| 19   people, at your direction, are gathering in | 19        Yes, that's part of the |
| 20   connection with adjusting the claim? | 20   adjusting process. |
| 21        MS. WILMS: | 21        MR. FINEMAN: |
| 22        I'm going to instruct you not to | 22        And it's part of the process |
| 23   answer that question.  You've laid the | 23   that we're not, he's not going to testify |
| 24   foundation for our claim of privilege over | 24   about? |
| 25   the work of the adjuster, BC Johnson. | 25        MS. WILMS: |

| Page 82 | Page 84 |
|---|---|
| 1   EXAMINATION BY MR. FINEMAN: | 1        Correct. |
| 2        Q.   Can you -- | 2        MR. FINEMAN: |
| 3        MR. FINEMAN: | 3        Okay. |
| 4        Can he testify as to the subject | 4   EXAMINATION BY MR. FINEMAN: |
| 5   matter of the, like categories or types of | 5        Q.   Well, that certainly shortens up |
| 6   information that they're gathering as part | 6   that examination. |
| 7   of the adjusting process? | 7        Mr. Foster, is there anything in |
| 8        MS. WILMS: | 8   this letter that you think is inaccurate? |
| 9        No.  Not with regard to the | 9        MS. WILMS: |
| 10   types of information that they're | 10        Object as to form. |
| 11   gathering.  That would reveal the strategy | 11        THE WITNESS: |
| 12   with regard to the claim process and I | 12        We haven't finished the review |
| 13   think he's testified generally as to what | 13   and the detailed analysis to make that |
| 14   the process is. | 14   determination. |
| 15        And so I think we've gone as far | 15   EXAMINATION BY MR. FINEMAN: |
| 16   as we can with that at this point. | 16        Q.   So you don't know; is that |
| 17        MR. FINEMAN: | 17   right? |
| 18        Okay. | 18        A.   Right. |
| 19   EXAMINATION BY MR. FINEMAN: | 19        Q.   The next, if you look at page |
| 20        Q.   Whose decision will it be | 20   30743 and 30744, I don't believe these are |
| 21   whether to make a claim to the | 21   actually part of the letter.  I think |
| 22   underwriters? | 22   produced as part of the letter.  I think |
| 23        MS. WILMS: | 23   it's just -- I believe it's a function of |
| 24        Object as to form. | 24   the production.  I just want to find out |
| 25        THE WITNESS: | 25   from you. |

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 21

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010     Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 85

```
 1          This is a contract endorsement
 2  to the energy package policy; correct?
 3       A.   Correct.
 4       Q.   And it's dated at the bottom
 5  9/6/2010.  Is that correct?
 6       A.   Correct.
 7       MS. WILMS:
 8          What are you looking for?  The
 9  date?  I'm sorry.
10       MR. FINEMAN:
11          To the bottom it says --
12       MS. WILMS:
13          Oh, 00 --
14       EXAMINATION BY MR. FINEMAN:
15       Q.   This is not part of this letter;
16  is it?
17       A.   No, it's not.
18       Q.   Okay.  And this should have been
19  just a part of the policy, endorsement to
20  the policy; correct?
21       A.   Correct.
22       Q.   And while we're on it, can you
23  just tell me what this is?
24       A.   This is to confirm that we have
25  coverage for the relief well that was being
```

Page 86

```
 1  drilled, relief wells that was being
 2  drilled in case they blew out.
 3       Q.   Okay.  I notice in a number of
 4  the policies that sometimes the dates of
 5  the document refer to past, a past policy
 6  period.  Is that normal?  That is normal?
 7  So, for example, let me start over.  I'll
 8  ask the question.
 9          This says, this is dated
10  September 6, 2010; right?  That's what it
11  says here in this?
12       A.   That is the date that he signed
13  it.
14       Q.   Okay.  But it applies; correct,
15  to the policy year that ended June 2010?
16       MS. WILMS:
17          Object as to form.
18       EXAMINATION BY MR. FINEMAN:
19       Q.   Correct?
20       A.   Correct.
21       Q.   Okay.  And my only question is:
22  Is that a normal thing?  Is there anything
23  unusual about that?
24       A.   No.
25       MS. WILMS:
```

Page 87

```
 1          Object as to form.
 2       EXAMINATION BY MR. FINEMAN:
 3       Q.   That's all I wanted.  That's
 4  what I was trying to --
 5       A.   Okay.
 6       Q.   Did you -- the notice that was
 7  sent with respect to the energy policy, did
 8  it, would it have addressed this coverage
 9  as well?
10       A.   No.
11       MS. WILMS:
12          Object as to form.
13       THE WITNESS:
14          Sorry.  No.
15       EXAMINATION BY MR. FINEMAN:
16       Q.   Have you sent a notice with
17  respect to this coverage?
18       A.   No, we have not.
19       Q.   Okay.
20       MR. FINEMAN:
21          And just for the record, I was
22  referring to contract endorsement 17.  It's
23  ANA MDL 000030743 and 744.
24       EXAMINATION BY MR. FINEMAN:
25       Q.   If you take a look at the policy
```

Page 88

```
 1  there, 1848, you've identified this as the
 2  energy package policy; correct?
 3       A.   Correct.
 4       Q.   And it's for the policy period
 5  June 30, 2009 through June 30, 2010; is
 6  that correct?
 7       A.   Correct.
 8       Q.   If you look at 30770, it's the
 9  next --
10       MS. WILMS:
11          Page?
12       EXAMINATION BY MR. FINEMAN:
13       Q.   The reference here to Alliant
14  Insurance Services, that's the broker you
15  mentioned a moment ago; correct?
16       A.   Correct.
17       Q.   All right.  If you turn to
18  30771?  This policy, just so we're clear,
19  this policy covers Anadarko Petroleum and
20  all of its subsidiaries; correct?
21       A.   Correct.
22       Q.   And does this policy provide any
23  coverage for any company that -- any
24  non-Anadarko company?
25       MS. WILMS:
```

22 (Pages 85 to 88)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 89

```
 1          Object as to form.
 2     EXAMINATION BY MR. FINEMAN:
 3          Q.   In other words, can BP or MOEX
 4     Offshore make a claim against this policy?
 5          MS. WILMS:
 6          Object as to form.
 7          THE WITNESS:
 8          Is your question in context of
 9     the BP oil spill?
10          MR. FINEMAN:
11          Yes.  Thank you.
12          THE WITNESS:
13          The answer is no.
14     EXAMINATION BY MR. FINEMAN:
15          Q.   And has BP E&P, or any BP
16     entity, or MOEX Offshore sent a notice to
17     the carrier under this policy?
18          MS. WILMS:
19          Object as to form.
20     EXAMINATION BY MR. FINEMAN:
21          Q.   That you know of.
22          A.   No.
23          Q.   If you look at item 3 on this
24     page, at the bottom?
25          A.   Okay.
```

Page 90

```
 1          Q.   It identifies, and going on the
 2     next page, I guess it's five sections of
 3     coverage; is that correct?
 4          A.   Correct.
 5          Q.   And my understanding is that the
 6     only two parts of this policy that might
 7     apply to the BP oil spill are Sections II
 8     and III; is that correct?
 9          A.   Correct.
10          Q.   Okay.  If you turn the page to
11     30772, section -- this is where Section II
12     provides $250 million for a hundred percent
13     coverage.  Is that correct?
14          MS. WILMS:
15          Object as to form.
16          THE WITNESS:
17          For Section II; correct.
18     EXAMINATION BY MR. FINEMAN:
19          Q.   For Section II.
20          And Section III provides $150
21     million of coverage; correct?
22          A.   Correct.
23          Q.   Okay.  If you look at 30774, it
24     says Item 6, it says notice of loss to.  -- this
25     this, is the way it worked that you -- this
```

Page 91

```
 1     is the reason that you contact Alliant
 2     Insurance and Alliant then informs the
 3     underwriters?
 4          MS. WILMS:
 5          Object as to form.
 6          THE WITNESS:
 7          Yes.
 8     EXAMINATION BY MR. FINEMAN:
 9          Q.   If you look at 30776.  This is a
10     part of the policy describing general terms
11     and conditions; correct?
12          A.   Correct.
13          Q.   Can you -- I don't like usually
14     to do this, to ask you to read it,
15     paragraphs, but can you just read or skim
16     paragraph Section III, co-venturers,
17     sufficient and you can explain it to me,
18     what it means?
19          MS. WILMS:
20          You're not asking him to read it
21     out loud?
22          MR. FINEMAN:
23          No.
24          MS. WILMS:
25          Okay.
```

Page 92

```
 1          THE WITNESS:
 2          Okay.
 3     EXAMINATION BY MR. FINEMAN:
 4          Q.   Paragraph 3 is called
 5     co-venturers; correct?
 6          A.   Correct.
 7          Q.   Can you explain to me what this
 8     provision means?
 9          A.   Okay.  Let's take it in three
10     different sections, each by paragraph.
11          Q.   Fair enough.
12          A.   The first one is referencing
13     that if we agree to name somebody under our
14     policy, a co-venturer, then this insurance
15     would apply.
16          Q.   Okay.  Let's just stop there.
17     This has to do with my question earlier
18     about whether or not this coverage could be
19     applied to BP or MOEX.  And my
20     understanding is that this provision does
21     not apply, you've chosen for it not to
22     apply to them; is that correct?
23          A.   Correct.
24          Q.   Please go on.
25          A.   Okay.  The second paragraph at
```

23  (Pages 89 to 92)

Exhibit L
Page 23

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                Reported by:
STEVEN J. FOSTER                    April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 93

1  the top of page 0777, that this policy is
2  extended to cover the assured's interest of
3  the co-venturers if the operating agreement
4  requires us to do so.  For example, if we
5  agree to provide insurance.
6       Q.  And to your knowledge, did you
7  do that?
8       A.  No.
9       Q.  Okay.  And the next paragraph?
10      A.  The next one is a take-off on
11  the second paragraph because it says if we
12  wanted to extend coverage for the operator
13  when we are the non-operator, underwriters
14  must approve it.  And there is one
15  exception here.
16          When the named assured, that's
17  us, is required to extend insurance to any
18  operator for the risk of costs assumed by
19  the named assured under any earn-in,
20  farm-in, carried interest.
21      Q.  And does this apply in the
22  context of the BP oil spill?
23      A.  No.
24      Q.  I'd like you to do the same
25  thing for me on paragraph 4, section 4, if

Page 94

1  you could read it or skim it sufficiently,
2  if you can explain to me what it is.  You
3  don't have to read it out loud.
4       A.  Okay.
5       Q.  Can you explain paragraph 4,
6  contingent joint venture liability, to me?
7       A.  This says that if one of our
8  co-venturers becomes unable to meet their
9  bills, pay their share of any claims and
10  we -- our exposure increases as a result of
11  that, then this insurance would pick up
12  that portion.
13      Q.  So if MOEX Offshore couldn't
14  meet its 10 percent share, does that mean
15  that Anadarko would have to pick up,
16  proportionally pick up its share?
17      MS. WILMS:
18          Object as to form.
19      THE WITNESS:
20          Well, this says that if Anadarko
21  is liable for that.
22  EXAMINATION BY MR. FINEMAN:
23      Q.  Okay.
24      A.  And if we make a payment for
25  that we would be able to claim that against

Page 95

1  this insurance.
2       Q.  I see.  Okay.  I understand.
3  Thanks.
4          If you go to the next page,
5  30778.  Paragraph 7, payment of loss.  All
6  claims hereunder shall be due and payable
7  no later than 30 days after presentation
8  and acceptance of proof of loss by the
9  underwriters or their appointed
10  representatives.
11          Did I read that correctly?
12      A.  Yes.
13      Q.  Can you explain that provision
14  to me?
15      A.  This deals with, in essence, a
16  final proof of loss.  When you have
17  finished the claim, you have, you have
18  filed a claim, all the adjusting process is
19  done and the underwriters agree and you
20  agree the amount they're going to pay you,
21  they do a final proof of loss.
22          We sign that, we turn it in and
23  they make the payment within 30 days.
24      Q.  And as we discussed earlier,
25  this, that process hasn't commenced yet;

Page 96

1  correct?
2       A.  Correct.
3       Q.  That process would start with --
4  well, it's going on now, though, with the
5  adjusting.  But the payment process
6  wouldn't start until you make a claim;
7  correct?
8       A.  Correct.
9       Q.  Then after you make the claim,
10  what happens then?  What's the next step
11  after you make the claim?
12      MS. WILMS:
13          Object as to form.
14      THE WITNESS:
15          When we make the claim, the
16  underwriters will have a right to either
17  accept it, reject it or somewhere in the
18  middle.  We would talk about it, we would
19  meet and if we did not agree with their
20  answer, we have steps in the policy to take
21  action.  If we agree, then they would go
22  ahead and give us payment.
23  EXAMINATION BY MR. FINEMAN:
24      Q.  If you turn to 30808, which is
25  quite a ways through?

24  (Pages 93 to 96)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 24

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 97

```
1        THE WITNESS:
2        That's 30808?
3    EXAMINATION BY MR. FINEMAN:
4        Q.   Yes, sir.  So this is the
5    section of the policy that's dealing with
6    Section II, control of well and extra
7    expense insurance that we discussed
8    earlier; correct?
9        A.   Correct.
10       Q.   Okay.  And under item 4, under
11   coverage, it identifies three different
12   categories of coverage, correct?
13       A.   Correct.
14       Q.   And that's control of well
15   insurance, re-drilling, extra expense
16   insurance and seepage and pollution,
17   cleanup and contamination insurance;
18   correct?
19       A.   Correct.
20       Q.   And as I understand your earlier
21   testimony, each of those would apply, or
22   could apply to the BP oil spill situation;
23   correct?
24   MS. WILMS:
25       Object as to form.
```

Page 98

```
1        THE WITNESS:
2        Correct.
3    EXAMINATION BY MR. FINEMAN:
4        Q.   And the $250 million that's
5    available for these items, is it the, in
6    the adjusting process that one determines
7    which, where the money goes to A, B or C?
8    In other words, how does the $250 million
9    get allocated among these different
10   insurance coverages?
11   MS. WILMS:
12       Object as to form.
13   THE WITNESS:
14       The adjuster would look at the
15   cost that in this case BP incurred, and to
16   the extent that Anadarko would pay for
17   those costs, those costs would be put into
18   those buckets that I mentioned before.
19   These are three of the buckets.
20   EXAMINATION BY MR. FINEMAN:
21       Q.   Okay.  I understand.  Thank you.
22       If you turn to the next page,
23   30809?  Can you read to yourself
24   paragraph 2, the due diligence clause, or
25   scan it just enough so you can answer,
```

Page 99

```
1    explain to me what it means?
2        A.   Okay.
3        Q.   Can you explain to me what the
4    due diligence clause means?
5        A.   It's pretty much what it says,
6    is that the assured, that's us, shall
7    exercise due care and diligence in the
8    conduct of all operations, their reference
9    to safety practices and equipment.  This is
10   typical wording you'll see in a policy.
11       Q.   And the next paragraph there?
12       A.   The next one says in the case
13   where we are non-op, then the actions of
14   the operator shall not prejudice this
15   insurance.
16       Q.   So in the case of the BP oil
17   spill situation, if BP or one of the BP
18   companies is found to have acted
19   negligently, or grossly negligently, that
20   won't have any impact on Anadarko's
21   insurance?  Is that what that means?
22   MS. WILMS:
23       Object as to form.
24   THE WITNESS:
25       Correct.
```

Page 100

```
1    EXAMINATION BY MR. FINEMAN:
2        Q.   Okay.  All right.  If you look
3    at the next paragraph, that's the partial
4    interest clause.  But before you read that,
5    can you look at 30826, because I think that
6    replaces this language and I just want
7    to -- actually, I got the wrong -- no.
8    Sorry.  That's not right.
9        Let's just start with this,
10   let's just focus on 30809 for the moment
11   while we're in Section II.
12       A.   Okay.
13       Q.   During the course of the
14   deposition we've talked a little bit about
15   this partial interest clause that reduces
16   or scales, I think is your word, scales
17   Anadarko's insurance down to 25 percent
18   because of its 25 percent interest in the
19   Macondo well lease.
20       Is that what this provision is
21   addressing?
22   MS. WILMS:
23       Object as to form.
24   THE WITNESS:
25       Can you say that again, please?
```

25 (Pages 97 to 100)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                          Reported by:
STEVEN J. FOSTER              April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 101

1    EXAMINATION BY MR. FINEMAN:
2        Q.   Yes.  Earlier in the deposition
3    we have talked about the notion that
4    Anadarko's insurance may be scaled down, or
5    reduced to 25 percent, which would be equal
6    to its 25 percent nonoperating interest in
7    the Macondo lease.  Remember that
8    testimony?
9        A.   Yes.
10       Q.   And my question for you, is that
11   what this provision is addressing, at least
12   as to Section II of the energy policy?
13       MS. WILMS:
14           Object as to form.
15       THE WITNESS:
16           Yes.
17   EXAMINATION BY MR. FINEMAN:
18       Q.   Okay.  Is there -- do you have
19   an argument to make, Anadarko, does
20   Anadarko have an argument to make that the
21   partial interest clause does not apply to
22   the policy?
23       MS. WILMS:
24           Object as to form.
25       THE WITNESS:

Page 102

1            Yes.
2    EXAMINATION BY MR. FINEMAN:
3        Q.   And what is that argument?
4        MS. WILMS:
5            Object as to form.
6        THE WITNESS:
7            There are provisions that talk
8    about if we become liable, number one, the
9    one we just read about, if the co-owner
10   becomes bankrupt or unable to pay their
11   bills and our interest increases, then our
12   interest would increase, number one.
13           Two, there's another provision
14   that I'd have to look it up that talks
15   about if we are liable under the operating
16   agreement for more than our interest, then
17   they'll pick up that increased interest.
18           So those are our arguments that
19   we would use.  Could use, put it that way.
20   EXAMINATION BY MR. FINEMAN:
21       Q.   Is it your understanding that if
22   Anadarko makes a claim against its policy
23   that defense costs, the cost of litigation
24   defense would be covered by the policy?
25       A.   Yes.

Page 103

1        Q.   And is it the case that the
2    amount of available insurance is reduced by
3    the amount of defense costs?
4        A.   The defense costs are included
5    in the limits.
6        Q.   But as you said, as of now,
7    defense costs, this policy does not contain
8    defense costs; correct?
9        MS. WILMS:
10           Object as to form.
11       THE WITNESS:
12           Correct.
13   EXAMINATION BY MR. FINEMAN:
14       Q.   Okay.  This is a lot of pages in
15   this document.  I don't want to miss
16   anything good.
17           Okay.  If you go to 30826, this
18   is the section of the policy, of the energy
19   package policy that applies to excess
20   liability insurance; correct?
21       A.   Correct.
22       Q.   If you turn to the next page,
23   30827?
24       A.   Okay.
25       Q.   There is a provision that says

Page 104

1    joint ventures.  Do you see that?
2        A.   Yes.
3        Q.   Now, I believe, this is the one
4    I believe has been replaced by an
5    endorsement policy; right?  So if you go to
6    30844, can you just confirm for me that
7    section 4 on 30827 is replaced by the
8    endorsement at 30844?
9        A.   Yes.
10       Q.   And is this -- again, this is
11   the partial interest provision that we've
12   been talking about; correct?
13       MS. WILMS:
14           Object to form.
15       THE WITNESS:
16           It's called the joint venture
17   provision, but it deals with potential
18   scaling.
19   EXAMINATION BY MR. FINEMAN:
20       Q.   And is it essentially the
21   same -- strike that.  Is it the same, does
22   it have the same potential impact on
23   coverage as the partial interest provision
24   that applies to Section II?
25       MS. WILMS:

26 (Pages 101 to 104)

Exhibit L
Page 26

Page 105

```
 1          Object as to form.
 2      THE WITNESS:
 3          Yes.  But with two exceptions
 4  that are listed.
 5      EXAMINATION BY MR. FINEMAN:
 6      Q.   And can you summarize those for
 7  me?
 8      A.   Sure.  The first one says the
 9  joint venture clause shall not apply to any
10  liability of the assured when as a result
11  of the circumstances of the occurrence the
12  terms of the joint venture agreement placed
13  ahold of the exposure of the joint venture
14  of the assured, or on the assured.
15          So if in this case, if the
16  operating agreement makes us liable for an
17  increased percentage, then this would
18  ratchet up.
19      Q.   Just so I'm clear, this
20  endorsement applies only to the joint
21  venture provision in Section III.  Is that
22  correct?
23      MS. WILMS:
24          Object as to form.
25      THE WITNESS:
```

Page 106

```
 1          Yes.
 2      EXAMINATION BY MR. FINEMAN:
 3      Q.   Okay.  Now, if you look at page
 4  30850, this is amending the definition of
 5  the word property damage.  Is that correct?
 6      MS. WILMS:
 7          Object as to form.
 8      THE WITNESS:
 9          Yes.
10      EXAMINATION BY MR. FINEMAN:
11      Q.   It says the words property
12  damage, wherever used in this policy, shall
13  mean physical damage to or destruction of
14  tangible property which is caused by an
15  occurrence, including the loss of use
16  thereof at any time resulting therefrom.
17          Did I read that correctly?
18      A.   Yes.
19      Q.   Or loss of use at any time of
20  tangible property which has not been
21  physically damaged or destroyed provided
22  such loss of use is caused by an
23  occurrence.  Did I read that correctly?
24      A.   Yes.
25      Q.   My question to you is whether
```

Page 107

```
 1  the definition of -- whether economic loss
 2  without physical property damage, or
 3  without property damage as defined here, is
 4  covered by this policy?
 5      MS. WILMS:
 6          Object as to form.
 7      THE WITNESS:
 8          We believe it is covered.
 9      EXAMINATION BY MR. FINEMAN:
10      Q.   And what's the basis for that?
11      A.   This, as well as if you go to
12  Endorsement 6 --
13      Q.   Can you tell me what page you're
14  looking at?
15      A.   I'm sorry.
16      Q.   I'm sorry.  I can tell you.
17      A.   30853.
18      Q.   Right.  Okay.
19      A.   This endorsement makes it very
20  clear, in our opinion, for all sums caused
21  by or arising from an occurrence which the
22  insured, that's us, shall be liable to pay
23  under any country's statute, regulation or
24  common law, or under the terms of any oil
25  and gas lease or license -- and it goes on
```

Page 108

```
 1  and on for pollution, discharge, et cetera,
 2  et cetera.  Okay.
 3      Q.   Okay.
 4      A.   And in addition, Endorsement 8,
 5  which is Exhibit 30856, called the OPA '90
 6  buyback endorsement, so you add those two
 7  together and we think there is coverage.
 8      Q.   That's great.  You've answered
 9  the next three or four questions on my
10  outline.  But can you look for me 30856 for
11  me, that's the OPA?
12      A.   Okay.
13      MS. WILMS:
14          55, you mean?
15      EXAMINATION BY MR. FINEMAN:
16      Q.   I'm sorry.  30856.
17          What is, what does it mean?  It
18  says Oil Pollution Act of 1990 buyback
19  endorsement.  Can you tell me what that
20  means, buyback endorsement?
21      MS. WILMS:
22          Object as to form.
23      THE WITNESS:
24          I believe there is an exclusion
25  in here that says they will not pay for OPA
```

Exhibit L
Page 27

Page 109

1    '90 exposures or be a guarantor.  And
2    that's very common, so you get this buyback
3    endorsement which gives it back to you.
4    EXAMINATION BY MR. FINEMAN:
5        Q.  I see.  Okay.  And that's
6    something that's just addressed when you
7    apply for the insurance and when they set
8    the premiums?
9        A.  Correct.
10       Q.  That's all I have on this
11   policy.
12       MR. FINEMAN:
13           Why don't we take a break here?
14   We can take our 15-minute break now and
15   then we'll come back and we'll talk about
16   the excess policies.
17       THE VIDEOGRAPHER:
18           This is the end of Tape 2, we're
19   now off the record at 10:28.
20           (Off the record.)
21       THE VIDEOGRAPHER:
22           This is the beginning of Tape 3.
23   We're now back on the record.  The time is
24   10:44.
25   EXAMINATION BY MR. FINEMAN:

Page 110

1        Q.  Mr. Foster, if you could look at
2    Exhibit 1847 again for me, I'm going to
3    correct a mistake that I made earlier.
4            I had suggested that 30743 and
5    30744 were not part of the June 11, 2010
6    letter from the Westmoreland Hall firm
7    because I had misread this date as being
8    September 6, 2010.  It's actually June 9,
9    2010.
10           And it really should be, it is
11   the enclosure to the letter.  Is that your
12   understanding as well?
13       A.  Yes.
14       Q.  Okay.  Thanks.
15           Going back to the energy package
16   policy for just one second.
17           We looked at the Endorsement
18   No. 8 for Section III at 30856 that
19   provides coverage under, for OPA.  Do you
20   remember that testimony?
21       A.  Yes.
22       Q.  The question I have for you is
23   whether claims under the Oil Pollution Act
24   are covered by Section II?
25       MS. WILMS:

Page 111

1            Object as to form.
2        THE WITNESS:
3            Yes.
4    EXAMINATION BY MR. FINEMAN:
5        Q.  Is there a specific Oil
6    Pollution Act buyback endorsement to
7    Section II or is it covered by, just
8    covered by the original text of the policy?
9        A.  It's covered by the original
10   text of the policy.  We believe.
11       Q.  Okay.  Is there, to your
12   knowledge, is there going -- is there now a
13   dispute with the underwriters over whether
14   Section II applies to OPA claims?
15       MS. WILMS:
16           Object as to form.
17       THE WITNESS:
18           I'm not aware of any.
19   EXAMINATION BY MR. FINEMAN:
20       Q.  And can you tell me what
21   provision of Section II you believe covers
22   OPA claims?
23       A.  If you start with
24   Document 30817?
25       Q.  30817, yes.

Page 112

1        A.  That's Section II, Subsection C,
2    seepage and pollution cleanup.  We believe
3    that that first section would give us
4    coverage.
5        Q.  Where it says insuring
6    agreements?
7        A.  Insuring agreements; correct.
8        Q.  That this language here will
9    cover OPA claims?
10       A.  Correct.
11       MS. WILMS:
12           Object to form.
13       THE WITNESS:
14           Sorry.  Correct.
15   EXAMINATION BY MR. FINEMAN:
16       Q.  I'm sorry if I already asked you
17   this.  To your knowledge, is, are
18   underwriters disputing that there's OPA
19   coverage under this provision of Section
20   II?
21       MS. WILMS:
22           Object as to form.
23       THE WITNESS:
24           To my knowledge, no, they are
25   not disputing it.

28  (Pages 109 to 112)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                  Reported by:
STEVEN J. FOSTER              April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 113

```
 1   EXAMINATION BY MR. FINEMAN:
 2      Q.   Okay.  Let me ask you a
 3   question.  Before we move on to talk about
 4   the excess policy -- you can put that down
 5   because I'm done with it.
 6      A.   Okay.
 7      Q.   Has Anadarko sent a notice to
 8   the insurer for any other party in the BP
 9   oil spill litigation?
10      A.   Can you say that again, please?
11      Q.   Sure.  Does Anadarko believe
12   that it is entitled to insurance coverage,
13   that's coverage for a different party in
14   the BP oil spill litigation?
15      MS. WILMS:
16          Object as to form.
17      THE WITNESS:
18          Yes.
19   EXAMINATION BY MR. FINEMAN:
20      Q.   And which companies and which
21   kinds of policies?
22      MS. WILMS:
23          Object as to form.
24      THE WITNESS:
25          We have filed pleadings in the
```

Page 114

```
 1   case between BP and Transocean to assert
 2   our rights in their insurance coverage and
 3   we have not made a decision about the other
 4   parties involved.
 5   EXAMINATION BY MR. FINEMAN:
 6      Q.   Okay.  I presume that
 7   Transocean's lawyers are going to ask you
 8   questions later about that and so I'm going
 9   to -- I'm not going to go there right now.
10          Depending on how that goes, I'll
11   leave myself some time at the end if we
12   need to talk about it.
13      MR. FINEMAN:
14          So let's mark --
15   EXAMINATION BY MR. FINEMAN:
16      Q.   While she's pulling those,
17   Mr. Foster, the $150 million of excess
18   insurance that's included in the energy
19   package policy, as I understand it,
20   underwriters is providing the -- let me
21   start again.
22          As I understand it, under the
23   energy package policy underwriters is
24   providing the 250 million in coverage and
25   $150 million of excess; is that correct?
```

Page 115

```
 1      A.   Yes.
 2      Q.   Okay.  So with that in mind I'm
 3   going to try to understand the rest of your
 4   excess coverage.
 5          I'm going to give you 1849,
 6   which is ANA MDL 000030745 through 30767.
 7   And I'm going to give you 1850, which is
 8   ANA MDL 000030956 through 30958.
 9          (Whereupon, the documents
10   referred to were marked as Exhibit No. 1849
11   and Exhibit No. 1850 for identification.)
12   EXAMINATION BY MR. FINEMAN:
13      Q.   If you take a moment to look at
14   those, skim them just so that we can talk
15   about them generally, and if we get more
16   specific we can zero in.
17      A.   Okay.
18      Q.   Can you first -- do you
19   recognize 1349?  I'm sorry.  1849?
20      A.   Oh, Exhibit --
21      Q.   Yes.  Exhibit --
22      A.   Yes.
23      Q.   And what is this?
24      A.   This is what we called the OCIL
25   excess policy.
```

Page 116

```
 1      Q.   I'm sorry?
 2      A.   OCIL, O-C-I-L.
 3      Q.   OCIL?  That's Oil Casualty
 4   Insurance?
 5      A.   Correct.
 6      Q.   Now, this policy, what is the --
 7   first of all, what is the policy period for
 8   this policy?
 9      A.   June 30, 2009 to June 30, 2010.
10      Q.   Okay.  As far as you can tell,
11   is the policy complete?  In other words, do
12   I have all of the pages, the relevant pages
13   of the policy?
14      A.   I believe so, yes.
15      Q.   Okay.  And what is the, what are
16   the policy limits of this policy?  I don't
17   want to make this a guessing game.
18          Look at 30752.  It's a schedule
19   of primary and underlying excess insurance
20   and self-insured retention under primary
21   insurance; correct?
22      A.   Correct.
23      Q.   Okay.  What I'd like to
24   understand is, where does this policy fit
25   in in the schedule?
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 29

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 117

```
 1       A.   This policy would be on top of
 2  the XL policy.  Where it shows XL, the
 3  limit is 100 million, attachment point 250
 4  million for just the third-party liability.
 5  So you exclude the OEE coverage that we
 6  talked about, that's not included in this
 7  limit.
 8            So the OCIL policy would be 50
 9  excess of that.  Of 350.
10       Q.   So excess is 350.  I'm not
11  understanding.
12       A.   Okay.
13       Q.   Maybe I can ask this way.
14            This excess policy, is this in
15  addition to the $150,000 -- $150 million,
16  that Section III of the energy package?
17       A.   Yes.
18       Q.   Okay.  So that this, this is a
19  $50 million policy; correct?
20       A.   Correct.
21       Q.   So does this then give you a
22  total of $200 million of excess coverage?
23       A.   No.
24       Q.   This is what I'm not
25  understanding, then.
```

Page 118

```
 1       A.   Okay.  Because if you take the
 2  150 million that's on the document that you
 3  referenced, that 150 million, that is the
 4  third-party liability section in the
 5  package.  And then you stack on top of that
 6  Argo policy for 50 million to get you up to
 7  200.  Torus, 50 million to 250, XL gives
 8  you a hundred up to 350 and OCIL policy is
 9  50 excess of 350 to get you up to the 400
10  million.
11       Q.   I understand.  So this actually,
12  this policy then actually comes after Argo,
13  Torus and XL?
14       A.   Yes.
15       Q.   That's what I wasn't
16  understanding.
17       A.   (Witness nods head).
18       Q.   Okay.  I should have done it
19  later.  All right.  I understand now.
20            Okay.  In any event, this is a
21  $50 million, excess policy; correct?
22       A.   Correct.
23       Q.   And have you -- has Anadarko
24  submitted a notice to Oil Casualty
25  Insurance?
```

Page 119

```
 1       A.   Yes.
 2       Q.   Has Anadarko made a claim under
 3  this policy to Oil Casualty Insurance?
 4       A.   No.
 5       Q.   And earlier we talked about the
 6  adjusting process that is underway right
 7  now between Anadarko and its insurers over
 8  the BP oil spill issue.
 9            Do you recall that testimony?
10       A.   Yes.
11       Q.   Okay.  Is the adjusting process,
12  is that adjusting process that you
13  described earlier include the Oil Casualty
14  Insurance excess policies and carriers and
15  the Argo, Torus and XL policies?
16       A.   We will use those adjustments or
17  those adjusting schedules prepared by BC
18  Johnson to help us submit a claim against
19  these policies.
20       Q.   Okay.  But as of now, you have
21  not made such a claim?
22       A.   Exactly.  Correct.
23       Q.   And, again, the timing of when
24  the excess claim will be made is dictated
25  by when you conclude the adjusting process,
```

Page 120

```
 1  among other things, I suppose; is that
 2  correct?
 3       MS. WILMS:
 4            Object as to form.
 5       THE WITNESS:
 6            Once the adjusting process is
 7  finished and Anadarko pays for costs that
 8  we would claim under the policy.
 9  EXAMINATION BY MR. FINEMAN:
10       Q.   All right.  So if Anadarko never
11  has to pay anything, there would be no
12  reason to make a claim; correct?
13       MS. WILMS:
14            Object as to form.
15       THE WITNESS:
16            Well, with the exception of
17  legal fees.
18  EXAMINATION BY MR. FINEMAN:
19       Q.   Okay.  Fair enough.  Always got
20  to pay the legal fees.
21            Is this Oil Casualty Insurance
22  excess policy subject to the partial
23  interest provision of Section III, or what
24  you call the joint venture provision of
25  Section III?
```

30  (Pages 117 to 120)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 30

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER            April 27, 2011      JOSEPH R. KAISER, JR., CCR, RPR

Page 121

```
 1        MS. WILMS:
 2           Object as to form.
 3        THE WITNESS:
 4           Yes.  I believe so.  Because
 5   it's following form.
 6   EXAMINATION BY MR. FINEMAN:
 7        Q.   Is it normally the case that
 8   excess policies follow the form of the
 9   primary, or the main policy?
10        MS. WILMS:
11           Object as to form.
12        THE WITNESS:
13           It varies.
14   EXAMINATION BY MR. FINEMAN:
15        Q.   In this instance that's what
16   happened; right, with these excess
17   policies?
18        A.   Correct.
19        Q.   Okay.  With a couple of
20   exceptions, probably, that we can talk
21   about.
22           That's not a question.
23        A.   Okay.
24        Q.   If you'll look at -- I'll have
25   you look at the next exhibit, the letter,
```

Page 122

```
 1   May 26, 2010 letter.
 2           From Jill Burns-Leman, claims
 3   analyst at Oil Casualty to you; correct?
 4        A.   Yes.
 5        Q.   Then can you tell me what -- do
 6   you recognize this letter?
 7        A.   Yes, I do.
 8        Q.   And what is this letter?
 9        A.   It's an acknowledgment that they
10   have, number one, received our notice and
11   two, they are drawing our attention to a
12   possible reservation of rights.
13        Q.   Okay.  So, again, if you'll look
14   in the, under the re line on this letter
15   it's referencing the coverage layer; right?
16   And that's the 50 million in excess of the
17   350 million you just described?
18        A.   Yes.
19        Q.   And, again, it appears here that
20   it was your -- strike that.
21           What's JLT Park?
22        A.   They are the Bermuda broker.
23        Q.   And it was, it's the case here
24   that, is that broker sent the notice to Oil
25   Casualty Insurance with respect to your BP
```

Page 123

```
 1   oil -- Anadarko's BP oil spill claim?
 2        A.   We sent the notice to them, I
 3   believe, and then they went ahead, I
 4   believe, and forwarded that notice.
 5        Q.   You sent the notice to JLT Park
 6   and JLT Park forwards the notice to the
 7   insurer?
 8        A.   Yes.
 9        MR. FINEMAN:
10           I don't know if it matters at
11   all, but we did not find any of the
12   notices, original notices in the file.
13   Just for completeness' sake we should
14   probably try to find them.
15        MS. WILMS:
16           I'll be happy to look into it,
17   it's under consideration.
18        MR. FINEMAN:
19           It probably doesn't matter.
20   EXAMINATION BY MR. MR. FINEMAN:
21        Q.   If you go down to the paragraph
22   starting due to the summary nature.
23        A.   Okay.
24        Q.   It says due to the summary
25   nature of the information provided, we are
```

Page 124

```
 1   unable to conduct a full coverage analysis
 2   at this time.  Therefore, we must generally
 3   reserve our rights for this claim under the
 4   terms and conditions of the policy.
 5           Did I read that correctly?
 6        A.   Yes.
 7        Q.   And that's a general reservation
 8   of rights statement; correct?
 9        A.   Yes.
10        MS. WILMS:
11           Object to the form.
12   EXAMINATION BY MR. FINEMAN:
13        Q.   In the next section they are,
14   and they're in the words of
15   Ms. Burns-Leman, drawing your attention to
16   the joint venture provision of Section III
17   of the energy package policy.
18           You see that?
19        A.   Yes.
20        Q.   Okay.  And that, that's their
21   way of putting Anadarko on notice that they
22   may invoke the 25 percent partial interest
23   claim; is that correct?
24        MS. WILMS:
25           Object as to form.
```

31 (Pages 121 to 124)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit L
Page 31

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER          April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 125

1          THE WITNESS:
2          Yes.
3     EXAMINATION BY MR. FINEMAN:
4          Q.   If you go to the next page, so
5     the page we were just reading from was
6     30956. If you go to 30957 it says in the
7     third to last paragraph, it says
8     furthermore, we request immediate
9     notification in the event you believe costs
10    for this incident have reached or will
11    exceed 25 percent of the 350 million
12    attachment point to ensure appropriate
13    reserving action is taken.
14         Did I read that correctly?
15         A.   Yes.
16         Q.   Do you know whether or not you
17    provided them with such notification?
18         A.   We have not.
19         Q.   Okay. Have you participated in
20    any meetings with any representatives of
21    Oil Casualty Insurance with respect to the
22    coverage addressed by the policy?
23         A.   No.
24         Q.   How would you characterize the
25    status of this insurance, of your -- strike

Page 126

1     that. Has anything been done with respect
2     to this policy, other than provide notice
3     to Oil Casualty Insurance?
4          MS. WILMS:
5          Object as to form.
6          THE WITNESS:
7          Besides the notice, we have
8     given them an update about the status and
9     our strategy of the claim that potentially
10    could come.
11    EXAMINATION BY MR. FINEMAN:
12         Q.   Is that something that you sent
13    them or was that something that was sent by
14    somebody else at Anadarko?
15         A.   Our counsel would have sent
16    that.
17         Q.   Do you know whether or not this
18    policy, the Oil Casualty Insurance policy
19    covers OPA claims?
20         MS. WILMS:
21         Object as to form.
22         THE WITNESS:
23         I believe it does.
24    EXAMINATION BY MR. FINEMAN:
25         Q.   Okay. And what's the basis for

Page 127

1     your belief?
2          A.   Because this is a following form
3     policy and since we've already, you know,
4     established before that we think the third
5     party, or Section III of the package would
6     cover OPA claims, this is a following form.
7          We do not believe that any of
8     the exclusions contained in or the
9     exceptions to that following form apply.
10    EXAMINATION BY MR. FINEMAN:
11         Q.   I'm going to give you what we're
12    marking as Exhibit 1851 which is ANA MDL
13    000030896 through 30913.
14         (Whereupon, the document
15    referred to was marked as Exhibit No. 1851
16    for identification.)
17    EXAMINATION BY MR. FINEMAN:
18         Q.   And Exhibit 1852, ANA MDL
19    000262859 through 262861.
20         (Whereupon, the document
21    referred to was marked as Exhibit No. 1852
22    for identification.)
23         THE WITNESS:
24         Okay.
25    EXAMINATION BY MR. FINEMAN:

Page 128

1          Q.   If you need to look back at
2     another exhibit, that's fine with me.
3          Can you, had you recognized
4     Exhibit 1851?
5          A.   Yes.
6          Q.   What is that?
7          A.   That's the Argo Re policy.
8          Q.   And that is another excess
9     insurance policy that may provide coverage
10    concerning the BP oil spill; correct?
11         A.   Yes.
12         Q.   And where does this policy fit
13    in the stacking of the excess policies?
14         A.   I believe it's the first excess
15    above Section III of the package. So I
16    believe it's 50 million of limit, excess of
17    150 million.
18         Q.   And that's what's reflected in
19    Items 4 and 5 on the front page of the
20    declarations; is that correct?
21         A.   Correct.
22         Q.   Okay. Under Item 4, the phrase
23    followed policy, used it a moment ago, that
24    just means, as I understand it, that it's
25    following, or using the language of the

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit L
Page 32

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                 Reported by:
STEVEN J. FOSTER            April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 129

```
 1   policy, of the energy package policy; is
 2   that correct?
 3        A.   In this case, correct.
 4        Q.   Okay.  Okay.  And it adopts,
 5   this policy, then, adopts the Section III
 6   of the energy package policy unless it says
 7   otherwise in this policy; is that correct?
 8        A.   Yes.
 9        MS. WILMS:
10        Can we come to a good place to
11   take a break, please, real quick?
12        MR. FINEMAN:
13        Sure.
14        MS. WILMS:
15        Is this okay now?
16        MR. FINEMAN:
17        Yes.
18        THE VIDEOGRAPHER:
19        We're now off the record at
20   11:07.
21        (Off the record.)
22        THE VIDEOGRAPHER:
23        We're now back on the record.
24   The time is 11:14.
25        MS. WILMS:
```

Page 130

```
 1        Counsel, Mr. Foster would
 2   appreciate the opportunity to clarify some
 3   of his prior testimony.
 4   EXAMINATION BY MR. FINEMAN:
 5        Q.   Let's do so.
 6        A.   When you asked the question does
 7   the OCIL policy follow form for the joint
 8   venture provision and you referenced this
 9   letter, Exhibit 1850, my answer, what I
10   meant to say was that that is the insurer's
11   position is that it does.  We have not yet
12   agreed with that.
13        Q.   I'm sorry.  It's the insurer's
14   position --
15        A.   That it does follow form for the
16   joint venture provision.
17        Q.   Okay.  And why would you not
18   want it to follow?
19        MS. WILMS:
20        Objection as to form.  And don't
21   reveal anything that you've learned through
22   counsel.
23        THE WITNESS:
24        Everything I've learned has been
25   through counsel.
```

Page 131

```
 1   EXAMINATION BY MR. FINEMAN:
 2        Q.   Okay.
 3        MS. WILMS:
 4        He was evaluated by counsel.
 5   EXAMINATION BY MR. FINEMAN:
 6        Q.   Okay.  Let's go back where we
 7   were.  We were looking at the Argo policy,
 8   which is 1851, and we were looking at
 9   Item 4.
10        Subpart C of that says
11   Quota-Share policy.  You see that language?
12        A.   Item 4?
13        Q.   Item 4C.
14        A.   Yes.
15        Q.   Do you know what that refers to?
16        Is that -- I'm sorry to answer
17   for you but is that, again, a reference to
18   the 25 percent share that either the joint
19   venture provision or what I've also been
20   referring to as the partial interest
21   provision?
22        A.   It's referenced in Endorsement 1
23   in Section II.
24        Q.   What number are you looking at,
25   sir?
```

Page 132

```
 1        A.   I'm just saying for Exhibit 1851
 2   it says, it's referenced in Endorsement 1,
 3   Section II.
 4        Q.   Okay.
 5        A.   So I need to go to that and see.
 6        Q.   I think Endorsement 1 is on page
 7   30903.  It appears that this page has been
 8   redacted.  Information has been redacted
 9   from the page.  You may not get an answer.
10   That's the reason I asked the question is
11   because I couldn't -- I followed the same
12   track you did, but couldn't get there.
13        A.   I'm not sure what they meant by
14   that.
15        Q.   Okay.  That happens sometimes
16   when we take text out of a document.
17        Can you go to 3091?  I'm sorry.
18   30910.  This is Endorsement 7 to the Argo
19   policy; correct?
20        A.   Yes.
21        Q.   And it's a non-followed
22   endorsement.  That's what it says; correct?
23        A.   Yes.
24        Q.   And it looks like, if I
25   understand this, it says Endorsement 8 to
```

33 (Pages 129 to 132)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 33

Page 133

```
 1   the followed policy, which is Endorsement 8
 2   to the energy package policy concerning the
 3   Oil Pollution Act and 1990 buyback
 4   endorsement we looked at earlier.
 5          That's what it's referring to;
 6   correct?
 7       A.  Yes.
 8       Q.  That -- this says that that
 9   buyback endorsement is not part of this
10   policy?
11       A.  Correct.
12       Q.  Okay.  So does that mean that
13   this Argo excess policy does not include
14   coverage for Oil Pollution Act claims?  Is
15   that what that means?
16       MS. WILMS:
17          Object as to form.
18       THE WITNESS:
19          No.
20   EXAMINATION BY MR. FINEMAN:
21       Q.  Okay.  It just means that that
22   particular endorsement isn't applied here?
23       A.  Correct.
24       MS. WILMS:
25          Object as to form.
```

Page 134

```
 1       THE WITNESS:
 2          Correct.
 3   EXAMINATION BY MR. FINEMAN:
 4       Q.  Does this policy cover OPA
 5   claims?
 6       A.  We believe so, yes.
 7       Q.  Under what provision?
 8       A.  Under Endorsement 6 that we
 9   referenced earlier in the underline in
10   Section III.  The one I read to you.
11       Q.  All right.  If you look at the
12   next exhibit, 1852.  A December 14, 2010
13   letter to Bettina Truran, that's
14   T-R-U-R-A-N, at JLT Park.  From the law
15   firm Hanson -- yes.  The law firm of Hanson
16   Peters Nye.  Correct?
17       A.  Yes.
18       Q.  Do you recognize this letter?
19       A.  Yes.
20       Q.  And what is this letter?
21       A.  This is an acknowledgment that
22   they got, or -- well, can I read it first?
23   Let me make sure.
24       Q.  Sure.  Absolutely.
25       A.  Okay.
```

Page 135

```
 1       Q.  The question is:  What is this
 2   letter?
 3       A.  This letter is, I believe, is
 4   when Argo reappointed outside counsel to
 5   represent them so this is the letter, you
 6   know, acknowledging that and picking up on
 7   the status of the incident.  As well as a
 8   reservation of rights letter and the status
 9   about the info provided to them.
10       Q.  Okay.  Have you personally ever
11   participated in any conversations with
12   anybody at Hanson Peters & Nye about this
13   policy?
14       A.  I believe so, yes.
15       Q.  Do you recall who you spoke
16   with?
17       A.  I'm sorry.  Did you mean about
18   this policy or about the incident?
19       Q.  Well, my question was actually
20   about the policy.
21       A.  Okay.  Then no.
22       Q.  You've spoken to somebody at the
23   law firm about the incident, the DEEPWATER
24   HORIZON incident?
25       A.  Yes.
```

Page 136

```
 1       Q.  And what was the context of that
 2   meeting?
 3       MS. WILMS:
 4          Don't describe any of the
 5   contents.  Like who was, who did you speak
 6   to, when did the meeting take place, if you
 7   recall.
 8       THE WITNESS:
 9          Counsel and I made a
10   presentation to these, to the Bermuda
11   carriers, of which somebody from this firm
12   was in attendance, I do not recall the
13   name, where we provided them a status and
14   our strategy.
15   EXAMINATION BY MR. FINEMAN:
16       Q.  Okay.  And were representatives
17   of the other excess carriers present at
18   that meeting?
19       A.  Yes.
20       Q.  So somebody representing Oil
21   Casualty Insurance was present?
22       A.  I believe so, yes.
23       Q.  And somebody from Argo was
24   present?
25       A.  Yes.
```

34 (Pages 133 to 136)

Exhibit L
Page 34

Page 137

```
 1      Q.   And somebody from XL was
 2  present?
 3      A.   I believe so.
 4      Q.   And was there anybody present
 5  from Torus?
 6      A.   I believe so.
 7      Q.   Was there anybody present from
 8  the underwriters?
 9      A.   I believe it included mostly the
10  claims people.  And their outside counsel,
11  if applicable.
12      Q.   When did that meeting take
13  place?
14      A.   I believe February 2011.
15      Q.   Where did that meeting take
16  place?
17      A.   In Bermuda.
18      Q.   Who from Anadarko was present,
19  in addition to you?
20      A.   Inside counsel, Ingram Lee.
21      Q.   Okay.
22      MR. FINEMAN:
23          And, Nancy, is it your position
24  that the content of that meeting is
25  privileged?
```

Page 138

```
 1      MS. WILMS:
 2          Yes, it is.  Thank you.
 3      MR. FINEMAN:
 4          And the privilege is work
 5  product?
 6      MS. WILMS:
 7          It is work product and common
 8  interest.
 9      MR. FINEMAN:
10          Okay.
11  EXAMINATION BY MR. FINEMAN:
12      Q.   Were minutes taken of that
13  meeting?
14      A.   No.  Not to my knowledge.
15      Q.   Okay.  Did you take notes at
16  that meeting?
17      A.   Did I take notes?  No.
18      Q.   Did you prepare written
19  materials for that meeting?
20      A.   I don't remember if we gave them
21  a presentation, or it was simply verbal.  I
22  don't recall.
23      Q.   Do you remember whether or not
24  you, your presentation included a
25  PowerPoint?
```

Page 139

```
 1      A.   I don't, I don't remember.  But
 2  I believe we did not present that.  I
 3  believe it was simply verbal.  Questions
 4  and answers.
 5      Q.   Is that the only meeting of that
 6  kind that you participated in?
 7      MS. WILMS:
 8          Object as to form.
 9  THE WITNESS:
10          Oh, sorry.  No.
11  EXAMINATION BY MR. FINEMAN:
12      Q.   What other meetings of that type
13  have you participated in?
14      A.   We had --
15      Q.   Go ahead.
16      A.   We had a similar meeting with
17  Cliff Hall.
18      Q.   Just with Cliff Hall?
19      A.   And his associates.
20      Q.   And Cliff Hall, for the record,
21  Cliff Hall is the lawyer representing the
22  underwriters with respect to the energy
23  package policy; correct?
24      A.   Correct.
25      Q.   And when did that meeting take
```

Page 140

```
 1  place?
 2      A.   The fall of 2010.
 3      Q.   And where did that meeting take
 4  place?
 5      A.   In Houston.
 6      Q.   At Anadarko's offices?
 7      A.   Yes.
 8      Q.   Who was present from Anadarko at
 9  that meeting?
10      A.   Besides me, it was counsel
11  Ingram Lee.
12      Q.   And were written materials
13  prepared for that meeting?
14      A.   No.
15      Q.   Okay.  Without telling me the
16  substance of what was discussed at the
17  February 2011 meeting with the excess
18  carriers, what were the general subjects
19  that were covered?
20      MS. WILMS:
21          Don't go into any details, just
22  kind of -- I think that's asked and
23  answered; isn't it?
24      MR. FINEMAN:
25          I'm sorry.
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile: (504) 525-9109

Exhibit L
Page 35

Page 141

EXAMINATION BY MR. FINEMAN:
1
2     Q.   If you can do it again for me?
3  Just the general subject matter of the
4  meeting.
5     A.   Our strategy regarding the
6  litigation involved, status of the MDL
7  claims.
8     Q.   Was the -- but were coverages,
9  the coverages themselves discussed?
10    A.   No.
11    Q.   Were there any discussions about
12 any of the reservations of rights letters?
13    A.   No.
14    Q.   I'm sorry.  Or any of the
15 contents of those letters?
16    A.   No.
17    Q.   It was informational, from your
18 point of view?
19    MS. WILMS:
20       Object as to form.
21    THE WITNESS:
22       Informational?
23 EXAMINATION BY MR. FINEMAN:
24    Q.   Did you make a presentation and
25 then did they ask questions, or did you

Page 142

1  just, or was it just a presentation?
2     A.   No.  It was questions included.
3  Right.
4     Q.   All right.  Going back to
5  Exhibit 1852, if you look at the second
6  page of the, the second page of the letter,
7  first full paragraph, about halfway through
8  it says in view of Anadarko's $25 percent
9  ownership interest, the $150 million limit
10 under Section III of underwriters' policy
11 is reduced to $37.5 million.  The limit of
12 liability under Argo's policy is likewise
13 reduced from $50 million to $12.5 million.
14       Do you see that?
15    A.   Yes, I do.
16    Q.   So is it your understanding that
17 Argo's position is that they are only
18 responsible for 12.5 million for Anadarko's
19 coverage for the BP oil spill?
20    MS. WILMS:
21       Object as to form.
22    THE WITNESS:
23       That's, that's what they're
24 saying in that sentence; correct.
25 EXAMINATION BY MR. FINEMAN:

Page 143

1     Q.   All right.  Is that a matter of
2  dispute as between Anadarko and Argo?
3     MS. WILMS:
4        Object as to form.  And don't
5  give any information that you've learned
6  through counsel.
7     THE WITNESS:
8        We have not made a decision yet
9  and outside counsel was looking into it.
10 EXAMINATION BY MR. FINEMAN:
11    Q.   And Anadarko has not made a
12 claim against this policy yet; correct?
13    A.   Correct.
14    Q.   A minute ago I asked you about
15 whether or not you thought this policy
16 covered OPA claims and you told me that you
17 did.
18       In the next paragraph it says
19 pursuant to Endorsement No. 7, which we
20 looked at a moment ago; right, it's the
21 non-followed endorsement, Argo does not
22 follow the Oil Pollution Act of 1990
23 buyback endorsement, Endorsement No. 8, of
24 underwriters' policy.
25       And the sentence goes on.  Okay.

Page 144

1  Do you see that?
2     A.   Yes, I do.
3     Q.   So is it your understanding that
4  Argo's position is that their coverage
5  doesn't apply to OPA claims?
6     MS. WILMS:
7        Object as to form.
8     THE WITNESS:
9        I really do not know what they
10 mean by that statement.
11 EXAMINATION BY MR. FINEMAN:
12    Q.   Okay.  All right.
13    MR. FINEMAN:
14       I want you to pull, why don't
15 you pull 14 and 15?
16       So I'm marking and I'm going to
17 give to you, Mr. Foster, Exhibit 1853 which
18 is ANA MDL 000030914 through 30934.
19       (Whereupon, the document
20 referred to was marked as Exhibit No. 1853
21 for identification.)
22    MR. FINEMAN:
23       And 1854 which is ANA MDL
24 000030945 through 30948.
25       (Whereupon, the document

Exhibit L
Page 36

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER          April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 145

1    referred to was marked as Exhibit No. 1854
2    for identification.)
3        THE WITNESS:
4            Okay.
5    EXAMINATION BY MR. FINEMAN:
6        Q.   Just take a quick moment to
7    glance at those.  Let me know when you're
8    ready.
9        A.   Sure.  Okay.
10       Q.   If you look at 1853 first.  Do
11   you recognize this document?
12       A.   Yes.
13       Q.   What is this document?
14       A.   This is the Torus Insurance
15   excess policy.
16       Q.   Okay.  And what are the limits
17   of this policy?
18       A.   50 million excess of, I think,
19   excess of 200.
20       Q.   So this would be above the
21   Section III 150 million and above the Argo
22   50 million?
23       A.   Correct.
24       Q.   As far as you know, do I have
25   the complete policy here?

Page 146

1        A.   I believe so.
2        Q.   Okay.  And Anadarko gave notice
3    to Torus?
4        A.   Yes.
5        Q.   And I take it, again, Anadarko
6    has not made a claim against this policy;
7    is that correct?
8        A.   Correct.
9        Q.   If you -- again, this policy, as
10   I understand it, follows the Section III of
11   the energy package policy unless otherwise
12   noted by endorsements to the policy; is
13   that correct?
14       MS. WILMS:
15           Object as to form.
16       THE WITNESS:
17           Correct.
18   EXAMINATION BY MR. FINEMAN:
19       Q.   Just so we're clear about that,
20   on the first page of this Exhibit 1853 it
21   says the company further agrees that this
22   policy will follow the same terms,
23   definitions, exclusions and conditions
24   except as otherwise provided herein as are,
25   at inception hereof, contained in the

Page 147

1    followed policy.  You see that?
2        A.   Yes.
3        Q.   So that just means that they're
4    the same, it's the same as Section III
5    unless it says otherwise here?
6        MS. WILMS:
7            Object as to form.
8        THE WITNESS:
9            Correct.
10   EXAMINATION BY MR. FINEMAN:
11       Q.   Okay.  And if you look at 30918,
12   the declarations page?
13       A.   Okay.
14       Q.   So the policy period, again, is
15   June 30, 2009 through June 30, 2010;
16   correct?
17       A.   Correct.
18       Q.   And, again, this shows united,
19   if you look at Items 5 and 6 together, you
20   actually go through Items 4, 5 and 6
21   together, this shows that this policy
22   provides for $50 million of coverage above
23   200 million?  Is that correct, sir?
24       A.   That's correct.
25       Q.   I'm sorry.  Sorry about that.

Page 148

1            If you look at, if you look at
2    Exhibit 1854, do you recognize this
3    correspondence, June 16, 2010, to Bettina
4    Truran at JLT Park from Joy LaHuta at Torus
5    and copied to you; is that correct?
6        A.   Yes.
7        Q.   You know what we're going to do
8    now, we're going to go off the record so
9    the videographer can change the tape and
10   then I'll finish up with this.  Okay.
11       A.   Sure.
12       THE VIDEOGRAPHER:
13           This is the end of Tape 3.
14   We're now off the record at 11:36.
15           (Off the record.)
16       THE VIDEOGRAPHER:
17           We're now back on the record.
18   The time is 11:39.
19   EXAMINATION BY MR. FINEMAN:
20       Q.   So we were talking about
21   Exhibit 1854.  And you said you recognized
22   it; correct?
23       A.   Yes.
24       Q.   And what is it?
25       A.   It's an acknowledgment that they

37 (Pages 145 to 148)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:
STEVEN J. FOSTER                    April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 149

1   received our notice and they are reserving
2   rights and they are asking for updates.
3       Q.   And other than the February 2011
4   meeting that you described where
5   representatives from Torus and the other
6   excess carriers were present, have you
7   participated in any other meeting with
8   Torus representatives concerning the Torus
9   coverage, or the DEEPWATER HORIZON
10  incident?
11      MS. WILMS:
12          Object as to form.
13      THE WITNESS:
14          Since the Bermuda meeting we
15  referenced?
16      MR. FINEMAN:
17          Other than the Bermuda meeting.
18      THE WITNESS:
19          Other than the Bermuda meeting?
20  Correct.
21  EXAMINATION BY MR. FINEMAN:
22      Q.   I take it that since you haven't
23  made a claim to Argo, Torus or the Oil
24  Casualty Insurance policies, that those
25  carriers have not taken a position one way

Page 150

1   or the other on whether they're going to
2   provide coverage?
3       MS. WILMS:
4           Object as to form.
5   EXAMINATION BY MR. FINEMAN:
6       Q.   Is that true?
7       A.   Well, that's all I know is what
8   they put in writing.  And they have
9   reserved their rights.
10      Q.   So there's, they have expressed
11  no other views other than what -- well,
12  strike that.
13          I only know what I have been
14  able to read in the documents provided to
15  me, so I don't know if there are other
16  communications, other documents.
17          So the question I have, then,
18  is:  With respect to any of these excess
19  carriers, whether it's Torus or Argo or Oil
20  Casualty or XL, which we'll talk about in a
21  minute, have any of them written any
22  correspondence to you, other than the
23  reservation of rights letters laying out
24  reasons why they don't think coverage
25  applies?

Page 151

1       A.   No.
2       MS. WILMS:
3           Object as to form.
4       THE WITNESS:
5           Sorry.  No.
6       MR. FINEMAN:
7           Let's look at for XL, 11 and 12.
8   EXAMINATION BY MR. FINEMAN:
9       Q.   Mr. Foster, I'm going to give
10  you two more exhibits.  First is 1855, it's
11  ANA MDL 000030873.  And 1856, which is ANA
12  MDL 000030952 through 30953.
13          (Whereupon, the documents
14  referred to were marked as Exhibit No. 1855
15  1855 and Exhibit No. 1856 for
16  identification.)
17  EXAMINATION BY MR. FINEMAN:
18      Q.   Sorry to do this to you, but
19  before you turn to XL, there's a couple of
20  questions I wanted to ask you about Torus
21  that I forgot to ask you.
22          Is it your, is it Anadarko's
23  position that the Torus excess policy
24  covers Oil Pollution Act claims?
25      A.   Yes.

Page 152

1       Q.   For the reasons you described
2   earlier?
3       A.   Yes.
4       Q.   Is it your understanding that
5   Torus is also -- strike that.  Is it
6   Anadarko's position or understanding that
7   Torus is also taking the position that only
8   25 percent of the $50 million applies?
9       MS. WILMS:
10          Object as to form.
11      THE WITNESS:
12          I don't see it in this letter.
13  EXAMINATION BY MR. FINEMAN:
14      Q.   If you'll look at 30946, in the
15  middle of the page?
16      A.   Oh, yes.  I missed that.
17      Q.   In part it says the Torus policy
18  limits and attachment point scale to
19  Anadarko's percentage interest in the joint
20  operating agreement.  Do you see that?
21      A.   Yes.
22      Q.   Is that their way of referring
23  to this joint venture provision that we
24  discussed earlier?
25      A.   Yes.

38  (Pages 149 to 152)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 38

Page 153

1    MS. WILMS:
2         Object as to form.
3    THE WITNESS:
4         I'm sorry.  Yes.
5    EXAMINATION BY MR. FINEMAN:
6    Q.   I'm sorry.  Let's go back now to
7    the XL policy which is 1855.
8         Do you recognize Exhibit 1855?
9    A.   Yes.
10   Q.   And what is this exhibit?
11   A.   This is the excess policy for
12   XL.
13   Q.   And where does this policy show
14   up in the stack of excess policies?
15   A.   This is a hundred million excess
16   at 250 so it would be, you start off with
17   the Section III in the package for 150,
18   then Argo, Torus and then the XL policy
19   would sit on top of that.
20   Q.   And then on top of that would be
21   the $50 million from the Oil Casualty
22   insurance that we discussed a little while
23   ago?
24   A.   Yes.
25   Q.   And, again, this policy period

Page 154

1    is June 30, 2009 to June 30, 2010?
2    A.   Correct.
3    Q.   And as far as you know, do I
4    have the complete policy here?
5    A.   I believe so.
6    Q.   And as with the other excess
7    carriers, I take it that Anadarko provided
8    notice to XL?
9    A.   Yes.
10   Q.   Okay.  And, again, Anadarko has
11   not made a claim against this policy; is
12   that correct?
13   A.   Correct.
14   Q.   And, again, this as I understand
15   it, this XL policy is following the Section
16   III policy, or Section III of the energy
17   package policy except as otherwise noted in
18   the document; is that correct?
19   MS. WILMS:
20        Object as to form.
21   THE WITNESS:
22        Yes.
23   EXAMINATION BY MR. FINEMAN:
24   Q.   30874 shows the -- shows the
25   stacking; correct?  The underlying policies

Page 155

1    and the followed policy.  So 7 shows the
2    $150 million from Section III and the 50
3    million from Argo and the 50 million from
4    Torus prior to application of the hundred
5    million from this XL policy; is that
6    correct?
7    A.   Correct.
8    Q.   If you'll look at 30881, this is
9    a non-followed endorsement, Endorsement 1
10   to the XL policy; correct?
11   A.   Correct.
12   Q.   And this, again, says that
13   they're not following -- strike that.  Does
14   this say that XL's not following the Oil
15   Pollution Act of 1990 buyback endorsement
16   from Section III of the energy package
17   policy?
18   A.   Correct.
19   Q.   Okay.  Is it your understanding
20   that -- strike that.
21        Do you believe that this XL
22   policy provides coverage for Oil Pollution
23   Act claims?
24   MS. WILMS:
25        Object as to form.

Page 156

1    THE WITNESS:
2         Yes.
3    EXAMINATION BY MR. FINEMAN:
4    Q.   And the basis for that belief is
5    what?
6    MS. WILMS:
7         Object as to form.
8    THE WITNESS:
9         Because of Endorsement 6 in
10   Section III of the package policy.
11   EXAMINATION BY MR. FINEMAN:
12   Q.   If you look at Exhibit 1856,
13   this is a letter dated April 28, 2010 from
14   Christina Jones to JLT Park; correct?
15   A.   Correct.
16   Q.   And do you recognize this
17   letter?
18   A.   Yes, I do.
19   Q.   What is this letter?
20   A.   This letter is an
21   acknowledgement that they, that XL received
22   our notice.  They are providing a
23   reservation of rights and asking for any
24   type of updates to be given to them.
25   Q.   And have you -- other than the,

Exhibit L
Page 39

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                   Reported by:
STEVEN J. FOSTER          April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 157

1  other than during the February 2011
2  presentation to representatives of all of
3  the excess carriers, have you had any
4  communication with XL concerning their
5  coverage?
6       MS. WILMS:
7          Object as to form.
8       THE WITNESS:
9          No. Sorry. No.
10 EXAMINATION BY MR. FINEMAN:
11      Q.   Do you know whether XL has also
12 taken the position that this policy is
13 limited by Anadarko's 25 percent interest
14 in the Macondo lease?
15      MS. WILMS:
16          Object as to form.
17      THE WITNESS:
18          I'm not aware of any that
19 they've made.
20 EXAMINATION BY MR. FINEMAN:
21      Q.   Are you aware of that issue
22 being addressed anywhere in the XL policy?
23      MS. WILMS:
24          Object as to form.
25      THE WITNESS:

Page 158

1          Can you say that again, please?
2  EXAMINATION BY MR. FINEMAN:
3       Q.   Yes. The reason I'm asking the
4  question, because unlike the other
5  policies, unless I missed it I haven't seen
6  that specific reference in this policy.
7  And I'm wondering if you know if it's here
8  and you can point it out to me. That's the
9  reference to the 25 percent to the joint
10 venture provision, the partial interest
11 provision.
12          I mean, other than the fact that
13 they're following the language of the
14 Section III.
15      A.   So are you asking --
16      Q.   My question for you is: Do you
17 know anywhere in this policy that issue is
18 addressed and if so, can you point it out
19 to me?
20      A.   Other than they say that they
21 followed form except what's stated. I'm
22 not aware of that.
23      Q.   Is it your understanding that
24 the excess policies that we've discussed
25 provide for payment of defense costs?

Page 159

1       A.   Yes.
2       Q.   So as we discussed with the
3  energy package policy, defense costs falls
4  within the policy limits of those excess
5  policies that we've covered today?
6       MS. WILMS:
7          Object as to form.
8       THE WITNESS:
9          Yes.
10 EXAMINATION BY MR. FINEMAN:
11      Q.   None of those excess policies
12 have paid any defense costs in this case,
13 though; is that true?
14      A.   Correct.
15      Q.   Are there any other insurance
16 policies, primary or excess, that Anadarko
17 has provided notice to of a potential claim
18 for the BP oil spill that we have not
19 addressed today?
20      A.   That we have not addressed?
21      MS. WILMS:
22          And that Anadarko was provided
23 notice to.
24      THE WITNESS:
25          Provided notice to? Just to be

Page 160

1  clear, we talked about the D&O insurance.
2  EXAMINATION BY MR. FINEMAN:
3       Q.   Okay.
4       A.   We talked about Transocean's
5  insurance; correct?
6       Q.   Correct.
7       A.   To my knowledge we have not
8  provided notice to any other policies.
9       Q.   Okay. Aside from the Transocean
10 insurance and apart from the D&O coverage,
11 are there any other insurance policies
12 other than the ones we've discussed today
13 that you believe provide Anadarko coverage
14 with respect to the BP oil spill?
15      A.   We are evaluating with outside
16 counsel if some of the other contractors
17 involved, if their insurance would apply as
18 well.
19          So, you know, similar to the
20 Transocean, but we have not given notice,
21 we haven't asserted our rights. Yet.
22      Q.   Okay. I'm going to give you a
23 document, a part of a document that has
24 previously been marked as Exhibit 1243.
25 And we'll attach to your deposition just

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 40

Page 161

```
 1   the part that I'm giving you.  Okay.
 2       MR. FINEMAN:
 3           I've given the witness is, are
 4   pages from Exhibit 1243.  It was the
 5   ratification and joinder of operating
 6   agreement, Macondo Prospect.  Pages 1, 2
 7   and 3 of the ratification joinder, that's
 8   ANA MDL 000030610 through 612, along with
 9   the first page of the operating agreement,
10   which is APC HEC 1000001601.
11           And then it's also Exhibit B,
12   offshore insurance provisions, is APC HEC
13   1000001757 through 1760.
14       MS. WILMS:
15           And I'm going to object for the
16   record to providing the witness just a
17   portion of or various pieces of a whole
18   document.
19       MR. FINEMAN:
20           I have the whole thing with us,
21   if he needs it.
22       MS. WILMS:
23           Okay.
24       MR. FINEMAN:
25           If he needs to see the whole
```

Page 162

```
 1   document -- I was trying to save trees.
 2   But if you need to see the entire document,
 3   I'm only going ask you about a very
 4   specific provision, anyhow.
 5       MS. WILMS:
 6           Okay.  Go ahead.
 7   EXAMINATION BY MR. FINEMAN:
 8       Q.   First of all, if you just look
 9   at the front page, do you recognize that
10   this document is called ratification and
11   joinder operating agreement?
12       A.   No.
13       Q.   To your knowledge, have you ever
14   seen the operating agreement between BP,
15   MOEX Offshore and Anadarko?
16       A.   Have I seen it?
17       Q.   Yes.
18       A.   Yes.
19       Q.   Okay.  Have you seen it in some
20   context other than in preparing for the
21   deposition?
22       A.   I first saw it in preparation
23   for giving notice to the insurance
24   carriers.
25       Q.   So if you'll turn to page 1757,
```

Page 163

```
 1   the Exhibit B to the operating agreement,
 2   offshore insurance provisions?
 3       A.   Okay.
 4       Q.   Is that exhibit familiar to you?
 5       A.   Again, first time I saw it was
 6   after the incident before we gave it to
 7   insurers, but, yes.
 8       Q.   Okay.  My question about this
 9   document is actually very simple.  If you
10   look at the next page 1758, this -- you
11   know, I'll let you read it if you need to.
12           This provides that each party to
13   the agreement shall insure or self-insure
14   for their share of any liabilities assumed
15   under the joint operating agreement.
16           You see that?
17       A.   Yes, I do.
18       Q.   The cost of these insurance for
19   self-insurance programs shall be the
20   individual responsibilities of each of the
21   parties and none of the costs associated
22   with these programs shall be charged the
23   joint account.  You see that?
24       A.   Yes.
25       Q.   Each party shall insure or
```

Page 164

```
 1   self-insure the following coverage for the
 2   minimum limits stated.  You see that?
 3       A.   Yes.
 4       Q.   Then it lists five categories of
 5   insurance that each party to the agreement
 6   was expected to carry.
 7           Do you understand that?
 8       A.   Yes.
 9       MS. WILMS:
10           Object as to form.
11       THE WITNESS:
12           Oh, sorry.  Yes.
13   EXAMINATION BY MR. FINEMAN:
14       Q.   And my question to you is
15   simple.  As far as you know, did Anadarko
16   have the requisite insurance under each of
17   these categories?
18       A.   Yes.
19       Q.   Take time to look at it.  The
20   answer's yes?
21       A.   Yes.
22       Q.   I'll just follow up.
23           And the insurances, the
24   insurance policies that we've discussed
25   today, the energy package policy and the
```

41 (Pages 161 to 164)

Page 165

```
 1   excess policy satisfy these requirements;
 2   correct?
 3       A.   No.
 4       MS. WILMS:
 5           Object to form.
 6   EXAMINATION BY MR. FINEMAN:
 7       Q.   I'm sorry.  They address --
 8   which ones do they address?
 9       A.   1, 3, 4 and we have separate
10   insurances for auto and non-owned aviation.
11       Q.   Okay.  I'm going to now give you
12   a document that we're going to mark 1857.
13           (Whereupon, the document
14   referred to was marked as Exhibit No. 1857
15   for identification.)
16   EXAMINATION BY MR. FINEMAN:
17       Q.   It is ANA MDL 000062706 through
18   62720.  Just take a moment and take a look
19   at that.  I have a few questions about it.
20       A.   (Witness looking at documents).
21           Okay.
22       Q.   Do you recognize this document?
23       A.   Yes.
24       Q.   Okay.  If you look at page 4 of
25   the document, or 62709?
```

Page 166

```
 1       A.   Okay.
 2       Q.   Is that your signature and name
 3   stamp under Anadarko Petroleum Company?
 4       A.   Yes.
 5       Q.   Corporation, I'm sorry.
 6       A.   Yes.
 7       Q.   And it's dated July 1, 2010?
 8       A.   Yes.
 9       Q.   I'm making sure I'm getting my
10   English for American dates correct.
11       A.   Yes.
12       Q.   And what is this document, which
13   by the way is for the record, is dated on
14   the front, it's dated May 19, 2010 and it's
15   titled common interest and confidentiality
16   agreement.
17       MS. WILMS:
18           Object as to form.  And you can
19   state, you can respond to the question as
20   long as you're not revealing communications
21   with counsel.
22   EXAMINATION BY MR. FINEMAN:
23       Q.   So all I've asked you so far
24   is what is this?
25       A.   This is a CA, a, you know,
```

Page 167

```
 1   confidentiality agreement amongst the
 2   parties that would be involved in the
 3   adjusting process.  And the underwriters.
 4       Q.   Is a document like this
 5   standard?  Is it a normal document?  Have
 6   you seen documents like this before in your
 7   job, in your position with Anadarko?
 8       MS. WILMS:
 9           Object as to form.
10       THE WITNESS:
11           It varies.
12   EXAMINATION BY MR. FINEMAN:
13       Q.   Okay.  Was this document your
14   idea?
15       A.   No.
16       Q.   Do you know why you were asked
17   to sign the document on behalf of Anadarko?
18       MS. WILMS:
19           Object as to form.  And, again,
20   if your understanding comes from
21   discussions with counsel, I'm going to
22   instruct you not to answer.  If you have an
23   understanding separate and apart from that,
24   you can go ahead and respond.
25       THE WITNESS:
```

Page 168

```
 1           I was told by BC Johnson that BP
 2   insisted that this be signed before BC
 3   Johnson be allowed to adjust the claim.
 4   EXAMINATION BY MR. FINEMAN:
 5       Q.   You said BP --
 6       A.   British Petroleum; right.
 7       Q.   So is BP a party to this
 8   agreement?
 9       A.   I don't see their name on here,
10   no.
11       Q.   I'm sorry if this sounds like a
12   silly question, but what does BP have to do
13   with adjusting Anadarko's insurance policy?
14       A.   Because in order for BC Johnson,
15   the adjusting firm we mentioned, they would
16   have to get the data from BP.
17       Q.   Okay.  And do you have an
18   understanding of the -- well, before I go
19   there, are the excess carriers or
20   representatives of the excess carriers
21   parties to this agreement?
22       A.   The excess carriers?
23       Q.   Yes.  So Torus, XL, Oil Casualty
24   and Argo.
25       A.   I don't think they were a party
```

42 (Pages 165 to 168)

Exhibit L
Page 42

Page 169

```
 1   to this.  This is just for the London
 2   package.
 3        Q.  Right.  So this is just for
 4   the -- for our purposes that's really
 5   addressing Section II and III of the energy
 6   package?
 7        A.  Correct.
 8        Q.  And do you understand the scope,
 9   or the impact of this document?
10        MS. WILMS:
11            Object as to form.
12   EXAMINATION BY MR. FINEMAN:
13        Q.  Yes.  Let me ask it another way.
14   Do you understand the purpose of this
15   document?
16        MS. WILMS:
17            Object as to form.  And asked
18   and answered.
19        THE WITNESS:
20            In general, yes.
21   EXAMINATION BY MR. FINEMAN:
22        Q.  And that is what?
23        MS. WILMS:
24            And, again, if you've learned --
25   anything that you've learned through
```

Page 170

```
 1   communications with counsel or through BC
 2   Johnson working as a consultant, I don't
 3   want you to reveal.
 4        THE WITNESS:
 5            Right.  So what I learned
 6   through BC Johnson is part of the
 7   privilege?
 8        MS. WILMS:
 9            That's correct.
10        THE WITNESS:
11            Okay.
12        MS. WILMS:
13            You've already laid the
14   foundation.  I think this question's been
15   asked and answered.
16   EXAMINATION BY MR. FINEMAN:
17        Q.  So, it's your understanding --
18        MR. FINEMAN:
19            Well, I mean, he described the
20   document.  I think I get to at least get a
21   little bit of information.
22        MS. WILMS:
23            Right.
24   EXAMINATION BY MR. FINEMAN:
25        Q.  So is it your understanding that
```

Page 171

```
 1   this document was intended to keep
 2   communications between the parties involved
 3   in the adjusting private and confidential?
 4        A.  Yes.
 5        MR. FINEMAN:
 6            Are you okay going another 15,
 7   20 minutes before lunch or do you want to
 8   stop now?
 9        MS. WILMS:
10            You're a go?
11        THE WITNESS:
12            Yes.
13        MS. WILMS:
14            We're a go.
15        THE WITNESS:
16            Let's move on.
17   EXAMINATION BY MR. FINEMAN:
18        Q.  After the DEEPWATER HORIZON
19   incident, do you recall being on a need to
20   know list at Anadarko with respect to
21   information relating to the BP oil spill?
22        MS. WILMS:
23            Object as to form.
24        THE WITNESS:
25            I know I was on several groups,
```

Page 172

```
 1   you know, committees.  I didn't know they
 2   called it a need to know list.
 3   EXAMINATION BY MR. FINEMAN:
 4        Q.  Okay.  So were you aware that
 5   you were on such a list?
 6        MS. WILMS:
 7            Objection to form.
 8   EXAMINATION BY MR. FINEMAN:
 9        Q.  A need to know list?
10        MS. WILMS:
11            Object as to form.
12        THE WITNESS:
13            I don't recall.
14   EXAMINATION BY MR. FINEMAN:
15        Q.  Okay.  Are you aware of any --
16   let's talk about the committees real quick.
17            You were on, you said you were
18   on a number of committees that related to
19   the BP oil spill; correct?
20        A.  Correct.
21        Q.  Can you identify those
22   committees by name or title?
23        MS. WILMS:
24            Again, because these committees
25   were working under the direction of
```

43  (Pages 169 to 172)

Exhibit L
Page 43

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                      Reported by:
STEVEN J. FOSTER            April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 173

```
 1    counsel, you can speak generally as to
 2    purpose but I don't want you to reveal any
 3    communications.
 4        THE WITNESS:
 5        Okay.
 6    EXAMINATION BY MR. FINEMAN:
 7        Q.  I think right now so far, I just
 8    asked you for the name or title of the
 9    committees.  That's all I want to know
10    right now.  We'll take it a step at a time.
11        A.  I don't know the official names
12    of all the committees but one committee we
13    were on looked at contracts.  For example,
14    what -- well, just contracts in general.
15    The second committee would deal with issues
16    relating to the claim.
17        Q.  Any other committees you were
18    on?  That's two, contracts and claims.
19        A.  I may have been on others.  We
20    didn't really have formal names, and we
21    just met.
22        Q.  Who is the we?
23        A.  Well, whoever was on the
24    committees.  Mainly inside legal.  And
25    occasionally operations would be involved.
```

Page 174

```
 1        Q.  And I understand that you're a
 2    30(b)(6) witness, you're here for
 3    insurance.  So my questions really are what
 4    role did you play, you know, as the top
 5    insurance guy on these committees?  What
 6    was the purpose of you being on these
 7    committees?
 8        Not what did you say to somebody
 9    but just the purpose of you being on the
10    committee?
11        A.  To see how it could affect our
12    insurance coverage.
13        Q.  And these committees that you
14    were on, contract, claims, any others, did
15    they include only Anadarko people, or do
16    they include representatives from any other
17    company?
18        A.  To my knowledge, APC people
19    only.
20        Q.  Anadarko Petroleum Corporation?
21        A.  Right.
22        Q.  Are you aware of Anadarko
23    conducting an internal investigation or an
24    audit of the causes of the BP oil spill?
25        MS. WILMS:
```

Page 175

```
 1        Object as to form.  He's just
 2    asking if you're aware of such a thing.
 3        THE WITNESS:
 4        Yes, I'm aware.
 5    EXAMINATION BY MR. FINEMAN:
 6        Q.  Do you know who was responsible,
 7    or who the most knowledgeable person is
 8    about that particular investigation or
 9    audit?
10        A.  No, I do not.
11        Q.  Do you know whether or not you
12    were part of any such investigation or
13    audit?
14        A.  I was not.
15        Q.  So were these committees that
16    you were on, whether they're contracts or
17    claims, part of a broader investigation or
18    audit of the causes, potential causes of
19    the BP oil spill?
20        MS. WILMS:
21        Object as to form.
22        THE WITNESS:
23        To my knowledge, no.
24    EXAMINATION BY MR. FINEMAN:
25        Q.  Are you aware of any internal
```

Page 176

```
 1    Anadarko investigation or audit of BP's
 2    performance in containing the oil and
 3    capping the Macondo well post-event?
 4        MS. WILMS:
 5        Object as to form.
 6        THE WITNESS:
 7        Am I aware of that?
 8    EXAMINATION BY MR. FINEMAN:
 9        Q.  Yes.
10        A.  Yes.
11        Q.  And what can you tell me about
12    that?
13        MS. WILMS:
14        I don't want you to reveal any
15    information that you've learned from
16    counsel, or was directed by counsel.
17        THE WITNESS:
18        Everything I learned was given
19    to me, or directed by counsel.
20    EXAMINATION BY MR. FINEMAN:
21        Q.  Did you participate personally
22    in that, in the internal investigation or
23    audit of BP's performance in containing the
24    oil and capping the well post-event?
25        MS. WILMS:
```

44 (Pages 173 to 176)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 44

Page 177

```
 1        Object as to form.
 2        THE WITNESS:
 3        No.
 4     EXAMINATION BY MR. FINEMAN:
 5        Q.   Have you ever had meetings with
 6  anybody from BP regarding the applicable
 7  insurance for the BP oil spill?
 8        A.   Yes.
 9        Q.   Okay.  And who at BP did you
10  speak with?
11        A.   William Siebenaler, something
12  like that.  I don't know his last name.
13        Q.   When did that conversation take
14  place?
15        A.   Shortly after the incident.
16        Q.   Okay.  And did you have more
17  than one conversation with that gentleman?
18        A.   I may have had two total.
19        Q.   And the second conversation, do
20  you recall when that was?
21        A.   It would have been maybe a few
22  weeks later.
23        Q.   And do you recall the subject
24  matter of your conversations with the BP
25  insurance person?
```

Page 178

```
 1        MS. WILMS:
 2        General subject matter.
 3        THE WITNESS:
 4        General subject matter was to
 5  set up the adjusting firm to go in and
 6  adjust the claim for us.
 7     EXAMINATION BY MR. FINEMAN:
 8        Q.   And that's BP Johnson?
 9        A.   BC Johnson.
10        Q.   I'm sorry.  BC Johnson?
11        A.   Right.
12        Q.   BC Johnson; correct?
13        A.   Correct.
14        Q.   Is BC Johnson -- I'm sorry, who
15  was BC Johnson adjusting for other than
16  Anadarko and BP?
17        MS. WILMS:
18        Object as to form.
19        THE WITNESS:
20        Well, they're not adjusting for
21  BP.  They're only adjusting for Anadarko as
22  well as MOEX.
23     EXAMINATION BY MR. FINEMAN:
24        Q.   But you were coordinating with
25  the BP representative with respect to that
```

Page 179

```
 1  adjusting?
 2        A.   Correct.
 3        Q.   Have you had any other
 4  conversations, have you had any other
 5  conversations with anybody from BP about
 6  Anadarko's insurance?
 7        A.   No.
 8        Q.   Have you had any conversations
 9  with any representative of any of the other
10  defendants in the litigation or any of
11  their companies involved with respect to
12  Anadarko's insurance?
13        A.   Yes.
14        Q.   Okay.  Who did you speak with?
15        A.   I got a call from George Jones
16  at Halliburton yesterday, asking for copies
17  of, or if we would be willing to share on a
18  going forward basis our insurance coverage,
19  terms and conditions.
20        Q.   You mean like the policies we've
21  been through today?
22        A.   No.  On a --
23        Q.   Going forward.
24        A.   On a -- new policies; right.
25        Q.   I'm sorry.  Does that
```

Page 180

```
 1  conversation have anything do with the
 2  Macondo well or the DEEPWATER HORIZON?
 3        A.   No.  It doesn't.
 4        Q.   Okay.
 5        A.   Right.
 6        Q.   I'm sorry.  That might have been
 7  a bad question.  My question is:  Have you
 8  talked to any representative of any of the
 9  other companies involved in this matter,
10  other than BP?  Did you talk to any of
11  their insurance people about Anadarko's
12  insurance relating to the BP oil spill
13  case?
14        A.   No.
15        Q.   Post-event, how would you
16  characterize your responsibility for
17  dealing with insurance related matters at
18  the company?
19        MS. WILMS:
20        Object as to the form.
21        THE WITNESS:
22        Related to this incident?
23     EXAMINATION BY MR. FINEMAN:
24        Q.   Yes.
25        A.   It's to maximize the recovery of
```

45 (Pages 177 to 180)

Exhibit L
Page 45

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:
STEVEN J. FOSTER                    April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 181

1    insurance for this claim.
2        Q.   Okay.  And how do you do that?
3        MS. WILMS:
4            Object as to form.
5        THE WITNESS:
6            We give notice to the carriers.
7    We monitor the costs that we have paid.
8    Participate with inside counsel and outside
9    counsel.  Coordinate the strategies or at
10   least update insurers or make sure that
11   outside counsel does in terms of where
12   we're going with this.
13   EXAMINATION BY MR. FINEMAN:
14       Q.   Okay.  In the May 2010 to
15   September 2010 time period, did you have
16   communications with Anadarko personnel
17   regarding something called, a topic called
18   incident cost analysis?
19       A.   Incident cost analysis?
20       Q.   Yes.
21       A.   It doesn't ring a bell.
22       Q.   Okay.  How about well costs?
23       A.   I've had, I had an e-mail
24   exchange regarding the components of the
25   cost for the Macondo well as of the time of

Page 182

1    the blowout.
2        Q.   Okay.  And that's because that
3    would relate to potential coverage issues?
4        MS. WILMS:
5            Object as to form.
6        THE WITNESS:
7            Potential coverage issues,
8    they're part of our strategy, part of our
9    claim process.
10   EXAMINATION BY MR. FINEMAN:
11       Q.   Do you recall that time period I
12   mentioned, May 2010 through September 2010,
13   having communications with other Anadarko
14   personnel regarding well updates?
15       A.   Well updates?
16       Q.   Yes.
17       A.   I may have had some about the
18   insurance coverage renewals.  Well updates
19   is pretty broad.
20       Q.   How about relief efforts?
21       MS. WILMS:
22           Object as to form.
23       THE WITNESS:
24           The only context I would have
25   been involved in those exchanges would be

Page 183

1    to make sure we had coverage for the relief
2    well that was being drilled.  And to
3    communicate that to insurers.
4    EXAMINATION BY MR. FINEMAN:
5        Q.   How about kill operations, do
6    you know what that phrase means?
7        A.   Yes, I do.
8        Q.   Do you remember having any
9    internal communications with other Anadarko
10   personnel about kill operations in the May
11   to September 2010 time period?
12       A.   No, I do not.
13       Q.   Okay.  I think earlier you
14   mentioned -- well, you told me that Bruce
15   Busmire is your immediate superior?  He's
16   your boss?
17       A.   Correct.
18       Q.   And did you communicate with
19   him -- during the May 2010 to
20   September 2010 time period, do you recall
21   communicating with him by e-mail?
22       A.   Regarding?
23       Q.   I'm sorry.  Regarding the BP oil
24   spill.
25       A.   Yes.

Page 184

1        Q.   Okay.  Were you ever told by
2    anybody in the legal department at
3    Anadarko -- strike that.
4            What kind of communications
5    would you have with Mr. Busmire by e-mail?
6        MS. WILMS:
7            Object to form.
8    EXAMINATION BY MR. FINEMAN:
9        Q.   In the time period discussed.
10       A.   To update him about the status
11   of the claim, if any.
12       Q.   Is Mr. Busmire an attorney?
13       A.   No.
14       Q.   He's not in the legal
15   department?
16       A.   No, he's not.
17       Q.   Who's Robert Gwin?
18       A.   He is chief financial officer.
19       Q.   Okay.  He's not an attorney
20   either; right?
21       A.   No.
22       Q.   He's not in the legal
23   department?
24       A.   Correct.
25       Q.   Okay.  Barbara Dunbar, she's an

46 (Pages 181 to 184)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                              Reported by:
STEVEN J. FOSTER                 April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 185

1  attorney in the legal department; correct?
2      A.  Yes.
3      Q.  Bobby Reeves, he's an attorney
4  in the legal department?
5      A.  Yes.
6      Q.  And to the extent you
7  communicated with any Anadarko personnel
8  about the Macondo well, or the blowout or
9  the event in the May to September 2010 time
10  period, can you characterize what the
11  purpose of that communication would be?
12  Was it always about insurance?
13      MS. WILMS:
14          Object as to form.
15      THE WITNESS:
16          It would have been involving the
17  insurance claim regarding the incident, or
18  the renewal process that came shortly
19  thereafter.
20  EXAMINATION BY MR. FINEMAN:
21      Q.  Okay.  Have you heard the phrase
22  liability cap committee?
23      MS. WILMS:
24          Object as to form.
25      THE WITNESS:

Page 186

1          No.  I don't recall that.
2  EXAMINATION BY MR. FINEMAN:
3      Q.  Do you remember being on a
4  committee that was called the liability cap
5  committee?
6      A.  No, I do not.
7      Q.  Okay.
8      MR. FINEMAN:
9          Why don't we break for lunch?
10      THE VIDEOGRAPHER:
11          This is the end of Tape 4.
12  We're now off the record at 12:24.
13          (Off the record.)
14          (Recess for lunch).
15      THE VIDEOGRAPHER:
16          This is the beginning of Tape 5.
17  We're now back on the record.  The time is
18  1:29.
19  EXAMINATION BY MR. KATZ:
20      Q.  Good afternoon, Mr. Foster.  My
21  name is Allen Katz and I'm appearing on
22  behalf of Transocean Offshore Deepwater
23  Drilling, Inc. and some other Transocean
24  affiliates.
25      A.  Okay.

Page 187

1      Q.  How long did you say you had
2  been involved in risk management for
3  Anadarko?
4      A.  13 years.
5      Q.  Do you participate in any
6  industry groups relating to insurance or
7  risk management?
8      A.  Yes.
9      Q.  And what are those?
10      A.  One is Houston Energy Risk
11  Managers group.
12      Q.  And any others?
13      A.  One is a OIM, Oil Insurance
14  Managers group.
15      Q.  Any others?
16      A.  That's it.
17      Q.  And the Houston Energy Risk
18  Managers group, what types of things do
19  they involve themselves in?
20      A.  We discuss current topics
21  regarding insurance issues, coverage
22  issues.  Just general industry topics for
23  the energy.
24      Q.  And the Oil Insurance Manager's
25  group?

Page 188

1      A.  Same thing.
2      Q.  Do you ever recall any meetings
3  or discussions in any of these groups
4  regarding the issue of coverage for claims
5  arising from gross negligence?
6      A.  Claims arising from gross
7  negligence?
8      Q.  Yes.  Anything having to do with
9  whether there's coverage if there's gross
10  negligence?
11      A.  No.  I don't recall that.
12      Q.  Now, during the time that you've
13  been involved in risk management for
14  Anadarko, I take it that Anadarko itself
15  has been the operator of wells in the Gulf
16  of Mexico; is that correct?
17      A.  Yes.
18      Q.  Now, in instances where Anadarko
19  is the operator of a well, does the risk
20  management function include the allocation
21  of risks in the drilling contract that
22  Anadarko uses?
23      A.  We get involved in the
24  discussions with legal counsel.
25      Q.  So the risk management group at

47 (Pages 185 to 188)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 47

Page 189

```
 1   Anadarko plays a role in the drafting of
 2   the form of drilling contract that Anadarko
 3   likes to use?
 4        MS. WILMS:
 5            Object as to form.
 6        THE WITNESS:
 7            Not in the drafting.
 8   EXAMINATION BY MR. KATZ:
 9        Q.  Explain to me what role you do
10   play, then.
11        A.  With inside counsel we look at
12   the risk that Anadarko would be assuming
13   under the service contracts to see if our
14   insurance coverage would apply to those.
15        Q.  And are you generally familiar
16   from that activity with the way in which
17   risks are allocated in Anadarko's drilling
18   contracts between Anadarko as operator and
19   the drilling company as contractor?
20        A.  In general, yes.
21        Q.  And as an example, are you
22   generally familiar with the fact that
23   Anadarko as operator assumes the risk of
24   pollution coming underwater from the well?
25        A.  Well, the section that would
```

Page 190

```
 1   apply to that would be from a blowout.
 2            I don't have it committed to
 3   memory what that language says.
 4        Q.  But you have a general
 5   understanding that that's a risk that in
 6   the drilling contract Anadarko assumes; is
 7   that correct?
 8        A.  That is correct.
 9        Q.  And Anadarko agrees to indemnify
10   the contractor in those types of contracts
11   for that risk; is that correct?
12        MS. WILMS:
13            I'm going to object as to form
14   and I'm also going to object, you know,
15   foundational questions about this being
16   outside the scope of the 30(b)(6)
17   deposition notice.
18            I'm not instructing the witness
19   not to answer, I'm just making the
20   objection that it appears that your
21   questions go beyond the scope of topics for
22   which Mr. Foster has been designated.
23            If you recall the question, if
24   you need it read back now, that's fine.
25        THE WITNESS:
```

Page 191

```
 1            Yes, please.
 2   EXAMINATION BY MR. KATZ:
 3        Q.  I'll say it again.  Is it your
 4   understanding that when Anadarko is the
 5   operator in the drilling contract, it
 6   agrees to indemnify the drilling contractor
 7   for claims related to the blowout of a
 8   well?
 9        MS. WILMS:
10            Object as to form.
11        THE WITNESS:
12            In general, yes.
13   EXAMINATION BY MR. KATZ:
14        Q.  And are you also aware that
15   under the drilling contract that Anadarko
16   typically uses, the drilling contractor
17   assumes certain risks; is that correct?
18        MS. WILMS:
19            Object as to form.
20        THE WITNESS:
21            Yes.
22   EXAMINATION BY MR. KATZ:
23        Q.  And one of those risks would be
24   for injury to the contractor's employees;
25   correct?
```

Page 192

```
 1        A.  Yes.
 2        Q.  And another one of those risks
 3   would be for pollution that emanates from
 4   the drilling vessel itself; is that
 5   correct?
 6        MS. WILMS:
 7            Object as to form.  And can we
 8   have a continuing objection?  I kind of
 9   meant my prior objection to be outside the
10   scope to be a continuing objection to this
11   line of questioning so I don't have to keep
12   saying it.  Is that okay?
13        MR. KATZ:
14            That's perfectly okay.  Thank
15   you very much.
16        MS. WILMS:
17            Okay.
18        THE WITNESS:
19            Well, without going back and
20   looking at our drilling contract, I don't
21   happen to recall by memory on that and I'm
22   a little bit uncomfortable in doing that
23   without seeing it.  Because that was not
24   part of my scope for this.
25        MR. KATZ:
```

48 (Pages 189 to 192)

Exhibit L
Page 48

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER              April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 193

1        Well, let's mark as next in
2    order which is Exhibit 1858.
3        (Whereupon, the document
4    referred to was marked as Exhibit No. 1858
5    for identification.)
6    MR. KATZ:
7        I've marked as Exhibit 1858 a
8    contract between Anadarko and Transocean
9    Holdings dated November 1, 2005 with
10   respect to the DEEPWATER MILLENNIUM
11   drilling rig.
12   EXAMINATION BY MR. KATZ:
13       Q.   Have you seen this document
14   before?
15       A.   Not to my knowledge.
16       Q.   Okay.  But you're generally
17   familiar with the form of Anadarko's
18   drilling contract; is that correct?
19   MS. WILMS:
20       Object as to form.
21   THE WITNESS:
22       In general form.
23   EXAMINATION BY MR. KATZ:
24       Q.   All right.  So you are aware,
25   generally, in your role as a risk manager

Page 194

1    that in Anadarko's drilling contracts the
2    drilling contractor assumes the risk of
3    pollution that emanates from the vessel
4    itself, above water pollution such as the
5    release of diesel, for example?
6    MS. WILMS:
7        Object as to form.
8    THE WITNESS:
9        Again, in general, yes, but
10   since I didn't draft these provisions I
11   haven't looked at them and I'm not an
12   attorney, I'm very, I'm very uncomfortable
13   getting down to the nitty-gritty on those,
14   so just general statement.
15   EXAMINATION BY MR. KATZ:
16       Q.   Now, let's just start with that.
17   You do acknowledge that the drilling
18   contractor assumes certain risks of certain
19   types of loss under a drilling contract
20   with Anadarko; that's correct?  Certain
21   losses, without getting into details of
22   what they are.
23   MS. WILMS:
24       Object as to form.
25   THE WITNESS:

Page 195

1        Yes.
2    EXAMINATION BY MR. KATZ:
3        Q.   And does Anadarko rely solely
4    upon the financial ability of the drilling
5    contractor to satisfy those obligations for
6    which the contractor has agreed to
7    indemnify Anadarko, or does it require that
8    the drilling contractor carry insurance
9    with respect to those obligations?
10   MS. WILMS:
11       Object as to form.
12   THE WITNESS:
13       We typically have insurance
14   obligations that the contractor must
15   provide to support their indemnities or
16   just in general insurance.  So it's not
17   just limited to the indemnities.
18   EXAMINATION BY MR. KATZ:
19       Q.   In what respects is it not
20   limited to the indemnities?
21   MS. WILMS:
22       Object to form.
23   THE WITNESS:
24       Again, I would have to go and
25   read the insurance, you know, because -- do

Page 196

1    you have the insurance exhibit, or is it in
2    the body of the agreement?
3    EXAMINATION BY MR. KATZ:
4        Q.   Well, let's turn to Section 1004
5    and I believe that's on -- the whole
6    insurance article starts at the bottom of
7    page 21, Article 10 and starts with --
8        A.   Okay.
9        Q.   -- 1001 on page 22.  Do you have
10   that in front of you?
11       A.   Yes, I do.  Thank you.
12       Q.   And as you read through that,
13   you'll see there's a reference to Appendix
14   E and unfortunately I don't have that
15   appendix attached.
16       A.   Okay.
17       Q.   Now, can you direct your
18   attention to Section 1004 concerning
19   additional insured?
20       A.   Okay.
21       Q.   Now, that says for liabilities
22   assumed hereunder by contractor the
23   required insurance shall be endorsed to
24   provide that the insurers of contractor
25   will name operator as additional insureds

49 (Pages 193 to 196)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit L
Page 49

Page 197

```
 1   as set forth in Appendix E.
 2           Do you have an understanding of
 3   what the term for liabilities assumed
 4   hereunder by contractor refers to?
 5       MS. WILMS:
 6           Object as to form.
 7       THE WITNESS:
 8           I would like to see Appendix E
 9   because that's how it's set forth, before I
10   answer.
11   EXAMINATION BY MR. KATZ:
12       Q.   Now, do we as part of your --
13   so without seeing Appendix E you say you're
14   not able at all to explain what the term
15   for liabilities assumed hereunder by
16   contractor means?
17       MS. WILMS:
18           Objection as to form.
19       THE WITNESS:
20           Well, I didn't write that.  That
21   was by our legal group so I don't know what
22   they meant by that.  If you're asking me
23   just a general comment, that's different.
24   Okay.
25   EXAMINATION BY MR. KATZ:
```

Page 198

```
 1       Q.   Okay.  I'm asking you for your
 2   general comment.  What do you understand
 3   that, as a risk manager, to mean?
 4       A.   Exactly what it says.  For the
 5   liability assumed hereunder by contractor.
 6       Q.   Have you ever seen additional
 7   insured language in an Anadarko contract
 8   which does not have that phrase for
 9   liabilities assumed hereunder by contract?
10       MS. WILMS:
11           Object as to form.
12       THE WITNESS:
13           I'd be guessing and I don't want
14   to guess.
15   EXAMINATION BY MR. KATZ:
16       Q.   Have you ever heard of Anadarko
17   requiring in any contract that a drilling
18   contractor provide unlimited additional
19   insured coverage as opposed to additional
20   insured coverage with respect to the
21   obligations assumed under the contract?
22       MS. WILMS:
23           Object as to form.
24       THE WITNESS:
25           I'm unclear of the question.
```

Page 199

```
 1   Can you say it again, please?
 2       EXAMINATION BY MR. KATZ:
 3       Q.   The provision I directed you to,
 4   Section 1004, says that for liabilities
 5   assumed hereunder by contractor the
 6   required insurance shall be endorsed to
 7   name the operator as an additional insured.
 8           And my question is:  Have you
 9   ever seen an Anadarko contract where that
10   clause for liabilities assumed hereunder by
11   contractor is left out?
12       MS. WILMS:
13           Object as to form.
14       THE WITNESS:
15           I'd be guessing.
16       MR. KATZ:
17           Okay.
18   EXAMINATION BY MR. KATZ:
19       Q.   And do you have an understanding
20   of what the purpose is of Section 1004?
21       A.   Well, since I did not write
22   that, I don't know what the purpose is of
23   that.
24       Q.   Do you know what the purpose is
25   generally of having in the drilling
```

Page 200

```
 1   contract that Anadarko uses, what is the
 2   purpose of having Anadarko named as an
 3   additional insured?
 4       MS. WILMS:
 5           Object as to form.
 6       THE WITNESS:
 7           To give us the rights to go
 8   collect against the driller's insurance
 9   coverage.
10   EXAMINATION BY MR. KATZ:
11       Q.   For obligations of the drillers
12   assumed under the contract; correct?
13       A.   In certain cases, yes.
14       Q.   Now, you testified earlier that
15   you are involved somehow in the assertion
16   of the claim that Anadarko has filed in the
17   MDL with respect to Transocean's policies;
18   is that correct?
19       MS. WILMS:
20           Object as to form.
21       THE WITNESS:
22           Yes.
23   EXAMINATION BY MR. KATZ:
24       Q.   Do you recall when after the
25   incident that issue first came to your
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit L
Page 50

Page 201

1    attention?
2        A.   It was brought up by outside
3    counsel. I do not know exactly when.
4        Q.   And you don't know precisely
5    when, but are you able to estimate at all
6    whether it was a matter of days after the
7    incident, a matter of weeks, a matter of
8    months?
9        A.   I'd be guessing. I'd be
10   guessing.
11       Q.   Do you remember whether it was
12   before or after British Petroleum filed
13   legal papers seeking additional insured
14   status under the Transocean policies?  In
15   other words, did it first come to your
16   attention before or after British Petroleum
17   filed its legal papers?
18       A.   I'd be guessing with that.
19       Q.   Have you discussed the issue of
20   Anadarko's status as an additional insured
21   under the Transocean policies with anyone
22   from Anadarko, other than counsel?
23       A.   No.
24       Q.   When you learned of the blowout
25   of the Macondo well, did you, yourself,

Page 202

1    undertake any project to review the
2    insurance coverage that Anadarko had?
3        MS. WILMS:
4            Object as to form.
5        THE WITNESS:
6            That Anadarko had?
7    EXAMINATION BY MR. KATZ:
8        Q.   Yes.
9        A.   Yes.
10       Q.   And how soon after the -- you
11   learned of the blowout did you begin that
12   project?
13       A.   When we appointed outside
14   insurance counsel.
15       Q.   So until you had retained
16   counsel, you, yourself, did nothing to
17   review what policies Anadarko had that
18   might cover the incident?
19       A.   Correct.
20       Q.   Did anyone instruct you not to
21   do anything until you had an opportunity to
22   talk to counsel about it?
23       MS. WILMS:
24           Object as to form.
25       THE WITNESS:

Page 203

1            No.  Sorry.
2        MS. WILMS:
3            No problem.
4        THE WITNESS:
5            No.
6    EXAMINATION BY MR. KATZ:
7        Q.   Let's go back to the situation
8    where Anadarko is an operator of a well.
9            Is it part of the risk
10   management function that you're involved in
11   to purchase insurance that protects
12   Anadarko against potential liabilities it
13   might have as operator of a well?
14       A.   Yes.
15       Q.   Do you have any understanding of
16   whether the liability policies that
17   Anadarko purchases, or wells in which it's
18   an operator covers Anadarko if there is a
19   claim alleging that Anadarko, as operator,
20   was grossly negligent?
21       MS. WILMS:
22           Object as to form.
23       THE WITNESS:
24           Can you repeat that, please?
25   EXAMINATION BY MR. KATZ:

Page 204

1        Q.   Do you have any understanding as
2    to whether the liability insurance that you
3    purchased for Anadarko covers Anadarko in
4    the event there is a claim by an injured
5    party that an incident was caused by
6    Anadarko's gross negligence?
7        MS. WILMS:
8            Object as to form.
9        THE WITNESS:
10           I do not know the answer to
11   that. I haven't researched it.
12   EXAMINATION BY MR. KATZ:
13       Q.   And you never discussed that
14   topic with anyone?
15       A.   No.
16       Q.   Does the risk management
17   function in which you're employed play any
18   role in reviewing -- strike that. I'll
19   start over again.
20           Let's look at the situation
21   where you're in a joint operating agreement
22   such as you had with British Petroleum with
23   respect to the Macondo well.
24           In such an instance, does the
25   risk management function review insurance

51 (Pages 201 to 204)

Exhibit L
Page 51

Page 205

1  policies issued by a contractor, a drilling
2  contractor working for the operator under
3  the joint operating agreement?
4       MS. WILMS:
5          Object as to form.
6       THE WITNESS:
7          No.
8  EXAMINATION BY MR. KATZ:
9       Q.   Do you know in the ordinary
10 course whether anyone at Anadarko typically
11 reviews the insurance coverage maintained
12 by drilling contractors where Anadarko is a
13 participant in a joint operating agreement?
14      A.   Where we are participating, you
15 mean as operator or non-operator?
16      Q.   Let's take it both ways.
17         Let's first take the situation
18 where you're not an operator.  Where you
19 have a participating interest in a joint
20 operating agreement, does anyone at
21 Anadarko, to your knowledge, review the
22 insurance provided by a drilling
23 contractor?
24      A.   To my knowledge, no.
25      Q.   And in the situation where

Page 206

1  Anadarko is an operator of a well, does the
2  practice of reviewing policies differ,
3  depending on whether it's a sole operator
4  or the operator under a joint operating
5  agreement?
6       MS. WILMS:
7          Object as to form.
8       THE WITNESS:
9          When Anadarko is operator under
10 an operating agreement, you're saying?
11 EXAMINATION BY MR. KATZ:
12      Q.   I'll rephrase the question.
13         Let's first look at the
14 situation where Anadarko is a sole operator
15 of a well.
16      A.   Okay.
17      Q.   Somebody, does somebody in
18 Anadarko review the insurance policies that
19 are provided by the drilling contractor to
20 make sure they're sufficient to meet the
21 requirements of the drilling contract?
22      MS. WILMS:
23         Object as to form.
24      THE WITNESS:
25         We do not look at the policies.

Page 207

1  We are provided a certificate of insurance
2  when the contract is first signed.
3  EXAMINATION BY MR. KATZ:
4       Q.   And when you say we are
5  provided, is that the risk management
6  function within Anadarko?
7       A.   That is the group that handles
8  the contract.  That's not in my group.
9       Q.   But even though you're not
10 employed in that group, you have sufficient
11 knowledge that you know that the general
12 practice is for the contract group to
13 receive a certificate of insurance and
14 review it?
15      MS. WILMS:
16         Object as to form.
17      THE WITNESS:
18         They are supposed to receive it,
19 review it, yes.
20 EXAMINATION BY MR. KATZ:
21      Q.   And what happens when Anadarko
22 is an operator under a joint operating
23 agreement?  Does the contract group, also,
24 review certificates of insurance provided
25 by drilling contractors in that situation?

Page 208

1       MS. WILMS:
2          Object as to form.
3       THE WITNESS:
4          Yes.  When we are the operator
5  of an operating agreement; correct.
6  EXAMINATION BY MR. KATZ:
7       Q.   Do you know what type of
8  information is shown on one of the
9  certificates of insurance that you
10 referenced?
11      MS. WILMS:
12         Object as to form.
13      THE WITNESS:
14         I can only tell you in general
15 what they typically include.
16 EXAMINATION BY MR. KATZ:
17      Q.   Okay.
18      A.   It would be the name of the
19 coverage, the limits, the carriers, or
20 insurers, any special provisions may be on
21 there.
22      Q.   And do you know if the
23 certificate contains information on whether
24 the operator has been named an additional
25 insured in the policies?

52 (Pages 205 to 208)

Page 209

```
 1        A.   They typically do.
 2        Q.   So from a risk management
 3   perspective, the risk management group had
 4   nothing whatsoever to do with British
 5   Petroleum's decision to use Transocean as a
 6   drilling contractor for the Macondo well;
 7   is that correct?
 8        MS. WILMS:
 9             Object as to form.
10        THE WITNESS:
11             I wasn't involved in that so I
12   don't know.  The risk management group was
13   not involved; correct.
14   EXAMINATION BY MR. KATZ:
15        Q.   And the risk management group
16   was not involved in any way in looking at
17   or evaluating the insurance coverage that
18   Transocean obtained under the drilling
19   contract; is that correct?
20        MS. WILMS:
21             Object as to form.
22        THE WITNESS:
23             Correct.
24   EXAMINATION BY MR. KATZ:
25        Q.   And to your knowledge, the only
```

Page 210

```
 1   people who reviewed that were, if at all,
 2   were people in the contract group; is that
 3   correct?
 4        MS. WILMS:
 5             Object as to form.
 6        THE WITNESS:
 7             Okay.  I'm sorry, I thought that
 8   your question was in the case where BP
 9   contracted with Transocean, did anybody
10   look at that.  Are you now talking where we
11   are the operator?
12   EXAMINATION BY MR. KATZ:
13        Q.   No.  I'm sorry for any
14   confusion.  I'm now directing my questions
15   to Transocean's involvement in the Macondo
16   well.
17        A.   Okay.
18        Q.   Okay.  And let me start over
19   just to make sure there's no confusion.
20             With respect to Transocean's
21   involvement in the Macondo well, to your
22   knowledge, nobody in the risk management
23   function reviewed in any way, any of the
24   insurance coverage that Transocean obtained
25   pursuant to the drilling contract prior to
```

Page 211

```
 1   the incident; is that correct?
 2        MS. WILMS:
 3             Object as to form.
 4        THE WITNESS:
 5             Correct.
 6   EXAMINATION BY MR. KATZ:
 7        Q.   And it's your understanding that
 8   if anyone within Transocean -- if anyone
 9   within Anadarko had reviewed that -- I'll
10   withdraw that.
11             Is it your understanding that
12   because Anadarko's involvement in the
13   Macondo well was as a participant and not
14   as an operator, that nobody within Anadarko
15   reviewed Transocean's policies prior to the
16   incident; is that correct?
17        MS. WILMS:
18             Object as to form.
19        THE WITNESS:
20             I can only answer no one in my
21   group did that.
22   EXAMINATION BY MR. KATZ:
23        Q.   Well, based on your knowledge of
24   how Anadarko conducts its operations, do
25   you have an understanding whether when
```

Page 212

```
 1   Anadarko's role as a participant in a joint
 2   operating agreement, anyone within Anadarko
 3   would review, in the ordinary course of
 4   business, the insurance policies submitted
 5   by the drilling contractor to the operator,
 6   who in this case was BP?
 7        MS. WILMS:
 8             Object as to form.
 9        THE WITNESS:
10             It's my, my understanding that
11   you are correct, that no one would have
12   looked at Transocean's insurers, insurance
13   coverage prior to the incident.
14   EXAMINATION BY MR. KATZ:
15        Q.   And basically, am I correct that
16   as a participant in the joint operating
17   agreement, Anadarko looks to the operator,
18   here BP, to be the one that would review
19   those insurance policies?  Is that correct?
20        MS. WILMS:
21             Object as to form.
22        THE WITNESS:
23             It's correct but it's an
24   operating agreement.  Not a joint -- it's
25   not a joint operating agreement, it's an
```

Exhibit L
Page 53

Page 213

1   operating agreement, so we do not get
2   involved in that; correct?
3   EXAMINATION BY MR. KATZ:
4       Q.   Just to clarify.  The insurance
5   that Transocean provided was provided under
6   the drilling contract; correct?
7       MS. WILMS:
8          Object as to form.
9       THE WITNESS:
10         I assume you mean for the
11  Macondo incident.
12  EXAMINATION BY MR. KATZ:
13      Q.   Yes.
14      A.   Was provided to BP.
15      Q.   And Anadarko as a participant
16  doesn't review what insurance Transocean
17  provided to BP under the drilling contract;
18  correct?
19      MS. WILMS:
20         Object as to form.
21      THE WITNESS:
22         To my knowledge; correct.
23  EXAMINATION BY MR. KATZ:
24      Q.   Now, I believe you said earlier
25  in your testimony that you did not review

Page 214

1   the joint operating agreement for the
2   Macondo well until sometime after the
3   incident; is that correct?
4       MS. WILMS:
5          Object as to form.
6       THE WITNESS:
7          Correct.
8   EXAMINATION BY MR. KATZ:
9       Q.   And do you recall when you first
10  reviewed it?
11      A.   I skimmed it when I was given a
12  copy to forward to the insurers as part of
13  the notice provision.  And providing the
14  documents.
15      Q.   And prior to your seeing this
16  particular joint operating agreement for
17  the first time at that time, did you have
18  any general knowledge of what a joint
19  operating agreement looked like or what its
20  general terms were?
21         In other words, did you have a
22  general working knowledge of a joint
23  operating agreement prior to that time?
24      MS. WILMS:
25         Object as to form.

Page 215

1       THE WITNESS:
2          I do have, or I did have a
3   general knowledge.  I have looked at some
4   in the past but not this particular one.
5   EXAMINATION BY MR. KATZ:
6       Q.   Did you become aware at some
7   point in time that the joint operating
8   agreement had a provision relating to
9   liability or nonliability in the event the
10  operator was grossly negligent?
11      MS. WILMS:
12         Object as to form.
13      THE WITNESS:
14         Are you asking was I made aware
15  of that?
16  EXAMINATION BY MR. KATZ:
17      Q.   Yes.  At some point in time.
18      A.   Yes, I was.
19      Q.   And do you remember when you
20  were first made aware of that provision in
21  the joint operating agreement, the
22  provisions dealing with gross negligence?
23      MS. WILMS:
24         Object as to form.
25      THE WITNESS:

Page 216

1          I was first made aware by inside
2   counsel.
3   EXAMINATION BY MR. KATZ:
4       Q.   And prior -- and that was
5   sometime after the incident; correct?
6       A.   Correct.
7       Q.   Prior to that time had you been,
8   had any general awareness in your prior
9   general knowledge of joint operating
10  agreements that there was a provision
11  dealing with gross negligence?
12      MS. WILMS:
13         Object as to form.
14      THE WITNESS:
15         Are you asking in general
16  statements my prior -- my prior experience
17  in that area?
18  EXAMINATION BY MR. KATZ:
19      Q.   Yes.
20      A.   Yes.
21      Q.   So you were aware, generally,
22  prior to the incident that joint operating
23  agreements had a carveout for the
24  participants' liability in the event a
25  claim resulted from the operator's gross

54 (Pages 213 to 216)

Exhibit L
Page 54

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
STEVEN J. FOSTER                    April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 217

1  negligence?
2      MS. WILMS:
3          Object as to form.
4      THE WITNESS:
5          I was aware that sometimes they
6  include that provision.
7  EXAMINATION BY MR. KATZ:
8      Q.  And were you aware that
9  sometimes they did not include such a
10 provision?
11     A.  Correct.
12     Q.  And did you have an
13 understanding of whether the inclusion or
14 exclusion of such a provision made a
15 difference in what would be the exposure to
16 Anadarko?
17     MS. WILMS:
18         Object as to form.
19     THE WITNESS:
20         Can you ask that one more time,
21 please?
22 EXAMINATION BY MR. KATZ:
23     Q.  Okay.  You indicated that before
24 this incident, you had a general awareness
25 of joint operating agreements and in that

Page 218

1  general awareness, you knew that sometimes
2  the agreement had a carveout for the
3  operator's gross negligence and that
4  sometimes it did not have such a carveout;
5  correct?
6      A.  Correct.
7      Q.  My question is:  Did you
8  understand that that difference in the
9  contract made a difference as to what
10 Anadarko's potential liability might be
11 under that joint operating agreement?
12     MS. WILMS:
13         Object as to form.
14     THE WITNESS:
15         Yes.
16 EXAMINATION BY MR. KATZ:
17     Q.  And what difference did it make,
18 to your understanding?
19     A.  It depends if we were the
20 operator or the non-operator.
21     Q.  And in situations where you were
22 the non-operator, how would it differ
23 depending on whether the contract had the
24 carveout or did not have the carveout?
25     MS. WILMS:

Page 219

1          Object as to form.
2      THE WITNESS:
3          If we are non-operator and the
4  provision is in the operating agreement
5  that says if the operator is gross, then
6  the non-ops are not liable, then in that
7  case Anadarko is the non-operator, then we
8  would not have to pay our share of the
9  exposure.
10 EXAMINATION BY MR. KATZ:
11     Q.  And if that carveout was not in
12 the contract, was it your understanding
13 that you would then have to pay your share
14 of the liability?
15     MS. WILMS:
16         Object as to form.
17     THE WITNESS:
18         I don't know if it wasn't
19 addressed.  I'm not a lawyer, so I don't
20 know what that means.  I'm only saying if
21 there's expressed provisions in there
22 saying gross negligence this way, gross
23 negligence that way.  If it's never
24 mentioned, I don't know what effect that
25 has on it.

Page 220

1  EXAMINATION BY MR. KATZ:
2      Q.  Did you ever have any
3  conversation with anyone from British
4  Petroleum regarding the issue of additional
5  insured status under Transocean's policies?
6      A.  Yes.
7      Q.  And who did you speak to at
8  British Petroleum?
9      A.  Bill Siebenaler, whatever his
10 name is.  I can look it up.  Schnelenberger
11 (spelled phonetically).  I don't know his
12 last name.
13     Q.  If you have something that you
14 can look it up, why don't we do that now?
15     MS. WILMS:
16         That's fine.
17     THE WITNESS:
18         Yes, I'm sorry.  I didn't know
19 I'd have to know his last name.
20     MS. WILMS:
21         That's totally fine.
22     THE WITNESS:
23         Okay.  It's William J. and I'm
24 just going to spell it,
25 S-I-E-B-E-N-A-L-E-R.

55 (Pages 217 to 220)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit L
Page 55

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                       Reported by:
STEVEN J. FOSTER               April 27, 2011    JOSEPH R. KAISER, JR., CCR, RPR

---

Page 221

EXAMINATION BY MR. KATZ:
1
2       Q.   Siebenaler?
3       A.   I guess that's close enough.
4       Q.   And what was the context -- what
5    gave rise to the conversation that you had
6    with him on that topic?
7       A.   We were discussing the claims
8    adjusting process and he just made a
9    one-sentence statement that BP feels they
10   have rights against Transocean's insurance
11   policy.
12      Q.   And to the best of your
13   recollection, when did this conversation
14   take place?
15      A.   Probably the best, maybe within
16   a month and a half of the incident.
17           Again, I don't know where along
18   that timeline, but somewhere in the first
19   month and a half.
20      Q.   Sitting here today, you're not
21   able to remember whether, whether it was
22   within the first week after the incident,
23   or more towards a month after the incident?
24      A.   No.  I'm sorry.
25      Q.   When Mr. Siebenaler raised this

---

Page 222

1    in conversation with you, was that the
2    first time you had heard the idea of making
3    a claim against Transocean's policies with
4    respect to the incident?
5       MS. WILMS:
6           Object as to form.
7       THE WITNESS:
8           Well, regarding BP's asserting
9    rights; right.
10      EXAMINATION BY MR. KATZ:
11      Q.   Had you thought of that idea
12   before Mr. Siebenaler's mentioning it to
13   you?
14      MS. WILMS:
15          Object as to form.
16      THE WITNESS:
17          Have I thought of it?
18      EXAMINATION BY MR. KATZ:
19      Q.   Had you?
20      A.   No.
21      Q.   So as risk manager for Anadarko,
22   you had not thought of the idea of making a
23   claim against Transocean's policies until
24   Mr. Siebenaler of BP mentioned it to you;
25   is that correct?

---

Page 223

1       MS. WILMS:
2           Object as to form.
3       THE WITNESS:
4           Well, that's part of the process
5    you go through when you have this type of
6    incident.  Everything is investigated.  But
7    if you're asking me did I originate that
8    idea before that, no.
9       EXAMINATION BY MR. KATZ:
10      Q.   The idea came from BP, from
11   Mr. Siebenaler to you; correct?
12      A.   Well, he had mentioned that to
13   me.  Sorry.
14      MS. WILMS:
15          Object as to form.
16      THE WITNESS:
17          Yeah.
18      EXAMINATION BY MR. KATZ:
19      Q.   Just to be clear, you had not
20   thought of the idea of Anadarko's making a
21   claim until Mr. Siebenaler mentioned it to
22   you in this phone conversation; correct?
23      MS. WILMS:
24          Objection as to form.
25      THE WITNESS:

---

Page 224

1           Well, just to be clear, I knew
2    that would be investigated and researched
3    in due order.
4       EXAMINATION BY MR. KATZ:
5       Q.   Did somebody tell you it was
6    being investigated and researched before
7    then?
8       A.   No.  No.
9       Q.   So when you say you knew that
10   somebody would investigate it, you mean you
11   assumed that somebody in -- somebody would
12   look at that?
13      MS. WILMS:
14          Object as to form.
15      THE WITNESS:
16          Yes.
17      EXAMINATION BY MR. KATZ:
18      Q.   And when you say you assumed
19   that they would look at it, are you saying
20   that you assumed, you assumed that all
21   conceivable issues would be looked at and
22   now in hindsight you realized that that's a
23   conceivable issue?
24           What I'm trying to get at is,
25   had the idea of Anadarko's making a claim

---

56 (Pages 221 to 224)

Exhibit L
Page 56

Page 225

1    against Transocean's policies, had that
2    thought occurred to you before this call
3    with Mr. Siebenaler?
4        MS. WILMS:
5            Object as to form.
6        THE WITNESS:
7            Had that thought occurred to me
8    for us to go after, or for BP to go after
9    that, no, the thought had not occurred.
10   EXAMINATION BY MR. KATZ:
11       Q.   Thank you.
12           Prior to the Macondo incident,
13   in your function as risk manager, had you
14   ever been involved in making a claim on
15   behalf of Anadarko on another company's
16   insurance under an additional insured
17   provision?
18       A.   Yes.
19       Q.   And is that something that has
20   happened frequently, or are there only a
21   few occasions?
22       MS. WILMS:
23           Object as to form.
24       THE WITNESS:
25           My involvement has been a few

Page 226

1    occasions.
2    EXAMINATION BY MR. KATZ:
3        Q.   Give me the ones that you've
4    been involved with.
5        A.   Personal injury claims,
6    employees of our service contractor gets
7    hurt, sues Anadarko.  We assert our rights
8    as the additional insured under their
9    policy.
10       Q.   Now, are you thinking of a
11   particular instance of such a PI claim and
12   such an assertion, or is this something
13   that's happened on multiple occasions?
14       MS. WILMS:
15           Object to form.
16       THE WITNESS:
17           Sorry.  On multiple occasions.
18   EXAMINATION BY MR. KATZ:
19       Q.   Can you remember any specific
20   occasions?
21       A.   I couldn't recall the name of
22   the claimant, or plaintiff.
23       Q.   But these are situations where
24   under their particular contract, the
25   contractor has agreed to indemnify Anadarko

Page 227

1    and has agreed to provide insurance naming
2    you as an additional insured with respect
3    to that contractual indemnity; is that
4    correct?
5        MS. WILMS:
6            Object as to form.
7        THE WITNESS:
8            Correct.
9        MR. KATZ:
10           I'm going to mark as next in
11   order which will be Exhibit 1859.
12           (Whereupon, the document
13   referred to was marked as Exhibit No. 1859
14   for identification.)
15       MR. KATZ:
16           This is Tab 14 in the disks that
17   are here for anybody who wants to look at
18   it on the disk.
19   EXAMINATION BY MR. KATZ:
20       Q.   Exhibit 1859 has the Bates
21   stamped ANA MDL 000197325 through 197327.
22           Do you recognize this?
23       A.   Yes, I do.
24       Q.   And this appears to be an e-mail
25   from you to Mr. Tackett; is that correct?

Page 228

1        A.   Correct.
2        Q.   And you say in this e-mail,
3    finally.  You see that?
4        A.   Yes, I see it.
5        Q.   Do you remember what you meant
6    by finally?
7        A.   Well, what I meant was that we
8    have issued this statement.
9        Q.   So had you been anticipating
10   this statement for a period of time and
11   then you finally saw that the company
12   issued it so you passed it on to somebody
13   with the comment finally?  Is that what
14   happened?
15       MS. WILMS:
16           Object as to form.
17       THE WITNESS:
18           I was not involved in the
19   determination whether BP was gross,
20   allegedly or not.  I knew that that was
21   being worked upon within the company and
22   outside counsel, so I knew that we were
23   going to either make a decision one way or
24   the other because I was aware of the
25   provision in the operating agreement.

Exhibit L
Page 57

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                          Reported by:
STEVEN J. FOSTER          April 27, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 229

1   EXAMINATION BY MR. KATZ:
2       Q.   And so by finally, you meant you
3   finally learned what the decision was?
4       A.   Right.
5       MR. KATZ:
6           Can we take a five-minute recess
7   to see if I have any more questions?
8       THE VIDEOGRAPHER:
9           This is the end of Tape 5, we're
10  now off the record at 2:16.
11          (Off the record.)
12      THE VIDEOGRAPHER:
13          This is the beginning of Tape 6.
14  We're now back on the record.  The time is
15  2:28.
16  EXAMINATION BY MR. KATZ:
17      Q.   Mr. Foster, earlier you
18  mentioned that there were several instances
19  where Anadarko had made a claim under
20  additional insured coverage of service
21  contractors.
22          Can you remember any of the
23  incidents where the service contractor's
24  involved, by name?
25      MS. WILMS:

Page 230

1           Object as to form.
2       THE WITNESS:
3           No, I don't remember.  Sorry.
4   EXAMINATION BY MR. KATZ:
5       Q.   Do you recall any instance where
6   Anadarko made a claim as an additional
7   insured where the claim went beyond the
8   risk for which the contractor owed
9   indemnity under the contract?
10      MS. WILMS:
11          Objection as to form.
12      THE WITNESS:
13          I don't recall.
14  EXAMINATION BY MR. KATZ:
15      Q.   All right.  You mentioned
16  earlier when you were being questioned by
17  plaintiff's counsel that Anadarko is giving
18  consideration to making claims under other
19  policies, as well, as additional insured;
20  is that correct?
21      A.   Correct.
22      Q.   And who are the companies whose
23  policies you're considering making claims
24  against?
25      MS. WILMS:

Page 231

1           Object as to form.
2   EXAMINATION BY MR. KATZ:
3       Q.   If you know.
4       A.   That is a discussion with
5   outside counsel.
6       Q.   So everything you've learned on
7   that, you've learned through outside
8   counsel; is that correct?
9       A.   Correct.  Correct.
10      Q.   In the phone call that you had
11  with Mr. Siebenaler that you testified
12  about, did he mention BP's seeking
13  additional insured coverage against any
14  companies other than Transocean, or did he
15  only mention Transocean?
16      A.   He only mentioned Transocean.
17      MR. KATZ:
18          I have nothing further.
19          I withdraw that.
20      THE VIDEOGRAPHER:
21          We're now off the record at
22  2:30.
23          (Off the record.)
24      THE VIDEOGRAPHER:
25          We're now back on the record.

Page 232

1   The time is 2:31.
2   EXAMINATION BY MR. KATZ:
3       Q.   One last set of questions.
4   Going back to the conversation you had with
5   Mr. Siebenaler that you testified about, to
6   the best of your recollection, what did he
7   say about the possibility of making a claim
8   as additional insured under Transocean's
9   policy?
10      MS. WILMS:
11          Object as to form.
12      THE WITNESS:
13          As best as I could recall, he
14  said that BP thinks they have rights under
15  Transocean's insurance as an additional
16  insured.
17  EXAMINATION BY MR. KATZ:
18      Q.   And did he say as an additional
19  insured with respect to any particular
20  issue, or arrangement?
21      A.   No.
22      MS. WILMS:
23          Object as to form.
24      MR. KATZ:
25          Okay.  I have nothing further.

58  (Pages 229 to 232)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile: (504) 525-9109

Exhibit L
Page 58

Page 233

1   Does anyone else, any other counsel want to
2   question the witness, or should I end the
3   deposition?
4       MS. WILMS:
5           Sounds like.
6       THE VIDEOGRAPHER:
7           This is the end of Tape 6.
8   We're now off the record at 2:32.
9           (Whereupon the deposition is
10  concluded at 2:32 p.m.)

Page 235

REPORTER'S CERTIFICATE
1
2
3
4       I, JOSEPH R. KAISER, JR., Certified
5   Court Reporter, State of Louisiana, do
6   hereby certify that the above-mentioned
7   witness, after having been first duly sworn
8   by me to testify to the truth, did testify
9   as hereinabove set forth;
10      That the testimony was reported by
11  me in shorthand and transcribed under my
12  personal direction and supervision, and is
13  a true and correct transcript, to the best
14  of my ability and understanding;
15      That I am not of counsel, not
16  related to counsel or the parties hereto,
17  and not in any way interested in the
18  outcome of this matter.
19
20
21      JOSEPH R. KAISER, JR., CCR, RPR
        Certified Court Reporter
        State of Louisiana
22
23
24
25

Page 234

1
2
3       WITNESS' CERTIFICATE
4
5
6
7
8       I, STEVEN J. FOSTER, read or have
9   had the foregoing testimony read to me and
10  hereby certify that it is a true and
11  correct transcription of my testimony, with
12  the exception of any attached corrections
13  or changes.
14
15
16
17
18
19      STEVEN J. FOSTER
20
21
22
23
24
25

Exhibit L
Page 59