# EXHIBIT Q

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010

Reported by:

**JESSE GAGLIANO**                    **May 11, 2011**                    **TAMARA CHAPMAN, CSR**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )   MDL NO. 2179
by the OIL RIG,        )
DEEPWATER HORIZON in  )   SECTION "J"
the GULF OF MEXICO,    )
April 20, 2010      )   JUDGE BARBIER
                )
                )   MAG. JUDGE
                )   SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of JESSE GAGLIANO,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on May 11, 2011

APPEARANCES:

Mr. Tom Thornhill
Ms. Emily Gebhardt
THORNHILL LAW FIRM
1308 Ninth Street
Slidell, Louisiana 70458
(800) 989-2707

---

Page 2

APPEARANCES (continued):

Mr. Scott R. Bickford
MARTZELL & BICKFORD
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
    -
Mr. Ronnie Penton
LAW OFFICES OF RONNIE G. PENTON
209 Hoppen Place
Bogalusa, Louisiana 70427
(985) 732-5651
        APPEARING FOR THE
        PLAINTIFFS' STEERING COMMITTEE

Mr. Philip Chen
KIRKLAND & ELLIS, LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400
        APPEARING FOR BP, INC.

Mr. A. Nathaniel Chakeres
Mr. Scott Cernich
U.S. DEPARTMENT OF JUSTICE
Civil Division, Torts Branch
1425 New York Avenue, Northwest, Suite 10100
Washington, D.C. 20005
        APPEARING FOR THE UNITED
        STATES

---

Page 3

APPEARANCES (continued):

Ms. Deborah Kuchler
Ms. Sara Iiums
Ms. Janika Polk
Mr. Lee Ziffer
KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
(504) 592-0691

        APPEARING FOR ANADARKO PETROLEUM
        COMPANY AND MOEX OFFSHORE 2007,
        LLC

Mr. Dan Goforth
GOFORTH GEREN EASTERLING, LLP
4900 Woodway, Suite 750
Houston, Texas 77056
(713) 650-0022
        APPEARING FOR TRANSOCEAN

Mr. Floyd Hartley
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
(214) 939-4412 Fax: 214-939-4803

        APPEARING FOR HALLIBURTON

Mr. Eric J.R. Nichols
BECK, REDDEN & SECREST
515 Congress, Suite 1750
Austin, Texas 78701
(512) 708-1000
        APPEARING FOR CAMERON

---

Page 4

APPEARANCES (continued):

Mr. Lambert J. "Joe" Hassinger Jr.
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
(504) 525-6802
        APPEARING FOR THE STATE OF
        LOUISIANA

Mr. Eric A. Kuwana
KATTEN MUCHIN ROSENMAN, LLP
2900 K Street NW, Suite 200
Washington, DC 20007
(202) 625-3500
        APPEARING ON BEHALF OF JESSE
GAGLIANO

ALSO PRESENT:

Mr. Karl Stiegman, Videographer

REPORTED BY:

        TAMARA CHAPMAN, CSR
        Certified Court Reporter
        State of Texas

---

1 (Pages 1 to 4)

JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

---

**Page 5**

```
 1               I N D E X
 2                          PAGE
 3   Appearances.............................1
 4   JESSE GAGLIANO
 5   Examination by Mr. Thornhill............8
 6   Examination by Ms. Kuchler............187
 7   Examination by Mr. Goforth............286
 8   Examination by Mr. Chen...............292
 9   Examination by Mr. Thornhill..........370
10   WITNESS' CERTIFICATE..................379
11   REPORTER'S CERTIFICATE................380
12
13             EXHIBITS
14   NO.    DESCRIPTION          PAGE
15   2031   Fifth Amendment Statement   36
16   2032   The Transcript of The Joint
            United States Coast Guard, The
17          Bureau of Ocean Energy
            Management - Tuesday, August 24,
18          2010                         52
19   2033   Telephone Interview of:  Jesse
            Marc Gagliano - Friday, June 11,
20          2010                         53
21   2034   9 7/8" Design Report - May 25,
            2009 Bates HAL_0554765 - 78  62
22
     2035   E-Mail - From Jesse Gagliano,
23          Sent Thu Apr 29 08:46:28 2010 -
            Subject: Foamed Production Jobs
24          at BP - Livelink 10 KB, Bates
            HAL_0559564              375
25
```

---

**Page 6**

```
 1         EXHIBITS (continued)
 2
     NO.    DESCRIPTION          PAGE
 3   2036   E-mail from Erick Cunningham,
            sent Wed Feb 24 17:21:55
 4          2010 - Subject RE: Cementing
            Planning - Livelink 29 KB
 5          Bates HAL_0534942 - 44      87
 6   2037   [Brett.Cocales@bp.com] sent
            Thursday, February 25, 2010,
 7          10:46 AM - Subject: RE: CST
            info Bates HAL_0072120      88
 8
     2038   E-mail from Erick Cunningham,
 9          sent Mon, Mar 22 14:32:58
            2010 - Subject: FW: Production
10          Cement 41 Job Bates
            HAL_0537224              93
11
     2039   E-mail sent Tuesday, April 13,
12          2010 12:04 PM to VHG3@aol.com;
            Brian P. Morel - Subject: RE: 7"
13          float collar Bates HAL_0536145 94
14   2040   Macondo #1 - 9 7/8"X7"
            PRODUCTION CASING DESIGN
15          REPORT - For:  Brian Morel,
            Date:  April 14, 2010     96
16
     2041   E-mail from Brian P. Morel,
17          sent Thu Apr 15 15:59:51
            2010 - Subject: RE: OptiCem
18          Report - Livelink 92 KB
            HAL_0535018 - 20         99
19
     2042   E-mail from Mark E. Hafle, sent
20          Fri Apr 16 14:30:35 2010 - 4l
            Subject: RE: Production Casing
21          and Design Proposal & OptiCem
            Report BP-HZN-2179MDL00011184 -
22          85                      109
23   2043   Input Difference between OptiCem
            Report on 4-15-10 & 4-18-10
24          Bates HAL_0562829 - 35     117
25
```

---

**Page 7**

```
 1         EXHIBITS (continued)
 2
     NO.    DESCRIPTION          PAGE
 3
 4   2044   E-mail from Jesse Gagliano,
            sent Wednesday, April 21, 2010
            7:58 AM - Subject: RE: Casing
 5          test data?  Bates HAL_0113583  136
 6   2045   E-mail from Jesse Gagliano, sent
            Sat Apr 17 14:29:58 2010 -
 7          Subject: Updated OptiCem
            Bates HAL_0502625 - 38      144
 8
 9   2046   E-mail from Jesse Gagliano, sent
            Sun Apr 18 11:29:03 2010 -
10          Subject: Updated OptiCem     144
11   2047   Macondo #1 - 9 7/8"X7"
            PRODUCTION CASING DESIGN
12          REPORT - For:  Brian Morel,
            Date:  April 18, 2010      144
13   2048   E-mail from Brett W. Cocales,
            sent Sun Apr 25 08:56:54 2010 -
14          Subject: RE: Macondo Cementing
            Records - Livelink 8 KB,
15          Bates HAL_0537548 - 49     144
16   2049   E-mail from Kent Corser, sent
            Thu Apr 29 19:35:00 2010 -
17          Subject: FW: Post Job Reports,
            Bates BP-HZN-BLY00132170 - 265  144
18
19   2050   Global Laboratories Best
            Practices, Vol. - Section 2:
20          Standard Testing Bates
            HAL_0051624 - 46         150
21   2051   E-mail from Jesse Gagliano, sent
            Saturday, May 01, 2010 8:18 AM -
22          Subject: Lab test for Macondo
            Bates HAL_0084845        379
23
24
25
```

---

**Page 8**

```
 1        THE VIDEOGRAPHER:  This is the
 2   videotaped deposition of Jesse Gagliano.
 3   This deposition is being held at 601 Poydras
 4   Street in New Orleans, Louisiana, on May the
 5   11th, 2011.  The time indicated on the video
 6   screen, 8:34 a.m.
 7        This deposition is being taken
 8   in the matter of the oil spill by the
 9   DEEPWATER HORIZON in the Gulf of Mexico on
10   April the 20th, 2010, in the United States
11   District Court, Eastern District, State of
12   Louisiana.
13        Would the court reporter please
14   swear in the witness.
15        JESSE GAGLIANO,
16   having been first duly sworn, testified as
17   follows:
18           EXAMINATION
19   BY MR. THORNHILL:
20   Q.   State your name and address for
21   the record, please, sir.
22   A.   Jesse Marc Gagliano.  Address is
23   23251 Dewflower Drive, Katy, Texas 77494.
24   MR. KUWANA:  Counsel, I just want to
25   make you aware of the witness has a sciatic
```

---

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

JESSE GAGLIANO               May 11, 2011               TAMARA CHAPMAN, CSR

---

Page 9

1  nerve issue -- a sciatic nerve issue, and
2  literally his legs go numb if he sits for too
3  long.
4          He will let you know if he needs
5  to go off the record and just simply stand up
6  and stretch, but that may happen one or two
7  or three times today.
8          MR. THORNHILL:  There will be no
9  problem with that.  Eric, I can tell you that
10 we routinely have to stop every hour to
11 change tapes.
12         MR. KUWANA:  Yeah, I understand.
13         MR. THORNHILL:  And we take about a
14 five-minute break.  And anytime that you or
15 your client feels like he needs to take a
16 break, as Mr. Hartley will tell you, we'll
17 accommodate that.  That's not a problem.
18         MR. KUWANA:  I appreciate that,
19 Counsel.
20         MR. THORNHILL:  Yes.
21    Q.   (BY MR. THORNHILL) Mr. Gagliano,
22 I'm Tom Thornhill with the PSC, and I have
23 with me today co-counsel.  I have my
24 associate, Emily Gebhardt, and I have the
25 esteemed colleagues Ronny Penton and Scott

---

Page 10

1  Bickford with me, also with the Plaintiffs
2  Steering Committee.
3          So today I need to first ask you
4  how long you've lived at your current
5  address.
6     A.   Approximately five, five and a
7  half years.
8     Q.   All right.  By whom are you
9  employed?
10    A.   Halliburton.
11    Q.   Can you give us your educational
12 background.
13    A.   I graduated from LSU in '98 with
14 an industrial engineering degree.
15    Q.   Have you engaged in any other
16 formal education since 1998 when you
17 graduated with this bachelor of science in
18 industrial engineering?
19    A.   No.
20    Q.   Have you been to training
21 courses for your employer, Halliburton?
22         MR. KUWANA:  You can answer that.
23    A.   Yes.
24    Q.   (BY MR. THORNHILL) Okay.  Can
25 you explain generally your training courses?

---

Page 11

1     A.   On the advice of counsel, I
2  decline to answer based upon my Fifth
3  Amendment privilege, which, according to the
4  United States Supreme Court, protects
5  innocent men who otherwise might be ensnared
6  by ambiguous circumstances where truthful
7  responses of an innocent witness may provide
8  the government with evidence which could be
9  somehow used against him.
10    Q.   Okay.  I understand you're
11 represented by counsel today and that they
12 are here today, correct?
13    A.   Yes.
14    Q.   You have private counsel as well
15 as Halliburton counsel with you at the table
16 today, correct?
17    A.   Yes.
18    Q.   All right.  We obviously respect
19 the constitutional privilege that you have
20 asserted not to testify.  My understanding is
21 that you're also familiar with other
22 constitutional privileges that may be
23 asserted.  Is that correct?  Should I give
24 you an example such as your right to a trial
25 by jury?

---

Page 12

1     A.   Okay.  Yes.
2     Q.   You're familiar with that?
3     A.   Yes.
4     Q.   And you have counsel, so you're
5  obviously familiar with the constitutional
6  privilege to have counsel, correct?
7     A.   Yes.
8     Q.   All right.  In this case there
9  are numerous issues, but let me begin with
10 this one that you've raised about privileges.
11         Have you previously been
12 arrested or charged with the commission of a
13 felony?
14    A.   No.
15    Q.   Have you ever been convicted of
16 a criminal offense?
17    A.   No.
18    Q.   Other than a traffic violation?
19    A.   Yeah, other than speeding
20 ticket, no.
21    Q.   Right.  Other than the DEEPWATER
22 HORIZON explosion, have you ever been
23 involved in any regulatory prosecution?
24    A.   No.
25    Q.   Have you ever been charged by

---

3 (Pages 9 to 12)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 3

Page 13

1    the Minerals Management Service, now referred
2    to as BOEMRE with any violation of
3    regulations promulgated by that agency?
4         A.    No.
5         Q.    Other than the explosion
6    incident involving the DEEPWATER HORIZON,
7    have you ever been interviewed by agents of
8    criminal prosecutorial authorities?
9         A.    No.
10        Q.    Let's talk about lawsuits.  Have
11   you been previously sued?
12        A.    Yes.
13        Q.    Okay.  Explain to us what suits
14   have been filed against you.
15        A.    It's my understanding I was
16   named in, I believe, the Plaquemines Parish
17   School Board suit related to this incident.
18        Q.    Are there any other suits
19   against you?
20        A.    No.
21        Q.    Have you previously been sued in
22   a case that is now closed?
23        A.    No.
24        Q.    Have you filed suit against
25   someone else?

Page 14

1         A.    No.
2         Q.    In this case involving the
3    DEEPWATER HORIZON, have you met with federal
4    prosecutorial authorities?
5         MR. KUWANA:  You can answer.
6         MR. HARTLEY:  Object; form.
7         A.    I testified with the Coast
8    Guard, and I had a phone conference with
9    Senator Waxman's group, and I believe I met
10   with the MMS, now BOEMRE, one time besides
11   the testimony.
12        Q.    (BY MR. THORNHILL)  Okay.  Have
13   you met with the FBI?
14        A.    No.
15        Q.    Have you met with the EPA?
16        A.    No.
17        Q.    Have you met with environmental
18   commissions in any state?
19        A.    No.
20        Q.    When you met -- or had a
21   telephone interview with the Waxman
22   committee, I understand that's been reduced
23   to writing.  Have you seen that writing?
24        A.    No, I haven't.
25        Q.    Okay.  When you met with the

Page 15

1    Coast Guard and gave testimony, your
2    testimony was reduced to writing.  Have you
3    seen that writing?
4         A.    Yes.
5         Q.    That transcript of your
6    testimony?
7         A.    Yes.
8         Q.    You've seen that.  Have you
9    reviewed it before today?
10        A.    Not recently, no.
11        Q.    Okay.  In connection with this
12   case, have you been told that you are the
13   subject of a potential criminal investigation
14   or an ongoing criminal investigation and
15   particularly that you are a target of that
16   investigation?
17        A.    Yes.
18        Q.    Were you so advised by people
19   with the Coast Guard or with one of the
20   federal agencies with which you spoke?
21        MR. KUWANA:  Objection.  Based on
22   privilege, I'll instruct him not to answer.
23   Only what he knows is through counsel.
24        Q.    (BY MR. THORNHILL)  Okay.  Eric
25   tells us that --

Page 16

1         MR. THORNHILL:  And, I'm sorry, I need
2    to refer to you as Mr. Kuwana, Eric.
3         Q.    (BY MR. THORNHILL)  Mr. Kuwana
4    tells us that you have been advised only
5    through him that you're a target of an
6    investigation; is that correct?
7         A.    Yes.
8         Q.    Now --
9         MR. KUWANA:  Just to -- Counsel, to
10   clarify, he's not a target.  You used the
11   both subject and target in your first
12   questions --
13        MR. THORNHILL:  Okay.
14        MR. KUWANA:  -- actually, he's been
15   advised that he's a subject.
16        MR. THORNHILL:  Thank you for
17   clarifying that.  I did ask both, and thank
18   you for clarifying that.
19        Q.    (BY MR. THORNHILL)  So in this
20   case, it's my understanding, based upon the
21   representations of Mr. Kuwana, Mr. Gagliano,
22   that you've been told that you are a subject
23   of the investigation, a criminal
24   investigation involving the DEEPWATER
25   HORIZON; is that correct?

                              4  (Pages 13 to 16)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 17

1    MR. KUWANA: Again, I'm going to object
2  based on privilege. The only way he knows
3  that information is through counsel.
4    MR. THORNHILL: Okay. I'll rephrase
5  the question. Thank you, Mr. Kuwana.
6    Q.   (BY MR. THORNHILL) Am I correct
7  in understanding that you understand that you
8  have been made the subject of a criminal
9  investigation involving the DEEPWATER
10  HORIZON?
11    A.   Yes, I was informed by counsel.
12  Yes.
13    MR. THORNHILL: After all that.
14    Q.   (BY MR. THORNHILL) Have you
15  testified in front of a state or a federal
16  grand jury?
17    A.   No.
18    Q.   Particularly involving the
19  DEEPWATER HORIZON explosion?
20    A.   No.
21    Q.   Have you, in connection with the
22  DEEPWATER HORIZON matter, been promised
23  anything by those who might be potentially
24  prosecuting you in this case?
25    MR. KUWANA: Could you rephrase that,

Page 18

1  Counsel?
2    Q.   (BY MR. THORNHILL) Let's cut to
3  the chase. Have you been promised immunity
4  from prosecution in exchange for cooperation
5  with the prosecutors?
6    MR. KUWANA: Again, I'm going to
7  instruct him not to answer. The only way he
8  would know any of that information is through
9  counsel.
10    Q.   (BY MR. THORNHILL) Do you
11  understand, Mr. Gagliano, that if you
12  cooperate with the prosecutors that you will
13  not be prosecuted?
14    MR. KUWANA: Again, I'm going to
15  instruct him not to answer. The only way he
16  has any understanding of that is through
17  counsel.
18    Q.   (BY MR. THORNHILL) Are you
19  providing information to the prosecutors of
20  crimes arising out of the explosion of the
21  DEEPWATER HORIZON in exchange for immunity?
22    MR. KUWANA: Again, any deals,
23  immunity, any arrangements with the
24  government is -- he only knows through
25  counsel, so I will instruct him not to

Page 19

1  answer.
2    Q.   (BY MR. THORNHILL) Provide us,
3  if you will, with the benefit of whether you
4  have personally signed any deal or any
5  agreement with the prosecutors, Mr. Gagliano,
6  or counsel?
7    A.   No.
8    Q.   Okay. Have you been tendered a
9  written deal for signing?
10    A.   No.
11    Q.   Okay. Other than the school
12  board suit for Plaquemines Parish, am I
13  correct in saying that you have not been
14  sued, to your knowledge, in any of the civil
15  cases involving the DEEPWATER HORIZON
16  explosion?
17    A.   No, not to my knowledge.
18    Q.   Okay. Describe your
19  responsibilities in your job for Halliburton.
20    MR. HARTLEY: Object to form.
21    Q.   (BY MR. THORNHILL) Mr. Gagliano,
22  you may not have been privy to these
23  depositions before, so let me share with you
24  a little background information. And I think
25  it's probably a good time for us to perhaps

Page 20

1  have some basic housekeeping rules on the
2  record.
3    First, as I've told you and your
4  counsel, if at any time you need to take a
5  break, don't hesitate to tell us. Obviously,
6  you're the witness and you and your counsel
7  have some degree of control.
8    I understand that you have a
9  back injury, a sciatic nerve injury; is that
10  correct?
11    A.   Yes, sir.
12    Q.   I know from others that that can
13  be very painful. Once again, if you need to
14  stop, stand up, stretch, take a break, just
15  let us know and we'll be happy to accommodate
16  that.
17    A.   Okay.
18    Q.   About every hour we plan to stop
19  and change the tape. Usually at those points
20  we do go to the bathroom and get water, so
21  you should know that that is going to be
22  available to you. But that's not the only
23  time that you can stop and do those things.
24    A.   Okay.
25    Q.   You know perhaps from discussing

5 (Pages 17 to 20)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Page 21

1  this with others, but this is a civil
2  deposition and it's just as if you were in
3  court. You are under oath. Do you
4  understand that?
5      A.   Yes, I do.
6      Q.   And you've sworn to tell the
7  truth. Do you understand that?
8      A.   Yes.
9      Q.   Although the judge is not here,
10  it's just as if he was here. You understand
11  that, do you not?
12     A.   Yes.
13     Q.   And he has authority over these
14  proceedings. Do you understand that?
15     A.   Yes.
16     Q.   Now, you have counsel. And
17  we've talked about your rights, but you know
18  that if you do not testify truthfully in this
19  matter, there are always potential
20  consequences, including prosecution for
21  perjury that would arise out of this sort of
22  proceeding. Are you familiar with that?
23     A.   Yes.
24     Q.   Okay. Regarding your assertion
25  of the Fifth Amendment privilege, the one

Page 22

1  time that you read your statement, we as
2  lawyers obviously respect that. But I would
3  suggest and hope that counsel, Mr. Kuwana or
4  Mr. Hartley or both of you, will join in our
5  wanting to abbreviate the need for you to
6  read that entire statement every time that
7  you would assert that privilege. We would be
8  happy to accommodate an assertion of
9  privilege or Fifth Amendment, however you
10  wish to characterize it to shortcut it, and
11  consider that to be whichever expanded scope
12  of the privilege you wish to say that it
13  relates to.
14     MR. THORNHILL: Let him do that.
15     MR. KUWANA: We understand the
16  position. The witness would like to read the
17  statement. If it is agreed upon that he
18  would have that inserted as his answer each
19  time, we are fine doing something like that,
20  but otherwise it's his intent to read the
21  whole thing.
22     MR. THORNHILL: I don't have any
23  problem with that. Do you guys?
24     MR. KUWANA: Is there any objection in
25  the room that the court reporter -- if he

Page 23

1  states the Fifth as his answer, that the
2  initial statement that he read be inserted in
3  place of that answer?
4      THE DEFENDANTS: No objection.
5      MR. HARTLEY: To clarify --
6      MR. THORNHILL: Mr. Hartley?
7      MR. HARTLEY: -- if the excerpts are
8  played of the videotape at trial or otherwise
9  that the video of him reading the statement
10  will be interposed as the answer rather than
11  him saying an abbreviated statement.
12     Is that the understanding?
13     MR. THORNHILL: Well, I think that what
14  we probably should do is let's try for the
15  first hour however it might be that you wish
16  to do that. We're all fine, I think, with
17  his simply saying "Fifth Amendment" and that
18  that would protect the record.
19     I'm not so sure that the Court
20  would allow us to dub in that statement
21  entirely. I think by stipulation we can do
22  that, but I don't know if we can modify the
23  record as you've suggested.
24     I think by agreement we can
25  essentially do that, but I'm not so sure that

Page 24

1  we can agree to manipulate the record. So
2  with that reservation, Mr. Hartley --
3      MR. KUWANA: I guess the concern is the
4  visual dynamics.
5      MR. BICKFORD: Well, my concern is that
6  the statement that he's read in terms of
7  asserting his Fifth Amendment privilege is,
8  in fact, goes beyond a regular assertion of
9  Fifth Amendment privilege. And is -- if he's
10  asserting the Fifth Amendment to not testify,
11  I mean, he can obviously read this, you know,
12  until the -- whether it's proper or not, I'm
13  not sure.
14     MR. HARTLEY: I mean, it's pretty much
15  a verbatim statement.
16     MR. THORNHILL: We understand. But
17  when you -- you obviously, as an officer of
18  the court, understand our concern. We can't
19  manipulate the record.
20     MR. HARTLEY: Understood.
21     MR. THORNHILL: Okay. So if you accept
22  the stipulation, fine. If not, let's see how
23  it goes in the first hour.
24     MR. KUWANA: Counsel, I think we ought
25  to see how it goes in the first hour. And if

Exhibit Q
Page 6

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010        Reported by:

JESSE GAGLIANO                    May 11, 2011              TAMARA CHAPMAN, CSR

Page 25

1  it becomes too burdensome, we can talk about
2  that at that point.
3          MR. THORNHILL:  That was my suggestion.
4  We can talk at the next break.
5          Okay, Mr. Hartley?
6      MR. HARTLEY:  Fair enough.
7      Q.    (BY MR. THORNHILL)  Describe for
8  us, if you will, the details of your job
9  responsibilities for Halliburton.
10     A.    On the advice of counsel, I
11  decline to answer based on my Fifth Amendment
12  privilege, which, according to the United
13  States Supreme Court, protects innocent men
14  who otherwise might be ensnared by ambiguous
15  circumstances where truthful responses of an
16  innocent witness may provide the government
17  with evidence which it could be somehow used
18  against him.
19     Q.    In this case we've seen and have
20  introduced into evidence a chart of the
21  organization of Halliburton employees,
22  including your name in the chart.
23          That chart shows that you had
24  report responsibilities to individuals in
25  Lafayette or in Houston.  Were you involved

Page 26

1  in working for Halliburton in the Lafayette
2  office?
3      MR. KUWANA:  Counsel, if you ask only
4  the last part of your question, I think
5  that's fine.  The first part, the premise, he
6  would answer the Fifth Amendment to.
7      MR. THORNHILL:  Right.  Well, just for
8  the record, we've previously introduced and
9  marked as an exhibit the organizational
10  chart.  And we can provide you, Mr. Kuwana,
11  with the organizational chart number.  I know
12  Mr. Hartley's familiar with it.  We had it
13  recently in a deposition involving another
14  Halliburton employee.
15          And we are by reference to that
16  exhibit, the number for which we'll give you
17  in a minute, making the record clear that it
18  is to that chart that we're referring.  We
19  can give you a copy of it momentarily here if
20  you would like.  It is that organizational
21  chart that's been recognized and accepted as
22  the organizational chart for Halliburton to
23  which we make reference, just so you know.
24      MR. KUWANA:  I understand.
25      MR. THORNHILL:  Okay.  And that's the

Page 27

1  reason I gave that preface.  I didn't want
2  him to feel in any way as if we're asking him
3  to acknowledge any other chart than that
4  which every other Halliburton employee has
5  admitted is the chart.
6      Q.    (BY MR. THORNHILL)  So let's do
7  cut to the last question.  Were you employed
8  in the Lafayette office for Halliburton?
9      A.    No.
10     Q.    Okay.  Were you employed in the
11  Houston office for Halliburton?
12     A.    Yes.
13     Q.    Did you actually physically work
14  in the Houston office for Halliburton or did
15  you work in the BP office?
16     A.    On the advice of counsel, I
17  decline to answer based upon my Fifth
18  Amendment privilege, which, according to the
19  United States Supreme Court, protects
20  innocent men who otherwise might be ensnared
21  by ambiguous circumstances where truthful
22  responses of an innocent witness may provide
23  the government with evidence which it could
24  be somehow used against him.
25     Q.    Okay.  One other background

Page 28

1  question.  From the time that you graduated
2  from LSU in 1998 with a degree in industrial
3  engineering, have you worked for anyone other
4  than Halliburton?
5      A.    Yes.
6      Q.    For whom have you worked?
7      A.    Cintas.
8      Q.    Could you spell that for us,
9  please?
10     A.    C-i-n-t-a-s.
11     Q.    For how long did you work with
12  them?
13     A.    Approximately a year.
14     Q.    What were your job
15  responsibilities?
16     A.    I was a -- hired as an
17  industrial engineer, but I managed the
18  stockroom.
19     Q.    What does it mean to manage a
20  stockroom?
21     A.    Whenever orders came in from
22  customers, we were -- I was responsible for
23  filling those orders, getting the proper
24  names and patches put on them, things of that
25  sort, just managing that whole process.

7 (Pages 25 to 28)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters   Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 29

1      Q.    Did you work there from 1998 for
2   several years?
3      A.    Approximately one year.
4      Q.    In the entire time that you
5   worked for Cintas, did you do anything else
6   other than manage the stockroom?
7      A.    No.
8      Q.    After Cintas, did you work some
9   other place for another employer?
10      A.    Worked for Randa Corporation for
11   approximately six months.
12      Q.    Would you spell Randa?
13      A.    R-a-n-d-a.  And I believe they
14   were purchased during my employment with
15   Wemco.  So it was Randa and then Wemco they
16   were a tie manufacturing company.
17      Q.    Tire manufacturing company?
18      A.    Tie.  Tie manufacturing company.
19      Q.    Apparel, clothing apparel?
20      A.    Yes.
21      Q.    You mentioned the name Wemco as
22   having bought Randa?
23      A.    Yeah.  I think it was Wemco to
24   Randa -- I'm trying to remember.  I think it
25   was Randa, and then Wemco purchased them or

Page 30

1   they changed the name to Wemco.
2      Q.    Is that the same as the
3   Wimberley Tie Company from New Orleans?
4      A.    Yes, I believe so.
5      Q.    Wemco being short for Wimberley?
6      A.    Yes.
7      Q.    Made some nice ties.
8            What was your job?
9      A.    I was hired as an industrial
10   engineer there.
11      Q.    Tell us what you did in your
12   role at Wemco or Randa.
13      A.    The lathes were paid on a
14   per-tie basis, so I did time studies.  I did
15   process flows to improve the flow of the
16   process.  It's -- just speedy manufacturing,
17   things of that short.
18      Q.    And you said six months you were
19   employed there?
20      A.    About six months, yes.
21      Q.    So at this point in the
22   chronology of your time we're about mid-1999.
23   Is that fair?
24      A.    Approximately, yes.
25      Q.    After Randa or Wimberley Tie

Page 31

1   Company, where did you work?
2      A.    I started with Halliburton.
3      Q.    Halliburton.  Were you
4   employed -- incidentally were you employed by
5   Cintas in Houston or in New Orleans?
6      A.    In Baton Rouge.
7      Q.    Baton Rouge?
8      A.    Yes.
9      Q.    And then Randa Corporation, the
10   Wimberley Tie Company?
11      A.    It was here in New Orleans.
12      Q.    Your first job for Halliburton
13   you were employed in which of the offices?
14      A.    I was hired and started in
15   Lafayette.  As far as employment, I've also
16   been in the Marine Corps for the last 18
17   years, so on a reserve status.
18      Q.    So you received a check for
19   your --
20      A.    Yes.
21      Q.    -- weekend duty.  Is that fair
22   to say?
23      A.    That's correct.
24      Q.    And I don't mean to minimize it.
25   We thank you for your service, but -- and, in

Page 32

1   fact, it's my understanding that you
2   generally are serving on the weekends in the
3   Reserves?
4      A.    Yes.
5      Q.    Have you been called to active
6   duty?
7      A.    Yes.  I served a year in
8   Afghanistan.  I was activated a year for
9   Afghanistan.
10      Q.    When was that?
11      A.    Approximately February '04 to
12   about February '05.
13      Q.    Okay.  Since that active duty in
14   Afghanistan, have you seen any other extended
15   time of employment as a member of the
16   Reserves?
17      A.    No.  Other than just two-week
18   duties, you know, standard two-week duty in
19   the summer, no.
20      Q.    Okay.  When in Lafayette, what
21   was your job for Halliburton?
22      A.    Based on advice of counsel, I
23   decline to answer based upon my Fifth
24   Amendment privilege, which according to the
25   United States Supreme Court, protects

8  (Pages 29 to 32)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters      Facsimile: (504) 525-9109

Exhibit Q
Page 8

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010    Reported by:
JESSE GAGLIANO              May 11, 2011              TAMARA CHAPMAN, CSR

Page 33

1   innocent men who otherwise might be ensnared
2   by ambiguous circumstances where truthful
3   responses of an innocent witness may provide
4   the government with evidence, which could be
5   somehow used against him.
6       Q.   For how long did you work in
7   Lafayette for Halliburton?
8       A.   Approximately October '99 to
9   July of '05.  So about five and a half, six
10  years.
11      Q.   Okay.  Did you have more than
12  one job responsibility while you were at
13  Halliburton in Lafayette?
14      A.   On the advice of counsel, I
15  decline to answer based upon my Fifth
16  Amendment privilege, which, according to the
17  United States Supreme Court, protects
18  innocent men who otherwise might be ensnared
19  by ambiguous circumstances where truthful
20  responses of an innocent witness may provide
21  the government with evidence which it could
22  be -- which could be somehow used against
23  him.
24      Q.   In your job for Halliburton
25  isn't it true that you were soon taught how

Page 34

1   to engage in the performance of cement jobs
2   on drilling rigs?
3       A.   On the advice of counsel, I
4   decline to answer based upon my Fifth
5   Amendment privilege, which, according to the
6   United States Supreme Court, protects
7   innocent men who otherwise might be ensnared
8   by ambiguous circumstances where truthful
9   responses of an innocent witness may provide
10  the government with evidence which it could
11  be somehow used against him.
12      MR. THORNHILL:  Could we go off the
13  record just one second.  And I'd like to,
14  Mr. Kuwana and Mr. Hartley, recommend to you
15  that we now begin seriously the discussion of
16  his being able to use Fifth Amendment rather
17  than having to read the entire script every
18  time.
19      THE VIDEOGRAPHER:  We're going off the
20  record.  It's 8:59.  This is Videotape No. 1.
21      (Break.)
22      THE VIDEOGRAPHER:  Back on the record.
23  This is Videotape No. 1.  It's 9:09.
24      MR. THORNHILL:  We're back on the
25  record.  We need to enter for the record at

Page 35

1   this point two stipulations.  One is
2   regarding the prior organizational chart,
3   which we know from exhibit numbers in prior
4   depositions is No. 970, 970.
5       We've shown it to you,
6   Mr. Hartley.  Any problem with that being
7   referred to in this deposition by a
8   stipulation?
9       MR. HARTLEY:  Not at all.
10      MR. THORNHILL:  Okay.  Thank you very
11  much.
12      Our next stipulation involves
13  the Fifth Amendment privilege.  And I'm going
14  to allow Mr. Kuwana to offer the stipulation.
15      MR. KUWANA:  Thank you, Counsel.  In
16  the interest of moving this deposition along,
17  we have, during the break, discussed with the
18  representatives of the Plaintiffs Steering
19  Committee how to shorten the witness'
20  statement.  We are going to go ahead and mark
21  as Exhibit --
22      MS. GEBHARDT:  2031.
23      MR. KUWANA:  -- 2031, the statement by
24  the witness on the Fifth Amendment.  And we
25  would offer a stipulation that each time that

Page 36

1   he invokes his Fifth Amendment that the
2   following statement would have been read and
3   that if his deposition by video or transcript
4   is used in future proceedings, that this
5   statement will be read, whether it be in
6   court, to a jury, to the judge, as an
7   understanding of this would be what he would
8   say each time, the witness would say
9   each time on the advice of counsel --
10  actually, I'm going to ask him to read it.
11      (Exhibit No. 2031 was marked.)
12      MR. THORNHILL:  Would you, please?
13      MR. HARTLEY:  Thank you.
14      A.   On the advice of counsel, I
15  decline to answer based upon my Fifth
16  Amendment privilege, which, according to the
17  United States Supreme Court, protects
18  innocent men who otherwise might be ensnared
19  by ambiguous circumstances where truthful
20  responses of an innocent witness may provide
21  the government and others with evidence which
22  it could be somehow used against him.
23      MR. THORNHILL:  Mr. Kuwana.
24      MR. KUWANA:  We would offer that
25  stipulation on that it's accepted.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 9

Page 37

1     MR. THORNHILL:  On behalf of the PSC,
2  we accept the stipulation that that statement
3  just read by Mr. Gagliano would be considered
4  to have been urged by him each time that he
5  says "Fifth Amendment privilege." Okay?
6     MR. KUWANA:  Yes.
7     MR. THORNHILL:  Now, for the record, I
8  believe almost all of the parties are present
9  and represented today.  Let us ask for the
10  record if any counsel here objects to the
11  stipulation.
12     (No objections heard.)
13     MR. THORNHILL:  Hearing none, we'll
14  consider that to have been a stipulation.
15  One thing I will point out, I know that at
16  least one of the lawyers who is consulted on
17  this has suggested that the acceptance of the
18  stipulation does not mean that we agree with
19  the legal position that that information
20  cannot be offered and will not waive any of
21  the rights of any of the parties to seek to
22  compel responses.
23     MR. KUWANA:  We understand that
24  position.
25     MR. THORNHILL: Fair enough, Deb?

Page 38

1     MS. KUCHLER:  Thank you.
2     MR. THORNHILL:  Thank you.
3     Okay.  We all agree.
4     2031 is offered into the record
5  as the stipulation.
6     Q.    (BY MR. THORNHILL) Isn't it
7  true, Mr. Gagliano, that in your job as a
8  cement professional at Halliburton you were
9  required to design cement programs for oil
10  and gas wells?
11     A.    I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14     MR. THORNHILL:  Is that the short
15  version?
16     MR. KUWANA:  That's the short version.
17     MR. THORNHILL:  All right.  Take what
18  we can.
19     Q.    (BY MR. THORNHILL) In connection
20  with your designing cement programs for
21  Halliburton, you did, do you not admit, that
22  job of a cement engineer offshore in the Gulf
23  of Mexico?
24     A.    I respectfully decline to answer
25  based on my Constitutional Fifth Amendment

Page 39

1  privilege.
2     Q.    As a cement engineer working for
3  Halliburton, you were employed by it to work
4  on the DEEPWATER HORIZON in the year 2010?
5     A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8     Q.    In connection with your job, you
9  design cement programs for cementing around
10  the production casing generally referred to
11  as the 9-7/8 to 7-inch production casing for
12  the Macondo No. 1 well?
13     A.    I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16     Q.    Isn't it true that you also
17  worked from the very beginning on the
18  planning stage of the Macondo No. 1 well in
19  designing the well plan for the Macondo No. 1
20  well commencing sometime in the summer of
21  2009?
22     A.    I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege?
25     Q.    Do you deny, Mr. Gagliano, that

Page 40

1  in your capacity as a cement engineer for
2  Halliburton, you designed cement programs
3  beginning in 2009 based upon information
4  given to you by BP, which reflected that at
5  total depth of the intended well, the well
6  formations would likely fracture?
7     MR. HARTLEY:  Object; form.
8     A.    I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10  privilege.
11     Q.    (BY MR. THORNHILL) Do you deny,
12  Mr. Gagliano, that your familiarity with the
13  intended drilling of the Macondo No. 1 well
14  gave you information that showed the likely
15  size of the formation of the reservoir and
16  the pressure and temperature that was
17  expected from that reservoir?
18     A.    I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21     Q.    Isn't it true, Mr. Gagliano,
22  that you knew from the early stages of
23  planning this well with BP, this Macondo
24  No. 1 well in particular, that the porosity
25  and permeability of this likely find would

10  (Pages 37 to 40)

Exhibit Q
Page 10

Page 41

1 make it an elephant, a huge find for BP?
2        MR. CHEN:  Objection; form.
3        A.    I respectfully decline to answer
4 based on my constitutional Fifth Amendment
5 privilege.
6        Q.    (BY MR. THORNHILL)  Isn't it
7 true, Mr. Gagliano, that before BP was able
8 to drill the Macondo No. 1 well to projected
9 total depth, it was required to stop short
10 because of lost circulation problems and
11 evidence of the zones fracturing?
12       A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15       Q.    Do you deny, Mr. Gagliano, that
16 Halliburton and BP knew in advance of
17 drilling this well of the hazards associated
18 with drilling a high-pressure,
19 high-temperature well at approximately 18,000
20 to 20,000 feet?
21       A.    I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24       Q.    Do you deny, Mr. Gagliano, that
25 both Halliburton and BP knew that when it

Page 42

1 began to experience in March of 2010 loss
2 circulation problems, that it had encountered
3 a well, the Macondo No. 1 well, that
4 presented both integrity and safety issues?
5        MR. HARTLEY:  Object; form.
6        MR. CHEN:  Object to the form.
7        A.    I respectfully decline to answer
8 based on my constitutional Fifth Amendment
9 privilege.
10       Q.    (BY MR. THORNHILL)  Isn't it
11 true, Mr. Gagliano, that despite the
12 integrity and safety issues facing
13 Halliburton and BP, they elected to continue
14 drilling and to take risks with the lives of
15 the men and women on the rail -- on the well
16 and the environment of the states of Florida,
17 Alabama, Georgia, Mississippi, Louisiana,
18 Texas, and even the state of Mexico?
19       MR. HARTLEY:  Object to form.
20       MR. CHEN:  Object to the form.
21       A.    I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24       Q.    (BY MR. THORNHILL)  Do you deny,
25 Mr. Gagliano, that you've given testimony to

Page 43

1 the Presidential Commission, the National Oil
2 Spill Response Presidential Commission?
3        A.    Yes, I did meet with them, yes.
4        Q.    Okay.  In connection with your
5 meeting with them, did you offer to them
6 information?
7        A.    Yes.
8        Q.    Was that information which you
9 offered to them in a private meeting, the
10 details of the discussions for which have not
11 been reduced to writing?
12       MR. KUWANA:  Do you know?
13       A.    I'm not sure if it's been
14 reduced to writing, no.
15       Q.    (BY MR. THORNHILL)  Is it fair
16 for me to say, then, insofar as you know,
17 your discussions with the National Oil Spill
18 Commission, the national commission that
19 investigated this oil spill, has not made it
20 into any writing that you've ever seen or
21 been presented?
22       A.    I know there is a report out,
23 but I don't know if they had writings of my
24 specific conversation.
25       Q.    Okay.  Have you read any of the

Page 44

1 information that has been published as the
2 National Commission report?
3        A.    I have not read the entire
4 report.  I've only read an excerpt from it.
5        Q.    Do you remember which excerpts
6 you've read?
7        A.    I think there was one or two
8 where I was -- I was -- my name was brought
9 up in it.
10       Q.    Okay.  Can you tell us those one
11 or two that you recall where your name was
12 brought up that you read from the National
13 Commission report?
14       A.    I think it had to do with an
15 internal e-mail at BP discussing me between,
16 I believe, Brian and Mark Hafle, Brian Morel
17 and Mark Hafle.
18       Q.    Do you recall the contents of
19 the e-mail?
20       A.    I believe the contents,
21 paraphrasing -- I don't remember it word for
22 word -- basically saying, you know, Brian
23 wanted to talk about my replacement with Mark
24 Hafle.
25       Q.    Now, did you, in fact, have

11 (Pages 41 to 44)

Exhibit Q
Page 11

Page 45

```
 1    discussions with Brian or Mr. Hafle about
 2    your replacement?
 3         MR. HARTLEY:  Object; form.
 4         A.   I respectfully decline to answer
 5    based on my constitutional Fifth Amendment
 6    privilege.
 7         Q.   (BY MR. THORNHILL)  Did you read
 8    the Chief Counsel's report or any excerpt
 9    from the Chief Counsel's report that was
10    issued in February of 2011?
11         A.   I don't believe I have, no.
12         Q.   Okay.  We're going to show you a
13    copy of that in a minute.
14         Have you read that which has
15    been dubbed the BP Bly report?
16         A.   Yes, I have seen parts of that
17    and have read parts of it.
18         Q.   Do you know which parts you've
19    seen?
20         A.   I know I looked at a couple of
21    appendixes (sic).  I can't remember
22    specifically.  I know they had one with lab
23    testing.  I don't remember the number of the
24    appendix of that.  And the body of the
25    report, I read most of that.
```

Page 46

```
 1         Q.   Okay.  Was the section which
 2    you -- which you read from the Bly report the
 3    CSI, an acronym for Cement Specialties Inc.,
 4    report on the lab testing by Halliburton for
 5    the Macondo No. 1 well?
 6         A.   Yes, I did look at that section,
 7    yes.
 8         Q.   Did you read the section of the
 9    Bly report, particularly the CSI report, that
10    showed that the Halliburton tests performed
11    for the Macondo No. 1 well were performed
12    inconsistent with the obligations of cement
13    science for wells and the regulations that
14    have been published by the federal
15    government?
16         MR. HARTLEY:  Object; form.
17         A.   I respectfully decline to answer
18    based on my constitutional Fifth Amendment
19    privilege.
20         Q.   (BY MR. THORNHILL)  Do you deny
21    that CSI found in its investigation of the
22    cement job around the production casing
23    generally referred to as the 7-inch
24    production casing, to have been designed
25    incorrectly?
```

Page 47

```
 1         MR. HARTLEY:  Object; form.
 2         A.   I respectfully decline to answer
 3    based on my constitutional Fifth Amendment
 4    privilege.
 5         Q.   (BY MR. THORNHILL)  Do you deny,
 6    Mr. Gagliano, that the information that
 7    should have been included in the design of
 8    the lab tests by Halliburton for the Macondo
 9    No. 1 well did not include information such
10    as that required by the contract between BP
11    and Halliburton, specifically free water and
12    fluid tests?
13         A.   I respectfully decline to answer
14    based upon my constitutional Fifth Amendment
15    privilege.
16         Q.   In your reading the report,
17    which we've dubbed the CSI and Bly report,
18    did you see the discussions of the failures
19    of Halliburton to properly lab test the
20    cement that was intended for use around the
21    7-inch production casing?
22         MR. HARTLEY:  Object; form.
23         A.   I respectfully decline to answer
24    based upon my constitutional Fifth Amendment
25    privilege.
```

Page 48

```
 1         Q.   (BY MR. THORNHILL)  Did you see
 2    the information in the Chief Counsel's
 3    report, a copy of which I have here and so
 4    that you can see the cover of it?  Is that
 5    the Chief Counsel's report incidentally that
 6    you reviewed?
 7         A.   I'm not sure.  I didn't see the
 8    cover.  I just got an e-mail section to me,
 9    no.
10         Q.   Okay.  Who e-mailed to you the
11    section to which you refer?
12         A.   Counsel.  My counsel.
13         Q.   Okay.  Do you remember which
14    section it was?
15         A.   It is just the section I
16    referenced earlier, the little section about
17    the e-mail, which we -- Brian Morel and Mark
18    Hafle.
19         Q.   Okay.  Did you read any other
20    section of the Chief Counsel's report?
21         A.   No.
22         Q.   Have you been told by someone
23    other than your counsel that the Chief
24    Counsel's report is very critical of the work
25    done by you and Halliburton on the cement job
```

12  (Pages 45 to 48)

Page 49

1    around the 7-inch production casing?
2         MR. HARTLEY: Object to form.
3         A.   I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.   (BY MR. THORNHILL) Do you deny
7    that Halliburton is publishing in annual
8    reports for 2010 and the year 2011
9    information that acknowledges that there was
10   included in the National Commission report a
11   finding that the Halliburton cement job was a
12   cause, in fact, of the blowout?
13        MR. HARTLEY: Object; form.
14        A.   I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        Q.   (BY MR. THORNHILL) Did you give
18   testimony to the Marine Board of Inquiry?
19        A.   Are you referring to MMS or
20   BOEMRE?
21        Q.   Yeah.  That's right.  The Coast
22   Guard Commission --
23        A.   Yes.
24        Q.   -- is sometimes referred to as a
25   Marine Board.

Page 50

1         A.   Okay.
2         Q.   Did you give testimony?
3         A.   Yes.
4         Q.   Did you specifically give
5    testimony to them on April 21 and 22, 2010?
6         DEFENSE COUNSEL: Object; form.
7         A.   I don't think those are the
8    dates.
9         Q.   (BY MR. THORNHILL) Okay.  May I
10   ask you to turn in this black book that you
11   have before you to Exhibit No. 1 -- or Tab
12   No. 1 is what I'll often refer to.
13        (Discussion off the record.)
14        Q.   (BY MR. THORNHILL) I'll show you
15   Tab No. 1 on the first page.  You'll see four
16   pieces of information that look like they're
17   reduced sizes on the pages.  And I'm not
18   asking you to read any of this information.
19   I'm simply asking that you tell us whether or
20   not you are the person that's shown as --
21   actually, it's on the second page -- the
22   Jesse Gagliano who was questioned, as is
23   indicated on the first page of April 21,
24   2010.
25        (Discussion off the record.)

Page 51

1         Q.   (BY MR. THORNHILL) I'm sorry.
2    It's the 24th.  It's August 24, 2010.  I gave
3    you the wrong date.  I read the wrong date.
4    Forgive me.  Thank you.
5             Does August 24 sound to you like
6    the day --
7         A.   That sounds like the correct
8    date, yes.
9         Q.   -- that you gave testimony?
10        A.   Yes.
11        Q.   Thank you.  The testimony that
12   you gave was a testimony before the Bureau of
13   Ocean Energy Management, Regulation and
14   Enforcement investigation, correct?
15        A.   Yes.
16        Q.   All right.  Now, have you had
17   occasion to review the transcript of your
18   testimony?
19        A.   Yes, I have reviewed it.
20        Q.   All right.  Is there anything in
21   the testimony that you gave that you feel was
22   inaccurate?
23        A.   I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

Page 52

1         Q.   Okay.  We'll come back to that.
2    The second tab I would ask you to turn to --
3    oh, incidentally, let us make sure we have
4    this in the right --
5         MR. THORNHILL: This was previously an
6    exhibit, as I recall.  See if you can check
7    on that.  If not --
8         MR. BICKFORD: We'll double-check on
9    that.
10        MR. THORNHILL: Okay.  For now, we'll
11   tentatively give this Exhibit No. 2032.
12        (Exhibit No. 2032 was marked.)
13        Q.   (BY MR. THORNHILL) And the
14   second tab -- do you see, Mr. Gagliano, this
15   second body of information that appears to be
16   a transcript of testimony by you in a
17   telephone interview on June 11, 2010?  You
18   may go ahead.
19        A.   Oh, yeah.  Yeah, it appears to
20   be.  Yes.
21        Q.   Okay.  Have you reviewed this
22   testimony?
23        A.   No.
24        (Discussion off the record.)
25        Q.   (BY MR. THORNHILL) Go ahead.

13  (Pages 49 to 52)

Page 53

1    Did you read this transcript of the Waxman
2    Committee testimony?
3         A.    I have not seen this, no.
4         Q.    All right.  All righty.  We'll
5    mark this testimony as Exhibit No. 2033.
6         (Exhibit No. 2033 was marked.)
7         MR. THORNHILL:  Is that right?
8         Q.    (BY MR. THORNHILL)  Okay.  For
9    now.  We'll have more questions for you on
10   that later.
11        Do you remember, incidentally,
12   giving testimony in this telephone interview
13   that specifically said that you did not have
14   any discussions with anybody regarding the
15   last OptiCem report that you prepared for the
16   cement job around the 7-inch production
17   casing?
18        A.    I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21        Q.    Do you deny that on Page 87 --
22   let me rephrase that.
23        Do you deny that in the Waxman
24   Committee testimony, you said regarding the
25   last OptiCem report that you prepared for the

Page 54

1    seven centralizers model that you didn't have
2    any discussions with anybody regarding that
3    document after you sent it out?
4         DEFENSE COUNSEL:  Object; form.
5         A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8         Q.    (BY MR. THORNHILL)  Isn't it
9    true, Mr. Gagliano, that in your preparation
10   of the OptiCem models for the cement job
11   around the 7-inch production casing BP asked
12   that you, as a Halliburton employee working
13   in the BP offices, trick or fudge the cement
14   model to justify the prospect of a successful
15   cement job around the 7-inch production
16   casing?
17        MR. HARTLEY:  Object; form.
18        MR. CHEN:  Objection; form.
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    (BY MR. THORNHILL)  Isn't it
23   true, Mr. Gagliano, that BP required you to
24   trick or fudge the information put into the
25   OptiCem report and order that it could

Page 55

1    justify the use of a long string production
2    casing rather than a liner with a tieback?
3         MR. HARTLEY:  Object; form.
4         MR. CHEN:  Objection; form.
5         A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8         Q.    (BY MR. THORNHILL)  Do you deny,
9    Mr. Gagliano, that when you ran this model
10   with seven centralizers showing the -- on the
11   OptiCem report showing that there was the
12   prospect of severe gas flow around that,
13   you immediately told Mr. Greg Walz of the
14   risks -- Greg Walz being an employee of BP,
15   incidentally -- that you immediately told
16   Mr. Greg Walz of the risks associated with
17   the cement job channeling because of severe
18   gas flow?
19        DEFENSE COUNSEL:  Objection; form.
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    (BY MR. THORNHILL)  Do you deny,
24   Mr. Gagliano, that BP did not tell you on
25   April 18, or thereafter, before the explosion

Page 56

1    of the DEEPWATER HORIZON, that it was the
2    intention of the engineers for BP not to run
3    21 centralizers?
4         A.    I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7         Q.    In fact, isn't it true,
8    Mr. Gagliano, that BP never communicated to
9    you that they intended to run only six
10   centralizers after you had recommended to
11   Mr. Walz that he had ordered the 15
12   additional centralizers to allow for the use
13   of 21 on the 7-inch production casing job?
14        A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        MR. CHEN:  Objection; form.
18        Q.    (BY MR. THORNHILL)  Isn't it
19   true -- isn't it true, Mr. Gagliano, that BP
20   never requested that you run the OptiCem
21   model showing the prospects of success or
22   failure of the cement job using only six
23   centralizers?
24        MR. CHEN:  Objection; form.
25        A.    I respectfully decline to answer

14  (Pages 53 to 56)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 14

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                     May 11, 2011                      TAMARA CHAPMAN, CSR

Page 57

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   (BY MR. THORNHILL) Isn't it
4  true, Mr. Gagliano, that BP asked you to
5  model a safe job, and you felt as if you had
6  done so when you designed a cement model
7  around the 7-inch production casing that
8  required 21 centralizers?
9      MR. CHEN:  Objection; form.
10     A.   I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.   (BY MR. THORNHILL)  Do you,
14 Mr. Gagliano, join in with Mr. Chaisson, who
15 has testified on behalf of Halliburton, I
16 will represent to you, that the design of the
17 cement program around the 7-inch production
18 casing was clearly defective?
19     MR. HARTLEY:  Object; form.
20     A.   I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.   (BY MR. THORNHILL)  Now,
24 regarding the MBI testimony, let me ask you a
25 general question.  Were you under oath when

Page 58

1  you testified at the MBI hearing?
2      A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.   Tell me, Mr. Gagliano, isn't it
6  true that when you on about April 19, 2010,
7  spoke with Mr. Walz after running the cement
8  model, the OptiCem cement model, with seven
9  centralizers showing the potential for severe
10 gas flow, that you knew then that if that job
11 were run with only six centralizers, as
12 you've been told by Mr. Tabler on the phone,
13 the job was potentially unsafe?
14     MR. HARTLEY:  Object; form.
15     A.   I respectfully decline to answer
16 based on my constitutional Fifth Amendment
17 privilege.
18     Q.   (BY MR. THORNHILL)  Do you deny
19 that the job involving cement around the
20 7-inch production casing led to an explosion
21 that was the cause of the explosion of the
22 DEEPWATER HORIZON?
23     MR. HARTLEY:  Object; form.
24     A.   I respectfully decline to answer
25 based on my constitutional Fifth Amendment

Page 59

1  privilege.
2      Q.   (BY MR. THORNHILL) I understand.
3  And we respect that.
4           We're moving on to the third
5  exhibit.  The third exhibit in this -- or the
6  third tab in this book of information is a
7  document that is dated May 25, 2009, correct?
8      A.   Yes.  Yes.
9      Q.   And it's a document that is said
10 to be a Halliburton document according to the
11 signature line at the bottom, correct?
12     MR. HARTLEY:  Objection; form.
13     Q.   (BY MR. THORNHILL)  The bottom
14 right?
15     A.   Yes.
16     Q.   For the record, this document is
17 Halliburton Bates Page Nos. 0554765, and it
18 runs through 0554778.
19           This document says at the top
20 that it's for BP America Production Company,
21 does it not?
22     A.   Yes.
23     Q.   And it says it's for the Macondo
24 Prospect No. 1, correct?
25     A.   Yes.

Page 60

1      Q.   Now, it shows 9-7/8 inch design
2  report, correct?
3      A.   Yes.
4      Q.   Am I correct in understanding
5  that this design report was prepared by you?
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   Is the date of May 25, 2009, a
10 correct date for the preparation of the
11 document?
12     A.   I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.   Now, if you turn to Page 773,
16 the last three digits of this document, do
17 you see in this document under Section 3.4,
18 the section that reads "Gas flow potential"?
19     A.   Yes.
20     Q.   Does it say, "Gas flow potential
21 is 12.30"?
22     MR. HARTLEY:  Object; form.
23     A.   Yes.
24     Q.   (BY MR. THORNHILL) Does it say
25 that the "Gas flow potential of 12.30 is at

15  (Pages 57 to 60)

Exhibit Q
Page 15

Page 61

1    the reservoir zone-measured depth of intended
2    TD of 20,200 feet"?
3        MR. HARTLEY:  Object; form.
4        A.    I request -- I respectfully
5    decline to answer based on my constitutional
6    Fifth Amendment privilege.
7        Q.    (BY MR. THORNHILL)  Okay.  May I
8    direct your attention, again, to Page 773 and
9    ask you, sir, if under this gas flow
10   potential of 12.30 there is the following
11   statement, which reads, "Based on analysis of
12   the above-outlined weld conditions, this well
13   is considered to have a SEVERE," in all caps,
14   "gas flow problem.  Wells in this category
15   fall into the flow condition 3."
16       MR. HARTLEY:  Object; form.
17       Q.    (BY MR. THORNHILL) Did I read
18   that correctly, sir?
19       A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22       Q.    Do you deny that you prepared in
23   May -- on about the 25th day of May, 2009,
24   this 9-7/8 inch design report the Bates page
25   numbers for which we put into the record and

Page 62

1    gave it to BP showing that the intended TD of
2    the well, Macondo No. 1, there were severe
3    gas flow potentials?
4        MR. CHEN:  Objection; form.
5        A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8        MR. THORNHILL:  Now, for the record,
9    we'll label this document under Tab 3 as
10   2034.
11       (Exhibit No. 2034 was marked.)
12       Q.    (BY MR. THORNHILL)  May we turn
13   to the next exhibit?  Tab 4.  Are you with
14   me?
15       A.    Yes.
16       Q.    Now, I'm going to jump around a
17   little bit in this in light of the procedure
18   we're following.  So I'll turn you to the
19   back document, if I may, and it is a document
20   that purports to be an e-mail of April 20,
21   2010, from Eric Cunningham to Brian Morel.
22   It's BPHZN 2179 MDL 00273974.
23            I have only one question to you,
24   sir.  In the first sentence, does this
25   document not say, "Brian, it seems that the

Page 63

1    plan to move Jesse has been put on hold for
2    at least a couple of months until they can
3    identify a suitable replacement.  The person
4    that they had in mind has apparently moved on
5    or was lost."
6        MR. HARTLEY:  Object; form.
7        A.    I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10       MR. THORNHILL:  At this time we need to
11   stop to take a break because they have to
12   change tapes.
13       THE VIDEOGRAPHER:  We're going off the
14   record.  It's 9:41.  This is the end of
15   Videotape No. 1.
16          (Break.)
17       THE VIDEOGRAPHER:  We're back on the
18   record.  This is the beginning of Videotape
19   No. 2.  It's 9:58.
20       Q.    (BY MR. THORNHILL) Mr. Gagliano,
21   regarding the third tab item, the 9-7/8 inch
22   design report, which we've already introduced
23   into evidence -- or into the record as
24   2034 -- Exhibit No. 2034, that design report
25   was issued by Halliburton to BP America,

Page 64

1    correct?
2        A.    I respectfully decline to answer
3    based on my constitutional Fifth Amendment
4    privilege.
5        Q.    Okay.
6        MR. CHEN:  Objection.  Objection; form.
7        Q.    (BY MR. THORNHILL)  Sure.  Let's
8    go to Tab 4 again.  We're at the back of the
9    Tab 4 once again.  And I'll ask you, sir, the
10   gentleman mentioned in this e-mail, Brian P.
11   Morel, do you know Mr. Morel?
12       A.    Yes.
13       Q.    Okay.  Was Mr. Morel an engineer
14   for BP?
15       A.    Yes.
16       Q.    Okay.  Did you work in a cubicle
17   right next to Mr. Morel?
18       MR. HARTLEY:  Object; form.
19       A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22       Q.    (BY MR. THORNHILL)  Did
23   Mr. Morel render services to BP as an
24   engineer on the DEEPWATER HORIZON?
25       A.    I respectfully decline to answer

16  (Pages 61 to 64)

Page 65

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   We see in this e-mail a
4  reference to Mr. Erick Cunningham, do we not?
5      A.   Yes.
6      Q.   Do you know Mr. Cunningham?
7      A.   Yes.
8      Q.   Okay.  Did you have occasion to
9  work with Mr. Cunningham on the DEEPWATER
10 HORIZON?
11     MR. CHEN:  Objection; form.
12     A.   I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.   (BY MR. THORNHILL)  Okay.  What,
16 Mr. Gagliano, were your job responsibilities
17 in April of 2010 while working with
18 Halliburton?
19     A.   I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.   Were you required by Halliburton
23 to work in the BP offices when the Macondo
24 No. 1 well was being drilled?
25     A.   I respectfully decline to answer

Page 66

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   Did your job duties while
4  working for Halliburton include designing
5  cement jobs around the production casing,
6  7-inch production casing, that was installed
7  around April 18, 2010?
8      MR. HARTLEY:  Object; form.
9      A.   I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.   (BY MR. THORNHILL) In your job
13 for Halliburton in April of 2010, did BP
14 provide to you information that would allow
15 you to complete the OptiCem software
16 products -- I'm sorry -- the OptiCem software
17 reports that were issued by Halliburton to BP
18 about that time?
19     MR. HARTLEY:  Object; form.
20     A.   I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.   (BY MR. THORNHILL) Okay.  Did BP
24 discuss with you beginning in 2009 the poor
25 performance of Halliburton employees in doing

Page 67

1  work for cement jobs on the Macondo well?
2      A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.   Did BP discuss with you
6  beginning in 2009 the failures of Halliburton
7  employees and equipment to properly perform
8  their jobs on the Kodiak well?
9      MR. HARTLEY:  Object; form.
10     A.   I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.   (BY MR. THORNHILL)  Are you
14 familiar, sir, with a gentleman by the name
15 of Tabler?
16     A.   Yes.
17     Q.   Okay.  Did you work with him at
18 Halliburton?
19     A.   Yes.
20     Q.   Okay.  Now, was it Mr. Tabler
21 who called from the rig around April 18 or 19
22 to discuss with you the running of only six
23 centralizers rather than the 21 which you had
24 modeled for the 7-inch production cement job?
25     A.   I respectfully decline to answer

Page 68

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   Okay.  All righty.  I'll ask you
4  to turn in this Tab 4 to a page number that
5  is last three digits 371.  It looks like an
6  e-mail of December 21, 2009, from
7  Mr. Kellingray to Mr. Cunningham.
8      Okay.  At the bottom of this
9  there is a reference to you, Mr. Gagliano.
10 In fact, you're shown as a sender of an
11 e-mail to various people at the very bottom
12 of this page.  Do you see that?
13     A.   Yes.
14     Q.   Okay.  In fact, does it say that
15 on December 18, 2009, you sent to various
16 people that are listed here this e-mail
17 that's at the bottom of this page regarding
18 the 11-7/8 inch lab test proposal and OptiCem
19 report?
20     A.   I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.   Okay.  The top of this page,
24 371, shows, does it not, that Mr. Kellingray
25 and Mr. Cunningham were concerned that there

17 (Pages 65 to 68)

Exhibit Q
Page 17

Page 69

1 were not included in the OptiCem report all
2 of the lab tests required under the contract?
3     A.   I respectfully --
4     MR. HARTLEY:  Object; form.
5     A.   I respectfully decline to answer
6 based on my constitutional Fifth Amendment
7 privilege.
8     Q.   (BY MR. THORNHILL)  On this Page
9 371 in this top e-mail, it reads, does it
10 not, "Also suspect they are nowhere close to
11 all the lab tests in the contract.  I'm
12 beginning to wonder if Jesse has lost it.  He
13 was not good but pulling -- putting in a cue
14 like this is pretty poor."
15     Did I read that correctly?
16     MR. KUWANA:  Would you rephrase the
17 question, Counsel?
18     MR. THORNHILL:  Yes.
19     Q.   (BY MR. THORNHILL)  I intend to
20 ask you if I'm reading this correctly just
21 for the record if you don't mind.
22     Does it say in this top e-mail,
23 "Also suspect they are nowhere close to all
24 the lab tests in the contract.  I'm beginning
25 to wonder if Jesse has lost it.  He was not

Page 70

1 good but putting in a cue," c-u-e, "like this
2 is pretty poor."  Did I read that correctly?
3     A.   That's what it says.
4     Q.   Okay.  Did Mr. Cunningham or
5 Mr. Kellingray at any time about December 21,
6 2009, discuss with you the failure of
7 Halliburton to include in the lab tests -- to
8 include in the OptiCem report, rather, all of
9 the lab tests required under the contract?
10     A.   I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.   Okay.  I'll ask you to turn to
14 the second page in this Tab 4, and it's
15 BP-HZN-2179MBO00666183.
16     This document purports to be a
17 Cunningham to M. Goodine e-mail, does it not?
18     It's November 14, 2009.
19     A.   What was the number again?
20     Q.   Last three digits 183, second
21 page.
22     A.   Okay.
23     Q.   That is -- this is an e-mail
24 from Mr. Cunningham to Mr. Goodine, is it
25 not?

Page 71

1     A.   Yes.
2     Q.   Okay.  In the last paragraph or
3 last substantive paragraph there is a
4 sense -- or the last paragraph reads -- and I
5 want to make sure we're on the same page --
6 "When I was asked to have a look at the
7 design, H-A-L, Halliburton, was actually
8 already blending this stuff and preparing to
9 send it to the rig.  Their engineers seemed
10 to think everything looked a-okay and was
11 even a bit offended when I told them that it
12 looked a bit dangerous for a plug design and
13 that we would not be pumping it."  Did I read
14 that correctly?
15     A.   That's what it says.
16     Q.   Okay.  Now, sir, did anyone
17 discuss with you in November of 2009 from BP
18 the prospect of a Halliburton blend
19 intended -- cement intended to be used in a
20 plug design as likely being dangerous?
21     A.   I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24     Q.   Turn to the first page of this
25 document, the Bates page numbers ending in

Page 72

1 381, and it's 634381, same preface
2 BP-HZN-2179MDL.  I believe this has
3 previously been marked as an Exhibit 626 in
4 the record.
5     I'll ask you, sir, does this
6 purport to a Kellingray to Cunningham e-mail
7 of October 26, 2009?
8     MR. KUWANA:  And, Counsel, we had a
9 discussion off the record.  I just want to
10 put on the record.  To the extent that you're
11 asking him what documents say, he is going to
12 agree or disagree with you on what they say,
13 but by no means is that a subject matter
14 waiver of his Fifth Amendment privilege.  To
15 the extent that you're just asking him what a
16 document says, he will answer those
17 questions.
18     MR. THORNHILL:  We understand that
19 that's a full reservation of all the
20 privileges and acknowledge that as something
21 we previously told.  So just for the record,
22 thank you.
23     Q.   (BY MR. THORNHILL)  In the first
24 paragraph this document says, does it not,
25 "Welcome to my world, Jesse and David are

18  (Pages 69 to 72)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                 Reported by:
JESSE GAGLIANO                           May 11, 2011                    TAMARA CHAPMAN, CSR

Page 73

1   typical of Halliburton engineers.  They work
2   well with BP drilling engineers (they know
3   how to keep them happy and don't make their
4   life difficult.)  They tend to have a lot of
5   experience which breeds confidence from the
6   BP side and rely heavily on Lafayette for the
7   slurry design and engineering input."  Did I
8   read that correctly?
9       A.   Yes, that's what it says.
10      Q.   Okay.  Did anyone at BP, such as
11  Mr. Kellingray or Mr. Cunningham, ever have a
12  discussion with you about the experience of
13  Halliburton engineers?
14      A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.   The fourth paragraph, last
18  sentence, read with me.  "Also you will have
19  picked up I know more about their modeling
20  capability than most of their engineers as
21  they have a very poor training system and no
22  enforced design processes."  Did I read that
23  correctly?
24      A.   That's what it says.
25      Q.   Did anyone at BP discuss with

Page 74

1   you the absence of Halliburton training or
2   enforced design processes?
3       A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6       Q.   The next paragraph in this
7   document reads, does it not, "Part of the
8   reason for today's meeting was to see how bad
9   things are.  It really concerns me that we
10  are plus or minus 20 weeks away from spudding
11  a critical well, and we're still in
12  exploration well mentality."  Did I read that
13  correctly?
14      A.   Yes.
15      Q.   All right.  Did anyone at BP
16  discuss with you the issues involving what
17  this sentence we just read says, "how bad
18  things are"?
19      MR. HARTLEY:  Object; form.
20      A.   I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23      (Discussion off the record.)
24      Q.   (BY MR. THORNHILL) Move to
25  Tab 5.  This document is marked as previous

Page 75

1   Exhibit 808, just for the record.
2       Mr. Gagliano, looking at this
3   document, which has Halliburton Bates Page
4   Nos. 0502434 and 435, at the top it says,
5   "Cement Lab Weigh-Up Sheet, February 12,
6   2010."
7       Did I read that correctly?
8       A.   Yes.
9       Q.   The engineer at the top right is
10  said to be Jesse Gagliano.  Did I read that
11  correctly?
12      A.   Yes.
13      Q.   The request date is said to be
14  the 10th day of February, 2010.  Did I read
15  that date correctly?
16      A.   Correct.
17      Q.   It's a European date system,
18  right? 10.02.2010, right?
19      A.   I believe so.
20      Q.   Yes.  All right.
21      And then the "required by" date
22  is February 12, 2010, correct?
23      A.   Yes.
24      Q.   All right.  There is in the
25  middle of this document a section called

Page 76

1   "Materials."  Do you see that?
2       A.   Yes.
3       Q.   There is a whole list of about
4   seven items, which have strike-outs in this
5   column dealing with test amount, correct?
6       A.   Yes.
7       Q.   All right.  And then there is an
8   arrow to the blend weight, correct?
9       A.   Correct.
10      Q.   Were those strike-outs because
11  the blend included all of the seven items
12  shown in the list?
13      A.   I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16      Q.   Okay.  Were you involved,
17  Mr. Gagliano, in preparing information with
18  Halliburton employees that was given to BP
19  such as this Cement Lab Weigh-Up Sheet?
20      MR. CHEN:  Objection; form.
21      A.   I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.   (BY MR. THORNHILL) Did
25  Halliburton provide to BP a clear indication

19  (Pages 73 to 76)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 19

Page 77

1  of the tests that it intended to run for each
2  cement job?
3      MR. HARTLEY:  Object; form.
4      A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.    (BY MR. THORNHILL)  Okay.  Isn't
8  it a fact, Mr. Gagliano, that the tests that
9  are required by the contract between BP and
10  Halliburton were known by BP not to be
11  routinely run?
12      MR. CHEN:  Objection; form.
13      MR. HARTLEY:  Object; form.
14      A.    I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.    (BY MR. THORNHILL)  I need to
18  now ask your indulgence to turn to the back
19  of this book to Tab 86.  We'll look at
20  sections of the contract briefly.
21         This document was previously an
22  exhibit in the record, number -- we'll give
23  it to you in a few minutes.
24      MR. THORNHILL:  We used it again
25  yesterday.  I have the -- incidentally, if

Page 78

1  you care to, Counsel, the 400-page original
2  exhibit is here.  These are excerpts from it,
3  but you're welcome to look at the entire
4  document.
5      MR. HARTLEY:  The contract?
6      MR. THORNHILL:  Yes.
7      MR. HARTLEY:  I do appreciate the
8  offer.
9      Q.    (BY MR. THORNHILL)  These four
10  pages begin with BP-HZN-MBI22241.
11      A.    Okay.
12      Q.    There at the end, Tab 86.  All
13  righty?
14         This document on the first page,
15  41, says at the top, "Section 3, Scope of
16  Work, Appendix 5, Description of Work, A,
17  Cementing Services."
18         Did I read that correctly?
19      A.    Yes.
20      Q.    And at the bottom, Section 1.3
21  begins to describe the following:  "Provide
22  and maintain fully operational cementing and
23  pumping package suitable for all required
24  cementing, pumping and pressure testing,
25  surface and subsurface and make immediate

Page 79

1  provision of cementing bulks and additives
2  suitably bulked, sacked or drum necessary to
3  provide all slurries and spacers as to
4  company's specification."  Did I read that
5  correctly?
6      A.    Yes.
7      Q.    Do you know, Mr. Gagliano, that
8  to be the contractual requirements of
9  Halliburton under the BP service contract?
10      MR. HARTLEY:  Object; form.
11      A.    I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14      Q.    (BY MR. THORNHILL)  I need you
15  to turn with me a couple of pages into this
16  document to a chart that's on Page 401.  And
17  at the top -- the top of this page says, does
18  it not, under 2.0, "The minimum testing for
19  cement operations"?  Do you see that?  Did I
20  read it correctly?
21      A.    Yes.
22      Q.    Okay.  There is under 2.3
23  specific requirements the following entries.
24  Under the fourth entry, "Production casing
25  and drilling liners."  Did I read that

Page 80

1  correctly?
2      A.    Correct.
3      Q.    Under "Slurry, lead and tail."
4  Did I read that correctly?
5      A.    Yes.
6      Q.    Under the section or column
7  "Pump time," it says "yes," correct?
8      A.    Yes.
9      Q.    Under the column "Compressive
10  strength," it says "yes," correct?
11      A.    Yes.
12      Q.    Under "Operating freewater," it
13  says "yes," correct?
14      A.    Yes.
15      Q.    Under "API fluid loss," it says
16  "no," correct?
17      A.    Correct.
18      Q.    Under "Rheology," yes, correct?
19      A.    Yes.
20      Q.    And then under "Company
21  settlement test," it refers to "Note 3,"
22  correct?
23      A.    That's correct.
24      Q.    Note 3 reads, "When the whole
25  angle exceeds 70 degrees, a company

Page 81

1    settlement test is required." Did I read
2    that correct?
3        A.    Yes.
4        Q.    Do you know, Mr. Gagliano, these
5    company contract requirements imposed by BP
6    upon Halliburton to be as shown in this
7    document on Page 401?
8        MR. HARTLEY:  Object; form.
9        A.    I respectfully decline to answer
10   based on my constitutional Fifth Amendment
11   privilege.
12       Q.    (BY MR. THORNHILL)  Okay.  Now,
13   let's go back to the lab test --
14       MR. THORNHILL:  For the record, that
15   which we've been looking at is the entire
16   document, 400-plus pages, is 640 in the
17   record, Exhibit 640.
18       Q.    (BY MR. THORNHILL)  We'll go
19   back to the beginning and looking at some of
20   these lab tests.  Were you, Mr. Gagliano, in
21   a position at BP working in their office,
22   that is -- let me rephrase that.
23            Were you working in the office
24   at BP and did BP instruct you, as a
25   Halliburton employee, on the tests which they

Page 82

1    wanted run for the cement jobs to be used on
2    BP wells?
3        A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6        Q.    Did you, working for Halliburton
7    in the BP offices, have regular discussions
8    with Mr. Morel, one of the engineers who we
9    previously identified?
10       A.    I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13       Q.    Was your cubicle from which you
14   worked in the BP office immediately adjacent
15   to that of Mr. Morel and an engineer by the
16   name of Hafle?
17       A.    I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20       Q.    Okay.  Did you solicit from the
21   Lafayette lab the tests we see,
22   Exhibit 808 under Tab 5, for use in
23   connection with the cement lab testing report
24   which comprises part of the OptiCem report
25   that was issued by Halliburton to BP?

Page 83

1        MR. HARTLEY:  Object; form.
2        A.    I respectfully decline to answer
3    based on my constitutional Fifth Amendment
4    privilege.
5        Q.    (BY MR. THORNHILL)  All right.
6    Was this document, 808, prepared by
7    Halliburton for issuance to BP for work done
8    on the TRANSOCEAN HORIZON about the dates
9    that we see, February 10 and 12, 2010?
10       MR. CHEN:  Objection; form.
11       A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14       Q.    (BY MR. THORNHILL)  Let's turn
15   to Tab 6.  This is a document previously
16   introduced in the record as Exhibit 809.
17   This document says at the top, does it not,
18   "Cement Lab Weigh-Up Sheet, February 16,
19   2010"?
20       A.    Yes.
21       Q.    And the request date for it is
22   February 10, 2010, correct?
23       A.    That's correct.
24       Q.    Were you personally involved in
25   requesting that the Lafayette lab for

Page 84

1    Halliburton prepare this report after running
2    the tests that were requested by Halliburton
3    for issuing reports under the OptiCem to BP?
4        MR. HARTLEY:  Object; form.
5        A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8        Q.    (BY MR. THORNHILL)  Okay.  Was it
9    part of your job duties to identify for the
10   lab in the Lafayette office of Halliburton
11   the tests which should be run for BP cement
12   jobs?
13       MR. HARTLEY:  Object; form.
14       A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17       Q.    (BY MR. THORNHILL)  Okay.  Let's
18   turn to Tab 7.  This is a document
19   Halliburton Bates Page Nos. 0534942, running
20   through 0534944.
21            Let's turn to the last page
22   first, and it says, did it not, at the top,
23   that it is from Harry Prewett dated
24   February 15, 2010, and to Jesse Gagliano and
25   Erick Cunningham.  Did I read that correctly?

21  (Pages 81 to 84)

Page 85

1      A.    That's correct.
2      Q.    Are you the Jesse Gagliano
3  that's mentioned in this e-mail?
4      MR. HARTLEY:  Object; form.
5      A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8      Q.    (BY MR. THORNHILL)  Okay.  In
9  the e-mail that is immediately above this one
10 dated February 15 from Erick Cunningham to
11 Harry Prewett and Jesse Gagliano -- first,
12 did I read that correctly?
13     A.    Yes.
14     Q.    All right.  There is a section
15 that's addressed to Jesse, comma.  Did I read
16 that correctly?
17     A.    Yes.
18     Q.    Are you the Jesse to whom this
19 e-mail was addressed?
20     A.    I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.    There is in the fifth bullet
24 point down, is there not, the following
25 language.  "Would like to see a free-water

Page 86

1  test on the WellLife slurry at 80 degrees
2  Fahrenheit.  Agree with Harry the surface
3  rheologies look very thin.  Would worry some
4  about settling at surface, but the micromax
5  eases this concern."  Did I read that
6  correctly?
7      A.    Correct.
8      Q.    And then three bullet points
9  down, does it not read, "Mud spacer
10 compatibility and API wetability.  No rush on
11 this, but needs to be done and reported and
12 captured in the preplanning.  Can also drive
13 up ECDs if we have any rheology increases if
14 the fluid interfaces."  Did I read that
15 correctly?
16     A.    Yes.
17     Q.    Did you have discussions with
18 Mr. Cunningham about February of 2010 as
19 shown on this e-mail on requirements of BP to
20 specifically run the tests, such as the
21 freewater tests and to determine the
22 compatibility of the mud in the spacer on all
23 cement lab tests of Halliburton issued to BP
24 after February 15, 2010."
25     MR. HARTLEY:  Object; form.

Page 87

1      A.    I respectfully decline to answer
2  based on my constitutional Fifth Amendment
3  privilege.
4      Q.    (BY MR. THORNHILL)  We will mark
5  Tab 7 as the next exhibit number, 2036.
6      (Exhibit No. 2036 was marked.)
7      Q.    (BY MR. THORNHILL)  Let's go to
8  Tab 8.  Skip Tab 8, please.  I'm sorry.  Skip
9  Tab 8.  We'll go to Tab 9.
10     Tab 9 is Halliburton Bates Page
11 No. 72120.
12     This document says at the top,
13 does it not, that it's from Brett W. Cocales
14 on February 25, 2010, to Jesse Gagliano.  Did
15 I read that correctly?
16     A.    Yes.
17     Q.    Okay.  At the bottom of this
18 section is an e-mail dated February 25, 2010,
19 "From: Jesse Gagliano, To: Brett Cocales,
20 Mark Hafle, and Brian Morel."  Did I read
21 that correctly?
22     A.    Correct.
23     Q.    In this e-mail it says in the
24 second sentence at the bottom, "If we set a
25 balance plug, we need something below us to

Page 88

1  keep the cement from swapping with the mud."
2  Did I read that correctly?
3      A.    Yes.
4      Q.    Isn't it true, Mr. Gagliano,
5  that you told BP beginning in February 2010
6  that its designs for cement jobs included the
7  prospect of the swapping of mud with cement?
8      MR. CHEN:  Objection; form.
9      A.    I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.    (BY MR. THORNHILL)  We'll
13 introduce as an Exhibit 2037 as Tab 9.
14     (Exhibit No. 2037 was marked.)
15     Q.    (BY MR. THORNHILL)  Let's go to
16 Tab No. 10, please.  This document is
17 previously marked in the record as Exhibit
18 No. 810.
19     At the top does this document
20 read, "Cement Lab Weigh-Up Sheet, March 7,
21 2010"?
22     A.    Yes.
23     Q.    Does it show that it's for the
24 rig TRANSOCEAN HORIZON?
25     A.    Correct.

22  (Pages 85 to 88)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 22

Page 89

1     Q.    Does it show at the top that the
2  engineer is Jesse Gagliano?
3     A.    Yes.
4     Q.    Is the request date March 4,
5  2010?
6        MR. KUWANA: And, Counsel, I'm just
7  going to object. You've started moving your
8  questions to not what the document shows --
9        MR. THORNHILL: Oh, I'm sorry.
10       MR. KUWANA: -- but what it says. So
11 if you want to keep it to what the document
12 says, he will answer those questions.
13       MR. THORNHILL: We want to accommodate
14 you so that we can get the information. We
15 appreciate your concerns with privileges.
16    Q.    (BY MR. THORNHILL) And I'll
17 rephrase my question.
18       Mr. Gagliano, does this document
19 say that the request date is March 4, 2010?
20    A.    Yes.
21    Q.    Does it show that the required
22 date is March 6, 2010?
23    A.    Correct.
24    Q.    Does this document have in the
25 middle under "Sections of Materials" seven

Page 90

1  strike-outs for various materials that were
2  put in the form so that the test amount shows
3  as having been stricken out?
4        MR. HARTLEY: Object; form.
5     A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8     Q.    (BY MR. THORNHILL) This
9  document as 810, then, under Tab 10, we
10 will -- incidentally, it has Halliburton
11 Bates Page Nos. 506909 and 910.
12       Let's skip forward in the tabs
13 to No. 16, if we can.
14       This is Halliburton's Bates Page
15 No. 537224. At the bottom of this page, does
16 it show that it is an e-mail from Brian P.
17 Morel to Erick Cunningham?
18    A.    Correct.
19    Q.    March 22, 2010, the document
20 reads, correct?
21    A.    Yes.
22    Q.    Okay. Now, read with me this
23 e-mail. "Erick, can you come over and meet
24 with us tomorrow regarding the production
25 cement job on the Macondo. We're looking at

Page 91

1  needing a 7 5/8-inch pipe, and right now
2  based on the data we currently have, the
3  models show us not getting enough cement
4  lift." Did I read that correctly?
5        This e-mail from Mr. Morel to
6  Mr. Cunningham, did I just read that
7  correctly?
8        MR. KUWANA: You had a word or two --
9        MR. THORNHILL: Oh, did you say I had a
10 word that was missing?
11       MR. KUWANA: You added a few words.
12    Q.    (BY MR. THORNHILL) I'll read it
13 again, then. Thank you if you saw -- maybe I
14 did. I didn't realize it.
15       "Erick, can you come over and
16 meet with us tomorrow regarding the
17 production cement job on Macondo. We're
18 looking at needing 7 5/8-inch pipe, and right
19 now based on the data we currently have, the
20 models show us not getting enough cement
21 lift." Did I read that correctly?
22    A.    Yes.
23    Q.    Thank you. Now, above this at
24 the very type -- very top, there is an e-mail
25 from Erick Cunningham to Jesse Gagliano dated

Page 92

1  March 22, 2010, correct? Does the document
2  show an e-mail of that date from
3  Mr. Cunningham to Jesse Gagliano?
4     A.    Yes.
5     Q.    All right. And does the e-mail
6  read, "Can you attend?"
7     A.    That's what it says, yes.
8     Q.    All right. Did you,
9  Mr. Gagliano, attend a meeting on or about
10 March 23, 2010, with Mr. Cunningham to
11 discuss the 7 5/8-inch -- or 7-inch
12 production casing cement job?
13    A.    I respectfully decline to answer
14 based on my constitutional Fifth Amendment
15 privilege.
16    Q.    We'll mark as Exhibit No. 2038
17 Tab No. 16.
18       (Exhibit No. 2038 was marked.)
19    Q.    (BY MR. THORNHILL) We'll skip
20 ahead to Tab 21. This is Halliburton's Bates
21 Page 536145. This document shows in the
22 bottom e-mail an e-mail from VHG3@aol.com,
23 Tuesday, April 13, 2010, to Brian Morel; is
24 that correct? Did I read that correctly on
25 this document?

23  (Pages 89 to 92)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:

JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

---

Page 93

1    A.   Correct.
2    Q.   Okay.  The text reads, does it
3  not, "Any concerns about the Diverter closing
4  ball (1 5/8 inches) going through or landing
5  in the cage top of the FC and blocking
6  circulation."  Did I read that correctly?
7    A.   Correct.
8    Q.   Okay.  Did you, while you were
9  working on the Macondo No. 1 well, have
10 discussions with gentlemen such as the author
11 of this e-mail, Vemon Goodwin from Allamon
12 Tool Company, about the ball, the closing
13 ball in the diverter that's discussed here
14 going through or landing in the cage top and
15 blocking circulation?
16    A.   I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19    Q.   Okay.  I'll mark this document
20 as 2040.
21    (Exhibit No. 2039 was marked.)
22    Q.   (BY MR. THORNHILL)  Turn to
23 Tab 24.  This document is previously Exhibit
24 No. 727.  And for the record, it's
25 BP-HZN-MBI100143272 running through to 290.

---

Page 94

1    This document on the first Page
2  272 reads, "9 7/8-inch by 7-inch Production
3  Casing Design Report."  Did I read that
4  correctly?
5    A.   Correct.
6    Q.   It's for the Macondo No. 1.  Did
7  I read that correctly?
8    A.   Yes.
9    Q.   It's "For: Brian Morel, Date:
10 April 14, 2010."
11    Did I read that correctly?
12    A.   Yes.
13    Q.   Turn on this document to
14 Page 274.  It's like the third or fourth page
15 in under "1.0 design," please, sir.
16    Okay.  Under the design name,
17 does there appear the following language,
18 "Macondo prospect MC 252 #1 9.875 times 7
19 with seven barrels base oil."  Did I read
20 that correctly?
21    A.   I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24    Q.   Turn to Page 285, Section 4.4,
25 under "Gas Flow Potential."

---

Page 95

1    "4.4 Gas Flow Potential" reads,
2  "Gas flow potential 3.62 at reservoir zone
3  measured depth 17,700 feet."  Did I read that
4  correctly?
5    A.   Correct.
6    Q.   Let's turn to the next tab, 25.
7    MR. KUWANA:  Counsel, could we go off
8  the record for a second?
9    MR. THORNHILL:  Do you want to go meet
10 for a second?
11    MR. HARTLEY:  (Nods.)
12    THE VIDEOGRAPHER:  We're going off the
13 record.  It's 10:33.
14    This is Videotape No. 2.
15    (Break.)
16    THE VIDEOGRAPHER:  We're back on the
17 record.  This begins Videotape No. 3.  It's
18 10:46.
19    Q.   (BY MR. THORNHILL)  We're back
20 on the record, Mr. Gagliano.
21    We're at Tab 24 or 25.  I
22 believe we were at 25.  The document, No. 24,
23 was prior Exhibit 727.  And I have one
24 question about it, which I did not ask you.
25 If I can perhaps have you -- direct your

---

Page 96

1  attention to that 7-inch production casing
2  design report.
3    Did you prepare on behalf of
4  Halliburton and have issued to BP America
5  this design report of April 14, 2010, for the
6  Macondo No. 1 well?
7    A.   I respectfully decline to answer
8  based on my constitutional Fifth Amendment
9  privilege.
10    Q.   Tab No. 25 is a document that
11 may be previously in the record.  We're not
12 sure because it has a different Bates number,
13 Halliburton 10336 through 10354, which, for
14 the record, we will identify as 2040.
15    (Exhibit No. 2040 was marked.)
16    Q.   (BY MR. THORNHILL)  This
17 document purports to be 9-7/8 by 7-inch
18 production casing design report of April 14,
19 2010, for Brian Morel.  Did I read that
20 correctly?
21    A.   That's what the document says,
22 yes.
23    Q.   Okay.  It says it's for the
24 Macondo No. 1 well from Halliburton to BP
25 America.  Did I read that, correctly?

---

24  (Pages 93 to 96)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Page 97

1     A.    That's what it says.
2     Q.    Did you, through the use of the
3  OptiCem software product that was licensed to
4  Halliburton, prepare this document and have
5  it issued to BP?
6     A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9     Q.    I will mark, then -- we had
10  already marked this document.
11     THE REPORTER:  2040.
12     MR. THORNHILL:  2040.
13     (Exhibit No. 2040 was marked.)
14     Q.    (BY MR. THORNHILL) Let's go to
15  27, No. 27.  This document is Halliburton
16  535018 through 020.  If you'll look at the
17  first page, sir, does it not read that it is
18  an e-mail from Brian Morel on April 15, 2010,
19  to Jesse Gagliano, Mark Hafle, Brett Cocales,
20  and Greg Walz.  Did I read that correctly?
21     A.    Yes, that's what the document
22  says.
23     Q.    The document reads, does it not,
24  "We have six centralizers.  We can run them
25  in a row, spread out or any combinations of

Page 98

1  the two.  It's a vertical hole, so hopefully
2  the pipe stays centralized due to gravity.
3  As far as changes, it's too late to get any
4  more product to our rig" -- or "to the rig,"
5  rather.  "Our only option is to rearrange
6  placement of these centralizers.  Please see
7  attached diagram for my recommendation."  Did
8  I read that correctly?
9     A.    Yes, that's what the document
10  says.
11     Q.    Did you receive, Mr. Gagliano,
12  this e-mail on or about April 15, 2010, and
13  review it?
14     A.    I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17     Q.    Did you -- isn't it true -- let
18  me rephrase that.
19         Isn't it true that the reference
20  to six centralizers that we see in this
21  e-mail is a reference to a prospective cement
22  design plan using six centralizers, which was
23  never requested by BP from Halliburton?
24     A.    I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 99

1  privilege.
2     MR. CHEN:  Objection; form.
3     Q.    (BY MR. THORNHILL) Let's then
4  skip ahead --
5     MR. THORNHILL:  Did I give a number to
6  this?
7     MR. HARTLEY:  No.
8     MR. THORNHILL:  Okay.
9     Q.    (BY MR. THORNHILL) No. 27 is
10  going to be Exhibit 2041.
11     (Exhibit No. 2041 was marked.)
12     Q.    (BY MR. THORNHILL) Let's skip
13  to Tab 30.  This document was previously
14  Exhibit No. 811 in the record.  It's
15  Halliburton Bates Page No. 502393 and 94.
16         Does this document read at the
17  top "Cement Lab Weigh-Up Sheet" for April 16,
18  2010?
19     A.    Yes, that's what the document
20  says.
21     Q.    Does it show that it's for the
22  TRANSOCEAN HORIZON at the fop?
23     A.    Yes, the document says that.
24     Q.    Does it show Jesse Gagliano as
25  the engineer, the request date of April 12,

Page 100

1  2010?
2     A.    Yes, the document says that.
3     Q.    Are the materials in the middle,
4  the first seven items of materials under test
5  amount struck out within a notation blend,
6  b-l-e-n-d?
7     A.    Yes, the document shows that.
8     Q.    Okay.  Now, on the second page,
9  394, at the top of this lab test, does it not
10  read in handwriting, "Cancel foamed stability
11  as per Jesse"?
12     A.    Yes, the document says that.
13     Q.    Okay.  Did you, Mr. Gagliano,
14  request on or about April 16, 2010, that the
15  foam stability test be canceled?
16     A.    I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19     Q.    This is Exhibit No. 811 -- 811
20  in the record.
21         Okay.  Let's go to No. 31.  This
22  document is BP-HZN-MB1001, 192806 through 840
23  is previously Exhibit No. 730 in the record.
24  This document on the first -- first page, 806
25  shows, does it not, "From: Jesse Gagliano,

Exhibit Q
Page 25

Page 101

1    April 16, 2010"?  Did I read that correctly?
2         A.   Yes, the document says that.
3         Q.   There is then a whole list of
4    persons who are recipients, including Anthony
5    Cupit, Brett Cocales, Christopher Haire, Don
6    Vidrine, and many others that we see in that
7    list.  Did I read that correctly?
8         MR. HARTLEY:  Object; form.
9         A.   Yes, the document shows that.
10        Q.   (BY MR. THORNHILL)  Okay.  In
11   the text does it read, "Attached is the
12   updated proposal and OptiCem report.  Please
13   review and let know if you have any
14   questions.  Thanks"?  Did I read that
15   correctly?
16        A.   Yes, the document states that.
17        Q.   Turn to Page 833 under
18   "Centralizer Placement 4.4," please.  Did you
19   find that section?
20        A.   Yes, I have the section.
21        Q.   Does this document call for the
22   use of -- let me rephrase that question.
23        Under this section, "Centralizer
24   placement" and "centralizer number," are
25   there 21 numbered centralizers mentioned?

Page 102

1         A.   Yes, the document shows 21.
2         Q.   Okay.  Then on the Page 835, two
3    pages over, under the Section 5.4, "Gas flow
4    potential," does the document read "Gas flow
5    potential 2.56 at reservoir zone measured
6    depth 18,300 feet"?  Did I read that
7    correctly?
8         A.   Yes, the document shows that.
9         Q.   Mr. Gagliano, did you prepare
10   and issue pursuant to the e-mail that we saw
11   and identified on the first page of this
12   document, which is referenced as the
13   9-7/8-inch by 7-inch production casing report
14   for April 15, 2010, Version No. 4, for
15   Halliburton for BP America?
16        A.   I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.   Tab 32, please, sir.
20        MR. THORNHILL:  For the record, this
21   document was previously Exhibit No. 731,
22   Halliburton Bates Page Nos. 10572 through
23   10591.
24        Q.   (BY MR. THORNHILL)  Mr. Gagliano,
25   I would ask you, sir, to tell me if the cover

Page 103

1    page shows, as I now read, that this is the
2    9-7/8-inch by 7-inch production casing design
3    report for Brian Morel, April 15, 2010, for
4    the Macondo No. 1 well.  Did I read that
5    correctly?
6         A.   That's what the document says.
7         Q.   On Page 10583 under the
8    Section 3.4, "Foam slurry data," is there a
9    description in Line 2 that reads, "6.7 PPG
10   base oil Macondo"?
11        A.   Yes, there's a line that states
12   that.
13        Q.   Under -- on Page 586 of this
14   document, under Section 5.4, "Gas flow
15   potential," does it read, "Gas flow potential
16   7.65 at reservoir zone measured depth of
17   18,200 feet"?  Did I read that correctly?
18        A.   Yes, the document states that.
19        Q.   Okay, sir.  Under Section 4.4,
20   which is a couple of pages before, Page 84,
21   on "Centralizer placement," does this
22   document show under the column "Centralizer
23   number," ten centralizers?
24        A.   Yes, the document shows ten.
25        Q.   Ask you, Mr. Gagliano, did you,

Page 104

1    while at Halliburton as a cement design
2    engineer, prepare and issue for Halliburton
3    to BP this report that is under Tab 32 and
4    Exhibit 731?
5         MR. HARTLEY:  Object; form.
6         A.   I respectfully decline to answer
7    based on my constitutional Fifth Amendment
8    privilege.
9         Q.   (BY MR. THORNHILL)  Okay.  Let's
10   go to Tab 33.  This was the document that was
11   previously Exhibit No. 732, bears Bates Page
12   Nos. BP-HZN-2179MDL81607 through 81630.
13        Ask you, sir, on the first page
14   if this shows to have been, in the middle,
15   "From: Jesse Gagliano, Thursday, April 15,
16   2010, To: Brian Morel, Mark Hafle, Brett
17   Cocales, and Greg Walz"?  Is that what the
18   document reads?
19        A.   Yes, the document shows that.
20        Q.   In the text does it read from
21   you, "Attached is the updated OptiCem report
22   and centralizer placement.  The six
23   centralizer subs will be every 45 feet on
24   bottom (from 18,300 feet to 18,075 feet).
25   Then the box spring centralizers will be

26 (Pages 101 to 104)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile: (504) 525-9109

Exhibit Q
Page 26

Page 105

1  every 45 feet above the subs to 17,400 feet."
2  Did I read that correctly?
3      A.   I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.   I'll ask you, sir, to turn to
7  Page No. 8162, the Section 4.4 "Centralizer
8  placement."
9           And ask you, sir, if in this
10  section for this 9 7/8-inch, 7-inch
11  production casing design report there is
12  listed under "Centralizer number," 21
13  centralizers.
14      A.   What page are you on, again?
15      Q.   I think it's 162, are the last
16  three numbers.
17      A.   I have a couple of pages that
18  list 162 here. I'm not sure.
19      Q.   Two pages? Yeah, it is. Looks
20  like a duplication. I'm under Section 4.4.
21      A.   Okay.
22      Q.   I think that's a typo. It
23  actually shows a three, and it just got cut
24  off.
25      A.   Okay.

Page 106

1      Q.   But in any case, the one that
2  I'm looking at is Page 15 of the report, and
3  it shows 62 in the bottom right. And it's --
4  the section is "4.4 centralizer placement."
5  It shows 21 centralizers; is that correct?
6      A.   Yes, the document shows 21.
7      Q.   The next page -- and you're
8  right. I believe this is one of those
9  natively produced documents so that the
10  numbers stay the same throughout. So it will
11  be a little confusing.
12           But the next page number is 17,
13  Page 17, of the document. And we're looking
14  at Section 5.4, "Gas flow potential."
15           Sir, does the document read,
16  "Gas flow potential 2.56 at reservoir zone
17  measured depth of 18,200 feet"?
18      A.   Yes, the document shows that.
19      Q.   Did you, Mr. Gagliano, prepare
20  and have issued for Halliburton to BP this
21  production casing design report that is
22  Tab 33, Exhibit 732 in the record?
23      A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 107

1      Q.   Did you, Mr. Gagliano, discuss
2  with Greg Walz, Mark Hafle, or Brian Morel
3  the need to have 21 centralizers for the
4  cement job that's being designed in this
5  exhibit?
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   Isn't it true, Mr. Gagliano,
10  that you told the engineers at BP that using
11  less than 21 centralizers showed a
12  significant risk of gas flow potential on the
13  cement job for the 7-inch production casing?
14      MR. CHEN: Objection; form.
15      A.   I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18      Q.   (BY MR. THORNHILL) Turn to
19  Tab 36. Skip a couple here to 36. This is a
20  document that has BP-HZN-2179MDL11184 through
21  85. And I'll ask you, sir, if at the bottom
22  of the first page it shows, "From: Jesse
23  Gagliano, Thursday, April 15, 2010, To:
24  Anthony Cupit, Brett Cocales, Christopher
25  Haire" and many others listed in the

Page 108

1  addressee section.
2      A.   Yes, the document shows that.
3      Q.   And the text of this says,
4  "Attached is the updated proposal and OptiCem
5  report. Please review and let me know if you
6  have any questions." Did I read that
7  correctly?
8      A.   Yes, the document states that.
9      Q.   Above that e-mail, is there an
10  e-mail from Brian Morel, Friday, April 16,
11  2010, to Mark Hafle, which in the text reads,
12  "Looks like he forgot us. Procedure is
13  wrong. Doesn't include base oil." Did I
14  read that correctly?
15      A.   That's what the document states.
16      Q.   Okay. And at the very top, Mark
17  Hafle writes to Brian Morel, "Oh, my." Did I
18  read that correctly?
19      A.   Yes, the document states that.
20      Q.   That document will be Exhibit
21  No. 2042.
22           (Exhibit No. 2042 was marked.)
23      Q.   (BY MR. THORNHILL) Turn to
24  Tab 37. This document -- this document was
25  previously Exhibit 734. It's Bates Page

27 (Pages 105 to 108)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 27

Page 109

1    BP-HZN-2179MDL31460 through -- it's --
2    apparently it's a natively produced document,
3    and the entire document bears that Bates page
4    number.
5          The e-mail at the bottom is
6    reading, "From: Jesse Gagliano, April 15,
7    2010, To: Anthony Cupit, Brett Cocales,
8    Christopher Haire, and others." Did I read
9    that correctly?
10         A.   Yes, the document states that.
11         Q.   And the text says, "Attached is
12   the updated proposal and OptiCem report."
13   Did I read that correctly?
14         A.   Yes, that document states that.
15         Q.   Now, let's -- ask you to turn to
16   the 15th page of the document and ask you,
17   sir, under "4.4 centralizer placement," if
18   centralizer number shows 21 centralizers.
19         A.   Yes, the document shows 21.
20         Q.   Did you prepare for Halliburton
21   and issue to BP this OptiCem report on the
22   9-7/8-inch by 7-inch production casing,
23   April 15, 2010, as Version No. 4?
24         A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment

Page 110

1    privilege.
2          Q.   Okay.  38 is Halliburton 0502625
3    and runs through 38.  Through 38.
4          I'll ask you, sir, if at the top
5    of the first page it shows from Jesse
6    Gagliano, April 17, 2010, to Nathaniel
7    Chaisson, Paul Anderson, Anthony Cupit,
8    Christopher Haire, the DEEPWATER HORIZON BP,
9    Jason Fleming, and Vincent Tabler.  Did I
10   read that correctly?
11         A.   Yes, that's what the document
12   states.
13         Q.   Does the text read, "Attached is
14   the procedure I sent to Brian this morning
15   and haven't gotten any feedback yet.  Let me
16   know if you have any questions."  Did I read
17   that correctly?
18         A.   Yes, the document states that.
19         Q.   Okay.  On the next page, 26,
20   does it show that this was an April 17, 2010,
21   document, Version No. 5, prepared for the
22   9-7/8 inch by 7-inch production casing?
23         A.   Yes, the document shows that.
24         Q.   Now, did you prepare, along with
25   others at Halliburton, and send to BP this

Page 111

1    document by way of this e-mail designating
2    DEEPWATER HORIZON BP as a recipient of the
3    e-mail?
4          A.   I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7          Q.   Okay.  Tab 39,
8    BP-HZN-2179MDL250656 through 669 is
9    previously Exhibit No. 735.  I'll ask you,
10   sir, if on the first page, from Jesse
11   Gagliano, Saturday, April 17, 2010, to Brian
12   Morel, Mark Hafle, Brett Cocales and Greg
13   Walz, the document reads, "Attached is the
14   revised proposal with the changes I believe
15   I've captured all of the changes," did I read
16   that correctly?
17         A.   Yes, the document states that.
18         Q.   Is this a document that you and
19   others at Halliburton prepared and issued to
20   BP showing the design of the production
21   casing job for the 9-7/8 inch by 7-inch
22   production casing?
23         A.   I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

Page 112

1          Q.   Okay.  Let's turn to Tab 40.
2    This is a document that was previously
3    introduced as Exhibit 736.  It's Halliburton
4    Bates Page Nos. Halliburton 125561 to 564.
5          Top of the first page, the
6    e-mail shows from Nathaniel Chaisson, Sunday,
7    April 18, 2010, to Jesse Gagliano.  Did I
8    read that correctly?
9          A.   Yes, the document shows that.
10         Q.   The text reads, "Jesse, we are
11   currently running casing, and the projected
12   cement job time is tomorrow at noon.  We had
13   a meeting yesterday to discuss the job, and I
14   have attached the job procedure which should
15   be final."  Did I read that correctly?
16         A.   Yes, the document states that.
17         Q.   Okay.  The next to the last
18   sentence in this document, does it read, "He
19   will make a decision once we have the 24 hour
20   strengths for this slurry"?  Did I read that
21   correctly?
22         A.   The document states that, yes.
23         Q.   Did you, Mr. Gagliano, receive
24   from Mr. Chaisson this e-mail with the
25   projected procedure for the cement job?

28  (Pages 109 to 112)

Page 113

1     A.   I respectfully decline to answer
2 based on my constitutional Fifth Amendment
3 privilege.
4     Q.   Did you, Mr. Gagliano, see in
5 this procedure on the second page that it is
6 for the Macondo 252 Well No. 1, Version 1,
7 and it calls for a pump rate of four barrels
8 per minute for the spacer?  Did you see that?
9     A.   I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.   Isn't it true, Mr. Gagliano,
13 that you had discussions with engineers at BP
14 about your concerns that the pump rate may be
15 too low?
16     MR. CHEN:  Objection; form.
17     A.   I respectfully -- respectfully
18 decline to answer based on my constitutional
19 Fifth Amendment privilege.
20     Q.   (BY MR. THORNHILL) Specifically
21 that the pump rate for the cement would not
22 be fast enough to effectively displace any
23 mud around the production casing in the
24 annulus and could lead to a bad cement job?
25     MR. CHEN:  Objection; form.

Page 114

1     A.   I respectfully decline to answer
2 based on my constitutional Fifth Amendment
3 privilege.
4     Q.   (BY MR. THORNHILL) Tab 41,
5 previously marked in the record as
6 Exhibit 737 as Halliburton Bates Pages 129303
7 through 306.  This is Version 2 of the
8 Macondo 252 Well No. 1 casing job procedure.
9 Did I read that correctly?
10     A.   That's what the document says,
11 yes.
12     Q.   Okay.  Did you, sir, receive
13 from those preparing this procedure -- this
14 document, review it and discuss it with
15 people at BP acting as engineers for BP?
16     A.   I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19     Q.   Turn to the 42nd tab, if you
20 would.  This is Halliburton's Bates Pages
21 numbered 502621 to 622.  This purports to be,
22 and does it not read at the top, from Jesse
23 Gagliano, sent Sunday, April 18, 2010, to
24 Nathaniel Chaisson and Paul Anderson with a
25 text, "Attached is the OptiCem with six

Page 115

1 centralizers."  Did I read that correctly?
2     A.   That's what the document says.
3     Q.   Is it true, Mr. Gagliano, that
4 the OptiCem report attached to this e-mail
5 was actually an OptiCem report using seven
6 centralizers instead of six centralizers as
7 this cover sheet shows?
8     MR. CHEN:  Objection; form.
9     A.   I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.   (BY MR. THORNHILL) Turn to
13 Tab 44, please, sir.  This is a document that
14 has Halliburton Page Nos. 0562829 through
15 2835, and reads at the top on the first page,
16 does it not, "Input Differences between" --
17     (Discussion off the record.)
18     Q.   (BY MR. THORNHILL) And it says
19 on the first page, "Input Differences between
20 OptiCem Report on 4-15-10 & 4-18-10,"
21 correct?
22     A.   That's what the document says,
23 yes.
24     Q.   Okay.  And then the document
25 purports to show parameters under 1.2,

Page 116

1 indicating the "Fracture Zone Measured Depth
2 are different.  Report on April 15th, 18,300
3 feet; Report on April 18th, 18,305 feet."
4 Did I read that correctly?
5     A.   The report shows that, yes.
6     Q.   Were you, Mr. Gagliano, involved
7 in preparing this document to show the
8 distinctions or differences between the April
9 15th and the April 18th OptiCem reports
10 prepared by Halliburton?
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.   Okay.  Does this document --
15 strike that.
16     I'll offer Exhibit No. 44 as our
17 next exhibit, No. 2043.
18     (Exhibit No. 2043 marked.)
19     Q.   (BY MR. THORNHILL) Let's go to
20 45.  45 is a prior Exhibit No. 738.  It is a
21 document Bates Page BP-HZN-MBI 128708 through
22 756.
23     Ask you, sir, if on the first
24 page it shows it's from Jesse Gagliano,
25 Monday, April 19, 2010, to Anthony Cupit,

29 (Pages 113 to 116)

Exhibit Q
Page 29

Page 117

1   Brett Cocales, Christopher Haire, and many
2   others shown in the addressee section of that
3   e-mail.  Did I read it correctly?
4       A.    Yes, the document shows that.
5       Q.    Does the text of this document
6   read, "Attached it the revised information
7   for the upcoming 9-7/8 inch by 7-inch
8   Production Casing job.  The compressive
9   strength is not completed yet, it currently
10  has 34 hours.  The chart of the progress is
11  below.  Let me know if you have any
12  questions.  Thanks!!  Jesse Gagliano."  Did I
13  read that correctly, sir?
14      A.    The document states that.
15      Q.    Yes.  On the next page, does
16  this show that this is Version No. 6, dated
17  April 18, 2010?
18      A.    The document shows that.
19      Q.    Turn to Page 737, the section
20  under "Centralizer Placement," 4.4.  Does
21  that section read centralizer number, seven
22  centralizers?
23      A.    The document does show seven.
24      Q.    On the next page, 739, under
25  Section 5.4, "Gas Flow Potential," do you see

Page 118

1   that?
2       A.    Yes, I see where the document
3   shows that.
4       Q.    Does it read "Gas Flow
5   Potential, 10.29, at Reservoir Zone Measured
6   Depth, 18,200 feet"?
7       A.    The document shows that.
8       Q.    Did you, Mr. Gagliano, prepare
9   and have issued on behalf of Halliburton to
10  BP this production casing design report that
11  indicates a gas flow potential of 10.29 for
12  seven centralizers at 18,200 feet in the
13  intended cement job on the Macondo 252 No. 1
14  well?
15      A.    I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18      Q.    Turning to Page No. 755, looking
19  at the lab test results at the top, does this
20  page say "Lab Test Results - Primary"?
21      A.    Yes, the document shows that.
22      Q.    Does it show a rig name of the
23  TRANSOCEAN HORIZON and a date of April 12th,
24  2010?
25      A.    The document shows that.

Page 119

1       Q.    Under the "Cement Information -
2   Primary Design," does it show that the
3   ZoneSealant is from the lab March 15, 2009?
4       MR. HARTLEY:  Objection; form.
5       A.    The document shows that.
6       Q.    (BY MR. THORNHILL)  Does it show
7   that the SCR-100L is from the lab October 22,
8   2009?
9       MR. HARTLEY:  Objection; form.
10      A.    The document shows that.
11      Q.    (BY MR. THORNHILL)  Does it show
12  that the Fresh Water is from the lab
13  April 12, 2010?
14      MR. HARTLEY:  Objection; form.
15      A.    The document does show that.
16      Q.    (BY MR. THORNHILL)  Okay.  Does
17  it show that of the cement properties the
18  foam quality is 12.98 percent?
19      A.    The document shows that.
20      Q.    Did you prepare for Halliburton
21  and send to BP this report showing the
22  information that we have just read indicating
23  the lab test results that we just read?
24      A.    I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 120

1   privilege.
2       Q.    Isn't it true, Mr. Gagliano,
3   that this report was issued by Halliburton to
4   BP, and it shows that the materials tested
5   were not all from the rig?
6       A.    I respectfully decline to answer
7   based on my constitutional Fifth Amendment
8   privilege.
9       MR. HARTLEY:  Objection; form.
10      Q.    (BY MR. THORNHILL)  Isn't it a
11  fact, Mr. Gagliano, that the individuals who
12  are addressees in this e-mail and who are
13  familiar with the design and placement of
14  cement jobs and who worked for BP were
15  provided with this report an indication of
16  the testing materials and the source of the
17  testing materials routinely used by
18  Halliburton for BP cement jobs?
19      MR. HARTLEY:  Objection; form.
20      MR. CHEN:  Objection; form.
21      A.    I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.    (BY MR. THORNHILL)  Isn't it
25  true, Mr. Gagliano, that you discussed with

30 (Pages 117 to 120)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:

JESSE GAGLIANO                  May 11, 2011                  TAMARA CHAPMAN, CSR

Page 121

1    BP engineers the prospect of using foam
2    cement as called for in this report and the
3    hazards that were associated with using foam
4    cement with a design as indicated in this
5    OptiCem report?
6         MR. CHEN: Objection; form.
7         MR. HARTLEY: Objection; form.
8         A.    I respectfully decline to answer
9    based on my constitutional Fifth Amendment
10   privilege.
11        Q.    (BY MR. THORNHILL) Okay. Isn't
12   it true, Mr. Gagliano, that you prepared and
13   sent this version No. 6, April 18, 2010,
14   report on April 19, 2010, to BP engineers?
15        A.    I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.    Turn to Tab 46, please, sir.
19   This is a document that has Bates Page Nos.
20   Halliburton 10955 through 10987. I ask you,
21   sir, if on the first page, it shows that it's
22   the "9 7/8" X 7" Production Casing Design
23   Report," Brian Morel, April 18, 2010, for
24   Halliburton on the Macondo No. 1 well to BP?
25   Did I read that correctly?

Page 122

1         A.    The document states that.
2         Q.    Turn to Page 970 in the report,
3    please, sir. Under the Section 4.4,
4    "Centralizer Placement, Centralizer Number."
5    Does this document reflect that there are
6    seven centralizers called for in this design?
7         A.    I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10        Q.    This document shows seven
11   centralizers under "Centralizer Number,"
12   correct?
13        A.    Yes, it does show seven.
14        Q.    Okay. Turn to Page 972 under
15   the Section 5.4, "Gas Slope Potential,"
16   please, sir. Does this document read under
17   that section, "Gas Flow Potential, 10.29, at
18   Reservoir Zone Measured Depth, 18,200 feet"?
19   Did I read that correctly?
20        A.    The document shows that, yes,
21   sir.
22        Q.    Now, sir, my question to you is,
23   at the back is there information -- let me
24   turn to the page for you. Make this easier.
25             Beginning on Page 983, is there

Page 123

1    information provided by Halliburton on the
2    whole angle?
3         A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.    Okay. Isn't it true,
7    Mr. Gagliano, that you and others at
8    Halliburton on behalf of Halliburton sent to
9    BP this document on or about April 19, 2010,
10   showing Version No. 6 of April 18, 2010, for
11   the intended cement job on the 7-inch
12   production casing?
13        MR. CHEN: Objection; form.
14        A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        Q.    (BY MR. THORNHILL) Let's turn
18   to Tab 47. This is a document previously
19   740. It's Bates Pages BP-HZN-2179MDL22599
20   through 22604. And I'll ask you, sir, to
21   look at the first page with me. Does it not
22   show at the top it's from Jesse Gagliano,
23   Monday, April 19, 2010, to Brian Morel?
24        A.    The document shows that.
25        Q.    It shows in the text, "Attached

Page 124

1    is the lab test and below is the progress of
2    the CS." Did I read that correctly?
3         A.    The document shows that.
4         Q.    Okay. Now, at the bottom, is
5    there not in an April 18 e-mail from Jesse
6    Gagliano to Anthony Cupit, Brett Cocales, and
7    others the e-mail that reads, "Attached is
8    the revised information for the upcoming
9    9 7/8" X 7" Production Casing job. The
10   compressive strength is not completed yet, it
11   currently has 34 hours"? Did I read that
12   correctly?
13        A.    The document shows that.
14        Q.    Okay. On Page 603 under lab
15   tests, lab results for the surface plug. Do
16   you see that?
17        A.    Yes, the document shows that.
18        Q.    Dated April 17th, 2010. Do you
19   see that?
20        A.    The document shows that.
21        Q.    Does it show in the document
22   that the seawater is from the lab,
23   December 17, 2009?
24        MR. HARTLEY: Objection; form.
25        A.    The document shows that.

31 (Pages 121 to 124)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:
JESSE GAGLIANO                      May 11, 2011                      TAMARA CHAPMAN, CSR

Page 125

1    Q.   (BY MR. THORNHILL) And that the
2  slurry density is 16.399.  Does it show that?
3    A.   The document shows that.
4    Q.   Isn't it a fact, Mr. Gagliano,
5  that this document provided by Halliburton to
6  BP showed that the lab testing material was
7  not all from the rig and that that procedure
8  was well-known to BP as has been indicated in
9  the various OptiCem reports we have reviewed
10  today?
11    MR. CHEN:  Objection; form.
12    MR. KUWANA:  Objection; form.
13    A.   I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16    Q.   (BY MR. THORNHILL) Okay. Let's
17  turn to Tab 49.  This is a document that's
18  previously Exhibit No. 741.  It's Bates Page
19  Nos. BP-HZN-2179MDL15356 and it runs through
20  15404.
21    In the middle on the first page,
22  the e-mail says from Jesse Gagliano, Sunday,
23  April 18, 2010, to Anthony Cupit, Brett
24  Cocales, Christopher Haire, and others.  Did
25  I read it correct?

Page 126

1    A.   The document shows that.
2    Q.   This e-mail shows in the
3  signature line Jesse Gagliano of Halliburton
4  Energy Services.  Did I read it correctly?
5    A.   The document shows that.
6    Q.   Okay.  Does this document on the
7  next page show that a date of April 18 in
8  version No. 6?
9    A.   The document shows that.
10    Q.   Okay.  On Page 385 under
11  "Centralizer Placement," Section 4.4, does
12  the centralizer number show seven?
13    A.   The document shows that.
14    Q.   Now, does this document on the
15  next page, 386, say under Section 5.1,
16  "Volume and Pressure Results," the following,
17  "Annulus fluid is heavier than casing fluid
18  by 38 psi.  Apply appropriate back pressure
19  on casing if floating equipment does not hold
20  properly."  Did I read it correctly, sir?
21    A.   The document states that.
22    Q.   Okay.  On the -- on the
23  Page 403, lab test -- "LAB RESULTS -
24  Primary," does this document show that the
25  ZoneSealant 2000 lab, March 4 -- March 15,

Page 127

1  2009, SCR-100L Lab, October 22, 2009, and
2  Fresh water lab, April 12, 2010?  Did I read
3  it correctly?
4    A.   I'm sorry.  Can you read it
5  again.  I was still flipping.
6    Q.   That's okay.
7    A.   Make sure --
8    Q.   "LAB RESULTS - Primary shown
9  also including ZoneSealant 2000 lab, March
10  15, 2009; SCR-100L Lab, October 22, 2009; and
11  Fresh Water Lab, April 12, 2009."  Does it
12  show that?
13    MR. HARTLEY:  Objection; form.
14    MR. KUWANA:  Counsel, for the record,
15  you read the last date wrong.
16    MR. THORNHILL:  Fresh Water Lab, April
17  12, 2010.
18    MR. KUWANA:  You read 2009.
19    MR. THORNHILL:  Did I say "2009"?
20    Q.   (BY MR. THORNHILL) It's
21  April 12, 2010, for the Fresh Water.  Does it
22  say that?
23    A.   Yes, the document states that.
24    Q.   Okay.  Does the foam quality
25  read 12.98 percent?

Page 128

1    A.   The document shows that.
2    Q.   Okay.  Now, this is for the
3  April 12th, 2010, TRANSOCEAN HORIZON rig,
4  correct, at the top?
5    MR. KUWANA:  Can you ask him if the
6  document shows that?
7    Q.   (BY MR. THORNHILL) Yeah.  Does
8  the document show that?
9    A.   The document shows that.
10    Q.   Isn't it true, Mr. Gagliano,
11  that you and others at Halliburton prepared
12  this report that is shown as the 9-7/8 by
13  7-inch production casing report and you sent
14  it on behalf of Halliburton to engineers at
15  BP?
16    MR. HARTLEY:  Objection; form.
17    A.   I respectfully -- respectfully
18  decline to answer based on my constitutional
19  Fifth Amendment privilege.
20    Q.   (BY MR. THORNHILL) The next
21  document is Tab 50.  It's a document 725 in
22  the record, and it's Halliburton 0502596
23  through 97.
24    At the top it reads from
25  Nathaniel Chaisson, April 20, 2010, to Jesse

32 (Pages 125 to 128)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters   Facsimile: (504) 525-9109

Page 129

1  Gagliano. Did I read it correctly, sir?
2      A.   The document states that.
3      Q.   It says, "Jesse, I have attached
4  the OptiCem RT that you asked for. Two
5  things I should mention are:  1) Stages 5 and
6  6 are a little off due to...engineer not
7  timing it right...my apologies." Did I read
8  that correctly?
9      A.   The document states that.
10     Q.   No. 2, "Once the rig started to
11  displace, RT continued to read pressure for a
12  while, then it looks like some interference
13  came into play. The data gets erratic for
14  some unknown reason. It has to be an RT
15  issue, or the modem between the two laptops,
16  because the Cemwin data looks fine." Did I
17  read that correctly?
18     A.   The document states that.
19     Q.   Okay. Did you, Mr. Gagliano,
20  receive and review this e-mail on or about
21  April 20, 2010?
22     A.   I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25     Q.   Isn't it a fact, Mr. Gagliano,

Page 130

1  that you and Mr. Chaisson discussed by e-mail
2  problems with the collection of data by the
3  Halliburton or Sperry-Sun measuring devices
4  and the processing of that data also being a
5  problem for the Halliburton computers?
6      A.   I --
7      MR. HARTLEY:  Objection; form.
8      A.   I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10  privilege.
11     Q.   (BY MR. THORNHILL) Let's go to
12  51, previously in Exhibit 743. It's Bates
13  Page Nos. BP-HZN-CEC011406 through 19.
14  Purports to be on the first page, does it
15  not, the 9.875-inch by 7-inch foam production
16  casing post job report submitted by Nathaniel
17  Chaisson. Did I read that correctly?
18     A.   The document shows that.
19     Q.   Okay. Did you, Mr. Gagliano,
20  receive this report from Mr. Chaisson and
21  transmit it to BP in accordance with the
22  contract between BP and Halliburton?
23     MR. HARTLEY:  Objection; form.
24     A.   I respectfully design -- decline
25  to answer based on my constitutional Fifth

Page 131

1  Amendment privilege.
2      Q.   (BY MR. THORNHILL) Turn to 52.
3  It's Halliburton Bates Page Nos. 113583.
4  This is from Jesse Gagliano, April 21, 2010,
5  to Mark Hafle. It reads, does it not, "I
6  never did receive the data from the 9 7/8" X
7  7" Casing Test." Did I read it correctly?
8      A.   The document shows that.
9      Q.   And that e-mail, it has a
10  signature, Jesse Gagliano, Halliburton Energy
11  Services, correct?
12     A.   The document shows that.
13     Q.   Okay. We'll introduce that as
14  the next exhibit, No. 2044.
15     (Exhibit No. 2044 was marked.)
16     Q.   (BY MR. THORNHILL) 54 is
17  previously Exhibit 743. It's Bates Page Nos.
18  Halliburton 125645 through 659, and then
19  there is --
20     MR. THORNHILL:  Is this correct? There
21  is another page number here.
22     (Discussion off the record.)
23     MR. KUWANA:  Counsel, that's not what I
24  have.
25     MR. THORNHILL:  Yeah. The last page in

Page 132

1  mine is numbered 564. That's what mine has.
2      (Discussion off the record.)
3      MR. THORNHILL:  We'll go over, then,
4  page by page to make sure we have it right.
5          This Tab 54 incidentally -- we
6  will check to make sure that the prior
7  Exhibit 743 included this last page, 559564,
8  which is an April 29 e-mail from Mr. Gagliano
9  to Mr. Cunningham. And if it didn't, of
10  course, we'll exclude it.
11         We'll -- we'll go over it in any
12  case. We may have to give another number to
13  this just to be safe.
14     MR. KUWANA:  Just for the record, this
15  exhibit appears to skip from 659 to 559564.
16     MR. THORNHILL:  Right.
17     MR. KUWANA:  It's not in sequence.
18     MR. THORNHILL:  Well, the last page
19  seems to be --
20     MR. KUWANA:  Last page --
21     MR. THORNHILL:  -- either added to the
22  exhibit or something incorrectly. That's
23  what I saw, too, and that's why I paused. So
24  we'll make sure that's correct, and otherwise
25  proceed to go over it since we're making this

33 (Pages 129 to 132)

Exhibit Q
Page 33

Page 133

1    the record.
2         Q.    (BY MR. THORNHILL) Okay. This
3    purports to be, does it not, a document -- on
4    the first page from Nathaniel Chaisson April
5    21, 2010, to Jesse Gagliano.
6              It reads, "Jesse, I've included
7    the post job report to include all events
8    that occurred prior to the cement job. Two
9    things that are not mentioned in my report
10   are as follows:  1) The rig was circulating
11   and getting fast -- gas back when we arrived
12   on 4/16/10." Did I read that correctly?
13        A.    The document shows that.
14        Q.    "2) There was an issue with a
15   Drill-Quip tool not shearing correctly, and
16   resulted in a run to retrieve it. I believe
17   it required 170k pull to shear, but don't
18   quote me on that. This occurred on the
19   morning of the 17th." Did I read that
20   correctly?
21        A.    The document states that.
22        Q.    Last sentence reads, "Just
23   mentioned these two incidents because they
24   come to mind, and are not in the report.
25   Thanks. Nathaniel Chaisson." Did I read the

Page 134

1    document correctly?
2         A.    The document states that.
3         (Discussion off the record.)
4         MR. THORNHILL: The last page that we
5    identified as potentially -- potentially
6    extraneous does not belong in the exhibit.
7    This exhibit should end with 659. Okay?
8         DEFENSE COUNSEL:  Could you restate
9    that?
10        MR. THORNHILL: The exhibit which is
11   under Tab 54 that previously was marked 743
12   runs from Halliburton Bates Page Nos. 125645
13   through 659. The last page in the tab is
14   extraneous, should be ignored. Okay?
15        Q.    (BY MR. THORNHILL)  Isn't it a
16   fact, Mr. Gagliano, that this revised casing
17   post job report for the 9.875-7/8 inch foam
18   production cement job was sent by Halliburton
19   to BP and included these changed items on the
20   first page of Mr. Chaisson's e-mail that we
21   just read?
22        MR. KUWANA: Objection; form.
23        MR. CHEN: Objection; form.
24        A.    I respectfully decline to answer
25   based on my constitutional Fifth Amendment

Page 135

1    privilege.
2         Q.    (BY MR. THORNHILL)  Next tab is
3    55. 55, and it's a single document.
4    Halliburton 0537548.  It's from Brett
5    Cocales, April 25, to Jesse Gagliano.  Do you
6    see that? Did I read it correctly?
7         A.    The document states that.
8         Q.    At the bottom, the e-mail is
9    from Cocales to Gagliano and Quang Nguyen and
10   reads, "Jesse, I need all the Macondo
11   cementing job reports, records ASAP." Did I
12   read that correctly?
13        A.    The document states that.
14        Q.    And above did you, in fact,
15   provide some of those reports as indicated in
16   your e-mail to Mr. Cocales?
17        A.    I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20        Q.    Isn't it true, Mr. Gagliano,
21   that you and others, such as Mr. Cocales, an
22   engineer at BP, discussed the post job
23   report, including that for the cement job on
24   the production casing, and specifically the
25   problems collecting data and presenting data

Page 136

1    as indicated in Mr. Chaisson's report?
2         MR. CHEN: Objection; form.
3         A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.    (BY MR. THORNHILL)  Isn't it
7    true, Mr. Gagliano, that the requirement of
8    the contract between BP and Halliburton that
9    scorecards be provided has never been
10   satisfied by Halliburton?
11        MR. HARTLEY: Objection; form.
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    (BY MR. THORNHILL) Okay.  Let's
16   turn to Tab --
17        (Discussion off the record.)
18        Q.    (BY MR. THORNHILL) Let's turn
19   to Tab 59. 59 is not a prior exhibit.  Okay.
20             Ask you, sir, to look at this
21   document. It's BP-HZN-BLY132170 through
22   13226.
23        (Discussion off the record.)
24        Q.    (BY MR. THORNHILL) And it reads
25   on the top from Kent Corser to Warren

34 (Pages 133 to 136)

Exhibit Q
Page 34

Page 137

1  Winters, Post Job Reports, and lists
2  attachments for the Macondo 252.  Do you see
3  that, Mr. Gagliano?  Did I read it correctly?
4      A.    The document states that.
5      Q.    Isn't it a fact that the BP
6  engineers received and read the details of
7  the post job reports as provided by
8  Halliburton --
9      MR. HARTLEY:  Objection; form.
10     Q.    (BY MR. THORNHILL) -- after the
11 blowout of the Macondo well?
12     A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.    (BY MR. THORNHILL) Okay.  Isn't
16 it also a fact, Mr. Gagliano, that the
17 information on the actual slurries that were
18 pumped, the cement slurries that were pumped,
19 were not provided by Halliburton to show the
20 lab test results in advance of pumping the
21 cement?
22     MR. HARTLEY:  Objection; form.
23     A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

Page 138

1      Q.    (BY MR. THORNHILL) Okay.  Let's
2  turn to Tab No. 60, and it's Halliburton
3  Bates Page Nos. 84845 through --
4      (Discussion off the record.)
5      MS. GEBHARDT:  When Halliburton
6  produced it, they did not give us the
7  attachments following it in exact order, so
8  they were gathered using the name.  And I
9  actually believe the Department of Justice
10 gathered these for the Cocales deposition,
11 and so it is a compilation of all of the
12 necessary lab tests, but the reason that it's
13 not sequential Bates numbers is because that
14 was not how it was given to us.
15     MR. THORNHILL:  Okay.  We'll skip that
16 one and come back to it later.  Confusing.
17 Make a note to come back to that one, if you
18 don't mind.
19     Q.    (BY MR. THORNHILL) Let's turn
20 to 63.  Tab 63 shows an Exhibit No. 816 in
21 the record.  And I'll ask you, Mr. Gagliano,
22 if you were interviewed by a gentleman by the
23 name of Martin, Mr. BJ Martin?
24     A.    I respectfully decline to answer
25 based on my constitutional Fifth Amendment

Page 139

1  privilege.
2      Q.    These handwritten notes show
3  Pages BP-HZN-BLY61275 through 61280.  And I
4  will ask you, sir, to turn to Page 61277 and
5  look at the middle of the document to the
6  handwriting which reads, "Did not do test
7  with foam cement."
8      A.    I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10 privilege.
11     Q.    Does the handwriting in the
12 middle not also read "Did not test for free
13 water or fluid loss, not cap cement, entire
14 system had 2.5 LE factor in it" and "did not
15 test for contamination and base oil"?  Did I
16 read that correctly?
17     A.    I respectfully decline to answer
18 based on my constitutional Fifth Amendment
19 privilege.
20     Q.    And on the next page, under 4.0
21 "Centralizers," do you see that section that
22 says "Calculated Spacer"?  Can you read that
23 language, sir?
24     A.    It's very difficult to read.
25     Q.    It is, isn't it?  Okay.  Did you

Page 140

1  discuss with Mr. Martin the information on
2  the tests that were not run by Halliburton
3  for the Macondo 252 well about the time of
4  the pumping of the 7-inch production case?
5      MR. HARTLEY:  Objection; form.
6      A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment --
8  Amendment privilege.
9      Q.    (BY MR. THORNHILL) Do you deny,
10 sir, that you had an interview with
11 Mr. Martin where you admitted to him that
12 Halliburton did not run the tests that we
13 just discussed including free water and fluid
14 loss?
15     MR. HARTLEY:  Objection; form.
16     A.    I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19     Q.    (BY MR. THORNHILL) Let's turn
20 to the next one, and then we're probably
21 going to take a break because we're short on
22 tape.
23     Tab 64, previously marked in the
24 record as Exhibit No. 817, and I'll ask you,
25 sir, to consider Bates Page

35 (Pages 137 to 140)

Exhibit Q
Page 35

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 141

1  Nos. BP-HZN-BLY61292 through 61298.  And turn
2  with me to the Page 1294, and ask you, sir,
3  if you had an interview with Brett Cocales?
4      A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.    Isn't it true, Mr. Gagliano,
8  that you told Mr. Cocales that on the 14th of
9  April, you reviewed the OptiCem report with
10  Brian Morel and with Erick Cunningham and
11  Greg Walz?
12      A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15      Q.    Isn't it true, Mr. Gagliano,
16  that this set of handwritten notes shows that
17  "Brian decided he liked foam, Jesse agreed."
18  Did I read that correctly?
19      MR. CHEN:  Objection; form.
20      MR. HARTLEY:  Objection; form.
21      A.    I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.    (BY MR. THORNHILL)  Isn't it
25  true that these notes read "Trent Fleece came

Page 142

1  up with the idea of base oil, had never used
2  base oil before."  Did I read that correctly?
3      MR. HARTLEY:  Objection; form.
4      A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.    (BY MR. THORNHILL)  Isn't it
8  true that on the next page, 96, these notes
9  read, "Did not do test on foam"?  Did I read
10  that correctly?
11      MR. HARTLEY:  Objection; form.
12      A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15      Q.    (BY MR. THORNHILL)  And the next
16  entry, "No free water test."  Did I read that
17  correctly?
18      MR. HARTLEY:  Objection; form.
19      A.    I respectfully -- I respectfully
20  decline to answer based on my constitutional
21  Fifth Amendment privilege.
22      Q.    (BY MR. THORNHILL)  The next
23  note, "No fluid loss."  Did I read that
24  correctly?
25      MR. HARTLEY:  Objection; form.

Page 143

1      A.    I respectfully decline to answer
2  based on my constitutional Fifth Amendment
3  privilege.
4      THE VIDEOGRAPHER:  Counsel, I need to
5  change the tape.
6      Q.    (BY MR. THORNHILL)  Next entry,
7  "Did not do it for cap cement or tail
8  cement."  Did I read that correctly?
9      A.    I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12      Q.    Next entry, "Did not check
13  compatibility of base oil with cement."  Did
14  I read that correctly?
15      MR. HARTLEY:  Objection; form.
16      A.    I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19      MR. THORNHILL:  We're at the end of the
20  tape.  We'll go off the record.
21      THE VIDEOGRAPHER:  This is the end of
22  Videotape Tape No. 3.  It's 11:45.
23      (Break.)
24      THE VIDEOGRAPHER:  We're back on the
25  record.  This is the beginning of Videotape

Page 144

1  No. 4.  It's 12:51.
2      Q.    (BY MR. THORNHILL)  We're going
3  to begin, again, first, with some
4  housecleaning items, tabs that we reviewed,
5  put Bates page numbers for the tabs into the
6  record.  Apparently the stickers were not put
7  on with numbers.  Tab 38 should be Exhibit
8  2045.  Tab 42, Exhibit 2046.  Tab 46,
9  Exhibit 2047.  Tab 55, Exhibit 2048.  And Tab
10  59, Exhibit 2049.
11      (Exhibit Nos. 2045 - 2049 were marked.)
12      Q.    (BY MR. THORNHILL)  Now, let's
13  go back to the last question I asked you
14  regarding the notes.  I previously referred
15  to Tabs 63 and 64 as handwritten notes taken
16  by BP interviewers.
17      Isn't it true, Mr. Gagliano,
18  that Tab 63, which is Exhibit 816 in the
19  record, reflects the handwritten notes of
20  Mr. Martin from an in-person interview with
21  you on May 14, 2010, according to the notes
22  on the first Page, 61275?
23      A.    I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

36  (Pages 141 to 144)

Page 145

1      Q.   Having -- having the opportunity
2   now to look at these handwritten notes and
3   knowing from your attendance of the
4   deposition with -- of the statement that you
5   made to Mr. Martin in the interview with
6   Mr. Martin from BP, have you any changes to
7   the information that you provided to
8   Mr. Martin?
9      A.   I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12     Q.   Isn't it true that the
13  information that you gave to Mr. Martin on
14  May 14, 2010, is true and correct?
15     A.   I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18     Q.   Tab 64 reflects handwritten
19  notes of May 14, 2002, from the BP
20  interviewer, Mr. Corser, who I believe I
21  earlier identified in the record as Cocales.
22  Isn't it a fact that you on April -- on May
23  14, 2010, were interviewed by Mr. Corser?
24     A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 146

1   privilege.
2      Q.   Isn't it true that these notes
3   which you and I have reviewed in your prior
4   responses to questions right before the lunch
5   break reflect information that you've
6   provided truthfully to Mr. Corser?
7      A.   I respectfully decline to answer
8   your -- based on the constitutional Fifth
9   Amendment privilege.
10     Q.   Do you deny that these
11  handwritten notes accurately reflect the
12  truthful comments that you made to Mr. Corser
13  when interviewed back on May 14, 2010?
14     A.   I respectfully decline to answer
15  based on the constitutional Fifth Amendment
16  privilege.
17     Q.   Okay.  Let us then go to the
18  next exhibits, which in the interest of time,
19  will be Exhibit No. 77 -- I'm sorry -- Tab
20  No. 77, which is a previously entered Exhibit
21  No. 745.  It's Halliburton Bates Pages 46635
22  through 728.
23        My question to you, sir, is,
24  does this document reflect on the first page
25  "Foam Cementing Operations Manual for

Page 147

1   Halliburton"?
2      A.   That's what the document states.
3      Q.   Okay.  And isn't it true, sir,
4   that you are familiar with and you utilized
5   this foam cementing manual for your
6   preparation of cement reports issued by
7   Halliburton to BP on the Macondo 252 No. 1
8   well?
9      A.   I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12     Q.   Okay.  The next tab is No. 78,
13  which I will represent to you is Bates 56 out
14  of the Bly report that was a prior Exhibit
15  No. 1 in these proceedings, and ask you, sir,
16  if that document reflects the cement job for
17  the 7-inch production casing on the Macondo
18  252 No. 1 well?
19        MR. HARTLEY:  Objection; form.
20     A.   I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23     Q.   (BY MR. THORNHILL)  Isn't it
24  true, sir, that the information that is
25  provided here accurately reflects the density

Page 148

1   of fluids that were used in that cement job
2   which was prepared by BP?
3      A.   I respectfully decline --
4         MR. CHEN:  Objection; form.
5      A.   -- decline to answer based on my
6   constitutional Fifth Amendment privilege.
7      Q.   (BY MR. THORNHILL)  Isn't it
8   true, sir, that the density of fluids shown
9   on this Page 56 of the Bly report indicates
10  that there is a very high likelihood of
11  swapping of the tail cement at the bottom of
12  the shoe with the synthetic oil-based mud in
13  the rat hole?
14        MR. HARTLEY:  Objection; form.
15        MR. CHEN:  Objection; form.
16     A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19     Q.   (BY MR. THORNHILL)  Isn't it
20  true, sir, that you and others at Halliburton
21  knew and represented to BP that this design
22  was likely to fail?
23        MR. CHEN:  Objection; form.
24        MR. HARTLEY:  Objection; form.
25     A.   I respectfully decline to answer

37  (Pages 145 to 148)

Page 149

1    based on my constitutional Fifth Amendment
2    privilege.
3        Q.    (BY MR. THORNHILL) Okay, sir.
4    Now, let's turn to Tab 84. And I would ask
5    you, sir, to look at this document, which is
6    Halliburton Bates Page No. 51624 through
7    51646.
8        (Discussion off the record.)
9        Q.    (BY MR. THORNHILL) I ask you,
10   sir, if this document shows on the first
11   page, Standard Testing of the Global
12   Laboratory Best Practices, Volume 4, dated
13   July 2009. Did I read that correctly?
14       A.    The document states that.
15       Q.    Okay. Isn't it true, sir, that
16   this document reflects the Halliburton
17   standard testing methodology used in
18   preparing cement slurries such as that which
19   were prepared and used on the Macondo 252
20   well?
21       A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24       Q.    Do you deny, sir, that
25   Halliburton required that you and others

Page 150

1    involved in the preparation of cement designs
2    utilized the standards for testing that are
3    reflected in this document?
4        MR. HARTLEY: Objection; form.
5        A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8        MR. THORNHILL: We will enter this
9    document as Exhibit No. 2050.
10       (Exhibit No. 2050 was marked.)
11       (Discussion off the record.)
12       Q.    (BY MR. THORNHILL) Previously
13   marked and introduced into evidence are
14   Appendix J and K, which went to the Bly
15   report, and they were as part of Exhibit 2.
16       And my -- my earlier questions
17   to you, sir, regarding your having read the
18   portions of the Bly report were, as I recall,
19   that you did, in fact, read the CSI lab
20   testing results that were attached to the Bly
21   report. I present to you Appendix J and
22   Appendix K reflecting information considered
23   by and opined upon by CSI in the Bly report
24   and ask you, sir, are these documents the
25   ones that you reviewed in your consideration

Page 151

1    of the portions of the Bly report?
2        MR. HARTLEY: Objection; form.
3        A.    I'm not sure if this is all of
4    it, but I did look at these sections.
5        Q.    (BY MR. THORNHILL) Okay. Thank
6    you very much.
7        In fact, did you see in the CSI
8    report, as reflected in this information,
9    that the testing methodology of Halliburton
10   and the noncompliance with API required
11   procedures is reflected upon by CSI?
12       A.    I respectfully --
13       MR. HARTLEY: Objection; form.
14       A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17       Q.    (BY MR. THORNHILL) Okay. Sir,
18   I'll show you a copy of the Chevron report
19   that is dated October 26, 2010, and ask you,
20   sir, if this document dated October 26, 2010,
21   showing tests of the cement design for the
22   National Commission on the BP DEEPWATER
23   HORIZON has been reviewed by you previously?
24       A.    I have not seen this document,
25   no.

Page 152

1        Q.    Has someone discussed with you
2    the contents of this document other than
3    counsel?
4        A.    No.
5        Q.    All right. We discussed earlier
6    today your having given information to the
7    DEEPWATER HORIZON joint investigation team on
8    about August 24, the transcript for which I
9    submit to you is under Tab 1.
10       And my question to you, sir, is,
11   is it true that the information you provided
12   to the joint investigation team, as shown in
13   the transcript under Exhibit 1, was true and
14   correct testimony regarding the facts of the
15   DEEPWATER HORIZON explosion?
16       A.    I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19       Q.    Sir, it's my understanding that
20   Tab 2 reflects, as shown in Exhibit No. 2033,
21   a transcript of the telephone interview you
22   gave to the Committee on Energy and Commerce.
23       Do you deny, sir, that that
24   transcript accurately reflects information
25   which you gave to the committee in the

Exhibit Q
Page 38

Page 153

1   telephone interview of June 11, 2010?
2       MR. HARTLEY:  Objection; form.
3       A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6       Q.   (BY MR. THORNHILL)  Do you deny,
7   sir, that you testified truthfully before the
8   commission, or before the committee, that is,
9   when interviewed on June 11, 2010?
10      A.   I respectfully decline to answer
11  based on my constitutional Fifth Amendment
12  privilege.
13      Q.   Okay.  Were you, sir, on
14  September 10, 2002 -- 10 -- September 10,
15  2010, interviewed by the National Commission
16  on the DEEPWATER HORIZON?
17      A.   I respectfully decline to answer
18  based on my constitutional Fifth Amendment
19  privilege.
20      Q.   Isn't it true that the
21  information you gave to the DEEPWATER HORIZON
22  National Commission was information that is
23  true and correct?
24      A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 154

1   privilege.
2       Q.   Do you deny the accuracy of the
3   information that you gave to the National
4   Commission in your interview on September 10,
5   2010?
6       A.   I respectfully decline to answer
7   based on my constitutional Fifth Amendment
8   privilege.
9       Q.   Tell me, Mr. Gagliano, please --
10  for the record, I need to turn to another
11  topic now.  This doesn't relate to any
12  exhibit.  Describe for us your job duties
13  while you've been employed at Halliburton.
14      A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.   Please describe for us each of
18  the positions that you have held while you've
19  been employed at Halliburton.
20      A.   I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23      Q.   Please describe for us, sir,
24  each position and the job duties and
25  responsibilities for those positions while

Page 155

1   you have been employed by Halliburton.
2       MR. HARTLEY:  Objection; form.
3       A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6       Q.   (BY MR. THORNHILL)  For each of
7   the positions which you have held at
8   Halliburton, who was your immediate
9   supervisor?
10      A.   I respectfully decline to answer
11  based on my constitutional Fifth Amendment
12  privilege.
13      Q.   For the time that you worked on
14  the DEEPWATER HORIZON project, at all times
15  in 2009 and 2010, and specifically as it
16  relates to the Macondo well 252 No. 1, who at
17  Halliburton was involved?
18      MR. HARTLEY:  Objection; form.
19      A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22      Q.   (BY MR. THORNHILL)  For all of
23  the work that you performed on the
24  Macondo 252 No. 1 well, who was your
25  supervisor?

Page 156

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   For all of the work that you
5   performed on the Macondo relief wells, who
6   was your supervisor?
7       A.   I respectfully decline to answer
8   based on my constitutional Fifth Amendment
9   privilege.
10      Q.   For all of the work that you
11  performed on the Macondo relief wells, who at
12  Halliburton was involved in working with you?
13      MR. HARTLEY:  Objection; form.
14      A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.   (BY MR. THORNHILL)  For all of
18  the work that you performed on the
19  Macondo 252 No. 1 well, at what location were
20  your offices?
21      A.   I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.   For all of the work that you
25  performed upon the Macondo relief wells, at

39  (Pages 153 to 156)

Exhibit Q
Page 39

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010          Reported by:
JESSE GAGLIANO                    May 11, 2011              TAMARA CHAPMAN, CSR

Page 157

1    what location were your offices?
2         A.   I respectively -- respectfully
3    decline to answer based on my constitutional
4    Fifth Amendment privilege.
5         Q.   How many times and when did you
6    visit the DEEPWATER HORIZON at the Macondo
7    site?
8         A.   I respectfully decline to answer
9    based on my constitutional Fifth Amendment
10   privilege.
11        Q.   How many times and when did you
12   visit the Macondo relief wells?
13        A.   I respectfully -- respectfully
14   decline to answer based on my constitutional
15   Fifth Amendment privilege.
16        Q.   Please describe for us, sir,
17   what you did during any or each of your
18   visits to the Macondo 252 No. 1 well site?
19        MR. HARTLEY:  Objection; form.
20        A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.   (BY MR. THORNHILL) Also, please
24   describe for us what you did on each of your
25   visits to the Macondo relief wells.

Page 158

1         A.   I respectfully decline to answer
2    based on my constitutional Fifth Amendment
3    privilege.
4         Q.   If I ask you, Mr. Gagliano,
5    further questions regarding your job duties
6    at Halliburton, the identities of your
7    supervisors, questions concerning activities
8    in connection with the Macondo 252 number
9    well, is it your intention to assert your
10   Fifth Amendment privilege and decline to
11   testify?
12        A.   Yes.
13        Q.   While you were an employee at
14   Halliburton, what was your training?
15        MR. HARTLEY:  Objection; form.
16        A.   I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.   (BY MR. THORNHILL) While at
20   Halliburton as an employee, when and where
21   were you trained?
22        A.   I respect --
23        MR. HARTLEY:  Objection; form.
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment

Page 159

1    privilege.
2         Q.   (BY MR. THORNHILL) While you
3    were an employee at Halliburton, were you
4    trained on the detailed modeling of cement
5    jobs?
6         MR. HARTLEY:  Objection; form.
7         A.   I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10        Q.   (BY MR. THORNHILL) While an
11   employee at Halliburton, were you trained on
12   casing modeling?
13        MR. HARTLEY:  Objection; form.
14        A.   I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        Q.   (BY MR. THORNHILL) While an
18   employee at Halliburton, were you trained on
19   the placement of cement in the annulus?
20        MR. HARTLEY:  Objection; form.
21        A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.   (BY MR. THORNHILL) While an
25   employee at Halliburton, were you trained on

Page 160

1    the placement of cement in the drill stem?
2         MR. HARTLEY:  Objection; form.
3         A.   I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.   (BY MR. THORNHILL) While an
7    employee at Halliburton, were you trained on
8    the design of downhole assemblies?
9         MR. HARTLEY:  Objection; form.
10        A.   I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13        Q.   (BY MR. THORNHILL) While an
14   employee at Halliburton, were you trained on
15   pump rates and the affect of pump rates on
16   cement placements?
17        A.   I respect --
18        MR. HARTLEY:  Objection; form.
19        A.   I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.   (BY MR. THORNHILL) While you
23   were an employee at Halliburton, were you
24   trained on decision making with respect to
25   the types of cement to use?

40 (Pages 157 to 160)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 161

1      MR. HARTLEY: Objection; form.
2      A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.   (BY MR. THORNHILL)  Isn't it
6  true, Mr. Gagliano, that you were not trained
7  in well control?
8      A.   I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10  privilege.
11     Q.   Were there any courses or
12  trained of any type while you were at
13  Halliburton on identifying well control facts
14  or scenarios?
15     MR. HARTLEY: Objection; form.
16     A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19     Q.   (BY MR. THORNHILL)  Was there
20  any training while you were an employee at
21  Halliburton on risks of blowout associated
22  with failure to maintain well control?
23     MR. HARTLEY: Objection; form.
24     A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 162

1  privilege.
2      Q.   (BY MR. THORNHILL)  Was there
3  any training while you were at Halliburton on
4  maintaining well control to comply with the
5  Federal Code of Federal Regulations?
6      MR. HARTLEY: Objection; form.
7      A.   I respectfully decline to answer
8  based on my constitutional Fifth Amendment
9  privilege.
10     Q.   (BY MR. THORNHILL)  While you
11  were at Halliburton, did you receive any
12  training on deepwater well cementing, in
13  particular?
14     MR. HARTLEY: Objection; form.
15     A.   I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18     Q.   (BY MR. THORNHILL)  While you
19  were at Halliburton, did you receive any
20  training on deviations from normal OptiCem
21  modeling?
22     MR. HARTLEY: Objection; form.
23     A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 163

1      Q.   (BY MR. THORNHILL)  While at
2  Halliburton as an employee, were you trained
3  to run the OptiCem software model program?
4      A.   I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.   While an employee at
8  Halliburton, were you trained on the effects
9  of use of different chemical additives on
10  cement models?
11     MR. HARTLEY: Objection; form.
12     A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15     Q.   (BY MR. THORNHILL)  While an
16  employee at Halliburton, were you trained on
17  the use of centralizers?
18     MR. HARTLEY: Objection; form.
19     A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22     Q.   (BY MR. THORNHILL)  While an
23  employee at Halliburton, were you trained on
24  the impact upon design of different types of
25  casing utilized in deepwater wells?

Page 164

1      MR. HARTLEY: Objection; form.
2      A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.   (BY MR. THORNHILL)  If I asked
6  you, sir, further questions regarding your
7  training either on the job or through
8  Halliburton or in connection with any outside
9  trainer on any aspect of your job or your
10  employment at Halliburton, is it your
11  intention to assert your Fifth Amendment
12  privilege and refuse to answer?
13     A.   Yes.
14     Q.   Now, I'd like to turn to a
15  conversation that you may have had regarding
16  review of data generated regarding the
17  Macondo well.  Okay?
18         Excluding your counsel here
19  today or any other lawyer that you have
20  counseled with, what conversations have you
21  engaged in with anyone regarding the Macondo
22  well?
23     MR. HARTLEY: Objection; form.
24     A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

41 (Pages 161 to 164)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 165

1   privilege.
2       Q.   (BY MR. THORNHILL)  Isn't it
3   true, Mr. Gagliano, that you engaged in
4   conversations with Mr. Greg Walz, a BP
5   engineer, with respect to the severe gas flow
6   potential shown in the April 19 OptiCem
7   report showing the potential use of only
8   seven centralizers?
9       MR. CHEN:  Objection; form.
10      A.   I respect -- respectfully
11  decline to answer based on my constitutional
12  Fifth Amendment privilege.
13      Q.   (BY MR. THORNHILL)  Isn't it
14  true, Mr. Gagliano, that you testified before
15  the Coast Guard hearing, the MBI
16  investigation, or joint investigation team as
17  it's sometimes referred to, regarding your
18  conversations with Mr. Walz and the OptiCem
19  report of April 19 showing severe gas flow
20  potential with the use of only seven
21  centralizer?
22      MR. HARTLEY:  Objection; form.
23      A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 166

1       Q.   (BY MR. THORNHILL)  Please
2   describe for us the contents of any
3   communication in which you have engaged,
4   including e-mails, telephone calls, or oral
5   communication or any other kind of
6   communication regarding the Macondo 252 No. 1
7   well?
8       MR. HARTLEY:  Objection; form.
9       MR. KUWANA:  To the extent that it asks
10  for privileged material --
11      MR. THORNHILL:  Let me rephrase that --
12      MR. KUWANA:  -- I would --
13      MR. THORNHILL:  -- the question.
14      MR. KUWANA:  -- instruct him not to
15  answer.
16      MR. THORNHILL:  I'll withdraw it and
17  rephrase it.
18      Q.   (BY MR. THORNHILL)  Excluding
19  your conversations with counsel here today or
20  otherwise counsel with whom you have
21  consulted, please describe for us the
22  contents of any communications which you've
23  engaged, including e-mails, telephone calls,
24  oral conversations, or any other form of
25  communication regarding the Macondo 252 No. 1

Page 167

1   well?
2       MR. HARTLEY:  Objection; form.
3       A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6       Q.   (BY MR. THORNHILL)  Excluding
7   your conversations with counsel here today or
8   any other counsel with whom you have
9   consulted, please describe for us any work
10  that you may have engaged in and described to
11  those persons.
12      A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15      Q.   Specifically with respect to the
16  Macondo 252 No. 1 well, and excluding your
17  conversations with counsel, please describe
18  for us any communications, e-mails, phone
19  calls, letters, faxes, communications of any
20  kind that you've had with those persons as to
21  the activity on the Macondo 252 No. 1 well?
22      MR. HARTLEY:  Objection; form.
23      A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 168

1       Q.   (BY MR. THORNHILL)  Excluding
2   your conversations with counsel, please
3   describe for us any communications which you
4   have engaged in with respect to any of the
5   Macondo relief wells?
6       A.   I respectfully decline to answer
7   based on my constitutional Fifth Amendment
8   privilege.
9       (Discussion off the record.)
10      Q.   (BY MR. THORNHILL)  Mr. Gagliano,
11  to your knowledge, has anyone at Halliburton,
12  other than yourself, participated in the
13  design of cement or the actual placement of
14  cement on the Macondo 252 No. 1 well?
15      MR. HARTLEY:  Objection; form.
16      A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19      Q.   (BY MR. THORNHILL)  If I were to
20  ask you, Mr. Gagliano, who those persons may
21  have been, other than yourself, who
22  participated in the design or placement of
23  cement on the Macondo 252 No. 1 well or what
24  they did in their participation to design or
25  place the cement on the Macondo 252 No. 1

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 42

Page 169

1    well, would you continue to refuse to testify
2    based upon your assertion of your Fifth
3    Amendment privilege?
4         A.    Yes.
5         Q.    Okay.  Mr. Gagliano, what
6    testing information or report or log
7    information as is referred to in the industry
8    did you review regarding the Macondo 252 No.
9    1 well?
10        MR. HARTLEY:  Objection; form.
11        A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.    (BY MR. THORNHILL)  Mr. Gagliano,
15   what tests did you participate in preparing,
16   performing, overseeing or otherwise become
17   involved in with respect to the Macondo 252
18   No. 1 well?
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    What computerized information,
23   logs, data, or other written material was --
24   strike that.  Let me rephrase it.
25             What material, that would

Page 170

1    include data, computerized information, or
2    compiled information of any kind, did you
3    review with respect to the Macondo 252 No. 1
4    well, whether generated by Halliburton, BP,
5    MI-SWACO or any other company as respects
6    that well?
7         A.    I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10        Q.    Describe for us, Mr. Gagliano,
11   the practice of modeling cement jobs as you
12   have engaged in that practice at Halliburton.
13        MR. HARTLEY:  Objection; form.
14        A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        Q.    (BY MR. THORNHILL)  In general,
18   Mr. Gagliano, what is cement modeling?
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    Other than Halliburton,
23   Mr. Gagliano, did anyone or any company
24   provide services to the Macondo 252 No. 1
25   well for the placement of cement?

Page 171

1         MR. HARTLEY:  Objection; form.
2         A.    I respectfully decline to answer
3    based on my constitutional Fifth Amendment
4    privilege.
5         Q.    (BY MR. THORNHILL)  Other than
6    Halliburton, Mr. Gagliano, did anyone or any
7    company provide design services for cement
8    that was intended to be placed in the Macondo
9    252 number well -- No. 1 well that was, in
10   fact, placed in the Macondo 252 No. 1 well?
11        A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.    Mr. Gagliano, what computer
15   modeling does Halliburton have capacity to
16   perform or provide for use by it or other
17   companies in the drilling and completion of
18   oil and gas wells?
19        MR. HARTLEY:  Objection; form.
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    (BY MR. THORNHILL)
24   Mr. Gagliano, what cement modeling was
25   ordered by you or anyone working with you

Page 172

1    which, to your knowledge, was intended for
2    use at the Macondo 252 No. 1 well?
3         A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.    Mr. Gagliano, what were the
7    results of any modeling that was performed on
8    the intended cement job for the Macondo 252
9    No. 1 well?
10        MR. HARTLEY:  Objection; form.
11        A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.    (BY MR. THORNHILL)
15   Mr. Gagliano, what was your role, what extent
16   did you or others at Halliburton participate
17   in the design of the well plan for the 252
18   No. 1 well?
19        MR. HARTLEY:  Objection; form.
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    (BY MR. THORNHILL)  Isn't it
24   true, Mr. Gagliano, that you and others at
25   Halliburton were engaged in the well planning

43 (Pages 169 to 172)

Exhibit Q
Page 43

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 173

1   and the well design for the Macondo 252 No. 1
2   well?
3        MR. HARTLEY:  Objection; form.
4        A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7        Q.   (BY MR. THORNHILL)
8   Mr. Gagliano, what tests or logs, as they are
9   referred to in the industry, were performed,
10  to your knowledge, for any cementing job on
11  the Macondo 252 No. 1 well?
12       A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15       Q.   Mr. Gagliano, please relate to
16  us the source of any information about which
17  you have knowledge that reflects upon the
18  results of any tests or logs as they -- as
19  that term is used in the industry -- for
20  cement jobs that were performed on the
21  Macondo 252 No. 1 well?
22       MR. HARTLEY:  Objection; form.
23       A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 174

1        Q.   (BY MR. THORNHILL)
2   Mr. Gagliano, what formulations of cement or
3   cement recipes were proposed by you or others
4   at Halliburton with which you are familiar
5   were the Macondo 252 No. 1 well?
6        MR. HARTLEY:  Objection; form.
7        A.   I respectfully decline to answer
8   based on my constitutional Fifth Amendment
9   privilege.
10       Q.   (BY MR. THORNHILL) Mr. Gagliano,
11  with regards to those formulations or recipes
12  of cement, what cement recipes or
13  formulations were actually mixed for the
14  Macondo 252 No. 1 well?
15       A.   I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18       Q.   Mr. Gagliano, what formulations
19  of cement or cement designs for slurries to
20  be poured or pumped on the Macondo 252 No. 1
21  well were actually tested and what were the
22  test results by Halliburton?
23       MR. HARTLEY:  Objection; form.
24       A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 175

1   privilege.
2        Q.   (BY MR. THORNHILL) Mr. Gagliano,
3   please describe the cement modeling that
4   Halliburton conducted on the Macondo 252 No.
5   1 well and specifically describe for us the
6   type of cement, the blends of additives, and
7   the design procedures for placement of the
8   cement on the Macondo 252 No. 1 well.
9        MR. HARTLEY:  Objection; form.
10       A.   I respectfully decline to answer
11  based on my constitutional Fifth Amendment
12  privilege.
13       Q.   (BY MR. THORNHILL) Mr. Gagliano,
14  for any cementing performed or overseen by
15  Halliburton or anyone else that works with
16  Halliburton for the time period between April
17  18 and April 20, were there samples of that
18  cement sent for testing?
19       MR. HARTLEY:  Objection; form.
20       A.   I respectfully -- respectfully
21  decline to answer based on my constitutional
22  Fifth Amendment privilege.
23       Q.   (BY MR. THORNHILL) And now a
24  little broader, Mr. Gagliano.  With respect
25  to all cement jobs that were performed on the

Page 176

1   Macondo 252 No. 1 well, were samples of
2   cement sent for testing by any other
3   laboratory?
4        MR. HARTLEY:  Objection; form.
5        A.   I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8        Q.   (BY MR. THORNHILL) Mr. Gagliano,
9   do you know if any cement that may have blown
10  out of the Macondo 252 No. 1 well was
11  recovered and tested by Halliburton or anyone
12  on its behalf?
13       A.   I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16       Q.   Mr. Gagliano, were any of the
17  samples which were tested for potential use
18  in the Macondo 252 No. 1 well kept by it,
19  used by it, tested by it, and any of those
20  test results published?
21       MR. HARTLEY:  Objection; form.
22       A.   I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25       Q.   (BY MR. THORNHILL) Well,

44 (Pages 173 to 176)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Page 177

1    Mr. Gagliano, were any of the cement samples
2    potentially intended for use on the
3    Macondo 252 No. 1 well tested and the
4    information with respect to those tests
5    destroyed by Halliburton?
6         MR. HARTLEY:  Objection; form.
7         A.   I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10        Q.   (BY MR. THORNHILL)  Do you know,
11   Mr. Gagliano, the results of any tests
12   performed on the samples of material
13   potentially intended for use on the
14   Macondo 252 No. 1 well?
15        MR. HARTLEY:  Objection; form.
16        A.   I respect -- I respectfully
17   decline to answer based on my constitutional
18   Fifth Amendment privilege.
19        Q.   (BY MR. THORNHILL)  There has
20   been testimony by individuals that certain
21   tests were run after the blowout of the
22   Macondo 252 No. 1 well and that those test
23   results were destroyed.  Do you know who
24   destroyed those test results?
25        MR. HARTLEY:  Objection; form.

Page 178

1         A.   I respectfully decline to answer
2    based on my constitutional Fifth Amendment
3    privilege.
4         Q.   (BY MR. THORNHILL)  Were you
5    personally involved in the destruction of any
6    of the test results for the materials that
7    were intended for potential use on the
8    Macondo 252 No. 1 well?
9         A.   I respect -- respectfully
10   decline to answer based on my constitutional
11   Fifth Amendment privilege.
12        Q.   Were you personally involved in
13   or know of persons who were involved in the
14   destruction of test results for materials
15   that were actually used on the Macondo 252
16   No. 1 well?
17        MR. HARTLEY:  Objection; form.
18        A.   I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21        Q.   (BY MR. THORNHILL)  Do you know
22   of anyone, whether at Halliburton or not at
23   Halliburton, but potentially working for any
24   other cement company or any company
25   associated with Halliburton, that has

Page 179

1    knowledge of the location of test results for
2    cement samples that were used or intended for
3    use on the Macondo 252 No. 1 well?
4         MR. HARTLEY:  Objection; form.
5         A.   I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8         Q.   (BY MR. THORNHILL)  Mr. Gagliano,
9    with respect to these questions that I've
10   asked you regarding computer modeling,
11   calculations, tests, proposed tests, tests of
12   potential cement additives and cement
13   materials, with respect to mathematical
14   calculations or cement formulations, with
15   respect to cement recipes, the placement of
16   cement, is it your intention, sir, to decline
17   to answer these questions based upon your
18   Fifth Amendment privilege?
19        A.   Yes.
20        Q.   Okay.  One last little set of
21   questions and we're done.
22        Isn't it true, Mr. Gagliano,
23   that Halliburton failed to perform all of the
24   tests required by the BP contract?
25        MR. HARTLEY:  Objection; form.

Page 180

1         A.   I respectfully decline to answer
2    based on my constitutional Fifth Amendment
3    privilege.
4         Q.   (BY MR. THORNHILL)  Isn't it
5    true, Mr. Gagliano, that Halliburton failed
6    to perform the tests that are required by the
7    American Petroleum Institute recommended
8    procedures, including but not limited to No.
9    65, as set out in the BP contract?
10        MR. HARTLEY:  Objection; form.
11        A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.   (BY MR. THORNHILL)  Isn't it
15   true, Mr. Gagliano, that you were told that
16   the employees of BP had asked that you be
17   removed from your position as the designated
18   Halliburton employee at the BP office?
19        A.   I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.   Isn't it true, Mr. Gagliano,
23   that Halliburton and you personally both knew
24   that the cement test for the cement that was
25   actually pumped around the production casing,

45 (Pages 177 to 180)

Exhibit Q
Page 45

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 181

1   that's 7 inches in diameter, the last cement
2   job by Halliburton, were not provided to BP
3   before the pumping of that cement?
4       MR. HARTLEY: Objection; form.
5       A.   I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8       Q.   (BY MR. THORNHILL) Isn't it
9   true, Mr. Gagliano, that Halliburton
10   employees knew that the cement tests, or lab
11   tests as they're sometimes referred to, for
12   the production casing cement job performed on
13   or about 19 April 2010 on the Macondo 252 No.
14   1 well showed that the stability of that
15   cement would be unstable?
16       MR. HARTLEY: Objection; form.
17       A.   I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20       Q.   (BY MR. THORNHILL) Isn't it
21   true, Mr. Gagliano, that under the terms of
22   the contract with BP, Halliburton and
23   specifically you were required to stop the
24   job because the cement job intended for 19
25   April 2010 showed that the cement would not

Page 182

1   be stable and/or that the potential for gas
2   flow was severe, presenting hazards to people
3   and the environment?
4       MR. HARTLEY: Objection; form.
5       A.   I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8       Q.   (BY MR. THORNHILL) Isn't it
9   true, Mr. Gagliano, that all of the tests
10   required by law for those testing cement were
11   not run by Halliburton on the BP well, the
12   Macondo 252 No. 1?
13       MR. HARTLEY: Objection; form.
14       A.   I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17       Q.   (BY MR. THORNHILL) Isn't it
18   true, Mr. Gagliano, that the failure of
19   Halliburton to take steps to stop the work on
20   the cement job, the 252 No. 1 Macondo well at
21   the production casing level of approximately
22   18,250 feet, was, in fact, a cause of the
23   blowout leading to the death of 11 men?
24       MR. HARTLEY: Objection; form.
25       A.   I respectfully decline to answer

Page 183

1   based on my constitutional Fifth Amendment
2   privilege.
3       Q.   (BY MR. THORNHILL) Isn't it
4   true, Mr. Gagliano, that you and others at
5   Halliburton knew that Halliburton was
6   performing poorly and that the risks of a
7   blowout or other danger to those working on
8   the well was real and that these risks were
9   known to BP, as well, ultimately leading to
10   the blowout in the well?
11       MR. CHEN: Objection; form.
12       MR. HARTLEY: Objection; form.
13       A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16       Q.   (BY MR. THORNHILL) Isn't it
17   true, Mr. Gagliano, that the result of
18   Halliburton taking catastrophic risks of the
19   DEEPWATER HORIZON Macondo 252 No. 1 well led
20   to the blowout on or about April 10, 2010 --
21       MR. CHEN: Objection; form.
22       Q.   (BY MR. THORNHILL) -- April 20,
23   2010?
24       MR. HARTLEY: Objection; form.
25       Q.   (BY MR. THORNHILL) Go ahead.

Page 184

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   Isn't it true, Mr. Gagliano,
5   that the findings of the National Commission
6   that the cement operations of Halliburton
7   were designed improperly and that the cement
8   job around the production casing was a cause
9   of the blowout is true and correct?
10       MR. HARTLEY: Objection; form.
11       A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14       Q.   (BY MR. THORNHILL) Isn't it
15   true, Mr. Gagliano, that you and others at
16   Halliburton knew from the information
17   provided to you by BP that the cement job
18   that was to be performed around the design
19   around the production casing would likely
20   fail because the cement and other fluids were
21   heavier than the synthetic oil-based mud and
22   therefore the fluids would invert?
23       MR. HARTLEY: Objection; form.
24       A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment

46 (Pages 181 to 184)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 46

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                Reported by:

JESSE GAGLIANO                May 11, 2011                TAMARA CHAPMAN, CSR

---

Page 185

1   privilege.
2        Q.   (BY MR. THORNHILL)  Three more.
3            Isn't it true, Mr. Gagliano,
4   that you and others at Halliburton knew the
5   temperature, pressure, fracture gradient, and
6   pore pressure information that had been
7   provided to you by BP, but you failed or
8   refused to include that in your OptiCem
9   modeling causing for improper modeling,
10  improper design, and a cement job that
11  ultimately not only failed but led to the
12  catastrophic injury to men on the rig and to
13  the environment for multiple states in the
14  Gulf South?
15       MR. HARTLEY:  Objection; form.
16       A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19       Q.   (BY MR. THORNHILL)  Isn't it
20  true, Mr. Gagliano, that you and others at
21  Halliburton knew of the likely risks
22  associated with the high temperature, high
23  pressure reservoir such as that which was the
24  target of the Macondo 252 No. 1 well and of
25  the associated risks of uncontrolled flow

---

Page 186

1   with consequences of a blowout such as that
2   experienced on April 20, 2010?
3        MR. HARTLEY:  Objection; form.
4        A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7        Q.   (BY MR. THORNHILL)  And isn't it
8   true, Mr. Gagliano, that you and others at
9   Halliburton knew that if this reservoir were
10  to blow out of control, that it would likely
11  continue to blow for many, many months just
12  as it did?
13       MR. HARTLEY:  Objection; form.
14       A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17       Q.   (BY MR. THORNHILL)  One last
18  question.  Isn't true, Mr. Gagliano, that
19  you and Halliburton -- you and other
20  Halliburton employees knew that your
21  performance for BP on its wells had become so
22  poor at the time of the Kodiak and Macondo
23  wells that you were required to guarantee not
24  more than 2 percent nonproductive time in
25  order to be continually engaged on BP wells?

---

Page 187

1        MR. HARTLEY:  Objection; form.
2        A.   I respectfully decline to answer
3   based on my constitutional Fifth Amendment
4   privilege.
5        MR. THORNHILL:  Any more?
6        Q.   (BY MR. THORNHILL)  Thank you
7   very much, sir.  I'll turn you -- I'll turn
8   you over to others and ask, sir, that you --
9   you answer their questions, and I'll reserve
10  any further time that's allowed to us in this
11  deposition.  Thank you.
12       MR. THORNHILL:  We'll go off the record
13  at this point.
14       THE VIDEOGRAPHER:  We're going off the
15  record.  It's 1:37.  This is the end of
16  Videotape No. 4.
17           (Break.)
18       THE VIDEOGRAPHER:  We're back on the
19  record.  This is beginning of Videotape
20  No. 5.  It's 1:47.
21           EXAMINATION
22  BY MS. KUCHLER:
23       Q.   My name is Deb Kuchler, and I'm
24  here with Sarah Iiams.  Together we represent
25  Anadarko and MOEX.  I have some questions for

---

Page 188

1   you.
2            You never communicated with
3   anyone from Anadarko Petroleum Corporation or
4   any entity you knew to be affiliated with
5   Anadarko about the Macondo well or any issue
6   regarding the cement process for that well,
7   did you?
8        A.   I respectfully decline to answer
9   based on my constitutional Fifth Amendment
10  privilege.
11       Q.   And you never communicated with
12  anyone at MOEX Offshore 2007, LLC, or any
13  company which you know to be affiliated with
14  MOEX regarding the Macondo well or any issue
15  with respect to the cement process on the
16  Macondo well, did you?
17       A.   I respectfully decline to answer
18  based on my constitutional Fifth Amendment
19  privilege.
20       Q.   You aren't aware of anyone
21  communicating with Anadarko or MOEX about any
22  decision made with respect to the cement
23  process at Macondo, are you?
24       A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

---

47 (Pages 185 to 188)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 47

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:

JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 189

```
 1    privilege.
 2        Q.   You were involved in preparing
 3    the preliminary basis of design for the
 4    Macondo cement job for the final production
 5    casing, weren't you?
 6        A.   I respectfully decline to answer
 7    based on my constitutional Fifth Amendment
 8    privilege.
 9        Q.   You would agree that BP provided
10    Halliburton with information about the well,
11    and based upon that information, Halliburton
12    prepared and provided BP with its preliminary
13    basis of design; is that right?
14        A.   I respectfully decline to answer
15    based on my constitutional Fifth Amendment
16    privilege.
17        Q.   BP had to approve the basis of
18    design -- design for the Macondo well, didn't
19    it?
20        A.   I respectfully decline to answer
21    based on my constitutional Fifth Amendment
22    privilege.
23        Q.   As drilling commenced and BP
24    provided additional information about the
25    well to Halliburton, Halliburton prepared and
```

Page 190

```
 1    provided BP with updated cement designs,
 2    correct?
 3        MR. CHEN:  Objection; form.
 4        A.   I respectfully decline to answer
 5    based on my constitutional Fifth Amendment
 6    privilege.
 7        Q.   (BY MS. KUCHLER)  You were
 8    personally involved in updating the design
 9    for Macondo, weren't you?
10        A.   I respectfully decline to answer
11    based on my constitutional Fifth Amendment
12    privilege.
13        Q.   It is true that BP approved each
14    cement design prior to the execution of the
15    cement job, isn't it?
16        MR. CHEN:  Objection; form.
17        A.   I respect -- I respectfully
18    decline to answer based on my constitutional
19    Fifth Amendment privilege.
20        Q.   (BY MS. KUCHLER)  When the
21    DEEPWATER HORIZON arrived at Macondo to
22    replace the MARIANAS rig, it had on board a
23    large quantity of cement dry blend that
24    Halliburton originally designed for use at
25    Kodiak No. 2, didn't it?
```

Page 191

```
 1        A.   I respectfully decline to answer
 2    based on my constitutional Fifth Amendment
 3    privilege.
 4        Q.   Kodiak No. 2 well was the
 5    previous BP well the crew of the rig had
 6    drilled; is that right?
 7        A.   I respectfully decline to answer
 8    based on my constitutional Fifth Amendment
 9    privilege.
10        Q.   You had designed the primary
11    features of that dry blend in late 2009,
12    didn't you?
13        MR. HARTLEY:  Objection; form.
14        A.   I respectfully decline to answer
15    based on my constitutional Fifth Amendment
16    privilege.
17        Q.   (BY MS. KUCHLER)  So the cement
18    dry blend already on the rig was not
19    specifically designed for use on the Macondo
20    well, was it?
21        A.   I respectfully decline to answer
22    based on my constitutional Fifth Amendment
23    privilege.
24        Q.   BP made the decision not to
25    bring in a new blend, didn't it?
```

Page 192

```
 1        MR. CHEN:  Objection; form.
 2        A.   I respectfully decline to answer
 3    based on my constitutional Fifth Amendment
 4    privilege.
 5        Q.   (BY MS. KUCHLER)  It saved BP
 6    time to use what they already had on the rig
 7    as a base slurry, didn't it?
 8        MR. CHEN:  Objection; form.
 9        A.   I respectfully decline to answer
10    based on my constitutional Fifth Amendment
11    privilege.
12        Q.   (BY MS. KUCHLER)  If a new blend
13    had been used, BP would have had to pay for
14    it; isn't that right?
15        A.   I respectfully decline to answer
16    based on my constitutional Fifth Amendment
17    privilege.
18        Q.   So it saved BP money to use the
19    cement that was already out on the rig,
20    didn't it?
21        MR. CHEN:  Objection; form.
22        A.   I respectfully decline to answer
23    based on my constitutional Fifth Amendment
24    privilege.
25        Q.   (BY MS. KUCHLER)  BP made this
```

48  (Pages 189 to 192)

Exhibit Q
Page 48

Case 2:10-md-02179-CJB-DPC   Document 3156-12   Filed 07/06/11   Page 50 of 96

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                  Reported by:
JESSE GAGLIANO              May 11, 2011              TAMARA CHAPMAN, CSR

Page 193

1   decision to use nitrogen foam cement on the
2   Macondo well, didn't it?
3        MR. CHEN:  Objection; form.
4        A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7        Q.   (BY MS. KUCHLER)  Halliburton
8   could not have chosen to use nitrogen foam
9   cement on this well without BP's approval,
10  could it?
11       A.   I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14       Q.   BP approved the ultimate slurry
15  design, correct?
16       MR. CHEN:  Objection; form.
17       A.   I respectfully decline to answer
18  based on my constitutional Fifth Amendment
19  privilege.
20       Q.   (BY MS. KUCHLER)  Halliburton
21  could not have pumped this cement job without
22  BP approving the design, could it?
23       MR. CHEN:  Objection; form.
24       A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 194

1   privilege.
2        Q.   (BY MS. KUCHLER)  And here BP
3   not only approved the design, BP actually
4   participated in designing the slurry, didn't
5   it?
6        MR. CHEN:  Objection; form.
7        A.   I respectfully decline to answer
8   based on my constitutional Fifth Amendment
9   privilege.
10       Q.   (BY MS. KUCHLER)  BP did not
11  have much experience with using foam cement
12  at this depth, did it?
13       MR. CHEN:  Objection; form.
14       A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17       Q.   (BY MS. KUCHLER)  Greg Walz of
18  BP worked with you during the design process
19  for this job, didn't he?
20       A.   I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23       Q.   Greg Walz had never been
24  involved in the use of nitrified cement at
25  the depths of the Macondo well, had he?

Page 195

1        MR. CHEN:  Objection; form.
2        A.   I respectfully decline to answer
3   based on my constitutional Fifth Amendment
4   privilege.
5        Q.   (BY MS. KUCHLER)  It is true,
6   isn't it, that nitrogen foam cement if
7   unstable can fail to provide zonal isolation?
8        A.   I respectfully decline to answer
9   based on my constitutional Fifth Amendment
10  privilege.
11       Q.   You were aware of a March
12  statement by Eric Cunningham of BP that using
13  foam cement could present some stability
14  challenges because of potential
15  destabilization by base oil in the mud,
16  weren't you?
17       MR. CHEN:  Objection; form.
18       A.   I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21       Q.   (BY MS. KUCHLER)  You've
22  previously testified that a nitrified slurry
23  can be contaminated by mud and lead to
24  destabilization, haven't you?
25       A.   I respectfully decline to answer

Page 196

1   based on my constitutional Fifth Amendment
2   privilege.
3        Q.   And, in fact, a nitrified slurry
4   can be contaminated by mud and lead to
5   destabilization, can't it?
6        A.   I respectfully decline to answer
7   based on my constitutional Fifth Amendment
8   privilege.
9        Q.   Basically, if the foam does not
10  remain stable as the cement cures, the small
11  nitrogen bubbles may coalescence with larger
12  ones; isn't that right?
13       A.   I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16       Q.   And if that happens, that can
17  make the hardened cement porous and permeable
18  to fluids and gases; is that right?
19       A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22       Q.   And if that happens, that can
23  make the hardened cement porous and permeable
24  to hydrocarbons, correct?
25       A.   I respectfully decline to answer

49 (Pages 193 to 196)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 49

Page 197

1    based on my constitutional Fifth Amendment
2    privilege.
3        Q.    The nitrogen could even break
4    out of the cement in that case, couldn't it?
5        A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8        Q.    You agree that that's why it was
9    important for the operator, in this case BP,
10   to follow Best Practices when using foam
11   cement on the Macondo job, wouldn't you?
12       MR. CHEN:  Objection; form.
13       A.    I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16       Q.    (BY MS. KUTCHLER) You
17   participated in a planning meeting on
18   April 14th with Eric Cunningham and others
19   from BP where potential contamination of foam
20   was discussed, didn't you?
21       A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24       Q.    The potential for foam
25   contamination with synthetic-based mud was

Page 198

1    specifically discussed by BP at that
2    April 14th meeting, wasn't it?
3        MR. CHEN:  Objection; form.
4        A.    I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7        Q.    (BY MS. KUCHLER) So you have
8    personal knowledge that BP was aware of a
9    potential for nitrogen issues with foam
10   cement prior to the blowout on the DEEPWATER
11   HORIZON, don't you?
12       MR. CHEN:  Objection; form.
13       A.    I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16       Q.    (BY MS. KUCHLER) And you are
17   aware of other occasions when potential
18   problems with using nitrogen were discussed
19   by BP, aren't you?
20       MR. CHEN:  Objection; form.
21       A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24       Q.    (BY MS. KUCHLER) You sent Brian
25   Morel, Mark Hafle, and Brett Cocales of BP an

Page 199

1    e-mail on April 16th, 2010, stating that
2    synthetic-based mud can destabilize the foam
3    system, didn't you?
4        A.    I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7        Q.    So Mr. Morel, Mr. Hafle, and
8    Mr. Cocales were, again, made aware of the
9    potential for nitrogen break out on
10   April 16th, weren't they?
11       A.    I respectfully decline to answer
12   based on my constitutional Fifth -- Fifth
13   Amendment privilege.
14       Q.    You provided BP with production
15   casing reports before the blowout that showed
16   the constituents of the slurry that were
17   going to be used on the Macondo well; is that
18   right?
19       A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22       Q.    The reports you provided to BP
23   before April 20th showed that the cement
24   contained D-AIR 3000, didn't they?
25       A.    I respectfully decline to answer

Page 200

1    based on my Fifth -- constitutional Fifth
2    Amendment privilege.
3        Q.    D-Air 3000 is a defoamer, isn't
4    it?
5        A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8        Q.    The reports provided to BP
9    before April 20th did not list a fluid
10   additive in the cement slurry, did they?
11       MR. HARTLEY:  Objection; form.
12       A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15       Q.    (BY MS. KUCHLER) So you have
16   personal knowledge that before the cement job
17   was pumped, BP was aware that the cement did
18   contain a defoamer, but had no fluid loss
19   additive; is that right?
20       MR. CHEN:  Objection; form.
21       A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24       Q.    (BY MS. KUCHLER) BP actually
25   made the decision as to the amount of

50 (Pages 197 to 200)

Exhibit Q
Page 50

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                Reported by:
JESSE GAGLIANO                    May 11, 2011                  TAMARA CHAPMAN, CSR

Page 201

1  retarder that was going to be used in this
2  slurry, didn't it?
3      MR. CHEN:  Objection; form.
4      A.   I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.   (BY MS. KUCHLER)  You made a
8  recommendation to BP that .08 gallons per
9  sack retarder should be used in the slurry,
10 didn't you?
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.   BP ignored your recommendation
15 and instead used .09 gallon per sack
16 retarder, correct?
17     MR. CHEN:  Objection; form.
18     A.   I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21     Q.   (BY MS. KUCHLER)  The BP
22 decision to use more retarder in the cement
23 resulted in a longer pump time for the
24 cement, didn't it?
25     A.   I respectfully decline to answer

Page 202

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   The longer pump time negatively
4  impacted the cement job, didn't it?
5      MR. CHEN:  Objection; form.
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   (BY MS. KUCHLER)  You were not
10 comfortable with the retarder concentration
11 that BP put in the slurry that was actually
12 pumped at Macondo, were you?
13     MR. CHEN:  Objection; form.
14     A.   I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17     Q.   (BY MS. KUCHLER)  You believe
18 that BP's decision to overrule your retarder
19 recommendation was a mistake, don't you?
20     MR. CHEN:  Objection; form.
21     A.   I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24     Q.   (BY MS. KUCHLER)  You believe
25 that BP's decision to use more retarder was

Page 203

1  unsafe, don't you?
2      MR. CHEN:  Objection; form.
3      A.   I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.   (BY MS. KUCHLER)  You believe
7  that BP's decision to use more retarder
8  contributed to the blowout on the Macondo
9  well, don't you?
10     MR. CHEN:  Objection; form.
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.   (BY MS. KUCHLER)  If base oil
15 commingles with cement, it can lead to
16 destabilization and channeling when foam
17 cement is used, can't it?
18     MR. HARTLEY:  Objection; form.
19     A.   I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.   (BY MS. KUCHLER)  I've already
23 asked you about BP's cementing expert, Eric
24 Cunningham, warning in March that cementing
25 the production casing using foam cement would

Page 204

1  present some significant stability challenges
2  for foam as the base oil in the mud
3  destabilizes most foaming surfactants and
4  would result in nitrogen breakout if
5  contamination occurs.
6          My question is, if there was a
7  concern for keeping space between the mud
8  which contained base oil and the cement, BP
9  should not have chosen to use the base oil as
10 a spacer, should it?
11     MR. CHEN:  Objection; form.
12     A.   I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.   (BY MS. KUCHLER)  There were
16 instances where you saw or heard BP
17 expressing concerns about the use of base
18 oil, aren't there?
19     MR. CHEN:  Objection; form.
20     A.   I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.   (BY MS. KUCHLER)  And in March,
24 some at BP were saying they did not like base
25 oil for this job, but then they used it

51 (Pages 201 to 204)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 51

Page 205

1    anyway, didn't they?
2         MR. CHEN:  Objection; form.
3         A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.    (BY MS. KUCHLER)  BP was the one
7    who made the decision to use base oil as a
8    spacer in that April cement job; is that
9    right?
10        MR. CHEN:  Objection; form.
11        A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.    (BY MS. KUCHLER)  On April 16,
15   2010, Brian Morel at BP sent you a written
16   direction to include the addition of base oil
17   in the job procedure that Halliburton had
18   sent him for Macondo; isn't that right?
19        MR. CHEN:  Objection; form.
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    (BY MS. KUCHLER)  Mr. Morel from
24   BP also directed you as to the amount of base
25   oil that BP wanted included in the job

Page 206

1    procedure, didn't he?
2         MR. CHEN:  Objection; form.
3         A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.    (BY MS. KUCHLER)  And base oil
7    was, in fact, used as a spacer on this cement
8    job, wasn't it?
9         MR. CHEN:  Objection; form.
10        A.    I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13        Q.    (BY MS. KUCHLER)  Let's talk
14   about the testing that was done before the
15   cement job.  You would agree that a properly
16   designed slurry should involve thorough
17   testing, don't you?
18        MR. HARTLEY:  Objection; form.
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    (BY MS. KUCHLER)  It's important
23   that these tests on the cement slurry be
24   conducted under proper -- proper conditions
25   including temperature and pressure; is that

Page 207

1    right?
2         A.    I respectfully decline to answer
3    based on my constitutional Fifth Amendment
4    privilege.
5         Q.    Every well presents a different
6    combination of cementing conditions.  Would
7    you agree with that?
8         MR. HARTLEY:  Objection; form.
9         A.    I respectfully decline to answer
10   based on my constitutional Fifth Amendment
11   privilege.
12        Q.    (BY MS. KUCHLER)  Because every
13   well is different, it was critical to test
14   the Macondo cement slurry design against
15   expected conditions in that particular well
16   before pumping the cement into the well;
17   isn't that right?
18        MR. HARTLEY:  Objection; form.
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    (BY MS. KUCHLER)  You relied on
23   BP to provide you with the best available
24   information regarding the well conditions for
25   use in your testing, didn't you?

Page 208

1         MR. CHEN:  Objection; form.
2         A.    I respectfully decline to answer
3    based on my constitutional Fifth Amendment
4    privilege.
5         Q.    (BY MS. KUCHLER)  And you know
6    now that BP did not always provide you with
7    accurate information for the Macondo well,
8    did it?
9         MR. CHEN:  Objection; form.
10        A.    I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13        Q.    (BY MS. KUCHLER)  You are now
14   aware that BP's own recommended practice for
15   cement design and operations required it to
16   have foam stability, compressive strength,
17   and fluid loss tests for the cement slurry,
18   aren't you?
19        MR. HARTLEY:  Objection; form.
20        MR. CHEN:  Objection; form.
21        A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.    (BY MS. KUCHLER)  A fluid loss
25   test was never performed on the cement for

52 (Pages 205 to 208)

Exhibit Q
Page 52

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 209

1  the Macondo well, was it?
2       A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5       Q.   BP never requested that you
6  perform a fluid loss test as required by its
7  own recommended practice, did it?
8       MR. CHEN:  Objection; form.
9       A.   I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12      Q.   (BY MS. KUCHLER)  A compressive
13 strength test is typically performed to
14 determine how long it takes for the cement to
15 get to a particular compressive strength,
16 isn't it?
17      A.   I respectfully decline to answer
18 based on my constitutional Fifth Amendment
19 privilege.
20      Q.   A compressive strength test is
21 important because it tells you when it's safe
22 to continue testing or drilling operations,
23 right?
24      MR. HARTLEY:  Objection; form.
25      A.   I respectfully decline to answer

Page 210

1  based on my constitutional Fifth Amendment
2  privilege.
3       Q.   (BY MS. KUCHLER)  A foam-mixing
4  and stability test is important because if
5  the slurry is unstable, it can fail to
6  provide zonal isolation; isn't that right?
7       MR. HARTLEY:  Objection; form.
8       A.   I respectfully -- respectfully
9  decline to answer based on my constitutional
10 Fifth Amendment privilege.
11      Q.   (BY MS. KUCHLER)  In February
12 2010 you asked Halliburton's Broussard,
13 Louisiana, lab to conduct initial pilot tests
14 on a cement slurry recipe that you had
15 designed, didn't you?
16      A.   I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19      Q.   The recipe that Halliburton
20 tested in February was identical to the
21 recipe eventually used at Macondo except that
22 the February recipe included roughly twice
23 the amount of liquid chemical retarder that
24 you eventually used; is that right?
25      MR. HARTLEY:  Objection; form.

Page 211

1       A.   I respectfully decline to answer
2  based on my constitutional Fifth Amendment
3  privilege.
4       Q.   (BY MS. KUCHLER)  The Broussard
5  lab conducted two separate foam stability
6  tests in February, didn't it?
7       A.   I respectfully decline to answer
8  based on my constitutional Fifth Amendment
9  privilege.
10      Q.   You'll agree that the
11 February 13th foam stability test indicated
12 instability, wouldn't you?
13      MR. HARTLEY:  Objection; form.
14      A.   I respectfully decline to answer
15 based on my constitu -- my constitutional
16 Fifth Amendment privilege.
17      Q.   (BY MS. KUCHLER)  A second test
18 was performed around February 16th or 17th,
19 2010, wasn't it?
20      A.   I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23      Q.   You'll agree that the second set
24 of February tests also indicated instability
25 because the results were significantly higher

Page 212

1  than the target density; is that right?
2       A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5       Q.   You'll also agree that these two
6  February lab tests indicate that the foam
7  cement Halliburton was planning to pump at
8  Macondo was likely unstable --
9       MR. HARTLEY:  Objection; form.
10      Q.   (BY MS. KUCHLER)  -- wouldn't
11 you?
12      A.   I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15      Q.   You reported the February pilot
16 lab test data to BP on March 8th, 2010,
17 didn't you?
18      A.   I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21      MR. CHEN:  Objection; form.
22      Q.   (BY MS. KUCHLER)  So you have
23 personal knowledge that BP was aware of these
24 February test results prior to the blowout,
25 don't you?

53 (Pages 209 to 212)

JESSE GAGLIANO              May 11, 2011              TAMARA CHAPMAN, CSR

Page 213

1      MR. CHEN: Objection; form.
2      A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.   (BY MS. KUCHLER) You also
6  ordered a first set of pre-job tests on April
7  12th, 2010, didn't you?
8      A.   I respectfully -- respectfully
9  decline to answer based on my constitutional
10 Fifth Amendment privilege.
11     Q.   The design recipe was nearly
12 identical to the one that was eventually
13 pumped except that the tested recipe
14 contained slightly less retarder, .08 gallons
15 per sack instead of .09 gallons per sack than
16 the pumped recipe; is that right?
17     MR. HARTLEY: Objection; form.
18     A.   I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21     Q.   (BY MS. KUCHLER) The first set
22 of April test results also indicated
23 instability of the foam slurry, didn't they?
24     A.   I respectfully decline to answer
25 based on my constitutional Fifth Amendment

Page 214

1  privilege.
2      Q.   Another April foam stability
3  test was done on April 17th or 18th using the
4  same amount of retarder, meaning .08 gallons
5  per sack; is that right?
6      A.   I respectfully decline --
7  decline to answer based on my constitutional
8  Fifth Amendment privilege.
9      Q.   You considered the second set of
10 April results to be unstable, didn't you?
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.   You had concerns with respect to
15 the second set of April test results, didn't
16 you?
17     A.   I respectfully --
18     MR. HARTLEY: Objection; form.
19     A.   I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.   (BY MS. KUCHLER) The second
23 foam stability test on the .08 gallons per
24 sack concentration wasn't even completed
25 before the primary cement job was pumped, was

Page 215

1  it?
2      MR. HARTLEY: Objection; form.
3      A.   I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.   (BY MS. KUCHLER) To your
7  knowledge, no one provided BP a copy of the
8  second April foam stability test results
9  before the cement job began. Isn't that
10 true?
11     MR. HARTLEY: Objection; form.
12     A.   I respect -- respectfully
13 decline to answer based on my constitutional
14 Fifth Amendment privilege.
15     Q.   (BY MS. KUCHLER) Now, so far
16 we've been discussing foam stability tests
17 run with .08 gallons per sack of retarder. I
18 also have questions about tests that you may
19 have done on the cement recipe that was
20 actually pumped, which contain .09 gallons
21 per sack of retarder.
22         I think previously today you
23 looked at the cement lab weigh-up sheet that
24 indicated you cancelled foam stability and
25 compressive strengths on the cement recipe

Page 216

1  using .09 gallons per sack of retarder; is
2  that right?
3      MR. HARTLEY: Objection; form.
4      A.   I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.   (BY MS. KUCHLER) You did cancel
8  the compressive strength test on the comment
9  slurry that was actually pumped containing
10 .09 gallons per sack of retarder, didn't you?
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.   And you did cancel the foam
15 stability test on the cement slurry that was
16 actually pumped containing .09 gallons per
17 sack of retarder, didn't you?
18     A.   I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21     Q.   Before the cement job, you
22 specifically told BP that the compressive
23 strength tests on the cement slurry were not
24 complete, didn't you?
25     A.   I respectfully decline to answer

54 (Pages 213 to 216)

Exhibit Q
Page 54

Page 217

1    based on my constitutional Fifth Amendment
2    privilege.
3        Q.    And the lab results that you did
4    give BP on April 19th, just before the cement
5    job, in fact, showed that your compressive
6    strength tests for the cement were not
7    complete; isn't that right?
8        A.    I respectfully decline to answer
9    based on my constitutional Fifth Amendment
10   privilege.
11       Q.    Before the cement job, you did
12   not give BP any foam stability tests for the
13   cement that was actually pumped, did you?
14       A.    I respect --
15       MR. HARTLEY:  Objection; form.
16       A.    -- respectfully decline to
17   answer based on my constitutional Fifth
18   Amendment privilege.
19       Q.    (BY MS. KUCHLER)  You never
20   provided BP with any results for the .08
21   gallon per sack or .09 gallon per sack slurry
22   concentrations before the blowout, did you?
23       MR. CHEN:  Objection; form.
24       A.    Respect -- respectfully
25   decline -- respectfully decline to answer

Page 218

1    based on my constitutional Fifth Amendment
2    privilege.
3        Q.    (BY MS. KUCHLER)  Since no foam
4    stability test was completed using the amount
5    of retarder that was actually in the slurry
6    on the rig, BP couldn't have had a test in
7    hand that indicated the actual slurry pumped
8    before this cement job started on the Macondo
9    well production casing; isn't that right?
10       A.    I respectfully -- respectfully
11   decline to answer based on my constitutional
12   Fifth Amendment privilege.
13       Q.    So the only test results BP had
14   in hand before the cement job began were from
15   February and indicated the foam slurry would
16   not be stable; is that right?
17       MR. CHEN:  Objection; form.
18       A.    I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21       Q.    (BY MS. KUCHLER)  You would
22   agree that the well operator, in this case
23   BP, should have in hand test results
24   confirming foam stability before beginning to
25   pump a cement job using nitrified cement,

Page 219

1    wouldn't you?
2        MR. CHEN:  Objection; form.
3        A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6        Q.    (BY MS. KUCHLER)  You believe
7    that that would be the prudent thing to do,
8    for the operator, BP, to delay pumping the
9    job until BP had good reason to believe the
10   foam slurry would be stable under downhole
11   conditions, don't you?
12       MR. CHEN:  Objection; form.
13       A.    I respectfully -- respectfully
14   decline to answer based on my constitutional
15   Fifth Amendment privilege.
16       Q.    (BY MS. KUCHLER)  But, in fact,
17   BP directed Halliburton to start pumping the
18   cement on April 19th without having good
19   reason to believe that the foam slurry would
20   be stable under downhole conditions, didn't
21   it?
22       MR. CHEN:  Objection; form.
23       A.    I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

Page 220

1        Q.    (BY MS. KUCHLER)  You agree that
2    there is a wait on cement time that should
3    pass before the operator proceeds with
4    activity on a well after a cementing job,
5    don't you?
6        MR. HARTLEY:  Objection; form.
7        A.    I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10       Q.    (BY MS. KUCHLER)  Wait on cement
11   time is the time it takes for the cement to
12   cure or set, correct?
13       A.    Respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16       Q.    BP was required to confirm that
17   the cement had, in fact, reached the
18   appropriate set time before proceeding with
19   pressure testing the casing, wasn't it?
20       MR. CHEN:  Objection; form.
21       A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24       Q.    (BY MS. KUCHLER)  But BP did not
25   confirm that the cement was properly set, did

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 221

1   it?
2        MR. CHEN:  Objection; form.
3        A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6        Q.   (BY MS. KUCHLER)  And that is
7   the kind of decision that's typically made by
8   the operator, isn't it?
9        MR. CHEN:  Objection; form.
10       A.   I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13       Q.   (BY MS. KUCHLER)  If drilling
14   mud was inverted into the cement slurry
15   causing contamination of the cement, it would
16   take longer for the cement slurry to set than
17   initially predicted, wouldn't it?
18       A.   I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21       Q.   And the amount of retarder that
22   BP directed to be added to the slurry would
23   also have affected set times, wouldn't it?
24       MR. CHEN:  Objection; form.
25       A.   I respectfully decline to answer

Page 222

1   based on my constitutional Fifth Amendment
2   privilege.
3        Q.   (BY MS. KUCHLER)  The crush test
4   results you did give to BP indicated zero
5   compressive strength after 24 hours, didn't
6   it?
7        A.   I respectfully -- respectfully
8   decline to answer based on my constitutional
9   Fifth Amendment privilege.
10       MR. CHEN:  Objection; form.
11       Q.   (BY MS. KUCHLER)  And the
12   pressure test was done less than 24 hours
13   after the cement was pumped, wasn't it?
14       A.   I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17       Q.   The UCA compressive strength
18   test is important because it tells you when
19   it's safe to continue testing on drilling
20   operations, right?
21       MR. CHEN:  Objection; form.
22       A.   I decline -- I respectfully
23   decline to answer based on my constitutional
24   Fifth Amendment privilege.
25       Q.   (BY MS. KUCHLER)  But, again,

Page 223

1   you never gave BP complete UCA compressive
2   strength test results before the blowout, did
3   you?
4        A.   I respectfully decline --
5        MR. HARTLEY:  Objection; form.
6        A.   I respectfully decline to answer
7   based on my constitutional Fifth Amendment
8   privileges.
9        Q.   (BY MS. KUCHLER)  So BP did not
10   have the test in hand that would tell it
11   whether it was safe to proceed with pressure
12   testing before it proceeded with pressure
13   testing, did it?
14       MR. CHEN:  Objection; form.
15       A.   I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privileges -- privilege.
18       Q.   (BY MS. KUCHLER)  You used a
19   210-degree temperature input for the
20   compressibility test on the cement slurry,
21   didn't you?
22       A.   I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25       Q.   You arrived at this temperature

Page 224

1   by using a temperature model called WELLCAT,
2   correct?
3        A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6        Q.   You used this number because you
7   were never provided by BP with the actual or
8   projected bottom hole static temperature of
9   240 degrees for the Macondo well; is that
10   right?
11       MR. CHEN:  Objection; form.
12       A.   I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15       Q.   (BY MS. KUCHLER)  Using 210
16   degrees instead of 240 degrees would have
17   affected the compressibility test results,
18   wouldn't it?
19       MR. CHEN:  Objection; form.
20       A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23       Q.   (BY MS. KUCHLER)  The higher
24   temperature would cause the cement to set
25   faster, wouldn't it?

56  (Pages 221 to 224)

Page 225

1      A.   I respectful -- respectfully
2  decline to answer based on my constitutional
3  Fifth Amendment privilege.
4      Q.   If you don't start with the
5  right bottom hole static temperature, the
6  test results can't be correct, can they?
7      MR. CHEN:  Objection; form.
8      A.   I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10  privilege.
11      Q.   (BY MS. KUCHLER) The 210-degree
12  temperature you were using was set out in the
13  April 12 lab results that you sent to BP,
14  correct?
15      A.   I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18      MR. CHEN:  Objection; form.
19      Q.   (BY MS. KUCHLER) So you have
20  personal knowledge that BP was aware that you
21  were using 210-degrees bottom hole
22  temperature rather than 240; is that right?
23      MR. CHEN:  Objection; form.
24      A.   I respectfully -- respectfully
25  decline to answer based on my constitutional

Page 226

1  -- my constitutional Fifth Amendment
2  privilege.
3      Q.   (BY MS. KUCHLER) Now, let's
4  talk about volume of cement.  The cement
5  plans called for using only about 60 barrels
6  of cement for this job; is that right?
7      A.   I respectfully decline to answer
8  based on my constitutional Fifth Amendment
9  privilege.
10      Q.   You consider 60 barrels of
11  cement to be a very low volume for this job,
12  don't you?
13      MR. CHEN:  Objection; form.
14      A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.   (BY MS. KUCHLER) The
18  information on volume to be pumped is set out
19  in your modelling reports based on data that
20  BP asked you to input into that model; is
21  that right?
22      MR. CHEN:  Objection; form.
23      A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 227

1      Q.   (BY MS. KUCHLER) The data BP
2  gave you as to the location of the top of
3  cement indicated or dictated what the volume
4  would be, didn't it?
5      MR. CHEN:  Objection; form.
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   (BY MS. KUCHLER) You told BP in
10  a March e-mail that the volumes you were
11  getting based on BP's top of cement were
12  lower than what you had run before, didn't
13  you?
14      A.   I respectfully -- respectfully
15  decline to answer based on my constitutional
16  Fifth Amendment privilege.
17      Q.   You indicated to BP that the
18  volumes you were modeling did not allow much
19  cement -- cement volume on the backside of
20  the casing, right?
21      A.   I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.   You were concerned about the low
25  volumes BP was planning to run for Macondo,

Page 228

1  weren't you?
2      MR. CHEN:  Objection; form.
3      A.   I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.   (BY MS. KUCHLER) You told BP,
7  quote, these volumes are lower than what we
8  have run in the past, especially at these
9  depths, close quote.  Isn't that what you
10  said?
11      A.   I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14      Q.   And the depth of this job made
15  it even more important to run a sufficient
16  volume of cement, correct?
17      MR. CHEN:  Objection; form.
18      MR. HARTLEY:  Objection; form.
19      A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22      Q.   (BY MS. KUCHLER) Over time BP
23  specifically directed you to decrease the
24  volume of cement to be pumped for this job
25  even further, didn't it?

57 (Pages 225 to 228)

Page 229

1      MR. CHEN:  Objection; form.
2      A.    I respect -- respectfully
3  decline to answer based on my constitutional
4  Fifth Amendment privilege.
5      Q.    (BY MS. KUCHLER)  BP designed
6  the top of cement where they had it because
7  they were trying to keep ECD down.  Is that
8  your understanding?
9      MR. CHEN:  Objection; form.
10     A.    I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.    (BY MS. KUCHLER)  You agree that
14 keeping the top of cement to a minimum
15 necessarily reduced the total volume of
16 cement that could be pumped down the well,
17 don't you?
18     MR. CHEN:  Objection; form.
19     A.    I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.    (BY MS. KUCHLER)  Your March
23 e-mail to BP suggested that a lower volume of
24 cement could mean that there may be
25 insufficient cement in the shoe track, didn't

Page 230

1  it?
2      MR. CHEN:  Objection; form.
3      A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.    (BY MS. KUCHLER)  And there are
7  other difficulties that can be created by
8  using a low volume of cement, aren't there?
9      A.    I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.    You would agree that with less
13 cement, there is a greater chance for mud
14 contamination, isn't there?
15     A.    I respectfully decline to answer
16 based on my constitutional Fifth Amendment
17 privilege.
18     Q.    And you would agree that a lower
19 volume of cement would mean less cement in
20 the annular space above the hydrocarbon zone,
21 correct?
22     MR. CHEN:  Objection; form.
23     A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

Page 231

1      Q.    (BY MS. KUCHLER)  It's standard
2  industry practice to pump more cement as a
3  safeguard against uncertain cementing
4  conditions, isn't it?
5      MR. CHEN:  Objection; form.
6      A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.    (BY MS. KUCHLER)  Pumping more
10 cement would dilute the amount of any
11 contaminants, wouldn't it?
12     MR. CHEN:  Objection; form.
13     A.    I respectfully decline to answer
14 based on my constitutional Fifth Amendment
15 privilege.
16     Q.    (BY MS. KUTCHLER)  Pumping more
17 cement would reduce the risk of
18 contamination, wouldn't it?
19     A.    I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     MR. CHEN:  Objection; form.
23     Q.    (BY MS. KUCHLER)  You agree that
24 engineers can improve the odds of zonal
25 isolation by increasing the volume of cement

Page 232

1  in the well design, don't you?
2      A.    I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.    You have personal knowledge that
6  BP was aware of the risks associated with
7  using this lower volume based on its desired
8  top of cement, don't you?
9      MR. CHEN:  Objection; form.
10     A.    I respect -- respectfully
11 decline to answer based on my constitutional
12 Fifth Amendment privilege.
13     Q.    (BY MS. KUCHLER)  BP decided to
14 use only as much cement as required to meet
15 MMS standards, correct?
16     MR. CHEN:  Objection; form.
17     A.    I respectfully decline to answer
18 based on my constitutional Fifth Amendment
19 privilege.
20     Q.    (BY MS. KUCHLER)  Top of cement
21 was planned by BP for only 500 feet above the
22 hydrocarbon zone, wasn't it?
23     MR. CHEN:  Objection; form.
24     A.    I respectfully design -- decline
25 to answer based on my constitutional Fifth

58  (Pages 229 to 232)

Exhibit Q
Page 58

Page 233

```
 1   Amendment privilege.
 2        Q.   (BY MS. KUCHLER)  BP's internal
 3   guidelines found in ETP, GP 1060, require a
 4   thousand feet of cement above the uppermost
 5   hydrocarbon zone, don't they?
 6        MR. CHEN:  Objection; form.
 7        A.   I respectfully decline to answer
 8   based on my con- -- on my constitutional
 9   Fifth Amendment privilege.
10        Q.   (BY MS. KUCHLER)  BP's decision
11   to pump 60 barrels of foamed cement violated
12   its own technical guidance standards, didn't
13   it?
14        MR. CHEN:  Objection; form.
15        A.   I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.   (BY MS. KUCHLER)  Let's discuss
19   pump rate.  BP decided what pump rate would
20   be used for the cement job, didn't it?
21        MR. CHEN:  Objection; form.
22        A.   I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.   (BY MS. KUCHLER)  There were
```

Page 234

```
 1   risks associated with BP's decision to pump
 2   the cement at four barrels per minute or
 3   less, weren't there?
 4        MR. CHEN:  Objection; form.
 5        A.   I respectfully decline to answer
 6   based on my constitutional Fifth Amendment
 7   privileges -- privilege.
 8        Q.   (BY MS. KUCHLER)  Pumping at a
 9   low rate decreases the efficiency with which
10   the cement would have displaced mud from the
11   annular space, correct?
12        MR. CHEN:  Objection; form.
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   (BY MS. KUCHLER)  Pumping at a
17   low rate also increased the risk of
18   mud-related cementing failures such as
19   channeling, contamination, and gas flow,
20   correct?
21        MR. HARTLEY:  Objection; form.
22        MR. CHEN:  Objection; form.
23        A.   I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.
```

Page 235

```
 1        Q.   (BY MS. KUCHLER)  Let's turn our
 2   attention to the computer modeling.  You
 3   agree that computer modeling is a way to
 4   determine the potential gas flow on wells?
 5        A.   I respect -- respectfully
 6   decline to answer based on my constitutional
 7   Fifth Amendment privilege.
 8        Q.   Computer modelling is used to
 9   predict the effect of centralizer placement
10   on mud displacement, isn't it?
11        MR. CHEN:  Objection; form.
12        MR. HARTLEY:  Objection; form.
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   (BY MS. KUCHLER)  You would
17   agree that proper centralization is important
18   because it reduces channeling and reduces
19   potential gas flow, doesn't it?
20        MR. CHEN:  Objection; form.
21        A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.   (BY MS. KUCHLER)  Centralization
25   is highly recommended when using foam cement,
```

Page 236

```
 1   isn't it?
 2        MR. CHEN:  Objection; form.
 3        A.   I respectfully decline to answer
 4   based on my constitutional Fifth Amendment
 5   privilege.
 6        Q.   (BY MS. KUCHLER)  That's what
 7   Halliburton considers to be a best practice,
 8   isn't it?
 9        MR. CHEN:  Objection; form.
10        MR. HARTLEY:  Objection; form.
11        A.   I respectfully decline --
12   decline to answer based on my constitutional
13   Fifth Amendment privilege.
14        Q.   (BY MS. KUCHLER)  That's
15   consistent with the recommendations that you
16   made to BP at the Macondo well, isn't it?
17        MR. CHEN:  Objection; form.
18        A.   I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21        Q.   (BY MS. KUCHLER)  OptiCem is the
22   name of the computer model that Halliburton
23   ran for the Macondo well, right?
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment
```

59  (Pages 233 to 236)

Exhibit Q
Page 59

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:
JESSE GAGLIANO                              May 11, 2011                          TAMARA CHAPMAN, CSR

Page 237

```
 1   privilege.
 2        Q.    You agree that the results from
 3   OptiCem modeling are only as good as the
 4   information that's input, don't you?
 5        MR. CHEN:  Objection; form.
 6        A.    I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.    (BY MS. KUCHLER)  Here
10   Halliburton relied on BP for information that
11   was input into the OptiCem modeling, didn't
12   it?
13        MR. CHEN:  Objection; form.
14        A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        Q.    (BY MS. KUCHLER)  Since the
18   blowout and explosion on the DEEPWATER
19   HORIZON, you have learned that BP did not
20   always provide you with accurate information
21   for input into the OptiCem modeling; is that
22   right?
23        MR. CHEN:  Objection; form.
24        A.    I respectfully -- respectfully
25   decline to answer based on my constitutional
```

Page 238

```
 1   Fifth Amendment privilege.
 2        Q.    (BY MS. KUCHLER)  You're
 3   familiar with the term "stand-off" as it
 4   relates to centralization, aren't you?
 5        A.    I respectfully decline to answer
 6   based on my constitutional Fifth Amendment
 7   privilege.
 8        Q.    "Stand-off" means how centered
 9   the pipe is in the well, doesn't it?
10        A.    I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13        Q.    Halliburton's Best Practices
14   require stand-off about 70 percent, don't
15   they?
16        A.    I respectfully decline to answer
17   based on my constitution -- constitutional
18   Fifth Amendment privilege.
19        Q.    In March, you worked with Brett
20   Cocales of BP on cementing models to
21   determine centralization and stand-off for
22   the Macondo well, didn't you?
23        MR. CHEN:  Objection; form.
24        A.    I respectfully decline to answer
25   based on my constitutional Fifth Amendment
```

Page 239

```
 1   privilege.
 2        Q.    (BY MS. KUCHLER)  It was
 3   determined that 70 percent was the best case
 4   stand-off for this well, correct?
 5        MR. CHEN:  Objection; form.
 6        A.    I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.    (BY MS. KUCHLER)  That was
10   consistent with Halliburton's Best Practices,
11   wasn't it?
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        MS. KUCHLER:  We need to go off the
16   record for a technical issue.
17        THE VIDEOGRAPHER:  We're going off the
18   record.  It's 2:27.  This is Videotape No. 5.
19            (Break.)
20        THE VIDEOGRAPHER:  Back on the record.
21   It's 2:28.  This is Tape No. 5.
22        Q.    (BY MS. KUCHLER)  We're back on
23   the record.
24            On April 14th, 2010, you
25   participated in a workshop with BP engineers
```

Page 240

```
 1   where you worked together to prepare
 2   different computer models, correct?
 3        MR. CHEN:  Objection; form.
 4        A.    I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7        Q.    (BY MS. KUCHLER)  And Mr. Morel
 8   of BP gave you different parameters and input
 9   and then asked you to run different models
10   using the information he had given you; isn't
11   that right?
12        MR. CHEN:  Objection; form.
13        A.    I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.    (BY MS. KUCHLER)  Based on
17   information BP gave you on April 14th, you
18   did some modelling which included the use of
19   six centralizers; is that right?
20        MR. CHEN:  Objection; form.
21        A.    I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.    (BY MS. KUCHLER)  As early as
25   April 15, you noticed a problem with running
```

60 (Pages 237 to 240)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.       Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 60

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                              Reported by:
JESSE GAGLIANO                        May 11, 2011                    TAMARA CHAPMAN, CSR

Page 241

```
 1   only six centralizers, didn't you?
 2        MR. HARTLEY:  Objection; form.
 3        MR. CHEN:  Objection; form.
 4        A.    I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7        Q.    (BY MS. KUCHLER)  On April 15,
 8   2010, you noticed a potential gas flow issue
 9   using six centralizers in the model; is that
10   right?
11        MR. CHEN:  Objection; form.
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    (BY MS. KUCHLER)  You brought
16   this potential gas flow problem to the
17   attention of BP, didn't you?
18        A.    I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21        Q.    And you discussed the
22   significance of gas flow and channeling with
23   BP management on April 15th, correct?
24        MR. CHEN:  Objection; form.
25        A.    I respectfully decline to answer
```

Page 242

```
 1   based on my constitutional Fifth Amendment
 2   privilege.
 3        Q.    (BY MS. KUCHLER)  This was
 4   several days before the cement job was
 5   pumped, wasn't it?
 6        A.    I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.    You specifically discussed the
10   potential for channeling and gas flow
11   resulting from using only six centralizers
12   with Greg Walz, Brett Cocales, and Mark Hafle
13   of BP on April 15th; is that right?
14        MR. CHEN:  Objection; form.
15        A.    I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.    (BY MS. KUCHLER)  You explained
19   to them the effects of channeling and gas
20   flow potential at that time, didn't you?
21        MR. CHEN:  Objection; form.
22        A.    I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.    (BY MS. KUCHLER)  And then on
```

Page 243

```
 1   April 15th, you worked with Mr. Walz and
 2   Mr. Cocales to design a model that would
 3   address your concerns, didn't you?
 4        MR. CHEN:  Objection; form.
 5        A.    I respectfully decline to answer
 6   based on my constitutional Fifth Amendment
 7   privilege.
 8        Q.    (BY MS. KUCHLER)  And BP, at
 9   least at that point, agreed it would be a
10   good idea to do additional modelling with
11   more centralizers; is that right?
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    So you prepared a model with ten
16   centralizers, didn't you?
17        A.    I respectfully -- respectfully
18   decline to answer based on my constitutional
19   Fifth Amendment privilege.
20        Q.    You sent the model with ten
21   centralizers to BP on April 15th, correct?
22        A.    I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.    The model that you sent to BP
```

Page 244

```
 1   showed that with increased centralizers,
 2   there was less of a gas flow potential; is
 3   that right?
 4        MR. CHEN:  Objection; form.
 5        A.    I respectfully decline to answer
 6   based on my constitutional Fifth Amendment
 7   privilege.
 8        Q.    (BY MS. KUCHLER)  But your model
 9   showed that even with ten centralizers, there
10   was still a moderate gas flow potential; is
11   that right?
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    You advised BP that even with
16   ten centralizers, there was cement channeling
17   and ECD was going on as a result of that
18   channeling based on your modelling; is that
19   right?
20        MR. CHEN:  Objection; form.
21        A.    I respectfully -- respectfully
22   decline to answer based on my constitutional
23   Fifth Amendment privileges.
24        Q.    (BY MS. KUCHLER)  The stand-off
25   you showed in your e-mail and model that you
```

61 (Pages 241 to 244)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                        Reported by:

JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 245

1    provided to BP also indicated that at some
2    depths you were getting stand-off less than
3    70 percent; is that right?
4         MR. CHEN: Objection; form.
5         A.   I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privileges.
8         Q.   (BY MS. KUCHLER) You believed
9    that this could negatively impact the cement
10   job, didn't you?
11        A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.   You advised BP that you were
15   going to run additional modelling to
16   determine if additional centralizers would
17   help; is that right?
18        A.   I respectfully -- respectfully
19   decline to answer based on my constitutional
20   Fifth Amendment privilege.
21        Q.   You also ran a model with 21
22   centralizers and sent it to BP on April 15,
23   didn't you?
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment

Page 246

1    privileges.
2         Q.   The model with 21 centralizers
3    that you sent to BP showed that any gas flow
4    potential would be minor; is that right?
5         A.   I respectfully -- respectfully
6    decline to answer based on my constitutional
7    Fifth Amendment privilege.
8         Q.   So you have personal knowledge
9    that BP was aware on April 15th that adding
10   more centralizers did reduce gas flow
11   potential, correct?
12        MR. CHEN: Objection; form.
13        A.   I respectfully -- respectfully
14   decline -- decline to answer based on my
15   constitutional Fifth Amendment privilege.
16        Q.   (BY MS. KUCHLER) In fact,
17   Mr. Cocales and Mr. Walz of BP actually
18   worked with you on the different models
19   throughout the day on April 15th, and you all
20   settled on 21 centralizers as the number that
21   would be appropriate for this job, didn't
22   you?
23        MR. CHEN: Objection; form.
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment

Page 247

1    privilege.
2         Q.   (BY MS. KUCHLER) So as of April
3    15, BP agreed that running 21 centralizers
4    was needed for this job.  Would you agree?
5         MR. CHEN: Objection; form.
6         A.   I respectfully decline to answer
7    based on my constitutional Fifth Amendment
8    privilege.
9         Q.   (BY MS. KUCHLER) At that point,
10   it was your understanding that BP was making
11   plans to obtain additional centralizers,
12   wasn't it?
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   BP was doing this because BP did
17   not have enough centralizers on the rig to
18   run the amount you recommended --
19        MR. CHEN: Objection; form.
20        Q.   (BY MS. KUCHLER) -- correct?
21        A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.   BP only had six centralizers on
25   the rig; is that right?

Page 248

1         A.   I respectfully -- respectfully
2    decline to answer based on my constitutional
3    Fifth Amendment privilege.
4         Q.   Now, despite your recommendation
5    and Mr. Walz's and Mr. Cocales' agreement
6    about the need for additional centralizers
7    and the fact that efforts were underway to
8    get additional centralizers, Mr. Morel from
9    BP continued to plan for six centralizers
10   only; is that right?
11        MR. CHEN: Objection; form.
12        A.   I respectfully -- respectfully
13   decline to answer based on my constitutional
14   Fifth Amendment privilege.
15        Q.   (BY MS. KUCHLER) And this was
16   after Mr. Morel at BP had been made aware of
17   the risks associated with running only six
18   centralizers; is that right?
19        MR. CHEN: Objection; form.
20        A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.   (BY MS. KUTCHLER) In fact,
24   Mr. Morel of BP said he hoped the pipe would
25   stay in place because of gravity, didn't he?

62 (Pages 245 to 248)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 62

Page 249

```
 1        MR. CHEN:  Objection; form.
 2        A.   I respectfully decline to answer
 3   based on my constitutional Fifth Amendment
 4   privilege.
 5        Q.   (BY MS. KUCHLER)  You don't
 6   think it was prudent for the operator at BP
 7   to rely on gravity to achieve adequate
 8   centralization, do you?
 9        MR. CHEN:  Objection; form.
10        A.   I respect -- respectfully
11   decline to answer based on my constitutional
12   Fifth Amendment privilege.
13        Q.   (BY MS. KUCHLER)  You're
14   familiar with an e-mail from Greg Walz of BP
15   to John Guide of BP dated April 16th
16   discussing your modelling, aren't you?
17        A.   I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20        Q.   You, again, discussed the
21   problem with running six centralizers with
22   Mr. Walz of BP on April 16th, didn't you?
23        MR. CHEN:  Objection; form.
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment
```

Page 250

```
 1   privilege.
 2        Q.   (BY MS. KUCHLER)  Mr. Walz
 3   indicated in his e-mail to John Guide of BP
 4   that BP needed to honor the modeling to be
 5   consistent with the previous discussions to
 6   go with the long string, didn't he?
 7        MR. CHEN:  Objection; form.
 8        A.   I respectfully decline to answer
 9   based on my constitutional Fifth Amendment
10   privilege.
11        Q.   (BY MS. KUCHLER)  You agree that
12   it was very important to have proper
13   centralization, given that BP was going to be
14   using a long string production casing, don't
15   you?
16        MR. CHEN:  Objection; form.
17        A.   I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20        Q.   (BY MS. KUCHLER)  And that was
21   because there were additional risks
22   associated with BP's decision to use the long
23   string production casing at Macondo, correct?
24        MR. CHEN:  Objection; form.
25        A.   I respectfully decline to answer
```

Page 251

```
 1   based on my constitutional Fifth Amendment
 2   privilege.
 3        Q.   (BY MS. KUCHLER)  Sometime after
 4   April 15, you learned that BP did not plan on
 5   running the additional centralizers you
 6   recommended, correct?
 7        MR. CHEN:  Objection; form.
 8        A.   I respectfully decline to answer
 9   based on my Fifth Amendment -- my
10   constitutional Fifth Amendment privilege.
11        Q.   (BY MS. KUCHLER)  No one from BP
12   even informed you of BP's decision to use
13   only six centralizers, did they?
14        MR. CHEN:  Objection; form.
15        A.   I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.   (BY MS. KUCHLER)  You heard this
19   in passing from other Halliburton employees
20   on the rig, didn't you?
21        MR. CHEN:  Objection; form.
22        A.   I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.   (BY MS. KUCHLER)  When you heard
```

Page 252

```
 1   through the grapevine that BP was going to
 2   ignore your recommendations about 21
 3   centralizers, you actually contacted
 4   Mr. Morel, Mr. Hafle, and Mr. Cocales of BP
 5   and asked for confirmation as to whether they
 6   were going to run additional centralizers,
 7   didn't you?
 8        MR. CHEN:  Objection; form.
 9        A.   I respectfully -- I respectfully
10   decline to answer based on my constitutional
11   Fifth Amendment privilege.
12        Q.   (BY MS. KUCHLER)  You offered to
13   update the OptiCem model to reflect the
14   different amount of centralizers if that was
15   their plan, didn't you?
16        MR. CHEN:  Objection; form.
17        A.   I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20        Q.   (BY MS. KUCHLER)  When you
21   didn't get a response from BP about whether
22   they were going to run additional
23   centralizers, you ran a new model with seven
24   centralizers, didn't you?
25        A.   I respectfully decline to answer
```

63 (Pages 249 to 252)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 63

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

JESSE GAGLIANO                  May 11, 2011              TAMARA CHAPMAN, CSR

Page 253

```
 1   based on my constitutional Fifth Amendment
 2   privilege.
 3        Q.   With seven centralizers, your
 4   model said, open quote, all caps, SEVERE GAS
 5   FLOW PROBLEM, close quote, didn't it?
 6        A.   I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.   Before the blowout, you sent a
10   report to BP stating that there would be a
11   severe gas flow problem with running only
12   seven centralizers, didn't you?
13        MR. CHEN:  Objection; form.
14        A.   I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17        Q.   (BY MS. KUCHLER) So you have
18   personal knowledge that BP knew before this
19   cementing job began that they would have a
20   severe gas flow potential if they ran as few
21   as seven centralizers; isn't that right?
22        MR. CHEN:  Objection; form.
23        A.   I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.
```

Page 254

```
 1        Q.   (BY MS. KUCHLER) On the morning
 2   of April 19, 2010, you brought the report
 3   showing a severe gas flow potential to the
 4   attention of Greg Walz of BP to make sure he
 5   had seen it, right?
 6        MR. CHEN:  Objection; form.
 7        A.   I respectfully decline to answer
 8   based on my constitutional Fifth Amendment
 9   privilege.
10        Q.   (BY MS. KUCHLER) You discussed
11   channeling and gas flow potential with Greg
12   Walz of BP on the morning of April 19th,
13   correct?
14        MR. CHEN:  Objection; form.
15        A.   I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.   (BY MS. KUCHLER) You spoke
19   directly with other BP team members on April
20   19th about the severe gas flow potential on
21   the Macondo well if BP ran as few as seven
22   centralizers, didn't you?
23        MR. CHEN:  Objection; form.
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment
```

Page 255

```
 1   privilege.
 2        Q.   (BY MS. KUCHLER) Now, the
 3   April 18th OptiCem report that predicted
 4   severe gas flow potential and mud channeling
 5   assumed BP would use seven centralizers when
 6   BP was actually only planning to use only
 7   six; is that right?
 8        A.   I respectfully decline to answer
 9   based on my constitutional Fifth Amendment
10   privilege.
11        Q.   If less centralizers were used,
12   the gas flow potential would be even worse,
13   wouldn't it?
14        A.   I respectfully -- respectfully
15   decline to answer based on my constitutional
16   Fifth Amendment privilege.
17        MR. CHEN:  Objection; form.
18        Q.   (BY MS. KUCHLER) Your -- your
19   report assumed BP would space the
20   centralizers evenly along the casing;
21   whereas, BP had placed them in sections of
22   the bore hole where BP thought they would be
23   most effective; isn't that right?
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment
```

Page 256

```
 1   privilege.
 2        Q.   Your report of April 18
 3   contained the incorrect pore pressure in the
 4   reservoir zone, didn't it?
 5        MR. HARTLEY:  Objection; form.
 6        A.   I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.   (BY MS. KUCHLER) This could
10   influence the model's prediction of gas flow
11   into the cement column, couldn't it?
12        MR. HARTLEY:  Objection; form.
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   (BY MS. KUCHLER) BP provided
17   you with this incorrect pore pressure, didn't
18   they?
19        MR. CHEN:  Objection; form.
20        A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.   (BY MS. KUCHLER) BP never asked
24   you to run a new OptiCem report using the
25   correct assumptions before it began this
```

64 (Pages 253 to 256)

Exhibit Q
Page 64

Page 257

1    cement job, did it?
2         MR. CHEN:  Objection; form.
3         A.   I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.   (BY MS. KUCHLER)  Despite its
7    potential flaws, that April 18th OptiCem
8    report was the most accurate modeling of the
9    cementing process that existed before the
10   blowout, wasn't it?
11        MR. CHEN:  Objection; form.
12        A.   I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.   (BY MS. KUCHLER)  And that
16   April 18th OptiCem report predicted that
17   channeling and a severe gas flow problem
18   would likely occur, didn't it?
19        MR. CHEN:  Objection; form.
20        A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.   (BY MS. KUCHLER)  To your
24   knowledge, BP was familiar with the use of
25   OptiCem models on both this well and other

Page 258

1    wells, right?
2         MR. CHEN:  Objection; form.
3         A.   I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.   (BY MS. KUCHLER)  In fact, you
7    had actually worked with BP on OptiCem models
8    before, hadn't you?
9         MR. CHEN:  Objection; form.
10        A.   I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13        Q.   (BY MS. KUCHLER)  BP engineers
14   never asked you to create an executive
15   summary of the OptiCem reports with
16   highlights, did they?
17        A.   I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20        Q.   BP never asked you to summarize
21   key portions of the OptiCem report, did it?
22        A.   I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.   BP personnel never expressed

Page 259

1    concern to you that the OptiCems were too
2    long or they were unable to read or
3    understand the full report; is that right?
4         MR. CHEN:  Objection; form.
5         A.   I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8         Q.   (BY MS. KUCHLER)  It was
9    certainly your expectation that BP personnel
10   actually read the reports that they asked you
11   to run, correct?
12        MR. CHEN:  Objection.
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   (BY MS. KUCHLER)  You agree it
17   would be prudent for the operator, in this
18   case BP, to actually read the reports that
19   they asked you to run?
20        MR. CHEN:  Objection; form.
21        A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.   (BY MS. KUCHLER)  You understand
25   that time and cost factors played a role in

Page 260

1    BP's decision not to use additional
2    centralizers, don't you?
3         MR. CHEN:  Objection; form.
4         A.   I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7         Q.   (BY MS. KUCHLER)  It would have
8    taken time for BP's installation of
9    additional centralizers, wouldn't it?
10        MR. CHEN:  Objection; form.
11        A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.   (BY MS. KUCHLER)  You
15   recommended that BP use 21 centralizers on
16   the production casing to improve mud
17   displacement, didn't you?
18        A.   I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21        MR. CHEN:  Objection; form.
22        Q.   (BY MS. KUCHLER)  And to
23   minimize contamination?
24        MR. CHEN:  Objection; form.
25        A.   I respectfully decline to answer

65  (Pages 257 to 260)

Exhibit Q
Page 65

Page 261

1    based on my constitutional Fifth Amendment
2    privilege.
3         Q.    (BY MS. KUCHLER)  To prevent
4    channeling?
5         MR. CHEN:  Objection; form.
6         A.    I respectfully decline to answer
7    based on my constitutional Fifth Amendment
8    privilege.
9         Q.    (BY MS. KUCHLER)  To lower the
10   well's gas flow potential?
11        MR. CHEN:  Objection; form.
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    (BY MS. KUCHLER)  You believe
16   that running 21 centralizers was important
17   from a safety standpoint, didn't you?
18        MR. HARTLEY:  Object; form.
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    (BY MS. KUCHLER)  You informed
23   BP of this, but BP ignored your
24   recommendation to run 21 centralizers, didn't
25   it?

Page 262

1         MR. CHEN:  Objection; form.
2         A.    I respectfully decline to answer
3    based on my constitutional Fifth Amendment
4    privilege.
5         MS. KUCHLER:  We're near the end of the
6    tape, so let's take a break here.
7         THE WITNESS:  Okay.
8         THE VIDEOGRAPHER:  We're going off the
9    record.  It's 2:45.  This is the end of
10   Videotape No. 5.
11             (Break.)
12        THE VIDEOGRAPHER:  We're back on the
13   record.  This is the beginning of Videotape
14   No. 6.  It's 2:51.
15        Q.    (BY MS. KUCHLER)  So,
16   Mr. Gagliano, you circulated an updated model
17   showing the potential for channeling and gas
18   flow if BP used only seven centralizers on
19   the evening of April 18th, correct?
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    BP never received a cementing
24   model from you or anyone at Halliburton
25   indicating that the channeling and gas flow

Page 263

1    concerns stemming from the use of six
2    centralizers had been addressed, correct?
3         MR. CHEN:  Objection; form.
4         A.    I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7         Q.    (BY MS. KUCHLER)  And you now
8    have personal knowledge that BP went ahead
9    and ran only six centralizers on the Macondo
10   well; is that right?
11        A.    I respectfully decline to answer
12   based upon my constitutional Fifth Amendment
13   privilege.
14        Q.    You believe it was a mistake for
15   BP to run the cement job with only six
16   centralizers, don't you?
17        MR. CHEN:  Objection; form.
18        A.    I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21        Q.    (BY MS. KUCHLER)  BP's decision
22   to run only six centralizers was unsafe,
23   wasn't it?
24        MR. CHEN:  Objection; form.
25        A.    I respectfully decline to answer

Page 264

1    based on my constitutional Fifth Amendment
2    privilege.
3         Q.    (BY MS. KUCHLER)  If BP had run
4    additional centralizers, as you recommended,
5    this incident could have been avoided,
6    couldn't it?
7         MR. CHEN:  Objection; form.
8         A.    I respectfully decline to answer
9    based on my constitutional Fifth Amendment
10   privilege.
11        Q.    (BY MS. KUCHLER)  Let's switch
12   topics to running a full bottoms up.  The
13   bottoms-up procedure involves circulating
14   drilling mud through the well from the bottom
15   up; is that right?
16        A.    I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.    You'd agree that circulating
20   bottoms up is important to achieve a good
21   cement job, isn't it?
22        A.    I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.    Circulating a full bottoms up

66 (Pages 261 to 264)

Exhibit Q
Page 66

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 265

1    allows the workers to check whether the mud
2    is absorbing gas, right?
3         A.    I respectfully decline to answer
4    based on my constitutional Fifth Amendment
5    privilege.
6         Q.    It's important to do this
7    because you'd want to detect gas in the well
8    and remove it before it becomes a problem,
9    wouldn't you?
10        MR. CHEN:  Objection; form.
11        MR. HARTLEY:  Object; form.
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    (BY MS. KUCHLER)  Doing a
16   bottoms up also cleans the casing and pipe of
17   cuttings and debris that can interfere with a
18   good cement job, right?
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    Isn't it standard practice to
23   circulate a full bottoms up before starting a
24   cement job?
25        MR. CHEN:  Objection; form.

Page 266

1         A.    I respectfully decline to answer
2    based on my constitutional Fifth Amendment
3    privilege.
4         Q.    (BY MS. KUCHLER)  Doesn't the
5    American Petroleum Institute describe bottoms
6    up as a common cementing best practice?
7         MR. CHEN:  Objection; form.
8         A.    I respectfully decline to answer
9    based on my constitutional Fifth Amendment
10   privilege.
11        Q.    (BY MS. KUCHLER)  Likewise,
12   Halliburton considers running a full bottoms
13   up to be a best practice, doesn't it?
14        MR. HARTLEY:  Object; form.
15        A.    I respectfully decline to answer
16   based on my constitutional -- based on my
17   constitutional Fifth Amendment privilege.
18        Q.    (BY MS. KUCHLER)  Although it is
19   a best practice, BP did not circulate a full
20   bottoms up before this cement job, did it?
21        MR. CHEN:  Objection; form.
22        A.    I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.    (BY MS. KUCHLER)  You're aware

Page 267

1    that BP's original plan called for
2    circulating and conditioning one and a half
3    times pipe volume of drilling fluid, right?
4         A.    I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7         Q.    But the amount that BP later
8    decided to run was significantly less than
9    what the original plan called for, wasn't it?
10        MR. CHEN:  Objection; form.
11        A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.    (BY MS. KUCHLER)  And it
15   certainly wasn't a full bottoms up, was it?
16        A.    I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.    It was John Guide at BP who made
20   the decision not to run a full bottoms up,
21   wasn't it?
22        MR. CHEN:  Objection; form.
23        A.    I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

Page 268

1         Q.    (BY MS. KUCHLER)  Isn't it true
2    that Halliburton actually made a
3    recommendation to run a complete bottoms up
4    and BP did not follow that recommendation?
5         MR. CHEN:  Objection; form.
6         A.    I respectfully decline to answer
7    based on my constitutional Fifth Amendment
8    privilege.
9         Q.    (BY MS. KUCHLER)  BP claims that
10   it did not do a bottoms up just prior to the
11   cementing job because of a concern for lost
12   returns.  Are you aware of that?
13        A.    I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.    (BY MS. KUCHLER)  But, in fact,
17   there was a full return before and during
18   this trip, wasn't there?
19        MR. HARTLEY:  Object; form.
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    (BY MS. KUCHLER)  You aren't
24   aware of any reason why BP could not have
25   circulated a full bottoms up, are you?

67 (Pages 265 to 268)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile: (504) 525-9109

Page 269

1       A.    I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.    You believe that failing to
5   adequately circulate the mud was a serious
6   mistake on BP's part, don't you?
7       MR. CHEN:  Objection; form.
8       A.    I respectfully decline to answer
9   based on my constitutional Fifth Amendment
10  privilege.
11      Q.    (BY MS. KUCHLER)  With the low
12  volumes BP planned to bump, it would be
13  impossible to analyze the upcoming mud at rig
14  level to see if hydrocarbons were in the mud,
15  wouldn't it?
16      MR. CHEN:  Objection; form.
17      A.    Excuse me.  I respectfully
18  decline to answer based on my constitutional
19  Fifth Amendment privilege.
20      Q.    (BY MS. KUCHLER)  And the
21  amounts that BP pumped wouldn't have
22  conditioned the mud; isn't that correct?
23      MR. CHEN:  Objection; form.
24      A.    I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 270

1   privilege.
2       Q.    (BY MS. KUCHLER)  You would
3   agree that the limited circulation rather
4   than a full bottoms up would provide a very
5   diminished cleaning of the casing, drill pipe
6   and well bore of cuttings, gels, mud, and
7   other debris, wouldn't you?
8       MR. CHEN:  Objection; form.
9       A.    I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12      Q.    (BY MS. KUCHLER)  Diminished
13  cleaning can interfere with good cement
14  placement and performance; isn't that right?
15      A.    I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18      Q.    Running a full bottoms up would
19  have minimized the risk of a failure of the
20  cement job, wouldn't it?
21      MR. CHEN:  Objection; form.
22      A.    I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25      Q.    (BY MS. KUCHLER)  Bottoms up can

Page 271

1   be a time-consuming process, can't it?
2       A.    I respectfully decline to answer
3   based on my constitutional Fifth Amendment
4   privilege.
5       Q.    A bottoms up at the depth of the
6   Macondo well could take about 12 hours,
7   right?
8       MR. CHEN:  Objection; form.
9       A.    I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12      Q.    (BY MS. KUCHLER)  But here, they
13  only pumped for about half an hour before
14  beginning the cement job, right?
15      MR. CHEN:  Objection; form.
16      A.    I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19      Q.    (BY MS. KUCHLER)  So not
20  running a bottoms up saved BP time, didn't
21  it?
22      A.    I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25      MR. CHEN:  Objection; form.

Page 272

1       Q.    (BY MS. KUCHLER)  Time is money
2   on a drilling rig, is it not?
3       MR. CHEN:  Objection; form.
4       A.    I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7       Q.    (BY MS. KUCHLER)  You believe
8   that the time it would have taken -- the 12
9   hours it would have taken for a full bottoms
10  up was a factor in BP's decision, don't you?
11      MR. CHEN:  Objection; form.
12      A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15      Q.    (BY MS. KUCHLER)  Let's discuss
16  BP's failure to run a cement bond log.
17      MR. CHEN:  Objection; form.
18      Q.    (BY MS. KUCHLER)  You believe
19  that BP's decision not to run a cement bond
20  log was a mistake, don't you?
21      MR. CHEN:  Objection; form.
22      A.    I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25      Q.    (BY MS. KUCHLER)  You agree that

68  (Pages 269 to 272)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone:  (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile:  (504) 525-9109

Exhibit Q
Page 68

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010        Reported by:
JESSE GAGLIANO              May 11, 2011              TAMARA CHAPMAN, CSR

Page 273

1  a cement bond log is a key tool to
2  effectively evaluate a cement job, don't you?
3      MR. CHEN: Objection; form.
4      A.   I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.   (BY MS. KUCHLER) A cement bond
8  log can tell you whether the cement has
9  effectively filled the annular space, can't
10 it?
11     MR. CHEN: Objection; form.
12     A.   I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.   (BY MS. KUCHLER) It can tell
16 you if there has been channeling in the
17 cement, can't it?
18     MR. CHEN: Objection; form.
19     A.   I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.   (BY MS. KUCHLER) And if you
23 discover channeling with a cement bond log,
24 you could then remediate by perforating the
25 casing and pump in additional cement to seal

Page 274

1  off the channel, couldn't you?
2      A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.   Once remediation was done, you
6  could perform another cement bond log and
7  know acoustically that you do not have
8  channeling and you should not have
9  hydrocarbon influx; is that right?
10     MR. CHEN: Objection; form.
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.   (BY MS. KUCHLER) Despite the
15 benefits of the cement bond log, BP did not
16 do one in this case, did it?
17     MR. CHEN: Objection; form.
18     A.   I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21     Q.   (BY MS. KUCHLER) You're aware
22 of the decision tree that was developed by BP
23 that they use to decide whether they should
24 run a cement bond log, right?
25     A.   I respectfully decline to answer

Page 275

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   You were not involved in
4  developing that decision tree, were you?
5      MR. CHEN: Objection; form.
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   (BY MS. KUCHLER) That decision
10 tree was created by BP, wasn't it?
11     A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     MR. CHEN: Objection; form.
15     Q.   (BY MS. KUCHLER) Your
16 understanding of BP's decision tree is that
17 if they observe full returns and lift
18 pressure, they would not run a cement bond
19 log, right?
20     A.   I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     MR. CHEN: Objection; form.
24     Q.   (BY MS. KUCHLER) The
25 observations of no lost returns and the

Page 276

1  presence of lift pressure could not tell BP
2  the precise location where cement ended up;
3  is that true?
4      A.   I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      MR. CHEN: Objection; form.
8      Q.   (BY MS. KUCHLER) Those same
9  observations could not tell BP whether
10 channeling had occurred, right?
11     MR. CHEN: Objection; form.
12     A.   I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.   (BY MS. KUCHLER) Those same
16 observations could not tell BP whether the
17 cement had been contaminated, correct?
18     A.   I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21     Q.   Lost returns of lift pressure
22 could not tell BP whether the foam cement had
23 remained stable, correct?
24     A.   I respectfully decline to answer
25 based on my constitutional Fifth Amendment

69 (Pages 273 to 276)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 69

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                     May 11, 2011                     TAMARA CHAPMAN, CSR

Page 277

1   privilege.
2       Q.   But a cement bond log could have
3   given BP data on those issues, couldn't it?
4       MR. CHEN:  Objection; form.
5       A.   I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8       Q.   (BY MS. KUCHLER)  You're not
9   aware of any industry manual or best practice
10  that says lift pressure and full returns are
11  the most accurate way to determine the
12  success of a cement job, are you?
13      MR. HARTLEY:  Object; form.
14      A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.   (BY MS. KUCHLER)  You're
18  familiar with BP's engineering technical
19  practices that we discussed earlier, ETP
20  GP 1060, are you not?
21      A.   I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.   (BY MS. KUCHLER)  BP's own
25  engineering technical practices provides

Page 278

1   specific means by which to accurately assess
2   zonal isolation in top of cement, don't they?
3       MR. CHEN:  Objection; form.
4       A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7       Q.   (BY MS. KUCHLER)  Lift pressure
8   is not one of the proven methods of
9   evaluation for these purposes, according to
10  BP's own standards, is it?
11      MR. HARTLEY:  Object; form.
12      MR. CHEN:  Objection; form.
13      A.   I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16      Q.   (BY MS. KUCHLER)  According to
17  BP's standards, full returns is not one of
18  the proven methods of evaluation of zonal
19  isolation or top of cement, correct?
20      MR. CHEN:  Objection; form.
21      A.   I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24      Q.   (BY MS. KUCHLER)  You agree that
25  achieving zonal isolation is important

Page 279

1   because it prevents gas and fluids from
2   flowing to the surface; isn't that right?
3       MR. CHEN:  Objection; form.
4       A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7       Q.   (BY MS. KUCHLER)  You agree that
8   BP violated its own technical guidelines
9   about assessing zonal isolation, didn't it?
10      MR. CHEN:  Objection; form.
11      A.   I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14      Q.   (BY MS. KUCHLER)  The decision
15  not to run the cement bond log was made by BP
16  during the morning meeting on April 20th,
17  wasn't it?
18      A.   I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21      MR. CHEN:  Objection; form.
22      Q.   (BY MS. KUCHLER)  BP actually
23  had both the equipment and the Schlumberger
24  personnel on the rig to run a cement bond log
25  on April 19th in the early hours of April

Page 280

1   20th, didn't it?
2       A.   I respectfully decline to answer
3   based on my constitutional Fifth Amendment
4   privilege.
5       Q.   So BP could have run a cement
6   bond log had it chosen to; is that right?
7       MR. CHEN:  Objection; form.
8       A.   I respectfully decline to answer
9   based on my constitutional Fifth Amendment
10  privilege.
11      Q.   (BY MS. KUCHLER)  You're aware
12  that Schlumberger was sent home by BP before
13  conducting a cement bond log; is that right?
14      A.   I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17      Q.   There was no reason for BP not
18  to run a cement bond log, was there?
19      MR. CHEN:  Objection; form.
20      A.   I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23      Q.   (BY MS. KUCHLER)  There was no
24  downside to BP running a cement bond log, was
25  there?

70 (Pages 277 to 280)

Exhibit Q
Page 70

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                  Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 281

```
 1        MR. CHEN:  Objection; form.
 2        A.   I respectfully decline to answer
 3   based on my constitutional Fifth Amendment
 4   privilege.
 5        Q.   (BY MS. KUCHLER)  BP saved about
 6   $128,000 by not running a cement bond log,
 7   didn't it?
 8        MR. CHEN:  Objection; form.
 9        A.   I respectfully decline to answer
10   based on my constitutional Fifth Amendment
11   privilege.
12        Q.   (BY MS. KUCHLER)  Running a
13   cement bond log would also take additional
14   rig time, wouldn't it?
15        MR. CHEN:  Objection; form.
16        A.   I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.   (BY MS. KUCHLER)  And additional
20   rig time would mean additional costs to BP if
21   a cement bond log had been run; is that
22   right?
23        MR. CHEN:  Objection; form.
24        A.   I respectfully decline to answer
25   based on my constitutional Fifth Amendment
```

Page 282

```
 1   privilege.
 2        Q.   (BY MS. KUCHLER)  You agree that
 3   the only way to confirm if there was
 4   channeling in the cement was to do a cement
 5   bond log, don't you?
 6        MR. CHEN:  Objection; form.
 7        A.   I respectfully decline to answer
 8   based on my constitutional Fifth Amendment
 9   privilege.
10        Q.   (BY MS. KUCHLER)  And it was
11   even more important to do a cement bond log
12   in light of the issues that we've discussed
13   already concerning the centralizers; is that
14   right?
15        MR. CHEN:  Objection; form.
16        A.   I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.   (BY MS. KUCHLER)  You agree that
20   the only way -- you agree that the only way
21   to determine the success of the cement job
22   downhole is to run a cement bond log; is that
23   right?
24        MR. CHEN:  Objection; form.
25        A.   I respectfully decline to answer
```

Page 283

```
 1   based on my constitutional Fifth Amendment
 2   privilege.
 3        Q.   (BY MS. KUCHLER)  You believe BP
 4   should have run a cement bond log, don't you?
 5        MR. CHEN:  Objection; form.
 6        A.   I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.   (BY MS. KUCHLER)  Mr. Gagliano,
10   you believe that BP's failure to follow best
11   practices with regard to the cement job
12   caused or contributed to the blowout,
13   explosion, and fire aboard the DEEPWATER
14   HORIZON?
15        MR. CHEN:  Objection; form.
16        A.   I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.   (BY MS. KUCHLER)  You believe
20   that BP's failure to follow Halliburton's
21   recommendations regarding centralization
22   caused or contributed to the blowout,
23   explosion, and fire aboard the DEEPWATER
24   HORIZON, don't you?
25        MR. CHEN:  Objection.
```

Page 284

```
 1        A.   I respectfully decline to answer
 2   based on my constitutional Fifth Amendment
 3   privilege.
 4        Q.   (BY MS. KUCHLER)  You believe
 5   that BP's failure to follow Halliburton's
 6   recommendations regarding use of a retarder
 7   caused or contributed to the blowout,
 8   explosion, and fire aboard the DEEPWATER
 9   HORIZON, don't you?
10        MR. CHEN:  Objection; form.
11        A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.   (BY MS. KUCHLER)  You believe
15   that BP's failure to follow Halliburton's
16   recommendations regarding mud circulation
17   caused or contributed to the blowout,
18   explosion, and fire aboard the DEEPWATER
19   HORIZON, don't you?
20        MR. CHEN:  Objection; form.
21        A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.   (BY MS. KUCHLER)  If BP had
25   followed Halliburton's recommendations with
```

71 (Pages 281 to 284)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

JESSE GAGLIANO                      May 11, 2011                    TAMARA CHAPMAN, CSR

Page 285

```
 1   respect to the cement job, the blowout,
 2   explosion, and fire aboard the DEEPWATER
 3   HORIZON could have been avoided; is that
 4   right?
 5        MR. CHEN:  Objection; form.
 6        A.    I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.    (BY MS. KUCHLER) If the
10   blowout, explosion, and fire aboard the
11   DEEPWATER HORIZON had been avoided, there
12   would have been no injuries or death
13   experienced by the workers on the rig; is
14   that right?
15        A.    I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.    If there had been no blowout,
19   explosion, and fire aboard the DEEPWATER
20   HORIZON, there would have been no
21   environmental damage; is that right?
22        A.    I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        MS. KUCHLER:  Thank you.  Those are all
```

Page 287

```
 1        Q.    Did you ever speak to or
 2   otherwise communicate with anyone at
 3   Transocean about the results of the foam
 4   stability tests that were performed by
 5   Halliburton?
 6        A.    I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.    To your knowledge, did
10   Transocean ever receive or see any of the
11   results of the cement tests that were
12   performed by Halliburton for the Macondo 2
13   well --
14        A.    I respect --
15        Q.    -- or Macondo 1 well?
16        A.    I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.    To your knowledge, did anyone at
20   Halliburton inform Transocean or anyone with
21   Transocean about the results of any of the
22   cement tests that were performed?
23        A.    I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.
```

Page 286

```
 1   my questions.  Go off the record.
 2        THE VIDEOGRAPHER:  We're going off the
 3   record.  It's 3:08.  This is Videotape No. 6.
 4            (Break.)
 5        THE VIDEOGRAPHER:  We're back on the
 6   record.  It's 3:10.  This is Videotape No. 6.
 7            EXAMINATION
 8   BY MR. GOFORTH:
 9        Q.    Mr. Gagliano, my name is Danny
10   Goforth, and I represent Transocean.  Do you
11   understand that?
12        A.    Yes.
13        Q.    Did you ever send any of the
14   results of any of your cement tests that were
15   performed by Halliburton to Transocean?
16        A.    I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19        Q.    Did you ever speak to or
20   communicate with anyone at Transocean about
21   the results of the cement tests that were
22   performed by Halliburton?
23        A.    I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.
```

Page 288

```
 1        Q.    Mr. Gagliano, were you trained
 2   at Halliburton to perform laboratory tests
 3   such as the foam stability test?
 4        A.    I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7        Q.    Were you trained at Halliburton
 8   to perform laboratory tests -- to perform
 9   free water laboratory tests?
10        A.    I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13        Q.    Were you trained at Halliburton
14   to perform fluid loss tests?
15        A.    I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18        Q.    Isn't it a fact that you did not
19   actually perform the lab tests yourself?
20        A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23        Q.    If you know, please tell us who
24   actually performed the lab tests.
25        A.    I respectfully decline to answer
```

72 (Pages 285 to 288)

Exhibit Q
Page 72

Page 289

```
 1   based on my constitutional Fifth Amendment
 2   privilege.
 3       Q.   Did you do anything yourself to
 4   ensure or confirm that there was a procedure
 5   in place for each test that was performed on
 6   the cement slurry?
 7       MR. HARTLEY:  Object; form.
 8       A.   I respectfully decline to answer
 9   based on my constitutional Fifth Amendment
10   privilege.
11       Q.   (BY MR. GOFORTH) Did you do
12   anything yourself to ensure or confirm that
13   the proper lab procedure was followed for
14   each test?
15       A.   I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18       Q.   To your knowledge, did anyone at
19   Halliburton do anything to ensure or confirm
20   that the proper lab procedures were followed
21   for each test?
22       A.   I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25       Q.   Did you do anything to ensure or
```

Page 290

```
 1   confirm that the testing that was performed
 2   by Halliburton was conducted in accordance
 3   with industry standards for the testing?
 4       A.   I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7       Q.   To your knowledge, did anyone at
 8   Halliburton do anything to confirm or ensure
 9   that the testing that was performed was
10   conducted in accordance with industry
11   standards for the testing?
12       A.   I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15       Q.   To your knowledge, did anyone at
16   Halliburton do anything to ensure or confirm
17   that the lab tests were -- results were
18   accurately reported?
19       MR. HARTLEY:  Object; form.
20       A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23       MR. GOFORTH:  Thank you, sir.
24       THE VIDEOGRAPHER:  We're going off the
25   record.  It is 3:15.
```

Page 291

```
 1       MR. KUWANA:  Please stay on the record.
 2       THE VIDEOGRAPHER:  This is Videotape
 3   No. 6.
 4       MR. KUWANA:  Can we stay on the record?
 5       THE VIDEOGRAPHER:  Oh, sorry.  We're
 6   still on the record.  It's 3:15.
 7       MR. KUWANA:  During the break, the
 8   Court Reporter and I had a brief conversation
 9   that a few times where the witness said
10   either respectfully or started to say
11   respectively, if there would be any objection
12   that she would put in "respectfully" in those
13   instances where he started to mix up the two
14   words a little bit.
15       MR. GOFORTH:  I don't know about that.
16       MR. KUWANA:  Yes.
17       MR. GOFORTH:  No.  I don't -- have no
18   objection about that.
19       MS. KUCHLER:  No objection.
20       MR. KUWANA:  There's no objection by
21   the counsel gathered.  Thank you.
22       THE VIDEOGRAPHER:  We're going off the
23   record.  It's 3:16.  This is still Videotape
24   No. 6.
25           (Break.)
```

Page 292

```
 1       THE VIDEOGRAPHER:  We're back on the
 2   record.  It's 3:26.  This is Videotape No. 6.
 3               EXAMINATION
 4   BY MR. CHEN:
 5       Q.   Good afternoon, Mr. Gagliano.
 6       A.   Hi.
 7       Q.   My name is Phillip Chen, and I'm
 8   here on behalf of BP.  And I have a few
 9   questions for you.
10           I'd like to start off where
11   Anadarko and MOEX's counsel left off, if
12   that's okay.
13       A.   Okay.
14       Q.   Did you know that Anadarko has a
15   25 percent interest in the Macondo well?
16       A.   I respectfully decline to answer
17   based on my constitutional Fifth Amendment
18   privilege.
19       Q.   Did you know that Mitsui
20   Offshore Exploration has a 10 percent
21   interest in the Macondo well?
22       MS. KUCHLER:  Object to form.
23       A.   I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.
```

73 (Pages 289 to 292)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                          Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 293

1      Q.   (BY MR. CHEN)  Are you aware of
2   the relationship between BP and Anadarko and
3   MOEX as working interest owners of the well?
4      A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7      Q.   Anadarko and MOEX, as the
8   working interest owners, had access to all of
9   the engineering information on this well;
10  isn't that true?
11     MS. KUCHLER:  Objection; form.
12     A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15     Q.   (BY MR. CHEN)  And Anadarko and
16  MOEX could have requested any information
17  about this well that they wanted from BP;
18  isn't that correct?
19     MS. KUCHLER:  Object to the form.
20     A.   I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23     Q.   (BY MR. CHEN)  And based on your
24  experience, don't you believe that Anadarko
25  and MOEX should have requested more

Page 294

1   information about the Macondo well?
2      MS. KUCHLER:  Object to form.
3      A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6      Q.   (BY MR. CHEN)  Because Anadarko
7   and MOEX had all the same information about
8   the Macondo well that BP had, they should
9   have taken all the same actions that BP
10  should have taken with regard to this well?
11     MS. KUCHLER:  Objection; form.
12     A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15     Q.   (BY MR. CHEN)  Now,
16  Mr. Gagliano, you're not a drilling engineer,
17  are you?
18     A.   I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21     Q.   You've never been employed as a
22  drilling engineer?
23     A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

Page 295

1      Q.   Likewise, you've never worked
2   for an operator; isn't that true?
3      A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6      Q.   Actually, let me be more clear.
7   You've never been employed by an operator as
8   an employee?
9      A.   I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12     Q.   So when you -- so when you were
13  providing testimony as to what the drilling
14  engineers should do, you actually don't have
15  a basis for saying what they shouldn't be
16  doing; isn't that true?
17     MR. HARTLEY:  Object; form.
18     MS. KUCHLER:  Object to form.
19     A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22     Q.   (BY MR. CHEN)  And when you were
23  asked about what the operator, BP, should do,
24  you actually don't have a basis for any
25  opinions on what the operator should do;

Page 296

1   isn't that correct?
2      MS. KUCHLER:  Object to form.
3      MR. HARTLEY:  Object; form.
4      A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7      Q.   (BY MR. CHEN)  Now, there was a
8   lot of questioning about whether or not this
9   incident could have been avoided if more
10  centralizers were used.  Do you recall that?
11     A.   I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14     Q.   Don't you agree that
15  centralization would, if anything, help with
16  channeling in the annulus?
17     MR. HARTLEY:  Object; form.
18     A.   I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21     Q.   (BY MR. CHEN)  You don't need to
22  centralize anything for the cement in the --
23  in the casing to have a good -- to have a
24  good fill; isn't that correct?
25     MS. KUCHLER:  Objection; form.

74 (Pages 293 to 296)

Exhibit Q
Page 74

Page 297

```
 1        MR. HARTLEY:  Object; form.
 2        Q.   (BY MR. CHEN)  Let me withdraw
 3   that and ask it more -- in a better way.
 4        There is no way to centralize
 5   the shoe cement?
 6        A.   I respectfully decline to answer
 7   based on my constitutional Fifth Amendment
 8   privilege.
 9        Q.   So regardless of how many
10   centralizers you run on the outside of the
11   casing, that doesn't change the fact that you
12   have shoe cement, correct?
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   And if that shoe cement -- and
17   if that shoe cement had set up and formed a
18   good, solid bond, it would have acted as a
19   barrier to flow up the casing; isn't that
20   true?
21        MR. HARTLEY:  Object; form.
22        A.   I respectfully decline to answer
23   based on my constitutional Fifth Amendment
24   privilege.
25        Q.   (BY MR CHEN)  And portions of the
```

Page 298

```
 1   casing near the bottom were well centralized;
 2   isn't that true?
 3        MR. HARTLEY:  Object; form.
 4        A.   I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7        Q.   (BY MR. CHEN)  Indeed, your
 8   April 18th OptiCem report shows channeling
 9   above the centralizers, but no channeling
10   below the centralizers; isn't that true?
11        MR. HARTLEY:  Object; form.
12        A.   I respectfully decline --
13   respectfully decline to answer based on my
14   constitutional Fifth Amendment privilege.
15        Q.   (BY MR. CHEN)  So if the cement
16   had formed and set and made a good barrier in
17   that section of well centralized pipe,
18   hydrocarbons could not have flown down the
19   annulus to get to the shoe; isn't that
20   correct?
21        A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24        Q.   Now, isn't it true that no one
25   at Halliburton ever recommended to the BP
```

Page 299

```
 1   Macondo team that they should run a bottoms
 2   up?
 3        MR. HARTLEY:  Object; form.
 4        A.   I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7        Q.   (BY MR. CHEN)  And isn't it true
 8   that no one at Halliburton ever told the BP
 9   Macondo team that it was Halliburton's
10   internal best policy to run a bottoms up?
11        MR. HARTLEY:  Object; form.
12        MS. KUCHLER:  Objection; form.
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   (BY MR. CHEN)  I'd like you to
17   turn to Tab 63 of the plaintiff's binder.
18   This was Exhibit 816.  If you could flip to
19   the last page.  Let me know when you're
20   there, Mr. Gagliano.
21        A.   Tab 63?
22        Q.   Tab 63, last page.
23        Okay.  I'm going to read you the
24   fourth line, and you let me know if I read it
25   correctly.  And these are the notes of
```

Page 300

```
 1   Kent -- of Brian Martin of your interview to
 2   the BP incident investigation team; isn't
 3   that correct?
 4        A.   I respectfully decline to answer
 5   based on my constitutional Fifth Amendment
 6   privilege.
 7        Q.   Okay.  Let me read you that
 8   last -- that sentence.  It says, "Read GFP on
 9   April 18th report.  Did not discuss report
10   with BP.  He did read the report."  Did I
11   read that correctly?
12        MR. HARTLEY:  Object; form.
13        A.   I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16        Q.   (BY MR. CHEN)  Okay.  Can you
17   read that sentence into the record?
18        MR. KUWANA:  I'm going to object.  This
19   is not his handwriting, and I'm not going to
20   let him interpret --
21        MR. CHEN:  Okay.
22        MR. KUWANA:  -- the document for you.
23        MR. CHEN:  Fair enough.
24        Q.   (BY MR CHEN)  Now, when you told
25   the Bly investigation team that you did not
```

75 (Pages 297 to 300)

Exhibit Q
Page 75

Page 301

1   discuss your April 18th report and the GFP in
2   that report with BP, were you telling the
3   truth?
4        MR. HARTLEY:  Object; form.
5        A.   I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8        Q.   (BY MR. CHEN) And,
9   Mr. Gagliano, are you a cement bond log
10  expert?
11       A.   I respectfully --
12       MR. HARTLEY:  Object; form.
13       A.   I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16       Q.   (BY MR. CHEN) How many cement
17  bond logs have you been responsible for
18  running in your lifetime?
19       A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22       Q.   Have you been responsible for
23  running any cement bond logs or interpreting
24  any cement bond logs in your life?
25       A.   I respectfully decline to answer

Page 302

1   based on my constitutional Fifth Amendment
2   privilege.
3        Q.   Isn't it fair to say that the
4   questions asked -- that you're not an expert
5   in -- and are unable to answer the questions
6   about how to interpret cement bond logs?
7        A.   I respectfully --
8        MR. HARTLEY:  Object; form.
9        A.   -- respectfully decline to
10  answer based on my constitutional Fifth
11  Amendment privilege.
12       Q.   (BY MR. CHEN) Isn't it fair to
13  say that because you're not a cement bond log
14  expert, you're not able to tell us what
15  information cement bond logs can provide
16  about foam cement?
17       MR. HARTLEY:  Object; form.
18       A.   I respectfully decline to answer
19  based on my constitutional Fifth Amendment
20  privilege.
21       Q.   (BY MR. CHEN) Now, you're not
22  an expert in interpreting BP's ETP GP 1060,
23  are you?
24       A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

Page 303

1   privilege.
2        Q.   And you're not qualified to
3   offer opinions in what that document means
4   and how it applies to the Macondo well; isn't
5   that true?
6        MR. HARTLEY:  Object; form.
7        A.   I respectfully decline to answer
8   based on my constitutional Fifth Amendment
9   privilege.
10       Q.   (BY MR. CHEN) Earlier you were
11  asked whether in a meeting on April 14th --
12  do you remember a meeting on April 14th when
13  you were running the OptiCem model to
14  determine whether a long string could be
15  successfully cemented?
16       MR. HARTLEY:  Object; form.
17       A.   I respectfully decline to answer
18  based on my constitutional Fifth Amendment
19  privilege.
20       Q.   (BY MR. CHEN) On April 14 when
21  you were running OptiCem models to determine
22  whether a long string could be successfully
23  cemented, BP did not ask you to trick the
24  model, did they?
25       MR. HARTLEY:  Object; form.

Page 304

1        A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4        Q.   (BY MR. CHEN) Instead, BP asked
5   you to correct certain inputs that were
6   incorrect?
7        A.   I respectfully --
8        MR. HARTLEY:  Object; form.
9        A.   I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12       Q.   (BY MR. CHEN) If you could turn
13  to Tab 3, please, Mr. Gagliano.  This was
14  previously marked as Exhibit 2034.  The front
15  of this document says "9-7/8 Design Report,
16  Date:  May 25, 2009."  Did I read that
17  correctly?
18       A.   That's what the document says.
19       Q.   This is the -- and if you flip
20  to Page 9 in this document, Bates number HAL
21  0554773, under Section 3.4, it says, "Gas
22  Flow Potential 12.3 at Reservoir Zone
23  Measured Depth 20,200 feet."  Did I read that
24  correctly?
25       A.   That's what the document says.

76 (Pages 301 to 304)

Exhibit Q
Page 76

Page 305

1    Q.    And to the best of your
2  knowledge, this document was not provided to
3  BP, was it?
4        MR. HARTLEY:  Object to form.
5        A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8        Q.    (BY MR. CHEN)  Okay.  Different
9  topic.
10       Now, Halliburton holds itself
11 out as the leading cement contractor in the
12 world for oil wells; isn't that true?
13       MR. HARTLEY:  Object; form.
14       A.    I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17       Q.    (BY MR. CHEN)  Halliburton, in
18 fact, claims that it originated oil field
19 cementing; isn't that true?
20       MR. HARTLEY:  Object; form.
21       A.    I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24       Q.    (BY MR. CHEN)  And Halliburton
25 claims that it leads the world in effective

Page 306

1  efficient delivery of zonal isolation and
2  engineering for the life of the well; isn't
3  that correct?
4        MR. HARTLEY:  Object; form.
5        A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8        Q.    (BY MR. CHEN)  In fact,
9  Halliburton claims that it offers proven
10 solutions for every cement job; isn't that
11 true?
12       MR. HARTLEY:  Object; form.
13       A.    I respectfully decline to answer
14 based on my constitutional Fifth Amendment
15 privilege.
16       Q.    (BY MR. CHEN)  You're aware that
17 BP relied on these representations and other
18 Halliburton representations in allowing
19 Halliburton to do the cementing work at the
20 Macondo well?
21       MR. HARTLEY:  Object; form.
22       A.    I respectfully decline to answer
23 based on my constitutional Fifth Amendment
24 privilege.
25       Q.    (BY MR. CHEN)  Now, do you know

Page 307

1  that there is a contract between Halliburton
2  and BP for work -- for professional services
3  in the Gulf of Mexico?
4        A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7        Q.    And in that contract,
8  Halliburton represented to BP that it would
9  carry out all of its obligations under the
10 contract and shall execute the work with all
11 due care and diligence and with the skill to
12 be expected of a reputable contractor
13 experienced in the types of work to be
14 carried out under the contract; isn't that
15 true?
16       MR. HARTLEY:  Object; form.
17       A.    I respectfully decline to answer
18 based on my constitutional Fifth Amendment
19 privilege.
20       Q.    (BY MR. CHEN)  And, further,
21 Halliburton represents that it takes full
22 responsibility for the adequacy, stability,
23 health, safety, and environmental protection
24 of all its operations and methods necessary
25 for the performance of the work --

Page 308

1        MR. HARTLEY:  Object.
2        Q.    (BY MR. CHEN) -- isn't that
3  correct?
4        MR. HARTLEY:  Object; form.
5        A.    I respectfully decline to answer
6  based on my constitutional -- based on my
7  constitutional Fifth Amendment privilege.
8        Q.    (BY MR. CHEN)  And you're aware
9  that BP relied on these provisions and other
10 provisions in the contract in allowing
11 Halliburton to perform the work at the
12 Macondo well, aren't you?
13       MR. HARTLEY:  Object; form.
14       A.    I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17       Q.    (BY MR. CHEN)  Now,
18 Mr. Gagliano, earlier on, you testified that
19 you have been working for Halliburton for
20 over a decade; isn't that right?
21       MR. HARTLEY:  Object; form.
22       A.    Yes.
23       Q.    (BY MR. CHEN)  And have you been
24 working in positions with Halliburton related
25 to cementing that entire time?

77 (Pages 305 to 308)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                   Reported by:

JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 309

1      A.    I respectfully decline to answer
2  based on my constitutional Fifth Amendment
3  privilege.
4      Q.    (BY MR. CHEN)  And, in fact, in
5  March of 2001, you were promoted to cementing
6  sales advisor; isn't that correct?
7      A.    I respectfully decline to answer
8  based on my constitutional Fifth Amendment
9  privilege.
10     Q.    And in that role, you
11 would support all Halliburton customers in
12 the Gulf of Mexico with technical support
13 issues; isn't that correct?
14     A.    I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17     Q.    Now, when you told the
18 Congressional Committee on Energy and
19 Commerce these facts about your promotion and
20 your job responsibilities, were you telling
21 them the truth?
22     MR. HARTLEY:  Object; form.
23     A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

Page 310

1      Q.    (BY MR. CHEN)  And over this
2  decade of work in the industry -- in the
3  cement industry, you've gained a fair amount
4  of cement expertise; isn't that true?
5      MR. HARTLEY:  Object; form.
6      A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.    (BY MR. CHEN)  And BP knew that
10 you were an experienced cement engineer that
11 had worked for Halliburton for over a decade?
12     A.    I --
13     MR. HARTLEY:  Object; form.
14     A.    -- respectfully decline to
15 answer based on my constitutional Fifth
16 Amendment privilege.
17     Q.    (BY MR. CHEN)  And you knew that
18 the BP Macondo team was relying on you for
19 cement expertise; isn't that right?
20     MR. HARTLEY:  Object; form.
21     A.    I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24     Q.    (BY MR. CHEN)  Starting in early
25 2009 through April 2010, you were the

Page 311

1  Halliburton account representative for BP;
2  isn't that right?
3      A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.    And as to the Macondo well, you
7  were the Halliburton engineer assigned to the
8  Macondo well team, weren't you?
9      A.    I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.    You worked in BP's offices while
13 doing your work for the Macondo well; isn't
14 that correct?
15     A.    I respectfully decline to answer
16 based on my constitutional Fifth Amendment
17 privilege.
18     Q.    And your office was on the same
19 floor, in fact, the same corner, as the BP
20 drilling engineers who were working on this
21 well?
22     A.    I respectfully decline to answer
23 based on my constitutional Fifth Amendment
24 privilege.
25     Q.    And that office was located on a

Page 312

1  secure floor on BP's campus because the
2  Macondo well was a tight hole because it
3  was -- and information was restricted?
4      A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.    So you had, as Halliburton
8  engineer assigned to the BP Macondo team,
9  better information about this well than many
10 of the other BP employees and engineers?
11     MR. HARTLEY:  Object; form.
12     A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.    (BY MR. CHEN)  And no other
16 Halliburton engineer other than you,
17 yourself, were assigned to BP's Macondo team?
18     A.    I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21     Q.    Based on all your interactions
22 and work with the BP Macondo team, you knew
23 that they relied on you for cementing
24 expertise?
25     MR. HARTLEY:  Object; form.

78  (Pages 309 to 312)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Exhibit Q
Page 78

Page 313

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   (BY MR. CHEN) Mr. Morel relied
5   upon you and consulted you on cement issues?
6       A.   I respect --
7       MR. HARTLEY:  Object; form.
8       A.   -- respectfully decline to
9   answer based on my constitutional Fifth
10   Amendment privilege.
11       Q.   (BY MR. CHEN) Mr. Mark Hafle
12   also relied on you and consulted you on
13   cement issues?
14       MR. HARTLEY:  Object; form.
15       A.   I respectfully decline to answer
16   based on my constitutional Fifth Amendment
17   privilege.
18       Q.   (BY MR. CHEN) You knew that
19   other than you, the BP Macondo well team did
20   not have another engineer with cementing
21   expertise?
22       MR. HARTLEY:  Object; form.
23       A.   I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

Page 314

1       Q.   (BY MR. CHEN) You knew that
2   Eric Cunningham was not assigned to the
3   Macondo well team?
4       MR. HARTLEY:  Object; form.
5       A.   I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8       Q.   (BY MR. CHEN) And no other BP
9   cementing specialist was assigned to be a
10   part of the BP Macondo well team?
11       A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14       Q.   In fact, you never provided any
15   documentation or engineering materials to
16   Mr. Cunningham before the blowout; isn't that
17   right?
18       A.   I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21       Q.   The same thing for BP's other
22   cementing specialist, you didn't provide him
23   with any engineering materials prior to the
24   blowout?
25       MR. HARTLEY:  Object; form.

Page 315

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   (BY MR. CHEN) Do you agree that
5   as the cementing engineer on the Macondo
6   team, you had full accountability for the
7   technical quality, safety, and environmental
8   performance of the cementing services that
9   Halliburton offered?
10       MR. HARTLEY:  Object; form.
11       A.   I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14       Q.   (BY MR. CHEN) As the
15   Halliburton engineer assigned to the Macondo
16   team, you were required to provide
17   engineering support for all aspects of the
18   cementing surface?
19       A.   I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22       Q.   And as the assigned engineer,
23   you were required to provide solutions where
24   conventional cement designs and procedures
25   were not suitable, such as blend and foam

Page 316

1   cement; isn't that right?
2       MR. HARTLEY:  Object; form.
3       A.   I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6       Q.   (BY MR. CHEN) And as the
7   assigned engineer to BP, you were required to
8   make recommendations on fit-for-purpose
9   slurry designs to meet agreed specifications;
10   isn't that right?
11       MR. HARTLEY:  Object; form.
12       A.   I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15       Q.   (BY MR. CHEN) Do you recall
16   testifying in front of the joint
17   investigation team that you recommended to BP
18   that it use foam cement?
19       A.   I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22       Q.   But that statement was true,
23   right, you, in fact, recommended to BP that
24   it should use foam cement?
25       MR. HARTLEY:  Object; form.

79 (Pages 313 to 316)

Exhibit Q
Page 79

Page 317

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   (BY MR. CHEN) Do you still have
5   Tab 3, Exhibit 2034, in front of you?
6       A.   Tab 3?
7       Q.   Exhibit 2034.  Do you have that
8   in front of you?
9       A.   I don't have an exhibit number
10   on this.
11       Q.   Okay.  Fair enough.
12       A.   I'm not sure.
13       Q.   So do you have Tab 3 in front of
14   you?
15       A.   I have Tab 3, yes.
16       Q.   Okay.  And for the record, it's
17   Exhibit 2034.
18           Now, in this early OptiCem
19   report -- and this is an OptiCem report, as
20   far as you can tell, right?
21       A.   I respectfully decline to answer
22   based on my constitutional Fifth Amendment
23   privilege.
24       Q.   Okay.  I'd like you to look at
25   Page 2, the bottom right.  It says, "Created:

Page 318

1   June 15, 2009 at 12:56 PM.  OptiCem v6.4.2."
2   Did I read that correctly?
3       A.   The document states that.
4       Q.   Okay.  And if you flip to the
5   pumping schedule on Page 4, it has a list of
6   five cementing fluids that are pumped.  And
7   I'm going to read them to you and ask you if
8   I read them correctly.
9           The first fluid, No. 1, is
10   "(Composite) SBM."  Did I read that
11   correctly?
12       A.   The document states that.
13       Q.   And the second fluid is "Macondo
14   TS3."  Did I read that correctly:
15       A.   The document shows that.
16       Q.   The third fluid is "(Composite)
17   Premium + adds Top Plug."  Did I read that
18   correctly?
19       A.   It's on separate lines, but --
20   "Top Plug" is a different line, but that's
21   what the document states.
22       Q.   I apologize.  So No. 3 is
23   actually "(Composite) Premium + adds."  Did I
24   read that correctly?
25       A.   The document shows that.

Page 319

1       Q.   And No. 4 is "Macondo TS3,"
2   correct?
3       A.   The document shows that.
4       Q.   And No. 5 is "(Composite) SBM,"
5   correct?
6       A.   The document shows that.
7       Q.   Now, this document does not show
8   that foam cement is being used, correct?
9       MR. HARTLEY:  Object; form.
10       A.   I respectfully decline to answer
11   based on my constitutional Fifth Amendment
12   privilege.
13       Q.   (BY MR. CHEN) To put it this
14   way, in the pumping schedule, the word "foam"
15   does not appear under 1.5.  Can we agree to
16   that?
17       MR. HARTLEY:  Object; form.
18       A.   I respectfully decline to answer
19   based on my constitutional Fifth Amendment
20   privilege.
21       Q.   (BY MR. CHEN) And if you turn
22   to 3.4, which we've already looked at, the
23   document says that gas flow potential is
24   12.3, correct?
25       MR. KUWANA:  Counsel, if you could wait

Page 320

1   for him to turn to it.
2       Q.   (BY MR. CHEN) Oh, I apologize.
3   Are you at 3.4 now, Mr. Gagliano?
4       A.   Yes.
5       Q.   And does 3.4 say "Gas Flow
6   Potential 12.3"?
7       A.   The document states that.
8       Q.   Okay.  And does the document
9   also say "...this well is considered to have
10   a severe gas flow problem"?
11       MR. HARTLEY:  Object; form.
12       A.   The document shows that.
13       Q.   (BY MR. CHEN) Isn't it true
14   that you recommended foam cement to address
15   the severe gas flow problem that you
16   recognized based on your early OptiCem
17   modeling?
18       MR. HARTLEY:  Object; form.
19       MS. KUCHLER:  Objection; form.
20       A.   I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23       Q.   (BY MR. CHEN) Now, Halliburton
24   has stated publicly that foam cement helps
25   improve mud displacement, helps prevent gas

Exhibit Q
Page 80

Page 321

1  migration and helps protect the formation;
2  isn't that true?
3      MR. HARTLEY:  Object; form.
4      A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.    (BY MR. CHEN)  Halliburton has
8  also stated that the compressed gas bubbles
9  in foam cement shrink or expand, but they
10 don't move around or coalesce.  Result,
11 virtually no gas migration into the cement
12 ever while the cement is being placed or
13 while it sets; isn't that true?
14     MR. HARTLEY:  Object; form.
15     A.    I respectfully decline to answer
16 based on my constitutional Fifth Amendment
17 privilege.
18     Q.    (BY MR. CHEN)  And you
19 understand these statements to be true and
20 that to be the properties of foam cement?
21     MR. HARTLEY:  Object; form.
22     A.    I respectfully decline to answer
23 based on my constitutional Fifth Amendment
24 privilege.
25     Q.    (BY MR. CHEN)  And you,

Page 322

1  yourself, have told BP about these properties
2  of foam cement; isn't that true?
3      A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.    And you know that BP relied on
7  your recommendation and Halliburton's
8  statements about foam cement in accepting to
9  use foam for the Macondo well?
10     A.    I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.    Now, we just -- now, the phrase
14 "gas migration" referred to in "Result,
15 virtually no gas migration in the cement," is
16 the same thing as what's referred to in gas
17 flow potential; isn't that correct?
18     MR. HARTLEY:  Object; form.
19     A.    I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.    (BY MR. CHEN)  Gas flow
23 potential attempts to predict whether there
24 is going to be gas migration; isn't that
25 correct?

Page 323

1      MR. HARTLEY:  Object; form.
2      A.    I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.    (BY MR. CHEN)  And Halliburton's
6  literature says that foam cement -- if you
7  use foam cement, there's virtually no gas
8  migration into the cement ever; isn't that
9  true?
10     MR. HARTLEY:  Object; form.
11     A.    I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14     Q.    (BY MR. CHEN)  In fact,
15 Halliburton's literature and its OptiCem
16 program says that foam cement is the
17 recommended solution for wells having a gas
18 flow potential value in the severe category?
19     MR. HARTLEY:  Object; form.
20     A.    I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.    (BY MR. CHEN)  And you
24 understand that statement to be true, don't
25 you?

Page 324

1      A.    I respectfully decline to answer
2  based on my constitutional Fifth Amendment
3  privilege.
4      Q.    As the engineer assigned to the
5  BP wells team, you were also required to
6  participate in the review of the previous
7  day's drilling activities with BP; isn't that
8  true?
9      A.    I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12     Q.    These reviews occurred usually
13 in the morning on what's known as the morning
14 call; isn't that true?
15     A.    I respectfully decline to answer
16 based on my constitutional Fifth Amendment
17 privilege.
18     Q.    (BY MR. CHEN)  As the assigned
19 engineer, you were required to participate in
20 risk assessments as required by BP; isn't
21 that true?
22     MR. HARTLEY:  Object; form.
23     A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

81 (Pages 321 to 324)

Page 325

1    Q.    (BY MR. CHEN) And that includes
2  participating in the morning meetings about
3  what happened the day before and the
4  planned -- planned activities for the coming
5  day; isn't that true?
6    A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9    Q.    Now, the cementing reports and
10 recommendations that you prepared for the
11 Macondo well do not identify the key risks
12 with the cement, do they?
13   MR. HARTLEY:  Object; form.
14   A.    I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17   Q.    (BY MR. CHEN) And even if they
18 did identify the key risks, the cement
19 reports and recommendation that you prepared
20 for the Macondo well do not identify how
21 these major risks could be mitigated?
22   MR. HARTLEY:  Object; form.
23   A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

Page 326

1    Q.    (BY MR. CHEN) And your reports
2  and recommendations that were sent to BP do
3  not identify how to evaluate the success of
4  cementing operations?
5    A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8    Q.    (BY MR. CHEN) Now, your
9  April 18th OptiCem report calculates a GFP
10 value of 10.29; isn't that right?
11   MR. HARTLEY:  Object; form.
12   A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15   Q.    (BY MR. CHEN) And you never
16 told anyone at BP that that posed a safety
17 problem; isn't that right?
18   A.    I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21   Q.    That was because you were using
22 a foam cement slurry to cement that
23 production interval?
24   A.    I respectfully decline to answer
25 based on my constitutional Fifth Amendment

Page 327

1  privilege.
2    Q.    And you knew that when you use a
3  foam cement slurry, the foam prevents gas
4  migration?
5    MR. HARTLEY:  Object; form.
6    A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9    Q.    (BY MR. CHEN) And that's why
10 you never considered the gas flow potential a
11 problem for that well?
12   A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15   Q.    Now, let's talk about
16 centralization.  Do you agree with me that
17 it's not really centralization that you need,
18 but you need good mud displacement to prevent
19 channeling?
20   MR. HARTLEY:  Object; form.
21   A.    I respectfully decline to answer
22 based on my constitutional Fifth Amendment
23 privilege.
24   Q.    (BY MR. CHEN) And circulation
25 is one way to increase mud displacement,

Page 328

1  isn't it?
2    A.    I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5    Q.    However, Halliburton's
6  literature states that foam cement helps
7  improve mud displacement; isn't that true?
8    MR. HARTLEY:  Object; form.
9    A.    I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12   Q.    (BY MR. CHEN) And you know that
13 to be true, based on your decade of
14 experience with Halliburton?
15   MR. HARTLEY:  Object; form.
16   A.    I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19   Q.    (BY MR. CHEN) And that was the
20 reason that you recommended foam cement to
21 the BP team for the Macondo well?
22   MR. HARTLEY:  Object; form.
23   A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

82 (Pages 325 to 328)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 329

1     Q.    (BY MR. CHEN) So foam cement
2  helps accomplish the same result as
3  centralization; isn't that true?
4        MR. HARTLEY:  Object; form.
5        A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8        Q.    (BY MR. CHEN) Circulation is
9  another tool that you can use to increase mud
10  displacement efficiency; isn't that right?
11        MR. HARTLEY:  Object; form.
12        A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15        Q.    (BY MR. CHEN) And you know that
16  foam cement helps accomplish the same result
17  of increasing foam mud displacement
18  efficiency as circulation?
19        MR. HARTLEY:  Object; form.
20        A.    I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23        Q.    (BY MR. CHEN) Now, OptiCem --
24  the OptiCem program doesn't capture the
25  energized nature of foam cement; isn't that

Page 330

1  true?
2        MR. HARTLEY:  Object; form.
3        A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6        Q.    (BY MR. CHEN) So other than the
7  physical properties of rheology and density,
8  OptiCem doesn't take into account the effect
9  of the energized fluid on preventing gas
10  flow; isn't that correct?
11        MR. HARTLEY:  Object; form.
12        A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15        MR. THORNHILL:  We need to take a short
16  break.
17        THE VIDEOGRAPHER:  We're going off the
18  record.  This is the end of Videotape No. 6.
19  It's 4:02.
20        (Break.)
21        THE VIDEOGRAPHER:  We're back on the
22  record.  It's 4:10.  This is the beginning of
23  Videotape No. 7.
24        Q.    (BY MR. CHEN) Now,
25  Mr. Gagliano, another way to increase mud

Page 331

1  displacement is to use a flush in front of
2  the cement; isn't that correct?
3        A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6        Q.    And that was done here for the
7  Macondo well.  The team ran seven barrels of
8  base oil to help flush the mud cake out?
9        A.    I respectfully decline to answer
10  based on my constitutional Fifth Amendment
11  privilege.
12        Q.    And you agree that running the
13  base oil in the Macondo well in front of the
14  tuner and the -- the Tuned Spacer and the
15  cement helped with mud displacement?
16        A.    I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19        Q.    And yet another way to increase
20  mud displacement is to run a spacer in front
21  of the cement; isn't that right?
22        A.    I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25        Q.    Now, Halliburton's Tuned Spacer

Page 332

1  III was used in this well, and Halliburton
2  advertises that its Tuned Spacer can achieve
3  a hundred percent mud displacement.  You're
4  aware of that, right?
5        MR. HARTLEY:  Object; form.
6        A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9        Q.    (BY MR. CHEN) But you
10  understand that to be true, that Tuned Spacer
11  can be used to achieve a hundred percent mud
12  displacement?
13        MR. HARTLEY:  Object; form.
14        A.    I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17        Q.    (BY MR. CHEN) And if you
18  achieve a hundred percent mud displacement,
19  there is no mud channeling because you've
20  removed all the mud?
21        MR. HARTLEY:  Object; form.
22        A.    I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25        Q.    (BY MR. CHEN) At the Macondo

83 (Pages 329 to 332)

Page 333

1  well, a larger than normal amount of spacer
2  was run in front of the cement; isn't that
3  correct?
4      A.    I respectfully decline to answer
5  based on my constitutional Fifth Amendment
6  privilege.
7      Q.    The use of this Tuned Spacer in
8  the Macondo well, its volume and its
9  composition helped with mud displacement.
10 Don't you agree?
11     MR. HARTLEY:  Object; form.
12     A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.    (BY MR. CHEN) So at the Macondo
16 well, the BP team used foam cement, base oil,
17 and Tuned Spacer in addition to running more
18 spacer than average to help with mud
19 displacement; isn't that true?
20     A.    I respectfully decline to
21 answer --
22     MR. HARTLEY:  Object; form.
23     A.    -- based on my constitutional
24 Fifth Amendment privilege.
25     Q.    (BY MR. CHEN) So based on all

Page 334

1  these efforts to help with mud displacement,
2  you really weren't worried about running less
3  centralizers, were you?
4      MR. HARTLEY:  Object; form.
5      A.    I respectfully decline to answer
6  based on my constitutional Fifth Amendment
7  privilege.
8      Q.    (BY MR. CHEN) That's because
9  you had addressed channeling by other means?
10     A.    I respectfully decline --
11     MR. HARTLEY:  Object; form.
12     A.    I respectfully decline to answer
13 based on my constitutional Fifth Amendment
14 privilege.
15     Q.    (BY MR. CHEN) In fact, between
16 April 15th, when you --
17        Well, let me ask you this.  When
18 you gave your interview under oath to the
19 Committee on Energy and Commerce, you told
20 them that you found out that BP was running
21 six centralizers on April 18th when Vince
22 Tabler, the Halliburton cementer, told you;
23 isn't that correct?
24     MR. HARTLEY:  Object; form.
25     A.    I respectfully decline to answer

Page 335

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.    (BY MR. CHEN) When, in fact,
4  Mr. Chaisson had called you from the rig on
5  April 16th after talking to Mr. Morel and
6  Mr. Vidrine and learning that BP was only
7  running six centralizers, he called you to
8  tell you that; isn't that true?
9      MR. HARTLEY:  Object; form.
10     A.    I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.    (BY MR. CHEN) Now, from
14 April 16th through April 20th, you didn't
15 tell or talk to anybody at BP that they
16 should run more centralizers than six; isn't
17 that true?
18     MR. HARTLEY:  Object; form.
19     A.    I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22     Q.    (BY MR. CHEN) And you didn't
23 talk to anyone at Halliburton, any superiors
24 or people who could take action, about BP
25 running six centralizers; isn't that true?

Page 336

1      MR. HARTLEY:  Object; form.
2      A.    I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5      Q.    (BY MR. CHEN) That's because
6  channeling -- that's because channeling does
7  not create a safety concern; isn't that true?
8      A.    I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10 privilege.
11     Q.    Based on your experience, you
12 know that many cement jobs fail to achieve
13 zonal isolation?
14     A.    I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17     Q.    And that these cement jobs that
18 fail to achieve zonal isolation can be
19 repaired by remedial cementing operation?
20     A.    I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.    In fact, your only concern with
24 fewer centralizers was that BP might have to
25 run a remedial cement job later?

84 (Pages 333 to 336)

Page 337

```
 1        A.    I respectfully decline to answer
 2  based on my constitutional Fifth Amendment
 3  privilege.
 4        Q.    That was -- sorry.  And that was
 5  why you sent your April 18th OptiCem; isn't
 6  that correct?
 7        A.    I respectfully decline to answer
 8  based on my constitutional Fifth Amendment
 9  privilege.
10        Q.    That April 18th OptiCem was not
11  a warning, it was simply something to cover
12  you in case BP later needed a remedial cement
13  job?
14        MS. KUCHLER:  Object to form.
15        MR. HARTLEY:  Object; form.
16        A.    I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19        Q.    (BY MR. CHEN)  And,
20  Mr. Gagliano, you were responsible for
21  designing the slurry recipe at the Macondo
22  well, correct?
23        A.    I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.
```

Page 338

```
 1        Q.    Isn't it true that you provided
 2  the slurry recipe for the cement that was
 3  pumped on April 19th?
 4        A.    I respectfully decline to answer
 5  based on my constitutional Fifth Amendment
 6  privilege.
 7        Q.    Isn't it true other than
 8  retarder concentration, BP did not provide
 9  any input into the cement slurry design?
10        MR. HARTLEY:  Object; form.
11        A.    I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14        Q.    (BY MR. CHEN)  And either on
15  retarder concentration, BP only requested a
16  pump time, and Halliburton was the one that
17  made the change to the cement design to
18  increase the retarder?
19        MR. HARTLEY:  Object; form.
20        MS. KUCHLER:  Object to form.
21        A.    I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24        Q.    (BY MR. CHEN)  Now, let me ask
25  you about the dry blend that was on the
```

Page 339

```
 1  DEEPWATER HORIZON.  Was it possible for you,
 2  a Halliburton engineer, to ask for new dry
 3  blend to be brought out to the DEEPWATER
 4  HORIZON?
 5        MS. KUCHLER:  Object to form.
 6        A.    I respectfully decline to answer
 7  based on my constitutional Fifth Amendment
 8  privilege.
 9        Q.    (BY MR. CHEN)  In fact, you know
10  that's been done in the past before when the
11  dry blend on the rig was inappropriate for
12  the cement job?
13        MR. HARTLEY:  Object; form.
14        A.    I respectfully decline to answer
15  based on my constitutional Fifth Amendment
16  privilege.
17        Q.    (BY MR. CHEN)  Well, let me ask
18  that again.
19        You know that that has been done
20  before, dry blend being brought out to the
21  rig?
22        MR. HARTLEY:  Object; form.
23        A.    I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.
```

Page 340

```
 1        Q.    (BY MR. CHEN)  In fact, no one
 2  from BP ever told you that you couldn't order
 3  new dry blend or you were required to use the
 4  dry blend on the DEEPWATER HORIZON; isn't
 5  that correct?
 6        A.    I respectfully decline to answer
 7  based on my constitutional Fifth Amendment
 8  privilege.
 9        Q.    No one from BP has ever told you
10  that cost is more important than safety;
11  isn't that true?
12        A.    I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15        Q.    And that's Halliburton's
16  practice, that cost is not more important
17  than safety; isn't that true?
18        MR. HARTLEY:  Object; form.
19        A.    I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22        Q.    (BY MR. CHEN)  And that's your
23  personal philosophy, that cost is not more
24  important than safety?
25        A.    I respectfully decline to answer
```

85  (Pages 337 to 340)

Page 341

1    based on my constitutional Fifth Amendment
2    privilege.
3         Q.    Now, could you turn to Tab 49,
4    please.  This has previously been marked as
5    Exhibit 741.
6              If you could turn to the second
7    page.  It's titled "9 7/8" x 7" Production
8    Casing, Prepared for Brian Morel April 18,
9    2010, Version: 6."  Did I read that
10   correctly?
11        A.    That's what the document states.
12        Q.    Okay.  And if you could turn to
13   Page 6 of 12 of that document.
14        A.    (Witness complies.)
15        Q.    Are you there?
16        A.    Yes.
17        Q.    I want to focus you on Fluid 4.
18   The third ingredient in Fluid 4 says "0.25%
19   D-AIR 3000 (Defoamer)."  Is that correct?
20   Did I read that correctly?
21        A.    That's what the document states.
22        Q.    And you know that D-AIR 3000
23   will destabilize foam cement?
24        MR. HARTLEY:  Object; form.
25        A.    I respectfully decline to answer

Page 342

1    based on my constitutional Fifth Amendment
2    privilege.
3         Q.    (BY MR. CHEN)  And, in fact,
4    you've never pumped a foam cement job for a
5    production interval that contains a defoamer;
6    isn't that correct?
7         A.    I respectfully decline to answer
8    based on my constitutional Fifth Amendment
9    privilege.
10        Q.    Now, let's look at the second
11   item there, "0.07% Halliburton EZ-FLO (Bulk
12   Flow Enhancer."  Did I read that correctly?
13        A.    That's what the document states.
14        Q.    Now, EZ-FLO is a
15   Halliburton-designed cement additive,
16   correct?
17        A.    I respectfully decline to answer
18   based on my constitutional Fifth Amendment
19   privilege.
20        Q.    (BY MR. CHEN)  And you know that
21   EZ-FLO will destabilize a foam slurry; isn't
22   that correct?
23        MR. HARTLEY:  Object; form.
24        A.    I respectfully decline to answer
25   based on my constitutional Fifth Amendment

Page 343

1    privilege.
2         Q.    (BY MR. CHEN)  I'd like to take
3    a look at the second-to-last line item.  It
4    says, "0.09 gallons per sec SCR-100L
5    (Retarder)."  Do you see that, and did I read
6    it correctly?
7         MR. HARTLEY:  Object; form.
8         A.    The document states that.
9         Q.    (BY MR. CHEN)  Now, SCR-100L is
10   also a Halliburton-designed cement additive,
11   right?
12        A.    I respectfully decline to answer
13   based on my constitutional Fifth Amendment
14   privilege.
15        Q.    You know that SCR-100L is a
16   dispersant and it acts to destabilize foam
17   cement; isn't that true?
18        MR. HARTLEY:  Object; form.
19        A.    I respectfully decline to answer
20   based on my constitutional Fifth Amendment
21   privilege.
22        Q.    (BY MR. CHEN)  Now, at the very
23   top of this Page 6 of 12, it says, "Job
24   Recommendation 9 7/8" x 7" Production
25   Casing."  Did I read that correctly?

Page 344

1         A.    The document states that.
2         Q.    And if you flip back to Page 2
3    of 12, the very first sentence reads,
4    "Enclosed is our recommended procedure for
5    cementing the casing strings in the
6    referenced well."  Did I read that correctly?
7         A.    The document states that.
8         Q.    So this was your recommended
9    slurry for the Macondo well?
10        MR. HARTLEY:  Object; form.
11        A.    I respectfully decline to answer
12   based on my constitutional Fifth Amendment
13   privilege.
14        Q.    (BY MR. CHEN)  Well, let's read
15   a little bit further down on Page 2 of 12.
16   It says, "Prepared and Submitted by," and the
17   signature block is blank.  And it says "Jesse
18   Gagliano, Technical Advisor."  Did I read
19   that correctly?
20        A.    The document states that.
21        Q.    And that's you, right, Jesse
22   Gagliano, technical advisor?
23        A.    I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:
JESSE GAGLIANO                      May 11, 2011                    TAMARA CHAPMAN, CSR

Page 345

1     Q.    Now, the -- this document also
2 contains a detailed pumping schedule, if you
3 look at Page 8.  And let me read that to you.
4 It says, "Job procedure 9 7/8" x 7"
5 Production Casing, Detailed Pumping
6 Schedule."  Do you see that?
7     A.    The document states that.
8     Q.    And then further down on the
9 page, there is a pumping schedule or
10 procedure.  Would you agree with that?
11    A.    I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14    Q.    (BY MR. CHEN) And in that
15 procedure, there are cement volumes and
16 cement -- cementing fluids -- I'm sorry.  Let
17 me take -- let me start over.
18         In the detailed pumping
19 schedule, there are -- the third column says
20 "Fluid Name," correct?
21    A.    The document states that.
22    Q.    And then the last column says
23 "Downhole Volume."  Did I read that
24 correctly?
25    A.    The document states that.

Page 346

1     Q.    So the detailed pumping schedule
2 in Halliburton's recommendation provides not
3 only the cementing fluids, but also the
4 volume of the fluids?
5     A.    I respectfully decline to answer
6 based on my constitutional Fifth Amendment
7 privilege.
8     Q.    The procedure also sets out --
9 actually, let me read it to you.  On Line
10 Item 2, about two-thirds down the page, it
11 says, "With rig pumps, pump and circulate 111
12 barrels @ 1 BPM.  Next, circulate 150 barrels
13 @ 4 BPM as per company man."  Did I read that
14 correctly?
15    A.    That's what the document states.
16    Q.    And so the job procedure
17 includes a recommendation on circulation;
18 isn't that correct?
19    MR. HARTLEY:  Object; form.
20    A.    I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23    Q.    (BY MR. CHEN)  And the job
24 procedure also contains pump rates for the
25 cement and for the displacement; isn't that

Page 347

1 correct?
2     MR. HARTLEY:  Object; form.
3     A.    I respectfully decline to answer
4 based on my constitutional Fifth Amendment
5 privilege.
6     Q.    (BY MR. CHEN) I'd like to turn
7 to cement testing.  On BP well's team, you
8 were responsible for ordering the cement
9 testing for the Macondo well; isn't that
10 correct?
11    A.    I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14    Q.    You were responsible for
15 interpreting those test results also, weren't
16 you?
17    MR. HARTLEY:  Object; form.
18    A.    I respectfully decline to answer
19 based on my constitutional Fifth Amendment
20 privilege.
21    Q.    (BY MR. CHEN) You knew that
22 there was no other member of the BP Macondo
23 team other than yourself that had the cement
24 expertise to order cement tests and to
25 interpret the test results?

Page 348

1     MR. HARTLEY:  Object; form.
2     A.    I respectfully decline to answer
3 based on my constitutional Fifth Amendment
4 privilege.
5     Q.    (BY MR. CHEN)  Now, BP engineers
6 did ask you about some of the test results.
7 They asked about pump time and compressive
8 strength testing; isn't that correct?
9     A.    I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12    Q.    (BY MR. CHEN)  But the BP
13 Macondo team did not ask you about any other
14 testing for the cement?
15    A.    I respectfully decline to answer
16 based on my constitutional Fifth Amendment
17 privilege.
18    Q.    And you understood that the BP
19 well's team was relying on you and
20 Halliburton to identify any issues with the
21 cement that they might not understand?
22    A.    I respectfully decline to answer
23 based on my constitutional Fifth Amendment
24 privilege.
25    Q.    Now, we looked at laboratory

87 (Pages 345 to 348)

Page 349

1    worksheets earlier.  BP did not have access
2    to those laboratory worksheets before the
3    blowout?
4          A.    I respectfully decline to answer
5    based on my constitutional Fifth Amendment
6    privilege.
7          Q.    And the data from those
8    laboratory worksheets are stored in a Viking
9    system or database at Halliburton.  BP did
10   not have access to that Viking database,
11   either; isn't that correct?
12         MR. HARTLEY:  Object; form.
13         A.    I respectfully decline to answer
14   based on my constitutional Fifth Amendment
15   privilege.
16         Q.    (BY MR. CHEN)  To be clear, the
17   BP Macondo well's team did not have access to
18   that Viking database; isn't that correct?
19         MR. HARTLEY:  Object; form.
20         A.    I respectfully decline to answer
21   based on my constitutional Fifth Amendment
22   privilege.
23         Q.    (BY MR. CHEN)  Okay.  Let's turn
24   to Tab 5.  And this has been previous --
25         (Off the record.)

Page 350

1          Q.    (BY MR. CHEN)  Now, if you could
2    turn to Tab 5, which has been previously
3    marked as Exhibit 808.  Let me know when
4    you're there.
5          Are you there, Mr. Gagliano?
6          A.    Yes.
7          Q.    So this document is titled
8    "Cement Lab Weigh-Up Sheet Feb 2nd, 2010."
9    Did I read that correctly?
10         A.    No.  It's February 12.
11         Q.    Oh, I'm sorry.  It reads -- it's
12   called -- it's labeled "Cement Lab Weigh-Up
13   Sheet, Feb 12, 2010."  Now is that correct?
14         A.    That's what the document states.
15         Q.    Okay.  And then on the second
16   page under "Foam Mix and Stability," it
17   states, "Specific gravity top, 2.02."  And
18   then handwritten notes underneath, 16.8.  And
19   then specific gravity bottom, 2.11.  And
20   underneath that, 17.6.  Did I read that
21   correctly?
22         A.    The document states that.
23         Q.    And you knew that that indicated
24   foam instability; isn't that correct?
25         MR. HARTLEY:  Object; form.

Page 351

1          A.    I respectfully decline to answer
2    based on my constitutional Fifth Amendment
3    privilege.
4          Q.    (BY MR. CHEN)  And on the fourth
5    test, crush compressive strength, if you
6    could go there, there is a hand note that
7    says, "Slurry is settling.  Will repeat
8    test."  Do you see that?
9          A.    I respectfully decline to answer
10   based on my constitutional Fifth Amendment
11   privilege.
12         Q.    I'm sorry, did I read that
13   correctly?  It says, "Slurry is settling.
14   Will repeat test"?
15         MR. KUWANA:  Again, Counsel, it's a
16   handwritten note.  We're not going to have
17   him interpret.
18         MR. CHEN:  Fair enough.
19         MR. KUWANA:  It's tough enough to read.
20   I'm not going to have him agree with what it
21   says.
22         MR. CHEN:  Fair enough.
23         Q.    (BY MR CHEN)  Mr. Gagliano, you
24   know that if the crush compressive strength
25   test on the foam cement -- if that slurry is

Page 352

1    settling and you have to cancel the test,
2    that means that that slurry is not stable;
3    isn't that true?
4          MR. HARTLEY:  Object; form.
5          A.    I respectfully decline to answer
6    based on my constitutional Fifth Amendment
7    privilege.
8          Q.    (BY MR. CHEN)  And this foam
9    stability test result and this canceled --
10   this note on this canceled compressive
11   strength test result were never provided to
12   BP before the incident?
13         MR. HARTLEY:  Object; form.
14         A.    I respectfully decline to answer
15   based on my constitutional Fifth Amendment
16   privilege.
17         Q.    (BY MR. CHEN)  And you would
18   know it if it were provided, because you're the
19   one line of communication between the
20   Halliburton labs and the BP Macondo team,
21   correct?
22         MR. HARTLEY:  Object; form.
23         A.    I respectfully decline to answer
24   based on my constitutional Fifth Amendment
25   privilege.

88  (Pages 349 to 352)

Page 353

1    Q.   (BY MR. CHEN) If you could flip
2  to the next tab, which has been previously
3  marked as Exhibit 809.  And this document is
4  titled "Cement Lab Weigh-Up Sheet, Feb 16,
5  2010."  Did I read that correctly?
6    A.   The document states that.
7    Q.   So at this point in time, you've
8  had failed foam stability tests from the
9  prior lab result, and it would have been
10 prudent to redesign the slurry; isn't that
11 true?
12   MR. HARTLEY:  Object; form.
13   A.   I respectfully decline to answer
14 based on my constitutional Fifth Amendment
15 privilege.
16   Q.   (BY MR. CHEN) But instead of
17 redesigning the slurry, what was done here is
18 that the same slurry was tested, but the test
19 conditions were modified for the foam tests.
20 Do you agree?
21   MR. HARTLEY:  Object; form.
22   A.   I respectfully decline to answer
23 based on my constitutional Fifth Amendment
24 privilege.
25   Q.   (BY MR. CHEN) Okay.  Looking at

Page 354

1  the -- looking at the test results on the
2  second page for foam mix and stability, the
3  second test, it says, "Foam Mix and Stability
4  (Foamed to 14.5 ppg Condition for 2 hours
5  before pouring) at 180 degrees F."  Did I
6  read that correctly?
7    A.   The document states that.
8    Q.   And the results are specific
9  gravity top, 1.91, and specific gravity
10 bottom, 1.91.  Did I read that correctly?
11   A.   I respectfully decline to answer
12 based on my constitutional Fifth Amendment
13 privilege.
14   Q.   Now, you know that conditioning
15 that slurry at temperature would increase its
16 stability because of its -- because of the SA
17 541 additive; isn't that correct?
18   MR. HARTLEY:  Object; form.
19   A.   I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22   Q.   (BY MR. CHEN) The prior failed
23 slurry test did not have any conditioning
24 before foaming, whereas this stability test
25 had two hours of conditioning at 180 degrees

Page 355

1  before foaming?
2    A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5    Q.   You know that this conditioning
6  is not representative of field conditions;
7  isn't that correct?
8    MR. HARTLEY:  Object; form.
9    A.   I respectfully decline to answer
10 based on my constitutional Fifth Amendment
11 privilege.
12   Q.   (BY MR. CHEN) On the rig,
13 cement is mixed and pumped immediately with
14 no period of conditioning -- let me take that
15 back.
16        On the rig, the cement is mixed
17 and foamed and then pumped immediately?
18   MR. HARTLEY:  Object; form.
19   A.   I respectfully decline to answer
20 based on my constitutional Fifth Amendment
21 privilege.
22   Q.   (BY MR. CHEN) And there is no
23 period of conditioning of the foam -- of the
24 unfoamed cement before it's foamed and
25 pumped; isn't that correct?

Page 356

1    MR. HARTLEY:  Object; form.
2    A.   I respectfully decline to answer
3  based on my constitutional Fifth Amendment
4  privilege.
5    Q.   (BY MR. CHEN) And the cement
6  isn't heated up before it's foamed and sent
7  down the well, is it?
8    A.   I respectfully decline to answer
9  based on my constitutional Fifth Amendment
10 privilege.
11   Q.   And based on well modeling, you
12 know that the cement would not have reached a
13 temperature of 180 degrees until it had been
14 sitting down at the bottom of the well for
15 several hours; isn't that correct?
16   MR. HARTLEY:  Object; form.
17   A.   I respectfully decline to answer
18 based on my constitutional Fifth Amendment
19 privilege.
20   Q.   (BY MR. CHEN) Under "Crush
21 compressive strength," there's notations
22 here.  It says at 60 hours, hard on bottom,
23 soft on top and at 84 hours, hard on bottom,
24 firm on top.  Did I read that correctly?
25   MR. HARTLEY:  Object; form.

89 (Pages 353 to 356)

Exhibit Q
Page 89

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                              Reported by:

JESSE GAGLIANO              May 11, 2011              TAMARA CHAPMAN, CSR

---

Page 357

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   (BY MR. CHEN)  Despite these
5   indications of instability, this cement
6   sample was crushed, and the crush strength
7   was obtained for this foam sample; isn't that
8   correct.  And it says "C/S 1145"?
9       MR. HARTLEY:  Object; form.
10      A.   I respectfully decline to answer
11  based on my constitutional Fifth Amendment
12  privilege.
13      Q.   (BY MR. CHEN)  Based on your
14  experience, you knew that this was another
15  sign that the foam cement was not stable?
16      A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19      Q.   Now, I'm going to hand you --
20  it's been previously marked as Exhibit 1508.
21  This is an e-mail that you sent to BP on
22  April 1st, 2010, correct?
23      A.   I respectfully decline to answer
24  based on my constitutional Fifth Amendment
25  privilege.

---

Page 358

1       Q.   And in the text of the e-mail,
2   you write, "...a pilot test run, see
3   attached"?
4       A.   I respectfully decline to answer
5   based on my constitutional Fifth Amendment
6   privilege.
7       Q.   (BY MR. CHEN)  I'd like you to
8   look at the second -- the attachment behind
9   the e-mail.  Is this the type of cement lab
10  report that you prepare for BP?
11      MR. HARTLEY:  Object; form.
12      A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15      Q.   (BY MR. CHEN)  The document says
16  laboratory report in the top right corner,
17  doesn't it?
18      MR. HARTLEY:  Object; form.
19      A.   The document states that.
20      Q.   (BY MR. CHEN)  Now, in this
21  laboratory report, you omitted the foam
22  stability test and the crush foam -- crush
23  compressive test from the April 12 lab work
24  sheet; isn't that correct?
25      MR. HARTLEY:  Object; form.

---

Page 359

1       A.   I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4       Q.   (BY MR. CHEN)  Instead you only
5   reported the results from the February 16th
6   worksheet?
7       A.   I respectfully decline to answer
8   based on my constitutional Fifth Amendment
9   privilege.
10      Q.   Furthermore, you misreported the
11  lab results because you reported the
12  conditioning time of the foam stability test
13  as zero hours when, in fact, we just looked
14  at the other sheet and it said two hours;
15  isn't that correct?
16      MR. HARTLEY:  Object; form.
17      A.   I respectfully decline to answer
18  based on my constitutional Fifth Amendment
19  privilege.
20      Q.   (BY MR. CHEN)  And the crush
21  test results are reported here for the foam
22  cement, but it does not include the
23  observations seen by the technicians that
24  would indicate instability; isn't that
25  correct?

---

Page 360

1       MR. HARTLEY:  Object; form.
2       A.   I respectfully decline to answer
3   based on my constitutional Fifth Amendment
4   privilege.
5       Q.   (BY MR. CHEN)  Now, although the
6   e-mail says -- that you sent to BP says you
7   had "a pilot test run, see attached," you
8   actually did not attach all of the pilot
9   testing results; isn't that correct?
10      MR. HARTLEY:  Object; form.
11      A.   I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14      Q.   (BY MR. CHEN)  Likewise, on
15  March 8th -- actually, let me do this with
16  the document.  I'll hand you what's been
17  previously marked as Exhibit 819.  So this is
18  from Jesse Gagliano, correct?
19      A.   I respectfully decline to answer
20  based on my constitutional Fifth Amendment
21  privilege.
22      Q.   (BY MR. CHEN)  I'm just reading
23  from the document.  It says "From: Jesse
24  Gagliano" on the very top line?
25      MR. HARTLEY:  Object; form.

---

90 (Pages 357 to 360)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Exhibit Q
Page 90

Page 361

1      A.    The document states that.
2      Q.    (BY MR. CHEN)  And the document
3  says, "Sent Monday, March 8...", right?
4      A.    The document states that.
5      Q.    And it says to Hafle, Mark and
6  Morel, Brian, correct?
7      A.    The document states that.
8      Q.    And it says in the third
9  paragraph, second line, "I've attached the
10 lab test for your review."  Does the document
11 say that?
12     A.    The document states that.
13     Q.    But when you sent this, you did
14 not send all of the lab tests for Mr. Hafle
15 and Mr. Morel's review; isn't that correct?
16     A.    I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19     Q.    Now, you had a meeting with BP's
20 drilling engineers in March of 20 -- let me
21 start over.
22           You had a meeting with BP's
23 drilling engineers on March 23rd of 2010 to
24 determine the appropriate casing size to run
25 into the well.  Do you remember that?

Page 362

1      A.    I respectfully decline --
2      MR. HARTLEY:  Object; form.
3      A.    I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.    (BY MR. CHEN)  At that meeting,
7  there was a discussion on whether foam cement
8  or conventional cement should be used.  Do
9  you recall that?
10     A.    I respectfully decline to answer
11 based on my constitutional Fifth Amendment
12 privilege.
13     Q.    And at that time, you had an
14 opportunity to fully discuss the results of
15 the February cement testing and discuss
16 whether or not to pump foam cement into the
17 Macondo well, but you didn't raise anything;
18 isn't that true?
19     MR. HARTLEY:  Object; form.
20     A.    I respectfully decline to answer
21 based on my constitutional Fifth Amendment
22 privilege.
23     Q.    (BY MR. CHEN)  Instead, you
24 continued to recommend the foam cement,
25 despite these test results that you had?

Page 363

1      A.    I respectfully decline to answer
2  based on my constitutional Fifth Amendment
3  privilege.
4      Q.    Now, you did more cement testing
5  in April; isn't that correct?  Or you ordered
6  more cement testing in April?
7      A.    I respectfully decline to answer
8  based on my constitutional Fifth Amendment
9  privilege.
10     Q.    And on the cement lab -- on a
11 document titled "Cement Lab Weigh-Up Sheet,
12 dated April 13th, 2010," there was another
13 cement foam stability test run where the
14 cement slurry was conditioned at 180 degrees
15 for 1.5 hours.  Do you recall that?
16     A.    I respectfully decline to answer
17 based on my constitutional Fifth Amendment
18 privilege.
19     Q.    The results of this test were
20 15.7 pounds per gallon on the top and 15.1
21 pounds per gallon density on the bottom.  In
22 your years of experience, you knew that that
23 meant that foam was unstable?
24     MR. HARTLEY:  Object; form.
25     A.    I respectfully decline to answer

Page 364

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.    (BY MR. CHEN)  Now, that test
4  result was also never reported to BP before
5  the blowout; isn't that true?
6      A.    I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.    Now, on April 17th, you sent
10 another lab report or set of lab reports to
11 BP stating that you had attached the lab
12 tests; isn't that correct?
13     A.    I respectfully decline to answer
14 based on my constitutional Fifth Amendment
15 privilege.
16     Q.    And despite saying that you had
17 attached the lab tests, you did not attach
18 the foam stability testing on the worksheet
19 dated February 12th and you did not attach
20 the foam stability testing on the worksheet
21 dated April 13th; isn't that correct?
22     MR. HARTLEY:  Object; form.
23     A.    I respectfully decline to answer
24 based on my constitutional Fifth Amendment
25 privilege.

91 (Pages 361 to 364)

Exhibit Q
Page 91

Page 365

1     Q.    (BY MR. CHEN) And you had a
2   meeting with the BP team on April 14th to
3   determine whether a long string or a liner
4   should be used in the production interval,
5   specifically whether or not a long string
6   could be -- I'll restate that.
7          On April 14th you met with the
8   BP Macondo well team to see whether or not a
9   long string could be successfully cemented in
10  the production interval; isn't that correct?
11    A.    I respectfully decline to answer
12  based on my constitutional Fifth Amendment
13  privilege.
14    Q.    And at that meeting, you also
15  had an opportunity to discuss foam cement and
16  the testing results, but you did not raise
17  the -- the failed foam tests and discuss them
18  with BP; isn't that correct?
19    MR. HARTLEY:  Object; form.
20    A.    I respectfully decline to answer
21  based on my constitutional Fifth Amendment
22  privilege.
23    Q.    (BY MR. CHEN) And those failed
24  tests that we've discussed, those were not
25  made available to BP before the blowout;

Page 366

1   isn't that true?
2     MR. HARTLEY:  Object; form.
3     A.    I respectfully decline to answer
4   based on my constitutional Fifth Amendment
5   privilege.
6     Q.    (BY MR. CHEN) And one reason
7   that you decided not to tell BP about the
8   stability problems with the foam cement is
9   because that you knew that BP -- some members
10  of BP had complained about you, and you
11  didn't want to give them any further grounds
12  to complain?
13    MR. HARTLEY:  Object; form.
14    MS. KUCHLER:  Objection; form.
15    A.    I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18    Q.    (BY MR. CHEN) And another
19  reason why you did not tell BP about the
20  stability problems was because you had just
21  been promoted in March 2010, and you -- to
22  cementing sales advisor and soon you would be
23  moved to your new position?
24    MS. KUCHLER:  Object to form.
25    MR. HARTLEY:  Object; form.

Page 367

1     A.    I respectfully decline to answer
2   based on my constitutional Fifth Amendment
3   privilege.
4     Q.    (BY MR. CHEN) Now, the contract
5   with BP requires Halliburton to provide
6   testing results 24 hours before the cement
7   job; isn't that correct?
8     MR. HARTLEY:  Object; form.
9     Q.    (BY MR CHEN) Well, let me take
10  that back.
11         The testing results here were
12  not provided to BP 24 hours before the cement
13  job; isn't that correct?
14    MR. HARTLEY:  Object; form.
15    A.    I respectfully decline to answer
16  based on my constitutional Fifth Amendment
17  privilege.
18    Q.    (BY MR. CHEN) Now, the foam
19  testing was done at a foam quality of 13
20  percent; isn't that correct?
21    A.    I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24    Q.    However, based on your OptiCem
25  modeling, including your April 18th OptiCem

Page 368

1   model, the foam quality at the bottom of the
2   well was 18, 19 or even greater percent;
3   isn't that true?
4     MR. HARTLEY:  Object; form.
5     A.    I respectfully decline to answer
6   based on my constitutional Fifth Amendment
7   privilege.
8     Q.    (BY MR. CHEN) And based on your
9   years of experience, you know that foam
10  becomes less stable when the foam quality
11  increases?
12    MR. HARTLEY:  Object; form.
13    A.    I respectfully decline to answer
14  based on my constitutional Fifth Amendment
15  privilege.
16    Q.    (BY MR. CHEN) Thus,
17  Halliburton's tests on the foam cement
18  reflected higher stability than would have
19  actually been experienced by the cement
20  pumped into the well?
21    A.    I respectfully decline to answer
22  based on my constitutional Fifth Amendment
23  privilege.
24    Q.    And you never -- on April 19th,
25  you had a conversation with Greg Walz about

Exhibit Q
Page 92

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                     Reported by:

JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 369

1  your April 18th OptiCem report; isn't that
2  correct?
3      A.   I respectfully decline to answer
4  based on my constitutional Fifth Amendment
5  privilege.
6      Q.   You discussed channeling, but
7  you and Greg were not concerned about it
8  because you knew that if there were -- if
9  there was channeling, the ECD would increase,
10 so it would be able to detect that
11 channeling?
12     MS. KUCHLER:  Object to form.
13     MR. HARTLEY:  Object; form.
14     A.   I respectfully decline to answer
15 based on my constitutional Fifth Amendment
16 privilege.
17     MR. HARTLEY:  Okay.  Mr. Chen, it's
18 time.
19     MR. CHEN:  Okay.  Well, thank you very
20 much for your time today, Mr. Gagliano.
21     THE VIDEOGRAPHER:  We're going off the
22 record.  It's 4:49.  This is Videotape No. 7.
23          (Break.)
24     THE VIDEOGRAPHER:  Back on the record.
25 This is Videotape No. 7.  It's 4:54.

Page 370

1          FURTHER EXAMINATION
2  BY MR. THORNHILL:
3      Q.   Good afternoon, Mr. Gagliano.  A
4  couple of follow-up questions, particularly
5  to BP's counsel, Philip Chen's questions of
6  you.  And Tab 54 earlier today, the very last
7  page, we earlier excluded it from the exhibit
8  that was introduced because that particular
9  e-mail from you had been attached erroneously
10 to that exhibit.  But now I want to go to
11 that e-mail.
12     MR. KUWANA:  Just to clear for the
13 record, you're talking about 0559564?
14     MR. THORNHILL:  Sure is.  About what I
15 was -- that's exactly the document that I was
16 previously referring to.  It's the
17 Halliburton Bates stamp page that you just
18 read.
19     Q.   (BY MR. THORNHILL)  At the top
20 of this document, it says, does it not,
21 Mr. Gagliano, the following:  "From: Jesse
22 Gagliano Thursday, Apr 29, 2010, To: Eric
23 Cunningham, Subject: Foamed production jobs
24 at BP."  Did I read that correctly?
25     A.   The document states that.

Page 371

1      Q.   Okay.  And then the document
2  reads as follows:  "Eric, per our discussion
3  yesterday, below is a list of foamed
4  production jobs that I have performed here at
5  BP on the Horizon/Marianas since January
6  2006.  Job dates for the first three jobs are
7  approximate dates.  My understanding is that
8  all were bond logged.  I've not seen the bond
9  log or received any feedback from the
10 Isabella and King South wells.  They were
11 both bond logged at a later date.  Nakita was
12 bond logged after job and was considered
13 good.  Let me know if you have any questions.
14 Thanks."  Did I read that correctly?
15     A.   The document states that.
16     Q.   And then there's listed four
17 items, the first of which is Isabella
18 Prospect Horizon, drilling engineer Nick
19 Laurette, 10 3/4 inches x 9 7/8 inches
20 production casing MC 562, OCSG 19966.  Date
21 of job around April 11, 2007.  Did I read
22 that correctly?
23     A.   The document states that.
24     Q.   Okay.  And No. 2, King South
25 Prospect Horizon.  And the last line under

Page 372

1  No. 2, "Date of job around April 22, 2008."
2  Did I read that correctly?
3      A.   The document states that.
4      Q.   And No. 3, "Nakita H2 Marianas,"
5  and then the "Date of job around July 2,
6  2009."  Did I read that correctly?
7      A.   The document states that.
8      Q.   And No. 4, "Macondo No. 1
9  Horizon" and "Date of job, April 19, 2010."
10 And then signed, "Jesse Gagliano."  Did I
11 read that correctly?
12     A.   The document states that.
13     Q.   You told us earlier, sir, that
14 you were employed by Halliburton to work in
15 the Houston office beginning July of 2005; is
16 that correct?
17     MR. KUWANA:  Counsel, I don't remember
18 him putting any dates on it.
19     MR. THORNHILL:  I'll ask the question,
20 then.  I'll ask the question.
21     Q.   (BY MR. THORNHILL)  On your work
22 history, we asked you where you had been --
23 where you had worked.  You told us you worked
24 in Lafayette from October '99, approximately,
25 until July of '05; is that correct?

93 (Pages 369 to 372)

Page 373

1      A.   Yes.
2      Q.   Okay.  From July 2005 until
3  sometime recently, were you employed by
4  Halliburton to work in the BP office in
5  Houston?
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   Did you work at any other office
10  besides the BP office in Houston from the
11  time -- July 2005 to now?
12      A.   I respectfully decline to answer
13  based on my constitutional Fifth Amendment
14  privilege.
15      Q.   Is it not true, Mr. Gagliano,
16  that the only foam production jobs that you
17  were engaged in from the time that you began
18  working at BP were those foam production jobs
19  that we see on this exhibit Halliburton
20  0559564, your e-mail summary of April 29,
21  2010?
22      A.   I respectfully decline to answer
23  based on my constitutional Fifth Amendment
24  privilege.
25      Q.   Do you deny, Mr. Gagliano, that

Page 374

1  you only had three -- three instances of
2  pumping foam cement, one in each of the years
3  2007, 2008, and 2009, before you engaged in
4  pumping the Macondo 252 No. 1 production
5  casing job?
6      A.   I respectfully decline to answer
7  based on my constitutional Fifth Amendment
8  privilege.
9      Q.   Okay.  Isn't it a fact,
10  Mr. Gagliano, that BP knew or must have known
11  of your limited experience in foam cement
12  jobs before the Macondo 252 No. 1 production
13  casing job?
14      MR. HARTLEY:  Object; form.
15      MR. CHEN:  Objection; form.
16      A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19      Q.   (BY MR. THORNHILL)  Are there
20  any other records in the possession of, you,
21  Mr. Gagliano, or Halliburton that would show
22  that you had any other foam cement pump jobs
23  at any time other than those four jobs that
24  we see on this document, 0559564?
25      A.   I respectfully decline to answer

Page 375

1  based on my constitutional Fifth Amendment
2  privilege.
3      Q.   We'll mark that document as
4  document No. 2035.
5      (Exhibit No. 2035 was marked.)
6      Q.   (BY MR. THORNHILL)  You were
7  asked a lot of questions by Mr. Chen about
8  what you sent or did not send to BP in the
9  way of lab tests.  I direct you to Tab 60,
10  the first page.  It's Halliburton
11  Document 084845.  It's an e-mail from Jesse
12  Gagliano dated May 1, 2010, to Timothy Quirk.
13  Do you see that, sir?
14      A.   The document states that.
15      Q.   Okay.  It shows the lab tests
16  for Macondo and lists those and says, does it
17  not, in the document, "Tim, attached are the
18  lab tests that we used on the Macondo.  The
19  attached tests are the slurries that were
20  actually pumped on the well.  I have a few
21  other tests that were not pumped.  Not sure
22  if you need those as well.  Most of the tests
23  include the TT charts and the UCA charts.
24  Might need to double-check to see which ones
25  are missing charts.  If any are missing the

Page 376

1  charts, let me know and I can send you the
2  Word document so we can add it to the file.
3  Below shows which jobs were done by which
4  rig."  At the bottom, it's signed "Jesse
5  Gagliano."  Did I read that correctly?
6      MR. HARTLEY:  Object; form.
7      A.   The document states that.
8      Q.   (BY MR. THORNHILL)  Okay, sir.
9  I ask you this basic question.  Based upon
10  the questions of the BP counsel, Mr. Chen,
11  was it the practice of Halliburton to not
12  send lab tests in advance of pumping the
13  cement job?
14      A.   I respect --
15      MR. HARTLEY:  Object; form.
16      A.   I respectfully decline to answer
17  based on my constitutional Fifth Amendment
18  privilege.
19      Q.   (BY MR. THORNHILL)  Is it true,
20  Mr. Gagliano, that BP directed Halliburton to
21  pump cement jobs without lab test results?
22      A.   I respectfully --
23      MR. HARTLEY:  Object; form.
24      A.   I respectfully decline to answer
25  based on my constitutional Fifth Amendment

94 (Pages 373 to 376)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
JESSE GAGLIANO                    May 11, 2011                    TAMARA CHAPMAN, CSR

Page 377

```
 1    privilege.
 2        Q.   (BY MR. THORNHILL)
 3    Mr. Gagliano, assuming that the predicate to
 4    the questions of Mr. Chen on behalf of BP are
 5    correct and that Halliburton did not send lab
 6    tests to BP before it directed the pumping of
 7    cement jobs, was it the practice of BP to
 8    routinely not have in hand lab tests for
 9    cement jobs it was pumping?
10        MR. CHEN:  Objection; form.
11        A.   I respectfully decline to answer
12    based on my constitutional Fifth Amendment
13    privilege.
14        Q.   (BY MR. THORNHILL)  At any time
15    in your experience when working in-house at
16    BP on behalf of Halliburton, did BP in your
17    experience refuse to undertake the pumping of
18    cement jobs because it did not have in hand
19    lab test results?
20        A.   I respectfully decline to answer
21    based on my constitutional Fifth Amendment
22    privilege.
23        Q.   Thank you.  Or was it, as was
24    suggested in the questions of BP counsel,
25    that BP in many cases did not have the lab
```

Page 378

```
 1    test results, and yet, nevertheless, elected
 2    to pump the cement jobs?
 3        MR. CHEN:  Objection; form.
 4        A.   I respectfully decline to answer
 5    based on my constitutional Fifth Amendment
 6    privilege.
 7        MR. THORNHILL:  I'll offer this
 8    document, Halliburton 0084845, the May 1,
 9    2010, e-mail from Mr. Gagliano to Mr. Quirk
10    as Exhibit No. 2051.  And I'll thank you,
11    Mr. Gagliano, for your patience today and for
12    attending to answer our questions.
13        No further questions.
14        (Exhibit No. 2051 was marked.)
15        MR. HARTLEY:  Thank you.
16        THE VIDEOGRAPHER:  This is the
17    conclusion of the deposition.  We're going
18    off the report.  It's 5:04.  This is the end
19    of Videotape No. 7.
20        (THE DEPOSITION CONCLUDED AT 5:04 P.M.)
21
22
23
24
25
```

Page 379

```
 1                WITNESS' CERTIFICATE
 2
 3
 4
 5            I, JESSE GAGLIANO, read or have
 6    had the foregoing testimony read to me and
 7    hereby certify that it is a true and correct
 8    transcription of my testimony, with the
 9    exception of any attached corrections or
10    changes.
11
12
13
14
15
16                JESSE GAGLIANO
17
18
19
20
21
22
23
24
25
```

Page 380

```
 1                REPORTER'S CERTIFICATE
 2
 3            I, Tamara Chapman, Certified
 4    Court Reporter, State of Louisiana, State of
 5    Texas, do hereby certify that the
 6    above-mentioned witness, after having been
 7    first duly sworn by me to testify to the
 8    truth, did testify as hereinabove set forth;
 9            That the testimony was reported
10    by me in shorthand and transcribed under my
11    personal direction and supervision, and is a
12    true and correct transcript, to the best of
13    my ability and understanding;
14            That I am not of counsel, not
15    related to counsel or the parties hereto, and
16    not in any way interested in the outcome of
17    this matter.
18
19
             Tamara Chapman
20           Certified Court Reporter
             State of Texas, CSR No. 7248
21           GAUDET KAISER, LLC
             601 Poydras, Suite 1720
22           New Orleans, Louisiana 70130
             T: (504) 525-9100
23           F: (504) 525-9109
24
25
```

95  (Pages  377 to 380)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.        Telephone:  (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile:  (504) 525-9109