# EXHIBIT V



Jul 1 2011
11:54PM
38490311

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 SECTION: J |
| Applies to: *All Cases* | * * | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

* * * * * * * * * * * *

## THE BP PARTIES' FIRST SET OF INTERROGATORIES TO ANADARKO

*IN ACCORDANCE WITH THE ARBITRATION PROVISION IN THE MACONDO PROSPECT OFFSHORE DEEPWATER OPERATING AGREEMENT, BP IS PURSUING A MOTION TO STAY ANADARKO'S CLAIMS AGAINST BP. THE COURT HAS NOT YET RULED ON BP'S MOTION. THE MAGISTRATE JUDGE, HOWEVER, HAS RULED THAT DISCOVERY CAN PROCEED BETWEEN BP AND ANADARKO SO LONG AS IT IS RELEVANT TO THE PARTIES' MDL DEFENSES. IN RELIANCE ON THAT ORDER, AND TO COMPLY WITH THE COURT'S SCHEDULING ORDERS, BP SERVES THE FOLLOWING INTERROGATORIES. BY SERVING THESE INTERROGATORIES, BP DOES NOT—AND DOES NOT INTEND TO—WAIVE ANY RIGHTS UNDER THE OPERATING AGREEMENT, INCLUDING THE ARBITRATION RIGHTS UNDER THAT AGREEMENT, AND BP EXPLICITLY RESERVES ALL SUCH RIGHTS. BP STIPULATES THAT ANADARKO SHALL HAVE NO OBLIGATION TO RESPOND TO ANY DISCOVERY REQUESTS BY BP IN THE EVENT THAT, AND AT SUCH TIME AS, THE COURT RULES THAT SUCH DISCOVERY IS INCONSISTENT WITH BP'S RIGHT TO ARBITRATE ITS DISPUTES WITH ANADARKO.*

*IN ADDITION, BP HAS SERVED CERTAIN INTERROGATORIES TO PRESERVE ITS RIGHT TO OBTAIN DISCOVERY IN THE EVENT THAT THE COURT DENIES BP'S MOTION TO STAY. BP STIPULATES THAT ANADARKO HAS NO OBLIGATION TO RESPOND TO INTERROGATORY NOS. 40 THROUGH 43 UNLESS AND UNTIL THE COURT DENIES BP'S MOTION TO STAY.*

Pursuant to Federal Rules of Civil Procedure 26 and 33, BP Exploration & Production Inc. and BP America Production Company (the "BP Parties") propound the following interrogatories to Anadarko Petroleum Corporation and Anadarko E&P Company LP (which may be referred to singly or collectively as "Anadarko") to be responded to no later than August 1, 2011.

Exhibit V
Page 1

## INTERROGATORIES

1.     Identify all meetings or decisions of the board of directors of Anadarko and all related entities relating to, mentioning, or discussing the Deepwater Horizon, Deepwater Horizon Incident, Macondo Well, Oil Spill, Oil Spill Response, or any Anadarko internal investigation into the incident; identify all minutes of the meetings of the boards of directors, corporate minutes, records of any decisions made by the boards of directors, or other documents relating to such meetings or decisions; and identify all persons who participated in or were involved with such meetings or decisions.

2.     Please describe in detail your well control or well shut-in procedures, including any ways in which those procedures have changed since April 20, 2010, and ways in which you contend they differ from what you allege was done on the Macondo Well.

3.     Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you experienced kicks, including the identity of each person who experienced, monitored, or reported such kicks, and the actions taken in response to such kicks.

4.     Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you experienced a blowout, including the identity of each person who experienced, monitored, or reported such blowout, and the actions taken in response to such blowout.

5.     Please describe in detail your temporary abandonment procedures for deepwater wells in the Gulf of Mexico, including a detailed description of each prescribed, suggested or optional step, including but not limited to the depth of any cement plug utilized, the timing and method of installation of lock-down sleeves, and running the lead impression tool, and ways in

which you contend that your procedures differ from what you allege was done on the Macondo Well.

6. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you chose to use a long string in lieu of a liner in a deep high-pressure well being installed in formations exhibiting different pore pressures in the open-hole interval.

7. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you performed a temporary abandonment procedure that differed from the one you actually submitted to, or different from the one that was approved by, the US Minerals Management Service (MMS) or Bureau of Ocean Energy Management (BOEM), including in your answer all ways in which the employed procedures differed from the submitted or approved procedures.

8. Please describe in detail your negative pressure test procedure for deepwater wells in the Gulf of Mexico, including the steps in negative pressure testing communicated to your rig personnel and all criteria for gauging whether a negative pressure test has succeeded or failed, and ways in which you contend that your procedures differ from what you allege was done on the Macondo Well.

9. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which a negative pressure test was not performed or was deemed by some or all personnel to have failed.

10. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you displaced seawater to more

than 500' below mud level before negative pressure testing during temporary abandonment, including in your answer the total number of feet you displaced to in each instance.

11. Please describe in detail your policies with respect to running cement bond logs for deepwater wells in the Gulf of Mexico, including in your answer your policies regarding when a cement bond log is required, when a cement bond log is recommended, and when a cement bond log is optional, and ways in which you contend that your policies differ from what you allege was done on the Macondo Well.

12. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which there was not a cement bond log run at the conclusion of a cement job.

13. Please describe in detail all procedures related to cementing your deepwater wells in the Gulf of Mexico, including any procedures related to the use of nitrified foam cement, and ways in which you contend that your procedures differ from what you allege was done on the Macondo Well.

14. Please identify each instance of your drilling deepwater wells in the Gulf of Mexico since April 20, 2010, in which you have used Halliburton as your cement subcontractor.

15. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you directed your cement contractor to proceed with a cement job when an Opticem or similar modeling report showed the well could have a gas flow problem.

16. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you did not conduct a full

bottoms-up circulation of the drilling fluid before beginning a cement job, including in your answer the reason(s) why you did not conduct such circulation.

17. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you used a pressure greater than 2000 psi to establish sufficient circulation to convert the float collar in preparation for cementing.

18. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you had to attempt more than one time to convert the float collar before it was declared converted prior to cementing, including in your answer the number of attempts you made, and the results of those attempts.

19. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you used nitrogen foamed cement, including the length of time you permitted the cement to sit prior to conducing a negative-pressure test, and the circumstances that led you to determine that nitrified foam cement was the appropriate cement mixture.

20. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you used lost circulation materials as spacer, including in your answer the circumstances that led you to determine that lost circulation material could be used as spacer.

21. Please describe in detail your policies and procedures regarding use of the diverter system on your owned, contracted, or leased deepwater drilling rigs in the Gulf of Mexico, including in your answer the effective dates of the policy or procedure and whether it applies to rigs that you own, those that you contract, those that you lease, or some combination, and ways

in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

22.     Please describe in detail your policies and procedures regarding use of the Emergency Disconnect System (EDS) on your owned, contracted, or leased deepwater drilling rigs in the Gulf of Mexico, including in your answer the effective dates of the policy or procedure and whether it applies to rigs that you own, those that you contract, those that you lease, or some combination, and ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

23.     Please describe in detail your policies and procedures related to changes or substitutions of personnel on board MODUs or otherwise involved in deepwater wells in the Gulf of Mexico, including but not limited to temporary personnel changes or substitutions of well site leaders, and ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

24.     Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you changed your well site leader within one week of the commencement of temporary abandonment procedures.

25.     Please describe in detail your policies and procedures related to training of personnel on board MODUs or involved in deepwater wells in the Gulf of Mexico, including ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

26.     Please describe in detail your policies and procedures relating to monitoring well conditions, including duties of well site leaders, mudloggers, rig personnel, or any other person

with the ability to monitor well conditions, and ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

27. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you had no on-shore real-time monitoring process to assess what was happening in the well on a continuing basis.

28. Please describe in detail your policies and procedures relating to the use of centralizers during cement jobs for your deepwater wells in the Gulf of Mexico, and ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

29. Please describe in detail your policies and procedures relating to mudlogging of deepwater wells in the Gulf of Mexico, and ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

30. Please describe in detail your policies and procedures relating to spotting heavy mud (more than 1.5 ppg heavier than the drilling fluid utilized in drilling operations) in the rat hole before beginning a cement job in deepwater wells in the Gulf of Mexico, and ways in which you contend that your policies and procedures differ from what you allege was done on the Macondo Well.

31. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you did not spot heavy mud (more than 1.5 ppg heavier than the drilling fluid utilized in drilling operations) in the rat hole prior to any cement job and identify the data upon which any person based that decision.

32. Please describe in detail your procedures to ensure that you would be notified or otherwise made aware of any maintenance on, modifications to, or malfunctions with any part of

the rigs utilized in your drilling operations in the Gulf of Mexico, including the BOPs on such rigs, including in your answer the owner of the rig(s) to which such procedure has been applied, and ways in which you contend that your procedures differ from what you allege was done on the Macondo Well.

33. Please identify each instance of your drilling deepwater wells in the Gulf of Mexico since April 20, 2010, in which you have hired a Transocean rig under a drilling contract.

34. Please identify each person whom you may call as an expert witness, including each and every person whom you may call as either a retained or a non-retained expert (such as a current employee, agent or independent contractor). With respect to each person you identify, please state: (a) the subject matter on which the expert is expected to testify; (b) the substance of the facts and opinions to which the expert is expected to testify; and (c) a summary of the grounds for each opinion.

35. Please identify each person you intend to call or may call as a witness in this matter and, for each person identified, state the subject of their expected testimony.

36. Please identify and describe in detail all internal discussions at Anadarko before April 21, 2010, discussing the safety of the Macondo Well.

37. Please describe in detail any instances of your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which an Opticem or similar modeling report indicated that, with the number of centralizers you chose to use (and actually did use) in a well, there was a gas flow problem, including but not limited to, the number of centralizers used and the gas flow potential indicated by modeling.

38. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you executed a cement job

despite conditions that were not optimal, including when Opticem models or another model used by any cementing expert or contractor predicted or suggested that there was a possibility of gas flow, channeling, or cement failure. As part of your response identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

39. Please describe in detail any instances in your drilling of deepwater wells or use of MODUs in the Gulf of Mexico in the last five years in which you concluded, or any person suggested, that the cement job failed to achieve zonal isolation for any reason (including channeling, nitrogen breakout, contamination, poor design), including details concerning the composition of the cement used, the pre- and post-job testing, the reports prepared for the cement job, any discussion or conclusion whether the cement failed, the known or suspected reason why the cement failed, and how the issue was resolved. As part of your response identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

40. Please identify each person who provided any information that forms the basis for your responses, or any portion thereof, to these Interrogatories, including the substance of the information each such person provided.

41. Please describe in detail all reasons you contend that you are not required to pay any portion of any Joint Interest Billing related to the Macondo Well.

42. Please describe in detail all ways in which you contend that BP has breached the JOA.

43. Please describe in detail all ways in which you contend BP's conduct constituted gross negligence or willful misconduct, as those terms are used in your crossclaims against BP.

9

Exhibit V
Page 9

44. Please describe in detail all ways in which you contend BP's conduct constituted negligence, as that term is used in your crossclaims against BP.

## DEFINITIONS

1. "You," "your," and "yours" shall mean Anadarko and/or any corporate affiliate, including without limitation any of its present or former agents or representatives, or anyone acting or purporting to act for or on Anadarko's behalf for any purpose whatsoever, including operators of wells in which any Anadarko-affiliated entity holds any percentage of any kind of ownership.

2. "Describe," when used in a question about wells, includes providing the name, location and dates of drilling of the pertinent wells.

3. "Procedure" includes any oral or written guideline, procedure, requirements, protocol, standard, best practice, standard practice, system or recommendation.

4. "Including" or "includes" means "including but not limited to" or "including without limitation."

5. "Relating to" or "related to," when referring to any given subject matter, means constitutes, comprises, involves, contains, embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

6. The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

7. "Communication" or "communicated" means any transmission of information by one or more persons to one or more persons by any means including, without limitation, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail, computer

linkups, written memoranda, and face-to-face conversations; "communication" includes all documents and electronically stored information ("ESI") containing, summarizing, or memorializing any communication.

8. "Identify" or "identity" when used in reference to: (a) an individual, shall mean to provide the individual's full name, job title, and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and document control number(s); (d) an oral communication or statement, shall mean to state the date, place, each person making or listening to such oral communication or statement, all other persons present at the time, a summary of the substance, and the identities of each document referring or relating to, in whole or in part, such oral communication or oral statement; (e) a piece of equipment or other tangible object besides a document, shall mean to provide sufficient information to identify that object, including any name used to identify the object, its manufacturer, the make and model of the object, its location, and any serial numbers or other identifying numbers; and (f) an act, shall mean to state the substance of the event or events constituting such act, the date, the duration, the location, the persons attending or participating, and each document referring or relating to such act

9. "Macondo Well" means the MC252 #1 Well, the exploratory well that was being drilled by the Transocean *Marianas* and *Deepwater Horizon* rigs in Mississippi Canyon, Block 252 on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

10. "BOP" means, unless otherwise specified, the entire subsea blowout preventer system, including, but not limited to, the BOP stack, BOP control system, BOP operating panels, Lower Marine Riser Package ("LMRP"), all rams, all preventers, any and all connectors and connections to the BOP stack, including the choke and kill lines and MUX cables, any and all emergency systems, any and all back-up systems, the autoshear system, ROV intervention panels, the Automatic Mode Function deadman system, and any other components to the BOP.

11. "BP" means BPXP and all of its affiliates and subsidiaries.

12. "Blowout," whether or not capitalized, means an uncontrolled release of hydrocarbons from a well.

13. "Kick," whether or not capitalized, means the intrusion or influx of formation fluids (such as hydrocarbons or water) into a wellbore.

14. "Well control event," whether or not capitalized, means any kick, lost circulation event, or blowout.

## INSTRUCTIONS

1. Pursuant to Federal Rule of Civil Procedure 26(e), these interrogatories are continuing and you must revise or supplement your responses whenever new or additional responsive information becomes known.

2. Each interrogatory solicits all information that is known to you or in your possession, custody or control, and all information available to you from your attorneys, agents, investigators, experts, employees, insurers and representatives.

3. Each interrogatory is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular interrogatory.

4. These interrogatories are to be answered in detail. If you cannot answer any interrogatory in full, you should answer it to the extent possible and explain your inability to answer any further.

5. If you claim that the language of any interrogatory is vague or ambiguous, then you must identify the language you believe is ambiguous and describe the different interpretations that you believe may apply to such language. Regardless of any vagueness or ambiguity you claim, you are to answer the interrogatory to the best of your ability.

6. When asked for a date, an exact date should be given if known. If an exact date is not known, an approximate date should be given and identified as such.

7. If any of the answers to these interrogatories are derived from papers, records or documents in your possession or under your control, please attach a copy thereof to your answers or, in the alternative, please describe each of the documents with specificity and state when and where they will be available to BPXP's counsel for inspection and copying.

8. If you contend that information responsive to any interrogatory is protected from disclosure pursuant to any privilege or work-product doctrine, then you must comply with the requirements of Pre-Trial Order No. 14 and Federal Rule of Civil Procedure 26(b)(5).

13

Exhibit V
Page 13

Dated:  July 1, 2011                                Respectfully submitted,

  /s/ J. Andrew Langan, P.C.
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:       (312) 862-2200

and

Don K. Haycraft (Bar # 14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:     (504) 581-7979
Facsimile:       (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:     (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

14

Exhibit V
Page 14

15

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 1st day of July, 2011.

                                    /s/ J. Andrew Langan, P.C.