# EXHIBIT Y

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3   IN RE:  OIL SPILL        )     MDL NO. 2179
    by the OIL RIG,          )
4   DEEPWATER HORIZON in     )     SECTION "J"
    the GULF OF MEXICO,      )
5   April 20, 2010           )     JUDGE BARBIER
                             )
6                            )     MAG. JUDGE
                             )     SHUSHAN
7



13

14                       **VOLUME 2**

15

16

17          Deposition of **DAVID RAINEY**, taken at
    Pan-American Building, 601 Poydras Street,
    11th Floor, New Orleans, Louisiana, 70130, on
18  June 3, 2011.

19

    **APPEARANCES:**
20

21  Mr. Duke Williams
    Mr. Christopher Zainey
22  WILLIAMS LAW GROUP
    909 Poydras Street, Suite 1650
23  New Orleans, Louisiana 70112
    (985) 876-7595

24

25

1     **APPEARANCES (continued):**

2

    Ms. Beth Abramson
3   LEWIS, KULLMAN, STERBCOW & ABRAMSON
    601 Poydras Street, Suite 2615
4   New Orleans, Louisiana 70130
    (504) 588-1500
5
                    APPEARING FOR THE DERIVATIVE
6                   PLAINTIFFS, MDL 2185

7

    Mr. Walter R. Lancaster
8   KIRKLAND & ELLIS, LLP
    333 South Hope Street
9   Los Angeles, CA 90071
    (213) 680-8400
10
                    APPEARING FOR BP, INC.
11

12  Mr. Scott Cernich
    U.S. DEPARTMENT OF JUSTICE
13  Civil Division, Torts Branch
    1425 New York Avenue, Northwest, Suite 10100
14  Washington, D.C. 20005

15                  APPEARING FOR THE UNITED
                    STATES
16

17  Ms. Deborah Kuchler
    Ms. Miele St. Julien
18  KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
    1615 Poydras Street, Suite 1300
19  New Orleans, Louisiana 70112
    (504) 592-0691
20
                    APPEARING FOR ANADARKO PETROLEUM
21                  COMPANY

22

    Ms. Catherine C. McCulley
23  PILLSBURY WINTHROP SHAW PITTMAN, LLP
    909 Fannin, Suite 2000
24  Houston, Texas 77010
    (713) 276-7633
25

1   **APPEARANCES (continued):**

2

3   Mr. David S. Cannon
    BINGHAM McCUTCHEN
    Three Embarcadero Center
4   San Francisco, CA 94111
    415.393.2000

5
                    APPEARING FOR MOEX OFFSHORE
6

7   Mr. Ben Alexander
    Mr. C. J. Hebert
8   PREIS & ROY, PLC
    601 Poydras, Suite 1700
9   New Orleans, LA 70130-6002
    (504) 581-6062

10
                    APPEARING FOR TRANSOCEAN
11

12  Mr. Bruce Bowman
    Mr. Israel Silvas
13  GODWIN RONQUILLO
    1201 Elm Street, Suite 1700
14  Dallas, Texas 75270-2041
    (214) 939-4412

15
                    APPEARING FOR HALLIBURTON
16

17  Ms. Patrice Childress
    BECK, REDDEN & SECREST
18  1221 McKinney Street, Suite 4500
    Houston, Texas 77010-2010
19  (713) 951-3700

20                  APPEARING FOR CAMERON

21
    Mr. Lambert J. "Joe" Hassinger Jr.
22  GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
    701 Poydras Street, 40th Floor
23  New Orleans, Louisiana 70139
    (504) 525-6802

24
                    APPEARING FOR THE STATE OF
25                  LOUISIANA

**GAUDET, KAISER, L.L.C.**
**Board-Certified Court Reporters**
Exhibit Y
Page 3

1    **APPEARANCES (continued):**

2

3    Ms. Lauren Courtney Mastio
     JONES WALKER
     201 St. Charles Avenue
4    New Orleans, Louisiana 70170
     (504) 582-8442

5

     Mr. Michael A. Chernekoff
6    JONES WALKER
     600 Travis St
7    Houston, TX 77002
     713.437.1827

8
                        APPEARING FOR WEATHERFORD
9

10   Ms. Rebecca Patty
     ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
11   1400 Coliseum Boulevard
     Montgomery, Alabama 36110
12   (334) 270-5606

13                       APPEARING ON BEHALF OF STATE OF
                         ALABAMA
14

15   Mr. W. Brad Nes
     MORGAN LEWIS
16   1111 Pennsylvania Ave., NW
     Washington, DC 20004-2541
17   (202) 739-5779

18                       APPEARING ON BEHALF OF M-I, LLC

19

     Mr. John Sifton
20   COHEN MILSTEIN
     1100 New York Ave NW, Suite 500 West
21   Washington, DC 20005
     (202) 408-4600
22
                         APPEARING ON BEHALF OF NYROH AND
23                       CLASS (SECURITIES):

24

25

1   **APPEARANCES (continued):**

2   Mr. David Matthew Fragale
    Mr. Frank Monago
3   STEPTOE & JOHNSON, LLP
    1330 Connecticut Avenue, NW
4   Washington DC 20036
    (202) 429-8195
5
        APPEARING ON BEHALF OF DAVID RAINEY
6

7   Mr. Gregory Lacour
    CHRISTOVICH & KEARNEY, L.L.P.
8   601 Poydras Street
    Suite 2300
9   New Orleans, Louisiana 70130
    (504) 561-5700
10
                    APPEARING ON BEHALF OF IAR
11

12  Mr. Michael D. Cangelosi
    GIEGER, LABORDE & LAPEROUSE L.L.C.
13  701 Poydras Street, Suite 4800
    New Orleans, Louisiana 70139
14  (504) 561-0400

15                  APPEARING ON BEHALF OF DYNAMIC
                    AVIATION
16

17  Mr. Sean Brady Vol 2
    FLANAGAN PARTNERS, LLP
18  201 St. Charles Ave., Suite 2405
    New Orleans, Louisiana 70170
19  (504) 569-0235

20                  APPEARING ON BEHALF OF
                    DRC EMERGENCY, LLC
21

22

23

24

25

1    **APPEARANCES (continued):**

2

Ms. Wendy Ware Bishop
3    WARE, JACKSON, LEE & CHAMBERS
2929 Allen Parkway, 42nd Floor
4    Houston, Texas 77019
(713) 659-6400
5
             APPEARING FOR DRIL-QUIP
6

7    Mr. Thomas J. Heiden
LATHAM & WATKINS, LLP
8    233 South Wacker Drive, Suite 5800
Chicago IL 60606
9    (312) 876-6564

10             APPEARING ON BEHALF OF NALCO

11
Mr. Patrick E. O'Keefe
12   BARNETT, BROWN, READ, HAMMOND & MINTZ
1100 Poydras Street, Suite 3300
13   New Orleans, LA 70163-3300
(504) 585-3200
14
             APPEARING ON BEHALF OF O'BRIEN'S
15             AND NRC

16
ALSO PRESENT:
17   Mr. Frank A. Monago - BP America Senior
Attorney
18
Mr. Todd Meaux, Videographer
19

20   REPORTED BY:

21
             TAMARA CHAPMAN, CSR
22             Certified Court Reporter
             State of Texas
23

24

25

1                    **I N D E X**

2                                              PAGE

3   Appearances...........................304

4    DAVID RAINEY

5       Examination by Mr. Bowman...........313

6       Examination by Mr. Heiden...........375

7       Examination by Mr. O'Keefe..........381

8       Examination by Ms. Childress........385

9       Examination by Ms. Kuchler..........387

10       Examination by Ms. McCulley.........450

11       Examination by Mr. Lancaster........454

12   WITNESS' CERTIFICATE....................471

13   REPORTER'S CERTIFICATE..................472

14

15                    **EXHIBITS**

16

17   NO.   DESCRIPTION                    PAGE

18   3226  BP CONFIDENTIAL Document
          BP-HZN-BLY00196068               333

19   3227  E-Mail From: Rainey, David I
20         Sent: Wed Apr 07 23:04:20 2010
           Subject: RE: Macondo plan
           Forward
21         BP-HZN-2179MDL01826006           338

22   3228  E-Mail From: Daly, Mike
           Sent: Fri Apr 09 18:03:09
23         2010
           BP-HZN-2179MDL00005189           345

24

25

```
 1              EXHIBITS (continued)

 2
        NO.    DESCRIPTION                    PAGE
 3      3229   E-Mail From: Rainey, David I
               Sent: Thu Apr 15 15:56:41 2010
 4             Subject: FW: Macondo deepening
               Recommendation
 5             BP-HZN-CEC083577 - 79           346

 6      3230   E-Mail From: Rainey, David I
               Sent: Mon Apr 19 13:21:29 2010
 7             Subject: RE: Macondo Discovery
               Review Board
 8             BP-HZN-2179MDL01826776 - 77     347

 9      3231   E-Mail From: Rainey, David I
               Sent: Tue Apr 20 23:44:56 2010
10             Subject: Macondo Discovery
               Review Board
11             BP-HZN-2179MDL00009348          350

12      3232   E-Mail From: Liu, Xuemei Sent:
               Sat Mar 27 02:54:32 2010
13             Subject: FW: Macondo FM
               Supplement
14             BP-HZN-2179MDL01828120 - 21     359

15      3233   E-Mail From: Beirne, Michael
               Sent: Tue Mar 30 21:02:06 2010
16             Subject: Macondo Second
               Supplemental AFE - MOEX
17             Approval
               BP-HZN-2179MDL00009471          360
18

19      3234   E-Mail From: Little, Ian
               Sent: Mon Apr 20 21:26:26 2010
20             Subject: Horizon Finger Injury
               Draft One Page Summary
21             BP-HZN-2179MDL01825429 - 30     371

22      3235   E-Mail From: Rainey, David I
               Sent: Thu Aug 20 12:55:17 2009
23             Subject: RE: Evaluation Time
               BP-HZN-BLY00357532 - 33         372
24

25
```

```
 1              EXHIBITS (continued)

 2
       NO.   DESCRIPTION                      PAGE
 3
       3236  HEARING before the COMMITTEE
 4           ENERGY AND NATURAL RESOURCES
             UNITED STATES SENATE -
 5           November 19, 2009                 391

 6     3237  E-Mail From: Rainey, David I
             Sent: Sun Apr 25 23:58:34 2010
 7           Subject: RE: Macondo Discovery
             Review Board
 8           BP-HZN-2179MDL01617881           403

 9
       3238  Daily Drilling Report
10           (dated 06-Oct-2009)
             TRN-HCJ-00076343 - 47            406
11
       3239  E-Mail From: Rainey, David I
12           Sent: 21 October 2009 00:35
             Subject:  Macondo deals
13           BP-HZN-2179MDL01833704           417

14     3240  E-Mail From: Thorseth, Jay C
             Sent: Wed Dec 09 18:09:48
15           2009 - Subject:  Rig schedule
             and Koala op
16           BP-HZN-2179MDL01822297           429

17     3241  Statement of David Rainey        439

18     3242  Daily Operations Report -
             Partners (Drilling) {3/26/2010}
19           BP-HZN-MBI00013850 - 55          455

20     3243  E-Mail From: Thorseth, Jay C
             Sent: Thu Nov 19 17:14:57 2009
21           Subject: RE: Macondo co-owners
             BP-HZN-2179MDL01829370 - 71      462
22

23

24

25
```

```
 1            THE VIDEOGRAPHER:  This is Day 2,
 2    Tape 1.  We're on the record at 8:31.
 3                      EXAMINATION
 4    BY MR. BOWMAN:
 5            Q.      Good morning, Mr. Rainey.  My
 6    name is Bruce Bowman.  I represent
 7    Halliburton.
 8            A.      Good morning.
 9            Q.      And I'm going to try to explore
10    other items than were explored yesterday.  I
11    may not succeed, but that's what I'm going to
12    try to do.
13                    First of all, you mentioned
14    you're going to have a new job.  What's your
15    new business address?  Do you have one?
16            A.      I'm not going to remember the
17    exact address.  It's on Post Oak Lane in --
18            Q.      In Houston?
19            A.      In Houston, yeah.  In the
20    Galleria area.
21            Q.      Okay.  Whatever the name of your
22    company is, you have an address there?
23            A.      Yeah.  Well, it's British --
24    BHP.
25            Q.      BHP.  That's fine.
```

1          Now, I think there is a

2   reference yesterday to the TIGER team

3   reporting to you or something?

4          A.     That's correct.

5          Q.     What is the TIGER team?

6          A.     It's a team of subsurface

7   specialists who focus on issues of the

8   subsurface that relate to operations.

9          Q.     Okay.  And so what did they do

10  for you?

11         A.     They -- they actually start from

12  before lease access, they are the keeper of

13  the basin model, the three-dimensional basin

14  model.  They do -- our biostratigraphers are

15  part of the TIGER team and they operate

16  throughout the whole exploration process, all

17  the way from regional work through lead

18  identification, through prospect maturation.

19         Q.     And so what did the TIGER team

20  do in connection with the Macondo well?

21         A.     Then as it gets closer to

22  operations when -- when a decision is made to

23  test a prospect with the drill bit, then

24  they -- the TIGER team makes the pore

25  pressure prediction and the fracture gradient

1    prediction that is then handed over to the

2    drilling engineers to design the well around

3    it.

4         Q.      Now, as far as Macondo is

5    concerned, give me -- well, first of all, the

6    TIGER team is a group of people who -- who do

7    they report to?

8         A.      The manager of the TIGER team is

9    a gentleman called Pinky Vincent.

10        Q.      Pinky Vincent?

11        A.      Uh-huh.

12        Q.      And who does he report to?

13        A.      I think at the time -- I think

14   two weeks before the incident we had elevated

15   Pinky from reporting to the exploration

16   manager, who at the time was Jay Thorseth,

17   and elevated him to reporting to me.

18        Q.      Okay.  Let's kind of talk -- if

19   we can go by broad brush, let's try.

20   Sometime spring of 2009, I think is more or

21   less when the decision was made to go forward

22   on the Macondo; is that correct?

23        A.      I can't say for certain.

24        Q.      Well, we can get some documents

25   if we need to.

```
 1              A.      Yeah.
 2              Q.      Whenever that was made, what did
 3     the TIGER team do before and after?
 4              A.      Before they -- some of the
 5     specialists would probably have been involved
 6     in the evaluation of the prospect --
 7              Q.      Okay.
 8              A.      -- doing a specialist
 9     geophysical analysis to demonstrate that it
10     was a valid prospect.
11              Q.      And somehow that information
12     would have to get up the line to you,
13     correct?
14              A.      In a very general sense, yes.
15     They keep me informed as to whether the
16     prospect is still valid and still one that
17     would merit the possibility of testing with
18     the drill bit.
19              Q.      Who is Robert Bodek?
20              A.      He is operations geologist in
21     the TIGER team.
22              Q.      He is in the TIGER team?
23              A.      Yes.
24              Q.      Because he did work on this
25     Macondo well, did he not?
```

```
 1              A.       Yes, I believe he did.
 2              Q.       Okay.  And as part of the work
 3    on the Macondo, would they try to ascertain
 4    if there were pay zones and maybe how much
 5    was there?
 6              A.       That is not specifically the
 7    TIGER team's role.
 8              Q.       Okay.
 9              A.       We have what we call --
10              Q.       Educate me.  What is their role
11    specifically?
12              A.       Well, we just talked about the
13    TIGER team role.  The aspect of defining the
14    prospect and describing the prospect, that
15    sits with the exploration teams.
16              Q.       The exploration teams.  That was
17    under you --
18              A.       That's correct.
19              Q.       -- ultimately --
20              A.       Yeah.
21              Q.       -- because you're VP in charge
22    of exploration?
23              A.       Yeah.
24              Q.       Okay.  So -- and there are AFEs
25    that you have signed, and we'll look at some
```

```
 1    of those.

 2         A.      Right.

 3         Q.      But before you sign an AFE, you

 4    have to have some reasonable expectation that

 5    you're going to hopefully find something --

 6         A.      That's correct.

 7         Q.      -- is that right?

 8                 Okay.  And someone then has done

 9    some type of work anticipating where you

10    might find something and what you might find;

11    is that correct?

12         A.      That's correct.

13         Q.      Okay.  So let's go back -- and

14    you're exploration.  I understand yesterday

15    you said you're not operations?

16         A.      That's correct.

17         Q.      We're going to explore that a

18    little bit so I can understand it.

19         A.      Uh-huh.

20         Q.      Let's say -- how long were you

21    VP of exploration?

22         A.      Up to the point of the incident,

23    about five years.

24    ████      ███████████    █████    ████

25    ████████████████████████████████████████
```









5        Q.     (BY MR. BOWMAN)  I guess what
6  I'm trying to get at, and maybe I'm wrong,
7  but it seems like there has to be some degree
8  of working together between exploration and
9  drilling and completion, correct?
10      A.     Correct.
11      Q.     Yeah, because you have to have
12  an interest in whether that well is drilled
13  and comes up, right?
14      A.     I do.
15      Q.     Okay.  And is that -- we'll
16  explore some e-mails later as time goes by.
17  But is that the reason you were kept up
18  oftentimes on what was going on as far as
19  drilling on wells?
20      A.     Obviously I have an interest in
21  the progress of the well.
22      Q.     Okay.  Now, then, I'm going to
23  show you, I think, what was marked as
24  Exhibit 3202 yesterday.  I've just opened it
25  to you.

1          A.        This page?

2          Q.        That page.  And up at the top it

3    says something about you antic- -- this is on

4    the Macondo well.  And you can look and make

5    sure it is the Macondo well.

6          A.        Yeah.

7          Q.        Something about anticipate six

8    strings.  Do you see that?

9          A.        Where should I be looking?

10          Q.        Well, I think it's up at the

11    top.

12          A.        Six string.  Okay.

13          Q.        Yeah.  Do you know how many

14    strings there ended up being used on the

15    Macondo?

16          A.        I know we used up some of our

17    contingency, so I am -- I would assume it was

18    more than six.

19          Q.        Okay.  Now, you are the -- you

20    would sign the AFEs on the Macondo and --

21    along with two other people.  What -- do you

22    remember what the original estimate was for

23    the Macondo?

24          A.        Not off the top of my head, no.

25          Q.        Okay.  Well, when you were asked

```
 1    to do an increase, what did you consider?
 2         A.     When I -- I'm sorry, I don't
 3    understand.
 4         Q.     When you were asked to raise the
 5    AFE.  Let's say you were asked to raise it
 6    from a hundred to 139 million, what would you
 7    consider?
 8         A.     I'd need more context to answer
 9    the question.  I --
10         Q.     Well, do you remember whether
11    you signed or did not sign more than one AFE
12    for the Macondo well?
13         A.     I can't actually remember.
14         Q.     You can't remember.  Can you
15    remember if the Macondo well cost more than
16    it was anticipated to cost?
17         A.     I believe it did.
18         Q.     But you can't remember how much?
19         A.     Not off the top of my head.
20         Q.     Even by tens of millions of
21    dollars?
22         A.     Not off the top of my head, no.
23         Q.     Okay.  Is that because you've
24    blocked it out or is that because it just
25    can't make an impression on you when you
```

1    signed the AFE or what?

2         MR. LANCASTER:  Object to form.

3         A.    I don't know why.

4         Q.    (BY MR. BOWMAN)  Okay.  Well,

5    when you would sign an increased AFE, would

6    you ask anybody why?

7         A.    Yes, I'd expect to have that

8    explained.

9         Q.    And who would you ask?

10        A.    It would be the -- whoever

11   brought the AFE to me.  And usually it would

12   be the drilling team.

13        Q.    Okay.  Do you remember who it

14   was on the Macondo?

15        A.    No.

16        Q.    You just have no memory at all

17   on that today?

18        A.    Well, I know who some of the

19   engineers were, but I don't know specifically

20   who brought me the AFE.

21        Q.    Okay.  Do you know who any of

22   the engineers on the Macondo were?

23        A.    I know Mark Hafle.

24        Q.    Anybody else?

25        A.    I know David Sims was in the

1  line somewhere.  I think John Guide.  Those
2  are the three in particular that I remember.
3      Q.    Do you remember actually talking
4  to them?
5      A.    Not specifically, no.
6      Q.    No.  Do you remember any
7  discussion at all talking to any of those
8  three people about the Macondo well before
9  the blowout?
10     A.    I do remember discussions around
11 AFEs, but I don't remember the details of
12 those discussions.
13     Q.    Do you remember generally what
14 was said?
15     A.    Conversation around the AFEs.
16     Q.    Okay.  I'm going to hand you
17 what has been previously marked as 2370.  Do
18 you remember that?
19     A.    I don't remember this specific
20 e-mail.
21     Q.    Okay.  Well, if you'd go to the
22 third page.  Do you recognize your signature?
23     A.    It doesn't look like the e-mail
24 was sent to me.  But, yes, I do recognize my
25 signature.

1      Q.      And what's the date of that?

2      A.      September 30, '09.

3      Q.      Okay.

4      MR. LANCASTER:   And just for the record

5  to clear up my confusion.   Are you

6  representing that these are AFEs?

7      MR. BOWMAN:   No.

8      MR. LANCASTER:   Okay.

9      Q.      (BY MR. BOWMAN)   So -- well,

10  just clear it up.   What is a document called

11  "Execute Financial Memorandum"?   What is that

12  document?

13     A.      That's a financial memorandum

14  which provides the approval to drill the well

15  within -- there is an estimate of what the --

16  what the cost will be.

17     Q.      Okay.

18     A.      And then the AFE is actually the

19  document that releases the funds.

20     Q.      Okay.   And this very first

21  financial memorandum that you signed talks

22  about risk and it has key risks and other

23  significant points.   Do you remember who put

24  that in those risks on this document?

25     A.      This being a financial document,

```
1   this was probably written by one of the
2   financial people.
3        Q.     Okay.  Did they have the
4   expertise to be able to figure out that
5   subsurface and drilling risk include a narrow
6   pore pressure and fracture gradient window?
7        A.     They will have talked to the
8   drilling team as to what the risks were.
9        Q.     Okay.  Well, let's keep going
10  on.  Let's go over to the next financial
11  memorandum.  And looks like you dated --
12  looks like you signed it 11/9/09.  Look at
13  the last four digits, 6303.  Do you see that?
14       A.     Yep.
15       Q.     Now, explain to me what the key
16  risk about the failure to complete this deal
17  will cause BP to miss opportunity to maximize
18  what?
19       A.     Working interest.
20       Q.     Okay.  Do you remember signing
21  this?
22       A.     I'd have to take some time to
23  read this because, as I think you know, this
24  well was started with the Marianas.  And I
25  would need to remind myself in the timeline
```

```
 1    where these AFEs were written.  Were they
 2    written during the Marianas phase of the
 3    well, were they written between the Marianas
 4    and the HORIZON.
 5            Q.      Okay.
 6            A.      So I would need to have -- to
 7    see other documents before I could comment --
 8            Q.      Okay.
 9            A.      -- in any detail on this.
10            Q.      Well, let's keep going since I
11    have a limited amount of time.
12                    But I do notice that you signed
13    it twice.  Why did you sign it twice?
14            A.      So this is -- this is an FM to
15    complete a deal.  This is asking for approval
16    to complete a deal.  Okay.  So this is --
17    this is -- this is an authority to complete a
18    deal.
19            Q.      Okay.
20            A.      Part of that deal is
21    relinquishing working interest in an asset
22    which has a financial implication.  And it
23    reduces our costs in the well --
24            Q.      Okay.
25            A.      -- because it would bring
```

1    somebody else into the well.

2         Q.      So why did you sign it twice?

3         A.      Because I have -- this was

4    within my financial authority to do.  And

5    that's the supported by.  And then I'm also

6    the officer of the company.  So the approved

7    by is the legal approval, the supported by is

8    the financial approval.  If you go back to

9    the previous ones, which was beyond my

10   financial approval, it was -- actually I

11   suspect beyond Mike Daly's approval also, was

12   signed by Andy Inglis.  And then I signed

13   because Andy is not an officer of BP America.

14        Q.      What was your approval, by the

15   way?

16        A.      I think it was 50.

17        Q.      50 million?

18        A.      50 million.

19        Q.      You're thinking -- you're not

20   sure about that?

21        A.      I'm not sure.  It was either 25

22   or 50.

23        Q.      Okay.  And you don't remember

24   how much the well ended up costing you?

25        A.      No.

```
 1            Q.      Okay.  And do you remember how
 2    much extra time it took than anticipated?
 3            A.      No.  Again it was a very complex
 4    well because it started with one rig.  That
 5    rig got hit by a storm.  There were costs
 6    associated with the storm.  And then we
 7    brought on another rig.  So the financial
 8    approvals are quite complicated.
 9            Q.      Uh-huh.  So sitting here today
10    you don't know how much longer it took to
11    complete the well than originally
12    anticipated?
13            A.      Not off the top of my head, no.
14            Q.      You don't know if it was two
15    days or two months?
16            A.      It was more than two days.
17            Q.      Less than two months?
18            A.      I don't know.
19            Q.      Don't know.  Okay.
20                    Let me ask you this now.  You
21    are a geologist, right?
22            A.      I am.
23            Q.      And this well -- by the time the
24    production casing was put down this well, did
25    BP believe that it knew where the pay zones
```

1    where?

2            A.        I believe we did, yes.

3            Q.        Okay.  I mean, because if you

4    don't know where the pay zones were, you

5    don't know where the oil is going to come

6    from, right?

7            A.        Right.

8            Q.        Now, I have seen something that

9    indicates that after the blowout, and

10   specifically I think it's in June of 2010, BP

11   found out that there was a -- I guess higher

12   pay zone than they knew about or anticipated.

13   Now --

14           MR. LANCASTER:  Object to form.

15           Q.        (BY MR. BOWMAN)  Have you heard

16   that, number one?

17           A.        I don't believe I have, no.

18           Q.        You never heard that.  Well, let

19   me -- let's mark this.

20           (Exhibit No. 3226 was marked.)

21           Q.        (BY MR. BOWMAN)  Let me show you

22   what's been marked as 3266 [sic].  This is a

23   part of a report that was done.  It's part of

24   a report BP-HZN-BLY00173428.  Some sort of BP

25   investigation team analysis.

```
1            MR. LANCASTER:  Counsel, do you not
2    have a complete copy of the document to give
3    to the witness?
4            MR. BOWMAN:  No, I don't.
5            MR. LANCASTER:  All right.
6        Q.    (BY MR. BOWMAN)  Now, can you
7    look at that particular part I just handed
8    you.  And it shows sands identified.  Do you
9    see where it says, Table 1:  Sands Identified
10   on the Macondo well?  It's that chart down on
11   the bottom.
12       A.    Okay.  Yeah.  Got it.
13       Q.    Yeah.  And you can see that the
14   very first one says:  Identified as a
15   possible hydrocarbon June 2010 not a major
16   pressure.
17            Now, how would -- how could that
18   have happened?
19            MR. LANCASTER:  Object to form.
20       A.    So I do remember something
21   about -- I don't know whether it's this or
22   not -- a zone that on the logs was ambiguous
23   and was not clearly pay.  That's all I
24   remember.  But -- so if it is -- it wasn't
25   clear -- my understanding, my memory -- and I
```

1   was -- say this was when I was in Robert.  So
2   I was very much on the edge of it.  This was
3   a zone that was not clearly pay -- would
4   not -- would not have been measured as pay
5   under normal circumstances.  But there were
6   some special circumstances that could have
7   led to it being a zone that might have been
8   an unusual lithology that might have had
9   hydrocarbons in them.  I'm sure you know that
10  not all log analysis is unambiguous.
11          Q.      (BY MR. BOWMAN)  I have been
12  told that.
13              And you can have a flow -- I
14  mean, you can have a flow from a nongood
15  hydrocarbon zone, can you not?
16      MR. LANCASTER:  Object to form.
17          A.      Again, I'm -- I'm not a
18  reservoir engineer.
19          Q.      (BY MR. BOWMAN)  Well, you're a
20  geologist.  You can actually have a flow from
21  water, can't you?
22          A.      You can.
23          Q.      You can.
24              So who -- who was it that made
25  this discovery in June of 2010 about this --

```
 1    I don't know whether to call it a high or a
 2    lower pay zone.  How about a zone that wasn't
 3    mapped out before.  Do you know who made that
 4    discovery?
 5           MR. LANCASTER:  Object to form.
 6           A.     I don't know.
 7           Q.     (BY MR. BOWMAN)  Do you know if
 8    in fact that could have had any significance
 9    as to whether that zone needed to be covered
10    by cement or not?
11           A.     I don't know.
12           Q.     That's because you're not on the
13    operations side?
14           A.     Correct.
15           Q.     You would leave it up to someone
16    on the operations side to make sure that they
17    identify all the zones and have it all
18    covered, would you not?
19           A.     Yeah.
20           Q.     Okay.  Actually, let me ask you
21    a few things right now.  Have you talked to
22    anyone from Halliburton about the Macondo
23    blowout?
24           A.     Not that I'm aware of.
25           Q.     Do you have any opinion sitting
```

1  here today about the cement job Halliburton

2  did on the HORIZON?

3          A.       (Witness nods.)

4          Q.       No?

5          A.       No.

6          Q.       And, likewise, do you have any

7  opinions about any of the mud logging that

8  was done by Sperry on the HORIZON?

9          A.       No.

10          Q.       Now, excluding lawyers, has

11  anyone talked to you about what they think

12  happened on the cement job on the Macondo

13  well?

14          A.       Certainly not in any detail.  I

15  know I've had conversations with many people

16  on what we thought happened, but not with

17  anybody that probably had any more expertise

18  than I have.

19          Q.       Well, here's what I'm getting

20  at.  You know we're going to have a trial

21  coming up.  And I want to find out, are you

22  going to be able to come in and say, well, I

23  think this about the cement job or that about

24  the cement job, or are you just going to be

25  able to offer no opinions and no facts about

```
 1    the cement job?
 2         A.      I don't have the expertise to
 3    offer any opinion on the cement job.
 4         Q.      One way or the other.  That's
 5    fine.
 6              And the same on the mud logging
 7    done by Sperry?
 8         A.      That's -- would be the same.
 9         Q.      Let's go to Tab 25.
10         MR. BOWMAN:  Put a sticker on it.
11         (Exhibit No. 3227 was marked.)
12         Q.      (BY MR. BOWMAN)  Now, this
13    particular e-mail is dated April 7th from Jay
14    Thorseth.  We've mentioned his name.  But
15    tell me again, who was he and what did he
16    have to do with the Macondo well?
17         MS. KUCHLER:  Excuse me just a minute.
18    Our tab doesn't --
19         MR. BOWMAN:  I'm sorry it's Tab 25.  I
20    probably mumbled.
21         MS. KUCHLER:  Even though we're in a
22    more acoustically designed room, it would be
23    helpful if you could all speak up.  It's
24    still hard to hear back here.
25         MR. BOWMAN:  I will.
```

```
 1            (Discussion off the record.)
 2        Q.        (BY MR. BOWMAN)   This April 7th
 3    memo which has been identified as 3227, the
 4    question was who is Mr. Thorseth and what did
 5    he have to do with the Macondo well?
 6        A.        Mr. Thorseth is the exploration
 7    manager under whom the Macondo well was
 8    drilled, and he is a direct report of mine.
 9        Q.        And by "exploration manager,"
10    what did he do on this?  What did he do?
11        A.        He's the manager of the
12    exploration team.  The TIGER team did report
13    to him.  But, again, he's not an operational
14    person.
15        Q.        He takes everything up to the
16    start of the operations.  And then he must
17    continue monitoring operations?
18        A.        He has the same interest that I
19    do in watching the progress of the well to
20    test the prospect that he's worked; in Jay's
21    case, from before the lease sale through
22    acquiring the lease through getting approval
23    to drill the well.
24        Q.        Okay.  Because if you look at
25    this e-mail, it's fairly specific.  It talks
```

1   about Dave -- and that's you, right?

2        A.      That is correct.

3        Q.      He's writing:  Dave, our

4   recommendation is to drill another 100 to 135

5   feet then TD, log and run 7-inch production

6   casing.

7                Now -- and that's signed "Jay,"

8   right?

9        A.      That's correct.

10       Q.      That sounds a little bit to me

11  like an operational decision.  In other

12  words, what size production casing and how

13  long you run it and when you TD the hole.

14  Explain to me how his job overlaps with the

15  operations on these points.

16       A.      This is really a recommendation

17  based on subsurface information that we have

18  effectively tested the prospect.  Because he

19  goes on to say:  We are not interested in

20  deepening to secondary target because --

21                I mean, I believe there is no

22  indication of reservoir on seismic.  The well

23  is calibrated in eastern Mississippi Canyon

24  on sand presence and seismic which is -- that

25  techol- -- that science has matured since

1   Macondo went to forum.  And when Jay

2   presented the prospect to forum, he presented

3   a primary target and a secondary target.  And

4   the primary target was one that the well

5   ultimately tested and the secondary target

6   was deeper.

7                  When we told Mr. Daly that we

8   were effectively at TD, he said, well, what

9   about the secondary target that you told me

10  about when you brought the prospect to

11  target -- to forum?  So Jay -- that push went

12  back down and Jay came back and said, no, we

13  see -- we don't actually see any

14  prospectivity any more deeper, and these were

15  the reasons.  Therefore, in conversations

16  with the drillers, this looks to me like we

17  tested the primary reservoir and we need to

18  drill a rathole and finish the well.

19                  So this was about -- is there

20  deeper prospect- -- is there deeper

21  prospectivity to drill for.

22       Q.    Okay.  So Mr. Thorseth is

23  keeping up -- is he reading the seismics that

24  are being taken while the well is being

25  drilled?

```
 1          MR. LANCASTER:  Object to form.
 2          A.     He certainly isn't doing any
 3    technical work, but he's the manager of the
 4    team that has monitored the prospect and the
 5    well from a subsurface perspective.
 6          Q.     (BY MR. BOWMAN)  So the TIGER
 7    team is reporting to him and they are
 8    continuing to monitor the seismics on the
 9    well?
10          A.     I don't know what you mean by
11    seismic on the well.
12          Q.     Well -- okay.  The very first
13    report bullet point there says:  No reservoir
14    indication on seismic.
15                 Somebody -- you must have known
16    what he was talking about?  Or did you write
17    him back --
18          A.     That has nothing to do with the
19    well.
20          Q.     Oh, so "no reservoir indication
21    on the seismic" had nothing to do with the
22    Macondo well?
23          A.     It has nothing -- the seismic is
24    the seismic that covers the prospect.  It's
25    independent of the well.  We use the seismic
```

```
 1    to describe and define the prospect.
 2         Q.      The prospect is not -- has
 3    nothing to do with the well?
 4         A.      I don't understand your point.
 5         Q.      Well, the third bullet point:
 6    New seismic data since last year.
 7                 What seismic data is he talking
 8    about?
 9         A.      It sounds like we acquired some
10    new seismic data over the prospect.  But that
11    seismic data --
12         Q.      Okay.  Okay.  Well, explain the
13    prospect.  Maybe that's where we're having a
14    little communication problem.
15         A.      Okay.  You understand the
16    concept of seismic?
17         Q.      I think so.  But go ahead and
18    explain -- answer my question about what is a
19    prospect.
20         A.      The prospect is defined on
21    seismic data, calibrated to other wells
22    around about.  So the seismic data is
23    essentially a sonic record of the subsurface.
24    You know?
25         Q.      Uh-huh.
```

1        A.        And based on that we get

2   indications of prospectivity but we don't

3   know if there are all the elements that you

4   need to be present to have a hydrocarbon

5   accumulation.

6        Q.        And somebody makes then a

7   determination and decides to drill

8   ultimately?

9        A.        And then the ultimate test of

10  whether there is an oil field present or not

11  is with the drill bit.

12       Q.        That's what happened on the

13  Macondo, correct?

14       A.        That's correct.

15       Q.        Okay.  So would Mr. Thorseth and

16  the TIGER team continue to monitor seismic

17  during the drilling of this well?

18       A.        They would.  It looks like they

19  got some new seismic data.

20       Q.        Okay.

21       A.        And I don't know the timing of

22  that, but it was certainly since Jay took the

23  prospect to the exploration forum.  And the

24  team will continue to work it and will -- as

25  the well is drilled, they will be applying

```
 1    that data back into the seismic to calibrate
 2    the seismic.
 3         Q.    Now, as the well is being
 4    drilled and as they are going down to the
 5    anticipated pay zones, what testing do they
 6    do to see what those pay zones show?
 7         A.    After the pay zones are drilled,
 8    then we run wireline logs which make variety
 9    of physical measurements.  And on the basis
10    of those measurements, we determine whether
11    there is reservoir present and whether the
12    reservoir contains hydrocarbons.
13         Q.    And would Mr. Thorseth and his
14    team monitor those wireline logs?
15         A.    Yes.
16         Q.    Okay.  I'm now handing you
17    what -- what is Tab 26 which is marked 3228.
18         (Exhibit No. 3228 was marked.)
19         Q.    (BY MR. BOWMAN)  I think that's
20    what you were telling me about earlier.
21               Who is Mr. Daly?
22         A.    He is the global head of
23    exploration, and I have a dotted line
24    relationship to him.
25         Q.    Okay.  I'm now going to show you
```

```
 1   what has -- is Tab 27, which is marked 3229.
 2          (Exhibit No. 3229 was marked.)
 3          Q.     (BY MR. BOWMAN)  That's from you
 4   again to Mr. Daly.  And this is April 15th,
 5   right?
 6          A.      Yeah.
 7          Q.      Now, you're recommending that --
 8   you're recommending that you TD at the
 9   current depth, right?
10          A.      That's correct.
11          Q.      Okay.  So you stayed involved,
12   as far as from your production side, all the
13   way through the drilling down to TD, right?
14          A.      I don't understand the reference
15   to production.
16          Q.      Okay.  Well, yesterday you were
17   saying you were a geologist and you didn't
18   get involved in drilling and completion.  But
19   even though you're not directly involved in
20   drilling and completion, you seem to stay up
21   on what's going on, enough so that April 15th
22   you make a recommendation that you don't
23   drill -- that BP not drill any deeper, right?
24          A.      Because there is no -- we don't
25   see prospectivity.  There is only -- the
```

```
 1   purpose for drilling wells is to test for
 2   prospectivity.
 3        Q.     Sure.  So your side and your
 4   team stayed involved enough to make
 5   recommendations on the prospectivity, right?
 6        A.     That's correct.
 7        Q.     Okay.  Again, working hand in
 8   hand, so to speak, with drilling and
 9   completion?
10        MR. LANCASTER:  Object to form.
11        A.     The drilling and completions
12   have no input into the presence or absence of
13   prospectivity.
14        Q.     (BY MR. BOWMAN)  Right.  But
15   you're making a recommendation on whether
16   they drill or not?
17        A.     That's correct.
18        Q.     Let's go to Tab 28 now.  This is
19   being marked as 3230.
20        (Exhibit No. 3230 was marked.)
21        Q.     (BY MR. BOWMAN)  This is a few
22   days earlier.  You see Sunday -- well,
23   actually, it's later.  It's April 18th,
24   right?
25        A.     Uh-huh.
```

```
 1            Q.      Two days before the blowout.
 2    And it's from Mr. Thorseth, again, to you?
 3            A.      Yeah.
 4            Q.      And who are these other people?
 5            A.      The names down here --
 6            Q.      Yeah.
 7            A.      -- in the e-mail?
 8            Q.      Yeah.  And who are they and what
 9    do they do?
10            A.      Okay.  So Jay -- let me give you
11    the context for the e-mail first.
12            Q.      Sure.  Please do.
13            A.      So when we make a discovery,
14    there is then a process around how that
15    discovery is handed over to our development
16    organization.  So a team is created that is a
17    combination of explorers and what we would
18    call appraisers slash developers.
19                    And then their role now is to
20    make a recommendation to Mr. Daly and
21    Mr. Shaw, who is the head of the global
22    developments organization, whether this
23    discovery merited being developed.  So this
24    is Jay making a recommendation to me as to
25    what -- or who the members of that appraisal
```

1   review board should be, the discovery review

2   board.

3                    So he said I, Jay Thorseth, will

4   be the chair.  And now because we're moving

5   more into -- we're talking about development,

6   so we're now beginning to see more engineers

7   come in here.  So Rob Marshall is the manager

8   of subsea engineering.  And that this was

9   going to be developed because it was a small

10  discovery.  It was going to be a subsea

11  development.

12                   Jami Zinkham was the resource

13  appraisal advisor.  Charlos Ward, I don't

14  know who that is.  It looks like a project

15  engineer.  It's going to be the project

16  manager in the developments organization if

17  it went forward.

18                   Bryan Ritchie is the exploration

19  team leader.  Russ Stauffer is the commercial

20  manager.  Important, obviously, because this

21  is a big commercial decision.

22                   Doris Reiter is the resource

23  team leader for Pompano because this -- if

24  this was developed, it would be a tieback to

25  Pompano.

1           And then Kelly McAughan was the

2    reservoir engineer for the prospect and was

3    the keeper of all the reservoir engineering

4    knowledge on the prospect and on the well.

5         Q.     Okay.  Let me give you tab 30

6    which is Exhibit 3231.

7           (Exhibit No. 3231 was marked.)

8         Q.     (BY MR. BOWMAN)  And just keep

9    that together with the one you just had

10   because I think that may tie together.

11          So Exhibit 3231 is an e-mail

12   from you and it's dated April 20th?

13        A.     Right.

14        Q.     And it indicates logging is

15   complete, production casing has been set, and

16   temporary abandonment is at progress.  The

17   well is a discovery.

18        A.     Uh-huh.

19        Q.     What do you mean by "the well is

20   a discovery"?

21        A.     It discovered hydrocarbons.

22        Q.     Okay.  And how do you know that?

23   How did you know that on April 20th, 2010?

24        A.     We had drilled -- we had drilled

25   the target section and we had wireline logged

1    the target section.

2          Q.      Okay.  And who had looked at

3    those wireline logs?

4          A.      I'm sure people in my

5    organization had and people upstream in the

6    developments organization, I'm sure, had

7    looked at those logs.

8          Q.      Do you know where those wireline

9    logs are today?

10         A.      I have no idea.

11         Q.      Now, did those wireline logs,

12   did anyone do any kind of calculation from

13   those logs about anticipated recovery

14   amounts?

15         A.      I -- by this time frame, I don't

16   know if that work had been done.  That would

17   have been the role of this team, frankly.

18   Prior to drilling the well, predictions had

19   been made and the well came in very close to

20   prognosis.

21         Q.      Uh-huh.  Okay.  One reason I was

22   asking that question is, I took the

23   deposition a couple of weeks ago of -- I

24   can't remember what her name is.  In

25   financial, very bright lady.  And she said

```
 1    that y'all set the original anticipated
 2    recovery of barrels when you started the
 3    well, and that as far as she knew, that had
 4    never been updated for any more recent data.
 5              Is that the way y'all -- BP
 6    would do business, that is, they wouldn't
 7    update the data as they got more wire log
 8    information?
 9    A.      By April the 20th, given that we
10    were, say, I don't know, within a week of
11    having run the logs, given that that would
12    have been the role of this team to do that
13    work, no, I'm not surprised it hasn't been
14    done.
15    Q.      Okay.  Because this team --
16    A.      At this time --
17    Q.      -- is going to take the logs --
18    A.      This team -- that would be the
19    role of this team.
20    Q.      Okay.  The e-mail of the 20th
21    looks like Mr. Thorseth is still there but
22    now we have a couple of other people that
23    look like they're different.  Who are they?
24    Why did you send it to them?
25    A.      Mr. Addison --
```

```
 1          Q.      Yes.
 2          A.      -- and Michelle --
 3          Q.      Yes.
 4          A.      -- Judson?
 5                  Mr. Addison was the vice
 6    president of appraisal, project appraisal in
 7    the global projects organization.  So he
 8    would have been the receiver of this project.
 9                  Michelle Judson is the vice
10    president of resource appraisal, which is
11    really an advisory role reporting to
12    Mr. Daly.
13          Q.      Okay.  So it looks like that you
14    were the person that had the right to declare
15    the well a discovery?
16          A.      That's correct.
17          Q.      Okay.  And going in you thought
18    you had a very high likelihood of having a
19    good well, correct?
20          A.      In what time frame?  Going into
21    what?
22          Q.      Before you started drilling the
23    Macondo well?
24          A.      It was a good prospect, yes.
25          Q.      Yeah.  And -- okay.  Let me show
```

1  you what is Tab 19 which has been marked

2  previously as Exhibit 572.  It appears to be

3  an e-mail from you on the 26th.  And that is

4  to -- to me, a lot of people in drilling and

5  completion.  You've got Mr. Sims, Mr. Guide,

6  Mr. Hafle, Mr. Morel, Mr. Cocales,

7  Mr. Sepulvado.  Both Sepulvados.

8  Mr. Vidrine.  Why did you send this?

9          A.      As it says in the first

10  sentence:  I have a standing agenda item on

11  my leadership team staff meeting.  Or in

12  recognitions so -- recognizing people who

13  have done a good job.

14          Q.      So this was sent to them kind of

15  indicating that all of them had gone more or

16  less above and beyond, as far as you were

17  concerned?

18          A.      That's the way it seemed at the

19  time.

20          Q.      Okay.

21          A.      So my direct reports had taken

22  the trouble to recognize their colleagues in

23  the drilling -- in the wells team.

24          Q.      Okay.

25          A.      Because they were the ones who

1    had tested the prospect for us.

2        Q.      But was it your idea to send

3    this?  Or did Mr. Thorseth say this would be

4    a good idea?  Or how did that e-mail actually

5    come into being?

6        A.      I don't know.  I tried -- when

7    people are recognized at my staff meeting, I

8    try to let those individuals know.

9        Q.      Would they be at your staff

10   meeting?

11        A.      The people who -- the

12   addressees?

13        Q.      Yes, sir.

14        A.      No, they would not.

15        Q.      No.  And you copied Mr. Ian

16   Little?

17        A.      That's correct.

18        Q.      Okay.  Again, you don't know if

19   it was your idea or Mr. Thorseth or somebody

20   else's idea that you put this e-mail together

21   and send it to all these people?

22        A.      No.  But it's something that I

23   try to do if somebody's -- if somebody around

24   my table recognizes an individual, if I can

25   speak to them face to face, I will.  But if

```
1   it's -- if I know it's not going to be
2   possible to speak face to face, this group is
3   not on my floor, many of them are in the
4   field, I probably decided the easiest way for
5   me to do this is by e-mail.
6        Q.    Okay.  Now -- and what were you
7   actually trying to recognize them for, do you
8   know?
9        A.    They had put a lot of effort
10  into drilling this well.  And ultimately the
11  prospect had been tested and the well was at
12  TD and it was a discovery, so it seemed
13  appropriate to say thank you.
14       Q.    By March 26th it was at TD and
15  you were -- as far as you were concerned, it
16  was a discovery?
17       A.    That's correct.
18       Q.    And did y'all -- and you say:
19  It demanded more than its fair share.
20            What did you mean by that?
21       A.    There were difficult parts to
22  the well.  The well was difficult.
23       Q.    Had you heard the term "well
24  from hell" by then?
25       A.    No, not at that point.
```

1      Q.      Not at that point?

2      A.      No.

3      Q.      While you hadn't heard that

4  term, you did know it had been exceedingly

5  difficult to drill that well?  Was that what

6  you were trying to share here, that it was

7  really hard and they had done a great job?

8      A.      It was certainly more difficult

9  than the recent wells that we had drilled.

10      Q.      And what do you remember at this

11  date, March 26th, making it so difficult?

12      A.      I don't remember what I

13  remembered on this date.

14      Q.      Do you remember if there were

15  various kicks?

16      A.      I imagine I was aware of the

17  kicks and the lost circulation.

18      Q.      And the lost circulation.  How

19  about a stuck pipe, were you aware of that?

20      A.      I probably was.  I'm sure I was.

21      Q.      Because you -- again, because

22  you kept up with what was going on?

23      A.      Yeah.

24      Q.      Now, sitting here today knowing

25  what you have found out in the last year,

1    would you still have sent this e-mail

2    congratulating everybody for such a good job?

3            A.      That's a hypothetical question.

4            MS. KUCHLER:  Object to the form of the

5    answer.

6            A.      Knowing what I knew then, this

7    seemed like the right thing to do.

8            Q.      (BY MR. BOWMAN)  I understand

9    that.

10            My question now is, this is a

11    little over a year later, knowing what you

12    know today, would you have still sent this

13    same e-mail?

14            A.      In this situation at this time

15    in the well, knowing what I knew then, this

16    seemed like the right thing to do.

17            Q.      Not saying it wasn't.  In --

18    March 26th.  I'm saying we're sitting here

19    today June 3rd -- I think it's the 3rd --

20    would you send an e-mail to these same people

21    today congratulating them for a job well

22    done, going above and beyond?

23            A.      Clearly today, no.

24            Q.      Okay.  Let's go to Tab 20.  I'm

25    handing you what is Tab 20, Exhibit 3232.

```
 1              (Exhibit No. 3232 was marked.)
 2        Q.      (BY MR. BOWMAN)  Can you go to
 3   the bottom part of it, it says:  Just talked
 4   to Dave --
 5              By the way, who is this from?
 6        A.      It's from Xuemei Liu, who was
 7   the commercial manager for exploration.
 8        Q.      Actually, Xuemei Liu is who I
 9   did take the deposition of.  She's very
10   bright.
11              What does it mean, Out of the 87
12   days / 10K in the NDT, how much --
13              That whole sentence, what does
14   that mean?
15        A.      Let me read the e-mail.
16        Q.      Sure.
17        A.      Okay.  So it looks like we were
18   trying to complete the paperwork for the well
19   and needed to get approval for what we
20   thought the ultimate cost of the well was
21   going to be.  And I was trying to understand
22   the components of that cost.  So out of -- I
23   would take this to mean -- 25th.  Out of the
24   predicted 87 days for 10K, how much of that
25   was due to BOP problems.  So I'm looking to
```

```
 1    find how much of the additional cost was due
 2    to BOP --
 3          Q.     Okay.
 4          A.     -- problems.
 5          Q.     Okay.  And what was the
 6    additional cost?  Can you tell from this?
 7          A.     No.
 8          Q.     But you were trying to ascertain
 9    how much of the additional cost was related
10    to the BOP problems?
11          A.     I was just trying to understand
12    what the components of the additional costs
13    were.
14          Q.     Okay.  And did this 151 million
15    eventually get approved?
16          A.     I can't -- I don't know.  I
17    can't --
18          Q.     Let me show you Item 21 and
19    we're going to have to -- Tab 21,
20    Exhibit 3233.
21          (Exhibit No. 3233 was marked.)
22          Q.     (BY MR. BOWMAN)  Then I bet our
23    videographer is going to tell me to stop.
24                 Do you recognize that document?
25          A.     I don't remember it, but I
```

1    certainly received it, by the looks of it.

2         Q.     Okay.  And that indicates that

3    MOEX anyway has approved the Macondo second

4    supplemental AFE for 151 million gross?

5         A.     Yeah.

6         MR. BOWMAN:  Okay.  Yeah.

7         THE VIDEOGRAPHER:  We're going off the

8    record at 9:27.  This is the end of Tape 1.

9                    (Break.)

10        THE VIDEOGRAPHER:  We're back on the

11   record at 9:43.  This is beginning of Tape 2.

12        Q.     (BY MR. BOWMAN)  Mr. Rainey, I'm

13   going to give you an exhibit that's

14   previously been marked as 2422 that is Tab 31

15   in the binder.

16             Now, what in the world are you

17   doing there?

18        A.     I'm reading down in the bottom

19   half here.

20        Q.     Read the whole memo because my

21   question is really what are you doing that's

22   shown in that memo -- or that e-mail.

23        A.     Are there any other e-mails

24   around this?

25        Q.     Not that I know of.  There may

```
 1   be, but I don't have it.
 2         A.      And the question is?
 3         Q.      What is this about?
 4         A.      Okay.  Well, I think --
 5   recognize this is Sunday, April the 25th.
 6         Q.      Yes, sir.
 7         A.      And I think it has to do with
 8   permits for the relief wells.
 9         Q.      Okay.
10         A.      I think it's some conversations
11   around what needed to be included in the
12   application.
13         Q.      Okay.
14         A.      That's what I think it is.
15         Q.      And what did you have to do with
16   the relief wells?
17         A.      Looks like I had been asked to
18   comment on the seismic interpretation of the
19   top hole section and how that might have
20   related to what we had seen in the Macondo
21   top hole section.
22         Q.      Okay.  By the way, who did the
23   wireline on the Macondo well?  Was it
24   Schlumberger?  Or do you know?
25         A.      I don't -- it probably was
```

1    Schlumberger, but I couldn't say that for

2    certain.

3        Q.     That's fine.  I'm going to hand

4    you now what is Tab 29, which has previously

5    been marked 1146.  It's a series of e-mails

6    where you're copied.

7          Can you look at the very last

8    page -- well, next to last page at the top

9    where it says:  Here is my first pass at the

10    SOO letter?

11        A.     Uh-huh.

12        Q.     And the last sentence:  While

13    the Nile P&A timing is a critical path to us,

14    the MMS unit group may not see it that way.

15          What is the Nile P&A timing

16    that's being talked about?

17        A.     I believe we had some obligation

18    to P&A a well on Nile.

19        Q.     Okay.

20        A.     I'm not certain.

21        Q.     The "we" being, of course, BP,

22    right?

23        A.     I believe that to be the case.

24        Q.     Okay.  And do you know if there

25    were getting to be a timing problem on

1   finishing up the Macondo in time to do the

2   necessary work on the Nile?

3          A.      I don't know the details of

4   that.

5          Q.      Who would?

6          A.      Well, the person who wrote the

7   e-mail, perhaps.

8          Q.      Dale Morrison?

9          A.      Could be, yeah.

10         Q.      Who is Dale Morrison?

11         A.      He's a land person.

12         Q.      Let me ask you a couple of

13   things to make sure what you know about.  Do

14   you know about annular pressure buildup?

15         A.      In -- very general, yes.  But

16   not in any -- I have no expertise in the

17   matter.

18         Q.      Okay.  Do you know that BP first

19   started encountering annular pressure buildup

20   in the Gulf in the late '90s?

21         MR. LANCASTER:  Object to form.

22         A.      (Witness nods.)

23         Q.      (BY MR. BOWMAN)  You don't know

24   that one way or the other?

25         A.      I don't know that for a fact.

```
 1          Q.      Okay.  Do you know if part of

 2    the casing design that was typically used by

 3    BP after the late '90s up to this Macondo

 4    well was triggered in part by annular

 5    pressure buildup?

 6          A.      I don't know that.

 7          Q.      Do you know if that's the reason

 8    that they would typically have burst disk?

 9          A.      (Witness nods.)

10          Q.      You don't know that?

11          A.      I don't know that.

12          Q.      That's strictly on the drilling

13    side?

14          A.      Right.

15          Q.      And so you've never even heard

16    that?

17          A.      I've heard the words, but I

18    don't --

19          Q.      You've heard the words, but you

20    haven't heard the reasons for the words; is

21    that fair?

22          A.      I don't understand the science

23    behind the words.

24          Q.      Have you asked anyone to explain

25    it to you?
```

```
 1              A.      No.
 2              Q.      Okay.  Did you get involved in
 3     any way with the centralizer issue on the
 4     Macondo well?
 5              A.      I don't believe I did.
 6              Q.      Okay.  Have you ever been
 7     involved in any issues as to the number of
 8     centralizers that should or would not be used
 9     on a well?
10              A.      Not that I'm aware of.
11              Q.      Not your deal?
12              A.      No.
13              Q.      How about did you get involved
14     in the use of a long string for the -- on the
15     production casing in this well?
16              A.      I don't believe so.
17              Q.      Okay.  You were aware or were
18     you not aware that a long string was
19     ultimately used?
20              A.      I am aware of it.
21              Q.      Were you aware of it at the time
22     it was being used?
23              A.      I first became aware on that
24     daily summary report --
25              Q.      Yes.
```

```
 1           A.       -- when I saw the words
 2    "production casing."  And I actually thought
 3    it was a mistake because I had not seen that
 4    before.  I always seen "production liner."
 5           Q.       And who did you ask about that?
 6           A.       I didn't.
 7           Q.       You just -- you saw it, you
 8    thought it was a mistake and you just went
 9    on --
10           A.       I thought it was a typo by the
11    geologist who was preparing the report.
12           Q.       And based on that, you just
13    assumed it was a typo and you went on your
14    way?
15           A.       Yeah.
16           Q.       Okay.  When is the next time
17    after that that the question of liner versus
18    long string reached your radar, so to speak?
19           A.       I believe I was -- I had a
20    conversation with Doug Suttles very early on
21    in Robert, so it might have even been on the
22    Friday -- on the Friday night when we arrived
23    at Robert.  And I said something about I saw
24    this word "production casing" and Doug said,
25    oh, so it was a long string.  And at that
```

```
 1    point I go, okay, maybe this wasn't a

 2    mistake, maybe this is...

 3            Q.      Okay.  Was this the Friday after

 4    the blowout?

 5            A.      That's correct.

 6            Q.      Okay.  And did you ask Mr. --

 7    did y'all have any further discussion on why

 8    it was a long string and not a liner?

 9            A.      No.

10            Q.      Have you ever had any discussion

11    with anybody about it since that time?

12            A.      I don't think I discussed it.

13    I've followed along with some of the -- on

14    C-SPAN and things I've listened to.

15            Q.      Okay.  Did you have anything to

16    do with -- do you know what circulating a

17    bottoms-up is?

18            A.      I do.

19            Q.      Okay.  Did you have anything to

20    do with whether or not to circulate a full

21    bottoms-up on the production before the

22    cement was fed on the production casing --

23            A.      No.

24            Q.      -- in this particular well?

25            A.      No.
```

```
 1            Q.      No.  And it's the first time you
 2   heard about that coming into question is
 3   after the blowout?
 4            A.      Yes.
 5            Q.      Do you have any opinions on it
 6   one way or the other sitting here today?
 7            A.      No.
 8            Q.      Do you know that generally it's
 9   preferable to circulate a full bottoms-up?
10            MR. LANCASTER:  Object to form.
11            A.      Not -- not in my expertise.
12            Q.      (BY MR. BOWMAN)  You haven't
13   asked anyone whether it's generally better to
14   do that or not?
15            A.      No.
16            Q.      Okay.  Hadn't read anything on
17   it?
18            A.      I'm sure I've read reports in
19   the media.
20            Q.      Okay.  How did you come to know
21   what a bottoms-up was?
22            A.      Because I worked as a rig
23   geologist 30 years ago.
24            Q.      Yeah.  It's pretty basic, isn't
25   it?
```

```
 1              A.      Uh-huh.
 2              Q.      And what is accomplished by
 3     circulating a full bottoms-up?
 4              A.      From a rig geologist's
 5     perspective, is it brings up the cuttings
 6     from the bottom of the well so we know what
 7     was in the last hundred feet or so of the
 8     wellbore.
 9              Q.      And you can analyze the
10     cuttings?
11              A.      That's correct.
12              Q.      Now, I don't think you did.  Did
13     you have anything to do with the
14     interpretation of the negative test on the
15     Macondo well?
16              A.      Nothing.
17              Q.      Have you ever been involved in
18     interpreting a negative test?
19              A.      No.
20              Q.      You probably have heard the
21     words "negative test"?  Or have you before
22     this well?
23              A.      I'm not sure I had before this
24     well.
25              Q.      Okay.  Now, have you been
```

1    involved in any way in trying to reconstruct,

2    I'll say, the flow path of the hydrocarbons

3    on the Macondo well?

4         A.    I don't think so, no.

5         Q.    Okay.  When you say you don't

6    think so --

7         A.    No, I haven't.

8         Q.    Okay.  By that, that means you

9    haven't; and if you have, it's such an

10   insignificant amount, you're just trying to

11   make sure you didn't forget about it?  Is

12   that fair?

13        A.    That's correct.

14        Q.    Okay.  Now, then, let's look at

15   9.  This is Tab 9 being marked as

16   Exhibit 3234.

17        (Exhibit No. 3234 was marked.)

18        Q.    (BY MR. BOWMAN)  Now, then, this

19   is from Ian Little to you and Mr. Thorseth,

20   who was your manager of exploration.  You may

21   have told me, I don't remember what you said,

22   who is Sammye Berryhill?

23        A.    Sammye was my admin assistant.

24        Q.    Okay.  Now, this has to do with

25   some sort of finger injuries or something is

1    what it looks like to me.

2          A.      This is 2009.

3          Q.      Yes.  I'm just trying to wonder,

4    you're exploration, why are you involved in

5    analysis of finger injuries?

6          A.      Again, we try to stay in -- to

7    be informed on what was happening on rigs

8    that were carrying out work for exploration.

9          Q.      To the detail of analyzing --

10   I'm not trying to minimize finger injuries,

11   because if you have one, they hurt.  But you

12   say it evolved into the detail of particular

13   types of injuries, huh?

14         A.      We -- everybody tried to learn

15   from all the incidents so --

16         Q.      Okay.

17         A.      Finger injuries can happen in

18   the office just as easily as they can happen

19   on the rig.

20         Q.      I'm now handing you Tab 12,

21   Exhibit 3235.

22         (Exhibit No. 3235 was marked.)

23         Q.      (BY MR. BOWMAN)  It is August of

24   2009 from you.  Ian Little.  Start out

25   August 19th from Mr. Little to you.  Again,

```
 1   who is Mr. Little?
 2        A.      He was the -- I don't remember
 3   what his title was at the time, but he was
 4   essentially the drilling manager for the
 5   HORIZON.
 6        Q.      Okay.  Pretty high up?
 7        A.      Yes.
 8        Q.      All right.  So why is he sending
 9   you and Mr. Thorseth this information about
10   logging and being critical of Schlumberger's
11   recent performance, that type stuff?
12        A.      Can I read the e-mails?
13        Q.      Sure.
14        A.      So, again, just trying to piece
15   it together from these e-mails, it looks like
16   I was -- we were in conversations around
17   costs for the Macondo well.
18        Q.      Yeah.
19        A.      I had noticed that the costs for
20   evaluating Macondo were significantly higher
21   than the actual costs for evaluating the
22   Isabella well.  Isabella was essentially a
23   very similar well, at least in terms of what
24   we thought Macondo was going to be, to
25   Macondo.
```

```
 1                  And I asked the question why --
 2      why did you allow seven days for evaluating
 3      Macondo well when we evaluated Isabella in
 4      four and a half days.
 5           Q.      So at this time you're involved
 6      in the cost of the evaluation on the Macondo,
 7      right?
 8           A.      I'm asking questions about the
 9      cost, yes.
10           Q.      Why are you asking questions as
11      opposed to one from the drilling side?
12           A.      Because the budget for the
13      exploration well comes through exploration.
14           Q.      Okay.
15           A.      It comes through me.
16           Q.      That's the reason you approve
17      the AFE?
18           A.      That's correct.  Or people in my
19      line.  Mike Daly.  Because most of these
20      wells are beyond my authority.
21           Q.      Let's go to Tab 16.
22           MR. LANCASTER:  Counsel.
23           MR. BOWMAN:  Yes.
24           MR. LANCASTER:  I think you're at your
25      75 minutes.
```

1     MR. BOWMAN:  Okay.  So are we stopping?

2     MR. LANCASTER:  Yes, we.  Have a

3  schedule to keep.

4     MR. BOWMAN:  I'm happy to keep going.

5     THE VIDEOGRAPHER:  We're going off the

6  record at 10:02.

7              (Break.)

8     THE VIDEOGRAPHER:  We're back on the

9  record at 10:04.

10              <u>EXAMINATION</u>

11  BY MR. HEIDEN:

12     Q.     Good morning, Mr. Rainey.  My

13  name is Tom Heiden, H-e-i-d-e-n, and I

14  represent a company called Nalco, N-a-l-c-o,

15  which you may or may not have heard of.  Or

16  have you heard of it?

17     A.     I have heard of Nalco.

18     Q.     I realize you've been at this

19  for a long time.  If you don't hear one of my

20  questions, let me know and I'll repeat it.

21  If you don't understand one of my questions,

22  let me know and I will rephrase it until you

23  do understand it.  Is that agreeable?

24     A.     That's fine.  Thank you.

25     Q.     Mr. Rainey, if you could focus

```
 1   on efforts directed at the oil that was being
 2   released after April 20.  If you could do
 3   that, that's what I want to ask you questions
 4   about.
 5          A.      Uh-huh.
 6          Q.      You with me?
 7          A.      Yeah.
 8          Q.      Sir, did those efforts include
 9   surface burns of oil?
10          A.      They did.
11          Q.      Did those efforts include the
12   use of booms or booming?
13          A.      They did.
14          Q.      Did those efforts, Mr. Rainey,
15   include skimming oil from the surface of the
16   Gulf?
17          A.      Yes, they did.
18          Q.      And did those efforts,
19   Mr. Rainey, also include the use of
20   dispersants?
21          A.      Yes, they did.
22          Q.      Did you yourself participate
23   with the unified command?
24          A.      I did.
25          Q.      Tell us how you participated
```

1   with the unified command, if you would, sir.

2       A.      I was deputy incident commander

3   at Robert.  So deputy incident commander of

4   the unified area command at Robert.

5       Q.      Did you meet with the unified

6   command at Robert regularly?

7       A.      I was part of the unified

8   command.

9       Q.      So when they met, you were

10  there?

11      A.      So there were regular meetings

12  of unified command.  And early on, if Doug

13  Suttles wasn't available, then I would sit in

14  his chair.  Early on, again, sometimes even

15  if he was there, I would sit in the back.

16      Q.      Did you also meet with, as part

17  of those meetings or otherwise, the FOSCs?

18      A.      I did.

19      Q.      How often?

20      A.      Frequently.  They -- we had the

21  regular meetings.  The FOSCs were -- I'm not

22  sure if they were in the immediately next

23  office, but they were very close.  And we'd

24  meet in the corridor and we'd meet in each

25  other's offices.  So very regular

1   conversations.

2       Q.      Mr. Rainey, were requests,

3   proposals, suggestions for responding to the

4   oil that was actually released brought to the

5   unified area command?

6       A.      In what sense?

7       Q.      In the most general sense.  Let

8   me try it again.  Requests or proposals or

9   suggestions or plans for how to respond to

10  the oil that was actually being released,

11  were those things brought to the unified

12  command?

13      A.      There was a piece of the unified

14  command structure that was the alternative

15  response technology -- I'm not sure what

16  you're talking about.  If you're talking

17  about the 5,000 suggestions that we got every

18  day for how to deal with the oil, that was

19  handled through the alternative response

20  technologies group which was part of the

21  unified command.

22      Q.      What I'm -- what I'd be happy to

23  have you narrow this to are suggestions --

24      A.      Uh-huh.

25      Q.      -- BP's suggestions, for

```
 1    instance --
 2           A.       Right.
 3           Q.       -- for skimming, burning,
 4    booming, dispersants, were they brought to
 5    the unified command?
 6           A.       They were part of unified
 7    command.  So yes.
 8           Q.       And were they brought to FOSCs?
 9           A.       The FOSC was part of the unified
10    command.  So the conversations were happening
11    all the time, how do we best respond to this.
12           Q.       So the answer to that question
13    is yes also?
14           A.       Again, I'm not sure what you
15    mean by were proposals brought.
16           Q.       Well, let me try it again.
17           A.       Proposals surfaced in those
18    conversations.
19           Q.       Were all of the actions, so far
20    as you know, for responding to the oil that
21    was released subject to the approval of the
22    FOSC?
23           A.       Absolutely.
24           Q.       And did you -- and in that
25    respect, I mean you, BP -- undertake to do
```

1    anything with skimming or burning or booming

2    or dispersants without the approval or

3    direction of the United States government?

4         A.      Not to my knowledge.

5         Q.      And did you undertake to do

6    anything -- again, skimming or burning or

7    bombing or dispersants -- without the

8    approval or the direction of the FOSC?

9         A.      Not to my knowledge.

10        Q.      And further narrowing the focus,

11   Mr. Rainey, to dispersants.  Were you

12   required to obtain permission from the FOSC

13   before using any dispersants?

14        A.      Yes.

15        Q.      Were you required to do that

16   each time before you used dispersants?

17        A.      We did get a point -- we get to

18   a -- we got to a point, I believe, where we

19   got approval for maybe a week at a time,

20   maybe a month at a time for specific amounts.

21   But in general in answer to your question,

22   yes.

23        Q.      Was there any use of

24   dispersants, so far as you know, over the

25   objection of the United States government or

```
 1    the FOSCs?
 2         A.      Not that I'm aware of.
 3         Q.      And were any -- any of the
 4    things concerning the actual use of
 5    dispersants done without the approval and
 6    direction of the United States government and
 7    the FOSCs?
 8         A.      No.
 9         Q.      Thank you, sir.
10         MR. O'KEEFE:  Mr. Rainey, my name is
11    Patrick O'Keefe.
12         THE VIDEOGRAPHER:  Wait a minute.
13    We're off the record at 10:12.
14                     (Break.)
15         THE VIDEOGRAPHER:  We're back on the
16    record at 10:12.
17                   EXAMINATION
18    BY MR. O'KEEFE:
19         Q.      Mr. Rainey, my name is Patrick
20    O'Keefe, and today I'm here on behalf of two
21    of the cleanup responders, O'Brien's and NRC.
22    Are you familiar with those two companies?
23         A.      I am.
24         Q.      All right.  I wanted to follow
25    along the thread that my colleague
```

1    established a few minutes ago by asking you,

2    within the incident command structure, was

3    there a safety officer who was responsible

4    for dispersant safety?

5         A.      I imagine there was in Houma,

6    but I don't believe there was a safety

7    officer who was specifically charged with

8    dispersant safety at Robert.

9         Q.      You indicate that you think

10   there might have been somebody in Houma.  Do

11   you have any idea what that individual's name

12   might have been?

13        A.      No.

14        Q.      Okay.  Did you personally go out

15   to the DEEPWATER HORIZON site between

16   April 20 and April 22 when the vessel sank?

17        A.      No.

18        Q.      So you would have no personal

19   knowledge about the activities that went on

20   between the blowout on April 20th and the

21   sinking of the rig on the 22nd?

22        A.      No.

23        Q.      Okay.  Are you familiar with the

24   federal agency called OSHA, O-S-H-A?

25        A.      I am.

1      Q.     To your knowledge, did OSHA

2   participate in cleanup response activities

3   such has the spraying of dispersants, in situ

4   burning, booming, skimming, any of those

5   things?

6      A.     I don't know.

7      Q.     All right.  What is your

8   impression -- or what information do you have

9   about OSHA's involvement with regard to

10  safety and health plans?

11     A.     I believe OSHA was involved

12  certainly in the -- developing the plans for

13  air monitoring and for worker safety

14  monitoring, but I don't know the details of

15  that.

16     Q.     Do they have personnel from that

17  agency present in the -- in Robert or in

18  Houma, that you know of?

19     A.     I'm not -- I don't know.

20     Q.     Okay.  Are you familiar with an

21  entity called NIOSH, that's the National

22  Institute of Occupational Safety and Health?

23     A.     I am.

24     Q.     Did that agency or did that

25  entity participate in cleanup response

1    activities such as the spraying of

2    dispersants, the in situ burning, the booming

3    and the skimming?

4         A.      Again, I believe NIOSH was

5    involved in developing the plans for

6    monitoring worker health and public health,

7    but I don't know the details of where their

8    representatives were and how that was done.

9         Q.      Okay.  Do you know the name of

10   anybody who represented NIOSH in this

11   process?

12        A.      No.

13        Q.      Okay.  Were OSHA or -- and NIOSH

14   involved in any of the decision making with

15   regard to the use of dispersants, in situ

16   burning, skimming and booming?

17        A.      I'm sorry, could you repeat?

18        Q.      Sure.  We've been talking about

19   two agencies or entities, OSHA and NIOSH.

20        A.      Right.

21        Q.      And my question was:  Were they

22   involved in any of the decision making or in

23   the decision-making process with regard to

24   the use of dispersants, in situ burning,

25   booming and skimming?

```
 1        A.       I don't know.
 2        Q.       I think that's all I have,
 3   Mr. Rainey.  Thanks very much.
 4        A.       Thank you.
 5        THE VIDEOGRAPHER:  We're going off the
 6   record at 10:16.  This is the end of Tape 2.
 7                  (Break.)
 8        THE VIDEOGRAPHER:  We're back on the
 9   record at 10:20.  This is beginning of
10   Tape 3.
11                  EXAMINATION
12   BY MS. CHILDRESS:
13        Q.       Good morning, Mr. Rainey.  I
14   have just a few questions for you.  You
15   mentioned yesterday that you had read the DNV
16   report, right?
17        A.       Not from cover to cover, but
18   pieces of it, yes.
19        Q.       Okay.  And you're a geologist;
20   isn't that correct?
21        A.       I am.
22        Q.       And I think you mentioned a
23   number of times in your testimony yesterday
24   that you're a geologist, not an engineer,
25   right?
```

1          A.      That's correct.

2          Q.      Now, have you yourself conducted

3     any analysis of the BOP?

4          A.      No.

5          Q.      Have you inspected or conducted

6     any testing of the BOP?

7          A.      No.

8          Q.      Have you ever been involved in

9     any forensic testing of a BOP?

10          A.      No.

11          Q.      So you're not prepared to

12     testify here today regarding the methodology

13     or further detail about the DNV report?

14          A.      No.

15          Q.      Thank you very much.

16          A.      All right.

17          THE VIDEOGRAPHER:  We're going off the

18     record at 10:21.

19                    (Break.)

20          THE VIDEOGRAPHER:  We're back on the

21     record at 10:41.

22                    EXAMINATION

23     BY MS. KUCHLER:

24          Q.      Mr. Rainey, my name is Deb

25     Kuchler.  With me I have Miele St. Julien.

1    Together we represent Anadarko.

2              What degrees do you hold?  I

3    know you told us that you were a geologist,

4    but what college degrees or university

5    degrees do you hold?

6         A.    I have a bachelor's in geology

7    from the University of Edinburg and I have a

8    Ph.D. in geology from the University of

9    Edinburg.

10        Q.    And you got that Ph.D. in 1980,

11   I see from your linked in profile?

12        A.    That's correct.

13        Q.    Do you hold any certifications?

14        A.    No.

15        Q.    Or licenses?

16        A.    No.

17        Q.    Have you ever been to well

18   control school?

19        A.    Not well control school, no.

20        Q.    Okay.  When you say it that way,

21   it makes me think that you have been to some

22   other sort of school.  What other formal

23   education or classroom-type training do you

24   have in addition to your Ph.D.?

25        A.    In the matter of drilling, I --

```
 1    20 years ago I did stuck pipe school.
 2         Q.      Stuck pipe school.  And where
 3    was that?
 4         A.      Lafayette.
 5         Q.      How long did the class last?
 6         A.      I can't remember.  More than one
 7    day.
 8         Q.      Was there a certification
 9    attached to finishing that class
10    successfully?
11         A.      I don't believe so.
12         Q.      Now, given your Ph.D., should we
13    actually be calling you Dr. Rainey?
14         A.      You can.
15         Q.      It's a lot of work.  So you're
16    entitled to the recognition.
17         A.      Mister is fine.
18         Q.      Okay.  Fair enough.
19              Now, you testified before the
20    Committee On Energy and Natural Resources for
21    the United States senate on November 19th,
22    2009, didn't you?
23         A.      I did.
24         Q.      Do you recall that testimony?
25         A.      Not the details of it but I --
```

1          Q.       But that you did it?

2          A.       I recall doing it.

3          Q.       If you could turn to Tab 2,

4    please.  What's listed as Page 35 in Tab 2, I

5    have it highlighted there in the middle.

6          A.       Okay.

7          Q.       You were quoted as saying,

8    quote:  To be clear, any release from our

9    operations is unacceptable.

10                  Do you still stand by that

11   statement today?

12         A.       Yes.

13         Q.       And so is this a statement that

14   was made reflecting BP's philosophy as well

15   as your own?

16         A.       I believe it was, yes.

17         Q.       So the release of oil from the

18   DEEPWATER HORIZON and the Macondo well on

19   April 20th, 2010, then, is unacceptable in

20   BP's viewpoint; is that correct?

21         A.       I think that's correct.

22         Q.       And in your personal viewpoint,

23   it is also unacceptable; is that right?

24         A.       I think that's correct.

25         Q.       You went on to say:  We will

```
 1    continue to invest in research and technology
 2    to drive us to our ultimate goal of zero
 3    discharge.
 4              Did I read that correctly?
 5       A.    Yes.
 6       Q.    Is that also a statement of BP's
 7    philosophy?
 8       A.    I believe it is.
 9       Q.    And so BP does have an ultimate
10    goal of zero discharge; is that right?
11       A.    I believe that's correct.
12       Q.    And of course in the case of the
13    Macondo well, that goal was not met, was it?
14       A.    It was not.
15       Q.    Because I'm following behind
16    many others, bear with me as I scroll through
17    because I have stricken out those questions
18    that have already been covered.
19              Yes, let's mark the hearing
20    transcript as Exhibit 3236.
21       (Exhibit No. 3236 was marked.)
22       Q.    (BY MS. KUCHLER)  And that was
23    Tab 3 in the binder?
24       MS. ST. JULIEN:  2.
25       Ms. KUCHLER:  2.  Thank you.
```

```
 1            Q.      (BY MS. KUCHLER)  Before the
 2   spudding of the Macondo well and during
 3   Macondo operations, you were BP's vice
 4   president of Gulf of Mexico exploration; is
 5   that right?
 6            A.      That's correct.
 7            Q.      And BP's goal with respect to
 8   the Macondo area was to gain operatorship of
 9   that field; is that fair?
10            A.      I don't quite understand the
11   question.
12            Q.      Okay.  Well, let's take a look
13   at Tab 5.  Maybe that will help us hone in.
14   Tab 5 bears Bates number
15   BP-HZN-2179MDL00112388.  And it appears to be
16   an e-mail from you to Neil Shaw, who I
17   understand was the person to whom you
18   reported; is that right?
19            A.      That's correct.
20            Q.      And the date was June 5th, 2009?
21            A.      That's correct.
22            Q.      If we could look, please, at the
23   third line it says:  BHPB does not want Noble
24   to operate.  Who is BHPB?
25            A.      It's BHP, Billiton Petroleum.
```

```
 1           Q.      Okay.  And what connection did
 2    they have with the Macondo well?
 3           A.      None.
 4           Q.      Okay.  So why is there a
 5    reference to what they want with respect to
 6    Macondo?
 7           A.      If you let me read the e-mail --
 8           Q.      Sure.
 9           A.      -- it appears to be more about
10    the Freedom prospect.
11                   So I have frankly no idea why
12    Macondo is on the subject line for this.
13    This entire e-mail is about the Freedom
14    prospect.
15           Q.      Okay.  So the subject line is a
16    little confusing there, then?
17           A.      Right.
18           Q.      All right.  But I am interested,
19    though, in the line in one, two, three, four,
20    five or six lines down where it says:  I
21    pointed out that we have more leverage to
22    gain operatorship of the field if we were the
23    operator of 992.
24                   I realize that the details of
25    that line are not relevant to the Macondo,
```

```
 1    given what you just told us.  But is it
 2    important for BP to obtain operatorship in a
 3    prospect like Macondo?
 4         A.      Sometimes; sometimes not.
 5         Q.      Was it considered important for
 6    the Macondo well that BP gained operatorship
 7    of the well?
 8         A.      Operatorship wasn't an issue for
 9    Macondo because we owned the acreage a
10    hundred percent.  We were already the
11    operator.
12         Q.      So what are the benefits of
13    being the operator versus being a
14    nonoperating investor?
15         A.      Control of schedule.  For
16    Macondo, the obvious development was a
17    tieback to Pompano, which is one of our
18    facilities.  So enabling us to tie it back to
19    Pompano.
20         Q.      Well, in addition to controlling
21    the schedule, the operator also gets to
22    direct and control the drilling operations
23    themselves; isn't that right?
24         MR. LANCASTER:  Object to form.
25         A.      Can you rephrase -- can you
```

1    repeat the question?

2         Q.     (BY MS. KUCHLER)  Sure.  In

3    addition to directing the schedule, which you

4    said was one of the reasons why it's a

5    benefit to be the operator, the operator also

6    gets to direct the drilling operations

7    themselves; isn't that true?

8         MR. LANCASTER:  Object to form.

9         A.     They are -- they can be the

10   operator of the well if they choose to be.

11        Q.     (BY MS. KUCHLER)  And so tell me

12   what that means, that the operator can be the

13   operator of the well.

14        A.     The operator of the lease --

15        Q.     Okay.  The operator of the

16   lease?

17        A.     -- does not necessarily have to

18   be the operator of the well.  You can

19   delegate that to somebody else.

20        Q.     Okay.  In the case of Macondo,

21   was BP the operator of both the lease and the

22   Macondo well?

23        A.     That's correct.

24        Q.     And so as the operator of the

25   lease and the well, it would have been BP who

1    would have been in the position to direct and

2    control the drilling of the Macondo well; is

3    that a fair statement?

4         A.     In conversations with the

5    partners, yes.

6         Q.     All right.  What was your role

7    with respect to Macondo daily operations, if

8    any?

9         A.     Essentially with regard to daily

10   operations, none.  I received a daily summary

11   of the previous 24 hours of operations.

12        Q.     So did you actively participate

13   in Macondo daily operations?

14        A.     No.

15        Q.     Did you have any decision-making

16   authority over Macondo operations?

17        A.     Only to the extent of the

18   stratigraphy and the prospectivity that we

19   were testing.  But in terms of actual

20   operations, no.

21        Q.     So if I were to ask you

22   questions about specific drilling activities

23   such as conducting the negative test,

24   converting the float collar, those kinds of

25   things, you would not be able to shed any

1  light on how and when that was done on the

2  Macondo?

3         A.     Absolutely not, no.

4         Q.     So what was the purpose of you

5  receiving the daily reports and monitoring

6  the well's progress?

7         MR. LANCASTER:  Object to form.

8         A.     I have an interest in the

9  progress of the well.  The well is to test

10  the prospect that my teams have developed

11  over, in many cases, many years.  And we like

12  to stay in touch with the wells so that we

13  understand the progress and when we're going

14  to get to target.

15         Q.     (BY MS. KUCHLER)  Did you ever

16  provide any feedback on operational issues to

17  the well's team leader for the Macondo well,

18  John Guide?

19         A.     I don't believe so.

20         Q.     Did you ever provide any

21  feedback on operational issues to the well

22  site leaders on the rig?

23         A.     I don't believe so.

24         Q.     Did you ever provide any

25  feedback on operational issues to the

1   drilling engineers?

2        A.      I don't believe so.

3        Q.      Now, earlier, I believe in

4   response to Mr. Bowman's question, you

5   mentioned that you saw something in an e-mail

6   that you thought was a typographical mistake

7   with respect to the long string versus the

8   liner, and that you didn't take it upon

9   yourself to try to investigate that.

10       A.      Uh-huh.

11       Q.      Was there ever a time that you

12  received information in a daily report or

13  otherwise about operational activities

14  related to the Macondo well and you did

15  intervene to investigate or provide resources

16  or anything of that sort?

17       A.      Not that I can think of off the

18  top of my head.

19       Q.      So if you had seen, for example,

20  in a daily report a reference to a negative

21  test where there was 1,400 pounds of pressure

22  on the drill pipe and none on the kill line,

23  is that something that from your position you

24  would have questioned?

25       A.      No, I would not.  And I don't

```
 1    believe I would have seen that on the summary

 2    report.

 3         Q.    When did you learn of the

 4    blowout and explosion on the DEEPWATER

 5    HORIZON?

 6         A.    I received a telephone call from

 7    Pat O'Bryan, who is our vice president of

 8    drilling and completions, at about 11

 9    o'clock, thereabouts, on the 20th of April.

10    And at that point he was on the DAMON

11    BANKSTON and the rig had been evacuated and

12    he called me to tell me that there had been

13    an explosion and the rig had been evacuated.

14         Q.    Where were you when you got that

15    call?

16         A.    In bed.

17         Q.    And what was the purpose of him

18    calling you about the blowout?  Did he have

19    an assignment for you or was it

20    informational?

21         A.    It was informational.  He did

22    ask me -- and I had two telephone calls with

23    him because I asked him to let me get out of

24    bed and get my thoughts straight, wake up,

25    and then he called me back.
```

```
 1              And then after the second one,
 2   he asked me to just check that the crisis
 3   team had been mobilized.  And I did that.
 4   And he asked me to call his wife and David
 5   Sims' wife and let them know that they were
 6   okay.
 7        Q.      What information, if any, did he
 8   give you about the blowout itself in those
 9   calls?
10        A.      In the second call -- I have
11   carried around for many years just a
12   checklist of questions that if I ever did get
13   a call like this, that I would ask, just it's
14   a habit I developed from having done oil
15   spill drills.  My mind doesn't work without
16   some checklists at times like that.  So I
17   run -- the time of the second call I had got
18   my checklist and I was just running through
19   my questions, and he answered those questions
20   to the best of his ability.
21        Q.      Did you take down notes to the
22   answers to those questions?
23        A.      I did.
24        Q.      Have you produced those notes?
25        A.      I believe so.  I'm not sure.
```

```
 1          Q.     Do you have your checklist with

 2    you today?

 3          A.     No.

 4          Q.     Tell me what kinds of

 5    questions --

 6          A.     It's possible it may be in my

 7    briefcase, actually.

 8          Q.     I'd appreciate it if you'd

 9    check.

10          A.     Right now?

11          Q.     No.  Let's go ahead and wait

12    until we get to the end of the tape and that

13    will be a better use of our time, I think.

14          A.     Uh-huh.

15          Q.     What kinds of questions are on

16    your checklist?

17          A.     Is the source controlled.

18          Q.     Obviously we know the answer to

19    that one --

20                 (Multiple voices.)

21          Q.     -- no.  Right?

22          A.     Status of people.

23          Q.     And what did he tell you with

24    respect to the status of people?

25          A.     He told me -- he gave me the
```

1    number on board and he said at that point

2    there were -- when he was talking to me,

3    there were 12 people unaccounted for.

4                Status of notifications.

5    Actions taken to respond to the incident.  So

6    just a series of questions like that.

7         Q.     Did he give you any information

8    on what he thought might have been the cause

9    of the blowout?

10        A.     No.

11        Q.     I was confused about when you

12   received word of the blowout because of some

13   time differences on the e-mail that

14   Mr. Bowman had you look at, which was

15   identified Exhibit 3231.

16              If you would look at Tab 9 in

17   the binder.  That same e-mail appears at

18   Bates number BP-HZN-2179MDL01617881.  Now,

19   the time on the e-mail that Mr. Bowman showed

20   you at Exhibit 3231, which is this same

21   e-mail, was dated April 20th but at a time

22   after the blowout, and this same exact body

23   of the e-mail and everything seems to be

24   dated April 21, 2010, at 12:45 a.m.  And I

25   was wondering if you could shed any light on,

```
 1   A, whether you sent this e-mail before or

 2   after the blowout, first?

 3        A.      I certainly wasn't sending

 4   e-mails at a quarter to 1:00 in the morning

 5   on April the 21st.

 6                So what was the timing on the

 7   other one?

 8        MS. KUCHLER:  Do we have Exhibit 3231

 9   there?

10        Q.      (BY MS. KUCHLER)  The time on

11   Exhibit 3231 says:  Tuesday, April 20th at

12   2344.

13                It looks like the exact same

14   e-mail.

15        A.      There is some timing issue here

16   because I know I did not send this e-mail

17   either at 12:45 a.m. on the 21st or -- I

18   don't understand this.

19        Q.      Okay.

20        A.      This is not an e-mail that I

21   would have sent after learning about the

22   incident.

23        Q.      Well, that's why I was confused.

24   After learning of the incident, you wouldn't

25   be sitting down writing the well as a
```

1    discovery, would you?

2        A.      No.

3        Q.      Okay.  So let's attach this

4    other version of the e-mail as Exhibit 20 --

5    I'm sorry -- 3237.

6        (Exhibit No. 3237 was marked.)

7        Q.      (BY MS. KUCHLER)  So while we

8    don't know what time you did send it, you are

9    comfortable in testifying that you did not

10   send it after the explosion?

11       A.      Yes.

12       Q.      Let's turn our attention back to

13   the relationship between BP and Anadarko with

14   respect to the Macondo well.

15       A.      Uh-huh.

16       Q.      Part of your job was to go out

17   and see if you could find investors to

18   participate in the well; is that right?

19       A.      That's correct.

20       Q.      And you explored it with several

21   companies, right?

22       A.      Uh-huh.

23       Q.      And in the end Anadarko ended up

24   with a 25 percent working interest as a

25   nonoperator in that lease; is that right?

```
 1              A.      That's correct.

 2              Q.      And BP had a 65 percent

 3      interest, right?

 4              A.      That's correct.

 5              Q.      And BP was the operator, right?

 6              A.      That's correct.

 7              Q.      Now, did you have any part to

 8      play in negotiating or drafting or finalizing

 9      an actual written operating agreement that

10      would be signed by BP and Anadarko?

11              A.      Not the details of the operating

12      agreement.  I work with our land team on the

13      high level terms of the agreement but not on

14      the wording of the actual operating

15      agreement.

16              Q.      And what would you consider to

17      be high level terms of the agreement?

18              A.      Working interest, how much the

19      promote was, if any.

20              Q.      Okay.  What's a promote?

21              A.      A promote is -- let's say if

22      Anadarko was coming in for a 25 working

23      interest.  If we agreed to let Anadarko

24      participate in the well at a 25 percent cost

25      interest, that would be zero promote.  If we
```

```
 1   allowed them to come in at a 25 percent
 2   working interest for which they had to pay a
 3   50 percent cost interest, that would be a
 4   two-for-one promote.
 5        Q.     I see.  Okay.  And what was the
 6   promote in this instance?
 7        A.     I don't remember.
 8        Q.     Would that be reflected in the
 9   operating agreement?
10        A.     I believe it would, yes.  I
11   think it is, yes.
12        Q.     We're going to take a look at
13   the operating agreement in just a minute.
14        A.     Okay.
15        Q.     Drilling of the Macondo well had
16   already begun before Anadarko entered into
17   the operating agreement with BP; isn't that
18   right?
19        A.     I don't know.
20        Q.     Okay.  Let's take a look at
21   Tab 13, please.  This is the Daily Drilling
22   Report dated October 6, 2009.  And if you
23   look down at the bottom block, third line
24   from the bottom it says:  12:40, 10/6/09.
25   Date and time of spud.
```

```
 1                    Do you see that there?
 2          A.      No.   Where am I?   Where should I
 3   be?   Under --
 4          Q.      Third -- the last block -- I
 5   have it highlighted in yellow there.
 6          A.      Okay.   Thanks.
 7          Q.      Does this indicate that the
 8   Macondo well was spudded on October 6, 2009?
 9          A.      Yes, that looks -- that looks
10   correct.
11          Q.      All right.   We'll attach this as
12   Exhibit 3238.   And it bears Bates number
13   beginning with TRN-HCJ-00076343.
14          (Exhibit No. 3238 was marked.)
15          Q.      (BY MS. KUCHLER)   And then if
16   you could turn over to Tab 14.   This document
17   is the Ratification and Joinder of the
18   Operating Agreement for the Macondo Prospect.
19                    Do you see that?
20          A.      I do.
21          Q.      And if you turn over to the next
22   page, it shows that it was signed by BP and
23   Anadarko on December 17th, 2009; is that
24   correct?
25          A.      That's correct.
```

```
 1            Q.       And back on the first page under
 2   the "Now, therefore' paragraph, it says that
 3   Anadarko -- the Anadarko entities do hereby
 4   ratify, confirm and adopt and join the
 5   operating agreement that had been previously
 6   signed between BP and MOEX.
 7                     Is that right?
 8            A.       That's correct.
 9            Q.       And then if we keep going, that
10   operating agreement is attached to this
11   ratification and joinder.  And the first
12   page, first regular numbered page, says:
13   This agreement effective as of October 1st,
14   2009, is between BP and MOEX.
15                     Is that right?
16            A.       That's correct.
17            Q.       And that's the operating
18   agreement that Anadarko adopted by signature
19   on December 17th, 2009; is that right?
20            A.       That's correct, I think, but --
21            Q.       And it's --
22            A.       I know there are -- well, there
23   may be other legal documents around that I'm
24   not familiar with, so -- just --
25            Q.       So if this Ratification and
```

1   Joinder of the Operating Agreement dated

2   December 17th, 2009 is the agreement between

3   BP and Anadarko, then clearly the Macondo

4   well had been spudded before Anadarko entered

5   into the agreement with BP; is that fair?

6       A.      That looks to be the case from

7   these documents.

8       Q.      Okay.  If you could turn,

9   please, to Page 14 of the operating

10  agreement.  Under Section 4.1, Designation of

11  the Operator, it says:  BP Exploration &

12  Production Inc. is designated as the operator

13  of the contract area.

14          Did I read that correctly?

15      A.      That's correct.

16      Q.      And so BP was designated in the

17  operating agreement with Anadarko as the

18  operator of the Macondo lease; is that right?

19      A.      That's correct.

20      Q.      If you would please turn over to

21  Page 20, Article 5.1.  Exclusive Right to

22  Operate.  It says:  Except as otherwise

23  provided, the operator has the exclusive

24  right and duty to conduct or cause to be

25  conducted all activities or operations under

```
 1    this agreement.
 2              Did I read that correctly?
 3         A.     That's what it says.
 4         Q.     And so that comports with your
 5    understanding of the relationship of BP and
 6    Anadarko for the Macondo prospect, doesn't
 7    it, that BP had the exclusive right and duty
 8    to conduct or cause to be conducted all
 9    activities or operations on the Macondo
10    well --
11         MR. LANCASTER:  Object --
12         Q.     (BY MS. KUCHLER)  -- is that
13    right?
14         MR. LANCASTER:  Object to form.
15         A.     Can you repeat the question.
16         Q.     (BY MS. KUCHLER)  This comports
17    with your understanding of the relationship
18    between BP and Anadarko for this lease that
19    BP has the exclusive right and duty to
20    conduct or cause to be conducted all
21    activities or operations on the lease?
22         MR. LANCASTER:  Object to form.
23         A.     So I'm -- I'm not a legal
24    expert, so I would have to consult with my
25    attorneys to answer that question.
```

1      Q.      (BY MS. KUCHLER)  Well, you're

2  the one who actually went out and secured

3  Anadarko as a nonoperating co-lessee for this

4  prospect, right?

5      A.      Working with my land and legal

6  representatives, yes.

7      Q.      And it was your intention that

8  BP be the operator of the Macondo lease,

9  correct?

10      A.      That's correct.

11      Q.      And this contract which gives BP

12  that exclusive right and duty as the operator

13  was what you envisioned as BP's role, wasn't

14  it?

15      A.      Yes.  But I don't understand the

16  legal implications of all that.

17      Q.      But it's typical in the industry

18  for the operator of a lease like the Macondo

19  with 65 percent ownership interest to be the

20  one who would conduct the activities and

21  operations on the lease, isn't it?

22      A.      It's also typical to have

23  conversations with the co-owners as to what

24  those operations should be.

25      MS. KUCHLER:  Object to the

1    responsiveness of the answer.

2        Q.      (BY MS. KUCHLER)  Is the answer

3    to my question yes?

4        A.      Remind me what your question

5    was.

6        Q.      It's typical in the industry for

7    the operator with a 65 percent ownership

8    interest to have the exclusive right to

9    conduct the activities and operations on the

10   lease?

11       A.      Usually the operating agreements

12   give -- there are nonconsent clauses,

13   et cetera, that allow co-owners to conduct

14   operations as well.  So I don't know what --

15   we'd have to read the whole agreement to see

16   what's in here.

17       MS. KUCHLER:  I still have to object to

18   the responsiveness of the answer.

19       Q.      (BY MS. KUCHLER)  You haven't

20   given me a yes or a no.  You're entitled to

21   explain --

22       MR. LANCASTER:  First of all, no

23   speaking objections, whether it's the

24   questioner or the people that are sitting

25   here objecting to the question.  If you want

```
1    to object to the form, object to form.  Don't
2    make a speech.
3              Q.      (BY MS. KUCHLER)  Would you
4    answer my question, please?  Is it typical in
5    the industry for the operator with a 65
6    percent ownership interest to have the
7    exclusive right and duty to conduct the
8    activities as stated in this contract
9    provision?
10             MR. LANCASTER:  Object to form.
11             A.      I actually don't know if that's
12   typical in the industry or not.
13             Q.      (BY MS. KUCHLER)  Based on your
14   30 years' experience in exploration and
15   developing prospects, you can't answer that
16   question?
17             MR. HEBERLIG:  Objection to form.
18             MR. LANCASTER:  Object to form.
19             A.      I can't answer the question.
20             Q.      (BY MS. KUCHLER)  You certainly
21   have no reason to dispute the provision of
22   the contract that both parties sign here, do
23   you?
24             A.      I don't dispute the words that
25   are in front of me, but I would need to read
```

```
 1   the rest of the agreement to determine
 2   whether there were clauses in here that allow
 3   for other co-owners to conduct operations.
 4   There usually are nonconsent clauses in these
 5   agreements.
 6        Q.      And a consent agreement does not
 7   necessarily deprive the operator of the right
 8   and duty to conduct all activities and
 9   operations, does it?
10        MR. LANCASTER:  Object to form.
11        A.      Again, I'm not an attorney.
12        Q.      (BY MS. KUCHLER)  Okay.  But
13   your answer was no; is that right?
14        A.      My answer is --
15        Q.      You guys were speaking over each
16   other.
17        A.      My answer is I'm not an attorney
18   and I don't know.  It wouldn't be appropriate
19   for me to answer.
20        Q.      If we read the second sentence:
21   In performing services under this agreement
22   for the nonoperating parties, the operator is
23   an independent contractor not subject to the
24   control or direction of nonoperating parties
25   except as provided in Article 8.2 (Voting and
```

```
 1   Election Procedures) or Article 8.5 (Approved
 2   by Unanimous Agreement.
 3                   Did I read that correctly?
 4        A.      Yes.
 5        Q.      So according to this agreement,
 6   BP was an independent contractor with respect
 7   to the Macondo well; is that correct?
 8        MR. LANCASTER:  Object to form.
 9        A.      I'm not a legal expert.  I would
10   have to consult with my counsel on this.
11        Q.      (BY MS. KUCHLER)  The agreement
12   goes on to say:  The operator is not the
13   agent or fiduciary of the nonoperating
14   parties.
15                   Did I read that correctly?
16        A.      You did.
17        Q.      With the exception of any
18   feasibility team or project team formed under
19   this agreement, the operator shall select and
20   determine the number of employees,
21   affiliates, contractors and/or consultants
22   used in conducting activities or operations
23   under this agreement.
24                   Do you see that?  Did I read
25   that correctly?
```

1      A.      You did.

2      Q.      So with respect to the Macondo

3   well, for example, it was BP who contracted

4   with Transocean for the rig and drilling

5   activities; isn't that right?

6      A.      I don't know the answer to that

7   question.

8      Q.      Do you know who it is who

9   contracted with Halliburton to do the

10  cementing work?

11     A.      I would assume it was BP.

12     Q.      You don't have any evidence that

13  Anadarko contracted with any subcontractor

14  for any drilling work that was done on the

15  Macondo, do you?

16     A.      No.

17     Q.      And, in fact, it says in the

18  next sentence:  The operator shall contract

19  for and employ any drilling rigs, tools,

20  machinery, equipment, materials, supplies and

21  personnel reasonably necessary for the

22  operator to conduct the activities or

23  operations provided for in this agreement.

24          Did I read that correctly?

25     A.      You did.

1      Q.      And that would comport with your

2  understanding that Anadarko as a nonoperating

3  co-lessee did not contract for any of the

4  drilling equipment or personnel to conduct

5  the activities on the well; is that right?

6      A.      That's correct.

7      Q.      And when the decision was made

8  to send Mr. Ronnie Sepulvado to well control

9  school and bring in Bob Kaluza several days

10  before the incident, that was a BP decision,

11  wasn't it?

12      A.      I imagine it was, yes.

13      Q.      So if I understand your

14  testimony correctly, you did not play a part

15  in actually preparing the written operating

16  agreement that was signed by the parties?

17      A.      No.

18      Q.      And so would you say that the

19  document would speak for itself with respect

20  to what the terms are?

21      MR. LANCASTER:  Object to form.

22      A.      I'm not a legal expert.

23      Q.      (BY MS. KUCHLER)  I got that.

24  Would you agree with me with regard to your

25  testimony, if I went through and read

1    everything that's in here with you, your

2    answer would be that that's what the contract

3    says and you can't comment further; is that

4    fair?

5              A.      That's fair.

6              Q.      If you could turn over, please,

7    to Tab 15 which bears Bates number

8    BP-HZN-2179MDL01833704 and we will attach

9    this as Exhibit 3239.  This appears to be an

10   e-mail from you to several other folks dated

11   October 22nd.  Do you see that there?

12        (Exhibit No. 3239 was marked.)

13             A.      I do, yes.

14             Q.      (BY MS. KUCHLER)  And in the

15   middle of the page Mike Daly is telling you:

16   Dave, need to be sure to retain clear control

17   in Macondo.

18                Do you see that?

19             A.      I do.

20             Q.      Can you shed any light for us on

21   the context of this e-mail?

22             A.      Try and read the e-mail down

23   below.  It looks like we were closing in on

24   the deals with Anadarko and Mitsui.  So these

25   were -- both of these deals were quite

1   complicated.  It wasn't just around Macondo.

2   Other prospects were involved.  And Mike had

3   a concern that we -- I don't actually know

4   what was in his mind.  But we certainly have

5   a philosophy of having as much working

6   interest in good prospects as we can -- as we

7   can.

8        Q.       And having as much working

9   interest as you can equates to more control

10  of the prospect; is that fair?

11       A.       It can do.

12       Q.       Was it important to you in your

13  role with respect to Macondo to, quote,

14  retain clear control?

15       A.       From my perspective, it's

16  important to retain as much of the prize as

17  possible.

18       Q.       And what do you mean by "prize"?

19       A.       The barrels.

20       Q.       And does retaining clear control

21  also mean retaining clear control of the

22  operational activities that will be conducted

23  in the drilling?

24       A.       I don't know.  It could do.

25       Q.       Was that one of your intentions

 1    in trying to work through the Macondo deal

 2    with Anadarko was to make sure that BP

 3    retained clear control of the operational

 4    activities?

 5              A.       I think to retain operatorship

 6    was important, yes.

 7              Q.       Would you agree with this

 8    statement:  The operator of the well

 9    determines the detailed planning and

10    execution of the well?

11              A.       Usually in conversations with

12    the co-owners.

13              Q.       What do you mean by that, in

14    conversation with the co-owners?

15              A.       The well design is shared, I

16    believe, with the co-owners, and they get an

17    opportunity to comment on it and they -- when

18    they sign the AFE, they're usually signing

19    off on the well design.

20              Q.       Well, they're signing off to pay

21    that portion for the well design, correct?

22              MR. LANCASTER:  Object to form.

23              Q.       (BY MS. KUCHLER)  That's what

24    the function of the AFE is, right?

25              MR. LANCASTER:  Object to form.

```
 1            A.      I don't understand the question.
 2            Q.      (BY MS. KUCHLER)   In signing off
 3    on an AFE, the co-owner is agreeing to pay
 4    their portion of the cost that's reflected in
 5    the AFE, correct?
 6            MR. LANCASTER:  Object to form.
 7            A.      They also understand the -- the
 8    well design that lies behind the cost.
 9            MS. KUCHLER:  I'm going to object to
10    the responsiveness of the answer.
11            Q.      (BY MS. KUCHLER)   When the
12    co-lessee nonoperating investor signs off on
13    an AFE, are they agreeing to pay their share
14    of the costs reflected on that AFE?
15            A.      That's correct.
16            Q.      Do you agree that the operator
17    is responsible for the day-to-day activities
18    of and decisions executed by personnel on the
19    rig?
20            A.      Yes.
21            Q.      Would you agree that consistent
22    with standard industry practice around the
23    world, nonoperating investors rely upon the
24    operator to make the appropriate decisions on
25    the rig?
```

```
 1            A.      I believe so, yes.
 2            Q.      Now, you mentioned that the
 3    nonoperating investors get a copy of the well
 4    plan in association with the AFE.  Let's take
 5    a look at the well plan that Anadarko was
 6    provided for the Macondo well.  And that's at
 7    Tab 18.  It starts with Bates number
 8    BP-HZN-MBI00192549.  This, along with the
 9    operating agreement, are already attached as
10    deposition exhibits to Mr. Bodek's
11    deposition, so we won't reattach it here.
12            Do you recognize this
13    Authorization for Expenditure dated
14    August 28th, 2009?
15            A.      It doesn't look like I signed
16    it.  So I'm not sure whether I ever saw it or
17    not.
18            Q.      It does reflect Mississippi
19    Canyon 252, Macondo 252 No. 1 well, right?
20            A.      Right.
21            Q.      And you were ultimately
22    responsible for authorizations for
23    expenditure in your role; is that right?
24            A.      Right.
25            Q.      So whether you signed off on it
```

1  or not, this would have been done under your

2  jurisdiction, so to speak?

3          A.      That is correct.

4          Q.      This was actually before --

5  written before Anadarko even signed its

6  operating agreement, as you'll notice that it

7  was dated in August of '09.  But this is the

8  well plan.  These three pages, the AFE and

9  two attachments are the well plan.  Would you

10  agree with me that these three pages

11  significantly lack detail with respect to the

12  plan to drill the Macondo well?

13          A.      I don't know what's appropriate

14  detail for engineers to consider.

15          Q.      Well, you would agree with me

16  that it contains one diagram on Page 2 of the

17  proposed wellbore; is that right?

18          A.      That's correct.

19          Q.      And then a schematic on Page 3

20  that lays out that wellbore and also some of

21  the activities would be conducted in way of

22  logging and wirelining; is that right?

23          A.      That is correct.

24          Q.      If you look at the last arrow on

25  Page 3, that says that a CBL would be run on

1    the Macondo well; is that right?

2        MR. LANCASTER:  Object to form.

3        A.      Can you repeat the question?

4        Q.      (BY MS. KUCHLER)  Yes.  The last

5    arrow of the well plan that was provided to

6    the nonoperating investors reflects that a

7    CBL would be run for the Macondo well; is

8    that right?

9        MR. LANCASTER:  Object to form.

10       A.      Actually, I'm not sure just on

11   this copy what's showing up as planned and

12   what's optional here because I can't see any

13   distinction in the -- on these arrows.

14       Q.      (BY MS. KUCHLER)  You do know --

15       A.      I see a difference in the

16   legend, but I can't see any difference on

17   the -- on the actual chart.

18       Q.      You do know that a cement bond

19   log was never run on the production casing

20   cement job for the Macondo; is that right?

21       A.      I've heard that, yes.

22       Q.      Are you aware of anyone from

23   Anadarko ever visiting the DEEPWATER HORIZON

24   while the Macondo well was being drilled?

25       A.      No.

1      Q.      And you know, of course, that no

2    one from Anadarko was stationed on the rig

3    like the company men for BP, right?

4      A.      Right.

5      Q.      BP had already hired Transocean

6    as the driller of this well and the provider

7    of the rig before Anadarko even became a

8    nonoperating co-lessee, didn't it?

9      A.      I believe that the original well

10   was spudded with the Marianas, which was

11   Transocean, so...

12     Q.      And that was before Anadarko's

13   involvement?

14     A.      Right.

15     Q.      I'd like you to turn to Tab 21,

16   an exhibit that had already been attached to

17   Bobby Bodek's deposition as Exhibit 1251.

18   It's a string of e-mails starting with Bates

19   number DWHMX00068852.  And I'd like to turn

20   your attention to the last page where

21   Mr. Michael Beirne, who was BP's offshore

22   land negotiator, was responding to a request

23   of Mr. Ishii of MOEX.  Do you see that?

24     A.      This is on Page 3?

25     Q.      Yes.  Mr. Ishii had requested a

```
 1   copy of the drilling contract with

 2   Transocean.  And could you read for us the

 3   first paragraph of Mr. Beirne's response to

 4   Mr. Ishii?

 5        A.      I don't see Ishii-San's request.

 6        Q.      That would be on the second

 7   page.

 8        A.      So the time sequence here is

 9   from top --

10        Q.      From oldest --

11        A.      -- from bottom to top --

12               (Multiple voices.)

13        Q.      -- to the newest, correct?

14        A.      Okay.

15        Q.      Well, the first page is the

16   newest and the last page is the --

17        A.      Right.

18        Q.      -- oldest.

19               So on March 15th Mr. Ishii wrote

20   to Mr. Beirne, and at Bullet Point No. 3,

21   requested a copy of the rig contract?

22        A.      Okay.

23        Q.      And then would you read for the

24   record, please, Mr. Beirne's response in the

25   first paragraph on the third page.
```

1          A.      I sent a note on our drilling

2    group regarding the HORIZON contract.  As you

3    are aware, drilling contracts are highly

4    confidential and it is not customary to share

5    with other companies, including co-owners.

6          Q.      So Mr. Beirne refused to provide

7    to one of the co-owners a copy of the

8    drilling contract; is that right?

9          A.      He's making a statement.  I

10   don't know whether he ultimately refused or

11   not.

12         Q.      Well, the statement here is that

13   it isn't even customary to share that

14   contract with the other companies who are

15   paying a portion of the cost of the well; is

16   that right?

17         A.      That's what the statement says.

18         Q.      Now, the decision to call total

19   depth was BP's decision alone, wasn't it?

20         MR. LANCASTER:  Object to form.

21         A.      I would imagine that there were

22   conversations with the co-owners about that.

23         Q.      (BY MS. KUCHLER)  Do you have

24   any firsthand knowledge of that?

25         A.      No.

1       Q.      And if the documentary evidence

2   reflects that in fact total depth was called

3   before the co-owners were even notified,

4   would you have any reason to dispute that

5   with respect to the Macondo?

6       A.      Depends on the documentary

7   evidence.

8       Q.      Do you have any evidence that

9   anyone from Anadarko was involved in making

10   the decision to call total depth at 18,360

11   feet for the Macondo well?

12       A.      I don't know.

13       Q.      On the document you looked at

14   earlier in response to previous questions

15   which had been attached as Exhibit 3228.

16   3228, on April 9th an e-mail from Mike Daly

17   to you discussing total depth.  Is anyone

18   from Anadarko copied on that e-mail?

19       A.      Nobody from Anadarko is

20   contacted -- is copied on this e-mail.

21       Q.      And on Exhibit 3229 that you

22   discussed earlier, April 15th e-mail from you

23   to Mike Daly talking about the consensus view

24   is there is no justification to deepen the

25   well, was anyone from Anadarko copied on that

```
 1  e-mail string?
 2          A.      Nobody from Anadarko copied on
 3  this e-mail string between myself and my --
 4  and the global head of exploration in London.
 5  So clearly nobody would -- nobody from
 6  Anadarko would be copied on that.
 7          Q.      Now, as far as the use of the
 8  DEEPWATER HORIZON, it was BP who chose to use
 9  that rig as the drilling rig for the Macondo
10  well once the Marianas rig was not available;
11  is that correct?
12          A.      That's correct.
13          Q.      Did you participate in the
14  decision to use the DEEPWATER HORIZON for
15  Macondo?
16          A.      I can't remember specifically,
17  but I would expect that there were
18  conversations at the SPU leadership team
19  around how best to use the rig lead.
20          Q.      And did you participate in
21  those?
22          A.      I expect that I would have
23  participated.
24          Q.      Do you have any specific
25  recollection of the decision-making process
```

```
1    about why the DEEPWATER HORIZON was chosen?
2         A.      No.
3         Q.      Were other rigs considered to
4    drill the Macondo well?
5         A.      I don't know.
6         Q.      Do you know why BP did not use
7    the WEST SIRIUS rig to drill Macondo?
8         A.      No, I don't.
9         Q.      Take a look at Tab 27 to see if
10   that refreshes your recollection at all.
11   It's BP-HZN-2179MDL0182229 which we will
12   attach as Exhibit 3240.
13        (Exhibit No. 3240 was marked.)
14        Q.      (BY MS. KUCHLER)  I'm
15   specifically interested in the second bullet
16   point of the middle paragraph where it says:
17   BP drills Macondo with the WEST SIRIUS.
18             Does that refresh your
19   recollection?
20        A.      Let me read the memo.
21        Q.      Sure.
22        A.      So the context is that we were
23   in the throes of a deal with Devon, that they
24   were rig driven with their rig, which is WEST
25   SIRIUS.  That we were -- that they were rig
```

```
 1   driven.  That we were concerned that they

 2   would spud a well that when we closed the

 3   deal, we would suddenly be the operator of

 4   and it would -- potentially could be a train

 5   wreck and we didn't want that to happen.

 6                So another option that was

 7   considered was that we would take the WEST

 8   SIRIUS off their hands and put it on Macondo.

 9        Q.      So the WEST SIRIUS was a rig

10   that was available for use and BP chose not

11   to use; is that fair?

12        A.      No, it wasn't available for use

13   because I believe it was on contract to

14   Devon.  We would have had to have done a deal

15   with Devon to make that happen.

16        Q.      Were you aware that on

17   December 9th, 2009, BP considered an offer by

18   Anadarko for Anadarko to provide one of its

19   own rigs for the remainder of the Macondo?

20        A.      I don't remember that but --

21        Q.      Okay.  Take a look at Tab 28.

22        A.      Okay.

23        Q.      Which has already been attached

24   to Mr. Bodek's deposition at Exhibit 1262.

25   And on the second page of that document is an
```

1   e-mail from Ian Little to David Rich and

2   Kevin Lacey, copied to Jay Thorseth David

3   Sims, dated December 9th, 2009.  It says in

4   the middle of the page:  Also there is a

5   proposal from Anadarko to take one of their

6   moored rigs to do Macondo.  I have said we

7   would not want to do that.

8           Did I read that correctly?

9       A.      Yes, you read it correctly.

10      Q.      Were you part of the discussion

11  of whether or not to use the Anadarko rig for

12  Macondo?

13      A.      I don't remember being part of

14  it, but I may have been.

15      Q.      Do you know why BP would not

16  have wanted to do that?

17      A.      Let me see when the timing would

18  be.  We were very nervous with moored rigs,

19  particularly during storm season, and

20  particularly given the track record of the

21  Marianas.  And we had already had one rig

22  damaged, a moored rig damaged on this well,

23  and I imagine we didn't want to do that

24  again.

25      Q.      Do you know of any investigation

1  that was undertaken to compare the fitness of

2  the Anadarko rig with the fitness of the

3  DEEPWATER HORIZON before a decision was made

4  on which one to use?

5          A.      I'm not aware.

6          Q.      And then also in that e-mail, in

7  the first paragraph Mr. Little references in

8  discussions about the Koala and Gila wells.

9  Quote:  The key driver here is to force the

10  operatorship on both of these prospects,

11  close quote.

12          Again, I see an emphasis on

13  forcing the operatorship issue.  What

14  significance does that have to BP?

15          A.      It depends on the circumstances

16  of the prospect.

17          Q.      Well, I see a continued thread

18  among the e-mails seemingly placing

19  importance on driving operatorship, obtaining

20  operatorship, retaining operatorship.  And as

21  the vice president of exploration, I would

22  really appreciate it if you could explain to

23  me why operatorship is of such importance to

24  BP.

25          A.      Again, it depends on the

1    circumstance.  We're not averse to other

2    companies operating.  We have many -- we have

3    facilities that we don't operate -- or

4    other -- we are working interest owners in

5    other facilities that other companies

6    operate.

7         Q.     Would you agree with me, though,

8    that in those circumstances where BP is the

9    operator, BP jealously guards its role as

10   operator?

11        MR. LANCASTER:  Object to form.

12        A.     I can't speak for the firm in

13   general.

14        Q.     (BY MS. KUCHLER)  In your

15   position as vice president of exploration,

16   did you jealously guard BP's operatorship on

17   those prospects where it held that position?

18        A.     If it was appropriate to do so.

19        Q.     When would it not be appropriate

20   to do so?

21        A.     I can imagine a number of

22   examples where it wouldn't be appropriate to

23   do so.

24        Q.     Such as?

25        A.     A prospect that was in somebody

```
 1    else's heartland, close to their facilities.
 2           Q.      Okay.   That's one.   You said you
 3    could think of a number.   What are the
 4    others?
 5           A.      A prospect where there were many
 6    co-owners with similar working interests.
 7           Q.      Any others?
 8           A.      That's all I can come up with at
 9    the moment off the top of my head.   But I'm
10    sure if I had other -- other circumstances,
11    there would be others.
12           Q.      And neither of those
13    circumstances were present with the Macondo
14    prospect, were they?
15           A.      No.   I think we've already
16    talked about that.
17           Q.      Then if you would take a look at
18    Tab 30, please.   Getting back to the issue of
19    why the Anadarko rig was declined and the
20    DEEPWATER HORIZON accepted.   I wanted to
21    invite your attention to this document which
22    had previously been attached as Exhibit 1263
23    to Mr. Bodek's deposition.   It's a
24    September 17th e-mail from Nicholas Lirett to
25    Brett Cocales in which he is discussing the
```

1    DEEPWATER HORIZON.  And he says:  The rig is

2    not in appropriate condition to part a well!

3    I just hope we can convince Transocean's

4    management and the office to do the right

5    thing and take care of the critical items

6    that Kevin has presented to us from his

7    audit.  The rig management in the field is

8    getting pressure from their office to start

9    this well and change PMs just to get back to

10   business as usual.

11            Do you see that there?

12        A.    I don't see the word "HORIZON"

13   anywhere here.

14        Q.    Didn't the HORIZON come from the

15   Kodiak?

16        MR. LANCASTER:  Object to form.

17        A.    I don't understand the context

18   of this e-mail.

19        Q.    (BY MS. KUCHLER)  Was the

20   DEEPWATER HORIZON the drilling rig for the

21   Kodiak well?

22        A.    It did -- I believe the HORIZON

23   drilled Kodiak, but I don't know we -- which

24   rigs were on -- which rigs we considered

25   using for the Kodiak well.

1    Q.    Okay.  But if you look through

2  this e-mail string, the entire e-mail string

3  is talking about issues with the rig that

4  were being used to drill the Kodiak well.

5  And that rig was the DEEPWATER HORIZON,

6  wasn't it?

7    A.    I don't see anything that talks

8  about the HORIZON on the first page.

9    Q.    I'm asking you whether the whole

10  e-mail string deals with the rig that was

11  drilling the Kodiak.  Kodiak is mentioned, I

12  believe, on every page.

13    A.    I can't say whether this is

14  about the HORIZON or not.

15    Q.    Sir, that was not my question.

16  I've asked it twice.  Let me try again.

17         This e-mail string clearly

18  discusses the rig that is being used to drill

19  the Kodiak well, does it not?

20    A.    I can't see that.  It says --

21  it's a conversation about before we get

22  started on Kodiak.

23    Q.    Okay.

24    A.    So I don't know whether this is

25  about the rig that drilled Kodiak or not.

```
 1        Q.     We're almost at the end of the
 2   tape so we'll stop and change tapes.  If
 3   you'd like to take a break, we can.  If not,
 4   we'll push through.
 5        THE VIDEOGRAPHER:  We're going off the
 6   record at 11:40.  This is the end of Tape 3.
 7                 (Break.)
 8        THE VIDEOGRAPHER:  We're back on the
 9   record at 11:51.  This is beginning of
10   Tape 4.
11        Q.     (BY MS. KUCHLER)  You testified
12   before the break that you expected there were
13   conversations between BP and the co-owners
14   about operations or design with respect to
15   the Macondo.  I wanted to ask you if you
16   could point us to any specific conversation
17   between BP and the co-owners regarding either
18   operations or design?
19        A.     No.  I wouldn't have been
20   involved in those conversations.
21        Q.     And could you delineate for us
22   any specific topic that was discussed?  I
23   guess not since you weren't involved in any
24   of those?
25        A.     No.
```

```
 1              Q.      Can you point us to evidence of
 2    any operational decision made by Anadarko
 3    with respect to the drilling of the Macondo
 4    well?
 5              A.      No.
 6              Q.      Let's take a look at Tab 3 in
 7    your binder, which is your statement to the
 8    Senate Energy and Natural Resources Committee
 9    Hearing on Environmental Stewardship and
10    Offshore Energy Production dated November 19,
11    2009.  Are you with me?
12              A.      Tab 3.
13              Q.      Tab 3, your statement to the
14    Senate Energy and Natural Resources
15    Committee.
16              A.      Yeah, uh-huh.
17              Q.      We're going to label this
18    Exhibit 3241?
19              (Exhibit No. 3241 was marked.)
20              Q.      (BY MS. KUCHLER)  You've said
21    quite a few times in this deposition that
22    you're not an expert in operations.
23              A.      That's correct.
24              Q.      But in this statement to the
25    senate committee you actually did provide
```

1 input to the senate on operational issues,

2 didn't you?

3    A.    Well, I wouldn't have said these

4 were operational issues, but there are

5 operational terms in here, yes.

6    Q.    Okay.  And on Page 3 you gave

7 examples of the technologies which have

8 helped to reduce accidental releases, didn't

9 you?

10    A.    I did.

11    Q.    Okay.  And let's go through

12 those together.  The first one that you

13 mentioned to the senate committee was:

14 Downhole flow control valves that shut the

15 well automatically if damage to the surface

16 equipment is detected.

17         Did I read that correctly?

18    A.    You did.

19    Q.    On April 20th, 2010, was there

20 damage to surface equipment on the DEEPWATER

21 HORIZON due to the explosion?

22    A.    I imagine there was.

23    Q.    Did the DEEPWATER HORIZON have

24 downhole flow control valves that would

25 automatically shut down the well if damage to

1    the surface equipment was detected?

2         A.     I think this particular

3    technology is applicable to production wells.

4    Not exploration wells.

5         Q.     So we shouldn't have expected

6    the Macondo to have downhole flow control

7    valves to automatically shut the well in?

8         A.     From my naive perspective in

9    operations, that's what I would assume, yes.

10        Q.     The second thing you listed

11   there was:  Blowout preventer technology

12   which includes redundant systems and

13   controls.

14              Did I read that correctly?

15        A.     You did.

16        Q.     Would that technology address

17   exploration wells such as the Macondo?

18        A.     It would.

19        Q.     What were the redundant systems

20   and controls on the DEEPWATER HORIZON blowout

21   preventer?

22        A.     There were multiple blowout

23   preventers.

24        Q.     Weren't there two control units,

25   one in the tool pusher shack and one on the

1    bridge of the rig floor?

2          A.     I believe that's the case, yes.

3          Q.     And those two control units were

4    connected via MUX cables that were routed

5    through the moon pool and ran around the

6    riser to the BOP stack?

7          A.     That's way beyond my expertise.

8          Q.     So you don't know how they were

9    routed?

10         A.     No.

11         Q.     So would you be able to address

12   the impact of the explosion on those MUX

13   cables and whether that destroyed the ability

14   of the redundant system to operate correctly?

15         A.     No.

16         Q.     You also told the senate that

17   there are new and improved well control

18   techniques which maintain constant control of

19   the fluids in the wellbore, did you not?

20         A.     I did.

21         Q.     And would these techniques apply

22   to an exploration well such as the Macondo?

23         A.     I don't know for certain, but I

24   think this was a very new technology that we

25   may have done some pilots on but -- I don't

1   actually know the details of this one.  I

2   probably did at the time, but I can't

3   remember now.

4        Q.     So as we sit here today, are you

5   able to tell us whether or not the DEEPWATER

6   HORIZON had these new and improved well

7   control techniques available to it to

8   maintain constant control of the fluids in

9   the wellbore?

10       A.     Not sitting here today, no.

11       Q.     Have you read the Bly report

12  produced by BP's investigative team?

13       A.     No.

14       Q.     You also told the senate that

15  there are sensors which continually monitor

16  the subsurface and seabed conditions for

17  sudden changes in well pressures; is that

18  right?

19       A.     That's correct.

20       Q.     Did the Macondo have those

21  sensors installed on it?  The DEEPWATER

22  HORIZON, I'm sorry.

23       A.     Again, I suspect this is for

24  production wells.

25       Q.     Okay.  So none of the examples

1    of the technologies that you listed to the

2    senate to help reduce accidental releases

3    were in operation for the DEEPWATER HORIZON

4    other than the last one which was an ability

5    to monitor well pressures in real-time?

6            MR. HEBERLIG:  Objection to form.

7            MR. LANCASTER:  Object to form.

8            Q.    (BY MS. KUCHLER)  Is that fair?

9            MR. HEBERLIG:  Objection; form.

10           A.    No, that's not fair.

11           Q.    (BY MS. KUCHLER)  Tell me why

12   it's wrong.

13           A.    Well, there were multiple

14   blowout preventers, for a start.  And the

15   others, I said I wasn't sure.

16           Q.    Okay.  For the multiple blowout

17   preventers, did any of those blowout

18   preventers prevent this blowout?

19           A.    I know what I read in the DMB

20   report.

21           Q.    And that's that it did not,

22   correct?

23           MS. CHILDRESS:  Objection; form.

24           A.    I'm not an expert in BOP

25   technology.

```
 1              Q.      (BY MS. KUCHLER)  Sir --
 2              A.      I believe -- I believe some of
 3     the blowout preventers worked and others
 4     didn't.
 5              Q.      Well, sir, you claim not to be
 6     an expert and yet you were comfortable to
 7     discuss these issues with the United States
 8     senate, correct?
 9              MR. HEBERLIG:  Objection to form.
10              A.      Repeat your question.
11              Q.      (BY MS. KUCHLER)  You were
12     comfortable enough on these issues of blowout
13     preventer technology to discuss it with the
14     United States senate, correct?
15              A.      To discuss the existence of
16     these technologies, yes.  But not to get into
17     the details of them.
18              Q.      You testified yesterday that you
19     predicted the pore pressure and fracture
20     gradients for exploratory wells.  Did you
21     ever get involved in the actual pore
22     pressures and fracture gradients discovered
23     while drilling the Macondo well?
24              A.      I didn't testify yesterday that
25     I provided pore pressure or frac gradient
```

1   predictions.

2         Q.      Okay.   Did you ever get involved

3   in the actual pore pressures and fracture

4   gradients discovered during the drilling of

5   the Macondo well?

6         A.      I don't believe I did.

7         Q.      Okay.   What is your role or what

8   was your role as vice president of

9   exploration with respect to predicting pore

10  pressures and fracture gradients for

11  exploratory wells?

12        A.      I had no role.

13        Q.      No role.   Did you review the

14  information that came in on predicting pore

15  pressures and fracture gradients?

16        A.      No.

17        Q.      Did you ever get involved in

18  calculating the drilling margin for the

19  Macondo well?

20        A.      No.

21        Q.      Do you understand that there is

22  a drilling margin that consists of the

23  difference between the pore pressure and the

24  mud weight?

25        A.      I believe there are various

1  definitions of drilling margin, and that's

2  one of them.

3          Q.      And do you understand that there

4  is a drilling margin that consists of the

5  difference between the mud weight and the

6  fracture gradient?

7          A.      And that's another one of them.

8          Q.      And that's something that you

9  were trained as a geologist on, right?

10         A.      A long time ago.

11         Q.      And in part of your work in

12  evaluating prospects, do you evaluate the

13  pore pressures and fracture gradients of the

14  prospects?

15         A.      In some cases pore pressures and

16  fracture gradient has a bearing on seal

17  capacity for the prospect.  So yes.

18         Q.      Do you know what drilling margin

19  was set forth by BP in the Macondo

20  application for permit to drill that BP

21  submitted to the MMS?

22         A.      No.

23         Q.      Do you know if the drilling

24  margin during the drilling of the Macondo

25  well ever fell below the drilling margin that

1  was set forth in the application for permit

2  to drill that BP submitted to the MMS?

3       A.    No.

4       Q.    Who at BP had the obligation to

5  notify the MMS if the drilling margin ever

6  fell below the drilling margins set forth in

7  the application for permit to drill?

8       MR. LANCASTER:  Object to form.

9       A.    Can you repeat the question.

10      Q.    (BY MS. KUCHLER)  Sure.  Who at

11  BP had the obligation to notify MMS if the

12  actual drilling margin fell below the

13  drilling margin that was set forth by BP in

14  the application for permit to drill.

15      A.    I don't know that there was an

16  obligation to do that.

17      Q.    Whose responsibility would it be

18  to monitor whether the actual drilling margin

19  falls below the drilling margins set forth in

20  the permit?

21      A.    I would expect the drilling team

22  would be aware of what they're obligations

23  were.

24      Q.    Who's -- what does the drilling

25  team comprise?  What is the drilling team

1    comprised of?  Who's on that team?

2          A.      The drilling engineers, the

3    drilling supervisors, and the subsurface

4    representatives on that team.

5          Q.      All with BP, correct?

6          A.      We engage our contractors as

7    well.

8          Q.      Anadarko wasn't one of BP's

9    contractors, was it?

10         A.      It was not.

11         Q.      Now, finally, in your testimony

12   this morning when you talked about potential

13   conversations with co-owners, who at BP would

14   have been responsible for communicating with

15   Anadarko as a co-owner on well design issues?

16         A.      Some of those conversations

17   would take place through the land department

18   and some would take -- I would expect would

19   take place directly with the drilling teams.

20         Q.      Okay.  And who at the land

21   department would be charged with

22   communicating with Anadarko?

23         A.      I don't know specifically who

24   had responsibility for this well.

25         Q.      Okay.  And who on the drilling

1   team would be responsible for communications

2   with Anadarko?

3       A.      Again, I don't know specifically

4   who for this well would have had that

5   obligation.

6       Q.      Okay.  And would the same be

7   true of any conversations between BP and

8   Anadarko on operations?  Can you name for me

9   any specific person at BP who would have been

10  responsible for those kinds of conversations?

11      A.      Not specifically, no.

12      Q.      Would the land department be

13  charged with those communications?

14      A.      Not if they were in any

15  technical depth whatsoever.

16      Q.      Would the drilling team be

17  charged with those -- the responsibility for

18  those conversations?

19      MR. LANCASTER:  Object to form.

20      A.      I would expect.

21      Q.      (BY MS. KUCHLER)  Those are all

22  my questions.  Thank you.

23      A.      Okay.

24      THE VIDEOGRAPHER:  We're going off the

25  record at 12:03.

```
 1                    (Break.)
 2         THE VIDEOGRAPHER:  We're back on the
 3    record at 12:06.
 4                   EXAMANATION
 5    BY MS. McCULLEY:
 6         Q.     Mr. Rainey, I'm Catherine
 7    McCulley with Pilsbury, Winthrop, Shaw,
 8    Pittman in Houston and I have just a few
 9    questions for you today.
10              Are you aware of anyone from
11    MOEX ever visiting the DEEPWATER HORIZON?
12         A.     Not off the top of my head, no.
13         Q.     Do you have any reason to
14    believe that anyone ever did?
15         A.     No.
16         Q.     Did MOEX have any personnel
17    stationed on the DEEPWATER HORIZON?
18         A.     No, not that I'm aware of.
19         Q.     Are you personally aware of
20    anyone from MOEX ever providing technical
21    input on the operations of the Macondo well?
22         A.     I'm not personally aware, no.
23         Q.     What about any input from MOEX
24    with regard to the temporary abandonment
25    procedure for the Macondo well?
```

```
 1            A.        Not that I'm aware of.
 2            Q.        Are you aware of anyone from
 3   MOEX providing any technical input with
 4   regard to design of the Macondo well?
 5            A.        Again, I believe the well design
 6   would have been shared with MOEX.  And I'm
 7   not aware of any input received from MOEX.
 8            Q.        You're not aware of any
 9   technical input?
10            A.        Technical input.
11            Q.        Directing your attention to
12   Tab 18 in the binder that you --
13            A.        The binder?
14            Q.        -- just had.  Yes.
15                      And that is the AFE for
16   expenditure dated -- I believe it's
17   October 1st, 2009.  Yes.
18                      You testified earlier with
19   regard to this AFE.  And you'll note that on
20   this exhibit there is a signature from
21   Mr. Ishii-San, president of MOEX offshore?
22            A.        Uh-huh.
23            Q.        And attached to this is a Basis
24   of Design document, two pages?
25            A.        Yep.
```

1    Q.    Do you have any knowledge of any

2  well design materials other than what's

3  attached to this AFE being provided to MOEX

4  offshore?

5    A.    I don't personally have any

6  knowledge, no.

7    Q.    Do you have reason to believe

8  anything else was provided to them?

9    A.    I have no reason to believe

10  either way.

11    Q.    All right.  Do you have any

12  personal knowledge of anyone from MOEX being

13  involved in the decision to call total depth

14  at 18,360 feet?

15    A.    I have no personal knowledge of

16  that.

17    Q.    Do you have any personal

18  knowledge of any operational decision

19  regarding drilling of the Macondo well made

20  by MOEX?

21    A.    I have no personal knowledge,

22  no.

23    Q.    And my last question is:  Would

24  you agree with me that MOEX was not a member

25  or a participant in the BP drilling team that

1    you've testified about earlier today?

2         A.      No, they were not a member of

3    the wells team for Macondo.

4         Q.      And they did not participate in

5    what the wells team or drilling team did in

6    the course of their work?

7         A.      I don't know if there were

8    conversations with MOEX technical staff or

9    not.

10        Q.      You have no personal

11   knowledge --

12        A.      No, I have --

13        Q.      -- one way or the other?

14        A.      I have no personal knowledge one

15   way or the other.

16        Q.      That's all I have.  Thank you

17   very much.

18        A.      Thank you.

19        THE VIDEOGRAPHER:  We're going off the

20   record at 12:09.

21                    (Break.)

22        THE VIDEOGRAPHER:  We're back on the

23   record at 12:11.

24                    EXAMINATION

25   BY MR. LANCASTER:

1        Q.      Good afternoon, Mr. Rainey.

2        A.      Good afternoon.

3        Q.      I want to turn your attention to

4    what I believe is Tab 1 of Ms. Kuchler's

5    binder.  And that's Exhibit 572 and you were

6    asked some questions earlier about that.  Do

7    you recall that?

8        A.      I do.

9        Q.      All right.  And I believe you

10   were asked some questions about it,

11   and without any other historical documents

12   other than March 26th --

13       A.      Right.

14       Q.      -- Exhibit 572 in front of you,

15   and you said that you believed that the wells

16   team had reached total depth at the time that

17   you sent this March 26th e-mail.  So I'm

18   going to show you a couple of documents.

19   I'll mark the Daily Operations Drilling

20   Report March 26, 2010 as Exhibit 3242 and ask

21   you to take a look at that?

22       (Exhibit No. 3242 was marked.)

23       Q.      (BY MR. LANCASTER)  I'm also

24   going to hand you Exhibit 2370, it looks

25   like, which was discussed earlier, which

1    contains the three financial memoranda, and

2    I've highlighted some language at the back of

3    the third financial memoranda, and give you a

4    minute to look at both of those.

5         A.       Okay.  Okay.

6         Q.       Having had a chance to look at

7    those documents, does that refresh your

8    recollection as to whether or not the wells

9    team had reached total depth as of March 26,

10   2010?

11        A.       Yes.  And clearly the well had

12   not reached total depth --

13        Q.       All right.

14        A.       -- on March the 26th.

15        Q.       At the time that you sent your

16   March 26th e-mail, were you aware that the

17   well had encountered losses and taken a kick

18   on March 8th, and that the well had cost more

19   and taken longer than originally anticipated?

20        MR. BOWMAN:  Objection; form.

21        MS. KUCHLER:  Objection; form.

22        Q.       (BY MR. LANCASTER)  You can

23   answer.

24        A.       The details, I'm not sure.  But

25   certainly, yes, this had -- whole -- this had

```
 1   been a difficult well to this point, and I
 2   was aware that they had taken kicks and lost
 3   circulation.
 4        Q.     Okay.  What is the date of your
 5   signature on the financial memoranda that I
 6   put in front of you?
 7        A.     30th of March.
 8        Q.     All right.  And does the
 9   financial memoranda that I put in front of
10   you that you signed on the 30th of March
11   indicate that the well had taken losses?
12        A.     Yes, it does.
13        Q.     Does it indicate that the well
14   had taken at least one kick?
15        A.     It does.
16        Q.     And does the financial memoranda
17   reflect a request to allocate more funds
18   because the well had taken longer and cost
19   more than originally anticipated?
20        MS. KUCHLER:  Object to form.
21        A.     It does, I believe, involve a
22   request for additional funds to complete the
23   well.
24        Q.     (BY MR. LANCASTER)  Okay.  Now,
25   having had your recollection refreshed with
```

1    respect to the context around Exhibit 26,

2    look at the sentence that reads:  I know that

3    this well had demanded more than its fair

4    share of your time and attention and wanted

5    you to know that it has not gone unnoticed or

6    unrecognized.

7              What were you trying to

8    communicate to David Sims and John Guide and

9    Mark Hafle and Brian Morel and Brett Cocales

10   and Maurice Sepulvado and Ronald Vidrine and

11   Don Lupe [phonetic] early when you -- when

12   you wrote that?  And Mr. Bodek, for that

13   matter?

14        MR. BOWMAN:  Objection; form.

15        A.     I was trying to recognize the

16   fact that this had been a difficult well.  I

17   knew that it had required a lot more than

18   eight hours a day for five days a week.  They

19   had worked very hard to get the well to this

20   point.  And it looks like this point was --

21   the whole section above the target section.

22   And I just wanted to recognize them for what

23   they had accomplished.

24        Q.     (BY MR. LANCASTER)  All right.

25   And you say:  Thank you for your commitment

```
 1    but to remain by far the highest performing
 2    exploration wells team in the Gulf of Mexico.
 3                   What were you saying to them
 4    when you wrote that?
 5        A.       I was congratulating them again
 6    on the work they had done in the well to this
 7    point and consistent with the work that they
 8    had done over the previous years and previous
 9    wells.
10        Q.       And were you aware even
11    generally of the safety record of the
12    DEEPWATER HORIZON that it had achieved up to
13    that date?
14        A.       I was.
15        Q.       Okay.  And you were asked a
16    question about knowing everything you know
17    today, would you still have written that
18    e-mail or something to that effect, and I
19    believe your answer was no, but you weren't
20    asked why.  Why wouldn't you write the same
21    e-mail today?
22        A.       Knowing what we know now and
23    what happened after this, it would just be
24    inappropriate to send a congratulatory e-mail
25    like this given the impact of the incident.
```

```
 1          Q.     Do you have any firsthand
 2    knowledge as to whether or not any of the men
 3    who you sent this e-mail to did anything
 4    wrong in connection with what happened on
 5    April 20th?
 6          A.     No, I don't.
 7          Q.     Now, you were asked a number of
 8    questions by Ms. Kuchler about the operating
 9    agreement, which is at Tab 14.   Will you turn
10    to that?
11                 First of all, had you ever dealt
12    with Anadarko petroleum prior to their
13    becoming a working interest owner under this
14    operating agreement?
15          A.     Yes, I had.
16          Q.     And what -- how far back in
17    time?  How many years had you interacted with
18    Anadarko?
19          A.     I can't remember the specifics,
20    but I was familiar with their vice president
21    of exploration.  I can't remember the
22    specifics of the relationship.
23          Q.     Okay.  Your perception of them,
24    are they a sophisticated oil company?
25                 MS. KUCHLER:  Object to the form.
```

1          A.        I think they are very competent,

2     yes.

3          Q.        (BY MR. LANCASTER)   Do they seem

4     to understand the oil business?

5          A.        I believe --

6          MS. KUCHLER:  Object to form.

7          A.        I believe so.

8          Q.        (BY MR. LANCASTER)   All right.

9     As best as you can tell, do they seem to be

10    aware of and familiar with the risks

11    associated with deepwater drilling?

12          MS. KUCHLER:  Object to form.

13          A.        I believe so.

14          Q.        (BY MR. LANCASTER)   Did anyone

15    from Anadarko ever come to you and say that

16    they didn't understand the risks associated

17    with deepwater drilling?

18          A.        No.

19          Q.        Did anyone from Anadarko ever

20    come to you and say that they were not

21    sophisticated enough to enter into the

22    operating agreement?

23          A.        No.

24          Q.        Did anyone -- you were shown a

25    page that included a well plan schematic, and

1    it was reduced to 8 and a half by ten

2    noncolor copy.   But did anyone from Anadarko

3    ever come to you and say that the well plan

4    or any well plans that they received from BP

5    lacked sufficient detail?

6         A.    No.

7         Q.    Did anyone from Anadarko ever

8    come to you and say that that well plan or

9    any other well plan that they received from

10   BP lacked sufficient detail for them to be

11   able to make intelligent decisions with

12   respect to their responsibilities under the

13   operating agreement?

14        MS. KUCHLER:  Object to the form.

15        A.    No.

16        Q.    (BY MR. LANCASTER)  Turn to

17   Tab 20 of Ms. Kuchler's binder.  And this

18   is -- I don't believe it was marked as an

19   exhibit, so why don't we go ahead and mark

20   it.  3243.

21        (Exhibit No. 3243 was marked.)

22        Q.    (BY MR. LANCASTER)  And

23   apparently it was prehighlighted.  I don't

24   think it came that way, so -- but I'll give

25   you a minute to read the highlighted e-mail

```
 1   from Mr. Thorseth to a number of individuals,
 2   cc's you.
 3          A.      Okay.
 4          Q.      Do you see where it says:  Our
 5   operations geologists assign to the well
 6   answers and makes phone calls as necessary
 7   when the operational status changes.
 8                  Do you see that?
 9          A.      I do.
10          Q.      Did anybody from Anadarko ever
11   come to you and say that they weren't getting
12   answers or anybody -- nobody was answering
13   the phone when they made calls about
14   operational or status changes?
15          A.      No.
16          Q.      Did anybody come to you from
17   Anadarko and say that they weren't getting
18   operational updates?
19          A.      No.
20          Q.      All right.  Turn to -- back to
21   Tab 14.  If you turn to Page 25 of the
22   operating agreement.  Do you see Tab 25 -- or
23   I'm sorry -- see Tab 14, which is the
24   operating agreement, Page 25, Section 5.1.0,
25   at the top says Health, Safety and
```

1  Environment?  Do you see that?

2        A.     Yes.

3        Q.     And that reads:  With the goal

4  of achieving safe and reliable activities and

5  operations in compliance with all applicable

6  laws and regulations, including avoiding

7  significant and unintended impact on, one,

8  the health or safety of people; two,

9  property; or three, the environment.  The

10 operator shall with the support and

11 cooperation of the nonoperators while

12 conducting or operations under this

13 agreement, A, design and manage activities or

14 operations to standards intended to achieve

15 sustained reliability and promote the

16 effective management of HSE risks.

17              Do you see that?

18       A.     I do.

19       Q.     Did Anadarko ever come to you

20 and say that they lacked the information

21 necessary for them to support and cooperate

22 with BP with respect to health, safety and

23 the environment?

24       A.     No.

25       Q.     There is a reference to an

```
 1    Exhibit K.  Exhibit K is at the back.  If you
 2    look at these Bates numbers at the bottom,
 3    it's all the way at the back under Bates
 4    No. 1837.  Tell me when you get there.
 5         A.      Okay.  Got it.
 6         Q.      It says:  Health, Safety and
 7    Environmental Inspections - Nonoperator's
 8    Right of Access.  For Purposes of Conducting
 9    health, safety and environmental inspection,
10    the nonoperators shall have the right of
11    access to activities and operations and shall
12    have access to operator's HSE files as
13    provided for in this operating agreement.
14              Did anybody from Anadarko, to
15    your knowledge, ever exercise that right of
16    access?
17         A.      Not to my knowledge.
18         Q.      Did anybody from Anadarko ever
19    come to you and saying -- and say that they
20    were any way inhibited from exercising that
21    right of access under the HSE provision of
22    this contract?
23         A.      Not to my knowledge.
24         Q.      Let's go back to Page 22 of the
25    operating agreement.
```

1          A.       Okay.

2          Q.       Information to Participating

3    Parties.

4                   Subsection A:   A copy of each

5    application for a permit to drill and all

6    amendments to that application.

7                   Do you see that?

8          A.       I do.

9          Q.       Did anybody from Anadarko ever

10   come to you and say they are failing to get

11   the applications for permits to drill and

12   amendments?

13         A.       No.

14         Q.       Did anybody from Anadarko ever

15   come to you and say they were failing to get

16   the drilling or workover reports?

17         A.       No.

18         Q.       Did anybody from Anadarko ever

19   say that they were failing to get the

20   real-time information that was -- they were

21   given access to?

22         A.       No.

23         Q.       Anybody from Anadarko ever say

24   that they weren't -- come to you and say they

25   weren't getting copies of drilling prognoses,

1   which is under Item I; copies of well test

2   results, Item B; copies of well test results,

3   Item E; copies of logs and surveys, Item D?

4   Did anybody from Anadarko ever come to you

5   and say that?

6        MS. KUCHLER:  Object to form.

7        A.      No.

8        Q.      (BY MR. LANCASTER)  Anybody from

9   Anadarko ever come to you and say that they

10  lacked any information necessary to make

11  intelligent decisions about their

12  participation in the well?

13       MS. KUCHLER:  Objection; form.

14       A.      No.

15       Q.      (BY MR. LANCASTER)  In fact, if

16  you'll go down below it to Page 23, below all

17  these enumerated subparts, it then says:

18  Upon written request, the operator shall use

19  reasonable efforts to furnish to a requesting

20  party any additional available information,

21  including a complete slab section of all

22  recovered cores, if requested and available,

23  required by the operator for the

24  participating parties.

25             And then it goes on.

```
 1              Did anybody from Anadarko ever
 2    come to you and say that they lacked any
 3    information that they needed from BP?
 4         A.      No.
 5         MS. KUCHLER:  Object to form.
 6         Q.      (BY MR. LANCASTER)  Were you
 7    aware that:  After BP informed Anadarko that
 8    it was calling total -- either "objective
 9    depth or total depth," is how the word's
10    used -- in part for safety reasons, Anadarko
11    encouraged BP to drill deeper?
12         MS. KUCHLER:  Objection; form.
13         A.      Can you repeat the question.
14         Q.      (BY MR. LANCASTER) Sure.  Were
15    you aware that:  After BP informed Anadarko
16    that it was calling total depth or objective
17    depth, in part for safety considerations,
18    Anadarko encouraged BP to drill deeper?
19         MS. KUCHLER:  Object to form.
20         A.      I may have been aware at the
21    time, but I have no memory of that now.
22         Q.      (BY MR. LANCASTER)  There was
23    some testimony about whether or not you
24    received daily operations reports.  Earlier,
25    I believe it was yesterday, you were shown
```

```
 1   some e-mails from Mr. Bondurant [phonetic]
 2   that attached daily summaries.  Do you recall
 3   that?
 4        A.     Not specifically.
 5        Q.     I'm hunting through all the -- I
 6   thought I saw one in here as an example.
 7               I want to make sure, though,
 8   that the record is clear.  Do you have the
 9   daily ops report that I put in front of you
10   from March 26th?  I ask you to take a look at
11   it to refresh your recollection.
12        A.     (Indicating.)
13        Q.     Right.  The date of the ops
14   report I marked -- what's the Exhibit number
15   I put on there?
16        A.     3242.
17        Q.     Right.  So Exhibit 3242, that
18   daily ops report, is that the kind of daily
19   report that you would receive during the
20   drilling of the Macondo well?
21        A.     No --
22        Q.     Okay.
23        A.     -- I would not receive this.
24        Q.     What kind of daily report would
25   you receive related to the Macondo well?
```

1          A.     I receive a report that is one

2     or two or three sentences that summarizes the

3     subsurface information that is of interest to

4     an explorer.

5          Q.     That's all the questions I have.

6     Thank you.

7          THE VIDEOGRAPHER:  We're going off the

8     record at 12:28.

9          (THE DEPOSITION CONCLUDED AT 12:28 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **WITNESS' CERTIFICATE**

2

3

4

5          I, **DAVID RAINEY**, read or have

6   had the foregoing testimony read to me and

7   hereby certify that it is a true and correct

8   transcription of my testimony, with the

9   exception of any attached corrections or

10  changes.

11

12

13

14

15          _____

16          **DAVID RAINEY**

17

18

19

20

21

22

23

24

25

1                **REPORTER'S CERTIFICATE**

2

3              I, **Tamara Chapman**, Certified

4    Court Reporter, State of Louisiana, State of

5    Texas, do hereby certify that the

6    above-mentioned witness, after having been

7    first duly sworn by me to testify to the

8    truth, did testify as hereinabove set forth;

9              That the testimony was reported

10   by me in shorthand and transcribed under my

11   personal direction and supervision, and is a

12   true and correct transcript, to the best of

13   my ability and understanding;

14              That I am not of counsel, not

15   related to counsel or the parties hereto, and

16   not in any way interested in the outcome of

17   this matter.

18

19                    _____
                     **Tamara Chapman**
20                   Certified Court Reporter
                     State of Texas, CSR No. 7248
21                   GAUDET KAISER, LLC
                     601 Poydras, Suite 1720
22                   New Orleans, Louisiana 70130
                     T: (504) 525-9100
23                   F: (504) 525-9109

24

25