# EXHIBIT Z

```
 1                    UNITED STATES DISTRICT COURT

                     EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL        )     MDL NO. 2179

     BY THE OIL RIG           )
 4   "DEEPWATER HORIZON" IN    )     SECTION "J"

     THE GULF OF MEXICO, ON    )
 5   APRIL 20, 2010            )     JUDGE BARBIER

                              )     MAG. JUDGE SHUSHAN
 6

 7

 8

 9

10

11

12

13

14

15

16

17               * * * * * * * * * * * * * * * * *

                         VOLUME 2
18               * * * * * * * * * * * * * * * * *

19

20

21        Deposition of Anthony Hayward, taken at

     Kirkland & Ellis International, 30 St. Mary Axe, 22nd
22   Floor, London EC3A 8AF, England, United Kingdom, on the

     8th of June, 2011.
23

24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit Z

Page 1

```
 1                    A P P E A R A N C E S
 2
 3        Magistrate Judge Sally Shushan
          UNITED STATES DISTRICT COURT
 4        EASTERN DISTRICT OF LOUISIANA
          500 Poydras Street, B345
 5        New Orleans, Louisiana  70130
 6   APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
          Mr. Stephen J. Herman
 7        HERMAN, HERMAN, KATZ & COTLAR
          820 O'Keefe Avenue
 8        New Orleans, Louisiana  70113
 9        Mr. Robert T. Cunningham
          Mr. William E. Bonner
10        CUNNINGHAM BOUNDS, LLC
          1601 Dauphin Street
11        Mobile, Alabama  36604
12        Mr. Ronnie G. Penton
          LAW OFFICES OF RONNIE G. PENTON
13        209 Hoppen Place
          Bogalusa, Louisiana  70427-3827
14
          Mr. John Parkerson Roy
15        DOMENGEAUX, WRIGHT, ROY & EDWARDS
          556 Jefferson Street, Suite 500
16        Lafayette, Louisiana  70501
17        Mr. Calvin C. Fayard, Jr.
          FAYARD & HONEYCUTT
18        519 Florida Avenue, SW
          Denham Springs, Louisiana  70726
19
     APPEARING FOR THE DERIVATIVE PLAINTIFFS, MDL 2185
20   SECURITIES PLAINTIFFS SUBCLASS:
          Mr. Richard Warren Mithoff
21        MITHOFF LAW FIRM
          500 Dallas St. - Penthouse
22        Houston, Texas  77002
23   APPEARING FOR BP, INC.:
          Mr. Richard C. Godfrey
24        KIRKLAND & ELLIS
          300 North LaSalle
25        Chicago, Illinois  60654
```

```
 1       Mr. Michael Brock
         COVINGTON & BURLING
 2       1201 Pennsylvania Avenue, Northwest
         Washington, D.C.  20004-2401
 3
         Mr. Daryl A. Libow
 4       SULLIVAN & CROMWELL
         1701 Pennsylvania Avenue, N.W.
 5       Washington, D.C.  20006-5805
 6       Mr. James J. Neath
         ASSOCIATE GENERAL COUNSEL
 7       BP LEGAL
         BP AMERICA INC.
 8       501 Westlake Park Boulevard
         Houston, Texas  77079
 9
    APPEARING FOR ANTHONY HAYWARD:
10       Mr. Dan K. Webb
         Mr. Thomas L. Kirsch II
11       WINSTON & STRAWN
         35 West Wacker Drive
12       Chicago, Illinois  60601-9703
13  APPEARING FOR ANDY INGLIS:
         Ms. Kathleen H. Goodhart
14       COOLEY LLP
         101 California Street, 5th Floor
15       San Francisco, California  94111-5800
16  APPEARING FOR TRANSOCEAN:
         Mr. Steven L. Roberts
17       Mr. Carter L. Williams
         SUTHERLAND ASBILL & BRENNAN
18       1001 Fannin, Suite 3700
         Houston, Texas  77002-6760
19
         Ms. Heather G. Callender
20       TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC.
         4 Greenway Plaza
21       Houston, Texas  77046
22  APPEARING FOR ANADARKO PETROLEUM COMPANY:
         Ms. Diane C. Hertz
23       Mr. Robert C. Stillwell
         Mr. Peter C. Neger
24       BINGHAM MCCUTCHEN
         399 Park Avenue
25       New York, New York 10022-4689
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 3

```
 1   APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
          Mr. David J. Beck
 2        Mr. David W. Jones
          BECK, REDDEN & SECREST
 3        One Houston Center
          1221 McKinney Street, Suite 4500
 4        Houston, Texas  77010-2010
 5   APPEARING FOR DRIL-QUIP, INC.:
          Mr. C. Dennis Barrow, Jr.
 6        WARE, JACKSON, LEE & CHAMBERS
          America Tower, 42nd Floor
 7        2929 Allen Parkway
          Houston, Texas  77019-7101
 8

     APPEARING FOR M-I SWACO:
 9        Mr. Steven A. Luxton
          MORGAN, LEWIS & BOCKIUS, LLP
10        1111 Pennsylvania Avenue, NW
          Washington, D.C.  20004
11

          Mr. Hugh E. Tanner
12        MORGAN, LEWIS & BOCKIUS
          1000 Louisiana Street, Suite 4000
13        Houston, Texas  77002
14   APPEARING FOR HALLIBURTON:
          Mr. Donald E. Godwin
15        Ms. Jenny L. Martinez
          Ms. Stefanie K. Major
16        GODWIN RONQUILLO
          1201 Elm Street, Suite 1700
17        Dallas, Texas 75270-2041
18        Ms. Stephanie T. Bragg
          HALLIBURTON
19        2107 CityWest Boulevard, Building 2
          Houston, Texas  77042-3051
20

     APPEARING FOR WEATHERFORD:
21        Mr. Wayne G. Zeringue, Jr.
          JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
22        DENEGRE, LLP
          201 St. Charles Avenue
23        New Orleans, Louisiana  70170
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 4

```
 1   APPEARING FOR THE UNITED STATES:
           Mr. R. Michael Underhill
 2         Attorney in Charge
           West Coast Office
 3         U.S. DEPARTMENT OF JUSTICE
           TORT BRANCH, CIVIL DIVISION
 4         450 Golden Gate Avenue
           7th Floor, Room 5395
 5         San Francisco, California  94102-3463
 6   APPEARING FOR THE STATE OF ALABAMA:
           Mr. Luther Strange
 7         Attorney General
           Mr. Corey L. Maze
 8         Special Deputy Attorney General
           Mr. Winfield J. Sinclair
 9         Assistant Attorney General
           OFFICE OF THE ATTORNEY GENERAL
10         STATE OF ALABAMA
           501 Washington Avenue
11         Montgomery, Alabama  36104
12   APPEARING FOR THE STATE OF LOUISIANA:
           Mr. Allan Kanner
13         Ms. Elizabeth "Lili" Petersen
           Attorneys for Louisiana Attorney General
14         KANNER & WHITELEY
           701 Camp Street
15         New Orleans, Louisiana  70130-3504
16   APPEARING FOR OHIO PENSION FUNDS:
           Mr. Jeffrey C. Block
17         BERMAN DEVALERIO
           One Liberty Square
18         Boston, Massachusetts  02109
19   ALSO PRESENT:
           Mr. Peter Jennings, Logistics Supervisor
20         Mr. Ray Aguirre, Case Manager
           Mr. Max Kennedy, Videographer
21         Ms. Lilia Garcia
           Mr. Chad Paris
22         Ms. Cecelia Aguilar
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 5

453

```
 1                           INDEX
 2               VIDEOTAPED ORAL DEPOSITION OF
                      ANTHONY HAYWARD
 3                     JUNE 8, 2011
                        VOLUME 2
 4
 5
 6   Appearances...............................    449
 7
     Examination-Mr. Strange...................    457
 8   Examination-Mr. Kanner....................    477
     Examination-Mr. Roberts...................    539
 9   Examination-Mr. Godwin....................    595
     Examination-Ms. Hertz.....................    660
10   Examination-Mr. Beck......................    734
     Examination-Mr. Godfrey...................    800
11   Redirect-Mr. Cunningham...................    859
12
     Changes and Signature.....................    903
13
     Reporter's Certificate....................    905
14
15
16                       EXHIBIT INDEX
17
     Exhibit No.        Description              Marked
18
19   1356A    Drilling Contract No. 980249, RBS-8D
              Semisubmersible Drilling Unit, Vastar
20            Resources, Inc. and R&B Falcon
              Drilling Co., December 9, 1998, marked
21            CONFIDENTIAL; beginning Bates number,
              BP-HZN-MBI00021461, ending Bates,
22            number 21545                            751
23   6018A    Complete Document 14 - From 'BP
              Parties' database, 2010 Drilling
24            Excellence Update PowerPoint            849
25   6055     DVD, Tony Hayward, Apology              458
```

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | | |
|---|---|---|---|
| 6056 | June 25, 2010 E-mail string among Tony Hayward, Andy Inglis, Bernard Looney, Christina Verchere, Kent Wells, Subject: Tech update, marked as CONFIDENTIAL; BP-HZN-2179MDL00965473 | | 530 |
| 6057 | BP Media Communication Plan for next 2 weeks, May 3, 2010, marked as CONFIDENTIAL; BP-HZN-2179MDL01890180 - 1890185 | | 533 |
| 6058 | Tony Hayward Townhall GoM Response Update, July 16, 2010, marked as CONFIDENTIAL; BP-HZN-2179MDL01115520 - 1115523 | | 535 |
| 6059 | July 9, 2010 E-mail from Tony Hayward, Subject: Gulf of Mexico update from Tony Hayward, marked as CONFIDENTIAL; BP-HZN-2179MDL01617349 - 1617350 | | 537 |
| 6060 | United States House of Representatives Committee on Energy and Commerce Subcommittee on Oversight and Investigations, statement by Tony Hayward, Chief Executive, BP plc, June 17, 2010, marked as CONFIDENTIAL; BP-HZN-2179MDL01164162 - 1164167 | | 543 |
| 6061 | Printout of 5/18/10 Forbes.com interview, In His Own Words: Forbes Q&A With BP's Tony Hayward; seven pages | | 551 |
| 6062 | Tony Hayward Townhall GoM Response Update, July 16, 2010, marked as CONFIDENTIAL; BP-HZN-2179MDL01124483 - 1124486 | | 585 |
| 6063 | September 8, 2010 E-mail from Employee Communications, marked as CONFIDENTIAL; BP-HZN-BLY00076345 & BP-HZN-BLY00076346 | | 590 |
| 6064 | Gulf of Mexico SPU Major Hazards Risk Management Policy, marked as CONFIDENTIAL; BP-HZN-2179MDL02027549 - 2027569 | | xx |

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z

455

| 1 | 6065 | Gulf of Mexico SPU GoM Drilling and |
| 2 | | Completions; GoM D&C Operating Plan/ Local OMS Manual, marked as CONFIDENTIAL; |
| | | BP-HZN-MB100193448 - BP-HZN-MB100193520 | 689 |
| 3 | | |
| | 6066 | Exploration and Production, Drilling and |
| 4 | | Completions, Beyond the Best Common Process, marked as CONFIDENTIAL; |
| 5 | | BP-HZN-2179MDL00333308 | 692 |
| 6 | 6067 | Document GP 10-35, Dated 11/18/2008, Well Operations, Group Practice, BP Group |
| 7 | | Engineering Technical Practices, marked as HIGHLY CONFIDENTIAL; |
| 8 | | BP-HZN-2179MDL00407729 - 407747 | 709 |
| 9 | 6068 | Article of The Washington Post, June 27, 2010, Headline: Trouble at the tiller; |
| 10 | | If Hayward beats a retreat, it's unclear who could lead BP; three pages | 719 |
| 11 | | |
| | 6069 | April 8, 2010, E-mail from Tony C. |
| 12 | | Emmerson to Robert Kaluza with Attachments, marked as CONFIDENTIAL; |
| 13 | | BP-HZN-2179MDL00305452, 305464 - 305477 | 721 |
| 14 | 6070 | 2009 Annual Individual Performance Assessment of Robert Kaluza, Period |
| 15 | | Reviewed: 2009, marked as CONFIDENTIAL; BP-HZN-MBI00193095 - 193098 | 725 |
| 16 | | |
| | 6071 | January 11 and 12, 2010 E-mail string to |
| 17 | | various parties with Attachment: Process Safety 2010 Plan.ppt, marked as |
| 18 | | CONFIDENTIAL; BP-HZN-2179MDL01109991, seventeen pages | 730 |
| 19 | | |
| | 6072 | Final Report, Blow-out Prevention |
| 20 | | Equipment Reliability, Joint Industry Project (Phase I?Subsea), May 12, 2009, |
| 21 | | West Engineering Services, marked as CONFIDENTIAL, BP-HZN-2179MDL00210163 - |
| 22 | | 210280 | 773 |
| 23 | 6073 | April 22, 2010, Press Release, BP INITIATES RESPONSE TO GULF OF MEXICO |
| 24 | | OIL SPILL, marked as CONFIDENTIAL TREATMENT REQUESTED BY BP p.l.c.; |
| 25 | | BP-HZN-SEC00104535 -104536 | 805 |

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 8

456

| | | |
|---|---|---|
| 6074 | April 25, 2010, Press Release, BP FORGES AHEAD WITH GULF OF MEXICO OIL SPILL RESPONSE, marked as CONFIDENTIAL, BP-HZN-2179MDL02176212 - 2176213 | 807 |
| 6075 | May 5, 2010, Press Release, UPDATE ON GULF OF MEXICO OIL SPILL RESPONSE, marked CONFIDENTIAL, BP-HZN-2179MDL01588108 - 1588109R809 | 809 |
| 6076 | May 6, 2010 BP Press Release, UPDATE ON GULF OF MEXICO OIL SPILL RESPONSE, marked as CONFIDENTIAL; BP-HZN-2179MDL01588106 - 1588107 | 812 |
| 6077 | July 28, 2010 BP Document, MAKING THINGS RIGHT, marked as CONFIDENTIAL; BP-HZN-2179MDL01830445 - 1830446 | 814 |
| 6078 | March 4, 2009 BP document from David Bickerton to SEEAC, Subject:  BP Sustainability Review, attaching BP Sustainability Review, marked as HIGHLY CONFIDENTIAL; BP-HZN2179MDL00085565 - 85595 | 837 |
| 6079 | BP Annual Report and Accounts 2006; seven pages | 864 |
| 6080 | Printout from BP website, Executive management/Governance/BP; three pages | 882 |

457

1          MR. GODFREY:  Good morning.  Welcome to

2    Day 2.

3          MR. STRANGE:  I believe we're ready.

4          THE VIDEOGRAPHER:  All set?

5      On the record at 7:33 a.m., continuing the

6    deposition with Tape 10.

7                    ANTHONY HAYWARD,

8    having been previously duly sworn, continued to testify

9    upon his oath as follows:

10                      EXAMINATION

11   QUESTIONS BY MR. STRANGE:

12      Q.   Good morning, Mr. Hayward.  My name is Luther

13   Strange.  I'm the Attorney General of the State of

14   Alabama.  Your lawyers have probably told you the

15   Attorney General is the Chief Law Enforcement Officer

16   for a State.

17          I'm also the coordinating counsel for all the

18   States involved in this multidistrict litigation in New

19   Orleans, so I represent not only the State of Alabama

20   but other States that are involved in this case.

21          I want to put you at ease off the bat, and I'm

22   going to tell you I'm not going to ask you if you've

23   gotten your life back.  Frankly, I don't care.

24          I'm here to talk to you about things you said

25   to the people of the Gulf.  My focus is on what has

1  happened in the Gulf and what BP has done and plans to

2  do to make it right.

3            So what I'm going to do is I'm going to play

4  for you a CD of a commercial that you made shortly

5  after the disaster on April 20th.  I'd like you to look

6  at the CD, along with the other folks in the room here,

7  and then will ask you some questions about it.

8                 MR. STRANGE:  Kym, I'd like --

9                 MR. GODFREY:  Is this going to be marked

10  as an exhibit?

11                 MR. STRANGE:  This will be marked as an

12  exhibit.  Counsel, here's a copy of it.

13        (Exhibit No. 6055 marked.)

14                 MR. STRANGE:  Rick, here's a copy.  I'm

15  also going to distribute for the room copies of the

16  written transcript so that they can refer to that,

17  so --

18                 MR. MAZE:  They'll be coming from that

19  end.

20                 MR. STRANGE:  -- that should be coming

21  along.

22                 THE COURT REPORTER:  Mark one of the CDs,

23  Ray.

24        May I have one of the CDs, please?

25                 MR. MAZE:  It's right here.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 11

1          MR. STRANGE:  It's right here.  Sorry,

2  Kym.

3          THE COURT REPORTER:  6055.

4          MR. WEBB:  Will there be a date when this

5  plays, so we know what date this is coming from?

6      (Discussion off the record.)

7          MR. STRANGE:  It was played countless

8  times across the Gulf.  I don't have an exact date for

9  this particular --

10          MR. WEBB:  Or --

11          MR. STRANGE:  -- broadcast.

12          MR. WEBB:  -- you don't have a date range

13  when it did play?

14          MR. STRANGE:  It would have been starting

15  approximately 30 days after the accident, I guess.

16          THE WITNESS:  Yeah, I thi -- I think

17  probably from sometime towards the second half of May.

18      (Discussion off the record.)

19          THE COURT REPORTER:  Okay, Peter.

20      (Video played as follows:)

21      "The Gulf spill is a tragedy that never should

22  have happened.

23      "I'm Tony Hayward.  BP has taken full

24  responsibility for cleaning up the spill in the Gulf.

25  We've helped organize the largest environmental

1  response in this Country's history.  More than

2  2 million feet of boom, 30 planes, and over 1300 boats

3  are working to protect the shoreline.

4       "Where oil reaches the shore, thousands of

5  people are ready to clean it up.  We will honor all

6  legitimate claims, and our cleanup efforts will not

7  come at any cost to taxpayers.

8       "To those affected and your families, I'm

9  deeply sorry.  The Gulf is home for thousands of BP

10  employees, and we all feel the impact.  To all the

11  volunteers and for the strong support of the

12  Government, thank you.  We know it is our

13  responsibility to keep you informed and do everything

14  we can so this never happens again.

15       "We will get this done.  We will make this

16  right."

17       (End of video.)

18   Q.   (By Mr. Strange) Mr. Hayward, would you like

19  to see that again?

20   A.   No.

21   Q.   To the best of your knowledge, is this a true

22  and accurate recording of a commercial you made and BP

23  aired after the disaster?

24   A.   It is.

25   Q.   While we're on the subject of media, would it

**PURSUANT TO CONFIDENTIALITY ORDER**

1   surprise you, Mr. Hayward, to learn that BP spent

2   $93 million in advertisements such as this for the

3   period April through July of 2010?

4       A.   I wasn't aware of the number, but I was aware

5   that --

6       Q.   But you wouldn't be surprised at --

7       A.   I was aware --

8       Q.   -- at that number?

9       A.   -- that we were advertising to try and, in

10  essence, provide information to people about what we

11  were doing and what we intended to do on an ongoing

12  basis.

13      Q.   So it wouldn't surprise you that you spent 300

14  percent more in '10 than in '09 on media and

15  advertising in the U.S.?

16      A.   Of course, with respect, we weren't faced with

17  the challenge that we had in -- after the terrible

18  accident in the Gulf.  So what we were trying to do was

19  inform people.  Those were information broadcasts, in

20  essence.

21      Q.   At the time this commercial was made and

22  broadcast, you were the CEO of BP, correct?

23      A.   That's correct.

24      Q.   And you served on the Board of Directors; is

25  that correct?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 14

1      A.    That's correct.

2      Q.    So when you made these statements, you had the

3  full and complete authority to make these promises

4  binding, didn't you?

5      A.    The statements were accurate and reflected

6  what we -- what we were doing and intended to do.

7      Q.    And you had the authority to make them?

8      A.    And I had the authority to make them.

9      Q.    Okay.  Now, let me turn to some of the

10  specific things you said in the broadcast.  First of

11  all, you said, "The Gulf spill is a tragedy that never

12  should have happened," correct?

13      A.    I did.

14      Q.    That's an acknowledgement this whole

15  catastrophe could have, in fact, been avoided, isn't

16  it?

17      A.    I think it's evident from all of the

18  investigations that have occurred subsequent that it

19  could have been avoided if any number of things had

20  fallen into place.  If there had been a good cement

21  job, it would have been avoided.  If the negative

22  pressure test had been properly interpreted, it would

23  have been avoided.  If the well control procedures had

24  been followed, it would have been avoided.  If the

25  blowout preventer had worked, it would have been

1   avoided.   There -- there are multiple things that could

2   have happened.

3       Q.   But it could have --

4               MR. GODWIN:   Objection, form.

5       Q.   (By Mr. Strange) -- been avoided?

6               MR. ROBERTS:   I'll object.   Objection,

7   form.

8       A.   And it could -- could have been avoided,

9   undoubtedly.

10      Q.   (By Mr. Strange) Could have been avoided.

11  That's --

12      A.   Yeah.

13      Q.   That's what I want to know.

14          Then you said, "BP has taken full

15  responsibility for cleaning up the spill in the Gulf."

16  Is that correct?

17      A.   That's correct.

18      Q.   Did BP take responsibility for the cleanup

19  because it was responsible for the spill?

20      A.   We took responsibility for the cleanup because

21  we were a responsible party under OPA 1990, and it was

22  our responsibility to clean up the spill.

23      Q.   Is that because you caused the spill?

24      A.   Doesn't say anything about who caused the

25  spill.   It says very clearly under the -- I believe

464

1  under the statute, that we had a responsibility to

2  clean up the spill.  I -- I believe that there were

3  four parties named by the Government as responsible

4  parties.

5      Q.   But you took full responsibility for the

6  cleanup?

7      A.   We took responsibility for the cleanup.

8      Q.   Full responsibility?

9      A.   We took responsibility for the cleanup.  We

10 made it clear that we expected the other responsible

11 parties to share their burden, and that remains --

12     Q.   I'm just asking you --

13     A.   -- in place today.

14     Q.   -- what you said about your responsibility,

15 which is full responsibility.  It wasn't conditioned on

16 what you just said on --

17     A.   I just --

18     Q.   -- contributions from other parties or

19 insurance or --

20     A.   I -- I -- I said --

21              MR. WEBB:  I object to the form of the

22 question.

23          You can answer.

24     A.   I said that we would take responsibility for

25 the cleanup.  That's what -- have we got a

PURSUATN TO CONFIDENTIALITY ORDER
Exhibit Z
Page 17

1    transcription --

2         Q.    (By Mr. Strange) Do you say you would take

3    full responsibility for the cleanup?

4         A.    BP has taken full responsibility --

5         Q.    It's a simple question.

6         A.    -- for cleaning up the spill in the Gulf.

7         Q.    Thank you.

8         A.    That's what I said.

9         Q.    That's all I wanted -- that's the answer to

10   the question.

11             So BP didn't limit its commitment to any set

12   time period, did it?

13        A.    It didn't.

14        Q.    BP didn't limit its commitment to any amount

15   of money, did it?

16        A.    It didn't.

17        Q.    In fact, there were no strings attached, were

18   there?

19        A.    There were no limits to time or to money.

20        Q.    No limits to time or to money.  Thank you.

21             That sounds like a pretty unqualified

22   commitment, doesn't it?

23        A.    I think what we've done and continue to do has

24   been pretty unqualified.

25        Q.    So that means BP will continue to work until

1    every drop of oil is removed and every legitimate claim

2    is paid, correct?

3        A.   We've -- we've said all along that we will be

4    there until we have restored the Gulf to its -- its --

5    what's the word I'm looking for?  Restored the Gulf to

6    the -- the way it was prior to the spill.

7        Q.   Good.  Well, I'm not just so concerned about

8    what happened in the past, but there are future

9    concerns, as well.

10            So let me ask you this:  There are reports

11   that 15 miles of oil in the form of tar mats still lie

12   off Alabama's coast.  Forecasters are predicting as

13   many as 18 named storms in the Gulf of Mexico this

14   hurricane season.  If one of those hurricanes washes

15   the remaining oil from the spill onto Alabama's

16   beaches, or any other State's beaches, for that matter,

17   will BP honor its promise to, quote, "clean up the

18   spill," to, quote, "get this done," and to, quote,

19   "make this right," by cleaning up that oil?

20       A.   My --

21            MR. GODFREY:  Objection as to form.

22       A.   My view is that BP will honor the commitment

23   that I made.  Clearly, I'm no longer in a position to

24   make a commitment about what might happen in the

25   future with --

PURSUANT TO CONFIDENTIALITY ORDER

467

1       Q.    (By Mr. Strange) Correct.

2       A.    -- respect to that, because I no longer have

3    the authority.

4       Q.    The commitment has already --

5       A.    My --

6       Q.    -- been made.

7       A.    My --

8       Q.    We covered that.

9       A.    -- expectation is that the company will

10   fulfill the commitments that I made.

11      Q.    At no cost to the innocent taxpayers of the

12   region?

13      A.    Well, there was -- it was -- we always made it

14   very clear that the taxpayer would not bur -- share any

15   burden in this.

16      Q.    Good.

17      A.    It would be BP --

18      Q.    That was your promise.

19      A.    It was.  And I believe so far that's been the

20   case.

21      Q.    The next thing you said, you said, "BP will

22   honor all legitimate claims," correct?

23      A.    That's correct.

24      Q.    So that included States' claims?

25      A.    It included all legitimate claims.  I --

PURSUANT TO CONFIDENTIALITY ORDER

468

1    Q.   Individuals?

2    A.   I wasn't -- I wasn't -- all legitimate

3  claims --

4    Q.   Let me just go over the categories, and you

5  can just answer it "Yes" --

6    A.   Okay.

7    Q.   -- or "No."

8    A.   Well, I can --

9    Q.   States' claims, "Yes" or "No"?

10    A.   Legitimate claims are legitimate --

11    Q.   Right?

12    A.   -- claims.

13    Q.   "Yes"?

14    A.   I -- I --

15    Q.   That's a "Yes."

16         Individuals?

17    A.   If it's a legitimate claim, yes.

18    Q.   Businesses?

19    A.   Legitimate claim, yes.

20    Q.   As it relates to economic damages and losses

21  due to the spill?

22    A.   Le --

23             MR. GODFREY:   Objection as to form.

24    A.   Legitimate claims are legitimate claims.  I --

25  I --

PURSUANT TO CONFIDENTIALITY ORDER

469

1      Q.    (By Mr. Strange) As it relates --

2      A.    -- don't have the full legal listing of what

3   the claims might be.

4      Q.    I just said covered categories, and I just

5   want to confirm what you've said.

6      A.    All right.

7      Q.    Environmental claims?

8      A.    Legitimate claims.

9      Q.    Thank you.

10     A.    I -- I can't speak --

11     Q.    That's enough.

12     A.    -- to the --

13     Q.    That's all I needed to know.

14     A.    -- comprehensive listing of all the various

15   claims.

16     Q.    I'm just trying to make sure I understand what

17   you were committing to do when you said "all legitimate

18   claims."

19     A.    Yeah, I think --

20     Q.    So we've covered, I think, most of the

21   categories.

22     A.    And I think --

23     Q.    Now --

24     A.    -- there's no evidence that that's not been

25   the case.

1    Q.    That's not what I asked.

2          Now, you said you know at BP that "...it's our

3    responsibility to do everything we can so this never

4    happens again," correct?

5    A.    That's correct.

6    Q.    Wasn't it BP's responsibility to ensure that

7    this never happened in the first place?

8              MR. GODFREY:   Objection as to form.

9    A.    Clearly, the -- no one would have wanted a --

10   such a tragic accident to have occurred.  And, you

11   know, that is why we had so many systems and processes

12   in place to prevent it from happening.  And if, you

13   know -- if any one of them had not failed, then the

14   accident would not have occurred.

15   Q.    (By Mr. Strange) Was it your responsibility at

16   BP to ensure this never happened in the first place?

17   A.    I think --

18             MR. GODFREY:   Objection as to form.

19   A.    -- in -- in a situation as complex as this,

20   where so many parties having so many different pieces

21   of it, ascribing our responsibility to ensure it never

22   happens, you -- you cannot take responsibility for

23   human error.  So the answer is "No."

24   Q.    (By Mr. Strange) Well, I'm not sure I agree

25   with what you just said, but would you give me the

PURSUANT TO CONFIDENTIALITY ORDER

1  answer to the question?

2       Was it BP's responsibility to ensure this

3  never happened?  If it wasn't BP's responsibility --

4     A.   It was our responsi --

5     Q.   -- whose B --

6            MR. WEBB:  And I object, asked and

7  answered.

8     Q.   (By Mr. Strange) -- responsibility was it?

9            MR. WEBB:  -- form of the question.

10    A.   Well, I -- it was clearly our responsibility,

11 to -- to the very best of our ability, to ensure that

12 no accidents occurred in our Operations, m-h'm.

13    Q.   (By Mr. Strange) Right.

14    A.   Whether that describes the responsibility, I'm

15 not -- I don't know.

16    Q.   Well, pre -- to prevent this from happening

17 again, don't you first have to understand and admit

18 what you did wrong?

19    A.   I think --

20           MR. GODFREY:  Objection as to form.

21    A.   -- we have den -- identified very clearly in

22 the Bly Report what -- the causes of the accident and

23 who was involved at which stage.

24    Q.   (By Mr. Strange) What did BP do wrong that

25 could have been prevented -- could have prevented --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 24

1          MR. GODFREY:  Objection, form.

2     Q.   (By Mr. Strange) -- the spill?

3          MR. GODFREY:  Objection as to form.

4     A.   I -- I think if you look at the Bly Report,

5    there are eight causes for this accident, and BP had

6    direct involvement in a part of one of them.  We didn't

7    design the cement.  We didn't pour the cement.

8          MR. GODWIN:  Object to form.

9     A.   That was Halliburton.

10          MR. GODWIN:  Excuse me.  Object to form.

11     Q.   (By Mr. Strange) I know.  I'm just asking --

12          MR. WEBB:  Keep going.

13     Q.   (By Mr. Strange) -- about BP.

14          MR. WEBB:  Go -- go ahead.  Finish your

15    answer.

16     A.   We didn't -- we, along with Transocean,

17    erroneously interpreted the negative pressure test.

18          MR. ROBERTS:  Object to the form.

19     A.   BP was not monitoring the well, was not

20    monitoring the mud system.  BP was not holding the --

21    the drill brake and taking corrective action when the

22    well started flowing.  BP did not intervene to send the

23    con -- the flow to the gas pass diverter rather than

24    the diverter, which is what the well control procedures

25    described.  BP didn't design the blowout preventer or

1    maintain it.

2           So we acknowledged in the Bly Report -- I

3    think it was a very rigorous piece of analysis which

4    has stood the test of time -- exactly where and where

5    not BP was involved in the accident.

6                MR. GODWIN:  Object to form.

7       Q.   (By Mr. Strange) Well, have you learned

8    anything you could tell me about how to prevent this in

9    the future?

10      A.    I think we and the industry have learned an

11   enormous amount.  An enormous amount.

12      Q.    So if this kind of accident happens again,

13   what can the citizens of our State expect?

14      A.    Well --

15                MR. GODFREY:  Objection as to form.

16      A.    -- the first thing they should expect is that

17   the -- BP and the industry will do everything in its

18   power to ensure it never does happen again.

19           If -- if it -- if, God forbid, it ever did

20   happen again, the industry and BP will be massively

21   better prepared to be able to intervene in the subsea,

22   because we've learned from this accident.

23      Q.    So if this accident were to happen tomorrow,

24   how long do you think it would take to stop --

25      A.    I can't --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 26

1    Q.    -- the well?

2    A.    -- speculate on that, because it would depend

3    on the specifics of the accident.  If it was --

4    Q.    The same accident.

5    A.    -- exactly the same?

6              MR. GODFREY:  Objection as to form.

7    A.    I -- I -- impossible to speculate, but you

8    would -- you would have to believe that the ability to

9    stop the well flowing would be achieved faster than we

10   were able to in this case.

11   Q.    (By Mr. Strange) So had you been prepared, had

12   you been responsible, you might have saved some time?

13             MR. GODFREY:  Objection as to form.

14   A.    This isn't about being responsible.  As I

15   said, we learned a lot in this accident, which, if it

16   was a direct repeat, clearly could be applied.

17   Q.    (By Mr. Strange) The last thing you said in

18   this commercial was you were "deeply sorry."  Is that

19   correct?

20   A.    I -- I was and I remain deeply sorry.

21   Q.    Does that mean you personally or BP as a

22   corporation, or both?

23   A.    Both.  It means me personally, and it means

24   the company.

25   Q.    What would you personally do differently to

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 27

1   prevent an explosion -- to have done differently,

2   looking back?

3              MR. GODFREY:  Objection as to form.

4      A.   I -- I think it's difficult for someone at --

5   at the top of a company, with a hundred-thousand people

6   and multiple thousands of operations ongoing every day,

7   to say precisely what they would do differently with

8   respect to an individual accident.

9      Q.   (By Mr. Strange) So you don't have an opinion

10  on that?

11     A.   I don't have an opinion on that.

12     Q.   What would you personally do differently to

13  contain the spill sooner?

14     A.   We did --

15             MR. GODFREY:  Objection as to form.

16     A.   -- everything that we could, and I did

17  everything that I could possibly have done at the time,

18  and I -- I don't know that I could have done anything

19  different, frankly, to contain the spill sooner, given

20  the sit -- sit -- situation and circumstance at the

21  time.

22     Q.   (By Mr. Strange) You're a man of your word,

23  aren't you, Mr. Hayward?

24     A.   I am.

25     Q.   So could I go back to the people of Alabama

1   and the other Gulf States and tell them that when you

2   promised BP would make this right, you were committing

3   that BP would keep working as long as it takes,

4   whatever it costs BP, to make the people, the States,

5   the businesses, and the environment whole, for the

6   catastrophic damages BP caused with the explosion of

7   April 20th, '10 -- 2010 and the resulting oil spill?

8              MR. GODFREY:  Objection --

9              MR. WEBB:  Object, form of the

10  question --

11             MR. GODFREY:  Form.

12             MR. WEBB:  -- for multiple reasons.

13     A.   Can I read the question, as it's a very long

14  question.

15     Q.   (By Mr. Strange) I'll just repeat it for you.

16     A.   Okay.

17     Q.   When I go back, can I tell them that you've

18  promised and reiterated and affirmed your promises

19  to -- that BP will keep working as long as it takes,

20  whatever it costs, to make the people, the States, the

21  environment, and the economy whole for the damages

22  caused by the oil spill?

23             MR. GODFREY:  Objection as to form.

24             MR. WEBB:  Objection, form.

25     A.   You can certainly tell them that we

1    continue -- we will -- we have and we will continue to

2    honor our ob -- obligations and meet all legitimate

3    claims, and we will continue to be there cleaning up

4    whatever residual environmental impact there is for as

5    long as it may occur.

6         Q.   Okay.  Thank you.

7              MR. STRANGE:  That concludes my time for

8    now.  I'm going to reserve whatever time I have left

9    and turn it over to Louisiana.

10        You want to break here and let them come in?

11             MR. WEBB:  I -- whatever -- Kym, whatever

12   you want to do.

13             THE WITNESS:  Okay.

14             MR. GODFREY:  We're ready -- we're ready

15   to continue.

16        (Discussion off the record.)

17             THE VIDEOGRAPHER:  Off the record at 7:51

18   a.m.

19        (Recess from 7:51 a.m. to 7:54 a.m.)

20             MR. KANNER:  Ready.

21             THE VIDEOGRAPHER:  All set?

22        On the record 7:54 a.m., beginning Tape 11.

23                   EXAMINATION

24   QUESTIONS BY MR. KANNER:

25        Q.   Good morning --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 30

```
 1      A.    Hello.

 2      Q.    -- Mr. Hayward.  My name is Allan Kanner, and

 3   with my law partner, Lili Petersen, we're representing

 4   the State of Louisiana today.

 5      A.    Yes.

 6      Q.    Yesterday, I think the Department of Justice

 7   showed you a number of E-mails, exchanges between

 8   Mr. Sims and Mr. Guide.  Do you recall that?

 9      A.    I do.

10      Q.    I have one question about that:  Where was the

11   adult supervision?

12              MR. GODFREY:  Objection to form.

13              MR. WEBB:  Object to the form of the

14   question.

15      Q.    (By Mr. Kanner) I mean, shouldn't BP have

16   somebody in there to supervise, work these differences

17   out?

18      A.    I think there was -- there was plenty of

19   people supervising actually.

20      Q.    But -- well, okay.  We took the HSSE people

21   out of the equation, correct?

22              MR. GODFREY:  Objection to form.

23      A.    We reduced, as I understand it from our

24   discussion on Monday, the overlapping HSEs -- HSSE

25   roles to create clarity of accountability on the rig.
```

 1      Q.   (By Mr. Kanner) Okay.  Who -- you just said I
 2  think that adult supervision was being provided.
 3  Who -- who specifically --
 4      A.   No, I --
 5      Q.   -- with respect to the DEEPWATER HORIZON and
 6  MC 252 was responsible for the adult supervision --
 7                  MR. GODFREY:  Objection.
 8      Q.   (By Mr. Kanner) -- of -- of this exploratory
 9  well?
10                  MR. GODFREY:  Objection to form.
11                  MR. WEBB:  Object to the form of the
12  question.
13      A.   I didn't say anything about adult supervision.
14  I said there was supervision of the Drilling Team.
15  There was a management structure in place.  I -- I
16  don't recall the names of the individuals.
17      Q.   (By Mr. Kanner) You would ultimately be
18  responsible, though, as Chief Executive?
19      A.   I'm responsible for establishing processes,
20  systems, and the tone.  I can't be responsible for
21  every specific operation in a company of a hundred
22  thousand people operating in a hundred countries.
23      Q.   You said during Attorney General Strange's
24  questioning, you can't take responsibility for human
25  error.

PURSUANT TO CONFIDENTIALITY ORDER

1          Do you recall that?

2     A.    I do.

3     Q.    Shouldn't there be supervision in place to

4  help avoid human error?  Shouldn't there be systems and

5  processes in place to avoid human error?

6              MR. GODFREY:  Objection to form.

7              MR. WEBB:  Object to the form.

8     A.    There was a lot of systems and processes in

9  place.  And the -- the investigations have identified

10 that each one of them in this tragic accident was

11 unfortunately breached.  But there was a lot of systems

12 and process in place.  And it required multiple

13 breaches of many systems and processes to result in

14 this accident.

15    Q.    (By Mr. Kanner) You don't recall which

16 individual was supposed to provide supervision of this

17 exploratory well?

18    A.    I don't.

19    Q.    After you first learned of the tragedy at

20 DEEPWATER HORIZON, didn't you try to meet with or talk

21 to the person who was in charge?

22    A.    What -- what I did was two -- two things:

23 Firstly, I oversaw the mounting of the biggest re --

24 spill response in history; and, secondly, initiated an

25 investigation to get to, as best as we were able to,

1  what has caused the accident.

2      Q.   Well, you -- you had to respond.  You -- you

3  had to oversee a response, correct?

4      A.   I did.

5      Q.   Because you had to clean up your mess,

6  correct?

7              MR. GODFREY:  Objection to form.

8      A.   We were clearly a responsible party under the

9  OPA 1990 Regulations, and we took that responsibility

10  seriously and led, in conjunction with the Coast Guard,

11  the biggest response any company has ever mounted.

12      Q.   (By Mr. Kanner) Because this was the biggest

13  marine spill in history, it would be the biggest

14  response, correct?

15              MR. GODFREY:  Objection to form.

16      A.   It was certainly the biggest -- biggest oil

17  spill in the U.S. history, that is correct.

18      Q.   (By Mr. Kanner) And you say that systems and

19  processes were -- were breached.  Do you know -- did

20  you change any systems and processes before you left

21  the company?

22      A.   Did I change?

23      Q.   Yeah.  In order --

24      A.   I caused --

25      Q.   -- to avoid these sorts of tragedies?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   I caused as -- as we learned about the causes

2  of the accident, we changed a number of things, and I'm

3  certain more things have been changed subsequent, as --

4  as is the case across the industry.  It is what happens

5  every time there's an accident, unfortunately.

6     Q.   The -- I think you've already said that you're

7  sorry this oil spill happened, and you are sorry

8  that -- about the severe environmental and human

9  consequences, correct?

10     A.   Correct.

11     Q.   Do you personally as CEO feel any

12  embarrassment that this happened during your watch?

13               MR. WEBB:   Objection, form.

14               MR. GODFREY:   Same objection.

15     A.   I am deeply sorry, and -- that the accident

16  occurred, that so many people's lives were impacted,

17  and it caused so much distress for so many people.

18     Q.   (By Mr. Kanner) Do you feel remorse?

19     A.   Of course I feel remorse.  Eleven people died.

20     Q.   And --

21     A.   How could you not feel remorse?

22     Q.   And the ecosystem of the Gulf has been

23  changed?

24     A.   I think I'm not in a position to say whether

25  the ecosystem of the Gulf has been changed or not.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   I've long held the view that we should allow time and

2   science to determine what the environmental impact is,

3   and that remains my position today.

4        Q.   In hindsight, would you personally do anything

5   differently, for example, maybe have a hotline, if

6   people believed they have a "nightmare" well?

7                MR. GODFREY:   Objection to the form.

8        A.   I wouldn't advocate the CEO of any company

9   getting involved in Operations in that way.

10       Q.   (By Mr. Kanner) Why not?

11       A.   Because, A, I'm not qualified; and, B, it

12   would -- it had potential to create chaos and

13   short-circuit all of the -- all of the systems and

14   processes that were in place.

15       Q.   But you could save lives?

16                MR. GODFREY:   Objection to the form.

17       A.   I don't think that would -- that would -- I'm

18   not certain that you could say that would be the case

19   or not.

20       Q.   (By Mr. Kanner) You're aware that this was

21   described by your own people as a "nightmare" well?

22       A.   I'm aware because I was shown an E-mail in my

23   Congressional testimony that one of the young Drilling

24   Engineers described it as a "nightmare" well.

25       Q.   Do you disagree with that assessment?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 36

484

1    A.    I'm not in a position to make an assessment

2  one way or the other as to whether it was a "nightmare"

3  well.  Based on what I have seen subsequent to the

4  accident, it doesn't appear that it was significantly

5  more challenging than many wells that the company

6  drills in the Gulf of Mexico.

7    Q.    As CEO, did -- did you receive any E-mails or

8  updates or presentations on the progress of wells that

9  were being drilled?

10    A.    No.

11    Q.    Why not?

12    A.    Because there are lots of other people

13  receiving them, and we would -- BP drills hundreds of

14  wells every year.  It's not the role of the CEO to

15  monitor individual wells.

16    Q.    Well, this particular well was behind

17  schedule, and I guess it was approximately 21 million

18  in payments, extra days with Transocean at this point

19  in time.  Is that something that the CEO would be

20  involved with?

21              MR. WEBB:  Objection to the form.

22    A.    It's not unusual for wells to be behind

23  schedule, and BP was investing close to $20 billion a

24  year, so I'm afraid at the level of the CEO, a $20

25  million -- $20 million cost overrun actually wasn't

1    that significant.

2       Q.   (By Mr. Kanner) Because you make about seven

3    billion a quarter?

4                MR. GODFREY:   Objection to form.

5       A.   The First Quarter result was $7 billion, as we

6    heard from the Department of Justice lawyer on Monday.

7       Q.   (By Mr. Kanner) You had said that you were

8    determined to see it through, the -- the response.   And

9    earlier I think you -- you said you lead the response.

10   Why didn't you stay with the company?

11               MR. WEBB:   Objection to the form.

12      A.   I decided with my Board colleagues that the

13   company needed a new face in America, actually.

14      Q.   (By Mr. Kanner) Were you fired?

15      A.   No.

16      Q.   Do you -- do you still have a relation with

17   the company as a consultant?

18      A.   No.

19      Q.   Are you still a shareholder of the

20   corporation?

21      A.   I am as a private citizen.

22   ███   ████████████████████████████████

23   ███   ███████████████████████████████

24   ██████████████████

25   ███   ████████████████████████████████████



6      Q.    Did you ever specifically talk to either

7    Anadarko, MOEX, or Transocean CEOs about this disaster?

8      A.    I spoke twice to Jim Hackett at Anadarko.

9      Q.    What did you discuss?

10     A.    We just -- we discussed the response.

11     Q.    Did you discuss -- was he just asking what you

12    were doing, or did you also ask him to chip in his fair

13    share?

14     A.    No, I didn't ask him to do anything.  We

15    discussed the response.  There was no discussion.  That

16    discussion was left for the lawyers.

17     Q.    You -- you referred a few times to industry

18    practices during your testimony yesterday.  For

19    example, you said that the BOP was viewed as a

20    fail-safe by the industry.

21           Do you recall that?

22     A.    Correct.

23     Q.    And I think when you mentioned your Emergency

24    Response Plan with the walruses, you mentioned, well,

25    just like everybody else in the industry, right?

1      A.    That's correct.

2      Q.    Do you recall that?

3      A.    I do, yeah.

4      Q.    Would you agree with me that it's -- it's not

5  sufficient, that one of the lessons learned is it's not

6  sufficient to just rely on what everybody else in the

7  industry is doing or thinking?

8              MR. GODFREY:  Objection to form.

9      A.    I think what I would say is that the -- there

10  were a lot of lessons for the industry from this

11  accident as the Presidential Commission found.  This is

12  an industry issue, not a BP-specific issue.

13      Q.    (By Mr. Kanner) Do you -- do you think the

14  fact that you at BP shared this alleged industry belief

15  that the BOP was a guaranteed fail-safe, do you think

16  that that encouraged scrimping on safety?

17      A.    No.

18              MR. WEBB:  Object to the form of the

19  question.

20      A.    No, none whatsoever.

21      Q.    (By Mr. Kanner) Well, if it was --

22      A.    And there's no evidence from any of the

23  investigations there was scrimping on safety.

24      Q.    Well, safety was certainly mishandled, and

25  there was substantial evidence of that.  You -- you

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 40

488

```
 1    itemized --

 2                  MR. GODFREY:  Objection, form.

 3         Q.   (By Mr. Kanner) -- a couple of -- you -- you

 4    itemized some of the material for General Strange:

 5    The -- the BOP had not been inspected, there was a

 6    hydraulic problem, there was a dead battery, correct?

 7         A.   Correct.

 8                  MR. WEBB:  Object to the form.

 9                  MR. ROBERTS:  Object to the form.

10         Q.   (By Mr. Kanner) These are your contractors,

11    you expect your contractors to be complying with all

12    applicable Regulations, correct?

13                  MR. GODWIN:  Object to form.

14         A.   I do.

15         Q.   (By Mr. Kanner) Okay.  So -- so I ask you

16    again:  Were -- was it your belief -- because you

17    believed that this BOP would be a fail-safe, is that

18    one reason you didn't police your contractors, say,

19    with respect to the BOP?

20                  MR. GODFREY:  Objection to form.

21         A.   To the best of my knowledge, we were providing

22    the appropriate oversight to the contractors.

23         Q.   (By Mr. Kanner) You -- you say "to the best of

24    your knowledge," but earlier you said that you really

25    had no knowledge of what was going on at the well,
```

1    correct?

2       A.   I had no knowledge prior to the accident of

3    this well at all, other than it was drilling and

4    appeared to have made a discovery.  That is when I

5    first became aware of this well.

6       Q.   In -- in your mind, when -- when -- when this

7    catastrophe happened, did -- did you feel that -- that

8    somebody was to blame, maybe Head of Exploration?

9            MR. GODFREY:  Objection to form.

10      A.   Well, I was never interested in the blame

11   game.  I was interested in understanding the cause of

12   the accident, which I believe the Bly Report was a

13   pretty good basis.  And I was interested in responding

14   to the accident in terms of the spill response.

15      Q.   (By Mr. Kanner) Well --

16           MR. GODWIN:  Objection, form.

17      Q.   (By Mr. Kanner) -- leaving aside the blame

18   game, one way you avoid human error is by holding

19   people accountable for their actions; isn't that true?

20      A.   That's true.

21      Q.   Okay.  So did you make an effort to hold

22   anybody accountable for their actions or mistakes?

23      A.   I -- I said a number of times, if we found any

24   evidence of people putting costs ahead of safety, we

25   would hold them accountable, but we -- we have not, nor

1    has anyone else.

2        Q.   You -- let me just be sure I've got that

3    right.  Your testimony is BP has never held anybody,

4    any person accountable for any of the mistakes, errors,

5    that led to the DEEPWATER HORIZON disaster, correct?

6        A.   I --

7                 MR. WEBB:  Object to the form of the

8    question.

9                 MR. GODFREY:  Objection to the form of

10   the question.

11       A.   I think -- two things I would say.  I -- at

12   the time when the Report was published, I was leaving

13   the company.  So that was beyond my tenure at the

14   company.  So the honest answer to the question is I

15   don't know.

16            But based on my reading of the Report, which

17   was published two or three weeks before I left the

18   company, I think it would be difficult to identify

19   anyone in terms of, you know, culpability because it

20   was an accident.

21       Q.   (By Mr. Kanner) Well, the Report specifically

22   did not look at Management failures, correct?  We --

23   you discussed --

24       A.   The report --

25       Q.   -- this on Monday.

1    A.   The Report was designed to determine the cause

2  of the accident, and it did so pretty effectively, I

3  think.

4    Q.   But it did not -- but it specifically excluded

5  looking at Management failures, correct?

6              MR. GODFREY:  Object to the form.

7    A.   It was designed to identify the cause of the

8  accident.  And the terms of reference are clear.  We

9  can go back to the terms of reference if you'd like,

10  but it is -- it's clear what the terms of reference

11  were.

12    Q.   (By Mr. Kanner) Well, you agree that

13  Management failures could be a possible cause of -- of

14  a serious accident, right?

15              MR. GODFREY:  Object to the form.

16    A.   In a theoretical context, absolutely.

17    Q.   (By Mr. Kanner) Yes.  Theoretically, yes, is

18  that your testimony?

19    A.   Theoretically.

20    Q.   So when you have an accident like this, why

21  don't you at least investigate that possibility, as

22  well?

23              MR. WEBB:  Object to the form of the

24  question.

25    A.   The investigation was focused on the cause of

1   the accident.  That's all I can tell you.

2       Q.   (By Mr. Kanner) Well, if it didn't look at all

3   of the theoretically possible causes, wasn't it an

4   incomplete investigation?

5              MR. WEBB:  Object to the form of the

6   question.

7              MR. GODFREY:  Object to form.

8       A.   I believe the Report stands on its face as a

9   vigorous and robust investigation into the accident.

10      Q.   (By Mr. Kanner) You say it's vigorous and

11  robust.  Did you hire any consultants, independent

12  analysts to help you design a comprehensive or robust

13  investigation?

14      A.   The Investigation Team have certainly had

15  expertise from outside of the company.  I don't know --

16      Q.   Well, Mr. Bly --

17      A.   -- to the -- what extent, because I -- I -- I

18  wanted it to be independent.  So it was under the

19  direction and leadership of Mr. Bly.

20      Q.   Who has been promoted since then, has he not?

21      A.   I believe he's in -- broadly in the same role,

22  actually, but --

23      Q.   You were shown -- so your testimony is you

24  don't believe he's been promoted?

25      A.   I think -- I --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 45

1              MR. WEBB:  Objection to the form of the

2      question.

3          A.   I don't know, because I'm not in the company

4      anymore.  I don't -- I don't -- I haven't followed what

5      he's been doing, but I -- I believe he's in,

6      essentially, the same role.

7          Q.   (By Mr. Kanner) You were shown a lot of

8      documents on Monday about safety and cost-cutting.  Do

9      you recall that?

10         A.   I do.

11         Q.   Okay.  Would you agree that -- that both were

12     important to you, safety and cost-cutting?

13             MR. GODFREY:  Object to the form.

14         A.   As I explained, the first focus was on safe

15     and reliable operations, and a -- the second focus was

16     on having the right people with the right skills in the

17     right place, and the 3rd focus was on performance.  And

18     part of that performance was reducing the overhead cost

19     factor of the company; simplifying it, removing the

20     bureaucracy and the complexity of the corporate head

21     offices.

22         Q.   (By Mr. Kanner) Why is it that prior to the

23     accident you never wrote a memo or gave a presentation

24     telling your people that cutting cost was important but

25     not at the price of compromising safety?

1    A.   I think I said that --

2              MR. WEBB:   Objection to the form of the

3    question.

4    A.   -- on multiple, multiple occasions, if you go

5    back -- and we can do it if you'd like, go back through

6    any one of my speeches and texts, I make it very clear

7    that safety is safety and cannot be compromised by

8    cutting costs.

9    Q.   (By Mr. Kanner) You -- you're saying there's a

10   document where you specifically say that -- that

11   safety's -- that you should not compromise safety when

12   you cut cost?

13   A.   M-h'm.

14   Q.   Which documents are you talking about?

15   A.   My speech to the AGM in 2009 says exactly

16   that, I believe.

17   Q.   Who's the AGM?

18   A.   Annual General Meeting.

19   Q.   Say that again.

20   A.   The Annual General Meeting of Shareholders at

21   BP.

22   Q.   You told the shareholders?

23   A.   That -- that communication goes to every

24   employee at BP.  Every employee in BP is a shareholder.

25   Q.   Can you think of anything else?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   I think you could go to pretty well anything I

2  said at my time as CEO and find essentially the same

3  statement.

4    Q.   Your testimony is -- you were -- you were

5  shown a commercial, a television commercial, that y'all

6  paid for by Attorney General Strange --

7    A.   M-h'm.

8    Q.   -- do you recall that?

9    A.   Yes, I do.

10    Q.   Why didn't you immediately start spending --

11  taking that money instead of helping the BP brand and

12  try to do -- direct that money at actually avoiding

13  negative impacts on tourism and maybe the Gulf seafood

14  brand?

15    A.   We did.

16              MR. WEBB:  I object to the form of the

17  question for multiple reasons.

18    A.   We did.

19    Q.   (By Mr. Kanner) Later --

20    A.   I gave -- pretty much synchronously with that,

21  we gave 25 million pound grants to each of the states

22  to promote tourism.

23    Q.   The 25 million you gave was for tourism?

24    A.   It was designed to -- we -- there were

25  multiple grants.  The first 25 million pound grant was

1   to accelerate the area contingency plans for each

2   state.   There were then subsequent grants to -- to

3   support tourism through -- through ad -- advertising

4   and that sort of thing.

5           And I -- I want to be clear that those

6   commercials were about information.   They weren't

7   advertising the brand of BP.   They were about

8   information as to what was happening and what we were

9   doing.   We wanted the people of the Gulf Coast to know

10  the scale and scope of the response that was being

11  mounted and the nature of the commitments that we had

12  made.

13      Q.   You wanted to preserve the BP brand.   You were

14  concerned about the BP name, were you not?

15      A.   I think --

16              MR. GODFREY:   Objection to form.

17      A.   That was not our focus at that point in

18  this -- in this.

19      Q.   (By Mr. Kanner) Okay.   Let's break it up.   You

20  were concerned about BP's name, protecting it, correct?

21      A.   Clearly our brand was being damaged.

22      Q.   All right.

23      A.   Those commercials were not designed to restore

24  the brand.

25      Q.   Okay.

497

1      A.    They were designed to provide information to

2  the people of the Gulf Coast as to the scale of the

3  response and our commitment to stay with it until it

4  was complete.

5      Q.    And you're concerned about your brand both for

6  your share prices and your ability to -- to deal with

7  Regulators in the future, correct?

8             MR. GODFREY:  I'm going to object as to

9  form.

10     A.    The brand's the brand, yeah.  I mean, it's --

11  but it -- I say the brand was not at all my focus at

12  that moment.  The best way of protecting the brand was

13  to be able to mount the response and stop the well.

14  But --

15     Q.    (By Mr. Kanner) You say -- oh, I'm sorry.

16     A.    Go ahead.

17     Q.    You say these were grants for tourism,

18  correct?

19     A.    M-h'm.

20     Q.    Did you do anything to ascertain if that was

21  enough money to actually fix the problem?

22     A.    Fix what problem?

23     Q.    The people weren't coming to the Gulf.  The

24  people weren't enjoying Gulf seafood.  I mean, did you

25  undertake that that was enough money?  Was it an

**PURSUANT TO CONFIDENTIALITY ORDER**

1    arbitrary figure?

2        A.   It wasn't -- it wasn't designed to compensate

3    people.  It was designed to mitigate the extent to

4    which people were not coming to the Gulf.

5        Q.   And my question is:  Did you undertake an

6    investigation --

7        A.   No.

8        Q.   -- to determine if it fully mitigated?

9        A.   No.

10       Q.   So sitting here today, you have no reason to

11   think that the $25 million grant either did or didn't

12   fully mitigate the problem, correct?

13       A.   It was designed to simply support advertising

14   in the tourist in -- industry.

15       Q.   So, really, all you were doing at that point

16   was mitigating your own corporate damages since you

17   would be responsible for those tourism losses, correct?

18                MR. WEBB:  Object to the form.

19                MR. GODFREY:  Object to form.

20       A.   I think we were trying to help the Gulf Coast

21   States, actually.

22       Q.   (By Mr. Kanner) Would you also --

23       A.   At the time they all seemed extremely grateful

24   that it was something we were prepared to do, because I

25   met with each one of the Governors, and they expressed

PURSUANT TO CONFIDENTIALITY ORDER

1   their thanks and gratitude for us doing it.

2       Q.   Well, they -- they certainly needed help after

3   the explosion on the DEEPWATER HORIZON, and we

4   certainly appreciated you helping us out of the

5   disaster that was created here.  But isn't it true that

6   by -- by spending that limited amount of money you were

7   at least also trying to mitigate your own corporate

8   damages because, as you said earlier, BP is going to

9   make people whole, put them --

10              MR. WEBB:  Object to the form.

11      Q.   (By Mr. Kanner) -- in a position they would

12  have been in but for the disaster?

13              MR. WEBB:  I object to the form of the

14  question for several reasons.

15              MR. GODFREY:  Object to form.

16      A.   Our focus was trying to help the States.

17  That's what we did.

18      Q.   (By Mr. Kanner) Well, the State of Louisiana,

19  for example, had asked for more money for tourism and

20  for seafood safety testing.  You -- you're aware of

21  that?

22      A.   I don't recall that -- I honestly don't recall

23  that.

24      Q.   Okay.  We received less than what we had asked

25  for, and we -- we had presented our reasons for why we

PURSUANT TO CONFIDENTIALITY ORDER

1    thought --

2        A.   M-h'm.

3        Q.   -- we needed what we needed.

4        A.   M-h'm.

5        Q.   Why wasn't it all provided?

6        A.   I can't --

7                MR. GODFREY:  Objection to form.

8        A.   -- can't answer that question.  I mean, I do

9    recall that we -- not only did we do that in Louisiana,

10   we also provided a very large sum of money to build

11   berms and do shoreline protection.

12       Q.   (By Mr. Kanner) Correct.

13       A.   $350 million is my recollection.

14       Q.   I think you spent 260 million on berms.  And

15   that's to be expected in an environmental disaster like

16   this --

17       A.   Well --

18       Q.   -- that you got to take response actions,

19   right?

20       A.   It would be -- it would have been expected if

21   it had been part of any sort of Spill Response Plan,

22   which it clearly was not, and if -- and if there had

23   been a belief that it was going to be an effective

24   mitigant to the spill.  But I think time has

25   demonstrated that that was not the case.

PURSUANT TO CONFIDENTIALITY ORDER

501

1      Q.    You --

2      A.    And it certainly was not part of any Spill

3  Response Plan.

4      Q.    You're not criticizing -- you the company with

5  the Walrus Emergency Response Plan are not criticizing

6  the State of Louisiana for not having a better Response

7  Plan for this tragedy?

8      A.    No --

9            MR. GODFREY:  Objection to form.

10     A.    -- I'm not -- I'm not criticizing the State of

11  Louisiana.  I'm simply making the observation that

12  building berms was not part of any approved Oil Spill

13  Response Plan by anyone.

14     Q.    (By Mr. Kanner) Didn't Admiral --

15           (Speakerphone conversation.)

16           MR. KANNER:  Stop horsing around down

17  there.

18           MR. WEBB:  Did we ever get the answer?

19  Did you get the answer?  Okay.

20           (Discussion off the record.)

21           MR. GODFREY:  You've got the answer, Kym?

22           THE COURT REPORTER:  Yes.

23     Q.    (By Mr. Kanner) You say the berm was not

24  approved.  Admiral Allen approved the berms, didn't he?

25     A.    I said --

502

1      Q.    President Obama?

2      A.    I simply meant that in terms of the

3   preapproved Response Plan that was in place prior to

4   the accident there was no notion or obligation or idea

5   of building berms.

6      Q.    Yeah.  But berms are built all -- throughout

7   the south.  I mean, in inlets, correct, there are lots

8   of different types of berms?

9      A.    There were berms built in Louisiana comprising

10   major removal of sand.  There wasn't any other berms

11   built, I don't believe.

12      Q.    There are berms built in Florida to protect

13   certain beaches, correct?

14      A.    I don't think so.  Not to my knowledge.  I'm

15   honestly not sure, but I don't think so.

16      Q.    Okay.  You keep saying it wasn't part of an

17   approved plan.  I -- I -- just don't understand what

18   you're -- you're talking about.  Were you saying that

19   the state was supposed to have a plan in place for each

20   well that you're drilling --

21      A.    No.

22      Q.    -- in the event that any of them --

23      A.    I didn't say that at all.

24      Q.    All right.

25      A.    I said it was not part of the approved

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 55

503

1  Response Plan which the company submitted to the

2  authorities and was approved by authorities.

3      Q.   Oh.  You're saying once the well started

4  leaking you developed a Response Plan and the berms

5  were originally not a part of it?

6      A.   No.

7              MR. GODFREY:  Objection to form.

8      A.   We -- we deployed our Response Plan that had

9  already been approved prior to commencing operations.

10  There was no part of berms in that Response Plan.

11     Q.   (By Mr. Kanner) Okay.  And the State felt that

12  they wanted some berms for protection.  The matter was

13  taken up with Admiral Allen, and he approved it and BP

14  spent the money, correct?

15     A.   That's correct, yeah.

16     Q.   You, if anybody, I think, might agree that in

17  the context of a disaster where you've got uncontrolled

18  oil, hurricane seasons, that people have to do -- that

19  -- that a great deal is being done kind of as you go

20  along, people are trying to take precautionary

21  measures, correct?

22     A.   M-h'm.

23     Q.   And hindsight, that may or may not have been

24  your first choice, but you're in the middle of a crisis

25  and you're dealing with a crisis; is that fair?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 56

504

1      A.   That's fair.

2      Q.   You said a -- a Junior Engineer had described

3   this as a "nightmare" well.  Do you recall that?

4      A.   I do.

5      Q.   You certainly want your -- your Engineers to

6   be expressing their opinions, correct?

7      A.   Correct.

8      Q.   And you try to take every opinion from a

9   professional seriously in your company?

10     A.   Correct.

11     Q.   Do you know why nobody ever followed through

12   on the -- the "nightmare" well issue?

13               MR. GODFREY:  Objection to form.

14     A.   I -- I'm not aware of any of the details

15   around it.

16     Q.   (By Mr. Kanner) You agree that the oil spill

17   has already caused extensive and severe damage to the

18   marine and wildlife habitats in Louisiana?

19               MR. GODFREY:  Objection to form.

20     A.   As I said previously, I think we need to allow

21   time and science to determine the full extent of the

22   damage.  I'm not in a position to make any assessments,

23   sitting here today.

24     Q.   (By Mr. Kanner) I didn't ask you about the

25   full extent of the damage.  I asked you if you agreed

PURSUANT TO CONFIDENTIALITY ORDER

1   that, based on what you knew at the time you left the

2   company that, in fact, the oil spill has already caused

3   extensive and severe damage to marine and wildlife

4   habitats?

5               MR. WEBB:  Object to the form of the

6   question.

7       A.   The answer is, I don't know the answer to that

8   question.

9       Q.   (By Mr. Kanner) Okay.  You -- you -- you saw

10  oiled animals, correct?

11      A.   M-h'm.

12      Q.   "Yes"?

13      A.   Clearly -- it was clearly a tragic and serious

14  oil spill.

15      Q.   Right.  And -- and I'm asking if you viewed

16  severe damage to marine and wildlife or their habitats.

17  Would the answer be "Yes," you would?

18      A.   We were clearly -- there were clearly birds

19  impacted, and that was -- that was a tragedy.

20           I -- I can't judge the impact on the habitat.

21      Q.   Okay.  You were -- you -- you actually went to

22  some of the marshes --

23      A.   Yes.

24      Q.   -- that were oiled, correct?

25      A.   I did.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 58

506

1    Q.   Did anybody explain to you what the

2  consequences were of the oiling of the marshes?

3    A.   I think the consequences were still being

4  determined when I was there, and I -- I honestly don't

5  know what the conclusions were.

6    Q.   Were you told that marsh grass might die as a

7  result of the oil?

8    A.   I was told that marsh -- marsh grass might

9  die.

10   Q.   Were you told that the root system of the

11 marsh grash -- grass would then cease to hold soil

12 together?

13   A.   I didn't go into any details, I'm afraid, of

14 the --

15   Q.   You weren't told --

16   A.   -- marsh grass.

17   Q.   -- that -- that this sort of damage might

18 accelerate erosion, coastal erosion?

19   A.   I wasn't -- as I said, I wasn't -- I didn't go

20 into any of the details that I think that the -- the

21 science that is being progressed as we speak will

22 determine, you know, the extent of the damage.

23   Q.   But you agree that the environmental damage

24 that you observed firsthand and that you were spending

25 money responding to was, in fact, severe environmental

**PURSUANT TO CONFIDENTIALITY ORDER**

1   damage?

2                    MR. WEBB:  Objection, form.

3       A.   I can't make an assessment about the severity.

4   It's clear there was oil on beaches and there was oil

5   on marsh.

6       Q.   (By Mr. Kanner) How many animals needed to die

7   before it became severe, in your mind?

8                    MR. WEBB:  Objection, form.

9                    MR. GODFREY:  Objection, form.

10      A.   In the matter of bird impact, it was clear it

11  was severe.  In the matter of the habitat impact, I --

12  I have no -- no basis for assessing the impact on

13  marine environment.  I've never seen any data.

14          In the matter of the habitat, I -- I think

15  it's -- without the benefit of science and time,

16  it's -- you can't make an assessment.

17      Q.   (By Mr. Kanner) A full assessment?

18      A.   A full assessment.

19      Q.   But you can make an interim assessment?

20      A.   You can make an assessment that says we had to

21  do -- we had to take steps to remediate, and that's

22  what was -- was happening.

23      Q.   Okay.  And part of the reason -- by

24  "remediate," you mean going out to the beaches and

25  picking up tar balls, for example?

1    A.   Yeah, and going to marshes and cleaning the

2  grass blade by blade.

3    Q.   Okay.  And you understand that even after you

4  went to the marshes and cleaned blade by blade, there

5  was still oil in the marshes, correct?

6    A.   I understand that in some areas, the cleaning

7  operation is very challenging.

8    Q.   And you understand that re-oiling has -- has

9  occurred, and is still occurring, correct?

10    A.   I -- I'm not at all current with the current

11  state of what is occurring in Louisiana, I'm afraid.

12    Q.   As of the time you left the company in

13  October, re-oiling was still occurring?

14    A.   I was aware that the remediation was certainly

15  not complete, and that if you tell me re-oiling was

16  occurring, then I believe you.  I don't remember that,

17  but I'm sure if that's what you're saying, then it's

18  true.

19    Q.   Do -- do you recall rough any metrics, like

20  600 miles of Louisiana Coastline were oiled?

21    A.   No, I don't -- I don't recall the details, I'm

22  afraid.

23    Q.   You -- you agree with General Strange when he

24  mentioned that -- that there were tens of thousands of

25  gallons of oil, or some oil residue still in the Gulf

1   today?

2       A.   I haven't seen any data to know whether that's

3   right or not.  If that -- if -- if you're telling me

4   that there is hard data that says that's the case,

5   then, of course, I believe you, but I -- you know, I

6   have not been involved in this now, and I haven't been

7   party to any information for, you know, almost nine

8   months, so I can't --

9       Q.   As of --

10      A.   -- really help you.

11      Q.   I'm sorry.  As of the time you left the

12  company, you understood that there was still

13  uncontrolled oil in the Gulf of Mexico, correct?

14                  MR. GODFREY:  Objection to form.

15      A.   What I understood was that we hadn't completed

16  the cleanup operation.  It was still ongoing, and --

17      Q.   (By Mr. Kanner) As of the time you left the

18  company, was there a plan to clean up the oil that is

19  loose in the Gulf?

20      A.   There was a plan to remediate the

21  environmental impact.  I'm not -- I'm sure if someone

22  can identify where there is oil in the Gulf, it will be

23  remediated.

24      Q.   Do -- what is your understanding -- strike

25  that.

1          You're saying that you believed BP has a plan

2    to remediate any and all oil, wherever it's found,

3    that -- that came from this oil spill?

4          A.    I believe that's the intent.

5          Q.    Do you -- do you agree that the -- the oil

6    spill has also caused extensive and severe damage to

7    the Gulf fishing industries?

8                MR. GODFREY:   Objection to form.

9          A.    It's certainly created a significant impact at

10   the time.  I'm not in a position to judge the lasting

11   impact, because again, I've not seen any current

12   information, so all I can -- all I can say is that at

13   the time, it clearly caused significant impact because

14   many of the fishing grounds were closed.

15         Q.    (By Mr. Kanner) And --

16         A.    I believe they're now all open, and I believe,

17   and it's only hearsay, frankly, newspapers, that the

18   fishing catches are as good, if not better, than

19   they've ever been, but I don't know whether that's true

20   or not.  That's what I've read in newspapers.

21         Q.    Actual -- actually the brown shrimp season has

22   been quite disastrous this year.  Have you heard about

23   that?

24         A.    No.  Sorry.

25         Q.    You're aware that the oil spill also caused

1   extensive and severe damage to Gulf tourism industry?

2           MR. GODFREY:  Objection to form.

3       A.   I'm clearly aware that in the middle of the

4   accident last Summer and the aftermath, a lot of people

5   that would have come to the Gulf Coast didn't.

6       Q.   (By Mr. Kanner) The -- do you agree that the

7   spill also had adverse consequences for deep and

8   shallow water drilling industries operating in the Gulf

9   of Mexico?

10          MR. GODFREY:  Objection to form.

11      A.   Clearly, the moratorium imposed by the

12  Government had a big impact on shallow and deepwater

13  activity.

14      Q.   (By Mr. Kanner) I think yesterday you said you

15  thought that was reasonable, correct?

16      A.   I thought it was a reasonable decision at the

17  time until the nature of the accident was understood.

18      Q.   Leave aside the former moratorium, if you

19  would, for a second.

20      A.   M-h'm.

21      Q.   And I -- I certainly agree that the response

22  efforts were -- were unprecedented.  I think you

23  had 48,000 people involved at one point in time,

24  some 6700 vessels, 125 aircraft.  I think you -- you --

25  you bought all the dispersant that was available in the

1    United States of America, and most of the boom; is

2    that -- is that fair?

3        A.   That's correct.

4        Q.   I -- I have one question about that:  Had

5    there been -- would you agree that it was prudent at

6    the -- during the course of your response, at least

7    until the well was plugged, would you agree that there

8    weren't resources available, dispersant or boom, for

9    another spill at another well?

10                   MR. GODFREY:  Objection, form.

11       A.   That's speculation.  No, I can't -- I can't --

12   there was clearly a lot of equipment in the Gulf.

13       Q.   (By Mr. Kanner) Well, didn't you specifically

14   buy all the dispersant that was available at one point

15   in time?

16       A.   What -- what we did, actually, was to work

17   with the dispersant manufacturer to ramp up production.

18   And at no time then was dispersant ever an issue.  And

19   I suspect if there had, God forbid, been another

20   accident of the same sort, dispersant would have been

21   available --

22       Q.   It would have?

23       A.   -- because of the rampup in production.

24       Q.   What about boom?

25       A.   Well, we -- we deployed a lot of -- we had

PURSUANT TO CONFIDENTIALITY ORDER

513

1   available a lot of boom.  In the end, we didn't -- you

2   know, it -- we had a lot of boom deployed, but never

3   got anywhere near -- we had millions of feet of boom in

4   Florida, but never saw even a tar ball.

5        Q.   And so you don't know what resources would

6   have been available to other companies if they --

7        A.   It's entirely speculation.

8        Q.   Did -- did BP shut down its other wells when

9   this -- when this accident happened?

10       A.   Well, we -- we were subject to the moratorium,

11   so everyone shut down all their wells.

12       Q.   Before the moratorium?

13       A.   The moratorium was announced very early, I

14   think.  I -- I can't recall whether -- the precise

15   sequencing of the shutdown, but it was --

16       Q.   But --

17       A.    -- it was announced very shortly after the

18   accident.

19       Q.   But prior to the moratorium, BP was going to

20   continue to operate its other wells in the Gulf?

21       A.   We had -- we had no other exploration wells

22   drilling.  We had no -- to my recollection, we had no

23   other production wells drilling at the time, but I

24   can't honestly recall.  I'm -- I'm certain about the

25   exploration wells.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 66

514

```
 1      Q.   You've talked a bunch about remediation,
 2  which, to my mind, means cleanup.  Is that -- is that
 3  how you understand it?
 4      A.   M-h'm, correct.
 5      Q.   What about restoration of the ecosystem to its
 6  pre-pollution condition?
 7      A.   M-h'm, right.
 8      Q.   Has anything been done in that regard at this
 9  point in time?
10              MR. GODFREY:  Objection to form.
11      Q.   (By Mr. Kanner) As -- as of the time you left
12  the company?
13      A.   As of the time I left the company, that
14  process was beginning, but only had just begun, so I'm
15  afraid I -- I'm just not familiar with the details of
16  what have -- what has occurred over the last nine
17  months.
18      Q.   But you agree that the company needs to
19  restore ecosystem that's been damaged, correct?
20      A.   I believe --
21              MR. GODFREY:  Object to the form of the
22  question.
23              MR. WEBB:  Objection to the form.
24      A.   I believe we have an obligation to restore and
25  remediate under the environmental damage provision, I
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 67

515

1    can't remember the exact --

2        Q.   (By Mr. Kanner) OPA?

3        A.   Under OPA, yeah.

4        Q.   Okay.  But that's something you would -- you

5    believed the company ought to do anyway, whether that

6    law --

7        A.   M-h'm --

8        Q.   -- existed or not --

9        A.   It was --

10       Q.   -- correct?

11       A.   -- something I believe the company is doing.

12       Q.   Now, to the extent that people were not able

13   to enjoy recreational fishing, enjoy beaches, you also

14   agree that there should be compensation for their loss

15   of use of those resources during the period that they

16   were contaminated until they were restored to their

17   prepollution condition?

18            MR. GODFREY:  Objection as to form.

19       A.   Yeah, I -- I mean, the -- the statement we

20   made is that all legitimate claims for business impact,

21   personal impact, would be -- would be honored, and I

22   believe that the -- the fund -- the $20 billion fund

23   that we established has to date dispersed on the order

24   of $5 billion.

25       Q.   (By Mr. Kanner) Okay.  But my question was --

**PURSUANT TO CONFIDENTIALITY ORDER**

516

1    was different.  My question was:  We talked about

2    restoring resources, we talked about cleaning up

3    resources, but some of those resources are out of play

4    for a certain period of time, you would agree with

5    that, correct?

6                MR. GODFREY:  Objection as to form.

7        Q.   (By Mr. Kanner) People can't use them.

8        A.   Well, I -- I -- what sort of resources are you

9    referring to?  Are we referring to today or are we

10   referring to last Summer?  Clearly last Summer, they

11   were out of play.  I -- I had -- I'm not --

12       Q.   Okay.

13       A.   -- I'm not in a position to know whether they

14   are still out of play.

15       Q.   Fair enough.  With respect to last Summer --

16       A.   Right.

17       Q.   -- to the extent that people weren't able to

18   use some of the resources that they typically use,

19   that's something that also ought to be compensated,

20   correct?

21       A.   I'm -- I'm -- I'm --

22                MR. GODFREY:  Objection as to form.

23       A.   -- I'm not -- I don't understand the -- the --

24   the -- the obligations around this, I'm afraid, so I

25   don't --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 69

1    Q.   (By Mr. Kanner) But you said, "We are taking

2  full responsibility for the spill, and we will clean it

3  up and where people can present legitimate claims for

4  damages, we will honor them."

5    A.   That's correct.

6    Q.   "We are going to be very aggressive in all of

7  that."

8    A.   We have been, I believe.

9    Q.   Okay.  What -- what --

10    A.   I can't think of any other accident in history

11  where $5 billion has been paid out within nine months

12  of the accident.

13           THE COURT REPORTER:  Mr. Hayward, would

14  you fix your microphone.

15           THE WITNESS:  Sorry, that's --

16    Q.  (By Mr. Kanner )  Well --

17           THE WITNESS:  -- apologies.

18    Q.  (By Mr. Kanner) -- when you're -- when you're

19  talking about the worst spill, I guess the amount of

20  money is less interesting than whether everybody has

21  been made whole or not, correct?

22    A.   I think we --

23           MR. WEBB:  Objection, form.

24           MR. GODFREY:  Objection, form.

25    A.   -- have to separate whether it was the worst

**PURSUANT TO CONFIDENTIALITY ORDER**

518

1   spill from it was the largest spill.  It was certainly

2   the largest spill.  We need to determine, with the

3   fullness of time, whether it was the worst spill.

4      Q.   (By Mr. Kanner) And certainly the five billion

5   may turn out to be just a drop in the bucket.

6      A.   I think that's --

7            MR. WEBB:  Objection, form.

8      A.   -- most unlikely.

9      Q.   (By Mr. Kanner) Most unlikely?

10     A.   M-h'm.

11     Q.   Did you have -- you made various

12   representations to your shareholders about the

13   consequences of the spill.  When you say "most

14   unlikely" that it would be -- five billion would be a

15   drop in the bucket, are you relying on any --

16     A.   It sort of depends on how big your bucket is.

17     Q.   H'm --

18     A.   If it's --

19     Q.   -- h'm --

20     A.   -- a small bucket, it might be.

21     Q.   Well, here the bucket is all of the losses of

22   the States and --

23     A.   M-h'm.

24     Q.   -- individuals and businesses throughout the

25   Gulf --

**PURSUANT TO CONFIDENTIALITY ORDER**

519

1      A.    M-h'm.

2      Q.    -- Region until this -- until the environment

3  is restored to its --

4      A.    M-h'm.

5      Q.    -- prepollution condition --

6      A.    M-h'm.

7      Q.    -- which could be an enormous bucket.

8      A.    It could or it could be --

9            MR. GODFREY:  Object as to form.

10           MR. WEBB:  Objection, form.

11     Q.    (By Mr. Kanner) Correct?

12     A.    -- it could or it could be a $6 billion

13 bucket.

14     Q.    Did you have any consultants help the company

15 understand the size of that bucket of damages?

16     A.    I -- I'm not aware of whether we did or

17 didn't, actually.

18     Q.    So you don't -- when you say it might be six

19 billion, you're just pulling that number --

20     A.    That's just --

21     Q.    -- out of the air?

22           MR. WEBB:  Objection.

23     A.    -- that's Tony Hayward talking as a private

24 citizen --

25     Q.    (By Mr. Kanner) Okay.

1      A.   -- not in any other capacity.

2      Q.   You -- you didn't hire any experts to do at

3  least a --

4      A.   Not -- not --

5      Q.   -- quick and dirty assessment?

6      A.   -- in the time when --

7           MR. GODFREY:  Objection as --

8      A.   -- I was at --

9           MR. GODFREY: -- to form.

10     A.   -- BP.

11     Q.   (By Mr. Kanner) H'm --

12     A.   To my knowledge.  I mean, I don't know, but

13  I'm not aware of any of that.

14     Q.   BP committed $500 million for research on

15  ecological impacts of the spill, correct?

16     A.   That's correct.

17     Q.   You agree that, to the extent that research

18  finds problems or damages in the Gulf as a result of

19  the spill, that those are things that BP should pay for

20  whether they find them today or 20 years down the road,

21  correct?

22     A.   I think if there is --

23           MR. GODFREY:  Objection as to form.

24     A.   -- clear and unequivocal linkage between the

25  damage and the spill, then we've made it clear that we

1  will restore and remediate.

2     Q.   (By Mr. Kanner) "Unequivocal linkage"?

3     A.   Yeah.

4     Q.   That's -- that's your standard?

5     A.   Well, I -- I --

6     Q.   I mean, how much science --

7     A.   -- I'm not a lawyer, so I'm not going to split

8  hairs with you about legal terminology, okay?

9     Q.   No, no, no.  What I'm --

10     A.   If there is -- if there is clear linkage

11 between the science and the spill, then I believe the

12 company has made it clear that it will take the

13 necessary action to restore -- restore any damage.

14     Q.   Well, what about a situation like we have

15 here, where there -- there hasn't been a lot of science

16 with massive oil spills in the deep Gulf, you would

17 agree with that, correct?

18          MR. GODFREY:  Objection as to form.

19     A.   That's true.

20     Q.   (By Mr. Kanner) Okay.  So if you -- the

21 standard were unequivocal linkage, I mean, isn't that

22 certainly --

23     A.   As I said, I don't want to get into a lawyer

24 debate about what "unequivocal" means.  If there is a

25 clear linkage, I'm certain -- I -- I -- I can't say.

PURSUANT TO CONFIDENTIALITY ORDER

522

1    Q.    And --

2    A.    Because I no longer have any authority.  But I

3  can imagine that the company would honor the

4  obligations that we made.

5    Q.    Well, when you said you were going to be very

6  aggressive about paying all claims, would you agree

7  that, to the extent the science comes out 50/50 on some

8  of these ecological issues, that those are things BP

9  should take responsibility for?

10   A.    Well, I --

11              MR. WEBB:  Objection, form.

12              MR. GODFREY:  Objection as to form.

13   A.    -- I think that's for someone in BP to make

14  that decision today, not myself.

15   Q.    (By Mr. Kanner) What was your intent when you

16  told people that you were going to be very aggressive

17  about paying all claims?  Would it have been that if

18  there's a -- if there's a doubt 50/50 that that's

19  something BP will probably --

20   A.    It was -- it was --

21   Q.    -- ought to take care of?

22   A.    -- it was about two things:  It was about

23  getting money into the hands of people fast, which I

24  believe we succeeded in doing.  And -- and it -- it was

25  in -- in the -- in -- in the matter of individuals and

523

1   small businesses, which was our focus, erring on the

2   side of generosity, which I believe is what has

3   happened over the last year or so with the fund.

4       Q.   But with respect to the $500 million dollars

5   dedicated to research in the Gulf, your goal at BP,

6   when -- when you authorized the -- the establishment of

7   that sum of money, was to discover all harms, and

8   ultimately remedy those as to which there's a linkage?

9       A.   That's true.

10              MR. GODFREY:  Objection as to form.

11      A.   That's correct.

12      Q.   (By Mr. Kanner) You also paid a hundred

13  million dollars to workers hurt by the moratorium?

14              MR. GODFREY:  Objection as to form.

15      Q.   (By Mr. Kanner) Yes?

16      A.   We established a fund for work that's impacted

17  by the moratorium.

18      Q.   Well --

19      A.   I don't know to what extent it has been

20  deployed.

21      Q.   Okay.  And was part of the reason for that, a

22  feeling that the moratorium was connected to the spill?

23      A.   No, it was a -- it was a -- a request of the

24  Administration.

25      Q.   The President asked you to put a hundred

524

```
 1   million into --

 2        A.    The President --

 3        Q.    -- a fund?

 4        A.    -- the President's team asked us to establish

 5   a fund.

 6        Q.    And you agreed to, why?

 7        A.    Because we were trying to reach a broad-based

 8   agreement with the Government at the time to allow us

 9   to move forward together to deal with the spill.

10        Q.    Well, you certainly had an obligation to your

11   shareholders to be -- to only pay money as to which you

12   thought you might have some responsibility, correct?

13        A.    As I said --

14              MR. WEBB:  Objection, form.

15              MR. GODFREY:   Objection as to form.

16        A.    -- we were trying to reach a broad-based

17   agreement which would be beneficial to the Government,

18   to BP, and, therefore, to its shareholders.

19        Q.    (By Mr. Kanner) H'm.  Let's see.  Oh.  BP has

20   subsequently put money up for mental health issues

21   associated with ecological damage to the Gulf.  Were

22   you involved in any of that?

23        A.    I have no knowledge of that at all, I'm

24   afraid.

25        Q.    Would that have been after your time?
```

525

1     A.   As I no -- have no knowledge, I surmise it was

2  after my time.

3     Q.   Do you agree it's important to monitor, for

4  possible problems associated with the spill, things

5  that might manifest in the future?

6     A.   I -- it --

7              MR. GODFREY:  Objection as to form.

8     A.   -- it seems like an entirely sensible thing to

9  do, yes.  Excuse me.

10     Q.   (By Mr. Kanner) The -- you've worked on rigs,

11  have you not?

12     A.   A very long time ago, yes.

13     Q.   Okay.

14     A.   They were very different operations when I was

15  working on them, of course.

16     Q.   The -- safer or less safe?

17              MR. GODFREY:  Objection as to form.

18     A.   Undoubtedly less safe.  Today the industry has

19  gotten massively safer over the last 20 years.

20     Q.   (By Mr. Kanner) You agree drilling muds

21  contains some toxic materials?

22     A.   I think some drilling muds have some materials

23  that are potentially tox -- potentially toxic in --

24  toxic in some situations.

25     Q.   You -- you told Congress that, during the top

526

1    kill, that no toxic materials were used.  Was that

2    correct, or not?

3        A.    I subsequently, under advice of my Technical

4    Team, corrected that to say that in some particular

5    circumstances, some components of the mud that we are

6    using could possibly be toxic.  That the point I was

7    trying to make is that we were using water-based mud

8    with no oils or anything of that sort.  So it was then

9    the most benign mud that you could use in -- in terms

10   of mud systems available.

11       Q.    So at the very least, you could have been a

12   little clearer with Congress on that point?

13       A.    It was --

14             MR. GODFREY:  Objection as to form.

15             MR. WEBB:  Object to the -- object to the

16   form of the question.

17       A.    It was simply a misunderstanding on my part.

18       Q.    (By Mr. Kanner) Okay.  It was a

19   misunderstanding on your part, and that

20   misunderstanding led to a miscommunication, correct?

21             MR. WEBB:  Objection to the form of the

22   question.

23       A.    It was a misunderstanding which I communicated

24   and subsequently clarified with Congress.

25       Q.    (By Mr. Kanner) H'm --

PURSUANT TO CONFIDENTIALITY ORDER

1    A.    I believe to their satisfaction.

2    Q.    It seems that most of the safety eff --

3    efforts that in -- you talked a lot about safety.  It

4    seems that most of the emphasis was focused on the high

5    incidence events:  The slip and falls, people hurting

6    themselves working on rigs, those sorts of accidents.

7    Does that seem right to you?

8    A.    No.  It was completely not right.

9    Q.    Okay.

10   A.    And in the time that I was the CEO, we focused

11   extensively on process safety, and implemented a whole

12   series of new systems and standards which were focused

13   on process safety.

14   Q.    And who was in charge of that?  Who --

15   A.    The --

16   Q.    -- reported to you on that?

17   A.    -- the Head of that -- of the organization

18   accountable for creating those standards and then

19   implementing them, was Mark Bly.

20   Q.    Who?

21   A.    Mark Bly.

22   Q.    The author of the Bly Report?

23   A.    Correct.

24   Q.    So he really investigated his own work, right?

25             MR. GODFREY:  Objection --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z

528

```
1      A.   No, he --
2             MR. GODFREY:   -- as to form.
3      A.   -- didn't investigate his own work.   He
4  investigated the accident.   He was the most qualified
5  person in the company to lead that investigation.
6      Q.   (By Mr. Kanner) H'm --
7      A.   It was done with a team of 55 Engineers and
8  professionals, some of them drafted from outside of the
9  company, to ensure that the full skills of the industry
10  were deployed in the investigation.
11      Q.   Did you have a -- one or more E-mail accounts
12  when you were at the BP?
13      A.   No.
14      Q.   You did not -- you -- you didn't receive
15  E-mails?
16      A.   I had an E-mail account.   I'm sorry, I thought
17  you said if I had one -- more than one, sorry.
18      Q.   Okay.
19      A.   I had an E-mail account.
20      Q.   Okay.   It was a BP E-mail --
21      A.   It was a BP --
22      Q.   -- account?
23      A.   -- E-mail account, yes.
24      Q.   Did you also have a private E-mail account?
25      A.   No.
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 81

1    Q.   So if you're sending an E-mail to a friend at

2  that time, it would have been --

3    A.   It was BP.

4    Q.   -- it would have been BP?

5    A.   Yes.

6    Q.   And were you -- in any of the -- did you send

7  your own E-mails, or was this something you had your

8  assistants do from time to time, or both?

9    A.   Both.  Sometimes E-mails were sent from my --

10  from my E-mail, you know, communication broadly to BP

11  and the company employees, then it would go -- go from

12  my E-mail box or would be -- or would be sent by one of

13  my assistants.

14    Q.   H'm.  Just one moment.

15            THE COURT REPORTER:  Four minutes.

16            MR. KANNER:  Can I take my break here if

17  you've got four minutes?

18            THE VIDEOGRAPHER:  Off the record at 8:50

19  a.m., ending Tape 11.

20        (Recess from 8:50 a.m. to 9:01 a.m.)

21            MR. GODFREY:  Okay.  We're ready to go,

22  please.

23        Shut the door down there, please.  We're ready

24  to go.

25            MR. KANNER:  Ready.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 82

530

1          THE VIDEOGRAPHER:  All set?

2          On the record at 9:01 a.m., beginning Tape 12.

3     Q.   (By Mr. Kanner) Okay.  In Exhibit 512 --

4 Exhibit 512 is the Baker Report.  I just want to read a

5 quote from you and ask if -- if you agree with it.  It

6 says:  "Preventing process accidents requires

7 vigilance.  The passing of time without a process

8 accident is not necessarily an indication that all is

9 well and may contribute to a dangerous and growing

10 sense of complacency."  And it goes on to say people

11 can forget to be afraid.

12          Do you agree with that?

13          MR. GODFREY:  Objection as to form.

14     A.   I think it's undoubtedly one of the things

15 that can -- could create a process accident, yeah.

16     Q.   (By Mr. Kanner) Complacency.  I'd like to --

17          MR. KANNER:  Has this been marked?

18          MS. PETERSEN:  No.

19          MR. KANNER:  Tab 9, please.  I'd like to

20 mark that as 6056.

21          (Exhibit No. 6056 marked.)

22     Q.   (By Mr. Kanner) So we'll mark this one.  Do

23 you have that in front of you?

24          MS. PETERSEN:  It's --

25     Q.   (By Mr. Kanner) It should be in your --

PURSUANT TO CONFIDENTIALITY ORDER

1    A.   I'm sorry.  Tab 9, did you say?

2    Q.   I -- I'm just going to read a quick quote from

3    that.  This is an E-mail from Tony Hayward, June 25th,

4    to Andy Inglis and a few others.

5    A.   Sorry, can you --

6    Q.   Tab 9.

7    A.   Tab 9.

8              MR. WEBB:  This is Exhibit 6056?

9              MR. KANNER:  Correct.

10             MR. GODFREY:  Bates No. 861 are the last

11   three?

12             THE WITNESS:  Is the Bates No. 861, is

13   it?

14             MR. KANNER:  No.  It's 5473.

15             MR. WEBB:  I don't think he has -- he

16   does not have the right exhibit in front of him.

17             THE WITNESS:  It's not in --

18             MR. GODFREY:  It's not Tab 9.

19             THE WITNESS:  Not -- not Tab 9.

20             MS. PETERSEN:  Here, take this one.

21             MR. GODFREY:  I -- I -- I removed Tab 9

22   from what you gave me.

23   Q.   (By Mr. Kanner) Let me just read from this,

24   and --

25   A.   Okay.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.   It says:  "Andy" --

2              MR. GODFREY:  Tab 10?

3              MS. PETERSEN:  Yes.

4    Q.   (By Mr. Kanner) The very bottom two lines:

5    "Andy can u make sure we get the technical briefing on

6    the relief well out today - there are all sorts of

7    ridiculous stories going around - it's the main reason

8    behind" the -- "the share price weakness Tony."

9              Do you recall writing that?

10   A.   No, I don't.

11   Q.   Were -- were -- were one of the goals of the

12   tech -- technical briefings and the -- the -- the --

13   the media blitz, if you will, to keep share price up?

14   A.   No.

15             MR. GODFREY:  Objection as to form.

16   A.   The -- the objection -- the objective of the

17   technical briefing was to provide clear, coherent,

18   factual information as to what was and was not going on

19   at any moment in time.

20   Q.   (By Mr. Kanner) With respect to --

21   A.   And then people could form their own view as

22   to whether that was good or bad for the share price.

23   Q.   If -- if it was informational, as you said

24   earlier, why were you buying ads in New York Times,

25   Washing -- you know, Wall Street Journal, in California

533

1   papers, Connecticut papers, Ohio papers?

2      A.   Such -- such that the -- so the -- the

3   American people knew what we were doing.

4      Q.   Why -- why was it more important to spend the

5   money in Connecticut than on the Gulf?

6      A.   It wasn't more important.  It was in addition

7   to.  The focus was in the Gulf, clearly, because that's

8   where people were being impacted.

9      Q.   And --

10     A.   And the -- the nature of the adverts was much

11  more specific in the Gulf, as -- as I recall, and more

12  generic, but, you know, we found it was equally

13  important to let the American people know what we were

14  doing by way of responding.

15     Q.   The -- I'd like to show you Tab 7, which is a

16  Media Communication Plan for the next two weeks.

17                MR. WEBB:  Does this have an Exhibit

18  number?

19                MR. KANNER:  Let's get an exhibit number

20  for it.

21                MR. WEBB:  60 --

22                MR. KANNER:  That would be 6057.

23        (Exhibit No. 6057 marked.)

24     Q.   (By Mr. Kanner) On the first page --

25     A.   I -- I have not seen this document previously.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 86

1    Q.   Okay.  Do you know what a media communication

2  plan was?

3    A.   Yes, I do.

4    Q.   Okay.  And the first -- the -- the second page

5  of the document, there would be a daily press release

6  from your press office and a daily press conference?

7    A.   Yeah.

8    Q.   You see that?

9    A.   Yes.

10    Q.   And on the third page, your consistent -- big,

11  consistent, leadoff messages every day were supposed to

12  be:  "We're doing everything possible.  We are working

13  in partnership.  Deeply appreciate the efforts of all

14  responders."

15          Do you see that?

16    A.   I do.

17    Q.   Is -- is that -- is that your recollection

18  that those were your talking points?

19    A.   It is.

20    Q.   As a practical matter, wasn't it true that --

21  that only the relief well could ever really stop the

22  leak?  You never really thought that the top kill, the

23  junk shot, or any of those other things would -- had a

24  chance of working, did you?

25    A.   Of course.  It wasn't the relief well that

535

1   stopped the leak.  It was the capping stack that

2   stopped the leak.

3        Q.   Okay.

4        A.   So whatever we thought, it was not relevant.

5   What we had to -- what we determined to do was to apply

6   every intervention we could design, as soon as we could

7   design it, as soon as we could make it available.  And

8   in the -- in the -- in the final analysis, the capping

9   stack stopped the leak well ahead of when the relief

10  well would have stopped the leak.

11       Q.   And why wasn't the capping stack used earlier?

12            MR. GODFREY:  Objection as to form.

13       A.   It wasn't available earlier.

14       Q.   (By Mr. Kanner) On Tab 14, the last -- this is

15  a Tony Hayward Townhall Gulf of Mexico Response Update,

16  July 16.

17            MR. KANNER:  And we'll call that Tab --

18  I'm sorry, Exhibit 6058.

19            (Exhibit No. 6058 marked.)

20       Q.   (By Mr. Kanner) The very last page, one --

21            MR. GODFREY:  6058?

22            MR. KANNER:  Correct.

23            MR. GODFREY:  Thank you.

24       Q.   (By Mr. Kanner) One, two, three, four, five

25  Q's up from the bottom.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 88

536

1          MR. GODFREY:  What page?

2          MR. WEBB:  What page are you on?

3          MR. KANNER:  The last page.

4          MR. GODFREY:  5523?

5          MR. KANNER:  Yeah.

6     Q.   (By Mr. Kanner) It's how -- underlined "How do

7  we know when we are done?"  It says:  "When we stop the

8  leak, clean up the oil, remediate any environmental

9  damage, and get the communities back on their feet

10 (...the way they use to)."

11          You meant that then?

12    A.   Well, I don't -- can -- can we just ascertain

13 the veracity of this document?  I don't know whether

14 this is a recorded transcript, a description of someone

15 taking notes, I have no idea what the -- what this is.

16 But -- so I don't -- so --

17    Q.   I -- I -- when I saw this document, I assumed

18 it was talking points that were prepared for you for

19 Town Hall in or about that -- that period of time.  Is

20 that incorrect?

21    A.   I don't -- I don't know.  I don't ever

22 remember seeing this, to be quite honest with you.

23    Q.   Do you disagree with the sentiment?

24    A.   I don't disagree with the sentiment.

25    Q.   As read?

537

```
 1        A.   When we stop the leak, clean up the oil,
 2   remediate any environment and damage and get the
 3   communities back on their feet.  Correct.
 4             (Discussion off the record.)
 5                  MR. GODFREY:  Have you been ceded more
 6   time, or are you --
 7                  MR. KANNER:  I think I have another
 8   minute.  One last exhibit.
 9                  MR. GODFREY:  Just as long as we keep on
10   the track of the time.
11                  MR. KANNER:  Tab 11.
12                  MR. GODFREY:  Is he over his time?
13                  MR. WEBB:  Someone keep track of time.
14   Okay.
15        Q.   (By Mr. Kanner) This is 6059.  It's an
16   employee communication from Tony Hayward, July 9th.
17   Have you seen this document before?
18        A.   I'm certain at the time I saw it.  I don't
19   recall now, I'm afraid.  But this --
20             (Exhibit No. 6059 marked.)
21        A.   -- these were going out on a regular basis.
22        Q.   (By Mr. Kanner) You say at the -- about this
23   far down, you go -- you say:  "You should also be in
24   no" --
25        A.   Sorry, where are we, please?
```

PURSUANT TO CONFIDENTIALITY ORDER

538

1    Q.   Right -- right here.  Right before --

2    A.   Okay.  Down at the bottom, yeah.

3    Q.   You say:  "You should also be in no doubt that

4  we fully intend to hold all parties responsible for the

5  cost of the oil spill to their obligations."

6         You see that?

7    A.   I do.

8    Q.   Did you take any actions to hold other parties

9  responsible for their share of the cost?

10              MR. GODWIN:  Object to form.

11    A.   As I said earlier, at this point in time, on

12  the 16 -- or 9th of July, four parties had been named

13  as responsible parties under OPA 1990, and you would

14  therefore expect that they would be paying their share

15  as reference to that.  At this point in time, we had

16  billed other parties.  They had not been forthcoming.

17              MR. GODWIN:  Object to form.

18              MR. KANNER:  Right.  Thank you.  That's

19  my time.

20              THE WITNESS:  Thank you very much.

21              THE VIDEOGRAPHER:  Off the record at 9:11

22  a.m., ending Tape 12.

23         (Recess from 9:11 a.m. to 9:15 a.m.)

24              MR. ROBERTS:  Ready.

25              THE VIDEOGRAPHER:  All set?

**PURSUANT TO CONFIDENTIALITY ORDER**

539

```
 1          On the record at 9:15 a.m., beginning Tape 13.
 2                     EXAMINATION
 3  QUESTIONS BY MR. ROBERTS:
 4      Q.   Doctor, my name is Steve, and the most
 5  important question I'm going to ask you today is:  What
 6  do you think of my tie?
 7      A.   It looks like a great British tie, to me.
 8               MR. ROBERTS:  I just want y'all to hear
 9  that:  He likes my tie.
10      Q.   (By Mr. Roberts) Do you know Transocean, sir?
11      A.   I do, yeah.
12      Q.   How do you know it?
13      A.   As one of the world's largest and most
14  respected drilling contractors.
15      Q.   How long have you, in your industry, worked
16  with Transocean?
17      A.   Personally, or as BP -- with BP?  I'm not --
18  I've --
19      Q.   BP.
20      A.   I've -- yeah.  Well, for many years, decades.
21  I mean, since the company was formed through the merger
22  of -- I'm trying to remember who it was formed through.
23      Q.   Global/Santa Fe?
24      A.   Global/Santa Fe and -- was it Global Santa
25  Fe -- Global and Santa Fe, wasn't it?
```

1      Q.    M-h'm.

2      A.    Yeah.

3      Q.    Is -- was BP, at least as of the time you

4   left -- excuse me.

5            Was Transocean, as of the time you left BP,

6   one of the preferred providers throughout the world for

7   BP in drilling its deepwater wells?

8      A.    It was.

9      Q.    Who -- who would be some of the other

10   companies that would have been preferred providers?

11     A.    Pride.

12     Q.    Which is no longer there.

13     A.    Which is no --

14     Q.    Been sold to Ensco?

15     A.    Ensco.   Ensco now.

16     Q.    Now.

17     A.    I'm trying to think of who are the other big

18   deepwater -- give me some names, and I'll tell you

19   whether --

20     Q.    Well, I can't give you the names of my -- my

21   client's competitors.   That -- that would seem

22   inappropriate.

23            But getting back to Transocean, during the

24   period that you were with BP, was Transocean, as a

25   drilling contractor, held in a high regard?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.    Yes, they were.

2      Q.    All right.  Did anyone in your Senior

3  Management or lower down ever come to you and suggest

4  to you that Transocean, as a corporation, had a

5  philosophy of indifference to the welfare of the

6  environment?

7      A.    No.

8      Q.    Or that any of its employees were indifferent

9  to the welfare of the environment?

10     A.    No.

11     Q.    Did anyone in your Senior Management ever come

12  to you and say Transocean was indifferent to the

13  welfare of individuals, the employees and -- and their

14  health?

15     A.    No.

16     Q.    All right.  Have you ever heard that suggested

17  by anyone?

18     A.    Not in the time I was at BP.

19     Q.    As -- one of the roles that I gathered

20  yesterday from your conversation with one of the

21  lawyers was you were at -- at least over HSSE while you

22  were at BE -- BP?

23     A.    Well, I -- the CEO is, by definition, over

24  everything.

25     Q.    Yeah.  Including depositions.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 94

1      A.    Including depositions.

2            I was the Chair of the Group Operating Risk

3      Committee, which was the focal point in the company for

4      reviewing safety performance and HSSE matters.

5      Q.    If anyone in your company had ever come to you

6      and suggested that Transocean was callous, indifferent,

7      or just didn't plain give a damn about the welfare of

8      the environment or individuals, wouldn't it have been

9      your obligation as CEO to either terminate the

10     relationship with Transocean or appoint someone to look

11     into those allegations?

12                 MR. WEBB:  Objection, form.

13                 MR. GODFREY:  Object as to form.

14     A.    The reality, of course, that if that was --

15     had been the case, other -- others would have taken

16     action before it got to me, I'm certain.

17     Q.    (By Mr. Roberts) Yeah.  But you've never heard

18     any of that?

19     A.    I haven't heard any of that.

20     Q.    Do you know any individuals with Transocean?

21     A.    I knew from a -- I knew the Chairman, Bob --

22     Q.    Bob Long?

23     A.    Bob Long.

24     Q.    Okay.  Did he seem to be a conscientious

25     individual concerned about the industry you were both

PURSUANT TO CONFIDENTIALITY ORDER

543

1   involved in?

2       A.   He did.

3       Q.   Did he seem, from your discussions with him,

4   to be concerned about the safety and welfare of both

5   the environment and the people?

6       A.   He did.

7       Q.   Okay.  Did he express the same type of goals

8   that you would want expressed as a partner to BP in the

9   offshore drilling business?

10      A.   I -- I -- we -- neither -- Bob and I did not

11  at any point talk in any detail about goals and

12  objectives, but I have no reason to believe that he

13  wouldn't.

14      Q.   Okay.

15           MR. ROBERTS:  I don't what the next

16  exhibit number is.

17           MR. GODFREY:  Is this the new one you

18  were talking about?

19           MR. ROBERTS:  Yes, sir.

20           MR. GODFREY:  The next exhibit number

21  should be 6060, according to my record.  Is that the

22  correct number --

23           MR. ROBERTS:  6060.

24        (Exhibit No. 6060 marked.)

25           THE COURT REPORTER:  Mark one of them.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 96

544

```
 1                   MR. ROBERTS:  Yes, sir.
 2                   THE COURT REPORTER:  No, no, no, not you,
 3     not you.  I'm talking to my manager.
 4                   MR. ROBERTS:  The court reporters from
 5     Houston are testy sorts.
 6                   THE COURT REPORTER:  Objection, form.
 7            (Laughter.)
 8                   MR. ROBERTS:  Oh, God, help me.
 9                   THE COURT REPORTER:  Objection, form.
10     Q.   (By Mr. Roberts) Doctor, I've handed you a
11     document that's been produced by BP.  It -- it appears
12     to be your testimony before -- a transcript of your
13     testimony before the House Representatives' Committee
14     on Energy and Commerce.
15                   MR. GODFREY:  Excuse me.  Do you have
16     another copy that I might have, please?
17                   MR. ROBERTS:  I'm sorry.
18                   MR. GODFREY:  His personal counsel has
19     it.  The company counsel does not.  Do you need this --
20                   MR. ROBERTS:  No.
21                   MR. GODFREY:  Okay, thank you.
22                   MR. ROBERTS:  There's so many BP lawyers
23     here, I just didn't bring enough copies, right?
24     Q.   (By Mr. Roberts) Let me go back over this.
25     This appears to be a transcript of your testimony on
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 97

545

1    June 17 before the House Committee -- Subcommittee on

2    the Oversight and Investigations.  And I'm sure you

3    recall that particular day?

4        A.   How could I forget it?

5        Q.   I have highlighted for your attention a -- a

6    couple of parts in that.

7        A.   Yeah.

8        Q.   The first is the paragraph that begins:  "When

9    I learned that 11 men had lost their lives in the

10   explosion and fire on the DEEPWATER HORIZON, I was

11   personally devastated."  Do you recall making those

12   comments?

13       A.   I do.

14       Q.   It goes on to say:  "Three weeks ago I

15   attended a Memorial Service for those men, and it was a

16   shattering moment.  I want to offer my sincere

17   condolences to their friends and families.  I can only

18   imagine their sorrow."  Do you recall saying that, sir?

19       A.   I do.

20       Q.   That -- that service, the Memorial Service you

21   attended, was that the Transocean Memorial Service?

22       A.   It was.  It was.

23       Q.   And -- and at that service, you met a number

24   of the families?

25       A.   I did.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   A number of the people involved in the rig?

2    A.   Yes.

3    Q.   And you at least got a sense of their

4 feelings, their attitudes, and their emotions, correct?

5    A.   I did, yes.

6    Q.   What did you think about those folks?

7    A.   I thought they were great people, and I was

8 deeply touched by the sorrow that they were feeling and

9 the loss that they experienced.

10    Q.   Did you get any inim -- any impression from

11 them that they were callous or hardened people that

12 didn't care about the welfare of others?

13    A.   No.

14    Q.   Quite the contrary, did you -- did you get the

15 impression that those employees that you met were

16 deeply care -- deeply cared about others and their own

17 family?

18    A.   Indeed, yes.

19    Q.   Their own drilling family, I'm talking about.

20    A.   Yeah.  I -- I understand your -- entirely your

21 sentiment.

22    Q.   Did you get the impression of how close the

23 family on the drilling rig was; that is, the men that

24 worked together on the --

25    A.   I did.

1    Q.    -- drilling rig?

2         Did you get a chance to talk to some of your

3    employees who worked on the DEEPWATER HORIZON with

4    these men?

5    A.    I did.

6    Q.    And did you get the impression that they all

7    considered themselves one big family, even though they

8    were from different companies?

9    A.    Yes.

10   Q.    Do you remember any of the names of the

11   individuals who lost their lives?

12   A.    I -- I remember some of them.  Ja -- James

13   Anderson.

14   Q.    Yes, sir.

15   A.    Gordon Clark.  Karl Kleppinger, I think.

16   Q.    Yeah.  One --

17   A.    I can't remember any more of them, I'm afraid.

18   Q.    On April 20th of this year, BP filed a

19   lawsuit, a legal pleading, claiming, among other

20   things, that these men were callous, indifferent, and

21   grossly negligent in causing this explosion.  Are you

22   aware of that, sir?

23   A.    It's after I left the company.  I --

24   Q.    Sir?

25   A.    It was after I left the company.  I've had no

PURSUANT TO CONFIDENTIALITY ORDER

1  involvement in it.

2      Q.   Does April 20 have any significance in your

3  life?

4      A.   Of course, it does.

5      Q.   It's the anniversary of --

6      A.   I know exactly what it is.

7      Q.   It's the anniversary --

8      A.   I remember the anniversary.  I spent an hour

9  in the church on my own, reflecting.

10     Q.   As did many.

11     A.   I'm sure that's right.

12     Q.   I -- I gather that you weren't consulted in

13  the decision by BP, on the anniversary of these men's

14  deaths and these many injuries that you knew took

15  place -- you weren't consulted on whether they should

16  be accused of being incompetent, not knowing what they

17  were doing, or grossly negligent?

18     A.   I have --

19          MR. GODFREY:  Objection as to form.

20     A.   -- not been consulted on anything with respect

21  to BP since I left the company on the 30th of

22  September.

23     Q.   (By Mr. Roberts) You saw these people at the

24  Memorial Service, and you saw the families of the

25  deceased workers, and you saw the surviving workers and

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 101

1   their families.  Can -- can we agree just as humans --

2   can we agree that it would have been insensitive, at

3   the minimum, on the anniversary of these folks' tragic

4   incident, to file a claim saying they were grossly

5   negligent?

6                   MR. WEBB:  I object to the --

7                   MR. GODFREY:  Objection as to form.

8                   MR. WEBB:  -- form of the question.

9       A.   I had no part or parcel in any of that.  I'm

10  not -- I'm not --

11      Q.   (By Mr. Roberts) Oh, I understand that, sir.

12      A.   -- prepared to pass any judgment one way or

13  the other as to the sensitivity or not.  I don't know

14  the context, I don't know the legal context, so I'm

15  afraid I'm not prepared to pass a judgment.

16      Q.   You're not prepared to say that it's

17  insensitive to claim that these dead men were

18  incompetent on the anniversary of their deaths?

19                  MR. WEBB:  Objection, form.

20      A.   As I said, I'm not prepared to pass a judgment

21  because I don't know the context in which that decision

22  was taken.

23      Q.   (By Mr. Roberts) Whatever the context the

24  decision was made by BP, are you seriously telling me

25  you're not in a position to say that that would have

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 102

1   been, at a minimum, insensitive?

2            MR. WEBB:  Objection, form.

3            MR. GODFREY:  Objection as to form.

4   A.   As I said, I was no part of the decision.  I

5   had left the company almost nine months, it was.

6   Q.   (By Mr. Roberts) You -- you met those wives?

7   A.   I did.

8   Q.   Can you imagine what it would have been like

9   for them to find out on the year anniversary of the

10  deaths of their husbands and loved ones, that those men

11  are being accused of incompetence?

12           MR. GODFREY:  Objection as to form.

13           MR. WEBB:  Objection, form.

14           MR. GODFREY:  Move on.

15  A.   I'm not aware of what they've been accused of.

16  I'm very sorry, but I don't -- I have no basis to

17  make --

18  Q.   (By Mr. Roberts) I'm asking you to assume that

19  was the case.  If that is the case, can you understand

20  how that might have been at least insensitive?

21           MR. GODFREY:  Objection as to form.  Move

22  on, please.

23  A.   I can --

24  Q.   (By Mr. Roberts) Sir?

25  A.   I can imagine how -- how, on the anniversary

PURSUANT TO CONFIDENTIALITY ORDER

1  of the accident, the families and particularly the

2  wives were very upset.  It's the anniversary of the

3  accident.

4      Q.   Thank you, sir.

5           Let me make sure -- (tendering).

6      A.   Thank you.

7               MR. GODFREY:  Is this 6061?

8               MR. ROBERTS:  I -- no, no, no.  I think

9  we have -- pass 6061.  I need one for the court

10  reporter.

11          (Exhibit No. 6061 marked.)

12     Q.   (By Mr. Roberts) What I've handed to you is a

13  transcript of a -- it's actually a copy of a "Forbes"

14  magazine interview entitled, "In His Own Words:  Forbes

15  Q&A With BP's Tony Hayward," and dated May 18, 2010.

16  Do you see that, sir?

17     A.   I do.

18     Q.   Do you recall giving this interview?

19     A.   I don't, no.

20     Q.   Sir?

21     A.   I don't recall it, no.

22     Q.   You were giving a lot of interviews --

23     A.   I was doing lots of -- lots of things.

24     Q.   It -- it says:  "Last" -- it begins:  "Last

25  week Forbes sat down with BP Chief Executive Tony

PURSUANT TO CONFIDENTIALITY ORDER

1   Hayward at the company's emergency response center in

2   Houston," then goes on to say something that I am sure

3   is inaccurate:  "A well-rested Hayward shared his

4   thoughts..."

5          I can't imagine you were well-rested at that

6   point.

7      A.   It's the definition of "well-rested," of

8   course, but at the time I was getting probably four or

9   five hours' sleep a night.

10     Q.   Yeah.

11          I want to go to the last page.  There's a

12   question that's asked of you beginning at the top:

13   "That makes me think...you didn't mean a real insurance

14   policy of course, but if one was to go to Lloyd's of

15   London and insure against a 25 billion hit to my market

16   cap and 5 billion in punitive damages, what kind of

17   premiums would you have to pay?"

18          The answer that's written down here is:  "You

19   can't insure.  That's why we're self-insured.  You

20   can't insure risks you want to insure.  And the things

21   you can insure, premiums are so high that it makes no

22   sense for a company like" P -- "BP to do anything other

23   than self-insure."  Do you see that, sir?

24     A.   I do.

25     Q.   Do you recall giving that answer?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 105

553

```
1        A.    I -- I don't, but it's -- it's not an

2   unreasonable answer.  I don't recall it, no.

3        Q.    You're not denying that you gave it?

4        A.    No.

5        Q.    You just --

6        A.    Yeah, yeah.

7        Q.    -- don't recall giving it?

8        A.    I don't recall, yeah.

9        Q.    And the answer that is there is certainly

10   consistent with your thought process and your

11   understanding of the situation?

12              MR. GODFREY:  Objection as to form.

13        A.    Certainly that BP is self-insured.  We don't

14   have insurance policies in place, correct.

15        Q.    (By Mr. Roberts) Right.

16        A.    Certainly --

17        Q.    It goes on to say that if you did get

18   insurance, "...the premiums are so high that it makes

19   no sense for a company like BP to do anything other

20   than self-insure."  Is that accurate as well?

21        A.    Can -- sorry.  The -- you -- you mean the next

22   question, or is --

23        Q.    No, the next statement, "...and the things you

24   can insure, the premiums" --

25        A.    I'm sorry.
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 106

554

1    Q.   -- "are so high..."

2    A.   I'm sorry.  Yes.  M-h'm, yeah.  Yes.

3    Q.   All right.  Let's start with that.  What does

4  "self-insurance" mean to you, at least when you were

5  CEO of BP?

6    A.   It meant that the company didn't have an

7  insurance policy against the risks it was -- it was

8  undertaking, in essence, and the -- and as it says

9  here, we self-insured and took those risks onto our

10  balance sheet.

11    Q.   Is -- is "self-insured" an -- another way of

12  saying "no insurance"?

13    A.   Yes.  Well, no -- no external third-party

14  insurance, yeah.

15    Q.   All right.

16    A.   Yes.

17    Q.   So BP elected to have no external insurance --

18    A.   M-h'm.

19    Q.   -- for terms of the environmental risks that

20  might be occasioned in connection with deepwater

21  drilling?

22         MR. GODFREY:  Objection as to form.

23    A.   We had no external insurance for anything at

24  BP.

25    Q.   (By Mr. Roberts) For anything at BP?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 107

555

1    A.    That's correct.

2    Q.    Okay.  I don't know about the cars y'all drive

3    or that kind of stuff.  I'm -- I'm only interested in

4    deepwater drilling --

5    A.    Obviously we're think -- thinking of --

6    Q.    -- particularly the Gulf of Mexico.

7    A.    -- any other operational activity.

8    Q.    Okay.  The statement here that the premiums

9    are so high that it makes no sense, like BP, to do

10   anything else other than self-insure, am I right that

11   BP, some years ago, made a corporate decision that the

12   differential between the cost of having insurance in

13   connection with the claims that it was covering were

14   such that BP might as well not have insurance, handle

15   the claims itself, and in the end save itself money?

16   A.    That's cor -- that was a decision taken in

17   about 1991.

18   Q.    And that was still the decision in effect at

19   the time --

20   A.    M-h'm.

21   Q.    -- you undertook your --

22   A.    That's correct.

23   Q.    -- undertook the CEO position?

24   A.    That's correct.

25   Q.    That was still the situation as of Macondo?

1      A.    That's correct.

2      Q.    Is there any reason, in your mind, to think

3  that deepwater well pollution insurance, if it's not

4  affordable on a practical level to BP, would be

5  affordable on a practical level to somebody like

6  Halliburton or MI or Dril-Quip or Transocean?

7                MR. WEBB:  Object to the form.

8                MR. GODWIN:  Objection as to form.

9      A.    I don't know anything about the insurance

10  market, I'm afraid, so I can't make that -- take that

11  view.  I think everyone, every company, looks at the

12  risks that they're undertaking, the cost of insurance,

13  and weighs that against the likelihood of occurrence,

14  and makes a decision appropriately.  I -- I'm -- I --

15  but I'm not an expert in the insurance market, so I

16  can't answer your question, I'm afraid.

17      Q.    (By Mr. Roberts) Did you have any expectation

18  that your subcontractors would go out and purchase

19  insurance for you, since you had a -- made a corporate

20  decision not to purchase insurance for yourself?

21                MR. WEBB:  Objection, form.

22                MR. GODFREY:  Same objection.

23      A.    We had no expectation of what our contractors

24  did and did not -- insur -- what insurance our

25  contractors did and did not purchase with respect to

557

1    risks that they were undertaking.

2        Q.    (By Mr. Roberts) As -- while you were CEO of

3    BP, as between BP, on the one hand, and its contractors

4    that were involved in drilling of wells, in the other

5    hand, was there a normal allocation of environmental

6    risks in the contracts that BP entered into?

7                    MR. GODFREY:  Object as to form.

8        A.    Would you just repeat your question again?

9        Q.    (By Mr. Roberts) Sure.  You know what

10   environmental risks are?

11       A.    Yeah.  Yes.

12       Q.    All right.  And you know that in your

13   contracts with subcontractors, there is an allocation

14   of who's responsible for those risks?

15       A.    M-h'm.

16       Q.    You're familiar with the term of indem --

17   you're familiar with the term "indemnity"?

18       A.    Yes.

19       Q.    All right.  While you were CEO, what was the

20   policy with respect -- at BP -- as to who would assume

21   environmental risk for blowout pollution, for

22   instance -- BP or its subcontractors?

23                   MR. GODFREY:  Objection as to form.

24       A.    I think the -- it de -- it de -- in the

25   contracts, of course, it's -- I -- I -- I -- I don't

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 110

1   have a contract in front of me, and I won't remember

2   the right language.  But if there was -- if there was

3   reasons to believe that the contractor was at fault,

4   then the indemnity may or may not apply.

5       Q.   (By Mr. Roberts) "At fault" meaning what?

6            MR. WEBB:  Well, object to the form.

7   Object to the form of the question, without a document.

8            MR. GODFREY:  The same objection.

9       A.   A -- a -- a -- some sort -- some form of

10  fault.  I'm not a lawyer.  I'm not going to try and

11  describe a legal description.

12      Q.   (By Mr. Roberts) All right.  Well, let's --

13      A.   I certainly won't try and do it without the --

14      Q.   Let's go back up --

15      A.   -- without the contract in front of us.

16      Q.   Let's go back up to your level, the

17  40,000-foot level of a CEO.  And I don't mean that

18  disrespectfully.  I understand you don't read the

19  details of every contract -- of all your contracts.

20           But what -- what was the industry -- you

21  talked yesterday at length about the industry.  In

22  general, what was the industry allocation of

23  environmental risk between an Operator such as BP and

24  subcontractors who worked for the Operator while

25  drilling wells for the Operator?

1           MR. WEBB:  Object to form.

2           MR. GODFREY:  Same objection.

3           MR. GODWIN:  Object to form.

4      A.   The industry norm would be, in most

5   circumstance, that the Operator would take that risk.

6      Q.   (By Mr. Roberts) Okay.

7      A.   But circumstances, of course, differ in time

8   and place.

9      Q.   Right.  But that was the industry standard?

10     A.   M-h'm, yeah.

11     Q.   Has been that way for years, hasn't it?

12     A.   Yeah, it is.

13          MR. GODFREY:  Object to form.

14     Q.   (By Mr. Roberts) All right.  If you would,

15  that notebook that's in front of you, turn to Tab --

16  let's see if this helps.  I've got mine upside down.

17  Tab 4.

18          THE COURT REPORTER:  Do you want it

19  marked, Mr. Roberts?

20          MR. ROBERTS:  No, sir.  It's been

21  previously marked as Exhibit 1488, and it is on the --

22  the disc that everybody has.

23          THE COURT REPORTER:  Thank you, sir.

24          MR. ROBERTS:  You're welcome, sir.

25     Q.   (By Mr. Roberts) Do you have Tab 4, sir?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 112

560

1    A.   I do.

2    Q.   It is the -- as you can tell, it's Amendment

3 No. 38 to the Drilling Contract.  It's dated -- it's

4 for the DEEPWATER HORIZON.  It's dated September 28th

5 2009, and it goes into effect, I believe, in September

6 of 2010.

7         So to put this in perspective, it was signed

8 before Macondo, concerning the DEEPWATER --

9    A.   M-h'm.

10    Q.   -- HORIZON, to go into effect after Macondo.

11 Are you with me, sir?

12    A.   I am.

13    Q.   The day rates are specified there with

14 Mr. Suttles -- and, by the way, do -- you do know

15 Mr. Suttles?

16    A.   Yes, I do.  Yes, I do.

17    Q.   He was the COO of the company?

18    A.   That's correct, yeah.

19    Q.   Was he the --

20    A.   He was Chief Operating Officer of the

21 Exploration and Production Company.

22    Q.   Okay.  Was he a direct report to you?

23    A.   No.

24    Q.   Okay.  Who did he directly report to?

25    A.   To Mr. Ingalls.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z

 1    Q.    Mr. Ingalls.  Was Mr. Ingalls a direct report

 2  to you?

 3    A.    He was.

 4    Q.    And what was his position with respect to BP

 5  PLC?

 6    A.    Mi -- Mr. Ingalls was the Chief Executive

 7  Officer of Exploration & Production.

 8    Q.    Did he serve any ca -- in --

 9    A.    And was on the Board of BP PLC.

10    Q.    All right.  And did he have any other position

11  other than being on the Board of PLC?

12    A.    He was the Chief Executive of Exploration and

13  Production.

14    Q.    All right.  That's --

15    A.    Well, I don't think I understand --

16    Q.    No, not -- it's -- it's -- my question is not

17  artful.

18          Is Exploration and Production part of PLC?

19    A.    It's -- yes, it's one of the -- it -- it's not

20  a legal subsidiary.  It's an internal organizational

21  unit.

22    Q.    Okay.  It's an organizational format created

23  under PLC, or within PLC?

24    A.    It's within PLC, yes.

25    Q.    All right.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 114

1    A.    That's a better way to think about it.

2    Q.    So when we talk about him being a COO of

3  Exploration and Production, that -- that is a position,

4  it's not a company that he's over?

5    A.    That's correct.

6    Q.    It's a group?

7    A.    Well, within the Exploration and Production

8  business, there are a series of legal entities.

9    Q.    This Amendment 38, I did the math with

10  Mr. Suttles, and the value of this contract over its

11  lifetime is in excess of a half a billion dollars.  And

12  I asked him whose authority it would have required for

13  this contract to be approved by BP.  And he said this

14  contract would either have been approved by Mr. Ingalls

15  or by yourself.

16    A.    (Nodding.)

17    Q.    And so I'm asking yourself, are you the one

18  that approved the entering in --

19    A.    It was Mr. Ingalls that approved.

20    Q.    That's a great answer.

21    A.    Well, it -- it is a fact, though.

22    Q.    And I'm not suggesting it's not.

23    A.    On long -- long-term capital commitments, we

24  made a distinction between capital allocation and

25  long-term commitments, of which this contract is one.

1    Q.   Did Mr. Ingalls need to consult with you

2  before he approved this contract?

3    A.   He probably -- I don't recall, but he probably

4  would have made me aware he was going to sign a

5  contract, but not in any formal sense.

6    Q.   Not in any detailed sense?

7    A.   Not in any formal sense or detailed sense.

8    Q.   Would he have been --

9    A.   It was within his delegated authority.

10   Q.   That's a good word.  I hear it throughout this

11 case, "delegated authority."

12   A.   It's -- it's a fact.  If you go and look at

13 the delegated authorities from -- brought to me and

14 from myself to my reports, you'll find that this

15 contract -- a contract of this type is within the

16 delegated authority of Mr. Ingalls.

17   Q.   So Mr. Ingalls would have been the one who had

18 the delegated responsibility to review the details of

19 the contract, decide whether it should be approved, and

20 then would have simply advised you of the generalities,

21 and approval would have been agreed downstream?

22       MR. GODFREY:  Objection as to form.

23   A.   That's broadly correct.

24   Q.   (By Mr. Roberts) All right.  This contract --

25 and if you would, turn to Page 9 of the document.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 116

564

1          MR. GODFREY:  Page, or the Bates number,

2    please?

3          MR. ROBERTS:  Yeah, it's 9 of the

4    document.  It's -- it's -- the BP number is 41484.

5          MR. GODFREY:  Okay, thank you.

6    Q.    (By Mr. Roberts) Do you see that, sir?

7    A.    I do.

8    Q.    It -- it -- and I will tell you generally, you

9    see highlighted the words "indemnity and willful

10   misconduct"?

11   A.    M-h'm.

12   Q.    You see that, sir?

13   A.    I do.

14   Q.    Did Mr. Ingalls have the authority to, on

15   behalf of BP, enter into an agreement that included

16   indemnity for another party's willful misconduct?

17         MR. GODFREY:  Objection as to form.

18   A.    He had the approval to approve this contract,

19   so --

20   Q.    (By Mr. Roberts) Whatever is in here, he had

21   that authority?

22   A.    Yes.  Actually, he had the authority to

23   approve this contract, not the approval to approve this

24   contract.

25   Q.    I'm sorry, I couldn't hear you.

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit Z

Page 117

565

1    A.   I, inaccurately, said he had the approval to

2    approve this contract.  What I meant to say was he had

3    the authority to approve this contract.  I was just

4    correcting the court recorder here.

5    Q.   If you would, turn to Page 15 of that same

6    document.

7         MR. GODFREY:  Is that No. 490 of that?

8         MR. ROBERTS:  41490.

9         MR. GODFREY:  Thank you.

10        MR. ROBERTS:  M-h'm.

11   Q.   (By Mr. Roberts) You see in the middle there

12   is the BP Code of Conduct --

13   A.   Yes.

14   Q.   -- as part of this contract?

15   A.   I do.

16   Q.   Let me just start there.  It says in the

17   middle, "BP wishes to make it clear that it intends its

18   business dealings to be characterized by honesty, and

19   freedom from deception and fraud, and that it finds

20   unethical behavior unacceptable.  Practices that BP

21   considers dishonest, unethical or unacceptable

22   include," and the second bullet point is "Deception."

23   Is that correct, sir?

24   A.   It is.

25   Q.   What is the BP Code of Conduct in general,

**PURSUANT TO CONFIDENTIALITY ORDER**

Exhibit Z
Page 118

566

1    what -- what --

2        A.   It's -- it's the Code by which we expect

3    everyone in BP to conduct business.  It sets out the

4    norms and standards of performance and behavior --

5        Q.   So you would --

6        A.   -- in business.

7        Q.   I'm sorry, did I --

8        A.   Yes.

9        Q.   -- interrupt you?

10       A.   No, no.  Go.  I finished.

11       Q.   You would expect all representatives of BP to

12   conduct themselves at the highest level of

13   professionalism consistent with this Code of Conduct?

14       A.   I would.

15       Q.   You would, for instance, expect all levels of

16   BP representatives to honor contractual commitments

17   that they make?

18       A.   I would.

19       Q.   You would, of course, expect all BP

20   representatives not to enter into contracts that they

21   didn't intend to honor?

22           MR. GODFREY:  Objection, form.

23           MR. WEBB:  Objection, form.

24       A.   Indeed.

25       Q.   (By Mr. Roberts) Did I say that wrong?  Let me

1   say it again.

2        A.   No, you -- indeed.  I said, "Indeed," yes.

3        Q.   All right.  I got a lot of objections, and I

4   wondered if I said something nasty.

5        A.   I think it was to your question rather than --

6   the phrasing of your question, perhaps.

7        Q.   Yeah, but --

8        A.   But I'm not a lawyer, so --

9        Q.   I'm obviously not much of one with all the

10  objections I'm getting, but the --

11       A.   There are plenty of experts in the room.

12       Q.   But shorthand is, is you expect your

13  representatives, when they're entering into contracts,

14  to intend and to honor the contractual -- the

15  contractual obligations they enter into?

16       A.   That's correct.

17            MR. GODFREY:  Objection, form.

18       Q.   (By Mr. Roberts) That's part of your Code of

19  Conduct?

20            MR. GODFREY:  Objection, form.

21       A.   It is.

22       Q.   (By Mr. Roberts) Don't enter into agreements

23  and be deceptive, meaning don't enter into an agreement

24  that you really don't intend to perform under?

25            MR. WEBB:  Objection, form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    That's correct.  We also expect those who

2  enter into contracts with us to perform.

3    Q.    (By Mr. Roberts) No doubt about it.

4    A.    So --

5    Q.    That's the way the oil industry has worked

6  since --

7    A.    It's a binary process, two sides of the party.

8    Q.    It's worked that way since you've been in this

9  business, hasn't it, sir?

10    A.    That's correct.

11    Q.    It's worked that way since you did your first

12  handshake deal with your first opposition in drilling a

13  well, hasn't it?

14    A.    I'm not sure I ever did a handshake deal

15  drilling a well, but, yes, correct.

16    Q.    Well, you know that this industry, the

17  industry that you've been a proud member of for over 30

18  years, is characterized by men of great integrity and

19  honesty?

20         MR. WEBB:  Objection, form.

21    A.    I agree with that.

22    Q.    (By Mr. Roberts) Well --

23    A.    I agree with that.

24    Q.    Despite your lawyer, I knew you were going to

25  agree with that.  And you know that men in this

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 121

1  industry expect others to honor their contractual

2  commitments?

3      A.   That's correct.

4           MR. GODFREY:  Objection to form.

5      Q.   (By Mr. Roberts) And that's been a cornerstone

6  of this industry throughout its existence?

7      A.   That's correct.

8      Q.   It's the only way it works, isn't it, sir?

9           MR. WEBB:  Objection, form.

10          MR. GODFREY:  Objection, form.

11     A.   It is.

12     Q.   (By Mr. Roberts) And you're still in this

13 industry, aren't you?

14     A.   I'm sort of in the industry.  I --

15     Q.   I saw --

16     A.   I intend to become part of the industry

17 again --

18     Q.   I -- I saw --

19     A.   -- in the relatively near future.

20     Q.   You -- you've got a -- what do you call it, an

21 IPO, investment group going in the energy business

22 that's starting up now?

23     A.   That's correct.

24     Q.   What's the name of that company?

25     A.   It's called Vallares.

1    Q.   Vallares?

2    A.   M-h'm.

3    Q.   Sounds like a song, "Vo-la-re."  That's not

4  that same group, though, I guess.

5         Anyway, what is this company going to do?

6    A.   It's -- it's going to invest in oil and gas

7  opportunities.

8    Q.   As in drilling?

9    A.   Potentially in drilling, almost -- almost

10  certainly at some point will be involved in drilling, I

11  expect.

12    Q.   If -- if the opportunity comes up, any reason

13  you wouldn't use Transocean to drill one of those

14  wells?

15         MR. GODFREY:  Objection as to form.

16    A.   We would look very hard at all the potential

17  contractors and make an appropriate decision.

18    Q.   (By Mr. Roberts) All right.  Barbara Yilmaz,

19  what is her position with your company?  And I may have

20  said her name incorrectly.

21    A.   She -- she certainly was last year -- I

22  don't -- I don't know what her position is now, but she

23  was last year the Head of Global Drilling Operations.

24    Q.   What does that mean in terms of her

25  responsibilities over the Gulf of Mexico drilling?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   She had global oversight of the Drilling

2  Operations Worldwide, which was not in a -- in -- to

3  have sort of direct operational oversight on a

4  day-to-day basis, but to ensure that the right people

5  with the right skills are in the right places to insure

6  that we had the right standards in place to take a

7  leading role in managing the global rig fleet that BP

8  was contracting on an ongoing basis.

9    Q.   Was she still with the company as -- as of

10  when you left?

11    A.   Yes, she was.

12    Q.   So ultimately all drilling responsibilities go

13  to her worldwide?

14    A.   Yes, not in the -- not in the matter of

15  specific operational decision-making, but in the matter

16  of people, the rig fleet, with systems and processes

17  that we use.  She wasn't involved in the day-to-day

18  operational decision-making around any particular well,

19  because there were people beneath her doing that.

20    Q.   Yes, sir, I understand.  She's not going to be

21  deciding what mud weight to be putting down a hole, but

22  she is going to be involved in a decision as to what

23  drilling contractor will be --

24    A.   That's correct.

25    Q.   -- retained --

1    A.    That's correct.

2    Q.    -- what rig will be used, high-level decisions

3  of that sort?

4    A.    That's correct.

5    Q.    Would you turn to -- same document, turn to

6  Page 41561.

7              MR. GODFREY:  This is in 1488, 41561 did

8  you say?

9              MR. ROBERTS:  Yes, sir.

10              MR. GODFREY:  Thank you.

11    Q.    (By Mr. Roberts) Beginning at the bottom,

12  there's a Section E.2.3, "Ram Pipe Preventers," and it

13  carries over to the next page with E.2.4, "Stack

14  Configuration"?

15    A.    Yeah.

16    Q.    Do you see that, sir?

17    A.    I do.

18    Q.    How is it determined within your company how

19  you decide what the stack figuration will be on

20  deepwater drilling rigs that your fleets use?

21    A.    I honestly don't know.

22    Q.    That would be in Barbara's area?

23    A.    I would certainly believe that it's in

24  Barbara's area, but I don't know the -- the basis for

25  that sort of decision.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   You are aware that your company decides what

2  the stack configuration will be, aren't you, sir?

3      A.   I believe that's the case.

4      Q.   Okay.  You are aware that your company

5  instructs not just Transocean, but other drilling

6  contractors what type of rams and where the rams are to

7  be located in a BOP?

8      A.   I'm -- I wasn't personally aware of that.  If

9  that's -- if that's your assertion to be true, then I

10  accept it.  I wasn't personally aware of that.

11      Q.   Well, we can look at this document, this

12  contract, and you can see that the location and types

13  of rams have been specified by BP?

14      A.   Yeah.

15           MR. GODFREY:  Objection as to form.

16      Q.   (By Mr. Roberts) Are you aware that some of

17  your rigs under contract are equipped with two blind

18  shear rams and some are equipped with only one?

19      A.   I am aware of that now.

20      Q.   Okay.  Is the reasoning for equipped --

21  equipping some of the rigs with two blind shear rams

22  opposed to one based upon on how the rig is going to be

23  utilized or what pressures are expected to be seen or

24  what?

25      A.   I don't -- I don't know the basis for that

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 126

1   decision-making.

2      Q.   Do you know why it was that of the six rigs in

3   the Gulf of Mexico, for instance, that Transocean had

4   under lease to BP, four of them had two blind shear

5   rams and two had one blind shear ram?

6      A.   I don't know.

7      Q.   Were you aware that --

8      A.   I wasn't aware that was the case --

9      Q.   Okay.

10     A.   -- prior to the accident.  And I don't know

11  what the basis of that situation was.

12     Q.   Were you -- were you aware that the two rigs

13  that had one blind shear ram were the two rigs that

14  were placed and instructed by BP to go to Macondo, the

15  MARIANAS and the DEEPWATER HORIZON?

16     A.   I wasn't aware of that -- I wasn't aware of

17  the configuration of either of those rigs with respect

18  to whether they had one or two blind shear rams.

19     Q.   Were you aware that all of the relief rigs

20  that BP asked Transocean to redeploy were two blind

21  shear rams?

22     A.   I became aware of that in the course of the

23  response.

24     Q.   Has BP gone to a system where it requires its

25  rigs to be equipped with two blind shear rams in

1    deepwater drilling?

2              MR. GODFREY:   Objection as to form.

3         Q.   (By Mr. Roberts) At least as of when you left?

4         A.   I -- I don't -- I don't know.   I don't recall.

5         Q.   Sir?

6         A.   I don't know.   I don't know.

7         Q.   That would be a question for Ms. Yilmaz?

8         A.   I'm certainly -- I would imagine that

9    Ms. Yilmaz would be able to answer that question, but I

10   don't know the answer to it.

11        Q.   Okay.   Well, is there anybody else that you

12   would suggest that I ask that of BP other than

13   Ms. Yilmaz?

14        A.   Well, I -- I'm not certain what role

15   Ms. Yilmaz now has.

16        Q.   I -- I'm sorry, it's an inartful question.   At

17   least as of the time you left BP, can you --

18        A.   She would be the best person to ask.

19        Q.   She would be the best person to discuss blind

20   shear rams in drilling rig allocation?

21        A.   I believe so.

22        Q.   All right.

23        A.   I believe so.

24        Q.   She'll probably hate you for saying that,

25   but --

```
 1      A.   I said I believe so, I didn't say it was a
 2  fact.  I said I believe so.
 3      Q.   Okay.
 4      A.   It's a truthful answer to your question.
 5      Q.   Is there any difference in the blind shear ram
 6  utilization by BP in other parts of the world, any
 7  difference, from your understanding, between what BP
 8  did in the Gulf of Mexico and what BP did in other
 9  parts of the world?
10      A.   I'm not aware.  I don't know the -- the
11  details of blind -- of BP's blind shear ram
12  utilization.
13      Q.   Okay.  I have a couple of questions to ask
14  you, sir, and -- and --
15           MR. GODFREY:  Are we done with this
16  notebook or at least this Tab?
17           MR. ROBERTS:  Yes, sir.
18           MR. GODFREY:  Thank you.
19           MR. ROBERTS:  Yes, sir.
20           MR. GODFREY:  I'm juggling things here.
21      Q.   (By Mr. Roberts) Want to ask you a couple of
22  statements and see if you agree or disagree with them,
23  okay?  I have a feeling I know what the answers are
24  going to be.
25           Statement No. 1, that BP's history is littered
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 129

```
 1   with inappropriate actions and decisions pertaining to

 2   wells with little or no accountability?

 3                    MR. WEBB:  Objection, form.

 4                    MR. GODFREY:  Objection, form.

 5        Q.   (By Mr. Roberts) Agree or disagree?

 6        A.   I disagree.

 7        Q.   No. 2, for too long --

 8        A.   Can I -- are you citing from a document, can

 9   I see what --

10        Q.   No, sir, I'm reading my notes.

11        A.   Okay.  So where --

12        Q.   I'm reading my notes.

13        A.   I'm not allowed to know where these are from,

14   or they're just from you, are they?  I guess you'll

15   let --

16        Q.   I may be making it up.

17        A.   Okay.

18        Q.   Okay.  No. 2, for too long BP treated wells as

19   one would treat a hire car.  There is little or no

20   oversight or ownership of our wells, outside the

21   drilling and completion construction phase.  Agree or

22   disagree with that?

23                    MR. WEBB:  Objection, form.

24                    MR. GODFREY:  Same objection.

25        A.   I -- I disagree with it.
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 130

1    Q.   (By Mr. Roberts) Okay.  No. 3, there is a lack

2  of accountability in BP's Well Engineering.  Agree or

3  disagree?

4              MR. WEBB:  Same objection.

5              MR. GODFREY:  Same objection.

6    A.   I don't know -- I don't have a basis for

7  agreeing or disagreeing on any of this.

8    Q.   (By Mr. Roberts) So there may be a lack of

9  accountability in BP's Well Engineering from your --

10             MR. WEBB:  Objection, form.

11             MR. GODFREY:  Objection, form.

12   A.   I'm -- I'm not -- I'm just not in a position

13  to make --

14   Q.   (By Mr. Roberts) As of when --

15   A.   Today or when I left or --

16   Q.   As of when you left BP.  All of my questions

17  are as of the day you walked out the door.  Was there a

18  lack of accountability from your standpoint as CEO in

19  Well Engineering?

20   A.   Not to my knowledge.

21   Q.   All right.  As of the day you left BP as CEO,

22  do you agree or disagree that the only time there was

23  crystal clear accountability in Well Engineering was

24  during the construction phase?

25             MR. WEBB:  Objection, form.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 131

```
 1                    MR. GODFREY:  Same objection.
 2       A.   I don't have a basis for forming a judgment,
 3   I'm afraid.
 4       Q.   (By Mr. Roberts) All right.  So there could
 5   have been --
 6                    MR. WEBB:  Objection, form.
 7       Q.   (By Mr. Roberts) -- this lack of
 8   accountability?
 9       A.   Could have been, there could not have been.
10   I just don't have a basis for -- to forming a judgment.
11       Q.   (By Mr. Roberts) You agree or disagree that as
12   of the period you were CEO, that the greatest obstacle
13   in delivering appropriate levels of integrity across
14   BP's well stock is the lack of clear accountability?
15                    MR. WEBB:  Objection, form of the
16   question.
17       A.   I -- I don't have any basis to agree or
18   disagree on that.
19       Q.   (By Mr. Roberts) Well, you sure wouldn't want
20   that to have been the case, would you?
21                    MR. WEBB:  Objection, form.
22       A.   I say I don't have any basis to agree or
23   disagree whether that's the case.
24       Q.   (By Mr. Roberts) No, that wasn't my question.
25   You wouldn't -- you would not have wanted that to be
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 132

580

1   the case while you were CEO --

2        A.    That's correct.

3        Q.    -- right?

4        A.    That's correct.

5        Q.    If that was the case, it wouldn't have been

6   with your approval?

7                    MR. WEBB:  Objection, form.

8        A.    That's, indeed, the case.

9        Q.    (By Mr. Roberts) All right.  Do you agree or

10  disagree that all BP's major well integrity incidents

11  prior to Macondo were due to simple bad practice?

12                    MR. GODFREY:  Objection as to form.

13       Q.    (By Mr. Roberts) That the well integrity --

14  that well integrity is no more than an output of

15  competent, basic operation practice, complexity and

16  cost is a product of having to replace failed wells?

17                    MR. WEBB:  Objection to form.

18       A.    I don't have a basis to agree or disagree.  I

19  don't know what you're --

20       Q.    (By Mr. Roberts) Well, let me --

21       A.    -- referring to or assuming.

22       Q.    Would you agree that you would not want -- you

23  wouldn't have wanted, while you were CEO at the

24  company, all of your well incidents to have been due to

25  simple bad practice?

**PURSUANT TO CONFIDENTIALITY ORDER**

581

```
 1              MR. WEBB:  Objection, form.

 2     A.   Correct.

 3     Q.   (By Mr. Roberts) All right.  Do you agree that

 4  all of BP's well integrity train wrecks resulted from

 5  simple bad practice?

 6              MR. GODFREY:  Objection, form.

 7     Q.   (By Mr. Roberts) As an example.

 8              FIRE ALARM VOICE:  The fire alarm system

 9  is about to be tested.

10              (Fire alarm drill sounding.)

11              FIRE ALARM VOICE:  Attention, please.

12  Attention, please.  A fire has been reported in the

13  building.

14              THE COURT REPORTER:  Somebody just shoot

15  me.

16              FIRE ALARM VOICE:  Please leave the

17  building immediately by the nearest exit.

18         The fire alarm test is now completed.

19              MR. ROBERTS:  I know -- I know you

20  arranged this.

21         (Laughter.)

22              MR. GODFREY:  There -- there actually was

23  a sign coming in this morning that informed us of this.

24  I -- it was somewhat disbelief, but the building is

25  unrelated to Kirkland, so I apologize on behalf of the
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 134

582

1    building, but we're also --

2                    MR. ROBERTS:  I don't know who owns the

3    Gerkin anymore.  It used to be Swiss Reed, didn't it?

4                    MR. GODFREY:  Yep.

5        A.   It did.

6        Q.   (By Mr. Roberts) Who owns it now?  I don't

7    know.

8        A.   I don't know.

9                    MR. ROBERTS:  All right.  Are we back on?

10                   THE COURT REPORTER:  We never left.

11       Q.   (By Mr. Roberts) All right.  Back to my

12   questions.  Do you agree that all of BP's well

13   integrity train wrecks resulted from simple bad

14   practice?  As an example, the Alaska A22 procedures

15   were not followed, and there was little or no

16   understanding of the effect of a cement retainer?

17                   MR. GODFREY:  Objection as to form.

18       Q.   (By Mr. Roberts) Sir?

19       A.   I don't have a basis to agree or disagree

20   about cement --

21       Q.   Do you know the Alaska A22?

22       A.   No, I don't know the Alaska A22.

23       Q.   Okay.  Do you know the OLA A5?

24       A.   I don't.

25       Q.   Do you know the Colombian blowout?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 135

1    A.    The Colombian blowout, no, I don't.

2    Q.    What is an SPU?

3    A.    Strategic Performance Unit.

4    Q.    Is that an -- an --

5    A.    It's an --

6    Q.    -- important part of your business?

7    A.    It's an organizational entity within BP.

8 There were around 30 of them.

9    Q.    What was the function or the intention of an

10 SPU?

11    A.    It was an organizational unit.

12    Q.    I mean, what did they do?

13    A.    A business -- organizational business unit.

14          It ran -- they ran a business.

15               MR. GODFREY:  Excuse me.  What --

16    A.    A production business, a retail business,

17 and --

18    Q.    (By Mr. Roberts) Excuse me, sir.

19               MR. GODFREY:  I was going to shut the

20 door because we had some background noise.  Hold on for

21 one second, please, I apologize for interrupting.

22 Okay.

23    Q.    (By Mr. Roberts) Was an SPU an important part

24 of the business Operations of BP at least as of when

25 you --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 136

1    A.    Yes.

2    Q.    -- left BP?

3    A.    It was.

4    Q.    What types of individuals were appointed to

5  head an SPU?

6    A.    Relatively Senior Executives.

7    Q.    Senior Executives.  Would you agree with me,

8  sir, that the SPUs of BP were motivated by greed and

9  fear?

10              MR. GODFREY:   Objection to form.

11    A.    No, I would not.

12    Q.    Would you agree with me, sir, that the wells

13  were BP's biggest asset, yet they were treated with

14  much indifference at the corporate level?

15              MR. GODFREY:   Object to form.

16    A.    I wouldn't agree with that, sir.

17    Q.    (By Mr. Roberts) Okay.  Who is David Andrews?

18    A.    I don't know.

19    Q.    You don't know him to be the Global Well

20  Integrity Lead of the segment Engineering Technical

21  Authority part of that SPU?

22    A.    Part of which SPU?  I don't know the name, I'm

23  afraid.  I'm sorry, but I don't know him.

24    Q.    You've never heard of him?

25    A.    I haven't.

**PURSUANT TO CONFIDENTIALITY ORDER**

585

1    Q.   I gather you've never seen the paper he did in

2 August of 2009 about well integrity?

3    A.   I haven't.

4              MR. ROBERTS:   Okay.   What's the next

5 exhibit?

6              THE COURT REPORTER:   6062.

7         (Exhibit No. 6062 marked.)

8              THE COURT REPORTER:   Here comes the

9 exhibit sticker.

10             MR. GODFREY:   Is this 6062?

11             MR. ROBERTS:   Yes, sir.

12   Q.   (By Mr. Roberts) Exhibit 6062 has been

13 produced by BP, and it appears to be your working notes

14 or Town Hall notes for a July 16, 2010, meeting.

15       Do you see that, sir?

16   A.   I do.

17   Q.   On Page 2 there is -- there's a bullet point

18 that I've highlighted.   And -- and I guess these are

19 notes that -- or comments, thoughts that you were

20 making at this time?

21   A.   I -- I didn't write this document and I -- I

22 don't recall it and I don't know that I've used it.   I

23 think this was written by someone else for -- for me --

24   Q.   By?

25   A.   -- but I certainly didn't write it.

```
 1              By an Executive Assistant, I expect.

 2      Q.   By a PR person or whom?

 3      A.   No.  By a -- an assistant, one of mine.

 4      Q.   All right.  Is this something that you worked

 5  from while you were making your --

 6      A.   No.

 7      Q.   -- presentation?

 8      A.   No.

 9      Q.   What was -- what was to be done with this?

10      A.   I hon -- honestly don't know.  I didn't use

11  this in the presentation.  I -- I don't know.

12      Q.   Fair enough.

13              Let's go to the -- the second page, and let's

14  start with -- there -- there is a bullet point that

15  says:  "Accusations and blaming going on is rubbish."

16              Do you see that, sir?

17      A.   I do.

18      Q.   Is that something that you would have agreed

19  with at that time?

20      A.   I probably wouldn't have expressed it that

21  way, actually.

22      Q.   "Rubbish" is a little bit too strong a word?

23      A.   Yeah.

24      Q.   But you did express earlier in this deposition

25  that you're -- you're not going to endorse the blame
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 139

587

1    game.  That wasn't your role?

2              MR. WEBB:  Objection, form.

3         A.   I said -- I don't recall exactly what I said,

4    but I think I was referring to -- I can't remember.  I

5    mean, if -- I mean, if we have to go back to the

6    record, we should look at it, but --

7         Q.   Have you engaged in any blaming of anybody for

8    the cause of this incident?

9         A.   I have not, no --

10             MR. WEBB:  Objection, form.

11        A.   -- I don't believe so, no.

12        Q.   (By Mr. Roberts) Okay.  You need to let your

13   lawyer yell at me first, and then you get to answer,

14   because I -- even with hearing aids, I can't

15   discriminate two conversations.

16             So what was your answer again, sir?

17        A.   I don't believe so.

18        Q.   All right.  The second part of the bullet

19   point was that the "accident was not about poor well

20   design," end quote.

21             Do you see that, sir?

22        A.   That's correct.

23        Q.   All right.  Do you believe that to be the

24   case?

25        A.   I believe that the Bly Investigation, which

PURSUANT TO CONFIDENTIALITY ORDER

588

1    was only part way through at this point, at the poi --

2    at the date of this -- this Town Hall, has concluded

3    that well design was not part of the accident.

4        Q.   So at least as of the time you left BP, you

5    believed that poor well design was not a reason, an

6    underlying reason for this incident?

7        A.   I believe that's what is documented in the Bly

8    Report.

9                    MR. GODWIN:  Object to form.

10       Q.   (By Mr. Roberts) I don't care about the Bly

11   Report, but --

12       A.   Well, that's what my date -- that's what my --

13       Q.   But --

14       A.   -- my statement was based on.  So it's

15   important that I preface my statement with that was in

16   the Bly Report, I accepted the Bly Report, and that's

17   the basis for my statement that well design was not

18   part of this accident.

19       Q.   All right.  So maybe --

20                   MR. GODWIN:  Object to form.

21                   MR. ROBERTS:  Anybody else?

22       Q.   (By Mr. Roberts) All right.  Let me approach

23   it this way:  Do you have any understanding from any

24   other source about the cause of this incident aside

25   from what's in the Bly Report?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 141

1    A.    I have the Bly Report and a very high level

2  cursory overview of what the Presidential Commission

3  found.

4    Q.    All right.

5    A.    That's the extent of my knowledge.

6    Q.    So from -- as we sit here today, from all

7  sources you've reviewed, you can find no evidence of

8  well design being part of the cause --

9    A.    From the two sources that I've reviewed, the

10  Bly Report and the cursory inspection of the

11  Presidential Commission.

12    Q.    You get to let me get my --

13    A.    I'm sorry.

14    Q.    -- question out.

15    A.    I apologize.

16    Q.    I'm --

17    A.    I'm sorry.

18    Q.    I'm a Texan, and I talk slow.

19        From your review of the two documents that you

20  looked at, the Bly Report and the cursory review, and

21  no other things that you reviewed, you have no reason

22  to believe that well design played any role in the

23  cause of this incident?

24    A.    Correct.

25    Q.    And you have reviewed nothing else and have

1  heard nothing else that would give you any reason to

2  believe that well design played any role in this

3  incident?

4      A.   That's correct.

5      Q.   All right.

6           (Exhibit No. 6063 marked.)

7              THE COURT REPORTER:  6063.

8           Five minutes.

9              MR. GODFREY:  Is it in the notebook, or

10 is it --

11             MR. ROBERTS:  No, sir.

12             MR. GODFREY:  Thank you.

13             MR. ROBERTS:  Even the court reporter's

14 getting tired of hearing me.

15             THE COURT REPORTER:  Getting?

16     Q.   (By Mr. Roberts) All right.  Turning to

17 Exhibit 6063, do you recognize this, sir, as a

18 communication -- employee communication by you and

19 Mr. Bob Dudley?

20     A.   I do.

21     Q.   Dated September 8th, 2010?

22     A.   Yes.

23     Q.   Is this the communication that -- that was

24 issued as you were leaving the company?

25     A.   Yes.  I believe it was issued on the day that

**PURSUANT TO CONFIDENTIALITY ORDER**

1    we published the internal investigation, which is, I

2    guess, 20 days before I formally left the company.

3        Q.   It -- it says in this, and I quote:  "Based on

4    the report, it would appear unlikely that well design

5    contributed to the incident, as evidenced by the fact

6    that hydrocarbons flowed up the production casing

7    through the bottom of the well," unquote.

8            Do you see that, sir?

9        A.   I do.

10       Q.   I'm intrigued by that.  Are you intending to

11   suggest that the fact that well -- that "hydrocarbons

12   came up the production casing" means that well design

13   could not have played any role in the incident?

14       A.   I think you have to go back to the -- the

15   alternative theory, where well design was an issue,

16   where the flow was up the annulus, up the back side of

17   the production casing, and there is no evidence of

18   that.

19           So on that -- on the -- on that basis, I think

20   the Bly Report concluded that well design did not

21   contribute to the incident.

22       Q.   But that's a little bit --

23               MR. GODWIN:  Object to form.

24       Q.   (By Mr. Roberts) That's a little bit different

25   than -- than your communication here.  Your

1  communication indicates, it says as the -- as evidenced

2  by the fact that hydrocarbons flowed up the production

3  casing through the bottom of the well, it appears that

4  well design didn't contribute to the incident.  That's

5  what you said, isn't it, sir?

6      A.   That is what I said.

7      Q.   So, therefore, I conclude that you concluded

8  that since the hydrocarbons came through the production

9  casing from the bottom of the well that means that well

10  design wasn't implicated?

11          MR. WEBB:  Object to the form.

12     A.   The conclusions of the Bly Report was that

13  well design wasn't implicated, and that is paraphrased

14  in this communication.

15     Q.   (By Mr. Roberts) But you adopted --

16          MR. GODWIN:  Object to form.

17     Q.   (By Mr. Roberts) -- that philosophy.

18     A.   I re -- I communicated what the Bly Report

19  found.

20     Q.   You're not communicating --

21     A.   And I was not any -- any position to make any

22  other judgment.

23     Q.   Sir, this is your communication and Bob

24  Dudley's communication to the employees.  This isn't

25  Mr. Bly's communication.  You --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 145

1    A.    But what --

2    Q.    Let me finish.

3    A.    Sorry.

4    Q.    You and Mr. Dudley have told your employees

5    that since hydrocarbons flowed up the production casing

6    and through the bottom of the well, that it appears

7    unlikely that well design contributed to the incident?

8    A.    That's correct.

9    Q.    All right.  So as I understand what you're

10   saying, the fact that it came through the production

11   casing, that means it couldn't have been due to bad

12   well design?

13           MR. GODFREY:  Objection as to form.

14   A.    Which meant it did not go up -- the flow

15   through the production casing excluded the -- the flow

16   through the annulus, which was the ba -- which had been

17   a basis for concerns around the well design.

18   Q.    (By Mr. Roberts) So to the extent that the Bly

19   Report looked at well design, it concluded that since

20   hydrocarbons came up through the production casing well

21   design was not implicated?

22           MR. GODFREY:  Objection as to form.

23   A.    It concluded that based on this and other --

24   other things that are documented in this Bly Report.

25           MR. GODWIN:  Object to form.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 146

1    A.   And we can go to the Bly Report to understand

2  exactly how that conclusion was drawn.

3    Q.   (By Mr. Roberts) And --

4             MR. GODWIN:  Object to form.

5    Q.   (By Mr. Roberts) And you accepted that as a --

6    A.   And I accepted the Bly Report.

7    Q.   You accepted that as a thorough analysis of

8  how well design could have contributed to this

9  incident?

10   A.   I accepted the Bly Report as a thorough

11 analysis of the incident, which effectively ruled out

12 well design as a cause of the accident.

13            MR. ROBERTS:  Thank you, sir.  It's been

14 a pleasure talking to you.

15            THE WITNESS:  Thank you.

16            MR. ROBERTS:  Nice meeting you.

17            THE WITNESS:  The same.  Thanks.

18            THE VIDEOGRAPHER:  Off the record at

19 10:14 a.m.  Ending Tape 13.

20       (Recess from 10:14 a.m. to 10:25 a.m.)

21            MR. GODFREY:  Can you shut the door down

22 there, please?

23       We're ready to go.  Thank you.

24            THE VIDEOGRAPHER:  On the record at

25 10:25 a.m., beginning Tape 14.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 147

595

```
 1                    EXAMINATION
 2   QUESTIONS BY MR. GODWIN:
 3       Q.   Good morning, Dr. Hayward.  How are you, sir?
 4       A.   I'm very well, thank you.
 5       Q.   Good.  Good.  You and I, I think, met on
 6   Monday briefly, to exchange --
 7       A.   Pleasantries.
 8       Q.   -- pleasantries, if you will.
 9       A.   Yes.
10       Q.   Is that the first time that we have spoken
11   about any matter whatsoever?
12       A.   It is.
13       Q.   Okay.  As you know, having been introduced by
14   me or to you, by Rick Godfrey, I represent Halliburton.
15       A.   Yes.
16       Q.   And I'm here accompanied in your deposition
17   today by my partner, Jenny Martinez, seated here to my
18   immediate right.
19       A.   Hi, Jenny.
20       Q.   Have you at anytime prior to Monday or at
21   anytime during this deposition spoken to Jenny about
22   any subject pertaining to this litigation?
23       A.   No, I haven't.
24       Q.   Okay, sir.  Thank you.
25            And a couple of things I want to have an
```

1  understanding with you about is, is that while I'm

2  asking you questions, if you don't understand one of my

3  questions, I want you to ask me to repeat it or clarify

4  it.

5         I know you've given in your life, I believe in

6  your career, you said a number of depositions, but it's

7  important that -- that you allow me to ask my question,

8  and it's equally important that I allow you to give

9  your answer.  So if you're trying to give an answer and

10 I start asking another question, either hold up your

11 hand or say something if your lawyers don't do it, and

12 I'll definitely stop because I want to give you the

13 courtesy of answering my questions and for you to do so

14 completely, okay?

15    A.    Thank you very much.

16    Q.    You're very welcome, sir.

17         Now, I understand -- understood you to say on

18 Monday that you have a Ph.D., did you say in Geology?

19    A.    That's correct.

20    Q.    Okay.  Sir, in what year did you get that

21 Ph.D.?

22    A.    1982.

23    Q.    Okay, sir.  And I understood you to say during

24 the course of your deposition, that a long time ago,

25 you had worked on a -- on a drilling rig?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 149

597

1      A.    That's correct.

2      Q.    And had you -- have you ever worked on an

3  offshore drilling rig in deepwater?

4      A.    It wasn't in deepwater.

5      Q.    It was --

6      A.    It was an offshore drilling rig in a few

7  hundred meters of water.

8      Q.    Okay.  In shallow water?

9      A.    Shallow water.

10      Q.    Okay.  Have you at any time been onto a

11  drilling rig in the deepwater in the Gulf of Mexico?

12      A.    I have, yes.

13      Q.    Okay, sir.  With regard to the relief wells,

14  relief well that was drilled here next to the Macondo

15  following the incident on April 20, did you ever go out

16  to the relief well --

17      A.    I didn't go to the relief well.

18      Q.    -- to the --

19      A.    I went to other operations, but not to the

20  relief well.

21      Q.    Okay.  Never flew out to the rig?  Okay.

22      A.    I flew out to the ENTERPRISE, which was the

23  production vessel --

24      Q.    Right.

25      A.    -- that was actually -- to the drilling.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 150

1    Q.   Okay.  I understand, sir.

2         Now you had you had said that I believe it was

3    in the latter part of July of 2010, you ceased being

4    the CEO of BP?

5    A.   Yeah.  I -- I announced my intention to step

6    down on the 27th and went through a transition to Bob

7    Dudley and left the company on the first of October.

8    Q.   Okay.  I believe you said you, quote, "handed

9    over the reins" at the -- in late July --

10   A.   That's correct.

11   Q.   -- to Mr. Dudley?

12   A.   That's correct.

13   Q.   Since late July of 2010, have you spoken to

14   Bob Dudley at any time regarding any subject pertaining

15   to the incident on April 20, 2010?

16   A.   We spoke regularly -- regularly in the period

17   between July the 27th and the 1st of August -- 1st of

18   October, and we've not spoken about it since then.

19   Q.   Okay.  So up until when you left the company,

20   you said -- was it in --

21   A.   On the 30th of September.

22   Q.   30th of September, you actually left the

23   company.  Since that date, you and Mr. Dudley have not

24   had a single conversation pertaining to anything

25   regarding the incident of April 20, 2010; is that

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 151

1   correct?

2        A.    That's correct.

3        Q.    Now, Mr. Mark Bly, you said that he was the

4   gentleman that you appointed to head up the internal

5   investigation of BP, as I understood your testimony?

6        A.    That's correct.

7        Q.    And since you left the company, effectively

8   September 30 of 2010, have you spoken to Mr. Bly

9   concerning any aspect of his internal investigation of

10  what is referred to as the Bly Report?

11       A.    I have not.

12       Q.    You have not.

13            I understood you to say here earlier today,

14  that the reason you chose Mr. Bly was that you felt

15  that he was the person that was most qualified within

16  the company to head up the investigation?

17       A.    That's correct.

18       Q.    Okay.  And I believe you said that you thought

19  by selecting him, that you would be getting a -- a --

20  what was it you called it, a --

21       A.    I said I thought that the investigation or the

22  Report that resulted from that investigation was both

23  rigorous and robust.

24       Q.    Okay.  And I believe you -- and did I

25  understand you to say that you thought that -- that

**PURSUANT TO CONFIDENTIALITY ORDER**

1  even though Mr. Bly was employed by BP, that you

2  thought that his heading up the investigation, it would

3  be an independent investigation?

4      A.   I believe that it was an independent

5  investigation.

6      Q.   Well, you believe that it was, but was it your

7  intention when you chose him that it be an independent

8  investigation, even though he was an employee working

9  within the company?

10     A.   It was my intention that it would be an

11  inde -- independent investigation.

12     Q.   Okay.

13     A.   He was outside of the line.  He was outside of

14  the operating line.

15     Q.   All right.

16     A.   And he had a role that was not in any way to

17  do with the operations where the accident occurred.

18     Q.   Okay.  And he was outside of the line, and as

19  I understand it, he appointed all of the people that

20  were on his in -- his investigative team, both internal

21  and external?

22     A.   That's correct.

23     Q.   Okay.  Now, while he may have been outside of

24  the line, he reported to you, did he not, with regard

25  to the investigation?

```
 1      A.   He reported to me, and he reported to the
 2   SEEAC and the Board.
 3      Q.   Okay.  And, of course, the Board had the
 4   interest of BP stockholders always at -- in mind.  That
 5   would be part of its function, would it not?
 6      A.   Certainly part of its --
 7               MR. GODFREY:  Objection to the form.
 8      A.   It's part of any Board's duties to take care
 9   of the shareholders of the company.
10      Q.   (By Mr. Godwin) Okay, sir.  And -- and that
11   is -- and doing that, as long as the law is followed,
12   to do it to the exclusion of all others?
13      A.   I'm sorry?
14      Q.   Even -- and while carrying forth and carrying
15   out its duties as a Board Member or as a Board as a
16   body is to look after the interest of the shareholders
17   to the exclusion of others, so long as the law -- the
18   law is followed?
19               MR. GODFREY:  Objection.
20      Q.   (By Mr. Godwin) Would you agree with that?
21               MR. GODFREY:  Objection to the form.
22      A.   I would say that to protect the interest of
23   shareholders --
24      Q.   (By Mr. Godwin) Okay, sir.
25      A.   -- in the context of ensuring that other --
```

1    other people are equally taken care of as well.

2        Q.    Okay.  All right.

3        A.    It's not to the exclusion of.

4        Q.    I understand, sir.

5              Now, let me ask you this, Dr. Hayward:  You --

6    I understood you to say here earlier today that you

7    accepted the Bly Report?

8        A.    (Nodding.)

9        Q.    Did you mean to convey when you said you

10   accepted the Report, that you agreed with all aspects

11   of the Bly Report?

12       A.    I had no basis to disagree.  I --

13       Q.    Okay.  So the answer would be "Yes"?

14       A.    Yes, I had no basis to disagree.

15       Q.    Okay.

16       A.    I accepted the Report as it was written.

17       Q.    Okay.  Now, let me ask you this:  Whenever

18   you -- when you chose Mr. Mark Bly, who you know who

19   has been deposed in this case, you're aware of that?

20       A.    I am.

21       Q.    Let me, before I go there, how much time have

22   you spent preparing for your deposition today, in terms

23   of number of days, and then in terms of number of

24   hours?

25       A.    I've spent of the order of three full days

1  reminding myself of the events because, you know, as I

2  think you're well aware, I -- I've been out of the

3  company now for a long time, and I've been pursuing my

4  future.

5      Q.   Right.

6      A.   I'm not really spending any time at all on any

7  of the events of 2010.

8      Q.   Well, from what I read in the paper and the

9  Internet, it sounds as though you have a bright future

10  in the business that you spoke of earlier today, and I

11  congratulate you on that.

12      A.   Thank you.  I hope that's the case.

13      Q.   You -- you're welcome.

14          But in terms of -- in terms of the appointing

15  of -- of Mr. Bly to report to you with regard to the

16  investigation, why was it that you did not go to the

17  outside of BP to hire someone to perform the

18  investigation as opposed to using an insider?

19      A.   I think one -- one of the reasons is we wanted

20  to initiate it very quickly.

21      Q.   Okay.

22      A.   And finding someone from outside and getting

23  organized would -- would have taken a lot of time.  So

24  Mark was very well qualified.

25      Q.   Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

604

1    A.   He was outside of the business line.  He had

2  no accountability for the operation where the accident

3  occurred.  So he was in some -- and he was the ultimate

4  "expert" is the right -- is the wrong word, but he was

5  the ultimate -- he was at the pinnacle of the knowledge

6  of safe -- safe -- Safety and Operations in the

7  company, so he was -- I -- I believed he was the right

8  person to lead the investigation.

9    Q.   Okay, sir.

10    A.   All right.

11    Q.   And did you -- did you even try to look for

12  anyone outside of the company prior to when you chose

13  Mr. Bly to conduct an --

14    A.   Well --

15    Q.   Let me finish.

16    A.   I'm sorry.  Of course.

17    Q.   Prior to the time that you selected Mr. Bly

18  for the investigation, did you try to locate someone

19  outside of the company to head up the internal

20  investigation?

21    A.   I did not.

22    Q.   Thank you, sir.

23         Did anyone do so on your behalf?

24    A.   No.

25    Q.   Thank you, sir.

1          Now, when the Report was issued September 8 of

2   2010, you had, of course, as you say, "handed over the

3   reins," but you still were employed by BP up -- for

4   about three weeks longer after that, were you not?

5          A.   That's correct.

6          Q.   Once the Report was finalized, did Mr. Bly

7   and/or others on his team, did they make a presentation

8   to you regarding the Report itself?

9          A.   They made a presentation to the Board of BP --

10         Q.   Okay.

11         A.   -- and to the Safety, Ethics and Environmental

12   Assurance Committee separately.  I was present in both

13   of those presentations.

14         Q.   And in terms of the date of the Report being

15   September 8, I'll just show it to you.  It's been

16   marked as Exhibit No. 1 in the deposition a long time

17   ago, if you will, in these depositions, was the -- was

18   the meeting or the meetings that you attended where

19   the re -- where the Report was discussed after it was

20   finalized, were those on or -- on or before or after

21   September 8?

22         A.   I can't remember.  I think it was probably a

23   meeting -- well, I'd have to go back to a diary.  I

24   honestly can't remember whether the review with the

25   Board preceded the formal publication or post-dated the

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 158

1  formal publication, but I'm certain that will be

2  available in the -- in the Minutes of the Board

3  meeting.

4       Q.   All right, sir.  Let me ask you this:  Did

5  you -- did you have a draft of the Bly Report or any

6  parts of it presented to you for any reason prior to

7  when it -- the Report was finalized?

8       A.   There -- there were interim presentations to

9  inform myself and others as to where the findings had

10 got to --

11      Q.   Okay.

12      A.   -- for information.

13      Q.   And -- and would this have been on a chapter-

14 by-chapter basis --

15      A.   No.

16      Q.   -- or some other way?

17      A.   No.  It was a summary of the overall findings

18 of the investigation at a moment in time.

19      Q.   Okay.  So when was it that you actually hired

20 or asked Mr. Bly to -- to conduct the investigation?

21      A.   Within 48 hours of the accident.

22      Q.   Okay.  And about how long was it before he or

23 anyone under his jurisdiction on the investigation

24 actually started giving you reports about the findings

25 of that team?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 159

1    A.    I think some of the early insights were

2  provided to Congress and to myself at about the same

3  time, which was -- would have been, I believe, in early

4  June.

5    Q.    Okay.  And -- of 2010?

6    A.    Of 2010.

7    Q.    Okay.  And when you were receiving these

8  reports or meetings, interim reports from Mr. Bly and

9  perhaps others on his team, were there notes made of

10  those meetings?

11    A.    Well, I certainly didn't make any notes.

12    Q.    Did anybody make any notes --

13    A.    I -- I -- I --

14    Q.    -- to your knowledge?

15    A.    Not to my knowledge.  I'm -- I'm not aware

16  that they did.

17    Q.    Where did those meetings take place?  Were

18  they in person or by phone or both?

19    A.    They were -- they were in person and by video

20  conference.

21    Q.    Okay.  All right.  And -- now when they were

22  in person, where did the meetings take place?

23    A.    I can remember one meeting in Houston, and a

24  second meeting in London.

25    Q.    In London?

608

1    A.    Yeah.

2    Q.    Okay.  When was the one in Houston, your best

3    estimate as time?

4    A.    It would have -- would have been in the course

5    of late May, early June, I think.

6    Q.    Okay.  And how about the second one, the other

7    one you say that was in London?

8    A.    I think that would have been sometime in the

9    second half of July.

10   Q.    Okay.  All right.  Now, did Mr. Andy Ingalls,

11   did he attend any of those meetings where they -- where

12   there were interim reports that were provided to you

13   and others regarding the Bly Investigation?

14   A.    He did, yes.  He did.  He did.

15   Q.    Okay.

16   A.    Not -- I don't recall all of them, but he

17   certainly was present in some of them.

18   Q.    Okay, sir.  Now, with regard -- I understood

19   you to say that the only knowledge you have about the

20   events leading up to the incident and the terrible

21   accident on April 20, came from your reading the Bly

22   Report and what the Members of the Investigative Team

23   told you.  Did I remember that correctly?

24            MR. GODFREY:  Objection as to form.

25   A.    That's correct.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 161

1    Q.   (By Mr. Godwin) Okay.  Now, in terms of the --

2  in terms of the investigation itself, you were not

3  personally involved in the investigation, were you?

4    A.   I was not.

5    Q.   Okay.  And did you have any personal knowledge

6  of the design or execution of the cement job on the

7  production casing?

8    A.   I had no personal knowledge prior to the

9  investigation.

10   Q.   After the incident, did you go back and ask to

11 review a copy of the design -- the well design?

12   A.   I didn't, no.

13   Q.   You did not.  After the incident, did you --

14 did you go --

15   A.   I don't -- sorry, I apologize.

16   Q.   I'm sorry, sir.  Had you finished?

17   A.   My rationale was simply that I had launched an

18 investigation --

19   Q.   Right.

20   A.   -- to get to the cause of the accident, and I

21 wanted the intervent -- investigation to take its

22 course and determine the accident, so I did not do

23 anything over and above the investigation.

24   Q.   Okay.  Well, you, as a Ph.D. in -- a Ph.D. in

25 Geology, you certainly --

PURSUAT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 162

1      MR. GODWIN:  Do you need some water, Dan?

2      MR. WEBB:  I'm fine.

3   Q.   (By Mr. Godwin) Yeah -- you certainly had the

4  ability to go back and look at the well design and

5  understand it, had you chosen and had the time to do

6  so?

7   A.   I would have been able to make a layman --

8  take a layman's view of it, frankly.  I'm -- I'm -- I'm

9  not a Drilling Engineer, I'm a Geologist.  And that was

10  a long time ago, as well --

11   Q.   I understand, sir.  Okay.  Now, did you --

12  with regard to my client, Halliburton, are you familiar

13  with the name Sperry?

14   A.   Sperry-Sun, yes.

15   Q.   Okay.  Used to be, I think, referred to as

16  Sperry-Sun and now referred to as Sperry --

17   A.   M-h'm, m-h'm.

18   Q.   -- as a -- a unit of Halliburton?

19   A.   Yes.

20   Q.   Did you have any -- did you -- after the

21  incident on April 20, did you form any opinion

22  regarding the mud logging services that were provided

23  by Halliburton Sperry there prior to the incident on

24  April 20?

25      MR. GODFREY:  Object as to form.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 163

1       A.   I had -- I -- I had no view prior to, and I

2   form no view post --

3       Q.   (By Mr. Godwin) Okay, sir.

4       A.   -- until such time as I read and received

5   the -- the Bly Report.

6       Q.   Okay, sir.  And other than the Bly Report, did

7   you undertake to talk to anyone, other than Members of

8   the Bly Investigative Team, about the -- the mud

9   logging services that Halliburton Sperry had provided?

10      A.   No --

11      Q.   Okay.

12      A.   -- I did not.

13      Q.   With regard to the cementing services that my

14  client provided, Halliburton, the foam cement slurry,

15  you're aware that a foam cement slurry was used on the

16  Macondo Well in the production casing string, are you

17  not?

18      A.   I -- I am.

19      Q.   Okay.  Now, other than Members of the Bly

20  Investigative Team, did you speak to a single person

21  about any aspect of the cementing job that Halliburton

22  provided to -- to BP in connection with the production

23  string casing?

24      A.   I did not.

25      Q.   You did not.  Thank you, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Now, you, of course, know the company

2    Halliburton as -- as one of the significant third-party

3    providers of services to BP, do you not, sir?

4          A.    I don't know them very well.

5          Q.    You do not?

6          A.    I do know them very well.

7          Q.    You do know them very well.  Okay, sir.  And

8    over the years that you served as -- for three years,

9    as the CEO of BP, and prior to that as a Senior Officer

10   of the company, did you form an opinion about the

11   company Halliburton?

12         A.    I did.

13         Q.    And what was your opinion of Halliburton

14   during the time that you were with BP, particularly in

15   those last years when you were the CEO, sir?

16         A.    They were a very good provider of services to

17   the oil field across a broad -- broad range of

18   activities, and had -- were well-respected in the

19   industry and -- and well thought of.

20         Q.    And -- and in terms of your familiarity with

21   Halliburton, did you form an opinion as to whether or

22   not their leadership would -- mandated, if you will,

23   and expected of its people to always perform at the

24   highest level of service, when providing services to a

25   company such as BP?

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          MR. GODFREY:  Objection as to form.

 2     Q.   (By Mr. Godwin) And I'm speaking only -- only

 3  about BP.

 4     A.   I don't -- I don't know for certain, based on

 5  personal knowledge, but I have a belief that the

 6  expectation was set by the leadership of Halliburton,

 7  that services were performed -- performed properly and

 8  appropriately.

 9     Q.   And in accordance with the expectations of BP,

10  and certainly to the extent of your involvement and

11  knowledge, would you agree with that?

12     A.   I'd agree with that.

13          MR. GODFREY:  Object as to form.

14     Q.   (By Mr. Godwin) Thank you.  Had you --

15     A.   I would agree with that.

16     Q.   Thank you, sir.  Do you know Mr. Dave Lesar?

17     A.   I do.

18     Q.   And the Chairman and CEO and President of

19  Halliburton?

20     A.   I do.

21     Q.   How long have you known Dave?

22     A.   I have known him a long time.  Twenty-five

23  years probably.

24     Q.   I understand.  A long time.  What's your

25  opinion of Dave Lesar as a -- as --

1    A.   He's -- he's a very -- he's been a very good

2   CEO of Halliburton.  He's been a very good Leader of

3   the oil and gas industry over a long period of time.

4    Q.   Based upon your dealings and -- and being

5   around Mr. Lesar, do you believe that he would expect

6   at all times that everyone working for Halliburton

7   would provide to the very best of their abilities the

8   very best service that could be provided to BP when

9   engaged by BP to perform any service?

10                MR. WEBB:  Object to form.

11    A.   I'm certain that is Dave Lesar's expectation

12   of his employees.

13    Q.   (By Mr. Godwin) Thank you, sir.  I understood

14   you to say here earlier today that whatever happened

15   there on the well, on the -- on the day and evening of

16   April 20, you thought whatever happened was as a result

17   of human error.  Did I understand that correctly?

18    A.   I think the Bly Report found that to be one of

19   the causes of the -- of the -- of the accident, not the

20   sole cause --

21    Q.   Right.

22    A.   -- but certainly one of the causes.

23    Q.   Well, I'm certainly not going to go off into

24   that again.  You spoke of that this morning and that

25   record will speak for itself.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 167

```
 1            My question is this:  In all of your
 2   conversations with Members of the Bly Team, the
 3   Investigative Team, did you learn from any source that
 4   anybody on that team thought that Halliburton did
 5   anything with the intent of -- of not performing at the
 6   very highest level with respect to the services to be
 7   provided to BP under its contract?
 8                 MR. WEBB:  Object, form.
 9        A.   I don't think there was any conversation that
10   said that their intent --
11        Q.   (By Mr. Godwin) Right.
12        A.   -- was not to do that.
13        Q.   Okay.
14        A.   Whether that was the result, of course, is a
15   matter for debate --
16        Q.   Right.
17        A.   -- of the intent.
18        Q.   And -- and with -- and did all the time that
19   you were meeting with Members of the Bly Investigative
20   Team, did you see anything that suggested to you in any
21   way that anyone with Halliburton did anything in a
22   conscious matter to -- to in any way harm BP?  Did you
23   see anything like that?
24        A.   I didn't see anything, no.
25        Q.   Did you hear anything from Mr. Mark Bly or
```

616

1    anyone else --

2        A.   No.

3        Q.   -- with his team that would suggest to you

4    that Halliburton had done anything with a conscious

5    effort, if you will, made to not do it, not perform in

6    the interest of BP?  Did you see anything like that?

7        A.   I did not.

8        Q.   The whole time that you were talking to

9    Mr. Mark Bly and others on his team -- or let me ask

10   this:  Other than Mr. Mark Bly, did anyone else on his

11   team make any presentation to you?

12       A.   They -- they did not.

13       Q.   They did not?

14       A.   It was -- it was just Mark.

15       Q.   Okay.  So there -- he was the only one that

16   ever spoke to you about it --

17       A.   M-h'm.

18       Q.   -- from his team?

19       A.   Yes.

20       Q.   Okay.  Did you read anything that others had

21   prepared, other than perhaps Mark Bly, with regard to

22   the investigation?

23       A.   I did not.

24       Q.   You didn't?

25                 MR. GODFREY:  Objection as to the extent

1  you're calling for anything privileged.

2     Q.   (By Mr. Godwin) Well, let me say this:  These

3  lawyers know I certainly -- and Rick knows, worked with

4  me a lot -- I'm not going to ask you any questions

5  which are designed to elicit a response that would be

6  privileged.  And if I should ask you one there, stop

7  me, don't ask, say, "Don, you're going in -- in the

8  wrong direction," or whatever, sir.  I certainly

9  don't want to violate that privilege, okay?

10             MR. GODFREY:  Or -- or we could do it

11  simply, which is, I'm assuming you're asking about

12  nonlawyer --

13             MR. GODWIN:  Right.

14             MR. GODFREY:  -- conversation?

15             MR. GODWIN:  Absolutely.

16             MR. GODFREY:  So his company counsel --

17             MR. GODWIN:  Right.

18             MR. GODFREY:  -- not his personal

19  counsel, but as his company counsel I'm assuming you're

20  asking that about anything.  I may have had

21  conversations with him at the time he was CEO --

22             MR. GODWIN:  Right.

23             MR. GODFREY:  -- or his company when I

24  was company counsel.

25             MR. GODWIN:  Same thing applies to Rick

1   as your -- as the company counsel as it does to Don as

2   your personal lawyer.

3                 MR. GODFREY:  Right.

4                 MR. GODWIN:  I'm not after back --

5   anything you talked to him about.

6                 MR. GODFREY:  I -- I assumed that, but

7   I -- I thought we just should --

8                 MR. GODWIN:  Yeah.

9                 MR. GODFREY:  Okay.  Fair enough.

10   Q.   (By Mr. Godwin) Okay.  So you understand that

11   the rules are in that regard, Dr. Hayward?

12   A.   I do.

13   Q.   Thank you, sir.

14       Now, I understand that the only person on the

15   Bly Team you spoke with was Mark Bly, no one else, and

16   you didn't read anything or see anything that anyone

17   else prepared other than Mark Bly?

18   A.   That's correct.

19   Q.   Okay.  And your belief is that the ultimate

20   Report that was prepared, while others may have

21   assisted him in preparing it, he had actually put his

22   name on it as the author of the Report when it was

23   finalized?

24   A.   He certainly did.

25   Q.   Okay, sir.  Thank you.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 171

619

1          Now, the -- did you -- and -- and, again, so

2    I'll understand, with regard to the Bly Report itself,

3    and say with particular reference to the negative test,

4    my understanding is, is that you -- all opinions you

5    formed regarding this case, no matter what aspect of

6    it, came from the Bly Report?

7         A.   That's correct.

8         Q.   Okay.  Okay.  Now, did the -- you talked about

9    Process Safety in the first day of your deposition, as

10   well as today.  Do you recall that, sir?

11        A.   I do.

12        Q.   Would you agree that one goal of Process

13   Safety is to postulate what events could happen, say,

14   on a -- on a deepwater drilling wig -- rig such as the

15   Macondo?

16             MR. GODFREY:  Objection as to form.

17        A.   The primary goal of Process Safety is to -- is

18   to have the right systems and procedures in place such

19   that accidents don't happen.  And part of --

20        Q.   (By Mr. Godwin) I wrote down -- I'm sorry.  Go

21   ahead.

22        A.   -- part of that is to do what amounts to job

23   risk assessment to understand what risks may be

24   associated with a particular activity to ensure that

25   that's been properly managed and eliminated.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   And to have Process Safety in place, that

2  would prevent incidents from happening.  Would you

3  agree with that?

4    A.   I would.

5            MR. GODFREY:  Objection as to form.

6    Q.   (By Mr. Godwin) And would you also agree that

7  you have Process Safety in place -- systems in place

8  that would -- that would prevent potential incidents

9  from happening that may not have yet occurred?

10    A.   That is the intention of Process Safety.

11    Q.   Okay.  Do you believe that it is critical

12  that -- that BP with regard to Process Safety get it

13  right, and that is understand it and have the

14  procedures and systems in place so that they make the

15  very best effort, if you will, to protect the interest

16  of the well and the people on it and the property?

17            MR. GODFREY:  Objection as to form.

18    A.   I do.

19    Q.   (By Mr. Godwin) Okay, sir.  Do you know

20  Mr. Sam DeFranco with BP?

21    A.   No, I don't.

22    Q.   Okay.  Have you read Mr. DeFranco's

23  deposition?

24    A.   I have not.

25    Q.   Have you read Mark Bly's deposition?

1      A.    I have not.

2      Q.    Have you read any depositions in this case?

3      A.    I haven't read any depositions in this case.

4      Q.    Okay, sir.  All right.  Would you agree that

5  there's really nothing worse on a deepwater rig from a

6  Process Safety perspective than act -- than a blowout

7  of a well?

8      A.    A blow -- a blowout of a well in any situation

9  is clearly a -- a catastrophic incident.

10      Q.    Okay.  Do you -- do you agree that there are

11  always going to be risks associated where it is shown

12  that a well is flowing in an uncontrolled manner?

13      A.    Where -- I do agree that where a well is

14  flowing in an uncontrolled manner there will be risk --

15      Q.    Thank you, sir.

16      A.    -- significant risk.

17      Q.    Do you believe that any thorough Process

18  Safety study for a deepwater well should consider a

19  blowout as a possible hazard?

20            MR. GODFREY:  Objection as to form.

21      A.    I do.

22      Q.    (By Mr. Godwin) Okay, sir.  Do you believe

23  that all steps should be taken by BP in the terms of --

24  of executing on its Process Safety Plan and Procedures?

25  Do you believe that all steps should be taken to ensure

1   against the remote possibility that a blowout could

2   occur?

3               MR. GODFREY:  Object to the form.

4       A.   And I think the way you do that is through

5   looking at the breakdown of the activities that take

6   place.  So you can't say we're going to do an

7   assessment of a blowout because it --

8       Q.   (By Mr. Godwin) Right.

9       A.   -- could occur through many different things.

10  So you need Process Safety in place to put the relevant

11  barriers in place to prevent a blowout occurring.

12      Q.   Right.  And another way of saying that is, is

13  that to the extent that BP is involved in the well as

14  an owner and an operator BP is going to try to put in

15  place procedures to do its very best with regard to

16  everything it has oversight over to ensure that a

17  blowout would not occur?

18               MR. GODFREY:  Object to form.

19               MR. WEBB:  Object to the form.

20      A.   BP is going to endeavor to ensure that the

21  people in involved constructing the well --

22      Q.   (By Mr. Godwin) Yes, sir.  Thank you.

23      A.   -- many people have in their systems and

24  processes the right systems and processes in place to

25  prevent a blowout.

**PURSUANT TO CONFIDENTIALITY ORDER**

623

1    Q.   They may be doing that, as well, but I'm

2   talking about BP.  You would expect as the former CEO

3   for everybody involved in the well, specifically one

4   such as the DEEPWATER HORIZON, for all the people there

5   working on that well for BP to do everything they could

6   to carry forward with the Process Safety procedures to

7   ensure that the likelihood of a blowout would not

8   exist?

9              MR. GODFREY:  Object to form.

10   A.   That's --

11   Q.   (By Mr. Godwin) Would you agree with that,

12   sir?

13   A.   I would agree with that in -- inasmuch as, of

14   course, the -- let's talk about the well control, for

15   example.  The well control procedures are not BP's

16   procedures.  They're the procedures of Transocean.

17   Q.   And I'm talking really about just -- about

18   just what BP was doing --

19   A.   What BP was doing --

20   Q.   -- not what others were doing.

21              MR. ROBERTS:  Objection to form.

22   A.   What BP was doing was endeavoring to ensure

23   that respective contractors had the right processes in

24   place and that they were being followed.

25   Q.   (By Mr. Godwin) Thank you, sir.

624

1    A.    Because BP was not actually undertaking the

2  processes.

3    Q.    Would you expect if BP received

4  recommendations from a contractor there on the Horizon

5  well that would put the well at risk?  Would you expect

6  BP to follow the recommendations of the third-party

7  contractors?

8    A.    I would.

9    Q.    Okay.  And if you were to learn that BP

10  employees were told by a third-party contractor, one of

11  its employees, that what BP was doing could put the

12  well at risk and the lives of those working on the rig,

13  would that give you some reason for wanting to have

14  some study, investigation made to see why BP was making

15  that decision?

16           MR. GODFREY:  Objection as to form.

17           MR. WEBB:  Objection, form.

18    A.    I believe that was investigated as part of

19  this investigation.

20    Q.    (By Mr. Godwin) Are you aware -- do you know

21  a -- an Engineer, an experienced Engineer, with BP by

22  the name of Greg Walz, W-a-l-z?

23    A.    No, I don't.

24    Q.    All right.  Do you know the name Greg Walz

25  insofar as he was one of the Engineers that was

 1   actually working on the Macondo Well?

 2        A.   I don't.  I don't know the name, and I've not

 3   come across the name previously.

 4        Q.   Okay, sir.  Sometime ago we took the

 5   deposition of a Mr. Greg Walz in New Orleans, a senior

 6   level Engineer there for BP working on the -- on the

 7   Macondo, and he testified in his deposition that on the

 8   morning of April 19, 2010, he and Mr. Jesse Gagliano of

 9   Halliburton, who designed the cement job, they met

10   there at BP's office in Houston.

11        A.   M-h'm.

12        Q.   And he testified further that during the

13   course of that meeting that Mr. Gagliano told him that

14   BP's decision to only put six centralizers on the

15   casing string would give rise to a -- the possibility,

16   or the potential, for a severe gas flow problem.  And

17   he testified that he heard that from Jesse and that

18   Jesse had, in fact, put that in what is known as an

19   OptiCem Report the night before, on the 18th.  And he

20   said, "But we did -- I did have him tell me that, and

21   re -- and even though he told me that on behalf of

22   Halliburton, that there was going to be a severe gas

23   flow problem, we assumed the risk," BP did, "We made

24   the decision to run the casing with only six

25   centralizers."

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 178

```
 1            Other than through lawyers, have you heard

 2   anything to that effect prior to me just stating it?

 3                 MR. WEBB:   Object to the form of the

 4   question.

 5                 MR. GODFREY:   Object to the form.

 6       A.   I haven't heard anything even through

 7   lawyers --

 8       Q.   (By Mr. Godwin) Okay.

 9       A.   -- about that meeting.

10       Q.   All right.

11       A.   What I do know is that the Bly Report

12   concluded that it was very unlikely stabilizers had

13   anything to do with this accident --

14       Q.   Okay.

15       A.   -- as the flow of the hydrocarbons was up the

16   production casing --

17       Q.   All right.

18       A.   -- not the annulus.

19       Q.   Okay.

20       A.   And as I understand the findings, it would

21   have been an issue if the flow was up the annulus, but

22   it wasn't.

23       Q.   Well, that's what the Bly Report says.   And

24   you, of course, know nothing about that opinion you

25   just gave other than what you read in the Bly Report?
```

1      A.    That's correct.

2      Q.    Okay.  Now, let me go back and ask this

3  question from this perspective, and forgetting what the

4  Bly Report said about what caused the blowout.  I'm not

5  after that at this point.  I'm talking about Process

6  Safety, doing things to ensure that -- that the well is

7  not put at risk and the lives are not put at risk.

8          Would you expect as the former CEO of BP if

9  one of your Senior Engineers on a deepwater rig,

10  deepwater well, such as the Macondo, were told by a

11  company, a third-party provider of services,

12  Halliburton, that what BP was going to do was going to

13  create a severe gas flow problem, would that cause you

14  to be concerned about what that BP employee did?

15                  MR. WEBB:  Objection to form.

16                  MR. GODFREY:   Object to the form.

17      A.    I would expect that the BP employee would take

18  that input, discuss it with his colleagues, and take

19  the appropriate action.

20      Q.    (By Mr. Godwin) If you were to learn that

21  Mr. Walz testified in his deposition that after he

22  learned from Jesse Gagliano that there was going to be

23  a severe gas flow problem on the morning of the 19th of

24  April, that he did not discuss that with anyone at BP,

25  he simply allowed the decision to go forward to have

```
 1    the casing run with only six centralizers, would that
 2    concern you about his action in that regard of not
 3    discussing what Mr. Gagliano told him with other
 4    members of the BP Team?
 5                    MR. WEBB:  Objection to form.
 6                    MR. GODFREY:  Object to the form.
 7         A.   With no context, it's very difficult for me to
 8    make a judgment.
 9         Q.   (By Mr. Godwin) You understand where I'm going
10    with that, don't you?
11         A.   In -- in -- so I'm not -- you know, I'm not
12    prepared to make a judgment about whether that was the
13    right thing to do or not, the right thing to do without
14    the full context of the meeting and the situation at
15    the time.
16         Q.   Well, you remember, you testified,
17    Dr. Hayward, a little while ago, you said that -- that
18    there's always going to be risk where gas could be
19    shown to be flowing in an uncontrolled manner?
20    Remember that?
21         A.   I don't remember --
22         Q.   You said --
23         A.   -- that, actually.
24         Q.   Earlier today, you said that -- when I asked
25    you, you said that -- that there would be risk
```

1    associated in terms of doing --

2         A.    I think when a well --

3         Q.    -- a Process Safety?

4         A.    If a well was flowing in an uncontrolled

5    manner --

6         Q.    There would be risks?

7         A.    -- there is risks.

8         Q.    There would be risks?

9         A.    M-h'm.

10        Q.    And -- and my point being is with that

11   backdrop, with that knowledge that you testified about,

12   if the Senior Engineer there on the Macondo Well were

13   told by Halliburton that, "If you run the casing with

14   only six centralizers, you're going to have a severe

15   gas flow problem of a..." then would that cause you to

16   think, "Well I would expect that BP Engineer to make

17   certain that what was being done was the right thing"?

18             Is that the conclusion you would reach?

19        A.    I would --

20                  MR. WEBB:  Object to the form.

21                  MR. GODFREY:  Object to the form.

22        A.    I think it's reasonable to expect that the

23   Engineer would take that information into account and

24   make the right decision.

25        Q.    Okay.  And would you expect before the cement

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 182

1  job were to be run, that if BP had that information

2  from Halliburton, through Mr. Gagliano, that BP would

3  want to stop whatever was going on with the well to

4  make certain that it made the right decision regarding

5  the number of centralizers, in view of the warning that

6  it had been given by Halliburton?

7      A.   I -- I think --

8           MR. GODFREY:  Objection as to form.

9      A.   -- trying to take one Report, one meeting --

10     Q.   (By Mr. Godwin) Yes, sir.

11     A.   -- out of context and make judgments about

12  what I wouldn't -- would and would not expect is --

13  I -- I don't have a basis for making a judgment.  I

14  don't know anything about the credibility of the

15  Report, I don't know anything about the circumstance

16  in -- in which --

17     Q.   Right.

18     A.   -- the meeting took place.  So in a -- in a

19  normal situation, yes, I think --

20     Q.   Okay.

21     A.   -- I think the answer is "Yes."  But without

22  the context --

23     Q.   Right.

24     A.   -- I think it's not possible to make a -- a

25  sensible judgment.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.   Well, according to -- according to Mr. Walz,

2  he had received, on the night before at about 9:00

3  o'clock in the evening, an OptiCem Report, as well as

4  had several other peoples, many of whom are BP

5  employees, from Jesse Gagliano, showing that -- what

6  would happen if they ran seven centralizers.  And it

7  would be a severe gas flow problem.

8         Mr. Walz said that the next morning, that he

9  was approached by Mr. Gagliano, who came in expressing

10 concern.  That if you're going to run six or seven

11 centralizers and not run the 21 Halliburton

12 recommended, you're going to have a big problem.

13        Even though I know there are other factors

14 you'd want to consider, it's my understanding you're

15 saying that, if you had an Engineer that received that

16 Report from an employee of a provider of services, such

17 as Halliburton, with its credibility, if you will, that

18 you would expect your employee to make certain that he

19 had looked at all the necessary aspects of going

20 forward so to make sure that it was done safely.

21             MR. WEBB:  Object to form.

22    Q.   (By Mr. Godwin) Would that be a -- would that

23 be a fair conclusion to reach?

24             MR. WEBB:  Objection to the form of the

25 question.

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. GODFREY:  Objection, form.

2     A.    Provided the Report was a -- based on accurate

3     set of input data and it was a credible Report, in

4     terms of the projection of what might happen, then I

5     would expect that to be the case.  Now, I don't -- I

6     don't know whether it was or it wasn't.

7     Q.    (By Mr. Godwin) Well, if you were to learn

8     here that Mr. Walz testified in his deposition when I

9     deposed him, that once Mr. Gagliano told him that, I

10    asked him, "Would you have any reason to disagree that

11    there would be a severe gas flow problem," he said

12    "No."

13          Does that help add to further you say if it's

14    a credible Report and Mr. Walz said that it was --

15    A.    M-h'm.

16    Q.    -- would that give you some reason for concern

17    about the decision Mr. Walz participated in --

18    A.    Well --

19    Q.    -- to allow -- excuse me -- to allow only six

20    centralizers to be run?

21          MR. WEBB:  Objection to the form of the

22    question.

23          MR. GODFREY:  Objection, form.

24    Q.    (By Mr. Godwin) Would it, sir?

25    A.    I think I would have expected him to at least

PURSUANT TO CONFIDENTIALITY ORDER

1    understand that the -- what the Report said.

2        Q.   Okay, sir.  And why Mr. Gagliano was making

3    the recommendation that he was recommending, would you

4    expect him to also look into that; that is, Mr. Walz,

5    your BP Engineer?

6                MR. WEBB:  Objection, form.

7                MR. GODFREY:  Objection, form.

8        A.   I would.

9        Q.   (By Mr. Godwin) Thank you, sir.  Let me hand

10   you, if I can, please, a sen -- Tab 66 in the materials

11   that we passed out, there's a document that was

12   formerly marked as Exhibit 862, Dr. Hayward.  And

13   it's -- you spoke of it on Monday.  It's GP 48-02.

14   It's a "Hazard and Operability (HAZOP) Study."  And

15   it's from the BP Group Engineering Technical Practices.

16   You spoke of -- of this document on Monday.  And it has

17   been previously marked.

18           Have you read this document before, sir, or

19   all -- or any part of it?

20       A.   No.

21       Q.   Okay.  Are you familiar with this document or

22   any part of it?

23       A.   No.

24       Q.   It shows that the date of it is June 12th,

25   2008, in the upper right-hand corner, does it not?

634

1      A.    It does.

2      Q.    Okay.  And at that time, you were the CEO of

3  the BP, what, Group?

4      A.    I was.

5      Q.    Okay, sir.  Now, do you know -- are you

6  familiar with what is known as a HAZOP?

7      A.    I am.

8      Q.    Okay, sir.

9      A.    In -- in a -- in a --

10     Q.    Broad sense?

11     A.    -- broad sense, yes.

12     Q.    I understand, sir.  I respect that.

13           Is it your understanding that one of the

14  reasons for a HAZOP is so as to include barriers to

15  prevent a blowout?

16     A.    It's -- one of the reasons of a HAZOP is --

17  is --

18     Q.    Okay.

19     A.    -- to provide barriers to prevent an accident.

20     Q.    An accident --

21     A.    I don't --

22     Q.    -- that could result in a blowout?

23     A.    -- I don't believe this is focused on

24  blowouts.

25     Q.    Okay, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 187

1    A.   It's a broad-based --

2    Q.   All right.

3    A.   -- description of how to preserve -- how to

4  undertake --

5    Q.   Okay.

6    A.   -- hazard operability studies.

7    Q.   Okay, sir.  And are you aware that BP Policy,

8  specifically Exhibit 862, requires that the HAZOP Study

9  be in a written form manner?

10   A.   Yes.

11   Q.   Okay, sir.  And are you aware that, on the

12 Macondo Well, that there was not a written HAZOP

13 prepared by BP or anyone in connection with the Macondo

14 Well?  Are you aware of that?

15   A.   I wasn't aware of that.

16   Q.   Okay.  Well, have you learned through any

17 source, from Mr. Mark Bly, or anybody else, that the

18 Macondo Well was considered to be, by BP's definition,

19 a critical well?

20        MR. GODFREY:  Objection as to form.

21   Q.   (By Mr. Godwin) Have you learned that, sir?

22   A.   I -- I don't -- no, I don't believe I have

23 heard it described as a critical well.  Critical in

24 what sense?

25   Q.   Well, critical well according to the

 1    deposition -- excuse me, the definition that -- that BP

 2    uses.  And -- and Mr. David Rich, who's a -- was

 3    formerly an Interim Vice President there for BP, he

 4    testified that a critical well is -- let me give you

 5    that -- he said that a critical well is any -- any

 6    deepwater well in the Gulf of Mexico, in his opinion.

 7         A.   Okay.  Well, I wasn't aware that Macondo was

 8    classified as a critical well.  Or that someone had

 9    identified any well in the deepwater Gulf of Mexico as

10    a critical well.  I -- I don't know whether that's an

11    official designation.

12         Q.   Okay.  You're familiar with the designation of

13    a well's Director at the Gulf --

14         A.   M-h'm.

15         Q.   -- of Mexico?

16         A.   Yes.

17         Q.   Do you know that -- do you know David Rich?

18         A.   No.

19         Q.   Okay.  Do you know Pat O'Bryan?

20         A.   I know Pat O'Bryan.

21         Q.   Do -- have you learned through any source that

22    Mr. Pat O'Bryan was involved there with the relief well

23    effort?

24         A.   I was -- I was aware of that, yes.

25         Q.   Have you learned through any source that his

637

1   replacement as a Vice President of BP in the Gulf of

2   Mexico --

3       A.   M-h'm.

4       Q.   -- that his replacement, while he was on the

5   relief well, was Mr. David Rich?

6       A.   No, I didn't know that.

7       Q.   I deposed Mr. Rich recently, and he testified

8   within the last several days, that while he was

9   operating as a -- as a Vice President in the place of

10  Pat O'Bryan, that he formed the opinion that the

11  Macondo Well was, in fact, a critical well.  Now --

12                MR. GODFREY:  Objection as to form.

13      Q.   (By Mr. Godwin) -- and I asked him, "What did

14  you mean by critical well?"

15           He says, "My opinion is, as a Well's Director

16  for BP and an Interim Vice President, is that any

17  deepwater well in the Gulf of Mexico."

18           Would you dis -- would you disagree with his

19  conclusion --

20      A.   I -- I --

21      Q.   -- in that regard?

22      A.   -- I'm not --

23                MR. WEBB:  Object -- object to the form

24  of the question.

25      A.   I'm not qualified to determine --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 190

638

1      Q.    (By Mr. Godwin) Okay.

2      A.    -- which wells are critical or not.  I'm not a

3   Drilling Engineer, so --

4      Q.    I understand, sir.  Okay.

5      A.    I presume that's based on some

6   technical assessment or --

7      Q.    It could --

8      A.    -- challenges of the well.  And I --

9      Q.    It could well be.

10     A.    And I --

11     Q.    But that's what he said.

12     A.    -- have no opinion with regard to that.

13     Q.    Now, my question to you, is:  Is -- with re --

14  are you aware that, on the Macondo Well, that over the

15  life of the well, that the Presidential Commission

16  Chief Counsel Report you spoke of quite extensively

17  today, reported that this well had lost 16,000 barrels

18  of mud during the drilling of the well?

19     A.    I wasn't aware of that.

20     Q.    Are you aware that the Chief Counsel Report,

21  Fred Bartlit's Report for the Presidential Commission,

22  which you said you had some familiarity with, that the

23  losses -- that the cost to BP for the losses of the mud

24  was in excess of $13 million in time and materials?

25  Are you aware of that?

```
1        A.    I was not --
2              MR. GODFREY:  Objection as to the form of
3   claiming the Presidential Commission when it was the
4   Chief Counsel's Report.
5              MR. GODWIN:  Okay.
6        Q.   (By Mr. Godwin) Now, with regard to -- going
7   back again to the HAZOP, are you aware that, in the
8   Exhibit 862, that requires that the HAZOP be in
9   writing, that if there's going to be any deviation from
10  that Policy, that that deviation would also have to be
11  in writing and approved?  Are you aware of that?
12       A.    I've -- if I was, I've forgotten it.
13       Q.    Okay.
14       A.    I probably was at the time, but I'm not --
15  I --
16       Q.    Okay.
17       A.    -- I can't recall that.
18       Q.    All right.  We deposed here yesterday, a lady
19  by the name of Gill -- Gillian Cowlam, C-o-w-l-a- --
20  l-a-m.  Do you know Ms. Cowlam?
21       A.    I don't.
22       Q.    She's a for -- or she is a BP employee based
23  in the U.K., and she's worked in -- in -- she --
24       A.    M-h'm.
25       Q.    -- worked on the investigation for about three
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 192

640

1   weeks over in the Houston area.

2          And she testified yesterday in her deposition,

3   that she thought that it would be almost virtually

4   impossible for a well like the Macondo, for there to be

5   an exception that the HAZOP Report not be reduced to

6   writing.  Were you aware of that?

7      A.   I wasn't aware --

8               MR. WEBB:  Objection to form.

9      A.   -- of it and I clearly -- I have none of the

10  technical knowledge and understanding --

11     Q.   (By Mr. Godwin) Okay.

12     A.   -- that she can have to make that judgment.

13     Q.   Okay.  Well, with regard to a HAZOP as you

14  understand it, and you said that you were aware of a

15  HAZOP, you have not read Exhibit 862, but you know what

16  a HAZOP is, within the confines of BP.

17     A.   (Nodding.)

18     Q.   Are you aware of any incident -- instant --

19  instance when the HAZOPs can be changed or modified

20  without the change being reduced to writing?

21               MR. GODFREY:  Objection --

22     A.   Well, I --

23               MR. GODFREY:  -- as to form.

24     A.   -- I believe that -- and I haven't read

25  this --

1    Q.   (By Mr. Godwin) Yes, sir.

2    A.   -- but I think you said, and I don't have any

3  reason to disagree with you, that in here it says if

4  you want to change the HAZOP, you need to achieve

5  dispensation, you have to do it in writing.

6    Q.   Yes, sir, it does that.

7    A.   Where -- where does it say that?  I'm sure

8  it's true.

9    Q.   Let's see here.  Let's look at -- is terms of

10  the "in writing" part of it, you can look at pa --

11  what's number -- Bates No. 7797.

12    A.   Okay.

13    Q.   If you see there where it says -- talks about,

14  under e., "A HAZOP report" shall include the following

15  sections," and it talks about all others.  And then

16  there's other places in here that I'm not going to take

17  the time to find it, talk about if there's going to be

18  any changes or amendments, they must be in writing, as

19  well.

20        But that is a part of a HAZOP, and that is

21  what Ms. Cowlam testified to, as well.

22        Now, my question to you, sir, is -- is:  Would

23  it surprise you -- or does it surprise you to learn

24  here today, that with a -- that with a well that was

25  almost three and a half miles below the seabed, would

 1  it surprise you that there was not a written HAZOP

 2  prepared for the Macondo Well?

 3           MR. WEBB:  Objection, form.

 4           MR. GODFREY:  Objection as to form.

 5  Q.   (By Mr. Godwin) In the face of Exhibit 862,

 6  which required that it be in writing?

 7           MR. WEBB:  Objection, form.

 8           MR. GODFREY:  Same objection.

 9  Q.   (By Mr. Godwin) Would that surprise you, sir?

10  A.   I don't -- I honestly don't feel that I'm

11  qualified to express surprise or otherwise --

12  Q.   Well --

13  A.   -- because --

14  Q.   -- as -- I'm sorry, sir.  Have you finished?

15  A.   I have.

16  Q.   As -- as the former CEO of BP, would you

17  expect that the policies and the procedures pertaining

18  to a HAZOP, would you expect them to be performed by --

19  A.   I would.

20  Q.   -- and followed by all employees of BP?

21  A.   I would.

22  Q.   Okay.  And if the -- if the HAZOP document,

23  which is marked 862, required that it be in writing,

24  you would expect that that be done in accordance with

25  the terms of the document for each well that it would

1   be associated with, would you not?

2      A.    I would --

3             MR. GODFREY:   Objection to form.

4             THE WITNESS:   Sorry.

5      A.    I -- I would, and I'd like to -- I -- I would

6   like to understand why it was not done in this case if,

7   indeed, it was not done.

8      Q.    (By Mr. Godwin) And if you were the CEO today,

9   and you learned, as you've learned here, that

10  Ms. Cowlam said that it was not -- that it was not

11  reduced to writing, that is, a HAZOP, if you learned

12  that, would you want to go back and check with someone

13  to find out why on the Macondo Well we had no written

14  HAZOP plan, would you --

15     A.    I would like to understand --

16     Q.    -- would you expect to do that?

17     A.    I would like to understand the full context of

18  what did and did not go on with respect to the HAZOP.

19     Q.    Okay.

20     A.    Although I don't feel I --

21     Q.    Mister --

22     A.    -- have a basis today.

23     Q.    I understand, sir, and I respect that.

24  Mr. DeFranco also testified in his deposition --

25     A.    Who is Mr. DeFranco again, sorry?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.    -- Sam DeFranco of BP, Process Safety

2    Engineer.  He testified sometime ago in this

3    litigation.

4    A.    He -- he was a member of the Bly Team, or what

5    was -- what was his --

6    Q.    He was a member -- there was a -- there were

7    different members of the Bly Team, but only one aspect

8    of the Bly Team dealing with certain parts of it, it

9    was a team that was made up of Ms. Gillian Cowlam.  She

10   testified yesterday.

11   A.    M-h'm.

12   Q.    Mr. DeFranco.

13   A.    Okay.

14   Q.    And there was a third member of that team.

15   A.    Okay.

16   Q.    And there were other member -- members of

17   different parts --

18   A.    M-h'm.

19   Q.    -- of the team --

20   A.    M-h'm.

21   Q.    -- that Mr. Bly put together.  And

22   Mr. DeFranco, he also testified in his deposition that

23   he was unaware that there was a written HAZOP plan that

24   was done on the Macondo Well, and that he had looked

25   and could not find one, had asked about it, and there

645

 1   was no -- not one prepared, to his knowledge.

 2        Now, having heard that now from me, where it's

 3   been testified by two members of the Bly Team that

 4   there was not a HAZOP plan that was in writing pursuant

 5   to Exhibit 862, do I understand you to say that that

 6   would concern you, as -- as the CEO of BP, and you

 7   would want to look into it?

 8        A.   I would cert --

 9             MR. WEBB:  Objection -- objection to the

10   form of the question.

11             MR. GODFREY:  Objection, form.

12        Q.   (By Mr. Godwin) Go ahead, sir.

13        A.   I would certainly like to understand fully the

14   situation surrounding the presence or absence of the

15   HAZOP, the basis of why the decision was taken, if it

16   was taken, not to do one, and what the grounds for it

17   were.

18        Q.   Okay, sir.  And -- and do you -- are you

19   aware, sir, that with regard to the HAZOP plan, that

20   that would have been, pursuant to Exhibit 862, the

21   responsibility of the BP Operation Leader, Mr. Pat

22   O'Bryan, to have prepared that report -- that plan or

23   had it done under his direction, are you aware of that?

24        A.   I wasn't --

25             MR. GODFREY:  Objection as to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

646

1      A.    I was not aware of who was deemed to be the

2   accountable person with respect to a HAZOP study that

3   may or may not have been done on the Macondo Well.

4      Q.    (By Mr. Godwin) Well, Mr. DeFranco testified

5   that the person -- the position -- it changes with

6   different wells, if you will, but the position of the

7   person doing the HAZOP written document would have been

8   the BP Operation Leader, who on the Macondo Well was

9   Mr. Pat O'Bryan.

10     A.    Well, I have no basis to disagree with

11  Mr. DeFranco's testimony.

12     Q.    Okay, sir.  And if you were still the CEO and

13  you were to learn that, in fact, there was no written

14  report prepared by Mr. Pat O'Bryan, as the BP Operation

15  Leader, or anyone on -- on his behalf and his

16  direction, would you want either him or Mr. Andy

17  Ingalls to give you some explanation why that did not

18  occur?

19     A.    I would like to und --

20            MR. WEBB:  Objection, form.

21            MR. GODWIN:  May the witness finish?

22            MR. WEBB:  Well, no.  I -- I don't have

23  time to get my objection in because --

24            THE WITNESS:  Sorry.

25            MR. WEBB:  -- the form of the question

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 199

1   was improper.  He now can answer the question.

2                MR. GODWIN:  Okay.  Well, the form of the

3   question was not improper, but you made your objection.

4       Q.   (By Mr. Godwin) Will you give your answer,

5   please, sir?

6                MR. GODFREY:  I join the objection to the

7   improper question.

8       Q.   (By Mr. Godwin) Go ahead, sir.

9       A.   I was -- I would certainly want to understand

10  the basis on which the decisions were made around the

11  HAZOP -- HAZOP Operability Report.

12      Q.   And -- and you would really want to understand

13  why it was not reduced to writing, would you not, sir?

14      A.   I would like to understand the full

15  circumstances of the decisions around this.

16      Q.   Thank you, sir.  Now, with regard to the

17  negative test that was performed --

18      A.   Yes.

19      Q.   -- did you learn, from talking to Mr. Bly and

20  reading his Report, that he and others on his team

21  formed the opinion that BP had misinterpreted the

22  negative test?

23      A.   No, I -- from the Report and from the

24  discussion we had, I -- I learned that the negative

25  test was misinterpreted by three people:  the

648

1    Transocean Toolpusher, the Transocean Driller, and the

2    BP Well Site Leader.

3        Q.   Okay.  So what you're --

4             MR. ROBERTS:  Objection, form.

5        Q.   (By Mr. Godwin) -- you're stating then that in

6    terms of the negative test, that it was interpreted

7    by -- your understanding is by BP and also by TO?

8        A.   By TO and by BP, yeah.

9        Q.   Okay.  And is your understanding that Mr. Bly

10   and his Investigative Team formed the opinion that TO

11   and BP had misinterpreted the test?

12       A.   That's correct.

13       Q.   Did you learn, from talking to Mr. Bly or

14   reading his Report, that, in fact, there were two

15   negative tests that were performed?

16       A.   I did, at the -- at the insistence of the BP

17   Well Site Leader, who was not satisfied with the

18   procedure that had been followed for the first

19   negative --

20       Q.   Was that Mister --

21       A.   -- pressure test.

22       Q.   Was that Mr. Don Vidrine, or was that Mr. Bob

23   Kaluza that made that decision?

24       A.   I -- I -- I don't know.

25       Q.   And it was one --

649

1    A.   I can't recall.

2    Q.   Were you aware that there were two Well Site

3  Leaders there --

4    A.   I was.

5    Q.   -- for BP on the rig?

6    A.   I was.

7    Q.   Okay.  And your understanding is the second

8  test was -- was requested by BP's Well Site Leader, one

9  of those two gentlemen?

10   A.   That's correct.

11   Q.   Because he was not satisfied with the

12  procedure that was use -- being used in the first one?

13   A.   That's my understanding.

14   Q.   Okay.

15   A.   Based on the Bly Report.

16   Q.   I understand.  But in talking to Mr. Bly?

17   A.   Yeah.  In -- in essence, based on what's in

18  the Report.

19   Q.   Okay.  Do you have familiarity with what a

20  negative test is performed for --

21   A.   I cert --

22   Q.   -- on a deepwater well?

23   A.   I certainly didn't, ahead of this accident.

24   Q.   Do you now?

25   A.   And I suspect no one else in the room did.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 202

1    Q.   Okay.  Do you know, sir?

2    A.   I -- I have a layman's knowledge now of what a

3  negative pressure test is, and -- and how you -- some

4  idea as to how it's conducted, but I certainly couldn't

5  conduct one, nor could I interpret the results of one.

6    Q.   Had -- and the Bly Report speaks to a negative

7  test, and it states that a -- and words to this effect:

8  That a properly conducted interpreted negative test

9  would have eliminated or mitigated the consequences of

10 the cement job that failed to isolate hydrocarbons.

11        In terms of your reading of the Bly Report,

12 did you understand that -- that if the negative test

13 had been properly interpreted, that any consequences

14 associated with an unsuccessful cement job could have

15 been determined?

16        MR. GODFREY:  Objection as to form.

17   Q.   (By Mr. Godwin) Did you -- did you understand

18 that from Mr. Bly?

19   A.   I --

20        MR. GODFREY:  Same objection.

21   A.   I think there were many things that went on in

22 the rig that could have mitigated the effects of what

23 was clearly an unsuccessful cement job.  Unfortunately,

24 none of them did.

25   Q.   (By Mr. Godwin) Okay.  And I'm talking about

1    right now the negative test.

2        A.    (Nodding.)

3        Q.    And in terms of your speaking with Mr. Bly,

4    did he tell you that it was his belief that if the

5    negative test had been properly interpreted, one or

6    both of them, if they had been properly interpreted,

7    that that would have eliminated or mitigated the

8    consequences of an unsuccessful cement job?

9              MR. GODFREY:  Objection as to form.

10       A.    It certainly could have mitigated the -- the

11   consequences of -- of a bad cement job.

12       Q.    (By Mr. Godwin) Of a bad cement job?

13       A.    M-h'm.

14       Q.    Okay.  And when you say that if they had

15   properly interpreted the negative test, that that could

16   have mitigated the consequences of a, as you define it,

17   bad cement job, what did you mean by that, sir, when

18   you just said it?

19       A.    If they had been taking the correct remedial

20   action, it may -- may -- it may not have been too late

21   to prevent flow into the well.

22       Q.    Okay, sir, which could have ultimately

23   prevented the blowout?

24       A.    Exactly.

25       Q.    Thank you, sir.  Now --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 204

652

1          THE COURT REPORTER:  Three minutes.

2          MR. GODWIN:  Three minutes, okay.

3     Q.   (By Mr. Godwin) When you -- I want to close on

4  this point before we take our break.  When you said,

5  "They could have then taken the proper remedial work or

6  efforts or -- or moves," if you will, tell us, if you

7  will, briefly, what you meant by that.

8     A.   Actions to control the flow of hydrocarbons

9  into the wellbore.  Exactly what they would have done,

10 I'm not certain, because I'm not a Drilling Engineer,

11 but I'm certain that they would have taken some action.

12    Q.   Would one of those things have been the

13 performance of a cement bond log?

14          MR. WEBB:  Objection, form.

15    A.   I think that's unlikely at that point in time.

16    Q.   (By Mr. Godwin) Okay.

17    A.   I assume what they would have wanted to do is

18 to control the well.

19    Q.   Want to control the well, would that mean shut

20 it in?

21    A.   Probably shut it in, yes.

22    Q.   So that nothing further could go on, so that

23 no hydrocarbons could be allowed to escape to the

24 surface?

25    A.   Correct.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 205

1    Q.   And by doing that, had the negative test been

2  properly interpreted, proper remedial efforts could

3  have been taken, part of which would have been shutting

4  in of the well.  Had that occurred, we likely would not

5  be here today, would we, sir?

6               MR. WEBB:  Objection to the form of the

7  question.

8               MR. GODFREY:  Objection as to form of the

9  question.

10    Q.   (By Mr. Godwin) Had that occurred, we likely

11  would not be here today, would we, sir?

12               MR. WEBB:  Objection to the form of the

13  question.

14               MR. GODFREY:  Objection as to form of the

15  question.

16    A.   The same would be true --

17    Q.   (By Mr. Godwin) Would that -- just that

18  question.  All I'm asking is that question.

19    A.   The same would be true if the cement job had

20  been good, if the well control procedures had been

21  followed, if the correct actions had taken once the

22  well started flowing.  So as the --

23    Q.   So in terms --

24    A.   As the Bly Report very clearly stated, which

25  is the only basis I have to assess --

654

1    Q.    Yes, sir.

2    A.    -- the cause of this accident --

3    Q.    Right.

4    A.    -- the misinterpretation of the negative

5    pressure test was one of eight causes of the accident.

6    Q.    But -- but just --

7              MR. ROBERTS:  Objection, form.

8    Q.    (By Mr. Godwin) -- limiting it right now to

9    the negative test --

10    A.    Any -- any one of them could -- any one of

11    them could have prevented the accident.

12    Q.    Let's talk about the negative test.  You've

13    already said that if they properly interpreted, the

14    improper remedial efforts could have been taken that

15    could have pre -- that would have allowed for the

16    shut-in of the well, which would have -- would

17    precluded the existence of the blowout, would you agree

18    with that, sir?

19              MR. GODFREY:  Objection as to form.

20              MR. WEBB:  Objection, form.

21    Q.    (By Mr. Godwin) Would you agree with that,

22    sir?

23              MR. GODFREY:  Objection, form.

24              MR. WEBB:  Object to the form.

25    Q.    (By Mr. Godwin) Sir?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 207

655

1           MR. GODFREY:  Objection, form.

2           MR. WEBB:  Same objection.

3      Q.   (By Mr. Godwin) Did you agree with that, sir?

4           MR. GODFREY:  Objection, form.

5           MR. WEBB:  Objection, form.

6      Q.   (By Mr. Godwin) You did?

7      A.   Yes.

8      Q.   Thank you, sir.

9           MR. GODWIN:  We'll take a break.

10          THE VIDEOGRAPHER:  Off the record

11   at 11:24 a.m., ending Tape 14.

12          (Recess from 11:24 a.m. to 11:34 a.m.)

13          MR. GODWIN:  Ready, Rick?

14          MR. GODFREY:  Yes.

15          THE VIDEOGRAPHER:  All set?

16      On the record at 11:34 a.m., beginning Tape

17   15.

18      Q.   (By Mr. Godwin) Dr. Hayward, I thank you for

19   your time, sir.

20          MR. GODWIN:  Halliburton passes the

21   witness at this time.

22      And I appreciate your patience and the way

23   you've handled yourself in answering my questions.

24          THE WITNESS:  Thank you very much.

25          MR. GODWIN:  Thank you, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 208

1     THE WITNESS: Thank you very much.

2     MR. GODWIN: Thank you.

3     THE VIDEOGRAPHER: Off the record at

4 11:34 a.m., ending Tape 15.

5   (Proceedings on the stenographic record only.)

6     MS. HERTZ: As you know, Anadarko and

7 MOEX have historically had an hour and fifteen minutes

8 to conduct their examinations. As you also know, MOEX

9 has recently settled with BP. I believe that the

10 position -- MOEX attorneys are not here, the counsel --

11     THE COURT REPORTER: Hold it, hold it,

12 hold it, hold it.

13     MS. HERTZ: There -- there is -- there

14 are no coun -- there is nobody here representing MOEX.

15 I intend -- and -- and we have been repre -- Kathy

16 McCollum, who's in-house at MOEX, represented to Deb

17 Kuchler, who you know, that there was no problem with

18 the time that we could have if they weren't coming to

19 London. I have, based on the representation, prepared

20 to examine Mr. Hayward, Dr. Hayward, for an hour and

21 fifteen minutes.

22   The other point I would like to make is that,

23 you know, Anadarko, next to TO and BP, have as much

24 skin in this game as anybody. You know, we're possibly

25 liable for OPA damages, we've got Clean Water Act. And

1  so to try to relegate us to half of an hour and 15

2  minutes seems like it would be extraordinarily

3  prejudicial.  I have a good deal to explore with this

4  witness, and based on the Mitsui representation, I had

5  planned to take up a -- an hour and 15.

6            MR. GODFREY:  Let me state our position.

7       First, I'm not aware of the Mitsui

8  representation.  What I asked for today was to be put

9  on the record so that we could have a basis as to who

10 made it.  It's news to us.  I'm not going to say it

11 wasn't given, but I'd like to know who made it.

12      Second, I think that the assumption that

13 Anadarko has that they get all MOEX's time has not been

14 true in the events subsequent to the settlement.  I

15 know Anadarko -- that MOEX asked some questions the

16 other day at a deposition.

17      And third, if we want to talk about prejudice,

18 I'm relegated to half an hour, while my witness has,

19 you know, 16 and a half hours of hostile questioning

20 from every lawyer in the one -- room.  And I think it's

21 a fundamental due process issue to get Anadarko more

22 time and have me less time.

23      Now, fortunately, in this instance,

24 Weatherford has been gracious enough to save me its

25 time, unless they want to take it back for some reason

1    that comes up due to a unique issue, which I don't

2    anticipate.

3              But I want the representation on the record,

4    and if the Court thinks that that's appropriate that

5    they have the time, I don't think so, but I do not

6    think anyone should assume that because MOEX has

7    settled in part -- it still has skin in the game --

8    that Anadarko, therefore, gets twice the time that BP

9    gets, when BP is the one producing most of the

10   witnesses, most of the documents, and is undergoing

11   most of the discovery effort in this case.

12             MAGISTRATE SHUSHAN:  Let me ask counsel:

13   Is this one of the depositions that we reallocated time

14   on before we came over?

15             MR. GODFREY:  You gave --

16             MAGISTRATE SHUSHAN:  I just don't recall.

17             MR. GODFREY:  You gave additional time,

18   Your Honor.

19             MAGISTRATE SHUSHAN:  Right.

20             MR. GODFREY:  Yes.

21             MAGISTRATE SHUSHAN:  Exactly.  Did we

22   allocate time relative to Anadarko and MOEX?  We did

23   not.

24             MR. GODWIN:  I don't believe that's the

25   case.  There's an additional time limit for the PSC,

1  Your Honor.

2          MAGISTRATE SHUSHAN:  Right.

3          MR. GODWIN:  You left everything else

4  intact --

5          MAGISTRATE SHUSHAN:  Everything else --

6          MR. GODWIN:  -- the way it had --

7          MAGISTRATE SHUSHAN:  -- was intact.

8          MR. GODWIN:  That's right, Judge.

9          MAGISTRATE SHUSHAN:  But because of the

10  settlement, we did not reallocate the time like we did

11  on a couple of the others?

12          MR. GODWIN:  That's right.

13          MAGISTRATE SHUSHAN:  Okay.  All right.

14          MR. CUNNINGHAM:  As far as I understand.

15          MR. GODWIN:  That's correct, Your Honor.

16          MR. GODFREY:  That's -- that was my

17  understanding, Your Honor.

18          MAGISTRATE SHUSHAN:  Okay.  So we've not

19  reallocated.

20          MR. GODFREY:  That -- that would be news

21  to us, and that --

22          MAGISTRATE SHUSHAN:  And it's your

23  representation that the time has been ceded to you?

24          MS. HERTZ:  That's what I was told.

25          MAGISTRATE SHUSHAN:  And --

 1                  MS. HERTZ:  And that's the inception of

 2     the --

 3                  MAGISTRATE SHUSHAN:  -- it is my

 4     understanding that, by agreement, cessation of time has

 5     been agreed to, right?

 6                  MS. HERTZ:  Many times.

 7                  MAGISTRATE SHUSHAN:  Does anybody besides

 8     BP disagree with the ceding of time?  I'm sorry, but

 9     we're going to allow the ceding of time.

10                  MR. GODFREY:  Thank you, Your Honor.

11                  MAGISTRATE SHUSHAN:  Okay.

12              (Recess from 11:39 a.m. to 11:43 a.m.)

13                  THE VIDEOGRAPHER:  On the record at

14     11:43 a.m., beginning Tape 16.

15                        EXAMINATION

16     QUESTIONS BY MS. HERTZ:

17        Q.   Good morning, Dr. Hayward.

18        A.   Good morning.

19        Q.   My name is Diane Hertz.  I'm here with my

20     colleague, Robert Stillwell.  We represent Anadarko

21     Petroleum Corporation.  You understand that Ana -- and

22     I'm going to call them "Anadarko" for short.

23              You understand that Anadarko was a

24     nonoperating investor in the lease for the Macondo

25     Well?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 213

1       A.    I understand they're a nonoperating party.

2       Q.    Nonoperating party.

3             And before the blowout and explosion on

4   April 20th, 2010, did you personally ever speak with

5   anyone from Anadarko or any entity which you knew to be

6   affiliated with Anadarko regarding the Macondo Well?

7       A.    Not regarding the Macondo Well, no.

8       Q.    Okay.  To the best of your knowledge, no one

9   from Anadarko played a role in the design of the

10  Macondo Well, correct?

11      A.    I don't have any knowledge of that.

12      Q.    Okay.  Do you have any knowledge as to whether

13  or not Anadarko played a role in connection with the

14  operation of -- the operations at the Macondo Well?

15      A.    I don't have any detailed knowledge.

16      Q.    Do you have any general knowledge?

17      A.    I -- I believe that they were provided with

18  information as to how the operating was proceeding, but

19  that's the extent of my knowledge.

20      Q.    Thank you.

21            You mentioned you had two discussions with Jim

22  Hackett --

23      A.    That's correct.

24      Q.    -- the CEO of Anadarko?

25      A.    That's correct.

1  Q. And those were after April 20th, correct?

2  A. They were.

3  Q. And in connection with the relief efforts?

4  A. With -- in connection with the response.

5  Q. With the response.  Okay.

6    What role did Anadarko play in connection with

7 the -- the response efforts?

8  A. To -- to my knowledge, they provided some of

9 their people and some of their -- their Technicians,

10 Engineers --

11  Q. Okay.

12  A. -- to help with the response.

13  Q. So they were assisting?

14  A. They were assisting, yes.

15  Q. Are you aware of -- of any decisions that

16 Anadarko made with respect to the relief efforts or

17 leading the relief efforts in any way, or was it your

18 understanding they were simply assisting?

19  A. They were assisting.

20  Q. Okay.  Have you had any other communications

21 with Anadarko since April 20, 2010, other than those

22 two discussions with Jim Hackett?

23  A. I haven't.

24  Q. Thank you.

25    Go back to an old, familiar subject, the OMS.

PURSUANT TO CONFIDENTIALITY ORDER

663

1   Did you know in April of 2010, that the OMS had not

2   been fully implemented in the Gulf of Mexico?

3       A.   I -- yeah.  I believe I was aware that it had

4   not been fully implemented.  It was in the process of

5   being implemented as it was in other parts of BP.

6       Q.   But specifically with respect to the Gulf of

7   Mexico, that's your answer?

8       A.   Yes.

9       Q.   Okay.  When did you come to learn that?

10      A.   I would have been aware of it prior to the --

11  you know, in the course of doing my -- my job.

12      Q.   Okay.

13      A.   Because we had a -- as I've explained a number

14  of times through this deposition, the Group Operations

15  Risk Committee was looking at the progress of

16  implementation.

17      Q.   So you were getting reports as to where it was

18  implemented, where it was not yet implemented?

19      A.   And where it -- where it was entrained, so to

20  speak.

21      Q.   Okay.  Were there any parts of OMS, to your

22  knowledge, that were applicable in the Gulf of Mexico

23  in April of 2010?

24      A.   That were applicable?  It was all applicable.

25  I'm --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 216

664

1     Q.   That were implemented then?

2     A.   I'm -- I'm not aware of the precise status on

3  that date of the implementation.

4     Q.   Okay.  Now, I want to read you something from

5  BP Magazine, Issue 3, 2006, and it's a statement made

6  by -- you're welcome to look at it if you want.  It's

7  Tab 1, but you don't need to.  It's a statement that

8  John Mogford made in an article entitled, "Safety, THE

9  NUMBER ONE PRIORITY."

10          Let me ask you first:  Who is John Mogford?

11     A.   He was the Head of Group Operations -- Group

12  Safety and Operations prior to Mark Bly.

13     Q.   Okay.  All right.  On page -- the numbered

14  Page 13 of this article, he's talking about OMS, and he

15  says:  "It is about" -- and he means -- he's discussing

16  OMS:  "It is about how we make our operations people

17  understand more of the context, increase their

18  awareness of inherent risk, empower them to continually

19  improve what they do, and enable them to build their

20  learning into the system for future use."

21          Do you agree with that --

22     A.   I do.

23     Q.   -- description of OMS?

24     A.   I do.

25     Q.   Okay.  And in the same magazine on, let's see,

1  numbered Page 19, Mr. Mogford also says at the top

2  right corner:  "Whatever we say in the centre, if it

3  doesn't help people who are conducting hazardous

4  activities day-to-day in our plants, we have failed and

5  have only a management piece of paper."

6         And, again, he's referring to the OMS.  Do you

7  agree with that statement?

8     A.   I do.

9     Q.   Okay.  Thank you.

10        Now, you said on Monday that although --

11  although OMS was not rolled out across the entire

12  company, that you said, quote, "That's not to say there

13  wasn't a Process Safety system in place before OMS.

14  OMS was designed to bring all our Process Safety

15  systems to a common, consistent standard."

16        Do you remember that testimony?

17    A.   M-h'm.  Yes.

18    Q.   Okay.  So I take it that it's your position,

19  then, that there were, in fact, BP Process Safety

20  systems and procedures applicable to the Gulf of

21  Mexico -- implemented and applicable to the Gulf of

22  Mexico on April 20th, 2010?

23    A.   Correct.

24    Q.   And that you believed that those were designed

25  to mitigate against major accidents or -- such as the

1   DEEPWATER HORIZON?

2       A.   That's correct.

3       Q.   Okay.  And these were BP Process Safety

4   systems, correct?

5       A.   The BP Process Safety systems are in the

6   matter of the drilling operation.  They were systems

7   and processes designed by Transocean, which BP had

8   oversight of.

9       Q.   Okay.  So is it -- is it your position, then,

10  that BP had none of its own safety processes in place

11  in April 2010?

12              MR. GODFREY:   Objection as to form.

13      A.   It -- it had many of its own -- a -- a

14  complete suite of Process Safety systems in place in

15  April 2010.  The point I was making is that the systems

16  and processes on the rig were Transocean systems and

17  processes, which were required to be consistent and

18  verified by BP.

19      Q.   (By Ms. Hertz) Okay.  So just so I understand,

20  are you -- are you saying that BP -- the BP processes

21  and systems didn't apply on the Transocean rig, or they

22  applied in conjunction with Transocean processes?

23      A.   They applied in conjunction with.

24      Q.   So they were fully applicable to the DEEPWATER

25  HORIZON?

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z

1    A.   Correct.

2    Q.   You also testified on Monday that the

3  identification of a blowout was the sort of accident

4  that was, quote, "part of the Group wide risk

5  assessment," and that such risk was, quote, "believed

6  to have been mitigated by the things we had in place"?

7    A.   That's correct.

8    Q.   Do you recall that?

9    A.   (Nodding.)

10    Q.   Okay.  And when you were asked by Mr. Sterbcow

11  what those things were in place, you stated you didn't

12  recall discussing that with anybody in detail, but that

13  one such thing that would have mitigated it would have

14  been a blow -- a functioning blowout preventer.

15        Do you remember that?

16    A.   Correct.

17    Q.   Okay.  What other things in place were you

18  talking about, other than the blowout preventer?

19    A.   Effective well control systems --

20    Q.   Okay.

21    A.   -- as an example.

22    Q.   Okay.  And what is an effective well control

23  system?

24    A.   It is a set of procedures that, if implemented

25  when a well begins to flow, as I -- as I understand it

1   because I'm not a driller, but -- and I'm going to give

2   you the -- my layman's version as to what a well

3   control system is.  It's a system of measurement and

4   monitoring to determine the state of the well, and it's

5   a system of interventions to be taken in the event that

6   a well starts flowing.

7       Q.   And, again, the effective well control system,

8   is that something that is both part TO's and part BP's?

9       A.   Yes, very largely Transocean, because it is a

10  Transocean Drilling Team that implement the well

11  control procedures.  There's no one from BP involved in

12  implementing well control procedures.

13          So what we have to do is determine that the

14  well control procedures that Transocean has and that

15  are documented as their well control procedures are

16  appropriate, and, of course, that they're -- they're

17  followed.

18      Q.   Okay.  But if there are well control

19  procedures and process procedures in place in the Gulf

20  of Mexico, BP procedures, those are applicable as well

21  as the TO procedures?

22      A.   Well, I don't want to be pedantic, but BP

23  doesn't have well control procedures to manage a well

24  that is beginning to flow, because we're not actually

25  drilling any of the wells that our contractors are.  So

1  what we want to verify is that those procedures are in

2  place, and they're deemed to be appropriate, and people

3  have been trained such that they know them, and when a

4  situation occurs, that they implement and follow them

5  to control the well.

6       Q.   Well, does BP have procedures regarding well

7  operations that apply to wells being drilled off

8  someone else's rig?

9            MR. GODFREY:  Objection as to form.

10      A.   Do we have procedures relating to -- sorry, I

11  don't understand the question.

12      Q.   (By Ms. Hertz) Related to BP drilling --

13      A.   Okay.

14      Q.   -- from a rig that's not owned by BP.

15            MR. GODFREY:  Objection as to form.

16      A.   Well, again, not to be -- we're not -- BP is

17  not conducting the drilling operation.

18      Q.   (By Ms. Hertz) Is BP is not the operator?

19      A.   BP is the operator, but we're not actually

20  physically conducting the operation.

21      Q.   Okay.  Well, I'm going to show you some

22  specific procedures because I want to understand --

23      A.   Yeah.  Sure.

24      Q.   -- how they relate to the drilling that was

25  going on in the Gulf of Mexico on a non-BP-owned rig.

670

1    A.   All right.

2    Q.   So --

3    A.   I will try and help you to the best I can.

4    Q.   Thank you.  I'll appreciate it.

5         MS. HERTZ:  Let's turn to Tab 2, please,

6  and we need to mark this as -- what is this going to

7  be?

8         THE COURT REPORTER:  6064.

9         MS. HERTZ:  Thank you.

10        (Exhibit No. 6064 marked.)

11   Q.   (By Ms. Hertz) Tab 2 is the "Gulf of Mexico

12  SPU Major Hazards Risk Management Policy," and have --

13  I just wanted to know first if you've ever seen this

14  document before.

15   A.   I haven't.

16   Q.   Okay.

17   A.   Not to my recollection.

18   Q.   All right.  On the first page of the document,

19  it says:  "SPA Integrity Management."

20        What do you understand the term "SPA" to mean

21  in BP's --

22   A.   Single point authority, I think.

23   Q.   -- the way that BP uses it?

24        Single point of authority?

25   A.   I think.

1    Q.    And what do you understand that to mean?

2    A.    That there's an account -- who has the

3  authority for this -- this document.

4    Q.    Okay.  And single point of authority is --

5  would mean the only person that has the authority for

6  whatever?

7    A.    The -- the person who has authority for this

8  document.

9    Q.    Okay.  Thank you.

10         If you would turn to Page Bates 551, please.

11   A.    (Complying.)

12   Q.    Okay.

13   A.    In the same tab, 55 -- right, yeah.  Sorry.

14  Sorry.

15   Q.    That's all right.

16   A.    Sorry.

17   Q.    I wanted to direct your attention to 1.2



1        And I'm going to stop there.

2        "Shall" is mandatory; is that right?

3            MR. GODFREY:  Objection as to form.

4    Q.  (By Ms. Hertz) As you understand it and

5  used -- as used in the BP document?

6    A.   Yeah, will -- "shall be achieved," an

7  expectation that they would be achieved.

8    Q.   All right.  But you understand "shall" to be a

9  requirement?

10            MR. GODFREY:  Object to form.

11    A.   Yeah, I think so, yes.

12    Q.  (By Ms. Hertz) Okay.

13    A.   Let me just --

14    Q.   All right.  Now a document like this from

15  the --

16    A.   Let me read this.

17        (Discussion off the record.)

18    A.   Yeah.  "Shall," will, I mean, it's --

19    Q.   It's mandatory, right?

20            MR. GODFREY:  Object to form.

21    A.    It doesn't actually say "are mandatory."  It

22  says "shall."  So we can have a debate about the

23  interpretation of "shall," but it said "shall," so I

24  would say --

25    Q.  (By Ms. Hertz) You would understand it as a

PURSUANT TO CONFIDENTIALITY ORDER

1   requirement?

2        A.   I would say -- I would use -- yeah, it --

3   it -- you would -- I would believe it implies a

4   requirement.

5        Q.   Thank you.  Okay.

6             And now with that context that, the -- the

7   purpose of this document, is it your understanding that

8   something -- that a policy such as Major Hazard Risk

9   Management Policy would apply to the drilling of a well

10  in the Gulf of Mexico from a rig that is -- where BP is

11  the operator but not the owner of the rig?

12       A.   I would expect that it would be -- sorry,

13  could you say again the question so I was half

14  reading --

15       Q.   Okay.  As in the deepwater --

16       A.   -- and half --

17       Q.   As --

18       A.   -- half reading the document and half

19  listening to you.

20       Q.   Okay.  As with the DEEPWATER HORIZON, BP's

21  drilling a well -- or BP's the operator on a rig owned

22  by Transocean, and what I'm wondering is:  Is this

23  procedure or policy applicable to that kind of

24  situation?

25       A.   Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          MR. GODFREY:  Objection as to form.

 2     A.   I would expect that it would be.

 3     Q.   Okay.  Thank you.

 4          All right.  If you'd turn to Bates 553,

 5     please.

 6          One more quick question on the first page,

 7     because I just didn't establish this.  I know you

 8     haven't seen it, but it indicates an issue date of

 9     September 1, 2007, correct?

10     A.   That's correct.

11     Q.   Okay.  So unless it had been revised, would it

12     be your understanding, just from looking at this

13     document, that it was in effect as of September 1, '07?

14     Is that how you would interpret that?

15     A.   I think that's how I would interpret it.

16     Q.   Okay.  So Bates 553, I wanted to look at

17     Section 2.2 called "Hazard Identification, Risk

18     Assessment and Prioritization."  Do you see that?

19     A.   I do.

20     Q.   Okay.  The first line under that heading

21     reads:  "Hazard identification and risk assessment is

22     an evergreen process through a Facility's life-cycle."

23          Do you have an understanding as to what an

24     "evergreen process" is?

25     A.   Continuous.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 227

1    Q.   Continuous.  And "throughout a facility's

2  life-cycle," how would you interpret that to apply to

3  the drilling of a deepwater well?

4    A.   I don't think that terminology is really

5  focused on a deepwater well, to be honest with you.

6  It's focused on a production facility.  I think as

7  applied to a deepwater well -- I'm -- I'm not honestly

8  certain how you would apply that terminology to a

9  deepwater well, actually.  I don't know whether that

10  would mean that the identification risk assessment was

11  continuous through the course of the drilling --

12  drilling operation.  I think that would be a reasonable

13  interpretation.

14    Q.   That would be a reasonable interpretation.

15  You certainly wouldn't stop, want to stop hazard

16  identification and risk assessment in the middle of a

17  drilling procedure, would you?

18    A.   I agree.

19    Q.   Okay.  And then again -- the next sentence



PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z

676

1        Now, again, with our understanding of the word

2   "shall," that appears to be a mandatory pro --

3   provision; is that correct?

4        A.    Yes.

5              MR. GODFREY:   Objection as to form.

6        Q.    (By Ms. Hertz) And the reason for a policy

7   such as this, to identify hazards and to conduct a

8   continual risk assessment, is to mitigate the risk of a

9   major hazard, correct?

10       A.    It's to manage and mitigate.

11       Q.    To manage and mitigate.   And it's extremely

12  important, right?

13       A.    It is.

14       Q.    Okay.   And failure to comply with this policy

15  could potentially lead to a catastrophic event,

16  couldn't it?

17             MR. GODFREY:   Object to the form.

18             MR. WEBB:   Object to the form.

19       A.    In some situations, that could be the case.

20       Q.    (By Ms. Hertz) Okay.   And the sentence that I

21  read, the second sentence, talks about the fact that

22  risk evaluation and hazard identification should be

23  updated throughout the facility's life cycle, or I

24  would translate that as drilling operations; is that

25  right?

1    A.   Well, it says "Facility's life-cycle," and as

2  I said, it is written with, I think, a specific thought

3  around, you know, a production facility.  So we have to

4  determine how it would and should have been translated

5  to a drilling operation, and I can't determine that

6  from this line, I'm afraid.  And I'm not aware of how

7  that translation takes place.

8    Q.   I understand.  But if, in fact, this policy

9  applies to deepwater drilling in the Gulf of Mexico,

10  then that would certainly mean that throughout the --

11    A.   It could apply.

12         Sorry.  I apologize.

13    Q.   Sorry?

14    A.   Sorry.  I apologize for --

15    Q.   That's okay.

16    A.   -- interrupting you.

17    Q.   If it, in fact, applies -- and we think it

18  does -- then we would -- then wouldn't you agree, then,

19  that this provision requires them to continually

20  identify hazards and risk assessments throughout the

21  drilling operations?

22              MR. GODFREY:  Object to the form.

23              MR. WEBB:  Objection to the form.

24    A.   I agree that it certainly applies to drilling

25  operations and there should be ongoing assessment of

1   risk in a drilling operation.

2       Q.   (By Ms. Hertz) Okay.   Okay.   And the last line

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████

7           Does that appear to be mandatory language to

8   you?

9               MR. GODFREY:   Objection as to form.

10      A.   It is.   I'm just troubled by this referral

11  back to "Facility" and whether and how this -- this

12  sort of policy is then translated to a -- a mobile

13  drilling unit, drilling an exploration well.

14      Q.   (By Ms. Hertz) Well, I understand.   Do you --

15  do you have a familiarity with the term "Risk

16  Register"?

17      A.   Yes.

18      Q.   All right.   And what is that, to the best of

19  your understanding?

20      A.   It's documentation of the principal risks in

21  any operating business.

22      Q.   Okay.   And are risk registers to be part of

23  the evergreen process, meaning that they are to be

24  continually updated, or at least reviewed as the

25  operations are continuing to identify hazards and

 1   continue the risk assessment process?

 2       A.   I think there's an important distinction --

 3   again, I don't want to split hairs.  Okay?  But there

 4   is an important distinction to -- to separate between a

 5   Risk Register --

 6       Q.   M-h'm.

 7       A.   -- which is a periodic assessment of risk, and

 8   the management of risk on an ongoing operation minute

 9   by minute, hour by hour.

10       Q.   M-h'm.

11       A.   So you would not look at a Risk Register to

12   see it being updated every minute --

13       Q.   M-h'm.

14       A.   -- because of the way in which an operation

15   was developing.

16       Q.   It's not like Facebook?

17       A.   It's not Facebook.  It wouldn't be very

18   helpful.

19       Q.   All right.  But you would anticipate that a

20   Well Team would consider and review a Risk Register

21   throughout the operation?

22       A.   I would expect the Well Team to be reviewing

23   and managing risks on a -- on an ongoing basis.  I'm

24   not certain how that relates to, you know, the

25   establishment of a Risk Register.  The Risk Register

680

1  concept is much more about a sort of periodic

2  assessment of risk at a more macro level.

3       So the Risk Register for the Gulf of Mexico is

4  a risk of a deepwater well blowing out and the risk of

5  pipeline failing, the risk of a hurricane impact, the

6  risk of -- sort of macro level risks.

7    Q.  So you don't --

8    A.  It's not a -- it's not a -- I don't believe

9  it's -- a Risk Register is a tool that is used in the

10  hour to hour, minute to minute oversight of an

11  operation.

12    Q.  Okay.  Do you consider it to be static; once

13  it's created, it should --

14    A.  No, it's not static.

15    Q.  -- just been put aside?

16    A.  It's clearly not static.  It's something that

17  should be updated on a regular basis.

18    Q.  Okay.  Just not hour to hour, minute by

19  minute, but it is certainly something that should be

20  updated and risks should be documented; is that

21  correct?

22    A.  Correct.

23    Q.  Okay.

24       MR. GODFREY:  Object to the form -- I'll

25  withdraw that.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                    THE WITNESS:  I apologize.
 2                    MR. GODFREY:  No.  I was -- I was
 3    withdrawing my objection.
 4           (Laughter.)
 5                    MR. GODFREY:  You're very quick, but I
 6    decided I was going to withdraw.
 7       Q.   (By Ms. Hertz) Now, again, back up to the
 8    second paragraph, it talks about a Hazard and Risk
 9    Evaluation Plan, that "Every Facility shall have," and
10    I understand that you're not quite sure how "Facility"
11    translates to deepwater drilling.  But my question is:
12    If you were told while you were the CEO of BP that the
13    DEEPWATER HORIZON Wells Team did not have a Hazard and
14    Risk Evaluation Plan, what would your ex -- what would
15    your reaction be?
16       A.   I would want to know why --
17                    MR. GODFREY:  Objection as to form.
18       Q.   (By Ms. Hertz) You'd want to know why,
19    wouldn't you?
20           And would you want to know if there was a
21    dispensation to -- that -- that allowed them not to
22    have one?
23       A.   I'd want to know why they didn't have one.
24       Q.   Okay.  Would you have expected them to have
25    one?
```

682

1      A.    I think it's reasonable to expect that there

2    should be one.

3      Q.    Okay.

4      A.    And I'd want to understand why there was not

5    one.

6      Q.    Okay.  You would have looked into it and

7    investigated it?

8      A.    I would have someone look into it and

9    investigate it.

10     Q.    Okay.  All right.  Let's turn to Tab 3,

11   please, which is previously been marked as Exhibit 910.

12   And this is a PowerPoint on the Major Hazard and Risk

13   Management Policy Leadership Action.

14         Have you ever seen this document before,

15   Dr. Hayward?

16     A.    I have not.

17     Q.    All right.  Could you turn to Bates 983 for

18   me, please.

19     A.    (Complying.)

20     Q.    Have you ever seen this slide?

21     A.    No.

22     Q.    No?  Well, this appears to be a -- a

23   presentation or a slide deck internally created at BP,

24   and page bearing Bates 983 is entitled "Risk

25   Ownership."  Do you see that?

1      A.   I do.

2      Q.   And it says:  "Who Owns The Risk?"  And at the

3  bottom of the page, it says:  "Ultimately it is the BP

4  Wells Team."  Do you agree with that statement?

5      A.   Well, I --

6           MR. GODFREY:  Object to the form.

7      A.   -- I think it's very difficult to make any

8  sensible comment.  And, again, I'm not trying to be

9  cute, but, you know, this is a view graph.  I've got no

10  idea what the context is.  It's got three lines on it,

11  and it says "Ultimately it is the BP Wells Team," but

12  I -- we don't know which risk they're talking about.

13      Q.   Well, they're talking -- it says:  "The key

14  drivers associated with management of risks around

15  drilling, completions and intervention" actions.  So

16  around those intervention actions, who owns the risk?

17      A.   Well, it says here --

18           MR. GODFREY:  Object to form.

19      A.   -- it ultimately is the BP Wells Team.

20      Q.   Do you have any reason to disagree with that?

21      A.   I don't have any reason to disagree with it

22  with -- without -- other than I have no idea what

23  context they're talking about --

24      Q.   Okay.

25      A.   -- and exactly what risk they're talking

PURSUANT TO CONFIDENTIALITY ORDER

684

1   about.

2           There are many risks involved in drilling,

3   completions, and intervention activities.  Some of

4   which it is right for the BP Wells Team to own and some

5   of which it is right for others to own.

6       Q.   Okay.  Will you turn to Bates 989, please.

7           All right.  If you'll look in the box at the

8   top of the page, it's entitled "GoM SPU Major Hazards

9   Risk Management System," and it -- below is discussing

10  the Gulf of Mexico SPU Major Hazards and Risk

11  Management Policy, which is the document that we just

12  looked at and marked as the previous exhibit, which it

13  says came into effect on the 1st of September 2007.

14          Below that, it says:  "The policy has five

15  components shown in the boxes with a goal of achieving"

16  continuous -- "Continuous Risk Reduction."

17          And in the five boxes, one of them is

18  "Implementation & Operation."  Do you see that?

19      A.   M-h'm.

20      Q.   Okay.  And then at the bottom of the page, it

21  says, quote, "Implementation and Operation addresses

22  the practical development of plans to implement the

23  decisions taken to reduce risks.  The Operation

24  component involves verifying that the hazard identified

25  are fully accounted for in the emergency response plans

685

 1   and that people who work on the facilities are aware of

 2   the hazards and controls in place to manage them."  Do

 3   you see that?

 4        A.   I do.

 5        Q.   Okay.  And above -- again, back to the box,

 6   there's a section that says "Tools" for "Hazard

 7   Identification, Risk Assessment & Prioritization."  Do

 8   you see that?

 9        A.   I do.

10        Q.   Okay.  And you've already talked about -- I

11   believe you identified a "HAZID" and a "HAZOP"?

12        A.   Yes.

13        Q.   A "HAZOP" is Hazard Operations.  "HAZID" is

14   a --

15        A.   Hazard Identification.

16        Q.   -- Hazard Identification.  "LOPA" is a Layer

17   Of Protection?

18        A.   Correct.

19        Q.   Do you know what a "What If" is?

20        A.   I don't actually, no.

21        Q.   Do you know what a "QRA" is?

22        A.   Quantified Risk Assessment.

23        Q.   Okay.  Quantified Risk Assessment.  All right.

24   And the other two, I believe, are probably

25   self-explanatory.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Let me ask you something:  Are those

2   documents, or those tools, as you understand them, are

3   each of those a written document?

4               MR. GODFREY:  Objection as to form.

5       A.   HAZID, HAZOP, and Layers Of Protection

6   certainly is.  I'm -- I'm not certain about What If.

7       Q.   (By Ms. Hertz) Okay.

8       A.   Quantified Risk Assessment is a written

9   document.

10      Q.   All right.  And would you presume that Fire &

11  Smoke Studies and Blast Studies are also written --

12      A.   Yes.

13      Q.   -- assessments?

14      A.   Yes, I would.

15      Q.   Okay.  And what is the purpose of documenting

16  perceived risks?

17      A.   Such that they can be managed and mitigated.

18      Q.   Thank you.  And when a risk is identified in

19  these documents as it says in here, you would agree,

20  right, that it's imperative that the people who work on

21  the facilities are made aware of the hazards and

22  controls in place to manage them?

23      A.   That's correct.

24      Q.   Okay.  So when risks -- risks are identified,

25  the Well Site Leaders and others on the rig who are in

687

1    charge of operations must be told about the risks so

2    that they can be aware of the hazards and be in a

3    position to manage them, correct?

4         A.   Well --

5              MR. GODFREY:   Objection as to form.

6         A.   -- the way it would normally work is that they

7    would be identifying the risk.   There's not some sort

8    of higher authority sitting up somewhere identifying

9    risk.   The people who are most able to identify the

10   risk are those ones involved in managing it, so

11   documenting it and then ensuring that the right action

12   is taken is --

13        Q.   (By Ms. Hertz) But you're not just saying the

14   guys on the rig were identifying, were you?

15        A.   No, I'm -- but I'm also -- the -- there are

16   many people involved in risk identification in drilling

17   operation.

18        Q.   Right.

19        A.   Clearly the people on the rig are intimately

20   involved in risk identification.

21        Q.   M-h'm.

22        A.   The Well's Team who designed the well are

23   involved in risk identification.

24        Q.   M-h'm.   And mitigation, right?

25        A.   And, of course, mitigation.   And there may be

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 240

688

1   some higher generic concern about risk in a -- in a

2   drilling operation.

3       Q.   Okay.  So let me restate my question, or -- or

4   just sort of try to pinpoint that then.

5       A.   All right.

6       Q.   So where risks are identified by the Drilling

7   Team, the Well's Team Leader, or somebody like that,

8   it's important that those risks are communicated to the

9   folks on the rig, the Well Site Leaders and the others,

10  so that they're in a position to be aware, to look out

11  for, and to mitigate against those risks; is that

12  right?

13              MR. GODFREY:  Objection as to form.

14      A.   That is correct.

15      Q.   (By Ms. Hertz) Thank you.  All right.  Could

16  you turn to Tab 4, please.  See, we're moving quickly.

17      A.   That's good.  You may not take your hour

18  and 15 minutes.

19      Q.   Oh, no, no.

20      A.   That whole big debate will not --

21      Q.   No, no.

22      A.   -- have been necessary.

23      Q.   I'll need it all.  Sorry.

24           Okay.  Tab 4 is --

25              MS. HERTZ:  We need to mark this as a new

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 241

1    exhibit -- oh, 6065, please.

2            (Exhibit No. 6065 marked.)

3        Q.    (By Ms. Hertz) This document is entitled Gulf

4    of Mexico Drilling & Completions "Operating Plan/Local

5    OMS Manual."  And the authority for this document is

6    shown on the front page as Kevin Lacy, and the date of

7    this document is November 1, 2009.  Is that what you

8    read, as well?

9        A.    It is.

10       Q.    Okay.  Have you ever seen this document

11   before?

12       A.    I haven't, no.

13       Q.    All right.  Can you turn to Bates 452, please.

14   And we're back to your favorite subject, OMS.  And I'd

15   like to direct your attention to the fourth paragraph,

16   I think fourth letter -- fourth sentence that says,

17   quote:  "We use two main procedures for managing work

18   processes:  Beyond the Best Common Process, and Major

19   Project Common Process.  The" Gulf of Mexico "D&C Risk

20   Management Plan will bring our process into alignment

21   with OMS so that the risk is managed effectively and

22   consistently, in compliance with OMS requirements.  All

23   risks shall be recorded in and managed by the BP RAT."

24   Do you see that?

25       A.    I do.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 242

```
 1        Q.   And does that comport with your understanding
 2   of OMS?
 3        A.   Indeed, it does.
 4        Q.   Okay.  What is "Beyond the Best Common
 5   Process"?
 6        A.   It's a process designed to continuously
 7   improve the drilling operations in all dimensions, be
 8   it safety or -- or drilling performance.
 9        Q.   Okay.  Now, if there are requirements in
10   Beyond the Best Common Practice [sic], they're supposed
11   to be followed, correct?
12             MR. GODFREY:  Objection as to form.
13        Q.   (By Ms. Hertz) As opposed to recommendations
14   if there's --
15        A.   No.  Beyond the Best Common Process is a --
16   it's -- it's not mandatory --
17        Q.   It's not?
18        A.   -- in the sense that you're trying to imply.
19        Q.   Okay.
20        A.   It's not mandatory.
21        Q.   Okay.  All right.  The last sentence I read
22   is:  "All risks shall be recorded and managed by the BP
23   RAT."  Do you know what that is?
24        A.   I don't know what the BP RAT is, I have to
25   confess.
```

1    Q.   If I were to tell you it was a Risk Assessment

2  Tool, would that --

3    A.   Sounds --

4    Q.   -- refresh your recollation -- recollection?

5    A.   Sounds sensible, yes.

6    Q.   Great name, right?

7    A.   Great.

8    Q.   Okay.  And that appears to be a requirement as

9  well, right, all risks shall be included --

10    A.   M-h'm.

11    Q.   -- and managed by the --

12    A.   Yes.

13    Q.   -- BP RAT?

14    A.   Yes.

15    Q.   Okay.  And what is Major Project Common

16  Process?

17    A.   Again, it's the -- it's the -- a process used

18  to measure performance safety and -- and business

19  performance in the delivery of major projects, big

20  facilities, or things of that sort.

21    Q.   Okay.  And would you consider these two

22  documents to be the cornerstones of Process Safety

23  within BP prior to the implementation of OMS?

24    A.   Not really the cornerstones of Process Safety.

25  They're the cornerstones of improving performance, a

1    component of which is -- is safety, but they weren't

2    the cornerstones of Process Safety.

3        Q.    Okay.

4        A.    There were some other tools in place, such as

5    things like the control of work standard, the integrity

6    management standard, that are the cornerstones of

7    Process Safety.

8        Q.    Okay.  Can you turn to Tab 5, please.  And

9    this is a document called "Beyond the Best Common

10   Process."  This is Exhibit 6066.

11               MR. GODFREY:  What number, please?

12               MS. HERTZ:  6066.

13               MR. GODFREY:  Thank you.

14           (Exhibit No. 6066 marked.)

15       Q.    (By Ms. Hertz) And you've seen this document

16   before, I assume?

17       A.    I haven't.

18       Q.    Oh, you have not?

19       A.    I don't think so, no.

20       Q.    Is this the one you were just referring to?

21       A.     It's the one I was referring to, but I haven't

22   seen this document, no.

23       Q.    Oh, okay.  You just knew it existed?

24       A.    I knew it existed, yes, yes.

25       Q.    Okay.  The second page, Bates 309, indicates

693

1  that "Drilling & Completions - Beyond the Best Common

2  Process," dated June 2008.  Do you see that small print

3  in the bottom?

4      A.    Yes.

5      Q.    Okay.

6      A.    I do.

7      Q.    All right.  And Barbara Yilmaz you said was --

8      A.    Is the -- she's -- official title is the

9  Technical Vice President for Drilling and

10  Completions --

11      Q.    Okay.

12      A.    -- TVP, in essence, the functional Head of

13  Global Drilling.

14      Q.    Okay.  And if you just quickly look at her

15  letter on 309, "Dear Colleagues," and then she goes on,

16  she says that this is the third edition of this

17  handbook.  "Our mission in Drilling and Completions is

18  to" delivery -- "deliver industry leading wells that

19  maximize the recovery of BP's global asset base.

20  Beyond the Best remains a key component of the strategy

21  since its development in 2001."

22          So this is a document that had been in place

23  prior to -- not this particular document, let me back

24  up -- this Best Common Process Handbook had been in

25  place prior to Texas City, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 246

1     A.    Right.

2     Q.    And -- but this edition came out in '08, so

3  this postdates Texas City; is that right?

4     A.    This had nothing to do with a refinery.  This

5  is about how to drill wells more effectively on an

6  ongoing basis.

7     Q.    I understand, but this is post Texas City,

8  correct?

9     A.    Yes, yes, it is.

10    Q.    Okay.  If you'd look at Bates 315, please.

11 Now, you had mentioned that it wasn't your

12 understanding that this document was mandatory, but I'd

13 like to draw your attention to the second paragraph on

14 this page:  "Due to its extreme importance, its use is

15 mandatory," referring to this document, Beyond the Best

16 Common Process, "stressing rigour and consistency.

17 Common processes address both the design and execution

18 of well programmes through cross-discipline application

19 of four components."  Do you see that?

20    A.    I do.

21    Q.    So it was -- does that change your

22 understanding as to whether this document is, in fact,

23 mandatory or not?

24    A.    You know, I -- I have to confess, I --

25 certainly we had at the time eight common processes,

**PURSUANT TO CONFIDENTIALITY ORDER**

1  and certainly some of the others were not mandatory, so

2  obviously, what's written here suggests that this

3  document is mandatory.

4      Q.   Okay.  You don't have any reason to believe

5  it's not?

6      A.   No.

7      Q.   Okay.  In the last paragraph on that page, it

8  says:  "Since the conception of" Beyond the Best Common

9  Process "in 2000 we have learned new lessons and

10  identified better practices.  This updated publication

11  captures those lessons and best practices."  Do you see

12  that?

13      A.   I do.

14      Q.   Do you know if any of the lessons learned from

15  Texas City were in any way incorporated into this

16  document?

17      A.   I don't know.

18      Q.   Would you expect that they would have been?

19      A.   I think there were other processes that were

20  focused on Process Safety that the lessons from Texas

21  City were incorporated into.

22      Q.   And what would those have been?

23      A.   As I said, the Control of Work and Integrity

24  Management Standards.

25      Q.   Okay.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 248

1    A.   Which were the two key Process Safety tools to

2  improve Process Safety performance across the company.

3    Q.   And you consider Risk Management part of

4  Process Safety?

5    A.   I do.

6    Q.   So if this document contains a section -- and

7  we'll look at it -- called "Risk Management," then this

8  document will also inherently pertains to Process

9  Safety, right?

10    A.   In --

11        MR. GODFREY:   Objection as to form.

12    A.   Inasmuch as Risk Management is part of Process

13  Safety, that's correct.

14    Q.   (By Ms. Hertz) Okay.  And Risk Management is

15  not something that is necessarily different in concept

16  from a facility such as Texas City to deepwater

17  drilling, is it?

18        MR. GODFREY:   Objection as to form.

19    A.   Certainly, there are some risks that are

20  common, such as the containment of hydrocarbons.

21    Q.   (By Ms. Hertz) And there certainly were

22  lessons learned from Texas City that BP applied or

23  attempted to apply --

24    A.   Correct.

25    Q.   -- to deepwater drilling; is that right?

 1      A.    Correct.

 2      Q.    Okay.

 3      A.    Such as layers of protection analysis.

 4      Q.    Okay.

 5      A.    Which --

 6      Q.    And others, right?

 7      A.    And -- and, yeah, Integrity Management

 8  Standards and that sort of thing.

 9      Q.    Okay.  I'm going to ask you to jump, please,

10  to 361, Bates 361.

11                MR. GODFREY:  361?

12                MS. HERTZ:  Yes.

13                MR. GODFREY:  Thank you.

14      Q.    (By Ms. Hertz) And this is a page entitled

15  "Element 5 - Risk Management," and I'd like to draw

16  your attention to the bottom of that page under "Risk

17  Management Process."  It says, "The Risk Management

18  Process has four main, cyclical steps (identify,

19  assess, respond, control) the outputs of which are

20  recorded in a database known as a Risk Register.  The

21  cycle is not a once-per-well or even a once-per-stage-

22  gate process.  It is a continuous loop by which risks

23  are captured and worked throughout the well

24  life-cycle..."

25                And do you see that?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 250

```
1        A.    I do.

2        Q.    Does that comport with your understanding

3   that --

4        A.    It is --

5        Q.    -- of --

6        A.    -- it does.

7        Q.    -- let -- let me just finish my question for

8   the record --

9        A.    Sorry.

10       Q.    -- that's okay.

11             Does that comport with your understanding that

12  a Risk Register is, in fact, an evergreen --

13       A.    Yeah, a continuous --

14       Q.    -- process document, continuous document?

15       A.    Indeed.

16       Q.    And that risks need to be continually

17  identified --

18       A.    Assessed and managed.

19       Q.    Exactly.  Thank you.

20             Next page, under "Risk Management Roles and

21  Responsibilities," it says, "It is important that the

22  Project Manager set" his or her "expectations"

23  arouse -- "around" misk -- "risk management early,

24  clearly and concisely.  This is the primary purpose of

25  the Risk Management Plan.  Day-to-day responsibility
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 251

```
 1   (not accountability) for running the risk process may
 2   be delegated to a Risk Champion."
 3            So at least with respect to that paragraph, it
 4   does talk about day-to-day responsibility for risk
 5   process, doesn't it?
 6       A.   It does.
 7       Q.   And it --
 8               MR. GODFREY:   Objection as to form.
 9       Q.   (By Ms. Hertz) -- and it is something that
10   needs to be done every day, right?
11       A.   Certainly the assessment of risk should be
12   done on an ongoing basis.
13       Q.   On a day-to-day basis as operations --
14       A.   M-h'm.
15       Q.   -- continue, correct?
16       A.   Yes.
17       Q.   Okay.  Do you have any understanding who would
18   be the, quote/unquote, Project Manager on -- in
19   deepwater drilling?  Is that the Well's Team Manager?
20       A.   I --
21       Q.   I'm sorry the Well's Team Leader?
22       A.   I don't know.  I don't know.
23       Q.   Okay.  Do you know what a Risk Champion is?
24       A.   Well, it says here, "(typically an
25   office-based member of the engineering team)."
```

1    Q.   Had you ever heard the term "Risk Champion"?

2    A.   No, I hadn't.

3    Q.   You never heard that?

4    A.   No.

5    Q.   So you wouldn't know, then, what their

6  responsibilities are?

7    A.   Well, it says here what their responsibilities

8  are.

9    Q.   Other than what you see there.

10   A.   Probably not.

11   Q.   Okay.  Let's turn to the next page, Bates 363.

12  All right.  If you look at "Project Manager" on that

13  page, it says, "(typically" Well's Team Leader).

14       Do you see that?

15   A.   It does, yes.

16   Q.   You don't have any reason to believe that

17  that's not the case, do you?

18   A.   No, that seems --

19   Q.   Okay.

20   A.   -- only reasonable.

21   Q.   And it says -- next to the Well's Team Leader

22  it says, "Single Point" of "Accountability, Owns risk

23  process, Assigns risk process, Monitors overall risk

24  exposure," and "Monitors response progress."

25       Do you see that?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 253

1    A.    I do.

2    Q.    Okay.  And as I read it, those are some of the

3  roles and responsibilities of your Project Manager,

4  typically the Well's Team Leader.  Is that how you read

5  it?

6    A.    It is.

7    Q.    Okay.  And those are obviously extraordinarily

8  important tasks in connection with Risk Management --

9              MR. GODFREY:  Objection as --

10    Q.    (By Ms. Hertz) -- isn't that right?

11              MR. GODFREY:  -- objection as to form.

12    A.    It would certainly appear that way, yes.

13    Q.    (By Ms. Hertz) Okay.  And, again, as -- as you

14  stated, Risk Management is something that needs to be

15  done on an ongoing -- needs to be monitored on an

16  ongoing basis, correct?

17    A.    Correct.

18    Q.    And mitigated, correct, as --

19    A.    Correct.

20    Q.    -- necessary.

21    A.    Correct.

22    Q.    Okay.  All right.  Let's go to Bates 365,

23  please.  All right.  This doc -- page is entitled "Risk

24  Register," and it says, "The risk register captures all

25  the outputs of...identify and assess steps.  The

1    response and control steps may be recorded in the

2    register...in a separate action..."

3         Do you see that?

4    A.   I do.

5    Q.   And then below it says, "Two Risk Register

6    tools in particular are recommended for use in"

7    drilling and completions.  And there you are with the

8    "BP RAT - An intranet-based tool designed to meet the

9    needs of BP's Major Projects."

10        And as we saw earlier, there's a requirement

11   in the Gulf of Mexico that all risks be implemented --

12   or, excuse me, input into the BP RAT, correct?

13             MR. GODFREY:  Objection as to form.

14   Q.   (By Ms. Hertz) You recall --

15   A.   Yes --

16   Q.   -- that?

17   A.   -- I think that's what you said is.

18   Q.   I think that's what we read, right --

19   A.   Yes.

20   Q.   -- in the prior document?

21   A.   Yes.

22   Q.   Okay.  All right.  Let's go to Tab 6.  This

23   has previously been marked as Exhibit 93.  And it's the

24   "Drilling and Well Operations Practice" for E&P.  And

25   I'd like to know first if you've ever seen this

 1  document before.

 2       A.    I don't believe so.

 3       Q.    Okay.  Were you aware of its -- its existence?

 4       A.    Yes, I was aware of its existence.

 5       Q.    Okay.  What did you understand it to be?

 6       A.    It's to set out the operating practice for

 7  drilling wells.

 8       Q.    Okay.

 9       A.    In E&P.

10       Q.    Okay.  And was this the type of process or

11  system that you were talking about that was in place in

12  the Gulf of Mexico in April that you had believed would

13  mitigate the risks involved with deepwater drilling?

14       A.     It was certainly one of the pieces of process

15  that were in place to mitigate risks in the

16  deepwater --

17       Q.    Okay.

18       A.    -- correct.

19       Q.    Let's go to Bates 263, please -- why am I

20  doing that -- just to point out that this is dated

21  October 2008.  It's issue 1, and I'll just represent to

22  you that the gentlemen on the Well's Team have

23  indicated that this is the version that they were

24  operating under when they were working on Macondo.

25            All right.  276, please, Bates 276.  Under

```
 1    "1.3 Application," it states, "This practice applies to
 2    all drilling and wells operations comprising well
 3    construction" --
 4        A.    Sorry.  I'm on the wrong page.
 5        Q.    I'm sorry.
 6        A.    Apologies.
 7        Q.    It's all right.
 8              MR. WEBB:  He's got the right page.
 9        A.    Apologies.
10        Q.    (By Ms. Hertz) "This practice applies to all
11    drilling and well operations comprising well
12    construction, drilling, testing, completion, workover,
13    well operations and intervention activities related to
14    wells performed under the control or supervision of BP,
15    or on behalf of BP as the operator."
16              You see that?
17        A.    I do.
18        Q.    So is it your understanding that this was, in
19    fact, a document that governed the drilling of wells in
20    the Gulf of Mexico in April of 2010?
21        A.    That was my understanding.
22    ███ ████████████████████████████████████████████████
23    ██████████████████████████████████████████████
24    ██████████████████████████████████████████████
25    ██████████████████████████████████████████████
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 257



4      Q.    Okay.   And what do you understand that

5    sentence to mean?

6      A.    It says what it -- is what it says.

7      Q.    That you shall follow this procedure --

1 ███████████████████████

2      ████████████████

3    ██  ████

4      Q.   Now, if, in fact, there was no documented and

5 auditable Risk Management process in place on the

6 Macondo Well, that would have been a violation of BP

7 Policy without a written exception; isn't that --

8                 MR. GODFREY:  Object to the --

9      Q.   (By Ms. Hertz) -- correct?

10                MR. WEBB:  Objection to form.

11                MR. GODFREY:  -- form of the question.

12      A.   Well, I -- I'm not aware whether there was or

13 wasn't, so if there wasn't, it would certainly not be

14 consistent with this document, would it.

15      Q.   (By Ms. Hertz) Or BP Policy, correct?

16      A.   Well, this is BP Policy.

17      Q.   All right.  And let's look at 292, Bates 292,

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 ██████████████████████████████████

22           Do you see that?

23      A.   I do.

24      Q.   If that was not done, that would have been a

25 violation of BP's Policy as well, correct?

1          MR. GODFREY:  Objection as to form.

2     A.   If it was not done, it would not be consistent

3  with this Policy, correct.

4     Q.   (By Ms. Hertz) Okay.  And I could walk you

5  through lots of those examples, but I don't want to

6  take your time up with that.  So generally, if -- if --

7  if -- if the requirements of this document are not

8  followed, that's a violation --

9     A.   It's not consistent --

10     Q.   -- of this BP Policy?

11     A.   -- with this Policy.

12          MR. WEBB:  Well, wait, I -- I --

13     Q.   (By Ms. Hertz) It's not --

14          MR. WEBB:  -- object to the form of the

15  question.

16          Go ahead answer.

17     A.   It's not consistent with this Policy.

18     Q.   (By Ms. Hertz) All right.  Thank you.

19          Are you familiar with the Traction reporting

20  system?

21     A.   Yes.

22     Q.   What do you understand that to be?

23     A.   It's a database to record all safety-related

24  incidents --

25     Q.   Okay.

708

1     A.    -- in BP.

2     Q.    On Page Bates 308, if you want to look at it,

3  it says:  "A Well Control Incident Report shall be

4  completed and documented within the Traction reporting

5  system following any Well Control Incident."

6          What do you understand the term "Well Control

7  Incident" to mean?

8     A.    A Well Control Incident is a well control

9  incident where -- where, at least for a period of time,

10  the well is not under control.

11    Q.    Okay.  Would -- would a kick be considered a

12  well control event in your mind?

13    A.    In most situations, probably, yeah.

14    Q.    Okay.  So if there was a kick at the Macondo

15  Well and it wasn't recorded in Traction, ever, would

16  that be a violation of BP policy?

17              MR. GODFREY:  Objection.

18              MR. WEBB:  Objection to the form of the

19  question.

20    A.    There's an expectation that all safety-related

21  incidents are recorded in Traction.

22    Q.    (By Ms. Hertz) Well, it's not just an

23  expectation, right?  It's a requirement --

24              MR. GODFREY:  Objection as to the form.

25    A.    There's a -- there's --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 261

1    Q.    (By Ms. Hertz) -- without a dispensation?

2    A.    There's a re --

3    Q.    10.2?

4    A.    2.10 you mean, no.  10 -- which page are you

5  on?

6    Q.    Oh, I'm sorry, excuse me, 15.2.12.  I

7  apologize.

8    A.    Okay.  (Reviewing document.) That's what it

9  says, yes.

10    Q.    So it's a requirement?

11    A.    Yes.

12    Q.    Okay.  And you would expect --

13    A.    You would expect that if there had been a

14  kick, provided it was designated a Well Control

15  Incident, then it would be reported.

16    Q.    In Traction?

17    A.    In Traction.

18    Q.    Okay.  Tab 7, please?

19          MS. HERTZ:  What are we going to mark

20  this?  This will be Exhibit 6067.

21          (Exhibit No. 6067 marked.)

22    Q.    (By Ms. Hertz) Have you ever seen this

23  document before?

24    A.    No, I haven't.

25    Q.    It appears to be a BP Wells Operation Group

1   Practice dated November 18, 2008.  Is that what you

2   see?

3        A.   It is.

4        Q.   All right.  If you turn to Bates 730, the

5   second line says:  "All Well Operations activity shall

6   conform to Engineering Technical Practice GP-1035 -

7   Well Operations."

8            That appears to be a mandatory requirement,

9   doesn't it?

10       A.   It certainly says "shall."

11       Q.   And "shall" is -- appears to be mandatory,

12   right?

13               MR. GODFREY:  Objection as to form.

14       A.   It is what it says there, "shall."

15       Q.   (By Ms. Hertz) Well, "shall" is not "should,"

16   right?  Can we agree on that?

17       A.   Yeah, "shall" is -- is not "should."

18       Q.   Okay.

19            (Laughter.)

20       Q.   (By Ms. Hertz) All right.  All right.  Let's

21   go to Bates 738, and under 7.2.1, "Minimum

22   Requirements," do you see that?

23       A.   I do.

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 263

711



11    Q.   What do you understand "critical operational

12  tasks" to be --

13    A.   I don't know.

14    Q.   -- in drilling?

15    A.   I don't know what the definition of that is

16  for drilling.

17    Q.   Okay.  Well, I can represent to you that

18  everyone on the Macondo Well Team who's testified who's

19  been asked considers the negative pressure test to be a

20  critical operational task, all the way from the

21  Engineering Team Leader to the Well Site Leaders, and

22  that the negative pressure test is -- and the reason

23  it's critical is because it's the last clear chance to

24  ensure well integrity has been achieved before

25  temporary abandonment.  So with that --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z

712

1    A.   It's part of the process to assure well

2  integrity has been achieved.

3    Q.   It's the last test, though?

4    A.   It's the last test.  It's the last test.  It's

5  not the exclusive test --

6    Q.   No, no, that's not what I said.

7    A.   -- or -- or anything else --

8    Q.   No.

9    A.   -- that implies that it's the only thing that

10  you use.

11    Q.   No, no.  And let me back up.

12         So what the folks on the Wells Team had said

13  it's the last clear chance to test the integrity of the

14  well.

15    A.   I have no reason to --

16    Q.   Do you have any reason to --

17    A.   I apologize.

18    Q.   -- disagree with that?

19    A.   I have no reason to disagree with the views of

20  the Well Team.  They are far more qualified than I am

21  to make that judgment.

22    Q.   Based on that representation, and the

23  testimony of the Wells Team, and this procedure --

24  excuse me, this minimum requirement set forth in the

25  DWOP, 7.2.1, would you have expected there to be a

1  written procedure for how to conduct and interpret a

2  negative pressure test at BP?

3            MR. GODFREY:  Objection as to form.

4      A.   I don't know is my honest answer.  Well, the

5  only reason I say that is because with the benefit of

6  hindsight, which is a wonderful thing, it turns out

7  that no one has got written procedures for conducting

8  negative pressure tests, whether should have they done.

9  With the benefit of the hindsight, the answer is

10 probably "Yes."

11     Q.   (By Ms. Hertz) Do you know for a fact that no

12 one has negative -- written --

13     A.   I -- I don't --

14     Q.   -- negative pressure tests, or is that what

15 you have been told?

16     A.   I have been -- I -- I don't know for a fact.

17 I haven't done my own independent research, so --

18     Q.   Okay.  So back to my question, there certainly

19 would be no downside --

20     A.   There would certainly be --

21     Q.   -- from having --

22     A.   -- no downside --

23            MR. WEBB:  Let me --

24            THE WITNESS:  I apologize.

25            MR. WEBB:  Tony, you keep interrupting

1   her question which means --

2                    THE WITNESS:  Okay.  Sorry.

3                    MR. WEBB:  -- we're getting an incomplete

4   transcript.  And so we're going to just ask you to

5   listen to her question, then go ahead and answer.

6                    THE WITNESS:  Thank you.

7       Q.  (By Ms. Hertz) Okay.  So there certainly would

8   have been no downside to having a written negative test

9   procedure and instructions on interpretation of that

10  procedure in as far as the Wells Team has deemed this a

11  critical activity?

12                   MR. WEBB:  Objection to the form of the

13  question.

14                   MR. GODFREY:  Objection to the form.

15      Q.  (By Ms. Hertz) Right?

16      A.   There would have been --

17                   MR. GODFREY:  Same objection.

18      A.   -- no downside.

19      Q.  (By Ms. Hertz) Okay.

20                   THE COURT REPORTER:  Three minutes.

21      A.   I believe that is what the Bly Report

22  concluded and made as a recommendation.

23      Q.  (By Ms. Hertz) Well, let -- let me just ask

24  you if you're aware of something.  Do you know that BP

25  has strict guidelines, written guidelines barring

1  employees from carrying a cup of coffee without a lid

2  or walking down a staircase without holding a handrail?

3  Are you aware of that?

4      A.   We certainly have guidelines to prevent people

5  doing that sort of thing, yeah.

6      Q.   Okay.  So you have written guidelines not to

7  walk down a stairwell without holding on to the

8  handrail, but no written guidelines for a negative

9  pressure test?

10             MR. WEBB:  Object to the form of the

11  question.

12             MR. GODFREY:  Objection to the form.

13  That's false.

14             MS. HERTZ:  I haven't even asked one yet.

15             MR. GODFREY:  You just stated it on the

16  record.  I thought that was a question.

17             MS. HERTZ:  That was not yet a question,

18  and don't accuse me of saying anything false.

19             MR. WEBB:  You didn't.

20             MR. GODFREY:  Well, you just said that BP

21  had no guidelines, nothing in writing about a negative

22  pressure test.  That is not accurate.

23             MR. HERTZ:  Well, let me restate the

24  question then.

25             MR. GODFREY:  Fair enough.

**PURSUANT TO CONFIDENTIALITY ORDER**

716

1     Q.  (By Ms. Hertz) Isn't it the fact that BP has a

2 written guideline directing its employees not to walk

3 down stairwells without a hand on a handrail, and the

4 fact that does -- did not on April 20, 2010, have a

5 written procedure for how to conduct and how to

6 interpret a negative pressure test seem like the focus

7 is more -- is on personal safety versus Process Safety?

8           MR. WEBB:  Objection as to form.

9           MR. GODFREY:  Objection, form.

10    A.  That can be your interpretation.  I don't

11 believe it was the case.

12    Q.  (By Ms. Hertz) You don't believe what was the

13 case?

14    A.  That our focus was on personal safety versus

15 Process Safety.

16    Q.  Okay.  Did you attend BP's Operations Academy

17 program at MIT?

18    A.  I did.

19    Q.  All right.  And why?

20    A.  Because I wanted to set an example to the

21 leadership of BP that the -- the operational safety --

22 focus on operational safety, the roll-out of the

23 Operating Management System, and Process Safety were

24 all important.

25    Q.  All right.  The Process Safety lessons taught

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 269

1  at the Academy include, "Critical procedures should be

2  formalized and carried out with rigor."

3       Do you agree with that?

4  A.   I do.

5  Q.   "It is essential to maintain multiple

6  safeguards against an accident."

7       Do you agree with that?

8  A.   We can short-circuit this, if you want to.  I

9  agree with everything that was taught at the Academy,

10 because it was a program that I was instrumental in --

11 Q.   Let me just run through my little points,

12 though, if you don't mind.

13      Is it dangerous to change operational plans on

14 the fly?

15           MR. GODFREY:  Objection as to form.

16 A.   Yes.

17 Q.   (By Ms. Hertz) I'm going restate that

18 question.

19      The process safety lessons taught at the

20 Academy include the fact that it is dangerous to change

21 operating plans on the fly.  Do you agree with that?

22 A.   I agree with all of the suggestions at the

23 operations Academy, all of the -- the long list of

24 things that you're about --

25 Q.   It's not that long.

1     A.    -- to go through --

2     Q.    Just let me get through it.

3     A.    -- I completely agree with.

4     Q.    All right.  So you agree that anomalies --

5     A.    There should be no ambiguity as to whether I

6  do or do not agree --

7     Q.    Are --

8     A.    -- in what was being taught at the operations

9  Academy.

10    Q.    Okay.

11    A.    I cert -- I was instrumental in setting up

12 that program.

13    Q.    Okay.

14    A.    And I absolutely subscribe to everything

15 that --

16    Q.    Okay.

17    A.    -- they taught.

18    Q.    Three more.  Do you agree that anomalies need

19 to be clearly resolved?

20    A.    Of course.

21    Q.    Do you agree that small incidents are warning

22 signs that conditions are ripe for a disaster?

23    A.    They are.

24    Q.    "A long stretch without a serious accident

25 breeds complacency because people forget to be afraid."

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 271

 1          Do you agree with that?

 2     A.    That is correct, as well.

 3     Q.    Okay.

 4          (Discussion off the record.)

 5     Q.    (By Ms. Hertz) All right.  And -- and also is

 6 it dangerous to change operating procedures on the fly?

 7     A.    It is.

 8              MS. HERTZ:  All right.  We'll go off.

 9              THE VIDEOGRAPHER:  Off the record at

10 12:42 p.m., ending Tape 16.

11          (Recess from 12:42 p.m. to 12:51 p.m.)

12          (Exhibit No. 6068 marked.)

13              MR. GODFREY:  Ready.

14              THE VIDEOGRAPHER:  On the record at

15 12:51 p.m., beginning Tape 17.

16     Q.    (By Ms. Hertz) I -- I ask you please to turn

17 to Tab 13, which is an article from "The Washington

18 Post," dated June 27th, 2010, headed -- entitled

19 "Trouble at the tiller."  This is Exhibit 6068.

20          And if you would turn to the second page of

21 the document, it states in the -- about fourth

22 paragraph down, quote, "The top of the organization

23 doesn't listen hard enough to what the bottom of the

24 organization is saying," and it indicates that you

25 wrote that in a memo in 2006.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 272

1          Do you -- do you agree with that statement as

2    a general matter?

3          A.   I didn't write it in a memo.  I did say it in

4    a Town Hall meeting, which was then written by an

5    employee into a memo, and at the time it was a serious

6    concern that I had, that -- and a lot of what occurred

7    in BP in the subsequent three or four years was a real

8    focus on engaging the operational people and ensuring

9    that the right decisions were taken.

10         Q.   So it's important then, and it was something

11   that you strived to implement --

12         A.   It was.

13         Q.   -- at BP?

14         A.   It was.

15         Q.   If you'll turn to Tab 14, we've got an E-mail

16   from Tony Emmerson to Bob Kaluza, dated April 8th,

17   2010.  Do you know who Bob Kaluza is?  Have you --

18   Robert Kaluza?  Have you heard that name?

19         A.   I believe he was one of the Well Site Leaders.

20         Q.   Okay.  And this is attaching a TH, or

21   Thunderhorse, Pulse Check, which was apparently a

22   survey taken of the individuals on the Thunderhorse rig

23   in March of 2010.

24              MR. GODFREY:  Are -- do you want to mark

25   this as an exhibit, Counsel?

PURSUANT TO CONFIDENTIALITY ORDER

721

1          MS. HERTZ:  Yes.  6069.  Thank you.

2          MR. GODFREY:  Thank you.

3          MR. WEBB:  You said 6069?

4          MS. HERTZ:  Yes.

5          (Exhibit No. 6069 marked.)

6     Q.   (By Ms. Hertz) You -- you haven't seen this

7  document, have you?

8     A.   I haven't, no.

9     Q.   Okay.  Thunderhorse was one of BP's rigs?

10    A.   It was -- it was one of -- it was a BP

11 production facility, not a -- not a drilling rig.

12    Q.   Okay.  Now, if you turn to Bates 468, the page

13 is entitled "Common Themes (Perceived Gaps) from Face

14 to Face Breakout Session."

15         What do you understand a gap to be?

16    A.   Probably the same as what you understand a gap

17 to be, some -- something that -- something that needs

18 to be filled.

19    Q.   Okay.  So -- so something that needs to be

20 fixed or filled?

21    A.   Yeah.

22    Q.   All right.  And these appear to be -- and your

23 reading is probably the same of mine -- as mine, that

24 these perceived gaps were indicated by folks on the rig

25 in the Pulse Check.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 274

1          And I was just wondering, given the importance

2    of Management listening to folks at the bottom and,

3    thus, surveys like this, which I --

4          A.    M-h'm.

5          Q.    -- assume are designed to --

6          A.    M-h'm.

7          Q.    -- help the folks higher --

8          A.    M-h'm.

9          Q.    -- up understand what the operational people

10   are thinking, did anyone from the Gulf of Mexico ever

11   tell you about any of these -- any perceived gaps or

12   problems that resulted from surveys taken on the rigs?

13         A.    They didn't tell me, but they would have told

14   people who could have taken action to do something

15   about it.  And I think it's in -- interesting to see

16   the context of this -- these comments, which were part

17   of the Pulse Survey.  "Do you understand the process of

18   how to report an unsafe condition?"  96 percent said

19   "Yes."

20              "When you report an unsafe" position --

21   "condition, do you believe it is addressed in a

22   reasonable time?"  97 percent said "Yes."

23         Q.    I appreciate that, but that doesn't really

24   answer my question, so --

25         A.    Well, it's just important to have --

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.    -- let me just ask you a couple of things.  If

2  anybody ever brought to your attention --

3    A.    M-h'm.

4    Q.    -- the belief that Management places a higher

5  priority on production compared to safety, and an

6  example of -- and that's an example of BP breaking its

7  own safety rules?

8    A.    Sorry.  Where are you referring to?

9    Q.    Page 468.  I'm -- I'm looking at the "Gaps,"

10  the "Perceived Gaps."  I'm just wondering if anybody

11  ever brought that to your attention.

12    A.    Where -- where are you referring to in this

13  page?

14    Q.    Under "Miscellaneous," "Hurricane Ida

15  Response - Decision to not shut-in production was

16  viewed as management placing a higher priority on

17  production compared to safety and an example of BP

18  breaking its own safety rules."

19        Did anybody ever bring that to your attention?

20    A.    They didn't.

21    Q.    Okay.  Did anybody ever tell you that folks on

22  the Thunderhorse rig believed that requirement and

23  procedure changes were causing confusion and

24  frustration?

25    A.    Where are you referring to now?

724

1       Q.    Under "COW Management," "Requirement change

2   constantly from one hitch to the other.   This is

3   causing confusion and frustration."

4             Did anybody ever bring that to your attention?

5       A.    They didn't.

6       Q.    Okay.   If you turn to the next page, if you

7   want to follow along, under "Leadership" -- "Leadership

8   Style," it says -- or excuse me.   Did anyone ever tell

9   you that there was a general feeling that -- of being

10  fired if you stop a job, get hurt, or question your --

11      A.    Where -- where --

12      Q.    -- Supervisor?

13      A.    Where does it say that?

14            So that is one comment at the back of a

15  survey, where at the front of the survey --

16      Q.    Mr. Hayward, your --

17      A.    -- it says --

18      Q.    -- your counsel can get you to talk about

19  that.   I -- and --

20      A.    Well --

21      Q.    And I understand that.   I'm just asking if

22  anybody ever told you that --

23      A.    They didn't.

24      Q.    -- comment, with or without respect to the --

25  the document, because I know you've never seen it.

1     A.   But, seemingly, you're taking sentences out of

2     context.

3     Q.   Well, they're in the section called "Gap" --

4     "Perceived Gaps," and I'm simply asking if anybody

5     communicated to you that there were these perceived

6     gaps?

7     A.   They did not.

8     Q.   Okay.  But you said it was your belief or

9     expectation that these concerns would have been

10    elevated to somebody and that some -- they would have

11    been addressed or -- or some action would have been

12    taken; is that correct?

13    A.   That's correct.

14    Q.   Okay.  And if you turn to the next tab, 15,

15    this is Robert Kaluza's performance review from 2009.

16              MR. GODFREY:  Is there an exhibit number

17    for this?

18              MS. HERTZ:  6070.

19         (Exhibit No. 6070 marked.)

20    Q.   (By Ms. Hertz) And if you'll turn to Bates



PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 278



19    Q.    Okay.  Now, I will represent to you that

20 Mr. Kaluza was the Well Site Leader on the Thunderhorse

21 when the --

22    A.    M-h'm.

23    Q.    -- Safety Pulse was taken on that Thunderhorse

24 rig in March of 2010, and it was under his watch, then,

25 that certain people on the crew felt a fear of being

**PURSUANT TO CONFIDENTIALITY ORDER**

1    fired --

2       A.   I think we need to be -- back up a minute

3    here.

4       Q.   Sure.

5       A.   As I understand it, Kaluza was a Well Site

6    Leader.  Thunderhorse is a production facility.  And I

7    don't think you can take a survey of a production

8    facility and apply it in a narrow way to the area that

9    Kaluza may have been supervising.  I may be wrong.

10   I --

11      Q.   Even if it has to do with safety?

12      A.   Kaluza had a very narrow area of supervision

13   on the -- on the Thunderhorse facility.

14      Q.   You know that for a fact?

15      A.   Because he's a driller.  So he's not a

16   producer.  Most of the people on the drilling facil --

17   on the Thunderhorse facility are involved in

18   ███████████████████████████████████████████

19   ███████████████████████████████████████████████

20   which was a narrow drilling operation, but I don't

21   think you can link Mr. Kaluza to a survey of

22   Thunderhorse.

23            (Discussion off the record.)

24      Q.   (By Ms. Hertz) Well, all right.  I don't know

25   what you're talking about.  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 280

1          My understanding is that Mr. Kaluza was on the

2   rig not during production, but during drilling.

3       A.   No, but this is -- I don't want to be

4   difficult.

5       Q.   Is there one Thunderhorse or two?

6       A.   There's one Thunderhorse.  It's an enormous

7   facility.  It has very significant production

8   operations, where most of the people work.  As part of

9   that facility, there is a small drilling operation

10  where Mr. Kaluza was.

11      Q.   Ah.  Okay.  I see what you're saying.

12      A.   The survey was across the whole --

13      Q.   Okay.

14      A.   -- production facility, so, you know, it's not

15  reasonable to link Kaluza to what was going on at

16  Thunderhorse.

17      Q.   I understand.  Thank you very much for that

18  clarification.

19          Okay.  Nonetheless -- then let's put the --

20  the Pulse Check aside.  Nonetheless, looking at

21  Mr. Kaluza's Performance Report, and we note that there

22  are a number of issues re: safety, are you aware that

23  he was put onto the DEEPWATER HORIZON four days before

24  the Mon -- Macondo Well blew out?

25      A.   I -- I wasn't, no.  I --

PURSUANT TO CONFIDENTIALITY ORDER

 1    Q.   You weren't aware of that?

 2    A.   Huh-uh, no.

 3    Q.   And that this had been referred to, as you

 4  previously mentioned, a "nightmare well" and the "well

 5  from hell"?

 6    A.   Well, I didn't mention that.

 7              MR. WEBB:  Object to the form of the

 8  question.

 9    Q.  (By Ms. Hertz) Oh, you --

10    A.   I didn't --

11    Q.   You mentioned that you -- that an Engineer had

12  referred to it as that; is that correct?

13    A.   That's correct.

14    Q.   Okay.  And are you aware that Mr. Kaluza was

15  an individual who did not stop the job to resolve the

16  anomaly of 1400 psi on the drill pipe, that we all now

17  know about?

18              MR. GODFREY:  Objection as to form.

19    A.   I don't know who was involved in that decision

20  because I wasn't there.  Reading the Bly Report, I

21  don't believe there's a reference to the individual.

22    Q.  (By Ms. Hertz) So you have no understanding as

23  to whether Mr. Kaluza or Mr. Vidrine was the Well Site

24  Leader on tour at the time the well blew?

25    A.   I -- I -- I don't recall.  If I did know, I

1   don't know now.

2       Q.    Okay.

3       A.    I don't remember.

4       Q.    All right.  All right.  Tab 17.  This is going

5   to be Exhibit 6071.

6             (Exhibit No. 6071 marked.)

7       Q.    (By Ms. Hertz) This is a document from Steven

8   Ruehle, an E-mail dated January 11, 2010 to a number of

9   individuals, entitled "Process Safety 2010 Plan," and

10  attached to it is a PowerPoint entitled "Process Safety

11  Plan 2010."  And it's dated January 12th, 2010.  Do you

12  see that?

13      A.    I do.

14      Q.    All right.  I'm going to ask you to turn to

15  the seventh page of the PowerPoint.  It is not

16  numbered, but it's entitled "Process Safety, 2010 Plan

17  (Major Hazard Awareness)."

18            And the "Problem Statement" under that states:

19  "As we have started to more deeply investigate process

20  safety incidents," it become -- it's become apparent

21  that process safety major hazards and risks are not

22  fully understood by engineering or line operating

23  personnel.  Insufficient awareness is leading to missed

24  signals that precede incidents, and responses after

25  incidents; both of which increases the potential for,

1  and severity of, process safety related incidents."  Do

2  you see that?

3      A.   I do.

4      Q.   If, in fact, that's true, do you consider that

5  to be a serious problem?

6               MR. WEBB:  Object to the form of the

7  question.

8      A.   I think it's difficult to determine whether

9  it's a seri -- how serious the problem is on the basis

10  of that statement alone.  I'd like to know a lot more

11  about it before I drew a conclusion.

12          But what it is pointing is that people are

13  endeavoring to continuously improve, which is what you

14  always want people to do.  I can't make a judgment

15  based on that statement.

16      Q.   (By Ms. Hertz) Did anybody ever bring this

17  issue of the problems in Process Safety in the Gulf of

18  Mexico to your attention?

19      A.   No.

20      Q.   All right.  And as the CEO who was focusing

21  like a laser on safety, wouldn't you have expected to

22  have known about these deficiencies in Process Safety,

23  especially when they had led to a, quote, "number of

24  serious and potentially serious process safety

25  incidents"?

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. GODFREY:  Objection as to form.

2     A.   Well, that -- certainly, the -- any incidents

3  would have been reviewed at the Group Operations Risk

4  Committee.  So in that -- in that context, I may have

5  become aware of them, because everything that occurred

6  in -- in the matter of Process Safety incidents in the

7  company were documented and recorded in something which

8  we referred to as the Orange Book.  It was a sort of

9  database of everything that was happening.  And that

10 was -- the trends and the incidents that occurred

11 across the company were -- were reviewed at the GORC in

12 that way.

13     Q.   (By Ms. Hertz) And was it your understanding

14 that Process Safety incidents were going down?  In

15 fact, I think you said that in an article, right?

16     A.   They were going down --

17     Q.   They were going down --

18          All right.  Last page.

19     A.   -- across the company.

20     Q.   Okay.  Let's look at the ninth page, please,

21 two pages back.

22          MR. GODFREY:  The same exhibit?

23          MS. HERTZ:  Yes.

24     Q.   (By Ms. Hertz) "Process Safety Incidents"

25 across the Gulf of Mexico.  I understand that you've

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 285

1    stated that Process --

2        A.    Sorry.  Which page are we --

3        Q.    The ninth.  So two more past where you were.

4        A.    Okay.

5        Q.    Entitled "Process Safety Incidents."  Now,

6    according to this page, it indicates that Process

7    Safety incidents, in fact, in the Gulf of Mexico went

8    up in 2009 from previous years; isn't that correct?

9        A.    It -- it would appear that there was a small

10   increase in this -- in this particular area.

11       Q.    In the Gulf of Mexico, correct?

12       A.    In the Gulf of Mexico.

13       Q.    An increase in Process Safety accidents; is

14   that correct?

15              MR. GODFREY:  Objection --

16       A.    There -- an increase --

17              MR. GODFREY:  -- as to form.

18       A.    -- an increase in Process Safety incidents,

19   which may or may not have been accidents.

20       Q.    (By Ms. Hertz) All right.  We'll call it

21   incidents.  There was an increase in Process Safety

22   incidents in 2009 in the Gulf of Mexico, correct?

23       A.    That is correct.

24       Q.    Okay.

25              MS. HERTZ:  I have nothing further.

PURSUANT TO CONFIDENTIALITY ORDER

734

1                    THE VIDEOGRAPHER:  Off the record at 1:07

2  p.m., ending Tape 17.

3              (Recess from 1:07 p.m. to 1:49 p.m.)

4                    MR. BECK:  All right.  Let's go.

5                    THE VIDEOGRAPHER:  On the record at

6  1:49 p.m.  Beginning Tape 18.

7                         EXAMINATION

8  QUESTIONS BY MR. BECK:

9     Q.   Dr. Hayward, my name is David Beck, and I

10  represent Cameron.

11     A.   Yes.

12     Q.   And I'm sure you know who Cameron is --

13     A.   I certainly do.

14     Q.   -- do you not?

15     A.   I do.

16     Q.   I don't have a lot of questions.  That's one

17  of the advantages of going toward -- till -- toward the

18  end of the questioning, but the bad news is I have

19  some.

20         So what I'd like to do is to go through about

21  a handful of subjects with you.  And I -- I'm going to

22  ask you to do the same thing for me that you did for

23  some of the other lawyers, and that is, if I ask you

24  something, because I clumsily ask it, and you don't

25  understand what I'm asking you, will you stop me and

735

1    say, "Please repeat the question."  Will you do that?

2        A.   I will.

3        Q.   All right.  Now, you do not hold yourself out

4    as a BOP expert, do you?

5        A.   I certainly do not.

6        Q.   And as a Geologist, I'm sure that, in fact,

7    you are not a BOP expert?

8        A.   I'm not a BOP expert.

9        Q.   Okay.  Now, is it true that no one from

10   Cameron has ever told you that a BOP, blowout

11   preventer, during its lifetime would never fail

12   regardless of the circumstances in which it was asked

13   to function?

14       A.   No one -- excuse me.  No one from Cameron has

15   ever said that to me.

16       Q.   And, in fact, you know there are other blowout

17   preventer manufacturers in the industry, do you not?

18       A.   There are, indeed.

19       Q.   And would it be equally true that no other BOP

20   manufacturer, if you will, has ever made such a

21   statement to you?

22       A.   Not to me, no.

23       Q.   And furthermore, is it also true that no one

24   at BP has ever made such a statement like that to you?

25       A.   That blowout preventers can never fail?

PURSUANT TO CONFIDENTIALITY ORDER

736

1      Q.   That's correct.

2      A.   That's correct.

3      Q.   Now, you have testified before the United

4  States Congress on June 17, 2000 [sic], correct?

5      A.   Correct.

6      Q.   And during your testimony, as I'm sure you

7  remember, you referred to the blowout preventer on the

8  DEEPWATER HORIZON as the ultimate fail-safe mechanism.

9  Do you recall that?

10     A.   Yes, I do.

11     Q.   Your answer's "Yes"?

12     A.   I do, yes.

13     Q.   And is -- is that a phrase that you came up

14  with on your own?

15     A.   I honestly can't recall where the phrase came

16  from.

17     Q.   You don't know where the phrase came from?

18     A.   I don't where the phrase came from.

19     Q.   Okay.  As you've used it, did you mean the

20  word "ultimate" to mean final, the final fail-safe

21  mechanism, if you will?

22     A.   Yes.

23     Q.   All right.  Now, just so -- and you understand

24  that the ladies and gentlemen of the jury, assuming we

25  have a jury, or the Judge is going to see and hear your

1    testimony given here on Monday and today?

2        A.   I do.

3        Q.   You understand that's a definite possibility?

4        A.   Yeah, I do.

5        Q.   Okay.

6        A.   Indeed, I do.

7        Q.   Now, I want to ask you some questions with

8    respect to during the period you were Chief Executive

9    Officer of BP.  Okay?  So that's the time frame we're

10   talking about.

11       A.   M-h'm.

12       Q.   While you were Chief Executive Officer of BP,

13   was it BP's intention to rely upon this mechanical

14   device, the BOP, as BP's last line of defense in the

15   end -- in the event of a potential blowout?

16               MR. GODFREY:  Objection as to form.

17       A.   I think before the accident on April the 20th

18   I -- I had never considered the details of a drilling

19   operation and a blowout preventer in the -- in the

20   sense that you're describing it today.  What would I --

21   what I would say is based on my 30 years in the

22   industry that I think it was acknowledged that the

23   blowout preventer was the last line of defense, and in

24   the event that a well was out of control, the blowout

25   preventer would be operated.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 290

1      Q.   (By Mr. Beck) M-H'm.

2      A.   And it was designed to close the well.   That

3   was -- that has been the design basis of a blowout

4   preventer since they were created 50 or 60 years ago.

5            MR. BECK:  I object to the answer as

6   unresponsive.

7      Q.   (By Mr. Beck) My question, though, is:  Was it

8   BP's intention to rely upon the blowout preventer as

9   this last line of defense that you just described?

10           MR. WEBB:  Object to the form.

11           MR. GODFREY:  Object to form.

12     A.   I never considered it in that sense.  So I

13   can't answer the question.

14     Q.   (By Mr. Beck) Well, what sense did you

15   consider it?

16     A.   I considered it to be the -- the ultimate

17   piece of equipment in the event that a blowout was

18   occurring.

19     Q.   It's the last line of defense?

20     A.   I mean, you -- if you -- if you want to use

21   those words, you can use them.  I -- I -- I haven't

22   used them, and I wouldn't use -- I hadn't -- certainly

23   hadn't used them ahead of the -- the accident.

24     Q.   All right.  Well, let's use --

25     A.   I hadn't talked about blowout preventers.  I

1    apologize.

2          I hadn't talked about blowout preventers --

3    well, I hadn't talked about blowout preventers at all,

4    frankly.

5    Q.   Now, let me use your words, then.  Would you

6    agree that if a blowout preventer is the -- as you

7    described it, the ultimate fail-safe mechanism, would

8    you agree that it would be imprudent for BP to do

9    anything to diminish its effectiveness?

10          MR. GODFREY:  Objection as to form.

11   A.   Certainly if -- if anything had been done to

12   diminish its effectiveness, that -- that would be

13   imprudent.

14   Q.   (By Mr. Beck) And would you also agree that it

15   would be imprudent for BP to do anything to diminish

16   the blowout preventer's ability to function under

17   appropriate circumstances?

18          MR. GODFREY:  Objection as to form.

19   A.   I agree that it would be imprudent to --

20   Q.   (By Mr. Beck) All right.  And would you also

21   agree that BP should do whatever it can to make certain

22   that what it considers to be the ultimate fail-safe

23   mechanism is effective and properly used?

24   A.   I would agree with that.

25   Q.   And that BP should take whatever steps it

740

1   reasonably can to make certain that the BOP is and

2   remains effective?

3       A.    Yes --

4               MR. GODFREY:   Object to form.

5       A.    -- I agree with that, as well.

6       Q.   (By Mr. Beck) And during the time you were

7   CEO, that's something you agreed with, correct?

8       A.    Well, hang on.   During the time I was CEO,

9   I -- not at one point did I have any conversations

10  about blowout preventers.

11      Q.    I'm not -- not asking you about conversations

12  about blowout preventers.   I'm simply asking you about

13  in your capacity, in your position as CEO of BP during

14  the time period you served in that role, do you agree

15  that BP should do whatever it takes to make certain

16  that a blowout preventer which you considered to be the

17  ultimate fail-safe mechanism is effective and properly

18  used?

19      A.    I agree.

20              MR. WEBB:   I'm going to object to the

21  form of the question.

22          Answer the question, then, Tony.

23      A.    I agree that BP should make every endeavor to

24  ensure that whatever -- however you described it --

25      Q.   (By Mr. Beck) Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.    -- most certainly the blowout preventer was

2  operating effectively.

3      Q.    And that do you also agree that your company,

4  when you were with the company as Chief Executive

5  Officer, should do nothing to increase the risk that a

6  blowout preventer would not do what it was supposed to

7  do?

8            MR. GODFREY:  Object to form.

9      A.    I agree with that.

10     Q.    (By Mr. Beck) All right.  Let me hand you what

11  has been marked as Exhibit 731.

12            (Tendering.)

13            MR. WEBB:  Thank you.

14     Q.    (By Mr. Beck) And this Exhibit 731 is a

15  document dated October 11, 2004, is it not?

16     A.    It is.

17     Q.    And it is on Transocean stationery, and it is

18  addressed to BP America Production Company, correct?

19     A.    It is.

20     Q.    Were you part of the Senior Management of BP

21  in 2004?

22     A.    I was.

23     Q.    And you will see where it says the subject,

24  it's a Drilling Contract, is it not, that's referenced?

25  A Drilling Contract is referenced?

742

1    A.    (Reviewing document.)

2          Yes.

3    Q.    And you see that it refers to a December 9,

4    1998 contract between R&B Falcon Drilling Company and a

5    company called Vastar Resources, Inc., right?

6    A.    It does.

7    Q.    And so that the Judge and perhaps the jury who

8    may see this will understand, Vastar Resources was a

9    company that you-all bought or acquired, right?

10   A.    That's correct.

11   Q.    And was Vastar Resources, Inc., acquired

12   during the time you were with Senior Management at BP?

13   A.    It was.

14   Q.    And so, essentially, in layman's terms, once

15   you acquired or took over Vastar Resources Inc., BP

16   stepped into the shoes of Vastar?

17   A.    That's correct.

18   Q.    And if I -- I want to refer you to the third

19   paragraph of this letter.  And this is a Letter

20   Agreement, is it not?

21   A.    That's what it said it is.

22   Q.    And it pertains to the conversion of a VBR to

23   a test ram.  Do you see that?

24   A.    I do.

25   Q.    And a VBR is a variable bore ram, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.    I believe that's the case.

2      Q.    And that is a part of a blowout preventer, is

3   it not?

4      A.    Yes, it is.

5      Q.    And in the third paragraph in the first

6   sentence, it says, quote:  "Company acknowledges that

7   the Conversion will reduce the built-in redundancy of

8   the BOP, thereby potentially increasing Contractor's

9   risk profile and corresponding cost structure," end of

10   quote.

11           Is that what this letter states?

12      A.    It does.

13      Q.    Now, increasing the contractor's risk profile

14   means, does it not, that you are increasing the risk,

15   in this case, that R&B Falcon Company has with respect

16   to the BOP, does it not?

17           MR. GODFREY:  Objection -- I'll withdraw

18   the objection.

19      A.    That's what I would imagine it -- it is

20   referring to based on this letter.

21      Q.    (By Mr. Beck) And I take it from what you told

22   us earlier about just general information you had with

23   respect to blowout preventers you know that one of the

24   features which is commonly known with respect to

25   blowout preventers is what is called "redundancy"?

1      A.    Correct.

2      Q.    In other words, you -- you have the blowout

3  preventer that can react to a certain situation.   In

4  the event there's a problem, you have a backup system

5  called a "redundant system," correct?

6      A.    I'm not certain it's a redundant system.

7  There are elements of redundancy I think is how I would

8  describe it.   It's not a complete and separate system.

9      Q.    Fair enough.   And -- and -- and I think -- I

10  think you're absolutely accurate in that respect.

11          What is happening here is that the

12  redundant -- built-in redundancy of the BOP is being

13  reduced, correct?

14      A.    That appears to be what this letter

15  determines.

16      Q.    And -- and as a result of this built-in

17  redundancy of the blowout preventer being reduced, it

18  is increasing the risk profile of R&B Falcon Drilling

19  Company, which was a predecessor to a Transocean

20  entity, correct?

21      A.    That's what the letter says.

22      Q.    And are you aware of what the purpose of a

23  variable bore ram in a blowout preventer is?

24      A.    No.

25      Q.    So you, at least as you sit here today, don't

745

1 have any idea of the significance or the effect of

2 reducing the built-in redundancy of the BOP in this

3 regard?

4     A.   In -- the answer is -- to that is "No."  I do

5 not -- I do not -- I am not -- I am not -- not able to

6 judge the extent to which redundancy has been reduced

7 or risk has been increased by what's written here.

8     Q.   But you will see that as a result of

9 increasing the risk for the contractor, that Vastar,

10 your predecessor, or BP's predecessor, is actually

11 agreeing to reimburse the contractor for any problems

12 that occur with respect to the MMS requiring certain

13 activities to be done --

14                 MR. GODFREY:  Objection as to form.

15     Q.   (By Mr. Beck) -- correct?

16     A.   I'd have to honestly read it, because I

17 haven't seen it before.

18     Q.   That's fine.

19     A.   After one -- (reviewing document).

20 What they're -- what it appears to be saying is if

21 there's a require -- if there is any mechanical reason

22 or the MMS requires the variable bore ram is to be

23 replaced, then the contractor will bear the cost.

24     Q.   Yeah.

25     A.   That's the -- what I understand this to say.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.   And I -- I think you understand it correctly.

2   In other words, if the MMS requires the contractor to

3   do such things as pulling the BOP out of the water, and

4   by the way, that involves substantial expense, doesn't

5   it?

6     A.   It does, yeah.

7     Q.   "We're going to pay for it"?

8     A.   Yes.

9     Q.   BP is going to pay for it, right?

10    A.   Yes.

11    Q.   Now, do you know who it was who actually

12  requested that one of these variable bore rams be

13  converted to a test ram?

14    A.   I don't.

15    Q.   Do you know whether anybody at your company

16  believed that converting a variable bore ram to a test

17  ram was, in fact, financially beneficial to BP?

18    A.   I don't.  It -- it would imply in this letter

19  that it was not.

20    Q.   And that's because of the indemnity?

21    A.   Because of the additional -- the indemnity on

22  the additional cost that could be incurred if there was

23  a mechanical reason to change it or if the -- the

24  Regulator required us to do --

25    Q.   Well, if --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 299

```
 1      A.    -- something with it.
 2      Q.    -- if someone who has personal knowledge of
 3  this transaction says that it was done at BP's request
 4  because BP believed it was to its advantage, you would
 5  not dispute that?
 6               MR. WEBB:   Well, I'm going to object to
 7  the form of the question.   Answer it.
 8      A.    I --
 9      Q.    (By Mr. Beck) What's your answer?
10      A.    I clearly have no basis to agree or disagree.
11      Q.    All right.   In your capacity as CEO, during
12  the time period you served in that capacity, did you
13  believe that it was important for BP to select the best
14  available technology as this ultimate fail-safe
15  mechanism?
16      A.    I did.   I -- I believed it was important for
17  us to select the best available technology full stop.
18      Q.    All right.   And this is consistent with what
19  you said earlier, where you said that BP should do
20  whatever it takes to make certain that the BOP is
21  effective, and it's safe, and it provides the best
22  mechanism to prevent a potential blowout?
23      A.    That's correct.
24      Q.    All right.   Now, you testified this morning
25  that BP didn't design the blowout preventer on the
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 300

1    DEEPWATER HORIZON.  Do you remember that?

2        A.   (Nodding.)

3        Q.   Don't you just love it when a lawyer starts

4    out with that kind of a question?

5        A.   I -- I believe it's accurate.  I don't think

6    we designed the blowout preventer.

7        Q.   Now, if the evidence in this case shows that

8    Vastar, the company you quire -- acquired and

9    purchased, actually specified the BOP configuration,

10   then would you agree that at least one of your

11   predecessor companies had an involvement in the design

12   of the BOP on the DEEPWATER HORIZON?

13               MR. WEBB:  I'm going to object to the

14   form of the question.

15       A.   We can have a very convoluted debate about

16   what design is and what design isn't.  When I said

17   "design," I meant the engineering design behind the

18   fundamentals of a blowout preventer.

19       Q.   (By Mr. Beck) Well --

20       A.   What you've --

21       Q.   Excuse me.  Go ahead.

22       A.   What you've illustrated is that there was

23   clearly a -- an involvement of Vastar in determining

24   which -- which of the various configurations that are

25   available for a blowout preventer was deployed.

```
 1        Q.   All right.  Well, let me hand you, just to
 2   kind of help us in this discussion here --
 3                   MR. WEBB:  Thank you.
 4                   MR. BECK:  And just for the record, there
 5   apparently, Rick, have been multiple copies of this
 6   produced, and so the Bates numbers are different on
 7   these different copies that have been produced, so I
 8   just want to kind of alert you to that.
 9                   MR. WEBB:  Are you putting an exhibit
10   number on this, or is there already one on --
11                   MR. BECK:  Yes.  It's Exhibit 1356.  It's
12   already an exhibit.
13                   MR. WEBB:  (Nodding.)
14                   MR. GODFREY:  The writing on the
15   left-hand side looks like it's not on the original.
16                   MR. BECK:  Yeah, the writing up on the
17   right-hand corning is my handwriting.
18                   MR. GODFREY:  And then -- and then the
19   writing on the left-hand side, not the initials, but
20   the arrows, and that's added after the fact, too, and
21   that's added during the course of litigation?
22                   MR. BECK:  I think that's right, and I'll
23   agree to redact it if that's the case.
24                   MR. GODFREY:  Okay.
25                   MR. BECK:  Okay?
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 302

```
1                    MR. GODFREY:  You want to read the Bates
2   stamp numbers in so it's --
3                    MR. NEATH:  Yes.
4                    MR. GODFREY:  -- just as -- 21461
5   to 21545.  Oh, well, it looks like there's --
6                    MR. BECK:  No.
7                    MR. GODFREY:  This is not a complete
8   document, I guess.
9                    MR. BECK:  It's not a com -- I mean --
10                   MR. GODFREY:  Okay.
11                   MR. BECK:  -- it -- it has multiple
12  amendments.
13                   MR. GODFREY:  So this is a couple of
14  selected pages from a longer document?
15                   MR. BECK:  That's correct, and -- and
16  I'll try to go through this with the witness.
17                   MR. GODFREY:  Okay.  But this has been
18  marked this way as 1356?
19                   MR. BECK:  Correct.
20                   MR. GODFREY:  Okay.  Thank you.
21           (Discussion off the record.)
22                   MR. BECK:  The full document is 1356.
23                   MR. GODFREY:  All right.  Well, then we
24  ought to give this a new number then, because it's --
25  it's -- if it's less than the full document, I don't
```

1   want --

2                   MR. BECK:  Why don't we call it 1356A.

3                   MR. GODFREY:  That will be fine.  I just

4   don't want someone thinking the witness saw the full

5   document --

6                   MR. BECK:  That's fine.

7                   MR. GODFREY:  -- when it's just --

8                   MR. BECK:  We'll call it 1356A.

9                   MR. GODFREY:  Okay.

10                  THE COURT REPORTER:  That's a document we

11  need.

12                  MR. GODFREY:  Thank you.

13           (Exhibit No. 1356A marked.)

14       Q.   (By Mr. Beck) Okay.  All right.  Dr. Hayward,

15  you will see that this document that is marked as

16  Exhibit 1356A is a Drilling -- or at least excerpts of

17  a Drilling Contract for a semisubmersible drilling unit

18  between -- the agreement's between Vastar and R&B

19  Falcon.  Do you see that?

20       A.   Yes.

21       Q.   And if I could direct your attention to the

22  page ending in the Bates Nos. 1464, and the "RECITALS,"

23  and -- and specifically the second full paragraph

24  starting out, "Whereas this CONTRACT and the attached

25  exhibits establishes the terms and conditions contained

1   in this document entitled 'DRILLING CONTRACT' and the

2   attached exhibits."  Do you see that?

3       A.   M-h'm, I do.

4       Q.   And then you see the third exhibit is Exhibit

5   B-2, called "MATERIAL EQUIPMENT LIST"?

6       A.   I do.

7       Q.   So this document establishes the terms and

8   conditions between what was formerly Vastar and what

9   was formerly R&B Falcon?

10      A.   M-h'm.

11      Q.   Is your answer "Yes"?

12      A.   Yes.  Sorry.

13      Q.   Okay.

14      A.   My answer is "Yes."

15      Q.   Now, if we can turn to the page beginning --

16  or ending in 1507, and at the top it says "Exhibit B-2,

17  MATERIAL EQUIPMENT LIST"?

18      A.   Yep.

19      Q.   And Section E pertains to "WELL CONTROL/SUBSEA

20  EQUIPMENT."  Do you see that, sir?

21      A.   I do.

22      Q.   And then if you go over, and -- and

23  specifically if you look at E2, it talks about the

24  "Primary BOP Stack."  Do you see that?

25      A.   I do.

1     Q.   And then, if you go over to the page ending in

2  Bates Nos. 1537, you see it says, "Primary BOP Stack

3  from top to bottom."  Do you see that?

4     A.   I see that.

5     Q.   And you see that there are a number of items

6  on here in which the party acquiring the BOP and having

7  the BOP built is saying, "Yes, we want this," "No, we

8  don't want this."  Do you see that?

9     A.   I do.

10     Q.   And, for example, you have the parties to this

11  agreement, and the parties requesting that this be

12  built even specifying such things as the bore size,

13  correct?

14     A.   I do.  Could -- could I just ask a point of

15  clarification?

16     Q.   Sure.

17     A.   It's a -- was this a contract to specify the

18  construction of a rig, or to enter into a contract to

19  use a rig and its associated equipment?  I'm just not

20  clear what this contract is for.  Was it --

21     Q.   Well, I only know what the contract says.

22  This is a Drilling Contract between Vastar and R&B

23  Falcon, and this is one of the attachments to the

24  contract.

25     A.   Because the Drilling Con --

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.    Cameron is not a party to this.

2      A.    No.  The Drilling Contract would normally be

3  with -- to engage a drilling rig that was already

4  constructed.  So I'm -- I'm -- what I'm not clear about

5  is whether this contract refers to construction or, you

6  know, putting in place a long-term contract for

7  utilization of a piece of equipment already built.

8      Q.    Well, I -- I -- I can't answer your question

9  for you.  My question to you, though, is, does this

10 document, Exhibit E-2, which is part of the material

11 equipment list, specifically go through very precise

12 terms of the primary BOP stack?

13     A.    It specifies the sort of BOP that was --

14     Q.    Right.

15     A.    -- was required.

16     Q.    And it's --

17     A.    I -- I -- I don't believe it's a -- a design

18 basis for a new BOP.

19     Q.    Well, whether it is --

20     A.    It's specifying --

21     Q.    -- or not is for somebody to decide.  But my

22 point is that each of these items on here -- or excuse

23 me, strike that.

24          Some of these items on here are very specific,

25 are they not?

1      A.    They are.  Some of these --

2      Q.    For example, the -- the --

3      A.    Some of them are specific.

4      Q.    -- the bore size specifies the inches,

5  correct?

6      A.    Sorry.  Where are you now, please?  Sorry.

7      Q.    The page ending in 1537.

8      A.    (Reviewing document.)  Yep.

9      Q.    The working pressure, the psi working pressure

10  is specified --

11      A.    Correct.

12      Q.    -- is it not?

13      A.    Correct.

14      Q.    And then if you look at the next page, under

15  the "RAM TYPE PREVENTERS," specifically talks about the

16  bore size, correct?

17      A.    It does.

18      Q.    The working pressure, correct?

19      A.    It does.

20      Q.    The stack configuration, correct?

21      A.    It is, that's correct.

22      Q.    And then when you look at the ram locks, blind

23  shear rams, the number, and the number specified is

24  one, one set of --

25      A.    M-h'm.

1    Q.    -- blind shear rams, correct?

2    A.    Yeah.

3    Q.    And I think you've testified earlier that --

4  well, let me just ask you, just to make sure I'm right.

5  Do you know when the first time BP specified it wanted

6  two blind shear rams --

7    A.    I don't.

8    Q.    -- sets of blind shear rams --

9    A.    I don't.

10    Q.    -- on any of its rigs?

11    A.    I don't.  I don't, no.

12    Q.    And then we go to E.2.4, "STACK

13  CONFIGURATION," again, very specific, right?

14    A.    Yes.

15    Q.    And without going through each of these, it

16  even goes through the annular type preventer, correct?

17    A.    It doesn't actually have any description of an

18  annular type preventer.

19    Q.    Look at Page 1539.

20    A.    I am.  And it says "Size," not applicable.

21    Q.    Size inch 18 and three-quarter inches.

22    A.    I'm sorry.  I --

23    Q.    Do you see that?

24    A.    Sorry.  I must be looking at a different --

25  Ah.

1    Q.   Correct?

2    A.   I was looking at E.2.5.  You're looking at

3  E.3.2.

4    Q.   Correct.

5    A.   I apologize.

6    Q.   And that is correct, is it not?

7    A.   Yes.

8    Q.   Quantity, two of them, right?  Correct?

9    A.   Correct.

10    Q.   Working pressure, 10,000 psi?

11    A.   That's right.  Correct.

12    Q.   And did you notice in here that in some

13  instances, it is specified that the product or a part

14  of the product need not even be Cameron?

15    A.   No.  It says equivalent -- Cameron or

16  equivalent.

17    Q.   Right.  So --

18    A.   So I interpret it to say --

19    Q.   Pardon me?

20    A.   I interpret this document to be the

21  specification of the piece of equipment the -- the

22  contractor wished to employ.  It's not a design

23  specification for the piece of equipment.

24    Q.   Well, would you --

25            MR. BECK:  And object to the answer as

758

1    unresponsive.  There wasn't even a question on the

2    floor.

3        Q.   (By Mr. Beck) But my question is:  Would you

4    at least agree, Dr. Hayward, that your predecessor

5    company that you acquired while you were part of the

6    senior leadership was at least involved in specifically

7    specifying the -- the type of BOP preventer it wanted

8    and some of the component parts?

9        A.   I -- I would.

10            (Discussion off the record.)

11            MR. BECK:  I don't understand.  I'm

12   sorry, my colleague says that I referred to this --

13   referred to the letter as 731.  It's 7031.

14            MR. ROBERTS:  What was that?  What was

15   the reference?

16            MR. BECK:  It was the first document I

17   referenced, the conversion of the VBR to the test ram.

18   It's 7031.  I think erroneously said 731.

19            MR. ROBERTS:  Thank you.

20       Q.   (By Mr. Beck) You also testified before

21   Congress that the BOP failed, quote, "when it was

22   activated," end of quote, on the drilling rig.

23            Do you remember saying that?

24       A.   I don't remember saying that.

25       Q.   All right.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 311

1    A.    I'm sure I did if you have a record of it.

2    Q.    Okay.

3    A.    I'm not going to dispute that.

4    Q.    And -- and you're welcome to look at your

5  testimony --

6    A.    No, I'm sure --

7    Q.    -- if you'd like.

8    A.    I'm sure that's the case.

9    Q.    You've told us you read the Bly Report,

10  correct?

11    A.    Correct.

12    Q.    And you agree with it?

13    A.    I did.

14    Q.    Had no reason to disagree with it?

15    A.    I don't have basis to disagree with it.

16    Q.    Okay.  Now, in fact, doesn't the Bly Report

17  say that the well sealed after the BOP was activated?

18    A.    "The well sealed after the BOP was activated"?

19    Q.    And let me refresh your recollection.  This is

20  an excerpt from Exhibit 1, which is the Bly Report.

21  It's just too big to mark other copies of it.

22    A.    M-h'm.

23    Q.    And I specifically want to refer you to --

24    A.    Ah, okay.

25    Q.    -- to Section 3.5 --

1    A.   Yep.

2    Q.   -- which, for the record, is Page 123 of the

3    Bly Report.  The first sentence --

4    A.   Yeah.

5    Q.   -- reads --

6    A.   That's -- I've -- you jogged my memory.  I

7    didn't understand what you meant when you said "seal."

8    Q.   Okay.

9    A.   The BOP sealed around the drill pipe.

10   Q.   Right.  It says, quote:  "The INVESTIGATION

11   TEAM believes that the BOP was closed (but did not

12   fully seal) around the drill pipe at approximately

13   21:" --

14   A.   Yeah.

15   Q.   "42 hours and that the BOP fully sealed around

16   the drill pipe at approximately 21:47 hours."

17        Correct?

18   A.   That's what it says, yeah.

19   Q.   All right.  And you have no reason to disagree

20   with that?

21   A.   I don't.

22   Q.   Now, do you know a man by the name of

23   Fereidoun Abbassian?

24   A.   I do not.

25   Q.   Fereidoun Abbassian was an appointed to lead

PURSUANT TO CONFIDENTIALITY ORDER

1    BP's Blowout Preventer Investigation Team, and he has

2    testified that he was actually in the Head Office in

3    London as an Executive Assistant in 2003.  Would it be

4    in the same building you were?

5        A.    For part of the time, that's correct.

6        Q.    But you -- you've never met him?

7        A.    I don't -- if I have, I don't recall.

8        Q.    Okay.  Well, he -- he is a Ph.D. in

9    Engineering.  He's still with BP.

10       A.    M-h'm.

11       Q.    And he testified under oath within the last

12   few months that there was no indication of any flow out

13   of the drill pipe at 2147, which I think you will agree

14   was consistent with what the Bly Report says, correct?

15       A.    Yeah, that's right.

16       Q.    And you would have no reason to disagree with

17   what Dr. Abbassian testified?

18       A.    I have no basis to agree or disagree with

19   Dr. Abbassian.

20       Q.    All right.

21       A.    I'm certainly -- if that's what he said, then

22   that's what he believes and is --

23       Q.    Okay.  All right.  And -- and so based on what

24   we know today, after the blow -- the Bly Investigation,

25   the Bly Report, what PhDs like Dr. Abbassian have

 1    testified to under oath, would you agree that the

 2    statement that you had made to Congress that the well

 3    failed to seal when activated is incorrect?

 4                MR. WEBB:  Object to the form of the

 5    question.

 6        A.   I think what I was referring to is that

 7    despite the fact that the blowout preventer was

 8    activated and it may well have sealed around the drill

 9    pipe, it clearly did not seal the well.  There was

10    still hydrocarbons flowing through -- from the well

11    into the rig and ultimately into the seabed.

12        Q.   (By Mr. Beck) But you don't know why it didn't

13    seal the well?

14        A.   I don't know why it didn't seal the well.

15        Q.   All right.

16        A.   But it is evident that it had not sealed the

17    well.

18        Q.   Well, if you were making the same statement --

19    if you were testifying before Congress today, would you

20    still make the statement that whenever the BOP was

21    first activated, it failed to seal the well?

22        A.   It failed seal the well, yes.

23        Q.   No, sir, that's not my question.  My question

24    is:  If you were testifying today before the United

25    States Congress, would you still testify that when the

1  BOP was activated, it failed to seal the well?

2              MR. WEBB:  Object to the form of the

3  question.

4      A.   Well, I'm sorry, I must be missing something.

5  I don't understand the question.

6      Q.   (By Mr. Beck) All right.

7      A.   Because as far as I -- I can -- I understand,

8  the BOP did fail to seal the well.

9      Q.   Well, if Dr. Abbassian has testified under

10 oath that the blowout preventer did, in fact, seal the

11 well, you've told us you have no basis to disagree with

12 that, correct?

13             MR. WEBB:  Well, he said he didn't agree

14 with it.  That he's what he just testified.

15     A.   Can I --

16             MR. BECK:  I understand.

17     A.   I just need to -- I'm sorry, I'm not trying to

18 be difficult.  I'm just trying to understand what you

19 mean by sealing the well, given that hydrocarbons

20 continue to flow to surface.  My -- my definition of

21 sealing the well is you prevent hydrocarbons flowing to

22 surface, prevent hydrocarbons flowing through the

23 blowout preventer.

24     Q.   (By Mr. Beck) Well, my definition of sealing

25 the well is no flow.  Okay?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 316

1       A.    (Indicating.)

2       Q.    And my question to you is, if Dr. Abbassian

3    has testified that there was no flow out of the drill

4    pipe at 2147, no flow, would you still tell Congress --

5       A.    If --

6       Q.    -- if you were testifying today --

7       A.    Well --

8       Q.    -- that when the BOP was activated, it failed

9    to seal the well?

10                 MR. WEBB:   Objection to the form of the

11   question.

12      A.    I -- my un -- I'm completely confused now by

13   my understanding of what occurred in this accident,

14   frankly, because does that mean that Dr. Abbassian does

15   not agree with the findings of the Bly Report?

16      Q.    (By Mr. Beck) Well, do you know, for example,

17   whether or not the flow was through the annulus?

18      A.    All I know is the findings of the Bly Report

19   which is --

20      Q.    What do you recall?

21      A.    -- which was that the -- the findings of the

22   Bly Report was that the flow was up the production

23   casing and through the blowout preventer and likely

24   through the drill pipe that was across the blowout

25   preventer.

PURSUATN TO CONFIDENTIALITY ORDER

1      Q.   And that --

2      A.   That's my understanding, and I have no -- I

3  have no basis to make any other understanding.  And I

4  haven't seen Dr. Abbassian's Report, and I've not seen

5  any analysis of the blowout preventer, so I -- I can't

6  make an informed judgment.

7      Q.   All right.

8      A.   And I can't -- certainly can't make a decision

9  based on with respect -- so I can't make a decision

10 based on this conversation about whether I agree or

11 disagree with what I said in Congress --

12     Q.   Fair --

13     A.   -- because it was based on what I understood

14 at the time and what I understood to be the case until

15 you brought all this up in the last five minutes.

16     Q.   All right.  Fair enough.  Fair enough.  Let's

17 move on to another subject.

18          To kind of close it out, you don't know

19 anything other than what's in the Bly Report, with

20 respect to this --

21     A.   Well, that is the basis --

22     Q.   Let me finish my question.

23     A.   I'm sorry, apologies.

24     Q.   You don't know anything with respect to what

25 happened or why it happened other than what you've read

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 318

1    in the Bly Report?

2         A.   The basis of my knowledge is the Bly Report.

3         Q.   All right.  Now, there were a few documents

4    that I want to show you -- and by the way, you told

5    us -- by -- did you ever read the Presidential

6    Commission Report?

7         A.   I didn't -- I didn't read it in detail.  I

8    read the press reports at the time.  I asked my PA to

9    print it, and I skimmed it, but I did not read it.

10        Q.   And you were asked earlier about the Chief

11   Counsel's Report, Chief Counsel to the National

12   Committee on the BP Deepwater Horizon Oil Spill and

13   Offshore Drilling?

14        A.   I haven't read the Chief Counsel's Report.

15        Q.   Did you -- has anybody ever advised you or did

16   you read a statement by the Chief Counsel, and I quote,

17   "Hydrocarbons had entered the riser well before the

18   crew attempted to activate the BP, and even a perfectly

19   functioning BOP could not have prevented the explosions

20   that killed 11 men on April 20th."

21             Had you ever seen that statement before?

22        A.   I -- I think I saw it referred to in the

23   press.

24        Q.   And do you agree with that?

25        A.   I don't have the basis for agreeing with it,

**PURSUANT TO CONFIDENTIALITY ORDER**

1  because I wasn't part of the investigation.  I don't

2  know.

3       Q.   All right.  You were asked about a number of

4  documents on Monday, and time does not allow me to go

5  into a lot of them.  But I want to hit a couple of

6  them, and then I want to ask you about another

7  document.

8       A.   M-h'm.

9       Q.   With respect to your testimony about blowout

10 preventers, I'm sure you haven't had the opportunity to

11 read BP's Well Control Manual.  Is that --

12      A.   I'm afraid I haven't.

13      Q.   Okay.  It is a multivolume set of documents --

14      A.   M-h'm.

15      Q.   -- okay?  Volume 2 is entitled "Fundamentals

16 of Well Control."  And I'm not going to ask you,

17 mercifully, about a -- a lot of these pages in the

18 document, but I do want to just refer you to something

19 in the document.  And specifically, I want to refer you

20 to --

21           MR. BECK:  And by the way, this is

22 Exhibit 2390 for the record.

23      Q.   (By Mr. Beck) And if you would look -- it's

24 toward the end, Doctor, it's the pages ending 0797.

25           MR. GODFREY:  7 -- what was the last one?

1          MR. BECK:  0797.

2      Q.   (By Mr. Beck) Do you have that page?

3      A.   I do.

4      Q.   BP's own Well Control Manual recognizes, does

5  it not, that over time, over the history of a blowout

6  preventer, that there can be instances and

7  circumstances where it will fail, correct?

8      A.   You are asking me to confirm that it says it

9  here or --

10      Q.   Yes, sir.

11      A.   Yeah, I would --

12      Q.   And look at Paragraph 1 entitled "General" on

13  the page "Fundamentals of Well Control," Paragraph 1?

14      A.   All right.  Paragraph -- one second.  Okay.

15      Q.   All right.  You see where BP's own Well

16  Control Manual specifically recognizes what it believes

17  are common causes --

18      A.   M-h'm.

19      Q.   -- of failure?

20      A.   I do.

21      Q.   Correct?

22          So this is an indication, is it not, that BP's

23  own Well Control Manual recognizes that there can, in

24  fact, over time be instances where a BOP could fail?

25          MR. WEBB:  Object to the form of the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    question.

2         A.    It does.

3         Q.    (By Mr. Beck) All right.  And without going

4    into them, such things as "Casing wear," correct?

5         A.    Correct.

6         Q.    "Wellhead or BOP connections working loose

7    through vibration"?

8         A.    Correct.

9         Q.    "Deterioration of seals in valves and BOPs"?

10        A.    Correct.

11        Q.    "Leaks and faults occurring in control

12   system"?  Is that correct?

13        A.    That's -- right.

14        Q.    Let me show you what was previously marked as

15   Exhibit 6032.

16                   MR. GODFREY:  Are we done with 2390?

17                   MR. BECK:  Yes.

18                   MR. GODFREY:   Thank you.

19        Q.    (By Mr. Beck) And this was a document that was

20   marked earlier, Doctor.

21                   MR. BECK:  Is that in one of these

22   notebooks here?

23                   THE COURT REPORTER:  What's the number,

24   David?

25                   MR. BECK:  6032.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 322

770

```
 1              THE COURT REPORTER:  (Tendering.)

 2              THE WITNESS:  Thank you.  Tab num -- Tab

 3  number?

 4              THE COURT REPORTER:  6032.

 5              THE WITNESS:  32.

 6     Q.  (By Mr. Beck) It's entitled "RB FALCON

 7  DEEPWATER HORIZON BOP" --

 8     A.  M-h'm.

 9     Q.  -- "ASSURANCE ANALYSIS."

10     A.  Yeah.

11     Q.  You see that?

12     A.  I do.

13     Q.  And I have a couple of questions to ask you

14  about this document.  And by the way, this was issued

15  in March of 2001, was it not?

16     A.  Yes.

17     Q.  I refer you to page ending in Bates number

18  3050.  I think down in the left corner it says,

19  "Issue" --

20     A.  Yep.

21     Q.  -- "Date"?

22     A.  Yep.

23     Q.  Is that correct --

24     A.  Correct.

25     Q.  -- March 2001?
```

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 323

771

1        If you will just jump to the page ending in

2   53052, please, sir.

3              MR. GODFREY:  52?

4              MR. BECK:  Correct.

5      A.   Yep.

6      Q.   (By Mr. Beck) This is the "EXECUTIVE SUMMARY"

7   and this was what is called an interect -- "Integrated

8   Project," correct?

9      A.   It's referred to as "Integrated Project Team,"

10  yes.

11     Q.   And it was intended "...to provide a high

12  level of confidence that the BO system on the Deepwater

13  Horizon is a reliable and safe system," right?

14     A.   That -- that's correct.

15     Q.   And in -- in -- involved in this effort was,

16  among others, BP, correct?

17     A.   Correct.

18     Q.   Cameron, right?

19     A.   Correct.

20     Q.   And you had other members of industry that

21  participated, right?

22     A.   Correct.

23     Q.   And then if you'll look at the second -- or

24  the third bullet point, it talked about "A risk

25  assessment" of focusing on reliability being completed,

1   right?

2       A.   Correct.

3       Q.   And then it talked about "Engineering and

4   operations personnel from RB Falcon, BP, Cameron, TSF

5   and West identified 260 failure modes that could

6   require pulling of the BOP or" the "LMRP," right?

7       A.   Yes.

8       Q.   And it talked about the -- the -- the type of

9   malfunctions that were identified during this Project;

10  is that correct?

11      A.   Correct.

12      Q.   Would it be safe to say that at least BP was

13  aware that these type of failure modes can, in fact,

14  occur with respect to a blowout preventer?

15              MR. GODFREY:   Object to the form.

16      A.   I guess what they're identifying is potential

17  failure modes.

18      Q.   (By Mr. Beck) Right.

19      A.   And to identify that these issues are focused

20  on.

21      Q.   All right.  And --

22      A.   In the course of its utilization.

23      Q.   And these are potential failure modes that BP,

24  among others, would be aware of?

25              MR. GODFREY:   Object to form.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 325

1      A.    That's what it says here.

2      Q.   (By Mr. Beck) All right.  As well as other

3    members of the industry, right?

4      A.    Correct.

5      Q.    And the purpose of this Study was to identify

6    hazards with respect to blowout preventers, right?

7      A.    I believe so, yes.

8      Q.    Okay.  Let me show you --

9           (Discussion off the record.)

10           MR. BECK:  Let's do this.

11      Q.   (By Mr. Beck) Let me hand you a -- a new

12    document.

13           MR. BECK:  And it's on one of the CDs,

14    for the record.

15           Is there another one?  Dan, I think we're

16    short one.

17           MR. WEBB:  I'll look over his shoulder.

18           MR. BECK:  Okay.

19           MR. WEBB:  But is that one for him or is

20    it in this binder here?

21           MR. BECK:  It's -- it's going to be in --

22    it's going to be -- I just handed him one.  Here we go.

23           (Exhibit No. 6072 marked.)

24           MR. BECK:  I apologize --

25           MR. WEBB:  No problem.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 326

1          MR. BECK:  -- we just didn't have time to

2    get it made.

3          MR. WEBB:  That's okay.

4          THE COURT REPORTER:  6072.

5          MR. BECK:  What's the number?

6          THE COURT REPORTER:  6072.

7          MR. WEBB:  All right.  The witness has

8    Exhibit 6072 in front of him.

9      Q.   (By Mr. Beck) Exhibit 6072 is a Report dated

10   May 12, 2009, entitled "Blow-out Prevention Equipment

11   Reliability Joint Industry Project," correct?

12     A.   Correct.

13     Q.   And this was done by West Engineering, right?

14     A.   Yes.

15     Q.   And are you familiar with West Engineering?

16     A.   I'm not.

17     Q.   West Engineering -- or do you know whether

18   West Engineering has done any projects for BP?

19     A.   I -- I'm sure they have.

20     Q.   This Project was intended, was it not, to

21   examine the historical reliability of subsea well

22   control systems in the Gulf of Mexico?

23     A.   I don't know what this study was --

24     Q.   Well --

25     A.   -- designed to do, because I haven't seen it

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 327

1    to say --

2        Q.   Look specifically --

3        A.   This?

4        Q.   -- on the page ending in 164.

5        A.   Okay.

6        Q.   And do you see where it says, "The Blowout

7    Preventer Reliability study was conducted to examine

8    the historical reliability of subsea well control

9    systems operating in the Gulf of Mexico under the

10   jurisdiction of the Mineral Management Service,"

11   correct?

12       A.   Yeah.  It says the Study was -- "The goal of

13   the study was to understand BOP reliability and the

14   extent that testing impacts that reliability."

15       Q.   Where -- where does it say "testing"?

16       A.   It says it in the second sentence.

17       Q.   Okay.  Well, let -- let me -- just -- the

18   first sentence says what the purpose is, correct?  And

19   that's to examine the historical reliability of subsea

20   well control systems operating in the Gulf of Mexico,

21   under the jurisdiction of the Mineral Management

22   Service.

23       A.   And it then goes on -- that's correct.  And it

24   then goes on to say, "The goal of the study was to

25   understand" --

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.   All right.

2    A.   -- "BOP reliability and the extent that

3    testing impacts that reliability."

4    Q.   And the information upon which the Study in --

5    is based, incorporated data from 238 subsea wells in

6    the Gulf of Mexico, right?

7    A.   Correct.

8    Q.   And that involved, I think it was at least 37

9    different semi --

10    A.   Yes.

11    Q.   -- submersible or drillship units during the

12    2004-2006 period, right?

13    A.   That's what it says here.

14    Q.   Okay.  Now, refer to the page ending in Bates

15    number 0200.  This reflects, does it not, that during

16    the period of the Study, which was a three-year period,

17    from January 1, 2004, through December 31, 2006, there

18    were a number of control system failures identified,

19    right?

20    A.   It says 89 failures.

21    Q.   And then if you look in the second par --

22    A.   In the initial BOP test for the first time the

23    BOP was landed.

24    Q.   And then if you look in the second paragraph,

25    it says, "...39 were identified as control system

1   failures," correct?

2       A.   Correct.

3       Q.   And then "The next largest equipment category

4   of failures to the controls system failures was ram and

5   annular failures..." right?

6       A.   (Reviewing document.) I'm just reading here.

7            Correct.

8       Q.   And then the next category, most common, were

9   valve failures, right?

10      A.   Of which there were two.

11      Q.   Is that correct?

12      A.   Correct.

13      Q.   And the data included in this Study,

14  Dr. Hayward, were for a number -- from a number of

15  industry sources, right?

16      A.   M-h'm, well, I -- I don't know, but I -- I

17  imagine that's the case.

18      Q.   And would you also believe that the -- this

19  Report was disseminated in the industry?

20      A.   I would expect that it was disseminated in the

21  industry.

22      Q.   And would you also expect that the results

23  would have been made known to the industry?

24      A.   I would expect that they were made known to

25  the industry.

**PURSUANT TO CONFIDENTIALITY ORDER**

1  Q.   All right.  So in looking at the last three

2 documents, which is BP's own Well Control Manual, which

3 is Exhibit 2390, the R&B FALCON BOP ASSURANCE ANALYSIS

4 in March of 2001, marked as Exhibit 6032, and then also

5 what we've just marked as Exhibit 6072, this Blow-out

6 Prevention Equipment Reliability Joint Industry

7 Project, it shows, does it not, that at least during

8 about a nine-year span, there are at least three

9 studies that have been done to identify potential

10 problems with BOPs?

11     MR. WEBB:  Object to the form of the

12 question.

13  A.   I think the -- you know, I haven't had a

14 chance to read what this study actually does.  What

15 it -- what it's identifying is failures that occur

16 on -- let me just read it again -- immediately on

17 landing the BOP.

18    So has it identified failures, yes.

19  Q.   (By Mr. Beck) All right.

20  A.   And --

21  Q.   And that's all I'm asking, is it -- that there

22 are at least three studies, if you will --

23  A.   So this is --

24  Q.   Let me finish my question.

25  A.   Apologies.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 331

779

1    Q.   There are three studies, if you will, from

2  2000 through 2009 that identify potential problems with

3  BOPs, correct?

4    A.   I think --

5             MR. WEBB:  I'm going to object to the

6  form of the question.

7    A.   I think what this says was failures were

8  identified which occurred on the initial -- the initial

9  BOP test.

10   Q.   (By Mr. Beck) All right.

11   A.   I.e., when it was being tested, to assure

12 it's -- it was going to operate or the first time the

13 BOP was put in the water at the beginning of the well.

14 And what people are doing is testing the reliability of

15 it before they start using it.

16           So I -- I just want to be clear, that's what

17 this Report is.

18   Q.   Well, your own Well Control Manual isn't

19 limited to BOPs simply --

20   A.   Of course, but this --

21   Q.   -- this -- beginning?

22   A.   Of course.  But this Report is about failure

23 at initial deployment --

24   Q.   Well, let me --

25   A.   -- on the first test on when the BOP was first

1   put in the water.

2       Q.   Well, let me come at it this way:  Of the

3   documents you have seen just during this deposition,

4   would you agree that there have been many instances

5   where someone in the industry or a consultant hired on

6   behalf of the industry have identified potential

7   problems with BOPs or potential common causes of BOP

8   failures?

9                MR. WEBB:  Object to the form of the

10  question.

11      A.   I would agree that there have been problems

12  identified with BOPs and common causes around those

13  problems.

14      Q.   (By Mr. Beck) All right.  And that was known

15  to the industry, correct?

16      A.   I believe that was known to the industry

17  because --

18      Q.   Okay.

19      A.   -- you told me, and I'm sure you're right,

20  that this was widely circulated.

21      Q.   Now, since the DEEPWATER HORIZON occurrence,

22  you have seen many documents related to that

23  occurrence, have you not?

24      A.   Yes, I have.

25      Q.   And of all the documents that you have seen,

1  have you seen any Cameron document that says that a BOP

2  would never fail during its lifetime regardless of the

3  circumstances in which it was asked to function?

4      A.   I haven't seen any Cameron doc -- documents

5  full stop.

6      Q.   Have you seen any Cameron document that refers

7  to its product as the ultimate fail-safe mechanism?

8      A.   I haven't seen any Cameron documents full

9  stop.

10              THE COURT REPORTER:  Microphone,

11  Mr. Beck.

12      Q.   (By Mr. Beck) Let me change subjects, and I'm

13  almost finished.

14          I want to talk to you a little bit about

15  OMS --

16      A.   M-h'm.

17      Q.   -- the Operations Management System.

18      A.   Okay.

19      Q.   I think you've told us earlier that OMS was

20  the cornerstone of achieving safe, reliable, and

21  responsible operations in all of BP's activities,

22  correct?

23      A.   That's correct.

24      Q.   And you also told us that OMS focused on

25  Process Safety?

1       A.    It did.

2       Q.    Now, you testified this morning that while you

3  were CEO, "We focused extensively on Process Safety."

4  And that's a true statement?

5       A.    That's correct.

6       Q.    Now, on April 20, 2010, BP was in the third

7  year of a five-year implementation of OMS, correct?

8       A.    That's correct.

9       Q.    So that as of the time of the DEEPWATER

10  HORIZON incident, you were three years into the

11  implementation of OMS, correct?

12       A.    Correct.

13       Q.    Now, is it true that the risk of a deepwater

14  blowout was one of the highest risks for BP --

15       A.    That's true.

16       Q.    -- in its business?

17       A.    That's correct.

18       Q.    And was it also true that the risk of a

19  deepwater blowout in the Gulf of Mexico was a very

20  serious and a high risk for the company?

21       A.    That's correct.

22       Q.    Do you recall offhand what the revenues

23  produced for the company by wells in the Gulf of Mexico

24  were?

25              MR. WEBB:  For when?  Any given year

1    or --

2                 MR. BECK:  Just -- just general.

3        A.   I think it would be best just to talk about

4    barrels of production because revenue depends on the

5    price --

6        Q.   Of course.  Of course.

7        A.   A lot of oil.

8        Q.   A lot of oil?

9        A.   (Nodding.)

10       Q.   So, again, so that the Judge and perhaps the

11   jury might know, the revenues that your wells that you

12   owned or operated in the Gulf of Mexico produced for

13   the company were very significant, were they not?

14       A.   They were.

15       Q.   Now, who was it in BP that made the decision

16   that OMS was going to be implemented over five years?

17       A.   It's not a decision.  It's the reality of the

18   time it takes to design, build, and then implement

19   change processes in a very large organization.

20       Q.   And who was it who concluded that that was all

21   going to take five years?

22       A.   It's not a conclusion.  It's a fact.  It's not

23   physically possible to do it any faster.  So it's not

24   a -- it's not a predetermined conclusion or a --

25   determined by a person.  It's a consequence of the time

 1   it takes to implement a program.

 2       Q.   Is it your testimony that BP could not have

 3   done that in less than five years?

 4       A.   I think it's very difficult to conceive how it

 5   could have been done in a shorter period of time.

 6       Q.   No, sir, I didn't ask you if it was very

 7   difficult.  Is it your testimony that it was impossible

 8   for BP to fully implement OMS in less than five years?

 9                MR. WEBB:  Object to the form of the

10   question.

11       A.   I don't know whether it was impossible.

12       Q.   (By Mr. Beck) Well, weren't you the one that

13   was in charge of this whole process?

14       A.   I was.

15       Q.   Was there any --

16       A.   And --

17       Q.   Excuse me.

18       A.   Apologies.

19       Q.   Was there any financial impediment to BP

20   implementing this process in less than five years?

21       A.   There was no financial impediment.  It's not

22   about financial.  It's about how do you actually go

23   about putting in place new systems and processes in an

24   organization of a hundred thousand people.  Un -- and,

25   unfortunately, that takes time.

1   Q.   Any other reason why OMS was not fully

2  implemented in less than five years, other than what

3  you just said?

4   A.   No.

5   Q.   Can you tell us who it was that decided the

6  order in which OMS was going to be implemented?

7   A.   What we were doing was transitioning from an

8  existing Process Safety Management System to a new one,

9  and the process was to assess what we had, measure

10  against OMS, and figure out the most appropriate way

11  was minimizing the risk to the operation of

12  transitioning from one to another.  So that -- those

13  decisions were taken by the experts accountable for

14  putting in place OMS.

15   Q.   Who?

16   A.   So the --

17   Q.   Who -- go ahead.  Who?

18   A.   So it was -- the overall implementation of OMS

19  across the company was under the guidance of Mark Bly.

20   Q.   Mark Bly?

21   A.   The -- the -- the person who designed much of

22  the system was a gentleman called John Sieg, who we

23  recruited from DuPont.

24   Q.   I'm sorry, could you say that again?

25   A.   John Sieg, who we recruited from DuPont.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 338

1    Q.    How do you spell that last name?

2    A.    S-i-e-g.

3    Q.    (Nodding.)

4    A.    And the decision to proceed was a -- an

5  agreement between some combination of the Safety and

6  Operations function and the business unit concerned.

7    Q.    And did you ever meet with Mark Bly or John

8  Sieg about the implementation, the rate of the

9  implementation, how it was going to be implemented?

10   A.    We discussed it on a monthly basis.

11   Q.    And were you the ultimate decisionmaker?

12   A.    I wasn't the ultimate decisionmaker, because I

13 didn't have the knowledge to make the decision.  What I

14 listened to was where the experts concluded was -- you

15 know, what was the right pace to go and ensured that

16 the resources that were necessary to make the

17 implementation happened were available.

18   Q.    And the experts were Mark Bly, who was in

19 charge of implementation, correct?

20   A.    Mark Bly.

21   Q.    Did I say John?

22   A.    You did.

23   Q.    I'm sorry, Mark Bly.  I apologize.

24         And then John Sieg, S-i-e-g?

25   A.    Correct.

787

1    Q.   He was the expert in charge of what?

2    A.   The design of the OMS system.

3    Q.   And who was it that was the expert in charge

4  of deciding the order in which it was implemented?

5  Would that be Mark Bly?

6    A.   Well, it wasn't the case of order.  It was a

7  case of at what point was a business unit or operating

8  entity sufficiently well-prepared to proceed with the

9  implementation.

10   Q.   Um --

11   A.   So there was multiple implementa -- multiple

12 parallel implementation going on over a three-year

13 period.

14   Q.   How long did it take BP to actually begin

15 implementation?

16   A.   I can't remember the precise date, but I --

17 I -- I think the first implementation occurred probably

18 in the Fall of 2007, early 2008.  I can't recall,

19 honestly.

20            THE COURT REPORTER:  One minute.

21   A.   The cause of that.

22   Q.   (By Mr. Beck) The fall of 2007, 2008?

23   A.   (Nodding.)

24   Q.   Is that correct?

25   A.   Yeah.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 340

1          MR. BECK:  Okay.  Why don't we change the

2   tape.  I've just got a few more minutes, and I'm done.

3               THE WITNESS:  Okay.

4               THE VIDEOGRAPHER:  Off the record at

5   2:48 p.m.  Ending Tape 18.

6          (Recess from 2:48 p.m. to 2:58 p.m.)

7               THE VIDEOGRAPHER:  On the record at

8   2:58 p.m., beginning Tape 19.

9      Q.   (By Mr. Beck) Dr. Hayward, as of April 20,

10  2010, what part of OMS was implemented?

11     A.   We were in the middle of companywide

12  implementation, so a lot of the -- in fact, all of

13  the -- if I can call it the superstructure was in

14  place.  We had completed implementation at the

15  operating level in around 80 percent, I think, of the

16  operations and were -- in the case of the Gulf of

17  Mexico, I -- I think my recollection is we had begun

18  that process in the Fall of 2009.  And we, in fact,

19  were on target to complete implementation by the end of

20  2010, which would, in fact, have been in three years,

21  not five.

22     Q.   The -- and just see if I understand what

23  you're -- you're saying.  When you say that the OMS was

24  implemented 80 percent at the operating level, the

25  operating level would include what?

1    A.   The -- the operations down through to the

2  front line.  So all of the -- you know, the

3  superstructure was complete, and in -- I think it was

4  80 percent of the operations that had gone through all

5  the way down to the front line operations.

6    Q.   All right.  When you say the "superstructure,"

7  you're talking about the plan?

8    A.   The -- the -- yeah, the -- the -- well, not --

9  not only the plan, but the systems and processes would

10  make -- that would make a plan become alive.

11    Q.   All right.  And then you said that you were on

12  target to implement OMS in the Gulf of Mexico in 2009?

13    A.   I -- my recollection is that we began the

14  process of cutover to OMS in the Fall of 2009.

15    Q.   And --

16    A.   That's my recollection.

17    Q.   And your recollection also is that you would

18  have completed that implementation in the Gulf of

19  Mexico by the end of 2010?

20    A.   That's correct.

21    Q.   In -- in -- in other parts of the world, at

22  the operating level, was OMS fully implemented?

23    A.   In some places, yes.

24    Q.   What places?

25    A.   A relatively large number.  Colombia, Egypt, I

790

1 think, all of our refineries in the United States, our

2 refineries in Europe and places like Australia.  I'm

3 not -- I can't remember exactly the -- the list, but --

4 but we -- we had made a lot of progress.

5     Q.   Were any other areas begun in 2009 other than

6 the Gulf of Mexico Operating --

7     A.   Yes, they were.

8     Q.   -- Division?  And what areas were those?

9     A.   I can't recall, but we can certainly find out.

10     Q.   All right.  And, again, just so we're clear,

11 who was it who made the decision to begin

12 implementation of the process in 2009 in the Gulf of

13 Mexico?

14     A.   I -- I don't know who was actually involved in

15 the decision to begin the process, but I can imagine

16 that it was the Business Unit Leader of the Gulf of

17 Mexico, along with Mark Bly and people in his

18 organization.

19     Q.   And who was the Business Unit Leader?

20     A.   A gentleman called James Dupree.

21     Q.   James Dupree?

22     A.   Correct.

23     Q.   Where is he located?

24     A.   In Houston.

25     Q.   Do you recall his title or position?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 343

791

1      A.    Strategic Performance Unit Leader.

2            THE COURT REPORTER:  Dupree?

3            THE WITNESS:  Dupree.

4      Q.   (By Mr. Beck) All right.  And what other areas

5  would not have had OMS fully implemented until the end

6  of 2010, other than the Gulf of Mexico?

7      A.    I can't remember the list, but, you know, we

8  have a list that's in many of these reports, that --

9  that document -- if you refer to the thing called the

10 Orange Book, it's very clear which areas are complete,

11 which areas are in -- in transition.  And I think by

12 the time we're talking about, everywhere was in

13 transition.  I don't think there was anywhere that had

14 not started the process.

15     Q.   All right.  And just again so I'm clear, when

16 you're implementing OMS, do you do it by well site at a

17 time?  Do you do it by group?  I mean, how -- how --

18 how do you specifically do it?

19     A.    You do it by operating activity.  So

20 Drilling -- Drilling, broadly.  Production Operations,

21 broadly.  And then within Production Operations, at an

22 indepen -- individual production facility.  But I

23 believe that Drilling would have been done as Drilling,

24 not rig by rig.

25     Q.    All right.  It would have been done across the

1    board simultaneously?

2        A.    Yeah, essentially.

3        Q.    And you testified earlier that this was -- one

4    of the ways it was implemented, that it was determined

5    when the Business Unit was sufficiently prepared.  Who

6    determined when the Business Unit was sufficiently

7    prepared to implement OMS?

8        A.    That was a -- as I said earlier, a combination

9    of the Safety and Operations Team, led by -- Safety and

10   Operations Team, led by Mark Bly, and the Business Unit

11   Team.

12       Q.    All right.  I want to ask you two questions,

13   and I'm going to ask you to assume something for me.  I

14   know you're not going to agree with the assumption, so

15   I'll alert you to that right now, okay?  But I want to

16   ask you anyway.

17               MR. GODFREY:  Should I preemptively

18   object?

19               MR. BECK:  No.

20       Q.    (By Mr. Beck) And -- and my question is this:

21   If OMS had been implemented over a three-year period

22   instead of a five-year period, wouldn't there have been

23   a better chance of avoiding the April 20, 2010

24   incident?

25               MR. WEBB:  Object to the form of the

 1  question.

 2          MR. GODFREY:  Same objection.

 3      A.   The answer is I don't know.  I don't know.

 4      Q.   (By Mr. Beck) There is certainly --

 5      A.   Do you think -- excuse me.  Do you think I

 6  haven't thought about that?  Of course, I have.  But

 7  do -- can I sit here today and say one way or the

 8  other?  The answer is I can't.

 9      Q.   If it had been implemented by April 20, 2010,

10  by Drilling, which would have included the Gulf of

11  Mexico, would you agree that at least there's the

12  potential, Dr. Hayward, that this terrible catastrophe

13  would have been averted?

14          MR. GODFREY:  Objection as to form.

15          MR. WEBB:  Object to the form of the

16  question.

17      A.   There's lots of assumptions in your question.

18      Q.   (By Mr. Beck) (Nodding.)

19      A.   There -- on the basis of your assumptions, it

20  is potentially possible that it may have been avoided.

21  There are many other things that potentially possibly

22  may have prevented the accident.

23      Q.   Not -- not -- and, again, I'm not saying

24  they're -- they're not.  But -- but -- but -- but,

25  again, to get back to my two questions:  If OMS had

1    been implemented in the Gulf of Mexico before April 20,

2    2010, is there not the potential for having avoided

3    this terrible catastrophe?

4              MR. GODFREY:  Objection, form.

5              MR. WEBB:  Objection, form.

6        A.    There is possible potential --

7        Q.    (By Mr. Beck) All right.

8        A.    -- undoubtedly.

9        Q.    All right.  And, similarly, if OMS had been

10   implemented during a three-year period instead of a

11   five-year period, there was at least the potential that

12   the April 20, 2010 incident could have been avoided?

13             MR. GODFREY:  Objection as to form.

14             MR. WEBB:  Objection to the form of the

15   question.

16       A.    There's potential for all sorts of things in a

17   theoretical world, which is the one we're talking

18   about.

19       Q.    (By Mr. Beck) So would you agree --

20       A.    It wasn't the real world.  It was a

21   theoretical world.

22       Q.    All right.  So would you agree, then, that at

23   least there's the potential?

24             MR. GODFREY:  Object as to form.

25             MR. WEBB:  Objection, form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    There's a potential for anything in a

2  theoretical world.

3    Q.    (By Mr. Beck) All right.  By the way, just so

4  I'm clear, ha -- have you had any conversations with

5  anybody at Cameron related to the DEEPWATER HORIZON?

6    A.    I've never had any conversations with anyone

7  at Cameron.

8    Q.    And you consider Cameron to be well-respected

9  in the industry?

10   A.    I consider them to be very well-respected in

11  the industry.

12   Q.    And then my last question to you:  If the

13  Judge or Jury who decides this case determines that the

14  safety culture at BP on April 20, 2010 was either poor

15  or not what it should have been, who would have been

16  responsible for that?

17          MR. WEBB:  Object to the form of the

18  question.

19          MR. GODFREY:  Same objection.

20   A.    I'll cross that bridge when I come to it.

21   Q.    (By Mr. Beck) I'm not sure I understand your

22  answer.

23   A.    That's another -- completely --

24   Q.    I'm asking the question now.

25   A.    -- theoretical question.

1    Q.   Well, there -- you know there's going to be a

2    Judge and/or Jury who's going decide this case.  You

3    understand that?

4    A.   That's one possible outcome.

5    Q.   Okay.  And --

6    A.   There are, I believe, others.

7    Q.   And you know that some of the positions that

8    BP has taken in this case are, in fact, disputed?

9    A.   I do.

10   Q.   And you understand that even though you may

11   testify a certain way, others may disagree with your

12   testimony -- legitimately so.  You understand that?

13   A.   I do.

14   Q.   And so I'll ask my question again, that if

15   whoever decides this case determines that the safety

16   culture at BP was not what it should have been on April

17   20, 2010, my question to you is:  Who would have been

18   responsible for that?

19              MR. WEBB:  And I object --

20              MR. GODFREY:  Objection as to form.

21              MR. WEBB:  -- to the form of the

22   question.

23   A.   It would depend on what it is they find with

24   respect to the safety culture.  If they find that there

25   was no leadership from the top, no systems and

1  processes being implemented, no people being put in the

2  right place, no people being recruited from the

3  external world, then I would take that responsibility.

4  I don't believe that was the case.

5           MR. BECK:  That's all I have.  Thank you

6  very much, sir.

7           THE WITNESS:  Thank you.

8           THE VIDEOGRAPHER:  Off the record at 3:09

9  p.m., ending Tape 19.

10      (Recess from 3:09 p.m. to 3:15 p.m.)

11          MR. GODFREY:  Are we ready to go back on

12  the record.

13          THE VIDEOGRAPHER:  All set?  On the

14  record at 3:15 p.m., beginning Tape 20.

15          MR. ROBERTS:  I just want to make sure

16  I've got a clarification.  Weatherford yesterday

17  donated its time to BP and today, as I understand it,

18  has ceded all of its time to BP.  We are all operating

19  under an obligation to report any formal or informal

20  cooperation agreements or standdown agreements, so I

21  don't want any -- another MOEX issue to come up.  So

22  I'm -- I'm proceeding as if there is still adversity

23  and there are no agreements between Weatherford and BP.

24      And I do appreciate your hospitality, and I

25  don't mean anything against you professionally.  I just

PURSUANT TO CONFIDENTIALITY ORDER

1   want to get that on the record and -- and get your

2   agreement that that is the situation.

3                  MR. GODFREY:  If you are asking me

4   whether or not BP and Weatherford have, what?

5                  MR. ROBERTS:  Whether you have any formal

6   or informal standdown agreement, cooperation agreement,

7   time arrangement, or deal.

8                  MR. GODFREY:  Well, what we have is I've

9   asked Weatherford, as a matter of professional courtesy

10  several weeks ago, whether they would cede me 45

11  minutes, and they agreed.  That's --

12                 MR. ROBERTS:  I have no -- no objection

13  to that as long as there is --

14                 MR. GODFREY:  Thank you.

15                 MR. ROBERTS: -- no overriding agreement,

16  deal, standdown arrangement, or anything else in the

17  works.  The -- the MOEX thing kind of surprised all of

18  us, and I applaud you for working that out.  But as

19  long as -- as there's true adversity amongst the

20  parties, then the working arrangement and time

21  allocation stands.

22                 MR. GODFREY:  I'll make two observations.

23  One, two weeks ago or three weeks ago, Weatherford sued

24  my client.  Two, that stand -- that complaint still

25  stands.  And, three, there is no Settlement Agreement

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 351

```
 1   that has been reached between Weatherford and BP, at

 2   least as far as I know.

 3              MR. ROBERTS:  I -- I -- I -- I didn't ask

 4   about a Settlement Agreement.  What I'm asking about is

 5   a formal or informal standdown arrangement.

 6              MR. GODFREY:  Well, I'm sorry, Steve.

 7   I'm not going to comment further.  I'm very well aware

 8   of the informal agreements among Halliburton,

 9   Transocean, and the PSC to blame BP in this, because

10   I've seen it repeatedly of every deposition.

11              MR. ROBERTS:  I -- I -- I'd --

12              MR. GODFREY:  I don't think I need --

13              MR. ROBERTS:  -- be glad to disclose

14   anything.  I don't have an agreement with anyone.

15              MR. GODFREY:  Well, I'm going to proceed

16   with the deposition the way I want to proceed.

17              MR. GODWIN:  Rick, we -- you know, we --

18   we didn't need that sidebar remark about Halliburton.

19   We have defended the depositions to the best of our

20   ability, without trying to attack anyone.  So I would

21   just ask you respectfully, save your self-serving

22   remarks for somebody that cares, because I don't care

23   to hear them.

24              MR. GODFREY:  I'd like to proceed with

25   the deposition.  I've been very --
```

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 352

```
 1                    MR. WEBB:  So would the witness.

 2                    MR. GODFREY:   -- cautious and -- and

 3     patient with everyone else here.

 4                    MR. ROBERTS:  But let me raise my

 5     objection.  If it turns out that there is some formal

 6     or informal standdown, then I'm going to move to strike

 7     the deposition.

 8                    MR. GODFREY:  You don't have a --

 9                    MR. ROBERTS:  Your portion of it.

10                    MR. GODFREY:  Well, I'm sorry,

11     Mr. Roberts, but that's not something that I think is

12     provided for by the Rules.  I'm going to proceed.  I

13     have the agreement that I've reached with Mr. Lemoine.

14     I've told you that Mr. Lemoine's client has sued my

15     client.  I've told you that as far as I know, we have

16     no Settlement Agreement with them, and I think I'm not

17     obligated to go any further than that.

18                    MR. ROBERTS:  Okay.  We'll work that out

19     on another day.  And I appreciate the hospitality; I

20     didn't mean to indicate otherwise.

21                    THE COURT REPORTER:  Dan, your phone.

22              (Discussion off the record.)

23                         EXAMINATION

24     QUESTIONS BY MR. GODFREY:

25         Q.   Dr. Hayward, good afternoon.
```

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 353

1      A.    Good afternoon.

2      Q.    As you know, I'm Rick Godfrey.   I represent

3   the company.   You're here with your personal counsel,

4   Mr. Webb, right?

5      A.    Correct.

6      Q.    I think I misspoke yesterday when I said I

7   wanted to confer with you one time as my client,

8   because for much of last Summer, you and I spent some

9   time together, as you recall.

10     A.    We did, indeed.

11     Q.    So we've known each other for some time.

12           Where do you live, sir?

13     A.    I live in Sevenoaks, south of London.

14     Q.    Are you married?

15     A.    I am.

16     Q.    What's your wife do?

17     A.    She's working with a couple of non-Government

18   organizations, one a think tank, and another, I guess

19   you'd call it a charity in the U.S.

20     Q.    Do you have children?

21     A.    I have a son of 20 who's at University,

22   finished his last second-year exam yesterday, and a --

23   a daughter of 16, who is -- as I'm going through this,

24   is doing French and Physics exams.   So I probably got

25   the better part of the -- of the deal today.

1      Q.    Of which country are you a citizen, sir?

2      A.    I'm a citizen of the U.K.

3      Q.    United Kingdom?

4      A.    Correct.

5      Q.    What is your educational background?

6      A.    I have a B.S.C. in Geology from the University

7   of Birmingham and a Ph.D. in Geology from the

8   University of Edinburgh.

9      Q.    The -- I -- I think I have a layman's

10  understanding of what a Geologist does, but what --

11  what does a Geologist in the petroleum industry do?

12  What --

13     A.    Tells drillers where to drill.

14     Q.    I see.  Is that what you did the first couple

15  of years in your job?

16     A.    For the first almost ten years, I was -- I was

17  trying to identify which basins were going to have

18  hydrocarbons in them or trying to determine within a

19  basin where was the best place to drill to find

20  hydrocarbons.

21     Q.    And what, just in a few minutes, if you could,

22  tell us from the time you started working for BP or a

23  Heritage B key -- BP company, through today, what your

24  jobs basically entailed.

25     A.    I began my career as a rig Geologist in the

**PURSUANT TO CONFIDENTIALITY ORDER**

1  North Sea, working a week offshore and a week in the

2  office over a couple of years.  And then I moved to

3  Paris and then China for a couple of years and then

4  back to Scotland.  And then I had a brief period in

5  London for about a year, as we discussed on Monday, in

6  the role of an Executive Assistant.

7       And then after that, I went to Colombia for

8  about four years, where my daughter was born, and then

9  to Venezuela.  And then I returned to London in '97,

10  held a couple of roles in Exploration and Production,

11  and then became the Group Treasurer in 2000, the CEO of

12  Exploration and Production in 2003, and the Group CEO

13  in 2007.

14       Q.   Are you appearing here voluntarily today?

15       A.   I am.

16       Q.   Are you currently a private citizen; that is,

17  someone not working for BP or BP PLC?

18       A.   That's correct.

19       Q.   All right.  Let's -- I'd like to begin by

20  discussing with you the oil spill response.  And I'll

21  discuss subsea containment secondly, but I'd like to

22  get your perspective on the oil spill response; that

23  is, from the time you learned that there had been an

24  explosion on the rig, to the -- whatever you did or did

25  not do with respect to responding to the spill, okay?

1      A.    (Nodding.)

2      Q.    You testified on Monday that you learned of

3    the rig explosion in the early morning of April 21st,

4    London time.  Do you recall that?

5      A.    That's correct.

6      Q.    And after you learned of the explosion, when

7    did you decide to go to Houston?

8      A.    I decided to go to Houston about two days

9    later, after the rig -- as the rig was sinking, in

10   fact.

11     Q.    And when you went to Houston, for what purpose

12   did you go to Houston after -- you know, two days

13   later?

14     A.    To -- to lead the response to what -- what was

15   clear at that time was going to be a very serious -- a

16   seri -- a serious accident, or had been a serious

17   accident.

18     Q.    In general terms, when you first went to

19   Houston, what -- what did you do in terms of either

20   organizing or to lead the response?

21     A.    Well, really, two things.  One, to ensure that

22   we had launched the -- to the best of our ability, the

23   maximum surface response to the spill, to make certain

24   that everyone understood that no resources were to be

25   spared, the full power and resources of BP were at the

PURSUANT TO CONFIDENTIALITY ORDER

805

1  disposal of those responding.

2        And then secondly, to -- with the -- with the

3  Subsea Technical Team, to conceive a plan of

4  intervention to plug the well.

5     Q.   All right.  Turn to -- I've handed you a

6  notebook, I think you have before you.  Turn to Tab 1,

7  please.  Do you have that?

8     A.   I do.

9        MR. GODFREY:  And, Kym, what's the next

10  exhibit number that we'll apply to this?

11        THE COURT REPORTER:  6073.

12        (Exhibit No. 6073 marked.)

13        MR. GODFREY:  Thank you.

14     Q.   (By Mr. Godfrey) Placed before you,

15  Dr. Hayward, is Exhibit 6073, which is a press release

16  dated April the 22nd, 2010, entitled "BP INITIATES

17  RESPONSE TO GULF OF MEXICO OIL SPILL."  Do you see

18  that?

19     A.   I do.

20     Q.   Have you seen this document before?

21     A.   I certainly saw it at the time that it was put

22  out, I'm sure.

23     Q.   Looking at this document, does this document

24  refresh your recollection as to the nature of what BP's

25  response had been to the spill as of April 22nd, 2010,

806

1  which is the day that the -- the rig tragically sank

2  and two days after this -- this accident, this

3  casualty?  What was the nature -- if you can summarize

4  BP's response as of April 22nd, 2010, in terms of the

5  oil spill?

6      A.   By that time we had mobilized a flotilla of

7  vessels, 32 spill response vessels, including large

8  storage barges, skimming capacity of 170,000 barrels a

9  day.  Storage capacity offshore of 120,000 barrels a

10 day, with a further 175 on its way.  The supply of more

11 than a hundred-thousand gallons of dispersant and --

12 and four aircraft to -- to -- to deploy.  We had on --

13 on location 500,000 feet of boom, and it was expected

14 to increase to a million feet of boom by the end of the

15 day.

16     Q.   Now, the -- the Transocean rig, the DEEPWATER

17 HORIZON, it had diesel fuel on it, right?

18     A.   It did.

19     Q.   Did Transocean mount any type of oil pollution

20 response, to your knowledge?

21     A.   Not to my knowledge, no.

22     Q.   All right.  Let's go to the next document

23 which is in the book.  It's Tab 2, please.

24          MR. GODFREY:  And, Kym, we'd like to mark

25 this as Exhibit 6074.

**PURSUANT TO CONFIDENTIALITY ORDER**

1              THE COURT REPORTER:   (Nodding.)

2         (Exhibit No. 6074 marked.)

3      Q.    (By Mr. Godfrey) Do you have that,

4    Dr. Hayward?

5      A.    I do.

6      Q.    This document is dated April 25th, 2010, and,

7    again, it -- it summarizes -- if you take a look at it,

8    it summarizes the then state of the BP response to the

9    oil spill.  Do you see that?

10     A.    I do.

11     Q.    First of all, the second page of the document

12   refers to the Marine Spill Response Corporation.  Are

13   you familiar with that corporation?

14     A.    I am.

15     Q.    What is the Marine Spill Response Corporation?

16     A.    It's the not-for-profit organization that was

17   established by the oil industry post EXXON VALDEZ to

18   deal with oil spills at sea, in the marine environment.

19     Q.    Is BP the only company that uses the Oil Spill

20   Response Corporation?

21     A.    The entire industry uses the Oil Spill

22   Response Corporation, and all of our major peers and

23   competitors are partners in the Oil Spill Response

24   Cor -- Corporation.

25     Q.    Now, it refers here in this document which

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 360

1    we've marked as Exhibit 6074 that -- it quotes the CEO

2    and President of the Marine Spill Response Corporation

3    of saying that it had worked for many years with BP on

4    drills and exercises.  Do you see that?

5         A.    That's correct.

6         Q.    Can you give us a general sense of the types

7    of drills and exercises, if you know, that BP had

8    worked on previous to this -- this tragedy on April 20

9    and 22nd, with the Oil Spill Response Corporation --

10   Marine Spill Response Corporation?

11        A.    We, on regular -- on a regular occurrence,

12   mounted both desktop and actual physical response

13   practices, in essence, whereby we would deploy the --

14   the equipment in -- in -- in essential training

15   exercises.

16        Q.    If you turn to the first page of Exhibit 6074,

17   which is Tab 2 in the notebook, can you summarize for

18   us, for the Judge or Jury, if there's ever a Jury in

19   the case, what was the nature or scope of BP's response

20   to the oil spill as of April 25th, 2010, five days

21   after the -- the explosion and three days after the

22   sinking of the rig?

23        A.    In the -- in the subsea, we were assisting

24   Transocean on the blowout preventer.  We were preparing

25   to drill relief wells, was -- the first drilling rig

 1   was moving into position, and the second drilling rig

 2   was -- was on its way.  And we had a very significant

 3   response on the surface, 30 stoo -- 32 spill response

 4   vessels, skimmers, tugs, barges, and recovery vessels,

 5   five aircraft, and 100,000 gallons of dispersant, which

 6   at the time was a third of the world's available

 7   dispersant.

 8        Q.   It refers here in the last paragraph, on the

 9   first page of Exhibit 6074, to Houma, Louisiana, with

10   field operations of about 500 people.  What is that

11   referring to, if you know?

12        A.   The surface response was coordinated out of a

13   number of centers.  Robert was the basis for the

14   Unified Command.  Houma was the operational base

15   essentially for Louisiana.  There was one in -- in

16   Mobile for Alabama, and Pensacola, ultimately, for

17   Florida.  And this is the 500 people that have been

18   assembled in Houma to coordinate the oil spill

19   response.

20        Q.   Turn to Tab 3, please, sir.

21             MR. GODFREY:  Kym, we'll mark this, if

22   it's agreeable to you, as Exhibit 6075.

23             (Exhibit No. 6075 marked.)

24        Q.   (By Mr. Godfrey) This is a document dated May

25   the 5th, 2010, "Update on Gulf of Mexico Oil Spill

 1  Response."  I assume you've seen this document before,

 2  sir?

 3      A.   Yeah.  I saw it at the time it was released,

 4  I'm pretty certain.

 5      Q.   All right.  So it refers here on May 5th, 2010

 6  to something which I think you discussed earlier this

 7  morning.  I don't recall whether it was with Attorney

 8  General Strange or with the counsel for The state of

 9  Louisiana, Mr. Kanner -- the 25 million block grants to

10  each of the States of Louisiana, Alabama, Mississippi,

11  and Florida.  Do you see that?

12      A.   I do.

13      Q.   What's the background -- or what was the

14  reason for why BP gave $25 million in block grants to

15  each of the States of Louisiana, Alabama, Mississippi,

16  and Florida on or before May the 5th, 2010?

17      A.   The -- the foundation stone to the oil

18  still -- oil spill response for any of the States was

19  something that was referred to as Area Contingency

20  Plan.  And we wanted to be absolutely certain that

21  resources -- that is to say, financial resources --

22  were not in any way getting in the way of the rapid and

23  effective deployment of the Area Contingency Plans.

24      Q.   Did -- as of this date, did Transocean, the

25  owner of the drilling rig DEEPWATER HORIZON -- had it

 1   given the States of Louisiana, Alabama, Mississippi, or

 2   Florida any money whatsoever to assist them in response

 3   to the spill?

 4        A.   As of this date, BP was unique in responding

 5   in any shape or form, and certainly --

 6        Q.   As --

 7        A.   -- in terms of providing grants to States.

 8        Q.   As of the time that you left BP as the CEO of

 9   BP PLC, had you heard of Transocean giving any money of

10   any type to the people of the State of Louisiana or

11   Alabama, Mississippi, or Florida or to the Governments

12   of those States, for that matter?

13        A.   Not to my knowledge.

14        Q.   All right.  What about Anadarko?  Had they

15   given any money, as a co-owner -- or co-operator of the

16   well, I should say, 25 percent co-operator -- or

17   co-owner of the well.  Had Anadarko given any money, as

18   of the time you left as CEO from BP PLC, to any of the

19   States of the Gulf Coast?

20                  MS. HERTZ:  Object to the form.

21        A.   To my knowledge, Anadarko had not given any

22   money.

23        Q.   (By Mr. Godfrey) Turn to Page -- Tab No. 4,

24   please --

25                  MR. GODFREY:  -- which, Kym, we'll mark

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 364

812

```
 1   as Exhibit 6076, if that's agreeable.
 2           (Exhibit No. 6076 marked.)
 3       Q.   (By Mr. Godfrey) This is a document dated May
 4   the 6th, 2010.  Do you have that, sir?
 5       A.   I do.
 6       Q.   I assume you saw this on or about the date of
 7   May 6th, 2010?
 8       A.   Correct.
 9       Q.   As of May 6th, 2010, does -- does Document
10   6076 -- does it summarize the -- the general nature of
11   BP's response to the -- to the oil spill?
12       A.   Yes.  Particularly, I think, in terms of
13   people.
14       Q.   All right.  Can you --
15       A.   This says more than 11,000 people have
16   volunteered and more than 4,000 have already received
17   training.
18       Q.   All right.  Can you summarize with this
19   document, or based on your recollection as refreshed by
20   this doculet -- document, what the state of BP's
21   response had been as of May 6th, 2010 to the oil spill
22   in the Gulf of Mexico?
23       A.   We had thrown everything at the response.  We
24   had over 10,000 people, of which nearly half had been
25   trained.  We had deployed boom to protect over a
```

1    hundred miles of shoreline.  And on this day, it says

2    here -- I clearly would not remember this, but we had

3    carried out 12 flights over the spill and delivered

4    4 -- 34,000 gallons of dispersant, in addition to

5    conducting in situ burning of oil on the surface.

6        Q.  Did, to your knowledge, Anadarko ever deploy

7    boom or pay for -- let's just strike that.

8            What -- tell us what "boom" is, just so we're

9    clear on the record.

10       A.  "Boom" is floating plastic baffles which are

11   used to prevent oil from contacting the shore in the

12   near-shore environment.

13       Q.  To your knowledge or the best of your

14   knowledge, did Anadarko ever deploy bloom to try to --

15   booms to try to protect the environment from the oil

16   spill?

17           MS. HERTZ:  Object to form.

18       A.  No.

19       Q.  (By Mr. Godfrey) Did Transocean ever deploy

20   booms to try to protect the environment or the

21   shoreline from the oil spill?

22       A.  They did not.

23       Q.  Turn to Tab 5, please --

24           MR. GODFREY:  -- which we'll mark, Kym,

25   as Exhibit 6077.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 366

814

```
 1              (Exhibit No. 6077 marked.)
 2       Q.   (By Mr. Godfrey) This is dated July the 28th,
 3   2010, it's another two-page document ending in Bates
 4   stamp Nos. 445 and 446.
 5           Do you recall -- if -- if you would take a
 6   moment to look at this document, sir, and refresh your
 7   recollection, and I'll have some questions about the
 8   total commitment that BP made in its actions up through
 9   July the 28th, okay?
10       A.   (Nodding.)
11       Q.   Now, on July the 28th, the oil was no longer
12   flowing out of the Macondo Well.  Is that -- is that
13   your understanding?
14       A.   That's correct.  That's correct.
15       Q.   As of the end of the oil flowing out of the
16   Macondo Well in July 2010, what steps or what had been
17   the nature of BP's response to cleaning the spill?
18       A.   We had deployed almost 4 million feet of boom,
19   we had 7,000 boats and 125 aircraft in the sky, and
20   4,700 people engaged in cleanup operations.
21       Q.   How much oil had you recovered from the water?
22       A.   We had recovered almost 35 million gallons of
23   oil and water, using skimmers.  And they captured
24   826,000 barrels of oil.  We'd estimated that we'd
25   succeeded in burning off at the surface around
```

815

1    11 million gallons.

2         Q.   Now, it refers in Document 6077, Exhibit 6077,

3    to compensating residents and businesses for losses.

4         Do you see that?

5         A.   I do.

6         Q.   And as of this time, July the 28th, 2010,

7    approximately how much had BP spent to compensate

8    individuals and businesses for claimed losses resulting

9    from the spill?

10        A.   We had disbursed $256 million to more than

11   125,000 people.  We established a claims structure with

12   37 field offices, 17 of them had foreign language

13   capability to recognize the large number of,

14   Vietnamese-speaking in particular, fishermen.  And --

15        Q.   How many people were working to pay claims

16   that were being made to BP under the --

17        A.   There were --

18        Q.   -- Oil Pollution Act?

19        A.   I'm sorry.  There were 1,550 people working on

20   pay claims, process claims in this facility.

21        Q.   And turn to the next page, sir.  I'd like to

22   ask you about these, these other comments about

23   supporting the Gulf Region, if I could.  It says, on

24   the second page of Exhibit 6077, that the 555 million

25   in grants have been given by BP to Louisiana,

1  Mississippi, Alabama, and Florida.

2       Do you see that?

3    A.   That's correct.

4    Q.   Actually, it says the Governments of those

5  States.

6    A.   (Nodding.)

7    Q.   What were the nature of the grants that were

8  given by BP that total $555 million as of July

9  the 28th, 2010, from BP to those four State

10 Governments?

11   A.   There was a $25 million grant as I -- as we've

12 discussed to implement the Area Contingency Plans, and

13 we added a further $25 million in the case of Florida

14 given their length of the shoreline.  We had made

15 $70 million available for state tourism and promotion,

16 and we had set up a $360 million escrow account for the

17 construction of berms in Louisiana.

18   Q.   Is that for the barrier islands?

19   A.   That's correct.

20   Q.   What about it then has another section here,

21 this document which is marked as Exhibit 6077,

22 referring to restoring the environment.

23       Do you see that?

24   A.   I do.

25   Q.   What does that refer to, sir?

1    A.   We had established a research fund to study

2  the impact of the -- the spill and the response to the

3  spill and were already taking very comprehensive

4  samples.  It says here three and a half thousand, 3,600

5  water samples analyzed with 300 water testing stations

6  along the Gulf Coast.

7    Q.   As far as you know, has any other corporation

8  ever mounted such a response as quickly or as -- with

9  the size of the massivity of the resources to an oil

10 spill or to an environmental event that B -- than BP?

11   A.   I don't think any other corporation has

12 mounted a response of the scale and int -- and

13 intensity that BP mounted last Summer.

14   Q.   Did BP set up a compensation fund for persons

15 who had claims, legitimate claims under Federal law?

16   A.   We established a compensation fund.  We made

17 very early -- said early on that we would not stand

18 behind the hundred million dollar cap.

19   Q.   Is that the OPA cap you're referring to?

20   A.   The OPA cap.

21        And in the course of the Summer, we

22 transitioned that fund to an independent ind -- an --

23 an -- an individual who was independent to administer

24 the fund.

25   Q.   Who was that?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 370

818

1              DEFENSE COUNSEL:  Object to form.

2       A.    That was --

3       Q.    (By Mr. Godfrey) Who was that individual?

4       A.    That was Ken Feinberg.

5       Q.    Did -- and what was the size of the

6    compensation fund that BP established last Summer, in

7    the Summer of 2010?

8       A.    The -- the fund that we finally agreed to

9    establish was $20 billion.

10      Q.    When you say "you finally agreed to establish

11   the fund," with whom did BP agree to establish the $20

12   billion fund?

13      A.    We -- we agreed to the -- the fund with the

14   White House, with President Obama and his

15   Administration.

16      Q.    I see.  Has, to your knowledge, Transocean

17   established a compensation fund?

18      A.    Not to my knowledge.

19      Q.    Has Transocean, to your knowledge, spent any

20   money to clean up the environment, the pollution?

21      A.    Not to my knowledge.

22      Q.    To your knowledge, has Transocean spent any

23   money to prevent the oil from spreading in the Gulf?

24      A.    Not to my knowledge.

25      Q.    To your knowledge, has Anadarko spent any

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 371

1    money to prevent the oil from spreading in the Gulf?

2         A.    Not to my knowledge.

3         Q.    To your knowledge, has Anadarko set up a

4    compensation fund for persons claiming losses under

5    OPA?

6              MS. HERTZ:   Objection, form.

7         A.    Not to my knowledge.

8         Q.    (By Mr. Godfrey) Has Halliburton set up a

9    compensation fund for people claiming losses under OPA?

10             MR. GODWIN:   Objection, form.

11        A.    Not to -- not to my knowledge.

12        Q.    (By Mr. Godfrey) Do you know whether or not

13   Halliburton spent any money to clean up or restore the

14   environment of the Gulf?

15             MR. GODWIN:   Objection, form.

16        A.    Not to my knowledge.

17        Q.    (By Mr. Godfrey) Now, the United States

18   Government, it spent a certain amount of money in

19   connection with the oil spill as far as you know,

20   right?

21        A.    Correct.

22        Q.    Did the United States Government -- strike

23   that.

24             Do you know whether or not the United States

25   Government billed BP for its oil spill response costs?

1    A.   BP was billed for all of the Coast Guard

2  response to the oil spill and all of the other agency

3  responses to the oil spill.

4    Q.   Do you know whether or not, based on your

5  knowledge, whether or not BP paid or reimbursed the

6  United States Government for its response costs?

7    A.   To my knowledge, they did.

8    Q.   Thank you.

9    A.   To my belief.

10    Q.   Let's -- let's change topics then.

11       We've discussed part of what BP did, which was

12  the response to the spill.  Now, let's discuss the

13  subsea containment efforts.

14    A.   M-h'm.

15    Q.   Just, basically, what is a "subsea containment

16  effort"?

17    A.   It was the interventions that we were making

18  on the well to try and stop flow through -- stop the

19  flow of the oil into the Gulf prior to having the

20  relief valves in place, and those interventions --

21  those containment efforts took various forms.

22    Q.   Were you involved, at least in a general sense

23  or some -- strike that.

24       What was your involvement, generally speaking,

25  in the intervention efforts, the subsea containment

1  efforts?

2      A.   Well, my involvement was in determining, I

3  suppose, the strategy of the intervention.  So we

4  agreed very early on, in the first two or three days,

5  the way we would approach it is to pursue multiple

6  potential options to intervene in parallel, to engineer

7  them, to resource them, and to make them available in

8  the fastest possible time, and to deploy them in the

9  time sequence which was driven by their availability.

10          So the easiest engineering options were those

11  that were conducted first, and the more complex, more

12  difficult engineering options were those would clearly

13  take a longer time and were deployed later.

14      Q.   What was the first intervention option, if you

15  recall?

16      A.   The first intervention option was something

17  called a cofferdam which had been used successfully --

18  successfully by BP and the industry following Hurricane

19  Katrina and -- and later Rita to contain leaking wells

20  in shallow water, in water depths up to about 300 feet.

21      Q.   Prior to the cofferdam, do you know whether or

22  not there were any efforts to activate the BOP using

23  ROVs?

24      A.   There was a period of over two weeks where

25  efforts were made to activate the BOPs using ROVs.

1    Q.   And what two -- two-week period was that, if

2   you recall, Dr. Hayward?

3    A.   It was from immediately following the

4   accident.  I think there are ROVs in the water whilst

5   the rig was still on fire on the surface.  And then

6   they were -- once, obviously, when -- when the rig

7   sank, it was clearly a lot of turbulence in the water.

8   It became impossible to see anything, so we couldn't

9   use the ROVs for probably 12 hours.  And soon as the

10  turbulence cleared, then the ROVs were on location,

11  working on the BOP, trying to get the BOP to close.

12   Q.   And what was the -- how -- how -- can you

13  describe just briefly how the ROVs were trying to get

14  the BOP to close and for what purpose?

15   A.   They were latching on to various valves on the

16  BOP to use hydraulic pressure to pump on the valves and

17  try and get one or other of the rams in the BOP to

18  shut.

19   Q.   And why was the attempt being made to get one

20  or other of the rams in the BOPs to shut?

21   A.   Because the well --

22          MR. BECK:  Object to form.

23          MR. ROBERTS:  Objection, form.

24   A.   The well was evidently flowing, and,

25  therefore, it meant that the BOP had not sealed the

```
 1  well.

 2      Q.   (By Mr. Godfrey) What was the purpose, if you

 3  know, of the ROV intervention with the BOP?

 4      A.   It was to close the BOP, to the seal the well.

 5      Q.   And if the ROV intervention with the BOP had

 6  been successful, what would the result have been with

 7  respect to the flowing well?

 8      A.   It would have shut the well in.  It would have

 9  stop flowing.

10      Q.   Would it have stopped the oil spill?

11      A.   It would have stopped the oil spill.

12      Q.   Was there any discussion at any point in time

13  about drilling relief wells?

14      A.   The relief wells were -- the first relief well

15  was initiated within a couple of days of the -- the

16  accident, and the second relief well was initiated

17  within a couple of weeks of the accident.

18      Q.   And were these -- describe briefly, if you

19  can, how -- what it is to drill a relief well.  What

20  does that mean --

21      A.   It's to drill --

22      Q.   -- in layman's term?

23      A.   Is to drill a well to -- to intersect the well

24  that was leaking the while it was blowing out in such a

25  way that you can plug the well and seal it off.  So, in
```

PURSUANT TO CONFIDENTIALITY ORDER

 1   essence, we had a -- if can you imagine a well in the

 2   middle, two relief wells targeting it from either side.

 3       Q.   During this period of time -- that is, between

 4   April 22nd and the time cofferdam was -- was used or

 5   implemented -- were you dealing at all with anyone from

 6   the United States Government?

 7       A.   I was dealing some days every hour with

 8   someone from the United States Government.  My

 9   principal contact after the first four or five days was

10   Thad Allen, who was ultimately appointed as the

11   incident -- Incident Commander for the -- for the

12   accident and the response, and he and I talked many

13   times most days.

14       Q.   What was the role of the Incident Commander in

15   the subsea containment efforts that BP was engaged in?

16       A.   He was the ultimate decisionmaker.  We would

17   recommend to the Commander the interventions that we

18   were intending to make, and he -- we needed his

19   approval before we could go ahead.

20       Q.   Cofferdam -- did the cofferdam work?

21       A.   The cofferdam didn't work.  It was -- it

22   wasn't a surprise it didn't work.  It was, of course, a

23   great shame that it didn't, but it was accepted by many

24   people, not everyone but many -- many people, including

25   myself, thought that the likelihood of success was low,

1   but it was worth trying because it was -- it was

2   available and could be deployed.

3       Q.   Approximately when did cofferdam not work?

4   About what date?

5       A.   To my recollection, it was sometime in the

6   early, middle part of the 9th.

7       Q.   What was -- I'm sorry.

8       A.   It was the 8th or 9th of May, I think,

9   something like that.  I'm not sure.

10      Q.   Do you know some -- what -- what's something

11  called a RIT insertion tool is?

12      A.   That's something called the riser insertion

13  tool, which was designed to be inserted into the riser.

14  The configuration on the seabed was a -- a wellhead

15  with a 5,000 feet of riser trawled around the seafloor

16  like a piece of spaghetti, and the oil was leaking from

17  the end of the riser.  And we designed something that

18  we could stick into the end of the riser in an attempt

19  to produce the oil and gas to surface.

20      Q.   Was that -- was the RIT used?

21      A.   It was used for a period of several weeks.

22  I --

23      Q.   Was it able to stop the well from flowing?

24      A.   It was able to produce oil and gas to surface

25  in variable volumes.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 378

1    Q.   After the riser insertion tool, what was the

2   next attempt that BP engaged in, if you recall, to shut

3   the well in?

4    A.   The next effort was something that we referred

5   to as a top hat, which is -- was simply like an

6   inverted cup, really, that was put over the -- the leak

7   and allowed us to produce oil and gas to surface.  And

8   if I remember, we -- we designed and built around ten

9   of those various dimensions, shapes, and sizes.

10  Ultimately I think only used one of them.

11   Q.   Was the top hat able to stop the oil from

12  flowing or just collect some of the oil coming out of

13  the pipe?

14   A.   It was not able to -- it was neither able nor

15  designed to stop the well from flowing.  It was

16  designed to contain -- produce oil to surface to the

17  greatest extent possible.

18   Q.   Who was designing or working on all these --

19  these -- the riser insertion tool and the cofferdam and

20  the top hat, who -- who was working on these things in

21  Houston?

22   A.   It was a -- a Multidiscipline Engineering Team

23  lead by BP with input from various contractors, various

24  others from -- from engineering and science input.  And

25  it was being engineered and built on a sort of 24-hour

1   basis.

2      Q.   What was top kill or -- and junk shot?

3      A.   The top kill and then junk shot was an attempt

4   to stop the flow of the well by pumping heavy mud at

5   high rates into the well to stop the flow.  When that

6   was not successful, what we tried to do was to bridge

7   the flow through the blowout preventer by pumping

8   various materials, which the drillers refer to as

9   "junk," into the blowout preventer to try and create an

10  impediment to the flow path of the hydrocarbons.  If we

11  could do that, then we would have a reduced flow rate,

12  and we could perhaps use the top kill to kill the well.

13     Q.   Did junk shot or top kill work to kill the

14  well?

15     A.   I'm afraid they didn't.

16     Q.   What was the reaction among the Engineering

17  Team down in Houston when they -- the -- were you --

18  first of all, were you in Houston at the time --

19     A.   I was.

20     Q.   -- of the top kill and junk shot?

21     A.   When we did the top kill, it was -- it was

22  analogous to a moon shot.  There was a -- it was a

23  control room with a very similar set of displays and

24  screens.  A large number of Engineers intensely focused

25  on executing the operation.  And when it became evident

 1   that it had failed, many of them were in tears,

 2   actually.  It was a very emotional time.

 3        Q.   When you say "a moon shot," have you by any

 4   chance seen the movie Apollo 13?

 5        A.   I have.

 6        Q.   The Crisis Command Center, when you compare

 7   that to the what I think -- many people in the United

 8   States have seen the movie -- what it was -- what it

 9   was like compared to the Crisis Command Center for the

10   NASA event in 1970 or '69 versus the event last Summer

11   in Houston?

12        A.   It was very analogous in terms of the -- the

13   structure, the display, the intensity of the effort,

14   the commitment of people.  I think I wasn't, of course,

15   part of the -- I only saw the film, but if the film was

16   an accurate -- accurate portrayal, then what was going

17   on on the third floor in West Lake in Houston was very

18   comparable to what was shown in the Apollo 13 movie.

19        Q.   How many Engineers came to Houston to try

20   to -- try to work on this shutting in the well?

21        A.   We had a team of more than a thousand

22   Engineers and Scientists from -- from BP, from across

23   the industry, and from all of the major science and

24   engineering institutes in the United States.

25        Q.   When you say from "across the industry," did

1   you have Engineers there from Exxon?

2       A.    I think we had Engineers from Exxon, from

3   Chevron, from Shell, from Conoco, from Total, from many

4   of our major contractors.

5       Q.    Did anyone from Exxon say, "Hey, we've got

6   we've got a -- we've got a cofferdam or a top hat or a

7   riser insertion tool.  Just borrow ours"?

8       A.    They didn't, because, of course, they didn't

9   have them.

10      Q.    Did Exxon have any equipment available to

11  offer to BP for any price that would have shut this

12  well in before BP shut it in?

13                  MS. HERTZ:  Objection, form.

14                  MR. ROBERTS:  Objection to form.

15      A.    They did not.

16      Q.    (By Mr. Godfrey) How do you know that?

17      A.    Because we asked them.

18      Q.    Did Shell or Chevron or ConocoPhillips have

19  any equipment of any type available for any price to

20  shut well in before BP did it?

21                  MR. ROBERTS:  Objection, form.

22      A.    There was no one in the industry who had

23  anything that we hadn't already acquired.

24      Q.    (By Mr. Godfrey) Did you ask them?

25      A.    We asked them.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 382

1      Q.    How was the well eventually shut in, sir?

2      A.    The well was eventually shut in with a --

3  something that we refer to as a capping stack, which is

4  a -- in essence, a very large valve that was designed

5  and engineered and -- and built and machined, was

6  lowered onto the wellhead once it had been cleared of

7  the debris, and it had a valving system on it that

8  allowed us to progressively shut separate valves and

9  ultimately to stop the flow.

10     Q.    Once the flow was stopped using the capping

11  stack, were there any discussions with anyone about

12  whether that was something that should have been done?

13     A.    There was a very intense dialogue ongoing

14  between BP and the Government in the buildup to putting

15  the capping stack on the well and for probably two or

16  three weeks after the capping stack was put in place.

17  There -- there was a strongly held view in

18  Government -- in the Government in the -- amongst

19  the -- some of their technical people that closing the

20  capping stack would cause the well casing to fail, and

21  we would get a breach of the well in the subsurface.

22        BP's view of that was that we could measure

23  very clearly what was going on in the well.  If there

24  was any indication of that, we would know it from our

25  measurement, and we'd be able to take the appropriate

1  action.  The --

2               MR. ROBERTS:  Objection, for --

3     A.    The --

4               MR. ROBERTS:  Whoops.

5     A.    -- the outcome, of course, was that the well

6  did have integrity.  It became clear within 24 hours of

7  putting the capping stack on that -- certainly to the

8  BP Engineers, that the well had integrity.  We had what

9  is referred to as a pressure buildup chart, which

10 followed a completely normal pressure buildup

11 trajectory.  And it was clear to BP that the well had

12 integrity, the casing had integrity, and that there was

13 no breach or flow into the subsurface.

14        It took us some time to convince the

15 Government that that was the case.

16               MR. ROBERTS:  Objection, form.

17    Q.    (By Mr. Godfrey) What was the Government's

18 position as expressed to you with respect to the use of

19 the capping stack?

20    A.    The Government didn't want us to put the

21 capping stack on in the first instance and then wanted

22 us to remove it shortly after we put it on.

23    Q.    After the well stopped flowing, did the

24 Government of the United States ask you to consider

25 removing the capping stack to let the oil flow back

1  into the Gulf?

2      A.   They did.

3      Q.   And what did you say?

4      A.   I said I thought we had sufficient data to

5  give us comfort that that was not -- there was not an

6  issue with the well and that we should keep the capping

7  stack on.  And at the end of the day, the view of the

8  BP Team and myself prevailed.

9      Q.   One more question:  You referred to all these

10 vessels on the surface.  Do you recall that?

11     A.   I do.

12     Q.   How many vessels were around relief wells that

13 were being drilled and on the surface in the immediate

14 vicinity, do you know?

15     A.   There was of the order of 20 or 30 in very

16 close proximity.  It was, perhaps, akin to -- I heard

17 someone describe it as a -- a sea of skyscrapers, all

18 floating around and being held in position and not

19 interfering with each other.  It was a very complex

20 operation to manage the simultaneous operations on the

21 surface.

22     Q.   Had anyone seen that before?  Have you ever

23 seen that before?

24     A.   I don't think it had ever been done in the

25 industry.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 385

1    Q.   Okay.  Let's change topics.  I'd like to

2  discuss a few -- a few topics -- a few questions about

3  flow rate.

4         Do you recall being asked some questions last

5  Monday by Mr. Underhill from the United States about

6  flow rate estimates?  Do you recall that?

7    A.   I do.

8    Q.   And do you recall saying in answer to one of

9  his questions that there was no credible way at the

10  time to measure flow rate, do you recall that?

11    A.   I do.

12    Q.   Can you explain what you meant by that, that

13  there's no credible way during --

14    A.   What --

15    Q.   -- the crisis to measure flow rate?

16    A.   Well, what I meant was that to measure flow

17  rate you either need a -- a -- a dial, a measurement of

18  the flow, or you need some engineering-based assessment

19  of flow.  What -- what we had was a videotape of a

20  plume of oil and gas emerging from the end of a riser

21  with no way of calibrating how much was oil and how

22  much was gas.  We had no way of knowing what the --

23  what the real flow path was from the reservoir through

24  three and a half miles of casing, through a damaged

25  blowout preventer, and then along 5,000 feet of riser

PURSUANT TO CONFIDENTIALITY ORDER

1    to the end of the riser.  And we weren't -- we -- we

2    had no real knowledge of what the -- what reservoir

3    section was actually flowing.  So if you took all of

4    those things together, it was very difficult to come up

5    with any form of credible estimate as to what the flow

6    rate was.

7           And -- and as I think I said on Monday, I

8    wasn't focused on the flow rate because it wasn't

9    changing anything that we did with respect to the

10   surface response or the subsea response.

11   Q.   Do you also re -- remember being asked some

12   questions by Mr. Sterbcow about top kill?

13   A.   I do.

14   Q.   And do you recall being asked whether the

15   failure of the top kill operations showed that the well

16   was flowing more than 18,000 barrels at the time, and

17   you -- do you recall that question?

18   A.   I do.  And that was certainly one of the

19   reasons it could have failed.  It wasn't the re -- the

20   view favored by the Government Scientists working with

21   us.  The favorite reason for the failure of the top

22   kill was that the casing was damaged, and we had pumped

23   mud into the well, and then out of the casing into the

24   formation.

25          So, you know, whilst it -- it could have been

1    an indication of flow rate, it could also have been an

2    indication of many other things.  And, as I say, the --

3    the view that was most favored by the Government

4    Scientists was that it was a -- the casing was -- was

5    broke, breached.

6        Q.   I'm going to switch topics again.  I'm going

7    to ask you a few questions following up with some

8    questions that Mr. Godwin asked you earlier today.

9            Do you recall Mr. Godwin stating to you his

10   view of what BP Engineer Greg Walz had testified to

11   earlier?

12       A.   I can barely recall it, I'm afraid.

13       Q.   That's fair enough.  It's been a long two

14   days, I understand.

15           First, have you ever seen the Halliburton

16   written Job Recommendations sent on the night of April

17   the 18th, 2010 to BP's Engineers about pouring this

18   cement job?

19       A.   I --

20               MR. GODWIN:  Objection to form.

21       A.   I have seen none of the Halliburton Reports.

22       Q.   (By Mr. Godfrey) Have you seen any post-Job

23   Reports sent on April 20, April 23rd, or May 3rd from

24   Halliburton about the success of the cement job that

25   was poured?

836

```
1        A.    I have not.

2        Q.    If Halliburton had an Engineer or Engineers

3   who thought that the cement job that they were pouring

4   was dangerous, did -- would you, as the CEO of BP,

5   expect them to call a halt and not pour the cement?

6                  MR. GODWIN:   Object to form.

7        A.    I would certainly hope that they would,

8   particularly given that there were clearly Halliburton

9   people involved in running the operation.

10       Q.    (By Mr. Godfrey) You mean on the rig?

11       A.    On the rig.

12       Q.    Okay.  You don't think Halliburton Engineers

13  would knowingly endanger their own people on the rig,

14  do you?

15                 MR. GODWIN:   Object to form.

16       A.    I don't believe they would knowingly endanger

17  either their own people or other people.

18       Q.    (By Mr. Godfrey) Okay.  Let's talk about

19  safety.  You became CEO when?

20       A.    In 2000 -- early 2007.

21       Q.    All right.  I'd like you to turn to Tab 7,

22  please, which is a document we've given Exhibit

23  No. 6078 to.

24                 MR. GODFREY:   Kym?  Thank you.

25                 THE COURT REPORTER:   6078?
```

```
 1              MR. GODFREY:  Yes.

 2              THE WITNESS:  Thank you.

 3         (Exhibit No. 6078 marked.)

 4    Q.   (By Mr. Godfrey) It's entitled "BP

 5  Sustainability Review."  It's dated March 2009.  Do you

 6  have that?

 7    A.   I do.

 8    Q.   What is a Sustainability Review, if you know?

 9    A.   It's the nonfinancial report on BP, which --

10  which is produced every year, so it covers Safety,

11  Environment, Government affairs, expectations of

12  society, all of the nonfinancial reporting that a

13  company is doing in the 21st Century.

14    Q.   And does B -- has BP produced -- or did BP

15  produce a Sustainability Review each of the three years

16  that you were CEO?

17    A.   They did.

18    Q.   All right.  And did the Sustainabil -- what

19  were -- what were you reporting in the Sustainability

20  Review?  What was the purpose of it?

21    A.   It was to report on our environmental

22  performance, our health performance, our safety

23  performance, our societal performance, what we were

24  doing with respect to community relations, what we were

25  doing with respect to developing our own people.
```

1  It's -- it's all of the things that you need to do to

2  be a successful company that goes above and beyond

3  financial reporting.

4      Q.   If you turn to the page that's Bates-stamped

5  No. 50 -- 570, it's the third page in, please.  You see

6  the first question which says, "With so much of your

7  focus on improving BP's performance, does this mean

8  that the environment and your other sustainability

9  commitments to shareholders are less important?"

10         Do you see that question?

11     A.   I do.

12     Q.   And what was your answer with respect to

13  safety, if you can find it in that answer?

14     A.   Well, I first mentioned safety when I say we

15  measure our performance not only with financial

16  notices, but also with data on safety, the environments

17  and employees.

18     Q.   What -- what was the next sentence of your

19  answer?

20     A.   "This reflects my top three priorities as

21  chief executive: safety, people and performance."

22     Q.   And when you came Chief Executive, did you --

23  in light of those three priorities, what did you do to

24  focus on safety, if you recall?

25     A.   I did an enormous amount, actually.  Firstly,

1   of course, I made it clear it was -- it was the

2   priority, and it set the agenda.  But over and above

3   that, we created management processes at the top of the

4   company, to measure and monitor and intervene in our

5   safety performance.

6          The Group Operating Risk Committee was one

7   such system.  We began the implementation of the

8   Operating Management System, which we've talked at

9   length about in this deposition.  We created new

10  standards for -- to govern the integrity of our

11  operations, new standards to govern the control of work

12  in our operations, so-called Integrity Management

13  Standard and Control of Work Standard.

14         We recruited extensively into our operations

15  to ensure that we had the right people with the right

16  skills doing the right things.  We recruited

17  extensively into the Safety Leadership of the company

18  from places which had a reputation for good safety,

19  such as the nuclear industry such as DuPont, and areas

20  of the petrochemical industry.

21     Q.   Who did you recruit from the nuclear industry?

22     A.   We recruited the Head of Engineering of BP

23  now, a guy called John Baxter, who had, prior to

24  joining BP to set the engineering standards, had run

25  the Dounreay Nuclear Plant in Northern England.

1    Q.   And the Group Operations Risk Committee that
2  you created, what is that?
3    A.   It was the Committee that reviewed on a pretty
4  well monthly basis the safety performance of BP.  In
5  much the same way as I would have a business review, we
6  had a review of safety with each one of the Chief
7  Executives of the different businesses.
8         So the Group Operations Risk Committee
9  comprised myself, the Head of E&P, Exploration &
10  Production, the Head of Refining and Marketing, the
11  Head of our Alternative Energy business, plus the right
12  sort of functional skills and capabilities.  So Mark
13  Bly, the Head of Safety and Operations attended, John
14  Baxter, the Head of Engineering attended, and often
15  John Sieg, the man who was given the task of
16  implementing the Operating Management System across BP.
17    Q.   And did John Sieg -- was he the person you
18  recruited from DuPont?
19    A.   That's correct.
20    Q.   What was the forward agenda?
21    A.   The forward agenda was the agenda that I
22  created for BP.  When I became the CEO, it had three
23  components.  The first component was safe reliable
24  operations.  The second component was people, having
25  the right people, the right skills in the right place.

1    And the third component was performance, ensuring that

2    we had good business performance.

3        Q.   Now, several times you referred to on Monday

4    and then again a minute or so ago about recruiting

5    people.  But you also were asked a number of questions

6    about whether or not you cut costs.  Do you recall

7    that?

8        A.   Yes.

9        Q.   And several times you attempted to explain in

10   answers that you were cutting costs and cutting staff

11   above the operational level.  Do you recall that?

12       A.   That's correct.

13       Q.   What do you mean when you're saying you're

14   cutting staff above the operational level?

15       A.   We were cutting layers of management,

16   management in various Head Offices and Corporate

17   Centers around the world.  So at the same time as we

18   were doing that, we were adding to the operations

19   staff.  We recruited thousands of Engineers into the

20   operations at the same time as we reduced and

21   streamlined the -- the Head Office and the sort of

22   management oversight functions.

23       Q.   What's SEEAC?

24       A.   SEEAC is the Safety Environment Ethics

25   Assurance Committee.  It's --

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 394

1    Q.   Do you participate in SEEAC?

2    A.   It's a Subcommittee of the main Board, and I

3 attended every SEEAC as -- not as a member of the

4 SEEAC, but as a participant in the meeting.

5              THE COURT REPORTER:  Five minutes.

6              MR. GODFREY:  Five minutes left total, or

7 five minutes left before the tape change?

8              THE WITNESS:  Must be tape change.

9              THE COURT REPORTER:  Five minutes before

10 the tape change.

11             MR. GODFREY:  Thank you.

12             THE VIDEOGRAPHER:  You've got 20 minutes

13 left.

14             MR. GODFREY:  Okay.  I was going to say,

15 that's the fastest hour and 15 I've ever had.

16   Q.   (By Mr. Godfrey) How many times a year does

17 SEEAC meet, if you recall, during the time that you

18 were CEO?

19   A.   It was -- on a typical year, it would be

20 probably six times, that sort of number.

21   Q.   I see.  Do you know a man named Dwayne Wilson?

22   A.   I do.

23   Q.   Who is Dwayne Wilson?

24   A.   He was the independent expert that we

25 appointed following the recommendation of the Baker

1    Panel.

2        Q.    An independent expert to do what with --

3        A.    To --

4        Q.    -- respect to BP?

5        A.    -- oversee the implementation of new --

6    oversee implementation of a renewed focus on safety in

7    our U.S. refineries.  So he was, in essence, to oversee

8    the implementation of the Baker Panel recommendations

9    in our U.S. refineries.

10       Q.    How often did the GORC meet a year?

11       A.    The GORC met around once a month.

12       Q.    And what was the purpose of the GORC meetings?

13       A.    The GORC meetings was to review the safety

14   performance, to review the progress we were making with

15   respect to implementation of OMS, to review the audits

16   that -- that the Safety Audit Group had conducted to

17   assess safety perfor -- performance broadly and in

18   detail, and to make interventions as necessary.

19       Q.    Did you just have meetings with Business

20   Managers, or did you ever go out into the field?

21       A.    I spent as much time as I sensibly could in

22   the operations.  I would try and visit an operation at

23   least once a month.  Typically I'd spend a day in the

24   operation and perhaps spend an hour with the Plant

25   Manager before visiting the plant, spend five or six

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 396

1    hours walking the plant, talking to the Operators,

2    understanding what their concerns were, understanding

3    how they were doing with their work systems and other

4    safety-related issues.

5          And then at the end of the -- at the end of

6    that time, I -- I'd sit with the Plant Manager and his

7    Team to review what it was I found.  I tried to do that

8    at least once a month.

9    Q.    What were the Engineering Technical Practices,

10   if you know?

11   A.    They were the standards by which any

12   engineering activity in BP was required to take place.

13   Q.    Was that a focus of yours in respect to

14   safety?

15   A.    It was a focus of mine.  It was under the

16   leadership of John Baxter, the person we'd recruited

17   from the nuclear industry.  He was tasked to put in

18   place the right set of engineering standards across

19   BP's operations.

20   Q.    You mentioned earlier today when you were --

21   in questioning Town Hall meetings.  Did you have Town

22   Hall meetings ever devoted to safety?

23   A.    I had Town Hall meetings in -- in some se --

24   some senses they -- some cases they were entirely

25   devoted to safety.  In other cases, safety was a part

845

1    of the Town Hall agenda.  It was always the first part

2    of the Town Hall agenda, if there were other things to

3    discuss.

4                    MR. GODFREY:  Would this be a convenient

5    time, Kym, to -- to stop?

6                    THE COURT REPORTER:  (Coughing) Sure,

7    before I die.

8                    MR. GODFREY:  Okay.  We don't want that

9    to happen.

10                    MR. WEBB:  We want to avoid that.

11                    THE VIDEOGRAPHER:  Off the record at 4:14

12   p.m., ending Tape 20.

13          (Recess from 4:14 p.m. to 4:23 p.m.)

14                    MR. GODFREY:  Ready.  We're ready to

15   start, please.  Thank you.

16                    THE VIDEOGRAPHER:  On the record at

17   4:23 p.m., beginning Tape 21.

18       Q.   (By Mr. Godfrey) Dr. Hayward, could you turn

19   to Tab No. 9 in the notebook I've placed before you,

20   please.

21          Do you have that, sir?

22       A.   I do.

23       Q.   What you have before you in Tab 9 is a copy of

24   Exhibit 6002 that was used with you the another day.

25          Do you see that?

1      A.    That's correct.

2      Q.    Now, the other day you were asked about one or

3  two pages in this document.

4            Do you recall that?

5      A.    I do.

6      Q.    Let's take a look at Page 3 of Exhibit 6002.

7  Do you recall being asked any questions by counsel for

8  the Plaintiffs the other day about Page 3?

9      A.    I was not.

10     Q.    What does Page 3 reflect in Exhibit 6002,

11 which is entitled, "Leading from the top," sir?

12     A.    It shows BP's improving safety performance

13 over the last 20 years.

14     Q.    I see.  Including the last several years?

15     A.    Including the last several years.

16     Q.    Page 4, what is that title of Exhibit --

17 Page 4 of Exhibit 6002, what is that entitled?

18     A.    H'm, actually it's entitled, "BP'S HSSE

19 performance."

20     Q.    And what does that show, sir?

21     A.    It shows recordable injuries falling over

22 time, the number of oil spills falling over time, the

23 number of fatalities falling over time, and the number

24 of major incidents falling over time.

25     Q.    And, of course, the one tragic exception here

1   was 2005 where there's the Texas City, right?

2       A.   Right.

3       Q.   Go to Page 7 in Exhibit -- by the way, were

4   you asked any questions the other day by Plaintiffs'

5   counsel about Page 4?

6       A.   I wasn't.

7       Q.   Go to Page 7, please, of Exhibit 2000 -- 6002.

8   What is on Page 7 of this document?  What's the title,

9   first of all, of Page 7?  What's the title of it?

10      A.   It's "Strategic model" for -- for safety and

11  risk.

12      Q.   That's for BP?

13      A.   For BP.

14      Q.   And then, finally, sir, go to the last page,

15  the conclusion page, the summary page of Exhibit 6002,

16  which is Page 11.

17           Do you have that?

18      A.   I do.

19      Q.   Can you tell us what the summary points were

20  of this document and just read them into the record for

21  us, the first several of them, on Page 11 of

22  Exhibit 6002?

23      A.   It's "...about getting the" basic -- "basics

24  right, consistently."  It's "not just occupational

25  safety but also process safety."  Delivering --

1    deliver -- pardon -- "developing and maintaining

2    integrated and consistently delivered systems and

3    processes which underpin learning and sharing; ensuring

4    risks are owned and managed locally, in a sustainable

5    way; developing well-trained, competent people and

6    teams who have Pride in what they do; creating and

7    sustaining a world class operating culture, supported

8    by a few clear and well-understood values and

9    behaviours and an environment of continuous performance

10   improvement... And most of all, it's about leadership."

11        Q.   That's the entirety of what appears on that

12   Page 11, the summary of Exhibit 2000 -- 6002, right?

13        A.   That's correct.

14        Q.   Is there anything on that page about cutting

15   costs?

16        A.   There's nothing about costs on this page.

17        Q.   It's all about safety, right?

18        A.   It is.

19        Q.   Okay.  If you turn, sir, to page -- to Tab

20   No. 14, do you have that, sir?

21        A.   I do.

22        Q.   Do you recognize Tab 14 as Exhibit 6018 marked

23   the other day?

24        A.   I do.

25        Q.   Now, Tab 14 is marked and shown to you as how

1   many pages in length, sir?

2        A.   It's two or three with the cover.

3        Q.   Right.  Turn to Tab 15, which I'd like to mark

4   for the record as 6018A.

5             (Exhibit No. 6018A marked.)

6        Q.   (By Mr. Godfrey) Have you seen this document

7   before, sir?

8        A.   I haven't.

9        Q.   Okay.  Is the cover page or the second page of

10  Tab thousand -- strike that.

11            Is the first color page, Page 2 of Exhibit

12  6018, the same as 6018A?

13       A.   It is.

14       Q.   Go to Page 21 of Exhibit 6018 and compare that

15  to Page 21 of 6018-A.  Are they the same?

16       A.   They are.

17       Q.   Go to the last page of Exhibit 6018 as shown

18  to you, which is marked as Page 25 of Exhibit 6018A.

19            Do you have that?

20       A.   I do.

21       Q.   Is 6018 that you were shown the complete

22  document, or is it 6018A which is the complete

23  document?

24       A.   6018A is the complete document, and the first

25  document is three slides or three viewgraphs from a

1    53-page pack.

2        Q.   All right.  So let's look at 6018A, the

3    complete document.  Turn to Page 17, please.

4            Do you have that?

5        A.   I do, at 17.

6        Q.   Yeah, 17.  It says, "2010 Collective

7    Priorities Continued"?

8        A.   It does.

9        Q.   And what does it say with respect to

10   implementing OMS?

11       A.   It says, "Implement OMS, close gaps 1Q."

12       Q.   1Q of 2010?

13       A.   Yep.

14       Q.   Turn to page to 20 of the document, please,

15   6018A.  What's the title of Page 20?

16       A.   "Drilling excellence, driving" -- "driving

17   consistency through standardization."

18       Q.   Does it say anything on Page 20 about cutting

19   costs?

20       A.   It says nothing about costs.  It says about

21   equipment standardization, Engineering procedures

22   guides, and operating Engineering guidelines.

23       Q.   I see.  To understand the document, that is

24   Exhibits 6018 and 6018A, can you look at a couple of

25   pages, or should you read the entire document for

1    context?

2         A.    I think it's important that you read the

3    entire document for context.

4         Q.    Take a look at Page 38 of Exhibit 6018A.  Do

5    you have that?

6         A.    I do.

7         Q.    It says at the top, "No. 1 in the Gulf of

8    Mexico."  Do you see that?

9         A.    I do.

10        Q.    And what are some of the objectives listed on

11   the No. 1 in the Gulf of Mexico?

12        A.    Top quartile HSE performance, largest

13   producer, well objectives are clearly achieved, rely --

14   reliability of wells, productivity of wells.

15        Q.    And what is the big bullet at the top?  Does

16   it say, "It's not just days or 10,000K or days

17   completion"?

18        A.    It does.

19        Q.    It refers to things like top quartile HSSE

20   performance and reliability, among other things, right?

21        A.    It does.

22        Q.    Okay.  Turn to Tab 16, please, in the

23   notebook.  Do you have Tab 16?

24        A.    I do.

25        Q.    All right.  This is entitled, "Gulf of

852

1    Mexico... Drilling and Completions, The Way We Work"?

2        A.    It is.

3        Q.    Do you recall the suggestion made on Monday

4    that on April 1st, 2009, as reflected in 6019, BP had a

5    plan to have HSSE Managers out on the rigs in the Gulf

6    of Mexico.  Do you recall that?

7        A.    I do.

8        Q.    And then do you recall the reference to your

9    speech at the Annual General Meeting a week or so

10   later, which is found in Tab 11, April 16th, 2009.

11            Do you see that?

12       A.    I do.

13       Q.    All right.  Do you recall a suggestion made

14   that after your speech, that's when BP decided to get

15   rid of the HSSE Managers to cut costs?  Do you recall

16   that suggestion?

17       A.    I recall that suggestion.

18       Q.    When was the plan to have HSSE Managers

19   issued, which is reflected in Exhibit 6019, was it

20   issued and approved after your speech or before your

21   speech?

22       A.    It was issued and approved after my speech.

23       Q.    All right.  Let's take a look at Tab No. 17,

24   please.  This is Exhibit 6020, marked the other day.

25            Do you have that?

853

1      A.   I do.

2      Q.   Now, this is the organizational change that

3   you had not seen the other day with respect to the HSSE

4   organization in the Gulf.  Do you recall that?

5      A.   That's correct.

6      Q.   And looking at the first two bullet points,

7   does that explain, at least as far as you can tell, the

8   reasons for why there was a change with respect to HSSE

9   Managers out on the rigs?

10     A.   It seems a very credible basis for the change.

11  It says:  "D&C has reached the place in our HSSE

12  journey where the Drilling Contractors must take full

13  responsibility for HSSE on their rigs, while BP retains

14  accountability" for "verification.  There are currently

15  duplicate HSSE roles on the MODU rigs and triple

16  redundant HSSE" role -- "roles on BP owned

17  facilities..."

18     Q.   Turn to the second page of the Exhibit 6020,

19  please.  Was it your understanding, after reviewing

20  this document, that -- well, what was your

21  understanding with respect to HSSE advisors?  Would

22  there still be HSSE advisors by BP out on the rigs?

23     A.   It says on the first two bullets here that

24  there will be full-time Field HSSE Advisors.

25     Q.   Okay.  The final document, since I'm running

1    out of time, turn to Tab 18.  It's Exhibit 1351.  Do

2    you recall being shown this the other day?

3         A.   I do.

4         Q.   Do you recall being shown on the second page,

5    which is Bates stamp No. 6378 toward the bottom, where

6    someone from Transocean, someone unidentified person,

7    was complaining that it would be nice to have a BP HSSE

8    advisor onboard?

9         A.   I do.

10        Q.   First of all, you've never seen this document

11   prior to being shown it the other day, right?

12        A.   I had not.

13        Q.   All right.  So before we get to the comments

14   on the page, the second page, let's get to the first

15   comments, the very first paragraph of comments on the

16   first page.

17             Do you see that?

18        A.   I do.

19        Q.   The first question was, quote:  "How do you

20   think our senior management visits could be more

21   effective?  Duration, frequency, structured meetings?

22   What is it the guys would like to hear/see" --

23        A.   "Visit" --

24        Q.   -- "when the VIP's visit?"

25             Do you see that?

855

1     A.   It says:  "Visits are fine as long as they

2  have substance.  Too many times are doom and

3  gloom...talking about all the incidents we are having

4  throughout the fleet."

5     Q.  Do you understand, looking at this --

6           MR. ROBERTS:  Objection to form to the

7  question and the answer.

8     Q.  (By Mr. Godfrey) Do you understand, looking at

9  this document, that the first complaint by this

10  unidentified Transocean was that they didn't like to

11  have safety visits talking about other safety incidents

12  in the fleet?

13     A.  That is what --

14           MR. ROBERTS:  Objection, form.

15     A.  That is what this seems to imply.

16     Q.  (By Mr. Godfrey) All right.  Let's take a look

17  at second question on the first page that you weren't

18  shown the other day.  Do you see where it says, quote:

19  "Audits have become overwhelming.  With a TOI audit one

20  week and BP doing the exact same audit the next week"?

21           Do you see that?

22           MR. ROBERTS:  Objection, form.

23     A.  Yes.

24     Q.  (By Mr. Godfrey) Do you see where it says:

25  "Weekly BP HSE visits" during -- "doing their audits"?

PURSUANT TO CONFIDENTIALITY ORDER

1        MR. ROBERTS:  Objection, form.

2    A.    I do.

3    Q.    (By Mr. Godfrey) So the person that you were

4  shown that was complaining about the BP HSE Rep no

5  longer being onboard 24/7, someone is complaining --

6  maybe it's the same person, maybe someone not -- that

7  there are too many gloom-and-doom meetings about safety

8  incidents and that there are too many safety audits.

9  Is that how you understand this?

10   A.    That's what this --

11        MS. HERTZ:  Objection, form.

12        MR. ROBERTS:  Objection, form.

13   A.    That is what this document says.

14   Q.    (By Mr. Godfrey) All right.

15        MR. GODFREY:  How many more minutes do I

16  have?

17        THE VIDEOGRAPHER:  (Indicating.)

18        MR. GODFREY:  Three?  Well, that's not

19  very much time.

20   Q.    (By Mr. Godfrey) Dr. Hayward, I have a lot

21  more questions I could ask you, but I'm unfortunately

22  limited by the amount of time allotted.  So I'd like

23  to, if I could, turn to Tab 13, which is the BP

24  Sustainability Report for the Year 2009.  And the very

25  first -- not the very first cover page, but the page --

1    and this is dated April 15th, 2010, the very first

2    printed page has on the top "A Systemic Approach,"

3    right?

4        A.   It does.

5        Q.   Can you read, please, what you wrote in that

6    page?  And I think that will take our three minutes,

7    which is all I have time for, unfortunately.

8        A.   "BP constantly seeks to improve its safety

9    performance through the procedures, process, and

10   training programs that we implement in pursuit of our

11   goal of no accidents, no harm to people, and no damage

12   to the environment.  Our commitment to safe, reliable,

13   and responsible operations starts with the Group Chief

14   Executive, Tony Hayward, and his leadership Team, a

15   commitment that filters down through the organization

16   is regularly communicated to all staff.  Safety

17   performance is a regular focus of the Group Chief

18   Executive's formal communications such as BP quarterly

19   results, and in less formal communications such as his

20   regular town halls with BP staff.  BP's leadership has

21   continued to reinforce the importance of safety when

22   undertaking regular site visits to BP facilities around

23   the world and from all parts of the business.  I'm

24   proud of BP's 2009 safety performance.  It reflects a

25   sustained effort across all of our operations over many

1    years."

2        Q.    During the time that you were CEO of BP, PLC,

3    did you do your level, utmost best to focus on safety

4    and to focus the organization on safety?

5        A.    I did.

6        Q.    Did you ever make a decision, from your

7    perspective, where you were cutting costs at the

8    expense of safety?

9        A.    I did not.

10       Q.    When you said the other day that you'd hired

11   thousands of Engineers, for what purpose did you hire

12   thousands of Engineers?

13       A.    To make our operations safer and more

14   reliable.

15       Q.    Is that the reason why you hired John Baxter?

16       A.    That's the reason I hired John Baxter.  That's

17   the reason I hired John Sieg.  That's the reasons those

18   beneath me hired many thousands of other people into

19   our operations over that period of time.

20             MR. GODFREY:  Dr. Hayward, you've been

21   very patient with us.  I know it's a long process, and

22   I very much appreciate your willingness to come

23   voluntarily before us to give your testimony.

24             I -- I have many more questions, but my time

25   is not -- is up, so I thank you very much, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 411

1              THE WITNESS:  Thank you.

2              THE VIDEOGRAPHER:  Off the record at

3   4:38 p.m., ending Tape 21.

4         (Recess from 4:38 p.m. to 4:42 p.m.)

5              MR. CUNNINGHAM:  I'm ready.

6              THE VIDEOGRAPHER:  All set?

7         On the record at 4:42 p.m., beginning Tape 22.

8                REDIRECT EXAMINATION

9   QUESTIONS BY MR. CUNNINGHAM:

10     Q.   Dr. Hayward, you've briefly described the

11  Apollo Crisis Command Center, do you recall that?

12     A.   I -- yeah, but I briefly described the Houston

13  Crisis Center.

14     Q.   Okay.  Is that -- is that the correct

15  terminology for it --

16     A.   That's correct.

17     Q.   -- the Houston Crisis Center?

18     A.   Correct.

19     Q.   Located in Houston, obviously?

20     A.   In West Lake Houston, yeah.

21     Q.   Okay.  Would you describe the room, what it

22  consisted of and what was--

23     A.   Well --

24     Q.   -- in it?

25     A.   It -- it con -- has many rooms to it.  There

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 412

1   were -- it -- it covers many thousands of square feet,

2   I don't know exactly how many, on one level.  And there

3   were rooms set up for oversight of the ROV Operations.

4   There was a room set up for Simultaneous Operations.

5   There was a room set up for the Drilling Operations.

6   There was a room set up for the Containment Operations,

7   a sort of engineering design of the Containment

8   Operations.  There was a separate room for the Top Kill

9   Operation.  It was -- you know, there were -- at the

10  peak, there were almost a thousand Engineers and

11  scientists, operating in that Center.

12      Q.   I think what I heard you describe was the --

13  the room set up for Drilling Operations for the relief

14  well.  What -- what did that consist of?

15      A.   It was where the relief wells were -- were

16  being planned from.

17      Q.   Is it where monitoring of the relief wells was

18  conducted?

19      A.   There was some monitoring of the relief wells

20  going on there, I believe, yes.

21      Q.   Well, if you could describe the room itself.

22  Is -- is it a room with a lot of Engineers and a lot of

23  monitors?

24      A.   It's a room with Engineers and monitors, yeah.

25      Q.   Okay.  24-hour operation?

861

1    A.   It was a -- a 24-hour operation, by

2  definition.

3    Q.   And it was compared, for those of us who have

4  never seen such a room, to what we might have seen in

5  the Apollo Crisis Command Center, that type of room --

6    A.   Absolutely --

7    Q.   -- correct?

8    A.   Yes.

9    Q.   All right.  And this is what was set up after

10 the blowout to monitor the drilling operations of the

11 relief wells --

12   A.   Well --

13   Q.   -- to try to stop --

14   A.   -- it was --

15   Q.   -- the flow of oil, correct?

16   A.   It wasn't set up to monitor the drilling

17 operations.  It was set up to monitor all of the

18 intervention activity that was taking place.

19   Q.   Well, the po --

20   A.   There was a room that had Drilling.  There was

21 another room that had Simultaneous Operations, all of

22 that sort of thing.

23   Q.   Right.  But I'm talking about the one that was

24 set up to monitor drilling.  You've described that

25 accurately thus far, haven't you?

PURSUANT TO CONFIDENTIALITY ORDER

1    A.   What was your -- what do -- how do you believe
2  I described it?
3    Q.   I thought you described it as a room full of
4  Engineers and monitors, or with Engineers and
5  monitors --
6    A.   I --
7    Q.   -- that operated a 24-hour day it -- a day --
8  24 hours a day to monitor the Drilling Operations.
9    A.   I had a room of Drilling Engineers and
10  monitors.
11    Q.   All right.  And the room you're describing was
12  set up after the blowout?
13    A.   It was set up --
14    Q.   -- right?
15    A.   -- as part of the crisis response.
16    Q.   All right.  I want to talk about the Command
17  Center for Drilling that you had set up to prevent a
18  blowout in the Gulf of Mexico for a minute, all right?
19         Tell us where that room was located.
20    A.   I'm not aware that --
21         MR. GODFREY:  Objection as to form.
22    A.   I'm not aware where that room was, I'm afraid.
23  I don't know what was in place prior to the accident.
24  I was only in Houston post the accident.
25    Q.   (By Mr. Cunningham) Have you ever been in any

1  room that you could characterize as a Command Center,

2  used for the purpose of monitoring offshore drilling to

3  prevent the very kind of blowout we had --

4      A.   A --

5      Q.   -- on the 20th?

6      A.   There are drilling -- drilling centers that

7  provide oversight of Drilling Operations.

8      Q.   I'm talking about the oversight of the

9  Drilling Operations on the Macondo Well.  Have you ever

10  been in that room?

11      A.   No, I have not.

12      Q.   Have you ever seen that room?

13      A.   I have not.

14      Q.   Do you know that it has been decide --

15  described as about the size of a closet?

16             MR. GODFREY:  Objection as to form.

17      A.   I was not aware of that.

18      Q.   (By Mr. Cunningham) Not aware of that?  Do you

19  know that it was closed on weekends?

20      A.   As I said, I haven't been to it, and I'm not

21  aware of it.

22      Q.   You've described deepwater drilling as similar

23  to or comparable to exploring out of -- outer space,

24  haven't you?

25      A.   I've made that analogy --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 416

1    Q.   All right.

2    A.   -- yes.

3    Q.   And so BP, the Apollo Crisis Center that it

4 had for monitoring the outer space that was being

5 explored at the time of the Macondo incident, was the

6 size of a closet and was closed on weekends.

7              MR. WEBB:  Object to the form.

8    Q.   (By Mr. Cunningham) You didn't know that?

9              MR. WEBB:  Object to the form.

10   A.   I wasn't aware of the Drilling Operations.

11   Q.   (By Mr. Cunningham) We've talked a good deal

12 about BP, and I want to be sure that there's no

13 question about what exactly we're referring to when we

14 use the term "BP."  This is Tab 7 from the previous CD.

15          (Exhibit No. 6079 marked.)

16              MR. GODFREY:  Has it -- has this been

17 marked 6079?

18              MR. CUNNINGHAM:  No.  I'm just marking

19 it.

20              MR. GODFREY:  Okay.  Fine.

21   Q.   (By Mr. Cunningham) I will hand you Exhibit

22 6079.  Just for purposes of clarity, if you'll turn to

23 the page marked 2 at the bottom left.  Do you have

24 that?

25   A.   I do.

865

1    Q.   These are "Miscellaneous terms," and below

2   that it says, "In this document, unless the context

3   otherwise requires, the following terms shall have the

4   meaning set out below."

5         Do you see that?

6    A.   I do.

7    Q.   And does it define "BP, BP Group or the

8   group," any of those three terms, as "BP p.l.c. and its

9   subsidiaries"?

10    A.   That's what it says.

11    Q.   All right.  And then on the right, does it

12   define "Subsidiary" as follows:  An entity that is

13   controlled by the BP group.  Control is the power to

14   govern the financial and operating policies of an

15   entity so as to obtain the benefits from its

16   activities."

17         Is that how a subsidiary is defined?

18    A.   That's what it says.

19    Q.   All right.  And is that an accurate

20   definition?

21    A.   I'm sure it is an accurate --

22    Q.   So it's a --

23    A.   -- definition.

24    Q.   -- BP document, isn't it?

25    A.   I -- I wasn't the author of it, but it -- I'm

1   sure it's an accurate definition.

2       Q.   Now, you mentioned in your earlier testimony

3   that the Bly Investigation had concluded that there

4   were eight causes of the -- of the blowout, correct?

5       A.   That's correct.

6       Q.   And you said, "We" -- and I think I will --

7   I -- I'm quoting you correctly, you can correct me if

8   I'm not -- "We had responsibility for part of one of

9   them."  Is that what you said?

10      A.   In terms of the direct cause, I think that's

11  correct.

12      Q.   All right.  What part of that "one" did BP

13  have responsibility for?  Half?  A third?  Two-thirds?

14              MR. GODFREY:  Objection as to form.

15      Q.   (By Mr. Cunningham) How much?

16      A.   The cause that I was referring to, as I'm

17  certain you're aware, was the interpretation of the

18  negative pressure test.  And my understanding is that

19  there were three people involved in that decision, two

20  from Transocean and one from BP.

21      Q.   Okay.  So you were referring to a one-third

22  responsibility for one of the eight causes of the

23  blowout?

24      A.   I didn't --

25              MR. GODFREY:  Objection --

1          MR. WEBB:  Objection, form.

2     Q.   (By Mr. Cunningham) Correct?

3          MR. GODFREY:  Objection --

4     A.   -- I wasn't referring --

5          MR. GODFREY:  -- as to form.

6     A.   -- to that at all.  I said it was BP was

7  involved in that decision with two other people.

8     Q.   (By Mr. Cunningham) What --

9     A.   That doesn't imply a third -- the world

10  generally doesn't work like that --

11    Q.   All right.  Well, what --

12    A.   -- it is --

13    Q.   -- what --

14    A.   -- it is not divided by fractions.

15    Q.   -- what part of the one of the eight that you

16  said BP had responsibility for, what part of it?

17    A.   Part of it.  We were involved in that

18  decision.

19    Q.   Half of it?

20    A.   A part of it.  We were involved --

21    Q.   Just a part of it.

22    A.   We --

23    Q.   You can't -- you can't say whether it was a

24  half, a third, two-thirds or --

25    A.   I can --

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 420

1    Q.    -- what it was?

2    A.    -- say we were clearly party to that decision.

3    Q.    All right.  Well, however you break it up,

4  that means that you believe and BP believes that 96, 97

5  percent of the causes of the blowout somebody else is

6  responsible for; is that right?

7              MR. WEBB:  Objection to the form of the

8  question.

9    A.    Based on the Report, the people taking

10 decisions around the individual causes of the Reports,

11 there was direct BP involvement in the negative

12 pressure test.  There was not direct -- direct BP

13 involvement in the design of the cement or the pumping

14 of the cement.  There -- there wasn't direct BP

15 involvement in the well control procedures.  There

16 wasn't direct BP involvement in monitoring the mud

17 system.

18             MR. GODWIN:  Object -- object to form.

19    A.    That -- that is the point I was making.

20    Q.    (By Mr. Cunningham) So out of the eight causes

21 of the blowout, if you had responsibility for part of

22 one of them, you had responsibility for 5 percent or

23 less of what caused the blowout, correct?

24    A.    That's not --

25             MR. WEBB:  Object to the form of the

1   question.

2       Q.   (By Mr. Cunningham) Is my math wrong?

3       A.   Yeah, I think so.

4       Q.   All right.  Well, do --

5       A.   It's not --

6       Q.   -- do it --

7       A.   -- I -- I -- I'm afraid --

8       Q.   -- you do the math.  You've got a Ph.D.  You

9   probably --

10      A.   Well, I --

11      Q.   -- could a lot quicker than --

12              MR. WEBB:  Object to the form of the

13  question.

14      A.   I -- I don't do maths on that sort of

15  analysis, I'm afraid.  It's not what maths is designed

16  to do.

17      Q.   (By Mr. Cunningham) Well, you're the one that

18  said -- not me, you're the one that said "We had

19  responsibility for part of one of the eight causes."

20  And I'm trying to determine what part of the total

21  causes you accept responsibility for at BP.  Is it 5

22  percent, 10 percent, 2 percent, 1 percent?  What is it?

23              MR. WEBB:  Objection.  Asked and --

24      A.   Well, I --

25              MR. WEBB:  -- answered.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    A.    -- don't have an answer to that question.

 2    Q.    (By Mr. Cunningham) You -- you mean, you don't

 3  want to answer --

 4    A.    No --

 5    Q.    -- the question?

 6    A.    -- I don't have --

 7          MR. WEBB:  Objection --

 8    A.    -- an answer.

 9          MR. WEBB:  -- asked and answered --

10    Q.    (By Mr. Cunningham) You don't have an answer?

11          MR. WEBB:  -- four times.

12    Q.    (By Mr. Cunningham) Why do you not have an

13  answer?

14    A.    Because I don't know how to calculate that

15  metric.  I don't know what -- on what basis you would

16  calculate that metric.

17    Q.    You also testified earlier that you and the

18  top leadership at BP did not monitor Drilling

19  Operations because BP drills hundreds of wells every

20  year.  Did I hear that correctly?

21    A.    What --

22          MR. GODFREY:  Objection as to form.

23    A.    -- what I said was that I did not receive

24  daily or weekly reports of drilling operations, because

25  it's not what a Chief Executive does.

1    Q.   (By Mr. Cunningham) All right.  So you -- you

2    did say that you and the top leadership did not monitor

3    Drilling Operations, because BP drills hundreds of

4    wells every year?

5    A.   That's not what I said.  I said --

6    Q.   So you do monitor drilling operations?

7              MR. GODFREY:  Objection as to form.

8    A.   What I said was that we -- I nor my immediate

9    Team monitored Drilling Operations on a week-to-week

10   basis, in terms of individual wells being drilled.

11   Q.   (By Mr. Cunningham) Well, do you monitor --

12   monitor it on a month-to-month basis, in terms of

13   individual wells being drilled?

14   A.   Not in terms of individual wells, no.

15   Q.   And is that because there are hundreds of

16   wells being drilled every year, as you testified to

17   earlier?

18   A.   That's correct.

19   Q.   Sir, excuse me?

20   A.   That is correct.

21   Q.   All right.  Now, there are wells and there are

22   deepwater wells, correct?

23   A.   That's correct.

24   Q.   And the -- they're two different things,

25   aren't they?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z

1    A.   Well, I think there's a transition between

2  wells and deepwater wells, because there are deepwater

3  wells and deepwater wells.

4    Q.   Well, you described deepwater drilling as

5  being comparable to outer space exploration, we've --

6  you've agreed that you have in the past described that,

7  haven't you?

8    A.   I've described deepwater exploration as akin

9  to outer --

10    Q.   All right.

11    A.   -- space exploration.

12    Q.   And --

13    A.   And it involves more than just drilling.

14    Q.   Is there or is there not a big difference

15  between shallow wells and deepwater wells --

16    A.   There is.

17    Q.   -- in terms of drilling?

18    A.   (Nodding.)

19    Q.   All right.  What number of deepwater wells

20  were being drilled on April the 20th of 2010?

21    A.   I don't know.

22    Q.   Give me your best judgment.

23    A.   I don't know.  Tens, I would imagine, but I

24  don't --

25    Q.   Tens?

1      A.   I would imagine tens globally.

2      Q.   And -- and would that be like 30 or 20 or 50

3  or --

4      A.   Well, of --

5      Q.   -- 60 or 80?

6      A.   Probably 20, I would --

7      Q.   All right.

8      A.   -- I would think.

9      Q.   Well, what -- what is Hodoa?

10     A.   I don't know.

11     Q.   Fragata?

12     A.   I don't know.  I think that's an exploration

13  prospect.

14     Q.   Moccasin?

15     A.   I think Hodoa is what -- is that right?

16     Q.   Is that the way you pronounce, Hodoa,

17  H-o-d-o-a?

18     A.   That's right.

19     Q.   For -- is -- is that a well?

20     A.   That's a --

21     Q.   Fragata?

22     A.   Yeah, it's either a well or an exploration

23  prospect.

24     Q.   Moccasin?

25     A.   Don't know.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 426

1    Q.   Tucker?

2    A.   Tucker is a -- was a well and is now a

3    discovery.

4    Q.   All right.  Can -- can you testify under oath

5    today that there were more than five deepwater wells

6    being drilled on April 20th of 2010?

7    A.   Globally or --

8    Q.   Globally.

9    A.   I honestly don't know.

10   Q.   And even within the context of drilling

11   deepwater wells, there are wells that are higher risk

12   and wells that are lower risk, aren't there?

13   A.   That's correct.

14   Q.   And what determines whether they may be higher

15   or lower risk?

16   A.   An assessment of pressure and temperature.

17   Q.   Is that in the layman's language whether

18   they're in a state being drilled in a stable formation

19   or an unstable formation?

20   A.   No.  It's about the pressure and

21   temperature --

22   Q.   All right.

23   A.   -- that you expect to encounter.

24   Q.   And what determines pressure and temperature?

25   A.   Depth and geological formation.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 427

1   Q.   All right.  In terms of geological formation,

2   where does the Gulf of Mexico geological formation fit

3   in the scale of high risk versus low risk?

4   A.   It's higher risk.

5   Q.   It's higher risk.  How many deepwater wells

6   were being drilled on April 20th in high risk areas?

7   A.   Probably only two or three.

8   Q.   Two or three.  What would be the two or three

9   other than Macondo?

10   A.   At the time we -- we may have been drilling in

11   Angola.  I'm not certain.  We may have been drilling in

12   Egypt.

13   Q.   All right.  You may and you may not have?

14   A.   I can't recall exactly, but I'm -- I'm

15   referring to areas where the deepwater drilling was

16   high pressure and high temperature.

17   Q.   All right.  In any event, the number would be

18   somewhere between one and three?

19   A.   One and five, probably.

20   Q.   And do I understand that BP has the same level

21   of Executive Management oversight for low risk wells as

22   it did on April 20th, 2010 for the higher risk

23   deepwater wells that were being drilled?

24   A.   I think what's -- what is the case is that the

25   executive oversight at my level did not distinguish

1    between different sets of wells.

2       Q.   Right.

3       A.   That wasn't what I was doing.

4       Q.   Right.  The exec --

5       A.   Someone in the company was, but it wasn't me.

6       Q.   The executive oversight was no different for a

7    shallow well being drilled on land than it was for a

8    higher risk deepwater drill -- well being drilled in

9    the Gulf of Mexico, was it?

10      A.   That is --

11              MR. WEBB:  Objection --

12              THE WITNESS:  Sorry.

13              MR. WEBB:  -- to the form of the

14   question.

15      A.   That is --

16      Q.   (By Mr. Cunningham) Was it?

17      A.   That is not what I said.  I said that I didn't

18   have a role in executive oversight of drilling.

19      Q.   Well, that's what I'm talking about.  Did you

20   have a different role in executive oversight of

21   drilling in a high risk well in the Gulf of Mexico than

22   whatever you had for a shallow low risk well on land?

23      A.   I had no oversight in either.

24      Q.   And that's the reason you knew nothing about

25   the day-to-day risk level at the DEEPWATER HORIZON on

877

1    April the 20th, correct?

2        A.    That's correct.

3        Q.    Because that's what the policy was.  That --

4    that's the way BP --

5        A.    That's --

6        Q.    -- operated, correct?

7        A.    That's not what CEOs do.  I'm sorry, but it's

8    not.

9        Q.    Well, one thing you did do as a CEO was you

10   made sure you knew when the Macondo hit pay dirt,

11   didn't you?

12       A.    I didn't make -- sir, I was made aware when

13   the well was a discovery.

14       Q.    So were you accidentally made aware, or were

15   you made aware because it was the policy at BP that

16   when you hit gold, when you hit pay dirt, you tell the

17   CEO?

18       A.    No.  I was made aware during a normal course

19   of business.  Some -- some time after it was evident

20   that they had made a discovery.

21       Q.    So --

22       A.    So it would be a couple of weeks.

23       Q.    -- within the normal course of business, the

24   CEO did know when the well struck pay sands, true?

25       A.    The CEO was made aware of a discovery, if

1   there had been one, in the normal course of business.

2        Q.    But there was no policy for the CEO or top

3   level Executive Management to be aware if a well was

4   experiencing hazard drilling conditions, correct?

5        A.    There was no basis for me to be involved in

6   day-to-day drilling operations on a well in the

7   deepwater Gulf of Mexico.  I have neither the skills

8   nor capabilities to do that.

9        Q.    Mr. Godwin was questioning you, and I think I

10  understood you to say that Mark Bly was chosen to lead

11  the investigation because he could be objective by

12  virtue of the fact that he did not have accountability

13  for the DEEPWATER HORIZON.  Did I hear that correctly

14  or not?

15       A.    I -- I -- I chose Mark because I believed he

16  was the best qualified person in BP to lead the

17  investigation, and he was outside of the line with

18  respect to that operation.  He -- he sat in a function

19  with no line accountability.  His role was to develop

20  standards and systems and processes and to help in

21  their implementation.

22       Q.    Okay.  He was chosen because he was the most

23  qualified person and because he was outside of the line

24  of accountability with respect to the DEEPWATER

25  HORIZON, correct?

1     A.   That's correct.

2     Q.   Who was the highest level Executive

3 responsible to you for Process Safety?

4     A.   Mark Bly.

5     Q.   Mark Bly.  And he reported directly to you in

6 his capacity as having responsibility for the

7 implementation of OMS and for being responsible for

8 Process Safety, didn't he?

9     A.   That's correct.

10    Q.   And as we discussed earlier, Process Safety

11 deals with major accidents, preventing major accidents,

12 correct?

13    A.   Correct.

14    Q.   Major accidents just like the one that

15 occurred on the DEEPWATER HORIZON, correct?

16    A.   The DEEPWATER HORIZON was a major accident by

17 anyone's definition.

18    Q.   And it's the type of accident that Process

19 Safety Principles are implemented to try to prevent;

20 isn't that true?

21    A.   That's correct.

22    Q.   So what -- what you did, then, is you

23 appointed the highest level Executive next in line to

24 you who was responsible for preventing exactly what

25 happened, a major disaster.  You -- you appointed that

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 432

1    person to investigate this major disaster, didn't you?

2              MR. WEBB:  Objection to the form of the

3    question.

4        Q.   (By Mr. Cunningham) Didn't you?

5              MR. GODFREY:  Same objection.

6        A.   That's not correct, because --

7        Q.   (By Mr. Cunningham) You didn't?

8        A.   No, because he's not accountable for the

9    implementation.  The line is accountable for the

10   implementation.

11       Q.   You --

12       A.   He sets the standards.  Mark is not

13   accountable for the im -- implementation at the

14   operating level.

15       Q.   Didn't you testify earlier that he was

16   accountable for OMS and the implementation of OMS

17   throughout BP?

18       A.   He was accountable for overseeing, but he was

19   not accountable for the implementation at the operating

20   level on a day-to-day basis.

21       Q.   He was accountable for overseeing the

22   implementation of OMS.  You've testified to that,

23   haven't you?

24       A.   Correct.

25       Q.   That's correct.  So you appoint him to conduct

```
 1   the investigation, and then the two of you exclude from
 2   the investigation one of the three standard elements of
 3   a BP investigation, and that is systemic causes, or
 4   root causes, which are Management-related causes; isn't
 5   that true?
 6                 MR. WEBB:  Objection --
 7                 MR. GODFREY:  Object to the form.
 8                 MR. WEBB:  Objection, asked and
 9   answered --
10       A.   We've discussed --
11                 MR. WEBB:  -- three times.
12       A.   We've discussed previously the terms in
13   reference of the investigation.  They're the terms --
14       Q.   (By Mr. Cunningham) All right.
15       A.   -- we reference in investigation.  They are --
16   it is what it is.
17       Q.   And they excluded investigation of systemic
18   causes, didn't it?
19       A.   In terms of the reference --
20                 MR. WEBB:  Objection to form.
21       A.   -- to determine the cause of the accident,
22   that's what the Report did.
23       Q.   (By Mr. Cunningham) So the investigation by
24   definition would not investigate you or Mark Bly, true?
25                 MR. WEBB:  Objection to the form of
```

1    question.

2        A.    The investigation was designed to determine

3    the cause of the accident.

4        Q.    (By Mr. Cunningham) The investigation by the

5    exclusion of systemic causes which are

6    Management-related causes excluded investigation of you

7    and Mark Bly, didn't it?

8                MR. GODFREY:   Objection to the form.

9        A.    It was designed to investigate the cause of

10   the accident.   That's what it did.

11               (Discussion off the record.)

12       Q.    (By Mr. Cunningham) And since -- since the

13   investigation Mr. Bly conducted, he's been promoted,

14   hasn't he?

15       A.    I believe he's still doing the same job.

16       Q.    So you don't believe he's been promoted?

17       A.    I believe he's doing the same job.  He may

18   have a different title.  He's still doing the same job.

19   I think he's -- remains the Head of Safety and

20   Operations.

21       Q.    Well, when you -- when you look at the

22   Executive Management structure -- and this is Tab 53 in

23   the earlier CD that was handed out.

24               (Exhibit No. 6080 marked.)

25                   MR. CUNNINGHAM:   Here, give me that one,

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 435

1    and I'll give you this one.  It's been marked.  It's

2    Exhibit 6080.

3            MR. GODFREY:  Can I take the time to see

4    what you're talking about?

5            MR. CUNNINGHAM:  I'm sorry.

6            MR. GODFREY:  No, that's all right.  I'll

7    just take -- I've probably seen it, and I just want to

8    see what it looked like.

9        All right.  I know what this is.  Got it.

10   Thank you.

11       Q.   (By Mr. Cunningham) This shows the Executive

12   Management at BP, correct?

13       A.   Yes.

14       Q.   And at the top we see Mr. Dudley --

15       A.   Correct.

16       Q.   -- right?

17           And then the second face on the page is Mark

18   Bly, isn't it?

19       A.   That's right.

20       Q.   And if you had disclosed to Congress that you,

21   in fact, did not do a complete full investigation that

22   covered everything and instead had told them that you

23   excluded systemic causes and that the man you had

24   appointed to head the investigation was responsible for

25   Process Safety, which includes systemic causes, you --

884

1    you know what the reaction would have been, don't you?

2              MR. GODFREY:  Objection, form.

3              MR. WEBB:  Form.

4    A.    The Congress was fully aware of the

5    investigation.  We had shared the extent of our

6    investigation with the Oil and Gas Oversight Committee

7    ahead of my testimony.  They were fully aware of our

8    investigation --

9    Q.    (By Mr. Cunningham) Did you --

10   A.    -- and the extent of it.

11   Q.    Did you tell the Congress that Mark Bly was

12   responsible for the implementation of Process Safety

13   within OMS, as well as OMS itself, and that you were

14   appointing him to investigate the accident and you were

15   excluding any investigation of you and him as part of

16   that?

17             MR. GODFREY:  Objection as to form.

18   Q.    (By Mr. Cunningham) Did you tell them that?

19   A.    I was never asked that question.

20   Q.    You were never asked.  Okay.

21   A.    Well, the rules are you answer the questions,

22   right?

23   Q.    Well, the rules are you tell the truth, the

24   whole truth, and nothing but the truth.  You understood

25   that, didn't you?

1          MR. WEBB:  Object to the form of the

2   question.

3      A.   Well --

4          MR. GODFREY:  Object to form.

5          MR. WEBB:  Move on.

6      A.   In answer to questions.

7      Q.   (By Mr. Cunningham) You understood that,

8   right?

9      A.   I certainly do.

10     Q.   All right.  Now, you testified also earlier

11  that you were not fired; is that correct?

12     A.   I testified that I -- in discussion with the

13  Board, we came to a mutual agreement that it would --

14  it was in the best interests of BP that I leave the

15  company.

16     Q.   All right.  You decided -- you -- you decided

17  it was best for BP to have a new face in the Gulf, I

18  think you said, or in the U.S.?

19     A.   A new face --

20     Q.   Is that right?

21     A.   -- in America.  That's correct.

22     Q.   So you resigned of your own accord, then?

23     A.   It was a mutual agreement between myself and

24  the Board.  I think the Board probably felt the same,

25  so --

1    Q.   Well, did you resign of your own accord, or

2   were you told, "Resign, or you're going to be fired"?

3              MR. WEBB:  Objection, form.

4              MR. GODFREY:  Objection, form.

5    A.   It was a mutual agreement.

6    Q.   (By Mr. Cunningham) That isn't -- that -- that

7   isn't what I'm asking you.

8    A.   I'm telling you what the --

9    Q.   Were you told that if you did not resign, you

10  would be fired?

11             MR. GODFREY:  Objection to form.

12   A.   I'm telling you what happened.  It was a

13  mutual agreement, so the issue of firing or resigning

14  never came up.  We agreed --

15   Q.   (By Mr. Cunningham) Okay.  So then, you were

16  not told that, is the answer, correct?

17   A.   Correct.

18             MR. WEBB:  Object to the form.

19   Q.   (By Mr. Cunningham) Correct.

20        And with respect to any accountability for

21  what happened on April the 20th of 2010, the Board did

22  not hold you accountable and discharge you; is that

23  correct?

24             MR. WEBB:  Objection to the form.

25             MR. GODFREY:  Objection as to form.

1      A.   You'll have to ask the Board what they

2  concluded, but as I said, we agreed that I should -- it

3  was in the best interests of BP that I should leave,

4  and there was no other discussion.

5      Q.   (By Mr. Cunningham) Did the Board hold you

6  accountable for what happened on April the 20th of

7  2010?

8                MR. WEBB:  Objection, form.

9      A.   I was never told that was the case.

10     Q.   (By Mr. Cunningham) All right.  Did the Board

11  ever sanction you in any way for what happened on April

12  20th?

13     A.   I -- I left my post in the middle of Jul -- at

14  the end of July.

15     Q.   Did the Board ever sanction you between April

16  the 20th and the time you left your post?

17     A.   They didn't.

18     Q.   Did they ever reprimand you?

19     A.   They did not.

20     Q.   Did they ever penalize you?

21     A.   They did not.

22     Q.   Did they ever privately, to you, criticize you

23  for what happened on April 20th?

24                MR. WEBB:  Objection, form.

25     A.   They did not.

1    Q.   (By Mr. Cunningham) Did they ever publicly

2  criticize you for what happened on April 20th?

3    A.   I don't believe so.

4    Q.   Was there any top-level Executive Management

5  person at BP who was sanctioned for what happened on

6  April 20th?

7    A.   What is top-level Management?

8    Q.   The top five.

9    A.   I don't believe so.

10   Q.   Was any top-level Executive Management person

11 reprimanded for what happened on April 20th?

12   A.   Not to my knowledge.

13   Q.   Fired.  Anybody fired for what happened on

14 April 20, in the top Management?

15   A.   Not to my knowledge.

16   Q.   Anybody penalized?

17   A.   Not to my knowledge.

18   Q.   Anybody privately criticized in the top

19 Management?

20   A.   I don't know, if it was private, do I?

21   Q.   Publicly.

22   A.   Not to my knowledge.

23   Q.   Do you use a computer?

24   A.   I do.

25   Q.   A laptop or a desktop, or both?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 441

889

1      A.    Laptop.

2      Q.    You use a BlackBerry?

3      A.    I do.

4      Q.    Have you for the last few years used both a

5  laptop and a BlackBerry?

6      A.    I have.

7      Q.    How about a -- an iPhone or an iPad or some

8  other kind of --

9      A.    I used -- in -- in my time at BP, I used a

10  BlackBerry and a laptop.

11      Q.    And did you use these devices like most

12  everybody does, fairly frequently?

13      A.    Fairly frequently.

14      Q.    We've been provided with your custodial file,

15  Dr. Hayward, and it consisted of 71 E-mails, seven

16  before April the 20th and 64 after April the 20th.

17      A.    M-h'm.

18      Q.    I suspect that a lot of people in this room in

19  the last day or two have gotten far more E-mails than

20  that while they've been sitting in this deposition.

21            You had dozens and dozens and dozens and

22  dozens of other E-mails beyond that number of 71,

23  didn't you?

24            MR. WEBB:  Objection, form.

25      A.    Are those E-mails received or sent?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 442

1      Q.    (By Mr. Cunningham) Either one.

2      A.    I'm certain I had more received, for sure.

3      Q.    You communicated with other Executives within

4  BP, didn't you?

5      A.    Very rarely using E-mail.  Very rarely.

6      Q.    Why not?

7      A.    I don't like using it as -- as -- as a form of

8  communication.  I prefer to talk to them, so I can --

9      Q.    You don't --

10     A.    -- phone them.

11     Q.    So you -- you use the telephone when you

12  communicate with other Executives?

13     A.    I do.

14     Q.    Even the ones in the U.S.?

15     A.    I do.

16     Q.    Did you communicate with Board Members by

17  E-mail?

18     A.    Only in formal communications.

19     Q.    Well, then --

20     A.    Formal updates.

21     Q.    Well, then, who did you communicate with by

22  E-mail?

23     A.    Person -- I don't use E-mail very much going

24  out.  I receive a lot of E-mail.  I don't use it -- I

25  used it very little, in my time as the CEO, to send

```
1   E-mails.

2        Q.   So you'd get E-mails, but you sent very few of

3   them.  Is that what your --

4        A.   That's correct.

5        Q.   -- testimony is?

6        A.   That's true.

7        Q.   You have a cell phone, I take it, that you

8   use?

9        A.   I do.

10        Q.   Is that --

11        A.   It's a BlackBerry.

12        Q.   Your BlackBerry is your principal phone that

13   you use?

14        A.   It's my only phone.

15        Q.   It's your what?

16        A.   It's my only phone.

17        Q.   And so for communication purposes, most of

18   your communication took place on a BlackBerry; is that

19   right?

20        A.   That's correct.

21        Q.   What was the number of that BlackBerry?

22        A.   The number.

23        Q.   Yeah.

24   ███    ██████████████████

25        Q.   And who is your account with, what server?
```

1    A.   My account is with -- I believe it was with
2  Vodafone.  It was a BP account, and I think it was with
3  Vodafone.
4    Q.   Did you also have a different phone that you
5  used for personal business?
6    A.   No.
7    Q.   You said, I -- I believe earlier, that you had
8  one E-mail account and that was at BP, correct?
9    A.   That's correct.
10    Q.   And that -- is that "HaywardT@BP.com"?
11    A.   That's correct.
12    Q.   You had no personal E-mail account?
13    A.   No.
14    Q.   And you testified to that earlier, right?
15    A.   I did.
16    Q.   Well, then, whose E-mail address is
17  "Haywar" -- "H-a-y-w-a-r-a-b-1@yahoo.com"?
18    A.   It was a -- it was an account I never used.
19  Nothing in it.  You can go and look.
20  

1    Q.   Is that your testimony?

2    A.   I set it up, and I've never used it.

3    Q.   Set it up and never used it.  Well, why did

4  you set it up?

5    A.   I thought I might, but I just never did.  I

6  could never -- I could remember -- never remember the

7  E-mail.

8    Q.   You could never what?

9    A.   I could never remember the E-mail address.

10   Q.   You couldn't remember the E-mail address?

11   A.   That's right.  You can look -- you can go and

12  look at it.  There's nothing in it.  I don't -- it may

13  not even be extant anymore.  I don't know.

14   Q.   Well, why did you testify that you never had

15  an -- an -- an E-mail address --

16   A.   Because it was never act -- sorry.

17   Q.   -- when you had one?

18   A.   It was never activated.

19   Q.   Nobody asked you whether it was activated.

20   A.   Well, I'm --

21   Q.   Why did you testify under oath twice?

22   A.   I'm sorry, but I never used it, so it -- as

23  far as I was concerned, it was not relevant because it

24  was never used.

25   Q.   So you think you can answer a question saying

894

1  you don't have an account because you didn't think it

2  was relevant?  You -- you think that's okay?

3      A.   It was never used.  So it was -- it was, in

4  essence, not an account.  There wasn't an E-mail ever

5  sent from it.

6      Q.   There was an exhibit offered earlier, a

7  "Forbes" article.  I don't know the number of the

8  exhibit, but you may have it over there somewhere.  Do

9  you remember that?

10     A.   I remember you showing it to me, yeah.

11     Q.   I didn't show it to you.  I think the --

12     A.   Or someone else showing me --

13     Q.   -- gentleman from Transocean showed it to you.

14              MR. CUNNINGHAM:  Do y'all -- do you have

15  it?

16              MR. GODFREY:  Oh, this is one --

17     Q.   (By Mr. Cunningham) All right.  Well, I can't

18  give you the number, but --

19              MR. GODFREY:  What is it --

20              MR. CUNNINGHAM:  I don't know the number,

21  but it's a "Forbes" article.

22              MR. GODFREY:  Okay.  Hold on.  Let me see

23  if we can find it.

24              MR. CUNNINGHAM:  Steve, you got the

25  number?

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 447

1          MR. ROBERTS:  Yeah.  The "Forbes" article

2  is 6061.

3          MR. GODFREY:  6061?  Is this it?

4          MR. CUNNINGHAM:  Yes.

5     Q.   (By Mr. Cunningham) I'd ask you to take a look

6  at Page 2 of that.  And this is a document that's in

7  your own words.  It's a Q&A with you, correct?

8          MR. GODFREY:  Objection as to form.

9     A.   I believe so, yeah.

10    Q.   (By Mr. Cunningham) All right.  On Page 2,

11 second paragraph, first sentence says this:  "Do I feel

12 that anything I've done, I would have done

13 differently," question mark.  "Not at all," period.

14        And I think you were referring -- or

15 responding to a question about the response effort

16 there; is that correct?

17    A.   I -- I think it was actually a -- a question

18 about what I'd done in the prior three years, actually.

19    Q.   Oh, was it?

20    A.   I think so.

21    Q.   Okay.

22    A.   I think so.

23    Q.   Well, then --

24    A.   That's what I interpreted --

25    Q.   -- that was going to be my next question.

PURSUANT TO CONFIDENTIALITY ORDER
Exhibit Z
Page 448

1  With respect to what you did in the three years leading

2  up to the blowout on April the 20th of 2010, would this

3  question and this answer still be yours today?

4      A.   I've thought a lot about that, and -- and I --

5  I had done everything that I could do as a human being,

6  as a person, to implement changes to Process Safety, to

7  introduce new people, new systems, new processes.  I

8  don't know what else I could have done.

9      Q.   So the question today, "Do I feel that

10 anything I've done, I would have done differently," the

11 answer today would still be, "Not at all," correct?

12             MR. WEBB:  Objection, asked and answered.

13     Q.   (By Mr. Cunningham) Correct?

14             MR. GODFREY:  Same objection.

15     A.   I feel that I did everything that I could --

16     Q.   (By Mr. Cunningham) Would the answer --

17     A.   -- as a person.

18     Q.   Would the answer to the question, "Do I feel

19 that anything I've done, I would have done

20 differently" -- would the answer to that question today

21 still be, quote, "Not at all" --

22             MR. WEBB:  Objection --

23     Q.   (By Mr. Cunningham) -- period, end quote?

24             MR. WEBB:  -- asked and answered three

25 times.

PURSUANT TO CONFIDENTIALITY ORDER

1    A.    I can't put my finger on what I would have

2  done differently.

3              MR. CUNNINGHAM:   That's all the questions

4  I have.

5              THE VIDEOGRAPHER:   Off the record at 5:19

6  p.m., ending Tape 22.

7          (Recess from 5:19 p.m. to 5:23 p.m.)

8          (Proceedings on the stenographic record only:)

9              MR. GODFREY:   Okay.   Thank you.

10          Well, first, I appreciate everyone's patience

11  for the last two days, during the depositions, and I

12  think it went about as well as could be expected, so I

13  appreciate that very much.

14          There is a continuing issue, and I think this

15  deposition illustrates that I think Mr. Langan has made

16  clear that with a number of BP witnesses, we feel that

17  the time allocations are not fair.

18          But what happened today was -- you know, I've

19  previously, when I've talked to Mr. Lemoine of

20  Weatherford, and he agreed to graciously cede his time

21  with the condition that they could yank it if they saw

22  something they didn't like, and I just wanted to do

23  that.   And as you saw, I felt I could use more time.

24          But with respect to Anadarko and MOEX, my

25  understanding had not been that MOEX had ceded its

1  time.  And so the reason I asked counsel about that,

2  was I wanted to run down who, given that resolution has

3  been reached, at least in part, between BP and MOEX.

4        So there is a time difference between the West

5  Coast in the United States and London, so Mr. Brock and

6  Mr. Neath sent an inquiry, after what was said on the

7  record.  And I thought we should put on the record now

8  what our understanding is and the basis for it.

9        Mr. Brock will do that, since he had the

10  communications, I didn't.

11        But I do think this is subject to further

12  communication that, Your Honor, when you return to the

13  United States, although we welcome you here in London

14  as much as you'd like to come, when you return to the

15  United States, I think that we need to have a little

16  further clarity about this issue, particularly where,

17  you know, I went and I was prepared to show the

18  documents, i.e., E-mails between Mr. Lemoine and myself

19  that I had at the time, although his partner was here,

20  so he was able to confirm it, anyway.

21        But it leaves us in a bit of an awkward

22  position, particularly when we're away from the quick

23  call.  And just as a matter of personal approach, I

24  don't like controversies like this, so I like to try to

25  work them out in advance, and if the Court rules for

1   me, great.  If it rules against me, well, then I move

2   forward and I don't think about it.

3            But if Mr. Brock could put on the record what

4   our understanding is, and the basis for it, I think

5   that's important, because I do think that this is a

6   matter for further discussion with respect to time

7   allocations, particularly the Senior BP witnesses,

8   where the likelihood that there will ever be a former

9   CEO is unlikely that he'll ever be in the United States

10  to testify, and short time allocations, I think, really

11  are prejudicial, and I think that particularly when

12  it's sixteen hours one way and one hour the other way.

13            So, Mr. Brock, if you could be kind enough to

14  put on the record what we've learned since.

15            MR. BROCK:  All right.  So Mike Brock for

16  BP.

17            I think, Your Honor, what we would ask for, in

18  depositions going forward, is that if a Party claims to

19  have been ceded time from a Party who is not present at

20  the deposition, that they should have some verification

21  that that time has been ceded by the Party that is not

22  present.

23            We asked for that verification today.  It was

24  not forthcoming.  We proceeded on the representation of

25  counsel.

**PURSUANT TO CONFIDENTIALITY ORDER**
Exhibit Z
Page 452

1        Members of our Team have inquired of MOEX's

2  present counsel as to whether they ceded time to

3  Anadarko for this deposition.

4        Tom Campbell of Pillsbury has responded that

5  he did not cede that time for this deposition.  There

6  was reference to Kathy McCollum having possibly been

7  the person that did that.  Tom checked with Kathy to

8  see if she'd ceded time to Anadarko for the Tony

9  Hayward deposition.  And our information, at this

10  point, is that she says she did not.

11        So I think what we would like to say to the

12  Court, at this point, is that there could be further

13  clarification of this, and we understand that, but the

14  information that we have at this point is that time was

15  not given to Anadarko from MOEX, and if that holds to

16  be the case, as we believe from what we know now, we'll

17  file an appropriate Motion to Strike portions of their

18  exam.

19            MAGISTRATE SHUSHAN:  Okay.

20            MS. HERTZ:  Your Honor, may I just say --

21            MAGISTRATE SHUSHAN:  Yes, please.

22            MS. HERTZ:  I just want to make a

23  representation on the record that I simply conveyed

24  what I was told, and I didn't have a writing.  It

25  wasn't that it wasn't forthcoming.  It's I didn't have

1 one, and I was proceeding with the information I have.

2 And that's all I can tell you right now.

3          MAGISTRATE SHUSHAN:  Okay.

4          MS. HERTZ:  There was no false

5 representations.  I just wanted you to know that, and

6 certainly not --

7          MAGISTRATE SHUSHAN:  And I'm not

8 suggesting, and nor do I have the impression that

9 counsel for BP are suggesting that, so --

10          MR. GODFREY:  Let me confirm that, Your

11 Honor.  I think this is where -- the importance of the

12 communications here.  I took the time to have an

13 E-mail, but then Mike's partner was here, anyway, so I

14 knew it, and I spoke with him privately.

15          I just think, that given the potential

16 importance of depositions, and our concerns about the

17 time allocation, anyway, I was surprised.  We were

18 surprised.  That had not been our understanding, and

19 when you're an eight hours time difference from the

20 West Coast, learning that at 11:00 a.m. London time

21 does not allow us to do any check.  And that goes all

22 the way around, so I'm not suggesting that, but what I

23 am suggesting is a need for clarity.

24          MAGISTRATE SHUSHAN:  I agreed with that,

25 and in addition, it has occurred to me that the

**PURSUANT TO CONFIDENTIALITY ORDER**

1  informal agreement that the Defendants had been working

2  under might require some tweaking because of the

3  settlement with MOEX.  So that is something that had

4  occurred to me.  And I think maybe tomorrow morning,

5  off the record, we might be able to sit down and talk

6  about what my thinking is, because I would like to work

7  it out on a longer term basis, so that you don't have

8  the problem.

9        I do think that the amount of time you had

10 today was tight.  You did a really good job with it,

11 but I will agree it was tight, and so it's something

12 that I do think we should talk about.

13        MR. GODFREY:  But at 16 to 1, I may be

14 fast, but I'm not that fast.

15        MAGISTRATE SHUSHAN:  I'm with you.

16        MR. GODFREY:  Okay.

17        MAGISTRATE SHUSHAN:  I do think that if,

18 indeed, somebody has the idea that time has been ceded,

19 but the person that is the person ceding has not

20 attended the deposition and can't confirm it, I do

21 think it would be a good idea if we get it in writing.

22        MR. GODFREY:  All right.  Well, thank

23 you.  And that's all we had, and now we're off the

24 record.

25        (Deposition concluded at 5:30 p.m.)

```
1                      CHANGES AND SIGNATURE

2    WITNESS NAME:  ANTHONY HAYWARD

3    DATE OF DEPOSITION:  JUNE 8, 2011

4    PAGE  LINE           CHANGE        REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1

2          I, ANTHONY HAYWARD, have read the foregoing

3   deposition and hereby affix my signature that same is

4   true and correct, except as noted on the attached

5   Amendment Sheet.

6

7

                        ANTHONY HAYWARD

8

9

    THE STATE OF                    )

10

    COUNTY OF                       )

11

12          Before me,                            , on

    this day personally appeared ANTHONY HAYWARD, known to

13   me (or proved to me on the oath of

                            or through                )

14   to be the person whose name is subscribed to the

    foregoing instrument and executed the same for the

15   purposes and consideration therein expressed.

            GIVEN UNDER my hand and seal of office this

16       day of                    , 2011.

17

18

                    Notary Public in and for

19                   The State of

20

21

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3  IN RE:  OIL SPILL        )     MDL NO. 2179
    BY THE OIL RIG           )
 4  "DEEPWATER HORIZON" IN    )     SECTION "J"
    THE GULF OF MEXICO, ON    )
 5  APRIL 20, 2010           )     JUDGE BARBIER
                             )     MAG. JUDGE SHUSHAN
 6
 7
 8              REPORTER'S CERTIFICATION
          TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9                    ANTHONY HAYWARD
                      JUNE 8, 2011
10                       VOLUME 2
11
12
        I, Emanuel A. Fontana, Jr., Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
    to the following:
14
        That the witness, ANTHONY HAYWARD, was duly sworn
15  by the officer and that the transcript of the oral
    deposition is a true record of the testimony given by
16  the witness;
17      That the deposition transcript was submitted on
             , 2011, to the witness or to
18  Attorney                      , for the witness to
    examine, sign, and return to Worldwide Court Reporters,
19  Inc., by                      , 2011.
20      That the amount of time used by each party at the
    deposition is as follows:
21
        Mr. Strange - 18 Minutes
22      Mr. Kanner - 1 Hour, 6 Minutes
        Mr. Roberts - 59 Minutes
23      Mr. Godwin - 59 Minutes
        Ms. Hertz - 1 Hour, 15 Minutes
24      Mr. Beck - 1 Hour, 13 Minutes
        Mr. Godfrey - 1 Hour, 11 Minutes
25      Mr. Cunningham - 37 Minutes
```

1    I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
2 action in which this proceeding was taken, and
further that I am not financially or otherwise
3 interested in the outcome of the action.
4    SUBSCRIBED AND SWORN to by me on this 8th day of
June, 2011.
5
6
7    _____

                    Emanuel A. Fontana, Jr., RPR
8                   Texas CSR No. 1232
                    Expiration Date: 12/31/12
9                   Worldwide Court Reporters
                    Firm Registration No. 223
10                  3000 Weslayan, Suite 235
                    Houston, Texas  77027
11                  (713) 572-2000
12
13
14
15
16
17
18
19
20
21
22
23
24
25