## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** | **MDL No. 2179** |
| **This Document Relates to:** *Pleading Bundle C* | **SECTION: J** |
| (This Document also applies to No. 10-2771) | **JUDGE BARBIER** |
| | **MAGISTRATE SHUSHAN** |

**In re:  Oil Spill by the Oil Rig
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010**

**This Document Relates to:**
*Pleading Bundle C*

(This Document also applies to No. 10-2771)

**MDL No. 2179**

**SECTION: J**

**JUDGE BARBIER**

**MAGISTRATE SHUSHAN**

### <u>OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE VOLUNTARY MASTER COMPLAINT FOR LOCAL GOVERNMENTAL ENTITIES ("BUNDLE C")</u>

# TABLE OF CONTENTS

**Page**

ADOPTION AND INCORPORATION OF PREVIOUS BRIEFS.................................................7

LEGAL STANDARDS ...............................................................................................................8

LEGAL ARGUMENT.................................................................................................................8

   I.   PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED. ....................................8

      A.   *OPA's Savings Clauses Preserve State Common Law Claims In Addition To Claims Brought Under State Statutory Regimes* .........................................................8

      B.   *OPA's Savings Provisions Apply To Discharges Of Oil That Migrate Into State Territorial Waters* .....................................................................................................12

   II.   PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF UNDER THE FLORIDA, LOUISIANA, AND TEXAS STATE OIL POLLUTION STATUTES............................13

      A.   *The Local Government Master Complaint States A Claim For Relief On Behalf Of The Florida Local Government Entities Under The Florida Pollutant Discharge Prevention and Control Act* ....................................................................................13

      B.   *The Local Government Master Complaint States A Claim For Relief Under The Louisiana Oil Spill Prevention And Response Act On Behalf Of The Louisiana Local Government Entities* .........................................................................................14

      C.   *The Texas Local Government Entities Have Stated A Claim For Damages Pursuant To The Texas Oil Spill Prevention And Response Act of 1991* .........................................16

   III.   OPA DOES NOT DISPLACE PLAINTIFFS' GENERAL MARITIME LAW CLAIMS. 18

      *The Phrase "Except as Otherwise Provided in this Act" Simply Means: Where Not Specifically Provided Within the OPA Statute ……………………………………………… 18*

      *The Recent Supreme Court Decision in* American Electric Power v. Connecticut *Does Not Alter the Preemption / Displacement Analysis from* Exxon v. Baker………….19

   IV.   PLAINTIFFS HAVE STATED A CLAIM FOR REMOVAL COSTS UNDER OPA.....22

   V.   THE COURT SHOULD NOT DISMISS PLAINTIFFS' ACTION FOR LACK OF PRESENTMENT....................................................................................................................23

   VI.   LOSPRA DOES NOT PREEMPT PLAINTIFFS' STATE COMMON LAW CLAIMS. 25

## TABLE OF CONTENTS
(continued)

**Page**

VII. THE RULE IN *ROBINS DRY DOCK* DOES NOT BAR PLAINTIFFS' ECONOMIC LOSS CLAIMS................................................................................................ 26

VIII. THE SUPREME COURT'S RECENT DECISION IN *CSX TRANSPORTATION, INC. v. MCBRIDE* AND OPA'S LEGISLATIVE HISTORY SUPPORT A BROAD INTERPRETATION OF OPA'S CAUSATION PROVISIONS. ...................................... 27

IX. THE LOCAL GOVERNMENT MASTER COMPLAINT STATES A CLAIM FOR FRAUDULENT CONCEALMENT ON THE PART OF BP, TRANSOCEAN, AND HALLIBURTON. ......................................................................................................... 28

X. PLAINTIFFS STATE A VALID CLAIM FOR NEGLIGENCE AGAINST THE MOEX AND ANADARKO DEFENDANTS ................................................................. 29

XI. PLAINTIFFS HAVE PROPERLY ALLEGED CLAIMS FOR WHICH RELIEF MAY BE GRANTED FOR TRESPASS. .................................................................... 36

XII. DEFENDANTS MISSTATE THE ECONOMIC LOSS RULE UNDER STATE LAW. 36

XIII. THE LOUISIANA PARISH DISTRICT ATTORNEYS HAVE STATED A CLAIM FOR PENALTIES UNDER TITLE 56 FOR DAMAGE TO WILDLIFE IN LOUISIANA AND ADJACENT WATERS............................................................................. 36

    A. *Title 56 Claims Are Preserved Under OPA's Savings Clause*....................................... 38

    B. *There Is No Presentment Requirement For Claims Under Title 56.* ............................ 38

    C. *Title 56 Claims Are Not Barred By LOSPRA*................................................. 39

XIV. MOEX AND ANADARKO ARE INCLUDED IN THE CLAIM FOR RELIEF UNDER THE FLORIDA ACT....................................................................................... 45

CONCLUSION……………………………………………………………………… 46

CERTIFICATE OF SERVICE………………………………………………..…… 48

**CASES**

*Abundiz v. Explorer Pipeline Co.*, No. 00-2029, 2003 WL 23096018, at *3-4 (N.D.Tex. Nov.25, 2003) ................................................................................................ 39

*American Electric Power Co. v. Connecticut*, No. 10-174 .................................................... 12, 19

*Askew v. Am. Waterways Operators, Inc.,* 411 U.S. 325, 343 (1973) ........................................ 12

*Avitts v. Amoco Prod. Co.,* 840 F. Supp. 1116, 1121 (S.D. Tex. 1994), *rev'd on other grounds,* 53 F.3d 690 (5th Cir. 1995) .................................................................. 17

*Bolivar v. R&H Oil & Gas Co.,* 789 F. Supp. 1374, 1380-81 (S.D. Miss. 1991) ...................... 35

*CSX Transp., Inc. v. McBride*, No. 10-235, 2011 U.S. LEXIS 4795 (Sup. Ct., June 23, 2011) .................................................................................................................. 27

*Darr v. Chevron U.S.A.*, 1997 WL 470153, 3 (E.D. La. 1997) .................................................. 31

*Davidson v. Enstar Corp.,* 848 F.2d 574, 577-78 (5th Cir.), *modified on rehearing on other grounds,* 860 F.2d 167 (5th Cir.1988) ........................................................ 31, 32, 33

*Exxon Shipping Co. v. Baker*, 556 U.S. 471, 484-89 (2008) ........................................................ 21

*Galloway v. Baton Rouge General Hospital*, 602 So. 2d 1003, 1005 (La.1992) ...................... 16

*Heavin v. Mobil Oil Exploration,* 697 F. Supp. 1408, 1411-1412 (E.D. La. 1988) *rev'd on reh'g on other grounds,* 710 F. Supp. 1073 (E.D. La. 1989) *affirmed* 913 F.2d 178 (5th Cir. 1990) .................................................................................... 32, 33

*Heavin,* 697 F. Supp. at 1411 n. 1 ................................................................................................ 32

*Hercules Carriers, Inc. v State of Florida*, 720 F.2d 1201, 1203 (11th Cir. 1983) (Clark, J.), *vacated and affirmed,* 728 F.2d 1359 (11th Cir. 1984) .................................... 26

*Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 112 -113 (Tex.App.–El Paso 1997) ................................................................................................................................ 30

*Illinois v. City of Milwaukee,* 731 F.2d 403, 411 n.3 (7th Cir. 1984) ...................................... 13

*Int'l Paper Co. v. Ouellette,* 479 U.S. 481 (1987) .................................................................. 12

*Isla Corp v. Sundown Energy LP*, No. 06-8645, 2007 WL 1240212, at *2 (E.D. La. April 27, 2007) ............................................................................................................ 9, 38

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 545 (1995) ........................................................................................................................ 11

*Joffrion-Woods, Inc, v. Brock*, 154 So. 660, *affirmed,* 180 La. 771, 157 So. 589 (1934) ...................................................................................................................... 16

*Kelty v. Brumfield*, 633 So. 2d 1210, 1216 (La. 1994) .............................................................. 16

*Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* 959 F.2d 49, 53 (5th Cir. 1999) ................................................................................................ 11

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .............................................................................. 19

*Miller v. Slam Offshore,* 1997 WL 537686, 1 (E.D. La. 1997) .................................................. 31

*Parker v. McDermott, Inc.,* 1990 WL 223011, 4 (E.D. La. 1990) ...................................... 34, 35

*PLIVA, Inc. v. Mensing,* Nos. 09-993, 09-1039, 09-1501, 2011 U.S. LEXIS 4793 (Sup. Ct. June 23, 2011) ........................................................................................ 8

*Rice v. Harken Exploration Co.,* 250 F.3d 264, 267 (5th Cir. Tex. 2001) .................................. 23

*Robins Dry Dock & Repair Co. v Flint,* 275 U.S. 303 (1927)...................................... 26

*Russo v. M/T Dubai Star,* 2010 U.S. Dist. LEXIS 50967 at *3................................... 10

*State ex rel Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985) *(en banc)* ..................... 26

*Taylor v. Getty Oil Co.,* 637 F. Supp. 886, 889 (E.D. La. 1986) ........................... 31, 32

*The St. Joe Co. v. Transocean Offshore Deepwater Drilling, Inc.,* No. 1:10-cv-968-LPS, 2011 U.S. Dist. LEXIS 26391 (D. Del. 2011)...................................... 10

*U.S. v. Bodenger,* No. 03-0272, 2003 WL 22228517, at *3 (E.D. La. Sept. 25, 2003) ............................................................................. 10

*U.S. v. Locke,* 529 U.S. 89 (2000)............................................................. 9, 38

*United States v. M/V Cosco Busan,* 557 F. Supp. 2d 1058 (N.D. Cal. 2008) ........................ 24

*United States v. Murphy Exploration & Production Co.,* 939 F. Supp. 489 (E.D. La 1996) .................................................................................. 24

*Weber v. State,* 635 So.2d 188, 193 (La. 1994) .................................................. 16

*Williams v. Potomac Elec. Power Co.,* 115 F. Supp. 2d 561, 565 (D. Md. 2000)................ 10, 38

*Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199 (1996)........................................... 11

## STATUTES

33 C.F.R. 136.231(a).............................................................................. 26

33 U.S.C. § 2702 ................................................................................. 26

33 U.S.C. § 2702(b)(1)(B) ........................................................................ 23

33 U.S.C. § 2713 ................................................................................. 24

33 U.S.C. § 2717(f)(2) ........................................................................... 24

33 U.S.C. § 2718 ............................................................................. 37, 39

33 U.S.C. § 2718(a) .............................................................................. 9

33 U.S.C. § 2718(a) and (c) ...................................................................... 38

33 U.S.C. § 2718(a)(1)(A) ........................................................................ 12

33 U.S.C. § 2718(c) .............................................................................. 9

33 U.S.C. §2717(f)(2) ............................................................................ 24

42 U.S.C. § 7401 ................................................................................. 19

42 U.S.C. § 9601 ................................................................................. 26

43 U.S.C. § 1333(a)(1) ........................................................................... 11

43 U.S.C. § 1333(a)(2)(A) ........................................................................ 11

45 U.S.C. § 51 *et seq*........................................................................... 27

Fla. Stat. § 376.031(7 ........................................................................... 14

Fla. Stat. §§ 376.011, *et seq* .................................................................. 45

Fla. Stat. §§376.011, *et seq*., ................................................................. 13

Fla. Stat. §376.041 .............................................................................. 13

Fla. Stat. §376.041. ............................................................................. 13

La.-R.S. 30:2451 ................................................................................................ 14

La.-R.S. 30:2453 ................................................................................................ 16

La.-R.S. 30:2454 ................................................................................................ 15

La.-R.S. 30:2479 ................................................................................................ 15

La.-R.S. 30:2483-2490 ....................................................................................... 15

La.-R.S. 30:2491 ................................................................................................ 15

La-R.S. 30:2479 C .............................................................................................. 16

LOSPRA's §2466 ............................................................................................... 42

LSA-30:2481 ...................................................................................................... 43

LSA-R.S. 2491A ................................................................................................. 41

LSA-R.S. 30:2453 .............................................................................................. 43

LSA-R.S. 30:2466B ............................................................................................ 42

LSA-R.S. 30:2479 .............................................................................................. 42

LSA-R.S. 30:2479C ............................................................................................ 42

LSA-R.S. 30:2488 .............................................................................................. 43

LSA-R.S. 30:2491(A) ......................................................................................... 37

LSA-R.S. 50:40.1 ............................................................................................... 36

LSA-R.S. 56:40.1 ........................................................................................... 37, 39

LSA-R.S. 56:40.4 ........................................................................................... 39, 40

LSA-R.S. 9:2800.52 ........................................................................................... 41

TEX. NAT. RES. CODE § 40.003 (23) ............................................................. 17

TEX. NAT. RES. CODE § 40.003 (6)(a)(ii). ..................................................... 18

TEX. NAT. RES. CODE ANN. § 40.001 ........................................................... 16

# OTHER AUTHORITIES

Boigon, *Liabilities of Nonoperating Oil and Gas Interest Owners,* 13D Rocky Mt.
 Min. Law Inst. 4 (1983) ......................................................................... 30, 36

# RULES

Fed. R. Civ. P. 12(b)(1)......................................................................................... 8

Federal Rules of Civil Procedure
 Rule 12(b)(6)............................................................................................... 8

# TREATISES

57A Am. Jur. 2d *Negligence* § 602 ...................................................................... 28

Plaintiffs respectfully submit the following memorandum in response to the motions to dismiss filed by BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") [Doc. 2214]; Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater, Inc. and Triton Asset Leasing GmbH (collectively, "Transocean") [Doc. 2657]; Halliburton Energy Services, Inc. ("Halliburton") [Doc. 2642]; Cameron International Corporation ("Cameron") [Doc. 2636]; Weatherford U.S., L.P. ("Weatherford") [Doc. 2638]; Anadarko Petroleum Corporation, Anadarko E&P Company LP (collectively, "Anadarko") [Doc. 2218]; MOEX Offshore 2007 LLC and MOEX USA Corporation (collectively, "MOEX") [Docs. 2220, 2221][1];  and M-I LLC ("M-I") [Doc. 2224]; (all collectively, "Defendants").[2]

## MAY IT PLEASE THE COURT:

Plaintiffs include local governmental entities located in the Gulf States that have sustained damage, destruction and/or diminution in value of property; loss of tax revenue,

---

[1] The Local Government Master Complaint lists MOEX USA Corporation as a party defendant and describes the corporate relationship between the MOEX defendants. (Loc. Gov't. Master Compl. ¶¶ 205-219.) As stated in the Local Government Master Complaint, MOEX USA was named as a defendant "because it is part of the corporate construct by which MOECO owns, dominates, controls, and benefits from the activities of MOEX Offshore." (Id. ¶ 205.) Thus, the allegations against MOEX (and MOEX Offshore), including its access to real-time data that was transmitted from the Deepwater Horizon on April 20, 2010, and actual or constructive knowledge of the red flags indicating a leak in the well in sufficient time to avert the disaster, are attributable to MOEX USA. (Id. ¶ 546.) Accordingly, MOEX USA's assertion that the Local Government Master Complaint does not contain allegations identifying MOEX USA as a party that committed any wrongful act is without merit.  In any event, Plaintiffs accept MOEX USA's adoption of the arguments asserted in the Memorandum filed by its affiliate, MOEX Offshore.

[2] Although Dril-Quip, Inc. ("Dril-Quip") was not named as a party defendant in the Local Government Master Complaint, it has been joined as a third party in Transocean's Third-Party Complaint. [Doc. 1320]  Based on its status as a third party by virtue of Transocean's Rule 14(c) tender, Dril-Quip has filed a motion to dismiss the Local Government Master Complaint. [Doc. 2442]   This Memorandum, including those memoranda incorporated herein, also responds to Dril-Quip's motion to dismiss.

income and/or use; costs of response, removal, clean-up, restoration and/or remediation; damage to natural resources; costs associated with providing additional public services; other damages, losses, and/or costs; and/or are seeking civil and/or criminal fines or penalties;  as a result of the oil spill in the Gulf of Mexico commencing on or around April 20, 2010.[3]

## ADOPTION AND INCORPORATION OF PREVIOUS BRIEFS

In seeking dismissal of the Local Government Master Complaint, Defendants raise a number of issues that have been addressed in previous opposition memoranda. To avoid repetition, Plaintiffs respectfully adopt and incorporate, in their entirety, the OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS BUNDLE B1 FIRST AMENDED MASTER COMPLAINT (the "B1 Omnibus Memorandum in Opposition") [Doc. 1821]; the SUPPLEMENT TO OPPOSITION TO MOTIONS TO DISMISS THE AMENDED B1 MASTER COMPLAINT (the "Supplement to B1 Omnibus Memorandum in Opposition") [Doc. 2400]; the PSC's OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS CERTAIN BUNDLE C COMPLAINTS SUBMITTED BY THE PLAINTIFFS' STEERING COMMITTEE (the "B1 Omnibus Opposition to Certain Bundle C Complaints") [Doc. 2110]; the LOUISIANA PARISH DISTRICT ATTORNEYS' JOINT OPPOSITION TO BP DEFENDANTS' MOTION TO DISMISS [Doc. 2161]; the MEMORANDUM IN OPPOSITION TO THE MOEX AND ANADARKO DEFENDANTS' MOTIONS TO DISMISS (the "B1 Opposition to Anadarko/MOEX Motions to Dismiss") [Doc. 1803]; the MEMORANDUM IN OPPOSITION TO DEFENDANTS CAMERON'S AND WEATHERFORD'S MOTIONS TO DISMISS PRODUCTS LIABILITY CLAIMS (the "B1 Opposition to Cameron/Weatherford Motions to Dismiss") [Doc. 1804]; and the MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS

---

[3] *See generally,* VOLUNTARY LOCAL GOVERNMENT MASTER COMPLAINT [Doc 1510];  (*see also,* PRE-TRIAL ORDER NO. 33).

PLAINTIFFS' FRAUD CLAIMS  (the "B1 Opposition to Motions to Dismiss Fraud Claims") [Doc. 1808].

## LEGAL STANDARDS

The legal standards governing motions to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure and for lack of subject matter jurisdiction under Rule 12(b)(1) are fully addressed in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp. 19-22.

## LEGAL ARGUMENT

I.    **PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED.**[4]

A.    **OPA's Savings Clauses Preserve State Common Law Claims In Addition To Claims Brought Under State Statutory Regimes.**

Contrary to Weatherford's argument (Weatherford Memo in Support of Mot. to Dismiss, pp.18-20), 33 U.S.C. § 2718(a) and (c), the savings provisions of the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* ("OPA"), preserve state common law actions in addition to state oil spill or "mini-OPA" claims.  The plain language of Section 2718(a) expressly provides that it does not preempt the imposition of additional liabilities under state law, *including common law*:

---

[4]The Supreme Court's recent decision in *PLIVA, Inc. v. Mensing,* No. 09-993, 2011 U.S. LEXIS 4793 (June 23, 2011) ("PLIVA"), lends no support to Defendants' preemption arguments. *PLIVA* is a conflict preemption case in which the Court decision was premised on impossibility, holding that it would not have been lawful under Federal Law for the defendant drug manufacturers to have done the plaintiffs in that case claimed was required under State Law.  As such, the State Law claims in *PLIVA* were preempted.  *PLIVA* is inapposite here because Defendants do not, and cannot, claim that their compliance with State Law would "violate" either OPA, the Clean Water Act, or some other Federal statute. Or, stated another way:  It was possible, at all times, for Defendants to comply with both Federal Law requirements and the requirement of State statutory and/or common law.  To the extent Defendants suggest that the Local Government Master Complaint is preempted on conflict preemption grounds, that issue is addressed in detail in the OMNIBUS MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS BUNDLE B3 MASTER COMPLAINT [Doc. 1815], pp.4-9, which is incorporated herein.

Relationship to other law

(a) Preservation of State authorities…. Nothing in this Act… shall—

   (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

      (A) the discharge of oil or other pollution by oil within such State; or

      (B) any removal activities in connection with such a discharge; or

   (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) *or State law, including common law*.

33 U.S.C. § 2718(a) (emphasis added).[5]

As the Supreme Court explained in *U.S. v. Locke*, 529 U.S. 89 (2000), "[t]he evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills." *Id.* at 105-106.  Cases construing Section 2718 have concluded that it preserves not only the "mini-OPA" statutes enacted in some states, but also state common law. *Isla Corp v. Sundown Energy LP*, No. 06-8645, 2007 WL 1240212, at *2 (E.D. La. April 27, 2007) (holding that OPA did not preempt plaintiff's state law claims of strict liability and

---

[5] Likewise, nothing in the language of Section 2718(c) limits the preservation of state law claims to those claims asserted under state oil spill statutes:

      (c) Additional requirements and liabilities; penalties. Nothing in this Act… shall in any way affect, or be construed to affect, the authority of the United States *or any State or political subdivision thereof*—

         (1) to *impose additional liability or additional requirements*; or

         (2) to *impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge, of oil.*

33 U.S.C. § 2718(c) (emphasis added).  The language of Section 2718(c) does not restrict its preservation of "additional liability" or "additional requirements" to state "mini-OPA" statutes.

negligence); *see also Russo v. M/T Dubai Star,* 2010 U.S. Dist. LEXIS 50967 at *3 (N.D. Cal.

Apr. 29, 2010) (holding **"**OPA does not preempt state laws governing liability and compensation

relating to oil spills, such as the state [common law] claims alleged by plaintiff in this case");

*Williams v. Potomac Elec. Power Co.,* 115 F. Supp. 2d 561, 565 (D. Md. 2000) (finding "OPA

does not preempt state laws of a scope similar to the matters contained in Title I of OPA, such as

the state common law actions pleaded here [negligence, trespass, strict liability, and nuisance]");

*U.S. v. Bodenger*, No. 03-0272, 2003 WL 22228517, at *3 (E.D. La. Sept. 25, 2003) (stating

"OPA's savings provisions expressly preserve state authority to impose additional liability.").

In *The St. Joe Co. v. Transocean Offshore Deepwater Drilling, Inc*., No. 1:10-cv-968-

LPS, 2011 U.S. Dist. LEXIS 26391 (D. Del. 2011) ("St. Joe"), a case arising out of the

Deepwater Horizon oil spill, Transocean argued that Section 2718(a)(1) applies only to state

statutory regimes, while Section 2718(a)(2) is limited to state law (including common law)

relating to waste disposal.  Id. at *21.   The court rejected Transocean's argument, explaining as

follows:

> The first clause preserves the authority "of any State or political subdivision
> thereof" to impose "any additional liability or requirements with respect to" "the
> discharge of oil or other pollution by oil within such state; or . . . any removal
> activities in connection with such discharge." 33 U.S.C. § 2718(a)(1). This clause
> draws no distinction between a State exercising this authority via state common
> law or a state statutory regime. *See Williams v. Potomac Elec. Power Co.,* 115 F.
> Supp. 2d 561, 565 (D. Md. 2000) ("OPA does not preempt state laws of a scope
> similar to the matters contained in Title I of OPA, such as the state common law
> actions pleaded here [negligence, trespass, strict liability, and nuisance].")
> (internal citations omitted). The second clause provides in pertinent part:
> "[n]othing in this Act . . . shall . . . affect or be construed to affect or modify in
> any way obligations or liabilities of any person under the Solid Waste Disposal
> Act (42 U.S.C. § 6901*, et seq.*) or State law, including common law." 33 U.S.C.
> §2718(a)(2). This provision, therefore, makes clear that, in addition to the
> preservation of state authority to impose liability above and beyond OPA, any
> liability existing prior to OPA under State law, including common law, is not
> altered either.

*Id.* at *21-22.   This reasoning is in accord with the plain language of the savings provisions. There is no basis for Weatherford's argument that OPA does not preserve state common law claims.

Transocean does not repeat the argument it made in the *St. Joe* case.   Instead, Transocean argues that the Outer Continental Shelf Land Act, 43 U.S.C. §1333(a)(1), 43 U.S.C. §1333(a)(2)(A) ("OCSLA") requires the application of maritime law and, since maritime law preempts state common law, Plaintiffs' state common law claims are preempted.[6]

OCSLA's jurisdictional and substantive provisions are reviewed in detail at pages 21-33 of the B1 Omnibus Memorandum in Opposition, where the B1 Plaintiffs demonstrate that the substantive law provisions of OCSLA do not control claims arising out of the *Deepwater Horizon* disaster.

Yet, even assuming application of the substantive (as distinct from jurisdictional) provisions of OCLSA, (and as discussed in the B1 Omnibus Memorandum in Opposition, pp. 53-56), it is well-established that the exercise of admiralty jurisdiction does not result in the automatic preemption or displacement of state law.   *See Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 206 (1996); *see also, Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 545 (1995).   To promote uniformity in the general maritime law, admiralty courts may also look to, and borrow from, general common law. *See Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.,* 959 F.2d 49, 53 (5th Cir. 1999). For these reasons, and as more fully addressed in the B1 Omnibus Memorandum in Opposition, the argument that Section 2718 does not preserve Plaintiffs' state common law claims because they were preempted by maritime law before OPA was enacted should be rejected.

---

[6] *See* Transocean Memo in Support of Mot. to Dismiss, pp. 18-20; *see also* Halliburton Memo in Support of Mot. to Dismiss, p. 15.

**B.      OPA's Savings Provisions Apply To Discharges of Oil That Migrate Into State Territorial Waters.**

OPA's savings clause specifically preserves state law claims for any oil pollution damage occurring within a state, regardless of where the discharge originated.  Specifically, Section 2718(a) allows states to impose liability for discharges of oil within a state "*or* pollution by oil within a state." (emphasis added).  If states were only permitted to impose liability for spills originating in state territorial waters, then Section 2718(a) would not have expressly distinguished between "discharge[s]" in the state and "pollution by oil" within the state, allowing for claims under state law in either scenario.  When the discharge occurs outside of the state, resulting in pollution by oil within the state, OPA preserves the state's authority to impose its own civil penalties and liability apart from that provided by OPA.[7]

This interpretation of Section 2718(a) was adopted recently by the court in *St. Joe, supra.* "Transocean's interpretation of the saving provisions . . . is a structurally illogical reading of the pertinent clause." *St. Joe v. Transocean,* 2011 U.S. Dist. LEXIS 26391, at *21.  "By specifying that States can impose additional liability for 'other pollution by oil within such State' (33 U.S.C. § 2718(a)(1)(A)) the statute contemplates penalization of more than merely discharges occurring within the state's territory." *Id.* at *21.  The court noted further that "courts have consistently recognized that sea-to-shore pollution is within the police power of the states." *Id.* at *43; *citing, Askew v. Am. Waterways Operators, Inc.,* 411 U.S. 325, 343 (1973) (holding "sea-to-shore pollution - historically within the reach of the police power of the States - is not silently taken

---

[7] Defendants' reliance on *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), for the proposition that the savings provisions of OPA do not preserve Plaintiffs' state law claims in connection with oil spills that occur beyond state territorial waters is misplaced.  As discussed in detail in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.50-53, Defendants greatly overstate the holding in *Ouellette*.  The Supreme Court's recent decision in *American Electric Power Co. v. Connecticut*, No. 10-174, 2011 U.S. LEXIS 4565 (June 20, 2011), does not alter the analysis under *Ouellette* or *Exxon v. Baker,* as discussed more fully *infra.*

away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy"); *see also, Illinois v. City of Milwaukee,* 731 F.2d 403, 411 n.3 (7th Cir. 1984).  Thus, the court concluded, OPA, through its saving clauses, preserved plaintiff's state law claims.

## II.     PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF UNDER THE FLORIDA, LOUISIANA, AND TEXAS STATE OIL POLLUTION STATUTES.

### A.     The Local Government Master Complaint States A Claim For Relief On Behalf Of The Florida Local Government Entities Under The Florida Pollutant Discharge Prevention and Control Act.

As noted above, OPA specifically preserves state law claims in this case despite the location of the source outside of state territorial waters.  Likewise, the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. §§376.011, *et seq.*, specifically permits recovery where state waters are polluted by a discharge that originates elsewhere.  The Florida Act prohibits "[t]he discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the state." Fla. Stat. §376.041.  The statute expressly states that "the discharge of pollutants into or upon any coastal waters . . .. adjoining the seacoast of the state . . . is prohibited."  Fla. Stat. §376.041.  The statute broadly defines "discharge" as "any spilling, leaking, seeping, pouring, emitting, emptying, or dumping which occurs within the territorial limits of the state *or outside the territorial limits of the state* and affects lands and waters within the territorial limits of the state."  Fla. Stat. §

376.031(7) (emphasis added).  Thus, by its clear terms, the Florida Act applies to any oil spill, regardless of where it occurs, so long as it affects Florida resources.[8]

### B.     The Local Government Master Complaint States A Claim For Relief Under The Louisiana Oil Spill Prevention And Response Act On Behalf of Louisiana Local Government Entities.

Defendants Transocean and Dril-Quip have raised a unique argument under the Louisiana Oil Spill Prevention and Response Act ("LOSPRA"), La. R.S. 30:2451, *et seq*., without any apparent support within either LOSPRA or Louisiana jurisprudence interpreting the Act.[9]  Unlike their numerous co-defendants, Transocean and Dril-Quip have suggested that LOSPRA bars any recovery other than claims by the state coordinator for reimbursements to the "Oil Field Contingency Fund" and claims against that fund by victims of oil spills.[10]  Nowhere in the language of LOSPRA is there any provision that the sole remedy for oil spill victims under Louisiana law is through the state-administered "Oil Spill Contingency Fund."

While LOSPRA provides for the creation of an "Oil Spill Contingency Fund" and provides a mechanism for victims of oil spills to make claims against that fund, the Act most certainly does *not* provide that the fund is the sole vehicle for recovery of damages under Louisiana law for victims of oil spills.  Nowhere in either the provisions dealing with the

---

[8] The arguments that the *Ouellette* decision and the dormant Commerce Clause require dismissal of Plaintiffs' Florida Act claim are addressed in detail in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp. 83-92.

[9] *See Transocean* Memo in Support of Mot. to Dismiss, pp. 34-35; *see also* Dril-Quip Memo in Support of Mot. to Dismiss, pp. 30-31.

[10] Defendants Transocean and Dril-Quip also acknowledge that LOSPRA allows actions under the Act for damage to wildlife under La. 56:40.1, *et seq.,* but contend that under LOSPRA, only the Louisiana Department of Wildlife and Fisheries may assert that claim.  This issue has been addressed in the LOUISIANA PARISH DISTRICT ATTORNEYS' JOINT OPPOSITION TO BP DEFENDANTS' MOTION TO DISMISS [Doc 2161]. Plaintiffs will not repeat those arguments here but rather refer the Court to that earlier filing.

Contingency Fund (La. R.S. 30:2483-2490, Section VI of LOSPRA) or in the numerous other sections of the Act, is there any suggestion that the only claims for oil spills under Louisiana law are those by and through the Contingency Fund.  Tellingly, the sections defining damages and providing limitations of liability all appear well *before* Section VI addressing the Contingency Fund and make no reference to the Contingency Fund.  *See e.g.* La. R.S. 30:2454 (5)(a-f) (defining damages without reference to the Oil Spill Contingency Fund); *see also* La. R.S. 30:2479 (establishing limits of liability for oil spills with no reference to the Oil Spill Contingency Fund).  Moreover, nothing in Section VI of the Act, specifically addressing the Contingency Fund, states that the fund is the exclusive means of recovery for oil spills under Louisiana Law.

The only section addressing exclusivity of the Act appears outside of the Contingency Fund provisions and provides not even a suggestion that the Contingency Fund is the exclusive means of recovery.  Rather, as has been previously briefed by certain government entity Plaintiffs, the exclusivity provision of LOSPRA is limited, and does not exclude pursuit of remedies under any theory of liability available under Louisiana law.  Rather, the exclusivity provision merely states that "[w]hen applicable, the *limitations and immunities* provided in the chapter shall be exclusive..." La. R.S. 30:2491 (emphasis added).  As has been previously briefed, this limited exclusivity provision does not preclude victims of oil spills from bringing claims under any theory of liability under Louisiana law, but merely holds that if they apply, the Act's caps on damages would apply to any such claims.[11]  As has also been briefed previously, these limitations and immunities do not apply because plaintiffs have alleged that the defendants

---

[11] *See* LOUISIANA PARISH DISTRICT ATTORNEYS' JOINT OPPOSITION TO BP DEFENDANTS' MOTION TO DISMISS [Doc. 2161].

were willful and wanton in causing the oil spill and resultant damages and/or that defendants breached applicable federal and state regulations.[12]  See La. R.S. 30:2479 C.

Tellingly, no Louisiana court has embraced Transocean and Dril-Quip's proffered interpretation.  The inference of a bar to recoveries under Louisiana law, in the absence of any specific provision, flies in the face of well-established rules of statutory construction.  Statutes must be accepted as written and not added to by construction. *See Joffrion-Woods, Inc, v. Brock*, 154 So. 660, *affirmed,* 180 La. 771, 157 So. 589 (1934).  Statutes that grant immunities or advantages to special classes in derogation of the general rights available to tort victims must be strictly construed against the party claiming the immunity or advantage. *See Weber v. State*, 635 So.2d 188, 193 (La. 1994); *see also, Kelty v. Brumfield*, 633 So.2d 1210, 1216 (La. 1994); *Galloway v. Baton Rouge General Hospital*, 602 So.2d 1003, 1005 (La.1992).

Although LOSPRA does provide certain limitations on liability not applicable under the facts alleged in the instant case, LOSPRA does not bar claims asserted outside of the scheme of the Oil Spill Contingency Fund.  To so hold would not only read language into the Act that the Louisiana legislature chose not to include, but also would fly in the face of the Legislature's stated purposed in adopting LOSPRA - to protect against the "substantial threat to the public health and welfare" posed by oil spills.  La. R.S. 30:2453.

### C.     The Texas Local Government Entities Have Stated A Claim For Damages Pursuant To The Texas Oil Spill Prevention And Response Act of 1991.

M-I, Dril-Quip, the Anadarko and MOEX Defendants, and Transocean assert that Plaintiffs have failed to state a claim for damages under the Texas Oil Spill Prevention and Response Act of 1991 (the "Texas Act"), TEX. NAT. RES. CODE ANN. §40.001, *et seq See* M-I Memo in Support of Mot. to Dismiss, p. 23; *see also* Dril-Quip Memo in Support of Mot. to

---

[12] *Id.*

Dismiss, p.31; Anadarko Memo in Support of Mot. to Dismiss, p. 27; MOEX Offshore Memo in Support of Mot. to Dismiss, p.25; Transocean Memo in Support of Mot. to Dismiss, p. 36.  They are mistaken.  First, the Texas Act defines "terminal facility" as "any waterfront or offshore pipeline, structure, equipment, or device used for the purposes of drilling for, pumping, storing, handling, or transferring oil and operating where a discharge of oil from the facility could threaten coastal waters . . . . " TEX. NAT. RES. CODE § 40.003 (23).  This certainly includes the Macondo Well.

Second, the Texas Act defines "discharge of oil" as "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters *or at a place adjacent to coastal waters where, unless controlled or removed, an imminent threat of pollution to coastal waters exists.*"  TEX. NAT. RES. CODE § 40.003 (8) (emphasis added).  Thus, oil need not actually invade coastal waters in order for a discharge to fall within the Texas Act.   The location of the Macondo well was "adjacent to" the coastal waters of Texas, and the spill created an imminent threat to the coastal waters of the State of Texas.

Finally, the Texas Act states:

> The remedies in this chapter are cumulative and not exclusive. This chapter does not require pursuit of any claim against the fund as a condition precedent to any other remedy, nor does this chapter prohibit any person from bringing an action at common law or under any other law not inconsistent with this chapter for response costs or damages resulting from a discharge or other condition of pollution covered by this chapter.

*Id.* at § 40.256.  In *Avitts v. Amoco Prod. Co.,* 840 F. Supp. 1116, 1121 (S.D. Tex. 1994), *rev'd on other grounds,* 53 F.3d 690 (5th Cir. 1995), the court found this language to mean that the scheme of compensation from the fund to be the only type of claim authorized by the Texas Act for *private parties.*   Here, however, Plaintiffs are not private parties.   Instead, they are

governmental entities in Texas seeking recovery of removal costs and damages sustained as a result of a Spill that has threatened the coastal waters of the State. The Texas Act provides for damages to local governments in the form of "any direct, documented net loss of taxes or net costs of increased entitlements or public services." TEX. NAT. RES. CODE § 40.003 (6)(a)(ii). The Texas Act does not specify that Texas local governmental entities may not bring suit under the Texas Act against those responsible for discharges of oil. Accordingly, the argument that Plaintiffs cannot state a cause of action under the Texas Act should be rejected.

## III.     OPA DOES NOT DISPLACE PLAINTIFFS' GENERAL MARITIME LAW CLAIMS.

The preemption or displacement of general maritime law by OPA is addressed in PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS THE B1 MASTER COMPLAINT, at pp.30-49.  Plaintiffs write here to: (i) address the question specifically raised by the Court in oral argument; and (ii) address a recent U.S. Supreme Court decision provided to the Court by Defendants.

**The Phrase "Except as Otherwise Provided in this Act" Simply Means:  Where Not Specifically Provided Within the OPA Statute.**

"Except as otherwise provided in this Act" simply means: where not specifically provided within the statute.

Thus, general maritime law is likely displaced to the extent that a person or entity seeks the removal costs or damages "provided in" OPA [33 U.S.C. §2702(b)] from the responsible party.

However, general maritime law is *not* displaced with respect to traditional maritime claims against other parties, nor with respect to maritime claims for remedies such as punitive

damages that are not provided in (nor precluded, pre-empted, displaced or otherwise addressed by) OPA against the responsible party.

It is both logical and consistent with the history and structure of OPA to afford compensation to a broad class of people from a designated responsible party on an expedited and strict liability basis, while at the same time allowing people to pursue their traditional maritime remedies against other parties, in negligence, and/or for gross negligence against the responsible party.  Indeed, there is nothing within the statutory language expressing an intent by Congress to preclude or displace such pre-existing maritime remedies.

As a practical matter, then, local government entities and other plaintiffs who were afforded traditional maritime remedies for punitive damages in the absence of OPA still have the right to sue BP for punitive damages under the maritime law.  Additionally, with respect to other defendants like Transocean and Halliburton, traditional maritime claims and remedies are preserved, and no presentment is required.

### The Recent Supreme Court Decision in *American Electric Power v. Connecticut* Does Not Alter the Preemption / Displacement Analysis from *Exxon v. Baker*

The recent Supreme Court decision in *American Electric Power Co. v Connecticut*, No. 10-174, 2011 U.S. LEXIS 4565 (June 20, 2011) ("*AEP*"), provided to the Court by Defendants, does not alter this analysis.  That case addressed the question of whether the Clean Air Act ("CAA"), 42 U.S.C. §7401, *et seq.*, displaced plaintiffs' claims (if any) for injunctive relief under federal common law to require power plants to cap their carbon dioxide emissions.  In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Court had held that the Clean Air Act specifically authorized the EPA to regulate emissions of carbon dioxide and other greenhouse gases.  *See AEP, supra,* 2011 U.S. LEXIS 4565, at *10.  Because the EPA is specifically

authorized to regulate such emissions, (and, indeed, in the *Massachusetts* case, was sued for failure to do so by many of the same plaintiffs that sought to enjoin defendants in the *AEP* action), the parties were pursuing what was, in effect, a duplicative remedy.  Specifically, the Court reasoned that:

> EPA is currently engaged in a §7411 rulemaking to set standards for greenhouse gas emissions from fossil-fuel fired power plants.  To settle litigation brought under §7607(b) by a group that included the majority of the plaintiffs in this very case, the agency agreed to complete that rulemaking by May 2012.  The Act itself thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants – *the same relief the plaintiffs seek by invoking federal common law*.  We see no room for a parallel track.

*Id*. at *11 (emphasis added) (citations omitted).  As the Court found, the "critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law."[13]

In the instant case, by contrast, the plaintiffs are seeking to invoke pre-existing maritime remedies that fall beyond the scope of OPA.  Not only does OPA fail to expressly address a responsible party's exposure for punitive damages (other than to make clear that the $75 million limitation does not apply where there is gross negligence or the violation of a federal safety standard) or claims that sound in negligence (or gross negligence) against other potentially liable parties, OPA in fact includes a savings provision expressly preserving the Court's admiralty

---

[13] The Court also reasoned that displacement was evident in the *AEP* case due to the complexity of setting carbon dioxide emissions standards by judicial decree under federal tort law.  Such an analysis would require questions of national and international policy, including an evaluation of competing interests and an assessment of the Nation's energy needs. *AEP* at 13.  "It is all together fitting that Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions," as judges lack the scientific and technological resources to make many of the decisions regarding the appropriateness of issuing an injunction against the carbon dioxide emitting defendants. *Id*. at 14.  In the present case, by contrast, such separation of powers issues are not implicated, as the Court is being asked to perform a traditional judicial function, (*i.e.* retrospective imposition of liability for discreet acts or omissions, as opposed to broad and prospective policy-making).

jurisdiction and general maritime claims other than those which are specifically provided in OPA. 33 U.S.C. §2751(e).

While Defendants appear to assert that there is a critical distinction between displacement and preemption, the *AEP* decision does nothing to alter the Court's analysis in the extremely analogous case of *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 484-489 (2008), in which the Court held that the Clean Water Act does not preempt or displace claims for punitive damages under the general maritime law by those who suffered damages as a result of the Exxon Valdez oil spill in Alaska. Using the terms "preemption" and "displacement" interchangeably, the Court conducted a typical preemption analysis, and concluded that the Clean Water Act – like OPA – neither evidenced a clear Congressional intent to occupy the field, nor would be frustrated by the imposition of punitive damages for private harms.[14] *See Exxon, supra,* 554 U.S. at 488-489.[15]

Also, as fully discussed in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.30-43, OPA's legislative history confirms that OPA does not displace general maritime claims for damages not provided in Section 2702, and the cases upon which Defendants rely were either decided before, or failed to take into account, the Supreme Court's decisions in *Baker* and *Townsend.*[16]

---

[14] One could conceivably argue that OPA's imposition of strict liability, subject to a $75 million cap, might be frustrated by the imposition of punitive damages under the GML. However, as noted, the OPA cap is not available to a responsible party guilty of gross negligence or willful misconduct - *i.e.* the same type of conduct for which punitive damages may be imposed. Hence, there is no "conflict" between OPA's statutory scheme and the imposition of punitive damages under general maritime law, as the responsible party's liability for damages (whether punitive or otherwise) are not limited under OPA where the conduct of the responsible party is particularly egregious in causing the substantial threat or discharge of oil.

[15] The situation in *AEP,* by contrast, lends itself to typical conflict preemption analysis, as the court might have crafted an injunction that was contrary to, or otherwise inconsistent with, the requirements (or lack thereof) ultimately adopted by the EPA under its rulemaking authority.

[16] *Atl. Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2569 (2009).

There is simply no displacement of federal common law for the remedies Plaintiffs seek here, arising out of an oil spill that was not subject to a permit and could not have been "permitted" under any existing federal statutory scheme.

In *AEP,* the Supreme Court made it clear that "[t]he test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." *AEP* at *10 (citations omitted).  In this case, OPA does not speak directly to the issues at hand, and, indeed, saves all general maritime claims beyond those expressly provided for in the OPA statute.

As with the Clean Water Act, it is "hard to conclude that a statute expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals." *Exxon,* 554 U.S. at 488-489.


## IV.   PLAINTIFFS HAVE STATED A CLAIM FOR REMOVAL COSTS UNDER OPA.

Defendants Anadarko, MOEX Offshore and MOEX USA (by incorporation of the arguments of MOEX Offshore) argue that Plaintiffs have not stated a claim for removal costs under OPA because there are no allegations that the Local Government Plaintiffs have already incurred removal costs in response to the oil spill.[17]  They are mistaken.  At paragraph 172 of the Local Government Master Complaint, Plaintiffs specifically allege that the Spill caused Plaintiffs damage "in the form of…. removal costs, including personnel salary costs, overtime travel and per diem expenses; costs for use of government-owned equipment and facilities, and actual expenses for goods and/or services supplied by contractors and/or vendors.  *See* Loc. Gov't

---

[17] *See* MOEX Offshore Memo in Support of Mot. to Dismiss, p.11; *see also* Anadarko Memo in Support of Mot. to Dismiss, p.13.

Master Compl. ¶172.  Plaintiffs make the same allegation at paragraph 515. *Id.* at ¶ 515.  Hence, the Local Government Master Complaint sufficiently alleges that Plaintiffs incurred removal costs before filing suit against Defendants.

Second, citing *Rice v. Harken Exploration Co.,* 250 F.3d 264, 267 (5th Cir. 2001), Defendants Anadarko and MOEX assert that Plaintiffs' claim for removal costs must be dismissed because there are no allegations in the Local Government Master Complaint that the costs related to response to the Spill were incurred consistent with the National Contingency Plan ("NCP").[18]  *Rice* did not address the issue of whether an allegation of consistency with the NCP is required to be asserted in a complaint; the Court in *Rice* merely mentioned in a footnote that removal costs "incurred by an injured party are only recoverable by a private party if they are consistent with the National Contingency Plan. 33 U.S.C. §2702(b)(1)(B)." *Id.* at 267, n.1.  It ultimately did not reach the issue of whether the plaintiffs' proposed remediation was consistent with the NCP. *Id.*   In any event, Plaintiffs believe that a cause of action for removal costs can be reasonably inferred as "plausible" from a fair and appropriate reading of the Local Government Master under Federal Rules 8 and 12.  Assuming *arguendo,* however, that the Court is inclined to require a specific allegation of consistency with the NCP, Plaintiffs should be granted reasonable leave to amend.


## V.    THE COURT SHOULD NOT DISMISS PLAINTIFFS' ACTION FOR LACK OF PRESENTMENT.

In their motions to dismiss, Defendants assert that this Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs have failed to "present" their claims to a "responsible party"

---

[18] *See* MOEX Offshore Memo in Support of Mot. to Dismiss, p.12; *see also* Anadarko Memo in Support of Mot. to Dismiss, p.14.

as required by 33 U.S.C. §2713.[19] In addition to the reasons stated in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.56-59, Defendants' arguments fail because Plaintiffs are not required to present their removal claims before filing suit against responsible parties.

In *United States v. M/V Cosco Busan,* 557 F.Supp.2d 1058 (N.D. Cal. 2008), after an allision resulting in a discharge of 50,000 gallons of bunker fuel into the San Francisco Bay, the United States brought suit against a cargo ship, its owner and operator, seeking removal costs and damages under OPA.  The defendants asserted that the court lacked jurisdiction because the United States failed to comply with OPA's presentment requirement.  The court held that defendants' argument was foreclosed by 33 U.S.C. §2717(f)(2), which provides that "[e]xcept as otherwise provided in this paragraph, an action may be commenced under this subchapter for recovery of removal costs *at any time* after such costs have been incurred." 33 U.S.C. §2717(f)(2) (emphasis added).  "This resolution of the relationship between §§2713 and 2717 comports with the underlying purpose of OPA.  Congress likely recognized that the United States, a State, or a Tribe seeking to recover removal and cleanup costs should be allowed greater flexibility in its recovery efforts than individuals seeking damages." *Id.* at 1061.  "One can imagine situations where, given the size of the spill, the scope of the cleanup process, the complexity of the legal issues, or the intransigence of the Responsible Party, it would be preferable to proceed directly to a court to seek recovery costs. Section 2717 plainly provides this option of initiating an action in court without first submitting removal cost claims to the Responsible Party." *Id.*  The Court distinguished the decision in *United States v. Murphy Exploration & Production Co.,* 939 F. Supp. 489 (E.D. La 1996), because, in *Murphy,* the

---

[19] *See* BP Memo in Support of Mot. to Dismiss, pp. 7-9; Halliburton Memo in Support of Mot. to Dismiss, pp. 23-24; *see also* Transocean Memo in Support of Mot. to Dismiss, pp. 6-7; Anadarko Memo in Support of Mot. to Dismiss, p. 9; M-I Memo in Support of Mot. to Dismiss, p. 10; MOEX Offshore Memo in Support of Mot. to Dismiss, p.9.

government had clearly satisfied the presentation requirement, and the Court did not address Section 2717.  *Id.* at 1062.  The court in *Cosco Buson* also held that, in the interest of judicial economy, the government was permitted to proceed with its damages claim, despite a lack of presentment in accordance with Section 2713, because doing so would "further the primary purpose of OPA, which is to streamline the recovery process for oil spill damages and cleanup costs."  *Id.* at 1063.

Likewise, here, Section 2717(f)(2) permits Plaintiffs to seek removal costs without first presenting their claims to the responsible party.   Section 2717 clearly gives government plaintiffs the right to file their claims *at any time* after removal costs have been incurred and, accordingly, it is not necessary for them to meet the requirements of Section 2713 before filing suit.  In the interest of judicial economy and in accordance with the purpose of OPA, Plaintiffs here should be permitted to proceed with their damage claims under OPA, even in the absence of presentment.

## VI.    LOSPRA DOES NOT PREEMPT PLAINTIFFS' STATE COMMON LAW CLAIMS.

BP's argument that the LOSPRA preempts Plaintiffs' state common law claims is equally unpersuasive.[20]  First, the "surrogate law" provisions of OCSLA are inapplicable, as detailed in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.21-30.   Second, LOSPRA, which was intended solely to complement OPA, cannot be read to preempt common law claims that were specifically preserved by Congress in enacting OPA.

---

[20]   *See BP* Memo in Support of Mot. to Dismiss, p.12.

**VII.   THE RULE IN *ROBINS DRY DOCK* DOES NOT BAR PLAINTIFFS'
ECONOMIC LOSS CLAIMS.**

For the reasons stated in the B1 OMNIBUS BRIEF IN OPPOSITION, pp.74-77, the rule in

*Robins Dry Dock & Repair Co. v Flint,* 275 U.S. 303 (1927) and the Fifth Circuit's decision in

*State ex rel Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985) (*en banc*), do not bar

Plaintiffs' economic loss claims.  First, the economic loss rule does not apply to OPA claims.  33

U.S.C. § 2702; *see, e.g.,* 33 C.F.R. 136.231(a) (holding "[t]he claimant need *not* be the owner of

the damaged property or resources to recover for lost profits or income") (emphasis added).[21]

Second, the Comprehensive Environmental Response, Compensation and Liability Act of 1980,

42 U.S.C. § 9601, *et seq.* ("CERCLA", also known as "The Superfund Act"), was amended just

after *TESTBANK* in 1986 to overrule *TESTBANK* and *Robins Dry Dock*.    Third, *Robins Dry*

*Dock* should be construed to apply only in cases where the Plaintiff is damaged because of injury

to a party in privity with the plaintiff.  *See Hercules Carriers, Inc. v State of Florida*, 720 F.2d

1201, 1203 (11th Cir. 1983) (Clark, J.), *vacated and affirmed*, 728 F.2d 1359 (11th Cir. 1984).

In addition, in *TESTBANK,* the Fifth Circuit made clear that its decision was applicable

only to unintentional maritime torts. *TESTBANK,* 752 F.2d at 1020 (stating "we are asked to

abandon physical damage to a proprietary interest as a prerequisite to recovery for economic loss

in cases of unintentional maritime tort.  We decline the invitation").  In Footnote 1 of its opinion,

the court stated that it was not addressing "intentional torts or ultrahazardous activity, such as

blasting."  *Id.* at n. 1.  Hence, to the extent that Defendants are found to have engaged in the

willful or intentional misconduct alleged against them in the Local Government Master

Complaint, they cannot rely on *TESTBANK* to shield them from liability for damages for

---

[21] *See also,* 33 U.S.C. §2702(a) (responsible party liable for damages resulting from the mere
"*threat*" of an oil spill) (emphasis supplied).

economic loss.  Moreover, deepwater drilling qualifies as ultrahazardous activity, as it creates a high degree of risk to persons, land and chattels, and poses special and different challenges not faced on land or in shallow water.  Accordingly, because Defendants have engaged in willful conduct and the activity in which Defendants were engaged constitutes ultrahazardous activity, *TESTBANK* is inapplicable here and Plaintiffs are entitled to recover for their economic losses, even in the absence of a proprietary interest.


**VIII.   THE SUPREME COURT'S RECENT DECISION IN *CSX TRANSPORTATION, INC. v. MCBRIDE* AND OPA'S LEGISLATIVE HISTORY SUPPORT A BROAD INTERPRETATION OF OPA'S CAUSATION PROVISIONS.**

In addition to the arguments and authorities provided in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.63-74, and Plaintiffs' SUPPLEMENT TO OPPOSITION TO MOTIONS TO DISMISS [Doc 2400 and Doc 2400-1], a broad interpretation of OPA's causation provisions is further bolstered by the Supreme Court's recent decision in *CSX Transp., Inc. v. McBride*, No. 10-235, 2011 U.S. LEXIS 4795 (June 23, 2011), wherein the Court addressed the standard of causation applicable in cases arising under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*  The Court concluded that FELA does not incorporate "proximate cause" standards developed in non-statutory common-law tort actions and, therefore, upheld a jury charge that tracked the language Congress employed to inform the jury that "the defendant railroad caused or contributed to the plaintiff employee's injury if the railroad's negligence played *any part* in bringing about the injury."  *Id.* at *36-37 (emphasis added).  In her opinion, Justice Ginsburg noted that:

> Congress, it is true, has written the words "proximate cause" into a number of statutes.  But when the legislative text uses less legalistic language, *e.g.*, "caused by," "occasioned by," "in consequence of," or, as in FELA, "resulting in whole or in part from," and the legislative purpose is to loosen constraints on recovery,

there is little reason for courts to hark back to stock, judge-made proximate-cause formulations.

*Id.* at *32-33 (footnote omitted).   The remedial purposes of OPA and the relaxed causation language chosen by Congress demonstrate that the moratorium claims and other claims brought by either private litigants or local government entities are subject to a much more relaxed causation standard than strict "proximate causation" standards advocated by Defendants.

In any event, the causal connection between the defendants' acts or omissions and the damages sustained by Plaintiffs are not appropriate for resolution under Rule 12.  57A Am.Jur.2d *Negligence* §602. ("Generally, the determination of whether an intervening act was foreseeable or could have been reasonably anticipated is a question of fact for the jury or trier of fact.").  As for Transocean's argument that "geographically remote" local government entities cannot establish a causal link to the Spill under OPA, it provides no definition of what it considers "remote" and, certainly, this is also not an issue that can be determined in the context of a Rule 12 motion to dismiss.


IX.   **THE LOCAL GOVERNMENT MASTER COMPLAINT STATES A CLAIM FOR FRAUDULENT CONCEALMENT ON THE PART OF BP, TRANSOCEAN, AND HALLIBURTON.**

The Local Government Master Complaint contains detailed allegations with respect to the fraudulent statements and omissions by Defendants BP, Transocean, and Halliburton. Plaintiffs allege that BP misrepresented and concealed facts about: (1) the size and severity of the Spill, *see* Local Government Master Complaint ¶¶ 449-455, 693; (2) the likelihood of an oil spill and its ability to respond to one, *id.* ¶¶ 247, 451-453, 455, 504-512; (3) its knowledge of the stability of the cement used to seal the Macondo well, *id.* ¶¶ 313-314, 317-318, 705; and (4) its commitment to safety, *id.* ¶ 441-446.  Transocean, for its part, misrepresented the poor condition

and inadequate maintenance of the Deepwater Horizon drilling vessel.  *Id.* ¶¶ 258, 390-400, 419-424, 428, 443-444, 704-709.   Both BP and Transocean concealed aftermarket modifications made to the Deepwater Horizon's blowout preventer ("BOP").  *Id.* ¶¶ 400-401.  Finally, Plaintiffs allege that Halliburton misrepresented the stability of the foam cement used at the Macondo well, despite having performed three tests before the blowout that demonstrated that the cement was unstable, and that these were material facts that Halliburton had a duty to disclose.  *Id.* ¶ 702.  Each of these misrepresentations and omissions is independently sufficient to state a valid claim for fraud against BP, Transocean, and Halliburton under Rule 9(b) of the Federal Rules of Civil Procedure and the common law, as more fully addressed in the B1 OPPOSITION TO MOTIONS TO DISMISS FRAUD CLAIMS [Doc. 1808].

## X.   PLAINTIFFS STATE A VALID CLAIM FOR NEGLIGENCE AGAINST THE MOEX AND ANADARKO DEFENDANTS

Plaintiffs adopt the arguments set forth in the B1 OPPOSITION TO ANADARKO/MOEX MOTIONS TO DISMISS [Doc. 1803].

Furthermore, because the Joint Operating Agreement between BP, Anadarko, and MOEX Offshore was in the nature of a joint venture, the argument that the MOEX and Anadarko Defendants lacked control over the operations at the Macondo site should be rejected.

It is undisputed, in this regard, that Anadarko, MOEX Offshore, and BP were parties to a Joint Operating Agreement (JOA) and that said Agreement is, in large part, a boiler-plate form JOA commonly used in the oil and gas industry to delineate the rights and liabilities between the parties.[22]  As with most JOAs, the one at issue here delegated sole management and control of

---

[22]*See, e.g;* Boigon, *Liabilities of Nonoperating Oil and Gas Interest Owners,* 13D Rocky Mt. Min. Law Inst. 4 (1983) (observing that "[t]he joint operating agreement has been relatively standardized in oil and gas operations for many years"); *see also Hill v. Heritage Resources,*
*Footnote continued on next page*

the *day-to-day* operations to one co-owner as "operator" (BP) and disclaimed any intention of the parties to form a partnership or otherwise render the parties joint and severally liable for third party injuries.  However, as with most JOAs, the one at issue also allowed the non-operators Anadarko and MOEX to exercise some joint control in the overall direction and management of the venture.  This ability to exercise at least some joint control has compelled most courts, including the Fifth Circuit and its district courts, to look past the lack of day-to-day control and language disavowing joint liability and find that JOAs constitute joint-ventures, thereby imposing joint liability upon the non-operator for the damages caused by the well or operator's negligence.

The Anadarko and MOEX Defendants set forth the same arguments commonly asserted by non-operating interest owners seeking to escape liability; namely, that they did not have control over the day-to-day operations and that the JOA included a clause expressly disavowing joint and several liability between them and the operator.  However, the Anadarko and MOEX Defendants fail to cite *any* of the controlling jurisprudence or authorities, including the numerous decisions from the Fifth Circuit and its district courts, determining the liability of non-operators for third party damages.

Paragraph 22.1 of the Operating Agreement does not support the Anadarko and MOEX Defendants' claim that the parties did not intend to be bound jointly and severally.  It provides:

---

*Footnote continued from previous page*

*Inc.,* 964 S.W.2d 89, 112 -113 (Tex.App.–El Paso 1997) (noting that JOAs are not ordinary contracts but instead are "standardized forms developed over years by the industry to govern ventures in the development of oil and gas properties, ... [t]hey govern operations involving immense financial risk and reward; the parties to J.O.A. are experienced and sophisticated and generally have balanced bargaining positions). These are agreements which involve liabilities and obligations unique to the legal and technical peculiarities of the oil and gas industry. Nevertheless, this case highlights that they are still basic structures with minimal safeguards and protections from the misconduct of a party."

> obligations, duties, and liabilities of the Parties under this Agreement are several
> and not joint or collective, and ... nothing in this Agreement shall be construed to
> create a partnership, joint venture, association or other form of business entity
> recognizable in law for any purpose.

(JOA, ¶ 22.1.)  In the Fifth Circuit, as in most jurisdictions, such clauses are not determinative in

deciding the issue. *See Davidson v. Enstar Corp.,* 848 F.2d 574, 577-78 (5th Cir.), *modified on*

*rehearing on other grounds,* 860 F.2d 167 (5th Cir.1988); *see also Miller v. Slam Offshore,* 1997

WL 537686, 1 (E.D. La. 1997) (noting "[i]t is of no moment that the agreement provides that it is

not intended 'to create a partnership, association, trust or other legal entity among the parties'").

In fact, the courts have consistently disregarded similar language in finding that joint ventures

existed between the parties to the JOA.  There are a number of examples of similar language that

was disregarded in finding the existence of a joint venture thereby imposing joint liability non-

operating parties to a JOA. *See Davidson,* 848 F.2d 576 (rejecting the JOA provision that "[i]t is

not the intention of the parties hereto to create a partnership, association, trust, or other

semblance of business entity"); *see also Darr v. Chevron U.S.A.*, 1997 WL 470153, 3 (E.D. La.

1997) (rejecting the JOA provision that "[t]he obligations, duties and liabilities of the Parties

shall be several and not joint or collective; and nothing contained herein shall ever be construed

as creating a partnership of any kind, joint venture, association, or other character of business

entity recognizable in law for any purpose"); *Taylor v. Getty Oil Co.,* 637 F.Supp. 886, 889 (E.D.

La. 1986) (rejecting the JOA provision that "[i]t is distinctly understood and agreed that this

Agreement shall not in any manner create the relationship of a partnership, an association for

profit between the parties or any other legal entity for any purpose between the parties, and no

act done by either party pursuant to the provisions hereof shall operate to create such

relationship, nor shall the provisions of this Agreement be construed as creating such

relationship.  The liability of the parties shall be several and not joint or collective, and each

party shall be responsible only for its obligations as herein set forth and shall be liable only for its proportionate share of the costs, expenses and liabilities incurred hereunder").   This approach of disregarding similar language when determining potential third-party tort liability of non-operators is also followed by a majority of courts throughout the country.

Instead, in construing a JOA to determine the existence of a joint-venture, the Court must seek to ascertain the "true intentions" of the parties "by examining the *entire* writing in order to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Taylor,* 637 F. Supp. at 889 (quoting *Chapman v. Orange Rice Mill Co.,* 747 F.2d 981 (5th Cir. 1984)); *see also, Heavin v. Mobil Oil Exploration,* 697 F. Supp. 1408, 1411-1412 (E.D. La. 1988) *rev'd on reh'g on other grounds,* 710 F. Supp. 1073 (E.D. La. 1989) *affirmed* 913 F.2d 178 (5th Cir. 1990) (holding ".. whether the parties intended to form a partnership or joint venture, is answered only by considering the Agreement *in toto*").   This examination is performed by applying the four-factor test set forth by the Fifth Circuit in *Davidson*: 1) whether the parties intended to form a partnership or joint venture; 2) whether the parties share a common interest in the subject matter of the venture; 3) whether the parties share profits and losses from the venture; and 4) whether the parties have joint control or the joint right of control over the venture." *Davidson,* 848 F.2d at 577; *Heavin,* 697 F. Supp. at 1411 n. 1.  Furthermore, *Davidson* does not require that all four of these criteria be met in order to have a joint-venture. *Id.*  In fact, the first factor (intent) is usually found when the second, third, and/or fourth factors are affirmatively answered.   A review of the entirety of the JOA in this case points to one conclusion: Anadarko, MOEX and BP intended to form a joint venture.

Although BP had the exclusive right to control the *day-to-day* operations, the JOA allocated joint control of the entire venture among *all* parties, including Anadarko and MOEX.

It specified that each party had a voting interest equal to its working or participating interest. *See JOA*, ¶ 8.1.1.  The operator was prohibited from making expenditures in excess of $500,000 without prior approval of the participating parties. *Id.* at ¶ 6.2.  The Agreement provided procedures to challenge the operator's conduct of operations. *Id.* at ¶ 4.2.  Furthermore, the Agreement provided for the removal of the operator should it fail to perform its duties.  *Id.* at ¶ 4.4, as well as a mechanism to select a successor operator.  *Id.* at ¶ 4.5.

It was also agreed that the operator would pay all costs incurred and that each party would reimburse the operator in proportion to the participating party's interest. *Id.* at ¶ 6.1. The Operating Agreement established a joint account, to which the operator was to charge certain costs of the operation, including liability insurance for third-parties claims.  *Id.* at ¶ 21.1.  The parties were each responsible for all taxes assessed or levied upon the joint property in proportion to the party's interest. *Id.* at ¶ 20.2.  Furthermore, the participating parties shared in royalty payments in respect of their shares of production.  *Id.* at ¶ 19.2.2.

The Fifth Circuit and its district courts have repeatedly held that JOAs containing similar provisions created joint ventures.  The court in *Davidson* determined that a joint venture existed based upon the following facts: each party contributed to the development costs and expenses and shared in the profits according to its percentage of ownership; while the operator had sole control over the day-to-day decisions the non-operators retained some control over major spending decisions; and the non-operators could remove the designated operator and appoint a new operator.  *Davidson,* 848 F.2d at 577.

In *Heavin*, the court determined that the satisfaction of the second, third and fourth *Davidson* factors constituted a joint venture.  The fourth factor (actual or the right to joint control) was satisfied even though the operator was given "full control" over the operations

because that control was "subject to certain provisions" including requiring the operator to obtain consent from the non-operators before spending in excess of $25,000 and the mutual agreement of the owners before certain activities could take place.   The second (sharing of common interest) and third factors (sharing in profits and losses) were also satisfied because the Agreement provided that each owned an interest in the well and called for the parties to share expenses in proportion to its' ownership interests.   The court concluded that "[t]hese considerations collectively, if not separately, evidence a clear intention [by the parties] to form a joint venture." *Id.* at 1412.

In *Parker v. McDermott, Inc.,* 1990 WL 223011, 4 (E.D. La. 1990)*,* the second and third factors - whether the parties share a common interest in the subject matter of the venture and whether the parties share profits and losses from the venture - were satisfied because the agreement provided procedures to challenge the operator's conduct, the parties made payments to the operation in proportion to their interest, and they shared the royalty payments.   The court also found that a joint right of control - the fourth factor - existed because the voting rights provision granted each party a vote in major, non-administrative decisions of the endeavor.

The court in *Darr* found the existence of a joint venture because the parties agreed to share expenses and costs in proportion to their equity interests, and, while the operator had sole control over daily operations, the non-operator retained some control over major expenditures and other decisions.   The Agreement also provided for the removal of the operator should the non-operators determine that it was not performing its duties.

Next, the Anadarko and MOEX Defendants seek to escape liability by arguing that they did not exercise, nor have the right to exercise, actual control over the day-to-day operations. *See Anadarko* Memo in Support of Mot. to Dismiss, pp. 15-17; MOEX Offshore Memo in

Support of Mot. to Dismiss, pp. 12-15.   However, that level of control is not required to satisfy

the fourth *Davidson* factor (actual or the right to exercise control).   Instead, the only requirement

is that the non-operator have the *right to* exercise control and that said right exists not over the

day-to-day operations, but simply over some portion of the enterprise; even if that portion is only

minimal. *See e.g; Davidson, Heavin, Parker,* and *Darr; see also Bolivar v. R&H Oil & Gas Co.,*

789 F. Supp. 1374, 1380-81 (S.D. Miss. 1991) at 1380-81 (holding ".. it is not the actual exercise

of control that is determinative.   Rather it is the right to exercise control that governs").   This

right to joint participation, even if minimal, is "the kind of participation inherent in the typical

operating agreement." *See Boigon, supra* note 1 at 4.   For this reason, JOAs are not Agreements

involving merely passive investors, but instead JOAs establish "an interlocking web of mutual

rights and responsibilities envisioning a concerted effort in the development of an oil and gas

property." *Id.*

Finally, any alleged inequality in ownership or control of the venture between BP and the

Anadarko and MOEX Defendants is also irrelevant.   Instead, most courts, including the Fifth

Circuit, follow the position that operating agreements with unequal shares and rights of control

are joint ventures nevertheless. *See, e.g; Parker,* 1990 WL 223011, 5 (... "*Davidson,* finds that a

joint right of control exists so long as each party has a say, no matter its size, in major, non-

administrative decisions of the endeavor").   Examples of situations in which joint-ventures were

found regardless of disproportionate shares and rights of control include *Parker* (non-operating

interest owners found to be part of a joint-venture despite the fact that they only owned

15.9725%, 6.25%, and 2.7775% interest respectively while sole operator owned 75% interest);

*Davidson* (three non-operating interest owners who collectively owned only 16% found to be

involved in joint-venture with operator); and *West* (non-operators with interest of only 10% and

16% determined to be involved in a joint venture with sole operating interest owner).  For these reasons, these Defendants' motions to dismiss should be denied.

## XI.   PLAINTIFFS HAVE PROPERLY ALLEGED CLAIMS FOR WHICH RELIEF MAY BE GRANTED FOR TRESPASS.

The allegations of trespass in the Local Government Master Complaint are identical to those asserted in the Bundle B1 First Amended Master Complaint.  As explained in detail in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.77-83, Plaintiffs have stated a claim for trespass under the common law and the law of each of the Gulf States, and the claim is available to those who own or lease property damaged by the oil spill.  As alleged in the Local Government Master Complaint, "[s]ome Plaintiffs own or lease real property, and have suffered the loss, destruction, and/or diminution in value of their property as a result of the Spill."  Loc. Gov't Master Compl., ¶ 513.  Accordingly, BP's motion to dismiss Plaintiffs' trespass claim should be denied.

## XII.   DEFENDANTS MISSTATE THE ECONOMIC LOSS RULE UNDER STATE LAW.

Defendants suggest that Plaintiffs' state law claims are barred under the "economic loss rule" of *Robins Dry Dock* and its progeny as adopted by state law.  As addressed in the B1 OMNIBUS MEMORANDUM IN OPPOSITION, pp.92-94, this argument misstates the Gulf States' laws and should be rejected.

## XIII.   THE LOUISIANA PARISH DISTRICT ATTORNEYS HAVE STATED A CLAIM FOR PENALTIES UNDER TITLE 56 FOR DAMAGE TO WILDLIFE IN LOUISIANA AND ADJACENT WATERS.

The District Attorneys of several coastal parishes in the State of Louisiana have brought claims which they are authorized by statute (*see* LA. R.S. 50:40.1, *et seq*., hereinafter "Title 56") to bring for civil penalties for damage to wildlife in Louisiana and adjacent waters caused by oil

pollution as a result of the Deepwater Horizon disaster.  *See* Loc. Gov't Master Compl. ¶¶735-737.  Although OPA expressly preserves claims for civil penalties under state law, and although Louisiana's Oil Spill Pollution Recovery Act, La. R.S. 30:2491(A) (LOSPRA), expressly preserves claims brought under La. R.S. 56:40.1 *et seq.*, BP, Anadarko, and MOEX suggest that the Louisiana Parish District Attorneys' claims are somehow preempted by OPA and LOSPRA.[23]  Defendants' strained construction of OPA and LOSPRA not only is contrary to the express provisions of these laws and Title 56, but also flies in the face of the stated purpose of both OPA and LOSPRA.

Both OPA and LOSPRA were enacted for the purpose of protecting natural resources from the destruction occasioned by oil spills.  Recognizing that more stringent state penalty provisions for pollution from oil spills fulfill the overriding purpose of OPA, Congress included a savings clause in OPA that preserves state remedies not provided by OPA.  *See* 33 U.S.C. §2718.  In passing LOSPRA, the Louisiana Legislature cited the threat to Louisiana's wildlife and aquatic life from an oil spill as justification for the passage of LOSPRA.  Moreover, the Louisiana Legislature recognized the critical role Title 56 plays in protecting wildlife that could be harmed as a result of an oil spill in exempting actions brought under Title 56 from the limitations of liability of LOSPRA.  Defendants' suggestion that OPA and LOSPRA somehow preempt the District Attorneys' Title 56 claims, which fall squarely within the savings provisions of both the state and federal laws, is contrary to both the letter and the spirit of these statutes which, at their core, are intended to extend protections against the threats of pollution from oil spills near Louisiana's delicate shores.

---

[23] *See* BP Memo in Support of Mot. to Dismiss, p. 16; Anadarko Memo in Support of Mot. to Dismiss, p. 31; *see also* MOEX Offshore Memo in Support of Mot. to Dismiss, p.29.

### A.      Title 56 Claims Are Preserved Under OPA's Savings Clause

As discussed above, state laws such as Title 56, which impose additional liability or restrictions regarding oil spill pollution, are expressly preserved under OPA at 33 U.S.C. § 2718(a) and (c). The United States Supreme Court has found that these savings clauses were intended to allow additional remedies to be recovered under state law. *Locke*, 529 U.S. at 105-106. The *Locke* court held:

> The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills. *See Gutierrez v. Ada*, 528 U.S. 250, 255, 120 S. Ct. 740, 145 L.Ed.2d 747 (2000) (words of a statute should be interpreted consistent with their neighbors to avoid giving unintended breadth to an Act of Congress).

*Id.*

Defendants' suggestion that OPA preempts claims under Title 56 is contrary to the unequivocal provisions of Section 2718.  Indeed, if accepted by this Court, BP's preemption argument would render the savings clauses of Section 2718 meaningless.

### B.      There Is No Presentment Requirement For Claims Under Title 56.

Numerous courts have held that when plaintiffs assert state law claims preserved by OPA, they need not follow OPA's presentment requirements before asserting such claims. When a claimant presents state law claims for oil spill clean up, which claims are preserved by Section 2718, the presentment requirement of OPA does not apply to those state law claims. *Williams,* 115 F. Supp. At 565 & n. 3 (holding "OPA does not preempt ... state common law actions .... [a]nd there is, in consequence, no requirement for the presentment of claims under OPA prior to commencing suit"); *see also Isla Corp.*, No. 06-8645, 2007 WL 1240212, at *1-2 (applying OPA presentation requirement only to claims brought under OPA and not to state law claims); *Abundiz v. Explorer Pipeline Co.*, No. 00-2029, 2003 WL 23096018, at *3-4 (N.D.Tex.

Nov.25, 2003) (same). Just as BP has ignored the provisions of § 2718, so has it ignored this well-established line of cases.  The instant state law claims, which are expressly preserved by OPA, are not subject to the presentation requirements of claims asserted under OPA's liability provisions.

### C.     Title 56 Claims Are Not Barred By LOSPRA

LOSPRA's limited exclusivity provision does not bar the District Attorneys from proceeding with an action for penalties under Title 56.  First, LOSPRA expressly preserves Title 56 actions, and contrary to Defendants' assertion, that preservation includes claims brought by District Attorneys for the benefit of the Department of Wildlife and Fisheries.  Second, under the language of the provision upon which Defendants rely, even assuming the savings clause does not include actions by the District Attorneys, under the facts alleged, LOSPRA does not bar this claim for civil penalties.

Acknowledging that Section 2491 of LOSPRA expressly allows claims under Title 56, BP asserts that the instant Title 56 claims are nevertheless barred, because this savings clause only applies when the Louisiana Department of Wildlife and Fisheries (DWF) itself brings actions under Title 56.  *See* BP Memo in Support of Motion to Dismiss, p. 17.  This narrow construction of the statute ignores the statute's express incorporation of the provisions of LA. R.S. 56:40.1, *et seq.*, which provisions authorize the District Attorneys to bring such suit to recover funds *for the Department of Wildlife and Fisheries*.  *See* LA. R.S. 56:40.4; 56:40.9

Here the DWF has expressly authorized the district attorneys to bring the Title 56 actions.[24]  The authority to do so is expressly granted by LA. R.S. 56:40.4 and 56:40.9, which

---

[24]   *See* Certifications of Robert Barham, Secretary of LDWF and Donald Puckett, General Counsel of LDWF, attached to the LOUISIANA PARISH DISTRICT ATTORNEYS' JOINT OPPOSITION TO BP DEFENDANTS' MOTION TO DISMISS COMPLAINTS FILED BY CERTAIN GOVERNMENTAL

*Footnote continued on next page*

empower the District Attorneys to bring suit to recover funds to be paid to the DWF.[25]   Thus, BP's argument that LOSPRA's savings provision only applies when DWF has initiated a Title 56 action falls flat, since here DWF has ceded the authority to bring those suits to the District Attorneys, as allowed by LA. R.S. 56:40.4 and 56:40.9, which provisions are expressly preserved by LOSPRA's savings clause.  Moreover, BP's suggestion that the savings provision of Section 2491(B) does not apply to claims which the DWF has authorized the District Attorneys to bring, and which the District Attorneys are empowered by statute to bring to recover funds for DWF, is not only without support in the statute or jurisprudence, but also conflicts with the stated purpose of LOSPRA, which is to afford protection to Louisiana's vulnerable coastal wildlife from oil spills.

Even assuming that the savings clause of Section 2491 does not apply to claims by the District Attorneys, under the facts alleged, Section 2491 does not bar the District Attorneys' actions.  Although BP refers to Section 2491 as an exclusivity provision, by its clear language, it is a limited exclusion and does not act as a bar to actions under provisions other than LOSPRA. Rather, Section 2491 provides that the *limitations of liability and immunities* afforded under LOSPRA apply to any actions arising from oil spills.  This limited exclusivity provision does not preclude causes of actions under theories other than LOSPRA, but merely holds that the

---

*Footnote continued from previous page*
ENTITIES IN PLEADING BUNDLE C [Doc. 2161, Exhibit A].

[25]   Under the framework of LA. R.S. 56:40.1, *et seq.*, the District Attorneys need not obtain authorization by the DWF to initiate suit under Title 56, as that authorization is provided by the legislature pursuant to LA. R.S. 56:40.4 and 56:40.9.  However, the fact that the DWF has expressly authorized the District Attorneys to proceed with these claims in its stead and for its benefit only serves to bolster the argument that LOSPRA's savings provision for Title 56 claims encompasses the instant actions brought by the District Attorneys.

limitations of liability and immunities of LOSPRA will apply to any such claims in connection with oil spills.  Section 2491 provides:

> A. When applicable, **the limitations of liability and immunities** provided in this Chapter shall be exclusive and shall supersede any other liability provisions provided by any other applicable state law. The provisions of this Chapter shall supersede, but not repeal, any conflicting laws of this state. Any conflicting applicable federal law shall take precedence over this Chapter.

LA. R.S. 2491A (emphasis added).

Nothing in this language precludes an action under Title 56, or under any other applicable Louisiana code article or statute, by any party.  Rather, this language provides that when such an action is brought (assuming it does not fall within the savings provision discussed, *supra*) that action will be subject to the *limitations and immunities* afforded by LOSPRA.[26]  However, accepting the allegations of the Complaint as true, which this Court must for purposes of Defendants' Rule 12 motions, none of those limitations applies to the District Attorneys' claims, because the District Attorneys have alleged facts which fall within exceptions to LOSPRA's limitations of liability and immunities.

Further highlighting that the exclusivity provision of Section 2491 is limited, the section provides that its limitations and immunities supercede other claims only "when applicable."  By their own terms, which provide that the limitations apply only to "damages", the limitations of liability in LOSPRA are not applicable to the instant claims for penalties.  Moreover, under the facts alleged, the limitations and exclusions are not applicable, because the District Attorneys have alleged facts which fall into the exceptions to LOSPRA's limitations and immunities.

---

[26]   Contrast the language of Section 2491 with the exclusivity provision of the Louisiana Products Liability Act (LPLA), which provides, "This Chapter establishes the *exclusive theories of liability* for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any *theory of liability* that is not set forth in this Chapter." LA. R.S. 9:2800.52 (emphasis added).  Unlike the LPLA, which precludes all theories of liability not set forth in the LPLA, LOSPRA merely provides that its limitations and immunities will apply to any actions involving oil spills.

The "limits of liability" of LOSPRA apply only to "damages."  LA. R.S. 30:2479.  By definition, civil penalties are not "damages."  Moreover, even assuming that the limits of liability of LOSPRA did apply to claims for civil penalties, those limits do not apply "if the incident was primarily caused by gross negligence or willful misconduct of, or the violation of an applicable federal, state, or local safety, construction or operating regulation by the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party..." LA. R.S. 30:2479C.

The District Attorneys have alleged that the subject oil spill was caused by the gross negligence and willful misconduct of BP, its agents employees and parties acting pursuant to contractual relationships with BP.[27]  The District Attorneys have likewise alleged that the oil spill was caused by violations of federal, state and local safety regulations by BP, its agents and employees, and persons acting pursuant to contractual relationship with BP.[28]  Pursuant to LOSPRA, these allegations are exempted from LOSPRA's limits of liability, and as such LOSPRA's exclusivity provision, which merely provides that limitations of liability and exclusions will apply to all claims arising from oil spills, is of no consequence to the claims asserted.

The immunities of LOSPRA are likewise inapplicable to the claims asserted herein. LOSPRA provides immunities under a discreet set of circumstances not at issue herein. LOSPRA's §2466, which provides an immunity for response efforts, is not applicable to a party who is responsible for the initial discharge.  LA. R.S. 30:2466B.  Other immunities in LOSPRA relate to liability of the fund created by LOSPRA, which likewise do not apply to defendants.

---

[27]  *See* Local Government Entity Voluntary Master Complaint, Cross-Claim, and Third Party Complaint, (Doc. 1510), at ¶¶168, 586-596, 748, 760-764, and 766.

[28]  *Id.* at ¶557.

*See* LA. R.S. 30:2488. Defenses in LOSPRA of Act of War, act of government, unforeseeable occurrence and willful misconduct of a third party do not apply, as the facts alleged do not give rise to any of these defenses. *See* La. R.S. 30:2481. Since none of the "limitations of liability or immunities" under LOSPRA is "applicable" to the facts alleged, LOSPRA's limited exclusivity provision does not even come into play in this action, and it cannot act as a bar to the District Attorneys' pursuit of Title 56 claims, regardless of whether those claims fall within the savings provision of La. R.S. 30:2491B.

Moreover, contrary to Defendants' contention, allowing the District Attorney actions to proceed is in accord with the stated purposes of LOSPRA. In passing LOSPRA, the Louisiana Legislature stated that the intent of the Act was to protect, conserve and replenish the wildlife and aquatic life of the State of Louisiana from the "real and substantial" threat posed by the release of oil into the environment. La. R.S. 30:2453. Allowing Parish District Attorneys to bring actions for civil penalties for injury to wildlife caused by an oil spill pursuant to a statute that expressly authorizes them to do so is entirely consistent with this stated purpose.

Defendants have suggested that allowing District Attorney actions to proceed would frustrate the purpose of LOSPRA, because 40% of the proceeds in such an action would go to the District Attorneys. Nothing in LOSPRA suggests that payment of a portion of the civil penalties to the District Attorneys, whose parishes have borne the brunt of the injury to wildlife and who undertake the burden of prosecuting the actions without diverting the limited resources of DWF, is in any way inconsistent with the goals of LOSPRA.

Most significantly, LOSPRA makes no provision for civil penalties and provides no directive with respect to how civil penalties should be directed. Since civil penalties are distinct from damages, and are awarded over and above amounts recoverable for actual damage and/or

remediation, participation in the recovery by District Attorneys is in no way inconsistent with the designation of DWF as an entity responsible for directing restoration of damage to natural resources. LOSPRA is intended to maximize the protections to wildlife and the replenishment of wildlife. Allowing District Attorneys whose parishes have been impacted by the damage to wildlife to share in the recovery of Title 56 civil penalties is entirely consistent with that purpose.

Moreover, Defendants ignore the fact that when weighing the advantages of allowing the District Attorneys to bring actions under Title 56, there are two sides to the equation: the proceeds of litigation and the *costs* of litigation. While allowing the District Attorneys whose parishes have suffered from the loss of wildlife to share in the recovery of civil penalties is entirely consistent with the remedial purposes of LOSPRA, requiring DWF, whose resources have been and will continue to be stretched to the limit, to divert its limited resources to pursuit of a Title 56 action or receive no recovery at all is entirely *inconsistent* with both the remedial and protective intent of LOSPRA. As has been witnessed in the wake of the unprecedented disaster that is the Deepwater Horizon explosion and oil spill, DWF has been overwhelmed with fulfillment of its duties as a designated State Natural Resources Trustee. The suggestion that DWF must divert resources from these duties or have no recovery at all is inconsistent with the stated purpose of LOSPRA. Conversely, allowing District Attorneys to shoulder the burden of Title 56 litigation for the benefit of DWF, thus allowing DWF to recover Title 56 penalties without diverting its limited resources away from oil spill response efforts, furthers the purpose of LOSPRA.

In authorizing Title 56 claims to proceed without respect to LOSPRA's limitations of liability and immunities, the drafters of LOSPRA imposed no restriction on DWF with respect to who could act on its behalf to recover civil penalties. Title 56, on the other hand, does identify

the parties who may bring actions to recover funds for DWF, and expressly authorizes the District Attorneys to do so.  In the instant case, DWF has authorized the District Attorneys to take the initiative in pursuing these remedies, the majority of which recoveries will, by operation of §56:40.9, be paid to DWF.  Allowing the District Attorneys to pursue these actions in return for a share of the proceeds, thus relieving a strained DWF of the burden of this litigation and directing some of the proceeds to the impacted parishes, is entirely consistent with both the letter and the intent of LOSPRA.

## XIV.   MOEX AND ANADARKO ARE INCLUDED IN THE CLAIM FOR RELIEF UNDER THE FLORIDA ACT.

With respect to the Claim for Relief by the Florida Subclass Members under the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. §§ 376.011, *et seq*., (the "Florida Act"), Defendants MOEX Offshore and Anadarko note that they are not named in the title of the claim; however, they are named in the text of the claim, and Plaintiffs specifically allege that Anadarko and MOEX are responsible parties from whom damages are recoverable under the Florida Act. *See* Loc. Gov't Master Compl. ¶¶ 712, 716. To the extent that there is any question, Plaintiffs clarify that Anadarko and MOEX were intended to be named, and were named, as party defendants to the Claim for Relief under the Florida Act.  Anadarko and MOEX Offshore have incorporated by reference their arguments made in the Non-Operating Defendants' Motion to Dismiss the Master B1 Complaint, in the event they were intended to be included among the defendants to the Florida Act claim as alleged in the Local Government Master Complaint, which Plaintiffs accept.

## **CONCLUSION**

For the above and foregoing reasons, Defendants' Motions to Dismiss the Voluntary Local Government Entities Master Complaint should be denied.

This <u>7</u><sup>th</sup> day of <u>July</u>, <u>2011</u>.


Respectfully submitted,


       /s/ Stephen J. Herman                 /s/ James Parkerson Roy

**Stephen J. Herman**, La. Bar No. 23129     **James Parkerson Roy**, La. Bar No. 11511

HERMAN HERMAN KATZ           DOMENGEAUX WRIGHT ROY

  & COTLAR, LLP                 & EDWARDS LLC

820 O'Keefe Avenue              556 Jefferson Street, Suite 500

New Orleans, Louisiana 70113      Lafayette, Louisiana 70501

Telephone: (504) 581-4892        Telephone: (337) 233-3033

Fax No. (504) 569-6024           Fax No. (337) 233-2796

E-Mail: sherman@hhkc.com       E-Mail: jimr@wrightroy.com

*Plaintiffs' Liaison Counsel MDL 2179*   *Plaintiffs' Liaison Counsel MDL 2179*


*Of Counsel :*

**WALTER J. LEGER, JR.**

Leger & Shaw

600 Carondelet, 9th Floor

New Orleans, Louisiana 70130

Telephone: (504) 588-9043

E-Mail: wleger@legershaw.com

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Of Counsel:
BILLIE H. LEETH
JOSHUA S. WHITLEY
BRIAN COLOMB
STEPHEN MURRAY, JR.
On Brief

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 7th day of July, 2011.

/s/ Stephen J Herman and James Parkerson Roy