**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** **This Pleading applies to:** **2:10-CV-04182 (***State of Alabama v. BP P.L.C.***)** **-and-** **2:10-CV-04183 (***State of Alabama v. Transocean,*** ***et al.***)** | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SHUSHAN** |

**THE STATE OF ALABAMA'S BRIEF IN OPPOSITION**
**TO THE VARIOUS DEFENDANTS' MOTIONS TO DISMISS**

Pursuant to the Court's May 6, 2011 Order (Doc. 2273), the State of Alabama responds to the following Defendants' motions to dismiss ("MTDs") and accompanying briefs in this omnibus brief:  BP (Doc. 2644), Transocean (Doc. 2655), Halliburton (Doc. 2642), Cameron (Doc. 2639), Weatherford (Doc. 2638), M-I LLC (Doc. 2630), Anadarko (Doc. 2645) and MOEX (Doc. 2647).  Each of the various MTDs should be denied for the reasons outlined within.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... v

PREFACE ................................................................................................................... 1

STANDARDS OF REVIEW & APPLICATION ................................................................. 1

     A.  Rule 12(b)(1) ................................................................................. 1

     B.  Rule 12(b)(6) ................................................................................. 1

     C.  Rule 12(c) ...................................................................................... 2

ARGUMENT ............................................................................................................... 2

    I.  The State Has Fully Viable Claims under OPA, General Maritime Law, and
       State Law. ............................................................................................ 2

     A.  Neither OCSLA nor the CWA Displace Alabama's General Maritime
        Law Claims, nor Does Either Statute Preempt Alabama's State Law
        Claims. ........................................................................................... 3

        1. *Even If There Were A Conflict, OPA Governs the Alleged Displacement
          of Maritime Law and Preemption of State Law in this Case* ......................... 3

        2. *If OCSLA Rules Apply, OCSLA Applies General Maritime Law Without
          Preempting State Law.* ....................................................................... 5

        3. *If the CWA Rules Apply, the CWA Does Not Displace General Maritime
          Law or Preempt Alabama Law With Regard to Oil Pollution.* ..................... 9

     B.  OPA Does Not Displace Maritime Law Claims. ................................ 11

     C.  OPA Does Not Preempt Alabama Law. ............................................ 13

        1. *OPA's Plain Language Expressly Saves State-law Claims.* ......................... 14

        2. *OPA's Legislative History Confirms that Congress Knowingly Chose
          Not to Preempt State Law.* ................................................................. 16

        3. *The Defendants Cannot Meet Any Preemption Standard.* ........................... 16

     D.  OPA Does Not Preclude Punitive Damages. ..................................... 17

II.   OPA's Presentment Requirement Does Not Require Dismissal of Alabama's
       Claims. ................................................................................................................ 19

       A.   OPA's Presentment Procedure Is Not Jurisdictional, as Supported by
             the Supreme Court's Recent Opinion in *Henderson v. Shinseki*. ........................ 19

       B.   Alabama Was Not Required To Make an OPA Presentment Before
             Commencing Litigation. .................................................................................... 22

             1.   *Because Alabama Incurred Removal Costs, Alabama Was Not
                   Required to Present a Claim to the Responsible Party Before
                   Commencing Litigation.* .............................................................................. 23

             2.   *Alabama Did Not Have to Present Non-OPA Claims Before
                   Filing Suit.* ................................................................................................... 26

             3.   *Only BP Has Standing to Raise the Presentment Argument.* ........................ 26

       C.   Alabama Made A Proper Presentment. ................................................................ 27

             1.   *OPA Requires Presentment of a Single Claim before Commencing
                   Litigation.* .................................................................................................... 27

             2.   *Alabama Presented Multiple Claims to BP before Commencing
                   Litigation.* .................................................................................................... 29

       D.   Alabama Is Willing to Voluntarily Dismiss Its OPA Claims Without
             Prejudice, Then File Them Anew, If The Responsible Parties Will
             Stipulate That Filing the Claims Anew Satisfies § 2713. ..................................... 30

III.   Alabama Need Not Prove Direct Physical Damage under *Robins Dry Dock* to
       Raise Viable Claims. ........................................................................................... 31

       A.   The *Robins Dry Dock* Rule Does Not Apply to OPA Claims. ............................ 31

       B.   Alabama State Law Does Not Recognize *Robins Dry Dock* in the Form
             of an "Economic Loss Rule." .............................................................................. 32

       C.   The *Robins Dry Dock* Rule Should Not Apply to Alabama's General
             Maritime Claims. ............................................................................................... 33

IV.   OPA and the AWPCA Require "But For" Causation, Not Proximate Cause. ............... 36

       A.   The Recent Supreme Court Decision in *CSX v. McBride* Supports the
             "But For" Reading of OPA and the AWPCA. ...................................................... 37

B. Alabama Raised Viable Claims for Damages Based on the Moratorium............ 38

C. Alabama Raised Viable Claims for "Stigma Damages.".................................... 39

V.   None of Alabama's State Law Claims Are Subject to Dismissal. ..................................... 40

A. Alabama Seeks Enforcement Of Its Laws For Violations Occurring
Within Its Territorial Boundaries. ........................................................... 40

B. Alabama Has Stated A Claim Under The Alabama Environmental
Management Act. ..................................................................................... 42

C. Alabama Has Stated A Claim Under Its Water Pollution Control Act................. 43

D. Alabama Has Stated A Claim Under The Alabama Air Pollution
Control Act. ............................................................................................. 46

E. Alabama Has Stated A Claim Under The Alabama Hazardous Wastes
Management Act. ..................................................................................... 46

F. Alabama Has Stated a Claim Under the Alabama Solid Waste Disposal
Act. .......................................................................................................... 47

G. Alabama Stated Viable Claims For Fraudulent Concealment or
Suppression. ............................................................................................ 48

1. *The Rule 9(b) Standard* ............................................................ 48

2. *The Amended Complaint Contains Sufficient Allegations To State A
Claim For Fraudulent Concealment Or Suppression Against BP,
Transocean, and Halliburton.* ..................................................... 49

H. The State Alleges A Viable Claim For Private Nuisance. ................................ 53

I. Alabama Has Stated A Claim For Trespass. ....................................................... 56

J. Alabama States A Claim For Relief For Wanton Conduct. ............................... 56

VI.   The State Pleaded Valid Claims Against Anadarko and MOEX. .................................. 58

VII.  While It Is Entitled to Seek Punitive Damages, Alabama Did Not Plead
Punitive Damages as an Independent Cause of Action. ................................. 66

CONCLUSION....................................................................................................................... 67

### TABLE OF AUTHORITIES

**Cases**

*AEP, Co. Inc v. Connecticut*, __ U.S. __, 2011 WL 2437011 (June 20, 2011) ............................................................................................................... 11

*Alabama Dep't of Envtl. Management v. Wright Bros. Constr. Co.*, 604 So. 2d 429 (Ala. Civ. App. 1992) ........................................................................................ 44

*Alabama Dept. of Envtl. Mgmt. v. Friends of Hurricane Creek*, No. 2090633, 2011 WL 1334390 (Ala. Civ. App. Apr. 8, 2011) .................................... 46

*AmSouth Bank, N.A. v. City of Mobile,* 500 So. 2d 1072 (Ala. 1986) .......................... 56

*Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973) .................................... 8

*Atlantic Sounding Co., Inc. v. Townsend*, 129 S.Ct. 2561 (2009) ................................ 17

*Boca Ciega Hotel Inc. v. Bouchard Transp. Co. Inc.*, 51 F.3d 235 (11th Cir. 1995) ................. 21

*Bonvillain v. La. Land & Exploration Co.*, 702 F. Supp. 2d 667 (E.D. La. 2010) ...................... 49

*Carroll v. Fort James Corp.*, 470 F.3d 1171 (5th Cir. 2006) ...................................... 49

*Chevron U.S.A. v. Natural Resources Defendse Counsel, Inc.*, 467 U.S. 837 (1984) ................. 12

*Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587 (E.D. La. 1993) ...................... 49

*CSX Transp. Inc v. McBride*, __ U.S. __, 2011 WL 2472795 (June 23, 2011) ........................... 37

*Davidson v. Enstar Corp.,* 848 F.2d 574, 577-78 (5th Cir.), *modified on rehearing on other grounds,* 860 F.2d 167 (5th Cir.1988) ....................................... 60, 62

*Exxon v. Baker*, 554 U.S. 471 (2008) ............................................................... 18

*Grubert Inc v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ........................................ 7

*Harris Moran Seed Co, Inc. v. Phillips*, 949 So. 2d 916 (Ala. Civ. App. 2006) ......................... 32

*Heavin v. Mobil Oil Exploration,* 697 F. Supp. 1408 (E.D. La. 1988) *rev'd on reh'g on other grounds,* 710 F. Supp. 1073 (E.D. La. 1989) *affirmed* 913 F.2d 178 (5th Cir. 1990) .............. 62

*Henderson v. Shinseki*, 131 S.Ct. 1197 (2011) ................................................... 20

*Hercules Carriers, Inc. v State of Florida*, 720 F.2d 1201 (11th Cir. 1983) .......................... 35

*Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89 (Tex.App.–El Paso 1997) ............................... 59

*Int'l Paper Co. v. Ouelette*, 479 U.S. 481 (1987) ...................................................... 9

*Leboeuf v. Texaco*, 9 F.Supp.2d 661 (E.D. La. 1998) .................................................. 21

*Malsch v. Bell Helicopter Textron, Inc.,* 916 So2d 600 (Ala. 2005) ........................................ 42

*Martin v. Arnold*, 643 So. 2d 564 (Ala. 1994) .......................................................... 56

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ...................................................... 18

*Miller v. Slam Offshore,* 1997 WL 537686 (E.D. La. 1997) ........................................... 60

*Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970) ........................................... 8

*Norfolk S. Ry. Co. v. Johnson,* No. 1090011, 2011 Ala. LEXIS 29
   (Ala. Mar. 11, 2011 ................................................................................ 56

*Oil Spill by the Oil Rig Deepwater Horizon*, 2010 WL 3943451 (E.D. La.
   Oct. 6, 2010) ....................................................................................... 3

*Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118 (11th
   Cir. 1993) ...................................................................................... 50, 52

*Parker v. McDermott, Inc.,* 1990 WL 223011 (E.D. La. 1990) ...................................... 64, 65

*Payton v. Monsanto Co.,* 801 So2d 829 (Ala. 2001) .................................................. 45

*PLIVA, Inc. v. Mensing*, __ U.S. __, 2011 WL 2472790 (June 23, 2011) ............................. 14

*Ridgeway v. CSX Transp., Inc.,* 723 So.2d 600 (Ala. 1998) ........................................... 56

*Robins Dry Dock & Repair Co. v Flint,* 275 U.S. 303 (1927) ......................................... 31

*Rogers v. Coastal Towing, LLC*, 723 F. Supp. 2d 929 (E.D. La 2010) ................................ 8

*Russell Corp. v. Sullivan,* 790 So. 2d 940 (Ala. 2001) ................................................. 54

*State ex rel Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985)………………….. 31, 35

*Sweetwater Investors, LLC v. Sweetwater Apts. Loan LLC*, No. 1:10-cv-223, 2010
   U.S. Dist. LEXIS 124923 (M.D. Ala. Nov. 24, 2010) ............................................. 50

*Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859 (E.D. La. 2001) ................................ 5, 15

*Taylor v. Getty Oil Co,* 637 F. Supp. 886 (E.D. La. 1986) ............................................ 62

*United States ex rel. Grubbs v. Ravikumar Kanneganti,* 565 F.3d 180 (5th Cir. 2009) .............. 49

*United States v. Estate of Romani*, 523 U.S. 517 (1998) .................................................. 4

*United States v. M/V Cosco Busan*, 557 F.Supp. 2d 1058 (N.D. Cal. 2008) ............................. 24

*United States v. Pickett*, 598 F.3d 231 (5th Cir. 2010) .................................................. 7

*Wagoner v. Exxon Mobil Corp.*, 2010 U.S. Dist. LEXIS 91023 (E.D. La. 2010) ....................... 49

*Williams v. Potomac Elec. Power Co.*, 115 F.Supp.2d 561 (D. Md., 2000) ............................... 26

*Williams v. WMX Techs., Inc.*, 112 F.3d 175 (5th Cir. 1997) .............................................. 49

*Wood Coal Co. v. Clark Equipment Co.*, 543 So. 2d 671 (Ala. 1989) ...................................... 32

*Wyeth v. Levine*, 555 U.S. 555 129 S.Ct. 1187 (2009). ................................................ 7, 13, 15, 17

*Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996) .................................................... 8

## Statutes

§ 6-5-102 .................................................................................................. 49, 52
§ 6-5-120 .................................................................................................. 54, 55
§ 6-5-121 .................................................................................................. 54
§ 6-11-20(b)(3) ............................................................................................ 56
§ 22-22-1(b)(2) ........................................................................................... 41, 44, 45
§ 22-22-1(b)(8) ........................................................................................... 41, 43
§ 22-22-9(m) .............................................................................................. 17, 18, 37, 45
§ 22-22A-2(2) ............................................................................................. 41
§ 22-22A-5 ................................................................................................ passim
§ 22–22A–5(18)(a) ......................................................................................... 45
§ 22-22A-5(18)(b) ......................................................................................... 47
§ 22–22A–5(18)(c) ......................................................................................... 44, 46
§ 22-27-2(7) .............................................................................................. 41
§ 22-27-2(36) ............................................................................................. 48
§ 22-27-3(c) .............................................................................................. 48
§ 22-27-7 ................................................................................................. 47
§ 22-27-11(a) ............................................................................................. 47
§ 22-28-2(1) .............................................................................................. 41
§ 22-28-22 (a) ............................................................................................ 46
§ 22-30-19(e)(6) .......................................................................................... 47
§ 22-30-3 (4) ............................................................................................. 42
§ 1333(a) ................................................................................................. 6
§ 2702(b)(2)(B), .......................................................................................... 31

§ 2702(b)(2)(C) ........................................................................................................... 32
§ 2702(b)(2)(D) ........................................................................................................... 32
§ 2702(b)(2)(E) ........................................................................................................... 32
33 U.S.C. § 2702 ........................................................................................ 5, 22, 31, 36
33 U.S.C. § 2702(b)(1) ................................................................................................ 23
33 U.S.C. § 2705(a) ..................................................................................................... 26
33 U.S.C. § 2713 .......................................................................................... 20, 21, 22, 24
33 U.S.C. § 2713(b) ...................................................................................................... 23
33 U.S.C. § 2717 .................................................................................................... passim
33 U.S.C. § 2717(b-c) .................................................................................................. 19
33 U.S.C. § 2717(c) ................................................................................................ 15, 17
33 U.S.C. § 2717(f)(2) .................................................................................... 22, 23, 24, 25
33 U.S.C. § 2718(a)(1), -(a)(2), -(c). .................................................................... 16, 18
33 U.S.C. § 2751 ................................................................................................ 12, 17, 19
38 U.S.C. § 7266(a) ..................................................................................................... 20
47 U.S.C. § 6903(3) ..................................................................................................... 43


**Other Authorities**

10B Charles A. Wright, Arthur R. Miller, Mary K. Kane, *Federal Practice and Procedure*
    § 9.03[1][e] (3d ed. 2010) ..................................................................................... 48

Comprehensive Environmental Response, Compensation and Liability Act of 1980
    ("CERCLA," also known as "The Superfund Act"), 42 U.S.C. § 9601 .................. 33

Clean Water Act of 1972 ("CWA"), 33 U.S.C. §§ 1251 ................................................ 3

Deepwater Port Act of 1974, 33 U.S.C. §1505 ............................................................ 4

*Liabilities of Nonoperating Oil and Gas Interest Owners,* 13D Rocky Mt. Min. Law Inst.
    4 (1983) ................................................................................................................. 59

*Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?* 67 Tul. L.
    Rev. 271, 300 (1992) ............................................................................................. 34

*Statutes and Statutory Construction*, § 51.02 at 186-87 (6th ed. 2000) .......................... 4

*The Robins Dry Dock Rule: Is the 'Bright Line' Fading?* 4 U.S.F.Mar.L.J. 85, 95
    (1992) .................................................................................................................... 32

Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. §1651 ............................. 4
Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 ................................................ 3

Outer Continental Shelf Lands Act of 1978 ("OCSLA"), 43 U.S.C. §1801 .................. 3

**Rules**
Fed R. Civ. P. 9(b) ...................................................................................................... 48

## THE STATE OF ALABAMA'S BRIEF IN OPPOSITION
## TO THE VARIOUS DEFENDANTS' MOTIONS TO DISMISS

### PREFACE

The State cannot possibly address every variation of every argument from every Defendant in a 75-page brief. So, the State addresses each of the overarching issues under one heading, attempting not to miss any particular issue or argument raised in the Defendants' MTDs and accompanying briefs. To assist the Court, the State attaches a chart that outlines which Defendants' arguments our issue heading addresses, with the corresponding page numbers of the Defendant's brief. *See* Exhibit A. If the State misses an argument, or any particular variation of an argument, the State disagrees with and denies the Defendant's argument, and the State preserves its right to respond to any argument upon which the Court wishes further briefing.

### STANDARDS OF REVIEW & APPLICATION

The State adopts the PSC's recitation of the prevailing legal standards for judging Rule 12 defenses and will not duplicate it here. *See* Doc. 1822 at 18-21.[1] None of the State's claims are subject to dismissal under the various Rule 12 defenses.

**A.     Rule 12(b)(1):** Rule 12(b)(1) dismissal is unwarranted because the State has pleaded facts that, if proved true, would establish the Court's jurisdiction.

**B.     Rule 12(b)(6):** Accepting as true all of the facts pleaded by the State, Rule 12(b)(6) dismissal is unwarranted because each of our claims is facially plausible, and if proved, would invoke the Defendant(s)' liability.

---

[1] To avoid unnecessary duplication, the State often refers to, or adopts, the PSC's argument on issues previously briefed and argued before the Court with regard to the Master Complaints. *See* Doc. 1822 (PSC's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss Bundle B1 First Amended Master Complaint, Cross-Claim, and Third-Party Complaint).

     **C.**     **Rule 12(c):**  Accepting as true our pleaded facts, a judgment on the pleadings is not presently appropriate, and the State is entitled to offer evidence to support our claims.

**ARGUMENT**

**I.**     **The State Has Fully Viable Claims under OPA, General Maritime Law, and State Law.**

     The Defendants attempt to cabin the State's complaint to OPA damages, thereby erasing Alabama's remedies under general maritime and state law.  Before we tackle the Defendants' arguments in greater detail, the State briefly summarizes how its general maritime and state law claims co-exist with our federal statutory claims:

- OPA is the preeminent federal statute governing oil pollution cases;

- The displacement and preemption provisions contained in the oil-pollution-specific OPA (1990) trump any conflicting displacement and preemption provisions contained in older, more general statutes like OCSLA (1978) and the CWA (1972);

- OPA expressly preserves general maritime law claims; thus, OPA does not displace maritime claims; and,

- OPA expressly preserves state law claims; thus, OPA does not preempt state law claims.

Accordingly, the State may seek remedies provided by general maritime law and state law, in addition to its OPA remedies.  We flesh out these general principles below.

2

### A. Neither OCSLA nor the CWA Displace Alabama's General Maritime Law Claims, nor Does Either Statute Preempt Alabama's State Law Claims.

To avoid the remedies provided by general maritime law and state law (*e.g.* punitive damages), the Defendants rely heavily on the Outer Continental Shelf Lands Act of 1978 ("OCSLA"), 43 U.S.C. §1801*, et seq.* to argue that (a) federal law preempts Alabama's state law claims and (b) either OPA or Louisiana state law (as a surrogate federal law) provide the substantive federal law, to the exclusion/displacement of general maritime law.  Similarly, the Defendants rely on the Clean Water Act of 1972 ("CWA"), 33 U.S.C. §§ 1251, *et. seq*, to argue preemption of Alabama's state law claims.

In parts 2 and 3, we show why neither statute, if applied of its own force, displaces or preempts any of Alabama's maritime or state law claims.  But first, we show why OCSLA and the CWA are virtually (if not wholly) irrelevant when judging displacement and preemption in this oil pollution case:  The more recent, more specific Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701, *et. seq*. trumps older, more general statutes like OCSLA and the CWA.

### 1. *Even If There Were A Conflict, OPA Governs the Alleged Displacement of Maritime Law and Preemption of State Law in this Case.*

By their terms, OCSLA, the CWA, and OPA all apply here.[2]  So, we begin with two principles of statutory construction:

- "Where two statutes are involved, each of which by its terms applies to the facts before the Court, the statute which is the more recent of the two irreconcilable conflicting statutes prevail;" and

- "Where a conflict exists, the more specific statute controls over the more general one."

---

[2] To be clear, the State does not challenge the Court's ruling that OCSLA gives the Court *jurisdiction* over this case.  *See In re Oil Spill by the Oil Rig Deepwater Horizon*, 2010 WL 3943451 (E.D. La. Oct. 6, 2010).  But jurisdiction and displacement/preemption are entirely separate questions.

Norman J. Singer, *Statutes and Statutory Construction*, § 51.02 at 186-87 (6th ed. 2000). *See also United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (treating the Tax Lien Act of 1966 "as the governing statute" among similar, older statutes because "the Tax Lien Act is the later statute, the more specific statute, and it provisions are comprehensive").  OPA is the most recent, most comprehensive, and most specific statute dealing with oil pollution in coastal waters; thus, to the extent there is any conflict among the statutes regarding displacement and preemption of oil spill-related claims, OPA governs.

Before the 1989 *Exxon Valdez* spill, oil discharges were governed by a hodgepodge of federal statutes, including OCSLA (1978), the CWA (1972), the Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. §1651, *et seq.*, and the Deepwater Port Act of 1974, 33 U.S.C. §1505, *et seq.*    But after the *Valdez* disaster highlighted the inadequacy and unworkability of the various, then-existing statutes in the context of a major oil spill, Congress enacted OPA to serve as a comprehensive law to cover future oil spills: "The [OPA] builds upon §311 of the [CWA] to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."  S. Rep. 101-94, at 9 (1990).[3]

When it crafted OPA to provide the "single" federal statute for "oil pollution" cases, *id.*, Congress simultaneously repealed Title III of OCLSA, which defined/governed compensable injuries, standing to raise claims, liability limits (with exceptions for gross negligence), and the imposition of joint, several, and strict liability for owners and operators.  *See* P.L. 101-380 § 2004.  Congress similarly repealed portions of the CWA that established liability for oil spills. *See* P.L. 101-380, §2002.    The reason was two-fold:  Congress knew that, (1) before 1990,

---

[3] Any question that OPA was specifically tailored to govern cases like this is put to rest by provisions like 33 U.S.C. § 2704(b), which determines liability when "mobile offshore drilling units" (MODUs) like the *Deepwater Horizon* are involved.

4

OCSLA, the CWA, and their brethren "all play[ed] a role in oil spill liability and compensation, [b]ut they provide[d] varying and uneven liability standards and scope of coverage for cleanup costs and damages," S. Rep. 101-94, at 3 and that, (2) after 1990, OPA would govern spill-related claims in their stead.  *See, e.g.,* 33 U.S.C. § 2702 (liability and damages), 33 U.S.C. § 2704 (Limits on liability).

In short, OPA cut the Gordian Knot.   Congress enacted OPA to be the specific statute that superseded the confusing and under-protective amalgamation of general statutes like OCSLA and the CWA in oil pollution cases.  Or, as this Court put it, OPA "create[d] a new, comprehensive federal scheme for the recovery of oil spill clean-up costs and the compensation of those injured by such spills."  *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859 (E.D. La. 2001).

As shown in Issues I(B-C), to ensure broad protection, Congress expressly stated in OPA that claims raised under general maritime law and state law would remain available to spill victims.  Any argument that the remnants of OCSLA (1978) or the CWA (1972) can effectively supersede OPA (1990) by foreclosing general maritime and state law claims resulting from an oil spill must fail because the argument (a) conflicts with fundamental canons of statutory construction and (b) is diametrically opposed to Congress' express intent in passing OPA.

### 2. *If OCSLA Rules Apply, OCSLA Applies General Maritime Law Without Preempting State Law.*

Even assuming *arguendo* that OCSLA does play a part in shaping the displacement and preemption question here, the result does not change because (1) general maritime law is the applicable federal law under OCSLA and (2) general maritime law does not preempt state law claims.

We start with the relevant statute, 43 U.S.C. §1333(a)(1-2):

(a) (1) The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: Provided, however, that mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the outer Continental Shelf.

(B) Within one year after September 18, 1978, the President shall establish procedures for setting any outstanding international boundary dispute respecting the outer Continental Shelf.

By its plain text, § 1333(a) is a choice of law provision, not a preemption provision. While §1333(a)(1) extends federal jurisdiction to the Outer Continental Shelf, it does not expressly preempt state laws—except state tax laws—from being applied in addition/supplemental to federal law. If anything, that Congress expressly preempted state tax laws in § 1333(a) shows that it considered preemption and chose *not* to preempt the remainder of state laws. Section 1333(a)(2) merely answers the question as to which set of laws govern while providing a "federal" law framework.

Because OCSLA's plain language does not reveal that "the clear and manifest purpose" of Congress was to preempt state law, state law claims are available to spill victims as long as

the state laws do not directly conflict with the federal law chosen by OCSLA.  *See Wyeth v. Levine*, 555 U.S. 555, __, 129 S.Ct. 1187, 1194-95 (2009).  Accordingly, if OCSLA is relevant here, the question is whether the federal law chosen by OCSLA preempts State law claims.

*Choice of Law: Maritime vs. Surrogate State*:  The PSC ably sets forth this Circuit's three-part "*PLT* test" for determining whether State law acts as a surrogate for federal law under OCSLA:  (1) Did the controversy arise on a covered "situs"; (2) does general maritime law apply of its own force; and, (3) is the State law inconsistent with Federal law?  *See* Doc. 1822 at 21-26 (citing *Union Tex. Petroleum Corp. v. PLT Eng'g Inc.*, 895 F.2d 1043 (5th Cir. 1990) and related cases).   We adopt the PSC's recitation and application of the *PLT* test and merely summarize that effort here.

Briefly, adjacent state law does not apply as a surrogate because it fails the first two *PLT* factors.  First, the *Deepwater Horizon* was a floating vessel dynamically positioned by thrusters; therefore, it fails the "situs" requirement of being attached to the seafloor.  *See United States v. Pickett*, 598 F.3d 231, 236 (5th Cir. 2010) (Clement J. concurring) ("for a rig or platform to be [covered by OCSLA] it must be 'erected' on the Outer Continental Shelf . . . OCSLA does not apply to vessels that float on water.").  Second, admiralty law applies of its own force.  *See, e.g., Grubert Inc v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (stating that admiralty jurisdiction exists over a tort claim arising on navigable waters if the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity").

*Preemption under Maritime Law:*  Because general maritime law is the substantive federal law under OCSLA, the final question is whether general maritime law preempts state law claims.  The Supreme Court answered "no" to this question in *Yamaha Motor Corp. v. Calhoun*,

516 U.S. 199 (1996), at least generally, when the Court held that a wrongful-death victim's parents could raise a claim under State law despite the availability of a federal maritime wrongful-death action under *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970).  *See also Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973) (holding that federal admiralty law does not "swallow most of the police power of the States over oil spillage and thus upheld application of a Florida oil pollution statute).

Citing *Yamaha Motor*, this Court recently noted that "the Supreme Court has approved the application of State law where it serves to supplement, but not contravene, the general maritime law by filling a 'gap' therein."  *Rogers v. Coastal Towing, LLC*, 723 F. Supp. 2d 929, 933 (E.D. La 2010).  As the Court noted, state law claims can coincide with maritime claims, unless "the State law (i) conflicts with an applicable act of Congress, (ii) works material prejudice to a characteristic feature of the general maritime law, or (iii) interferes with the proper harmony and uniformity of the general maritime law in its international and interstate relations." *Id.*

Here, the various Defendants have failed to show how Alabama's state law either works a "material prejudice" to maritime law or intereferes with the maritime law's ability to unify international and interstate relations.  To the contrary, Alabama's state law harmonizes with maritime law, and often fills the gap in areas where maritime law is silent.  As a result, OCSLA allows victims to raise both general maritime and state law claims.  (And, again, if it did not, OCSLA's preemption rules would be trumped by OPA.)

### 3. *If the CWA Rules Apply, the CWA Does Not Displace General Maritime Law or Preempt Alabama Law With Regard to Oil Pollution.*

Some Defendants argue that the CWA's permitting scheme preempts state law claims, relying heavily on the Supreme Court's decisions in *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987). Like the CWA, *Ouellette* predates Congress' passage of OPA's express provisions that preserve state law and general maritime claims in oil-spill cases like this. Thus, OPA—not the CWA and *Ouellette*—governs the displacement and preemption questions in this case.

But, for the moment, we digress. Even if the CWA's rules on preemption applied with full force, the result would not change for two related reasons: (1) the CWA and its precedent are concerned with challenging *permitted* discharges, not unpermitted spills, and (2) *Ouellette* concerned the choice between conflicting state laws, not the question of whether the CWA preempted *all* state law claims. To the contrary, the *Ouellette* Court expressly acknowledged that the CWA does allow state common law actions. *See Ouellette*, 479 U.S. at 500 ("Nothing in the Act prevents a court sitting in an affected State from hearing a common-law nuisance suit, provided that jurisdiction otherwise is proper.").

*Ouellette*: Under the CWA, a "source" State may impose additional, and more stringent, requirements than the federal statute. *See id.* at 492 ("Although Congress intended to dominate the field of pollution regulation, the saving clause negates the inference that Congress 'left no room' for state causes of action."). Under the CWA, the permittee must therefore comply with *both* federal and state law with regard to permitted discharges. Thus, the argument in *Ouellette* was not whether the CWA preempts all state laws (the Court said it didn't); the question was whether a plaintiff could rely on an "affected" State's different, and possibly more stringent, laws to challenge a discharge permitted by federal and source state law. The Court held that the CWA preempted the "affected" State's law—and *only* the affected State's law—because it

9

would frustrate the purpose of the CWA to allow lawsuits under "affected" States' laws when the permittee followed both the relevant federal and source State's laws:

> An interpretation of the saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests. If a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State. The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State. Such penalties would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits

*Id.* at 495.  In other words, the CWA preempts an affected State's laws because it would wreak havoc on a permittee if he had to understand and comply with federal law, source State law, *and* the differing laws of every other State to which permitted discharges might flow.

*Permitted vs. Unpermitted*:  The first distinction in this case and *Ouellette* is obvious:  No one permitted the Macondo Spill.  Quite the contrary, the OCS General Permit at issue here explicitly banned the Defendants from spilling formation oil.  *See* National Pollutant Discharge Elimination System Permit No. GMG290000 I(B)(2)(c)(2) ("Formation Oil: No Discharge"); *see also* Nos. GMG290000 I(B)(1)(a), I(B)(1)(b), I(B)(2)(a), I(B)(10)(a) (barring various discharges of free oil and oil-based drilling fluids).  So, unlike the permitted party in *Ouellette*, the Defendants here cannot claim that "Alabama's stringent law must be preempted because our Spill was permitted beforehand by federal and Louisiana law."  No one permitted the Defendants to spill millions of gallons of oil into the Gulf; thus, *Ouellette* says nothing about this situation.

*Conflicting Laws*:  The second distinction is just as obvious.  Unlike *Ouellette*, there is no conflict on how the Defendants could have complied with OPA, Alabama law, Louisiana law, or any other State's law: **Don't spill any oil.**  Again, the point of the CWA and *Ouellette* was to ensure a system in which a permittee understands what state and federal rules he must comply

with.  Here, nothing about Alabama's statutory or common law conflicted with the federal

requirement that the Defendants not blow up their rig and spill millions of gallons of oil.

In a nutshell, even if the CWA's preemption rules apply, Alabama law is not preempted.

As the *Ouellette* Court noted, the CWA expressly allows state law actions.  The CWA (and

*Ouellette*) simply prevent the application of *multiple, conflicting* state laws.  Here, there is no

source state with which Alabama's law conflicts, nor does Alabama's law conflict with federal

law so that the Defendants could not comply with both.  Accordingly, Alabama law is not

preempted by the CWA and *Ouellette*.  (And, again, if the CWA preempted Alabama law, the

CWA's preemption rules would be trumped by OPA.)

* * *

Once OCSLA and CWA are set aside, the pertinent question remains:  Does OPA

displace general maritime claims and/or preempt state law claims?  We start with the former.

### B.  OPA Does Not Displace Maritime Law Claims.

We agree with the Defendants on two things.  First, the standard for displacement of

maritime law is less stringent than preemption of state law:

> "Legislative displacement of federal common law does not require the 'same sort
> of evidence of a clear and manifest congressional purpose' demanded for
> preemption of state law. . . . The test for whether congressional legislation
> excludes the declaration of federal common law is simply whether the statute
> 'speaks directly to the question' at issue."

*AEP, Co. Inc v. Connecticut*, __ U.S. __, 2011 WL 2437011 at *9 (June 20, 2011).   Second,

OPA applies to this instance of oil pollution.  *Id.*  As a result, if Congress was silent on the issue,

we might agree that OPA displaces maritime law.  *See id.*  But Congress spoke, plainly and

clearly:

11

Savings Provision

(e) Admiralty and maritime law
Except as otherwise provided in this Act, this Act does not affect--

(1) admiralty and maritime law; or

(2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

33 U.S.C. § 2751.

*Plain Language*:  In plain and unmistakable language, Congress said that OPA (1) "does not affect admiralty and maritime law;" (2) "does not affect the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction;" and, (3) "sav[es] to suitors in all cases all other remedies to which they are otherwise entitled." *Id.* This language could not be any clearer:  OPA saves "admiralty and maritime law" claims and grants spill victims the right to seek, in addition to OPA remedies, "all other remedies" to which they would be entitled if OPA did not exist.  By its plain language, OPA does not displace admiralty and maritime law claims, especially those claims that provide "other remedies" not provided by OPA.  *See Chevron U.S.A. v. Natural Resources Defendse Counsel, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.")

*Legislative History*:  Because the language is plain, the Court need not delve into the legislative history of displacement.  *Id.*  That said, if the Court does, it will reach the same answer (*i.e.* no displacement) because Congress not only meant what it said in § 2751, it clearly thought about avoiding displacement during the process.

The PSC gave the Court a thorough history of the Savings Clause's birth, which we adopt and will not duplicate here.  *See* Doc. 1822 at 38-39.  In a nutshell, the Senate and House had

two different versions of OPA; the Senate's did not include the Savings Clause, the House's did. *See* H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.). And the House was clear on its intent for the provision: "Article III, clause 2, of the Constitution creates the admiralty and maritime law of the United States. This section is intended to clarify that this Act [OPA] does not supercede [sic] that law." H.R. Rep. No. 101-242, p. 2: Committee on Merchant Marine and Fisheries, at 93 (Sept. 18, 1989). The Conference Committee adopted the House version with the Savings Clause, and explained that Section 1002, which imposes OPA liability, "established liability notwithstanding any other provision or rule of law . . . Therefore, there is no change in current law unless there is a specific provision to the contrary." *See* H.R. Rep. No. 101-653, at 159 (Aug. 1, 1990) (Conf. Rep.).

In short, admiralty and maritime law claims clearly existed in oil pollution cases before OPA, and it is equally clear that Congress intended them to exist after OPA. Section 2751 embodies that intent in plain language.

### C.  OPA Does Not Preempt Alabama Law.

Finding that OPA does not preempt state law is simpler for two reasons: (1) the standard for preempting state law is much more onerous that the standard for displacement and (2) OPA has an express savings clause for state law too.

*Standard of Review*: First, the starting point: "[I]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 129 S.Ct. at 1194-95.

13

There are three ways the Defendants can overcome the assumption against preemption. First, the Defendants could show an express provision in OPA that preempts state law. Second, the Defendants could establish "implied preemption" by showing that Congress intended to wholly occupy the field of oil pollution—to the exclusion of all other laws—with OPA. Third, the Defendants could prove that "it is impossible for a private party to comply with both state and federal requirements." *PLIVA, Inc. v. Mensing*, __ U.S. __, 2011 WL 2472790 (June 23, 2011). As shown below, OPA's plain language destroys a preemption argument under any of these theories.

### 1. OPA's Plain Language Expressly Saves State-law Claims.

Like maritime law, Congress expressly saved state law claims, at least three times, within the plain language of OPA:

1.  "Nothing in this Act . . . shall affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to the discharge of oil or other pollution by oil within such State" 33 U.S.C. §2718(a)(1);

2.  "Nothing in this Act . . . shall affect, or be or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law." 33 U.S.C. §2718(a)(2); and,

3.  "Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of . . . any State or political subdivision thereof--(1) to impose additional liability or additional requirements; or (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law; relating to the discharge, or substantial threat of a discharge, of oil." 33 U.S.C. §2718(c).

OPA's text could not be any plainer. States' can impose "additional liability or requirements," and additional "fine[s] or penalt[ies]", on top of OPA.

If OPA's savings clauses were not enough, OPA's concurrent jurisdiction provision seals the deal:

(c) State court jurisdiction

A State trial court of competent jurisdiction over claims for removal costs or damages, as defined under this Act, **may consider claims under this Act or State law** and any final judgment of such court (when no longer subject to ordinary forms of review) shall be recognized, valid, and enforceable for all purposes of this Act.

33 U.S.C. § 2717(c) (emphasis added).  OPA gives state courts concurrent jurisdiction over claims for removal costs or damages raised under OPA "or State law." *Id.*  If OPA gives state courts jurisdiction to hear state law claims in oil pollution cases, then clearly OPA does not preempt state law claims.  Both OPA claims and state law claims exist, as this Court noted when determining that the concurrent jurisdiction provision does not prevent removal to federal court:

[T]he creation of concurrent state court jurisdiction complements OPA's non-preemption principals. As one group of commentators has observed, state court "jurisdiction under the OPA ... to hear claims for removal costs and damages is not surprising, as **the OPA explicitly does not preempt state law in the area of oil spill liability and compensation**." Cynthia M. Wilkinson, L. Pittman, Rebecca F. Dye, *Slick Work: An Analysis of the Oil Pollution Act of 1990*, 12 J. energy Nat. Resources & envtl. L. 181 (1992).  **The Senate Report regarding OPA expresses an intent to "affirm[ ] the rights of States to protect their own air, water, and land resources by permitting them to establish State standards which are more restrictive than Federal standards**", S. Rep. No. 101-94 (1989), reprinted in 1990 U.S.C.C.A.N. 722, which was given life in Section 1018 of the OPA, 33 U.S.C. § 2718.FN6 See National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp., 924 F.Supp. 1436, 1448 (E.D.Va.1996), aff'd, 122 F.3d 1062 (4th Cir.1997) (table), cert. denied, 523 U.S. 1021, 118 S.Ct. 1301, 140 L.Ed.2d 467 (1998). Thus, subsection (c) of the OPA jurisdictional statute by itself does not indicate an intent to prohibit removal, as plaintiffs argue, but merely **provides that state and federal claims for removal costs or damages can be brought together in a state forum**, rather than requiring plaintiffs to bring their OPA claims exclusively in federal court.

*Westchester*, 153 F. Supp. 2d at 863-64 (emphasis added).  In this one paragraph, this Court, commentators, and the Senate all affirmed that OPA does not preempt state law claims for removal costs or damages.  Any question of state-law preemption should end here, especially when the default rule is *against* preemption.  *Wyeth*, 129 S.Ct. at 1194-95.

### 2. OPA's Legislative History Confirms that Congress Knowingly Chose Not to Preempt State Law.

The PSC ably outlines the successful fight in Congress against preemption, and we adopt (rather than duplicate) that effort here. *See* Doc. 1822 at 36-38. As noted by the PSC, "Preemption [was] discussed by the members of the Committee [on Enviromental and Public Works] more than any other single issue." S. Rep. No. 101-94: Committee on Environmental and Public Works, at 17 (July 28, 1989).

More importantly, after the debates, both the House and Senate Bills contained provisions *saving* State law, as noted by the Conference Committee: "Section 106 of the Senate amendment and section 1018 of the House bill are generally similar provisions preserving the authority of any State to impose its own requirements or standards with respect to the discharges of oil within the State." H.R. Rep. No. 101-653, at 121 (Aug. 1, 1990) (Conf. Rep.). In other words, Congress bestowed upon States "the freedom to impose standards that reflect the resources at risk" by allowing us to "establish [our] own liability and compensation systems." 136 Cong. Rec. H6920-H6949, at H6934 (daily ed. Aug. 3, 1990) (statement of Rep. Lowey).

### 3. The Defendants Cannot Meet Any Preemption Standard.

In light of OPA's plain language and legislative history, the Defendants cannot establish express, implied, or conflict/impossibility preemption of Alabama law.

*Impossibility Preemption*: No one can seriously argue that compliance with Alabama law made it impossible for the Defendants to comply with OPA. Nor do we believe that anyone has. Again, there is a simple way to comply with both Alabama law and OPA: Don't spill any oil.

*Express Preemption*: OPA does not contain a provision expressly preempting state law claims. Quite the contrary, OPA expressly saves state law claims at least three times. *See* 33 U.S.C. §2718(a)(1), -(a)(2), -(c). As a result, the Defendants cannot prove express preemption.

16

*Implied Preemption*:  That leaves the Defendants with implied preemption; that is, the Defendants must establish that it was Congress' clear and manifest intent that OPA provide the *entire* field of oil spill remedies, to the exclusion of additional state law remedies, even though Congress did not say so.  But there can be no implication that Congress intended to preempt state law remedies when the express language of OPA and its legislative history not only acknowledge the existence of additional state law remedies/penalties, Congress embraced additional state law remedies/penalties.  In fact, Congress gave state courts concurrent jurisdiction to hear "state law" claims for removal costs or damages.  33 U.S.C. § 2717(c).  As the Court stated in *Wyeth*, "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them."  *Wyeth*, 129 S.Ct. at 1200.

### D.     OPA Does Not Preclude Punitive Damages.

This leads us to the brass tacks: punitive damages.  In short, punitive damages are available to Alabama because OPA neither displaces general maritime law, which allows punitive damages, *see Atlantic Sounding Co., Inc. v. Townsend*, 129 S.Ct. 2561, 2566 (2009), nor does it preempt Alabama law, which also provides for punitive damages.  *See*, *e.g.*, Ala. Code § 22-22-9(m) (Alabama Water Pollution Control Act, which allows punitive damages for "willful and wanton conduct").

Granted, OPA itself does not provide for punitive damages.  But, as discussed above, OPA embraces additional remedies beyond those it provides, if the additional remedies are available in state or maritime law.  Again, with regard to maritime claims, OPA states that it saves to suitors "all other remedies to which they are otherwise entitled."  33 U.S.C. § 2751.  As for State law remedies, OPA provides that state law can "impose additional liability or additional

17

requirements . . . relating to the discharge, or substantial threat of a discharge, of oil." 33 U.S.C. § 2718(c). In other words, not only does OPA fail to preempt or displace claims for punitive damages, it expressly saves them.

The PSC rightly recounts the Supreme Court's recent decisions in *Townsend* and *Exxon v. Baker*, 554 U.S. 471 (2008) as examples of the State's point, and we adopt the PSC's discussion of the cases, and their effect on prior conflicting circuit precedent, in full. *See* Doc. 1822 at 43-49. In *Exxon*, the Court allowed punitive damages under maritime law because the Clean Water Act did not clearly displace maritime law's punitive damages. *Exxon*, 554 U.S. at 488-89. In *Townsend*, the Court held the neither the Jones Act nor its decision in *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) precluded maritime law's punitive damages. This case fits neatly in the same groove: OPA does not preempt state law, nor does it displace maritime law (in fact, OPA expressly saves both); thus, punitive damages are available in OPA cases, just as they were in cases under the CWA and the Jones Act.

Finally, to understand why Congress did not preclude punitive damages, one must remember the context of OPA: the *Exxon Valdez*. As demonstrated briefly above, and in greater detail in the PSC's brief, the OPA Congress reacted to the *Valdez* disaster by providing *broader* protection and remedies to Spill-victims. It is incomprehensible that the same Congress desired OPA *shield* Defendants from punishment for willful, reckless, and otherwise reprehensible conduct upon proof of such conduct.

Here, the collective Plaintiffs will prove that the Defendants acted in a willful, wanton, and grossly negligent manner towards the coastal States' citizens and environment. For example, we intend to prove that BP caused the spill via "willful or wanton conduct," Ala. Code § 22-22-9(m), by imposing a profits over safety mentality on its employees—precisely the type

of mentality that warrants the punishment and deterrence provided by punitive damages.  *See* 33 U.S.C. § 2751(e)(2) (saving "in all cases[,] all other remedies to which [claimants] are otherwise entitled").

* * *

In summary, the State may seek the remedies provided by OPA, *and* it may seek additional remedies such as punitive damages under general maritime law and Alabama state law.  Congress intentionally created this "OPA+" remedial scheme when it wrote OPA after the *Exxon Valdez* disaster.  General, pre-OPA statutes such as OCSLA and the CWA cannot thwart the plain language and intent of a subsequent Congress.  Thus, neither Alabama's maritime claims, nor its state law claims, are subject to summary dismissal.

## II.     OPA's Presentment Requirement Does Not Require Dismissal of Alabama's Claims.

Generally, the Defendants argue that (1) OPA Presentment is a jurisdictional prerequisite; (2) Alabama failed to make a valid presentment before filing its original complaint; and, therefore (3) the Court must dismiss Alabama's OPA claims (if not its entire complaint) without prejudice, so that Alabama can make a proper presentment before (re)filing its complaint. Before we explain how Alabama satisfied OPA's presentment requirement, *see* Issue II(C), even though we did not have to before filing our complaint, *see* Issue II(B), we dispel the argument that OPA's presentment procedure is "jurisdictional", and the Court must therefore dismiss Alabama's OPA claims if presentment was not met.

### A. OPA's Presentment Procedure Is Not Jurisdictional, as Supported by the Supreme Court's Recent Opinion in *Henderson v. Shinseki*.

OPA's jurisdictional provisions are contained in the subchapter entitled "Litigation, jurisdiction, and venue."  *See* 33 U.S.C. § 2717(b-c) (granting "exclusive original jurisdiction" to

federal district courts and concurrent jurisdiction to state courts).  OPA's presentment provision, 33 U.S.C. § 2713, however, is contained in the "Claims procedure" subchapter, which does not refer to the jurisdiction of the courts.  Section 2713 is a claims processing provision that speaks in mandatory—but never jurisdictional—terms.

The Supreme Court's recent opinion in *Henderson v. Shinseki*, 131 S.Ct. 1197 (2011) is on point.  At issue in *Henderson* was whether a mandatory 120-day appeal deadline for veterans, *see* 38 U.S.C. § 7266(a), was also jurisdictional and therefore not subject to equitable tolling. The Court began by explaining why it has recently levied strict "discipline" to the attachment of the "jurisdictional" label on mandatory rules:

> Because the consequences that attach to the jurisdictional label may be so drastic, we have tried in recent cases to bring some discipline to the use of this term. We have urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction. [citations omitted]  Other rules, even if important and mandatory, we have said, should not be given the jurisdictional brand.

*Id.* at 1202-03.  The Court then specified "claim-processing rules"—*i.e.* "rules that seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times"—as "[a]mong the type of rules that should not be described as jurisdictional."  *Id*. at 1203.

The Court noted that filing deadlines are "quintessential claim-processing rules." *Id.*  It then held that the 120-day deadline at issue was *not* jurisdictional because Congress did not clearly prescribe the deadline as jurisdictional.  Among the factors that led the Court to its conclusion were

- "The terms of the provision setting that deadline, 38 U.S.C. § 7266(a), do not suggest, much less provide clear evidence, that the provision was meant to carry jurisdictional consequences . . . This provision does not speak in jurisdictional terms or refer in any way to the jurisdiction of the Veterans Court";

20

- "Congress placed § 7266, numbered § 4066 in the enacting legislation, in a subchapter entitled 'Procedure.' *See* VJRA, § 301, 102 Stat. 4113, 4115-4116. That placement suggests Congress regarded the 120-day limit as a claim-processing rule";

- "Within that subchapter, a separate provision, captioned 'Jurisdiction; finality of decisions,' prescribes the jurisdiction of the Veterans Court"; and,

- Congress crafted the statute to benefit Veterans (*i.e.* Appellants).

*Id.* at 1204-06.

*Henderson* reads like a blue print of the present jurisdictional question.  Like the *Henderson* deadline, OPA's presentment requirement is a "claim-processing rule." *Id.* at 1203. Like the *Henderson* deadline, OPA's presentment provision "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [district court]."  *Id*. at 1204.  Like the *Henderson* deadline, OPA's presentment provision is found in a subchapter entitled "[Claims] Procedure." *Id.* at 1205.  Like the *Henderson* deadline, OPA's jurisdictional provisions are contained elsewhere in the statute.  *Id.* And like the statute in *Henderson*, Congress crafted OPA to help Spill-victims (not polluters); in this instance, by creating a streamlined claims processing procedure.  So, like the *Henderson* deadline, OPA's presentment procedure, while mandatory in language, is a non-jurisdictional claim processing rule.

This Court reached the same conclusion in *Leboeuf v. Texaco*, 9 F.Supp.2d 661 (E.D. La. 1998).  In *Leboeuf*, this Court rejected the Eleventh Circuit case relied upon by the Defendants, *Boca Ciega Hotel Inc. v. Bouchard Transp. Co. Inc.*, 51 F.3d 235 (11th Cir. 1995)—or, at least the implication that *Boca Ciega* held that OPA presentment is jurisdictional—and held that the "presentment requirements of 33 U.S.C. § 2713 are not jurisdictional."  *Leboeuf*, 9 F.Supp.2d. at 666.  As the Supreme Court recently showed in *Henderson*, this Court got it right.

21

As a result, while § 2713's pre-litigation presentment requirement may speak in mandatory terms, the failure to make a presentment before filing OPA claims in Court is not fatal.  In fact, as we show below, OPA itself allows the State to file OPA claims for "removal costs" without making presentment at all.  33 U.S.C. § 2717(f)(2).  Therefore, even if Alabama had to make a pre-trial presentment (it did not, *see* Part B), and Alabama failed to properly present a claim (it did not, *see* Part C), this Court could still excuse Alabama's failure to jump through the procedural hoops of § 2713 before filing its present claims.

### B.  Alabama Was Not Required To Make an OPA Presentment Before Commencing Litigation.

The "jurisdictional versus mandatory" debate is largely irrelevant with regard to Alabama's claim because States do not have to present claims to the responsible party before filing a complaint. Three provisions are relevant here.

*33 U.S.C. § 2702*:  Section 2702(b) specifies two distinct types of recoveries: "removal costs" and "damages," such as lost profits, lost tax revenue, and property damage.  Relevant here, §2702(b)(1) limits the parties able to recover "removal costs" to "the United States, a State, or an Indian tribe."

*33 U.S.C. § 2713*:  Section 2713(a) states that "all claims for removal costs or damages shall be presented first to the responsible party."  Subsection (b), however, then makes an exception for claims for removal costs made by a State's Governor; that is, a State's removal costs need not be first presented to the responsible party.  Finally, subsection (c) states that if a victim makes a claim to the responsible party, and either "(1) each person to whom the claim is presented denies all liability for the claim, or (2) the claim is not settled by any person by payment within 90 days after the date upon which the claim was presented" . . . "the claimant

22

may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund."

*33 U.S.C. § 2717*:   Section 2717(f) provides OPA's statutes of limitation.   Subsection (f)(2) establishes a three-year limitation period for removal costs, then states, "[e]xcept as otherwise provided in this paragraph, an action may be commenced under this subchapter for recovery of removal costs at any time after such costs have been incurred."   In other words, a civil action for removal costs can be filed without presenting a claim to the responsible party. And, again, actions for removal costs under § 2702(b)(1) can only be brought by the United States, a State, or an Indian Tribe.

### 1. *Because Alabama Incurred Removal Costs, Alabama Was Not Required to Present a Claim to the Responsible Party Before Commencing Litigation.*

As sovereigns, States are different.   And OPA treats us differently.   Unlike private citizens and businesses, States can not only seek removal costs, 33 U.S.C. §  2702(b)(1), we can go straight to court to do so, without first presenting a claim to the responsible party.   33 U.S.C. §§  2713(b), 2717(f)(2).

Oil entered Alabama's waters on May 8, 2010.   At that moment, OPA provided that the State could march directly into court to sue the responsible parties under OPA for removal costs, without first presenting the responsible parties with an out-of-court claim under § 2713.   *See id.* And we did, three months later.   Both of Alabama's original complaints raised OPA claims for "all removal costs incurred by the State" that resulted from the Spill.   *See* Case No. 2:10-cv-04182, Doc. 1-1 at 17 (Complaint against BP); Case No. 2:10-cv-04183, Doc. 1-1 at 17 (Complaint against Transocean, *et al*).

On August 12, 2010 (the day we filed our initial complaints), OPA's plain text gave Alabama the right to sue each of the Defendants for OPA removal costs without first presenting a

claim to a responsible party, 33 U.S.C. § 2717(f)(2), and OPA's plain text also gave this Court jurisdiction to hear our claims. *See* 33 U.S.C. § 2717(b) (granting federal courts jurisdiction over controversies arising under OPA). And as we show in Part B(2), Alabama also had the right to raise its non-OPA claims (*e.g.* state-law claims) without first making a presentment. So, the Defendant's arguments that this Court had no jurisdiction over Alabama's original complaints, or its OPA claims, because Alabama had yet to make a presentment are meritless.

The Defendants' sole contention that is arguably supported by OPA's text is that Alabama had to first present a claim for "damages"—as opposed to "removal costs"—to a responsible party, and have that party reject our claim, before we could seek OPA damages in court. *See* 33 U.S.C. § 2713(c). But, as an initial matter, the argument that Alabama could not litigate "damages" under OPA without first presenting those damages to a responsible party in no way changes the fact that, under OPA's plain text, Alabama could sue for "removal costs" under OPA without presentment.

As a result, the Defendants' argument poses the seemingly absurd question: Does OPA require piecemeal resolution of Alabama's claims? Or, put another way, did Alabama have to wait for BP's answer to our damages claim(s) before we could sue BP for damages, even though we were simultaneously suing BP for removal costs and state law remedies? In *United States v. M/V Cosco Busan*, 557 F.Supp. 2d 1058 (N.D. Cal. 2008), a district court answered "no", there is no logical reason to read OPA to subject a sovereign to piecemeal litigation of damages and removal costs that arise from the same causes of action.

*Cosco Busan* involved the Federal Government's claims for damages and removal costs, which it sought via litigation filed before presentment. The *Cosco Busan* court first rejected the argument that the Government's failure to present meant that the court never had jurisdiction

over the Government's complaint because § 2717(f)(2) plainly allowed the United States' action for removal costs without presentment. *Id*. at 1060-61, 1063. The court then considered the follow-up question, "whether the Government's damages claims under the same OPA causes of action may proceed without first being presented to the Responsible Party?" *Id.* at 1062. In line with our argument, the court held that OPA does not require the functional equivalent of piecemeal litigation:

> Given that the removal costs and damages are both sought under the same OPA causes of action, it would be anomalous to permit the same claim to proceed for removal costs but not for damages. Requiring such a course of conduct would seemingly have no impact on the final result and would instead create extra, unnecessary steps in the recovery process. For example, if the damages aspect of the OPA causes of action were to be dismissed or stayed, the parties would still litigate the removal costs and the Court would issue a judgment. This judgment would then be binding on Defendants for the subsequent damages. *See* 33 U.S.C. § 2717(f)(2) (stating that in an action for recovery of removal costs, "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages"). With this judgment, the Government would then seek the damages, either directly from the responsible party or through a return trip to the Court.
>
> In the interest of judicial economy, the Court will permit the damages claims to proceed with the removal costs claims. Defendants have offered no reason why this should not be the case and a contrary decision would frustrate, rather than further, the primary purpose of OPA, which is to streamline the recovery process for oil spill damages and cleanup costs.

*Id.* at 1062-63. As the *Cosco Busan* court correctly noted, it makes not a whit of sense to litigate a State's OPA claims to provide remuneration of only "removal costs," which §2717(f)(2) plainly allows a State to do, when the successful State can simply turn around and use his success on the same claim to recover damages at a later date. Why not simply handle them all at the same time?

In summary, OPA plainly allowed Alabama to file its original August 12, 2010 complaint raising OPA claims to seek removal costs, without first making a presentment. OPA also gave

this court jurisdiction to hear our OPA claims.  Thus, the Defendants' argument that the Court had no jurisdiction over Alabama's complaint as a whole, or our OPA claims particularly, is meritless.  As for the question of whether Alabama could include claims for OPA damages, in addition to removal costs, we ask the Court to adopt the sensible reading forwarded by the *Cosco Busan* court:  Once a State can file suit under OPA for removal costs, the State can seek all available OPA remedies without prior need of presentment.

### 2.  *Alabama Did Not Have to Present Non-OPA Claims Before Filing Suit.*

To be clear, even if OPA required Alabama to present the responsible parties with claims for removal costs and damages before filing a complaint containing OPA claims, OPA did not require Alabama to present its *non-OPA* claims before filing suit.  *See Williams v. Potomac Elec. Power Co.*, 115 F.Supp.2d 561, 565 & n.3 (D. Md., 2000).  We could raise our state law claims at any time.  Accordingly, dismissal for want of jurisdiction over Alabama's original August 12, 2010 complaint as a whole is unwarranted because Alabama had the ability to file its state law and general maritime law claims without presentment, and thus this Court always had jurisdiction to hear Alabama's complaints.

### 3.  *Only BP Has Standing to Raise the Presentment Argument.*

Finally, while it may be a meritless defense, only BP has standing to assert a presentment defense.  Section 2713 only requires victims to present claims to "responsible parties" under OPA.  Thus, Alabama could sue the non-RP Defendants from the outset, as they did not have a procedure for presenting claims.

As for the remaining Defendants who were designated responsible parties, but did not establish a claims procedure as required by 33 U.S.C. § 2705(a), their arguments that Alabama's claims against them should be dismissed for failure to present should fall on deaf ears.  A

responsible party should not be allowed to shirk its responsibility under OPA, and then use its irresponsibility as a defense to liability.  While we have serious concerns with it, BP did set up the only functioning claims procedure; thus, only BP should be allowed to complain that a Plaintiff failed to utilize it.

### C.  Alabama Made A Proper Presentment.

While Alabama did not have to meet § 2713's presentment requirement before filing our complaints on August 12, 2010, we did, as explained below.

### 1.  *OPA Requires Presentment of a Single Claim before Commencing Litigation.*

First, we dispel the argument that *all* claims for OPA damages must be presented and rejected before litigation can be commenced.   One practical reason to reject the "all damages" argument leaps out:  Our damages are still on-going; thus, it is impossible to this day to have presented them all.  With statutes of limitations and monitions dates, there must be some point in which presentment has been satisfied and the courthouse doors are opened.  As OPA's plain text shows, the opening date is after *any one* claim has been rejected by the responsible party.

Section 2713 provides, in relevant part,

a) Presentation

Except as provided in subsection (b) of this section, all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source designated under section 2714(a) of this title. . . .

(c) Election

If a claim is presented in accordance with subsection (a) of this section and--

(1) each person to whom the claim is presented denies all liability for the claim, or

(2) the claim is not settled by any person by payment within 90 days after the date upon which (A) the claim was presented, or (B) advertising was begun pursuant to section 2714(b) of this title, whichever is later,

27

Case 2:10-md-02179-CJB-DPC   Document 3203   Filed 07/08/11   Page 36 of 77

> the claimant may elect to commence an action in court against the responsible
> party or guarantor or to present the claim to the Fund.

33 U.S.C. §§ 2713(a), -2713(c).  We agree with the Defendants that, for a claimant who must comply with § 2713, two conditions must be met before litigation is commenced:  (1) present a claim and (2) have the claim be rejected, either expressly or by not being fulfilled within 90 days.

But the next part of the statute is crucial:  Once the claim is rejected in either way, "the claimant may elect to commence an action in court against the responsible party."  *Id.* at § 2713(c).  Nothing in OPA's limits the claimants' action to rejected claims.  OPA says the rejected claimant "may elect to commence an action," period.  Rejection opens the courthouse doors, and nothing in OPA's text prevents the empowered litigant from raising any and all OPA claims that he may have.  The Defendants, who trumpet § 2713's plain text, point to no text that provides otherwise.

And, if they are candid, the Defendants must acknowledge how procedurally absurd claim-by-claim litigation would be.  Under the Defendants' theory, a claimant apparently must either file a new complaint, or amend his original complaint, every time another claim is rejected by a responsible party.  For a State, that could happen dozens of times while the case is pending, as our compensable damages and removal costs are numerous and still on-going—more than a year after the Spill.  And when a 1-year monitions date and 3-year statute of limitation are thrown into the mix, it becomes impossible to present and have rejected every damages claim before the clock runs out, because many damages claims will not ripen or reveal their full extent until after the relevant deadline(s).

Accordingly, OPA's plain text, and judicial efficiency/fairness, require that only *one* claim be presented and rejected before a claimant may initiate full-fledged litigation.

### 2. *Alabama Presented Multiple Claims to BP before Commencing Litigation.*

Despite not having to, *see* Issue II(B), Alabama met § 2713's presentment standard. Applying BP's interpretation of § 2713—*i.e.* (1) presentation of a sum-certain claim, (2) documentation, and (3) rejection—Alabama met the presentment requirement before filing its initial complaints on August 12, 2010.  For example, the Alabama Emergency Management Agency (a State agency) presented BP with a sum-certain claim of $30,785.27 for Spill-related losses.  On or about June 30, 2010, BP paid only $13,663.57, rejecting the balance.  At that point, the State had the right to commence litigation for the remaining amount because we properly presented a sum-certain claim to a responsible party, with documentation, and the responsible party rejected it—at least a majority portion of it—before we filed our initial complaints.[4]

Furthermore, Alabama clearly meets the presentment requirement if §2713 is applied against the filing of our First Amended Complaint—*i.e.* the Complaint at issue here.  We presented BP with multiple claims before filing our original complaints on August 12, 2010, including a $100+ million claim for economic losses, that BP rejected shortly after we filed suit.  There can be no question that these pre-litigation presentments were denied months before April 5, 2011, when we raised the same claims in the Amended Complaint at issue here.

---

[4] The Defendants' arguments that Alabama's OPA claims must be dismissed because we did not plead the details of our claims to BP in our amended complaint is a red herring.  Presentment is a procedural rule, not a cause of action.  We pleaded that we had satisfied it.  Amended Complaint at ¶ 217.  Nothing more was required, and presentment is a pleaded fact that must be accepted in the light most favorable to Alabama.  Of course, should the Court require additional briefing or offer of proof, the State stands ready with supporting documentation.

**D. Alabama Is Willing to Voluntarily Dismiss Its OPA Claims Without Prejudice, Then File Them Anew, If The Responsible Parties Will Stipulate That Filing the Claims Anew Satisfies § 2713.**

To be clear, Alabama met § 2713's requirements before commencing litigation, even though we did not have to.  *See* Issues (II)(B-C).   Plus, this Court has the power to excuse any presentment shortfalls because § 2713 is not jurisdictional.  *See* Issue II(A).

That said, this is an unnecessary battle benefits no litigant.  Arguing over Alabama's presentment is, quite frankly, absurd because the "remedy" for Alabama's alleged failure(s) is to simply have us dismiss our OPA claims, without prejudice, and turn around and (re)file them the next day—because there is no question that Alabama has presented multiple claims to BP that satisfy § 2713 since filing our original complaint 11 months ago.

So, perhaps an alternate solution should be considered. In the interests of advancing this litigation and avoiding unnecessary complexity, Alabama may well be willing to voluntarily dismiss its OPA claims, without prejudice, and then promptly re-file them, on two conditions:

1. The responsible parties state on the record, either at oral argument or in their reply brief(s), exactly how Alabama can remedy its alleged presentment failure, without prejudice, and

2. The responsible parties stipulate that Alabama's compliance with their proposed dismissal and refiling procedure satisfies § 2713.[5]

Again, we do not make this offer as an admission that the Defendants are legally correct.  We believe them to be wrong, as explained above and in the PSC and Louisiana's previous filings.  We suggest this solution simply to eliminate further argument and to advance the litigation interests of all parties.

---

[5] We add Point #1 so that the responsible parties will tell the Court and Alabama whether we must dismiss without prejudice (a) just our OPA damages claims, (b) all of our OPA claims (damages and removal costs), or (c) our entire complaint (including non-OPA claims), to cure the alleged defect.

### III.   Alabama Need Not Prove Direct Physical Damage under *Robins Dry Dock* to Raise Viable Claims.

In maritime law, *Robins Dry Dock & Repair Co. v Flint,* 275 U.S. 303 (1927) stands for the proposition that, absent personal injury or damage to physical property in which the plaintiff has some proprietary interest, no duty is owed to a plaintiff that suffers only economic loss as a result of the alleged wrongful act.   *See also State ex rel Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985) (*en banc*).   The Defendants rely on *Robins Dry Dock* to limit Alabama's recovery.

But, as outlined below, neither OPA nor Alabama law require the State to prove direct physical damage to property or personal physical injury to assert a valid claim for economic damages.   We simply need to prove "but for" causation.   *See* Issue IV.   And while general maritime law may possess a direct physical damage requirement, the *Robins Dry Dock* rule does not apply to Alabama's maritime law claims in this case.

#### A.   The *Robins Dry Dock* Rule Does Not Apply to OPA Claims.

OPA's text eliminates the *Robins Dry Dock* rule:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).   First, OPA states that a responsible party "is liable"—strictly, jointly, and severally—to any claimant, not just property owners. *Id.; see also* 33 C.F.R. 136.231(a) ("The claimant need *not* be the owner of the damaged property or resources to recover for lost profits or income") (emphasis added).   *Id.*   Second, in addition to damages arising from the destruction of real property (*i.e. Robins Dry Dock*), *id.* at § 2702(b)(2)(B), OPA allows recovery for

31

numerous other types of damages "that result from such incident," including lost use of natural resources, *id.* at § 2702(b)(2)(C), lost tax revenues, *id.* at § 2702(b)(2)(D), lost earning capacity, *id.* at § 2702(b)(2)(E), and the increased costs of public services, *id.* at § 2702(b)(2)(E).  In other words, OPA statutorily eliminates *Robins Dry Dock's* limitation on damages claims.  *See* Francis J. Gonyor, *The Robins Dry Dock Rule: Is the 'Bright Line' Fading?* 4 U.S.F.Mar.L.J. 85, 95 (1992) ("OPA allows any injured party to recover for any damage which was the result of the pollution incident, whether or not the party has a financial interest in the property affected, whether or not the party is a coastal dweller or lives inland, and whether or not the damage is direct or indirect, pecuniary or not.")

### B.  Alabama State Law Does Not Recognize *Robins Dry Dock* in the Form of an "Economic Loss Rule."

Calling it the "economic loss rule," the Defendants try to graft *Robins Dry Dock* onto Alabama's state law claims.  Although the Defendants have cited to the holdings of federal courts in Alabama that have applied the *Robins Dry Dock* rule in *federal maritime cases*, they have not cited an Alabama decision that has extended the *Robins Dry Dock* economic loss rule to claims brought under Alabama *state* law.

To our knowledge, Alabama courts have never held (much less currently hold) that Alabama state law recognizes the *Robins Dry Dock* bright line rule.  Alabama law does not require physical damage to a proprietary interest in order to assert a claim for economic loss.

The Alabama state court decisions cited by Transocean (Doc. 2655 at 29) do not embrace a *Robins Dry Dock* type of rule.  *See Lloyd Wood Coal Co. v. Clark Equipment Co.*, 543 So. 2d 671 (Ala. 1989); *see also Harris Moran Seed Co, Inc. v. Phillips*, 949 So. 2d 916 (Ala. Civ. App. 2006).  Both the *Lloyd Wood Coal* and *Harris Moran* decisions dealt with claims for damage to a defective product.  These cases do not stand for the proposition that Alabama law will

automatically reject claims for economic loss absent physical damage to a proprietary interest.

Again, no Alabama court to our knowledge has adopted such a rule with respect to claims

brought under Alabama law, nor have the Defendants cited one.

### C. The *Robins Dry Dock* Rule Should Not Apply to Alabama's General Maritime Claims.

As shown above, *Robins Dry Dock* does not apply to Alabama's OPA claims or its state

law claims.  So all that is left is the rule's original target: general maritime claims.  While *Robins*

*Dry Dock* may still limit general maritime claims in some cases, the rule should not apply to

Alabama's maritime claims in this case for various reasons.

*CERCLA*:   Just one year after the Fifth Circuit's decision in *TESTBANK,* Congress

amended the Comprehensive Environmental Response, Compensation and Liability Act of 1980

("CERCLA," also known as "The Superfund Act"), 42 U.S.C. § 9601, *et seq.* as follows:

> *The owner or operator of a vessel shall be liable* in accordance with this
> section, *under maritime tort law,* and as provided under section 9614 of
> this title *notwithstanding* any provision of the Act of March 3, 1851 (46
> U.S.C. 183ff)[which is "The Limitation of Liability Act"] or *the absence
> of any physical damage to the proprietary interest of the claimant*.

42 U.S.C. § 9607(h) (emphasis added).  In short, CERCLA ensures liability under maritime lae

regardless of the existence of physical damage to the claimant's property interest.

Granted, the State has not asserted claims under CERCLA in its First Amended

Complaint.   But some commentators have suggested that these statutory amendments were

intended to alter not only claims brought under the Superfund Act, but claims brought under the

general maritime law.   For example, one commentator has indicated that these legislative

pronouncements were intended to implicitly overrule *Robins Dry Dock* and *TESTBANK*:

> The subsection can be understood to mean that the requirement of physical
> injury to a proprietary interest and the Limitation of Liability Act are
> inapplicable in three situations: (1) actions brought under section 9607 of
> CERCLA, namely the Act's liability provisions; (2) *actions brought under*

*the general maritime law*; and (3) actions brought under state law pursuant
to the authority of section 9614 of CERCLA.

S. Olssen, *Recovery for the Lost Use of Water Resources: M/V TESTBANK on the Rocks?*
67 Tul. L. Rev. 271, 300 (1992) (emphasis added).

The legislative history of CERCLA's amendment backs up this reading.  The current version of § 9607(h) was part of Amendment 671, introduced as part of the Superfund Amendments and Reauthorization Act of 1986.  The relevant part of the Amendment provides: "Section 107(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 is amended by inserting 'under maritime tort law,' after 'with this section' and by inserting before the period 'or the absence of any physical damage to the proprietary interest of the claimant.'"  Pub. L. No. 99-499, 94 Stat. 2767 (October 17, 1986).  The House Report issued on October 3, 1986 explained as follows concerning the Amendment: "Section 107 of CERCLA is amended to clarify that a vessel owner would be liable in accordance with section 107 under maritime tort law and that physical damage to the proprietary interest of the claimant is not required as a condition of liability."  H.R. Rep. No. 99-962, at 56 (1986) (Conf. Rep.), as reprinted in 1986 U.S.C.C.A.N. 3068, 3352.

In short, both commentators and the legislative history suggest that CERCLA legislatively abrogated the *Robins Dry Dock* rule for maritime claims.  No court, to the State's knowledge, has specifically addressed this argument and held to the contrary.

*Privity*:  To be honest, the full extent and boundaries of the *Robins Dry Dock* rule is not clear in any circuit.  But there is one relevant distinction to be made between this case and *Robins Dry Dock*. Unlike the situation presented in *Robins Dry Dock*, the State does not complain that a party in contractual privity with it was injured by the acts of Defendants, which

34

in turn caused the State's damage.  Instead, the State seeks recovery for the torts committed by Defendants that have caused direct, albeit economic, harm.

As Judge Clark explained in his special concurrence in *Hercules Carriers, Inc. v State of Florida*, 720 F.2d 1201, 1203 (11th Cir. 1983), vacated and affirmed by equally divided *en banc* court*, 728 F.2d 1359 (11th Cir. 1984), *Robins Dry Dock* should be construed to apply only in cases where the plaintiff is damaged because of injury to a party *in privity* with the plaintiff. Judge Clark's succeeded in having the court consider the privity issue *en banc*, but came up one vote short, with the entire court being evenly split on the issue.  *Id.*   The facts here make a far more compelling case for confining *Robins Dry Dock* to its original privity boundaries, in which case the doctrine would not apply here.  Hence, even if the Court were of the opinion that *Robins Dry Dock* has not been overruled by statute, it should still be held inapplicable.

*Intentional Torts*:  Finally, the Fifth Circuit's *TESTBANK* decision is applicable only to unintentional maritime torts.  *See TESTBANK,* 752 F.2d at 1020 ("[w]e are asked to abandon physical damage to a proprietary interest as a prerequisite to recovery for economic loss in cases of unintentional maritime tort.  We decline the invitation.").  In footnote 1 of its opinion, the circuit court stated that it was not addressing "intentional torts or ultrahazardous activity, such as blasting."  *Id*. at n. 1.

To the extent that Defendants are found to have engaged in the willful or intentional misconduct we allege in our First Amended Complaint, the Defendants cannot rely on *TESTBANK* to shield them from liability for damages for economic loss.  Moreover, deepwater drilling qualifies as ultrahazardous activity, as it creates a high degree of risk to persons, land and chattels, and poses special and different challenges not faced on land or in shallow water. Accordingly, because the Defendants have engaged in willful conduct and the activity in which

Defendants were engaged qualifies as ultrahazardous, *TESTBANK* is inapplicable here and the State is entitled to recover for its economic losses under maritime law.

* * *

To summarize, the *Robins Dry Dock* rule does not apply, whatsoever, to Alabama's OPA claims or our state law claims. The rule's application (if any) is confined to claims under general maritime law, and there are at least three reasons why it should not apply to Alabama's maritime claims in this case: (1) statutory eradication in CERCLA, (2) a lack of privity, and (3) the intentional and ultrahazardous nature of the Defendants' actions.

## IV.   OPA and the AWPCA Require "But For" Causation, Not Proximate Cause.

Both the PSC and Louisiana ably tackled OPA's "but-for versus proximate cause" argument previously, so we will not duplicate their efforts here. *See* Docs. 1822 at 66-74 (PSC); 1993-1 at 43-53 (Louisiana). We adopt the PSC's prior argument in whole, to the extent that it does not conflict with an argument made herein.

In short, Congress rejected strict causation standards when drafting OPA, choosing instead to make a responsible party liable for removal costs and damages "that result from such incident." 33 U.S.C. § 2702(a). "That result from" is simply another way to say "but for." And OPA defines "incident" as "any occurrence or series of occurrences having the same origin . . . resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14). So, to be entitled to relief under OPA, a claimant merely needs to prove that he would not have suffered removal costs or damages "but for" the Macondo Well blowout and resulting Spill (*i.e.* the "incident")—not the stricter, legalistic "proximate cause" standard advanced by the Defendants.

The same "but for" standard holds true for Alabama's Water Pollution Act, which utilizes similar "resulting from" language: "The commission, the Attorney General or any district attorney may commence a civil action for damages for pollution of the waters of the state including, but not limited to, any reasonable costs to prevent, minimize or clean up *any damage resulting from pollution resulting from the wrongful act, omission or negligence of a person*." Ala. Code § 22-22-9(m) (emphasis added).

In short, the Defendants' attempts to graft a "proximate cause" requirement onto Alabama's claims under OPA or Alabama law are meritless. As long as the State can prove that we would not have suffered the claimed damages but for the Macondo explosion and resulting Spill, we are entitled to relief.

### A. The Recent Supreme Court Decision in *CSX v. McBride* Supports the "But For" Reading of OPA and the AWPCA.

Since the last round of briefing, the Supreme Court issued *CSX Transp. Inc v. McBride*, __ U.S. __, 2011 WL 2472795 (June 23, 2011). At issue was the appropriate jury instruction for FELA's causation standard: Carriers are liable for injuries "resulting in whole or in part from [carrier] negligence." *Id.* at *3 (quoting 45 U.S.C. § 51). The trial court gave the following, broad causation instruction at the request of the victim: "[The] Defendant 'caused or contributed to' Plaintiff's injury if Defendant's negligence played a part—no matter how small—in bringing about the injury." *Id.* at *4.

On certiorari review, CSX argued that the broad "played a part—not matter how small" instruction was too narrow; that the court should have instead given a proximate cause instruction. Familiar here, CSX argued that the trial court's "'any part' instruction opens the door to unlimited liability . . . *inviting juries to impose liability on the basis of 'but for' causation*." *Id.* at * 10 (emphasis added).

The Supreme Court rejected CSX's argument, affirming the trial court's use of the broader, as CSX put it, "but for" instruction, rather than a proximate cause instruction. Telling here, in rejecting the call to graft a "proximate cause" requirement into the statutory phrase "resulting in whole or in part from negligence," the Court stated,

> Congress, it is true, has written the words "proximate cause" into a number of statutes. But when the legislative text uses less legalistic language, *e.g.,* "caused by," "occasioned by," "in consequence of," or, as in FELA, "resulting in whole or in part from," and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate-cause formulations

*Id.* at * 11.

Alabama's Water Pollution Control Act employs the same "resulting from" standard as FELA. So, applying *McBride*, Alabama state law also employs the broader "but for" test, as opposed to a proximate cause test.

FELA's "resulting from" and OPA's "that result from" causation standards are nearly identical. Accordingly, if FELA's "resulting from" causation standard is broader than proximate cause, then by the same token, OPA's "that result from" standard is broader than proximate cause. Or, put another way, if FELA's "resulting from" causation standard is a "but for" test, then OPA's "that result from" standard is a "but for" test as well.

**B. Alabama Raised Viable Claims for Damages Based on the Moratorium.**

Alabama included claims for damages sustained as a result of the Moratorium on all new and existing deepwater drilling in the Gulf of Mexico. *See* First Amended Complaint, ¶¶ 87-92. Transocean asserts that these claims must be dismissed for failure to state a claim under OPA, because the imposition of the Moratorium was a "superseding" cause of damage that it could not reasonably have foreseen. Transocean Memo in Support of Motion to Dismiss at 33.

The PSC previously dealt with this argument in great detail, and we adopt that argument. *See* Doc. 1822 at 66-74.  We briefly highlight it below.

Transocean's argument essentially has two parts.  First, by arguing that the Moratorium was a "superseding" cause of the claimed damages, TO is arguing that the Macondo Well explosion and the resulting spill were not the proximate cause of the claimed "Moratorium damages"—the Moratorium was.  But as we explained above, both OPA and the AWPCA employ the broader "but for" causation standard.  Using this standard, the moratorium damages would not have happened "but for" the Macondo explosion and resulting Spill; thus, recovery is available.  We pleaded our claim that way.  *See*, *e.g.*, First Amended Complaint at ¶90 ("The imposition of the Moratorium was the direct result of the Defendants' actions in causing and/or contributing to the blowout, explosion, fires, and Spill.").  Thus, our claim is not subject to summary dismissal on the pleadings.

As for Transocean's "foreseeability" argument, we deny it.  TO could reasonably foresee a shutdown of economic activity in the Gulf after a massive oil spill.  But more to the issue at hand, foreseeability is a factual issue that, as pleaded, must be accepted as true for Rule 12 purposes, and should ultimately be determined by a judge or jury, not disposed of on a motion to dismiss.  *See* 57A Am.Jur.2d *Negligence* §602 ("Generally, the determination of whether an intervening act was foreseeable or could have been reasonably anticipated is a question of fact for the jury or trier of fact.")

**C.  Alabama Raised Viable Claims for "Stigma Damages."**

The Defendants similarly complain that Alabama cannot claim "stigma damages"—*i.e.* damages, such as lost tax revenues, which arose because of a public perception that Alabama's beaches and our commercial seafood were covered in oil.  The PSC outlined and cited, in great

detail, examples of the OPA Congress' intent to compensate "stigma" type losses after the *Exxon Valdez*, and we adopt their citations and argument here. *See* Doc. 1822 at 70-72 & n.42-48.

Briefly, this is another attempt to graft a proximate cause requirement onto OPA's "but for" test. "But for" the Macondo Well explosion and resulting oil spill, Alabama would not have lost hundreds of millions of dollars in tax revenue, etcetera, because people quit coming to our beaches and frequenting our coastal businesses. The question of whether this lost income was, in fact, tied to the oil spill is a factual issue that the Defendants can challenge to a jury or this Court on a later date. But, for now, the Defendants must accept our pleaded facts as true for Rule 12 purposes, and because stigma damages "result[ed] from" the explosion and resulting Spill, dismissal on the pleadings is inappropriate.

**V.     None of Alabama's State Law Claims Are Subject to Dismissal.**

The Defendants attack the State's claims for relief under Alabama statutes and Alabama common law. Before we address why their motions should be denied, we begin with an important point: Alabama is seeking damages for what occurred in our waters, and on our land, and in our air, not just what happened beyond our borders.

   **A.  Alabama Seeks Enforcement Of Its Laws For Violations Occurring Within Its Territorial Boundaries.**

BP complains that the State cannot enforce its environmental statutes beyond its territorial limits absent explicit authority in the statutes to do so. *See* BP Memo in Support of Motion to Dismiss at 32-33. But, to be clear, the State does not seek to give its statutes "extraterritorial effect." Our complaint seeks to penalize the Defendants for their damage of *Alabama's* water, *Alabama's* land, and *Alabama's* air, in violation of Alabama law—not to penalize the Defendants for their pollution of extraterritorial waters.

Exerting our inherent police powers, Alabama's environmental statutes empower the State to assess penalties for the pollution of its water, land, and air without regard to the original source of the pollution.  The AEMA authorizes the Attorney General to commence civil actions against any person to recover civil penalties for violations of the AWPCA, AAPCA, AHWMA, and ASWDA.     Ala. Code § 22-22A-5.  The State Legislature's intent in enacting the AEMA was "to retain for the state, within the constraints of appropriate federal law, *the control over its air, land and water resources* and to secure cooperation between agencies of the state, agencies of other states, interstate agencies and the federal government in carrying out these objectives."  Ala. Code. § 22-22A-2(2) (emphasis added).

The language of the AWPCA, AAPCA, AHWMA, and ASWDA demonstrates that the State Legislature intended to regulate pollution and contamination of Alabama's air and water, regardless of the location of the source of the pollution.  The AWPCA defines the term "discharge" as the "*addition, introduction*, leaking, spilling or emitting of any sewage, industrial waste, pollutant or other wastes *into waters of the state*."  Ala. Code § 22-22-1(b)(8) (emphasis added). The AWPCA defines "waters of the state" as "all waters of any …coastal water…wholly or partially within the state."  Ala. Code § 22-22-1(b)(2).  The AAPCA defines "air pollution" as "[t]he *presence in the outdoor atmosphere* of one or more air contaminants in such quantities and duration as are, or tend to be, injurious to human health or welfare, animal or plant life or property or would interfere with the *enjoyment of life or property throughout the state and in such territories of the state as shall be affected thereby*.  Ala. Code § 22-28-2(1) (emphasis added).  The ASWDA defines "discharge" as "[t]he accidental or intentional spilling, leaking, pumping, emitting, emptying, or dumping of solid waste, including leachate, into or on *any land or water*.  Ala. Code § 22-27-2(7) (emphasis added). The AHWMA defines "disposal" as "[t]he

41

discharge, deposit, injection, dumping, spilling, leaking or placing of any hazardous waste *into or on any land or water so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.* Ala. Code § 22-30-3 (4) (emphasis added).

As the italicized language demonstrates, each of the foregoing statutes evidence the Legislature's intent to establish a statutory scheme that allows the State to exercise its authority over out-of-state activities that have adverse effects inside Alabama's borders.   BP's assertion that Alabama's environmental statutes are inapplicable here should therefore be rejected.

**B. Alabama Has Stated A Claim Under The Alabama Environmental Management Act.**

M-I's argument that the State of Alabama is not a proper plaintiff under the AEMA is baseless.   "The Attorney General shall represent the department in any and all legal actions brought by the department to enforce any provisions of this chapter."   Ala. Code § 22-22A-5 (12).  The Attorney General represents the Department.  The Department is the State.

Also, contrary to M-I's argument, nothing in the AEMA prevents the Attorney General from bringing suit under the AEMA in federal court. The AEMA provides that "[n]othing in this subdivision shall be construed so as to impair the authority of the Attorney General to independently enforce the provisions of this chapter."  Ala. Code § 22-22A-5(12).  Hence, the Attorney General is empowered to enforce the provisions of the AEMA, and nothing within AEMA, including the place of filing, impair his authority.  Furthermore, the statute uses the permissive "may," as opposed to the mandatory "shall," meaning that filing in state court is not mandatory under the AEMA.  *See, e.g., Malsch v. Bell Helicopter Textron, Inc.,* 916 So2d 600, 606 (Ala. 2005).

42

Further, the State does not seek a "double recovery" against M-I.  The State is permitted to allege Defendants' violation of every statute that is applicable to Defendants' conduct, which it has done. M-I has violated each of the statutes as alleged in the First Amended Complaint, and M-I has not been subjected to "jeopardy" through punishment in a criminal prosecution.

Equally unavailing is M-I's argument that the State has failed to plead facts supporting the factors to be considered in the assessment of a civil penalty up to $25,000 per violation under Ala. Code § 22-22A-5(18)(c).  This is not an issue properly decided in the context of a Rule 12 motion.   In any event, Amended Complaint provides great detail concerning the harm to the environment and the health and safety of the public caused by the Spill, warranting a civil penalty of $25,000 per violation.

### C.  Alabama Has Stated A Claim Under Its Water Pollution Control Act.

BP complains that the "passive migration" of oil into the State's territorial waters from the Outer Continental Shelf is not a "discharge" under the AWPCA.  It argues that because the "discharge" did not take place in State territorial waters, Alabama cannot assess penalties under the AWPCA.

In support of its argument, BP cites cases that address the meaning of the term "disposal" under CERCLA, which is inapposite because the terms are different.  *See* BP Memo in Support of Motion to Dismiss, p. 34.  The term "discharge" is defined in the AWPCA as the "*addition, introduction*, leaking, spilling or emitting of any sewage, industrial waste, pollutant or other wastes *into waters of the state*."  Ala. Code § 22-22-1(b)(8) (emphasis added).   The definition of different term "disposal" under CERCLA, does not include the terms "addition" or "introduction" that are employed in the definition of the term "discharge" in the AWPCA. *See* 47 U.S.C. § 6903(3).  BP's CERCLA-based argument is, therefore, pointless here.

Further, the AWPCA defines "waters of the state" as "all waters of any …coastal water…wholly or partially within the state."  Ala. Code § 22-22-1(b)(2). The Gulf of Mexico is partially within the state of Alabama.  The State does not seek to regulate waters beyond its territory.  Instead, it seeks penalties for the pollution of the waters of the State, which includes that portion of the Gulf of Mexico within the State's territory.  The AWPCA allows the State to assess penalties for violations within its state territorial waters and, accordingly, BP's argument that it does not permit the penalties and civil damages claimed in the Amended Complaint is without merit.

BP complains further that the State cannot multiply penalties by subdividing Alabama's bodies of water that BP polluted and attaching a civil penalty to each body of water.  *See* BP Memo in Support of Motion to Dismiss at 35.  BP misreads Alabama law.

The AWPCA provides that "[a]ny civil penalty assessed or recovered . . . shall not be less than $100 or exceed $25,000 for each violation, provided however, that the total penalty assessed in an order issued by the department . . . shall not exceed $250,000. Each day such violation continues shall constitute a separate violation. . . ." Ala. Code § 22-22A-5(18)(c).

In *Alabama Dep't of Envtl. Management v. Wright Bros. Constr. Co.*, 604 So. 2d 429, 432-433 (Ala. Civ. App. 1992), the state civil appeals court held that it is clear from the language of this section that the State is not statutorily limited to one violation per day when it imposes civil penalties on those violating the AWPCA.  *Id.* at 432. The Court explained that "every time discharges . . . resulted in new or increased pollution," this section was violated.  *Id.*  Therefore, the assessment of multiple violations within a 24-hour period was not contrary to the language contained in § 22-22A-5(18)(c) or § 22-22-9(i)(3) (requiring a permit prior to discharging pollution into the waters of the State).

44

Likewise, here, the State is not limited to the assessment of one violation per day; we can seek penalties for *new or increased* pollution for each body of water affected by the pollution caused by the Defendants.  Each polluted body of water was an *addition* to the pollution the Defendants caused.  BP's attempt to limit the State to the assessment of one violation per day for "all" of the waters of the State pursuant to § 22-22-1(b)(2) is not supported by the statute's plain language or the state court's decision in *Wright Bros., supra.*

BP asserts, erroneously, that penalties cannot be imposed under the AWPCA beyond July 10, 2010, when the Macondo well was capped.  *See* BP Memo in Support of Motion to Dismiss at 38.  Under BP's theory, if BP had capped the Macondo well before any oil had entered Alabama's waters, Alabama would have no remedy at all for any oil that thereafter polluted Alabama's beaches, estuaries, lands, and waters, an obviously ridiculous result that could not possibly have been intended by lawmakers enacting the AWPCA.  In support of its argument, BP cites *Payton v. Monsanto Co.,* 801 So.2d 829 (Ala. 2001), an inapposite case addressing the question of continuing violations in the context of the defendant's statute of limitations argument.  BP's violations did not stop when the well was capped.  Each day of "new and increased pollution" into the "waters of the state" is a separate violation under the AWPCA, regardless of when BP finally capped the Macondo well.  *See Wright Bros., supra.*  Simply put, if BP's oil is still flowing into Alabama's waters, BP is still violating Alabama law.

M-I argues that the "AWPCA authorizes damages, Ala. Code § 22-22-9(m), but nowhere mentions civil penalties."  *See* M-I Memo in Support of Mot. to Dismiss at 24.  This is incorrect. Under Alabama law, the Department of Environmental Management [ADEM] is vested with the discretion to "assess [] *a civil penalty* to any person who violates" various environmental statutes, including those pertaining to water pollution. Ala. Code 1975, § 22–22A–5(18)(a). Such

a penalty, if imposed, "shall not be less than $100.00 or exceed $25,000.00 for each violation," subject to a $250,000 total, and each day that a violation continues is deemed, under Alabama law, to be a separate violation. Ala. Code § 22–22A–5(18)(c) (emphasis added);  *Alabama Dept. of Envtl. Mgmt. v. Friends of Hurricane Creek*, No. 2090633, 2011 WL 1334390 (Ala. Civ. App. Apr. 8, 2011).

### D.  Alabama Has Stated A Claim Under The Alabama Air Pollution Control Act.

M-I argues that the "AAPCA is a criminal statute and provides no civil cause of action. Alabama cannot state a civil claim for violating AAPCA." *See* M-I Memo in Support of Mot. to Dismiss at 26.  The AAPCA provides:

> Any person who knowingly violates or fails or refuses to obey or comply with this chapter, or any rule or regulation adopted thereunder, or knowingly submits any false information under this chapter, or any rule or regulation thereunder, including knowingly making a false material statement, representation, or certification, or knowingly rendering inaccurate a monitoring device or method, upon conviction, shall be punished by a fine not to exceed ten thousand dollars ($10,000) for the violation *and an additional penalty not to exceed ten thousand dollars ($10,000) for each day thereafter during which the violation continues* and may also be sentenced to hard labor for the county for not more than one year.

Ala. Code § 22-28-22 (a) (emphasis added).  Plainly, civil penalties are available under the AAPCA.  While the State can seek criminal penalties, nothing in this section forces the State to seek *only* criminal penalties.  Civil penalties are also available for violations of the AAPCA pursuant to the AEMA. Ala. Code § 22-22A-5(18)(b).  Therefore, M-I's argument that civil penalties are not available for violation of the AAPCA is meritless.

### E.  Alabama Has Stated A Claim Under The Alabama Hazardous Wastes Management Act.

M-I similarly contends that the AHWMA is a criminal statute providing no civil cause of action.  *See* M-I Memo in Support of Mot. to Dismiss at 26.  The AHWMA provides that any person who

> violates any provision of this chapter, any rule or regulation promulgated by the department, any provision of any permit issued by the department or any provision of any order issued under this chapter shall, upon conviction, be subject to a term of imprisonment of not more than 10 years nor less than one year and one day and in addition, may be fined not more than $50,000.00 for each violation; provided that if the conviction is for a violation committed after a first conviction of such person, under this chapter, such person shall be subject to a term of imprisonment of not more than 20 years nor less than two years and in addition, may be fined not more than $100,000.00 for each violation. Each day such violation continues shall constitute a separate violation for purposes of this subsection."

Ala. Code § 22-30-19(e)(6).  This section does not foreclose civil penalties under the AHWMA.

Also, penalties are available for violation of the AHWMA pursuant to the AEMA. Ala. Code § 22-22A-5(18)(b).

### F.   Alabama Has Stated a Claim Under the Alabama Solid Waste Disposal Act.

M-I argues that the "ASWDA does not authorize recovery of civil penalties."  Granted, the Act provides that any person violating it "shall be guilty of a misdemeanor and, upon conviction, shall be fined." Ala. Code § 22-27-7 *See* M-I Memo in Support of Mot. to Dismiss at 27.  But the ASWDA goes on to provide that "[i]n addition to any penalties lawfully assessed, any person committing a *violation shall be liable for all costs of abatement of any pollution and correction of any public nuisance caused by the violation*." Ala. Code § 22-27-11(a) (emphasis added).

M-I and BP wrongly contend that oils and dispersants do not meet the definition of "solid waste" under ASWDA.  *See* M-I Memo in Support of Mot. to Dismiss at 27; BP Memo in Support of Mot. to Dismiss at 42.  The ASWDA states: "Any garbage, rubbish, construction or demolition debris, ash, or sludge from a waste treatment facility, water supply plant, or air pollution control facility, and any other discarded materials, including solid, *liquid*, semisolid, or contained *gaseous material resulting from industrial,* commercial, mining, or agricultural

47

operations or community activities[.]" Ala. Code § 22-27-2(36) (emphasis added).    Oil and dispersants fall within the ASWDA because they are "discarded materials, including . . . liquid. . . material resulting from industrial…activities."

The ASWDA also provides that "[a]s used in this article, the terms 'solid wastes', 'garbage', and 'ash' do not include fly ash waste, bottom ash waste, boiler slag waste, or flue gas emission control waste which result primarily from the combustion of coal or other fossil fuels at electric generating plants, nor shall such terms include any drilling discharges from oil or natural gas operations."    Ala. Code § 22-27-3(c).  M-I incorrectly relies on this section to say that oil and dispersants do not meet the definition of "solid waste" under the ASWDA. First, a blowout and oil leak is not an "oil or natural gas operation."   Second, leaking or spilled oil and dispersants cannot be considered "drilling discharges."  There was no drilling involved when the oil was leaking or when the dispersants were used.

Hence, there is no basis for the argument that the ASWDA is inapplicable here and the motions to dismiss this claim should be denied.

### G.    Alabama Stated Viable Claims For Fraudulent Concealment or Suppression.

#### 1.    *The Rule 9(b) Standard*

When a complaint asserts a claim for fraud, the Federal Rules of Civil Procedure require plaintiffs to plead the circumstances comprising that fraud with particularity.  Fed R. Civ. P. 9(b); 10B Charles A. Wright, Arthur R. Miller, Mary K. Kane, *Federal Practice and Procedure* § 9.03[1][e] (3d ed. 2010).   This requirement extends only to "circumstances constituting fraud or mistake," however; "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed R. Civ. P. 9(b).

When a plaintiff alleges fraud by omission, "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the

way in which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (citation omitted).  However, as noted in *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587 (E.D. La. 1993), "Fraud by silence … is by its very nature, difficult to plead with particularity." *Id.* at 598.  Thus, the "'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *See United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009).  The rule is "context specific and flexible . . . ." *Id.*  In particular, the requirements of Rule 9(b) are relaxed when the facts relating to alleged fraud are "peculiarly within the perpetrator's knowledge." *Wagoner v. Exxon Mobil Corp.*, 2010 U.S. Dist. LEXIS 91023, at *6-7 (E.D. La. 2010) (citing *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003)); *see also Bonvillain v. La. Land & Exploration Co.*, 702 F. Supp. 2d 667, 678 (E.D. La. 2010) (*citing Tuchman v. DSC Comm'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

Rule 9(b), moreover, does not operate in isolation.  Instead, it should be read "as part of the entire set of rules, including Rule 8(a)'s insistence upon 'simple, concise, and direct' allegations." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).  When the requirements of Rule 8, Rule 9, *Twombly*, and *Iqbal* are construed together, they require "simple, concise, and direct" allegations of the facts and circumstances constituting fraud, which make relief plausible.  *See Bonvillain*, 702 F. Supp. 2d at 678 (citation omitted).

### 2.    *The Amended Complaint Contains Sufficient Allegations To State A Claim For Fraudulent Concealment Or Suppression Against BP, Transocean, and Halliburton.*

In Alabama, "[s]uppression of a material fact which the party is under a obligation to communicate constitutes fraud."  Ala. Code § 6-5-102.  A plaintiff must show the following basic elements to state a claim for fraud:  (1) the materiality of the fraudulent statement; (2) the defendant's intent to deceive; (3) the plaintiff's reliance and; (4) that injury resulted from that

reliance. *Sweetwater Investors, LLC v. Sweetwater Apts. Loan LLC*, No. 1:10-cv-223, 2010 U.S. Dist. LEXIS 124923, at *11 (M.D. Ala. Nov. 24, 2010) (citing *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 1999)).   Alabama recognizes a cause of action for fraud by omission.  *Sweetwater Investors*, 2010 U.S. Dist. LEXIS 124923, at *11.   A cause of action for fraud by omission includes an additional element: a plaintiff must allege that the defendant owed a duty to disclose the concealed information.  *See, e.g.*, *Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1124 (11th Cir. 1993) (citing *Bank of Red Bay v. King*, 482 So. 2d 274, 285 (Ala. 1985)).

   *BP*:  In the Amended Complaint, the State alleges that BP misrepresented and concealed facts about: (1) the size and severity of the Spill (Amended Complaint, ¶ 266); (2) the likelihood of an oil spill and its ability to respond to one (Amended Complaint, ¶ 267-268); and (3) its knowledge of the stability of the cement used to seal the Macondo well. (Amended Complaint, ¶ 275.) BP wrongly argues that the Amended Complaint fails to allege that it had knowledge of these facts at the time they were concealed.  (BP Memo in Support of Mot. to Dismiss, p. 54.)

   In the Amended Complaint, the State alleges that "Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky.  BP's mid-April plan review predicted cement failure, stating '[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown.'"  (Amended Complaint, ¶ 55.)  The State also asserts that "BP attempted to downplay and conceal the severity of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day." (Amended Complaint, ¶ 266.)  The allegations provide further that after the explosions, "BP did not provide complete and timely

announcements and warnings about the severity, forecast and trajectory of the Spill." (Amended Complaint, ¶267.) Also, "BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was 'unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses.'" (Amended Complaint, ¶ 268.)  After the Spill, BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before." (Amended Complaint, ¶ 270.)   Further, "[d]espite its inability to respond and to control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well." (Amended Complaint, ¶ 271.)  The State alleges also that "[t]he severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose." (Amended Complaint, ¶ 272.)

These allegations sufficiently demonstrate that BP had knowledge of material facts at the time they were concealed.   As alleged, BP's "failure to do so induced the State to act or to refrain from acting to protect its property, the environment, economy of the State, businesses, livelihoods, and income." (Amended Complaint, ¶ 279.)  These allegations are sufficient to state a claim for fraudulent concealment against BP under Alabama law.

*Transocean:*  Transocean argues that it did not have a confidential relationship with the State and, therefore, was not under a duty to disclose the facts it concealed.  *See* Transocean Memo in Support of Mot. to Dismiss at 26-27.   By statute in Alabama, an "obligation to

communicate may arise from the confidential relations of the parties *or from the particular circumstances of the case*." Ala. Code § 6-5-102 (emphasis added).

First, whether or not a defendant had "a duty to communicate is generally for the jury to decide." *Oxford Furniture*, 984 F.2d at 1124 (citation omitted). Second, the circumstances of the instant case, as alleged in the Amended Complaint, gave rise to Transocean's duty to disclose. The allegations of the Amended Complaint sufficiently allege Transocean's duty. The State alleges that "Transocean misrepresented, concealed and suppressed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia,* its BOP." (Amended Complaint, ¶ 276.) It also alleges that "Transocean misrepresented, suppressed, and concealed the condition of the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury, or environmental damage." (*Id.*) The State further asserts that "Transocean … misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel. (Amended Complaint, ¶ 277.) In addition, the State alleges that these issues "were material facts that Transocean had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose." (Amended Complaint, ¶ 278.)

Also, contrary to Transocean's argument, the State alleged intent on the part of Transocean when we asserted that the "the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the State is entitled to an award of compensatory and punitive damages." (Amended Complaint, ¶

52

281.)   Hence, the Court should deny Transocean's motion to dismiss the State's fraudulent concealment or suppression claim.

*Halliburton*:   Wrongly applying Louisiana law to the question, Halliburton also argues that the Amended Complaint fails to allege its duty to disclose.   *See* Halliburton Memo in Support of Mot. to Dismiss at 29.   First, for the reasons stated *supra*, Louisiana law is inapplicable here.   Second, under Alabama law, the Amended Complaint sufficiently states a duty to disclose against Halliburton, given the particular circumstances of this case.   The State alleges that Hallburton "misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the blowout, all of which demonstrated that the foam cement used at Macondo was unstable" and that "[t]he instability of the cement used at the Macondo well and the results of the testing performed before the blowout were material facts that Halliburton had a duty to disclose because of the dire consequences of these facts  and the risks attendant with the failure to disclose."  (Amended Complaint ¶¶ 273-274.)   The level of danger attendant to the decisions Halliburton made concerning the foam cement it designed for the Macondo well are circumstances under which a duty to disclose arises under Alabama law.   Moreover, this question, again, is an issue of fact that is not properly determined in a motion to dismiss under Rule 12(b)(6).

For these reasons, the motions to dismiss the State's fraudulent concealment or suppression claims should be denied.

### H.  The State Alleges A Viable Claim For Private Nuisance.

BP, Halliburton, and M-I argue that Alabama cannot assert a private nuisance claim under Alabama law.  *See* BP Memo in Support of Mot. to Dismiss, pp. 53-54; M-I Memo in

Support of Mot. to Dismiss, pp. 19-20.[6]  They take the position that the State may only to bring a claim for public nuisance.

In Alabama, a nuisance is defined as "anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man."  Ala. Code § 6-5-120.  The Code of Alabama provides further as follows:

> Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals. Generally, a public nuisance gives no right of action to any individual, but must be abated by a process instituted in the name of the state. A private nuisance gives a right of action to the person injured.

Ala. Code § 6-5-121.  Additionally, "[i]f a public nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action."  Ala. Code § 6-5-123.  A private nuisance, under Alabama law, "may injure either the person or property, or both, and in either case a right of action accrues." Ala. Code § 6-5-124.  BP and M-I interpret the language of Section 6-5-21 to mean that claims of private and public nuisances are mutually exclusive.   However, they fail to cite any authority holding that the State may not bring actions for both public and private nuisance.

BP interprets the Alabama Supreme Court's decision in *Russell Corp. v. Sullivan,* 790 So. 2d 940, 952 (Ala. 2001) to mean that a private nuisance claim cannot stand where it arises out of the contamination of public waters.  It has misconstrued *Sullivan.*  In *Sullivan,* the plaintiffs asserted a private nuisance claim based on the defendants' release of chemicals into Lake Martin,

---

[6] Halliburton claims that Alabama's nuisance claims against it fail because the State does not allege that Halliburton was a "neighbor" as that term has been interpreted by Louisiana courts.  *See* Halliburton Memo in Support of Mot. to Dismiss at 30.  Again, Louisiana law is inapplicable here.  Accordingly, authorities addressing nuisance law in Louisiana are irrelevant.

a public body of water.  The plaintiffs alleged that the defendants' actions resulted in the loss of the use and enjoyment of Lake Martin.   *Id.* at 30.  The court held that the plaintiffs did not have a private nuisance claim because they owned no part of the lake and "not suffer the type of damage anticipated where contaminated water causes a nuisance on someone's property as the water passes across the land."  *Id.* at 30.  Here, by contrast, the State alleges that the Defendants' negligence "caused and/or contributed to the blowout and subsequent Spill which directly and proximately caused an invasion that has interfered with the use an enjoyment of the waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources *of the State of Alabama,* and have materially diminished and continue to diminish the value thereof, constituting a private nuisance pursuant to Ala. Code § 6-5-120, *et. seq.* and/or common law."  (Amended Complaint, ¶ 228.)  At paragraph 230, the State alleges that the defendants' creation of the private nuisance "caused past, present, and future damages to the State by allowing oil, chemical dispersants, and other materials and substances to contaminate *State property.*"  (Amended Complaint, ¶ 230.)  The State also alleges that it "has suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, loss of tax base, *loss of beneficial use, enjoyment, and exclusive possession of State property, and diminished value of State properties, for which the State is entitled to compensation.*  (Amended Complaint, ¶ 231.)  Hence, unlike the plaintiffs in *Sullivan,* the State is not seeking damages for the loss of use and enjoyment of property that it does not own in its private nuisance claim.

Accordingly, the arguments posed by M-I and BP in support of their motions to dismiss the State's private nuisance claim should be rejected.

## I.  Alabama Has Stated A Claim For Trespass.

M-I argues that Alabama "can only recover for trespass for property that it owns upon which oil was present."  *See* M-I Memo in Support of Mot. to Dismiss at 20.  If it is M-I's argument that Alabama can only recover for trespass where it has an ownership interest in the property invaded, it is mistaken.  *See AmSouth Bank, N.A. v. City of Mobile,* 500 So. 2d 1072, 1074 (Ala. 1986) (tenant who has right of possession can maintain an action for trespass).  Otherwise, it is true that a trespass requires an invasion of property, and the State has sufficiently alleged invasion and intrusion in the Amended Complaint.  (Amended Complaint, ¶¶ 234-235.)

## J.  Alabama States A Claim For Relief For Wanton Conduct.

The Court should reject BP's argument that the allegations of the First Amended Complaint are insufficient to state a claim for wantonness.  *See* BP Memo in Support of Mot. to Dismiss at 55-56.  Wantonness is conduct that is "carried on with a reckless or conscious disregard of the rights or safety of others."  Ala. Code 1975, § 6-11-20(b)(3). It "involves the conscious doing of some act, or the omission of some duty, under knowledge of existing conditions and while conscious that from the doing of such act or omission of such duty injury will likely or probably result."  *Ridgeway v. CSX Transp., Inc.,* 723 So.2d 600, 608 (Ala. 1998) (quoting *Hamme v. CSX Transp., Inc.,* 621 So.2d 281 (Ala. 1993)).  "Before a party can be said to be guilty of wanton conduct, it must be shown that, with reckless indifference to the consequences, he consciously and intentionally did some wrongful act or omitted some known duty that produced the injury."  *Id*.; *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994); *Norfolk S. Ry. Co. v. Johnson,* No. 1090011, 2011 Ala. LEXIS 29, *52-56 (Ala. Mar. 11, 2011).

The First Amended Complaint is replete with allegations of BP's wanton and reckless behavior.   The State alleges that BP knew that the cementing work being performed on the Deepwater Horizon was especially risky, yet it made minimal efforts to contain the risk.  BP

chose not to run a cement bond log, or to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below.  BP knew that the slurry design was unstable, and that there was an increased risk of failure of the BOP at the depths of operations taking place. (Amended Complaint, ¶¶ 55-57.)   Despite this knowledge, BP failed to act.

As the State further alleges, BP breached its duties to the State by acting with reckless, willful, and wanton disregard for the State in the "operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster." (Amended Complaint, ¶¶ 340-341.)   The State also alleges that BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few barriers to gas flow; failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log test to evaluate the integrity of the cement job; failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well; using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes; and ignoring and/or misinterpreting abnormal, "red flag" pressure test results.  (Amended Complaint, ¶¶ 351-358.)

In addition, the State alleges that BP recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and

improper operation and use of the BOP; failure to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout; disregard for proper drilling, casing, mudding, and cementing procedures; failure to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico; failure to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill.  (Amended Complaint, ¶¶ 359-364.)

The foregoing allegations describe conscious acts and omissions on the part of BP under conditions that it knew would likely result in injury.  While these allegations are sufficient to maintain a claim for negligence, they amount to a far more reckless level of conduct.  Because BP was aware of the dangers and likelihood of injury, its conduct as alleged in the Amended Complaint as set forth above amounted to wantonness for which the State is entitled to recover.  This Court should therefore reject BP's argument that the State has failed to state a claim for relief for wantonness.

## VI.    The State Pleaded Valid Claims Against Anadarko and MOEX.

Anadarko and MOEX raise various defenses to liability based on their alleged failure to assert "operational control" over the Macondo Well.  The PSC (on behalf of the B1 Plaintiffs) explained, in great detail, the basis for the negligence liability of Defendants Anadarko and MOEX, and the OPA liability of Anadarko E&P.    *See* Doc. 1803.  The State adopts the arguments made in the B1 Opposition to Anadarko/MOEX Motions to Dismiss in their entirety.  We expand upon those arguments below.

*The Joint Operating Agreement*: Anadarko and MOEX had control over the Macondo site because the Joint Operating Agreement between BP, Anadarko, and MOEX Offshore was in the nature of a joint venture. Consequently, Anadarko and MOEX cannot hide behind an alleged "lack of control" over the operations at the Macondo site.

No one disputes that Anadarko, MOEX Offshore, and BP were parties to a Joint Operating Agreement (JOA), or that the Agreement is, in large part, a boiler-plate JOA commonly used in the oil and gas industry to delineate the rights and liabilities between the parties. *See, e.g*, Boigon, *Liabilities of Nonoperating Oil and Gas Interest Owners,* 13D Rocky Mt. Min. Law Inst. 4 (1983) (observing that "[t]he joint operating agreement has been relatively standardized in oil and gas operations for many years"); *see also Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 112 -113 (Tex.App.–El Paso 1997) (noting that JOAs are not ordinary contracts but instead are "standardized forms developed over years by the industry to govern ventures in the development of oil and gas properties, ... [t]hey govern operations involving immense financial risk and reward; the parties to J.O.A. are experienced and sophisticated and generally have balanced bargaining positions. These are agreements which involve liabilities and obligations unique to the legal and technical peculiarities of the oil and gas industry. Nevertheless, this case highlights that they are still basic structures with minimal safeguards and protections from the misconduct of a party.").

As with most JOAs, the one at issue here delegated sole management and control of the *day-to-day* operations to one co-owner as "operator" (BP) and disclaimed any intention of the parties to form a partnership or otherwise render the parties joint and severally liable for third party injuries. However, as with most JOAs, the JOA at issue also allowed the non-operators (Anadarko and MOEX) to exercise some joint control in the overall direction and management

of the venture.  This ability to exercise at least some joint control has compelled most courts, including the Fifth Circuit and its district courts, to look past the lack of day-to-day control and language disavowing joint liability and find that JOAs constitute joint-ventures, thereby imposing joint liability upon the non-operator for the damages caused by the well or operator's negligence.

*'Lack of Control' Rejected:*  Anadarko and MOEX trot out the same arguments commonly asserted by non-operating interest owners seeking to escape liability; namely, that they did not have control over the day-to-day operations and that the JOA included a clause expressly disavowing joint and several liability between them and the operator.  However, Anadarko and MOEX disregard a wealth of controlling jurisprudence/authorities determining the liability of non-operators for third party damages, including the numerous decisions from the Fifth Circuit and its district courts.

> To be sure, Paragraph 22.1 of the Operating Agreement provides:
>
> obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective, and ... nothing in this Agreement shall be construed to create a partnership, joint venture, association or other form of business entity recognizable in law for any purpose.

(JOA, ¶ 22.1.)   But in the Fifth Circuit, as in most jurisdictions, such clauses are not determinative in deciding the issue. *Davidson v. Enstar Corp.,* 848 F.2d 574, 577-78 (5th Cir.), *modified on rehearing on other grounds,* 860 F.2d 167 (5th Cir.1988); *see also Miller v. Slam Offshore,* 1997 WL 537686, 1 (E.D. La. 1997) ("It is of no moment that the agreement provides that it is not intended 'to create a partnership, association, trust or other legal entity among the parties.'").  In fact, courts have consistently disregarded similar language in finding that joint ventures existed between the parties to the JOA.

The following are just a few examples of similar language that was disregarded in finding

the existence of a joint venture thereby imposing joint liability non-operating parties to a JOA:

- "It is not the intention of the parties hereto to create a partnership, association, trust, or other semblance of business entity." *Davidson,* 848 F.2d at 576;

- "The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and nothing contained herein shall ever be construed as creating a partnership of any kind, joint venture, association, or other character of business entity recognizable in law for any purpose." *Darr v. Chevron U.S.A.*, 1997 WL 470153 at * 3 (E.D. La. 1997);

- "It is not the intention of the parties to create, nor shall this Agreement be construed as creating[,] a mining or other partnership or association, or to render them liable as partners." *West v. Kerr-McGee Corp.,* 586 F. Supp. 493, 496 (D.C. La. 1984);

- "It is distinctly understood and agreed that this Agreement shall not in any manner create the relationship of a partnership, an association for profit between the parties or any other legal entity for any purpose between the parties, and no act done by either party pursuant to the provisions hereof shall operate to create such relationship, nor shall the provisions of this Agreement be construed as creating such relationship.  The liability of the parties shall be several and not joint or collective, and each party shall be responsible only for its obligations as herein set forth and shall be liable only for its proportionate share of the costs, expenses and liabilities incurred hereunder." *Taylor v. Getty Oil Co.,* 637 F. Supp. 886, 889 (E.D. La. 1986).

Most courts throughout the country disregard similar language when determining potential

third-party tort liability of non-operators.

**The Davidson Test:**   Instead of paying blind allegiance to self-serving agreements, Courts instead construe JOAs by ascertaining the "true intentions" of the parties "by examining the *entire* writing in order to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Taylor,* 637 F. Supp. at 889 *quoting Chapman v. Orange Rice Mill Co.,* 747 F.2d 981 (5th Cir. 1984); *see also Heavin v. Mobil Oil Exploration,* 697 F. Supp. 1408, 1411-1412 (E.D. La. 1988) *rev'd on reh'g on other grounds,* 710 F. Supp. 1073 (E.D. La. 1989) *affirmed* 913 F.2d 178 (5th Cir. 1990) (".. whether the parties intended to form a partnership or joint venture, is answered only by considering the Agreement *in toto*.")

This examination is performed by applying the four-factor test set forth by the Fifth Circuit in *Davidson*: 1) whether the parties intended to form a partnership or joint venture; 2) whether the parties share a common interest in the subject matter of the venture; 3) whether the parties share profits and losses from the venture; and 4) whether the parties have joint control or the joint right of control over the venture." *Davidson,* 848 F.2d at 577; *Heavin,* 697 F. Supp. at 1411 n. 1.  To be clear, *Davidson* does not require that all four of these criteria be met in order to have a joint-venture. *Id.*  In fact, the first factor (intent) is usually found when the second, third, and/or fourth factors are affirmatively answered.

A review of the entirety of the JOA in this case points to one conclusion: Anadarko, MOEX and BP intended to form a joint venture.  While BP had the exclusive right to control the day-to-day operations, the JOA allocated joint control of the entire venture among all parties, including Anadarko and MOEX.  It specified that each party had a voting interest equal to its working or participating interest. (JOA, ¶ 8.1.1.) The operator was prohibited from making expenditures in excess of $500,000 without prior approval of the participating parties. (JOA, ¶

62

6.2.)   The Agreement provided procedures to challenge the operator's conduct of operations. (JOA, ¶ 4.2.)  Furthermore, the Agreement provided for the removal of the operator should it fail to perform its duties (JOA, ¶ 4.4), as well as a mechanism to select a successor operator.  (JOA, ¶ 4.5.)

The parties also agreed that the operator would pay all costs incurred and that each party would reimburse the operator in proportion to the participating party's interest. (JOA, ¶ 6.1.)  The Operating Agreement established a joint account, to which the operator was to charge certain costs of the operation, including liability insurance for third-parties claims.  (*Id*. ¶ 21.1.)  The parties were each responsible for all taxes assessed or levied upon the joint property in proportion to the party's interest. (JOA, ¶ 20.2.)  Furthermore, the participating parties shared in royalty payments in respect of their shares of production.  (JOA, ¶ 19.2.2.)

The Fifth Circuit and its district courts have repeatedly held that JOAs containing similar provisions created joint ventures.  The court in *Davidson* determined that a joint venture existed based upon the following facts: each party contributed to the development costs and expenses and shared in the profits according to its percentage of ownership; while the operator had sole control over the day-to-day decisions the non-operators retained some control over major spending decisions; and the non-operators could remove the designated operator and appoint a new operator.

In *Heavin*, the court determined that the satisfaction of the second, third and fourth *Davidson* factors constituted a joint venture.  The fourth factor (actual or the right to joint control) was satisfied even though the operator was given "full control" over the operations because that control was "subject to certain provisions" including requiring the operator to obtain consent from the non-operators before spending in excess of $25,000 and the mutual agreement

63

of the owners before certain activities could take place.   The second (sharing of common interest) and third factors (sharing in profits and losses) were also satisfied because the Agreement provided that each owned an interest in the well and called for each of the parties to share expenses in proportion to its' ownership interests.   The court concluded that "[t]hese considerations collectively, if not separately, evidence a clear intention [by the parties] to form a joint venture." *Id.* at 1412.

In *Parker v. McDermott, Inc.,* 1990 WL 223011, 4 (E.D. La. 1990)*,* the second and third factors - whether the parties share a common interest in the subject matter of the venture and whether the parties share profits and losses from the venture - were satisfied because the agreement provided procedures to challenge the operator's conduct, the parties made payments to the operation in proportion to their interest, and they shared the royalty payments.   The court also found that a joint right of control - the fourth factor - existed because the voting rights provision granted each party a vote in major, non-administrative decisions of the endeavor.

The court in *Darr* found the existence of a joint venture because the parties agreed to share expenses and costs in proportion to their equity interests, while the operator had sole control over daily operations the non-operator retained some control over major expenditures and other decisions, and the Agreement also provided for the removal of the operator should the non-operators determine that it was not performing its duties.

Again, the Anadarko and MOEX Defendants seek to escape liability by arguing that they did not exercise, nor have the right to exercise, actual control over the day-to-day operations. However, that level of control is not required in order to satisfy the fourth *Davidson* factor (actual or the right to exercise control).   Instead, the only requirement is that the non-operator have the *right to* exercise control and that said right exists not over the day-to-day operations, but

simply over some portion of the enterprise; even if that portion is only minimal. *See e.g; Davidson, Heavin, Parker,* and *Darr; see also Bolivar,* 789 F. Supp. at 1380-81 (".. it is not the actual exercise of control that is determinative.  Rather it is the right to exercise control that governs.")    This right to joint participation, even if minimal, is "the kind of participation inherent in the typical operating agreement."   *See <u>Boigon,</u> supra* note 1 at 4. For this reason, JOAs are not Agreements involving merely passive investors, but instead JOAs establish "an interlocking web of mutual rights and responsibilities envisioning a concerted effort in the development of an oil and gas property." *Id.*

    ***Level of Ownership/Control:***  Finally, any alleged inequality in ownership or control of the venture between BP and the Anadarko and MOEX Defendants is also irrelevant.  Instead, most courts, including the Fifth Circuit, follow the position that operating agreements with unequal shares and rights of control are joint ventures nevertheless. *See, e.g; Parker,* 1990 WL 223011, 5 (... "*Davidson,* finds that a joint right of control exists so long as each party has a say, <u>no matter its size</u>, in major, non-administrative decisions of the endeavor.").

    Examples of situations in which joint-ventures were found regardless of disproportionate shares and rights of control include *Parker* (non-operating interest owners found to be part of a joint-venture despite the fact that they only owned 15.9725%, 6.25%, and 2.7775% interest respectively while sole operator owned 75% interest); *Davidson* (three non-operating interest owners who collectively owned only 16% found to be involved in joint-venture with operator); and *West* (non-operators with interest of only 10% and 16% determined to be involved in a joint venture with sole operating interest owner).

**VII.    While It Is Entitled to Seek Punitive Damages, Alabama Did Not Plead Punitive Damages as an Independent Cause of Action.**

To be clear, the State did not plead punitive damages as a stand-alone claim.  *See* Amended Complaint at ¶346-68; BP's Memo. of Law at 56 ("to the extent Alabama alleges a freestanding claim for punitive damages, it must be dismissed, because no such claim exists"). We noted at the beginning of the punitive damages section that we were applying the punitive damages to our previously pleaded claims.  *See* Amended Complaint at ¶346.  We included a separate section regarding punitive damages simply to place the named Defendants on notice of the nature and scope of their conduct, intent, and motivations, and how their conduct, intent, and motivations relate to the relevant punitive damage factors.  *See* FRCP 8, 9.

Because Alabama's punitive damages section does not include stand-alone claims, but instead relates back to causes of actions that allow for punitive damages, there are no punitive damage claims for the Court to summarily dismiss.

## Conclusion

The Court should deny the various Defendants' motions to dismiss Alabama's First Amended Complaint.

Respectfully Submitted,

LUTHER J. STRANGE
 *Attorney General*

 /s/ Corey L. Maze                              .
COREY L. MAZE
 *Special Deputy Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130

Phone: (334) 242-7300
Fax:    (334) 242-4891

Email:  lstrange@ago.state.al.us
         cmaze@ago.state.al.us

Attorneys for the State of Alabama

JAMES W. DAVIS
 *Assistant Attorney General*

WINFIELD J. SINCLAIR
 *Assistant Attorney General*

ROBERT D. TAMBLING
 *Assistant Attorney General*

67

ARGUMENT CHART

| Issue / Argument | Corresponding Defendant's Argument with Page Numbers |
|---|---|
| I(A). OSCLA or CWA Preemption | BP 5-13, Transocean 10-13, Halliburton 12-23, M-I LLC 15-18, Cameron 6-12, Anadarko 43-59, MOEX 15-17 |
| I(B). OPA Displacement | BP 12-14, Transocean 13-6, Halliburton15-19, Cameron 13-21, Anadarko 9-12  , MOEX 3-4 |
| I(C).  OPA Preemption | BP 10-13, Transocean 13-25, Halliburton 10-12, M-I LLC1 18-19, Cameron 21-24, Anadarko 43-59, MOEX 17-19<br><br>Cameron 34-35 |
| II(A).     Presentment to Non Responsible Parties | Halliburton 25-26, M-I LLC 12-14, Cameron 29-32 |
| II(B).  Presentment Not Required | BP14-18, Transocean 3-4, Halliburton 23-24, M-I LLC 10-12, Cameron 27-29, Anadarko 12-18, MOEX 4-5 |
| II(C). Presentment Satisfied | BP 18, Transocean 3-4, Halliburton 23-24, M-I LLC 10-12, Cameron 27-29, Anadarko 12, MOEX 4-5 |
| III. Direct Physical Damage Not Required (Fed Law) | Transocean 27-28, M-I LLC 14-15 |
| III.  Direct Physical Damage Not Required (State Law) | Transocean 29-30, Halliburton 26-27 |
| IV(B).  Moratorium | Transocean 33 |

| | |
|---|---|
| IV(C).  Stigma Damages | Transocean 33-36 |
| V(B)  EMA | M-I LLC 21-22 |
| V(C). WPCA | BP 34-41,Transocean 30-31, M-I LLC 23-25 |
| V(D).  APCA | Transocean 30-31, M-I LLC 25-26 |
| V(E).  HWMA | BP 42-43, Transocean 30-31, Halliburton 32, M-I LLC 26-27 |
| V(F). SWDA | BP 41-43, Transocean 30-31, M-I LLC 27-28 |
| V(G).  Fraud Conceal | BP 54-55, Transocean 25-27, Halliburton 28-29 |
| V(H).  Private/Public Nuisance | BP 53-54, Halliburton 30-31, M-I LLC 19-20 |
| V(I).  Trespass | M-I LLC 20 |
| V(J).  Wantonness | BP 55-56 |
| VI.  MOEX & Anadarko | Anadarko 28-38, MOEX 7-12 |
| VII.  Stand-alone Punitive Damages | BP 56, Transocean 31-32, Halliburton 32-33, M-I LLC 28-29 |