**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| Gulf of Mexico, on April 20, 2010 | § | SECTION:  J |
| | § | |
| THIS DOCUMENT RELATES TO | § | JUDGE BARBIER |
| | § | MAG. JUDGE SHUSHAN |
| 2:10-cv-03059 | § | |
| 2:11-cv-00516 | § | |
| | § | |
| | § | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**STATE OF LOUISIANA'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**THE STATE OF LOUISIANA'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES .............................................................................................. vi

INTRODUCTION ...............................................................................................................1

LEGAL STANDARD.........................................................................................................3

Argument and Authorities.................................................................................................4

    I.      FEDERAL STRUCTURE AND CLAIMS ................................................4

            A.      OPA is the Controlling Federal Statute Applicable to All Oil Discharges, and It Expressly Saves State Law and Maritime Claims. ...............................................................................................5

            B.      Even if OCSLA Were Presumed to Apply, State Law and Maritime Law Would Still Apply Under OCSLA's Choice-of-Law Provision. ..............................................................6

                   1.      Maritime Law Applies of Its Own Force.......................................7

                   2.      State Police Power to Regulate Sea-to-Shore Pollution Applies of Its Own Force. ...............................................................7

            C.      The Clean Water Act Does Not Preempt State Law Claims, and *Ouellette* and Its Progeny Do Not Apply. ......................................................9

            D.      Louisiana's Suit Should Not Be Dismissed for Lack of Presentment...........................................................................................11

                   1.      The State Has Sufficiently Pleaded Presentment...........................11

                   2.      The State's Claims Need Not Be Presented Because OPA Explicitly Permits a Party to Sue at any Time to Recover Removal Costs; Claims for Damages Brought in Conjunction with Claims for Removal Costs Are Permissible, Irrespective of Whether Presentment Was Made. ......................................................................................13

                   3.      Louisiana's Claims Must Be Allowed to Proceed to Avoid Improper Claim-Splitting and the Risk of Claims Preclusion......................................................................................15

            E.      The State Has Sufficiently Pleaded Its Claims for Removal Costs. ..........16

F.      Defendants' Motions to Dismiss Louisiana's Claims Against
        Parties Not Designated as Responsible Parties Should Be Rejected. ........17

G.      Louisiana's First Amended Complaint States Valid Claims for
        Declaratory Judgment under OPA. ...........................................................19

        1.      Louisiana's Claims for Declaratory Judgment Meet the
                Necessary Legal Requirements....................................................20

        2.      Defendants' Motions to Dismiss the Claims for Declaratory
                Relief Fail...................................................................................21

II.     STATE LAW STRUCTURE AND CLAIMS ......................................................24

A.      LOSPRA Does Not Preempt Other State Law Claims. ...........................24

        1.      Defendants' LOSPRA Preemption Argument Conflicts
                with the Clear Legislative Intent to Preserve Other State
                Remedies.....................................................................................24

        2.      OPA Expressly Allows Overlapping Remedies Between
                OPA and LOSPRA. ....................................................................26

B.      LOSPRA Creates a Cause of Action Against Responsible Parties
        for Damages. ............................................................................................27

C.      The State's Claims for Civil Penalties under the Louisiana
        Environmental Quality Act Are Valid. ....................................................31

        1.      Oil and Other Pollutants Indisputably Entered Louisiana
                Waters and Caused Water Pollution in Violation of the
                Louisiana Environmental Quality Act. .......................................31

        2.      Louisiana's Claim for Civil Penalties is Authorized Under
                the Louisiana Environmental Quality Act and Has Been
                Sufficiently Pleaded. ..................................................................34

                a.      Louisiana Law Does Not Require a Continuous Tort
                        for Imposition of Civil Penalties Under LEQA. ...............35

                b.      Louisiana Law Authorizes the Assessment of up to
                        an Additional $1 Million for Each Penalty Event.............37

                c.      Louisiana's Civil Penalty Statute Does Not Require
                        Presentment of its Response Costs to a Responsible
                        Party as a Condition Precedent to Filing Suit. ..................39

D.      Louisiana Civil Law Claims Are Valid. ...................................................40

III.   ALL OF LOUISIANA'S DAMAGES ARE RECOVERABLE ..........................42

    A.   Moratorium Damages are Recoverable Under OPA. ...............................43

        1.   OPA's Liability Provision Requires Only "But For"
            Causation.......................................................................................44

            a.   "Result From" Means "But For."........................................44

            b.   "Incident" is a Defined Term Under OPA .........................46

            c.   Rules of Statutory Construction Require that
               "Incident" be Used as Defined in the Statute....................47

        2.   The Moratorium Resulted From the "Incident."............................49

        3.   Moratorium Damages Are Recoverable Under OPA. ..................51

            a.   There is No Traditional Proximate Cause
               Requirement in OPA's Liability or Damages
               Provisions..........................................................................52

            b.   Congress Expressly Referenced Proximate Cause in
               OPA's Provisions Regarding Exceeding the
               Liability Caps, and Its Absence from OPA's
               Liability and Damages Provisions Precludes Its
               Consideration in that Context. ...........................................55

            c.   Congress Considered and Expressly Rejected
               Proximate Cause Standards in OPA's Liability and
               Damages Provisions...........................................................57

            d.   Even if Foreseeability Applies, it is Limited by the
               Text of OPA and Does Not Equate to Traditional
               Proximate Cause. ...............................................................61

            e.   Even if the Court Were to Draw "Proximate Cause"
               Lines Here, Louisiana is the Geographic Epicenter
               of the Spill and its Governmental Damages are
               Specifically Enumerated. ...................................................63

    B.   LOSPRA Also Provides for the Recovery of Moratorium
       Damages....................................................................................................64

    C.   The State's Claims under Federal Maritime and State Law Are Not
       Barred by the Economic Loss Rule. .........................................................68

    D.   Louisiana's Damages Are Not Too Remote. .............................................69

E.      OPA Does Not Preempt Louisiana's Maritime and State Law
        Claims for Punitive Damages. ...................................................................71

# TABLE OF AUTHORITIES

## Cases

*Apex Oil Co. v U.S.*,
   208 F. Supp. 2d 642 (E.D. La. 2002) ..................................................................................48

*Arabie v. CITGO Petroleum Corp.*,
   49 So. 3d 529 (La. App. 3 Cir. 2010) ..............................................................................72

*Artesian Water Co. v. Gov't of New Castle*,
   659 F. Supp. 1269 (Del. 1987) ..........................................................................................17

*Ashcroft v. Iqbal*,
   ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) ...............................................................3, 12

*Askew v. Am. Waterways Operators, Inc.*,
   411 U.S. 325 (1973) .......................................................................................................8, 34

*Atl. Sounding Co. v. Townsend*,
   129 S. Ct. 2561 (2009) .......................................................................................................72

*Baker v. Putnal*,
   75 F.3d 190 (5th Cir.1996) .............................................................................................70

*Ballard Shipping Co. v. Beach Shellfish*,
   32 F.3d 623 (1st Cir. 1994) ............................................................................................53

*Barr v. Smith*,
   598 So. 2d 438 (La. App. 2 Cir. 1992), writ denied, 604 So. 2d 998 ...............................41

*Barrilleaux v. NPC, Inc.*,
   704 So. 2d 449 (La. App.1 Cir. 1997) ...............................................................................42

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................................3

*Benefiel v. Exxon Corp.*,
   959 F.2d 805 (9th Cir. 1992) ..........................................................................................70

*Billeaud v. Assoc. of Retarded Citizens of Evangeline*,
   569 So. 2d 1020 (La. App. 3 Cir. 1990) ...........................................................................30

*Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*,
   51 F.3d 235 (11th Cir. 1995) .........................................................................................13

*Carr v. Oake Tree Apts.*,
   786 So. 2d 230 (La. App. 2 Cir. 2001) .............................................................................41

*Chaney v. Travelers Ins. Co.*,
    249 So. 2d 181 (La. 1971) ............................................................................................41

*Chertkof v. U.S.*,
    676 F.2d 984 (4th Cir. 1982) ......................................................................................26

*Chevron, U.S.A. v. NRDC*,
    467 U.S. 837, 104 S. Ct. 2278, 81 L.Ed.2d 694 (1984)......................................28, 38, 67

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
    783 F.2d 577 (5th Cir. 1986) ........................................................................................8

*Concise Oil & Gas P'ship v. La. Intrastate Gas Corp.*,
    986 F.2d 1463 (5th Cir. 1993) ....................................................................................21

*Corbello v. Iowa Production*,
    850 So. 2d 686 ............................................................................................................36

*CSX Transp., Inc. v. McBride*, No. 10-235, 2011 U.S. LEXIS 4795 at *32-33 (June 23,
    2011) ..........................................................................................................................57

*Davis v. Dallas Area Rapid Transit*,
    383 F.3d 309 (5th Cir. 2004) ......................................................................................15

*Demette v. Falcon Drilling Co., Inc.*,
    280 F.3d 492 (5th Cir. 2002) ........................................................................................7

*Diamond Offshore Co. v. A & B Builders, Inc.*,
    302 F.3d 531 (5th Cir. 2002) ........................................................................................7

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990)......................................................................................................47

*Dunham-Price Group, LLC v. Citgo Petroleum Corp.*,
    2010 WL 1285446 (W.D. La. March 31, 2010) ..........................................................54

*Exxon Shipping Co. v. Baker*,
    54 U.S. 471, 489 (2008)........................................................................................11, 72

*Gabarick v. Laurin Mar. (Am.), Inc.*,
    2009 WL 102549 (E.D. La. Jan. 12, 2009)..................................................................18

*Gatlin Oil Co. v. U.S.*,
    169 F.3d 207 (4th Cir. 1999) ................................................................................46, 47

*Golnay Barge Co. v. M/T Shinoussa*,
    1991 WL 267956 (S.D. Tex. 1991) ............................................................................68

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
   589 F.3d 778 (5th Cir. 2009) ......................................................................7

*Gulf Ins. Co. v. Employers Liability Assurance Corp.*,
   170 So. 2d 125 (La. App. 4 Cir. 1964) ......................................................41

*Hamker v. Diamond Shamrock Chem. Co.*,
   756 F.2d 392 (5th Cir. 1985) ....................................................................36

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
   634 F.3d 787 (5th Cir. Feb. 24, 2011) ...................................................3, 35

*Henderson v. Eric Shinsekie, Sec'y of Veterans Affairs*,
   131 S. Ct. 1197 (2011)..............................................................................11

*Hogg v. Chevron USA, Inc.*,
   45 So. 3d 991 (La. 2010) ..........................................................................36

*Holmes v. SCC. Investor Protection Corp.*,
   503 U.S. 258 (1992)..................................................................................70

*In re Exxon Valdez*,
   270 F.3d 1215 (9th Cir. 2001) ............................................................53, 70

*In re Pet. of Settoon Towing LLC*,
   2009 WL 4730971 (E.D. La. Dec. 4, 2009).............................................27

*In re Recovery I, Inc.*,
   635 So. 2d 690 (La. App. 1st Cir. 1994)............................................29, 38

*In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*,
   848 F.2d 1151 (11th Cir. 1988) ................................................................26

*In re Settoon Towing LLC*,
   2009 WL 4730969 (E.D. La. Dec. 4, 2009).............................................46

*Int'l Harvester Credit Corp. v. Seale*,
   518 So. 2d. 1039 (La. 1988) .....................................................................30

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987)..........................................................................9, 10, 11

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004)..................................................................................26

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
   513 U.S. 527 (1995)....................................................................................7

*Johnson v. Colonial Pipeline Co.*,
    830 F. Supp. 309 (E.D. Va. 1993) ...................................................................................12

*Joslyn Mfg. Co. v. T.L. James & Co., Inc.*,
    836 F. Supp. 1264 (W.D. La. 1993)................................................................................33

*La. Ex rel. Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) .......................................................................................53

*Lormand v. U.S. Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .........................................................................................70

*Marathon Pipe Line Co. v. LaRoche Indus. Inc.*,
    944 F. Supp. 476 (E.D. La. 1996)..................................................................................14

*Marin v. Exxon Mobil Corp.*,
    48 So. 3d 234 (La. 2010) ...............................................................................................36

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011).....................................................................................................4

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*,
    453 U.S. 1 (1981)...........................................................................................................37

*Montelepre v. Edwards*,
    359 So. 2d 1311 (La. App. 4 Cir. 1978) ........................................................................25

*Murphy Exploration & Prod. Co. v. Davis*,
    41 F.3d 663 (5th Cir. 1994) ...........................................................................................16

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)......................................................................................................32

*O'Neal v. Roadway Express, Inc.*,
    2006 WL 2037380 (E.D. La. July 17, 2006) .................................................................15

*Orex Credit Alliance, Inc. v. Wolfe*,
    212 F.3d 891, 897 (5th Cir. 2000) .................................................................................23

*Oster v. Dept. of Transp. & Dev.*,
    582 So. 2d 1285 (La. 1991) ...........................................................................................42

*Pierson v. Orlando Regional Healthcare Sys., Inc.*,
    2009 WL 2151176 (M.D. Fla. July 13, 2009) .................................................................4

*Pippen v. Shell Oil Co.*,
    661 F.2d 378 (5th Cir. 1981) ...........................................................................................7

*Poe v. PPG Indus.*,
   782 So. 2d 1168 (La. App. 3rd Cir. 2001) ....................................................................10

*Reserve Mooring, Inc. v. Am. Commercial Barge Lines*,
   251 F.3d 1069 (5th Cir. 2001) ...................................................................................66

*Roberts v. Cardinal Servs., Inc.*,
   266 F.3d 368 (5th Cir. 2001) .....................................................................................41

*Robins Dry Dock v. Flint*,
   275 U.S. 303 (1927)...............................................................................................53, 65

*Rodrigue v. Aetna Cas. & Sur. Co.*,
   395 U.S. 352, 357 (1969)...............................................................................................6

*Rogers v. Coastal Towing, L.L.C.*,
   723 F. Supp. 2d 929, 933 (E.D. La. 2010) ....................................................................8

*Russello v. U.S.*,
   464 U.S. 16, 23 (1983)..................................................................................................58

*Sherwin-Williams Co. v. Holmes County*,
   343 F.3d 383 (5th Cir. 2003) .....................................................................................20

*Smith v. Mid-Valley Pipeline Co.*,
   2007 WL 1309612 (E.D. Ky. May 4, 2007) ................................................................19

*St. Bernard Citizens for Envt'l Quality v. Chalmette Refining, LLC*,
   500 F. Supp. 2d 592 (E.D. La. 2007)...........................................................................16

*State of Louisiana ex rel. Guste v. M/V TESTBANK*,
   752 F.2d 1019 (5th Cir. 1985) ...................................................................................66

*State of New York v. Shore Realty Corp.*,
   759 F.2d 1032 (2nd Cir. 1985) ...................................................................................66

*State v. Fontenot*,
   36 So. 630 (La. 1904) ...................................................................................................29

*Sun Pipe Line Co. v. Conewago Contractors, Inc.*,
   1994 WL 539326  (M.D. Pa. Aug. 22, 1994) ..............................................................48

*Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*,
   444 F.3d 371 (5th Cir. 2006) ..........................................................................45, 46, 53

*Tanguis v. M/V Westchester*,
   153 F. Supp. 2d 859 (E.D. La. 2001).............................................................................5

*Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Co.*,
    803 So. 2d 86 (La. App. 4 Cir. 2001) ............................................................42

*Theriot v. Bay Drilling Corp.*,
    783 F.2d 527 (5th Cir. 1986) ........................................................................7

*U.S. v. 150 Acres of Land*,
    204 F.3d 698 (6th Cir. 2000) ........................................................................33

*U.S. v. CDMG Realty Co.*,
    96 F.3d 706 (3rd Cir. 1996) ..........................................................................33

*U.S. v. Conoco, Inc.*,
    916 F. Supp. 581 (E.D. La. 1996) ...........................................................47, 48

*U.S. v. Hyundai Merchant Marine, Co.*,
    172 F.3d 1187 (9th Cir. 1999) ......................................................................48

*U.S. v. Locke,* 529 U.S. 89 (2000).............................................................6, 8, 9

*U.S. v. M/V Cosco Busan*,
    557 F. Supp. 2d 1058 (N.D. Cal. 2008) .......................................................13

*U.S. v. Mizhir*,
    106 F. Supp. 2d 124 (D. Mass. 2000) ..........................................................48

*U.S. v. Murphy Exploration & Production Co.*,
    939 F. Supp. 489 (E.D. La. 1996) ................................................................48

*U.S. v. Southeastern Pa. Transp. Auth. (SEPTA)*,
    1986 WL 7565 (E.D. Pa. July 2, 1986).................................................16, 17

*U.S. v. Tohono O'Odham Nation*,
    131 S. Ct. 1723, 79 USLW 4271 (2010) ......................................................15

*Union Petroleum Corp. v. U.S.*,
    651 F.2d 734 (Ct. Cl. 1981) .........................................................................47

*Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*,
    895 F.2d 1043 (5th Cir. 1990) ...................................................................6, 7

*Unocal Corp. v. U.S.*,
    222 F.3d 528 (9th Cir. 2000) ........................................................................22

*Venator Group Specialty, Inc. v. Matthew/Muniot Family, LLC*
    322 F.3d 835 (5th Cir. 2003) ..........................................................20, 21, 23

*Wallace C. Drennan, Inc. v. City of New Orleans*,
    2011 La. App. LEXIS 500 (La. App. 4 Cir. April 27, 2011)...........................30

*Who Dat Yat LLC v. Who Dat ? Inc.,*
    2011 WL 39043 (E.D. La. Jan. 4, 2011)........................................................................70

*Wright v. Shell Offshore, Inc.,*
    2011 U.S. Dist. LEXIS 16290 (E.D. La. Feb. 17, 2011) ...................................................3

*Wyo. v. Platte Pipe Line Co.,*
    649 P.2d 208 (Wyo. 1982)..............................................................................................34

*Yamaha Motor Corp. v. Calhoun,*
    516 U.S. 199 (1996)..........................................................................................................8

## **Statutes and Regulations**

1991 Lᴀ. ALS 7 ........................................................................................................................26

1995 Lᴀ. ALS 740 ....................................................................................................................26

2702(b)(2)(E) ............................................................................................................................62

28 U.S.C. § 2101 ......................................................................................................................21

33 C.F.R. § 136.233(b) ............................................................................................................53

33 U.S.C. § 1365 ......................................................................................................................36

33 U.S.C. § 2701(14) ...............................................................................................................46

33 U.S.C. § 2701(17) ...............................................................................................................66

33 U.S.C. § 2701(32) ...............................................................................................................18

33 U.S.C. § 2701(32)(C) ..........................................................................................................18

33 U.S.C. § 2702(a) ...............................................................................................18, 44, 51, 52

33 U.S.C. § 2702(b)(1) ............................................................................................................14

33 U.S.C. § 2702(b)(1)(B) .......................................................................................................17

33 U.S.C. § 2702(b)(2) (A) & (D) – (F) .................................................................................63

33 U.S.C. § 2702(b)(2) ............................................................................................................51

33 U.S.C. § 2702(b)(2)(A) .......................................................................................................63

33 U.S.C. § 2702(b)(2)(E) .......................................................................................................54

33 U.S.C. § 2703(a) .................................................................................................................48

33 U.S.C. § 2704(c)(1) .................................................................................55

33 U.S.C. § 2712(h)(2) .................................................................................15

33 U.S.C. § 2718(a) .............................................................................6, 19, 71

33 U.S.C. § 2718(a)(2) ..................................................................................26

33 U.S.C. § 2718(c) .........................................................................................6

33 U.S.C. § 2751(e) ...................................................................................6, 71

33 U.S.C. § 2717(f)(2) .............................................................................14, 22

33 U.S.C. §§ 2701(5), (31), (32) and (14) ....................................................48

33 U.S.C. §§ 2701, *et seq.* ..............................................................................5

33 U.S.C. §§ 2702(a) ...............................................................................51, 62

33 U.S.C. 2718(c) ..........................................................................................71

33. U.S.C. § 2701(14) ..............................................................................51, 62

33 U.S.C. § 2702(a) .......................................................................................49

42 U.S.C § 9607(a)(4)(B) ..............................................................................17

42 U.S.C. § 9607(b) .......................................................................................48

43 U.S.C. § 1333(a)(2)(A) ...............................................................................6

43:XXIX.129(B)(5) .......................................................................................64

La. Civ .Code. Ann. art. 450...................................................................42, 66

La. Civ. Code Ann. art. 667............................................................................41

La. Civ. Code. Ann. art. 2315.1.....................................................................72

La. Code Civ. Proc. Ann. arts. 3542-3548 .....................................................72

La. Rev. Stat. § 30:2025(B) ...........................................................................65

La. Rev. Stat. § 30:2451(5)(c) .......................................................................64

La. Rev. Stat. § 30:2453(A) ...........................................................................65

La. Rev. Stat. § 30:2454(B) ...........................................................................66

LA. REV. STAT. § 49:2 ................................................................................................42, 66

LA. REV. STAT. ANN. § 30:2001 *et seq.* .................................................................28

LA. REV. STAT. ANN. § 30:2011(D)(1) ....................................................................37

LA. REV. STAT. ANN. § 30:2025 ........................................................................34, 38

LA. REV. STAT. ANN. § 30:2025(B) ..........................................................................28

LA. REV. STAT. ANN. § 30:2025(B)(1)(a) .................................................................39

LA. REV. STAT. ANN. § 30:2025(E) ...........................................................................37

LA. REV. STAT. ANN. § 30:2025(E)(1) .......................................................................39

LA. REV. STAT. ANN. § 30:2025(E)(3)(a)(i)-(ix) .......................................................40

LA. REV. STAT. ANN. § 30:2073 ................................................................................33

LA. REV. STAT. ANN. § 30:2076 ................................................................................35

LA. REV. STAT. ANN. § 30:2453 ................................................................................33

LA. REV. STAT. ANN. § 30:2491(A) ...........................................................................25

LA. REV. STAT. ANN. § 30:2496 ................................................................................25

LA. REV. STAT. ANN. §1:12-13 .................................................................................25

LA. REV. STAT. ANN. 30:2004(10) ............................................................................31

LA. REV.STAT. ANN. § 30:2073 ................................................................................32

LAC 33:I.701 *et seq.* ...................................................................................................38

LAC 33:I.703 ..............................................................................................................38

LAC 33:I.705 ..............................................................................................................38

LAC 33:I.705(I) ..........................................................................................................38

LAC 33:IX.107 ...............................................................................................31, 32, 33

LAC 33:IX.703 and 705 .............................................................................................39

LAC 43: XXIX.129(B)(6) ..........................................................................................64

LAC 43:XXIX.101 ......................................................................................................28

## Other Authorities

10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*, § 2759 ...........................21

136 Cong. Rec. H6933-02, H6944...........................................................................................5, 61

BLACK'S LAW DICTIONARY, 660 (7th ed. 1999) ....................................................................52

*Claimant's Guide:  A Compliance Guide for Submitting Claims Under the Oil Pollution
Act of 1990*, National Pollution Funds Center, U.S. Coast Guard, April 2003
(updated November 2009) .............................................................................................54

*Declaratory Judgments* 299 (2d ed. 1941) ...............................................................................21

Dictionary.com, http://dictionary.reference.com/browse/result ..................................................44

Goldberg, John C.P., *Liability for Economic Loss in Connection with the Deepwater
Horizon Spill*, November 22, 2010, prepared at the request of Kenneth R.
Feinberg ................................................................................................................57, 62

H.R. 1465 (Nov . 15, 1989), § 1002(a)(1) ...............................................................................60

H.R. 2325 (May 11, 1989), § 102(a)........................................................................................60

H.R. 3027 (July 17, 1989), § 102(a)(1)....................................................................................60

H.R. 3394 (Oct. 3, 1989), § 1002(a)(1) ...................................................................................60

H.R. Conf. Rep. 101-653, 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 779, 781, 1990
WL 132747 ..........................................................................................53, 54, 57, 60

Holmen, Brian Theodore, *Gatlin Oil Co. v. United States:  A Myopic View of OPA
Liability*, 42 WM. & MARY L. REV. 1893 (2001)...............................................47

Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006,* 20 Tul. Envt. L.J. 347, 34
(Summer 2007) .............................................................................................................36

PL 101-380 § 405............................................................................................................5

PL 101-380, § 2004 (Aug. 18, 1990).......................................................................................59, 60

PL 99-372, Sept. 18, 1978, 92 Stat. 629 ................................................................................59, 60

Ramseur, Jonathan L., *Oil Spills in U.S. Coastal Waters:  Background, Governance, and
Issues for Congress*, at 3, Congressional Research Service RL33705, April 30,
2010...............................................................................................................................34, 62

Robertson, David, The Oil Pollution Act's Provisions on Damages for Economic Loss,
April 10, 2011 ("Robertson Report"), at 33-34 ...............................................57, 58, 59, 60

S. Rep. No. 101-94 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734.....................................5, 29

S. Rep. No. 101-94 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 780.........................................48

S. Rep. No. 94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 722...................62

*The Merriam-Webster Dictionary online*, http://www.merriam-
    webster.com/dictionary/result?show=0&t= 1302396398; http://www.merriam-
    webster.com/dictionary/from........................................................................................44

*The Merriam-Webster Dictionary online*, http://www.merriam-
    webster.com/dictionary/spill.........................................................................................32

W. Page Keeton *et al.*, *PROSSER AND KEETON ON TORTS* § 41 (5th ed. 1984)................................61

## <u>Rules</u>

Fed. R. Civ. P. 8.................................................................................................................12

Fed. R. Civ. P. 57...............................................................................................................23

NOW INTO COURT, through undersigned counsel, comes the State of Louisiana, by and through Governor Bobby Jindal and Attorney General James D. "Buddy" Caldwell (hereinafter "Louisiana" or the "State"), and offers the following Memorandum of Law in Support of its Opposition to Defendants' Motions to Dismiss the State's First Amended Complaint.

## <u>INTRODUCTION</u>

Louisiana has suffered the most extensive damages of all the plaintiffs with claims pending in the Deepwater Horizon Multidistrict Litigation.  The State's coastline experienced a direct frontal assault from the waves of oil and other pollutants that were released as a result of Defendants' actions and remains at risk from more of the same from uncontrolled oil still in the Gulf.  Louisiana's coastal environment and ecosystem continue to suffer extensive injuries that could fundamentally alter Louisiana's most defining natural resources for generations.  The State's economy is still battling the prolonged downturn brought on by the *Deepwater Horizon* event and resulting spill (the "Spill"), including the impacts of the offshore drilling Moratorium imposed in direct response to the Spill.  The State's revenues depend on a robust coastal economy, and that very economy continues to struggle in the wake of the Spill.

Defendants BP Exploration and Production Inc., BP Corporation North America Inc., BP America Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") (Doc. 2644), Anadarko Petroleum Company and Anadarko E&P Company (collectively, "Anadarko") (Doc. 2646), M-I L.L.C. ("M-I") (Doc. 2631), Halliburton Energy Services, Inc. ("Halliburton") (Doc. 2642), Weatherford U.S., L.P. ("Weatherford") (Doc. 2638), Cameron International Corporation ("Cameron") (Doc. 2637), and Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater, Inc., and Triton Asset Leasing GmbH (collectively, "Transocean") (Doc. 2656) (all previously identified defendants collectively, "Defendants") have filed a series of motions asking the Court to dismiss—based on the face of the pleadings and

1

without factual inquiry—the entirety of the State's claims arising from the Spill.  According to Defendants, the State has no right to seek relief for its injuries at this time, even though the State has received only a small fraction of the compensation that it is owed.  None of the authorities cited by Defendants, however, require deferring the State's day in court while Defendants systematically rebuff the State's requests to be made whole.  The relief requested in these motions would devastate Louisiana, and, without valid basis, deprive Louisiana of the application of its own laws and shift the responsibility for enormous damages from Defendants to the public.  Thus, for the reasons specified more fully below, the State requests that the Court deny Defendants' motions to dismiss in their entirety.

Defendants' arguments fall into three general categories which are addressed in the following order.

First, Defendants argue that various federal statutes preempt the application of the State's laws and federal maritime law to this oil spill because of Defendants' operations on the outer continental shelf and therefore the State has limited causes of action available to it.  Defendants next posit that the State cannot recover under its few remaining available claims because the State has failed to properly plead or present those claims.  Both of these lines of argument fail. The matters at issue here all derive from the single largest oil spill in the country's history.  As such, the Oil Pollution Act is the paramount controlling federal statute, and it expressly saves claims under state law and federal maritime law.  The State has properly presented and pleaded its claims under the Act.

The second set of arguments challenges Louisiana's claims under state law.  Defendants assert that the State's oil spill act is the exclusive state law remedy, if available at all, and that penalties cannot be assessed against them because oil was not spilled into Louisiana's waters.

But the State's spill act expressly preserves other state laws regarding oil spill liability, including imposition of civil penalties for discharges affecting Louisiana's waters.

Defendants' final set of arguments seeks to limit the damages recoverable by the State as a result of the oil spill. Defendants argue that only damages directly resulting from oiling are recoverable, and that a variety of other damages suffered by the State are too remote or barred by the economic loss rule. Those arguments are misplaced, fail to recognize Louisiana's unique position and wide-spread impacts, and fail as a matter of law.

## LEGAL STANDARD

To defeat a motion to dismiss, a plaintiff must merely "plead enough facts 'to state a claim to relief that is plausible on its face.'" *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at *5-6 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009). This Court has observed that "[a] claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wright*, 2011 U.S. Dist. LEXIS 16290 at *6 (quoting *Iqbal*, 129 S. Ct. at 1949). The Fifth Circuit recently recognized the fact that *Iqbal* and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) have not altered traditional pleading standards. In *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. Feb. 24, 2011), the Fifth Circuit held:

> The Supreme Court's decisions in *Iqbal* and *Twombly* . . . did not alter the long-standing requirement that when evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] all well-pleaded facts as true and view[ ] those facts in the light most favorable to the plaintiff." *Iqbal* and *Twombly's* emphasis on the plausibility of a complaint's allegations does not give district courts license to look behind those allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial.

*Huggins Realty*, 634 F.3d at 803 n. 44 (citations omitted).

Earlier this year, a unanimous Supreme Court reversed an order of dismissal, in a decision further clarifying the standards set forth in *Iqbal* and *Twombly*. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011). The Court reiterated that there are no "bright line" pleading requirements under *Twombly*/*Iqbal* and that the functional test is whether the complaint, taken as a whole, raises "a reasonable expectation that discovery will reveal evidence" that could enable the ultimate trier of fact to decide the case in the plaintiff's favor. *Id*. at 1323. The State's First Amended Complaint, which copiously details the many ways the State was harmed by Defendants' actions, satisfies this standard.[1]

## **Argument and Authorities**

## I.    **FEDERAL STRUCTURE AND CLAIMS.**

In seven different motions, Defendants put forward a series of arguments designed ultimately to limit their exposure to the damages suffered by the people of Louisiana. As set forth below and in Louisiana's Memorandum of Law in Interest in and Opposition to Defendants' Pending Motions to Dismiss ("Statement of Interest") (Doc. 1993), incorporated herein in entirety by reference, these arguments first attack the State's use of its own laws and general maritime law through a series of misconceived preemption arguments that ignore the most salient fact:  this is an oil spill case. Thus, Louisiana's state law and maritime claims survive, irrespective of the preemption argument put forward by Defendants. Additionally, Defendants put forward a series of arguments under the applicable federal laws that the State has

---

[1] The suggestion that it is somehow unclear which of the claims in Louisiana's First Amended Complaint are asserted against each Defendant is misplaced. Each Count in the First Amended Complaint expressly identifies each Defendant against which it is asserted. As such, the authority from the Middle District of Florida cited by Anadarko regarding Rule 8 of the FEDERAL RULES OF CIVIL PROCEDURE is inapplicable. *Pierson v. Orlando Regional Healthcare Sys., Inc.*, No. 6:08-cv-466-Orl-28GJK, 2009 WL 2151176 (M.D. Fla. July 13, 2009) (finding a failure to identify to which defendant a loss of consortium claim had been pleaded).

failed to properly plead or present certain claims, but these too fail, as set forth below. Defendants' motions to dismiss should be denied.

> **A.**    **OPA is the Controlling Federal Statute Applicable to All Oil Discharges, and It Expressly Saves State Law and Maritime Claims.**

The matter before the Court arises from an oil spill of epic proportions.  The Court's analysis must therefore begin with the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701, *et seq.* Defendants do not contest that OPA applies.  Rather, Defendants seek to limit the reach of OPA by arguing that OPA applies only through the prism of the Outer Continental Shelf Liability Act ("OCSLA"), which they argue somehow restricts or eliminates OPA's savings provisions that preserve state law claims and federal maritime law.  Defendants' argument is wrong and must be rejected.

OPA, not OCSLA, is the paramount, single controlling federal statute that exclusively governs liability and compensation for all oil discharges to waters of the United States.[2]  OPA was enacted in the wake of the *Exxon Valdez* incident specifically to address disasters like the *Deepwater Horizon* event and resulting Spill.  Congress enacted OPA to be the single controlling federal statute over oil discharges in waters of the United States.  S. Rep. No. 101-94, at 9 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 230; *see Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001).  In enacting OPA, Congress explicitly repealed and replaced the oil liability and compensation provisions in other statutes, including <u>all</u> such provisions formerly contained in OCSLA.  *See* P.L. 101-380 § 405.  Accordingly, OCSLA today contains no substantive liability or damages provisions applicable to oil spills because such events are now covered by OPA.

---

[2] OPA was drafted and implemented "in response to the *Exxon Valdez* oil spill in Prince William Sound.  It represents Congress's attempt to provide a comprehensive framework in the area of marine pollution."  136 Cong. Rec. H6933-02, H6944.

Because OPA applies of its own force, OPA's savings clauses are not affected by OCSLA.  To the contrary, the plain language of OPA expressly saves state law and general maritime law.  33 U.S.C. § 2718(a); 33 U.S.C. § 2718(c); 33 U.S.C. § 2751(e); *see also, U.S. v. Locke,* 529 U.S. 89, 105-106 (2000) (noting that OPA was not intended to preempt state law).  Importantly, OPA preserves state law claims *regardless* of whether an oil discharge, or the ensuing pollution, occurs in federal waters or within a state's territorial waters.  States are specifically authorized to impose additional liability for "other pollution by oil within such State," and as "relating to the discharge of oil."  33 U.S.C. § 2718(a); 33 U.S.C. § 2718(c).  Each of these provisions contemplates a state's exercise of authority over any discharge that affects a state's resources and citizens.

### B.    Even if OCSLA Were Presumed to Apply, State Law and Maritime Law Would Still Apply Under OCSLA's Choice-of-Law Provision.

Moreover, even assuming, *arguendo*, that OCSLA somehow controlled here, state and maritime law would still apply, contrary to Defendants' assertions.  Application of the choice-of-law framework that courts developed under OCSLA establishes that, in addition to OPA, maritime law and the law of the various affected states apply to Louisiana's claims.[3]

OCSLA defines the body of law applicable to the seabed, subsoil and fixed structures on the outer Continental Shelf ("OCS") and chooses state law as surrogate federal law in certain circumstances.  43 U.S.C. § 1333(a)(2)(A); *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357, 363 (1969); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).  When maritime law applies of its own force in disputes arising on the OCS, however, state law does not apply as surrogate federal law.  *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d

---

[3] *See* Statement of Interest, Doc. 1993, at 21-32, incorporated herein by reference.

492, 497 (5th Cir. 2002) (citing *PLT Eng'g*, 895 F.2d at 1047), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).

### 1.  Maritime Law Applies of Its Own Force.

Under the *PLT* test, the conclusion that maritime law applies of its own force ends the choice-of-laws analysis required by OCSLA under § 1333(a)(2)(A).  The requirements for admiralty tort jurisdiction set forth in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), "location" and "connection with maritime activity," are satisfied in this case, and maritime law therefore applies of its own force.  *Id*. at 534.  The Spill occurred as a result of the blowout on the *Deepwater Horizon* forty miles off the coast of Louisiana in the Gulf of Mexico.  The *Deepwater Horizon* is a vessel for purposes of OCSLA.[4]  *Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 544 n.12 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009); *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 394 n.1 (5th Cir. 1991).  The blowout and resulting Spill had a real, disruptive impact on maritime commerce in the Gulf of Mexico.  Oil and gas drilling, when done from a vessel such as the *Deepwater Horizon,* has long been held to be a traditional maritime activity.  *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986); *Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 (5th Cir. 1981).  Because federal maritime law applies of its own force to the Spill, state law does not apply as surrogate federal law.

### 2.  State Police Power to Regulate Sea-to-Shore Pollution Applies of Its Own Force.

Contrary to some of Defendants' positions, however, the conclusion that state law does not apply as surrogate federal law does not preclude the application of state law of its own force.  Application of maritime law does not displace state law here because maritime law does not

---

[4] The classification of the *Deepwater Horizon* under OCSLA differs somewhat from its classification under OPA. *See* Statement of Interest, Doc. 1993, at 24 n.4, incorporated herein by reference.

preempt all applications of state law and in no way impacts the application of OPA to the State's claims.  Courts have allowed the application of state law to supplement where maritime law is silent.  *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 933 (E.D. La. 2010) (citing *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996)); *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986).  Here, Louisiana's maritime and state law claims are not included in the covered damages specified in OPA.  Rather, the State has asserted additional liabilities and remedies for damages suffered as a result of the Spill, and these claims supplement, but do not contradict, the provisions of OPA.  These additional remedies are specifically preserved by OPA's savings clauses.

In *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973), a pre-OPA case, the Court considered a challenge to the Florida Oil Spill Prevention and Pollution Control Act. *Askew*, 411 U.S. at 339.  The Court held the Florida law did not conflict with the Admiralty Extension Act, which extends admiralty and maritime jurisdiction to damage on land caused by a vessel on navigable water.  *Id.* at 343, 344.  In upholding the Florida law, the Court stated that "sea-to-shore pollution—historically within the reach of the police power of the States—is not silently taken away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy."  *Id.* at 343.

The holding in *Askew* was reiterated by the Supreme Court after the enactment of OPA in *U.S. v. Locke*, 529 U.S. 89, 106 (2000).  In *Locke*, the Court invalidated Washington state oil tanker regulations enacted after the *Exxon Valdez* oil spill.  *Locke*, 529 U.S. at 111-16.  The Court noted that OPA's savings clauses are found in Title I of the Act, titled "Oil Pollution and Compensation," which creates a liability scheme for oil pollution.  *Id.*  The Court reasoned that "[p]lacement of the savings clauses in Title I of OPA suggests that Congress intended to preserve

8

state law of a scope similar to the matters contained in Title I of OPA . . . ."  *Id.*  Washington's attempt to regulate vessel operation, design, and manning was held to be outside the scope of Title I.  *Id.*  In so holding, the Court affirmed the holding in *Askew* as an example of the proper exercise of a state's police power to regulate oil spills under both maritime law and OPA's savings clauses, stating "[w]e have upheld state laws imposing liability for pollution caused by oil spills.  Our view of OPA's savings clauses preserves this important role for the States, which is unchallenged here."  *Id.* at 106.

The State's police power to regulate sea-to-shore pollution applies in this case of its own force because that law is not preempted by federal maritime law.  Louisiana's claims at issue here create liability schemes for oil pollution consistent with the proper exercise of the states' police power.  These claims, therefore, are not preempted by maritime law or OPA.  Likewise, these state law claims are not affected by the fact that this Spill occurred on the OCS.  *Locke*, 529 U.S. at 105; *Askew*, 411 U.S. at 343.

> **C.** **The Clean Water Act Does Not Preempt State Law Claims, and *Ouellette* and Its Progeny Do Not Apply.**

Defendants BP, Halliburton, and Weatherford argue that all state common law claims based on water pollution are preempted by the Clean Water Act ("CWA") under *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987).  In *Ouellette*, the Supreme Court determined that, as between two states, a state could not use its own nuisance laws to challenge a point source discharge in another state that had been authorized under an Environmental Protection Agency ("EPA") permit program.  *Ouellette*, 479 U.S. at 494-96.  Relying on *Ouellette*, Defendants assert that because the Macondo well blowout occurred on the OCS, the "source" of the pollution is federal and therefore the Spill is governed only by federal law, *i.e.*, none of the laws of any of the states affected by that discharge apply.  But *Ouellette* does not support Defendants' position.

9

First, *Ouellette* and the other cases cited by Defendants all involved a <u>permitted</u> discharge authorized by EPA.  The Court in *Ouellette* reasoned that allowing application of one state's laws against a discharge authorized in another state would allow the affected state to circumvent the permit system promulgated by EPA under its CWA authority, thereby upsetting the balance of public and private interests addressed by the CWA.  *Ouellette*, 479 U.S. at 494-96.  Here, the discharge of millions of gallons of oil from the rig explosion and well blowout into the Gulf cannot in any way be characterized as an authorized discharge (nor as non-compliance with discharge permit limits) under any permit program; therefore, there is no balance of interests to preserve.

Second, all of the cases cited by Defendants deal specifically with <u>interstate</u> water pollution, namely a dispute between states, and not with the federal-to-state pollution the Defendants allege here.  More specifically, the cases cited by Defendants involve disputes about which state has the right to administer its permitting scheme and establish effluent limitations and standards that will govern a regulated entity's discharge.  Aside from the federalism concerns inherent in such a situation, it is not valid to treat a non-permitted, uncontrolled, unexpected discharge from federal lands into the high seas and onto the lands of five sovereign states the same as an EPA-authorized discharge in one state that impacts a neighboring state.

Finally, the cases cited by Defendants all involve common law nuisance claims for the <u>intended</u> release of pollutants into public waterways.  Here, as in *Poe v. PPG Indus.*, 782 So. 2d 1168 (La. App. 3rd Cir. 2001), it is alleged that Defendants' negligence caused an <u>unintended</u>, accidental oil spill that resulted from the well blowout.  *See Poe*, 782 So. 2d at 1177.  Thus, this case is distinguishable from the common law nuisance actions found to be preempted by the

CWA, as the claims raised by the State threaten no interference with federal regulatory goals for water pollution control.  *See id.*; *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 (2008).[5]

Therefore, for the reasons stated here and in the State's Statement of Interest, Defendants' argument that the State's laws governing oil pollution, and thus the State's claims arising therefrom, are preempted by the CWA should be rejected.[6]

### D.    Louisiana's Suit Should Not Be Dismissed for Lack of Presentment.

Defendants argue that the State's claims that fail to allege compliance with OPA's presentment procedure must be dismissed.[7]  Defendants assert that compliance with OPA's presentment procedure is a mandatory condition precedent that, if not satisfied, strips the Court of jurisdiction over the State's OPA claims.  They argue that presentment must be alleged with the same specificity as the State's presentment to the responsible party.  For the reasons set forth below, Defendants' arguments should be rejected.

### 1.    The State Has Sufficiently Pleaded Presentment.

As fully set forth in the Statement of Interest, presentment under OPA is not jurisdictional.[8]  Because presentment is not jurisdictional, the Court has the authority to shape practical, efficient, and economical processes that can accomplish the laudable goals of presentment–early notice and opportunities for resolution–even in a matter of this magnitude. Defendants' attempt to "brand" OPA presentment as "jurisdictional" fails.  *See Henderson v. Eric Shinsekie, Sec'y of Veterans Affairs*, 131 S. Ct. 1197, 1203 (2011) ( "claims processing

---

[5] *See also Ouellette*, 479 U.S. at 497 ("The CWA precludes only those suits that require standards of effluent control incompatible with those established by the Act's procedures.").

[6] These issues are addressed in further detail in the Statement of Interest, Doc. 1992 at 32-42, incorporated herein by reference.

[7] *See* Doc. 2646-1 at 12-25 (Anadarko); *See* Doc. 2644-1 at 14-19 (BP); Doc. 2642-1 at 23-24 (Halliburton); Doc. 2631 at 10-12 (M-I); Doc. 2638 at 13-15 (Weatherford); Doc. 2649-1 at 4-5 (Moex Offshore 2007 LLC); Doc. 2656-1 at 2-5 (Transocean).

[8] Statement of Interest, Doc. 1993 at 34-39, incorporated herein by reference.

rules" which are not clearly indicated as being "jurisdictional" by Congress should not be "branded" as jurisdictional).

In any event, Louisiana has pleaded facts sufficient to demonstrate that it has presented claims and provided Defendants with adequate notice.[9]  *See* Statement of Interest, Doc. 1993 at 33-42 and First Amended Complaint, Doc. 2031 ¶¶ 143–152, both incorporated herein by reference.  Presentment allegations contained in the State's First Amended Complaint include:

> . . . the State has been regularly presenting to . . . BP a variety of the State's claims . . . .

> The State has previously presented claims to BP for voluminous removal costs, increased costs of public services, loss of revenues and earning capacity, property damages, and other damages including but not limited to Department of Natural Resources' claims for lost royalties and severance taxes associated with shut in wells; Department of Wildlife and Fisheries claims for lost fishing license revenue; Department of Transportation and Developments claims for transportation infrastructure repairs; costs to repair the harm to the State's tourism industry; claims to address seafood safety and response; response costs; and claims associated with coastal restoration projects.

> Some of the State's presented . . . claims have been rejected by BP . . . while other claims have been subjected by BP to . . . rejections and . . . reservations.

*First Amended Complaint*, Doc. 2031 ¶¶ 143, 144 & 151, respectively.

Rule 8 of the FEDERAL RULES OF CIVIL PROCEDURE merely requires the State to allege the fact of its compliance with the OPA presentment procedure, and Louisiana has done so.  *Iqbal*, 129 S. Ct. at 1949.  There is nothing in OPA that alters these basic rules when it comes to pleading presentment, and certainly OPA does not require the State to duplicate the substance of its pre-suit presentment in its First Amended Complaint.  Thus, whether the State has complied

---

[9] OPA defines a "claim" to be presented as "a request, made in writing for a "sum certain," for compensation for damages or removal costs resulting from an incident[.]" 33 U.S.C. § 2701(3).  To properly "present" a claim within the meaning of § 2713(a) requires "some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed."  *Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 311 (E.D. Va. 1993).  Here, where damages are ongoing and costs incurred daily, presentment of known quantities and claims should suffice for all future claims when the sums become certain.  To require repeated presentment in these circumstances is to demand claim-splitting and judicial inefficiency.

with OPA's presentment procedure is a fact-specific inquiry that is not appropriate for dismissal on the face of the pleadings.

> ## 2. The State's Claims Need Not Be Presented Because OPA Explicitly Permits a Party to Sue at Any Time to Recover Removal Costs; Claims for Damages Brought in Conjunction with Claims for Removal Costs Are Permissible, Irrespective of Whether Presentment Was Made.

OPA and the applicable jurisprudence establish that the State's OPA claims need not be presented here and, in any circumstance, need not be presented repeatedly each and every time Louisiana suffers injuries, damages, costs, and claims due to the Spill.[10]  Defendants have failed to point to any jurisprudence contradicting *U.S. v. M/V Cosco Busan*, 557 F. Supp. 2d 1058, 1060-63 (N.D. Cal. 2008), a case analyzed in the Statement of Interest, which directly held that presentment does not apply to government claims for damages brought in tandem with claims for removal costs.[11]  Instead, Defendants rely heavily upon a decision holding that private party claimants must present claims for damages to a responsible party before instituting a claim against the Oil Spill Liability Trust Fund (the "Fund").  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.,* 51 F.3d 235 (11th Cir. 1995) (emphasis added).  The distinction between the two holdings is significant, as *Boca Ciega* mandates a private claimant to attempt to recover directly from the responsible party before seeking relief from the government, which would in turn then have to seek subrogated repayment of those funds from a responsible party.  *Id.* at 1060-63.

By contrast, *Cosco Busan* specifically involved a governmental claim against a private party for removal costs and damages.  *Cosco Busan*, 557 F. Supp. at 1060-63.  Because OPA § 2717(f)(2), titled "Litigation, jurisdiction, and venue" allows a governmental entity to file a claim for removal costs at any time after such costs are incurred, the *Cosco Busan* court

---

[10] *See* Statement of Interest, Doc. 1993 at 39-42, incorporated herein by reference.

[11] *See* Doc. 2646-1 at 14-18 (Anadarko); Doc 2644-1 at 17 (BP); Doc. 2631 at 11 (M-I); Doc. 2649-1 at 5-6 (Moex Offshore 2007 LLC).

determined that judicial economy allowed the government to bring its damages claims simultaneously with the removal claims. *Id*. at 1062 (emphasis added). The court correctly reasoned that allowing a governmental entity to bring its removal claims but also requiring that entity to bring damages claims separately after presentment would add an "extra, unnecessary" step in the recovery process. *Id*. Defendants cast *Cosco Busan*'s reading of § 2717(f)(2)'s allowance for removal cost actions <u>at any time</u> as creating an inappropriate "exception" to OPA presentment; however, § 2717(f)(2) and the court merely recognize the practical reality that governmental entities incur considerably more and more complex claims for damages than private party claimants (such as those at issue in *Boca Ciega*).[12]

Moreover, Anadarko's attempt to insert an additional condition—presentment—into § 2717(f)(2) should be rejected in favor of the plain language of the subsection: "[e]xcept as otherwise provided in this paragraph, an action may be commenced under this subchapter for recovery of removal costs at any time after such costs have been incurred." *See* 33 U.S.C. § 2717(f)(2). Had Congress intended for presentment to be a condition to an action in § 2717(f)(2), it would have cross-referenced § 2713 in the same manner that it referenced § 2702(b)(1). *See Marathon Pipe Line Co. v. LaRoche Indus. Inc*., 944 F. Supp. 476, 478-9 (E.D. La. 1996) (refusing to judicially amend OPA § 2702(d)(1)(A) to include a presentment requirement where Congress could have included a presentment requirement but did not).

---

[12] Defendant Anadarko also asserts that *Cosco Busan* is incorrect because § 2717(f)(2) only imposes an <u>additional</u> requirement that claims for removal costs be brought "<u>only after a person has incurred some costs</u>." Anadarko's reading of § 2717(f)(2) is redundant, as OPA defines removal costs as "all removal costs <u>incurred</u>." 33 U.S.C. § 2702(b)(1) (emphasis added). In other words, one cannot have compensable removal costs without those costs having already been incurred. *See* Doc. 2646-1 at 17.

14

### 3. Louisiana's Claims Must Be Allowed to Proceed to Avoid Improper Claim-Splitting and the Risk of Claims Preclusion.

The claims asserted in this multi-district litigation action arise in federal court and include federal questions; they are therefore subject to the uniform federal rules and concerns over *res judicata* as developed by the United States Supreme Court. *U.S. v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 79 USLW 4271 (2010). *Res judicata*, or claim preclusion, bars "repetitious suits involving the same cause of action" once a court of competent jurisdiction has rendered a final judgment on the merits. *Id*. at 1730. The standard test for claim preclusion involves examining factual overlap and barring claims arising from the same set of facts. In other words, claim preclusion is based upon "facts rather than relief." *Id*. In the Fifth Circuit, claim preclusion forecloses re-litigation of claims <u>that could have been advanced</u> in support of a cause of action on the occasion it was formerly litigated arising out of the same "nucleus of operative facts." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 312-13 (5th Cir. 2004).

Under these authorities, Louisiana arguably must bring all of its claims related to the operative facts of the Spill now, as part of this action, because they can be litigated, and possibly disposed of, during this action. This may well include claims that Defendants assert have not been "properly" presented, given that a claimant has three years to gather information to present a claim for damages to a responsible party. 33 U.S.C. § 2712(h)(2).

In this complex case, with differing claims arising from the same set of facts, the State is operating in an abundance of caution and bringing all of its claims for relief in the instant litigation to avoid potentially losing those claims later to claim preclusion. *O'Neal v. Roadway Express, Inc.*, No. 06-0883, 2006 WL 2037380 (E.D. La. July 17, 2006) (under the Fifth Circuit "nucleus of operative facts" test, claim preclusion bars a subsequent action when those claims could have been litigated in a prior lawsuit); *see Murphy Exploration & Prod. Co. v. Davis*, 41

F.3d 663 (5th Cir. 1994) (claim preclusion bars a subsequent action seeking recovery of benefits erroneously applied in a setoff of a personal injury claim when the claim could have been brought in an underlying personal injury action); *St. Bernard Citizens for Envt'l Quality v. Chalmette Refining, LLC*, 500 F. Supp. 2d 592, 604, 608 (E.D. La. 2007) (claim preclusion barred a subsequent action in a citizen suit for violations of state and federal environmental standards, when the enforcement of, and remedy for, those violations was previously settled in a consent decree approved by the Eastern District and commented upon by the citizen suit plaintiffs). Accordingly, the State should be allowed to bring all of its claims at this time.

### E. The State Has Sufficiently Pleaded Its Claims for Removal Costs.

Anadarko asserts that the State's claims for removal costs should be dismissed because the State has not pleaded that it actually incurred removal costs and that its removal costs are consistent with the National Contingency Plan ("NCP") or are otherwise authorized by state law.[13] This argument should be rejected.

The State's First Amended Complaint includes substantial factual allegations to support its claims,[14] which if accepted as true, sufficiently state a plausible claim. *See Twombly*, 550 U.S. at 570; *U.S. v. Southeastern Pa. Transp. Auth. (SEPTA)*, Nos. 86-1094, 86-0595, 86-2229, 86-2235, and 86-2669, 1986 WL 7565, at *1-3 (E.D. Pa. July 2, 1986) (holding that "although plaintiffs' allegations may lack specificity, the damages asserted by plaintiffs do qualify as removal costs [under CERCLA, 42 U.S.C. §9601 *et seq.*]" and were sufficient to withstand a motion to dismiss for failure to properly plead "response costs" and compliance with the NCP). Any purported lack of specificity in the State's First Amended Complaint with respect to costs or

---

[13] *See* Doc. 2646-1 at 26–27 (Anadarko); Doc. 2649-1 at 5-6 (Moex Offshore 2007 LLC).

[14] *See* First Amended Complaint, Doc. 2031 at ¶¶ 8, 109, 112, 121, 122, 133, 157, 159, 160, 166, 180, 190-194, 204, 205 & 214, incorporated herein by reference.

compliance with the NCP is not fatal. The State's allegations are sufficient to support claims for removal costs without including such allegations. *See SEPTA*, 1986 WL 7565, at *1-3 (holding that plaintiffs' allegations relating to response costs under CERCLA were sufficient without alleging compliance with the NCP).[15]

Moreover, the issue should be resolved after development of the factual record through discovery, not on the face of the pleadings. *Id.* (denying motion to dismiss for failure to plead NCP compliance, noting that "the question of compliance with the [NCP] appears to be related to the recovery of damages and not to the existence of a valid claim for relief."); *see also Artesian Water Co. v. Gov't of New Castle*, 659 F. Supp. 1269, 1292-93 n.44 (Del. 1987) (citing CERCLA cases standing for the proposition that "consistency with the NCP cannot be resolved on the complaint alone and must instead await development of a factual record").

### F.    Defendants' Motions to Dismiss Louisiana's Claims Against Parties Not Designated as Responsible Parties Should Be Rejected.

Certain Defendants seek to capitalize on their assertion that OPA is the "exclusive" remedy for those injured by the Spill by arguing that–if they are not a "responsible party" under OPA—the Court must dismiss *all* claims brought against them by the State.[16] These Defendants argue that (i) an injured party may assert claims—regardless of whether the claim is brought under OPA, other federal law or state law—only against those designated by the Coast Guard as a "responsible party" and (ii) recovery against an entity not so designated is limited to an action for contribution by the designated "responsible party." This argument fails for several reasons.

---

[15] CERCLA provides for recovery of costs consistent with the NCP and includes "any other necessary costs of response incurred by any other person consistent with the national contingency plan[.]"   *See* 42 U.S.C § 9607(a)(4)(B). This language is substantially similar to that in OPA relied upon by Anadarko which provides that recoverable costs include "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan."  *See* 33 U.S.C. § 2702(b)(1)(B).

[16] Doc. 2646-1 at 28-30 (Anadarko); Doc. 2642-1 at 25-26 (Halliburton); Doc. 2637 at 19-26 (Cameron); Doc. 2642 at 25-26 (Halliburton); Doc. 2631 at 12-13 (M-I ); Doc. 2638 at 14-15 (Weatherford); Doc. 2651-1 (Moex USA Corporation).

As an initial matter, it is premature to dismiss a claim based upon a defendant's status as a "responsible party."  OPA provides that "each responsible party for a vessel or facility from which oil is discharged . . . is liable for the removal costs and damages . . . that result from such incident."  33 U.S.C. § 2702(a).  Section 2701(32) defines who is a "responsible party" depending on the type (vessel, facility, port or pipeline) and location (onshore or offshore) of the spill at issue.  33 U.S.C. § 2701(32).  For an offshore facility, the "responsible party" is defined as "the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1301–1356) for the area in which the facility is located (if the holder is a different person than the lessee or permittee) . . . ."  33 U.S.C. § 2701(32)(C).  As this Court has previously noted, "[w]hile the designation of the source of the discharge is initially made by the Coast Guard, the ultimate determination of which party or parties is a responsible party, within the meaning of 33 U.S.C. § 2702(a), is to be made by the court."  *Gabarick v. Laurin Mar. (Am.), Inc.*, No. 08-4007, 2009 WL 102549 at *4 n.25 (E.D. La. Jan. 12, 2009).

The facts alleged in the State's First Amended Complaint when taken as true establish that the acts or omissions of Defendants Cameron, Halliburton, M-I, and Weatherford (as well as Anadarko, BP, MOEX and Transocean) caused the Spill.[17]  The factual support for the State's allegations for purposes of its OPA claims will be explored during fact discovery.  But until there is a judicial determination concerning the liability of the responsible party or parties, it is

---

[17] *See* Summary Chart of Allegations in First Amended Complaint, attached hereto as Exhibit A and incorporated herein by reference.

improper and premature to dismiss any party simply because that party has not been designated a "responsible party" by the Coast Guard.[18]

Furthermore, to the extent this Court ultimately determines that any given defendant is not a "responsible party" under OPA, any such determination would not foreclose the State's non-OPA claims against that particular defendant.  OPA's savings clauses expressly provide that OPA does not affect in any way "the obligations or liabilities of <u>any person</u> under . . . State law, including common law."   33 U.S.C. § 2718(a) (emphasis added).   Nothing in OPA or the relevant case law suggests—as Defendants suggest—that non-OPA causes of action arising from a discharge of oil can proceed only against a party designated a "responsible party" under OPA. *See* 33 U.S.C. § 2718(a); *Smith v. Mid-Valley Pipeline Co.*, No. 3:07-CV-13-KKC, 2007 WL 1309612 (E.D. Ky. May 4, 2007) (dismissing plaintiffs' OPA claim against a defendant determined not to be a "responsible party" under OPA but allowing several non-OPA causes of action to proceed against that defendant, including state law claims for negligence, strict liability, trespass and nuisance).[19]

The State's claims against Defendants that are not designated as responsible parties should be allowed to proceed.

**G.    Louisiana's First Amended Complaint States Valid Claims for Declaratory Relief under OPA.**

Defendants Anadarko and BP also ask the Court to dismiss Louisiana's claims for declaratory relief seeking to establish the rights and responsibilities of the parties concerning

---

[18] *See* United States' Combined Memorandum of Law:  (1) In Opposition to Defendant Anadarko E&P Company LP's Motion to Dismiss and (2) In Support of United States' Motion for Partial Summary Judgment as to the Liability of the Anadarko Defendants, Doc. 2587-2.

[19] *See also* Statement of Interest at 15-21 and note 9 (discussing cases that allowed non-OPA causes of action to proceed as not preempted by OPA), incorporated herein by reference.

removal costs and damages occasioned by the State resulting from the Spill.  Anadarko's and BP's requests should be denied.

## 1. Louisiana's Claims for Declaratory Judgment Meet the Necessary Legal Requirements.

The Fifth Circuit uses a three-step test to determine whether a declaratory judgment action should proceed.  "A federal district court must determine:  (1) whether the declaratory judgment action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action."  *Sherwin-Williams Co. v. Holmes County,* 343 F.3d 383, 387 (5th Cir. 2003).

Applying that test here, the State's declaratory judgment action is justiciable because there is a substantial controversy of sufficient immediacy and reality as to the existence and extent of Defendants' liability and responsibility to the State for its costs and damages occasioned from the Spill.  *Venator Group Specialty, Inc. v. Matthew/Muniot Family,* 322 F.3d 835, 838 (5th Cir. 2003).  Additionally, none of the factors precluding the Court's authority to issue a declaratory judgment apply in this case; therefore, it is within authority of the Court to do so.  *See Sherwin-Williams Co.,* 343 F.3d at 388 n.1 (precluding a federal district court from issuing a declaratory judgment where (1) defendants have sued in state court; (2) the issues in the state case are the same as those in the federal court; and (3) the district court is prohibited from enjoining the state case under 28 U.S.C. § 2283) (citations omitted).  And, finally, 28 U.S.C. § 2201(a) gives the Court discretion to address the State's requests for declaratory relief pursuant to the Declaratory Judgment Act.

Under the circumstances of this case, the Court should allow the declaratory judgment claims to proceed to clarify the rights, responsibilities, and liability of the parties for removal costs and damages.[20]

### 2.   Defendants' Motions to Dismiss the Claims for Declaratory Relief Fail.

Anadarko and BP argue for dismissal of the State's declaratory relief claims primarily based on the false premise that the State has not complied with OPA's presentment procedure, and that the Court therefore lacks jurisdiction over the State's claims.  Defendants reason that, lacking presentment, the State does not have a valid cause of action under OPA, and without an underlying OPA claim, the State has no valid claim for declaratory relief.[21]   Anadarko thus characterizes the State's request for declaratory relief as "freestanding," arguing that the Declaratory Judgment Act, 28 U.S.C. § 2101, does not provide the Court with subject-matter jurisdiction.[22]  This argument should be rejected.

In the context of declaratory relief, the State's allegations must be taken as true.[23]  The State's First Amended Complaint sufficiently establishes that the State has complied with OPA's presentment procedure, and that the State has valid underlying OPA and state law claims.  As such, the State's claims for declaratory relief are not freestanding, but are tethered to the

---

[20] The Fifth Circuit instructed that "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *See Concise Oil & Gas P'ship v. La. Intrastate Gas Corp.*, 986 F.2d 1463, 1471 (5th Cir. 1993) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*, § 2759 at 647-48 (quoting Borchard, *Declaratory Judgments* 299 (2d ed. 1941))).

[21] *See* Doc. 2646-1 at 18-22 (Anadarko); Doc. 2644-1 at 20 (BP).

[22] *See* Doc. 2646-1 at 21 (Anadarko).

[23] *See Venator Group Specialty, Inc. v. Matthew/Muniot Family, LLC.*, 322 F.3d 835, 841 (5th Cir. 2003) (In the context of declaratory relief, the court instructed that "[i]n reviewing the complaint with respect to evaluating justiciability, we must assume that allegations made by Appellant are true, as at this stage of litigation Appellant is required to allege facts consistent with its claim that it is presently incurring injury, but Appellant is not required to produce evidence sufficient to support the claim.") (citation omitted).

underlying OPA and LOSPRA claims.[24]  At most, Defendants' challenges raise fact issues that should be resolved after discovery.  Moreover, it is the availability of declaratory relief itself that gives the State and the Court the ability to declare the rights and obligations of the parties now, without requiring the State to re-present claims for increased costs, damages and injuries over and over and over again.

Anadarko, wanting it both ways, also objects that the State fails to state a claim for declaratory relief for "forward looking" claims made by the State in an abundance of caution.[25] The State's claims include both past and forward-looking claims for injury.  While the State has alleged removal costs and damages that have been incurred,[26] this is not to the exclusion of damages and costs that continue to mount daily.  Section 2717(f)(2) expressly contemplates a ruling on liability for forward-looking claims.  *See* 33 U.S.C. § 2717(f)(2) ("[i]n any such action described in [OPA § 2717(f)(2)], the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any <u>subsequent action or actions to recover further removal costs or damages</u>" (emphasis added)).[27]  Thus, because the instant action includes claims for removal costs, the Court is required pursuant to 33 U.S.C. 2717(f)(2) to enter a declaratory judgment on liability for removal costs or damages in this action, which will be

---

[24] *See* First Amended Complaint, Doc. 2031 at ¶¶ 143-180, 190-238 and at pages 107-108, incorporated herein by reference.

[25] *See* Doc. 2646-1 at 18 (Anadarko).

[26] *See* First Amended Complaint, Doc 2031 at ¶¶ 143-180, 190-238 and at pages 107-108 incorporated herein by reference.

[27] *See also Unocal Corp. v. U.S.*, 222 F.3d 528, 544-5 (9th Cir. 2000) (§ 2717(f)(2) requires a court to issue a declaration for removal costs or damages).

binding on further (or "forward looking") claims for removal costs or damages in subsequent actions.[28]

Anadarko also challenges the State's right to submit a claim under the Declaratory Judgment Act.  Anadarko argues that § 2717(f)(2) of OPA is the only means available to the State to seek declaratory relief.  This challenge should be rejected because the Declaratory Judgment Act and Rule 57 of the FEDERAL RULES OF CIVIL PROCEDURE are procedural vehicles through which the State has properly made its claims for declaratory relief pursuant to underlying causes of action under OPA.  Anadarko has provided no case on point that forecloses the pursuit of claims under the Declaratory Judgment Act concurrently with relief in an action pursuant to OPA.  Moreover, Anadarko concedes that the Declaratory Judgment Act is a "purely procedural statute,"[29] a proposition contrary to displacement and consistent with the State's use of the Declaratory Judgment Act as procedural authority to pursue declaratory relief as to its state law claims pursuant to LOSPRA.[30]

Finally, BP suggests that declaratory relief is unnecessary because BP has accepted a role as a responsible party under OPA, set up a presentment procedure, and purportedly waived the

---

[28] Like 33 U.S.C. § 2717(f)(2), the Declaratory Judgment Act, 28 U.S.C. § 2101, does not preclude a declaration of liability for forward looking claims.  *Venator Group Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 839-40 (5th Cir. 2003) (quoting *Orex Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) (cautioning that "it is important to remember that the very nature of relief in a declaratory context is *ex ante*" and "the fact that certain contingencies pertaining to plaintiff's potential liability remain executory at the time of the declaratory suit does not defeat jurisdiction . . . .  Instead, the court must assess the likelihood that the contingencies will occur and then determine, 'whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention.'")) (internal citations omitted).

[29] Doc. 2646-1 at 19 (Anadarko).

[30] Anadarko also argues that the Declaratory Judgment Act is not available to provide relief where another remedy is available, but this argument should also be rejected.  *See* FED. R. CIV. P. 57 ("the existence of another adequate remedy does not preclude a declaratory judgment under 28 U.S.C. § 2201 that is otherwise appropriate").  Similarly, Anadarko's urging that the Court should not exercise its discretion to rule on the declaratory judgment should be denied.  Here, a declaratory judgment would clarify the relative rights and responsibilities of the parties, and have the practical result of enhancing the Court's ability to manage the case from a judicial administration standpoint.

OPA limitation-of-liability provisions.[31]   Nonetheless, the Court has not yet determined BP's status as a responsible party and BP's liability for removal costs and damages occasioned from the Spill.  A declaratory judgment as to BP and other Defendants would add important clarity to the issues in the proceeding.

For these reasons, the Court should reject the Defendants' arguments against declaratory relief and enter a declaratory judgment accordingly.

## II.   STATE LAW STRUCTURE AND CLAIMS.

Defendants challenge the State's ability to assert state law claims by arguing that LOSPRA preempts all other state laws relating to oil spills, and provides only a claim for reimbursement against responsible parties.   BP further argues that civil penalties do not lie against it because the Spill did not occur in State waters.  All of these arguments fail.  LOSPRA expressly preserves other state remedies for oil spill pollution, including imposition of civil penalties for discharges affecting State waters, and creates a direct cause of action against responsible parties for damages resulting from oil spills.  Thus, for the reasons specified below, Defendants arguments should be rejected.

### A.   LOSPRA Does Not Preempt Other State Law Claims.

#### 1.  Defendants' LOSPRA Preemption Argument Conflicts with the Clear Legislative Intent to Preserve Other State Remedies.

Defendants BP, Anadarko, and Transocean suggest LOSPRA is the sole basis for liability in oil pollution cases under Louisiana law and preempts all other state law remedies.  This contention is based on an argument that ignores the plain meaning of the statutory language in LOSPRA.  However, even if the statute were not itself clear on this point, the legislative history

---

[31] *See* Doc. 2644-1 at 20-21 (BP).

confirms that LOSPRA does not preempt other state law claims.  Rather, the statute was amended in 1995 for the express purpose of preserving other state remedies.

Defendants' preemption argument finds no support in LOSPRA's text.  Defendants selectively quote the passage from LOSPRA that it is "exclusive and shall supersede any other liability provisions provided by any other applicable state law."  *See*, *e.g.*, Doc. 2646-1 at 61 (Anadarko) (citing LA. REV. STAT. ANN. § 30:2491(A)).  This quote, while accurate, is woefully incomplete.  The full provision states that "[w]hen applicable, <u>the limitations of liability and immunities</u> provided in this Chapter shall be exclusive and shall supersede any other liability provisions provided by any other applicable state law."  LA. REV. STAT. ANN. § 30:2491(A) (emphasis added).  Defendants ignore the obvious—that LOSPRA's exclusivity provision applies only to limitations of liability and immunities.[32]

An additional LOSPRA provision relied on by Defendants likewise fails to support the contention that the statute preempts other state law remedies.  In a key passage of LOSPRA, the Legislature declared that the statute "shall be the exclusive authority on oil spill prevention, response, removal, and the limitations of liability."  LA. REV. STAT. ANN. § 30:2496.  Defendants overlook the obvious point—that the enumerated list of matters as to which LOSPRA is exclusive does not include liability (as opposed to limitations of liability).

Moreover, even if LOSPRA were somehow ambiguous on the question of whether it preempts other state remedies (and it is not), any such ambiguity is resolved by reference to the legislative history.  Following OPA's enactment in 1990, LOSPRA was originally enacted in 1991.  In the 1991 version of the statute, § 2496 stated that LOSPRA is the exclusive authority

---

[32] The heading of §30:2491, "Exclusive remedies," has no bearing on the question of LOSPRA's preemptive effect.  A statute's heading is not afforded the force of law and may not be used to override the plain meaning of the statutory language.  *Montelepre v. Edwards*, 359 So. 2d 1311, 1314 (La. App. 4 Cir. 1978) (citing LA. REV. STAT. ANN. §1:12-13).  Moreover, the unambiguous intent to preserve other state remedies revealed by the legislative history belies any argument that the heading somehow undermines the statutory text.

on "oil spill prevention, response, removal, and <u>liability</u> and the limitations of liability."  *See* 1991 LA. ALS 7 (emphasis added) (attached hereto as Exhibit B).  However, the statute was amended in 1995, in part, to strike the words "and liability" from § 2691.  *See* 1995 LA. ALS 740 (attached as Exhibit C).  This amendment provides clear evidence of the Legislature's intent to preserve other state laws regarding liability in oil pollution cases.  *See*, *e.g.*, *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1154-55 (11th Cir. 1988), *abrogated by Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ("When the legislature deletes certain language as it amends a statute, it generally indicates an intent to change the meaning of the statute") (citations omitted); *Chertkof v. U.S.*, 676 F.2d 984, 987 (4th Cir. 1982) (if words in a prior statute that express a plain meaning are deleted, a court may presume that a change of meaning was intended).  Despite the foregoing, Defendants ask this Court to nullify the 1995 amendment by reinserting language that the legislature intentionally removed.   The Court should uphold the statute's clear meaning and deny Defendants' Motions to Dismiss on this ground.

## 2. OPA Expressly Allows Overlapping Remedies Between OPA and LOSPRA.

BP contends that the overlapping remedies available in both OPA and LOSPRA means that LOSPRA's remedies are disallowed.  This argument ignores OPA's broad savings clause, which expressly preserves the right of states to impose liabilities on any person.  33 U.S.C. § 2718(a)(2).  Contrary to BP's representation, this savings clause is not restricted to only those instances where the liabilities are in addition to those set forth in OPA.

BP correctly notes that 33 U.S.C. § 2718 contains the applicable savings clauses.  But BP goes awry in suggesting that § 2718 contains only a single savings clause for state laws.  In fact, there are at least three separate savings clauses that address the preservation of state laws.  Of

these, only one is addressed to the imposition of "additional" liabilities.  The other two savings clauses contain no such restriction.  In particular, the savings clause in 33 U.S.C. § 2718(a)(2) states that nothing in OPA shall "affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law."  Yet that is precisely what BP is suggesting—that OPA modifies LOSPRA's liabilities—in clear contravention of the savings clause in § 2718(a)(2) that preserves such liabilities.

BP's reliance on *In re Pet. of Settoon Towing LLC*, Civ. A. No. 07-1263, 2009 WL 4730971 (E.D. La. Dec. 4, 2009) is equally flawed, because that case involved the savings clause in § 2718(c) and never addressed the savings clause in § 2718(a)(2).  Doc. 2644-1 at 22 (BP).  Notably, the savings clause in § 2718(a)(2) relied on by the State is applicable to state but not federal law.[33]  The holding in *Settoon*—which involved a claim under federal general maritime law—is limited to the savings clause in § 2718(c) and is therefore inapposite.

## B.  LOSPRA Creates a Cause of Action Against Responsible Parties for Damages.

Defendants Transocean and Cameron argue that LOSPRA provides a cause of action only for a reimbursement claim brought by the oil spill coordinator against responsible parties for monies paid to injured parties out of the Oil Spill Contingency Fund ("Fund").[34]  As such, Defendants argue, the State's claims for damages must be dismissed because the State is seeking to recover its damages directly from the responsible parties instead of waiting to pursue a claim for reimbursement. This argument fails for four independent reasons.

First, the Louisiana Environmental Quality Act ("LEQA"), of which LOSPRA is but one part, authorizes the direct cause of action alleged by the State.  LA. REV. STAT. ANN. § 30:2001 *et*

---

[33] The only exception is for claims under the federal Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq*.

[34] *See* Doc. 2656-1 at 28-29 (Transocean); Doc. 2637-1 at 28-29 (Cameron).

*seq.*  Specifically, LEQA provides that the State may bring a civil action to recover "any damages" resulting from a violation of LEQA, which includes LOSPRA.  LA. REV. STAT. ANN. § 30:2025(B).  This language creates an express cause of action on behalf of the State to recover damages set forth under LOSPRA, and that is precisely what the State has done in its First Amended Complaint.  There simply was no need to insert language in LOSPRA itself that creates a cause of action for damages (as opposed to reimbursement) since LEQA already contained such language.

Second, LOSPRA's regulations expressly contemplate that the State is empowered to pursue all responsible parties for its damages.  As described *supra*, LOSPRA could not achieve its statutory purpose absent a right of action to recover damages.  Section 101 of these regulations states that the natural resource trustees for the State "may bring a claim for natural resource damages pursuant to their authority under . . . OSPRA, R.S. 30:2451 et seq."  *See* LAC 43:XXIX.101.  The regulations also note that the State's trustees may recover assessment and other costs in "an action filed or settled pursuant to the Oil Spill Prevention and Response Act (OSPRA), R.S. 30:2480."  *Id*. § 129(B).  Finally, the regulations provide that, in those instances where the natural resource trustees choose to recover from the state Oil Spill Contingency Fund instead of the responsible parties, the oil spill coordinator will be subrogated to all "causes of action" held by the state trustees.  *Id*. § 129(E)(4).

Yet, Defendants argue that the State's trustees do not possess *any* cause of action.  Such an interpretation would render the foregoing regulatory provisions meaningless.  To the contrary, the regulations demonstrate that LOSPRA provides a cause of action on behalf of the State against responsible parties for the recovery of natural resource and other damages.  *See Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long

recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ."); *In re Recovery I, Inc.*, 635 So. 2d 690, 696 (La. App. 1 Cir. 1994) (citing *Chevron* with approval and holding that an executive agency's interpretation should stand unless it is "arbitrary, capricious or manifestly contrary" to the statute).  Thus, the State does not have to wait until monies are paid out of the Fund before it may recover its damages, and standing to seek relief is not limited to the oil spill coordinator.

Third, the legislative intent expressed in LOSPRA states that the statute was intended to support and complement OPA and therefore it should be interpreted in a manner consistent with its federal counterpart.  A central purpose of OPA was to permit injured parties to recover a broad class of damages from the responsible parties.  S. Rep. No. 101-94 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734 (OPA's liability provisions are "intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation.").  LOSPRA could not support this central purpose unless it also permitted a right of action to recover damages attributable to oil pollution.

Finally, the interpretation proposed by Defendants would improperly render large portions of LOSPRA irrelevant and upend the carefully crafted administrative scheme for assessing natural resource damages, thereby violating one of the fundamental tenets of statutory construction.  *See*, *e.g.*, *State v. Fontenot*, 36 So. 630, 634 (La. 1904) (courts are bound, to the extent possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless if a construction giving force to all words may be found).  For example, a significant portion of LOSPRA addresses the process whereby natural resource trustees for the State issue an assessment for natural resource injuries and restoration.

Accordingly, LOSPRA expressly provides for a cause of action on behalf of the State to recover enumerated damages. However, even if that were not the case, at a minimum the statute creates an implied cause of action. Transocean erroneously suggests that Louisiana courts disfavor implied causes of action. Doc. 2656-1 at 29 n.15 (citing *Billeaud v. Assoc. of Retarded Citizens of Evangeline*, 569 So. 2d 1020, 1024 (La. App. 3 Cir. 1990); *Int'l Harvester Credit Corp. v. Seale*, 518 So. 2d. 1039, 1041 (La. 1988). Yet neither *Billeaud* nor *Int'l Harvester* addresses implied causes of action. *Billeaud* held that the plaintiff, a private citizen, lacked standing to assert a cause of action based on the defendant's failure to comply with certain rules and regulations. *Billeaud*, 569 So. 2d at 1024. Notably, the court held that the state did have standing to assert the cause of action. *Id.* The *Billeaud* court never addressed whether the state's cause of action was express or implied. Likewise, *Int'l Harvester* never suggested that a cause of action could not be implied from statutory language. *Int'l Harvester*, 518 So. 2d at 1041-43. Rather, the opinion merely states that punitive damages may not be awarded absent clear legislative intent that they are recoverable. *Id.*

In contrast to the inapposite case law cited by Transocean, there is clear and recent authority for the proposition that a court can and indeed should recognize implied causes of action based on statutory language that falls short of creating an express cause of action. *Wallace C. Drennan, Inc. v. City of New Orleans*, Case No. 2010-CA-1301, 2011 La. App. LEXIS 500 (La. App. 4 Cir. April 27, 2011). In *Drennan*, the trial court held that the Public Bid Law created an "implied" cause of action based on a section that discusses damages suffered by the contractor that are attributable to a delay caused by the public entity. Drennan, 2011 La. App. LEXIS 500 at *2. The court displayed no hesitancy in recognizing the implied cause of

action, and nowhere does the court suggest—as Transocean does—that Louisiana courts "disfavor" implied causes of action.  *Id.*

The language in LOSPRA, LEQA, and the applicable regulations demonstrate that the Louisiana Legislature created an express cause of action for damages against responsible parties. Even if this were not the case, the Court should still deny the motions to dismiss because, at a minimum, LOSPRA creates an implied cause of action.

**C.      The State's Claims for Civil Penalties Under the Louisiana Environmental Quality Act Are Valid.**

BP attempts to avoid liability for civil penalties under state law by arguing tha,t if pollutants move away from the site of the discharge, there can be no violation of LEQA.  Such an interpretation of the term "discharge" is contrary to the plain language of the statute.

**1.      Oil and Other Pollutants Indisputably Entered Louisiana Waters and Caused Water Pollution in Violation of the Louisiana Environmental Quality Act.**

Count III of Louisiana's First Amended Complaint asserts, in pertinent part:

> La. R.S. 30:2076(A)(1) prohibits the discharge into any waters of the State of any waste or any substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation.  La. R.S. 30:2076(A)(3) prohibits the violation by a person of any rule or regulation adopted under the Louisiana Water Control Law, La. R.S. 30, Subtitle II, Chapter 4 or under authority of that Subtitle.
>
> Defendants caused and/or allowed the unauthorized discharge of oil, gas and other pollutants into the waters and onto the coastline of the State of Louisiana. Defendants' unauthorized discharge of pollutants constitute continuing violations of La. R.S. 30:2075, La. R.S. 30:2076(A)(1)(a) and (A)(3) and LAC 33:IX.1701.B.

First Amended Complaint ¶¶ 184-85.  Discharge is defined as "the placing, releasing, spilling, percolating, draining, pumping, leaking, seeping, emitting, or other escaping of pollutants into the air, waters, subsurface water or ground as the result of a prior act or omission . . . ."  LA. REV. STAT. ANN. 30:2004(10); *see also* LAC 33:IX.107.  "In the absence of an indication to the

contrary, words in a statute are assumed to bear their ordinary, contemporary, and common meaning." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 n.5 (2002) (citations omitted). Thus, the words used to describe "discharge" should be given their ordinary and common meanings. "Spill" is defined as "to flow, run, or fall out, over, or off and become wasted, scattered, or lost;" "to cause or allow something to spill;" and "to spread profusely or beyond bounds."[35]

Oil and pollutants from the *Deepwater Horizon* rig and Macondo well clearly flowed from the source and spread profusely throughout the waters of the Gulf of Mexico and into adjoining Louisiana waterways. The term "leak" means "to enter or escape through an opening usually by a fault or mistake."[36] The oil also leaked because it escaped through an opening in the well and the pipes attached to the well as a result of the fault of Defendants. Finally, pursuant to the plain language of the statute, LEQA does not require that the substance causing the water pollution be directly placed in the waters of the state;[37] it is sufficient that the substance enters into the waters of the state. The term "into" is "used as a function word to indicate entry, introduction, insertion, superposition, or inclusion."[38] Thus, there is no dispute that oil and pollutants spilled or leaked from the *Deepwater Horizon* rig and Macondo well and entered into the waters of Louisiana, and there is no reasonable dispute that this constitutes a "discharge" that therefore triggers the State's claims under LEQA.

BP also attempts to evade paying civil penalties in Louisiana, the state which has sustained the most significant impact to its natural resources, wildlife, and the environment, by

---

[35] http://www.merriam-webster.com/dictionary/spill.

[36] *Id.*

[37] "Waters of the state" are defined as "both the surface and underground waters within the state of Louisiana including all rivers, streams, lakes, groundwaters, and all other water courses and waters within the confines of the state, and all bordering waters and the Gulf of Mexico." LA. REV.STAT. ANN. § 30:2073; LAC 33:IX.107.

[38] *Id.*

suggesting that the term discharge does not encompass the "passive migration" of pollution.  *See* Doc. 2646-1 at 23 (BP).  The characterization of approximately 5 million barrels of oil gushing from the *Deepwater Horizon* rig and Macondo well into the Gulf of Mexico and into Louisiana's waters in as little as 10 days as "passive migration" is disingenuous, at best.  Indeed, all three cases cited by BP to support its argument that passive migration does not constitute a discharge involve questions related to "disposal" under CERCLA, 42 U.S.C. §9601 *et seq*.  Indeed, all three of those cases involve contaminants gradually leaching over decades.[39]  Here, massive unauthorized discharges of oil and pollutants entered Louisiana's waters in a matter of days.  The Spill at issue is not "passive migration."

The only remaining issue here is whether Louisiana has sufficiently pleaded that the oil and pollutants caused, or will tend to cause, "water pollution."  "Water pollution" is defined in the LEQA as "the introduction into waters of the state by any means, including but not limited to dredge and fill operations, of any substance in concentrations which tend to degrade the chemical, physical, biological, or radiological integrity of such waters."[40]  The Louisiana Legislature has declared that "the release of oil into the environment presents a real and substantial threat to the public health and welfare, to the environment, the wildlife and aquatic life."[41]  Significantly, BP has not argued that oil does not cause water pollution, but rather focuses only on its allegation that an oil spill does not constitute a discharge of a substance. Common sense and judicial logic dictate that Louisiana has made a sufficient factual showing

---

[39] *See U.S. v. 150 Acres of Land*, 204 F.3d 698 (6th Cir. 2000) (whether the migration of hazardous substances from drums that were dumped in the mid-1950s to early 1970s resulting in contamination of land constitutes disposal for purposes of determining the applicability of the innocent landowner defense under CERCLA); *U.S. v. CDMG Realty Co.*, 96 F.3d 706 (3rd Cir. 1996) (gradual leaching of contaminants over several years does not constitute disposal); *Joslyn Mfg. Co. v. T.L. James & Co., Inc.*, 836 F. Supp. 1264 (W.D. La. 1993) (CERCLA action involving wood treating plant operations from the 1950s and 1960s whereby plaintiffs argued that rainfall during a subsequent ownership of the property caused the hazardous materials to leach through the soil).

[40] LA. REV. STAT. ANN. § 30:2073; s*ee also* LAC 33:IX.107.

[41] LA. REV. STAT. ANN. § 30:2453.

that the oil and pollutants from the Macondo well have degraded, or will tend to degrade, the chemical, physical, and biological integrity of Louisiana's waters.[42]  Indeed, as discussed below, every oil spill has an impact on natural resources.  *See, e.g.,* Ramseur, Jonathan L., *Oil Spills in U.S. Coastal Waters:  Background, Governance, and Issues for Congress*, at 3, Congressional Research Service RL33705, April 30, 2010.  The State has sufficiently pleaded water pollution in its First Amended Complaint.

### 2.  Louisiana's Claim for Civil Penalties is Authorized Under the Louisiana Environmental Quality Act and Has Been Sufficiently Pleaded.

Louisiana law provides that the State may assess civil penalties against any person found to be in violation of LEQA.  LA. REV. STAT. ANN. § 30:2025.  Louisiana's First Amended Complaint asserts that BP, Anadarko, MOEX, and Transocean violated LEQA and that each of these Defendants is liable for civil penalties.  BP argues that Louisiana's entire claim for penalties should be dismissed on two grounds:  (1) the alleged violation does not constitute a continuing tort since the "release of oil ended at the latest in July 2010 when the Macondo well was capped;" and (2) LEQA does not authorize an additional penalty of $1 million per day of violation.  *See* Doc. 2644-1 at 24-26 (BP).  Neither statement is sufficient to support dismissal.  Louisiana's First Amended Complaint provides sufficient factual allegations to support a cause of action for civil penalties for violations of LEQA.  Even assuming, *arguendo*, BP's allegations

---

[42] *See Askew*, 411 U.S. 328-29 (Oil pollution is "an insidious form of pollution of vast concern to every coastal city or port and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent");  *Wyo. v. Platte Pipe Line Co.*, 649 P.2d 208, 211 (Wyo. 1982):

> discharge is defined . . . to mean any addition of pollution to state waters, when oil spills and mixes into a Wyoming river, pollution has been added to the water . . . .  Also, oil's addition to water will definitely alter the physical, chemical or biological properties of the water . . . .  This includes a change in taste, color, turbidity or odor of the water.  Also the oil will render the water harmful to public health, livestock, wildlife, and aquatic life.  Though none of these facts were alleged in the complaint, they are so well known that they come within the scope of matters a court should take judicial notice of when considering whether to dismiss a complaint for failure to state a claim for which relief may be granted.  We take judicial notice of the effect on water when crude oil is added to it.

were correct, which Louisiana denies, the effect would be to reduce the penalty amount to which Louisiana is entitled, not to eliminate the penalty claims altogether.  The Court should deny BP's Motion to Dismiss Louisiana's claim for civil penalties.

### a. Louisiana Law Does Not Require a Continuous Tort for Imposition of Civil Penalties Under LEQA.

BP argues that penalties are not authorized for the days following the capping of the well because there is no continuing violation.  However, the availability of a cause of action for civil penalties under LEQA does not require a finding that the discharge was a continuous violation.  Louisiana law prohibits the discharge of any substance into the waters of the State that will tend to cause water pollution.  LA. REV. STAT. ANN. § 30:2076.  Section 30:2075 also prohibits any person from conducting any activity which results in the discharge of any substance into the waters of the state without a permit.  *Id*.

Louisiana's First Amended Complaint provides that Defendants BP, Transocean, Anadarko, and MOEX "caused and/or allowed the unauthorized discharge of oil, gas and other pollutants into the waters and onto the coastline of the State of Louisiana."  *See* First Amended Complaint, Doc. 2031 at ¶ 185.  At the motion to dismiss stage of litigation, the Court must accept as true all of the factual allegations in the First Amended Complaint, and construe any ambiguities or doubts in favor of the State.  *Huggins Realty*, 634 F.3d at 803 n.44.  Therefore, Defendants are not entitled to dismissal of the State's claims for penalties unless Defendants make a showing that the State cannot prove any set of facts in support of its claim.  Here, Defendants have done nothing more than argue, without support, that the State cannot prove that it is entitled to per day penalties beyond the date on which the Macondo well was capped.  Moreover, Defendants do not claim that penalties are unavailable for each day of violation

<u>before</u> the well was capped.[43]   Thus, Defendants' Motions to Dismiss on this ground must be denied.

Additionally, none of the cases cited by Defendants are applicable to the issue at hand. *Hogg v. Chevron USA, Inc.*, 45 So. 3d 991 (La. 2010) and *Marin v. Exxon Mobil Corp.,* 48 So. 3d 234 (La. 2010) are both legacy site cases[44] involving the existence, or migration, of contaminants over many years, and the determination of whether the contamination was a continuing tort was made in the context of prescription.[45]   BP also cites to *Hamker v. Diamond Shamrock Chem. Co.,* 756 F.2d 392 (5th Cir. 1985) for the premise that oil remaining in groundwater did not constitute a continuing tort.   *See* Doc. 2646-1 at 25 (BP).   However, in *Diamond Shamrock*, the plaintiffs sought an injunction pursuant to the citizen suit provision of the CWA, 33 U.S.C. § 1365, requiring the defendant to ensure that a pipeline would not leak in the future, as well as civil penalties for each day of violation.   *Diamond* Shamrock, 756 F.2d at 394.   The Fifth Circuit reasoned that a single past leak from the pipeline did not constitute an ongoing violation, which is required to maintain a CWA citizen suit.[46]   *Id.* at 398.   ("section 1365 'allows suits under the Act by private citizens, . . . [it] authorizes only prospective relief . . . .") (quoting *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*, 453 U.S. 1, 5

---

[43] To the extent that BP's first argument—that the Macondo well did not discharge into Louisiana waters—is adopted as rebuttal of Louisiana's claim for penalties per day of violation, see section II.(B) *supra*.

[44] *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 239 n.1 (La. 2010) ("'Legacy litigation' refers to hundreds of cases filed by landowners seeking damages from oil and gas exploration companies for alleged environmental damage in the wake of this Court's decision in *Corbello v. Iowa Production,* 02–0826 (La.2/25/03), 850 So. 2d 686   These types of actions are known as 'legacy litigation' because they often arise from operations conducted many decades ago, leaving an unwanted 'legacy' in the form of actual or alleged contamination. Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006,* 20 Tul. Envt. L.J. 347, 34 (Summer 2007)").

[45] *Hogg*, 45 So.3d 991, 1006 (continuing presence of gas on property does not constitute a continuing tort that suspended the running of prescription); *Marin*, 48 So.3d 234, 255 (finding that the damage-causing conduct terminated when the pits were closed; therefore, the continued contamination of plaintiffs' property does not give rise to a continuing tort and plaintiffs' delictual actions have prescribed).

[46] 33 U.S.C. § 1365 authorizes a citizen to commence a civil action against any person "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . . ."

36

(1981))  Unlike the CWA, however, LEQA does not require a showing of an ongoing violation to recover civil penalties.

Louisiana has sufficiently stated a claim for civil penalties under LEQA.  The amount of that civil penalty will be determined by the Court at the appropriate time and will be based on many factors, including the number of days that LEQA was violated.  BP's argument that the discharge is not a continuing tort is irrelevant and premised upon inapplicable case law.  BP's motion to dismiss Louisiana's civil penalty claims should be denied.

### b.  Louisiana Law Authorizes the Assessment of up to an Additional $1 Million for Each Penalty Event.

Section 30:2025(E) of the Louisiana Civil Code authorizes the Louisiana Department of Environmental Quality ("LDEQ") to assess a civil penalty for any violation of LEQA up to the cost to the State of any response action made necessary by the violation which is not voluntarily paid by the violator <u>and</u> a penalty of up to $32,500 for each day of the violation.  LA. REV. STAT. ANN. § 30:2025(E).  However, when such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, the violator may be liable for an additional penalty of not more than one million dollars for any penalty event.  LA. REV. STAT. ANN. § 30:2025(E).  Each day of violation is subject to this penalty.

The Louisiana Legislature, in enacting the LEQA, authorized the secretary of LDEQ to "adopt, amend, or repeal all rules, regulations, and standards for the protection of the environment."  LA. REV. STAT. ANN. § 30:2011(D)(1).  In accordance with this authority, LDEQ

has promulgated regulations regarding penalty determinations.[47]   LAC 33:I.705 sets forth a penalty determination method for the calculation of penalties.  Part I of this section provides:

> In accordance with La. R.S. 30:2025(E)(1)(a), the department reserves the right to assess an additional penalty of not more than $1,000,000.00 <u>for any penalty event</u> that is done intentionally, willfully, or knowingly, or results in a discharge or disposal that causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health.

LAC 33:I.705(I) (emphasis added).   "Penalty event" is defined as "any violation for which the administrative authority, after consideration of the factors listed in R.S. 30:2025(E)(3)(a), determines a penalty is warranted.  <u>For violations lasting more than one 24-hour day, each such day of violation may be treated as a separate penalty event</u>."  LAC 33:I.703 (emphasis added).

Thus, under § 30:2025 and the regulations lawfully promulgated by LDEQ, Louisiana may properly assess additional penalties of up to $1 million dollars for each 24-hour day that the violation occurs.  LA. REV. STAT. ANN. § 30:2025.  An administrative agency's construction and interpretation of a statute that it is authorized to administer is entitled to deference.[48]   The *Deepwater Horizon* oil spill clearly resulted in a violation that lasted for more than one 24-hour day; therefore, Louisiana law allows the State to assess the additional penalty for this incident for each day during which the violation was ongoing.

Accordingly, Louisiana law authorizes the civil penalties sought by the State.[49] Therefore, our Court should deny BP's Motion to Dismiss Louisiana's claim for civil penalties.

---

[47] LAC 33:I.701 *et seq.*

[48] *See Chevron*, 467 U.S. at 837; *In re Recovery I, Inc.*, 635 So. 2d 690, 696 (La. App. 1ˢᵗ Cir. 1994) ("an agency such as DEQ should be entitled to deference regarding interpretation and construction of the rules and regulations that it promulgates").

[49] The same analysis applies to the State's claim for civil penalties for a violation of a Compliance Order.  If the State fails to prove a violation of the Orders, then the maximum penalty amount will be reduced in kind.

c.   **Louisiana's Civil Penalty Statute Does Not Require Presentment of its Response Costs to a Responsible Party as a Condition Precedent to Filing Suit.**

The LEQA does not require the State to present its claim to a responsible party prior to filing an action to recover unpaid response costs.  Section 2025 of Title 30 provides for the enforcement mechanisms of the LEQA, including provisions related to civil suits for damages, compliance orders, and civil penalties.  LA. REV. STAT. ANN. § 30:2025(B) provides that "[t]he department may bring a civil action in the name of the state to recover any damages or penalties resulting from a violation of this Subtitle . . . ."  LA. REV. STAT. ANN. § 30:2025(B)(1)(a). Section 30:2025(B)(2) provides:

> If a penalty is assessed against the violator under Subsection E of this Section, any amount paid by the violator shall be credited toward the amount for which he is held liable to the state in a judgment or settlement in any suit brought under this Subsection and which is based on the same violation or violations.

Subsection E authorizes the court to assess a civil penalty,

> of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and a penalty of not more than thirty-two thousand five hundred dollars for each day of violation.

LA. REV. STAT. ANN. § 30:2025(E)(1).  The court can also assess a penalty of up to an additional one million dollars per penalty event for egregious violations, as defined by the statute, and for violations that cause severe damage to the environment.  LA. REV. STAT. ANN. § 30:2025(E)(1); LAC 33:IX.703 and 705.

Read together, it is clear that subsections B and E do not require the State to present its claim for response costs to a responsible party prior to filing a suit for damages or penalties. Rather, § 30:2025 sets forth the factors to be used by the court in determining the amount of the

penalty.[50]  If the court assesses a penalty against the responsible party, which includes response costs incurred by LDEQ, then subsection B allows that party to deduct from that total penalty assessment the response costs that have been voluntarily paid.  In other words, subsections B and E prevent the State from recovering twice for the same response costs.

Since LEQA does not require presentment as a condition precedent to filing suit, it follows that the State was also not required to allege in its First Amended Complaint "that it has given the BP Defendants an opportunity to examine the claim and refuse payment."[51] Nonetheless, LDEQ has been invoicing BP for its response costs.  Considering that BP has submitted payments for some of these invoices, even though the statute does not establish presentment as a bar to filing suit, BP is certainly aware of the claims for response costs, and the presentment of response costs has occurred.  In fact, LDEQ continues to invoice BP for its response costs.  Of course, at the time the Court assesses any penalty against BP, the final penalty will not include paid response costs.  However, LEQA does allow for a penalty to include unpaid response costs, and any unpaid costs should be included.

> **D.    Louisiana Civil Law Claims Are Valid.**

Anadarko asserts that Louisiana has not pleaded its state law claims with sufficient specificity against particular Defendants.  This assertion is misplaced.  Each Count of the First Amended Complaint expressly identifies the particular Defendant(s) against which it is asserted.[52]

---

[50] *See also* LA. REV. STAT. ANN. § 30:2025(E)(3)(a)(i)-(ix), listing nine additional statutory factors to be used to determine the amount of a civil penalty.

[51] Doc. 2644 at 32 (BP).

[52] *See* n.1, *supra.*

Halliburton and BP incorrectly argue for dismissal of Louisiana's nuisance claims under state law,[53] asserting that Louisiana cannot be considered a "neighbor" as that term is defined in the statute.  However, Louisiana courts have held that there is no requirement under Article 667 that the property of a plaintiff who suffers damage by another be proximate to the wrongdoer's property; indeed the property may be remote.  *Gulf Ins. Co. v. Employers Liability Assurance Corp.*, 170 So. 2d 125, 129 (La. App. 4 Cir. 1964) (finding that the word "neighbor" as used in Article 667 is indefinite and refers to any land owner whose property may be damaged irrespective of the distance his property may be from that of the proprietor whose work caused the damage); *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368 (5th Cir. 2001) (acknowledging above language with approval).[54]

Additionally, Louisiana jurisprudence provides that "proprietor" under Article 667 "is not limited to owners of the property," but rather "has been broadly interpreted to encompass agents, contractors, and representatives whose activity causes damage to a neighbor."  *Carr v. Oake Tree Apts.*, 786 So. 2d 230, 238 (La. App. 2 Cir. 2001); s*ee also Chaney v. Travelers Ins. Co.*, 249 So. 2d 181 (La. 1971); *Barr v. Smith*, 598 So. 2d 438 (La. App. 2 Cir. 1992), *writ denied*, 604 So. 2d 998 (La. 1992).   In the instant case, Halliburton was a contractor to BP, the owner of the Macondo well lease, and Halliburton's operations on the Transocean-owned *Deepwater Horizon* rig, arising out of its contractual arrangement with BP, are alleged to have caused the State injury.  Halliburton and BP therefore fall within the term "proprietor" for purposes of Article 667.

---

[53] *See* LA. CIV. CODE ANN. art. 667.

[54] The *Roberts* court ultimately found against the application of Article 667 in that case largely because the plaintiff was an employee injured on the offshore rig, *i.e.,* on the servient estate itself.

Defendants' assertion that a trespass may not lie where an intent to trespass is not shown is misplaced.   To constitute a trespass, there must be an "unlawful physical invasion of the property of another."   *Barrilleaux v. NPC, Inc.*, 704 So. 2d 449, 451 (La. App.1 Cir. 1997).   "[A] defendant may be held liable for an inadvertent trespass resulting from an intentional act."   *Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Co.*, 803 So. 2d 86, 96 (La. App. 4 Cir. 2001).   It is the act that led to the trespass which must be intentional, not the trespass itself.   *Id*.   Both of these factors are present here.   Similarly, to the extent Defendants argue that the State cannot maintain an action based upon an alleged lack of an ownership and/or proprietary interest, this argument fails.   In addition to traditional ownership of land, the State has a proprietary interest in its waterways, waterbottoms, and natural resources.   LA. REV. STAT. § 49:2; LA. CIV. CODE ANN. art. 450.

Defendants' effort to defeat the State's claim for strict liability under La. C. C. 2317 is similarly flawed.

> In essence, the only difference between the negligence theory of recovery and the strict liability theory of recovery is that the plaintiff need not prove the defendant was aware of the existence of the 'defect' under a strict liability theory.   Under the negligence theory, it is the defendant's awareness of the dangerous condition of the property that gives rise to a duty to act.   Under a strict liability theory, it is the defendant's legal relationship with the property containing a defect that gives rise to the duty.

*Oster v. Dept. of Transp. & Dev.*, 582 So. 2d 1285 (La. 1991).[55]

## III.   ALL OF LOUISIANA'S DAMAGES ARE RECOVERABLE.

Throughout their various Motions to Dismiss, Defendants seek to limit the damages recoverable by the State by seeking to limit maritime and state law claims available through a variety of flawed preemption arguments and other theories.   As addressed in Sections I and II,

---

[55] BP erroneously asserts that Louisiana has made a claim under LA. CIV. CODE ANN. art. 667 for an ultrahazardous or abnormally dangerous activity under Louisiana Law.   The State has not made that claim under article 667.

*supra*, none of these arguments warrant dismissal of the State's claims, and the motions should be denied.  Moreover, many of Defendants take straight aim at broad categories of damages sought by the State, arguing that the public should bear these losses rather than those responsible for the Spill.  Defendants argue that damages arising from response activities, including the Moratorium, and a variety of other damages suffered by the State, are too "remote" or are otherwise barred by the economic loss rule.  As set forth herein, these arguments fail as a matter of law, and Defendants' motions should be denied.

### A.      Moratorium Damages Are Recoverable Under OPA.

In its Motion to Dismiss the State's First Amended Complaint, Transocean asserts that claims for economic damages associated with the Moratorium should be dismissed because OPA only allows recovery of damages that result <u>directly</u> from the "incident," and that "incident" means a pollution incident, *i.e.*, the discharge of oil.  *See* Doc. 2656-1 at 31-32 (Transocean). Thus, argues Transocean, any damages associated with the Moratorium were not caused by the release of 5 million barrels of oil into the Gulf of Mexico, but were instead caused by an unforeseeable, superseding cause.  *Id.* at 32.  Transocean is, in effect, seeking to impose proximate cause, a traditional element of tort liability, into the statutory framework of OPA. Additionally, Transocean argues that the "due to" language in one of OPA's damages provision imposes a second layer of proximate causation and foreseeability into certain categories of economic damages and thus asks that this Court draw a line beyond which it will not entertain factual inquiry.  *Id.*  Transocean's Motion to Dismiss on these grounds should be denied for the reasons stated herein, as well as in the State's Statement of Interest incorporated herein by reference.  *See* Statement of Interest, Doc. No. 1993 at 42-65.

**1.  OPA's Liability Provision Requires Only "But For" Causation.**

Based upon the clear language of OPA, as well as a significant amount of available legislative history and applicable case law, OPA requires only "but for" causation.  In such case, "Moratorium" claims clearly fall within the purview of OPA's liability and damage provisions. The text of OPA's liability provision, alone, requires this interpretation of the statute:

> <u>Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged</u>, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone <u>is liable for the removal costs and damages</u> specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a) (emphasis added).  As indicated by the first clause, the provision must be read and construed solely within the text of the Act and "[n]otwithstanding any other provision or rule of law. . . ."  *Id.*  The next clause, "each responsible party for a vessel or a facility from which oil is discharged," illuminates the applicability of the paragraph.  It is the enabling provision of OPA's liability section.  OPA makes clear that responsible parties are liable for: "[T]he removal costs and damages specified in subsection (b) of this section that result from such incident."  *Id.*  The key phrase for the causation question as it pertains to the liability section of OPA is "that result from such incident."  This phrase may be further broken down into two components:  "result from" and "such incident."  Each will be addressed in turn.

**a.  "Result From" Means "But For."**

Fundamentally, "result" means "to proceed or arise as a consequence, effect, or conclusion" and "from" "indicate[s] the source, cause, agent or basis;" *e.g.*, "death resulted from the disease."[56]  Stated another way, "result from" means the cause without which the event

---

[56]  *The Merriam-Webster Dictionary online*, http://www.merriam-webster.com/dictionary/result?show=0&t=1302396398;  http://www.merriam-webster.com/dictionary/from.  *See also*, Dictionary.com, http://dictionary.reference.com/browse/result ("something that happens as a consequence").

would not have occurred, *i.e.*, "but for."  As used in § 2702(a), then, a responsible party is liable for removal costs and damages that would not have occurred "but for" the incident.  This level of causation, cause in fact, is precisely what was contemplated by Congress in passing OPA and is the basis for OPA's "result from" language in § 2702(a).

Without explanation, Transocean substitutes the phrase "caused by" in its brief instead of OPA's "result from" language actually used in OPA.  *See* Doc. 2656-1 at 32 (Transocean).  To the extent Transocean is using the phrase "caused by" to mean cause in fact (*i.e.*, "but for" causation), the State does not disagree.  However, Transocean's further analysis of causation in its brief is fundamentally flawed.

Transocean, citing *Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371, 383 (5th Cir. 2006), argues that a "responsible party may thus be liable under OPA only if the Plaintiffs' damages 'were caused by the pollution incident,' *i.e.*, the discharge or threatened discharge of oil."  *See* Doc. 2656-1, at 32 (Transocean) (emphasis added).)   Contrary to Transocean's arguments, the issue before the Fifth Circuit in *Taira Lynn* was whether certain categories of damages under OPA—property damages pursuant to § 2702(b)(2)(B) and economic damages pursuant to § 2702(b)(2)(E)—were recoverable by private plaintiffs according to the specific facts of that case.  *Taira Lynn*, 444 F.3d at 371.  The Fifth Circuit did not address OPA's liability provision, § 2702(a), or that provision's "result from" language.  Accordingly, *Taira Lynn* is inapplicable to construing OPA's liability provision.[57]  Transocean's extrapolation of the Fifth Circuit's discussion of the availability of two categories of damages to the facts of a specific case to apply across-the-board to OPA liability is unfounded.  Furthermore, the *Taira Lynn* decision as to certain categories of OPA damages available in that case was

_____

[57] The *Taira Lynn* case is further discussed, *infra*, regarding causation as it relates to specific categories of damages under § 2702(b).

premised upon the Fourth Circuit's decision in *Gatlin Oil Co. v. U.S.*, 169 F.3d 207 (4th Cir. 1999).  As discussed, *infra*, *Gatlin Oil* is not binding on this Court, was wrongly decided, and is contrary to the text, intent and implementation of OPA.

### b.  "Incident" is a Defined Term Under OPA.

Transocean next argues that "incident," as used in § 2702(a), is synonymous with "the discharge or threatened discharge of oil," and contends that all damages must result directly from oil in order to be compensable under OPA.  *See* Doc. 2656-1 at 32 (Transocean).  Transocean reaches this conclusion based upon the Fourth Circuit Court of Appeal's opinion in *Gatlin Oil, supra*, *cited in Taira Lynn*, 444 F.3d 371.  However, *Gatlin* is not binding on this Court, and is wrongly decided as discussed extensively in Louisiana's Statement of Interest, pp. 46-52, filed 4/18/11 (Doc. 1993).

Reading OPA as it is written, "incident" is defined as:

> any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil.

33 U.S.C. § 2701(14) (emphasis added).  "Such incident" referenced in § 2702(a) is therefore, by statutory definition, an "occurrence or series of occurrences . . . resulting in the discharge . . . of oil."  33 U.S.C. § 2701(14).  Thus, the "incident" is not the discharge of oil itself.[58]  Rather, it is the event or series of events that give rise to the discharge or threatened discharge of oil to which liability attaches.  *Id.*  Here, then, the occurrence resulting in the discharge of oil—the "incident" at issue—was the *Deepwater Horizon* rig explosion and Macondo well blowout.   That

---

[58] In its brief, citing *In re Settoon Towing LLC*, Civ. A. No. 07-1263, 2009 WL 4730969, at *4 (E.D. La. Dec. 4, 2009), Transocean argues that "under OPA, the 'damages' must also result from 'the discharge of oil.'"  *See* Doc. 2656-1 at 32 (Transocean).  The court in *In re Settoon* cited *Taira Lynn* and *Gatlin Oil* for this proposition.  The rationale and applicability of *Taira Lynn* and *Gatlin Oil* are addressed, *supra*.  Further, the *Settoon* court's language cited by Transocean was directed only at economic damages under 33 U.S.C. § 2702(B)(2)(E), not liability as argued by Transocean.

occurrence or series of occurrences resulted in the discharge of more than 5 million barrels of oil into the Gulf of Mexico.  And it clearly resulted in the Moratorium.

### c.  Rules of Statutory Construction Require that "Incident" Be Used as Defined in the Statute.

OPA, its legislative history, and its purpose further reflect that the majority in *Gatlin Oil* strained to interpret OPA in such a way as to deny compensating Gatlin Oil from the Oil Spill Liability Trust Fund.[59]  Indeed, the majority in *Gatlin Oil* ignored basic rules of statutory construction that must guide the Court here.  *See Gatlin Oil*, 165 F.3d at 211.

First, "[i]n construing a statute, the court is 'guided not by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.'" *U.S. v. Conoco, Inc.*, 916 F. Supp. 581, 583 (E.D. La. 1996) (quoting *Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990)).  The *Gatlin Oil* majority wrongly focused on a single word:  "such."  *See Gatlin Oil*, 165 F.3d at 211.

Second, in construing environmental statutes, courts should avoid a "'hypertechnical approach' to [] statutory definitions . . . that would be 'likely to delay cleanup operations while arguing over the responsibility.'"  *Union Petroleum Corp. v. U.S.*, 651 F.2d 734, 744 (Ct. Cl. 1981) (court broadly construed definition of "onshore facility" under an OPA precursor, the Federal Water Pollution Control Act, where vandals opened valves on two railroad tank cars and discharged 60,000 gallons of oil).  Again, the *Gatlin Oil* majority strained to protect the Fund by a hypertechnical reading of the word "such" so as to avoid using the definition Congress gave.

Third, the statutory definitions afforded to "damages," "removal costs," "responsible party," as well as "incident," are all wide-ranging, reflecting an intent that OPA's provisions be

---

[59] For an extensive and in depth analysis of the *Gatlin Oil* case, *see* Holmen, Brian Theodore, *Gatlin Oil Co. v. United States:  A Myopic View of OPA Liability*, 42 WM. & MARY L. REV. 1893 (2001).

read broadly.[60]   Only by reading "incident" in a circular fashion so as to point back at the pollution itself, rather than the source of the pollution, does the scope of OPA collapse on itself as in *Gatlin Oil*.[61]

Fourth, Congress clearly intended that "incident" be read to encompass all occurrences contributing to the discharge or threatened discharge of oil; it defined it as such.  *See* S. Rep. No. 101-94, at 102 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 780.  ("'Incident' is defined to mean an occurrence or series of related occurrences because, as under other Federal law, it is the intent of the Conferees that the entire series of events resulting in the spill of oil comprise one 'incident.'").   Again, the *Gatlin Oil* majority's holding is clearly contrary to Congressional intent.

Finally, as a general rule, OPA, like other remedial statutes, is to be read broadly to effectuate its purpose and obvious remedial intent.[62]   For example, in *U.S. v. Hyundai Merchant Marine, Co.*, 172 F.3d 1187 (9th Cir. 1999), Hyundai, the responsible party under OPA, argued that the salaries of Coast Guard personnel who monitored cleanup operations after an oil spill were "not a cost that 'results from' the incident."  *Id.* at 1192.   The court rejected Hyundai's argument for such a narrow reading of "incident" under OPA and instead recognized a broader definition that included monitoring costs as response costs that resulted from the incident.[63]  *Id.*

---

[60] 33 U.S.C. §§ 2701(5), (31), (32) and (14), respectively.

[61] In addition, Transocean's efforts to read these terms narrowly is inconsistent with their arguments regarding preemption.

[62] *See*, *e.g.*, *U.S. v. Conoco, Inc.*, 916 F. Supp. 581 (E.D. La. 1996) (monitoring costs recoverable as removal costs under OPA); *U.S. v. Murphy Exploration & Production Co.*, 939 F. Supp. 489 (E.D. La. 1996) (same); *Sun Pipe Line Co. v. Conewago Contractors, Inc.*, 1994 WL 539326, *12-14 (M.D. Pa. Aug. 22, 1994) (reading "navigable" expansively in connection with oil spill on a golf course); *U.S. v. Mizhir*, 106 F. Supp. 2d 124, 125 (D. Mass. 2000) (accepting a broad definition of "waters of the United States" for OPA liability).

[63] "The <u>only</u> defenses to strict liability under CERCLA and OPA are that removal costs were caused solely by (1) and act of God (2) an act of war, or (3) a third party not in a contractual relationship with the responsible party.  *See* 33 U.S.C. § 2703(a); 42 U.S.C. § 9607(b)."  *Apex Oil Co. v U.S.*, 208 F. Supp. 2d 642, 652 (E.D. La. 2002) (emphasis added).

(quoting 33. U.S.C. § 2702(a)).  A reading of OPA that excises those damages flowing from the cause of the spill, as in *Gatlin Oil*, artificially constrains the remedial nature of the statute and frustrates Congressional intent.

Thus, by simply applying the definition that Congress provided, and using common rules of statutory construction, it is clear that this Court should not read OPA so as to limit damages only to those resulting directly from the discharged oil.  A broader interpretation of OPA's terms, as required by the statute's own text, its legislative history, applicable case law, and as described by Judge Niemeyer in his dissent in *Gatlin Oil*, prevents a responsible party from unfairly limiting its strict, joint and several liability.  Such a straight-forward reading also furthers the goals of Congress in enacting OPA by avoiding situations where defendants would leave innocent parties uncompensated and deflect the burden of removal costs and damages upon the public.

### 2.  The Moratorium Resulted From the "Incident."

With the *Deepwater Horizon* rig explosion and Macondo well blowout identified as the "incident" subjecting certain Defendants to § 2702(a) liability, it is abundantly clear that the Moratorium was a result of the "incident."   In his Decision Memorandum directing the imposition of the Moratorium, the Secretary of the Department of the Interior identified the *Deepwater Horizon* rig explosion and Macondo well blowout (referred to by the Secretary as the "BP Oil Spill") as the basis for the Moratorium (set out in part below):

> This suspension is required to mitigate a clear threat that additional deepwater drilling poses of serious, irreparable, or immediate harm to life, to property, or to the marine, coastal, or human environment.  I have concluded, based on an extensive record, that this temporary pause in deepwater drilling will provide time for a number of important steps <u>toward addressing this threat and improving the safety of drilling operations</u>, including the following:
>
> . . .

> 3. The submission of evidence by operators demonstrating that they have the ability to respond effectively to a potential oil spill in the Gulf, <u>given the unprecedented commitment of available oil spill response resources that are now being dedicated to the BP Oil Spill</u>.

*DOI Decision Memorandum*, dated July 12, 2010, at 2 (emphasis added).[64]

> Further:

> The third key reason for my decision is that the unprecedented deployment of spill response equipment and cleanup crews <u>to address the massive BP Oil Spill</u> raises serious legal and practical questions about whether other deepwater operators would be able to employ adequate quantities of skimmers, boom, and other spill response resources to address another spill if it occurs. Simply put, there may be insufficient resources available to respond should another deepwater spill occur <u>while the BP Oil Spill containment and clean-up efforts</u> are at their peak. Before deepwater drilling activity resumes, oil spill response plans need to be reviewed under <u>the changed circumstances presented by the BP Oil Spill</u> to determine whether sufficient spill response resources are available to address another deepwater spill event.

*DOI Decision Memorandum*, dated July 12, 2010, at 2.

In discussing the proposed length of the Moratorium, the Secretary again repeatedly referenced the *Deepwater Horizon* rig explosion and Macondo well blowout as the cause of the Moratorium:

> The 6-month duration of the May 28, 2010, suspension was intended, among other things, to minimize the possibility of <u>another catastrophic event, *particularly while we are still responding to the BP Oil Spill*</u>; to ensure that operators <u>similarly situated to the *Deepwater Horizon*</u> were operating in a safe manner; to take into account the expected timeline <u>for killing the Macondo well</u>; and to provide adequate time to obtain information from <u>on-going investigations of the disaster</u> and to develop regulations <u>addressing the safety-related issued described in the [Deepwater Horizon] Safety Report</u>."

*Id.,* at 6-7 (emphasis added). The "catastrophic event" and "disaster" refer to the "*Deepwater Horizon*" rig explosion, the wild "Macondo well," and the "BP Oil Spill."

---

[64] For full discussion on this issue *see* Statement of Interest at 52-54 and Ex. A to that document, incorporated herein by reference.

Thus, three main bases (or causes) for imposing the Moratorium were identified by the Secretary at the time he imposed it, and all three arise from the *Deepwater Horizon* incident:  (1) the fact of the *Deepwater Horizon* rig explosion; (2) assessing the cause of the explosion, blowout, and spill and the blowout containment resources that failed to quell the flow of oil from the wild Macondo well; and (3) the lack of remaining resources to respond to other potential spills due to their deployment to respond to the Deepwater Horizon incident.  All three result from, and indeed are directly due to, the *Deepwater Horizon* rig explosion and Macondo well blowout.  As summed up by the Secretary, "I am reminded daily that deepwater drilling accidents can have <u>and in the case of the BP Oil Spill do have a profound, devastating impact on the economic and environmental health of an entire region</u>."  *Id.* at 3 (emphasis added).

After giving "result from such incident" its intended and defined meaning under OPA, and applying that definition to the facts here, it is clear that the Moratorium "result[ed] from the incident."  *See* 33 U.S.C. §§ 2702(a), 2701(14).  Accordingly, Moratorium "response costs and damages" fall within the purview of OPA's liability scheme and are recoverable to the extent they are listed in § 2702(b).

### 3.   Moratorium Damages Are Recoverable Under OPA.

Damages recoverable pursuant to § 2702(a) are only those that are "specified in subsection (b)."  33 U.S.C. § 2702(a).  Subsections 2702(b)(2)(A) and (D) – (E)[65] are of primary importance to the State in regards to the Moratorium.[66]

---

[65] 33 U.S.C. § 2702(b)(2) provides, in pertinent part:

    (A)    Natural resources.  Damages for injury to, destruction of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.

    . . .

    (D)    Revenues.  Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction of, or loss of real property, personal property, or

### a. There is No Traditional Proximate Cause Requirement in OPA's Liability or Damages Provisions.

In its brief, Transocean has focused on the economic damages contemplated in § 2702(b)(2)(E), *i.e.*, lost profits and diminished earning capacity.  Specifically, Transocean argues that the "due to" language in § 2702(b)(2)(E) imposes yet another layer of causation above and beyond liability and requires that the damages be <u>directly</u> caused by the oil.  For example, Transocean states that "[a]s the Moratorium Plaintiffs' damages were not caused by the discharge of oil, but in fact resulted from the Moratorium, a superseding unforeseeable cause, the Moratorium Plaintiffs may not recover as a matter of law under OPA, or under any other laws, state or federal."  *See* Doc. 2656-1 at 32 (Transocean) (emphasis added).)  "Superseding unforeseeable cause" is the language of proximate cause in traditional tort analysis.[67]  OPA, however, is a statutory construct and must be construed as such, not as a common law tort.  Such importation of tort principles into OPA is precluded by the opening clause of OPA's liability provision:  "<u>Notwithstanding any other provision or rule of law, and subject to the provisions of this Act</u> . . . ."  33 U.S.C. § 2702(a).  Proximate cause, at least in the traditional tort sense, is not

---

natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

(E)      Profits and earning capacity.  Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

(F)      Public services.  Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

[66] This is not to say that other categories of damages, as well as response costs addressed in § 2702(a), are not important to the State.  The State expressly reserves all of its rights in this regard.

[67] "Foreseeability, n.  The quality of being reasonably anticipatable.  Foreseeability, along with actual causation, is an element of proximate cause in tort law."  *BLACK'S LAW DICTIONARY*, 660 (7th ed. 1999).  "Superseding cause.  An intervening act that the law considers sufficient to override the cause for which the original tortfeasor was responsible, thereby exonerating that tortfeasor from liability."  *Id.* at 213.

part of OPA's statutory framework.  Indeed, as discussed *infra*, it was explicitly rejected by Congress in drafting OPA.

Transocean bases its superseding unforeseeable cause argument on its claim that "Moratorium Plaintiffs' damages were not <u>caused by the discharge of oil</u> . . . ."  *See* Doc. 2656-1 at 32 (Transocean) (emphasis added).  Transocean's argument is belied by the discussion of OPA's text, the defined term "incident" and "but for" causation, as discussed, *supra*.[68]  Furthermore, Congress's explicit use of "caused by a discharge of oil" in subsection § 2702(b)(2)(F), the very next category of recoverable damages in OPA's damages provision, indicates that economic damages recoverable under § 2702(b)(2)(E), which does not contain such language, do <u>not</u> need to be caused by the discharge of oil itself.  If Congress intended the "due to" language in § 2702(b)(2)(E) to mean "caused by a discharge of oil," Congress would have said so and used the same language as it did in § 2702(b)(2)(F), but it did not.  A better reading of § 2702(b)(2)(E) is that the "due to" language means "as a consequence of."  This is the interpretation implemented by the United States Coast Guard ("USCG") in administering the Oil Spill Liability Trust Fund.  *See* 33 C.F.R. § 136.233(b).  "As a consequence of" is merely another way of saying "but for."

---

[68] Moreover, based upon the statute's text ("Notwithstanding any other provision of law") and legislative history, OPA clearly abrogated the common law economic loss doctrine, also known as "*Robins Dry Dock*" or "*Testbank*." *See*, *e.g.*, *La. Ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020-21 (5th Cir. 1985) (*en banc*) (citing *Robins Dry Dock v. Flint*, 275 U.S. 303 (1927)).  As set forth in the August 1, 1990 Conference Report explaining the bill that was enacted into law as OPA.

> Liability under this Act is established notwithstanding any other provision or rule of law.  This means that the liability provisions of this Act would govern compensation for removal costs and damages notwithstanding any limitations under . . . <u>existing requirements that physical damage to the proprietary interest of the claimant be shown</u>.

H.R. Conf. Rep. 101-653, 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 779, 781, 1990 WL 132747 at *3 (emphasis added).  The courts that have addressed this Act would uniformly recognized that OPA rejects the *Robins Dry Dock* / *Testbank* doctrine.  *See*, *e.g.*, *In re Taira Lynn*, 444 F.3d at 382; *In re Exxon Valdez*, 270 F.3d at 1252-53; *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 631 (1st Cir. 1994).

Further, OPA's legislative history, as well as the USCG's official guidance on Oil Spill Liability Trust Fund claims, makes clear that one need not own the damaged property or resource to recover economic damages.  *See* H.R. Conf. Rep. No. 101-653, at 104 (1990); *see also Claimant's Guide:  A Compliance Guide for Submitting Claims Under the Oil Pollution Act of 1990*, National Pollution Funds Center, U.S. Coast Guard, April 2003 (updated November 2009), at 10.  Indeed, the USCG's Claimant's Guide identifies an eligible claimant as "<u>anyone</u> with loss of profits or income" and goes on to provide that a claimant must only demonstrate that "[p]roperty or natural resources [] were damaged, destroyed or lost, <u>resulting in your loss</u>" to qualify.  *Id.*  The Coast Guard, the agency tasked with administering the Oil Spill Liability Trust Fund, interprets the "due to" language in § 2702(b)(2)(E) to be synonymous with "result[s]" from, which, as discussed, *supra*, means "but for."  According to USCG, such "due to" showing may be made by, *inter alia*, "Information on EPA or USCG notification" or "[n]ewspaper reports describing the spill."  *Id.*  The burden is therefore very low and certainly not the "caused by" or foreseeability standard espoused by Transocean.

Here, there is no doubt that the Moratorium was "a consequence of" the "injury, destruction, or loss of real property, personal property, or natural resources."  *See Claimant's Guide*, at 10; 33 U.S.C. § 2702(b)(2)(E).  As discussed above, the pertinent focus is on the incident, the *Deepwater Horizon* rig explosion and Macondo well blowout.  It is undisputed that the rig was injured and destroyed.  Similarly, it is undisputed that the Macondo well gushed tens of millions of gallons of oil into the Gulf of Mexico and its adjoining shorelines, particularly in Louisiana, thereby injuring, *inter alia*, the State's natural resources.[69]  Clearly, then, Moratorium

---

[69] *See, e.g.*, *Dunham-Price Group, LLC v. Citgo Petroleum Corp.*, No. 2:07 CV 1019, 2010 WL 1285446 at *3 (W.D. La. March 31, 2010) (denying Citgo's Motion for Summary Judgment against a concrete facility located several miles upriver from Citgo's refinery and the area closed by the Coast Guard that sought economic damages under § 2702(b)(2)(E) because the undisputed facts showed that Citgo had discharged oil into the Calcasieu River,

economic damages fall within the purview of § 2702(b)(2)(E) and are recoverable pursuant to OPA.

   **b. Congress Expressly Referenced Proximate Cause in OPA's Provisions Regarding Exceeding the Liability Caps, and Its Absence from OPA's Liability and Damages Provisions Precludes Its Consideration in that Context.**

   As discussed, *supra*, OPA was drafted and intended to address marine oil spills, ranging in size from small to catastrophic, particularly in light of the prior five federal statutes' failure to effectively address such occurrences, as demonstrated by the *Exxon Valdez* incident. As reflected in the extensive legislative history, OPA was ultimately a compromise that addresses various, and often competing, interests. On the one hand, OPA imposes strict liability for oil discharges, provides both civil and criminal penalties for violations of the statute, and expands the categories of available damages. On the other hand, OPA imposes certain liability caps for most responsible parties, provides the Oil Spill Liability Trust Fund for damages in excess of the liability caps and to address absent responsible parties, provides a mechanism for replenishing the Fund through a per barrel tax on oil, and allows for subrogation actions in order for the responsible party to potentially re-distribute responsibility. OPA, then, contemplates statutorily limited exposure, except in the case of gross negligence or willful misconduct, or the violation of an applicable Federal regulation, by the responsible party related to the incident. *See* 33 U.S.C. § 2704(c)(1).

   Congress <u>has</u> provided a proximate cause requirement in those situations where the caps are inapplicable due to gross negligence or willful misconduct, or the violation of an applicable

---

the Calcasieu River met OPA's definition of a natural resource, and the Coast Guard issued a community advisory regarding the spill).

Federal regulation, though limited to the analysis of whether an exception to the caps is triggered.  *See id.*  Section 2704(c)(1) (the exceptions to the caps) provides:

> Subsection (a) [liability caps] of this section does not apply if the incident was proximately caused by—
>
> > **(A)**   gross negligence or willful misconduct of, or
> >
> > **(B)**   the violation of an applicable Federal safety, construction, or operating regulation by,
>
> the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party (except where the sole contractual arrangement arises in connection with carriage by a common carrier by rail).

*Id.*  The express use of proximate cause language in this subsection of OPA, but not in the liability or damages sections of OPA, clearly indicates that Congress intended that proximate cause apply <u>only</u> to this subsection where Congress <u>used</u> the term "proximate cause" (*i.e.*, the limited issues related to the exceptions to the caps).   Congress recognized that in those exceptional cases in which the responsible party's conduct was so egregious, a heightened level of causation should be required in making that determination.   As noted, *supra*, regarding Congress's use of "caused by a discharge of oil" in § 2702(b)(2)(F) and not in § 2702(b)(2)(E), had Congress intended proximate cause to apply to either OPA's liability provision (§ 2702(a)) or certain categories of damages (*e.g.*, § 2702(b)(2)(E)), Congress would have said so just as it said "proximately caused by" in § 2704(c)(1).  But Congress did not.  The Court should not read "proximate cause" into OPA when Congress chose not to incorporate the concept.  As recently stated by the United States Supreme Court:

> Congress, it is true, has written the words "proximate cause" into a number of statutes.  But when the legislative text uses less legalistic language, *e.g.*, "caused by," "occasioned by," "in consequence of," or, as in FELA, "resulting in whole or in part from," and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate-cause formulations.

*CSX Transp., Inc. v. McBride*, No. 10-235, 2011 U.S. LEXIS 4795 at *32-33 (June 23, 2011)
Given the purpose and legislative history of OPA, there is no doubt that the intention of Congress was to loosen the constraints on recovery by those injured by an oil spill.

### c. Congress Considered and Expressly Rejected Proximate Cause Standards in OPA's Liability and Damages Provisions.

OPA's legislative history conclusively proves that Congress rejected a proximate cause standard and intended the § 2702(b)(2)(E) term "due to" to have the same meaning as the § 2702(a) term "result from."  The House Conference Report, in its provision-by-provision analysis of the House-passed bill, states:  "Subsection (b)(2)(E) provides that any claimant may recover for loss of profits or impairment of earning capacity <u>resulting from</u> [the statutory term is "due to"] injury to property or natural resources."[70] Thus, in explaining the precise subsections at issue, Congress stated that "resulting from" (§ 2702(a) term) and "due to" (§ 2702(b)(2)(E) term) are synonyms.

The legislative history rejects the standard of proximate cause or use-right limitation (a surrogate for the economic loss doctrine)[71] for a variety of other reasons.

First, Congress expressly included a use-right limitation in § 2702(b)(2)(C), which requires a subsistence-use claimant to show that he "uses natural resources which have been injured, destroyed, or lost," but did not in § 2702(b)(2)(E), which provides for certain economic damages.[72] One of the Supreme Court's strongest statutory-construction canons is:

---

[70] H.R. CONF. REP. NO. 101-653, at 104 (1990) (emphasis added).  *See also* Robertson Report, at 13.

[71] A "use-right" limitation would mean that a claimant "must establish that his or her losses are due to damage or loss of property or resources, which damage or loss prevents the claimant from exercising a right to put that property or those resources to commercial use."  *See* Goldberg, John C.P., *Liability for Economic Loss in Connection with the Deepwater Horizon Spill*, November 22, 2010, prepared at the request of Kenneth R. Feinberg ("Goldberg Report").

[72] *See* Robertson, David, The Oil Pollution Act's Provisions on Damages for Economic Loss, April 10, 2011 ("Robertson Report"), at 33-34.

> Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.[73]

This canon of construction precludes reading a use-right limitation into § 2702(b)(2)(E).

Second, Congress deleted use-right limitations from the economic loss provision (ultimately, § 2702(b)(2)(E)) during the OPA deliberations.[74]  Three of the preliminary bills that were introduced during Congress' OPA deliberations included explicit use-right limitations in their economic loss provisions.[75]  As the bills made their way through the legislative process, Congress deleted the use-right limitations in each of them.[76]  A second fundamental statutory-construction canon expounded by the Supreme Court is:

> Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.[77]

---

[73] *Russello v. U.S.*, 464 U.S. 16, 23 (1983) (citation and internal quotation marks omitted).

[74] *See* Robertson Report, at 34-35.

[75] The three bills were:

- H.R. 1465 (introduced March 16, 1989) provided in § 102(a)(2)(B)(v) for "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the activities which utilize such property or natural resources, or, if activities are seasonal in nature, 25 percent of his or her earnings during the applicable season."

- H.R. 2325 (May 11, 1989) provided in § 102(a)(3)(D) for "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of natural resources, which shall be recoverable by any claimant who derives at least 25 per centum of his or her earnings from the activities which utilize such natural resources, or, if such activities are seasonal in nature, 25 per centum of his or her earnings during the applicable season."

- H.R. 3027 (July 27, 1989) provided in § 102(a)(2)(B)(v) for "Damages equal to the loss of profits or impairment of earning capacity (based on prior profits and earnings) due to the injury, destruction, or loss of real property, personal property, or natural resources.  Such damages shall be recoverable by any claimant who derives at least 25 percent of his or her earnings from the activities which utilize such property or natural resources, or, if such activities are seasonal in nature, 25 percent of his or her earnings during the applicable season."

[76] H.R. Rep. 101-241, Part 1 (to accompany H.R. 3027) was issued on Sept. 13, 1989, showing the use-right limitation still in that bill.  Part 2 of that Report, issued on Sept. 18, 1989, to accompany H.R. 1465, shows the use-right limitation still in that bill.  But on October 13, 1989, H.R. 3394 was introduced and explained as a composite bill, designed to merge the others.  Section 1002(b)(2)(E) of that bill has the language that was enacted as OPA Section 1002((b)(2)(E), 33 U.S.C. § 2702(b)(2)(E)—language shorn of any version of a use-right requirement.

[77] *Russello*, 464 U.S. at 23-24.

For this reason also, no use-right limitation may be read into § 2702(b)(2)(E).

Third, OPA repealed prior legislation that contained a proximate-cause standard.[78] OPA's predecessor legislation included an explicit proximate cause limit.  Title III of the OCSLA Amendments of 1978[79] provided for the recovery of pollution-caused damages that were "proximately caused by the discharge of oil from an offshore facility or vessel."[80]  OPA repealed this provision,[81] replacing it with § 2702(a).  Congress therefore intended to <u>eliminate</u> the proximate cause requirement and none should be read into OPA's liability provision.  Thus repealed, no proximate cause standard should be read into § 2702(a).

Moreover, OPA repealed prior legislation that contained an express use-right limitation.[82] The same Act, Title III of the OCSLA Amendments of 1978,[83] authorized recovery of pollution-caused economic-loss damages "due to injury to, or destruction of, real or personal property or natural resources . . . if the claimant derives at least 25 per centum of his earnings from activities which utilize the property or natural resource."[84]  OPA repealed these provisions,[85] replacing them with § 2702(b)(2)(E) which does not contain a use-right limitation.  Thus repealed, no use-right limitation should be read into § 2702(b)(2)(E).

Fourth, Congress deleted direct-causation requirements from the final bill.[86]  The House of Representatives' bills that eventually culminated in OPA originally included direct-causation

---

[78] *See* Robertson Report, at 37.

[79] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[80] *Id.* § 301(15).

[81]  *See* PL 101-380, § 2004 (Aug. 18, 1990).

[82] *See* Robertson Report at 35.

[83] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[84] *Id.,* §§ 303(a)(2)(E) and 303(b)(4).

[85] *See* PL 101-380, § 2004 (Aug. 18, 1990).

[86] *See* Robertson Report at 37-38.

requirements.[87]  In fact, the bill that passed the House of Representatives included such a limit.[88]  But the directness requirement was deleted from the bill that emerged from the House-Senate conference and was eventually signed into law.[89]  Once again, the second *Russello* canon requires a strong presumption that Congress intended that to recover economic-loss damages under OPA, the only causation requirement is factual causation.  For this reason, no direct-causation requirements may be read into § 2702(b)(2)(E).

Additionally, OPA repealed prior legislation that contained a direct-causation requirement.[90]  Once again, Title III of the OCSLA Amendments of 1978[91] provided for the recovery of pollution-related damages "by any person suffering any direct and actual injury proximately caused by the discharge of oil from an offshore facility or vessel."[92]  OPA repealed this provision,[93] replacing it with § 2702(a), which contains no "directness" or "proximate cause" language.  Congress' intent is, once again, clear.  Thus repealed, no direct-causation requirement should be read into OPA in either its liability or economic damages sections.

---

[87] *See* the March 16, 1989, version of H.R. 1465, § 102(a) (limiting recoverable damages to those "that arise out of or directly result from" a spill or substantial threat of a spill); H.R. 2325 (May 11, 1989), § 102(a) (limiting recoverable damages to those "that arise out of or directly result from such discharge or threat of discharge"); H.R. 3027 (July 17, 1989), § 102(a)(1) (limiting recoverable removal costs to those "which arise out or directly result from" a spill or substantial threat of a spill); H.R. 3394 (Oct. 3, 1989), § 1002(a)(1) (limiting recoverable removal costs and damages to those "that directly result from" a spill or substantial threat of a spill).

[88] *See* H.R. 1465 (Nov . 15, 1989), § 1002(a)(1) (limiting recoverable removal costs and damages to those "that directly result from" a spill or substantial threat of a spill).

[89] *See* H.R. CONF. REP. NO. 101-653 (Aug. 1, 1990) (presenting § 1002(a) of H.R. 1465 as providing for liability for removal costs and damages "that result from" a spill or substantial threat of a spill.  The language is identical to the enacted § 2702(a).

[90] *See* Robertson Report at 38.

[91] PL 99-372, Sept. 18, 1978, 92 Stat. 629.

[92] *Id.* § 301(15).

[93] *See* PL 101-380, § 2004 (Aug. 18, 1990).

### d. Even if Foreseeability Applies, it is Limited by the Text of OPA and Does Not Equate to Traditional Proximate Cause.

Despite the clear language and legislative history of OPA, Transocean and others have argued for the application of traditional proximate cause from the tort jurisprudence.  *See* Doc. 2656-1 at 32 (Transocean).  Proximate cause is merely the limitation traditionally imposed by courts on the realm of liability for a tortfeasor's negligent conduct.  Arguably, the consequences of an act go forward to eternity, and the cause of an event go backward to the dawn of time.  Thus, as a practical matter, courts and legislatures impose limitations on a tortfeasor's scope of liability based upon some idea of justice or policy.  *See generally*, W. Page Keeton *et al.*, PROSSER AND KEETON ON TORTS § 41, at 264 (5th ed. 1984).  For common law torts, proximate cause has traditionally been analyzed according to notions of temporal and physical proximity to the negligent act.  There is no indication, in the extensive legislative history or otherwise, that OPA was drafted and implemented with the same notions of justice or policy as is the basis for the concept of proximate cause in torts.  Beyond the fact that OPA is a statutory construct, OPA was drafted and implemented "in response to the *Exxon Valdez* oil spill in Prince William Sound.  It represents Congress's attempt to provide a comprehensive framework in the area of marine oil pollution."  136 Cong. Rec. H6933-02, H6944.  Indeed, it was meant to expand the liability and damages associated with oil spills that, up until OPA's implementation, had been woefully unaddressed via five prior federal statutes.[94]   Simply put, the policy behind OPA's implementation is not the same as the policy limiting the scope of liability for a negligent tortfeasor.  Moreover, Defendants' conduct here, as it relates to the *Deepwater Horizon* rig explosion, Macondo well blowout, and spilling of almost 5 million barrels of oil, was well

---

[94] The five federal statutes are the Outer Continental Shelf Lands Act of 1953, the Water Quality Improvement Act of 1970, the Clean Water Act of 1972, the Trans-Alaskan Pipeline Authorization Act of 1973, and the Deepwater Port Act of 1974.

beyond negligence.  The allegations and evidence support a finding of intentional, willful or grossly negligent conduct.

Assuming, *arguendo*, that there is some element of foreseeability applicable to economic damages under § 2702(b)(2)(E), it would be confined to the clear language of the provision, *i.e.*, the "due to" language, and would not equate to traditional notions of foreseeability in tort.  *See* 33 U.S.C. §§ 2702(a) ("Notwithstanding any other provision or rule of law, and subject to the provisions of this Act. . . .") & 2702(b)(2)(E) ("[Economic] [d]amages . . . due to the injury, destruction or loss of real property, personal property, or natural resources . . . .").  Thus, any claimant may recover certain economic damages that are due to any injury to any real property, personal property or natural resource, so long as the damage resulted from the incident.[95]  *Id*. While some would argue that such a reading draws a distinction between discharges that cause no property or resource damages and those that cause some property or resource damages,[96] the distinction is of no consequence.[97]  In reality, every discharge of oil that falls within the purview of OPA will have injured, at the very least, a natural resource in some manner.  *See, e.g.,* Ramseur, Jonathan L., *Oil Spills in U.S. Coastal Waters:  Background, Governance, and Issues for Congress*, at 3, Congressional Research Service RL33705, April 30, 2010 ("No oil spill is entirely benign.  Depending on timing and location, even a relatively small spill can cause significant harm to individual organisms and entire populations.  Oil spills can cause impacts over a range of time scales, from days to years, or even decades for certain spills.")  Whether that

---

[95] OPA's principal purpose is to compensate any party, including natural resource trustees, suffering damages from oil spills.  *See* S. Rep. No. 94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 722.  Indeed, Congress designed OPA to provide protection for the environment and to aid all victims of oil spills.  *Id*.

[96] *See*, *e.g.*, Goldberg Report.  Fundamentally, Mr. Goldberg misunderstands the "incident" made the basis of OPA liability.  As in *Gatlin Oil*, Mr. Goldberg improperly focuses upon the discharge of oil, not the "occurrence or series of occurrences . . . resulting in the discharge or threatened discharge of oil."  33. U.S.C. § 2701(14).

[97] Mr. Goldberg agrees that "[o]n this reading, there is no such thing, under OPA, as a spill that fails to cause damage to, or loss of, *some* property or natural resources."  *Id*. at 19 (emphasis in original).

injury is quantifiable is a separate question saved for the calculation of damages under the natural resource damages provision of OPA. *See* 33 U.S.C. § 2702(b)(2)(A).

> **e.  Even if the Court Were to Draw "Proximate Cause" Lines Here, Louisiana is the Geographic Epicenter of the Spill and its Governmental Damages are Specifically Enumerated.**

To the extent temporal and physical proximity are ever read into OPA's economic damages provision, the State of Louisiana's claims, including for Moratorium damages, would clearly fall within the scope of proximate cause as applied to § 2702(b)(2)(E).  Given the situs of the incident, Louisiana suffered damages quickly and in a manner unparalleled by any other state or trustee.  Moreover, Louisiana has incurred tremendous response and removal costs.  Indeed, the damages and response costs remain ongoing in Louisiana.  Given its physical proximity to the *Deepwater Horizon* rig and Macondo well, even Defendants agree[98] that, to the extent state law applies to any claims, it should be Louisiana's law.  Additionally, Louisiana's culture, its "brand," is based principally upon its water-based resources, specifically its bayous, lakes, marshlands, estuaries, the Gulf of Mexico and its tributaries, and the rich variety of aquatic and avian species that depend upon these precious resources.  In terms of proximity, Louisiana is uniquely situated, both temporally and physically, in relation to the *Deepwater Horizon* rig explosion, Macondo well blowout and oil spill.  Louisiana was ground zero of the Spill.

Likewise, when read in the context of the specified subcategories of damages and impacts that OPA authorizes States and public entities to recover, Transocean's remoteness argument falls away.  Congress specifically enumerated subcategories of damages that States and public entities may recover in the event of a spill:  natural resource damages, revenues, profits and earning capacity, and increased costs of services.  33 U.S.C. § 2702(b)(2) (A) & (D) – (F).  By

---

[98] *See* Defendants' arguments in BP's Brief at 26-9; Transocean's Brief at 22, 23 n. 17, 41-2; Halliburton's Brief at 12, 14 n. 15; Cameron's Brief at 14; Weatherford's Brief at 12, 15; MOEX's Brief at 31 n. 14; Anadarko's Brief at 23-4.

identifying both the subcategories of claimants and damages recoverable by those claimants, these damages were clearly foreseen by Congress and no limitation based on "proximity" was included.

**B.      LOSPRA Also Provides for the Recovery of Moratorium Damages.**

The State of Louisiana is further uniquely situated in this case because Louisiana law also authorizes the State to recover economic damages without a direct connection to the source of oil.   As such, Louisiana law provides discrete authority and a separate basis for the State to recover its damages resulting from the *Deepwater Horizon* rig explosion and Macondo well blowout, including Moratorium economic losses.

Specifically, the State has claims for economic damages, *e.g.*, lost revenues, pursuant to LOSPRA, LA. REV. STAT. § 30:2451, *et seq*., and applicable regulations, LAC 43:XXIX.101, *et seq*.  LOSPRA defines revenue damages as "damages equal to the net loss of taxes, royalties, rents, fees, or net profit share due to the injury . . . ."  LA. REV. STAT. § 30:2451(5)(c). Moreover, the applicable regulations clearly provide the State with a claim for recovery of its economic damages, including "the net loss of taxes, royalties, rents, fees, or net profit share <u>that the state would otherwise have collected in the absence of the unauthorized discharge of oil</u>." 43:XXIX.129(B)(5)(emphasis added).   Additionally, as expressly stated in the regulations, the State may recover "<u>all costs that have a rational connection to the assessment</u> and are incurred in the performance of the assessment, and the development, implementation, and monitoring of the restoration plan."   LAC 43: XXIX.129(B)(6)   (emphasis added).   Importantly, the regulatory provisions authorizing recovery of these damages do not require a direct connection to the discharge of oil.  Indeed, the language requires only "but for" causation.

In the absence of the *Deepwater Horizon* rig explosion and Macondo well blowout, the State of Louisiana would have continued to collect taxes, royalties, fees, or net profits from

continued drilling and exploration operations.   LOSPRA is part of Louisiana's broader environmental law scheme, the LEQA, which authorizes the State to bring an action to recover "any damages or penalties" resulting from any of the requirements of the LEQA, including LOSPRA.   LA. REV. STAT. § 30:2025(B).   Thus, Louisiana is unequivocally entitled to the revenues it would have received in the absence of the unauthorized discharge of oil, including those lost due the Moratorium or other response injuries resulting from the incident and Spill.

LOSPRA's regulations further clarify the scope of recoverable damages under LOSPRA, and specifically allow recovery for loss of services of natural resources resulting <u>either directly or indirectly</u> from exposure to an unauthorized discharge of oil.   LAC 43:XXIX.109(A).   Both the text of LOSPRA itself and the regulations implementing LOSPRA operate to further the Louisiana Legislature's goal of making the State whole in terms of its wildlife, ecology, and *economy* when the release of oil into the environment presents a threat to natural resources.   LA. REV. STAT. § 30:2453(A).   Accordingly, LOSPRA's implementing regulations specify that LOSPRA encompasses recovery of <u>both direct and indirect</u> losses which would undoubtedly encompass Moratorium damages.

As with OPA, Defendants try to graft traditional tort principles onto the statutory scheme of recovery articulated in LOSPRA, by referring to the economic loss rule to disclaim responsibility for damages caused by the Spill and subsequent Moratorium.   The economic loss rule, however, is a rule of general tort law.   *Robins Dry Dock*, upon which Defendants so heavily rely, specifically states as such ("no authority need be cited to show that, as a general rule, at least, a <u>tort</u> to the person or property of one man does not make that tortfeasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong.").   275 U.S. at 309 (emphasis added).   The Louisiana cases addressing *Robins Dry*

*Dock* make clear that the economic loss rule applies to limit damages in traditional tort settings. *See*, *e.g.*, *Reserve Mooring, Inc. v. Am. Commercial Barge Lines*, 251 F.3d 1069 (5th Cir. 2001) (claim for purely economic damages in case of unintentional maritime tort denied); *State of Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985) (noting *Robins Dry Dock* was a decision limiting the tort doctrine of foreseeability).

LOSPRA, on the other hand, as the State's statutory complement and supplement to OPA, encompasses the strict liability standard of OPA.[99]  OPA defines liability as "the standard of liability which obtains under section 1321 of [the Clean Water Act, 33U.S.C. § 1321 ("CWA")]."[100]  The adoption of the CWA standard of liability indicates strict liability, even when a provision for strict liability is not specifically stated.  *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2nd Cir. 1985) (finding identical language in CERCLA indicates strict liability standard).  The tort standards articulated by *Robins Dry Dock* and *Testbank* do not alter the statutory scheme established by LOSPRA, nor could they without an act of the Legislature.

Additionally, even if the economic loss rule could somehow be applied onto the strict liability statutory scheme (which at all times the State expressly denies), the State undoubtedly satisfies the *Robins Dry Dock* rule, as the State has a proprietary interest in its waterways, waterbottoms, and natural resources.  LA. REV. STAT. § 49:2 ("[t]he State of Louisiana has full sovereignty over all the waters of the Gulf of Mexico and of the arms of the Gulf of Mexico within the boundaries of Louisiana, and over the beds and shores of the Gulf and all arms of the Gulf within the boundaries of Louisiana"); LA. CIV .CODE. ANN. art. 450 (classifying "running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the

---

[99] LA. REV. STAT. § 30:2454(B).

[100] 33 U.S.C. § 2701(17).

seashore" as "public things" that "are owned by the state or its political subdivisions in their capacity as public things").  Again, Louisiana was the epicenter of the oiling and property damage resulting from the Spill, and the State's First Amended Complaint certainly pleads as much.

Because the question of the scope of recoverable damages under LOSPRA is a matter of statutory construction, not traditional tort law, the appropriate inquiry is to the language of the statute and its implementing regulations.  The Louisiana Legislature delegated to LOSCO the duty to implement LOSPRA with the goal of facilitating recovery of wildlife, ecology, and economy upon discharges of oil into Louisiana's waterways.  The statutory language specifically allows recovery of economic losses that would have accrued had the discharge not occurred. Undoubtedly, the State would have continued to earn economic profits, taxes and revenues, rents, and royalties from oil and gas activities and the thousands of jobs necessary thereto had the Spill not have occurred.  In *Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 104 S. Ct. 2278, 81 L.Ed.2d 694 (1984), the United States Supreme Court held considerable weight should be given to an administrative agency's construction of the statute it administers.  The State should be granted that deference at this time in its request to recover economic losses to which it is entitled under LOSPRA and its implementing regulations.

Thus, this Court should recognize that the State has unique and valid claims pursuant to Louisiana law that authorize it to recover for substantial injuries and damages to the natural resources and related economic losses suffered by the State as a result of the Spill, including those economic losses occasioned from the Moratorium.

C.     **The State's Claims Under Federal Maritime and State Law Are Not Barred by the Economic Loss Rule.**

As discussed, the economic loss rule, embodied in *Robins Dry Dock*, is inapplicable to OPA claims.  *See*, *supra*, at § III(A).   Similarly, the economic loss rule does not apply to LOSPRA.  *See*, *supra*, § III(B).

Moreover, as previously briefed, the rule should not apply to the State's maritime or other state law claims.  Even assuming, *arguendo*, that the economic loss rule is somehow found to be applicable to the State's claims, it would not preclude the State's claims.[101]   Indeed, at least one court has carved out an exception to the bright-line rule of *Robins Dry Dock* for governmental entities seeking to recover economic damages related to public rights.  In *Golnay Barge Co. v. M/T Shinoussa*, Civ. A. Nos. H-90-2414, H-90-2476, H-90-2488 & H-91-180, 1991 WL 267956 (S.D. Tex. 1991), a collision between several vessels resulted in the discharge of over 700,000 of oil into the Houston Ship Channel.  *Id*. at *1.  The defendants filed a motion to dismiss the Port of Houston Authority's claim for lost profits resulting from the closure of the ship channel.  *Id*.  One of the questions before the court was a whether a governmental entity, "because of its special nature, functioning for the public good and safety, is of itself excluded from *Testbank*."  *Id*. at *4.

The court found that the Port Authority was not barred by *Testbank*, stating "the Port has a definite proprietary interest in public waters and, because of its special nature, the *Testbank* prerequisite of physical damage to property before recovery for economic loss does not apply to it."  *Id*. at *5.  The court further reasoned:

> A governmental entity such as the Port should be recognized in admiralty as favored and its public economic interest should require the fullest possible

---

[101] Certain Defendants raise the issue of whether the State's claims have a direct enough link to physical injuries to the State's proprietary interests.  The sufficiency of the nexus between the State's claims and physical injuries to its proprietary interests is a fact-intensive inquiry that is not appropriate for a motion to dismiss.

> protections. Unlike seamen, who do not have individual property rights with
> respect to the aquatic life harmed by oil pollution, the Port by governmental
> mandate does have such rights. When there is a claim of the Port occasioned by
> an oil spill, there is an interference with the public right to receive, discharge and
> load vessels entering or departing the Port.

*Id.* at *4. Similarly here, like the Port in *Golnoy*, Louisiana has a direct proprietary interest in the

its waters, waterbottoms, and seashore, and is not barred by the economic loss rule. In fact, the

State's First Amended Complaint plainly and repeatedly alleges physical damage to its

proprietary interests, including ongoing damages to Louisiana waters, marshes, wetlands,

shorelines, fisheries, wildlife, and other natural resources. *See, e.g.,* ¶¶'s 1,2,5,10,52,109 *et seq.*,

120 *et seq.* Even assuming, *arguendo*, that the State did not have a proprietary interest, the

economic loss rule would not preclude the State's claims. Following the reasoning of the court

in *Golnoy*, because of the State's special nature as trustee of the natural resources for the benefit

of its citizens, the economic loss rule should not apply to Louisiana.[102]

### D.      Louisiana's Damages Are Not Too Remote.

In ¶ 142 of its First Amended Complaint, Louisiana asserts it has suffered "injuries to the

Louisiana brand and similar impacts to the State's earning capacity as a result of the Defendants'

conduct." Transocean has moved to dismiss this entire category of damages related to the State's

earning capacity as "stigma" damages that are too remote to be recoverable. As discussed,

*supra*, these damages are clearly recoverable under OPA and LOSPRA. Regarding the State's

maritime and other state law claims, Transocean's argument should be denied, as it is premature

at best.

Damages may be dismissed on summary judgment if they are "remote and derivative"

and alleged by a claimant with purely economic losses. *In re Exxon Valdez*, 270 F.3d 1215,

---

[102] Certain Defendants raise the issue of whether the State's claims have a direct enough link to physical injuries to
the State's proprietary interests. The sufficiency of the nexus between the State's claims and physical injuries to its
proprietary interests is a fact-intensive inquiry that is not appropriate for a motion to dismiss.

1253 (9th Cir. 2001); *Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992).  As discussed, *supra*, Louisiana has suffered physical damages to its proprietary interests in the form of damage to its seafood and coastline as a result of the oil spill.  As such, Louisiana's brand damages are not "harm flowing merely from the misfortunes visited upon a third person" and are therefore not "remote and derivative."  *Holmes v. SCC. Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

Moreover, it is premature to consider dismissal of an entire category of damages through a Rule 12(b)(6) motion.  When presented with a Rule 12(b)(6) motion to dismiss, "[a] court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff."  *Who Dat Yat LLC v. Who Dat ? Inc.*, No. 10-1333 c/w 10-2296, 2011 WL 39043, *5 (E.D. La. Jan. 4, 2011) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009) & *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996)).  Louisiana's First Amended Complaint provides an extensive factual account of the numerous and far-reaching impacts the Spill has had on Louisiana's citizens, waters, marshes, wetlands, shoreline, ecology, economy, tourism, fisheries, and wildlife.  *See* First Amended Complaint, Doc. 2031 at ¶¶ 109-152.  All reasonable inferences in favor of Louisiana with respect to the asserted damages support the fact that Louisiana suffered and continues to suffer real and calculable economic damages as a result of these numerous and far-reaching impacts.  To dismiss this entire category of damages before Louisiana has had the opportunity to conduct discovery and present evidence of this harm would be inappropriate under Rule 12(b)(6).

Transocean cites *In re Exxon Valdez*, 270 F.3d at 1253, as its sole support for dismissal of what it characterizes as "stigma" damages.  In that opinion, the Ninth Circuit Court of Appeals summarily affirmed the trial court's summary judgment dismissing a number of claimants alleging pure economic damages (the opinion's primary focus was a discussion of punitive

damages).   Without discussion of the specific facts presented in support and opposing the motions for summary judgment, or a discussion or definition of what constitutes "stigma damages," the court held, "[s]ummary judgment was appropriately granted against "area businesses," "commercial fishermen outside the closed areas," the aquaculture association, and persons claiming "stigma" damages." *Id.*

Transocean also cites *In Re Exxon Valdez* as the sole support for its statement that stigma damages are too remote for recovery under general maritime law.   However, the court's holding in *In re Exxon Valdez* regarding summary judgment against persons claiming "stigma" damages was based on Alaskan law.   *Id.* (holding, "[w]hether the dismissed claimants can recover depends, therefore, on whether economic recovery is indeed available under Alaska law").  Accordingly, it is inapplicable to maritime law, the lost revenues and property damages available under OPA and to the facts and circumstances now before the Court.

Louisiana's brand damages are not "too remote."   Further, they are directly related to physical damages incurred by the State as a result of the Spill.

### E.    OPA Does Not Preempt Louisiana's Maritime and State Law Claims for Punitive Damages.

OPA includes savings clauses with respect to maritime and state law claims.[103]   33 U.S.C. § 2718(a); 33 U.S.C. 2718(c); 33 U.S.C. § 2751(e).   These provisions expressly preserve admiralty and maritime law with respect to claims for damages or other relief not covered by OPA, such as punitive damages.   *Id.*   OPA is silent on the recoverability of punitive damages; therefore, they survive to the extent they are recoverable under maritime and state law.   *See id.* The Supreme Court's decisions in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) and *Atl.*

---

[103] *See also  infra*, Section I (A) through (C); and Statement of Interest, Doc. 1993, at 21-32, incorporated herein by reference.

*Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009) recognize the "firmly established" availability of punitive damages under maritime law.  *Baker*, 556 U.S. at 484-89; *Townsend*, 129 S. Ct. at 2569.

With respect to the availability of punitive damages under state law, BP argues that Louisiana law precludes punitive damages because the former Civil Code article for punitive damages, LA. CIV. CODE. ANN. art. 2315.1, was repealed in 1996; and Louisiana does not allow punitive damages unless specifically authorized by statute.[104]  However, pursuant to Louisiana's choice-of-law rules, and more specifically LA. CODE CIV. PROC. ANN. art. 3546, punitive damages are available "if two of three criteria are met:  (1) if punitive damages are authorized by the state where the injury-causing conduct occurred; and/or, (2) punitive damages are authorized by the state where the injury occurred; and/or, (3) punitive damages are authorized by the state where the defendant is domiciled."  LA. CODE CIV. PROC. ANN. arts. 3542-3548; *see also Arabie v. CITGO Petroleum Corp.*, 49 So. 3d 529, 551 (La. App. 3 Cir. 2010).

In *Arabie*, construction workers brought an action for damages against CITGO after the release of over four million gallons of slop oil and seventeen million gallons of wastewater into the Calcasieu River from CITGO's refinery in Lake Charles.  *Arabie*, 29 So. 3d at 533.  The Third Circuit upheld the trial court's award for punitive damages reasoning that pursuant to Article 3546 "CITGO was domiciled where its headquarters were located at pertinent times relative to this litigation and that CITGO's injurious conduct occurred at its corporate headquarters where it made budget and management decisions leading to the subject release in 2006."  *Id*. at 551.[105]  The court also reviewed the other choice-of-law provisions of Book IX of Louisiana's Civil Code, and held that it would apply the punitive damage law of Texas "because

---

[104] *See* Doc. 2644-1 (BP) at 52.

[105] CITGO maintained its headquarters in Oklahoma until 1994 before moving to Houston, Texas in 2004.  *Id*.

it is appropriate under articles 3515, 3518, 3542, 3543, 3546, and it is not inappropriate under article 3547." *Id*. at 557.

Here, Louisiana has a claim for punitive damages against BP and Transocean pursuant to La. C.C.P. Art. 3546, and the State has clearly stated the facts to support a claim for punitive damages, including that the Defendants' conduct was grossly negligent, reckless, willful, and wanton.[106]  Further, OPA's savings provisions also expressly preserve state authority to impose additional liability.  As previously briefed, both the statutory and legislative history clearly confirms that OPA was not intended to occupy the field with respect to oil spills and it does not preempt state or general maritime law.  *Id*.

In sum, OPA does not preempt the State's maritime or state law claims for punitive damages.  Defendants' Motions to Dismiss based on OPA's preemptive effects should be denied.

Dated this 8th day of July, 2011.

Respectfully submitted,

JAMES D. "BUDDY" CALDWELL                       KANNER & WHITELEY, LLC
LOUISIANA ATTORNEY GENERAL

                                                 /s/ Allan Kanner
James Trey Phillips                              Allan Kanner
First Assistant Attorney General                Elizabeth B. Petersen
Megan K. Terrell                                David A. Pote
Assistant Attorney General                      Douglas R. Kraus
Section Chief –Environmental                     701 Camp Street
State of Louisiana                              New Orleans, LA 70130
P.O. Box 94005                                  Telephone: (504) 524-5777
Baton Rouge, LA 70804-9005                      **Special Counsel for Plaintiff**
Telephone: (225) 326-6708                       **Attorney General, State of Louisiana**

HENRY DART,                                      USRY, WEEKS, &
ATTORNEYS AT LAW P.C.                            MATTHEWS, APLC

/s/ Henry T. Dart                                /s/ T. Allen Usry
Henry T. Dart                                    T. Allen Usry
Grady J. Flattmann                               1615 Poydras St.

---

[106] *See* Louisiana's First Amended Complaint, Doc. 2031, ¶¶ 386-391, incorporated herein by reference.

510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

SHOWS, CALI, BERTHELOT &
WALSH, LLP

/s/ E. Wade Shows
E. Wade Shows
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: (225) 346-1461
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

MARTEN LAW, PLLC

/s/ Bradley M. Marten
Bradley M. Marten
Linda R. Larson
1191 Second Avenue
Suite 2200
Seattle, WA 98101
(206) 292-2600
**Special Counsel for Plaintiff**
**Attorney General, State of Louisiana**

JACKSON GILMOUR & DOBBS, PC

/s/ William J. Jackson
William J. Jackson
John D.S. Gilmour
3900 Essex, Suite 700
Houston, Texas  77027
(713) 355-5000
**Special Counsel for Plaintiff**
**State of Louisiana**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing State of Louisiana's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the State of Louisiana's First Amended Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of July, 2011.

Kanner & Whiteley, L.L.C.

 /s/ Allan Kanner
Allan Kanner
a.kanner@kanner-law.com

74