# EXHIBIT A

**STATE OF LOUISIANA'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
<u>THE STATE OF LOUISIANA'S FIRST AMENDED COMPLAINT</u>**

# SUMMARY OF FACTS
## CONTAINED IN THE STATE OF LOUISIANA'S FIRST AMENDED COMPLAINT THAT ESTABLISH THE LIABILITY OF DEFENDANTS THAT ARE NOT FORMALLY DESIGNATED AS RESPONSIBLE PARTIES

| Defendant | Para/page | Summary of Facts Alleged in the First Amended Complaint |
|---|---|---|
| **Anadarko** | 38/12 | BP's lease granted by MMS allowed Anadarko to drill and perform oil production-related activities at the Macondo Prospect. |
| | 39/13 | BP assigned 25% ownership and operation stake in the lease to Anadarko. |
| | 102/32 | According to BP, it gave or made available to Anadarko documents that showed the well design and changes to the well design. BP also identified major well control events encountered during drilling operations and Anadarko personnel engaged in periodic communications with BP regarding the well design and other issues related to the well. |
| | 103/32 | Anadarko was aware of the design choices for the well, including the so-called "long string casing" and the number of centralizers being utilized to stabilize the long string, as opposed to the safer alternative of hanging a liner to the lower end of the casing with a "tieback." |
| | 104/32 | Among other things, the Operating Agreement between BP, Anadarko and Moex required copies of all reports, documents, data, etc. be given to Anadarko, gave Anadarko the right to request copies of certain documents, gave Anadarko the right of access to activities and operations, and required Anadarko to give cooperation and support to the Operator. |
| | 105/33 | The foregoing contractual rights and obligations put Anadarko in the position of being able to oversee all operations at the Macondo Well and to intervene to prevent the Incident from occurring. Anadarko failed to properly exercise those rights and obligations which caused, in part, the Incident. |
| | 176/53<br>229/65 | Anadarko was an owner and/or operator of the Macondo Well and the Deepwater Horizon rig. |
| **Cameron** | 73/23 | Cameron manufactured, designed, and installed the BOP and its control systems. The BOP and its systems were not properly configured, had been improperly modified and were not properly functioning. Required inspections and maintenance on the BOP were not performed. |
| | 272/75<br>342/91<br>356/94 | Cameron manufactured, designed, supplied and installed the BOP, which, at all times, was an appurtenance of the vessel and part of the equipment of the vessel. |
| | 273/76 | Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations on the rig. |

|  | 274/76 | Cameron sold and delivered the BOP to Transocean in 2001. |
|---|---|---|
|  | 275/76<br>358/95 | Cameron's BOP was used in the manner intended (or as reasonably foreseeable). |
|  | 276/76<br>343/91<br>356/94 | Cameron's BOP was defectively designed and/or manufactured in that it failed to operate as intended on 4/20/10, causing the blowout and the resultant explosion and spill. |
|  | 277/76 | Cameron failed to provide reasonable instructions or warnings to reduce or avoid the risk of harm posed by the BOP.  This failure rendered the BOP unreasonably dangerous. |
|  | 278/76 | Cameron knew or should have known about the unreasonably dangerous condition of the BOP at the time it was supplied for use by Deepwater Horizon. |
|  | 349/93 | Cameron knew of the risk of a well blowout and a resulting fire, explosion and oil spill. |
|  | 350/93<br>351/93 | Cameron, through its actions, wrongfully discharged a polluting substance on the State's property. |
|  | 359/95 | Cameron's BOP was unreasonably dangerous for a number of reasons – including, Cameron failed to ensure shearing rams would effectively seal the well, failed to ensure the BOP was suitable for the types of drill pipe and casing used, designed the BOP so that it was vulnerable to a single-point failure, failed to install a backup activation system and failed to provide adequate warnings, instructions and guidelines. |
| **Halliburton** | 60/19 | Halliburton recommended the use of nitrified foam cement slurry to seal the formations in the well.  Halliburton should have mixed fluid loss additives in the slurry mix to prevent formation losses but it did not. |
|  | 61/19 | Halliburton performed a variety of services on the rig and had 4 employees stationed on the rig at the time of the accident.  As a result of testing performed prior to the start of final cementing operations, Halliburton knew its slurry was unstable but never utilized an alternative design. |
|  | 62/20 | Halliburton knew or should have known that the cement design and implementation was not an effective barrier to the flow. |
|  | 68/22 | Warning signs were being transmitted to Halliburton's Houston office but no one was there to monitor the data and issue an appropriate warning. |
|  | 279/76<br>363/96 | Halliburton manufactured, designed, supplied, and/or installed the cement and/or nitrogen foam cement slurry used in connection with drilling operations by the Deepwater Horizon. |
|  | 280/77 | Halliburton was in the business of designing, manufacturing, marketing, selling, and/or distributing the cement used in connection with the drilling operations on the rig. |
|  | 281/77 | Halliburton sold and delivered the cement used to temporarily seal the well in 2010. |
|  | 282/77 | Halliburton's cement was used in the manner intended (or as |

|  | 365/96 | reasonably foreseeable). |
|---|---|---|
|  | 283/77<br>363/96 | Halliburton's cement was defectively designed and/or manufactured in that it failed to operate as intended on 4/20/10. Halliburton failed to provide reasonable instructions or warnings to reduce or avoid the risk.  This failure rendered the cement unreasonably dangerous. |
|  | 284/77 | Halliburton knew or should have known about the unreasonably dangerous condition of the cement at the time it was supplied for use by the Deepwater Horizon. |
|  | 330/88 | Halliburton was responsible for cement operations at all relevant times aboard the rig.  Halliburton provided expertise, including testing of cement properties as well as engineering services and onshore support.  Halliburton provided technical and expert advice regarding the design, modeling, testing and placement of cement. Halliburton was responsible for mudlogging personnel and equipment.  At all relevant times, Halliburton participated in drilling operations and provided onshore support and engineering services. |
|  | 331/88-89 | Lists 5 allegations in support of a negligence claim under La. Civil Code.  Examples include but are not limited to the following: Halliburton's failure to ensure safety of cement by failing to employ adequate testing standards and ignoring the results of a negative pressure test. |
|  | 336/90 | Halliburton knew of the risk of a well blowout and a resulting fire, explosion and oil spill. |
|  | 337/90<br>338/90 | Halliburton, through its actions, wrongfully discharged a polluting substance on the State's property. |
|  | 366/96 | The cement was defective in design as the product was unreasonably dangerous for a number of reasons, including the fact that Halliburton failed to ensure the cement would effectively seal and prevent uncontrolled transmission of nitrogen and failed to provide adequate warnings, instructions and guidelines. |
|  | 376/100 | Halliburton misrepresented and concealed the stability of the cement after having performed 3 tests which indicated that the cement was unstable. |
| **M-I** | 44/14 | M-I is the contractor that provided BP and Transocean with drilling fluids in the attempt to temporarily abandon the well.  M-I also provided support and supervisory personnel to oversee the use of the fluids.  M-I employees planned, participated in and supervised mud displacement activities that led to the blowout. |
|  | 45/14 | M-I elected to utilize an inappropriate and unusually large amount of spacer fluid during the mud displacement operations.  This increased the risk that the mud displacement operations would be ineffective, interfered with requisite testing of the integrity of the cementing operations, and/or adversely impacted the BOP.  M-I selected the inappropriate amount to circumvent environmental |

|  |  | regulations regarding the proper disposal of materials contained in the spacer fluid. |
|---|---|---|
| **Moex** | 38/12 | BP's lease granted by MMS allowed Moex to drill and perform oil production-related activities at the Macondo Prospect. |
|  | 39/13 | BP assigned 10% ownership and operation in the lease to Moex. |
|  | 102/32 | According to BP, it gave or made available to Moex documents that showed the well design and changes to the well design. BP also identified major well control events encountered during drilling operations and Moex personnel engaged in periodic communications regarding the well design and other issues related to the well. |
|  | 103/32 | Moex was aware of design choices for the well, including the so-called "long string casing" and the number of centralizers being utilized to stabilize the long string, as opposed to the safer alternative of hanging a liner to the lower end of the casing with a "tieback." |
|  | 104/32 | Among other things, the Operating Agreement between BP, Anadarko and Moex required copies of all reports, documents, data, etc. be given to Moex, gave Moex the right to request copies of certain documents, gave Moex the right of access to activities and operations, and required Moex to give cooperation and support to the Operator. |
|  | 105/33 | The foregoing contractual rights and obligations put Moex in the position of being able to oversee all operations at the Macondo Well and to intervene to prevent the Incident from occurring. Moex failed to properly exercise those rights and obligations which caused, in part, the Incident. |
|  | 176/53 229/65 | Moex was an owner and/or operator of the Macondo Well and the Deepwater Horizon rig. |
| **Transocean** | 41/13 | Defendants began drilling in October 2009, using the Transocean Marianas, which was owned by Transocean and operated pursuant to contractual agreements between BP and Transocean. |
|  | 42/13 | The Deepwater Horizon rig, owned and operated by Transocean, replaced Marianas in February 2010. |
|  | 64/20 | After cementing operations, BP & Transocean ran a negative pressure test designed to test the integrity of the cement. The test was abnormal. Transocean personnel advised the well site leader that the abnormal reading was due to the "bladder effect" and that the test results were normal. Transocean had actual and/or constructive knowledge before the Incident that a negative pressure test indicated that the cement had failed to seal the hydrocarbon-bearing formation. Transocean knew of and elected to ignore the abnormal reading without shutting the well. |
|  | 67/21 | Transocean was responsible for ensuring that well control was maintained at all times. Before the blowout, Transocean decided to offload mud to a waiting vessel, which caused workers to become |

|  |  | distracted and fail to monitor well conditions and data. |
|---|---|---|
|  | 73/23 | Rig audits of Deepwater Horizon performed in September 2009 and April 2010 placed Transocean on notice of problems with the BOP and control systems. |
|  | 77/24 | Transocean employee, Billy Stringfellow, has testified that he knew of the leak in the hydraulic system that controls the BOP. |
|  | 81/25 | A maintenance audit conducted in September 2009 found that Transocean had left 390 maintenance jobs undone. |
|  | 113/35 | LDEQ issued a compliance order to Transocean on October 12, 2010. |
|  | 176/53 229/65 | Transocean was an owner and/or operator of the Macondo Well and the Deepwater Horizon rig. |
|  | 201/59 | The Coast Guard designated Transocean as a responsible party. |
|  | 375/99 | Transocean misrepresented, concealed and suppressed the condition of the rig, the BOP rams and valves (which had not been inspected for 10 years), and at least 36 components and systems which were in "bad" or "poor" condition.  Transocean also concealed the safety record of the vessel based on false data supplied by its personnel. |
|  | 388/103 | Transocean consistently made reckless decisions concerning, for example, well design, cementing, integrity testing that put speed and costs saving above safety, the State's natural resources and economic interests of the people of Louisiana. |
|  | 389/104-105 | Lists 15 allegations where Transocean (and BP) put their financial interests above the health and safety of others.  Examples include but are not limited to the following:  performed critical pressure tests with untrained personnel and ignored the results of those tests, disabled the flammable gas alarm system aboard the rig, used a well design with too few barriers to gas flow, and failed to use a sufficient number of "centralizers" to prevent channeling during the cement process. |
|  | 390/105-106 | Lists 10 allegations where Transocean (and BP) engaged in outrageous, oppressive, willful, wanton, malicious, reckless and/or grossly negligent conduct.  Examples include but are not limited to the following:  ignored warnings that the integrity of the well, cement and vessel were in jeopardy, failed to provide appropriate disaster prevention equipment, and failed to have an appropriate emergency response plan. |
| **Weatherford** | 46/15 285/78 | Weatherford manufactured, designed, supplied, and/or installed the float collar used in connection with drilling activities on the Deepwater Horizon. |
|  | 47/15 | During drilling, personnel onboard (including Weatherford personnel) encountered problems with the float collar, including difficulties with closing the collar. |
|  | 286/78 | Weatherford is in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to |

| | | |
|---|---|---|
| | | the vessel. |
| | 287/78 | Weatherford sold and delivered the float collar to Transocean in 2001. |
| | 288/78 | Weatherford's float collar was used in the manner intended (or as reasonably foreseeable). |
| | 289/78 | Weatherford's float collar was rendered unreasonably dangerous in that it was defectively designed and/or manufactured and/or Weatherford failed to provide reasonable instructions or warnings. |
| | 290/78 | Weatherford knew or should have known about the unreasonably dangerous condition of the float collar at the time it was supplied for use by the Deepwater Horizon. |
| **All Defendants** | 41/13 | Defendants began drilling the Macondo Well in October of 2009. |
| | 53-54/17 87/27 | Defendants knew of dangers of deepwater drilling and failed to take appropriate measures to prevent such dangers. |
| | 55/18 108/34 | Defendants failed to observe and/or comply with federal regulations and/or industry standards regarding design, installation, maintenance, surveillance, repair, observation and operation of drilling equipment and/or operations. These regulations and industry standards include 30 CFR 250 et seq., as well as American Petroleum Institute's recommended practices (API RP 65 and 75). |
| | 56/18 | Defendants made a number of reckless decisions concerning the well design, cementing, and integrity testing in the interest of speed and cost savings, at the expense of safety and industry best practices. |
| | 86/26 | Defendants violated numerous statutes and regulations, including but not limited to, statutes and regulations issued by OSHA and the Coast Guard, including testing requirements on the BOP. |
| | 106/33 | Defendants had actual or constructive knowledge of significant problems with the Deepwater Horizon's equipment, its maintenance and the negligent design and operation of the Macondo Well. |
| **All Defendants Except Weatherford** | 245/68-70 | Lists 23 allegations establishing Defendants' negligence (and/or gross negligence and/or willful) under maritime law. Examples include but are not limited to the following: Failing to properly operate the rig and its apparatuses, failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the rig, and employing poorly trained or untrained employees. |
| | 251/71 258/73 | Defendants engaged in negligent, reckless, and/or willful conduct that caused both a public and private nuisance. |
| **All Defendants Except M-I and Weatherford** | 177/54 230/65 | Defendants caused, allowed or permitted the unauthorized discharge of oil from the Macondo Well and Deepwater Horizon rig. |
| | 262/73 264/74 269/75 | Defendants negligently, recklessly and/or intentionally released, discharged or permitted the escape of oil in a manner they knew or should have known would invade the State's property. |

| | | |
|---|---|---|
| | 266/74 | Defendants have not sought or obtained the State's consent to store hazardous substances on State properties. |
| | 304/84 | Defendants' acts or omissions allowed the oil to invade State property. |
| | 383/102 | Defendants made economic and financial decisions in their operations which enriched themselves and resulted in economic and other losses by the State. |
| **All Defendants Except Cameron, M-I and Weatherford** | 325/86 | Defendants' drilling activities are abnormally dangerous and ultra hazardous activity. |
| **All Defendants Except Cameron, Halliburton, M-I and Weatherford** | 185/55 | Defendants caused and/or allowed the unauthorized discharge of oil, gas and other pollutants into the waters and onto the coastline of Louisiana. |
| | 296/80-82 | Lists 20 allegations establishing Defendants' negligence (and/or gross negligence and/or willful) under Louisiana Civil Code. Examples include but are not limited to the following: Failing to properly operate the rig and its apparatuses, failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the rig, and employing poorly trained or untrained employees. |
| | 297/82 | Defendants knew or should have known of the defective equipment, which at all relevant times, were in the care, custody and control of the Defendants. |
| | 298/82 | Defendants failed to take necessary actions to mitigate the danger associated with the operations. |
| | 299/82 | There is no other possible conclusion than that the fire, explosion, sinking and oil spill resulted from the gross negligence of the Defendants. |
| | 311/84 | The continuing migration of oil on the State's property resulted from the Defendants' well operations. |
| | 313/85 | The Defendants have not sought or obtained the State's consent to store hazardous substances on the State's property. |
| | 318/85<br>319/86<br>320/86<br>321/86 | The rig and the prospect, which caused the State's damages, were and continue to be in the custody and control of the Defendants. |