

## Beck Redden & Secrest
A Registered Limited Liability Partnership

July 8, 2011

Re:  Cameron Production
     MDL No. 2179
     In Re:  Oil Spill by the Oil Rig "Deepwater Horizon"
     In the Gulf of Mexico on April 20, 2010

Honorable Sally Shushan
Magistrate Judge
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, Louisiana 70130

Dear Judge Shushan:

      We write in response to the letter regarding Cameron's Production sent by Plaintiffs' Liaison Counsel ("PLC") on July 1, 2011.  The PLC Letter raised two primary issues: (1) the limitation of Cameron's production to documents related to the Deepwater Horizon; and (2) Cameron's assertion of privilege regarding certain post-April 20, 2010 documents.  Cameron respectfully submits that, in addition to producing Deepwater Horizon documents, it has produced a great many documents over a broad range of subjects not directly linked to the Deepwater Horizon, and that documents were properly withheld pursuant to attorney-client privilege and the work-product doctrine.

**Background regarding BOPs**

      Blowout preventer ("BOP") stacks and controls delivered by Cameron are highly complex pieces of equipment, incorporating thousands of components (almost all of which have not been alleged to have played any role in the Deepwater Horizon incident) into a product that is over 50 feet tall and weighs hundreds of thousands of pounds.  Each BOP stack is highly customized and built to the customer's specifications.  A BOP stack can have a variety of different controls, different rams, and different emergency systems – all based upon the customer's specifications.  BP's predecessor Vastar Resources, Inc. specified the configuration of the Deepwater Horizon BOP stack in a Drilling Contract dated December 9, 1998.  Vastar and Transocean's predecessor (R&B Falcon) developed and gave signature approvals to Technical

David J. Beck
dbeck@brsfirm.com

One Houston Center
1221 McKinney Street, Suite 4500 ~ Houston, Texas 77010
Telephone 713.951.3700 ~ Facsimile 713.951.3720
www.brsfirm.com

383.00206/482962.v1

Honorable Sally Shushan
July 8, 2011
Page 2

Position Papers regarding, for example, BOP stack design and the "Disconnect Philosophy" for the Emergency Disconnect Sequence and Deadman System for the Deepwater Horizon (Exhibits A & B). Vastar, R&B Falcon, and Cameron met regularly to discuss Vastar & R&B Falcon's design requirements. Examples of the minutes from such meetings illustrate decisions about intricate details of the configuration and design of the stack: for example, references are made to "discuss[ing] desired operating pressure internally and provid[ing] an answer so that exact bottle count can be determined" (Exhibit C, ¶ 7), providing the "definition of EDS/DMS [Emergency Disconnect Sequence and Deadman System]" (Exhibit D, ¶ 14(c)), and confirming that the deadman system "will substitute for Acoustic system" (Exhibit D, ¶ 14(h)). The level of specificity and customization was such that Cameron was asked to investigate whether the accumulator banks for the BOP could be made 4 inches shorter in height. (Exhibit E). In short, the design and build process for any given BOP is a lengthy, detail-oriented process. BOP stacks are not bought "off the shelf" from a standard inventory. In light of this context, many of the plaintiffs' discovery requests reflect an oversimplification of the background facts. Those requests ask for information: (1) regarding every one of the thousands of components in a BOP; (2) spanning well over a decade; and (3) regarding issues not alleged to have impacted the Deepwater Horizon incident.

### *Deepwater-Horizon*-related documents

In Cameron's Response to Plaintiffs' First Interrogatories and Requests for Production, Cameron noted that many of the Plaintiffs' requests were extremely broad, with no attempt to limit the scope to issues relevant to this litigation. For example, RFP #23 requested "All documents generated by the Cameron Corporation referencing variations on the design of subsea Blowout preventers, what they are, including documents offered to purchasers, the varying prices, and dates they were offered, during the relevant time period." (Exhibit A to PLC Letter, ¶ II.) (The "relevant time period" is defined as spanning from January 1997 to "current date.") As explained in the preceding paragraph, Cameron's customers consider, discuss, and specify a nearly infinite number of "variations on the design" of the BOPs they obtain from Cameron. It is not reasonable to expect Cameron to produce tens of thousands of documents like those it has produced related to the Deepwater Horizon for *all of the other BOPs it has sold for a period of over 13 years*. Many of Plaintiffs' requests are broad enough to reach every scrap of paper regarding every one of the thousands of components on a BOP stack, regardless of whether or not it is alleged they played any role in the Deepwater Horizon incident.

It is incorrect that Cameron has "limited its production largely, if not exclusively, to the *Deepwater Horizon*," as the PLC Letter claims. Cameron has produced thousands of documents with no specific tie to the Deepwater Horizon. In particular, Cameron has searched its files for those documents most likely to address the matters relevant to this litigation. For example, in response to discovery in this case, Cameron has produced:

- **Field Performance Reports:** Field Performance Reports are the documents used for reporting and resolving non-conformances and performance issues for Cameron products which occur or are discovered in the field. Cameron has produced Field

> Performance Reports, regardless of whether related to the Deepwater Horizon in any way, that address blind shear rams, shearing/sealing buckled or off-centered drill pipe, elastomers (for annulars, blind shear rams, and VBRs), deadman batteries, solenoids, blowouts, well control, and kicks.
> 
> - **Engineering Bulletins:** Engineering Bulletins provide information to Cameron field personnel and customers relating to the purpose, installation, service, and repair of equipment. Cameron has produced Engineering Bulletins, regardless of whether related to the Deepwater Horizon in any way, that address the TL 18 3/4" 15KBOP, DL annular 18 3/4" 10K BOP and stripping versions thereof, bonnet subassemblies, ST-lock assemblies, operating piston subassemblies, shear ram blades, VBR subassemblies, SBR subassemblies, and deadman batteries.
> - **Engineering Reports:** Engineering Reports provide product performance data (which can include test lab data as well as field data), and also are used to record results from any scientific experiment. Cameron has produced Engineering Reports, regardless of whether related to the Deepwater Horizon in any way, that address shearing/sealing tests, elastomers (for annulars, blind shear rams, and VBRs) and solenoids.
> - **Product Advisories/Safety Alerts:** Product Advisories and Safety Alerts are issued when necessary for safe and proper use of Cameron-supplied equipment, or when necessary to inform customers of non conformances to design acceptance criteria. Cameron has produced Product Advisories and Safety Alerts, regardless of whether related to the Deepwater Horizon in any way, that address the TL 18 3/4" 15KBOP, DL annular 18 3/4" 10K BOP and stripping versions thereof, bonnet subassemblies, ST-lock assemblies, operating piston subassemblies, shear ram blades, VBR subassemblies, SBR subassemblies, deadman batteries, solenoids, and elastomers (for annulars, blind shear rams, and VBRs).
> - **Marketing Materials:** Cameron has produced materials that generally describe its various product offerings, including those that were not incorporated in the Deepwater Horizon BOP. (*See, e.g.,* CAM_CIV_0019658)

In short, Cameron has made a broad and far-reaching production of the documents it maintains to capture the types of issues in which Plaintiffs are interested: failures of Cameron products in the field, guidance regarding service and repair, results of product testing, alerts regarding safe use of Cameron equipment, and catalogs of available BOP products.

The PLC Letter mentions nine specific requests, each of which Cameron addresses here in turn:

> - **RFP #31:** This is a request for all communications with <u>any</u> governmental agency for a period of well over a decade having <u>anything</u> to do with subsea BOPs. Cameron respectfully submits that the request is overbroad on its face, and goes far afield from the issues that might be relevant to this litigation. (By way of example, Cameron's

annual report from 1997 filed with the SEC would arguably be responsive to this request because it mentions blowout preventers.)

- **RFP #32:** This request asks for documents evidencing a model or computer simulation which performed a risk assessment that predicted the need for a blind-shear device to cut through various materials in the wellbore. Cameron is aware of no model or simulation that might "predict the need . . . to cut through various materials." However, Cameron has produced Engineering Bulletin 702D, which provides the method by which Cameron assists customers in determining what materials can be sheared by Cameron equipment. Cameron has also produced a number of Engineering Reports detailing the results of shear tests on various materials in the wellbore.
- **RFP #35:** This asks for warnings by Cameron regarding limitations of blind shears to cut through a given material. Please see the discussion, *supra*, of RFP #32.
- **RFP #36:** This request asks for procedures for testing subsea BOPs and their components. While Cameron objects to producing records for all subsea BOPs and all components, it has produced a number of testing documents that would be relevant to the Deepwater Horizon equipment, including those related to shearing blind rams, solenoid valves, accumulators, fail safe kits, and the deadman/AMF system.
- **RFP #49:** This request asks for warnings, bulletins, updates, etc. for the Deepwater Horizon Blowout Preventer. Cameron has produced such documentation.
- **RFP #61:** Plaintiffs requested risk studies/cost-benefit analyses regarding the deadman and emergency disconnect systems in the Deepwater Horizon Blowout Preventer. Cameron has produced a *Risk Assessment of the Deepwater Horizon Blowout Preventer (BOP Control System)* from April 2000, which contains a Fault Tree analysis for failure of the Emergency Disconnect System. In addition, a *HAZOP of Cameron MUX System* was conducted in 1999, and related documents have been produced. Cameron has produced all studies of the Deepwater Horizon Blowout Preventer, in full satisfaction of this request.
- **RFP #68:** Plaintiffs have requested communications with purchasers/users of the Deepwater Horizon BOP regarding changes to subsea BOPs. Like plaintiffs' other requests, this request spans well over a decade and apparently encompasses every one of the thousands of components that comprise a BOP stack. Cameron stands on its overbreadth objection, but notes that it has produced documentation regarding changes made and contemplated for the Deepwater Horizon, as well as communications regarding maintenance/repairs/changes to the Deepwater Horizon BOP.
- **RFP #121:** This request is also overbroad, asking for information regarding alternative designs or design modifications considered, discussed, or analyzed over more than a decade for any of the thousands of component parts in a BOP stack. Cameron's Engineering Bulletins, Product Advisories, Safety Alerts, and marketing materials have been produced that are responsive to this request generally, as well as information specific to the Deepwater Horizon.
- **Interrogatory #2:** This interrogatory seeks information regarding "well control risks" considered by Cameron in designing the Deepwater Horizon BOP. Cameron

has produced documents reflecting issues regarding the configuration and design of the Deepwater Horizon BOP, including communications beginning in 1999 among RB Falcon (Transocean's predecessor), Vastar (BP's predecessor), and Cameron regarding the configuration and design to be used. Cameron has produced a *Risk Assessment of the Deepwater Horizon Blowout Preventer (BOP Control System)* from April 2000, which contains a Fault Tree analysis for failure of well control operations.

While the PLC Letter does not specifically mention any other Requests or Interrogatories, Cameron attaches hereto as Exhibit F brief responses to the issues raised in Exhibit A to the PLC Letter.

**Privileged materials**

The PLC Letter also alleges that the documents withheld by Cameron are not privileged, and "appear to have been created during the routine course of business by control group, non-lawyer, non-executive, Cameron employees." To be clear, Cameron has produced a number of post-April 20 internal Cameron communications that relate to, for example, BOP pod retrieval efforts (*see, e.g.*, Exhibit G), intervention efforts (*see, e.g.*, Exhibit H), and equipment Cameron built to assist in capping operations (*see, e.g.*, Exhibit I). The only post-April 20 communications Cameron withheld were those relating to preparing for litigation and obtaining legal advice. As the descriptions in Cameron's Fourth Privilege Log state, the vast majority of the withheld documents were prepared in anticipation of litigation/trial, and were made at the direction of counsel in furtherance of the rendition of professional legal services. Both the work-product doctrine and attorney-client privilege apply to the logged documents, regardless of whether an attorney was actually the sender or recipient of the specific document in question. *See, e.g., Clover Staffing, LLC v. Johnson Controls World Servs., Inc.*, 238 F.R.D. 576, 581 (S.D. Tex. 2006) ("[U]nder Texas law, *a communication may be privileged even if it is not made to an attorney*, as long as it is made by qualified persons for the purpose of facilitating the rendition of legal advice.") (emphasis added).

The logged communications among Cameron personnel, where indicated, are protected by work-product doctrine, despite the fact that no attorneys were directly involved in the communications. The Federal Rules state that "[o]rdinarily, a party may not discover documents . . . that are *prepared in anticipation of litigation or for trial by* or for *another party* . . . ." FED. R. CIV. P. 26(b)(3)(A) (emphasis added). "[T]he *work product doctrine is no longer limited to documents prepared by an attorney*. The 1970 amendment to the rule expressly extends protection to documents prepared by or for a representative of a party, including his agent." *Kansas City S. Ry. Co. v. Nichols Const. Co.*, Nos. 05-1182, 05-5220, 05-4653, 2007 WL 2461014, at *3 (E.D. La. Aug. 27, 2007) (emphasis added; internal quotation omitted). The same holds true under Texas law[1]: work product includes "*a communication made in anticipation of litigation or for trial* . . . among a party's representatives, *including the party's* .

---

[1] Cameron is headquartered in Texas, as is Beck, Redden & Secrest, LLP, its lead counsel in this litigation.

.. *employees* . . . ." *See* TEX. R. CIV. P. 192.5(a)(2) (emphasis added). Many of the withheld communications relate to Cameron's efforts to collect information potentially relevant to Cameron's defense at the request of counsel. Texas courts recognize that materials prepared for litigation "by or ***at the direction of an attorney***" is protected work product. *In re Toyota Motor Corp.*, 94 S.W.3d 819, 825 (Tex. App.—San Antonio 2002, orig. proceeding) (emphasis added).

Additionally, the communications fall within the ambit of attorney-client privilege. In assessing attorney-client privilege, federal courts have relied upon Supreme Court Standard 503, which states that "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between representatives of the client" are privileged. *In re Papst Licensing GmbH Patent Litig.*, No. CIV. A. 99-MD-1298, 2001 WL 797314 at *27 (E.D. La. July 12, 2001). The attorney-client privilege is not waived "if a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *Hodges, Grant & Kaufmann v. U.S. Government, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985). The Texas Rules of Evidence also protect as attorney-client privileged those communications "made for the purpose of facilitating the rendition of professional legal services." Protected communications include not just those between the client and the lawyer, but also those "***between representatives of the client.***" TEX. R. EVID. 503(b)(1)(D) (emphasis added). "[U]nder Texas law, ***a communication may be privileged even if it is not made to an attorney***, as long as it is made by qualified persons for the purpose of facilitating the rendition of legal advice." *Clover Staffing, LLC v. Johnson Controls World Servs., Inc.*, 238 F.R.D. 576, 581 (S.D. Tex. 2006) (emphasis added).

The PLC Letter does not challenge any particular documents withheld by Cameron, instead merely stating that the documents "appear to have been created during the routine course of business by control group, non-lawyer, non-executive, Cameron employees." As described above, the fact that "non-lawyer, non-executive" Cameron employees made confidential communications does not render those communications non-privileged. A "representative of the client" whose communications are privileged is any person who, "for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client." TEX. R. EVID. 503(a)(2)(B). There is no requirement that the representative be a "lawyer" or an "executive." The premise of the plaintiffs' argument is faulty. Attached hereto as Exhibit J is an affidavit from Cameron Drilling Systems President Glenn Chiasson, which confirms that, at the request of counsel, he called upon a number of Cameron personnel to assist in gathering documents, offering opinions, and supplying information to prepare Cameron's defense. He often sent these communications by e-mail, and those are the types of communications withheld by Cameron as privileged. Cameron stands ready to submit further evidence and documents for *in camera* review, should the Court so desire.

We would be pleased to furnish any additional information at your request.

383.00206/482962.v1

Honorable Sally Shushan
July 8, 2011
Page 7

                                                    Sincerely yours,

                                                    David J. Beck  /by permission GG

DJB/rct

383.00206/482962.v1