UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : | MDL NO. 2179<br><br>SECTION: J<br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |
| **THIS DOCUMENT RELATES TO ALL CASES** | : : : | JURY TRIAL DEMANDED |

**MEMORANDUM IN SUPPORT OF
CAMERON INTERNATIONAL CORPORATION'S
OBJECTIONS TO AND APPEAL FROM MAGISTRATE JUDGE'S ORDER
REGARDING OBJECTIONS TO DEPOSITIONS [REC. DOC. 3090]**

More than 135 depositions have been taken in this litigation, each noticed by parties other than Cameron International Corporation ("Cameron"), and each noticed without any showing of the need or relevance of the depositions. Recently, and for the first time since the depositions began, Cameron noticed depositions of three BP employees with critical knowledge of the *Deepwater Horizon*'s blowout preventer ("BOP"). Cameron noticed these depositions following BP's filing of its cross-claim against Cameron seeking to blame Cameron and the BOP for some or all of its damages.

The Magistrate Judge denied Cameron's request to depose these three fact witnesses with knowledge of BP's basis for its claims against Cameron, stating, "It is not clear that it is necessary that each of them be deposed. Cameron will be permitted to depose one of the three. It is Cameron's choice as to which one is deposed." Cameron is mindful that the Magistrate Judge has a difficult job in this complex litigation and has spent substantial time addressing many issues. Cameron must nevertheless object to and appeal from this Order [Rec.

- 1 -

1062920v.1

Doc. 3090] ("Order") because it is clearly erroneous and contrary to law. Respectfully, the Order should be reversed for the following reasons:

(1) the Order improperly applied a good cause requirement for the taking of individual depositions, a requirement that is contrary to the Federal Rules of Civil Procedure;

(2) having improperly imposed a good cause standard, the Order incorrectly holds that Cameron had not established good cause for deposing the three witnesses;

(3) by improperly imposing a cause requirement for the first fact depositions Cameron has sought in the MDL, the Order improperly imposes obligations on Cameron not required of the other parties; and

(4) the Order erroneously concluded that the requested depositions impermissibly burdened BP and/or were otherwise unnecessary.

I.  **Relevant Background Facts**

   A.  **Depositions Have Been Ongoing For Months With Virtually No Limitations**

Pursuant to CMO 1, "fact depositions regarding blow-out, spill, limitation and related issues may commence on or after January 18, 2011." Rec. Doc. 569. Despite the fact that the parties collectively identified over 900 fact witnesses whom they desired to depose, the Court has never set any limit to the number of depositions that would take place. To the contrary, after the depositions began, the Court *expanded* the deposition duration to two days of questioning for each fact witness and embraced early on the notion that depositions would need to be multi-tracked. The message was clear: Any party could request a deposition of a fact witness, and that witness would be produced. And indeed, Cameron voluntarily produced four employees, including an employee who lives in Aberdeen, Scotland, solely because one party--

BP--requested the depositions.[1]  Depositions have progressed at a dizzying, multi-tracked pace; some days as many as eight different depositions are set on two different continents.

To keep this ambitious schedule, the Court set July 31 as the deadline for those depositions the parties deemed "priority"---fact depositions needed for expert reports. Ultimately, parties other than Cameron identified approximately 200 witnesses as "priority". As to virtually all of these depositions, the Court never required that any party establish a threshold need for the depositions. By July 31, it is expected that at least 189 fact depositions will have been taken. *None of those depositions were noticed by Cameron.*

> **B.    BP Objects To BP Fact Witness Depositions Requested By Cameron As Unnecessary**

BP objected to the depositions of all six persons requested by Cameron. BP claimed that two witnesses were litigation consultants, and Cameron therefore withdrew its request.[2] Three of the remaining four witnesses, Tony Emmerson, Tim Allen and Ray Fleming, are BP employees who participated in the company's investigation of the Deepwater Horizon BOP.[3] Dr. Fereidoun Abbassian, the supervisor of the BP BOP team, during his deposition, repeatedly deferred to his three colleagues in answering Cameron's questions, acknowledging

---

[1] The Cameron employees who have been or will be deposed are Carter Erwin, William LeNormand, David McWhorter, Melvyn Whitby and Ed Gaude. BP requested those depositions.

[2] The withdrawn requests were for the depositions of Ralph Linenberger and Mark Childress.

[3] The remaining witness, Mike Byrd, is scheduled for two days of deposition, July 13 and 14, as BP's Rule 30(b)(6) designee as to BOP topics. Notwithstanding that Cameron timely requested his fact deposition, BP has objected to that deposition as well, and on July 8, 2011, the Magistrate sustained the objection, without prejudice to Cameron re-urging the request following the Rule 30(b)(6) deposition.

that they were integral to BP's investigation of the BOP.  Nonetheless, BP objected to presenting these three witnesses, claiming that "given the dozens of witnesses that BP has willingly presented in this matter, and the substantial burden to BP for presenting three witnesses whose testimony is likely duplicative or of limited value," the Court should deny Cameron's request to depose these three employees.  (*See* Exhibit A, Emails from David Beck and J. Andrew Langan to Magistrate Shushan, p. 3).

In response, Cameron pointed out that each of these three employees were involved in distinct and separate parts of the BOP investigation undertaken in BP's "Bly Report".[4]  Notably, the Bly Report contained 40 pages of findings related to the BOP.

### Tony Emmerson

According to Dr. Abbassian, Tony Emmerson was the deputy team leader in charge of the entire BOP investigation when Dr. Abbassian "was away."  He was also in charge of "testing," and was identified as the person who could identify those individuals who observed leaks in the system.[5]

---

[4] The "Bly Report" is BP's report containing an analysis of the events leading up to the accident, eight key findings related to the causal chain of events and recommendations to enable the prevention of a similar accident.  *See*  http://www.bp.com/liveassets/bp_internet/globalbp/globalbp_uk_english/incident_response/STAGING/local_assets/downloads_pdfs/Deepwater_Horizon_Accident_Investigation_Report.pdf.

[5] Q.  What were the names of the people directly underneath you?

A.  Norman Wong was looking after maintenance.  Tony Emmerson was looking after testing, and also he was acting as my — was, when I was away, and that was my, essentially right-hand man, put it that way, as a deputy team leader.  Tim Allen was looking after BOP system and its performance.  So anything he was involved with, BOP rating and any tests that we had to do to determine, for example, the impact of flow rate on elastomeric parts, so that was Tim Allen.  And let me recall everybody.  And then — Nik Politis was looking after — Nik Politis was reporting to Tim Allen.  It was Ray

*(continued on next page)*

Further, Emmerson was present during BP's BOP intervention activities almost immediately following the blowout on April 20. He was onsite on the *Deepwater Horizon* on April 22, 2010 and witnessed an attempt to cut through the autoshear trigger pin, according to testimony of another witness who spoke to him about that experience. (*See* Exhibit B, Deposition of Henry Matthew Thierens, Vol. II, June 10, 2011 at pp. 672-74.)

### Tim Allen

Tim Allen was involved with the actual testing of the BOP's performance: "anything he was involved with, BOP rating and any tests that we had to do to determine, for example, the impact of flow rate on elastomeric parts . . . ." (*See* Exhibit C, Deposition of Dr.

---

> Fleming who was leading the control system performance, so that is all the leaks, the performance of the parts, everything was under ─ so Tim was the hardware, Tim Allen, and Ray Fleming was the control maintenance testing. Those are the four individuals.

(*See* Exhibit C, Deposition of Dr. Abbassian, Vol. I, May 3, 2011, pp. 365-66.)

Q. Tony Emmerson was someone on your team?

A. Yes, a member of my team.

Q. His area of responsibility was what?

A. Testing and he was also acting as a deputy team leader.

(*See* Exhibit D, Deposition of Dr. Abbassian, Volume II, May 4, 2011, p. 481.)

Q. But, again, the answer to who -- my question was focused on identifying the person who I can go to for BP and say, what did you see and why do you think that is consistent with an accumulator discharging? You don't know who that person is?

A. No. Many people on my team may have the names. Tony Emmerson could be one individual who would be able to tell you the name of the individuals who actually observed the ROV, but more importantly the leak.

(*Id.*, p. 701.)

Abbassian, Vol. I, May 3, 2011, pp. 365-66.)  Mr. Allen also performed calculations for shearing pressure, allegedly through the use of formulas devised by Cameron - something which Dr. Abbassian could not answer questions about:

> Q.      On Page 157, you have a graph showing among other things Cameron shearing pressure BOP at surface.  Do you see that?
>
> A.      That's right here.
>
> Q.      Do you know who on your team made those calculations?
>
> A.      Yes, I do.  **Tim Allen** was the name of the individual who did it.
>
> Q.      Did Mr. Allen make all the --well, there's also the calculation for BOP at seabed.  Did Mr. Allen make that calculation as well?
>
> A.      Using Cameron spreadsheet.
>
> Q.      Using Cameron EB702D?
>
> A.      Oh, yes, this was based on Cameron formulas, yes.
>
> Q.      And was Mr. Allen aware of EB702D before getting involved with the BP investigation?
>
> A.      I can't answer this question because I don't know.

(Exhibit D, Deposition of Dr. Abbassian, Vol. II, May 4, 2011, pp. 708-09.)

> Q.      Now, you have a line on here, on this chart, this chart was part of the report that you were responsible for?
>
> A.      Yes, correct.
>
> Q.      It was done by someone under your control, I think you said Mr. Allen?
>
> A.      Yes, **Tim Allen**.

> Q. And it actually has -- the line that says "the shearing pressure at BOP at the surface," do you see that line? It's a dotted line, it goes up diagonally?
>
> A. Yeah.
>
> Q. And then below that it says: "Cameron shearing pressure BOP at seabed, 5,000," I assume DW is water depth?
>
> A. Yes.
>
> *****
>
> Q. Today, can you tell me why BP put in their report that it takes less pressure to shear a piece of drill pipe at 5,000 feet water depth than it does at sea level?
>
> A. I can't explain to you before having the formula in front of me.
>
> Q. So you can't explain **Mr. Allen's** reasoning in preparing the chart this way?
>
> A. I have reviewed -- at the time of writing this report, I've reviewed detail calculations performed on this, I've reviewed the formula provided in Cameron Engineering bulletin and --
>
> Q. Sure you have.
>
> A. I satisfied myself that this -- the authenticity of this data.

(*Id*. at pp. 743-45.) Mr. Allen also conducted other types of calculations and played a role in the conclusions reached in section 4.2 of the BOP chapter in the Bly Report ("Status of the Drill Pipe Across the BOP After the Explosion"), and in drafting Appendix H to the Report ("Description of the BOP Stack and Control System").

- 7 -

### Ray Fleming

Ray Fleming was "leading the control system performance, so that is all the leaks, the performance of the parts . . . Ray Fleming was the control maintenance testing." (*See* Exh. C., pp. 365-66.) Dr. Abbassian readily admitted that Mr. Fleming had knowledge regarding the control system operations and post-accident battery testing that he himself did not possess:

> Q. Is it true that if Solenoid 103 on the yellow pod could not be energized, then the system for the yellow pod would not have disarmed, given what we just talked about?
>
> A. No, it's not true what you said.
>
> Q. Why?
>
> A. Or may I say -- I don't have the answer to this question, but somebody in my team has the answer to this question, but I cannot really rationalize it for you here because I don't have the information in my hand.
>
> Q. Do you not know enough about the operation of the Programming Logic to answer it?
>
> A. I had a team who -- I had a control -- a team of control engineers who know the details of operation of the parts. That question should be put to them.
>
> \*\*\*\*\*
>
> Q. So you don't know -- so there were people on your team with more knowledge about the operation of the control system, is that true?
>
> A. I had a team of multidisciplined experts, yes.
>
> Q. Who would those people be that could answer the question that I just asked?
>
> A. **Ray Fleming**.
>
> Q. Anyone else?

> A.   I just don't -- I think **Ray Fleming** is sufficient.  He was the team leader for the control.  He had sufficient expertise within his team to be able to answer that question.

(*Id*. at pp. 490-92.)

Mr. Emmerson and Mr. Fleming were also identified by the head of the BP rig audit team as two of the three people involved in the BP internal investigation with the most knowledge concerning BOPs.  (*See* Exhibit E, Deposition of Norman Wong, Vol. I, June 13, 2011, p. 132.)  Dr. Abbassian himself was not so identified.

It is plain from the testimony of the previously-deposed BP employees that those persons with the most direct, useful and first-hand knowledge of BP's investigation of the BOP are Tony Emmerson, Tim Allen, and Ray Fleming.

### C.   <u>The Magistrate Judge's Ruling Denied Cameron's Request</u>

Following BP's objections to the requested depositions, Magistrate Judge Shushan ruled on June 29, 2011, that Cameron's request for the depositions was timely made.  However, her Order went on to state that, "It is not clear that it is necessary that each of them be deposed.  Cameron will be permitted to depose one of the three.  It is Cameron's choice as to which one is deposed."  Cameron is therefore required to prove its entitlement to take depositions in its defense - no longer the CMO 1 standard ("fact depositions regarding blow-out, spill, limitation and related issues") but rather a more nebulous standard under which Cameron must prove "clear" necessity to take every deposition it requests, notwithstanding the small number of depositions it has requested.

Moreover, the Order seems only to apply this standard to Cameron alone, out of all of the numerous parties involved.  For example, in the same Order, BP was allowed to take the depositions of Halliburton employee James Bement, over Halliburton's objections and

regardless of the fact that two other deponents have already been scheduled to testify regarding similar issues. [Rec. Doc. 3090, p. 10.]

**II.     Law and Argument**

    **A.     The Magistrate Judge's Ruling Should Be Reversed Where Clearly Erroneous and Contrary To Law**

Pursuant to 28 U.S.C. § 636(b)(1)(A), magistrate judges are empowered by the United States Code to "hear and determine" non-dispositive pretrial motions. Parties may appeal magistrate judge findings to the district court, which may reconsider the orders "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed.R.Civ.P. 72(a). Reversal of the magistrate judge's order is appropriate "when a magistrate judge has obviously misapprehended a party's position, the facts, or the applicable law." *Kreger v. General Steel Corp.*, No. 07-575 (E.D.La. Dec. 30, 2008), 2008 WL 5429607 at *1 (Berrigan, J.) (finding clear error and reversing magistrate order limiting discovery by plaintiffs).

    **B.     The Order Improperly Applied A Good Cause Requirement For The Taking Of Individual Depositions**

Rule 30(a) of the Federal Rules of Civil Procedure provides in relevant part that "*any* party may, by oral questions, depose *any* person, including a party. . . ." (Emphasis added.) The Rules put no limits on depositions, barring a stipulation by the parties.

In the Fifth Circuit, "[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Salter v. Upjon Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *see also Caringal v. Karteria Shipping, Ltd.*, No. 99-3159 (E.D. La. Jan. 12, 2001), 2001 WL 41015 at *1 (Berrigan, J.) ("[Movant] is asking this Court to prohibit the taking of a deposition altogether, a highly unusual

measure."); *In re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 429, 437 (E.D. Pa. 1981) ("The Court is not satisfied that 'extraordinary circumstances' are present here which would warrant an order preventing 'altogether' the taking of the deposition.").

Given the legal standard that depositions can only be prevented under "extraordinary circumstances," the Order's imposition of additional prerequisites that effectively prevent the taking of necessary and reasonable depositions is clearly erroneous and contrary to law. *See Salter*, 593 F.2d at 651. There are no demonstrated "extraordinary circumstances" here that could justify the denial of three timely-noticed depositions of persons plainly involved in key aspects of the BP post-accident investigation.

**C. Even Under This New "Clear Necessity" Requirement, Cameron Has Established The Clear Necessity For Taking Each Of The Three Requested Depositions.**

Having been required to make a showing that was not required of the 189 depositions expected to be completed by July 31, Cameron nevertheless did show that the depositions are necessary, and that each proposed deponent was selected because of the specific area of concentration involving the BOP investigation and Bly Report.

As established above, testimony of other BP employees and investigators has demonstrated that each of the three proposed deponents possesses unique knowledge and firsthand experience about some aspect of the BOP performance, analysis, testing and other investigation that witnesses to date could not address and as to which Cameron is entitled to discover.

Tony Emmerson was involved both on the rig itself following the explosion and in assisting with the testing undertaken during the investigation - Dr. Abbassian, in contrast, was not involved until the post-accident investigation process began, and he delegated responsibilities

and oversight to Emmerson when he was away, making Emmerson the best source of information relating to BP's onsite analysis of the BOP prior to the rig sinking, as well as all post-accident testing for investigative purposes, and anything that occurred in Dr. Abbassian's absence.

Tim Allen was involved with the actual testing of the BOP performance and performed calculations that were the basis of several portions of the report, including a chart representing shearing pressure that was purportedly based in part on formulae and spreadsheets provided by Cameron - which application Cameron should also be able to question.

Ray Fleming was in charge of analyzing the control system performance and thus led testing of all the potential leaks and parts.  Dr. Abbassian admitted that Mr. Fleming had knowledge regarding the control system operations and post-accident battery testing that he himself did not possess, and both Mr. Emmerson and Mr. Fleming were identified by the head of the BP rig audit team as two of the three people involved in the BP internal investigation with the most knowledge concerning BOPs.

Although no extra "clear necessity" or "good cause" requirement should be applied under the law, if such a requirement were to be applied here, Cameron has carried its burden that these depositions are necessary, reasonable, and proper.  And, respectfully, the Order's conclusion to the contrary is legally and factually wrong.

> D.      **The Order Is Patently Unfair To Cameron**

This new "clear necessity" requirement unfairly targets Cameron.  No other defendant has been asked to establish a heightened level of need to justify the taking of *any* deposition in this matter.  Furthermore, in a Status Conference following the entry of this Order,

the Magistrate Judge made clear that the Court would not impose any heightened "cause" requirements on parties seeking depositions:

> Now, we're going to go through the post-July 31 deposition requests. I guess I just want to make a comment to the group. . . ..So I want you all to start thinking about really, really, really, do you need the people we're getting ready to go through and schedule. If we didn't need them for expert reports, do we really need them is the question. **I'm not going to make you show cause**, but I do think it should be a reality check for you guys to question yourself with regard to that.

(*See* Exhibit F, Transcript of Discovery Status Conference Proceedings Held Before the Honorable Sally Shushan, July 1, 2011, p. 96, emphasis added; *see also* Rec. Doc. 3168.)

Cameron is only seeking targeted discovery on a single aspect of the entire incident: the BOP.  This focus should not act to eliminate potential avenues of discovery, but rather should reassure the Court that Cameron is not seeking limitless, repetitive or harassing discovery but is instead seeking appropriate and relevant discovery on a single issue pursuant to its rights as a party under F.R.C.P. 30(a) and this Court's PTO 27.

### E. BP's Has Not Carried Its Burden To Support Its Objections

BP primarily objected to the three depositions because (1) Cameron's request was untimely and (2) having already produced "dozens of witnesses" and at least one BOP-related Bly Report investigator (Abbassian), the deposition of three additional witnesses would cause a "substantial burden" on BP.[6]  (Exh. A, pp. 2-3.)

---

[6] BP also objected to the three witnesses on the basis that Cameron has just as much knowledge about the BOP as did these three employees. (Exh. A, p. 2.)  This argument should not be taken seriously, given that Cameron seeks to question the employees about <u>their</u> investigation, as internal BP employees, of the BOP with respect to the Bly Report.

As to the first argument, that Cameron was untimely, the Magistrate Judge rejected that contention, finding that Cameron's requests were timely.

As to the other basis for BP's objection--burdensomeness--the Court apparently accepted BP's argument. But BP did not establish that the three depositions were burdensome or repetitive. Nor was Cameron responsible for the volume of discovery that BP has undergone since January 18.

To establish that a proposed deposition is unduly burdensome, a party must do more than simply complain about burden; it must establish what the burden complained of actually is (whether undue expense, repeated and unnecessary travel, etc.). *See Scottsdale Ins. Co. v. Education Management, Inc.*, No. 04-1053, 2007 WL 2127798 at *3 (E.D.La. July 25, 2007) (Berrigan, J.); *Beechgrove Redevelopment v. Carter & Sons*, No. 07-8446, 2008 WL 5382310 at *2-3 (E.D.La. Dec. 22, 2008) (Shushan, J.) (rejecting unsupported "burdensome" objection raised to witness's second deposition).

In the *In Re Vioxx Products Liability Litigation* matter, for example, the FDA moved to quash a noticed deposition of its employee, arguing that the deposition would be unduly burdensome because it would divert the FDA's time and resources, as well as create precedent for numerous other FDA-employee-depositions being noticed, and was further unnecessary because the deponent's opinions were available in previously produced documents. 235 F.R.D. 334, 346-46 (E.D.La. 2006). The Court disagreed and allowed the deposition to go forward, finding that the deposition requested was not burdensome and, further, that testimony was necessary from this witness because, "[n]one of the documents provided by the FDA can express Dr. Graham's opinion with the clarity and tone as he personally can in his deposition."

*Id*. at 346.  Importantly, the Court also found that each deposition would be evaluated *on its own merits*, such that the FDA's complaints about the potentially burdensome cumulative effect of multiple depositions were rejected by the Court.  *Id.* at 345-46.

To date, BP has produced 46 witnesses for depositions, according to its own numbers.  (*See* Exh. A, p. 6.)  To be sure, that is more than any other party to the MDL, but that fact hardly establishes that BP has experienced any singular burden.  BP is a designated Responsible Party under the OPA.  *See* 33 U.S.C. § 2702.  As a Responsible Party under OPA, it is not unreasonable that BP will have significantly greater discovery obligations.  Moreover, BP's potential liability and thus its need to answer in discovery are considerably broader than any other defendant in the MDL and far broader that just the BOP issue.  BP's liability touches on well design; general engineering; training; safety process; cement and well monitoring, just to name a few.  BP's "burdensome" argument fails to establish any true "burden" on BP in producing the three witnesses for these depositions - each of which being reasonable and necessary on its own merits - and BP's "burdensome" objection should accordingly be rejected.

BP also claimed that the three depositions were unnecessary as cumulative, but in doing so BP ignored that its own witness, Dr. Abbassian, contradicted its argument.  His testimony and that of the other cited BP witnesses all demonstrated how each of the three witnesses has different areas of knowledge.  And other than argue that one Bly Report BOP witness was all that Cameron needed, BP offered no other support for the Court's finding that it is not "clear" that the three depositions Cameron sought were "necessary".  If Dr. Abbassian were the repository of all BP BOP knowledge, why then did he testify he did not have answers to Cameron's questions and refer Cameron to his co-workers?  Other than to declare that these three

witnesses can offer nothing new, BP offered nothing--specifically, it offered no proof of its bare claim. BP cannot be permitted to be the gatekeeper for who among its employees may be deposed.

### III.     Conclusion

As set out above, the Magistrate Judge's Order was clearly erroneous and contrary to law. Cameron respectfully appeals from the Order Regarding Objections to Deposition [Rec. Doc. 3090] and asks that it be permitted to depose BP employees, Tim Allen, Tony Emerson and Ray Fleming.

Respectfully submitted,

| | |
|---|---|
| David J. Beck, T.A. | /s/ Phillip A. Wittmann |
| dbeck@brsfirm.com | Phillip A. Wittmann, 13625 |
| Joe W. Redden, Jr. | pwittmann@stonepigman.com |
| jredden@brsfirm.com | Carmelite M. Bertaut, 3054 |
| David W. Jones | cbertaut@stonepigman.com |
| djones@brsfirm.com | Keith B. Hall, 24444 |
| Geoffrey Gannaway | khall@stonepigman.com |
| ggannaway@brsfirm.com | Jared Davidson, 32419 |
| | jdavidson@stonepigman.com |
| BECK, REDDEN & SECREST, L.L.P. | |
| One Houston Center | STONE PIGMAN WALTHER WITTMANN L.L.C. |
| 1221 McKinney, Suite 4500 | 546 Carondelet Street |
| Houston, TX 77010-2010 | New Orleans, Louisiana 70130 |
| 713-951-3700 | 504-581-3200 |
| 713-951-3720 (fax) | 504-581-3361 (fax) |

**ATTORNEYS FOR DEFENDANT CAMERON INTERNATIONAL CORPORATION**

1062920v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support of Cameron International Corporation's Objections to and Appeal From Magistrate Judge's Order Regarding Objections to Depositions [Rec. Doc. 3090] has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of July, 2011.

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann