

38490311

Jul  1 2011
11:54PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179  SECTION: J |
| This Document Relates To: All Cases | : : | JUDGE BARBIER  MAGISTRATE JUDGE SHUSHAN |
| ……………………………………………... | : | |

### THE BP PARTIES' THIRD SET OF
### INTERROGATORIES TO HALLIBURTON ENERGY SERVICES, INC.

Pursuant to Federal Rules of Civil Procedure 26, 33 and 34, BP Exploration & Production Inc. and BP America Production Company (the "BP Parties") propound the following Interrogatories to Defendant Halliburton Energy Services, Inc. ("Halliburton") to be responded to within 30 days of service. The BP Parties request that all documents and electronically stored information responsive to the following Third Set of Interrogatories be produced at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654.

### DEFINITIONS

1. "You," "your," and "yours" shall mean Halliburton, including without limitation all of Halliburton's present or former employees, agents or representatives, or anyone acting or purporting to act for or on Halliburton's behalf for any purpose whatsoever, and includes any and all affiliates, subsidiaries, contractors and divisions, such as Sperry Drilling, and includes the present employees, agents and representatives of those affiliates, subsidiaries, contractors and divisions.

2. "Person" shall mean an individual as well as any entity including any proprietorship, partnership, corporation, firm, committee, or any other organization.

# Exhibit B

3. "Communication" means any transmission of information by one or more persons to one or more persons by any means including, without limitation, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail (including both business and personal email), text messages, computer linkups, written memoranda, and face-to-face conversations; "communication" also includes all documents and ESI containing, summarizing, or memorializing any communication.

4. "Document" or "documents" includes "communications" as defined above, and has the full meaning ascribed to it by Federal Rule of Civil Procedure 34(a), including electronically stored information ("ESI"), and includes the original and any identical or non-identical copy, regardless of origin or location, of any writing or record of any type or description, including but not limited to all writings; records; contracts; agreements; communications (intra or inter-company); correspondence; memoranda; letters; facsimiles; electronic mail (e-mail); minutes, recordings, transcripts, and summaries of meetings, or recordings of meetings, speeches, presentations, conversations, or telephone calls (whether recorded in writing, mechanically, or electronically); handwritten and typewritten notes of any kind; statements; reports; voice recordings; desk calendars; diaries; logs; drafts; studies; analyses; schedules; forecasts; surveys; invoices; receipts; computer data; computer printouts; financial statements; balance sheets; profit and loss statements; statements of earnings; statements of net worth; credit reports; statements of operations; audit reports; financial summaries; statements of lists of assets; work papers; pictures; photographs; drawings; computer cards; tapes; discs; printouts and records of all types; instruction manuals; policy manuals and statements; books; pamphlets; cancelled checks; check stubs; and every other device or medium

by which information or intelligence of any type is transmitted, recorded, or preserved, or from which intelligence or information can be perceived.

5. "Identify," when used with respect to: (a) an individual, shall mean to provide the individual's full name, job title and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and Bates number(s).

6. "Including" or "includes" means "including but not limited to" and "including without limitation."

7. "Relating to" or "related to," when referring to any given subject matter, means any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

8. The words "and" and "or" should be construed conjunctively or disjunctively as necessary to make the interrogatory inclusive rather than exclusive.

9. "Any" should be construed, when possible, to mean "any and all."

10. "Each" should be construed to include the word "every," and "every" should be construed to include the word "each."

11. The singular includes the plural, and the plural includes the singular.

12. "MC252 well" and "Macondo well" refer to the exploratory well that was being drilled by the *Deepwater Horizon* in the Macondo prospect of Mississippi Canyon 252 in the

outer continental shelf of the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

14.  "Halliburton" means Halliburton Energy Services, Inc. and all of its affiliates, subsidiaries, contractors and divisions, such as Sperry Drilling, and includes the present employees, agents and representatives of those affiliates, subsidiaries, contractors and divisions.

14.  "BP" means BP p.l.c and all of its affiliates and subsidiaries.

15.  "Kick," whether or not capitalized, means the intrusion of hydrocarbons into a wellbore.

16.  "Blowout," whether or not capitalized, means an uncontrolled release of hydrocarbons from a well.

17.  "OptiCem" means Halliburton's proprietary software used to model cement slurry operations and as that term was used by Halliburton in communications with BP.

## INSTRUCTIONS

1.  Pursuant to Federal Rule of Civil Procedure 26(e), these interrogatories are continuing and you must revise or supplement your responses whenever new or additional responsive information becomes known.

2.  Each interrogatory solicits all information that is known to you or in your possession, custody or control, and all information available to you from your attorneys, agents, investigators, experts, employees, insurers and representatives.

3.  Each interrogatory is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular interrogatory.

4. These interrogatories are to be answered in detail. If you cannot answer any interrogatory in full, you should answer it to the extent possible and explain your inability to answer any further.

5. If you claim that the language of any interrogatory is vague or ambiguous, then you must identify the language you believe is ambiguous and describe the different interpretations that you believe may apply to such language. Regardless of any vagueness or ambiguity you claim, you are to answer the interrogatory to the best of your ability.

6. When asked for a date, an exact date should be given if known. If an exact date is not known, an approximate date should be given and identified as such.

7. If any of the answers to these interrogatories are derived from papers, records or documents in your possession or under your control, please attach a copy thereof to your answers or, in the alternative, please describe each of the documents with specificity and state when and where they will be available to BP's counsel for inspection and copying.

8. If you contend that information responsive to any interrogatory is protected from disclosure pursuant to any privilege or work-product doctrine, then you must comply with the requirements of Pre-Trial Order No. 14 and Federal Rule of Civil Procedure 26(b)(5).

## INTERROGATORIES

32. Describe in detail, from January 2004 to April 2010, each well where you pumped a foamed cement job in the Gulf of Mexico at a depth greater than 10,000 feet, where your pre-job modeling calculated a Gas Flow Potential value in the "severe" category including, but not limited to, the following information:

   a. the well;

   b. the client/operator of the well;

   c. the Halliburton account representative for the well;

5

    d.  the number of centralizers used on this particular cemented interval of the well; and

    e.  any changes to the casing and/or cement design, including changes to the type or number of centralizers, that took place as a result of the pre-job modeling indicating a Gas Flow Potential value in the "severe" category.

As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

    33.  Describe in detail Halliburton's monitoring of data during the cement job performed on April 19-20, 2010 aboard the *Deepwater Horizon* including, but not limited to, the following information:

    a.  the Halliburton personnel who were engaged in monitoring the pressure data;

    b.  the data, including pressure data, recorded by the Halliburton system during the cement job;

    c.  the Halliburton personnel aware of the difference between the predicted pressure and the actual pressure during the cement job and when and how they became aware; and

    d.  when BP was first informed of the difference between the predicted pressure and the actual pressure during the cement job.

As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

    34.  Describe in detail the transmission of laboratory test results from Halliburton to BP for the April 19-20, 2010 cement job on the production interval of the Macondo Well, including the process by which Jesse Gagliano ordered laboratory testing, the process by which

Mr. Gagliano determined what conditions the testing should be run under, the lab technicians that Mr. Gagliano communicated with, the reporting of test results to Mr. Gagliano, the review and interpretation of test results by Mr. Gagliano, the selection of test results by Mr. Gagliano for lab reports, and the communication of lab reports and test results by Halliburton to BP. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

35. Describe in detail the reasons why Halliburton did not conduct laboratory testing on the foamed cement slurry with 0.09 gallon per sack of retarder, including foam stability, FYSA and crush compressive strength testing, that was pumped for the production interval of the Macondo Well. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

36. Describe in detail Halliburton's communication of laboratory testing results for the cement slurry, in particular the foam stability testing results, to BP before the cement job was pumped on April 19-20, 2010, including each person who reviewed the testing results; when each person reviewed the testing results, whether Jesse Gagliano reviewed the results from the foam stability testing completed on April 19, 2010 before the cement job, and how and when laboratory results, in particular the foam stability testing results, were communicated to BP. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

37. Describe in detail all communications from Halliburton to BP indicating that BP would need to run a cement bond log in order to rely on the cement job performed by Halliburton on April 19-20, 2010, including when any communication occurred, the persons involved and the substance of the communication. As part of your response, please identify all witnesses with

knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

38. Describe in detail the reasons why Halliburton did not redesign the cement slurry for the production interval of the Macondo Well once Halliburton was aware that BP was planning on running 6 centralizers on the production casing. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

39. Describe in detail all potential effects (both beneficial and adverse) from using defoamers, among others D-AIR 3000, in foam cement. As part of your response, please identify any testing or research that you have conducted indicating that the use of defoaming agents in foam cement jobs is recommended or proper.

40. Describe in detail all reasons why Halliburton recommended a cement blend containing a defoaming agent for the foam cement job conducted on the production interval on the Macondo Well. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

41. Describe in detail all communications between Halliburton and BP where BP was informed of any concerns Halliburton had with the cement job on the production interval of the Macondo Well, including concerns with the cement design, testing results, and selection of cementation equipment, and including when the communications occurred, the persons involved, and the substance of the communications. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

42. Describe in detail the history of cement dry blends that Halliburton ordered for the Macondo Well, including orders of dry blend for delivery to the *Transocean Marianas* and the *Deepwater Horizon*, including when the cement blend was ordered, the person(s) specifying the dry blend to be ordered, the person(s) ordering the dry blend, and the composition of each order of dry blend, including the details of any communications between Halliburton and BP relating to dry blends ordered for the Macondo Well, including any communication where BP was informed of the differences between the cement blend from the *Marianas* and the cement blend used on the *Deepwater Horizon*. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

43. Describe in detail all communications between Jesse Gagliano and any other person, including BP and Halliburton employees, relating to the Macondo Well, including communications about the cement design, cement testing or any concerns about the cement job, between April 1, 2010 and April 20, 2010, including when the communications occurred, the persons involved, and the substance of the communications. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

44. Describe in detail all communications by Halliburton employees relating to cement testing for the Macondo Well, including both pre- and post-incident communications, including when the communications occurred, the persons involved, and the substance of the communications. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

45. For each Halliburton and/or Sperry Sun employee viewing real-time data from the Macondo Well on April 19-20, 2010, whether on the *Deepwater Horizon* rig and/or offshore from any location, please provide the identity of the individual, whether the individuals was logged into Insite, when the individual began and ended viewing data, whether the individual was monitoring the data, including for mudlogging purposes, whether the individual noticed any anomalies in the data, whether any of the individuals had concerns about the data, whether any of the individuals took action based on the data, and the substance of all communications of these individuals pre-incident and post-incident concerning the data. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

46. Describe in detail each cement job in the last ten years where Halliburton has pumped a foamed cement containing a defoamer, including D-AIR 3000, across the production interval of a well, including the date of the job, the location of the job, the depth of the job, the operator, the design of the cement slurry, the design of the cement job, the execution of the cement job, and the status of the well, including whether it is in production well and whether it required remedial cementing. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

47. Describe in detail the work of the SWAT Team identified in HAL_0575033, including the formation of the SWAT Team, the work the SWAT Team was charged with, the members of the SWAT Team, the work performed by the SWAT Team, any analyses, reports or findings by the SWAT Team, and the content of any reports and/or findings, including drafts of any reports and/or findings. As part of your response, please identify all witnesses with

knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

48. Describe in detail the access of Halliburton employees, including Jesse Gagliano, to Wellspace before the *Deepwater Horizon* Incident on April 20, 2010, including the level of access of each individual, the dates of access for each individual, and the date of and data accessed by each individual, including whether Wellspace data or information was accessed indirectly through another person with access to Wellspace. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

49. Describe in detail all Halliburton communications relating to the *Deepwater Horizon* incident, including internal and external communications relating to the Macondo Well, well design, casing design, centralizers, cement design, foam cement, cement testing, pumping the cement job on the production interval of the Macondo Well, channeling, gas flow potential, lost returns, cement bond log, and flow path. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

50. Describe in detail each meeting of the Halliburton board of directors that mentioned the *Deepwater Horizon* Incident, including when the meeting occurred, who attended the meetings, what was discussed (including without limitation the Macondo Well, any investigation, the cause of the incident, or potential liability), whether any minutes for meetings exist, the identity of those minutes, any decisions made by the board, and the identity of any other documents relating to such meetings or decisions. As part of your response, please identify

all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

Dated:  July 1, 2011

Respectfully submitted,

/s/ J. Andrew Langan, P.C.
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:     (504) 581-7979
Facsimile:     (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:     (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 1st day of July, 2011.

                                            /s/ J. Andrew Langan, P.C.