UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the Oil Rig "DEEPWATER HORIZON" in the GULF OF MEXICO, on April 20, 2010 | ) ) ) ) ) ) ) ) ) ) ) | MDL No. 2179 <br><br> SECTION "J" <br><br> JUDGE BARBIER <br> MAG. JUDGE SHUSHAN |
| THIS DOCUMENT RELATES TO: <br><br> Civil Action No. 2:10-cv-03879 | | |

---

**MEMORANDUM OF LAW
IN SUPPORT OF THE MOTION FOR RECONSIDERATION OF THE FINAL
JUDGMENT REGARDING THE ENDANGERED SPECIES ACT CLAIMS**

---

Defenders of Wildlife, the Gulf Restoration Network, Inc., and Save the Manatee Club, Inc. (hereafter, the "ESA plaintiffs" or "plaintiffs"), the plaintiffs in *Defenders of Wildlife et al. v. BP, p.l.c. et al.*, Civ. A. No. 2:10-cv-03879-CJB-SS (E.D. La. Oct. 20, 2010) (hereafter, "*Defenders of Wildlife v. BP*") by and through counsel, file this memorandum of law in support of their motion for reconsideration brought pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. On June 16, 2011, the Court issued "Order and Reasons [As to D1 Master Complaint]," Rec. Doc. 2784, (hereafter "Order Dismissing D1 Master Compl.") which dismissed the claims against BP for violation of section 9 of the Endangered Species Act, 16 U.S.C. § 1538, in their entirety. *See* Order Dismissing D1 Master Compl. at 13. It is not clear whether the Court's order operates as a final judgment dismissing the underlying *Defenders of Wildlife v. BP* complaint, and, therefore, the ESA plaintiffs file this Rule 59(e) motion out of an abundance of caution. The Plaintiffs' Steering Committee supports the filing of this motion, out

1

of an abundance of caution, to preserve the issue, but does not believe the Court should take up the motion at this time.

The ESA plaintiffs respectfully submit that the Court's order failed to take into account the unique nature of the ESA claims and crucial distinctions between violations of the Endangered Species Act (the "ESA" or "Act") and violations of the Clean Water Act and other statutes invoked in the D1 Master Complaint. When these distinctions are considered, they merit reinstatement of the ESA claims against BP.[1]

In reaching its decision on the ESA claims, the Court concluded that dismissal was appropriate because there was no ongoing ESA violation as "the alleged violations — the release of oil — occurred in the past." Order Dismissing D1 Master Compl. at 12. A violation of section 9 of the ESA, which broadly prohibits the "take" of listed species, including death, injury, harm, and harassment, is not contingent on a continuing or intermittent discharge of pollutants but exists so long as any party's action, whether past or present, is resulting in the *ongoing* take of listed species. As is the case here — where an action is continuing and will continue to harm listed species in the absence of relief by the Court — a remediable violation of the Act exists. The ESA plaintiffs do not and have never contested the fact that the Macondo well has been capped since July 15, 2010 and sealed since September 2010. However, they have alleged that oil and the impacts of the oil spill caused by BP on the Gulf ecosystem continue to adversely affect listed species in violation of section 9 of the Act *even after* the closure of the well. There is no legal or practical reason why the Court cannot craft remedies specifically

---

[1] The ESA claims are the only claims for which the ESA plaintiffs seek reinstatement in this Rule 59(e) motion. They take no position on the other claims brought in the D1 Master Complaint.

aimed at those ongoing impacts, which the ESA plaintiffs maintain — and BP has not disputed — are injuring plaintiffs' concrete interests in the species in myriad ways.

Thus, rather than an attempt to oversee or second guess the general cleanup of the Gulf of Mexico following the oil spill, the ESA plaintiffs seek narrow and targeted equitable relief — for example, requiring BP to take specific measures to ameliorate the ongoing impacts of its spill on listed species through an endowment dedicated to that objective or other appropriate means — in order to remedy ongoing injury to plaintiffs' interests in the species. This is precisely the type of equitable relief authorized for violations of section 9 of the ESA, and there is nothing in the language, structure, or purpose of the Act that suggests that BP should not be accountable under the statute for the *ongoing* impacts of its spill on endangered and threatened species. Exactly the opposite result is contemplated by the comprehensive scheme embodied in the Act.

Once again, the ESA plaintiffs do not wish to enjoin or otherwise interfere with any remediation efforts currently underway in the Gulf by either federal and state agencies or BP itself. However, it remains an unresolved factual matter that cannot be answered at this stage of the litigation as to whether the current *general* cleanup effort will provide *any* relief, let alone fully adequate relief, to the listed species experiencing continuing impacts from the spill. Certainly, the federal government itself has never suggested that its cleanup actions will, or were designed to, address all ongoing injuries to listed species. Should the injuries to listed species be unaddressed, the ESA provides the Court authority to craft a remedy that is supplemental and complementary to the general cleanup. Accordingly, irrespective of whether claims targeted at preventing *discharges* should be permitted to proceed, there is simply no valid legal or factual basis on which the much different ESA claims predicated on ongoing unlawful take can be deemed moot or nonjusticiable at this juncture.

For these reasons, the ESA plaintiffs respectfully request that the Court reinstate the claims against BP brought pursuant to the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and set forth in *Defenders of Wildlife v. BP*.

## BACKGROUND

On October 20, 2010, the ESA plaintiffs filed a civil action against BP, p.l.c., BP America, Inc., and BP Exploration and Production, Inc. (collectively, "BP") for violations of section 9 of the ESA, 16 U.S.C. § 1538, because of the ongoing take of endangered and threatened species in the Gulf of Mexico caused by the oil spill. *See Defenders of Wildlife v. BP*. The ESA plaintiffs specifically alleged that the take of sea turtles, piping plovers, sperm whales, and manatees was "reasonably certain" to continue even after the capping of the Macondo well on July 15, 2010. *See id.* at ¶¶ 37-73.

Under Pre-trial Order No. 11, "the Court created 'pleading bundles' for the purposes of filing master complaints, answers, and any Rule 12 motions." Order Dismissing D1 Master Compl. at 1-2. The plaintiffs' ESA claims were consolidated into the D1 bundle which included "claims for injunctive relief brought against private parties." *Id.* at 2. The Plaintiffs' Steering Committee filed the D1 Master Complaint on December 15, 2010. *See id.* at 2; D1 Master Compl., Rec. Doc. 880. On February 28, 2011, BP filed a motion to dismiss the ESA claims and other claims in the D1 Master Complaint. *See* BP's Motion to Dismiss the D1 Master Compl., Rec. Doc. 1441. On June 16, the Court dismissed most claims contained in the D1 Master Complaint in their entirety, including the ESA claims. *See* Order Dismissing D1 Master Compl. at 13.

Since the Court did not resolve all of the claims in the D1 Master Complaint, *see id.* at 13 (providing that claims "under General Maritime Law and/or state law" will be considered

4

"separately when [the Court] addresses the pending motions to dismiss the B1 bundle Master Complaint"), and since the Court has yet to rule on motions to dismiss other Master Complaints in the MDL, it is not clear whether the Court intended its ruling to operate as a final judgment for purposes of a Rule 59(e) motion or other filing deadline related to the underlying *Defenders of Wildlife v. BP* complaint. The ESA plaintiffs file this Rule 59(e) motion out of an abundance of caution within the 28-day period prescribed by the rule.

## ARGUMENT

### I. STANDARD OF REVIEW.

"[A] motion to alter or amend the judgment under Rule 59(e) must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003) (internal quotations and citations omitted). Under the standard for a motion to dismiss brought pursuant to Rule 12(b)(6), a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "courts must . . . accept all factual allegations as true . . . [and] must draw all reasonable inferences in favor of the plaintiff." *Lormand v. US Unwired*, 565 F.3d 228, 232-33 (5th Cir. 2009) (internal quotations and citations omitted). Legal conclusions "are not entitled to the assumption of truth." *Iqbal*, 129 S.Ct. at 1950.

Here, the ESA plaintiffs respectfully submit that the Court's Order Dismissing D1 Master Complaint did not apply the plain language of section 9 of the ESA and the case law broadly construing that section and, therefore, the Court failed to recognize that the plaintiffs had adequately pled a continuing violation of the Act's unique prohibition on the "take" of listed

species. Additionally, the Court did not apply the Rule 12(b)(6) standard to the plaintiffs' allegations and instead reached factual conclusions unsupported by the pleadings regarding the redressability of the plaintiffs' claims and the scope of the general Gulf cleanup. The plaintiffs respectfully submit that these are errors of law that warrant reinstatement of the ESA claims against BP pursuant to Rule 59(e).

## II. VIOLATIONS OF THE ENDANGERED SPECIES ACT CAN CONTINUE AS A MATTER OF LAW *EVEN THOUGH* THE MACONDO WELL IS NO LONGER DISCHARGING OIL.

### A. Violations of the Endangered Species Act are not contingent on an ongoing discharge.

The ESA plaintiffs have alleged injuries to listed species resulting from the oil spill that have continued since the Macondo well was capped on July 15, 2010.[2] These ongoing injuries, caused by BP, constitute a violation of section 9 of the ESA *even though* the well itself is no longer discharging oil. Although it arises under several different legal headings, the primary basis for the Court's Order Dismissing D1 Master Complaint is that violations of the various environmental statutes ceased when the Macondo well was killed. *See* Order Dismissing D1 Master Compl. at 6, 9-13. The ESA plaintiffs respectfully submit that the Court did not discern the unique nature of the violations of the ESA alleged in the *Defenders v. BP* complaint, which do *not* by their plain terms depend on any ongoing or intermittent discharge, and hence the Court erroneously conflated the ESA claims with those brought under the Clean Water Act, which do require such a discharge to be cognizable.

---

[2] The ESA plaintiffs do not question the fact that the Macondo well was capped on July 15, 2010 and specifically acknowledged its closure in their complaint. *See Defenders of Wildlife v. BP* at ¶ 30.

Unlike other federal environmental statutes, a violation of section 9 of the ESA is simply not contingent on a continuous or intermittent discharge of pollutants at the time the complaint is filed. *Compare* 33 U.S.C. § 1311 (subject to specific exceptions, "the *discharge* of any pollutant by any person shall be unlawful") (emphasis added) *with* 16 U.S.C. § 1538 (subject to certain narrow exceptions, "it is unlawful for any person . . . to take any such [listed] species" or "cause to be committed [ ] any offense defined in this section"). A party may commence a citizen suit under the Clean Water Act only when discharges are "continuous or intermittent" at the time of filing. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.* 484 U.S. 49, 64 (1987) (holding that 33 U.S.C. § 1365 "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation"). In contrast, a violation of section 9 of the ESA occurs in the following way. The statute sets forth a broad prohibition on the "take" of listed species: without express authorization, "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any [listed] species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1). "Take" is defined broadly to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). Violations of the section 9 take prohibition exist against "any person subject to the jurisdiction of the United States" who "attempt[s] to commit, solicit[s] another to commit, *or cause[s] to be committed*, any offense defined" by section 9. *Id.* § 1538(g) (emphasis added).

Therefore, if oil released from the Macondo well prior to its closure on July 15, 2010, continues to harass, harm, wound, or kill listed species in the Gulf after the closure, including significantly modifying or degrading habitat for listed species, *see* 50 C.F.R. §§ 17.3, 222.102, that results in a prohibited "take" and is a violation of section 9 of the Act. Unlike a CWA

7

violation, a discharge of oil does not have to be ongoing or intermittent at the time the complaint is filed for an ESA violation to be cognizable. Instead, where an action results in ongoing injury to listed species in violation of section 9 of the ESA, the fact that the action itself occurred in the past does not automatically end the *violation* of the Act if, as plaintiffs have alleged, the take of listed species persists. Indeed, injuries to listed species cognizable under the ESA are commonly delayed or even remote in time from the action initiating the injury, but that does not in itself foreclose a section 9 claim. As courts have recognized, to allow ESA violators to escape liability where ongoing harms are occasioned by their past actions would fly in the face of the Act's overarching purposes. *See, e.g.*, *Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294, 1301 (8th Cir. 1989) (finding EPA's decision to register strychnine violated section 9 of the ESA because it resulted in future prohibited takings of listed species); *Nat'l Wildlife Fed'n v. Hodel*, 23 Env't Rep. Cas. (BNA) 1089, 1089-93 (E.D. Cal. 1985) (finding that the FWS's authorization of the use of lead shot violated section 9 of the ESA because the lead shot caused future secondary poisoning of bald eagles when eagles ingested poisoned prey).

Courts have embraced an expansive reading of the ESA's "take" prohibition. In *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995), the Supreme Court recognized

> that Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions. The Senate Report stressed that '"take' is defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." . . . The House Report underscored the breadth of the "take" definition by noting that it included "harassment, *whether intentional or not*."

*Id*. at 704-05 (quoting S. Rep. No. 93-307 at 7 (1973) and H. R. Rep. No. 93-412 at 15 (1973)) (emphasis in original).  In *TVA v. Hill*, 437 U.S. 153 (1978), the Supreme Court observed that, through the ESA, Congress intended

> to halt and reverse the trend towards species extinction, whatever the cost.  This is reflected not only in the stated policies of the Act, but in literally every section of the statute.  All persons, including federal agencies, are specifically instructed not to 'take' listed species, meaning that no one is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" such life forms.

*Id.* at 184-85.  Following the Supreme Court's guidance, lower courts have construed the "take" prohibition broadly.  *See Animal Welfare Inst. v. Beech Ridge Energy, LLC*, 675 F. Supp. 2d 540, 561 (D. Md. 2009) ("The text of § 9 and its legislative history also indicate that Congress intended that the 'take' provision be expansive in scope."); *Loggerhead Turtle v. County Council of Volusia County, Fla.*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995), *rev'd on other grounds by* 148 F.3d 1231 (11th Cir. 1998), *cert. denied*, 526 U.S. 1081 (1999) ("[T]he Act does not distinguish between a taking of the whole species or only one member of the species.  *Any taking and every taking* – even of a single individual of the protected species – is prohibited by the Act.  Hence the future threat of even a single taking is sufficient to invoke the authority of the Act.") (internal citations omitted; emphasis in original).

In light of the plain language of the ESA's prohibition on "take" and the expansive interpretation of "take" applied by the courts, the ESA plaintiffs adequately alleged legal violations of section 9 of the ESA sufficient to survive a Rule 12(b)(6) motion to dismiss, and respectfully submit that the Court should reinstate these claims.

> **B.   The ESA plaintiffs' provided ample factual support for their claims to survive a motion to dismiss.**

The ESA plaintiffs provided ample factual support in their complaint "to state a claim to relief that is plausible on its face" for the alleged violations of section 9. *See Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also Lormand*, 565 F.3d at 232-33 (the "courts must . . . accept all factual allegations as true . . . [and] must draw all reasonable inferences in favor of the plaintiff.") (internal quotations and citations omitted).  The ESA plaintiffs alleged that oil remained in Gulf waters during the fall of 2010:  "Residual oil continues to be observed in Gulf waters and on Gulf shorelines," and, according to the testimony of Ian MacDonald before the President's National Oil Spill Commission, "more than 50% of the total discharge of oil . . . remains in the Gulf ecosystem, much of it in coastal and marine sediments." *See Defenders of Wildlife v. BP* at ¶¶ 33-35.  The ESA plaintiffs also alleged that "[t]he much smaller Exxon Valdez spill produced long-term devastating impacts on the wildlife of Prince William Sound." *Id.* at ¶ 36.  Based on the persistence of oil in the Gulf ecosystem after the Macondo well was killed, the long-term ecological effects that have resulted from other, much smaller oil spills after the spills stopped, and detailed allegations of the biology of listed species that make them vulnerable to ongoing harm from oil that persists in the Gulf, the ESA plaintiffs alleged reasonably certain continuing take of sea turtles, sperm whales, piping plovers, and manatees.[3] *Id.* at ¶¶ 56, 64, 70, & 73.  These allegations — the continued presence of oil in the Gulf ecosystem, the known impacts of oil exposure for specific listed species, and the reasonably

---

[3] Exhibit J to BP's memorandum supporting its motion to dismiss the D1 Master Complaint includes this statement by the Trustees of the Natural Resource Damage Assessment: "While injured natural resources may eventually naturally recover to the condition they would have been in had the discharges not occurred, interim losses have occurred, *or are likely to occur in the future, and these will continue until baseline conditions are met*."  BP Mem., Ex. J at 4 (emphasis added).

10

certain continuing take of these species — are sufficient to survive a motion to dismiss at this stage of the litigation.

Further factual development as part of this litigation is necessary before the plaintiffs' ESA claims can be resolved, and, because the plaintiffs expect research on the impacts to these species to span months, some evidence will undoubtedly be developed slowly.[4]  However, publicly available data from the United States Fish and Wildlife Service ("FWS") about the impacts of the spill on bird species underscores the continued viability of the plaintiffs' claims. *See generally* FWS, Bird Impact Data and Consolidated Wildlife Reports, *available at* http://www.fws.gov/home/dhoilspill/collectionreports.html (*last visited* July 14, 2011).  In the impact report released on September 14, 2010,[5] FWS reported 20 collected clapper rails of which 8 (5 dead and 3 live birds) were visibly oiled.  *See* FWS, Bird Impact Data from DOI-ERDC Database Download 14 Sept. 2010, 1 (Sept. 14 2010).  In the most recent report, released May 12, 2011, FWS reported 120 collected clapper rails of which 29 were visibly oiled.  *See* FWS, Bird Impact Data from DOI-ERDC Database 12 May 2011, 2 (May 12, 2011).  In other words, between September 2010 and May 2011, a period well after the closure of the Macondo Well on July 15, 2010, the number of visibly oiled clapper rails more than tripled and the total number of impacted clapper rails increased by a factor of 6.

---

[4] Much of the research necessary to establish continuing impacts to listed species is incomplete or sealed within the Natural Resource Damage Assessment.  The ESA plaintiffs intend to seek discovery of NRDA data at the commencement of the impact phase of the MDL litigation.

[5] The September 15, 2010 report is the oldest report available on the FWS website, and, therefore, the report closest in time to the capping of the well on July 15, 2010.

The same trend is apparent for other species: greater shearwater; brown pelican; Audubon shearwater; and laughing gull.[6]  *See* FWS, Bird Impact Data from DOI-ERDC Database Download 14 Sept. 2010, 1 (Sept. 14 2010); FWS, Bird Impact Data from DOI-ERDC Database 12 May 2011, 2 (May 12, 2011).  The total number of oiled birds reported by FWS also increased during this period from 1843 individuals to 2642 individuals.  *See id.*  Clapper rails, shearwaters, and laughing gulls are not listed species identified in the ESA complaint, but impacts to these species confirm that the risk of take from oil contamination continues even after the Macondo well was killed.

Oil persists in marshes, estuaries, and tidal environments throughout the northern Gulf and oil-laden sediment coats the Gulf seafloor in places.  In addition to direct exposure, the remaining oil in the Gulf ecosystem contaminates food sources and disrupts food chains.  A complete understanding of the nature and scope of these impacts for sea turtles, piping plovers, sperm whales, and manatees requires further scientific research and further factual development as part of this litigation.

However, rather than allowing for the development of evidence concerning the ongoing take of listed species through the course of this litigation, the Court prematurely dismissed the ESA claims.  A Rule 12(b)(6) motion is intended to test the *legal* sufficiency of a plaintiff's case,

---

[6] Greater shearwater: 12 impacted birds reported September 14, 2010 – 89 impacted birds reported May 12, 2011.

Brown pelicans: 568 impacted birds reported September 14, 2010 (233 visibly oiled) − 826 impacted birds reported May 12, 2011 (339 visibly oiled).

Audubon's shearwater: 3 impacted birds reported September 14, 2010 – 36 impacted birds reported May 12, 2011.

Laughing gull: 1885 impacted birds reported September 14, 2010 (747 visibly oiled) − 2981 impacted birds reported May 12, 2011 (1182 visibly oiled).

not evaluate whether facts can actually be developed to support the allegations contained in the complaint. *See, e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996) (holding that "in determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence."). The ESA plaintiffs have pled cognizable claims under the ESA — violations of the section 9 take prohibition that continue even after the Macondo well was capped — and should be permitted to develop the evidence to substantiate their claims.

### III. THE VIOLATIONS OF THE ENDANGERED SPECIES ACT ALLEGED BY THE PLAINTIFFS ARE REDRESSABLE.

The Court held that, in addition to the absence of a violation, the D1 claims are not redressable because (a) "BP and the agencies comprising the Unified Area Command have been and are cleaning up the Gulf of Mexico," and (b) the general cleanup is dependent on the actions of third parties, i.e. the agencies, who are not before the Court. Order Dismissing D1 Master Compl. at 6-7. In reaching its conclusions, the ESA plaintiffs respectfully submit that the Court did not address the specific examples of appropriate relief offered by the plaintiffs, the broad scope of equitable relief available under the ESA, or the factual presentation necessary to determine whether or not the general cleanup will include specific actions to mitigate the injuries to listed species.

#### A. The Endangered Species Act authorizes equitable relief — like the establishment of a permanent endowment — to redress the ongoing injuries to listed species alleged by the plaintiffs.

At the outset, the ESA plaintiffs emphasize that their ESA citizen suit does not seek to "clean up" the Gulf — they do not, through this lawsuit, question the efficacy of the general cleanup of the Gulf nor do they attempt to oversee or second-guess the remedial efforts already underway. Rather, the plaintiffs seek narrow and targeted equitable relief that will, in fact,

13

enjoin and help mitigate the continuing injuries to listed species described in **Section II** *supra*. The Court characterizes the D1 plaintiffs' claims for relief as limited to "injunctive relief of a prospective nature to stop noncompliance in the form of a continued release of oil." Order Dismissing D1 Master Compl. at 10. While some plaintiffs may be seeking relief of that type, the ESA plaintiffs offered examples of appropriate relief in their underlying complaint that specifically targeted impacts on listed species, including the establishment of a permanent endowment to redress ongoing impacts on listed species. *See Defenders of Wildlife v. BP* at ¶ 74. Although the exact nature of the appropriate relief will depend on the factual presentation to the Court, the indisputable availability of remedies focused specifically on listed species *continuing* to be harmed by the oil spill is sufficient to refute any notion that the ESA plaintiffs' injuries cannot be redressed pursuant to an ESA citizen suit. *See Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (quoting *Larson v. Valente*, 456 U.S. 228, 244 n. 15 (1982), for the holding "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.").

The ESA citizen suit provision establishes that "any person may commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." 16 U.S.C. § 1540(g)(1)(A). There is nothing in this expansive language, or its underlying purpose as construed by the Supreme Court, that forecloses a section 9 claim against a party whose past actions *are continuing to cause violations of the ESA's take prohibition*. *See Bennett v. Spear*, 520 U.S. 154, 164-65 (1997) (observing that the ESA citizen suit provision is "an authorization of remarkable breadth when compared with the

language Congress ordinarily uses"). Indeed, while appropriate relief for violations of section 9 of the ESA must be designed to prevent or mitigate ongoing impacts to listed species, "[t]he ESA does not limit the injunctive power available in a citizen suit" and "grant[s] a district court the full scope of its traditional equitable injunctive powers." *Strahan v. Coxe*, 127 F.3d 155, 170 (1st Cir. 1997); *see also Weinburger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.") (internal quotations and citations omitted); *Loggerhead Turtle v. County Council of Volusia County, Fla.*, 148 F.3d 1231, 1254 (11th Cir. 1998) (finding that "the district court in this case has available a wide range of effective injunctive relief" to remedy ESA violations). Here, should the facts offered at summary judgment or at trial ultimately confirm the plaintiffs' allegations that the oil spill is causing injuries to listed species, and will continue to do so in the future, the Court can order targeted actions — like the establishment of an independent and permanent endowment — that will help mitigate the injuries to listed species.[7]

### B. Whether or not the general Gulf cleanup will address the ESA violations is a factual matter that cannot be resolved at this stage of the litigation.

The ESA plaintiffs do not dispute the existence of the general effort to clean up the Gulf. However, whether or not the general cleanup of the Gulf will include *any* actions specifically tailored to address the impacts to sea turtles, piping plovers, sperm whales, and manatees — *i.e.*,

---

[7] Although the few ESA cases cited by the Court make clear that an ESA citizen suit may also be brought to address a *wholly* future action that is reasonably certain to result in take, *see* Order Dismissing D1 Master Compl. at 12, they in no way foreclose, or even purport to address, the kind of claim that the ESA plaintiffs have brought here, *i.e.*, one in which a party's prior actions *are resulting in the ongoing take* of listed species. To the contrary, the reasoning in those cases — which stressed "Congress's overriding" species protection purposes, the broad scope of the ESA's citizen suit provision, and the specific intent of section 9 to "prevent prospective *harm*" to listed species, *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785-86 (9th Cir. 1995) (emphasis added) — counsel strongly in favor of allowing the ESA claims to proceed.

the listed species for which the ESA plaintiffs have alleged ongoing, concrete injuries — is a purely factual matter that cannot be resolved at this stage of the litigation. Although BP offered numerous exhibits to its motion to dismiss, it did not provide *any* information about what actions, if any, have been taken or are planned that are narrowly drawn to address the take of these listed species.

As an initial matter, the ESA plaintiffs observe that the mere fact of the existence of the Natural Resource Damage Assessment does not, as a matter of law, preclude a citizen suit for enforcement of section 9 of the ESA. The Act sets forth a specific and narrow set of circumstances under which a citizen suit is precluded: "the Secretary has commenced action to impose a penalty pursuant to [16 U.S.C. § 1540(a)]; or if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation." 16 U.S.C. § 1540(g). These circumstances are not present in this case. In fact, the United States has specifically reserved the right to commence an ESA action but has thus far not done so. *See U.S. v. BP Exploration & Prod., Inc.*, Civ. A. No. 2:10-cv-04536-CJB-SS at ¶ 92 (E.D. La. Dec. 15, 2010).

Notwithstanding that the ESA citizen suit is not precluded under the terms of the statute, the ESA plaintiffs are aware that the Court will not apply its equitable powers in a vacuum, and they do not ask that the Court ignore the ongoing remedial effort undertaken by the Unified Area Command. As this case is prosecuted and as the general cleanup continues, it is possible that BP will be able to point to specific actions to address some of the injuries to sea turtles, piping plovers, sperm whales, and manatees. The ESA plaintiffs are not asking the Court to evaluate the effectiveness or appropriateness of those actions or to choose their proposed relief over the remedies implemented by the agencies of the Unified Area Command in the cleanup effort. At

this stage, however, it is impossible to conclude that all of the alleged impacts on listed species (and hence plaintiffs' recreational, scientific, and other interests in them) will be fully rectified by the general cleanup activities. Indeed, because of the massive injuries to commercial fisheries and human livelihoods as a result of the spill, there is a high likelihood that impacts to some or all of the listed species will be overlooked, minimized, or simply afforded a low priority in favor of other objectives. Accordingly, at least until and unless it is demonstrated that the general cleanup effort will render unnecessary or redundant all actions narrowly targeted at impacts to listed species — a showing that BP has not even begun to make — there is no legal or factual reason why plaintiffs here may not pursue appropriate remedies under the ESA's broad citizen suit provision. Where the general restoration effort produces no actions narrowly targeted to restore listed species, the ESA provides a remedy.[8]

*SPPI-Somersville, Inc. v. TRC Cos.*, No. C 04-2648 SI, consolidated with 07-5824 SI, 2009 U.S. Dist. LEXIS 74464 (N.D. Cal. Aug. 21, 2009), a case relied on by both BP and the Court, does not support dismissal of the ESA claims in particular. In that case, the plaintiffs expressly sought an injunction requiring remediation of contaminated groundwater "to the satisfaction of" various state agencies even though the defendants, under the oversight of the state agencies, had been engaged in a remediation effort for more than 8 years. *Id.* at 49, 53-54. The decision in *SPPI-Somerville, Inc.* might suggest dismissal had the ESA plaintiffs sought to generally clean up the Gulf or to require BP to clean up the Gulf to the satisfaction of the federal and state agencies, or if the current cleanup efforts included the narrowly targeted relief afforded

---

[8] On May 2, 2011, the United States, Alabama, Louisiana, and BP filed a "Report on 'Framework for Early Restoration Addressing Injuries Resulting from the Deepwater Horizon Oil Spill.'" Rec. Doc. 2239. In that report, the parties indicated that "no particular restoration projects are identified" for early restoration activities. *Id.* at 5.

under the Act to mitigate the continuing injury to listed species that the plaintiffs are seeking. But at this stage of the litigation, there is simply no evidence to demonstrate that the general cleanup will include any specific actions to restore sea turtles, piping plovers, sperm whales, and manatees.[9]

Finally, the ESA plaintiffs are not seeking relief that will require the Court to direct the federal and state agencies administering the cleanup.[10] For example, the establishment of an independent permanent endowment to address impacts to listed species in the Gulf will not involve the agencies of the Unified Area Command, will not require the Court to second-guess agency decision-making, and will not inject the Court into role of cleanup manager. Nor would the establishment of an independent permanent endowment be contingent on the actions of the federal and state agencies. Rather, an endowment, funded by an order of the Court and directed to provide grants for activities that will help restore listed species would operate like any one of the many other private funding mechanisms for conservation. Established with a clear and well-designed set of guiding principles, an endowment would merely be complementary with and supplementary to the existing government clean up and, if truly permanent, would continue to help restore listed species in the Gulf well after the conclusion of the official cleanup effort.

---

[9] Unlike the present case, the *SPPI-Somerville, Inc.* court made its determination that the plaintiffs' claims were already being redressed on a motion for summary judgment after detailed factual development. *See SPPI-Somerville, Inc.* at 44-48 (citing witness declarations).

[10] In its Order Dismissing D1 Master Complaint the Court relied on *Young America's Found. v. Gates*, 573 F.3d 797 (D.C. Cir. 2009); *Fund for Animals v. Norton*, 295 F. Supp. 2d 1 (D.D.C. 2003) and *ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989) to support the idea "an injury is not redressable for purposes of Article III standing when a claim depends on the actions of actors not before the court." Order Dismissing D1 Master Compl. at 7. Unlike those cases in which plaintiffs actually did seek relief that would involve the actions of third parties, there is nothing preventing BP from acting unilaterally to implement additional mitigation measures to protect listed species.

## IV. THE VIOLATIONS OF THE ENDANGERED SPECIES ACT ARE NOT MOOT.

The ESA claims are not constitutionally moot. The Court characterizes the relief sought by all of the citizen suits as "injunctive relief of a prospective nature to stop noncompliance in the form of a continued release of oil." Order Dismissing D1 Master Compl. at 10. However, as discussed throughout this memorandum, the ESA plaintiffs seek narrowly targeted equitable relief to mitigate for the ongoing impacts of previously released oil to threatened and endangered species. As is discussed in **Section III** above, the Court can draw upon its traditional equitable powers to redress the plaintiffs' injuries. *See Strahan*, 127 F.3d at 170; *Loggerhead Turtle*, 148 F.3d at 1254. These powers allow the Court to provide at least a partial remedy for the damage caused. "The available remedy, however, does not need to be fully satisfactory, to avoid mootness;" in fact, "[t]he availability of a partial remedy is sufficient to prevent [a] case from being moot." *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (internal quotations and citations omitted). Because the Plaintiffs allege ongoing violation of section 9 of the ESA after the well was killed on July 15, 2010, and there are available remedies that could help mitigate impacts on listed species, the ESA claims are not moot.

## V. CONCLUSION.

For the foregoing reasons, Defenders of Wildlife, Save the Manatee Club, Inc., and the Gulf Restoration Network, Inc., respectfully request that the Court reinstate the Endangered Species Act claims against BP.

        Respectfully submitted,

        /s Gregory Buppert
        Gregory Buppert, Tenn. Bar No. 024340
        Michael Senatore, D.C. Bar No. 453116
        Sierra B. Weaver, D.C. Bar No. 488560
        DEFENDERS OF WILDLIFE
        1130 17th Street, N.W.

Washington, DC 20036-4604
Telephone: 202.682.9400
Facsimilie: 202.682.1331
gbuppert@defenders.org
msenatore@defenders.org
sweaver@defenders.org

Catherine M. Wannamaker, Ga. Bar No. 811077
SOUTHERN ENVIRONMENTAL LAW CENTER
127 Peachtree Street, Suite 605
Atlanta, GA 30303
Telephone: 404.521.9900
Facsimile: 404.521.9909
cwannamaker@selcga.org

*Counsel for Plaintiffs*


*Of counsel for Plaintiffs:*

Eric R. Glitzenstein
MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
Telephone: 202.588.5206
eglitzenstein@meyerglitz.com


## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2011, I electronically served the foregoing memorandum on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing in accordance with the procedures established in MDL 2179.

/s Gregory Buppert
Gregory Buppert