**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  OIL SPILL by the OIL RIG | * | CIVIL ACTION |
| "DEEPWATER HORIZON" | * | |
| In the GULF OF MEXICO, on | * | MDL NUMBER:     2179 |
| APRIL 20, 2010 | * | |
| | * | SECTION:    "J"-(1) |
| | * | |
| | * | JUDGE: |
| | * | CARL J. BARBIER |
| | * | |
| This document relates to: 10-CV-3895, | * | MAGISTRATE: |
| 10-CV-3896, 10-CV-3897, 10-CV-4168 | * | SALLY SHUSHAN |
| 10-4169 and 11-0058 and All Cases in | * | |
| Pleading Bundle B4 | * | |
| | * | |

**************************************************************************

<u>**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**</u>

**NOW COMES**, Plaintiffs, through undersigned counsel, who respectfully request that this Honorable Court deny Defendants' Motion to Dismiss pursuant to Rule 12(B)(6) and (C) for the reasons as more fully stated herein.

**I.      INTRODUCTION**

The self-described "Emergency Responder Defendants" are before the Court because they negligently and without forethought, and in violation of clear and explicit proper maritime firefighting procedures, sunk the Deepwater Horizon rig and in so doing, transformed a potentially serious oil spill into one of epic and historical proportions.  Let's be clear, the Deepwater Horizon did not sink minutes or even hours after Defendants began inundating the rig with water.  Instead, it was only after days of spraying thousands of tons of water of the rig that the Deepwater Horizon ultimately gave way and sunk.  This occurred long after any emergency response or rescue mission had ended.  When the Deepwater Horizon sunk, the actions of Defendants are best characterized as a salvage/firefighting mission not a rescue mission.

1

Additionally, these Defendants, at the time of the sinking of the Deepwater Horizon, had been hired to address the fire on the rig.  The assertion that at the time of the sinking these Defendants were doing anything other than firefighting is belied by the facts.

Plaintiffs sued the listed Defendants and the vessels they operated because they were grossly negligent in pumping 800 gallons of water per second, per vessel on the DEEPWATER HORIZON for thirty-six hours, causing the vessel to sink and contributing to the greatest natural disaster this country has ever experienced.  The defendants are not being sued as emergency responders, but as a group of vessels who acted negligently with no direction and with no purpose, resulting in the sinking of the DEEPWATER HORIZON.  There was a hero emergency responder, and that was the MV DAMON B. BANKSTON.  Within one hour after the explosion, the BANKSTON had rescued all of the 115 surviving crew members of the DEEPWATER HORIZON.  What is relevant here is the 36 1/2 hours of video evidence showing the Defendant Vessels adding water weight, causing stability problems and significant displacement changes, and, eventually, sinking the DEEPWATER HORIZON.  Had the DEEPWATER HORIZON not been sunk, the oil spill could have been contained at the surface, minimizing the damages that ultimately occurred.

The Defendants seem to suggest that this litigation is about sixty-six claims filed in the Limitation Actions when, in fact, the Plaintiffs represent Putative Classes of hundreds of thousands of people.  The Chief Executive Officers, Chief Operating Officers, and Officers of the Defendants watched their Captains and crews of the vessels for over thirty-six hours pump water on the DEEPWATER HORIZON and eventually sink the vessel.  The Plaintiffs will clearly prove that there was privy and knowledge, justifying the dismissal of the Limitation Proceedings.

The Responder Defendants maintain that the damages from their acts were not legally foreseeable. The Responder Defendants are trained and knowledgeable in hydro-carbon fires under pressure, knowledgeable on the downwater from water cannons affecting vessel stability and potentially causing the sinking of the vessels, and knowledgeable of the effect of the sinking of the DEEPWATER HORIZON in 5000 feet of water, with its risers attached to the well head. The Chouest Vessels had a charter arrangement with BP and/or Transocean concerning the operations of the DEEPWATER HORIZON.  The Seacor Vessels are believed to have been engaged by Transocean in connection with salvage operations. The knowledge and consequences of the actions of the Responder Defendants and the foreseeability of their acts, can best be determined after adequate discovery.  In any event, Plaintiffs maintain that the harm caused by the Responder Defendants is foreseeable and because their actions were foreseeable, the Responder Defendants are responsible for the harm cause.  As such, the issues are not suited for a Rule 12 Motion to Dismiss.

Likewise, because the *Robins Dry Dock* rule no longer has such a bright line, and has been modified by subsequent jurisprudence as to commercial fisherman, oyster harvesters and shrimpers, it is inappropriate to evaluate any claim under the *Robins Dry Dock* on a Rule 12 Motion.  In other words, because *Robins Dry Dock* is not the clear cut rule as the Responder Defendants suggest, each Plaintiff (or category of Plaintiff), need to be analyzed under the context of the modified *Robins Dry Dock* rule.  Such evaluation and analysis is inappropriate at the Rule 12 stage.  Also, the Plaintiffs Steering Committee is currently addressing the *Robins Dry Dock* issue in oppositions filed in the Transocean Proceedings. Should the Court dismiss the Responder Defendants' Limitation Proceedings and Class Certification is addressed, the various class representatives can then be evaluated under the *Robins Dry Dock* rule.

Plaintiffs maintain that OPA does not pre-empt or displace General Maritime Law.  In fact, as expressly stated in the savings clause, General Maritime Law remains to supplement and fill in the gaps.  The OPA applies to responsible parties and none of the Responder Defendants has been designated a responsible party by the Coast Guard.  While Plaintiffs might prefer the strict liability that comes with OPA, the Act does not preempt Plaintiffs' claims against parties not designated as responsible parties.  Still, OPA provides a guideline for analyzing the scope of the nature and type of harm that courts have been reluctant to address since *Robins Dry Dock*.  Although it does not preempt these Plaintiffs claims, OPA's framework can be useful in evaluating such claims and issues like foreseeability.

**Background**

On April 20, 2010, explosions occurred aboard the DEEPWATER HORIZON (also referred to as MODU). The vessel was latched to a riser attached 5000 feet down into the well head on the ocean floor.  A fire developed, fueled by a hydro-carbon source under pressure.  The MV DAMON B. BANKSTON was in close proximity and immediately responded.  Within one hour the BANKSTON and its fast response craft had rescued all 115 of the surviving crew.[1]  In all, approximately twenty vessels responded of which four of the motor vessels were designated by Transocean as stand-by vessels.[2]  There is no doubt that the MV DAMON B. BANKSTON'S actions saved many lives.

The United States Coast Guard prioritized the search rescue efforts but did not take charge of or coordinate marine firefighting efforts.   Within six hours of the explosion, Transocean had SMIT Salvage Americas at their command center.  Because it was common knowledge there was no way fight the fire without removing the fuel force, SMIT directed its

---

[1] Coast Guard Report pg. 62.
[2] Coast Guard Report pg. 67.

attention to removing the fuel source of the fire.  For a substantial period of time, there was no effort to minimize the "downflooding" of the DEEPWATER HORIZON.  Massive quantity of water was placed on the deck by the Defendant Responders without consideration of the effects of the water entering the hull.  Neither Transocean nor SMIT Salvage Americas ever developed a salvage plan.  The Defendant Responders continued for 36 hours, pouring massive amounts of water, causing "downflooding" of the MODU.[3]  Eleven 11 vessels using fire monitors (water cannons) with little or no coordination, caused a large volume of water to accumulate within the hull, and with increasing amounts of water sank the DEEPWATER HORIZON at 10:26 on April 22, 2010.  The USCG recognizes that the accumulation of water from firefighting efforts on the MODU ("downflooding") was a factor in the sinking of the DEEPWATER HORIZON.  The water from the Responder Vessels increased the weight of the DEEPWATER HORIZON and reduced its stability.  It was this water weight that caused the MODU additional displacement of water and caused the sinking of the DEEPWATER HORIZON.

While Plaintiffs do not want to minimize in any way the tragic loss of life, the Responder Defendants were engaged in a flawed salvage mission, not a rescue operation.   The MV DAMON B. BANKSTON and other nearby craft had already completed the rescue mission, a mission that would sadly not be able to save everyone.  Immediately after the explosion, it was known that the eleven missing workers were on the drill floor or in the mud pump room at the time of the explosion.  Thirty-six hours after the explosion, the continuous pumping of massive amounts of water did not facilitate rescue.  Sinking the vessel did not aid rescue.

After the explosion the crew determined that the vessel was not listing.[4]  It is common knowledge as testified to by the chief engineer that the MODU had to be unlatched from the riser

---

[3] Coast Guard Report at xvii.
[4] Coast Guard Report pg. 2.

if the fire was to be fought with the available equipment.[5]   The Defendant Responders had an understanding of the structure of the DEEPWATER HORIZON, which would contain fires to the space of area of origin and limit fire spread to uninvolved areas.[6]

Because the fuel source is under pressure, the fire projects upward or in a vertical direction. The most intense heat is directed away from the structure of the vessel.  The steel structures could withstand the potential heat of 44-51 MJ/kg (19,000-22,000 BTU/lb.) range. The Defendant Responders knew or should have known that the vessel had H class fire barriers, protecting the structural members from hydro carbon fuel fires.[7]   Just as the Transocean fire brigade members and crew members knew they were not going to be able to fight the fire, Defendant Responders, likewise, knew or should have known that they could not fight the fire.

On April 20 at 22:06 BP assembled a crisis team. Twenty vessels responded to render assistance.[8]   The USCG assumed the role of on-scene coordinator but did not involve itself in the firefighting aspect.[9]   One hour after the explosion all 115 of the surviving crew members were rescued by and were aboard MV DAMON B. BANKSTON.[10]   A complete muster took place. The USCG report acknowledges the MV DAMON B. BANKSTON as heroes and responsible for saving lives but gives no such credit to the Responder Defendants.   The Responder Defendants were aware that during normal operations prior to the explosion, the crew took active measures to maintain the stability of the DEEPWATER HORIZON by regularly adjusting weights and balance to compensate for any changes in the loading conditions on board.   The Responder Defendants were aware this was no longer possible, making the DEEPWATER

---

[5] Coast Guard Report pg. 34.
[6] Coast Guard Report pg. 39.
[7] Coast Guard Reports pg. 21.
[8] Coast Guard Reports pg. 47.
[9] Coast Guard Reports pg. 47.
[10] Coast Guard Reports pg. 62.

HORIZON less stable.  The Responder Defendants knew or should have known the explosions and fire may have resulted in loss of systems of water tight boundaries needed to keep the MODU in an upright level condition.  The USCG report shows that from the logs of the MAX CHOUEST and communications from the SEACOR WASHINGTON, vessel instability was suspected at 14:50 on April 21st, yet Responder Defendants continued the massive inundation of the vessel until it sunk.

Plaintiffs, through their experts as well as with evidence generated by the USCG, will prove the DEEPWATER HORIZON was structurally intact when it was sunk from the water cannons of Responder Defendants.  Transocean on-scene salvage master at 00:15 on April 22 reported that the hull and leg structures appear primarily intact.[11]  As of 00:55 on April 21, four boats were on the scene fighting the fire with more than 15 on the way.  Subsequently eleven vessels reported engaging in the firefighting efforts. Transocean's operations manager-performance was one of four people on the DEEPWATER HORIZON who remained on scene after the survivors departed.  He realized stability was a concern in the morning of April 21, 2010. The MV DAMON B. BANKSTON at 01:30 on April 21, 2010 was also aware of stability problems noting a list to the stern.  All of the defendants knew or should have known of this stability concern and the detrimental affect the water weight they were placing on the DEEPWATER HORIZON would have and the potential of sinking of the DEEPWATER HORIZON. The USCG concluded:

> *The attempts to control the fire and cool the structure resulted in application of large volumes of sea water. As discussed below, it is likely that some portion of that water accumulated inside the hull. Internal damage to a water tight subdivisions, poor maintenance of water tight closures, or simply having left watertight closures open prior to evacuation may have allowed the migration of liquid loads and flooding throughout the DEEPWATER HORIZON.* [12]

---

[11] Coast Guard Reports pg. 72.
[12] Coast Guard Report pg. 73 (emphasis added).

From communication with SMIT Salvage Americas, the Responder Defendants knew stability was an issue and the DEEPWATER HORIZON was listing towards the aft-stbd between 12 and 22 degrees.[13]   Despite the foreseeability of the sinking of the DEEPWATER HORIZON, the Responder Defendants continued their imprudent, negligent actions.   The flooding of the hull caused by Responder Defendants water cannons caused reduced freeboard and the DEEPWATER HORIZON heeled exposing previously un-submerged opening in the hull closer to the water line. Increasing amounts of water as more openings were submerged resulted in the DEEPWATER HORIZON sinking.[14]   Transocean knew that they had issues with water tight integrity of the DEEPWATER HORIZON affecting proper operations of water tight doors and dampers.   Transocean was aware of system pump and valve failures prior to the explosion. A survey performed in April 2010, identifies the stability issues with the DEEPWATER HORIZON.   The valves could allow unrestricted passage of flood water from one compartment to another increasing the heel of the vessel.   Presumably with SMIT and with Transocean's personnel remaining on site and furnishing information to the Responder Defendants, they would have increase concern about their water cannons flooding the vessel.   The Responder Defendants presumably would know of the USCG SAR policy not to mount a complete response to an incident when because of the complex and potentially hazardous nature, they do not have the necessary staffing or equipment.   Prudently, the USCG takes cautious approach to marine firefighting, unlike the Responder Defendants who with no direction or coordination disregarded caution, and their acts contributed to the sinking of the DEEPWATER HORIZON.   The Responder Defendants acted independently as "loose cannons" with full knowledge that

---

[13] Coast Guard Report pg. 73.
[14] Coast Guard Report pg. 73-74.

Transocean's salvage contractor had not developed a salvage plan.[15]   The USCG gave no direction of firefighting. FOFC did not direct any effort to firefight.[16] The master of the DEEPWATER HORIZON was not leading the firefighting efforts and left the scene on the morning of April, 21, 2011, 24 hours before the vessel sank.[17]   Transocean's operations manager-performance who remained on the scene aboard a CHOUET Vessel stated, he was not leading the firefighting efforts, though there is evidence he did get permission via radio communication to a vessel to put water on the fire.[18]

Responder Defendants' characterization about their connection to the DEEPWATER HORIZON appears to be misleading. Operations manager–performance was actually on board the MV MAX CHOUEST at 13:15 on April 21, 2010.  The captain aboard the MAX CHOUEST instructed the USCG to have the fire vessels redirect water flow to the legs of the DEEPWATER HORIZON.  At this time the six vessels had a formal relationship with Transocean. Despite this alleged instruction, photographs and videos after 13:15 on April 21 clearly show the Responder Defendants continued placing water on the deck of the DEEPWATER HORIZON up to the moment it sank.[19]   Seacor Vessels, specifically the SEACOR VANGUARD, were directly chartered by SMIT Salvage Americas to directly take control of the firefighting efforts.  Despite the allegation that the Responder Defendants were instructed to direct their water cannons at the legs of the DEEPWATER HORIZON ten hours before it sunk, the video evidence proves any such direction was disregarded up until the moment the vessel sank.  The Chouest Vessels, particularly, ISLAND VENTURES III and NAUTICAL SOLUTIONS vessels were under charter with BP prior to the explosion.

---

[15] Coast Guard Reports pg. 78.
[16] Coast Guard Reports pg. 79.
[17] Coast Guard Reports pg. 79.
[18] Coast Guard Reports pg. 79.
[19] Coast Guard Reports pg. 79.

Within six hours after the explosion, SMIT Salvage Americas was on scene and knew as the Responder Defendants knew that the fire was a "well control" issue. It was clear that the fuel source from the well head had to be controlled before anything else could get done. SMIT was communicating with Transocean personnel aboard a Schouest vessel and Responder Defendant, SEACOR VANGUARD. The massive oil spill that resulted was foreseeable with documented concerns as of mid-day on April 21, 2010. The Schouest and Seacor vessels cannot credibly argue a foreseeability defense.[20] On April 21, despite reports and knowledge by the responder Defendants that the MODU was heeling and listing, Responder Defendants continued to actively put massive water on the deck of the DEEPWATER HORIZON. Sinking the DEEPWATER HORIZON ended attempts to secure the fuel source locally, ultimately requiring BP to secure the well head a mile down on the ocean floor.[21]

The USCG concluded, there is a substantial likelihood that the water from the Responder Vessels added weight to the DEEPWATER HORIZON.[22] *"Some of the 11 response vessels engaged in putting water on the DEEPWATER HORIZON had the capability to apply up to 8,000 gallons of water per minute, using both of their fire monitors; With 100% effectiveness that equates to 31 metric tons per minute per boat",[23]* Plaintiff/Claimants will prove substantial amount of this water remained on board. As USCG report stated:

> *The stability analysis conducted by the Coast Guard (Appendix L) estimated that the MODU'S displacement changed by 1,500 metric tons (400,000 gallons sea water), between pre-casualty condition, assumed to be the maximum authorizes drilling draft, and its condition after 30 hrs. The changes in DEEPWATER HORIZON'S stability and free board over that time period were too great to have been caused by a simple shifting of weight from the collapsed derrick, internal liquid loads, and/or fixed weights. This would appear that some of the*

---

[20] Coast Guard Reports pg. 80.
[21] Coast Guard Reports pg. 81.
[22] Coast Guard Report pg. 81.
[23] Coast Guard Report pg. 81 (emphasis added).

*firefighting water has accumulated in the structure and may have contributed to its sinking.*[24]

The Responder Defendants knew what the USCG concluded, that effective control of the fire would have required removal of the fuel source by securing or disconnecting from the well, and large volumes of water entered the hull and contributed to the destruction of stability and the ultimate sinking of the DEEPWATER HORIZON.   Responder Defendants have a clear understanding that to control the fire aboard the DEEPWATER HORIZON, would have required removal of the fuel source by securing or disconnecting from the well.   They knew that if the DEEPWATER HORIZON sunk with the riser attached to the DEEPWATER HORIZON and the well head 5000 feet below a massive oil spill would occur.   They knew the danger of putting a mass amount of water at the rate of 88,000 gallons per second for over 36 hours on the MODU. This was clearly foreseeable and took place over a 36 hour period with the Responder Defendants watching as they slowly sank the DEEPWATER HORIZON and caused the massive oil spill and economic disaster.   Responder Defendants Chief Executive Officer, Chief Operating Officer and other Officers watched this event unfold and had privy and knowledge.   The extensive economic and environmental damage caused by the Exxon Valdez oil spill put the world on notice of the forereaching damages that are caused by massive oil spills.   The Responder Defendants are engaged in oil field services, and as experts in the field are completely aware of the foreseeable damages caused by an oil spill from the sinking of a MODU with a riser attached to a wellhead 5000 feet below.   Responder Defendants are aware of and must comply with many federal laws and regulations addressing potential damages that can result from oil exploration and production. Foreseeability is obvious and cannot defeat Plaintiffs' claims.

## II.    LEGAL STANDARDS

---

[24] Coast Guard Report pg. 81-82 (emphasis added).

## A.  **Plaintiffs' Complaints Meet the Rule 12(b)(6) Standards.**

When ruling on a Rule 12(b)(6) motion to dismiss such as that filed by Defendants herein, the court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiffs.  *Oppenheimer v. Prudential Security, Inc.*, 94 F.3d 189, 194 (5th Cir. 1996).  "A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff."  *Lorman v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009).  In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts."  *Tel-Phonic Services, Inc., v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992).

Rule 12 motions to dismiss "'are viewed with disfavor and are rarely granted.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Master Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).  In ruling on a Rule 12(b)(6) Motion to Dismiss, courts are obliged to "accept all factual allegations in the complaint as true."  *Id.* (internal citations omitted).  The Plaintiff must only plead sufficient factual allegations that, if true, "raise a right to relief above the speculative level."  *Id.* (internal quotations omitted).

To defeat a motion to dismiss, a plaintiff must merely plead enough facts to state a claim to relief that is plausible on its face.  "A claim is facially plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 U.S. Dist. LEXIS 16290, at 5-6 (E.D. La. Feb. 17, 2011).

Recently, in *Matrixx Intuitives, Inc., v. Siracusano*, 131 S. Ct. 1309 (2011), the United States Supreme Court affirmed that there are no bright line pleading requirements and that the functional test is whether the complaint, taken as a whole, raises a reasonable expectation that

discovery will reveal evidence that could enable the ultimate trier of fact, weighing contested evidence and opinion and making the allowable inferences, to decide the case for plaintiffs.  *Id.* at  1324-25.   The court in *Matrixx* recognized that the ultimate proof of liability as to such elements as materiality and causation require considerations, often complex and nuanced, of source, content, and context that go beyond what can or should be required in a pleading. *Id.* Reviewing Plaintiffs' Complaint in its entirety as is required, Plaintiffs' have stated facially plausible claims that raise a reasonable expectation that discovery may reveal evidence to support their claims at trial.

## III.   DEFENDANTS' FORSEEABILITY ARGUMENT MUST FAIL

The Defendants cite *In re Great Lakes*, 624 F.2d 201 (2010) as the most recent example of the Fifth Circuit's application of the *Consolidated Aluminum* foreseeability test, but *In re Signal International, LLC*, 579 F.3d 478, 493 (5th Cir. 2009) applies the test in a factual scenario more analogous to this case.   In *Signal*, two barges owned by a Pascagoula, MS marine fabricator broke from their moorings during Hurricane Katrina and the storm surge floated the barges inland a distance of almost five miles where they eventually allided with a bridge on Interstate 10.   Signal knew that Katrina was bearing down on the Mississippi Gulf Coast but failed to properly moor the barges under those conditions, despite the fact that Signal's own procedure called for specific moorings when a hurricane was imminent.   The Fifth Circuit found the damage to the bridge foreseeable because the barges were moored shortly before Katrina made landfall and a reasonable person could foresee both that an insufficiently moored barge would break from its moorings during a hurricane and that the barge would travel in an uncontrolled manner and allide with objects in its path.   The court held that foreseeability was a test of "whether the harm that does occur is within the *scope of danger* created by the defendant's

negligent conduct." *Id.* at 492.  Foreseeability is not based on ordinary conditions, but rather all those that "were anticipated or reasonably should have been anticipated. *Id.* at 493.  As such, even though Hurricane Katrina's storm surge carried the barges a distance longer than anticipated, the allision "was foreseeable to a reasonable person considering the interplay of the anticipated hurricane forces and the Pascagoula River basin's known topology." *Id.* at 495.

Furthermore, for a duty to exist, defendants need foresee only *general* harm, not the particular harm that resulted.  *In re Signal Int'l, LLC*, 579 F.3d 478, 493 (5th Cir. 2009) (holding "[w]e find no principled reason to break with our precedent that guides our determination of duty by reference to the general sorts of harms that are reasonably foreseeable consequences of the scope of danger risked by the negligence involved."  Even where the risk of harm is small, it can still be foreseeable.  *Id.* (citing *In re City of New York*, 522 F.3d 279, 284 (2d Cir. 2008) ("The probability that the injury would occur in this case ... is very small.  But the risk, while small, is undoubtedly foreseeable.").  Indeed, the exact nature and geography of the particular injury need not be foreseeable.  All that is required is that it is foreseeable that the type of injury could occur and impact the class of people ultimately harmed by the injury.  *Id.* at 492.  "Under a negligence theory an actor is held accountable only on the basis of the knowledge he could, or should, have had at the time he acted; negligence is measured from the actor's perspective and the then foreseeable future."  *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1084 (5th Cir. 1986).

Defendants' reliance on *In Re Great Lakes* is misplaced as in that case, at least 10 years passed between the dredging and the resulting harm.  In this case, the negligent activity and corresponding damage starting occurring within days and the damage was an immediately

foreseeable consequence during the firefighting operation (*i.e.* sinking an uncapped oil rig might cause or exacerbate a spill that could impact large parts of the Gulf of Mexico).

Similarly, the facts of *Consolidated Aluminum* differ from the present case.   In *Consolidated Aluminum*, negligent dredging led to the rupture of a natural gas pipeline which causes a loss of power at an aluminum plant three miles from dredging site, damaging equipment and ruining in-process production.   There the Fifth Circuit held the harm was not foreseeable because, in order to anticipate harm, the dredger would have had to know that Consolidated operated using a rare power system in which the natural gas was the sole source of power and that no alternative or backup existed.   833 F.2d at 68.   Defendants would have needed specialized knowledge to foresee harm to a manufacturing facility that relied exclusively on the pipeline for power, and such knowledge went "beyond the pale of general harm which reasonably might have been anticipated."   *Id.*

Here, the responders had, or should have had, the basic knowledge of any maritime responder concerning the risks of continually pumping large amounts of water on a semi-submersible oil rig for thirty-six hours could cause the rig to sink and that its uncapped riser pipe could leak a tremendous amount of oil into the Gulf.   Although Plaintiffs do not doubt that the Responder Defendants wanted to try to save lives, there are at least two fundamental flaws in these defendants' well-meaning actions, flaws in which they should have been aware.   First, is the old adage, "You don't put out an oil fire with water."   Defendants, all knowledgeable in firefighting basics, knew or should have known that putting water on a burning oil rig could make matters worse.   While defendants may dispute the efficacy of pouring copious amounts of water on an oil fire, Plaintiffs' allegations about the Responder defendants using an improper technique, if true, as they must be construed at this stage, state a foreseeable cause of action.

Like the defendant in *Signal* who had procedures for securing barges it failed to follow, the Responder Defendants undoubtedly had the knowledge of how to properly fight an oil fire in an emergency situation and that the results of their failure to exercise reasonable care by pumping water onto a semi-submersible oil rig with an uncapped riser pipe could cause a massive oil spill.

Alternatively, assuming the oil spill and the resulting damages may not have been foreseeable when the boats began to spray the Deepwater Horizon, the spill and resulting damage was undeniably foreseeable as the boats continued to spray the listing platform over a 36 hour period.  The longer the Responder Defendants sprayed water on this oil fire on a semi-submersible rig, the more foreseeable it was that the rig would sink.  A semi-submersible rig cannot maintain buoyancy and will sink if it fills up with water.  As to the defendants' well-meaning efforts to save lives,[25] there is no evidence that anyone was left alive on the Deepwater Horizon after thirty-six, twenty-four or even twelve hours.  The entire nation is familiar with the horrific scale and extent of the explosions and flames on the Deepwater Horizon.  At some point, perhaps after several hours, the Responder Defendants should have made an assessment of the situation in front of them.  Even if putting water on an oil fire was the correct way to suppress the fire for a rescue attempt, after more than a day and a half had passed, defendants were no longer in a  rescue phase, but rather were engaged in a an attempt (using improper methods) to salvage the property of other defendants.[26]

Defendants argue a legal duty because the alleged harm was not foreseeable.  First, Plaintiffs have pled that at the time the Deepwater Horizon sank, Defendants herein were no

---

[25] As the Defendants acknowledge, the merits of their possible defense under the "Good Samaritan" statute, 46 U.S.C. § 2303(c), cannot be determined on a Rule 12 motion.  Emergency Responder Mem. at 3 n. 6 (Doc. 2707-1).  Plaintiffs in no way want to trivialize the deaths of the eleven victims of the Deepwater Horizon explosion; however, after more than a day, the Responder Defendants' actions were not calculated to save lives and the harm of continuing to spray water on a gradually sinking oil rig was foreseeable.

[26] Of course, whether this salvage attempt was done at the Responder Defendants' own initiative or at the direction of BP or any other party is not known.  Discovery is required.

longer engaged in any type of rescue mission but instead, were engaged in a salvage mission. This factual distinction is important as it has substantial legal ramifications and for purposes of Defendants' Rule 12 Motion, must be resolved in favor of Plaintiffs.

The National Fire Protection Association, the foremost publisher of codes and materials regarding firefighting, has been publishing guides and practices for firefighting, including fighting fires aboard vessels, for decades.  For years now, a number of their publications have addressed the risk of vessel stability in association with efforts to fight fires aboard marine structures.  In fact, the NFPA in its guide for land based firefighters who respond to marine vessel fires, states:

> In combatting a fire aboard a vessel, firefighters should give attention to the volume of water used for extinguishment and its **effect on the stability** of the vessel.  Water applied to a vessel fire can jeopardize the stability of the vessel and the safety of the personnel on board.  At the application of water should be monitored carefully, and water should be removed in a timely and efficient manner.  It is recommended that the IC have a basic understanding of this Chapter.

NFPA, Guide For Landbased Firefighters Who Respond to Marine Vessel Fires at Chap. 6(2006 ed.).  As shown from the above quoted excerpt, the risk of sinking a marine structure by inundating it with water is a known risk which was foreseeable and should have been known to Defendants.

The fact of the matter is, through all of the evidence that is currently available, the April 20th explosion on the Deepwater Horizon did not damage the structure's stability such that it was in any danger of sinking.  It was only after over a day of constant inundation with water that the structure began to list.  Even after this listing, Defendants continued pouring thousands and thousands of gallons of water onto the structure resulting in the Deepwater Horizon's sinking on the morning of April 22nd.  After being sprayed with water for nearly 37 hours.

As alleged by Plaintiffs, the oil spill at the Deepwater Horizon would have been manageable had Defendants not sunk the structure on top of the riser pipe resulting in the largest oil spill in American history.  Defendants' reliance on *Great Lakes* is misplaced as no analogy can be drawn to the facts of that case.  Defendants' argument on foreseeability turns the law on its head and essentially would insulate the most negligent and most ignorant from liability under the law.

Plaintiffs submit that Defendants knew, or should have known, that their acts would lead to a probable sinking of the Deepwater Horizon.  It is certainly foreseeable that the sinking of the Deepwater Horizon in over 5,000 feet of water would exacerbate the situation, lead to further damages, and make the oil spill more difficult to manage.   In fact, it has been universally accepted that the riser pipe did not start leaking until after the rig sank.

## IV.    THE OPA DOES NOT PREEMPT PLAINTIFFS' MARITIME AND STATE LAW CLAIMS

The Oil Pollution Act of 1990 expressly provides that, "Except as otherwise provided in this Act, this Act does **not** affect: (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 33 U.S.C. §2751(e) (emphasis added).   Some courts have erroneously stated that general maritime law might be preempted to the extent that the damages sought fall within the specifically enumerated provisions of the OPA; however, even those decisions recognize that the OPA has no effect on claims for damages or other relief which are not covered under the OPA. It is further noted that Defendants herein allege that they are not responsible persons under the OPA.

In fact, the OPA contains within it a Second Savings Clause, which states that nothing within the OPA shall in any way affect, or be construed to affect, the authority of the United States to: (1) impose additional liability or additional requirements; or (2) impose, or to determine the amount of, any fine or penalty for any violation of law relating to the discharge, or substantial threat of a discharge, of oil.  *See* 33 U.S.C. §2718(c); *see also U.S. v. Egan Marine Corp.*, 2009 WL 855964, at 3 (N.D. Ill. March 3, 2009)(stating plaintiff may pursue claims under both the OPA and the Rivers and Harbors Act); *U.S. v. M/V Cosco Busan*, 557 F.Supp.2d 108, 1063 (N.D. Cal. 2008)(holding that plaintiff may pursue claims based on the Cleanwater Act and other federal statutes in addition to the OPA, even when seeking to recover the same damages).

Additionally, Defendants' argument as contained within its' Memorandum, (Doc. 2707-1), is completely flawed.  Defendants at one point argue that they are not responsible parties under OPA and then later argue that OPA displaces general maritime law in this matter.  Defendants cannot have it both ways.  They cannot simultaneously be excluded from liability under OPA and at the same time, have all other remedies against them be preempted by OPA.

Additionally, the argument, contained on pg. 18 of Defendants' Memorandum, that OPA would act as a shield to insulate persons or entities that would have been otherwise liable for compensatory and/or punitive damages under existing law seems incomprehensible given the purpose and intent of the OPA.  The OPA was passed by Congress in response to the then existing federal and state laws that were deemed to provide inadequate remedies and to present substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills.  Congress's intent is that the OPA would affect compensation for victims, quick and efficient clean-up with minimization of damages to natural resources, and the internalization of the costs of oil spills within the oil industry.  *U.S. v.*

*Bodenger*, 2003 WL 22228517, at 3 (E.D. La. Sept. 25, 2003)(citing S.Rep.No. 94, 101st Congress, 1st Sess. (1989)).

### A. *Gabarick* is not Controlling.

The *Gabarick* decision is a clear illustration of the winding road on which courts embark when attempting to look to legislative history as a principle or primary guide to the intent of Congress in adopting legislation.  This road turns from windy to rocky when that reliance on legislative history reads meaning into a statute that could not be gleamed from the plain language of the text and in fact runs contrary to a fair reading of the statute.

"When a federal law contains an express preemption clause, we 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1977 (2011) (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)).

OPA contains an express savings provision set forth in 33 U.S.C. §2751 and states in pertinent part:

> (e) Admiralty and Maritime Law
> Except as otherwise provided in this Act, this Act does not affect-
> (1) admiralty and maritime law; or
> (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

At §2702, OPA states in pertinent part:

> (a) In General
> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. §2702(a).

In *Gabarick*, the court states, "The text of OPA implies its mandatory and exclusive nature." *Gabarick*, 623 F.Supp.2d 741, 745 (ED. La. April 24, 2009).  Where the *Gabarick* decision errors in interpreting OPA is in ignoring the plain language of the statute in favor of an allegedly implied meaning based in large part on a selective recitation of the Act's legislative history.  The United States Supreme Court has recently stated its long held position that, "Congress' authoritative statement is the statutory text, not the legislative history."  *Whiting*, 131 S.Ct. at 1980.

The *Gabarick* court's interpretation of OPA renders the admiralty and maritime law savings clause essentially meaningless.  As quoted above, OPA expressly, clearly, and unequivocally states that except as provided for in the Act, admiralty and maritime law is not affected.  We must then look at how the Act affects admiralty and maritime law.  To do so, we turn to Section 2702.  In that section, also quoted above, OPA states that each "responsible party" is liable under the Act for discharge of oil or the threat of discharge of oil.  *See* Section 2702(a).  That section then goes on to state in part (b) what is defined as "covered removal costs and damages".  It is in this section where OPA deviates from admiralty and maritime law, as it existed at the time.  Specifically, with regard to a "responsible party", OPA expressly lays out the categories of damages for which that responsible party can be held liable.  *See* Section 2702(b).  This category of damages is substantially broader than that which was available under admiralty and maritime law at the time OPA was adopted in 1990.  It can only be concluded that it is this expansion of the categories of recoverable damages to which Congress is referring to in Section 2702(a) when the statute states, "notwithstanding any other provision or rule of law."[27] That is because other provisions, or rules of law, specifically general maritime law at the time,

---

[27] The use of the term "rule of law" leads to the conclusion Congress was referring to the judicial rule limiting damages for purely economic losses.

did not provide for recovery of economic losses where there was no damage to property in which the claimant had a proprietary interest, i.e. the *Robin's Dry-dock* rule.

We now turn to the savings clause found at Section 2751 which states, "Except as otherwise provided in this Act, this Act does not affect (1) admiralty and maritime law."  33 U.S.C. §2751(e)(1).  Based on a clear reading of the statutory language, the savings clause is stating except as to the expansion of available damages provided for in this Act, admiralty and maritime law is not affected.  It is this interpretation which gives meaning to the actual text of the statute and does justice to all sections of OPA.

It must be remembered that in *Gabarick*, the sole rationale of the court in determining that OPA preempted claims against third parties under general maritime law was reference to the legislative history of the statute.  *See Gabarick*, 623 F.Supp.2d at 750.  In fact, the *Gabarick* court seemed very uncertain with the path it had chosen to follow when it stated, "It *appears* that claimants *should* pursue claims covered under OPA only against the responsible party and in accordance with the procedures established by OPA."  *Id.* (emphasis added).  The use of the words "appears" and "should" creates serious doubt as to the legal foundation of the court's decision.  This is added to the fact that there is absolutely no citation to any authoritative source for this proposition.

Additionally, the *Gabarick* court's interpretation of OPA in addition to rendering Section 2751 meaningless, also results in the loss of an entire avenue of recovery previously available potential to claimants.  Certainly, if Congress had intended to take away claimants' rights to pursue claims against at fault parties, who are not considered responsible persons under OPA, Congress would have explicitly and expressly done so.  Such an interpretation results in a loss of a right of recovery against an entire class of individuals.

Recently, Tulane University School of Law held a symposium on the legal ramification of the Deepwater Horizon Oil spill.  There, it was unequivocally concluded that OPA does not preempt general maritime law.  "The intention of Congress seems clear: the remedies provided by OPA, state law, and general maritime law should be *cumulative*."  *Deepwater Horizon: Removal Costs, Civil Damages, Crimes, Civil Penalties, and State Remedies in Oil Spill Cases*, 85 Tul. L. Rev. 889, 970 (2011) (emphasis added).  This is contrary to what was held in *Gabarick*.  The rationale of the *Gabarick* holding is further undercut by the savings clause in OPA as to state law.[28]

Any argument that Congress somehow intended OPA to be an all-encompassing statute that was not subject to supplementation by the general maritime law is completely unsupported. First, Section 2751 expressly preserves the applicability of general maritime law to oil spills. Second, such an interpretation is at odds with established Supreme Court doctrine in interpreting issues of preemption.

Most recently in *Chamber of Commerce v. Whiting*, 131 S.Ct. 1968 (2011), the United States Supreme Court held that Arizona's law, which was contrary to federal immigration laws, was not preempted by the federal statute.  In so holding, the Supreme Court stated that the statute itself had expressed no clear intent to prevent States from imposing more strict requirements.  *Id.* at 1977.  In *Whiting*, the Supreme Court expressly stated that in adapting the Immigration and Nationality Act, the statute established, "A comprehensive federal statutory scheme for regulation of immigration and naturalization."  *Id.* at 1973.  Despite Congress' comprehensive federal statutory scheme, the Supreme Court held that Arizona's law, which mandated participation in a program that the federal statute had stated was voluntary, did not run afoul of

---

[28] As stated in the article, OPA allows states to impose "additional liability, fines, or penalties relating to the discharge of oil."  85 Tul. L. Rev. 889, 970.  If Congress was not concerned will additional state remedies why would one *infer* that Congress was concerned with additional general maritime law remedies.

the federal statute.   The Supreme Court expressly rejected reliance on legislative history and instead focused on the plain wording of the statute.   *Id.* at 1977.   In *Whiting*, the argument was presented that Congress had "intended the federal system to be exclusive" and that the State system necessarily conflicted with the statute.   *Id.* 1981.   In rejecting this argument, the Supreme Court stated that Congress, in allowing states through the savings clause to legislate in the area, it therefore stood to reason that Congress did not intend to prevent states from using appropriate tools to exercise that authority.   *Id.*

Turning to OPA, Congress expressly, in savings clause located at Section 2751, stated that the statute does not affect admiralty or maritime law except as otherwise provided in the Act.   Thus, it stands to reason that Congress did not intend to prevent the general maritime law from being used to pursue claims against third parties not covered under OPA.   It is undisputed that OPA does not expressly preempt general maritime law claims against third parties not considered responsible persons under OPA.   Thus, if general maritime law is preempted by OPA, it is impliedly preempted.

"Implied preemption analysis does not justify free-wheeling judicial inquiry into whether a state statute is intention with federal objections; such an endeavor would undercut the principle that it is Congress, rather than the courts, that preempts state law."   *Whiting*, 131 S.Ct. at 1985. Plaintiffs submit that this same analysis to questions of Congress' preemption of general maritime law.

In *Gabarick* the court employed an older Second Circuit test for determining preemption. The Second Circuit in *United States v. Oswego Barge Corp*. set forth factors to analyze the preemption of general maritime law claims.[29]  The test relies on four factors: (1) legislative

---

[29] 664 F.2d 327 (2nd Cir. 1981).

history, (2) the scope of the legislation, (3) whether judge made law would fill a gap left by Congress's silence or rewrite rules that Congress enacted, and (4) likeliness of Congress's intent to preempt "long established and familiar principles of the common law or the general maritime law."

In *Gabarick*, the court held that general maritime law is only preempted by the OPA to the extent that the damages claimed under maritime law are recoverable under the federal OPA. Our claims are not recoverable under the OPA as they allege the liability of parties not designated responsible parties by the federal government. Because a claim against a non-responsible party is not recoverable under the OPA, the general maritime claims are not preempted.

The OPA cannot be comprehensive (and have preemptive effect) because it expressly precludes claims against non-solely liable third parties. The OPA assigns liability to an extremely limited pool of defendants – only those parties designated as responsible parties by the United States Coast Guard.  In contrast, any combination of interrelated or remote parties may be found partially liable following an oil spill – the leaseholder, rig operator, subsidiaries of the rig operator, rig manufacturer, subcontractors of the rig manufacturer, cement manufacturer, tool manufacturer, monitoring equipment manufacturer, etc. A law that is actually comprehensive, and therefore has preemptive effect, would have to account for the web of liability that results from the complex nature of the oil industry. The OPA makes no such consideration and therefore does not preempt general maritime law, which includes these considerations.

Congress's express goal in enacting the OPA was to ensure that all victims of oil spills be fully compensated for their harm.[30]  Accordingly, the OPA should be construed to benefit the

---

[30] *See* Oil Pollution Act of 1990, S. REP. 101-94, at 1 - 4 (1989).

victims of oil spills, not deny them relief. Consistent with this principle, the OPA's saving clause preserved general maritime law so that an oil spill victim could seek relief under general maritime law if the OPA did not provide the victim full compensation. This is the precise type of relief sought by Plaintiffs in this case - recovery from a non-solely liable third party that would not be available under the OPA.  *Gabarick*'s interpretation of the OPA is clearly inconsistent with the OPA and Congress's intent in enacting the OPA.[31]  Marine firefighting is a traditional maritime activity.  The Defendants herein are not, and have never been, producers or owners of vessels that produce oil.   Nor are they sellers of materials or component parts that are incorporated into the oil drilling process.  One could argue that OPA has absolutely no bearing upon these Defendants.  It must be remembered that OPA at §2702 directs itself towards "each responsible party for a vessel of a facility from which oil is discharged".  This further supports Plaintiffs' position that general maritime law and admiralty law applies to the claims asserted against Defendants herein and not OPA.

## B.  OPA Expressly Saves Both State Law and General Maritime Law Causes of Action.

In order for a statute to abrogate a common law principal, the statute must speak directly to the question addressed by the common law.  The OPA expressly provides that admiralty and maritime laws are not affected except as otherwise provided in the act:

> Savings Provisions
> (e)  Admiralty and Maritime Law.  Except as otherwise provided in this Act, this Act does not affect-
> 1. Admiralty and maritime law; or
> 2. The jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

---

[31] *See* Robert Force et. al., Deepwater Horizon: Removal Costs, Civil Damages, Crimes, Civil Penalties, and State Remedies in Oil Spill Cases, 85 Tul. L. Rev. 889, 982 (2011).

33 U.S.C. §251.  Examining that plain language of the OPA clearly demonstrates that Congress did not intend to occupy the field of recovery for oil spills.  The statute, on its face, states that it does not preempt admiralty and maritime law.

The OPA does not contain an express preemption clause and if fact, to the contrary, the OPA expressly preserves general maritime law and admiralty claims.  Therefore, Defendants' statement that OPA "on its face" precludes general maritime law claims is simply directly contradicted by the express language of the statute itself.  Nor is there any implied preemption of general maritime law.  Defendants also argue that OPA precludes general maritime law claims by its very structure.  *See* Doc. 2707-1 at p. 19.  The United States Supreme Court recently addressed the issue of express and implied preemption in *Chamber of Commerce of U.S. v. Whiting*, 131 S.Ct. 1968 (2011).  The issue in *Whiting* was whether Arizona's employment of illegal immigrant's law was preempted by the Immigration Reform and Control Act (IRCA), which is the federal statutory scheme enacted to address the employment of illegal immigrants.  The Supreme Court first addressed the issue of express preemption and found that the Arizona law was not expressly preempted by the IRCA.  *Id.* at 1981.  Plaintiffs note, that the area of immigration is certainly a segment of law where the federal government has chosen to enact substantial and comprehensive legislation.  Nevertheless, the Supreme Court declined to interpret the IRCA in such a manner that it preempted the Arizona law.

The challengers in *Whiting*, also argued that the Arizona law was impliedly preempted because it conflicts with the IRCA.  In addressing the proper role of the judiciary under an implied preemption analysis, the Supreme Court stated that said analysis, "does not justify a freewheeling judicial inquiry into whether a state statute is intention with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the court's that preempts

state law." *Whiting*, 131 S.Ct. at 1985. "Our precedence establishes that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal act." *Id.* This analysis regarding implied preemption applies even more so to general maritime law and admiralty law.

With regard to general maritime law, there is simply no evidence presented, nor argument, by Defendants to support any contention that Congress, in enacting the OPA, intended to impliedly preempt the general maritime law claims asserted by Plaintiffs herein. There was vigorous congressional debate as to whether the OPA would preempt state law. In arguing against preemption, various members of Congress put it out that the OPA should not preempt state law because stricter state standards would ensure that victims are compensated fully for their injuries and would enhance cleanup efforts. *See* S.Rep.No. 101-94: Committee on Environment and Public Works Act 7 (July 28, 1989). Additionally, it was noted that preemption would violate the longstanding tradition that federal environmental laws should not preempt state laws. At a joint conference, it was agreed to preserve the right of the states to establish their own liability and compensation systems with the goal of providing to coastal states, "the freedom to impose standards that reflect the importance of the resources at risk." 136 CONG. Rec. H6920-H6949, at H6934 (Daily Ed. Aug. 1990)(Statement of Representative Lowey). Additionally, Congress indicated that, "Nothing in this Act shall affect or modify in any way the obligations of liabilities of any person under other federal or state law, including common law, with respect to discharges of oil." 135 CONG. Rec. S9689-AS9716, at S9683 (Aug. 3, 1989).

## C. **Alternatively, Oil Pollution Act Preemption Only Applies to "Responsible Parties".**

As the defendants correctly point out, none of the responder defendants have been designated a "Responsible Party" by the Coast Guard. As such, the Oil Pollution Act—which applies only to responsible parties—does not displace general maritime law.

Contrary to the defendants' assertions, the OPA is not the sole remedy for private parties asserting economic and property damage claims. Although BP cites the language in *Tanguis v. M/V Westchester*[32] that the OPA "'represents Congress' attempt to provide a comprehensive framework in the area of marine oil pollution,'" that citation ignores case after case that holds that the OPA does not preempt all maritime claims and that general maritime law remains a viable options for claims not arising under the OPA. 153 F.Supp.2d 859, 867 (E.D.La. 2001). Rather, in *Tanguis*, then-District Judge Clement, in determining whether OPA allowed cases filed in state court to be removed, held that "the admiralty and savings clause recognizes that certain maritime remedies are preempted by OPA, while others survive." *Id.* Again, contrary to what is asserted by the BP defendants in their brief, the OPA only preempts the cause of action the statute says it preempts as "[p]reemption by OPA of the claims covered by OPA still allows the claimant to pursue claims not covered by OPA under general maritime law." *Gabarick v. Laurin Mar. (Am.), Inc.*, 623 F.Supp.2d 741.

## V.     THE RULE IN *ROBIN'S DRYDOCK* DOES NOT BAR PLAINTIFS' ECONOMIC LOSS CLAIMS

*Robin's Dry-dock and Repair Company v. Flint*, 275 U.S. 303 (1927) is typically interpreted to stand for the proposition that no duty is owed under general maritime law to a plaintiff that suffers only economic loss as a result of the alleged wrongful act, absent personal injury or damage to physical property in which the plaintiff has some proprietary interest. With

---

[32] Quoting *Rice v. Harken Exploration Co*., 89 F.Supp.2d 820, 822 (N.D. Tex. 1999), which in turn cites the Congressional Record.

respect to OPA claims, it is clear and cannot reasonably be argued otherwise that the limitation from *Robin's Dry-dock* does not apply.

In 1985, the Fifth Circuit rendered its decision in *State X Rel Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985)(en banc), reaffirming the limitation from Robin's Dry-dock. However, in 1986, just after the *TESTBANK* decision, Congress amended the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund Act, 42 U.S.C. §9601, et seq., adding the following language:

> The owner or operator of a vessel shall be liable in accordance with this section, under maritime tort law, and as provided under section 9614 of this title notwithstanding any provision of the Act of March 3, 1851 (46 U.S.C. §183ff) [which is "the Limitation of Liability Act"] or the absence of any physical damage to the proprietary interest of the claimant.

42 U.S.C. §9607(h).

As stated previously, under OPA the claimant need not be the owner of the damaged property or resources to recover for loss profits or income. OPA, by its language, has expressly rejected the limitations on recovery provided for in *Robin's Dry-dock* and *TESTBANK*. Additionally, in 1986, immediately following the *TESTBANK* decision, Congress, with regard to claims under CERCLA, expressly amended the statute to provide that physical damage to a proprietary interest of the Claimant is not required for there to be a recovery.

It is well understood that maritime and "admiralty law is judge-made law to a great extent," with the Supreme Court vested with authority to fashion general maritime law. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 259-60 (1979). "Admiralty courts have historically been responsive to common-law developments and to legislative enactments. *See* e.g., *Moragne v. States Marinelines*, 398 U.S. 375, 392 (1970); *Coats v. Penrod*, 61 F.3d 1113, 1130 (5th Cir. 1995). In *Moragne*, for example, the Supreme Court

created a general maritime wrongful death cause of action after observing that federal and state law, "had **changed** to allow recovery for wrongful death". *Coats*, 61 F.3d at 1130, (emphasis added; *Moragne*, 398 U.S. at 390-93.

The Supreme Court has long recognized that in crafting general maritime law applicable statutes "both direct and delimit our actions" in shaping the general maritime law. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 27, 33 (1990). There are numerous examples of the general maritime law being modified based on developments in statutory and common law. For example, in *Edmonds*, 43 U.S. at 260, the United States Supreme Court approved the application of joint and several liabilities in the context of Sect. 905(b) actions under the LHWCA. This was done after an analysis of federal maritime statutes namely; the Jones Act and the LHWCA in recognizing that said statutes apply joint and several liability principles. This is but one example of admiralty courts being responsive to common law developments and to legislative enactments.

In *Coats*, the Fifth Circuit directly addressed defendants' proposal for modified joint liability under the general maritime law. 61 F.3d at 1118. In rejecting the defendants' proposal, the Fifth Circuit stated, "Penrod's proposal would sanction a form of recovery for general maritime law that is different from the form of recovery under the LHWCA and the Jones Act. The present uniformity would be replaced by a lack of uniformity among the legislative and the judicial schemes. Such dissonance has concerned the Supreme Court in many cases." 61 F.3d at 1135. What is instructive about the decision in *Coats* is that the Court relying on federal statutory law modified general maritime law so as to be consistent with, and in uniformity with, that legislation. "As *Moragne* itself implied, DOHSA should be the court's primary guide as they refine the non-statutory remedy, both because of the interest in uniformity and because Congress' considered judgment has great force in its own right, allowing a distinction in

remedies to remain in the general maritime law because of a desire for uniformity cannot override the statute." *Id.*

"Admiralty is not created in a vacuum; legislation has always served as an important source of both common law and admiralty principles." *Miles*, 498 U.S. at 24. The general maritime law, as shown herein, has historically been changed or modified in response to statutory enactments. As relates to this matter, Congress, under OPA, has chosen to provide a measure of damages in the event of an oil spill which includes recovery for economic loss even in the absence of physical damage to a proprietary interest of the claimant. Congress has likewise expressly provided for the recovery under CERCLA against the owner or operator of a vessel even in, "the absence of any physical damage to the proprietary interest of the claimant." 42 U.S.C. §9607(h). The *Robin's Dry-dock* decision essentially represents a policy determination made in 1927 where damages, although foreseeable, were not recoverable having been deemed by the court as too remote. However, Congress, more recently, has chosen to explicitly and expressly deviate from that general maritime law principle and allow recovery absent any physical damage to a proprietary interest of the claimant. This can only be viewed as a repudiation by Congress of this judicially created general maritime law principle. In keeping with the rationale as clearly stated by the Supreme Court in *Edmonds, Miles,* and *Townsend*, the general maritime law must yield and conform to the statutorily included categories of damages.

This is especially true in this case. OPA was expressly enacted by Congress to address damages caused by oil spills. As with other areas of law, the general maritime law supplements and fills in the gaps left by this statutory scheme. Under the facts of this case, the general maritime law applies to the claims asserted against these vessel owner defendants, and their vessels. It would be contrary to establish Supreme Court interpretation of general maritime law

to allow the remedies provided for under general maritime law to differ from, and be more limited than, the remedies provided for under OPA.  Modifying general maritime law to allow for the recovery of economic loss without damage to pecuniary interest in the case of oil spills is identical to what was done years ago in allowing a wrongful death cause of action to exist under general maritime law after recognizing that Congress had allowed said cause of action to exist under the Jones Act and DOHSA.

### A. **Alternatively *Robin Dry Dock* Is Broader Than Defendants Claim.**

*Robin Dry Dock's* limitation on recovery of economic damages absent physical damages to property in which the plaintiff has a propriety interest is not absolute.  *In State of Louisiana ex rel. Guste v. M/V Testbank*, the *Robin Dry Dock* limitation was expanded to allow commercial fisherman to recover.   524 F.Supp. 1170, 1982 A.M.C. 2246 (E.D. La. 1981) (Beer, J.).  *Testbank* involved a claim by oystermen and other commercial fishermen whose access to publically owned oyster beds and fishing grounds was blocked by contaminants that had been spilled into the Mississippi River Gulf Outlet, In allowing for such commercial fishermen to recover even though there was no physical damage to property in which the plaintiffs had a propriety interest, the court in *Testbank* noted that "[t]raditionally, seamen have been recognized as favored in admiralty and their economic interests required the fullest possible legal protection."  *Id*. at 2250.  Thus, when the waters fished by commercial oystermen, shrimpers, crabbers and fishermen are tortiously invaded by pollution or contaminants, such parties may recover their economic losses, if those losses are foreseeable.  *Id*. at 2250-2251.  Finally, the *Testbank* court held that "where plaintiff fishermen have established a course of business conduct which makes *commercial use* of a public right with which the defendant interferes,

pecuniary losses may be recoverable." *Id*. at 2251 (emphasis in original).  This is what was held in *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974).

Here commercial fishermen like oysterman Terry Robin are clearly covered by the *Testbank* decision as they are a class of persons who enjoy special protection in the right to access and use publically- owned waterways.  As the Responders Defendants' actions were foreseeable, they owed a duty to commercial fishermen like Terry Robin and *Robin Dry Dock* is not a bar to recovery.  The oil spill not only killed oysters, shrimp, crab and fish, but blocked commercial fishermen from making commercial use of the public right of fishing in the Gulf of Mexico.

## CONCLUSION

Plaintiffs with the assistance of their retained experts and with graphic modeling will prove that the sinking of the DEEPWATER HORIZON, the resulting oil spill, and the damages that resulted were foreseeable.  The experts will provide testimony that the Responder Defendants knew, or should have known, of these consequences of their actions.  Plaintiffs' experts will provide evidence and testimony establishing that the Responder Defendants used improper firefighting methods that affected the stability of the MODU, causing it to destabilize, capsize, and sink.  The experts will assist in proving the progressive ingress of water from Responder water cannons in the MODU's internal spacers causing the loss of stability.

To take away a remedy for hundreds of thousands in various Putative Classes on the grounds of foreseeability, proprietary interest is unconscionable and not supported by reason or law. In the event the Court dismisses this matter, or in the event the limitation protection is defeated, there is if a likelihood BP would seek recovery against the Responder Defendants. Though BP has stated they would not seek the benefit of the 75 million dollar liability limit of

OPA, the OPA Act does provide BP that protection. Under those circumstances there could be no preemption because of the savings clause, preserving rights under Admiralty and General Maritime Law.

For the reasons stated herein, Plaintiffs respectfully request that this Honorable Court deny Defendants Motion to Dismiss under Rule 12 and hold that this matter is not appropriate for resolution under Rule 12 and Defendants have failed to show that they are entitled to dismissal. Additionally, Plaintiffs pray that the Court hold that general maritime law is not preempted by OPA and that the *Robins Dry Dock* rule regarding recoverable damages is not applicable to these Defendants or under the facts of this case and in fact general maritime law should be modified at least in cases involving oil spills.

Respectfully Submitted,

**/s/Lloyd N. Frischhertz**
**LLOYD N. FRISCHHERTZ (#5749)**
Frischhertz & Associates
1130 St. Charles Avenue
New Orleans, LA 70130
Telephone - (504) 523-1500
Facsimile - (504) 581-1670

and

**/s/Gerald Maples**
**F. Gerald Maples, (#25960)**
Carl D. Todd Campbell, II, (#31084)
Carlos Zelaya, II, (# 22900 )
F. Gerald Maples, P.A.
365 Canal Street, Suite 2650
New Orleans, Louisiana 70113
Telephone: (504) 569-8732
Facsimile:  (504) 525-6932

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that the above and foregoing Memorandum in Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of July, 2011.

<u>/s/ Lloyd Frischhertz</u>
Lloyd Frischhertz
