

# UNITED STATES COAST GUARD

Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking and Loss of Eleven Crew Members Aboard the
MOBILE OFFSHORE DRILLING UNIT

# *DEEPWATER HORIZON*

In the GULF OF MEXICO
April 20 – 22, 2010



Volume I
MISLE Activity Number: 3721503



The JIT also recommends that the Commandant revise regulations to:

- Require the crew to practice launching liferafts during evacuation drills; and
- Establish requirements for designated standby vessels for MODUs engaging in oil and gas drilling activities on the U.S. OCS.

## IV. Flooding and Sinking

During the two days following the explosions, the Coast Guard engaged in search and rescue efforts aimed at finding the 11 missing personnel. They were never found and are presumed to have died. During the same period, 11 different vessels arrived on scene to fight the fire on *DEEPWATER HORIZON* using fire monitors (water cannons). At the outset, there was little coordination of the firefighting efforts until SMIT Salvage Americas, a contractor engaged by Transocean, began to take charge late on April 21. With the large volumes of water applied to the fire, some portion of that water likely began to accumulate inside of, and migrated within, the hull. By the morning of April 22, as more openings became submerged, *DEEPWATER HORIZON* began taking on increasing amounts of water until at 1026, it sank.

### A. Causal Analysis

- Although the exact cause of the loss of stability and sinking of *DEEPWATER HORIZON* cannot be determined based on the limited information available, possible factors include (1) damage to the MODU from the explosions and fire; (2) accumulation of water from firefighting efforts in the interior portions of the MODU, known as "downflooding"; and (3) migration of water within the MODU through watertight barriers that were damaged, poorly maintained, or left open by crew at the time of evacuation.

- Some amount of water from firefighting efforts remained onboard, increased the weight of the vessel, and reduced its stability. Although there is insufficient data to determine what percentage of such water remained onboard, a Coast Guard post-casualty stability analysis (Appendix L) revealed that the MODU's displacement of water increased by an amount that was too great to have been caused by the shifting of loads onboard prior to the explosion.

- In the absence of the volume of firefighting water applied to *DEEPWATER HORIZON*, the MODU's structure would likely have been exposed to more extreme heat, which could have expedited a catastrophic structural failure. It is therefore not possible to conclude that the water from the firefighting vessels accelerated its sinking.

### B. Key Investigative Findings

- Prior to the explosions, *DEEPWATER HORIZON* was not in compliance with established requirements for maintaining the watertight integrity of its internal compartments. Audits in September 2009 and April 2010 found watertight integrity

not provided with training or procedures to clarify when conditions warranted activation of the ESD systems and what actions to take in such an event.[76] Thus, when multiple gas alarms were received in the CCR during the well control event, no personnel manually activated the ESD systems for the operating main engines.[77]

Similarly, *DEEPWATER HORIZON* had a ventilation monitoring and control system that was designed to monitor and indicate ventilation failures in those areas where positive or negative pressure was required to control potentially hazardous gas levels. In the event that a loss of pressure was detected, an alarm would have appeared in the IACS and in the CCR, but the alarm would not automatically cause equipment shutdown.[78]

Section 9.8 of the 1989 IMO MODU Code states that a gas detection and alarm system should be provided to the satisfaction of the MODU's flag Administration. The Code does not indicate whether the gas detection system should provide an alarm only, or if it should be arranged to activate emergency shutdown of equipment in the affected areas. In addition, it provides no guidance regarding the type and number of gas detectors, their arrangement, alarm set points, response times, wiring protocols or survivability requirements.

While Section 6.5 of the 1989 MODU Code specifies criteria for the emergency shutdown of selected equipment in case of emergency conditions due to drilling operations, it does not clearly indicate whether the gas detection system should be arranged to automatically activate these emergency shutdown provisions or if they are to be manually activated.

For a MODU using a dynamic positioning system, there is a particular concern that a gas explosion that impacts the generators would threaten the MODU's station keeping ability. The 2009 IMO MODU Code includes a further recommendation for dynamic positioned units such as *DEEPWATER HORIZON*:

> "6.5.2  In the case of units using dynamic positioning systems as a sole means of position keeping, special consideration may be given to the selective disconnection or shutdown of machinery and equipment associated with maintaining the operability of the dynamic positioning system in order to preserve the integrity of the well."

The intent of this new recommendation is not clear, as the IMO MODU Code does not provide a recommended hierarchy of automatic and manual emergency shutdown actions following gas detection in areas that may impact the dynamic positioning system, or the emergency power sources necessary for maintaining the MODU's position in the event of a flammable gas release.

E. **Crew Blast Protection Failures**

During and following the explosions, 11 personnel were missing and are presumed dead, and 16 others were injured. The primary means of protection from the effects of an explosion are the bulkhead divisions that separate different areas on the MODU. On *DEEPWATER HORIZON*, A-

---

[76] Testimony ▓▓▓ 10/5/2010 pp 60-61.
[77] Ibid.
[78] *DEEPWATER HORIZON* Operations Manual March 2001 Section 9.2, ABS DWH0000547-558.

21

**Chapter 2 | FIRE**

This section describes the events onboard the offshore mobile drilling unit (MODU) *DEEPWATER HORIZON* following the explosions and fire on April 20, 2010 at 2150 hours local time until April 22, 2010 when the vessel sank. It provides an overview of the fire-fighting and emergency response by the crew, describes the fire-fighting and fire protection systems onboard the vessel and the vessel's structural fire protection measures, and identifies system limitations and deficiencies and crew actions and decisions that may have impacted the course of the fire and fire-fighting activities.

I. **Overview**

As a result of the flammable gas explosion on the Drill Floor at approximately 2150 on April 20, 2010, *DEEPWATER HORIZON* experienced a significant fire that lasted until approximately 1026 on April 22, 2010, when the MODU sank. Crew members on the vessel's fire brigade initially attempted to respond to the fire as assigned by the MODU's emergency procedures. The chief mate, who was the assigned on-scene fire brigade team leader, testified that after the initial explosion, he responded to the fire equipment locker, but was not immediately joined by the other assigned fire brigade members, and "was basically waiting for any fire team-wise to show up."[114]

> "I grabbed my radio back off my desk and headed out of the starboard door and went to the Fire Gear Locker Number 1, which is port forward and just aft of the bridge. And I began -- I grabbed a jacket at first, was the only thing I grabbed as far as suiting up and waited.... I got reports that there was a man down over by the starboard crane so I made my way over there.... I knew I couldn't move him myself so I went to get help. I went back to the gear locker and one more person showed up there. They suited up in fire gear."[115]

After the second explosion, the chief mate decided to abandon fire-fighting efforts and focus on evacuation.

> At that point.... another explosion went off and we couldn't get back to him basically. The area was obstructed.... We basically started making our way to the boats.... We were just trying to get people out of there."[116]

Concurrently, the chief engineer and two other members of the crew left the Central Control Room/Bridge (CCR) and made an unsuccessful attempt to start the standby generator in order to bring one of the main generators on line to supply electrical power for the fire pumps.[117] The chief engineer testified that he believed that if the emergency disconnect system (EDS) could have been activated and the MODU unlatched from the riser, the fire could have been fought with the available fire-fighting equipment on *DEEPWATER HORIZON*.

---

[114] Testimony ▮ 5/27/2010 p 287.
[115] Ibid., pp 264-266,
[116] Ibid., pp 265-266.
[117] Testimony ▮ 7/19/2010 p 191.

and time delays to automatically shut down ventilation systems in the protected areas before $CO_2$ was discharged.[128]

### 4. Helideck Foam System

The *DEEPWATER HORIZON* helideck and adjacent JP-5 fueling equipment was protected by a fixed foam system. The system utilized 3% Aqueous Film Forming Foam (AFFF) as an extinguishing medium, stored in a 750 liter (200 gal) Ansul horizontal bladder tank located on the roof of the central control room. Foam could be discharged from three 63 mm (2-1/2 in) hose reels and three 76 mm (3 in) fixed monitors located at each of the three access stairways to the helideck. The JP-5 fuel unit was protected by six Grinnell model B-1 overhead foam/water sprinklers that were supplied through a separate discharge line from the foam system.

### 5. Structural Fire Protection

*DEEPWATER HORIZON*'s structure was subdivided by fire-resistant bulkheads and decks designed to contain fires to the space or area of origin, and to limit fire spread to uninvolved areas. These structural fire protection measures were designed to comply with standards contained in Table 9.1 of the 1989 International Maritime Organization (IMO) MODU Code. There are two defined levels of protection in the Code. A-class divisions are intended to prevent the spread of fire for 60 minutes, while B-class divisions prevent the spread of fire for 30 minutes. These levels of protection are intended to shield the crew for a sufficient time period to allow escape from the affected areas, and allow the fire brigade to safely assemble and begin fire-fighting efforts. In accordance with this table, the CCR and $CO_2$ room were separated from adjacent areas by A-60 class divisions.[129] The paint locker, warehouse, and electrical equipment rooms were surrounded by A-0 class boundaries. The standby generator room was separated from adjacent areas by A-0 class divisions, except for an A-60 starboard bulkhead which separated the generator room from the paint locker. The galley was separated from the adjacent mess area by A-class bulkheads. The sack storage room was separated by A-class divisions except that the forward bulkhead which shared a boundary with the accommodation spaces, and the aft bulkheads which shared a boundary with Engine Rooms # 5 and # 6, were A-60 class divisions.

In addition to the bulkhead and deck classification requirements in Table 9-1, paragraph 9.1.3 of the 1989 IMO MODU Code requires exterior boundaries of superstructures and deckhouses enclosing crew accommodation areas to be constructed of A-60 class divisions for the entire portion which faces and is within 30 m (98 ft) of the center of the Drill Floor rotary table. Because of this requirement, A-60 bulkheads were used to surround the drilling area on the second and third decks. The drilling area on the Main Deck (at elevation 41.5 m (136 ft)), and

---

[128] High Pressure $CO_2$ Fire Extinguishing System Drawings, Hyundai Heavy Industries Co., LTD, ABSDWH004163-4180.

[129] In addition to 60 minutes of fire resistance, fire rated divisions may be insulated to limit the temperature rise on the fire unexposed side of the division. Such divisions are designated by an alpha-numeric rating system, where the letter indicates whether the division provides 30 or 60 minutes of fire resistance, while the numeral indicates the insulating value of the division. An A-60 bulkhead, for example, provides both 60 minutes of fire integrity and 60 minutes of temperature rise limitation. An A-0 bulkhead (typically a bare 3 mm (1/8 inch) thick steel bulkhead) will have 60 minutes of fire integrity, but no insulating capability.

evacuation.[147] At 2206, the BP Shore Base Supervisor notified the U.S. Coast Guard by telephone and advised the BP Houston, Texas Logistics Marine Operations Coordinator to assemble a crisis team.[148]

At 2156, the on-watch DPO activated *DEEPWATER HORIZON's* Global Maritime Distress Safety and System (GMDSS) Digital Select Calling (DSC) Alert, which was automatically relayed first by *M/V NORDSTERN* to Maritime Rescue Coordinator Center Rome, Italy and then sent to the Eighth Coast Guard District Command Center New Orleans, Louisiana for action.[149]

Coast Guard Sector Mobile, Alabama received *DEEPWATER HORIZON's* DSC alert, as well as a Good Samaritan VHF radio report from the recreational fishing vessel *RAMBLIN' WRECK* that *DEEPWATER HORIZON* was engulfed in fire and that the personnel were abandoning the MODU.[150] The Coast Guard issued an Urgent Marine Information Broadcast, and approximately twenty vessels operating in the area responded to render assistance.[151]

Coast Guard Air Station New Orleans received the Search and Rescue (SAR) alarm at 2210 and launched Coast Guard helicopter CG-6605 at 2228. At 2310, CG-6605 arrived on scene and assumed the role of On-Scene Coordinator (OSC).[152]

B. Crew Muster[153]

The chief mate and others went to their assigned Emergency Stations and attempted to execute their Fire and Emergency (evacuation) duties as required by the *DEEPWATER HORIZON* Station Bill.[154] Upon arriving at his Fire and Emergency Station in the CCR, the chief engineer heard "The master screaming at the on-watch DPO for pushing the distress button."[155] After assessing the emergency condition on the Drill Floor and evaluating the fire condition, the chief mate returned to the CCR, reported an uncontrolled fire and informed the master that the crew needed to evacuate.[156]

Personnel attempted to reach their assigned Lifeboat Embarkation Stations at Lifeboat #1 or Lifeboat #2 on the second deck. A crane operator testified that when he reported to his secondary muster station at the galley, also known as the Temporary Refuge Area for Lifeboat # 1, the galley was completely collapsed.[157] He waited with others for about ten seconds until they noticed the door leading to the Lifeboat Deck was open. He and the others then made their way

---

[147] Testimony ▓▓ 10/6/2010 pp 12-16.
[148] Statement ▓▓ 10/5/2010; USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G), pp G-2.
[149] USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G), p 2.
[150] Ibid., p 8.
[151] Ibid., pp 2-3.
[152] Ibid., p 5.
[153] The term "muster" in a maritime setting means to assemble the crew for the purposes of accounting for personnel.
[154] Statement ▓▓ 4/22/2010.
[155] Statement ▓▓ 4/21/2010.
[156] Testimony ▓▓ 10/5/2010 p 19.
[157] Testimony ▓▓ 5/28/2010 pp 233-234.

## B. The crew did not conduct a complete muster (headcount) to account for all personnel prior to evacuation.

During the evacuation, there was confusion that resulted in an inability to achieve a full accounting of personnel before departing *DEEPWATER HORIZON*. The first complete muster of the one 115 persons evacuated was not completed until more than an hour later, after all of the surviving crew members had boarded *DAMON B. BANKSTON*.[242]

This result could be attributed in part to the fact that the personnel on *DEEPWATER HORIZON* who should have the most knowledge about coordinating a mass evacuation were its merchant marine officers listed in Table 3. Of those officers, at least two of the four senior merchant marine officers did not participate in the muster or the launching of either lifeboat, as they were fulfilling other duties and responsibilities as outlined in *DEEPWATER HORIZON* Station Bill "Fire & Emergency Stations."[243]

Table 3 - *DEEPWATER HORIZON* Station Bill: "Abandon Unit Stations"

| Life Boat 1 | |
|---|---|
| Position | Assigned |
| In Charge | Master |
| 2nd In Charge | DPO (off-watch) |
| 3rd In Charge | Chief Mechanic (off-watch) |
| Prepare Liferaft | A/B Seamen |
| Take Muster | Assistant Driller (off-watch) |
| Life Boat 2 | |
| Position | Assigned |
| In Charge | Chief Mate |
| 2nd In Charge | SDPO (off-watch) |
| 3rd In Charge | Boatswain- |
| Prepare Liferaft | A/B Seamen |
| Take Muster | Assistant Driller (off-watch) |

Further, despite providing formal and shipboard training, Transocean's training scenarios did not prepare the merchant marine officers and industrial drilling crew to function as a team under foreseeable hazards such as a well blowout, which was identified in *DEEPWATER HORIZON* Major Hazards Risk Assessment.[244] According to the records of drills, the marine crew and the drill crew performed all required drills within their respective occupations, but the entire crew did not collectively participate in the fire and abandonment drills because of drilling operations.[245] 95% of the time, the drill crew would take their muster and emergency preparations on the Drill Floor.[246] Third party contractors were excused from the drills.[247] The

---

[242] BANKSTON Log; USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G).
[243] Statement ▆ 4/21/2010; Statement ▆ 4/21/2010; Statement ▆ 4/26/2010; Statement ▆ 4/21/2010. The chief mate was in charge of the fire team and the master was one of the last crew members to leave the CCR.
[244] *DEEPWATER HORIZON* Major Hazards Risk Assessment, 8/29/2004.
[245] Testimony ▆ 10/5/2010 pp 200-201.
[246] Ibid.
[247] Ibid.

available in the case of evacuation that can provide additional lifesaving capabilities. Although there is no regulatory requirement that a MODU have a designated standby vessel, 33 CFR § 143 establishes the requisite operating capabilities of a standby vessel if one is designated in an EEP.

The EEP for *DEEPWATER HORIZON*, Appendix D, Evacuation Craft Details, listed four motor vessels, including *DAMON B. BANKSTON,* as "evacuation craft." None of the vessels were "specifically designated" as a standby vessel, nor was *DAMON B. BANKSTON's* Certificate of Inspection endorsed for standby service.[262] Nevertheless, during the casualty, *DAMON B. BANKSTON* performed the services and duties of a standby vessel, and there is no doubt that *DAMON B. BANKSTON's* proximity to *DEEPWATER HORIZON*, its construction and equipment standards, and its crew's actions that night saved lives.



Figure 12 - *DAMON B. BANKSTON*

### C. Fast Rescue Craft

At least 15 of the 115 personnel who evacuated *DEEPWATER HORIZON* were assisted by the FRC deployed from *DAMON B. BANKSTON*. A benefactor of its capabilities testified, "Every rig that's designed needs a fast rescue craft…if the boat wouldn't have had a fast rescue craft, there may have been ten more lives that was lost."[263]

*DEEPWATER HORIZON* was not outfitted or required to be outfitted with a FRC as identified in SOLAS 74. The IMO noted in Resolution A.656 (16), adopted on 19 October 1989, the "current extensive use of Fast Rescue Boats, in particular in offshore activities for rescue purposes." In addition, the IMO was of the opinion, "…that Fast Rescue Boats are of value in certain circumstances for the rescue, in particular, of persons involved in offshore activities." Despite these positive endorsements, there remains no requirement for MODUs on the U. S. Outer Continental Shelf to have a FRC.

---

[262] Ibid.
[263] Testimony ▮▮▮▮ 5/27/2010 pp 337-338.

# Chapter 4 | FLOODING AND SINKING

This section describes the events on or near the mobile offshore drilling unit (MODU) *DEEPWATER HORIZON* relating to its flooding and sinking, from the initial indications of the emergency situation and explosions onboard the vessel on April 20, 2010 at 2150 hours local time until the MODU sank on April 22, 2010 at 1026. It provides an overview of actions impacting the stability and fire-fighting efforts, a description of the systems in place to address the possible flooding and sinking of *DEEPWATER HORIZON*, and significant actions and decisions leading up to the sinking, including decisions regarding the primary focus of response activities, the failure to issue a salvage plan, and the failure to follow the Vessel Response Plan.

## I. Overview

During normal operations prior to the event, the crew took active measures to maintain the stability of *DEEPWATER HORIZON* by regularly adjusting weights and ballast to compensate for any changes in the loading condition onboard. However, after *DEEPWATER HORIZON* was evacuated and power was lost, the ability to actively maintain the MODU's stability was lost.

### A. Damage from Explosions and Fire

At the time of the explosions, *DEEPWATER HORIZON* carried a variety of fixed and liquid loads. The explosions and fire aboard *DEEPWATER HORIZON* caused significant damage that may have resulted in the loss of systems or watertight boundaries needed to keep the MODU in an upright level condition. While it is not possible to determine the nature or extent of damage to the underwater hull or internal structures, comparisons of *DEEPWATER HORIZON's* attitude before and during the casualty indicate that the weight of *DEEPWATER HORIZON* increased, or buoyancy was lost, and that its center of gravity shifted aft and to starboard.[268] Photographs taken on the morning of April 22 reveal that there was serious deformation of topside structures just prior to the sinking. Up to this point there were conflicting reports on the extent of damage. The log from *MAX CHOUEST*, one of the vessels responding to the scene, indicated that another vessel, "*SEACOR WASHINGTON* noticed a breach in Port Fwd Leg" at 1450 on April 21;[269] however, Transocean's on-scene salvage master, responsible for saving the MODU, reported at 0015 on April 22nd that "hull and leg structures appear primarily in-tact."[270] As the fire progressed, the equipment on deck began to shift, including the derrick which toppled to starboard.[271] Although video footage taken from the ocean floor after the sinking indicated damage to parts of the hull that were normally below the waterline, it is unclear if this damage occurred before *DEEPWATER HORIZON* sank or as a result of sinking in approximately 5000 feet of water.

---

[268] USCG Marine Safety Center Post Sinking Analysis for DEEPWATER HORIZON (Appendix L).
[269] *MAX CHOUEST* Rough Log, 4/21/2010.
[270] SMIT Salvage Americas Salvage Daily Progress Report *DEEPWATER HORIZON* dated 4/22/2010.
[271] Ibid.

72

## B. Marine Fire-fighting

According to the master of *DAMON B. BANKSTON*, at approximately 0055 on April 21, four boats were on scene fighting the fire, with two more on the way. These were all offshore supply vessels or crew boats fitted with high capacity fire-fighting monitor nozzles that were in the area servicing other offshore facilities. When asked if anybody was coordinating the fire-fighting he stated, "Not fully, no."[272] According to the log on *DAMON B. BANKSTON*, at 0130 on April 21, *DEEPWATER HORIZON* "starts to show a list to stbd stern and rotating some with secondary explosions" and at 0318 "a heavy list stbd-stern."[273] At 0500, the master of *DAMON B. BANKSTON* noted in the log "many more vessel[s] on station to[o] many to list."[274] Based on logs obtained from response vessels, 11 different vessels reported engaging in fire-fighting efforts during the response. Transocean's operations manager-performance, who was one of four people on *DEEPWATER HORIZON* that remained on scene after the survivors departed, realized that stability was a concern around 0800 or 0900 on the morning of April 21.[275]

The attempts to control the fire and cool the structure resulted in application of large volumes of seawater. As discussed below, it is likely that some portion of that water accumulated inside the hull. Internal damage to watertight subdivisions, poor maintenance of watertight closures, or simply having left watertight closures open prior to the evacuation may have allowed the migration of liquid loads and flooding throughout *DEEPWATER HORIZON*.

The only information regarding the orientation and drafts of *DEEPWATER HORIZON* during the casualty came from SMIT Salvage Americas, Transocean's contractor engaged to provide salvage services. The contractor's salvage logs indicated that *DEEPWATER HORIZON* was "listing towards aft stbd @22 degrees w/8' freeboard" at 0015 on April 22.[276] The salvage master notes indicated no change in this reported condition between 0300 and 0900.[277] However, based on a stability analysis conducted by the Coast Guard (Appendix L), the heel angle observed in pictures during this time frame was only about 12 degrees; and the logs from the Transocean emergency response center reported that their "Naval Architect Assessment from Smit 6:00 am observation. Trim of the MODU 7-8 degrees, Heel 12-13 degrees. Combination is about 20 degrees."[278]

Some unknown combination of damage, flooding, and shifting loads slowly trimmed, heeled, and reduced the freeboard on *DEEPWATER HORIZON*, allowing previously un-submerged openings in the hull to move closer to the waterline. On the morning of April 22, *DEEPWATER*

---

[272] Testimony ▮ 5/11/2010, p 148.
[273] *DAMON B BANKSTON* Log.
[274] Ibid.
[275] Testimony ▮ 8/23/2010, p 470.
[276] SMIT Salvage Americas Salvage Daily Progress Report, *DEEPWATER HORIZON*, dated 22 April 2010.
[277] SMIT Salvage Americas Salvage Master Observations, April 22, 2010.
[278] Transocean emergency response center log, TRN-USCG_MMS-00038830.
It is not correct to add trim angles and heel angles together, but it appears this was done to get the 22 degrees reported in the SMIT Salvage Master Observations.

73

HORIZON began taking on increasing amounts of water as more openings were submerged. By 1026, *DEEPWATER HORIZON* had sunk.[279]

Figure 13 shows *DEEPWATER HORIZON* as it came to rest on the ocean floor, depicting some of the damage and showing that the upper hull was buried and is not visible.[280]



Figure 13 – *DEEPWATER HORIZON* on the Ocean Floor

## II. Systems

### A. Operations Manual – Watertight Integrity

Prior to the explosion on April 20, 2010, *DEEPWATER HORIZON* had established requirements for maintaining the watertight integrity of its internal compartments. The investigation identified, however, that during the month of the explosion, *DEEPWATER HORIZON* was not in compliance with those requirements.

---

[279] USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G).
[280] Phoenix International Drawing, *DEEPWATER HORIZON* Major Debris Distribution, Sheet 2 of 2, 10/13/2010.

74

- "The COTP will advise the [Incident Commander] on unique vessel fire-fighting hazards not normally associated with land based fires. Some of these hazards include: Vessel stability due to water discipline, Free surface effect, Hull integrity, List correction/vessel de-watering...."[300]

### III. Actions / Decisions Contributing to System Failure

#### A. Decisions Relating to Fire-fighting

The parties involved in the fire-fighting and salvage efforts made two decisions that, taken together, resulted in a marine fire-fighting effort that lacked direction and coordination and paid insufficient attention to the risks of excess water destabilizing the MODU. These decisions were (1) the Coast Guard's decision to focus priority on Search and Rescue; and (2) the Transocean salvage contractor's decision not to develop a salvage plan.

##### 1. Decision to Focus Priority on Search and Rescue

Both the ACP and SAR policies focus on near-shore or in-port fires and thus do not emphasize a coordinated offshore marine fire-fighting effort. As discussed above, the ACP states that for situations occurring within their zone, the COTP, as FOSC, has jurisdiction over marine fire-fighting and that the first priority is the safety of the crew and other personnel in the area. The secondary concerns are for environmental protection and vessel salvage.[301] The Coast Guard Search and Rescue Policy also prioritizes SAR over fire-fighting.[302] Based on the reports of missing persons, this policy was understandably followed. As a result, however, the marine fire-fighting efforts lacked direction and coordination.

The investigation revealed that there was no formal establishment of a fire-fighting group.[303] The Eighth Coast Guard District quickly took over the Search and Rescue Mission Coordinator (SMC) responsibilities from Sector New Orleans as the event was categorized as a Mass Rescue Operation. The FOSC duties, including marine fire-fighting, remained with the Sector New Orleans sub-unit, Marine Safety Unit Morgan City.[304] But it was the Eighth Coast Guard District office that had the authority to launch Coast Guard boats and aircraft from throughout the Eighth District, which covers most of the units near the Gulf of Mexico. The District established communications with the assets it deployed and had good visibility over all of the directed sub-units.[305]

The initial Coast Guard assets on scene were operating under the SAR policy that takes a cautious approach to marine fire-fighting and thus did not direct those activities. According to

---

[300] Ibid., 8332.118(2) p 8-6.
[301] Ibid., 9720.1 page 9-57.
[302] United States Coast Guard, Commandant Instruction M16130.2E, "U.S. COAST GUARD Addendum to the United States National Search and Rescue Supplement (NNS) to the International Aeronautical and Maritime Search and Rescue Manual (IAMSAR)" September 21, 2009, Preface.
[303] Testimony ▬▬▬ USCG, 10/4/2010, p 30, USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G).
[304] Testimony ▬▬▬ 10/4/2010 p 27.
[305] Ibid., p 30.

78

the Commanding Officer of the Coast Guard Cutter ZEPHYR, who assumed On Scene Coordinator duties at 0724 on April 21, "We gave no direction on fire-fighting."[306] Meanwhile, on shore, the Executive Officer at Marine Safety Unit Morgan City, who was acting as the FOSC and Incident Commander during the Commanding Officer's absence, stated that, "Marine Safety Unit didn't fight the fire nor did we direct any efforts to fight the fire on the *DEEPWATER HORIZON*." According to the Executive Officer, "We (MSU) were told to stay back from any fire-fighting, and to just work on pre-staging and getting ready for the possible need to respond to any pollution."[307]

At the same time, no one from *DEEPWATER HORIZON* took charge of marine fire-fighting. The master was responsible for the safety of *DEEPWATER HORIZON*, but could not recall leading a fire-fighting effort before he departed the scene on the morning of April 21.[308] Transocean's operations manager-performance, who remained on scene after the survivors departed, indicated that he was not leading the fire-fighting effort,[309] though when a responding vessel requested permission to put water on *DEEPWATER HORIZON* over the radio, he authorized it.[310] When asked if he considered the impact of the water on the stability of *DEEPWATER HORIZON* when he authorized the boats to use fire monitors (water cannons), the operations manager-performance stated, "We didn't go into great detail there."[311]

Transocean's salvor, SMIT Salvage Americas, initially did not take the lead either. When SMIT Salvage Americas arrived at the Transocean Emergency Response Center in Houston, Texas at approximately 0500 on April 21, it was not clear who was directing the fire-fighting effort on scene.[312] The first successful two-way communication between SMIT Salvage Americas at the Transocean emergency response center and the operations manager-performance onboard *MAX CHOUEST* was at 1300 on April 21.[313] At 1315, the Captain on watch aboard the *MAX CHOUEST*, logged "Informed C. G. Cutter ZEPHYR to have fire vessels redirect water flow to legs as per Transocean - ▮▮▮▮▮▮▮▮"[314]  Figure 14 shows at least 6 vessels providing water to the fire.

According to SMIT Salvage Americas, it initially had "very little and erratic information" regarding the condition of *DEEPWATER HORIZON* from on scene and "didn't have any clear lines of communication" until its chartered vessel *SEACOR VANGUARD* arrived on scene at 2345 on April 21.[315] At that time, a full day into the response, SMIT Salvage Americas members proceeded to take control of and actively direct the fire-fighting efforts and, by their account,

---

[306] USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G).
[307] USCG Final Action Report on the SAR Case Study into the Mass Rescue of Personnel off the Mobile Offshore Drilling Unit *DEEPWATER HORIZON* (Appendix G).
[308] Testimony ▮▮▮ 5/27/2010 p 219.
[309] Testimony ▮▮▮ 8/23/2010 p 469.
[310] Ibid., p 470.
[311] Ibid.
[312] Testimony ▮▮▮ 10/4/2010 pp 112, 187.
[313] Ibid., p 122.
[314] *MAX CHOUEST* Log.
[315] Testimony ▮▮▮ 10/4/2010 p 138.

79

made sure that the vessels with fire monitors were minimizing the risk of "downflooding" of the MODU from excess fire-fighting water.[316]

## 2. Decision to Not Issue a Salvage Plan

In the case of a vessel fire or casualty, the vessel owner typically develops a salvage plan to ensure that the situation does not worsen and that the risks to personnel, the vessel, and the environment have been addressed and minimized. However, despite having SMIT Salvage Americas in the Transocean emergency response center within about 6 hours of the initial incident, Transocean and SMIT Salvage Americas did not produce a salvage plan in the following day and a half before *DEEPWATER HORIZON* sank.



Figure 14 – Vessels directing water towards the fire

From the perspective of SMIT Salvage Americas, it viewed the fire as a well control issue. The president and general manager of SMIT Salvage Americas indicated that it was very clear that the well had to be dealt with before anything else could be done.[317] As a result, he was apparently waiting for the fuel source to be removed from *DEEPWATER HORIZON* before developing a salvage plan; that never happened. SMIT Salvage Americas was also getting conflicting reports and did not have a clear line of communication from on scene, which made it difficult to develop a salvage plan.

---

[316] SEACOR VANGUARD Log, Testimony ▉ 10/4/2010 p 188.
[317] Testimony ▉ 10/4/2010 p 115.

SMIT Salvage Americas did produce an introductory guidance document at 2000 on April 21. But, despite the difficult communications, reports that the MODU was heeling and listing, and knowledge that response vessels were actively putting water on *DEEPWATER HORIZON*, the SMIT Salvage Americas document did not designate a specific person on scene to direct the efforts of response vessels and it did not warn of the direct impact that excess water could have on the stability and buoyancy of *DEEPWATER HORIZON*.[318]

### 3. Impact of Uncoordinated Fire-fighting Decisions

Marine fire-fighting is challenging because the water used to try and extinguish the fire can add weight to the vessel and ultimately cause it to sink before the fire is extinguished.[319] Without leadership and guidance to avoid it, there is a substantial likelihood that the water from the responding vessel added weight to *DEEPWATER HORIZON*. Some of the 11 response vessels engaged in putting water on *DEEPWATER HORIZON* had the capability to apply up to 8,000 gallons of water per minute using both of their fire monitors; with 100% effectiveness that equates to 31 metric tons per minute, per boat.

There is insufficient data to determine what percentage of water directed from the responding vessels' fire monitors remained onboard *DEEPWATER HORIZON* as added weight. Nevertheless, there are indications that some portion of the water did remain onboard. The heat of the fire required the responders to direct the water from a considerable distance. *DEEPWATER HORIZON* was a moving target as it slowly changed location and heading so it was difficult to always get the water on the intended location. In addition, smoke from the fire hindered visibility, complicating the efforts. Any water that reached the deck was quickly deflected in all directions, possibly allowing it to collect in numerous locations. Figure 15 shows water draining off the starboard aft corner of *DEEPWATER HORIZON*, indicating that some portion of the water from the fire monitors had reached the deck. *DEEPWATER HORIZON* was equipped with a zero-discharge, pollution containment system to prevent the mixture of rainwater and pollutants that collect on deck from running directly overboard,[320] although it is not known if the system was open at the time of the casualty. If so, it may have retained water onboard from the fire monitors.[321]

The stability analysis conducted by the Coast Guard (Appendix L), estimated that the MODU's displacement changed by 1500 metric tons (400,000 gallons of sea water), between the pre-casualty condition, assumed to be the maximum authorized drilling draft, and its condition after 30 hours. The changes in *DEEPWATER HORIZON*'s stability and freeboard over that time period were too great to have been caused by a simple shifting of weight from the collapsed derrick, internal liquid loads, and/or fixed weights.

---

[318] SMIT Salvage Americas Preliminary Salvage Plan *DEEPWATER HORIZON* Mississippi Canyon Block 252 dated 4/21/2010.
[319] Efforts were taken to secure the fuel source locally on the ocean floor, but the *DEEPWATER HORIZON* sank before the well was controlled.
[320] Testimony ▓▓▓ 10/4/2010 pp 165-166.
[321] Ibid.