# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

July 7, 2011

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
        Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179:  Request for Limited Discovery from Federal Employees in
        the Executive Office of the President

Dear Judge Shushan:

        I write on behalf of BP to seek the Court's guidance regarding BP's request for limited document discovery from employees assigned to the Executive Office of the President ("EOP") at the time of and immediately after the *Deepwater Horizon* incident.

        More specifically, BP respectfully requests that the Court direct the United States to provide document discovery in incremental steps from EOP employees with proven knowledge about issues such as efforts to control the damage from the oil spill, the oil flow rate and volume of oil spilled from the Macondo well, and the United States' highly-publicized efforts to quantify and account for the spilled Macondo oil.  Pursued in this fashion, through a calibrated, stepwise process such as the one described below, such documentary discovery would impose minimal burdens on the government and likely provide great informational benefits to the parties.

        BP is cognizant, of course, of the Court's insistence that all parties reduce discovery burdens where possible.  But given that (i) the United States has alleged that BP may be liable for billions of dollars of penalties premised on the volume of discharged oil; (ii) other litigants have alleged that BP misstated or falsified estimates of the rate at which oil was flowing from the Macondo well; (iii) the government has publicly announced its own flow rate and spill volume estimates; (iv) documents obtained through Freedom of Information Act ("FOIA") requests indicate EOP involvement in the government's decision-making process, including in key decisions relating to the determination of the government's estimates of oil spill volumes in

Chicago        Hong Kong        London        Los Angeles        Munich        New York        Palo Alto        San Francisco        Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 2

advance of its decision to sue BP; and (v) BP has carefully tailored the EOP discovery it seeks so that it proceeds in a calibrated, stepwise fashion that imposes minimal burdens on the government, BP's requested discovery on these issues that plaintiffs, including the United States, have made central should be allowed.

Although, based on documents obtained through FOIA requests and facts developed through discovery to this point, there appears to be material EOP involvement in the government's response to the oil spill and spill volume estimation process, the specific discovery BP seeks from the EOP at this point is confined to just a few named individuals, one former and three present federal government employees; namely, Ms. Carol Browner, the former Assistant to the President for Energy and Climate Change, Dr. Jerry Miller, PhD, the Assistant Director for Ocean Sciences at the White House Office of Science and Technology Policy ("OSTP"), Heather Zichal, the Deputy Assistant to the President for Energy and Climate Change, and Dr. Kathryn (Kate) Moran, PhD, an OSTP Senior Policy Analyst. The discovery is limited to document discovery and would be governed by search terms and a date range to be agreed upon by the parties.

As the Court would expect, BP and the United States have been engaged for quite some time (approximately two months) in efforts to resolve this issue through discussion. After first discussing the issue in detail as early as April 27, the parties continued meeting and conferring in person and by telephone. This extended discussion culminated in BP sending a letter to opposing counsel on June 24, 2011, *see* Attachment A, and the Department of Justice responding on July 6 that the "United States is quite firm in our position that it is inappropriate to search the files of the Executive Office of the President." (*See* Attachment B.) Only now that it has become apparent that the Government's position is, apparently, an across-the-board decision in favor of resisting discovery from EOP custodians does BP seek this Court's guidance.

## OVERVIEW

As Your Honor knows, allegations by various plaintiffs in this litigation have made flow rate, volume, and the fate of the oil critical issues in this litigation. (*See* Attachment C.) For example, various complaints brought by the United States, the State of Louisiana, and numerous other plaintiffs include:

- allegations that BP fraudulently misrepresented and concealed the actual flow rate;
- allegations that BP downplayed and/or concealed the severity of the spill;
- allegations that BP was negligent in providing inaccurate and/or incomplete information about the flow rate and the volume of the spill; and

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 3

- allegations that BP delayed response efforts by deliberately underestimating the rate at which oil was flowing into the Gulf.

Moreover, the United States is seeking to impose Clean Water Act civil penalties for each barrel of oil discharged. (*See id.*)

Through its Flow Rate Technical Group ("FRTG"), the government developed — and then publicly released — estimates of the rate at which oil was flowing from the Macondo well, proffering those estimates as having been arrived at via scientific inquiry. (*See, e.g.,* DOI Press Release "U.S. Scientific Teams Refine Estimates of Oil Flow from BP's Well Prior to Capping" (http://www.doi.gov/news/pressreleases/US-Scientific-Teams-Refine-Estimates-of-Oil-Flow-from-BP-Well-Prior-to-Capping.cfm) (last visited July 4, 2011).)

BP has reason to believe at this point that at least four individuals who worked in the EOP were personally and directly involved in the process that produced the estimates of flow rate and oil spill volume and thus are likely to have documents relevant to this litigation. Documents received from the government's FRTG through a FOIA request suggest that individuals working at the EOP were directly involved in decision-making regarding the timing of, and perhaps the substance of, the FRTG's publicly disclosed oil flow rate estimate, spill volume estimate, and so-called "oil budget" (an estimate prepared by the federal government concerning the volumes of oil that evaporated, biodegraded, or remained in the water).

There is compelling evidence Ms. Browner was personally and substantially involved in the decision-making process that produced the United States' estimates of oil flow rates and oil spill volumes. For instance, BP's FOIA request produced a heavily-redacted email of June 13, 2010, with the subject line "Re:  Flow Rate Estimate," that states: "I will direct the same to Marcia and her group later today. The plan is to get Dr. Chu and Dr. Mcnutt together *to develop the single number.*" (*See* Attachment D (003350) (emphasis added).) Importantly, one recipient of this email is "cbrowner@[redacted]" — presumably Carol Browner at the Executive Office of the President. In other words, it appears that discussions involving Secretary of Energy and Nobel-Prize-winning physicist Steven Chu and FRTG head Marcia McNutt were conducted with a key EOP employee seeking to achieve "the single number." The fact that such a group met with Ms. Browner to coordinate the United States' "single number" estimate appears to be a telling fact. Of the known addressees of and persons mentioned in the June 13 email, Ms. Browner would have been the one best positioned to insist upon a single number — as opposed to a range of numerical estimates such as is often produced by purely scientific inquiry — be developed and published to the public. Access to Ms. Browner's email would help evaluate how

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 4

the United States came to reach its "single number" estimate and whether the decision to publish a "single number" estimate was scientifically warranted.

Further evidence suggests Ms. Browner's involvement in other matters at issue in this MDL. In another document, also obtained through FOIA, Francis Sturm forwarded "a public information document on the oil budget passed down to one of our NOAA reps on the IASG. *This [document] was created at the request of Carol Browner to Dr. Lubchenko.*" (*See* Attachment E (010144) (emphasis added).) Again, the fact that a key representative of the EOP directed the creation of documents relating to the "oil budget" confirms the likelihood that Ms. Browner played a prominent role in the process of developing that document. Finally, it has been publicly reported that Ms. Browner participated on daily "principals" calls held by Admiral Thad Allen during the oil spill response effort. It appears these daily calls involved senior-level government officials ("principals") and provided a forum for discussion of source control and spill response, among other issues. (*See* http://in.mobile.reuters.com/article/worldNews/idINIndia-50298820100721) (last visited July 1, 2011).

Like Ms. Browner, it appears that Dr. Miller, working from within the EOP, was also personally involved in the United States' efforts to address the spill. In particular, the available evidence indicates Dr. Miller was significantly involved in the United States' oil monitoring and sampling program. Indeed, as a representative of the EOP, in May 2010 Miller personally met with BP scientists to discuss ongoing research. (*See* Attachment F.) He also was involved with monitoring issues in September of the same year. (*See* Attachment G.)

Like their colleagues, it appears that Ms. Zichal and Dr. Moran, also working from within the EOP, were personally involved in the United States' efforts to address the spill, including flow rate. For example, Dr. Moran is a participant in email exchanges with members of the FRTG regarding the formation and progress of the FRTG. (*See* Attachment H). She also responds to an email request for "any and all ideas on how we will reach a consensus on numbers that we will ultimately have to defend" with a series of recommendations about potential experts to staff or peer review the FRTG's work. (*See id.*) Similarly, Ms. Zichal is a participant in email exchanges evidencing her involvement in flow rate, including the draft results of the FRTG, and the oil budget, about which Ms. Zichal wrote, "On the oil budget, seems like in addition to sorting out last remaining issues w epa, we need to decide whether we're ok w the 60k bpd estimate or if we want to rerun the tool with another number." (*See* Attachment I.)

Accordingly, limited and incremental documentary discovery from at least these four individuals is highly relevant to this litigation. Given that various parties, including the United

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 5

States itself, have put in play questions regarding the adequacy of BP's source control and spill response efforts, the volume of oil spilled, and BP's alleged misdeeds in supposedly failing accurately to estimate and disclose that spill volume, BP has a right under the Federal Rules to discovery of documents needed to understand the government's own oil flow rate and oil spill volume estimates and the process used within the government to arrive at those estimates.

More specifically, BP is entitled to learn discoverable facts tending to show whether or not the government itself experienced difficulty in getting reliable answers to the question of how fast oil was flowing from the uncapped Macondo well into the Gulf. Indeed, this evidence is especially important to BP's defense of the many claims in this MDL that assert that BP improperly falsified estimates of how fast the oil was flowing, while it was still flowing.

As described in detail below, case law strongly supports the practical reasons counseling in favor of this discovery. *First*, this Court enjoys absolutely undoubted authority to compel, where appropriate, documentary discovery of former or current employees working within the Executive Office of the President. Indeed, as confirmed by Supreme Court decisions like *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367 (2004), and *Clinton v. Jones*, 520 U.S. 681 (1997), civil discovery can be required from even the President and Vice President themselves. It necessarily follows that the federal district courts may also compel, as appropriate, discovery of unelected government employees working within the EOP.

*Second*, the specific discovery that BP requests is appropriate because it is quite circumscribed and relates directly to the validity of the United States' claims and the claims of numerous other plaintiffs about the volume of discharged oil, BP's conduct in estimating that spill volume, and BP's conduct in otherwise responding to the spill. Significantly, BP does not ask for any discovery from the President, or the Vice President, or other high-ranking EOP personnel. Instead, as a modest initial step down this discovery road, BP simply requests access to the email records (including all electronic attachments) of one former EOP employee and three current EOP employees, Ms. Browner, Dr. Miller, Ms. Zichal, and Dr. Moran. Especially given that one of these individuals no longer works at the EOP (Ms. Browner) and that two others are a couple of the many EOP policy analysts (Dr. Miller; Dr. Moran), and given that BP's request for emails (and attachments) covers only a limited period of time, this initial request is modest indeed. (BP reserves its right to later seek other documentary discovery and depositions, as appropriate, based on the results of this requested discovery and other facts developed in this litigation or otherwise.)

*Finally*, this letter addresses the United States' contention that discovery is improper because Ms. Browner and Dr. Miller were not part of the chain of command responding to the

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 6

spill.  As an initial matter, such a claim is not true.  But in any event, there is no "official duty" precondition to obtaining discovery under the Federal Rules.  To the contrary, BP is entitled to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b).

## EOP CUSTODIANS ARE NOT IMMUNE FROM CIVIL DISCOVERY

At noted above, this Court has ample power to order that civil discovery proceed regarding documents in the possession of EOP custodians.  The Federal Rules confirm that "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," is appropriate, and broadly declares that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b); *see generally United States v. Holley*, 942 F.2d 916, 924 (5th Cir. 1991) ("Courts have long recognized the broad scope of discovery" and "'either party may compel the other to disgorge whatever facts he has in his possession.'") (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

Nor is there any exception to the Federal Rules for cases involving the EOP custodians. The Supreme Court has considered that question and soundly rejected it.  In *Jones* the Supreme Court unanimously held that the President himself can be required to participate in civil discovery. *See id.* at 691-92; *id.* at 724 (Breyer, J., concurring).  And in *Cheney*, the Court reiterated that district courts can order even an elected Vice President to comply with lawful discovery orders. *See* 542 U.S. at 388-90 (reversing, not on grounds that civil discovery of the Vice President is impermissible per se, but on grounds that the district court permitted "unnecessarily broad" discovery in the particular instance).  Indeed, while recognizing that such discovery must always be properly tailored, the *Cheney* Court did nothing to suggest that even elected Executive Branch officials should be deemed immune from properly managed civil discovery. *See id.* (citing *United States v. Poindexter*, 727 F. Supp. 1501 (1989), approvingly and noting that the district court in that case had properly struck the balance by tailoring "the scope of the subpoenas").

With these principles in mind, it is unsurprising that federal courts routinely manage cases involving civil discovery obtained from Executive Branch officials working within or in close connections with the Executive Office of the President. *See, e.g., Cummock v. Gore*, 180 F.3d 282, 293 (D.C. Cir. 1999) ("[O]n remand, the District Court must engage in the necessary discovery and fact finding to determine whether any additional materials fall within the parameters to which Cummock is entitled."); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 916 (D.C. Cir. 1993) ("We remand for further proceedings, including

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 7

expedited discovery, regarding the working group."); *Alexander v. FBI*, 194 F.R.D. 299 (D.D.C. 2000) (establishing discovery regarding document requests directed towards White House offices); *cf. Tripp v. Exec. Office of the President*, 200 F.R.D. 140, 141, 147 (D.D.C. 2001) (noting "[t]he Court is persuaded by plaintiff that there should be discovery, briefing, and an evidentiary hearing to determine whether Bacon and Bernath [high-level Department of Defense officials] were acting within the scope of their employment" when they allegedly revealed private information to the press, potentially with the involvement of the EOP, but finding that the EOP itself was not subject to the Privacy Act). Nothing suggests that complying with such orders burdens the functioning of the government. To the contrary, the Supreme Court has unanimously expressed its "confidence in the ability of our federal judges" to manage the civil discovery process. *Jones*, 520 U.S. at 709.

## BP'S REQUESTS ARE LIMITED AND IMPORTANT

The limited, necessarily incomplete, evidence BP has been able to glean to date through FOIA and otherwise strongly suggests that government employees working within the EOP, personally and individually, obtained information relevant to the claims and defenses being asserted in this MDL.

As explained above, it appears highly probable, based on the limited evidence to be made available to date, that Ms. Browner was personally and substantially involved in the decision-making process that produced the United States' estimates of oil flow rates and oil spill volumes, while further evidence suggests her involvement in other matters at issue in this MDL. Similarly, the available evidence indicates that Dr. Miller was significantly involved in the United States' oil monitoring and sampling program and personally met with BP scientists to discuss ongoing research, and that Ms. Zichal and Dr. Moran also were personally involved in the United States' efforts to address the spill, including flow rate.

Against this backdrop, MDL litigants are contending that BP should be held liable for what they claim are faulty BP estimates of the very same oil flow rates and spill volumes that BP is now seeking to better understand through EOP discovery. Even apart from the United States' claims, numerous other plaintiffs have challenged BP's conduct in the aftermath of the spill. The B2 Plaintiffs, for example, have alleged that BP fraudulently misrepresented and concealed from regulators the actual flow rate of the oil discharge, thereby hindering clean-up efforts. *See* Attachment C. Other parties, including the State of Louisiana, have made similar allegations. *See id.* As a matter of basic fairness, these litigants should not be permitted to sue BP premised on alleged failures in estimating those spill volumes, while at the same time depriving BP of discovery from key government decision-makers regarding how the United States itself went

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 8

about arriving at spill volume estimates. BP's ability to defend itself against such accusations crucially depends on its being able to show what information, methodologies, and processes the United States used to arrive at its own numerical estimates.

Moreover, the volume of oil discharged is one predicate of the United States' Clean Water Act penalty claim against BP. *See* Complaint of the United States of America, ¶¶ 1, 4, 60, 75. While BP contends that any penalty may be assessed on a per-day-of-spill basis (as opposed to a per-barrel basis), BP is entitled in the meantime to discover relevant information about the United States' liability and penalty theories, including how the United States reached its initial and public estimates of the total number of barrels spilled into the Gulf. Just as the United States has been permitted documentary discovery of BP's Internal Investigation Report, BP should be permitted documentary discovery of the United States' publicly available spill volume estimates.

## BP's Requests Are Limited in Scope

Mindful of the Court's admonitions that parties should conduct more cabined discovery, where possible, BP has carefully limited the EOP discovery it now seeks.

- *At this time, BP seeks only emails from only four Individuals.* BP has not sought documents from every individual within the EOP that may have relevant information. Most importantly, BP does not seek documents from the President or Vice President. Nor at this time is BP seeking documents from Valerie Jarrett, a senior advisor to the President, even though there are indications that she too was personally and substantially involved in the decision-making process that produced the United States' response to the spill. Instead, at this time BP seeks only emails (together with attachments) from Ms. Browner, Dr. Miller, Ms. Zichal, and Dr. Moran.

- *Before any documents are produced, agreed-upon search terms will be used.* BP has agreed to restrict the universe of emails that should be produced. In particular, before any EOP emails are produced, agreed-upon search terms would be applied to weed irrelevant communications out of the search results. By employing jointly-negotiated search terms, the burden on the United States will be considerably reduced.

- *BP's request is limited in time.* At this time, BP seeks only emails (and attachments) sent or received between April 20, 2010, and January 31, 2011.

- *BP is not now seeking broader discovery or depositions.* Importantly, BP is not at this time seeking additional discovery from the EOP, and is not at this time seeking to depose Ms. Browner, Dr. Miller, Ms. Zichal, or Dr. Moran. Instead, BP simply reserves its right

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 9

to later seek additional documentary discovery and depositions from these, and/or other EOP custodians, as appropriate, based on the results of this initial EOP documentary discovery and other MDL discovery being pursued by the parties. BP carefully designed this discovery request with the goal that discovery involving the EOP should proceed one step at a time.

In sum, the burden on the United States associated with BP's limited discovery request appears to be, while not *de minimis*, at least quite circumscribed. In view of the potential centrality of the requested emails to BP's defense and the minimal burden producing them would impose, there can be no doubt which way the balance tips regarding this discovery request.

## THE GOVERNMENT'S OFFICIAL DUTIES ARGUMENT IS UNPERSUASIVE

During the meet-and-confer process, the United States suggested that the emails need not be produced because Ms. Browner and Dr. Miller had no "official" duties regarding the government's response to the oil spill — that is, they derived their authority from their White House address, as opposed to an official position in the chain of command. This argument is factually erroneous and legally irrelevant.

As an initial matter, there is no basis to claim that Ms. Browner was not in the chain of command. As explained above, a document obtained through FOIA confirms that "a public information document on the oil budget ... was created at the request of Carol Browner ...." (010144) Other documents suggest Ms. Browner regularly represented the EOP in meetings relating to the Executive Branch's response to the spill, and it is well known that she regularly addressed the media about oil spill matters as an apparent spokesperson for the Executive Branch as a whole.

Moreover, even if Ms. Browner and Dr. Miller in fact had no "official" duties relating to the spill, nothing in the Federal Rules turns on such a distinction. Instead, for purposes here, it is sufficient that their emails (and email attachments) are "relevant to any party's claim or defense" and may "lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b). Ms. Browner and Dr. Miller were key figures in the United States' response efforts. Their emails, at a minimum, will be invaluable in discovering where to look throughout the executive Branch for other pieces of admissible evidence. Under the plain terms of the Federal Rules, that is enough.

\*   \*   \*   \*   \*

Plaintiffs' allegations in these cases have put at issue the volume of discharged oil, and whether BP improperly estimated the rate at which oil was being discharged while it was still

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 7, 2011
Page 10

flowing.  BP is therefore entitled to relevant information from the United States as to how it arrived at its own spill volume determinations.  Although BP understands and readily accepts that seeking discovery from EOP employees should not be undertaken lightly, precedent nonetheless makes clear that, in appropriate cases such as this one, government employees who work in the EOP cannot claim immunity from the civil discovery process.

BP respectfully requests the Court to direct the United States to provide relevant emails and attachments from EOP employees Jerry Miller, Heather Zichal, and Kathryn (Kate) Moran and former EOP employee Carol Browner.

Sincerely,

Robert R. Gasaway

Attachments

cc:    R. Michael Underhill
       Steven O'Rourke
       Sarah D. Himmelhoch
       J. Andrew Langan, P.C.
       Stuart A. C. Drake
       Joseph A. Eisert
       Don K. Haycraft
       Defense Liaison Counsel
       Plaintiffs' Liaison Counsel
       Hon. Luther Strange
       Corey L. Maze

# ATTACHMENT A

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

June 24, 2011

**BY ELECTRONIC MAIL**

Sarah D. Himmelhoch, Esq.
Senior Attorney
U.S. Department of Justice
RFK Main Building
950 Pennsylvania Ave., NW
Washington, D.C. 20530

Re:     **MDL 2179 — US Responses to BP Discovery**

Dear Sarah:

This letter follows up the US's June 20, 2011 discovery responses. We are still reviewing those responses and will undoubtedly have additional comments as our review progresses. Nonetheless, we wanted to raise the following issues in hopes that we might meet, confer, and resolve these issues or, failing that, approach the Court and obtain appropriate guidance.

## 1.  EOP Custodians

It appears from the US's Third Response to BP's First Set of Discovery Requests that no one from the EOP is included in the US's proposed list of custodians. The US's response states that the files of Carol Browner and Jerry Miller, *inter alia*, will not be searched "because they were not assigned duties and are [sic] reasonably likely to be in possession of unique information related to Event, Source Control, or Quantification."

As you know, BP has requested that the US search the files of EOP custodians such as Ms. Browner and others who are likely to have relevant, non-privileged information regarding this matter. (*See* spreadsheet attached to S. Himmelhoch email dated 05/31/2011 07:26 PM re Custodian List.) In our view, contrary to your view, the "official" duties of individual EOP personnel, including Ms. Browner, did in fact include responsibility "for quantification or source control efforts in the response." Ms. Browner repeatedly spoke publicly about spill-related matters, and she and other EOP personnel were assigned, albeit perhaps only temporarily, to work extensively on relevant spill-related matters and, as a result, generated or accumulated relevant documents.

Chicago     Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai

### KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch, Esq.
June 24, 2011
Page 2

In particular, documents received from the government's Flow Rate Technical Group ("FRTG") through a Freedom of Information Act ("FOIA") request suggest that individuals working at the EOP were directly involved in the decision-making process with regard to the timing of release, and perhaps the substance, of the FRTG's flow rate estimate. Moreover, even if our perception of Ms. Browner's and others' "official" role and duties were incorrect, it is our further view that any purported lack of an "official" role does not remove discovery obligations. Accordingly, we would ask that you kindly reconsider your position on EOP custodians, Carol Browner in particular, and search those custodians' files for responsive documents.

### 2.   Hard Copy Files

The US's Third Response to BP's First Set of Discovery Requests, after identifying proposed search terms and before identifying various custodians, states that the US "will search the electronic files in the custody of the following individuals using the search terms set forth above." Nowhere does it state that the US also will search these custodians' hard copy files. We ask that you confirm the US will search and review both custodians' electronic files and custodians' hard copy files for responsive documents.

### 3.   Responses to RFAs

Our preliminary review of your responses indicates that the US has incorrectly objected or categorized many of BP's requests for admission as "not relate[d] to the Event, Source Control, or Quantification" trials.

In particular, your responses object to responding to RFAs 156-181 and 343-406 on this basis; yet all of those requests relate to the Source Control or Quantification phase and, accordingly, should be subject to our agreed August 1, 2011 deadline. Given the relevance of RFAs 156-181 and 343-406 to issues in the Phase 2 trial, we ask that you reconsider your position on these RFAs and respond to them by August 1st.

RFAs 156-181, for example, deal with the general formation and operation of the Unified Command. As you know, the Unified Command ultimately controlled all aspects of the source control effort, and its authority and decisions regarding source control are likely to be central issues in the Phase 2 trial. Similarly, RFAs 343-406 directly address the government's role with regard to the various source control methods utilized as part of the response and are clearly part of Phase 2.

We note further that your position regarding these requests is at odds with your response to requests for production that cover the same topics. For instance, RFA 360 asks the Government to "[a]dmit that representatives of the United States Government stationed in Houston approved every procedure utilized to seal the MC252 Well." While you have objected

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch, Esq.
June 24, 2011
Page 3

to this request based on its purported lack of relevance to the Phase 2 trial, you have already agreed to produce documents in response to BP's RFP 68, which sought "[a]ll documents referring or relating to the decision to approve or reject any procedure considered or submitted as part of the effort to cap, seal or collect hydrocarbons from the MC252 Well." These requests overlap in subject matter, and both should be answered as part of the discovery leading up to the Phase 2 trial.

### 4.  **Search Criteria and Custodian Lists**

The US's Third Response to BP's First Set of Discovery Requests identifies proposed search terms for a number of RFPs and divides proposed custodians into lists of custodians whose files are to be searched, custodians still under consideration, and custodians not included in searches. As you know, Mark Nomellini and others have been reviewing search terms and custodians, and Mark plans to get back to you shortly on these issues.

### 5.  **Deadline for Motions to Compel**

The current deadline for a motion to compel against the US with respect to Phase 1 documents is July 5, 2011. Given the deadline extensions BP has granted at the US's request, plus the rolling nature of the US's productions and the large volume of materials recently produced and expected to be produced in the future, BP cannot complete a sufficiently thorough review of the US's discovery responses by July 5.

Accordingly, BP proposes that BP and the US agree to the following deadlines for any motion to compel with respect to discovery responses from each other only (and not with respect to other parties): August 15, 2011 for responses relating to the "Event," and September 15, 2011 for responses relating to Source Control and Quantification.

Sincerely,

Robert R. Gasaway

cc (via electronic mail):

R. Michael Underhill          Mark J. Nomellini
Steven O'Rourke               Joel M. Gross
J. Andrew Langan, P.C.        Allison B. Rumsey
Stuart A.C. Drake             Don K. Haycraft

# ATTACHMENT B



**U.S. Department of Justice**
Environment & Natural Resources Division

90-5-1-1-10026

_____

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0180*
*sarah.himmelhoch@usdoj.gov*


July 6, 2011

BY ELECTRONIC MAIL

Robert R. Gassaway, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC  20005
robert.gassaway@kirkland.com

Dear Rob:

I write in further response to your letter of June 24, 2011 regarding the US's June 20, 2011 discovery responses and your email of today's date.  I will respond to the topics raised in the order you presented them.

**1.      EOP Custodians**

You are correct when you note that "no one from the EOP is included in the US's proposed list of custodians."  You request that we agree to search the files of "Carol Browner and Jerry Miller, *inter alia.*"  You have since clarified that you want the United States to search the files of four custodians (two of whom have not previously been identified by BP):  Carol Browner, Jerry Miller, Heather Zichal, and Kathryn (Kate) Moran.  You have asked that we apply all of the search terms to these custodians' files.

As the Magistrate suspects, the United States is quite firm in our position that it is inappropriate to search the files of the Executive Office of the President.  As you correctly point out, certain individuals in the Executive Office of the President did correspond with individuals in the particular agencies regarding the response activities, including efforts to estimate the amount of oil discharged beginning on April 20, 2011.  Where we differ, however, is on the likelihood of there be *non-privileged* and *unique* responsive information in the files of these four custodians.

Your pointing to the materials found in the productions from the agencies proves our point.  Employees in the Executive Office of the President had acted during the response through the agency personnel directly assigned to the response activities.  If they made public statements regarding the response, it was based upon information provided by personnel in the agencies.

We have agreed to search for and produce the non-privileged communications between the Executive Office of the President and the agencies.

The only communications unlikely to be captured by our search of the agency files are those entirely internal to the Executive Office of the President.  These communications are highly likely to be privileged or at least to require close scrutiny to determine whether any privilege applies.  The burden of this review far outweighs the small possibility that some unique information can be gleaned from entirely internal communications of the Executive Office of the President.

Bear in mind that the United States has agreed to conduct extensive searches in response to BP's massive discovery requests.  We have agreed to search the entirety of the Coast Guards' consolidated spill response archive – a collection comprising millions of pages of paper and electronic files.  In addition, we have agreed to search the files of over 800 federal employees and contractors, including a number of individuals proposed only by BP.

In recognition of the significant and unique nature of this litigation, the United States has included in these searches the files of several cabinet and other very high level officials.  These officials include Secretary Napolitano, Secretary Chu, Secretary Salazar, Administrator Jackson, Administrator Lubchenco, and former Director Birnbaum.  The United States has also agreed to search the files of contract employees at several of the Department of Energy's National Laboratories as well as individuals who provided voluntary service to the United States during the response.

In short, we have agreed to an unprecedented search of the United States' files and now must insist, as BP has all along, that reasonable boundaries be drawn around the search for responsive information.  Before we can fully declare us at an impasse, however, let me be sure I am clear on what BP seeks from the Executive Office of the President:

1. What date range are you seeking?
2. Am I correct that you expect *all* the search terms to be applied?
3. Are the four individuals identified in your email of today the only individuals whose files you would ask the Magistrate to order us to search?

If you can provide answers to those questions, I will provide you with the formal position of the United States on this issue so that it may be presented to the Court.

**2.      Hard Copies**

The United States is searching for hard copy documents of the identified custodians, as noted in the United States' Initial Response to BP's Requests for Production.

**3.      Responses to RFAs**

You next turn to response to RFAs 156-181 and 343-406.  With respect to these RFAs, in addition to the objection we responded to these requests by referencing the awaited proposed

stipulation from BP to address the fact that the response activities undertaken by BP were within the structure of the Unified Command.  If BP is no longer interested in negotiating such a stipulation, we will respond to RFAs 156-181 and 343-406 on or before August 31, 2011.

**4.      Search Criteria and Custodian Lists**

Mr. Nomellini has inquired by email regarding the date range for our searches, enquiring whether we will agree to "reasonable searches" after the date cut offs for certain requests.  Quite honestly, I have no idea what is meant by a "reasonable search" if not an application of the same search terms to the later time period, which we simply cannot agree to conduct.  Therefore, please clarify what you would be expecting in terms of a "reasonable search."

I don't believe I have received any additional comments from Mr. Nomellini regarding our search terms.  If I am incorrect, please let me know.  Please also bear in mind that we have begun our searches and have had to make some corrections and alterations to the search terms to allow them to run in the various search programs being used by the various agencies.  We do not believe these changes will significantly or meaningfully alter the scope of the searches and will forward the revised search terms as they are finalized.

**5.      Deadline for Motions to Compel**

We have agreed to your requested extension of the deadlines for filing of motions to compel.

Sincerely,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch

cc:      Liaison and Coordinating Counsel

# ATTACHMENT C

**Attachment C**

## MDL 2179 -- Spill Volume Allegations

| Allegation or Issue | Source Document | Party Asserting |
|---|---|---|
| Whether BP fraudulently misrepresented and concealed from regulators the actual flow rate and, thereby, hampered appropriate containment and cleanup responses | B2 Consolidated RICO Complaint, ¶ 162 | B2 Plaintiffs |
| Whether BP downplayed and / or concealed the severity of the spill | First Amended B1 Master Complaint, ¶¶ 260, 480[1] | B1 Plaintiffs |
| Whether BP was negligent in providing inaccurate and incomplete information to the public, governmental regulatory agencies, governmental entities, and Plaintiff about the flow rate and volume of the spill | State of Veracruz, Mexico v. BP PLC, et al., ¶ 51(n); State of Tamaulipas, Mexico v. BP Plc, et al., ¶ 51(n); State of Quintana Roo, Mexico v. BP Plc, ¶ 51(n) | Mexican States |
| Whether BP deliberately delayed critical disaster response efforts by estimating the flow rate at 1,000 barrels per day | West, et al. v. BP Plc, et al., ¶¶ 68, 71 | Putative Class |
| Whether BP fraudulently concealed and misrepresented the severity of the spill, including the estimated flow rate | State of Louisiana v. BP Exploration & Production Inc., et al., ¶¶ 369, 374 | State of Louisiana |
| The United States is seeking to impose Clean Water Act civil penalties for each barrel of oil that the Defendants discharged into the Gulf of Mexico. | United States of America v. BP Exploration & Production Inc., et al., ¶¶ 4, 75 | United States |

---

[1]  Numerous individual and putative class complaints contain similar allegations.

## MDL 2179 – Source Control Allegations

| Allegation or Issue | Source Document | Party Asserting | Individual / Class Complaint[2] |
|---|---|---|---|
| 1. Whether BP and/or Transocean failed to timely bring the oil release under control | Rule 14(c) Third-Party Complaint, § XLII.16<br><br>First Amended Master Claim in Limitation, ¶¶ 146(l)<br><br>First Amended B1 Master Complaint, ¶ 611(l) | Transocean<br><br><br>Limitation Claimants<br><br><br>B1 Plaintiffs | 239 |
| 2. Whether BP failed to exercise reasonable care in the operation, maintenance, handling, design, implementation, and execution of relief and recovery efforts | Rule 14(c) Third-Party Complaint, § XLII.17 | Transocean | 2 |
| 3. Whether, after the blowout and before the well was sealed, BP was aware of procedures that would immediately block the flow of oil but delayed implementing such procedures, and limited efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible | First Amended B1 Master Complaint, ¶ 766<br><br>Voluntary Master Complaint, ¶ 765 | B1 Plaintiffs<br><br><br>Local government entities | None |

---

[2] This column provides the number of individual and class action complaints underlying the MDL master complaints that contain the allegation or issue.

# ATTACHMENT D

003350

**Timothy Bagley**

From: ▮
Sent:     Sunday, June 13, 2010 8:23 AM
To:       ▮; ▮ Hayes, David
Cc:       'Rod.OConnor@hq.doe.gov'; 'jane.lubchenco@noaa.gov'; cbrowner@ ▮;
          'heather_r._zichal@ ▮;
Subject:  Re: FLOW RATE ESTIMATE

Thad,
I will direct the same to Marcia and her group later today. The plan is to get Dr. Chu and
Dr. Mcnutt together to develop the single number.
Ken

----- Original Message -----
From: ▮
To: ▮ Rod.OConnor@hq.doe.gov <Rod.OConnor@hq.doe.gov>; Jane.Lubchenco@noaa.gov
<jane.lubchenco@noaa.gov>; cbrowner ▮; Zichal, Heather R.
▮;
Sent: Sun Jun 13 05:29:05 2010
Subject: FW: FLOW RATE ESTIMATE

Secretaries,
Per discussion at Principals Call last night.  I will have this conversation today.
Thad

-----Original Message-----
From: ▮
Sent: Sunday, June 13, 2010 5:25 AM
To: 'mcnutt@usgs.gov'
Subject: FW: FLOW RATE ESTIMATE

Marcia,



When you are up and about, let me know your schedule and a good time to talk.

Thad

# ATTACHMENT E

**Subject:** FW: Draft oil budget public information document
**From:** "Sturm, Francis" <Francis.J.Sturm@uscg.mil>
**Date:** Fri, 30 Jul 2010 10:08:11 -0400
**To:** "Hammon, Steve" <sehammon@usgs.gov>, Mark Miller - NOAA
<Mark.W.Miller@noaa.gov>

Mark and Steve,

I should have copied you on this email I sent to ADM Allen and others (below).

Frank

F. J. Sturm
NIC Interagency Staff
U.S. Coast Guard
francis.j.sturm@uscg.mil
Tel: 202-372-1734


-----Original Message-----
From: Sturm, Francis
Sent: Friday, July 30, 2010 9:23 AM
To: Gautier, Peter CAPT; Arguin, Wayne CDR; Kayyem, Juliette;
'Connie.Rooke@dhs.gov'; Rooke, Connie CDR; 'thad.allen@dhs.gov'; Haynes, David
CAPT
Cc: Grawe, William; Parsons, Roger
Subject: Draft oil budget public information document

Admiral, Juliette, et al,

Attached is a public information document on the oil budget passed down to one of
our NOAA reps on the IASG.  This was created at the request of Carol Browner to
Dr. Lubchenko.  Dr. Lubchenko had a personal hand in the creation/editing of the
document which was pulled together yesterday.

We understand that this document could be changed following the meeting of the
FRTG scheduled to be held later today.

Our NOAA and USGS reps in the IASG are not included in today's FRTG meeting.  As
our IASG reps are provided more information, I will pass it along.

v/r
Frank

F. J. Sturm
NIC Interagency Staff
U.S. Coast Guard
francis.j.sturm@uscg.mil
Tel: 202-372-1734


-----Original Message-----
From: Mark.W.Miller@noaa.gov [mailto:Mark.W.Miller@noaa.gov]
Sent: Thursday, July 29, 2010 9:27 PM
To: Brown, Baron CDR; Gleason, Joseph CDR; Parsons, Roger; HQS-DG-LST-NIC-
HQ-INTERAGENCY-SOLUTIONS-GROUP
Subject: Where did the Oil Go?

This document, based on the Oil Budget tool, has just started clearance by the
White House. It is positioned as a public information document and contains

general description of the oil fate. If there are changes I will route the final
version.

Mark

| Oil Budget description 7 29 v 7.doc | Content-Description: | Oil Budget description 7 29 v 7.doc |
|---|---|---|
| | Content-Type: | application/msword |
| | Content-Encoding: | base64 |

# ATTACHMENT F

From: Williams, Ellen D
Sent: Tue May 18 15:42:28 2010
Subject: Meeting with Heads in Science in the US
Importance: Normal
Attachments: RE: meeting on scientific research on effects of oil in the ocean

<<...>>

LOCATION:      **Environmental Protection Agency, Ariel Rios Building**
**1200 Pennsylvania Ave., NW, Washington, DC**

**Use South entrance on 12th St. between Pennsylvania Ave. NW and**
**Constitution Ave. NW, 3rd floor, Green Room**

**From:** Miller, Jerry L.
 **Sent:** Tue May 18 20:44:41 2010
 **To:** Rainey, David I; Williams, Ellen D
 **Cc:** Moran, Kathryn; Abbott, Shere; Wells, Kent; Marcia K McNutt; Larson, Phillip P.; Andersen, Lauren E.; Carter, Sarah R.; Loschnigg, Johannes P.
 **Subject:** RE: meeting on scientific research on effects of oil in the ocean
 **Importance:** Normal
 **Attachments:** Invitation to BP reps.docx; OSTP_Science_Mtg_Agenda_5_19_2010.pdf; OSTP_Science_Mtg_Info_5_19_2010.pdf

Ms. Williams and Mr. Rainey,
   Please find the attached invitation, draft agenda, and informational flyer for tomorrow's meeting.

Best regards,
Jerry

Jerry L. Miller, PhD
Office of Science and Technology Policy
Executive Office of the President
Washington, DC 20502
Phone: +1 202 456 6137
Mobile: +1 202 288 7860
Email:   Jerry.L.Miller@ostp.eop.gov


**From:** Wells, Kent [mailto:kent.wells@se1.bp.com]
**Sent:** Tuesday, May 18, 2010 1:29 PM
 **To:** Marcia K McNutt; Miller, Jerry L.
 **Cc:** Moran, Kathryn; Abbott, Shere; Rainey, David I; Williams, Ellen D
 **Subject:** RE: meeting on scientific research on effects of oil in the ocean

Attending from BP will Ellen Williams, BP's Chief Scientist and Dave Rainey, VP of Exploration. Please communicate directly with them on Logistic, etc.  They are copied on this email.  Thanks

Kent Wells
281-366-3340


**From:** Marcia K McNutt [mailto:mcnutt@usgs.gov]
**Sent:** Tuesday, May 18, 2010 11:09 AM
 **To:** Miller, Jerry L.
 **Cc:** Moran, Kathryn; Wells, Kent; Shere Abbott

**Subject:** Re: meeting on scientific research on effects of oil in the ocean
Kent et al have been discussing David Rainey and BP's VP for Research. Kent can confirm.

I already passed on to Kent the approximate times for the meetings and venue.

Marcia

---

**From:** "Miller, Jerry L." [Jerry_L._Miller@ostp.eop.gov]
**Sent:** 05/18/2010 11:57 AM AST
**To:** Marcia McNutt
**Cc:** "Moran, Kathryn" <Kathryn_Moran@ostp.eop.gov>; <kent.wells@bp.com>; "Abbott, Shere" <Sherburne_B._Abbott@ostp.eop.gov>
**Subject:** RE: meeting on scientific research on effects of oil in the ocean

Marcia,
    Names of BP reps for tomorrow's meeting?  I want to give them as much lead time as possible. Copying Kent.
Jerry

Jerry L. Miller, PhD
Office of Science and Technology Policy
Executive Office of the President
Washington, DC 20502
Phone: +1 202 456 6137
Mobile: +1 202 288 7860
Email:   Jerry.L.Miller@ostp.eop.gov

**From:** Marcia K McNutt [mailto:mcnutt@usgs.gov]
**Sent:** Monday, May 17, 2010 11:31 PM
**To:** Miller, Jerry L.
**Subject:** Re: meeting on scientific research on effects of oil in the ocean

I will send you names in the am. Kent Wells (kent.wells@bp.com) was helping to find the right rep.

---

**From:** "Miller, Jerry L." [Jerry_L._Miller@ostp.eop.gov]
**Sent:** 05/17/2010 11:28 PM AST
**To:** Marcia McNutt
**Cc:** "Abbott, Shere" <Sherburne_B._Abbott@ostp.eop.gov>; "Moran, Kathryn" <Kathryn_Moran@ostp.eop.gov>
**Subject:** Re: meeting on scientific research on effects of oil in the ocean

Marcia,
 If you could help us identify the key invitees from BP, I would be very appreciative.

Jerry

JLM --- sent from my BlackBerry

# Scientific Research on the Effects and Fate of Oil in the Ocean



Wednesday, May 19th, 2010
0900 - 1230

Environmental Protection Agency Headquarters

1200 Pennsylvania Ave., N.W.
The "Green" Room
3rd Floor Ariel Rios Building

**The entrance to the building is shown at marker 'B' on the map below.**

**Directions from the Metros:**
Orange/Blue Lines: Federal Triangle Metro Stop is located across the street from the entrance

All Lines: Metro Center – walk 3.5 blocks south on 12th St.



The BP Deepwater Horizon oil spill is having a major impact on the Gulf of Mexico region – physically, ecologically, and economically. The Administration has responded by bringing the full force of its assets to respond to the oil spill.

The academic community has responded by contributing ideas, modifying existing science plans to assist in the study of the oil spill, offering equipment, and submitting proposals to NSF and NOAA to conduct oil spill and impacts related research. This meeting will begin to refine the short and long term oil spill research needs and identify the resources and assets within the academic community that can be mobilized and integrated into our national response and mitigation strategies.

# Summary Agenda

9:00 - 9:45 Scene Setting
  Administrator Jackson
  Secretary Salazar (invited)
  Dr. John Holdren
  Admiral Allen (invited)
  Dr. Marcia McNutt

9:45 - 12:15 Sessions
  Session 1: Research on fates
  Session 2: Research on effects
  Session 3: Research partnerships

12:15 - 12:30 Next Steps

## About OSTP

Established in 1976, OSTP is mandated to advise the President and others within the Executive Office of the President on the effects of science and technology on domestic and international affairs. OSTP also leads interagency efforts to develop and implement sound science and technology policies and budgets, and to work with the private sector, state and local governments, the science and higher education communities, and other nations toward this end. This meeting is being conducted under the auspices of the National Science and Technology Council.

## Contacts

Phil Larson 202-294-0200 plarson@ostp.eop.gov
Jerry Miller 202-288-7860 jmiller@ostp.eop.gov
Kate Moran 202-841-1566 kmoran@ostp.eop.gov

# Meeting Preparation

For academic institutions, please review the draft list of research needs and be prepared to discuss (1 or 2 slides are optional) your institution's interest and capabilities for addressing the broad questions related to the fate and effects of spilled oil over short and long time periods. Two separate sessions are organized on the needs for short and long term research. The first is focused on oil spill fate and the second on effects. Please self-select the session for making your short presentation that would best represent your institution's interests.

For Federal Agencies please review the research needs and be prepared to discuss, during the third session on the agenda, the following questions: What are your agency's top oil spill research priorities in both the short term and long term? What research questions of importance to your agency can best be answered by a partnership with universities? What are your agency's best mechanisms for partnering and are there roadblocks or challenges associated with these mechanisms?

# Short Term Research

· Quantifying oil, gas, and dispersant volumes
· Understanding subsea plumes
· 3D Model forecasting of oil and dispersants fates
· Immediate mid-water column ecosystem impacts, including seafood
· Understanding oil behavior and transport in space and time
· Conducting oil fingerprinting to identify oil sources
· Evaluating skimming, burning, and booming success/failure rates as input for research on new methods
· How will the hurricane season impact the fate of the oil?

# Long Term Research

· Dispersants and the marine ecosystem
· Tailoring the long term monitoring programs for the coastal zones
· Long term impacts on deepwater ecosystems and the best approaches for monitoring
· Bioremediation approaches to spill clean-up
· Development of new clean-up technologies
· How can we learn from natural seafloor leaks?

Dear Ms. Williams and Mr. Rainey:

As you are aware, the BP Deepwater Horizon oil spill is having a significant impact on the Gulf of Mexico region.  President Obama has responded with the full force of the Federal government's assets, and work is continuing around the clock.

The academic community has also been responding by contributing ideas, offering equipment, modifying existing research plans in order to assist in the study of the oil spill, and submitting proposals to NSF and NOAA to conduct oil spill and impacts-related research.

BP's response to the operational and S&T challenges is valued and, on behalf of the Office of Science and Technology Policy, I wish to invite you to attend a meeting of Federal agency and academic leaders on May 19.

In order to attend, please RSVP at your earliest convenience to Phil Larson via e-mail at plarson@ostp.eop.gov and include your **full name** to facilitate clearance into the meeting venue.

MEETING: **Scientific Research on the Effects & Fate of Oil in the Ocean**
DATE: **Wednesday, May 19th**
TIME: **9:00 a.m. to 12:30 p.m.**
LOCATION:  **Environmental Protection Agency, Ariel Rios Building**
**1200 Pennsylvania Ave., NW, Washington, DC**
**Use South entrance on 12th St. between Pennsylvania Ave. NW and**
**Constitution Ave. NW, 3rd floor, Green Room**

The meeting goals are to begin to define the short- and long-term research required to address the effects and fate of oil in Gulf waters and beyond and identify the resources and assets within the academic community that can be mobilized and integrated into our National response and mitigation strategies.

The short notice for this meeting reflects our keen interest in beginning this process now so that we can expediently bring our substantial National academic resources to bear on this important research problem.

You will be contacted with more information after your RSVP is received.

Sincerely,

John P. Holdren
Assistant to the President for Science and Technology
Director, White House Office of Science and Technology Policy

# ATTACHMENT G

**From:**   Burnett, Paul MST2
 **Sent:**   Sat Sep 18 04:01:31 2010
 **To:**  Richard.Crout@noaa.gov
 **Cc:** Jon Fajans;  johndkessler@GMAIL.COM;  valentine@geol.ucsb.edu;
Charles.H.Thompson@noaa.gov;  Jon.Hare@noaa.gov;  Lisiecki, Simon;  Collinson, Peter;
Sam.Walker@noaa.gov;      Janet.Baran@noaa.gov;      Benjamin.Shorr@noaa.gov;
Data.SMU@noaa.gov;  rahul.vadgana@bp.com;  Pelz, Oliver X;  jrpayne@sbcglobal.net;
Chief.SMU@noaa.gov;   OPS.SMU@noaa.gov;   weber@ccom.unh.edu;   CO.Pisces@noaa.gov;
Daniel.Hahn@noaa.gov;  _OMAO MOA OPS Pisces;  Yong Kim;  Debbie French McCay;
weberzach@ymail.com;      bparks@integral-corp.com;      glawson@conshelf.com;
dmyers@conshelf.com;    tstevens@conshelf.com;    djlee@entrix.com;    wgraeber@entrix.com;
lriege@entrix.com;   tthompson@entrix.com;   rmulcahy@conshelf.com;    jharney@entrix.com;
dmetzler@entrix.com;   dhanzlick@roverenv.com;  jlevesque@conshelf.com;   Xiubin.Qi@csiro.au;
Parkin, Anthony (BP MC252);  t.villareal@mail.utexas.edu;  montoya@gatech.edu;  Kate Moran;
Jerry Miller - OSTP;  cdavis@whoi.edu;  kurtz.jan@epa.gov;  taylormr83@hotmail.com;  Pisegna,
Daniel [FGUS];  Malinda Sutor;  Harvey Seim;  NOAA.MC252.NRDACoord@noaa.gov;  Molly
Baringer;  osat.smu@noaa.gov;  Oscar Garcia;  Dave Browning;  Shawn Hinz;  Shari Vaughan;
richardb@metoc.co.uk
 **Subject:**   Mission Guidance for Saturday 18 September 2010
 **Importance:**   Normal
 **Attachments:**    Mission Guidance 18 Sep 2010.doc

Greetings All,

Attached are the notes from today's mission guidance call and the  associated data and ship plots.

Please let me know if there were any omissions.

Thank you,
Paul Burnett

Greetings : Guidance for Friday, 17 September 2010

Paul Burnett is leading the guidance calls and providing Mission Guidance with input from the OSAT, JAG, Entrix, BP, and CSA. If there are errors below, please contact me.

The updated depiction of the DO sag / depression (interpreted as an impact of the subsurface dispersed oil) for the past seven days is shown below as figure 1. Thirteen stations have been added since yesterday. The Aquatracka map is provided in Fig. 2. No mission guidance ship tracks are provided for tomorrow.

**Notes from the 3pm CDT call** :

No vessels called in.

**No contact:** *Walton Smith, HOS Davis, Pisces, Bunny Bordelon, Jack Fitz, Ocean Veritas, Meg Skansi, Pisces, Rachel Bordelon, Ryan Chouest, Oceanus, Pelican, Specialty Diver, Wes Bordelon , Arctic, Wes Bordelon, and Cape Hatteras.*

**Specific Ship Guidance** :
None.



Fig. 1. Updated DO sag/depression map covering the last seven days.



Fig. 2. Updated cumulative Aquatracka fluorometry chart.

# ATTACHMENT H

002258

**Subject:** Re: FRTT
**From:** Bill Lehr <bill.lehr@noaa.gov>
**Date:** Mon, 17 May 2010 13:29:27 -0700
**To:** "Moran, Kathryn" <Kathryn_Moran@ostp.eop.gov>
**CC:** "Moore, David M." <David.Moore@mms.gov>, "Cesnik, Catherine M" <Catherine_Cesnik@ios.doi.gov>, austin.j.gould@uscg.mil, Richard.R.Wingrove@noaa.gov, Edward.D.Cokelet@noaa.gov, "Miller, Jerry L." <Jerry_L._Miller@ostp.eop.gov>

To bring everyone up to speed:

Original calculation of 5000 bbl/ day leak rate was designed simply as a working number to ascertain the level of response effort.

BP Background information:

From verbal discussions with BP:

Fluid in reservoir has GOR (cu ft to bbl) of 3000
Available footage is not representative of average flow( We have asked BP repeatedly for longer video)
Pipe has an interior dimension of 19.5 inches with a 6 in interior pipe that contains no flow.
Pipe mouth is damaged and constrained (70% area)

Attached are some of the oil data we have collected from BP

Academics

We have been in contact with Prof. Wereley of Purdue and Prof Savas of UC Berkeley, who have both produced rather large estimates of leakage. I have recieved permission to provide these Professors and other fluid dynamics experts with the information given to us by BP.

We have done preliminary arrangements with Prof. Riley of the University of Washington to reproduce the method of Prof. Wereley

We have begun contacting the Petroleum Engineering Departments of UT and LSU to verify the translation of fluid leakage into surface bbl of oil.

Surface Oil

Visual estimates of surface volume using the Bonn Agreement method are very inaccurate. I will provide a copy of my paper discussing this for those who are interested. The AVIRIS team should have an estimate soon, based upon more rigorous analysis.

Oil Fate

Standard oil weathering models such as ADIOS2 and the SINTEF model are not reliable for this spill due to its subsurface release from great depths and the application of dispersants

Re: FRTT

002259

at the source. Actual field measurements are preferrable for this situation.



On 5/17/10 11:33 AM, Moran, Kathryn wrote:

> Dear David,
>
> For the USACE modeling, I suggest asking Captain Gould at the USCG R&D Center for an expert in modeling.  Modeling of the oil particles as a buoyant jet that evolves into a buoyant plume would also provide input to the other two teams, so we may want to integrate with these two groups on this aspect.
>
> The university colleague I mentioned was Peter Cornillon at the University of Rhode Island who operates a PIV laboratory and could assist with particle imagery velocimetry (PIV) interpretations of video.  I can contact him, if you'd like.
>
> There was a mention of WHOI scientists this morning.  I've since learned that James Witkop was correct this morning about WHOI's potential to measure flow rates. WHOI proposed to use an instrument that was used on the black smokers for measuring flow rates.  My understanding is that the WHOI team proposed this to BP, but because of limited ROV time, it was not possible to use their instrument.  I am trying to contact them to get more information.  A direct measurement to calibrate these other estimating methods would be ideal.
>
> Is there a protocol for engaging the academic community?  For example, are there funds available to contract them or are we asking them to volunteer?
>
> Kate
>
> ---
>
> **From:** Moore, David M. [mailto:David.Moore@mms.gov]
> **Sent:** Monday, May 17, 2010 1:29 PM
> **To:** Cesnik, Catherine M; austin.j.gould@uscg.mil; Richard.R.Wingrove@NOAA.GOV; Bill.Lehr@NOAA.GOV; Edward.D.Cokelet@NOAA.GOV; Moran, Kathryn
> **Cc:** Robert.G.Pond@uscg.mil; Wingrove, Richard CDR; Mark W Miller; William Conner; Absher, David; Prendergast, Michael; Herbst, Lars; Saucier, Michael; Buffington, Sharon; Slitor, Doug; McCammon, Joanne
> **Subject:** FRTT
> **Importance:** High
>
> All,
>
> This is my take on where we are at now and where we need to be at the end of the day. Any feedback on identification of subject matter experts on fluid flow modeling is appreciated.  We will need to identify staff for the team to come up with the numbers and then a group to peer review.  Again, no industry input other than from BP supplying raw data from the well under review.
>
> Please feel free to edit this at will. Need any and all ideas on how we will reach a consensus on numbers that we will ultimately have to defend.  (Apologies for typos, grammar, etc.)
>
> Thanks,
>
> David



**Objective**
Develop a consensus on the flow rates from well MC252 #001 at multiple time periods following the loss of the Deepwater Horizon. (I envision a number in barrels per day beginning at t=0, immediately after the rig went down, and then at 24-hour intervals thereafter.)

**Methodology**
Obtain all data that is available on the reservoir, wellbore, leak points, plume, and surface observations. Where firm data is unavailable, develop best estimates. Run state of the art models to calculate flow rates and compare results.

**Organization**

Lead - MMS - Don McClay (Gulf of Mexico Region)

NOAA - Pending: Bill Lehr; Ned Cokelet
USCG - Captain Gould to provide name of confirmed volunteer from Academy
USCG - Bob Pond providing name of volunteer to assist in getting data from BP
USCOE - Kate Moran to provide name of confirmed volunteer
DOE - Call for volunteer out
DOT - Working with Richard Lolick to identify DOT SME at Volpe Center at Cambridge.
USGS - Catherine Cesnick to provide name of confirmed volunteer.

National Laboratories - Catherine Cesnick to provide name of confirmed volunteer

Tulsa University - Dr Mike Volk and Dr. Scot Graham (I will confirm their interest)
Texas A&M - Call for volunteer out

SINTEF - Mark Reed (I will confirm his interest. He is in Norway so may be a delay in response.)

**Data Requirements**

Reservoir (MMS has access to some core data, PVT analysis (underway by lab), logs.
Wellbore - Will need to obtain survey data from BP
Plume images for periods throughout spill event as pressure have fluctuated 4,000 psi since beginning of event. (Will need to request data from BP)
BOP flowing pressure readings - Will need to request data from BP.
Arial observation analysis prior to application of dispersants and use of mechanical recovery
Flow measurement on Enterprise separator since initiation of RITT
Time line of subsea dispersant injection.

**Modeling Requirements**
Reservoir (Needed to understand reservoir flow characteristics and to feed nodal analysis. MMS can do with Merlin software.)
Nodal Analysis (Needed to understand frictional forces in wellbore. MMS has Avalon software).
Particle Velocity
Acoustic Modeling?
Others?

**Schedule**
Need to fast track effort but should not do so at the expense of the generation of credible estimates. Note that we will be pushed to get this out quickly.

Re: FRTT                                          002261



─Oildata.pdf─────────────────────────────────────────────────

**Subject: Fw: Macondo flowrate**
**From: Steve Lehmann <Steve.Lehmann@noaa.gov>**
**Date: Fri, 14 May 2010 11:12:44 -0400**
**To: "'bill.lehr@noaa.gov'" <Bill.Lehr@noaa.gov>, "'Debbie.Payton@noaa.gov'"**
**<Debbie.Payton@noaa.gov>**

Blackberry message from:
Steve Lehmann, NOAA-SSC
Please excuse typos

────────────────────────────────────────────────────

**From:** Herbst, Lars <Lars.Herbst@mms.gov>
**To:** steve.lehmann@noaa.gov <steve.lehmann@noaa.gov>
**Sent:** Fri May 14 11:10:17 2010
**Subject:** Macondo flowrate

Details- bottom of stack pressure is 3800 psi and top of stack pressure is 2650 psi. I have staff looking at these pressures and the 5000 BOPD estimate. The 2650 psi would actually be only 400 psi over the seawater hydrostatic pressure. If you look at the 400 psi and the 5000 barrel per day, we should be able to estimate choke size and determine if the choke size makes sense. The difficulty is that this is multiphase flow.



Lars Herbst
────────────────────────────────
Sent from my BlackBerry Wireless Handheld

                    | **Oildata.pdf** |


─Fw_ Macondo flowrate.eml──────────────────────────────────────

                | **Fw_ Macondo flowrate.eml** |

# ATTACHMENT I

003380

## Timothy Bagley

| | |
|---|---|
| **From:** | Zichal, Heather R. ████████████████ |
| **Sent:** | Saturday, July 31, 2010 3:42 PM |
| **To:** | Rod.OConnor@hq.doe.gov; Smith, Sean; David_Hayes@ios.doi.gov |
| **Cc:** | jane.lubchenco@noaa.gov; ████████████ |
| **Subject:** | Re: Flow Rate results |

Thanks, Rod. We'll get the press release finalized, circulated to small group for clearance (doi has pen) and sort through timing on that and press call.

On the oil budget, seems like in addition to sorting out last remaining issues w epa, we need to decide whether we're ok w the 60k bpd estimate or if we want to rerun the tool with another number. Jane - what is your thought on that?

**From:** OConnor, Rod <Rod.OConnor@hq.doe.gov>
**To:** Zichal, Heather R.; Smith, Sean; Hayes, David <David_Hayes@ios.doi.gov>
**Cc:** jane.lubchenco@noaa.gov <jane.lubchenco@noaa.gov> ███████████████████
**Sent:** Sat Jul 31 15:26:37 2010
**Subject:** Flow Rate results

Below is the draft conclusion reached by the flow rate teams today. McNutt, Chu and Hunter led the discussion and all of the independent teams participated...

Conclusion
"Total flow ~4.9 million barrels with an estimated uncertainty of ± 10%. That makes the daily range equivalent to 53,000-62,000 barrels over 84 days (with declining flow over those days).

We will continue to refine this estimate and its uncertainty."