## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO on APRIL 20, 2010 | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | |
| ALL CASES | * | JUDGE BARBIER |
| | * | |
| | * | MAG. JUDGE SHUSHAN |
| ************************************** | | |

### PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
### SUPERVISION OVER THE BP INTERIM CLAIMS PROCESS

Plaintiffs, through undersigned counsel, respectfully supplement their briefing in response to the Court's Order and Reasons of February 2, 2010,[1] requesting the parties' respective positions regarding BP's compliance, or lack thereof, with the requirements of the Oil Pollution Act of 1990 ("OPA"):

**MAY IT PLEASE THE COURT:**

As more fully outlined below, Plaintiffs respectfully submit that BP is in violation of OPA's requirement to establish an interim claim process and to pay interim claims; that BP, through its Gulf Coast Claims Facility ("GCCF"), has violated of the spirit of the Court's Order seeking to protect plaintiffs and putative class members from confusion and misunderstanding; and that the releases obtained from plaintiffs and other putative class members are invalid and should not be enforced.  Plaintiffs, therefore, respectfully ask the Court to appoint a Special

---

[1] *See generally,* MOTION TO SUPERVISE *EX PARTE* COMMUNICATIONS BETWEEN BP DEFENDANTS AND PUTATIVE CLASSMEMBERS [Doc 912] (Dec. 21, 2010); ORDER AND REASONS [Doc 1098] (Feb. 2, 2011); *and,* PLAINTIFFS' SUPPLEMENTAL MEMORANDUM CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA [Doc 1318] (Feb. 18, 2011).

Master, pursuant to Rule 53(a)(1)(A) and/or (C) of the Federal Rules of Civil Procedure, to **(i)** assure compliance with OPA; **(ii)** ensure accurate and appropriate communication with claimants; **(iii)** make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements; and **(iv)** make findings and/or recommendations regarding the scope and/or efficacy of releases.

## I.     THE GCCF'S ABJECT FAILURE TO PAY INTERIM CLAIMS VIOLATES OPA.

On February 2, 2011, over five months ago, this Court entered an Order identifying the GCCF as the entity with the responsibility to ensure that the mandates of OPA are implemented. (Rec. Doc. 1098).  The GCCF's own June 2011 statistics reveal that the GCCF has paid fewer than 16% of interim claims filed, compared to the 97% payment rate of "quick" final claims accompanied by releases.[2]  This telling statistic demonstrates that the GCCF continues to follow the BP litigation mandate of settling as many claims as possible to reduce the size of the putative class.

By amending OPA in 1996 to establish the mandatory interim claim requirement, Congress sought to ensure that victims were paid immediately after an oil spill without losing rights to pursue long-term claims.  Like any law, the goals of OPA can only be accomplished if polluters adhere to it—or they are forced to comply.  The complaints of Gulf Coast residents today are identical to those of Rhode Island's spill victims in 1996, which led to the creation of the interim claims process.  BP's coercive tactics to obtain final releases from putative class members filing claims with the GCCF are also similar to those tactics revealed to Congress in

---

[2] Gulf Coast Claims Facility, Status Report at 1 (May 14, 2011), attached as <u>Exhibit A</u>.

1996 when it considered amending OPA.  BP's strategy to obtain releases has permeated its interactions with putative class members from the outset.  The abject failure of the interim claims process administered by the GCCF is the latest, and most troubling, in a long line of actions by BP designed to "close the books" on the oil spill.  In dire need of relief, Plaintiffs turn to this Court, with its broad authority to protect putative class members and "to ensure that the mandates of OPA are implemented."  [Doc 1098, at 7]

### A.    BP's Early Tactics to Withhold Interim Payments to Obtain Releases.

Barely one week after the April 20, 2010, oil spill, BP convinced hundreds of unsuspecting and confused Gulf Coast fishermen to sign releases of all claims against BP.  The releases were extracted either as a condition of working in the Vessel of Opportunity (VoO) program or in exchange for a $5,000 one-time payment.[3]  Judge Engelhardt of this Court ruled at an emergency hearing that BP's release was overbroad.[4]  After public backlash and official rebuke,[5] BP subsequently entered into a Consent Judgment formally invalidating the release.[6]

### B.    BP's Coercive Tactics Continue with the GCCF.

Following the failure of these early efforts, BP changed only its tactics for obtaining releases, not its overall strategy.  After struggling with its own oil spill claims process for over 3 months, BP established the GCCF in August 2010 to administer the OPA-mandated interim claim process.  The first phase, the Emergency Advance Payment program, was marred by several significant problems, which are well documented in the previously filed Plaintiffs'

---

[3] See George Talbot, BP Told to Stop Circulating Settlement Agreements With Coastal Alabamians, Mobile Press-Register, May 2, 2010, at http://blog.al.com/live/2010/05/bp_told_to_stop_circulating_se.html; Stephanie Condon, BP Told to Stop Distributing Oil Spill Settlement Agreements, CBSNews.com, May. 3, 2010, at http://www.cbsnews.com/8301-503544_162-20003978-503544.html, attached as Exhibit B.
[4] Id.
[5] Id.
[6] See Consent Judgment, Rec. Doc. 6 in Barisich v. BP, EDLA Case No. 2:10-cv-01316, attached as Exhibit C.

Motion to Supervise. [Doc 912-1]  Notably, when the GCCF ended the Emergency Advance Payment program in November 2010, it left two-thirds of the claims unresolved.[7] Indeed, BP's failure to pay interim claims under its Emergency Advance Payment program had the effect of stranding the majority of putative class members without the type of immediate relief Congress required polluters to provide under OPA.  As of Thanksgiving of 2010, putative class members continued to go without interim relief.

In mid-December 2010, the GCCF unveiled the next phase of BP's claims program—a "quick pay" program offering $5,000 per individual and $25,000 per business.  Again, rather than provide the required interim relief mandated by OPA, the GCCF's protocol made it clear that BP intended to require putative class members to make a final claim in exchange for a full release of their rights and an assignment of those rights to BP.[8] For months, this "quick pay" program was for all intents and purposes the only mechanism to obtain compensation for oil spill losses.  For example, as of late January 2011, the GCCF paid <u>one</u> interim claim out of the 42,155 interim claims submitted.  In contrast, by that same date, the GCCF had paid 81,933 quick pay claims out of the 85,741 quick pay claims submitted.[9] A seafood business owner in Mobile, Alabama, who took a quick pay during this time articulated the crux of the problem: "It was kind of like a pressure signing.  If you're hungry and someone offers you something to eat, it's hard to say no."[10]

---

[7] <u>See</u> Jonathan L. Ramseur, Cong. Research Serv., <u>Liability and Compensation Issues Raised by the 2010 Gulf Oil Spill</u> at 16, (Mar. 11, 2011), attached as <u>Exhibit D</u>.
[8] <u>See</u> <u>Feinberg Releases 'Emergency Protocol' For BP Oil Spill Claims (With Complete Protocol)</u>, Mobile Press-Register, Aug. 20, 2010, at http://blog.al.com/live/2010/08/feinberg_releases_emergency_pr.html, attached as <u>Exhibit E</u>.
[9] <u>See</u> Rec. Doc. 1085 at 5-6.
[10] <u>See</u> <u>Gulf Oil Spill: Tracking the Claims – Struggles Persist for Those Seeking Compensation</u>, Mobile Press-Register, Feb. 6, 2011, http://blog.al.com/live/2011/02/gulf_oil_spill_tracking_the_cl_6.html, attached as <u>Exhibit F</u>.

**C.** **The GCCF Continues to Withhold Interim Payments in Attempts to Secure Quick Pay Releases.**

The GCCF allegedly instituted an interim claims process in February 2011, yet it has failed to provide interim relief to putative class members.  In practice, there is still no interim claim process in place. The GCCF continues to manipulate putative class members making interim claims and drives them to sign full releases in exchange for relief that should not come at such a cost.  BP, through the GCCF, is using the interim claim procedure to leverage releases in direct contravention of OPA's mandate.

Statistics appearing on the GCCF website reveal the disparity between the payment of interim claims and the payment of quick pay claims.  As of late May 2011, GCCF has failed to pay 86.4% of interim claimants.  Conversely, as of that same date, GCCF has failed to pay only 3% of the quick pay claims.[11]

While the statistics clearly indicate that the GCCF is paying quick pay claims and not paying interim claims, they do not offer a clear understanding of the type and quality of relief actually flowing to claimants.[12]  For example, the statistics do not distinguish whether interim claimants actually received interim relief, or some other type of payment—for example, a quick payment.  It is also unclear if the number of claims paid includes any or all of the 3,658 claimants who accepted final offers.  Even the 13.6% of interim claimants who have been paid may have, in fact, been paid through the quick pay option.  The GCCF Status Report ambiguously reports "claimants paid" not "interim claims paid."[13]  The dollar amount of interim claims paid to individuals averages $6,441.84, barely more than the $5,000 individual quick

---

[11] See Gulf Coast Claims Facility, Status Report at 1 (May 14, 2011), Exh. A.
[12] Id.

settlements being offered by the GCCF.[14]   Similarly, businesses receiving interim relief have been paid on average $25,249.39, not even $250 more than the quick business settlement of $25,000.[15]

The GCCF's figures suggest that many payments made on interim claims were, in fact, quick pay equivalents made in exchange for the claimant signing a release and assignment of rights.  Regardless of the GCCF's confusing representations on how many interim claims have been paid, one thing is clear: the vast majority of interim claimants have received no payment whatsoever.  More significantly, only 184,091 of 511,171 claimants, that is to say 36% of all claimants, have received any payment at all from the GCCF at any time.[16]

While the failure to pay interim claims, as noted above, helps explain why so many victims are in dire straits and easily manipulated, the "payment" statistics illustrate only part of the problem.  The GCCF reported as of May 31, 2011 that 88% of claims "have been processed,"[17] thus leading Mr. Feinberg to declare victory and "wind down" the GCCF sooner than expected.[18]  This statistic, however, says nothing about what it means to "process" a claim or how these claims have actually been handled (or mishandled).

First, the statistic relating to total number of claims "processed" includes quick pay claims, which require no review by the GCCF[19] and are often not the type of claim the claimant initially submitted (but rather offered in response to an interim claim).  This suggests a

---

[13] Id.
[14] Id.
[15] Id.
[16] Id.
[17] Gulf Coast Claims Facility, Status Report at 1 (June 1, 2011), attached as Exhibit G.
[18] BP Spill Fund Winding Down After $4 Billion Paid Out: Report, Reuters, May 29, 2011, http://uk.reuters.com/article/2011/05/29/business-us-bp-fund-idUKTRE74S18I20110529, attached as Exhibit H.
[19] Ramseur, supra note 6 at 16, Exh. D.

fundamental failure by the GCCF to process interim claims.  Second, the manner in which claims are processed contributes to delay, which exacerbates not only economic hardship but also confusion and frustration, driving more and more residents and businesses already on the brink of economic collapse to throw in the towel and give up the rights that Congress sought to protect. The GCCF seemingly presents the option to victims of obtaining interim relief, yet in actuality, the documentation requirements are confusing and daunting—especially when compared to the ease of obtaining a quick payment, which BP offers without any documentation requirements in exchange for a release.

Moreover, the GCCF fuels the growing uncertainty and frustration surrounding the requirements for presentment under OPA by alleging documentation deficiencies in interim claims.  This continued uncertainty leads many putative class members to wonder whether they have preserved their ability to sue BP in court.  This most fundamental aspect of OPA presentment, inextricably linked with both the GCCF and this Court's MDL, cannot remain a mystery or a moving target.

Putative class members' experience with the GCCF's ongoing claims methodology and procedure has borne out the concerns of Plaintiffs earlier expressed in their initial moving papers regarding confusion in the process that leads to abuse of victims who seek the interim relief that OPA guarantees.  "Processed" putative class members who actually receive a substantive response, as opposed to a "Deficiency Notice," get a "Determination Letter" along with attachments that outline the GCCF's calculation of loss.  Whether or not a claimant has filed a "full final claim," an inordinate amount of the GCCF's response concerns the "full final" payment calculation.  The "full final" calculation represents the most that the claimant can

expect from the GCCF if it satisfies significant documentation requirements,[20] and generally, the calculation predicts a minimal chance of being compensated in the future.  The resulting message is clear: the only way to get compensation from the GCCF is to take the "quick pay" and sign the complete release and assignment of all rights to BP.

The accounts of individual, putative class members illustrate the widespread problems suggested by the statistics and support the need for judicial intervention to prevent "potential coercion and potentially unknowing waivers of rights."[21]  The Affidavit submitted in support of this supplemental Memorandum, for example, from Bui Tinh, a representative of Queen Mary of Vietnam Community Development Corporation ("CDC"), a social service organization helping members of affected communities to file claims, describes how the burdensome and unrealistic requirements for interim claim documentation set up certain failure that is then used by the GCCF to manipulate putative class members into accepting quick payments and signing releases.[22]   The CDC Affidavit further recounts how the GCCF "processes" claims by misapplying its own methodology to arrive at the quick pay or nothing alternative.[23]   The Affidavit of the CDC exposes the subtle scare tactics employed by the GCCF that lead putative class members to accept quick payments out of fear and based on the belief that they will never

---

[20] See Gulf Coast Claims Facility, GCCF Document Requirements,
http:www.gulfcoastclaimsfacility.com/requirements.pdf, attached as Exhibit I.
[21] The accounts of individual, putative class members illustrate the widespread problems suggested by the statistics and support the need for judicial intervention to prevent "potential coercion and potentially unknowing waivers of rights." Sorrentino v. ASN Roosevelt Center LLC, 584 F.Supp. 2d 529,532 (E.D.N.Y. 2008) quoting Ralph Oldsmobile, Inc. v. General Motors Corp., 2001 WL 1035132 at *2 (S.D.N.Y. 2001) ("Findings of potential coercion and potentially unknowing waivers of rights" suffice to require court supervision, correction, and enforcement.).
[22] See, for example, the Affidavit of Tinh Bui at ¶ 10, describing the confusing and burdensome documentation requirements imposed on claimants as representative of the experience of hundreds of claimants assisted by the MQVN Community Development Corporation, attached as Exhibit J.
[23] Id. ¶ 7 (stating that the GCCF's erroneous methodology led to gross underestimations of damages).

get a better offer.[24]   These examples indicate the systemic nature of the problem and reinforce Plaintiffs need for judicial relief.  These accounts shed light on exactly what the GCCF means when it reports that 88% of the claims "have been "processed."

> **D.    Defects in the GCCF Review Process Cause Additional Hardships for Putative Class Members.**

The experiences of claimants not only evidence the tactics employed by the GCCF to obtain releases for BP, but they also expose defects in the GCCF's review process.  In one case, the CDC avers that the GCCF's assumptions about income operated to reduce an oyster shucker's calculated 2010 losses by almost 50%.[25]   That amount is then halved again, based on the Tunnel Report's speculation about the longevity of environmental impacts,[26] yielding a full final loss amount, which is the equivalent of nine months of 2009 income.  Under the GCCF's methodology, the claimant's full final offer—the total amount he can ever expect from the GCCF—is $0.

Grace Scire, the Gulf Coast Regional Director of Boat People S.O.S. (BPSOS), a non-profit organization helping Asian-Americans in Louisiana, Mississippi, and Alabama to navigate the GCCF and OPA claims submission process, corroborates "the desperation and confusion created by the GCCF's handling of the claims submitted by the Vietnamese and Southeast Asian Community."   She confirms that several "individuals have accepted final payments in the amount of $5,000 because they could not wait any longer and were desperate for some income to offset their losses."   Ms. Scire, who has personally been helping hundreds of putative class

---

[24] Id. ¶ 5 (stating that claimants believe they have no other option than to accept the quick pay).
[25] Id. ¶ 7.
[26] For a discussion of the myriad flaws in the Tunnel Report underlying the GCCF's methodology, see Plaintiffs' Supplemental Memorandum Concerning BP's Failure to Comply with the Mandates of OPA (Rec. Doc. # 1061 at III.B.)

members, confirms that "there has not been a single offer of interim payment made by the GCCF to any claimant who has come to BPSOS."[27]

### E.  These and Other Systemic Problems Violate the Spirit of the Court's February 2, 2011 Order.

In addition to the GCCF's own statistics, noted above, sworn affidavits of organizations and institutions collectively representing hundreds of putative class members, together with several media reports, demonstrate the increasing severity and breadth of the GCCF's failed interim claims process:

- The President of the Louisiana Oysterman's Association confirmed that BP/GCCF "has a pattern of requiring endless documentation, many times asking for the same materials over and over again as well as not paying interim claims for our members [thus] forcing many of the members of the Association to have to accept the quick pay option or starve because the GCCF refuses to pay their interim claims."[28]

- Wayne Ciko, the owner of the Billet Bay Historical Society, whose property BP significantly contaminated with oil from the April 20, 2010 spill, has waited more than 90 days for a response to his interim claims.  The damages to remediate the property are estimated to be in excess of $750,000. GCCF asked him to send the same documents he previously sent in on several occasions.  In the meantime, GCCF offered him the quick pay option.[29]

- Oystermen in lower Plaquemines are reportedly accepting $5,000 quick payments and signing releases because they have not received interim payments and cannot wait any longer for relief.[30]

- Alabama Attorney General Luther Strange stated during an interview in March 2011 that the GCCF's payment of claims "has been too slow [and] the Gulf Coast Claims Facility has dragged its feet until victims are desperate to settle for anything."[31]

---

[27] Affidavit of Grace Scire, Gulf Coast Regional Director of Boat People S.O.S. (BPSOS), attached as Exhibit K.
[28] Affidavit of Byron Encalade, President, Louisiana Oysterman's Association, attached as Exhibit L.
[29] Affidavit of Wayne Ciko, Billet Bay Historical Society, LLC, attached as Exhibit M.
[30] Susan Buchanan, Oyster Growers Say Post-Spill Assistance Is Inadequate, Huffington Post, Apr. 25, 2011, at http://www.huffingtonpost.com/susan- buchanan/oyster-growers-say-postsp_b_853469.html, attached as Exhibit N.
[31] Katherine Sayre, Alabama Attorney General Luther Strange Urges BP Claims Czar to "Quit Dragging Your Feet", Mobile Press-Register, Mar. 21, 2011, attached as Exhibit O.

- For Florida putative class members, a news outlet reported that "the final and interim payments have been slow" since the end of the EAP program. "Take away the 'quick payments,' and less than 5 percent of Florida business claims and 15 percent of its overall claims filed since the end of the emergency process have been paid."[32]

- Ryan Lambert, a Louisiana fishing guide, told CNN that "[i]f you don't agree to this [quick pay] amount you start a terrible process – constant delays, requests for more documentation, with no communications from BP. Most people can't wait any longer to pay off their bills." He has received only 10% of his million-dollar losses and believed that the claims process "is pressing business owners to the ropes in the hope that we'll become desperate enough to accept the company's 'quick claim' $25,000 settlement offers."[33]

The affidavits and materials accompanying this Memorandum all indicate the same systemic problems. Cumulatively the statistics, the individual illustrations, and the representative affidavits demonstrate that since February 2011, the GCCF is strategically and systematically forcing putative class members to accept quick payments with accompanying releases because they are offered no other viable option. It is not limited to a few mistakes or egregious examples. BP has established a claims process with the primary function of convincing putative class members that the only compensation available is a minimal set amount that comes with a full release attached. The delay in responding to interim claims, the near-complete failure to pay interim claims, and the skewed final payment calculation delivers the message to over 112,000 putative class members: the only way to ever get any more compensation is to take the quick payment amount and sign a release.

---

[32] Travis Pillow, Oil Spill Claims Numbers: Payments Still Slow, The American Independent, Apr. 19, 2011, attached as Exhibit P.

[33] Ryan Lambert, BP Defaulting on Debt to People of the Gulf, Special to CNN Opinion, Apr. 19, 2011, available at http://articles.cnn.com/2011-04-19/opinion/lambert.bp.oil.spill.compensation_1_bp-blowout-oil-spill-catastrophic-spill?_s=PM:OPINION, attached as Exhibit Q.

## II.     OPA REQUIRES BP TO PAY INTERIM CLAIMS.

BP and its claims agent, the GCCF, have challenged this Court's authority to monitor and if necessary ensure compliance with OPA's mandates related to the claims process. BP contends: "OPA imposes very limited, purely procedural requirements. It requires only the existence of some process whereby claims are presented to the responsible party...In short, OPA does not prescribe how a responsible party must implement the required claims 'procedure.'"[34] Not surprisingly, Kenneth Feinberg and the GCCF echo BP's argument: "With respect to the issues on which the Court has directed further briefing – the processing of claims, methods for evaluating them, and releases - OPA *has no mandates*."[35]

BP's and GCCF's position that BP can lawfully establish any interim claim procedure it wants, regardless of how ineffective at compensating short term losses, regardless of how coercive in securing full releases, is incorrect and should not be countenanced by this Court. The responsible party establishes the procedure, no doubt, but the procedure has to work as intended by OPA in order to comply with OPA. When enacting OPA, in response to the environmental tragedy wrought by the grounding of the *Exxon Valdez* in Prince William Sound, Congress intended to enact, and in fact did pass, a law that would quickly and fully compensate victims and place the costs of an oil spill on the polluter.  See Rice v. Harken Exploration Co., 250 F.3d 264, 266 (5th Cir. 2001) (stating that the goals of OPA are "to streamline federal law and 'provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry'") (citing Senate Report No. 101-94, reprinted in 1990 U.S.C.C.A.N. 772, 723)(excerpts attached as Exhibit R).

---

[34] BP's Supp. Mem. Re: OPA and GCCF [Doc. 1330] at p.5.
[35] Kenneth R. Feinberg Amicus Curiae Brief [Doc. 1332-2] at p.8 (emphasis in original).

Congress did not intend, however, and OPA does not provide, a process by which BP can limit a putative class member's right to obtain complete compensation by withholding payment subject to a full and final release. The process BP has established is antithetical to OPA's mandate. The GCCF's own statistics convey the reality that it is not paying interim claims and the numbers reveal just how little BP is paying to secure full and final releases of claims, with full subrogation rights, and with no concern for the full compensation of those affected.

OPA unambiguously establishes the rule that a responsible party must pay all amounts to which a claimant is entitled.  OPA § 1005(b), 33 U.S.C. § 2705(b).  As previously briefed to the Court [Doc. 1318, at pp.3-7], the requirement that a responsible party make continuing payment of interim claims for damages without obtaining a release for more than it paid appears throughout OPA; it is an integral part of its goal of ensuring full compensation for putative class members.

In 1996, six years after Congress enacted OPA, the *North Cape* oil spill off the coast of Rhode Island exposed the need to protect victims from the financial hardship created by long term spill impacts.  In the aftermath of the *North Cape* oil spill, which resulted in lengthy and extensive fisheries closures and the decimation of the lobster fishery, desperate victims with no other options released all legal rights in exchange for needed short-term compensation. Congress amended OPA in direct response to this polluter-created duress by adding the interim claims provisions.

Testimony offered in support of the 1996 OPA amendments reveals the fragility of victims and the methods of abuse.  For example, the President of the Rhode Island Lobstermen's Association testified that the polluter was using OPA to pay off claims at minimal rates and to effectively discourage putative class members from seeking legitimate, long-term claims for

damages.  He further testified that the polluter was also using OPA as a tool to coerce releases from putative class members by waving "a few dollars in front of people to force them to agree to limitations on their rights."[36] He also expressed concern that the polluter was using OPA to "set up road blocks that prevent putative class members from obtaining full recovery for their losses," in contravention of the purposes of the Act.  The same coercive tactics to obtain final releases being employed by BP today were squarely before Congress when it was considering amending OPA.  Congress designed the interim claim amendments to redress the problem.  The interim claim procedure mandated by OPA must function to avoid these problems, not exacerbate them as is currently occurring.

Congress specifically considered arguments against the proposed amendment to OPA to create a mandatory interim claims process.  Insurers complained that the interim process would create too much uncertainty for insurers by making "virtually every claims payment interim" and instead expressed a preference for a final payment and release process that would allow them to "close the books on a spill."[37] Congress flatly rejected the argument and enacted the interim provisions as proposed. Congress also considered the suggestion that interim payments and the procedures governing them should be discretionary and that the Responsible Party was voluntarily being more efficient and generous than anyone had a right to expect.[38] Congress rejected that approach as inadequate.  Indeed, Congress refused to retreat from the mandatory

---

[36] Prepared Testimony of Bob Smith, President, RILA, Before the Senate Environment and Public Works Committee Re: The Rhode Island Oil Spill and Implementation of the OPA 90 (excerpts), attached as Exhibit S *en globo*.
[37] Prepared Testimony of Richard H. Hobbie, III, President Water Quality Insurance Syndicate on Behalf of the American Institute of Marine Underwriters Before the Senate Environment and Public Works Committee Re: S.1730, The Oil Spill Prevention and Response Improvement Act (excerpts), Exhibit S.
[38] Id.

nature of interim claims, even as it relates to claims paid from federal monies in the Oil Spill Liability Trust Fund (Trust Fund).

The United States Coast Guard-administered Trust Fund and the implementing regulations are instructive on the issue of releases and lend further support to the argument that interim claims must be paid and any release should be narrow in scope. The Coast Guard does not require a claimant to release the responsible party, or others, from any and all damages, known or unknown, 33 C.F.R. § 136.115. Under OPA, it cannot. The Coast Guard only obtains an automatic release for a compensated claim, just as OPA provides.

III. **THE MANNER IN WHICH THE GCCF IS REFUSING TO PAY INTERIM CLAIMS THREATENS BOTH THE RIGHTS OF PUTATIVE CLASS MEMBERS AND THE AUTHORITY OF THIS COURT AND DISTORTS OPA'S PRESENTMENT REQUIREMENT.**

The current manner in which BP's interim claim process is being handled by the GCCF has created unnecessary uncertainty and confusion that adversely affects the rights of putative class members and litigants, but also the authority of this Court to manage this litigation. Because OPA's presentation requirement is both a condition precedent to later legal challenges, as well as a mechanism intended to promote resolution of claims for damages and to facilitate immediate payment of interim claims suffered by victims of oil spills, Plaintiffs respectfully maintain that the conditions for meeting this requirement should be simple, straightforward, and obvious. Allowing the presentment requirement to become increasingly more complicated and mysterious cuts against the clear definition of the term "claim"—"a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." OPA § 1001; 33 U.S.C. § 2701. It also does violence to the remedial nature of the statute. To prevent continued abuses of the process, Plaintiffs request that the Court appoint a monitor or Special

Master to oversee and/or supervise the interim claims process to halt the ongoing coercion and impairment of rights by BP and the GCCF.

Under the plain terms of the Act, the "presentment" requirement is satisfied when a written request for a sum certain for covered damages is made to the responsible party. Presentment must inform the responsible party "of the nature and extent of the damages alleged and of the amount of monetary damages claimed." Johnson v. Colonial Pipeline Co., 830 F. Supp. 309, 311 (E.D. Va. 1993). The responsible party must publish the procedures by which a victim may present a claim within 15 days after designation as such.  OPA § 1014(b); 33 U.S.C. § 2714(b).   However, the responsible party is not given the authority to define what "presentment" means for purposes of OPA.

BP's unpredictable, abstruse procedures have effectively created a moving target that no claimant stands a fair chance of hitting.  Judicial intervention at this stage to clarify presentment is appropriate and well within the Court's authority under 28 U.S.C. §1407 and Federal Rule of Civil Procedure 23.[39]  Any writing by a claimant submitted to BP and/or the GCCF under any phase of the various claims process, that sets out a "sum certain" (whether interim or final) and a simple, reasonable description of the damages claimed, should be deemed to satisfy the definition of "claim" and thus presentment under OPA.

---

[39] *See also*, 33 U.S.C. §2717(b) (federal district courts "shall have original exclusive jurisdiction over all controversies arising under this Act").  The plaintiffs' requests for a declaration of legal rights and obligations under OPA are "controversies" between Plaintiffs and BP under the Act which are separate and distinct from a substantive claim for a sum certain of damages or removal costs from BP.

Additionally, the GCCF's handling of interim claims threatens putative class members' rights, and has intruded into the province of this Court to determine liability and allocation of fault and ensure that BP complies with the mandates of OPA.   The GCCF's practice of requesting documents that do not exist and submitting calculations that misrepresent documents that have been produced are being used as tools to force putative class members to accept final payments and sign releases.

Courts have created the rule that these relationships deserve the Court's heightened attention and that communications and the exchange of documents can and should be supervised by the district court.  See, e.g., Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1197 (11th Cir. 1995); Jones v. Jeld-Wen, Inc., 250 F.R.D. 554, 561 (S.D. Fla. 2008); Hampton Harwarde, Inc. v. Cotter & Co., 156 F.R.D. 630, 631-32 (N.D. Tex. 1994).   Rule 23(d)(1) protects the members of a proposed class against coercion and mis-information.   See, e.g., In re Currency Conversion Fee Antitrust Litigation, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (stating that the district court's authority to regulate communications under Rule 23(d) "is not limited to communications that actually mislead or otherwise threaten to create confusion, but extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class"); Keystone Tobacco Co., Inc v. U.S. Tobacco Co., 238 F.Supp.2d 151, 154 (D.D.C. 2002) ("[T]he Court rejects defendants' position that it has no authority to limit communications between litigants and putative class members prior to class certification.").   "Rule 23(d)(1) augments and informs this Court's case management powers," and "may be combined with an order under Rule 16." Fed.R.Civ.P. 23(d)(3).

This court may exercise its Rule 16/Rule 23(d) authority at any time, including during the pre-certification stage.  MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal Judicial Center 2004), §21.12.  This Court is vested with the authority to protect putative class members against "settlement offers that are potentially overreaching or coercive."  Sorrentino v. ASN Roosevelt Center LLC, 584 F.Supp. 2d 529,530 (E.D.N.Y. 2008).  This power applies "even before a class is certified." Sorrentino, 584 F. Supp. 2d at 532, quoting Ralph Oldsmobile, Inc. v. General Motors Corp., 2001 WL 1035132 at *2 (S.D.N.Y. 2001). "Findings of potential coercion and potentially unknowing waivers of rights" suffice to require court supervision, correction, and enforcement.  Id.

A Rule 23(d)(1) order is an exercise of the Court's case management authority.  It is not a Rule 65 injunction.  Kleiner, supra.  Thus, courts have held that a specific showing of abuse is not needed for a court to exercise authority; indeed, the goal of Rule 23(d)(1) orders is to prevent confusion, concern or abuse before it happens, by recognizing and regulating the situations in which the risk of such incursions into class members' rights can arise, before such rights are lost.  See, e.g., Abdallah v. Coca-Cola Co., 186 F.R.D. 672, 678 (N.D. Ga. 1999) ("Coca-Cola has not given the Court any reason to suspect that it will attempt to mislead its employees and coerce them into non-participation in this case. But simple reality suggests the danger of coercion is real and justifies the imposition of limitations on Coca-Cola's communications with potential class members").

OPA does not mention, contemplate, or provide any authority for the use of a release of litigation rights during the OPA-presentment stage.   OPA does not provide any mechanism to resolve (with a release or otherwise) punitive damage claims, maritime claims, medical

monitoring or personal injury claims. The GCCF's motivation to use the OPA-presentment requirement as a tool to avoid litigation by extracting releases is unquestioningly a BP directive. As a BP directive, the release should be clear to a layperson, contain necessary safeguards, be expressly limited to OPA claims against BP, and not infringe upon the Court's authority to supervise and manage this litigation and the putative class. As such, all releases entered into by unrepresented putative class members should be retroactively voided, or at a minimum, the Court should suspend the effectiveness of any releases obtained from putative class members by the GCCF for the benefit of BP and other defendants until such time as the validity of the releases can be judicially determined.

## IV.    CONCLUSION AND RELIEF REQUESTED.

This Court has already recognized that it has the responsibility to ensure that the mandates of OPA are implemented. BP has failed to comply with the letter and spirit of OPA, a law designed to provide an interim claims process focused on paying short-term damages to putative class members without requiring them to waive their rights pending full compensation. Instead, BP through the GCCF continues to make things as difficult as possible for the victims to receive interim payments. Desperate people do desperate things, and BP and the GCCF have been able to extract releases via the quick pay option from those who could no longer afford to wait. GCCF's release-encumbered, low dollar, so-called "quick pay" payments outnumber OPA-prescribed interim payments by nearly 10-to-1. GCCF's own numbers bear this out: as of May 31, 2011, only 13,085 putative class members throughout the entire Gulf Coast have received interim payments compared to 114,482 who took quick pays and signed overbroad releases.

Plaintiffs therefore respectfully request the Court to appoint a Special Master to supervise the BP / GCCF claims process in order to: **(i)** assure compliance with OPA; **(ii)** ensure accurate and appropriate communication with claimants; **(iii)** make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements; and **(iv)** make findings and/or recommendations regarding the scope and/or efficacy of releases.

This 25<u>th</u> day of <u>July</u>, <u>2011</u>.


Respectfully submitted,


    /s/   Stephen J. Herman             /s/ James Parkerson Roy

**Stephen J. Herman**, La. Bar No. 23129       **James Parkerson Roy**, La. Bar No. 11511
**Herman Herman Katz & Cotlar LLP**       **Domengeaux Wright Roy & Edwards LLC**
820 O'Keefe Avenue                556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113           Lafayette, Louisiana 70501
Telephone: (504) 581-4892            Telephone: (337) 233-3033
Fax No. (504) 569-6024             Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com           E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel*             *Plaintiffs Liaison Counsel*


### PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS,<br>MITCHELL, ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office:  (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com<br><br>Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office:  (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY  10003<br>Office:  (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com<br><br>Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN,<br>PORTIS & MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office:  (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail: rhon.jones@beasleyallen.com |

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

**SOREN E. GISLESON**
**JULIA A. LeMENSE**
**CLAY GARSIDE**
**K. LUAN TRAN**
**DARRIEL McCORVEY**
**KIM EVERS**
**AARON AHLQUIST**

*On Brief.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Brief will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and will be filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 25th day of July, 2011.

/s/  James Parkerson Roy and Stephen J. Herman