

# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

| All Claimants | No. of Claimants |
|---|---|
| **Total All Claimants** *(This is a unique count that includes all Emergency Advance Payment Claimants)* | **511,178** |
| 1. Individual | 407,754 |
| 2. Business | 103,424 |
| *Claimants Represented by Counsel: 35,278* | |

| Claimant Review Status | No. of Claimants |
|---|---|
| **Interim and Final Claimants** *(A Claimant can be in only one category below.)* | **293,087** |
| **Reviewed** | **260,893** |
| 1. Final Payment Issued | 132,884 |
| a. Quick Payment | 112,197 |
| b. Full Review | 20,687 |
| 2. Final Release Accepted Pending Payment | 544 |
| 3. Final Offer Made | 16,826 |
| With Interim Payment (5,107 out of these 16,826 Final Offers) | |
| Final Offer Accepted (3,658 out of these 16,826 Final Offers) | |
| 4. Other Claim Determinations: | 110,639 |
| a. Determination Letters (No Loss) | 6,608 |
| b. Withdrawal Requested | 464 |
| c. Claimants Notified Additional Information Required | 45,579 |
| d. Claimant Denied | 57,988 |
| **Under Review** | **32,662** |
| 1. Phase II | 32,194 |
| 2. EAP Unresolved / Under Review (Claims Subject to Liens, Audit Holds, etc.) | 468 |
| **EAP Claimants Resolved** *(Many EAP Claimants have refiled a claim in Phase II - Interim and Final Stage)* | **447,881** |

| Paid Claimants | Paid Claimants | Total Amount Paid |
|---|---|---|
| **Total Unique Claimants** | **184,091** | **$ 4,080,576,527.41** |
| 1. Quick Pay / Full Review / Interim Payment | 143,478 | $ 1,498,246,642.23 |
| *a. Individual* | *112,279* | *$ 653,878,854.24* |
| *b. Business* | *31,199* | *$ 844,367,787.99* |
| 2. Emergency Advanced Payment (EAP) | 169,127 | $ 2,582,329,885.18 |
| *a. Individual* | *122,331* | *$ 1,033,635,545.80* |
| *b. Business* | *46,796* | *$ 1,548,694,339.38* |
| Separate Fund for Real Estate Brokers and Agents | | $ 60,222,089.75 |
| | **Total Paid:** | **$ 4,140,798,617.16** |

| Quick Payments | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| **Total Quick Payments** | **115,689** | **113,812** | **112,197** | **$ 1,077,675,000.00** |
| 1. Individual | 88,723 | 87,387 | 86,235 | $ 431,435,000.00 |
| 2. Business | 26,966 | 26,425 | 25,962 | $ 646,240,000.00 |

| Interim Payments | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| **Total Interim Payments** | **77,533** | **61,420** | **10,587** | **$ 115,162,202.66** |
| 1. Individual | 52,355 | 46,583 | 8,090 | $ 52,114,477.56 |
| 2. Business | 25,178 | 14,837 | 2,497 | $ 63,047,725.10 |

| Full Review Payments | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| **Total Full Review Payments** | **108,090** | **93,613** | **20,694** | **$ 305,409,439.57** |
| 1. Individual | 86,907 | 77,784 | 17,954 | $ 170,329,376.68 |
| 2. Business | 21,183 | 15,829 | 2,740 | $ 135,080,062.89 |

| Final Payment Offers *(Inclusive of Offers with Release Accepted and Final Payment Issued)* | Offers Made | Amount Offered | Offers Accepted | Amount Accepted |
|---|---|---|---|---|
| **Total Final Offers** | **43,049** | **$ 700,082,883.31** | **24,415** | **$ 366,281,824.27** |
| 1. Final Offers: Individual | 34,283 | $ 363,303,622.42 | 21,576 | $ 222,190,706.43 |
| 2. Final Offers: Business | 8,766 | $ 336,779,260.89 | 2,839 | $ 144,091,117.84 |

EXHIBIT A



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Claimant Submissions
*(Quick Pay, Interim and Full Review Claimants only)*

| All Submitted and Paid Claimants | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| 1. Final: Quick Pay | 115,689 | 113,812 | 112,197 | $ 1,077,675,000.00 |
| 2. Final: Full Review *(net of Claimants with Quick Payment or Interim Submissions)* | 108,090 | 93,613 | 20,694 | $ 305,409,439.57 |
| 3. Interim Payment *(net of Claimants with Quick Payment Submissions)* | 77,533 | 61,420 | 10,587 | $ 115,162,202.66 |
| **Total** | **301,312** | **268,845** | **143,478** | **$ 1,498,246,642.23** |

| Submitted and Paid Claimants - Individual | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| 1. Final: Quick Pay | 88,723 | 87,387 | 86,235 | $ 431,435,000.00 |
| 2. Final: Full Review *(net of Claimants with Quick Payment or Interim Submissions)* | 86,907 | 77,784 | 17,954 | $ 170,329,376.68 |
| 3. Interim Payment *(net of Claimants with Quick Payment Submissions)* | 52,355 | 46,583 | 8,090 | $ 52,114,477.56 |
| **Sub-Total** | **227,985** | **211,754** | **112,279** | **$ 653,878,854.24** |

| Submitted and Paid Claimants - Business | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| 1. Final: Quick Pay | 26,966 | 26,425 | 25,962 | $ 646,240,000.00 |
| 2. Final: Full Review *(net of Claimants with Quick Payment or Interim Submissions)* | 21,183 | 15,829 | 2,740 | $ 135,080,062.89 |
| 3. Interim Payment *(net of Claimants with Quick Payment Submissions)* | 25,178 | 14,837 | 2,497 | $ 63,047,725.10 |
| **Sub-Total** | **73,327** | **57,091** | **31,199** | **$ 844,367,787.99** |

### All Claimants with Filed Claims



### Amount Paid to All Claimants





# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Individual Claims by Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Amount | No. of Claims | Amount Paid |
|---|---|---|
| 1. $0.01 - $5,000.00 | 152,902 | $ 645,683,470.50 |
| 2. $5,000.01 - $10,000.00 | 43,493 | $ 325,446,601.17 |
| 3. $10,000.01 - $25,000.00 | 32,420 | $ 496,232,902.60 |
| 4. $25,000.01 - $100,000.00 | 5,772 | $ 210,820,677.10 |
| 5. $100,000.01 - $500,000.00 | 72 | $ 9,330,748.67 |
| 6. Over $500,000.00 | 0 | $ - |
| **Total** | **234,659** | **$ 1,687,514,400.04** |



Individual Claims Paid by Value Range



Individual Amount Paid by Value Range



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

## Business Claims by Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Amount | No. of Claims | Amount Paid |
|---|---|---|
| 1. $0.01 - $5,000.00 | 12,462 | $ 34,502,446.66 |
| 2. $5,000.01 - $10,000.00 | 9,394 | $ 70,444,985.40 |
| 3. $10,000.01 - $25,000.00 | 39,789 | $ 887,872,693.67 |
| 4. $25,000.01 - $100,000.00 | 13,472 | $ 670,988,584.13 |
| 5. $100,000.01 - $500,000.00 | 2,888 | $ 516,872,183.25 |
| 6. Over $500,000.00 | 131 | $ 212,381,234.26 |
| **Total** | **78,136** | **$ 2,393,062,127.37** |



**Business Claims Paid by Value Range**



**Business Amount Paid by Value Range**



# Gulf Coast Claims Facility
## www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Claims by Category and Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Category and Amount | No. of Claims | Amount Paid |
|---|---|---|
| **1. Removal and Clean Up Costs** | | |
| a. $0.01 - $5,000.00 | 50 | $ 118,332.05 |
| b. $5,000.01 - $10,000.00 | 13 | $ 100,369.88 |
| c. $10,000.01 - $25,000.00 | 19 | $ 396,990.18 |
| d. $25,000.01 - $100,000.00 | 3 | $ 133,700.00 |
| e. $100,000.01 - $500,000.00 | 3 | $ 516,063.08 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **88** | **$ 1,265,455.19** |
| **2. Real or Personal Property** | | |
| a. $0.01 - $5,000.00 | 161 | $ 516,033.15 |
| b. $5,000.01 - $10,000.00 | 36 | $ 253,920.00 |
| c. $10,000.01 - $25,000.00 | 47 | $ 868,654.04 |
| d. $25,000.01 - $100,000.00 | 13 | $ 500,963.38 |
| e. $100,000.01 - $500,000.00 | 2 | $ 292,871.98 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **259** | **$ 2,432,442.55** |
| **3. Lost Earnings or Profits** | | |
| a. $0.01 - $5,000.00 | 165,057 | $ 679,325,402.59 |
| b. $5,000.01 - $10,000.00 | 52,833 | $ 395,500,592.99 |
| c. $10,000.01 - $25,000.00 | 72,132 | $ 1,382,650,258.17 |
| d. $25,000.01 - $100,000.00 | 19,225 | $ 881,036,704.82 |
| e. $100,000.01 - $500,000.00 | 2,954 | $ 525,213,492.92 |
| f. Over $500,000.00 | 131 | $ 212,381,234.26 |
| **Sub-Total** | **312,332** | **$ 4,076,107,685.75** |



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Claims by Category and Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Category and Amount | No. of Claims | Amount Paid |
|---|---|---|
| **4. Loss of Subsistence Use of Natural Resources** | | |
| a. $0.01 - $5,000.00 | 24 | $ 100,563.99 |
| b. $5,000.01 - $10,000.00 | 3 | $ 21,860.84 |
| c. $10,000.01 - $25,000.00 | 6 | $ 119,183.52 |
| d. $25,000.01 - $100,000.00 | 3 | $ 137,893.03 |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **36** | **$ 379,501.38** |
| **5. Physical Injury / Death** | | |
| a. $0.01 - $5,000.00 | 72 | $ 125,585.38 |
| b. $5,000.01 - $10,000.00 | 2 | $ 14,842.86 |
| c. $10,000.01 - $25,000.00 | 5 | $ 70,510.36 |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 1 | $ 180,503.94 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **80** | **$ 391,442.54** |
| **6. Other Claims** | | |
| a. $0.01 - $5,000.00 | 0 | $ - |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **0** | **$ -** |
| **Total** | **312,795** | **$ 4,080,576,527.41** |



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Individual Lost Earnings or Profits Claims Paid by Industry
*(Claimants may have more than one Claim Category)*

| Paid Claims By Industry | No. of Claims | Amount Paid |
|---|---|---|
| Fishing | 10,808 | $ 133,703,683.33 |
| Food, Beverage and Lodging | 123,405 | $ 797,769,862.74 |
| Multiple Industry / Business Types | 8,644 | $ 80,058,145.00 |
| No Industry Designation | 821 | $ 6,665,340.74 |
| Rental Property(ies) | 3,561 | $ 27,193,243.12 |
| Retail, Sales and Service | 75,313 | $ 543,378,682.92 |
| Seafood Processing and Distribution | 7,821 | $ 69,616,037.90 |
| Tourism and Recreation | 3,984 | $ 27,571,350.42 |
| **Total** | **234,357** | **$ 1,685,956,346.17** |



### # of Individual Claims Paid by Industry

Retail, Sales and Service 32.14%
Rental Property(ies) 1.52%
No Industry Designation 0.35%
Multiple Industry / Business Types 3.69%
Food, Beverage and Lodging 52.66%
Seafood Processing and Distribution 3.34%
Tourism and Recreation 1.70%
Fishing 4.61%

### Amount of Individual Claims Paid by Industry

Retail, Sales and Service 32.23%
Rental Property(ies) 1.61%
No Industry Designation 0.40%
Multiple Industry / Business Types 4.75%
Food, Beverage and Lodging 47.32%
Seafood Processing and Distribution 4.13%
Tourism and Recreation 1.64%
Fishing 7.93%



# Gulf Coast Claims Facility
### www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Business Lost Earnings or Profits Claims Paid by Industry
*(Claimants may have more than one Claim Category)*

| Paid Claims By Industry | No. of Claims | Amount Paid |
|---|---|---|
| Fishing | 15,086 | $ 507,969,405.93 |
| Food, Beverage and Lodging | 7,200 | $ 350,763,226.87 |
| Multiple Industry / Business Types | 790 | $ 21,444,890.82 |
| No Industry Designation | 2,063 | $ 67,203,273.75 |
| Rental Property(ies) | 20,927 | $ 392,221,472.43 |
| Retail, Sales and Service | 29,181 | $ 856,028,585.33 |
| Seafood Processing and Distribution | 1,311 | $ 135,284,882.01 |
| Tourism and Recreation | 1,417 | $ 59,235,602.44 |
| **Total** | **77,975** | **$ 2,390,151,339.58** |





# Gulf Coast Claims Facility
### www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of May 14, 2011)*

### Claims by State of Residence
*(Claimants may have more than one Claim Type)*

| Claim State of Residence | Submitted Claims | Paid Claims | Amount Paid |
|---|---|---|---|
| Louisiana | 336,530 | 105,553 | $ 1,285,409,194.79 |
| Florida | 285,494 | 118,983 | $ 1,466,238,227.66 |
| Alabama | 123,250 | 45,429 | $ 668,516,373.08 |
| Mississippi | 91,075 | 26,498 | $ 332,016,699.81 |
| Texas | 16,480 | 4,180 | $ 143,564,303.59 |
| Others | 32,650 | 12,152 | $ 184,831,728.48 |
| **Total** | **885,479** | **312,795** | **$ 4,080,576,527.41** |





### Claims by State of Loss
*(Claimants may have more than one Claim Type)*

| Claim State of Loss | Submitted Claims | Paid Claims | Amount Paid |
|---|---|---|---|
| Louisiana | 224,857 | 106,104 | $ 1,318,845,130.71 |
| Florida | 240,566 | 126,864 | $ 1,577,835,069.57 |
| Alabama | 94,132 | 47,873 | $ 707,813,661.18 |
| Mississippi | 60,335 | 25,486 | $ 316,195,628.02 |
| Texas | 9,078 | 2,691 | $ 104,803,533.60 |
| Other State / Pending Location Verification | | 3,777 | $ 55,083,504.33 |
| **Total** | | **312,795** | **$ 4,080,576,527.41** |







Site Search | Search Local Business Listings

Brought to you by:


| Home | News | Weather | Sports | Entertainment | Travel | Interact | Jobs | Autos | Real Estate | Rentals | Classified Ads | Shop |

 **Top Stories**  **Video: 2011 Miss Alabama rehearsal**  **Idols Studdard, Hicks to perform tornado relief concert…** **Birmingham black bear gets checkup (video)**

Home > Breaking News from the Press-Register > Mississippi Press

# BP told to stop circulating settlement agreements with coastal Alabamians

Published: Sunday, May 02, 2010, 8:49 PM   Updated: Monday, May 03, 2010, 6:32 AM

 By **George Talbot**
 **Follow**

💬 **Comment** 95   **Share**
🐦 **Tweet** 0   ✉ **Email**
reddit ⬆ ⬇ 3 points   🖨 **Print**

Alabama Attorney General **Troy King** said tonight that he has told representatives of **BP Plc.** that they should stop circulating settlement agreements among coastal Alabamians.

The agreements, King said, essentially require that people give up the right to sue in exchange for payment of up to $5,000.

King said BP's efforts were particularly strong in Bayou La Batre.

The attorney general said he is prohibited from giving legal advice to private citizens, but added that "people need to proceed with caution and understand the ramifications before signing something like that.

"They should seek appropriate counsel to make sure their rights are protected," King said.

By the end of Sunday, BP aimed to sign up 500 fishing boats in Alabama, Mississippi and Florida to deploy boom.

BP had distributed a contract to fishermen it was hiring that waived their right to sue BP and required confidentiality and other items, sparking protests in Louisiana and elsewhere.

Darren Beaudo, a spokesman for BP, said the waiver requirement had been stripped out, and that ones already signed would not be enforced.

"BP will not enforce any waivers that have been signed in connection with this activity," he wrote in an e-mail.

But King said late Sunday that he was still concerned that people would lose their right to sue by accepting settlements from BP of up to $5,000, as envisioned by the claim process BP has set up.

The attorney general said he is prohibited from giving legal advice to private citizens, but added that "people need to proceed with caution and understand the ramifications before signing something like that."

"To the best of my knowledge BP did not ask residents of Alabama to waive their legal rights in


✚ View full size
Huntsville Times photo

Attorney General Troy King has asked BP to cease circulating settlement agreements among south Alabamians.

Sponsored By:

TAMERON Honda

**More Breaking News from the Press-Register**

**Most Comments**   **Most Recent**

**Breaking News from the Press-Register** stories with the most comments in the last 7 days.

EXHIBIT B

the way it has been described," Beaudo said.

*(Updated at 8:48 p.m. with BP response.)*

**Related topics:** BP, Deepwater Horizon, Gulf of Mexico oil spill, Gulf of Mexico oil spill 2010, lawsuit, oil spill, Troy King

**Sponsored Links**

**Dream With The Principal**
Get tips, tools & inspiring stories to help you dream for your future.
DreamAgain.com

**FreeCreditScore.com™**
Checking Your Own Credit Won't Affect Your Score & It's Free!
www.FreeCreditScore.com/Official

**FreeCreditReport.com®**
See Your Credit Report in Seconds! Easy to Read and Viewable Online.
www.FreeCreditReport.com/Official

**Share this story**       **Story tools**   ✉ **Email**   🖶 **Print**

---

**More stories in Breaking News from the Press-Register**

‹  **Previous story**
Baldwin County 13 extension to open Wednesday

**Next story**
Fleet Blessing boat parade winners announced  ›

---

**95** Comments   📶 **Feed**                    💬 **Post a comment**

**View:** Oldest first | Newest first

1 | 2 | 3 | 4 | 5 | 6 | 7                     **Next comments »**

 **AreYouListening**   May 02, 2010 at 6:24PM
👤 Follow

Money won't change this.

🗨 Reply   🗨 Post new                    ⊘ Inappropriate? Alert us.

 **bamarollon**   May 02, 2010 at 6:55PM
👤 Follow

This guy has come 180 degrees. What leadership and good advice. I am VERY impressed with him over the last couple of months. I am beginning to think he was being smeared by his foes.

🗨 Reply   🗨 Post new                    ⊘ Inappropriate? Alert us.

**jjinbhm**   May 02, 2010 at 9:20PM
👤 Follow

Oh Please...this guy is a putz. He is just hoping to place a dollar amount the state can recoup before the election cycles.

🗨 Reply   🗨 Post new                    ⊘ Inappropriate? Alert us.

 **cottonbayou2**   May 02, 2010 at 10:03PM
👤 Follow



**129**  Alfa to cut 73,000 insurance policies in Alabama after tornadoes (updated)

**74**  Man dead in Theodore after altercation with officers investigating apparent marijuana operation

**32**  Ladd-Peebles Stadium contract rejected by Mobile City Council

**23**  Elaborate marijuana operation uncovered in Theodore; man dead after struggle with police (video, photos)

**21**  Prichard pension crisis: Deal could leave current, former employees in the cold

**Most Active Users**   What's this?

Users with the most **al.com** comments in the last 7 days

**153**   tcarl

**121**   ausouthal

**112**   oldtimer1938

**96**   AUtuitionX2

**93**   Amon

**Users We Love**

**Regions Bank**
Even big corporations can be a User We Love on al.com!

**More Users We Love**

**Connect with al.com**
What's this?

   

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

GEORGE BARISICH, individually and on behalf of THE UNITED COMMERCIAL FISHERMAN'S ASSOCIATION, INC.

      **Plaintiff**

**Versus**

BP, P.L.C., BP EXPLORATION & PRODUCTION INC., and BP AMERICA PRODUCTION COMPANY

      **Defendants**

Magistrate: 2

Civil Action Number: 10-1316

Section: "N"

Jury Demand

## CONSENT JUDGMENT

Plaintiff George Barisich, individually and on behalf of the United Commercial Fisherman's Association, Inc. as President thereof, filed an Emergency Motion for Temporary Restraining Order ("Motion for TRO").

1. Plaintiff, together with Defendants BP Exploration & Production, Inc., and BP America Production Company (collectively "BP"), as well as Troy Wetzel, Extreme Fishing, LLC and the class of similarly situated individuals and entities Mr. Wetzel and Extreme Fishing, LLC seek to represent in matter No.10-01222 pending in this Court who intervened in Plaintiff's Motion for TRO (the "Wetzel Plaintiffs"), through their respective undersigned counsel, hereby consent to the following Consent Judgment ("Judgment") by amending the terms of the Master Vessel Charter Agreement that is the subject of the Motion for TRO (the "Agreement" or "CHARTER") as follows:

   a.     Article 13(I)(1) will be deleted in its entirety.

1

EXHIBIT C

b. Article 13(F) will be deleted in its entirety (but not deleting Article 13(G), which typographically is mistakenly a part of Article 13(F)).

c. Paragraph 5 of the Agreement Regarding Proprietary and Confidential Information attached as Exhibit C to the Agreement will be deleted in its entirety.

d. Article 22 will be deleted in its entirety.

e. Article 13(A) of the Agreement will be deleted except as follows: "VESSEL OWNER confirms that it will maintain in place any insurance policies it is carrying as of the date immediately prior to entering into this CHARTER or that it routinely carries for its usual operations."

2. The foregoing provisions deleted from the Agreement are agreed to be null and void, and BP agrees to abide by the foregoing changes to the Agreement with respect to any person or entity, including, but not limited to, the Plaintiff herein, all members of the United Commercial Fisherman's Association, Inc. (the "Association"), the Wetzel Plaintiffs, and other fishermen, shrimpers or oystermen, who voluntarily participate in the clean-up and mitigation operation following the April 20, 2010 DEEPWATER HORIZON explosion (collectively defined herein as "VOLUNTEERS"), whether those VOLUNTEERS agreed to those provisions pursuant to a document identical to or substantially similar to the Agreement or some other document containing those provisions, regardless of the state in which the document is entered or executed and regardless of the domicile or residence of the VOLUNTEER. However, this Judgment does not apply to commercial enterprises that own or operate multiple vessels, which enterprises were in the business of oilfield support or oilfield clean up or mitigation before April 20, 2010. Further, this Judgment does not apply to vessels contracted for purposes other than mitigation or clean up of oil

2

from the DEEPWATER HORIZON explosion in the Gulf of Mexico, nor does it apply to any contracts entered into before April 20, 2010.

3. With respect to the clean-up efforts following the explosion of the DEEPWATER HORIZON, BP stipulates that it will not request or require that any VOLUNTEERS sign any agreement, charter or other document containing the foregoing deleted or modified provisions, except as allowed by Paragraph 2 above.

4. With regard to all VOLUNTEERS that agreed to the deleted or modified foregoing provisions before the date of this Judgment, whether that person or entity agreed to those provisions pursuant to a document identical to or substantially similar to the Agreement or some other document containing those provisions, BP shall undertake to inform those persons and entities that the foregoing provisions have been deleted or modified and declared null and void.

5. Plaintiff, individually and on behalf of the Association as President thereof, and the Wetzel Plaintiffs reserve all rights under applicable law to challenge on any basis available under that law the remaining provisions contained in the Agreement or any other document BP presents for signature to Plaintiff, the Wetzel Plaintiffs, and/or other VOLUNTEER seeking to assist in the clean-up efforts ongoing as a consequence of the April 20, 2010 explosion on the DEEPWATER HORIZON. However, it is specifically agreed by Plaintiff and the Wetzel Plaintiffs that nothing contained herein or as a result of this Judgment shall be construed as a judicial admission to or stipulation of Plaintiff's or the Wetzel Plaintiffs' ability to represent a class of persons or entities in a legal representative capacity.

6.    It is specifically agreed that nothing contained either herein or in the Agreement or any identical or substantially similar document shall be construed as an agreement to terms inconsistent with any insurance coverage held by Plaintiff, the Wetzel Plaintiffs, or any of the other VOLUNTEERS.

7.    The Court retains jurisdiction of this matter in the event that further proceedings hereunder become necessary.

8.    BP further agrees to assume all reasonable costs, expenses and legal fees incurred by Plaintiff, individually and on behalf of the Association, and the Wetzel Plaintiffs in this action up to the date that this Consent Judgment is entered..

9.    By entering into this Consent Judgment, BP is not making an appearance in this, or any other action, and expressly reserves all rights and defenses to same.

New Orleans, Louisiana, this ___ day of May, 2010.

_____
UNITED STATES DISTRICT COURT JUDGE

*Signatures of counsel appear on next page*

4

Respectfully submitted by:

*Counsel for Plaintiff, George Barisich, individually and on behalf of the United Commercial Fisherman's Association, Inc. as President thereof*

**JAMES M. GARNER (# 19589)**
**TIMOTHY B. FRANCIS (# 14973)**
**JOSHUA S. FORCE (# 21975)**
**SHARONDA R. WILLIAMS (# 28809)**
**EMMA ELIZABETH ANTIN DASCHBACH (#27358)**
Sher Garner Cahill Richter Klein & Hilbert, L.L.C.
909 Poydras Street, 28th Floor
New Orleans, Louisiana 70112-1033
Telephone:     (504) 299-2100
Facsimile:      (504) 299-2300


**GLADSTONE N. JONES, III (# 22221)**
**EBERHARD D. GARRISON (# 22058)**
**KEVIN E. HUDDELL (# 26930)**
**H.S. BARTLETT III (# 26795)**
**JACQUELINE A. STUMP (# 31981)**
Jones, Swanson, Huddell & Garrison, L.L.C.
Pan-American Life Center
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Telephone:     (504) 523-2500
Facsimile:      (504) 523-2508


**STUART H. SMITH # 17805**
**MICHAEL G. STAG**
Smith Stag, L.L.C.
365 Canal Street, Suite 2850
New Orleans, LA 70130
Telephone:     (504) 593-9600
Facsimile:      (504) 593-9601

5

**VAL PATRICK EXNICIOS, ESQ.**
Liska, Exnicios & Nungesser
One Canal Place 22nd Floor
365 Canal Street, Ste. 2290
New Orleans, LA 70130
Telephone:     (504) 410-9611
Facsimile:     (504) 410-9937

*Counsel for Troy Wetzel, Extreme Fishing, LLC and the class of*
*similarly situated individuals and entities Mr. Wetzel and Extreme*
*Fishing, LLC seek to represent in matter No.10-01222 pending in*
*this Court*

**JONATHAN B. ANDRY**
The Andry Law Firm, LLC
610 Baronne Street
New Orleans, LA 70113
Telephone:     (504) 586-8899
Facsimile:     (504) 586-8933

**BOB F. WRIGHT**
**JAMES P. ROY**
Domengeaux, Wright Roy & Edwards
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, LA 70502-3668
Telephone:     (337) 233-3033
Facsimile:     (337) 233-2796

**PIERCE O'DONNELL**
**ROBERT PARTAIN**
O'Donnell & Associates PC
800 Wilshire Boulevard, Suite 500
Los Angeles, CA 90017
Telephone:     (213) 347-0290
Facsimile:     (213) 347-0298

**CALVIN C. FAYARD, JR.**
Fayard & Honeycutt
519 Florida Avenue, S.W.
Denham Springs, LA 70726

6

Telephone:     (225) 664-4193
Facsimile:      (225) 664-6925

**WILLIAM S. STRAIN**
William Strain & Associates
422 East Woodstone Court
Baton Rouge, LA 70808
Telephone:     (225) 939-0163
Facsimile:      (225) 767-8150


*Counsel for Defendants , B.P Exploration & Production, Inc. and*
*BP America Production Company*

**ANTONIO J. RODRÍGUEZ** (#11375)
**ALANSON T. CHENAULT, IV** (#20747)
**MAT M. GRAY, III** (#6264)
**NORMAN C. SULLIVAN, JR.** (#12754)
**H. JAKE RODRIGUEZ** (#27867)
Fowler Rodriguez Valdes-Fauli
400 Poydras St., 30th Floor
New Orleans, LA 70130
Telephone:     (504) 523-2600
Facsimile:      (504) 523-2705

7



Congressional
Research
Service

# Liability and Compensation Issues Raised by the 2010 Gulf Oil Spill

**Jonathan L. Ramseur**
Specialist in Environmental Policy

March 11, 2011

**Congressional Research Service**

7-5700

www.crs.gov

R41679

EXHIBIT D

# Summary

The 2010 *Deepwater Horizon* incident produced the largest oil spill that has occurred in U.S. waters, releasing more than 200 million gallons into the Gulf of Mexico. BP has estimated the combined oil spill costs—cleanup activities, natural resource and economic damages, potential Clean Water Act (CWA) penalties, and other obligations—will be approximately $41 billion.

The *Deepwater Horizon* oil spill raised many issues for policymakers, including the ability of the existing oil spill liability and compensation framework to respond to a catastrophic spill. This framework determines (1) who is responsible for paying for oil spill cleanup costs and the economic and natural resource damages from an oil spill; (2) how these costs and damages are defined (i.e., what is covered?); and (3) the degree to which, and conditions in which, the costs and damages are limited and/or shared by other parties, including general taxpayers.

The existing framework includes a combination of elements that distribute the costs of an oil spill between the responsible party (or parties) and the Oil Spill Liability Trust Fund (OSLTF), which is largely financed through a per-barrel tax on domestic and imported oil. Responsible parties are liable up to their liability caps (if applicable); the trust fund covers costs above liability limits up to a per-incident cap of $1 billion.

Policymakers may want to consider the magnitude of the *Deepwater Horizon* incident and the liability and compensation issues raised under a scenario in which BP had refused to finance response activities or establish a claims process to comply with the relevant OPA provisions. BP has either directly funded oil spill response operations or reimbursed the federal government for actions taken by various agencies. BP has paid damage claims well above its liability limit and outside the scope of its liable damages.

Although evidence indicates that the levels of current framework (liability limits and OSLTF) may be sufficient to address the more common mix of spills that have historically occurred, the current combination of liability limits and $1 billion per-incident OSLTF cap is not sufficient to withstand a spill with damages/costs that exceed a responsible party's liability limit by $1 billion. Even if the per-incident cap were increased, the current (and projected) level of funds in the OSLTF may not be sufficient to address costs from a catastrophic spill.

The options available to address these issues depend upon the overall objective of Congress. One objective—which has been expressed by many in and outside Congress—is to provide full restoration and timely compensation (i.e., through channels other than litigation) for the impacts from the spill, without directly burdening the general taxpayers. If this is the objective, Congress may consider some combination of (1) increasing the offshore facility liability limit and corresponding financial responsibility demonstration; (2) increasing the OSLTF per-incident cap; or (3) increasing the level of funds available in the OSLTF. In addition, policymakers may want to consider an industry-financed fund, akin to the nuclear power industry's fund, that could supplement or potentially replace the current system.

Another objective might be to maintain the existing system, which may be sufficient to address all but the most extreme scenarios. Catastrophic spills in U.S. waters have historically been rare. Some may argue that establishing a system that can withstand a catastrophic event would impose costs and yield consequences that would not justify the (expected) ability to address a catastrophic event.

# Contents

Introduction .......................................................................................................................... 1

Existing Liability and Compensation Framework ................................................................ 2

    Responsible Party ............................................................................................................ 2

    Liability .......................................................................................................................... 3

        Liability Limits ......................................................................................................... 5

        Financial Responsibility ........................................................................................... 6

    The Oil Spill Liability Trust Fund .................................................................................. 7

    Compensation or Claims Process .................................................................................... 8

Issues for Policymakers ....................................................................................................... 9

    Liability Limits ............................................................................................................. 10

    OSLTF Limitations ...................................................................................................... 11

        Per-Incident Cap ..................................................................................................... 11

        Level of Funding ..................................................................................................... 12

    Claims Process ............................................................................................................. 14

Potential Options for Policymakers ..................................................................................... 18

## Figures

Figure 1. Oil Spill Liability Trust Fund .............................................................................. 13

## Tables

Table 1. Deepwater Horizon Oil Spill Claims Data by State ............................................... 16

Table A-1. Evolution of the Scope of Oil Spill Liability ..................................................... 21

Table A-2. Evolution of Oil Spill Liability Limits .............................................................. 22

## Appendixes

Appendix. Liability Tables—Historical Perspectives .......................................................... 21

## Contacts

Author Contact Information ................................................................................................ 24

# Introduction

On April 20, 2010, the *Deepwater Horizon* oil drilling rig was nearing completion of BP's deepwater oil well when an uncontained release of hydrocarbons (oil and natural gas) caused explosions and fire, resulting in 11 crew member fatalities. The incident produced the largest oil spill that has occurred in U.S. waters, releasing more than 200 million gallons over approximately 84 days.[1] Although several companies were and are involved (to varying degrees) with the *Deepwater Horizon* incident, BP was (and continues to be) the most prominent private party in oil spill response and compensation activities. Thus, for the purpose of this report, BP is discussed as if it is the sole responsible party—a key term in the existing liability and compensation framework.[2]

The United States has not encountered a spill comparable to the 2010 Gulf spill since the 1989 *Exxon Valdez* in Prince William Sound, Alaska. The *Exxon Valdez* spill tallied approximately $2 billion in cleanup costs and $1 billion in natural resource damages in 1990 dollars. These combined figures equate to approximately $5 billion in today's dollars and do not include the wider array of claims for which responsible parties are now liable.[3]

The total costs of the 2010 Gulf spill are projected to dwarf those of the *Exxon Valdez*. In its 2010 financial statement, BP estimated the combined oil spill costs—cleanup, natural resource and economic damages, potential Clean Water Act (CWA) penalties, and other obligations—will be approximately $41 billion. This estimate includes payments made to date as well as projected future payments, such as claims. However, BP acknowledges the difficulty in estimating some costs and does not include these costs in its projection.[4] Therefore, this estimate is subject to considerable uncertainty.

The incident received considerable attention in 2010,[5] highlighting multiple policy matters regarding oil spills and their aftermath. An issue that has generated (and to some degree continues

---

[1] A portion (17%) of this oil did not enter the Gulf environment, but was directly recovered by BP. See, Federal Interagency Solutions Group, Oil Budget Calculator Science and Engineering Team, *Oil Budget Calculator: Deepwater Horizon-Technical Documentation*, November 2010.

[2] Transocean owned the *Deepwater Horizon* drilling rig. Three companies own the Macondo well: BP has a 65% share, Anadarko Petroleum Corporation has a 25% share, and MOEX Offshore has a 10 % share (National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling, Report to the President (hereinafter "Commission Report") January 2011).

[3] In addition, this figure does not include punitive damages. Punitive damage claims were litigated for more than 12 years, eventually reaching the U.S. Supreme Court in 2008 (*Exxon Shipping v. Baker*, 554 U.S. 471 (2008)). Plaintiffs were awarded approximately $500 million in punitive damages—substantially less than was originally awarded ($5 billion) by a U.S. district court in 1994. An additional $500 million in post-judgment interest on those damages was subsequently awarded.

[4] As stated by BP: "The total amounts that will ultimately be paid by BP in relation to all obligations relating to the incident are subject to significant uncertainty and the ultimate exposure and cost to BP will be dependent on many factors. Furthermore, the amount of claims that become payable by BP, the amount of fines ultimately levied on BP (including any determination of BP's negligence), the outcome of litigation, and any costs arising from any longer-term environmental consequences of the oil spill, will also impact upon the ultimate cost for BP." BP, Fourth quarter and full year 2010 financial statement, February 1, 2011, at http://www.bp.com/.

[5] In the 111th Congress, the House of Representatives conducted at least 33 hearings in 10 committees; the Senate conducted at least 30 hearings in 8 committees. Members introduced more than 150 legislative proposals that would address various topics related to the oil spill.

---

to generate) particular interest is the oil spill liability and compensation framework.[6] This framework, which is grounded in federal statute and regulations, determines the following:

1. who is responsible for paying for oil spill cleanup costs;

2. who is responsible for paying for economic and natural resource damages associated with an oil spill;

3. how these costs and damages are defined (i.e., what is covered); and

4. the degree to which (or conditions in which) the costs and damages are limited and/or shared by other parties, including general taxpayers.

The first section of this report provides an overview of the existing liability and compensation framework. The second section highlights many of the liability and compensation issues raised by the *Deepwater Horizon* event. The third section discusses options for policymakers to adjust, amend, or supplement the current framework.

# Existing Liability and Compensation Framework

President George H. W. Bush signed into law the Oil Pollution Act of 1990 (OPA)[7] on August 18, 1990, consolidating existing federal oil spill laws, expanding authorities within the CWA, and creating new provisions regarding oil spill liability and compensation.[8]

The OPA liability and compensation framework includes a combination of elements that distribute the costs of an oil spill between the responsible party (or parties) and a trust fund, which is largely financed through a per-barrel tax on domestic and imported oil. Responsible parties are liable up to their liability caps (if applicable); the Oil Spill Liability Trust Fund covers costs above liability limits up to a per-incident cap of $1 billion. These elements are discussed in some detail below.

## Responsible Party

A critical term and concept in the OPA liability and compensation framework is the responsible party. The liability provisions of OPA apply to "each responsible party for a vessel or a facility from which oil is discharged" (33 U.S.C. § 2702). The responsible party is specifically tasked with further OPA obligations, including claim duties. Some have identified OPA's specific assignment of liability (often referred to as "channeling")[9] and other duties as a key component of the framework. The channeling mechanism may simplify the compensation process, because the

---

[6] See CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

[7] P.L. 101-380, primarily codified at 33 U.S.C. § 2701 *et seq*. OPA amended other sections of the U.S. Code, including the Clean Water Act (e.g., 33 U.S.C. § 1321) and portions of the tax code (26 U.S.C. § 4611 and § 9509).

[8] See also CRS Report R41266, *Oil Pollution Act of 1990 (OPA): Liability of Responsible Parties*, by Robert Meltz; and CRS Report RL33705, *Oil Spills in U.S. Coastal Waters: Background and Governance*, by Jonathan L. Ramseur.

[9] See e.g., Nathan Richardson, *Deepwater Horizon and the Patchwork of Oil Spill Liability Law*, Resources for the Future discussion paper, June 2010.

responsible party assignment makes it unnecessary for agencies and courts to determine which party caused the spill.[10]

The term "responsible party" has a specific meaning for different sources of oil spills.[11] As defined by OPA (Section 1001), "responsible party" means the following:

> (A) Vessels. - In the case of a vessel, any person owning, operating, or demise chartering the vessel.

> (B) Onshore facilities. - In the case of an onshore facility (other than a pipeline), any person owning or operating the facility, except a Federal agency, State, municipality, commission, or political subdivision of a State, or any interstate body, that as the owner transfers possession and right to use the property to another person by lease, assignment, or permit.

> (C) Offshore facilities. - In the case of an offshore facility (other than a pipeline or a deepwater port licensed under the Deepwater Port Act of 1974 (33 U.S.C. § 1501 et seq.)), the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. § 1301-1356) for the area in which the facility is located (if the holder is a different person than the lessee or permittee), except a Federal agency, State, municipality, commission, or political subdivision of a State, or any interstate body, that as owner transfers possession and right to use the property to another person by lease, assignment, or permit.

> (D) Deepwater ports. - In the case of a deepwater port licensed under the Deepwater Port Act of 1974 (33 U.S.C. § 1501- 1524), the licensee.

> (E) Pipelines. - In the case of a pipeline, any person owning or operating the pipeline.

> (F) Abandonment. - In the case of an abandoned vessel, onshore facility, deepwater port, pipeline, or offshore facility, the persons who would have been responsible parties immediately prior to the abandonment of the vessel or facility.

# Liability

OPA unified the liability provisions of existing oil spill statutes,[12] creating a freestanding liability regime. Section 1002 states that responsible parties are liable for any discharge of oil (or threat of discharge) from a vessel or facility[13] to navigable waters, adjoining shorelines, or the exclusive economic zone of the United States (i.e., 200 nautical miles beyond the shore). Liability under OPA is strict,[14] meaning that impacted parties need not show or prove that the spiller acted negligently for liability to attach.[15]

---

[10] See e.g., Mark A. Cohen *et al.*, *Deepwater Drilling: Law, Policy, and Economics of Firm Organization and Safety*, Resources for the Future discussion paper, January 2011.

[11] See 33 U.S.C. § 2701(32).

[12] The Federal Water Pollution Control Act of 1972, as amended, generally referred to as the Clean Water Act (CWA, 33 U.S.C. § 1251 et seq); the Trans-Alaska Pipeline Authorization Act of 1973 (TAPAA, 43 U.S.C. § 1651), the Deepwater Port Act of 1974 (DPA, 33 U.S.C. § 1501 et seq), and the Outer Continental Shelf Lands Act Amendments of 1978 (OCSLAA, 43 U.S.C. § 1801 et seq).

[13] The definition of "facility" is broadly worded and includes pipelines and motor vehicles. OPA § 1001(9).

[14] Under OPA, the terms "liable" and "liability" are "construed to be the standard of liability which obtains under section 311 of the [Clean Water Act]." Courts have interpreted section 311 of the Clean Water Act as imposing strict (continued...)

Under OPA, a responsible party is liable for cleanup costs incurred, not only by a government entity, but also by a private party. But the cleanup activities must be consistent with the National Oil and Hazardous Substances Pollution Contingency Plan, generally referred to as the National Contingency Plan (NCP), the regulations governing oil and hazardous substance response operations.[16]

In addition, OPA broadened the scope of damages (i.e., costs) for which an oil spiller would be liable. (For a historical comparison of oil spill liability provisions, see **Table A-1** in the **Appendix** to this report.) Damages include the following:

- **Natural resources:** "damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee." [17]

- **Real or personal property:** "damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property."[18]

- **Subsistence use:** "damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."[19]

- **Revenues:** "damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof."[20]

- **Profits and earning capacity:** "damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."[21]

- **Public services:** "damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire,

---

(...continued)

liability on parties responsible for the discharge of oil or hazardous substances into the waters of the United States. See United States v. New York, 481 F. Supp. 4 (S. D.N.Y. 1979). See CRS Report R41266, *Oil Pollution Act of 1990 (OPA): Liability of Responsible Parties*, by Robert Meltz.

[15] See, e.g., Nathan Richardson, *Deepwater Horizon and the Patchwork of Oil Spill Liability Law*, Resources for the Future discussion paper, June 2010.

[16] OPA §1002(b)(1)(B). The NCP is codified in 40 CFR Part 300. For further information on the NCP see CRS Report RL33705, *Oil Spills in U.S. Coastal Waters: Background and Governance*, by Jonathan L. Ramseur.

[17] OPA § 1002(b)(2)(A).

[18] OPA § 1002(b)(2)(B).

[19] OPA § 1002(b)(2)(C).

[20] OPA § 1002(b)(2)(D).

[21] OPA § 1002(b)(2)(E).

safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State."[22]

OPA provided limited defenses from liability: Act of God, act of war, and act or omission of certain third parties.[23] These defenses are similar to those of the Comprehensive Environmental, Response, Compensation, and Liability Act (CERCLA), enacted in 1980 for releases of hazardous substances and pollutants or contaminants (but not oil).

## Liability Limits

OPA provides liability limits (or caps) for those responsible for a spill. Liability limits are not unique to OPA and limits existed in several federal statutes preceding OPA. (For a historical comparison of liability limits see **Table A-2** in the **Appendix** to this report.) However, the limits are not automatic, but conditional. First, the liability limits do not apply to situations involving acts of gross negligence or willful misconduct. Second, liability limits do not apply if the violation of a federal safety, construction, or operating requirement proximately caused the spill. Third, parties must report the incident and cooperate with response officials to maintain their liability caps.[24] According to the National Pollution Funds Center—an office of the U.S. Coast Guard that manages the Oil Spill Liability Trust Fund (discussed below)—liability limits are "not usually well defined until long after response," and litigation may be required to resolve the issue.[25]

The liability limits differ based on the source of the oil spill (**Table A-2**). The limits for most sources are simple dollar amounts.

- Vessel liability limits are generally based on the size of the vessel (measured in gross tonnage). For example, a tank vessel matching the size of the *Exxon Valdez* (95,000 gross tons) would have a cap of either $304 million (single-hull) or $190 million (double hull).

- Onshore facility (which includes pipelines) liability is limited to $350 million. Although OPA allows the President to decrease this limit through regulations, this authority has not been exercised.

- Deepwater port (e.g., Louisiana Offshore Oil Port, LOOP)[26] liability is limited to $350 million. OPA authorizes the Secretary of the department in which the Coast Guard is operating (i.e., Homeland Security)[27] to adjust this limit to not less than

---

[22] OPA § 1002(b)(2)(F).

[23] OPA § 1003.

[24] OPA § 1004(c).

[25] National Pollution Funds Center, *FOSC Funding Information for Oil Spills and Hazardous Materials Releases, April 2003*, p. 4.

[26] The Louisiana Offshore Oil Port (LOOP) is the only offshore deepwater port for oil in U.S. coastal waters. According to the U.S. Department of Transportation's Maritime Administration, three other deepwater ports are in operation that accept liquefied natural gas. See http://www.marad.dot.gov.

[27] The Homeland Security Act of 2002 (P.L. 107-296) transferred the Coast Guard to the Department of Homeland Security. The Coast Guard was formerly within the Department of Transportation.

$50 million. This authority was exercised in 1995, setting the liability limit at $62 million,[28] and subsequently increased to $87 million in 2009.[29]

- Offshore facilities (like the BP oil well involved in the 2010 Gulf of Mexico spill) have unlimited liability for oil removal (cleanup) costs[30] and a $75 million limit on other damages—natural resources and the five categories of economic damages (listed above).

- Mobile offshore drilling units (MODUs), like the *Deepwater Horizon*, are first treated as tank vessels for their liability cap. If removal and damage costs exceed this liability cap, a MODU is deemed to be an offshore facility for the excess amount.[31]

OPA requires the President to issue regulations to adjust the liability limits at least every three years to take into account changes in the consumer price index (CPI).[32] Despite this requirement, adjustments to liability limits were not made until Congress amended OPA in July 2006 (**Table A-2**). As of the date of this report, onshore and offshore facility liability limits remain at the same level established in 1990. If the adjustments had been made, offshore facility liability limits for economic and natural resource damages would be approximately $125 million (plus unlimited removal costs).[33]

## Financial Responsibility

To ensure that parties responsible for an oil spill can provide funding for oil spill response and compensation to affected parties, OPA requires that vessels and offshore facilities maintain evidence of financial responsibility (e.g., insurance or financial statements documenting significant revenue). OPA does not have an analogous requirement for onshore facilities.

The current levels of financial responsibility are related to the current liability limits for various sources (e.g., vessels, offshore facilities) of potential oil spills. The liability limits differ by potential source. In the case of vessels, whose liability limits are a single dollar amount encompassing both removal costs and other damages, the financial responsibility levels are

---

[28] 60 *Federal Register* 39849, August 4, 1995.

[29] 74 *Federal Register* 31368, July 1, 2009. Codified in 33 CFR § 138.230(b).

[30] OPA § 1002 defines removal costs as "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident." Relatedly, OPA § 1002 defines remove or removal as "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches."

[31] 33 USC § 2704(b). For further interpretation see National Pollution Funds Center, "Oil Pollution Act Liabilities for Oil Removal Costs and Damages as They May Apply to the Deepwater Horizon Incident" (undated).

[32] With Executive Order 12777 (October 18, 1991), President George H.W. Bush delegated this responsibility to several federal agencies. Executive Order 13286 (signed by President George W. Bush on March 5, 2003) reorganized duties in response to the creation of the Department of Homeland Security. The Coast Guard covers vessels, deepwater ports (including associated pipelines), and transportation-related onshore facilities; the Department of Transportation (DOT) covers onshore pipelines, motor carriers, and railways; the Environmental Protection Agency (EPA) covers non-transportation-related onshore facilities; the Department of the Interior (DOI) covers offshore facilities and associated pipelines, other than deepwater ports.

[33] CRS prepared this estimate using Consumer Price Index figures from the U.S Department of Labor Bureau of Labor Statistics, at ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt.

directly tied to the corresponding liability caps. Current law requires responsible parties for vessels to demonstrate the "maximum amount of liability to which the responsible party could be subjected under [the liability limits in OPA Section 1004; 33 U.S.C. § 2704]."

Because the structure of offshore facility liability limit is different than vessels (liability for removal costs is unlimited), the corresponding financial responsibility limit provisions differ. Responsible parties for offshore facilities in federal waters must demonstrate $35 million financial responsibility, unless the President determines a greater amount (not to exceed $150 million) is justified (33 U.S.C. § 2716(c)). The federal regulations that implement this statutory provision (30 CFR Part 254) base the financial responsibility amount—between $35 million and $150 million—on a facility's worst-case discharge volume (as defined in 30 CFR Section 253.14). For example, a facility with a worst-case discharge volume over 105,000 barrels—the highest level of worst-case discharge listed in the regulations—must maintain $150 million in financial responsibility.

The Coast Guard's National Pollution Funds Center (NPFC) implements the financial responsibility provisions for vessels; the Bureau of Ocean Energy Management, Regulation, and Enforcement (formerly the Minerals Management Service, MMS) implements this requirement for offshore facilities.

## The Oil Spill Liability Trust Fund

Prior to OPA's passage, a topic of debate concerned the mechanisms and hurdles of private parties recovering damages resulting after an oil spill.[34] To address this and other concerns,[35] Congress established the Oil Spill Liability Trust Fund (OSLTF). Although Congress created the OSLTF in 1986,[36] Congress did not authorize its use or provide its funding until after the 1989 *Exxon Valdez* oil spill. In 1990, OPA provided the statutory authorization necessary to put the fund in motion.[37]

In complementary legislation, Congress imposed a 5-cent-per-barrel tax on domestic and imported oil to support the fund.[38] Collection of this fee started January 1, 1990, and ceased on December 31, 1994, due to a sunset provision in the law. However, in April 2006, the tax resumed as required by the Energy Policy Act of 2005 (P.L. 109-58). In addition, the Emergency Economic

---

[34] See, e.g., U.S. Congress, House Committee on Merchant Marine and Fisheries, Report accompanying H.R. 1465, Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989, 1989, H.Rept. 101-242, Part 2, 101st Cong., 1st sess., p. 35.

[35] Another key function of the OSLTF is to provide a source of immediately accessible funds to support federal agencies, such as the Coast Guard or EPA, conducting oil spill response activities. Access to such funds is especially important if the responsible party is unknown or is unwilling or unable to pay for response activities.

[36] Omnibus Budget Reconciliation Act of 1986 (P.L. 99-509).

[37] Pursuant to OPA authorization, Congress transferred monies from other federal liability funds into the OSLTF, including the CWA Section 311(k) revolving fund; the Deepwater Port Liability Fund; the Trans-Alaska Pipeline Liability Fund; and the Offshore Oil Pollution Compensation Fund. According to the trust fund managers (the National Pollution Funds Center), no additional funds remain to be transferred to the OSLTF. National Pollution Funds Center, *Oil Spill Liability Trust Fund (OSLTF) Annual Report FY 2004–FY 2008*.

[38] Omnibus Budget Reconciliation Act of 1989 (P.L. 101-239). Other revenue sources for the fund include interest on the fund, cost recovery from the parties responsible for the spills, and any fines or civil penalties collected.

Stabilization Act of 2008 (P.L. 110-343) increased the tax rate to 8 cents through 2016. In 2017, the rate is set to increase to 9 cents. The tax is scheduled to terminate at the end of 2017.[39]

The National Pollution Funds Center (NPFC), an office within the Coast Guard, manages the trust fund.[40] The trust fund plays a substantial role in the liability and compensation framework, as discussed below.

## Compensation or Claims Process

OPA established a claims process for compensating parties affected by an oil spill. In general, before claims for removal costs and other costs/damages can be presented to the OSLTF, they must be presented first to a responsible party.[41] If the party to whom the claim is presented denies all liability, or if the claim is not settled by payment within 90 days after the claim was presented, the claimant may elect either to initiate an action in court against the responsible party or present the claim directly to the OSLTF.[42] If a responsible party denies a claim that is subsequently processed and awarded with monies from the OSLTF, the federal government may seek to recover these costs from the responsible party.[43]

Regulations implementing the OSLTF claims process are found in 33 C.F.R. Part 136. The NPFC's guidance document—*Claimant's Guide: A Compliance Guide for Submitting Claims Under the Oil Pollution Act of 1990* (November 2009)—provides assistance to those submitting claims.

OSLTF managers are limited in the amount of payments that may be awarded for each incident.[44] Under current law, the per-incident cap is $1 billion.[45] Because of this per-incident cap on the OSLTF, a scenario could arise in which the trust fund managers would be prohibited from compensating claimants who were initially denied by a responsible party. Such a scenario has not occurred in OPA's history.

Costs (including, for example, natural resource damages, economic losses, etc.)[46] beyond this per-incident limit could be addressed in several ways. One mechanism would be for parties to use

---

[39] Section 405 of P.L. 110-343.

[40] Pursuant to Executive Order 12777, 56 *Federal Register* 54,757 (1991).

[41] 33 U.S.C. § 2713(a). Under OPA, the term "claim" means "a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an [oil spill] incident." 33 U.S.C. § 2701(3).

[42] 33 U.S.C. § 2713(c). Claims for removal costs must be presented to the Fund within six years after the date of completion of all removal activities related to the oil spill incident. 33 U.S.C. § 2712(h)(1). Damage claims must be "presented within 3 years after the date on which the injury and its connection with the discharge in question were reasonably discoverable with the exercise of due care." 33 U.S.C. § 2712(h)(2).

[43] The federal government may also seek cost recovery from the responsible party's guarantor, "or any other person who is liable, pursuant to any law, to the compensated claimant or to the Fund, for the cost or damages for which the compensation was paid." 33 U.S.C. § 2715(c).

[44] "Incident" means any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil. 33 U.S.C. § 2701(14).

[45] 26 U.S.C. § 9509(c).

[46] Although offshore facilities are liable for all removal costs, liability for removal costs for other responsible party categories (e.g., tank vessels, onshore facilities) is limited. Thus, a significant oil spill from a tank vessel could potentially encounter the per-incident trust fund cap, based solely on its response costs.

state laws. OPA does not preempt states from imposing additional liability or requirements relating to oil spills, or establishing analogous state oil spill funds.[47] OPA legislative history[48] and statements from OPA drafters[49] indicate the intention that state laws and funds would supplement (if necessary) the federal liability framework under OPA.

Alternatively, existing federal authorities could be used to provide assistance in some circumstances. For example, an emergency declaration under the Stafford Act would appear to be a potential approach for the current situation, because it is intended to lessen the impact of an imminent disaster. Such a declaration in the context of a manmade disaster is unprecedented: during the *Exxon Valdez* spill, the President turned down the governor of Alaska's two requests for an emergency declaration.[50] CRS is not aware of similar requests made during the *Deepwater Horizon* incident.

# Issues for Policymakers

The 2010 *Deepwater Horizon* oil spill generated considerable interest in the existing oil spill liability and compensation framework. The incident placed a spotlight on multiple elements of the framework, in particular the liability limits and the size and limitations of the OSLTF.

The issues raised by the spill highlight a central policy debate: how should policymakers allocate the costs associated with a catastrophic oil spill? What share of costs should be borne by the responsible party (e.g., oil vessel owner/operators) compared to other groups, such as the oil industry (e.g., through the per-barrel tax), and/or the general treasury (assuming Congress would appropriate funds to compensate for unpaid costs/damages)?

Policymakers may want to consider the magnitude of the *Deepwater Horizon* incident and the liability and compensation issues raised under a scenario in which BP had refused to finance response activities or establish a claims process to comply with the relevant OPA provisions. BP has either directly funded oil spill response operations or reimbursed the federal government for actions taken by various agencies. According to BP, response costs have tallied over $10 billion.[51] BP has paid damage claims well above its liability limit of $75 million (assuming it would apply) and outside the scope of its liable damages (e.g., human health-related claims). BP and the Obama Administration jointly announced on June 16, 2010, the creation of the Gulf Coast Claims Facility (GCCF), an independent claims facility that BP will finance with incremental payments eventually totaling $20 billion.

---

[47] 33 U.S.C. § 2718.

[48] U.S. Congress, House Committee on Merchant Marine and Fisheries, Report accompanying H.R. 1465, Oil Pollution Prevention, Removal, Liability, and Compensation Act of 1989, 1989, H.Rept. 101-242, Part 2, 101st Cong., 1st sess., p. 36.

[49] See George Mitchell, "Preservation of State and Federal Authority under the Oil Pollution Act of 1990," *Environmental Law*, Vol. 21, no. 2 (1991).

[50] The rationale for the turndowns was that a declaration by the President would hinder the government's litigation against Exxon that promised substantial compensation for the incident. See CRS Report R41234, *Potential Stafford Act Declarations for the Gulf Coast Oil Spill: Issues for Congress*, by Francis X. McCarthy.

[51] For details, see BP, Fourth quarter and full year 2010 financial statement, February 1, 2011, at http://www.bp.com/.

## Liability Limits

In the aftermath of the *Deepwater Horizon* spill, many Members of the 111th Congress expressed concern about the level of the liability limit for offshore facilities. Several Members offered proposals that would have either significantly increased the offshore facility liability limit or removed the limit entirely. These increases (e.g., to $10 billion) would have been well above the inflation adjustment increase required by OPA (if implemented would have raised the limit to $125 million). In July 2010, the House passed legislation that would have removed the liability limit for offshore facilities.[52] The Senate placed a comparable bill (S. 3663) on its Legislative Calendar in late July 2010, but did not vote on its passage. In the 112th Congress, several Members have offered proposals that would eliminate the liability limit for offshore facilities.[53]

Liability limits have been a part of the oil spill framework for decades (**Table A-2**). Eliminating the offshore facility liability limit altogether would constitute a substantial change in U.S. oil spill policy. In the current system, costs from a major spill are shared between the responsible party (an individual company) and the OSLTF (largely financed through a tax on oil). Until the *Deepwater Horizon* incident, no individual spill threatened the framework.[54]

Unlimited liability for offshore facilities would shift the burden to the individual company. Although such a shift would likely reduce the risk of depleting the OSLTF during a catastrophic spill, the OSLTF would continue to provide multiple functions, including a role as a compensation backstop. Within a system of unlimited liability, the risk remains that the responsible party would fail to meets its compensation obligations (for whatever reason), and the OSLTF would continue to provide funds.

Indeed, raising or removing the liability limits would not guarantee that a company would be able to fund all response costs and compensate all affected parties. If Congress increases or eliminates the liability cap without making a corresponding change in the financial responsibility requirements, a responsible party could comply with its financial responsibility requirements and still go bankrupt before paying even a small fraction of the damage associated with a spill.[55]

Some proponents of increasing (or abolishing) the liability limit have argued that the current cap distorts economic decisions and provides incentives that may increase the likelihood of an oil spill.[56] Others point out that a liability cap represents a subsidy to the offshore oil industry—the lower the cap, the greater the subsidy.[57]

---

[52] H.R. 3534, the Consolidated Land, Energy, and Aquatic Resources Act (CLEAR Act), passed July 30, 2010. For more information, see CRS Report R41453, *Oil Spill Legislation in the 111th Congress*, by Jonathan L. Ramseur.

[53] See CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

[54] A 2007 GAO report examined occurrences of vessel liability limits being exceeded and resulting trust fund vulnerability. GAO found that "major oil spills [defined by GAO as those with response costs and damage claims exceeding $1 million] that exceed the vessel's limit of liability are infrequent, but their impact on the Fund could be significant…. Of the 51 major oil spills that occurred since 1990 [which accounted for 2% of all oil spills since 1990], 10 spills resulted in limit of liability claims on the Fund." GAO, *Maritime Transportation: Major Oil Spills Occur Infrequently, but Risks to the Federal Oil Spill Fund Remain*, Sept. 7, 2007.

[55] National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Liability and Compensation Requirements under the Oil Pollution Act, Staff Working Paper No. 10, March 2011.

[56] Michael Greenstone (Massachusetts Institute of Technology), Testimony before the House Committee on Transportation and Infrastructure, June 9, 2010.

[57] Thomas W. Merrill (Columbia Law School), "Insurance and Safety Incentives," Working Paper for the National (continued...)

---

Others argue that a significant increase in the liability cap (or its removal) would be problematic from an insurance standpoint, depending, in part, on whether the financial responsibility requirements have corresponding increases.[58] Some contend that the insurance market does not have the capacity to meet a significant increase in the liability limit (e.g., to $10 billion).[59] These concerns are based on current market conditions, but the market may be able to adjust to different requirements. To what degree it can adjust is beyond the scope of this report, but some initial evidence suggests the market is adjusting. The January 2011 final report from the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling highlighted a September 2010 announcement from an insurance company (Munich Re) advertising coverage in the $10 billion to $20 billion range.[60]

Some have argued that higher liability limits would be a disadvantage to the companies that cannot self-insure (as BP has done), because insurance may become cost-prohibitive or even unobtainable (as argued above). Along this line of reasoning, increased liability provisions (and corresponding financial responsibility demonstrations) may preclude (relatively) smaller companies from offshore operations and increase the marketshare of the small group of major oil companies. Others counter that if companies cannot afford to bear the potential costs of their activities, they should not be in operation.[61]

## OSLTF Limitations

### Per-Incident Cap

Although reaching the OSLTF's per-incident ($1 billion) cap would be an unprecedented event in the fund's history, it is a conceivable occurrence with the *Deepwater Horizon* incident. As of November 7, 2010, the trust fund expenditures and obligations have exceeded $690 million.[62] As reported on the federal government's *Deepwater Horizon* response website,[63] BP has reimbursed the federal government through multiple payments, totaling over $600 million.[64] Although the

---

(...continued)

Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, January 2011.

[58] For a more thorough discussion of these issues, see CRS Report R41320, *Deepwater Horizon Oil Spill Disaster: Risk, Recovery, and Insurance Implications*, by Rawle O. King.

[59] Robert P. Hartwig (Insurance Information Institute), Testimony before the House Committee on Transportation and Infrastructure, June 9, 2010; Ron Baron (Willis, Global Energy Practice), Testimony before the Senate Committee on Environment and Public Works, June 9, 2010.

[60] Press Release from Munich Re, September 12, 2010, at http://www.munichre.com/en/media_relations/press_releases/2010/2010_09_12_press_release.aspx.

[61] Se e.g., Thomas W. Merrill (Columbia Law School), "Insurance and Safety Incentives," Working Paper for the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, January 2011.

[62] Personal communication with the U.S. Coast Guard, November 22, 2010.

[63] See http://www.restorethegulf.gov.

[64] According to the federal government's response website (as of January 11, 2011), BP has provided 8 reimbursement payments totaling $606 million. A further bill for over $25 million is pending. See http://www.restorethegulf.gov/release/2011/01/11/oil-spill-cost-and-reimbursement-fact-sheet.

reimbursement payments would be transferred into the OSLTF,[65] they have no effect on the trust fund expenditures and obligations and their relationship with the per-incident cap.[66]

Several proposals from the 111th Congress would have increased the per-incident cap to varying amounts. Often these proposals were coupled with provisions to bolster the revenues in the trust fund (discussed below). In the 112th Congress, several Members have offered proposals that would increase the per-incident cap.[67]

## Level of Funding

The magnitude of the costs associated with *Deepwater Horizon* has spurred concern regarding the level of funding in the OSLTF. As **Figure 1** illustrates, the OSLTF unobligated balance was approximately of $1.7 billion at the end of FY2010.[68] The National Pollution Funds Center projects the fund will reach approximately $2.7 billion at the end of FY2014.[69] Although these projected levels are substantially higher than historic levels, they are unlikely to be sufficient to mitigate impacts—finance response activities and compensate injured parties—from a catastrophic spill akin to the *Deepwater Horizon* incident.

However, data from a 2007 GAO report suggest that the projected levels may be sufficient to address the more common mix of spills that have historically occurred. In 2007, GAO examined occurrences of vessel liability limits being exceeded and resulting trust fund vulnerability. GAO found that "major oil spills [defined by GAO as those with response costs and damage claims exceeding $1 million] that exceed the vessel's limit of liability are infrequent, but their impact on the Fund could be significant…. Of the 51 major oil spills that occurred since 1990 [which accounted for 2% of all oil spills since 1990], 10 spills resulted in limit of liability claims on the Fund."[70]

---

[65] Pursuant to 26 U.S.C. § 9509(b)(3), referencing OPA § 1015 (33 U.S.C. § 2715), which concerns cost recovery actions.

[66] 33 U.S.C. § 9509(c)(2). See also GAO, *Deepwater Horizon Oil Spill: Preliminary Assessment of Federal Financial Risks and Cost Reimbursement and Notification Policies and Procedures: Briefing for Congressional Requesters*, November 9, 2010.

[67] See CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

[68] Office of Management and Budget, *Budget of the U.S. Government for Fiscal Year 2012*, Appendix, pp. 529-530.

[69] Personal communication with the NPFC, February 2011.

[70] GAO, *Maritime Transportation: Major Oil Spills Occur Infrequently, but Risks to the Federal Oil Spill Fund Remain*, Sept. 7, 2007.

---

**Figure 1. Oil Spill Liability Trust Fund**

Historical, Current, and Projected Balance



**Source:** Prepared by CRS; FY1991-FY2010 end-of-year unobligated balances from Office of Management and Budget, Budget of the United States Government, Appendix. FY2011-FY2014 projections from the National Pollution Funds Center, prepared January 18, 2011, and provided to CRS in personal communication February 2011.

**Notes:** Most of the trust fund's revenue has come from a per-barrel tax on domestic and imported oil. The Omnibus Budget Reconciliation Act of 1989 (P.L. 101-239) initiated the tax in January 1990 at 5 cents-per-barrel. Due to a sunset provision in the law, collection ceased December 31, 1994. In April 2006, the tax resumed as required by the Energy Policy Act of 2005 (P.L. 109-58). In 2008, pursuant to the Emergency Economic Stabilization Act of 2008 (P.L. 110-343), the tax rate increased to 8 cents through 2016. In 2017, the rate will increase to 9 cents, but is scheduled to terminate at the end of 2017.

The apparent plateau in the data between FY2010 and FY2011 is due to the transition between OMB observed values and NPFC projections. The NPFC projections include several assumptions: (1) Fines/penalties receipts based on recent annual averages; (2) claims based on recent averages; (3) 100% cost recovery for expenses associated with *Deepwater Horizon* incident.

In the 111th Congress, Members offered several proposals that would have increased the per-barrel tax that finances the OSLTF. Some of these proposals would have increased the rate substantially, and over time, provided substantial revenue to the OSLTF.[71] In the 112th Congress, Members have offered at least one bill that would alter the OSLTF tax rate.[72]

Potential CWA penalties may play a role in increasing the level of funding in the OSLTF.[73] Unless specifically addressed otherwise, the Miscellaneous Receipts Act (31 U.S.C. §3302(b)) provides that all court, or administratively imposed penalties are paid to the U.S. Treasury. The underlying

---

[71] For example, S. 3793 (Baucus) would have increased the tax from 8 to 78 cents, raising $31.4 billion over 10 years (Summary of the Baucus Job Creation and Tax Cuts Act, September 16, 2010).

[72] See CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

[73] See CRS Report R41370, *Federal Civil and Criminal Penalties Possibly Applicable to Parties Responsible for the Gulf of Mexico Oil Spill*, by Robert Meltz.

statutory provisions of the OSLTF effectively override this general provision by transferring CWA Section 311 penalties (among others)[74] into the OSLTF.[75] CWA penalties from the *Deepwater Horizon* incident could be substantial. Sections 311(b)(7)(A) and 311(b)(7)(D)[76] provide for the maximum civil penalties under the CWA. The amount of revenue generated by applying these provisions depends on several key factors, including (1) the estimate of the amount of oil discharged;[77] (2) a determination of whether the oil spill was a result of "gross negligence or willful misconduct;"[78] (3) a decision of whether the oil that was directly captured—approximately 820,000 barrels—by BP via a pipeline-to-surface-vessel system is subtracted from the total estimate; and (4) the application of the CWA factors that must be considered by the "EPA Administrator, the Secretary [of Homeland Security], or the court, as the case may be," when determining penalty amounts.[79]

The recent National Commission report included a range of $4.5 billion to $21.5 billion for possible CWA penalty revenue.[80] Providing a more precise estimate is impossible, due to the four factors identified above. Moreover, several Members of Congress (with support from the Administration)[81] have offered legislation that would redirect any CWA *Deepwater Horizon* penalties to fund Gulf restoration efforts. The degree to which this goal is met will impact the level of funding in the OSLTF.

## Claims Process

The OPA oil spill claims process has generated considerable interest in the aftermath of the *Deepwater Horizon* incident. BP is seeking to fulfill its OPA claims obligations through the Gulf Coast Claims Facility (GCCF, see text box below). Many have voiced concerns that claimants were/are not receiving adequate payments for their losses or receiving payments in a timely

---

[74] 26 U.S.C. § 9509(b)(8) states "any penalty paid pursuant to section 311 of the Federal Water Pollution Control Act, section 309(c) of such Act (as a result of violations of such section 311), the Deepwater Port Act of 1974, or section 207 of the Trans-Alaska Pipeline Authorization Act."

[75] The relationship between trust funds, such as the OSLTF, and the general treasury is complex and beyond the scope of this report. For more information, see GAO, *Federal Trust and Other Earmarked Funds: Answers to Frequently Asked Questions*, January 2001.

[76] 33 U.S.C. § 1321(b)(7); see also 40 C.F.R. § 19.4, which increased various penalty amounts to account for inflation.

[77] See CRS Report R41531, *Deepwater Horizon Oil Spill: The Fate of the Oil*, by Jonathan L. Ramseur.

[78] Such a determination would increase the maximum per-barrel penalty from $1,100/barrel to $4,300/barrel.

[79] As listed in CWA § 311(b)(8), these include "the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require."

[80] See Commission Report, p. 211. The low end of this range is achieved by multiplying 4.1 million barrels (amount of discharge after removing the 17% directly captured by BP) by $1,100/ barrel. The upper end of range is achieved by multiplying 4.9 million barrels (total discharge amount) by the maximum penalty of $4,300/barrel, which presumes a determination of either gross negligence or willful misconduct.

[81] See the Obama Administration's America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill (sometimes referred to as the "Mabus Report"), September 2010.

---

fashion.[82] The 111th Congress held at least four hearings on compensation and claims process issues.[83] Some interest has remained in the 112th Congress.[84]

Evaluating the validity of criticism expressed toward the GCCF presents challenges. A key reason for difficulty is the lack of information (i.e., transparency) available to assess the GCCF process. Indeed, some have pointed to the lack of transparency as a substantial concern.[85]

---

### The Gulf Coast Claims Facility

In the early weeks of the spill response, the issue of BP's liability limit received considerable attention. On many occasions BP executives stated that the company would pay all "legitimate claims,"[86] but some Members of Congress were skeptical about BP's application of the term "legitimate." For example, would legitimate claims entail only those within BP's liability limit? A complicating factor in the debate was the uncertainty regarding whether BP would be subject to a liability limit. At least in part to address this uncertainty,[87] BP agreed (after discussions with the Obama Administration) to establish a $20 billion fund to compensate those affected by the spill.[88] The claims would be processed through an independent claims facility, administered by Kenneth Feinberg. This facility—the Gulf Coast Claims Facility (GCCF)—began accepting claims August 23, 2010. Prior to that time, BP processed and awarded claims. According to BP, the company awarded $399 million in claims from May 3 until the August 23 transition to the GCCF.[89]

---

To address transparency concerns, the GCCF offered its final claim payment methodology for public comment February 2, 2011. The final claim methodology includes several assumptions about the expected recovery of the Gulf ecosystem and economy. For example, the GCCF states that "it is anticipated that, for all businesses other than oyster harvesting, recovery will continue in 2011 with full recovery expected in 2012."[90] Final claim payments are based on this future losses assumption, which the GCCF states will be reassessed every four months and thus may decrease/increase over time. It is unclear how the future losses assumption was derived.[91] The final methodology includes an expert opinion (as an appendix) which provides some basis for the

---

[82] See, e.g., Letter from Thomas Perrelli (U.S. Associate Attorney General) to Kenneth Feinberg (GCCF Administrator), September 17, 2010; and a subsequent letter from Perrelli to Feinberg, February 4, 2011.

[83] E.g., House Committee on Small Business (June 30, 2010); House Committee on the Judiciary (July 21, 2010); Senate Committee on Homeland Security and Governmental Affairs (July 22, 2010); and the House Committee on Energy and Commerce (July 27, 2010).

[84] The Senate Ad Hoc Subcommittee on Disaster Recovery of the Senate Committee on Homeland Security and Governmental Affairs held a hearing January 27, 2011. See also CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

[85] See, e.g., Letter from Congressman Scalise to Kenneth Feinberg, January 24, 2011; and Thomas Perrelli (U.S. Associate Attorney General) to Kenneth Feinberg (GCCF Administrator), February 4, 2011.

[86] See, e.g., Testimony of Lamar McKay (Chairman & President, BP America) before the Senate Committee on Energy and Natural Resources, May 11, 2010.

[87] Other motivations may have played a role, but that discussion is beyond the scope of this report.

[88] White House Press Release, June 16, 2010, at http://www.whitehouse.gov/the-press-office/fact-sheet-claims-and-escrow. See also Deepwater Horizon Oil Spill Trust Agreement between BP Exploration and Production, Inc. as grantor of the funds, and individual and corporate trustees, dated Aug. 6, 2010.

[89] BP Press Release (August 23, 2010), at http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7064597.

[90] The methodology is available at the GCCF website, http://www.gulfcoastclaimsfacility.com.

[91] In a February 19, 2011 interview with CBS News, Kenneth Feinberg stated that the assumption was based on "gathering together all the best expertise," reiterating that his assumption is a "reasonable estimate."

---

assumption.[92] Regardless of one's perspective concerning this assumption, payment of final claims (that award claimants with expected losses in upcoming years) necessitates some projection of the timing of ecosystem recovery and associated economic losses.

The GCCF does provide some statistical data on its website,[93] allowing for a limited evaluation. For example, GCCF data indicate that (as of February 10, 2011) approximately 38% of submitted claims have been paid, with percentages varying by state (**Table 1**).

### Table 1. Deepwater Horizon Oil Spill Claims Data by State

As of February 10, 2011—States Listed In Order of Claims Submitted

|  | Louisiana | Florida | Alabama | Mississippi | Texas | Other | Total |
|---|---|---|---|---|---|---|---|
| Number of claims submitted | 270,000 | 210,938 | 94,180 | 69,506 | 12,015 | 23,561 | 680,200 |
| Number of claims paid | 89,767 | 94,035 | 37,521 | 22,014 | 3,237 | 9,040 | 255,614 |
| Percent of submitted claims receiving some level of payment | 33% | 45% | 40% | 32% | 27% | 38% | 38% |
| Amount paid | $1,099,355,733 | $1,205,226,776 | $558,111,338 | $281,526,529 | $96,026,300 | $134,083,900 | $3,374,330,576 |

**Source:** Prepared by CRS with data from the GCCF website, at http://www.gulfcoastclaimsfacility.com/.

**Notes:** Above data reflect claims by state of residence (as opposed to state of loss). Above data only include claims paid through the GCCF, which began processing claims August 23, 2010. Prior to that date, BP paid approximately $400 million in claims.

Some have argued that the percent of claims receiving some payment (38%) may be overstating the effectiveness of the GCCF to pay out claims.[94] The basis for this argument is that a substantial portion of the paid claims (86,835 or 34%) are so-called "quick payments." These are expedited final claims (i.e., additional documentation not required) for individuals ($5,000) and businesses ($25,000) who received emergency advance payments (or would qualify for interim payments). If these expedited claims are not included in the data in **Table 1**, the percent of total paid claims decreases to 29%.

A key piece of information that emerged in a January 2011 Senate hearing raised the issue of whether BP (until August 23, 2010) and the GCCF (on and after August 23, 2010) have processed claims in accordance with procedures of the NPFC. During the hearing, the Director of the NPFC (Craig Bennett) stated that the NPFC has received approximately 500 claims related to the Gulf spill.[95] The Director stated that the NPFC has adjudicated 200 of these claims, all of which were denied. In the hearing this fact was presented as evidence that the GCCF was processing claims in

---

[92] Dr. John W. (Wes) Tunnell, Jr., (Harte Research Institute for Gulf of Mexico Studies, and Texas A&M University-Corpus Christi), "An Expert Opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill," January 31, 2011.

[93] http://www.gulfcoastclaimsfacility.com.

[94] See e.g., Senator Vitter's remarks at a hearing in the Senate Ad Hoc Subcommittee on Disaster Recovery in the Senate Committee on Homeland Security and Governmental Affairs, January 27, 2011. Data related to this argument were published in a story by David Hammer in the *Times-Picayune* January 26, 2011.

[95] In accordance with OPA, these would all be claims already filed with either BP or the GCCF. The claims would have been denied or the claimants were not satisfied with the outcome.

accordance with NPFC protocols. However, the status of the claims that have not been adjudicated was not discussed. Without this information, an assessment of the BP/GCCF claims process and its consistency with the NPFC would be premature.

Although OPA does provide authority to the Comptroller General to audit claim activities of the NPFC,[96] OPA does not provide a federal agency with the authority to oversee or audit the claims activities of the responsible party. At least one proposal from the 111th Congress included provisions that would have addressed this issue.[97]

A related concern shared by some Members of Congress is the time period embedded in the OPA claims process. Before seeking compensation from the OSLTF, claimants must first submit their claim to the responsible party. If the claim is not settled within 90 days, the claimant may either pursue the claim through the OSLTF or seek recourse through litigation. Many argued that the 90-day clock was too long for impacted parties to wait, and several proposals from the 111th Congress would have altered the waiting period (many shortening the clock to 45 days).[98] At least one proposal in the 112th Congress would amend this provision.[99]

During the GCCF claims process, several stakeholders have criticized the "proximate cause" language of various GCCF protocols, arguing that such provisions are not consistent with OPA and its claims process.[100] The issue has evolved, with the GCCF Administrator addressing the concerns to some degree. The GCCF's August 2010 Emergency Advance Payment Protocol text read:

> The GCCF will only pay for harm or damage that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA and the proximate cause doctrine. Determinations of non-OPA claims will be guided by applicable law. The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources.[101]

In October 2010, Administrator Feinberg announced the GCCF was removing the geographic proximity text (referred to as the "geographic test") for claim eligibility that is part of the above protocol. The interim and final claim protocol now reads:

> The GCCF will only pay for harm or damage that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA. Determinations of physical injury and death claims will be guided by applicable law.

---

[96] OPA § 1012 (33 U.S.C. § 2712).

[97] See e.g., H.R. 6016 (Brady) and H.R. 3534 ("CLEAR Act," Section 707). Both bills passed the House in 2010.

[98] Bills that passed the House with a 45-day clock include H.R. 5629 (Oberstar) and H.R. 3534 ("CLEAR Act," Section 722). S. 3663 (Reid) would have shortened the wait-period to 30 days.

[99] CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

[100] See e.g., Letter from Bill McCollum (Attorney General of Florida) to Kenneth Feinberg (GCCF Administrator), August 20, 2010. See also Letter from Thomas Perrelli (Associate Attorney General) to Kenneth Feinberg (GCCF Administrator), February 4, 2011.

[101] GCCF, "Protocol for Emergency Advance Payments" (August 23, 2010).

The relevant OPA provision does not specifically address geographic proximity, but states that "each responsible party for a vessel or a facility from which oil is discharged, or which poses the threat of a discharge of oil is liable for the removal costs and damages … that *result from* such an incident."[102] Moreover, neither the implementing regulations (33 C.F.R. Part 136) nor OSLTF claim guidance documents indicates that proximate cause is a consideration. Of course, as a practical matter the OSLTF must apply *some* cut-off akin to proximate cause so that injuries far down the causal chain of events following a spill are not compensated.

On this matter, the Presidential Deepwater Commission concluded:

> There is no easy legal answer to the question of how closely linked those lost profits or earnings must be to the spill before they should be deemed compensable. The search for such a rational endpoint for liability has already stymied the Gulf Coast Claims Facility in its processing of claims.[103]

# Potential Options for Policymakers

The current combination of liability limits and $1 billion per-incident cap is not sufficient to withstand a spill with damages/costs that exceed a responsible party's liability limit (assuming it would apply) by $1 billion. Even if the per-incident cap were increased, the current (and projected) level of funds in the OSLTF may not be sufficient to address costs from a catastrophic spill.

The options available to address these issues depend upon on the overall objective of Congress. One objective—which has been expressed by many in and outside Congress—is to provide full restoration and timely compensation for the impacts from a catastrophic spill, without directly burdening the general taxpayers. In the context of this objective, "timely" compensation means that an injured party would have access to compensation without going through a court system, which would likely require more of a claimant's time and resources. With that objective in mind, several options are discussed below.

Potential options for Congress include (but are not limited to) the following, many of which were proposed in various legislation in the 111th Congress and some of which are included in proposals in the 112th Congress:[104]

- Increase the liability limits, so that the responsible party would be required to pay a greater portion of the total spill cost before accessing trust fund dollars. Congress may consider different limits for different offshore activities. Precedent exists in OPA for setting different liability limits to account for different oil spill risks: The liability limit for single-hulled tank vessels is approximately 50% higher than for double-hulled vessels. In the outer continental shelf (OCS) oil exploration and development sector, policymakers may consider a wide array of factors that could influence (1) the risk of an oil spill occurring and (2) the risk

---

[102] OPA § 1002; 33 U.S.C. § 2702 (emphasis added).

[103] National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling*, Report to the President, January 2011, p. 186.

[104] CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

that the oil spill could not be contained before impacting sensitive ecosystems and/or affecting large populations. Policymakers could then structure the liability limit framework based on certain behavior, the use of specific technologies, and/or the location of the activity. However, CRS is not aware of a comprehensive risk assessment of individual factors (or their combinations) regarding OCS drilling activities. A rigorous analysis of possible risk factors could be instructive to policymakers.[105]

- Increase the required financial responsibility coverage, either matching the increased liability limit (as OPA requires for vessels) or setting the coverage at a level based on other factors, such as capacity in the insurance market. Congress could increase coverage amounts through a staggered approach, to allow more time for the market to adjust.

- Remove or raise the per-incident cap on the trust fund. If removed entirely, the fund could be at risk of depletion with one incident.

- Increase the per-barrel oil tax to more quickly raise the fund's balance.

- Authorize "repayable advances" to be made (via the appropriations process) to the trust fund, so that the fund would have the resources to carry out its functions (cleanup efforts, claim awards). Up until 1995, the fund had this authority, in order to ensure it could respond to a major spill before the fund had an opportunity to grow (via the per-barrel tax).

- Require industry to establish a pool of funds (of significant magnitude) that would be available to finance response actions, injured party compensation, or both. Such a fund could either replace or complement the existing OPA system of individual liability and support from the OSLTF. This would be analogous to the framework for the nuclear power industry created by the Price-Anderson Act (primarily Section 170 of the Atomic Energy Act of 1954, 42 U.S.C. § 2210).[106]

Another objective might be to maintain the existing system, which may be sufficient to address all but the most extreme scenarios. Catastrophic spills in U.S. waters have historically been rare. Some may argue that establishing a system that can withstand a catastrophic event would impose costs and yield consequences that would not justify the (expected) ability to address a catastrophic event.

Interest in issues raised by the 2010 Gulf oil spill has waned in recent months. However, Members in the 112th Congress have introduced multiple proposals, many of which would address liability and compensation framework issues.[107] Legislative activity in the 112th Congress may be influenced by several factors, including (but not limited to) assessments of conditions in

---

[105] According to a recent Resources for the Future discussion paper, "the literature on oil offshore exploration and production, and fixed platforms specifically, remains relatively underdeveloped." The same paper included a "preliminary" analysis and found (among other things) "for an average platform (i.e., a platform with the sample's average age, annual production, number of producing wells, and other characteristics), each 100 feet of added depth increases the probability of a company-reported incident by 8.5 percent." See Lucija Muehlenbachs *et al.*, "Preliminary Empirical Assessment of Offshore Production Platforms in the Gulf of Mexico," Resources for the Future Discussion Paper, January 2011.

[106] See CRS Report RL33558, *Nuclear Energy Policy*, by Mark Holt.

[107] CRS Report R41684, *Oil Spill Legislation in the 112th Congress*, by Jonathan L. Ramseur.

---

the Gulf region, reports from other independent inquiries,[108] further information regarding the claims process, and results from the natural resource damage assessment process. Moreover, it may be worth noting that passage of the Oil Pollution Act of 1990 occurred 18 months after the *Exxon Valdez* spill.

---

[108] For example, the U.S. Coast Guard and the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEM) are conducting a joint investigation into the *Deepwater Horizon* incident to develop conclusions and recommendations as they relate to the explosion and loss of life on April 20, 2010. The final report is due no later than July 27, 2011. For more details, see http://www.deepwaterinvestigation.com.

# Appendix. Liability Tables—Historical Perspectives

**Table A-1. Evolution of the Scope of Oil Spill Liability**

| Pre-OPA Clean Water Act[a] | Pre-OPA Outer Continental Shelf Lands Act Amendments[b] | Pre-OPA Deepwater Port Act[c] | Pre-OPA Trans-Alaska Pipeline Authorization Act[d] | OPA 1990 |
|---|---|---|---|---|
| Liability applied to vessels and facilities that discharge oil into or on U.S. navigable waters, adjoining shorelines, and other specified areas.<br><br>Applicable parties liable for removal costs and natural resource damages.[e] | Liability applied to offshore facilities and vessels transporting oil from offshore facilities.<br><br>Applicable parties liable for removal costs, natural resource damages, and economic damages, including (1) real or personal property; (2) loss of use of real or personal property; (3) subsistence use; (4) profits and earning capacity; and (5) tax revenue. | Liability applied to deepwater ports and vessels operating in their vicinity. Applicable parties liable for cleanup costs and for damages that result from a discharge of oil. "Damages" is defined to as "all damages (except cleanup costs) suffered by any person, or involving real or personal property, the natural resources of the marine environment, or the coastal environment of any nation, including damages claimed without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or natural resources." | Liability applied to the holder of a pipeline right-of-way and vessels transporting oil from the trans-Alaska pipeline. The vessel was liable for "all damages, including clean-up costs." The right-of-way holder was "liable to all damaged parties, public or private." | Liability applies to vessels and facilities that discharge oil into or upon navigable waters or adjoining shorelines or the exclusive economic zone.<br><br>Applicable parties liable for removal costs, natural resource damages (and their assessments), and economic damages, including (1) real or personal property; (2) subsistence use; (3) public revenues; (4) profits and earning capacity; and (5) public services. |

**Source:** Prepared by CRS.

**Notes:**

a. The Clean Water Act contains liability limits for vessels and facilities in §311(f) (33 U.S.C. §1321(f)) that were in place before OPA's enactment in 1990. These provisions remain. However, OPA §2002 states that the CWA provisions do not apply to incidents that fall under OPA's liability.

b. Outer Continental Shelf Lands Act Amendments of 1978 (OCSLAA, 43 U.S.C. § 1801 *et seq*). OPA Section 2003 repealed the liability provisions in the OCSLAA (43 U.S.C. §§1811-1824).

c. Deepwater Port Act of 1974 (DWPA, 33 U.S.C. § 1501 et seq). OPA Section 2003 repealed the liability provisions in the Deepwater Port Act (33 U.S.C. §1517).

d. Trans-Alaska Pipeline Authorization Act of 1973 (TAPAA, 43 U.S.C. § 1651). OPA §§ 8101-8102 amended provisions of TAPAA, repealing 43 U.S.C. §1653(c), which applied to vessels transporting oil from the trans-Alaska pipeline.

e. 33 U.S.C. §1321(f)(4) states that removal costs include the costs of restoration or replacement of natural resources damaged by an oil spill.

**Table A-2. Evolution of Oil Spill Liability Limits**

| | Pre-OPA CWA[a] | Other Pre-OPA Statutes[b] | OPA 1990 | Current Limit |
|---|---|---|---|---|
| **Tank Vessels/Barges** | | | | |
| -Single-hull | The greater of: $125/gross ton or $125,000 for inland oil barges; $150/gross ton or $250,000 for other tank vessels/barges | **OCSLAA:** the greater of $300/gross ton or $250,000[c] **DWPA:** the lesser of $150/gross ton or $20 million **TAPAA:** $14 million | The greater of $1,200/gross ton or (1) $10 million if vessel is more than or equal to 3,000 gross tons; (2) $2 million if vessel is less than 3,000 gross tons | The greater of $3,200/gross ton or (1) ~$23.5 million if vessel is more than or equal to 3,000 gross tons (2) ~$6.4 million if vessel is less than 3,000 gross tons.[d] |
| -Double-hull | Same as single-hull | Same as single-hull | Same as single-hull | The greater of $2,000/gross ton or (1) ~$17.1 million if vessel is more than or equal to 3,000 gross tons (2) ~$4.3 million if vessel is less than 3,000 gross tons.[e] |
| Non-Tank Vessels | $150/gross ton | NA | The greater of $600/gross ton or $500,000 | The greater of $1,000/gross ton or $854,000.[f] |
| Offshore Facilities | $50 million | **OCSLAA:** $35 million for natural resource damages and covered economic damages; removal costs not limited. | $75 million for natural resource damages and covered economic damages; *removal costs not limited* | Same as OPA 1990[g] |
| Onshore Facilities (includes pipelines) | $50 million | **TAPAA:** Trans-Alaska pipeline right-of-way holder liable for "total removal of the pollutant." Liability limited to $50 million for other damages. | $350 million for removal costs, natural resource damages, and covered economic damages; allows President to decrease limit through regulations, but this authority has not been exercised. | Same as OPA 1990[h] |
| Deepwater Ports Louisiana Offshore Oil Port (LOOP)[i] | $50 million[j] | **DWPA:** $50 million | $350 million for removal costs, natural resource damages, and covered economic damages, but allowed the Secretary (of the department in which the Coast Guard operates)[k] to adjust this limit to not less than $50 million. In 1995, the Department of Transportation set the liability limit for the LOOP at $62 million.[l] | $87.6 million for the LOOP.[m] |

**Source:** Prepared by CRS.

**Notes:**

a.   The Clean Water Act contains liability limits for vessels and facilities in §311(f) (33 U.S.C. §1321(f)). These were in place before OPA's enactment in 1990 and were not repealed by OPA. However, OPA §2002 states that the CWA provisions do not apply to incidents that fall under OPA's liability.

b.   In addition to the CWA, three other statutes had liability provisions that applied to some oil spills before OPA's passage: the Trans-Alaska Pipeline Authorization Act of 1973 (TAPAA, 43 U.S.C. § 1651), the Deepwater Port Act of 1974 (DPA, 33 U.S.C. § 1501 *et seq*), and the Outer Continental Shelf Lands Act Amendments of 1978 (OCSLAA, 43 U.S.C. § 1801 *et seq*). These statutes were limited to covering special spills related to specific oil spill events. OPA Section 2003 repealed the liability provisions in the Deepwater Port Act (33 U.S.C. §1517) and the OCSLAA (43 U.S.C. §§1811-1824). OPA §§ 8101-8102 amended provisions of TAPAA, repealing 43 U.S.C. §1653(c), which applied to vessels transporting oil from the trans-Alaska pipeline.

c.   OCSLAA §1814 (repealed by OPA §2003).

d.   The Coast Guard and Maritime Transportation Act of 2006 (P.L. 109-241) increased limits to $1,900/gross ton for double-hulled vessels and $3,000/gross ton for single-hulled vessels. The Coast Guard made further adjustments (pursuant to the consumer price index provision in OPA §1004(d)(4)) in 2009: The limits are codified in 33 CFR §138.230.

e.   33 CFR §138.230.

f.   33 CFR §138.230.

g.   Although OPA §1004(d)(4) requires the President to issue regulations to increase the liability limit (per the consumer price index), the offshore facility limit has remained constant.

h.   Although OPA §1004(d)(4) requires the President to issue regulations to increase the liability limit (per the consumer price index), the onshore facility limit has remained constant.

i.   There is only one deepwater port for oil in U.S. coastal waters: the Louisiana Offshore Oil Port (LOOP). According to the U.S. Department of Transportation's Maritime Administration, three other deepwater ports are in operation that accept liquefied natural gas. See http://www.marad.dot.gov.

j.   Deepwater ports are not specifically identified in CWA §311(f), but would likely meet the definition of offshore facility.

k.   The Homeland Security Act of 2002 (P.L. 107-296) transferred the Coast Guard to the Department of Homeland Security. The Coast Guard was formerly located within the Department of Transportation.

l.   60 *Federal Register* 39849, August 4, 1995.

m.   33 CFR §138.230(b).

# Author Contact Information

Jonathan L. Ramseur
Specialist in Environmental Policy
jramseur@crs.loc.gov, 7-7919



Home > Breaking News from the Press-Register > Breaking News

# Feinberg releases 'emergency protocol' for BP oil spill claims (with complete protocol)

Published: Friday, August 20, 2010, 10:21 AM    Updated: Friday, August 20, 2010, 3:46 PM



**By Press-Register staff**
👤 Follow

💬 Comment | 2    ↗ Share
🐦 Tweet | 28    ✉ Email
🔴 ⬆ ⬇ 7 points    🖨 Print



(AP Photo/Susan Walsh)

Kenneth R. Feinberg, appointed by President Barack Obama as the Independent Administrator of the Gulf Claims Facility for the $20 billion BP Deepwater Horizon oil spill compensation fund, on Friday, Aug. 20, 2010, announced emergency protocols for claims against the fund. Feinberg is seen here speaking at the Economics Club in Washington, Monday, July 19, 2010.

Kenneth R. Feinberg, the man put in charge of the $20 billion fund to pay claims related to the BP oil spill in the Gulf of Mexico, today announced "emergency protocol" guidelines to assist claimants in filing claims for costs and damages incurred as a result of the oil spill.

Feinberg said in a news release that the protocol was released in anticipation of the Monday, Aug. 23 opening of the Gulf Coast Claims Facility.

"These guidelines are the result of many town hall meetings throughout the Gulf, listening to the people affected by this disaster," Feinberg stated in the new release.

**(See full protocol below or**

**download .doc document here)**

Feinberg and his team also worked with the governors and attorneys general of Louisiana, Alabama, Mississippi and Florida, he said.

Individuals and businesses that have incurred costs as a result of the spill (cleanup, loss of profit, damage of property etc.) are among those authorized by the protocol to submit a claim for emergency payment. There are also provisions for those physically harmed by the spill.

Feinberg said he believes the emergency protocol guidelines answer many questions about the fund, including the required proof and information that the claimant should submit.

Brought to you by:
🌴 gulf shores and orange beach

Sponsored By:



1 Tip for a tiny belly :
Cut down a bit of your belly everyday by following this 1 weird old tip
Tip ▶

**More Breaking News from the Press-Register**

Most Comments | Most Recent

EXHIBIT E

"When the centers open on August 23rd, the entire process will be in place go get checks out the door and money to those most deeply affected," said Feinberg.

Feinberg has said the goal for the new fund will be to get emergency 6-month payment checks out the door within 24 hours for individuals and in no more than 7 days for businesses.

Emergency Advance Payment applications may be submitted during the Aug. 23-Nov. 23, 2010, time period. After that date, applications for final claims, and in some circumstances applications for interim claims, will continue to be accepted. Protocols for the final claims will be issued in the near future, according to Feinberg's office.

All current individual and business claims have been transferred from BP to Feinberg's office. Claims previously filed with the BP Claims Process have been transitioned to the new Gulf Coast Claims facility for review, evaluation and determination; however claimants will be required to file new forms with the GCCF to receive payments.

Claimants will be able to file their claims in any of the following ways:

- **Online:** By accessing the GCCF Website.  The web address will be distributed on August 23rd when the site becomes live and functional.
- **By Phone:** Toll free to request a form in the mail,        **1.800.916.4893**
- **By Mail**: Mail the completed form to the following address:

    Gulf Coast Claims Facility

    P.O. Box 9658

    Dublin OH 43017-4958

- **By Fax:** Complete the claim form and fax it to        **1.866.682.1772**
- **At a Claim Site Office:** Offices are located in Alabama, Florida, Louisiana, Mississippi and Texas. The website will feature a complete list of the claim centers.

## The protocol announced today is included in full below:

Gulf Coast Claims Facility
Protocol for Emergency Advance Payments
August 23, 2010

**I.  PURPOSE**

This Protocol sets forth the procedure for the submission and resolution by the Gulf Coast Claims Facility ("GCCF") of claims for Emergency Advance Payments by Individuals and Businesses for costs and damages incurred  as a result of the oil discharges from the April 20, 2010 Deepwater Horizon incident ("the Spill").

    A.  Role
The United States Coast Guard ("USCG") has designated BP Exploration & Production, Inc. ("BP"), as a Responsible Party under the Oil Pollution Act of 1990 ("OPA") for oil discharges from the Deepwater Horizon facility.  Under OPA, Responsible Parties must establish a claims process to receive certain claims by eligible claimants.    USCG, without in any way relieving other Responsible Parties of liability, directed BP to maintain a single claims facility for all Responsible Parties to avoid confusion among potential claimants.

The GCCF is intended to replace BP's claims facility for individuals and businesses. The GCCF (and the protocols under which it operates) are structured to be compliant with OPA. A final claim may be presented to the GCCF at any time that the facility is receiving claims.  Whether or not a claim has been presented shall be governed by OPA and applicable law.  All open Individual and Business claims that have been filed with the BP Claims Process will be transferred to the GCCF. BP has also authorized the GCCF to process certain non-OPA claims involving personal injury.

**Most Active Users**    What's this?

Users with the most **al.com** comments in the last 7 days



**205**   **AUtuitionX2**

**190**   **ausouthal**

**147**   **ahsaaref- 71 days to KO**

**137**   **sane the blog killer**

**122**   **masspike**

**Users We Love**

**Knitting blogger Alda Prosser**
Alda's blog, Sittin' and Knittin', has been going strong on al.com for the past year and a half, and Alda has been knitting since WWII!

**More Users We Love**

**Connect with al.com**
**What's this?**

    

**All Facebook & Twitter accounts »**

**From Our Advertisers**

• **Serra Honda Man Will Save You Money**
• **BEAT THE HEAT... stay beachfront By the Sea!**
• **Making Buildings That Make Our Builders The Best**

**Advertise With Us »**

**Popular Tags**    What's this?

**Alabama**  Baldwin County  **Bob Riley**  **BP**  crime  Daphne  **Deepwater Horizon**  Fairhope  **forecast**  **Gulf of Mexico oil spill**  **Gulf of Mexico oil spill 2010**  Gulf Shores  **Mobile**  mobile  Mobile County  Mobile police  Mobile Police Department  **murder**  **oil spill**  Orange Beach  Prichard  rain  robbery  shooting  **weather**

Submission of such claims shall be wholly voluntary and participation in the GCCF shall not affect any right that the claimant would have had absent such participation unless final resolution and settlement of the claim is achieved.

## B. Approach

The following non-exclusive principles apply to the operation of the GCCF:

- The GCCF will evaluate all claims in a prompt and fair manner guided by applicable law.
- The establishment of the GCCF does not diminish any right of any individual or business that existed prior to the creation of the GCCF; claimants have all of the same rights with respect to their various claims that they had prior to the creation of the GCCF and shall not be forced to relinquish any rights for the opportunity to seek compensation through the GCCF.
- The GCCF claims process is structured to comply with OPA and apply the standards of OPA.

The GCCF is administered by Kenneth R. Feinberg ("the Claims Administrator"), a neutral fund administrator responsible for all decisions relating to the administration and processing of claims by the GCCF. This Protocol addresses only claims for Emergency Advance Payments; a subsequent Protocol will deal with all Final Claims. Under the Final Protocol, interim claims will be considered where appropriate.

## II. ELIGIBILITY

Claimants who are experiencing hardship resulting from damages set forth below incurred due to the Spill may apply for an Emergency Advance Payment.

A. Removal and Clean Up Costs

1. Who may make a claim?

Any Individual or Business that incurred costs, as a result of the Spill for the removal of oil or to prevent, minimize, or mitigate oil pollution.

2. Required Proof

- The costs are for removal of oil discharged due to the Spill or that are to prevent, minimize or mitigate oil pollution from the Spill;
- The costs are reasonable and necessary; and
The actions taken to remove, prevent, minimize, or mitigate oil pollution were approved by the Federal On-Scene Coordinator or are otherwise proven to be consistent with the National Contingency Plan.

3. What information should the claimant submit?

- Information or documentation (e.g., bills) showing the costs incurred after the Spill for removal of oil discharged as a result of the Spill or incurred to prevent, minimize, or mitigate oil pollution from the Spill.
- Information or documentation explaining how the actions taken were necessary to prevent, minimize, or mitigate the effects of the Spill.
- Information or documentation showing that the actions taken were approved by the Federal On-Scene Coordinator or were consistent with the National Contingency Plan.
- Information or documentation explaining why the costs were reasonable.

## B. Real or Personal Property

1. Who may make a claim?

Any Individual or Business that owns or leases real or personal property physically damaged or destroyed as a result of the Spill.

In order to avoid duplication of claims, an owner or lessee of the property must provide notice to all others with an ownership or lease interest in the property of the intent to file a claim. If duplicate claims are received, the GCCF will determine the appropriate claimant.

2. What information should the claimant submit?

- Information or documentation showing an ownership or leasehold interest in the property.
- Information or documentation showing the property was physically damaged or destroyed.
- Information or documentation showing the damages claimed were incurred as the result of the physical damage to or destruction of the property.
- Information or documentation showing the cost of repair or replacement of the property, or economic losses resulting from destruction of the property.
- Information or documentation showing the value of the property both before and after damage.

## C. Lost Profits and Lost Earning Capacity

1. Who may make a claim?

An Individual or Business that incurred a loss in profits or earning capacity due to the injury, destruction, or loss of real property, personal property or natural resources as a result of the Spill.   The individual or business need not be the owner of the injured property or resources to recover for lost profits or income.

2. What information should the claimant submit?

- Identification of injury, destruction, or loss to a specific property or natural resource.
- Information concerning Claimant's lost earnings or profits that were caused by the injury, destruction, or loss of specific property or natural resource as a result of the Spill (such as lost income by a fisherman whose fishing grounds have been closed or a hotel or rental property that has had decreased profits because beaches, swimming, or fishing areas have been affected by the oil from the Spill).
- Reduction of earnings or profits, or increase in expenses resulting from such damage.
- Amount of profits and earnings or expenses in comparable time periods.
- Income received from alternative employment or business during the period when the loss was suffered, and expenses incurred in generating the alternative income.
- Savings to overhead and other normal expenses not incurred as a result of the Spill.

## D. Subsistence Use of Natural Resources

1. Who may make a claim?

Any Individual who uses the natural resources that have been injured, destroyed or lost as a result of the Spill to obtain food, shelter, clothing, medicine, or other subsistence uses.

2. What information should be submitted?

- Identification of the specific natural resources that have been injured, destroyed or lost as a result of the Spill for which compensation for loss of subsistence use is being claimed.  The Claimant need not own the affected natural resource.
- Description of the actual subsistence use made of each specific natural resource.
- Description of how and to what extent the subsistence use was affected by the injury to or loss of each specific natural resource as a result of the Spill.
- Description of expenditures made to replace or substitute for the subsistence use.

## E. Physical Injury /Death

1. Who may make a claim?

A claim may be made by an injured individual or the representative of a deceased individual for a physical injury or death proximately caused by the Spill or the explosion and fire associated with the Deepwater Horizon incident, or by the clean-up of the Spill.

Submitting a physical injury or death claim to the GCCF is entirely voluntary.  However, unlike claims under the Oil Pollution Act, claims for physical injury and death cannot be submitted to the National Pollution Funds Center.

## 2. What information should be submitted?

- Medical records or death certificate demonstrating physical injury or death.
- Medical records reflecting diagnosis by a medical practitioner.
- Information concerning the cause of physical injury.
- Information concerning the circumstances of the physical injury and the location where the physical injury occurred.
- Information concerning any total or partial disability of the Claimant.
- Records showing expenditures for medical care not otherwise compensated.
- Proof of lost income, if the Claimant seeks compensation for such lost income.

## F. Causation

The GCCF will only pay for harm or damage that is proximately caused by the Spill.  The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA and the proximate cause doctrine.  Determinations of non-OPA claims will be guided by applicable law.    The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources.

## III.  FILING FOR AN EMERGENCY ADVANCE PAYMENT

A.  Equal Access and Fair Adjudications in the Claims Process

All potential claimants will be treated with respect, dignity, and fairness, without regard to race, color, sexual orientation, national origin, religion, gender, or disability. The GCCF shall strive to ensure that all claimants can equally access the GCCF process, and that claims will be adjudicated fairly. Individuals with disabilities will be able to effectively communicate their claims and problems to the GCCF.  Individuals with language barriers will have meaningful access to the process and to the GCCF.  Individuals with low literacy will have documents and forms explained to them plainly and in a simple manner they understand.

B.  Claim Form

1. The Claimant will indicate on the Claim Form if the Claimant is applying for an Emergency Advance Payment.   Claimants will complete a Claim Form for an Individual or Business.

2. Claimants shall submit the documentation requested on the Claim Form for an Emergency Advance Payment or other similar information as is sufficient to substantiate the claim and for the GCCF to review and process the Claim.

C. Process for Filing a Claim for an Emergency Advance Payment

A Claim Form may be obtained and submitted in any one of the following ways:

1. Via the Internet – Claimants may submit a claim online by visiting the GCCF website: www.gulfcoastclaimsfacility.com. Claimants will be instructed to follow simple steps for completing a claim.   Once completed, the claim will be automatically submitted to the GCCF Database, a printable confirmation notification will be generated and displayed immediately confirming submission and providing the Claim Number and a confirmation email will be sent to those Claimants who have provided email addresses.   The Claim Number will be the claim identifier throughout the process.  The Claim Form and Instructions will be available in English, Spanish, Vietnamese and Khmer.

2. By Visiting a GCCF Claims Site Office – Claimants may visit one of the 36 Claims Site Offices established to assist Claimants with the claims submission process to (1) seek information about filing a claim or to (2) submit a claim in person.  Claimants may either walk in to one of the Claims Site Offices or may make an appointment by calling the toll-free telephone line. The locations of the Claims Site Offices are posted on the GCCF website, www.gulfcoastclaimsfacility.com.  If a visitor requires an interpreter and an interpreter is not available on site, the Claims Evaluator will make arrangements to provide these services either via

conference call or a scheduled return trip to the Claims Site Office.  A Claims Evaluator will assist the Claimant in completing the Claim Form.  The Claims Evaluator will print a copy of the Claim Form, the claimant will sign the Claim Form and the claim will be automatically submitted to the GCCF Database.  A confirmation of the claim submission and Claim Identification Number will be provided by the Claims Evaluator.   The Claim Form must be signed by the Claimant.

3. Via U.S. Postal Service – Claimants may call the toll free, dedicated telephone line to request that a Claim Form be mailed via U.S. Postal Service.  The Claims Operator will ask the caller to provide basic information which the Claims Operator will enter into the on-line system.  The system will automatically generate a unique, pre-populated and bar-coded Claim Form which will include the identifying information provided by the caller.  The Claim Form will contain a Claim Identification Number which will be the Claim identifier through the course of the process.  The coded Claim Form will be mailed via U.S. Postal Service to the Claimant. The Claim Form must be signed by the Claimant.  The Claimant may return the completed form via:

**U.S. Postal Service:**

Gulf Coast Claims Facility
P. O.  Box XXX
Dublin, OH 43017-4958

**Overnight, Certified or Registered Mail:**

Gulf Coast Claims Facility
5151 Blazer Parkway, Suite A
Dublin, OH 43017-4958

**Fax**: 1 866 682-1772

**Email: info@gccf-claims.com**.

**The toll-free telephone lines are as follows:**

- Toll Free Number:            **1-800 916-4893**
- Multilingual Telephone Line:        **1-800 916-4893**
- TTY Telephone Line:         **1-866 682-1758**

All submitted Claim Forms, regardless of the method of submission, will be automatically forwarded to the Central Processing Database and integrated into a comprehensive GCCF Database.

**D.  Appointment with a Claims Evaluator**

The Claimant may request an appointment with a Claims Evaluator at the nearest Claims Site Office to answer or clarify issues regarding a claim for an Emergency Advance Payment.  The Claims Evaluator will review the claim for completeness and eligibility and may contact the Claimant to request additional supporting documentation if necessary or if the Claims Evaluator has any questions about the information submitted with the Claim Form.   Examples of information and documentation that support a claim are attached as Exhibit A.

**E.  Evaluation of Application for Emergency Advance Payment**

1. Evaluation of an Emergency Advance Payment application will apply a less rigorous standard for required corroboration than evaluation of a claim for Final Payment. Documentation sufficient to establish the claim will be described in the Claim Form.

2. Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant.   Complex

business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant.

3.  Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours.

**F.   Period for Application for Emergency Advance Payment**

1.  Emergency Advance Payment applications may be submitted on a monthly basis.  Emergency Advance Payment applications for Lost Profits and Lost Earning Capacity, Loss of Subsistence Use of Natural Resources, or loss of income due to physical injury or death may be submitted either on a monthly basis or for six months of losses, at the option of the Claimant. Claimants seeking an Emergency Advance Payment on a six month basis must establish that they will incur loss for the six month period.  To the extent possible, six month payments will be based on the seasonally adjusted lost income or lost profits, as applicable.

2. Emergency Advance Payment applications may be submitted during the period August 23 - November 23, 2010.  After that date, applications for Emergency Advance Payments will no longer be accepted.  Applications for Final Claims, and in appropriate circumstances applications for interim claims, will continue to be accepted pursuant to the Protocol for Final Claims.

G.  Request or Receipt of Emergency Advance Payment Does Not Waive Any Rights

Claimants requesting an Emergency Advance Payment or receiving an Emergency Advance Payment will not be asked or required to sign a release or waive any rights to assert additional claims, to file an individual legal action, or to participate in other legal actions associated with the Spill.

H. Credit Against Final Payment

Any Emergency Advance Payment made to a Claimant will be deducted from any Final Payment of a Final Claim.

**IV. REPORTING**

The GCCF shall provide reports of non-personally identifiable information to state, local, and federal government officials and to BP to permit an evaluation of the claims process.  The GCCF shall submit to interested parties, including BP, periodic reports regarding claims made and claims determinations.

**V.  PRIVACY**

Information submitted by a Claimant to the GCCF will be used and disclosed for purposes of:  (i) processing the Claimant's claim for compensation and any award resulting from that claim;  (ii) legitimate business purposes associated with administering the GCCF, including the prevention of fraud and the determination of collateral source payments;  and/or (iii) as otherwise required by law, regulation or judicial process.

**VI. QUALITY CONTROL AND PROCEDURES TO PREVENT AND DETECT FRAUD**

A. Review of claims

For the purpose of detecting and preventing the payment of fraudulent claims and for the purpose of accurate and appropriate payments to Claimants, the GCCF shall implement procedures to:

1. Verify and authenticate claims.

2. Analyze claim submissions to detect inconsistencies, irregularities, and duplication.

3. Ensure the quality control of claims review procedures.

B. Quality Control

1. The GCCF shall institute periodic quality control audits designed to evaluate the accuracy of submissions and the accuracy of payments.

2.  The GCCF shall engage an independent outside accounting firm to perform an independent test of claims to ensure that the claims have been accurately processed.

C. False or Fraudulent Claims

Each Claimant will sign a form at the time of application, stating that he or she certifies that the information provided in the Claim Form is true and accurate to the best of his or her knowledge, and that he or she understands that false statements or claims made in connection with that application may result in fines, imprisonment, and/or any other remedy available by law, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.  The GCCF shall refer all evidence of false or fraudulent claims to appropriate law enforcement authorities.

**Related topics:** BP, Kenneth Feinberg, oil spill, oil spill claims



**Sponsored Links**

**President Lowers Mortgage**
If you owe under $729k you probably qualify for the Govt Refi Program.
www.MortgageRatesExperts.com

**Small Business Under $30K**
Compare Quality Small Businesses Become Your Own Boss!
www.FranchiseGator.com

**Obama's Refinance Program**
Refinance rates hit 2.99%! Calculate new payment now.
www.Refinance.LowerMyBills.com

Share this story       Story tools    Email    Print

**More stories in Breaking News from the Press-Register**

Previous story
Alabama news links: Fort Rucker command changes hands; Montgomery police seize $5 million worth of cocaine

Next story
Activities at Murphy High resume after lock-down this morning

**2** **Comments**   Feed       Post a comment

**View: Oldest first** | **Newest first**

**right0ndude**   August 20, 2010 at 12:56PM
Follow

Gulf residents, the picture is of Mr. Feinberg visually illustrating your chances of ever seeing your lives getting back to normal, or ever getting any cash out of this.

Reply    Post new        Inappropriate? Alert us.



**fumundachiz**    August 20, 2010 at 2:30PM

Follow

I thought it was visually illustrating something else. You're probably right with your assesment though.

Reply    Post new

Inappropriate? Alert us.

## Post a comment

**Sign in to al.com**

Username

Password

Remember me?    **Sign In**

I forgot my username or password »

**Don't have an account?**

**Register now for free**, or sign in with any of these services:

**Connect with Facebook**

AIM

Google

OpenID

---

Advance Internet    al.

Site Search    Search Local Business Listings

Go

**Home** | **News** | **Weather** | **Sports** | **Entertainment** | **Travel** | **Interact** | **Jobs** | **Autos** | **Real Estate** | **Rentals** | **Classified Ads** | **Shop** | **Place an Ad**

Site Map | Advertise | Contact us
Make us your home page

- Your Photos
- Your Videos
- Blogs
- Forums
- Travel
- Music

- Post a Job
- Post a free classified ad
- Sell your car
- Sell/Rent your Home
- Apartments & Rentals
- Claim your Business Listing for Free

- Alabama Business News
- US & World News
- Obits / Death Notices
- Weddings & Celebrations
- Lifestyle News
- Good Deals & Frugal Living

- Subscribe to our content (RSS)
- Follow @aldotcom on Twitter
- Friend al.com on Facebook
- al.com mobile site

SUBSCRIBE    Special home delivery offers!   **The Birmingham News** | **The Huntsville Times** | **Mobile Press-Register**

© 2011 Alabama Live LLC. All Rights Reserved. Use of this site constitutes acceptance of our **User Agreement**. Please read our **Privacy Policy**. **Community Rules** apply to all content you upload or otherwise submit to this site. **Contact interactivity management**.



Gulf Oil Spill: Tracking the Claims -- Struggles persist for those seeking compensation | al.com

Home > Breaking News from the Press-Register > Breaking News

# Gulf Oil Spill: Tracking the Claims -- Struggles persist for those seeking compensation

Published: Sunday, February 06, 2011, 5:00 AM    Updated: Sunday, February 06, 2011, 7:47 PM



**By Press-Register staff**
Follow



Sponsored By:




1 Tip for a tiny belly :
Cut down a bit of your belly everyday by following this 1 weird old tip
Tip ▶

Greg Kennedy thought his claim was a no-brainer.

He and two partners, brothers Marty and Johnny Hoffman, own Waves Shopping Center on West Beach Boulevard in Gulf Shores. In October, one of their tenants, Shakes Frozen Custard, closed up shop after the slow summer, when tourists shied away from the beach because of the Deepwater Horizon oil spill.

The shopping center has since missed out on $15,000 in rent.

Kennedy said he and the Hoffmans have tried to attract a new tenant, but haven't had any luck.

"We haven't even had a call," Kennedy said. "Anybody who is going to open a business down here is going to start in January so they can be ready in time for spring break. We're not holding out a whole lot of hope."

The partnership, Hoffman Kennedy LLC, filed for an emergency claim from the Gulf Coast Claims Facility last year to offset losses resulting from the oil spill, but was denied.



**+ View full size**

Business partners Marty Hoffman (left) and Greg Kennedy, owners of Waves Shopping Center in Gulf Shores, say they were denied for an emergency claim by the Gulf Coast Claims Facility last year. Hoffman and Kennedy stand by the sign announcing commercial space available on Friday, January 28, 2011. (Press-Register correspondent/Jon Hauge)

### More Breaking News from the Press-Register

**Most Comments** | Most Recent

Breaking News from the Press-Register stories with the most comments in the last 7 days.

**148** Former Gov. Bob Riley seriously injured in Alaska motorcycle crash (Updated)

**58** Shelby Robinson's probation record a state secret; he allegedly kidnapped, raped 2 women

**48** Roy Moore injured in Etowah County horse riding accident

**33** Video shows Pensacola sex with minors sting operation in action

**30** PARCA: Mobile spending too much on extras, not enough on infrastructure

EXHIBIT F

"Our losses are so definable, so digitized, so clear," Kennedy said. "It's a no-brainer, we thought."

He said owners of the individual stores in the shopping center have received payments, as have employees working there.

"It makes no sense," he said.

## Terrance Roberts, 49, Mobile

**Occupation**: Owner of T-Rob Seafood since 2007. He holds a second job managing a warehouse.

The Press-Register reported **beginning May 13** that Roberts was worried about whether he would be able to maintain his mobile seafood business, which he operated out of a truck, through the summer. He had received two $5,000 checks from BP and was awaiting Ken Feinberg's takeover of the claims process.

**Outlook**: Roberts is still uncertain about the future of his business. He wants to make sure that seafood is safe, and he's continually tracking reports from scientists studying Gulf seafood. "Until it gets closer to April, then we really don't now," he said recently. "I'm going to take my money and invest it back into my business, because that's my dream."

**Claims process**: After months of submitting paperwork with the Gulf Coast Claims Facility, Roberts accepted a $5,000 quick-claim payment around Christmastime. "It's over with for me," he said of efforts to be made whole through **the claims program**. "To me that was kind of like a pressured signing. If you're hungry and somebody offers you something to eat, it's hard to say no."

Terrance Roberts.JPG

✚ **View full size**

Terrance Roberts (Press-Register/John David Mercer)

## Paul Johnson, 32, Coden

**Occupation**: Commercial fisherman and co-owner of Three Men and a Boat on Heron Road, where Johnson, his brother and father fish, shrimp, crab and pack and sell oysters.

The Press-Register reported that Johnson, who is a sixth-generation fisherman, and his family reopened after closing the boat for more than two months following the oil spill. Johnson has filed multiple personal claims with BP and the Kenneth Feinberg administration and received payments of more than $10,000.

**Outlook**: Johnson said Three Men and a Boat continues to struggle after the spill. "Before this all happened, I would pull in an average of 400 gallons of oysters a week," Johnson said. "Now, I may be averaging 60. It's dropped off that much."

**Claims process**: In addition to a $2,500 check he received from BP the first week of the original claims process, Johnson received additional payments from BP prior to Feinberg taking control, but he declined to give the amounts. Johnson told the Press-Register that he received a $7,000 check from the Feinberg administration, and his business received $1,000. "I am not taking a final payment," Johnson said. "I think they are just waiting people out."

Paul Johnson.JPG

✚ **View full size**

Paul Johnson (File)

**Editor's note**

**"Tracking The Claims"** is chronicling the experiences of dozens of oil spill victims as they deal with the claims process and work to regain their feet. This is the seventh installment of the series since Aug. 15.

## Sheila Hodges, Baby boomer, Foley

**Occupation**: Owner of Century 21 Meyer Real Estate.

**Most Active Users**    **What's this?**

Users with the most **al.com** comments in the last 7 days

205        AUtuitionX2

190    NO IMAGE    ausouthal

147    ahsaaref- 71 days to KO

137    sane the blog killer

122    NO IMAGE    masspike

**Users We Love**

**Knitting blogger Alda Prosser**
Alda's blog, Sittin' and Knittin', has been going strong on al.com for the past year and a half, and Alda has been knitting since WWII!

**More Users We Love**

**Connect with al.com**
**What's this?**

    

**All Facebook & Twitter accounts »**

**Recommendations**

 You need to be logged into Facebook to see your friends' recommendations

**No Nick Saban to Ohio State speculation? Just shows his home's in Alabama**
471 people recommend this.

**Orlando Magic star Dwight Howard works on tornado-damaged homes in Birmingham**
127 people recommend this.

**Wake up! Auburn's first three games get morning starts for TV, including 11 a.m. season-opener**
145 people recommend this.

 Facebook social plugin

The Press-Register reported beginning Aug. 15 that after suffering summer vacation cancellations from the spill, **the company has struggled to receive full compensation** from its claims, first from BP and now from the Ken Feinberg-led process. In November, Hodges said that Meyer Real Estate filed a multimillion-dollar claim, but got a check for less than 10 percent of its request.

**Business**: Hodges, who became full owner of the firm in the mid-1990s, said she's helped the company grow for the last 25 years. There are regularly 250 full-time employees, but that shoots up to 700 or 800 people during the peak summer season, she said. There's also a sales department with up to 50 agents.

**Outlook**: Hodges said that her business outlook is positive, and the beachside companies are using marketing tools to reach out to potential tourists beyond the south Alabama area. At this time last year, vacation reservations were up 15 percent from 2009. This year, rentals are below last year's high, but still beating the 2009 reservations. "We'll just keep building on that," Hodges said.

**Claims process**: Meyer Real Estate has now received about 80 percent of its claim, up from less than 10 percent of its request in November. Hodges said that in a December meeting, her company was able to point out the errors the Gulf Coast Claims Facility's accountants had made in evaluating her claim, and she said she was assured her company would receive 100 percent. But when the check arrived in January, it was only 80 percent — and the claims facility never called or wrote to explain the difference. She said there's a breakdown in communication between what Feinberg promises and what comes out of his organization. "It's the lack of professionalism," she said. The company has enough to survive this year, she said, but her company's profitability is suffering.

Sheila Hodges.JPG

✦ View full size
Sheila Hodges  (File)

**From Our Advertisers**

• **Swim. Grill. Chill...plan your STAYcation today!**
• **Enter to Win a Big Green Egg**
• **Seafood & Surf, it just comes natural here!**

**Advertise With Us »**

**Popular Tags**                    What's this?

Alabama  Baldwin County  Bob
Riley  BP  crime  Daphne
Deepwater Horizon  Fairhope
forecast  Gulf of Mexico oil spill
Gulf of Mexico oil spill 2010  Gulf
Shores  Mobile  mobile  Mobile
County  Mobile police  Mobile Police
Department  murder  oil spill
Orange Beach  Prichard  rain
robbery  shooting  weather

## Kathleen Walker-Gordon, 53, Bon Secour



(File)
Kathleen Walker-Gordon (File)

**Occupation**: Unemployed

The Press-Register reported that Walker-Gordon, who comes from a family of charter fishermen, was unemployed and planned to take a job through a friend to provide housekeeping services for beachfront condos when the oil hit. She filed a claim with BP and heard nothing. However, after Kenneth Feinberg took control of the claims process, Walker-Gordon received a check "for what I would have made had I been able to work," she said.

**Outlook**: Walker-Gordon remains unemployed, though she said she was able to find short-term employment as a housekeeper late last fall.

**Claims process**: Walker-Gordon said she filed again after she lost her most recent housekeeping position, and received a final $5,000 check. "I wasn't going to wait to see what they might come up with," she said. "A lot of people took the $5,000 because they could not afford not to. People have got to survive."

## Erik Nist, 38, Fairhope

**Occupation**: President and owner of Alabama Beach Vacation Rentals, or ALBVR.com, in Gulf Shores.

The Press-Register reported beginning July 11 that Nist and his wife, Anna Lisa, had not received a check from BP for lost rental income from two condos they own. Nist was debating with BP over the amount of the only check he had received for his vacation rental management





Eric Nist.JPG

✦ **View full size**

Erik Nist (File)

business. The couple filed their BP claim in April, the first Monday after the Deepwater Horizon oil well exploded.

**Outlook**: Erik Nist said he's "confident we're going to have a busy year." The business was down by about 12 percent this month, but he's optimistic things are going to "pick up."

**Claims process**: "Nothing has changed at all," in claims payments made to the business, said Erik Nist. They have received only about one-third of the money they claimed as lost income from the condo rental business, he said. "We had a CPA justify our claims and the Gulf Coast Claims Facility has not taken that into account," said Nist, adding that he's still "exasperated" with the process. For people who haven't been affected by the oil spill and don't understand his anger, Nist used the analogy of filing taxes. He said it's like filing your taxes and expecting a certain amount back that you justified to the government. But the government "comes back to you in December and says you get 30 percent of that amount."

## Jeanne and Bob Donald, 59 and 62, Gulf Shores

**Occupation**: Owners of Hope's Cheesecake.

The Press-Register reported that Hope's Cheesecake saw its cheesecake orders plummet by half in the usually busy summer months, after the Deepwater Horizon oil spill in April. Jeanne Donald had to lay off her chief baker, and picked up the slack by working 12-hour days.



Jeanne Bob Donald.JPG

✦ **View full size**

Jeanne and Bob Donald (Press-Register/John David Mercer)

**Business**: The Donalds opened Hope's Cheesecake after moving from Valdez, Alaska, to Gulf Shores 15 years ago. In Valdez, where they experienced the Exxon Valdez oil spill, Jeanne Donald worked for the city of Valdez, and Bob Donald was a mental health counselor.

**Outlook**:  "Our Christmas sales were down about a third of what they were last year," said Jeanne Donald. "We worked real hard to contact people outside of the spill area to get orders from corporate customers, and that helped. January is down quite a bit. We'll have spring break starting the first of March, and we usually get a shot in the arm about that time. We don't see a lot of increase until about Memorial Day. I'm hoping people are going to come back to the beautiful beach. I hope there's been enough promotion and advertising. If they come back to the beach, then everything down here will benefit."

**Claims process**: The Donalds feel, to date, they have gotten "satisfaction" from the claims process. From May through July, they received a series of checks for $5,000, $10,000 and $25,000. In response to their petition for emergency funds, they received a check in September for $26,000. In November, Jeanne Donald said, "We filed a final claim for the loss of revenue for the rest of 2010, and anticipated losses. They have received our claim, that's all I know."

## Belinda and Albert "Coy" Wilkerson, 62 and 51, Bayou La Batre

**Occupation**: Shrimpers and oyster workers.

The Press-Register reported beginning May 2 that the Wilkersons were concerned about the future of the seafood industry. The couple got more than $70,000 while working in BP's program that paid out-of-work fishermen to aid in spill cleanup. They own two boats — one for shrimping, the other for oysters — and both have worked in the industry their entire lives.

Albert "Coy" Wilkerson (left) and Belinda Wilkerson. (Press-Register/Mike Kittrell)

✦ View full size

**Outlook**:  The Wilkersons will likely retire from the seafood business. After the oil spill, one of their two boats sank off the shores of Mississippi, Belinda Wilkerson said. They recovered the vessel, but it's not running. She said the couple used some of the claims money to pay bills, and "we're just going to live off our little Social Security checks, if we can."

**Claims process**:  The couple settled for a $25,000 quick payment to escape the claims process, Belinda Wilkerson said. But she was disappointed that both she and her husband were not offered settlements, even though they worked in the business together. "We only got credit for one boat," she said. "I don't understand none of this. I just got tired of it. I don't think you're going to get more out of them, anyways." The $25,000 payment was a quick settlement that claims czar Ken Feinberg offered to businesses. He offered $5,000 to individuals.

## Chuck Campbell, 52, Orange Beach and Birmingham

**Occupation**: Co-owner with wife, Shannon, of Liberty Linen and Janitorial Supply and At Work Uniforms of Orange Beach.

The Press-Register reported Nov. 14 that the Campbells had been rejected for a $1.4 million loan to consolidate debt after losing about $250,000 in 2010. Campbell said they are continuing to seek the loan and are now talking to Wells Fargo in Foley about a loan through the Small Business Administration.

✦ View full size

Chuck Campbell (File)

**Outlook**: The couple bought Uniform Rental Service in 1989, changed the name, and the business evolved into two companies supplying linens, cleaning supplies and uniforms to Gulf Coast condominiums and other businesses. Campbell said the company has been working with the Business Support Center in Gulf Shores to secure financing, but that he has found that most banks do not want to work through the SBA programs. "I think it is excess paperwork," he said.

**Claims process**: Campbell said that all claims filed as of late January have been paid. "We are thinking about filling another one, now that some time has passed and we see some of the unforeseen results of the spill on our customers, and subsequently our business," he said.

## Ralph Atkins, 67, Mobile

**Occupation**: Owner of Southern Fish & Oyster Co., on the Eslava Street dock in downtown Mobile, selling seafood to individuals, restaurants and other seafood resellers since 1934.

The Press-Register reported Nov. 15 **that business was still off 50 percent**, but the holidays might bring some relief. Atkins also said he'd


Ralph Atkins.JPG

✦ View full size

Ralph Atkins (Press-Register/Kate Mercer)

received a "small quantity of money the other day, nowhere near what it should be" from the Ken Feinberg claims apparatus.

**Outlook**: "We had a pretty good Thanksgiving, and we got a nice little boost for a couple weeks at Christmas, but now it's stopped in the water. Part of it is the economy, but part of it is still the negative results of the oil spill," Atkins said. The cold weather has scattered the shrimp while fuel costs are tending to keep the fishermen at home, he said. He's talked to some seafood dealers who may leave the industry altogether.

**Claims process**: Atkins called the recent meetings with Feinberg in Bayou La Batre and elsewhere "dog and pony shows." He has filed an interim claim but is still talking with his accountant about their next move. Seafood dealers aren't being paid anything close to what restaurants are getting, he said. "The last money I got was in October — they keep changing around the rules and telling you something different," he said. "And they're giving all this money to the Department of Conservation, which doesn't know anything about marketing."

## Eddie Spence, 50, Gulf Shores

**Occupation**: Co-owner of eight Shrimp Basket restaurants and The Steamer and Baked Oyster Bar; sole owner of Mikee's Seafood and Shrimpy's Mini Golf.

The Press-Register reported that Spence and business partner David Cahoon delayed plans to open a Shrimp Basket in Mobile, given the uncertainty created by the oil spill, but had opened in October on Old Shell Road. Claims had been filed with BP for all the restaurants, with money received for May and part of June and July. Revenue at the five beach restaurants was down 25 percent to 35 percent in June, compared to the same period in 2009. On Nov. 14, Spence said he had received payment in full on all but four of their 10 restaurants. The four were in Orange Beach and Gulf Shores, and were underpaid from 6 percent to 56 percent, he said. Spence attended one of Ken Feinberg's public meetings and gave him the information to show the discrepancy. "He told me, 'It looks like they got slighted.'"

Eddie Spence.JPG

✦ View full size

Eddie Spence (Press-Register/John David Mercer)

**Outlook**: "Business is OK. It is not where we were pre-oil, but it's fine. Seafood is going up in price and that cuts our profit margins way down," Spence said. He will not raise prices to offset the increased costs. "How can you raise your prices in an unstable market? You've got to suck it up. Our profit margins are real slim. I am still optimistic. But there's a lot of skepticism that we still have the risk of oil washing up on the beach and ruining our summer. Personally, I'm looking for a big year."

**Claims process**: "I'm through with everything except my final settlement. My in-house accountants are working on that with Bert Sanders, (a Gulf Shores accountant). I've received my emergency claims. I hope BP handles the final claims in a timely fashion. I'm ready for this to be over with and move on."

## Greg Miller, 55, Fort Morgan



greg-miller.JPG

✦ View full size

Gregory Miller. (Press-Register file/Kate Mercer)

**Occupation**: Owner, Fort Morgan Realty

The Press-Register reported June 21 that guest check-ins were down 90 percent at Miller's business. On Aug. 23, the Press-Register reported that the claims process had been a "nightmare," according to Miller. He'd received about 20 percent of what he thought he was owed through the BP claims process. He had hoped the process would be more equitable under claims czar Kenneth Feinberg.

**History**: Miller's mother started the real estate company in 1973. Today, it manages about 70 rental properties on the peninsula, a handful in which Miller and his wife, Susan Miller, have ownership stakes. Susan Miller has said that the couple's rental properties were meant to be their children's inheritance. Some of the homes owned by the Millers' clients are run strictly as investment properties; others are owned by people who live in them for much of the year.

**Outlook**: Miller said he's already had to sell one of his rental properties because of its negative cash flow. Money from the property management business is being used to prop up the rental property business — losses that have been poorly compensated by the Feinberg emergency process, he said.

**Claims process**: Miller said that the claims facility has compensated him fairly for the property management, poorly for his rental property business and not at all for his real estate business. Miller said he filed the rental properties as a six-month emergency claim. On one of his rental properties, the facility paid in full, plus a couple bucks, he said. Three it totally denied. Others were paid at varying percentages. In total, the facility shorted him about $156,000, by his reckoning. Each of the properties has a similar rental history and many are within a stone's throw of each other on the peninsula, Miller said, so the wide spread in the facility's payments is baffling. Other property owners whose beach rentals he manages have had similar experiences, he said.

Miller said he will now file interim claims for his rental properties. He said it irked him that Feinberg has said he'd be "generous" in assessing claims. "I don't want him to be generous," Miller said. "I want him to pay what he owes."

*(The Press-Register's Guy Busby, Renee Busby, David Ferrara, David Helms, Roy Hoffman, Kathy Jumper, Jillian Kramer, Robert McClendon, Dan Murtaugh and Katherine Sayre contributed to this report.)*

**Related topics:** Albert "Coy" Wilkerson, Belinda Wilkerson, Bob Donald, Chuck Campbell, Eddie Spence, Erik Nist, Greg Miller, Gulf Oil Spill: Tracking the Claims, Jeanne Donald, Kathleen Walker-Gordon, Paul Johnson, Ralph Atkins, Sheila Hodges, Terrance Roberts

**Sponsored Links**

**Get Money Online Fast**
Apply now & get your money tomorrow. Flexible options for you.
CheckIntoCashOnline.com

**Home Business Opportunity**
Start your own business, full training, coaching, support.
www.bestsecretsofsuccess.com



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

| All Claimants | No. of Claimants |
|---|---|
| **Total All Claimants** *(This is a unique count that includes all Emergency Advance Payment Claimants)* | **514,263** |
| 1. Individual | 410,130 |
| 2. Business | 104,133 |
| *Claimants Represented by Counsel: 39,029* | |

| Claimant Review Status | No. of Claimants |
|---|---|
| **Interim and Final Claimants** *(A Claimant can be in only one category below.)* | **298,932** |
| **Reviewed** | **273,053** |
| 1. Final Payment Issued | 139,950 |
| a. Quick Payment | 114,482 |
| b. Full Review | 25,468 |
| 2. Final Release Accepted Pending Payment | 523 |
| 3. Final Offer Made | 16,952 |
| With Interim Payment (5,908 out of these 16,952 Final Offers) | |
| Final Offer Accepted (4,299 out of these 16,952 Final Offers) | |
| 4. Other Claim Determinations: | 115,628 |
| a. Determination Letters (No Loss) | 7,429 |
| b. Withdrawal Requested | 536 |
| c. Claimants Notified Additional Information Required | 31,983 |
| d. Claimant Denied | 75,680 |
| **Under Review** | **26,293** |
| 1. Phase II | 25,879 |
| 2. EAP Unresolved / Under Review (Claims Subject to Liens, Audit Holds, etc.) | 414 |
| **EAP Claimants Resolved** *(Many EAP Claimants have refiled a claim in Phase II - Interim and Final Stage)* | **447,756** |

| Paid Claimants | Paid Claimants | Total Amount Paid |
|---|---|---|
| **Total Unique Claimants** | **188,198** | **$ 4,240,433,382.38** |
| 1. Quick Pay / Full Review / Interim Payment | 153,045 | $ 1,657,862,097.20 |
| *a. Individual* | *118,004* | *$ 704,412,272.90* |
| *b. Business* | *35,041* | *$ 953,449,824.30* |
| 2. Emergency Advanced Payment (EAP) | 169,143 | $ 2,582,571,285.18 |
| *a. Individual* | *122,212* | *$ 1,031,255,045.80* |
| *b. Business* | *46,931* | *$ 1,551,316,239.38* |
| Separate Fund for Real Estate Brokers and Agents | | $ 60,222,089.75 |
| | **Total Paid:** | **$ 4,300,655,472.13** |

| Quick Payments | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| **Total Quick Payments** | **117,566** | **115,751** | **114,482** | **$ 1,107,260,000.00** |
| 1. Individual | 89,953 | 88,684 | 87,691 | $ 438,775,000.00 |
| 2. Business | 27,613 | 27,067 | 26,791 | $ 668,485,000.00 |

| Interim Payments | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| **Total Interim Payments** | **80,293** | **67,453** | **13,085** | **$ 149,247,682.10** |
| 1. Individual | 54,348 | 49,363 | 9,190 | $ 59,348,878.32 |
| 2. Business | 25,945 | 18,090 | 3,895 | $ 89,898,803.78 |

| Full Review Payments | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| **Total Full Review Payments** | **111,486** | **99,986** | **25,478** | **$ 401,354,415.10** |
| 1. Individual | 89,482 | 82,216 | 21,123 | $ 206,288,394.58 |
| 2. Business | 22,004 | 17,770 | 4,355 | $ 195,066,020.52 |

| Final Payment Offers *(Inclusive of Offers with Release Accepted and Final Payment Issued)* | Offers Made | Amount Offered | Offers Accepted | Amount Accepted |
|---|---|---|---|---|
| **Total Final Offers** | **48,440** | **$ 960,770,711.91** | **29,234** | **$ 532,224,066.98** |
| 1. Final Offers: Individual | 36,667 | $ 446,822,463.35 | 24,674 | $ 292,040,254.04 |
| 2. Final Offers: Business | 11,773 | $ 513,948,248.56 | 4,560 | $ 240,183,812.94 |

EXHIBIT G



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Claimant Submissions
*(Quick Pay, Interim and Full Review Claimants only)*

| All Submitted and Paid Claimants | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| 1. Final: Quick Pay | 117,566 | 115,751 | 114,482 | $ 1,107,260,000.00 |
| 2. Final: Full Review *(net of Claimants with Quick Payment or Interim Submissions)* | 111,486 | 99,986 | 25,478 | $ 401,354,415.10 |
| 3. Interim Payment *(net of Claimants with Quick Payment Submissions)* | 80,293 | 67,453 | 13,085 | $ 149,247,682.10 |
| **Total** | **309,345** | **283,190** | **153,045** | **$ 1,657,862,097.20** |

| Submitted and Paid Claimants - Individual | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| 1. Final: Quick Pay | 89,953 | 88,684 | 87,691 | $ 438,775,000.00 |
| 2. Final: Full Review *(net of Claimants with Quick Payment or Interim Submissions)* | 89,482 | 82,216 | 21,123 | $ 206,288,394.58 |
| 3. Interim Payment *(net of Claimants with Quick Payment Submissions)* | 54,348 | 49,363 | 9,190 | $ 59,348,878.32 |
| **Sub-Total** | **233,783** | **220,263** | **118,004** | **$ 704,412,272.90** |

| Submitted and Paid Claimants - Business | Claimants with Filed Claims | Reviewed Claimants | Paid Claimants | Amount Paid |
|---|---|---|---|---|
| 1. Final: Quick Pay | 27,613 | 27,067 | 26,791 | $ 668,485,000.00 |
| 2. Final: Full Review *(net of Claimants with Quick Payment or Interim Submissions)* | 22,004 | 17,770 | 4,355 | $ 195,066,020.52 |
| 3. Interim Payment *(net of Claimants with Quick Payment Submissions)* | 25,945 | 18,090 | 3,895 | $ 89,898,803.78 |
| **Sub-Total** | **75,562** | **62,927** | **35,041** | **$ 953,449,824.30** |



**All Claimants with Filed Claims**



**Amount Paid to All Claimants**



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Individual Claims by Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Amount | No. of Claims | Amount Paid |
|---|---|---|
| 1. $0.01 - $5,000.00 | 156,575 | $ 662,180,642.29 |
| 2. $5,000.01 - $10,000.00 | 44,395 | $ 332,137,403.54 |
| 3. $10,000.01 - $25,000.00 | 33,152 | $ 507,539,328.14 |
| 4. $25,000.01 - $100,000.00 | 6,062 | $ 223,026,076.37 |
| 5. $100,000.01 - $500,000.00 | 84 | $ 10,783,868.36 |
| 6. Over $500,000.00 | 0 | $ - |
| **Total** | **240,268** | **$ 1,735,667,318.70** |



### Individual Claims Paid by Value Range

- 3. $10,000.01 - $25,000.00 — 13.80%
- 2. $5,000.01 - $10,000.00 — 18.48%
- 4. $25,000.01 - $100,000.00 — 2.52%
- 5. $100,000.01 - $500,000.00 — 0.03%
- 6. Over $500,000.00 — 0.00%
- 1. $0.01 - $5,000.00 — 65.17%

### Individual Amount Paid by Value Range

- 5. $100,000.01 - $500,000.00 — 0.62%
- 4. $25,000.01 - $100,000.00 — 12.85%
- 3. $10,000.01 - $25,000.00 — 29.24%
- 1. $0.01 - $5,000.00 — 38.15%
- 6. Over $500,000.00 — 0.00%
- 2. $5,000.01 - $10,000.00 — 19.14%



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Business Claims by Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Amount | No. of Claims | Amount Paid |
|---|---|---|
| 1. $0.01 - $5,000.00 | 13,055 | $ 35,870,628.40 |
| 2. $5,000.01 - $10,000.00 | 9,778 | $ 73,299,035.01 |
| 3. $10,000.01 - $25,000.00 | 42,011 | $ 938,663,892.09 |
| 4. $25,000.01 - $100,000.00 | 14,169 | $ 702,178,632.92 |
| 5. $100,000.01 - $500,000.00 | 2,963 | $ 530,767,363.33 |
| 6. Over $500,000.00 | 141 | $ 223,986,511.93 |
| **Total** | **82,117** | **$ 2,504,766,063.68** |





## Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

### Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Claims by Category and Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Category and Amount | No. of Claims | Amount Paid |
|---|---|---|
| **1. Removal and Clean Up Costs** | | |
| a. $0.01 - $5,000.00 | 50 | $ 118,332.05 |
| b. $5,000.01 - $10,000.00 | 13 | $ 100,369.88 |
| c. $10,000.01 - $25,000.00 | 21 | $ 420,478.66 |
| d. $25,000.01 - $100,000.00 | 4 | $ 162,291.00 |
| e. $100,000.01 - $500,000.00 | 3 | $ 516,063.08 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **91** | **$ 1,317,534.67** |
| **2. Real or Personal Property** | | |
| a. $0.01 - $5,000.00 | 161 | $ 516,033.15 |
| b. $5,000.01 - $10,000.00 | 37 | $ 260,147.41 |
| c. $10,000.01 - $25,000.00 | 46 | $ 851,749.11 |
| d. $25,000.01 - $100,000.00 | 14 | $ 529,786.12 |
| e. $100,000.01 - $500,000.00 | 2 | $ 292,871.98 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **260** | **$ 2,450,587.77** |
| **3. Lost Earnings or Profits** | | |
| a. $0.01 - $5,000.00 | 169,340 | $ 697,272,034.40 |
| b. $5,000.01 - $10,000.00 | 54,121 | $ 405,061,078.40 |
| c. $10,000.01 - $25,000.00 | 75,091 | $ 1,444,860,482.10 |
| d. $25,000.01 - $100,000.00 | 20,213 | $ 924,512,632.17 |
| e. $100,000.01 - $500,000.00 | 3,041 | $ 540,561,792.69 |
| f. Over $500,000.00 | 141 | $ 223,986,511.93 |
| **Sub-Total** | **321,947** | **$ 4,236,254,531.69** |



# Gulf Coast Claims Facility
### www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Claims by Category and Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Category and Amount | No. of Claims | Amount Paid |
|---|---|---|
| **4. Loss of Subsistence Use of Natural Resources** | | |
| a. $0.01 - $5,000.00 | 7 | $ 19,285.71 |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **7** | **$ 19,285.71** |
| **5. Physical Injury / Death** | | |
| a. $0.01 - $5,000.00 | 72 | $ 125,585.38 |
| b. $5,000.01 - $10,000.00 | 2 | $ 14,842.86 |
| c. $10,000.01 - $25,000.00 | 5 | $ 70,510.36 |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 1 | $ 180,503.94 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **80** | **$ 391,442.54** |
| **6. Other Claims** | | |
| a. $0.01 - $5,000.00 | 0 | $ - |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **0** | **$ -** |
| **Total** | **322,385** | **$ 4,240,433,382.38** |



# Gulf Coast Claims Facility
### www.GulfCoastClaimsFacility.com

## Overall Program Statistics
### *(Status Report as of June 01, 2011)*

### Individual Lost Earnings or Profits Claims Paid by Industry
#### *(Claimants may have more than one Claim Category)*

| Paid Claims By Industry | No. of Claims | Amount Paid |
|---|---|---|
| Fishing | 10,900 | $ 133,624,525.82 |
| Food, Beverage and Lodging | 125,627 | $ 814,156,663.61 |
| Multiple Industry / Business Types | 10,079 | $ 96,550,117.66 |
| No Industry Designation | 899 | $ 7,420,111.12 |
| Rental Property(ies) | 3,700 | $ 28,072,117.53 |
| Retail, Sales and Service | 76,271 | $ 552,292,453.78 |
| Seafood Processing and Distribution | 8,027 | $ 71,935,874.99 |
| Tourism and Recreation | 4,483 | $ 30,182,678.65 |
| **Total** | **239,986** | **$ 1,734,234,543.16** |



### # of Individual Claims Paid by Industry

Retail, Sales and Service 31.78%
Rental Property(ies) 1.54%
No Industry Designation 0.37%
Multiple Industry / Business Types 4.20%
Food, Beverage and Lodging 52.35%
Seafood Processing and Distribution 3.34%
Tourism and Recreation 1.87%
Fishing 4.54%

### Amount  of Individual Claims Paid by Industry

Retail, Sales and Service 31.85%
Rental Property(ies) 1.62%
No Industry Designation 0.43%
Multiple Industry / Business Types 5.57%
Food, Beverage and Lodging 46.95%
Seafood Processing and Distribution 4.15%
Tourism and Recreation 1.74%
Fishing 7.71%



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Business Lost Earnings or Profits Claims Paid by Industry
*(Claimants may have more than one Claim Category)*

| Paid Claims By Industry | No. of Claims | Amount Paid |
|---|---|---|
| Fishing | 15,591 | $ 520,462,050.79 |
| Food, Beverage and Lodging | 7,595 | $ 366,562,667.11 |
| Multiple Industry / Business Types | 1,307 | $ 33,804,831.56 |
| No Industry Designation | 2,746 | $ 84,877,129.97 |
| Rental Property(ies) | 21,684 | $ 408,434,823.10 |
| Retail, Sales and Service | 30,216 | $ 889,034,573.16 |
| Seafood Processing and Distribution | 1,332 | $ 137,312,965.16 |
| Tourism and Recreation | 1,490 | $ 61,530,947.68 |
| **Total** | **81,961** | **$ 2,502,019,988.53** |





# Gulf Coast Claims Facility
### www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of June 01, 2011)*

### Claims by State of Residence
*(Claimants may have more than one Claim Type)*

| Claim State of Residence | Submitted Claims | Paid Claims | Amount Paid |
|---|---|---|---|
| Louisiana | 339,201 | 107,642 | $ 1,319,247,830.96 |
| Florida | 290,799 | 123,106 | $ 1,534,941,585.80 |
| Alabama | 124,666 | 46,671 | $ 691,696,932.64 |
| Mississippi | 92,313 | 27,598 | $ 347,524,586.86 |
| Texas | 16,820 | 4,418 | $ 148,370,407.71 |
| Others | 33,333 | 12,950 | $ 198,652,038.41 |
| **Total** | **897,132** | **322,385** | **$ 4,240,433,382.38** |





### Claims by State of Loss
*(Claimants may have more than one Claim Type)*

| Claim State of Loss | Submitted Claims | Paid Claims | Amount Paid |
|---|---|---|---|
| Louisiana | 227,370 | 108,120 | $ 1,352,074,338.21 |
| Florida | 246,383 | 131,473 | $ 1,654,140,805.22 |
| Alabama | 95,551 | 49,158 | $ 730,234,402.75 |
| Mississippi | 61,414 | 26,535 | $ 330,565,698.15 |
| Texas | 9,300 | 2,869 | $ 108,488,172.66 |
| Other State / Pending Location Verification | | 4,230 | $ 64,929,965.39 |
| **Total** | | **322,385** | **$ 4,240,433,382.38** |







**» Print**

This copy is for your personal, non-commercial use only.

# BP spill fund winding down after $4 billion paid out: report

Sun, May 29 2011

LONDON (Reuters) - The fund BP (BP.L: Quote, Profile, Research) set up to deal with compensation claims after 2010's Gulf of Mexico oil spill is starting to wind down after paying out around $4 billion of the $20 billion set aside by the oil firm, the Sunday Telegraph reported.

The newspaper said Ken Feinberg, the lawyer in charge of the fund, had processed more than 80 percent of the claims submitted by those who suffered economically following the Deepwater Horizon accident, and so far used just over $4 billion.

"I don't envision a flood of new claims," the paper quotes Feinberg as saying. Eight regional offices had been closed, it added.

The oil major established the fund last June for victims such as fishermen and property owners.

In an interview with Reuters in April, Feinberg said the fund was "working as intended," though some local officials and advocacy groups alleged that the money was being distributed slowly and unfairly.

BP (BP.N: Quote, Profile, Research) has estimated that the total cost of capping the well, cleaning up the damage from America's largest-ever offshore oil spill and compensating those affected will be more than $41 billion, including fines.

(Reporting by Rosalba O'Brien; Editing by Jon Loades-Carter)

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only.

EXHIBIT H

## GULF COAST CLAIMS FACILITY DOCUMENT REQUIREMENTS

You must provide the documentation described below for each type of injury or damage you claim to have suffered as a result of the Deepwater Horizon Incident on April 20, 2010 and resulting oil discharges (the "Spill"). These requirements apply to Interim Payment Claims and to Full Review Final Payment Claims.

The requirements below are the **minimum requirements** for processing your Claim. **In certain cases, the GCCF may request additional documentation from claimants**. Providing thorough documentation is the best way to ensure your claim is processed quickly. If you have additional documents or materials that would be helpful in showing the GCCF how the Spill resulted in a loss to you, or the amount of that loss, you should provide them. **All documents you submit to establish your past losses or estimate your future losses will be reviewed and considered by the GCCF.**

Interim Payment Claims will be evaluated solely on the documents submitted and missing records will lead to denial of your Interim Payment Claim or a smaller payment. If your Interim Payment Claim is denied or paid a smaller amount because of missing documentation you will not be able to file another Interim Payment Claim until the following calendar quarter. The GCCF will send deficiency notices asking for missing documents on Full Review Final Payment Claims when necessary, but inadequate documentation will delay the evaluation and may reduce the amount of an offer for Final Payment.

If you submit your Claim Form online, you must submit all supporting documentation within five (5) days of your online filing. If you submit your Claim Form by mail, email, overnight delivery, fax or in person, you must submit all supporting documentation with your Claim Form. Claim applications and supporting documentation that are submitted in person are not retained at the GCCF Claims Site Offices. These materials are sent to the GCCF processing center in Dublin, Ohio, or are scanned and sent to the processing center via the internet.

When submitting documents, be sure to include information that allows us to identify you such as your Claimant Identification Number, Social Security Number, or other Taxpayer Identification Number, as applicable.

## I.  Requirements for Documenting <u>Individual</u> Lost Earnings Claims

Any person claiming lost earnings as an employee or wage earner must submit the documents described below. If you are self-employed, an owner of rental property, or operate a business as a sole proprietor, and you pay the expenses of the operation and report business income on a Schedule C or other business tax form, then use the documents list for Business Lost Profits claims in Section II rather than this list.

**1.  Documents that establish your earnings history from January 1, 2008, to the present**

   (a)  Provide federal income tax returns for 2008 and all subsequent years up to your most recently filed return. Include all W-2 forms, 1099 forms, and other attachments or schedules to each return. If any of your prior year federal income tax returns are not available, provide a statement explaining why.

   (b)  For any prior year for which you cannot provide a federal tax return, and for the current year through the date you are claiming a loss, you must establish your earnings history for the entire period with at least one of the following sources:

   (i)  State tax returns, including all W-2 forms, 1099 forms, and other attachments or schedules to each return.

   (ii)  Paycheck stubs or other payroll records from all employment demonstrating all earnings from 1/1/08 up to the present.

   (iii)  A letter or other records from an employer that describe when you were working and your rate of pay and total earnings.

**2.  Documents that establish the effects of the Spill on your earnings**

   (a)  You must demonstrate how the Spill affected your ability to earn the amounts you expected, such as with a letter from an authorized representative of your employer that describes a lay-off, reduction in hours and/or reduction in your rate of pay resulting from the Spill. If you were not working and had no income for a period of time after the Spill, your documentation must establish when that period began and, if it has ended, when.

   (b)  If you received any replacement income, such as payments from an income protection insurance policy or from a company severance plan, you must submit documents that establish the amount of the payments and when you received them.

   (c)  If you were out of work for any period after the Spill, you must establish your efforts to find work or the reasons you made no efforts to find work. You can demonstrate your efforts to find work by documenting that you were receiving unemployment benefits, or by submitting copies of job applications, rejection letters or notices demonstrating that you were not hired, or by providing a list of the dates of attempts to find work. If you submit such a list, include the employer contacted, the person contacted, and the results of the effort.

**3.  For Full Review Final Payment Claims — Documents supporting future damages**

   Claimants who submit a Full Review Final Payment Claim Form may submit documents that support any amount claimed as future damages as a result of the Spill, including documents demonstrating the manner in which such future damages have been calculated, the period of time for which they are claimed, and any expert reports or other analyses on which the calculation is based.

EXHIBIT I

## II.  Requirements for Documenting **Business** Lost Profits Claims

Any business claiming lost profits caused by the Spill must submit the documents described below.  If you are self-employed, an owner of rental property, or operate a business as a sole proprietor, and you pay the expenses of the operation and report business income on a Schedule C or other business tax form, use this document list rather than the list in Section I.

1.  **Documents that establish revenue and income from January 1, 2008, to the present**

 (a)  Provide federal income tax returns for 2008 and all subsequent years up to your most recently filed return.  Include all W-2 forms, 1099 forms, and other attachments or schedules to each return. If any of your prior-year federal income tax returns are not available, provide a statement explaining why.

 (b)  For any prior year for which you cannot provide a federal tax return, and for the current year through the date you are claiming a loss, you still must establish your revenue and income history for the entire period with at least one of the following sources:

 (i)  Monthly and annual Profit and Loss statements.

 (ii)  Monthly sales and use tax returns.

 (iii)  For seafood harvesting businesses, a report, obtained from the applicable governmental agency, of the claimant's landings since January 1, 2008.

 (iv)  For new or start-up businesses, all available financial statements and business plans.

 (c)  In addition to federal tax returns, any business claimant seeking more than $200,000 must submit monthly and annual profit and loss statements from 2008 to the present.

2.  **Documents that establish the effects of the Spill on the Business**

 You must demonstrate how the Spill affected the business's revenue and income, such as with a letter from an authorized representative, customers and/or vendors describing the effects, or with other business records such as customer lists and invoices.  For claims based on business cancellations as a result of the Spill, such as from a canceled rental agreement, contract or tour reservation, the claimant must submit copies of documents that demonstrate any cancellations, and documentation of any refunds of deposits or escrows that resulted from the cancellation.  A claimant asserting no revenues or income for any period after the Spill, or a total failure of the business as a result of the Spill, must submit documents, such as profit and loss statements or other financial records demonstrating that the claimant was closed and/or had no revenue.

3.  **Documents that establish ownership or authority to act**

 Business claimants must establish that the representative who signs a Claim Form is authorized to act on behalf of the business claimant.  Examples of documents that establish authorization include operating agreements, corporate bylaws or board resolutions, shareholder agreements, partnership agreements, or certificates of incumbency.  If the claim is for loss of rental income, the claimant must submit copies of the deeds to the rental property owned by the claimant.  If the claimant is a business entity with officers (or individuals with similar authority), the claimant must submit a list of the name and title of each officer.

4.  **Documents supporting increased costs**

 If the claimant is claiming that it suffered a loss as a result of increased costs of operating or additional expenses incurred as a result of the Spill, the claimant must submit copies of documents that support such increased costs.

5.  **Fishing Licenses**

 If the claimant asserts losses from any commercial fishing or harvesting operation, the claimant must also submit copies of any valid fishing license from any state or federal entity held by the claimant from 2008 until the present.

6.  **Documents that establish how rental property is managed**

 Claims for lost rental property income by property owners must document whether the rental property is managed by the claimant or by a third party, such as a management agreement or invoices from a property management company.

7.  **Insurance for Lost Income**

 Claimants must document any amounts received or anticipated from any insurance policy or program for lost income or interruption in business operations as a result of the Spill, as well as the dates that the claimant received such payments and the date that such payments are scheduled to cease.

8.  **Mitigation**

 Claimants must submit documentation of efforts made to reduce or otherwise mitigate losses during any period since the Spill.

9.  **For Full Review Final Payment Claims—Documents supporting future damages (if any)**

 Claimants who submit a Full Review Final Payment Claim Form may submit documents that support amounts claimed as future damages as a result of the Spill, including documents demonstrating the manner in which such future damages have been calculated, the period of time for which they are claimed, and any expert reports or other analyses on which the calculation is based.

### III.  Requirements for Documenting Removal and Clean Up Costs Claims

Any person claiming removal and clean up costs as a result of the Spill must submit the documents described below.

**1.  Documents describing the Removal and Clean Up Action**

**2.  Documents establishing when and where the Removal and Clean Up Action occurred**

**3.  The Federal On-Scene Coordinator and the National Contingency Plan**

Claimants must establish that the Removal and Clean Up action was approved by the Federal On-Scene Coordinator or was consistent with the National Contingency Plan.

**4.  Documents establishing why the action was taken**

Claimants must demonstrate that the action was undertaken because of the Spill, such as by including maps or pictures of the contaminated area.

**5.  Documents establishing cost and payment**

Claimants must demonstrate the cost of the action, and that payments were actually made, such as by providing copies of receipts, invoices or bills, or similar records supporting the costs incurred to perform the action, and bank statements, canceled checks, credit card statements, or other documents demonstrating payment of the cost.

**6.  Reasonableness of costs**

Claimants must explain how claimed amounts for incurred costs were determined by providing any cost comparisons, alternative bids or pricing, or other documents demonstrating that the costs were reasonable.

**7.  Payments from insurance or other sources**

Claimants  must document payments received to perform the action from private insurance or other entities relating to any of the matters that form the basis of the claim.

**8.  For Full Review Final Payment Claims—Documents supporting future damages (if any)**

Claimants who submit a Full Review Final Payment Claim Form may submit documents that support amounts claimed as future damages as a result of the Spill, including documents demonstrating the manner in which such future damages have been calculated, the period of time for which they are claimed, and any expert reports or other analyses on which the calculation is based.

### IV.  Requirements for Documenting Real and Personal Property Claims

Any person claiming physical damage to real or personal property caused by the Spill must submit the documents described below.

**1.  Proof of ownership interest**

Claimants must document their ownership or leasehold interest in the property claimed to be damaged, such as by providing a copy of a title, deed, or lease to property in the claimant's name.  If the claim is for damage to a boat, submitted documents must establish the vessel or hull's Identification Number.

**2.  Proof of damage**

Claimants must establish that property was physically damaged or destroyed by the Spill, such as by providing copies of invoices for repairs, insurance claims, or photographs.

**3.  Documents establishing loss of value**

Property claims based on a loss of value of physically damaged property must establish realized loss, such as by providing copies of a purchase or sales contract for the property prior to the Spill and a settlement or closing document relating to the sale or other disposition of the property after the Spill.

**4.  Documents of repair or replacement costs**

Property damage claims based on the cost to repair or replace the damaged property must establish the amount of those costs, such as by providing copies of bills, invoices or estimates.

**5.  Payments from Insurance**

Claimants must state and document the amount of payments from any insurance policy or program for property that was damaged or destroyed by the Spill, as well as the dates that the claimant received such payments.

**6.  Property Damage during Vessels of Opportunity work**

Claimants must indicate if the property damage occurred while working for the Vessels of Opportunity program.

**7.  For Full Review Final Payment Claims—Documents supporting future damages (if any)**

Claimants who submit a Full Review Final Payment Claim Form may submit documents that support amounts claimed as future damages as a result of the Spill, including documents demonstrating the manner in which such future damages have been calculated, the period of time for which they are claimed, and any expert reports or other analyses on which the calculation is based.

## V.  Requirements for Documenting Loss of Subsistence Use of Natural Resources Claims

Any person claiming loss of subsistence use of natural resources as a result of the Spill must submit the documents described below.

**1.  Documents identifying the Subsistence Use of Natural Resources**

Claimants must provide photographs, affidavits, witness statements, or other documents identifying the affected natural resource used by the claimant before the Spill and proving that the claimant used and relied upon that resource for the claimant's subsistence. Subsistence is defined as necessary to support life.

**2.  Documentation of replacement costs**

Claimants must provide copies of receipts or other verifications of expenditures to replace the natural resources previously relied upon for subsistence.

**3.  For Full Review Final Payment Claims — Documents supporting future damages (if any)**

Claimants who submit a Full Review Final Payment Claim Form may submit documents that support amounts claimed as future damages as a result of the Spill, including documents demonstrating the manner in which such future damages have been calculated, the period of time for which they are claimed, and any expert reports or other analyses on which the calculation is based.

## VI.  Requirements for Documenting Physical Injury or Death Claims

Any person claiming damages from physical injury or death as a result of the Spill must submit the documents described below.

**1.  Documented diagnosis**

Claimants must provide documents from a medical practitioner providing a diagnosis of the injury/death, such as hospital records or medical records.

**2.  Documents establishing the cause of the injury or death**

Claimants must provide documents from the treating medical practitioner providing a description of the cause of the injury/death, such as hospital records, medical records, or affidavits.

**3.  Documents establishing where the injury or death occurred**

Claimants must provide documents that demonstrate the geographic location where the injury/death occurred, such as copies of employer records, hospital records or medical records.

**4.  Proof of medical expenses**

Claimants must provide documents establishing any medical expenses incurred as a result of the injury/death, such as copies of pharmacy receipts, hospital bills, or bills from a medical practitioner.

**5.  Proof of disability**

If disability is claimed, proof of the nature and degree of such disability, such as copies of hospital records, or other medical records from treatment of the claimant.

| 6. | **Physical injury during Vessels of Opportunity work** |
|---|---|
| | If the injury occurred while working for the Vessels of Opportunity program or a beach clean-up program, proof of employment such as copies of pay stubs and any incident reports related to the injury. |
| 7. | **Proof required for death claims** |
| | If death is claimed to have been caused by the Spill, copies of a death certificate and, where available, an autopsy report.  If the death occurred while in a hospital or other care facility, copies of all records relating to that stay in the hospital or facility. |
| 8. | **Documentation of payments from insurance or any other source** |
| | Claimants must state and document the amount of any compensation, reimbursements or other payments received for the injuries and/or for medical expenses resulting from the injury from any source such as private health insurance, Medicare, Medicaid, worker's compensation insurance, or any party. |
| 9. | **For Full Review Final Payment Claims—Documents supporting future damages (if any)** |
| | Claimants who submit a Full Review Final Payment Claim Form may submit documents that support amounts claimed as future damages as a result of the Spill, including documents demonstrating the manner in which such future damages have been calculated, the period of time for which they are claimed, and any expert reports or other analyses on which the calculation is based. |

## VII.  Requirements for Documenting Representative Claimants

**If you are filing a claim on behalf of a person who is deceased, legally incompetent, or legally a minor under the laws of the state or jurisdiction where the minor lives, you also must submit the following documents.  To obtain any of the forms required by the GCCF mentioned below, go to www.gulfcoastclaimsfacility.com, call toll-free at 1-800-916-4893, or visit a GCCF Site Office.**

| 1. | **Representative of a deceased Claimant** |
|---|---|
| | Provide a copy of a court order or other document issued by an official showing appointment as the representative of the estate of a deceased claimant.  If no such document can be obtained, the claimant must submit an Affidavit of Heirship using the form required by the GCCF. |
| 2. | **Representative of a legally incompetent Claimant** |
| | Provide a copy of a court order or other document issued by an official showing appointment as the guardian or other authorized representative of the incompetent claimant.  If no such document can be obtained, the claimant must submit an Affidavit of Guardianship using the form required by the GCCF. |
| 3. | **Representative of a minor Claimant** |
| | Provide a copy of a court order or other document issued by an official showing appointment as the guardian or other authorized representative of the minor claimant.  If no such document can be obtained, the claimant must submit an Affidavit of Parentage or Custodial Capacity using the form required by the GCCF. |

## AFFIDAVIT OF MQVN COMMUNITY DEVELOPMENT CORPORATION, INC.

STATE OF LOUISIANA
PARISH OF ORLEANS

Before me, the undersigned notary public, did come and appear, **TINH BUI**, an individual of sound mind who has reached the age of majority, who did swear and attest as follows:

1.

I, Tinh Bui, am the Lead Technical Assistant for Workforce Development of MQVN Community Development Corporation ("MQVN CDC"), a not-for-profit, Vietnamese American organization located in New Orleans East, with the mission to preserve and promote the unique diversity of our community and improve the quality of life of residents in the Greater New Orleans area, beginning in New Orleans East. Together with community partners, our work encompasses health care, environmental and agricultural concerns, education, housing, social services, economic development and culture and the arts.

2.

My responsibilities include providing technical assistance to community members filing claims with the Gulf Coast Claims Facility ("GCCF"). MQVN CDC is assisting more than 500 claimants in the GCCF process.

1

EXHIBIT J

3.

MQVN CDC has been very active assisting our community members in the aftermath of the Gulf Oil Spill. Many of the community members are commercial fishermen, shrimpers or oystermen, or they work in the seafood processing industry. As such, the community has been severely impacted economically by the oil spill.

4.

MQVN CDC has dedicated considerable staff time and financial resources to assisting community members with their claims for economic relief following the spill, first with BP, and then with GCCF. I, personally, have spoken with and assisted hundreds of individuals with various issues and problems they have experienced in the aftermath of the oil spill, including speaking with individuals at the GCCF, translation services, explanation of the claims and associated forms, assisting the claimants with acquiring the various supporting documents necessary to accompany claims submitted to the GCCF, and developing and negotiating a framework for making subsistence claims.

5.

Through my direct observations, I have seen the GCCF claims process create confusion and desperation among our community members. This confusion and desperation has created significant pressure on the claimants to release their claims, many of whom do not believe they have any other option but to accept the "quick payments" offered to them. The confusion is largely related to poor translation services and a difficult claim process, and the desperation is related to the long delay in paying claims since the end of the emergency advance payment process in November 2010.

6.

MQVN CDC has provided technical assistance to 531 individuals who asked for help with the GCCF process. Of the approximately 48 interim claimants that I have personally assisted to demonstrate a loss of income in 2010, only 3 have been offered an interim payment. None of the claimants who received an interim payment were associated with the fishing industry. All of the interim claimants were provided a "full final" calculation with their rejected interim claim. All were also offered a quick payment settlement. Only 6 of the interim claimants, typically those who were denied compensation last year, have received a "full final" offer that was greater than the quick pay offer. The other technical assistants at MQVN CDC have reported comparable experiences.

7.

In some cases where the claimant would show a loss even according to the GCCF's calculation methodology, the GCCF made errors or miscalculations that reduced or erased the loss. For example, one oyster shucker who I am assisting had his 2010 income more than doubled in the GCCF's calculation, which reduced his loss considerably. Then that reduced loss was multiplied by two years instead of the four years called for in the GCCF methodology. With a proper calculation, even using GCCF's methodology, this shucker should have received an offer of tens of thousands of dollars. Because of the GCCF mistakes his offer was $0.

8.

I have noticed a very common situation among our community members, particularly the deckhands. Many claimants were lead to believe they would receive interim payments from the GCCF this year, so they budgeted accordingly. However, the GCCF failed to pay them any interim compensation. This spring the claimants found that they owed large tax bills and had no way to pay those bills. This situation has forced many deckhands to accept the final quick payments because no other income was available to pay taxes.

9.

I have noticed among the oyster shuckers within our community that they received very low compensation from the emergency advance payment program last year and have been offered no interim payments. This particular community of workers has become desperate and many have been forced to accept the $5,000 quick payment to feed their families and obtain the basic necessities of life.

10.

The GCCF's handling of interim claims submitted by our community has been slow and burdensome. The GCCF routinely takes a month to three months to provide a response to interim claims and occasionally much longer. The GCCF routinely asks for resubmission of documents that have already been submitted before it will process the claim, which further extends the wait time. Many of our community members took the final quick payments because they could not

wait any longer and were desperate for some income to pay basic living expenses.

The above and foregoing was sworn and subscribed before me by the Affiant, _Tinh Bui  dba  MQUN CDC_ , this _2nd_ day of _June_ , 2011.

_____
Signature of Notary Public

_____
Signature of Affiant

_Clay Garside_
_____
Printed Name of Notary Public

_TINH BUI_
_____
Printed Name of Affiant

Notary Public or Attorney No.: _85219_
Commission expires: _at death_

## <u>AFFIDAVIT OF GRACE SCIRÉ</u>

STATE OF LOUISIANA

PARISH OF ORLEANS

Before me, the undersigned notary public, did come and appear, **GRACE SCIRÉ**, an individual of sound mind who has reached the age of majority, who did swear and attest as follows:

1.

I, Grace Sciré, am the Gulf Coast Regional Director of Boat People S.O.S. ("BPSOS"), a not-for-profit, Vietnamese American organization with the mission to "empower, organize, and equip Vietnamese individuals and communities in their pursuit of liberty and dignity." Previously, I practiced law and was a state representative in the state of Connecticut.

2.

My responsibilities with BPSOS include oversight of three offices in the Gulf South, including offices in Gretna, Louisiana, Biloxi, Mississippi, and Bayou La Batre, Alabama. My physical office is in the Bayou La Batre office.

3.

BPSOS provides community services for the Southeaset Asian population along the Gulf Coast (as well as some non-Southeast Asian individuals in need of support). These services include, but are not limited to: translation for non-english speaking community members, food programs, community and educational programs and events, and general assistance with societal issues that impact the Southeast Asian population in the Gulf South.

EXHIBIT K

4.

BPSOS has been very active assisting its constituent families in the aftermath of the Gulf Oil Spill.  Many of the community members are either: Commercial Fishermen, Shrimpers or Oystermen; or they work in the seafood processing industry.  As such, the community has been severely impacted economically by the oil spill.

5.

BPSOS has dedicated considerable staff time and financial resources to assisting community members with their claims for economic relief following the spill, first with BP, and then with the Gulf Coast Claims Facility ("GCCF").  This assistance has included translation services, explanation of the claims and associated forms, assisting the claimants with acquiring the various supporting documents necessary to accompany claims submitted to the GCCF, and accompanying the claimants to the GCCF offices to assist with the claims process.

6.

I, personally, have spoken with and assisted hundreds of individuals with various issues and problems they have experienced in the aftermath of the oil spill, including speaking with individuals at the local GCCF claims offices, attending numerous town hall meetings and having conversations with Ken Feinberg, the appointed claims administrator.  Additionally, as regional director for BPSOS, the staff from the three regional offices report to me their experiences assisting individuals in the aftermath of the oil spill, including but not limited to their experiences in dealing with the GCCF local offices.

7.

Through my direct observations, I have seen the actions by the GCCF create confusion and desperation amongst the community members BPSOS has tried so hard to help. This confusion and desperation has created significant pressure on the claimants to settle their claims, many of whom do not believe they have any other option but to accept the $5,000 individual settlement claims offered to them.

8.

One major problem has been the lack of translation services offered through the GCCF for the non-English speaking population. In Bayou La Batre, approximately one-third of the population is comprised of Vietnamese and other Southeast Asian individuals. However, in the Bayou La Batre office, of the twenty or so claims processing staff, only one is a Vietnamese speaker. As such, claimants are forced to wait for long periods of time, or are unable to understand what they are being told by the GCCF claims processors.

9.

Further, the GCCF's early efforts at document translation resulted in incomprehensible gibberish, and claimants could not understand the "translated" documents. BPSOS had offered translation services to the GCCF and Ken Feinberg early in the operation, but the offer of assistance was declined.

10.

Recently, numerous individuals who had filed claims for short term, interim relief have come to BPSOS asking for assistance in interpreting the responses received by them from the

3

GCCF.  Not a single person, of the several dozen who have come to BPSOS seeking our help, was actually offered any amount for an interim payment.  In fact, they have been told that they are not owed additional amounts, that they are owed very little, or that they produced insufficient documentation, and all of them have been offered $5,000 for a full and final settlement.

11.

There are a number of communications from the GCCF to the claimant that I have personally witnessed that have created significant confusion, and frustration, while doing nothing to actually assist those claimants who are becoming increasingly desperate.  A non-exclusive list of this is as follows:

1.  The claimant has submitted additional documentation, upon the request of the GCCF, to more fully document losses, and the claimant is then told that the additional documentation is not "contemporaneously produced" to show loss, and therefore cannot be used in any calculation for loss;

2.  Numerous mathematical and numerical errors in the claimants damages calculations, including substantial typographical errors, and 2-year damage calculations, rather than 4-year calculations for those in the oyster industry.  When the GCCF is made aware of the mistakes or problems, the claimants are told that while the GCCF is aware of the mistakes, the claimants need to submit letters to the GCCF asking for reconsideration, to which the GCCF usually simply re-sent the original letter;

3.  GCCF has told claimants that they were represented by counsel, when in fact they were not, and when the clarification was made, told that the GCCF could not speak directly with the claimant for at least two weeks, without explanation why; and

4

4. Telling an oyster shucker, who has done nothing else for her entire adult life, that because she works at a facility that has also processed crabs, she was not entitled to a four year calculation granted the oyster industry, but would only be entitled to a two year damage calculation.

12.

While there has not been a single offer of interim payment made by the GCCF to any claimant who has come to BPSOS, a number of those individuals have ended up accepting the $5,000 quick settlement because they explained they could not take the process anymore, that they couldn't understand what they had done wrong that their claims were rejected, or that they simply were desperate and needed to take the money to survive.

13.

I have witnessed the desperation and confusion created by the GCCF's handling of the claims submitted by the Vietnamese and Southeast Asian Community, and am aware that a number of individuals have accepted final payments in the amount of $5,000 dollars because they could not wait any longer and were desperate for some income to offset their losses. I am aware that a number of these individuals who accepted the $5,000 payment had submitted interim claims, but had not received an interim payment offer from GCCF. I have experienced how the GCCF's actions directly contribute to the confusion, frustration and desperation of the claimants and do not provide the relief that was promised by Ken Feinberg and the GCCF.

The above and foregoing was sworn and subscribed before me by the Affiant,

GRACE SCIRE _____, this __26th__ day of __MAY__, 2011.

_____
Signature of Notary Public

_____
Aaron Ahlquist
Printed Name of Notary Public

Notary Public or Attorney No.: __29063__
Commission expires: __at death__

_____
Signature of Affiant

_____
GRACE SCIRE
Printed Name of Affiant

**AFFIDAVIT**

STATE OF LOUISIANA

PARISH OF PLAQUEMINES

BEFORE ME, the undersigned authority, personally came and appeared, <u>Byron Encalade,</u> <u>President of the Louisiana Oysterman's Association</u>, who after being duly sworn did depose and say that:

I <u>Byron Encalade</u>, in my capacity as President of the Louisiana Oysterman's Association, have worked very closely with members of our Association since the Deepwater Horizon Explosion of April 20, 2010. Most of our members are from the towns of Point a la Hache, Phoenix and Davant, Louisiana. It has been my personal experience from trying to assist members of the Association in recovering from BP/GCCF as a result of the spill, that BP has a pattern of either not paying emergency payments to our members, or requiring endless documentation, many times asking for the same material over and over again, including statements that we have not given documents that in fact we have already provided, as well as not paying interim claims for our members of our Association, that to my personal knowledge were supported with the requested documentation.

The actions of BP have put members of the Association into a dire situation. It is forcing many of the members of our Association to have to accept the quick pay option or starve because the GCCF refuses to pay their interim claims.

Our area in particular, the east side of the Mississippi River, has been severely damaged by the State's response to the Deepwater Horizon Oil Spill. Particularly, our oyster beds that our members lease have been killed as a result of fresh water that was diverted to push oil out of Black Bay and various areas on the east side of the Mississippi River. In spite of these efforts, some oil and chemicals did get into Black Bay and Barataria Bay. It is our firm belief that the combination of oil, dispersant chemicals and fresh water diversion caused our oyster beds to die and these beds have not started to repopulate as of this date.

Our main request as an organization is that the GCCF promptly pay members of the Louisiana Oysterman's Association's interim claims as submitted because the vast majority of our members have no income coming in whatsoever because they cannot harvest oysters and have not been able to harvest oysters since the oil spill of April 20, 2010.

Witnesses:

_Terence Williams_

_James Der Nelle_

BYRON ENCALADE

SWORN TO AND SUBSCRIBED before me, Notary, this 26 day of May, 2011.

_Derriel McCorvey_

**DERRIEL C. MCCORVEY/ NOTARY # 058714**
**ATTORNEY AT LAW AND NOTARY PUBLIC**

EXHIBIT L

## <u>AFFIDAVIT OF WAYNE CIKO</u>

STATE OF LOUISIANA

PARISH OF ORLEANS

Before me, the undersigned notary public, did come and appear, **WAYNE CIKO**, an individual of sound mind who has reached the age of majority, who did swear and attest as follows:

1.

I, Wayne Ciko, am an owner and the agent for the Billet Bay Historical Society, LLC, which makes no money but, rather, consists of a number of families who share a recreational fish camp (the "Property") Located on a small island in Billet Bay, Plaquemines Parish, Louisiana.

2.

Following the BP Oil Spill, during and throughout the summer of 2010, oil and other contaminants washed ashore the Property.

3.

The oiling of the property occurred at a time when oil from BP Oil Spill was coming ashore across the Gulf South, and particularly in Barataria Bay and surrounding waters, which includes Billet Bay.

1

EXHIBIT M

4.

The members of the Billet Bay Historical Society, including myself, documented the oil coming ashore to the best of our ability. This consisted of taking numerous photographs, including time lapse and date stamped photographs of the oil washing ashore the Property.

5.

The digital photographs were stored on the camera, on a computer hard drive, and burned onto CDs for redundancy and to ensure that the color photographs could be submitted in support of any claims made to BP or the Gulf Coast Claims Facility ("GCCF").

6.

In September, 2010, I submitted an emergency assistance claim with the GCCF. Included in support of that claim were the photographs taken of the oil on the Property. I was told by the GCCF claims adjuster that I would need additional documentation to support a removal claim, and upon submission of the additional documentation, the emergency assistance claim would be reviewed and I would hear from them.

7.

In response to this request for additional support, two separate remediation specialists were engaged to give clean-up and removal estimates on the property.

8.

I received no further communications from the GCCF relating to the emergency assistance claim.

9.

Hearing nothing from the GCCF for almost five months, in February, 2011, I submitted an interim claim seeking relief from the GCCF for the oil on the Property. Submitted along with the claim were all color photographs and the estimates in support of the removal claims. I was told that there was ample documentation submitted, and that the GCCF would respond within 90 days.

10.

I called the GCCF to inquire as to the status of the claim after 90 days had passed, and was told that they needed the photographs to be submitted in color, not black and white. All photographs had been submitted in color. I then had all color photos burned onto CD, again in color, and submitted the CD, and accompanying photos, to the GCCF's office in Dublin, Ohio, on April 6, 2011, in support of the claim. Registered mail receipt confirms that the Garden City Group in Dublin received the submission on April 8, 2011.

11.

When I called to check on the claim, I was told, again, that they needed the photographs in color, not black and white. When I explained that they had been produced on three separate occasions in color, I was told that the photographs had been scanned into the file in black and white and that they did not know where the hard copies that had been submitted were located. They then requested that I again submit the photographs, this time via email attachment. I did so.

12.

In May, I received a deficiency letter notifying me that the Billet Bay Historical Society's claim lacked documentation showing loss of income. The claim was submitted for a recreational fishing camp. There is no income. At no point was there any claim submitted for loss of income, and at no point prior to May, 2011 was there any communication from the GCCF that they considered the claim to include loss of income.

13.

After this letter from the GCCF, and to clarify that the GCCF had received (in color) all of the photographs I had since emailed to it in support of my claim, I was told that the two removal/remediation estimates I had submitted in support of the claim were not specific enough. Both estimates were in excess of $750,000. I was told that if the adjuster forwarded the estimates as they were, it could impact the offer from GCCF, and that adjuster could no longer speak with me.

14.

During this process, I was offered $25,000 to settle the claim.

15.

It is well over 90 days, and except for multiple requests for documentation which I already submitted and a request for more documentation to prove non-existent lost income, there has been no substantive response from GCCF.

The above and foregoing was sworn and subscribed before me by the Affiant,

_WAYNE C. CIKO_ , this __3__ day of _JUNE_ , 2011.

_____
Signature of Notary Public

_Aaron Ahlquist_
Printed Name of Notary Public

Notary Public or Attorney No.: _29063_
Commission expires: _at death_

_Wayne C. Ciko_
Signature of Affiant

_WAYNE C. CIKO_
Printed Name of Affiant

5

BIG NEWS: **Deficit**  Unemployment  Financial Reform  Budget Cuts  Gas & Oil  Blackberry 101  Login




News | Web

# HUFFPOST BESINESS

SEARCH ›

Like  350K  Follow
CONNECT

| FRONT PAGE | POLITICS | BUSINESS | ENTERTAINMENT | MEDIA | TECH | COMEDY | STYLE | WORLD | FOOD | HEALTHY LIVING | IMPACT | MORE | LOCAL |

BUSINESS  SMALL BIZ BLOG  DAILY FINANCE  REAL ESTATE  THE WATCHDOG  HUFFPOST TECH  TECHCRUNCH  AUTOBLOG



**GREAT AMERICAN PILE-UP**



**Professionals Now View 40-Hour Work Week As Part-Time: Report**



**Public Sector Workers Happier Than Those In Private Sector**



**Susan Buchanan**
*Business Writer*

GET UPDATES FROM SUSAN BUCHANAN

FAN  RSS  EMAIL  Like

# Oyster Growers Say Post-Spill Assistance Is Inadequate

Posted: 04/25/11 05:28 PM ET

React ›  Inspiring | Greedy | Typical | Scary | Outrageous | Amazing | Innovative | Infuriating

Follow ›  ⊕ BP Oil Spill , ⊕ Restaurants , Caernarvon Diversion , Louisiana Dept. Of Wildlife And Fisheries , Natural Resource Damage Assessment , New Orleans , Oil Pollution Act , St. Bernard Parish , U.S. Army Corps Of Engineers , U.S. Dept. Of The Interior , Greater New Orleans Foundation , Gulf Coast Claims Facility , Ken Feinberg , Mississippi River , National Oceanic And Atmospheric Administration , Plaquemines Parish , Shrimp , Business News

SHARE THIS STORY

Like  You like Oyster Growers Say Post-Spill Assistance Is

5 | 17 | 1 | 1
share | tweet | email | comment

**Get Business Alerts**

Sign Up

Submit this story

(This article was published in "The Louisiana Weekly" in the April 25, 2011 edition.)

African American oystermen in Louisiana's lower Plaquemines Parish, where beds are damaged, are a tenacious bunch and don't intend to abandon their livelihoods and seek work elsewhere if they can help it. After a disastrous year since the spill, they're getting assistance from the state but want BP to live up to a commitment to restore beds. And they hope that Gulf Coast Claims Facility paymaster Ken Feinberg will compensate them fairly for losses.

ADVERTISEMENT


AWARD-WINNING LUXURY.
Consumers Digest named the 2011 Buick Enclave a Best Buy.
BUICK  EXPLORE ENCLAVE ›

PHOTO GALLERIES


**10 Brands That Will Disappear Next Year**


**Harlingen, Texas: Cheapest Place To Live In...**


**America's 10 Most**


**10 Cities That Will**

EXHIBIT N

"Oyster beds on the east bank of lower Plaquemines were decimated by the opening of the Caernarvon Freshwater Diversion" on the Mississippi River, said Telley Madina, executive director of the Louisiana Oystermen Association based in Pointe a la Hache. He spoke at an April 19 panel on the coast sponsored by the Greater New Orleans Foundation.

Last May, the state opened the Caernarvon Diversion -- located 15 miles below New Orleans on the east bank near Braithwaite at the St. Bernard and Plaquemines Parish border -- at full capacity to keep oil from the west bank and surrounding areas. Fresh water from the river, however, reduced salinity in oyster habitats, with deadly consequences.

Madina said that his father in law, Byron Encalade -- president of the Louisiana Oystermen Association -- expects to harvest nothing this year from the waters around Pointe a la Hache, where Encalade lives. Oysters there died from the intrusion of fresh water. He said "most of the population on the east bank of lower Plaquemines is minority African American, and many families have been surviving off the water there for generations."

In addition to killing oysters, fresh water diversions didn't always keep oil at bay. "The Caernarvon opening was intended to suppress oil, but oil still got into both the west and east banks, including Spanish Bay," an oyster area east of the river in Plaquemines, Madina said. Some private beds on the east bank in lower Plaquemines survived oil and the diversion's opening, however.

Madina said "we're estimating that it will take five years for most east bank beds to recover, partly because it took five years for them to come back strong after Katrina. They had just gotten full grown when the oil spill happened." Other predictions are that recovery will take 3 to 5 years, or 5 to 10 years, he said.

"The diversions were done for the good of the state because of the spill, to keep oil from the west bank and from coming into Spanish Bay on the east bank -- although it eventually did," Madina said. "BP should help the state recoup losses but has already said it doesn't want to pay for oyster damage from diversions."

Olivia Watkins, spokeswoman for the Louisiana Dept. of Wildlife and Fisheries, said last week "we had a $15 million, verbal commitment for oyster restoration from BP last fall, but they're trying to back out of it now. In Louisiana, a verbal commitment and a handshake are as good as a promise."

Watkins pointed to the high mortality of oysters along Louisiana's coast as a result of the oil spill and spill-response actions. "The oyster industry can't wait for the federal NRDA process--which can take five to ten years to complete--to begin restoration," she said. Louisiana and other Gulf states are to be returned to pre-spill conditions through a Natural Resource Damage Assessment or NRDA. Scientists involved in the NRDA continue to collect data in the Gulf, and restoration ideas are being sought.

Watkins said "we can't sit back and do nothing" about the beds. The state took action this month, and announced two, $2 million allocations, or a total of $4 million, in emergency funding for cultch planting on public oyster seed grounds on the Mississippi River's east bank. Cultch, mostly shells and limestone, is used to provide bedding where young oysters, called spat, attach and grow. Louisiana oysters spawn in the spring and in late August or September. Watkins said the state will ask BP to compensate it for the $4 million in cultch spending.

She said "we already have permits from the U.S. Army Corps of Engineers for the Lake Borgne cultch planting." And at the request of the Louisiana Oyster Task Force, "we will be applying for a permit for Black Bay in Plaquemines Parish so that planting can get started there in time for the fall spat set."

Curtis Thomas, Louisiana-based spokesman for BP's Gulf Coast Restoration Organization, said last week that BP intends to fulfill its environmental and economic commitments to the Gulf, and added "BP knows the NRDA process will resolve many issues that remain through and even after this unprecedented response" to the spill. Thomas continued, saying "with respect to the oyster beds, alleged damage to them caused by the state of Louisiana's fresh water diversion, which may have reduced water salinity, is not compensable under the Oil Pollution Act -- that is, BP is not obligated to pay for such damage because it was not caused by the oil spill."

He also said "some, senior Gulf state regulatory officials are reporting that damage to oyster beds in 2010 was not caused by the spill or the fresh water diversion; rather it was caused by increased water temperature and lower levels of dissolved oxygen." He did not explain who those state regulatory officials were or what locations they had referred to.

Rapidly Aging Cities    Take A Decade To Recover...


HUFFPOST SOCIAL NEWS
FOLLOW US


MOST POPULAR ON HUFFPOST    ◄ 1 of 2 ►


'To Catch A Predator' Host Chris Hansen Caught Cheating... By Hidden Camera: Report
 Recommend    32K


How To Sign Up For Google's Social Network
Like    1K


Mark Halperin SUSPENDED For Calling Obama 'D*ck' (VIDEO)
Like    13K


AOL TV: Chris Hansen, 'To Catch A Predator' Host, Caught Cheating by Hidden Cameras
Like    37K


PopEater: Is 'Idol' Thinking About Life Without Jennifer Lopez?
Like    298


What Does The Bible Actually Say About Gay Marriage?
Like    10K

Lisa Lubin How Could I Afford to Travel Around the World for Two Years?
Like    243

PopEater: Friend: Jonathan Rhys Meyers Did Not Attempt Suicide
Like    741

AOL Real Estate: HOA Halts Construction of Paralyzed Army Vet's Home
Like    826

DON'T MISS HUFFPOST BLOGGERS


Russell Simmons
Stop the Bitchin' And Get to Work!


Dan Rather
A Billion Dollar Blunder?

Sponsored Links
53 yr Old Mom Looks 30

BP will provide $1 billion for early, restoration projects in the Gulf for damage to natural resources caused by the spill, NRDA trustees said last week. The trustees include Louisiana, Mississippi, Alabama, Florida, Texas, the U.S. Dept. of the Interior and the National Oceanic and Atmospheric Administration. The trustees said they plan to use the money for rebuilding coastal marshes, replenishing damaged beaches, conserving ocean habitat for injured wildlife, and restoring barrier islands and wetlands.

Meanwhile, fishermen are getting the short end of the stick from the Gulf Coast Claims Facility, Madina said. "Less than 10% of GCCF payments have gone to Gulf fishermen, shrimpers and oystermen, who so far have been compensated for only a fraction of their losses." He had heard that some workers in seafood restaurants in New Orleans had been fully paid on their GCCF claims. "These groups of people shouldn't be pitted against each other, but GCCF should first help the people affected on the coast, like fishermen," he said.

Madina continued, saying "I don't think problems on the coast will wrap up in 2012 as Ken Feinberg says. We're still seeing big tar balls wash ashore in lower Plaquemines, and I won't be surprised if we have more, enormous fish kills, like we did last September."

Madina knows oystermen in lower Plaquemines who are taking $5,000 final, individual payments from the GCCF and signing away their rights to sue BP because they can't wait any longer for money. "For shrimpers, the season is starting and they need cash to get their boats ready," he said. "Fisheries are a $2.4 billion industry statewide, and it is just about the only industry on the east bank of lower Plaquemines."

Madina said "oystermen need money to pay their mortgage or rent. You can't survive these days floating up and down the river on a boat."

Under a new initiative, oyster shells from participating New Orleans restaurants will be collected to rebuild oyster beds in Louisiana, said Mandi Thompson, executive director of the Gulf Coast Leadership Forum, speaking at that group's conference in the Crescent City last week.

**Sponsored Links**

**53 yr Old Mom Looks 30**
Clever Mom Reveals $5 Wrinkle Trick That Has Botox Doctors Furious!
SkinCareTricks.com

**LOUISIANA:Do NOT Buy Car Insurance**
Until you see this 1 simple trick that can get you insured for as low as $9/week. Start Now -...
YourInsuranceSearch.com/CarInsuranc

**New Policy in Louisiana**
Drivers with no DUIs in Louisiana may be eligible for $9 per week car insurance.
LifestyleHeadlines.com/CarInsurance

**Louisiana Banks Lower Refi Rate to 3% APR**
New regulations approve any Louisiana Homeowner for 3% APR Refi Rate!
http://www.life-stylechoices.com

**Buy a link here**

Clever Mom Reveals $5 Wrinkle Trick That Has Botox Doctors Furious!
SkinCareTricks.com

**LOUISIANA:Do NOT Buy Car Insurance**
Until you see this 1 simple trick that can get you insured for as low as $9/week. Start Now - Only...
YourInsuranceSearch.com/CarInsuranc

**New Policy in Louisiana**
Drivers with no DUIs in Louisiana may be eligible for $9 per week car insurance.
LifestyleHeadlines.com/CarInsurance

**Buy a link here**



**TOP LINKS ON THIS TOPIC**        ◄  1 of 1  ►
- Oil Spill News

Mississippi flood renews Gulf coast anxieties -



Features - Al Jazeera English                        Previously on Restaurants

**10 Chain Restaurants Worth Visiting**

**Making a Restaurant Kosher for Passover**

**9 Great Small Food Towns**

**The New Fort Lauderdale - 100 Years in the Making**

**Look Ma, No Oven! Dorm Room Cashew Chicken (In The Microwave)**

**More in Business...**

10 Cities Where Government Employment Is On...

Citi Sued Over Man's Death In Relation...

Federal Reserve Raises Swipe Fee Cap In...

Timothy Geithner Considering Leaving Treasury After Budget...

**Comments** 1   Pending Comments 0                    View FAQ

**Comments are closed for this entry**

View All

Recency | Popularity

**Louisiana State Bedding**
1 Fans

11:25 AM on 4/27/2011

Nice! i impressed by your post.well done

Louisiana State Bedding

Permalink | Share it

SEARCH

| FRONT PAGE | POLITICS | BUSINESS | ENTERTAINMENT | MEDIA | TECH | COMEDY | STYLE | WORLD | FOOD | HEALTHY LIVING | IMPACT | MORE | LOCAL |

BUSINESS    SMALL BIZ BLOG    DAILY FINANCE    REAL ESTATE    THE WATCHDOG    HUFFPOST TECH    TECHCRUNCH    AUTOBLOG

Advertise  |  Log In  |  Make HuffPost your Home Page  |  RSS  |  Careers  |  FAQ

User Agreement  |  Privacy  |  Comment Policy  |  About Us  |  Contact Us

Copyright © 2011 TheHuffingtonPost.com, Inc.  |   "The Huffington Post" is a registered trademark of TheHuffingtonPost.com, Inc. All rights reserved.

Part of **Money & Finance**



Everything Alabama

# Alabama Attorney General Luther Strange urges BP claims czar to "quit dragging your feet"

Published: Monday, March 21, 2011, 12:37 PM   Updated: Monday, March 21, 2011, 2:24 PM



**Katherine Sayre, Press-Register**
By



View full size

Attorney General Luther Strange, right, and Alabama Gov. Robert Bentley, left, discuss last year's Deepwater Horizon oil spill during a news conference at Dominick's Seafood Inc. on Monday, March 21, 2011, in Bayou La Batre. (Press-Register, Mike Kittrell)

MOBILE, Alabama -- The Gulf Coast Claims Facility "appears inappropriately proud" of having processed half of BP oil spill claims while it has rejected many applicants for no apparent reason, Alabama Attorney General Luther Strange wrote in a letter today.

"Our anxiety has reached a boiling point," Strange wrote in the letter to oil spill claims czar Ken Feinberg. "In the summer of 2010, thousands of Alabamians desperately awaited compensation. As the summer of 2011 approaches, most are still waiting, more desperate than ever. And to be blunt, the Gulf Coast Claims Facility is largely -- if not primarily -- to blame."

Strange said the claims operation has failed to be fully transparent, overplayed the issue of fraud in the system and offered many claimants "meager payments."

The claims facility last week announced that it had reached an **"important milestone"** of processing more than half of the 256,000 final oil-spill claims applications it had received, including about 100,000 quick payments that require recipients to waive their rights to pursue further legal action over the April 20 spill.

Strange pointed to what he called "the demoralization, and often humiliation, of strong-willed, independent citizen who have been reduced to begging for handouts from an organization whose primary mission seems to be turning them down."

"Quit dragging your feet and stalling the large majority of claims to a point where victims are so desperate

EXHIBIT O

that they settle for anything," he wrote.

Strange joined Gov. Robert Bentley for a news conference on the docks of Bayou La Batre this morning.

Both leaders said they're collecting and organizing evidence in the federal lawsuit against BP and others involved in the spill.

"I believe that Alabama was affected worse than any state," Bentley said.

Feinberg and BP are also waiting a federal judge's ruling on whether his court will take a supervisory role in the oil spill claims process.

Plaintiffs lawyers and attorneys general from the Gulf Coast states have asked New Orleans-based U.S. District Court Judge Carl Barbier to rule that the Gulf Coast Claims Facility violates the federal Oil Pollution Act of 1990.

They want Barbier to force a number of changes onto the Gulf Coast Claims Facility, ranging from throwing out any lawsuit waiver that the facility has received to appointing monitors to review the decisions of its adjusters.

Feinberg and BP have argued that the court has no jurisdiction over the process, and even if it did, the operation is running according to law.

Barbier oversees the multi-district litigation against BP PLC and others involved in the summer's Gulf oil spill.

Feinberg took over the oil spill compensation process from BP in August, at President Barack Obama's behest, after Gulf Coast leaders complained that the company was slow to write checks and required too much paperwork.

Feinberg has since been the target of criticism from business owners, fishermen, municipal leaders, plaintiffs lawyers and legislators.

**(Staff reporter Dan Murtaugh contributed to this report.)**

© 2011 al.com. All rights reserved.

**BP Oil Spill Claims Help** Recover The Money You Deserve. Don't Wait, File Your BP Claim Now. www.BPClaims.cc

**Official BP Claims Site** Make A Claim Without A Lawyer Visit Our BP Claims Page For More Info www.BP.com/claims

**Oil Spill Claims** Law Firm Representing Businesses Affected by the Gulf Oil Spill. www.GulfCoastDisasterOnline.com

AdChoices ▷

| THE MINNESOTA INDEPENDENT | THE COLORADO INDEPENDENT | THE MINNESOTA INDEPENDENT | THE WASHINGTON INDEPENDENT | THE COLORADO INDEPENDENT |
|---|---|---|---|---|
| Campaign board rejects NOM's efforts to shield donors in gay marriage battle | Coloradans cast eyes on Amazon battle waging in California | GOP pressed for abortion, stem cell research bans during budget negotiations | Parts of Georgia, South Carolina immigration laws go into effect today | RTD set to receive $1 billion federal grant to help finish FasTracks |

✉ Sign up for our email newsletter

# THE AMERICAN INDEPENDENT
### State Politics in Context

Search

| HOME | STATES | ISSUES | CONGRESS | 2012 | VIDEO | ABOUT |

## TOP STORIES

### 2012 candidates have tended to announce candidacy twice

*By Meghan Malloy | 07.01.11 | The Iowa Independent*



Few supporters — for that matter, opponents — expected GOP candidate and U.S. Rep. Michele Bachmann (R-Minn) would jump into the 2012 race during the New Hampshire primary debate on June 13, after telling reporters her decision on the presidency would be announced in her native Waterloo. More…

### Abortion seekers in South Dakota not required to visit CPCs, for now

**By Sofia Resnick** | 07.01.11

A federal court on Thursday blocked (PDF) a new South Dakota law mandating 72-hour waiting periods and counseling sessions at a faith-based "crisis pregnancy center" that was to go into effect Friday. More…

### Workers protest as Minnesota government shuts down

*By Sam Lane | 07.01.11 | The Minnesota Independent*

Nell Nere sat on the steps of the Capitol Thursday night, hours before her state government shut down indefinitely.

Nere, a worker in the state's Department of Labor and Industry and a member of the Minnesota Association of Professional Employees, began chatting with a student representative from Minnesota College Republicans about the numbers behind the budget dispute that has caused a historic shutdown. More…

Advertisement


Gov. Rick Scott (right) with Panama City Mayor Scott Clemons (Pic via Facebook)

## Florida oil spill claims payments still slow-coming

**By Travis Pillow** | 04.19.11 | 5:29 pm | More from The Florida Independent

Comments 0     tweet     Like    Confirm

While Gov. Rick Scott and members of Florida's cabinet head out on a fishing trip, we're celebrating tomorrow's anniversary of the Deepwater Horizon disaster by delving into data from the oil spill claims process. #

It's easy to get lost in the numbers when sizing up Kenneth Feinberg's progress as administrator of the Gulf Coast Claims Facility. The fund has paid out $3.8 billion to 177,132 claimants since he took over from BP in August. Last summer, Florida wasn't doing as well in the process as other states, which often accumulated thicker globs of oil on their beaches but suffered smaller financial losses. #

Feinberg was supposed to set that right, and to some extent he has. #

Of that $3.8 billion, some $1.5 billion has gone to Florida, more than any other state. Compare that to how the state fared under BP: Floridians filed the more claims than their counterparts in other states, but were less likely to receive payments. #

But most of that money — nearly $1 billion for Florida, and $2.5 billion overall — was paid during the emergency claims process, which technically ended back in December (a few hundred of those claims are still being worked out). Since then, the final and interim payments have been slow, especially for business claims, which tend to be larger and more complicated. #

## TOP VIDEO

■ VIDEO: Romney, Santorum ads attacking Obama on economy

■ VIDEO: Minnesota SEIU sponsors anti-GOP ads

■ Rick Scott's plan to privatize Florida state parks getting national attention

EXHIBIT P





All numbers as of April 18.

# #

Almost all of the money paid out of the fund since the emergency process ended has come in the form of "quick payments," which allow claimants who have already received an emergency payment to take a $5,000 check ($25,000 for businesses) within two weeks, without supplying any additional documentation, in exchange for waiving their right to sue BP. #

Take away the "quick payments," and less than 5 percent of Florida's business claims and 15 percent of its overall claims filed since the end of the emergency process have been paid. #



Counting "quick pay" claims, nearly half of Florida's claims have been paid since the emergency payment process ended.

# #

## AINN TWEETS
### WHAT'S NEW IN THE NETWORK

 **TAI_news** RT @TXIndependent: Texas Republicans' special session wins include proof of citizenship for driver's licenses
http://ainn.ly/iw7gf0 #txlege
7 minutes ago · reply · retweet · favorite

 **MnIndy** Did abortion politics derail budget talks, lead to shutdown?
http://ainn.ly/maQuVQ #stribpol #mnshutdown
10 minutes ago · reply · retweet · favorite

 **TAI_news** Colorado Division of Wildlife: 'Extraordinarily stupid people' fed bears Burger King http://ainn.ly/ldmWNr
16 minutes ago · reply · retweet · favorite

 **TAI_news** Immigrant rights groups call for boycott of MLB All-Star game
http://ainn.ly/jMWI5e #immigration
50 minutes ago · reply · retweet · favorite

 **TAI_news** A big welcome to new @TXIndependent editor @PatrickMichels!
#ff
about 1 hour ago · reply · retweet · favorite

 **TAI_news** Teachers, religious groups file lawsuit against Indiana school voucher program http://ainn.ly/l2nuzQ #Indiana #schoolvouchers
about 1 hour ago · reply · retweet · favorite

**twitter** Join the conversation

abortion Arizona Barack Obama BP budget Campaign Finance Civil Rights Colorado Congress deepwater horizon delegation Economy/Finance Education Environment/Energy epa Florida Harry Reid illegal immigration Immigration Iowa LGBT Michele Bachmann Michigan Minnesota New

## AINN
### AFFILIATES

### The American Independent News Network:

**Colorado**
coloradoindependent.com

**Florida**
floridaindependent.com

**Iowa**
iowaindependent.com

**Michigan**
michiganmessenger.com

**Minnesota**
minnesotaindependent.com

**New Mexico**
newmexicoindependent.com

**Texas**
txindependent.com

Mexico news clips Obama oil spill planned parenthood Politics President Obama reproductive rights Rick Perry Rick Scott Rick Snyder Same-sex Marriage Susana Martinez Tallahassee Tea Party Terry Branstad Texas Headlines Tim Pawlenty U.S. House U.S. Senate unemployment



Take away "quick" payments, and the picture looks quite different.

# #

Feinberg has said the quick payments are likely to appeal to those who feel they cannot document additional losses, but during a conference call yesterday, he faced a volley of questions about whether delays were causing claimants to grow desperate, prompting them to accept the relatively small quick payments and give up their right to sue. He said that may true in some anecdotal cases, but he has seen little evidence that it's a systemic problem. #

So what's the holdup? #

According to statistics from the facility, while most non-quick pay claims have yet to be paid, the facility has completed reviews for most of them. Of the 65,000 or so non-quick pay claimants, only about 25,000 are still under review. #

Another 15,000 have been asked for additional documentation, while nearly 10,000 have already been paid and more than 5,000 have been denied. Most of the rest are mulling final claims offers, but have yet to decide whether to take the cash and waive their right to sue, or have accepted the offers but not received a check. #

Feinberg has pledged to resolve all the interim and final payments within 90 days (though some say that's too long), so expect a wave of payments and denials in the coming weeks. #

  0  Like Confirm

Print 

# Comments

Name:

Email:                          Never published

Comment:

SUBMIT

**Categories & Tags:**   Economy/Finance   |   Environment/Energy   |   Florida   |   Government Accountability/Reform   |   Issues   |   BP   |   claims process   |   deepwater horizon   |   Florida   |   Gulf Coast Claims Facility   |   Kenneth Feinberg   |   Offshore Drilling   |   oil spill   |   Rick Scott   |   Tallahassee   |

Home   |   About The Texas Independent   |   About Us   |   Contact the Texas Editor   |   Email Newsletter Signup   |   Contact   |   Terms of Use   |   Advertising   |   Yellow Pages

© 2011 The American Independent News Network

Switch to our mobile site

## CNN Opinion

SEARCH

| Home | Video | NewsPulse | U.S. | World | Politics | Justice | Entertainment | Tech | Health | Living | Travel | Opinion | iReport | Money ▸ | Sports ▸ |

Ads by Google

**IRS Payroll Tax Problems?**
Being chased by the IRS? Contact us for a Free Tax Relief Consultation.
www.TaxResolution.com

**Wage Garnishment Law**
Guaranteed, Trusted, Quick Results. Tax Debt Specialists, 888-260-2403.
CTRTaxRelief.com/irs-taxes

---

**Related Articles »**

Foul waters, hard lessons from BP oil spill
January 13, 2011

Transcript: Obama talks about oil spill response
June 15, 2010

Political fallout for Obama amid oil spill disaster?
April 30, 2010

---

**Find More Stories About »**
Oil Spill

Advertisement

OIL SPILL

# BP defaulting on debt to people of the Gulf

April 19, 2011 | By Ryan Lambert, Special to CNN

Recommend    434 people recommend this.

I've been a fishing guide in the waters of the Louisiana bayou for more than 30 years. This special place along the Gulf of Mexico is a national treasure, a place where you could cast a rod out into the warm waters and pull out a red fish or speckled trout like snapping your fingers.

Used to be we'd head out for a few hours and come back with ice chests full of the freshest, tastiest seafood ever caught. Unfortunately, the BP oil disaster almost put an end to that.



Ryan Lambert

Ads by Google

**Money Management Int'l**
Free Debt Counseling 24/7 Nonprofit Services. Start Today!
www.MoneyManagement.org

**Is Your Business In Debt?**
Keep Your Business Open and Eliminate Debt Without Bankruptcy.
www.DontDeclare.com

Advertisement





IMPACT YOUR WORLD — CNN

WHAT WOULD HAPPEN IF EVERYONE CARED? TAKE ACTION

Last year, my fishing and hunting business was all but wiped out by the oil spill -- I lost 94% of my business. I have 23 people working for me: 23 families dependent on the income. But no one wanted to come down to a place threatened by 170 million gallons of oil. All told, it has cost me $1.2 million in business losses already, with no end in sight. But BP compensated me for just 10% of that.

BP Claims Administrator Kenneth Feinberg says he is making us business owners whole. Ten cents on the dollar?

BP isn't making us whole: It's pressing business owners to the ropes in the hope that we'll become desperate enough to accept the company's "quick claim" $25,000 settlement offer.

The quick claim gives individuals $5,000 and business owners $25,000 if they sign away their rights to ever sue for more.

If you don't agree to this amount, you start a terrible process -- constant delays, requests for more documentation, with no communications from BP. Most people can't wait any longer to pay off their bills.

Forgive me if I blanch when I see BP spending millions on public relations trying to convince Americans that it is "making it right" in the Gulf of Mexico. Here's what making it right would look like:

First, people like me would be compensated for our losses -- fully, fairly and in a timely fashion, before we lose our homes, our boats and our businesses.

Second, the Congress would ensure that the fines BP pays for polluting our waters would go toward restoring the Gulf. Unless a law is passed, those fines -- which will likely amount to billions of dollars -- could instead be set aside for some future oil spill. That doesn't make sense. The money needs to go to correct the harm done here. Our lawmakers need to act.

Third, we must put in place a responsible Gulf restoration plan that deals with the devastation of this catastrophic spill while also addressing the long-term health of our wetlands.

Ads by Google

**Oil drilling jobs**        **Easy Debt Settlement**

EXHIBIT Q



SEARCH

| Home | Video | NewsPulse | U.S. | World | Politics | Justice | Entertainment | Tech | Health | Living | Travel | Opinion | iReport | Money ▸ | Sports ▸ |

Ads by Google

OIL SPILL

# BP defaulting on debt to people of the Gulf

April 19, 2011 | By Ryan Lambert, Special to CNN

Cleaning Business

Low Investment, Turn Key Franchise.
Start A Commercial Cleaning
Company
JaniKingNewOrleans.com

Recommend      434 people recommend this.

(Page 2 of 2)

The Louisiana wetlands -- the nursery to fish, birds and shellfish and the foundation of life in the Gulf -- are eroding before our eyes. We're losing thousands of acres each year. It didn't start with the BP blowout, but the oil has made matters worse, killing marsh grasses and other front-line vegetation that helps to hold our precious wetlands in place. A comprehensive restoration plan must address the diverse causes of this erosion while we still have wetlands here to protect.

Ads by Google

**Related Articles »**

**Foul waters, hard lessons from BP oil spill**
January 13, 2011

**Transcript: Obama talks about oil spill response**
June 15, 2010

**Political fallout for Obama amid oil spill disaster?**
April 30, 2010

**Find More Stories About »**
Oil Spill

Advertisement

**BP's Work in the Gulf**

BP continues their work in the Gulf. Visit BP.com to learn how.
www.BP.com/GulfOfMexicoResponse

**Oil Eating Microbes**

Don't Just Contain Oil. Microbes EAT Oil from Water Surfaces!
www.spillcontainment.com

Advertisement



Finally, Congress, the oil and gas industry and the Obama administration must work together to strengthen the safeguards we all rely on to protect our workers, our waters and wildlife.

As Gulf fishermen and outdoorsmen, we've lived with the petroleum industry all our lives. We mourned the loss of the 11 workers who died aboard the Deepwater Horizon last April. And we understand that rig workers need to make a living.

But this work has to be done safely. It has to be done right. The approach some lawmakers would take, rushing the permitting process in ways that would put our workers and waters at needless risk, is something we just can't afford. The stakes, for our home and our country, are just too high.

Six years ago, Hurricane Katrina blew 24 feet of water into my fishing lodge, the business I'd devoted my career to building, the sole means of support for myself and my family. I rebuilt that lodge nail by nail. I rebuilt my business, too. Now, I'm praying that I can hang on once again, not from a natural disaster this time, but from a corporate calamity inflicted on this special region I call home.

You see, this is more than just business to me. This is about saving a national treasure. It's about making our people whole. It's about making sure nothing like this ever happens again.

The opinions in this commentary are solely those of Ryan Lambert.

Ads by Google

**Oil drilling jobs**
Shell is Ready to Explore Off the Alaskan Coast. Find Out More Online
www.shell.us/Alaska

**Small Business Analytics**
Grow Revenue By Converting More Visitors to Customers. Free Signup.
www.SpringMetrics.com

<<    <    1    2

**We recommend**

Google hides Gay Pride rainbow CNN.com

**From around the web**

Try a lobster-themed rehearsal dinner for your Bahamian Wedding Snow.com



**Why one good teacher decided to quit** CNN US

**Building hurricane pushes waves toward Mexican coast** CNN World

**Seven indicted in videotaped shooting of Pakistani teen** CNN.com

**Hindu diners sue Indian restaurant for selling meat samosas** Religion

**Judge orders Lindsay Lohan to court for probation review** CNN Entertainment

**You're Gonna Need a Bigger Boat: The Real Horror of Jaws** Word and Film

**Try drinking beer like a girl at the Breckenridge Beer Festival** Snow.com

**Marine Spatial Planning For Barbados** Business Barbados

**119 years before Casey Anthony, there was another accused lady killer** The Daily

**Get Ready: The IRS Starts Thinking Like A Business** OPEN Forum

[what's this]

© 2011 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved

Advertising Practices | Articles.CNN.com | Index by Keyword | Index by Date | Terms of Service | Privacy Guidelines



S. REP. 101-94, S. Rep. No. 94, 101ST Cong., 1ST Sess. 1989, 1989 WL 225005, 1990 U.S.C.C.A.N. 722 (Leg.Hist.)

**\*\*1** P.L. 101-380, **\*\*\*722** , OIL POLLUTION ACT OF 1990

DATES OF CONSIDERATION AND PASSAGE

House: November 9, 1989; August 3, 1990
Senate: August 4, November 19, 1989; August 2, 1990
House Report Public Works and Transportation Committee) No. 101–242 (I and IV),
Sept. 18, Oct. 3, 1989 (To accompany H.R. 1465)
House Report (Merchant Marine and Fisheries Committee) No. 101–242 (II and V),
Sept. 18, Oct. 4, 1989 (To accompany H.R. 1465)
House Report (Science, Space, and Technology Committee) No. 101–242 (III),
Sept. 20, 1989 (To accompany H.R. 1465)
Senate Report (Environment and Public Works Committee) No. 101–94
July 28, 1989 (To accompany S. 686)
House Conference Report No. 101–653,
Aug. 1, 1990 (To accompany H.R. 1465)
Cong. Record Vol. 135 (1989)
Cong. Record Vol. 136 (1990)

RELATED REPORTS

Senate Report (Commerce, Science, and Transportation Committee) No. 101–99,
Aug. 1, 1989 [To accompany S. 1461]
House Report (Merchant Marine and Fisheries Committee) No. 101–200,
July 31, 1989 [To accompany H.R. 2158]
The House bill was passed in lieu of the Senate bill after amending its language to contain much of the text of the
Senate bill. The Senate Report is set out below and a Related Report and the House Conference Report follows.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION
ABOUT OMITTED MATERIAL.  EACH   COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WES-
TLAW.)

SENATE REPORT NO. 101–94
July 28, 1989
**\*1 \*\*\*723** The Committee on Environment and Public Works, to which was referred the bill (S. 686) to consolidate
and improve Federal laws providing compensation and establishing liability for oilspills, having considered the same,
reports favorably thereon with amendments and recommends that the bill as amended do pass.

GENERAL STATEMENT

The Committee on Environment and Public Works has long been concerned with the potential environmental
dangers posed by the transportation, storage, and handling of oil. In 1970, extensive committee activity resulted in
enactment of the Water Quality Improvement Act, which amended the Clean Water Act to establish liability for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT R

cleanup of spills of oil from facilities and vessels.

The oil pollution liability provision, section 311, was amended in 1977 to expand the geographic coverage of the law, raise the limits of liability for discharges of oil and hazardous substances, and add **2** restoration of damaged natural resources as an element of removal costs.

In 1978, the committee approved a bill, S. 2083, the Oil Pollution Liability and Compensation Act of 1978, to establish a liability fund and to provide for compensation for damages and cleanup costs caused by discharges of oil and hazardous substances. That portion of the bill regarding hazardous substances was modified and led to enactment of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. The portion of the bill relating to oil pollution was not enacted. In 1986 the Committee reported S. 2799 by a vote of 15–0 which passed the Senate unanimously. The House took no action on this bill.

****2** What the Nation needs is a package of complementary international, national, and State laws that will adequately compensate victims of oil spills, provide quick, efficient cleanup, minimize damage to fisheries, wildlife and other natural resources and internalize those costs within the oil industry and its transportation sector.

Instead, there is a fragmented collection of Federal and State laws providing inadequate cleanup and damage remedies, taxpayer subsidies to cover cleanup costs, third party damages that go uncompensated, and substantial barriers to victim recoveries—such as legal defenses, statutes of limitation, the corporate form, and the burdens of proof that favor those responsible for the spill.

Oil pollution

The 11–million gallon spill from the Exxon Valdez in Prince William Sound, Alaska, and the three spills within a 24–hour period just months later in the coastal waters of Rhode Island, the Delaware River and the Houston Ship Channel, have demonstrated that oil pollution from accidental tanker spills is a real and continuing threat to the public health and welfare and the environment.

The disaster caused by the nation's largest oil spill in Prince William Sound was exacerbated greatly by an unreasonably slow, confused ****724** and inadequate response by industry and government that failed miserably in containing the spill and preventing damage.

The responses to the spills in the waters of Rhode Island, the Delaware River and the Houston Ship Channel were more far more prompt and less chaotic than the Exxon Valdez effort, but they were not an unqualified success.

It took only four hours to get two booms in place around the World Prodigy, off the Rhode Island coast, but the booms were not successful in containing the light No. 2 oil. Within 24 hours the oil spread over a 20–mile stretch of water. One day after the spill in the Delaware River, the oil had been carried 15 miles downstream, and the Delaware Secretary of the Environment said that "the standard response failed."

The oil spills over the past five months clearly show that we are not using—or have not yet developed—technology capable of containing spills of less than a million gallons, let alone spills the size of the Exxon Valdez. The spills of less than one million gallons also demonstrated that any oil spill, no matter how quickly we respond to it or how well we contain it, is going to harm the environment. **3** Consequently, preventing oil spills is more important than containing and cleaning them up quickly.

Moreover, four major oil spills within a three-month period suggest that spills are still too much of an accepted cost of doing business for the oil shipping industry. At the present time, the costs of spilling and paying for its clean-up and damage is not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain them. Sound public policy requires reversal of these relative costs.

****3** The Nation's continued heavy dependence on oil will result in increasing transport of oil in tankers through U.S. waters and greater offshore exploration and production in deeper waters and harsher environments. These conditions can only increase the potential for future catastrophic oil spills and the need to prevent such pollution and minimize its damage.

Existing Federal law

Under existing Federal law, at least five statutes deal with the issue of oil spill liability and compensation. Each is different, and each is inadequate.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT R

ProQuest® Congressional Document
Case 2:10-md-02179-CJB-DPC   Document 3423-1   Filed 07/25/11   Page 109 of 119  5/18/11 3:11 PM

◀ Return to Full

**ProQuest® Congressional**

Copyright 1996 Federal Information Systems Corporation
Federal News Service

MARCH 27, 1996, WEDNESDAY

**SECTION:** IN THE NEWS

**LENGTH:** 5623 words

**HEADLINE:** PREPARED TESTIMONY OF
BOB SMITH,
PRESIDENT,
RILA
BEFORE THE SENATE ENVIRONMENT AND PUBLIC WORKS COMMITTEE
RE: THE RHODE ISLAND OIL SPILL AND
IMPLEMENTATION OF THE OPA 90

**BODY:**
Mr. Chairman and Members of the Committee:
Good morning. The Rhode Island Lobstermen's Association
thanks you conducting this hearing, inviting us to testify, and for demonstrating your concern over how small businesses and
individuals are faring after the devastating oil spill off Point Judith, Rhode Island, on January 19, 1996.
Today's testimony is presented by Bob Smith, who has been a lobsterman in and around Point Judith for 49 years and is privilegedto be President of the Rhode Island Lobstermen's Association
(RILA), and by Barry M. Hartman, with the law firm of Kirkpatrick
& Lockhart in Washington, and Counsel to RILA. Our association
and over 100 businesses damaged by the spill have retained Mr.
Hartman and his firm to make sure that our rights are protected and
that we are properly compensated for our losses. Mr. Hartman
served as Acting Assistant Attorney General for the Environment and
Natural Resources Division at the United States Department of Justice
during the Bush Administration, and is experienced in the legal
consequences of oil spills, having prosecuted the Exxon Valdez case, and having participated in enforcement efforts in a number of other
spills. He also was the Justice Department's representative in connection with the development of the Oil Pollution Act, which
President Bush signed in 1990.Senator Chafee, you in particular have been quite helpful to us. and we know the personal anguish you must be going through after this spill, which occurred not only in our places of business, but in both of our back yards.
For years you have been a champion for the environment. We know how important this issue is to you. You have spent a great deal of time at the site of the spill and we just want to take this opportunity to personally thank you for your countless hours of attention to this tragic and important issue. You certainly have been a good friend to Rhode Island's fishermen. And now, in your position as Chairman of the Committee on

EXHIBIT S

Environment and Public Works, we are confident you will again take the lead in breaking through the bureaucracy of the Federal Government to see that Rhode Island's fishermen are compensated for their losses as guaranteed under the law.RILA believes that it is both necessary and appropriate that the
Committee not only consider, but propose, certain changes in the Oil Pollution Act, so that issues that exist today with respect to the
damage compensation system, are not repeated the next time there is
an oil spill.
The problems we are outlining have been discovered through
actual experience, and might not have been anticipated when this law
was considered. By convening this hearing, you demonstrate your
commitment that we all learn from our experience. Our concerns may be summarized as follows. We are pleased
that OPA exists, however:
(1) it is being used by the barge owner's insurer to pay off claims at minimal rates and to effectively discourage claimants from seeking legitimate, long-term claims for damages;(2) the barge owner's insurer, under the guise of OPA, is demanding inappropriate releases from claimants, does not explain what is being demanded, and instead waves a few dollars in front of people to force them to agree to limitations on their rights;
(3) claimants are not being allowed meaningful participation in the Natural Resource Damage Assessment process even though it could directly affect their rights; and
(4) it appears that the barge owner's insurer and the Coast Guard are setting up road blocks that prevent claimants from obtaining full recovery for their losses.
Our testimony today will describe our Association, discuss how
we have fared since the spill, and outline some of the problems and
suggestions for improvement of OPA.
The Rhode Island Lobstermen's Association (RILA) is a non-
profit association of people who are engaged primarily in the business
of fishing for lobsters. We have almost 100 members, and our
businesses represents a large portion of the lobstering industry off
Point Judith, Rhode Island.Through the association, we have put together a group of over 100 businesses that are jointly developing their damage claims. These are not only lobster boat owners, but on- shore processing facilities, and other businesses that are part of the fishing industry in the Port of
Galilee.
As you know, Point Judith is the third largest fishing port on the
East Coast. Until January 19, 1996, we were proud to say that our lobsters are world renowned for their quality o in fact - we think they
were the best quality lobsters caught in this country. In fact the
fishing industry has contributed greatly to the local and statewide
economy. Millions of dollars have been pumped back into the
economy by way of direct and indirect business resulting from the
successful harvesting of Rhode Island's pristine seafood beds.Many lobstermen have been fishing in this area for years. In
Bob Smith's case, his father started over a half century ago, and he
has continued in his father's wake. Lobstermen are mostly small
businesses - each owns a boat or two and each hires a couple of
crewmen to help. They love what we do. They are independent,
self-sufficient and our own bosses. They are successful because of

their willingness to put in an honest day's hard work.

On January 19, 1996 the unthinkable happened- a barge spilled over 800,000 gallons of home heating oil after running aground off of Moonstone Beach.

The place where Bob Smith has been catching lobsters was directly under the barge and the spill.

We say this was unthinkable, since no one expected it to happen at all. But here is what made it even more shocking. We are sure you remember the World Prodigy spill of 1989, in Narragansett Bay,which is just a few miles from Point Judith. None of us thought this could ever happen again, at least not in our neighborhood. But it did. It's sort of like witnessing a horrible accident. Most of us never see one. But to be witness to two just outside our window is simply not something anyone expects.

We are not here today to talk about whose fault this was, or

how efficient and effective the response to the spill was, although quite frankly, the response teams basically shut out local efforts to help the cleanup. Our interest is simple: we want to get back to

work, and we want to make sure we are compensated for the losses

that we have suffered, are suffering, and sadly, are likely to suffer in

the future because of this spill.

The immediate impacts of this spill were incredible. Bob Smith walked on the beach where it happened, and saw literally hundreds ofthousands of dead lobsters. Most were small - 2, 3, or 4 years old. They were everywhere. At one point in a three square- foot area. he counted 730 dead lobsters. Some observers say that there were over a million lobsters killed.

As a result of the spill, a 250 square-mile area has been closed off to fishing and lobstering since January 19. That included the entire area leading into the Port of Galilee, where many seafood processors are located. A map illustrating the closed-off area is provided as Attachment A to this testimony.

Not only could we not catch lobsters in a prime area, but most shellfish catches upon which many on-shore facilities rely could not be brought into Point Judith to be sold. The buyers, processors, wholesalers and others were shut down because they use the waters that were closed down to supply feed tanks used to hold the lobsters.And the businesses that serve the industry - divers, electricians, plumbers, restaurants, operators, suppliers, and repairmen, were in turn shut down. In short, Point Judith, which is usually a hub of business activity, was turned into a ghost town.

Fortunately, fishing areas are gradually being reopened. Fin

fishing is now allowed in all areas. The shoreside facilities may

again use the water of Point Judith Pond to handle the delivered

catches. A very limited amount of lobster fishing is allowed off of

Newport. But the main area off Point Judith remains closed.

Please understand, we are not necessarily criticizing the decision

to keep the area closed. We, like everyone, want to make sure that

when it is opened, the lobsters are safe for eating.Sooner or later we expect lobster fishing to be permitted again. But what about long term effects? The hundreds of thousands of

lobsters that were washed up dead on the beach were young - 1, 2, 3,

and 4 years old. We are not permitted to catch lobsters until they

reach their legal size, which occurs around age 7. That means these

million or more dead lobsters will not be available to be caught in

1999, 2000, and 200 1, or 2002.

In addition, many of the dead lobsters were or would have been egg bearing. It could be eight to ten years from the time a lobster bears eggs until those eggs hatch and grow to the legal size permitted to be caught. So there are more years in the future when we will be impacted.

Further, the death of younger female lobsters, which will never reproduce, will reduce populations generally,

which is very likely to impact lobstering in the future. And, that's where the real economic impact will be felt by future generations of Rhode Islanders. Unfortunately, we still do not know just how severe the damage has been because of the immense devastation of the egg bearing lobsters.

And we can't just go somewhere else to fish, for a couple of reasons. First, in this area, most of the legal size population of lobsters are caught every year. The pie is only so big and now it is smaller. That is true even outside the closed area. So to move elsewhere would not eliminate our losses, it would just spread them around.

Second, many of us can't just go somewhere else. Fishing in different and deeper waters requires different boats, additional and more expensive equipment, is much costlier in terms of fuel and insurance, and involves more significant risks. Many lobstermen can't afford it, or don't want to put themselves at greater personal risk, even if it might mean a greater price for our catch. We are just plain shut down, with no alternatives.

As you consider this issue, remember that there are three very distinct types of harms that we are suffering: (1) actual damage to our property caused by the spill; (2) actual losses we suffer because we cannot engage in our livelihood today; and (3) losses we are likely to suffer in the future because of the long term impact that this spill is likely to have on the lobster population. All three types of damages are supposed to be fully compensated under OPA. Unfortunately, problems exist with compensation for all three.

Now to the question at hand: is the Oil Pollution Act helping us get compensated for our losses? Yes and no. On the one hand, it might be better than what would be the case if there were no law. On the other, there are problems - serious problems - that you need to know about. Some you may be able to address. Others may be unavoidable because of the attitude that the barge owner and its insurer take. In some respects the law could result in damaged parties getting less than what they would be entitled to if they simply went to court.

The Insurer Has Been Making Unreasonable Demands as a Condition of Making **Interim** Payments

First, it must be understood that just because the law creates liability for the responsible party, it does not necessarily follow that Eklof Marine or its insurer is willing to accept that responsibility. Here is the attitude that the insurer has, as reflected in a statement apparently made by one of its adjusters: "They charge you for every little dinky lobster and the fish that could have eaten them." The Providence Sunday Journal, March 24, 1996.

With due respect, anyone who knows about the lobster industry knows that every so-called "dinky" lobster that we are allowed to catch puts food on our tables. To trivialize our claims in this way demonstrates the insensitivity of the insurer for our plight.

The insurer's insensitive attitude is also shown by how it has treated claims. When this first happened, and claims started being filed, the insurer tried to use the claims payment process to minimize what it had to pay not only now, but in the future. For example, one person who allowed his boat to be used in the clean up was required to sign a release of all claims he might ever have as a result of the spill. A copy of that release is attached to this testimony as Attachment B. Others were required to sign releases that contained technical legal language limiting their rights, but which was not explained to them at all. The claims adjuster's answer? "We're not your lawyer." A copy of this language that is being forced on us is provided as Attachment C. In other instances, the claims examiners may have actually suggested to claimants that they are on our side. Nothing could be farther from the truth. Their duty is to the insurer, to pay only what they think they

absolutely must pay. To suggest to claimants that they are on the claimant's side is incorrect, and failing to make their positions clear to people having no experience in this process is disingenuous at best.

Regarding actual damages suffered by us, consider the following. Many of our members lost equipment such as lobster pots,because they were in the area where the spill occurred, and for weeks
we could not remove them. The insurer is willing to pay something
for these, and that something is generally the insurer's depreciated
value of the pot, not its really value - or cost - to us.
For example, assume a pot is 5 years old, and according to the insurer it has a life of 8 to 10 years. A new pot costs $40.00 to $55.00. The insurer offers $15.00 per pot. That means if a lobsterman lost 500 pots, he gets $7,500 to cover an actual replacement cost to him of $20,000.
In the real world, lobstermen not only cannot afford to replace
pots every 5 years, but using their own skill and time, often repair
pots that have no "useful life" so that they last well beyond ten years.
The insurer apparently gives no value for this skill and time. Wecan't repair pots that are lost in the ocean because we aren't permitted to recover them, since the area is closed.
Now the insurer will probably say that we didn't have new pots
in the first place, so giving us new pots now puts us in a "better"
position that we were in before the spill. To that we say the
following: Which is fair? Making an injured party pay to put
himself in the actual position he was in before he was injured, or
making the responsible party pay a little more so that the injured party is in the actual position he was in before the injury occurred?
In addition to not being fully compensated for actual losses, the insurer's efforts to make **interim** payments for lost income,1/creates a more serious problem. Most of the claimants in our group have been completely out of work since January 19, 1996. The insurer has
offered to pay some lost profits based on a calculation it developed.
But to take this money, we must sign a release that could jeopardize
our future claims. What's more, a provision of OPA could result in
our being denied the right to recover for future losses, even if a
release tries to preserve those rights.
Specifically, section 1015 of OPA provides:
Any person, including the Fund, who pays compensation pursuant to this chapter to any claimant for removal costs or damages shall be subrogated to all rights, claims and causes of action that the claimant has under any other law.
33 U.S.C. 2715.
For example, if I as a claimant accept an **interim** payment from the insurer under this law, this provision could be construed to
require that I give the insurer all my rights to claim damages under any other law, even if I was not yet compensated for all my losses. That could mean that once I accept money from the insurer, I mightlose my rights under state law to sue the insurer if I am unhappy with the payment I received under OPA, even though OPA would otherwise protect my ability to pursue such a claim.
We don't think this section was intended to create a mandatory
subrogation of rights by virtue of the words "shall be subrogated."
We don't think this section was intended to require subrogation of all
rights under all other laws except OPA, regardless of whether compensation was paid for the loss of that right.

We think it was
intended to make sure that only rights to claims that have been
compensated are subrogated to whoever pays. That is fair, and that
makes sense. But the language of the statute is less than artfully
drafted.

That leaves our members with three choices. First, we can take
an **interim** payment without any protection from this section of thelaw, and hope that the insurer, who says
"trust me, that is not what the section means," keeps its word and does not try to bar a future claim. And we
have to hope that the Coast Guard, which administers
the OPA Trust Fund when the insurer stops paying, agrees to do the
same.

Second, we can delay filing claims for **interim** payments now, and instead wait until we know whether long
term claims exist, and file all claims at one time. The problem is, many lobstermen cannot afford to wait.
Third, we can insist on written assurances from the Coast Guard
and the insurer that they would never assert this subrogation provision as a defense to an uncompensated
claim.We chose the third route, but getting those written assurances was not easy. The Coast Guard, after a
number of meetings. recently
agreed in writing that it would not raise the subrogation as a defense
except as to rights for which compensation is actually paid
(Attachment D). The insurer says it will agree to language that
recognizes that this section is not a bar to a future uncompensated claim.-2/
To prevent this from happening in the future, Congress should
simply add a phrase to section 1015 of the law, so that the section
reads as follows:
Any person, including the Fund, who pays compensation pursuant to this chapter to any claimant for removal
costs or damages shall be subrogated to all rights, claims and causes of
action that the claimant has under any other law, with respect to which compensation has been paid 3/
Access to Information in File Claims
In times like these, the federal government needs to partner with the RILA and help rebuild what was
destroyed. We are talking about hundreds of Rhode Island families being dramatically affected not over just
the past two months, but well into the future. Lobstermen and their families are not looking for handouts. We
are look for what is provided to us under the law of this country. We are reaching out to our government to
work with us and not shy away from a very traumatic event.
As the Committee knows, thankfully there have been only three major spills since OPA was enacted - one in
Tampa Bay, one in San
Juan, and the one in Rhode Island. Because of where the North
Cape spill occurred, it is likely to have the most devastating impact on natural resources and the economic
well being of the area.
As we understand it, although many small claims were
processed immediately in Tampa Bay and San Juan, there were, and
may still be, delays in determining claims for lost profits and
impairment of income.
To help our members understand what is expected when these claims are filed, and what kind of
documentation is needed -
particularly for impairment of income claims - we wanted to review
past claims under OPA. Of course, the insurer does not make these
available at all.

Our counsel filed a Freedom of Information Act request with the
Coast Guard to review their claims files. Again, the purpose was to have a full understanding of exactly what type of information is
provided, and what will be accepted as sufficient.
The Coast Guard, citing privacy concerns of claimants in other
spills, has effectively denied our request, except for producing a
single claim that it chose as "representative." It gave us only its final
decision, and declined to provide any of the foot thick stack of information that apparently led up to its decision, again claiming that
to do so would be too burdensome for it, since it would have to
redact confidential information. We did not seek any confidential
information.
It also told us that if we wanted this information, we would have
to pay thousands of dollars, and wait several months while it reviewed the information. Apparently there is not a single claims file anywhere that it would not take months and thousands of our dollars to screen and provide to us. Again, we are not seeking any private or confidential information, just data that will give us insight into how
the Coast Guard evaluates these claims, and how it reacts to
information provided it.4/
Withholding important information from claimants benefits the Coast Guard, and the insurer, and again undermines the ability of
claimants to obtain a full recovery. So the Coast Guard won't give us
important information without us paying for it, and no doubt will
suggest that if we do pay it to give us this information, that payment
will not be considered by it to be "reasonable costs incurred by the
claimant in assessing the damages," within the meaning of its regulations. The result: the Trust Fund - administered by the Coast Guard- is faced with lower claims.
To our knowledge, no claimant has ever recovered lost future profits or impairment of income under OPA, even though section 1002(2)(E) of OPA clearly authorizes such recoveries. Withholding this information from claimants will only serve to perpetuate that denial, except for those claimants willing to hire - and pay for experts to fight for them.
Participating in the Natural Resource Damage Assessment Process
In January of this year, just weeks before the spill, final regulations governing Natural Resource Damage Assessments (NRDA) were promulgated. See 61 Fed. Reg. 4 (Friday, January 5, 1996)(to be codified at 15 C.F.R. 990). They were to become effective on February 5, 1996, after the spill occurred. It is our understanding that the Federal Government contends that these
regulations will govern NRDA process arising from this spill.
Under OPA, the public is given the opportunity to comment on
plans developed for NRDA process. Under the regulations, a similar
opportunity for consultation exists.
Our concern is a practical one. If there is a long term adverse
impact on the lobster population, it could translate directly into an
economic impact on the lobster industry. The natural resource
damage assessment process will inevitably include studies that should
demonstrate the extent of that impact. The methodology used for these studies will significantly influence the results, and it is crucially important that sound science be used. The long-term impact of this spill could mean

the loss of scores of jobs and millions of dollars to the local and statewide economy. Job loss in this area could be permanent and that would be devastating to Rhode Island.

We have retained an expert, and have requested the opportunity to participate in the development of the plans that will form the

foundation for the NRDA process.

both the federal and state trustees.

We have made this request to

So far we have not been permitted

to participate in this process (it is claimed that the process has not yet started), but everyone is "thinking" about it.

We have contacted some of the scientists at the University of Rhode Island who are supposed to conduct surveys, but so far none of these surveys have been shared with us. The point is, while the law currently calls for notice and opportunity to comment on NRDAplans, and the regulations do so as well, that opportunity must come at a meaningful time - before the plans are selected. In fact, to be

meaningful, we should be permitted to attend all the meetings that are held about that planning process, to provide input and insights that

might not otherwise be appreciated or known. Quite frankly, we

think we are being stonewalled by the trustees who do not want to be

"burdened" with claimants' concerns.

The trustees have many interests that will or could influence the

NRDA planning process.

interest is sound science.

We want to make sure that the paramount

Taking the federal trustees' word for it,

"Trust us, we're the government," is not something that our members

are comfortable doing, particularly when the Federal Trust Fund pays

if lost income claims based on the NRDA process are filed.It would be expensive, unfair, unnecessary, and perhaps impossible to expect our members to conduct their own surveys and planning when a perfect opportunity exists for them to be involved in this process. We hope the Committee will not let this slip by.

The Coast Guard is Creating Road Blocks to Claimants' Ability to be Fully Compensated by Trying to Deny Them Costs Necessary to Prove Their Claim

You have asked us to comment on how certain policy issues

relating to compensation for losses are addressed under OPA. One such issue is whether OPA should give everyone the ability to recover the costs of proving a claim for damages so that they are made whole. Unfortunately, the Coast Guard seems to think that everyone except the claimants should recover these costs. This makes no sense.

OPA does not prohibit the payment of the claimant's costs of determining damages. The state and federal government can recoverthese costs, including attorneys' fees. The responsible party gets them because its insurers' pays. And as explained below, the only way claimants can be assured that they at least have a fighting chance to be fully compensated, is if they hire competent experts to help them prepare and pursue their claim. Yet the Coast Guard and insurer apparently do not want to pay these costs.

We believe the law clearly does not prohibit, and indeed

permits, the payment of claimants' costs and fees needed to prove

their claim for claimants. However, the Coast Guard in its

regulations may be arbitrarily and illegally trying to exclude these

costs and fees from the kinds of damages that a claimant may recover in connection with preparing a claim.5/

In order to avoid the fight that we are likely to have, OPA should be amended, or the Coast

Guard regulations corrected to address this inequity.


The fact is, if those sections of the Act authorizing claims for impairment of income and lost profits are to have any real meaning, that claimants must be permitted, and indeed encouraged, to get expert help to ensure that they receive what they are entitled to by law. They are entitled to be and on an level playing field with the insurer and the Coast Guard, both of which have boatloads of lawyers and experts. And the responsible party's insurer, or the Trust Fund, should pay for it.

There are several reasons why these costs should be covered as damages. First, claims for lost future income require some consideration of long term effects on the lobster population. No single lobsterman can afford to undertake such studies, and the insurer knows it. But without that backup, claims for lost income would be difficult to prove. Instead, the claimants must band together, and counsel and experts helps this happen. The governmenthas attorneys and other experts develop its claims for natural resource

damages, and those costs are paid by the insurer. Why shouldn't a small business person have the same benefit for its claims?

Second, proving lost profits, and particularly proving impairment of future income, can be complicated. By way of example, we reviewed one lost profit claim processed by the Coast Guard in another spill. The Coast Guard tells us that there is over a foot of documentation to support a claim for about $40,000. If this section of the law is to have any meaning, a claimant must be encouraged to hire competent experts to help him navigate through this morass and properly prepare a claim.

Third, while the law suggests that claims are to be processed within 90 days by the insurer, and within 6 months by the Coast Guard, that time period can be delayed indefinitely by insurance and Coast Guard lawyers who will say that the time period does not run

until the claim is fully documented. We think that is exactly what has

happened in other spills. Claimants need help to fight such abuses.

Finally, claimants must be advised of how this law works, so

they do not unwittingly waive their rights. Few know that if you file

a suit in court, you cannot pursue a claim with the Fund. More

importantly, it was through counsel that our members were able to get written confirmation that they won't be waiving our rights if they

accept **interim** payments. Until we hired counsel, no one advised us of the consequences of these releases. While promises were made, no

one would put it in writing.

Notwithstanding the policy reasons supporting the payment of

claimants' costs of proving his damages, and the fact that law does not prohibit it, the Coast Guard regulations governing the claimsprocess try to severely limit recovery of such costs. The regulations

provide:

(e)ach claim must include at least the following, as applicable: . . . (8) The reasonable costs incurred by the claimant in assessing the damages claimed. This includes the reasonable costs of estimating the damages claimed, but not attorney's fees or other administrative costs associated with preparation of the claim.

33 C.F.R. 136.105(e).-6/

There is no explanation for allowing one kind of cost, but not

another, and no justification either, except the desire to discourage

use of experts to document a claim. It is ironic that the Coast Guard

?

It is particularly disconcerting that these regulations are so vague

Do

Of course if and when an injured party seeks to challenge these regulations,the Coast Guard will no doubt say that such challenges are barred by section 1017 of OPA, which states that regulations must be challenged within 90 days of promulgation. Of course, until a spill occurs, no claimant would have a reason to challenge the regulations.appears to take this position that its own costs and attorneys' fees are
recoverable, as are those of every other state and federal agency
"damaged" as a result of the spill. See 61 Fed. Reg. 4 (Friday. January 5, 1996) (to be codified at 15 C.F.R. 990).7-/And the responsible party's costs are paid for by the insurer.
Without qualified experts studying the long-term effects of a
spill, any claim might well be reduced below its true value. Not
surprisingly, insurers who want to limit their payouts for claims in
order to preserve their profits, and the Coast Guard, which wants to
preserve the Trust Fund for future claims, have no problem with this.
In sum, while we believe law and policy clearly support the
payment of costs needed to prove a claim, and the insurer and Coast
Guard have the ability to make such payments, we frankly expect both it and the Coast Guard to fight us as part of their broader
strategy to limit claims in general.
Conclusion
In summary, we offer the following observations about the OPA
claims process.
(1) OPA is being used by insurer to pay off claims at minimal rates and to effectively discourage claimants from seeking legitimate long term claims for damages.
(2) The insurer, under the guise of OPA, is demanding inappropriate releases from claimants, does not explain what is being demanded, and instead waves a few dollars in front of people to force them to agree to limitations on their rights.
(3) Claimants are not being allowed meaningful participation in the Natural Resource Damage Assessment process.(4) It appears that the barge owner's insurer and the Coast Guard are setting up road blocks that prevent claimants from obtaining full recovery for their losses.
We appreciate and thank you for the opportunity to testify
before the Committee, and stand ready to answer any questions that
you might have.
--------------------
1/For example, lost profits from January 19 through today.
2/ See Attachment E. Curiously, the insurer seems to have agreed to this language, but claims it does not understand it.
3/
Other related and proposed changes are included as Attachment
4/ There are a variety of theories and approaches that may be used to determine lost future profits and impairment of income. The OPA is silent regarding which may apply. Reviewing state common law with respect to those possible theories is helpful, but claimants can hardly be expected to do so without the benefit of counsel, a benefit that the Coast Guard apparently wants to deny.
5_/ The insurer, who is plainly not bound by this arbitrary position of the Coast Guard, is free to pay costs as well.
6/
regarding the kinds of costs of assessment of damages that are recoverable. They say costs are recoverable, but don't say what those costs are. This leaves a claimant in an untenable situation. I hire an expert? An accountant? An attorney

7-/ In the single reported decision under OPA, a court allowed the Coast Guard and even private claimants to recover attorneys fees associated with removal costs, but with respect to damages, did not allow attorneys' fees to be recovered. This distinction, applicable to claimants but not to federal or state agencies, or to the insurer for that matter, is of questionable legal soundness. Avitts v. Amoco Production Co., 840 F.Supp. 1116, 1118 (S.D. Tex. 1994).
END

**LOAD-DATE:** March 28, 1996