

36824072

Apr 3 2011
10:50AM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| This Document Relates To:  All Cases | * | JUDGE BARBIER |
| | * | MAGISTRATE JUDGE SHUSHAN |
| * * * * * * * * * * * * * * * | * | |

## THE BP PARTIES' FIRST SET OF
## INTERROGATORIES TO HALLIBURTON

Pursuant to Federal Rules of Civil Procedure 26, 33 and 34, BP Exploration & Production Inc. and BP America Production Company (the "BP Parties") propound the following Interrogatories to Defendant Halliburton Energy Services, Inc. ("Halliburton") to be responded to within 30 days of service.  The BP Parties request that all documents and electronically stored information responsive to the following First Set of Interrogatories be produced at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654.

### DEFINITIONS

1.      "You," "your," and "yours" shall mean Halliburton, including without limitation all of Halliburton's present or former employees, agents or representatives, or anyone acting or purporting to act for or on Halliburton's behalf for any purpose whatsoever, and includes any and all affiliates, subsidiaries, contractors and divisions, such as Sperry Drilling, and includes the present employees, agents and representatives of those affiliates, subsidiaries, contractors and divisions.

2.      "Person" shall mean an individual as well as any entity including any proprietorship, partnership, corporation, firm, committee, or any other organization.

# Exhibit B

3.     "Communication" means any transmission of information by one or more persons to one or more persons by any means including, without limitation, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail (including both business and personal email), text messages, computer linkups, written memoranda, and face-to-face conversations; "communication" also includes all documents and ESI containing, summarizing, or memorializing any communication.

4.     "Document" or "documents" includes "communications" as defined above, and has the full meaning ascribed to it by Federal Rule of Civil Procedure 34(a), including electronically stored information ("ESI"), and includes the original and any identical or non-identical copy, regardless of origin or location, of any writing or record of any type or description, including but not limited to all writings; records; contracts; agreements; communications (intra or inter-company); correspondence; memoranda; letters; facsimiles; electronic mail (e-mail); minutes, recordings, transcripts, and summaries of meetings, or recordings of meetings, speeches, presentations, conversations, or telephone calls (whether recorded in writing, mechanically, or electronically); handwritten and typewritten notes of any kind; statements; reports; voice recordings; desk calendars; diaries; logs; drafts; studies; analyses; schedules; forecasts; surveys; invoices; receipts; computer data; computer printouts; financial statements; balance sheets; profit and loss statements; statements of earnings; statements of net worth; credit reports; statements of operations; audit reports; financial summaries; statements of lists of assets; work papers; pictures; photographs; drawings; computer cards; tapes; discs; printouts and records of all types; instruction manuals; policy manuals and statements; books; pamphlets; cancelled checks; check stubs; and every other device or medium

by which information or intelligence of any type is transmitted, recorded, or preserved, or from which intelligence or information can be perceived.

5.      "Identify," when used with respect to: (a) an individual, shall mean to provide the individual's full name, job title and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and Bates number(s).

6.      "Including" or "includes" means "including but not limited to" and "including without limitation."

7.      "Relating to" or "related to," when referring to any given subject matter, means any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

8.      The words "and" and "or" should be construed conjunctively or disjunctively as necessary to make the interrogatory inclusive rather than exclusive.

9.      "Any" should be construed, when possible, to mean "any and all."

10.     "Each" should be construed to include the word "every," and "every" should be construed to include the word "each."

11.     The singular includes the plural, and the plural includes the singular.

12.     "MC252 well" and "Macondo well" refer to the exploratory well that was being drilled by the *Deepwater Horizon* in the Macondo prospect of Mississippi Canyon 252 in the

outer continental shelf of the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

13.    "Halliburton" means Halliburton Energy Services, Inc. and all of its affiliates, subsidiaries, contractors and divisions, such as Sperry Drilling, and includes the present employees, agents and representatives of those affiliates, subsidiaries, contractors and divisions.

14.    "BP" means BP p.l.c and all of its affiliates and subsidiaries.

15.    "Kick," whether or not capitalized, means the intrusion of hydrocarbons into a wellbore.

16.    "Blowout," whether or not capitalized, means an uncontrolled release of hydrocarbons from a well.

17.    "OptiCem" means Halliburton's proprietary software used to model cement slurry operations and as that term was used by Halliburton in communications with BP.

## <u>INSTRUCTIONS</u>

1.    Pursuant to Federal Rule of Civil Procedure 26(e), these interrogatories are continuing and you must revise or supplement your responses whenever new or additional responsive information becomes known.

2.    Each interrogatory solicits all information that is known to you or in your possession, custody or control, and all information available to you from your attorneys, agents, investigators, experts, employees, insurers and representatives.

3.    Each interrogatory is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular interrogatory.

4.      These interrogatories are to be answered in detail.  If you cannot answer any interrogatory in full, you should answer it to the extent possible and explain your inability to answer any further.

5.      If you claim that the language of any interrogatory is vague or ambiguous, then you must identify the language you believe is ambiguous and describe the different interpretations that you believe may apply to such language. Regardless of any vagueness or ambiguity you claim, you are to answer the interrogatory to the best of your ability.

6.      When asked for a date, an exact date should be given if known. If an exact date is not known, an approximate date should be given and identified as such.

7.      If any of the answers to these interrogatories are derived from papers, records or documents in your possession or under your control, please attach a copy thereof to your answers or, in the alternative, please describe each of the documents with specificity and state when and where they will be available to BP's counsel for inspection and copying.

8.      If you contend that information responsive to any interrogatory is protected from disclosure pursuant to any privilege or work-product doctrine, then you must comply with the requirements of Pre-Trial Order No. 14 and Federal Rule of Civil Procedure 26(b)(5).

## **INTERROGATORIES**

1.      Describe in detail all warnings that Halliburton or anyone else gave to BP concerning the Macondo well, including any warning that the operations were unsafe or concerning any design or operational decision at the Macondo well, such as casing design, centralizers, circulation, float collar conversion, returns during the cement job, or the decision to run or not run a cement bond log.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

2.      Describe in detail all bases for any contention that any hydrocarbon or gas flow went up the annulus around the casing (as opposed to through the casing), including a detailed description of how and why this occurred.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

3.      Describe in detail all modeling, simulation(s) and testing that Halliburton performed, before or after April 20, 2010, relating to the Macondo well, including modeling, simulations or testing relating to:

      a.   the cement job performed on April 19 and 20, 2010;

      b.   the cement slurry poured on April 19 and 20, 2010;

      c.   the well fluids used for drilling, loss control, or as spacer;

      d.   any pilot or earlier iteration of the cement slurry that was poured on April 19 and 20, 2010; and

      e.   the cement job, cement slurry, well fluids and earlier iterations of the cement slurry for the prior intervals of the Macondo well.

As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

4.      Describe in detail all communications (written, oral, or otherwise) concerning any modeling, simulation(s) or testing that Halliburton performed for the Macondo well, including communications internal to Halliburton, with BP or with others regarding modeling, simulations or testing relating to:

      a.   the cement job that was performed on April 19 and 20, 2010;

      b.   the cement slurry that was poured on April 19 and 20, 2010;

      c.   the well fluids that were used for drilling, formation loss control, or as spacer;

      d.   any pilot or earlier iterations of the cement slurry that was poured on April 19 and 20, 2010; and

      e.   the cement job, cement slurry, well fluids and earlier iterations of the cement slurry for the prior intervals of the Macondo well.

As part of your response, please identify all persons involved in the communications, all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

5.      Describe in detail all documents, including reports, articles, papers, studies and materials discussing, reflecting or relating to the properties of the cement slurry that Halliburton recommended for cementing the production casing at the Macondo well, including:

      a.   a complete description of the characteristics, properties  and testing of the individual components of the cement;

      b.   any known or suspected interactions between any of the individual components of the cement;

7

     c.   any known or suspected dispersant or defoaming properties of any of the individual components of the cement; and

     d.   any known or suspected incompatibilities between any of the individual components of the cement.

As part of your response, please identify all persons involved in the communications, all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

     6.   Did you have all of the information that you needed to pour a successful cement job (including placing the cement to achieve zonal isolation) on April 19 and 20, 2010?  If your answer is "No", then please describe in detail what information you were lacking before the cement job on April 19 and 20, 2010 that prevented you from pouring a successful cement job.

     7.   As of the time you began to pour the cement job for the production interval on the Macondo well on April 19, 2010, did you believe that you would be able to successfully place cement in the well so as to achieve adequate zonal isolation to allow the Horizon crew to safely temporarily abandon the well?  If your answer is "Yes", please describe in detail the reasons supporting your belief.  If your answer is "No", please describe in detail why you nonetheless poured the cement.  If your answer is "you weren't sure" or is qualified, please describe in detail the reasons for your belief and uncertainty and who at BP or Transocean you shared your beliefs with.

     8.   Describe in detail the events that caused the *Deepwater Horizon* incident, including the events causing the primary cement job to fail, the well to flow, the flow to go undetected until it reached the surface, the blowout, the explosion, the loss of life, and the sinking of the *Deepwater Horizon*, including the act or omission of any person and the

performance or failure of any material, equipment or device that lead to blowout of the well. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

9.      Describe in detail the factual and legal basis for any contention that it is appropriate to condition the cement slurry before performing laboratory testing, including conditioning the cement slurry before performing the tests on the foamed cement. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

10.      Describe in detail the factual and legal bases for any contention that Halliburton was not at fault for the *Deepwater Horizon* incident, including the events causing the primary cement barrier to fail, the well to flow, the flow to go undetected until it reached the surface, the blowout, the explosion, the loss of life, and the sinking of the *Deepwater Horizon*. Your answer should include Halliburton's role in the design and testing of the cement slurry, modeling, simulation and execution of the cement job, monitoring and reporting of flow data, preparation and reporting of reports for BP, and the details of any prior foamed cement job that Halliburton contends supports its performance at the Macondo well. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

11.      Describe in detail the factual and legal bases for Halliburton's statement on January 11, 2011 that the Presidential Commission ignored exculpatory evidence and/or "selectively omitted information provided to it by Halliburton," including describing the allegedly exculpatory evidence and omitted information. As part of your response, please

identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

12.     Describe in detail the qualifications of the Halliburton personnel that performed work relating to the *Deepwater Horizon* from January 1, 2005 through April 20, 2010, including the cement engineers, the cementers, and the mud loggers, including their years of experience, training, and certifications.  As part of your response, please identify all witnesses with knowledge of the training, certifications or qualifications, and all statements, documents and other materials that describe or reflect the training, certifications or qualifications.

13.     Describe in detail the foam cement jobs performed by Halliburton on the production interval of any other deepwater wells in the Gulf of Mexico since January 1, 2005, including the design of the cement slurry for each job, whether it was similar to the composition used at the Macondo well, the modeling, simulation and testing conducted for each job, the results of the modeling, simulation and/or testing for each job (including the foam stability testing), and the result of each job.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

14.     Describe in detail each Halliburton cement job in the Gulf of Mexico since January 1, 2005 where any person made a claim or concluded that the cement failed to achieve zonal isolation for any reason, including channeling, nitrogen breakout, contamination, or poor design, including details concerning the identity of the well, the composition of the cement used, the pre- and post-job testing, the reports prepared for the job, any claim or conclusion that the cement failed, the known or suspected reason why the cement failed, and how the issue was

resolved.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

15.     Describe each instance since January 1, 2005, at any of your operations worldwide, where Halliburton concluded or any person made an allegation that a Halliburton (or Sperry Drilling) mud logger failed to properly monitor flow, including any instance where there was a conclusion or allegation that a mud logger failed to detect or take action within 20 minutes of a flow indication, including indications based on drill pipe pressure, flow rate in versus flow rate out or trip tank levels).  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

16.     Describe in detail all investigations that Halliburton has conducted from January 1, 2010 onward into any well, including the Macondo well, where any person believed or suspected, or that an allegation was made, that the cement job that Halliburton performed failed to achieve zonal isolation, including any investigation into the *Deepwater Horizon* incident.  As part of your response, please identify all reports, draft reports and supporting materials, all witnesses with knowledge of the investigations, and all statements, documents and other materials that describe or reflect the investigations.

17.     Describe in detail all instances since January 1, 2005 where Halliburton pumped a cement job despite modeling that showed weaknesses in the cement job, including when OptiCem models predicted channeling or a gas flow potential value that was moderate, severe or critical.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

18.     Describe in detail all instances since January 1, 2005 where Halliburton pumped a cement job despite decisions by the operator that contradicted Halliburton's recommendation, including when the operator did not adopt all of Halliburton's suggestions including suggestions on casing design, centralizers, float equipment, circulation and whether to run a cement bond log. As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

19.     Describe in detail all equipment that Halliburton had available for its mud loggers to use on the *Deepwater Horizon* on April 19 and 20, 2010 to assist them in monitoring the well for, among other things, well flow, kicks, and/or gas migration, including sensors, gauges, meters, computer systems or programs, visual or audio displays and alarms, and including whether each piece of equipment was or was not properly functioning on April 20, 2010 between the hours of 5PM and 10PM and whether the available alarms were disabled and why.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events.

20.     Describe in detail all Halliburton protocols, standards, best practices, and recommendations discussing, reflecting or relating to well drilling operations, including cementing and mud logging operations, and including pre- and post-job cement testing, cement slurry design, cement job design, gas flow potential, cement bond log, casing design, centralizers, float equipment, and temporary abandonment procedures.  As part of your response, please identify each Halliburton protocol, standard,  best practice or recommendation, explain why it applies to the Macondo well, explain whether it was met by the activities at the Macondo well, and identify all witnesses with knowledge of these materials, and all statements and documents describing these materials.

21.     Describe in detail all protocols, standards, best practices, and recommendations discussing, reflecting or relating to well drilling operations, including cement design, cement testing, cementing operations, coring, drilling, fluid services, formation evaluation, mud logging, real time services, reservoir testing/analysis, subsea, software relating to drilling, well completions and wireline that you contend applies to the activities at the Macondo well.  As part of your response, please identify each protocol, standard, best practice or recommendation, explain why it applies to the Macondo well, explain whether it was met by the activities at the Macondo well, and identify all witnesses with knowledge of these materials, and all statements and documents describing these materials.

22.     Describe in detail all documents, data or other material, whether in electronic, physical or other format, that Halliburton has destroyed, lost, deleted, discarded, or placed outside of its possession, custody or control that relates in any way to the Macondo well, including Sperry Drilling real time data, Insite or Insite Anywhere data, Wellspace data, real time data from the rig, including from the cement job and all data relating to Halliburton's work at the Macondo well.  As part of your response, please identify all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events, and whether this material is still available from any other source.

23.     Has Halliburton changed any of its policies, practices or procedures with respect to its deepwater cementing operations or deepwater mud logging services post April 20, 2010? If your answer is yes, please describe in detail each changed policy, practice or procedure and the reason for each change.

Dated:  April 3, 2011                              Respectfully submitted,

                                                   /s/ J. Andrew Langan, P.C.
                                                   Richard C. Godfrey, P.C.

13

J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:     (504) 581-7979
Facsimile:     (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:     (202) 662-5985

*Attorneys for BP Exploration & Production*
*Inc. and BP America Production Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 3rd day of April, 2011.

/s/ J. Andrew Langan, P.C.