

369111551

Apr 7 2011
12:30PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| This Document Relates To:  All Cases | * | JUDGE BARBIER |
| | * | MAGISTRATE JUDGE SHUSHAN |
| * * * * * * * * * * * * * * * | * | |

### THE BP PARTIES' FIRST REQUESTS FOR
### ADMISSION TO HALLIBURTON

Pursuant to Federal Rules of Civil Procedure 26, 33 and 36, BP Exploration & Production Inc. and BP America Production Company (the "BP Parties") propound the following Requests for Admission to Defendant Halliburton Energy Services, Inc. ("Halliburton") to be responded to within 30 days of service.  The BP Parties request that all documents and electronically stored information responsive to the following First Requests for Admission be produced at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654.

### DEFINITIONS

1.      "You," "your," and "yours" shall mean Halliburton, including without limitation all of Halliburton's present or former employees, agents or representatives, or anyone acting or purporting to act for or on Halliburton's behalf for any purpose whatsoever, and includes any and all affiliates, subsidiaries, contractors and divisions, such as Sperry Drilling, and includes the present employees, agents and representatives of those affiliates, subsidiaries, contractors and divisions.

2.      "Person" shall mean an individual as well as any entity including any proprietorship, partnership, corporation, firm, committee, or any other organization.

Exhibit D

3.      "Communication" means any transmission of information by one or more persons to one or more persons by any means including, without limitation, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail (including both business and personal email), text messages, computer linkups, written memoranda, and face-to-face conversations; "communication" also includes all documents and electronically stored information ("ESI") containing, summarizing, or memorializing any communication.

4.      "Document" or "documents" includes "communications" as defined above, and has the full meaning ascribed to it by Federal Rule of Civil Procedure 34(a), including ESI, and includes the original and any identical or non-identical copy, regardless of origin or location, of any writing or record of any type or description, including but not limited to all writings; records; contracts; agreements; communications (intra or inter-company); correspondence; memoranda; letters; facsimiles; electronic mail (e-mail); minutes, recordings, transcripts, and summaries of meetings, or recordings of meetings, speeches, presentations, conversations, or telephone calls (whether recorded in writing, mechanically, or electronically); handwritten and typewritten notes of any kind; statements; reports; voice recordings; desk calendars; diaries; logs; drafts; studies; analyses; schedules; forecasts; surveys; invoices; receipts; computer data; computer printouts; financial statements; balance sheets; profit and loss statements; statements of earnings; statements of net worth; credit reports; statements of operations; audit reports; financial summaries; statements of lists of assets; work papers; pictures; photographs; drawings; computer cards; tapes; discs; printouts and records of all types; instruction manuals; policy manuals and statements; books; pamphlets; cancelled checks; check stubs; and every other device or medium by which information or intelligence of any type is transmitted, recorded, or preserved, or from which intelligence or information can be perceived.

5.      "Identify," when used with respect to: (a) an individual, shall mean to provide the individual's full name, job title and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and Bates number(s).

6.      "Including" or "includes" means "including but not limited to" or "including without limitation."

7.      "Relating to" or "related to," when referring to any given subject matter, means any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

8.      The words "and" and "or" should be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

9.      "Any" should be construed, when possible, to mean "any and all."

10.     "Each" should be construed to include the word "every," and "every" should be construed to include the word "each."

11.     The singular includes the plural, and the plural includes the singular.

12.     "MC252 well" and "Macondo well" refer to the exploratory well that was being drilled by the *Deepwater Horizon* in the Macondo prospect of Mississippi Canyon 252 in the outer continental shelf of the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

13.     "Halliburton" means Halliburton Energy Services, Inc. and all of its affiliates, subsidiaries, contractors and divisions, such as Sperry Drilling, and includes the present employees, agents and representatives of those affiliates, subsidiaries, contractors and divisions.

14.     "BP" means BP p.l.c and all of its affiliates and subsidiaries.

15.     "Kick," whether or not capitalized, means the intrusion of hydrocarbons into a wellbore.

16.     "Blowout," whether or not capitalized, means an uncontrolled release of hydrocarbons from a well.

17.     "OptiCem" means Halliburton's proprietary software used to model cement slurry operations and as that term was used by Halliburton in communications with BP.

## <u>INSTRUCTIONS</u>

1.     Pursuant to Federal Rule of Civil Procedure 26(e), these requests are continuing and you must revise or supplement your responses and production whenever new or additional responsive information becomes known.

2.     Each request is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular request.

3.     If you claim that the language of any request is vague or ambiguous, then you must identify the language you believe is ambiguous and describe the different interpretations that you believe may apply to such language. Regardless of any vagueness or ambiguity you claim, you are to answer the request to the best of your ability.

4.     Each request for admission solicits all information that is known to you or in your possession, custody or control, and all information available to you from your attorneys, agents, investigators, experts, employees, insurers and representatives.

4

5.     If any of the answers to these requests are derived from papers, records or documents in your possession or under your control, please attach a copy thereof to your answers or, in the alternative, please describe each of the documents with specificity and state when and where they will be available to BP's counsel for inspection and copying.

6.     If you contend that information responsive to any request for admission is protected from disclosure pursuant to any privilege or work-product doctrine, then you must comply with the requirements of Pre-Trial Order No. 14 and Federal Rule of Civil Procedure 26(b)(5).

## <u>REQUESTS FOR ADMISSION</u>

1.      Admit that Halliburton never warned BP that the cement job at the Macondo well was unsafe.

2.      Admit that Halliburton never warned BP that the temporary abandonment procedure at the Macondo well was unsafe.

3.      Admit that Halliburton did not have any safety concerns about running six centralizers on the production casing of the Macondo well.

4.      Admit that after Halliburton found out that BP decided to run six centralizers instead of twenty-one centralizers, it did not raise the topic of centralizers with BP.

5.      Admit that Halliburton informed BP that the cement job was executed successfully after the job was completed on April 20, 2010.

6.      Admit that Halliburton confirmed to BP that there were full returns during the cement job completed on April 20, 2010.

7.      Admit that Halliburton confirmed to BP that there was lift pressure during the cement job completed on April 20, 2010.

8.      Admit that Halliburton confirmed to BP that the "Rig completed displacement and both plugs were bumped" as scheduled during the cement job completed on April 20, 2010.

9.      Admit that Halliburton did not tell BP to run a cement bond log after the cement job was completed on April 20, 2010.

10.     Admit that Halliburton did not warn the rig crew of the increasing pipe pressure around 21:26 to 21:30 on April 20, 2010.

11.     Admit that Halliburton did not warn the rig crew of the increasing pipe pressure around 21:31 on April 20, 2010.

12.     Admit that the foamed cement pumped into the Macondo well on April 19 and 20, 2010 was unstable.

13.     Admit that the foamed cement that Halliburton pumped into the annulus of the Macondo well failed to contain the flow of hydrocarbons.

14.     Admit that the unfoamed cement that Halliburton pumped into the shoe of the Macondo well failed to contain the flow of hydrocarbons.

15.     Admit that the hydrocarbon flow came up the casing of the Macondo well through the shoe track.

16.     Admit that the hydrocarbon flow did not come up the annulus of the Macondo well through the hanger seal assembly.

17.     Admit that the hydrocarbon flow did not come up the annulus of the Macondo well through a breach in the cross over.

18.     Admit that the hydrocarbon flow did not come up the annulus of the Macondo well through a breach in the body of the casing.

19.     Admit that the only gas flow potential category that requires a cement program change is Critical.

20.     Admit that the OptiCem program only recommends that changes be made to the cementing program if the gas flow potential category is Critical.

21.     Admit that Halliburton predicted that the gas flow potential for the cement job on the production interval of the Macondo well using seven centralizers would be Severe.

22.     Admit that Halliburton contends that the gas flow potential calculated by OptiCem is substantially the same for six centralizers and seven centralizers.

23.     Admit that a solution Halliburton recommends for the gas flow potential category of Severe is foam cement.

24.     Admit that Halliburton's OptiCem software (under the "Help" section of the OptiCem software under "Gas Flow Potential") recommends the use of foam cement in order to address severe gas flow potential.

25.     Admit that the calculation of a gas flow potential value using Halliburton's OptiCem software does not take into account the properties of the cement slurry to resist gas migration.

26.     Admit that the calculation of a gas flow potential value using Halliburton's OptiCem software does not take into account whether the cement used is foamed cement slurry.

27.     Admit that the calculation of a gas flow potential value using Halliburton's OptiCem software does not take into account the gel strength transition time properties of the cement slurry.

28.     Admit that the OptiCem modeling done by Halliburton for the Macondo well on April 18, 2010 predicts a cemented annular region with good mud displacement below the region of the open hole that is washed out.

29.     Admit that the OptiCem modeling done by Halliburton for the Macondo well on April 18, 2010 predicts a cemented annular region with no channeling below the region of the open hole that is washed out.

30.     Admit that the OptiCem modeling done by Halliburton for the Macondo well on April 18, 2010 predicts a cemented region with good mud displacement in the annular space between the production casing and the 9-7/8″ liner.

31.     Admit that the OptiCem modeling done by Halliburton for the Macondo well on April 18, 2010 predicts a cemented region with no channeling in the annular space between the production casing and the 9-7/8″ liner.

32.     Admit that nobody from Halliburton exercised their right to stop the job and refuse to pump the cement job on April 19 and 20, 2010 because of safety concerns.

33.     Admit that Halliburton did not maintain the sensors used in the mud logging services it performed on the *Deepwater Horizon* on April 20, 2010 to ensure they are were providing accurate data to assist real-time decision making, and for processing to aid post-well analysis.

34.     Admit that the Halliburton mud loggers on the *Deepwater Horizon* on April 20, 2010 did not advise BP or Transocean personnel of any situation developing with safety implications.

35.     Admit that on April 20, 2010 Halliburton did not inform BP or Transocean that rig activities prevented its mud loggers from accurately monitoring returns.

36.     Admit that on April 20, 2010 Halliburton did not "stop work" even though it knew that rig activities prevented its mud loggers from accurately monitoring returns.

37.     Admit that before April 20, 2010, Halliburton did not inform BP that the design of the production casing for the Macondo well was defective.

38.     Admit that before April 20, 2010, Halliburton did not inform BP that the design of the production casing for the Macondo well was dangerous.

39.     Admit that before April 20, 2010, Halliburton did not inform BP that the design of the production casing for the Macondo well should be changed.

40.     Admit that on April 19 and 20, 2010, Halliburton executed the cement job on the production casing at the Macondo well.

41.     Admit that Halliburton did not refuse to execute the cement job on the production casing at the Macondo well.

42.     Admit that Halliburton had authority to "stop work" on the *Deepwater Horizon* if it believed any operation was unsafe.

43.     Admit that Halliburton had authority to "stop work" on the *Deepwater Horizon* if it did not understand any operation.

44.     Admit that Halliburton did not exercise its "stop work" authority on April 19, 2010 on the *Deepwater Horizon*.

45.     Admit that Halliburton did not exercise its "stop work" authority on April 20, 2010 on the *Deepwater Horizon*.

46.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew the casing design left 189 feet of cement in the "shoe track."

47.     Admit that Halliburton did not inform BP that there were any issues with the casing design that left 189 feet of cement in the "shoe track."

48.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew the casing design placed the bottom of the casing only 55 feet beneath the lowest hydrocarbon zone.

49.     Admit that Halliburton did not inform BP of any issues with the casing design that placed the bottom of the casing only 55 feet beneath the lowest hydrocarbon zone.

50.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that the casing plan specified a long-string production casing instead of a liner.

51.     Admit that Halliburton did not inform BP of any issues with the casing plan for a long-string production casing instead of a liner for the production interval of the Macondo well.

52.     Admit that Halliburton advised BP that a long-string production casing could be successfully cemented at the Macondo well on April 14, 2010.

53.     Admit that subsequent to advising BP that a long-string production casing could be successfully cemented at the Macondo well on April 14, 2010, Halliburton did not advise BP that production casing could not be successfully cemented.

54.     Admit that a liner with tieback has a potential leak path at the tieback junction.

55.     Admit that a production casing does not have a potential leak path at the tieback junction.

56.     Admit that a liner with tieback has a higher risk of mechanical integrity failure during the life of the well compared to a production casing.

57.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that the casing design did not include a float shoe.

58.     Admit that Halliburton did not inform BP of any issues concerning the lack of a float shoe.

59.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that the float collar did not perform as expected during attempts to convert it.

60.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that nine attempts were made to convert the float collar.

61.     Admit that Halliburton did not inform BP of any issues concerning the conversion of the float collar.

62.     Admit that Halliburton's post-job report for the Macondo well sent to BP on April 23, 2010 states that the float collar was converted.

63.     Admit that Halliburton's post-job report for the Macondo well sent to BP on April 23, 2010 states that the float valves held after cementing.

64.     Admit that before April 19, 2010 Halliburton knew that the fifteen centralizers delivered to the *Deepwater Horizon* were not installed on the production casing.

65.     Admit that before the blowout on April 20, 2010, Halliburton did not inform BP that there were any safety issues with not installing the fifteen centralizers on the *Deepwater Horizon* on the production casing.

66.     Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that the fifteen centralizers delivered to the *Deepwater Horizon* were not installed on the production casing.

67.     Admit that Halliburton knew that BP had a decision tree specifying that a cement bond log would be run if full returns were not observed during execution of the cement job.

68.     Admit that Halliburton did not indicate to BP that criteria other than full returns should be considered as an indication of a successful cement job.

69.     Admit that using full returns as an indication of a successful cement job is appropriate.

70.    Admit that Halliburton knew and did not inform BP before April 20, 2010 that the well owner must perform a cement bond log to rely on the cement as an effective barrier.

71.    Admit that Halliburton's internal best practices do not recommend running a cement bond log for every cement job.

72.    Admit that Halliburton never discussed with BP the need to run a cement bond log at the Macondo well.

73.    Admit that Halliburton attended a meeting on April 14, 2010, where BP's plan for running a cement bond log only if there were lost returns was discussed.

74.    Admit that Halliburton attended a morning meeting with BP on April 20, 2010, where Halliburton presented the results from the cement job on April 19-20, 2010.

75.    Admit that at a morning meeting with BP on April 20, 2010, Halliburton stated that the cement job on April 19-20, 2010 had been pumped successfully.

76.    Admit that at a morning meeting with BP on April 20, 2010, Halliburton stated that the cement job on April 19-20, 2010 had been pumped with full returns.

77.    Admit that at a morning meeting with BP on April 20, 2010, Halliburton stated that the cement job on April 19-20, 2010 had been pumped with lift pressure.

78.    Admit that at a morning meeting with BP on April 20, 2010, Halliburton stated that the cement job on April 19-20, 2010 had been pumped with plugs bumping on schedule.

79.    Admit that Halliburton attended a morning meeting on April 20, 2010, where the plan to not run a cement bond log was discussed.

80.    Admit that at the morning meeting with BP on April 20, 2010, Halliburton did not state that a cement bond was needed.

81.    Admit that Halliburton did not tell BP that a cement bond log was needed before BP could rely on the cement as a barrier.

82.    Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew the plan was to not run a cement bond log if there were full returns.

83.    Admit that Halliburton did not raise with BP any issues with the plan to not run a cement bond log if there were full returns.

84.    Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that the float collar placement prevented a cement bond log from being run across over 83% of hydrocarbon bearing formations.

85.    Admit that Halliburton did not raise with BP any issue with the plan to place the float collar where it prevented a cement bond log from being run across over 83% of hydrocarbon bearing formations.

86.    Admit that Halliburton knew before April 20, 2010 that BP's intention was to run a cement bond log when it returned to the Macondo well for production.

87.    Admit that Halliburton knew before April 20, 2010 that BP's intention was to drill out a portion of the shoe before running a cement bond log when it returned to the Macondo well for production.

88.    Admit that Halliburton executed the cement job on the production interval of the Macondo well even though it knew that bottoms-up circulation was not performed after running the production casing.

89.    Admit that Halliburton did not tell BP that a bottoms-up circulation should be performed after running the casing on April 19, 2010.

14

90.     Admit that Halliburton did not warn BP of any issues with not running a bottoms-up circulation after running the casing on April 19, 2010.

91.     Admit that the decision to run less than bottoms-up circulation after running the casing on April 19, 2010 was appropriate given the conditions of the Macondo well.

92.     Admit that BP circulated more than a full bottoms-up circulation on April 16, 2010 at the Macondo well.

93.     Admit that the circulation on April 16, 2010 at the Macondo well gave indications that the well was in good shape for cementing.

94.     Admit that on April 20, 2010 Halliburton told BP on the *Deepwater Horizon* that there were no lost returns during execution of the cement job.

95.     Admit that on April 20, 2010 Halliburton told BP on the *Deepwater Horizon* that there was lift pressure during execution of the cement job.

96.     Admit that Halliburton mud loggers on the *Deepwater Horizon* are required to monitor pressure tests.

97.     Admit that on April 20, 2010, Halliburton mud loggers were monitoring data from the negative test.

98.     Admit that on April 20, 2010, Halliburton mud loggers knew that a successful negative test did not occur.

99.     Admit that on April 20, 2010, Halliburton mud loggers did not inform BP of any issues relating to the negative test.

100.    Admit that Halliburton did not exercise a "stop work" based on the negative test.

101.     Admit that the report titled 9 7/8″ X 7″ Production Casing that Halliburton sent to BP on April 18, 2010 encloses Halliburton's recommended procedure for cementing the long-string casing at the Macondo well.

102.     Admit that before the blowout on April 20, 2010, Halliburton knew that BP did not adjust their decision tree, and did not inform BP of any issues with the decision tree.

103.     Admit that before the blowout on April 20, 2010, Halliburton did not inform BP of any issues with the decision tree.

104.     Admit that Halliburton did not exercise a "stop work" on April 20, 2010 because BP did not adjust their decision tree.

105.     Admit that on April 20, 2010 Halliburton told BP employees on the *Deepwater Horizon* that the cement job was successfully executed.

106.     Admit that Halliburton provided to BP on April 23, 2010 a post-job report of the cement job on the production interval of the Macondo well.

107.     Admit that Halliburton has never indicated to BP that the post-job report it provided on April 23, 2010 was incorrect.

108.     Admit that Halliburton had the April 2010 logging data for the Macondo well before April 18, 2010.

109.     Admit that Halliburton had access to WellSpace before April 18, 2010.

110.     Admit that the April 2010 logging data for the Macondo well was in WellSpace before April 18, 2010.

111.     Admit that the April 2010 logging data for the Macondo well specified the pore pressures for the gas reservoirs.

112.    Admit that the April 18, 2010 OptiCem report did not use the correct pore pressures reflected in the April 2010 logging data.

113.    Admit that if the correct pore pressure was used for the gas flow potential calculation in the April 18, 2010 Opticem report, the gas flow potential would be Minor.

114.    Admit that BP provided Halliburton with its planned placement of the six centralizers before April 18, 2010.

115.    Admit that the April 18, 2010 OptiCem report did not use the centralizer locations provided by BP.

Dated: April 7, 2011                         Respectfully submitted,

                                              /s/ J. Andrew Langan, P.C.
                                              Richard C. Godfrey, P.C.
                                              J. Andrew Langan, P.C.
                                              KIRKLAND & ELLIS LLP
                                              300 North LaSalle Street
                                              Chicago, Illinois  60654
                                              Telephone:     (312) 862-2000
                                              Facsimile:     (312) 862-2200

                                              and

                                              Don K. Haycraft (Bar #14361)
                                              R. Keith Jarrett (Bar #16984)
                                              LISKOW & LEWIS
                                              701 Poydras Street, Suite 5000
                                              New Orleans, Louisiana  70139-5099
                                              Telephone:     (504) 581-7979
                                              Facsimile:     (504) 556-4108

                                              and

                                              Robert C. "Mike" Brock
                                              Covington & Burling LLP
                                              1201 Pennsylvania Avenue, NW
                                              Washington, DC  20004-2401
                                              Telephone:     (202) 662-5985

                                              *Attorneys for BP Exploration & Production Inc. and BP America Production Company*

17

## **CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 7th day of April, 2011.


      /s/ J. Andrew Langan, P.C.