

37962054

Jun 3 2011
11:06PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Cases | : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| …………………………………………... | : | |

**THE BP PARTIES' SECOND REQUESTS FOR**
**ADMISSION TO HALLIBURTON ENERGY SERVICES, INC.**

Pursuant to Federal Rules of Civil Procedure 26 and 36, BP Exploration & Production Inc. and BP America Production Company (collectively, the "BP Parties") propound the following discovery requests to Halliburton Energy Services, Inc., to be responded to within 30 days of service.

**DEFINITIONS**

1.      "You," "your," and "yours" shall mean, for plaintiffs that are natural persons, the plaintiff and his or her representatives, agents, attorneys, heirs, and assigns, and for plaintiffs that are entities, the entity and its officers, directors, employees, attorneys, successors, and assigns.

2.      "Person" shall mean an individual as well as any entity including any proprietorship, partnership, corporation, firm, committee, or any other organization.

3.      "Communication" means any transmission of information by one or more persons to one or more persons by any means including, without limitation, telephone conversations, letters, telegrams, teletypes, telexes, telecopies, e-mail, computer linkups, written memoranda, and face-to-face conversations; "communication" includes all documents and ESI containing, summarizing, or memorializing any communication.

Exhibit E

4.      "Document" or "documents" has the full meaning ascribed to it by Federal Rule of Civil Procedure 34(a), including electronically stored information ("ESI"), and includes the original and any identical or non-identical copy, regardless of origin or location, of any writing or record of any type or description, including, but not limited to, all writings; records; contracts; agreements; communications (intra or inter-company); correspondence; memoranda; letters; facsimiles; electronic mail (e-mail); minutes, recordings, transcripts, and summaries of meetings, or recordings of meetings, speeches, presentations, conversations, or telephone calls (whether recorded in writing, mechanically, or electronically); handwritten and typewritten notes of any kind; statements; reports; voice recordings; desk calendars; diaries; logs; drafts; studies; analyses; schedules; forecasts; surveys; invoices; receipts; computer data; computer printouts; financial statements; balance sheets; profit and loss statements; statements of earnings; statements of net worth; credit reports; statements of operations; audit reports; financial summaries; statements of lists of assets; work papers; pictures; photographs; drawings; computer cards; tapes; discs; printouts and records of all types; instruction manuals; policy manuals and statements; books; pamphlets; cancelled checks; check stubs; and every other device or medium by which information or intelligence of any type is transmitted, recorded, or preserved, or from which intelligence or information can be perceived.

5.      "Identify," when used with respect to: (a) an individual, shall mean to provide the individual's full name, job title, and employer during the period referred to, and current or last-known address and telephone number and business address and telephone number; (b) any entity other than an individual, shall mean to provide the entity's full name and current or last-known address (designating which); and (c) a document, shall mean to provide the date, title, subject matter, author(s), recipient(s), and Bates number(s).

6.     "Including" or "includes" means "including, but not limited to" or "including without limitation."

7.     "Relating to" or "relating to," when referring to any given subject matter, means any document that constitutes, comprises, involves, contains, embodies, reflects, identifies, states, mentions, alludes to, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

8.     The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

9.     "MC252 #1 Macondo Well" means the exploratory well that was being drilled by the *Deepwater Horizon* in the Macondo prospect of Mississippi Canyon 252 in the outer continental shelf of the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

10.    "Macondo Well" means that MC 252 #1 Macondo Well.

11.    *"Deepwater Horizon* Incident" and "Incident" means the events leading to (i) the loss of life and injuries on the *Deepwater Horizon* rig on or about April 20, 2010, and (ii) the eventual sinking of the rig on April 22, 2010, including the blowout, explosions, and fire.

12.    "Oil Spill" means the oil released from the Macondo Well as a result of the Incident.

13.    "Oil Spill Response" means any effort to clean up the Oil Spill.

14.    "BP" means BP p.l.c. and any and all of its affiliates.

15.    "Transocean" means Triton Asset Leasing GmbH and any and all of its affiliates.

16.    "Cameron" means Cameron International Corporation and any and all of its affiliates.

17.     "Anadarko" means Anadarko Petroleum Corporation and Anadarko E&P Company LP and any and all of its affiliates.

18.     "Anadarko Non Operating Party Defendants" means, without limitation, Anadarko.

19.     "Halliburton" means Halliburton Energy Services, Inc. and any and all of its affiliates.

20.     "BOP system" means, unless otherwise specified, the entire subsea blowout preventer system, including, but not limited to, the BOP stack, BOP control system, BOP operating panels, Lower Marine Riser Package ("LMRP"), all rams, all preventers, any and all connectors and connections to the BOP stack, including the choke and kill lines and MUX cables, any and all emergency systems, any and all back-up systems, the autoshear system, ROV intervention panels, the Automatic Mode Function deadman system, and any other components to the BOP.

21.     "Blowout," whether or not capitalized, means an uncontrolled release of hydrocarbons from a well.

22.     "Kick," whether or not capitalized, means the intrusion or influx of formation fluids (such as hydrocarbons or water) into a wellbore.

23.     "Lost circulation," whether or not capitalized, means a reduced amount or total absence of drilling fluids returning to the drilling rig after being pumped down a well.

24.     "Well control event," whether or not capitalized, means any kick, lost circulation event, or blowout.

## **INSTRUCTIONS**

1.     Each request is to be construed independently and not by or with reference to any other request for purposes of limiting the scope of any particular request.

4

2.      If you claim that the language of any request is vague or ambiguous, then you must identify the language you believe is ambiguous and describe the different interpretations that you believe may apply to such language.  Regardless of any vagueness or ambiguity you claim, you are to answer the request for admission to the best of your ability.

3.      Pursuant to Federal Rule of Civil Procedure 26(e), these requests are continuing and you must revise or supplement your responses and production whenever new or additional responsive information becomes known.

<u>**REQUESTS FOR ADMISSION**</u>

116.    Admit that on April 20, 2010, the responsibilities of the Sperry Sun mudlogger aboard the *Deepwater Horizon* included continuously monitoring the well.

117.    Admit that on April 20, 2010, the responsibilities of the Sperry Sun mudlogger aboard the *Deepwater Horizon* included alerting the Driller if any anomalies were observed while monitoring the well.

118.    Admit that on April 20, 2010, the responsibilities of the Sperry Sun mudlogger aboard the *Deepwater Horizon* included alerting other rig personnel if there are any operations, issues, or concerns that prevented the mudlogger from being able to continuously monitor the well.

119.    Admit that on April 20, 2010 Joseph Keith was a Sperry Sun mudlogger aboard the *Deepwater Horizon*.

120.    Admit that on April 20, 2010 Cathleena Willis was a Sperry Sun mudlogger aboard the *Deepwater Horizon*.

121.    Admit that the Halliburton employees aboard the *Deepwater Horizon* on April 19, 2010 had the authority to stop operations to prevent an incident from occurring.

122.    Admit that no Halliburton employee aboard the *Deepwater Horizon* exercised stop-work authority on April 19, 2010 during the cementing operations.

123.    Admit that the Halliburton employees aboard the *Deepwater Horizon* on April 20, 2010 had the authority to stop operations to prevent an incident from occurring.

124.    Admit that no Halliburton employee aboard the *Deepwater Horizon* exercised stop-work authority on April 20, 2010 during the cementing operations.

125.    Admit that no Halliburton employee aboard the *Deepwater Horizon* told BP that the cement job associated with the final production casing string should not be performed.

126.    Admit that on April 20, 2010 one or more Halliburton employees informed BP that the cement job associated with the final production casing string was successful.

127.    Admit that on April 20, 2010, one or more Halliburton employees informed BP that circulation was established through the float collar.

128.    Admit that Halliburton is one of the world's largest providers of products and services to the energy industry and has contributed to most of the world's deepwater-well completions.

129.    Admit that Halliburton is the premier cementing organization in the world.

130.    Admit that under the contract between BP and Halliburton, Halliburton is required to perform cement tests in accordance with the latest API/ISO Specifications.

131.    Admit that under the contract between BP and Halliburton, the minimum tests for cementing operations are: static gel strength, pump time, compressive strength, free water, fluid loss, rheology, and mud/spacer compatibility.

132.    Admit that under the contract between BP and Halliburton, Halliburton is required to provide the results of the cements tests to BP more than 24 hours before pumping cement.

6

133.    Admit that under the contract between BP and Halliburton, Halliburton is required to perform the cement tests on actual rig samples and not load out samples.

134.    Admit that Halliburton did not provide witnesses to be interviewed by the BP Internal Investigation Team and the Presidential Commission after Halliburton released previously unproduced lab worksheets for the Macondo Well on November 05, 2010.

135.    Admit that on April 20, 2010, Sperry Sun and/or Halliburton personnel "were monitoring the well activities at our Real Time Operations Center," as stated in deposition Exhibit 2011.

136.    Admit that BP requested that Halliburton produce off-the-shelf samples of the cementing materials used in the cementing operation at the Macondo Well on April 19, 2010.

137.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the Lafarge class H cement used in the cementing operation at the Macondo Well on April 19, 2010.

138.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the EZ-FLOW additive used in the cementing operation at the Macondo Well on April 19, 2010.

139.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the D-Air 3000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

140.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the potassium chloride salt additive used in the cementing operation at the Macondo Well on April 19, 2010.

141.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the SSA-1 (Silica Flour) additive used in the cementing operation at the Macondo Well on April 19, 2010.

142.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the SSA-2 (100 Mesh) additive used in the cementing operation at the Macondo Well on April 19, 2010.

143.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the SA-541 additive used in the cementing operation at the Macondo Well on April 19, 2010.

144.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the ZoneSealant 2000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

145.    Admit that BP requested that Halliburton produce an off-the-shelf sample of the SCR-100L additive used in the cementing operation at the Macondo Well on April 19, 2010.

146.    Admit that Halliburton did not produce to BP off-the-shelf samples of the cementing materials used in the cementing operation at the Macondo Well on April 19, 2010.

147.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the Lafarge class H cement used in the cementing operation at the Macondo Well on April 19, 2010.

148.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the EZ-FLOW additive used in the cementing operation at the Macondo Well on April 19, 2010.

149.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the D-Air 3000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

150.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the potassium chloride salt additive used in the cementing operation at the Macondo Well on April 19, 2010.

151.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the SSA-1 (Silica Flour) additive used in the cementing operation at the Macondo Well on April 19, 2010.

152.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the SSA-2 (100 Mesh) additive used in the cementing operation at the Macondo Well on April 19, 2010.

153.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the SA-541 additive used in the cementing operation at the Macondo Well on April 19, 2010.

154.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the ZoneSealant 2000 additive used in the cementing operation at the Macondo Well on April 19, 2010.

155.    Admit that Halliburton did not produce to BP an off-the-shelf sample of the SCR-100L additive used in the cementing operation at the Macondo Well on April 19, 2010.

156.    Admit that the results of the Chevron and CSI testing reflect what happened to the rig cement used on the production interval of the Macondo Well.

157.    Admit that all foam stability tests conducted by Halliburton for the Macondo Well production casing slurry at 12.98% foam quality were unstable after conditioning at 110 F and 135 F.

158.    Admit that Ronald Faul requested Timothy Quirk to mix and conduct post-incident testing on a slurry sample using the design of the Macondo Well production casing slurry.

159.    Admit that Halliburton personnel at the Broussard lab performed post-incident testing on a slurry sample mixed using the design of the Macondo Well production casing slurry.

160.    Admit that Timothy Quirk drafted notes relating to the post-incident testing performed at the Broussard lab on a slurry sample mixed using the design of the Macondo Well production casing slurry.

161.    Admit that Timothy Quirk discarded his notes relating to the post-incident testing performed at the Broussard lab on a slurry sample mixed using the design of the Macondo Well production casing slurry.

162.    Admit that Timothy Quirk's notes relating to the post-incident testing performed at the Broussard lab are not available and have not been produced.

163.    Admit that the Broussard lab created one or more cured slurry samples as a result of the post-incident testing ordered by Ronald Faul.

164.     Admit that the cured slurry sample(s) created as by the Broussard lab as a result of the post-incident testing ordered by Ronald Faul have been destroyed.

165.    Admit that Halliburton did not condition the slurry for the Macondo Well production casing prior to the cement job and after the cement was mixed on the rig.

166.    Admit that the foam slurry design for the Macondo Well production casing had a foam quality of over 60% at injection conditions.

167.    Admit that the foam slurry design for the Macondo Well production casing had a foam quality of over 18.5% at downhole conditions.

168.    Admit that the April 18 Opticem report, page 22, shows that foam quality down hole at 18107.5 feet was 18.61%.

169.    Admit that Halliburton's testing ordered on February 12, 2010 was performed on a cement slurry with a foam quality of 12.98%.

170.    Admit that Halliburton's testing ordered on February 16, 2010 was performed on a cement slurry with a foam quality of 12.98%.

171.    Admit that Halliburton's testing ordered on March 7, 2010 was performed on a cement slurry with a foam quality of 12.96%.

172.    Admit that Halliburton's testing ordered on April 13, 2010 was performed on a cement slurry with a foam quality of 12.98%.

173.    Admit that Halliburton's testing ordered on April 17, 2010 was performed on a cement slurry with a foam quality of 12.98%.

174.    Admit that Halliburton did not perform crush compressive strength testing for the Macondo Well cement slurry design pumped on April 19, 2010.

175.    Admit that Halliburton did not perform FYSA rheology profile and gel strength testing for the Macondo Well cement slurry design pumped on April 19, 2010.

176.    Admit that Halliburton did not perform foam stability testing for the Macondo Well cement slurry design pumped on April 19, 2010.

177.    Admit that prior to beginning the production casing cement job for the Macondo Well, Halliburton never generated a sample of the foam slurry using the design pumped on April 19, 2010.

178.    Admit that Halliburton did not perform any foamed slurry tests on the 0.09 gallon per sack retarder cement slurry before the slurry was pumped at the Macondo Well.

179.    Admit that Halliburton did not comply with the cement testing specifications in API 10B-4 for the foamed cement slurry for the production interval of the Macondo Well.

180.    Admit that Halliburton did not perform the set foam stability test on the cement slurry for the production interval of the Macondo Well in accordance with API 10B-4.

181.    Admit that Halliburton did not cut and weigh three sections of the cured foamed cement for the Macondo Well in accordance with the set foam stability test in API 10B-4.

182.    Admit that Halliburton did not perform the unset foam stability test on the cement slurry for the production interval of the Macondo Well in accordance with API 10B-4.

183.    Admit that the lightweight cement blend that Halliburton designed for the cement job on the Macondo Well on April 19 and 20, 2010 did not have less than 2 percent settlement under the BP settlement test.

184.    Admit that the lightweight cement blend Halliburton provided to BP for the cement job on the Macondo Well on April 19 and 20, 2010 did not have API Fluid Loss of less than 100 milliliters per 30 minutes.

185.    Admit that Halliburton did not exercise its right to stop the job and refuse to pump the cement job on April 19 and 20, 2010 because of safety concerns.

186.    Admit that defoamers can destabilize foamed cement slurry.

187.    Admit that dispersants can destabilize foamed cement slurry.

188.    Admit that EZ-FLO is a dispersant that can destabilize foamed cement slurry.

189.    Admit that D-AIR 3000 is a defoamer that can destabilize foamed cement slurry.

190.    Admit that salt is a dispersant that can destabilize foamed cement slurry.

191.    Admit that potassium chloride is a dispersant that can destabilize foamed cement slurry.

192.    Admit that SA-541 is a dispersant that can destabilize foamed cement slurry.

193.    Admit that SCR-100L is a dispersant that can destabilize foamed cement slurry.

194.    Admit that the final cement lab test results for the cementing job on the production interval at the Macondo Well were not provided to BP more than twenty-four hours before pumping the cement job on April 19 and 20, 2010.

195.    Admit that Halliburton did not conduct cement/spacer compatibility testing on the cement slurry for the Macondo Well before pumping the cement on April 19 and 20, 2010.

196.    Admit that Halliburton did not conduct cement/mud compatibility testing on the cement slurry for the Macondo Well before pumping the cement on April 19 and 20, 2010.

197.    Admit that Halliburton did not conduct cement/mud/spacer compatibility testing on the cement slurry for the Macondo Well before pumping the cement on April 19 and 20, 2010.

198.    Admit that Halliburton did not complete fluid loss testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

199.    Admit that Halliburton did not conduct free fluid testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

200.    Admit that Halliburton did not perform BP's settlement test on the cement slurry used on the production interval of the Macondo Well.

201.    Admit that Halliburton did not conduct static gel strength transition time testing on the cement slurry for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

202.    Admit that Halliburton did not conduct zero gel time testing on the cement slurry for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

203.    Admit that Halliburton did not conduct free water testing on the lead cement or tail cement slurry for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

204.    Admit that Halliburton did not conduct API mud/spacer testing for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

205.    Admit that Halliburton did not conduct compressive strength testing for a 95/5 cement/spacer combination for the production interval of the Macondo Well before it pumped the cement on April 19 and 20, 2010.

206.    Admit that Halliburton did not conduct static gel strength transition time testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

207.    Admit that Halliburton did not conduct expansion/shrinkage testing on the cement slurry pumped on the production interval of the Macondo Well before April 19 and 20, 2010.

208.    Admit that on March 8, 2010, Jesse Gagliano stated to BP that it was sending "the lab test for your review."

209.    Admit that on March 8, 2010, neither Jesse Gagliano, nor any other Halliburton employee, sent BP all of the available test results for the pilot slurry for the Macondo Well.

210.    Admit that on April 1, 2010, Jesse Gagliano stated to BP that "I already have a pilot test run, see attached."

211.    Admit that on April 1, 2010, neither Jesse Gagliano, nor any other Halliburton employee, sent BP all of the available test results for the pilot slurry for the Macondo Well.

212.    Admit that the test results for the pilot slurry sent on March 8, 2010 indicated that no conditioning had been done on the cement slurry for the foamed stability test.

213.    Admit that the test results for the pilot slurry sent on April 1, 2010 indicated that no conditioning had been done on the cement slurry for the foamed stability test.

214.    Admit that the results reported in the report sent March 8, 2010 were for a foamed stability test using a cement slurry that had been conditioned for two hours.

14

215.    Admit that the results reported in the report sent April 1, 2010 were for a foamed stability test using a cement slurry that had been conditioned for two hours.

216.    Admit that the test results for the pilot slurry sent on March 8, 2010 did not report any problems with the crush compressive strength test.

217.    Admit that the test results for the pilot slurry sent on April 1, 2010 did not report any problems with the crush compressive strength test.

218.    Admit that the test results for the pilot slurry sent on March 8, 2010 did not report the results of the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010.

219.    Admit that the test results for the pilot slurry sent on April 1, 2010 did not report the results of the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010.

220.    Admit that the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010 notes a "SG top" of 2.02 and a "SG bot." of 2.11.

221.    Admit that a foam stability test result showing a "SG top" of 2.02 and a "SG bot." of 2.11, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

222.    Admit that the crush compressive strength test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010 notes that the "slurry is settling, will repeat."

223.    Admit that the crush compressive strength test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 12, 2010 was canceled due to settling by the foam cement slurry.

224.    Admit that settling by the foam cement slurry can be an indication of foam instability.

225.    Admit that the crush compressive strength test documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010 notes at 60 hours that the cement is "hard on bottom, soft on top."

226.    Admit that the crush compressive strength test documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010 notes at 84 hours that the cement is "hard on bottom, firm on top."

227.    Admit that density segregation by the foam cement slurry can be an indication of foam instability.

228.    Admit that the foam stability test for the pilot slurry documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010 notes a "SG top" of 1.91 and a "SG bot." of 1.91.

229.    Admit that a foam stability test result showing a "SG top" of 1.91 and a "SG bot." of 1.91, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

230.    Admit that on April 17, 2010, Halliburton stated to BP that it "[a]ttached the lab tests."

231.    Admit that on April 17, 2010, Halliburton did not send all of the available test results for the cement slurry for the Macondo Well.

232.    Admit that on April 17, 2010, Halliburton did not send the foam stability test results for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010.

233.   Admit that the foam stability test for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010 notes a "SG top" of 1.88 and a "SG bot." of 1.82.

234.   Admit that a foam stability test result showing a "SG top" of 1.88 and a "SG bot." of 1.82, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

235.   Admit that the foam stability test for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 17, 2010 notes a "SG top" of 1.8 and a "SG bot." of 1.799.

236.   Admit that a foam stability test result showing a "SG top" of 1.8 and a "SG bot." of 1.799, when the target density is a SG of 1.737, indicates that the foamed slurry is unstable.

237.   Admit that Halliburton did not tell BP that it considers a foam stability test result within one pound per gallon of the target density to be a successful test.

238.   Admit that "conditioning time" documented on the Cement Lab Weigh-Up Sheet for foam stability testing refers to the time the unfoamed cement slurry is conditioned at a set temperature.

239.   Admit that the unfoamed cement slurry was conditioned at 180°F for 3 hours for the foam stability test documented on the Cement Lab Weigh-Up Sheet dated April 17, 2010.

240.   Admit that the unfoamed cement slurry was not conditioned at 180°F for 3 hours on April 19, 2010 on the *Deepwater Horizon* before foaming.

241.   Admit that the unfoamed cement slurry was conditioned at 180°F for 1.5 hours for the foam stability test documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010.

242.   Admit that the unfoamed cement slurry was not conditioned at 180°F for 1.5 hours on April 19, 2010 on the *Deepwater Horizon* before foaming.

243.    Admit that the unfoamed cement slurry was conditioned at 180°F for 2 hours for the foam stability test documented on the Cement Lab Weigh-Up Sheet dated February 16, 2010.

244.    Admit that the unfoamed cement slurry was not conditioned at 180°F for 2 hours on April 19, 2010 on the *Deepwater Horizon* before foaming.

245.    Admit that the unfoamed cement slurry was not conditioned at an elevated temperature on April 19, 2010 on the *Deepwater Horizon* before foaming.

246.    Admit that SA-541 is an additive that increases the viscosity of the cement slurry with increasing temperature.

247.    Admit that the cement slurry for the Macondo Well is designed to become more viscous with increasing temperature.

248.    Admit that the cement slurry for the Macondo Well produces a more stable foam with increasing temperature.

249.    Admit that the cement slurry for the Macondo Well forms a more stable foam at 180°F than at 80°F.

250.    Admit that Halliburton told BP on or around April 23, 2010 that he had tested stability of the foamed cement slurry containing a defoamer additive.

251.    Admit that Halliburton told BP on or around April 23, 2010 that the foam stability test showed that the cement slurry containing a defoamer additive was stable.

252.    Admit that on April 26, 2010, Halliburton wrote to BP to "See attached.  Lab test not captured in Post Job Report."

253.    Admit that on April 26, 2010, Halliburton did not send all of the available test results for the cement slurry for the Macondo Well not captured in the post-job report.

254.    Admit that on April 26, 2010, Halliburton did not send the foam stability test results for the cement slurry documented on the Cement Lab Weigh-Up Sheet dated April 13, 2010.

255.    Admit that prior to April 20, 2010, Halliburton did not send BP the Cement Lab Weigh-Up sheets dated February 12, 2010.

256.    Admit that prior to April 20, 2010, Halliburton did not provide BP all of the results of the cement testing from the Cement Lab Weigh-Up sheets dated February 12, 2010.

257.    Admit that prior to April 20, 2010, Halliburton did not send BP the Cement Lab Weigh-Up sheets from April 13, 2010.

258.    Admit that prior to April 20, 2010, Halliburton did not provide BP all of the results of the cement testing from the Cement Lab Weigh-Up sheets dated April 13, 2010.

259.    Admit that Halliburton did not take representative field samples of the dry blend cement used on the production interval of the Macondo Well.

260.    Admit that Halliburton did not take representative field samples of the dry additives used on the production interval of the Macondo Well.

261.    Admit that Halliburton did not take representative field samples of the liquid additives used on the production interval of the Macondo Well.

262.    Admit that Halliburton did not take representative field samples of the rig water used on the production interval of the Macondo Well.

263.    Admit that Halliburton did not adequately monitor the drilling operation on the *Deepwater Horizon* on April 20, 2010.

264.    Admit that Halliburton did not provide a mud logging program capable of monitoring mudflow trends on the *Deepwater Horizon* during the cementing operations or the negative test on April 19 and 20, 2010.

265.    Admit that Halliburton did not provide a mud logging program capable of monitoring gas trends on the *Deepwater Horizon* during the cementing operations or the negative test on April 19 and 20, 2010.

266.    Admit that Halliburton did not monitor trends of the pit volumes on the *Deepwater Horizon* during the cementing operations on April 19 and 20, 2010.

267.    Admit that Halliburton did not monitor trends of the pit volumes on the *Deepwater Horizon* during the negative test operations on April 19, 2010.

268.    Admit that Halliburton did not monitor trends of the pit volumes on the *Deepwater Horizon* during the riser displacement operations on April 20, 2010.

269.    Admit that Halliburton did not provide a mud logging system on the *Deepwater Horizon* where placement of the mud logging sensors allowed all measurements to be made independently of other contractor equipment.

270.    Admit that Halliburton did not provide BP with a full accounting for mud losses while drilling (especially in the reservoir) at the Macondo Well.

271.    Admit that, on April 19 and 20, 2010 on the *Deepwater Horizon*, during cementing operations, Halliburton did not monitor the progress of the circulation and returns.

272.    Admit that Halliburton did not reconcile the mud volumes during the cementing operations on April 19 and 20, 2010 on the *Deepwater Horizon*.

273.    Admit that Halliburton did not reconcile the mud volumes after the cementing operations on April 19 and 20, 2010 on the *Deepwater Horizon*.

20

274.    Admit that Halliburton did not implement mud logging engineering procedures on the *Deepwater Horizon* to a sufficiently high level of competency to detect kicks in a timely manner from the Macondo Well on April 20, 2010.

275.    Admit that Halliburton did not monitor the following parameters on the *Deepwater Horizon* during the negative test operations on April 20, 2010:

    a.  Casing pressure;

    b.  Standpipe pressure;

    c.  Total pit volume;

    d.  Mud weight in/out;

    e.  Mud flow in;

    f.  Total barrels displaced;

    g.  Total strokes pumped;

    h.  Plot of casing pressure, standpipe pressure and pit volume; and

    i.  Total gas.

276.    Admit that Halliburton did not monitor the following parameters on the *Deepwater Horizon* during the riser displacement operations on April 20, 2010:

    a.  Casing pressure;

    b.  Standpipe pressure;

    c.  Total pit volume;

    d.  Mud weight in/out;

    e.  Mud flow in;

    f.  Total barrels displaced;

    g.  Total strokes pumped;

h.   Plot of casing pressure, standpipe pressure and pit volume; and

i.   Total gas.

277.   Admit that, on April 20, 2010 on the *Deepwater Horizon*, Halliburton did not monitor the well for circulating system volumes during the negative test operations.

278.   Admit that, on April 20, 2010 on the *Deepwater Horizon*, Halliburton did not monitor the well for mud flow during the negative test operations.

279.   Admit that, on April 20, 2010 on the *Deepwater Horizon*, Halliburton did not monitor the well for circulating system volumes during the riser displacement operations.

280.   Admit that, on April 20, 2010 on the *Deepwater Horizon*, Halliburton did not monitor the well for mud flow during the riser displacement operations.

281.   Admit that Halliburton did not provide high resolution flow monitoring on the *Deepwater Horizon* on April 20, 2010 with the ability to:

a.   Compensate for rig heave, pitch/roll, and riser boosters on floating rigs;

b.   Raise alarms in response to influx rate, influx volume, loss rate and loss volume; and

c.   Sensitivity sufficient to allow detection of losses or kicks of 1-2 barrels.

282.   Admit that on April 18, 2010, a well control drill was conducted on board the *Deepwater Horizon*.

283.   Admit that on April 18, 2010, 16 persons attended the well control drill conducted on board the *Deepwater Horizon*.

284.   Admit that on April 18, 2010, Transocean was responsible for conducting the well control drill on board the *Deepwater Horizon*.

285.    Admit that on April 18, 2010, Transocean did in fact conduct the well control drill on board the *Deepwater Horizon*.

286.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed "kicks" which can take place during cement jobs.

287.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed the fact that kicks can occur while cementing.

288.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed the fact that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

289.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed that wells have been lost due to improperly designed cement slurries and spacers.

290.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which started at 10 am in the morning.

291.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which lasted for thirty (30) minutes.

292.    Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which was attended by sixteen (16) persons on board the vessel.

293.    Admit that on April 18, 2010, Transocean conducted only one well control drill on board the *Deepwater Horizon.*

294.    Admit that on April 18, 2010, the persons on board the *Deepwater Horizon* who attended the well control drill conducted by Transocean included each of the following:  Jason Anderson, Daniel Barron III, Donald Clark, Stephen Curtis, Miles (Randy) Ezell, Jimmy Harrell, Caleb Holloway, Roy Kemp, Karl Kleppinger, Todd Ladner, Blair Manuel, Jay Oldenwald, Dewey Revette, Shane Roshto, Donald Vidrine and Adam Weise.

295.    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* included Jason Anderson.

296.    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Miles (Randy) Ezell.

297.    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Jimmy Harrell.

298.    Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Dewey Revette.

299.    Admit that Jason Anderson was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

300.    Admit that Dewey Revette was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

301.    Admit that Stephen Curtis was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

302.     Admit that Donald Clark was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

303.     Admit that Jason Anderson was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

304.     Admit that Dewey Revette was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

305.     Admit that Stephen Curtis was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

306.     Admit that Donald Clark was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

307.     Admit that Jimmy Harrell was told during the April 18, 2010 well control drill conducted on Board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

308.     Admit that Jimmy Harrel was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

309.     Admit that Jimmy Harrel, the OIM for the *Deepwater Horizon*, personally approved the well control drill that Transocean conducted on April 18, 2010 on board the vessel.

310.    Admit that each of the Safety Drill Reports with document control numbers BP-HZN-MBI00167534 to BP-HZN-MBI00167575 is a record of a regularly conducted business activity of Transocean under Federal Rule of Evidence 803(6).

311.    Admit that deposition Exhibit 2122 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

312.    Admit that deposition Exhibit 2123 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

313.    Admit that deposition Exhibit 2124 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

314.    Admit that deposition Exhibit 2125 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

315.    Admit that deposition Exhibit 2128 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

316.    Admit that deposition Exhibit 2129 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

317.    Admit that deposition Exhibit 2130 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

318.    Admit that deposition Exhibit 2131 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

319.    Admit that deposition Exhibit 2133 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

320.    Admit that deposition Exhibit 2134 in the MDL 2179 proceedings is a record of a regularly conducted business activity of Halliburton under Federal Rule of Evidence 803(6).

Dated:  June 3, 2011

Respectfully submitted,

/s/ J. Andrew Langan, P.C.

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

and

Don K. Haycraft (Bar # 14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:     (504) 581-7979
Facsimile:     (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:     (202) 662-5985

*Attorneys for the BP Parties*

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 3rd day of June, 2011.

/s/ J. Andrew Langan, P.C.