# The Macondo Well Blowout: An Admiralty Tort?

By John J. Costonis



Is the Macondo oil and gas well blowout (Blowout) on the Outer Continental Shelf (OCS) an admiralty tort for purposes of establishing economic loss damages under the Oil Pollution Act of 1990 (OPA)?[1]

The grounds for a positive response are potent. OPA defines the Deepwater Horizon drilling rig, a mobile offshore drilling unit (MODU) in the Act's parlance,[2] as a "vessel."[3] The movement of some 4.1 to 4.9 million barrels of oil from the OCS wellhead to the navigable waters above the wellhead, along with the discharge of some 700 barrels of oil from the Deepwater Horizon into the same waters, arguably secures a general maritime situs for the incident.[4] The Admiralty Extension Act,[5] in turn, affords liability for vessel-caused losses inland of the immediate coastlines of the affected states. OPA itself states that "[e]xcept as otherwise provided in this Act, this Act does not affect . . . admiralty and maritime law" or "jurisdiction."[6]

Positive as well is judicial reluctance to disturb settled admiralty understandings, perhaps even in the face of the Blowout scenario's novel facts, which implicate correspondingly novel statutory issues that in turn invite outcomes that may appear dissonant with these understandings. In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Company*,[7] for example, the United States Supreme Court refused to adopt a multi-factor test to determine whether a maritime tort bears a substantial relationship to a traditional maritime activity. "For better or worse," the court stated, "case law has thus carved out the approximate shape of admiralty jurisdiction in a way that admiralty lawyers understand reasonably well."[8] To like effect is Judge Richard Posner's outright refusal to apply the traditional maritime activity requirement to deny admiralty jurisdiction: "The most important requirement of a jurisdictional rule is not that it appeals to common sense," he counseled, "but that it be clear."[9]

It may well turn out, in short, that familiar general maritime law categories and reasoning will determine the various choice of law outcomes and conflicts nestled within the Blowout incident. The position proposed in this article is not that they will not do so, but that getting to these outcomes will require considerably heavier lifting than may appear at first blush. Obstacles to them will be found, first, in the Outer Continental Shelf Lands Act (OCSLA), both independent of and in conjunction with OPA, and, second, in *Grubart*'s requirement of a link to a traditional maritime activity, which itself traces back to *Executive Jet Aviation Company v. City of Cleveland*.[10] The first may diminish general maritime law's role from a distinctly non-admiralty perch;[11] the second, from doctrinal development within admiralty jurisprudence itself.

## OCSLA and OPA: Restructuring Liability for Marine Pollution

The Blowout scenario poses questions under OCSLA that, with a single outdated exception,[12] remain to be systematically scrutinized by the courts. Congress has compounded the resulting uncertainties by opaque drafting both within OCSLA itself and within OPA as it relates to OCSLA. These are the two principal factors that impede a definitive response to this article's lead question, in the author's judgment.

For litigation purposes, OCSLA's overriding role to date has been a much narrower one than it will be called upon to play in the Blowout scenario. In situations in which a void in federal law must be filled, OCSLA Section 1333(a)(2)(A) channels the choice to fill the void as one between general maritime law and adjacent state law as surrogate federal law in two principal types of actions. Both actions, which currently afford the baseline for relevant OCSLA jurisprudence, are factually and perhaps legally remote from the Blowout scenario. The first encompasses personal injury/death torts in which the tort's situs is on or near an OCS facility. The second sounds in contract to address such matters as the construction of OCS facilities, the design and manufacture of equipment for these facilities, or cross-indemnification, typically for suits arising in tort from injuries to contractors' or subcontractors' employees.

While not without some relevance to this article's inquiry, these actions leave largely unaddressed at least four key issues central to this article's inquiry.

The first asks whether a discharge that occurs at an OCSLA situs retains its non-admiralty OCSLA status[13] as it migrates into navigable waters and beyond. If it does, then OCSLA, both by itself and most certainly in conjunction with OPA, would supplant general maritime tort law, which, under these conditions, cannot be said to apply "of its own force."[14] OPA comes into play as a "law of the United States" made directly applicable to the Blowout both under OCSLA Section 1333(a)(1) and independently under OPA Section 2702(a). OPA, moreover, would appear to dispense with the need to engage OCSLA Section 1333(a)(2)(A) because it essentially eliminates the "gap" in federal law that might otherwise require recourse to the section.[15]

The second inquiry addresses whether a MODU loses its assumed status as an admiralty jurisdiction-creating vessel under OCSLA Section 1333(a)(1), which, as clarified in 1978 OCSLA amendments, expressly covers "all installations . . . permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing or producing resources therefrom . . . ." In adopting this language, Congress sought to ensure that Section 1333(a)(1)'s coverage would expressly encompass "*all* activities on *all* devices in contact with the seabed for exploration, development and production."[16] The Deepwater Horizon was, at least arguably, "temporarily attached" to the OCS seabed by a drill pipe when the Macondo well blew out.

Turning to the relation between OCSLA and OPA, the third inquiry analyzes more precisely whether OPA comports with OCSLA's non-vessel characterization of semi-submersibles. Although the question is not without doubt, a positive response is not implausible on the basis of OPA's express confirmation that MODUs can function *either* as what may be termed true admiralty "vessels"[17] *or* as an "offshore facility"[18] or an "OCS facility,[19] both of which exclude the admiralty characterization. Significantly, OCSLA's 1978 amendments included a new Title III, which assigned the status of true vessels solely to ships carrying oil from offshore facilities, a status confirmed by OCSLA Section 1333(a)(1).[20] If nothing else, these developments deprive the term "vessel" of its assumed talismanic force, demonstrating in Lewis Carroll fashion that a term means just what Congress says it means, no more or less.[21]

Finally, it must be asked whether, if OCSLA and OPA were deemed to conflict on this matter, which should prevail and on what basis? The statutes' respective dates of adoption? OCSLA's more specific treatment of the question, especially in its legislative history? The scope, if any, of OPA's displacement of statutes other than those specifically identified in OPA's Title 1?

## "Significant Relationship to a Traditional Maritime Activity"

Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, capture and prizes, limitation of liability, cargo damage and claims for salvage.[22]

*Executive Jet* broke with the practice, hallowed since at least 1813,[23] of mechanically assigning admiralty jurisdiction to any tort occurring at sea. The court's goal was the admirable, if perhaps quixotic, goal of aligning the choice of admiralty jurisdiction with subject matter with which it fits. A proper fit, in *Executive Jet's* formulation, requires that the pursuit giving rise to the action bear a "significant relationship to a traditional maritime activity."[24] Through this linkage, the court sought to bar the assignment of admiralty jurisdiction to a matter that is "only fortuitously and incidentally connected to navigable waters and . . . bears no relationship to traditional maritime activities."[25]

*Grubart* reaffirmed the maritime situs requirement, substituted "substantially related" for *Executive Jet*'s "significantly related" test, and confirmed that the tortious activity must threaten to disrupt maritime commerce.[26] The court also posited that the activity be described "at an intermediate level of possible generality,"[27] rather than in an unduly abstract or nominalistic manner.

The requirement for a "traditional maritime activity" in this section is not unrelated to the previous section's basis for rejecting general maritime law as the improper



choice under OCSLA Section 1333(a)(2)(A). OCSLA starts with the premise that general maritime law is not the default candidate precisely because offshore drilling, as defined in Section 1333(a), is denied status as a traditional maritime activity by this section. General maritime law may prevail over adjacent state law, but only if it applies of "its own force," which is simply another way of saying "due to its link to some traditional maritime activity unrelated either to the OCSLA situs or to the exploration, production or development of OCS oil and gas." Consequently, this OCSLA analysis biases the *Executive Jet/Grubart* analysis against concluding that OCS oil drilling is a traditional maritime activity.

The Blowout threatened to and, it is claimed, did disrupt maritime commerce. Whether it satisfies the maritime situs test depends upon the outcome of the "vessel" and migration from OCS to navigable water issues discussed in the previous section. In OCSLA Section 1333(a)(1), Congress itself crisply defined the activity being pursued at the time of the incident as the use of "installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom."

We are left then with the article's opening question as reformulated in light of *Executive Jet* and *Grubart*: Does exploratory drilling of oil on the OCS bear a substantial relationship to a traditional maritime activity?

## OCS Oil Drilling Under *Rodrigue* and *Herb's Welding*

Lower federal courts, principal among them the United States 5th Circuit, have struggled with the classification oil drilling as either within or excluded from maritime commerce.[28] But the Supreme Court is unlikely to abandon its own precedents — chiefly, *Rodrigue* and *Herb's Welding, Inc. v. Gray*[29] — if it is called upon to address the issue in the BP Blowout setting. In both, significantly, the court brusquely rejected 5th Circuit rulings that the activities in question constitute maritime commerce.

In *Rodrigue*, the court held that OCSLA Sections 1333a(1) and 1333(a)(2)(A) required the application of Louisiana law as surrogate federal law over admiralty law in litigation arising out of the deaths of two platform employees working on OCS fixed platforms. *Rodrigue*'s immediate holding and rationale, however, would seem to disqualify it as a cogent precedent for OCS seabed blowout disputes.

The OCSLA/Louisiana law outcome derives both from the court's equation of the fixed platform with an "artificial island" and from a rationale linking Congress's use of the phrase to the welfare of the workers and their families within the nearby adjacent state.[30] Under OPA, the spill deals instead with a seabed well blowout and the allocation of liability for economic loss to private and governmental

claimants, not the personal injury or death of several platform workers resident in a nearby state.

Similar considerations might seem to limit the influence of *Herb's Welding*. This opinion too dealt with a worker's injury, rather than with an OCS blowout or economic loss. It denied coverage to an injured welder under the Longshore and Harbor Workers Compensation Act[31] (LHWCA) on the grounds that the welding of pipelines and drilling platforms used for oil and gas production does not constitute "maritime employment" under LHWCA Sec. 902(3).

Two considerations advise against dismissing *Rodrigue* and *Herb's Welding* too quickly, however. Although plausibly distinguishable from the BP scenario, these opinions afford the best guidance we have for gauging how the court may choose to view OCS oil and gas drilling. More importantly, the opinions recount not only the court's own reasoning process, but its interpretation of Congress's wishes regarding the inquiry's outcome in a manner that extends OCSLA's scope well beyond the scenarios present in either case.

In *Rodrigue*, for example, the court's treatment of OCSLA's legislative history confirms this vision of congressional intent. It stressed that OCSLA's Conference Committee "was acutely aware of the inaptness of admiralty law. The bill applies the same law to the *seabed and subsoil* as well as to the artificial islands, and admiralty law was obviously unsuited to this task."[32] The court also quoted testimony to the committee by an admiralty expert who stated that the application of maritime law would be unwise because "[m]aritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose."[33] The court then added that "[s]ince the Act treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for presumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that *admiralty treatment was eschewed altogether. . . ."*[34]

The court raised the ante even further with its unqualified statement that it had "specifically held that drilling platforms are not within admiralty jurisdiction,"[35] citing its per curiam affirmation, without opinion,[36] of a district court opinion, *Phoenix Construction Co. v. The Steamer Poughkeepsie*.[37] There, a federal district court had held that the allision of a vessel with a temporary platform in the Hudson River intended to support construction of an aqueduct did not engage admiralty jurisdiction. *Rodrigue* expressly approved the *Phoenix* court's conclusion that although the pilings and temporary platform above were in navigable waters, the project itself — supplying water to a metropolitan area — was "not even suggestive of maritime affairs."[38]

When considered in tandem with *Herb's Welding*, moreover, *Rodrigue* looms much larger than it did on its decision day. The 5th Circuit had ruled that an injured welder who worked on pipelines and drilling platforms was engaged in "maritime employment" under LHWCA, Section 902(3).[39] Holding that the 5th Circuit's position that "offshore drilling is maritime commerce" was "untenable,"[40] the court pressed *Rodrigue* into service in a variety of contexts going well beyond the case's immediate facts and holding.

It employed *Rodrigue*, an OCSLA choice of law case, as a governing precedent in this LHWCA dispute. It singled out *Rodrigue*'s use of the earlier *Phoenix Construction* district court opinion, other Supreme Court decisions, and *Rodrigue* itself to reassert that drilling platforms are not within admiralty jurisdiction and are "not even suggestive of maritime affairs."[41] It posited that Congress, when amending the LHWCA in 1972, presumably did so with awareness of the court's 1969 *Rodrigue* decision.

The court also adverted to its discussion in *Rodrigue* of OCSLA's legislative history to conclude that the latter "at the very least forecloses the Court of Appeals holding that offshore drilling is a marine activity...."[42] The plaintiff, the court stated: "[B]uilt and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment, *particularly since exploration and development of the Continental Shelf are not themselves maritime commerce*."[43]

## Conclusion

Elsewhere, I have detailed Congress's overwhelming commitment in 1978 to strengthen OCSLA by pervasively rewriting the statute to avoid the very consequences that the Blowout has visited upon the Gulf states and the nation.[44] A remarkably prescient expression of this concern appears in the 1989 joint statement of four senators on the Senate's version of the OPA bill. Wisely contrasting OCS blowouts with conventional tanker oil spills, the group observed:

> Vessels — even extremely large ones such as the Amoco Cadiz and the Exxon Valdez — carry finite supplies of oil and usually only a portion of the cargo is lost because it is compartmentalized. Such was the case with the Exxon Valdez and the oil she was carrying.
>
> OCS [blowouts] . . . can involve prodigious and seemingly unlimited quantities of crude oil. The size of such spills can be enough to fill hundreds or even thousands of tankers the size of the Exxon Valdez.[45]

The resolution of the various uncertainties outlined in this article will take years of litigation and, more than likely, the efforts of Congress to re-address the issues with which litigants, courts and commentators must struggle today. The author would not be surprised to see Congress seek either to re-integrate the equivalent of an updated Title III into OCSLA or to undertake some other form of carve-out in recognition of the entirely justified distinction the four senators offered between conventional vessel spills and OCS blowouts. Reinforcing the carve-out's merits are the myriad additional federal interests associated with the OCS, which encompass national revenue, national energy policy, federal public trust and proprietary responsibilities for this unique federal enclave, and, certainly not least of all, the prevention and management of catastrophic blowouts.

## FOOTNOTES

1. 33 U.S.C.A. § 2701 *et seq.* (2010) (hereinafter OPA).

2. OPA § 2701(13).

3. OPA § 2701(37).

4. A basis for countering the position suggested presently that oil discharges commencing on the OCS remain subject to the governance of the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331 *et seq.* (2011) (hereinafter OCSLA) appears in OCSLA § 1332(2), which states that OCSLA shall be construed to provide that the "character of the waters above the outer Continental Shelf as high seas . . . shall not be affected." OCSLA Section 1333(f) adds that the Act's application to OCS locations "shall not give rise to any inference that the application [to these locations] of any other provision of law is not intended."

5. 46 U.S.C.A. § 740. The Act provides in relevant part that "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

6. OPA § 2751.

7. 513 U.S. 527 (1995).

8. *Id.* at 547.

9. Tagliere v. Harrah's Illinois Corp., 445 F.3d 1012, 1013 (7 Cir. 2006). In Tagliere, Judge Posner ruled that the Admiralty Extension Act, which he deemed not subject to the "traditional maritime activity" standard, applied to an injury sustained when a slot machine player fell from a stool in a riverboat casino moored to a wharf. He dismissed legislative history contrary to this interpretation in favor of statutory language "which provides a clear and simple jurisdictional test for cases like this in contrast to the vague maritime nexus . . . test . . . that is used to determine jurisdiction under Section 1331(1)." *Id.* at 1014.

10. 409 U.S. 249 (1972). Intervening between Grubart and Executive Jet as opinions addressing the requirement are Foremost Ins. Co. v. Richardson, 457 U.S. 668 (1982), and Sisson v. Ruby, 497 U.S. 358 (1990).

11. The disconnect between OCSLA, a non-admiralty statute, and admiralty law's application to matters within the former's coverage is axiomatic. *See*, *e.g.*, Rodrigue v. Aetna Cas. & Sur. Co, 395 U.S. 352, 364 (1969) ("The bill [that became OCSLA] applied the same law to the seabed and subsoil as well as to artificial islands, and admiralty law was obviously unsuited to that task."); Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 218 ("[A]dmiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA."); Chevron Oil Co. v. Huson, 404 U.S. 97, 101 (1971) (rejecting the view that "comprehensive admiralty remedies apply under [OCSLA Sec.] 1333(a)(1)").

12. The reference in text is to litigation arising in consequence of the 1969 Santa Barbara OCS well blowout, which was addressed principally in Oppen v. Aetna Ins. Co, 485 F.2d 252 (9 Cir. 1973), and Union Oil v. Oppen, 501 F.2d 558 (9 Cir. 1974). Although declaring that drilling for oil on the OCS does *not* qualify as a traditional maritime activity under Executive Jet, Union Oil held, contrary to Executive Jet (and its successors) that the relevant activity is that of the victim — commercial fishermen in the case — not the tortfeasor. Union Oil, 501 F.2d at 561. Decided prior to the passage of OCSLA's transformative 1978 amendments and of OPA, the opinion reasons that movement of the discharged oil into navigable waters could qualify the blowout as actionable either in admiralty or under California law.

13. See note 11, *supra*.

14. General maritime law may be selected under OCSLA § 1333(a)(2)(A) if it proves applicable for reasons independent of a scenario's OCSLA situs. *See*, *e.g.*, Rodrigue, 395 U.S. at 355; Union Texas Petroleum Corp. v. PLT Engineering, Inc., 895 F.2d 1043, 1047 (5 Cir. 1990).

15. It is not unlikely, moreover, that Louisiana law — the probable candidate for adjacent state law under Section 1333(a)(2)(A) if that section were applicable — might fail in any event because it is "inconsistent with other federal law," *e.g.*, OPA itself under this section, in such critical respects, among others, as Louisiana's denial of the economic loss damages permitted under OPA §2702(b)(2)(E).

16. See Conf. Rep. No.1471, 95th Cong., 2d Sess. 80, reprinted in 1978 U.S.C.C.&A.N. 1450, 1679 (emphasis added) (hereinafter Conference Report). The report continues: "[T]he committee intends that Federal law is, therefore, to be applicable to activities on drilling ships, *semi-submersible drilling rigs,* and other watercraft, when they are connected to the seabed by drillstring, pipes or other appurtenances, on the OCS for exploration, development, or other production purposes. Ships and vessels are specifically not covered when they are being used for the purpose of transporting OCS mineral resources." (emphasis added) *Id.* Significantly, the conferees defined the "temporarily attached" and related language changes as "technical and perfecting and . . . meant to restate and clarify and not change the law." Conference Report, 1978 U.S.C.C.&A.N. 1679. It is not inconsistent with this proviso to conclude that the 1953 OCSLA language "fixed structures" included all "attached devices."

17. OPA, § 2701(37).

18. See OPA, §§ 2701(22) and 2704(b) (1) and (2).

19. See OPA, §§ 2701(25) and 2704(c)(3).

20. In 1990, Congress repealed Title III of OCSLA, upon its adoption of OPA. Its action was not premised on its objection to the title's goals, but rather to its concern that the fragmentation of federal maritime pollution laws had led to "inadequate cleanup and damage remedies . . . ." Sen. Rep. 101-94, 101st Cong., at p. 2, reproduced in 1990 U.S. Code & Cong. Admin. News 722.

21. To like effect is the observation of one 5th Circuit judge that "[w]e are not convinced that the term 'vessel' for Jones Act purposes . . . is necessarily a vessel for other purposes as well . . . ." Houston Oil & Minerals Corp. v. American Int'l Tool Co., 877 F.2d 1049, 1053 (5 Cir. 1987) (Politz, J.). Rodrigue itself demonstrates the Supreme Court's deference to Congress's power to alternatively designate a resource or location was falling within or without admiralty jurisdiction depending on the goal of the legislation in question. *See*, Rodrigue, 395 U.S. at 361 (Congress may denominate locations that could qualify for admiralty status as non-admiralty situses to enable platform workers to enjoy the benefits of their home state laws).

22. Executive Jet, 409 U.S. at 270.

23. *See*, Thomas v. Lane, 23 Fed.Cas. pp. 957, 960, No. 13, 902 (C.C. Me.1813) (Story, J.).

24. Executive Jet, 409 U.S. at 269.

25. *Id.* at 273.

26. Jerome B. Grubart, Inc., 513 U.S. at 533. The disruption requirement was initially enunciated in Sisson, 497 U.S. at 363.

27. Jerome B. Grubart, Inc., 513 U.S.at 538.

28. For an account of the struggle and for an exhaustive collection of the widely divergent cases in what one author terms this "infamously chaotic" sphere, *see* David R. Robertson, "The Outer Continental Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes," 38 J. Mar. L. & Com. 487 (2007).

29. 470 U.S. 414 (1986).

30. Rodrigue, 395 U.S. at 363-64.

31. 33 U.S.C.A. § 901 *et seq.*

32. Rodrigue, 395 U.S. at 364-65 (emphasis added).

33. *Id.* at 365.

34. *Id.* (emphasis added).

35. *Id.* at 360.

36. Phoenix Construction Co. v. The Steamer Poughkeepsie, 212 U.S. 558 (1908).

37. 162 F. 494 (1908).

38. *Id.* at 496.

39. Herb's Welding, 470 U.S. at 498.

40. *Id.* at 421.

41. *Id.* at 422.

42. *Id.* at 424-25 (emphasis added).

43. *Id.* at 425.

44. John Costonis, "The BP Oil Spill: Marine Pollution, Admiralty, and State Police Power under the Oil Pollution Act of 1990," at ssrn.com/abstract=1636775 (last visited, May 13, 2011).

45. Joint Statement of Senators Durenberger, Lieberman, Chaffee and Graham, Committee on Environment and Public Works, Sen. Rep. 114-94 re S. 868 (1989).



*John J. Costonis is chancellor-emeritus and professor of law at Louisiana State University Paul M. Hebert Law Center. He teaches courses in the BP Oil and Gas Blowout Litigation, Law of the Louisiana Coast, Urban Planning Law and Common Law Property. He is a member of the Governor's Advisory Commission to the Louisiana Coastal Preservation and Restoration Authority. His current research interests concern the role of federal environmental/maritime pollution law under such statutes as the Clean Water Act, the Outer Continental Shelf Lands Act, and the Oil Pollution Act of 1990 in relation both to federal admiralty and general maritime law and to the reserved police power of the states. Costonis has featured speakers in his BP litigation course affiliated with various parties in the current MDL action in the Eastern District of Louisiana, and to discuss some of the ideas expressed in this article with them. However, he is not himself professionally affiliated with any party in the litigation. (1849 Applewood Rd., Baton Rouge, LA 70808)*