**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| | * | |
| This document relates to: | * | |
| | * | Honorable CARL J. BARBIER |
| 2:10-CV-04182 | * | |
| 2:10-CV-04183 | * | Magistrate Judge SALLY SHUSHAN |
| 11-CV-0516 | * | |
| 10-CV-03059 | * | |

**BP'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6) THE FIRST AMENDED COMPLAINTS OF THE STATES OF ALABAMA AND LOUISIANA**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................ 1

Argument ............................................................................................................................ 2

I.     OCSLA, OPA, and the CWA Bar Alabama's and Louisiana's State Law Claims. ............ 2

     A.     None of the States' Arguments Can Alter the Basic Fact that OCSLA Applies to the States' Claims and Makes the Applicable Law Exclusively Federal ...................................................................................................... 2

     B.     Independently, *Ouellette* and the Clean Water Act Preempt Alabama's and Louisiana's State Law Claims. .................................................................. 5

     C.     OPA's Savings Clauses Cannot Save the States' Claims From Preemption By the Outer Continental Shelf Lands Act and the Clean Water Act ..................... 6

II.    The States' Responses Confirm That OPA Displaces Their Maritime Law Claims. .......... 7

     A.     OPA Speaks Directly to the Question of Liability for Damages Due to Oil Pollution and Must Therefore Displace the States' Maritime Claims ................... 7

     B.     The States' Opposition Briefs Fail to Demonstrate That Their Maritime Law Claims for Compensatory or Punitive Damages Are Saved Under OPA .......................................................................................................... 8

III.   The States' Oppositions Make Clear That Their OPA Claims Must Be Dismissed .......... 11

     A.     Presentment Is a Mandatory Condition Precedent That Must Be Satisfied Before Any Plaintiff Can Bring Suit for Damages or Removal Costs. ................. 11

     B.     *Cosco Busan* Does Not Relieve the States of the Presentment Requirement. ................................................................................................ 14

     C.     The States' Other Attempts to Avoid Presentment Fail ..................................... 17

          1.     OPA Does Not Support Alabama's Contentions That Presenting One Claim Satisfies Presentment for All Claims or That It May Rely on Claims Allegedly Presented After It Filed Suit. .......................... 17

          2.     Louisiana's Argument That It Needed to Bring Its OPA Claims to Avoid Improper Claim-Splitting and the Risk of Claim Preclusion Must Be Rejected. .................................................................. 19

     D.     The States' Claims for Declaratory Relief Under OPA Should Be Dismissed. ............................................................................................... 19

i

IV.  Certain of the States' Statutory, Civil, and Common Law Claims Fail for Independent, Additional Reasons. ....................................................................20

   A.  Louisiana's State Statutory Claims Are Fatally Defective. ...................................21

      1.  LOSPRA Is the State's Sole Remedy for Louisiana Oil Spills. ................21

      2.  Louisiana's Claim under the Louisiana Environmental Quality Act Must Be Dismissed Because Louisiana Fails to Satisfy the Threshold Elements of the Statute. ...........................................................22

      3.  Louisiana Seeks Penalties That Do Not Exist. ...........................................23

      4.  The Regulatory Provision Upon Which Louisiana Relies Is Not Valid. .........................................................................................................25

      5.  The LEQA Clearly Contemplates a Presentment Requirement. ................28

   B.  Louisiana's Civil Law Claims Fail to State a Basis Upon Which This Court May Grant Relief. ........................................................................................29

      1.  A Nuisance Claim Under Louisiana Law Requires a Neighbor Relationship. ..............................................................................................29

      2.  Louisiana's Trespass Claim Must Fail In View of Current Authority. .....................................................................................................30

      3.  Louisiana Fails to State a Claim Under Article 2317 By Any Standard. ......................................................................................................31

      4.  Statutory and Due Process Considerations Require Dismissal of the Punitive Damages Claims. ...................................................................32

   C.  Alabama's Attempt to Impose Civil Penalties for Conduct Occurring on the OCS Should be Rejected As Inconsistent With State Law. ............................34

      1.  Alabama Seeks Civil Penalties Under Its Environmental Statutes Without Specific Statutory Authorization. ................................................34

      2.  Alabama Has Failed to State a Claim Under the AWPCA. .......................35

      3.  Alabama's "Solid Waste" Claims Should Be Dismissed Because Dispersants Are Not a Solid Waste. ...........................................................38

   D.  Alabama Fails To State Claims for Fraudulent Concealment, Wantonness and Private Nuisance Under State Law. .............................................................38

      1.  The State Does Not Plead Any Facts That Show Reliance on the Alleged Fraudulent Concealment. ............................................................38

2.      Alabama Has Still Failed to Plead Facts Sufficient to Show
        Wantonness. ...............................................................................................39

3.      Alabama May Not Maintain a Suit for Private Nuisance for
        Alleged Damage to State Property..............................................................40

Conclusion ...........................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aasma v. American S.S. Owners Mutual Protection and Indemnity Association*,
   95 F.3d 400 (6th Cir. 1996) .......................................................................................... 4

*Abundiz v. Explorer Pipeline Co.*,
   Civ. A. Nos. 300CV2029H, 303CV0508H, 303CV0787H, 2003 WL 23096018
   (N.D. Tex. Nov. 25, 2003) .......................................................................................... 12

*Abundiz v. Explorer Pipeline Co.*,
   No. Civ. A. 3:00-CV-2029-H, 2003 WL 23594054 (N.D. Tex. Mar. 7, 2003) ....................... 18

*Alabama Department of Environmental Management v. Wright Brothers*,
   604 So. 2d 429 (Ala. Civ. App. 1992) .................................................................... 35, 36

*American Electric Power Co., Inc. v. Connecticut*,
   131 S. Ct. 2527 (2011) .......................................................................................... 5, 8

*Amoco Production Co. v. Sea Robin Pipeline Co.*,
   844 F.2d 1202 (5th Cir. 1988) .................................................................................... 4

*Arabie v. CITGO Petroleum Corp.*,
   49 So. 3d 529 (La. App. 3 Cir. 2010) .......................................................................... 33

*Arkansas v. Oklahoma*,
   503 U.S. 91 (1992) .................................................................................................... 5

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ............................................................................................ 11

*Atlantic Sounding Co. v. Townsend*,
   129 S. Ct. 2561 (2009) .............................................................................................. 9

*Barasich v. Shell Pipeline Co., L.P.*,
   Civ. A. Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 05-4512, 06-5102,
   2006 WL 3913403 (E.D. La. Nov. 20, 2006) ................................................................ 30

*Barney v. Plaquemines Parish Government*,
   22 So. 3d 1117 (La. Ct. App. 4 Cir. 2009) .................................................................. 31

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 39

*Belt v. EmCare, Inc.*,
    444 F.3d 403 (5th Cir. 2006) ........................................................................................... 24

*Benefield v. International Paper Co.*,
    Civ. A. No. 2:09cv232-WHA, 2009 WL 2601425 (M.D. Ala. Aug. 21, 2009) ...................... 40

*Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*,
    51 F.3d 235 (11th Cir. 1995) ............................................................................... 13, 14, 19

*Bonvillain v. Louisiana Land & Exploration Co.*,
    702 F. Supp. 2d 667 (E.D. La. 2010) .............................................................................. 39

*Broussard v. Lafayette Parish School Board*,
    998 So. 2d 1253 (La. App. 3 Cir. 2009) .......................................................................... 22

*Brown v. Georgetown University Hospital*,
    488 U.S. 204 (1988) ....................................................................................................... 24

*California Department of Toxic Substances Control v. Hearthside Residential Corp.*,
    613 F.3d 910 (9th Cir. 2010) ......................................................................................... 15

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ....................................................................................................... 24

*City of Baton Rouge/Parish of East Baton Rouge v. 200 Government Street, LLC*,
    995 So. 2d 32 (La. App. 1 Cir. 2008) .............................................................................. 24

*Clausen v. M/V NEW CARISSA*,
    171 F. Supp. 2d 1138 (D. Ore. 2001) .............................................................................. 32

*Cordiano v. Metacon Gun Club, Inc.*,
    575 F.3d 199 (2d Cir. 2009) ........................................................................................... 38

*Dean v. American Security Insurance. Co.*,
    559 F.2d 1036 (5th Cir. 1977) ....................................................................................... 10

*DeLaughter v. West Jefferson Levee District*,
    646 So. 2d 506 (La. App. 4 Cir. 1994) ............................................................................ 31

*Demette v. Falcon Drilling Co.*,
    280 F.3d 492 (5th Cir. 2002) ........................................................................................... 3

*Duffy v. Conoco, Inc.*,
    No. CIV. A. 95-0600, 1996 WL 271635 (E.D. La. May 21, 1996) ...................................... 31

*Ebanks v. Offshore Lifeboats, LLC*,
    Civ. A. No. 08-1340, 2009 WL 3834365 (E.D. La. Nov. 10, 2009) ....................................... 3

*EP Operating Ltd. Partnership v. Placid Oil Co.,*
  26 F.3d 563 (5th Cir. 1994) ................................................................................. 2

*Ex parte Emerald Mountain Expressway Bridge, LLC,*
  856 So. 2d 834 (Ala. 2003) ................................................................................ 36

*Ex parte Old Republic Surety Co.,*
  733 So. 2d 881 (Ala. 1999) ................................................................................ 35

*Exxon Mobil Corp. v. Alabama Department of Environmental Management,*
  986 So. 2d 1093 (Ala. 2007) .............................................................................. 39

*Exxon Shipping Co. v. Baker,*
  554 U.S. 471 (2008) ............................................................................................. 9

*Fourco Glass Co. v. Transmirra Products Co.,*
  353 U.S. 222 (1957) ........................................................................................... 22

*Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Commission,*
  108 F.3d 358 (D.C. Cir. 1997) .......................................................................... 24

*Gabarick v. Laurin Maritime (America) Inc.,*
  No. CIV.A. 08-4007, 2009 WL 102549 (E.D. La. Jan. 12, 2009) ......... 11, 12, 14, 18

*Geier v. American Honda Motor Co.,*
  529 U.S. 861 (2000) ............................................................................................. 7

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,*
  589 F.3d 778 (5th Cir. 2009) ............................................................................... 3

*Gulf Insurance Co. v. Employers Liability Assurance Corp.,*
  170 So. 2d 125 (La. App. 4 Cir. 1964) ............................................................. 29

*Gulf Offshore Co. v. Mobil Oil Corp.,*
  453 U.S. 473 (1981) ............................................................................................. 2

*Hallstrom v. Tillamook County,*
  493 U.S. 20 (1990) ........................................................................... 12, 13, 14, 18

*Hensley v. Redi-Med of Mandeville,*
  Civ. A. No. 09-47, 2009 WL 2408319 (E.D. La. Aug. 4, 2009) ......................... 11

*Hogg v. Chevron,*
  45 So. 3d 991 (La. 2010) .................................................................................... 30

*International Paper Co. v. Ouellette,*
  479 U.S. 481 (1987) ................................................................................... 1, 5, 6, 7

*Isla Corp. v. Sundown Energy, LP*,
  No. CIV.A. 06-8645, 2007 WL 1240212 (E.D. La. Apr. 27, 2007) ........................................ 14

*Jackson v. Brumfield*,
  40 So. 3d 1242 (La. App. 1 Cir. 2010) ................................................................................... 31

*Johnson v. Colonial Pipeline Co.*,
  830 F. Supp. 309 (E.D. Va. 1993) .......................................................................................... 12

*Leboeuf v. Texaco*,
  9 F. Supp. 2d 661 (E.D. La. 1998) ......................................................................................... 14

*Lee By & Through MacMillan v. Biloxi School District*,
  963 F.2d 837 (5th Cir. 1992) ............................................................................................. 20, 21

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ................................................................................................................ 26

*Marathon Pipe Line Co. v. LaRoche Industries, Inc.*,
  944 F. Supp. 476 (E.D. La. 1996) .......................................................................................... 14

*Miami-Dade County v. EPA*,
  529 F.3d 1049 (11th Cir. 2008) .............................................................................................. 27

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990) .................................................................................................................. 33

*Milwaukee v. Illinois*,
  451 U.S. 304 (1981) .................................................................................................................. 8

*Mobil Oil Corp. v. Higginbotham*,
  436 U.S. 618 (1978) .................................................................................................................. 8

*Montelepre v. Edwards*,
  359 So. 2d 1311 (La. App. 4 Cir. 1978) ................................................................................. 22

*Nicholas v. Allstate Insurance Co.*,
  739 So. 2d 830 (La. App. 2 Cir. 1999) ................................................................................... 33

*Northeast Maryland Waste Disposal Authority v. EPA*,
  358 F.3d 936 (D.C. Cir. 2004) ............................................................................................... 27

*Offshore Logistics, Inc. v. Tallentire*,
  477 U.S. 207 (1986) .............................................................................................................. 2, 3

*Perkins v. F.I.E. Corp.*,
  762 F.2d 1250 (5th Cir. 1985) ................................................................................................ 32

*Riggs v. Opelousas General Hospital Trust Authority*,
   997 So. 2d 814 (La. App. 3 Cir. 2008) .................................................. 32

*Roberts v. Cardinal Services, Inc.*,
   266 F.3d 368 (5th Cir. 2001) ............................................................ 30

*Rodrigue v. Aetna Casualty & Surety Co.*,
   395 U.S. 352 (1969) ..................................................................... 3

*Russell Corp. v. Sullivan*,
   790 So. 2d 940 (Ala. 2001) ............................................................. 40

*Sanford v. Louisiana*,
   228 Fed. Appx. 492 (5th Cir. 2007) .................................................... 11

*South Port Marine v. Gulf Oil Ltd. Partnership*,
   234 F.3d 58 (1st Cir. 2000) ................................................... 10, 32, 33

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
   538 U.S. 408 (2003) .................................................................... 33

*Tanguis v. M/V Westchester*,
   153 F. Supp. 2d 859 (E.D. La. 2001) .................................................... 9

*Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*,
   87 F.3d 150 (5th Cir. 1996) ............................................................. 2

*Texas Clinical Laboratories v. Sebelius*,
   612 F.3d 771 (5th Cir. 2010) .......................................................... 24

*Tolbert v. Tolbert*,
   903 So. 2d 103 (Ala. 2004) ............................................................ 39

*TS & C Investments LLC v. Beusa Energy Inc.*,
   344 Fed. Appx. 907 (5th Cir. 2009) .................................................... 30

*TS & C Investments LLC v. Beusa Energy Inc.*,
   637 F. Supp. 2d 370 (W.D. La. 2009) ................................................... 30

*United States v. CDMG Realty Co.*,
   96 F.3d 706 (3d Cir. 1996) ............................................................ 37

*United States v. Crouch*,
   84 F.3d 1497 (5th Cir. 1996) .......................................................... 25

*United States v. Locke*,
   529 U.S. 89 (2000) ..................................................................... 7

*United States v. M/V Cosco Busan*,
  557 F. Supp. 2d 1058 (N.D. Cal. 2008) ...................................................... 14, 15, 16

*United States v. Magnesium Corp. of America*,
  616 F.3d 1129 (10th Cir. 2010) ...................................................................... 24

*United States v. Murphy Exploration & Production Co.*,
  939 F. Supp. 489 (E.D. La. 1996) ................................................................... 16

*Winner v. Marion County Commission*,
  415 So. 2d 1061 (Ala. 1982) ........................................................................... 36

**Statutes**

33 U.S.C. § 1313 ................................................................................................. 6

33 U.S.C. § 1333(a)(1) ....................................................................................... 2

33 U.S.C. § 1362(8) ........................................................................................... 23

33 U.S.C. § 2702(b)(1)(B) ................................................................................ 15

33 U.S.C. § 2713 ................................................................................... 14, 16, 19

33 U.S.C. § 2713(a) ................................................................................... 11, 17

33 U.S.C. § 2713(b). ................................................................................. 11, 16

33 U.S.C. § 2713(c) ........................................................................................... 18

33 U.S.C. § 2717 ............................................................................................... 15

33 U.S.C. § 2717(f) ................................................................................... 19, 20

33 U.S.C. § 2751(e) ............................................................................................. 8

42 U.S.C. § 6972 ............................................................................................... 13

42 U.S.C. § 6972(b) .......................................................................................... 13

43 U.S.C. § 1312 ............................................................................................... 23

43 U.S.C. § 1333 ................................................................................................. 1

43 U.S.C. § 1333(a) ............................................................................................. 4

5 U.S.C. § 533(b)(3) ......................................................................................... 27

Ala. Code § 22-22-9(m) .................................................................................... 34

Ala. Code § 22-22-9(n) ................................................................... 34

Ala. Code § 22-22A-5(18) .............................................................. 34

Ala. Code § 6-5-121 ....................................................................... 40

Clean Water Act, 33 U.S.C. § 1251 *et seq.* .............................. passim

Comprehensive Environmental Response, Compensation and Liability Act,
   42 U.S.C. § 9601 *et seq.* ...................................................... 15, 36

La. Admin. Code tit. 33, §§ I.703, I.705 ...................................... 25

La. Rev. Stat. § 49:953 .................................................................. 27

La. Rev. Stat. § 49:953(G)(1) ........................................................ 28

La. Rev. Stat. § 49:953(G)(3)(C) ................................................... 28

La. Rev. Stat. § 49:968(H)(2) ........................................................ 27

La. Rev. Stat. Ann. § 30:2025(E)(1)(a) ......................................... 23

La. Rev. Stat. Ann. § 30:2075 ....................................................... 23

La. Rev. Stat. Ann. § 30:2496 ....................................................... 22

Limitation Act of 1851, 46 U.S.C. § 30501 *et seq.* ....................... 7

Louisiana Environmental Quality Act, La. Rev. Stat. § 30:2001 *et seq.* .............................. passim

Louisiana Oil Spill Response and Prevention Act,
   La. Rev. Stat. Section 30:2491 *et seq.* .................................. 21, 22

Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.* ................ passim

Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* ...... 1, 3, 4, 7

**Other Authorities**

8 Business & Commercial Litigation in Federal Courts (2d ed.) § 95:45 .................................... 15

99 Cong. Rec. 7164 ......................................................................... 3

Restatement (Second) of Torts § 821(B) (1979) ........................... 32

*United States v. CITGO Petroleum*,
   Louisiana Department of Environmental Quality's Post-Trial Memorandum,
   No. 2:08-cv-893 (W.D. La. Apr. 11, 2011) ............................... 25

**Rules**

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 11

Fed. R. Civ. P. 12(b)(6)........................................................................................................ 11

**Regulations**

24 La. Reg. 1984 (Oct. 20, 1998) ......................................................................................... 26

25 La. Reg. 657 (April 20, 1999).......................................................................................... 25

## INTRODUCTION

The States' opposition briefs demonstrate a fundamental misunderstanding of the governing federal statutes and law, which straightforwardly and unambiguously defeat their claims:

- The States do not and cannot dispute that the incident giving rise to this case occurred outside of any State on the Outer Continental Shelf, a federal enclave. Under the Outer Continental Shelf Lands Act ("OCSLA"), federal law is exclusive for claims arising from drilling for oil and other mineral exploration and development activities on the OCS. The Court may borrow the adjacent State's law as surrogate federal law but only to fill gaps in federal law. *See* 43 U.S.C. § 1333.

- For oil spills occurring outside of any State on the OCS, the applicable federal laws, in addition to OCSLA, are the Oil Pollution Act, which establishes a comprehensive liability and remedial scheme, and the Clean Water Act ("CWA"), which establishes a comprehensive penalty scheme. Hence there are no gaps in federal law and no basis under OCSLA for borrowed state law.

- A State has no independent authority, under common law or otherwise, to regulate pollution that originated from a source outside its territory, even if the effects of the pollution are felt within the State. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987).

- There is a presumption in favor of displacement of federal common law when a new federal statute is adopted to control a particular subject area. Congress enacted the Oil Pollution Act to provide the comprehensive federal scheme for non-personal injury damages in oil spill cases, and it accordingly displaces federal maritime common law.

- Congress explicitly and unequivocally required that ***all OPA claims*** must be presented to the responsible party before the claimant may sue on them in court.

The States respond that OPA preserves their state law claims and somehow prevents OCSLA and the CWA from operating as they normally do, that OPA saves their maritime law claims rather than displacing them, and that OPA's presentment requirement is not jurisdictional and does not apply to government plaintiffs. But none of these arguments change the basic principles set forth above.

First, OPA's savings clauses cannot save the States' state law claims from preemption by other federal statutes, namely, OCSLA and the CWA, which unambiguously bar such claims. Second, OPA's maritime law savings clause does not save the States' maritime law claims but instead confirms that the Act *may affect and displace* admiralty and maritime law where provided in OPA, as is the case here through the operation of well-established displacement principles. Finally, regardless of whether the presentment requirement is jurisdictional, it is an unambiguously *mandatory* statutory requirement that must be met by *all claimants*, including government claimants, and it requires dismissal of claims when it is not met.

In addition, Alabama's and Louisiana's state law claims, by which the States seek to stretch certain state statutes far beyond their language to seek remedies never contemplated by those statutes, are not only preempted by federal law, but also fail as a matter of state law.

## ARGUMENT

I. **OCSLA, OPA, AND THE CWA BAR ALABAMA'S AND LOUISIANA'S STATE LAW CLAIMS.**

A. **None of the States' Arguments Can Alter the Basic Fact that OCSLA Applies to the States' Claims and Makes the Applicable Law Exclusively Federal.**

The Outer Continental Shelf Lands Act establishes exclusive federal jurisdiction over conduct on the shelf. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480-81 (1981); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 156 (5th Cir. 1996); *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994). The States do not and cannot dispute that OCSLA itself specifies that federal law—and only federal law—governs conduct on the Outer Continental Shelf.[1] *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986);

---

1   The "civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." 33 U.S.C. § 1333(a)(1).

*Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969).  Although the law is exclusively federal, its content may be borrowed from the law of the adjacent State—in this case, Louisiana—but only (i) if necessary to fill a gap in federal law and (ii) indirectly as surrogate *federal* law.  *See Offshore Logistics*, 477 U.S. at 217; *Rodrigue*, 395 U.S. at 358 ("'where there is a void, the State law may be applicable'") (quoting 99 Cong. Rec. 7164).  As BP explained in its opening brief, because OPA provides a comprehensive federal remedial scheme to address oil spills, and the CWA similarly provides a comprehensive federal penalty scheme, there is no gap for borrowed state law to fill, and the States' state law claims are therefore preempted.  (See BP Mem. (Doc. 2214) at 11-12, 14.)

Both States argue that under the OCSLA analysis here, state law does not apply as surrogate federal law.  (*See* Ala. Opp. at 7; La. Opp. at 7.)  It is mystifying that the States believe this argument assists their case that state law applies.  Because OCSLA applies here and makes the applicable law exclusively federal, it provides the ***only way*** state law can apply.  If state law does not apply through OCSLA as surrogate federal law, it does not apply at all.  Moreover, because this incident involves an oil spill, it is unnecessary to assess the States' arguments that maritime law applies of its own force (*see* Ala. Opp. at 7; La. Opp. at 7), since as discussed in Section II *infra*, even if federal maritime common law were otherwise to apply, in this case it is displaced by OPA.[2]

---

[2]    There is no merit to Alabama's argument that the *Deepwater Horizon* was not an OCSLA situs because it was not attached to the sea floor.  (*See* Ala. Opp. at 7.)  "Both the Fifth Circuit and this Court have made clear that 'the use of the term 'temporarily' [in OCSLA] implies that devices that can detach from the seabed and are capable of movement on the sea — i.e., vessels — can fall within the scope of the OCSLA.'"  *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 n.19 (5th Cir. 2002), overruled in irrelevant part by *Grand Isle Shipyard, Inc. v. Seacor Marine*, LLC, 589 F.3d 778 (5th Cir. 2009); *Ebanks v. Offshore Lifeboats, LLC*, Civ. A. No. 08-1340, 2009 WL 3834365, at *6 (E.D. La. Nov. 10, 2009) (applying *Demette* and stating that "an offshore oil drilling platform that is temporarily or permanently attached to the seabed is considered an OCSLA situs'").  Moreover, besides the *Deepwater Horizon* MODU, the subsea well is itself an OCSLA facility within the meaning of OPA.  The law governing releases from well installations squarely implicates OCSLA.  (*See*

The States' arguments that state law may apply to fill gaps in federal maritime law suffers from the same defect.  Under OCSLA, Congress provided that state law will never apply of its own force on the OCS and it would therefore be inappropriate to bring in state law through this sort of roundabout maneuver.  State law is not applicable on the OCS, even when piggy-backing on maritime law.  The cases that the States cite in support of the use of state law for gap-filling do not involve OCSLA.

That the States' argument to incorporate state law into maritime law is unworkable and contrary to the purpose of OCSLA is also demonstrated by the fact that Alabama wishes to incorporate Alabama law, Louisiana wishes to incorporate Louisiana law, and other plaintiffs may wish to incorporate the law of other States.  There is no basis for this sort of *ad hoc* and selective incorporation of state law into maritime law.  Such a process would mean that multiple and potentially conflicting state laws could apply to the "efficient exploitation of the minerals of the" Shelf, the protection of which was a "primary reason for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Especially in light of OCSLA and OPA's applicability here, maritime law itself must be uniform since "a hodge-podge of state law rules" would undermine federal policies or statutes.  *Aasma v. Am. S.S. Owners Mut. Prot. and Indem. Ass'n*, 95 F.3d 400, 404 (6th Cir. 1996).

Finally, Alabama's point that 43 U.S.C. § 1333(a) is a "choice of law provision, not a preemption provision," (Ala. Opp. at 6), does not assist it, and indeed further demonstrates why its arguments in favor of the application of state law must fail.  As BP explained in its opening brief, state law does not and cannot apply here for reasons that are even stronger than ordinary preemption.  (*See* BP's Mem. at 6 n.9.)  State law can never apply ***beyond state territorial limits***

---

BP's 6/14/11 Bundle C Reply (Doc. 2741) at 3 for further discussion of why OCSLA situs arguments of the sort made by Alabama fail.)

to govern Shelf conduct unless Congress takes affirmative steps to permit it to apply—and Congress has not taken such affirmative steps here.

### B. Independently, *Ouellette* and the Clean Water Act Preempt Alabama's and Louisiana's State Law Claims.

As BP explained in its opening brief, a State may not impose liability under its own laws when the source of the oil spill lies outside the State's territorial boundaries. (*See* BP Mem. at 13.) In *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), the Supreme Court held that only the federal NPDES system and the law of the source State can regulate discharges of pollution within such a State, whereas other States (even if affected by the pollution) lack the power to regulate water pollution beyond their borders. *Id.* at 494. In *American Electric Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2540 (2011), the Supreme Court reaffirmed *Ouellette's* proposition "that the Clean Water Act does not preclude aggrieved individuals from bringing a 'nuisance claim pursuant to the law of *the source State*.'" (Emphasis in original.) The *Deepwater Horizon* was not present in a source State, but was within a federal enclave, outside any State's territorial jurisdiction. Under *Ouellette*, no State's law applies. 479 U.S. at 494.[3]

The States' attempts to distinguish *Ouellette* fail. First, the States claim there is a distinction between intentional discharges ***pursuant to*** NPDES permits and accidental discharges, such as the *Deepwater Horizon* incident, ***in violation*** of a NPDES permit. (*See* Ala. Opp. at 9-10; La. Opp. at 10.) But *Arkansas v. Oklahoma*, 503 U.S. 91 (1992), which reaffirmed the limited role played by the affected State under *Ouellette* in a situation where Clean Water Act standards ***had been*** violated, negates this theory. *Arkansas* reversed a ruling below that "the Clean Water Act prohibits granting an NPDES permit under the circumstances of this case (i.e.,

---

[3]   In addition, Alabama's claim under the Alabama Air Pollution Control Act (Count III.K) is precluded by the federal Clean Air Act regime, for the reasons stated in BP's opening brief. (*See* Mem. at 9-10.)

where applicable water quality standards [under 33 U.S.C. § 1313] *have already been violated*).)"  *Id.* at 107 n.12 (emphasis added); *see also Ouellette*, 479 U.S. at 498 n.18 (the correct Clean Water Act remedy for violating a NPDES permit is to, where possible, seek citizen suit relief, not to bring a state tort action under the law of the impacted State).

The States also argue that *Ouellette's* principle must be limited to cases of interstate water pollution where conflicting laws may apply—even though their own arguments urge alternative, conflicting sources of law (*i.e.*, the law of Alabama or Louisiana) and their logic brings into play the law of at least three more Gulf States.  (*See* Ala. Opp. at 10-11; La. Opp. at 10.)  *Ouellette*'s holding is not so limited and nothing suggests such an illogical interpretation.  It would be odd for Congress to protect source States from interference by non-source States but allow such interference when the source is a federal enclave.  The States cannot contest that there is no source State whose state law should apply.  (*See also* BP's B1 Reply (Doc. 2312) at 26-31 for additional discussion of why attempts to distinguish *Ouellette* are unavailing.)

### C.    OPA's Savings Clauses Cannot Save the States' Claims From Preemption By the Outer Continental Shelf Lands Act and the Clean Water Act.

The States rely on OPA's savings clauses in an attempt to save their state law claims from preemption.  But these clauses cannot and do not save their state law claims from preemption by OCSLA and the CWA.  First of all, under OCSLA, state law never applies of its own force on the OCS and thus there are no applicable state law claims to "save" under OPA's savings clause.

Moreover, *Ouellette* held that a savings clause framed in terms of "nothing in this section" was, by its own terms and basic common sense, limited to preemption caused only by that particular section of the statute.  *See* 479 U.S. at 493 (clause "does not purport to preclude pre-emption of state law by other provisions of the Act").  The same analysis applies to OPA's

6

savings clauses, which by their terms are limited to OPA preemption (or in some cases to saving against preemption by the Limitation Act of 1851, 46 U.S.C. § 30501 *et seq.*).

In addition, unless savings clauses explicitly provide otherwise, they do not prevent the ordinary operation of conflict preemption as found in cases such as *Ouellette*. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000). Where, as here, Congress expressly limited a savings clause to save only those claims that would otherwise be preempted by a defined statute, it could not possibly have intended (without any indication in the text) that the same narrow savings clause could save claims that are expressly or impliedly preempted ***by an entirely different and preexisting federal statute***. This is the explicit holding of *United States v. Locke*, 529 U.S. 89, 106 (2000), which held that the same OPA's savings clauses on which the States rely did not alter preexisting preemption under the Ports and Waterways Safety Act.

Therefore, there is no merit to Alabama's argument that because OPA is the later and more specific statute on oil pollution, OCSLA and the CWA do not apply. (*See* Ala. Opp. at 3-4.) Such an argument ignores *Locke* and the well-established and ordinary operation of conflict preemption. Moreover, contrary to the States' suggestions (*see* Ala. Opp. at 4-5, La. Opp. at 5), there is no merit to the argument that because Congress repealed portions of the CWA and OCSLA in enacting OPA, that OPA somehow also altered the effect of ***other unrepealed portions*** of those statutes. Indeed, the fact that OPA repealed some, but not all, provisions of those statutes, further confirms that the remaining provisions remain effective.

## II.  THE STATES' RESPONSES CONFIRM THAT OPA DISPLACES THEIR MARITIME LAW CLAIMS.

### A.  OPA Speaks Directly to the Question of Liability for Damages Due to Oil Pollution and Must Therefore Displace the States' Maritime Claims

The States cannot overcome the well-settled legal presumption that Congress intends to displace common law when its adopts a statute that controls a particular subject area—as the

Supreme Court recently reaffirmed in *American Electric Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537 (2011) ("*AEP*"). In *AEP*, the Supreme Court held that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." The Court also reiterated that "[l]egislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *Id.* (citing *Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981)) (some alterations in original). "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute '**speak[s] directly to [the] question' at issue**." *Id.* (citing *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)) (emphasis added).

Because the Oil Pollution Act speaks directly to the question of liability for and the recovery of damages due to oil pollution, it displaces maritime law, as numerous courts have held. (*See* cases cited in BP's LGE Mem. (Doc. 2214-1) at 4-5.)

   **B.    The States' Opposition Briefs Fail to Demonstrate That Their Maritime Law Claims for Compensatory or Punitive Damages Are Saved Under OPA.**

The States' reliance on 33 U.S.C. § 2751(e) is misplaced. (Ala. Opp. at 11-13; La. Opp. at 6.) Section 2751(e) provides that "[e]xcept as otherwise provided in this [Oil Pollution] Act, this Act does not affect – (1) admiralty or maritime law; or (2) the jurisdiction of the district courts" under maritime law. Contrary to the States' arguments, this section does not save their maritime law claims. It instead confirms that the Act *may affect and displace* admiralty and maritime law as provided in OPA. OPA's comprehensive remedial scheme "includes new remedies, which, in many respects, preempt traditional maritime remedies. This result is reflected in the first clause of OPA's admiralty and maritime savings provision: 'Except as otherwise provided in this [Act] . . . .'" *Tanguis v. M/V Westchester*, 153 F. Supp. 2d 859, 867

(E.D. La. 2001).  Because a comprehensive scheme for the recovery of oil spill damages is "*otherwise provided*" in OPA, there is no need or place for maritime remedies.[4]

Likewise, there is no merit to the States' arguments that two Supreme Court decisions, *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), and *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009), alter this well-established displacement analysis or save their maritime law claims for either compensatory or punitive damages.  (Ala. Opp. at 18; La. Opp. at 71-72.) Neither *Baker* nor *Townsend* involved OPA; it is OPA's comprehensive remedial scheme that displaces maritime law in cases involving oil pollution damages, so cases involving other statutes are limited in their applicability.

In *Baker*, the Court held that the **Clean Water Act** did not displace punitive damages under maritime law; the Court did not, of course, consider the effect of **OPA**, which was only enacted **after the Valdez spill**.  The Clean Water Act provides a penalty scheme but not a comprehensive remedial scheme for recovery of oil spill damages; OPA, on the other hand, does provide such a comprehensive scheme **for such damages**.  Because OPA speaks directly to the question of damages and specifies the damages recoverable for an oil spill, OPA displaces federal maritime law providing for recovery of damages.  Indeed, the States' reliance on *Baker* is especially inapposite, since OPA was expressly designed to provide the comprehensive set of federal remedies that were lacking prior to the *Exxon Valdez* spill.

Moreover, whereas Exxon's claim that was found "untenable" in *Baker*—that the Clean Water Act "somehow preempts punitive damages, but not compensatory damages, for economic loss"—would have resulted in an unwarranted "fragmenting [of] the recovery scheme," 554 U.S. at 489, OPA displaces **all** federal maritime common law damages (whether compensatory or

---

4   Of course, this does not suggest that Section 2751 is rendered meaningless.  For example, OPA does not apply to personal injuries caused by an oil spill; Section 2751 confirms that OPA does not displace traditional maritime law for personal injury claims.

punitive), as numerous courts have held.  It is the States who seek a fragmented recovery scheme here.  (*See also* BP's B1 Reply (Doc. 2312) at 6-8 for additional discussion of *Baker* and *Townsend*.)

Louisiana argues that OPA is silent on the issue of punitive damages and that they therefore survive to the extent they are recoverable under maritime law.  (La. Opp. at 71; *see also* Ala. Opp. at 17.)  To the contrary, OPA is silent on punitive damages because OPA deals with the issue of heightened liability in a different way than via a system of full compensatory damages with punitive damages available, for example, for gross negligence.  Instead, OPA provides for compensatory damages subject to a liability cap, and then lifts the cap if gross negligence or other aggravating factors can be shown.  Such a system is inherently incompatible with maritime law, which would permit compensatory liability without respect to a cap as well as punitive damages above and beyond the consequences under OPA if gross negligence could be proven.  *See Dean v. Am. Sec. Ins. Co.*, 559 F.2d 1036, 1039 (5th Cir. 1977) ("The provisions for liquidated damages for willful violation of the [Age Discrimination in Employment] Act and its silence as to punitive damages convinces us that the omission of any reference thereto was intentional . . . . *[I]t is obvious that, if Congress believed punitive damages necessary* to eliminate discrimination in employment based on age, *it knew exactly how to provide for them*.") (emphasis added); *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65 (1st Cir. 2000) ("*Congress's very specific treatment of oil pollution in the OPA, which does not provide for punitive damages,* supplanted general admiralty and maritime law.") (emphasis added).

Alabama's suggestion that it is "incomprehensible" that Congress would have reacted to the *Valdez* disaster by shielding defendants from punishment for willful or reckless conduct, (Ala. Opp. at 18), therefore misses the point entirely:  OPA sets out a different (and entirely

comprehensive) regime for providing oil spill remedies than the system that had preceded OPA. And at the same time it enacted OPA, Congress amended Section 311 of the Clean Water Act to substantially increase the penalties available for oil spills.  Allowing punitive damages would destroy the carefully calibrated system Congress put in place with the OPA liability cap system.

## III.   THE STATES' OPPOSITIONS MAKE CLEAR THAT THEIR OPA CLAIMS MUST BE DISMISSED.

### A.   Presentment Is a Mandatory Condition Precedent That Must Be Satisfied Before Any Plaintiff Can Bring Suit for Damages or Removal Costs.

The plain language of the Act requires that "[e]xcept as provided in subsection (b) of this section, *all claims for removal costs or damages* shall be presented first to the responsible party or guarantor of the source designated under Section 2714(a) of this title."  33 U.S.C. § 2713(a) (emphasis added).  The presentment requirement is a "mandatory condition precedent" and upon failure to comply, "claimants' OPA claims must be dismissed."  *Gabarick v. Laurin Mar. (Am.) Inc.*, No. CIV.A. 08-4007, 2009 WL 102549, at *3 (E.D. La. Jan. 12, 2009).

Just as other courts have consistently granted Fed. R. Civ. P. 12(b)(1) and 12(b)(6) motions to dismiss OPA claims given such a failure to present, this Court must do the same. (*See*, *e.g.*, Bundle C Mem. (Doc. 1786-1) at 8); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss"); *Sanford v. Louisiana*, 228 Fed. Appx. 492, 492-93 (5th Cir. 2007); *Hensley v. Redi-Med of Mandeville*, Civ. A. No. 09-47, 2009 WL 2408319, *2 (E.D. La. Aug. 4, 2009) (Barbier, J.).

The States' conclusory and non-specific allegations of presentment are insufficient.  (Ala. First Am. Compl. ¶ 217 ("The State has satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b).  Because the full extent of the State's damage is still unknown, and the State is presently assessing the breadth of its damages, the State may make additional presentments to the Defendants"); La. First Am. Compl. ¶143 ("To the extent that presentment is possible, even

if not required for Government claims, the State has directly presented BP with its claims.")).

Courts closely examine plaintiffs' allegations and the documentary evidence supporting their allegations to determine if OPA's requirements of a sum certain and substantiation have been satisfied. *See*, *e.g.*, *Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 311 (E.D. Va. 1993) (dismissing OPA claims for lack of presentment; holding that letter purporting to present an OPA claim was "plainly inadequate" under the statute because plaintiffs had made "no effort to describe the nature or extent of the[ir] alleged damages, much less to explain the basis for claiming that these damages have been sustained," and also "fail[ed] to state a sum certain for any of the types of damages alleged"); *Gabarick*, 2009 WL 102549, at *2 (granting motions to dismiss; invoice submitted by plaintiff did not satisfy OPA's "statutory requirements for a proper claim" because the plaintiff "has not described the manner in which the oil spill impacted it, nor has it cited evidence in support of its purported claim"); *Abundiz v. Explorer Pipeline Co.*, Civ. A. Nos. 300CV2029H, 303CV0508H, 303CV0787H, 2003 WL 23096018, at *3-5 (N.D. Tex. Nov. 25, 2003) (holding that plaintiff failed to comply with presentment requirement because it did not establish the amount in dispute; spreadsheets and letter were ambiguous and lacked the necessary specificity). Thus, Alabama's assertion that it merely had to plead, without support, that it had satisfied presentment and "[n]othing more was required," (Ala Opp. at 29 n. 4), is incorrect and contrary to this precedent. (*See also* Louisiana Opp. at 12 ("Rule 8 . . . merely requires the State to allege the fact of its compliance with the OPA presentment procedure.").)

The States' argument that the presentment requirement is not jurisdictional likewise does not assist them. (*See* Ala. Opp. at 19-23; La. Opp. at 11.) Whether the lack of presentment is jurisdictional is immaterial; non-compliance with the requirement results in dismissal. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1990). In *Hallstrom,* the Supreme Court held

that compliance with a similar provision in the Resource Conservation and Recovery Act ("RCRA") requiring citizens to provide notice before commencing suit, *see* 42 U.S.C. § 6972, is a "mandatory condition precedent to commencing suit" that "a district court may not disregard . . . at its discretion." *Hallstrom*, 493 U.S. at 31. The Court explained that "*[u]nder a literal reading of the statute, compliance* with the 60-day notice provision *is a mandatory, not optional, condition precedent for suit.*" *Id.* at 26 (emphasis added). The Court rejected petitioners' call for a "flexible or pragmatic construction" of the RCRA notice provision that would allow courts to stay an action for 60 days in the event notice was not provided prior to filing suit, holding that such an interpretation of Section 6972 "flatly contradicts the language of the statute." *Id.* Noting that "*[t]he parties have framed the question presented in this case as whether the [RCRA] notice provision is jurisdictional or procedural,*" the Supreme Court determined that "*[i]n light of our literal interpretation of the statutory requirement, we need not determine whether § 6972(b) is jurisdictional in the strict sense of the term. . . . As a general rule, if an action is barred by the terms of a statute, it must be dismissed*." *Id.* at 31 (citations omitted, emphasis added).

As the Eleventh Circuit observed in *Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*, 51 F.3d 235, 239 (11th Cir. 1995), OPA's pre-suit presentment requirement is similar to the RCRA notice provision at issue in *Hallstrom*. The Eleventh Circuit found *Hallstrom* instructive in reaching its holding that OPA's presentment requirement is a "mandatory condition precedent" to filing an OPA claim in court. *Id.* at 239-40 (finding nothing in OPA's text or legislative history to "justify departing from the plain meaning of [the] statute's text"). Pointing to *Hallstrom*, the Eleventh Circuit held:

> "We are not at liberty to create an exception where Congress has declined to do so. . . . If Appellants perceive a policy shortcoming

> caused by OPA's claims presentation requirement, that
> shortcoming 'arises as a result of the balance struck by Congress,
> and is properly remedied by congressional action.'"

*Id.* at 239 (quoting *Hallstrom*, 493 U.S. at 26, 30).

This Court has consistently followed the sound reasoning of the Eleventh Circuit in *Boca Ciega* to hold that OPA's presentment requirement is mandatory and cannot be waived. This includes *Leboeuf v. Texaco*, 9 F. Supp. 2d 661 (E.D. La. 1998), relied upon by Alabama (Ala. Opp. at 21), in which "this Court agree[d] with the Eleventh Circuit that [the presentment requirements of 33 U.S.C. § 2713] are ***mandatory conditions precedents*** to filing an action in either state or federal court." *Id.* at 666 (emphasis added); *see also Gabarick*, 2009 WL 102549, at *3; *Marathon Pipe Line Co. v. LaRoche Indus. Inc.*, 944 F. Supp. 476, 477 (E.D. La. 1996) (citing *Boca Ciega* in holding that "presentation requirement is jurisdictional and mandates dismissal" when not complied with by claimants); *Isla Corp. v. Sundown Energy, LP*, No. CIV.A. 06-8645, 2007 WL 1240212, at *2 (E.D. La. Apr. 27, 2007) ("[P]resentment of a claim in accordance with section 2713 is a 'mandatory condition precedent' for OPA claims.").

### B.  *Cosco Busan* Does Not Relieve the States of the Presentment Requirement.

The States argue in the alternative that the OPA's presentment requirement does not apply to government plaintiffs, relying exclusively on a single case decided outside this jurisdiction that has not been followed by any other court. (*See* Ala Opp. at 24; La. Opp. at 13) The court in *United States v. M/V Cosco Busan* held that OPA Section 2717(f)(2)—a "Period of limitations" subsection that provides that "an action may be commenced . . . for recovery of removal costs at any time after such costs have been incurred"—allows the U.S. government to bring an action for response costs without satisfying the presentment requirement. 557 F. Supp. 2d 1058, 1060-61 (N.D. Cal. 2008).

The *Cosco Busan* court's reasoning is contrary to the plain language of the statute and would render the mandatory language of the presentment requirement meaningless in any action seeking removal costs.  The relevant language in 33 U.S.C. § 2717 does not address, much less alter, the presentment requirement; instead, it clarifies that although the three-year statute of limitations for removal costs under OPA does not begin to run until "after completion of the removal action," the cause of action nonetheless ***accrues*** before that time, assuming, of course, that other requirements such as presentment are also met.  *See Cal. Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 915 n.5 (9th Cir. 2010) (analyzing virtually identical language in CERCLA; "[a]lthough these events trigger the statute of limitations, a remediator need not wait until removal is complete or remediation is initiated to file suit.  ***A CERCLA recovery action accrues 'at any time after [recovery] costs have been incurred*****.'") (alteration in original; emphasis added); *see also* 8 Bus. & Com. Litig. Fed. Cts. § 95:45 (2d ed.) ("The Oil Pollution Act of 1990 ("OPA") mirrors the provisions of CERCLA with respect to discharges of oil.").

Moreover, the *Cosco Busan* court misread the scope of 2717(f)(2) to apply only to ***government*** removal costs, whereas the section actually refers to ***all*** removal costs defined in Section 2702(b)(1) (and thus to ***all*** removal costs recoverable under OPA), including those incurred by "any person" consistent with the National Contingency Plan (NCP).  *Compare* 33 U.S.C. § 2702(b)(1)(B) (removal costs include those incurred by "any person" if "consistent" with the NCP) *with Cosco Busan*, 557 F. Supp. 2d at 1061  (Sections "2702(b)(1) and 2717(f)(2) permit only the United States, a State, or an Indian tribe to bring an action at any time to recover removal costs.").  By limiting its holding to government plaintiffs, the *Cosco Busan* court could still give apparent meaning to the presentment requirement for non-government plaintiffs.  *See*

*id.* ("Defendants' dire predictions of statutory nullification are, however, unfounded…. All [ ] claimants [other than the United States, a State, or an Indian tribe] seeking damages or recovery costs must first present their claims to the responsible party, pursuant to § 2713."). But this interpretation of Section 2717 that is contrary to the section's plain language cannot be adopted merely because it prevents the *Cosco Busan*'s court's holding from nullifying the presentment requirement in any action involving removal costs. Instead, section 2717(f)(2) must be understood to apply to all plaintiffs and to merely start the clock running for accrual purposes; it cannot instead be read to gut the statute's plain and unambiguous presentment requirement.

Furthermore, the additional holding of the *Cosco Busan* court—permitting not only the United States' removal costs but also its damages claims to proceed without presentment—is not based on any statutory text or even the court's erroneous interpretation of Section 2717. Section 2717(f)(1), which addresses damages actions, does not have any language like that in Section 2727(f)(2) that could support such a reading. Yet the court still permitted damages claims to proceed "[i]n the interest of judicial economy." 557 F. Supp. 2d at 1062. This only underscores the court's fundamental misreading of the statute and disregard of its terms.

In sum, *Cosco Busan* is an incorrectly decided case, as reflected in the fact that it contravenes the language of OPA, conflicts with other court decisions, including this Court's decisions, interpreting OPA's presentment requirement, and has not been followed by any other court.[5] *See also United States v. Murphy Exploration & Prod. Co.*, 939 F. Supp. 489, 492 (E.D. La. 1996) (noting that "[n]o legal authority . . . for the disregard of Section 2713 is offered by the

---

5   Contrary to Alabama's assertion (Ala. Opp. at 22-23), 33 U.S.C. § 2713 (b) (permitting removal costs incurred by the State to be presented directly ***to the Fund***) does not support an argument that a State need not fulfill presentment before suing a responsible party ***in court***; on the contrary, such a limited exception (which does not apply here) further confirms that presentment is mandatory in all other situations not explicitly excepted.

government," but allowing the United States' OPA claims to proceed because presentment had been satisfied).

### C.   The States' Other Attempts to Avoid Presentment Fail.

1.   <u>OPA Does Not Support Alabama's Contentions That Presenting One Claim Satisfies Presentment for All Claims or That It May Rely on Claims Allegedly Presented After It Filed Suit.</u>

Alabama's argument that only *a single OPA claim* must be properly presented before a plaintiff may sue for all OPA damages cannot be squared with OPA's plain language or its purpose of encouraging out-of-court settlements.  (*See* Ala. Opp. at 27-29.)  First, Alabama entirely ignores the language requiring that "*all claims* for removal costs or damages *shall be presented* first to the responsible party."  33 U.S.C. § 2713(a).  This language is itself sufficient to demonstrate why Alabama's reading is incorrect.

In addition, Alabama's argument that OPA's language permitting a rejected OPA claimant to "elect to commence an action" means that the claimant may then "rais[e] any and all OPA claims that he may have," because "[n]othing in OPA[ ] limits the claimants' action to rejected claims" (Ala. Opp. at 28) relies on a strained reading of the statute:

> "(c) Election
>
> If a claim is presented in accordance with subsection (a) of this section and--
>
> (1) each person to whom the claim is presented denies all liability for the claim, or
>
> (2) the claim is not settled by any person by payment within 90 days after the date upon which (A) the claim was presented, or (B) advertising was begun pursuant to section 2714(b) of this title, whichever is later, the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund."

33 U.S.C. § 2713(c).  Given that the provision speaks of a single claim being presented to the responsible party, denied, and/or presented to the fund, it is clear that the court action must be read in parallel to also concern only that single claim.

Furthermore, Alabama's suggestion that it has satisfied presentment through its alleged presentation of a claim for less than $31,000 that BP allegedly rejected (although it is noteworthy that Alabama does not allege that BP "denie[d] all liability for the claim," as required by OPA for immediate presentment, but instead paid the claim in part) before Alabama filed its complaint on August 12, 2010 demonstrates why Alabama's argument must be rejected.  If presentment of a single claim (particularly one reflecting only a small portion of a claimant's losses) was sufficient, there would be no opportunity for the out-of-court settlements encouraged by Congress.  Congress did not intend OPA's threshold requirement to be defeated by the obvious end run of a party satisfying presentment only as to an atomized part of its overall claims.

Alabama's reliance on additional claims allegedly presented after it filed its original complaint is also contrary to the plain language of OPA.  As courts have held, plaintiffs may not cure their presentment issues during the pendency of their lawsuit; instead, their claims must be dismissed.  *See Gabarick*, 2009 WL 102549, at *3 (holding that OPA claims must be "dismissed without prejudice, rather than stayed" when plaintiffs did not comply with OPA pre-suit presentment); *Abundiz v. Explorer Pipeline Co.*, No. Civ. A. 3:00-CV-2029-H, 2003 WL 23594054, at *3 (N.D. Tex. Mar. 7, 2003) (dismissing OPA claims because "a plaintiff's failure to make a proper presentment of OPA claims to a defendant before filing a lawsuit, is not amenable to cure by amending his presentment of claims during the pendency of the proceedings"); *see also Hallstrom*, 493 U.S. at 26 (holding that a 60-day stay of court proceedings would not cure a plaintiff's failure to wait 60 days after giving notice before filing a

lawsuit; "[w]hether or not a stay is in fact the functional equivalent of a precommencement delay, such an interpretation . . . flatly contradicts the language of the statute. . . . Staying judicial action once the suit has been filed does not honor this prohibition.").

Indeed, Alabama's offer to voluntarily dismiss its OPA claims without prejudice, (Ala. Opp. at 30)[6] effectively concedes that its OPA claims are deficient for lack of presentment.  The statute and the case law, as outlined above, make clear what the requirements for presentment are, and Alabama has failed to satisfy those requirements.

>2.    Louisiana's Argument That It Needed to Bring Its OPA Claims to Avoid Improper Claim-Splitting and the Risk of Claim Preclusion Must Be Rejected.

Presentment is entirely within Louisiana's control.  Louisiana had the choice of either presenting its claims or waiting to bring its lawsuit until it had done so.  Instead, Louisiana chose to bring suit without meeting presentment and to instead focus its energy on coming up with reasons, including its professed desire to avoid claim-splitting and the risk of claim preclusion, why it need not present its claims.  But as with its other reasons, Louisiana's arguments on claim-splitting and claim preclusion provide no excuse for the State to avoid a mandatory condition precedent.  *See Boca Ciega*, 51 F.3d at 239 ("We are not at liberty to create an exception where Congress has declined to do so.").

**D.    The States' Claims for Declaratory Relief Under OPA Should Be Dismissed.**

Because the States have failed to fulfill the mandatory presentment requirement, they have no valid OPA cause of action and thus are not entitled to a declaratory judgment under 33 U.S.C. § 2717(f).   Alabama failed to even address this argument in its brief.

---

6    "In the interests of advancing this litigation and avoiding unnecessary complexity, Alabama may well be willing to voluntarily dismiss its OPA claims, without prejudice, and then promptly re-file them, on two conditions: 1. The responsible parties state on the record, either at oral argument or in their reply brief(s), exactly how Alabama can remedy its alleged presentment failure, without prejudice, and 2. The responsible parties stipulate that Alabama's compliance with their proposed dismissal and refiling procedure satisfies § 2713."

Louisiana contends that BP's argument is "primarily based on the false premise that the State has not complied with OPA's presentment procedure." (La. Opp. at 21.) As BP has explained, there is no false premise—Louisiana *has not* complied with OPA's presentment procedure. Nor for the reasons stated above is it appropriate to take Louisiana's conclusory allegations of presentment as true, whether in the context of Louisiana's claim for declaratory relief or otherwise. (*Id.*) Due to its failure to present, Louisiana does not have such a valid OPA claim at this time.

Declaratory relief is also unnecessary here—at least with respect to BP—because BP has already accepted its role as a responsible party and waived OPA's limitation-of-liability provisions. Contrary to Louisiana's arguments, a declaratory judgment as to already uncontested and stipulated matters would not "add important clarity to the issues in the proceeding." (La. Opp. at 24.) The Declaratory Judgment Act and Article III require an actual live controversy; these stipulations moot Louisiana's request for declaratory relief. *See, e.g.*, *Lee By & Through MacMillan v. Biloxi Sch. Dist.*, 963 F.2d 837, 839 (5th Cir. 1992) (dismissing case as moot after plaintiff student moved to new school; defendant school's stipulation to plaintiff's disability and placement in special education program mooted claims for declaratory judgment and injunction).

## IV.   CERTAIN OF THE STATES' STATUTORY, CIVIL, AND COMMON LAW CLAIMS FAIL FOR INDEPENDENT, ADDITIONAL REASONS.

A number of Louisiana's and Alabama's state law claims are not only preempted by OCSLA, OPA, and the CWA, but also are defective on additional grounds that require their dismissal.

### A.    Louisiana's State Statutory Claims Are Fatally Defective.

#### 1.    LOSPRA Is the State's Sole Remedy for Louisiana Oil Spills.

Louisiana erroneously claims that the "exclusive remedies" provision of its Oil Spill Response and Prevention Act ("LOSPRA") applies narrowly to "limitations of liabilities and immunities" and thus supersede state laws only insofar as they impose limitations on liability and/or immunities.  (*See* La. Opp. at 25.)   In support of this argument, Louisiana relies on: (1) the wording of the statute's "exclusive remedies" provision; and (2) the legislative history of the "exclusive authority" provision.  (*See id.*)

Section 30:2491(A) of LOSPRA provides:

> "When applicable, the limitations of liability and immunities provided in this Chapter shall be exclusive and shall supersede ***any other liability provisions*** provided by any other applicable state law."[7]

*Id.* (emphasis added).  From this, Louisiana concludes that LOSPRA's exclusivity provision applies only to limitations of liability and immunities.  (*See* La. Opp. at 25.)   Louisiana's interpretation ignores that under Section 30:2491(A), the statute's limitations of liability and immunities provisions supersede not only those explicit provisions under applicable state laws but also "any other liability provisions" that exist under state laws.  Louisiana's interpretation depends on rewriting the statute to delete those words and must therefore be rejected.

Louisiana also overlooks that Section 30:2491(A) goes on to provide that LOSPRA shall "supersede . . . any conflicting laws of this state."[8]  Louisiana in its state law claims seeks damages based on alleged losses from property contamination resulting from the Deepwater

---

[7]    Louisiana asserts that Defendants only "selectively quote" this provision of LOSPRA in their briefing in support of the Motion to Dismiss.  (*See* La. Opp. at 25.)  This statement is incorrect with respect to the BP Defendants.  (*See* BP Defs.' Mem. in Supp. of Mot. to Dismiss at 43-44 (quoting Section 30.2491(A) in full).)

[8]    Nor can LOSPRA serve as a surrogate to federal law as to BP under the principles set forth in Section I.A, *supra*.

Horizon explosion.  (*See* La. First Am. Compl. ¶¶ 293-327, 368-91.)  Because LOSPRA covers "damages for injury to, destruction of, or loss of natural resources" as well as "damages for injury to, or economic loss resulting from destruction of, immovable or corporeal movable property," Louisiana's state law claims are not consistent with LOSPRA.[9]  Accordingly, Louisiana's state law claims are preempted by LOSPRA as a matter of state law.[10]

> 2.  <u>Louisiana's Claim under the Louisiana Environmental Quality Act Must Be Dismissed Because Louisiana Fails to Satisfy the Threshold Elements of the Statute.</u>

In their opening brief, the BP Defendants argue (1) that the alleged Louisiana Environmental Quality Act ("LEQA") violation is not a continuing tort; and (2) that the add-on daily penalties sought pursuant to the LEQA are not authorized.  (*See* La. Opp. at 34.)  But contrary to Louisiana's opposition, BP's motion also showed that Louisiana's LEQA claims must be dismissed because Louisiana fails to meet the threshold requirements of the statute, and because Louisiana seeks penalties pursuant to a regulation that both conflicts with the statute it implements and was promulgated improperly and therefore is invalid.  Thus, Louisiana has not sufficiently stated a claim for penalties under the LEQA (*see id.* at 34-35, 37), and the outcome

---

9  Louisiana summarily dismisses in a footnote the fact that Section 30:2091 is entitled "Exclusive remedies." While statutory headings do not themselves constitute part of a law, Louisiana courts consistently have consulted headings to "provide[] some guidance as to what the legislature intended the statute to cover." *Broussard v. Lafayette Parish Sch. Bd.*, 998 So. 2d 1253, 1256-57 (La. App. 3 Cir. 2009) (citing *Montelepre v. Edwards*, 359 So. 2d 1311 (La. App. 4 Cir. 1978)).

10  Louisiana notes that its Legislature in 1995 deleted the term "liability" from the categories for which LOSPRA is the "exclusive authority," such that the statute now provides that LOSPRA is the "exclusive authority on oil spill prevention, response, removal and the limitations of liability."  (*See* La. Opp. at 25 (quoting La. Rev. Stat. Ann. § 30:2496).)  But this amendment does not show an intent to reintroduce other state laws regarding liability in oil spill cases.  Rather, the limited available legislative history suggests that the deletion was a minor housekeeping amendment not intended to change the meaning of the provision.  *See* Tape No. 1 of the Audio Recording of the Louisiana Senate Natural Resources Committee Meeting (April 20, 1995) (comments of Roland Guidry, Oil Spill Coordinator for the Governor's Office, noting that bill amending LOSPRA contained a "series of house cleaning amendments" and "a lot of wordsmithing"); *cf. Fourco Glass Co. v. Transmirra Prods. Co.*, 353 U.S. 222, 227 (1957) (wordsmithing-type changes presumed to be non-substantive).

of this Court's decision on this matter does not have the effect of only "reduc[ing] the penalty amount to which Louisiana is entitled." (*Id.* at 35.)[11]

The LEQA prohibits, and authorizes penalties with respect to, "any activity which results in the discharge of any substance into the waters of the state."  La. Rev. Stat. Ann. § 30:2075; *see also id.* § 30:2025(E)(1)(a) (authorizing penalties for violations).  Louisiana—without reference to any supporting case law—argues that the LEQA does not require that the substance causing pollution "be directly placed in the waters of the state," relying on the presence of the word "into" as sufficient for this purpose.[12]  (*See id.* at 32 & n.37.)  However, Louisiana lacks the jurisdiction to enforce the LEQA on the OCS, bound as it is by federal laws limiting a State's inclusion of coastal waters within its territorial boundaries to a default of three miles offshore. *See* 43 U.S.C. § 1312 (Submerged Lands Act providing that boundary of each State generally extends three miles seaward from its coastline); 33 U.S.C. § 1362(8) (CWA definition of "territorial seas" as "the belt of seas extending three miles from the coast").  The LEQA should not be interpreted in a manner that is at odds with its language and in conflict with applicable limitations on state authority.  Accordingly, Louisiana is not entitled to penalties under the LEQA.

> 3.   Louisiana Seeks Penalties That Do Not Exist.

In support of its argument that the LEQA entitles the State to a million dollar per day penalty for each day the alleged violation continues (including, according to Louisiana, up until the present date and beyond), Louisiana simply invokes *Chevron U.S.A., Inc. v. Natural*

---

11  Louisiana similarly seeks to dispose of the BP Defendants' substantive arguments as to why Louisiana cannot recover penalties for violations of the Consolidated Compliance Order and Notice of Potential Penalty (*see* BP Defs.' Mem. in Supp. of Mot. to Dismiss at 29-30) by claiming that the outcome of this Court's decision with regard to the Order affects only the size of the penalty to which the State is entitled.  (*See* La. Opp. at 38 n.49.)

12  Louisiana's argument in this regard is puzzling since it cites to the statute and implementing regulations for its definition of "into" (*see* La. Opp. at 32 & n.38), despite the fact that neither defines the term.

*Resource Defense Council, Inc.*, 467 U.S. 837 (1984), for the principle that this Court should defer to the Louisiana Department of Environmental Quality's ("LDEQ") interpretation of the statute's penalty provision, notwithstanding the absurd results to which such an interpretation would lead.  While an agency's construction of its rules and regulations is generally entitled to deference, such deference is not appropriate where, as here, that construction is a "novel litigating position 'wholly unsupported by regulations, rulings, or administrative practice,'" amounts to "***what appears to be nothing more than an agency's convenient litigating position***," or is a "post hoc rationalization" that does that does not represent the "'agency's fair and considered judgment on the matter in question.'"  *See, e.g., Tex. Clinical Labs. v. Sebelius*, 612 F.3d 771, 777 (5th Cir. 2010) (citing *Brown v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) and *Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006)); *see also City of Baton Rouge/Parish of East Baton Rouge v. 200 Government Street, LLC*, 995 So. 2d 32, 38 (La. App. 1 Cir. 2008) (agency interpretation not entitled to deference when it appeared inconsistent with positions previously taken and was inconsistent with the statute).  This principle applies with particular force in the civil enforcement context, where due process prohibits the imposition of penalties without fair notice.  *United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1144 (10th Cir. 2010) (noting that principles of due process "pertain[] when an agency advances a novel interpretation of its own regulation in the course of a civil enforcement action") (quoting *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997)).

In this case, Louisiana has failed to identify any instance—because none exists—in which it has interpreted and applied the penalty provision in this novel and overreaching manner

which is so at odds with the statutory language, and which would led to unreasonable results.[13]

Nor has Louisiana provided any justification for interpreting the regulation in the current context differently than it has previously.   Rather, Louisiana's position—which would inflate the penalties to which it is entitled, in a manner that is flatly inconsistent with the statutory language and would deprive BP of fair notice—appears to have been devised for this case alone.[14]   In view of these circumstances, the interpretation of Section 30:2025 advanced by Louisiana is not entitled to *Chevron* deference, and is contrary to the plain language of the statute and its legislative history.  (*See* BP's Opening Mem. at 24-28).

4.      The Regulatory Provision Upon Which Louisiana Relies Is Not Valid.

The penalty regulations in question, La. Admin. Code tit. 33, §§ I.703, I.705, were promulgated in 1999.  *See* 25 La. Reg. 657 (April 20, 1999) (Ex. 1, Bloomer Decl., Tab B).  The rulemaking history indicates that the LDEQ amended the definition of "penalty event" on which Louisiana relies during the rulemaking process after the notice and comment period.  When the penalty regulations were first proposed, the definition of "penalty event" consisted only of the first sentence of the current definition; it did not expressly provide that each such day of a

---

13   As set forth in BP's opening brief, even if Louisiana were entitled to daily penalties at all under the LEQA, such penalties would be limited to the subset of days prior to the permanent capping of the Macondo Well, and to the maximum daily penalty of $32,500 specified in the statute itself.  (*See* BP's Opening Mem. at 25-26.)  Under Louisiana's construction, the BP Defendants would be subject to those penalties, plus an additional one million per day for as long as the State deems oil to be present in some arbitrary fashion.  This is a constitutionally intolerable "Chancellor's foot" test—*i.e.,* one in which the decisionmakers "define due process . . . by their own personal and private notions of fairness."   *United States v. Crouch*, 84 F.3d 1497, 1512 (5th Cir. 1996) (rejecting a test that had "no recognized general standards or principles . . . and virtually no body of precedent or historic practice to look to for guidance").

14   In recent papers filed in the CITGO Petroleum litigation, for example, Louisiana makes no mention of its theory that the one million penalty is calculated on a per-day basis.  Instead, Louisiana implies that the penalty is a single add-on.  *See, e.g.*, LDEQ Post-Trial Memorandum at 3, *United States v. CITGO Petroleum*, No. 2:08-cv-893 (W.D. La. Apr. 11, 2011) (Ex. 1, Decl. of Andrew B. Bloomer, Tab A) ("In this case, there were 2 days of undisputed discharge.  For the purposes of penalty, those 2 days should be multiplied by a low of $20,000 or a high of $32,500.  In addition, the violation warrants ***the one million dollar penalty event add-on***.") (emphasis added).  *See also id.* at 4 ("[T]here were closures and restrictions on the water body for a total of 24 days.  Twenty-four (24) days times a low of $20,000 or a high of $32,500.  Additionally, ***the one million dollar penalty event add on*** is warranted.") (citations omitted) (emphasis added).   The State's new per-day interpretation is incompatible with its "add on" interpretation.

violation could be treated as a separate penalty event.  *See* 24 La. Reg. 1984 (Oct. 20, 1998) (Ex. 1, Bloomer Decl., Tab C).  The lone public comment that the LDEQ received with respect to this definition was from EPA:

> "The following terms in § 703 are not clear: "Penalty Event."  The Reader will have to read the definition in the context of its use before understanding the term and even then the term is not clear."

Letter from EPA Region 6 to LDEQ, at 2 (Dec. 7, 1998) (Ex. 1, Bloomer Decl, Tab D).  Thus, EPA's comment did not specifically request that LDEQ amend the definition of "penalty event" to provide that each such day of a violation could be treated as a separate penalty event. Apparently, after the notice and comment period ended, LDEQ expanded the definition of "penalty event" to include the second sentence regarding violations lasting more than twenty-four hours.  In response to EPA's comment, LDEQ stated:

> "The commentor offered no suggestions for new language or explanation as to why the terms should be considered unclear, therefore the department is at a loss as to how to clarify this definition.  The department did ***expand this definition*** by adding the sentence, 'For violations lasting more than one 24-hour day, each such day may be treated as a separate penalty event.'"

Summary Report for Proposed Rule – (Log #OS026) – Civil Penalty Assessment, Response to Comment 10 (Feb. 10, 1999) (Ex. 1, Bloomer Decl, Tab E) (emphasis added).  Other than this statement, the rulemaking record is silent as to why LDEQ expanded the definition.

Given, however, that the definition was expanded ***after*** the notice and comment period, this provision is invalid.  The United States Supreme Court has held that the federal Administrative Procedure Act ("APA") requires an agency to include in its notice of proposed rulemaking information regarding the substantive aspects of a proposed rule.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) ("The [APA] requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking

'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'") (quoting 5 U.S.C. § 533(b)(3)).   The Courts of Appeals have interpreted this to mean that a final rule adopted by an agency must be a "logical outgrowth" of the rule proposed. *See id.* (citations omitted); *see also Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1058-59 (11th Cir. 2008) (citing *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004)). The APA provision cited by the *Coke* Court is nearly identical to that under the Louisiana APA, which requires "a statement of either the terms or the substance of the intended action or a description of the subjects and issues involved."   La. Rev. Stat. § 49:953.   The Louisiana APA goes on to provide:

> "Substantive changes to a rule proposed for adoption, amendment, or repeal occur if ***the nature of the proposed rule is altered*** or if ***such changes affect additional or different substantive matters or issues*** not included in the notice required by R.S. 49:953(A)(1). Whenever an agency seeks to substantively change a proposed rule after notice of intent has been published in the Louisiana Register pursuant to R.S. 49:953(A)(1), the agency shall hold a public hearing on the substantive changes preceded by an announcement of the hearing in the Louisiana Register . . . ."

La. Rev. Stat. § 49:968(H)(2).   Because the addition of the second sentence to the definition of "penalty event" qualifies as a "substantive change" that could exponentially increase the penalties assessed against a party, the LDEQ was required to hold a public hearing on the change.   *See* La. Atty. Gen. Op. No. 98-259, 1998 WL 414462 (June 15, 1998) (revisions to Department of Health and Hospitals rule subsequent to publication of notice constituted substantive changes requiring compliance with La. Rev. Stat. § 49:968(H)(2) despite Department's contention that "the revised language is a clarification of the Department's intent").   There is no evidence in the administrative record, however, that LDEQ did so.

Moreover, the Louisiana APA provides that, before promulgating a final regulation, the LDEQ must publish a report, or a summary report, in the Louisiana Register that includes certain

information.  *See* La. Rev. Stat. § 49:953(G)(1).[15]  This report is not required, however, if the regulation "[w]ill cost the state and affected persons less than one million dollars, in the aggregate, to implement."  *Id.* § 49:953(G)(3)(c).  In the penalty provision rulemaking record, the LDEQ claimed that the report was unnecessary because the regulation would cost the State and affected persons less than one million dollars, in the aggregate, to implement.  *See* Certification of Proposed Rule OS026 (Sept. 18, 1998) (Ex. 1, Bloomer Decl, Tab F).  If the LDEQ intended that one million in penalties could be assessed on a per-day basis, this conclusion is obviously erroneous, and the LDEQ should have prepared the report required under the APA.  Its failure to do so either demonstrates that the State's new interpretation of the statute is erroneous or that if it was intended, LDEQ violated the Louisiana APA, which would make the provision unlawful.

5.   The LEQA Clearly Contemplates a Presentment Requirement.

As Louisiana correctly states (*see* La. Opp. at 39), under Section 2025(E)(1)(a) of the LEQA, a violator may be subject to penalties "of not more than the cost to the state of any response action made necessary by such violation which is ***not voluntarily*** paid by the violator." (Emphasis added.)  In order to "volunteer" – or not – to pay a particular cost, a violator necessarily must be made aware of such costs and provided an opportunity to accept or decline to pay of its own volition.  Louisiana, however, dismisses the fact that the statute explicitly contemplates an opportunity by the alleged violator to "volunteer" to pay the costs, arguing that

---

15  Specifically, the report must include: "(a) a statement identifying the specific risks being addressed by the policy, standard, or regulation and any published, peer-reviewed scientific literature used by the department to characterize the risks; (b) a comparative analysis of the risks addressed by the policy, standard, or regulation relative to other risks of a similar or analogous nature to which the public is routinely exposed; (c) an analysis based upon published, readily available peer-reviewed scientific literature, describing how the proposed and final policy, standard, or regulation will advance the purpose of protecting human health or the environment against the specified identified risks; and (d) an analysis based on the best readily available data, that the proposed or final policy, standard or regulation presents the most cost-effective method practically achievable to produce the benefits intended regarding the risks identified."

the statute provides only that a court may assess whatever penalty it deems appropriate, and the BP Defendants can seek as credit against that penalty any response costs paid.

Other than the cursory statements in its First Amended Complaint that it has incurred response costs (*see* La. Am. Compl. ¶¶ 6, 133, 142, 144, 193), Louisiana has provided no evidence or information to support the claim that the BP Defendants have declined voluntarily to pay claims for such costs. Without knowing what specific actions Louisiana alleges it has taken and which have not been voluntarily paid for by the BP Defendants, neither the BP Defendants nor this Court can evaluate whether they qualify as "response actions" for which Louisiana is entitled to obtain recovery under Section 2025(E)(1)(a). Moreover, given the lack of a demand made on the BP Defendants for any particular type, or amount, of response costs, the BP Defendants have not even been afforded the opportunity to evaluate or consider making voluntary payment of whatever response costs Louisiana alleges it incurred.[16]

**B.    Louisiana's Civil Law Claims Fail to State a Basis Upon Which This Court May Grant Relief.**

1.    <u>A Nuisance Claim Under Louisiana Law Requires a Neighbor Relationship.</u>

Articles 667 through 669 of the Louisiana Civil Code confine nuisance claims to those obligations proprietors owe to their neighbors. Louisiana—whose coast is located some fifty miles from the site of the *Deepwater Horizon* incident—attempts to evade the neighbor requirement by relying on an outlier case from 1964, *Gulf Insurance Co. v. Employers Liability Assurance Corp.*, 170 So. 2d 125 (La. App. 4 Cir. 1964), for the proposition that "there is no requirement that under Article 667 that the property of a plaintiff . . . be proximate to the

---

16   In an apparent attempt to avoid running afoul of the presentment requirement, Louisiana states: "Nonetheless, LDEQ has been invoicing BP for its response costs." (La. Opp. at 40.) Louisiana does not allege, however, that the BP Defendants have not voluntarily paid any such costs, such that they are now recoverable in the form of LEQA civil penalties. To the contrary, Louisiana states "BP has submitted payments for some of these invoices." (*Id.*)

wrongdoer's property."  (La. Opp. at 41.)   However, no court has meaningfully relied on that case for this proposition in decades, in all likelihood because the plain language of Article 667 indicates that a neighbor relationship is required: "Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his ***neighbor*** of the liberty of enjoying his own, or which may be the cause of any damage to him.  However, if the work he makes on his estate deprives his ***neighbor*** of enjoyment or causes damage to him, he is answerable for damages . . . ."  (Emphasis added.)[17]

Even if this language were somehow ambiguous—and it is not—this Court and others interpreting the Article 667 in recent years have held that where parties were not "neighbors," the claim does not fall under the Article's scope.  *See, e.g.*, *Barasich v. Shell Pipeline Co., L.P.*, Civ. A. Nos. 05-4180, 05-4197, 05-4199, 05-4212, 05-4512, 05-4512, 06-5102, 2006 WL 3913403, at *8 (E.D. La. Nov. 20, 2006) (Barbier, J.); *TS & C Invs. LLC v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 381-84 (W.D. La. 2009).   Accordingly, Louisiana has failed to state the required elements of a claim for nuisance under Article 667, and the claim should be dismissed.

### 2.   Louisiana's Trespass Claim Must Fail In View of Current Authority.

Louisiana's argument that its trespass claim requires only an intentional act that leads to the trespass is not supported by more recent decisions, including by the Louisiana Supreme Court.  *See, e.g.*, *Hogg v. Chevron*, 45 So. 3d 991, 1002 n. 11 (La. 2010) ("[C]ivil trespass is generally considered to be an intentional tort, requiring proof that the defendant took some

---

17  The Fifth Circuit case cited by Louisiana, *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368 (5th Cir. 2001) (*see* La. Opp. at 54 & n.54), merely quotes the language from *Gulf Insurance Co.* as supportive of the Article 667 requirement that some nexus exist.  *See also TS & C Inv. LLC v. Beusa Energy Inc.*, 344 Fed. Appx. 907, 909 & n.10 (5th Cir. 2009) (affirming dismissal of plaintiffs' Article 667 claim based on the absence of a neighbor relationship "notwithstanding [plaintiffs'] . . . half-hearted" and "out-of-context citation to just one legal source," *Gulf Insurance*).

intentional action that resulted in harm to the plaintiff."); *Barney v. Plaquemines Parish Gov't*, 22 So. 3d 1117, 1118-19 (La. Ct. App. 4 Cir. 2009).

3.      Louisiana Fails to State a Claim Under Article 2317 By Any Standard.

As BP explained in its opening brief, Article 2317.1 claims are governed by a negligence standard, not strict liability.  (*See* BP's Opening Mem. at 47.)  Louisiana attempts to preserve its strict liability claim by citing the *Oster* case for the proposition that negligence and strict liability theories of recovery are essentially the same thing.[18]  (*See* La. Opp. at 42.)  While courts have treated the theories of recovery as similar, they are not identical.  "The essential difference between the negligence and strict liability theories is that, for strict liability, the defendants need not be shown to have had knowledge or notice of the unreasonably dangerous condition."  *See DeLaughter v. West Jefferson Levee Dist.*, 646 So. 2d 506, 508 (La. App. 4 Cir. 1994); *see also Duffy v. Conoco, Inc.*, No. CIV. A. 95-0600, 1996 WL 271635, at *3 (E.D. La. May 21, 1996) ("The difference between the two theories is that the plaintiff need not prove that the defendant knew or should have known of the existence of the defect under strict liability.").

To the extent Louisiana is making a claim under Articles 2317 and 2317.1 under a negligence theory, that claim must be dismissed as well.  To prevail on a claim under Louisiana Civil Code Article 2317.1, the plaintiff must prove that: (1) the thing which caused the damage was in defendant's custody or control, (2) it had a vice or defect that presented an unreasonable risk of harm, (3) the defendant knew or should have known of the vice or defect, (4) the damage could have been prevented by the exercise of reasonable care, and (5) the defendant failed to

---

18   Moreover, the *Oster* decision relied upon by Louisiana was issued before the 1996 amendment of Article 2317, which abolished the concept of strict liability governed by prior interpretation of the Article.  *See Jackson v. Brumfield*, 40 So. 3d 1242, 1243 (La. App. 1 Cir. 2010) ("A more appropriate term now for liability under La. C.C. arts. 2317 and 2317.1 might be 'custodial liability,' but such liability is nevertheless predicated upon a finding of negligence.")  Accordingly, the mere status as owner of the property is not sufficient to impose a duty under Article 2317 and 2317.1.  *See id.* at 1243-44.

exercise such reasonable care.  *See, e.g.*, *Riggs v. Opelousas Gen. Hosp. Tr. Auth.*, 997 So. 2d 814, 817 (La. App. 3 Cir. 2008).  Here, Louisiana alleges only that: "the Deepwater Horizon and the Macondo Prospect were . . . in the Defendants' custody and control" (La. First Am. Compl. ¶ 318); "the Deepwater Horizon and the Macondo Prospect had a vice or defect which created an unreasonable risk of harm" (*id.* ¶ 320); and "Defendants knew or should have known of these defects" (*id.* ¶ 297).  These conclusory and vague allegations do not meet the standard of Rule 12(b)(6) and, accordingly, this claim should be dismissed.[19]

   4. Statutory and Due Process Considerations Require Dismissal of the Punitive Damages Claims.

  Finally, Louisiana argues that, notwithstanding the fact that OPA does not permit the recovery of punitive damages and those damages explicitly are not allowed under Louisiana law, it is entitled to punitive damages based on the "savings clauses" of OPA and the choice of law provisions of Civil Code Article 3546.  (*See* La. Opp. at 72.)  Both theories are unavailing.

  First, federal courts have consistently rejected the argument that any provision of OPA allows an oil spill claimant to supplement its recovery with punitive damages under maritime law.  *See, e.g.*, *S. Port Marine v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000); *Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1138, 1143 (D. Ore. 2001).  As the First Circuit in *South Port Marine* noted, "[t]o our knowledge no case or commentator has suggested the availability of punitive damages under general maritime law survived the enactment of OPA." 234 F.3d at 65.  The First Circuit also relied on the Supreme Court's decision *Miles v. Apex*

---

19 Louisiana does not specifically respond to the BP Defendants' Motion to Dismiss with respect to two claims: (1) fraudulent concealment/negligent misrepresentation (Count XXII); and (2) unjust enrichment (Count XXIII).  As to its abnormally dangerous/ultra-hazardous activity (Count XV), Louisiana responds in a footnote that it "has not made that claim under article 667." (La. Opp. at 42 n.55.)  This is precisely the point: Count XV asserts a claim for abnormally dangerous/ultra-hazardous activity based on the factors set forth in the Restatement (Second) of Torts, whereas the Fifth Circuit has held that the only relevant factors for purposes of determining whether an activity is ultra-hazardous is whether the activity is identified in Article 667.  *See Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1265 (5th Cir. 1985).

*Marine Corp.*, 498 U.S. 19, 31 (1990), in determining "whether Congress's very specific treatment of oil pollution in OPA, which does not provide for punitive damages, supplanted general admiralty and maritime law."  *South Port Marine*, 234 F.3d at 65.  The court concluded that OPA did supplant punitive damages under maritime law, and this Court should do the same. (*See also* Section II.B, *supra*.)

Second, although not explicit in the State's briefing, the BP Defendants infer that Louisiana seeks to prevail on this basis by arguing that the BP Defendants engaged in the requisite conduct in the State of Texas (where BP America, Inc. is headquartered, and where punitive damages are permitted).[20]  This represents yet another attempt by Louisiana to grossly inflate the penalties and damages to which it is entitled.  On the one hand, its Amended Complaint goes on at great length about the damages Louisiana has allegedly suffered as a result of harms the BP Defendants inflicted *in Louisiana*—and for which there is a complex regulatory and enforcement scheme to assess liability.  On the other hand, where convenient to achieve unjustified add-on damages not authorized by Louisiana's own lawmakers, Louisiana claims that these harms actually were inflicted hundreds of miles away, in Texas.

Subjecting the BP Defendants to punitive damages on this basis, however, implicates fundamental principles of fair notice and due process.  The United States Supreme Court has held that, to comport with the Due Process Clause, the conduct allegedly warranting punitive damages must have "a nexus to the specific harm suffered by the plaintiff."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  Due process does not permit this Court to punish the BP Defendants for conduct in Texas that did not cause the specific harm alleged by

---

20  Notably, in support of this argument, Louisiana relies exclusively on the choice-of-law analysis in *Arabie v. CITGO Petroleum Corp.*, 49 So. 3d 529 (La. App. 3 Cir. 2010).  The Supreme Court of Louisiana, however, recently agreed to review that case.  *See Arabie v. CITGO Petroleum Corp.*, 56 So. 3d 981 (La. 2011).  In addition, *Arabie* conflicts with the decision of the state's Second Circuit in *Nicholas v. Allstate Insurance Co.*, 739 So. 2d 830, 844 (La. App. 2 Cir. 1999), *rev'd on other grounds*, 765 So. 2d 1017.

Louisiana: damages resulting from the physical pollution of property by oil from the Macondo well in the middle of the Gulf of Mexico.  Because the conduct at corporate headquarters that apparently forms the basis of the punitive damages claim was not the "conduct that harmed the plaintiff," the BP Defendants' due process rights would be violated by subjecting them to these claims.

      **C.**     **Alabama's Attempt to Impose Civil Penalties for Conduct Occurring on the OCS Should be Rejected As Inconsistent With State Law.**

Alabama argues that its attempt to seek civil penalties for the incident are actually an attempt to seek "damages" for pollution in the State, that it has not gone beyond its statutory authority under the Alabama Water Pollution Control Act, and that it has stated a claim under the Alabama Solid Waste Disposal Act (and, by implication, under the Alabama Hazardous Waste Management Act) because dispersants are solid waste under Alabama law.  These arguments are baseless and Alabama's claims should be dismissed.

      1.     <u>Alabama Seeks Civil Penalties Under Its Environmental Statutes Without Specific Statutory Authorization.</u>

A point of clarification is necessary because Alabama elides the important distinction between damages and civil penalties.  (*See* Ala. Opp. at 40 ("Alabama is seeking *damages* for what occurred in our waters, and on our land, and in our air, not just for what happened beyond our borders." (emphasis added)).)  *Compare* Ala. Code § 22-22A-5(18) (describing "civil penalty" authority) *with id.* § 22-22-9(m) (authorizing suit for "damages") *and id.* § 22-22-9(n) (referring to "penalties and remedies provided in subdivision (18) of Section 22-22A-5 and subsection (m) of this section").  Alabama is indeed properly seeking "damages," but through the

OPA process, not through the assertion of its civil penalty authority.[21]   In its assertion of claims under OPA, including the ongoing natural resource damage assessment, Alabama is seeking damages arising out of events that allegedly had ramifications within its borders.  (*See* Ala. Am. Compl. at 47.)  In attempting to apply its civil **penalty** authority to conduct that occurred on the OCS, however, Alabama is also seeking to **penalize** that extraterritorial conduct.  Alabama can seek damages under OPA; it cannot seek penalties for extraterritorial conduct.

Alabama's attempt to apply its civil penalty authority to conduct occurring far outside of state territory, on the OCS, is unprecedented.  Like Louisiana, Alabama reads its environmental statutes with an apparent presumption that civil penalty authority is available for extraterritorial discharges; only under such a reading is it plausible that a failure to specify limitations on the geographical source of the discharge means that the statute applies to conduct on the OCS.  However, it is a hornbook principle that statutes must "explicitly provide" for "extraterritorial effect."  *Ex parte Old Republic Sur. Co.*, 733 So. 2d 881, 884 (Ala. 1999).  For these reasons, the civil penalty claims must be dismissed in their entirety.

### 2.    Alabama Has Failed to State a Claim Under the AWPCA.

For the reasons set forth in Section I, *supra*, federal law preempts state law claims. Independently, Alabama has failed to show that state law permits the particular penalties that it seeks.  Alabama cites *Alabama Department of Environmental Management v. Wright Brothers*, 604 So. 2d 429 (Ala. Civ. App. 1992), for the principle that the civil penalty statute authorizes the imposition of more than one penalty per day.  (*See* Ala. Opp. at 44.)  However, even if *Wright Brothers* is correctly decided, the fact that the State may have the authority under the

---

21   Again, Alabama may not seek damages under state law.  Alabama also may not seek damages under both the AWPCA and state common law, because that would be an impermissible double recovery.  (*See* BP Defs.' Mem. in Supp. of Mot. to Dismiss at 41.)  Alabama has failed to respond to the latter argument.

statute to impose penalties for more than "one violation per day" says absolutely nothing about *what multipliers Alabama can use* to arrive at its multiple-per-day daily penalties.

In this case, for the first time and without citation to any authority in support, Alabama proposes a multiplier that has multiple flaws. *First*, it is anchored in a strained reading of several statutory provisions. *Second*, those readings are combined with a regulatory provision that was developed for different purposes and that is subject to changes at Alabama's own discretion (as the regulations themselves plainly show). In short, *Wright Brothers* says nothing about the validity of such a multiplier, Alabama has not supported its use, and the BP Defendants respectfully ask this Court to reject it.

Alabama claims that as oil migrated into state waters and from one part of the waters of the State to another, it created "new or increased pollution" for purposes of the statutory prohibition on unpermitted discharge. Again, as far as we are aware, Alabama has never used its authority to prohibit discharges without a permit as a means of imposing penalties for migration of a pollutant from one water body to another. Alabama does not point to any examples here. Instead, Alabama draws comfort from the distinctions between the statutory terms contained in CERCLA and in the AWPCA. (*See* Ala. Opp. at 43.) According to Alabama, "addition" and "introduction" encompass passive migration. (*See id.*) This argument fails. Under the doctrine of *noscitur a sociis* as interpreted by Alabama courts, "where general and specific words which are capable of an analogous meaning are associated one with the other, they take color from each other, so that the general words are restricted to a sense analogous to that of the less general." *Ex parte Emerald Mtn. Expressway Bridge, LLC*, 856 So. 2d 834, 842 (Ala. 2003) (quoting *Winner v. Marion County Comm'n*, 415 So. 2d 1061, 1064 (Ala. 1982)). The general terms here— "addition" and "introduction"—"take color" from the more specific terms—"leaking, spilling, or

emitting"—none of which "denotes the gradual spreading of contamination." *United States v. CDMG Realty Co.*, 96 F.3d 706, 714 (3d Cir. 1996).

Alabama is silent with respect to the problems created by the novel employment of its water use classification system.  We are aware of no court decision that upholds Alabama's use of its water classification system to impose civil penalties for separate "discharges" for pollution migrating from one part of the waters of the State to another.  Alabama has provided no such authority, nor does Alabama respond in any way to the clear difficulties, including the absence of fair notice, involved in using determining civil penalties based on an arbitrary, unilateral classification scheme that the State can alter at any time for any reason.  (*See* BP Defs.' Mem. in Supp. of Mot. to Dismiss at 36.)

Finally, Alabama argues that it is "ridiculous" to claim that the BP Defendants' violations, if any, are not ongoing because the well was capped and the discharges from the well stopped, thereby halting any migration of new oil in Alabama waters.  (Ala. Opp. at 45.) According to Alabama, the Legislature could not have intended the State to be left with "no remedy at all" for pollution in such circumstances.  (*Id.*)  This argument confuses the concept of having a remedy with the ability to seek penalties for conduct that is no longer taking place.  To the extent Alabama is continuing to suffer damages from the continued presence of oil from the Macondo well in state waters, it has broad remedies to recover such damages under OPA.  But penalties are intended to penalize conduct, and it is wholly reasonable that the Alabama legislature did not seek to extend penalties to a party whose allegedly unlawful actions have stopped.

For all of the foregoing reasons, Alabama has failed to state a claim under the AWPCA and its claims for civil penalties under the act should be dismissed.

3.     Alabama's "Solid Waste" Claims Should Be Dismissed Because
Dispersants Are Not a Solid Waste.

Alabama asserts again that "oils and dispersants" are "solid waste" under the SWDA.

Instead of providing a legal argument in support of that conclusion, Alabama simply repeats—

but does not interpret—the relevant words of the statute.  Alabama correctly quotes the statute to

the effect that only materials that are "discarded" can be solid wastes, but nowhere does Alabama

grapple with the meaning of the term "discarded," or attempt to distinguish cases interpreting the

term under similar statutes.   Alabama also does not contest that the use of dispersants was

authorized by the proper response authorities.  A substance that was employed for its intended

use is not "discarded" in any ordinary meaning of the term.  *See, e.g.*, *Cordiano v. Metacon Gun*

*Club, Inc.*, 575 F.3d 199, 208 (2d Cir. 2009); *see also* Webster's Third New International

Dictionary (1964) (defining discard as "to drop, dismiss, let go, or get rid of as no longer useful,

valuable, or pleasurable").   Because a substance must be "discarded" to constitute "disposal"

under the statute, Alabama has not shown and cannot show that the application of dispersants

during the response constituted "disposal" of a "solid waste" under the SWDA.   In addition,

because there was no disposal of a "solid waste," Alabama cannot establish a violation of the

HWDA.  Alabama's claims under these statutes should be dismissed.

**D.     Alabama Fails To State Claims for Fraudulent Concealment, Wantonness
and Private Nuisance Under State Law.**

1.     The State Does Not Plead Any Facts That Show Reliance on the Alleged
Fraudulent Concealment.

In its opening brief, BP pointed out that Alabama failed to allege facts that show that it

was induced to rely on the alleged fraudulent concealment.   Here, as Alabama admits,

"plaintiff's reliance" is one of the elements of a fraudulent concealment claim.  (*See* Ala. Opp. at

49.)  *See also, e.g.*, *Exxon Mobil Corp. v. Ala. Dep't Envtl. Mgmt.*, 986 So. 2d 1093, 1116 (Ala.

2007) ("The requirement for action on the part of the plaintiff can be met only if the plaintiff does, or does not do, something that the plaintiff would or would not have done but for the misrepresentation of a material fact.").   In its Amended Complaint and Brief in Opposition, Alabama fails to plead any facts that would support this element.   Instead, Alabama blandly repeats the element of the statute.   (*See* Ala. Opp. at 51 (the alleged concealment "induced the State to act or to refrain from acting to protect its property, the environment, the economy of the State, business, livelihoods, and income.").)   Such repetition is insufficient.   *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."); *Bonvillain v. La. Land & Exploration Co.*, 702 F. Supp. 2d 667, 677-78 (E.D. La. 2010) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").   Alabama does not describe even one action that it took or did not take as a result of the alleged misrepresentations.   Alabama's claim for fraudulent concealment should thus be dismissed.

2.   <u>Alabama Has Still Failed to Plead Facts Sufficient to Show Wantonness.</u>

In Alabama, an allegation of wantonness is different in kind from an allegation of negligence.   *See Tolbert v. Tolbert*, 903 So. 2d 103, 115 (Ala. 2004) ("Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the term 'negligence,' which conveys the idea of inadvertence, as distinguished from premeditation or formed intention.").   In its Brief in Opposition, Alabama still attempts to make out a claim of wantonness as if it were not different in kind from negligence.   But Alabama fails to allege facts that show that BP knew "injury is likely to result."   None of the facts that Alabama collects in its Brief in Opposition are sufficient to show that the BP Defendants acted with the knowledge that injury was likely to result.   (Ala. Opp. at 56-58.)

3.    <u>Alabama May Not Maintain a Suit for Private Nuisance for Alleged Damage to State Property.</u>

Alabama claims that it may sue in the same manner as a private landowner for injury to state property.  However, this argument is at odds with basic principles of nuisance law.  Under Alabama law, "a private nuisance must be limited in its injurious effects to one or a few individuals."  *Benefield v. Int'l Paper Co.*, Civ. A. No. 2:09cv232-WHA, 2009 WL 2601425, at 4 (M.D. Ala. Aug. 21, 2009) (citing Ala. Code § 6-5-121).  Also under Alabama law, however, injury to public property is not a private injury to the State as landowner, but an injury to the public.  *See Russell Corp. v. Sullivan*, 790 So. 2d 940, 952 (Ala. 2001) ("[T]he nuisance, if any, is a public nuisance, because . . . the alleged nuisance is in the water of Lake Martin, a public waterway.").  Alabama attempts to distinguish this case by focusing on the identity of the landowner, but as *Russell Corp.* makes clear, it is the relationship of the public to the injured property that counts, not merely the identity of the plaintiff.  Hence, Alabama's claim that it may sue for a private nuisance under Alabama law for injury to public property must be dismissed.

**CONCLUSION**

For the foregoing reasons and those set forth in BP's Opening Memorandum in Support of its Motion to Dismiss, BP respectfully requests that the First Amended Complaints of the States of Alabama and Louisiana be dismissed in their entirety.

Date:  August 5, 2011                                 Respectfully submitted,


/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Catherine L. Fitzpatrick
Elizabeth A. Larsen
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Robert R. Gasaway
Jeffrey B. Clark
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Joel M. Gross
Allison B. Rumsey
Kerri L. Stelcen
Brett Marston
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

41

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of August, 2011.


/s/ Don K. Haycraft_____
Don K. Haycraft