# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 |
| | * | SECTION J |
| | * | |
| This document relates to: | * | Honorable CARL J. BARBIER |
| 2:10-CV-04182 | * | |
| 2:10-CV-04183 | * | Magistrate Judge SHUSHAN |
| 11-CV-0516 | | |
| 10-CV-03059 | | |

## DECLARATION OF ANDREW B. BLOOMER

I, Andrew B. Bloomer, declare as follows:

1.      I am over twenty-one years of age and make this Declaration based on my own personal knowledge.

2.      I am a partner of the law firm of Kirkland & Ellis LLP, and one of the counsel for BP in these proceedings.

3.      I am submitting this Declaration in support of BP's Reply in Support of its Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) the First Amended Complaints of the States of Alabama and Louisiana.

4.      Attached hereto as Exhibit A is a true and correct copy of the Louisiana Department of Environmental Quality's April 11, 2011 Post-Trial Memorandum (Doc. No. 221) filed in *United States v. CITGO Petroleum*, No. 2:08-cv-893 (W.D. La.).

5.      Attached hereto as Exhibit B is a true and correct copy of an excerpt from the April 20, 1999 Louisiana Register containing 25 La. Reg. 657.

6.      Attached hereto as Exhibit C is a true and correct copy of an excerpt from the October 20, 1998 Louisiana Register containing 24 La. Reg. 1984.

7.      Attached hereto as Exhibit D is a true and correct copy of the December 7, 1998 Letter from EPA Region 6 to the Louisiana Department of Environmental Quality.

8.      Attached hereto as Exhibit E is a true and correct copy of the February 10, 1999 Summary Report for Proposed Rule – (Log #OS026) – Civil Penalty Assessment.

9.      Attached hereto as Exhibit F is a true and correct copy of the September 18, 1998 Certification of Proposed Rule OS026.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true.

_Andrew B. Bloomer_
Andrew B. Bloomer

Dated:  August 4, 2011

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE-OPELOUSAS DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and STATE OF LOUISIANA, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| CITGO PETROLEUM CORPORATION, | ) |
| Defendant. | ) |

Civil Action No. 2:08-cv-893

Judge Richard T. Haik, Sr.

Mag. Judge Patrick J. Hanna

## LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY'S
## POST-TRIAL MEMORANDUM

The Louisiana Department of Environmental Quality (the "State") is a co-plaintiff in this case with the United States of America and seeks penalties associated with the unauthorized discharge of oil and wastewater based on provisions of state law. The State's penalty factors are similar to the United States' penalty factors and are; a.) "the history of previous violations or repeated noncompliance"; b.) "the nature and gravity of the violation"; c.) "the gross revenues generated by the respondent"; d.) "the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders"; e.) "the monetary benefits realized through noncompliance"; f.) "the degree of risk to human health or property caused by the violation"; g.) "whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged"; h.) "whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance

1

or violation"; and  i.) "the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance".  See La. R.S. 30:2025(E) and LAC 33: I.703.  CITGO paid the State's response costs prior to trial.

La. R.S. 30:2025(E) provides for a per day penalty of up to $32,500.  La. R.S. 30:2025(E) and LAC 33:I.703 also provides, "…when any such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an additional penalty of not more than one million dollars per penalty event."  CITGO's willful misconduct and gross negligence as shown at trial warrants the additional penalty of one million dollars per penalty event.  Additionally, the substance discharged, in this case slop oil, is one which endangers human life or health because it is a hazardous substance containing benzene.  The court knows from the testimony of William Perry and Lyle Chinkin that workers were exposed to benzene.  This adds further support for the inclusion of the additional penalty of one million dollars per penalty event.

LDEQ's penalty regulations, LAC 33.I.701 *et seq*, lays out how penalties  are determined and section 705 lays out the parameters of the daily penalty and plots them in a matrix based on the 2 violation specific factors, the nature and gravity of the violation and the degree of risk to human health or property caused by the violation.  These 2 violation specific factors are weighted as major, moderate and minor and plotted on the penalty matrix.  In a serious event such as this, and CITGO has admitted throughout this trial that this was a serious event, the penalty would fall under a major/major event with an upper limit of $32,500 per day and a lower limit of $20,000 per day.  LDEQ believes the gravity or seriousness of the spill warrants the highest daily penalty of $32,500.

CITGO violated state law by its *unauthorized discharge of oil and wastewater into waters of the State.* State law provides:

- La. R.S. 30: 2076(A)(1) prohibits the discharge into any waters of the State, any waste or substance that would cause water pollution or any discharge which violates any term, condition or limit imposed by a permit. La. R.S. 30:2076(A)(3) also prohibits any person from violating any rule or regulation or the terms of any permit issued under this chapter.

- The state permit specially has a duty to comply provision and any permit noncompliance constitutes a violation of the Clean Water Act ("CWA") and the Louisiana Environmental Quality Act (LEQA).

- LAC 33: IX.501.A provides that failure to comply with any of the provisions of these regulations or the terms or conditions of any permit constitutes a violation of the LEQA.

- LAC 33: IX.2701.A mirrors the permit and mandates a duty to comply stating that the permittee must comply with all conditions of the permit. Any noncompliance constitutes a violation of the CWA and the LEQA.

In this case, there were 2 days of undisputed discharge. For the purposes of penalty, those 2 days should be multiplied by a low of $20,000 or a high of $32,500. In addition, the violation warrants the one million dollar penalty event add-on.

CITGO further violated state law by *interfering with a designated use of a water body*. In addition to La. R.S. 30:2076(A)(1) and (A)(3), and LAC 33:IX.501.A, state law also provides:

- LAC 33:IX.1111 provides that "secondary contact recreation" is a designated water use for surface water in Louisiana. This type of use includes fishing, wading, and boating.

- LAC 33:IX.1113.B.6 states: "Free or floating oil … shall not be present in quantities large enough to interfere with the designated water uses, nor shall emulsified oils be present in quantities large enough to interfere with the designates uses."

Jacqueline Michel testified on direct examination that there were closures and restrictions on the water body for a total of 24 days.  See Plaintiffs exhibits P-1050-13 and P-1050-08. Twenty-four (24) days times a low of $20,000 or a high of $32,500.  Additionally, the one million dollar penalty event add on is warranted.

CITGO violated state law by *failing to properly operate and maintain its wastewater treatment and control facilities, including its oil skimming system.*    In addition to the state permit, La. R.S. 30:2076(A)(1) and (A)(3), LAC 33:IX.501.A, and LAC 33:IX.2701.A ,state law also provides:

- LAC 33:IX.2701.E mandates that an LPDEQ "permittee shall at all time properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of [the] permit."

Gary Amendola testified on direct examination that CITGO had a skimming system on the roof of the tanks that had not operated for years prior to the spill.   Amendola also testified that the skimmers on tanks 320 and 330 did not work at least back to January of 2000 when Curtis Miller started working at the wastewater treatment plant.   See Curtis Miller deposition, Exhibit V of Plaintiffs' deposition binder, pages 46-47.  Amendola went on to testify that an email from Richard Doss, CITGO's Chief Wastewater Engineer, indicates the skimmers had not worked since their installation back in 1994. See Exhibit P-515.  Finally, Amendola testified that under CITGO's LPDES permit, the permittee is required at all time to properly operate and

4

maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of the permit. See Exhibit P-426, page 3611.

Dr. Lial Tischler, expert witness for CITGO, tried to testify on direct exam that the oil skimmers were not installed for the purpose of complying with the state permit and that the oil skimmers are not needed to achieve permit compliance. However, on cross examination, Dr. Tischler conceded that CITGO employees Renee Atkins, Unit Supervisor of Wastewater Operations, and William Hatch, Vice President of Refineries, considered the oil skimmers as pieces of critical equipment. In fact, CITGO's heavy rain procedure (see Exhibit P-234) states that, "In anticipation of a heavy rain event, every effort should be made to ensure that *all critical equipment* is in good operating condition …." Further, Dr. Tischler conceded that not using nozzles and having the skimmers broken caused oil to accumulate in the tanks. CITGO's failure to use the oil skimmers or any other method of oil removal from the tanks led to a violation of the state permit. This Court knows from cross examination of CITGO Civil Engineer Jerry Dunn, that *no oil was removed from the tanks after the year 2000*. In short, these facilities were not properly operated and maintained.

LDEQ did not become aware that the wastewater facilities and systems of treatment and control, including the oil skimmers, were not being properly operated and maintained until after the spill. Therefore, under La. R.S. 30:2025 (H), no prescriptive period began to run until *after* the spill. However, to avoid objection, if we calculate penalty going back at least 5 years from the date of the spill, the calculation would be 5 years, 365 days a year times $20,000 or times $32,500. If you look at the total picture, you are already in a ballpark of a low of over 37 million and a high of over 58 million dollars in penalty. Also, with regard to the gross revenues penalty

factor, CITGO has averaged over tens of millions of dollars in annual profits in the recent past.

**LDEQ believes that the evidence, state law, and LDEQ regulations fully support a penalty of at least 11 million dollars.**

Lastly, the State would like to address the permitting process. As Mr. Gary Amendola said in reply to the Courts' questions regarding this process, the State has oversight of what the discharge limits are. The discharger is responsible to ensure it has the facilities to meet the required limits. Throughout the trial, witnesses spoke of "outfalls". LDEQ, with EPA's oversight, sets limits and regulates what is discharged or what comes out of the outfall; the end-of-pipe limits. LDEQ and EPA do not regulate or permit engineering designs. LDEQ and EPA do not tell any company how to meet permit limits set by LDEQ and EPA; that is left up to each individual company. The Clean Water Act includes two basic approaches for protecting and restoring the nation's waters. One is a technology-based, end-of-pipe approach in which effluent guidelines are used in the development of water discharge permits. The other approach is water-quality based and is designed to achieve the desired uses of a water body. The LPDES program requires permits for end-of-pipe discharges of pollutants from any point source into waters of the state. See LAC 33:IX.2311 *et seq.*

In Conclusion, CITGO violated state law and is liable for civil penalties under state law. Based on the foregoing, the Louisiana Department of Environmental Quality requests that the Court order a penalty in the amount of at least 11 million dollars.

Respectfully submitted,


FOR THE LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY:

HERMAN ROBINSON (LA #2077)
Executive Counsel
Louisiana Department of Environmental Quality


s/ Dwana C. King
DWANA C. KING, Trial Attorney (LA #20590)
TED R. BROYLES, II (LA #20456)
ANN HILL (LA #29905)
Louisiana Department of Environmental Quality
P. O. Box 4302
Baton Rouge, Louisiana 70821-4302
Telephone:  (225) 219-3985
Facsimile:   (225) 219-4068
E-mail:  DWANA.KING@LA.GOV


## CERTIFICATE OF SERVICE

I herby certify that on April 11, 2011, a copy of the LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY'S POST-TRIAL MEMORANDUM was filed and served via
the Court's ECF system.


s/Dwana C. King
Dwana C. King

# Exhibit B



# Louisiana Register

VOLUME 25 NUMBER 4 APRIL 20, 1999

M.J. "MIKE" FOSTER, JR.
GOVERNOR

MARK C. DRENNEN
COMMISSIONER
OF ADMINISTRATION

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2054.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of Air Quality and Nuclear Energy, Air Quality Division, LR 13:741 (December 1987), amended by the Office of Air Quality and Radiation Protection, Air Quality Division, LR 25:656 (April 1999).

Gus Von Bodungen, P.E.
Assistant Secretary

9904#046

# RULE

## Department of Environmental Quality
## Office of Air Quality and Radiation Protection
## Air Quality Division

### Storage of Volatile Organic Compounds
### (LAC 33:III.2103)(AQ185)

Under the authority of the Environmental Quality Act, R.S. 30:2001 et seq., and in accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., the secretary has amended the Air Quality Division regulations, LAC 33:III.2103 (Log Number AQ185).

Additional methods will be allowed for the measurement of Reid vapor pressure. The allowed methods are ASTM D323, ASTM D4953, ASTM D5190, and ASTM D5191. The use of these methods was requested by a facility subject to the rule. The basis and rationale for this rule are to allow alternate test methods that are technically sound and that are allowed by other states.

This rule meets the exceptions listed in R.S. 30:2019(D)(3) and R.S.49:953(G)(3); therefore, no report regarding environmental/health benefits and social/economic costs is required.

### Title 33
### ENVIRONMENTAL QUALITY
### Part III. Air

Chapter 21.   Control of Emission of Organic Compounds
Subchapter A.   General
§2103.   Storage of Volatile Organic Compounds
* * *
[See Prior Text in A-H.3.a]
   b.   by ASTM Test Methods D323, D4953, or D5190 for the measurement of Reid vapor pressure, and adjusted for actual storage temperature using the nomographs contained in API Bulletin 2517;
* * *
[See Prior Text in H.3.c]
   d.   determined by ASTM Test Method D2879 or D5191; or
* * *
[See Prior Text in H.3.e-1.6]
AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2054.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of Air Quality and Nuclear Energy, Air Quality Division, LR 13:741 (December 1987), amended LR

16:27 (December 1989), amended by the Office of Air Quality and Radiation Protection, Air Quality Division, LR 16:27 (January 1990), LR 17:360 (April 1991), LR 18:1121 (October 1992), LR 20:1376 (December 1994), LR 21:1223 (November 1995), repromulgated LR 21:1333 (December 1995), amended LR 22:453 (June 1996), LR 22:1212 (December 1996), LR 24:20 (January 1998), LR 24:2242 (December 1998), LR 25:657 (April 1999).

Gus Von Bodungen, P.E.
Assistant Secretary

9904#038

# RULE

## Department of Environmental Quality
## Office of the Secretary

### Civil Penalty Assessment
### (LAC 33:I.Chapter 7)(OS026)

Under the authority of the Environmental Quality Act, R.S. 30:2001 et seq., and in accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., the secretary has amended the Office of the Secretary regulations, LAC 33:I.Chapter 7(OS026).

This rule will establish a consistent department-wide approach for the assessment of civil penalties. Included in this assessment is the consideration of multiple violations, gravity of any violation committed, and that economic incentives for noncompliance are eliminated. This regulation is designed to promote the goals of deterrence, as well as, to provide fair and equitable treatment of the regulated community. The Louisiana Environmental Quality Act, R.S. 30:2050.3, requires the secretary to establish criteria for the assessment of consistent department-wide penalties based upon the nine factors found in R.S. 30:2025(E). The basis and rationale for this rule are to comply with R.S. 30:2050.3.

This rule meets the exceptions listed in R.S. 30:2019(D)(3) and R.S. 49:953(G)(3); therefore, no report regarding environmental/health benefits and social/economic costs is required.

### Title 33
### ENVIRONMENTAL QUALITY
### Part 1. Office of the Secretary
### Subpart 1. Departmental Administrative Procedures
Chapter 7. Penalties
§701. Scope
   A.   The intent of this Chapter is to assure that, after the department has determined a penalty is to be assessed for one or more violations, each penalty is assessed in a consistent, fair, and equitable manner; that penalties are appropriate for the gravity of the violation committed; that economic incentives for noncompliance are eliminated; that penalties are sufficient to deter persons from committing future violations; and that compliance is expeditiously achieved and maintained.

   B.   After considering the nine factors in R.S. 30:2025(E)(3)(a), the department realizes there may be circumstances where violations have occurred that do not warrant a penalty action.

C.  This Chapter is to be utilized by the department only after it has determined that a penalty is to be assessed for a specific violation unless otherwise specified by rule or regulation. Nothing in this Chapter applies to the determination of whether to assess a penalty, or to the compromise or settlement of a penalty.

AUTHORITY NOTE:  Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE:  Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:657 (April 1999).

§703.  Definitions

For purposes of this Chapter, the terms defined in this Chapter shall have the following meanings, unless the context of use clearly indicates otherwise:

*Nine Factors*—the factors listed in R.S. 30:2025(E)(3)(a) and considered by the department in determining whether or not a civil penalty is to be assessed and in determining the amount agreed upon in compromise. The nine factors are as follows:

a.  the history of previous violations or repeated noncompliance;

b.  the nature and gravity of the violation;

c.  the gross revenues generated by the respondent;

d.  the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

e.  the monetary benefits realized through noncompliance.

f.  the degree of risk to human health or property caused by the violation;

g.  whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged;

h.  whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance or violation; and

i.  the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance.

*Penalty Event*—any violation [as defined in R.S. 30:2004(21)] for which the administrative authority, after consideration of the factors listed in R.S. 30:2025(E)(3)(a), determines a penalty is warranted. For violations lasting more than one 24-hour day, each such day of violation may be treated as a separate penalty event.

*Response Costs*—the costs to the state of any response action made necessary by a penalty event that are not voluntarily paid by the violator. These costs shall include, but are not limited to, the costs of surveillance staff activities including cleanup costs and the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance.

*Violation Specific Factor*—the two of the nine factors considered when plotting a violation on the penalty matrix. Each factor is weighed consistently without regard to the violator, and no special circumstances or violator-specific factors are considered when plotting the violation on the penalty matrix. These factors include:

a.  the nature and gravity of the violation; and

b.  the degree of risk to human health or property caused by the violation.

*Violator-Specific Factor*—the five of the nine factors considered when adjusting the difference between the minimum and maximum penalty range within a particular cell on the penalty matrix. The degree of adjustment in a particular penalty range on the penalty matrix will vary depending upon the specific and unique circumstances of these five factors. These factors include:

a.  the history of previous violations or repeated noncompliance;

b.  the gross revenues generated by the respondent;

c.  the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

d.  whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance or violation; and

e.  whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.

AUTHORITY NOTE:  Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE:  Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:658 (April 1999).

§705.  Penalty Determination Methodology

A.  A penalty range for each penalty event is calculated based on the two violation-specific factors. The two violation-specific factors are plotted on the penalty matrix to determine a penalty range for a particular penalty event (see Table 1). The various penalty ranges for a penalty event are found inside each cell of the penalty matrix.

| Table 1.  Penalty Matrix | | | | |
|---|---|---|---|---|
| | | Nature and Gravity of the Violation | | |
| | | Major | Moderate | Minor |
| Degree of Risk/Impact to Human Health or Property | Major | $25,000 to $20,000 | $20,000 to $15,000 | $15,000 to $11,000 |
| | Moderate | $11,000 to $8,000 | $8,000 to $5,000 | $5,000 to $3,000 |
| | Minor | $3,000 to $1,500 | $1,500 to $500 | $500 to $100 |

1.  Penalty Matrix—Degree of Risk to Human Health or Property. The first stage of the penalty calculation involves the categorization of each penalty event as major, moderate, or minor with regard to its degree of risk to human health or property. The following criteria are used to categorize each penalty event with regard to its degree of risk to human health or property:

a.  Major. Refers to a violation in which actual measurable harm or substantial risk of harm to the environment or public health occurs. The noncompliance

results in, or would reasonably be expected to result in, the temporary or permanent loss of a use of the environmental resource. A violation of major impact and hazard may be one characterized by high volume and/or frequent occurrence and/or high pollutant concentration. Such violations may have a detrimental impact on sensitive environments or include the discharge of toxic pollutants;

b. Moderate. Refers to a violation that has the potential for measurable detrimental impact on the environment or public health. A violation of moderate impact and hazard may be one characterized by occasional occurrence and/or pollutant concentration that may be expected to have a detrimental effect under certain conditions; and

c. Minor. Refers to a violation that does not directly present actual harm or substantial risk of harm to the environment or public health. Violations that are isolated single incidences and that cause no measurable detrimental effect to the environment or public health may be considered minor. Violations that are administrative in nature may be, but are not necessarily, considered minor.

2. Penalty Matrix—Nature and Gravity of the Violation. The second stage of the penalty calculation involves the categorization of each penalty event as major, moderate, or minor with regard to its nature and gravity. The following criteria are used to categorize each penalty event with regard to its nature and gravity:

a. Major. Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in negating the intent of the requirement. The respondent deviates significantly from the requirements of the statutes, regulations, or permit to such an extent that little or no implementation of requirements occurs;

b. Moderate. Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in substantially negating the intent of the requirement. The respondent deviates from the requirements of the statutes, regulations, or permit, but some implementation of the requirements occurred; and

c. Minor. Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in some deviation from the intent of the requirement. The respondent deviates somewhat from the requirements of the statutes, regulations, or permit; however, substantial implementation of the requirements occurred.

B. Once a penalty event has been categorized as major, moderate, or minor for both its degree of risk to human health or property and its nature and gravity, a penalty range is obtained by plotting these two categorizations with the corresponding cell of the penalty matrix.

C. Violator-Specific Factors (Adjustment Factors) Per Event. The next stage of the penalty calculation involves the adjustment of the penalty using the following violator-specific factors:

1. the history of previous violations or repeated noncompliance;

2. the gross revenues generated by the respondent;

3. the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

4. whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by the noncompliance or violation; and

3. whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.

D. The five violator-specific factors are used to adjust the penalty amount for each penalty event. Each violator-specific factor is assigned a percentage adjustment on a case by case basis. The upward or downward percentage adjustment for each violator-specific factor shall be no more than 100 percent of the difference between the minimum and maximum penalty amount for the chosen matrix cell. The five percentages are added together to calculate a total percentage adjustment for the penalty range for the penalty event. The total upward or downward percentage adjustment is also limited to 100 percent. The total percentage adjustment is multiplied by the difference between the minimum and maximum penalty amount for the chosen matrix cell. The product is then added to, or subtracted from, the minimum penalty amount in the chosen matrix cell.

E. The information obtained from the violation-specific and violator-specific factors can be entered into one of the following formula(s) to obtain a penalty amount ($P_n$) for each penalty event:

$$P_n = A_n + (B_n \times [C_n - A_n])$$
$$P_n = 2(A_n + [B_n \times (C_n - A_n)]) *$$

where:

$P_n$ = penalty amount for a given penalty event.

$A_n$ = the minimum value of the penalty range for the cell located on the penalty matrix for a given penalty event.

$B_n$ = the sum of percentage adjustments calculated for a given penalty event, where 100 percent ≥ B ≥ -100 percent.

$C_n$ = the maximum value of the penalty range for the cell located on the penalty matrix for a given penalty event.

* Note: The statutory maximum is double in circumstances where the penalty event constitutes a violation of a previous enforcement action as stated in R.S. 30:2025 (E)(2).

F. The values for each penalty amount ($P_n$) are added to determine a penalty subtotal ($P_s$):

$$P_s = P_1 + P_2 + P_3 ...$$

G. The department shall consider the monetary benefits realized through noncompliance. Any monetary benefits calculated may be added to the penalty subtotal. However, the amount calculated may not cause the penalty subtotal to exceed the maximum penalty amount allowed by law.

H. Response costs ($R_c$) are then added to the penalty subtotal ($P_s$) to determine the total penalty amount ($P_t$):

$$P_t = P_s + R_c$$

I. In accordance with R.S. 30:2025 (E)(1)(a), the department reserves the right to assess an additional penalty of not more than $1,000,000 for any penalty event that is done intentionally, willfully, or knowingly, or results in a discharge or disposal that causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health.

J. In circumstances where the respondent has provided, or has agreed to provide, a grant, donation, or other form of assistance with respect to a designated pollution source, as provided in R.S. 30:2031, the penalty amount may be reduced

by the monetary value of such grant, donation, or other form of assistance.

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:658 (April 1999).

Dale Givens
Secretary

9904#036

## RULE

### Department of Environmental Quality
### Office of the Secretary

Permit Qualifications and Requirements
(LAC 33:I.1701; III.501, 517, 5111; V.515; VII. 517, 520; IX.2331, 2387, 2407, 2765, 2769)(OS029)

Under the authority of the Environmental Quality Act, R.S. 30:2001 et seq., and in accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., the secretary has amended the Environmental Quality regulations, LAC 33:I.1701; III.501, 517, and 5111; V.515; VII.517 and 520; IX.2331, 2387, 2407, 2765, and 2769 (Log # OS029).

The rule requires that applicants for an environmental permit, or for transfer of ownership of a permit, meet certain requirements and also requires that an applicant provide the department with a list of states(s) where the applicant has similar or identical federal or state environmental permits. This rule is required by the Louisiana Environmental Quality Act, R.S. 30:2014.2. The basis and rationale for the rule are to comply with R.S. 30:2014.2.

This rule meets the exceptions listed in R.S. 30:2019(D)(3) and R.S.49:953(G)(3); therefore, no report regarding environmental/health benefits and social/economic costs are required.

### Title 33
### ENVIRONMENTAL QUALITY
### Part I. Office of the Secretary
#### Subpart 1.  Departmental Administrative Procedures
#### Chapter 17.   Permit Qualifications and Requirements
#### §1701.   Requirements for Obtaining a Permit

A.  In addition to meeting the requirements for permits outlined in the applicable sections of the Environmental Quality Regulations, an applicant shall:

1.  have no history of environmental violation(s) that demonstrates to the department an unwillingness or inability to achieve and maintain compliance with the permit for which the application is being made, unless the department determines that the applicant's history of environmental violation(s) can be adequately addressed by permit conditions;

2.  if required, register with the Secretary of State;

3.  owe no outstanding fees or final penalties to the department; and

4.  if under a compliance schedule, be making satisfactory progress in meeting the conditions of the compliance schedule.

B.  Before issuing any permit or transfer of ownership of a permit, the administrative authority may conduct an evaluation of the applicant related to the management of any facilities or activities subject to regulation under any applicable air, water, solid waste, hazardous waste, radiation control, or other environmental programs administered by the various states of the United States or by the federal government. If, pursuant to this evaluation, the administrative authority determines that the applicant has demonstrated an unwillingness or inability to achieve and maintain compliance with the permit for which application is being made, the administrative authority may:

1.  include such conditions in the permit as reasonably deemed necessary for the protection of human health and the environment; or

2.  deny any application for the issuance or transfer of the permit.

C.  The applicant shall provide to the department a list of the state(s) where he or she has federal or state environmental permits identical to, or of a similar nature to, the permit for which application is being made. This information shall be provided for all individuals, partnerships, corporations, or other entities who own a controlling interest (50 percent or more) in the company or who participate in the environmental management of the facility for an entity applying for a permit or an ownership interest.

D.  In addition to providing the information required in Subsection C of this Section, the applicant shall submit a written statement, as part of the permit application, to certify that:

1.  if required, the applicant has registered with the Secretary of State; and

2.  no outstanding fees or final penalties are owed to the department.

E.  The administrative authority may require the submission of additional information if the administrative authority deems such information necessary in order to make a determination under this Chapter.

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2014.2 et seq.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:660 (April 1999).

### Part III. Air Quality
#### Chapter 5.  Permit Procedures
#### §501. Scope and Applicability
* * *
[See Prior Text in A-C.9]

10.  Before issuing any permit for a new or existing source or transfer of ownership of a permit, the administrative authority may conduct an evaluation of the applicant and may include such conditions in the permit as reasonably deemed necessary for the protection of human health and the environment or may deny any application for the issuance, renewal, or transfer of the permit. Requirements of LAC 33:I.1701 are not applicable to permit modifications, unless such modifications include or are limited to a change of ownership.

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2011 and 2054.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of Air Quality and Nuclear Energy,

# Exhibit C

# Exhibit C



# Louisiana Register

VOLUME 24         NUMBER 10         OCTOBER 20, 1998

M.J. "MIKE" FOSTER, JR.
GOVERNOR

MARK C. DRENNEN
COMMISSIONER
OF ADMINISTRATION

A public hearing will be held on November 24, 1998, at 1:30 p.m. in the Maynard Ketcham Building, Room 326, 7290 Bluebonnet Boulevard, Baton Rouge, LA 70810. Interested persons are invited to attend and submit oral comments on the proposed amendments. Should individuals with a disability need an accommodation in order to participate, contact Patsy Deaville at the address given below or at (225) 765-0399.

All interested persons are invited to submit written comments on the proposed regulations. Commentors should reference this proposed regulation by AQ182. Such comments must be received no later than December 1, 1998, at 4:30 p.m., and should be sent to Patsy Deaville, Investigations and Regulation Development Division, Box 82282, Baton Rouge, LA 70884 or to FAX (225) 765-0486.

This proposed regulation is available for inspection at the following DEQ office locations from 8 a.m. until 4:30 p.m.:7290 Bluebonnet Boulevard, Fourth Floor, Baton Rouge, LA 70810; 804 Thirty-first Street, Monroe, LA 71203; State Office Building, 1525 Fairfield Avenue, Shreveport, LA 71101; 3519 Patrick Street, Lake Charles, LA 70605; 3501 Chateau Boulevard, West Wing, Kenner, LA 70065; 100 Asma Boulevard, Suite 151, Lafayette, LA 70508; 104 Lococo Drive, Raceland, LA 70394 or on the Internet at http://www.deq.state.la.us/ olae/irdd/olaeregs.htm.

Gus Von Bodungen
Assistant Secretary

FISCAL AND ECONOMIC IMPACT STATEMENT
FOR ADMINISTRATIVE RULES
RULE TITLE: Exemption of Methyl Acetate as a VOC

I.  ESTIMATED IMPLEMENTATION COSTS (SAVINGS) TO STATE OR LOCAL GOVERNMENTAL UNITS (Summary)
There will be no costs or savings to state or local governmental units from this proposal.

II.  ESTIMATED EFFECT ON REVENUE COLLECTIONS OF STATE OR LOCAL GOVERNMENTAL UNITS (Summary)
There will be no effect on revenue collections of state or local governmental units as a result of this rule.

III.  ESTIMATED COSTS AND/OR ECONOMIC BENEFITS TO DIRECTLY AFFECTED PERSONS OR NONGOVERNMENTAL GROUPS (Summary)
There will be no significant economic impact on directly affected persons or nongovernmental groups.

IV.  ESTIMATED EFFECT ON COMPETITION AND EMPLOYMENT (Summary)
This proposal will not have any known effect on competition or employment.

Hale Bohlinger                   H. Gordon Monk
Deputy Secretary                 Staff Director
9810#049                         Legislative Fiscal Office

## NOTICE OF INTENT

### Department of Environmental Quality
### Office of the Secretary

Civil Penalty Assessment
(LAC 33:I.Chapter 7)(OS026)

Under the authority of the Environmental Quality Act, R.S. 30:2001 et seq., and in accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., the secretary gives notice that rulemaking procedures have been initiated to amend the Office of the Secretary regulations, LAC 33:I.Chapter 7(OS026).

This proposed rule will establish a consistent department-wide approach for the assessment of civil penalties. Included in this assessment is the consideration of multiple violations, gravity of any violation committed, and that economic incentives for noncompliance are eliminated. This regulation is designed to promote the goals of deterrence, as well as, to provide fair and equitable treatment of the regulated community. The Louisiana Environmental Quality Act, R.S. 30:2050.3, requires the secretary to establish criteria for the assessment of consistent department-wide penalties based upon the nine factors found in R.S. 30:2025(E). The basis and rationale for this rule are to comply with R.S. 30:2050.3.

This proposed rule meets the exceptions listed in R.S. 30:2019(D)(3) and R.S. 49:953(G)(3); therefore, no report regarding environmental/health benefits and social/economic costs is required.

### Title 33
### ENVIRONMENTAL QUALITY
### Part 1. Office of the Secretary
#### Subpart 1.  Departmental Administrative Procedures
#### Chapter 7.  Penalties
#### §701. Scope

A.  The intent of this Chapter is to assure that, after the department has determined a penalty is to be assessed for one or more violations, each penalty is assessed in a fair and equitable manner; that penalties are appropriate for the gravity of the violation committed; that economic incentives for noncompliance are eliminated; that penalties are sufficient to deter persons from committing future violations; and that compliance is expeditiously achieved and maintained.

B.  After considering the nine factors in R.S. 30:2025(E)(3)(a), the department realizes there may be numerous circumstances where violations have occurred that are not significant enough to warrant a penalty action.

C.  This Chapter is to be utilized by the department only after it has determined that a penalty is to be assessed for a specific violation unless otherwise specified by rule or regulation. Nothing in this Chapter applies to the determination of whether to assess a penalty, or to the compromise or settlement of a penalty.

AUTHORITY NOTE:  Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE:  Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 24:
#### §703. Definitions

For purposes of this Chapter, the terms defined in this Chapter shall have the following meanings, unless the context of use clearly indicates otherwise:

*Nine Factors*—the factors listed in R.S. 30:2025(E)(3)(a) and considered by the department in determining whether or not a civil penalty is to be assessed and in determining the amount agreed upon in compromise.

*Penalty Event*—any violation [as defined in R.S. 30:2004(21)] for which the administrative authority, after consideration of the factors listed in R.S. 30:2025(E)(3)(a), determines a penalty is warranted.

*Violation Specific Factor*— the two of the nine factors considered when plotting a violation on the penalty matrix. Each factor is weighed consistently without regard to the violator, and no special circumstances or violator-specific factors are considered when plotting the violation on the penalty matrix. These factors include:

    a.  the nature and gravity of the violation; and

    b.  the degree of risk to human health or property caused by the violation.

*Violator-Specific Factor*—the five of the nine factors considered when adjusting the difference between the minimum and maximum penalty range within a particular cell on the penalty matrix. The degree of adjustment in a particular penalty range on the penalty matrix will vary depending upon the specific and unique circumstances of these five factors. These factors include:

    a.  the history of previous violations or repeated noncompliance;

    b.  the gross revenues generated by the respondent;

    c.  the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

    d.  whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance or violation; and

    e.  whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.

*Response Costs*—the costs to the state of any response action made necessary by a penalty event that are not voluntarily paid by the violator. These costs shall include, but are not limited to, the costs of surveillance staff activities and the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance.

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 24:

## §705. Penalty Determination Methodology

A.  A penalty range for each penalty event is calculated based on the two violation-specific factors. The two violation-specific factors are plotted on the penalty matrix to determine a penalty range for a particular penalty event (see Table 1). The various penalty ranges for a penalty event are found inside each cell of the penalty matrix.

| Table 1. Penalty Matrix | | | | |
|---|---|---|---|---|
| | | **Nature and Gravity of the Violation** | | |
| | | **Major** | **Moderate** | **Minor** |
| **Degree of Risk/Impact to Human Health or Property** | **Major** | $25,000 to $20,000 | $20,000 to $15,000 | $15,000 to $11,000 |
| | **Moderate** | $11,000 to $8,000 | $8,000 to $5,000 | $5,000 to $3,000 |
| | **Minor** | $3,000 to $1,500 | $1,500 to $500 | $500 to $100 |

1.  Penalty Matrix—Degree of Risk to Human Health or Property. The first stage of the penalty calculation involves the categorization of each penalty event as major, moderate, or minor with regard to its degree of risk to human health or property. The following criteria are used to categorize each penalty event with regard to its degree of risk to human health or property:

    a.  Major. Refers to a violation in which actual harm or substantial risk of harm to the environment or public health occurs. The noncompliance results in, or may result in, the temporary or permanent loss of a use of the environmental resource. A violation of major impact and hazard may be one characterized by high volume and/or frequent occurrence and/or high pollutant concentration. Such violations may have a detrimental impact on sensitive environments or include the discharge of toxic pollutants;

    b.  Moderate. Refers to a violation that has the potential for measurable detrimental impact on the environment or public health. A violation of moderate impact and hazard may be one characterized by occasional occurrence and/or pollutant concentration that may be expected to have a detrimental effect under certain conditions; and

    c.  Minor. Refers to a violation that does not directly present actual harm or substantial risk of harm to the environment or public health. Violations that are isolated single incidences and that cause no measurable detrimental effect to the environment or public health may be considered minor. Violations that are administrative in nature may also be considered minor.

2.  Penalty Matrix—Nature and Gravity of the Violation. The second stage of the penalty calculation involves the categorization of each penalty event as major, moderate, or minor with regard to its nature and gravity. The following criteria are used to categorize each penalty event with regard to its nature and gravity:

    a.  Major. Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in negating the intent of the requirement. The respondent deviates significantly from the requirements of the statutes, regulations, or permit to such an extent that little or no implementation of requirements occurs;

    b.  Moderate. Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in substantially negating the intent of the requirement. The respondent deviates from the requirements of the statutes, regulations, or permit, but some implementation of the requirements occurred; and

    c.  Minor. Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in some deviation from the intent of the requirement. The respondent deviates somewhat from the requirements of the statutes, regulations, or permit; however, substantial implementation of the requirements occurred.

B.  Once a penalty event has been categorized as major, moderate, or minor for both its degree of risk to human health or property and its nature and gravity, a penalty range is obtained by plotting these two categorizations with the corresponding cell of the penalty matrix.

C.  Violator-Specific Factors (Adjustment Factors) Per Event. The next stage of the penalty calculation involves the adjustment of the penalty using the following violator-specific factors:

1.  the history of previous violations or repeated noncompliance;

2.  the gross revenues generated by the respondent;

3.  the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

4.  whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by the noncompliance or violation; and

5.  whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.

D.  The five violator-specific factors are used to adjust the penalty amount for each penalty event. Each violator-specific factor is assigned a percentage adjustment on a case by case basis. The upward or downward percentage adjustment for each violator-specific factor shall be no more than 100 percent of the difference between the minimum and maximum penalty amount for the chosen matrix cell. The five percentages are added together to calculate a total percentage adjustment for the penalty range for the penalty event. The total upward or downward percentage adjustment is also limited to 100 percent. The total percentage adjustment is multiplied by the difference between the minimum and maximum penalty amount for the chosen matrix cell. The product is then added to, or subtracted from, the minimum penalty amount in the chosen matrix cell.

E.  The information obtained from the violation-specific and violator-specific factors can be entered into one of the following formula(s) to obtain a penalty amount ($P_n$) for each penalty event:

$$P_n = A_n + (B_n \times [C_n - A_n])$$
$$P_n = 2(A_n + [B_n \times (C_n - A_n)]) *$$

where:

$P_n$  = penalty amount for a given penalty event.

$A_n$  = the minimum value of the penalty range for the cell located on the penalty matrix for a given penalty event.

$B_n$  = the sum of percentage adjustments calculated for a given penalty event, where 100 percent $\geq$ B $\geq$ -100 percent.

$C_n$  = the maximum value of the penalty range for the cell located on the penalty matrix for a given penalty event.

* *Note:*  The statutory maximum is double in circumstances where the penalty event constitutes a violation of a previous enforcement action as stated in  R.S. 30:2025 (E)(2).

F.  The values for each penalty amount ($P_n$)  are added to determine a penalty subtotal ($P_s$):

$$P_s = P_1 + P_2 + P_3 \ldots$$

G.  The department shall consider the monetary benefits realized through noncompliance. Any monetary benefits calculated may be added to the penalty subtotal. However, the amount calculated may not cause the penalty subtotal to exceed the maximum penalty amount allowed by law.

H.  Response costs ($R_c$) are then added to the penalty subtotal ($P_s$) to determine the total penalty amount ($P_t$):

$$P_t = P_s + R_c$$

I.  In accordance with R.S. 30:2025 (E)(1)(a), the department reserves the right to assess an additional penalty of not more than $1,000,000 for any penalty event that is done intentionally, willfully, or knowingly, or results in a discharge or disposal that causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health.

J.  In circumstances where the respondent has provided, or has agreed to provide, a grant, donation, or other form of assistance with respect to a designated pollution source, as provided in R.S. 30:2031, the penalty amount may be reduced by the monetary value of such grant, donation, or other form of assistance.

AUTHORITY NOTE:  Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE:  Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 24:

A public hearing will be held on November 24, 1998, at 1:30 p.m. in the Maynard Ketcham Building, Room 326, 7290 Bluebonnet Boulevard, Baton Rouge, LA 70810. Interested persons are invited to attend and submit oral comments on the proposed amendments. Should individuals with a disability need an accommodation in order to participate, contact Patsy Deaville at the address given below or at (225) 765-0399.

All interested persons are invited to submit written comments on the proposed regulations. Commentors should reference this proposed regulation by OS026. Such comments must be received no later than December 8, 1998, at 4:30 p.m., and should be sent to Patsy Deaville, Investigations and Regulation Development Division, Box 82282, Baton Rouge, LA 70884 or to FAX (225) 765-0486. Copies of this proposed regulation can be purchased at the above referenced address. Contact the Investigations and Regulation Development Division at (225) 765-0399 for pricing information. Check or money order is required in advance for each copy of OS026.

This proposed regulation is available for inspection at the following DEQ office locations from 8 a.m. until 4:30 p.m.:

7290 Bluebonnet Boulevard, Fourth Floor, Baton Rouge, LA 70810; 804 Thirty-first Street, Monroe, LA 71203; State Office Building, 1525 Fairfield Avenue, Shreveport, LA 71101; 3519 Patrick Street, Lake Charles, LA 70605; 3501 Chateau Boulevard, West Wing, Kenner, LA 70065; 100 Asma Boulevard, Suite 151, Lafayette, LA 70508; 104 Lococo Drive, Raceland, LA 70394 or on the Internet at http://www.deq.state.la.us/ olae/irdd/olaeregs.htm.

Dale Givens
Secretary

**FISCAL AND ECONOMIC IMPACT STATEMENT
FOR ADMINISTRATIVE RULES
RULE TITLE:  Civil Penalty Assessment**

I.  ESTIMATED IMPLEMENTATION COSTS (SAVINGS) TO STATE OR LOCAL GOVERNMENTAL UNITS (Summary)
No significant implementation costs or savings to state or local governmental units are expected as a result of this rule.

# Exhibit D



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS, TX 75202-2733

DEC 7 1998

VIA FACSIMILE: (225)765-0486

Patsy Deaville
Investigations and Regulation Development Division
Louisiana Department of Environmental Quality
P.O. Box 82282
Baton Rouge, LA 70884

RE: Civil Penalty Assessment Draft Rule (OSO26)

Dear Ms. Deaville:

    The United States Environmental Protection Agency (EPA),
Region 6, has reviewed the Louisiana Department of Environmental
Quality's (LDEQ) Civil Penalty Assessment draft rule and would
like to provide you with the following comments before final
rule-making.

(1) The word "consistency" should be included in § 701 (A) along
    with "fairness" and "equitable manner" to underscore the
    intent of the Chapter.

(2) The nine factors in R.S. 30:2025(E)(a) should be listed
    before subsequent references are made. This would be
    helpful to small businesses and individuals who may not have
    ready access to reference materials.

                              RECEIVED BY:
                                   DEQ
                           Investigations and Regulation
                              Development Division

                            DEC 0 8 1998

                        Regulation Development Section
                        Time:_____
                        Clerk:_____

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on 100% Recycled Paper (40% Postconsumer)

(3)   To minimize speculation and to add clarity to the policy,
      the following terms should be deleted:
          -§ 701 (A): "after the department has determined a
          penalty is to be assessed for one or more violations";

          -Delete § 701 (B) in its entirety;

          -§ 701(C): "only after it has determined that a penalty
          is to be assessed for a specific violation unless
          otherwise"; and

          -§ 703 "unless the context of use clearly indicates
          otherwise."

(4)   The following terms in § 703 are not clear:
          -"Penalty Event" The reader will have to read the
          definition in the context of its use before
          understanding the term and even then the term is not
          clear.

          -"Violator-Specific Factor" (b) Gross revenues should
          be associated with a defined time period; also add the
          phrase, "as relates or is reflective of the violator's
          ability to pay and/or adverse impact on violators
          ability to remain in business." (c) Sensitivity of the
          environment and toxicity of the pollution should be
          included in this section.

          -"Response Cost" Does "response action" contemplate
          clean up costs and enforcement costs? It is confusing
          when the definition includes part of the term being
          defined, i.e., "response."  "Penalty event" by its very
          nature triggers a penalty, therefore its use in this
          definition is confusing.

(5)   The dollar amounts used in the Penalty Matrix under § 705,
seem to mirror EPA's RCRA Civil Penalty Policy prior to
January 1997.  Thereafter, EPA increased these amounts by 10% to
adjust for inflation.

2

and public health protection, improvements that may not have otherwise occurred without settlement incentives.   EPA recommends that acceptable grants, donations, etc., not be used to satisfy other legal obligations. *See*, EPA's Supplemental Environmental Policy for further guidance and detail.

If you should have any questions and/or need further explanation regarding the above comments, please contact Marcia E. Moncrieffe, enforcement counsel, of my staff at (214) 665-7343.

Sincerely yours,

Samuel Coleman, P.E.
Director
Compliance Assurance and
    Enforcement Division

Enclosure

4

# Exhibit E

# State of Louisiana

## Department of Environmental Quality

M.J. "MIKE" FOSTER, JR.
GOVERNOR

February 10, 1999

J. DALE GIVENS
SECRETARY

The Honorable N. J. Damico, Chairman
c/o Aaron McGee, Staff Attorney
House Committee on the Environment
10th Floor, State Capitol
Post Office Box 44486
Baton Rouge, Louisiana 70804

Dear Representative Damico:

RE:     Summary Report for Proposed Rule - (Log #OS026) - Civil Penalty Assessment

    Pursuant to the Louisiana Administrative Procedure Act, I am forwarding to you a report regarding the above referenced proposed rule, which was published in the October 20, 1998, issue of the *Louisiana Register*. Enclosed is a computer disk with the summary report.

    Should you have any questions regarding the enclosed material, please contact Patsy Deaville at 225-765-0399.

Sincerely yours,

Herman Robinson
Assistant Secretary

HR/PD/da

Enclosure



OFFICE OF LEGAL AFFAIRS AND ENFORCEMENT  INVESTIGATIONS AND REGULATION DEVELOPMENT DIVISION
P.O. BOX 82282  BATON ROUGE, LOUISIANA  70884-2282
AN EQUAL EMPLOYER





# State of Louisiana

## Department of Environmental Quality

M.J. "MIKE" FOSTER, JR.
GOVERNOR

February 10, 1999

J. DALE GIVENS
SECRETARY

The Honorable Louis J. Lambert, Chairman
c/o Christy Barbier, Staff Attorney
Senate Committee on Environmental Quality
Sub-Basement, State Capitol
Post Office Box 94183
Baton Rouge, Louisiana  70804

Dear Senator Lambert:

RE:    Summary Report for Proposed Rule - (Log #OS026) - Civil Penalty Assessment

     Pursuant to the Louisiana Administrative Procedure Act, I am forwarding to you a report regarding the above referenced proposed rule, which was published in the October 20, 1998, issue of the *Louisiana Register*.  Enclosed is a computer disk with the summary report.

     Should you have any questions regarding the enclosed material, please contact Patsy Deaville at 225-765-0399.

                        Sincerely yours,

                        Herman Robinson
                        Assistant Secretary

HR/PD/da

Enclosure


recycled paper

OFFICE OF LEGAL AFFAIRS AND ENFORCEMENT   INVESTIGATIONS AND REGULATION DEVELOPMENT DIVISION
P.O. BOX 82282   BATON ROUGE, LOUISIANA   70884-2282
AN EQUAL EMPLOYER



NOTICE OF INTENT

Department of Environmental Quality
Office of the Secretary

Under the authority of the Environmental Quality Act, R.S. 30:2001 et seq., and in accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., the secretary gives notice that rulemaking procedures have been initiated to amend the Office of the Secretary regulations, LAC 33:I.Chapter 7 (Log #OS026).

This proposed rule will establish a consistent department-wide approach for the assessment of civil penalties. Included in this assessment is the consideration of multiple violations, gravity of any violation committed, and that economic incentives for noncompliance are eliminated. This regulation is designed to promote the goals of deterrence, as well as, to provide fair and equitable treatment of the regulated community. The Louisiana Environmental Quality Act, R.S. 30:2050.3, requires the secretary to establish criteria for the assessment of consistent department-wide penalties based upon the nine factors found in R.S. 30:2025 (E). The basis and rationale for this rule are to comply with R.S. 30:2050.3.

This proposed rule meets the exceptions listed in R.S. 30:2019 (D) (3) and R.S.49:953 (G) (3); therefore, no report regarding environmental/health benefits and social/economic costs is required.

A public hearing will be held on November 24, 1998, at 1:30 p.m. in the Maynard Ketcham Building, Room 326, 7290 Bluebonnet Boulevard, Baton Rouge, LA 70810. Interested persons are invited to attend and submit oral comments on the proposed amendments. Should individuals with a disability need an accommodation in order to participate, contact Patsy Deaville at the address given below or at (225) 765-0399.

All interested persons are invited to submit written comments on the proposed regulations. Commentors should reference this proposed regulation by OS026. Such comments must be received no later than December 8, 1998, at 4:30 p.m., and should be sent to Patsy Deaville, Investigations and Regulation Development Division, Box 82282, Baton Rouge, LA 70884 or to FAX (225) 765-0486. Copies of this proposed regulation can be purchased at the above referenced address. Contact the Investigations and Regulation Development Division at (225) 765-0399 for pricing information. Check or money order is required in advance for each copy of OS026.

This proposed regulation is available for inspection at the following DEQ office locations from 8 a.m. until 4:30 p.m.: 7290 Bluebonnet Boulevard, Fourth Floor, Baton Rouge, LA 70810; 804 Thirty-first Street, Monroe, LA 71203; State Office Building, 1525 Fairfield Avenue, Shreveport, LA 71101; 3519 Patrick Street, Lake Charles, LA 70605; 3501 Chateau Boulevard, West Wing, Kenner, LA 70065; 100 Asma Boulevard, Suite 151, Lafayette, LA 70508; 104 Lococo Drive, Raceland, LA 70394 or on the Internet at http://www.deq.state.la.us/ olae/irdd/olaeregs.htm.

Dale Givens
Secretary

NOTICE OF INTENT

Department of Environmental Quality
Office of the Secretary

Under the authority of the Environmental Quality Act, R.S. 30:2001 et seq., and in accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., the secretary gives notice that rulemaking procedures have been initiated to amend the Office of the Secretary regulations, LAC 33:I.Chapter 7 (Log #OS026).

This proposed rule will establish a consistent department-wide approach for the assessment of civil penalties.  Included in this assessment is the consideration of multiple violations, gravity of any violation committed, and that economic incentives for noncompliance are eliminated.  This regulation is designed to promote the goals of deterrence, as well as, to provide fair and equitable treatment of the regulated community.  The Louisiana Environmental Quality Act, R.S. 30:2050.3, requires the secretary to establish criteria for the assessment of consistent department-wide penalties based upon the nine factors found in R.S. 30:2025 (E).  The basis and rationale for this rule are to comply with R.S. 30:2050.3.

This proposed rule meets the exceptions listed in R.S. 30:2019 (D) (3) and R.S.49:953 (G) (3); therefore, no report regarding environmental/health benefits and social/economic costs is required.

A public hearing will be held on November 24, 1998, at 1:30 p.m. in the Maynard Ketcham Building, Room 326, 7290 Bluebonnet Boulevard, Baton Rouge, LA 70810.  Interested persons are invited to attend and submit oral comments on the proposed amendments.  Should individuals with a disability need an accommodation in order to participate, contact Patsy Deaville at the address given below or at (225) 765-0399.

All interested persons are invited to submit written comments on the proposed regulations. Commentors should reference this proposed regulation by OS026.  Such comments must be received no later than December 8, 1998, at 4:30 p.m., and should be sent to Patsy Deaville, Investigations and Regulation Development Division, Box 82282, Baton Rouge, LA 70884 or to FAX (225) 765-0486.  Copies of this proposed regulation can be purchased at the above referenced address.  Contact the Investigations and Regulation Development Division at (225) 765-0399 for pricing information.  Check or money order is required in advance for each copy of OS026.

This proposed regulation is available for inspection at the following DEQ office locations from 8 a.m. until 4:30 p.m.:  7290 Bluebonnet Boulevard, Fourth Floor, Baton Rouge, LA 70810; 804 Thirty-first Street, Monroe, LA 71203; State Office Building, 1525 Fairfield Avenue, Shreveport, LA 71101; 3519 Patrick Street, Lake Charles, LA 70605; 3501 Chateau Boulevard, West Wing, Kenner, LA 70065; 100 Asma Boulevard, Suite 151, Lafayette, LA 70508; 104 Lococo Drive, Raceland, LA  70394 or on the Internet at http://www.deq.state.la.us/ olae/irdd/olaeregs.htm.

Dale Givens
Secretary

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

# TITLE 33
## ENVIRONMENTAL QUALITY
### Part 1.  Office of the Secretary
### Subpart 1.  Departmental Administrative Procedures

**Chapter 7.  Penalties**

**§701.   Scope**

A.  The intent of this Chapter is to assure that, after the department has determined a penalty is to be assessed for one or more violations, each penalty is assessed in a consistent, fair, and equitable manner; that penalties are appropriate for the gravity of the violation committed; that economic incentives for noncompliance are eliminated; that penalties are sufficient to deter persons from committing future violations; and that compliance is expeditiously achieved and maintained.

B.  After considering the nine factors in R.S. 30:2025(E)(3)(a), the department realizes there may be numerous circumstances where violations have occurred that are not significant enough to do not warrant a penalty action.

C.  This Chapter is to be utilized by the department only after it has determined that a penalty is to be assessed for a specific violation unless otherwise specified by rule or regulation. Nothing in this Chapter applies to the determination of whether to assess a penalty, or to the compromise or settlement of a penalty.

AUTHORITY NOTE:  Promulgated in accordance with R.S. 30:2050.3.
HISTORICAL NOTE:  Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:**

**§703.  Definitions**

For purposes of this Chapter, the terms defined in this Chapter shall have the following meanings, unless the context of use clearly indicates otherwise:

*Nine Factors*—the factors listed in R.S. 30:2025(E)(3)(a) and considered by the department in determining whether or not a civil penalty is to be assessed and in determining the amount agreed upon in compromise. The nine factors are as follows:

1

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

a.  the history of previous violations or repeated noncompliance;

b.  the nature and gravity of the violation;

c.  the gross revenues generated by the respondent;

d.  the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

e.  the monetary benefits realized through noncompliance;

f.  the degree of risk to human health or property caused by the violation;

g.  whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged;

h.  whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance or violation; and

i.  the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance.

*Penalty Event*—any violation (as defined in R.S. 30:2004(21)) for which the administrative authority, after consideration of the factors listed in R.S. 30:2025(E)(3)(a), determines a penalty is warranted.  For violations lasting more than one 24-hour day, each such day of violation may be treated as a separate penalty event.

*Response Costs*—the costs to the state of any response action made necessary by a penalty event that are not voluntarily paid by the violator.  These costs shall include, but are not limited to, the costs of surveillance staff activities including cleanup costs and the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance.

*Violation Specific Factor*— the two of the nine factors considered when plotting a violation on the penalty matrix.  Each factor is weighed consistently without

2

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

regard to the violator, and no special circumstances or violator-specific factors are considered when plotting the violation on the penalty matrix.  These factors include:

>   a.  the nature and gravity of the violation; and

>   b.  the degree of risk to human health or property caused by the violation.

>   *Violator-Specific Factor*—the five of the nine factors considered when adjusting the difference between the minimum and maximum penalty range within a particular cell on the penalty matrix.  The degree of adjustment in a particular penalty range on the penalty matrix will vary depending upon the specific and unique circumstances of these five factors.  These factors include:

>   a.  the history of previous violations or repeated noncompliance;

>   b.  the gross revenues generated by the respondent;

>   c.  the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

>   d.  whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance or violation; and

>   e.  whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.

>   AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2050.3.
>   HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:**

### §705.  Penalty Determination Methodology

>   A.  A penalty range for each penalty event is calculated based on the two violation-specific factors.  The two violation-specific factors are plotted on the penalty matrix to determine a penalty range for a particular penalty event (see Table 1).  The

3

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

various penalty ranges for a penalty event are found inside each cell of the penalty matrix.

| Table 1.  PENALTY MATRIX | | | |
|---|---|---|---|
| | NATURE AND GRAVITY OF THE VIOLATION | | |
| DEGREE OF RISK/IMPACT TO HUMAN HEALTH OR PROPERTY | | Major | Moderate | Minor |
| | Major | $25,000 to $20,000 | $20,000 to $15,000 | $15,000 to $11,000 |
| | Moderate | $11,000 to $8,000 | $8,000 to $5,000 | $5,000 to $3,000 |
| | Minor | $3,000 to $1,500 | $1,500 to $500 | $500 to $100 |

    1.  Penalty Matrix—Degree of Risk to Human Health or Property.  The first stage of the penalty calculation involves the categorization of each penalty event as major, moderate, or minor with regard to its degree of risk to human health or property. The following criteria are used to categorize each penalty event with regard to its degree of risk to human health or property:

    a.  Major.  Refers to a violation in which actual measurable harm or substantial risk of harm to the environment or public health occurs. The noncompliance results in, or may result would reasonably be expected to result in, the temporary or permanent loss of a use of the environmental resource.  A violation of major impact and hazard may be one characterized by high volume and/or frequent occurrence and/or high pollutant concentration.  Such violations may have a detrimental impact on sensitive environments or include the discharge of toxic pollutants;

    b.  Moderate.  Refers to a violation that has the potential for measurable detrimental impact on the environment or public health.  A violation of moderate impact and hazard may be one characterized by occasional occurrence and/or pollutant concentration that may be expected to have a detrimental effect under certain conditions; and

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

c.  Minor.  Refers to a violation that does not directly present actual harm or substantial risk of harm to the environment or public health.  Violations that are isolated single incidences and that cause no measurable detrimental effect to the environment or public health may be considered minor.  Violations that are administrative in nature may also be, but are not necessarily, considered minor.

2.  Penalty Matrix - Nature and Gravity of the Violation.  The second stage of the penalty calculation involves the categorization of each penalty event as major, moderate, or minor with regard to its nature and gravity.  The following criteria are used to categorize each penalty event with regard to its nature and gravity:

a.  Major.  Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in negating the intent of the requirement.  The respondent deviates significantly from the requirements of the statutes, regulations, or permit to such an extent that little or no implementation of requirements occurs;

b.  Moderate.  Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in substantially negating the intent of the requirement.  The respondent deviates from the requirements of the statutes, regulations, or permit, but some implementation of the requirements occurred; and

c.  Minor.  Refers to violations of applicable statutes, regulations, orders, permit limits, or permit requirements that result in some deviation from the intent of the requirement.  The respondent deviates somewhat from the requirements of the statutes, regulations, or permit;  however, substantial implementation of the requirements occurred.

B.  Once a penalty event has been categorized as major, moderate, or minor for both its degree of risk to human health or property and its nature and gravity, a penalty range is obtained by plotting these two categorizations with the corresponding cell of the penalty matrix.

C.  Violator-Specific Factors (Adjustment Factors) Per Event.  The next stage of the penalty calculation involves the adjustment of the penalty using the following

5

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

violator-specific factors:

    1.     the history of previous violations or repeated noncompliance;

    2.     the gross revenues generated by the respondent;

    3     the degree of culpability, recalcitrance, defiance, or indifference to regulations or orders;

    4.     whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by the noncompliance or violation; and

    5.     whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.

    D.  The five violator-specific factors are used to adjust the penalty amount for each penalty event.  Each violator-specific factor is assigned a percentage adjustment on a case by case basis.  The upward or downward percentage adjustment for each violator-specific factor shall be no more than 100 percent of the difference between the minimum and maximum penalty amount for the chosen matrix cell.  The five  percentages are added together to calculate a total percentage adjustment for the penalty range for the penalty event.  The total upward or downward percentage adjustment is also limited to 100 percent.  The total percentage adjustment is multiplied by the difference between the minimum and maximum penalty amount for the chosen matrix cell.  The product is then added to, or subtracted from, the minimum penalty amount in the chosen matrix cell.

    E. The information obtained from the violation-specific and violator-specific factors can be entered into one of the following formula(s) to obtain a penalty amount ($P_n$) for each penalty event:

$$P_n = A_n + (B_n \times [C_n - A_n])$$
$$P_n = 2(A_n + [B_n \times (C_n - A_n)]) *$$

6

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

where:

$P_n$  = penalty amount for a given penalty event.

$A_n$  = the minimum value of the penalty range for the cell located on the penalty matrix for a given penalty event.

$B_n$  = the sum of percentage adjustments calculated for a given penalty event, where 100 percent $\geq$ B $\geq$ -100 percent.

$C_n$  = the maximum value of the penalty range for the cell located on the penalty matrix for a given penalty event.

* Note—The statutory maximum is double in circumstances where the penalty event constitutes a violation of a previous enforcement action as stated in R.S. 30:2025 (E)(2).

F.  The values for each penalty amount ($P_n$) are added to determine a penalty subtotal ($P_s$):

$$P_s = P_1 + P_2 + P_3 \ldots$$

G.  The department shall consider the monetary benefits realized through noncompliance.  Any monetary benefits calculated may be added to the penalty subtotal. However, the amount calculated may not cause the penalty subtotal to exceed the maximum penalty amount allowed by law.

H.  Response costs ($R_c$) are then added to the penalty subtotal ($P_s$) to determine the total penalty amount ($P_t$):

$$P_t = P_s + R_c$$

I.  In accordance with R.S. 30:2025 (E)(1)(a), the department reserves the right to assess an additional penalty of not more than $1,000,000 for any penalty event that is done intentionally, willfully, or knowingly, or results in a discharge or disposal that causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health.

J.  In circumstances where the respondent has provided, or has agreed to provide, a

7

PROPOSED RULE WITH TECHNICAL AMENDMENTS/February 10, 1999          OS026

grant, donation, or other form of assistance with respect to a designated pollution source, as provided in R.S. 30:2031, the penalty amount may be reduced by the monetary value of such grant, donation, or other form of assistance.

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:2050.3.

HISTORICAL NOTE: Promulgated by the Department of Environmental Quality, Office of the Secretary, LR 25:**

LIST OF TECHNICAL AMENDMENTS FOR OS026
CIVIL PENALTY ASSESSMENT
LAC 33:I.Chapter 7

<u>Page 1</u>

§701.A          The word  "consistent" has been added.

§701.B          The subsection was reworded to minimize speculation.

<u>Pages 1 - 2</u>

§703          Added statutory "nine factors" to clarify definition used in the rule.

<u>Page 2</u>

§703          Expanded definition of "penalty event."

§703          The definition of "response costs" was amended to include cleanup costs.  Also, the definition was moved to its correct alphabetical position.

<u>Page 4</u>

§705.A.1.a   Added language to clarify the scope of the "major" category in the penalty matrix.

<u>Page 5</u>

§705.A.1.c   Added language to clarify the scope of the "minor" category in the penalty matrix.

COMMENT KEY (OS026)
CIVIL PENALTY ASSESSMENT
LAC 33:I.CHAPTER 7

| NUMBER | COMMENTOR |
|---|---|
| 1 - 3, 5, 8 - 11, 13, 18, 20 - 24, 26, 28, 30. | Samuel Coleman<br>Marcia E. Moncrieffe<br>USEPA - REGION 6 |
| 4, 15, 16, 19, 27, 29, 31, 33. | Richard T. Metcalf<br>LAMOGA |
| 6, 7, 14, 17, 32. | Henry T. Graham, Jr.<br>LCA |
| 12, 25. | John H. Turner<br>BFI |

CONCISE STATEMENT / SUMMARY OF COMMENTS
CIVIL PENALTY ASSESSMENT (OS026)
LAC 33:I.CHAPTER 7

COMMENT 1:      §701.A  The word "consistency" should be included with the existing
                wording "fair and equitable manner" to underscore the intent of this
                chapter.

FOR:            This proposed amendment would further the expressed intent of the
                chapter.

AGAINST:        This is an unnecessary addition of language which would not "clarify" the
                intent of the chapter.

RESPONSE 1:     In reviewing this comment, we decided that adding the term "consistent"
                would be appropriate to underscore the intent of this chapter.  "...each
                penalty is to be assessed in a consistent, fair and equitable manner..."

COMMENT 2:      §701.A  For clarity and to minimize speculation, delete the phrase
                "...after the department has determined a penalty is to be assessed for one
                or more violations..."  from this subsection.
FOR:            Deleting this phrase would clarify the chapter and reduce the ambiguity in
                the statement.

AGAINST:        Leaving the statement in the language would ensure the reader understood
                the expressed intent of the chapter.

RESPONSE 2:     We disagree with this comment.  The phrase was specifically included to
                ensure that any reviewer would fully understand that the chapter was
                intended to be used when, and only when, the department has determined
                that a penalty is to be assessed for one or more violations.

COMMENT 3:      §701.B  Delete this subsection in entirety for clarity and to minimize
                speculation.

FOR:            Deleting this subsection would clarify the intent of the chapter and ensure
                a penalty could be issued for any violation regardless of the department's
                review of the nine factors.

AGAINST:        Leaving this subsection in place would clarify the stated intent that the
                department recognizes there are some minor violations that, based on a
                review of the nine factors, do not warrant a penalty action.

RESPONSE 7:        We disagree with this comment and no change will be made.  It was the
                   Department's stated intent that after the department has determined a
                   penalty is to be assessed, that all penalties would be assessed in a fair and
                   equitable manner after reviewing the "nine factors" and any "appropriate
                   adjustment factors", etc.  We are not aware of any other "circumstances"
                   which would warrant a reduction of the proposed penalty outside of the
                   ranges provided for in this chapter.

COMMENT 8:         §701  In order to aid small businesses and individuals who may not have
                   ready access to reference materials, the nine factors in R.S.
                   30:2025(E)(3)(a) should be listed before subsequently referencing them.

FOR:               Listing the nine factors would assist small businesses and individuals who
                   may not have ready access to reference materials.

AGAINST:           The department can find no argument against making the suggested
                   change.

RESPONSE 8:        The suggested revision has been made, although to §703 rather than §701.

COMMENT 9:         §703  For clarity and to minimize speculation, delete the wording
                   "...unless the context of use clearly indicates otherwise:" from the first
                   sentence of this definitions section.

FOR:               By deleting the requested language it would minimize speculation
                   regarding other uses of the defined terms.

AGAINST:           The language merely acknowledges that a word can have a different
                   meaning depending on the context in which it is used.

RESPONSE 9:        The language merely acknowledges that a word can have a different
                   meaning depending on the context in which it is used.  This is standard
                   language that is included in many of our environmental regulations.

COMMENT 10:        §703  The definition of "penalty event" is unclear.

RESPONSE 10:       No for/against required because no change to rule is suggested.
                   The commentor offered no suggestions for new language or explanation as
                   to why the term should be considered unclear, therefore the department is
                   at a loss as to how to clarify this definition.  The department did expand
                   this definition by adding the sentence, "For violations lasting more than
                   one 24-hour day, each such day of violation may be treated as a separate
                   penalty event."

# Exhibit F

# CERTIFICATION

I hereby certify that proposed rule __**OS026**__ meets one of the following exceptions:

☐     Is required for compliance with a federal law or regulation.

☐     Is identical to a federal law or regulation applicable in Louisiana

☒     Will cost the state and affected persons less than one million dollars, in the aggregate, to implement

☐     Is an emergency rule under R.S. 49:953(B)

     Therefore, in accordance with R.S. 30:2019 D.(3) and R.S. 49:953(G)(3) no report regarding the environmental/health benefits and social/economic costs is required.

_9-18-98_
Date

_[signature]_
Signature

Secretary
Title