# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

J. Andrew Langan
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

August 3, 2011

**Via E-mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA 70130

Re:   In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico on April 20, 2010, MDL No. 2179

Dear Judge Shushan:

BP submits this letter as requested by the Court during the July 28, 2011 telephone conference regarding the scope and nature of BP 30(b)(6) Topic 7 – which was the subject of prior correspondence from BP, Anadarko, and the PSC submitted to Your Honor on July 28.

Topic 7 involves:   "The background, basis (or bases), intent, preparation, drafting, submission and approval of BP's Application for Permit to Modify the temporary abandonment procedure on or around April 16, 2010, including the deviations, if any, between that procedure and the procedure(s) described in (a) the April 12, 2010 Drilling Plan, (b) the April 14, 2010 Morel "Forward Ops" E-Mail, or (c) the April 20, 2010 Ops Note."

This letter sets out material from the discovery record demonstrating that the PSC's and Anadarko's view of Topic 7 as involving engineering and/or "risk assessment and safety process" of the Macondo Well temporary abandonment procedure would expand Topic 7 into areas already covered by at least five other 30(b)(6) topics.  Moreover, despite statements at the July 28th conference by PSC counsel that none of the witnesses BP identified in its July 27 letter to Tony Fitch had knowledge of or had testified about the temporary abandonment procedure, the discovery record summarized below makes clear that such statements are incorrect.  In fact, these aspects of the temporary abandonment procedure have been covered at length by: 1) testimony of BP 30(b)(6) witnesses, including Jim Cowie and Ian Little; 2) testimony of BP fact witnesses, including John Guide, Brett Cocales, Greg Walz, Lee Lambert and Ronnie Sepulvado, among others; and 3) written discovery to BP (including at least 10 interrogatories, 22 requests for admission, and 16 requests for production).  Accordingly, with respect to Topic 7, BP should

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 2

not be required to produce another 30(b)(6) witness to testify with respect to the engineering or risk assessment aspects of the temporary abandonment procedure.

The temporary abandonment procedure has been a central focus of discovery in these proceedings, as well as other proceedings related to the *Deepwater Horizon* incident. Temporary abandonment of a well is a common industry practice used to secure a well before the well's production and hydrocarbon-extraction-construction is complete. As reflected in the testimony of numerous witnesses and documents produced to date, BP planned to temporarily abandon the Macondo Well following the completion of drilling operations performed by the Deepwater Horizon and then to return to the Macondo Well at a later date with another rig to complete construction of the well. Because the temporary abandonment procedure was in the process of being implemented at the time of the incident on April 20, 2010, the procedure -- and actions taken or not taken as part of the procedure -- have received significant attention throughout the discovery process and in other related proceedings.

The temporary abandonment procedure for the Macondo Well included, among other thing, the following steps – all of which have been the subject of extensive discovery:

- Displacing mud in the well with seawater;
- Performing well integrity tests (including both a positive and negative pressure test);
- Setting a surface cement plug at approximately 3,300 feet below the mud line; and
- Setting a lock-down sleeve.

Although there are no standard industry procedures for temporary abandonment operations, MMS regulations establish certain requirements related to setting a surface cement plug. Accordingly, BP's temporary abandonment procedure for the Macondo Well was submitted to and approved by the MMS on April 16, 2010, before being implemented on April 20, 2010.

## 1. 30(b)(6) Testimony Regarding Temporary Abandonment Procedure

Consideration of Topic 7 in the context of the surrounding BP 30(b)(6) topics makes clear that the PSC's and Anadarko's expansive interpretation of Topic 7 would render Topic 7 duplicative of multiple other 30(b)(6) topics. BP interpreted Topic 7 to be regulatory in nature precisely because no less than five other 30(b)(6) topics address the engineering and risk assessment aspects of the temporary abandonment procedure:

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 3

- Topic 6:  "With respect to the Macondo Well, communications, evaluations, testing, training, policies and/or analyses, within BP and/or with any other party, relating to foam stability, cement testing, float collar conversion, use or non-use of centralizers, **the decision not to displace seawater and set the cement plug at approximately 3,300' below the mud line, and or the decision not to conduct or prepare cement bond logs, and/or not to do negative pressure tests, on or before April 20, 2010.**"

- Topic 8:        "The estimated, budgeted, expected and/or actual time and/or cost savings realized by:
  . . .
  **3. Not Running Cement Bond or Other Evaluation Log**
  . . .
  **5. Displacing Mud from Riser Before Setting Surface Cement Plug**
  **6. Setting Surface Cement Plug 3,000 Feet Below Mud Line in Seawater**
  **7. Not Installing Additional Barriers During Temporary Abandonment Procedure** . . . ."

- Topic 14:  "BP's evaluations of, and/or reservoir assessment, drill plan, operations plan, and or well or reservoir engineering and/or **temporary abandonment plan (and all changes or amendments thereto) for the Macondo Well** in response to, well control events (including but not limited to the March 8 "kick") between February 1, 2010 and April 20, 2010;"

- Topic 17:  "**The determination of the well design for the Macondo Well,**" for which BP explicitly designated a witness to testify with respect to the **"Temporary Abandonment Procedure."**[1]

- Topic 18:  "**Analysis or evaluation of risks associated with design and operational decisions made by BP personnel concerning operations and activities performed at the Macondo well** during the period from February 1 through April 20, 2010, including

---

[1]   *See* The BP Parties' Fourth Amended Responses and Objections to Plaintiffs' Agreed 30(b)(6) Deposition Notice with 30(b)(5) Document Requests, served May 11, 2011.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 4

but not limited to the creation, entry of data into and completion of a "risk register" or risk assessment tool ("RAT")."

The BP 30(b)(6) witnesses produced in response to these 30(b)(6) topics testified extensively about the aspects of the temporary abandonment procedure that the PSC and Anadarko now seek to read into Topic 7. For example, Ian Little, BP Vice President of Wells for North Africa, testified with respect to the engineering background, basis, and intent of the temporary abandonment procedure from a well design standpoint. The United States, Louisiana, and Transocean focused their questions to Mr. Little on this topic, especially with respect to alleged deviations among BP's Application for Permit to Modify the temporary abandonment procedure, the various temporary abandonment drafts, and the April 20 "Ops Note" – the very documents listed in Topic 7. Notably, the PSC opened their questioning of Mr. Little by asking him if he was prepared to testify on Topic 17 ("The determination of the well design for the Macondo Well" with respect to the "Temporary Abandonment Procedure"). After Mr. Little explained that he indeed was prepared to testify to this topic, the PSC then did not ask a single question related to temporary abandonment.

Mr. Little's testimony with respect to the temporary abandonment procedure covered scores of pages, a small sample of which is attached to this letter. Highlighted below are just a few illustrative examples of his detailed testimony regarding the temporary abandonment procedure, as well as alleged deviations among the MMS-approved procedure and the other documents listed in Topic 7.

Little_6/30/11 Dep. p._94:8-13

8     Q.  What does BP contend constitutes the Macondo
9   Well's temporary abandonment procedure?
10    A.  I believe that April 15th document was the
11  formal communication as to the -- the -- the procedure.
12  There were further correspondence that updated that
13  procedure.
**************************************************

Little_6/30/11 Dep._p. 95:1-15
1     Q.  Correct.  And was this plan provided to MMS,
2   the temporary abandonment procedure that was to be
3   followed?
4     A.  I believe there was a plan provided to the

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 5

   5  MMS.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Little_6/30/11 Dep. pp. 96:3-97:3</u>
   3  …This
   4  is the Ops note from Brian Morel, dated April the 20th,
   5  containing temporary abandonment procedure, as well,
   6  correct?
   7    A.  From -- from what I've been advised, this was
   8  the -- the note that was sent to update the April 15th
   9  plan.
  10    Q.  Which of these procedures was the one that was
  11  to be followed for temporary abandonment?
  12    A.  My understanding is that the procedure that
  13  was outlined in the note from Brian was the -- the
  14  procedure that the -- the Team were to follow on the
  15  rig.
  16    Q.  And that plan -- well, does the April 20th Ops
  17  note reflect the same procedure that was provided to
  18  MMS on April the 16th?
  19    A.  It is not an exact replication of what was
  20  provided to the MMS.
  21    Q.  Well, are there changes in the steps that --
  22  from what were provided to MMS?
  23    A.  The procedure here is not exactly as is in the
  24  procedure that was provided to the MMS.
  25    Q.  And how does the procedure differ?
   1    A.  It -- it gives more detail in -- in the April
   2  20th note as to how the negative test should be
   3  performed.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Little_6/30/11 Dep. p. 98:17-22</u>
  17    Q.  I believe you've testified that April -- the
  18  April 20th Ops note is the procedure that was to be
  19  followed for temporary abandonment, correct?
  20    A.  It's my understanding that this was a note

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 6

> 21   that was sent out to update the plan on April -- the
> 22   April 15th plan.

Additionally, Jim Cowie, BP Vice President of Wells for the North Sea, was designated as the 30(b)(6) witness for topics covering both the specific engineering decisions (Topic 6 and Topic 14) and risk management rationale (Topic 18) for the temporary abandonment procedure. His testimony included detailed information regarding the engineering basis and background of the major components of the temporary abandonment procedure.   Although his testimony extended over two full days, in the interest of brevity, I have attached only a few of the pages in which he testified with respect to these topics and highlighted several passages below.

<u>Cowie 6/29/11 Dep. p. 174:9-25</u>
>  9       Q.   Okay.  And you are aware that BP made the
> 10   decision for Schlumberger not to run the cement bond log
> 11   and instead to go back to -- go back -- go back home, if
> 12   you will?
> 13       A.   My understanding was there was a process to
> 14   make that decision.
> 15       Q.   Okay.
> 16       A.   Which was followed -- they made that decision.
> 17   And whether they were going to do the cement bond log
> 18   later or not, I don't know.
> 19       Q.   Okay.  But the ultimate decision not to run
> 20   the cement bond log at the time during the temporary
> 21   abandonment phase of the Horizon well was made by BP;
> 22   was it not?
> 23       A.   I would suggest that that discussion -- that
> 24   would have been a discussion that could have taken place
> 25   on the rig and, you know, with the rig team leadership.
> **************************************************

<u>Cowie 6/29/11 Dep. p. 341:10-17</u>
> 10       Q.   (BY MR. HASSINGER)  You agree with me that BP
> 11   failed to properly assess, manage, and communicate risk?
> 12       A.   No, sir.
> 13       Q.   You know from your work in the investigation
> 14   that BP did not properly communicate to the drilling
> 15   crew the lack of testing on the cement, don't you?

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 7

    16    A.  I believe that the lack of testing of the
    17  cement came to light after the fact.
**************************************************

Cowie  6/30/11 Dep. p. 378:12-24
    12   Q.   And with the decision not to run a cement bond
    13  log, do you know if BP followed a documented and
    14  auditable risk assessment process?
    15    A.  I believe they did the decision tree process.
    16    Q.   And that's -- you're talking about the -- it's
    17  a one-page decision tree document that walks through
    18  various indicators and outcomes?
    19    A.  Yes.
    20    Q.   And that process qualifies as a documented and
    21  auditable risk management process under DWOP?
    22    A.  I believe it demonstrates that a process was
    23  considered, went through, and the risks were considered
    24  to determine what the outcome should be.  So, yes, I do.
**************************************************

Cowie 6/30/11 Dep. pp.  380:11-383:18
    11    Q.   What happens if there are changes made to the
    12  drilling program after its initial approval?
    13    A.   Then a significant change would go through the
    14  management of change process.  As you mentioned earlier,
    15  you know, long string versus a liner.
    16    Q.   And what is the line of demarcation between a
    17  significant change that requires a management of change
    18  process versus a decision that does not require a
    19  management of change process?
    20    A.   A change in sequence of events would -- an ops
    21  note would be used for that on this location, and then a
    22  significant -- what -- anything that would change the
    23  design of the well or -- well, change the design of the
    24  well, then a management of change would be used.
    25    Q.   What is a change to a temporary abandonment
    1  plan?

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 8

***

3      Q.   (BY MR. WILLIAMS)  Is that a sequence of
4   events change or a design of well change?

***

6      A.   I would need a specific case to comment on
7   that.
8      Q.   (BY MR. WILLIAMS)  Well, on the Macondo are
9   you aware that there were several versions of a
10   temporary abandonment plan prepared by BP?

***

12      Q.   (BY MR. WILLIAMS)  During April 2010 there
13   were various versions of a temporary abandonment plan;
14   are you aware of that?

***

16      A.   I'm aware that there was a change in the
17   sequence of events.  I'm not aware that there were a
18   number of -- or various temporary abandonment plans.
19      Q.   (BY MR. WILLIAMS)  Okay.  You're aware that BP
20   changed the sequence of events in the temporary
21   abandonment plan at some point in April 2010?
22      A.   I am.
23      Q.   And what sort of risk assessment is required
24   for that change?
25      A.   That would depend on the team and how they saw
1   the risks that were occurring at that time.  So I don't
2   know what was actually completed for that event.
3      Q.   Just a couple more.  Not in- -- the decision
4   to not install additional barriers during the temporary
5   abandonment procedure, did BP follow a documented and
6   auditable risk management process with respect to that
7   decision?

***

9      A.   That's a strange terminology, the decision not
10   to do something.  My understanding was that the program
11   called for two barriers.  The policy states there should
12   be two barriers.  And my recollection is the MMS had
13   agreed two barriers was the design for this well.
14          The first barrier was the cement and the shoe

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 9

> 15   track, and after the negative test the plan was to set
> 16   the second barrier.  So I do not think that there was
> 17   any conscious decision made not to set additional
> 18   barriers.

Although Mr. Cowie and Mr. Little did occasionally respond "I don't know" in response to questions, that answer was often in response to fact-specific questions for which they were not provided corresponding documents by questioning counsel or to questions outside the scope of the 30(b)(6) topic.  Although they testified as corporate representatives, it is not reasonable to expect any 30(b)(6) witness to possess the mental faculty to retain, let alone testify to, detailed factual information without reference to any document.  Moreover, many of these responses were to questions that dealt with the regulatory aspects of the temporary abandonment procedure, an area in which the PSC and Anadarko expressed no interest in exploring at the July 28th telephone conference.

## 2.   Fact Testimony Regarding Temporary Abandonment Procedure

The discovery record also contains detailed testimony from BP fact witnesses regarding the intent, background, and bases of the temporary abandonment procedure, and specifically whether there were any deviations from the temporary abandonment procedure contained within the April 16, 2010, Application for Permit to Modify approved by the MMS.  These witnesses include Brett Cocales (Drilling Operations Engineer), John Guide (Wells Team Leader), Greg Walz (Engineering Team Leader), Lee Lambert (Wellsite Leader Trainee aboard the *DWH* at the time of the incident), and Ronnie Sepulvado (*DWH* Wellsite Leader), among others.  Each of these witnesses testified regarding their factual knowledge with respect to the background, basis, intent, preparation, and drafting of the temporary abandonment procedure identified in Topic 7.  In the interest of brevity I have attached only a small sampling of such testimony for Your Honor's review.

Additionally, Mr. Cocales, Mr. Walz, and Mr. Guide each testified at the MBI proceedings regarding the intent, background, and bases of the temporary abandonment procedure.  Each of the parties had access to this testimony as: 1) it is available on the MBI website; and 2) BP has produced the testimony in response to document production requests.  Moreover, each of these witnesses was subject to cross-examination at the MBI proceedings, and Anadarko specifically cross-examined these witnesses at the MBI proceedings with respect to the intent, background, and bases of the temporary abandonment procedure, as well as any deviations with the documents listed in Topic 7.  A sampling of the pertinent MBI testimony excerpts is attached.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 3, 2011
Page 10

## 3.   Written Discovery Regarding Temporary Abandonment Procedure

Finally, the temporary abandonment procedure (and the corresponding background, bases, and intent) have been the subject of at least 10 interrogatories, 22 requests for admission, and 16 requests for production to BP.  BP has provided voluminous document productions with respect to these interrogatories and document requests.

As these excerpts and the attached testimony make clear, and notwithstanding representations to the contrary during the July 28th telephone conference, multiple BP 30(b)(6) witnesses and fact witnesses have already testified with respect to the engineering or risk assessment aspects of the temporary abandonment procedure.  BP should not be required to produce another 30(b)(6) witness in those areas in response to Topic 7.

Respectfully submitted,

J. Andrew Langan, P.C.

Attachments

cc:     Plaintiffs Liaison Counsel
        Defense Liaison Counsel
        Mike Underhill
        Hon. Attorney General Luther Strange
        Cory Maze
        Donald E. Godwin
        James P. Roy
        Stephen J. Herman
        Robert Cunningham

1               UNITED STATES  DISTRICT COURT

               EASTERN DISTRICT OF LOUISIANA

2

3  IN RE:  OIL SPILL      )    MDL NO. 2179

    BY THE OIL RIG       )

4  "DEEPWATER HORIZON" IN  )    SECTION "J"

    THE GULF OF MEXICO, ON  )

5  APRIL 20, 2010       )    JUDGE BARBIER

                    )    MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17               *****************

                   VOLUME 1

18               *****************

19

20

21        Deposition of Ian Little, as a Corporate

Representative, taken at Kirkland & Ellis

22  International, 30 St. Mary Axe, 22nd Floor, London

EC3A 8AF, England, United Kingdom, on the 30th of June,

23  2011.

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.    I mean, I've had the -- the broad concept

2  explained to me, yes.

3     Q.    Okay.  So you're -- you understand that you're

4  here to testify on behalf of BP, so you're essentially

5  speaking for the corporation?

6     A.    That's correct.

7     Q.    If you could, turn to Tab 1 in the binder.

8     A.    This one?

9           MR. FIELDS:   (Indicating.)

10     Q.    (By Mr. Taylor) And this document is titled

11  "THE BP PARTIES' FOURTH AMENDED RESPONSES AND

12  OBJECTIONS TO PLAINTIFFS' AGREED 30(b)(6) DEPOSITION

13  NOTICE WITH 30(b)(5) DOCUMENT REQUESTS."

14           Have you seen this document before?

15     A.    No.

16     Q.    Okay.  Could you turn to Page 6, please?

17     A.    Six.  Okay.

18     Q.    And if you go down where it says No. 17.

19     A.    Yes.

20     Q.    And it reads:  "The determination of the well

21  design for the Macondo Well"?

22     A.    Yes.

23     Q.    And then below that, it says:  "The BP Parties

24  designate the following individuals to testify on the

25  indicated aspects of this topic:  Ian Little -

1   Centralizers, Cement Design and Evaluation, Temporary

2   Abandonment Procedure, and Float Collar."  Did I read

3   that correctly?

4       A.   Yes, that's correct.

5       Q.   And then if you turn to the next page, Page 7,

6   at the top, No. 19:  "Any financial incentives for BP

7   personnel working on the DEEPWATER HORIZON and/or the

8   Macondo Well."  And then underneath, a response:  "The

9   BP Parties designate Ian Little for this topic."

10      A.   That's correct.

11      Q.   So -- and you're here today prepared to

12  testify on these two topics?

13      A.   I am.

14           MR. TAYLOR:  And I'm going to go -- go

15  ahead and mark that as Exhibit 6288.

16           (Exhibit No. 6288 marked.)

17      Q.   (By Mr. Taylor) And what is the basis of your

18  knowledge on these two topics?

19      A.   My experience in -- in being involved in

20  Drilling Operations in -- for nearly 28 years and my

21  experience as -- as part of the -- the Gulf of Mexico

22  Exploration Team up until April 2nd, and I did some

23  preparation for -- for this deposition.

24      Q.   Okay.

25           MR. DART:  We can't hear down here.

**PURSUANT TO CONFIDENTIALITY ORDER**

1           THE WITNESS:  Okay.  I'll speak up.

2    Sorry.

3       Q.   (By Mr. Taylor) And as far as -- as the topics

4    relate to the Macondo Well specifically, what was your

5    role with the Macondo Well?

6       A.   I was the Wells Manager for Exploration &

7    Appraisal in the Gulf of Mexico during the period that

8    the Macondo Well was planned, and during a part of the

9    Operations, I was the Wells Manager for the Exploration

10   & Appraisal Team through to April 2nd.  And then

11   officially, from that point forward, I was no longer

12   involved.

13      Q.   Okay.  Were there any Incentive Plans --

14           MR. FIELDS:  Louder.

15           THE WITNESS:  Speak up more?

16      Q.   (By Mr. Taylor) Sorry.  Were there any

17   Incentive Plans in place for the Macondo Well?

18      A.   There was an original Incentive Plan in place

19   for the -- the rig crews and the service companies on

20   the rig for the Macondo Well when it was being drilled

21   by the MARIANAS.

22      Q.   And did that Incentive Plan only apply to the

23   rig crew?

24      A.   Rig crew and third parties that worked on the

25   rig, yeah.

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.    So the -- Mr. Morel was the Drilling Engineer

2    for the Macondo Well, correct?

3                    MR. FIELDS:  Object to form.

4      A.    He was one of the Drilling Engineers for the

5    well, yes.

6      Q.    (By Ms. McClellan) He, as well as Mr. Hafle,

7    right?

8      A.    That's correct.

9      Q.    And he's telling one of your experts, Stephen

10   Morey, that the well design is rapidly changing; is

11   that correct?

12     A.    That's what the note says.

13     Q.    Does BP have any reason to disagree with the

14   Drilling Engineer for the Macondo Well indicating to

15   its expert that the well design was rapidly changing?

16                   MR. RUBINSTEIN:  Objection, form.

17                   MR. FIELDS:  Objection, form.

18     A.    I -- I don't know what he in particular meant

19   by that, no.

20     Q.    (By Ms. McClellan) Okay.  For the Macondo

21   Well, what does BP contend documents the final design,

22   program, plan, whatever you want to call it, for

23   running the production casing and performing the cement

24   job?

25                   MR. FIELDS:  Objection, form.

1       A.    Could you clarify that?

2       Q.    (By Ms. McClellan) Yes.  We -- we discussed

3  that there were -- was the September Drilling Plan of

4  2009 --

5       A.    Yeah.

6       Q.    -- the January 2010 Drilling Plan, and then

7  there were revisions to that January 2010 Drilling Plan

8  in April of 2010, as well?

9       A.    There -- there were updates to the plan in

10  April based on some of the changes that had happened,

11  yes.

12      Q.    Okay.  There are a number of iterations of the

13  April 15th, what is known as the plan forward.  Are you

14  familiar with that or do we -- we need to go through

15  what the April 15th plan forward was?

16      A.    The -- I'm familiar with the -- a plan that

17  was issued on April 15th, but it would probably be

18  helpful if you had a copy of it to refresh my memory.

19      Q.    Yes, I do.  There's Tab 16, first of all,

20  which has previously been marked as Exhibits 841 -- 840

21  is the E-mail and 841 is the section applicable to the

22  production casing interval.  And then if you'll hold

23  your hand there, and flip back to Tab 25, which has

24  previously been marked in litigation as Exhibit 545.

25  This is an E-mail from Brian Morel to a number of

**PURSUANT TO CONFIDENTIALITY ORDER**

58

1   individuals on the rig, attaching the updated procedure

2   based on the current plan forward.

3               In reviewing these two documents, I'll

4   represent to you there are three changes.  And I'm just

5   trying to ascertain what BP contends was the final

6   instruction or plan forward for the production casing

7   interval of the Macondo Well.

8               MR. FIELDS:  Objection, form.

9       Q.   (By Ms. McClellan) What was the final design

10  document?

11      A.   I've not seen this E-mail, so if I can just

12  kind of read through it.

13      Q.   (Nodding.)

14      A.   (Reviewing document.) Again, I haven't read

15  through all of this, but from the documents I've seen,

16  this procedure dated April 15th was the -- the

17  procedure that was sent to the rig.

18      Q.   Okay.  So this would have been the -- then the

19  final version of the production interval program,

20  correct?

21               MR. FIELDS:  Objection, form.

22      A.   Well, I think even Brian says that there may

23  be updates based on some more information coming in, so

24  I guess this was the -- I don't know if this was the

25  actual final version of this that was sent out, but it

**PURSUANT TO CONFIDENTIALITY ORDER**

1    was -- the one I've seen was based -- was dated April

2    15th.

3        Q.    (By Ms. McClellan) Okay.  Does BP have any

4    reason to believe that after April 15th there was

5    another formal version of the production casing

6    interval sent to the rig?

7                MR. FIELDS:  Objection, form.

8        A.    Based on the date on the program of April

9    15th, no, I'm not aware of any document like this that

10   had been sent out after April 15th.

11       Q.    (By Ms. McClellan) And I believe you just

12   stated that you had not seen this document; is that

13   correct?

14       A.    I have seen this document or a version of it.

15       Q.    Had you seen it prior to April 20th of 2010?

16       A.    No.  I mean, I saw it in preparation for this

17   deposition.

18       Q.    So there was no Management review of this

19   document prior to April 20th of 2010, correct?

20                MR. FIELDS:  Objection, form.

21                MR. RUBINSTEIN:  Objection, form.

22       A.    I don't know that.  I -- I wasn't there, so --

23   I mean, the -- the -- the people on the note would be

24   the -- the -- the Wells Team, so I --

25       Q.    (By Ms. McClellan) To your knowledge, was

PURSUANT TO CONFIDENTIALITY ORDER

1   there any other Management review other than the

2   individuals listed on the E-mail?

3        A.   I'm not aware of any.

4        Q.   Okay.  For the Macondo Well, when does BP

5   contend that the final cement program was put together?

6        A.   I believe there was a -- a cement program sent

7   out on April 18th.

8        Q.   If I could refer you to Tab 24, is this the

9   document that BP contends is the final cement program

10  for the Macondo Well?

11             MR. FIELDS:  Objection to form.

12       A.   This is the -- the OptiCem Report, the -- the

13  last OptiCem report that was developed for the -- the

14  cement job.

15       Q.   (By Ms. McClellan) Where does BP contend that

16  the final cement program is documented?

17       A.   I think the -- the -- the programs were issued

18  on an ongoing basis and updated as -- as more

19  information came in.  So I would say that based that

20  this was the last OptiCem Report this was the final

21  version that was to -- that was issued.

22       Q.   Okay.  And --

23             MR. GODWIN:  Object to form.

24       Q.   (By Ms. McClellan) -- in answer to my

25  question, then, where does BP contend the final cement

**PURSUANT TO CONFIDENTIALITY ORDER**

1    that data is provided.

2          The cementing contractor develops a

3    recommendation which is given to BP which we ultimately

4    accept or -- or not.

5          Q.   And in this case --

6                MR. GODWIN:   Object to form.

7          Q.   (By Ms. McClellan) -- BP ultimately accepted

8    the recommendation from Halliburton, correct?

9          A.   The cement slurry that was pumped, yes.

10         Q.   And it's the responsibility of the Well Site

11   Leader and Drilling Engineer to verify that the final

12   slurry recommended meets the job requirements,

13   including the DWOP and ETP 10-60, right, and other ETP

14   compliance?

15         A.   It would be the Engineers in -- in conjunction

16   with the Team Leaders that -- that would do that, yes.

17         Q.   With respect to the temporary abandonment

18   procedure that was used at the Macondo Well, did that

19   go through the stage-gate process?

20         A.   That part of the program wasn't generally

21   reviewed through the stage-gate process.

22                THE COURT REPORTER:   Was?

23                THE WITNESS:   Was not.

24         Q.   (By Ms. McClellan) And why not?

25         A.   The -- the well planning process is generally

PURSUANT TO CONFIDENTIALITY ORDER

1   through to the -- the final operation on the well as

2   far as drilling and getting to TD, looking at what

3   would happen after that.  We don't generally review

4   that through the stage-gate process the -- the -- the

5   suspension program.

6       Q.   Okay.  The design of the temporary abandonment

7   procedure, that was designed by BP, correct?

8       A.   The -- the program that was issued by BP and

9   ultimately included the -- the temporary suspension

10  program, or temporary abandonment program.

11      Q.   And that was designed by BP, correct?

12      A.   The -- the plan was prepared by BP, yes.

13      Q.   Did BP have a standard temporary abandonment

14  procedure that was to be used in the Gulf of Mexico at

15  the time that the Macondo Well's temporary abandonment

16  procedure was designed?

17      A.   I'm not aware of a standard procedure, no.

18      Q.   What guidance was there, then, for the

19  Engineers in the Gulf of Mexico for temporary

20  abandonment?

21      A.   Again, the DWOP ETPs would be the -- the

22  guidance or the standards which would -- the Teams

23  would have meet in addition to any MMS Regulations.

24      Q.   The Macondo Well's temporary abandonment

25  procedure wasn't included in the January 2010 Drilling

94

1    Program that we looked at, was it?

2         A.    I don't believe so.  I don't know.

3         Q.    Should it have been?

4         A.    It wasn't a standard that we included the --

5    the abandonment or suspension procedure in that

6    Drilling Program.  Normally a program would be issued

7    later to cover the -- the temporary abandonment.

8         Q.    What does BP contend constitutes the Macondo

9    Well's temporary abandonment procedure?

10        A.    I believe that April 15th document was the

11   formal communication as to the -- the -- the procedure.

12   There were further correspondence that updated that

13   procedure.

14        Q.    The April 15th --

15        A.    I think it was Document 25.

16        Q.    Tab 25.  This document's the Temporary

17   Abandonment Procedure For the Macondo Well?

18        A.    It -- it contains the -- the temporary

19   abandonment plan.

20        Q.    Okay.  And was the temporary abandonment plan

21   that's outlined -- if you can point me to the section.

22        A.    So it continues on from the end of the -- the

23   cement job on the --

24        Q.    M-h'm.

25        A.    -- production casing.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Correct.  And was this plan provided to MMS,

2  the temporary abandonment procedure that was to be

3  followed?

4    A.   I believe there was a plan provided to the

5  MMS.

6    Q.   Is the plan that is in the April 15th forward

7  planning the same as the one that was provided to MMS?

8            MR. FIELDS:  Objection, form.

9    A.   I don't believe it is exactly the same, no.

10    Q.   (By Ms. McClellan) What I'm trying -- strike

11  that.

12            If you'll turn to Tab 570.

13    A.   570.

14            THE COURT REPORTER:  Tab?

15            MR. FIELDS:  Turn to Tab?

16    Q.   (By Ms. McClellan) Tab 17, which has

17  previously been marked as Exhibit 570.  Excuse me.  Is

18  this a temporary abandonment procedure that BP provided

19  to MMS on April the 16th?

20            MR. FIELDS:  Objection to form.

21    A.   From my understanding it's the procedure that

22  was submitted.

23    Q.   (By Ms. McClellan) And you said that this

24  procedure differs from the April 15th Drilling Plan,

25  correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.    That's correct.

2      Q.    And if you'll turn to the next Tab, Tab 18,

3  which has previously been marked as Exhibit 566.  This

4  is the Ops note from Brian Morel, dated April the 20th,

5  containing temporary abandonment procedure, as well,

6  correct?

7      A.    From -- from what I've been advised, this was

8  the -- the note that was sent to update the April 15th

9  plan.

10      Q.    Which of these procedures was the one that was

11  to be followed for temporary abandonment?

12      A.    My understanding is that the procedure that

13  was outlined in the note from Brian was the -- the

14  procedure that the -- the Team were to follow on the

15  rig.

16      Q.    And that plan -- well, does the April 20th Ops

17  note reflect the same procedure that was provided to

18  MMS on April the 16th?

19      A.    It is not an exact replication of what was

20  provided to the MMS.

21      Q.    Well, are there changes in the steps that --

22  from what were provided to MMS?

23      A.    The procedure here is not exactly as is in the

24  procedure that was provided to the MMS.

25      Q.    And how does the procedure differ?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   It -- it gives more detail in -- in the April

2 20th note as to how the negative test should be

3 performed.

4    Q.   Was there any ET -- an ETP or any other sort

5 of guidance for the negative pressure test on April the

6 20th of 2010?

7    A.   The own -- the -- within, I think, 10-60,

8 the -- the requirement is to have a -- to -- to be a --

9 a -- a barrier, a temporary barrier --

10    Q.   M-h'm.

11    A.   -- for suspension.  The -- the casing has to

12 be tested, and the preference is to test it in the

13 direction of flow which would say we should test

14 negatively.

15    Q.   Going back one moment, when we were discussing

16 the procedure that was provided to MMS, the April 20th

17 Ops note is not the same procedure that was provided to

18 MMS, correct?

19         MR. FIELDS:  Objection, asked and

20 answered.

21    A.   It is different.

22    Q.   (By Ms. McClellan) Okay.  Why didn't BP submit

23 a revised procedure to MMS?

24         MR. FIELDS:  Objection to form and scope.

25    A.   I don't know.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.    (By Ms. McClellan) Aside from ETP 10-60, which

2  you've just mentioned with respect to guidance for the

3  negative pressure test, was there any written procedure

4  governing the proper performance of a negative pressure

5  test, negative pressure test for the DEEPWATER HORIZON?

6              MR. FIELDS:  Objection, form.

7    A.    A written procedure -- so specifically for

8  Macondo or --

9    Q.    (By Ms. McClellan) In general.

10    A.    In general?

11    Q.    What -- did BP have a procedure as to how to

12  perform and interpret a negative pressure test at the

13  time, April 20th, 2010?

14    A.    We did not have a standard in -- in order --

15  that -- that outlined how to perform a negative test,

16  no.

17    Q.    I believe you've testified that April -- the

18  April 20th Ops note is the procedure that was to be

19  followed for temporary abandonment, correct?

20    A.    It's my understanding that this was a note

21  that was sent out to update the plan on April -- the

22  April 15th plan.

23    Q.    And does the April 15th plan or the April 20th

24  Ops note provide how a negative pressure test is to be

25  conducted?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Sorry.  Could you repeat that question?  I

2  didn't --

3    Q.   Do -- do either -- does the April 20th Ops

4  note provide how the negative pressure test is to be --

5  to be conducted?

6              MR. FIELDS:  Objection to form.

7    A.   It contains broad steps on which the -- the

8  recommendation as to -- as to conduct the negative

9  test.

10   Q.   (By Ms. McClellan) And it was BP who was

11 responsible for interpreting the negative pressure

12 test?

13             MR. RUBINSTEIN:  Objection.

14             MR. FIELDS:  Objection, form and scope.

15   A.   The -- the -- the interpretation of the

16 negative test would be done at the rig site by BP and

17 Transocean.

18             MR. JOHNSON:  Objection, form.

19   Q.   (By Ms. McClellan) Does BP dispute that the

20 abnormal pressures that were observed during the

21 negative pressure test were indicative of a failed or

22 inconclusive test?

23             MR. RUBINSTEIN:  Objection, form.

24             MR. FIELDS:  Objection, form and scope.

25   A.   Well, I think it's in the Bly Report, that the

1   A. -- or --

2   Q. And --

3   A. -- could be contacted.

4   Q. Well, and that's exactly what I'm asking is --

5 and I'm not asking about a particular time or a date or

6 anything, whether or not they were busy to -- to -- you

7 know, too busy to be available for consultation.  But

8 BP has Cement Experts that are available for

9 consultation by Wells Teams in the development of a

10 cement program; isn't that true?

11   A. There are BP experts available, yes.

12   Q. Okay.  Let's move on to Temporary Abandonment

13 Procedure.  Transocean was not involved in preparing

14 the Temporary Abandonment Procedure; isn't that true,

15 sir?

16   A. As it relates to the -- the Well Program?

17   Q. Yeah, the Temporary Abandonment Procedure.

18   A. The procedure that was issued was issued by

19 BP.

20   Q. Right.  And Transocean, as far as you know,

21 was not involved in preparing that procedure; isn't

22 that true?

23   A. I don't know if they were involved or

24 consulted over it.

25   Q. You're not aware of any involvement by

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Transocean in the preparation of the Temporary

2   Abandonment Procedure; isn't that true?

3       A.   I'm not aware of any.

4       Q.   Okay.  I think you may have answered this

5   earlier.  I just want to clarify:  At what point in

6   terms of -- of date and time -- and you don't have to

7   have the exact time -- was the final Temporary

8   Abandonment Procedure generated?

9       A.   I don't have the exact date.  I mean, from

10  what I've seen, there was the -- the -- the E-mail from

11  Brian Morel which outlined an update to the program

12  as --

13      Q.   As far as you know, that April 20 E-mail from

14  Brian Morel was the final Temporary Abandonment

15  Procedure; is that right?

16      A.   I haven't seen any other procedure that --

17  that is after that.

18      Q.   Okay.  So as far as you know, the April 20

19  E-mail from Brian Morel that was, I think, referred to

20  as an "Ops Note," that was the final Temporary

21  Abandonment Procedure; is that true?

22      A.   As far as I'm aware, yes.

23      Q.   Okay.  And it's true, sir -- and I -- I think

24  we've covered this, I just want to make sure -- that

25  final Temporary Abandonment Procedure that you

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.   (By Mr. Johnson) In your view -- and I think

2  this was the -- the document you were referring to that

3  reflected the final Temporary Abandonment Procedure

4  that we were talking about; is that right?

5    A.   This is what I've seen as the final that was

6  submitted.  I haven't seen anything beyond this.

7    Q.   Right.  As far as you know, that's the final

8  --

9    A.   The final --

10   Q.   -- Temporary Abandonment Procedure, right?

11   A.   That was the update to the plan, yeah.

12   Q.   Okay.  Just -- and I just want to clarify:  As

13  far as you know, that's the final Temporary Abandonment

14  Procedure, correct?

15   A.   As far as I'm aware, this is it.

16   Q.   Okay.  Does that -- I -- Mister -- do you know

17  Jon Sprague?

18   A.   I do know --

19   Q.   Okay.

20   A.   -- Jon Sprague.

21   Q.   He circled the two steps that he believed

22  related to the negative pressure test.  Do you see the

23  circles there?

24   A.   Yes.

25   Q.   What numbers are those?

PURSUANT TO CONFIDENTIALITY ORDER

143

1    A.    3 and 4.

2    Q.    Okay.  And do you -- just looking over that,

3  do you agree that those are the steps that -- that

4  cover the Negative Pressure Test Procedure?

5              MR. RUBINSTEIN:  Objection, form.

6    A.    I mean, the -- these relate to part of it.  I

7  mean, the -- obviously the running in the hole with

8  the -- the drill pipe would be part of it, too, right?

9    Q.    (By Mr. Johnson) Well, I'm just talking about

10 the test procedure.

11             MR. FIELDS:  Objection, form.

12   A.    This is a -- high level steps --

13   Q.    (By Mr. Johnson) Right.

14   A.    -- which -- in order to perform the negative

15 test.

16   Q.    Yeah.  Here's what I want to ask you is --

17 and -- and if you want to look at more than just those

18 two, that's fine -- do you believe that the Negative

19 Pressure Test Procedure contained in this final

20 Abandonment Procedure is sufficiently detailed?

21             MR. RUBINSTEIN:  Objection, form.

22   A.    So I -- I think this is a -- a fairly high

23 level procedure that would have been taken by the rig

24 and developed into a more specific procedure.

25   Q.    (By Mr. Johnson) Okay.  And -- and I

**PURSUANT TO CONFIDENTIALITY ORDER**

1  appreciate that.  I guess my question is:  Do you

2  believe that this one is sufficiently detailed?

3              MR. RUBINSTEIN:  The same objection.

4              MR. FIELDS:  Objection, form.

5  A.   Sufficiently detailed to -- I mean, in what

6  context?

7  Q.   (By Mr. Johnson) Do you believe that contains

8  sufficient detail as to the Negative test -- Pressure

9  Test Procedure?

10             MR. RUBINSTEIN:  Same objection.

11         (Discussion off the record.)

12  A.   Sorry.  Could you repeat the question?

13  Q.   (By Mr. Johnson) Yeah.

14             MR. JOHNSON:  Would you read that back

15  Kym, if you don't mind?

16         (Requested portion was displayed and read as

17  follows:

18         QUESTION:  "Do you believe that contains

19  sufficient detail as to the Negative Pressure Test

20  Procedure?")

21  A.   So I think this is a -- a high level step

22  procedure that would be in more detailed procedure

23  developed in order to execute the -- the negative test.

24  Q.   (By Mr. Johnson) So that one is not

25  sufficient, in your view?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. FIELDS:  Objection to form.

2     A.    This details in general terms how the negative

3 test should be performed.  There are obviously a lot of

4 other things need to happen in order to execute the

5 negative test.

6     Q.    (By Mr. Johnson) Sure.

7     A.    Those steps would have been developed on the

8 rig by the -- the rig personnel in conjunction with the

9 Well Site Leader.

10     Q.    My question is:  Is that one sufficient?

11     A.    Sufficient for what?

12     Q.    For -- do you believe that's a sufficiently

13 detailed procedure for conducting a negative pressure

14 test?

15          MR. FIELDS:  Objection, form.

16          MR. RUBINSTEIN:  Objection, form.

17     A.    It's the high level steps to conduct a

18 negative test.  There would need to be more detail in

19 order to execute --

20     Q.    (By Mr. Johnson) I --

21     A.    -- the test.

22     Q.    I'll accept that.  So that one, in and of

23 itself, is not sufficient, in your view?

24          MR. RUBINSTEIN:  Objection, form.

25          MR. FIELDS:  The same objection.

PURSUANT TO CONFIDENTIALITY ORDER

1    A.   It's the high level steps.  There would need

2  to be a more detailed procedure, because a lot of

3  things have to happen in order for this to be done.

4    Q.   (By Mr. Johnson) I accept that.  But my

5  question, just to be clear is:  That document by itself

6  is not sufficient; isn't that true?

7              MR. FIELDS:  Objection, form.

8              MR. RUBINSTEIN:  Same objection.

9    A.   This document would need to be taken by the

10  rig and developed into a more detailed procedure.

11    Q.   (By Mr. Johnson) Okay.  It's true that -- that

12  that final Abandonment Procedure contains no pass/fail

13  criteria for the negative pressure test, correct?

14    A.   It doesn't contain a specific reference to

15  outcome, no.

16    Q.   Okay.  And -- and that final Abandonment

17  Procedure containing the Negative Pressure Test

18  Procedure does not include any information regarding

19  bleed-back volumes, correct?

20    A.   It doesn't say anything about bleed-back

21  volumes, no.

22    Q.   Okay.  Regarding BP's determination of the

23  well design for the Macondo Well, was a formal Risk

24  Assessment conducted on the final Temporary Abandonment

25  Procedure to evaluate whether that procedure

PURSUANT TO CONFIDENTIALITY ORDER

1          UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

2

3   IN RE:  OIL SPILL         )      MDL NO. 2179
    BY THE OIL RIG            )

4   "DEEPWATER HORIZON" IN    )      SECTION "J"
    THE GULF OF MEXICO, ON    )

5   APRIL 20, 2010            )      JUDGE BARBIER
                              )      MAG. JUDGE SHUSHAN

6

7        ****************************************

         ORAL AND VIDEOTAPED DEPOSITION OF

8                    JAMES COWIE
                   JUNE 29, 2011

9                     VOLUME 1
         ****************************************

10

11

12

13

14

15

16

17

18

19

20

21          Deposition of JAMES COWIE, taken at

22   Kirkland & Ellis International, 30 St. Mary Axe, 22nd

23   Floor, London EC3A 8AF, England, United Kingdom, on the

24   29th of June, 2011.

25

**PURSUANT TO CONFIDENTIALITY ORDER**

1    made not to run it at that time?  Have you ever been --

2    been involved in such a decision?

3         A.    Not that I remember.

4         Q.    Okay.  You are aware that on the Macondo well

01:00  5    that the -- Schlumberger was out there on -- on the

6    Deepwater Horizon to perform a cement bond log for BP;

7    are you not?

8         A.    I am.

9         Q.    Okay.  And you are aware that BP made the

01:00 10    decision for Schlumberger not to run the cement bond log

11    and instead to go back to -- go back -- go back home, if

12    you will?

13         A.    My understanding was there was a process to

14    make that decision.

01:00 15         Q.    Okay.

16         A.    Which was followed -- they made that decision.

17    And whether they were going to do the cement bond log

18    later or not, I don't know.

19         Q.    Okay.  But the ultimate decision not to run

01:01 20    the cement bond log at the time during the temporary

21    abandonment phase of the Horizon well was made by BP;

22    was it not?

23         A.    I would suggest that that discussion -- that

24    would have been a discussion that could have taken place

01:01 25    on the rig and, you know, with the rig team leadership.

175

1    Q.   And -- and when you refer to "rig team

2  leadership" who are you referring to, if maybe not the

3  name of the individuals, their positions they held at

4  that time?

01:01   5    A.   I would think the well site leader,

6  toolpusher, OIM, that group of people.

7    Q.   Okay.  So that would mean the BP folks, the

8  well site leader, and it would be Transocean folks,

9  correct?

01:01  10    A.   In this case, yes.

11    Q.   In this case, dealing with Horizon well?

12    A.   Yes.  I guess there would also be a discussion

13  around with the cementer, who was there, you know, to

14  get his interpretation of the job earlier to see if he

01:01  15  was happy that the job had gone, you know, according to

16  the plan that was laid for the cement job.

17    Q.   But in terms of the decision to -- whether to

18  run a bond log or not are you suggesting to the Court in

19  this case that Halliburton was in any way involved in

01:02  20  making the decision to run the bond log?

21    A.   I'm not suggesting that.

22    Q.   Okay, sir, thank you.  And, in fact, you know

23  that the -- if a bond log decision was made not to be

24  run, which we know it was, was made, that was a decision

01:02  25  that you believe was made by BP and Transocean personnel

**PURSUANT TO CONFIDENTIALITY ORDER**

1    for developing detailed plans as to where and how the

2    well was to be drilled, cased, cemented, and completed?

3         A.   BP with the support of their service providers

4    was responsible for that.

04:47  5    Q.   Do you agree with me that BP retained full

6    authority over drilling operations, casing, cementing,

7    and temporary abandonment?

8                   MR. REGAN:  Object to form.

9         A.   No, sir.

04:47  10   Q.   (BY MR. HASSINGER)  You agree with me that BP

11   failed to properly assess, manage, and communicate risk?

12        A.   No, sir.

13        Q.   You know from your work in the investigation

14   that BP did not properly communicate to the drilling

04:47  15   crew the lack of testing on the cement, don't you?

16        A.   I believe that the lack of testing of the

17   cement came to light after the fact.

18        Q.   I think you did tell us earlier that you do

19   conclude that the primary cause of the disaster was the

04:48  20   failure of the cement to isolate the reservoir?

21        A.   I don't believe I said that was the primary.

22   If I did, that was wrong.  I believe that was one of the

23   causes.

24        Q.   Have you identified a primary cause?

04:48  25        A.   I don't believe so.  I believe there is a list

**PURSUANT TO CONFIDENTIALITY ORDER**

342

of causes in the document.

Q.   And, again, not -- I'm not focusing on the document, but you, you know, as a guy 30 years in the industry and a vice president of BP, have you identified what you believe to be a primary cause?

A.   As a guy with 30 years and vice president in BP, I think there were a number of causes.

Q.   I heard you the first time you said that.  I'm asking you, have you identified a primary cause?

MR. REGAN:  Motion to strike, objection to the form of the question.

A.   I believe there are a number of causes.  I have not identified a primary cause.

Q.   (BY MR. HASSINGER)  All right.  And that's all I was asking.

You do acknowledge that BP failed to assess the risk of the temporary abandonment procedure used at Macondo?

A.   I have no knowledge of that.

Q.   You don't admit that?

A.   I said I have no knowledge of that.

Q.   Do you admit that BP did not adequately test the cement slurry?

MR. REGAN:  Objection to form.

A.   No, I do not admit that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   (BY MR. HASSINGER)  Have you concluded that

2  the cement program at Macondo was of minimal quality,

3  left little margin for error, and was not tested

4  adequately before or after the cementing operation?

04:50  5      A.   Have I concluded that?  No, no, sir.

6      Q.   Do you believe that to be the case?

7      A.   Could you repeat the question.

8      Q.   Uh-huh.  The cementing program at Macondo was

9  of minimal quantity, left little margin for error, and

04:50  10  was not tested adequately before or after the cementing

11  operation?

12               MR. GODWIN:  Object; form.

13      A.   I -- I can't comment on that.  That wasn't

14  part of my arena in the investigation.

04:50  15      Q.   (BY MR. HASSINGER)  That was outside of your

16  scope?

17      A.   It was, sir, yes.

18      Q.   How long did your work last, your work on the

19  Bly team?

04:51  20      A.   About four months.

21               MR. HASSINGER:  That's all the questions I

22  have.  Thank you.

23               THE VIDEOGRAPHER:  Off the record at

24  4:51 p.m., ending tape 8.

25             (The deposition recessed at 4:51 p.m.)

**PURSUANT TO CONFIDENTIALITY ORDER**

348

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL           )      MDL NO. 2179

BY THE OIL RIG              )

"DEEPWATER HORIZON" IN      )      SECTION "J"

THE GULF OF MEXICO, ON      )

APRIL 20, 2010              )      JUDGE BARBIER

                            )      MAG. JUDGE SHUSHAN


*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES COWIE

JUNE 30, 2011

VOLUME 2

*****************************************


              Deposition of JAMES COWIE, taken at

Kirkland & Ellis International, 30 St. Mary Axe, 22nd

Floor, London EC3A 8AF, England, United Kingdom, on the

30th of June, 2011.


PURSUANT TO CONFIDENTIALITY ORDER

```
 1    "All D&C operations shall follow a documented and

 2    auditable risk management process to include

 3    identification, assessment, prioritization, and action.

 4    The process shall include all risk with either an HSSE

 5    or significant financial impact."

 6              Did I read that correctly?

 7         A.   You did, yes.

 8         Q.   And so is it fair to say that DWOP requires BP

 9    to conduct routine risk assessments?

10         A.   That is correct, yes.

11         Q.   And is temporarily abandonment considered a

12    D&C operation?

13              MR. REGAN:  Objection; form.

14         A.   It would be, yes.

15         Q.   (BY MR. WILLIAMS)  For purposes of DWOP?

16         A.   Yes, I believe so.

17         Q.   I wanted to ask you about a few decisions that

18    were made on the Macondo well and ask if a documented

19    and auditable risk assessment was conducted by BP.

20         A.   Okay.

21         Q.   Is that -- is that clear?  Do you understand

22    what I'm -- what I'm asking?

23         A.   Yes.

24         Q.   So the use of a long string instead of a liner

25    tieback, was it documented an auditable risk management
```

09:04  5
09:04 10
09:04 15
09:05 20
09:05 25

**PURSUANT TO CONFIDENTIALITY ORDER**

 1   process followed by BP?

 2       A.   My understanding is that a management of

 3   change process was executed for that change, and as part

 4   of the management of change process a risk assessment

09:05  5   should have been done.

 6       Q.   And are you aware if that risk assessment was

 7   done?

 8       A.   I believe there was a reference to the risk

 9   involved and that change in the MOC.

09:06  10      Q.   How about the use of only six centralizers,

 11  was a documented and auditable risk management process

 12  followed by BP with respect to that decision?

 13           MR. REGAN:   Object to form.

 14      A.   Not that I'm aware of.

09:06  15      Q.   (BY MR. WILLIAMS)  Was a documented and

 16  auditable risk management process followed by BP with

 17  respect to foregoing substantiated foam stability test

 18  results?

 19           MR. REGAN:   Objection; form.

09:06  20           MR. SCHWARTZ:   Objection; form.

 21      A.   I'm not sure that was a decision that was

 22  made.  I'm not clear on the question.

 23      Q.   (BY MR. WILLIAMS)  Well, the -- we talked

 24  yesterday about the final cement slurry being pumped

09:06  25  prior to BP having a foam stability test result for that

PURSUANT TO CONFIDENTIALITY ORDER

1    slurry.  Do you recall that?

2               MR. SCHWARTZ:  Objection; form.

3         A.   My understanding was that BP was issued with

4    planned recommendations for pumping that slurry.  So I

09:07  5    am not aware that BP was aware that they didn't have the

6    full test results.

7         Q.   (BY MR. WILLIAMS)  Okay.

8               MR. SCHWARTZ:  Objection; form.

9         Q.   (BY MR. WILLIAMS)  You are aware that a cement

09:07  10    bond log was not conducted on the Macondo well?

11        A.   I am.

12        Q.   And with the decision not to run a cement bond

13    log, do you know if BP followed a documented and

14    auditable risk assessment process?

09:07  15        A.   I believe they did the decision tree process.

16        Q.   And that's -- you're talking about the -- it's

17    a one-page decision tree document that walks through

18    various indicators and outcomes?

19        A.   Yes.

09:07  20        Q.   And that process qualifies as a documented and

21    auditable risk management process under DWOP?

22        A.   I believe it demonstrates that a process was

23    considered, went through, and the risks were considered

24    to determine what the outcome should be.  So, yes, I do.

09:08  25        Q.   Okay.  You're aware that BP used a spacer made

**PURSUANT TO CONFIDENTIALITY ORDER**

1    from lost circulation materials on the Macondo well?

2        A.   Yes.

3        Q.   Do you know if BP followed a documented and

4    auditable risk management process with respect to that

09:08  5    decision?

6                    MR. REGAN:   Object to form.

7        A.   I do not know if they did or not.

8        Q.   (BY MR. WILLIAMS)  And you are aware that BP

9    displaced mud from the riser before setting the surface

09:09  10   cement plug on the Macondo well?

11       A.   Yes.

12       Q.   Do you know if BP followed a documented and

13   auditable risk management process with respect to that

14   decision?

09:09  15                   MR. REGAN:   Objection; form.

16       A.   I would suggest that that was considered when

17   the drilling program was written as part of the process

18   and part of the operations.  So I would question whether

19   a risk assessment would be required for that operation.

09:09  20       Q.   (BY MR. WILLIAMS)  That may not qualify

21   because it was already part of the drilling plan?

22       A.   Yes, sir.

23       Q.   And is that the case with any decisions that's

24   in the drilling plan, that that qualifies as the

09:09  25   auditable risk assessment, the drilling plan itself?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   The drilling plan is prepared giving

2  consideration to the risks involved in that, so the risk

3  register is prepared, that is, prior to the drilling

4  program being written.  As the drilling program is

09:10  5  written the risk register is considered.  And then when

6  the drilling program was written the engineers will

7  review the program to determine, you know, if it is the

8  right thing to do, you know, what are the risks

9  associated with that event.  And then the drilling

09:10 10  program is approved through the organization.

11    Q.   What happens if there are changes made to the

12  drilling program after its initial approval?

13    A.   Then a significant change would go through the

14  management of change process.  As you mentioned earlier,

09:10 15  you know, long string versus a liner.

16    Q.   And what is the line of demarcation between a

17  significant change that requires a management of change

18  process versus a decision that does not require a

19  management of change process?

09:11 20    A.   A change in sequence of events would -- an ops

21  note would be used for that on this location, and then a

22  significant -- what -- anything that would change the

23  design of the well or -- well, change the design of the

24  well, then a management of change would be used.

09:11 25    Q.   What is a change to a temporary abandonment

1   plan?

2                    MR. REGAN:  Objection; form.

3        Q.   (BY MR. WILLIAMS)  Is that a sequence of

4   events change or a design of well change?

09:11   5                MR. REGAN:  Objection; form.

6        A.   I would need a specific case to comment on

7   that.

8        Q.   (BY MR. WILLIAMS)  Well, on the Macondo are

9   you aware that there were several versions of a

09:11  10   temporary abandonment plan prepared by BP?

11                   MR. REGAN:  Objection to form.

12       Q.   (BY MR. WILLIAMS)  During April 2010 there

13   were various versions of a temporary abandonment plan;

14   are you aware of that?

09:12  15                MR. REGAN:  Objection; form.

16       A.   I'm aware that there was a change in the

17   sequence of events.  I'm not aware that there were a

18   number of -- or various temporary abandonment plans.

19       Q.   (BY MR. WILLIAMS)  Okay.  You're aware that BP

09:12  20   changed the sequence of events in the temporary

21   abandonment plan at some point in April 2010?

22       A.   I am.

23       Q.   And what sort of risk assessment is required

24   for that change?

09:12  25       A.   That would depend on the team and how they saw

1    the risks that were occurring at that time.  So I don't

2    know what was actually completed for that event.

3        Q.   Just a couple more.  Not in- -- the decision

4    to not install additional barriers during the temporary

09:13  5    abandonment procedure, did BP follow a documented and

6    auditable risk management process with respect to that

7    decision?

8             MR. REGAN:  Objection to form.

9        A.   That's a strange terminology, the decision not

09:13 10    to do something.  My understanding was that the program

11    called for two barriers.  The policy states there should

12    be two barriers.  And my recollection is the MMS had

13    agreed two barriers was the design for this well.

14             The first barrier was the cement and the shoe

09:13 15    track, and after the negative test the plan was to set

16    the second barrier.  So I do not think that there was

17    any conscious decision made not to set additional

18    barriers.

19        Q.   (BY MR. WILLIAMS)  The -- are you aware that

09:14 20    there was in one of the temporary abandonment plans an

21    indication that BP would set the surface plug prior to

22    conducting the negative pressure test?

23             MR. REGAN:  Objection to form.

24        A.   I'm not aware of that, and I'm not sure why

09:14 25    you would do that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   (BY MR. WILLIAMS)  Do you know on Macondo

2  whether the surface plug was set prior to the negative

3  pressure test?

4      A.   It was not.

09:14  5      Q.   And if that was a change from the prior

6  temporary abandonment plan, the timing of placing the

7  surface plug, would that be a significant change?

8                 MR. REGAN:  Objection; to form.

9      A.   Sorry, to me this is a hypothetical question.

09:15 10  I mean, I'm not aware that there was a change made, you

11  know.  And to say -- I don't know if that change was

12  made.  I don't know if that change was discussed.  So

13  therefore I can't comment on whether a risk assessment

14  plan would be needed for that.  If you could clarify the

09:15 15  question, I'll try and answer it.

16      Q.   (BY MR. WILLIAMS)  Okay.  In terms of all the

17  decisions we just walked through on the Macondo well,

18  was there a risk assessment for the accumulation of any

19  risks in those decisions?

09:16 20                 MR. REGAN:  Objection; form.

21      A.   A written risk assessment?  I would say that

22  the team were continually assessing the risks involved

23  in what they were doing, I would say both Transocean and

24  BP.  So they were aware of the ongoing operations at the

09:16 25  time and the sensitivities of this well.  So the team

1          Q.    (BY MR. WILLIAMS)  Decision not to displace

2     the seawater and set the plug at approximately 3300 feet

3     below the mud line.

4          A.    I don't understand this question.  Again, I

09:44 5     don't believe there was a decision not to do this.

6          Q.    Let -- let me ask it this way:  Let's just

7     take the decision on where to set the plug, 3300 feet

8     below the mud line.

9          A.    Okay.

09:44 10          Q.    Were there any communications within BP

11     related to that decision?

12          A.    The communication that I have seen is the ops

13     note that was sent giving details of setting the cement

14     plug.

09:44 15          Q.    And was that an e-mail?

16          A.    Yes.

17          Q.    And is that typically how ops notes are done,

18     by e-mail?

19          A.    Yes.  I -- I'm saying that.  The sequence was

09:45 20     there.  I don't know specifically if the depth of the

21     plug was on that e-mail.

22          Q.    Okay.  But whatever that ops note says, that's

23     the only communication you're aware of --

24          A.    Yes.

09:45 25          Q.    -- regarding where to set the plug?

PURSUANT TO CONFIDENTIALITY ORDER

398

1     A.   Yes.

2     Q.   How about evaluations of that decision?

3     A.   I believe the team would have looked at, you

4  know, where is the appropriate place to set the plug,

09:45  5  bearing in mind the -- the temporary abandonment

6  program.

7     Q.   Testing, I mean, is it possible to do any

8  testing related to this decision or modeling?

9     A.   I believe that the testing -- you know,

09:45  10  testing that decision ties in with the policy, and the

11  policy states that two cement plug should be set, you

12  know, the first one inflow tested and the second one

13  weight tested again.  That's detailed, I believe, in

14  ETP 1060.

09:46  15     Q.   And does BP provide training with respect to

16  where to locate your plug?

17     A.   There is nothing specified around, you know,

18  where that plug should be set.  Right now I believe it's

19  a thousand feet below the mud line or thereafter.  At

09:46  20  least a thousand feet below the -- the mud line.  But as

21  far as training with regard to where to set that, I

22  don't believe so.  The guidance is provided, you know,

23  in the policy statement.

24     Q.   And are you aware of any analysis of that

09:47  25  decision of where to place the plug?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.    I'm not.

2       Q.    The decision not to conduct or repair cement

3   bond lugs, are you aware of a discussion within BP

4   related to that decision?

09:47   5       A.    I'm aware that there was a discussion around

6   how that decision would be made.

7       Q.    But you didn't see any other communications or

8   ops notes on that?

9       A.    I didn't.

09:47   10      Q.    And the evaluation is the decision tree?

11      A.    Yes, it is.

12      Q.    Was there any testing related to that

13  decision?

14      A.    No, I don't believe so.

09:47   15      Q.    How about training?

16      A.    No.

17      Q.    So whether or not to conduct a cement bond or

18  other cement evaluation log is not part of training

19  provided by BP?

09:48   20      A.    I guess when I look at training I'm thinking

21  is there a specific training course provided to make

22  this decision, and, you know, not that I'm aware of.

23  Part of the development of drilling engineers, you know,

24  includes the ability to make this type of decision, to

09:48   25  consult with the senior drilling engineers, and their

line managers regarding, you know, is this decision

appropriate, you know, does it meet our requirements.

    Q.   And do you know any of those specifics on

developing engineers to make that decision?

09:48                 MR. REGAN:  Object to form.

    A.   It's -- it would be part of their training.

Specifics, no, I don't know specifics.

    Q.   (BY MR. WILLIAMS)  And does BP have any

policies relating to the decision whether or not to

09:49   conduct a cement bond or other evaluation log?

    A.   There is a policy regarding that.

               THE VIDEOGRAPHER:  You have two minutes.

    A.   (Continuing)  Either policy or practice.  I

can't recall right now where it is.  Escapes me right

09:49   now.

    Q.   (BY MR. WILLIAMS)  Has BP implemented any new

policies or procedures related to these types of

decisions since the Macondo well incident?

               MR. REGAN:  Object to form.

09:49    A.   BP is in the process of reviewing our

engineering technical practices, you know, based on the

recommendations from the Bly investigation.  So that

process is ongoing as we speak.

    Q.   (BY MR. WILLIAMS)  Has -- have any changes

09:49   been implemented yet?

PURSUANT TO CONFIDENTIALITY ORDER

1    to proceed, anyway?

2          A.   No, sir.

3          Q.   From your investigation, are you aware of any

4    incentive that any of those men would have had to

11:52  5    believe that the well did not have integrity, but to

6    proceed, anyway?

7          A.   Absolutely not, no.

8          Q.   Okay.  And you see on the chart that there is

9    also a line for "Not Installing Additional Physical

11:53  10   Barriers During Temporary Abandonment Procedure."

11              Do you see that?

12         A.   I do, yes.

13         Q.   Okay.  From your understanding, how many

14   barriers were there to be installed in the well?

11:53  15         A.   Two.

16         Q.   Was that consistent with BP policy?

17         A.   Yes, sir.

18         Q.   What was the procedure that was underway as of

19   the time that the well became uncontrolled?

11:53  20         A.   The procedure was circulating the well with

21   seawater in preparation for setting the second plug.

22         Q.   Okay.  Are you aware of anyone on that rig

23   from your investigation deciding that they did not want

24   to set an additional physical barrier that was planned

11:53  25   to be set?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.    Yes.

2      Q.    Right?  Are you aware of any other

3 communications that would have taken place that

4 referenced the -- the depth of the plug to be used?

11:54  5      A.    I believe it was in the drilling program.

6      Q.    Okay.

7      A.    And I also believe there was a communication

8 with MMS.

9      Q.    Okay.  When you say "communication with MMS,"

11:55 10 are you referring to the temporary abandonment procedure

11 that was sent to MMS?

12     A.    Correct, yes.

13     Q.    Okay.  All right.  You were also asked a

14 number of questions yesterday about how Halliburton

11:55 15 OptiCem models as they reflected a number of

16 centralizers to be used.  Do you recall those questions

17 from Mr. Godwin?

18     A.    Yes, I do.

19     Q.    And he asked you about a model that included

11:55 20 21 centralizers; is that right?

21     A.    Yes.

22     Q.    And he asked you about a model that included

23 seven centralizers; is that correct?

24     A.    He did.

11:55 25     Q.    Okay.  Are you aware that Transocean has

**PURSUANT TO CONFIDENTIALITY ORDER**

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

3

4    IN RE:  OIL SPILL      MDL NO. 2179
     BY THE OIL RIG
5    "DEEPWATER HORIZON"    SECTION:  J
     IN THE GULF OF
6    MEXICO, ON APRIL       JUDGE BARBIER
     20, 2010               MAG. JUDGE SHUSHAN
7

8

9



15            Deposition of **RONALD W. SEPULVADO,**
16   taken in the Pan American Life Center,
     Bayou Room, 11th Floor, 601 Poydras Street,
17   New Orleans, Louisiana 70130, on Thursday,
     March 10, 2011.
18

19

     **APPEARANCES:**
20

21        LEWIS, KULLMAN, STERBCOW
          & ABRAMSON
22        (By:  Paul M. Sterbcow, Esquire)
          601 Poydras Street
23        Suite 2616
          New Orleans, Louisiana  70130
24            (Attorneys for the Plaintiffs
               Steering Committee)
25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1    referred to was marked as Exhibit No. 529

2    for identification.)

3    EXAMINATION BY MR. STERBCOW:

4         Q.    If you go past the next blue

5    divider, here's an e-mail from Morel,

6    Monday, April 12th, about, I think, five

7    hours or so after the response to Murray,

8    yourself and Guide.  And he says this isn't

9    perfect yet but I wanted to get everyone a

10   copy so you can ensure all the equipment

11   required for our upcoming operation is

12   offshore in time.

13              This is Bates stamped MBI

14   000126180 through 00126200.

15              Is this the first production

16   casing, I'll call it operation instruction

17   that you received?

18        A.    This is -- under subject matter

19   it says Rev. 1.

20        Q.    Right.  Rev. 1, which means

21   revision one?

22        A.    Right.

23        Q.    So this is the first one?

24        A.    Yeah, it should be the first

25   one.

1      Q.     Okay.  And the pages that

2    follow, it's 19 pages total.  First, let me

3    ask you:  Is this the typical production

4    casing plan that you would expect to

5    receive in this situation?

6      A.     Let's see what all he's got in

7    here.  Yes, it is.

8      Q.     Okay.  It appears to be very

9    detailed and they typically are, I would

10   think; right?

11     A.     Yes, sir.

12     Q.     Do you know if, does Mr. Morel

13   put this together?

14     A.     I'm not certain whether he does

15   or not but usually most of the engineers do

16   this type of work.

17     Q.     Do the well site leaders play

18   any role at all in putting this document

19   together?

20     A.     Usually the first one, we don't.

21   But then, like I said before, may have four

22   or five different versions of it before we

23   get the final one.  What he normally does

24   is send this out to us, the Rev. 1, let

25   everybody look at it and if it -- look for

1    mistakes or, you know, something we don't
2    agree with, you know, we call and discuss
3    it with him.
4         Q.    So at this point would it have
5    been -- you and Murray would have been the
6    ones on the rig, the BP well site leaders
7    to receive this and then sit down and look
8    at it and see if you wanted to suggest any
9    changes?
10        A.    Yes, sir.
11        Q.    If any changes were suggested
12   would that typically result in an R-E-V 2?
13        A.    Yes, sir.
14        Q.    Is there any discussion with
15   Mr. Morel, telephone, telephone discussion
16   regarding your suggested changes, a well
17   site leader's suggested changes?
18        A.    Sometimes it's e-mail, sometimes
19   it's telephone discussion.
20        Q.    Either way?
21        A.    Yes, sir.
22        Q.    Does Mr. Guide involve himself
23   in those discussions?
24        A.    Yes, sir.  If we see something
25   we want to change, usually John Guide's

1          We'll mark that as 536.

2          (Whereupon, the document

3     referred to was marked as Exhibit No. 536

4     for identification.)

5     EXAMINATION BY MR. STERBCOW:

6          Q.    Now we're on Wednesday,

7     April 14th and it looks like the next,

8     after the next blue sheet, this is 00126982

9     and this appears to be an e-mail from

10    Mr. Morel, it's called forward ops.

11          Is this the first time that you

12    received any guidance from Mr. Morel on the

13    temporary abandonment plan, to your

14    knowledge?

15          A.    I don't know if this was the

16    first one.

17          Q.    Now, this is different from the

18    casing program that he sent on the 12th;

19    right?

20          A.    Yeah.  Here he's saying -- let's

21    see.  Okay.  Looks like he's sending some

22    tools to the rig and he's just sending us

23    an e-mail saying that he's got them lined

24    up and coming to the rig.  He's actually

25    sending it to Nick, which is the rig clerk

 1   and he's just copying myself.

 2        Q.     James Wilson is Nick?

 3        A.     Yes, sir.

 4        Q.     He's the clerk who maintains the

 5   inventory?

 6        A.     He's the rig clerk.  He lines up

 7   logistics, you know, what's coming on

 8   boats, going on boats and helicopters.

 9        Q.     All right.  Do you know whether

10   or not this is the first e-mail -- if you

11   look down the list in the forward ops plan,

12   first he asks you do you see anything that

13   we should do differently based on these

14   limited details.

15             But if you go down the list

16   right after wait on cement/tag top of

17   cement with -- what is that, 15K?

18        A.     Yes.  15,000 pounds.

19        Q.     15,000 pounds.  Next thing,

20   negative test with base oil and kill/choke

21   line to the wellhead.  Is that the first

22   publication from Mr. Morel to the rig that

23   you know of where he specifically

24   references a negative test and how it's

25   going to be done?

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2

3

4    IN RE:  OIL SPILL      MDL NO. 2179
     BY THE OIL RIG
5    "DEEPWATER HORIZON"    SECTION:  J
     IN THE GULF OF
6    MEXICO, ON APRIL       JUDGE BARBIER
     20, 2010               MAG. JUDGE SHUSHAN
7

8

9



14                 **VOLUME II**

15         Deposition of **RONALD W. SEPULVADO,**
16   taken in the Pan American Life Center,
     Bayou Room, 11th Floor, 601 Poydras Street,
17   New Orleans, Louisiana 70130, on Friday,
     March 11, 2011.
18

19   **APPEARANCES:**
20

21
             LEWIS, KULLMAN, STERBCOW
22           & ABRAMSON
             (By:  Paul M. Sterbcow, Esquire)
23           601 Poydras Street
             Suite 2616
24           New Orleans, Louisiana  70130
                 (Attorneys for the Plaintiffs
25                Steering Committee)

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

1    you were given the information that the

2    cement slurry stability tests were not

3    concluded and that there is a severe

4    potential gas flow, that is information

5    that you would pass on to your drill crew?

6         A.    I would pass it on to Jimmy

7    Harrell.

8         Q.    He is the OIM of the rig?

9         A.    Yes, sir.

10        Q.    All right.  And he is over

11   drilling of the rig?

12        A.    Yes, sir.

13        Q.    All right.  Going back to what

14   was marked yesterday as Exhibit 537, I have

15   a copy of it in front of you, sir.

16            This is the series of e-mails

17   that begin on April 14th.  Brian Morel

18   sends you an e-mail and you send him an

19   e-mail back and at the top he sends you an

20   e-mail back; correct, sir?

21        A.    Yes, sir.

22        Q.    Now, as of April 14th -- let me

23   back up.  If I understood your testimony

24   correct yesterday, you had to request from

25   Mr. Morel both the negative pressure test

1   and the positive pressure test?

2        A.      Yes, I did.

3        Q.      In his well procedures, neither

4   the negative pressure test nor the positive

5   pressure test were included?

6        A.      They were omitted on the

7   original, I guess the Rev. 1.

8        Q.      Did it surprise you that these

9   are omitted?

10       A.      Well, you know, that's the

11  reason they send out Revs, you know, to let

12  everybody look at them that's going to be

13  involved with the job.  And if you see

14  anything omitted or something you'd like to

15  change, then you send it back to them with

16  the changes and then if they, you know, if

17  they agree to the changes, then you change

18  it.

19       Q.      I've never worked on a drill rig

20  but I've been doing oil and gas offshore

21  for 35 years and I've been on a bunch and

22  it seems to me that company men are pretty

23  busy when they're out on the rig.  Fair

24  enough?

25       A.      We stay pretty busy.

1       Q.     Did it surprise you that you

2    were having to go over documents that are

3    coming from Houston to find such basics

4    that were omitted as a negative pressure

5    test and a positive pressure test during

6    the temporary abandonment?

7       A.     I do it all the time.

8       Q.     They miss that all the time?

9       A.     I'm not saying they miss it all

10   the time, but there are certain things that

11   may be missed at different times that, you

12   know, we make the corrections and send them

13   back.

14              Not only I see this, you know, I

15   show it to Jimmy Harrell, I show it to

16   third-party people.  And before we get a

17   final procedure in place, everybody with

18   Transocean, or Jimmy Harrell with

19   Transocean, he's the guy that I deal with

20   most of the time with Transocean, either

21   him, the lead toolpusher, the third-party

22   people, BP people on the rig, we have a

23   chance to look at each revision that comes

24   out to the rig.

25              And if they don't like what they

1    see on there, you know, they can bring a

2    correction back to me and we'll send it

3    back to Houston and sometimes we may go

4    through five revisions before we get the

5    final one.  But whenever --

6         Q.    Well, this we're doing this sort

7    of temporary abandonment by committee

8    consensus, that takes time; doesn't it?

9         A.    Yes.  It does take time.

10        Q.    And are you aware that there

11   were two negative pressure test procedures

12   sent out within just hours before the

13   negative pressure test after you left the

14   rig?

15        A.    I'm not aware of that other than

16   just through e-mails and what I've heard.

17        Q.    But that clearly did not allow

18   for the kind of discussion and consensus

19   building situation that you're used to?

20        MR. LANCASTER:

21             Objection to form.

22        THE WITNESS:

23             Well, you know, I wasn't on the

24   rig so I don't know exactly what they did

25   but, you know, they probably fine-tuned it,

1    you know, before they actually did

2    everything, all these negative tests.

3    EXAMINATION BY MR. ROBERTS:

4         Q.    Well, let me get to this

5    procedure and what I've got the base of

6    this is the procedure dealing with the

7    negative pressure test on Exhibit 537; is

8    that correct, sir?

9         A.    Let's see.  Okay.  You're

10   talking about the one where it says

11   negative test with base oil and kill choke

12   line?

13        Q.    Yes.  What we have here is the

14   large e-mail on Exhibit 537 is the

15   temporary abandonment procedures that

16   include the negative pressure test.  Is

17   that correct, sir?

18        A.    Yes, sir.

19        Q.    Now, if I'm reading this

20   correctly, as it was originally set up with

21   you there was going to be a cement plug set

22   at 300 feet below the well or below the mud

23   line before the negative pressure test; is

24   that correct, sir?

25        A.    3,000 feet.

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2

3

   IN RE:  OIL SPILL      MDL NO. 2179
4  BY THE OIL RIG
   "DEEPWATER HORIZON"    SECTION:   J
5  IN THE GULF OF
   MEXICO, ON APRIL       JUDGE BARBIER
6  20, 2010               MAG. JUDGE SHUSHAN

7



12

13

              Deposition of **A. JOHN GUIDE**, taken
14  in the Pan American Life Center, Bayou
    Room, 11th Floor, 601 Poydras Street, New
15  Orleans, Louisiana 70130, on Monday, May 9,
    2011.

16

17
    **APPEARANCES**:
18

19

20          COTCHETT, PITRE & MCCARTHY
            (By:  Bryan Payne, Esquire)
21          San Francisco Airport Office Center
            840 Malcolm Road
22          Suite 200
            Burlingame, California 94010
23             (Attorneys for MDL 2185
                Securities plaintiffs subclass)

24

25

1    the casing hanger seal as the single

2    barrier for temporary abandonment.  The

3    attached decision tree --

4         A.    Tree.

5         Q.    -- addresses these options.

6         A.    Yeah.

7         Q.    A perf and squeeze operation

8    could be performed to add a second barrier

9    in the annulus.

10        A.    Yeah.

11        Q.    That's all the text I've ever

12   seen since last summer and nowhere do I see

13   any type of approval for adopting less than

14   a thousand foot above, you know, above the

15   permeable zone.  But you think this is the

16   MOC that you saw?

17        A.    I thought there was a

18   dispensation.  Maybe I was mistaken, or

19   maybe it's in the attachments.

20        Q.    Let me ask you one more, I got a

21   couple of minutes is all I have and then I

22   have to go.  But isn't it true that at

23   10:43 a.m., BP forwarded an ops note for

24   the temporary abandonment that had been

25   approved by MMS and what it did was, is

1    that it elevated the procedure to displace

2    seawater with the mud prior to running the

3    negative test, thereby underbalancing the

4    rig, underbalancing the well.

5         MS. KARIS:

6              Object to form.

7         THE WITNESS:

8              The way that I understood it was

9    that the displacement of the seawater was

10   going to be in a controlled environment and

11   a negative test conducted prior to the

12   final displacement.

13   EXAMINATION BY MR. PENTON:

14        Q.    But you're aware that they

15   displaced seawater before the negative test

16   and put that ahead of the negative test in

17   the forward ops note?

18        A.    It was always going to be that

19   way.

20        Q.    Let me show you the temporary

21   abandonment procedure, April 16th.

22        MS. KARIS:

23             The videographer indicated that

24   your time is up.

25        MR. PENTON:

```
 1              I understand.  It's my last
 2    question, is that okay?
 3         MS. KARIS:
 4              Okay.  For a question.
 5    EXAMINATION BY MR. PENTON:
 6         Q.    If you don't mind, these are the
 7    e-mails I was telling you about where the
 8    procedure changed here.
 9              Here's the e-mail here and
10    here's the procedure.  And just look at it
11    and I want you to tell me whether or not on
12    April the 20th the ops note here changed
13    the order of the seawater displacement.  It
14    was April 14th, April 16th and April 20th.
15         A.    These aren't the real
16    procedures, these are just snippets from
17    them.
18         Q.    Well, they are actually -- no.
19    They're actually part of the temporary
20    abandonment approval, the documents are,
21    and then the forward ops note is obviously
22    an e-mail from Brian Morel.
23              But really my only question, you
24    know, isn't it true that, that on April the
25    20th at 10:43 Brian Morel, or someone at BP
```

1    changed the order of the seawater

2    displacement to be the number one procedure

3    here on April the 20th, before the negative

4    test, whereas the negative test was the MMS

5    permitted procedure on April the 16th.

6              It was negative test and then

7    trip in the hole and then displacement.

8    Whereas the ops note, not approved by MMS,

9    put seawater displacement first and

10   negative test second?

11        MS. KARIS:

12             Object to form.

13   EXAMINATION BY MR. PENTON:

14        Q.    Were you aware of that?

15        MS. KARIS:

16             Object to form.

17        THE WITNESS:

18             My answer is no, that I was

19   always under the impression that we were

20   going to do the negative test with seawater

21   at 8367 feet and that is, indeed, what this

22   said, what the MMS approved.

23        MS. KARIS:

24             And you're out of time.

25        MR. PENTON:

1  been given an explanation or been able to

2  come up with a theory to explain why that

3  was done?

4       MS. KARIS:

5            Object to form.

6       THE WITNESS:

7            No.

8  EXAMINATION BY MS. LAWRENCE:

9       Q.    There's a couple of questions

10  about the negative test.  You had questions

11  about this morning that was done on the

12  rig.  Can you turn to Tab 27?  This has

13  previously been admitted as Exhibit 570.

14            You may have been asked to look

15  at this this morning, clearly an MMS

16  document.  But it has on the third page a

17  procedure and I think you were asked some

18  questions about this this morning.

19            And then I want you to, so when

20  you look at that at Tab 27 and then turn to

21  Tab 28.  I want you to compare these two

22  documents for me.  Tab 28 is previously

23  been marked as Exhibit 566.  That's an

24  e-mail from Brian Morel to yourself and

25  other individuals, including Don Vidrine

1   and Robert Kaluza, dated Tuesday,

2   April 20th at the time of 10:43 a.m.

3   entitled ops note.  And the first line of

4   the e-mail reads ops notes for the next few

5   days.

6              Did you testify earlier that the

7   ops notes for the next few days was a

8   series of numbered tasks?  Was this a

9   procedure relating to the negative test

10  that was sent out to the crew on the rig?

11       A.    Yes.

12       Q.    And did it differ from the

13  temporary abandonment procedure in Tab 27?

14       A.    No.

15       Q.    So as you see it, they're

16  exactly the same?

17       A.    The, you know, the wording is

18  slightly different.  But the, the procedure

19  is the same thing.

20       Q.    Mr. Guide, you've had over a

21  year now to think about the April 20th,

22  2010 DEEPWATER HORIZON blowout.  Can you

23  tell me what actions you believe you took

24  as the wells team leader, if any, that led

25  to the blowout?

1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2

3

   IN RE:  OIL SPILL      MDL NO. 2179
4  BY THE OIL RIG
   "DEEPWATER HORIZON"    SECTION:  J
5  IN THE GULF OF
   MEXICO, ON APRIL       JUDGE BARBIER
6  20, 2010               MAG. JUDGE SHUSHAN

7



13

14                   **VOLUME II**

15          Deposition of **A. JOHN GUIDE**, taken
   in the Pan American Life Center, Bayou
16 Room, 11th Floor, 601 Poydras Street, New
   Orleans, Louisiana 70130, on Tuesday, May
17 10, 2011.

18

19 **APPEARANCES:**

20

           COTCHETT, PITRE & MCCARTHY
21         (By:  Bryan Payne, Esquire)
           San Francisco Airport Office Center
22         840 Malcolm Road
           Suite 200
23         Burlingame, California 94010
               (Attorneys for MDL 2185
24              Securities plaintiffs subclass)

25

                **GAUDET KAISER, L.L.C.**
              Board-Certified Court Reporters

1    the addition of the 30 barrels of spacer

2    during the displacement of the cement.  But

3    I don't think anyone asked you what other

4    engineering decisions were recommended to

5    be changed.

6         A.     Well, the -- I'm trying to

7    remember.  The one that I referenced in my,

8    in my e-mail was the, was the 30 barrels.

9    Oh, I -- the other one that just came to my

10   mind was the addition of the six barrels of

11   base oil that was in the spacer that was --

12   and I, I didn't understand, I really didn't

13   understand that.

14            So that was just another example

15   and I was, you know, expressing that, you

16   know, frustration to Mr. Sims.

17        Q.     Of course, I'm not just talking

18   about that one e-mail but of course there

19   had been several modifications to the

20   temporary abandonment procedure; correct?

21        A.     Yeah.  There were numerous,

22   there were several draft procedures.

23        Q.     Including up until the morning

24   that the negative test was to be conducted

25   there was an additional change when

1    Mr. Morel issued his ops note; correct?

2          MS. KARIS:

3                Object to form.

4          THE WITNESS:

5                The way that I saw it and still

6    do understand it, is that that wasn't a

7    change, that was just a clarification to

8    make sure that the -- because we had for

9    some reason told the MMS we were going to

10   monitor the results on the kill line, we

11   wanted to make sure that we were in

12   compliance with what we had told the MMS we

13   were going to do.

14   EXAMINATION BY MS. KUCHLER:

15        Q.    What you had originally told the

16   MMS you were going to was displace to the

17   seafloor first; right, the mud line, and

18   then proceed before doing the displacement.

19               So the negative test was to be

20   done at the mud line, according to the

21   permit originally issued by the MMS; isn't

22   that right?

23        A.    No, ma'am.  That's not the way I

24   interpreted it.

25        Q.    So you interpreted it to mean

788

```
 1    that the displacement all the way down to

 2    8300 feet would take place at the time of

 3    the negative test?

 4         A.     Yes, ma'am.

 5         Q.     And there had been some going

 6    back and forth on whether to use a long

 7    string or a liner for some period of time

 8    before a final decision was made; is that

 9    right?

10         A.     Well, yeah, the original plan

11    was a long string as per the basis of

12    design.  But then the liner came in at a

13    later date.

14         Q.     So that was another change that

15    had been made on an engineering level that

16    the crew on the rig didn't know until

17    relatively late in the game what the final

18    decision would be; is that right?

19         MS. KARIS:

20              Object to form.

21         THE WITNESS:

22              It was an option that was made

23    available so we had to get equipment to the

24    rig.  That was another option, yes, ma'am.

25    EXAMINATION BY MS. KUCHLER:
```

1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
2

3    IN RE:  OIL SPILL      MDL NO. 2179
     BY THE OIL RIG
4    "DEEPWATER HORIZON"   SECTION:  J
     IN THE GULF OF
5    MEXICO, ON APRIL      JUDGE BARBIER
     20, 2010              MAG. JUDGE SHUSHAN
6

7

8



14

15          Volume 1 of 2 of the Videotaped
     Deposition of **GREGORY STEPHEN WALZ,** 20742
16   Castle Bend Drive, Katie, Texas, taken in
     the Pan American Life Center, Pontchartrain
17   Room, 11th Floor, 601 Poydras Street, New
     Orleans, Louisiana 70130, on Thursday,
18   April 21, 2011.

19   <u>**APPEARANCES**</u>:

20   ON BEHALF OF THE PLAINTIFFS
     STEERING COMMITTEE
21

22
     DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE
23   By:  John W. deGravelles, Esquire and
     Michael C. Palmintier, Esquire
24   618 Main Street
     Baton Rouge, LA 70801-1910
25

1    causing your team?

2         A.    I -- I just -- I was asking a

3    lot of questions and they were -- I mean,

4    they were responding.  You look at

5    the -- we were having a lot of

6    conversations at night, et cetera, and so

7    it was -- it was a lot of work.  But we

8    were having to adjust to the situation and

9    look at it, analyze it as best as we can,

10   and that's what we were doing.

11        Q.    Is it true, sir -- - it is true,

12   is it not, that in the 9 days before the

13   DEEPWATER HORIZON exploded there were at

14   least four different versions of the

15   temporary abandonment procedures?

16        A.    I don't believe so.  No.

17        Q.    One on April 12, which Brian

18   Morel circulated, correct?

19        A.    There were drafts that were out

20   and if that -- in that context, some being

21   drafts versus the final, there were several

22   drafts ahead.

23        Q.    And then on April 14, Mr. Morel

24   sends out the procedure which is different

25   from the draft, correct?

180

1      A.      I would have to look at these

2    documents, sir, to -- like I said, there

3    was a series of drafts that went out prior

4    to the final.

5      Q.      And none of the changes were

6    done after any formal risk assessment;

7    isn't that true, sir?

8      A.      I disagree with that.  We were

9    talking about the risks throughout the

10   whole planning process.

11     Q.      Was there a management of change

12   ever done in connection with any of these

13   changes?

14     A.      No, sir, other than the one

15   earlier.  We did two management changes

16   with the well.  One was around the TD

17   calling point early on and then around the

18   long string/liner decision.

19     Q.      All right.  The memorandum of

20   first change -- memorandum of change that

21   you referred to was when?

22     A.      It was prior to the long

23   string/liner decision, one.  It was the

24   subsurface team that came back and said

25   that we did not -- once we reached this

1    casing point, they had evaluated the data

2    and had concluded that we did not need to

3    continue on drilling to their -- the

4    exploration tail part that was still below

5    us, and it was just documenting that they

6    said that we had met the objectives of the

7    well.

8          Q.    And then the long string versus

9    liner, there was a formal memorandum of

10   change, correct?

11         A.    There -- there was that one,

12   yes, sir.

13         Q.    But none of the other changes

14   had a memorandum of changes; is that true?

15         A.    No, sir.

16         Q.    Now, Jesse Gagliano found out

17   about the new plan for six centralizers,

18   not from you, but from rig hands; isn't

19   that true?

20         A.    I don't know where he found it

21   out from.

22         Q.    And on April 17th, he asked you

23   for confirmation that that was so; isn't

24   that correct?

25         A.    He asked a number of us.

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2
    IN RE:  OIL SPILL       MDL NO. 2179
3   BY THE OIL RIG
    "DEEPWATER HORIZON"   SECTION:   J
4   IN THE GULF OF
    MEXICO, ON APRIL       JUDGE BARBIER
5   20, 2010               MAG. JUDGE SHUSHAN

6

7



13

14

15

16          Volume 2 of 2 of the Videotaped
    Deposition of **GREGORY STEPHEN WALZ,** 20742
17  Castle Bend Drive, Katy, Texas, taken in
    the Pan American Life Center, Pontchartrain
18  Room, 11th Floor, 601 Poydras Street, New
    Orleans, Louisiana 70130, on Friday, April
19  22, 2011.

20  **APPEARANCES:**

21  ON BEHALF OF THE PLAINTIFFS
    STEERING COMMITTEE
22

23  DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
    By:  John W. deGravelles, Esquire
24  618 Main Street
    Baton Rouge, LA 70801-1910
25

785

1    BY MS. HERTZ:

2         Q.    This is a document bearing the

3    Bates number ending in 127863, a BP-HZN.

4    And this is the approval by the MMS of the

5    Macondo TA ATM; isn't that correct?

6         A.    I -- this is the information

7    that Heather sent to Mark, so, yeah, the

8    approval.

9         Q.    Okay.  And if you turn to the

10   second-to-last page, that has the temporary

11   abandonment procedure that the MMS

12   approved; is that right?

13        A.    Yes, ma'am.

14        Q.    Okay.  And that has two negative

15   tests in it, doesn't it?

16        A.    No, ma'am.

17        Q.    Okay.  The first one, Negative

18   test casing to seawater gradient equivalent

19   to 30 minutes with the kill line, where --

20   tell me what that means?

21        A.    That was the objective

22   for step -- the next two items for --

23   the -- tripping in the 3 and 1/2 and

24   displacing the seawater and monitoring for

25   30 minutes.

1   Q.    Well, why would you put -- test

2   the casing before you -- before you trip in

3   the hole with a stinger to 8367 and

4   displace?

5   A.    That -- that first line was just

6   stating the objective that we were trying

7   to do.  The next two lines are really

8   detailing what -- the test.

9   Q.    Okay.  This was, in fact, what

10  you're looking at, the procedure that the

11  MMS approved, right?

12  A.    Yes, ma'am.

13  Q.    Okay.  55 -- 56.

14        Okay.  I want to -- I'm marking

15  as Exhibit 1816 a document bearing Bates

16  number BP-HZN Bly 70087.

17            (Exhibit 1816 marked for

18  identification.)

19  BY MS. HERTZ:

20  Q.    And, Mr. Walz, I -- I don't

21  know -- have you ever seen this document

22  before?  You're not on it, so I'm not

23  insinuating that you have.

24  A.    No, ma'am.  This is the first

25  time I've seen this document.

1

1        USCG/BOEM MARINE BOARD OF INVESTIGATION INTO THE

2        MARINE CASUALTY, EXPLOSION, FIRE, POLLUTION, AND

3     SINKING OF MOBILE OFFSHORE DRILLING UNIT DEEPWATER

4       HORIZON, WITH LOSS OF LIFE IN THE GULF OF MEXICO

5                      21-22 APRIL 2010

6

7

8

9

10

11            * * * * * * * * * * * * * * * * * * * * * * * *

12              FRIDAY, AUGUST 27, 2010

13                   8:00 A.M.

14            * * * * * * * * * * * * * * * * * * * * * * * *

15

16       The transcript of The Joint United States Coast

17    Guard/The Bureau of Ocean Energy Management,

18    Regulation and Enforcement Investigation of the

19    above-entitled cause, before Denyce M. Sanders,

20    Certified Shorthand Reporter and Registered

21    Professional Reporter, Notary Public in and for the

22    State of Texas, reported at the Hilton Hobby Airport

23    Hotel, 8181 Airport Boulevard, Houston, Texas 77061.

24

25

1        Q.      You have seen the APM?

2        A.      Do you have a copy of the APM?

3        Q.      I do have a copy.  Would it help to

4  refresh your memory?

5        A.      Yes.  Please.

6                MS. KIRBY:  May I approach?

7                HON. ANDERSEN:  Sure.

8                MS. KARIS:  If it would help, it's

9        behind Tab 29.

10               MS. KIRBY:  It's in Tab 29.

11               MR. HILDER:  Not in our book.

12               THE WITNESS:  That's the ops note.

13               MR. HILDER:  Next page.

14               MS. KARIS:  Behind it.

15               THE WITNESS:  Thank you.

16       Q.      (BY MS. KIRBY)  All right.  At Tab 29,

17  the APM procedure shows up on the page that is Bates

18  stamped BP-HZN-MBI00021238; is that right?

19       A.      Yes, I see that.

20       Q.      All right.  Now, now that you have

21  refreshed your memory by looking at this procedure,

22  do you agree that the permitted procedure called for

23  the negative test to be performed before the

24  displacement to seawater all the way down to 8,367

25  feet?

```
 1        A.      No, I do not.

 2        Q.      All right.  How is -- why do you

 3   disagree with me?

 4        A.      The step number 1 does not reference a

 5   depth to do a negative test.  That information is

 6   needed.

 7        Q.      All right.  Well, let's walk through

 8   this.  Step number 1 says, "Negative test casing to

 9   seawater gradient."  Correct?

10        A.      Yes.  Correct.

11        Q.      Step 2, which comes after step 1, says,

12   "Trip and hole with a 3-1/2-inch stinger to 8,367

13   feet"; true?

14        A.      That is true.

15        Q.      And then step 3 says, "Displace to

16   seawater, monitor well for 30 minutes"; true?

17        A.      That is true.

18        Q.      Can we agree that steps 2 and 3 come

19   after step 1?

20                     HON. ANDERSEN:  In time.  Would that

21         be the time sequence?

22                     MS. KIRBY:  That's what I mean.

23        A.      The negative test would be performed

24   before it's displaced to seawater.  Is that what

25   you're saying?
```

128

```
 1        Q.      (BY MS. KIRBY)   Yes.

 2        A.      Yes.

 3        Q.      All right.  So step 1 is performed

 4 before the displacement to seawater at 8,367 feet?

 5        A.      I'm sorry, say that again.

 6        Q.      Step 1 is conducted before the

 7 displacement to seawater down to 8,367 feet.

 8        A.      No, that's not correct.

 9        Q.      All right.  When is step 1 performed?

10        A.      The step 1 is performed -- it doesn't

11 reference a depth, it -- it's 1 and 2 is what that

12 is doing.  You're doing it at 8,367.

13        Q.      I see.  So 1 and 2 are really a combined

14 step is what you're saying?

15        A.      That is correct.

16        Q.      In fact, are you saying 1, 2 and 3 are

17 combined steps?

18        A.      No.  Because you're not doing the full

19 displacement in step 3 until you finish the negative

20 test.

21        Q.      Now, if one reads this, how is one to

22 know that you're not supposed to do step 1 until

23 after you have completed step 2 and are in the

24 process of step 3?

25        A.      Well, step 1 doesn't reference a depth,
```

129

1  so you couldn't do it unless you knew what depth to

2  go to.

3      Q.      Well, it does say, "Negative test casing

4  to seawater gradient equivalent," correct?

5      A.      Correct.

6      Q.      You could do that to what level safely?

7      A.      Well, I don't agree with the question.

8  I mean, you could do it at 8,367 feet safely.

9      Q.      Couldn't you do it to the mud line?

10     A.      Yes, you could.

11     Q.      All right.  So, why are we to assume

12  that you have to do it -- you have to take a trip in

13  the hole all the way to 8,367 and displace, how are

14  we to assume that from this permitted procedure?

15                  MR. HILDER:  Objection.  Document --

16                  HON. ANDERSEN:  Well, if he knows,

17          but -- well, he's got the --

18     A.      I do know.  And the reason being is,

19  you're not going to do a negative test to seawater

20  at the wellhead and then trip on in and continue to

21  displace the seawater at another 3,000 feet because

22  you would have not tested that barrier to the depth

23  you displaced the seawater.

24     Q.      (BY MS. KIRBY)  Well, the program that

25  we saw in Exhibit 10, didn't that effectively have

1  you doing the negative test before you displaced all

2  the way down?  And then once you do displace all the

3  way down, you monitor it again for 30 minutes; isn't

4  that right?  According to page 8 of Exhibit 10.

5       A.     Yeah.  That's -- that's the way that

6  particular procedure is written.

7       Q.     Okay.  So that was a two-step procedure?

8       A.     There's a change in this -- and what's

9  going on it, there is an approval to do a deeper

10  plug to 3,000 feet.  And if that approval is

11  not -- was not given by the MMS, then the procedure

12  that you're seeing would have been done to a

13  shallower depth.  So there was an option there, and

14  that was referenced in the operations note.

15       Q.     Right.  I understand that.  I'm just

16  looking at the -- the actual written procedure that

17  MMS approved, which does not say, "Displace to 8,367

18  and then do the negative test"; true?

19       A.     I thought I explained that.

20              HON. ANDERSEN:  He gave his

21          explanation, I think.

22       Q.     (BY MS. KIRBY)  All right.  So,

23  essentially -- well, let me ask you this:  Do you

24  know of anybody who -- who spoke with the well-site

25  leaders on the rig and said, "Look, here's how we

```
 1                 to pick up on it.

 2                      MR. FANNING:  You'll see.

 3                      MR. KOHNKE:  Thank you.

 4       Q.     (BY MR. DYKES)  I want to start at page

 5  6 of 21.  And look over under 9.2.3, we're talking

 6  about cementing the production casing.

 7       A.     Okay.

 8       Q.     You're on that page?

 9       A.     Yes, sir.

10       Q.     Then moving to the next page, page 7 of

11  21, item number -- starting down at the bottom with

12  Item No. 7, "Once confirmed floats are holding

13  prepare to release the running tool per DQ

14  procedure/hand.

15                 "Pick up drill string leaving 20,000

16  down on the running tool" --

17                      MR. HILDER:  Excuse me.

18                      MR. DYKES:  I'm sorry.

19                      MR. HILDER:  We're still trying to

20           find where it is.

21                      MR. DYKES:  Item No. 8.  Now on page

22           7 of 21.

23       A.     Okay.

24       Q.     (BY MR. DYKES)  And, basically, what I

25  want to confirm right there is 7, 8, 9, 10 and 11
```

1  and 12 are the procedures with respect to setting

2  the seal assembly and testing the seal assembly so

3  that I'm -- I'm clear on what we're reading.

4        A.      Yeah, that's correct.

5        Q.      Okay.  Then turning to page 8 of 21, at

6  the top, Item No. 13, "Pull out of the hole and lay

7  down the running equipment."  We rig up and "Test

8  casing and bind shear rams."

9                    And then Item No. 15, test --

10  "Negative test with base oil to the wellhead" and

11  "(monitor for 30 minutes" for "no flow)."

12                    Is that a negative test on the seal

13  assembly?

14        A.      Yes, it would be.

15        Q.      That would be?

16        A.      Yeah.

17        Q.      The next question I have with respect to

18  that base oil, is that base oil lighter than

19  seawater?

20        A.      Yes, it is.

21        Q.      What is the exact weight of that base

22  oil, do you know?

23        A.      It's -- it's in the range of 6.7 pounds

24  per gallon.

25        Q.      Okay.  Then moving into the next

1  section, section --

2      A.      Well, I mean, it can vary, but, I mean,

3  that's pretty close.

4      Q.      I'm looking for ballpark.  I guess the

5  main thing I want to confirm is, it is lighter than

6  a seawater gradient?

7      A.      Yes.

8      Q.      And it's lighter than a freshwater

9  gradient?

10      A.      Yes.

11      Q.      Then moving into the next item, 9.2.4,

12  surface cement plug.  And specifically, Item No. 1,

13  it says, "If cement job is not successful," and they

14  have here in parenthesis "(no returns or lift

15  pressure...)," and it gives you three things:  "Set

16  wear bushing, run the IBC" or the "CBL log" and then

17  "Wait on decision to do remedial work."

18              Now, Item No. 1 and then Item No. 2

19  says, "If cement job is successful."

20              The question I have first is, 1 and

21  2 are referring back to the cement job that is in

22  the previous section prior to Item No. 7 on page 7

23  of 21.

24              This is -- we're talking about the

25  previous job on the production casing?

1      A.      On Item No. 2, if cement job is

2  successful, that --

3      Q.      Right.   The decision here, 1 and 2, is

4  based on the cementing of the production casing,

5  that it starts out on page 6 --

6      A.      Right.

7      Q.      -- of 21.   I'm just trying to make sure

8  I understand the procedure.

9      A.      Right.   Right.

10     Q.      Okay.   The first question that I have

11 now with respect to Item No. 2, on page 8 of 21,

12 states, "If cement job is successful" -- and it's

13 underlined.   And in parenthesis, we have "(partial

14 returns or lift pressure seen) or" if the "IBC/CBL

15 log and required remedial work is completed."

16              And before we move into Item No. 3,

17 I want -- I'm concerned here.   You're

18 defining -- I'm not saying you, but whoever -- BP,

19 whoever put this procedure together, is defining a

20 successful cement job based on partial returns or

21 lift pressure.

22              What -- how much or what is

23 acceptable partial returns?   I mean, that term is

24 subjective, so I'm trying to --

25     A.      I understand.

```
 1        Q.      -- look for --
 2        A.      I don't think that that -- I don't know
 3   the answer to that.
 4        Q.      Would --
 5        A.      In my best -- in my -- in my opinion, I
 6   don't know exactly what the person that wrote this,
 7   you know, was trying to say with that.  But in my
 8   opinion, what it would do is prompt the conversation
 9   that we've got a problem with the cement job.  I
10   think what he's trying to say is, "Look, if we -- if
11   we've got 90 percent returns, we're probably in
12   pretty good shape."
13        Q.      Okay.
14        A.      Okay?  I mean, if you've got 50 percent
15   returns -- and I really -- I probably shouldn't
16   throw out numbers, but I'm just trying to get in a
17   relative scale.  But, either way, it would prompt a
18   discussion that says, you know, we did not get --
19   something's not as good as what we wanted with flow
20   returns.
21        Q.      Okay.  Thank you.
22                And then moving into Item No. 3,
23   "Run in hole to 8367 and displace the seawater."
24   And you move through those procedures, "Run
25   3-1/2-inch thousand feet of the stinger by
```

1  5-1/2-inch drill pipe above the wellhead."  Then

2  we're going to --

3       A.     Right.

4       Q.     -- "Monitor well for 30 minutes to

5  ensure no flow."

6                   Is that a second negative test

7  identified in this procedure?

8       A.     Well, it goes along with the deeper set

9  plug.

10      Q.     Right.

11      A.     Yeah.

12      Q.     But you're --

13      A.     It's not supposed to be a second

14 negative test.  It's supposed to be that -- to be

15 just one negative test if you're going to set the

16 deeper plug.

17      Q.     So which one do you -- do you omit?  Do

18 you omit Item No. 15, or do you omit --

19      A.     The -- my understanding of this is that

20 if you are going to be setting a shallower plug, you

21 would be doing the negative test at the wellhead

22 with your base hole.

23      Q.     Okay.  Now, let me ask you a question.

24 Displacing to 8,367 and performing a -- what appears

25 to be a second negative test, according to the

1   procedures that's lined out here -- and I'm speaking

2   as an engineer to another engineer, I want to make

3   sure I understand what's going on here.

4                When displacing to 8,367 or roughly

5   3,300 feet below the mud line, when we conduct that

6   second negative test at that depth, what barriers

7   are we testing before we set that cement plug?

8        A.    Well, it would be -- your internal

9   barriers would be your shoe track, your cement and

10  your shoe track, and your seal assembly and your

11  casing.  In essence, it's the same barriers as you

12  would be testing with base oil at your wellhead.

13       Q.    Okay.  Now, with respect to that, the

14  actual test that you would be seeing at the seal

15  assembly, you would be seeing a seawater gradient

16  test at the seal assembly to that depth?

17       A.    That is correct.

18       Q.    Which would be the same as the wellhead

19  depth for the base oil?

20       A.    That's correct.  Yes.

21       Q.    So you're actually testing it

22  slight- -- it would be a negative test, but it would

23  not be to the same low pressure as with the base

24  oil?

25       A.    I believe -- I believe -- yes, correct.

1 The base oil would give you a -- more of a negative

2 test.  That is correct.

3     Q.    Do you know if -- since both of these

4 are identified in sequence with each other, and from

5 what we've seen, it doesn't appear that they did a

6 negative test to the base oil.

7               Do you know if there was a

8 management of change done within the organization to

9 omit that procedure?

10    A.    Well, I think that was the intent of the

11 operations note, to update the program for that.

12    Q.    So if we flip back to Tab 29, to the APM

13 procedure that was submitted to the agency --

14    A.    Right.

15    Q.    -- that -- this procedure that's

16 outlined here is somewhat confusing when you lay it

17 up next to the procedure here and you start with

18 Item No. 15 and you correlate that to Item No. 1.

19               Do you see my confusion there?  It's

20 almost like whoever put this procedure together took

21 this procedure, and either by omission, by mistake

22 or by intention, decided, let's not do it to base

23 oil, let's do it to seawater gradient for Item No. 1

24 on the procedure, and correlating that back to Item

25 No. 15 in the drilling prognosis.

 1      A.      Yeah.   What page -- I'm sorry.

 2      Q.      Tab 29, the second page.

 3      A.      Yeah, I see that, but what's the -- what

 4 other tab was that -- that's Tab 10?

 5      Q.      Yes, sir.   Tab 10.

 6                   LT. BUTTS:   Page 8 of 21.

 7                   MR. MATHEWS:   Page 8 of 21.

 8                   Thank you, Robert.

 9      A.      Yeah, so that would be correct.   You

10 start on Step 1, you would be back to your Step 15,

11 right.

12      Q.      (BY MR. DYKES)   So what you addressed to

13 Ms. Kirby was that Item No. 1 is the guidelines for

14 the rest of the procedures.   But my question to you

15 is, if somebody is reading this such as an

16 engineer -- and there's three of us, and I think

17 Capt. Nguyen here has got a chemical engineering

18 degree, so he's just as guilty as the rest of us

19 about following procedures.   We're single-task

20 oriented --

21      A.      Yeah.

22      Q.      -- and walking through this, then what

23 we're reading in this temporary abandonment

24 procedure is actually two negative tests, then, if

25 you correlate it back to page 8 of 21.

153

```
 1                 So I'm just trying to make sure I
 2  understand what the intention was versus what's
 3  actually on the paper.
 4       A.    Well, I don't think the intent was to do
 5  two negative tests, it was just to replace that
 6  negative test with the deeper one.  So it would just
 7  really be one negative test.
 8       Q.    Okay.
 9       A.    That's -- that's my understanding.
10  I -- I realize that --
11       Q.    Do you see the confusion --
12       A.    Yes.
13       Q.    -- that we've identified here?
14       A.    Yes, I do.
15                 MR. DYKES:  Thank you.
16                 CAPT. NGUYEN:  Why don't we take a
17            break until 11:15.
18                 (Break.)
19                 HON. ANDERSEN:  Next is Halliburton.
20                 MR. GODWIN:  Thank you, Your Honor.
21                 HON. ANDERSEN:  Six people
22            referenced travel plans to me, and I just
23            want you to know, the Board is not going
24            to be the auspice of extending this
25            meeting beyond normal business hours.
```

Transcript of the Testimony of
# The Joint United States Coast Guard/Bureau of Ocean Energy Management Investigation

## Date taken: October 7, 2010
## AM Session

## USCG/BOEM Board of Investigation (Re: Deepwater Horizon)

## **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 141

1          Because he doesn't agree with

2    that, and you all haven't given him a chance

3    to answer.  He's talking about one test that

4    is expressed in three different documents,

5    not four tests.

6          MR. MATHEWS:

7              Okay.

8          MR. DYKES:

9              We're going to get to that.

10         MR. TUOHEY:

11             No, but I think the question

12   suggested that he agreed with it, and he

13   doesn't.

14         MR. MATHEWS:

15             Okay.  Well, let's clarify the

16   record.

17         MR. TUOHEY:

18             Okay.

19   EXAMINATION BY MR. MATHEWS:

20       Q   Do you agree with me that there

21   were four different tests within BP?

22       A   In all my discussions --

23       Q   Procedurally?

24         MR. TUOHEY:

25             "Yes" or "no."

Page 142

1    EXAMINATION BY MR. MATHEWS:

2        Q    Detailed procedurally?

3        A    No, sir.

4    EXAMINATION BY MR. DYKES:

5        Q    This is the well procedure for the

6    12th.  This is the one for the 15th.  And

7    these two.

8            If you will look at the one dated

9    April the 12th -- And for everybody else,

10   that's BP-HZN-MBI000196, and it actually

11   starts at Page 39 and it runs through -- I'm

12   sorry.  26, and it runs through 27.  And

13   it's dated April the 12th.

14       MR. TUOHEY:

15           196 is dated April the 15th.

16       MR. DYKES:

17           I'm sorry.  11126127.

18       MR. TUOHEY:

19           Okay.  That's dated April 12th,

20   yes, sir.

21       MR. DYKES:

22           April 12th.

23       MR. TUOHEY:

24           Yes, sir.

25   EXAMINATION BY MR. DYKES:

Page 143

```
 1        Q    What is the procedure at the top
 2   of the page?  What are we starting with?
 3        A    That's highlighted here?
 4        Q    Highlighted.
 5        A    It's "lead impression and
 6   lock-down sleeve."
 7        Q    "Lead impression and lock-down
 8   sleeve."  And would you please turn to the
 9   next page, and the next major procedure that
10   were run?
11        A    It says "TA plugs and riser plan."
12        Q    So in this drilling prognosis that
13   we have here, we have the lock-down sleeve
14   and the lead impression tool being run ahead
15   of the cement plug and the temporary
16   procedure, temporary abandonment, correct?
17        A    Yes, sir.  I believe this was a
18   document that, to my knowledge, was a draft
19   procedure.
20        Q    Okay.  Now, in that negative test
21   procedure, what do we have there?
22        A    What is highlighted is "displace,
23   run the bond log, run in the hole with the
24   three and a half by five and a half to
25   6,000 feet, displace the salt water from
```

Page 144

1   6,000 feet, and monitor well for 30

2   minutes."

3        Q    Would that to you be considered a

4   negative test?

5        A    No, sir.

6        Q    Why not?

7        A    To me, a negative test doesn't

8   occur until -- I mean, you maintain the

9   riser full of your mud, and the way this is

10  reading is that you have already displaced

11  the riser with mud.

12       Q    Well, what's the next step below

13  that?

14       A    Set sand, 300 feet.

15       Q    No.

16       A    I'm sorry.

17       Q    You're stating that you have

18  already displaced the riser.  What is the

19  next major step down that page?

20       A    Rig cleaning.  You're referring to

21  the rig cleaning?

22       Q    Correct.

23       A    Prior to the now P & A?

24       Q    And the next page, down at the

25  very bottom.

Page 145

1      A    Yes, sir.  Riser cleaning.

2      Q    "Riser cleaning."  Okay.  Go

3  ahead.

4      A    That's different.  I mean, back

5  here on the step where I said "displace the

6  salt water from 6,000 feet - surface," so at

7  that point in time they're taking it all the

8  way up.

9      Q    They have taken it all the way up?

10     A    As far as the sea water.  The rest

11 of it is cleaning operations, but you have

12 already created that.  As I said, to me a

13 negative test is performed prior to you

14 displacing your riser.

15     Q    Okay.  So that monitoring for 30

16 minutes right there is not considered a

17 negative test?

18     A    I do not consider it, no, sir.

19     Q    Okay.  Then move to the next one,

20 on April the 15th.

21     A    Yes, sir.

22     Q    And where do we start right there?

23     A    We have stated "negative test with

24 base oil to the wellhead."

25     Q    Okay.  And how would you do that?

Page 146

1        A    Monitor for 30 minutes.

2        Q    Okay.  Do you displace the riser

3    at that point in time with base oil?

4        A    Yes, sir.  And this procedure was

5    written prior to us having the approval to

6    set the deeper plug.

7        Q    That was written prior to the

8    approval?

9        A    That's my understanding.

10       Q    What is the depth that you're

11   setting that plug then?

12       A    It basically is showing 8367, in

13   which case it says "run in hole to 8367 and

14   displace to sea water."

15       Q    Okay.  Isn't that the approved

16   depth, it met the approved procedure?

17       A    Yes, it was.

18   MR. TUOHEY:

19            Your question is whether this

20   procedure spelled out in this document was

21   approved?

22   EXAMINATION BY MR. DYKES:

23       Q    No.  How many negative tests do

24   you have on that page?

25       A    One negative test, sir.

Page 147

1      Q    One negative test, and that was to

2  the wellhead only with base oil gradient; is

3  that what you're reading?

4      MR. TUOHEY:

5           You're asking if he agrees with

6  that?

7      MR. DYKES:

8           I'm asking if that's what the

9  document says.

10     MR. TUOHEY:

11          No, I thought your question was,

12  is that the negative test, and I thought he

13  just said it was all three, one negative

14  test.  I don't want to confuse the witness.

15  I know you're not trying to confuse the

16  witness, but your question was, is this

17  statement alone the negative test.  He just

18  said it's not.

19  EXAMINATION BY MR. DYKES:

20     Q    Tell me what the negative test

21  there is in that procedure.

22     A    Step 15 says, "Negative test with

23  base oil to the wellhead.  Monitor for 30

24  minutes, no flow."

25     Q    Okay.  Is that the only negative

Page 148

1    test on that page or is that the complete

2    negative test?

3         A    No, sir, the complete negative

4    test is when we are running in the hole to

5    8367.  That's the true negative test on the

6    well in displacing at that point.  Because

7    the base oil does not get you to the proper

8    differential.

9         Q    Okay.  So how many negative tests

10   are on that procedure right there?  Looking

11   at it as a petroleum engineer, I see two

12   negative tests.

13        A    Sir, I know what I discussed with

14   everybody, which was to go in and do a

15   negative test at 8367.  Prior to this

16   document, that was always going to be the

17   basis of the negative test, and that was

18   always what my understanding was in the well

19   plans.

20        Q    Okay.  But I guess we're confused,

21   and I'm thinking that some of the BP folks

22   were confused as well when they read this,

23   because if you would pull the next document

24   right there, which is the approval --

25        A    Yes, sir.

Page 149

1        Q     The approved procedure?

2        A     Yes, sir.

3        Q     And read that.

4        A     "Negative casing test, casing to

5   sea water gradient for 30 minutes with the

6   kill line."  And then --

7        Q     "With the kill line."  Now --

8        MR. TUOHEY:

9             Let him finish.  He's not

10   finished.

11        THE WITNESS:

12             They trip in the hole to the three

13   and a half inch and displace to monitor the

14   well there.  That was in accordance with

15   what my understanding we were going -- As I

16   stated, when I had conversations with the

17   engineers prior to this, that the plan was

18   for us to set -- To basically do the

19   negative test was to displace, run in the

20   hole, displace up to the wellhead with sea

21   water, and then the kill lines with sea

22   water from there while still maintaining mud

23   in the riser.

24   EXAMINATION BY MR. DYKES:

25        Q    Okay.  Now, is that what that

Page 150

```
1    procedure says?  Because I read that as

2    "negative test to sea water gradient."  I'm

3    assuming that's to the wellhead, meaning all

4    I'm doing is displacing down to the wellhead

5    with the kill line to sea water gradient.  I

6    still have mud from the wellhead down to

7    8367.

8         MR. TUOHEY:

9              What is your question, sir?

10        HON. JUDGE ANDERSEN:

11             Does he have the same

12   understanding?

13        THE WITNESS:

14             My understanding as we were going

15   through this is we would basically displace

16   sea water up to the BOPs, sea water through

17   the kill lines.

18   EXAMINATION BY MR. DYKES:

19        Q    From the --

20        A    Well, yes, we would have to

21   basically trip in to 8300, give or take,

22   displace up to sea water, to the stack, sea

23   water to the kill line, and then monitor it

24   for pressure.  That was always the plan that

25   I discussed with the engineers even before
```

Page 151

1    the permit was submitted.

2         Q    Okay.  And I hear what you're

3    saying, and I'm not disagreeing.  What I'm

4    asking is, is that what that procedure says?

5         A    It can be interpreted that way by

6    me.

7         Q    Okay.  Now, when you lay that up

8    side by side with the previous document from

9    April the 12th --

10        A    Yes, sir.

11        Q    -- and you match up --

12   MR. TUOHEY:

13             April the 12th?

14   EXAMINATION BY MR. DYKES:

15        Q    I'm sorry.  April 15th.  And you

16   match up line item to line item, starting

17   with item 15, and you match that up with

18   step one on the approval, doesn't that look

19   very similar?

20        A    It does look similar.

21        Q    Except for the base oil to sea

22   water change?

23        A    Yes, sir.

24        Q    And then it takes off, and you do

25   this test, and then you displace into the

Page 152

1    wellbore 8367?  I mean, I'm an engineer.  I

2    follow it step by step.  I'm single task

3    oriented.

4         A    Yes, sir, I understand.  As I

5    stated, my understanding of things, because

6    based off of all the conversations I had,

7    was that we were going to do the negative

8    tests by running in the hole, displacing up

9    to the sea water, up to the stack, and

10   running it from there.

11        Q    Right.  So that you're having a

12   sea water gradient?

13        A    And that was on the morning of the

14   20th.  Because of this, I think here, there

15   was conversation from the rig, "Okay.

16   Exactly how are we going to do the negative

17   test," because there was this confusion, and

18   then basically it was relayed to them

19   through Mark.  We discussed it.  John Guide

20   and I both concurred to basically do it the

21   way it was outlined on the "ops" note to

22   clear up this confusion that was floating

23   around on the procedure.

24        Q    Okay.

25        A    And that basically -- And then I

Page 153

1    checked with Mr. Hafle after I saw the "ops"

2    note from Mr. Morel to confirm that we were

3    in compliance -- that the rig was

4    comfortable with everything and that we were

5    in compliance with what we had submitted to

6    the MMS.

7        Q    Looking at those two documents, do

8    you think that you were in compliance with

9    what you submitted to MMS?

10       MR. TUOHEY:

11            Which two documents?

12   EXAMINATION BY MR. DYKES:

13       Q    Well, actually, all three.  The

14   "ops" note, the approved APM procedure and

15   the drilling prognosis from April the 15th?

16       A    I think we were in compliance.  I

17   mean, the tests that we performed was the

18   most stringent tests of everything here.

19   With the sea water down, the base water does

20   not give us the equivalent differential, and

21   what we did was the most stringent and

22   proper thing to do.

23       Q    And I'm not arguing that.  I'm

24   asking you, do you consider yourself to be

25   in compliance with the procedures outlined

Page 154

1    in the APM?

2         A    I was told that we were.

3         Q    Okay.  But do you consider it to

4    be --

5         MR. TUOHEY:

6              In your opinion?

7         THE WITNESS:

8              I think we were.

9    EXAMINATION BY MR. DYKES:

10        Q    Okay.  You think you followed that

11   APM?

12        A    I think we were in compliance,

13   yes, sir.

14        Q    Did you follow the APM

15   procedurally?

16        MR. TUOHEY:

17             He just answered "yes," Mr. Dykes.

18        MR. DYKES:

19             And I'm asking a separate

20   question.

21        MR. TUOHEY:

22             Okay.  I don't understand your

23   question.

24   EXAMINATION BY MR. DYKES:

25        Q    Does the "ops" note procedure

Page 155

1   follow the APM procedure?

2       A    In the way I interpret the things,

3   it did, yes, sir.

4       Q    Okay.  The way you interpret it?

5       A    Yes.

6       Q    On the page, does it follow it

7   procedurally?

8       MR. TUOHEY:

9           He just answered the question the

10  way he interpreted it.  You're beating a

11  dead horse, Mr. Dykes.  He said "yes," it

12  does.  He's beating a dead horse, Judge.  He

13  disagreed, but he said this is what he

14  believes.

15      HON. JUDGE ANDERSEN:

16          Right, but the point -- You know,

17  obviously, Mr. Dykes and the Board want to

18  find out exactly what was going on in his

19  mind.

20          If he's asking a follow-up

21  question, I think it's really not to change

22  his mind.  It's to clarify the confusion,

23  because until we get to talk to him --

24      MR. DYKES:

25          I agree with what you're saying.

Page 156

1        THE WITNESS:

2              Exactly.  And, sir, all I know and

3    I can tell you is the conversations I had

4    with everybody as far as what we were going

5    to do and why we're doing it and the like,

6    and the feedback I received from everybody

7    was that we were in compliance with the

8    permit.

9        MR. DYKES:

10             Okay.

11       THE WITNESS:

12             That's what I know.

13       MR. DYKES:

14             Okay.  Thank you.

15   EXAMINATION BY MR. MATHEWS:

16       Q    Sticking with the regulatory side,

17   do you review the APDs and APMs before they

18   get submitted to the regulatory group, sir?

19       A    No, sir.

20       Q    You rely solely on your drilling

21   engineers?

22       A    That has been the common practice.

23       Q    So you don't sign off on any

24   procedure or anything?

25       A    We have not.

1

1          USCG/BOEM MARINE BOARD OF INVESTIGATION
           INTO THE MARINE CASUALTY, EXPLOSION, FIRE,
2              POLLUTION, AND SINKING
           OF MOBILE OFFSHORE DRILLING UNIT
3          DEEPWATER HORIZON, WITH LOSS OF LIFE
           IN THE GULF OF MEXICO 21-22 APRIL 2010
4              Thursday, July 22, 2010

5

6              *   *   *   *   *   *

7

           The transcript of The Joint United
8      States Coast Guard/The Bureau of Ocean Energy
       Management, Regulation and Enforcement
9      Investigation of the above-entitled cause,
       before Dorothy N. Gros, a Certified Court
10     Reporter, authorized to administer oaths of
       witnesses pursuant to Section 961.1 of Title
11     13 of the Louisiana Revised Statutes of 1950,
       as amended, reported at the Radisson Hotel,
12     2150 Veterans Memorial Boulevard, Kenner,
       Louisiana, 70062, on Thursday, July 22, 2010,
13     beginning at 8:00 a.m.

14

15

16

17

18

19

1                    I N D E X
                              PAGE
2        Caption. . . . . . . . . . . . . . . . . 1
         Appearances. . . . . . . . . . . . . . . 2
3        Certificate. . . . . . . . . . . . . 457
         Examination of NATALIE ROSHTO:
4            BY MR. MATHEWS . . . . . . . . . . . 6
         Examination of ALEXANDER JOHN GUIDE:
5              BY MR. MATHEWS. . . . .20, 116, 246, 301
               BY MR. DYKES. . . . . . . .83, 86, 117
6              BY CAPT NGUYEN. . . . .87, 128, 169, 299
           BY MR. McCARROLL. . . . . . . . . .117
7          BY MR. WHEATLEY . . . . . . . . . .120
           BY MR. LINSIN . . . . . . . . . . .130
8          BY MS. KARIS. . . . . . . . . . . .174
           BY MR. GORDON . . . . . . . . . . .202
9          BY MR. FANNING. . . . . . . . . . .220
           BY MR. CLEMENTS . . . . . . . . . .228
10           BY MS. KIRBY. . . . . . . . . . .303
           BY MR. GODWIN . . . . . . . . . . .339
11           BY MR. LEMOINE. . . . . . . . . .398
           BY MR. PENTON . . . . . . . . . . .411

12

13

14

15

16

17

18

19

1    because you don't want to get scratches that

2    can affect the seal.  The second is that it

3    does provide the casing from thermally

4    expanding during the production operation.

5    The primary mechanism -- sorry, the primary

6    function of that lockdown hanger is to provide

7    a sealing surface internally for production

8    based equipment at the end of the well when

9    it's completed.

10        Q.   Do you know if when BP considered the

11    possible buoyancy effects on the casing after

12    the lockdown sleeve was put in place?

13        A.   After the lockdown sleeve was put in

14    place?

15        Q.   Correct.

16        A.   I didn't do any calculations or know of

17    any calculations in buoyancy after the

18    lockdown sleeve was in place.

19        Q.   This was an unusually deep displacement

20      of mud from the well, was it not?

21              A.   It was deeper than normal due to the

22      fact that the lockdown sleeve needed a way to

23      lower it to get set properly.

24              Q.   And do you know what considerations BP

25      gave with regard to the high differential

1    pressure due to the unusually deep

2    displacement of the mud from the well?

3         A.   Differential pressure in what -- in

4    what capacity?  I mean --

5         Q.   Well, the additional pressure -- given

6    the depth of this well, the displacement of

7    mud with water in a volume much greater than

8    is standard as normal?

9         A.   We were going to do a displacement at

10   roughly 8300 feet.  It was a little bit -- it

11   was deeper than normal, we got MMS approval to

12   set the plug deeper purely so we could set the

13   lockdown hanger properly.  And that's --

14   that's it.

15              MR. CLEMENTS:

16                   One second.  That's all I have,

17                   thank you, sir.

18         E X A M I N A T I O N

19   BY CAPT NGUYEN:

20          Yes.

21          MS. KIRBY:

22               For the record this is

23                    BP-HZN-MBI00021240.

24     BY MS. KIRBY:

25          Q.  Mr. Guide, have you ever seen this MMS

1    form 124, which is an application for permit

2    to modify?  That indicates it was in an

3    approved status.

4        A.  Yes, ma'am.  I've seen these before.

5        Q.  And, if we turn to the last page of

6    this document, we see the temporary

7    abandonment procedure that the MMS approved,

8    do we not?

9        A.  Yes, ma'am.

10        Q.  And under the temporary abandonment

11    procedure on that last page item number-1 is

12    "Negative test casing to seawater gradient

13    equivalent for 30 minutes with kill line",

14    right?

15        A.  Yes, ma'am.  It does.

16        Q.  Number -- I'm sorry?

17        A.  Yes, it does.

18        Q.  And then the item number-3 is "Displace

19    to seawater", is it not?

20          A.   Yes, ma'am.  The -- I believe how this

21      is the number-1 here doesn't -- doesn't give

22      any depth or anything like that.  It's trip

23      and hold with 3 and a half inch stinger at

24      8367 feet, displaced to seawater and monitor

25      the well for 30 minutes.

1          Q.   The first item on the temporary

2     abandonment procedure that was approved was

3     the negative test, correct?

4          A.   Yes, ma'am.  But there's no depth or

5     anything on there.  It's just saying that if

6     we're going to do a negative test on the

7     casing with seawater for 30 minutes on the

8     kill line and so -- and then it says that

9     we're going to do this at 8367 feet.

10         Q.   Are you telling me that this approved

11    modification permitted you to displace to

12    seawater while you were doing the negative

13    test?

14         A.   No, ma'am.  You have to displace to

15    seawater to do the negative test, ma'am.

16         Q.   Alright.  So you do not believe that

17    the procedure that was actually followed by

18    your folks as set forth in an -- I think it's

19    an Ops note by Mr. Morel on April 20 was in

20      fact a deviation?

21              A.  No, ma'am.  If the negative test would

22      have been done -- I am assuming -- well, if

23      the negative test would have done any higher

24      up in the well than 8367 then whenever we did

25      displacement it would not be given an accurate

1    negative test.

2         Q.  Let me ask you just a couple of

3    questions to clear up confusion in my own

4    mind.  A negative test -- I thought you said

5    there wasn't a standard negative test, is that

6    true?

7         A.  I'm sorry.  If I said that I guess I'll

8    have to clarify myself here.

9         Q.  Okay.  Does BP have a standard negative

10   test?

11        A.  The HORIZON did negative tests in a

12   usual manner.  I believe that some of the

13   different operations depending on the wellhead

14   configuration maybe did them slightly

15   different.  I'm really not aware.

16        Q.  But we will actually finish faster if

17   you just answer the question.  Do you have a

18   standard test, "You" BP, not the rigs, not,

19   you know, everybody else?  But does BP have a