

Frilot L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8000
Facsimile: 504.599.8100
www.frilot.com

August 3, 2011

Honorable Sally Shushan
United States Magistrate Judge
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130
**E-mail: Sally_Shushan@laed.uscourts.gov**

Re: Discovery of BP Contracts re: Gulf of Mexico Drilling Operations;
Certain Underwriters at Lloyd's London v. BP p.l.c.; 2:11-CV-00275-CJB-SS;
Our File: 56816

Dear Judge Shushan:

We submit this letter to set forth the position of Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater, Inc. and Triton Asset Leasing GmbH (collectively "Transocean") regarding the production of BP's contracts with its contactors for drilling operations performed in the Gulf of Mexico. As explained below, Transocean has also served certain Requests regarding the production of Gulf of Mexico drilling contracts in connection with the Declaratory Judgment action referenced in the above caption of this correspondence. As Your Honor is aware, a similar discovery related issue was addressed in open Court at the Friday conference on July 29, 2011 pertaining to the MDL proceedings.

**A.    TRANSOCEAN'S REQUEST FOR PRODUCTION TO BP**

On July 2, 2011, Transocean served BP with the following Request for Production regarding the insurance actions:

> 6. All of Your drilling contracts/agreements and master service contracts/agreements in effect at the time of the Incident in Question between You and all service contractors for operations in the Gulf of Mexico.

Responses to Transocean's Requests for Production, including Request No. 6, are not as yet due, but BP may assert that its drilling contracts that are responsive to this Request are not relevant and, therefore, not discoverable. However, for the reasons set forth below, BP's drilling contracts are relevant and discoverable in the declaratory judgment action. In addition, these contracts are relevant to the Phase 1 trial contemplated in the Limitation of Liability action, because BP and Transocean have filed counterclaims and cross-claims in that proceeding under the Drilling Contract.



**FRILOT LLC**
ATTORNEYS AT LAW

August 3, 2011                                                                                                                                         Page 2

### B.    SCOPE OF DISCOVERY IN THE DECLARATORY JUDGMENT ACTION

The scope of discovery is broad and permits the discovery of "any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1); *see Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir.1982). A discovery request is relevant when the request seeks admissible evidence or "is reasonably calculated to lead to the discovery of admissible evidence." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 820 (5th Cir. 2004) (citation and internal marks omitted); FED. R. CIV. P. 26(b)(1). The discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials. *Herbert v. Lando*, 441 U.S. 153, 176 (1979).

Under Texas law, which governs the insurance contracts at issue, interpretation of insurance contracts is governed by the same rules as interpretation of other contracts. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex.1997); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994). When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *Forbau*, 876 S.W.2d at 133. The same is true for contracts governed by general maritime law, which applies to the Drilling Contract between BP and Transocean. *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir.1986); 22 Williston on Contracts § 58:9 (4th ed.). Accordingly, evidence pertaining to the parties' intent is relevant and discoverable.

### C.    BP'S DRILLING CONTRACTS ARE RELEVANT TO THE CLAIMS ASSERTED IN THE DECLARATORY JUDGMENT ACTION.

BP's contracts for drilling operations in the Gulf of Mexico are relevant to the main issue presented in the declaratory judgment action, regarding the scope of BP's additional insured coverage under Transocean's insurance policies for pollution-related liabilities. BP's additional insured coverage arises out of its drilling contract with Transocean, which required Transocean to procure insurance coverage for liabilities it assumed under the contract. As a result, Transocean and its insurers assert that BP's additional insured coverage is limited to the risks expressly assumed by Transocean in the drilling contract.

In the Order entered by Your Honor on May 31, 2011, **Dkt. 2593**, it was ruled that "Ranger's amended complaint for declaratory judgment demonstrates that the insurance policy issued by it and the drilling contract between Transocean and BP are central to Ranger's claims. The same is true for the Lloyd's complaint." *Id.* at 2.[1] Judge Barbier has also entered a Case

---

[1] The same is also true with respect to Transocean's Complaint in Intervention, which contains similar language as the Complaints filed by Ranger and by Underwriters.



**FRILOT** LLC

ATTORNEYS AT LAW

August 3, 2011                                                                                                          Page 3

Management Order Governing Insurance Actions dated June 20, 2011, which provides for discovery "of information relevant to the claims of the Insurers found in paragraphs 11 thru 15 of Ranger's Amended Complaint and the defenses of BP, Anadarko, and MOEX related to these allegations." **Dkt. 2849, at 2, ¶ IV.A.**

As stated above, a court's interpretation of any contract requires consideration of the parties' intent. Here, the insurance issues require the Court to interpret the insurance contracts <u>and</u> the drilling contract to determine the scope of BP's additional insured coverage. BP's contracts with other drilling contractors are relevant to the issue of contractual intent regarding the allocation of risk for well pollution. In particular, those contracts are relevant to show BP's general pattern of requiring the contractor to assume responsibility for pollution originating on or above the surface of the water, and accepting full responsibility for all other pollution arising out of operations conducted under the drilling contract, including liabilities arising from well pollution. These contracts are also relevant to BP's longstanding practice of limiting its contractor provided insurance, and BP's similar longstanding practice of self-insuring its well pollution liabilities.

According to the deposition testimony of Tony Hayward, who was BP's Chief Executive Officer when the Drilling Contract was executed, BP would self-insure its risks relating to environmental pollution resulting from its operations. Mr. Hayward described BP's insurance practices for environmental risks as follows:

> Q. So BP elected to have no external insurance . . . for terms of environmental risks that might be occasioned in connection with deepwater drilling?
> A. We had no external insurance for anything at BP.

* * * *

> Q. Okay. The statement here is that the premiums are so high that it makes no sense, like BP, to do anything else other than self-insure, am I right that BP, some years ago, made a corporate decision that the differential between the cost of having insurance in connection with the claims that it was covering were such that BP might as well not have insurance, handle the claims itself, and in the end save itself money?
> A. That's cor—that was a decision taken in about 1991.



FRILOT LLC

ATTORNEYS AT LAW

August 3, 2011                                                                                                          Page 4

\* \* \* \*

> Q. That was still the situation as of Macondo?
> A. That's correct.

*See* Exhibit A, Excerpts from the Deposition of Tony Hayward, at 554-56. Moreover, with regard to the allocation of pollution risks as between an operator such as BP and a drilling contractor such as Transocean, Mr. Hayward testified that the industry standard has been for years that the operator—not its drilling contractor—bears the risk for environmental pollution liabilities:

> Q. Did you have any expectation that your subcontractors would go out and purchase insurance for you, since you had a—made a corporate decision not to purchase insurance for yourself?
> A. We had no expectation of what our contractors did and did not—insure—what insurance our contractors did and did not purchase with respect to risks that they were undertaking.

\* \* \* \*

> Q. Let's go back up to your level, the 40,000-foot level of a CEO. And I don't mean that disrespectfully. I understand you don't read the details of every contract—of all your contracts. But what—what was the industry—you talked yesterday at length about the industry. In general, what was the industry allocation of environmental risk between an Operator such as BP and subcontractors who worked for the Operator while drilling wells for the Operator?
> A. The industry norm would be, in most circumstance, that the Operator would take that risk. . . . But circumstances, of course, differ in time and place.
> Q. Right. But that was the industry standard?
> A. M-h'm, yeah.
> Q. Has been that way for years, hasn't it?
> A. Yeah, it is.

*See* Exh. A. at 556–59.



# FRILOT LLC
ATTORNEYS AT LAW

August 3, 2011                                                                                              Page 5

BP's pattern of accepting full and complete responsibility for well pollution in drilling contracts for the Gulf of Mexico is relevant to the issues presented in the declaratory judgment action, accordingly, Transocean's Request No. 6 properly seeks non-privileged matter that is relevant to the claims or defenses in that action.

**D.   BP'S DRILLING CONTRACTS ARE ALSO RELEVANT TO THE COUNTERCLAIMS AND CROSS-CLAIMS ASSERTED IN THE LIMITATION OF LIABILITY ACTION.**

Although Transocean's Request for Production seeking BP's drilling contracts for the Gulf of Mexico was propounded in the declaratory judgment action, the responsive documents are also relevant to the Phase 1 trial contemplated in the Limitation of Liability action, because BP and Transocean have filed counterclaims and cross-claims in that proceeding under the Drilling Contract. Transocean disagrees with BP's statement at the July 29, 2011 hearing to the effect that the discoverability of these contracts is not a Phase 1 issue, because these contracts are relevant to the contractual indemnity and contribution counterclaims and cross-claims asserted in the Limitation of Liability action. Although Judge Barbier has not as yet entered his Order, the proposed trial plan Order currently under consideration states: "**Phase One** of the Trial will address issues arising out of the conduct of various parties, third parties, and non-parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU *Deepwater Horizon* on April 20, 2010, and the sinking of the MODU *Deepwater Horizon* on April 22, 2010, and the initiation of the release of oil from the Macondo Well or Deepwater Horizon during those time periods (collectively, the "Incident"). Phase One will include issues asserted in or relevant to counterclaims, cross-claims third-party claims and/or comparative fault defenses as appropriate."

                                                                Very truly yours,

                                                                FRILOT LLP

                                                                By: _____
                                                                      Kerry J. Miller
                                                                      Attorney for Transocean

cc:   All Known Counsel
      (e-mail distribution list)