# BINGHAM

Warren Anthony Fitch
Direct Phone: 202.373.6695
Direct Fax:    202.373.6001
tony.fitch@bingham.com

August 5, 2011

**Via E-mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
     Eastern District of Louisiana
500 Poydras Street, Room B345
New Orleans, LA 70130

**Re:   GoM Oil Spill MDL No. 2179 -- Topic 7 of the Rule 30(b)(6) Notice to BP**

Dear Judge Shushan:

Anadarko respectfully submits this letter pursuant to your directives during the July 28 and 29 conferences, in response to Andy's letter of August 3, and with respect to the issue of the scope of Topic 7 in the Rule 30(b)(6) Notice to BP regarding certain aspects of the Temporary Abandonment ("TA") procedure at the Macondo Well.  In this letter, I will try to provide you with (i) a brief overview of the context of Topic 7, (ii) an analysis of the inaccuracies in Andy's summary of the factual record to date, and (iii) an analysis of the intended, proper and non-redundant scope of Topic 7.

## I.  Background

The importance of the Temporary Abandonment issues in this case cannot be overstated. In the most thorough, comprehensive, detailed and objective report yet issued with respect to the Macondo Well blowout, the Chief Counsel to the National Commission on the BP Deepwater Horizon Oil spill and Offshore Drilling found:

> BP developed a temporary abandonment procedure for Macondo that unnecessarily introduced significant risks into the operation.  BP disagrees with this finding and argues instead that the specific procedure it used at Macondo was necessary under the circumstances. The Chief Counsel's team disagrees.  BP could have avoided the additional risks created by the procedure by making a few simple changes.
>
>            * * * *
>
> BP changed its Temporary Abandonment Procedure repeatedly at the last minute without subjecting those changes to any formal risk assessment.  BP's temporary abandonment procedures for Macondo changed at least four times over the last nine days before the blowout.

Boston
Frankfurt
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
2020 K Street NW
Washington, DC
20006-1806

T +1.202.373.6000
F +1.202.373.6001
bingham.com

The Honorable Sally Shushan
August 5, 2011
Page 2

* * * *

BP's decision to change plans and set the lockdown sleeve last triggered a cascade of other decisions that led it to severely underbalance the well while leaving the bottomhole cement as the lone physical barrier in place during displacement of the riser.

* * * *

Post-incident interviews with the Macondo team confirm that it made signficant procedural changes in a relatively casual manner.

Macondo:  The Gulf Oil Disaster -- Chief Counsel's Report (2011), at 127, 140.[1]

It is against this backdrop that Topic 7 seeks binding testimony from BP itself on:

The background, basis (or bases), intent, preparation, drafting, submission and approval of BP's Application for Permit to Modify the temporary abandonment procedure on or around April 16, 2010, including the deviations, if any, between that procedure and the procedure(s) described in (a) the April 12, 2010 Drilling Plan, (b) the April 14, 2010 Morel "Forward Ops" E-Mail, or (c) the April 20, 2010 "Ops Note."

The Temporary Abandonment procedure included a negative pressure test, displacement from the well of heavy mud with seawater to 3000' below the ocean floor, the setting of a cement plug 3000' at that level and then the setting of a lock down sleeve.  The "deviations" referred to in Topic 7 are the same "changes" that the Chief Counsel's Report repeatedly focuses on and consistently emphasizes in the excerpts quoted above

---

[1]  BP has conceded that "the negative-pressure test [was] a critical activity." BP, _Deepwater Horizon Accident Investigation Report_ (September 8, 2010) ("Bly Report"), at 41.

Moreover, of the "eight key findings" made by BP's Bly Report investigative team, the only cause for which BP accepted even partial responsibility involved a key aspect of the Temporary Abandonment procedure:  "The negative-pressure test was accepted although well integrity had not been established. . . . Prior to temporarily abandoning the well, a negative-pressure test was conducted . . . _The Transocean rig crew and BP well site leaders reached the incorrect view that the test was successful and that well integrity had been established._" _Id._, at 10 (emphasis in original).

Not surprisingly, Transocean strongly disputes that it had responsibility for the execution or interpretation of the Negative Pressure Test that was part of the Temporary Abandonment Plan:  "BP was responsible for developing the temporary abandonment plan and directing the execution of procedures by the drill crew." Macondo Well Incident -- Transocean Investigative Report (June 2011), at 8; _see generally, Id,_ "Chapter 3.2, Temporary Abandonment," at 77-116.

The Honorable Sally Shushan
August 5, 2011
Page 3

and throughout the Report's examination of the Temporary Abandonment process.  Chief Counsel's Report, "Chapter 4.5, Temporary Abandonment," at 127-141 and "Chapter 4.6, Negative Pressure Test," at 143-164.  Thus, the "deviations" in the Temporary Abandonment procedure set forth in the April 20, 2010 Ops Note (item (c) in topic 7) and utilized at the Well on April 20 from the procedure reported in the Application for Permit to Modify ("APM") that was submitted to and approved by the Minerals Management Service of the U.S. Department of the Interior and from BP's prior approaches (as reflected in the April 12, 2010 Drilling Plan (item (a) in Topic 7, the April 14, 2010 Morel "Forward Ops" e-mail (item b) in Topic 7 and related documents) have, at the very least, been objectively identified by an impartial third-party as crucial to assessing what caused the Macondo blowout and who was responsible for it.[2]

In sum, The Negative Pressure Test issues and all the other aspects of the Temporary Abandonment procedure will be keenly examined at trial, and the Court's resolution of these issues as the finder of fact will be critically important to all the parties, including Anadarko as it defends against contentions by other parties that it bears responsibility directly or indirectly for the blowout in general and for the flawed Temporary Abandonment procedure specifically.

**II.      BP's Erroneous Characterization of the Record to Date**

BP asserts that prior 30(b)(6) and other fact witness testimony and BP's responses to written discovery have adequately covered the Temporary Abandonment procedure.  BP is mistaken.

**A.      BP's Prior 30(b)(6) Witnesses Did Not Adequately Address The Major Issues Involving Temporary Abandonment.**

BP contends that five other BP 30(b)(6) topics (Topics 6, 8, 14, 17, 18) have addressed Temporary Abandonment procedures.  BP fails to mention, however, two important circumstances -- that these topics were assigned to two witnesses who were ill-prepared to discuss the essential issues regarding the Temporary Abandonment procedures and

---

[2]   In the Foreword to the Chief Counsel's Report, the Co- Chairs of the Commission state: "When President Obama created the National Commission . . . he instructed the Commission to 'examine the relevant facts and circumstances concerning the root causes of the *Deepwater Horizon* oil disaster.'  This Chief Counsel's Report . . . . is essential reading for anyone seeking to extract the lessons of Macondo. . . .  What the investigation makes clear, above all else, is that management failures, not mechanical failures, were the ultimate source of the disaster.  Chief Counsel's Report at ix.  The apparent management failures associated with the Negative Pressure Test and other steps in the Temporary Abandonment procedures -- and what understandings and conclusions BP has reached with respect to them at this advanced stage of the case -- lie at the core of the case and of Topic 7.

The Honorable Sally Shushan
August 5, 2011
Page 4

that the topics were crowded into three days of deposition testimony in which numerous other significant BP 30(b)(6) topics were also supposed to be addressed.

### 1.    Ian Little's June 30, 2011 Deposition

Ian Little, whose one-day 30(b)(6) deposition was taken in London on June 30, 2011, was designated to testify for BP on the following topics:

- **Topic 17 -** The Determination of the well design for the Macondo Well.  Mr. Little was designated to testify to the following sub-issues: Centralizers, Cement Design and Evaluation, Temporary Abandonment Procedure, Float Collar

- **Topic 19 -** Any financial incentives for BP personnel working on the Deepwater Horizon &/or the Macondo Well.[3]

Thus, contrary to BP's implication, Mr. Little was not designated to testify about Topic 7, or even solely about Temporary Abandonment, and, instead, was BP's representative on a bevy of other critical well design issues.  For instance, "cement design and evaluation" alone covers a variety of important topics, including BP's decision to use nitrified cement, BP's internal policies regarding the use of cement, BP's understanding of regulatory requirements regarding production-zone cement, BP's decision to pump cement before seeing final test proving the foamed cement was stable, BP's decision not to run a Cement Bond Log ("CBL"), *etc.*  Accordingly, questioning for Ian Little's 30(b)(6) deposition largely focused on cementing issues and employee financial incentives.

Although the deposition focused largely on non-temporary abandonment issues, when asked about the Temporary Abandonment plans, Mr. Little was unprepared to answer even basic questions about the Temporary Abandonment plan.[4] Despite being designated as the 30(b)(6) witness, Mr. Little said he did not know the following:

---

[3] *See* The BP Parties' Fourth Amended Responses and Objections to Plaintiffs' Agreed 30(b)(6) Deposition Notice with 30(b)(5) Document Requests, served May 11, 2011.

[4] BP can point to only four pieces of information that Mr. Little had about the Temporary Abandonment issues at the Macondo Well:  1) He believes the April 15 Temporary Abandonment procedure to be the "formal communication" for the procedure although there was further correspondence that updated the procedure (Tr. 94:8-13), 2) a Temporary Abandonment plan was submitted to the MMS (Tr. 95:1-15), 3) the April 20th Ops Note is not an "exact replication" of the April 16 MMS-approved plan (Tr. 96:16-97:3), and 4) the April 20 Ops Note was the procedure the crew was supposed to follow on the rig. (Tr. 96:10-15).

The Honorable Sally Shushan
August 5, 2011
Page 5

- Whether there was a management review of the April 20 "Ops Notes" prior to April 20, 2010. (Tr. 59:18-60:2).

- Whether BP agreed with the drilling engineers' characterization of the Macondo Well in March and April as "rapidly changing." (Tr. 54:19-25).

- Whether BP had a standard Temporary Abandonment procedure in the Gulf of Mexico when the Macondo Well's Temporary Abandonment procedure was designed. (Tr. 93:13-17).

- Whether the Temporary Abandonment plan was included in the January 2010 drilling program. (Tr. 93:24-94:2).

- Why BP did not submit a revised Temporary Abandonment procedure to the MMS after the plan changed. (Tr. 97:22-25).

- Whether BP's drilling and completions operations such as Temporary Abandonment require a risk assessment to be done or whether it was done for the Macondo Well. (Tr. 115:13-118:25).

- Whether Transocean was involved or consulted in designing the Temporary Abandonment procedure. (Tr. 138:12-24).

- The date on which BP generated the final Temporary Abandonment procedure. (Tr. 139:4-17).

- Whether Temporary Abandonment procedures used on the rig should have been consistent with those submitted and approved by MMS. (Tr. 140:15-141:7).[5]

### 2.   Jim Cowie's June 29-30, 2011 Deposition[6]

Jim Cowie was never designated to speak to Topic 7.  He was designated to speak to six separate 30(b)(6) topics -- more than any other 30(b)(6) designee -- and many of the topics, as seen below, have numerous subparts, all of which were supposed to be covered in two short days:

---

[5] The referenced testimony is attached as Exhibit A.

[6] The Little and Cowie 30(b)(6) depositions overlapped on June 30, so it was impossible for parties to coordinate to ensure every topic was covered adequately if temporary abandonment topics did indeed overlap.

The Honorable Sally Shushan
August 5, 2011
Page 6

- **Topic: 6**: With respect to the Macondo Well, communications, evaluations, testing, training, policies and/or analyses, within BP and/or with any other party, relating to foam stability, cement testing, float collar conversion, use or non-use of centralizers, the decision not to displace seawater and set the cement plug at approximately 3,300' below the mud line, and or the decision not to conduct or prepare cement bond logs, and or not to do negative pressure tests, on or before April 20, 2010.

- **Topic 8**: The estimated, budgeted, expected and/or actual time and/or cost savings realized by:

  - Number and Nature of Centralizers Utilized
  - Foregoing Substantiated Foam Stability Test Results
  - Not Running Cement Bond or Other Evaluation Log
  - Using Spacer Made from Combined Lost Circulation Materials to Avoid Disposal Issues
  - Displacing Mud from Riser Before Setting Surface Cement Plug
  - Setting Surface Cement Plug 3,000 Feet Below Mud Line in Seawater
  - Not Installing Additional Barriers During Temporary Abandonment Procedure
  - Not Performing Further Well Integrity Diagnostics in Light of Troubling and Unexpected Negative Pressure Test Results
  - Bypassing Pits and Conducting Other Simultaneous Operations During Displacement

- **Topic 14**: BP's evaluations of, and/or reservoir assessment, drill plan, operations plan, and or well or reservoir engineering and/or temporary abandonment plan (and all changes or 6 amendments thereto) for the Macondo Well in response to, well control events (including but not limited to the March 8 "kick") between February 1, 2010 and April 20, 2010;

- **Topic 15**: Communications between BP employees on the rig and any BP personnel on the mainland (or United Kingdom) on April 20 and 21;

- **Topic 16**: BP plans for using the Deepwater Horizon at, and timing of transit to, the Nile and/or Kaskida sites after April 19, 2010;

- **Topic 18**: Analysis or evaluation of risks associated with design and operational decisions made by BP personnel concerning operations and activities performed at the Macondo well during the period from February 1 through April 20, 2010, including but not limited to the creation, entry of data into and completion of a "risk register" or risk assessment tool ("RAT").

The Honorable Sally Shushan
August 5, 2011
Page 7

Because of this excessive span of topics, Temporary Abandonment could not receive significant attention in Mr. Cowie's two-day deposition.

Moreover, when asked about Temporary Abandonment, Mr. Cowie did not have even rudimentary knowledge of the basic facts regarding the series of changes in the Temporary Abandonment procedures.[7]  Mr. Cowie did not know:

- If there were various versions of a Temporary Abandonment plan. (Tr. 381:8-18).

- Whether a risk assessment was performed as a basis for the changes in the sequence of events for the Temporary Abandonment plan. (Tr. 381:19-382:2).

- Whether there was a Temporary Abandonment plan where the surface plug was set prior to the cement plug, and whether a risk assessment was performed as a basis for that change. (Tr. 382:19-383:15).[8]

3.   **Messrs. Little and Cowie's Lack of Knowledge About the Temporary Abandonment Issues Necessitates the Topic 7 Deposition to Which BP Had Previously Agreed**

Contrary to BP's claims that witnesses answered "I don't know" only in response to "fact-specific questions for which they were not provided corresponding documents by questioning counsel or to questions outside the scope of the 30(b)(6) topic," both Little and Cowie were unable to testify about even the most basic facts regarding the changes to Temporary Abandonment.  Their testimony, unfortunately, does not come close to covering even the narrow range of information sought by Topic 7.  They provided no information about the bases or intent of the TA procedure, the drafting and submission of the TA procedure, or the deviations of preceding and ensuing TA plans from the MMS-approved plan.  Indeed, the fact that BP designated a completely different witness -- Mr. Sustalla -- to testify regarding Topic 7 is, at the very least, a tacit admission that the issues in Topic 7 were not intended to be, and would not be, covered in the depositions of

---

[7] The examples provided by BP in Andy's letter underscore how little Cowie testified regarding temporary abandonment.  Three of the excerpts address cement testing and the decision to eschew a cement bond log (Tr. 174:9-25; 341:10-17; 378:12-24) -- topics beyond the scope of the issue of the changes and deviations in the Temporary Abandonment procedures.  Indeed, the only excerpt involving the discussion of a Temporary Abandonment plan includes the admission that he was unaware there were multiple Temporary Abandonment plans.  (Tr. 380:11-383:18).

[8] The referenced testimony is attached as Exhibit B.

The Honorable Sally Shushan
August 5, 2011
Page 8

Messrs. Little or Cowie.  In short, BP simply has not yet provided a corporate representative who can competently answer questions regarding the bases, intent, deviations, or other issues regarding the Temporary Abandonment procedure.

> **B.**   **Prior Fact Witnesses Have Not Addressed the Critical Issues of BP's Corporate Knowledge and Positions regarding the Temporary Abandonment Procedures**

BP correctly points out that quite a number of fact witnesses were <u>asked</u> about the Temporary Abandonment procedure.  However, their <u>answers</u> have not provided the information sought in Topic 7.

*First*, the witnesses who designed and approved the Temporary Abandonment procedures have largely asserted their privileges against self-incrimination under the Fifth Amendment.  Brian Morel, the junior engineer who drafted the Temporary Abandonment plan, and Mark Hafle, the senior drilling engineer for Macondo, have both invoked the Fifth Amendment on virtually a blanket basis and have refused to answer questions related to the Temporary Abandonment procedure.  Bob Kaluza and Don Vidrine, the Well Site Leaders aboard the *Deepwater Horizon* at the time of the blowout and who were responsible for executing the Temporary Abandonment plan, have, respectively, invoked the protections of the Fifth Amendment and been unavailable because of a medical situation.  None of the other fact witnesses to whom BP points -- John Guide, Greg Walz, Lee Lambert, Ronnie Sepulvado, or Brett Cocales -- had the personal knowledge to testify about the evolution of the Temporary Abandonment plan from its formation on April 12 to its execution on April 20; indeed, these witnesses, perhaps properly enough, refused to speculate about any part of the procedure with which they were not personally involved.  Thus, no fact witnesses, individually or collectively, have come close to addressing the Topic 7 subject matter.

*Second*, fact witnesses are fact witness.  They have not, and cannot, provide BP's corporate information regarding the Temporary Abandonment issues.  This is especially true when BP fact witnesses have provided conflicting testimony.  For instance, there is an important dispute whether the April 16 MMS-approved APM specified one or two Negative Pressure Tests and, therefore, whether the final temporary abandonment plan sent by BP to the rig on April 20 differed from the MMS-approved procedure by providing for only one negative test.  Under fundamental principles of civil litigation in the federal courts, Anadarko and the other parties have a right to know what BP's understanding is in this respect, and to obtain binding testimony on this issue.  BP should not be allowed to avoid that obligation.

*Third*, the MBI Testimony, which is attached to Andy's letter without elaboration, is irrelevant to the question of whether BP needs to provide a witness in this case to testify regarding Topic 7 or any other matter.  The admissibility of MBI testimony in the trial in this case is far from certain.  Indeed, the law suggests it is not in many circumstances and the Joint Investigation Team of the Marine Board has taken the position in connection with discovery production that it probably is not.  Moreover, although Anadarko and

The Honorable Sally Shushan
August 5, 2011
Page 9

other parties had an opportunity to "cross-examine" the witnesses at the MBI hearing, the scope of that examination was limited to issues raised by the board's questioning, and the purpose of the MBI's investigation is by no means fully congruent with the issues as they have evolved and continue to develop in this action.  Indeed, during the MBI testimony of one Ian Little, BP made this very distinction in an attempt to cut off Anadarko's examination of Mr. Little.  *See* April 7, 2011 Afternoon Testimony of Ian Little before the MBI Hearing, Tr. 61:4-8.[9]

C.      **BP has Refused to Address the Critical Temporary Abandonment Issues in its Responses to Written Discovery**

Again, BP is correct that various parties have attempted to explore the TA issues in their written discovery but, again, BP would ignore the complete paucity of information provided by BP in response to such inquiries. For instance, MOEX Offshore 2007 asked the following in its Interrogatory No 15:

> Beginning with the MACONDO WELL temporary abandonment procedures, plan and/or steps discussed by YOUR EMPLOYEES by email or otherwise on April 12, 2010, DESCRIBE in detail each temporary abandonment procedure, plan and/or step YOU decided upon or changed between April 12 and the April 20th explosion on the DEEP WATER HORIZON, and the specific reasons for and basis on which YOU changed or revised each such procedure, plan and/or step.

BP's complete response consisted of the following:

> The BP Parties object to this interrogatory as vague, ambiguous and **potentially misleading to the extent that it suggests that the temporary abandonment procedure was changed subsequent to the submission on April 16, 2010 of their Form MMS-124 to the MMS, which set forth the plan for the temporary abandonment procedure.**

> Subject to their specific and general objections, the BP Parties will conduct a search of non-privileged documents for additional documents relating to the details as to how that temporary abandonment plan was implemented, and will produce responsive documents indentified as a result of that search.

> To the extent MOEX's interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party. [emphasis

---

[9] The referenced testimony is attached as Exhibit C.

The Honorable Sally Shushan
August 5, 2011
Page 10

added].[10]

As in the fact and 30(b)(6) depositions, BP has never stated whether it believes the April 20 Ops Note and actual Temporary Abandonment procedure performed on the day of the blowout differ from the MMS-approved April 16 plan.  Anadarko has not found any written discovery responses from BP that cover the subject matter of Topic 7.

## III.    The Purpose and Scope of Topic 7

As you may recall from reviewing last week my July 27 letter to Andy, Anadarko believes that the subject matter encompassed by Topic 7 (quoted in full above, on page 2 of this letter) can be fairly parsed as follows:

1.  The **background, bases, and intent** of BP's Application for Permit to Modify [APM] on or around April 16.

2.  The **drafting, submission, and approval** of BP's APM on April 16.

3.  The **deviations**, if any, between the APM and other procedures, including but not limited to the April 12, 2010 Drilling Plan, the April 14, 2010 Morel "Forward Ops" e-mail or the April 20, 2010 Ops note.

In Andy's July 27 response and our telephone conference on July 28, BP purported to interpret Topic 7 as encompassing only part of the second component of the Topic -- *viz*, the steps taken by a BP employee with some routine regulatory responsibilities to discharge the ministerial function of submitting the APM to MMS on April 20 and receiving MMS's approval approximately 90 minutes later.  Needless to say, if this were the only information being sought by Topic 7, I would have been happy to enter into a stipulation that the APM and the ensuing approval 90 minutes later were communicated electronically and then gotten on with my life.  The obvious problem with BP's attempt to unduly delimit Topic 7 is that BP's would-be interpretation ignores the express request for information regarding the background, bases and intent of the APM, the drafting of the information that appeared in the APM, and the deviations and differences, including the attendant reasons and circumstances, of the various formulations of the Temporary Abandonment procedure intended to be and actually utilized at Macondo notwithstanding what was specified in the APM and the approved APM.[11]

---

[10] The BP Parties' Responses and Objections to Defendant MOEX Offshore 2007 LLC's Interrogatories and Requests for Production of Documents, served February 22, 2011, is attached as Exhibit D.

[11] The words "regulatory context" do not appear in the wording of Topic 7 that BP agreed to. Rather, the text clearly reflects an intention to trace the evolution and deviations of the temporary abandonment plan, especially as it relates to the MMS-approved APM of April 16.

The Honorable Sally Shushan
August 5, 2011
Page 11

In Andy's August 3 submission, BP now takes the position that BP should be excused entirely from Topic 7, despite committing to it initially, on the ground that the subject matter supposedly has been addressed in other discovery.  I believe that I have demonstrated in the preceding section beyond dispute that the subject matter of Topic 7 has not been subsumed by other Topics in the Rule 30(b)(6) Notice and that, in any event, BP has produced corporate representatives who have not fulfilled their due diligence obligations as Rule 30(b)(6) designees and have not been able to provide the information that a party is required to provide (or acknowledge that it, as opposed to the witness in his individual capacity, does not have that information).  In light of all the foregoing considerations, I respectfully submit that the parties have a right at this stage of the case to learn with a reasonable degree of certainty and specificity what BP does and does not know and believe about the subject matter of Topic 7.  Anadarko, for example, needs this information as part of its assessment of the strengths and weaknesses of the various claims against it and its determination about what evidence in this area may be needed to defend against those claims, and Anadarko cannot advance with either of these tasks without knowing what information BP does or does not have and what TA-related evidence and positions BP is in a position to pursue or not pursue at trial -- the quintessential purpose of a Rule 30(b)(6) deposition.

Accordingly, Anadarko proposes to explore with the BP designee -- and believes that the designee should be prepared to answer -- such matters as

> Whether anyone other than BP personnel were involved in preparing the TA procedures in the Well Plan that Brian Morel sent M. Sepulvado, R. Sepulvado and J. Guide on April 12;

> Whether BP agrees that the April 12 Plan does not provide for a Negative Pressure Test;

> The background of and bases for the deviations between the April 12 procedures and the April 16 APM;

> Whether anyone other than BP personnel were involved in preparing the TA procedures in the "Forward Ops" e-mail that Brian Morel sent R. Sepulvado on April 14;

> The background and bases for the deviations between the April 14 procedures and the April 16 APM;

> The drafting of the April 16 APM;

> The bases or reasons for the TA procedure specified in the APM;

> Whether a Risk Assessment was the basis for the TA procedure in the APM or should have been;

The Honorable Sally Shushan
August 5, 2011
Page 12

> Whether BP believes that the April 20 "Ops Note" contains any
> deviations from the APM;

> The bases or reasons for any deviations in the April 20 "Ops Note" from
> the APM;

> Whether a Risk Assessment was the basis for the TA procedure in the
> "Ops Note" or should have been;

> Whether an April 18 e-mail from Morel to Guide was the basis for the
> deviation of the April 20 "Ops Note" from the APM;

> Whether in his response to the April 18 e-mail, Guide was calling for
> just one Negative Pressure Test and, if so, whether this was the basis for
> the apparent deviation of the April 20 "Ops Note" from the APM;

> Whether the TA procedure actually utilized on April 20 was the same as
> or deviated from the procedure set forth in Morel's April 20 "Ops
> Note;" and

> Whether a Risk Assessment was the basis for the TA procedure
> performed on April 20 or should have been

In addition to taking the unusual step above of providing BP with a great deal of
information about the areas of the inquiries that Anadarko believes are needed to explore
subject matter of Topic 7, I am submitting under separate cover, as I noted during our
July 28 conference, an only slightly more detailed but complete list of all the questions
that I intend to ask at the Topic 7 deposition for your *in camera* review, subject of course
to the need for follow-up that cannot presently be predicted with precision. Neither the
general areas that I have set out above or the specific questions that I intend to ask are
factually difficult or technically complex; those kinds of questions have been asked to
some extent in other depositions and will be explored during expert discovery, and I do
not intend to discuss or test or argue the engineering pros and cons of any of the TA
procedures with the BP representative. In this 30(b)(6) deposition, Anadarko simply
wants to know what knowledge BP has on the important but ambiguous and contested
factual issues related to the changes in the TA procedures and what conclusions it has
drawn from them. I respectfully suggest, now that all of the available BP fact and
30(b)(6) witnesses allegedly having information on the Temporary Abandonment issues
have been deposed -- and doubtlessly debriefed exhaustively by BP and its very
competent attorneys over the past 15 months -- that Anadarko and the other parties are
entitled to that information in accordance with the fundamental purpose of the Federal
Rules of Civil Procedure of avoiding trial by surprise.

The Honorable Sally Shushan
August 5, 2011
Page 13


Respectfully submitted,

Warren Anthony Fitch

cc:     J. Andrew Langan, Esq.
           Plaintiffs' Liaison Counsel
           Defendants' Liaison Counsel
           Michael Underhill, Esq.
           Corey Maze, Esq.
           Jeffrey Breit, Esq.
           Ky. E. Kirby, Esq.
           Deborah D. Kuchler, Esq.

# Exhibit A

**Excerpts of Ian Little's June 30, 2011 Deposition**

1

```
 1              UNITED STATES  DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL        )      MDL NO. 2179
     BY THE OIL RIG           )
 4   "DEEPWATER HORIZON" IN    )      SECTION "J"
     THE GULF OF MEXICO, ON    )
 5   APRIL 20, 2010            )      JUDGE BARBIER
                              )      MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17              * * * * * * * * * * * * * * * * *
                      VOLUME 1
18              * * * * * * * * * * * * * * * * *
19
20
21         Deposition of Ian Little, as a Corporate
     Representative, taken at Kirkland & Ellis
22   International, 30 St. Mary Axe, 22nd Floor, London
     EC3A 8AF, England, United Kingdom, on the 30th of June,
23   2011.
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1  developed --

2     Q.   M-h'm.

3     A.   -- by the -- the Engineering Team and the

4  Wells Team, that would be issued to the rig.  The rig

5  would then implement that procedure.  That is -- Well

6  Site Leaders on the rig would be there to -- to assure

7  that the -- the procedure's being implemented in

8  accordance with the program, but the -- the

9  implementation on the rig is -- is under the -- the --

10 the -- the Safety Management System of the Drilling

11 Contractor.

12    Q.   The temporary --

13            MR. JOHNSON:  Objection form.

14    Q.   (By Ms. McClellan) The temporary abandonment

15 procedure, though, that aspect of the well design lies

16 with BP, correct?

17    A.   So the -- the Wells Team and the Engineering

18 Team would develop the procedure, that's correct.

19    Q.   In March and April of 2010, BP's Drilling

20 Engineers characterized the well design for the Macondo

21 Well as rapidly changing.  Does BP agree?

22            MR. FIELDS:  Object to form.

23            MR. RUBINSTEIN:  Objection, form.

24    A.   I mean, I -- I don't have any insight into

25 that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    was -- the one I've seen was based -- was dated April

2    15th.

3         Q.   (By Ms. McClellan) Okay.  Does BP have any

4    reason to believe that after April 15th there was

5    another formal version of the production casing

6    interval sent to the rig?

7              MR. FIELDS:  Objection, form.

8         A.   Based on the date on the program of April

9    15th, no, I'm not aware of any document like this that

10   had been sent out after April 15th.

11        Q.   (By Ms. McClellan) And I believe you just

12   stated that you had not seen this document; is that

13   correct?

14        A.   I have seen this document or a version of it.

15        Q.   Had you seen it prior to April 20th of 2010?

16        A.   No.  I mean, I saw it in preparation for this

17   deposition.

18        Q.   So there was no Management review of this

19   document prior to April 20th of 2010, correct?

20             MR. FIELDS:  Objection, form.

21             MR. RUBINSTEIN:  Objection, form.

22        A.   I don't know that.  I -- I wasn't there, so --

23   I mean, the -- the -- the people on the note would be

24   the -- the -- the Wells Team, so I --

25        Q.   (By Ms. McClellan) To your knowledge, was

**PURSUANT TO CONFIDENTIALITY ORDER**

1   there any other Management review other than the

2   individuals listed on the E-mail?

3        A.   I'm not aware of any.

4        Q.   Okay.  For the Macondo Well, when does BP

5   contend that the final cement program was put together?

6        A.   I believe there was a -- a cement program sent

7   out on April 18th.

8        Q.   If I could refer you to Tab 24, is this the

9   document that BP contends is the final cement program

10  for the Macondo Well?

11            MR. FIELDS:  Objection to form.

12       A.   This is the -- the OptiCem Report, the -- the

13  last OptiCem report that was developed for the -- the

14  cement job.

15       Q.   (By Ms. McClellan) Where does BP contend that

16  the final cement program is documented?

17       A.   I think the -- the -- the programs were issued

18  on an ongoing basis and updated as -- as more

19  information came in.  So I would say that based that

20  this was the last OptiCem Report this was the final

21  version that was to -- that was issued.

22       Q.   Okay.  And --

23            MR. GODWIN:  Object to form.

24       Q.   (By Ms. McClellan) -- in answer to my

25  question, then, where does BP contend the final cement

**PURSUANT TO CONFIDENTIALITY ORDER**

1  through to the -- the final operation on the well as

2  far as drilling and getting to TD, looking at what

3  would happen after that.  We don't generally review

4  that through the stage-gate process the -- the -- the

5  suspension program.

6      Q.   Okay.  The design of the temporary abandonment

7  procedure, that was designed by BP, correct?

8      A.   The -- the program that was issued by BP and

9  ultimately included the -- the temporary suspension

10  program, or temporary abandonment program.

11     Q.   And that was designed by BP, correct?

12     A.   The -- the plan was prepared by BP, yes.

13     Q.   Did BP have a standard temporary abandonment

14  procedure that was to be used in the Gulf of Mexico at

15  the time that the Macondo Well's temporary abandonment

16  procedure was designed?

17     A.   I'm not aware of a standard procedure, no.

18     Q.   What guidance was there, then, for the

19  Engineers in the Gulf of Mexico for temporary

20  abandonment?

21     A.   Again, the DWOP ETPs would be the -- the

22  guidance or the standards which would -- the Teams

23  would have meet in addition to any MMS Regulations.

24     Q.   The Macondo Well's temporary abandonment

25  procedure wasn't included in the January 2010 Drilling

1    Program that we looked at, was it?

2        A.   I don't believe so.   I don't know.

3        Q.   Should it have been?

4        A.   It wasn't a standard that we included the --

5    the abandonment or suspension procedure in that

6    Drilling Program.   Normally a program would be issued

7    later to cover the -- the temporary abandonment.

8        Q.   What does BP contend constitutes the Macondo

9    Well's temporary abandonment procedure?

10       A.   I believe that April 15th document was the

11   formal communication as to the -- the -- the procedure.

12   There were further correspondence that updated that

13   procedure.

14       Q.   The April 15th --

15       A.   I think it was Document 25.

16       Q.   Tab 25.   This document's the Temporary

17   Abandonment Procedure For the Macondo Well?

18       A.   It -- it contains the -- the temporary

19   abandonment plan.

20       Q.   Okay.   And was the temporary abandonment plan

21   that's outlined -- if you can point me to the section.

22       A.   So it continues on from the end of the -- the

23   cement job on the --

24       Q.   M-h'm.

25       A.   -- production casing.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    It -- it gives more detail in -- in the April

2    20th note as to how the negative test should be

3    performed.

4    Q.    Was there any ET -- an ETP or any other sort

5    of guidance for the negative pressure test on April the

6    20th of 2010?

7    A.    The own -- the -- within, I think, 10-60,

8    the -- the requirement is to have a -- to -- to be a --

9    a -- a barrier, a temporary barrier --

10    Q.    M-h'm.

11    A.    -- for suspension.  The -- the casing has to

12    be tested, and the preference is to test it in the

13    direction of flow which would say we should test

14    negatively.

15    Q.    Going back one moment, when we were discussing

16    the procedure that was provided to MMS, the April 20th

17    Ops note is not the same procedure that was provided to

18    MMS, correct?

19             MR. FIELDS:  Objection, asked and

20    answered.

21    A.    It is different.

22    Q.    (By Ms. McClellan) Okay.  Why didn't BP submit

23    a revised procedure to MMS?

24             MR. FIELDS:  Objection to form and scope.

25    A.    I don't know.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    programs."

2           Do you understand that casing and cementing

3    programs must be submitted to the MMS for approval?

4           MR. FIELDS:  Objection, form.  Scope.

5       A.  I don't know.

6       Q.  (By Mr. Dart) As a spokesman for BP, you don't

7    know?

8       A.  No.

9           MR. FIELDS:  Objection to form.

10      Q.  (By Mr. Dart) All right.

11          MR. FIELDS:  Scope.

12      Q.  (By Mr. Dart) Thank you.

13          I'd like to talk about temporary abandonment

14   now.  Was a formal Risk Assessment performed on the

15   April 20th Ops note, which was the temporary

16   abandonment plan for the Macondo Well?

17      A.  I'm not aware of a formal Risk Assessment, no.

18      Q.  Was a formal Risk Assessment required to be

19   performed on the temporary abandonment Ops note?

20      A.  By BP?

21      Q.  Yes.

22      A.  I'm not aware of a requirement to perform a --

23   perform a Risk Assessment on a particular procedure.

24      Q.  Okay.  If you'd look at the DWOP, which I

25   think is Tab 5, and look at Section 3.4.  It's Risk

**PURSUANT TO CONFIDENTIALITY ORDER**

1  Management.  Do you see that?

2      A.   Yeah.

3      Q.   3.4.1 says:  "All D&C operations shall follow

4  a documented and auditable risk management process to

5  include identification, assessment, prioritization, and

6  action.  The process will include all risks with either

7  an HSSE or significant financial impact."

8          Does that section that we've just read require

9  that a formal Risk Assessment, documented and

10  auditable, be performed on the temporary abandonment

11  procedures?

12              MR. FIELDS:  Objection, scope.

13      A.   That says that there should be a Risk

14  Management process in place that the Teams will be --

15  will utilize.

16      Q.   (By Mr. Dart) It says:  "All D&C

17  operations..."  Temporary abandonment is a D&C

18  operation, correct?

19      A.   Correct.

20      Q.   All right.  It says:  "...D&C operations shall

21  follow a documented and auditable risk management

22  process."

23      A.   (Nodding.)

24      Q.   Was a Risk Assessment done by BP on the

25  temporary abandonment process for the Macondo Well?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. FIELDS:  Objection, form and scope.

2     A.    There was a Risk Management process in place

3   for the -- the -- the -- the Team that planned the

4   Macondo.

5     Q.    (By Mr. Dart) Okay.  Now, BP has a Recommended

6   Practice for Risk Management for Drilling & Completions

7   in the Gulf of Mexico; is that correct?

8     A.    If you could point me to a document, I --

9     Q.    I -- I have it in front of me.  I only have

10   one copy, though, but I'll show it to you in a second.

11          I'll show it to you right now.

12          You familiar with this document?  It was dated

13   January 20th of 2010.  I'll show it to you, hand it to

14   you.

15     A.    (Reviewing document.) I'm not sure I've seen

16   this in detail.

17     Q.    Have you se -- have you ever seen a document

18   like that before?

19     A.    I'm not sure I've seen this particular

20   document.

21     Q.    Well, not the one with all my highlights and

22   tabs on it, but have you seen a copy of that document

23   before?

24     A.    I don't recall if I've seen a copy of this

25   particular document.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.  Look -- look at the red tabs at the

2  top.  If you'll flip to the first one and read the

3  highlighted paragraph that has a star next to it, the

4  second paragraph.  Read that aloud, please.

5    A.   "This recommended practice shall be used by

6  GoM D&C teams to manage all risks.  bp RAT is the

7  standard risk management tool and ALL identified risks

8  shall be entered into, and managed through this tool."

9    Q.   Okay.  Does that -- it -- let's assume that

10  that was the Risk Management policy for D&C in the Gulf

11  of Mexico during April of 2010.  Does that document

12  require that the BP RAT be used to document all risks?

13              MR. FIELDS:  Objection, form and scope.

14    A.   It says there -- "This Recommended Practice

15  shall be used..."

16    Q.   (By Mr. Dart) Yes.  Now, what is the BP RAT?

17  Do you know?

18    A.   It's a Risk Assessment Tool, a web-based tool.

19    Q.   Okay.  Have you ever used it before?

20    A.   I have personally not used it, no.

21    Q.   Okay.  Do you know if it was used for the

22  temporary abandonment procedures for the Macondo Well?

23    A.   I don't know.

24    Q.   As a Representative of BP, you don't know?

25    A.   No.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    -- or --

2    Q.    And --

3    A.    -- could be contacted.

4    Q.    Well, and that's exactly what I'm asking is --
5  and I'm not asking about a particular time or a date or
6  anything, whether or not they were busy to -- to -- you
7  know, too busy to be available for consultation.  But
8  BP has Cement Experts that are available for
9  consultation by Wells Teams in the development of a
10 cement program; isn't that true?

11    A.    There are BP experts available, yes.

12    Q.    Okay.  Let's move on to Temporary Abandonment
13 Procedure.  Transocean was not involved in preparing
14 the Temporary Abandonment Procedure; isn't that true,
15 sir?

16    A.    As it relates to the -- the Well Program?

17    Q.    Yeah, the Temporary Abandonment Procedure.

18    A.    The procedure that was issued was issued by
19 BP.

20    Q.    Right.  And Transocean, as far as you know,
21 was not involved in preparing that procedure; isn't
22 that true?

23    A.    I don't know if they were involved or
24 consulted over it.

25    Q.    You're not aware of any involvement by

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Transocean in the preparation of the Temporary

2    Abandonment Procedure; isn't that true?

3        A.   I'm not aware of any.

4        Q.   Okay.  I think you may have answered this

5    earlier.  I just want to clarify:  At what point in

6    terms of -- of date and time -- and you don't have to

7    have the exact time -- was the final Temporary

8    Abandonment Procedure generated?

9        A.   I don't have the exact date.  I mean, from

10   what I've seen, there was the -- the -- the E-mail from

11   Brian Morel which outlined an update to the program

12   as --

13       Q.   As far as you know, that April 20 E-mail from

14   Brian Morel was the final Temporary Abandonment

15   Procedure; is that right?

16       A.   I haven't seen any other procedure that --

17   that is after that.

18       Q.   Okay.  So as far as you know, the April 20

19   E-mail from Brian Morel that was, I think, referred to

20   as an "Ops Note," that was the final Temporary

21   Abandonment Procedure; is that true?

22       A.   As far as I'm aware, yes.

23       Q.   Okay.  And it's true, sir -- and I -- I think

24   we've covered this, I just want to make sure -- that

25   final Temporary Abandonment Procedure that you

**PURSUANT TO CONFIDENTIALITY ORDER**

1  referenced was different than the Temporary Abandonment

2  Procedure submitted and approved by what was then known

3  as the MMS; is that true?

4           MR. FIELDS:  Objection, form and scope.

5      A.   There's differences between the procedures.

6      Q.   (By Mr. Johnson) Okay.  That -- it's different

7  than the one submitted and approved by the MMS --

8           MR. FIELDS:  Same --

9      Q.   (By Mr. Johnson) -- correct?

10          MR. FIELDS:  Same objection.

11     A.   The -- the procedure -- the steps in the

12 procedure are not the same as the steps that were

13 submitted to the MMS.

14     Q.   (By Mr. Johnson) Okay.  Should the final

15 Temporary Abandonment Procedure that was executed on

16 the rig, should it have been consistent with the

17 Temporary Abandonment Procedure submitted and approved

18 by the MMS?

19          MR. FIELDS:  Objection, form and scope.

20     A.   I -- I don't know.  I didn't look at that.

21     Q.   (By Mr. Johnson) You don't know -- you don't

22 know the answer to that question, whether it should

23 have been the same?

24     A.   I don't know.

25     Q.   Okay.  Well, you may not know the answer to

**PURSUANT TO CONFIDENTIALITY ORDER**

1  this one, but I'm going to ask just to make sure:

2  Should any change in the final Temporary Abandonment

3  Procedure, to the extent it was different than that one

4  that was submitted and approved by the MMS, should it

5  have been resubmitted and approved by the MMS?

6          MR. FIELDS:  Objection, scope.

7      A.   I don't know.

8      Q.   (By Mr. Johnson) You don't know.  Okay.

9          It's true that the Temporary Abandonment

10 Procedure contained a step requiring a negative

11 pressure test, correct?

12     A.   That's correct.

13     Q.   Okay.  And I think that we referred -- this

14 has been previously marked as 793.  Take a look at it.

15          MR. FIELDS:  Do you have another copy of

16 it?

17          MR. JOHNSON:  You know, I don't.  You can

18 look at mine for just a second.

19          MR. FIELDS:  Oh, okay.

20          MR. JOHNSON:  I don't mind.  I don't need

21 it.

22          MR. ALEXANDER:  I have one here.

23          MR. JOHNSON:  Do you need it?

24          MR. FIELDS:  Yeah, just --

25          MR. JOHNSON:  That's fine.

**PURSUANT TO CONFIDENTIALITY ORDER**

# Exhibit B

**Excerpts of Jim Cowie's June 30, 2011 Deposition**

01-36983
PW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )
APRIL 20, 2010 )
)
)
)

MDL NO.  2179

SECTION: J

JUDGE BARBIER

MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

## *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Jame Cowie

### VOLUME 2

JUNE 30, 2011

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group●Court Reporting●Video Production●Videoconferencing

### For U.S. & International Services
### 800 - 745 - 1101

1  plan?

2           MR. REGAN:  Objection; form.

3      Q.   (BY MR. WILLIAMS)  Is that a sequence of

4  events change or a design of well change?

09:11  5           MR. REGAN:  Objection; form.

6      A.   I would need a specific case to comment on

7  that.

8      Q.   (BY MR. WILLIAMS)  Well, on the Macondo are

9  you aware that there were several versions of a

09:11  10  temporary abandonment plan prepared by BP?

11           MR. REGAN:  Objection to form.

12      Q.   (BY MR. WILLIAMS)  During April 2010 there

13  were various versions of a temporary abandonment plan;

14  are you aware of that?

09:12  15           MR. REGAN:  Objection; form.

16      A.   I'm aware that there was a change in the

17  sequence of events.  I'm not aware that there were a

18  number of -- or various temporary abandonment plans.

19      Q.   (BY MR. WILLIAMS)  Okay.  You're aware that BP

09:12  20  changed the sequence of events in the temporary

21  abandonment plan at some point in April 2010?

22      A.   I am.

23      Q.   And what sort of risk assessment is required

24  for that change?

09:12  25      A.   That would depend on the team and how they saw

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the risks that were occurring at that time.  So I don't

2    know what was actually completed for that event.

3          Q.   Just a couple more.  Not in- -- the decision

4    to not install additional barriers during the temporary

09:13  5    abandonment procedure, did BP follow a documented and

6    auditable risk management process with respect to that

7    decision?

8                MR. REGAN:  Objection to form.

9          A.   That's a strange terminology, the decision not

09:13  10   to do something.  My understanding was that the program

11   called for two barriers.  The policy states there should

12   be two barriers.  And my recollection is the MMS had

13   agreed two barriers was the design for this well.

14               The first barrier was the cement and the shoe

09:13  15   track, and after the negative test the plan was to set

16   the second barrier.  So I do not think that there was

17   any conscious decision made not to set additional

18   barriers.

19         Q.   (BY MR. WILLIAMS)  The -- are you aware that

09:14  20   there was in one of the temporary abandonment plans an

21   indication that BP would set the surface plug prior to

22   conducting the negative pressure test?

23               MR. REGAN:  Objection to form.

24         A.   I'm not aware of that, and I'm not sure why

09:14  25   you would do that.

**PURSUANT TO CONFIDENTIALITY ORDER**

383

1      Q.    (BY MR. WILLIAMS)  Do you know on Macondo

2  whether the surface plug was set prior to the negative

3  pressure test?

4      A.    It was not.

09:14  5      Q.    And if that was a change from the prior

6  temporary abandonment plan, the timing of placing the

7  surface plug, would that be a significant change?

8             MR. REGAN:  Objection; to form.

9      A.    Sorry, to me this is a hypothetical question.

09:15  10  I mean, I'm not aware that there was a change made, you

11  know.  And to say -- I don't know if that change was

12  made.  I don't know if that change was discussed.  So

13  therefore I can't comment on whether a risk assessment

14  plan would be needed for that.  If you could clarify the

09:15  15  question, I'll try and answer it.

16      Q.    (BY MR. WILLIAMS)  Okay.  In terms of all the

17  decisions we just walked through on the Macondo well,

18  was there a risk assessment for the accumulation of any

19  risks in those decisions?

09:16  20             MR. REGAN:  Objection; form.

21      A.    A written risk assessment?  I would say that

22  the team were continually assessing the risks involved

23  in what they were doing, I would say both Transocean and

24  BP.  So they were aware of the ongoing operations at the

09:16  25  time and the sensitivities of this well.  So the team

**PURSUANT TO CONFIDENTIALITY ORDER**

# Exhibit C

**Excerpts of Ian Little's April 7, 2011 Testimony before the MBI Panel**

Transcript of the Testimony of
# The Joint United States Coast Guard/Bureau of Ocean Energy Management Investigation

### Date taken: April 7, 2011
### PM Session

### USCG/BOEM Board of Investigation (Re: Deepwater Horizon)

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

Page 40

1   everybody.  So I am not doing anything

2   personally with my team over the

3   recommendations.

4        MR. BOWMAN:

5             Pass the witness.

6        JUDGE ANDERSEN:

7             Okay.  We have Anadarko and MOEX.

8   EXAMINATION BY MR. NEGER:

9        Q.   Good afternoon.  My name is

10  Peter Neger, and I represent the Anadarko

11  Petroleum Corporation and MOEX Offshore

12  2000, LLC.  I understand that Anadarko and

13  MOEX were BP's nonoperating investors in the

14  lease for the Macondo well; is that right?

15       A.   That's correct.

16       Q.   One of your responsibilities as

17  wells manager in BP's wells division was to

18  be aware of audits performed by BP regarding

19  rigs working on BP wells under your

20  jurisdiction, correct?

21       A.   Yes.

22       Q.   And it was the responsibility of

23  the wells operation team to work with the

24  rig operator to ensure the operational

25  integrity of rigs, correct?

Page 60

1              Could you repeat that again?

2    EXAMINATION BY MR. NEGER:

3         Q.    Absolutely.

4              Who at BP is responsible for

5    approving the start of operations by a rig

6    when there are outstanding questions about

7    the rig's compliance with BP's own internal

8    policies and procedures?

9         A.    Are you referring to the rig

10   audit?

11        Q.    Generally, but with specific

12   reference to the rig audit, with which I

13   think we have now agreed that if the rig

14   audit says what it says, there were items

15   which were identified as being out of

16   compliance with BP's own internal policies

17   and procedures.

18        A.    And those actions were being

19   addressed, and they were being closed out by

20   Transocean as part of our normal procedure.

21        Q.    Thank you.  But that wasn't my

22   question.  My question is who at BP was

23   responsible for approving the start of

24   operations by a rig when there were

25   outstanding questions about the rig's

Page 61

1    compliance with BP's own internal policies

2    and procedures?

3        MR. GODFREY:

4            Objection.  How does that help the

5    board?  This is civil discovery.  I

6    understand Anadarko's goal of civil

7    discovery for the MDL litigation, but how

8    does that help the board?

9        JUDGE ANDERSEN:

10           It could conceivably help the

11   board insofar as we are interested in the

12   chain of command, so if the wells team

13   leader, for example, is overseeing

14   compliance with these things, maybe he is

15   the person who has to decide whether or not

16   a particular item is worth stopping the work

17   or worth going forward.  Does he make that

18   decision, generally speaking?

19       THE WITNESS:

20           The rig audit contains items --

21   again, pertaining to the rig audit, which I

22   believe the question was addressing, if the

23   rig audit says items need to be addressed

24   before resuming operations, then those items

25   would be addressed.

# Exhibit D

**Excerpt from The BP Parties' Responses and Objections to Defendant MOEX Offshore 2007 LLC's Interrogatories and Requests for Production of Documents**



36086798

Feb 22 2011
10:56PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| ………………………………………….... | : | |

### THE BP PARTIES' RESPONSES AND OBJECTIONS TO DEFENDANT MOEX OFFSHORE 2007 LLC'S INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendants BP America Inc. ("BPA"), BP America Production Company ("BPAP"), and

BP Exploration & Production Inc. ("BPXP") (collectively, "the BP Parties"), by their

undersigned Counsel, and, pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil

Procedure, hereby submit the following responses and objections to MOEX's Interrogatories and

Requests for Production.

### SPECIFIC RESPONSES AND OBJECTIONS

The BP Parties respond as follows to MOEX's specific interrogatories and requests for

production, subject to and without waiving their general objections, each and every one of which

are specifically incorporated into each individual response below.[1]

### INTERROGATORY NO. 1:

Please IDENTIFY every BP EMPLOYEE or other PERSON associated with BP who
concluded that the second, or any subsequent, negative pressure test at the MACONDO WELL
on April 20, 2010, was "successful" and DESCRIBE in detail each and every reason for such
conclusion.

---

[1] The BP Parties' general objections are set forth at pages 46 - 57.

**INTERROGATORY NO. 15:**

Beginning with the MACONDO WELL temporary abandonment procedures, plan and/or steps discussed by YOUR EMPLOYEES by email or otherwise on April 12, 2010, DESCRIBE in detail each temporary abandonment procedure, plan and/or step YOU decided upon or changed between April 12 and the April 20th explosion on the *DEEP WATER HORIZON,* and the specific reasons for and basis on which YOU changed or revised each such procedure, plan and/or step.

**RESPONSE TO INTERROGATORY NO. 15:**

The BP Parties object to this interrogatory as vague, ambiguous and potentially misleading to the extent that is suggests that the temporary abandonment procedure was changed subsequent to the submission on April 16, 2010 of their Form MMS-124 to the MMS, which set forth the plan for the temporary abandonment procedure.

Subject to their specific and general objections, the BP Parties will conduct a search of non-privileged documents for additional documents relating to the details as to how that temporary abandonment plan was implemented, and will produce responsive documents indentified as a result of that search.

To the extent MOEX's interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 16:**

Please DESCRIBE in detail all "kicks" experienced on the *DEEP WATER HORIZON* or with the MACONDO WELL from February 1, 2010 through April 20, 2010; IDENTIFY each PERSON who experienced, monitored and/or reported such kicks; and DESCRIBE in detail all actions taken in response to such kicks.

**RESPONSE TO INTERROGATORY NO. 16:**

The BP Parties object to this interrogatory as calling for information outside the reasonable custody, possession and/or control of the BP Parties in purporting to call for the