# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

J. Andrew Langan
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

August 9, 2011

**Via E-mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA 70130

     Re: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, MDL No. 2179

Dear Judge Shushan:

  BP submits this letter in reply to the letters submitted to the Court by the PSC on August 4 and by Anadarko on August 5 regarding the scope and nature of BP 30(b)(6) Topic 7. Although BP disagrees with the PSC's and Anadarko's characterization of the record, I believe that the testimony cited and appended to my letter submitted to Your Honor on August 3 not only refutes the factual assertions in the PSC's and Anadarko's letters but also provides ample proof that the engineering and risk assessment rationales of the background, basis, and intent of the temporary abandonment procedure (and any deviations among the documents listed in Topic 7) have been testified to at length by at least two BP 30(b)(6) witnesses and at least a half a dozen fact witnesses involved in the drafting, review, and implementation of the temporary abandonment procedures.[1]

  For example, of the nine bullet points for which Anadarko asserts Mr. Little had no knowledge (*see* Anadarko letter page 5), the record reflects that five of these points were addressed directly be either Mr. Little or another BP witness:

- **Whether BP had a standard Temporary Abandonment procedure in the Gulf of Mexico when the Macondo Well's Temporary Abandonment procedure was designed.**  Mr. Little testified immediately after the testimony cherry-picked by Anadarko about the guidance that existed for the wells team in developing temporary

---

[1] All of the testimony cited herein has already been provided to Your Honor in my original letter, or where noted, in Anadarko's response.  The two exceptions to this, Jim Cowie's testimony between pages 370-375 and Ian Little's testimony between pages 55-56, are attached to this letter as an exhibit.

Hong Kong  London  Los Angeles  Munich  New York  Palo Alto  San Francisco  Shanghai  Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 9, 2011
Page 2

>   abandonment procedures -- namely, the DWOP ETPs as well as MMS regulations.  *See* Little 6/30/2011 Tr. at p. 93:18-93:23.

- **Whether the Temporary Abandonment plan was included in the January 2010 drilling program.**  Mr. Little testified that he did not believe the TA procedures were included in the drilling program and that normally the TA procedures would not be included in such a program, but would be issued later.  *See* Little 6/30/2011 Tr. at pp. 92:17-94:7.

- **Whether BP's drilling and completions operations such as Temporary Abandonment require a risk assessment to be done or whether it was done for the Macondo Well.**  This is clearly outside the scope of Topic 7 and squarely within the scope of Topic 18, to which Mr. Cowie testified at length during his 30(b)(6) deposition.  *See* Cowie 6/30/2011 Tr. at pp. 370:24-382:18.

- **Whether Transocean was involved or consulted in designing the Temporary Abandonment procedure.**  Mr. Little testified that BP issued the final temporary abandonment procedure.  *See* testimony cited by Anadarko, Little 6/30/2011 Tr. p. 138:12-138:24.  Additionally, Ronnie Sepulvado, one of the well site leaders aboard the *Deepwater Horizon* during the time when the temporary abandonment procedure was drafted, testified several months earlier that his practice was to show each revision to the Transocean OIM and toolpusher to seek their input to each revision that was sent to the rig.  *See* R. Sepulvado 3/11/2011 Tr. at pp. 453:23-456:5.

- **The date on which BP generated the final Temporary Abandonment procedure.** *See* Little 6/30/2011 Tr. at pp. 94:8-97:3.

The remaining bullet points set out by Anadarko are argumentative and improper in that they assume as a predicate to the topic Anadarko's version of the events at issue, which BP disputes:

- **Whether there was a management review of the April 20 "Ops Notes" prior to April 20, 2010**.  This bullet point assumes that there were significant changes between the April 16 temporary abandonment procedure and the April 20 "Ops Note" and that a management review of the latter was necessary and/or proper.  Mr. Little testified that the Ops Note reflected more detail regarding how the negative test procedure was to be performed.  *See* Little 6/30/2011 Tr. at pp. 96:16-97:3.

- **Whether BP agreed with the drilling engineers' characterization of the Macondo Well in March and April as "rapidly changing."**  Anadarko only quotes the original

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 9, 2011
Page 3

> question and fails to quote Mr. Little's responses after being shown the document in question.  *See* Little 6/30/2011 Tr. at pp. 55:1-56:19.
>
> - **Why BP did not submit a revised Temporary Abandonment procedure to the MMS after the plan changed.**  No foundation was laid by the examiner that BP 1) should have submitted a revised Application for Permit to Modify; or, 2) that the "plan had changed."  *See* Little 6/30/2011 Tr. at p. 96:16-97:25.
>
> - **Whether Temporary Abandonment procedures used on the rig should have been consistent with those submitted and approved by MMS.**  These last two bullet points deal with the inherent regulatory component of Topic 7-- the area in which BP proffered its designated Topic 7 witness and for which the PSC and Anadarko displayed no interest during the July 28 telephone conference.

Moreover, I wish to address briefly Anadarko's assertions that Mr. Little and Mr. Cowie's 30(b)(6) depositions were "crowded" into three days and that Mr. Cowie was designated to speak to "more [topics] than any other 30(b)(6) designee."  These assertions are demonstrably incorrect.  Other parties, such as Cameron and MOEX, designated one witness for over 30 topics each.  Anadarko designated one witness, Robert Quitzau, to address no less than 14 topics, and a total of 8 witnesses to cover 31 topics over the course of 11 days.  BP, on the other hand, has produced (or will produce) a total of 20 witnesses over 31 days to cover its 30(b)(6) topics.  By contrast, no other party's 30(b)(6) testimony lasted more than 11 days.  Without taking a position now on whether the other parties have properly met their Rule 30(b)(6) obligations, it cannot be reasonably disputed that BP has done more than its fair share in meeting its 30(b)(6) obligations.

                Respectfully submitted,

                */s/ Andrew Langan*

                J. Andrew Langan, P.C.

Attachments

cc: Plaintiffs Liaison Counsel
   Defense Liaison Counsel
   Mike Underhill
   Hon. Attorney General Luther Strange
   Cory Maze

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 9, 2011
Page 4

    Donald E. Godwin
    James P. Roy
    Stephen J. Herman
    Robert Cunningham

1

```
 1              UNITED STATES  DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL        )     MDL NO. 2179
     BY THE OIL RIG           )
 4   "DEEPWATER HORIZON" IN   )     SECTION "J"
     THE GULF OF MEXICO, ON   )
 5   APRIL 20, 2010           )     JUDGE BARBIER
                              )     MAG. JUDGE SHUSHAN
 6
 7
 8
 9
10
11
12
13
14
15
16
17                     *****************
                            VOLUME 1
18                     *****************
19
20
21        Deposition of Ian Little, as a Corporate
     Representative, taken at Kirkland & Ellis
22   International, 30 St. Mary Axe, 22nd Floor, London
     EC3A 8AF, England, United Kingdom, on the 30th of June,
23   2011.
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                    MS. MCCLELLAN:  We can mark for the
 2   record --
 3                    MR. RUBINSTEIN:  Do you have one more?
 4                    MS. MCCLELLAN:  (Tendering.)
 5                    MR. RUBINSTEIN:  Thank you.
 6                    MS. MCCLELLAN:  -- as the next exhibit --
 7                    THE COURT REPORTER:  6292.
 8              (Exhibit No. 6292 marked.)
 9       Q.   (By Ms. McClellan) -- an E-mail dated March
10   the 12th from Brian Morel to Stephen Morey.
11       A.   Yeah.
12                    THE COURT REPORTER:  What Tab?  What Tab
13   number?
14                    MR. FIELDS:  It's not in the binder.
15                    MS. MCCLELLAN:  This is not in the
16   binder.
17       Q.   (By Ms. McClellan) "Steve, we have been"
18   encounting "issues" -- "encountering issues on Macondo
19   and the well design is rapidly changing."
20            Mr. Morel is a BP Drilling Engineer, correct?
21       A.   That's correct.
22       Q.   And Mister -- who is Mr. Morey?
23       A.   Mr. Morey is a -- an expert in our -- in our
24   Technology Group on casing design and casing
25   calculations, design calculations.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1      Q.   So the -- Mr. Morel was the Drilling Engineer
 2  for the Macondo Well, correct?
 3           MR. FIELDS:  Object to form.
 4      A.   He was one of the Drilling Engineers for the
 5  well, yes.
 6      Q.   (By Ms. McClellan) He, as well as Mr. Hafle,
 7  right?
 8      A.   That's correct.
 9      Q.   And he's telling one of your experts, Stephen
10  Morey, that the well design is rapidly changing; is
11  that correct?
12      A.   That's what the note says.
13      Q.   Does BP have any reason to disagree with the
14  Drilling Engineer for the Macondo Well indicating to
15  its expert that the well design was rapidly changing?
16           MR. RUBINSTEIN:  Objection, form.
17           MR. FIELDS:  Objection, form.
18      A.   I -- I don't know what he in particular meant
19  by that, no.
20      Q.   (By Ms. McClellan) Okay.  For the Macondo
21  Well, what does BP contend documents the final design,
22  program, plan, whatever you want to call it, for
23  running the production casing and performing the cement
24  job?
25           MR. FIELDS:  Objection, form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
  1              UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
  2

  3  IN RE:  OIL SPILL           )     MDL NO. 2179
     BY THE OIL RIG              )
  4  "DEEPWATER HORIZON" IN      )     SECTION "J"
     THE GULF OF MEXICO, ON      )
  5  APRIL 20, 2010              )     JUDGE BARBIER
                                 )     MAG. JUDGE SHUSHAN
  6
  7       ****************************************
                 ORAL AND VIDEOTAPED DEPOSITION OF
  8                      JAMES COWIE
                         JUNE 30, 2011
  9                        VOLUME 2
          ****************************************
 10
 ...
 21           Deposition of JAMES COWIE, taken at
 22  Kirkland & Ellis International, 30 St. Mary Axe, 22nd
 23  Floor, London EC3A 8AF, England, United Kingdom, on the
 24  30th of June, 2011.
 25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1  at?
 2       A.   Yeah, it's 370030.  It's marked Page 4 of my
 3  notes, my written, handwritten notes.
 4       Q.   Okay.  And where is the call -- where are the
 5  notes that you just read?
 6       A.   Fourth -- fourth line down.  Third line --
 7  fourth line down says, While running in the hole I am in
 8  office.  Hafle called to ensure had seen the modify APM.
 9       Q.   Okay.  And if we can look at -- that's all you
10  know you remember about that call?
11       A.   Yes, sir.
12       Q.   Okay.  And can you identify that on the log
13  just in terms of the time it took place?
14            MR. REGAN:  Object to form.
15       A.   If it's -- if Hafle had used a Westlake phone
16  or land line to call.  There is a call recorded at 7:54
17  on Page 5 of 8.  Subtracting the approximate four hours
18  from that would take it to around 4:00 o'clock in the
19  afternoon.  Looks like there was a call to the Horizon
20  company man's office at that time.
21       Q.   (BY MR. WILLIAMS)  Okay, thank you.
22       A.   I don't know if that is the call, but it could
23  be.
24       Q.   I wanted to ask you some questions about the
25  topic 18 of the 30(b)(6) designation, and I'll read that
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   for you.  It's, Analysis or evaluation of risks
 2   associated with design and operational decisions made by
 3   BP personnel concerning operations and activities
 4   performed at the Macondo well during the period from
 5   February 1 through April 20, 2010 including, but not
 6   limited to, the creation of entry data into and the
 7   completion of a risk register or risk assessment tool
 8   (RAT)?
 9            Is that one of the topics that you have been
10   designated to discuss today?
11       A.   Yes, sir.
12       Q.   What did you do to prepare for that topic?
13       A.   I read the topic and did research and inquiry
14   about what happened on this well relative to that.
15       Q.   Okay.  And can you describe the research that
16   you did?
17       A.   Yes.  The risk evaluation that was done
18   prior -- during the planning of the Macondo well wasn't
19   done according to the RAT tool.  It was pre-RAT tools.
20   That tool wasn't used.  But there was a risk register
21   used, and the main risks associated with the well were
22   recorded in that risk register.  That would have -- that
23   would have been used in preparation for writing the
24   drilling program, and these risks would have been
25   mitigated during the writing of the drilling program.
```

08:57

1  Once the rig went into execute phase, then
2  there would be daily meetings to discuss the rig -- the
3  risks associated with the well by the onshore, offshore
4  teams and communication with one another and also
5  separately in isolation during different conversations
6  during the day, managing risks day to day as they went
7  forward.
8  There was one event, well control event on
9  March the 8th.  There was a "lessons learned" document
10 created from that which was used to notify the teams
11 regarding -- the team regarding the outcome and what
12 happened during that event.  There was stuck pipe in
13 that situation.  The well had to be sidetracked and
14 another casing string run.  So there was a management
15 change for that.  The drills that were done on the rig
16 reflected the hole condition at the time the well
17 condition, the drills that were done with the BP
18 personnel and the wider crews out there, you know, the
19 pore pressure frac gradient, you know, how close that
20 was and how, you know, challenging it was to manage.
21 There was also some communication around why they
22 decided to call TD early on the well, because of the
23 challenging nature of the well and the geology and the
24 decision to do that, and that was recorded and agreed as
25 well.  That's the majority of things, I believe, at the

```
                1   time.
                2        Q.    And is that the extent of the analyses or
                3   evaluations of risk related to the Macondo well
                4   conducted by BP?
08:59           5              MR. REGAN:  Objection; form.
                6        Q.    (BY MR. WILLIAMS)  What you've just described,
                7   is that --
                8        A.    That's.
                9        Q.    -- kind of everything?
08:59          10        A.    That is what I have looked at in preparation
               11   for responding to that question.  Now, if you start to
               12   look at wider BP, we have all our policies, procedures
               13   and how we manage different aspects of the well and
               14   talking specifically what the team did in preparation
08:59          15   for this well, not the entire BP organization.
               16        Q.    You said a risk assessment tool was not done
               17   because that did not exist; is that correct?
               18              MR. REGAN:  Objection to form.
               19        A.    There had been a number of risk management
09:00          20   tools in the industry.  You know, as the industry
               21   progresses we use modified tools, you know, according to
               22   what our need is, as they get better.  And I believe at
               23   this time the risk register tool, which is also a very
               24   good tool, was used in the Macondo case.  The, RAT risk
09:00          25   assessment tool, came after that.  So that tool wasn't
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1  available at that time, so no character was used at that
2  time.
3      Q.   (BY MR. WILLIAMS)  On wells drilled now and in
4  the future is the RAT what is used instead of the risk
5  register?
6      A.   No, we have another tool which is a risk
7  management tool.  But all these tools incorporate the
8  risk register, you know, so the risk register is a list
9  of risks which have been identified and planned to
10 mitigate the effects.
11     Q.   Okay.  I'll show you what was previously
12 marked as Exhibit 296, which is on the disk for counsel.
13 Is this the risk register for the Macondo well?
14     A.   This to me looks like an operational risk
15 register.  So this register appears to identify the
16 operational risks associated with the Macondo well.
17     Q.   Is there another type of risk register?
18     A.   I do not know.  There can be risk registers
19 for various aspects of the well.  For the HSE aspects of
20 the well, you know, what are the risks to personnel,
21 personal injury, that type of stuff as well.
22     Q.   Did you find a risk register for HSE for
23 anything other than -- than this risk register when you
24 looked at the risk evaluations that were done on the
25 Macondo well?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
         1      A.   I have not found that.
         2      Q.   So is it fair to say this is the only risk
         3  register that you're aware of with respect to the
         4  Macondo well?
09:02    5      A.   That's correct.
         6      Q.   And do you know if this risk register was
         7  updated anytime after it was written?  And I see a date
         8  on here of 20 June 2009.  Is that your understanding of
         9  when this was prepared?
09:03   10      A.   That is the only record that I have, yes.
        11      Q.   And do you have the record of it ever being
        12  updated or changed after that date?
        13      A.   I do not.
        14      Q.   Are you familiar with DWOP?
09:03   15      A.   I am.
        16      Q.   And let me just show you a copy.  I believe
        17  it's already been introduced as Exhibit 93.
        18           MR. WILLIAMS:  Counsel, here's one for
        19  you.
09:03   20           MR. REGAN:  Thank you, sir.
        21      Q.   (BY MR. WILLIAMS)  I'd like to ask you about
        22  Section 3.4.1 which appears on a page ending in Bates
        23  labels 57282 in the lower right-hand corner.
        24      A.   Uh-huh.
09:04   25      Q.   Okay.  And under "Risk Management" 3.4.1 says,
```