

**Fw: MDL 2179 -- Request for Additional Phase 1 Depositions by BP**
**Mike O'Keefe**  to: Marie Firmin                                             08/11/2011 01:12 PM

Marie:  I missed this one.  It is not in the record.  Please file it.  Thanks.  Mike
----- Forwarded by Mike O'Keefe/LAED/05/USCOURTS on 08/11/2011 01:11 PM -----

| | |
|---|---|
| From: | "Andrew Langan" <alangan@kirkland.com> |
| To: | Sally_Shushan@laed.uscourts.gov |
| Cc: | mike_o'keefe@laed.uscourts.gov, James Roy <JIMR@wrightroy.com>, "Herman, S" <sherman@hhkc.com>, "michael underhill" <Mike.Underhill@usdoj.gov>, "Corey Maze" <CMaze@ago.state.al.us>, liaison2179@liskow.com |
| Date: | 08/05/2011 08:26 PM |
| Subject: | MDL 2179 -- Request for Additional Phase 1 Depositions by BP |

Dear Judge Shushan:

Per your July 26 Working Group order, BP makes the following requests for several additional Phase 1 deponents.

The majority of these requests have arisen from (1) the recently released Transocean investigation report and its subsequent production of supporting materials or (2) the as-yet unreleased Halliburton investigation report, which recent Halliburton witness deposition testimony has confirmed was undertaken without the expectation that privilege would apply.

As the Court is aware, BP released its Deepwater Horizon Accident Investigation Report ("IIT Report") to the public on September 8, 2010 -- almost a year ago.  Since that time, BP produced supporting materials to the IIT Report and, at the request of the parties in this litigation, made 12+ members of the IIT available for depositions in the first weeks of the deposition period in January and February.

Last April, in its April 11 Working Group Order  (Doc. 1908), the Court established a May 27 deadline for the vast majority of Phase 1 document production -- those documents that were responsive to requests served prior to April 4, 2011  (with "clean up" requests and production in response thereto to follow).   (Order at pages 1-2, Doc. 1908)   BP realizes that most of the parties to this litigation, including BP,  have made productions after the May 27 date as part of rolling production efforts.   What Transocean has done, however, far exceeds any rolling production to finish off what it had produced prior to May 27.

Surely the Curt did not contemplate the massive, late production that Transocean has made, well after the May 27 deadline that was set on April 11.  **In the two months plus since May 27, by our count, Transocean has produced 252,800 records with a total of 3,515,997 pages.**  Transocean released its report as the end of Phase 1 discovery approached on June 22, 2011, and then made large associated productions.  **Just since June 22, by BP's count, Transocean has produced 186,751 records covering 2,657,111 pages.**   Even assuming some of these are custodial productions for June and July deponents, the fact is that Transocean has made the lion's share of its production -- by far -- in the past month, long after the Court contemplated it would.

BP's requests for deponents arising from Transocean's report and supporting documentation produced in the last 5 weeks are timely and squarely relevant to the issues in play in this case. For example, we have requested below the deposition of Daniel Barron, a Transocean floorhand on the *Deepwater Horizon*, based on the Transocean investigation interview notes of Caleb Holloway, which were produced for the first time following the release of Transocean's investigation report and reveal that Mr. Barron was an eyewitness to the drill pipe bleed off and other final moments on the rig floor prior to the explosion on April 20.

Transocean should not be rewarded for delaying the release of its investigation report and the production of large volumes of documentation associated with that report (a production that occurred well after the May 27 deadline set by the April 11 Order) by only having to provide limited witnesses for depositions on these key topics. Similarly, Halliburton should not be rewarded for withholding the results of its investigation from the parties (and from the public) in an apparent effort to avoid discovery on those investigation results altogether.

As of this week, of the 179 depositions completed so far, 79 have been of BP affiliated witnesses. This compares to Transocean and 18 Halliburton affiliated witnesses, by our counts. As BP has repeatedly demonstrated through its fulsome and timely production of documents and by making a disproportionate number of witnesses available for deposition (including in the early stages of the deposition window), BP recognizes and has made every effort to comply and facilitate the Court's desire for an expedited schedule in this litigation, but it is important that goal not be achieved at the expense of BP's due process rights to defend itself in this case. Accordingly, BP makes the following requests for depositions on Phase 1 topics, and has endeavored to tailor this list as narrowly as reasonably possible in light of the key information these witnesses are expected to address.

In each case, the need for the deponent discussed below has arisen as a result of very recent document productions or recent testimony of other witnesses. One day will be adequate for these depositions, we believe, as long as BP is allotted sufficient examination time as the requesting party.

**1. Transocean** (these requests are in addition to **Eddy Red**, who has long been on the list and is still requested to be deposed):

    **A. Barry Braniff:** Mr. Braniff is with the Well Operations Group and has been referenced during recent depositions of David Cameron, Bill Ambrose, and Bill Sannan as an in house expert on well control and well control events at Transocean.

    **B/ Daniel Barron**, for his eyewitness testimony on April 20. According to TO investigation interview notes, Barron was an eyewitness of the key drill pipe bleedoff, and of the final moments on the rig floor.

    **C. Mike Fry**: Fry was the Subsea Superintendent, North American Field Support at the time of the April 20th Incident. He provided technical expertise relating to the Deepwater Horizon BOP, and during his time working as Subsea Superintendent, North American Field

Support, Mr. Fry visited the Horizon and assisted in troubleshooting its BOP. Mr. Fry is also an author of Transocean's Subsea Maintenance Philosophy, which provides the basis for Transocean's maintenance of the Deepwater Horizon BOP.

    **D.  Bob Scott.** Scott was one of 2 TO interviewers for TO hand Holloway.  He needs to be deposed in order to validate the statements in those notes.

    **E.  30(b)(6) re TO Well Advisor Program.**   Well Advisor is a TO spreadsheet program available, we believe, to OIMs and Rig Managers to serve as a method to review a customer's well design/plan.  It offers a checklist for things like well control preparedness.  It offers programs to judge pore pressure/fracture gradient and assess kick tolerance.  It belies the concept put forth by TO that it is a wrench-turner/mere tradesman who simply does what it is told by the sophisticated engineers at BP.

    **F.  Stress Engineering**: 30(b)(6) on the work it did for TO on the float collar and flow path as part of TO's investigation.

In addition, per Your Honor's order that allowing BP to take 4 additional domestic and 2 additional offshore depositions from the TO internal team, on August 1 we advised Transocean counsel of the following selections:

Perrin Roller (Halliburton concurs)
Derek Hart
Capt. John McDonald
Robert Tiano
Ewen Florence
Bob Walsh.


2. **Halliburton**

    **Halliburton Fact Witnesses as to Phase 1 issues**


A.   **Roger Dugas.** According to the testimony of Mr. Roth, Mr. Dugas was a sales manager at Halliburton at the time of the Incident who supervised Mr. Jesse Gagliano on his work for the Macondo well.  Mr. Dugas would have knowledge regarding Mr. Gagliano's performance within Halliburton and also likely communicated with Mr. Gagliano concerning the Macondo well.

B.   **Phyllis Stelly.** Ms. Stelly was a shift manager in the Halliburton Broussard laboratory at the time that laboratory performed testing on the Macondo slurry.  Ms. Stelly had at least one communication with Mr. Gagliano wherein he asked her to cancel a foam stability test and crush compressive strength test that had been previously requested for the Macondo slurry.  Ms. Stelly would also have knowledge regarding the practices and procedures of the lab, as well as the training and capabilities of lab personnel.

C.   **Quang Nguyen.**  Upon information and belief, Mr. Nguyen is an account representative at Halliburton who assisted Mr. Gagliano with the Macondo well.  Mr. Gagliano copied Mr. Nguyen on cement lab test results, design reports, and job procedures that he sent to BP, and Mr. Nguyen covered for Mr. Gagliano when he was vacation and when he was not available.  Mr. Nguyen would likely have information relating to Halliburton's work at the Macondo well and also would likely to have had conversations with Mr. Gagliano concerning the Macondo well.

D.   **Ricky Morgan.** Ronnie Faul testified that Mr. Morgan was involved with post-incident testing at the Duncan facility and that Mr. Morgan observed that the slurry "looked thin to him" and exhibited signs of settling.  These observations were not documented.  Halliburton likewise has identified Mr. Morgan (along with three other undeposed witnesses) as persons that "performed some degree of informal analysis related to the cement slurry pumped on April 19-20, 2010."  Mr. Morgan likely has information on Halliburton's post-incident investigation into the design of the Macondo well slurry and appears to be the author of a set of handwritten notes on a lab report.  Further, Mr. Morgan would have information on the undocumented test results indicating that slurry was unstable.

E.   **Earl Fly.**  Mr. Fly is the Surface Data Logging ("SDL") Operations Leader of Halliburton Sperry Drilling in charge of the BP account.  As an SDL Operations Leader, Mr. Fly is responsible for supervising Sperry mudloggers in the performance of their duties.  Mr. Fly would be able to testify as to the performance reviews for, and the duties and responsibilities of, the Halliburton mud loggers assigned to the Macondo well.

F.   **Ben Richard.** Mr. Richard was identified as the lab technician in the Halliburton Broussard laboratory who was involved in the final foam stability test before the incident.  Mr. Richard would have knowledge regarding how that foam stability test was performed, as well as the practices and procedures of the lab and training and capabilities of lab personnel.

   **Halliburton's Investigation of the Incident**

   Based on recent document productions by Halliburton, it is now evident that the following Halliburton witnesses were involved in HESI's post incident investigation. BP has asked HESI to produce information about this investigation and the parties are meeting and conferring about this subject.  BP does not believe any legitimate privilege applies to this investigation and is prepared to contest any claim of privilege in upcoming motion practice. Out of caution, and assuming no agreement can be reached, BP now lists the witnesses associated with the Halliburton investigation that BP wishes to depose:

**Marc Edwards**. Mr. Edwards is the Senior Vice President in the Completion & Production Division at Halliburton, and Tommy Roth's supervisor. Mr. Edwards was involved with Halliburton's post-incident investigation and is on correspondence relating to the investigation. Mr. Edwards has information relating to Halliburton's investigation, among other things, including information on developing a stop work process for elevating issues to an operator for issues like centralization and GFP; drafting media statements; causes for the incident; and potential flow paths. Mr. Edwards also edited cementing recommendations drafted by Mr. Roth

in October 2010 that were created based on Halliburton's post-incident investigation.

**Ronald Sweatman.** Mr. Sweatman is a Chief Technical Professional at Halliburton. Mr. Sweatman conducted post-incident investigation work for Halliburton on a team led by Tommy Roth. Mr. Sweatman's investigation work included work on modeling a gas kick, the effect of nitrogen breakout, and hydrocarbon zones.

**Roland Chemali.** Mr. Chemali is the Chief Petrophysicist at Halliburton Sperry Drilling. Mr. Chemali conducted post-incident investigation work analyzing Sperry data and hydrocarbon zones.

**Anthony Badalamenti**. Mr. Badalamenti is Halliburton's Strategic Business Manager.  Mr. Badalamenti's deposition was previously requested by BP, and  Halliburton objected, arguing that Tommy Roth and Ronnie Faul were "likely to provide" the same information "regarding post-incident cement testing and investigation" that Mr. Badalamenti held.  The Court ordered that Halliburton was not required to produce Mr. Badalamenti.  Recent Halliburton document produced for Mr. Roth's deposition show that Mr. Badalamenti had substantial involvement in Halliburton's post-incident investigation beyond cement testing.   For example, the documents identify Mr. Badalamenti as a  "key member" of a post-incident investigation team led by Mr. Roth that "simulate[d] the gas kick to help us better understand the situation."  Based on the documents, Mr. Badalamenti would also have knowledge on Halliburton's post-incident investigation into issues such as gas kick modeling; top of cement modeling; identification of hydrocarbon zones; operational decisions; flow path modeling; modeling casing uplift pressures; and developing a stop work process for elevating issues like centralization and GFP.  Based on this new information, we respectfully renew the request for his deposition.

**Simon Turton.**  Mr. Turton is Halliburton's Country Vice President for Russia.  As with Mr. Badalamenti, BP had previously requested Mr. Turton's deposition, and  Halliburton objected that Mr. Roth and Mr. Faul were "likely to provide" the same information "regarding post-incident cement testing and investigation."  The Court ordered that Halliburton was not required to produce Mr. Turton.  Recent Halliburton documents indicate that Mr. Turton had substantial involvement in Halliburton's investigation and identify him as a "key member" with knowledge of the investigation into to gas kick modeling; operational decisions and flow path analysis; and developing a stop work process for elevating issues.  Based on this new information, we respectfully renew the request for his deposition.

**Cameron**

**Richard Coronado.** Mr. Coronado is an engineer for Cameron who has knowledge about the Deepwater Horizon BOP's electronics and software systems.  Among other things, Mr. Coronado can provide testimony as to how the electronics and software in the BOP's AMF / Deadman system function, which is critical to the functioning of the BOP.  Divergent theories have been presented by different parties as to the functioning of the BOP, and specifically the electronics and software within the AMF/ Deadman, and Mr. Coronado may be able to provide testimony that clarifies these issues.

Thank you for the Court's consideration.

Respectfully submitted,

Andy Langan


**J. Andrew Langan, P.C.** | **Kirkland & Ellis LLP**
300 NORTH LASALLE STREET
CHICAGO, IL 60654-3406
(312) 862-2064 **DIRECT** | (312) 862-2200 **FAX**
andrew.langan@kirkland.com
************************************************************

The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************