# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL NO. 2179 |
| | SECTION "J" (1) |
| This document relates to:  11-275 | JUDGE BARBIER |
| | MAGISTRATE SHUSHAN |

**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
AND VARIOUS INSURANCE COMPANIES' ("UNDERWRITERS")
MEMORANDUM OPPOSING BP'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**PHELPS DUNBAR LLP**

Richard N. Dicharry (Bar # 4929)
George M. Gilly (Bar #6234)
Evans Martin McLeod (Bar #24846)
Kyle S. Moran (Bar #33611)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email: Richard.Dicharry@phelps.com
        George.Gilly@phelps.com
        Marty.McLeod@phelps.com
        Kyle.Moran@phelps.com

**ATTORNEYS FOR CERTAIN
UNDERWRITERS AT LLOYD'S,
LONDON AND VARIOUS INSURANCE
COMPANIES**

PD.5374579.1

**TABLE OF CONTENTS**

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**...................................................1

**BACKGROUND** ..............................................................................................................................3

      1.     The Drilling Contract...................................................................................4

      2.     The Excess Policies......................................................................................6

**ARGUMENT**

I.     THE COMPLAINT IS SUFFICIENTLY PLED AND UNDERWRITERS ARE ENTITLED TO OFFER EVIDENCE IN SUPPORT OF THEIR CLAIM..........................................................................................................................9

II.    TEXAS LAW REQUIRES THE COURT TO DETERMINE THE TRUE INTENT OF TRANSOCEAN AND UNDERWRITERS BY EXAMINING THE POLICIES IN THEIR ENTIRETY AND IN CONJUNCTION WITH THE DRILLING CONTRACT..................................................12

III.   BP IS NOT ENTITLED TO CONSTRUE THE EXCESS POLICIES AGAINST UNDERWRITERS.................................................................................13

IV.   THE DRILLING CONTRACT AND EXCESS POLICIES ARE DISTINGUISHABLE FROM THE *EVANSTON* POLICY AND SERVICES CONTRACT.......................................................................................16

V.    THE DRILLING CONTRACT AND EXCESS POLICIES ARE DISTINGUISHABLE FROM THE *AUBRIS* POLICY AND SERVICES CONTRACT.........................................................................................................21

**CONCLUSION** ...........................................................................................................................23

## TABLE OF AUTHORITIES

**CASES**                                                           **PAGES**

*Am. Nat'l Gen. Ins. Co. v. Ryan*,
   274 F.3d 319 (5th Cir. 2001) .......................................................................12

*Arnold v. National County Mut. Fire Ins. Co.*,
   725 S.W.2d 165 (Tex. 1987)........................................................................14

*Ashcroft v. Iqbal*,
   129 S.Ct. 1937 (2009).................................................................................10

*Aubris Resources, LP v. St. Paul Fire & Marine Ins. Co.*,
   566 F.3d 483 (5th Cir. 2009) .........................................................21, 22, 23

*Balandran v. Safeco Ins. Co. of America*,
   972 S.W.2d 738 (Tex. 1998)........................................................................14

*Beattie v. Madison County School Dist.*,
   254 F.3d 595 (5th Cir. 2001) .........................................................................6

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 127 S.Ct. 1955 (2007)........................................................9, 10

*Cannon Ball Motor Freight Lines v. Grasso*,
   59 S.W.2d 337 (Tex.App. – San Antonio 1933)...........................................13

*Coker v. Coker*,
   650 S.W.2d 391 (Tex. 1983)........................................................................12

*Concise Oil & Gas Partnership v. Louisiana Intrastate Gas Corp.*,
   986 F.2d 1463 (5th Cir. 1993) .......................................................................4

*Dallas Cent. Appraisal Dist. v. Mission Aire IV, L.P.*,
   279 S.W.3d 471 (Tex. App. – Dallas 2009)..................................................12

*Dedier v. Grossman*,
   454 S.W.2d 231 (Tex. App.-Dallas 1970) ....................................................12

*Dillee v. Sisters of Charity of Incarnate Word Health Sys., Houston,Tex.*,
   912 S.W.2d 307 (Tex. App. – Houston [14th Dist.] 1995)...............................14

*Evanston Ins. Co. v. ATOFINA Petrochem., Inc.*,
   256 S.W.3d 660 (Tex. 2008)................................................................. passim

*Forbau v. Aetna Life Ins. Co.*,
   876 S.W.2d 132 (Tex. 1994)....................................................................13, 20

PD.5374579.1

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305 (5th Cir. 2002) .......................................................................10

*Guidry v. American Public Life Ins. Co.*,
    512 F.3d 177 (5th Cir. 2007) .........................................................................9

*Jim Walter Homes, Inc. v. Scheunemann*,
    668 S.W.2d 324 (Tex. 1984)........................................................................12

*Johnson v. Johnson*,
    385 F.3d 503 (5th Cir. 2004) .........................................................................9

*In re Katrina Canal Breaches Litg.*,
    495 F.3d 191 (5th Cir. 2007) .........................................................................9

*Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*,
    20 S.W.3d 692 (Tex. 2002) ..........................................................................21

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009)..........................................................................9

*Lubrizol Corp. v. Gray Ins. Co.*,
    2009 WL 348820 (5th Cir. Feb. 12, 2009) ...................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S.Ct. 1309 (2011)...................................................................................10

*In re Media Arts Group, Inc.*,
    116 S.W.3d 900 (Tex.App. - Houston [14[th] Dist.] 2003) ..............................14

*Murray v. Amoco Oil Co.*,
    539 F.2d 1385 (5th Cir. 1976) .......................................................................9

*National Union Fire Ins. Co. v. CBI Indus.*,
    907 S.W.2d 517 (Tex. 1995).........................................................................12

*Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Ill.*,
    162 F.3d 789 (3rd Cir. 1998) .......................................................................15

*One Beacon Ins. Co. v. Crowley Marine Services, Inc.*,
    2011 WL 3195292 (5th Cir. July 28, 2011)..............................................13, 18

*Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*,
    3 S.W.3d 112 (Tex. App.-Corpus Christi 1999)............................................12

*Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*,
    311 F.3d 226 (3rd Cir. 2002) .......................................................................14

iii

*Reilly v. Rangers Mgmt., Inc.*,
    727 S.W.2d 527 (Tex. 1987)............................................................................12

*Rep. Waste Servs. v. Empire Indem. Ins. Co.*,
    98 Fed. Appx. 970 (5th Cir. 2004)..................................................................13

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974).........................................................................................9

*Service Corp. Intern. v. Lopez*,
    162 S.W.3d 801 (Tex.App. - Corpus Christ 2005) ........................................14

*State Farm Life Ins. Co. v. Beaston*,
    907 S.W.2d 430 (Tex. 1995)....................................................................12, 20

*Steeger v. Beard Drilling, Inc.*,
    371 S.W.2d 684 (Tex. 1963)...........................................................................12

*Tanglewood East Homeowners v. Charles-Thomas, Inc.*,
    849 F.2d 1568 (5th Cir. 1988) .......................................................................11

*Upshaw v. Trinity Co.*,
    842 S.W.2d 631 (Tex. 1992)...........................................................................12

*Urrutia v. Decker*,
    992 S.W.2d 440 (Tex. 1999).....................................................................13, 17

*Vought Aircraft Industries, Inc. v. Falvey Cargo Underwriting, Ltd.*,
    729 F. Supp. 2d 814 (N.D. Tex. 2010) ...............................................14, 15, 16

## OTHER AUTHORITIES

U.S.C. 28 § 2201....................................................................................................4

Federal Rule of Civil Procedure 56 ......................................................................6

Federal Rule of Civil Procedure 12(c)..................................................................8

Federal Rule of Civil Procedure Rule 12(b)(6) ...................................................8

11 Williston on Contracts §30:25 (4th ed. 1999)................................................13

PD.5374579.1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Because BP has not met its burden under Federal Rule of Civil Procedure 12(c), its motion for judgment on the pleadings (docket #3211) should be denied.[1,2]  The pleadings do not establish that BP is entitled to unlimited coverage for the pollution liabilities for which it seeks coverage under Transocean's excess liability insurance policies ("Excess Policies").

BP's additional insured status under the Excess Policies only extends to the liabilities assumed by Transocean in its Drilling Contract with BP and cannot extend to any of the liabilities assumed by BP under that contract.  BP specifically assumed liability for pollution liabilities emanating from below the surface of land or water.  This limitation was expressly incorporated into the Excess Policies.  Indeed, BP does not disagree with its obligations stated in the Drilling Contract.[3]  Instead, BP relies on a single case to argue that it is entitled to unrestricted coverage based on a mistaken theory that Underwriters purportedly failed to limit additional insured coverage to the liabilities that Transocean assumed under the Drilling Contract.  BP's position is flawed for a number of reasons:

- BP has not established that Underwriters failed to include any limiting provisions in the Excess Policies because BP has not established from the pleadings that Underwriters drafted the Excess Policies. Notwithstanding this threshold issue, the Excess Policies do limit additional insured coverage to those tort liabilities of BP that Transocean assumed by contract.

---

[1] "BP" as used in this Memorandum refers to the BP Parties that have filed the Motion for Judgment on the Pleadings, except BP plc.  BP plc previously stipulated that it does not seek any coverage under the Excess Policies at issue here.  *See* Ex. 1.

[2] On July 20, 2011, Anadarko E&P Company, LP and Anadarko Petroleum Corporation (collectively, "Anadarko") filed an Ex Parte Motion to Support the BP Parties' Motion for Judgment on the Pleadings in the Insurance Actions (docket #3378).  On July 21, 2011, the Court granted Anadarko's motion (docket #3411).  This Memorandum equally applies to Anadarko's joinder in the Motion.

[3] See BP's Answer (Jury Trial Demand) to Transocean's Complaint in Intervention (docket #3549 at ¶¶ 12-14).

- BP argues that the Excess Policies should be interpreted to Underwriters' detriment even though the Excess Policies are not contracts of adhesion and were arms-length agreements between sophisticated parties.

- BP fails to recognize that the Excess Policies are fundamentally different than the policy in *Evanston Ins. Co. v. ATOFINA Petrochem., Inc.*, 256 S.W.3d 660 (Tex. 2008).

BP has never negotiated unlimited additional insured under Transocean's Excess Policies. Instead, BP urges the Court to believe that it is entitled to a free pass to unlimited coverage for the pollution liabilities that BP assumed from Transocean based on what BP incorrectly perceives is a mistake in the wording of the Excess Policies. BP asks this Court to disregard the underlying Drilling Contract with Transocean, to ignore Transocean and Underwriters' clear intent when the Excess Policies were negotiated, and to abandon all logic to conclude that with one hand Transocean would apportion liabilities between it and BP in the Drilling Contract, and then with the other hand afford BP unlimited in scope additional insured protection for liabilities BP specifically assumed in that same Drilling Contract.[4] BP's theory defies its own well-publicized intent to be self-insured, industry practice, the law of contract and policy construction and simple common sense. In short, BP is not entitled to construe the Excess Policies against Underwriters because BP was not a contracting party to the Excess Policies; the Excess Policies are not contracts of adhesion; and BP has not established who drafted the Excess Policies. The Excess Policies are products of a sophisticated bargain among the named Insured, Transocean, its brokers (McGriff, Siebel & Williams, Inc., and/or Aon Risk Services ("Aon")) and Underwriters.

---

[4] BP is mentioned nowhere in the Excess Policies. That BP is an additional insured in any capacity requires that the Excess Policies and Drilling Contract be construed together.

PD.5374579.1

**BACKGROUND**

This matter arises out of the blowout of the Macondo Well and the subsequent explosion and fire aboard the *Deepwater Horizon*, which was owned and operated by various Transocean entities.  The casualty resulted in the tragic loss of eleven lives, the sinking and total loss of the *Deepwater Horizon* and a massive release of oil into the Gulf of Mexico.  At the time, the *Deepwater Horizon* was conducting drilling activities in Mississippi Canyon Block 252 pursuant to a Drilling Contract between Transocean, Ltd., its subsidiary, Transocean Holdings, LLC and BP America Production Company.[5]

At the time of this casualty, Transocean maintained several Excess Policies to which Underwriters subscribed.[6]  The Drilling Contract defined the obligations of Transocean and BP, and specifically identified and distinguished the liabilities that Transocean and BP separately assumed.  The Drilling Contract also required Transocean to name BP as an additional insured in its insurance policies for the certain, defined liabilities assumed by Transocean.

On May 14, 2010, BP provided notice to Aon, Transocean's broker, for unrestricted additional insured status under Transocean's Excess Policies.  On May 21, 2010, Underwriters filed the present action in the United States District Court, Southern District of Texas.  The action was subsequently transferred to this Court.  Underwriters seek declarations that:

- BP assumed full responsibility in the Drilling Contract for any and all liabilities arising out of or in any way related to the release of oil from BP's well.[7]

---

[5] *See* the Drilling Contract, Decl. of C. Wenk, Ex. C (TRN-MDL-0027313).  The Drilling Contract was executed by predecessors of Transocean (R&B Falcon Drilling) and BP (Vastar Resources).

[6] Citations to the Excess Policies are to the excerpts attached to BP's Motion as Decl. of C. Wenk, Ex. E through Ex. L.

[7] BP suggests that Underwriters have no legal basis for "requesting a determination of BP's obligations to Transocean (or anyone else) under the Drilling Contract."  (BP Memorandum at p. 27, docket # 3211-1)  However, "any court of the United States...may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." U.S.C. 28 §

- The additional insured status in the Drilling Contract therefore does not extend to the pollution liabilities BP has incurred and will incur with respect to oil emanating from BP's well.

- BP is not entitled to coverage under any of the Excess Policies for the pollution liabilities BP has incurred and will incur with respect to the oil emanating from BP's well.

## 1.    The Drilling Contract

The Drilling Contract is the source of BP's limited additional insured status.[8]  Articles 20 through 25 of the Drilling Contract identify and distinguish the liabilities that Transocean and BP respectively have assumed.   Generally, Transocean has assumed the liabilities of BP in connection with injuries to Transocean employees (Article 21.1), pollution originating on the surface of the water (Article 24.1), and other certain types of injuries and property damage set forth in the Drilling Contract.[9]   Specifically, Article 24.1 of the Drilling Contract defines Transocean's obligations with respect to pollution liabilities:

> [Transocean] shall assume full responsibility for and shall protect, release, defend, I ndemnify and hold [BP] and its joint owners harmless from and against any loss, damage, expense, claim, fine, penalty, demand, or liability for pollution or contamination, including control and removal thereof, **originating on or above the surface of the land or water**. . . .[10]

---

2201.  In making this determination, "two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Concise Oil & Gas Partnership v. Louisiana Intrastate Gas Corp.*, 986 F.2d 1463, 1471 (5th Cir. 1993).   Here, Underwriters are interested parties seeking a determination of rights and obligations affecting their duty to indemnify additional insureds under the Excess Policies.  Thus, Underwriters clearly have an interest in seeking clarification of obligations in light of the contract.

[8] This is so because BP is not mentioned in the Ranger Policy or the Excess Policies.

[9] *See* Decl. of C. Wenk, Ex. C (TRN-MDL-0027313)(the Drilling Contract).

[10] Decl. of C. Wenk, Ex. C at 25 of 36 (TRN-MDL-0027340)(full capitalization removed, emphasis added).

- 4 -

Article 24.2 defines BP's pollution liability obligations:

> [BP] shall assume full responsibility for and shall protect, release, defend, indemnify, and hold [Transocean] harmless from and against any loss, damage, expense, claim, fine, penalty, demand, or liability for pollution or contamination, including control and removal thereof, **arising out of or connected with operations under this Contract hereunder and not assumed by [Transocean] in Article 24.1 above** . . . .[11]

Article 20.1 of the Drilling Contract requires Transocean and its insurer(s) to provide "insurance covering the operations to be performed under [the Drilling Contract] as set forth in Exhibit C."[12]  Exhibit C to the Drilling Contract provides in relevant part:

> 1.    The insurance required to be carried by [Transocean] under this Contract is as follows:
>
> ****
>
> c. Comprehensive General Liability Insurance, including contractual liability insuring the indemnity agreement as set forth in the Contract and products-completed operations coverage with a combined single limit of not less than $10,000,000 covering bodily injury, sickness, death and property damage. . .
>
> ****
>
> 3.    [BP], its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers, and agents shall be named as **additional insureds** in each of [Transocean's] policies**,** except Workers' Compensation **for liabilities assumed by [Transocean] under the terms of this Contract.**[13]

---

[11] *Id.* (full capitalization removed, emphasis added).

[12] *Id.* at 22 of 36 (TRN-MDL-0027337).

[13] *Id.* at 1-2 of 3 (TRN-MDL-0027434 – TRN-MDL-0027435)(emphasis added).

Accordingly, under the plain terms of the Drilling Contract, the insurance requirement is strictly limited to the liabilities Transocean assumed **"under the terms of this [Drilling] Contract."** This limited in scope coverage is widely common in the drilling and insurance industries, and discovery will establish that Underwriters and Transocean unequivocally intended limited in scope coverage for additional insureds, and that in fact, the Excess Policies provide such limited in scope coverage on their face. *See* generally, Ex. 2, Declaration of George M. Gilly.[14]

## 2.    The Excess Policies

The Excess Policies severally provide limits of $700 million excess of a $50 million policy issued by Ranger Insurance Limited ("the Ranger Policy").  The Excess Policies follow the same terms, conditions and exclusions as the Ranger Policy.[15]  The Excess Policies contain both general and specific conditions defining and limiting the scope of coverage for additional Insureds for which Transocean may owe contractual indemnity.  General Condition 4 of Endorsement 1 provides:

---

[14] To the extent that BP's motion exceeds the pleadings, the Court should construe it as a motion for summary judgment pursuant to Fed. R .Civ. P. 56 and deny it as premature.  Underwriters should be allowed to conduct discovery to properly respond to BP's Motion. When a nonmoving party cannot sufficiently present facts essential to justify its opposition, a Court should deny the motion for summary judgment or hold it in abeyance pursuant to the nonmoving party's request under Fed. R. Civ. P. 56(d). Such arguments are "generally favored and should be liberally granted."  *Beattie v. Madison County School Dist.*, 254 F.3d 595, 606 (5th Cir. 2001).  Rule 56 was amended effective December 1, 2010. *Beattie* applies old Rule 56(f), which is nearly identical to the current Rule 56(d).

[15] As noted earlier, neither BP nor any other additional insured is identified in the Excess Policies (or the underlying Ranger Policy), and therefore reference to the Drilling Contract is necessary for BP to have any additional insured entitlement and to assess the scope of that entitlement.

**ADDITIONAL INSURED/WAIVER OF SUBROGATION**

> Underwriters agree **where required by written contract**, bid or work order, additional insureds are automatically included hereunder, and/or waiver(s) of subrogation are provided as may be required by contract.[16]

The Conditions of Section I – Protection and Indemnity – limit the scope of coverage to

additional insureds:

> III.

>> D)   Subject to the terms, clauses and exclusions of this insurance, this insurance includes full blanket coverage for liabilities assumed by the Insured under contract or agreement, connected with and/or incidental to the Insured's activities as a drilling contractor, including turnkey drilling and from their offshore Exploration and Production, for all tort liabilities to own and/or third party personnel and/or third party property damage including the provisions more fully set out below.

>> ****

>> 1.  The insured has a privilege to name others as an additional Insured for their respective rights and interests and/or waive any rights of recovery, **but only <u>to the extent</u> as may be required under contract or agreement**.[17]

Similarly, Section IIA – London Umbrella Policy, Endorsement No. 4, defines the

applicable coverage to Transocean and additional insureds:

---

[16] Decl. of C. Wenk, Ex. E at 74 of 99 (TRN-MDL-00235754)(emphasis added)(First Excess Layer policy).

[17] *Id*. at 13 (TRN-MDL-00235693), ¶ III(D)(1) (emphasis added).  BP has argued that Section I of the Excess Policies is not at issue in Underwriters' Complaint for Declaratory Relief.  (BP Memorandum at p. 7, FN 6).  BP is mistaken.  Item 12 of the Declarations of the Excess Policies explains that Section II applies to liabilities not covered by Section I.  Decl. of C. Wenk, Ex. E at 7 of 99 (TRN-MDL-00235687) (First Excess Layer policy).  As discussed, *infra*, all of the terms and conditions of the Excess Policies must be construed together such that no part is rendered meaningless.  Section I of the Excess Policies unequivocally limits the scope of BP's additional insured only to the required by the Drilling Contract.

I.      Insuring Agreements

1.      Coverage

. . . Underwriters agree, subject to the Insuring Agreements, Conditions, Exclusions, Definitions and Declarations contained in this Policy, to pay on behalf of the "Insured" in respect of their operations anywhere in the World, for "Ultimate Net Loss" by reason of liability:

****

(b)      **assumed by the "Insured" under an "Insured Contract".**[18]

There is no dispute that Transocean is the Insured, that BP is an additional Insured for certain liabilities, and that the Drilling Contract is an Insured Contract for limited purposes under the Excess Policies.  However, the Drilling Contract is not an Insured Contract for BP's pollution liabilities related to the Macondo Well because Transocean was not "required by written contract" to assume such liabilities.  An "Insured Contract" under the Excess Policies is one in which the Insured, Transocean, "assumes the tort liability of another party to pay for 'Bodily Injury', 'Property Damage', 'Personal Injury', or 'Advertising Injury' to a 'Third Party' or organization."[19]  By definition, the Drilling Contract is not an "Insured Contract" for BP's pollution liabilities because Transocean did not assume the pollution liabilities of BP under Article 24 of the Drilling Contract.

Although BP concedes that the terms of the "Insured Contract" are relevant to establish that BP is an additional insured at least for some liabilities under the Excess Policies, BP urges the Court to disregard the Drilling Contract and the clear terms of the Excess Policies – including

---

[18] *Id*. at 89 of 99 (TRN-MDL-00235769)(emphasis added).

[19] *Id*. at 37 of 99 (TRN-MDL-000235717).

Section I of the Excess Policies – in assessing the scope of the coverage.  Common sense dictates that if the Drilling Contract is relevant to establish BP's status as an additional insured, then it is just as relevant to determine the scope of BP's additional insured coverage.  BP seeks a broad declaration that it is an additional insured under the Excess Policies, but it is not.  The Excess Policies specifically provide that BP's additional insured coverage is limited to coverage "only to the extent as may be required under contract or agreement", or "where required by written contract" – here, the Drilling Contract.  The Drilling Contract does not contemplate coverage for the pollution-related liabilities that BP claims in this action, and therefore, it is not an "Insured Contract" for those pollution liabilities.

## ARGUMENT

### I.   THE COMPLAINT IS SUFFICIENTLY PLED, AND UNDERWRITERS ARE ENTITLED TO OFFER EVIDENCE IN SUPPORT OF THEIR CLAIM.

The standard for dismissal on a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same for dismissal for failure to state a claim under Rule 12(b)(6). *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir. 2004); *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (citing *In re Katrina Canal Breaches Litg.*, 495 F.3d 191, 205 (5th Cir. 2007).  The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the case.  *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Murray v. Amoco Oil Co.*, 539 F.2d 1385, 1387-88 (5th Cir.1976).  Rule 12 motions are "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted).

In determining whether the plaintiff has sufficiently pled its case, the factual allegations must allow the Court to draw a reasonable inference – that it is *plausible* – that the plaintiff may prevail on the claims asserted.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547; 127 S.Ct.

1955, 1960 (2007).  To survive a motion to dismiss, the complaint "must contain sufficient factual matter, *accepted as true*, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (emphasis added).  Indeed, the facts alleged must be taken as true, and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  *See Twombly*, 127 S.Ct. at 1964-65.  The "facial plausibility" requirement requires the court to determine whether the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.  This requirement does not change the focus of the court, or require a heightened pleadings standard.  *Twombly*, 127 S.Ct. at 1973-74.   When the allegations of the complaint "raise a reasonable expectation that discovery will reveal evidence" to satisfy the requirements of the plaintiff's claims and for the court to draw a reasonable inference that the plaintiff is entitled to the relief requested, the court must deny the motion to dismiss.  *Twombly*, 127 S.Ct. at 1965; *Iqbal*, 129 S.Ct. at 1949; *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1323 (2011).

When considering a Rule 12(c) motion, the court should liberally construe the pleadings in favor of the plaintiff.  *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002).  As the Fifth Circuit held:

> The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint.

*Id.* at 313.

PD.5374579.1

The Court must resolve all doubts in favor of Underwriters. *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). Here, the Court must accept the following material allegations as true:

- Drilling industry custom requires limited in scope additional insured protection.[20] Discovery will confirm that Transocean and BP never intended that BP would be entitled to unrestricted additional insurance coverage under Transocean's Excess Policies and that BP has never requested or obtained such broad coverage in any other relevant drilling contract. Similarly, discovery will confirm that Transocean and Underwriters, as the contracting parties to the Excess Policies, intended the Excess Policies to provide additional insurance coverage only to the extent provided by the Drilling Contract.

- Transocean assumed all pollution-related liabilities to the extent that the liabilities stem from activities originating above the surface of the land or water.[21]

- BP assumed responsibility for all pollution-related liabilities not assumed by Transocean.[22]

- The Drilling Contract limited BP's additional insured coverage to the liabilities assumed by Transocean under the terms of the Drilling Contract.[23]

- The liabilities that BP faces in connection with the Macondo oil spill relate to pollution emanating from BP's well below the surface of the water.[24]

Accepting these facts as true, which the Court must, Underwriters have stated facially plausible claims, and BP's motion for judgment on the pleadings must be denied.

---

[20] Decl. of C. Wenk, Ex. B at ¶ 11 (Underwriters' Complaint for Declaratory Judgment).

[21] *Id.* at ¶ 12

[22] *Id.* at ¶ 13.

[23] *Id.* at ¶ 15.

[24] *Id.*

II.   **TEXAS LAW REQUIRES THE COURT TO DETERMINE THE TRUE INTENT OF TRANSOCEAN AND UNDERWRITERS BY EXAMINING THE POLICIES IN THEIR ENTIRETY AND IN CONJUNCTION WITH THE DRILLING CONTRACT.**

In contract disputes, the court's goal is to determine the true intent of the parties, as expressed in the contract. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Dallas Cent. Appraisal Dist. v. Mission Aire IV, L.P.*, 279 S.W.3d 471, 475 (Tex. App. – Dallas 2009). The parties' intent must be taken from the agreement itself, <u>not from the parties' present interpretation</u>, and the agreement must be enforced as it is written. *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 121 (Tex. App.-Corpus Christi 1999, pet. denied) (emphasis added). Indeed, Texas courts have held that "[t]he interpretation of a written contract is a quest for the intention of the parties to it." *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex. 1987) (citing *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 330 (Tex. 1984)). In searching for the parties' intent, "[t]he entire instrument, taken by its four corners, must be read and considered to determine the true intention of the parties." *Dedier v. Grossman*, 454 S.W.2d 231, 234 (Tex. App.-Dallas 1970, writ ref'd n.r.e.); *Steeger v. Beard Drilling, Inc.*, 371 S.W.2d 684, 688 (Tex. 1963).

Insurance contracts are subject to the same rules of construction that are applied to other contracts. *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001); *National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995); *Upshaw v. Trinity Co.*, 842 S.W.2d 631, 633 (Tex. 1992). When interpreting insurance polices, courts strive to give effect to the parties' intent and read all parts of the contract together. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). "Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed

together." *One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, 2011 WL 3195292 at *8 (5th Cir. July 28, 2011), citing 11 Williston on Contracts § 30:25 (4th ed. 1999).  A contract may be incorporated into an insurance policy consistent with the intent of the parties.  *Urrutia v. Decker*, 992 S.W.2d 440, 442 (Tex. 1999) (citations omitted).  In construing a contract, the Court must give full effect to the intent of the parties, which requires examining the Excess Policies *and* the Drilling Contract.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 145 (Tex. 1994)(holding that a court should read all parts of a contract together to ascertain the agreement of the parties, and that each part of the contract should be given effect).

## III.    BP IS NOT ENTITLED TO CONSTRUE THE EXCESS POLICIES AGAINST UNDERWRITERS

Here, the parties whose intent controls are Underwriters and Transocean because these are the parties who negotiated the insurance contract.  As an additional insured, BP is a stranger to the insurance policy and bears the burden of proving the unlimited coverage for pollution liabilities that it seeks.  *One Beacon*, 2011 WL 3195292 at *12, citing *Rep. Waste Servs. v. Empire Indem. Ins. Co.*, 98 Fed. Appx. 970, 971 (5th Cir. 2004).  BP has not shown or even contended that it was a party to the negotiations of the Excess Policies.  Nor has BP met its burden of establishing that it is entitled to any benefit of construction greater than the construction to which Transocean would be entitled.  As an additional insured, whether restricted or not, BP can have no greater rights under the Excess Policies than Transocean has as the Named Insured.  That is, if Transocean is not entitled to construe the Excess Policies against Underwriters, then BP certainly is not entitled to do so.   As a stranger to the contract, BP's interpretation is irrelevant.  Indeed, the principle of construction against the insurer should not be applied where the party promoting such construction is a stranger to the contract.  *Cannon Ball Motor Freight Lines v. Grasso*, 59 S.W.2d 337, 342-43 (Tex. App. – San Antonio 1933)(finding

injured third party could not invoke construction against the insurer). As an additional insured, BP is certainly a stranger to the insurance policies between Transocean and Underwriters.

Texas law also is clear that the justification for construction against the insurer is the unequal bargaining power between insurers and insureds. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987); *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738, 741 (Tex. 1998). This rule is similar to many other jurisdictions that recognize that the doctrine of *contra proferentem*, or construction against the insurer, should apply to contracts of adhesion. Under Texas law, a contract of adhesion is one in which one party has absolutely no bargaining power or ability to change the contract terms. It typically is a standardized contract offered on a take it or leave it basis, with no opportunity to bargain. *In re Media Arts Group, Inc.*, 116 S.W.3d 900, 911 (Tex. App. - Houston [14th Dist.] 2003); *Service Corp. Intern. v. Lopez*, 162 S.W.3d 801, 809 (Tex. App. - Corpus Christ 2005). Unequal bargaining power exists where one party has no choice in accepting the terms of the contract. *Dillee v. Sisters of Charity of Incarnate Word Health System, Houston, Tex.*, 912 S.W.2d 307, 309 (Tex.App. - Houston [14th Dist.] 1995).

Significantly, Texas courts have recognized that "an exception to the general rule in favor of coverage is often made when corporate insureds with bargaining power equal to the insurer participate in drafting the insurance coverage." *Vought Aircraft Industries, Inc. v. Falvey Cargo Underwriting, Ltd.*, 729 F. Supp. 2d 814, 823 (N.D. Tex. 2010). In *Vought*, the court recognized that, while insurance policies are generally contracts of adhesion, an exception is justified where the insured contributed to drafting the policy (rather than merely adopting it), the contents of the policy are negotiable, and the insured is as capable as the insurer of interpreting the policy. *Id.* at 842 (citing *Port Auth. of. N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3rd Cir. 2002)).

The Court also recognized that the exception applies where the insurance policy is prepared by an independent broker acting for the insured. *Id.* (citing *Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Ill.*, 162 F.3d 789 (3rd Cir. 1998)).

BP is not entitled to judgment on the pleadings because it has not established – by the pleadings – any of the following:

- That Underwriters drafted the Excess Policies;[25]

- That the Excess Policies are contracts of adhesion;

- That Transocean had less than equal bargaining power in negotiating the terms of the Excess Policies;

- That the Excess Policies do not accurately reflect the intent of Transocean and Underwriters to provide limited additional insured coverage to the extent required by Transocean's Drilling Contract;

- That the policies are ambiguous; or

- That BP is entitled to construe the Excess Policies against Underwriters.

BP has not alleged in its motion for judgment on the pleadings, nor can it allege, that the Excess Policies are simple contracts of adhesion, or that Transocean and its brokers did not participate in drafting the terms and conditions of the Excess Policies. The basis for interpretation against an insurer is the presumed disparity in bargaining power and the assumption that insurance policies are generally contracts of adhesion. But where these concerns are not in play, an exception to the general rule applies. *Vought,* 729 F. Supp. 2d at 824-825. Transocean is "the world's largest offshore drilling contractor".[26] Transocean's insurance broker, Aon, "is the leading global provider of risk management services, insurance and

---

[25] Indeed, the Excess Policies appear to be written on Aon paper, and bear the document footer, "Y:CLIENT\ANR\Transocean Offshore Deepwater Drilling. . . ." Upon information and belief, "ANR" denotes Aon Natural Resources. *See* Decl. of C. Wenk, Ex. E through Ex. G.

[26] Ex. 3, excerpt from www.deepwater.com, Transocean's website.

reinsurance brokerage".[27]  Similarly, BP is "one of the world's leading international oil and gas companies".[28]  Underwriters are entitled to discovery to establish that this sophisticated insured exception applies to negate any presumption in favor of BP's interpretation (or misinterpretation) of the provisions of the Excess Policies.  *See Vought,* 729 F. Supp. 2d at 824-825 (holding that where an insurer can prove that the insured participated in drafting the policy, had equal bargaining power and was sophisticated, the terms should not be automatically interpreted against the insurer).

## IV.   THE DRILLING CONTRACT AND EXCESS POLICIES ARE DISTINGUISHABLE FROM THE *EVANSTON* POLICY AND SERVICES CONTRACT.

In support of its unrestricted additional Insured status, BP relies chiefly on *Evanston Ins. Co. v. ATOFINA Petrochem., Inc.*, 256 S.W.3d 660 (Tex. 2008), and would have the Court believe that *Evanston* sets a universal principle that in all cases of additional insured coverage, the court may only examine the policy despite what the underlying contract for insurance may require.[29]  This simply is not so.  *Evanston* merely held that the policy in that case did not contain language limiting the scope of coverage.[30]  In contrast here, the Excess Policies clearly limit coverage to the extent of the liabilities assumed by Transocean in the Drilling Contract.

In *Evanston*, a property owner sought coverage under a contractor's excess policy for liability associated with the death of one of the contractor's employees.  The court was asked to

---

[27] Ex. 4, excerpt from www.aon.com.

[28] Ex. 5, excerpt from bp.com.

[29] In further support of its argument, BP cites an unpublished Fifth Circuit opinion, *Lubrizol Corp. v. Gray Ins. Co.*, 2009 WL 348820 (5th Cir. Feb. 12, 2009).  Like *Evanston*, *Lubrizol* is distinguishable from the instant case and, in any event, does not constitute binding precedent.

[30] In construing the policy against the insurer in *Evanston*, the Court implicitly held that the policy there was a contract of adhesion, which further distinguishes that policy from the Excess Policies here.

decide "whether a commercial umbrella insurance policy that was purchased to secure the insured's indemnity obligation in a service contract with a third party also provides direct liability coverage for the third party." *Evanston*, 256 S.W.3d at 662.   The contractor and owner executed a services contract that contained separate, independent indemnity and additional insured clauses.  The indemnity clause exempted the contractor from any liabilities related to the owner's sole negligence, but the additional insured clause included no limitations or references to the indemnity clause.  Rather, under the terms of the services contract, the owner agreed to maintain insurance coverage up to certain limits, "**[i]ncluding** coverage for contractual liability insuring the indemnity agreement".  *Id.* at 662-663.  (Emphasis added).  Thus, while the additional insured provision of the services contract broadly included at least those liabilities contemplated by the indemnity agreement, it did not limit the obligation for coverage only to the indemnity agreement.  Compare the plain language of each agreement:

| *Evanston* **Services Contract** | **Transocean-BP Drilling Contract** |
|---|---|
| The contractor agreed to provide insurance to the property owner, "**[i]ncluding** coverage for contractual liability insuring the indemnity agreement".[31] | Transocean agreed to provide insurance to BP **"for liabilities assumed by [Transocean] under the terms of this Contract"**.[32] |

(Emphasis added).  Where the parties in *Evanston*, made no attempt to incorporate their indemnity agreement into the policy, Transocean and BP not only intended to limit coverage to the scope of the indemnity agreement in the Drilling Contract, they in fact did limit the insurance coverage available to BP (or any other contractual additional insured) under Transocean's policies.  *See Urrutia*, 992 S.W.2d at 442 (holding that a contract may be incorporated in an

---

[31] *Evanston*, 256 S.W.3d at 662-663.

[32] Decl. of C. Wenk, Ex. C (TRN-MDL-0027313)(the Drilling Contract).

PD.5374579.1

insurance policy consistent with the intent of the parties); see also, *One Beacon,* 2011 WL 3195292 at *8.

Similarly, the policy in *Evanston* made no attempt to reconcile the indemnity or additional insured clauses of the services contract. Section II(B)(6) of the Evanston policy provided:

> Each of the following is also an insured:
>
> ****
>
> 5.  A person or organization for whom you have agreed to provide insurance as is afforded by this policy; but that person or organization is an insured **only with respect to operations performed by you or on your behalf, or facilities owned or used by you.**

Exhibit 6, Evanston policy excerpts (Emphasis added).  In contrast to the Excess Policies here, the Evanston policy contained no language limiting the scope of coverage to the coverage agreed in the underlying services contract's indemnity provision.  Although the service contract excluded from coverage acts caused by the contractor's sole negligence, the Evanston policy made no reference to the services contract.  Instead, as the Court noted in *Evanston*, the policy afforded coverage to the contractor "with respect to operations performed by [the property owner] or on [the property owner's] behalf. . . ."   The *Evanston* Court's opinion was based in large part on the broad "with respect to" phrase in the policy.  *Id.* at 666.  The Court's analysis focused on whether the casualty "respected the operations" of the property owner.  There, under the terms of the Evanston policy, it did because the contractor's operations at the time of the casualty were causally related to the operations of the owner.  *Id.*   The court held that had the parties intended to limit the owner's liability to merely vicarious liability, words to that effect could have been placed in the policy.  *Id.*

Where the policy in *Evanston* did not reference or otherwise define any insured contract, here the Excess Policies clearly define the Insured Contract for which limited additional insured coverage applied.  That defined term was repeatedly used throughout the Excess Policies to limit the coverage to only what was required by the Drilling Contract – the liabilities Transocean assumed under the terms of the Drilling Contract – nothing more or less.  Compare the Evanston policy from *Evanston* and the Excess Policies' definitions of an additional Insured:

| ***Evanston* Policy** | **Excess Policies** |
|---|---|
| Each of the following is also an insured:<br><br>****<br><br>5.  A person or organization for whom you have agreed to provide insurance as is afforded by this policy; but that person or organization is an insured **only with respect to operations performed by you or on your behalf, or facilities owned or used by you**.[33] | **27.   Definitions, INSURED, Item 13(c),** is amended to read as follows:<br><br>(c) any person or entity to whom the "Insured" is **obliged by an oral or written "Insured Contract"** (including contracts which are in agreement but have not been formally concluded in writing) entered into before any relevant "Occurrence", to provide insurance such as is afforded by this Policy;<br><br>****<br><br>32.   **Definitions, INSURED CONTRACT, Item 14**,  is deleted and replaced with:<br>The words "Insured Contract", whenever used in this Policy, shall mean **any written or oral contract or agreement entered into by the "insured"** (including contacts which are in agreement but have not been formally concluded in writing) **and pertaining to business under which the "Insured" assumes the tort liability of another party** to pay for "Bodily Injury", "Property Damage", "Personal Injury", or "Advertising Injury" to a "Third Party" or organization. Tort Liability means a liability that would be imposed by law in the absence of any contact or agreement.[34] |

---

[33] Ex. 6, Evanston Policy (emphasis added).

[34] *See* Decl. of C. Wenk, Ex. E through Ex. L (Excess Policies).

Although BP clearly suggests otherwise by ignoring the plain terms of the Excess Policies, the terms of an insurance policy should be construed within the context of the entire contract, not in isolation. *Forbau*, 876 S.W.2d at 133; *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex. 1995). But BP repeatedly ignores the plain language of Excess Policies and comically argues that "[i]f [Underwriters] had wanted a narrower coverage obligation, it was incumbent upon them to limit the scope of coverage for an 'additional insured in the policies they issued."[35] In reality, the Excess Policies repeatedly limit an additional insured's coverage. The General Conditions of the Excess Policies recognize additional insureds only "where required by written contract, bid or work order."[36] Section I of the Excess Policies unequivocally provides that coverage is afforded "only to the extent as may be required under contract or agreement."[37] Section II of the Excess Policies includes repeated, specific references to the underlying Drilling Contract's limitations.[38] The intended and actual effect of these consistent references to the Insured Contract is that BP's additional insured status only extends to the liabilities assumed by Transocean in the Drilling Contract. Transocean did not assume BP's liabilities for pollution emanating from under land or water. BP cannot dispute the clear terms of the Drilling Contract and the Excess Policies.

The restricted coverage contemplated by the Drilling Contract and incorporated in the Excess Policies is common practice in the energy industry when securing insurance coverage. Discovery will confirm that it is uncommon or non-existent in the drilling industry for a well

---

[35] BP's Memorandum at p. 24.

[36] Decl. of C. Wenk, Ex. E through Ex. L (Excess Policies).

[37] Decl. of C. Wenk, Ex. E at 13 of 99(TRN-MDL-00235693)(First Excess Layer policy).

[38] Decl. of C. Wenk, Ex. E through Ex. L (Excess Policies).

operator like BP to expect or require a drilling contractor, such as Transocean, to bear the well operator's liabilities through unrestricted access to the drilling contractor's insurance coverage. Indeed, BP has publicly acknowledged that it self-insures its pollution risks.    Through discovery and depositions of BP's employees and Transocean's employees and insurance brokers, Underwriters intend to show that BP understood and appreciated that BP was not insured for its pollution liabilities under the Excess Policies and that BP never contemplated that it was covered for pollution-related liabilities such as those at issue here. [39]

## V.    THE DRILLING CONTRACT AND EXCESS POLICIES ARE DISTINGUISHABLE FROM THE *AUBRIS* POLICY AND SERVICES AGREEMENT.

BP's reliance on *Aubris Resources, LP v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 483 (5th Cir. 2009), is also misplaced. [40]  The competing issues in *Aubris* were whether the insurer had a duty to defend an additional insured (property owner) in a tort claim, or whether the duty was abrogated by an indemnity exclusion in a services agreement between the owner and its contractor, the primary insured.  The court held that the owner was entitled to a defense of the underlying tort claim.  But there is no duty to defend under an excess policy, as here.  *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 699-700 (Tex. 2002).

Importantly, in determining the scope of additional insured coverage, the court in *Aubris* considered "the relationship between and among the policy, the additional insured provision in the services agreement, **and** the indemnity provision in the services agreement."  566 F.3d at 487 (emphasis added).  The court did **not**, as BP has argued, confine its review solely to the insurance policy  The court also distinguished the additional insured provision from the general

---

[39] Ex. 2, Declaration of George M. Gilly.

[40] Just as in *Evanston*, the *Aubris* court implicitly recognized the policy as a contract of adhesion.  For this reason alone, the *Evanston* and *Aubris* policies are materially different than the Excess Policies.

- 21 -

indemnity provision in the underlying services agreement.  Compare the additional insured provision of the services agreement in *Aubris* with the Drilling Contract:

| *Aubris* Services Agreement | Transocean-BP Drilling Contract |
|---|---|
| Additional Insureds.  UNITED and its subsidiaries, affiliated companies, co-owners, partners and joint venturers (if any), and their respective members, managers, officers, directors, agents and employees shall be named as additional insureds in each of Contractor's policies, except Workers' Compensation; **however, such extension of coverage shall not apply with respect to any obligations for which UNITED has specifically agreed to indemnify Contractor.**[41] | [BP] shall be named as additional insureds in each of [Transocean's] policies except Workers' Compensation for liabilities assumed by [Transocean] **under the terms of this Contract.**[42] |

The services agreement in *Aubris* attempted to exclude any coverage for obligations which the owner "specifically agreed to indemnify Contractor."  566 F.3d at 487.  See also, Ex. 7, Section 10.2 of the *Aubris* services agreement.  However, the court noted that the services agreement only provided for *general* indemnity.  *Id.*  See also, Ex. 7.  The court construed the additional insured provision to require a *specific* agreement between the parties for indemnity with respect to the *specific* underlying tort claim.  That is, the court read the policy to require the contractor to separately agree to indemnify the owner for the specific tort lawsuit that had been filed against the owner.  In contrast, the Drilling Contract has no "specific" requirement that Transocean and BP execute indemnity agreements on a claim-by-by claim basis as the court construed in *Aubris.*  Instead, the Drilling Contract affords BP additional insured status for the limited liabilities that Transocean **assumed under the Drilling Contract**.  On their plain terms, neither the Drilling Contract nor the Excess Policies – when considered individually and

---

[41] Ex. 7, *Aubris* services agreement.

[42] Decl. of C. Wenk, Ex. E through Ex. L (Excess Policies).

collectively – extend additional insured protection to BP beyond the terms of the Drilling Contract. Simply put, BP is not an additional insured for the pollution liabilities that it claims in this case.

The *Aubris* Policy also substantially differs from the Excess Policies in that the policy lacked sufficient language to limit the scope of coverage of an additional insured to the underlying services agreement. Once again, just as with the services agreement, the *Aubris* policy required a separate, specific agreement to indemnify against a specific loss (i.e., the underlying litigation at issue in *Aubris*). The Excess Policies' additional insured coverage is clearly and specifically limited by the Insured Contract's terms, where Transocean agreed only to assume the tort liabilities of BP.  There is no requirement, as there was in *Aubris*, that Transocean and BP separately agree on indemnity on a claim-by-claim basis.  Indeed, under the terms of the Drilling Contract, such a requirement would be illogical because it was not the intent of Transocean and BP and would be burdensome for the parties.

## CONCLUSION

Underwriters' claims and BP's counterclaims plainly are not ripe for judgment on the pleadings.  To grant BP's motion, the Court would have to conclude, without the benefit of any discovery, all of the following:

1.   That Underwriters drafted the Excess Policies;

2.   That Transocean was not a sophisticated insured when it negotiated the Excess Policies;

3.   That the Excess Policies are contracts of adhesion;

4.   That BP can require the Court to selectively read only the portion of the Drilling Contract that favors BP's misinterpretation of additional insured status while ignoring the immediately following language in the Drilling Contract that limits the scope of that protection;

5.    That the Drilling Contract's restriction of BP's additional insured status "for liabilities assumed by Contractor under the terms of this Contract" either means nothing or somehow means "without any restriction at all";

6.    That BP's predecessor in 1998 was the first ever oil and gas operator to negotiate and obtain unlimited in scope additional insured protection from a drilling contractor;

7.    That BP's and Transocean's predecessors agreed to allocate risks by way of contractual indemnity but then totally contradicted that allocation by way of unlimited in scope additional insured status in favor of BP; and

8.    That the Excess Policies' language restricting additional insured status to the extent required by the Drilling Contract means nothing and should be ignored.

BP's request for a broad declaration that it is an unlimited additional insured under the Excess Policies must be denied because the Excess Policies specifically provide that BP's additional insured coverage is limited to liabilities "assumed by [Transocean] under contract or agreement", but "only to the extent as may be required under contract or agreement"[43] or "where required by written contract"[44] – the Drilling Contract.  The Drilling Contract does not contemplate coverage for the pollution-related liabilities that BP claims, and thus is not an "Insured Contract" for those pollution liabilities.  BP knows this, and should not be allowed to circumvent the plain language of the Excess Policies, the parties' intent, and industry practice to usurp coverage under the Excess Policies for which it never bargained.  For all of foregoing reasons, Underwriters respectfully request that the Court deny BP's motion for judgment on the pleadings.[45]

---

[43] Decl. of C. Wenk, Ex. E at 13 of 99 (TRN-MDL-00235693), ¶ III(D).

[44] *Id.*

[45] To the extent consistent with this Memorandum, Underwriters adopt and incorporate by reference Transocean's separate Memorandum in Support of Transocean's Response in Opposition to the BP Parties' Motion for Judgment on the Pleadings.

Respectfully submitted,

**PHELPS DUNBAR LLP**


BY: _____

Richard N. Dicharry (Bar # 4929)
George M. Gilly (Bar #6234)
Evans Martin McLeod (Bar #24846)
Kyle S. Moran (Bar #33611)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email:  Richard.Dicharry@phelps.com
          George.Gilly@phelps.com
          Marty.McLeod@phelps.com
          Kyle.Moran@phelps.com

**ATTORNEYS FOR CERTAIN
UNDERWRITERS AT LLOYD'S,
LONDON AND VARIOUS
INSURANCE COMPANIES**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of August, 2011.

_____

Richard N. Dicharry