**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:  **Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010** | **MDL No. 2179** |
| | **SECTION: J** |
| | **JUDGE BARBIER** |
| This Document applies to: 11-cv-274 c/w 11-cv-275 | **MAGISTRATE SHUSHAN** |

**MEMORANDUM IN SUPPORT OF TRANSOCEAN'S RESPONSE IN OPPOSITION TO THE BP PARTIES' MOTION FOR JUDGMENT ON THE PLEADINGS**

Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,
teri.donaldson@sutherland.com

Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

*Counsel for Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 4

I.  THE PLAIN LANGUAGE OF THE POLICIES AND THE DRILLING
    CONTRACT DICTATES THAT ANY ADDITIONAL INSURED COVERAGE
    AFFORDED TO BP IS EXPRESSLY LIMITED TO LIABILITIES ASSUMED
    BY TRANSOCEAN UNDER THE TERMS OF THE DRILLING CONTRACT. ........... 5

    A.  The Drilling Contract's Extension of Additional Insured Coverage Is
        Expressly Limited to the Liabilities Assumed by Transocean Under the
        Terms of the Drilling Contract. ............................................................. 6

    B.  Transocean's and Its Insurers' Plain Language Argument Is Supported by
        the Fifth Circuit's Interpretations of Similar Additional Insured Language ........ 10

        1.  *Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009). ......................... 10

        2.  *Certain Underwriters at Lloyd's London v. Oryx Energy Co.*, 142
            F.3d 255 (5th Cir. 1998). ......................................................... 13

        3.  *LeBlanc v. Global Marine Drilling Co.*, 193 F.3d 873 (5th Cir.
            1999). ................................................................................ 15

II. BP'S MOTION FOR JUDGMENT MUST BE DENIED BECAUSE ITS
    ARGUMENT FAILS TO GIVE ANY MEANING TO THE LIMITATION IN
    THE DRILLING CONTRACT'S ADDITIONAL INSURED PROVISION AND
    MISPLACES RELIANCE ON THE *EVANSTON* AND *AUBRIS* DECISIONS. ........... 17

    A.  BP Incorrectly Argues that Transocean's Insurers Admit that BP Is an
        Additional Insured, and Wrongly Advocates a Non-Existent "Policies
        Alone" Approach, Both of which Render the Additional Insured
        Limitation in the BP-Transocean Drilling Contract Meaningless. ...................... 18

    B.  The *Evanston* Case Is Materially Different From this Case and Does Not
        Support BP's Motion for Judgment. .................................................... 21

        1.  The additional insured issues present in this case were not before
            the court in *Evanston*. .......................................................... 21

        2.  BP tries to characterize *Evanston* as supporting its "policies alone"
            approach, but *Evanston* did not create such a rule. ................................ 23

C.    The *Aubris* Decision Supports Transocean's and Its Insurers' Position. .............. 25

    1.    *Aubris* interpreted the language of the additional insured provision in the service contract instead of ignoring it as BP does. ........................ 25

    2.    Unlike the additional insured provision in *Aubris*, the additional insured provision in the drilling contract is not "separate from and additional to" the indemnity provisions. .................................................. 28

III.    BP'S MOTION IGNORES THE RELEVANT ADDITIONAL INSURED PROVISIONS. ............................................................................................. 30

A.    Section I. of the Policies Restricts Additional Insured Coverage to Liabilities Assumed by Transocean, and Takes Priority over Section II. ............. 30

B.    If Applicable at All, Section II. of the Policies Restricts Additional Insured Coverage in the Same Manner as Section I. ........................................ 31

    1.    If Section II. does apply, Transocean's interpretation of it is the only reasonable interpretation under Texas contract law. ........................ 32

    2.    Assuming there is an irreconcilable conflict and BP's General Provision controls over the Endorsement Provision, there is no "Insured Contract." ................................................................................... 34

IV.    BP'S ARGUMENT FOR UNLIMITED ADDITIONAL INSURED COVERAGE FOR POLLUTION LIABILITIES BREACHES THE DRILLING CONTRACT. ......... 35

CONCLUSION ............................................................................................................. 35

CERTIFICATE OF SERVICE ...................................................................................... 37

# TABLE OF AUTHORITIES

## CASES

*ATOFINA Petrochems., Inc. v. Evanston Ins. Co.*,
   104 S.W.3d 247 (Tex. App. 2003) ................................................................... 22, 29

*Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.*,
   566 F.3d 483 (5th Cir. 2009) ................................................ 18, 24, 25, 26, 27, 28

*Balandran v. Safeco Ins. Co.*,
   972 S.W.2d 738 (Tex. 1998) ........................................................................... 6

*Barnett v. Aetna Life Ins. Co.*,
   723 S.W.2d 663 (Tex. 1987) ........................................................................... 5

*Becker v. Tidewater, Inc.*,
   586 F.3d 358 (5th Cir. 2009) ................................... 10, 11, 12, 13, 16, 17, 19, 20, 29

*Certain Underwriters at Lloyd's London v. Oryx Energy Co.*,
   142 F.3d 255 (5th Cir. 1998) ......................................... 13, 14, 15, 16, 17, 19, 20, 29

*Coker v. Coker*,
   650 S.W.2d 391 (Tex. 1983) ....................................................... 6, 8, 21, 31

*Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*,
   256 S.W.3d 660 (Tex. 2008) .................................. 18, 21, 22, 23, 24, 25, 28, 29, 32

*Fireman's Fund Ins. Co. v. Commercial Std. Ins. Co.*,
   490 S.W.2d 818 (Tex. 1973) ........................................................... 22, 24, 25

*Forbau v. Aetna Life Ins. Co.*,
   876 S.W.2d 132 (Tex. 1994) ......................................................... 6, 8, 31, 33

*Getty Oil Co. v. Insurance Co. of North America*,
   845 S.W.2d 794 (Tex. 1992) ........................................................................... 29

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
   327 S.W.3d 118, 124 (Tex. 2010) ..................................................................... 5, 17

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002) ........................................................................... 19

*LeBlanc v. Global Marine Drilling Co.*,
   193 F.3d 873 (5th Cir. 1999) ................................................. 15, 16, 17, 19, 20, 29

*Lubrizol Corp. v. Gray Ins. Co.*,
   No. 08-20289, 2009 WL 348820 (5th Cir. 2009) ..................................................... 26

*Markel Ins. Co. v. Muzyka*,
  293 S.W.3d 380 (Tex. App. 2009)..............................................................................35

*McDermott Int'l, Inc. v. Lloyds Underwriters of London*,
  944 F.2d 1199 (5th Cir. 1991) ....................................................................................6

*Mesa Operating Co. v. Cal. Union Ins. Co.*,
  986 S.W.2d 749 (Tex. App. 1999)...................................................................6, 31, 33

*One Beacon Ins. Co. v. Crowley Marine Services, Inc.*,
  No. 10-20417, 2011 WL 3195292 (5th Cir. July 28, 2011) ......................................19

*Puckett v. U.S. Fire Ins. Co.*,
  678 S.W.2d 936 (Tex. 1984).........................................................................................5

*Rep. Waste Servs. of Tex., Ltd. v. Empire Indem. Ins. Co.*,
  98 F. App'x 970 (5th Cir. 2004) ................................................................................17

*Vought Aircraft Indus., Inc. v. Falvey Cargo Underwriting*,
  729 F. Supp. 2d 814 (N.D. Tex. 2010) ........................................................................6

*Westchester Fire Ins. v. Heddington Ins. Ltd.*,
  883 F. Supp. 158 (S.D. Tex. 1995), *aff'd*, 84 F.3d 432 (5th Cir. 1996) ...................33

**STATUTES**

Longshore and Harbor Workers' Compensation Act § 905(b)....................................16

**OTHER AUTHORITIES**

I JACK P. GIBSON et al., COMMERCIAL LIABILITY INSURANCE,
  "V. Annotated ISO CGL Policy" § V.D.4 (11th reprint 1997) ..................................23

**MEMORANDUM IN SUPPORT OF TRANSOCEAN'S RESPONSE IN OPPOSITION
TO THE BP PARTIES' MOTION FOR JUDGMENT ON THE PLEADINGS**

TO THE HONORABLE JUDGE BARBIER:

Intervenors Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean") respectfully submit this Memorandum in Support of the attached Response in Opposition to the BP Parties' Motion for Judgment on the Pleadings in the Insurance Actions.  While BP's motion purports to apply only to Transocean's insurers' complaints and ignores Transocean's Complaint in Intervention, a grant of the requested declarations sought by BP would directly and adversely affect Transocean's rights under its own insurance policies in which it is the sole named insured. If the rights sought by BP, Anadarko and MOEX are established, they would potentially decrease the rights of Transocean to the finite sum of insurance allowable under its own policies.  As this Court observed in its Order and Reasons denying BP's Motion to Dismiss Transocean's Complaint in Intervention, Transocean "is asserting its own right to potentially recover a larger percentage of the coverage limits available under its insurance policies."  **Dkt. No. 3373, at 3.**

## INTRODUCTION

BP seeks to stand the oil and gas industry's contractual risk transfer principles on their heads, placing all of BP's well pollution risks on Transocean.  Such pollution risks are traditionally BP's, as oil well owner and operator, and the indemnity and insurance provisions in the drilling contract at issue clearly allocate such risks to BP.  Yet, contrary to industry norms, BP's counsel argues that Transocean was to provide BP with full coverage under Transocean's policies, to be purchased at Transocean's sole expense, for any oil pollution emanating from BP's well.  In effect, BP's attorneys contend that Transocean, a drilling contractor, was to be the exclusive insurer of a "super-major" oil company's well pollution risks, and that the drilling

1

contractor's insurance was to become the fund out of which hundreds of thousands of well pollution claims against the oil company are now to be paid.  But two things stand in the way of BP's attorneys' argument: (1) the testimony of BP's own CEO that this is not how pollution risks are allocated, and (2) the plain-language allocation of pollution risks in the policies of insurance and drilling contract in this case.

### BP's Tony Hayward Testifies that Well Owners and Operators, Not Drilling Contractors, Typically Assume Risks for Well Pollution and BP Is Self-Insured for Well Pollution Risks

BP's CEO at the time of the incident, Tony Hayward, has testified that it was impractical for BP to pay the enormous premiums associated with insuring risks of the magnitude undertaken by BP in the course of its exploration operations.  For that reason, BP made a corporate decision, long before the Macondo blowout, that it would self-insure, taking all such risks not to external third-party insurance carriers, but onto its own balance sheets.  Hayward described BP's insurance practices for environmental risks as follows:

> **Q.**[1]  There's a question that's asked of you beginning at the top: "That makes me think . . . you didn't mean a real insurance policy of course, but if one was to go to Lloyd's of London and insure against a 25 billion hit to my market cap and 5 billion in punitive damages, what kind of premiums would you have to pay?"
>
> The answer that's written down here is: "You can't insure. That's why we're self-insured.  You can't insure risks you want to insure.  And the things you can insure, premiums are so high that it makes no sense for a company like . . . BP to do anything other than self-insure."
>
> Do you see that, sir?
> **A.**[2]  I do.
>
> * * * *
>
> **Q.**  And the answer there is certainly consistent with your thought process and your understanding of the situation?

---

[1]  Steven L. Roberts for Transocean, quoting from a magazine interview Tony Hayward gave to *Forbes* on May 18, 2010.

[2]  Tony Hayward.

> **A.**      Certainly that BP is self-insured.  We don't have insurance policies in place, correct.
>
> * * * *
>
> **Q.**      What does "self-insurance" mean to you, at least when you were CEO of BP?
>
> **A.**      It meant that the company didn't have an insurance policy against the risks it was—it was undertaking, in essence, and the—and as it says here, we self-insured and took those risks onto our balance sheet.
>
> * * * *
>
> **Q.**      So BP elected to have no external insurance . . . for terms of environmental risks that might be occasioned in connection with deepwater drilling?
>
> **A.**      We had no external insurance for anything at BP.
>
> * * * *
>
> **Q.**      Okay.  The statement here is that the premiums are so high that it makes no sense, like BP, to do anything else other than self-insure, am I right that BP, some years ago, made a corporate decision that the differential between the cost of having insurance in connection with the claims that it was covering were such that BP might as well not have insurance, handle the claims itself, and in the end save itself money?
>
> **A.**      That's cor—that was a decision taken in about 1991.
>
> * * * *
>
> **Q.**      That was still the situation as of Macondo?
>
> **A.**      That's correct.

*See* **Exh. A. at 552–55.**  Moreover, with regard to the allocation of pollution risks as between a well owner/operator such as BP and a drilling contractor such as Transocean, Mr. Hayward testified that the industry standard has been for years that the owner/operator—not its drilling contractor—bears the risk for environmental pollution liabilities.

> **Q.**      Did you have any expectation that your subcontractors would go out and purchase insurance for you, since you had a—made a corporate decision not to purchase insurance for yourself?
>
> **A.**      We had no expectation of what our contractors did and did not—insur—what insurance our contractors did and did not purchase with respect to risks that they were undertaking.

3

* * * *

| | |
|---|---|
| **Q.** | Let's go back up to your level, the 40,000-foot level of a CEO.  And I don't mean that disrespectly.  I understand you don't read the details of every contract—of all your contracts.  But what—what was the industry—you talked yesterday at length about the industry.  In general, what was the industry allocation of environmental risk between an Operator such as BP and subcontractors who worked for the Operator while drilling wells for the Operator? |
| **A.** | The industry norm would be, in most circumstance, that the Operator would take that risk. . . .  But circumstances, of course, differ in time and place. |
| **Q.** | Right.  But that was the industry standard? |
| **A.** | M-h'm, yeah. |
| **Q.** | Has been that way for years, hasn't it? |
| **A.** | Yeah, it is. |

*See* **Exh. A. at 556–59.**  One of the world's largest, most profitable companies would not need to identify itself as self-insured for pollution risks and agree that the industry standard is for BP to assume pollution risks while drilling, as Mr. Hayward did, if such risks were shifted to a drilling contractor such as Transocean or to a drilling contractor's third-party insurers.  Thus, in determining whether Transocean committed itself to provide BP with coverage for risks traditionally assumed by oil companies such as BP, the choice for the Court is whether to believe BP and its CEO, or BP's attorneys.  Transocean respectfully submits to the Court that the reality is clear, not only from Mr. Hayward's testimony, but also from the clear and unequivocal language of the insurance policies and the drilling contract.

## ARGUMENT

There are two independent reasons for the Court to deny BP's motion.  First, the plain language of the relevant policies and contracts permits only one reasonable interpretation, that of Transocean and its insurers.  This plain-language interpretation is fully supported by Fifth Circuit precedent.  Second, all lines of reasoning set forth in BP's motion—whether the "policies-only"

legal principle it attempts to establish, or the cases it purports to rely on—upon examination, actually compel denial of the motion.  For either or both reasons, BP's motion must be denied.

## I.  THE PLAIN LANGUAGE OF THE POLICIES AND THE DRILLING CONTRACT DICTATES THAT ANY ADDITIONAL INSURED COVERAGE AFFORDED TO BP IS EXPRESSLY LIMITED TO LIABILITIES ASSUMED BY TRANSOCEAN UNDER THE TERMS OF THE DRILLING CONTRACT.

The outcome of this case depends upon the interpretation of the drilling contract's additional insured provision.  Its plain language expressly limits additional insured coverage to the liabilities assumed by Transocean under that same contract's indemnity provisions.  Further, in keeping with the plain meaning of these words, the Fifth Circuit has construed similar contractual language in other additional insured disputes in a manner that supports Transocean's and its insurers' argument for BP's limited additional insured coverage under the policies here.

BP bears the burden of proving additional insured coverage in this case.  *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) ("Initially, the insured has the burden of establishing coverage under the terms of the policy.").  While the insurer bears the burden to prove that a loss falls within an exclusion, Transocean's argument does not rest upon any exclusionary provision of the policy or contract, so it can never have the burden to prove non-coverage in this case.  *Id.*  Generally, a contract of insurance is subject to the same rules of construction as other contracts.  *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987).  If the policy language is worded so that it can be given only one reasonable construction, it will be enforced as written.  *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984).  However, the rule that a court must adopt the interpretation that most favors the insured when a policy is susceptible to more than one reasonable interpretation is not applicable in this case.  The Fifth Circuit has held that this rule of construction does not apply when as in this case the parties involved have equal bargaining power and the authorship of the policy is due

to both parties alike.  *See McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1207 (5th Cir. 1991); *see also Vought Aircraft Indus., Inc. v. Falvey Cargo Underwriting*, 729 F. Supp. 2d 814, 823–28 (N.D. Tex. 2010).  In the present matter, the evidence will show that Transocean, BP and Transocean's insurers had equal sophistication and bargaining power.[3]

A court is required to consider the entire writing in an effort to harmonize and give effect to all provisions of the contract so that no provision will be rendered meaningless, and no single provision should be read as controlling.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Thus, "every sentence, clause, and word" in an insurance policy must be given meaning to avoid rendering any portion of the policy inoperative or meaningless.  *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 740–741 (Tex. 1998).  Specific provisions in the policy control over general statements of coverage.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994).  Policy provisions and endorsements also "should be construed together unless they are so much in conflict that they cannot be reconciled."  *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754 (Tex. App. 1999).

> ### A.      The Drilling Contract's Extension of Additional Insured Coverage Is Expressly Limited to the Liabilities Assumed by Transocean Under the Terms of the Drilling Contract.

As plain-language arguments should be, the following interpretation of the additional insured language in the relevant policies and contract is very simple and brief.  Tony Hayward's testimony confirmed the industry standards for allocating and insuring against pollution risks as between oil companies and contractors.  It is thus no surprise that the relevant insurance policies, as well as the BP-Transocean drilling contract, conform to those traditional practices.  However, BP does not rely on, much less cite, the relevant additional insured provision in the policies at

---

[3]      Concurrent with this response, Transocean is moving to convert BP's motion to a motion for summary judgment and is seeking a continuance to permit ongoing development of this issue and related issues in discovery.

issue.[4]  The relevant additional insured provision, which is found in Section I., Condition D.1. of

the Ranger and excess policies' Protection & Indemnity (P&I) coverage sections, states:

> The Insured has privilege to name others as an additional Insured
> for their respective rights and interests and/or waive any rights of
> recovery, ***but only to the extent as may be required under
> contract or agreement***."[5]

BP contends that the "general liability" coverage section or Section II. of the policies applies, but

BP fails to take into account Item 12 of the Declarations that states Section II. only applies to

liabilities that are not covered by Section I.[6]  Thus, the relevant additional insured provision

extends the possibility of additional insured coverage "only to the extent as may be required

under contract or agreement."  The insurance policy's relevant additional insured provision

clearly and unequivocally links the insurance provided to claimed additional insureds such as

BP, Anadarko, and MOEX, to an envisioned separate, written contract.

Even if Section II. applies, the result is no different.  BP fails to mention the applicable

additional insured endorsements in Section II., which are found in General Conditions 3 of

Endorsement 1 of the Ranger Policy and General Condition 4 of Endorsement 1 of the Excess

Policies.  The endorsements provide:

---

[4]     The policies include one issued by Ranger Insurance Ltd. ("Ranger") as well as various excess liability policies issued by London market syndicates ("Excess Insurers").  The Ranger Policy is attached as Exhibit D to the Declaration of Christopher J. Wenk in Support of the BP Parties' Motion for Judgment on the Pleadings, and the Excess Policies are attached as Exhibits E–L to the Wenk Declaration.  For the Court's convenience, Transocean will use BP's exhibits and the MDL Bates numbering for reference.

[5]     This provision appears as Section III. Condition D. 1. in Section I of the Ranger and Excess Insurers' Protection & Indemnity coverage sections.  *See* **Decl. of C. Wenk, Exh. D at 13 (TRN-MDL-00237553)** (emphasis added); **Decl. of C. Wenk, Exh. E at 13 (TRN-MDL-00235693).**

[6]     As discussed in Section **III.** of this Response, Item 12 in the Declarations states that Section II.A. applies only to "Excess Liabilities other than those covered in Section I above and/or difference in conditions to Section I. above," and Section II.B. applies only to "onshore liabilities."  Simply put, because Section I. applies, Section II.A. does not, and BP has made no showing that "onshore liabilities" potentially covered by Section II.B. are implicated by the matters asserted in the declaratory judgment actions.  In the alternative, as discussed below, General Conditions 3 and 4 of Section II.'s Endorsement 1 in the Ranger and Excess Insurer Policies limit additional insured coverage in the same manner as Section I.

**ADDITIONAL INSURED/WAIVER OF SUBROGATION**

> Underwriters agree **where required by written contract, bid or work order**, additional insureds are automatically included hereunder, and/or waiver(s) of subrogation are provided as may be required by contract.[7]

Even if Section II. did apply, the relevant additional insured provisions in Section II. still envision the possibility of additional insured coverage only where additional insured coverage is "required by written contract, bid or work order."[8]   This endorsement thus provides the same limitation as the additional insured provision in Section I. stated above.

In the present matter, the written contract referenced by the relevant additional insured provision is the BP-Transocean drilling contract.   The drilling contract contains an additional insured provision that reads as follows:

> Vastar [BP], its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers, and agents shall be named as additional insureds in each of CONTRACTOR'S [Transocean's] policies, except Workers' Compensation **for liabilities assumed by CONTRACTOR under the terms of this Contract**.[9]

This sentence says that certain BP Parties "shall be named as additional insureds . . . for liabilities assumed by [Transocean] under the terms of this Contract."   It is clear from the

---

[7]   This provision appears as General Condition 3 of Endorsement 1 of the Ranger Policy.   *See* **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611)** (emphasis added).   It appears as General Condition 4 of Endorsement 1 of the first excess layer policy.   *See* **Decl. of C. Wenk, Exh. E at 74 (TRN-MDL-00235754).**

[8]   Again, without mentioning a relevant additional insured provision, BP contends that the "Insured" sections found in Sections II.A. and II.B. of the Ranger and Excess Policies at Section 13 as amended by Endorsement 4 provide additional insured coverage to BP.   As discussed in Section **III.**, *infra*, assuming Section II. applies, General Conditions 3 and 4 of the Ranger and Excess Insurers' Policies should be construed together with the "Insured" section to determine the extent to which  additional insured coverage is provided under the policies by virtue of the drilling contract.   A court is required to consider the entire writing in an effort to harmonize and give effect to all provisions of the contract so that no provision will be rendered meaningless.   *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).   Moreover, specific provisions in the policy control over general statements of coverage.   *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994).   Further, the "Insured" section—by itself—provides its own additional insured limitations by reference to the drilling contract.

[9]   *See* **Decl. of C. Wenk, Exh. C at 2 of 3 (TRN-MDL-00027435)** (emphasis added).

language of the drilling contract that any additional insured status that is extended under this provision is limited to the liabilities assumed elsewhere in the contract. The drilling contract's only "terms" governing "assumed" "liabilities" are its indemnity provisions and, therefore, the "liabilities assumed by CONTRACTOR under the terms of this Contract" language refers to the indemnity provisions in the drilling contract.

To determine whether an additional insured obligation exists, the question is whether the drilling contract's indemnity provisions allocate the particular risk to Transocean or to BP. Depending on the particular event that occurs, if the contractual indemnity provision allocates the risk to Transocean, Transocean owes an additional insured obligation as well as a contractual indemnity obligation to BP. If the contractual indemnity provision does not allocate the particular risk to Transocean, Transocean does not owe an additional insured obligation to BP.

The drilling contract's indemnity provisions (Articles 21–25)[10] answer the question of which party is potentially responsible for a particular risk when an event occurs. For example, they allocate responsibility for personal injury or death of BP or Transocean personnel, loss of or damage to drilling equipment or the mineral formation, as well as pollution incidents. Specifically, with regard to pollution risks, BP's motion acknowledges that Transocean contractually assumed liabilities for any pollution originating above the surface of the water, while BP contractually assumed all other possible pollution liabilities. **Dkt. No. 3211-1, at 4–5.** Thus, when an incident occurs and pollution damage is alleged, BP is only an additional insured under Transocean's policies for losses resulting from any pollution originating above the surface of the water. Significantly, BP is not entitled to additional insured coverage under Transocean's policies—and must rely on its corporate commitment to being self-insured—for any other pollution liabilities, including pollution from the well. This is the only reasonable interpretation

---

[10]     *See* **Decl. of C. Wenk, Exh. C at 22 of 36 (TRN-MDL-00027337).**

of the Transocean policies and the additional insured provision in the BP-Transocean drilling contract, which requires that Transocean's obligation to name BP as an additional insured be limited to "liabilities assumed by [Transocean] under the terms of this [Drilling] Contract."

**B.      Transocean's and Its Insurers' Plain Language Argument Is Supported by the Fifth Circuit's Interpretations of Similar Additional Insured Language.**

Transocean's and its insurers' plain language argument is amply supported by the Fifth Circuit.  Specifically, at least three decisions have resolved additional insured disputes in factually related cases in favor of Transocean and its insurers by interpreting additional insured provisions that are similar to the provision in the drilling contract.  Each is discussed in turn.

**1.      *Becker v. Tidewater, Inc.*, 586 F.3d 358 (5th Cir. 2009).**

The *Becker* decision is a Fifth Circuit case that interprets indistinguishable additional insured contract and policy provisions in manner that fully supports Transocean and its insurers' position in this case.  *See* 586 F.3d at 370–71.  In *Becker*, Baker Hughes time-chartered a vessel from its owner, Tidewater, to perform offshore well services.  Under the time-charter contract, Baker and Tidewater indemnified each other pursuant to common "knock for knock" contractual indemnity provisions, whereby Baker would be responsible for Baker employees and Tidewater for Tidewater employees.  *Id.* at 366.  Tidewater was required to purchase a Protection and Indemnity (P&I) policy that included certain additional insured coverage for Baker.  *Id.* at 370.  Seth Becker, a Baker employee, was injured.  The district court found the time-charter indemnity agreement required Baker to indemnify Tidewater for injuries to Becker, a Baker employee.  *Id.* at 365.  Baker contended that it was an additional insured under Tidewater's P&I policy and that that coverage must be exhausted before Baker Hughes owed contractual indemnity.  Tidewater argued, and the district court agreed, that any such additional insured coverage was limited to

risks assumed by Tidewater in the indemnity agreement; thus, no additional insured obligation was owed because Baker had assumed responsibility for injuries to its own employees.

The Fifth Circuit panel agreed with Tidewater.  The additional insured provision in the time-charter contract provided:

> [Tidewater] shall include CHARTERER [Baker Hughes], in its capacity as time-charterer of the vessel, as an additional assured, but only with respect to the risks assumed by OWNER [Tidewater] in this Charter.

*Id.* at 370.  The additional insured provision in the Tidewater P&I policy provided as follows:

> [T]he unqualified word "Assured" includes . . . any person, organization, trustee or estate to whom or to which the "Named Assured" [Tidewater] is obligated by virtue of a contract or agreement to include or name as an assured, co-assured or additional assured.

*Id.*  The court began by observing the requirements of the plain language of this clause: "In order to determine if Baker is an 'additional assured,' we must read the insurance and indemnity provisions of the time-charter contract in conjunction in order to properly interpret the meaning of the contract."  *Id.*  It reasoned:

> Although there is no case which presents a contract with the precise limiting language at issue here, Article XI of the time-charter contract expressly limits Tidewater's obligation to designate Baker as an "additional assured" to "the risks assumed by OWNER [Tidewater] in this Charter."  Tidewater's insurance policy, in turn, limits Baker's status as an "additional assured" to when Tidewater "is obligated by virtue of a contract or agreement" to designate Baker as an "additional assured."  Furthermore, the time-charter specifically excludes risks assumed by Baker from Tidewater's insurance coverage.  Here, the injury was to Seth, a Baker employee.  Under the parties' reciprocal-indemnity agreement, Baker, not Tidewater, assumed the risk of injury to Baker employees.  Because Tidewater did not assume the risk of injury to Seth, Baker is not an "additional assured" to Tidewater's insurance for Seth's injuries.  Thus, the district court did not err in holding that the insurance policies need not be exhausted before Baker's indemnification obligation began.

*Becker*, 586 F.3d at 371.

Taking the *Becker* decision in steps, the Fifth Circuit first observed that the "contract expressly limits Tidewater's obligation to designate Baker as an 'additional assured' to 'the risks assumed by OWNER [Tidewater] in this Charter.'" *Id.* Next, addressing "Tidewater's insurance policy, in turn," the court determined that the policy "limits Baker's status as an 'additional assured' to when Tidewater 'is obligated by virtue of a contract or agreement' to designate Baker as an 'additional assured.'" *Id.* The court then concluded that because Tidewater did not assume the risk of injury to Baker's employee under the indemnity provision, Baker was not an additional insured for the purpose of the Seth Becker litigation. *Id.*

*Becker* is indistinguishable from this case and should be applied to deny BP's motion.[11] Applying the guidance of *Becker* to the instant litigation, the BP-Transocean drilling contract contains a similar limitation in its additional insured provision. The *Becker* additional insured provision in the time-charter contract limited additional insured status to "risks assumed by OWNER [Tidewater] in this Charter." In the BP-Transocean drilling contract, the additional insured provision says: "[BP] . . . shall be named as additional insureds in each of [Transocean's] policies, except Workers' Compensation *for liabilities assumed by [Transocean] under the terms of this Contract*." Under *Becker*, this last clause limits BP's additional insured coverage to liabilities or risks assumed by Transocean in the BP-Transocean drilling contract. The

---

[11]     Of course, BP will argue that *Becker* is a maritime case. However, *Becker* is a Fifth Circuit decision analyzing coverage for a Gulf of Mexico drilling accident under maritime policies in light of a maritime contract, the additional insured contract and policy language of which is indistinguishable from that in the BP-Transocean drilling contract and the relevant policy language. This Court's jurisdiction in all of the insurance actions, and in most of the underlying actions, is alleged to be maritime; the insurance policies are maritime, insuring maritime risks; and the drilling contract is a maritime contract. Nor does the court in *Becker* indicate that it relies on some arcane doctrine of maritime contractual interpretation, nor is there even any such distinction to be imagined that could warrant *Becker* being ignored here. Rather, *Becker* is a plain-language decision interpreting a contractual additional insured provision's plain language using only the common understanding of the words themselves and syllogistic reasoning. Because that is Transocean's and its insurers' argument for limiting coverage as well, *Becker* certainly is relevant to the additional insured dispute in this case. The parallels are obvious.

relevant policies here also contain language similar to the additional insured provision in the Tidewater P&I policy. The Tidewater P&I policy's additional insured provision provided: "Tidewater 'is obligated by virtue of a contract or agreement'" to name Baker as an additional insured. The Ranger and excess policies similarly, in Section I., state that additional insured coverage is provided "to the extent as may be required under contract or agreement."[12] Because Seth Becker was a Baker employee, and Baker had agreed to indemnity Tidewater for injuries to Baker employees, under the additional insured provision of the contract Baker was not an additional insured. Similarly, because the pollution complained of in the instant litigation is pollution emanating from the Macondo well, and not from above the surface of the water, and BP has assumed liability for such pollution, *Becker*'s plain-language analysis of an indistinguishable additional insured provision dictates that BP is not an additional insured for oil pollution damage under the relevant policies.

> ### 2. *Certain Underwriters at Lloyd's London v. Oryx Energy Co.*, 142 F.3d 255 (5th Cir. 1998).

In *Oryx*, the Fifth Circuit relied on Texas law to interpret a similar additional insured provision in a manner that supports Transocean's position. Oryx Energy entered into a drilling contract with Mallard Drilling to drill a well. *See* 142 F.3d at 257. Under the drilling contract, Mallard agreed to indemnify Oryx for injuries to Mallard's employees "without limit," and to obtain liability insurance protecting Oryx as an additional insured under Mallard's Lloyd's liability policy. *Id.* at 258. A Mallard employee was injured and sued Oryx, and Oryx sought contractual indemnity from Mallard and additional insured coverage from Lloyd's underwriters. Lloyd's settled the claim, but reserved its rights to recover the settlement from Oryx. *Id.* at 257.

---

[12]    The result occurs under Section II., Conditions 3 and 4 of which state: "[u]nderwriters agree where required by written contract, bid or work order, additional insureds are automatically included hereunder." ***See*** **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611); Decl. of C. Wenk, Exh. E at 74 (TRN-MDL-00235754).**

Relying on language in the drilling contract's additional insured provision, underwriters argued that because the Texas Oilfield Anti-Indemnity Act invalidated the contractual indemnity provision or limited the amount of contractual indemnity to $500,000, the additional insured coverage did not exist or was limited to $500,000.  The district court agreed and held that the contractual indemnity and additional insured obligation was limited to $500,000.  *Id.*

The Fifth Circuit disagreed and reversed.  The additional insured provision in the drilling contract read as follows:

> [T]he policy (or policies) of insurance obtained by [Mallard], except Worker's Compensation, and Protection and Indemnity shall provide that [Oryx] . . . are additional insured [sic] for all coverages, to the extent of the indemnity provided by Mallard under this Contract.

*Id.* at 258 (emphasis removed).  The Fifth Circuit concluded that the "to the extent of the indemnity" language in the additional insured provision referenced the contractual indemnity provisions in the drilling contract but did not restrict additional insured coverage.  *Id.*  The contractual indemnity provision at issue did not limit the additional insured obligation because the indemnity provision provided indemnity "without limit" for injuries to Mallard's employees.  *Id.*  The Fifth Circuit therefore held that the Texas Oilfield Anti-Indemnity Act's restriction on the indemnity provision did not apply to the additional insured provision:

> The "extent" of the indemnity is "without limit" "on account of bodily injury" arising in favor of Mallard's employee.  The obligation of Mallard is to insure Oryx to that extent.  There is no justification for an argument that Texas courts would engraft a limit on coverage to match the Texas law defense [i.e., invalidity under the anti-indemnity statute] as if the suit were only to enforce the indemnity itself.

*Id.*  It is instructive that the Fifth Circuit (1) interpreted the policy's "additional Assured" provisions, (2) interpreted the contractual additional insured provision, and (3) referred to the contractual indemnity provisions to determine whether additional insured coverage existed.  *See*

14

*Id.* Oryx was claiming additional insured coverage for a negligence suit by an injured Mallard employee. Under the Mallard-Oryx drilling contract, Mallard's indemnity obligation in personal injury cases was to insure Oryx "without limit" "on account of bodily injury" to a Mallard employee. Thus, Oryx was fully insured under Mallard's policy.

The applicability of *Oryx* to this case is clear, especially where the additional insured provisions are indistinguishable—additional insured status is extended under the BP-Transocean drilling contract "for liabilities assumed by [Transocean] under the terms of this Contract," and in *Oryx* "to the extent of the indemnity provided by Mallard under this Contract." *Id.* Applying the Fifth Circuit's *Oryx* analysis here, the Court looks to the drilling contract's additional insured provision which, like the Oryx-Mallard provision, refers the Court back to the contract's indemnities. Thus, in the personal injury context, like that presented in *Oryx*, BP would be an additional insured to the full extent of the liability assumed by Transocean with respect to Transocean's employees. But in this case, Transocean assumed certain pollution liabilities (pollution originating from above the surface of the water), and BP assumed the rest. Thus, in the pollution context, the Court could extend additional insured coverage to BP only to the limited extent of the indemnity provisions: for liability resulting from pollution originating from above the surface of the water (i.e., the spilled diesel from the *Deepwater Horizon*). BP is not, however, an additional insured for oil pollution damages resulting from the Macondo blowout, where the offending substance originated below the surface of the water.

### 3.     *LeBlanc v. Global Marine Drilling Co.*, 193 F.3d 873 (5th Cir. 1999).

The *LeBlanc* decision also supports Transocean's and its insurers' position that additional insured coverage does not extend for BP's well pollution risks. In *LeBlanc*, Global Marine and Frank's executed a master service agreement (MSA), which obligated Frank's to indemnify Marine for injuries to Frank's employees. *See* 193 F.3d at 874. It also required Frank's to name

Marine as an additional insured in certain insurance policies to the extent of Frank's indemnities. LeBlanc, a Frank's employee, was injured on a Marine-owned rig and brought suit against Marine. Marine brought an additional insured claim against Frank's for LeBlanc's personal injury claim. *Id.* Frank's replied that the indemnity was unenforceable based on § 905(b) of the Longshore and Harbor Workers' Compensation Act and, as a result, the additional insured provision in the MSA was inapplicable. The additional insured provision in the MSA provided:

> [T]o the extent Subcontractor [Frank's] assumes liability hereunder, and agrees to indemnify Contractor [Marine], Contractor shall be named an additional insured in [certain] insurance policies.

*Id.* at 875 (emphases removed). Specifically, Frank's argued that, since the indemnity provision was unenforceable, the "to the extent Subcontractor assumes liability hereunder" language rendered the additional insured provision inapplicable. The Fifth Circuit disagreed:

> We are not persuaded that any provision in the MSA, or any language excerpted above, intends such a result [i.e., an indemnity's invalidity invalidates an additional insured clause that is tied to it]. The contractual interpretation advanced by Frank's would have significant force if the MSA required a *valid* indemnity agreement as a precondition to one obtaining assured status. Such is not the situation before us. ***The MSA merely states that as Frank's* agrees *to indemnify Marine, it concomitantly agrees to list it as an additional assured on its policies***. Consequently, we conclude that Frank's obligation to list Marine as an additional assured automatically arose upon its agreement to indemnify Marine in paragraph 7.2. ***The language of indemnification defines the parameters of the agreement regarding assured status***.

*LeBlanc*, 193 F.3d at 875 (emphases added, "agrees" italicized in original). The Fifth Circuit held—like *Becker* and *Oryx*—that, because the additional insured provision referred to the MSA's indemnity agreements, and because Frank's was obligated to indemnify Marine for its employee's personal injury claim, Marine was an additional insured under Frank's policy.

Like *Becker* and *Oryx*, the present case is indistinguishable from *LeBlanc*.[13]  In *LeBlanc*, the additional insured provision was expressly tied to the indemnity obligations of the parties: *LeBlanc*'s MSA extended additional assured coverage "[t]o the extent Subcontractor [Frank's] assumes liability hereunder, and agrees to indemnify Contractor [Marine]." *Id.*  Similarly, the drilling contract extends additional insured coverage to BP "for liabilities assumed by [Transocean] under the terms of this Contract." *LeBlanc* instructs that, when an additional insured provision's plain language so specifies, as the BP-Transocean drilling contract does, "[t]he language of indemnification defines the parameters of the agreement regarding assured status." *Id.*  Applying this plain-language principle to the instant coverage dispute, it is clear that, while BP is entitled to additional insured status for liabilities assumed by Transocean, BP is not an additional insured for well pollution risks or other liabilities not assumed by Transocean.

## II.   BP'S MOTION FOR JUDGMENT MUST BE DENIED BECAUSE ITS ARGUMENT FAILS TO GIVE ANY MEANING TO THE LIMITATION IN THE DRILLING CONTRACT'S ADDITIONAL INSURED PROVISION AND MISPLACES RELIANCE ON THE *EVANSTON* AND *AUBRIS* DECISIONS.

Though its motion for judgment should be denied solely based on Tony Hayward's testimony, Transocean's and its insurers' plain-language argument, and the Fifth Circuit cases in *Becker*, *Oryx* and *LeBlanc*, the Court should deny BP's motion because it fails to carry its burden of proving a reasonable interpretation that establishes additional insured coverage.  In an insurance coverage case, the insured has the burden of establishing coverage under the terms of the policy. *See Gilbert Tex.*, 327 S.W.3d at 124.[14]

---

[13]    *LeBlanc*, too, is a maritime contract case.  Again, however, here in *LeBlanc*, as in *Becker*, the Fifth Circuit is not following some distinguishable, particularly maritime hermeneutic for contract interpretation.  It is simply reading the words of a contractual additional insured provision—words which referred the court back to the indemnity agreement—and extending additional insured coverage accordingly.

[14]    *See also Rep. Waste Servs. of Tex., Ltd. v. Empire Indem. Ins. Co.*, 98 F. App'x 970, 971 (5th Cir. 2004) (per curiam) ("Under Texas law, additional insureds are strangers to an insurance policy and must bear the burden of proving additional insured status.  Moreover, the party claiming additional insured status is held to the same obligation as the policyholder to review the policy." (footnotes omitted)).

BP puts forth essentially two arguments for granting its motion, both of which contravene industry custom and practice.  Argument one is a two-part smokescreen to convince the Court to ignore half of the drilling contract's additional insured provision.  Its first component is that Transocean's insurers have admitted that BP is an additional insured at least for some risks; the other is that additional insured status is to be determined by having reference to the "policies alone."  However, neither component is valid.  Transocean and its insurers have not admitted BP is an additional insured in a manner that creates unlimited additional insured coverage, nor does any such "policies alone" rule exist at law.  The overarching flaw in BP's first argument is that BP's interpretation gives absolutely no meaning to the additional insured endorsement at issue, nor to the limiting language "for liabilities assumed by [Transocean] under the terms of this Contract" in the drilling contract's additional insured provision.  The other argument supporting BP's motion is its reliance on a decision of the Supreme Court of Texas and another by the Fifth Circuit, both of which BP puts forth as dispositive.  *See Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660 (Tex. 2008); *Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 483 (5th Cir. 2009).  However, upon closer inspection of what was before the courts—the policy and contractual language and the parties' arguments—and what was actually decided, and how, the *Evanston* decision does not support BP's position, while the *Aubris* case directly supports Transocean's and its insurers' interpretation.

A.     **BP Incorrectly Argues that Transocean's Insurers Admit that BP Is an Additional Insured, and Wrongly Advocates a Non-Existent "Policies Alone" Approach, Both of which Render the Additional Insured Limitation in the BP-Transocean Drilling Contract Meaningless.**

BP's arguments—that Transocean's insurers have admitted additional insured status and that additional insured status is determined by a "policies alone" approach—give no meaning to the additional insured limitation in the drilling contract.  BP contends that Transocean's insurers

(and presumably Transocean) "do not dispute that BP is an 'additional insured' under the insurance policies; indeed they plead in their complaints that the drilling contract qualifies as an 'Insured Contract,' as that term is defined in the policies, and accordingly, that BP is an 'additional insured' under the policies." **Dkt. No. 3211-1, at 15–17.**[15]  In their complaints, Transocean and its insurers have never admitted that BP is an additional insured in a manner that creates unlimited additional insured coverage.[16]  By making such a claim, BP hopes to ignore the limitation in the additional insured provision in the drilling contract.  The error that runs through this entire argument is that it renders the limitation in the additional insured provision meaningless, contrary to the teachings of *Becker*, *Oryx* and *LeBlanc*.[17]

---

[15]     BP is attempting to show that, by admitting BP is entitled to additional insured status for some risks, i.e., personal injury claims, Transocean's insurers have admitted that the drilling contract is an "Insured Contract."  However, as discussed in Section **III.**, BP's argument simply ignores the relevant additional insured policy provision.

[16]     BP's contention rests on a selective, incomplete quotation of the parties' complaints.  The full quote from paragraph 15 of Transocean's complaint in intervention reads:

> As is customary in the industry, a clause of the Drilling Contract requires additional insured protection in favor of certain BP entities; but in the same clause, such protection is expressly limited in scope to the liabilities assumed by Transocean under the terms of the Drilling Contract.  Therefore, reference to the Drilling Contract provisions cited above [Arts. 24.1 and 24.2] is necessary to determine the scope of any additional insured protection owed to BP, Anadarko and MOEX.

**Dkt. No. 1667-5, at 5–6.**  (Substantially the same allegation appears as paragraph 11 of both the Ranger and Excess Insurers' original complaints.)  This paragraph is in no way an admission that the drilling contract is an insured contract.  This allegation says nothing at all about Insured Contracts in particular or even policies generally.  Regardless, BP cannot shift its burden to prove coverage onto Transocean's insurers by way of a Rule 12(c) motion, because courts construe the pleadings in favor of the non-movant.  *See, e.g.*, *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312–13 (5th Cir. 2002).

[17]     In a recent contractual risk transfer case, the Fifth Circuit reaffirmed the general principle that a party cannot ignore one of two contracts whose plain language requires them to be read and construed together.  *See One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, No. 10-20417, 2011 WL 3195292, at *8 (5th Cir. July 28, 2011) ("Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together.  'Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument.'  The incorporation by reference doctrine applies to maritime contracts as well.  Under both general contract principles and admiralty law, a separate document will become part of the contract where the contract makes 'clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt.'  Terms incorporated by

Further, according to BP, its status and rights as an additional insured "are determined solely by reference to the insurance policies themselves," and not by reference to the terms of the underlying drilling contract. **Dkt. No. 3211-1, at 2.**[18]   Contrary to *Becker*, *Oryx* and *LeBlanc*, this "policies alone" approach ignores the relevant additional insured endorsement and its reference to the additional insured provision in the drilling contract.   BP cannot overlook the following additional insured limiting language, which requires that the full meaning of the drilling contract's additional insured provision be considered:

> The Insured has privilege to name others as an additional Insured for their respective rights and interests and/or waive any rights of recovery, ***but only to the extent as may be required under contract or agreement***."[19]

Contrary to contractual construction principles, BP gives no meaning to the "only to the extent as may be required under contract or agreement" language.[20]   "What else can this language mean? The terms "contract or agreement" can only have one meaning: the BP-Transocean drilling contract and its additional insured provision.

The drilling contract must be consulted to determine additional insured status.   BP understands this, but still cannot apply its "policies only" principle.   Rather, BP's real principle is to use the drilling contract as both a sword and a shield: look to its additional insured provision to identify BP as an additional insured, but pretend the limiting clause contained in the same sentence does not exist.   This provision provides:

---

reference will be valid so long as it is 'clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" (citations omitted)).

[18]   According to BP, "[t]he fact that BP has 'additional insured' coverage rights under the policies is readily apparent from the plain language of the policies."   **Dkt. No. 3211-1, at 16.**   This is an illusion; nowhere in the policies' "plain language" can one see the words "BP" in any sense, much less as an additional insured.

[19]   *See* **Decl. of C. Wenk, Exh. D at 8 (TRN-MDL-00237611)** (emphasis added); **Decl. of C. Wenk, Exh. E at 13 (TRN-MDL-00235754).**

[20]   If Section II. applies, BP still gives no meaning to the "where required by written contract" language in Conditions 3 and 4 of Endorsement 1 of that section of the Ranger and excess policies.   *See* **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611)** (Ranger policy); *see also* **Decl. of C. Wenk, Exh. E at 74 (TRN-MDL-00235754)** (first excess layer).

> Vastar [BP], its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers, and agents shall be named as additional insureds in each of CONTRACTOR'S [Transocean's] policies, except Workers' Compensation **for liabilities assumed by CONTRACTOR under the terms of this Contract**.[21]

Nowhere in its motion does BP offer an interpretation, reasonable or unreasonable, of that last clause. Nor does the motion ever attempt a justification for why it must be ignored completely. If BP is permitted to overlook this language, this case will mark a new era in contractual risk transfer in the oil and gas industry. Insurers would take larger losses; Transocean's premiums would go up to levels deemed unaffordable, according to Tony Hayward, by a super-major oil company as large as BP; BP would continue to pay no premiums, but be fully insured through its contractors rather than self-insured. Because no reasonable interpretation of a contract can leave an entire phrase meaningless, *see Coker*, 650 S.W.2d at 393, BP has not carried its Rule 12(c) burden to prove coverage under the relevant additional insured and policy provisions.

**B.     The *Evanston* Case Is Materially Different From this Case and Does Not Support BP's Motion for Judgment.**

**1.     The additional insured issues present in this case were not before the court in *Evanston*.**

The *Evanston* decision did not involve the interpretation of an additional insured provision's limitation clause like that found in the BP-Transocean drilling contract. *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660 (Tex. 2008). In *Evanston*, Atofina sought additional insured coverage for a personal injury claim resulting from the death of one of its contractor's employees. In the service agreement between Atofina and the contractor, Triple S, the additional insured provision stated: Atofina "shall be named as additional insured in each of [Triple S's] policies." *Id.* at 670. The additional insured provision also contained a limitation

---

[21]     *See* **Decl. of C. Wenk, Exh. C at 2 of 3 (TRN-MDL-00027435).**

clause similar to, but somewhat broader than, the drilling contract's additional insured provision. But, the Texas intermediate appellate court's opinion in *Evanston* makes it clear that the interpretation of this limitation clause was never at issue owing to the underlying facts:

> The [contractual additional insured provision] excepts the workers' compensation policy.  [It] provides further that the extension of coverage to ATOFINA as an additional insured would not apply to an obligation for which ATOFINA agreed to indemnify Triple S. ***Evanston does not argue that ATOFINA agreed to indemnify Triple S for any obligation at issue here***.

*ATOFINA Petrochems., Inc. v. Evanston Ins. Co.*, 104 S.W.3d 247, 250 n.3 (Tex. App. 2003) (emphasis added).   Triple S's additional insured obligation was limited to when Atofina contractually agreed to indemnify Triple S; but Triple S contractually agreed to indemnify Atofina for the incident at issue there, a Triple S employee's death.  Because Atofina did not owe contractual indemnity to Triple S, Evanston could never argue—***unlike*** Transocean's insurers— that the indemnities limited Atofina's additional insured coverage.  That provision—***unlike*** the present case—never came before the courts.

The issues concerning the interplay between contractual indemnity and additional insured provisions in *Evanston* also differ from those in the instant action.  Evanston, the insurer for Triple S, argued only that the contractual indemnity provision did not indemnify Atofina for Atofina's own negligence and that the insurance coverage was only meant to secure the agreement to provide contractual indemnity.  *See* 256 S.W.3d at 669 (relying on *Fireman's Fund Ins. Co. v. Commercial Std. Ins. Co.*, 490 S.W.2d 818 (Tex. 1973)); *see also* 104 S.W.3d at 249 (discussing Evanston's arguments at the intermediate appellate court).   Stated differently, Evanston argued that the contractual indemnity provision was unenforceable to indemnify Atofina for its own negligence, and that the insurance provision at issue did not provide additional insured coverage because it only provided liability coverage to insure the contractual

indemnity provision.[22]   At no time did Evanston ever argue that Atofina was not entitled to additional insured coverage because a limitation in the service agreement's additional insured provision restricted that coverage.  That is the issue in the present case.

Evanston also argued that a limitation in the umbrella policy's additional insured endorsements in Triple S's policy with Evanston precluded coverage for Atofina.  *See* 256 S.W.3d at 664 (part "A"), 667 (part "B").  For example, the court had to consider whether the last clause of the following additional insured endorsement limitation precluded coverage:

> A person or organization for whom you have agreed to provide insurance as is afforded by this policy; **but that person or organization is an insured only with respect to operations performed by you or on your behalf, or facilities owned or used by you.**

*Id.* at 664 (emphasis added).  That specific issue is also irrelevant here.  In sum, the *Evanston* decision did not involve the interpretation of a limitation in the service agreement's additional insured provision like the additional insured provision in the drilling contract.

### 2.   BP tries to characterize *Evanston* as supporting its "policies alone" approach, but *Evanston* did not create such a rule.

BP improperly characterizes the *Evanston* opinion as creating a "policies alone" approach to determine additional insured status.  In its motion, BP states that, "when determining the scope of a company's rights as an 'additional insured' under liability policies procured by its contractor, a court must look *not* 'to the indemnity agreement in the service contract' but rather to 'the terms of the insurance policy itself.'"  **Dkt. No. 3211-1, at 17** (citing *Evanston*, 256

---

[22]   Generally, a commercial general liability policy provides contractual liability coverage to the party owing the contractual indemnity obligation (the contractual indemnitor) for the tort liability of the party owed the contractual indemnity (the contractual indemnitee).  *See, e.g.*, I JACK P. GIBSON et al., COMMERCIAL LIABILITY INSURANCE, "V. Annotated ISO CGL Policy" § V.D.4 (11th reprint 1997).  Contracts require that commercial general liability insurance be carried, in part, to ensure that the contractual indemnity obligation is insured.  If no such insurance is in place, there is no insurance to secure the indemnity agreement, and the viability of the contractual indemnity obligation depends solely on the financial resources of the party owing the obligation.

S.W.3d at 664).[23]  *Evanston* did not, however, announce a "policies alone" rule, and must be

understood in the context of the different issues before the Texas Supreme Court in *Evanston*:

> In its service contract with Triple S, ATOFINA disclaimed any right of indemnity from losses "attributable to [its] concurrent or sole negligence."  Under the terms of the service contract, ATOFINA is not entitled to be indemnified by Triple S if the Jones loss was occasioned in any way by ATOFINA's negligence.  But ATOFINA does not seek indemnity from Triple S; it claims instead that it is entitled to indemnification from Evanston by virtue of its status as an additional insured on the umbrella policy Evanston issued to Triple S.  ***Instead of looking, as the court of appeals did, to the indemnity agreement in the service contract to determine the scope of any coverage, we base our decision on the terms of the umbrella policy itself.***

256 S.W.3d at 663–64 (emphasis added, footnote omitted).  BP transforms this last statement

into a hard and fast rule that a court must look to the terms of the policy alone, not the terms of

the indemnity agreement, in all additional insured coverage cases.  *See* **Dkt. No. 3211-1, at 2.**

But, as explained above, the *Evanston* court was not presented with the same issue before this

Court, i.e., the effect of a limitation in a drilling contract's additional insured provision.

The Texas Supreme Court's statement, however, is understandable as specifying the basis

for the *Evanston* decision when the issues addressed in *Evanston* are understood.  As discussed,

Evanston only argued that a contractual indemnity provision did not indemnify Atofina for

Atofina's own negligence and that the insurance provision only secured performance of the

contractual indemnity provision.  256 S.W.3d at 670.  The court's statement was directed at this

argument at least in part.  Evanston had argued that, under the decision in *Fireman's Fund*, 490

S.W.2d 818, the indemnity provision was unenforceable to indemnify Atofina for Atofina's own

---

[23]    The *Aubris* court cites *Evanston* and gives lip service to a statement that, "in determining whether there is coverage, a court looks to the additional insured provision itself; that indemnity is a separate, and later arising, question from coverage."  *Id.* at 488–89.  However, the *Aubris* court proceeds to interpret the additional insured policy endorsement *and* interpret the entire additional insured provision in the service agreement at issue.  *Id.* at 488–90.  BP, however, asks the Court simply to ignore half of the one-sentence additional insured provision in the BP-Transocean drilling contract, offering no interpretation of it.

24

negligence and that the insurance provision did not provide additional insured status but was only meant to secure, or insure, the indemnity provision. *Evanston*, 256 S.W.3d at 669. When faced with this argument, it is understandable why the court stated that it was not looking to the indemnity provision in the service agreement to determine whether Atofina was an additional insured. The court determined that the *Fireman's Fund* decision did not involve an additional insured provision and, thus, an additional insured provision simply requiring Atofina to be named as an additional insured extended direct insured status to Atofina.[24] *Id.* at 670.

Further, the supreme court stated that it was deciding the limitations in the additional insured policy endorsements at issue based on the policy, and not the indemnity provision, because all of Atofina's arguments for coverage, and all Evanston's against, were policy-based. For example, an additional insured endorsement in the umbrellas policy limited coverage to "operations performed by you [Triple S] or on your behalf, or facilities owned or used by you." *Id.* at 664. Rather than rely on the contractual indemnity argument under *Fireman's Fund*, the court had to interpret the terms of the umbrella policy. These distinctions—none of which are before the Court in the instant case—explain the basis for, and factually limited application of, *Evanston*'s statement that "we base our decision on the terms of the umbrella policy itself." *Id.*

    **C.**    **The *Aubris* Decision Supports Transocean's and Its Insurers' Position.**

        **1.**    ***Aubris* interpreted the language of the additional insured provision in the service contract instead of ignoring it as BP does.**

The *Aubris* court performed the same analysis that Transocean asks the Court to conduct in this case. *See Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 483 (5th Cir. 2009). As demonstrated below, the *Aubris* panel did the following: (1) look to the policy's

---

[24]    Relying on *Getty Oil Co. v. Insurance Co. of North America*, 845 S.W.2d 794 (Tex. 1992), the Texas Supreme stated that "it is unmistakable that the agreement in this case to extend *direct* insured status to ATOFINA as an additional insured is separate and independent from ATOFINA's agreement to forego *contractual* indemnity for its own negligence." *Evanston*, 256 S.W.3d at 670 (emphases in original).

additional insured endorsement (Part III.A. of the opinion); (2) interpret the additional insured

endorsement (Part III.B.); and (3) interpret the additional insured provision in the service

agreement (Part III.C.).[25]   That is what Transocean asks the Court to do.   The Fifth Circuit

interpreted the following additional insured endorsement:

> Any person or organization that you agree in a written contract for
> insurance to add as an additional protected person under this
> agreement is also a protected person for the following *if that*
> *written contract for insurance specifically requires such*
> *coverages* for that person or organization. . . .

566 F.3d at 487 (emphasis in original).   Based on its interpretation of the "if that written contract

for insurance specifically requires such coverages" language, the court determined that it was

necessary to interpret the additional insured provision in the service agreement at issue (Part

III.C. of the *Aubris* decision).   In the present case, the "but only to the extent as may be required

by written contract or agreement" language in the relevant additional insured provision is even

more compelling than *Aubris*' additional insured endorsement language.[26]   Similarly, this Court

should construe the meaning of the entire additional insured provision in the BP-Transocean

drilling contract.[27]

Applying this approach, the Court should adopt Transocean's interpretation of the

additional insured provision in the drilling contract as the only reasonable interpretation because,

---

[25]   In dicta, *Aubris* states that "a court looks only to the additional insured provision itself," but in Part C the court looks to the additional insured provision in the drilling contract and interprets it.   *Id*. at 488–90.

[26]   The "where required by written contract, bid or work order" limitation in Conditions 3 and 4 of Endorsement 1 in Section II. requires the same result.   *See* **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611)** (Ranger Policy)**;** *see also* **Decl. of C. Wenk, Exh. E at 74 (TRN-MDL-00235754)** (first excess layer).

[27]   The unpublished *Lubrizol* decision cited by BP in a footnote actually supports Transocean's position.   **Dkt. No. 3211-1, at 21 n.12.**   Lubrizol's insurance provision in the service agreement was unlike the one at issue here.   Even so, the court gave effect to "where required by written contract" language in the insurance policy's additional insured endorsement and similar limiting language in an additional insured provision in the agreement in that case.   The panel held that the policy's language and the agreement's additional insured limitation worked together to limit the right of the insured, Lubrizol, to coverage.   The policy and limitation limited Lubrizol's additional insurance coverage between $1 and $2 million to circumstances when the other contracting party owed contractual indemnity to Lubrizol.   *See generally Lubrizol Corp. v. Gray Ins. Co.*, No. 08-20289, 2009 WL 348820 (5th Cir. 2009).

unlike the *Aubris* provision, it plainly refers to other terms in the drilling contract.    The additional insured provision in the BP-Transocean drilling contract provides:

> Vastar [BP], its subsidiaries and affiliated companies, co-owners, and joint venturers, if any, and their employees, officers, and agents shall be named as additional insureds in each of CONTRACTOR'S [Transocean's] policies, except Workers' Compensation for liabilities assumed by CONTRACTOR **under the terms of this Contract**.

The "under the terms of this Contract" language can only mean that the other terms of the drilling contract must be considered to determine whether there are liabilities assumed by Transocean with respect to a particular risk and, therefore, whether any additional insured obligation exists.    The only liabilities assumed by Transocean in the drilling contract are found in the drilling contract's contractual indemnity provisions.

Unlike the present case, there is no language in the *Aubris* additional insured provision that refers to the other terms in the service agreement.    The clause at issue in the service agreement's additional insured provision in *Aubris* provided as follows:

> [H]owever, such extension of coverage shall not apply with respect to any obligations for which UNITED has specifically agreed to indemnify Contractor.

566 F.3d at 487.   No language can be found in this clause that refers back to any part of the service agreement.   The Fifth Circuit accepted as reasonable the insured's interpretation that additional insured coverage is required unless United, the party seeking additional insured status, separately and extra-contractually agreed to indemnify J&R Valley, the party against which additional insured status was sought.   *Id.* at 490.   The "under the terms of this Contract" language in the drilling contract's additional insured provision cannot reasonably be construed to refer to any extra-contractual agreement by BP apart from the drilling contract to indemnify Transocean. Unlike the insured in *Aubris*, BP has opted not to offer **any** proposed interpretation of the

conclusion of the additional insured provision.  Because "under the terms of this Contract" can only reasonably refer to the contractual indemnity provisions in the BP-Transocean drilling contract, Transocean's interpretation—the only reasonable one—must be adopted.

Another significant difference is *Aubris*' reliance on the term "specifically" in the service agreement's additional insured provision.  The court stated:

> We note that Section 10.2 excludes obligations for which United has *specifically*, not *generally*, agreed to indemnify J&R Valley. The qualifier "specifically" reasonably can be read to indicate that United intended to forego additional insured coverage only in the event United makes a separately considered and extra-contractual decision, i.e., to *specifically* agree to indemnify J&R Valley.

*Id*. at 489–90 (emphases in original).  There is no "specifically" language in the drilling contract's additional insured agreement and, therefore, the "under the terms of this Contract" cannot refer to an extra-contractual agreement.  "[U]nder the terms of this Contract" refers to the indemnity provisions in the drilling contract, and the only reasonable interpretation is that Transocean's additional insured obligation is limited to those contractual indemnities.

> **2.     Unlike the additional insured provision in *Aubris*, the additional insured provision in the drilling contract is not "separate from and additional to" the indemnity provisions.**

The additional insured provision in the drilling contract is not separate and independent like the service agreement's additional insured provision in *Aubris*.  Relying on *Evanston*, the *Aubris* court summarily concluded that the service agreement's additional insured provision was separate from and additional to an indemnity provision and then determined that the additional insured obligation was not limited to the service agreement's indemnity provisions.  *Aubris*, 566 F.3d at 488–89 ("The *separate* indemnity provision is not applied to limit the scope of coverage." (emphasis added)).  The additional insured provision in the BP-Transocean drilling contract is not "separate from and additional to," but is dependent upon, and directly refers to,

the indemnity provisions in the drilling contract.  The "for liabilities assumed by CONTRACTOR under the terms of this Contract" language expressly ties the additional insured provision to the indemnity provisions.  In other words, there is no additional insured obligation unless Transocean owes contractual indemnity to BP for a particular risk.  The relevant contractual indemnity obligation limits the additional insured obligation.  This is consistent with the teachings of *Becker*, *Oryx* and *LeBlanc* that, when additional insured and contractual indemnity provisions are tied together with similar language as that found in the BP-Transocean drilling contract, the indemnity provisions determine the parameters of the additional insured obligation.  *See, e.g.*, *LeBlanc*, 193 F.3d at 875.

This case also differs materially from *Getty Oil Co. v. Insurance Co. of North America*, 845 S.W.2d 794 (Tex. 1992), and *Evanston*.  In *Getty Oil*, there was no clause like the "for liabilities assumed by CONTRACTOR under the terms of this Contract" clause that tied the additional insured provision to the contractual indemnity provisions.  Rather, there was one insurance provision supporting the contractual indemnity provision and a second, separate provision broadly providing additional insured status, under which Getty claimed to be insured. *See Id*. at 804.  Likewise, as noted, the additional insured provision in the *Evanston* decision merely required Triple S to name Atofina as an additional insured, and the language similar to the language in the drilling contract's additional insured provision was not at issue.  *See ATOFINA Petrochems., Inc. v. Evanston Ins. Co.*, 104 S.W.3d 247, 250 n.3 (Tex. App. 2003).

In view of the foregoing, the existence of an additional insured obligation under the BP-Transocean drilling contract must be based on whether Transocean owed contractual indemnity to BP for pollution risks.

## III.   BP'S   MOTION   IGNORES   THE   RELEVANT   ADDITIONAL   INSURED PROVISIONS.

BP completely ignores the relevant additional insured provisions in Sections I. and II. of the policies.  Section I. of the Ranger and excess insurers' policies, the P&I section, contains the applicable additional insured provision that limits the extent of the additional insured coverage to pollution liabilities assumed by Transocean.[28]  BP, however, claims that Section II., the "general liability coverage" section, applies.  Yet, even if Section II. did apply, Section II. contains the same limitation by way of an endorsement.[29]  BP gives no reason for attempting to read these additional insured provisions out of the policies.  Instead, BP ignores them and relies solely on the definition of "Insured" section in Section II. (as amended by endorsements) that generally determines whether a party is an insured.[30]  **Dkt. No. 3211-1, at 8–9.**

### A.   Section I. of the Policies Restricts Additional Insured Coverage to Liabilities Assumed by Transocean, and Takes Priority over Section II.

Section I. of the Ranger and excess insurer policies limits additional insured coverage to liabilities assumed by Transocean, and establishes a priority of coverage over Section II.  According to the Declarations, coverage is only provided under Section II.A for "Excess Liabilities other than those covered in Section I above and/or difference in conditions to Section I above."[31]  The only reasonable interpretation of this provision is that Section II.A. does not

---

[28]     BP has stated that it is not seeking coverage under the P&I policy—not, at least, "at this time"—and, therefore, does not cite the additional insured provision contained in that section of the policies.  **Dkt. No. 3211-1, at 7 n.6**; *see, e.g.*, **Decl. of C. Wenk, Exh. D at 13 (TRN-MDL-0000237553).**

[29]     In Section II, Conditions 3 and 4 provide: "[u]nderwriters agree where required by written contract, bid or work order, additional insureds are automatically included hereunder."  *See* **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611); Decl. of C. Wenk, Exh. E at 74 (TRN-MDL-00235754).**

[30]     BP's provision is found at paragraph 4.13 in sections II.A. of the Ranger policy, *see* **Decl. of C. Wenk, Exh. D at 35 (TRN-MDL-00237575)**, as amended by Endorsement 4 at paragraph 27, ***Id.* at 89 (TRN-MDL-00237629)**, and paragraph 32, ***Id.* at 90 (TRN-MDL-00237630)**.  *See also* **Dkt. No. 3211-1, at 9 n.7.**

[31]     *See* **Decl. of C. Wenk, Exh. D at 8 (TRN-MDL-00237548); Decl. of C. Wenk, Exh. E at 7 (TRN-MDL-00235687).**

apply when Section I. provides the coverage.  At no time does BP mention Section I., violating the principle that no policy provision can be ignored.  *See, e.g.*, *Coker*, 650 S.W.2d at 393.

Based on the Declarations, a potential exception to Section I.'s priority could be alleged to exist under Section II.B.—though BP makes no such allegation—for additional insured coverage extending to "Onshore Operations/Liabilities."[32]   However, BP fails to identify the exception or a basis for the exception.  Of course, no such basis exists because "on-shore liabilities" do not include BP's "pollution-related liabilities for the oil emanating from BP's well as a result of the fire, explosion and sinking of Transocean's [vessel]."  **Dkt. No. 3211-, at 1.**

### B.      If Applicable at All, Section II. of the Policies Restricts Additional Insured Coverage in the Same Manner as Section I.

Even if Section II. applies, BP violates rules of construction by relying exclusively on the "Insured" section of Section II. to try to obtain additional insured coverage.  For ease of reference in this section, Transocean refers to the "Insured" definition in Section II. as the General Provision, and Endorsement 1, ignored by BP, as the Endorsement Provision. Specifically, BP's sole reliance upon the "Insured" General Provision, to the exclusion of the Endorsement Provision, is unreasonable because it violates at least three contract construction principles: (1) it fails to harmonize and give effect to all provisions of the policies so that the Endorsement Provision will not be rendered meaningless, *see Coker*, 650 S.W.2d at 393; (2) it is contrary to the principle that specific provisions such as the Endorsement Provision control over the general such as the "Insured" General Provision, *see Forbau*, 876 S.W.2d at 134; and (3) it fails to construe the General Provision and the Endorsement Provision together when there is no irreconcilable conflict between them, *see Mesa Operating*, 986 S.W.2d at 754.

---

[32]      *See* **Decl. of C. Wenk, Exh. D at 8 (TRN-MDL-00237548)**; **Decl. of C. Wenk, Exh. E at 7 (TRN-MDL-00235687).**

1.      **If Section II. does apply, Transocean's interpretation of it is the only reasonable interpretation under Texas contract law.**

Even if Section II. does apply, the only reasonable interpretation of Section II. is that a specific additional insured endorsement, the Endorsement Provision, limits additional insured coverage when construed together with the more general "Insured" definition.  As amended, the relevant language from the "Insured" section or General Provision relied on by BP reads:

> Only the following are included in the definition of "Insured" under this Policy:-
>
> . . . .
>
> (c)      any person or entity to whom the "Insured" is obliged by any oral or written "Insured Contract" (including contracts which are in agreement but have not been formally concluded in writing) entered into before any relevant "Occurrence", to provide insurance such as is afforded by this Policy;[33]

If Section II. applies, there is still the additional insured provision found in the General Conditions endorsement, or the Endorsement Provision:

> **ADDITIONAL INSURED/WAIVER OF SUBROGATION**
>
> Underwriters agree where required by written contract, bid or work order, additional insureds are automatically included hereunder, and/or waiver(s) of subrogation are provided as may be required by contract.[34]

Contrary to contract construction principles, BP gives no meaning to the more specific additional insured endorsement.  Texas courts will not "adopt a construction that renders ***any portion*** of a policy meaningless, useless, or inexplicable."  *See Evanston*, 256 S.W.3d at 668 (emphasis added).  The only reasonable interpretation is that the General Provision in the "Insured" section provides that an additional insured falls under the policies' definition of "Insured" if the "Insured Contract" definition is met.  The Endorsement Provision determines the extent to which a party

---

[33]      *See* **Decl. of C. Wenk, Exh. D at 35 (TRN-MDL-00237575)**; *Id.* **at 89 (TRN-MDL-00237629)**; *Id.* **at 90 (TRN-MDL-00237630)**; *see also* **Dkt. No. 3211-1, at 9 n.7.**

[34]      *See* **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611)**; *see also* **Decl. of C. Wenk, Exh. E at 74 (TRN-MDL-00235754).**

will be an additional insured, i.e., only "when required by written contract, bid or work order." As explained in Sections **I.** and **II.**, *supra*—discussing other inconvenient language BP attempts to overlook and render meaningless—this means that BP can only be an additional insured "for liabilities assumed by [Transocean]" per the additional insured provision in the BP-Transocean drilling contract.  BP fails to realize that its apparent interpretation is inconsistent with the contract construction principle that the more specific additional insured endorsement controls over the general "Insured" section as amended.  *See Forbau*, 876 S.W.2d at 134.  The only way to give the more specific additional insured endorsement meaning is to interpret the General and Endorsement Provisions harmoniously so that both will have meaning.

It is also impermissible for BP simply to ignore the Endorsement Provision because it deems the General Provision to be controlling.  "[A]n endorsement cannot be read apart from the main policy, and the endorsements will only supersede the previous policy terms to the extent they are truly in conflict."  *Mesa Operating*, 986 S.W.2d at 754 (citing *Westchester Fire Ins. v. Heddington Ins. Ltd.*, 883 F. Supp. 158, 165 (S.D. Tex. 1995), *aff'd*, 84 F.3d 432 (5th Cir. 1996)).  "The policy and endorsement should be construed together unless they are so much in conflict that they cannot be reconciled."  *Id.*  BP has not alleged an irreconcilable conflict between the General Provision and the Endorsement Provision, nor even a slight conflict.[35] Clearly, there is no conflict.  Thus, they "should be construed together."  *Id.*

In the alternative, if Section II.'s General Provision is considered by itself, the "Insured" section's requirement that the "Insured" be "obliged by any oral or written 'Insured Contract' . . . to provide insurance" is no different than the additional insured endorsement's "where required

---

[35]    Though it does not say as much, BP may be attempting to avail itself of General Condition 2 of Endorsement 1.  **Decl. of C. Wenk, Exh. D at 71 (TRN-MDL-00237611).**  Again, BP does not allege irreconcilable conflict, nor does one even exist under Texas contract law.  Thus, this provision does not come into play in this case.

by written contract" language.  These provisions provide that additional insured status is to be determined by an "Insured Contract" or "written contract" in which Transocean "is obliged" or "required" to secure additional insured protection for BP.  Thus, assuming the drilling contract is the "Insured Contract" or "written contract" in question, the Court must look to the drilling contract's additional insured provision to determine the extent to which Transocean "is obliged" or "required" to secure additional insured protection for BP.  As set forth in Section **I.** and **II.**, *supra*, under the plain language of the drilling contract's additional insured provision, Transocean "is obliged" or "required by written contract" only to provide additional insured protection to BP "for liabilities assumed by [Transocean] under the terms of this Contract."

> **2.      Assuming there is an irreconcilable conflict and BP's General Provision controls over the Endorsement Provision, there is no "Insured Contract."**

If BP does argue that the General Provision is in irreconcilable conflict with, and controls over, the Endorsement Provision, BP either has no additional insured coverage at all or its coverage is limited by the Drilling Contract's additional insured provision.   The General Provision provides that a party is an insured if Transocean "is obliged by any oral or written 'Insured Contract' . . . to provide insurance such as is afforded by this Policy."[36]   Insured contract is defined in an amendment in the endorsements as:

> The words "Insured Contract", whenever used in this Policy, shall mean any written or oral contract or agreement entered into by the "Insured" (including contracts which are in agreement but have not been formally concluded in writing) and pertaining to business under which the "Insured" assumes the tort liability of another party to pay for "Bodily Injury", "Property Damage", "Personal Injury" or "Advertising Injury" to a "Third Party" or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.[37]

---

[36]      **Decl. of C. Wenk, Exh. D at 89 (TRN-MDL-00237629).**
[37]      **Decl. of C. Wenk, Exh. D at 90 (TRN-MDL-00237630).**

Under this definition, an "Insured Contract" exists only where Transocean "assumes the tort liability of another."  With regard to pollution risks in particular, Transocean has not assumed BP's tort liability; rather, only BP is contractually liable for oil pollution originating from the wellhead.  Therefore, following the definition of "Insured Contract," there is no insured contract for pollution liabilities, and BP has no additional insured coverage under the General Provision for its pollution liabilities originating from the well.

## IV.   BP'S ARGUMENT FOR UNLIMITED ADDITIONAL INSURED COVERAGE FOR POLLUTION LIABILITIES BREACHES THE DRILLING CONTRACT.

At its own peril, BP asks the Court to ignore terms of the drilling contract's additional insured limitation with regard to well pollution risks and look only to the terms of the policies.  If this occurs, BP is invading Transocean's limits of insurance in a manner that was not intended by the parties and is explicitly prohibited by the plain language of the drilling contract.  BP would therefore be committing a material breach of the drilling contract.  As a result, Transocean would be entitled to bring a cause of action against BP for damages to the extent BP invaded Transocean's liability insurance limits and obtained coverage for well pollution risks.  If BP's interpretation of the drilling contract is successful, Transocean will be forced to amend its Complaint in Intervention and/or its MDL Cross-Claim/Counterclaim filed against BP and pursue such a recovery.  Transocean wishes to point this out and alert the Court that whatever BP wishes to take away with one hand will be given away with the other.  This absurd result is produced only if BP's interpretation of the contract and policies is followed.  Texas courts "will not construe contracts to produce an absurd result when a reasonable alternative construction exists."  *See Markel Ins. Co. v. Muzyka*, 293 S.W.3d 380, 387 (Tex. App. 2009).

## CONCLUSION

For the foregoing reasons, BP's Motion for Judgment on the Pleadings must be denied.

Respectfully submitted,

By:    /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Teri L. Donaldson (Florida, No. 784310)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,
teri.donaldson@sutherland.com

By:    /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com
-and-

By:    /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (Louisiana, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

*Counsel for Triton Asset Leasing GmbH,*
*Transocean Holdings LLC, Transocean*
*Offshore Deepwater Drilling Inc. and*
*Transocean Deepwater Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on this 11th day of August, 2011, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System, for filing and LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record.

/s/  Kerry J. Miller