**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re:  **Oil Spill by the Oil Rig**                              **MDL No. 2179**
       **"Deepwater Horizon" in the Gulf**
       **of Mexico, on April 20, 2010**          **SECTION J**

**Applies to:** *All Cases*                                       **JUDGE BARBIER**

                                       **MAGISTRATE SHUSHAN**

**BRIEF *AMICUS CURIAE* OF KENNETH R. FEINBERG AS**
**ADMINISTRATOR OF THE GULF COAST CLAIMS FACILITY**
**IN RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF**
**SUPERVISION OVER THE BP INTERIM CLAIMS PROCESS**

William F. Sheehan                          David B. Pitofsky
GOODWIN PROCTER LLP                         GOODWIN PROCTER LLP
901 New York Avenue, NW                     The New York Times Building
Washington, DC 20001-4432                   620 Eighth Avenue
(202) 346-4000                              New York, NY 10018-1405
                                            (212) 813-8800

*Counsel for Kenneth R. Feinberg as*
*Administrator of the Gulf Coast Claims Facility*

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

SUMMARY ..............................................................................................................................1

I. NEITHER OPA NOR ANY OTHER STATUTE OR RULE EMPOWERS A COURT
    TO REGULATE THE OPA CLAIMS PROCESS..............................................................3

II. THE GCCF HAS PAID BILLIONS TO THOUSANDS OF INTERIM CLAIMANTS ...........7

III. OPA DOES NOT REQUIRE THE PAYMENT OF INTERIM CLAIMS...............................9

IV. THE GCCF DOES NOT HOLD INTERIM CLAIMS HOSTAGE TO FINAL
    PAYMENTS ...............................................................................................................12

V. THE SUCCESS OF OPA'S CLAIMS PROCESS DEPENDS ON RELEASES....................15

VI. THE PRESENTMENT ISSUE IS FOR THE COURT TO DECIDE WHEN IT IS
    PROPERLY PRESENTED, NOT FOR A SPECIAL MASTER'S FINDINGS
    AND RECOMMENDATIONS .......................................................................................17

VII. THE GCCF HAS FULLY COMPLIED WITH THIS COURT'S ORDER ..........................19

CONCLUSION.........................................................................................................................20

LIBW/1790869.4

## TABLE OF AUTHORITIES

**CASES:**                                                                                                     **Page(s)**

*Abdallah v. The Coca-Cola Co.,*
    186 F.R.D. 672 (N.D. Ga. 1999)........................................................................................9, 10

*Abundiz v. Explorer Pipeline Co.*,
    No. 00-CV-2029, 2002 WL 2030880 (N.D. Tex.  Sept. 3, 2002) ....................................19, 23

*Boca Ciega Hotel, Inc. v. Bouchard Trans. Co.*,
    51 F.3d 235 (11th Cir. 1995)  .................................................................................................20

*Davis v. Huskipower Outdoor Equipment Corp.*,
    936 F.2d 193 (5th Cir. 1991) ..................................................................................................20

*EEOC v. TIC,*
    No. 01-1776, 2002 U.S.Dist. LEXIS 22728 (E.D. La. Nov. 21, 2002)...................................10

*In re Baldwin-United Corp.*,
    770 F.2d 328 (2d Cir. 1985)....................................................................................................10

*Johnson v. Colonial Pipeline Co.,*
    830 F. Supp. 309 (E.D. Va. 1993) ......................................................................13, 19, 20, 23

*Robin v. Binion*,
    469 F. Supp. 2d 375 (W.D. La. 2007)....................................................................................21

*Sorrentino v. ASN Roosevelt Center LLC,*
    584 F. Supp. 2d 529 (E.D.N.Y. 2008) .................................................................................8, 9

**CONSITUTION:**

Due Process Clause:

    U.S. CONST. amend. V.............................................................................................14
    U.S. CONST. amend. XIV..........................................................................................14

LIBW/1790869.4

**STATUTES:**

Coast Guard Authorization Act of 1966:

    Pub. L. No. 104-324, § 1142, 110 Stat. 3901, 399 ...............................................................15

Oil Pollution Act of 1990.......................................................................................... *passim*

    33 U.S.C.§ 2705...........................................................................................................14
    33 U.S.C.§ 2705(a) .....................................................................................................14
    33 U.S.C. § 2705(b) ....................................................................................................14
    33 U.S.C. § 2713.....................................................................................................14, 17
    33 U.S.C. § 2714...........................................................................................................15
    33 U.S.C. § 2715...........................................................................................................15

**RULES AND REGULATIONS:**

Fed. R. Civ. P. 23..............................................................................................................10

Fed. R. Civ. P. 23(d) .........................................................................................................10

**LEGISLATIVE HISTORY**:

104 Cong. Rec. E1908 (Oct. 2, 1996).............................................................................15

*Making the Gulf Coast Whole again: Assessing the Recovery Efforts of BP and the
    Obama Administration after the Oil Spill*: *Hearing before the House Oversight and
    Government Reform Committee,* June 2, 2011 (testimony of Governor Barbour), June
    2, 2011.....................................................................................................................5

*Oil Pollution Act Revision: Hearing Before the Senate Environment and Public Works
    Committee,* June 4, 1996 (statement of Rear Admiral Jim Card, Chief of Marine
    Safety and Env't. Prot. for the Coast Guard) .........................................................15

*Oil Pollution Act Revision: Hearing Before the Senate Environment and Public Works
    Committee*, June 4, 1996 (statement of Sidney J. Holbrook, Comm. Of the CT. Dep't.
    Env't. Prot.)............................................................................................................15

**OTHER AUTHORITIES:**

GCCF Executive Summary (April18, 2010), *available at*
    http://www.gulfcoastclaimsfacility.com/press20.php......................................12, 18

GCCF Overall Program Statistics (Status Report as of July 28, 2011), *available at*
www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf....................................5

Kenneth M. Murchison, *Liability Under the Oil Pollution Act: Current Law and Needed
Revisions*, 71 La. L. Rev. 917, (2011) ....................................................................................16

Summary of GCCF Interest Policy, *available at*
http://www.gulfcoastclaimsfacility.com/important ................................................................24

Summary of Options for Submission of Final and Interim Payment Claims, *available at*
www.gulfcoastclaimsfacility.com.............................................................................................21

LIBW/1790869.4

## INTRODUCTION

In the one year since its inception, the Gulf Coast Claims Facility ( the "GCCF") has established 35 claims offices throughout the Gulf States, employed over 3,400 individuals, processed over 97 percent of more than 900,000 claims submitted by over 527,000 claimants from all 50 states, and paid out nearly $5 billion dollars in honoring over 350,000 claims by individuals and businesses harmed by the Deepwater Horizon oil spill.[1]  Any reasonable, objective person genuinely interested in the welfare of those damaged by the spill would acknowledge and commend the extraordinary scope and speed of these accomplishments.

Plaintiffs object that the GCCF is following a course "of settling as many claims as possible to reduce the size of the putative class" (Pltfs. Br. at 2), but that is ***exactly what Congress intended*** when it imposed the Oil Pollution Act ("OPA") presentment requirement. While the GCCF has already paid over 350,000 claims, Plaintiffs' first trial will not even ***begin*** until February 2012.  The GCCF's exceptional job of fulfilling Congress's intent to expedite recovery and minimize litigation was recently recognized by Mississippi Governor Barbour in testimony before the House Committee on Government Operations:

> We don't get many complaints in Mississippi [regarding the GCCF].  They're doing something that's complicated, and I will say this about it.  It is sure better than having to litigate all this, where people wouldn't get their money for years and years and years, and the trial lawyers would get half the money.[2]

## SUMMARY

Many good reasons counsel in favor of the denial of Plaintiffs' request for the appointment of a Special Master to supervise the GCCF.  First and foremost, for the reasons

---

[1]     *See* GCCF Overall Program Statistics (Status Report as of August 12, 2011) (*available at* www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf) (last visited August 15, 2011).

[2]     *Making the Gulf Coast Whole Again: Assessing the Recovery Efforts of BP and the Obama Administration after the Oil Spill: Hearing before the House Oversight and Gov't Reform Comm.*, 112 Cong (June 2, 2011) (testimony of Governor Barbour).

stated in the February 18, 2011 briefs filed herein by the GCCF and the United States, the Court has no power to oversee the GCCF claims process.  Plaintiffs' latest brief adds nothing to the analysis of this threshold issue.

Beyond that, Plaintiffs' position rests on a profound misunderstanding of both OPA and the GCCF's activities – *i.e.,* both of the law and the facts.  On the law, Plaintiffs badly misconstrue OPA in saying that it contains a "requirement to * * * pay interim claims" and "Requires BP To Pay Interim Claims."  Pltfs. Br. at 1, 12.  OPA provides that a claimant may sue the responsible party in court if the presentment process does not produce a settlement – hardly a scheme consistent with a mandatory duty to pay (which in any event would violate due process).  Plaintiffs also err in saying that the releases the GCCF requires for the payment of final (not interim) claims are invalid (Pltfs. Br. at 1), for both the text and the legislative history of the Act show that releases are critical to OPA's goal of settling claims outside of court.

On the facts, Plaintiffs repeatedly assert that the GCCF has failed to pay interim claims.  Pltfs. Br. at 2 ("abject failure"), 5 ("failed"; "no interim claim process in place"), 6 ("failure to pay"), 7 ("failure to process"), 15 ("refusing to pay").  Yet, in just a 90-day period from August 23 to November 23, 2010, the GCCF paid ***$2.6 billion*** in Emergency Advance Payments, which are expressly a form of interim payment under the Act and, as of July 26, 2011, it had paid more than ***$250 million*** in additional Interim Payments.  Hence the factual as well as the legal cornerstones of Plaintiffs' case are faulty.[3]

We return to these points in the pages that follow.  We also demonstrate that (i) there is no basis for the accusation that the GCCF forces claimants to accept Quick Payment settlements

---

[3]     Notwithstanding that Plaintiffs filed their Supplemental Brief on July 25, 2011, they included as an exhibit and relied upon in support of their arguments the GCCF's publicly-available Overall Program Statistics report ***as of May 14, 2011***, more than two months earlier.  In that two-month period, the amount paid by the GCCF on Interim Claims more than doubled.

by making it hard to get Interim Payments; (ii) releases are essential to the OPA's goal of keeping the claims process out of court; (iii) what constitutes "presentment" under OPA in any particular case is a legal issue for the Court, not a Special Master, to decide at the appropriate time; and (iv) the GCCF has fully complied with both the letter and spirit of the Court's Order of February 2, 2011.

The appointment of a Special Master to supervise the GCCF is not only beyond the Court's power but also unnecessary, and, worse, would cause confusion and delay. By contrast, the GCCF has recently agreed with the Department of Justice to an independent audit to occur by year's end – an agreement that reflects the GCCF's ongoing commitment to transparency but will not impede the GCCF's progress in paying claimants.[4]

## I.
## NEITHER OPA NOR ANY OTHER STATUTE OR RULE EMPOWERS A COURT TO REGULATE THE OPA CLAIMS PROCESS

Under this same heading in the GCCF's February 18, 2011 brief, to which we respectfully refer the Court, we showed at pages 2 through 9 that there is "no legal basis for a court to exercise authority to prescribe the procedures, methodologies, or releases a responsible party, or a party to whom it delegates its claims processing responsibilities, must adopt under OPA." Feinberg 2/18/11 Br. at 2-3.[5] The brief submitted that same day by the United States reached the same conclusion. After describing OPA's statutory scheme, the United States noted that claims submitted to the National Pollution Fund Center ("NPFC") and paid by the Oil Spill Liability Trust Fund are subrogated to the Justice Department for pursuit against the responsible party. The United States then said:

---

[4]   *See* Appendix A (July 20, 2011 letter from U.S. Attorney General Eric Holder memorializing agreement to have independent audit).

[5]   For the Court's convenience a copy of our February 18th brief and the accompanying Declaration of Kenneth R. Feinberg appear at Appendix B.

The Responsible Party thus has incentives to resolve claims through its claims process, because any valid claims that it fails to settle will be pursued by the United States.  Similarly, claimants have the incentive to seek reasonable settlements from the Responsible Party, armed with the knowledge that they have a subsequent opportunity to submit their claim to the NPFC or in court if their claim is not resolved.

**The OPA leaves this extra-judicial claims settlement process largely in the parties' hands**.  While regulations provide considerable detail about procedures for submission of claims to the NPFC, **neither the OPA nor its implementing regulations provide similar requirements for private claims processes**.  Rather than dictating how and what specific claims parties must resolve, the OPA relies on its incentives – strict liability on the Responsible Parties, the backstop of the NPFC/Fund and the courts where resolution was not reached, and the clear benefits of expeditious out-of-court settlements – to encourage Responsible Parties to fairly compensate those harmed by an oil spill.

* * *

Finally, the OPA does not envision court management of a claims process. Rather, **the OPA claims process is intended as a mechanism by which parties may avoid litigation – not a mechanism that will generate litigation or open up new forum for disputes.**

Statement of the United States at 2-3 (emphasis added).[6]

Plaintiffs' latest filing adds nothing to the analysis.  They cite no OPA authority (statutory provision or decision) for the Court's supposed supervisory powers, and the class action cases they cite (Pltfs. Br. at 18) are irrelevant.  In *Sorrentino v. ASN Roosevelt Center LLC,* 584 F. Supp. 2d 529 (E.D.N.Y. 2008), which involved pre-class certification settlement offers by the defendant to members of the putative class, the court found "a risk of coercion" because of "ongoing business relationships" between the plaintiffs and the defendant, and on that ground directed the defendants to include in their settlement offer letters "a contemporaneous position letter" from plaintiffs' counsel "to ensure that the parties make an informed decision." *Id.* at 533.  Here, no plaintiff to our knowledge has an ongoing business relationship with the GCCF or BP which might make settlement offers from the GCCF coercive.  Moreover, in

---

[6]    Copy attached at Appendix C.

*Sorrentino* the court ruled that it was "without authority to review the content of the proposal" from the defendant.  *Id.*  The court explained that the settlement offers were "directed to individual members of a yet uncertified class" and a putative class action plaintiff "is without authority to prevent negotiation of settlements between the defendant and potential class members."  *Id.* at 534.  Thus that decision, recognizing the limits of judicial power, condemns rather than supports the idea of appointing a Special Master in this case to supervise the settlement process under OPA.

     *Abdallah v. The Coca-Cola Co.,* 186 F.R.D. 672 (N.D. Ga. 1999), upon which Plaintiffs also rely, is even farther afield.  The case had nothing to do with settlement agreements.  It was a purported class action alleging race discrimination by Coca-Cola against its African-American employees.  The court found "an inherent danger" that communications from Coca-Cola to those employees about the suit "could deter potential class members from participating in the suit out of concern for the effect that it could have on their jobs," and on that ground ordered Coca-Cola to include in its communications the advice that it "is unlawful for Coca-Cola to retaliate against employees who choose to participate in this case."  *Id.*  at 679.  Here, no relationship between the purported class members and the GCCF or BP would make communications about the class action suit from the GCCF inherently coercive on the question whether they should join the suit.  Thus *Abdallah* is no authority even for controlling the GCCF's communications with potential class members, least of all supervising its entire claims process.[7]

     There is, however, a more fundamental reason why the class action cases Plaintiffs cite are irrelevant.  OPA requires claimants to present their claims to a responsible party for a

---

[7]    *Abdallah* was distinguished by this Court in *EEOC v. TIC,* No. 01-1776, 2002 U.S. Dist. LEXIS 22728 (E.D. La. Nov. 21, 2002), as involving the need to protect purported class members "from the potential influences inherent in their employment status," whereas  "[n]on-employees are not subject to this inherent danger or concern for their jobs."  *Id.* at *17, 18.

possible settlement *before* they may file a lawsuit and, as the United States has correctly observed, "leaves this *extra-judicial* claims settlement process largely in the parties' hands."[8] Federal Rule of Civil Procedure 23(d) may grant a court certain limited powers to supervise certain communications between a defendant and purported class members after a class action has been filed, but it cannot be read to authorize courts to supervise the OPA settlement process, which Congress clearly intended to take place before a suit has been brought and without judicial intervention.  As we said in our February 18th brief, Rule 23(d) is not a general grant of judicial power over defendants in class actions, and no court to our knowledge has ever suggested that Rule 23 confers authority to oversee and regulate a party's compliance with a federal statute. Rather, Rule 23(d) "is a rule of procedure and creates no substantive rights or remedies enforceable in federal court."  *In re Baldwin-United Corp*., 770 F.2d 328, 335 (2d Cir. 1985) (citing *Piambino v. Bailey*, 610 F.2d 1306, 1331 (5th Cir. 1980)).

Accordingly, Plaintiffs offer no reason to contest the GCCF's and the United States' showing that no source of authority exists for this Court's supervision of the OPA pre-suit claims process, either directly or through a Special Master.  That should end the matter:  Plaintiffs' request for the appointment of a Special Master should be denied.

---

[8]    Appendix C, at 3 (emphasis added).

LIBW/1790869.4

## II.
## THE GCCF HAS PAID BILLIONS TO THOUSANDS OF INTERIM CLAIMANTS

The heart of Plaintiffs' position is that the GCCF has failed to pay interim claims and thereby violated a supposed OPA requirement that interim claims be paid.  Both the factual premise and the legal conclusion are incorrect, as we show below.

First, however, it may be useful briefly to review the GCCF claims programs.  The GCCF implemented the Emergency Advance Payment ("EAP") program on August 23, 2010.  The EAP program was itself an interim claims process that was designed to respond expeditiously to the nature of the circumstances and the massive number of claimants seeking emergency relief.[9]  It allowed claimants to receive emergency relief payments with a minimum of substantiating documentation and no release and was broader than OPA required.[10]

Starting in February 2011, claimants have had the option of filing an Interim Claim and/or a Final Claim.[11]  An Interim Claim seeks only past, substantiated damages.  No release is required to receive an Interim Payment.  Claimants may submit Interim Claims every calendar quarter (or more frequently in exigent circumstances) until the end of the GCCF program on August 22, 2013 (after which BP will receive claims directly).  Hence, claimants who prefer to see what actual damages they incur over the life of the GCCF program have the option to file multiple Interim Claims, as opposed to accepting in the near term a lump-sum Final Payment based on an estimate of future damages.

---

[9]  The Gulf Coast Claims Facility Protocol for Emergency Advance Payments expressly stated that "[a] claim for an Emergency Advance Payment is an interim claim under OPA."  *See*  ¶23, n.1 of the Feinberg Declaration accompanying GCCF's February 18 brief (App. B, *infra*), and Exhibit A thereto.

[10]  As the United States said in its February 18th brief, "the GCCF implemented an Emergency Advance Payment program, which is not specifically delineated in the OPA, that provided many individuals and some businesses with much needed funds on an expedited basis, and has made its claims process available for claimants who wish to resolve physical injury claims that are not covered by the OPA."  App. C at 5-6.

[11]  Claimants have been able to submit a Final Claim at any point in the program.

The GCCF provides two options for Final Payment claims, both of which require a release.[12]   The first is a Quick Payment Final Claim, which permits any claimant who has already been paid an EAP or an Interim Payment to receive an additional $5,000 per individual or $25,000 per business without additional documentation.  Mr. Feinberg designed this option – which is not required by OPA – to address the needs of those claimants who are satisfied with the EAP compensation they received and/or who lack further documentation to support additional claims.  Claimants receive Quick Payments within 14 days of the receipt of the signed release by the GCCF.  *See* Feinberg Declaration (App. B), ¶ 35.

The second Final Payment option is the Full Review Final Payment Claim, which covers all past and future losses or injuries and requires the claimant to substantiate the claim.  The GCCF relies on the documentation the claimant submits and analyses provided by GCCF experts to determine the proper amount of damages.  Claimants may choose this option even if they previously submitted a claim for and received one or more Interim Payments or an EAP.  *Id.*[13]

The EAP program instituted in August 2010 was an interim claim program under OPA.  Within just a few months of its creation, the GCCF made approximately 170,000 EAP payments totaling some ***$2.57 billion*** for which no releases were required.  The notion that the GCCF holds claims hostage to releases is conclusively refuted by this fact alone.

---

[12]    Physical injury and OPA claims are treated distinctly by the GCCF.  Claimants who settle their OPA claims do not release bodily injury claims and Claimants who settle their physical injury or death claims do not release OPA claims.

[13]    As noted above, the GCCF has processed over 97 percent of more than 900,000 claims submitted to it.  Plaintiffs say that the word "processing" as used by the GCCF is obscure (Pltfs. Br. at 6-7), but the GCCF explained the term in its April 18, 2011 Executive Summary *available at* http://www.gulfcoastclaimsfacility.com/press20.php:

> A claim is "processed" when the GCCF has made an offer of payment (to which the claimant has 90 days to respond), when the GCCF has made a payment, when the GCCF has sent a notice to the claimant of a deficiency in the proof and documentation submitted to substantiate the claim, or when the GCCF has sent a letter to the claimant denying the claim based on a finding by the GCCF that the claimant is not eligible for any compensation.

Plaintiffs' Exhibit A shows that, as of May 14, 2011, the GCCF had made Interim Payments to 10,587 claimants totaling $115,162,202.  By August 12, 2011, those numbers were 23,027 and $283,159,893, respectively.  Appendix D, *infra.*  Thus, in the 92 days between May 14th and August 12, the GCCF paid 12,440 Interim Claims totaling $167,997,691.

In short, in addition to paying over $2.5 billion in interim EAP payments in 2010, since mid-May the GCCF has been paying Interim Claims at the rate of nearly $2 million per day.  On this record, it is hard to grasp how the Plaintiffs can assert as a fact that the GCCF "has failed to provide interim relief" and "there is still no interim claim process in place."  Pltfs. Br. at 5.

### III.
### OPA DOES NOT REQUIRE THE PAYMENT OF INTERIM CLAIMS

Plaintiffs assert that the GCCF has disregarded "OPA's requirement to * * * pay interim claims," that Congress "required" payment of "immediate relief," that the GCCF has not provided "the required interim relief mandated by OPA," and that "OPA Requires BP To Pay Interim Claims."  Pltfs' Br. 1, 4, 4 12.  The idea that OPA requires the payment of interim claims is so obviously incorrect that it might have been ignored had the Plaintiffs not made it so central to their argument.

Congress doubtless intended that the OPA claims process would encourage the payment or settlement of claims, a doubly beneficial outcome that brings prompt relief to deserving claimants and relieves congested courts of added burdens.[14]  But no one could possibly suppose that Congress would enact (or that the Due Process Clause would abide) a law ***requiring*** a responsible party to pay an interim claim simply by virtue of its presentment.[15]

---

[14]  *See Johnson v. Colonial Pipeline Co.,* 830 F. Supp. 309, 311 (E.D. Va. 1993) ("The hope was to avoid costly and cumbersome litigation.").

[15]  The GCCF has received one claim for $20 billion and another for $10 billion.  Any analysis of what the GCCF has paid versus the total amount of all claims made is therefore a fruitless exercise.

In support of their view Plaintiffs cite only Section 1005(b) of OPA, 33 U.S.C. 2705(b).
Pltfs. Br. at 13.  That provision, entitled "Interest; partial payment of claims," provides in
subsection (a):

> The responsible party shall establish a procedure for the payment or
> settlement of claims for interim, short-term damages.  Payment or
> settlement of a claim for interim, short-term damages representing less
> than the full amount of damages to which the claimant ultimately may be
> entitled shall not preclude recovery by the claimant for damages not
> reflected in the paid or settled partial claim.

Nothing in that provision suggests that OPA requires the payment of interim claims.  Rather, the
provision must be read to call for the establishment of a process for the *consideration* of and
*possible* payment or settlement of those claims where the parties reach agreement.  Even if the
Constitution allowed it, reading Section 2705(b) to require the payment of those claims would be
forbidden by the text and context of the Act.

First, in speaking of both the payment *or settlement* of claims, Section 2705(b) itself
shows that Congress understood that the responsible party was not obliged to accept a claim as
presented but could offer a compromise and settle the claim accordingly.  Second, as the Court
knows, Section 2713 of the Act provides that all claims for damages must be presented first to
the responsible party and, if the responsible party denies liability or the claim is not settled
within 90 days of presentment, then "the claimant may elect to commence an action in court
against the responsible party " or "present the claim to the [Oil Spill] Fund."  Congress therefore
clearly intended that the responsible party might reject some claims outright and that the parties
might not be able to reach a settlement on other claims within 90 days, in which case litigation
might ensue.  Third, OPA contains no provision for the judicial review of a responsible party's
denial of a claim, an omission that would be unthinkable if the Act actually did require payment.

LIBW/1790869.4

The legislative history of the interim claims provision is also against Plaintiff's view. The provision was added to OPA by the Coast Guard Authorization Act of 1966.[16]  Experience with a spill off the coast of Rhode Island had raised concerns about the availability of interim payments and the ability of claimants to receive them without jeopardizing their entitlement to final payments as well.[17]  On October 2, 1996, Congressman Bud Shuster explained several sections proposed in the Act and said this about interim payments:

> These amendments make it clear that interim or partial claim payments are available for loss of profits or earning capacity under Oil Pollution Act.  The acceptance of such interim or partial payments will not prevent a claimant from recovering other damages to which he is entitled, but no double recovery by any claimant will be permitted.  This section clarifies the availability of partial or interim payments but does not, in any way, preclude a claimant from entering into a final settlement.[18]

Congressman Shuster's statement that interim payments will be "available" contains no hint that they will be mandatory; rather, adding the interim payment provision simply clarified that the payments could be made without threatening the claimant's ability to receive final payments as well.  Hence the legislative history of the interim payment provision supports the textual analysis leading to the conclusion that interim payments are not required.[19]

In sum, even if some legitimate source of authority did permit the Court to supervise the GCCF claims process, the Plaintiffs' alleged grounds for supervision – the supposed legal

---

[16]   Pub. L. No. 104-324, § 1142, 110 Stat. 3901, 3999, amending 33 U.S.C. 2705, 2713, 2714, 2715 (2007).

[17]   *See Oil Pollution Act Revision:  Hearing Before the Senate Environment and Public Works Committee*, 104 Cong. 16 (June 4, 1996), statement of Rear Admiral Jim Card, Chief of Marine Safety and Env't. Prot. for the Coast Guard, at 8; statement of Sidney J. Holbrook, Comm. Of the CT. Dep't. Env't. Prot.

[18]   *See* Congressional Record, Extension of Remarks, E1908 (Oct. 2, 1996).

[19]   *See also* Kenneth M. Murchison, *Liability Under the Oil Pollution Act: Current Law and Needed Revisions*, 71 La. L. Rev. 917, 948 (2011) (OPA as amended "includes almost nothing about the standards or procedures for paying" interim claims" and "[t]he result is uncertainty, ambiguity, and a lack of transparency regarding *how and when* claims will be paid.") (emphasis added).

requirement to pay interim claims and the GCCF's alleged failure to do so – are demonstrably incorrect in law and fact.

## IV.
## THE GCCF DOES NOT HOLD INTERIM CLAIMS HOSTAGE TO FINAL PAYMENTS

A recurring theme of Plaintiff's brief is that the GCCF is throwing up roadblocks to Interim Payment claimants to force them to accept Quick Payments and sign releases. *E.g.,* Pltfs. Br. at 11 ("GCCF is strategically and systematically forcing putative class members to accept quick payments with accompanying releases because they are offered no other viable option."). These allegations are made without a shred of evidentiary support beyond conclusory affidavits based on second-hand information and anecdotal newspaper reports about supposedly frustrated claimants who have accepted Quick Payments – inadmissible hearsay that provides no basis for reaching any conclusions about either the GCCF's motives or its operations.

Moreover, Plaintiff's supposed statistical evidence of the GCCF's allegedly coercive activities – that it pays of a higher percentage of Quick Payment claims than Interim Claims (Pltfs. Br. 2, 4, 5) – has a simple answer: Quick Payment Claims are almost presumptively payable. They require no substantiation other than proof that the claimant previously received an EAP or an Interim Payment. By contrast, an Interim Claim requires the claimant to document previous earnings and claimed losses, and can include fully documented claims, imperfectly documented claims, invalid claims, and fanciful claims. *See* pp. 7-8, *supra.* Hence one claim type presumes entitlement and is paid almost automatically while the other requires the careful attention of GCCF to ascertain whether it has satisfied certain prescribed minimum standards (as OPA contemplates, *see infra*).

Plaintiffs also fail to appreciate that the Quick Payment program provides an extraordinary and generous opportunity to claimants. It offers them the option to obtain $5,000

-12-

(for individuals) or $25,000 (for businesses) in full satisfaction of their remaining claims, even if the claimant cannot substantiate further losses (because of poor recordkeeping for example), or did not even incur further losses beyond those for which the claimant has already received compensation from either BP or the GCCF.  It is therefore unsurprising that more than 120,000 claimants have elected to take advantage of this program.  *See* Appendix D.

Plaintiffs' suggestion that only "[d]esperate people" elect a Quick Payment (Pltfs. Br. at 19) is made without any supporting evidence.  Moreover, Plaintiffs' position rests on the unproven assertion that some number of claimants have accepted Quick Payments when they might have received greater recoveries had they elected to pursue other claim options.  Even if this were true, it can be a perfectly rational decision to accept an assured short-term payment over a possibly larger but postponed long-term payment.  Threatened and pending lawsuits are routinely settled on the basis of such considerations, and those settlements are not subject to challenge on the ground that a party had a choice to make between accepting an early certain payment or waiting to see whether more might be received in the future.  Plaintiffs' unsupported supposition that the citizens of the Gulf are incapable of evaluating their options and making an informed decision to accept or reject the Quick Payment option is patronizing at best.

Plaintiffs also fail to appreciate that the Interim Claim program may be reasonably disfavored by claimants, for a number of reasons, such as (i) conditions in the Gulf appear to be improving and claimants cannot document quarterly damage, or (ii) claimants may have already been overpaid by the EAP program, or (ii) claimants know that any Interim Payment amount will be deducted from a Final Payment amount, or (iv) claimants prefer a Final Payment before the GCCF changes the Future Factor.[20]

---

[20]   Full Review Final Payments are currently made based, in part, on an *estimate* of potential future damage, called the Future Factor.  Oysterman claim are being paid 4 times, and all other claims are being paid 2 times, actual

Plaintiffs assert that the GCCF requirement that claimants document their Interim Payment claims is "confusing and daunting" and "burdensome and unrealistic" (Pltfs. Br. at 7, 9), and throughout their brief suggest that the GCCF sets an impossibly high documentation requirement so as to wear claimants out and "force putative class members to accept final payments and sign releases." *Id.* at 17.  But in fact the documentation requirement (which appears at Plaintiffs' Exhibit I) is simple and straightforward and asks for exactly what one would expect from an individual or business seeking recovery for damages caused by the spill. For an Interim Claim for lost earnings, for example, the claimant is asked to provide documents (1) "that establish your earnings history from January 1, 2008 to the present," and (2) "that establish the effects of the Spill on your earnings."  Documents in the first category include federal income tax returns or state tax returns, employment payroll records, or a letter or other records from an employer.  Documents in the second category include a letter from an employer establishing a lay-off or reduction in work, records of any replacement income during the relevant period, and, if the claimant was out of work during the period, documents showing an effort to find work (or excusing any effort).  There is nothing confusing about those requests, and it is hard to imagine how the GCCF could responsibly assess an Interim Claim with any less documentation.

---

2010 documented losses.  *See* the April18, 2010 GCCF Executive Summary, available at http://www.gulfcoastclaimsfacility.com/press20.php.  As the GCCF Final Rules dated February 18, 2011 state, "The Future Recovery Factor, as determined by the GCCF, may be modified going forward as more information becomes available about the future of the Gulf Coast economy.  It is, therefore, entirely possible that the Future Recovery Factor for determining the future impact of the Oil Spill in the Gulf will be increased or reduced as more information becomes available.  Claimants should take this possibility into account in deciding whether to file an Interim Payment Claim or a Final Payment Claim."  *See* p. 6 of the GCCF Final Rules Governing Payment Options etc., available at http://www.gulfcoastclaimsfacility.com/methodologylanding.

LIBW/1790869.4

The documentation requirement is also supported by OPA.  The OPA presentment requirement is designed to "promote settlement and avoid litigation," *Johnson v. Colonial Pipeline Company*, 830 F. Supp. 309, 311 (E.D. Va. 1993).  As the *Johnson* court explained:

> [T]he claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed.  Otherwise the responsible party will be unable to make an informed offer of its own, unable to engage in meaningful substantive negotiations, and thus unable to settle the matter by agreeing to a final amount.  Instead, the responsible party will have to ask for a more definite statement of the claim, as Colonial has done here, and the 90-day period will be spent trying to obtain basic information rather than actually negotiating a settlement.

*Id.*; *see also Abundiz v. Explorer Pipeline Co.*, No. 00-CV-2029, 2002 WL 2030880, at *2 (N.D. Tex. 2002) (following *Johnson*).

In short, there is no support for the accusation that the GCCF is purposefully making the Interim Payment process inhospitable so as to force claimants to accept a Quick Payment.  OPA anticipates that claimants will have to substantiate their claims, and the GCCF's documentation request is reasonable and straightforward.  It is, for that matter, far more simple and hospitable than the rules of evidence that would apply in a courtroom.

**V.**
**THE SUCCESS OF OPA'S CLAIMS PROCESS DEPENDS ON RELEASES**

Plaintiffs state that the releases that the GCCF requires for the payment of Final Claims "are invalid and should not be enforced," yet ask the Court to appoint a Special Master to "make findings and/or recommendations regarding the scope and/or efficacy of releases."  Pltfs. Br. at 1, 2.  No findings or recommendations are needed and the releases are both valid and essential to OPA's goal of resolving claims out of court.

The fundamental purpose of the claim presentation requirement is to provide early compensation and avoid litigation.  *See Boca Ciega Hotel, Inc. v. Bouchard Trans. Co*., 51 F.3d 235, 238-39 (11th Cir. 1995 (OPA reflects "a congressional desire to encourage settlement and

-15-

avoid litigation."); *Johnson,* 830 F. Supp. at 310-11 ("The purpose of the claim presentation procedure is to promote settlement and avoid litigation.").  The GCCF continues to fulfill these Congressional goals:  over 350,000 claimants have been paid billions of dollars in damages within months of the spill and many claims have been settled out of court.

Settlements by definition are designed to put an end to controversy and preclude further litigation, and are therefore invariably accompanied by releases.  We made the point at greater length in GCCF's February 18th brief, to which we respectfully refer the Court, along with the points that the Coast Guard also requires a release in settling claims against the Fund,[21] and that, without a full release, a claimant could pursue other responsible parties for damages who could then bring claims in subrogation against BP, producing additional litigation that OPA was designed to avert.  *See Davis v. Huskipower Outdoor Equip. Corp.*, 936 F.2d 193, 197 (5th Cir. 1991) ("Unless [plaintiff] released all possible defendants, the settlement agreement would abysmally fail to protect the named parties from liability" as the plaintiff could "later sue an unnamed party * * * and the unnamed party could then drag all the named parties back into the suit."); *Robin v. Binion*, 469 F. Supp. 2d 375, 384-87 (W.D. La. 2007) (release of "any and all claims" "known or unknown" should be enforced because not doing so would undermine the strong public policy favoring settlement).

Plaintiffs argue that the release "should be clear to a lay person" and should "contain necessary safeguards."  Pltfs. Br. at 19.  Without suggesting that the Court has power to design the GCCF release, in fact the release is clear and contains ample safeguards.[22]  Potential Quick Payment claimants are advised:  "**Do not elect the Quick Payment Final Claim process unless**

---

[21]   The Coast Guard does not require a general release of all potential claims, because, unlike the GCCF, the Coast Guard only pays for past damages, not future damages, and thus requiring a release of all claims would be unfair to claimants.

[22]   A sample appears at Exhibit C to the Feinberg Declaration (App. B).

**you are willing to accept the fixed payment of $5,000 for individuals and $25,000 for**

**businesses and to sign a full release of liability.  If you sign a release of liability, you will not**

**be able to seek further compensation from the GCCF, the Coast Guard, or in court**."[23]

Claimants are also instructed to "**Read the release and cover information page to the release**

**carefully.  Do not sign the release unless you fully understand and agree to all of its**

**terms**."[24]  Similar disclosures are repeated on the cover page of the release itself, which states:

> You are under no obligation to accept the final payment offered to you by the
> Gulf Coast Claims Facility.  You are free to reject the final payment offered by
> the Gulf Coast Claims Facility and to pursue other means of compensation.  If
> you want to file a lawsuit regarding the Incident or make a claim against the Oil
> Spill Liability Trust Fund, do not sign this Release.

The release also states:  "**If you are represented by an attorney in connection with your**

**claim, do not submit this Form or Sign the Release until you have conferred with your**

**attorney about the decision to submit it and sign the Release**."  *Id.*

Accordingly, there is no basis either for Plaintiffs' argument that the releases are invalid

under OPA, or for any concern that the releases are insufficiently clear or cautionary to claimants

contemplating final settlements.

## VI.
### THE PRESENTMENT ISSUE IS FOR THE COURT TO DECIDE
### WHEN IT IS PROPERLY PRESENTED, NOT FOR A SPECIAL MASTER'S
### FINDINGS AND RECOMMENDATIONS

Plaintiffs ask the Court to appoint a Special Master to "make findings and/or

recommendations regarding the satisfaction of OPA's presentment requirements."  Pltfs. Br. at 2,

20.  They argue that a Special Master is necessary because the GCCF's refusal to pay a claim

due to a documentation deficiency "leads many putative class members to wonder whether they

---

[23]   Summary of Options for Submission of Final and Interim Payment Claims, available at
www.gulfcoastclaimsfacility.com, at 1 (emphasis in original).

[24]   *Id.* at 2, ¶ A(3) (emphasis in original); *see also id.* at 3, ¶ B(8).)

have preserved their ability to sue BP in court." *Id.* at 7.  The Court should reject this request for a host of reasons (in addition to the fundamental reason that the Court has no authority to supervise the OPA claims process).

As discussed above, the purpose of the OPA presentment requirement is to "promote settlement and avoid litigation." *Johnson,* 830 F. Supp. at  310.  Using this central legislative purpose as a guide, courts have found that to satisfy the OPA presentment requirement a claimant must provide the responsible party with "enough information to accept the claim and make a payment that will settle the matter" or at least enough information for the responsible party "to formulate an offer of its own that might lead to settlement." *Id*. at 311; *see also Abundiz, supra,* at *2.  Accordingly, courts have ruled that to "present" a claim, a claimant must provide information to the responsible party that shows, with some specificity: (a) "the amount of monetary damages claimed" (a.k.a. "a sum certain"); and (b) "the nature and extent of the damages alleged." *Johnson*, 830 F. Supp. at 311; *see also Abundiz*, 2002 WL 2030880, at *3-4. The question of whether presentment has occurred is therefore a fact-specific analysis that must be analyzed based on the circumstances of each case.

The GCCF does not decide whether a given claim has been "presented" under OPA; it would not presume to usurp the Court's authority over that issue.[25]  Moreover, the GCCF has not designed its documentation requirements to equate to the presentment requirement under OPA (if

---

[25]  *See* Summary of GCCF Interest Policy (available at http://www.gulfcoastclaimsfacility.com/important) ("Because this [OPA presentment] standard is qualitative and does not provide a bright line that can be administratively applied in a uniform manner that will give claimants clear notice of the date that interest begins to accrue, the GCCF has determined that it will calculate and pay interest on all types of claims (EAP, Interim and Final) for past damages submitted to the GCCF under OPA from the 30th day after the claim is 'submitted' until the date the claim is 'paid.' This determination is based on administrative considerations and does not reflect the GCCF's view on when a claim is presented as a matter of law under OPA. * * * The GCCF will deem a claim 'submitted' for purposes of calculating interest on the date the claim form was received by the GCCF or BP, ***except*** the GCCF retains the discretion, in limited cases, where necessary in the interests of justice, to consider a claim 'submitted' for interest calculation purposes at a later date, *i.e.*, where the claim was submitted with such plainly deficient supporting documentation as to render it impossible for the GCCF to meaningfully review the claim.")

such an overarching, objective set of criteria applicable to all claims could even be established); rather, the GCCF's documentation requirement has been designed to be flexible and claimant-friendly.  A court-ordered mandate that the GCCF require that its documentation requirements satisfy the OPA presentment requirement might well create a ***higher*** burden for claimants to meet to substantiate their claims.

Additionally, an opinion by a Special Master regarding whether presentment has or has not occurred with respect to GCCF claims would be premature and unnecessary.  Not all GCCF claimants will sue BP in court (in large part because of the success of the GCCF in settling claims) and the question whether their claims were "presented" under OPA will therefore never arise.  In cases where GCCF claimants do sue, BP might or might not object on "presentment" grounds..  Each case in the end will turn on the specific facts of the plaintiff's documentation effort.

In short, this Court will have to decide each case on the basis of the presentation actually made.  Asking a Special Master today to ruminate and opine abstractly about OPA's presentment requirements would be a waste of time and effort, could not be adopted by the Court (which may not issue advisory opinions), and in the end would be worth no more to the Court than the parties' briefs on the specific issues presented as each case arises.

## VII.
## THE GCCF HAS FULLY COMPLIED WITH THIS COURT'S ORDER

Plaintiffs contend that the GCCF has "violate[ed] the spirit" of the Court's February 2, 2011 Order (Pltfs. Br. 1), and caption part I.E. of their brief with the same accusation (although the Court's Order is never mentioned therein).  Plaintiffs never cite any provision of the Order or explain how their complaints about the GCCF, even if true, would establish a violation of the Order's "spirit."

The Order required the GCCF to follow six specific directives concerning communications with claimants:  (1) to refrain from contacting claimants represented by counsel, (2) to refrain from saying that the GCCF is "neutral" or "independent" of BP, (3) to begin communications by advising that the claimant has the right to consult with counsel before accepting a settlement or signing a release, (4) to refrain from giving legal advice to claimants or advising them not to hire counsel, (5) to disclose to claimants their options under OPA if they do not accept a final payment, and (6) to advise claimants that the pro bono attorneys and community representatives retained to assist GCCF claimants are being compensated by BP. Feb. 2 Order, p. 14.

The GCCF fully implemented those directions, working closely with Special Master McGovern to ensure that it complied with both the letter *and* the spirit of the Order.  The unfounded accusation that the GCCF has supposedly violated the Order's "spirit" is no reason to consider appointing a Special Master to oversee the GCCF's administration of OPA's claims process.

## CONCLUSION

The Court is without authority to supervise the GCCF and, even if it were otherwise, Plaintiffs have not shown that supervision is necessary or even advisable.  Moreover, the GCCF is already effectively supervised by the Coast Guard and by several Committees of Congress, and it has voluntarily agreed with the Department of Justice to an independent audit of the OPA claims process.  Accordingly, Plaintiffs' request for the appointment of a Special Master should be denied.

August 15, 2011                          Respectfully submitted,
                                         _/s/ David B. Pitofsky_____
                                         David B. Pitofsky
                                         GOODWIN PROCTER LLP
                                         The New York Times Building
                                         620 Eighth Avenue
                                         New York, NY 10018-1405
                                         (212) 813-8800

                                         William F. Sheehan
                                         GOODWIN PROCTER LLP
                                         901 New York Avenue, NW
                                         Washington, DC 20001-4432
                                         (202) 346-4000

                                         *Counsel for Amicus Curiae Kenneth R. Feinberg as*
                                         *Claims Administrator of the Gulf Coast Claims*
                                         *Facility*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed this 15[h] day of April with the Clerk of the Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send notice of electronic filing in accordance with the procedures established in MDL 2179.

                                         _/s/ David B. Pitofsky_____