# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | |
| | * | SECTION J |
| | * | |
| | * | |
| This document relates to: | * | |
| | * | Honorable CARL J. BARBIER |
| *All Cases* | * | |
| | * | Magistrate Judge SHUSHAN |
| | * | |
| | * | |

## BP'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING SUPERVISION OF THE GCCF INTERIM CLAIMS PROCESS

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Catherine L. Fitzpatrick
Elizabeth A. Larsen
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:     (504) 581-7979
Facsimile:      (504) 556-4108


Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:     (202) 662-5985

*Attorneys for BP*

## TABLE OF CONTENTS

Introduction..................................................................................................................................1

Argument .....................................................................................................................................2

I.    The GCCF Claims Process Fully Complies with OPA. ...................................................2

     A.    BP and the GCCF Have Paid over $3 Billion in Interim Claims............................3

     B.    Quick Pay Complies with OPA. .............................................................................4

     C.    OPA Itself Contemplates that Not All Claimants Will Be Paid. .............................5

     D.    The Federal Government Has Overseen the GCCF Claims Process and
         Made Clear that Court Supervision Is Not Warranted Under OPA.........................6

II.   There Is No Evidentiary or Legal Basis for Court Intervention. .........................................9

     A.    Plaintiffs' "Evidence" Is Wholly Insufficient..........................................................9

         1.    Plaintiffs Misuse the GCCF's Statistics......................................................10

         2.    Plaintiffs' Hearsay Newspaper Articles and Affidavits Are Plainly
             Inadequate. ...................................................................................................11

     B.    Even If All of Plaintiffs' "Evidence" Were To Be Credited—Which
         Would Be Plainly Improper—It Does Not Warrant Court Intervention
         Under OPA, Rule 23, or Any Other Law..............................................................13

         1.    Supervision of the Extra-Judicial Claims Process Is Contrary to
             OPA................................................................................................................13

         2.    Rule 23 Does Not Permit Court Supervision of the OPA Claims
             Process. .........................................................................................................14

III.  Intervention Here Is Improper and Unnecessary. ............................................................18

     A.    The Relief Requested by Plaintiffs Would Result in Improper Advisory
         Opinions and Is Otherwise Imprudent. .................................................................18

     B.    Plaintiffs' Complaints about the Release and Other Issues Are Baseless as
         a Matter of Law......................................................................................................20

Conclusion ..................................................................................................................................23

## INTRODUCTION

The Gulf Coast Claims Facility ("GCCF") has paid out over $4.9 billion in total claims—*including more than $2.8 billion in interim claims*—to date.  In fulfilling its duties as a responsible party under OPA, BP, after reaching an agreement with the White House, transitioned the administration of the OPA claims process to the GCCF and its administrator, Mr. Kenneth Feinberg.  Since that transition occurred in August 2010, Mr. Feinberg and the GCCF have been faced with managing a claims facility of unrivaled scope and complexity.  As the unprecedented $4.9 billion in payments demonstrates, the GCCF has more than met the challenge and satisfied the requirements of OPA.

Despite these indisputable facts, plaintiffs contend that BP and the GCCF have violated "OPA's requirement to establish an interim claims process and to pay interim claims," as well as "the spirit" of the Court's February 2, 2011 Order and Reasons, and that the releases signed by OPA claimants "are invalid and should not be enforced."  (July 25, 2011 Supp. Br. at 1.) Plaintiffs are wrong—as a matter of law and fact—on every count.  Today, as before, plaintiffs' extraordinary request for Court supervision of the extra-judicial OPA claims process is plainly improper and should be rejected.

*First*, the GCCF claims process complies fully with OPA, including through the establishment of a robust interim claims process.  To date, the GCCF has paid over $2.8 billion in interim claims—payments for which no release has been required.

*Second*, plaintiffs have failed to establish any basis or authority for the extraordinary relief they seek.  Plaintiffs contend that this Court should supervise the extra-judicial OPA claims process even though OPA itself provides no authority or jurisdiction for the Court to do so.  Given this insurmountable problem, plaintiffs resort to seriously misstating the GCCF's record, misconstruing and attempting to re-write the plain language of OPA, and staking their

arguments on a few newspaper articles and hearsay affidavits—nearly every one of which lacks any meaningful detail about the OPA claims themselves or the GCCF's process.  To be clear, as of August 12, 2011, the GCCF had received more than 900,000 claims from more than 527,500 individuals and businesses.[1]  Against this, plaintiffs' barebones evidentiary submission says next to nothing about how that process operates.  Equally important, plaintiffs still do not come close to establishing the clear record necessary for this Court to grant *any* relief under Rule 23—let alone the wide-ranging, intrusive relief they seek.

*Third*, plaintiffs cannot show any violation of this Court's February 2, 2011 Order and Reasons.  (Doc. 1098.)  Indeed, plaintiffs do not identify a single term or provision of the Order that BP and the GCCF have not complied with since it was entered.

*Finally*, the relief plaintiffs seek is plainly improper and unnecessary.  To the extent plaintiffs raise any valid issues—which they do not—these issues will be decided in the ordinary course of litigation; in the meantime, the special master whose appointment plaintiffs seek would be able to do nothing but issue inappropriate advisory opinions on matters that are not (and may never be) ripe.  In addition, plaintiffs' arguments about the release, duress, and presentment are wholly without legal merit.  Relief here would be contrary to OPA and the Federal Rules, and should be denied.

## ARGUMENT

### I.   THE GCCF CLAIMS PROCESS FULLY COMPLIES WITH OPA.

At all times, the GCCF claims process has fully complied with OPA.  As BP previously explained, a responsible party complies with OPA if it establishes a process whereby claims are presented to that party.  (*See* BP's Feb. 18, 2011 Supp. Mem. (Doc. 1330) at 5.)   If the

---

[1]   Ex. 1, Declaration of Andrew B. Bloomer, Ex. A (August 12, 2011 GCCF Status Report).

responsible party denies an OPA claim or fails to settle it to the claimant's satisfaction within 90 days, the claimant may sue, but Congress left to the responsible party decisions about the particular process to employ.  As the United States has observed in these proceedings: "The ***OPA leaves this extra-judicial claims settlement process largely in the parties' hands***.  While regulations provide considerable detail about procedures for submission of claims to the NPFC [National Pollution Funds Center], ***neither the OPA nor its implementing regulations provide similar requirements for private claims processes***."  (Feb. 18, 2011 Statement of U.S. (Doc. 1322) at 2 (emphasis added).)  This is Congress's plainly expressed intent.

BP fully complied with OPA by first establishing its own claims process, under which it paid nearly $400 million in claims.  The White House and BP then agreed to appoint Mr. Kenneth Feinberg (who established the GCCF) to administer BP's OPA claims process and make independent claims decisions.  Since taking over the process, the GCCF has paid over ***$4.9 billion*** to Gulf State individuals and businesses.[2]  Plaintiffs' assertion that BP has failed to establish an OPA-compliant claims process is thus directly contradicted by the record.

### A.    BP and the GCCF Have Paid over $3 Billion in Interim Claims.

The interim claims payment history is robust, and plaintiffs' assertions that the GCCF has not established an interim claims process or paid interim claims is flat wrong: interim claims have been and are being paid.  The entire $2.58 billion paid by the GCCF in Emergency Advanced Payments consisted entirely of interim payments, and BP paid nearly $400 million in additional interim claims before the GCCF assumed administration of the OPA claims process in August 2010.  BP has explained these interim payments clearly in its previous briefing (Doc. 1330 at 6), but plaintiffs continue simply to ignore this fact, as well as the fact that the GCCF has

---

[2]    Bloomer Decl., Ex. A (August 12, 2011 GCCF Status Report).

paid an additional $283 million in interim claims as of August 12, 2011.[3]  Plaintiffs do not explain why in their view interim payments of over $3 billion do not count.

Not content with ignoring the entire EAP program, plaintiffs attempt to further minimize the GCCF's significant interim claims payments by relying on stale figures that were already ***two months out of date*** when plaintiffs filed their supplemental brief.  (*See* July 25, 2011 Supp. Br. at 2, 5-6 (citing the GCCF's May 14, 2011 status report); *see also id.* at 6 (citing the GCCF's June 1, 2011 status report).)  More recent figures were available to plaintiffs; the GCCF updates the figures on its website at least every few days.  But using the older figures allowed plaintiffs to ignore more than $100 million in interim payments made between May 14, 2011 and the date of their filing.[4]  That plaintiffs would not even bother to present current GCCF figures to the Court is telling, and along with plaintiffs' failure to acknowledge the interim EAP payments underscores the fatal problem with their request for relief: it is the proverbial solution in search of a problem.

### B.      Quick Pay Complies with OPA.

Plaintiffs continue to complain that the GCCF has processed Quick Pay claims more swiftly than interim claims.  Of course, by their very nature Quick Pay claims can be processed almost immediately because they require no further substantiation or support.  Quick Pay is appropriate for plaintiffs who cannot show losses for longer periods of time or who are close to or have fully recovered from any losses following the spill.  Moreover, accepting a Quick Pay is entirely voluntary and simply one option available to claimants; if claimants do not like that

---

[3]   *Id.*

[4]   Bloomer Decl., Ex. B (excerpt from July 26, 2011 GCCF Status Report) (showing $256 million in interim payments as of July 26); *cf.* July 25, 2011 Supp. Br., Ex. A (showing $115 million in interim payments as of May 14).  Given this healthy interim claims process, plaintiffs' focus on the legislative history and the amendments to OPA concerning interim payments does not help them; the GCCF has established an interim claims process and is paying interim claims (and not requiring releases for such payments) in accordance with OPA.

option, they are free to continue filing for interim claims or to file for a full final payment. Having options is the opposite of duress or coercion, and dooms any such claim.

### C.      OPA Itself Contemplates that Not All Claimants Will Be Paid.

On its face, OPA only requires the responsible party to establish a process "by which claims may be presented" (including claims for "interim, short-term damages") and to publicize that process through advertisements approved by the Coast Guard.  33 U.S.C. §§ 2714(b)(1), 2705.  Claimants, in turn, must present their claims to the responsible party as a mandatory condition precedent to filing suit.  *Id.* § 2713(a).  If the responsible party denies the claim or does not pay it within 90 days, the claimant may either sue the responsible party or file a claim with the federal Oil Spill Liability Trust Fund (the "Fund").  *Id.* § 2713(c).

Since OPA specifies what damages are eligible for payment, it clearly does not require that a responsible party pay any and all claims that it receives.  Some claimants will not be able to substantiate their claims for OPA compensable damages, connect their alleged damages to the oil spill, or provide a sum certain as required by OPA.  Others may not have any documentation or will have greater difficulty providing documentation (due to, for example, the prevalence of a cash economy in certain industries).[5]  Plaintiffs ignore these undeniable facts.

Given the substantial number of claims submitted to the GCCF, it is to be expected that many claimants will submit unmeritorious claims, or claims that do not set forth a sum certain or cannot be substantiated, while many other claimants will simply disagree with or dispute the GCCF's claims decisions.  The experience of the National Pollution Funds Center ("NPFC") confirms these realities.  The NPFC has independently reviewed claims submitted by dissatisfied

---

[5]      The GCCF provides various alternatives for claimants to prove their losses.  For example, although federal income tax returns are used to demonstrate an individual's past earnings, the GCCF permits claimants who do not have such returns to establish their earning history in other ways, such as with a letter from the claimant's employer providing that information.  (July 25, 2011 Supp. Br., Ex. I (GCCF Documentation Requirements).)

GCCF claimants and arrived at the same decisions as the GCCF, denying every one of the 538 claims for which it issued determinations as of March 31, 2011 (the most recent available data). The NPFC's denials break down as follows: 39% for failure to prove that the alleged damages were the result of the spill, 34% for lack of documentation, 10% for failure to prove damages, and the remaining for various other reasons.[6]  Moreover, there is no reason to think that the claims filed with the NPFC are unrepresentative of claims as a whole; indeed, if any conclusion can be drawn, it is likely that the claimants who pursue relief from the NPFC have greater faith in the strength of their claims.[7]

For those dissatisfied with the GCCF's process, Congress specified the only remedies: those claimants may file a claim with the Fund or sue the responsible party in court for OPA damages.  OPA neither provides for nor allows court involvement or intervention in the extra-judicial claims process.

**D.     The Federal Government Has Overseen the GCCF Claims Process and Made Clear that Court Supervision Is Not Warranted Under OPA.**

In its February 18, 2011 Statement in response to the Court's February 2 Order requesting briefing, the United States explained some of the ways in which Federal agencies and officials have been involved in overseeing the GCCF process.  First, OPA provides for direct oversight of a responsible party's advertising of its claims process:

> "The most extensive governmental oversight provided by the statute is in the advertising procedures…. The NPFC thus reviews proposed advertisements of claims processes under this statute, both to ensure that the process is advertised adequately, so that

---

[6]    *See* Bloomer Decl., Ex. C (Government Accountability Office, *Deepwater Horizon Oil Spill: Update on Federal Financial Risks and Claim Processing* 26 (April 18, 2011)).

[7]    Plaintiffs also complain about the GCCF's documentation requirements, but they propose no workable alternative.  It goes without saying that the GCCF must require substantiation before paying claims.  The GCCF requests additional information when a claim is unsubstantiated or deficient, thereby giving claimants the opportunity to remedy any deficiency.  It is difficult to understand why the plaintiffs assert that a request for information is wrongful when the alternative would be denial of the claim for insufficient documentation.

> claimants know about the opportunity to settle their claims, and to ensure that the process is advertised accurately, so that claimants are able to make informed decisions about whether to settle their claims."

(Feb. 18, 2011 Statement of the U.S. (Doc. 1322) at 3.)

Second, given the magnitude of the *Deepwater Horizon* spill, the Federal Government took on additional responsibilities in guiding the OPA claims process.  In this regard, the President and his administration were involved in the decision to establish the GCCF and appoint Mr. Feinberg:

> "[T]he Administration called on BP, as a Responsible Party for the oil spill, to take action to address these immediate and significant public concerns.  Following a meeting with the President on June 16, 2010, BP agreed to take actions to ensure that it could not renege on its commitments, that funds would be available to pay legitimate claimants, and that the people of the Gulf would have the opportunity to have their claims decided by an arbiter who was not controlled by BP.  Thus, BP agreed to establish a fund of $20 billion, backed by collateral to ensure the availability of such funds, and to hand over the keys to its claims process to a third-party claims administrator, Kenneth Feinberg, authorized to spend BP's funds with independent decision-making authority."

*Id.* at 4.

Third, the United States noted that it has provided oversight in accordance with OPA and the discretion that the statute places in the hands of the responsible party to manage the claims process:

> "Since the announcement that BP had relinquished control of its statutorily mandated claims process, the United States has worked closely with its state partners, stakeholders throughout the region, and BP itself to ensure that the GCCF fulfills BP's statutory obligations and its other commitments.  The United States has advocated numerous times for changes in the protocols or approach of the GCCF, either to ensure compliance with the OPA or to address perceived problems of fairness, lack of transparency, or failure of customer service.  As with any independent claims administrator — albeit to a lesser degree than would be expected of a Responsible Party charged with spending its own money —

there have been some suggestions that the GCCF has rejected.  In addition, however, the GCCF has taken a number of actions not contemplated by the OPA (but not inconsistent with the OPA) in an attempt to deal with the massive impact of the Deepwater Horizon tragedy.   For example, the GCCF implemented an Emergency Advance Payment program, which is not specifically delineated in the OPA, that provided many individuals and some businesses with much needed funds on an expedited basis, and has made its claims process available for claimants who wish to resolve physical injury claims that are not covered by the OPA."

*Id.* at 5-6.  The United States also committed that it would "continue to take whatever actions it can to ensure that the GCCF fairly and efficiently responds to and compensates claimants harmed as a result of the Deepwater Horizon tragedy." (*Id.* at 7.)  Indeed, in a letter issued less than one month ago, Attorney General Eric H. Holder, Jr. told Mr. Feinberg: "I note the GCCF's progress in the face of nearly one million claims filed and appreciate your efforts.  The GCCF's work continues to be critical, and we will continue to hold it to the highest standards of efficiency, consistency, and customer service."  (Bloomer Decl., Ex. D (July 20, 2011 Letter from Attorney General Holder to Mr. Feinberg) ("Holder Letter").)

Fourth, the United States has recognized that court management of the OPA claims process is not contemplated under the statute:

> "Finally, the ***OPA does not envision court management of a claims process***.  Rather, the OPA claims process is intended as a mechanism by which parties may avoid litigation — not a mechanism that will generate litigation or open up new forum[s] for disputes.  Indeed, the ***OPA envisions a court's coming into play only if a claimant invokes it after failing to receive a satisfactory resolution from the Responsible Party***."

Feb. 18, 2011 Statement of the U.S. (Doc. 1322) at 3 (emphasis added).

Finally, the GCCF and the U.S. Department of Justice have agreed that, in the interest of even more transparency, there will be an independent audit of the GCCF claims process.  Because the GCCF continues to receive thousands of claims per week, the audit will be

conducted later this year, after the claims process has slowed to the extent that the audit will not disrupt the timely processing of claims.  (Bloomer Decl., Ex. D (Holder letter).)  This additional oversight from the Federal government confirms that there is no basis or need for the Court to intervene in the OPA claims process.

## II.     THERE IS NO EVIDENTIARY OR LEGAL BASIS FOR COURT INTERVENTION.

In their motion for leave to file a supplemental brief, plaintiffs claimed "that the past five months of experience with BP's Gulf Coast Claims Facility claims process has shed new and additional light on several of the issues in which the Court specifically expressed an interest in its February 2, 2011 Order," and that its supplemental brief "provides further support for abuses in the BP claims process which adversely affect plaintiffs and putative class members."  (July 25, 2011 Mot. (Doc. 3445).)  On the contrary, the meager evidence mustered by plaintiffs over the past five months establishes that there is *no basis* for court intervention.

### A.      Plaintiffs' "Evidence" Is Wholly Insufficient.

Plaintiffs present three general categories of information that, they contend, demonstrate "systemic problems" with the GCCF: (1) the GCCF's statistics on payments, which plaintiffs distort in an attempt to turn the GCCF's payment of $4.9 billion in total claims (including over $2.8 billion in interim claims)—an amount unprecedented in the history of OPA—into a failure and a "violation" of that statute; (2) unsworn criticisms of the GCCF in news stories, many of which do not come from claimants themselves; and (3) a few affidavits, most of which are not submitted by claimants, are rife with hearsay, fail to describe the specifics of any claim or the claims process, and fail even to aver that a claim satisfied OPA's presentment requirements.  Such "evidence"—almost all of it inadmissible under the Federal Rules—whether considered

alone or in connection with plaintiffs' prior submissions, falls far short of establishing "systemic" flaws in the GCCF claims process, much less a violation of OPA.

        1.      Plaintiffs Misuse the GCCF's Statistics.

The GCCF and BP have together paid well over $3 billion in interim claims.  (*See* Section I.A, *supra*.)  Such a number itself indicates a healthy interim claims process.  Unable to refute such payments (all of which were made without any release of claims), plaintiffs simply ignore them.  But the Court cannot; these payments put the lie to plaintiffs' argument that "BP is in violation of OPA's requirement to establish an interim claims process and to pay interim claims."  (July 25, 2011 Supp. Br. at 1.)

Plaintiffs also rely heavily on the ***percentage of interim claims that have not been paid***. (*See id.* at 5 ("As of late May 2011, GCCF has failed to pay 86.4% of interim claimants.").)  This is statistical butchery of the worst sort, ignoring the fact that a high percentage—94%—of interim claims have in fact been ***reviewed*** by the GCCF.[8]  Contrary to plaintiffs' suggestion, the bare percentage of unpaid claims says nothing about whether claims were improperly denied or delayed.  As would be expected in a claims facility of the GCCF's scope, not all reviewed claims were paid; some claims were either denied (97,702 out of 311,123 reviewed interim and final claims (31%)), remain pending due to a request for additional information from claimants (19,104 interim and final claims) (6%)), or resulted in a determination that no loss had been shown (10,821 interim and final claims (3%)).[9]  Moreover, although plaintiffs insinuate that many interim claims have been pending since February 2011 or earlier (July 25, 2011 Supp. Br. at 5), they have no evidence to support this assertion.  The GCCF continually processes claims, including new claims it receives.

---

[8]    Bloomer Decl., Ex. A (August 12, 2011 GCCF Statistics) (87,540 out of 92,788).

[9]    *Id.*  In reporting the review status of claims, the GCCF does not distinguish between interim and final claims.

> 2.     Plaintiffs' Hearsay Newspaper Articles and Affidavits Are Plainly Inadequate.

Plaintiffs attach a few news stories to their brief.  On their face, these unsworn accounts do not show "systemic problems" with the GCCF, let alone provide competent evidence that can support plaintiffs' requested relief.  While some articles purport to contain criticisms from actual claimants, it is, of course, impossible to discern the full specifics of their claims (Ex. F, Ex. N, Ex. Q); others only report the criticisms of Alabama Attorney General Luther Strange (Ex. O), or profess to "delve into the data" on the GCCF's website.  (Ex. P.)  Some of the articles date from relatively early in the claims process (*e.g.*, Ex. F (February 6, 2011 (prior to the last round of briefing on the GCCF); Ex. O (March 21, 2011)), and nearly all of them date from April 2011 or earlier, thus providing no information about the current status of claims, over three months later. In sum, plaintiffs' articles are thin evidentiary gruel.

Plaintiffs also attach four affidavits, which do not even hint at "systemic problems" in the GCCF process.  Three affidavits are from administrators of organizations purporting to assist or represent certain groups of Gulf State residents: two from not-for-profit organizations that provide assistance to Vietnamese Americans and a third from the Louisiana Oysterman's Association.  (July 25, 2011 Supp. Br., Exs. J, K, L.)  The organization affiants claim that they are aware of few or no offers of interim claim payments to claimants represented or assisted by the organizations, but do not describe or discuss the complete picture of any claim.  Beyond this, the organization affiants offer only vague hearsay assertions that some unidentified claimants were allegedly "forced" to accept the GCCF's Quick Pay option.  They do not explain how or why.  Indeed, they do not identify any individual claimants or provide sufficient information to determine whether he or she submitted a claim that complied with OPA's requirements.  These inadmissible, incomplete, and secondhand descriptions of unidentified claims do not even

11

provide enough information to draw any conclusion about any particular claimant's situation, let alone demonstrate any "systemic problems" with the GCCF's process.[10]

Finally, plaintiffs submit a single affidavit from a claimant who allegedly submitted an OPA claim for more than $750,000 in removal costs (not yet incurred) related to oil allegedly contaminating a recreational fishing camp owned by the affiant and others.  (*Id.*, Ex. M.)  OPA, however, covers only "removal costs ***incurred*** by any person for acts taken by the person which are ***consistent with the National Contingency Plan***."  33 U.S.C. § 2702(b)(1)(B) (emphasis added).  The affidavit gives no indication that the claimant's remediation proposals were consistent with the National Contingency Plan or that the claimant had even consulted with the Federal On-Scene Coordinator regarding his removal proposal.  (*See* July 25, 2011 Supp. Br., Ex. I (GCCF's Documentation Requirements) (noting that "Claimants must establish that the Removal and Clean Up action was approved by the Federal On-Scene Coordinator or was consistent with the National Contingency Plan").)  Moreover, the affidavit reveals that removal costs had been merely contemplated, rather than actually ***incurred***, as the statute requires.  Nevertheless, according to the affidavit, the GCCF mishandled the claim by making multiple requests for already-submitted documentation and misidentifying the claim as a lost income claim.  Even giving full credit to this account, it provides no support for (and has nothing to do with) plaintiffs' contention that "the GCCF is strategically and systematically forcing putative class members to accept quick payments with accompanying releases because they are offered

---

[10]   The affidavits from the organization representatives also present a clear problem of selection bias: the claimants who come to the organization for assistance or make their complaints known to the organization are the very claimants most likely to be dissatisfied with the GCCF; conversely, claimants satisfied with the GCCF claims process are much less likely to seek out such organizations (or relate their stories to media outlets).  (*See, e.g.*, July 25, 2011 Supp. Br., Ex. K ("Not a single person, ***of the several dozen who have come to BPSOS seeking out help***, was actually offered any amount for an interim payment.  In fact, they have been told that they are not owed additional amounts, that they are owed very little, or that they produced insufficient documentation.") (emphasis added).)

no other viable option." (July 25, 2011 Supp. Br. at 11.) In any event, there is no basis for concluding that the circumstances of this particular incident illustrate a "systemic" problem. Indeed, in a claimant pool of more than 527,500 claimants as of August 12, 2011, the few affidavits submitted by plaintiffs—such as they are—are almost meaningless. Plaintiffs' failure to provide even minimally competent evidence supporting their various unsupported claims exposes the critical flaws in their position.

**B.     Even If All of Plaintiffs' "Evidence" Were To Be Credited—Which Would Be Plainly Improper—It Does Not Warrant Court Intervention Under OPA, Rule 23, or Any Other Law.**

1.     Supervision of the Extra-Judicial Claims Process Is Contrary to OPA.

The relief plaintiffs seek—appointment of a special master to run virtually every aspect of the GCCF claims process—has no basis in OPA and would subvert the Act's very purpose, which is to provide an opportunity to resolve claims without litigation. Such relief would convert the extra-judicial claims process specified by Congress into a judicially supervised process that provides parties and nonparties alike the opportunity to review and second guess claims decisions, thereby subjecting every aspect of the process to litigation, delay, and disruption—a scheme that Congress *rejected*. *See* 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) ("The system of liability and compensation provided for in the bill…is *intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation*.") (Statement of Rep. Hammerschmidt) (emphasis added).

OPA instead specifies a particular role for the courts. If the responsible party denies or does not settle a claim to claimant's satisfaction within a 90 day period, the claimant may either

13

sue the responsible party or bring a claim against the Fund.  *See* 33 U.S.C. § 2713(c).  That is the only judicial relief Congress afforded to claimants.[11]

In its previous filing, the United States agreed that "***OPA does not envision court management of a claims process***" and that "OPA envisions a court's coming into play only if a claimant invokes it after failing to receive a satisfactory resolution from the Responsible Party." (Feb. 18, 2011 Statement of U.S. (Doc. 1322) at 3 (emphasis added).)  In sum, this Court simply has no jurisdiction or authority to "supervise" the GCCF's OPA claims process.

2.    Rule 23 Does Not Permit Court Supervision of the OPA Claims Process.

In *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981), the Supreme Court held that a Rule 23 order "should be based on a clear record and specific findings."[12]  Plaintiffs' submission does not come close to establishing such a record.  *See Gates v. Cook,* 234 F.3d 221, 227 (5th Cir. 2000) (vacating, as contrary to "the principles enunciated in *Gulf Oil Co. v. Bernard,* 452 U.S. 89 [(1981)]," a no-contact order entered without specific evidence "establish[ing] the necessity for the order"); *Basco v. Wal-Mart Stores, Inc.,* No. Civ. A. 00-3184, 2002 WL 272384, at *4 (E.D. La. Feb. 25, 2002) (denying limitation on communications despite ongoing employer-employee relationship when plaintiffs "provided no evidence, other than speculation" of coercion); *Lee v. Am. Airlines, Inc.,* No. Civ. A. 3:01-CV-1179-P, 2002 WL 226347, at *2 (N.D. Tex. Feb. 12, 2002) (denying request to impose conditions when plaintiff failed to prove that "Defendant has

---

[11]   In addition, as BP has previously explained, no lawsuit asserting an OPA claim is permissible until the presentment requirement has been satisfied.  Plaintiffs do not claim that they have fulfilled that requirement, and certainly cannot meet that requirement on a class-wide basis.  (*See* Section III of BP's Feb. 18, 2011 Supp. Mem. (Doc.1330) for additional discussion of why OPA and Rule 23 do not permit court supervision of the claims process.)

[12]   Although *Gulf Oil* involved limitations on a party's speech, implicating First Amendment concerns, its holding, which explicitly did not rest on constitutional grounds, is equally applicable here.  First, plaintiffs continue to seek supervision of the GCCF's communications to "ensure accurate and appropriate communications with claimants."  (July 25, 2011 Supp. Br. at 20.)  Second, the holding in *Gulf Oil* extends to all orders under Rule 23.  The Court noted that only "a determination [based on a clear record and specific findings] can ensure that the court is furthering, rather than hindering, ***the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23***."  *Id.* at 102.

engaged in any abusive or unethical communications with the potential class members"); *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239, 245 (E.D. Tex. 1997) ("Without evidence of coercion, misleading statements, or efforts to undermine the purposes of Rule 23, the court cannot make the proper findings required by the Supreme Court in *Gulf Oil Co. v. Bernard*.").

Even if limited supervision of communications may be permitted on a lesser showing, the relief plaintiffs now seek is much more intrusive. This is especially true where, as here, no class has been certified. While courts possess some powers even before class certification, those powers are much more limited, and consequently a greater showing is required to empower the court to act. Plaintiffs' cases are not to the contrary; indeed, ***none*** of them grant the sort of extraordinary relief plaintiffs seek, including the vitiation of releases. In *Sorrentino v. ASN Roosevelt Center LLC,* 584 F. Supp. 2d 529, 532 (E.D.N.Y. 2008), for example, the court ***refused to grant exactly the sort of relief plaintiffs seek*** here. While the court did order that "a contemporaneous position letter" authored by plaintiffs be mailed with the defendant's settlement proposals "to ensure that the parties make an informed decision," the court specifically held that "it ***cannot regulate the content of the defendant's offer***" and "is ***without authority to review the content of the [settlement] proposal***." *Id.* at 533 (emphasis added). The reason is that Rule 23 only authorizes federal courts to review settlements in a ***certified*** class action, not settlements with putative members of an ***uncertified*** class:

> "[A] putative class action plaintiff has no legally protected right to sue on behalf of others and is without authority to prevent negotiation of settlements between the defendant and potential [class] members,…[as] 'it is only the settlement of the class action itself without court approval that [Rule 23] prohibits.' … Indeed, the proposed settlement offer and notices here are directed to individual members of a yet uncertified class. ***This is not a class settlement as contemplated by Rule 23 and would have no binding effect on members of the class who reject the settlement***

*offer. Accordingly, the Court cannot re-write the terms of the defendants' proposal.*"

*Id.* at 534 (quoting *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.*, 455 F.2d 770, 773, 775 (2d Cir. 1972) (emphasis added)). The court thus concluded that it "**will not attempt to restructure the defendants' offer**." *Id.* (emphasis added); *see also Turner v. Murphy Oil*, Civ. A. No. 05-4206 (E.D. La. Nov. 14, 2005) (Dkt. #39), at 11, (BP's Feb. 18, 2011 Supp. Mem. (Doc. 1330), Ex. 1, Bloomer Decl. Tab C) (declining to rule on plaintiffs' complaints about the validity of the Settlement and Release Agreement, and holding simply that it "should contain a statement [such as the GCCF releases already contain] that the individual signing the agreement should seek independent legal advice prior to any settlement or waiver of his or her legal rights"); *Rothe v. Wayzata Nissan LLC*, No. Civ. 02-3233, 2003 WL 21181343, at *1 (D. Minn. May 14, 2003) (Boylan, M.J.) (rejecting motion seeking, among other things, "nullification" of releases obtained by defendant from members of a putative class in exchange for settlement payments of $1,000; where no class had been certified, "[e]ach prospective plaintiff was at the time, and still is, a free agent who should be entitled to settle with the defendant").

Although some courts in other circuits have slightly relaxed the need for evidence that an abuse has actually occurred, they have only done so "where there is a relationship that is **inherently coercive**." *Sorrentino*, 584 F. Supp. 2d at 532 (emphasis added). Even then, however, the court "must still require a **clear record** of **threatened abuses**." *Id.* (emphasis added); *Burrell*, 176 F.R.D. at 244 ("[T]he cases do not eradicate the requirement of a clear record of the *threatened* abuses.") (citing *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1205 (11th Cir. 1985) (emphasis in original). BP acknowledges that, as the Court noted in its February 2 Order, "OPA itself mandates that claimants must first present their claims to BP as

16

the responsible party, thereby requiring **ongoing contact between the parties**."  (Feb. 2, 2011 Order at 12 (Doc. 1098) (emphasis added).)  BP respectfully submits that given the choices available to claimants, including the right to sue or appeal to the Fund, any ongoing contact between GCCF and the OPA claimants (as required by the statute) is not—and cannot be— "inherently coercive," as the law requires.  Unlike the separate pre-existing and ongoing relationships at issue in plaintiffs' cases (*e.g.*, employee/employer), the putative class members here do not have any involvement with the GCCF **apart from the claims process itself**.  As a result, claimants are not dependent upon the GCCF for a future relationship or contacts that will continue after the claims process is complete.  *Cf. Sorrentino,* 584 F. Supp. 2d at 533 ("[I]n light of the previous landlord-tenant relationship between the defendants and the former residents of the Westbury Complex and the impending offer to return, the Court finds a risk of coercion.  If the class members choose to return, **they will be dependent on the defendants** to obtain an apartment in the first instance, and, also, for priority selection of suitable dwelling units, lease terms, and **future services**.") (emphasis added); *Kleiner*, 751 F.2d at 1202 ("The class consisted of Bank borrowers, many of whom **were dependent on the Bank for future financing** … or [for] any type of discretionary financial indulgence from their loan officers, and who did not have convenient access to other credit sources.") (emphasis added); *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 678-79 (N.D. Ga. 1999) (finding danger of coercion given employer-employee relationship due to "concern for the effect [participating in the lawsuit] could have on [putative class members'] jobs").[13]  Regardless, plaintiffs have not demonstrated any record of threatened

---

[13]   Plaintiffs may suggest that the relationship between the claimants and the GCCF is inherently coercive because some plaintiffs are facing difficult financial circumstances, and may therefore feel "coerced" into taking the Quick Pay settlement.  If this sort of coercion were sufficient under the case law, every case where defendants are engaging in ongoing settlement negotiations with putative class members would involve coercion; but that is not what the case law holds.  Courts instead look for an ***ongoing relationship that will (or may) continue after the settlement, forcing the parties to continue to interact,*** *e.g.*, the relationship between an employee and

abuses here, much less a "clear record," so the intervention they seek—which also goes well beyond the limited regulation of communications permitted under Rule 23—is plainly unwarranted.[14]

## III.    INTERVENTION HERE IS IMPROPER AND UNNECESSARY.

Even if plaintiffs' requested relief were authorized under OPA or Rule 23—which it is not—or if plaintiffs had presented any evidence of OPA violations or "systemic problems" with the GCCF—which they have not—intervention here would still be improper and unnecessary.

### A.    The Relief Requested by Plaintiffs Would Result in Improper Advisory Opinions and Is Otherwise Imprudent.

Plaintiffs seek appointment of a special master with broad supervisory powers over the GCCF to: "(i) assure compliance with OPA; (ii) ensure accurate and appropriate communications with claimants; (iii) make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements; and (iv) make findings and/or recommendations regarding the scope and/or efficacy of releases."  (July 25, 2011 Supp. Br. at 20.)  Such relief is neither warranted nor proper because all of these issues will be decided in the normal course of litigation at more appropriate times.   For example, the Court is currently considering the parties' presentment arguments in connection with the defendants' pending motions to dismiss.  Claimants who have signed a release may sue if they believe they have a valid claim for duress or that the release is otherwise improper—although as discussed in Section III.B *infra*, such claims cannot succeed as

---

employer, bank and customer, or landlord and tenant.  Here, the contacts between the GCCF and a claimant end after a final settlement, if not before.

[14]    *Kleiner* also is inapposite given the court's concern there that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a **one-sided presentation of the facts, without opportunity for rebuttal**."  751 F.2d at 1203.  As BP has previously explained, there can be no similar concern here.  Plaintiffs' counsel has been vocal in criticizing the GCCF and praising the litigation alternative.  (*See* BP's Jan. 7, 2011 Br. (Doc. 963) at 23-24.)  In addition, the court in *Kleiner* found that limitations of only **oral** communications were warranted without an explicit showing of coercion because unsupervised oral solicitations can "exert pressure" and "encourage speedy and perhaps uninformed decisionmaking."  751 F.2d at 1206.  Here, the primary communications between the GCCF and claimants, including the release itself, are written and inform claimants of their right to seek counsel.

18

a matter of law.[15]   Appointment of a special master to decide such issues now—outside of the proper context, without a certified class or any specific individual's pending claim that presentment has been met or that a release should be invalidated—would clearly be improper.

In addition, granting such relief under the auspices of Rule 23 would violate that Rule, given that all of these issues—the sufficiency of presentment, the validity of the release, the existence of duress—will require individual rather than class-wide determinations.  (*See* BP's Feb. 18, 2011 Supp. Br. (Doc. 1330) at 20-21 (citing *Hall v. Burger King Corp.,* Civ. A. No. 89-0260-CIV-KEHOE, 1992 WL 372354 at *8-9 (S.D. Fla. Oct. 26, 1992) (denying class certification when "[e]ach plaintiff [would] necessarily need to address the unique questions pertaining to the validity of these releases," necessitating "examination of the circumstances under which each release was executed")).)  The Court cannot rely on Rule 23 to act when the substantive determinations the Court must make would contravene the requirements of that Rule.

Moreover, beyond inappropriate interference in OPA's extra-judicial claims process, it is difficult to see exactly what a special master would or could do to address many of plaintiffs' complaints.  For example, plaintiffs contend that the GCCF's Determination Letters convey the message that the "only way to get compensation from the GCCF is to take the 'quick pay' and sign the complete release and assignment of all rights to BP."  (July 25, 2011 Supp. Br. at 8.) Not so.   Instead, the GCCF's determination letters inform claimants of the GCCF's best calculation of what they will receive in a final claim.  In some cases, the GCCF calculates that amount to be zero or a low amount—and therefore less than what the claimant would receive under the Quick Pay option.  Contrary to plaintiffs' argument, if the GCCF's final claim offer

---

[15]   Despite the plaintiffs' dire predictions of confused claimants who are unhappy with the release, BP is aware of only a single claimant who has brought a lawsuit seeking to void the release (and plaintiffs already noted that lawsuit in their February 18, 2011 filing (Doc. 1318)).  That claim will be decided at the appropriate time, of course, and premature decisions by a special master related to the issues involved in the case would be inappropriate.

would be less than a Quick Pay, it ***benefits*** the claimant to know this so that the claimant can decide what action to take.   Moreover, as the Court previously ordered, the GCCF's Determination Letters "[f]ully disclose to claimants their options under OPA if they do not accept a final payment, including filing a claim in the pending MDL 2179 litigation." [16]   (Feb. 2, 2011 Order (Doc. 1098 at 14); Bloomer Decl., Ex. E (sample Determination Letters).)   Unless the special master could recalculate claimants' payments and offer additional money—which would be far beyond the Court's powers under Rule 23 and a blatant violation of Congress's decision to put the Responsible Party in charge of the claims process—there would be no point in requiring the GCCF to convey the (false) message that it is likely to offer the claimant more money than it actually will in a final settlement.

> **B.      Plaintiffs' Complaints about the Release and Other Issues Are Baseless as a Matter of Law.**

Intervention here is also unnecessary and improper because none of plaintiffs' criticisms have any merit.   ***First***, releases in exchange for final payments under OPA are entirely proper, as the United States confirmed in its own filing: "***Responsible Parties in oil spills regularly seek releases as part of the claims process***."   (Feb. 18, 2011 Statement of U.S. (Doc. 1322) at 2 (emphasis added); *see also id.* at 6 ("From the perspective of the United States, it has been critical that claimants have a true choice: under the GCCF process they can either file interim claims, for which the OPA requires Responsible Parties to provide, receive payments for damages as they accrue, and not sign any release; or they can, with appropriate legal counsel

---

[16]    As BP has previously described, BP and the GCCF have fully complied with the Court's February 2, 2011 order.  (*See* Section IV of BP's Feb. 18, 2011 Supp. Mem. (Doc. 1330).)  Although plaintiffs now complain that the GCCF "has violated the spirit of the Court's order seeking to protect plaintiffs and putative class members from confusion and misunderstanding," (July 25, 2011 Supp. Br. at 1), they fail to identify any purported violation of that order.  Nor do they present any facts—much less competent and admissible evidence—showing widespread confusion or misunderstanding about the GCCF process.

available, ***finally settle their claims — past and future — by agreeing to an appropriate release***.") (emphasis added).)

Indeed, it is black letter law that releases which waive any and all claims, known and unknown, are valid and enforceable, and indeed promote the strong public policy favoring settlement of disputes. *See, e.g., Ingram Corp. v. J. Ray McDermott & Co., Inc.,* 698 F.2d 1295, 1312 (5th Cir. 1983) ("When a release provides that 'any and all claims,' 'past, present, or future' are to be extinguished, a court [must] enforce its provisions both as to known and unknown claims."); *Robin v. Binion,* 469 F. Supp. 2d 375, 386-87 (W.D. La. 2007) (release of "any and all claims," "known or unknown," should be enforced).  Moreover, a general release serves OPA's purpose of providing an extra-judicial claims process "to encourage settlement and avoid litigation."  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.,* 51 F.3d 235, 238-39 (11th Cir. 1995).  The appropriateness of a release in settling final OPA claims and of the particular release used by the GCCF is discussed at greater length in Section III of BP's January 7, 2011 Memorandum in Opposition (Doc. 963) and Section II.B.1 of BP's February 18, 2011 Supplemental Memorandum (Doc. 1330).

***Second***, despite plaintiffs' complaints that presentment is a "mystery or a moving target," the case law on presentment is well-established, as discussed in BP's motion to dismiss briefing, and appointment of a special master to further opine on presentment is unnecessary.  (*See*, *e.g.*, BP's B1 Mot. To Dismiss (Doc. 1440-1) Section II.A.)  Plaintiffs' argument that "[a]ny writing ... that sets out a 'sum certain' (whether interim or final) and a simple, reasonable description of the damages claimed" should be sufficient simply ignores the case law, which clearly requires the claimant to submit ***evidence to support her claim***.  For example, in *Gabarick v. Laurin Maritime (America), Inc.*, Civ. A. No. 08-4007, 2009 WL 102549 (E.D. La. Jan. 12, 2009), the

court held that plaintiff had not satisfied OPA's "statutory requirements for a proper claim" because it "has not described the manner in which the oil spill impacted it, *nor has it cited evidence in support of its purported claim*." *Id.* at *2 n.21 (emphasis added). Similarly, as Judge Fallon has explained, "If the claim does not have the *necessary specificity*, the responsible party will be unable to make a[n] informed offer of settlement." *Turner v. Murphy Oil USA, Inc.*, Civ. A. No. 05-4206, 2007 WL 4208986, at *2 (E.D. La. Nov. 21, 2007). Plaintiffs' approach would defeat OPA's goal of encouraging out-of-court settlements:

> "[T]he purpose of OPA's claim presentation requirement is to enable the parties to negotiate, if possible, a settlement of potential claims resulting from an oil spill without having to resort to litigation. . . . In order to accomplish this purpose, the claim presented *must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed. Otherwise, the responsible party will be unable to make an informed offer of its own, unable to engage in meaningful substantive negotiations, and thus unable to settle the matter by agreeing to a final amount.* Instead, the responsible party will have to ask for a more definite statement of the claim, as Colonial has done here, and the 90-day period will be spent trying to obtain basic information rather than actually negotiating a settlement."

*Johnson v. Colonial Pipeline Co.*, 830 F. Supp. 309, 311 (E.D. Va. 1993) (emphasis added).

*Finally*, to the extent that plaintiffs attempt to allege duress by their frequent references to claimants being "coerced" into taking Quick Pay settlements, any such claim is without merit. Rhetorical repetition is no substitute for evidence, and on this score plaintiffs offer nothing that even approaches the high legal standard for establishing duress. To make such a claim, a complainant must demonstrate that another party has taken or threatened to take some action against complainant that actually overcomes the complainant's free will by forcing her to do something she otherwise would not have done. *See Stephens v. Ala. State Docks Terminal Ry.*, 723 So. 2d 83, 85 (Ala. Civ. App. 1998) (citing *Int'l Paper Co. v. Whilden*, 469 So. 2d 560, 562

22

(Ala. 1985)).  Dissatisfaction with the terms of a contract or release is not duress, *see Int'l Paper,* 469 So. 2d at 563 (quoting *Bd. of School Comm'rs of Mobile County v. Wright,* 443 So. 2d 35, 38-39 (Ala. Civ. App. 1983), *rev'd on other grounds,* 443 So. 2d 40 (Ala. 1983)), particularly where, as here, the claimant is free to reject the offer and pursue her claims in court.  In any event, the merits of such claims are properly resolved in the course of litigation—not in the extra-judicial, pre-litigation process that Congress established under OPA.  (*See also* Section II.B.2 of BP's Feb. 18, 2011 Supp. Mem. (Doc. 1330) for further discussion.)

## CONCLUSION

For the foregoing reasons and those stated in BP's Supplemental Memorandum Regarding OPA and the GCCF (Doc. 1330), BP respectfully requests that the Court deny plaintiffs' requested relief in its entirety.

Date:  August 15, 2011                              Respectfully submitted,


                                                    /s/ Don K. Haycraft
                                                    Don K. Haycraft (Bar #14361)
                                                    R. Keith Jarrett (Bar #16984)
                                                    LISKOW & LEWIS
                                                    701 Poydras Street, Suite 5000
                                                    New Orleans, Louisiana 70139-5099
                                                    Telephone: (504) 581-7979
                                                    Facsimile: (504) 556-4108

                                                    and

                                                    Richard C. Godfrey, P.C.
                                                    J. Andrew Langan, P.C.
                                                    Andrew B. Bloomer, P.C.
                                                    Catherine L. Fitzpatrick
                                                    Elizabeth A. Larsen
                                                    Kirkland & Ellis LLP
                                                    300 North LaSalle Street
                                                    Chicago, IL 60654
                                                    Telephone: (312) 862-2000
                                                    Facsimile: (312) 862-2200

                                                    Robert C. "Mike" Brock
                                                    Covington & Burling LLP
                                                    1201 Pennsylvania Avenue, NW
                                                    Washington, DC 20004-2401
                                                    Telephone: (202) 662-5985


                                                    *Attorneys for BP*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of August, 2011.


/s/ Don K. Haycraft_____
Don K. Haycraft