# EXHIBIT A

# Gulf Coast Claims Facility
# Protocol for Emergency Advance Payments
# August 23, 2010

## I. PURPOSE

This Protocol sets forth the procedure for the submission and resolution by the Gulf Coast Claims Facility ("GCCF") of claims for Emergency Advance Payments by Individuals and Businesses for costs and damages incurred as a result of the oil discharges from the April 20, 2010 Deepwater Horizon incident ("the Spill").

### A. Role

The United States Coast Guard ("USCG") has designated BP Exploration & Production, Inc. ("BP"), as a Responsible Party under the Oil Pollution Act of 1990 ("OPA") for oil discharges from the Deepwater Horizon facility. Under OPA, Responsible Parties must establish a claims process to receive certain claims by eligible claimants. USCG, without in any way relieving other Responsible Parties of liability, directed BP to maintain a single claims facility for all Responsible Parties to avoid confusion among potential claimants.

The GCCF is intended to replace BP's claims facility for individuals and businesses. The GCCF (and the protocols under which it operates) are structured to be compliant with OPA. A final claim may be presented to the GCCF at any time that the facility is receiving claims. Whether or not a claim has been presented shall be governed by OPA and applicable law. All open Individual and Business claims that have been filed with the BP Claims Process will be transferred to the GCCF. BP has also authorized the GCCF to process certain non-OPA claims involving personal injury. Submission of such claims shall be wholly voluntary and participation in the GCCF shall not affect any right that the claimant would have had absent such participation unless final resolution and settlement of the claim is achieved.

### B. Approach

The following non-exclusive principles apply to the operation of the GCCF:

- The GCCF will evaluate all claims in a prompt and fair manner guided by applicable law.
- The establishment of the GCCF does not diminish any right of any individual or business that existed prior to the creation of the GCCF; claimants have all of the same rights with respect to their various claims that they had prior to the creation of the GCCF and shall not be forced to relinquish any rights for the opportunity to seek compensation through the GCCF.
- The GCCF claims process is structured to comply with OPA and apply the standards of OPA.

The GCCF is administered by Kenneth R. Feinberg ("the Claims Administrator"), a neutral fund administrator responsible for all decisions relating to the administration and processing of claims by the GCCF. This Protocol addresses only claims for Emergency Advance Payments; a subsequent Protocol will deal with all Final Claims. Under the Final Protocol, interim claims will be considered where appropriate.

## II. ELIGIBILITY

Claimants who are experiencing hardship resulting from damages set forth below incurred due to the Spill may apply for an Emergency Advance Payment.

A. Removal and Clean Up Costs

1. Who may make a claim?

Any Individual or Business that incurred costs, as a result of the Spill for the removal of oil or to prevent, minimize, or mitigate oil pollution.

2. Required Proof

- o The costs are for removal of oil discharged due to the Spill or that are to prevent, minimize or mitigate oil pollution from the Spill;
- o The costs are reasonable and necessary; and The actions taken to remove, prevent, minimize, or mitigate oil pollution were approved by the Federal On-Scene Coordinator or are otherwise proven to be consistent with the National Contingency Plan.

3. What information should the claimant submit?

- o Information or documentation (e.g., bills) showing the costs incurred after the Spill for removal of oil discharged as a result of the Spill or incurred to prevent, minimize, or mitigate oil pollution from the Spill.
- o Information or documentation explaining how the actions taken were necessary to prevent, minimize, or mitigate the effects of the Spill.
- o Information or documentation showing that the actions taken were approved by the Federal On-Scene Coordinator or were consistent with the National Contingency Plan.
- o Information or documentation explaining why the costs were reasonable.

B. Real or Personal Property

1. Who may make a claim?

Any Individual or Business that owns or leases real or personal property physically damaged or destroyed as a result of the Spill.

In order to avoid duplication of claims, an owner or lessee of the property must provide notice to all others with an ownership or lease interest in the property of the intent to file a claim. If duplicate claims are received, the GCCF will determine the appropriate claimant.

2. What information should the claimant submit?

- o Information or documentation showing an ownership or leasehold interest in the property.
- o Information or documentation showing the property was physically damaged or destroyed.
- o Information or documentation showing the damages claimed were incurred as the result of the physical damage to or destruction of the property.
- o Information or documentation showing the cost of repair or replacement of the property, or economic losses resulting from destruction of the property.
- o Information or documentation showing the value of the property both before and after damage.

C. Lost Profits and Lost Earning Capacity

   1. Who may make a claim?

An Individual or Business that incurred a loss in profits or earning capacity due to the injury, destruction, or loss of real property, personal property or natural resources as a result of the Spill. The individual or business need not be the owner of the injured property or resources to recover for lost profits or income.

   2. What information should the claimant submit?

- o Identification of injury, destruction, or loss to a specific property or natural resource.
- o Information concerning Claimant's lost earnings or profits that were caused by the injury, destruction, or loss of specific property or natural resource as a result of the Spill (such as lost income by a fisherman whose fishing grounds have been closed or a hotel or rental property that has had decreased profits because beaches, swimming, or fishing areas have been affected by the oil from the Spill).
- o Reduction of earnings or profits, or increase in expenses resulting from such damage.
- o Amount of profits and earnings or expenses in comparable time periods.
- o Income received from alternative employment or business during the period when the loss was suffered, and expenses incurred in generating the alternative income.
- o Savings to overhead and other normal expenses not incurred as a result of the Spill.

D. Subsistence Use of Natural Resources

   1. Who may make a claim?

Any Individual who uses the natural resources that have been injured, destroyed or lost as a result of the Spill to obtain food, shelter, clothing, medicine, or other subsistence uses.

   2. What information should be submitted?

- o Identification of the specific natural resources that have been injured, destroyed or lost as a result of the Spill for which compensation for loss of subsistence use is being claimed. The Claimant need not own the affected natural resource.
- o Description of the actual subsistence use made of each specific natural resource.
- o Description of how and to what extent the subsistence use was affected by the injury to or loss of each specific natural resource as a result of the Spill.
- o Description of expenditures made to replace or substitute for the subsistence use.

E. Physical Injury /Death

   1. Who may make a claim?

A claim may be made by an injured individual or the representative of a deceased individual for a physical injury or death proximately caused by the Spill or the explosion and fire associated with the Deepwater Horizon incident, or by the clean-up of the Spill.

Submitting a physical injury or death claim to the GCCF is entirely voluntary. However, unlike claims under the Oil Pollution Act, claims for physical injury and death cannot be submitted to the

National Pollution Funds Center.

2. What information should be submitted?

- o Medical records or death certificate demonstrating physical injury or death.
- o Medical records reflecting diagnosis by a medical practitioner.
- o Information concerning the cause of physical injury.
- o Information concerning the circumstances of the physical injury and the location where the physical injury occurred.
- o Information concerning any total or partial disability of the Claimant.
- o Records showing expenditures for medical care not otherwise compensated.
- o Proof of lost income, if the Claimant seeks compensation for such lost income.

F. Causation

The GCCF will only pay for harm or damage that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA and the proximate cause doctrine. Determinations of non-OPA claims will be guided by applicable law. The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources.

## III. FILING FOR AN EMERGENCY ADVANCE PAYMENT

A. Equal Access and Fair Adjudications in the Claims Process

All potential claimants will be treated with respect, dignity, and fairness, without regard to race, color, sexual orientation, national origin, religion, gender, or disability. The GCCF shall strive to ensure that all claimants can equally access the GCCF process, and that claims will be adjudicated fairly. Individuals with disabilities will be able to effectively communicate their claims and problems to the GCCF. Individuals with language barriers will have meaningful access to the process and to the GCCF. Individuals with low literacy will have documents and forms explained to them plainly and in a simple manner they understand.

B. Claim Form

1. The Claimant will indicate on the Claim Form if the Claimant is applying for an Emergency Advance Payment.[1] Claimants will complete a Claim Form for an Individual or Business.
2. Claimants shall submit the documentation requested on the Claim Form for an Emergency Advance Payment or other similar information as is sufficient to substantiate the claim and for the GCCF to review and process the Claim.

C. Process for Filing a Claim for an Emergency Advance Payment

A Claim Form may be obtained and submitted in any one of the following ways:

1. Via the Internet - Claimants may submit a claim online by visiting the GCCF website: www.gulfcoastclaimsfacility.com. Claimants will be instructed to follow simple steps for completing a claim. Once completed, the claim will be automatically submitted to the GCCF Database, a printable confirmation notification will be generated and displayed immediately confirming submission and providing the Claim Number and a confirmation email will be sent to

those Claimants who have provided email addresses. The Claim Number will be the claim identifier throughout the process. The Claim Form and Instructions will be available in English, Spanish, Vietnamese and Khmer.

2. By Visiting a GCCF Claims Site Office - Claimants may visit one of the 36 Claims Site Offices established to assist Claimants with the claims submission process to (1) seek information about filing a claim or to (2) submit a claim in person. Claimants may either walk in to one of the Claims Site Offices or may make an appointment by calling the toll-free telephone line. The locations of the Claims Site Offices are posted on the GCCF website, www.gulfcoastclaimsfacility.com. If a visitor requires an interpreter and an interpreter is not available on site, the Claims Evaluator will make arrangements to provide these services either via conference call or a scheduled return trip to the Claims Site Office. A Claims Evaluator will assist the Claimant in completing the Claim Form. The Claims Evaluator will print a copy of the Claim Form, the claimant will sign the Claim Form and the claim will be automatically submitted to the GCCF Database. A confirmation of the claim submission and Claim Identification Number will be provided by the Claims Evaluator. The Claim Form must be signed by the Claimant.

3. Via U.S. Postal Service - Claimants may call the toll free, dedicated telephone line to request that a Claim Form be mailed via U.S. Postal Service. The Claims Operator will ask the caller to provide basic information which the Claims Operator will enter into the on-line system. The system will automatically generate a unique, pre-populated and bar-coded Claim Form which will include the identifying information provided by the caller. The Claim Form will contain a Claim Identification Number which will be the Claim identifier through the course of the process. The coded Claim Form will be mailed via U.S. Postal Service to the Claimant. The Claim Form must be signed by the Claimant. The Claimant may return the completed form via:

   o U.S. Postal Service:
     Gulf Coast Claims Facility
     P. O. Box 9658
     Dublin, OH 43017-4958
   o Overnight, Certified or Registered Mail:
     Gulf Coast Claims Facility
     5151 Blazer Parkway, Suite A
     Dublin, OH 43017-4958
   o Fax:
     1-866-682-1772
   o Email:
     info@gccf-claims.com.
   o The toll-free telephone lines are as follows:

     Toll Free Number: 1-800-916-4893
     Multilingual Telephone Line: 1-800-916-4893
     TTY Telephone Line: 1-866-682-1758

All submitted Claim Forms, regardless of the method of submission, will be automatically forwarded to the Central Processing Database and integrated into a comprehensive GCCF Database.

D. Appointment with a Claims Evaluator

The Claimant may request an appointment with a Claims Evaluator at the nearest Claims Site Office to answer or clarify issues regarding a claim for an Emergency Advance Payment. The Claims Evaluator will review the claim for completeness and eligibility and may contact the Claimant to request additional supporting documentation if necessary or if the Claims Evaluator has any questions about the

information submitted with the Claim Form. Examples of information and documentation that support a claim are attached as Exhibit A.

E. Evaluation of Application for Emergency Advance Payment

1. Evaluation of an Emergency Advance Payment application will apply a less rigorous standard for required corroboration than evaluation of a claim for Final Payment. Documentation sufficient to establish the claim will be described in the Claim Form.
2. Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant. Complex business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant.
3. Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours.

F. Period for Application for Emergency Advance Payment

1. Emergency Advance Payment applications may be submitted on a monthly basis. Emergency Advance Payment applications for Lost Profits and Lost Earning Capacity, Loss of Subsistence Use of Natural Resources, or loss of income due to physical injury or death may be submitted either on a monthly basis or for six months of losses, at the option of the Claimant. Claimants seeking an Emergency Advance Payment on a six month basis must establish that they will incur loss for the six month period. To the extent possible, six month payments will be based on the seasonally adjusted lost income or lost profits, as applicable.
2. Emergency Advance Payment applications may be submitted during the period August 23 - November 23, 2010. After that date, applications for Emergency Advance Payments will no longer be accepted. Applications for Final Claims, and in appropriate circumstances applications for interim claims, will continue to be accepted pursuant to the Protocol for Final Claims.

G. Request or Receipt of Emergency Advance Payment Does Not Waive Any Rights

Claimants requesting an Emergency Advance Payment or receiving an Emergency Advance Payment will not be asked or required to sign a release or waive any rights to assert additional claims, to file an individual legal action, or to participate in other legal actions associated with the Spill.

H. Credit Against Final Payment

Any Emergency Advance Payment made to a Claimant will be deducted from any Final Payment of a Final Claim.

## IV. REPORTING

The GCCF shall provide reports of non-personally identifiable information to state, local, and federal government officials and to BP to permit an evaluation of the claims process. The GCCF shall submit to interested parties, including BP, periodic reports regarding claims made and claims determinations.

## V. PRIVACY

Information submitted by a Claimant to the GCCF will be used and disclosed for purposes of: (i) processing the Claimant's claim for compensation and any award resulting from that claim; (ii) legitimate business purposes associated with administering the GCCF, including the prevention of fraud and the determination of collateral source payments; and/or (iii) as otherwise required by law, regulation or judicial process.

## VI. QUALITY CONTROL AND PROCEDURES TO PREVENT AND DETECT FRAUD

A. Review of claims

For the purpose of detecting and preventing the payment of fraudulent claims and for the purpose of accurate and appropriate payments to Claimants, the GCCF shall implement procedures to:

1. Verify and authenticate claims.
2. Analyze claim submissions to detect inconsistencies, irregularities, and duplication.
3. Ensure the quality control of claims review procedures.

B. Quality Control

1. The GCCF shall institute periodic quality control audits designed to evaluate the accuracy of submissions and the accuracy of payments.
2. The GCCF shall engage an independent outside accounting firm to perform an independent test of claims to ensure that the claims have been accurately processed.

C. False or Fraudulent Claims

Each Claimant will sign a form at the time of application, stating that he or she certifies that the information provided in the Claim Form is true and accurate to the best of his or her knowledge, and that he or she understands that false statements or claims made in connection with that application may result in fines, imprisonment, and/or any other remedy available by law, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution. The GCCF shall refer all evidence of false or fraudulent claims to appropriate law enforcement authorities.

### Exhibit A - Required Information/Documentation for a Claim for Final Payment

---

[1] A claim for an Emergency Advance Payment is an interim claim under OPA. To the extent that the claimant incurs additional compensable damages that are not reflected in the Emergency Advance Payment, receipt of an Emergency Advance Payment shall not preclude a claimant from seeking additional damages not reflected in the Emergency Advance Payment.

# EXHIBIT B

1

```
 1            GULF COAST RECOVERY:  AN EXAMINATION

 2            OF CLAIMS AND SOCIAL SERVICES IN THE

 3        AFTERMATH OF THE DEEPWATER HORIZON OIL SPILL

 4                        -  -  -

 5                THURSDAY, JANUARY 27, 2011

 6                              United States Senate,

 7            Ad Hoc Subcommittee on Disaster Recovery,

 8        Committee on Homeland Security and Governmental Affairs,

 9                              Washington, D.C.

10         The Subcommittee met, pursuant to notice, at 1:45 p.m.,

11    in Room 342, Dirksen Senate Office Building, Hon. Mary L.

12    Landrieu, Chairman of the Subcommittee, presiding.

13         Present:  Senators Landrieu, Carper, Nelson, Shelby,

14    and Vitter.

15             OPENING STATEMENT OF SENATOR LANDRIEU

16         Senator Landrieu.  The Subcommittee on Disaster

17    Recovery and Response will come to order.  I am pleased to

18    be joined by a colleague, Senator Shelby from Alabama, and

19    we are hoping to be joined by several other colleagues.  I

20    am expecting Senator Vitter and others to join us as the

21    afternoon goes on.

22         I want to thank our witnesses, particularly for making

23    the special effort to be here today because of the

24    challenges of weather and transportation, so I really thank

25    you, because we did not want to cancel this important
```

2

1    hearing and I am very pleased that we can proceed as

2    scheduled.

3         Let me go ahead and quickly begin with an opening

4    statement and then turn it over to Senator Shelby, and as

5    other members come, they will also be allowed for a brief

6    opening statement, and we want to get right into our witness

7    presentations.

8         I again thank all the witnesses for making a special

9    effort in these weather conditions to join us for this

10   important hearing.

11        As you all will note or know, last week, the Graham-

12   Reilly Oil Spill Commission released its report on the

13   technological and regulatory failures that caused the

14   Macondo well to explode on April 20 last year, taking the

15   lives of 11 men and creating one of the largest

16   environmental catastrophes in American history.  It is

17   important that we thoroughly review this accident, implement

18   new measures to ensure a robust and competitive offshore

19   energy industry that operates as safely as possible.  But

20   there are some other obligations that we have, as well.

21        This particular report, nor was this Commission charged

22   with this task, and so they did not go into the claims

23   payment and the human side of this tragedy.  They are

24   focused on the technological and the general business side

25   of offshore oil and gas drilling.  But as Senators, there is

1   another side, and that is what we are here for today.  That

2   side is about the human side of this disaster.

3        Four-hundred-and-eighty-three thousand people in the

4   Gulf have filed claims so far for lost wages and revenues.

5   They are currently experiencing severe challenges getting

6   timely payments or accurate information in some cases about

7   their claims.  Roughly 194,000 of these claimants are

8   located in Louisiana, but 162,000 are in Florida, 68,000 are

9   in Alabama, 52,000 in Mississippi, and 10,000 in Texas.  So

10  these claimants reach across the entire Gulf Coast.

11       The Commission report does not address these claims but

12  to say that after everything is over, we should do an after

13  action report.  But right now, this Committee is today and

14  has been for a while focused on this human side, the claims

15  process, helping make people as whole as possible due to

16  this catastrophe.

17       Fishermen, deck hands, and restaurant workers put out

18  of work by the oil spill, small business owners whose

19  businesses have been threatened, many of them still

20  struggling to make payroll to keep their doors open, are

21  each entitled to just compensation under the law, but the

22  system is not yet working, in my view, as well as it should

23  be.  Thousands of Gulf Coast residents have lost their jobs

24  and are fighting to feed their families, keep their homes,

25  and preserve their way of life.  For a while, clean-up jobs

1    and emergency payments made this situation tolerable, but

2    the clean-up jobs--the well is now capped--are diminishing

3    or substantially diminishing, and the seafood and tourism

4    markets have not yet recovered to their pre-spill levels.

5        Today, we are here to discuss the payment system

6    established by Mr. Feinberg under the authority of the White

7    House and BP to compensate people for lost earnings,

8    property damage, and subsistence losses resulting from the

9    spill.  We will also learn about work that nonprofit

10   organizations are doing along the Gulf and the continued

11   challenges they face in providing assistance to spill-

12   affected communities.

13       Frequent visits, and I have made many, to coastal

14   communities and dozens of conversations with constituents

15   and briefings with local leaders lead me to believe that the

16   claims determinations have not been as consistent as they

17   need to be or as transparent as they could be.  People have

18   still struggled to obtain information about their claim on a

19   timely basis.

20       In my view, NGOs have also been somewhat marginalized

21   and under-resourced throughout this recovery process, and it

22   seems like we are making a similar mistake that we made in

23   the aftermath of Katrina, Rita, Gustav, and Ike by

24   underestimating the power and the effectiveness of

25   community-based NGOs to help the Vietnamese community, for

1    instance, or the Hispanic community, for instance, or a

2    certain group of elderly people in a community from

3    accessing their rightful claims.

4         Mental health issues, including domestic violence and

5    suicide, are on the rise.  It is becoming increasingly a

6    challenge for the region.  A study released last July by

7    Ochsner Clinic revealed that 30 percent of interviewees in

8    Louisiana, Mississippi, Alabama, and Florida suffered from

9    serious psychological distress and cited disproportionate

10   impacts among children and low-income households.

11        Today, we are going to hear a very heartwarming story,

12   but a little sad ending, from a Vietnamese oysterman who

13   successfully piloted a boat of refugees out of Vietnam many

14   years ago, made a new life for himself fishing off the

15   waters of the Louisiana coast for decades, until suddenly

16   this oil spill caused him to lose his business and his

17   livelihood.  He represents a great and growing number of

18   Vietnamese American fishermen.  Over 80 percent of the

19   Vietnamese Americans in the Gulf region are connected to the

20   seafood industry.  We are going to hear from them today.

21        We also want to hear from NGO representatives that were

22   asked by BP to present social service proposals last summer

23   and have never received a response, despite backing from 53

24   organizations in the State of Louisiana and another 32

25   organizations in Mississippi.

1        And finally, BP has made a pledge of $20 billion to

2    cover legitimate claims and placed a portion of those funds

3    in escrow under Mr. Feinberg's control.  He is here with us

4    today.  He has testified before this Committee before and I

5    appreciate him being with us today to give us an update.

6        The function of the Claims Facility is to compensate

7    people fairly for their losses, to discharge BP's fiduciary

8    obligations under the Oil Pollution Act of 1990 in regards

9    to just those claims, and to offer a simple or speedier

10   alternative to prolonged litigation, which continued for 20

11   years after Exxon Valdez.  We are hoping it will not take 20

12   years to compensate people fairly in the aftermath of this

13   spill.

14       The Gulf Coast Claims Facility took over individual

15   business and claims from BP on August 23.  From May to

16   August, BP was operating the system.  And so far, Gulf Coast

17   Claims has paid out $3.3 billion to 168,000 claimants.  That

18   is what our records show.  If that is not updated, we will

19   get the new numbers today.

20       Mr. Feinberg has traveled extensively to the Gulf.

21   Senator Shelby, I am sure you have seen him or been with him

22   in Alabama.  I have attended several of the town hall

23   meetings in Louisiana.  You have made some commendable

24   program changes along the way and I want to acknowledge that

25   you have been flexible when things have been brought to your

1    attention, first, by not agreeing to subtract consolidated

2    social service proposals, and you have made some other

3    important changes in intermediate payments.  You did not

4    deduct the Vessels of Opportunity earnings from the total

5    claimants.  We are very, very grateful.

6         But on the other side, there are some challenges that

7    remain and one of the things we are going to explore today

8    is that BP did provide $1 million to Louisiana charities for

9    emergency relief and $32 million for mental health services

10   along the Gulf.  But without case management, financial

11   counseling, claims assistance, direct aid for food, rent,

12   and mortgages, many families are still struggling.

13        So conclusion, I am pleased to be joined today, as I

14   said, by many of my colleagues.  I want to thank Feeding

15   America and the Louisiana Association of Nonprofit

16   Organizations for submitting written testimony for this

17   hearing.  I would also like to acknowledge the White House

18   staff that is in attendance.  The White House is very

19   focused on this issue.  Congressman Steve Scalise for his

20   continued efforts to improve the claims process on behalf of

21   his constituents.  I want to recognize Darryl Tate with the

22   United Methodist Church in Louisiana and everyone else that

23   has joined us for this important hearing.

24        We have a great deal of business to cover, so let me

25   turn it for opening statements to Senator Shelby and then we

8

1    will get right into our witnesses.  Senator?

2                    OPENING STATEMENT OF SENATOR SHELBY

3         Senator Shelby.  Thank you, Madam Chairman, for letting

4    me join your Committee here today.

5         While the Deepwater Horizon rig has been capped, the

6    boom recalled and the media on to the next story, many may

7    think this disaster is over, but this is not true.  Like

8    many Alabamians, I remain extremely concerned regarding both

9    the short- and the long-term effects that the oil will have

10   on the Gulf Coast's economy and the ecosystem.  Alabama's

11   Gulf Coast region may take decades to recuperate and

12   downstream effects could cripple the region for years to

13   come.

14        Since the oil started pouring into the Gulf last April,

15   Alabama has seen a nearly 50 percent drop in tourism-

16   generated dollars and a substantial loss of jobs.  Tourism

17   revenues lost to Alabama's coastal economies as a direct

18   result of the oil spill are estimated at between $850

19   million and $1 billion, a figure that does not include the

20   additional losses to the fishing industry and the shipyard

21   repair and maintenance operations.

22        The federally mandated fishery closures have resulted

23   in a significant loss of income for the entire seafood

24   industry, fishermen, shrimpers, bait and tackle shops, and

25   processors.  Alabama's fishing industry represent one of the

1   largest economic engines in the State, accounting for more

2   than $800 million in sales annually and nearly 18,000 jobs.

3   The economic impact on the commercial and recreational

4   fishing industry already is severe and extensive.  I think

5   we must ensure that individuals and businesses are

6   compensated now, but also put in place mechanisms to assist

7   them with rebuilding and restoring efforts as the Gulf

8   continues to recover from the disaster.

9          I have met with Mr. Feinberg, who is with us today,

10  several times since the Gulf Coast Claims Facility was

11  created, yet I continue to have serious concerns regarding

12  the claims determinations made by this organization.  Like

13  the entire Gulf Coast, Alabama is at a critical juncture.

14  The Gulf Coast Claims Facility is not acting with

15  appropriate urgency as I thought they would.  Nine months

16  since the oil spill, 57 percent of claims in Alabama remain

17  unpaid.  This amounts to 38,605 individual and business

18  claims that have not received one penny in funding.  That is

19  a startling statistic to me.

20         Further, from January 12 to January 24 in Baldwin

21  County, the hardest-hit region in Alabama, only 28 claims

22  were processed.  That is less than three claims a day.  Let

23  me reiterate, Alabama has 38,604 outstanding claims and the

24  Gulf Coast Claims Facility is currently only processing

25  three Alabama claims a day.  Moreover, there is no

1   distinction given by the Gulf Coast Claims Facility in their

2   statistics between how many claims were paid and how many

3   claims were underpaid.  I am sure that this is not an

4   insignificant figure.

5       When Mr. Feinberg and I met in both November and

6   December, I relayed these issues to him, that one of the

7   largest issues that needed to be addressed was the lack of a

8   clear formula on how a claim is determined.  Filers, I

9   believe, deserve clarification as to why their claims were

10  denied, if they are denied, or why their payments were less

11  than expected, if that be the case.

12      On December 16, Mr. Feinberg told me here at the

13  Capitol that the formula for claim payments would be made

14  publicly available on the Gulf Coast Claims Facility

15  website.  Six weeks later, this information is still not

16  available and I believe this is unacceptable, Madam

17  Chairman.  Those affected by the spill need to know that

18  there is transparency, clarity, and consistency in the

19  payment process.

20      Finally, as we continue with the recovery efforts along

21  the Gulf Coast, Congress needs to swiftly address the

22  allocation of the Clean Water Act fines from the BP oil

23  spill.  The entire Gulf Coast faces an enormous ecological

24  and economic disaster with an estimated impact of as much as

25  $3 billion in my State of Alabama alone.  Under the Act, BP

1   could be liable for penalties up to $20 billion.  Congress,

2   I believe, needs to ensure that all five--all five--affected

3   Gulf States are treated equitably when these fines are

4   disbursed.  Each State should have the ability to use these

5   funds how they see fit to restore the economic and

6   ecological damage caused by the spill.  The impact to each

7   State is unique and there needs to be flexibility in

8   spending the Clean Water fines in the matter which best

9   meets their needs.

10        And while the national press has moved on, the Gulf

11   Coast continues to face the challenges from one of the

12   largest disasters in our Nation's history.  The damages

13   caused by the oil spill could last years.  Our residents and

14   businesses are severely hurting, and we need a commitment by

15   all stakeholders to the Gulf Coast's full recovery.  In

16   particular, it is my expectation that the Gulf Coast Claims

17   Facility will uphold and follow through on its obligation to

18   the people of the Gulf Coast.  Mr. Feinberg has assured me

19   of that.  My relationship is he has been a man of his word

20   in the past.

21        Thank you very much, Madam Chairman.

22        Senator Landrieu.  Thank you, Senator Shelby, and you

23   can rest assured that this Committee and this Chairman will

24   continue this focus and I thank you for your help and

25   support.

1    Senator Vitter, we would be happy to take opening

2    statements now if you want to do that, or wait a minute--

3                OPENING STATEMENT OF SENATOR VITTER

4    Senator Vitter.  Thank you, Madam Chair.  I will be

5    relatively brief.

6    First of all, thanks for your leadership and for this

7    hearing.  Thanks to all the witnesses and for your work.

8    I just wanted to stress three points in my opening

9    statement, and then I will follow up on all of these points

10   in questions.

11   First of all, Mr. Feinberg, thanks for your continuing

12   work.  It is obviously very important for all of our area.

13   But I just wanted to stress a concern and urge you not to

14   declare a victory quite yet based on the numbers and

15   statistics that you always present, and I apologize if I

16   missed any of your comments, but normally when we meet or

17   when we are in public settings, you certainly cite the

18   three-plus billion dollars issued and the tens of thousands

19   of claimants paid.  My concern is I really do not think that

20   is an accurate or full snapshot picture and I would urge us

21   to look at other metrics and make sure we all stay in it for

22   the long haul.

23   In particular, I think there has been a big emphasis on

24   the quick claims.  I believe over 50 percent of claims are

25   quick claims.  In Louisiana, I think it is over 57 percent,

1   the sort of $5,000 payments.  And in fact, that means that

2   the folks most impacted, most hurt, most directly impacted

3   by the spill are not taking those quick claims because their

4   claims are more complicated and bigger and so they are still

5   waiting or standing in line.

6        Just as an example, a huge percentage of the quick

7   claims have gone in Louisiana to tourism industry-type

8   people, and they have losses--I am not arguing against that-

9   -and a tiny percentage, maybe five percent, to fisheries

10   people.  And obviously the fisheries folks are the ones most

11   impacted and first impacted.  So I would caution all of us

12   to make sure we are in it for the long haul and use full

13   metrics and make sure we get to the right outcome over time.

14        Related to that, there have been some suggestions,

15   including from some of our colleagues from New York, that

16   you be appointed to this new 9/11 project coming out of the

17   First Responders bill.  Please take this as a compliment and

18   nothing else, but I do not think you can possibly take on

19   another job until this is fully closed out, and I invite you

20   to say that publicly.

21        [Laughter.]

22        Senator Vitter.  Third and finally, and this is not

23   your bailiwick, we continue to struggle with the economic

24   devastation of the spill and the resulting moratorium,

25   including the continuing de facto moratorium.  Now, this

1    story has left the front pages of the national papers.

2    Evidence of that, the President, unfortunately, did not even

3    mention this in the State of the Union.  But economically,

4    the Gulf Coast continues to be hit hard by all of this, and

5    it is not the spill directly, it is the de facto moratorium

6    which continues.  And this would be tragic whenever it

7    happened.  Coming in the middle of a serious recession, it

8    is triply tragic.

9        Just as an example, our State, Louisiana, before this

10   month, which was a slight and welcome uptick, we have had

11   eight straight months of increasing unemployment.  That is

12   not a coincidence with the spill and the moratorium.  That

13   is a direct result of the drilling moratorium, including the

14   de facto moratorium, eight straight months of increasing

15   unemployment catching up to the national average, and we

16   need to end that, and coincidentally, we need domestic

17   energy production from the Nation.  So certainly, I will

18   continue to work with my two colleagues here on that.

19       Thank you, and I look forward to your testimony and

20   questions.

21       Senator Landrieu.  Thank you, Senator Vitter, for those

22   observations and comments.

23       Let me quickly introduce the panel, and I am going to

24   shorten these introductions.

25       Mr. Feinberg has been introduced before.  He is the

1    Administrator of the Gulf Coast Claims Facility.  He has

2    testified before this Committee and others.  Prior to taking

3    on this challenge, he served as a court-appointed Special

4    Settlement Master, many important cases in the aftermath of

5    several disasters, so he comes to this job with tremendous

6    decades, literally, of experience, and he is going to need

7    all of that to get this right.  We are looking forward to

8    hearing from him today.

9        Craig Bennett is our second witness.  He serves as

10   Director of the U.S. Coast Guard National Pollution Funds

11   Center.  The National Pollution Funds Center was established

12   with the Oil Pollution Act of 1990.  They would normally be

13   managing the Oil Spill Liability Trust Fund.  That has been

14   specifically directed a different way, but they still have

15   obligations under the law.  We are looking forward to

16   hearing from you on that.  He has been in that position, or

17   with the Coast Guard for 22 years.

18       Mr. Ve Nguyen is the witness I referred to in my

19   opening statement.  He piloted a refugee boat out of Vietnam

20   and fled for his freedom with his family, got to the shores

21   of South Louisiana, where many South Vietnamese were

22   relocated, along the Gulf Coast--Mr. Shelby, I am certain in

23   Alabama, as well--and managed to get by all of that, only to

24   be shut down with this oil spill and has now either lost his

25   business or on the verge of losing his business.  And he,

16

1    like many fishermen, and particularly in the Vietnamese

2    community who fish in a sort of a subsistence sort of way,

3    are having a very difficult time specifically navigating

4    this claims process.

5         So, Mr. Feinberg, let us begin with you.  I think we

6    have got five-minute testimony and then we will go for a

7    round of questions.

1        TESTIMONY OF KENNETH FEINBERG, ADMINISTRATOR, GULF

2        COAST CLAIMS FACILITY

3    Mr. Feinberg.  Thank you very much, Madam Chairman.  I

4   am testifying today before three Senators who I have known

5   for a while and who have been among my most vigorous

6   supporters in trying to get this program to work right and

7   have been, thankfully, some of my most constructive critics

8   in pointing out in good faith how we can improve the

9   program, and I am grateful for that criticism.

10    The program--just as Senator Vitter predicted, I go

11   right away to the statistics--the program is working.  We

12   have paid out in five months almost $3.5 billion to 170,000

13   people, businesses, individuals in the Gulf region.  Baldwin

14   County, I believe--I will check this--is the second county

15   in the Gulf that has received the most funds from the Gulf

16   Coast Claims Facility, due in part, I guess, to Senator

17   Shelby's insistence that we focus on Baldwin County, which

18   we are doing.

19    Also, it is true that in the last five weeks, as

20   Senator Vitter has pointed out, 85,000 people and businesses

21   have accepted the quick payment option.  We have paid out in

22   the last five weeks about $700 million to individuals and

23   businesses who either have already been compensated and feel

24   that this is additional compensation that they will accept

25   in return for releasing their claim or cannot document any

18

1  additional damage.  I do not know which, but 85,000 people

2  have taken the quick payment option.

3      Now, transparency, a big point with the three Senators

4  today.  We are taking steps on this.  First, on Tuesday,

5  February 2, about a month later than I promised, Senator

6  Shelby, but on February 2, we will post publicly the

7  criteria and the methodologies being used to calculate final

8  payments and interim payments.  We are going to give a two-

9  week public comment period for any business or any

10  individual before we implement it.  Before we start making

11  these final payments and interim payments, everybody in the

12  Gulf will have an opportunity, as will the Senators, to

13  comment on what we propose to do.  And if there are comments

14  that we should change it before we implement it, but the

15  final payments and the interim payments, I assure the

16  Senators, will commence in February to about 90,000

17  businesses and individuals requesting a final payment and

18  about 40,000 businesses and individuals requesting an

19  interim payment.

20      And, Senator Shelby, the reason it took longer than I

21  had promised you, I have got to get this right.  The Final

22  Payment Program requires a lump sum payment for all present

23  and future damage, and I am trying, talking with all the

24  experts, with the citizens of Alabama, with the businesses

25  in the Gulf, to find out from them, what are the long-term

1    implications of this bill.  Nobody knows for sure.  And it

2    has taken me longer than I had hoped to gather that

3    information together.  But it will be announced on Tuesday.

4    It will be a two-week public comment period.  And at the end

5    of that period, we will finalize that program and begin to

6    commence to make those payments.

7         I also want to pick up on a point.  Senator Landrieu

8    advised me to do this three months ago.  We have now put in

9    place in Alabama, in Louisiana, Florida, and elsewhere local

10   people, live bodies in the claims facility offices to meet

11   with claimants, to answer their questions.  They are not

12   representing them in a court of law.  They are not offering

13   legal advice.  But instead of people being frustrated by

14   calling 1-800 numbers or not getting answers or getting

15   inconsistent answers, we are trying to deal with that by

16   hiring local people who will address local individuals with

17   local problems.

18        We have received in the last five months--the Coast

19   Guard has been fabulous.  We have been working with the

20   Coast Guard since day one.  Craig is here.  I acknowledge

21   their support for this.

22        The Gulf Coast Claims Facility has received about

23   500,000 claims.  I have to get back to Senator Shelby in

24   writing.  When he says we have only processed X percent or

25   three claims, he--you take what Senator Shelby says with a

1   good deal of credibility.  I have got to check this.  It

2   does not ring true, except it is coming from Senator Shelby.

3   I will get an answer to you in writing on this, Senator.

4        Senator Landrieu.  Thirty seconds.  Thirty seconds, if

5   you could.

6        Mr. Feinberg.  So, in sum, just as an opening comment,

7   we are taking steps to deal with transparency.  We are

8   dealing closely with Catholic Charities, Madam Chairman, and

9   those other nonprofit service providers.  We have no

10   authority under the facility to pay them.  That is a BP

11   obligation, if anybody has that obligation.  And I look very

12   much forward to the questions where we can get into some of

13   this in more detail.

14        Thank you, Madam Chairman.

15        [The prepared statement of Mr. Feinberg follows:]

21

1        Senator Landrieu.  Thank you.  We are going to go to

2   Mr. Bennett, but I want to clarify something.  You said, in

3   the last five weeks you did what?  What was the number you

4   threw out?

5        Mr. Feinberg.  We have paid out in the last five weeks

6   about 85,000 quick payments totaling almost $700 million.

7        Senator Landrieu.  Okay.  Thank you.  I wanted to get

8   that clear.

9        All right, Mr. Bennett?  And we have been joined by

10   Senator Nelson from Florida and he will join us in our round

11   of questioning.  Senator Bennett?  I mean, Mr. Bennett?

1          TESTIMONY OF CRAIG BENNETT, DIRECTOR, NATIONAL

2          POLLUTION FUNDS CENTER, U.S. COAST GUARD

3     Mr. Bennett.  Good afternoon, Madam Chairman.  I

4     appreciate--

5     Senator Landrieu.  You have been here long enough.  We

6     are going to have to promote you.  Twenty-two years.

7     Mr. Bennett.  Thank you.  Good afternoon, Madam

8     Chairman and other members of the Committee.  I am grateful

9     for this opportunity to testify today about the role the

10    National Pollution Funds Center, or NPFC, which I have

11    headed for these past two years, plays in implementing the

12    liability and compensation provisions of the Oil Pollution

13    Act of 1990, or OPA, particularly as they relate to the

14    Deepwater Horizon oil spill.

15    Let me start by saying that I have a deep appreciation

16    for the people and environment of the Gulf.  I graduated

17    from high school in Louisiana.  I met my wife and got

18    married in Houston, Texas.  And I spent time raising my two

19    children in St. Petersburg, Florida.  So I remain mindful of

20    my Gulf Coast heritage as I serve the NPFC.

21    The National Pollution Funds Center serves a number of

22    functions with respect to the funding of oil spills.  First,

23    it provides funding for Federal oil spill response through

24    the Oil Spill Liability Trust Fund, which this office

25    administers.  The fund was authorized in 1990 with the

1    passage of OPA to ensure no delay in the Federal response to

2    a spill and for those spills where there was not a viable

3    responsible party.  Fund revenue sources include a per

4    barrel tax on oil, cost recovery from responsible parties,

5    interest income, and Clean Water Act fines and penalties.

6    The NPFC also ensures that the responsible party is

7    advertising its availability to pay claims for removal costs

8    and damages.  If the responsible party denies a claim or

9    does not settle it within 90 days, the claimant may present

10    the claim to the fund.  Finally, the NPFC recovers Federal

11    response costs and any claims that are paid out of the fund

12    from any and all responsible parties.

13        As of January 24, the fund had obligated or expended

14    $684 million for the Federal response to the Deepwater

15    Horizon oil spill.  That was the removal actions of the

16    clean-up.  These costs included Federal agency oil removal

17    costs as well as funds provided to the Natural Resource

18    Damage Trustees to initiate assessments.

19        A key policy of OPA is that the polluter pays, not the

20    taxpayer.  The Federal Government has consistently billed

21    responsible parties for reimbursement of costs paid out of

22    the fund.  To date, nine bills have been sent to responsible

23    parties for the Deepwater Horizon expenses, of which the

24    first eight, totaling $606 million, have been paid by BP.

25    The ninth bill, for $26 million, was presented on January 11

1    and I anticipate it being paid soon.

2        OPA requires that I ensure that responsible parties are

3    advertising for and receiving claims.  They should also

4    advertise that if not settled in 90 days or denied, the

5    claimant may come to the fund or file an action in court.

6    The NPFC only receives claims which a responsible party has

7    not settled to the satisfaction of the claimant, in this

8    case BP, which has delegated the claims process for personal

9    and business claims to the GCCF, and the NPFC process

10   provides a venue to adjudicate any claims that were denied

11   or were not acted on through that normal process.

12       Information about the NPFC claims process is available

13   on our website.  It is also on the BP, the Gulf Coast Claims

14   Facility, and the Restore the Gulf websites, as well.  This

15   information includes a claimant's guide in English, Spanish,

16   Vietnamese, and Cambodian, as well as a list of frequently

17   asked questions.  Recognizing that not everyone is on the

18   web, claimants are also informed of our claims option by the

19   GCCF Claims Center and their call center.  Eighty percent of

20   the claimant inquiries that we have to our call center at

21   the NPFC tell us that they were referred to us by the Gulf

22   Coast Claims Facility.

23       Denial letters to claimants for final claims will also

24   include notification of the claimant's right to submit a

25   claim to the NPFC or to pursue litigation.  The reasons for

1    denial are generally due to insufficient documentation to

2    support the claim, or the documentation showed the claim was

3    not payable under OPA, or the responsible party had already

4    paid the claim.  Again, claimants who are denied by the NPFC

5    have 60 days in which to submit additional information for

6    reconsideration.

7         In conclusion, individuals, communities, and businesses

8    have suffered as a result of this spill.  The National

9    Pollution Funds Center is working to ensure a robust Federal

10   response, that those damaged from this spill are

11   compensated, and that the polluter pays.  The Department and

12   the administration are working to ensure a full recovery

13   throughout the affected States.

14        Thank you for the opportunity to testify today and I

15   look forward to your questions.

16        Senator Landrieu.  Thank you, Mr. Bennett.

17        Our next witness is Mr. Ve Nguyen.  As I said, he is a

18   resident of Plaquemines Parish, a commercial fisherman.  He

19   has worked in the waters of the Gulf for over 29 years.  He

20   has been directly impacted, and we have a translator, of

21   course, with the State Department.  Mr. Nguyen?

1          TESTIMONY OF VE NGUYEN, MEMBER, UNITED LOUISIANA

2          VIETNAMESE AMERICAN FISHERFOLKS

3      Mr. Nguyen.  [Speaking through interpreter.]  Members

4  of the Subcommittee and honored guests, my name is Ve

5  Nguyen.  I have been harvesting oysters in the Gulf of

6  Mexico for 29 years.

7      [Mr. Nguyen speaking in Vietnamese.]

8      Senator Landrieu.  Okay.  Let her translate.  Just a

9  minute.  Go ahead.

10     Mr. Nguyen.  [Speaking through interpreter.]  On behalf

11  of the United Louisiana Vietnamese American Fisherfolks,

12  thank you, Senator Landrieu, for calling this hearing and

13  special thanks for your staff for inviting me today.

14     I would like to take this opportunity to do three

15  things:  To share my story, to present to the Subcommittee a

16  request, and to ask Mr. Feinberg a question.

17     Senator Landrieu.  Okay.  We are going to have to do

18  all that in five minutes.  I am going to try to give a

19  little leeway, but try to go a little faster.

20     Mr. Nguyen.  [Speaking through interpreter.]  Senator,

21  if I may, my story is a common story in the Louisiana

22  Vietnamese American fishing community.  As of the spring of

23  2010, approximately 30 to 50 percent of all commercial

24  fishers living in the Gulf of Mexico region are Vietnamese

25  American, while more than half of every other Vietnamese

1    American in the region are connected to the seafood

2    industry.  In my neighborhood of Plaquemines Parish, 100

3    percent of the Vietnamese households are fishermen.

4    Louisiana fishermen of all ethnic backgrounds are

5    independent and hard-working people.

6         As refugees to the United States after the end of the

7    Vietnam War, we all chose to build our lives anew in these

8    fertile waters of the Gulf Coast and carry on the fishing

9    tradition and customs of our ancestors.  I was raised on my

10   father's fishing boat in Vietnam.  During the Vietnam War, I

11   used my naval skills to help the South Vietnamese Democratic

12   Government defy communism--

13        Senator Landrieu.  Thank you.  Thank you.  Go ahead.

14        Mr. Nguyen.  [Speaking through interpreter.]  At the

15   end of the war, I carried dozens of people on my boat to

16   escape the communist regime.  In the United States, our

17   people carry on the fishing tradition of our ancestors

18   despite the hate crimes from the Ku Klux Klan.  I taught our

19   children the love of the water and appreciate its creatures.

20   My daughter is a marine biologist and my son helps me on the

21   boats.

22        After I was forced to flee my country to the United

23   States and the United States took me in, I pledged an

24   allegiance to the U.S. that includes paying my taxes.

25   Unless I have no other choices, I do not seek Government

1    assistance.  But with the oil spill, like many of my fellow

2    fishermen, I have had to stand in line for handouts and Food

3    Stamps.

4         Before the BP Deepwater Horizon oil spill, my wife and

5    I would be out on the sea by 6:00 a.m. in the morning and

6    return in the late evening.  Like all of the other fishermen

7    in Louisiana, we typically hold back a portion of our catch,

8    five or ten percent, to bring home for personal consumption

9    in the family, to contribute to community events, and to

10   barter with other fishermen for other seafood.

11        I face many challenges in the Gulf Coast Claims

12   Facility process, but I would like to take this opportunity

13   to highlight one in particular.  Mr. Kenneth Feinberg

14   received over 16,000 emergency payment claims for

15   subsistence use, including mine, and Mr. Feinberg only paid

16   one claim of $3,000.  Mary Queen of Vietnam Community

17   Development Corporation, a Louisiana contracted technical

18   assistance provider, helped me packaging my subsistence use

19   claim.  Mr. Feinberg denied my neighbor's emergency

20   payments, loss of subsistence use claim almost that was

21   identical to mine.

22        I, therefore, would like to make our request to members

23   of the Senate today, the United Louisiana Vietnamese

24   American Fisherfolks, in solidarity with 14 other

25   organizations request that the members of this Subcommittee

1   to clarify, reaffirm the definition of subsistence use in

2   the OPA of 1990, fully acknowledging and recognizing the

3   local non-taxable practice of bartering community gifts and

4   family consumption of commercial fishing communities of all

5   ethnic backgrounds.  The definition is clearly intended by

6   Congress in 1990 and comports fully with the Department of

7   Wildlife and Fisheries definition.

8       Moreover, the calculation of emergency compensation for

9   loss of subsistence use should be based on the quantity of

10  the food that commercial fishermen subsisted on before the

11  spill multiplied by the current retail value of the seafood.

12  This formula has been summarized and defended by the White

13  Paper submitted by the United Louisiana--

14      Senator Landrieu.  Thirty seconds, please.

15      Mr. Nguyen.  [Speaking through interpreter.]  Finally,

16  I have a question for Mr. Feinberg.  On behalf of the 14

17  grassroots organizations, I would like to ask Mr. Feinberg

18  why only the people with $250,000 minimum payment can claim.

19  Why do not low-income people have the right to appeal to the

20  panel?

21      [The prepared statement of Mr. Nguyen follows:]

1       Senator Landrieu.  That is an excellent question, and

2   first of all, thank you for your testimony, Mr. Nguyen.  We

3   really appreciate it.

4       Why do we not start with that question, Mr. Feinberg,

5   if you do not mind starting with that, and we are going to

6   go through a five-minute round.  Go right ahead.

7       Mr. Feinberg.  Thank you very much, Madam Chairman.

8   Anybody can appeal, regardless of any amount.  In fact, you

9   can appeal to the Coast Guard if you have no amount and were

10   denied any amount.  So nobody at all, nobody who files a

11   lost income or lost wage claim with the GCCF, nobody is

12   foreclosed from an appeal to the United States Coast Guard,

13   and Mr. Bennett can give you the statistics on that.

14       It is true that I did establish in the GCCF an

15   additional limited right to appeal for claimants receiving

16   over $250,000 or my awarding the claimant over $500,000.  I

17   decided that an additional claim right should be awarded to

18   those high-impact claimants.  But any claimant can appeal to

19   the Coast Guard from my determination, and the reason I did

20   not have a broader appeal right, I am worried very much

21   about slowing down the process, which I am getting

22   criticized about.  Having appeals and more appeals is an

23   inefficient way to get money out the door and that is why I

24   limited it.  But everybody has a right to appeal.

25       Senator Landrieu.  But just to be clear, anyone at any

1    amount can appeal to the Coast Guard.

2         Mr. Bennett, you run that program, so is that your

3    understanding?

4         Mr. Bennett.   Yes, Senator.

5         Senator Landrieu.   Okay.   So if anybody gets a denial

6    letter, whether they have asked for $3,000 or $5,000 or

7    $500,000 or $5 million, they get a denial letter, or if they

8    are compensated $1 million with no explanation and they

9    thought they deserved $5 million, they could go to you.

10        All right.   Let me start with my line of questioning.

11   First, I want to acknowledge for the record that in the five

12   months that BP managed this claims process, and, of course,

13   they had to stand it up very quickly and it was

14   unprecedented, they only distributed $359 million Gulf-wide.

15   In the five months that Ken Feinberg has been on the job,

16   you have distributed $3.3 billion, so you should be

17   commended for that.

18        However, one of my first questions is that people in my

19   State, now I do not know about Florida or Mississippi or

20   Alabama, but in Louisiana, Mr. Feinberg, they go to the

21   centers.   They try to get an update on their claim, and all

22   they are told is, quote, "Your claim is under review."   They

23   cannot get access to the status of that review.   Is it the

24   beginning, the middle, or the end?   They cannot get a

25   confirmation that their documentation is either in order or

1   completely disorganized.  And I think that is a real problem

2   with the system and I would like you to respond.

3        And also in this light, as well, one of the things I

4   think many of us had asked you in the beginning is to have

5   these offices staffed with people who the communities knew,

6   local workers, and people who had knowledge or at least

7   access to the computer database to give people some update.

8   So would you please respond, and what are you going to do to

9   correct it?

10       Mr. Feinberg.  As I said in my opening statement, A, it

11  is a fair criticism.  B, there are 500,000 claims that have

12  come in since August 23.  We have picked up on your

13  suggestion, which was made for the first time months ago, we

14  have expanded our local people in these 35 claims offices so

15  that individuals will be not as frustrated in trying to get

16  an answer about deniability or the calculation of award--

17       Senator Landrieu.  But do these employees in some of

18  these law firms that have been, although they are not there

19  for legal purposes but for advocacy purposes, do they have

20  access to the database, because the Worley employees who

21  were there who are--you could define as local, it is a local

22  company, most certain, in Hammond, Louisiana.  I am sure

23  people work for their company from all over the company, but

24  many from the Gulf Coast.  But I want you to testify, do

25  they have access to the database, because they tell me no,

1    and are the other law firms that you are bringing in going

2    to have access so people can get an update when they need

3    one?

4         Mr. Feinberg.  The answer is yes.  I will not say they

5    have access to the confidential database.  They will have

6    access to the--

7         Senator Landrieu.  To the status?

8         Mr. Feinberg.  That is correct, to give status as to

9    eligibility, status as to denials, status as to the amount

10   of the money that has been calculated.

11        Senator Landrieu.  Okay.  We are going to follow that

12   up.  This is similar, along the same lines.  Claimants

13   receive a denial letter.  I do not have a copy of one with

14   me, but I am going to ask the staff, if they do, to give it

15   to me before the hearing is over, and if not, it will be up

16   on our website.  A copy of a denial letter is lower than

17   expected, or when it is, people are not receiving any

18   commentary or detail.  We know you requested $10,000.  Here

19   is a check for $2,000.  The reason you did not get the

20   additional $8,000 is because of X, Y, and Z.  There does not

21   seem to be any explanation, and people then get very

22   frustrated.  They do not even know where to begin.  Should

23   they completely refile?  What did they not understand?  This

24   is a real problem.

25        Mr. Feinberg.  It is a problem.  Now, I must say, the

1    great majority of people do not have this problem.  But I

2    agree with you.  If even a few people have this problem, it

3    is a big problem.

4         Senator Landrieu.  Okay.  So you are testifying that

5    denial letters or letters of substantially less have

6    explanations attached that are understood, because that is

7    not our understanding.

8         Mr. Feinberg.  No, I am not suggesting that.  I am

9    suggesting that, for the most part, when people get a denial

10   letter, even if there is not an explanation, they understand

11   why there has been a denial.  The number of people--the

12   critics are a relatively small number, but it is too many.

13   I agree, it is too many.

14        Senator Landrieu.  All right--

15        Mr. Feinberg.  But we are dealing with this problem, as

16   I said, by putting people in these local offices that have

17   the ability to come up with live answers to help these

18   people understand.

19        Senator Landrieu.  Okay.  Senator Shelby?

20        Senator Shelby.  Thank you.  Senator Landrieu,

21   Chairwoman, thank you very much for bringing forth this

22   meeting.  It is timely.

23        Mr. Feinberg, I want to reiterate again, it has been

24   nine months since the oil spill.  I will give these numbers

25   to you again.  Fifty-seven percent of claims in my State of

1    Alabama remain unpaid.  This amounts to 38,604 individual

2    and business claims that have not received one penny in

3    funding.  Further, from January 12 to January 24 in Baldwin

4    County, Alabama, this year, the hardest hit region in

5    Alabama, as you referenced, only 28 claims were processed.

6    That is less than three claims a day.  You mentioned the

7    numbers earlier.  All the claims and the statistics that I

8    referenced here came from your website.  They are from your

9    people.  If they are wrong, correct them for the website and

10   correct them for the record.  We are relying on your numbers

11   there.

12        Now, having said that, how many of the paid claims were

13   paid in full?  How many of the claims that you paid were

14   paid in full, and if you do not have this, can you get this

15   for the record--

16        Mr. Feinberg.  I will have to get that for the record.

17        Senator Shelby.  A lot of people have complained,

18   especially in Baldwin County, about partial claims, and they

19   are desperate for the money.  I know you are trying to

20   expedite a lot of this and I know you are acting in good

21   faith.

22        The claims process has surely slowed down.  Why is

23   that, could you just tell for the record?

24        Mr. Feinberg.  It has slowed down, briefly.  Now, it

25   has not slowed down in terms of 85,000 people in Alabama and

1  elsewhere who have accepted the quick payment.  The problem

2  I have run into, and it is about to be solved by next

3  Tuesday, I want to make sure before setting out a public

4  methodology for processing final payments that we take into

5  account, as you pointed out, Senator, the future of the

6  Gulf.  And it has taken me an extra month to gather together

7  all of that expert information, and next Tuesday, I will

8  announce, as I promised you I would, a final payment

9  methodology and criteria.

10      Senator Shelby.  Mr. Feinberg, we have known each other

11  a long time and we have dealt in good faith, and I believe

12  you are dealing in good faith.  I appreciate the times you

13  have gone to the Gulf Coast, not just my State of Alabama

14  but the whole Gulf Coast.  I know you have got a very

15  difficult situation.  I know that.  It is complex.  But to

16  our constituents that are frustrated, especially my area of

17  Alabama, they have seasonal--it is a seasonal deal.  The

18  winter is here.  They lost a lot back in the summer.  They

19  are not sure if they can make it until the spring.  And we

20  have talked about this before and a lot of your people have.

21      So if you can process those claims--only bona fide

22  claims.  I would never want you to pay one cent that was not

23  meritorious.  But I would want you to pay the meritorious

24  claims.  And by now, you should have some methodology to

25  differentiate between the real and the apparent, so to

1   speak.  That is all I am asking you, and I think that is all

2   my constituents in Alabama want, is they want to be

3   compensated for bona fide things and they are not all

4   getting it and that is why I am here today.

5        Mr. Feinberg.  And you have my word, Senator, that I am

6   diligent in understanding that concern.

7        Senator Shelby.  Thank you a lot.

8        Senator Landrieu.  Senator Vitter?

9        Senator Vitter.  Thank you, Madam Chairman, and Mr.

10  Feinberg, again, thanks for your continuing work.  I know it

11  is not easy.

12       Let me go back to some of the points in my opening

13  statement.  Will you publicly state that you will not take

14  the 9/11 First Responder job or any other big public project

15  until this Claims Facility is fully closed down?

16       Mr. Feinberg.  Senator, I do not see how I can.  I do

17  not want to publicly state absolutely I will not, because,

18  first of all, nobody has asked me.  There has been no

19  inquiry whatsoever that I do this.  I am just reluctant,

20  before the President of the United States or the Attorney

21  General of the Department of Justice or whatever, I am

22  reluctant to make that commitment before I know anything

23  about it.  But I assure you that--I assure you my wife

24  agrees with you, Senator.  Absolutely.

25       [Laughter.]

1      Senator Vitter.  Well, I am disappointed with your

2   response.  You know, it would be flattering and perhaps

3   appropriate for you to be asked, but, of course, you have

4   got to decide the answer, and I would suggest, given that

5   this is a big unfinished job, that the answer should be

6   public and unequivocal that you will not do that and would

7   not do anything like that until this facility is completely

8   closed down.

9      Mr. Feinberg.  I take that criticism as valuable.  Let

10   us see what unfolds over the next few weeks.

11      Senator Vitter.  Okay.  Well, I am a little surprised

12   and very disappointed with the response.

13      Is the compensation package of you and your firm for

14   this work public information?

15      Mr. Feinberg.  Yes.  It is public and it has been

16   public for the last three or four months.

17      Senator Vitter.  Okay.  Great.

18      Mr. Feinberg.  It is on the website, I think, but it is

19   certainly public.

20      Senator Vitter.  Okay.  I have not seen it, and that is

21   only my fault, apparently, if it is public.  If you could

22   just get us that detailed information, I would appreciate

23   it.

24      I talked about these quick payments.  Of the 124,000

25   claimants who have been paid, do you know what percentage

1    are quick payments?

2         Mr. Feinberg.  I can say this.  We paid 168,000, as

3    Senator Landrieu pointed out, 168,000 emergency payments.

4    Since that time, since those 168,000 were paid, we have paid

5    an additional 85,000, approximately, quick payments in the

6    last five weeks.  So we have made 168,000 emergency payments

7    plus 85,000 quick payments.

8         Senator Vitter.  Okay.  We may be using slightly

9    different terms.  My understanding is that of all payments

10   to claimants, over half are quick payments, and in

11   Louisiana, it is over 57 percent.  Does that sound like it

12   is roughly accurate?

13        Mr. Feinberg.  No.  No, I do not think so.  I mean, it

14   may be.  I would have to go back and do the math.  The

15   85,000 quick payments have all been made in the last five

16   weeks as supplemental payments.  I would have to go back and

17   do the math and give you those statistics.

18        Senator Vitter.  Okay, again, that is the statistics I

19   have, and the general point is that a huge percentage of

20   claimants paid are quick payments.

21        Mr. Feinberg.  That is true.  That is true.

22        Senator Vitter.  My understanding is over half.  Again,

23   in Louisiana, my understanding is over 57 percent.

24        If you look at those quick payments, my understanding

25   is that 92 percent go to retail, service, restaurant-type

1    folks.

2        Mr. Feinberg.  I do not know how anybody has that

3    information.  I can check and see.  I doubt that is true.

4        Senator Vitter.  Okay.  And my understanding, that

5    compared to that, about five percent go to seafood-related

6    folks.  Now, there are a lot less seafood-related folks than

7    the other category.  I understand that.  But I think there

8    is something else at work, which is that a lot of the

9    payments, a lot of the success, a lot of the numbers that

10   you cite, and it is appropriate to cite it, is essentially

11   the low-hanging fruit.  It is essentially the easiest cases

12   to do.  And my concern is that the folks most impacted, most

13   hit, and sometimes in most dire straits are not the low-

14   hanging fruit and are still waiting and in dire straits.  Do

15   you have a general response to that?

16       Mr. Feinberg.  I do not--I would characterize it

17   differently.  I would say that those who have accepted the

18   quick payment are either individuals who feel that they have

19   been adequately compensated and here is additional

20   compensation that is available simply by signing a release

21   or individuals who cannot document any further damage and

22   therefore see the wisdom of accepting these payments.

23       I agree completely with you, Senator, that fishermen

24   and shrimpers and commercial businesses dependent on Gulf

25   resources are waiting impatiently for the Final Payment and

1    the Interim Payment Program, which will be announced next

2    week, because they are the ones with long-term decisions to

3    make about whether to take the money and issue a release or

4    wait and see over time how the future will develop in the

5    Gulf.

6         Senator Vitter.  Okay.  Well, again, let me just state

7    my conclusion, and people can reach different conclusions.

8    I think these numbers, which are strong in dollar figures,

9    in claimants paid, in many ways, do represent the easiest

10   cases, and my concern is that the folks most hard hit are by

11   definition generally not in that category.

12        Mr. Feinberg.  Senator, I just want to make one other

13   point, which is it is a very interesting point you are

14   making.  You know, I get criticized for the opposite.  I get

15   criticized that people who take the quick payment are

16   desperate.  I do not believe this myself, but this is the

17   argument I hear.  It is the exact opposite of your argument.

18   It is, Mr. Feinberg, people who take the quick payment

19   cannot afford to wait.  They are tempted.  They are

20   desperate, so they take the quick payment because they need

21   it desperately.

22        You are making a different argument, which I tend to

23   share, and that is that people, commercial fishermen,

24   shrimpers, people who have a long-term view of the Gulf, are

25   in desperate need--Senator Shelby says it has been delayed

1    too long--for these final payments and interim payments.  So

2    I am basically in agreement with you that I have got to get

3    these final payments out to these people, these fishermen

4    who really need this.

5        Senator Vitter.  Can you come back to me?  I have some

6    more questions.

7        Senator Landrieu.  Yes, I can come back to you.  Let me

8    get Senator Nelson and then I will come right back to you.

9    Go ahead.

10        Senator Nelson.  Thank you for your service.  I just

11    want to underscore what that chart says.  You see that the

12    number of claims, even though the spill was closer to the

13    other three States than it was to Florida, nevertheless,

14    there are almost 800 miles of Gulf Coast coastline in our

15    State and that has spawned 162,000 claimants, compared, for

16    example, where the spill was right next to Louisiana,

17    194,000.  And it is simply that a spill far away is still

18    affecting a State like Florida.  And our people are

19    frustrated and I want to bring those frustrations to you,

20    Mr. Feinberg, respectfully.

21        Take, for example, a lady named Susan that was in the

22    process of renting vacation homes.  That is how she made her

23    living.  She put in a claim.  Obviously, she was impacted

24    because vacationers did not come, and her claim was denied.

25    Or take Theresa, who was selling advertising in directories

1   and vacation guides for tourists.  When the tourists did not

2   come because they thought there was oil on the beaches--she

3   is a disabled woman, that is her only source of income, and

4   her claim was denied.

5        And so I want to ask five questions, and if I cannot

6   get to it, since I did not have an opening statement, I am

7   down to three-and-a-quarter minutes--

8        Senator Landrieu.  Go ahead.

9        Senator Nelson.  Let me just say, first of all, your

10  structuring of the claims process.  Are the folks that are

11  processing the claims given some sort of worksheet or

12  instructions how to determine when all of the required

13  documentation is complete, and is that instruction sheet

14  there in order to determine how much the compensation should

15  be?

16       Mr. Feinberg.  Yes--

17       Senator Nelson.  In other words, I am looking for

18  uniformity.

19       Mr. Feinberg.  Yes.  There is an instruction sheet.

20  They have been trained.  The claims intake people in Florida

21  do not calculate the amount, but they make sure with their

22  instruction sheet that all the necessary documentation to

23  process the claim is there, is available, and is submitted.

24       Senator Nelson.  Okay.  As in any big organization,

25  somewhere it has broken down with, for example, the two I

1   just mentioned.

2        All right.  Question number two, we have seen with

3   similar documentation different outcomes.  So in what ways

4   do you oversee that the claims are processed so as to try to

5   get as much consistency as possible?

6        Mr. Feinberg.  In a small number of cases, relatively

7   speaking, there is inconsistency.  You are absolutely right.

8   It is inevitable.  There are 500,000 claims, Senator, that

9   we have processed in five months.  I agree with you, there

10  is inconsistency.  We are trying to deal with it in our

11  facility here in Washington.  Where we see inconsistency, we

12  flag it.  We correct it.

13       I went down to Alabama and Florida and met with people

14  who claimed inconsistency and we fixed some of them, but not

15  enough.  And I agree with you, we have got to do a better

16  job of uniformity.  I agree completely.

17       Senator Nelson.  Okay.  Now, there is a need for an

18  expedited review when there are folks that are desperate--

19  electricity shut off, foreclosure, cannot afford the basic

20  necessities of life.  Is there an expedited review?

21       Mr. Feinberg.  Senator, I think the answer to that is

22  categorically yes.  We have paid 168,000 people, including

23  in Florida 160,000 emergency benefits in 90 days without

24  requiring any release or anything.  Now, there may be some

25  people, Susan or Theresa or others, who for whatever the

1   reason.  But when those claims have been brought to my

2   attention, we have done what we have to do to try and

3   accelerate those claims.  I am mindful of this criticism.

4        Senator Landrieu.  Go ahead and take another minute,

5   Senator.

6        Senator Nelson.  People are hurting.  When you have got

7   your electricity shut off, they are hurting.

8        All right.  Now, you, your organization has said they

9   are going to release the formula in February.

10       Mr. Feinberg.  February 2, Tuesday.

11       Senator Nelson.  All right.  Would it not have been a

12   wise thing to do, to be beneficial to the people that are

13   making the claim, to know how those claims were going to be

14   evaluated before they submitted those claims?

15       Mr. Feinberg.  Absolutely.  On February--oh, well, let

16   me see if I understand the question.  On February 2, next

17   Tuesday, we are going to release for a two-week public

18   comment period the opportunity for claimants, experts,

19   whoever, to comment before we start processing the claims

20   next month, the final payments, to review the methodology,

21   review the criteria for people like Susan and Theresa, and

22   decide what they think before we process that claim, if they

23   like the approach we are going to take.

24       Senator Nelson.  That is a step in the right direction.

25   And then I will just say that you all said that there is an

1   appeal process to the Coast Guard?

2       Senator Landrieu.  Yes.

3       Senator Nelson.  Where is there not an appeal process

4   to your facility?

5       Mr. Feinberg.  There is.  We are implementing a very

6   limited--

7       Senator Landrieu.  Thirty seconds.

8       Mr. Feinberg.  --appeals process, a very limited

9   appeals process for high-end claims.  There are so many

10  claims, Senator Nelson.  I do not want to bog down the

11  processing of the claims with what could be thousands of

12  appeals.  Those individuals who are denied or who do not get

13  what they want can immediately appeal to the Coast Guard and

14  that is a separate appeal opportunity for any claimant.

15      Senator Landrieu.  Okay.  We have to move to the second

16  panel, but every member will get another two minutes on this

17  round, and I know, Senator Vitter, you had another question

18  or two.

19      Senator Vitter.  Thank you very much, Madam Chair.

20      Let me pick up where I left off.  My concern is that,

21  in terms of the payments that have been made, a lot of which

22  are quick payments, that has not hit the seafood and seafood

23  processing community significantly.  And so the seafood

24  sector remains unaddressed compared to other sectors, and

25  that is a big and important sector, very hard hit in

1    Louisiana.

2         Let me give you some examples.  You came to Louisiana

3    for some town hall meetings in January.  Thank you for that.

4    You were presented with a lot of cases that folks that were

5    not resolved, were not being adequately dealt with from

6    their point of view.  Tracy and Mike Roberts from Barataria

7    were at the Lafitte town hall and they brought up their

8    claim.  Michelle Chauncey [phonetic], also from Barataria,

9    she was at the same meeting.  Rudy Carmandell [phonetic]

10   from Crown Point, he was a fisherman.  He explained that his

11   paperwork was not straight and the Claims Facility said,

12   well, the problem was he needed to get something signed off

13   by the boat captain.  That really frustrated him, because

14   guess what, he is the boat captain.

15        In all of those cases, you said, "I am going to look

16   into it.  We are going to get back to you."  My information

17   is that in all of those cases, they have not heard anything,

18   nothing new, nothing at all from the Claims Facility since

19   that town hall meeting.  Do you want to respond to that, and

20   how can we fix that and address that?

21        Mr. Feinberg.  I do not believe--if I have not

22   responded to individuals who handed me a claim in a visit to

23   Louisiana, shame on me.  I would like to know, Senator,

24   through your staff, the names of those individuals or their

25   claim numbers and I will be back to you and your staff

1    forthwith.

2         Senator Vitter.   Okay.   We will give you those three.

3    Can I ask you, in those three Louisiana town hall meetings,

4    by definition, there are obviously a limited number of

5    people who could stand up, could you all also report to us

6    who is that list and what has happened to those people since

7    those meetings?

8         Mr. Feinberg.   Yes.

9         Senator Vitter.   Great.

10        Senator Landrieu.   Senator Shelby, and then I will get

11   Senator Carper.

12        Senator Shelby.   Thank you, Madam Chairman.   I will be

13   brief.

14        Mr. Feinberg, I know you have a very, very difficult

15   task.   I understand that.   As I said, I have known you a

16   long time and I know you are working to resolve this.   It is

17   not easy.   It is complex.   But I think my people in Alabama,

18   just like Florida, Louisiana, Mississippi, Texas, and

19   others, they are interested in a fair process, a process

20   that can be expedited, because time is everything to them

21   right now, to try to get over the winter into the spring and

22   praying and hoping that they can get another season.

23        You have been to Alabama several times and I appreciate

24   that, just like the others.   You have been involved and we

25   want you to continue to do this.   We know you cannot process

1   every claim yourself, that you rely on your staff and so

2   forth.  And you have made a lot of people happy.  I am not

3   saying whole.  You know, I do not know that.  But we have

4   got a long way to go and that is what my people want you to

5   do, is to finish the job, finish it as expeditiously as you

6   can, and do the right thing.

7         Mr. Feinberg.  Thank you, Senator.

8         Senator Shelby.  That is all I ask you.

9         Mr. Feinberg.  Thank you.

10        Senator Landrieu.  Senator Carper?

11        Senator Carper.  Thanks.  Welcome, one and all.  It is

12   very nice to see you.  Mr. Feinberg, thank you for taking

13   this on.  Sometimes I think you almost need the wisdom of

14   Solomon to be able to do this fair and square, so we

15   appreciate your efforts and those of Mr. Bennett, too, to be

16   fair.

17        I understand, and this is really a question both to Mr.

18   Bennett and to Mr. Feinberg, but I understand that under

19   current law, if a claim is denied or if it is not handled,

20   say, within the responsible party within, I think it is 90

21   days, then that claim can be presented to the Coast Guard

22   for adjudication for payment out of the Oil Spill Liability

23   Trust Fund.  Is that correct?

24        Mr. Feinberg.  That is correct, Senator.

25        Senator Carper.  Okay.  Mr. Feinberg, I think you

1  called this sort of a built-in appeals process.  I think

2  that is what--is that what you call it?

3      Mr. Feinberg.  There are two appeals processes.  There

4  is the one that you have just described and then there is an

5  additional appeals process that the Gulf Coast Claims

6  Facility has created independent of the Coast Guard.

7      Senator Carper.  Okay.  Mr. Bennett, I am told that

8  over 500 claims have been received by your office thus far,

9  but of those reviewed, none have been paid.  Let me just

10  ask, what do you believe the chances are that this will

11  continue?  That is my first question.  What do you believe

12  the chances are that this will continue?  And secondly, is

13  your office able to handle what I understand are an ever-

14  increasing number of claims that are being submitted to your

15  office every month?

16      Mr. Bennett.  Thank you, Senator.  That is a good

17  question.  You are correct.  My office has received to date

18  507 claims that have all been presented previously to the

19  Gulf Coast Claims Facility and either denied, or in some

20  cases paid before we got to it, or the payment did not meet

21  the claimant's satisfaction, so they brought it to us.  So

22  that is 507 out of the hundreds of thousands that are on

23  there.  We have finished adjudicating--

24      Senator Carper.  So in a case where they submit their

25  claim to Mr. Feinberg's folks for like, say, $200, they got

1   $100, but they are not satisfied.  So they come to you for

2   the second $100?  Is that right?

3       Mr. Bennett.  That is correct, Senator.  They can bring

4   it to us.  It is not really an appeal of his decision

5   because it is sort of an arm's length relationship between

6   the two of us.  But we are an alternate source for

7   adjudicating.  So as long as it has been properly presented

8   to the responsible party, in this case the Gulf Coast Claims

9   Facility, if after 90 days or denial, then they can bring it

10  to us and we will take a re-look at it.  We have an arm's

11  length relationship, so we try to understand what it was

12  that they did.  We want to make sure they have not already

13  paid it, which we found in about ten percent of the cases

14  the claimant has been paid, so we end up sending a denial.

15  And then we adjudicate it in our own process and get back to

16  the claimants.

17      We have adjudicated 200 and all of those have been

18  denials to date.  I cannot predict that it will continue to

19  go at that rate.  I think that is primarily an indication of

20  the fact that the protocols that are out there that BP and

21  GCCF have been able to do have actually been more inclusive

22  than OPA requires.  They can pay for personal injury.  They

23  can pay emergency advance payments.  I cannot pay advance

24  payments.  Their final claims protocol will include

25  prospective losses.  I cannot pay for speculative losses.

52

1    So there are a lot of reasons why when they--

2         Senator Carper.  Let me just ask you this.  Stop right

3    there.  I want to go back to my second question.  Is your

4    office able to handle what I understand to be an increasing

5    claims load demand?  Are you able to handle it?

6         Mr. Bennett.  Senator, that has been a concern of mine

7    for the last seven months, is what happens if we get a

8    deluge, and so far, we have not seen that deluge.  So far,

9    we have been able to scale up.  I have stood up a separate

10   staff just for Deepwater Horizon claims and we have been

11   able to keep up with the calls and the claims that have come

12   in.  I cannot--it depends on what happens in the future.  We

13   will continue to scale as we need to, using the resources

14   that we have.  But for right now, we have been able to stay

15   up.

16        Mr. Feinberg.  Senator, I just want to say one thing

17   about this.  Mr. Bennett has made two--from my perspective,

18   he has made my day.  First, the Coast Guard has acknowledged

19   in this testimony that the GCCF is more generous and more

20   open in finding eligibility than OPA requires.  I have said

21   that from day one.  And second, the Coast Guard has publicly

22   stated today at this hearing that it has received 507

23   appeals from the GCCF, and about half of those, we have

24   adjudicated and affirmed the decision without exception of

25   the GCCF.

1       Senator Carper.  Good.  Thank you.  Last question, if I

2   may.  Mr. Feinberg, how are you ensuring that you do not

3   deny a claim the Government might pay or that no claims fall

4   through the cracks?  If the Coast Guard did pay a claim that

5   you missed, would we be able to be reimbursed for those

6   funds?

7       Mr. Feinberg.  I do not understand the question.

8       Senator Carper.  I will say it again.

9       Mr. Bennett.  Can I answer that?

10      Senator Carper.  Please.

11      Mr. Bennett.  Senator, if I pay a claim that he denied,

12  the responsible party is liable for that expense because it

13  comes out of the trust fund.  So I would then--I would bill

14  BP for any and all claims that we pay and we would be

15  reimbursed by BP.

16      Senator Landrieu.  And they would probably bill him.

17  He has got the $20 billion.

18      Mr. Bennett.  They would work that out between

19  themselves.  Yes, ma'am, that would probably come out of the

20  escrow account.

21      Senator Carper.  All right.  Okay.  Thanks, Madam

22  Chair.

23      Senator Landrieu.  Senator Carper, good question.

24      Senator Nelson?

25      Senator Nelson.  Thank you, Madam Chairman, and I want

1   to thank you for doing this.  I want to thank you, Mr.

2   Feinberg, for coming several times to the Gulf Coast.

3       Now, I want to go back to your last question.  You do

4   not want the appeals process to bog down your process of

5   paying claims, but we would have to worry about that over in

6   the Coast Guard, as well, and we would have to worry about

7   the courts getting clogged.  And so if you will go back and

8   reevaluate that, because at the end of the day, what we are

9   trying to do is help people.  And so there is some breakdown

10  there.  Now, there is some breakdown also--for example, I

11  have seen our staff in my Florida offices work miracles.

12      Mr. Feinberg.  That is right.

13      Senator Nelson.  People have come to us.  They have got

14  a claim that is bogged down.  We get in touch with your

15  facility and they work it out.  But more recently, maybe it

16  is the holidays, the middle of December, I sent you--not

17  you, I sent to the Facility 40 cases, and it is well over a

18  month and ten days later.  And so I followed up with another

19  letter just recently.  If you would attend to that, I sure

20  would appreciate it.

21      Mr. Feinberg.  I think I have an answer for that.  You

22  are right.  I will attend to that.  I think the reason those

23  40 claims are sitting, waiting to be processed, is because

24  of the delay that I imposed in the methodology for

25  finalizing payments, final payments in Florida.  And as I

1    said, Senator, we are accelerating that.  We are going to

2    announce that methodology next Tuesday, and a two-week

3    public comment period, and then we will be paying all 40 of

4    those claims, and I will keep your staff posted on that.

5         Senator Nelson.  Thank you, Madam Chairman.

6         Senator Landrieu.  We are going to wrap this panel, but

7    I want to put a couple of things in the record.

8         One, 194,000 claimants have filed claims to date in

9    Louisiana.  Forty-four percent have been paid.  A hundred-

10   and-sixty-two thousand in Florida.  Sixty percent have been

11   paid.  Sixty-eight thousand in Alabama.  Sixty percent have

12   been paid.  Fifty-two thousand in Mississippi.  Forty-two

13   percent have been paid.  Texas, 10,000.  Thirty percent have

14   been paid.  Now, these are quick payments, emergency

15   payments, interim payments.  I am not sure that we have even

16   yet to see the final settlements filed, and we do not have

17   those complete numbers.  But it just gives us a rough

18   snapshot.

19        But Senator Vitter is absolutely correct that these

20   percentages, while they do tell a part of the story, it is

21   the easier claims, the smaller claims being paid, and some

22   of the businesses that were most affected, particularly in

23   the fisheries and fishing and seafood sector that were the

24   hardest hit have yet to be paid.  So I think, Mr. Feinberg

25   and also Mr. Bennett, we should keep our mind on that.

1    Secondly, I did go find a claims letter, and I want to
2    read it for the record because, to me, this is insufficient.
3    I am not going to read the whole letter, but the operative
4    is, You are denied.  Your claim has been denied.  You did
5    not provide sufficient documentation.  In this form letter,
6    there is no comment about what documentation you failed to
7    provide.  It does not say, you did not provide your birth
8    certificate, or you failed to put your driver's license, or
9    you failed to put the address of your business.  No specific
10   documentation.  And then it says, and if you have questions
11   about your denial, you can call this toll-free number.
12       So what I am going to do before the next hearing,
13   because I am going to call another one, is I personally,
14   with my staff, am going to get 20 people that have got these
15   denial letters, four from each State.  That would be 20, is
16   that correct?  Four times five?  We are going to do 20, four
17   from each State.  And I am going to call this number, Mr.
18   Feinberg, and I am going to hope to get on the other end
19   someone that is going to pull up their account and say, Ms.
20   Jones or Mr. Jones, your claim was denied because, you know,
21   your address was bogus, or because you said you were in the
22   restaurant business, but you are actually in the dry
23   cleaning business and we found out about it and we are not
24   paying you, or something.
25       And then, Mr. Feinberg, I will tell you, the next

1    hearing I have, I am going to have your Chief Operating

2    Officers in front of this panel, because you have a good big

3    picture and I think you have a really good handle on the

4    philosophy and strategic elements of this, but I am

5    convinced, getting more and more convinced, unfortunately,

6    that there is something lost between your vision and

7    actually what is happening on the ground.  And we just--this

8    is getting to be now fairly desperate for some of our

9    businesses and some of our people.

10        So let us end this panel on a positive note, but I am

11   going to do another review here in three or four weeks, give

12   everybody time to recoup.  I want to go to the second panel.

13        And I am also going to submit two other things for the

14   record.  Our State submitted industry-specific compensation

15   models for your review, Mr. Feinberg, and they have not

16   received a response, and that is an official submittal from

17   a very high office, maybe not from the Governor himself, but

18   from someone at a very high office.  And from the State of

19   Florida, your Chief Financial Officer, Jeff Atwater, sent a

20   letter from Florida to you.  They have not been given a

21   response.  So we do need--I know you postponed some things,

22   but this February 2 announcement, of course, is an important

23   one.  Florida and Louisiana have submitted some specifics to

24   you.  So let us please get on that, and we will see you all

25   back here in about four weeks, okay?

58

1          Mr. Feinberg.  Thank you, Senator.

2          Senator Landrieu.  All right.  Thank you.

3          And if the second panel will come forward, I am going

4     to ask Admiral Broderick to go first.  I know he has got a

5     tight flight schedule and I am sorry this has been delayed

6     slightly.  I really appreciate you all making the effort to

7     come with some weather conditions outside.

8          So first, Admiral Broderick is from the Substance Abuse

9     and Mental Health Services, SAMHSA, where he serves as

10    Deputy Administrator.  He has served for 34 years with the

11    Department.  He is a commissioned officer in the U.S. Public

12    Health Service.  He has extensive experience as a clinician

13    and he is here to testify about the impacts on the mental

14    health status of some of these communities and the stress

15    that has been placed on individuals, families, businesses

16    throughout the Gulf.

17         So, Admiral, why do we not start with you and then I

18    will introduce the other panelists in a moment.

1              TESTIMONY OF REAR ADMIRAL ERIC BRODERICK, D.D.S.,

2          M.P.H., DEPUTY ADMINISTRATOR, SUBSTANCE ABUSE AND

3          MENTAL HEALTH SERVICES ADMINISTRATION, U.S.

4          DEPARTMENT OF HEALTH AND HUMAN SERVICES

5      Admiral Broderick.   Thank you, Madam Chairman.   Thank

6   you for indulging my schedule.   If you do have questions of

7   me, if the Committee has questions of me, I would be happy

8   to answer them for the record afterwards.

9          I am pleased to have this time to share with you a few

10  highlights of SAMHSA's efforts in the Deepwater Horizon oil

11  spill recovery and response.   I am joining you today on

12  behalf of SAMHSA's Administrator, Pamela Hyde, who was

13  unable to attend the hearing, yet she has been very involved

14  with SAMHSA's role in the oil spill response.

15         As part of SAMHSA's mission to reduce the impact of

16  substance abuse and mental illness on American communities,

17  behavioral health is an essential part of health.  We know

18  that prevention works, that treatment is effective, and that

19  people recover from mental health and substance use

20  disorders.   Traumatic events, such as the Deepwater Horizon

21  oil spill, placed a heavy burden on individuals, families,

22  and communities and create challenges for public

23  institutions and service systems, especially the behavioral

24  health system.

25         SAMHSA and the behavioral health community know that

1    disasters often precipitate mental and substance use

2    disorders, which can be triggered when hope seems gone,

3    security is threatened, and lives and property are lost.

4    Addressing these behavioral health needs is critical to the

5    recovery for individuals, families, and communities affected

6    by the Deepwater Horizon oil spill and efforts will be

7    necessary for years to come.  With appropriate support and

8    intervention, people can overcome adversity and move

9    forward.

10       As part of the coordinated Department of Health and

11   Human Services response, we at SAMHSA worked to help ensure

12   that the immediate behavioral health needs of affected

13   individuals were addressed in the immediate aftermath of the

14   oil spill and we will continue to address these evolving

15   needs over time.

16       State reports show increased behavioral health needs in

17   the Gulf region in the wake of the oil spill.  These reports

18   document an increase in incidents of psychiatric disorders,

19   anxiety and depression, increase in the incidence of

20   substance use, and higher risks of suicide.  The rate of

21   family breakdown, including domestic violence, are also on

22   the rise.  These outcomes, while troubling, were not

23   unexpected.  These increased behavioral health needs are

24   similar to those observed after Katrina as well as after the

25   Exxon Valdez oil spill in 1989.

1      The current situation in the Gulf is exacerbated by the

2    fact that it occurs in the same region impacted by Hurricane

3    Rita and Katrina in 2005.  We know that when multiple events

4    happen over the course of time, individuals in those regions

5    are at heightened risk for behavioral health disorders.

6      SAMHSA has been engaged in supporting the impacted

7    States since the day after the oil spill.  We have provided

8    technical support and assistance to the States to assess and

9    meet the mental health and related substance abuse needs

10    concerning the affected communities.  SAMHSA has been in

11    contact with State officials assessing needs and helping

12    States formulate response plans, including the development

13    of a shared template to gather information and address the

14    emergent needs and provide technical assistance to States in

15    their request for funds from BP for behavioral health

16    services.

17      In addition, SAMHSA immediately began making relevant

18    and useful information available on our website.  There are

19    comprehensive resources and information available on

20    behavioral health and the Deepwater Horizon oil spill.  An

21    online annotated bibliography continues to provide an

22    extensive list of sources of information.  SAMHSA's website

23    also provides links to dozens of other Federal agencies and

24    organizations involved in the response.

25      At the request of Secretary Sebelius at HHS,

1  Administrator Hyde at SAMHSA, and multiple Gulf States, BP

2  provided $52 million to fund mental health and substance

3  abuse support services.  Funds went to SAMHSA and to four

4  States affected most in the region, Louisiana, Mississippi,

5  Alabama, and Florida.  Of this $52 million, SAMHSA received

6  $10 million to launch a toll-free crisis counseling hotline

7  for residents of the affected States, to develop behavioral

8  health educational materials for public health information,

9  and to conduct surveillance of ongoing behavioral health

10  needs for individuals affected by the spill.

11      SAMHSA created and successfully launched the Oil Spill

12  Distress Helpline, 1-800-985-5990.  This toll-free helpline

13  provides information, support, and counseling for those

14  affected by the Deepwater Horizon disaster.  SAMHSA has also

15  undertaken extensive regional public education campaigns to

16  raise awareness of the potential behavioral health impacts

17  of the spill and to connect those in need with available

18  services.  SAMHSA has assisted in the coordination of local

19  and regional outreach activities to promote awareness of the

20  hotline number.  We have also disseminated public education

21  and outreach materials on behavioral health among the

22  residents of the affected communities.  We have also

23  developed and distributed television, radio, and print

24  announcements to the public.

25      In addition, the $10 million that BP provided to us

1   also provided funds that we have used in coordination with

2   our Federal partners to do surveillance of the mental health

3   and substance abuse needs of the community.  This includes

4   collaboration with the Centers for Disease Control, who is

5   in the process now of conducting a telephone survey in the

6   Gulf.  That survey began on the 15th of December and will

7   continue for a year.

8       We also recently announced the provision of about

9   $650,000 in grants to the four States.  They amount to about

10  $162,000 per State to provide States funds to monitor the

11  mental health and substance abuse services being provided to

12  the people that they encounter in those communities.

13  SAMHSA's efforts represent only a part of the Federal

14  Government's comprehensive response to the Deepwater spill.

15      Despite many hardships, people of the Gulf are doing

16  their best to stay connected with friends of family, take

17  care of themselves and their neighbors.  I have to tell you,

18  Senator, the resilience of the folks in your jurisdictions

19  are truly phenomenal.  They are very, very resilient people

20  given what they have encountered over the last decade.  It

21  is truly amazing to us to see that.

22      History tells us, however, that the emotional impact of

23  the devastation is going to continue and we need to be very

24  vigilant of that and monitor carefully how those communities

25  are doing.  As such, the Oil Spill Distress Line will be

1    operational through 2011.  PSAs and information on our

2    websites will continue to be updated and disseminated.

3    Surveillance will continue.  And coordination with State and

4    voluntary providers will persist until such time as the

5    indicators signal that they are no longer needed.

6        Now that the immediate--

7        Senator Landrieu.  Would you wrap up, if you would,

8    please.

9        Admiral Broderick.  Sure.  Now that the immediate

10   response phase has come to an end, we are shifting our focus

11   to the long-term recovery efforts for the Gulf Coast

12   residents and to help them rebuild their lives.

13       It has been my pleasure to be here, Madam Chair, and I

14   would be happy to, as I said, answer any questions for the

15   record that you might have.

16       [The prepared statement of Admiral Broderick follows:]

1        Senator Landrieu.  Thank you, Admiral.

2        I do have one question, then we will excuse you because

3    I know of your flight, and then we will go to the rest of

4    the panel.

5        Admiral Broderick.  Okay.

6        Senator Landrieu.  Under the total amount of $52

7    million that BP contributed, and they did this voluntarily--

8        Admiral Broderick.  Correct.

9        Senator Landrieu.  --because I want to say for the

10   record, there is no law requiring them to contribute in any

11   way to social services, mental health.  It was not

12   contemplated in the Oil Pollution Act.  It is being, of

13   course, thought about now since the repercussions are so

14   clear and widespread.

15       But SAMHSA was provided $10 million by BP. Did you have

16   any money on hand as an agency prior to the $10 million

17   given to you by this BP contribution to respond as an

18   agency?

19       Admiral Broderick.  We have authority, Madam Chairman,

20   to do SAMHSA Emergency Response Grants, and this was a bit

21   different in that there was no Stafford Act declaration.

22       Senator Landrieu.  Right.

23       Admiral Broderick.  So FEMA funds were not available.

24   And in those instances when--

25       Senator Landrieu.  So what was available?

66

1       Admiral Broderick.  What was available is SAMHSA's

2  general appropriation.  And so while we do not--we have the

3  authority to provide funds to communities in response to

4  disasters.  We do not have a specific budget line item for

5  that, so we would shift funds around in those instances--

6       Senator Landrieu.  And how much did you shift around to

7  accommodate this situation?

8       Admiral Broderick.  We did not.  The $650,000 that we

9  provided to the four States came out of the $10 million that

10 BP provided us.

11      Senator Landrieu.  And what did you do with the other--

12      Admiral Broderick.  The rest of the $10 million?

13      Senator Landrieu.  The rest of the $10 million.

14      Admiral Broderick.  Six million goes to surveillance.

15 A hundred-and--

16      Senator Landrieu.  Surveillance?  What does that mean?

17      Admiral Broderick.  Epidemiologic surveillance,

18 monitoring the substance abuse and mental health conditions

19 of Gulf Coast residents--

20      Senator Landrieu.  So just reporting it, but not

21 treating it?

22      Admiral Broderick.  Correct.  It goes to monitoring--

23      Senator Landrieu.  Identifying it, reporting it, but

24 not treating it.

25      Admiral Broderick.  Right.  Epidemiologic--

1        Senator Landrieu.   So of the $10 million that went to

2    you, only $650,000 went for--

3        Admiral Broderick.   Correct.   The responsibility for

4    treatment is the responsibility of the States.   In these

5    kinds of situations, our mission is to coordinate a response

6    and to do things that cut across the entire region.   The $42

7    million of the $52 million that was provided was provided to

8    those States, and those States then were the ones that

9    provided treatment to people.

10       Senator Landrieu.   Okay.   And was that agreed to

11   between SAMHSA and the States, that you all would do all of

12   the identification and reporting so that they could use 100

13   percent of their money for treatment?   Do you know if that

14   was ever--

15       Admiral Broderick.   Actually, the Administrator

16   convened all five States in Atlanta in June, and I mentioned

17   the development of a common template.   Essentially what that

18   was was a common format for a claim, if you will, by each of

19   the States to BP.   And so we submitted our claim for the

20   things that States would not do, the things that cut across

21   the whole region.   For instance, that telephone number is

22   available to anybody in the region.   The surveillance occurs

23   across the entire region.   The Public Service Announcements

24   occur across the entire region.   And the States then

25   submitted their requests, which totaled $42 million, that BP

1   then paid to the States specifically for treatment.  We did

2   agree that we would--our request would cover the things that

3   cut across the region and the States would request funds for

4   treatment.

5        Senator Landrieu.  Because I am going to be asking each

6   State to give this Committee a very detailed report of how

7   they spent, in Louisiana, 15, in Mississippi, 12, Alabama,

8   12, and Florida, approximately 2.4, and we are going to ask

9   you for detail on your $10 million, and then $1 million went

10  to Catholic Charities.

11       I know that you have to leave, so let me go ahead and

12  excuse you now and thank you for your testimony.

13       Admiral Broderick.  Thank you.

14       Senator Landrieu.  Mr. Keller, if we can first go to

15  you, I guess, and then we will come back to Mr. Costanza and

16  Ms. West.

17       Thank you again, Admiral.  I appreciate it.

18       Mr. Keller, go ahead and outline what BP felt under

19  its--you do not have a legal obligation, but you all have

20  made a fairly significant commitment here.  There are still

21  some great needs, as you know, and we will discuss that as

22  you go on, but go ahead and proceed.  You have five minutes.

1          TESTIMONY OF LUKE KELLER, EXECUTIVE VICE

2          PRESIDENT, GULF COAST RESTORATION ORGANIZATION, BP

3          AMERICA, INC.

4     Mr. Keller.  Thank you, Chairman Landrieu.  I am Luke

5  Keller, Executive Vice President for BP America's Gulf Coast

6  Restoration Organization, the GCRO.  I welcome your

7  invitation to share information with you about the process

8  for addressing State and local government claims relating to

9  the Deepwater Horizon accident and BP's contributions to

10  various social services providers.

11     The Deepwater Horizon accident has profoundly affected

12  all of us.  We have deep sorrow for the lives lost, the

13  injuries sustained, and the impacts to the Gulf Coast

14  communities.

15     GCRO was formed in the summer of 2010 and manages all

16  aspects of the response to the Deepwater Horizon accident in

17  the Gulf of Mexico.  We have offices and dedicated local

18  teams in Louisiana, Mississippi, Alabama, Florida, and

19  Texas.  We essentially oversee four functions:  Spill

20  response and removal, economic restoration, environmental

21  restoration, and restoring trust.

22     Within days of the incident, we established a robust

23  claims process to address claims by individuals, businesses,

24  and government entities.  Our central focus has been and

25  remains the fair and proper resolution of all legitimate

1    claims.  In the GCRO, we work closely with State and local

2    governments to ensure we meet our commitments to the people

3    of the Gulf Coast.

4         And at the request of State Government leaders, BP has

5    provided advances to cover anticipated response and removal

6    costs even before they were incurred, approximately $291

7    million to Louisiana, $75 million to Mississippi, $56

8    million to Alabama, and $50 million to Florida.  Advances

9    were also made to governments for alleged losses of tax

10   revenue.

11        BP has a Government Claims Group within the GCRO that

12   is dedicated full-time to addressing claims filed by

13   Government entities.  We provide regular public reporting to

14   our Government claims process and also send periodic

15   newsletters to Government claimants.

16        [The prepared statement of Mr. Keller follows:]

1     Senator Landrieu.  Mr. Keller, let me just interrupt

2     you just a minute, and you may want to regroup.  We had

3     asked you specifically to come and talk about the mental

4     health, community outreach piece.  So you can submit the

5     rest in writing, but we were very, very clear about the

6     subject of this hearing.  So why do you not think about what

7     you might want to say about that and I am going to go to Mr.

8     Costanza and Ms. West now and then we will come back to you

9     and you can add some thoughts to what BP is observing in the

10    area about community stress or strain, how the process is

11    impacting people, not so much--I mean, everybody is fairly

12    aware of what you all have set up and we are grateful for

13    what you all have done so far, but we want to really stay

14    focused on the human aspect of this.

15    Mr. Costanza, let me introduce you so people know who

16    you are.  I do, but Tom is the Executive Director of the

17    Office of Justice and Peace for Catholic Charities.  He is

18    also the Chair of the Greater New Orleans Disaster Recovery

19    Partnership that has been working, unfortunately, too hard

20    and overtime since Katrina, Rita, Gustav, Ike, and now the

21    BP spill.  I just want to compliment you and Catholic

22    Charities for taking a leadership role through all of these

23    storms and disasters with so many different religious

24    organizations and community-based organizations to try to

25    help our people through some difficult times.

1          So we will start with you, and let me also introduce

2     Ms. West, and then we will go right to you.  She serves as

3     Chair of the South Mississippi Voluntary Organizations

4     Active in Disasters.  You all have been working very closely

5     together.  IRD and the U.S. Gulf Coast Community Resource

6     Center have assisted over 10,000 clients with hurricane

7     recovery and long-term needs since 2005.

8          So, Mr. Costanza, let us start with you.

1       TESTIMONY OF TOM COSTANZA, EXECUTIVE DIRECTOR,

2       OFFICE OF JUSTICE AND PEACE, CATHOLIC CHARITIES,

3       ARCHDIOCESE OF NEW ORLEANS

4    Mr. Costanza.   Good afternoon, Chairman Landrieu, and

5    thank you for your leadership in all these disasters.   We do

6    try to work together as NGOs in partnership and we feel that

7    is the best way to help people effectively recover.

8       My name is Tom Costanza with Catholic Charities in the

9    Archdiocese of New Orleans and I would like to begin by

10   remembering the families that lost loved ones and for the

11   families impacted by this current disaster.

12      As you know, the anxiety level is high and getting

13   higher in our communities across Southeast Louisiana, and

14   much of this is due, unfortunately, to the claims process

15   and structure.   Although the process has paid claims, there

16   is much confusion about its inconsistent methodology,

17   fairness, lack of access to information, lack of local

18   decision making, and lack of concrete, useful information as

19   to why claims were denied and what they can do to correct

20   it.

21      A real issue right now is a total of 4,230 fishing

22   sector claims have been denied for insufficient

23   documentation at the end of the emergency phase.   Some are

24   losing homes and vehicles.   There is increased stress and

25   anxiety because of frustration with the claims process and

1    reduced incomes.  Many are having difficulty finding other

2    employment.  Oystermen are concerned about the long-term

3    loss of the oyster beds, and shrimpers are concerned over

4    price and production levels.

5         However, the nonprofit sector is responding.  Along

6    with many other NGOs, five local Catholic Charities and

7    Second Harvest Food Bank agencies along the Gulf Coast have

8    provided food, relief, and recovery services to people

9    impacted by the disaster.

10        A simple story is recently one of our case managers

11   helped a fisherman with food, room, assistance, and

12   counseling until he can find some temporary work because he

13   cannot fish anymore.  This shows you a human side of this

14   recovery where a case manager is critical and important to

15   develop that relationship and recovery.

16        We are very grateful to BP for the initial direct

17   assistance and mental health funds which we are using, but

18   without the proven holistic approach to family recovery,

19   including case management, direct assistance, financial

20   counseling, the recovery simply is less effective.

21        Responding Catholic Charities agencies report a

22   collective total of nearly $2.7 million in resources we have

23   raised and delivered to the oil spill-impacted population.

24   We are asking both the Gulf Coast Claims Facility and the

25   Gulf Coast Restoration Organization staff to sit down with

1   the nonprofit and faith-based organizations and work

2   together in service to the common good of the residents in

3   our coastal communities.

4        In addition, we recommend the following.  We need to

5   absolutely fast track and resolve the 4,200 fishing industry

6   claims that were denied.  This is critical.  These are the

7   vulnerable families.  These are the families that need

8   immediate assistance and cannot wait until the interim claim

9   process is ironed out.  We need to restructure the claims

10   process for the fishing community using knowledge and

11   protocols developed by industry experts with special

12   cultural sensitivity to the highly impacted Asian Pacific

13   population.  And we must fund the NGO Technical Assistance

14   Providers Network proposal to increase the claims quality

15   and approval rates.

16        In order to stabilize our families during this critical

17   period, we would like to get the Family Stabilization Grant

18   funded, because this would directly help people with rent,

19   utilities, counseling, job development, so they can make it

20   through this tough time.

21        We need to be aware of health care and monitoring of

22   toxic exposure, especially for children and the oil spill

23   cleanup workers, and provide primary health care access and

24   services in these coastal communities.

25        We should pay subsistence claims, fund food banks, and

1    streamline the Food Stamp application to the two-page

2    Disaster Food Stamp Form to alleviate food insecurity.

3        And in terms of long term, we have brought that up,

4    should dedicate some of the fines from the Clean Water Act

5    to human recovery, to look at the tax policy relative to

6    spreading their final claims over a period of years, and as

7    you mentioned before, to revise the Oil Spill Pollution Act

8    to include human recovery.

9        We welcome the opportunity to continue to work together

10   with BP and the Gulf Coast Restoration Organization.  We

11   have worked successfully with the Feinberg team in D.C. on

12   some special critical cases and we look forward to building

13   on that relationship.

14       I would like to end with a quote from

15   Archbishop Aymond.  "Many of these same families have

16   rebuilt their lives after Katrina and are a sign of hope for

17   us all.  They are a vibrant people."  Thank you.

18       [The prepared statement of Mr. Costanza follows:]

1        Senator Landrieu.   Thank you, Tom.

2        Ms. West?

1          TESTIMONY OF LORI WEST, CHAIRMAN, SOUTH

2          MISSISSIPPI VOLUNTARY ORGANIZATIONS ACTIVE IN

3          DISASTERS

4     Ms. West.  Madam Chairwoman, I am honored to be here

5 today to provide you testimony to this prestigious

6 Subcommittee on behalf of South Mississippi VOAD, Voluntary

7 Organizations Active in Disasters, SMVOAD, and International

8 Relief and Development.

9     Since 2005, the members of SMVOAD have been working

10 together to address the effects of Hurricane Katrina, the

11 Nation's largest natural disaster.  Members of SMVOAD

12 include the American Red Cross, Catholic Charities, Hope

13 CDA, Interfaith Disaster Task Force, International Relief

14 and Development, Lutheran-Episcopal Services of Mississippi,

15 Salvation Army, STEPS Coalition, the United Way of South

16 Mississippi, and I have attached a complete list to this

17 testimony.

18     Since June of 2010 and continuing through January of

19 2011, SMVOAD and IRD have held frequent meetings with

20 British Petroleum to try and address the effects of the

21 Deepwater Horizon oil spill on the residents of the Gulf

22 Coast.  We have submitted multiple humanitarian proposals to

23 BP and have revised the proposals in response to BP's

24 feedback.  The time and effort expended by SMVOAD members on

25 this issue has been significant because we believe the

1   problems faced by the people of Mississippi and those along

2   the Gulf Coast are considerable.

3        I would like to draw your attention to an August 2010

4   study by the National Center for Disaster Preparedness at

5   Columbia University's Mailman School of Public Health.  I

6   believe this study is important because it has identified

7   some of the key findings which clearly show the impact the

8   spill has had on our local populations.  More specifically,

9   the study states the following.

10       More than 40 percent of the population living within

11  ten miles of the coast have experienced some direct exposure

12  to the spill.  One in five households has seen their income

13  decrease as a result of the spill, and eight percent have

14  lost jobs.  More than one-quarter of the coastal residents

15  think they may have to move from the area because of the

16  spill.  The oil spill had the greatest impact on those with

17  the fewest economic resources, much like Hurricane Katrina.

18  Coastal residents earning less than $25,000 a year were more

19  likely to report having an income loss than those earning

20  more.

21       In the summer of 2010, the United Way of South

22  Mississippi and the United Way of Jackson and George

23  Counties, the Gulf Coast Business Council, and the

24  Mississippi Center for Nonprofits conducted a survey of

25  health, education, employment, finances, arts, and tourism

1   to measure the impact of the oil spill on the residents.

2   The survey found that the top six issues facing residents

3   were stress, loss of job or income, increased need for food

4   assistance, problems meeting car, rent, or mortgage

5   payments, problems purchasing prescription drugs, and loss

6   of health insurance or other benefits.

7       Also, nearly 70 percent of the nonprofit organizations

8   that reported a decrease in fundraising since May 1, 2010,

9   indicated that the oil spill was a significant or moderate

10  reason for that decrease.  More than 80 percent of all the

11  nonprofits surveyed expected a decrease in fundraising for

12  the next 90 days.

13      Despite these negative impacts on our community and the

14  heroic efforts put forth by SMVOAD and other nonprofit

15  agencies, BP has not yet provided the funding necessary to

16  address the multiple social service needs of the Gulf Coast

17  residents.  I have been asked by our members to provide a

18  copy of our major VOAD proposals, including proposals to

19  address the various aspects of the spill's impact on our

20  community, including housing, finances, job and vocational

21  training, and livelihood means.  Our members believe that

22  ongoing conversations with BP have provided some feedback

23  regarding the proposals, but BP has stated that any funding

24  of these types of urgent programs will indicate culpability

25  or indirect or tertiary effects of the oil spill, and thus,

1    they seem to have made a decision not to fund these critical

2    programs.

3        There was some hope among SMVOAD members when BP agreed

4    to award $52 million for mental health services to the Gulf

5    Coast residents in 2010.  SMVOAD worked with several

6    agencies to present BP with a comprehensive program to

7    address both mental health and basic social service needs

8    for at least 1,300 residents affected by the spill.  It

9    remains unclear to our members why the bulk of the proposal

10   was not funded, and no funds were allocated for victims with

11   urgent social service or real day-to-day needs, such as

12   food, rent, transportation, and other critical financial

13   needs.  Based on our members' experience serving tens of

14   thousands of Hurricane Katrina victims, SMVOAD and IRD

15   member organizations can say with confidence that offering

16   mental health and case management services without also

17   providing critical housing and vocational needs is largely

18   ineffective.

19       We would like the Subcommittee members to note that

20   many organizations have expended their own resources to

21   assess and address the impact of the spill on low- to

22   moderate-income families.  Between May and September of

23   2010, my organization, IRD, enrolled 976 clients into its

24   case management and direct services program, compared to 266

25   clients the previous year.  Requests for rental assistance

1   also increased, from 236 during the first four months of

2   2010 to 678 in the five months between May and September of

3   2010.  And in addition, IRD's YouthBuild program, a program

4   that provides job training and GED preparation to at-risk

5   youth in the Gulf area, saw its applicant pool rise from 142

6   in 2009 to 314 in 2010, immediately after the spill.

7        IRD and members of SMVOAD are addressing the needs of

8   those affected by the spill through a range of direct

9   referral services.  In addition--

10       Senator Landrieu.  Wrap up, if you can.

11       Ms. West.  Okay.  In closing, I know the Subcommittee

12   recognizes that many nonprofit organizations in the Gulf

13   Coast region need additional resources to deliver effective

14   services that will help the residents who have been affected

15   by the oil spill recover, both in the short- and long-term.

16   But today, I am also representing South Mississippi VOAD to

17   ask for more direct support and engagement on this critical

18   issue with BP and its various representatives.  Thank you.

19       [The prepared statement of Ms. West follows:]

1        Senator Landrieu.   Thank you.

2        Let me begin with you, Mr. Costanza and Ms. West, to

3   just try to get a handle on the money that has been

4   allocated and how it has been spent.   Of the $15 million

5   that went to Louisiana and the $12 million that went to

6   Mississippi, did any of that portion go to the networks that

7   each of you represent, and if so, how much?

8        Mr. Costanza.   Of the $15 million, $6.7 went to

9   Catholic Charities and other organizations that are

10   developing the model implementing the comprehensive--it is a

11   comprehensive outreach, treatment, and community resiliency

12   model.

13        Senator Landrieu.   And so do we know where the other

14   non--

15        Mr. Costanza.   The State had the remainder.

16        Senator Landrieu.   Okay.

17        Mr. Costanza.   The State had the remainder.

18        Senator Landrieu.   So about $6 million went to the

19   network of organizations, and then we will find out about

20   the remainder.

21        And how about with you, Ms. West--

22        Ms. West.   It was a similar percentage.   The majority

23   went to the State and then a smaller percentage went to

24   local organizations, mental health specific.

25        Senator Landrieu.   Okay.   Mr. Keller, several of the

1   witnesses directly said or indicated that, potentially, BP

2   feels that if you compensate along these lines, that you

3   think that that puts you in either a disadvantage in a case

4   that you would be responsible for all of these mental health

5   issues or social service challenges.  Is that true, and did

6   that come into your thinking, and if so, why, and if not,

7   what has prevented you from maybe stepping up and helping a

8   little more?

9       Mr. Keller.  Senator, I am unaware of any statement

10   like that that has been made, and in fact, we have

11   encouraged our staff on the ground to bring any proposals or

12   requests that come to us forward so we can take a look at

13   those and evaluate them on their merits.

14       Senator Landrieu.  Okay, because I am aware and have

15   been for months, and it is part of why we wanted you all to

16   come, I think the Catholic Charities has asked BP several

17   times.  There are 53 Louisiana NGOs that have come together

18   to talk about a second tranche, if you will, for some direct

19   services, because as you can tell from the testimony in the

20   previous panel, we are going to be at this for another six

21   months, a year, or a year and a half--I hope not much longer

22   than that--until all of these claims are paid and settled,

23   but who knows.  As I said, 40 percent, 60 percent of claims

24   have been paid, but those have been the low-hanging fruit,

25   the easier claims.  Some of these are more difficult claims,

1    so who knows how long this is going to go on and the need is

2    immediate.

3        So there have been, I understand, several proposals

4    from Louisiana, Mississippi, and potentially other States.

5    Will you consider them?  Is there something that we should

6    know in your corporate governance that prevents you from at

7    least considering their request, and if not, will you

8    consider them?

9        Mr. Keller.  We will consider those, and I do not

10   believe there is anything that prevents us from doing that.

11       Senator Landrieu.  Okay.  Now, I know there is nothing

12   that requires you to do it.  I am clear that the law, and I

13   want the petitioners here to understand that BP is under no

14   legal obligation.

15       Now, in addition, BP was not under any legal obligation

16   to set up any fund of relief for rig workers put out of work

17   because of the moratorium.  You are not responsible, in my

18   view and many people's view, for people put out of work from

19   the moratorium.  The Government is.  But yet, BP stepped up

20   and you made a special arrangement and we are very grateful,

21   to help with some of those rig workers.

22       And I am thinking that perhaps, because this need is as

23   immediate and as clear as that, in this case, this is

24   directly related to the spill, these families, not

25   necessarily related to any indirect, like the slow down or

1    shutdown of some of the work related to oil and gas in the

2    Gulf, but more fisheries and people who really saw their

3    livelihoods curtailed.  So if you could look at that, it

4    would be very, very helpful.  I know that $52 million sounds

5    like a lot of money, but as these numbers are going, it is

6    $20 billion-plus for claims.  It does not seem like a lot of

7    money when you think about it relative to all the other

8    money that is being spent, and it is such an important need.

9          Let me, Tom, just ask you to just hit again how you all

10   are working together, because I know you are fairly

11   organized in Louisiana and Mississippi, but what about

12   Alabama?  What about Florida?  Do you all have any

13   communications with the social groups on the ground there?

14         Mr. Costanza.  I am aware of Catholic Charities'

15   disaster response is for the CCUSA having conference calls

16   with Mobile in Alabama, but we could do a better job of

17   coordinating a Gulf region response.

18         Senator Landrieu.  Ms. West?

19         Ms. West.  We have called together the regional VOADs

20   and New Orleans VOAD has joined in a meeting, Louisiana VOAD

21   has come together with South Mississippi VOAD, Mobile VOAD,

22   Baldwin County VOAD, and Alabama VOAD, and we have all come

23   together and have experienced similar situations requesting

24   for this direct assistance and not prevailing.

25         Senator Landrieu.  Well, it is clear to me, and we are

1    going to have to wrap up in a minute, that the law is

2    deficient and can be and hopefully will be corrected so that

3    the next time there is an environmental spill of a

4    significant magnitude where there are impacts, not just

5    environmental, not just economic, but community impacts or

6    human service impacts, that the polluter, the violator in

7    this case be held accountable.

8         But in the meantime, I think BP would show a great deal

9    of faith to the community, and as has been stated in many of

10   your hundreds of advertisements, that you are going to

11   really meet your obligations to really consider these

12   proposals.  I know that Governor Jindal, the Governor of

13   Louisiana, has written to Bob Dudley, and that letter was

14   sent on November 18.  I am assuming some of the other

15   leaders of the other States have also weighed in.  And, of

16   course, I met with you, Mr. Keller, and with Lamar McKay,

17   who is here--I do not see here, but was with me to discuss

18   this some weeks ago.  So again, you are under no obligation,

19   but it clearly is a need in the aftermath of a disaster to

20   try to provide some direct counseling.

21        But I will say this, because BP has stepped up in many

22   ways.  I am dismayed the Federal Government itself did not

23   have any monies readily available to respond through our own

24   agencies, and I am going to be asking the States in the Gulf

25   Coast what emergency funds do they have established in

1  advance so we are not every time after a major natural

2  disaster, or in this case a manmade pollution event, having

3  to scramble for funds to just respond to people's immediate

4  needs.  And sometimes, we get there too late and it is

5  tragic.

6       Do you all want to end--Mr. Keller, I would like maybe

7  one more minute from you each as we end.  We will start with

8  you and we will close out the panel.

9       Mr. Keller.  So I will be very brief.  Again, thank you

10  for having me here.  I apologize for the misunderstanding.

11  I was under the understanding you wanted to talk about both

12  our Government claims process as well as social services.

13       In a brief minute, I would just close out in saying

14  that we have taken our responsibility very seriously.  I

15  understand and appreciate the distinction you make between

16  those things we are obligated to do and those things that we

17  do voluntarily.

18       Just a nugget of information I would say is that,

19  including the rig workers' fund, other things, the $52

20  million, others, of the total of a little over $1 billion

21  that we have paid into the individual States in response to

22  removal costs, lost revenue, and that sort, we have also,

23  over and above our obligation, for every dollar spent there,

24  have spent somewhere on the order of 30 cents in voluntary

25  contributions, so--

1       Senator Landrieu.  We appreciate that, and just

2   continue to, you know, in my view, I would encourage you to

3   live up to your public statements that you are going to make

4   the region whole.  There are clearly some gaps, particularly

5   in this area.

6       Mr. Keller.  And we take these things very seriously

7   and will certainly look at that.

8       Senator Landrieu.  Thank you.  Thank you.

9       Mr. Costanza?

10      Mr. Costanza.  Well, first of all, thank you, Senator

11  Landrieu, for your leadership in bringing this human side of

12  this tragedy to the forefront once again.  It is critical

13  for our people to recover and our communities will then

14  recover.

15      Simply, the simple ask would be to continue to dialogue

16  with BP and engage in conversation with NGOs, VOADs.  We

17  bring expertise, compassion.  We leverage resources.  We are

18  effective.  We can bring in the private dollar leverage with

19  the other dollars.  We, unfortunately, know how to do this

20  well because of Katrina, but we have developed relationships

21  with other NGOs.  We know each other.  We work well.  And we

22  really think we could work together.  We will really help

23  people at this critical time so that they can recover and

24  get on with their lives.

25      Senator Landrieu.  Thank you.

1       Ms. West?

2       Ms. West.   Thank you, Senator Landrieu.   I want to

3  bring it to Mr. Keller's attention that when resources are

4  limited, folks go to their local community organizations for

5  assistance.   And so the requests are demanding right now and

6  our resources are limited.   So we would appreciate the

7  opportunity to continue engaging in conversation and take

8  another look at these proposals.   So thank you for the

9  opportunity.

10      Senator Landrieu.   Good.   And thank you all.   And as

11  you all know, we are drafting a piece of legislation to

12  address this, so we look forward to your input and we

13  appreciate what you have already given us.   And if anyone

14  has any additional information or suggestions, please get

15  that to us in the next couple of weeks.

16      With that, the meeting is adjourned.   Thank you.

17      [Whereupon, at 3:48 p.m., the Subcommittee was

18  adjourned.]

# EXHIBIT C

# GCCF    Gulf Coast Claims Facility

**GULF COAST CLAIMS FACILITY ANNOUNCEMENT**
**OF**
**PAYMENT OPTIONS, ELIGIBILITY AND SUBSTANTIATION CRITERIA, AND**
**FINAL PAYMENT METHODOLOGY**
February 2, 2011

## I.    INTRODUCTION

The Gulf Coast Claims Facility ("GCCF") seeks public comment pertaining to the next phase of the claims process. In particular, the GCCF invites all claimants and other interested parties to respond to the following draft proposal governing eligibility and substantiation criteria and payment methodologies for Final and Interim Claims. (NOTE: the "Quick Payment" option is always available to any claimant who received an Emergency Advance Payment or an Interim Payment.)

The public comment period will be open from Wednesday, February 2 through Wednesday, February 16, 2011. Thereafter, the GCCF will adopt final rules for adjudication and payment of all Final and Interim Claims.

During the past several months, the GCCF has sought the advice and guidance of experts who have studied the present and future condition of the Gulf. In addition, the GCCF has benefitted from the valuable input of individuals and businesses whose economic livelihood depends upon Gulf resources, including those involved in all aspects of tourism, commercial and charter fishing and other industries including shrimping, crabbing, oyster harvesting, etc. The GCCF has sought a comprehensive understanding of the impact caused by the Deepwater Horizon Incident (the "Oil Spill") and its aftermath. Experts retained by GCCF have pored through various reports and studies pertaining to the future of the Gulf, and have compiled an extensive list of references. Copies of the expert opinions and the reference materials used, are attached to this Announcement. In adopting its final rules governing payment of all Final and Interim Claims, the GCCF is gathering facts from various sources in order to develop a credible and fair payment program.

1

The purpose of the two-week public comment period is to promote transparency and open discussion. Written comments received by the GCCF during the two-week public comment period will be made publicly available on the GCCF website. What follows is a <u>draft</u> proposal; it may be modified following input received during the comment period.

## II.    ELIGIBILITY AND SUBSTANTIATION CRITERIA

The GCCF proposes to adopt the following principles governing the eligibility and substantiation criteria applicable to Final and Interim Claims for individuals and businesses to receive a Final or an Interim Payment from the GCCF:

1. All individuals and businesses that incurred losses due to the Oil Spill are encouraged to file a Final or Interim Claim with the GCCF. Documentation of damage <u>attributable to the Oil Spill</u> is essential.

2. Final and Interim Payments are available for those claimants who can prove their damages due to the Oil Spill, or who can establish a physical injury or death caused by the Deepwater Horizon Incident and its aftermath.

3. As expressly indicated from the very beginning of the Emergency Advance Payment Program, the documentation requirements for receiving either a Final Payment or an Interim Payment are more rigorous and exacting than the minimal documentation requirements that governed administration of the Emergency Advance Payment Program. Each claimant is required to establish both actual financial loss and the connection between the loss and the Oil Spill. More detailed guidance on required documentation will be posted on the GCCF website to assist claimants in providing all necessary supporting documentation and to reduce or eliminate delay due to deficient submissions.

4. The GCCF will not presume that a given loss was or was not caused by the Oil Spill, regardless of whether or not the claimant received an Emergency Advance Payment. Each claim stands on its own merits, and the GCCF will evaluate each submission to determine whether a loss was caused by the Oil Spill. In all cases, there must be an identifiable link between an actual loss

2

and the Oil Spill. Evidence establishing this connection is required. For example, a claimant might provide documentation of cancelled orders for goods or services, disruptions to the supply of Gulf seafood, a termination of employment or reduction in wages that an employer confirms was caused by the Oil Spill, etc. Likewise, the GCCF will not presume that a claimant's 2010 income or profits would have been greater or less than the claimant's 2009 income or profits. Providing financial information about losses sustained in 2010 is but one form of proof, and will not be sufficient documentation for many individuals and businesses other than those claiming injury to specific property or a specific natural resource, e.g., a beach, a swimming area, fishing grounds, etc. Documentation linking the sustained losses to the Oil Spill will be required.

Individuals claiming physical injury or death due to the Oil Spill will be eligible to receive compensation from the GCCF. Such claims must be documented, proving that the physical injury or death is attributable to the Oil Spill and not some other cause. In cases where claimants assert a disability caused by the Oil Spill, evidence of partial or permanent disability, such as a Social Security or State Workers' Compensation determination of disability, will be required in order to determine the extent of any long term impact on the ability of the claimant to work in his/her chosen profession.

## III.   CALCULATION OF AWARDS FOR FINAL AND INTERIM PAYMENTS

The GCCF has retained scientific and economic experts to comprehensively research and review studies pertaining to the impact of the Oil Spill on Gulf resources. These experts also reviewed numerous studies analyzing the economic recovery rates from other major catastrophic events affecting tourism. In addition, the GCCF consulted with numerous individuals and businesses located in the Gulf region in order to understand the possible impact to individuals and Gulf businesses due to the Oil Spill. The GCCF's goal is to determine the impact of the Oil Spill on seafood harvests, the recovery rate for the tourism industry and the general Gulf economy. An effort has

been made by the GCCF to determine the length of time to full economic recovery and the related pattern of gradual recovery over time.

The GCCF will base its calculation of awards for Interim Payments on actual documented losses incurred by a claimant during the period immediately following the Oil Spill on April 20, 2010 and the date the Interim Claim is filed.  For Final Payments, the GCCF will base its calculation on two important factors: (1) actual documented losses incurred by the claimant from the date the losses began since the Oil Spill on April 20, 2010, and (2) a future losses factor to value the risk of possible future losses as determined by the retained experts.

Having examined available expert opinions, studies, reports and comments the GCCF believes that based on the existing available data:

- There is evidence of a strong recovery underway.  However, the GCCF has concluded that it is reasonable to base its future payment calculations on the principle that a full economic recovery in the Gulf region is likely (but not certain) within two to three years from the date of the Oil Spill.

- Prediction is not an exact science.  In light of the uncertainty that remains, the GCCF believes that it is appropriate to provide claimants desiring to finally resolve their claim at this time with a payment that accounts for the inherent uncertainty concerning the future.

- The GCCF's conclusions are based on currently available data. The GCCF will undertake a renewed evaluation of available data every four months.  If such re-evaluation suggests a change in the relative uncertainty concerning the future that warrants an adjustment to the payment for future risk, the GCCF will make the appropriate adjustment and will apply the adjustment to all claims submitted from that date forward.   However, final claims previously submitted with complete documentation but not yet evaluated will be paid the higher of the future losses factor applicable at the time the claim submitted was completely documented, or the adjusted future losses factor.

- Any claimant who disagrees with the GCCF's approach regarding future payment calculations or is not ready to accept it, is free to opt for Interim Payments based

4

upon documented past damage, while awaiting further evidence of Gulf region economic recovery.

1. Actual Documented Losses – Once claimants have demonstrated a direct connection linking the sustained losses for past and present damages to the Oil Spill, eligible claimants will be compensated for documented losses directly caused by the Oil Spill incurred during the period immediately following the Oil Spill on April 20, 2010 and the date of the filing of an Interim or Final Claim with the GCCF ("the loss period").   (For many claimants, much of this documented loss has already been compensated by BP and the GCCF Emergency Advance Payment Program.  Such compensation will be deducted from the claimant's total payment offer.) The calculation of these actual documented losses will be based on a comparison to income from prior years for the same months (for example the average of income earned in  2008 - 2009 or another appropriate historical comparison deemed most relevant to the claimant's experience).  In these cases, the claimant's actual loss will be determined by taking the difference between the claimant's income during the loss period and the comparison period to arrive at the claimant's actual loss.   In other cases, for example for a "start-up" company which anticipated generating income in 2010, a different methodology will be employed.

2. Calculation of Future Losses – The calculation of future losses will be based upon the actual losses incurred during the period immediately following the Oil Spill on April 20, 2010 through December 31, 2010.  The GCCF will use these actual documented 2010 losses to anticipate the gradual economic recovery expected to conclude within two to three years from the date of the Oil Spill. It is anticipated that, for all businesses other than oyster harvesting, recovery will continue in 2011 with full recovery expected in 2012.  This gradual recovery anticipates that losses in 2011 will be approximately 70% of the actual documented losses in 2010.  With continuation of the recovery,

the GCCF expects claimants will experience losses in 2012, but at an average of approximately 30% of the actual documented losses in 2010. <u>Adding together the effect over 2011 and 2012, the Final Payment Offer will be equal to two times the actual documented losses in 2010.</u>

The experts anticipate that individuals and businesses engaged in harvesting oysters destroyed as a result of the Oil Spill, or due to the diversion of fresh water into the Gulf in reaction to the Oil Spill, will likely require a longer recovery period than that experienced by other claimants, without the same degree of gradual recovery. Accordingly, <u>the Final Payment Offer for those claimants will be equal to an amount four times the actual documented losses in 2010</u>.

For claimants with actual documented losses in 2010 of $500,000 or more, the GCCF will not automatically apply the future losses factor to claimant's actual 2010 total losses. The Final Payment calculation for these claimants will be determined on an individualized basis after analyzing input from the claimant as well as the experts retained by the GCCF. The Final Payment Offer will be the actual documented losses in 2010 and an additional amount to compensate for the recovery and risk of possible future losses.

3. In sum, eligible claimants will be paid <u>two times</u> actual documented 2010 losses due to the Oil Spill to compensate for all past and anticipated future losses (except, as described above for claimants with 2010 losses of $500,000 or more). Eligible oyster harvesters will be paid <u>four times</u> actual documented 2010 losses due to the Spill to compensate for all past and anticipated future losses. (The Final Payment Offer will be reduced by compensation already received in Emergency Advance Payments from BP, the GCCF and other offsets.) <u>If any claimant believes that the future of the Gulf continues to be uncertain and is not yet prepared to file a Final Claim, that Claimant may continue to file Interim Claims with the GCCF.</u>

6

4. Final Payments or Interim Payments – The GCCF will pay eligible individuals or businesses either a Final Payment or an Interim Payment, as the claimant may request.  The future losses factor, as determined by the GCCF, may be modified going forward as more information becomes available about the future of the Gulf Coast economy.  It is, therefore, entirely possible that the future losses factor for determining the future impact of the Oil Spill in the Gulf will be increased or reduced as more information becomes available.  Claimants should take this possibility into account in deciding whether to file an Interim Claim or a Final Claim.

For Claimants who have filed a Final Payment Claim with incomplete 2010 documentation, the GCCF will determine and calculate the claim based upon submitted documented actual 2010 losses.  Claimant will have the option to accept the Final Payment Offer based upon submitted 2010 documentation of actual loss that was available to the GCCF for determination and calculation, or accept the payment of an Interim Payment Claim as an installment on the Final Payment Offer and request the re-evaluation of the Final Payment Claim after they have submitted additional documentation of 2010 losses.

---

EACH CLAIMANT'S FINAL PAYMENT OFFER AMOUNT WILL BE THE LARGER OF:

(1)  Two times each eligible Claimant's 2010 Actual Documented Losses (except for claimants with 2010 losses in excess of $500,000); four times each eligible oyster harvester's 2010 Actual Documented Losses, or

(2)  The total actual documented losses through the date of the filing of the Final Claim.

---

# EXHIBIT D

# GCCF Gulf Coast Claims Facility

Learn More at: www.GulfCoastClaimsFacility.com

The Gulf Coast Claims Facility ("GCCF") is administered by Kenneth R. Feinberg, who is responsible for all decisions relating to the administration and processing of claims submitted to the GCCF.  Mr. Feinberg and the GCCF are acting for and on behalf of BP Exploration & Production Inc. in fulfilling BP's statutory obligations as a "responsible party" under the Oil Pollution Act of 1990.

Please note that you have the right to consult with an attorney of your choosing prior to accepting any settlement from the GCCF or signing a release of legal rights.

**Multilingual Toll Free: 1-800-916-4893  |  TTY: 1-866-682-1758**

## www.GulfCoastClaimsFacility.com

Contáctenos para obtener información en español.

Hãy liên hệ với chúng tôi để có thông tin bằng tiếng Việt

សូមទំនាក់ទំនងមកកាន់យើងខ្ញុំដើម្បីទទួលបានព័ត៌មានជាភាសាខ្មែរ។

**info@GCCF-Claims.com**

**GULF COAST CLAIMS FACILITY**
**SAMPLE RELEASE and COVENANT NOT TO SUE**

This is a sample of the Release and Covenant Not To Sue that you will be required to sign if you accept the GCCF Offer of Final Payment. DO NOT SIGN THIS SAMPLE RELEASE. You will receive a copy of the Release and Covenant Not to Sue for you to sign with your Offer of Final Payment.

<u>Important Information About the Attached Release And Covenant Not to Sue;</u>
<u>Acknowledgement and Election to Accept the Final Payment Offer</u>

The attached Release and Covenant Not to Sue ("Release") is a binding legal document. By signing this document, you are forever waiving and releasing all claims that you may have against BP or any other party other than claims for Bodily Injury (including claims alleging a mental health injury) ("Bodily Injury") or by shareholders of BP or other Released Parties for alleged violations of Securities laws ("Securities Claim") in connection with the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil spill in the Gulf of Mexico (the "Incident").

You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility. You are free to reject the final payment offered by the Gulf Coast Claims Facility and to pursue other means of compensation. If you want to file a lawsuit regarding the Incident or make a claim against the Oil Spill Liability Trust Fund, do not sign this Release.

By signing the attached Release, you are forever giving up and discharging any rights which you may have for any costs, damages or other relief related to or arising from the Incident (excepting claims for Bodily Injury or Securities Claim), even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future (i.e., additional oil impacts) or do not manifest themselves until the future.

By signing the attached Release, you acknowledge that you have read and understand the terms of the Release, and that you execute the Release voluntarily and without being pressured or influenced by, and without relying upon, any statement or representation made by any person acting on behalf of BP or any other released party.

**If you are represented by an attorney in connection with your Claim, confer with your attorney before signing this Release.**

For a Business Claimant, if the business is a sole proprietorship and you are the owner and you are married, or if the business is jointly owned by you and your spouse, both you and your spouse must sign the Release. For an Individual Claimant, if you are married, both you and your spouse must sign the Release. You and your spouse should not sign the Release unless you both intend to release all claims.

Claimant acknowledges that Claimant has read and understands the information in this Section. Claimant elects to accept the Final Payment Offer as a final settlement of all claims against any party in connection with the Incident (other than claims for Bodily Injury or Securities Claim).

Claimant consents to the use and disclosure by the GCCF and those assisting the GCCF of any information that it believes necessary and/or helpful to process Claimant's claim for compensation and payment including any legitimate business purposes associated with administering the GCCF and providing adequate documentation for insurance coverage of responsible parties, and/or as otherwise required by law, regulation or judicial process.

Signature of Claimant: _____ Date: _____

I acknowledge that I have read and understand the information in this Section. I consent to the claimant's election to accept the Final Payment Offer as a final settlement of all claims of Claimant against any party in connection with the Incident (other than claims for Bodily Injury or Securities Claim).

Spousal Signature (if applicable): _____ Date: _____

## RELEASE AND COVENANT NOT TO SUE

1. In consideration of payment in the amount of _____, Claimant hereby releases and forever discharges, and covenants not to sue BP Exploration & Production Inc. ("BP") and the other Released Parties, including but not limited to the parties listed in Attachment A to this Release, for any losses, damages, costs, expenses, injuries, claims, causes of actions, liabilities, or other relief that Claimant has or may have, whether known or unknown, whether present or future, whether direct or indirect, whether legal or equitable, arising from or relating in any way to the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil spill in the Gulf of Mexico (the "Incident") (collectively, "Claims"), provided however that this Release does not apply to claims (i) for bodily injury (including claims alleging a mental health injury) ("Bodily Injury") or (ii) by shareholders of BP or other Released Parties for alleged violations of securities laws ("Securities Claim").

2. Claimant also, on behalf of Claimant's spouse, heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, affiliates, partners, limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, and attorneys (collectively, "Affiliates"), hereby releases and forever discharges, and covenants not to sue BP and the other Released Parties for any Claims released by Claimant pursuant to Paragraph 1 above.  With regard to an insurer of the Claimant, notwithstanding anything to the contrary in the foregoing, the execution of this Release by Claimant shall not release the claims of an insurer of Claimant if and only if the Claimant has disclosed in writing on Claimant's Full Review Final Claim Form for Final Payment or Emergency Advance Payment Claim Form submitted to the Gulf Coast Claims Facility, the fact of a payment, and the amount of the payment, by the insurer to Claimant.

3. This Release applies to all Claims regardless of the legal or equitable theory (including legal and equitable theories under federal, state, local, and international law, and including without limitation statutory law, regulation, common law, maritime law, strict liability, negligence, gross negligence, punitive damages, nuisance, trespass, and all other legal and equitable theories), whether existing now or arising in the future, arising out of or in any way relating to the Incident, provided however that this Release does not apply to claims for Bodily Injury or Securities Claim.

4. Released Parties means anyone who is or could be responsible or liable in any way for the Incident or any damages related thereto, whether a person, company or governmental entity, including (but not limited to) BP, other potentially responsible or liable parties, including but not limited to the parties listed in Attachment A to this Release, the federal Oil Spill Liability Trust Fund and any state or local fund, and each of their respective Affiliates as defined above.

5. Claimant represents and warrants that Claimant (i) has authority to execute this Release; and (ii) has not sold or otherwise transferred or assigned any of the Claims, or any interests in such Claims.

6. Claimant represents and warrants that Claimant has not received any payment from any insurer or other party (other than BP or the GCCF) in connection with the Incident, other than payments disclosed on the Full Review Final Claim Form for Final Payment. However, the representation and warranty contained in this section (6) is not applicable to a Claimant electing to submit a Quick Payment Final Claim Form and receive a Quick Payment.

7. Claimant will dismiss with prejudice within 10 days of executing this Release any litigation concerning the Incident (other than litigation alleging only Bodily Injury or Securities Claim) filed by or on behalf of Claimant against BP or any other Released Parties. Claimant also will withdraw (the obligation to withdraw is satisfied by affirmatively declining to participate if and when the Claimant receives any communication giving Claimant the option of participating or not participating in a class action or similar procedural device) from any existing and will not join any new class actions or similar procedural devices concerning or relating to the Incident (other than class actions or similar procedural devices alleging only Bodily Injury or Securities Claim).

8. This Release is not intended to prevent any of the Released Parties from exercising their respective rights of contribution, subrogation, or indemnity under the Oil Pollution Act of 1990 ("OPA") or any other law.  As this Release is fully and completely resolving, together with all other Claims, Claimant's claim under OPA, BP is hereby subrogated to any and all rights that Claimant has arising from the Incident.

9. The payment to Claimant is made without any admission of liability or wrongdoing, or any acknowledgment that the law recognizes any allegation referenced herein, by BP or any other Released Party.

10. The provisions of this Release and all questions with respect to the construction and enforcement thereof and the rights and liabilities hereto shall be governed by, and construed and enforced in accordance with, the laws of the state of residence of the Claimant at the time of signing this Release without regard to conflicts of laws principles.

11. This Release supersedes any and all other agreements, written or oral, between BP and Claimant with respect to such subject matter of this Release.

12. If there is no signature on the line below for Claimant's Spouse, Claimant represents and warrants that Claimant is not married.

## RELEASE AND COVENANT NOT TO SUE

### Release and Covenant Not to Sue – Signature by the Claimant

As the Claimant, or authorized signatory of the Claimant, as set forth in the Claim Form, I am signing this Release and Covenant Not to Sue:

| | |
|---|---|
| **Signature of Claimant or Authorized Signatory of the Claimant:** | SAMPLE DO NOT SIGN |
| **Printed Name:** | |
| **Title, if a business:** | |
| **Date:** | (Month/Day/Year): _____ / _____ / _____ |

### Release and Covenant Not to Sue – Signature by the Claimant's Spouse (if applicable)

As the spouse of the individual signing above, I am signing this Release and Covenant Not to Sue:

| | |
|---|---|
| **Signature:** | SAMPLE DO NOT SIGN |
| **Printed Name:** | |
| **Date:** | (Month/Day/Year): _____ / _____ / _____ |

Aerotek, Inc.
Ameri-Force, Inc.
Anadarko Petroleum Company
Anadarko Petroleum Corporation
Anadarko E&P Company LP
Art Catering, Inc.
Ashland
BJ Services Company, USA
BP America Inc.
BP America Production Company
BP Company North America Inc.
BP Corporation North America Inc.
BP Corporation North America Inc. Savings Plan Investment Oversight Committee
BP Energy Company
BP Exploration (Alaska) Inc.
BP Global Special Products (America) Inc.
BP Holdings North America Limited
BP plc
BP Products North America Inc.
Brett Robinson Gulf Corporation
Cameron Corporation
Cameron International Corporation f/k/a Cooper Cameron Corporation
Cameron International Corporation d/b/a/ Cameron Systems Corporation
Center for Toxicology and Environmental Health L.L.C.
Chouest Shorebase Services, LLC
Clean Harbors
Core 4 Kebawk, LLC
Crowder/Gulf Joint Venture
Crowder Gulf Disaster Recovery
Diamond Offshore Company
DOF Subsea USA, Inc.
Drill-Quip, Inc.
Entrix, Inc.
Environmental Standards
EPS Corporation
ERG
ES&H Environmental Services
ESIS, Inc.
Exponent
Global Diving & Salvage, Inc.
Gulf Offshore Logistics, LLC
Gulf Offshore Logistics International,LLC
Halliburton Energy Services, Inc.
Halliburton Company
Hamilton Eng.
Hepaco
Hilcorp Energy Company
Hyundai Heavy Industries Co. Ltd, Inc.
Hyundai Motor Company
In Rem Vessels
Island Ventures II
Jupiter Insurance Limited
LaBorde Marine Services, LLC
Lloyd's of London
Marine Spill Response Corporation
MEG Energy Corp
M-I L.L.C.
M-I Drilling Fluids L.L.C.
M-I Swaco
Miller Environmental Group, Inc.
Mitsui & Co. (USA), Inc.
Mitsui & Co. Ltd.
Mitsui Oil Exploration Co. Ltd.
Moran Environmental Recovery, LLC
MOEX Offshore 2007 LLC

Moex USA Corporation
MV Monica Ann
MV Pat Tilman
MV Damon B. Bankston
MV Max Chouest
MV Ocean Interventions
MV C. Express
MV Joe Griffin
MV Mr. Sidney
MV Hilda Lab
MV Sailfish
MV Seacor Washington
MV Seacor Vanguard
Nalco Holding Company
Nalco Finance Holdings LLC
Nalco Finance Holdings Inc.
Nalco Holdings LLC
Nalco Company
Nautical Ventures, LLC
Nautical Solutions, LLC
O'Brien's Response Management, Inc.
Ocean Runner, Inc.
Oceaneering International, Inc.
Offshore Cleaning Systems L.L.C.Offshore Service Vessels, LLC
Offshore Inland Marine & Oilfield Services, Inc.
Ranger Offshore, Inc.
Reel Pipe, LLC
Schlumberger, Ltd.
Seacor Marine, LLC
Seacor Marine, Inc.
Seacor Marine International, Inc.
Siemens Financial, Inc.
Seafairer Boat, LLC
State Street Bank and Trust Company
Subsea 7 LLC
The Response Group, Inc.
TestAmerica, Inc.,
Tiburon Divers, Inc.
Tidewater Marine LLC
Tiger Safety, LLC
TL Wallace
Transocean Inc.
Transocean Deepwater, Inc.
Transocean Drilling (U.S.A.) Inc.
Transocean Enterprise Inc.
Transocean Holdings Inc.
Transocean Holdings LLC
Transocean Ltd.
Transocean Offshore Deepwater Drilling, Inc.
Transocean Offshore USA, Inc.
Triton Asset Leasing GmbH
Triton Hungary Asset Management KFT
Triton Hungary Asset Management Limited Liability Company
USES/Construct Corps
Weatherford International Ltd.
Weatherford U.S. L.P
Worley Catastrophe Services, LLC
Worley Catastrophe Response, LLC