

# MACONDO WELL INCIDENT
## Transocean Investigation Report
### Volume I

June 2011



4248

Exhibit No. _____
Worldwide Court Reporters, Inc.

# Table of Contents

Executive Summary ................................................................................................... 9

## Chapter 1
The Macondo Prospect and the *Deepwater Horizon* .................................................. 16
1.1 The Macondo Well ............................................................................................ 16
1.2 Companies Involved in Drilling the Macondo Well ........................................... 17
1.3 *Deepwater Horizon* History of Operations ....................................................... 19
1.4 Inspections of the *Deepwater Horizon* ............................................................. 19
1.5 Well Operations – February – April 2010 .......................................................... 20

## Chapter 2
Incident Chronology and Overview
2.1 Running Production Casing .............................................................................. 25
2.2 Converting the Float Collar .............................................................................. 26
2.3 Cementing ........................................................................................................ 27
2.4 Temporary Abandonment Plan ......................................................................... 28
2.5 Displacement .................................................................................................... 29
2.6 Negative Pressure Test ..................................................................................... 29
2.7 Sheen Test and Final Displacement ................................................................. 30
2.8 Activation of the BOP ....................................................................................... 31
2.9 Initial Emergency Response, Muster, and Evacuation ..................................... 32

## Chapter 3
Incident Analysis
3.1 Well Design and Production Casing Cement .................................................... 41
3.2 Temporary Abandonment ................................................................................. 77
3.3 Drill Floor Activities .......................................................................................... 117
3.4 Blowout Preventer (BOP) ................................................................................. 135
3.5 Gas Dispersion and Ignition ............................................................................ 173
3.6 Muster and Evacuation .................................................................................... 197

## Chapter 4
Key Findings ............................................................................................................. 211

Glossary .................................................................................................................... 221

Appendices ......................................................................................................... Vol. II



# Appendices

*Vol. II – Appendices can be viewed in its entirety at www.deepwater.com.*

Appendix A.  Abbreviations and Acronyms

Appendix B.  Macondo Casing Calculations

Appendix C.  Testing of Cementing Float

Appendix D.  Centralization Plan at Macondo

Appendix E.  Review of Macondo #1 7" x 9-7/8" Production Casing Cementation

Appendix F.  Lock-Down Sleeve Decision

Appendix G.  Hydraulic Analysis of Macondo #252 Well Prior to Incident of April 20, 2010

Appendix H.  BOP Modifications

Appendix I.  BOP Maintenance History

Appendix J.  BOP Testing

Appendix K.  BOP Leaks

Appendix L.  Drill Pipe in the BOP

Appendix M.  Structural Analysis of the Macondo #252 Work String

Appendix N.  AMF Testing

Appendix O.  Analysis of Solenoid 103

Appendix P.  *Deepwater Horizon* Investigation: Gas Dispersion Studies

Appendix Q.  Possible Ignition Sources



# Executive Summary

Transocean was contracted by BP Exploration & Production Inc. (BP) to provide the *Deepwater Horizon* rig and personnel to drill the Macondo well on Mississippi Canyon Block 252. Drilling started on Feb. 11, 2010, and was completed on April 9, 2010.

On April 20, 2010, the blowout of the Macondo well resulted in explosions and an uncontrollable fire onboard the *Deepwater Horizon*. Eleven people lost their lives, 17 were seriously injured, and 115 of the 126 onboard evacuated. The *Deepwater Horizon* sank 36 hours later, and the Macondo well discharged hydrocarbons into the Gulf of Mexico for nearly three months before it was contained.

Following the incident, Transocean commissioned an internal investigation team comprised of experts from relevant technical fields and specialists in accident investigation to gather, review, and analyze the facts and information surrounding the incident to determine its causes.

The investigation team began its work in the days immediately following the incident. Through an extensive investigation, the team interviewed witnesses, reviewed available information regarding well design and execution, examined well monitoring data that had been transmitted in real-time from the rig to BP and which had been available to BP's operating partners and Halliburton, consulted industry and technical experts, and evaluated available physical evidence and third-party testing reports.

The loss of evidence with the rig and the unavailability of certain witnesses limited the investigation and analysis in some areas. The team used its cumulative years of experience but did not speculate in the absence of evidence. This report does not represent the legal position of Transocean, nor does it attempt to assign legal responsibility or fault.

This report focuses on the following critical questions:

- How did reservoir fluids reach the rig floor?
    - How and why did reservoir fluids enter the well?
    - What actions did the drill crew take?
- Why did the blowout preventer (BOP) not stop the flow of reservoir fluids?
- How did reservoir fluids ignite?
    - What occurred after the reservoir fluids reached the rig?
    - How did personnel onboard evacuate the rig?

This report is the culmination of the investigation. These conclusions are the result of the investigation team's analysis of information available to date. The investigation team is aware of investigations conducted by other companies and is aware of, but did not review, additional testimony that is being developed in multi-district litigation proceedings.

The data relied upon by the investigation team is identified in footnotes, endnotes, and the appendices to this report.



# Executive Summary

## Overview of Findings

The Macondo incident was the result of a succession of interrelated well design, construction, and temporary abandonment decisions that compromised the integrity of the well and compounded the risk of its failure. The decisions, many made by the operator, BP, in the two weeks leading up to the incident, were driven by BP's knowledge that the geological window for safe drilling was becoming increasingly narrow. Specifically, BP was concerned that downhole pressure — whether exerted by heavy drilling mud used to maintain well control or by pumping cement to seal the well — would exceed the fracture gradient and result in losses to the formation. While these and other contributing factors were complex, the Transocean investigation team traced them to four overarching issues:

### Risk Management and Communication

BP was responsible for developing detailed plans as to where and how the Macondo well was to be drilled, cased, cemented, and completed, and for obtaining approval of those plans from the Minerals Management Service (MMS). It retained full authority over drilling operations, casing and cementing, and temporary abandonment procedures, including approval of all work to be performed by contractors and subcontractors. Evidence indicates that BP failed to properly assess, manage, and communicate risk. For example, BP did not properly communicate to the drill crew the lack of testing on the cement or the uncertainty surrounding critical tests and procedures used to confirm the integrity of the barriers intended to inhibit the flow of hydrocarbons. It is the view of the investigation team that on April 20, 2010, the actions of the drill crew reflected its understanding that the well had been properly cemented and successfully tested.

### Well Design and Construction

The precipitating cause of the Macondo incident was the failure of the downhole cement to isolate the reservoir, which allowed hydrocarbons to enter the wellbore.

BP's original well plan called for use of a long-string production casing. While drilling the Macondo well, BP experienced both lost circulation events and kicks and stopped short of its planned total depth because of an increasingly narrow margin between the pore pressure and fracture gradients. In the context of these delicate conditions, cementing a long-string casing further increased the risk of exceeding the fracture gradient. Rather than adjusting the production casing design, BP adopted a technically complex nitrogen foam cement program. The resulting cement program was of minimal quantity, left little margin for error, and was not tested adequately before or after the cementing operation. Further, the integrity of the cement may have been compromised by contamination, instability, and an inadequate number of devices used to center the casing in the wellbore.

### Risk Assessment and Process Safety

Based on the evidence, the investigation team determined that during various operations at Macondo, BP failed to properly require or confirm critical cement tests or conduct adequate risk assessments.

Halliburton and BP did not adequately test the cement slurry and program despite the inherent complexity, difficulties, and risks associated with the design and implementation of the program and some test data showing that the cement would not be stable.

BP also failed to assess the risk of the temporary abandonment procedure used at Macondo. BP generated at least five different temporary abandonment plans for the Macondo well between April 12, 2010, and April 20, 2010. After this series of last-minute alterations, BP proceeded with a temporary abandonment plan that created risk and did not have the required approval by the MMS. Most significantly, the final plan called for a substantial and unnecessary displacement of drilling mud, thus underbalancing the well before setting a second surface cement plug and conducting a negative pressure test.

It does not appear that BP used risk assessment procedures or prepared Management of Change documents for these decisions, or otherwise addressed these risks and the potential adverse effects on personnel and process safety.

### Transocean

## Operations

The results of the critical negative pressure test were misinterpreted. The negative pressure test was inadequately set up because of displacement calculation errors, a lack of adequate fluid volume monitoring, and a lack of management of change discipline when the well monitoring arrangement was switched during the test. It is now apparent that the negative pressure test results should not have been approved, but no one involved in the negative pressure test recognized the errors. BP approved the negative pressure test results and decided to move forward with temporary abandonment.

The well became underbalanced during the final displacement, and hydrocarbons began entering the wellbore through the faulty cement barrier and a float collar that likely failed to convert. None of the individuals monitoring the well, including the Transocean drill crew, initially detected the influx.

With the benefit of hindsight and a thorough analysis of the data available to the investigation team, several indications of an influx during final displacement operations can be identified. Given the death of the members of the drill crew, and the loss of the rig and its monitoring systems, it is not known which information the drill crew was monitoring or why the drill crew did not detect a pressure anomaly until approximately 9:30 p.m. on April 20, 2010. At 9:30 p.m.,[A] the drill crew acted to evaluate an anomaly. Upon detecting an influx of hydrocarbons by use of the trip tank, the drill crew undertook well-control activities that were consistent with its training including the activation of various components of the BOP. By the time actions were taken, hydrocarbons had risen above the BOP and into the riser, resulting in a massive release of gas and other fluids that overwhelmed the mud-gas separator system and released high levels of gas around the aft deck of the rig. The resulting ignition of this gas cloud was inevitable.

Forensic evidence from independent post-incident testing by Det Norske Veritas (DNV) and evaluation by the Transocean investigation team confirm that the *Deepwater Horizon* BOP was properly maintained and did operate as designed. However, it was overcome by conditions created by the extreme dynamic flow, the force of which pushed the drill pipe upward, washed or eroded the drill pipe and other rubber and metal elements, and forced the drill pipe to bow within the BOP. This prevented the BOP from completely shearing the drill pipe and sealing the well.

In the explosions and fire, the general alarm was activated, and appropriate emergency actions were taken by the *Deepwater Horizon* marine crew. The 115 personnel who survived the initial blast mustered and evacuated the rig to the offshore supply vessel *Damon B. Bankston*. Mild weather conditions and the presence of the *Bankston* at the location aided in the survival of all individuals who evacuated.

## Structure of Report

The report is structured as follows:

*Chapter 1* provides an overview of the Macondo prospect, the *Deepwater Horizon* drilling rig, well operations through mid-April 2010, and the companies involved.

*Chapter 2* sets forth a chronological summary of the incident, highlighting the critical technical, logistical, and operational issues at Macondo.

*Chapter 3* details the technical analysis and findings of the investigation team.

*Chapter 4* is a summary of the overall findings by the investigation team surrounding the questions outlined above and the possible causes of the incident.

The information in this report and its appendices is available on the Transocean website at *www.deepwater.com*.

---

[A] All references to time are displayed as Central Daily Time (CDT).

Transocean

# 1 The Macondo Prospect and the *Deepwater Horizon*



## 1.1 The Macondo Well

In March 2008, BP Exploration & Production Inc. (BP) leased the Mississippi Canyon Block 252 (MC252) for oil and gas exploration and designated it the Macondo Prospect. BP subsequently sold interests in the prospect to Anadarko (25%) and MOEX (10%) but remained the operator and majority owner (65%).[A] As operator, BP was responsible for all aspects of the design and development of the Macondo well.

BP's original Application for Permit to Drill was submitted to the Minerals Management Service (MMS) on May 13, 2009, and was approved on May 22, 2009. The plan specified using the Transocean *Marianas* to drill a well about 50 miles off the coast of Louisiana, southeast of New Orleans, in 4,992 feet (ft.) of water. The total depth of the well was planned to be 20,200 ft.

Once a drilling permit is secured, the operator designs the well in accordance with the geological conditions of the prospect. The operator's engineers and geologists determine the type and strength of the well casing, cement, well head, and other equipment, and their interpretation is critical to ensuring well integrity and preventing its failure.

The operator then selects and manages various contractors to perform specific procedures such as drilling, cementing, well monitoring, vessel support services, and other well-related tasks. The operator has the final authority and responsibility to make decisions throughout the design, cementing, testing, and final temporary abandonment phases of drilling the well.

At Macondo, BP began exploration on Oct. 6, 2009, using the Transocean *Marianas* rig.[1] On Nov. 9, 2009, Hurricane Ida damaged the *Marianas*, and drilling on Macondo was suspended following the installation and cementing of the well casing. The *Marianas* was demobilized to a shipyard for repairs, and BP applied to the MMS for permission to use the Transocean *Deepwater Horizon* rig to continue drilling. MMS approved this change on Jan. 14, 2010.

The various responsibilities of the operator and examples of tasks assigned to its respective contractors are summarized below.

### Operator Responsibilities

- Conduct geological and geophysical surveys of the prospect
- Analyze proprietary geological and geophysical data when designing the well to specify the type and strength of casing, cement, centralizers, reamers, shock absorbers, well head, and other equipment and materials used to maintain well integrity
- Design and submit a detailed plan to MMS, now the Bureau of Ocean Energy, Management, Regulation and Enforcement (BOEMRE), specifying where and how the well is to be drilled, cased, cemented, and completed
- Serve as general contractor and hire various specialists to work on its lease and perform specific functions in the construction of the well, and direct contractors with respect to their areas of responsibility
- Retain full authority over drilling operations, casing and cementing processes, and temporary abandonment testing and procedures (quality assurance and quality control of well)
- Approve all work to be performed by contractors/subcontractors
- Assist with overall safety on the rig
- Advise and consult with various rig owner personnel on key decisions in heightened-risk situations
- Determine and implement appropriate well-control procedures
- Contain the well and address any pollution from the well

---

A   BP Exploration & Production Inc., Anadarko Petroleum Corporation, and MOEX Offshore 2007 LLC were the leaseholders in the specified percentages of lease number G32306 for MC252 at the time of the incident.

Examples of Tasks Assigned to Contractors
- Provide rig and rig personnel for drilling operation (Transocean)
- Supervise cement operations, including but not limited to: designing cement program, maintaining equipment for cement jobs, maintaining inventory logs for cementing materials and equipment, and conduct cementing operations (Halliburton)
- Maintain logs of formations drilled during drilling operations (Sperry Sun)
- Monitor and report the presence and quantity of gas in drilling mud (Sperry Sun and Transocean)
- Provide separate measurement equipment for pit volumes, penetration rates, pump pressures, mud flow returns (loss/gain), and sample catching for geological analysis (Sperry Sun)
- Survey the hole and provide information to the operator with respect to the target (Sperry Sun and Schlumberger)
- Recommend mud additives and conduct mud testing (M-I SWACO)
- Calculate mud circulating times and volumes (M-I SWACO)
- Monitor mud properties of the drilling fluid and maintain drilling fluid logs (M-I SWACO)
- Design drilling fluid program and monitor fluid properties (M-I SWACO)
- Execute adjustments to mud properties and monitor mud weight (Transocean and M-I SWACO)

## 1.2 Companies Involved in Drilling the Macondo Well

The primary companies involved in drilling the Macondo well were:

### BP

BP personnel in Houston, Texas, managed the development and operation of the Macondo well, and provided direction and support to their personnel onboard the *Deepwater Horizon*. These onshore personnel consisted of three engineers, an engineer team leader, an operations team leader, and a manager. BP offshore personnel consisted of two well site leaders, a well site trainee, and three subsea personnel. The well site leaders exercised BP's authority on the rig, directed and supervised operations, coordinated the activities of contractors, and reported to BP's shore-based team.

*BP's contractors for the Macondo well included:*

### Transocean

BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it. The Transocean team included the drill, marine, and maintenance crews. The senior Transocean personnel involved in day-to-day operations were the offshore installation manager (OIM) and the captain. The OIM was the senior Transocean manager onboard who coordinated rig operations with BP's well site leaders and generally managed the Transocean crew. The captain was responsible for all marine operations and was the ultimate command authority during an emergency and when the rig was underway from one location to another.

The Transocean drill team was led by a senior toolpusher, who supervised two toolpushers responsible for coordinating the round-the-clock drilling operations. The toolpushers supervised the drillers and assistant drillers, who operated the drilling machinery and monitored the rig instruments. At the time of the incident, there were 79 Transocean personnel onboard the *Deepwater Horizon*, including nine who lost their lives.



### Halliburton

BP contracted Halliburton to provide specialist cementing services and expertise and to support the BP teams both onshore and on the *Deepwater Horizon*. At the time of the incident, two Halliburton cementing specialists were onboard the *Deepwater Horizon*.

### Sperry Sun

BP contracted Sperry Sun to install a sophisticated well monitoring system on the *Deepwater Horizon*. Sperry deployed trained personnel, or mud loggers, to monitor the system, interpret the data it generated, and detect influxes of hydrocarbons, or kicks. At the time of the incident, there were two Sperry Sun mud loggers onboard the *Deepwater Horizon*.

### M-I SWACO

BP contracted M-I SWACO to provide specialized drilling mud and mud engineering services on the *Deepwater Horizon*, which included mud material, equipment, and personnel. At the time of the incident, there were five M-I SWACO personnel onboard the *Deepwater Horizon*, including two who lost their lives.

### Schlumberger

BP contracted Schlumberger to provide specialized well and cement logging services on the *Deepwater Horizon*, which included equipment and personnel. At the time of the incident, no Schlumberger personnel were onboard the *Deepwater Horizon*.

### Weatherford

BP contracted Weatherford to provide casing accessories, including centralizers, the float collar, and the shoe track on the *Deepwater Horizon*. Weatherford also provided specialist personnel to advise BP and the drill crew on the installation and operation of their equipment. At the time of the incident, two Weatherford personnel were onboard the *Deepwater Horizon*.

### Tidewater Marine

BP contracted Tidewater Marine to provide the offshore supply vessel the *Damon B. Bankston*. The *Bankston* carried supplies (such as drilling equipment, drilling chemicals, food, fuel oil, and water) to and from the *Deepwater Horizon*. At the time of the incident, the *Bankston* was alongside the *Deepwater Horizon* and provided emergency assistance.

Other personnel onboard the *Deepwater Horizon* included 14 catering staff, two BP executives, and 14 BP subcontractors for a total of 126 personnel onboard.

# Chapter 4 Key Findings

This summarizes the key findings of the investigation team based on its extensive review of available information concerning the Macondo well incident.

As operator of the Macondo well, BP directed all aspects of its development. It chose the drilling location, designed the drilling program that included all operational procedures, set the target well depth, and created the temporary abandonment procedure for securing the well before departure of the drilling rig.

As drilling depths increased at Macondo, the window for safe drilling between the fracture gradient and the pore-pressure gradient became increasingly narrow. Maintaining the appropriate equivalent circulating density (ECD) became difficult, and BP experienced several kicks and losses of fluid to the formation. BP's knowledge of the narrowing window for safe operations guided key decisions during the final stage of operations. BP's changes from the original well plan in the final phase included:

- Reducing the target depth of the well
- Considering changes to the well casing
- Using a lower circulating rate than the parameters specified to convert the float collar
- Reducing cement density with nitrogen foam
- Using a lesser quantity of cement than that specified in BP procedures
- Deciding not to perform a complete bottoms-up circulation before cementing

Although aimed at protecting the formation and allowing operations to continue toward completion of the well, these decisions set the stage for the well control incident.

## 4.1 Running Production Casing

BP chose a long-string production casing design that required the development of a minimal and technically complex cement program to avoid damaging the formation during cementing, leaving little margin for error within normal field accuracy. BP and Halliburton then increased the risk by failing to adequately test the cement program.

The investigation confirmed that the operator's long-string casing design met the loading conditions that were experienced prior to and during the well-control incident. The use of this design, however, drove other plan departures that ultimately increased risk and contributed to the incident. Primarily, cementing the casing required a complex, small-volume, foamed cement program to prevent over-pressuring the formation. The plan allowed little room for normal field margin of error; it required exact calculation of annular volume and precise execution in order to produce an effective barrier to the reservoirs.

The operator had other abandonment alternatives. BP could have either installed a liner and tie-back or deferred the casing installation until the future completion operations began. Either approach would have placed additional and/or different barriers in the well prior to the negative pressure test and displacement.[A] Deferring installation until future completion operations would have allowed additional time for detailed planning and verification of the design.

## 4.2 Converting the Float Collar

BP deviated significantly from its plan to convert the float collar, but proceeded despite observations of anomalies. The investigation team found it possible that the float collar did not convert and thus left a clear path for hydrocarbons to flow from the formations to the rig.

BP's planned procedure to convert the float collar called for slowly increasing fluid circulation rates to 5–8 barrels per minute (bpm) and to generate pressure of 500–700 psi at the float, consistent with the float manufacturer's guidelines. However, because of the increasingly narrow window to avoid fracturing the formation, BP deviated from its planned conversion procedure.

---

[A] 30CFR250.1714-21.

BP made nine attempts to convert the float collar over the course of two hours. BP never circulated at a rate of more than 2 bpm, but it did increase the pressure applied on each successive attempt, finally achieving circulation at a pressure of 3,142 psi — almost five times that planned — and a flow rate of 1 bpm, less than ¼ of that planned. BP took this result as an indication that the float collar had converted even though the resulting circulating pressure was lower than BP's model had predicted. The BP well site leader expressed concern about the issue, took steps to investigate it, and discussed the question of whether the float collar had converted with the Halliburton cementing engineer and BP's shore team. Halliburton and BP proceeded, apparently having concluded that the float collar had converted.

The investigation team found it likely that debris in the wellbore may have plugged the shoe-track assembly and float collar and blocked circulation during the first eight attempts to convert the float collar. The increase to 3,142 psi may have cleared debris from the system without converting the float collar. If the float collar failed to convert, the cement program may have been further compromised.

## 4.3 Cementing

The precipitating cause of the Macondo incident was the failure of the cement in the shoe track and across the producing formations. This failed barrier allowed hydrocarbons to flow into the well.

The cement failed as a result of a number of factors that stemmed from BP's ECD-driven management decisions between April 12 and 20, 2010. These factors include the complexity of the cement program; inadequate testing of the cement; likely cement contamination during the operation; and inadequate testing of the cement after it had been pumped.

### Complexity of Cement Job

BP required a cement program that would exert minimal pressure on the formations. To minimize pressure, Halliburton devised a plan that called for pumping a small volume of cement, much of it nitrified, at a low rate. While this plan would help BP avoid losing cement into the formations, it required precise execution, left little room for error, and increased the risk of cement contamination.

### Cement Program Tests

Despite the inherent risks of cementing the long-string production casing in the conditions at Macondo, BP did not carry out a number of critical tests (e.g., fully testing setting time and cement compatibility with drilling fluid) before or after pumping the cement. Post-incident testing by both CSI Technologies and Chevron demonstrated that the nitrified cement slurry used at Macondo likely failed.

### Cement Contamination

Contrary to best practices, BP decided not to perform full circulation — or a "bottoms-up" — to condition the drilling fluid in the well before the cement job. A full bottoms-up circulation would have required approximately 2,750 barrels of clean mud to be pumped into the well over about 11.5 hours to keep the ECD under the maximum limit. Instead, BP decided to circulate only 346 barrels to reduce the chance of fracturing the formation, increasing the likelihood that debris remained in the wellbore after circulation.

The failure to run a full bottoms-up, coupled with the fact that drilling mud in the well had not been circulated for more than three days, suggests that cement in the annulus could have channeled and become contaminated. This could have delayed or prevented the cement from setting and developing the required compressive strength. Pre-job testing of the cement and spacer/mud/cement compatibility was not sufficient to rule out contamination.

### Post-Cement Program Review

Testing of the adequacy of the cement program could have identified areas of concern, but was not done. After approving the cement program, BP proceeded with its temporary abandonment plan.



## 4.4 Temporary Abandonment Procedure

**BP's final temporary abandonment plan contained unnecessary risks that were not subjected to formal risk analysis.**

BP engineers generated at least five different temporary abandonment plans for the Macondo well between April 12 and April 20, 2010. The plans varied considerably, as did the level of risk they introduced. The abandonment procedure ultimately implemented at Macondo never received the required MMS approval. Further, it was not developed and delivered to the *Deepwater Horizon* until the morning of April 20, 2010, after the rig had commenced temporary abandonment operations. The investigation team found no evidence that BP personnel on the rig or onshore subjected any of the successive temporary abandonment plans or changes to a formal risk assessment process.

The safest of the five versions (that dated April 14) provided that the surface cement plug be set in mud rather than seawater and that a negative pressure test be conducted before the drilling mud was displaced with seawater. The plan that was finally implemented lacked both of these features.

The most significant deficiency in the final plan was the cumulative lack of barriers to flow. The final plan required displacing the drilling mud to a depth of 8,367 ft. (approximately 3,300 ft. below the mudline), which was much greater than the normal displacement depth of between zero and 1,000 ft below the mudline. In addition, the plan removed the mud before testing the cement barrier with a negative pressure test and before setting the surface cement plug. As a result, no secondary cement barrier was in place during the negative pressure test and displacement.

## 4.5 Displacement

**The initial displacement was planned incorrectly, and the execution did not meet the objective of allowing for a valid negative pressure test.**

The final temporary abandonment plan required displacing the casing annulus below the annular blowout preventer (BOP) with seawater to achieve the desired negative pressure test conditions. However, post-incident analysis determined that this objective was not achieved because of calculation errors in the final displacement procedure, lower pump efficiencies which may have been caused by the unconventional spacer materials, potential downhole losses, and the movement of spacer below the closed annular. These factors resulted in a large volume of spacer in the annulus during the negative pressure test that went unidentified due to inadequate fluid volume tracking and lack of procedures to identify the appropriate pressure readings for a satisfactory initial test configuration.

With heavy spacer in the annulus below the closed annular BOP, a valid negative pressure test could not be achieved by monitoring the kill line, which was the method BP decided to use.

## 4.6 Negative Pressure Test

**The results of the negative pressure test were misinterpreted. After the test, BP decided to proceed with the final displacement.**

A negative pressure test is necessary to confirm that the cement will block flow from the reservoir into the well after mud is replaced with seawater. There is no established industry standard or MMS procedure for performing a negative pressure test, and procedures vary from well to well. At Macondo, BP was responsible for overseeing the test and determining if the test was successful.

Post-incident analyses confirmed that the test failed. Anomalous pressure observed on the drill pipe during the test should have alerted all of those monitoring the well to the fact that the cement barrier was not effective, that pressure was being transmitted past the cement and float equipment, and that the well was in communication with the formations.



Central to the misinterpretation of the test results was BP's decision to monitor the kill line instead of the drill pipe when conducting the test. Had the drill crew continued monitoring flow from the drill pipe, as they had been doing previously, those monitoring the well would have detected flow indicating that the well was in communication with the formation.

## 4.7 Sheen Test and Final Displacement

**Post-incident analysis indicated a change in flow path from the well during the final displacement masked influxes into the wellbore.**

Following its approval of the negative pressure test, BP directed the drill crew to proceed with displacing the riser with seawater and, when the spacer was expected at the surface, to stop operations for a sheen test.

Replacing the heavier drilling mud with lighter-weight seawater during final displacement eliminated the remaining hydrostatic barrier to flow, leaving the inadequate cement barrier at the bottom of the well as the primary barrier. According to post-incident calculations, the well became underbalanced to one or more of the exposed formations sometime between 8:38 p.m. and 8:52 p.m., but there was no clear indication of an influx at that time.

Just before the pumps were shut down for the sheen test, the trip tank was dumped into the flowline to send oil-based mud back to the mud pits. Based on post-incident analysis, the resulting increase in flow from the trip tank across the flow sensors masked an influx into the well.

More than one individual on the rig indicated the well was not flowing when the mud pumps were shut down for the sheen test. It is possible that no flow was seen because the flow path had been changed to overboard to dispose of the spacer before the visual confirmations. Post-incident data analysis shows that hydrocarbons flowed into the well during the sheen test, but the overboard discharge may have masked the flow.

Although the compliance engineer concluded and reported that the sheen test was successful, post-incident analysis indicates that the spacer had not reached the surface at the time the test was conducted. This report gave the driller an erroneous confirmation that the displacement was on track when, in fact, it was not.

Pump operations following the sheen test masked an underlying trend of increasing pressure which resulted from an influx into the well. It is not known what data the drill crew was monitoring or why they did not detect an anomaly until approximately 9:30 p.m. At that time, the drill crew acted upon a differential pressure anomaly between the kill line and drill pipe. Actions taken indicate behaviors consistent with a belief that the well was secure and a plug existed in the well. At 9:42 p.m., the pressure trend provided a conventional influx indication with a drop in pressure. At that time a flow check was completed on the trip tank and well control action followed.

## 4.8 Activation of the BOP

**The BOP functioned and closed but was overcome by well conditions.**

The *Deepwater Horizon* BOP and electro-hydraulic/multiplex (MUX) control system were fully operational at the time of the incident, and the equipment functioned. The equipment was maintained in accordance with Transocean requirements, and all modifications that had been made to the BOP either maintained or improved the performance of the device. Minor leaks identified pre-incident did not adversely affect the functionality of the BOP for well control.

Upon detecting flow, the drill crew shut in the well by (1) closing the upper annular BOP; (2) closing the diverter packer and diverting the flow to the mud-gas separator; and, (3) closing the upper and middle VBRs, which initially sealed the well.

However, because of the high flow rate of hydrocarbons from the well, the annular BOP element did not seal and the concentrated flow eroded the drill pipe just above the annular. The closing of the VBRs isolated the annular space and temporarily stopped the influx, but increased pressure inside the drill pipe until it ruptured at



# Chapter 4 Key Findings

the point of erosion above the upper annular. The ruptured drill pipe allowed hydrocarbons to again flow into the riser. When the *Deepwater Horizon* lost power and drifted off location, the drill pipe parted fully.

The explosions and fire disabled the communication link between the BOP and the rig, preventing activation of the BOP emergency disconnect system (EDS) from the toolpusher control panel.

The automatic mode function (AMF) operated as designed to close the blind shear rams following the explosion. However, high pressure bowed the drill pipe partially outside of the BSR shearing blades, trapping it between the ram blocks and preventing the BSR's from completely shearing the pipe, fully closing, and sealing the well.

## 4.9 Muster and Evacuation

All personnel who survived the explosions made their own way or were assisted to the forward lifeboat muster station and successfully evacuated the rig. Despite the obstacles and challenges, the muster and evacuation plans and training facilitated the evacuation of all 115 survivors.

The Macondo incident created extremely challenging conditions for everyone onboard. The explosions and fire happened in the evening, when many off-tour crew were asleep or in their cabins. The blast damage blocked some normal muster points. Some crew were injured and could not evacuate without assistance. It appears that, under the stress of the emergency, four persons evacuated independently rather than pursuant to the procedure in which they were trained.

Despite these obstacles and challenges, the muster and evacuation plans and training facilitated the evacuation of all 115 survivors to the *Damon B. Bankston* supply vessel nearby. One hundred people evacuated in the forward lifeboats, seven evacuated in one of the forward life rafts, and eight jumped from the forward end of the rig into the ocean and were recovered by the *Bankston* fast rescue craft (FRC). After the survivors reached the *Bankston*, the 17 most seriously injured survivors were airlifted by USCG helicopters to hospitals for treatment.

In addition to the heroic actions of many of the crew, assistance from the crew of the *Bankston* was critical in the evacuation and rescue effort.