# EXHIBIT "1"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010<br><br>This Document relates to:<br><br>*All cases* | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## DECLARATION OF SUSAN E. NASH

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I, Susan E. Nash, a person of the full age of majority and a resident of Los Angeles, California, do declare and state, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following facts are true and correct to the best of my personal knowledge and belief:

1. I am an attorney at the law firm of Munger, Tolles & Olson LLP ("MTO"), one of the firms representing the Transocean entities in this case.

2. Beginning in approximately December of 2010, our firm began a review of the attorney-client communication privilege and work product doctrine as applied to the internal investigation conducted by Transocean Offshore Deepwater Drilling Inc. ("Transocean"). MTO had not been involved in initiating, organizing or advising the investigative team.

3. Transocean has not asserted a broad work product privilege for the investigation as a whole. To the contrary, Transocean has produced the underlying historical documents and all

1

14910833.1

factual information assembled by the investigative team, including the team's internal memoranda and communications, with the exception of attorney-client communications between the team and counsel and work done by members of the team to assist counsel in other proceedings, separate and apart from the investigation. The categories of documents over which privilege has been asserted are described in more detail below.

4. The collection and review of the internal investigation documents has been a time-consuming and laborious process. In an abundance of caution, a wide-ranging initial collection from team members gathered over 1,000,000 documents (constituting many millions of pages). The collections included files stored on shared databases, all files from individual laptops, and paper files from team member offices. As I explain below, this large initial collection included many thousand duplicate documents, as well as items totally unrelated to the incident that employees had on their computers (including, for example, personal music files).

5. Beginning in April of 2011, I supervised a team of two MTO associates, several Sutherland associates, 6 MTO staff attorneys, and 9 paralegals reviewing internal investigation documents and emails (which continued to be generated and collected even as our review progressed) for responsiveness and for privilege. Additional teams at Sutherland reviewed other internal investigation documents and emails. Because of the technical nature of many of the documents and because of the multiple proceedings on which members of the internal team worked at different points, the document review and privilege coding have required extensive oversight and quality control.

6. Production of documents reviewed or generated by the internal investigation team began on approximately June 8, 2011, with an initial production of over 9,000 documents and 145,500 pages. On or about June 16, 2011, over 30,000 documents (261,000 pages) were produced. Additional large productions followed, sometimes two or three a week. As of approximately

August 18, 2011, I understand that over 247,000 documents, comprising over 3,360,000 pages, from the internal investigation team's files or computers have been produced.

7. Sutherland's and our review also had to exclude the hundreds of thousands of documents that were not responsive. Because entire laptop files were imaged, some 60,000-plus documents from one custodian alone had to be excluded as "junk," (e.g., iTunes files). Other documents have been produced multiple times by other parties in this case. To minimize the burden on everyone, we eliminated duplicates from the production where possible. Many team members also retained multiple copies of publicly available documents, such as transcripts from the Joint Investigative Team for the U.S. Coast Guard/Bureau of Ocean Energy Management ("JIT") proceedings. These documents were excluded to avoid unnecessary production of thousands of additional pages. The collected files also included thousands of non-responsive emails generated after team members stopped working on the investigation. These examples are provided to illustrate the scope of the undertaking required for the internal investigation document review. To date, approximately 750,000 documents have been excluded as duplicative and/or not responsive.

8. The document reviewing teams were specifically instructed to code certain documents as privileged: (1) post-incident attorney-client communications, including draft reports (which were communicated to counsel for the purpose of rendering legal advice and in anticipation of litigation (see Thibodeaux Declaration, filed concurrently)); (2) communications with public relations consultants with Financial Dynamics ("FD"), who were retained by Sutherland to assist in the rendition of legal advice and in anticipation of litigation; (3) documents and communications generated to assist counsel and the company in preparation for various legal proceedings (including congressional, JIT and Presidential Oil Spill Commission proceedings, as well as proceedings in this Court); (4) certain work by third party consultants conducted

3

14910833.1

separately from the investigation to assist counsel with the foregoing proceedings (*see* Thibodeaux declaration); and (5) weekly updates and other presentations to Transocean management and counsel -- many of which reflect communications with counsel on their face -- so that management could obtain legal advice and prepare for litigation. As of July 28, 2011, excluding post-incident attorney-client communications as allowed by Pretrial Order No. 14 and excluding the draft reports discussed below, MTO and Sutherland had identified an additional 1,880 documents to be withheld as protected by both the privilege for attorney-client communications and the work product doctrine, or by the work product doctrine alone. The Seventh Amended Privilege log filed on July 28, 2011 reflects these additions. I anticipate that the final privilege tally will be higher but it will only include documents that are covered by the principles outlined herein.

9.   The privilege log groups the drafts of the internal investigation report as log entry #2973 in Transocean's Seventh Amended Privilege Log. Although the number of "documents" that fall into this category is in the 3200-3500 range, many of these are duplicates, drafts of short sections of the reports, or illustrations or graphics for the report.

10.  In accordance with the instructions, the document review team has identified and produced as non-privileged the vast majority of the responsive documents. For example, summaries of the team's 200+ interviews with rig crew and others, including the notes and drafts of the summaries of those interviews, have been produced.[1] The team's investigative tools, such as "investigation tickets," "event tickets," timelines, and "root cause" analyses -- the heart of the investigation's work -- have been or are being produced. Spreadsheets showing the team's calculations related to well casing and cementing issues have been or will be produced. And

---

[1] A few interviews with non-rig risk management personnel were withheld as privileged, and a few were redacted to exclude legal advice.

4

thousands upon thousands of emails among team members about the investigation have been produced.[2]

11. The vast majority of work done by third party consultants has also been or will be produced, including (1) work done by Stress Engineering Services; (2) George Birch's Review of Macondo #1 7x9-7/8" Production Casing Cementation[3]; (3) Prospect's *Deepwater Horizon Gas Dispersion Studies*, including early drafts of the appendix to the report; (4) a report by InTuition Energy Associates, Pte., Ltd.; (5) Det Norte Veritas's analysis of the evacuation and emergency response of the *Deepwater Horizon*; (6) a report by Horizon Norsafe on the *DWH* lifeboats; and (7) work orders, agreements and other documents related to these consultants, as well as Kelvin Top-Set, Welaptega Marine Limited, TWI North America, Upstream Forensics, West Engineering Services, Wipro Technologies, except to the extent the documents reflect attorney- client communications or work done to assist counsel in other proceedings.

12. Collecting, reviewing and producing these materials has taken substantial amounts of time. The investigative report was not published until June of this year; the review work began as the team's work drew to a close, and has required many late nights and 12-hour days. MTO personnel spent over 1500 hours on this project in the month of May alone. The scale of that effort has continued. I believe that MTO and Sutherland have made a diligent, good faith effort to draw narrow and appropriate privilege lines and to produce as many documents as humanly

---

[2] Documents sent to counsel for review or emails including counsel in order to secure legal advice have been withheld.

[3] Certain of these documents were withheld as stated in the certification made by Transocean on July 11, 2011, related to the deposition of Bill Ambrose.

5

14910833.1

possible in a short period of time, with the express goal of creating as much transparency for the investigation as possible.

## CERTIFICATE

Pursuant to the provisions of 28 U.S.C. § 1746, I declare, certify, verify and state under penalty of perjury that the foregoing in true and correct.

Executed on this 26th day of August, 2011, at Los Angeles, California.

_____
Susan E. Nash