# EXHIBIT "2"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:   OIL SPILL BY THE OIL RIG<br>"DEEPWATER HORIZON" IN THE<br>GULF OF MEXICO, ON APRIL 20, 2010<br><br>This Document relates to:<br><br>*All cases* | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE<br>SHUSHAN |

## DECLARATION OF MARK THIBODEAUX

STATE OF LOUISIANA

PARISH OF NEW ORLEANS

I, Mark Thibodeaux, a person of the full age of majority and a resident of Bellaire, Texas, do declare and state, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following facts are true and correct to the best of my personal knowledge and belief:

1.      I am an attorney at the law firm of Sutherland Asbill & Brennan LLP ("Sutherland").

2.      Beginning in approximately late May of 2010, I was embedded with the team conducting an internal investigation on behalf of Transocean Offshore Deepwater Drilling Inc. ("Transocean").  Sutherland partner Steven Sparling was my supervisor and was also embedded with the team.

3.      I understood that my role on the team was to act as legal counsel, to protect the company's interests, and to help with the exchange and storage of documents.  During this

period I remained an employee of Sutherland. I believed that the work I did to assist the team or others in helping the company respond in various investigations and hearings would be protected by the work product doctrine and that any legal advice I gave to any member of the team or any employee of Transocean in connection with the Macondo incident, or any requests for such advice, would be protected attorney-client communications.

4.      As the investigation progressed, my litigation colleagues at Sutherland frequently needed assistance from team members -- many of whom had extensive engineering experience and were very familiar with the well control, cementing and rig operational issues that have arisen in this case and in related proceedings. I was often asked to facilitate getting the litigators the information they needed to understand the complex issues in the case and to defend the company.

5.      The assistance provided by the internal investigation team to the litigators included (1) drafting questions for the lawyers to ask in the hearings held by the Joint Investigation Team of the U.S. Coast Guard and Bureau of Ocean Energy Management ("JIT"); (2) reviewing testimony from the JIT proceedings and helping the lawyers coordinate a strategy for responding to issues that came up; (3) assisting the lawyers in responding to inquiries from various congressional entities and in preparing presentations for Congress on the status of the internal investigation and other matters; (4) assisting the lawyers in responding and making presentations to the President's Oil Spill Commission ("OSC"), particularly during the October-November 2010 time period; (5) in the case of investigation team leader Bill Ambrose, preparing for and testifying before the OSC over a 2-day period; and (6) assisting the lawyers with issues and questions in the MDL proceedings.

6.      The major portions of the internal investigation report were drafted after the conclusion of the OSC proceedings, beginning in mid-to-late November of 2010. Due to the number of issues and people involved, the process generally began with individual team members writing a

14910859.1                                    2

small section of a draft, or updating a draft prepared for the OSC, for review by their team lead. On many occasions the team members consulted me before sitting down to draft their sections. They would then submit the draft sections to their team lead and to me or Steven Sparling. Sutherland lawyer David Baay was also involved in reviewing some portions of the drafts. One of my jobs as counsel to the team was to make sure that we had an opportunity to review and comment on the drafts before sending a full draft to the litigation team for review.

7.      Our team's document system was set up so that the drafts were generally stored on a SharePoint system. This meant that anyone on the team could have access to a document at any time. On occasion a particular draft would be edited by multiple people at the same time, resulting in multiple versions. The drafts were also sometimes worked on by individual team members on their laptops, then circulated to others for review. This system makes it difficult, with respect to some of the drafts, to say now that a particular team member wrote or revised a particular draft. However, the drafts were kept confidential and communicated to us for legal review and advice. I estimate that Steven Sparling, David Baay or I reviewed over 90 percent of all of the drafts generated during this period.

8.      Once a full draft was assembled and the team lawyers had concluded our review, the draft was circulated to the litigation team for further review and comment, beginning in approximately February of 2011. Privileged emails between team leader Dan Farr and litigation counsel reflect these transmissions. Over the next several months, the initial draft was revised and commented on by counsel and others. Many of the drafts reflect counsel's "tracked" changes and other comments. These drafts were kept confidential and were communicated to counsel for the express purpose of securing legal advice. The drafts were consistently marked "Privileged and Confidential. Attorney-Client Communication. Work in Progress."

9.      I was also involved in communications with certain third party consultants retained by the team. Certain of these consultants were retained for specific litigation-related purposes, as

opposed to generating work to help the investigation team reach conclusions as to what happened. These include: (1) Scenarios prepared by Prospect to assist counsel in the OSC proceedings. It is my understanding that Prospect's work was separate and apart from the work done on the investigation report, and that, largely due to time constraints, Prospect's draft scenarios were never submitted to the OSC and remained confidential; (2) A maintenance review undertaken by Det Norte Veritas ("DNV") beginning in approximately August of 2010, in response to allegations concerning the rig's maintenance that had been made in the JIT proceedings; and (3) A regulatory analysis undertaken by GL Noble Denton, again in response to allegations that were made during the JIT proceedings.

10.     Two consultants, Bullfighter Design, which provides graphics services, and Torma Communications, a professional writing company, provided services in connection with the drafting of the OSC submissions and internal investigation report. Their work, which was communicated to counsel as part of these submissions, was viewed as privileged.

11.     Other consultants worked directly with the internal investigation team to assist in their efforts to determine the root cause of the blowout and related issues. It is my understandinng that their work was not treated as privileged. These consultants include: (1) DNV's analysis of the evacuation and emergency response of the *Deepwater Horizon*; (2) Stress Engineering Services; (3) George Birch's Review of Macondo #1 7:x9-7/8" Production Casing Cementation; (4) Prospect's *Deepwater Horizon* Gas Dispersion Studies; (5) InTuition Energy Associates, Pte., Ltd.; (6) Horizon Norsafe; (7) Welaptega Marine Limited; (8) TWI North America; and (9) Wipro Technologies.

12.     Other consultants, including Perrin Roller of Upstream Forensics, David Hamilton of Hamilton Engineering, David Ramsay of Kelvin Top-Set, and West Engineering were embedded with and worked directly with the internal investigation team. Again, with the exception of attorney-client communications and work done by Mr. Roller to assist litigation counsel in

various proceedings, it is my understanding that the work of these consultants has not been treated as privileged.

## CERTIFICATE

Pursuant to the provisions of 28 U.S.C. § 1746, I declare, certify, verify and state under penalty of perjury that the foregoing in true and correct.

Executed on this **25** day of August, 2011, at ___New Orleans, LA___ .

___Mark Thibodeaux___
Mark Thibodeaux