# EXHIBIT "4"

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

R. Chris Heck
To Call Writer Directly:                    (312) 862-2000                                    Facsimile:
(312) 862-3030                                                                              (312) 862-2200
r.chris.heck@kirkland.com                   www.kirkland.com

July 27, 2011

**BY ELECTRONIC MAIL**
**AND FIRST CLASS MAIL**

Carter L. Williams
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, TX 77002

>       Re:   Objections and Responses to the BP Parties' First Set of Requests for
>             Admission and First Set of Interrogatories in *In Re: Oil Spill by the Oil
>             Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL
>             No. 2179

Dear Carter:

I write to raise several issues with respect to the objections and responses served on behalf of Triton Asset Leasing GMBH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc. (collectively, "Transocean") on July 15, 2011 to the BP Parties' First Set of Requests for Admission  (the "RFA Responses") as well as Transocean's objections and responses to the BP Parties' First Set of Interrogatories to Transocean (the "Interrogatory Responses"), also served on July 15, 2011.  This letter also requests production of certain categories of documents responsive to the BP Parties' First and Second Requests for Production of Documents to the Transocean Parties.  We request a meet and confer to address any remaining disagreements.

A.      **Transocean's General Objections.**

Transocean's RFA Responses and Interrogatory Responses state a number of general objections without identifying what information, if any, Transocean is withholding on the basis of those objections.  Similarly, virtually all of Transocean's responses contain specific objections that are the same as certain of Transocean's general objections.  For the reasons described on pages 1-3 of my July 13, 2011 letter, please confirm that Transocean is not withholding any information on the basis of these general objections or specific objections that are the same as the general objections.  If Transocean is withholding information on these grounds, please identify each RFA or interrogatory for which information is being withheld, a description of what

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 2

information is being withheld, and the specific grounds upon with Transocean has withheld such information.

**B.      Transocean's RFA Responses.**

**1.      Responses Failing to Admit, Deny, or State a Lack of Information Concerning the Actual Subject of the Request.**

Under Rule 36 of the Federal Rules of Civil Procedure, a party responding to an RFA must admit, specifically deny, or state why it cannot either admit or deny the request. FRCP 36(a)(4).    However, for a number of its RFA Responses, Transocean has neither admitted, denied, or stated that it lacks sufficient information to admit or deny the particular RFA at issue. Rather, Transocean has responded to such requests by admitting to statements that are materially different from those contained in the requests for admission.  The following responses, among others, did not answer the actual RFA:

- RFA No. 222 seeks an admission that "on April 20, 2010, Captain Kuchta did not instruct anyone to activate the EDS until 21:56" while RFA No. 223 requests an admission that "on April 20, 2010, Captain Kuchta did not order a crew member to activate the EDS until after he had consulted with OIM Harrell."   Transocean's responses to both of these requests consists of a non-responsive admission "that at approximately 21:56, the OIM, one of the subsea engineers, and one of the BP well site leaders who were on the bridge attempted to use the BOP control panel to active the EDS."  Neither of these responses even mentions Captain Kuchta, and they clearly do not suffice to either admit or deny the actual RFAs.   Nor do these responses state that Transocean lacks sufficient knowledge or information to admit or deny these requests for admission.

- RFA No. 245 asks Transocean to admit that "at no time during April 19 or April 20, 2010 did the *Deepwater Horizon*'s OIM, Jimmy Harrell, have any safety concerns with respect to any of the operations that were taking place on the *Deepwater Horizon*."   As its response, Transocean admits only that Mr. Harrell "did not exercise his stop work authority on April 19-20, 2010."  Whether or not an individual exercised stop work authority does not answer whether that individual had safety concerns.

- In response to RFA No. 262 -- concerning whether "the overspeed controls on *Deepwater Horizon* engine 3 malfunctioned" on August 7, 2008 -- Transocean "admit[s] that on August 7, 2008 the *Deepwater Horizon* engine 3 overspeed alarm was triggered."  This statement is non-responsive to the issue of whether the overspeed controls *malfunctioned*.  Likewise, RFA No. 263 seeks an admission that a "malfunction in the overspeed controls on *Deepwater*

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 3

*Horizon* engine 3 . . . on August 7, 2008 caused a blackout" on the rig.  Transocean's response -- which admits only "that on August 7, 2008 the *Deepwater Horizon* experienced a blackout of the main power plant" -- is again non-responsive to the question of whether such blackout was caused by a malfunction in engine 3's overspeed controls.

- In response to RFA No. 278 -- whether "from the time of its launch through April 20, 2010, the *Deepwater Horizon* never went into a drydock or shipyard for repairs" -- Transocean admits only that "the *Deepwater Horizon* was scheduled for dry dock in 2011 and had underwent other repairs in lieu of earlier dry docking."  This response evades the question of whether the rig went into a drydock or shipyard for repairs before April 20, 2010.

- In response to RFA No. 281 -- which asks whether as of April 20, 2010, Transocean's maintenance personnel were "working on replacing saltwater pipes on the *Deepwater Horizon* that were leaking or about to leak" -- Transocean's response (aside from objections) consists of the statement that "on April 19, 2010, personnel were working on replacing water filters."  This answer is non-responsive to the subject of the request, which is replacing salt water pipes that were leaking or about to leak.

- In response to RFA No. 309 -- seeking an admission "that the *Deepwater Horizon* blowout preventer's remotely operated vehicle ('ROV') intervention panel was supposed to be connected to the middle pipe ram" -- Transocean "admit[s] that the *Deepwater Horizon's* BOP's ROV intervention panel was originally connected to a pipe ram that was later, at BP's request, converted to a test ram."   This response does not constitute an admission or denial as to whether the ROV intervention panel was *supposed* to be connected to the middle pipe ram.

- RFA No. 311 asks Transocean to admit whether "one or more Transocean employees knew that the *Deepwater Horizon* blowout preventer's ROV intervention panel was connected to an inverted test ram, which could not seal the well."  Transocean's response to this request consists of an admission "that the *Deepwater Horizon's* BOP's ROV intervention panel was originally connected to a pipe ram that was later, at BP's request, converted to a test ram" and other statements that do not address the RFA.  As this response fails to admit, deny, or state that Transocean lacks knowledge as to whether Transocean employees knew that the "ROV intervention panel was connected to an inverted test ram, which could not seal the well," it is non-responsive and deficient.

- Similarly, Transocean fails to properly respond to RFA No. 312, with regard to whether Transocean "t[old] any BP employee before April 20, 2010 that the *Deepwater Horizon* blowout preventer's ROV intervention panel was connected to an inverted test ram, which

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 4

could not seal the well." Transocean's response to this RFA is similar to its response to RFA No. 311, and simply contains no admission, denial, or statement that Transocean lacks knowledge as to whether it told any BP employee prior to April 20, 2010 that the ROV intervention panel was connected to an inverted test ram that could not seal the well.

- Likewise, in response to RFA No. 321 -- which asks Transocean to "[a]dmit that the Transocean driller is *responsible* for ensuring that tool joints on the drill string are located so that the BOP rams or annular preventers will not close on a tool joint if the rams or annular preventers are closed" -- Transocean responds that "it is *typical* for the driller to locate and position the drill pipe tool joint in the BOP" so as to "allow[] the rams to properly close around the drill pipe . . . ." (emphasis added). Whether this is a "typical" practice of a Transocean driller does not answer the request to admit that the driller was "responsible" to ensure that the tool joints on the drill string were located such that the BOP's rams or annular preventers would not close on a tool joint.

For each of these RFAs, as well as all other RFA Responses that do not specifically admit, deny, or state that Transocean cannot admit or deny the request at issue, the BP Parties request that Transocean amend its RFA Responses to conform to FRCP 36.

## 2.    Improper Citations to Documents or Statements Instead of Providing an Admission, Denial, or Statement of Insufficient Knowledge.

Similarly, a number of Transocean's RFA Responses are also deficient in that they merely refer the BP Parties to statements contained in a document without indicating Transocean's position on the statement at issue. By way of example:

- Transocean's responses to each of RFA Nos. 45 through 67, as well as No. 282, merely recite provisions of the Drilling Contract with the reservations that Transocean "express[es] no position regarding the interpretation" of the cited contractual provision, and that "Such questions will be determined by [the] appropriate tribunal at an appropriate time." Such responses ignore that FRCP 36(a)(1)(A) expressly allows a party to serve RFAs relating to the application of law to fact, or opinions about the application of law to fact. None of Transocean's responses constitutes an admission, denial, or statement that Transocean lacks sufficient knowledge or information to either admit or deny the request at issue. As such, each of these responses is deficient under Rule 36.

- Similarly, Transocean responds to a number of RFAs by admitting that certain statements are contained the Well Control Handbook, (see, e.g. responses to RFAs Nos. 101-05, 108) but without stating that Transocean presently admits or denies the subject of the request at issue.

## KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 5

The BP Parties are aware of the Well Control Handbook and what it says. The purpose of these requests is to ascertain Transocean's current contentions and determine what evidence BP will need to present at trial. Mere reference to the Well Control Handbook does not adequately respond to these requests.

- Likewise, in response to requests Nos. 126-27 and 130-53, each of which concern the April 18, 2010 well control drill aboard the *Deepwater Horizon*, Transocean responds by making reference to "a safety drill report dated April 18, 2010" but without actually admitting, denying, or stating that it lacks sufficient knowledge to admit or deny the subject matter of these requests.

- In response to RFA No. 289 -- seeking an admission "that on April 20, 2010, at 21:00, the *Deepwater Horizon*'s blowout preventer had a leak in the yellow control pod" -- Transocean refers to the BP Daily Operations Reports of Feb. 23-March 13, 2010 and states that "The operation report identified the leak as being on the yellow pod, and the drill crew switched to the blue pod to stop the leak and allow further investigation." This response does not constitute an admission, denial, or statement of insufficient knowledge as to Transocean's current position regarding the existence of a leak in the yellow control pod on April 20, 2010 at 21:00.

Transocean similarly responds to a number of requests by citing to deposition testimony without stating whether Transocean admits or denies the request or lacks sufficient information to do so. By way of example:

- In response to RFA No. 162 -- which concerns whether "the *Deepwater Horizon's* subsea supervisor, Christopher Pleasant, believed that the second negative test was successful" -- Transocean responds that "Christopher Peasant testified that Don Vidrine, BP Company Man, said the 'second negative pressure test' passed." This statement is not a proper response (admission, denial, or statement of lack of knowledge) by Transocean to the RFA.

- RFA No. 218 seeks an admission as to whether OIM Harrell "did not order any *Deepwater Horizon* crew member to activate the ESD on April 20, 2010." Transocean's response merely refers to Mr. Harrell's May 27, 2010 testimony "that he was not aware of any communication with anyone to shut down the engines." Transocean fails to admit, deny, or state that it lacks sufficient knowledge to respond to this request.

- In response to RFA No. 221 -- concerning whether Captain Kuchta instructed Chris Pleasant not to activate the EDS on April 20, 2010 -- Transocean merely refers to Mr. Pleasant's

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 6

deposition testimony without either adopting or disputing that testimony.  Transocean fails to admit, deny, or state that it has insufficient knowledge regarding the subject of the request.

- In response to RFAs Nos. 275 and 276 -- regarding whether first assistant engineer James Brent Mansfield and chief mechanic Douglas Brown had "expressed concerns" that the *Deepwater Horizon* "did not have sufficient maintenance personnel to properly maintain" the rig, Transocean's responses refer to statements made by Messrs. Mansfield and Brown at their depositions, but fail to indicate whether Transocean itself admits, denies, or states that it lacks sufficient knowledge to admit or deny whether Messrs. Mansfield and Brown actually expressed such concerns.

As you are aware, the purpose of requests for admission under Rule 36 of the Federal Rules of Civil Procedure is to establish the contentions or beliefs of the responding party and determine what facts or applications of law to fact are disputed.  As such, a response that merely refers to a document or witness statement without indicating the responding party's position (or stating that the responding party lacks information sufficient to admit or deny) does not comply with the Federal Rules of Civil Procedure and is insufficient.  Therefore, the BP Parties request that Transocean supplement their RFA Responses where necessary to admit, deny, or state that Transocean lacks sufficient knowledge after reasonable inquiry to admit or deny each request.

### 3.    Objection to the Term "Maintenance Personnel."

A number of Transocean's RFA Responses (see e.g. 275-77, 280-81) object to the use of the phrase "maintenance personnel" as vague and ambiguous insofar as "it is not clear if 'maintenance personnel' includes roustabouts, mechanics, electricians, welders, deckpushers, floorhands, motor operators, and/or any of the other Transocean crew member positions."  For purposes of clarification, BP instructs that the term "maintenance personnel" as used in its First Set of Requests for Admission means any Transocean personnel who were chief electricians, chief electronic technicians, chief engineers, chief mechanics, deckpushers, electrical supervisors, electronics supervisors, electrical/electronics supervisors, electricians, electronic technicians, first assistant engineers, second assistant engineers, third assistant engineers, floorhands, hydraulic technicians, maintenance supervisors, mechanics, mechanical supervisors, motormen, motor operators, roustabouts, senior subsea supervisors, subsea supervisors, assistants subsea, and welders.  Please supplement your responses, including the response to RFA No. 277, as appropriate.

KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 7

4. **Objection to Use of the Term "Transocean *Deepwater Horizon* Companies."**

For a number of its RFA Responses, Transocean objects that the term "Transocean *Deepwater Horizon* Companies" is vague and ambiguous. *See, e.g.,* Responses to RFA Nos. 44-67, 243, 286, 299, 300, 301, 324. The term "Transocean *Deepwater Horizon* Companies" as used in its First Set of Requests for Admission has the same meaning as that term is defined in definition No. 18 of The BP Parties' Second Requests for Production of Documents to the Transocean Parties, dated April 29, 2011. That is, for the purposes of the First Set of Requests for Admission, the term "Transocean *Deepwater Horizon* Companies" means Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH. Please supplement any of these RFA responses as necessary, or confirm that no supplementation is necessary.

C. **Transocean's Responses to the BP Parties' First Set of Interrogatories.**

In addition to the foregoing problems with Transocean's responses to the Requests for Admission, there are a number of deficiencies in Transocean's Interrogatory Responses which necessitate supplementation by Transocean.

1. **Failure to Identify Individuals as Requested in Interrogatories.**

Many of BP's interrogatories request that Transocean identify individuals. Transocean typically either fails to respond to these requests, providew vague responses without identifying individuals, or provides clearly incorrect responses. Examples include:

- Response to Interrogatory No. 4. This interrogatory asks Transocean to identify all persons who maintained, tested, or inspected, or were responsible for maintaining, testing, or inspecting, the *Deepwater Horizon's* BOP, mud-gas separator, diverter, and other well control equipment. Transocean's response does not identify any subsea supervisors, even though those employees are responsible for BOP maintenance. Moreover, Transocean states only that "some rig crew" may be required to take a subsea OJT and/or BOP Equipment Seminar, without identifying those individuals. Nor does Transocean's answer identify who is responsible for maintaining, testing or inspecting the *Deepwater Horizon's* mud-gas separator and diverter.

- Response to Interrogatory No. 5: Transocean does not identify the individuals responsible for maintaining, testing, or inspecting the *Deepwater Horizon's* alarms systems, overspeed controls, rig savers, or emergency shut down system, as requested by the interrogatory.

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 8


- Response to Interrogatory No. 13: Transocean does not identify the individuals with knowledge of whether the equipment listed in the interrogatory operated properly.

- Response to Interrogatory No. 19: Transocean does not identify the individuals involved in communicating information relating to well control events to Transocean employees.

- Response to Interrogatory No. 24: Transocean does not state the individuals who decided to change the hitch schedule or were involved with that change.

- Response to Interrogatory No. 33: Transocean does not identify the individuals involved with the decision to reflag vessels to the Republic of the Marshall Islands.

For each of these interrogatories, as well as all others where Transocean does not identify individuals as requested, please provide a supplemental response identifying the individuals specified by the interrogatory.

## 2. Failure to Specifically Identify Responsive Documents in Compliance with Rule 33(d).

For many of its responses, Transocean claims that it has produced responsive documents, but fails to identify bates ranges where these documents can be located. Specifically, in the following responses Transocean claims to have produced unspecified non-privileged and responsive documents:

- Response to Interrogatory No. 5 ("documents relating to emergency systems maintenance, including maintenance schedules and reports, and emergency systems inspections and audits")

- Response to Interrogatory No. 7 ("documents relating to 'function checks' on the 'automatic stop devices,' including RMS equipment histories")

- Response to Interrogatory No. 17 ("documents relating to the Sedco 711 'well control event' in the North Sea")

- Response to Interrogatory No. 20 ("documents relating to Gulf of Mexico 'well control events' in the one-year period preceding the incident" and "documents relating to the Sedco 711 'well control event' in the North Sea")

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 9

- Response to Interrogatory No. 21 ("documents relating to *Deepwater Horizon* 'safety incidents or violations'")

- Response to Interrogatory No. 22 ("documents relating to the *Deepwater Horizon* "'safety and environmental record'")

- In response to Interrogatory No. 27, Transocean states it has produced "responsive documents relating to the PIC [person-in-charge] designation, including the *Deepwater Horizon* Emergency Response Manual," but fails to identify with specificity any documents other than the Emergency Response Manual

- Response to Interrogatory No. 28 ("Respondents have produced non-privileged documents, including persons on board ('POB') records for the *Deepwater Horizon*")

- Response to Interrogatory No. 33 ("documents relating to the flagging of the *Deepwater Horizon* to the Marshall Islands, including Marshall Islands licenses, certificates, and inspections")

- Interrogatory No. 37 ("documents relating to the Marshall Islands' August 26, 2010 letter")

Federal Rule of Civil Procedure 33(d)(1) permits a party to answer an interrogatory through reference to business records, but the responding party must "specify[] the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." For the interrogatories listed previously, Transocean's responses are not in compliance with Rule 33(d). Accordingly, the BP Parties request that Transocean supplement its responses for each of these interrogatories by identifying by bates range the responsive documents that it claims to have produced.

### 3. Failure to Specifically Describe Training of Transocean Personnel in Response to Interrogatories Nos. 1 Through 6.

Interrogatories Nos. 1 through 6 each requested Transocean to "describe in detail" training provided to Transocean's *Deepwater Horizon* personnel with respect to well control, the blowout preventer and other well control equipment, alarm systems, overspeed controls, rig savers, and emergency shut down system. In response to these interrogatories, Transocean repeatedly states that "there are numerous forums and formats through which Transocean employees can acquire the appropriate training, including on-the-job ('OJT') modules, internal instructor-led training courses, and externally offered training courses." However, instead of

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 10

describing each of these "numerous forums and formats," Transocean's responses appear to provide only a few representative examples of such training.

The BP Parties are entitled to know, specifically, each type of training that Transocean may assert at trial to have provided to its personnel. Such information is necessary to develop BP's claims and defenses in this litigation, including for BP's factual and expert presentations. Transocean's general statements regarding "numerous forums and formats" of training is too vague to determine what training Transocean personnel have received, and the BP Parties will seek to exclude at trial any attempt by Transocean to introduce evidence of any form of training that it has not specifically described in response to the relevant interrogatories. Evidence may be excluded for failure to supplement interrogatories or other discovery requests pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure. *See also Celestine v. Petroleos De Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001) (application of "closing date" limiting relevant time period for employment discrimination claims appropriate where "appellants did not attempt to amend their complaint or supplement their responses to interrogatories to include evidence of discriminatory acts occurring after this date); *Jones v. Hancock Holding Co.*, Civil Action No. 06-14-RET-CN, 2010 WL 2541717 at *2-3 (M.D. La. June 17, 2010) (precluding trial testimony of witness who was not identified in interrogatories); *Francois v. Colonial Freight Systems, Inc.*, 2007 WL 4564866, at *3 (S.D. Miss. Dec. 21, 2007) ("In accordance with FRCP 37(c), . . . the Motion in Limine to exclude as evidence any medical record or bill for medical services that was not produced during discovery should be granted."). Please let us know if you intend to supplement any of these interrogatory responses to provide additional descriptions of training you claim Transocean employees received.

### 4. Failure to Address Each Piece of Equipment Specified in Interrogatory No. 13.

Interrogatory No. 13 requested that Transocean respond as to whether it believes that each of the following pieces of equipment properly functioned during the *Deepwater Horizon* Incident: the blowout preventer (including automatic mode function and remotely operated vehicle intervention panel), alarm system, mud-gas separator, diverter system, overspeed controls, rig savers, emergency shut down system, emergency disconnect system, firefighting equipment, primary generator, and auxiliary generators. Transocean's response to Interrogatory No. 13 fails to address several of the enumerated pieces of equipment. Specifically, Transocean does not state whether it believes that the following pieces of equipment properly functioned during the *Deepwater Horizon* Incident:

- the blowout preventer's remotely operated vehicle intervention panel,

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 11

- the alarm system,

- overspeed controls,

- rig savers,

- emergency shut-down system,

- firefighting equipment,

- primary generators, and

- auxiliary generators.

The BP Parties therefore request that Transocean complete its response to Interrogatory No. 13 by stating whether Transocean believes each of the foregoing pieces of equipment properly functioned.  Furthermore, as instructed by Interrogatory No. 13, Transocean should for each such piece of equipment "state all the factual bases that support your contention that such piece of equipment properly functioned; identify all persons with knowledge of whether the pieces of equipment properly functioned, and identify all documents relating to whether each piece of equipment properly functioned."  Moreover, as Transocean's response to Interrogatory No. 13 fails to identify any persons with knowledge or any documents relating to whether any of the pieces of equipment specified in this request had properly functioned during the *Deepwater Horizon* Incident, the BP Parties request that Transocean supplement its response with respect to the pieces of equipment that Transocean has already referenced in its response to Interrogatory No. 13.

### 5.    Response to Interrogatory No. 16.

With respect to Interrogatory No. 16, Transocean objects that "the term 'blowout' is not defined and its meaning is unclear."  However, "blowout" is in fact defined in the BP Parties' First Set of Interrogatories to Transocean in definition No. 18 to mean "an uncontrolled release of hydrocarbons from a well."  Moreover, Transocean's response to Interrogatory No. 16 states that it is "not aware of any instances where a Transocean rig experienced a blowout" excluding the April 20, 2010 incident.  This response does not address the full language of the interrogatory, which asks about wells being drilled by Transocean rigs experiencing blowouts *or* having hydrocarbons from the well enter the riser.  Transocean's response is thus inconsistent with the fact that gas entered the riser of its *Sedco 711* rig in the North Sea during December 2009.  In fact, Transocean admitted in its response to RFA No. 252 "that gas entered the riser

## KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 12

during the December 23, 2009 well control event on the *Sedco 711*." Please supplement Transocean's response to answer the entire interrogatory using the appropriate definitions.

### 6.   Response to Interrogatory No. 17.

Similarly, Transocean's response to Interrogatory No. 17 objects that "the term 'well control event' is not defined and its meaning is unclear," yet in fact that term is in fact defined in Definition No. 21 of the BP Parties' First Set of Interrogatories to Transocean to mean "any kick, lost circulation event, or blowout." Furthermore, the BP Parties note that Transocean has applied geographic and time limitations in its response to Interrogatory No. 17 to all "Gulf of Mexico 'well control events' in the one-year period preceding the incident." The BP Parties currently are evaluating this response, and reserve all their rights.

### 7.   Response to Interrogatory No. 19.

With respect to its response to Interrogatory No. 19, which requests Transocean to "Describe in detail all actions Transocean takes to communicate information, experience, and 'lessons learned' relating to well control events, well monitoring, and well control procedures to its drilling crews," Transocean again asserts that the term "well control events" is not defined and is unclear, when the BP Parties did in fact define that term in Definition No. 21. Moreover, despite Interrogatory No. 19's instructions to "identify all persons involved" and to "identify all documents relating to such actions," Transocean's response fails to identify any individuals or documents. Transocean should be able to identify individuals responsible for determining what information relating to well control events is posted on Transocean's internal network, as well as who determines the advisories that are discussed during meetings. Similarly, Transocean should be able to identify document regarding the process for determining what information regarding well control events is posted on Transocean's internal network or discussed at meetings. Moreover, Transocean's response appears to be limited to well control events, without discussing well monitoring or well control procedures, which also is called for by the interrogatory. Please supplement Transocean's response with the appropriate information.

### 8.   Response to Interrogatory No. 20.

Similarly, with respect to Interrogatory No. 20, Transocean again incorrectly states that the term "well control event" is not defined, when this term was defined in Definition No. 21. Furthermore, the BP Parties note that Transocean has applied geographic and time limitations in its response to Interrogatory No. 20 to "Gulf of Mexico 'well control events' in the one-year period preceding the incident." The BP Parties currently are evaluating this response, and reserve all their rights.

## KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 13

Moreover, Transocean's response to Interrogatory No. 20 is not fully responsive. The interrogatory is not limited to seeking information regarding specific well control events. Rather, Interrogatory No. 20 seeks information regarding Transocean presentations, meetings, and communications from January 1, 2005 through April 20, 2010 concerning well control events generally. The interrogatory seeks, by way of example, information concerning Transocean guidelines. meetings, and communications regarding actions that should be taken to avoid well control events, how Transocean personnel should respond to well control events, lessons learned from past experience with well control events, and any other applicable policies, procedures, protocols, instructions, warnings, advisories, or other communications concerning well control events. Please supplement Transocean's response to Interrogatory No. 20 to include such information, as well as identify all persons involved in such presentations, meetings, or communications.

9. **Response to Interrogatory No. 26.**

Although Transocean's response to Interrogatory No. 26 addresses Transocean's response to the September 2009 BP Follow Up Rig Audit, Marine Assurance Audit and Out of Service Period, Transocean fails to respond to the other audits, inspections, certifications, and surveys identified in Interrogatory No. 26, including but not limited to the September/October 2001 Integrated Acceptance Test; the January 2005 BP Technical Rig & Marine Audit; the May 2007 BP Marine Assurance Audit and DP Proving Trials; the January 2008 BP Technical Rig Audit; the January 2009 West Engineering Services Assessment of PRS Equipment for Transocean, the Lloyd's Register EMEA Safety Management and Safety Culture/Climate Reviews conducted in March 2010, and the April 2010 Moduspec USA, Inc. Rig Condition Assessment.

In addition, while a portion of Transocean's response to this interrogatory (pages 46-47 of Transocean's interrogatory responses) refers to findings and interpretations of certain of these audits and surveys, Transocean fails to describe the actions, if any, that it took as a result of such audits and surveys. For example, Transocean notes that "Moduspec recommended the annulars be sent for inspection and replaced, and further recommended that the leak be investigated and 'repair[ed] as necessary,'" but does not state what actions Transocean took in response to such findings.

Therefore, the BP Parties request that Transocean supplement its response to Interrogatory No. 26 to identify the actions taken by Transocean as a result of audits, inspections, certifications, or surveys identified (other than the September 2009 BP Follow Up Rig Audit). If Transocean did not take any actions in response to one or more of these inspections,

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 14

certifications, or surveys, please supplement Transocean's response to indicate for which of these inspections, certifications, or surveys Transocean did not take such actions.

### 10.    Response to Interrogatory No. 30.

Interrogatory No. 30 requests Transocean to "[i]dentify all notices, citations, warnings, penalties, incidents of noncompliance . . . related to the *Deepwater Horizon* and/or its appurtenances, including the blowout preventer, from any U.S. or State government agency . . . ." Transocean's response to this interrogatory appears to be improperly limited in scope to the blowout preventer and does not address whether Transocean received such notices, citations, warnings, penalties, incidents of noncompliance, etcetera with respect to the *Deepwater Horizon* rig generally or with respect to any other appurtenances of the rig other than the blowout preventer. Accordingly, please supplement Transocean's response to Interrogatory No. 30 to identify whether Transocean received such notices, citations, warnings, penalties, incidents of noncompliance, etc. with respect to the *Deepwater Horizon* rig generally or with respect to any other appurtenances apart from the blowout preventer, and if so state how each such notice, citation, or penalty was resolved and identify all related documents as instructed in Interrogatory No. 30. If Transocean did not receive such notices, citations, warnings, penalties, incidents of noncompliance, etcetera from any governmental agency, please so state.

### 11.    Failure to Respond to Interrogatory No. 36.

Transocean fails to provide any response to Interrogatory No. 36, which requests that Transocean describe actions taken prior to April 20, 2010 in response to the observation by Det Norske Veritas that "the statement of Master's authority [was] still not clearly and completely stated within the Company's Safety Management System." To the extent that Transocean refuses to answer on the ground that this interrogatory is "vague" or "ambiguous," please identify which term(s) Transocean finds to be insufficiently clear. To the extent Transocean objects on the ground that this interrogatory is "not reasonably calculated to lead to the discovery of admissible evidence," this objection is without merit. The issue of who was in command of the *Deepwater Horizon* -- and whether this was adequately communicated to the *Deepwater Horizon* crew as of April 20, 2010 -- is relevant to the issues of this litigation, including whether the *Deepwater Horizon* crew acted appropriately and in a timely manner to the incident. The BP Parties therefore reiterate their request that Transocean respond to Interrogatory No. 36.

### D.    Document Production.

As part of the BP Parties' continuing review of Transocean's document production, the BP Parties request that Transocean produce the following categories of documents, all of which

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 15

are responsive to the BP Parties' First and/or Second Requests for Production of Documents to the Transocean Parties:

1. *Drafts of Transocean Investigation Report*:  We have not located any drafts of the Transocean Investigation Report on the Macondo Well Incident.  Please confirm that Transocean will produce all non-privileged drafts of its report.

2. *Captain Kuchta's license in effect on April 20, 2010*:  In response to correspondence with Don Haycraft, on July 13, 2011 you produced a Merchant Mariner Credential issued by the U.S. Coast Guard for Captain Kuchta with an issue date of May 4, 2010, which is *after* the incident.  Please produce the Merchant Mariner Credential in effect for Captain Kuchta on April 20, 2010.

3. *Trim and stability documents*:  Please confirm that Transocean will produce all documents related to the trim and stability of the *Deepwater Horizon*.  In particular, please confirm that Transocean will produce any analyses or calculations of the trim and stability of the *Deepwater Horizon* performed by Rick Rogers after the incident occurred, as described in Pharr Smith's deposition at pages 263-75.

4. *Document re ESD incident*:  Mike Williams testified about an incident where the emergency shutdown system was activated and ripped off the doors to the engine room, and that he had seen a report on the incident along with an "engineering document." (M. Williams Dep. at 32-33)  We believe that we may have located some of the documents related to this incident at TRN-INV-00138765 and TRN-INV-00146978.  Please confirm that you have produced, or will produce, all documents related to this incident.

5. *Final Response to RMI Letter of August 26 2010*:  Regarding the August 26, 2010 letter from the Republic of the Marshall Islands ("RMI") to Jimmy Moore (as described in Interrogatory No. 37), we have located drafts of Transocean's responses, but have not yet located the final version of the response.  Please confirm that the final version of Transocean's response to the RMI letter will be produced.

6. Deepwater Horizon *Group E-mail Addresses*:  Please produce documents sufficient to show the individuals who received e-mails sent to group e-mail addresses for the *Deepwater Horizon's* crew, including the following group e-mail addresses:

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 16

- DWH Captain – captain.dwh@deepwater.com;
- DWH Asst Driller – AsstDriller.DWH@deepwater.com;
- DWH Chief ET – chiefeltech.dwh@deepwater.com;
- DWH Chief Mate – chiefmate.dwh@deepwater.com;
- DWH Crane Operator – craneoper.dwh@deepwater.com;
- DWH Deck Pusher – deckpusher.dwh@deepwater.com;
- DWH DP Operator/ DW Horizon Bridge – dpoperator.dwh@deepwater.com;
- DWH Driller – driller.dwh@deepwater.com;
- DWH Electrical – eltech.dwh@deepwater.com;
- DWH Electrical Supervisor – electsup.dwh@deepwater.com;
- DWH Maintenance Supervisor – maintsup.dwh@deepwater.com;
- DWH Materials – materials.dwh@deepwater.com;
- DWH OIM – oim.dwh@deepwater.com;
- DWH Radio Operator – radiooper.dwh@deepwater.com;
- DWH RSTC – rstc.dwh@deepwater.com;
- DWH Safety – safetydel.dwh@deepwater.com;
- DWH Subsea – subseasup.dwh@deepwater.com;
- DWH Toolpusher – toolpusher.dwh@deepwater.com;
- DWH, MechSup – MechSup.DWH@deepwater.com;
- DW Horizon Chief Eng. – maintenancesup.dwh@deepwater.com;
- DW Horizon ECR – ecr.dwh@deepwater.com;
- DW Horizon Electrical Supervisor – elecsup.dwh@deepwater.com;
- DW Horizon Mechanical Supervisor – mechsuper.dwh@deepwater.com;
- DW Horizon Medic – medic.dwh@deepwater.com;

# KIRKLAND & ELLIS LLP

Carter L. Williams
July 27, 2011
Page 17


To the extent that you refuse to supplement Transocean's responses to the BP Parties' First Set of Requests for Admission and BP Parties' First Set of Interrogatories as requested herein, or to produce the identified documents, the BP Parties request a meet and confer no later than August 5, 2011, pursuant to Federal Rule of Civil Procedure 37, to discuss any responses to requests for admission, information or documents that Transocean is unwilling to provide or produce.

Sincerely,

R. Chris Heck

cc:     Richard C. Godfrey, P.C.
        Andrew Langan, P.C.
        Barry E. Fields, P.C.
        Don K. Haycraft
        Steven L. Roberts
        Kerry J. Miller



SUTHERLAND ASBILL & BRENNAN LLP
First City Tower
1001 Fannin, Suite 3700
Houston, TX 77002-6760
713.470.6100  Fax 713.654.1301
www.sutherland.com

**CARTER L. WILLIAMS**
DIRECT LINE: 713.470.6126
E-mail: carter.williams@sutherland.com

July 29, 2011

<u>VIA EMAIL AND FIRST CLASS MAIL</u>

R. Chris Heck, Esq.
Kirkland & Ellis, LLP
300 N. LaSalle
Chicago, IL  60654

Re:   *In re:*  Deepwater Horizon, MDL No. 2179

Dear Chris:

I am in receipt of your July 27 letter regarding Transocean's Responses to the BP Parties' First Set of Requests for Admission and First Set of Interrogatories.  Your letter raises a number of issues which we are looking into.  We will respond as soon as we are able to do so after completing our review.

We agree that a good faith meet and confer may resolve some or all of the issues you raise and propose that we schedule such a discussion after you have received our response to your letter.

Sincerely,

Carter L. Williams

cc:   Rachel Clingman, Esq. (Sutherland Asbill & Brennan LLP)
      Kerry Miller, Esq. (Frilot LLC)

Atlanta          Austin          Houston          New York          Washington DC



SUTHERLAND ASBILL & BRENNAN LLP
First City Tower
1001 Fannin, Suite 3700
Houston, TX 77002-6760
713.470.6100  Fax 713.654.1301
www.sutherland.com

**CARTER L. WILLIAMS**
DIRECT LINE: 713.470.6126
E-mail: carter.williams@sutherland.com

August 10, 2011

<u>VIA EMAIL & FIRST CLASS MAIL</u>

Mr. R. Chris Heck
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654

> **Re:     Objections and Responses to the BP Parties' Requests for Admission and
> Interrogatories in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the
> Gulf of Mexico, on April 20, 2010*, MDL No. 2179**

Dear Chris:

This letter responds to the issues raised in your July 27, 2011 letter. Specifically, this letter addresses your questions regarding (A) Transocean's General Objections; (B) Transocean's Responses to the BP Parties' ("BP") Requests for Admission ("BP's RFAs"); (C) Transocean's Responses to BP's Interrogatories; and (D) Transocean's document production to date. We appreciate your efforts to identify and resolve issues cooperatively.

**A.     Transocean's General Objections.**

Transocean has stated a number of general and specific objections to BP's RFAs and Interrogatories. Many of these objections are substantially similar to BP's objections to other parties' RFAs and Interrogatories. As discussed in our July 27, 2010 letter, Transocean is not withholding any documents or information on the basis of its general objections or on the basis of specific objections that are the same as its general objections. Any limitation on the information produced in response to BP's written discovery, such as for discovery requests concerning prior well control events, has been explicitly stated in separate specific objections. Although Transocean is generally not withholding any non-privileged information or documents, Transocean does not waive objection and continues to maintain that BP's written discovery is not appropriate for the stated reasons.

**B.     Transocean's RFA Responses.**

Your letter addresses three general categories of Transocean's RFA responses: (1) responses to RFAs 126-127, 130-153, 162, 218, 221-222, 245, 262, 275-276, 278, 281, 289, 309, 311-312, and 321; (2) responses that reference documents or statements; and (3) responses containing an objection to a specific term as vague and ambiguous. This section addresses all

Page 2 of 4
R. Chris Heck
August 10, 2011

three categories.  First, we are reviewing RFAs 126-127, 130-153, 162, 218, 221-222, 245, 262, 275-276, 278, 281, 289, 309, 311-312, and 321 and will supplement Transocean's responses as needed and as is appropriate.

Second, RFAs 45-67 and 282 improperly request the admission of a purely legal contention.  Federal Rule of Civil Procedure 36(a)(1) allows a party to serve RFAs relating to facts, the application of law to fact, opinions about either, or the genuineness of documents.  It does not permit RFAs for any other purpose.  As such, RFAs are properly used for facts or facts as applied to law, but not pure legal conclusions.  *In re Katrina Canal Beaches*, No. 05-4182, 2007 WL  1852184 at *1 (E.D. La. June 27, 2007).  BP's RFAs 45-67 and 282 simply request that Transocean admit various recited portions of the Drilling Contract.  For example, RFA no. 46 states: "Admit that no BP entity had any direction or control of the Transocean *Deepwater Horizon* Companies or their employees or agents in the work performed under the Drilling Contract except in the results to be obtained."  It repackages the language of Drilling Contract section 18.1 without adding factual context.  As such, it improperly requests that Transocean interpret the Drilling Contract.  Interpretation of a contract is a question of law for the court.  *D.E.W., Inc. v. Local 93 Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992).  Transocean continues to maintain that matters of contract interpretation will be decided by the appropriate tribunal at an appropriate time.

RFAs 101-105 and 108 require clarification.  These RFAs ask that Transocean admit or deny various recited portions of the Well Control Handbook, which Transocean has done.  For example, RFA 101 states: "Admit that the first positive indicator that a well is flowing is an increase in the return flow rate while the pumps are running at constant output."  This RFA merely repackages the language of Well Control Handbook 5.2.2.  Transocean admitted this statement is an accurate reflection of its Well Control Handbook section on kick detection.  BP now states that the purpose of these RFAs is to ascertain Transocean's current contentions.  However, BP provides no guidance as to the substance of these contentions.  To the extent BP seeks to establish a rule applicable across all wells in all circumstances, Transocean believes RFAs 101-105 and 108 are inappropriate.  "Strictly speaking, Rule 36 is not a discovery device at all, since it presupposes that the party proceeding under it knows the facts or has the document and merely wishes its opponent to concede their genuineness."  *Id.* at *2 (citing Wright & Miller, Fed. Practice and Procedure § 2252 (2d ed. 1994)).  There are different types of wells installed using different equipment in various environments.  Also, a drilling rig itself is a dynamic, ever-changing environment.  BP does not describe the facts upon which to analyze the Well Control Handbook statements recited in RFAs 101-105 and 108.  To the extent BP seeks to determine how Transocean's Well Control Handbook is used in Transocean's operations, such a request would have been better suited for an interrogatory.  A party desiring to discover what the facts are should resort to other discovery rules.  *Id.*  We will review Transocean responses once BP clarifies what contentions it seeks with the above-identified RFAs.

Third, Transocean confirms it will supplement its responses to RFAs 275-276 and 280-281 as needed using the "maintenance personnel" definition provided in your July 27, 2011

letter.  Similarly, Transocean will supplement its responses to RFAs 67, 243, 286, 299-301, and 324 as needed using the "Transocean *Deepwater Horizon* Companies" definition provided in your July 27, 2011 letter.  We appreciate your efforts to clarify terms to which we had previously objected as vague and ambiguous.

**C.      Transocean's Interrogatory Responses.**

Your letter raises 11 general and specific issues with Transocean's Interrogatory responses.  These issues fall into three general categories: (1) responses to Interrogatories containing multiple subparts; (2) responses regarding Transocean's training programs; and (3) Interrogatories requesting information regarding non-Macondo wells.  We address each of these three general issues below.

First, Transocean notes that nearly all of BP's Interrogatories are compound and contain multiple subparts.  As such, they violate Pretrial Order 11's 50-interrogatory limit.  In addition, much of the information BP seeks may be found in Transocean's document production.  Due to the number and breadth of BP's interrogatories, it is unduly burdensome to require that Transocean articulate each and every detail sought when much of the information is contained within documents now in BP's possession.  BP has made similar objections in responding to other parties' written discovery.  Nonetheless, Transocean will review Interrogatories 4-5, 7, 13, 17, 19-22, 24, 26-28, 30, 33, and 36-37 and supplement its responses as needed.  To the extent Transocean references documents, Transocean will identify them by bates number.

Second, Transocean's Interrogatories 1-6, which ask Transocean to "describe in detail" its training programs, are compound, overly broad, and unduly burdensome.  Transocean has produced much of its training material and continues to produce documents on a rolling basis.  In the spirit of cooperation, Transocean will review its responses to Interrogatories 1-6 and supplement as needed.  To the extent Transocean references documents, it will identify them by bates number.

Third, Interrogatories 16-17 request information regarding "well[s] being drilled by a rig operated by Transocean anywhere in the world."  Interrogatory 20 is similarly broad.  Transocean notes that BP has objected to written discovery served by other parties that requests information regarding BP's non-Macondo wells as "seek[ing] information beyond that directly related to the Macondo well."  Please explain BP's contradictory stance that it is entitled to receive non-Macondo information without having to provide similar non-Macondo information.  With regard to the issue you raise with Transocean's response to Interrogatory 16, Transocean will supplement its response to address the alleged inconsistency.

**D.      Transocean's Document Production.**

Your letter identifies and asks six questions regarding Transocean's document production to date.  This section responds to each inquiry as numbered in your letter.  Please note that

Page 4 of 4
R. Chris Heck
August 10, 2011


Transocean incorporates the specific and General Objections as stated in its responses to each respective Request for Production.

1.  *Drafts of Transocean's Investigation Report*.  Transocean will produce non-privileged drafts of its investigation report, but at this time, we are not aware of any non-privileged drafts.  Draft reports have been logged in accordance with Pretrial Order No. 14.  *See* Entry 2973 of Transocean's Seventh Supplemental Privilege Log.

2.  *Captain Kuchta's license in effect on April 20, 2010*.  Captain Kuchta's original Merchant Mariner Credential was on the *Deepwater Horizon* on April 20, 2010, and is believed to have gone down with the rig.  Captain Kuchta had to request a replacement from the Coast Guard, which was issued on May 4, 2010.  A copy of that document has been produced.  The replacement license has the same expiration date, January 9, 2012, as the original.

3.  *Trim and stability documents*.  Transocean will search for and produce non-privileged and responsive documents relating to the trim and stability of the *Deepwater Horizon*.

4.  *Documents re EDS incident*.  As you indicated, Transocean has produced non-privileged and responsive documents relating to the incident described in your letter.  Transocean will produce any additional, non-privileged and responsive documents that are located.

5.  *Final Response to RMI Letter of August 26, 2010*.  Transocean will produce the final version of its response to the August 26, 2010 letter from the Republic of the Marshall Islands.

6.  *Deepwater Horizon group email addresses*.  Group email addresses are set up for the varying rig crew positions to use while on hitch and tour.  The specific position is reflected in the group email name.  For example, driller.dwh@deepwater.com would have been shared by the Drillers aboard the *Deepwater Horizon* at that time.  For a list of individuals aboard the *Deepwater Horizon* at any given time, and their respective positions, please see the personnel-on-board reports.  *See, e.g.,* TRN-MDL-00029793 – TRN-MDL-00030435.  These reports are sufficient to show the individuals who had access to the respective group email accounts.

Please feel free to call me if you have any questions.


Sincerely,

Carter L. Williams


cc:   Rachel Clingman, Esq.
      Kerry Miller, Esq.

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

R. Chris Heck
To Call Writer Directly:
(312) 862-3030
r.chris.heck@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

August 11, 2011

**BY ELECTRONIC MAIL
AND FIRST CLASS MAIL**

Carter L. Williams
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, TX 77002

Re:      Objections and Responses to the BP Parties' First Set of Requests for Admission
and First Set of Interrogatories in *In Re: Oil Spill by the Oil Rig "Deepwater
Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179

Dear Carter:

I write in response to your August 10, 2011 letter responding to the issues raised in my
July 27, 2011 letter concerning Transocean's objections and responses to the BP Parties' First
Set of Requests for Admission and the BP Parties' First Set of Interrogatories to Transocean.
We appreciate Transocean's willingness to review and supplement its interrogatory and RFA
responses.   This letter addresses the issues raised by your letter regarding certain RFAs,
interrogatories, and document production categories.

**A.      Transocean's RFA Responses.**

The BP Parties disagree with Transocean's position, as stated on page 2 of your August
10 letter, that "RFAs 45-67 and 282 improperly request the admission of a purely legal
contention," and thus we reiterate those requests.  First, although these RFAs include language
that may also be found in provisions of the Drilling Contract, these RFAs seek Transocean's
current, independent understanding of its duties and obligations (regardless of any contractual
language).   In other words, these RFAs are not "request[ing] that Transocean interpret the
Drilling Contract," but rather seek admissions as to Transocean's current contentions concerning
its duties relevant to the *Deepwater Horizon*, for example whether Transocean was "required to
use all reasonable means to control and prevent fire and blowouts" (RFA 53) and was
"responsible for taking all measures necessary or proper to protect the *Deepwater Horizon*'s
personnel and facilities" (RFA 55).

Moreover, even if these RFAs could be construed as calling for interpretation of the
terms of the Drilling Contract as applied to Transocean, these requests would be proper.  As you

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

KIRKLAND & ELLIS LLP

Carter L. Williams
August 11, 2011
Page 2

acknowledge in your letter, Federal Rule of Civil Procedure ("FRCP") 36(a)(1) expressly permits requests for admission concerning "the application of law to fact." Numerous federal courts have held that requests for admission concerning the interpretation of contractual provisions are precisely the sort of "application of law to fact" permitted by FRCP 36. *See, e.g.*, *Argus and Associates, Inc. v. Professional Benefits Servs., Inc.*, 2008 WL 5447738 at *3 (E.D. Mich. Dec. 31, 2008) ("Other examples of proper requests for admission involving the application of law to fact are (1) a request for admission that relates to the interpretation of a contract at issue in the case, . . . and (3) a request to admit what a party's obligations were under a contract." (citations omitted)); *Sigmund v. Starwood Urban Retail VI, LLC*, 236 F.R.D. 43, 46 (D.D.C. 2006) ("A request for admission that relates to the interpretation of a contract at issue in a case involves the application of law to the unique facts of that case and, therefore, would be permissible under the amended Rule 36"); *Booth Oil Site Admin. Group v. Safety-Kleen Corp.*, 194 F.R.D. 76, 80 (W.D.N.Y. 2000) ("[W]here the question of the meaning of [a] document is at issue in the case, a request directed to another party seeking an admission or denial of a document's meaning or intent by that party as stated in the request relates to a statement [of] fact, and is authorized by Rule 36 . . . . Nor are such requests objectionable because the request may call for an admission as to an interpretation of a contractual provision which could otherwise require a judicial determination." (citations omitted)); *S.A. Healy Company/Lodigiani USA, Ltd. v. United States*, 37 Fed. Cl. 204, 205 (1997) ("Admissions of the contents or interpretation of a contract at most involve the application of law to facts"). As such, your reliance on a holding that contractual interpretation is a question of law for purposes of summary judgment is inapposite. *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992).

With respect to RFAs 101-105 and 108, addressed on page 2 of your letter, the BP Parties likewise are not seeking merely to confirm whether certain language appears in the Well Control Handbook. Indeed, none of these RFAs mentions the Well Control Handbook. Nor do these RFAs "seek[] to determine how Transocean's Well Control Handbook is used in Transocean's operations," as suggested in your letter. Rather, the plain language of these RFAs seeks Transocean's position as to whether it currently agrees or disagrees with these statements concerning well control, independent of whether such statements appear in the Well Control Handbook.

Nevertheless, to cooperate and address your concerns, by way of clarification please construe these requests as including the phrase "when drilling deepwater wells in the Gulf of Mexico" or the grammatically appropriate equivalent at the end of RFAs 101-105 and 108. To the extent you believe further clarification is required, we note that under FRCP 36(a)(4) Transocean can admit the RFAs in part and deny them in part.

## KIRKLAND & ELLIS LLP

Carter L. Williams
August 11, 2011
Page 3

**B.      Transocean's Interrogatory Responses.**

On page 3 of your letter, you state that "BP has objected to written discovery served by other parties that requests information regarding BP's non-Macondo wells as 'seek[ing] information beyond that directly related to the Macondo well'" and inquire about this position. Providing the citation for the quoted language will allow me to provide a response.  While BP has objected to production of some irrelevant non-Macondo information, BP has produced a significant number of documents relating to non-Macondo wells.

**C.      Transocean's Document Productions.**

1.      *Drafts of Transocean's Investigation Report.*  Thank you for your clarification regarding the drafts.  We disagree with Transocean's position that all such drafts are privileged or that Entry No. 2973 is sufficient to maintain any such privilege for the reasons described in my letters regarding Transocean's privilege logs.

2.      *Captain Kuchta's license in effect on April 20, 2010.*  Our understanding is that a vessel owner always keeps a copy of such licenses onshore in its offices.  Please confirm that Transocean does not have a copy of Captain Kuchta's license in effect on April 20, 2010 on shore.  If Transocean does have a copy, please produce it.

3.      *Trim and stability documents.*  Thank you for your cooperation on this issue.  In particular, we have not yet located a copy of the *Deepwater Horizon's* trim and stability books, also known as stability books or booklets or stability manuals, for April 1 through April 20, 2010.  Please confirm that Transocean will search for and produce these documents, or the trim and stability books closest to the time of the incident.

Separately from the documents discussed in my July 27 letter, please confirm that Transocean has produced or will produce all documents from Transocean's Well Advisor program related to the Macondo well.

# KIRKLAND & ELLIS LLP

Carter L. Williams
August 11, 2011
Page 4


Please let me know promptly whether Transocean will supplement its responses to the RFAs described in Section A of this letter and produce the documents described in Section C. If Transocean will not do so, please let me know pursuant to Federal Rule of Civil Procedure 37 whether you believe we need to meet and confer further on these issues. In addition, please contact me if you have any questions.

Sincerely,

/s/ R. Chris Heck

cc:     Richard C. Godfrey, P.C.
        Andrew Langan, P.C.
        Barry E. Fields, P.C.
        Don K. Haycraft
        Rachel Clingman
        Kerry J. Miller



**CARTER L. WILLIAMS**
DIRECT LINE: 713.470.6126
E-mail: carter.williams@sutherland.com

SUTHERLAND ASBILL & BRENNAN LLP
First City Tower
1001 Fannin, Suite 3700
Houston, TX 77002-6760
713.470.6100   Fax 713.654.1301
www.sutherland.com

August 19, 2011

<u>**VIA E-MAIL & FIRST CLASS MAIL**</u>

Mr. R. Chris Heck
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654

> Re:   Responses to the BP Parties' First Requests for Admission and Interrogatories in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179

Dear Chris:

This letter responds to the issues raised in your August 11, 2011 letter.  As indicated in our August 10, 2011 letter, we are reviewing Transocean's responses to RFAs 126-127, 130-153, 162, 218, 221-222, 245, 262, 275-276, 278, 281, 289, 309, 311-312, and 321, and we will supplement those responses as needed.   Similarly, we are reviewing and will supplement Transocean's responses to Interrogatories 1-7, 13, 17, 19-22, 24, 26-28, 30, 33, and 36-37.  We appreciate your efforts to resolve issues cooperatively.

With regard to RFAs 101-105 and 108, we are reviewing and will supplement Transocean's responses.  We appreciate your efforts to clarify those requests.  With regard to RFAs 46-67 and 282, Transocean's position remains unchanged – RFAs 46-67 and 282 improperly seek a purely legal contention.

Your August 11, 2011 letter also raises four issues regarding Transocean's document production.  Please note that Transocean incorporates the specific and General Objections as stated in its responses to each respective Request for Production.

1.   *Drafts of Transocean's Investigation Report*.  Transocean maintains that drafts of its investigation report are privileged and have been logged in accordance with Pretrial Order No. 14.

2.   *Captain Kuchta's license*.  Transocean has located and will produce a copy of the Master's License issued to Captain Kuchta on January 7, 2009.  As mentioned in our August 10, 2011 letter, Captain's Kuchta's original license is believed to have gone down with the rig.

Page 2 of 2
R. Chris Heck
August 19, 2011


     3.    *Trim and Stability Documents*.  As mentioned in our August 10, 2011 letter, Transocean is searching for and will produce non-privileged and responsive documents relating to the trim and stability of the *Deepwater Horizon*, including trim and stability books that may exist for the time period April 1 through April 20, 2010.

     4.    *Well Advisor Documents*.  Transocean will search for and produce non-privileged and responsive documents from Transocean's Well Advisor program related to the Macondo well.

     Please feel free to call me if you have any questions.

                  Sincerely,

                  Carter L. Williams


cc:    Rachel Clingman, Esq.
       Kerry Miller, Esq.