# EXHIBIT "5"



Jul 15 2011
6:23PM

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" In the GULF OF MEXICO on April 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION:  J |
| | * | JUDGE BARBIER |
| Applies to: *All Cases* | * | MAG. JUDGE SHUSHAN |

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

## RESPONSE ON BEHALF OF TRITON ASSET LEASING GMBH, TRANSOCEAN HOLDINGS LLC, TRANSOCEAN DEEPWATER INC., AND TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. TO BP PARTIES' FIRST SET OF REQUESTS FOR ADMISSION[1]

Pursuant to Federal Rules of Civil Procedure 26 and 34, TRITON ASSET LEASING GMBH, TRANSOCEAN HOLDINGS LLC, TRANSOCEAN DEEPWATER INC., AND TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. (collectively, "Respondents") object to the BP Parties' ("BP") First Requests for Admission ("BP's Requests for Admission") as follows:

---

[1] Although BP's Requests for Admission also name Transocean Ltd. and Transocean Inc., these parties object generally to BP's Requests for Admission, and to each individual Request for Admission, on the grounds that this Court lacks personal jurisdiction over Transocean Ltd. and Transocean Inc.  Transocean Ltd. and Transocean Inc. so object with full reservation of rights, and by appearing now do not waive personal jurisdiction.  On May 6, 2011, this Court entered a Special Appearance by Transocean Ltd. and Transocean Inc. and ordered a standstill of jurisdictional discovery, allowing counsel to accept service of process without waiver of jurisdiction (Docket Number 2274).  Transocean Ltd. and Transocean Inc. have not consented to personal jurisdiction, and therefore, pending resolution of the standstill, BP's Requests for Admission as to Transocean Ltd. and Transocean Inc. are not proper.

**GENERAL OBJECTIONS**

These General Objections are hereby incorporated into each specific response below.

1.     Respondents object generally to BP's Requests for Admission to the extent that they pertain to putative claims between BP and Respondents arising out of or relating to the Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. dated December 9, 1998 ("Drilling Contact").  Article 35.4 of the Drilling Contact states that such claims are subject to arbitration, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Unless and until BP waives its right to arbitration under the Drilling Contract, Requests for Admission pertaining to such putative claims are not proper.

2.     Respondents object generally to BP's Requests for Admission, and to each individual Request for Admission, to the extent that they attempt to impose upon Respondents any obligations in excess of those imposed by the Federal Rules of Civil Procedure and the Local Rules of this Court.

3.     Respondents object generally to BP's Requests for Admissions, and to each individual Request for Admission, to the extent that they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  By responding to a Request for Admission, Respondents are not agreeing that such discovery is appropriate or any information disclosed is admissible into evidence.

4.     Respondents object generally to BP's Requests for Admission, and to each individual Request for Admission, to the extent that they are vague, ambiguous, overly broad, lack sufficient particularity, or purport to define words in a way not consistent with their generally understood meanings.

5.     Respondents object generally to BP's Requests for Admission, and to each individual Request for Admission, to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or exception.  Respondents intend to assert those privileges and protections with respect to any information to which they apply.  Any inadvertent disclosure of information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, or exception is not intended to be, and shall not be construed as, a waiver of any applicable privilege or protection.  Consistent with Pretrial Order 14, Respondents expressly reserve the right to demand, in the event of such an inadvertent disclosure, that BP return and/or destroy any information inadvertently produced, and all copies and derivative works therefrom.

6.     Respondents object generally to BP's Requests for Admission, and to each individual Request for Admission, to the extent that they seek the disclosure of information that contains or constitutes trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination as may be embodied in a protective order entered by the Court.

7.     Respondents object generally to BP's Requests for Admission, and to each individual Request for Admission, to the extent that they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, the protections of the Health Insurance Portability and Accountability Act, or that would result in disclosure of any confidential information or documents without appropriate restrictions on disclosure and dissemination as may be embodied in a protective order entered by the Court.

8.     Respondents respond to BP's Requests for Admission solely for the purpose of and in relation to the above-captioned action.  Respondents' responses are made subject to any and all objections to competence, relevance, materiality, and admissibility that would require the exclusion at the time of trial of any statement in response to these Requests for Admission. Respondents reserve their right to interpose any such objections at the time of trial.

9.     Respondents have not fully completed their investigation of the facts relating to this case and have not fully completed their preparation for trial or obtained all documents relative to this case or BP's Requests for Admission.  Respondents also have not completed discovery from other parties in this case.  All of the responses contained herein are based only upon the information and documents that are currently available to and specifically known to Respondents.  It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, add meaning to the known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to additions to, changes in and variations from the contentions set forth herein.  The following responses to BP's Request for Admissions are given without prejudice to Respondents' right to produce evidence of any subsequently discovered fact or facts which Respondents may later recall, discover, or locate. Respondents reserve the right to supplement or amend the responses herein.

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that the *Deepwater Horizon* was a vessel for purposes of maritime law.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon* was a vessel.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the *Deepwater Horizon* was a dynamically positioned vessel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon* was a dynamically positioned vessel.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the *Deepwater Horizon*'s blowout preventer was an appurtenance of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon*'s blowout preventer was an appurtenance of the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Transocean is the world's largest contractor of offshore drilling rigs.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "largest" is vague and ambiguous.  By way of example, it is not clear if "largest" refers to the number of drilling rigs, number of personnel, number of contracts, gross revenue, or some other measurement.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean is a leading international provider of offshore contract drilling services for oil and gas wells.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Triton Asset Leasing GmbH was the owner of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Triton Asset Leasing GmbH was the owner of the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 6:**

Admit that no other entity besides Triton Asset Leasing GmbH was the owner of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that no other entity besides Triton Asset Leasing GmbH was the owner of the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 7:**

Admit that one or more of the Transocean *Deepwater Horizon* Companies was the operator of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "operator of the *Deepwater Horizon*" is vague, ambiguous, and misleading. BP was operator of the Macondo well; Transocean was the drilling contractor. Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator. BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that BP

7

contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it.  As such, Transocean was involved in the day-to-day operations of the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 8:**

Admit that no BP entity was an operator of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "operator of the *Deepwater Horizon*" is vague, ambiguous, and misleading.  BP was operator of the Macondo well; Transocean was the drilling contractor.  Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it.  In this sense, BP was not the operator of the *Deepwater Horizon*.  As operator of the Macondo well, however, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 9:**

Admit that no BP entity was a demise or bareboat charterer of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Subject to and without waiving the foregoing specific and General Objections, Respondents admit that BP was not a demise or bareboat charterer of the *Deepwater Horizon*. Respondents state further that BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it.

**REQUEST FOR ADMISSION NO. 10:**

Admit that no BP entity managed the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "managed" is vague and ambiguous. Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator. BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it. As operator of the Macondo well, BP stationed its own personnel on the *Deepwater Horizon*,

including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

## REQUEST FOR ADMISSION NO. 11:

Admit that no BP entity controlled the *Deepwater Horizon*.

## RESPONSE TO REQUEST FOR ADMISSION NO. 11:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "controlled" is vague and ambiguous.  Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it.  As operator of the Macondo well, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the *Deepwater Horizon*'s Offshore Installation Managers ("OIMs") are employed by Transocean Deepwater Inc.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon*'s OIMs are employed by Transocean Deepwater Inc.

**REQUEST FOR ADMISSION NO. 13:**

Admit that on April 20, 2010, Jimmy Harrell was the OIM aboard the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Jimmy Harrell was the OIM aboard the *Deepwater Horizon* on April 20, 2010.

**REQUEST FOR ADMISSION NO. 14:**

Admit that the *Deepwater Horizon* was required to have a properly licensed Master aboard on April 20, 2010.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 14:</u>**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a Master is required to have a Master Unlimited license, and the Master aboard the *Deepwater Horizon* on April 20, 2010, Curt Kuchta, did have a Master Unlimited license.

**<u>REQUEST FOR ADMISSION NO. 15:</u>**

Admit that the *Deepwater Horizon*'s Masters are employed by Transocean Deepwater Inc.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 15:</u>**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon*'s Masters are employed by Transocean Deepwater Inc.

**<u>REQUEST FOR ADMISSION NO. 16:</u>**

Admit that on April 20, 2010, Captain Curt Kuchta was the Master aboard the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Curt Kuchta was the Master aboard the *Deepwater Horizon* on April 20, 2010.

**REQUEST FOR ADMISSION NO. 17:**

Admit that the *Deepwater Horizon*'s OIM was responsible for the *Deepwater Horizon*'s operations while a well is being drilled.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the senior Transocean manager onboard who coordinated rig operations while a well is being drilled with BP's well site leaders and generally managed the Transocean crew.  As operator of the Macondo well,

13

however, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the *Deepwater Horizon*'s OIM was responsible for the performance of all Transocean personnel while a well is being drilled.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the senior Transocean manager onboard who coordinated rig operations while a well is being drilled with BP's well site leaders and generally managed the Transocean crew.  As operator of the Macondo well, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

14

**REQUEST FOR ADMISSION NO. 19:**

Admit that at all times except during an emergency, the OIM was responsible for the safety, conditions and procedures on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that the OIM was the senior Transocean manager onboard who coordinated rig operations with BP's well site leaders.  As operator of the Macondo well, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 20:**

Admit that at all times except during an emergency, the OIM was solely responsible for the safety, conditions and procedures on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request.

**REQUEST FOR ADMISSION NO. 21:**

Admit that under Transocean's policies, the Person-In-Charge ("PIC") is the individual who is fully responsible for onboard activities or activities directly related to the vessel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator. BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the PIC holds overriding authority in situations involving safety and pollution prevention based upon written procedures, policies, recognized industry safe working practice, and relevant codes and standards. As operator of the Macondo well, however, BP stationed its own personnel on the *Deepwater Horizon*, including

two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 22:**

Admit that only one person could be the PIC of the *Deepwater Horizon* at any one time.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that only one person could be the PIC of the *Deepwater Horizon* at any one time.

**REQUEST FOR ADMISSION NO. 23:**

Admit that the Master was the PIC of the *Deepwater Horizon* when the *Deepwater Horizon* was in underway mode.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the Master was the PIC of the *Deepwater Horizon* when the *Deepwater Horizon* was in underway mode.

**REQUEST FOR ADMISSION NO. 24:**

Admit that the OIM was the PIC of the *Deepwater Horizon* when the *Deepwater Horizon* was in drilling mode.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the PIC of the *Deepwater Horizon* when the *Deepwater Horizon* was in drilling mode.

**REQUEST FOR ADMISSION NO. 25:**

Admit that while the *Deepwater Horizon* was "latched on" in a drilling mode, the OIM was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the PIC of the *Deepwater Horizon* when the *Deepwater Horizon* was in drilling mode.

**REQUEST FOR ADMISSION NO. 26:**

Admit that while the *Deepwater Horizon* was "latched on" in a drilling mode, the Master of the *Deepwater Horizon* was not the PIC of the *Deepwater Horizon* unless an emergency arose.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the Master was not the PIC of the *Deepwater Horizon* when the *Deepwater Horizon* was in drilling mode unless an emergency arose.

**REQUEST FOR ADMISSION NO. 27:**

Admit that no person other than a Master or OIM could have been the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that no person other than a Master or OIM could have been the PIC of the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 28:**

Admit that the PIC of the *Deepwater Horizon* had the ultimate and final authority in the execution of emergency procedures.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the PIC of the *Deepwater Horizon* has the ultimate authority in the execution of emergency procedures.

## REQUEST FOR ADMISSION NO. 29:

Admit that the *Deepwater Horizon*'s Master would not take any action solely because a BP Well Site Leader directed the Master to take the action.

## RESPONSE TO REQUEST FOR ADMISSION NO. 29:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission because it does not seek an admission of fact, but rather, improperly seeks an admission regarding an incomplete and speculative hypothetical.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  In addition, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee.  The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 30:**

Admit that the *Deepwater Horizon*'s OIM would not take any action solely because a BP Well Site Leader directed the OIM to take the action.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents further object to this Request for Admission because it does not seek an admission of fact, but rather, improperly seeks an admission regarding an incomplete and speculative hypothetical. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities. In addition, BP stationed its own personnel on the *Deepwater Horizon*, including two well site leaders and a well site trainee. The well site leaders exercised BP's authority on the rig, directed and supervised operations, and coordinated the activities of contractors.

**REQUEST FOR ADMISSION NO. 31:**

Admit that as of 20:30 on April 20, 2010, the OIM was the PIC of the *Deepwater Horizon*.

21

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the PIC of the *Deepwater Horizon* as of 20:30 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 32:**

Admit that as of 21:30 on April 20, 2010, the OIM was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the PIC of the *Deepwater Horizon* as of 21:30 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 33:**

Admit that as of 21:45 on April 20, 2010, the OIM was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the OIM was the PIC of the *Deepwater Horizon* as of 21:45 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 34:**

Admit that as of 21:52 on April 20, 2010, the OIM was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny that the OIM was the PIC of the *Deepwater Horizon* as of 21:52 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 35:**

Admit that as of 22:00 on April 20, 2010, the OIM was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents deny that the OIM was the PIC of the *Deepwater Horizon* as of 22:00 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 36:**

Admit that as of 20:30 on April 20, 2010, the Captain was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny that the Captain was the PIC of the *Deepwater Horizon* as of 20:30 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 37:**

Admit that as of 21:30 on April 20, 2010, the Captain was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny that the Captain was the PIC of the *Deepwater Horizon* as of 21:30 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 38:**

Admit that as of 21:45 on April 20, 2010, the Captain was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny that the Captain was the PIC of the *Deepwater Horizon* as of 21:45 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 39:**

Admit that as of 21:52 on April 20, 2010, the Captain was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the Captain was the PIC of the *Deepwater Horizon* as of 21:52 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 40:**

Admit that as of 22:00 on April 20, 2010, the Captain was the PIC of the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the Captain was the PIC of the *Deepwater Horizon* as of 22:00 on April 20, 2010.

**REQUEST FOR ADMISSION NO. 41:**

Admit that on April 20, 2010, after 21:00, there was no handoff of authority between the OIM and Captain.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request. Respondents further state that the Captain relieved the OIM the moment the emergency situation occurred. The use of the general alarm and the public address system to muster indicated that the Captain had relieved the OIM.

**REQUEST FOR ADMISSION NO. 42:**

Admit that on April 20, 2010, there was no verbal communication to any person on the *Deepwater Horizon* to indicate that the Captain had relieved the OIM as the PIC.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request.  Respondents further state that the Captain relieved the OIM the moment the emergency situation occurred.  The use of the general alarm and the public address system to muster indicated that the Captain had relieved the OIM.

**REQUEST FOR ADMISSION NO. 43:**

Admit that on April 20, 2010, there was no announcement over any public address system on the *Deepwater Horizon* to indicate that the master had relieved the OIM as the person in charge.

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request.  Respondents further state that the Captain relieved the OIM the moment the emergency situation occurred.  The use of the general alarm and the public address system to muster indicated that the Captain had relieved the OIM.

**REQUEST FOR ADMISSION NO. 44:**

Admit that one or more of the Transocean *Deepwater Horizon* Companies was solely responsible for the operation of the *Deepwater Horizon*.

27

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "operation of the *Deepwater Horizon*" is vague, ambiguous, and misleading.  BP was operator of the Macondo well; Transocean was the drilling contractor.  In addition, the term "Transocean Deepwater Horizon Companies" is vague and ambiguous.  Respondents cannot determine to which companies, in particular, this request purports to pertain.  Respondents further object to this Request for Admission to the extent it implies Transocean had assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that BP contracted Transocean to provide the *Deepwater Horizon* drilling rig and the personnel to operate it.  As such, Transocean was involved in the day-to-day operations of the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 45:**

Admit that in performing drilling operations using the *Deepwater Horizon* pursuant to the Drilling Contract, the Transocean *Deepwater Horizon* Companies were independent contractors.

**RESPONSE TO REQUEST FOR ADMISSION NO. 45:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 18.1 of the Drilling Contract states, in part: "In performing the work set forth in this CONTRACT, CONTRACTOR shall act at all times as an independent contractor." Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 18.1. Such questions will be determined by an appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 46:**

Admit that no BP entity had any direction or control of the Transocean *Deepwater Horizon* Companies or their employees or agents in the work performed under the Drilling Contract except in the results to be obtained.

**RESPONSE TO REQUEST FOR ADMISSION NO. 46:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous.

Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 18.1 of the Drilling Contract states, in part:

> "COMPANY shall have no direction or control of CONTRACTOR or its employees and agents except in the results to be obtained. The actual performance and superintendence of all work hereunder shall be by CONTRACTOR, but the work shall meet the approval of COMPANY and be subject to the general right of inspection herein provided in order for COMPANY to secure the satisfactory completion of the work."

In addition, Section 18.2 of the Drilling Contract states, in part: "COMPANY shall be entitled to designate a representative(s), who shall at all times have complete access to the Drilling Unit … [and] shall be empowered to act for COMPANY in all manner related to CONTRACTOR'S daily performance of the work."   Respondents further state that they express no position regarding the interpretation of Drilling Contract Articles 18.1-18.2.   Such questions will be determined by an appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 47:

Admit that in drilling the MC252 Well, the Transocean *Deepwater Horizon* Companies were responsible for detecting and preventing blowouts.

## RESPONSE TO REQUEST FOR ADMISSION NO. 47:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission to the extent it implies that BP had no

responsibility for detecting or preventing blowouts.  For example, at the Macondo well, BP, as operator, was responsible for the design and interpretation of the negative pressure test.  Also, a succession of interrelated well design, construction, and temporary abandonment decisions by BP compromised the integrity of the well, compounded the risk of its failure, and ultimately set off a chain of events that resulted in the *Deepwater Horizon* incident.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 15.2 of the Drilling Contract states, in part:

> "CONTRACTOR shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of the COMPANY. … In any event, CONTRACTOR, at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.2.  Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 48:

Admit that in drilling the MC252 Well, the Transocean *Deepwater Horizon* Companies were required to exercise due diligence to prevent a well from blowing out.

## RESPONSE TO REQUEST FOR ADMISSION NO. 48:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain.

31

Respondents also object to this Request for Admission on the grounds that the term "due diligence" is vague and ambiguous.  Neither the Drilling Contract nor BP's Requests define "due diligence."   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 15.6 of the Drilling Contract regarding the mud program states, in part:

> "CONTRACTOR shall use all reasonable care to make and maintain drilling mud having weight, viscosity. water loss, and other characteristics to satisfy the requirements as specified by COMPANY. CONTRACTOR shall exercise due diligence to prevent the well from blowing out, and to enable the efficient drilling, logging, and testing of all formations without caving or formation contamination. While drilling, CONTRACTOR shall test drilling mud for weight, viscosity, water loss, and other necessary characteristics as instructed by COMPANY …"

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.6.   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 49:

Admit that in drilling the MC252 Well, the Transocean *Deepwater Horizon* Companies were required to maintain well control equipment in accordance with good oilfield practices at all times.

## RESPONSE TO REQUEST FOR ADMISSION NO. 49:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain.

Respondents also object to this Request for Admission on the grounds that the term "good oilfield practices" is vague and ambiguous.  Neither the Drilling Contract nor BP's Requests for Admission define "good oilfield practices."   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 15.2 of the Drilling Contract states, in part:

> "CONTRACTOR shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of the COMPANY. … In any event, CONTRACTOR, at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.2.   Such questions will be determined by appropriate tribunal at an appropriate time.   Respondents further state that Respondents' BOP maintenance and inspection policies and procedures meet or exceed applicable governmental rules and recommendations and are intended to improve safety and functionality of the BOP.  Specifically, Respondents comply with 30 C.F.R. § 250.446 and meet or exceed guidelines of API RP 53 in their maintenance and inspection policies and procedures.  The Mineral Management Service ("MMS") has regularly inspected Respondents' BOP records regarding Respondents' maintenance and inspection procedures on all rigs in the Gulf of Mexico and never once implied or stated that Respondents' procedures were insufficient.  The MMS also has never cited Respondents for any violation of 30 C.F.R. § 250.446.

## REQUEST FOR ADMISSION NO. 50:

Admit that the Transocean *Deepwater Horizon* Companies were responsible for pressure testing the *Deepwater Horizon*'s blowout prevention devices as often as instructed by BP, usually once every seven days.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 15.2 of the Drilling Contract states, in part:

> "CONTRACTOR shall pressure test the blowout prevention devices as often as instructed by COMPANY, usually once every seven (7) days, and shall function test the blowout prevention devices by opening and closing to assure operating condition at each trip for a bit change. … In any event, CONTRACTOR, at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect."

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.2.  Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 51:**

Admit that the Transocean *Deepwater Horizon* Companies were responsible for function testing the *Deepwater Horizon*'s blowout prevention devices by opening and closing to assure operating condition at each trip for a bit change.

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 15.2 of the Drilling Contract states, in part:

> "CONTRACTOR shall pressure test the blowout prevention devices as often as instructed by COMPANY, usually once every seven (7) days, and shall function test the blowout prevention devices by opening and closing to assure operating condition at each trip for a bit change. … In any event, CONTRACTOR, at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect."

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.2.  Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 52:

Admit that the Transocean *Deepwater Horizon* Companies were required to use, test, and maintain the *Deepwater Horizon*'s blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect.

## RESPONSE TO REQUEST FOR ADMISSION NO. 52:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain.

Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 15.2 of the Drilling Contract states, in part:

> "CONTRACTOR shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of the COMPANY. … In any event, CONTRACTOR, at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.2.   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 53:

Admit that in drilling the MC252 Well, the Transocean *Deepwater Horizon* Companies were required to use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of BP.

## RESPONSE TO REQUEST FOR ADMISSION NO. 53:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission on the grounds that the term "all reasonable means" is vague and ambiguous.  Neither the Drilling Contract nor BP's Requests for Admission define "all reasonable means"  Subject to and without waiving the foregoing specific

and General Objections, Respondents admit that Article 15.2 of the Drilling Contract states, in part:

> "CONTRACTOR shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts and to protect the hole and all other property of the COMPANY. … In any event, CONTRACTOR, at a minimum, shall use, test, and maintain blowout prevention equipment in accordance with all applicable governmental rules, regulations, and orders then in effect. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 15.2.   Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 54:**

Admit that the Transocean *Deepwater Horizon* Companies had the primary responsibility for the safety of all of their operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 17.1 of the Drilling Contract states, in part:

"CONTRACTOR shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder. CONTRACTOR shall place the highest priority on safety while performing the work. CONTRACTOR shall also observe all of COMPANY'S safety rules and guidelines as set forth in "Safety and Health Manual" of Vastar Resources, Inc. …"

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 17.1. Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 55:

Admit that the Transocean *Deepwater Horizon* Companies were responsible for taking all measures necessary or proper to protect the *Deepwater Horizon*'s personnel and facilities.

## RESPONSE TO REQUEST FOR ADMISSION NO. 55:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 17.1 of the Drilling Contract states, in part:

"CONTRACTOR shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder. CONTRACTOR shall place the highest priority on safety while performing the work. CONTRACTOR shall also observe all of COMPANY'S safety rules and guidelines as set forth in "Safety and Health Manual" of Vastar Resources, Inc. …"

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 17.1. Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 56:**

Admit that the Transocean *Deepwater Horizon* Companies were required to observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted under the Drilling Contract.

**RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 17.1 of the Drilling Contract states, in part:

> "CONTRACTOR shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder. CONTRACTOR shall place the highest priority on safety while performing the work. CONTRACTOR shall also observe all of COMPANY'S safety rules and guidelines as set forth in "Safety and Health Manual" of Vastar Resources, Inc. …"

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 17.1. Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 57:**

Admit that the Transocean *Deepwater Horizon* Companies were responsible for maintaining the *Deepwater Horizon* at optimal operating condition, in accordance with good oil practices throughout the duration of the Drilling Contract.

**RESPONSE TO REQUEST FOR ADMISSION NO. 57:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission on the grounds that the term "good oil practices" is vague and ambiguous.   Neither the Drilling Contract nor BP's Requests for Admission define "good oil practices."   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1 of the Drilling Contract states, in part: "CONTRACTOR shall maintain the Drilling Unit at optimal operating condition, in accordance with good oilfield practices throughout the duration of the CONTRACT." Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.   Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 58:**

Admit that the Transocean *Deepwater Horizon* Companies represented that the *Deepwater Horizon* and related equipment shall be in a condition to permit its continuous and

efficient operation during the period of the Drilling Contract, subject to required periods of maintenance, repair, drydocking, and inspection by regulations bodies and classification societies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 58:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

> "CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1   Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 59:**

Admit that the Transocean *Deepwater Horizon* Companies represented that they would diligently perform the work under the Drilling Contract in a good workmanlike manner consistent with applicable industry standards and practices.

**RESPONSE TO REQUEST FOR ADMISSION NO. 59:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission on the grounds that the term "good workmanlike manner" is vague and ambiguous.  Neither the Drilling Contract nor BP's Requests for Admission define "good workmanlike manner."   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

> "CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield

practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 60:

Admit that the Transocean *Deepwater Horizon* Companies represented that they would use sound technical principles where applicable.

## RESPONSE TO REQUEST FOR ADMISSION NO. 60:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission on the grounds that the term "sound technical principles" is vague and ambiguous.  Neither the Drilling Contract nor BP's Requests for Admission define "sound technical principles."  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

"CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 61:

Admit that the Transocean *Deepwater Horizon* Companies represented that they would perform the work under the Drilling Contract in compliance with the Drilling Contract.

## RESPONSE TO REQUEST FOR ADMISSION NO. 61:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain.

Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

> "CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 62:

Admit that the Transocean *Deepwater Horizon* Companies represented that they would furnish material and equipment in good condition to sufficiently meet the applicable Drilling Contract requirements and good oilfield practices.

## RESPONSE TO REQUEST FOR ADMISSION NO. 62:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds

that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission on the grounds that the term "good condition" is vague and ambiguous. Neither the Drilling Contract nor BP's Requests for Admission define "good condition." Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

> "CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 63:

Admit that the Transocean *Deepwater Horizon* Companies would bear any cost incurred in placing the *Deepwater Horizon* in a condition to function continuously and efficiently during the period of the Drilling Contract.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

> "CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1  Such questions will be determined by appropriate tribunal at an appropriate time.

47

**REQUEST FOR ADMISSION NO. 64:**

Admit that the Transocean *Deepwater Horizon* Companies agreed to ensure that the *Deepwater Horizon* and all equipment and materials furnished by Transocean were adequately maintained and in such condition as to permit their continuous and efficient operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.1.1 of the Drilling Contract states, in part:

> "CONTRACTOR represents that (i) the Drilling Unit and related equipment shall be in a condition to permit its continuous and efficient operation during the Contract Period, subject to required periods of maintenance, repair, drydocking and inspection by regulatory bodies and classification societies, (ii) it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, (iii) it will use sound technical principles where applicable, (iv) it will perform the Work in compliance with this Contract, (v) it will furnish material and equipment in good condition to sufficiently meet the applicable CONTRACT requirements and good oilfield practices and (vi) where mutually agreed, it will furnish used material and equipment, fit for the intended use. CONTRACTOR shall bear any cost incurred in placing the Drilling Unit in a condition to function continuously and efficiently during the entire Contract Period. CONTRACTOR agrees to ensure that the Drilling Unit and all equipment and materials furnished by CONTRACTOR are adequately maintained and in such condition as to permit their continuous and efficient operation. CONTRACTOR shall appropriately protect and secure all COMPANY'S equipment and materials placed in its care. CONTRACTOR also agrees to carry out visual inspection on, and make available to COMPANY to test any of CONTRACTOR'S equipment in the manner prescribed by COMPANY. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.1.1   Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 65:**

Admit that the Transocean *Deepwater Horizon* Companies represented that all of Transocean's personnel on the *Deepwater Horizon* shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary law and regulations in connection therewith.

**RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 3.1.4 of the Drilling Contract states, in part:

> "CONTRACTOR represents that all of CONTRACTOR'S personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 3.1.4.   Such questions will be determined by appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 66:**

Admit that the Transocean *Deepwater Horizon* Companies represented that during the period of the Drilling Contract, the *Deepwater Horizon* was outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, and the U.S. Department of the Interior, as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, and any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters.

**RESPONSE TO REQUEST FOR ADMISSION NO. 66:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 14.5 of the Drilling Contract states:

> "Subject to Article 2.3.4, CONTRACTOR represents that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U. S. federal waters. "

Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 14.5.   Such questions will be determined by appropriate tribunal at an appropriate time.

## REQUEST FOR ADMISSION NO. 67:

Admit that the actual performance and superintendence of all work under the Drilling Contract was by the Transocean *Deepwater Horizon* Companies.

## RESPONSE TO REQUEST FOR ADMISSION NO. 67:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents also object to this Request for Admission on the grounds that the term "actual performance" is vague and ambiguous.   Neither the Drilling Contract nor BP's Requests for Admission define "actual performance."   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 18.1 of the Drilling Contract states, in part:   "The actual performance and superintendence of all work hereunder shall be by CONTRACTOR, but the work shall meet the approval of COMPANY and be subject to the general right of inspection herein provided in order for COMPANY to secure the satisfactory completion of the work."   Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 18.1.   Such questions will be determined by appropriate tribunal at an appropriate time.   In addition, Respondents deny any implication that

Respondents assumed or was otherwise responsible for any of the duties or obligations of the Macondo well operator.  BP, as operator of the Macondo well, retained full authority over well design, drilling operations, casing and cementing processes, temporary abandonment procedures and testing, and determination and implementation of appropriate well-control procedures, among other responsibilities.

**REQUEST FOR ADMISSION NO. 68:**

Admit that a blowout is a hazard common to all drilling rigs involved in hydrocarbon exploration or development operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 68:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "common" is vague and ambiguous.  By way of example, it is unclear if "common" refers to frequency of occurrence or a commonality across all drilling rigs.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a blowout is a potential hazard in hydrocarbon exploration or development operations.

**REQUEST FOR ADMISSION NO. 69:**

Admit that although unexpected reservoir conditions could lead to a blowout, a blowout is more likely to arise from human error or equipment failure.

**RESPONSE TO REQUEST FOR ADMISSION NO. 69:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "unexpected reservoir conditions" is vague and ambiguous. Respondents cannot determine to which conditions the Request for Admission is referring. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 70:**

Admit that the *Deepwater Horizon*'s drillers are employed by Transocean Deepwater Inc.

**RESPONSE TO REQUEST FOR ADMISSION NO. 70:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that *Deepwater Horizon*'s drillers were employed by Transocean Deepwater Inc.

**REQUEST FOR ADMISSION NO. 71:**

Admit that on the *Deepwater Horizon*, detection of a kick is the responsibility of the driller.

**RESPONSE TO REQUEST FOR ADMISSION NO. 71:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that the driller is the primary person responsible for monitoring the well.  The Sperry Sun mud logger, BP well site leader, and rest of the drill crew assist with this responsibility.

**REQUEST FOR ADMISSION NO. 72:**

Admit that on the *Deepwater Horizon*, one duty of the Transocean driller and his crew drillers is to continuously and constantly monitor the well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 72:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that the driller is the primary person responsible for monitoring the well.  The Sperry Sun mud logger, BP well site leader, and rest of the drill crew assist with this responsibility.

**REQUEST FOR ADMISSION NO. 73:**

Admit that on the *Deepwater Horizon*, one purpose of the continuous and constant monitoring performed by the Transocean driller and his crew was to determine whether well conditions are changing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 73:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that one purpose of monitoring the well was to determine whether well conditions were changing.

**REQUEST FOR ADMISSION NO. 74:**

Admit that on the *Deepwater Horizon*, the driller and his crew were responsible for continuously monitoring the surface systems indicators (flow rate, pit level, etc.) and break downhole indications, such as mud pressure, rate of penetration (drilling break), etc. for signs of a kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 74:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that the driller is responsible for monitoring the well at all times, identifying when the well is to be shut-in, and shutting-in the well.  Respondents further note that other contractors aboard the *Deepwater Horizon* shared those responsibilities.

**REQUEST FOR ADMISSION NO. 75:**

Admit that computer screens in the *Deepwater Horizon*'s driller's cabin displayed real-time information concerning the drill pipe's pressure.

**RESPONSE TO REQUEST FOR ADMISSION NO. 75:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondent also object to this Request for Admission on the grounds that the term "real time information" is vague and ambiguous.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the computer screens in the *Deepwater Horizon*'s driller's cabin were capable of displaying "real time information." Respondents can neither admit nor deny that the computer screens in the driller's cabin were displaying any particular piece of information at any given time.  The only people who can confirm what information was displayed on the computer screens at the time of the Incident are deceased.

## REQUEST FOR ADMISSION NO. 76:

Admit that computer screens in the *Deepwater Horizon*'s driller's cabin displayed real-time information concerning the flow rate of drilling fluid.

## RESPONSE TO REQUEST FOR ADMISSION NO. 76:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondent also object to this Request for Admission on the grounds that the term "real time information" is vague and ambiguous.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the computer screens in the *Deepwater Horizon*'s driller's cabin were capable of displaying "real time information." Respondents can neither admit nor deny that the computer screens in the driller's cabin were displaying any particular piece of information at any given time.  The only people who can

confirm what information was displayed on the computer screens at the time of the Incident are deceased.

**REQUEST FOR ADMISSION NO. 77:**

Admit that computer screens in the *Deepwater Horizon*'s driller's cabin displayed real-time information concerning the mud pit levels.

**RESPONSE TO REQUEST FOR ADMISSION NO. 77:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondent also object to this Request for Admission on the grounds that the term "real time information" is vague and ambiguous.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the computer screens in the *Deepwater Horizon*'s driller's cabin were capable of displaying "real time information." Respondents can neither admit nor deny that the computer screens in the driller's cabin were displaying any particular piece of information at any given time.  The only people who can confirm what information was displayed on the computer screens at the time of the Incident are deceased.

**REQUEST FOR ADMISSION NO. 78:**

Admit that the Transocean HiTec well-monitoring equipment on the *Deepwater Horizon* was available to Transocean personnel, including the Driller.

**RESPONSE TO REQUEST FOR ADMISSION NO. 78:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the HiTec well-monitoring equipment was available to all persons, including BP representatives, on board the *Deepwater Horizon* who needed to access it. Respondents deny any implication that access to such equipment was limited only to Transocean personnel.

**REQUEST FOR ADMISSION NO. 79:**

Admit that the Transocean HiTec well-monitoring equipment on the *Deepwater Horizon* was not available in the BP Well Site Leader's office.

**RESPONSE TO REQUEST FOR ADMISSION NO. 79:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the HiTec well-monitoring equipment was not physically located in the BP Well Site Leader's office.  Respondents further state that the HiTec well-monitoring equipment was available to all persons, including BP representatives, on board the *Deepwater Horizon* who needed to access it.  Respondents deny any implication that access to such equipment was limited only to Transocean personnel.

**REQUEST FOR ADMISSION NO. 80:**

Admit that the Transocean HiTec well-monitoring equipment on the *Deepwater Horizon* was not provided to the BP onshore personnel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 80:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit the Hi-Tec well-monitoring equipment was not provided to onshore personnel.

**REQUEST FOR ADMISSION NO. 81:**

Admit that the Transocean HiTec flow sensor on the *Deepwater Horizon* was located in a position that would enable it to detect flow while mud was being offloaded to the Damon Bankston on April 20, 2010.

**RESPONSE TO REQUEST FOR ADMISSION NO. 81:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondent also object to this Request for Admission on the grounds that the phrase "detect flow" is vague and ambiguous. Subject to and without waiving the foregoing specific and General Objections, Respondents admit as they understand the Request, the HiTec flow sensor could detect flow while mud was being offloaded to the *Damon Bankston* on April 20, 2010. Respondents further state that transfers to the *Damon Bankston* stopped at 5:10 pm and did not resume.

**REQUEST FOR ADMISSION NO. 82:**

Admit that the offices of both the senior toolpusher and OIM included displays of real-time data concerning the drill pipe's pressure, the flow rate of drilling fluid, and the mud pit levels.

**RESPONSE TO REQUEST FOR ADMISSION NO. 82:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondent also object to this Request for Admission on the grounds that the term "real time data" is vague and ambiguous. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the offices of the OIM and senior toolpusher included displays on which the "real-time data" could be displayed. Such data could be accessed from any number of CCTV displays around the rig. Respondents deny any implication that the "real-time data" was shown only on dedicated display(s).

**REQUEST FOR ADMISSION NO. 83:**

Admit that on the *Deepwater Horizon*, the Transocean driller was responsible for shutting-in the well as quickly as possible if a kick is indicated or suspected.

**RESPONSE TO REQUEST FOR ADMISSION NO. 83:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that the driller is responsible for monitoring the well at all times, identifying when the well is to be shut-in, and shutting-in the well quickly and safely.

**REQUEST FOR ADMISSION NO. 84:**

Admit that if a kick occurs and the well is not shut-in until 10 minutes after the kick begins, the well is not shut-in as quickly as possible.

**RESPONSE TO REQUEST FOR ADMISSION NO. 84:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Requests 84-89 attempt to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 85:**

Admit that if a kick occurs and the well is not shut-in until 20 minutes after the kick begins, the well is not shut-in as quickly as possible.

**RESPONSE TO REQUEST FOR ADMISSION NO. 85:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to the foregoing General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to

allow Respondents to admit or deny this Request for Admission.  Requests 84-89 attempt to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 86:**

Admit that if a kick occurs and the well is not shut-in until 30 minutes after the kick begins, the well is not shut-in as quickly as possible.

**RESPONSE TO REQUEST FOR ADMISSION NO. 86:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to the foregoing General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Requests 84-89 attempt to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 87:**

Admit that if a kick occurs and the well is not shut-in until 40 minutes after the kick begins, the well is not shut-in as quickly as possible.

**RESPONSE TO REQUEST FOR ADMISSION NO. 87:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to the foregoing General Objections, Respondents assert that

the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Requests 84-89 attempt to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 88:**

Admit that if a kick occurs and the well is not shut-in until 50 minutes after the kick begins, the well is not shut-in as quickly as possible.

**RESPONSE TO REQUEST FOR ADMISSION NO. 88:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to the foregoing General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Requests 84-89 attempt to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 89:**

Admit that if a kick occurs and the well is not shut-in until 60 minutes after the kick begins, the well is not shut-in as quickly as possible.

**RESPONSE TO REQUEST FOR ADMISSION NO. 89:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to the foregoing General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Requests 84-89 attempt to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 90:**

Admit that the longer time period before when a kick begins and when the drilling crew begins well control procedures, the more difficult the kick will be to control.

**RESPONSE TO REQUEST FOR ADMISSION NO. 90:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the time period described therein is incomprehensible.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  This Request for Admission attempts to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 91:**

Admit that the longer time period before when a kick begins and when the drilling crew begins well control procedures, the worse the potential consequence of the kick might be.

**RESPONSE TO REQUEST FOR ADMISSION NO. 91:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the time period described therein is incomprehensible.   Respondents also object to this Request for Admission on the grounds that the term "worse" is vague and ambiguous.  By way of example, the term "worse" could refer to loss of life, loss of property, loss of profits, environmental damage, or some other measurement.   Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.   This Request for Admission attempts to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 92:**

Admit that the longer time period before when a kick begins and when the drilling crew begins well control procedures, the more likely the kick might become a blowout.

**RESPONSE TO REQUEST FOR ADMISSION NO. 92:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the time period described therein is incomprehensible.  Subject to and without waiving the

foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.   This Request for Admission attempts to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 93:**

Admit that a Transocean drilling crew should begin well control procedures immediately after becoming aware of an indication of a kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 93:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that when a well kicks, it should be shut-in within the shortest time possible under the circumstances.   Respondents further state that although the immediate priority is to shut-in the well, the most suitable well control technique can only be determined after assessing the particular conditions at the rig site.

**REQUEST FOR ADMISSION NO. 94:**

Admit that a Transocean drilling crew should shut-in the well immediately after becoming aware of an indication of a kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 94:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that when a well kicks, it should be shut-in within the shortest time possible under the circumstances.  Respondents further state that although the immediate priority is to shut-in the well, the most suitable well control technique can only be determined after assessing the particular conditions at the rig site.

**REQUEST FOR ADMISSION NO. 95:**

Admit that if a Transocean drilling crew receives an indication of a kick, the Transocean drilling crew should immediately begin well control procedures instead of delaying well control procedures until after the Transocean drilling crew determines whether hydrocarbons are flowing into the well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 95:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that when a well kicks, it should be shut-in within the shortest time possible.  Respondents further state that although the immediate priority is to shut-in the well, the most suitable control technique can only be determined after assessing the particular conditions at the rig site.

**REQUEST FOR ADMISSION NO. 96:**

Admit that if a Transocean drilling crew receives an indication of a kick, the Transocean drilling crew should immediately shut-in the well instead of delaying shutting in the well until after the Transocean drilling crew determines whether hydrocarbons are flowing into the well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 96:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that when a well kicks, it should be shut-in within the shortest time possible under the circumstances.  Respondents further state that although the immediate priority is to shut-in the well, the most suitable well control technique can only be determined after assessing the particular conditions at the rig site.

**REQUEST FOR ADMISSION NO. 97:**

Admit that the *Deepwater Horizon*'s toolpushers were employed by Transocean Deepwater Inc.

**RESPONSE TO REQUEST FOR ADMISSION NO. 97:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon*'s toolpushers were employed by Transocean Deepwater Inc.

**REQUEST FOR ADMISSION NO. 98:**

Admit that the *Deepwater Horizon*'s toolpusher was responsible for directing well control procedures during a well control event.

**RESPONSE TO REQUEST FOR ADMISSION NO. 98:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that the toolpusher ensures that the crew is organized and prepared for killing the well, and liaises with the Operator Representative throughout the well kill operation.  In addition, the senior toolpusher is the Transocean Person-in-Charge of the kill operation if so delegated by the OIM.  The senior toolpusher may also delegate to the toolpusher if required.  Respondents further state that the responsibilities of the toolpusher in no way reduce those of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 99:**

Admit that in a well control event, the *Deepwater Horizon*'s OIM was responsible for being in charge of well control procedures.

**RESPONSE TO REQUEST FOR ADMISSION NO. 99:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit this Request for Admission to the extent that the OIM is responsible for overall safety of the installation and all the personnel onboard during the well kill.  In addition, the OIM convenes a pre-kill meeting in order to establish and agree upon the kill strategy to pursue.  Participants will be the senior toolpusher, the operator representative, and any other relevant personnel.  If required, the OIM may delegate responsibility for the well control operation to the senior toolpusher.  Respondents further state that the responsibilities of the OIM in no way reduce those of the well operator, here BP, with regards to well control.

### REQUEST FOR ADMISSION NO. 100:

Admit that in a well control event, the *Deepwater Horizon*'s OIM was responsible for ensuring the safety of the personnel and the *Deepwater Horizon*.

### RESPONSE TO REQUEST FOR ADMISSION NO. 100:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that the OIM is responsible for overall safety of the installation and all the personnel onboard during the well kill.  In addition, the OIM convenes a pre-kill meeting in order to establish and agree upon the kill strategy to pursue.  Participants will be the senior toolpusher, the operator representative, and any other relevant personnel.  If required, the OIM may delegate responsibility for the well control operation to the senior toolpusher.  Respondents further state that the responsibilities of the OIM in no way reduce those of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 101:**

Admit that the first positive indicator that a well is flowing is an increase in the return flow rate while the pumps are running at constant output.

**RESPONSE TO REQUEST FOR ADMISSION NO. 101:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 5.2.2, regarding kick detection while drilling, of the Well Control Handbook states that "the first positive indicator that a well is flowing is an increase in the return flow rate while the pumps are running at constant output."  Respondents further state that the Well Control Handbook sections on kick detection in no way reduce the responsibilities of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 102:**

Admit that a gain in pit volume is a positive indicator that a kick is occurring, assuming there are no other activities ongoing such as mud additions, mud transfers, start/stop of mud solids control or degassing equipment.

**RESPONSE TO REQUEST FOR ADMISSION NO. 102:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 5.2.3, regarding kick detection while drilling, of the

Well Control Handbook states that "a gain in pit volume is a positive indicator that a kick is occurring, assuming there are no other activities ongoing such as mud additions, mud transfers, start/stop of mud solids control or degassing equipment." Respondents further state that the Well Control Handbook sections on kick detection in no way reduce the responsibilities of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 103:**

Admit that any deviation from expected hole fill volumes must be investigated and the first action must be to install a fully open safety valve and then make a flow check.

**RESPONSE TO REQUEST FOR ADMISSION NO. 103:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 5.3, regarding kick detection while tripping, of the Well Control Handbook states: "Flow into the wellbore will cause improper hole fill-up. Any deviation from expected hole fill volumes must be investigated and the first action must be to install a fully open safety valve and then make a flow check." Respondents further state that the Well Control Handbook sections on kick detection in no way reduce the responsibilities of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 104:**

Admit that if while drilling within contract parameters, a decrease in pump pressure or an increase in pump speed occurs, a flow check should be conducted to determine the cause(s) of the variation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 104:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 5.2.4, regarding kick detection while drilling, of the Well Control Handbook states:

> "Whilst drilling with constant parameters, a decrease in pump pressure (shunt motors) or an increase in pump speed (series motors) may occur when low-density formation fluids flow into the annulus causing a "U-tubing" effect.  Changes in the pump speed and pressure do not always mean an influx has entered the wellbore and may be an indication of pump problems, a washout in the drillstring, washed nozzles etc. First, conduct a flow check before proceeding with other diagnostic measures to determine the cause(s) of the variation."

Respondents further state that the Well Control Handbook sections on kick detection in no way reduce the responsibilities of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 105:**

Admit that annular flow with the pumps shut off may be a positive indicator that a kick is in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 105:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 5.2.5, regarding kick detection while drilling, of the Well Control Handbook states that "[a]nnular flow with the pumps shut off may be a positive

indicator that a kick is in progress."  Respondents further state that the Well Control Handbook sections on kick detection in no way reduce the responsibilities of the well operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 106:**

Admit that changes in drill pipe pressure, which are not explained by drilling operations, may be a positive indicator that a kick is in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 106:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that changes in drill pipe pressure, which are not explained by drilling operations, could, in some circumstances, be an indicator that a kick is in progress. Respondents further state that the changes in drill pipe pressure that occurred on April 20, 2010 coincided with other events, such as shutting down or re-starting pumps, that would also cause an expected change in drill pipe pressure.

**REQUEST FOR ADMISSION NO. 107:**

Admit that the more quickly that the blowout preventer is activated, the more likely the blowout preventer will successfully prevent uncontrolled well flow.

**RESPONSE TO REQUEST FOR ADMISSION NO. 107:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

74

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  This Request for Admission attempts to create a generalized rule applicable across all kicks on all wells; however, each well is different and each kick creates a unique well control event.

**REQUEST FOR ADMISSION NO. 108:**

Admit that if there is any doubt about well control, the well should be shut in.

**RESPONSE TO REQUEST FOR ADMISSION NO. 108:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 7.1, regarding well control complications, of the Well Control Handbook states:

> Problems may occur during a well control situation and, depending on their nature, may have a significant impact on the operation. The principal personnel involved in the kill operation should be aware of potential problems, be able to recognize them, understand the implications and resolve them.  It should be noted that restarting a kill is a delicate operation and shutting-in the well should be avoided. However, if there is any doubt the well should be shut-in.

Respondents further state that the Well Control Handbook sections on well control complications in no way reduces the responsibilities of the Operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 109:**

Admit that on the *Deepwater Horizon*, the driller was the central point of contact for all well control concerns.

**RESPONSE TO REQUEST FOR ADMISSION NO. 109:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents state that the central point of contact for all well control concerns is the most senior crew member on the drill floor. Respondents further state that generally the driller is the most senior crew member on the drill floor; however, if the toolpusher is on the drill floor, he or she will have seniority. Respondents further state that the responsibilities of the driller and toolpusher in no way reduces those of the Operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 110:**

Admit that on the *Deepwater Horizon*, the driller had the most information about current operations on the rig and the ability to react to them.

**RESPONSE TO REQUEST FOR ADMISSION NO. 110:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the Transocean employee with the most information about current operations on the rig and the ability to the react to them will generally be the most senior crew member on the drill floor. Respondents further state that generally the driller is the most senior employee on the drill floor; however, if the toolpusher is on the drill floor, he or she will

have seniority.  Respondents further state that the responsibilities of the driller and toolpusher in no way reduces those of the Operator, here BP, with regards to well control.

**REQUEST FOR ADMISSION NO. 111:**

Admit that on the *Deepwater Horizon*, the toolpusher was responsible for ensuring that all drilling operations were carried out safely and in accordance with the well program.

**RESPONSE TO REQUEST FOR ADMISSION NO. 111:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the toolpusher's basic function is to supervise the drilling operations and associated activities and ensure it is in accordance with the well program provided by the operator, in this case, BP.  Respondents further state that the responsibilities of the toolpusher in no way reduce those of the well operator, here BP, with regards to well control and design.

**REQUEST FOR ADMISSION NO. 112:**

Admit that a Sperry-Sun mud logger on the *Deepwater Horizon* should have been constantly monitoring data regarding the MC252 Well and should have notified the driller of any kick indications.

**RESPONSE TO REQUEST FOR ADMISSION NO. 112:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that mud loggers, at times, will communicate with the drill crew. Respondents, however, do not direct the mud loggers nor set the mud loggers' responsibilities. As well operator, BP serves as general contractor and hires various specialists to work on its lease and perform specific functions in the construction of the well, directs contractors with respect to their areas of responsibility, and approves all work to be performed by contractors and subcontractors.

**REQUEST FOR ADMISSION NO. 113:**

Admit that a Sperry-Sun mud logger should have regularly informed the toolpusher and drill crew on the *Deepwater Horizon* of gas concentrations in the drilling fluid.

**RESPONSE TO REQUEST FOR ADMISSION NO. 113:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that mud loggers, at times, will communicate with the drill crew. Respondents, however, do not direct the mud loggers or set the mud loggers' responsibilities.  As well operator, BP serves as general contractor and hires various specialists to work on its lease and perform specific functions in the construction of the well, directs contractors with respect to their areas of responsibility, and approves all work to be performed by contractors and subcontractors.

**REQUEST FOR ADMISSION NO. 114:**

Admit that Sperry-Sun mud logger Joseph Keith did not express any concerns about monitoring data from the MC252 Well on April 20, 2010 to any Transocean personnel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 114:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Respondents do not have personal knowledge regarding what Joseph Keith expressed or did not express.

**REQUEST FOR ADMISSION NO. 115:**

Admit that Sperry-Sun mud logger Cathleena Willis did not express any concerns about monitoring data from the MC252 Well on April 20, 2010 to any Transocean personnel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 115:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for

Admission.   Respondents do not have personal knowledge regarding what Cathleena Willis expressed or did not express.

**REQUEST FOR ADMISSION NO. 116:**

Admit that on March 8, 2010, a kick occurred while the *Deepwater Horizon* was drilling the MC252 Well (the "March 8, 2010 Kick").

**RESPONSE TO REQUEST FOR ADMISSION NO. 116:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waving the foregoing specific and General Objections, Respondent admit that, on March 8, 2010, the *Deepwater Horizon* at the Macondo well took a kick while drilling.   Respondents further state that this was the only well control event recorded by the *Deepwater Horizon* in 2010 until the incident on April 20, 2010.

**REQUEST FOR ADMISSION NO. 117:**

Admit that the Transocean *Deepwater Horizon* drilling crew did not recognize the March 8, 2010 Kick until approximately 33 minutes after the kick began.

**RESPONSE TO REQUEST FOR ADMISSION NO. 117:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waving the foregoing specific and General Objections, Respondents admit that the BP Accident Investigation Report, or Bly Report, generally states: "[T]he influx from the reservoir went unnoticed for approximately 33 minutes

… before shutting in the well …."  Respondents further state that BP's Mark Hafle stated, on July 8, 2010, that pit volumes can move on the order of 25 barrels due to vessel motion. Transocean driller Dewey Revette caught the March 8, 2010 kick at 10 barrels, and as Paul Johnson's March 10, 2010 email notes, "BP [was] very happy with Dewey."  Respondents further note that BP performed no investigation following the kick, despite the mandatory reporting requirements in BP's own operations practices for well control incidents.

**REQUEST FOR ADMISSION NO. 118:**

Admit that the Transocean *Deepwater Horizon* drilling crew should have shut in the well earlier in response to the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 118:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that BP's Mark Hafle stated, on July 8, 2010, that pit volumes can move on the order of 25 barrels due to vessel motion.  Transocean driller Dewey Revette caught the March 8, 2010 kick at 10 barrels, and as Paul Johnson's March 10, 2010 email notes, "BP [was] very happy with Dewey." Respondents further note that BP performed no investigation following the kick, despite the mandatory reporting requirements in BP's own operations practices for well control incidents.

**REQUEST FOR ADMISSION NO. 119:**

Admit that during the March 8, 2010 Kick, the MC252 Well experienced a gain of 35 to 40 bbls.

**RESPONSE TO REQUEST FOR ADMISSION NO. 119:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the Transocean Morning Report dated March 8, 2010 shows the Operations Breakdown at 22:00 as follows:  "Observe gain of 10-1/2 bbls.  Picked-up off bottom, check for well flowing.  Shut in well in on lower annular @ 22:05 hours, with estimated : 30 bbl gain."  Respondents further state that BP's Mark Hafle stated, on July 8, 2010, that pit volumes can move on the order of 25 barrels due to vessel motion.  Transocean driller Dewey Revette caught the March 8, 2010 kick at 10 barrels, and as Paul Johnson's March 10, 2010 email notes, "BP [was] very happy with Dewey."  Respondents further note that BP performed no investigation following the kick, despite the mandatory reporting requirements in BP's own operations practices for well control incidents.

**REQUEST FOR ADMISSION NO. 120:**

Admit that Dewey Revette was the Transocean driller on tour during the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 120:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Dewey Revette was the driller on tour on March 8, 2010.

**REQUEST FOR ADMISSION NO. 121:**

Admit that Jason Anderson was the Transocean toolpusher on tour during the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 121:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Jason Anderson was the toolpusher on tour on March 8, 2010.  Respondents further state that BP's Mark Hafle stated, on July 8, 2010, that pit volumes can move on the order of 25 barrels due to vessel motion.  Jason Anderson was the toolpusher of the drill crew that caught the March 8, 2010 kick at 10 barrels, and as Paul Johnson's March 10, 2010 email notes, "BP [was] very happy with [drill crew member] Dewey [Revette]." Respondents further note that BP performed no investigation following the kick, despite the mandatory reporting requirements in BP's own operations practices for well control incidents.

**REQUEST FOR ADMISSION NO. 122:**

Admit that Transocean did not provide any additional training for identifying kicks to Dewey Revette as a result of the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 122:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that Dewey Revette did not attend additional kick detection training after March 8, 2010.  Mr. Revette completed the IADC WellCAP Supervisor Level training course on February 12, 2010 and was up to date on his training as of April 20, 2010.

**REQUEST FOR ADMISSION NO. 123:**

Admit that Transocean did not provide any additional training for identifying kicks to Jason Anderson as a result of the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 123:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Jason Anderson did not attend additional kick detection training after March 8, 2010.  Mr. Anderson completed the IADC WellCAP Supervisor Level training course on October 3, 2008 and was up to date on his training as of April 20, 2010.

**REQUEST FOR ADMISSION NO. 124:**

Admit that Transocean did not provide any additional instructions for identifying kicks to Dewey Revette as a result of the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 124:**

n addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Dewey Revette did not attend additional kick detection

training after March 8, 2010.  Mr. Revette completed the IADC WellCAP Supervisor Level training course on February 12, 2010 and was up to date on his training as of April 20, 2010.

**REQUEST FOR ADMISSION NO. 125:**

Admit that Transocean did not provide any additional instructions for identifying kicks to Jason Anderson as a result of the March 8, 2010 Kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 125:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Jason Anderson did not attend additional kick detection training after March 8, 2010.  Mr. Anderson completed the IADC WellCAP Supervisor Level training course on October 3, 2008 and was up to date on his training as of April 20, 2010.

**REQUEST FOR ADMISSION NO. 126:**

Admit that on April 18, 2010, a well control drill was conducted on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 126:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states a weekly well control drill was conducted aboard the *Deepwater Horizon* on April 18, 2010.

**REQUEST FOR ADMISSION NO. 127:**

Admit that on April 18, 2010, 16 persons attended the well control drill conducted on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 127:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states that 16 persons attended a weekly well control drill that was conducted aboard the *Deepwater Horizon* on April 18, 2010.

**REQUEST FOR ADMISSION NO. 128:**

Admit that on April 18, 2010, Transocean was responsible for conducting the well control drill on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 128:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean conducted the control drill on April 18, 2010.

**REQUEST FOR ADMISSION NO. 129:**

Admit that on April 18, 2010, Transocean did in fact conduct the well control drill on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 129:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean conducted the control drill on April 18, 2010.

**REQUEST FOR ADMISSION NO. 130:**

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed kicks which can take place during cement jobs.

**RESPONSE TO REQUEST FOR ADMISSION NO. 130:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 131:**

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed the fact that kicks can occur while

cementing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 131:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states: "Also discuss kick during cement jobs. Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation. Well [sic] have been lost due to improperly designed cement slurries and spacers." Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 132:**

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed the fact that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 132:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states: "Also discuss kick during cement jobs. Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation. Well [sic] have been lost due to improperly

designed cement slurries and spacers."   Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

## REQUEST FOR ADMISSION NO. 133:

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* in which Transocean discussed that wells have been lost due to improperly designed cement slurries and spacers.

## RESPONSE TO REQUEST FOR ADMISSION NO. 133:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states: "Also discuss kick during cement jobs.   Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.   Well [sic] have been lost due to improperly designed cement slurries and spacers."   Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

## REQUEST FOR ADMISSION NO. 134:

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which started at 10:00 in the morning.

## RESPONSE TO REQUEST FOR ADMISSION NO. 134:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 notes that the start time of the drill was 10:00.

**REQUEST FOR ADMISSION NO. 135:**

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which lasted for thirty (30) minutes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 135:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 notes that the duration of the drill was 00:30.

**REQUEST FOR ADMISSION NO. 136:**

Admit that on April 18, 2010, Transocean conducted a well control drill on board the *Deepwater Horizon* which was attended by sixteen (16) persons on board the vessel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 136:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 states that 16

persons attended a weekly well control drill that was conducted aboard the *Deepwater Horizon* on April 18, 2010.

**REQUEST FOR ADMISSION NO. 137:**

Admit that on April 18, 2010, Transocean conducted only one well control drill on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 137:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists one weekly well control drill.

**REQUEST FOR ADMISSION NO. 138:**

Admit that on April 18, 2010, the persons on board the *Deepwater Horizon* who attended the well control drill conducted by Transocean included each of the following: Jason Anderson, Daniel Barron III, Donald Clark, Stephen Curtis, Miles (Randy) Ezell, Jimmy Harrell, Caleb Holloway, Roy Kemp, Karl Kleppinger, Todd Ladner, Blair Manuel, Jay Oldenwald, Dewey Revette, Shane Roshto, Donald Vidrine and Adam Weise.

**RESPONSE TO REQUEST FOR ADMISSION NO. 138:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that a safety drill report dated April 18, 2010 lists the following 16 persons as in attendance: Jason Anderson, Daniel Barron III, Donald Clark, Stephen Curtis, Miles Ezell, Jimmy Harrell, Caleb Holloway, Roy Kemp, Karl Kleppinger, Todd Ladner, Blair Manuel, Jay Oldenwald, Dewey Revette, Shane Roshto, Donald Vidrine and Adam Weise.

**REQUEST FOR ADMISSION NO. 139:**

Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* included Jason Anderson.

**RESPONSE TO REQUEST FOR ADMISSION NO. 139:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Jason Anderson as in attendance.

**REQUEST FOR ADMISSION NO. 140:**

Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Miles (Randy) Ezell.

**RESPONSE TO REQUEST FOR ADMISSION NO. 140:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Miles Ezell as in attendance.

## REQUEST FOR ADMISSION NO. 141:

Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Jimmy Harrell.

## RESPONSE TO REQUEST FOR ADMISSION NO. 141:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Jimmy Harrell as in attendance.

## REQUEST FOR ADMISSION NO. 142:

Admit that on April 18, 2010, one of the Transocean employees who led the well control drill on board the *Deepwater Horizon* was Dewey Revette.

## RESPONSE TO REQUEST FOR ADMISSION NO. 142:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Dewey Revette as in attendance.

**REQUEST FOR ADMISSION NO. 143:**

Admit that Jason Anderson was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 143:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Jason Anderson as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 144:**

Admit that Dewey Revette was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 144:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Dewey Revette as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 145:**

Admit that Stephen Curtis was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 145:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Stephen Curtis as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 146:**

Admit that Donald Clark was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 146:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Donald Clark as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 147:**

Admit that Jason Anderson was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 147:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Jason Anderson as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well

[sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 148:**

Admit that Dewey Revette was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 148:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Dewey Revette as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 149:**

Admit that Stephen Curtis was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 149:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Stephen Curtis as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 150:**

Admit that Donald Clark was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 150:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Donald Clark as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 151:**

Admit that Jimmy Harrell was told during the April 18, 2010 well control drill conducted on Board the *Deepwater Horizon* that wells have been lost due to improperly designed cement slurries and operations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 151:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Jimmy Harrell as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 152:**

Admit that Jimmy Harrell was told during the April 18, 2010 well control drill conducted on board the *Deepwater Horizon* that kicks which can occur while cementing are the results of reducing the hydrostatic pressure during the operation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 152:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that a safety drill report dated April 18, 2010 lists Jimmy Harrell as in attendance and states: "Also discuss kick during cement jobs.  Kicks that occur while cementing are the results of reducing the hydrostatic pressure during the operation.  Well [sic] have been lost due to improperly designed cement slurries and spacers."  Respondents state further that cement slurries are designed and/or approved by the operator, in this case, BP.

**REQUEST FOR ADMISSION NO. 153:**

Admit that Jimmy Harrell, the OIM for the *Deepwater Horizon*, personally approved the well control drill that Transocean conducted on April 18, 2010 on board the vessel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 153:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a safety drill report dated April 18, 2010 notes that the OIM approved the drill report.

**REQUEST FOR ADMISSION NO. 154:**

Admit that each of the Safety Drill Reports with document control numbers BP-HZN-MBI00167534 to BP-HZN-MBI00167575 is a record of a regularly conducted business activity of Transocean under Federal Rule of Evidence 803(6).

**RESPONSE TO REQUEST FOR ADMISSION NO. 154:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Questions regarding the interpretation of Federal Rule of Evidence 803(6) will be determined by this Court at an appropriate time.

**REQUEST FOR ADMISSION NO. 155:**

Admit that Transocean toolpusher Jason Anderson and BP well site leader Murray Sepulvado prepared a written negative pressure test to be used on the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 155:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the ground that it lacks specificity with regard to time.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit this Request for Admission to the extent that Murry Sepulvado developed a rig-specific test procedure that Sepulvado and Jason Anderson wrote down.  Respondents deny any implication that this negative pressure test procedure was used on April 20, 2010.  BP well site leaders deviated from the written negative pressure test procedure on the day of the Incident.

**REQUEST FOR ADMISSION NO. 156:**

Admit that the *Deepwater Horizon* crew performed a negative test on the drill pipe at approximately 17:00 on April 20, 2010 (the "first negative test").

**RESPONSE TO REQUEST FOR ADMISSION NO. 156:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "first negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to and without waiving the foregoing specific and General objections, Respondents admit at 16:52 on April 20, 2010, the drill crew, under instruction from BP, shut down the mud pumps on the rig and closed the lower annular BOP to isolate the riser fluid above the BOP in preparation for the negative pressure test.  Respondents further state that at 16:58 a valve in the cementing unit was opened in an attempt to bleed pressure off the drill pipe, which resulted in a decline in pressure from 1395 psi to 240 psi.

**REQUEST FOR ADMISSION NO. 157:**

Admit that performing a negative test on the drill pipe was the standard procedure for the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 157:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon* crew used to a rig-specific test procedure developed by Murry Sepulvado, a BP Well Site Leader not then on the rig, that

required leaving the kill, choke, and boost lines closed and monitoring for flow on the drill pipe. Respondents deny any implication that this negative pressure test procedure was used on April 20, 2010.  BP well site leaders deviated from the written negative pressure test procedure on the day of the Incident.

**REQUEST FOR ADMISSION NO. 158:**

Admit that the *Deepwater Horizon*'s driller, Dewey Revette, believed that the first negative test was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 158:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "first negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 159:**

Admit that the *Deepwater Horizon*'s toolpusher, Jason Anderson, believed that the first negative test was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 159:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Respondents also object to the term "first negative test."   The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.   Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 160:**

Admit that the *Deepwater Horizon*'s OIM, Jimmy Harrell, believed that the first negative test was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 160:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Respondents also object to the term "first negative test."   The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit Jimmy Harrell's Coast Guard Testimony, taken on May 27, 2010, states that he believed the "first negative pressure test" was successful.

**REQUEST FOR ADMISSION NO. 161:**

Admit that the *Deepwater Horizon* crew performed a negative test on the kill line at approximately 18:00 on April 20, 2010 (the "second negative test").

**RESPONSE TO REQUEST FOR ADMISSION NO. 161:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "second negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to the foregoing specific and General objections, Respondents admit that at 17:52 on April 20, 2010, a valve was opened, exposing the drill pipe pressure gauge to the pressure that had built in the well, and the drill pipe pressure gauge showed an increase.  Drill pipe pressure was again bled.  It declined to nearly 0 psi, the well was shut in, and the drill pipe pressure increased to 1,400 psi.  Respondents further state that at around this time, both BP well site leaders arrived on the rig floor, and discussions occurred regarding pressure on the drill pipe and the method of conducting the negative pressure test.  At 19:15, the BP well site leader instructed the drill crew to monitor the kill line for flow instead of the drill pipe.  The kill line was connected to the mini trip tank, the mini trip tank was monitored for 30 minutes, and no flow was observed by BP or Transocean.  BP approved the test.  The drill crew then bled pressure from the drill pipe and opened the annular BOP to continue displacement of the riser.  Had the drill crew continued monitoring flow from the drill pipe, as they had been doing previously, those monitoring the well would have detected flow indicating that the well was in communication with the formation.

**REQUEST FOR ADMISSION NO. 162:**

Admit that the *Deepwater Horizon*'s subsea supervisor, Christopher Pleasant, believed that the second negative test was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 162:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to the term "second negative test." The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe. Subject to the foregoing specific and General objections, Respondents admit that during his March 15, 2010 deposition, Christopher Pleasant testified that Don Vidrine, BP Company Man, said the "second negative pressure test" passed.

**REQUEST FOR ADMISSION NO. 163:**

Admit that the *Deepwater Horizon*'s driller, Micah Burgess, formed the opinion that the second negative test was a good test.

**RESPONSE TO REQUEST FOR ADMISSION NO. 163:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to the term "second negative test." The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request. Respondents further state that Micah Burgess was not on shift and was not on the drill floor while the negative pressure test was being conducted.

**REQUEST FOR ADMISSION NO. 164:**

Admit that the *Deepwater Horizon*'s driller, Dewey Revette, believed that the second negative test was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 164:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "second negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 165:**

Admit that the *Deepwater Horizon*'s toolpusher, Jason Anderson, believed that the second negative test was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 165:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "second negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to and without

waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 166:**

Admit that during the second negative test pressure on the drill pipe increased to approximately 1,400 psi.

**RESPONSE TO REQUEST FOR ADMISSION NO. 166:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "second negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to the foregoing specific and General objections, Respondents admit that at 17:52 on April 20, 2010, a valve was opened, exposing the drill pipe pressure gauge to the pressure that had built in the well, and the drill pipe pressure gauge showed an increase.  Drill pipe pressure was again bled.  It declined to nearly 0 psi, the well was shut in, and the drill pipe pressure increased to 1,400 psi.  Respondents further state that at around this time, both BP well site leaders arrived on the rig floor, and discussions occurred regarding pressure on the drill pipe and the method of conducting the negative pressure test.  At 19:15, the BP well site leader instructed the drill crew to monitor the kill line for flow instead of the drill pipe.  The kill line was connected to the mini trip tank, the mini trip tank was monitored for 30 minutes, and no flow was observed by BP or Transocean. BP approved the test.  The drill crew then bled pressure from the drill pipe and opened the

annular BOP to continue displacement of the riser.  Had the drill crew continued monitoring flow from the drill pipe, as they had been doing previously, those monitoring the well would have detected flow indicating that the well was in communication with the formation.

**REQUEST FOR ADMISSION NO. 167:**

Admit that the *Deepwater Horizon*'s driller, Dewey Revette, stated that the 1,400 psi of pressure on the drill pipe during the second negative test was the result of a bladder effect or annular compression.

**RESPONSE TO REQUEST FOR ADMISSION NO. 167:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "second negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the "bladder effect" is not a phenomenon known to experts in the drilling industry.  Furthermore, no members of the crew of the *Deepwater Horizon* are familiar with the term, including the colleagues and supervisors of the drill crew members who were killed in the incident and allegedly used the term.  Nor do any *Deepwater Horizon* drill crew members recall this term being used to explain the drill pipe pressure reading during the negative pressure test.

**REQUEST FOR ADMISSION NO. 168:**

Admit that the *Deepwater Horizon*'s toolpusher, Jason Anderson, stated that the 1,400 psi of pressure on the drill pipe during the second negative test was the result of a bladder effect or annular compression.

**RESPONSE TO REQUEST FOR ADMISSION NO. 168:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to the term "second negative test."  The configuration of equipment within in the well never changed on April 20, 2010; rather, the place pressure was monitored changed from the drill pipe to the kill pipe.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the "bladder effect" is not a phenomenon known to experts in the drilling industry.  Furthermore, no members of the crew of the *Deepwater Horizon* are familiar with the term, including the colleagues and supervisors of the drill crew members who were killed in the incident and allegedly used the term.  Nor do any *Deepwater Horizon* drill crew members recall this term being used to explain the drill pipe pressure reading during the negative pressure test.

**REQUEST FOR ADMISSION NO. 169:**

Admit that on April 20, 2010, at approximately 20:52, hydrocarbons began to flow into the MC252 Wellbore.

**RESPONSE TO REQUEST FOR ADMISSION NO. 169:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew, at BP's instruction, resumed final displacement at 20:02 on April 20, 2010.  As the drilling mud was displaced, the well became underbalanced to one or more of the formations sometime between 20:38 and 20:52, but there was no clear indication of an influx at that time.

**REQUEST FOR ADMISSION NO. 170:**

Admit that during the kick that occurred in the MC252 Well on April 20, 2010, the hydrocarbons came into the wellbore through the shoe track.

**RESPONSE TO REQUEST FOR ADMISSION NO. 170:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the info known or readily available at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 171:**

Admit that during the kick that occurred in the MC252 Well on April 20, 2010, the hydrocarbons did not come into the wellbore through the casing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 171:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the info known or readily available at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 172:**

Admit that during the kick that occurred in the MC252 Well on April 20, 2010, the hydrocarbons did not come into the wellbore through the casing hanger seal assembly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 172:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the info known or readily available at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 173:**

Admit that Dewey Revette was the Transocean driller on tour during the April 20, 2010 kick.

112

**RESPONSE TO REQUEST FOR ADMISSION NO. 173:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Dewey Revette was the Transocean driller on tour during the night shift on April 20, 2010.

**REQUEST FOR ADMISSION NO. 174:**

Admit that on April 20, 2010, between approximately 20:58 and 20:59, the flow out of the MC252 Well increased from approximately 450 gallons per minute to approximately 850 gallons per minute.

**RESPONSE TO REQUEST FOR ADMISSION NO. 174:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that from about 20:27–20:36, approximately 43 bbl of fluid were emptied from the trip tank into the diverter housing. This temporarily increased the fluid volumes as measured by the flow sensor and also added to the total volume of fluids returning to the mud pits, complicating efforts to monitor flow returns. Respondents further state that the well became underbalanced to one or more of the exposed formations sometime between 20:38 and 20:52. Without a functional cement barrier in the shoe track, a converted float collar, or a surface plug to stop them, hydrocarbons began to enter the well, but there was no clear indication

113

of an influx at that time.   At approximately 20:49, the driller slowed the pump rates in anticipation of the spacer reaching the surface, based on the pump strokes outlined in the displacement procedure.  At approximately 20:58, fluid was again pumped from trip tank 2 (pit 17) into the diverter housing, and the pump rates were further reduced at 20:59.  This additional fluid from the trip tank resulted in a temporary increase in the flow of fluids exiting the well. The pumps were shut down at 21:09 p.m. to conduct a static sheen test.  At this time, an estimated 61 bbl of formation fluids had flowed into the well.

**REQUEST FOR ADMISSION NO. 175:**

Admit that on April 20, 2010, between approximately 20:58 and 20:59 the flow into the MC252 Well decreased from approximately 675 gallons per minute to approximately 585 gallons per minute.

**RESPONSE TO REQUEST FOR ADMISSION NO. 175:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that from about 20:27–20:36, approximately 43 bbl of fluid were emptied from the trip tank into the diverter housing.  This temporarily increased the fluid volumes as measured by the flow sensor and also added to the total volume of fluids returning to the mud pits, complicating efforts to monitor flow returns.  Respondents further state that the well became underbalanced to one or more of the exposed formations sometime between 20:38 and 20:52.  Without a functional cement barrier in the shoe track, a converted float collar, or a surface plug to stop them, hydrocarbons began to enter the well, but there was no clear indication

of an influx at that time.   At approximately 20:49, the driller slowed the pump rates in anticipation of the spacer reaching the surface, based on the pump strokes outlined in the displacement procedure.   At approximately 20:58, fluid was again pumped from trip tank 2 (pit 17) into the diverter housing, and the pump rates were further reduced at 20:59.   This additional fluid from the trip tank resulted in a temporary increase in the flow of fluids exiting the well. The pumps were shut down at 21:09 p.m. to conduct a sheen test.   At this time, an estimated 61 bbl of formation fluids had flowed into the well.

**REQUEST FOR ADMISSION NO. 176:**

Admit that the increase of flow out of the MC252 Well to a value greater than the flow into the well between approximately 20:58 and 20:59 on April 20, 2010 indicated that a kick was in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 176:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that from about 20:27–20:36, approximately 43 bbl of fluid were emptied from the trip tank into the diverter housing.   This temporarily increased the fluid volumes as measured by the flow sensor and also added to the total volume of fluids returning to the mud pits, complicating efforts to monitor flow returns.   Respondents further state that the well became underbalanced to one or more of the exposed formations sometime between 20:38 and 20:52.   Without a functional cement barrier in the shoe track, a converted float collar, or a surface plug to stop them, hydrocarbons began to enter the well, but there was no clear indication

115

of an influx at that time.   At approximately 20:49, the driller slowed the pump rates in anticipation of the spacer reaching the surface, based on the pump strokes outlined in the displacement procedure.   At approximately 20:58, fluid was again pumped from trip tank 2 (pit 17) into the diverter housing, and the pump rates were further reduced at 20:59.   This additional fluid from the trip tank resulted in a temporary increase in the flow of fluids exiting the well. The pumps were shut down at 21:09 p.m. to conduct a sheen test.   At this time, an estimated 61 bbl of formation fluids had flowed into the well.   Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in flow of fluids exiting the well indicated to the crew that a kick was in progress.

## REQUEST FOR ADMISSION NO. 177:

Admit that on April 20, 2010, at approximately 21:01, the *Deepwater Horizon*'s drill pipe pressure increased from 1250 psi to 1350 psi while the pump rate remained constant.

## RESPONSE TO REQUEST FOR ADMISSION NO. 177:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that between 20:59 and 21:07, and after establishing a constant pump rate, the drill pipe pressure began to increase.   Respondents further state that the compliance engineer conducted the sheen test over a four-minute interval from 21:09–21:13, and during this time, the drill pipe pressure increased from 1,013 psi to 1,202 psi.   Although both the BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks

during this period, both reported that the well was not flowing.  However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe.  Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off.  During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box.  During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits.  On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard.  Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.

## REQUEST FOR ADMISSION NO. 178:

Admit that the *Deepwater Horizon*'s drill pipe pressure increase from 1250 psi to 1350 psi while the pump rate remained constant at approximately 21:01 on April 20, 2010 indicated that a kick was in progress.

## RESPONSE TO REQUEST FOR ADMISSION NO. 178:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that between 20:59 and 21:07, and after establishing a constant pump rate, the drill pipe pressure began to increase.  Respondents further state that the compliance engineer conducted the sheen test over a four-minute interval from 21:09–21:13, and during this time, the drill pipe pressure increased from 1,013 psi to 1,202 psi.  Although both the

BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks during this period, both reported that the well was not flowing.  However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe.  Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off.  During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box.  During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits.  On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard.  Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in drill pipe pressure indicated to the crew that a kick was in progress.

**REQUEST FOR ADMISSION NO. 179:**

Admit that on April 20, 2010, from approximately 20:52 to 21:08, there was a drilling fluid gain on the *Deepwater Horizon* of approximately 39 bbls.

**RESPONSE TO REQUEST FOR ADMISSION NO. 179:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that from about 20:27–20:36, approximately 43 bbl of fluid were

emptied from the trip tank into the diverter housing.  This temporarily increased the fluid volumes as measured by the flow sensor and also added to the total volume of fluids returning to the mud pits, complicating efforts to monitor flow returns.  Respondents further state that the well became underbalanced to one or more of the exposed formations sometime between 20:38 and 20:52.  Without a functional cement barrier in the shoe track, a converted float collar, or a surface plug to stop them, hydrocarbons began to enter the well, but there was no clear indication of an influx at that time.  At approximately 20:49, the driller slowed the pump rates in anticipation of the spacer reaching the surface, based on the pump strokes outlined in the displacement procedure.  At approximately 20:58, fluid was again pumped from trip tank 2 (pit 17) into the diverter housing, and the pump rates were further reduced at 20:59.  This additional fluid from the trip tank resulted in a temporary increase in the flow of fluids exiting the well. The pumps were shut down at 21:09 p.m. to conduct a sheen test.  At this time, an estimated 61 bbl of formation fluids had flowed into the well.

**REQUEST FOR ADMISSION NO. 180:**

Admit that the 39 bbls gain in drilling fluid on the *Deepwater Horizon* from approximately 20:52 to 21:08 on April 20, 2010 indicated that a kick was in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 180:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that from about 20:27–20:36, approximately 43 bbl of fluid were emptied from the trip tank into the diverter housing.  This temporarily increased the fluid

volumes as measured by the flow sensor and also added to the total volume of fluids returning to the mud pits, complicating efforts to monitor flow returns.  Respondents further state that the well became underbalanced to one or more of the exposed formations sometime between 20:38 and 20:52.  Without a functional cement barrier in the shoe track, a converted float collar, or a surface plug to stop them, hydrocarbons began to enter the well, but there was no clear indication of an influx at that time.  At approximately 20:49, the driller slowed the pump rates in anticipation of the spacer reaching the surface, based on the pump strokes outlined in the displacement procedure.  At approximately 20:58, fluid was again pumped from trip tank 2 (pit 17) into the diverter housing, and the pump rates were further reduced at 20:59.  This additional fluid from the trip tank resulted in a temporary increase in the flow of fluids exiting the well.  The pumps were shut down at 21:09 p.m. to conduct a sheen test.  At this time, an estimated 61 bbl of formation fluids had flowed into the well.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in flow of fluids exiting the well indicated to the crew that a kick was in progress.

**REQUEST FOR ADMISSION NO. 181:**

Admit that on April 20, 2010, from approximately 21:08 to 21:13, the *Deepwater Horizon*'s drill pipe pressure increased from 1017 to 1263 psi.

**RESPONSE TO REQUEST FOR ADMISSION NO. 181:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit hat the compliance engineer conducted the sheen test over a four-minute interval from 21:09–21:13, and during this time, the drill pipe pressure increased from 1,013 psi to 1,202 psi.  Although both the BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks during this period, both reported that the well was not flowing.  However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe.  Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off.  During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box.  During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits.  On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard.  Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.

**REQUEST FOR ADMISSION NO. 182:**

Admit that the increase in the *Deepwater Horizon*'s drill pipe pressure from 1017 to 1263 psi from approximately 21:08 to 21:13 on April 20, 2010 indicated that a kick was in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 182:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit hat the compliance engineer conducted the sheen test over a four-

minute interval from 21:09–21:13, and during this time, the drill pipe pressure increased from 1,013 psi to 1,202 psi.  Although both the BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks during this period, both reported that the well was not flowing.  However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe.  Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off.  During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box.  During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits.  On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard.  Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in drill pipe pressure indicated to the crew that a kick was in progress.

**REQUEST FOR ADMISSION NO. 183:**

Admit that on April 20, 2010, from approximately 21:08 to 21:13, there was no flow of drilling fluids into the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 183:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that the pumps were shut down while the compliance engineer conducted the sheen test over a four-minute interval from 21:09–21:13, and during this time, drill pipe pressure increased from 1,013 psi to 1,202 psi.  Although both the BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks during this period, both reported that the well was not flowing.   However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe.  Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off.  During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box.  During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits.   On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard.  Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.

### REQUEST FOR ADMISSION NO. 184:

Admit that on April 20, 2010, from approximately 21:08 to 21:13, there was flow of drilling fluids out of the MC252 Well.

### RESPONSE TO REQUEST FOR ADMISSION NO. 184:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the compliance engineer conducted the sheen test over a

four-minute interval from 21:09–21:13, and during this time, drill pipe pressure increased from 1,013 psi to 1,202 psi. Although both the BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks during this period, both reported that the well was not flowing. However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe. Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off. During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box. During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits. On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard. Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.

**REQUEST FOR ADMISSION NO. 185:**

Admit that the flow of drilling fluids out of the MC252 Well while no drilling fluids were flowing into the MC252 Well from approximately 21:08 to 21:13 indicated that a kick was in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 185:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit hat the compliance engineer conducted the sheen test over a four-

minute interval from 21:09–21:13, and during this time, drill pipe pressure increased from 1,013 psi to 1,202 psi.  Although both the BP well site leader and the Sperry Sun mud logger have stated that they made visual flow checks during this period, both reported that the well was not flowing.  However, the pressure increase was the result of hydrocarbons flowing into the well and pushing heavy mud upward in the well around the drill pipe.  Respondents further state that it is possible that fluids were directed overboard before these flow checks, as the flow path may have been modified as the pumps turned off.  During drilling operations, the Sperry Sun flow sensor monitors the returns in conjunction with a camera in the gumbo box.  During final displacement of the riser, once the well is cased, cemented, and tested, non-SOBM fluids may be discharged overboard rather than returned to the rig pits.  On the *Deepwater Horizon*, the Sperry Sun flow sensor was placed behind the valve that is used to direct flow overboard.  Therefore, overboard discharge bypassed the Sperry Sun sensor, the pits, and the camera located in the gumbo box.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that flow out during the indicated time period with no flow in indicated to the crew that a kick was in progress.

## REQUEST FOR ADMISSION NO. 186:

Admit that on April 20, 2010, from approximately 21:14 to 21:25, the *Deepwater Horizon*'s drill pipe pressure increased.

## RESPONSE TO REQUEST FOR ADMISSION NO. 186:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that after the sheen test, the BP well site leader directed the drill crew to continue with the displacement, and pumping resumed at 21:13.  Pumps 3, 4, and 1 were turned on, with the returns being pumped overboard.  At 21:17, pump 2 was brought online, and the kill line pressure rapidly increased to 7,126 psi.  At this time, pump 2 was lined up to pump down the choke and kill lines but was turned on prior to opening the kill line valve.  Pumping against the closed valve caused the pressure to build and the pressure relief valve to open.  While pump 1 continued to pump down the boost line, pumps 2, 3, and 4 were shut down to assess the situation and to identify the affected pump.  During this time, the drill pipe pressure slowly increased.  After determining that the pressure relief valve on pump 2 had released, the crew brought pumps 3 and 4 back online to continue the riser displacement, which created an expected increase in drill pipe pressure readings.  Between 21:22 p.m. and 21:27, a gradual and unusual increase in the kill line pressure occurred.  The pressure slowly increased to 833 psi and then decreased at a constant rate.  Kill line pressure is not unusual; however, in this instance, the gradual build in pressure suggests that the kill line may have been plugged or that a valve was partially opened. At 21:30, the drill crew, recognized an anomaly in the pressure readings and shut down the pumps to investigate.

## REQUEST FOR ADMISSION NO. 187:

Admit that the increase in the *Deepwater Horizon*'s drill pipe pressure from approximately 21:14 to 21:25 on April 20, 2010 indicated that a kick was in progress.

## RESPONSE TO REQUEST FOR ADMISSION NO. 187:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that after the sheen test, the BP well site leader directed the drill crew to continue with the displacement, and pumping resumed at 21:13.  Pumps 3, 4, and 1 were turned on, with the returns being pumped overboard.  At 21:17, pump 2 was brought online, and the kill line pressure rapidly increased to 7,126 psi.  At this time, pump 2 was lined up to pump down the choke and kill lines but was turned on prior to opening the kill line valve.  Pumping against the closed valve caused the pressure to build and the pressure relief valve to open.  While pump 1 continued to pump down the boost line, pumps 2, 3, and 4 were shut down to assess the situation and to identify the affected pump.  During this time, the drill pipe pressure slowly increased.  After determining that the pressure relief valve on pump 2 had released, the crew brought pumps 3 and 4 back online to continue the riser displacement, which created an expected increase in drill pipe pressure readings.  Between 21:22 p.m. and 21:27, a gradual and unusual increase in the kill line pressure occurred.  The pressure slowly increased to 833 psi and then decreased at a constant rate.  Kill line pressure is not unusual; however, in this instance, the gradual build in pressure suggests that the kill line may have been plugged or that a valve was partially opened. At 21:30, the drill crew, recognized an anomaly in the pressure readings and shut down the pumps to investigate.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in drill pipe pressure indicated to the crew that a kick was in progress.

## REQUEST FOR ADMISSION NO. 188:

Admit that on April 20, 2010, from approximately 21:31 to 21:34, with the mud pumps off the *Deepwater Horizon*'s drill pipe pressure increased from approximately 1210 to 1766 psi.

**RESPONSE TO REQUEST FOR ADMISSION NO. 188:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that, between approximately 21:31 and 21:34, with the pumps shut down, the drill pipe pressure increased from 1227 to 1721 psi.

**REQUEST FOR ADMISSION NO. 189:**

Admit that while the mud pumps were turned off from approximately 21:31 to 31:34, the Transocean crew did not inform senior Transocean personnel or the BP well site leader of any anomalies or ask for help in addressing them.

**RESPONSE TO REQUEST FOR ADMISSION NO. 189:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents assume that the reference to 31:34 was meant to be 21:34. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 190:**

Admit that the increase in the *Deepwater Horizon*'s drill pipe pressure from approximately 1210 to 1766 psi with the mud pumps off from approximately 21:31 to 21:34 on April 20, 2010 indicated that a kick was in progress.

**RESPONSE TO REQUEST FOR ADMISSION NO. 190:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that, between approximately 21:31 and 21:34, hydrocarbons continued to flow into the well after the pumps stopped, pushing heavy fluid into the annulus above the end of the drill string and causing increased drill pipe pressure.  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny that the increase in drill pipe pressure indicated to the crew that a kick was in progress.

**REQUEST FOR ADMISSION NO. 191:**

Admit that on April 20, 2010, at approximately 21:38, hydrocarbons passed from the MC252 Well into the *Deepwater Horizon*'s riser.

**RESPONSE TO REQUEST FOR ADMISSION NO. 191:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that at approximately 21:36, the driller directed a floor hand to bleed pressure from the drill pipe until it equalized with the kill line.  This was done for a minute-and-a-half and is indicative of the drill crew diagnosing a plugged line or valve in the system. When the bleed stopped, pressure returned, but to a lower level than previously.

129

Respondents further state that at 21:39, while the drill crew was diagnosing the anomaly, post-incident analysis revealed that the influx of hydrocarbons reached the end of the drill string at a depth of 8,367 ft. and began to fill the annulus.  This influx resulted in a rapid decline in drill pipe pressure and triggered the typical pressure signal of a kick.  By 21:42, post-incident analysis indicates that hydrocarbons reached the top of the casing and began to flow into the riser.  At that time, the drill crew was changing the flow path to the trip tank to check for flow.  The rapid increase in volume in the trip tank alerted the drill crew to an influx.

**REQUEST FOR ADMISSION NO. 192:**

Admit that on April 20, 2010, at approximately 21:40, drilling fluid flowed onto the *Deepwater Horizon*'s rig floor.

**RESPONSE TO REQUEST FOR ADMISSION NO. 192:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the flow of hydrocarbons reached the rig floor between 21:43 and 21:45.

**REQUEST FOR ADMISSION NO. 193:**

Admit that on April 20, 2010, at approximately 21:41, drilling fluid shot up through the *Deepwater Horizon*'s derrick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 193:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the flow of hydrocarbons reached the rig floor between 21:43 and 21:45.  The drill crew activated the diverter to direct fluid to the mud-gas separator ("MGS") and called the BP well site leader, the senior toolpusher, and the bridge to alert them that a well-control event was occurring. Initially, the crew stopped the flow on the rig floor by diverting to the MGS.    However, the volume and force of the flow overwhelmed the MGS, and fluid began pouring out of its outlet lines.

## REQUEST FOR ADMISSION NO. 194:

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not take any well control action in response to the kick until approximately 21:41.

## RESPONSE TO REQUEST FOR ADMISSION NO. 194:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew activated the upper annular BOP element at 21:43.  Respondents further state that at that time, the well was flowing at an estimated 92 bbl per minute at the surface.  An increase in kill line pressure at this time indicates that the annular did close.  The subsequent decline in pressure indicates, however, that the annular did not hold a seal.

**REQUEST FOR ADMISSION NO. 195:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not attempt to activate any of the *Deepwater Horizon* blowout preventer's annular preventers in response to the kick until approximately 21:41.

**RESPONSE TO REQUEST FOR ADMISSION NO. 195:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew activated the upper annular BOP element at 21:43.  Respondents further state that at that time, the well was flowing at an estimated 92 bbl per minute at the surface.  An increase in kill line pressure at this time indicates that the annular did close.  The subsequent decline in pressure indicates, however, that the annular did not hold a seal.

**REQUEST FOR ADMISSION NO. 196:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not attempt to activate any of the *Deepwater Horizon* blowout preventer's pipe rams in response to the kick until approximately 21:46.

**RESPONSE TO REQUEST FOR ADMISSION NO. 196:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

132

Objections, Respondents admit that between 21:46 and 21:47, the crew activated one or more of the BOP variable bore rams ("VBRs") to seal the annular space.  Respondents further state that at 21:47, the drill pipe pressure increased and the kill line pressure decreased, indicating that a ram had successfully closed and sealed the annular space.

**REQUEST FOR ADMISSION NO. 197:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not attempt to activate the *Deepwater Horizon* blind shear ram in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 197:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Respondents further state that crew members on the bridge attempted to activate the emergency disconnect system ("EDS"), which is designed to close the blind shear rams ("BSRs") and detach the LMRP so that the rig can move away.  The explosions on the rig severed the communication link between the BOP stack and the rig, preventing surface control of the EDS.  As a result, efforts to activate the EDS from the bridge were unsuccessful.

**REQUEST FOR ADMISSION NO. 198:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew routed flow from the kick to the mud-gas separator.

**RESPONSE TO REQUEST FOR ADMISSION NO. 198:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew had already lined the diverter packer to direct the flow from the well to the MGS pursuant to BP and Transocean standard practice.  Therefore, the drilling crew could not have routed flow from the riser to the MGS, as it was already lined up to go to the MGS.

**REQUEST FOR ADMISSION NO. 199:**

Admit that on April 20, 2010, the *Deepwater Horizon* drilling crew's use of the mud-gas separator in response to the kick caused gas and drilling fluids to flow down onto the rig.

**RESPONSE TO REQUEST FOR ADMISSION NO. 199:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew closed the diverter packer to redirect the flow from the well to the MGS pursuant to BP and Transocean standard practice.  Respondents further state that when the drill crew detected flow on the trip tank, the flow rate was within the capacity of the MGS, as measured on the trip tank.  After flow was diverted to the MGS, the increasing rate of flow exceeded the design capacity of the MGS.  At approximately 21:48 witnesses said

mud began flowing out of the MGS vacuum breaker line located halfway up the derrick, and fluid overflow from the MGS filled the mini trip tank.

## REQUEST FOR ADMISSION NO. 200:

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew did not route the flow from the kick through an overboard diverter.

## RESPONSE TO REQUEST FOR ADMISSION NO. 200:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the drill crew closed the diverter packer to redirect the flow from the well to the MGS pursuant to BP and Transocean standard practice.  When the drill crew detected flow on the trip tank, the flow rate was within the capacity of the MGS, as measured on the trip tank.  After flow was diverted to the MGS, the increasing rate of flow exceeded the design capacity of the MGS.  Respondents further state that it does not appear actions were taken to direct flow through the main overboard diverter lines prior to the explosion.  It is impossible given the magnitude of the blowout to know if the diverter packer would have kept flow diverted overboard and if the gas ignition could have been prevented.

## REQUEST FOR ADMISSION NO. 201:

Admit that on April 20, 2010, the *Deepwater Horizon*'s drilling crew could have routed the flow from the kick through an overboard diverter.

2em

**RESPONSE TO REQUEST FOR ADMISSION NO. 201:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 202:**

Admit that on April 20, 2010, the *Deepwater Horizon* drilling crew should have used the starboard diverter, rather than the mud-gas separator, in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 202:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 203:**

Admit that Dewey Revette did not receive training from Transocean on when to use the mud-gas separator versus the overboard diverter in response to a blowout.

**RESPONSE TO REQUEST FOR ADMISSION NO. 203:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 204:**

Admit that Jason Anderson did not receive training from Transocean on when to use the mud-gas separator versus the overboard diverter in response to a blowout.

**RESPONSE TO REQUEST FOR ADMISSION NO. 204:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 205:**

Admit that the Transocean *Deepwater Horizon* drilling crew should have shut in the well earlier in response to the April 20, 2010 kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 205:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General

Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that at approximately 21:36, the driller directed a floor hand to bleed pressure from the drill pipe until it equalized with the kill line. This was done for a minute-and-a-half and is indicative of the drill crew diagnosing a plugged line or valve in the system. When the bleed stopped, pressure returned, but to a lower level than previously. Respondents further state that at 21:39, while the drill crew was diagnosing the anomaly, post-incident analysis revealed that the influx of hydrocarbons reached the end of the drill string at a depth of 8,367 ft. and began to fill the annulus. This influx resulted in a rapid decline in drill pipe pressure and triggered the typical pressure signal of a kick. By 21:42, post-incident analysis indicates that hydrocarbons reached the top of the casing and began to flow into the riser. At that time, the drill crew was changing the flow path to the trip tank to check for flow. The rapid increase in volume in the trip tank alerted the drill crew to an influx, and the crew undertook well-control activities.

**REQUEST FOR ADMISSION NO. 206:**

Admit that on April 20, 2010, at approximately 21:48, the *Deepwater Horizon*'s engine no. 3 started going into overspeed.

**RESPONSE TO REQUEST FOR ADMISSION NO. 206:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after

reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that some witnesses reported hearing the engines "revving up" prior to the loss of power, possibly indicating that the engines were consuming the gaseous vapors as an uncontrolled fuel. In that scenario, engines might trip off due to reverse power, over-frequency, or over-speed conditions.

## REQUEST FOR ADMISSION NO. 207:

Admit that on April 20, 2010, at approximately 21:48, the *Deepwater Horizon*'s engine no. 6 started going into overspeed.

## RESPONSE TO REQUEST FOR ADMISSION NO. 207:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that some witnesses reported hearing the engines "revving up" prior to the loss of power, possibly indicating that the engines were consuming the gaseous vapors as an uncontrolled fuel. In that scenario, engines might trip off due to reverse power, over-frequency, or over-speed conditions.

## REQUEST FOR ADMISSION NO. 208:

Admit that first assistant engineer James Brent Mansfield did not receive training from Transocean in when to operate the emergency shutdown system ("ESD") on the *Deepwater Horizon*.

139

**RESPONSE TO REQUEST FOR ADMISSION NO. 208:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that James Mansfield, at his May 12, 2011 deposition, testified that he was not trained on the ESD system.  Activation of the ESD requires in the involvement of bridge and additional crew members because the *Deepwater Horizon* is a dynamically positioned ("DP") vessel.  A DP vessel requires power for its station keeping system and thrusters to maintain its position.  Without power, the rig would lose its ability to stay in position and thus drift off location.  A powerless, drifting rig is a serious hazard to personnel onboard, as well as to those on nearby vessels., and could have significant environmental consequences.  Respondents further state that Mr. Mansfield was able to and had the authority to shut down any engine at any time by the push of a button.  Mr. Mansfield confirmed, during his May 12, 2011 deposition, that in an obvious emergency situation where an engine shutdown was needed, such as a fire, he would not hesitate to do so.

**REQUEST FOR ADMISSION NO. 209:**

Admit that chief mechanic Douglas Brown did not receive training from Transocean in when to operate the ESD on the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 209:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Douglas Brown, at his May 3, 2011 deposition, testified that he was not trained on the ESD system.  Activation of the ESD requires the involvement of bridge and additional crew members because the *Deepwater Horizon* is a dynamically positioned ("DP") vessel.  A DP vessel requires power for its station keeping system and thrusters to maintain its position.  Without power, the rig would lose its ability to stay in position and thus drift off location.  A powerless, drifting rig is a serious hazard to personnel onboard, as well as to those on nearby vessels., and could have significant environmental consequences.  Respondents further state that Mr. Brown was able to and had the authority to shut down any engine at any time by the push of a button.

**REQUEST FOR ADMISSION NO. 210:**

Admit that first assistant engineer James Brent Mansfield did not know whether he had authority to operate the ESD on the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 210:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that James Mansfield, at his May 12, 2011 deposition, testified he did not know if had the authority to operate the ESD.  Activation of the ESD requires the involvement of bridge and additional crew members because the *Deepwater Horizon* is a dynamically positioned ("DP") vessel.  A DP vessel requires power for its station keeping system and thrusters to maintain its position.  Without power, the rig would lose its ability to stay

in position and thus drift off location.  A powerless, drifting rig is a serious hazard to personnel onboard, as well as to those on nearby vessels., and could have significant environmental consequences.  Respondents further state that Mr. Mansfield was able to and had the authority to shut down any engine at any time by the push of a button.  Mr. Mansfield confirmed, during his May 12, 2011 deposition, that in an obvious emergency situation where an engine shutdown was needed, such as a fire, he would not hesitate to do so.

**REQUEST FOR ADMISSION NO. 211:**

Admit that chief mechanic Douglas Brown did not know whether he had authority to operate the ESD on the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 211:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Douglas Brown, at his May 3, 2011 deposition, testified he did not know if had the authority to operate the ESD.  Activation of the ESD requires the involvement of bridge and additional crew members because the *Deepwater Horizon* is a dynamically positioned ("DP") vessel.  A DP vessel requires power for its station keeping system and thrusters to maintain its position.  Without power, the rig would lose its ability to stay in position and thus drift off location.  A powerless, drifting rig is a serious hazard to personnel onboard, as well as to those on nearby vessels., and could have significant environmental consequences.  Respondents further state that Mr. Brown was able to and had the authority to shut down any engine at any time by the push of a button.

**REQUEST FOR ADMISSION NO. 212:**

Admit that first assistant engineer James Brent Mansfield did not receive training from Transocean on whether to shut down the *Deepwater Horizon*'s engines in response to combustible gas alarms going off.

**RESPONSE TO REQUEST FOR ADMISSION NO. 212:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that James Mansfield, at his May 12, 2011 deposition, testified he did not receive any well control training.  Respondents further state that Mr. Mansfield was able to and had the authority to shut down any engine at any time by the push of a button.  Mr. Mansfield confirmed, during his May 12, 2011 deposition, that in an obvious emergency situation where an engine shutdown was needed, such as a fire, he would not hesitate to do so.

**REQUEST FOR ADMISSION NO. 213:**

Admit that chief mechanic Douglas Brown did not receive training from Transocean on whether to shut down the *Deepwater Horizon*'s engines in response to combustible gas alarms going off.

**RESPONSE TO REQUEST FOR ADMISSION NO. 213:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that Douglas Brown, at his May 3, 2011 deposition, testified that he did not receive any training on what to do if combustible gas lights and audible alarms go off. Respondents further state that Mr. Brown was able to shut down any engine at any time by the push of a button.

**REQUEST FOR ADMISSION NO. 214:**

Admit that on April 20, 2010, at approximately 21:49, the *Deepwater Horizon*'s engine no. 3 exploded.

**RESPONSE TO REQUEST FOR ADMISSION NO. 214:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 215:**

Admit that on April 20, 2010, at approximately 21:49, the *Deepwater Horizon*'s engine no. 6 exploded.

**RESPONSE TO REQUEST FOR ADMISSION NO. 215:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

## REQUEST FOR ADMISSION NO. 216:

Admit that on April 20, 2010, at approximately 21:50, the *Deepwater Horizon* lost all power.

## RESPONSE TO REQUEST FOR ADMISSION NO. 216:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "all power" is not defined and its meaning is unclear.  Subject to and without waving the foregoing specific and General Objections, Respondents deny this Request for Admission as written.  Respondents further state that at approximately 21:49, the real-time Sperry Sun data feed to shore ended, and it is assumed that the rig lost power at this time.  However, certain areas of the rig, such as the bridge, retained power.

## REQUEST FOR ADMISSION NO. 217:

Admit that Captain Kuchta did not order any *Deepwater Horizon* crew member to activate the ESD on April 20, 2010.

## RESPONSE TO REQUEST FOR ADMISSION NO. 217:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Respondents further state Jimmy Harrell's Coast Guard Testimony, taken on May 27, 2010, states that he was not aware of any communication with anyone to shut down the engines.

**REQUEST FOR ADMISSION NO. 218:**

Admit that OIM Harrell did not order any *Deepwater Horizon* crew member to activate the ESD on April 20, 2010.

**RESPONSE TO REQUEST FOR ADMISSION NO. 218:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit Jimmy Harrell's Coast Guard Testimony, taken on May 27, 2010, states that he was not aware of any communication with anyone to shut down the engines.

**REQUEST FOR ADMISSION NO. 219:**

Admit that Transocean did not provide any training to its personnel on the *Deepwater Horizon* regarding when to activate the emergency disconnect system ("EDS") in response to a well control event.

**RESPONSE TO REQUEST FOR ADMISSION NO. 219:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 220:**

Admit that on April 20, 2010, none of the *Deepwater Horizon*'s crew attempted to activate the EDS before approximately 21:51.

**RESPONSE TO REQUEST FOR ADMISSION NO. 220:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that several minutes before 21:56, Chris Pleasant attempted to use the BOP control panel to activate the EDS.

**REQUEST FOR ADMISSION NO. 221:**

Admit that on April 20, 2010, at approximately 21:51, Captain Kuchta instructed subsea engineer Chris Pleasant not to activate the EDS.

**RESPONSE TO REQUEST FOR ADMISSION NO. 221:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that Chris Pleasant, at his March 14-15, 2011 deposition, stated that when he informed Captain Kuchta he was going to activate the EDS, Captain Kuchta responded, "Calm down; we're not hitting the EDS."   At another point in his deposition, Mr. Pleasant stated that he had been on the bridge for two seconds before hitting the EDS and that hitting the EDS was the first thing he did when he got to the bridge.   Respondents further state that Don Vidrine, BP well site leader, was also on the bridge at this time and did not attempt or order anyone to activate the EDS.

**REQUEST FOR ADMISSION NO. 222:**

Admit that on April 20, 2010, Captain Kuchta did not instruct anyone to activate the EDS until 21:56.

**RESPONSE TO REQUEST FOR ADMISSION NO. 222:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that at approximately 21:56, the OIM, one of the subsea engineers, and one of the BP well site leaders who were on the bridge attempted to use the BOP control panel to activate the EDS.

**REQUEST FOR ADMISSION NO. 223:**

Admit that on April 20, 2010, Captain Kuchta did not order a crew member to activate the EDS until after he had consulted with OIM Harrell.

**RESPONSE TO REQUEST FOR ADMISSION NO. 223:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that at approximately 21:56, the OIM, one of the subsea engineers, and one of the BP well site leaders who were on the bridge attempted to use the BOP control panel to activate the EDS.

**REQUEST FOR ADMISSION NO. 224:**

Admit that on April 20, 2010, before any crew member attempted to activate the EDS, Captain Kuchta asked Daun Winslow whether he should activate the EDS.

**RESPONSE TO REQUEST FOR ADMISSION NO. 224:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 225:**

Admit that on April 20, 2010, OIM Harrell had the authority to activate the EDS aboard the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 225:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

149

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that OIM Harrell had authority to activate the EDS.

**REQUEST FOR ADMISSION NO. 226:**

Admit that on April 20, 2010, OIM Harrell did not activate the EDS aboard the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 226:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that OIM Harrell did not activate the EDS.  Respondents further state that OIM Harrell was on the bridge when Christopher Pleasant attempted to activate the EDS.

**REQUEST FOR ADMISSION NO. 227:**

Admit that on April 20, 2010, Captain Kuchta had the authority to activate the EDS aboard the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 227:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Captain Kuchta had authority to activate the EDS.

**REQUEST FOR ADMISSION NO. 228:**

Admit that on April 20, 2010, Captain Kuchta did not activate the EDS aboard the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 228:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Captain Kuchta did not activate the EDS. Respondents further state that Captain Kuchta was on the bridge when Christopher Pleasant attempted to activate the EDS.

**REQUEST FOR ADMISSION NO. 229:**

Admit that on April 20, 2010, after the explosions at approximately 21:49, Captain Kuchta directed one or more crew members to return to their accommodations.

**RESPONSE TO REQUEST FOR ADMISSION NO. 229:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 230:**

Admit that on April 20, 2010, after the explosions at approximately 21:49, Captain Kuchta reprimanded Andrea Fleytas, the dynamic positioning officer, for pushing the distress button and sending out a "Mayday" call.

**RESPONSE TO REQUEST FOR ADMISSION NO. 230:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 231:**

Admit that on April 20, 2010, a number of gas detectors on the *Deepwater Horizon* were set in "inhibited" mode at the time of the explosions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 231:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the *Deepwater Horizon* fire and gas system was continuously monitored by a DPO and required manual intervention to trigger the general alarm. The sounding of the general alarm on the rig

required manual activation, consistent with USCG requirements. The occurrence of false alarms pose significant safety problems on a rig; they increase the risk of injuries, cause interruptions to operations, and can lead to what is known as "alarm fatigue." For example, smoke detectors, which operate not by specifically identifying smoke in the air but rather by detecting any small particles (e.g., soot, dust, cement, steam, water vapor, and sand particles), are prone to triggering frequent false alarms when the system is in automatic mode. Likewise, sensors on the exterior of the rig can trigger alarms due to their exposure to the elements. If these false alarms were to sound regularly, as has been the case when marine alarm systems are set in automatic mode, crew responsiveness would be likely to decline and injuries would be likely to increase. The manual activation system prevents this "alarm fatigue" problem, assuring that the alarms will continue to be heeded.

**REQUEST FOR ADMISSION NO. 232:**

Admit that if the gas detectors are set in "inhibited" mode, then the detection of gas would be reported to the control panel but no alarm would sound.

**RESPONSE TO REQUEST FOR ADMISSION NO. 232:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission. Respondents further state that the *Deepwater Horizon* fire and gas system was continuously monitored by a DPO and required manual intervention to trigger the general alarm. The sounding of the general alarm on the rig required manual activation, consistent with USCG requirements. The occurrence of false alarms

pose significant safety problems on a rig; they increase the risk of injuries, cause interruptions to operations, and can lead to what is known as "alarm fatigue." For example, smoke detectors, which operate not by specifically identifying smoke in the air but rather by detecting any small particles (e.g., soot, dust, cement, steam, water vapor, and sand particles), are prone to triggering frequent false alarms when the system is in automatic mode. Likewise, sensors on the exterior of the rig can trigger alarms due to their exposure to the elements. If these false alarms were to sound regularly, as has been the case when marine alarm systems are set in automatic mode, crew responsiveness would be likely to decline and injuries would be likely to increase. The manual activation system prevents this "alarm fatigue" problem, assuring that the alarms will continue to be heeded.

## REQUEST FOR ADMISSION NO. 233:

Admit that on April 20, 2010, none of Transocean's crew members aboard the *Deepwater Horizon* sounded the general alarm after the gas detectors activated.

## RESPONSE TO REQUEST FOR ADMISSION NO. 233:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.   Respondents further state that at approximately 21:45, a member of the drill crew called the bridge to report a well-control situation and then hung up.   The bridge team attempted to return the call to get more information but got no response.   Moments later, at about 21:47, the gas-detection system alarm panel on the bridge began to activate, first indicating the presence of gas in the shale shaker house, then the

drill floor, and then other areas of the *Deepwater Horizon*.   As trained, the bridge team immediately called the shale shaker house to alert personnel and gather information, but they got no response.  Shortly thereafter, the bridge team received a call from the engine control room and informed the crew member of a well-control situation.  The bridge team called the *Bankston* at about 21:48 and instructed her to move a safe distance away from the rig to a standby position. Senior rig personnel from both Transocean and BP were notified of the well-control event before the first alarms sounded and were attempting to respond to requests for assistance when the rig lost power and the first explosion occurred.  Following the first explosion at about 21:49, the bridge team sounded the general alarm and made a PA announcement instructing personnel to muster in the galley and cinema.

## REQUEST FOR ADMISSION NO. 234:

Admit that on April 20, 2010, after approximately 21:49, the *Deepwater Horizon*'s Emergency Response Team No. 1 did not take any action to fight the fire on the rig.

## RESPONSE TO REQUEST FOR ADMISSION NO. 234:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that that *Deepwater Horizon* crew members with emergency response duties attempted to proceed to their muster stations, such as the ECR and fire-fighting stations.   However, the conditions aboard the *Deepwater Horizon* precluded fire-fighting activities.  Once the rig lost power at approximately 21:49, the fire pumps were not operational.

The chief engineer and two colleagues left the bridge and attempted to start the standby generator at about 21:59, but they were unable to restore power.

**REQUEST FOR ADMISSION NO. 235:**

Admit that on April 20, 2010, after approximately 21:49, the *Deepwater Horizon*'s Emergency Response Team No. 2 did not take any action to fight the fire on the rig.

**RESPONSE TO REQUEST FOR ADMISSION NO. 235:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that that *Deepwater Horizon* crew members with emergency response duties attempted to proceed to their muster stations, such as the ECR and fire-fighting stations.  However, the conditions aboard the *Deepwater Horizon* precluded fire-fighting activities.  Once the rig lost power at approximately 21:49, the fire pumps were not operational. The chief engineer and two colleagues left the bridge and attempted to start the standby generator at about 21:59, but they were unable to restore power.

**REQUEST FOR ADMISSION NO. 236:**

Admit that on April 20, 2010, after approximately 21:50, the *Deepwater Horizon* did not have any generators online.

**RESPONSE TO REQUEST FOR ADMISSION NO. 236:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the chief engineer and two colleagues left the bridge and attempted to start the standby generator at about 21:59, but they were unable to restore power. Respondents further state that during the incident, display screens such as the fire and gas detection system and the BOP control panel were still operating, indicating that the uninterruptible power supply on the bridge was functioning.

## REQUEST FOR ADMISSION NO. 237:

Admit that on April 20, 2010, the *Deepwater Horizon*'s backup generator did not come online after engines nos. 3 and 6 exploded at approximately 21:49.

## RESPONSE TO REQUEST FOR ADMISSION NO. 237:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the chief engineer and two colleagues left the bridge and attempted to start the standby generator at about 21:59, but they were unable to restore power. Respondents further state that during the incident, display screens such as the fire and gas detection system and the BOP control panel were still operating, indicating that the uninterruptible power supply on the bridge was functioning.  In addition, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny whether engines nos. 3 and 6 exploded.

**REQUEST FOR ADMISSION NO. 238:**

Admit that from April 20 to April 22, 2010, firefighting vessels sprayed seawater on the *Deepwater Horizon*'s deck.

**RESPONSE TO REQUEST FOR ADMISSION NO. 238:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that firefighting vessels, under the direction of the U.S. Coast Guard, sprayed seawater on the *Deepwater Horizon*'s deck.

**REQUEST FOR ADMISSION NO. 239:**

Admit that from April 20 to April 22, 2010, firefighting vessels spraying seawater on the *Deepwater Horizon*'s deck caused the rig to list.

**RESPONSE TO REQUEST FOR ADMISSION NO. 239:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Respondents further state that firefighting efforts from April 20 to April 22, 2010 were directed by the U.S. Coast Guard.

**REQUEST FOR ADMISSION NO. 240:**

Admit that from April 20 to April 22, 2010, the seawater sprayed on the *Deepwater Horizon*'s deck caused the oil to spread across the deck leading to more ignitions.

**RESPONSE TO REQUEST FOR ADMISSION NO. 240:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that firefighting efforts from April 20 to April 22, 2010 were directed by the U.S. Coast Guard.

**REQUEST FOR ADMISSION NO. 241:**

Admit that from April 20 to April 22, 2010, firefighting vessels spraying seawater on the *Deepwater Horizon*'s deck contributed to the rig sinking.

**RESPONSE TO REQUEST FOR ADMISSION NO. 241:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for

Admission.  Respondents further state that firefighting efforts from April 20 to April 22, 2010 were directed by the U.S. Coast Guard.

**REQUEST FOR ADMISSION NO. 242:**

Admit that the *Deepwater Horizon* was required to comply with the International Safety Management ("ISM") code.

**RESPONSE TO REQUEST FOR ADMISSION NO. 242:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon* was required to comply with ISM code.

**REQUEST FOR ADMISSION NO. 243:**

Admit that the ISM code required the Transocean *Deepwater Horizon* Companies to ensure that the *Deepwater Horizon* was manned with qualified, certificated and medically fit seafarers in accordance with national and international requirements.

**RESPONSE TO REQUEST FOR ADMISSION NO. 243:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain.

Respondents further object to this Request for Admission to the extent it implies Transocean was not compliant with the ISM Code.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 6.2 of the ISM Code states: "The Company should ensure that each ship is manned with qualified, certified and medically fit seafarers in accordance with national and international requirements."  Respondents further state that they express no position regarding the interpretation of ISM Code § 6.2.  Such questions will be determined by this Court at an appropriate time.

**REQUEST FOR ADMISSION NO. 244:**

Admit that the ISM code required the Transocean *Deepwater Horizon* Companies to establish and maintain procedures for identifying any training which may be required in support of the safety management system and ensure that such training was provided for all personnel concerned.

**RESPONSE TO REQUEST FOR ADMISSION NO. 244:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Respondents further object to this Request for Admission to the extent it implies Transocean was not compliant with the ISM Code.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Section 6.5 of the ISM Code states: "The Company should establish and maintain procedures for identifying any training which may be required in

support of the safety management system and ensure that such training is provided for all personnel concerned."  Respondents further state that they express no position regarding the interpretation of ISM Code § 6.5.  Such questions will be determined by this Court at an appropriate time.

**REQUEST FOR ADMISSION NO. 245:**

Admit that at no time during April 19 or April 20, 2010 did the *Deepwater Horizon*'s OIM, Jimmy Harrell, have any safety concerns with respect to any of the operations that were taking place on the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 245:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission on the grounds that the term "safety concerns" is vague and ambiguous.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Jimmy Harrell did not exercise his stop work authority on April 19-20, 2010.

**REQUEST FOR ADMISSION NO. 246:**

Admit that under Transocean's policies, each employee has the obligation to interrupt an operation to prevent an incident from occurring.

**RESPONSE TO REQUEST FOR ADMISSION NO. 246:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that every Transocean employee and individual onboard the rig has the authority to stop work if she or she observes an unsafe condition.

**REQUEST FOR ADMISSION NO. 247:**

Admit that Transocean's toolpushers and drillers on the *Deepwater Horizon* had the authority to stop any operations they felt were unsafe.

**RESPONSE TO REQUEST FOR ADMISSION NO. 247:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that every Transocean employee and individual onboard the rig has the authority to stop work if she or she observes an unsafe condition.

**REQUEST FOR ADMISSION NO. 248:**

Admit that Transocean's policies encourage employees to stop a job or operation if they have doubts about its safety.

**RESPONSE TO REQUEST FOR ADMISSION NO. 248:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that every Transocean employee and individual onboard the rig has the authority to stop work if he or she observes an unsafe condition.

**REQUEST FOR ADMISSION NO. 249:**

Admit that Transocean's toolpushers and drillers on the *Deepwater Horizon* could have raised any concerns that they had about operations with the Transocean OIM or with the BP Well Site Leaders on board the rig.

**RESPONSE TO REQUEST FOR ADMISSION NO. 249:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that every Transocean employee and every other individual onboard the rig, including BP employees, could have raised concerns with the appropriate personnel.

**REQUEST FOR ADMISSION NO. 250:**

Admit that no person employed by any BP entity pressured the *Deepwater Horizon* drilling crew to complete the temporary abandonment procedures on the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 250:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 251:**

Admit that on December 23, 2009, a Transocean rig drilling a Shell well in the North Sea experienced a well control event.

**RESPONSE TO REQUEST FOR ADMISSION NO. 251:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a well control event occurred in the North Sea on December 23, 2009 on a Transocean Midwater Floater Rig, the Sedco 711.

**REQUEST FOR ADMISSION NO. 252:**

Admit that on December 23, 2009, a Transocean rig drilling the Shell well in the North Sea experienced an incident in which gas entered the riser for that rig.

**RESPONSE TO REQUEST FOR ADMISSION NO. 252:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that gas entered the riser during the December 23, 3009 well control event on the *Sedco 711*.

**REQUEST FOR ADMISSION NO. 253:**

Admit that on December 23, 2009, the Transocean crew drilling the Shell well in the North Sea underbalanced the well while displacing mud to seawater.

165

**RESPONSE TO REQUEST FOR ADMISSION NO. 253:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that on December 23, 2009 the *Sedco 711* crew was circulating the well to seawater, as per well program, on site instructions, and pit plans.  This circulation included base oil, Soapy Hi-vicious pills, and then seawater.  As the base oil entered the annulus, the overbalance on the reservoir started to reduce, and the reservoir continued to reduce as the clean-up pills and seawater entered the annulus until the well reached an underbalanced condition.

**REQUEST FOR ADMISSION NO. 254:**

Admit that a negative pressure test had been conducted on the Shell well in the North Sea which the Transocean drilling crew believed was successful.

**RESPONSE TO REQUEST FOR ADMISSION NO. 254:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that a negative pressure test had been conducted prior to the December 23, 2009 well control event aboard the *Sedco 711*.

**REQUEST FOR ADMISSION NO. 255:**

Admit that on December 23, 2009 the Transocean crew drilling the Shell well in the North Sea received indications of a kick prior to the well control event occurring.

**RESPONSE TO REQUEST FOR ADMISSION NO. 255:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that an increase in flow was noticed by a Sperry Sun mudlogger, an increase in the pits was noticed on the rig monitoring PVT, and problems were perceived at the shakers prior to the December 23, 2009 well control event aboard the *Sedco 711*.

**REQUEST FOR ADMISSION NO. 256:**

Admit that on April 14, 2010, Transocean issued an "Operations Advisory: Loss Of Well Control Event During Completions" discussing the December 23, 2009 well control event at the Shell well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 256:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean issued two advisories following the *Sedco 711* incident in the North Sea.  First, a Well Operations Group Advisory issued on April 5, 2010, explained that additional language would be added to the Well Control Handbook "to clarify the

167

requirements for monitoring and maintaining at least two barriers when displacing to an under-balanced fluid during completion operations.  This clarification is as a result of a recent well control incident on a Transocean installation which occurred due to a failure of a tested mechanical barrier."  This April 5, 2010 advisory was posted on Transocean's internal network, where it could be viewed by employees, and from which notifications were sent to employees registered to receive such notifications.  The advisory was also distributed by email.  Second, Transocean issued an Operations Advisory on April 14, 2010, which was posted on Transocean's internal network and distributed to the North Sea division.

**REQUEST FOR ADMISSION NO. 257:**

Admit that as of April 20, Transocean had not disseminated the April 14, 2010 "Operations Advisory: Loss Of Well Control Event During Completions" to the *Deepwater Horizon* crewmembers.

**RESPONSE TO REQUEST FOR ADMISSION NO. 257:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the April 14, 2010 Operations Advisory, which was intended for distribution to North Sea rigs, was not sent specifically to the crew of the *Deepwater Horizon*.  Respondents state further that the April 14, 2010 Operations Advisory was posted to Transocean's network and available for viewing by Transocean employees worldwide.

**REQUEST FOR ADMISSION NO. 258:**

Admit that as of April 20, 2010, the Transocean rig crew on the *Deepwater Horizon* had not been provided with any lessons learned from the December 23, 2009 well control event at the Shell well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 258:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that lessons learned from the December 23, 2009 well control event had not been sent specifically to the crew of the *Deepwater Horizon*.   Respondents state further that two Operations Advisories issued following that incident were posted to Transocean's network and available for viewing by Transocean employees worldwide.

**REQUEST FOR ADMISSION NO. 259:**

Admit that the Transocean *Deepwater Horizon* Companies did not develop a salvage plan for the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 259:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain.

Subject to and without waiving the foregoing specific and General Objections, Respondents admit that they did not develop a post-incident salvage plan for the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 260:**

Admit that as of September 2009 the *Deepwater Horizon* had a backlog of overdue maintenance consisting of 390 jobs totaling 3545 man hours.

**RESPONSE TO REQUEST FOR ADMISSION NO. 260:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 261:**

Admit that after BP conducted a rig audit in September 2009, BP did not allow the *Deepwater Horizon* to resume operations until certain issues found by the audit were resolved.

**RESPONSE TO REQUEST FOR ADMISSION NO. 261:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that work was suspended for a period of approximately five days on the *Deepwater Horizon* due to the audit's findings regarding watertight integrity, but the items were addressed and the vessel returned to work following a BP request on September 22, 2009.  Respondents further state that the BP September 2009 audit identified 70 repairs, and

Transocean had completed 63 of out of those 70 repairs within just five months – a 90% completion rate, which Angel Rodriguez, Marine Operations Lead for BP E&P Gulf of Mexico, stated was "commendable."  The seven items (all of which were given the lowest priority rating of 3) deemed incomplete as of March 29, 2010, were: rectify and tidy cabinet wiring in Kongsberg DPS 232 (to be completed on next rig move); provide outstanding technical concerns regarding the FMECA to BP (under discussion with rig management); inventory survey and inspection of MCTs (list of MCTs being compiled); install new volute casing for seawater pump #5 (waiting on parts, estimated completion July 2010); replace defective PPM meter on water maker #1 (parts on order, wrong parts initially received); replace leaking shaft seal on ballast pump #1 (parts on order); and investigate ballast pump #3 pump amp fluctuations (parts on order).  Respondents further state that Neil Cramond, BP Gulf of Mexico Marine Authority and one of the BP officials who reviewed the BP Audit, testified before the Coast Guard that the remaining seven items yet to be completed at the time of the incident "were not deemed critical to the operation of the rig."   In addition, Cramond testified that there were no "major nonconformities" aboard the *Deepwater Horizon* as of April 2010; the *Deepwater Horizon* was "tight, staunch, strong and fit for the work that it was performing" in April 2010; and no BP employee, including either of the BP Company Men aboard the rig, reported that the vessel was not fit or that they had any concerns about the rig in April 2010.  Respondents also note that if any item identified in the audit had not been closed out to BP's satisfaction, BP had the power to prevent the rig from resuming operations.

**REQUEST FOR ADMISSION NO. 262:**

Admit that on August 7, 2008, the overspeed controls on *Deepwater Horizon* engine 3 malfunctioned.

**RESPONSE TO REQUEST FOR ADMISSION NO. 262:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that on August 7, 2008 the *Deepwater Horizon* engine 3 overspeed alarm was triggered.

**REQUEST FOR ADMISSION NO. 263:**

Admit that the malfunction in the overspeed controls on *Deepwater Horizon* engine 3 that occurred on August 7, 2008 caused a blackout on the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 263:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that on August 7, 2008 the *Deepwater Horizon* experienced a blackout of the main power plant.

**REQUEST FOR ADMISSION NO. 264:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s emergency shut down system for engine no. 3 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 264:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 265:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s rig savers for engine no. 3 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 265:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 266:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s mechanical overspeed controls for engine no. 3 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 266:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 267:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s electrical overspeed controls for engine no. 3 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 267:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 268:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s emergency shut down system for engine no. 6 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 268:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 269:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s rig savers for engine no. 6 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 269:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 270:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s mechanical overspeed controls for engine no. 6 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 270:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after

reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 271:**

Admit that during the April 20, 2010 blowout, the *Deepwater Horizon*'s electrical controls for engine no. 6 did not operate properly.

**RESPONSE TO REQUEST FOR ADMISSION NO. 271:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 272:**

Admit that an April 2010 ModuSpec USA, Inc. audit of the *Deepwater Horizon* found that the *Deepwater Horizon* lacked systems to properly track its hazardous electrical equipment

**RESPONSE TO REQUEST FOR ADMISSION NO. 272:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission. Respondents further state that the April 2010 ModuSpec audit report of the *Deepwater Horizon* states that none of the EX

electrical equipment had been tagged with an ID number and there was no HAER spreadsheet. Respondents further state that overall, the 2010 ModuSpec Report describes the *Deepwater Horizon* as being in good working, though not perfect, condition.  Specifically, the main engines, gas detection system, ballast control system, the rig's riser and wellhead connectors, lower flex, riser and slip joints, marine riser adapter, riser tensioners, BOP stack frame, failsafe values, accumulator bottles, BOP control pods, and choke and kill manifold, piping, remote consoles and connectors were all listed as in good condition.

## REQUEST FOR ADMISSION NO. 273:

Admit that an April 2010 ModuSpec USA, Inc. audit of the *Deepwater Horizon* found that some of the electrical equipment on board was in bad condition and severely corroded.

## RESPONSE TO REQUEST FOR ADMISSION NO. 273:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the April 2010 ModuSpec audit report of the *Deepwater Horizon* states that the HVAC ventilation fans and duct work were in fair condition. This was due to the VMSA supply fans for the machinery area on the port and starboard sides of the rig.  They were severely corroded, and the gaskets were in bad condition.  Upon review of the history of the ventilation system, the PMs were being completed on regular bases.  During interviews with crew members, it was noted that they had replaced some of the vent duct work and that no major problems were noted with the system.  In addition, the ModuSpec audit report notes that several of the frames for agitators in

the hazardous area were noted as severely corroded.  Respondents further state that overall, the

2010 ModuSpec Report describes the *Deepwater Horizon* as being in good working, though not

perfect, condition.  Specifically, the main engines, gas detection system, ballast control system,

the rig's riser and wellhead connectors, lower flex, riser and slip joints, marine riser adapter, riser

tensioners, BOP stack frame, failsafe values, accumulator bottles, BOP control pods, and choke

and kill manifold, piping, remote consoles and connectors were all listed as in good condition.

**REQUEST FOR ADMISSION NO. 274:**

Admit that as of April 2010, the *Deepwater Horizon* had 35 critical items of equipment

that were either in bad condition, had shown excessive downtime, had passed manufacturer wear

limits, or that the manufacturer no longer supported.

**RESPONSE TO REQUEST FOR ADMISSION NO. 274:**

In addition to the General Objections set forth above, Respondents object to this Request

for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents deny this Request for Admission.  Respondents further state that the BP

September 2009 audit identified 70 repairs, and Transocean had completed 63 of out of those 70

repairs within just five months – a 90% completion rate, which Angel Rodriguez, Marine

Operations Lead for BP E&P Gulf of Mexico, stated was "commendable."  The seven items (all

of which were given the lowest priority rating of 3) deemed incomplete as of March 29, 2010,

were: rectify and tidy cabinet wiring in Kongsberg DPS 232 (to be completed on next rig move);

provide outstanding technical concerns regarding the FMECA to BP (under discussion with rig

management); inventory survey and inspection of MCTs (list of MCTs being compiled); install

new volute casing for seawater pump #5 (waiting on parts, estimated completion July 2010); replace defective PPM meter on water maker #1 (parts on order, wrong parts initially received); replace leaking shaft seal on ballast pump #1 (parts on order); and investigate ballast pump #3 pump amp fluctuations (parts on order).  Respondents further state that Neil Cramond, BP Gulf of Mexico Marine Authority and one of the BP officials who reviewed the BP Audit, testified before the Coast Guard that the remaining seven items yet to be completed at the time of the incident "were not deemed critical to the operation of the rig."  In addition, Cramond testified that there were no "major nonconformities" aboard the *Deepwater Horizon* as of April 2010; the *Deepwater Horizon* was "tight, staunch, strong and fit for the work that it was performing" in April 2010; and no BP employee, including either of the BP Company Men aboard the rig, reported that the vessel was not fit or that they had any concerns about the rig in April 2010. Respondents also note that if any item identified in the audit had not been closed out to BP's satisfaction, BP had the power to prevent the rig from resuming operations.

## REQUEST FOR ADMISSION NO. 275:

Admit that first assistant engineer James Brent Mansfield expressed concerns to the *Deepwater Horizon*'s captains and chief engineers that the *Deepwater Horizon* crew did not have sufficient maintenance personnel to properly maintain the *Deepwater Horizon*.

## RESPONSE TO REQUEST FOR ADMISSION NO. 275:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also  object to this Request for Admission on the grounds that the term "maintenance personnel" is vague and ambiguous.  Subject to and without waiving

the foregoing specific and General Objections, Respondents admit that James Mansfield stated, at his May 12, 2011 deposition, that it was apparent upon his arrival on the *Deepwater Horizon* that the maintenance department was understaffed considering the amount of work it was assigned.  This concern was communicated to his superiors.  Respondents further state that Mr. Mansfield acknowledged that Transocean recognized the need for additional manning, hired an extra motorman to work each tour on the rig, and set additional staffing as a goal.  Mr. Mansfield was not aware of any engine problems at the time of the April 20, 2010 incident.  In addition, Mr. Mansfield reviewed a statement he wrote on  one of his performance evaluations wherein he indicated that he was proud to be a Transocean employee and a member of the *Deepwater Horizon* crew.  Mr. Mansfield confirmed that he meant those words when he wrote them and still means them today.

## REQUEST FOR ADMISSION NO. 276:

Admit that chief mechanic Douglas Brown expressed concerns to his superior on the *Deepwater Horizon* that the *Deepwater Horizon* crew did not have sufficient maintenance personnel to properly maintain the *Deepwater Horizon*.

## RESPONSE TO REQUEST FOR ADMISSION NO. 276:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission on the grounds that the term "maintenance personnel" is vague and ambiguous.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Douglas Brown, at his May 3, 2011 deposition, stated that there was not proper manpower on the rig to

adequately address maintenance and repair issues.  Mr. Brown also stated that in October 2009, a first engineer was assigned to the day shift, and sometime thereafter, in the first quarter of 2010, another motorman was assigned.  Respondents further state that Mr. Brown acknowledged that the engines and their overspeed safety devices had been inspected and certified as functional in February 2010.  Mr. Brown could point to no single item, that in his opinion, the maintenance and/or mechanical departments failed to inspect or repair that ultimately led to the accident.  In addition, Mr. Brown never reduced any of his complaints or concerns to writing.

**REQUEST FOR ADMISSION NO. 277:**

Admit that on April 20, 2010, the *Deepwater Horizon* had fewer maintenance personnel than on January 1, 2005.

**RESPONSE TO REQUEST FOR ADMISSION NO. 277:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission on the grounds that the term "maintenance personnel" is vague and ambiguous.  By way of example, Transocean does not use the term "maintenance personnel" to describe crew member positions. It is not clear if "maintenance personnel" includes roustabouts, mechanics, electricians, welders, deckpushers, floorhands, motor operators, and/or any of the other Transocean crew member positions.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that on April 20, 2010 there were 79 Transocean personnel on board the *Deepwater Horizon*, and on January 1, 2005, there were 73 Transocean personnel on board the *Deepwater Horizon*.

**REQUEST FOR ADMISSION NO. 278:**

Admit that from the time of its launch through April 20, 2010, the *Deepwater Horizon* never went into a drydock or shipyard for repairs.

**RESPONSE TO REQUEST FOR ADMISSION NO. 278:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon* was scheduled for dry dock in 2011 and had underwent other repairs in lieu of earlier dry docking.

**REQUEST FOR ADMISSION NO. 279:**

Admit that as of April 20, 2010, Transocean had not repaired or addressed each of the items identified in the observations in BP's September 2009 *Deepwater Horizon* Follow Up Rig Audit, Martine Assurance Audit and Out of Service Period ("BP's September 2009 Audit").

**RESPONSE TO REQUEST FOR ADMISSION NO. 279:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that the BP September 2009 audit identified 70 repairs, and Transocean had completed 63 of out of those 70 repairs within just five months – a 90% completion rate, which Angel Rodriguez, Marine Operations Lead for BP E&P Gulf of Mexico, stated was "commendable."  The seven items (all

of which were given the lowest priority rating of 3) deemed incomplete as of March 29, 2010, were: rectify and tidy cabinet wiring in Kongsberg DPS 232 (to be completed on next rig move); provide outstanding technical concerns regarding the FMECA to BP (under discussion with rig management); inventory survey and inspection of MCTs (list of MCTs being compiled); install new volute casing for seawater pump #5 (waiting on parts, estimated completion July 2010); replace defective PPM meter on water maker #1 (parts on order, wrong parts initially received); replace leaking shaft seal on ballast pump #1 (parts on order); and investigate ballast pump #3 pump amp fluctuations (parts on order).  Respondents further state that Neil Cramond, BP Gulf of Mexico Marine Authority and one of the BP officials who reviewed the BP Audit, testified before the Coast Guard that the remaining seven items yet to be completed at the time of the incident "were not deemed critical to the operation of the rig."  In addition, Cramond testified that there were no "major nonconformities" aboard the *Deepwater Horizon* as of April 2010; the *Deepwater Horizon* was "tight, staunch, strong and fit for the work that it was performing" in April 2010; and no BP employee, including either of the BP Company Men aboard the rig, reported that the vessel was not fit or that they had any concerns about the rig in April 2010. Respondents also note that if any item identified in the audit had not been closed out to BP's satisfaction, BP had the power to prevent the rig from resuming operations.

## REQUEST FOR ADMISSION NO. 280:

Admit that the Transocean *Deepwater Horizon* crew lacked sufficient maintenance personnel to repair or address each of the items indentified in the observations in BP's September 2009 Audit.

**RESPONSE TO REQUEST FOR ADMISSION NO. 280:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "maintenance personnel" is vague and ambiguous.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 281:**

Admit that on April 20, 2010, Transocean's maintenance personnel on the *Deepwater Horizon* were working on replacing saltwater pipes on the *Deepwater Horizon* that were leaking or about to leak.

**RESPONSE TO REQUEST FOR ADMISSION NO. 281:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission on the grounds that the term "maintenance personnel" is vague and ambiguous.  By way of example, Transocean does not use the term "maintenance personnel" to describe crew member positions. It is not clear if "maintenance personnel" includes roustabouts, mechanics, electricians, welders, deckpushers, floorhands, motor operators, and/or any of the other Transocean crew member positions.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that on April 19, 2010, personnel were working on replacing water filters.

**REQUEST FOR ADMISSION NO. 282:**

Admit that under the Drilling Contract, BP was not obligated to pay Transocean during a shut down of the *Deepwater Horizon* for inspection, repair, or replacement of any surface or subsurface equipment in excess of 24 hours per calendar month with a maximum accumulation of 12 days.

**RESPONSE TO REQUEST FOR ADMISSION NO. 282:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Article 2.2.5(a) of the Drilling Contract states, in part: "CONTRACTOR shall be allowed a maximum of twenty-four (24) hours per calendar month Mechanical Downtime with a maximum accumulation of twelve (12) days; thereafter the day rate reduces to zero (0)." Respondents further state that they express no position regarding the interpretation of Drilling Contract Article 2.2.5(a). Such questions will be determined by an appropriate tribunal at an appropriate time.

**REQUEST FOR ADMISSION NO. 283:**

Admit that the *Deepwater Horizon* blowout preventer's design, manufacture, and installation were governed by 30 C.F.R. §§ 250.441–250.444.

**RESPONSE TO REQUEST FOR ADMISSION NO. 283:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter

jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon*'s BOP was governed by 30 C.F.R. §§ 250.441-250.444.

**REQUEST FOR ADMISSION NO. 284:**

Admit that the Transocean *Deepwater Horizon* Companies were not in compliance with American Petroleum Institute Recommended Practice 53 with respect to the *Deepwater Horizon*'s blowout preventer as of April 20, 2010.

**RESPONSE TO REQUEST FOR ADMISSION NO. 284:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents further state that Respondents are in compliance with 30 C.F.R. § 250.446.  RP 53, as incorporated by reference into the regulation, advises but does not require companies to follow a BOP manufacturer's maintenance and inspection guidelines.  Respondents work closely with Cameron in maintaining and inspecting their BOPs.  However, Respondents have implemented a more precise condition-based monitoring system that exceeds Cameron's recommendations and RP 53, and is intended to improve safety and functionality of the BOP.

**REQUEST FOR ADMISSION NO. 285:**

Admit that Transocean does not comply with American Petroleum Institute Recommended Practice 53 regarding inspections of blowout preventers.

**RESPONSE TO REQUEST FOR ADMISSION NO. 285:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission. Respondents further state that Respondents are in compliance with 30 C.F.R. § 250.446. RP 53, as incorporated by reference into the regulation, advises but does not require companies to follow a BOP manufacturer's maintenance and inspection guidelines. Respondents work closely with Cameron in maintaining and inspecting their BOPs. However, Respondents have implemented a more precise condition-based monitoring system that exceeds Cameron's recommendations and RP 53, and is intended to improve safety and functionality of the BOP.

**REQUEST FOR ADMISSION NO. 286:**

Admit that the Transocean *Deepwater Horizon* Companies used "condition-based maintenance" to maintain the blowout prevent on board the *Deepwater Horizon*.

**RESPONSE TO REQUEST FOR ADMISSION NO. 286:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents

admit that they have implemented a more precise condition-based monitoring system that exceeds Cameron's recommendations, and is intended to improve safety and functionality of the BOP.  Respondents further state that Respondents are in compliance with 30 C.F.R. § 250.446. RP 53, as incorporated by reference into the regulation, advises but does not require companies to follow a BOP manufacturer's maintenance and inspection guidelines.  Respondents work closely with Cameron in maintaining and inspecting their BOPs.  However, Respondents' condition-based monitoring system exceeds Cameron's recommendations and RP 53, and is intended to improve safety and functionality of the BOP.

**REQUEST FOR ADMISSION NO. 287:**

Admit that Transocean's "condition-based maintenance" does not include disassembling and inspecting BOPs on three-to five-year intervals.

**RESPONSE TO REQUEST FOR ADMISSION NO. 287:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without  waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents developed extensive preventative maintenance procedures which are implemented at varying time intervals during any given five year period – at the end of each well, after 360 days, and after 1800 days or five years.  In addition, some parts also have maintenance and inspection steps at the 90, 180, or 1080 day intervals.  For each of these time periods, Transocean follows specific procedures for the following major components of the BOP: TL ram, HC Connector, MCS Failsafe Valve, Mini Collect Connector, DL Annular, DWHC Connector, and Vetco Super HD H-4.  Transocean's rig

move maintenance involves replacement of the rubber goods, including: the upper annular element, the lower annular element, the ram packers, the top seal, blades on the blind shear ram, the bonnet seals, the riser connector ring gasket, three and sixteenths mini connector gaskets, and the wellhead ring gaskets. Respondents also inspect the BOP for evidence of failures and mechanical integrity. Respondents further state that Respondents have implemented a more precise condition-based monitoring system that exceeds the "frequency and scope" of Cameron's recommendations, and is intended to improve safety and functionality of the BOP. Respondents' condition-based monitoring system is compliant with 30 C.F.R. § 250.446. RP 53, as incorporated by reference into the regulation, advises but does not require companies to follow a BOP manufacturer's maintenance and inspection guidelines. Respondents work closely with Cameron in maintaining and inspecting their BOPs. However, Respondents' condition-based monitoring system exceeds Cameron's recommendations and RP 53, and is intended to improve safety and functionality of the BOP.

## REQUEST FOR ADMISSION NO. 288:

Admit that Cameron International Corporation ("Cameron"), the manufacturer of the BOP on the *Deepwater Horizon*, recommends disassembling and inspecting the BOP stack, choke manifold, and diverter components every three to five years.

## RESPONSE TO REQUEST FOR ADMISSION NO. 288:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Cameron Engineering Bulletin ("EB") 902D recommended

189

that BOPs be recertified every three to five years at a Cameron approved facility.  Respondents

further state that EB 902D states that equipment owners may adapt their own maintenance

procedures to their own specific format based on "their specific operating environment" so long

as the procedures meet the "frequency and scope" of Cameron's recommended practices.

Respondents further state that they have implemented a more precise condition-based monitoring

system that exceeds the "frequency and scope" of Cameron's recommendations, and is intended

to improve safety and functionality of the BOP.  Respondents further note that their condition-

based monitoring system is compliant with 30 C.F.R. § 250.446.  RP 53, as incorporated by

reference into the regulation, advises but does not require companies to follow a BOP

manufacturer's maintenance and inspection guidelines.  Respondents work closely with Cameron

in maintaining and inspecting their BOPs.  However, Respondents' condition-based monitoring

system exceeds Cameron's recommendations and RP 53, and is intended to improve safety and

functionality of the BOP.

## REQUEST FOR ADMISSION NO. 289:

Admit that on April 20, 2010 at 21:00, the *Deepwater Horizon*'s blowout preventer had a

leak in the yellow control pod.

## RESPONSE TO REQUEST FOR ADMISSION NO. 289:

In addition to the General Objections set forth above, Respondents object to this Request

for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit the Transocean subsea team reported the small volume test ram

leak to BP as reflected in the BP Daily Operations Reports of Feb. 23–March 13, 2010.  The

operation report identified the leak as being on the yellow pod, and the drill crew switched to the blue pod to stop the leak and allow further investigation. Respondents further state that the test ram is the lowermost ram and is used during function and pressure testing of the BOP stack; it is not used for well control and, therefore, could not have impacted the events of April 20, 2010.

**REQUEST FOR ADMISSION NO. 290:**

Admit that on April 20, 2010 at 21:00, the *Deepwater Horizon*'s blowout preventer had a leak in the lower annular.

**RESPONSE TO REQUEST FOR ADMISSION NO. 290:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that prior to the April 20, 2010 incident, the *Deepwater Horizon* senior subsea engineer noted a lower annular close function leak; however, the senior subsea engineer confirmed the leak was very small and the annular BOP would still close when needed. The leak appeared as a "tick," or a brief flickering indication, on the hydraulic fluid flow gauge located on the BOP control panel. The flow indication appeared only when the lower annular preventer was in the closed position, and the *Deepwater Horizon* subsea team did not identify any fluid leaking externally from the system. This leak would not have adversely affected the response time and sealing capability of the lower annular due to the large hydraulic supply that was continuously provided by the hydraulic conduit line being supplied by the *Deepwater Horizon* Cameron Surface Control System, including 45 40-gallon accumulators that were

continuously replenished to a stored pressure of 5,000 psi.  Respondents further state that BP was aware of this leak in the lower annular.

**REQUEST FOR ADMISSION NO. 291:**

Admit that on April 20, 2010 at 21:00, the *Deepwater Horizon*'s blowout preventer had a leak in the surge bottle of the upper annular.

**RESPONSE TO REQUEST FOR ADMISSION NO. 291:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that on February 19, 2010 a Transocean senior subsea supervisor identified a leak in the upper annular close circuit.  During the post-incident intervention, the upper annular close circuit leak was identified on the hose fitting that connects the 10-gallon accumulator surge bottle to the close function of the upper annular BOP.  The leak was detectable but very small.  At 1,500 psi, the leak rate was determined to be approximately 0.1 gallons per minute.  This leak would not have adversely affected the response time and sealing capability of the upper annular due to the large hydraulic supply that was continuously provided by the hydraulic conduit line being supplied by the *Deepwater Horizon* Cameron Surface Control System, including 45 40-gallon accumulators that were continuously replenished to a stored pressure of 5,000 psi.  Respondents further state that BP was aware of this leak in the upper annular.

**REQUEST FOR ADMISSION NO. 292:**

Admit that on April 20, 2010 at 21:00, the *Deepwater Horizon*'s blowout preventer had a leak from the ST-lock system adjacent to the blind shear ram ST-lock.

**RESPONSE TO REQUEST FOR ADMISSION NO. 292:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections,  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Respondents further state that during post-April 20, 2010 response efforts, when the ROV functioned the pipe ram on the ROV intervention panel, a leak was noted on the lock function of the ST Lock circuit for the BOPs.  The intervention team used an ROV to re-tighten the hose fitting to correct this leak.  Because the leak was noted after April 20, 2010 it is impossible to know if the ST Lock circuit was leaking on April 20, 2010.  Based on the ROV video, this leak was small and would not have prevented actuation of the pipe or shear rams even if  the ST Lock circuit was leaking on April 20, 2010.  The leak would not have reduced the available hydraulic power provided by the BOP stack accumulators enough to prevent the blind shear rams from shearing the drill pipe and sealing the wellbore.  Actuation of the AMF or auto-shear emergency modes would have properly operated the blind shear rams.

**REQUEST FOR ADMISSION NO. 293:**

Admit that on April 20, 2010 at 21:00, the *Deepwater Horizon*'s blowout preventer had a leak from the ST-lock system adjacent to the remotely operated vehicle ("ROV") intervention panel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 293:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections,  Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.   Respondents further state that a leak in the tubing connection that runs from the blind shear ram ST Lock sequence valve to the ST Lock chamber was indentified on April 26, 2010.  Because the leak was discovered after April 20, 2010 it is impossible to know if this tubing connection was leaking on April 20, 2010.  Respondents further state that the BOP ram must be approximately 90% closed for the ST Lock sequence valve to open, allowing fluid to pass through to the ST Lock locking function, creating the conditions for a leak in this location  The existence of this leak confirms that the shear ram on this bonnet was closed.  Further, based on the ROV video, this leak was small and would not have prevented the ST Lock function from operating.

**REQUEST FOR ADMISSION NO. 294:**

Admit that a blowout preventer will not operate effectively if the blowout preventer hydraulic system does not have a sufficient supply of hydraulic fluid to activate the blowout preventer's annular or ram preventers.

**RESPONSE TO REQUEST FOR ADMISSION NO. 294:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission. Respondents further state that on April 20, 2010 there was a sufficient supply of hydraulic fluid to activate the BOP's annular or ram preventers.

**REQUEST FOR ADMISSION NO. 295:**

Admit that leaks in the blowout preventer may deplete the hydraulic fluid in the subsea accumulators and decrease the blowout preventer's ability to effectively function if hydraulic power from the rig is lost.

**RESPONSE TO REQUEST FOR ADMISSION NO. 295:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after

reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  Respondents further state that the leaks in the blowout preventer discovered before or after April 20, 2010 did not impact or would not have impacted the BOP's ability to effectively function.

## REQUEST FOR ADMISSION NO. 296:

Admit that on April 20, 2010 at 21:00, the blowout preventer's yellow control pod's solenoid valve that operated the blowout preventer's automatic mode function ("solenoid valve 103") did not function.

## RESPONSE TO REQUEST FOR ADMISSION NO. 296:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections,  Respondents deny this request.  Respondents further state that testing performed on the yellow pod at NASA Michoud confirms the AMF system activated solenoid 103, and solenoid 103 activated the HP shear circuit to close the BSRs at the time of the incident.

## REQUEST FOR ADMISSION NO. 297:

Admit that in February 2010 one or more Transocean employees rebuilt solenoid valve 103 of the blowout preventer's yellow control pod.

## RESPONSE TO REQUEST FOR ADMISSION NO. 297:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections, Respondents admit that in the course of routine maintenance to the solenoid pods

during the *Deepwater Horizon* move to the Macondo well, several solenoids were replaced on

the yellow pod.  At that time, solenoid 103 was replaced with a rebuilt spare and function tested

prior to lowering the BOP stack to the wellhead.  No problems were noted with the yellow pod

solenoid 103 while the BOP stack was deployed on the Macondo well.

## REQUEST FOR ADMISSION NO. 298:

Admit that on April 20, 2010 at 21:00, the blowout preventer's blue control pod's 27-volt

battery did not have a sufficient charge to activate the blowout preventer's automatic mode

function.

## RESPONSE TO REQUEST FOR ADMISSION NO. 298:

In addition to the General Objections set forth above, Respondents object to this Request

for Admission on the grounds that it seeks information related to a putative claim covered by

Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General

Objections,  Respondents deny this request.  Respondents further state that once the AMF is

armed at the surface control panel, upon loss of power from the rig to the BOP, the 27V battery

will power the subsea transducer module ("STM") that measures surface hydraulic and subsea

hydrostatic pressures that are parameters used to activate the AMF sequence.  The 27V battery

remains connected to the STM while both SEM PLCs boot, execute, then reset and disconnect

the 27V battery from the STM. In the case of the blue pod, SEM B PLC did not boot or reset

(indicating low 9V battery power).  From the time of the incident until the blue pod was

recovered 74 days later on the *Discoverer Enterprise,* the SEM B AMF card continued to cycle

the 27V battery power to the STM transducers each time the AMF card initiated the restart process, thus draining the 27V battery pack.  The "dead" 27V battery combined with SEM B not re-setting during the AMF test at the NASA Michoud facility indicates the blue pod AMF activated on SEM A at the time of the incident.

**REQUEST FOR ADMISSION NO. 299:**

Admit that the Transocean *Deepwater Horizon* Companies were responsible for maintaining the *Deepwater Horizon*'s blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 299:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Respondents were responsible for maintaining the *Deepwater Horizon*'s blowout preventer.  Respondents further state that the BOP was inspected as part of the BP September 2009 audit, and it was found that the ST locks had been suitably inspected, ram cavity measurements were within recommended specifications, all annular and ram seals were replaced during inspection in July 2008, and one annular had been in service for three years and the other had pistons replaced in 2008. According to testimony of Paul Johnson, the BOP was deemed "in spec," "functioning correctly,"  and "working as designed" following the 2009 out of service

period.  BP was aware of the BOP's certification and maintenance status, and allowed the rig to go back to work after the audit.

**REQUEST FOR ADMISSION NO. 300:**

Admit that the Transocean *Deepwater Horizon* Companies were responsible for inspecting the *Deepwater Horizon*'s blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 300:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Respondents were responsible for inspecting the *Deepwater Horizon*'s blowout preventer.  Respondents further state that the BOP was inspected as part of the BP September 2009 audit, and it was found that the ST locks had been suitably inspected, ram cavity measurements were within recommended specifications, all annular and ram seals were replaced during inspection in July 2008, and one annular had been in service for three years and the other had pistons replaced in 2008.  According to testimony of Paul Johnson, the BOP was deemed "in spec," "functioning correctly," and "working as designed" following the 2009 out of service period.  BP was aware of the BOP's certification and maintenance status, and allowed the rig to go back to work after the audit.

199

**REQUEST FOR ADMISSION NO. 301:**

Admit that the Transocean *Deepwater Horizon* Companies were responsible for testing the *Deepwater Horizon*'s blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 301:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Respondents were responsible for testing the *Deepwater Horizon*'s blowout preventer. Respondents further state that the BOP was inspected as part of the BP September 2009 audit, and it was found that the ST locks had been suitably inspected, ram cavity measurements were within recommended specifications, all annular and ram seals were replaced during inspection in July 2008, and one annular had been in service for three years and the other had pistons replaced in 2008. According to testimony of Paul Johnson, the BOP was deemed "in spec," "functioning correctly,"  and "working as designed" following the 2009 out of service period.  BP was aware of the BOP's certification and maintenance status, and allowed the rig to go back to work after the audit.

**REQUEST FOR ADMISSION NO. 302:**

Admit that the reliability of a blowout preventer depends in part on the quality of blowout preventer maintenance.

**RESPONSE TO REQUEST FOR ADMISSION NO. 302:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for Admission on the grounds that the terms "reliability" and "quality of blowout preventer maintenance" are vague and ambiguous.  By way of example, it is unclear if reliability equates to functionality.  It is also unclear if quality of blow out preventer maintenance refers to frequency, workmanship, or some other maintenance measurement.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 303:**

Admit that improper or insufficient maintenance on a blowout preventer can cause the blowout preventer to fail to seal a well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 303:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for

Admission.  Respondents further state that they are not aware of an instance were improper or insufficient maintenance on a BOP caused the BOP to fail to seal a well.

**REQUEST FOR ADMISSION NO. 304:**

Admit that three or more minutes of uncontrolled well flow can damage a blowout preventer such that it may no longer stop well flow effectively.

**RESPONSE TO REQUEST FOR ADMISSION NO. 304:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 305:**

Admit that five or more minutes of uncontrolled well flow can damage a blowout preventer such that it may no longer stop well flow effectively.

**RESPONSE TO REQUEST FOR ADMISSION NO. 305:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after

reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 306:**

Admit that only the personnel of Cameron, or those authorized by Cameron, were allowed to make modifications to the *Deepwater Horizon*'s blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 306:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Respondents further object to this Request for Admission on the grounds that the term "allowed" is vague and ambiguous.   Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission as written.

**REQUEST FOR ADMISSION NO. 307:**

Admit that Transocean personnel made modifications to the blowout preventer without Cameron's knowledge or approval.

**RESPONSE TO REQUEST FOR ADMISSION NO. 307:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean personnel have completed blowout preventer

modifications without seeking the explicit permission of Cameron.  Respondents further state that Transocean personnel work closely with Cameron in maintaining and inspecting their BOPs. Respondents have implemented a more precise condition-based monitoring system that is in compliance with 30 C.F.R. § 250.446, exceeds Cameron's recommendations and RP 53, and is intended to improve safety and functionality of the BOP.

**REQUEST FOR ADMISSION NO. 308:**

Admit that Transocean personnel made modifications to the blowout preventer without BP's knowledge or approval.

**RESPONSE TO REQUEST FOR ADMISSION NO. 308:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 309:**

Admit that the *Deepwater Horizon* blowout preventer's remotely operated vehicle ("ROV") intervention panel was supposed to be connected to the middle pipe ram.

**RESPONSE TO REQUEST FOR ADMISSION NO. 309:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon*'s BOP's ROV intervention panel

was originally connected to a pipe ram that was later, at BP's request, converted to a test ram. Test rams allow pressure testing on most stack components above the test rams to full working pressure without having to run a test plug into the well.  This conversion saved time for running and retrieving the test plug while still allowing pressure testing of all the components above the test rams, with the exception of the shear rams.  The modification removed one wellbore sealing ram from the stack because the test rams can only seal pressure from the top side and not pressure coming from the wellbore.  With this modification, the BOP still met industry and regulatory requirements.

**REQUEST FOR ADMISSION NO. 310:**

Admit that Transocean connected the *Deepwater Horizon* blowout preventer's ROV intervention panel to an inverted test ram, which could not seal the well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 310:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon's*  BOP's ROV intervention panel was originally connected to a pipe ram that was later, at BP's request, converted to a test ram. Test rams allow pressure testing on most stack components above the test rams to full working pressure without having to run a test plug into the well.  This conversion saved time for running and retrieving the test plug while still allowing pressure testing of all the components above the test rams, with the exception of the shear rams.  The modification removed one wellbore sealing ram from the stack because the test rams can only seal pressure from the top side and not

pressure coming from the wellbore.  With this modification, the BOP still met industry and regulatory requirements.

**REQUEST FOR ADMISSION NO. 311:**

Admit that one or more Transocean employees knew that the *Deepwater Horizon* blowout preventer's ROV intervention panel was connected to an inverted test ram, which could not seal the well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 311:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon's*  BOP's ROV intervention panel was originally connected to a pipe ram that was later, at BP's request, converted to a test ram. Test rams allow pressure testing on most stack components above the test rams to full working pressure without having to run a test plug into the well.  This conversion saved time for running and retrieving the test plug while still allowing pressure testing of all the components above the test rams, with the exception of the shear rams.  The modification removed one wellbore sealing ram from the stack because the test rams can only seal pressure from the top side and not pressure coming from the wellbore.  With this modification, the BOP still met industry and regulatory requirements.

**REQUEST FOR ADMISSION NO. 312:**

Admit that Transocean did not tell any BP employee before April 20, 2010 that the *Deepwater Horizon* blowout preventer's ROV intervention panel was connected to an inverted test ram, which could not seal the well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 312:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the *Deepwater Horizon's*  BOP's ROV intervention panel was originally connected to a pipe ram that was later, at BP's request, converted to a test ram. Test rams allow pressure testing on most stack components above the test rams to full working pressure without having to run a test plug into the well.  This conversion saved time for running and retrieving the test plug while still allowing pressure testing of all the components above the test rams, with the exception of the shear rams.  The modification removed one wellbore sealing ram from the stack because the test rams can only seal pressure from the top side and not pressure coming from the wellbore.  With this modification, the BOP still met industry and regulatory requirements.  As this was done at BP's request, BP was aware of the conversion.

**REQUEST FOR ADMISSION NO. 313:**

Admit that Transocean modified the *Deepwater Horizon* blowout preventer's hydraulic piping from the ROV intervention panel to combine the ST-lock hydraulic system with the blind shear ram hydraulic system.

**RESPONSE TO REQUEST FOR ADMISSION NO. 313:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the ROV intervention panel was modified, by the *Deepwater Horizon* crew in approximately 2004, to consolidate blind shear ram close and ST Locks as one function, and pipe ram close and ST Locks as one function.  This modification improved the ROV intervention panel allowing the ROV to operate the blind shear rams and associated ST Locks through a single ROV stab.  The pipe rams were similarly modified.  Respondents further state that this modification allowed for faster and more efficient ROV intervention when required.

**REQUEST FOR ADMISSION NO. 314:**

Admit that combining the ST-lock hydraulic system with the blind shear ram hydraulic system created the potential for a leak on one system to affect the other.

**RESPONSE TO REQUEST FOR ADMISSION NO. 314:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 315:**

Admit that Transocean did not tell any BP employee before April 20, 2010 that Transocean modified the *Deepwater Horizon* blowout preventer's hydraulic piping from the ROV intervention panel to combine the ST-lock hydraulic system with the blind shear ram hydraulic system.

**RESPONSE TO REQUEST FOR ADMISSION NO. 315:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 316:**

Admit that Transocean modified the *Deepwater Horizon* blowout preventer to make a hard connection of the hydraulic supply lines and multiplex cable connections to the blowout preventer control pods.

**RESPONSE TO REQUEST FOR ADMISSION NO. 316:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after

reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 317:**

Admit that by modifying the *Deepwater Horizon* blowout preventer to make a hard connection of the hydraulic supply lines and multiplex cable connections to the blowout preventer control pods, the hydraulic supply lines and multiplex cable connections could only be disconnected from the control pods while on the surface.

**RESPONSE TO REQUEST FOR ADMISSION NO. 317:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 318:**

Admit that Transocean did not tell any BP employee before April 20, 2010 that the *Deepwater Horizon*'s blowout preventer had been modified to make a hard connection of the hydraulic supply lines and multiplex cable connections to the blowout preventer control pods.

**RESPONSE TO REQUEST FOR ADMISSION NO. 318:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 319:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s blowout preventer did not shut in the MC252 Well in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 319:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.  Respondents state further that, upon detection of the flowing well, the drill crew shut in the well by (1) closing the upper annular; (2) closing the diverter packer and diverting gas to the MGS; and (3) closing in the upper and middle variable bore rams ("VBRs"), which initially sealed the well.  The high flow rate of hydrocarbons and well debris prevented the upper annular from sealing on the drill pipe and subsequently eroded the drill pipe in the sealing area.  Increased pressure inside the drill pipe and external damage caused by erosion ruptured the drill pipe, allowing hydrocarbons to flow up the riser.

**REQUEST FOR ADMISSION NO. 320:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s blowout preventer's automatic mode function did not shut in the MC252 Well in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 320:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the AMF operated as designed to close the blind shear rams following the explosion.  High pressure bowed the drill pipe partially outside the of the blind shear rams shearing blades, trapping it between the ram blocks, and preventing the blind shear rams from completely shearing the pipe, fully closing, and sealing.

**REQUEST FOR ADMISSION NO. 321:**

Admit that the Transocean driller is responsible for ensuring that tool joints on the drill string are located so that the BOP rams or annular preventers will not close on a tool joint if the rams or annular preventers are closed.

**RESPONSE TO REQUEST FOR ADMISSION NO. 321:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that prior to displacement operations, it is typical for the driller to locate and position the drill pipe tool joint in the BOP, to ensure that a continuous length of drill pipe of uniform diameter runs through the rams, allowing the rams to properly close around the drill pipe and not on the larger diameter tool joint, for which they are not designed.  At the time

of the incident on April 20, 2010, the extreme flow rate from the well created sufficient force to lift the drill string, moving the tool joint up and partly into the upper annular BOP element.

**REQUEST FOR ADMISSION NO. 322:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s EDS did not shut in the MC252 Well in response to the kick.

**RESPONSE TO REQUEST FOR ADMISSION NO. 322:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the explosions and fire on April 20, 2010 severed the communication link between the BOP and the rig, preventing activation of the EDS.

**REQUEST FOR ADMISSION NO. 323:**

Admit that on April 20, 2010, the *Deepwater Horizon*'s EDS did not disconnect the lower marine riser package from the blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 323:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that the explosions and fire on April 20, 2010 severed the communication link between the BOP and the rig, preventing activation of the EDS.

**REQUEST FOR ADMISSION NO. 324:**

Admit that the Transocean *Deepwater Horizon* Companies did not recertify the *Deepwater Horizon*'s blowout preventer every three to five years, as recommended by the manufacturer's guidelines.

**RESPONSE TO REQUEST FOR ADMISSION NO. 324:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents also object to this Request for Admission on the grounds that the term "Transocean Deepwater Horizon Companies" is vague and ambiguous. Respondents cannot determine to which companies, in particular, this request purports to pertain. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 325:**

Admit that the *Deepwater Horizon*'s blowout preventer had not been recertified in over ten years.

**RESPONSE TO REQUEST FOR ADMISSION NO. 325:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 326:**

Admit that during a well control event, 10 minutes was sufficient time to activate the *Deepwater Horizon*'s blowout preventer.

**RESPONSE TO REQUEST FOR ADMISSION NO. 326:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.  This Request for Admission attempts to create a generalized rule applicable across all well control events on all wells; however, each well is different and varying circumstances surrounding each kick create a unique well control event.

**REQUEST FOR ADMISSION NO. 327:**

Admit that Transocean recommended that the batteries in the BOP pods on the *Deepwater Horizon* be inspected every year.

**RESPONSE TO REQUEST FOR ADMISSION NO. 327:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean recommends annual inspection of the batteries in BOP pods.

**REQUEST FOR ADMISSION NO. 328:**

Admit that on the *Deepwater Horizon*¸ the batteries contained in one of the BOP pods had not been replaced for two-and-a-half years prior to April 20, 2010.

**RESPONSE TO REQUEST FOR ADMISSION NO. 328:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 329:**

Admit that Cameron, the manufacturer of the BOP on the *Deepwater Horizon*, recommends replacing the batteries in a BOP pod at least annually and conducting yearly inspections of them.

**RESPONSE TO REQUEST FOR ADMISSION NO. 329:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Cameron Engineering Bulletin 891 D, dated September 8, 2004, states:

"It is recommended that the 9VDC and 27 VDC battery packs be replaced after:

- One year of on-time operation.

- When the number of actuations has been exceeded for that year (33).

216

- Five years after the date of purchase.

- Which ever of the above events happens first."

**REQUEST FOR ADMISSION NO. 330:**

Admit that BP complied with its standards, guidelines, recommendations, requirements and protocols that the top of the annular cement be 1,000 feet above the uppermost hydrocarbon zone between approximately April 10 and April 20, 2010 on the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 330:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 331:**

Admit that on or before April 16, 2010, one or more employees of Transocean was aware of BP's application on or about April 16, 2010 for permit to modify the temporary abandonment procedure for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 331:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents deny that on or before April 16, 2010, any employee of Transocean was

aware of BP's application on or about April 16, 2010 for permit to modify the temporary abandonment procedure for the MC252 Well.

**REQUEST FOR ADMISSION NO. 332:**

Admit that on or before April 16, 2010, none of Transocean's employees communicated to any BP employee an objection to BP's application on or about April 16, 2010 for permit to modify the temporary abandonment procedure for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 332:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Respondents further object to this Request for admission to the extent it implies that Transocean employees knew, on or before April 16, 2010, of BP's application on or about April 16, 2010.  Subject to and without waiving the foregoing specific and General Objections, Respondents state that, not being aware of such application, they were not in a position to object it on or before April 16, 2010, and, accordingly, are not aware of any communications conveying such objection.  Unfortunately, BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents. For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the

cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.  BP made these and other risky last-minute decisions without Transocean's knowledge.  Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.  Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

**REQUEST FOR ADMISSION NO. 333:**

Admit that on or before April 20, 2010, one or more employees of Transocean was aware that BP decided to use a long string casing during the temporary abandonment procedures for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 333:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents admit that one or more Transocean employees was aware that BP decided to use a long string casing on the MC252 Well.  Respondents deny any implication that they were responsible for the decision to run a long string casing.  Responsibility for well design lies with the well operator – in the case of the *Deepwater Horizon*, BP.  Respondents further state that BP made a series of risky, last-minute decisions that it did not coordinate with, or

adequately communicate to, Respondents.  For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.   BP made these and other risky last-minute decisions without Transocean's knowledge.  Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.   Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

## REQUEST FOR ADMISSION NO. 334:

Admit that on or before April 20, 2010, none of Transocean's employees communicated to any BP employee an objection to BP's decision to use a long string casing during the temporary abandonment procedures for the MC252 Well.

## RESPONSE TO REQUEST FOR ADMISSION NO. 334:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction

pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that they currently do not know of such communications. Respondents deny any implication that they were responsible for the decision to run a long string casing. Responsibility for well design lies with the well operator – in the case of the *Deepwater Horizon*, BP. Unfortunately, BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents. For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design. Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*." Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job. BP made these and other risky last-minute decisions without Transocean's knowledge. Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark. Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew." *See* Chief Counsel's Report, p. 103.

**REQUEST FOR ADMISSION NO. 335:**

Admit that on or before April 20, 2010, none of Transocean's employees suggested to any BP employee an alternative to BP's decision to use a long string casing during the temporary abandonment procedures for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 335:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents assert that they currently do not know of such communications. Respondents deny any implication that they were responsible for the decision to run a long string casing.  Responsibility for well design lies with the well operator – in the case of the *Deepwater Horizon*, BP.   Unfortunately, BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents.  For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the

integrity of the cement job.   BP made these and other risky last-minute decisions without Transocean's knowledge.   Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark. Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."   *See* Chief Counsel's Report, p. 103.

## REQUEST FOR ADMISSION NO. 336:

Admit that on or before April 20, 2010, one or more employees of Transocean was aware that BP decided to use six centralizers to centralize the casing during the temporary abandonment procedures for the MC252 Well.

## RESPONSE TO REQUEST FOR ADMISSION NO. 336:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean employees installed, at BP's direction, a long string casing on the MC252 Well that utilized six centralizers.   Respondents deny any implication that they were responsible for the decision to run six centralizers.   Responsibility for cement design lies with the well operator  and cement contractor– in the case of the *Deepwater Horizon*, BP and Halliburton, respectively.   Respondents further state that BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents.   For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty

of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.  BP made these and other risky last-minute decisions without Transocean's knowledge.  Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.  Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

## REQUEST FOR ADMISSION NO. 337:

Admit that on or before April 20, 2010, none of Transocean's employees communicated to any BP employee an objection to BP's decision to use six centralizers to centralize the casing during the temporary abandonment procedures for the MC252 Well.

## RESPONSE TO REQUEST FOR ADMISSION NO. 337:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that they currently do not know of such communications. Respondents deny any implication that they were responsible for the decision to run six

centralizers.  Responsibility for cement design lies with the well operator and cement contractor–
in the case of the *Deepwater Horizon*, BP and Halliburton, respectively.  Unfortunately, BP
made a series of risky, last-minute decisions that it did not coordinate with, or adequately
communicate to, Respondents.  For example, Respondents had no say in, and no knowledge of,
the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal
investigators have concluded that "BP's decision to use a long string production casing increased
the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision
did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the
final cement job involved another series of what federal investigators charitably call
"compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP
decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up
circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton;
and BP decided not to conduct a cement bond log to determine the integrity of the cement job.
BP made these and other risky last-minute decisions without Transocean's knowledge.  Without
knowing what BP engineers had done and without knowing of the severe risks BP had chosen to
take, Transocean drill crew was working in the dark.  Federal investigators found no evidence
"that BP ever communicated the above risks to its other contractors, primarily the Transocean rig
crew."  *See* Chief Counsel's Report, p. 103.

**REQUEST FOR ADMISSION NO. 338:**

Admit that on or before April 20, 2010, none of Transocean's employees suggested to
any BP employee an alternative to BP's decision to use six centralizers to centralize the casing
during the temporary abandonment procedures for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 338:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that they currently do not know of such communications. Respondents deny any implication that they were responsible for the decision to run six centralizers. Responsibility for cement design lies with the well operator and cement contractor– in the case of the *Deepwater Horizon*, BP and Halliburton, respectively. Unfortunately, BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents. For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design. Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*." Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job. BP made these and other risky last-minute decisions without Transocean's knowledge. Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark. Federal investigators found no evidence

"that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

**REQUEST FOR ADMISSION NO. 339:**

Admit that using centralizers can pose risks to drilling a well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 339:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 340:**

Admit that centralizers can cause problems with a BOP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 340:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 341:**

Admit that centralizers can dislodge and damage the integrity of a well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 341:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents assert that the information known or readily known at this time after reasonable inquiry is insufficient to allow Respondents to admit or deny this Request for Admission.

**REQUEST FOR ADMISSION NO. 342:**

Admit that on or before April 20, 2010, one or more employees of Transocean was aware that BP decided to run a lock down sleeve after displacement during the temporary abandonment procedures for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 342:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean employees are aware that BP began displacement before the lock down sleeve was installed. Respondents deny any implication that they were responsible for the decision to run a lock down sleeve after displacement. Responsibility for temporary abandonment procedures lies with the well operator – in the case of

the *Deepwater Horizon*, BP.  Respondents further state that BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents. For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.  BP made these and other risky last-minute decisions without Transocean's knowledge.  Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.  Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

**REQUEST FOR ADMISSION NO. 343:**

Admit that on or before April 20, 2010, none of Transocean's employees communicated to any BP employee an objection to BP's decision to run a lock down sleeve after displacement during the temporary abandonment procedures for the MC252 Well.

**RESPONSE TO REQUEST FOR ADMISSION NO. 343:**

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.   Subject to and without waiving the foregoing specific and General Objections, Respondents state that they currently do not know of such communications. Respondents deny any implication that they were responsible for the decision to run a lock down sleeve after displacement.   Responsibility for temporary abandonment procedures lies with the well operator– in the case of the *Deepwater Horizon*, BP.   Unfortunately, BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents.   For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.   Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."   Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.   BP made these and other risky last-minute decisions without Transocean's knowledge.   Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.   Federal investigators found no evidence "that BP ever communicated

the above risks to its other contractors, primarily the Transocean rig crew." *See* Chief Counsel's Report, p. 103.

## REQUEST FOR ADMISSION NO. 344:

Admit that on or before April 20, 2010, one or more employees of Transocean was aware that BP decided not to run a cement bond log during the temporary abandonment procedures for the MC252 Well.

## RESPONSE TO REQUEST FOR ADMISSION NO. 344:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2. Subject to and without waiving the foregoing specific and General Objections, Respondents admit that Transocean employees were aware that BP did not run a cement bond log on the Macondo well on April 20, 2010. Respondents deny any implication that they were responsible for the decision to not run a cement bond log. Responsibility for temporary abandonment procedures lies with the well operator – in the case of the *Deepwater Horizon*, BP. Respondents further state that BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents. For example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design. Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*." Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement

job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.   BP made these and other risky last-minute decisions without Transocean's knowledge.  Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.  Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

## REQUEST FOR ADMISSION NO. 345:

Admit that on or before April 20, 2010, none of Transocean's employees communicated to any BP employee an objection to BP's decision not to run a cement bond log during the temporary abandonment procedures for the MC252 Well.

## RESPONSE TO REQUEST FOR ADMISSION NO. 345:

In addition to the General Objections set forth above, Respondents object to this Request for Admission on the grounds that it seeks information related to a putative claim covered by Article 35.4 of the Drilling Contract, over which the Court lacks subject matter jurisdiction pursuant to 9 U.S.C. § 2.  Subject to and without waiving the foregoing specific and General Objections, Respondents assert that they currently do not know of such communications. Respondents deny any implication that they were responsible for the decision to not run a cement bond log.  Responsibility for temporary abandonment procedures lies with the well operator – in the case of the *Deepwater Horizon*, BP.  Unfortunately, BP made a series of risky, last-minute decisions that it did not coordinate with, or adequately communicate to, Respondents.  For

example, Respondents had no say in, and no knowledge of, the risks BP knowingly took in the temporary abandonment procedures' cement design.  Federal investigators have concluded that "BP's decision to use a long string production casing increased the difficulty of achieving zonal isolation during the cementing job" and "[w]hile the decision did not directly cause the blowout, it *increased the risk of cementing failure*."  Additionally, the final cement job involved another series of what federal investigators charitably call "compromises" to the quality of the cement job, resulting from BP's last-minute decisions: BP decided, contrary to API and Halliburton recommendations, to not conduct a full bottoms up circulation; BP chose to use a smaller number of centralizers than recommended by Halliburton; and BP decided not to conduct a cement bond log to determine the integrity of the cement job.  BP made these and other risky last-minute decisions without Transocean's knowledge.  Without knowing what BP engineers had done and without knowing of the severe risks BP had chosen to take, Transocean drill crew was working in the dark.  Federal investigators found no evidence "that BP ever communicated the above risks to its other contractors, primarily the Transocean rig crew."  *See* Chief Counsel's Report, p. 103.

 Respectfully submitted,


_____/s/ Steven L. Roberts_____          By:   _____/s/ Kerry J. Miller_____
Steven L. Roberts (Texas, No. 17019300)             Kerry J. Miller (Louisiana, No. 24562)
Rachel Giesber Clingman (Texas, No. 00784125)       Frilot, L.L.C.
Kent C. Sullivan (Texas, No. 19487300)              1100 Poydras Street, Suite 3700
Teri L. Donaldson (Florida, No. 784310)             New Orleans, Louisiana 70163
Sutherland Asbill & Brennan LLP                     Telephone: (504) 599-8169
1001 Fannin Street, Suite 3700                      Facsimile: (504) 599-8154
Houston, Texas 77002                                Email: kmiller@frilot.com
Telephone: (713) 470-6100                           Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,
teri.donaldson@sutherland.com

-and-

By:         /s/ Edwin G. Preis, Jr.        

Edwin G. Preis, Jr. (Louisiana, No. 10703)
Edward F. Kohnke, IV (LA, No. 07824)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com,
efk@preisroy.com

**Of Counsel:**

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com, allen.katz@mto.com

*Counsel for Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Deepwater Inc., and Transocean Offshore Deepwater Drilling Inc.*

234

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, on July 15, 2011.

s/Kerry J. Miller_____