# EXHIBIT 1



39032614

Aug  1 2011
11:46PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| …………………………………………... | : | |

### THE BP PARTIES' RESPONSES AND OBJECTIONS TO
### HALLIBURTON ENERGY SERVICES, INC.'S INTERROGATORIES

Defendants BP Exploration & Production Inc. ("BPXP") and BP America Production Company ("BPAP") (collectively, "BP" or the "BP Parties"), by their undersigned Counsel, and, pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, hereby submit the following responses to Halliburton Energy Services, Inc.'s ("Halliburton" or "HESI") Interrogatories.

### SPECIFIC RESPONSES AND OBJECTIONS

The BP Parties respond as follows to Halliburton's interrogatories, subject to and without waiving their general objections, each and every one of which are specifically incorporated into each individual response below.[1]

### INTERROGATORIES

### INTERROGATORY NO. 1:

Identify the exact location of every centralizer you used on the 9 7/8" x 7" production casing on the Macondo Well.

---

[1] The BP Parties' general objections are set forth at pages 42- 51.

**RESPONSE TO INTERROGATORY NO. 1:**

The BP Parties object to this request on the grounds that it seeks information already in Halliburton's possession. The BP Parties additionally object that the term "exact location" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties refer to, *inter alia*, the September 8, 2010 *Deepwater Horizon* Accident Investigation Report and Appendices. In addition, the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, and the BP Parties therefore refer Halliburton to, *inter alia*, documents previously produced at BP-HZN-2179MDL00317443, BP-HZN-BLY-00167748, the BP Parties' Cross-Claims against Halliburton, Cameron, Transocean, served on all counsel April 20, 2011, as well as document productions (the IIT Report and the backup materials and analyses produced in support thereof), in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 2:**

Were any unused centralizers delivered to the Deepwater Horizon returned to Weatherford? If so, state the date, time and method of return.

**RESPONSE TO INTERROGATORY NO. 2:**

The BP Parties object that the terms "delivered," "returned," and "method of return" are vague and ambiguous. The BP Parties further object to this interrogatory to the extent it seeks information that is likely more readily available from other parties in this litigation, such as Weatherford.

Subject to their specific and general objections, the BP Parties state that they are aware of fifteen centralizers provided by Weatherford to the United States government and that are currently in the possession, custody and control of the United States government.  To the extent those are the fifteen centralizers sent to the *Deepwater Horizon*, they would have been sent back to Weatherford as a part of BP's normal business operations, which includes transport from the *Deepwater Horizon* to Houma and then returned to Weatherford.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 3:

Identify the BP representatives who communicated with Weatherford about the design or type of centralizers and/or stop collars to be used on the 9 7/8" x 7" production casing on the Macondo Well.  Identify the date of such communications and the method of communication.

## RESPONSE TO INTERROGATORY NO. 3:

The BP Parties object that this request is unduly burdensome insofar as it requires the BP Parties to provide information concerning each and every communication between BP and Weatherford about centralizers and stop collars.  The BP Parties additionally object that the term "BP representatives" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties state that there are numerous communications between BP and Weatherford concerning the centralizers and/or stop collars for the production casing for the Macondo well.  The BP Parties identify the following communications between Brian Morel, Brett Cocales and Weatherford concerning the centralizers and stop collars for the Macondo Well.  Among other communications, Mr. Morel and Bryan Clawson at Weatherford exchanged correspondence concerning the availability of

centralizers for the Macondo Well.  Mr. Cocales and Mr. Clawson exchanged correspondence on March 31, 2010 concerning the availability of centralizers for the Macondo Well.  Mr. Cocales and Mr. Clawson spoke on April 15, 2010 regarding the availability of centralizers for the Macondo well.  Mr. Clawson emailed Mr. Cocales on April 15, 2010 concerning the availability of 31 centralizers with newly-designed stop collars.  Mr. Morel then emailed Mr. Clawson on April 16, 2010 to ask for drawings of the stop collars.  *See e.g.* BP-HZN-DHTF00262460; BP-HZN-DHTF00072620.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 4:**

Identify all BP wells since 2005 wherein BP utilized the Weatherford bow spring centralizers of the type/design BP ordered for the 9 7/8" x 7" casing on the Macondo Well.  For each well, identify the number of centralizers used and the depth of the well.

**RESPONSE TO INTERROGATORY NO. 4:**

The BP Parties object that the phrase "centralizers of the type/design BP ordered" is vague and ambiguous.  The BP Parties further object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 5:**

Identify all BP wells in the Gulf of Mexico since 2005 wherein a long string production casing without a tie back was not used.

**RESPONSE TO INTERROGATORY NO. 5:**

The BP Parties object to identifying all instances in the last six years in which BP chose not to use a long string production casing.  The BP Parties additionally object that the term "long string production casing without a tie back" is vague and ambiguous.  The BP Parties further object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to their specific and general objections, the BP Parties state that the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, therefore, in accordance with Federal Rule of Civil Procedure 33(d), the BP Parties refer Halliburton to documents containing information concerning well design in the Gulf of Mexico which are publicly available through the BOEMRE.  Further, the BP Parties refer Halliburton to documents previously produced at BP-HZN-BLY00000001 to BP-HZN-BLY00000372 as well as the database of information produced by the United States Government in these proceedings.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 6:**

Identify all BP wells wherein BP circulated at least one full bottoms up immediately prior to a final cement job.

**RESPONSE TO INTERROGATORY NO. 6:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome in that it is not limited in geographic scope.  The BP Parties further object to

this interrogatory on the grounds that Halliburton's use of phrase "immediately prior to a final cement job" is vague, ambiguous, and undefined.  Additionally, the BP Parties object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 7:**

Explain BP's policies and procedures regarding the design and interpretation of negative tests, and how such policies and procedures are communicated to BP well site leaders.

**RESPONSE TO INTERROGATORY NO. 7:**

The BP Parties object to this interrogatory as vague, ambiguous and overbroad as to "BP's policies and procedures regarding the design and interpretation of negative tests," because that phrase may be interpreted to apply to a range of policies and procedures that apply to these topics in various ways and because the details of the development and communication of any particular negative test may be different depending on the circumstances.  The BP Parties further object to this interrogatory to the extent that it calls for information likely in the possession of other parties, *e.g.,* the Transocean or other drilling contractors that worked to set up, monitor, perform and interpret negative tests.  The BP Parties further object to this interrogatory to the extent that it implies that BP or its well site leaders are responsible for designing and interpreting negative tests.

Subject to their specific and general objections, the BP Parties state that BP's policy specified the requirement to conduct a negative pressure test.  The negative test procedures used at various wells would have been developed by a combination of the drilling contractor and the BP engineering and operations teams depending upon the particular circumstances of a given

well.  Specifically at the Macondo Well, BP, Transocean, MI Swaco and other contractors were involved in designing and interpreting the negative test.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.


**INTERROGATORY NO. 8:**

What safety steps should be undertaken before underbalancing a well, and in particular, what safety steps should have been taken before underbalancing the Macondo Well on April 20, 2010?

**RESPONSE TO INTERROGATORY NO. 8:**

The BP Parties object to this interrogatory as vague, ambiguous and overbroad as to the phrases "safety steps," "should be undertaken," and "should have been undertaken."  The BP Parties also object to this interrogatory as misleading to the extent that it suggests that certain required actions were not taken prior to underbalancing the Macondo Well on April 20, 2010. The BP Parties further object to this interrogatory to the extent that it calls for information likely in the possession of other parties, *e.g.,* the Transocean or other drilling contractor rig crews that establish policies and procedures outlining steps to be taken prior to underbalancing a well. Additionally, the BP Parties object to this interrogatory to the extent that it implies that BP or its engineers are responsible for cementing or, in particular, cementing the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that the steps taken prior to underbalancing a well are determined by a combination of the drilling engineering and operations teams depending upon the particular circumstances of a given well, including input from BP, Transocean and other rig personnel as appropriate, as well as compliance with

applicable regulations, industry standards, and company standards.  On the Macondo Well, such operations were conducted in accordance with: (1) relevant BP company policies and procedures, including but not limited to the Drilling and Well Operations Practice (DWOP) and other relevant Engineering Technical Practices referenced therein, and (2) relevant Transocean company policies and procedures, including but not limited to the Transocean Operations Manual, the Transocean Field Operations Handbook, and the Transocean Well Control Handbook.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 9:**

Identify the job roles and responsibilities of the BP engineers as they relate to cementing, and in particular, the cementing of the production casing in the Macondo Well. In your response, identify the engineers who had such roles and responsibilities for the Macondo Well production casing.

**RESPONSE TO INTERROGATORY NO. 9:**

The BP Parties object to this interrogatory as vague, overbroad, and ambiguous as to the meaning of the phrases "roles and responsibilities," "BP engineers," and "relate to cementing." The BP Parties further object to this request to the extent that it calls for information likely in the possession of other parties, *e.g.,* Halliburton, which was responsible for designing and executing the cement job of the production casing in the Macondo Well.  The BP Parties further object to this interrogatory to the extent that it implies that BP or its engineers are responsible for cementing or, in particular, cementing the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties refer HESI to their response to Interrogatory No. 28 in The BP Parties' Responses and Objections to Plaintiffs'

Interrogatories, Requests for Production, and Requests for Admission ("December 8th Responses"), served on all counsel December 8, 2010, regarding the employees involved in operations relating to the cementing of the production casing in the Macondo Well.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 10:**

Identify and describe all pay zones and sands in the Macondo Well and list the pore pressures and depth for each.

**RESPONSE TO INTERROGATORY NO. 10:**

The BP Parties object to this interrogatory as "pay zone" and "sands" are vague and ambiguous. The BP Parties further object to this interrogatory as overbroad and unduly burdensome in that it seeks information that is available from Sperry-Sun data; materials in Halliburton's possession, custody and control and from various depositions in this case. The BP Parties further object to this interrogatory to the extent that it is vague and ambiguous as to time as downhole conditions can change after well flow.

Subject to these specific and general objections, the BP Parties respond that there are multiple methodologies of measuring downhole pressures and estimating downhole pore pressures. Not every sand in the well had a direct measurement of the pore pressure and some of the following numbers are estimated pore pressures, subject to the uncertainties of downhole estimations. Further, the following pore pressure and depth information is the reasonable estimate of well conditions prior to April 20, 2010. The estimated sands in the Macondo Well and pressure (in psi) include:

| TVDSS - Top | TVDSS - Bottom | Estimated Pressure Formation (psig) |
|---|---|---|
| 5,120 | 5,249 | 2,276 |
| 5,928 | 5,931 | 2,651 |
| 5,951 | 5,959 | 2,664 |
| 5,964 | 5,971 | 2,671 |
| 6,209 | 6,240 | 2,807 |
| 6,643 | 6,647 | 3,059 |
| 6,741 | 6,781 | 3,118 |
| 6,785 | 6,796 | 3,145 |
| 6,927 | 6,935 | 3,230 |
| 7,497 | 7,500 | 3,606 |
| 8,145 | 8,189 | 4,101 |
| 8,277 | 8,335 | 4,210 |
| 8,772 | 8,776 | 4,635 |
| 8,789 | 8,857 | 4,650 |
| 8,862 | 8,867 | 4,714 |
| 8,958 | 9,009 | 4,797 |
| 12,899 | 12,970 | 8,424 |
| 13,043 | 13,049 | 8,574 |
| 13,142 | 13,145 | 8,676 |

| TVDSS - Top | TVDSS - Bottom | Estimated Pressure Formation (psig) |
|---|---|---|
| 13,250 | 13,262 | 8,788 |
| 13,498 | 13,502 | 9,045 |
| 13,596 | 13,665 | 9,147 |
| 14,213 | 14,217 | 9,786 |
| 14,222 | 14,226 | 9,795 |
| 14,337 | 14,362 | 9,915 |
| 14,518 | 14,522 | 10,085 |
| 14,835 | 14,844 | 10,370 |
| 15,005 | 15,007 | 10,529 |
| 15,144 | 15,148 | 10,662 |
| 15,206 | 15,209 | 10,722 |
| 15,285 | 15,287 | 10,797 |
| 15,334 | 15,336 | 10,844 |
| 15,458 | 15,460 | 10,962 |
| 16,409 | 16,446 | 11,865 |
| 16,681 | 16,683 | 12,091 |
| 16,755 | 16,758 | 12,153 |
| 16,762 | 16,763 | 12,158 |
| 16,965 | 16,991 | 12,342 |

| TVDSS - Top | TVDSS - Bottom | Estimated Pressure Formation (psig) |
|---|---|---|
| 17,381 | 17,383 | 12,847 |
| 17,612 | 17,623 | 13,011 |
| 17,718 | 17,720 | 12,038 |
| 17,893 | 17,896 | 11,905 |
| 17,901 | 17,903 | 11,899 |
| 17,944 | 17,945 | 11,866 |
| 17,981 | 18,003 | 11,837 |
| 18,034 | 18,105 | 11,841 |
| 18,131 | 18,134 | 11,872 |
| 18,146 | 18,152 | 11,875 |

Further analysis of sands and their estimated depths and pore pressures are contained in various other locations, including the Sperry-Sun data collected and evaluated by the Sperry-Sun mud loggers, Schlumberger's wireline data and interpretation of the data, and IIT Report.  The burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, and the BP Parties therefore refer Halliburton to document productions (including the IIT Report and documents produced in support of that analysis; the Sperry-Sun mud logging data; the Schlumberger laminated sands analysis and wireline data among other documents) served on all counsel in MDL 2179, in accordance with Federal Rule of Civil Procedure 33(d).

12

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 11:

Who identified sand M57B (*See* BP-HZN-BLY00173436) as a possible hydrocarbon zone, and when and how in connection with the Macondo Well?

## RESPONSE TO INTERROGATORY NO. 11:

The BP Parties object to this interrogatory as vague and ambiguous to the extent "when and how in connection with the Macondo Well is undefined.

Subject to their specific and general objections, the BP Parties respond that based upon the data available to date,  the BP Parties have determined that the M57B sand is not a hydrocarbon bearing zone.  During the course of the investigation of the causes of the accident, BP's internal investigation team and certain petrophysicists continued to evaluate the downhole conditions to determine the various sand layers.  As reported in the Technical Memorandum Pst Well Subsurface Description of Macondo Well MC0252_1BP1 V.3 dated July 26, 2010 (BP-HZN-BLY00197188-197228) various people worked on the downhole analysis, including Galina Skripnikova, Martin Albertin, Chuck Bondurant, Kelly McNaughan, Binh van Nguyen, Bryan Richie, and Craig Scherschel.  That Technical Memorandum contains a reference to the M57B as a potential hydrocarbon zone.  BP further incorporates the testimony of Galina Skripnikova regarding the post-incident analysis of the M57B sand.  As Galina Skripnikova testified at her deposition, analysis began on April 21, 2010 and there was no analysis of the M57B sands until after the Incident.

Q. Okay. Was any further analysis conducted from -- between April 13th and April 21st on whether or not [M57B] was hydrocarbon bearing?

A. No.

July 8, 2011 Deposition Testimony of Galina Skripnikova at 440:23-441:1.   Galina Skripnikova further testified that between April 13 and April 20, she did not do any analysis of the M57B sand.  July 8, 2011 Deposition Testimony of Galina Skripnokova at 441:11-17.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 12:

Describe the flow path of the hydrocarbons from the Macondo Well starting on April 20, 2010, and continuing until the well was killed.

## RESPONSE TO INTERROGATORY NO. 12:

The BP Parties object to this interrogatory as vague and ambiguous as to the phrase "flow path of the hydrocarbons from the Macondo Well starting on April 20, 2010, and continuing until the well was killed."  The BP Parties further object to this interrogatory as overbroad and unduly burdensome in that it seeks information that is available from the BP Parties' various complaints, answers, cross-claims and document productions served on all counsel and is otherwise not susceptible to a response via interrogatory.

Subject to their specific and general objections, the BP Parties refer to, *inter alia*, the September 8, 2010 *Deepwater Horizon* Accident Investigation Report and Appendices.  In addition, the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, and the BP Parties therefore refer Halliburton to, *inter alia*, the BP Parties' Cross-Claims against Halliburton, Cameron, Transocean, and other parties served on all counsel April 20, 2011, as well as document productions (including Appendices G and W to the IIT Report, and the backup materials and analyses produced in

14

support thereof) served on all counsel in MDL 2179, in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 13:**

Identify all data that supports your answer to the preceding interrogatory.

**RESPONSE TO INTERROGATORY NO. 13:**

The BP Parties object to this interrogatory as vague and ambiguous as to the phrase "all data." The BP Parties further object to this interrogatory as overbroad and unduly burdensome in that it seeks information that is available from the BP Parties' various complaints, answers, cross-claims and document productions served on all counsel and is otherwise not susceptible to a response via interrogatory.

Subject to their specific and general objections, the BP Parties refer Halliburton to their response to Interrogatory No. 12.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 14:**

Identify the time of each activation of the Blowout Preventer ("BOP") on the Macondo Well on April 20, 2010, and describe the portions of the BOP that were actually activated.

**RESPONSE TO INTERROGATORY NO. 14:**

The BP Parties object to this request as premature to the extent information responsive to this request may not be identified until all fact and expert discovery is complete.  The BP Parties further object to this request on the grounds that the use of the terms "time and each activation of the Blowout Preventer" and "describe the portions of the BOP" are vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks information beyond BP's control or knowledge, and seeks information likely more readily available from other parties in this litigation such as Transocean, the owner and operator of the blowout preventer utilized by the *Deepwater Horizon* at the Macondo Well, whose personnel would have been responsible for any activation of the blowout preventer on April 20, 2010.

Subject to their specific and general objections, the BP Parties state that, to the best of their knowledge at this time, information responsive to this interrogatory may be found in the *Deepwater Horizon* Accident Investigation Report dated September 8, 2010 prepared by BP's incident investigation team.  The BP Parties refer Halliburton to the investigation report, its appendices, and the backup materials and analyses produced in support thereof served on all counsel in MDL 2179, in accordance with Federal Rule of Civil Procedure 33(d).  The BP Parties further state that information responsive to this interrogatory may be found in the Forensic Examination of Deepwater Horizon Blowout Preventer, Final Report for United States Department of the Interior, Bureau of Ocean Energy Management, Regulation, and Enforcement, dated March 20, 2011, prepared by Det Norske Veritas ("DNV "Report").  The BP Parties do not take any position regarding the accuracy of the information contained in the DNV Report by citing it in response to this interrogatory.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 15:**

Why did the BOP fail to prevent the blowout on April 20, 2010 on the Macondo Well, and in particular, what feature failed to stop the blowout?

**RESPONSE TO INTERROGATORY NO. 15:**

The BP Parties object to this request as premature to the extent information responsive to this request may not be identified until all fact and expert discovery is complete.  The BP Parties further object to this interrogatory on the grounds that the use of the term "fail to prevent the blowout" is vague, overbroad, ambiguous, and undefined.  The BP Parties additionally object to this request on the grounds that it is overbroad, unreasonable, and unduly burdensome to the extent it purports to require the identification of each and every cause of, or the failure to control, the blowout on the Macondo Well on April 20, 2010.  The BP Parties further object to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks information beyond BP's control or knowledge, and seeks information likely more readily available from other parties in this litigation such as Transocean, who owned and operated the blowout preventer utilized by the *Deepwater Horizon* at the Macondo Well on April 20, 2010, and Cameron International Corporation, the manufacturer of the blowout preventer.  The BP Parties further object to this request to the extent it suggests that any single particular feature of the blowout preventer failed to stop the blowout on April 20, 2010; because the blowout occurred, each feature of the blowout preventer did not stop the blowout.  Finally, the BP Parties object to this interrogatory to the extent that it suggests that any feature of the BOP, or the BOP as a whole, was the sole cause of the failure to prevent, control or stop the blowout.

17

Subject to their specific and general objections, the BP Parties state that, to the best of their knowledge at this time, information responsive to this interrogatory may be found in the *Deepwater Horizon* Accident Investigation Report dated September 8, 2010 prepared by BP's internal incident investigation team, as well as in the Forensic Examination of Deepwater Horizon Blowout Preventer, Final Report for United States Department of the Interior, Bureau of Ocean Energy Management, Regulation, and Enforcement, dated March 20, 2011, prepared by Det Norske Veritas.  BP does not take any position regarding the accuracy of the information contained in the DNV Report by citing it in response to this interrogatory.

Further information responsive to the subject matter of this interrogatory may be found in the deposition testimony of Mike Byrd and Fereidoun Abbassian.  Further responding, the BP Parties refer Halliburton to the allegations concerning defective design and/or manufacture of the blowout preventer on the *Deepwater Horizon* and the negligent maintenance of the blowout preventer that are contained in BP Exploration & Production Inc.'s Third-Party Complaint Against Cameron International Corp., BP's Cross-Claim Against Cameron International Corp., and The BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, all of which were served on all counsel April 20, 2011.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 16:

Do you contend that any additives should not have been used in the cement slurry for the 9 7/8" x 7" production casing on the Macondo Well? If your answer is yes, describe all such additives and state why they should not have been used.

18

## RESPONSE TO INTERROGATORY NO. 16:

The BP Parties object to this interrogatory on the grounds that it is overbroad, unreasonable, and unduly burdensome.  The BP Parties further object to this interrogatory on the grounds that Halliburton's use of phrase "should not have been used" is vague, ambiguous, and undefined.  Additionally, the BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties also object to this interrogatory on the grounds that it is premature. The BP Parties will provide the opinions of their experts in accordance with Rule 26 and the Pre Trial Orders of this Court.  The BP Parties further object to this interrogatory to the extent that it implies that BP is responsible for designing the cement slurry for the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state in response to subpart 16(a), "Do you contend that any additives should not have been used in the cement slurry for the 9 7/8" x 7" production casing on the Macondo Well," that the BP Parties contend certain additives in the Halliburton-designed slurry should not have been used in the quantities recommended by Halliburton absent adequate laboratory testing and disclosure of the risks to BP.

Subject to their specific and general objections, the BP Parties state in response to subpart 16(b) , "If your answer is yes, describe all such additives," that the following additives should not have been used in the quantities recommended by Halliburton in the Halliburton-designed cement slurry for the production interval at the Macondo Well absent adequate laboratory testing and disclosure of the risks to BP:  D-Air 3000, EZ-FLO, potassium chloride and SCR-100L.

Subject to their specific and general objections, the BP Parties state in response to subpart 16(c), "If your answer is yes, … state why they should not have been used,"  that these additives that could destabilize the foamed cement slurry and should not have been used in Halliburton-designed slurry that was pumped in the production interval at the Macondo Well.  Specifically, D-Air 3000 is a defoamer that can destabilize a foam cement slurry, and EZ-FLO, potassium chloride and SCR-100L are dispersants that can destabilize a foam cement slurry.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 17:**

For any additives listed above, when did you first learn they were to be used in the cement slurry on the 9 7/8" x 7" production casing on the Macondo Well?

**RESPONSE TO INTERROGATORY NO. 17:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  The BP Parties further object to this interrogatory on the grounds that Halliburton's use of phrase "first learn they were to be used in the cement slurry" is vague, ambiguous, and undefined.  The BP Parties further object to this interrogatory to the extent that it implies that BP is responsible for designing the cement slurry for the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-

recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not appreciate the significance of the additives used in the Halliburton-recommended slurry.  However, the date that Halliburton first recommended these additives to BP can be determined from documents and correspondence sent by Jesse Gagliano, including at Bates No. HAL_0126063 and other documents sent by Jesse Gagliano to BP that are in the possession of Halliburton, and the burden of deriving or ascertaining the specific date is substantially the same for Halliburton as it is for the BP Parties, therefore they refer Halliburton to these documents in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 18:

Identify all BP representatives who participated in the decision to proceed with the cement job for the 9 7/8" x 7" production casing on the Macondo Well without having received a foam stability test during the month of April 2010.  Include in your response the reasons each representative made such decisions.

## RESPONSE TO INTERROGATORY NO. 18:

The BP Parties object to this interrogatory as vague and ambiguous as to the phrases "foam stability test" and "participated in the decision."  The BP Parties also object to this interrogatory to the extent that it mischaracterizes the facts as to the cement testing that was performed by Halliburton and/or provided to BP and characterizes any decision made with respect to the cement job for the 9 7/8" x 7" production casing on the Macondo Well as having been made with conscious awareness or consideration of not having received a foam stability test during the month of April 2010.  Additionally, the BP Parties object to this interrogatory to the extent that it suggests that the BP Parties were solely responsible for making a decision to

21

proceed with the cement job for the 9 7/8" x 7" production casing on the Macondo Well. Finally, the BP Parties object to this interrogatory to the extent that it implies that BP is responsible for designing the cement slurry for the production casing at the Macondo Well.

Subject to their general and specific objections, the BP Parties state that Halliburton was hired as a specialized cement contractor to design, test, and pump the cement job for the well, and the BP Parties relied on Halliburton to properly execute a stable cement job. Halliburton performed the cement slurry tests for the 9 7/8" x 7" production casing on the Macondo Well, did not identify to the BP Parties any issues with foam stability identified in connection with those tests, and recommended the cement procedure to be run on the 9 7/8" x 7" production casing. Moreover, Halliburton personnel was directly involved in executing that cement recommendation at the Macondo Well and did not warn the BP Parties of any risks with respect to the foam stability testing (or the lack thereof), nor did they attempt to stop the job as they were entitled to do. The following BP personnel were involved in allowing Halliburton to proceed with the cement job for the 9 7/8" x 7" production casing on the Macondo Well based on the information and recommendation provided by Halliburton: Brian Morel, Robert Kaluza and Don Vidrine.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 19:**

Do you contend that the cement used on the 9 7/8" x 7" production casing on the Macondo Well was unsafe? If so, describe the reasons the cement was unsafe.

**RESPONSE TO INTERROGATORY NO. 19:**

The BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties further object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  Additionally, the BP Parties object to this interrogatory on the grounds that Halliburton's use of the phrase "unsafe" is vague, ambiguous, and undefined.  The BP Parties also object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

Subject to the foregoing, the BP Parties respond to subpart (a):  Based on information available through discovery after the Incident, the BP Parties contend that the foamed cement that Halliburton designed, tested, recommended and pumped on the production interval was defective and introduced risks that were unknown to BP before the incident due to Halliburton's failures and conduct.

23

Subject to the foregoing, the BP Parties respond to subpart (b):  Halliburton's failures and conduct increased the risk at the Macondo Well because Halliburton knowingly pumped a foamed cement that was unstable and failed to disclose that information to BP and others.  BP was unable to assess this risk and to take actions to reduce this risk or to mitigate its consequences due to Halliburton's misconduct.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 20:**

Do you contend that the foam cement used on the Macondo Well 9 7/8" x 7" production casing was unstable? If so, what do you contend occurred as a result of the instability?

**RESPONSE TO INTERROGATORY NO. 20:**

The BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties additionally object to this interrogatory on the grounds that Halliburton's use of the phrase "occurred as a result of the instability" is vague, ambiguous, and undefined.  The BP Parties further object to the extent that this interrogatory calls for a narrative of all events occurring as a result of Halliburton's cement failing and allowing hydrocarbons to flow down the annulus and up the casing.  The BP Parties further object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of

24

using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

Subject to the foregoing, the BP Parties respond to subpart (a):  Based on current information available after the incident, BP contends that the foamed cement that Halliburton designed, tested, recommended and pumped on the production interval was unstable.

Subject to the foregoing, the BP Parties respond to subpart (b):  Based on currently available information, the foamed cement slurry that Halliburton designed, tested, recommended and pumped on the production interval experienced, among other things, nitrogen breakout due to its instability.  Among other things, the nitrogen breakout caused the cement to fail to isolate and prevent the flow of hydrocarbons down the annulus and up the shoe track resulting in the uncontrolled flow of hydrocarbons and blowout that occurred on April 20, 2010.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 21:**

With the annular BOP closed and the fact that the drill pipe was sealed on the Macondo Well, did approximately 15 barrels return at approximately 17:26 on April 20, 2010 and if so, what caused this?

**RESPONSE TO INTERROGATORY NO. 21:**

The BP Parties object to this interrogatory as vague and ambiguous as to the terms "annular BOP," "closed," "sealed," "return" and "caused." The BP Parties further object to this interrogatory in that it seeks information likely more readily available from other parties in the litigation, such as Transocean and Cameron.

Subject to their specific and general objections, the BP Parties refer Halliburton to BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, which states: "After adjustment of the regulator hydraulic pressure for the annular preventer, an effective seal was established. The residual pressure of 1,260 psi in the drill pipe was bled off from the well. According to witness accounts, 15 bbls of fluid returns were taken. The investigation team's analysis indicates that approximately 3.5 bbls should have been expected. This excess flow from the drill pipe, with the well in an underbalanced condition, should have indicated to the rig crew a communication flow path with the reservoir through failed barriers."

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 22:**

Explain why it took multiple attempts to convert the float collar in the 9 7/8" x 7" production casing of the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 22:**

The BP Parties object that the term "multiple attempts to convert the float collar" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties state that based on available information, there was a blockage that prevented circulation from being established.

26

There were nine attempts to establish circulation.  Once circulation was established, available information shows that the float collar converted.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 23:**

Describe when and how you contend contamination of cement occurred in the shoe track during and/or after the cement job on the 9 7/8" x 7" production casing on the Macondo Well was pumped.

**RESPONSE TO INTERROGATORY NO. 23:**

The BP Parties object to this interrogatory because the term "contamination" is vague, ambiguous, and undefined.  The BP Parties additionally object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

27

Subject to the foregoing, the BP Parties respond that, based on the testimony of Halliburton witnesses that the wiper plugs bumped on time, the evidence does not indicate that much if any contamination occurred during the cement job itself.  Further, the BP Parties do not believe that much if any contamination occurred following the cement job based on the slight difference in density between the shoe cement and the mud in the rat hole, the gelled nature of the mud in the rat hole, and the restriction in flow imposed by the reamer shoe.  The BP Parties further states that Halliburton failed to conduct contamination testing on the cement slurry that it recommended despite that it was required by contract and industry practice to conduct such testing.  As such, even if there were contamination, it is unknown what the effect of any contamination may have had due to Haliburton's failure to conduct contamination testing.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 24:

Did any part of the 9 7/8" x 7" production casing in the Macondo Well fail or separate, thereby allowing hydrocarbons to enter the well, and if so, where?

## RESPONSE TO INTERROGATORY NO. 24:

The BP Parties object that Halliburton's use of the phrases "any part," and "fail or separate, thereby allowing hydrocarbons to enter the well" is vague and ambiguous.  The BP Parties further object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.

Subject to their specific and general objections, the BP Parties state that the 9-7/8" x 7" production casing in the Macondo Well did not "fail or separate" in a manner that allowed hydrocarbons to enter the casing through a breach in the casing.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 25:**

Why was the negative test on the Macondo Well on April 20, 2010 considered successful?  What persons declared it successful?

**RESPONSE TO INTERROGATORY NO. 25:**

The BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties further object to the extent this interrogatory purports to call upon the BP Parties to provide information as to the state of mind of individual persons, including persons not employed by the BP Parties.

Subject to their general and specific objections, the BP Parties state that as reported in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "the lack of flow from what was believed to be an open kill line, coupled with the erroneous explanation for the 1,400 psi on the drill pipe, led the well site leaders and the rig crew to the incorrect view that the negative-pressure test was successful. . . .  The rig crew discussed this 1,400 psi pressure abnormality.  Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'  The toolpusher and the driller reportedly stated that they had observed this phenomenon before. After discussing this concept, the rig crew and well site leader reportedly concluded that the explanation was plausible. . . .  'According to witnesses, the rig crew and well site leaders interpreted no flow coming from the open kill line as a demonstration of well integrity.  This

indication of no flow from an open kill line contributed to the incorrect conclusion that well integrity had been achieved.'"

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 26:

Describe all warnings that BP gave to HESI or anyone else concerning the Macondo Well, including any warning that the design or operations were unsafe. As part of your response, please identify all witnesses with knowledge of such warnings, and all statements, documents and other materials that describe or reflect such warnings.

## RESPONSE TO INTERROGATORY NO. 26:

The BP Parties object to this interrogatory on the grounds that Halliburton's use of the phrases "warnings that BP gave to HESI or anyone else," "any warning that the design or operations were unsafe" and "warnings" is vague, ambiguous, and undefined.  The BP Parties further object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  For example, this interrogatory appears to call for a narrative of all information relating to the Macondo Well that the BP Parties provided to Halliburton or any other party before the Incident that may have be understood as a "warning" alone or in conjunction with other facts known by Halliburton or any other party, or in light of information obtained subsequent to the Incident.  The BP Parties further object to this interrogatory to the extent that it implies that BP is responsible for designing, testing and/or pumping the cement program for the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state Halliburton was contracted to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with the BP Parties the ramifications of

using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to the BP Parties.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

The BP Parties further state that the BP Macondo Well team provided Halliburton with information concerning the design of the Macondo Well and operations at the Macondo Well that may be responsive to this interrogatory.  Individuals that may have knowledge include the following Macondo Well team members:  Marty Albertin, Jonathan Bellow, Bobby Bodek, Todd Boesiger, Chuck Bondurant, John Brannen, Allison Crane, Brent Cocales, Erick Cunningham, Keith Daigle, Pierre Depret, Scherie Douglas, Trent Fleece, Wayne Fletcher, Tanner Gansert, George Gray, John Guide, Mark Hafle, Cynthia Holik, Bob Kaluza, Brian Morel, Steven Morey, Eric Mueller, Joe Neumeyer, Binh Vin Nguyen, Kate Paine, Bryan Richie, Maniram Sankar, Craig Schershel, Tomieka Searcy, Samina Sewani, David Sims, Galina Skripnikova, Jay Thorseth, Jimmy Adams, Darell Boudreaux, Mack Parker, Shawn Southworth,  Don Vidrine, Greg Walz. The conversations and documents are too numerous to identify and would include every communication between BP and Halliburton.  The BP Parties state that various Halliburton employees would have received these communications, including Jesse Gagliano, Paul Anderson, Nathaniel Chaisson, Vincent Tabler, Anthony Cupit, Danny Mooney, and Chris Haire.  However, Halliburton would have the best information on the identity of Halliburton employees with information on the design and operations of the Macondo Well.  The BP Parties

also respond that BP posted information on WellSpace concerning the design and operations of the Macondo Well.  The WellSpace materials were produced at BP-HZN-MBI00190522 through BP-HZN-MBI00192367; BP-HZN-MBI00193200 through BP-HZN-MBI00193440; BP-HZN-2179MDL00058168 through BP-HZN-2179MDL00269030; and BP-HZN-2179MDL00058151 through BP-HZN-2179MDL00058857, and the burden of deriving or ascertaining the substance of those communications is substantially the same for Halliburton as it is for the BP Parties, therefore the BP Parties refer Halliburton to these documents in accordance with Federal Rule of Civil Procedure 33(d).  Halliburton maintains WellSpace and has superior information on who from Halliburton accessed the WellSpace information.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 27:**

Describe the division of responsibilities between BP and Transocean in operating the Deepwater Horizon and conducting drilling operations at the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 27:**

The BP Parties object to this interrogatory as vague and ambiguous, particularly the term "division of responsibilities" which is undefined and subject to multiple meanings.  The BP Parties will respond to this interrogatory using their understanding of that term.  The BP Parties further object to this interrogatory to the extent that it implies that the BP Parties were responsible for operating the *Deepwater Horizon* or conducting drilling operations at the Macondo Well, or to the extent that it implies that other contractors were not involved.  Various other parties, including Halliburton, also had responsibilities regarding the *Deepwater Horizon* and drilling operations at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that the Drilling Contract between BPAP (as successor to Vastar Resources, Inc.) and Transocean Holdings LLC (as successor to R&B Falcon Drilling Co.), Contract No. 980249, dated December 9, 1998 (the "Drilling Contract"), sets forth the responsibilities of BP and Transocean regarding operating the *Deepwater Horizon*, and pursuant to Federal Rule of Civil Procedure 33(d) the BP Parties refer Halliburton to the Drilling Contract.  The BP Parties further state that Transocean was solely responsible for the operation of the *Deepwater Horizon*, including such operations on board the *Deepwater Horizon* as may have been necessary or desirable for its safety.  Transocean was responsible for the safety of its operations, was responsible for using all reasonable means to control and prevent fires and blowouts, and for testing and maintaining the *Deepwater Horizon's* blowout prevention equipment.  Transocean also represented, and was responsible for ensuring, that the *Deepwater Horizon* satisfied all applicable laws, rules, requirements and regulations of U.S. federal, territorial possession, state, municipal, or local governments having jurisdiction over the operations in U.S. federal waters.  BPAP had no direction or control over Transocean or its employees and agents except in the results to be obtained.

The BP Parties further state that BPXP and/or BPAP's responsibilities regarding drilling operations at the Macondo Well included:  (i) communicating with and receiving the necessary approvals from the Minerals Management Services ("MMS"), now known as the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"); (ii) selecting contractors to provide products and perform services regarding drilling operations; (iii) providing the well design, which includes drilling parameters such as well depth, drilling location, and other well-related requirements; and (iv) complying with all applicable laws and regulations. Transocean's responsibilities included: (i) the activities set forth in the Drilling Contract and/or

in the preceding paragraph; (ii) drilling the Macondo Well; and (iii) complying with all applicable laws and regulations.   Other parties, including Halliburton, were responsible for aspects of the drilling operations at the Macondo Well.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.


**INTERROGATORY NO. 28:**

Describe BP's pre-Incident plan for containing and remedying a potential blowout and oil spill at the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 28:**

The BP Parties object to this interrogatory on the grounds that Halliburton's use of the terms "plan" and "containing" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties state that the burden of deriving or ascertaining this answer is the same for Halliburton as it is for the BP Parties, therefore the BP Parties refer Halliburton to the Regional Oil Spill Response Plan - Gulf of Mexico (BP-HZN-CEC 000025-607) and Initial Exploration Plan - Mississippi Canyon Block 252 (BP-HZN-2179MDL00001095-1218), in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 29:**

Describe the factual basis for any contention that BP is not fully at fault for the Incident. Include in your response any contention that other persons or entities are fully or partially at fault and the portions of fault attributable.

**RESPONSE TO INTERROGATORY NO. 29:**

The BP Parties object to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and not susceptible to response via interrogatory.

Subject to their specific and general objections, the BP Parties refer to the BP Parties' various answers and defenses to the Complaints served in these cases, as well as their cross-claims against Halliburton, Cameron, Transocean, and other parties, served on all counsel April 20, 2011, and the documents produced by the BP Parties and the other parties in connection with this litigation, all of which have been served on all counsel.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 30:**

Do you agree with the narrative of events and findings as set forth in the *Deepwater Horizon Accident Investigation Report* dated September 8, 2010? If not, please explain in detail each element of the Report with which you do not agree.  Include an explanation of those items for which you do not believe you have sufficient information to agree.

**RESPONSE TO INTERROGATORY NO. 30:**

The BP Parties object to this interrogatory as vague, ambiguous, overbroad and unduly burdensome to the extent that it purports to call for BP to provide a line-by-line, page-by-page analysis of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report.

Subject to their specific and general objections, the BP Parties refer Halliburton to their objections and response to Request for Production No. 42 in BP Exploration & Production Inc.'s

Responses and Objections to Halliburton Energy Services Inc.'s Requests for Production, served on all counsel on May 10, 2011.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 31:**

Did any person at BP or its employees, agents or consultants involved in the investigation and drafting of the *Deepwater Horizon Accident Investigation Report* dated September 8, 2010, express disagreement with or otherwise not fully agree or accept any observation or conclusion included within the Report?  If so, please name each person expressing such disagreement and describe the disagreement in detail.

**RESPONSE TO INTERROGATORY NO. 31:**

The BP Parties object to this interrogatory as vague and ambiguous as to the phrases "express disagreement," "not fully agree or accept," and "observation or conclusion."  The BP Parties further object to this interrogatory to the extent that it purports to call for the BP Parties to conduct an inquiry into the feelings -- both expressed or unexpressed -- of potentially thousands of individuals as to agreement -- including disagreement, not full agreement or acceptance, etc. -- of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report.

Subject to their specific and general objections, the BP Parties refer Halliburton to their objections and response to Request for Production No. 42 in BP Exploration & Production Inc.'s Responses and Objections to Halliburton Energy Services Inc.'s Requests for Production, served on all counsel on May 10, 2011.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

36

**INTERROGATORY NO. 32:**

Identify each person you intend to call or may call as a witness in this matter and, for each person identified, state the subject of their expected testimony.

**RESPONSE TO INTERROGATORY NO. 32:**

The BP Parties object to this interrogatory on the grounds that it seeks the premature identification of witnesses, including experts that the BP Parties may use at trial in accordance with Rule 26(a)(2)(A)-(D) and 26(b)(4)(A).

Subject to their specific and general objections, the BP Parties state that they will provide a list of testifying experts and other testifying witnesses in accordance with Rule 26(a) and (b) of the Federal Rules of Civil Procedure and upon the schedule established for such discovery set by the Court in this litigation.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 33:**

Identify each person who has or may have knowledge or information relating to the allegations in BP's claims against HESI, including, but not limited to, each person with knowledge or information relating to your allegations concerning HESI's alleged duty to indemnify BP.  For each person identified, state the subject area of his or her knowledge.

**RESPONSE TO INTERROGATORY NO. 33:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  For example, the interrogatory asks that the BP Parties identify each person with knowledge when many of the persons with knowledge are not employees of BP and those third parties would be in better position to identify persons with knowledge.  The BP parties also object to the extent that this interrogatory calls for persons with second-hand and/or post-incident

knowledge relating to the allegations in BP's claims against Halliburton. The BP Parties also object to this interrogatory on the grounds that it is premature. The BP Parties will identify their experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. But for Halliburton's multiple acts of fraud and other misconduct, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

The BP Parties further state that Halliburton failed to disclose, concealed, and misrepresented its misconduct and the persons having factual information underlying BP's claims against Halliburton pre-incident are Halliburton employees. On information and belief, those Halliburton employees include Richard Vargo, Ronnie Faul, Jesse Gagliano, Nathanial Chaisson, Vincent Tabler, Quang Nguyen, Paul Anderson, Anthony Cupit, Danny Mooney, Chris Haire, Timothy Quirk, Richard Dubois and various lab technicians. The BP Parties state

that Halliburton is in a better position to identify the persons with knowledge or information relating to the factual allegations underlying BP's claims against Halliburton.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 34:**

Identify all persons with knowledge of any fact relevant to any and all claims you are asserting in this litigation involving issues related to the Incident, the Oil Spill, or the Oil Spill Response, and indicate for each person the nature and relevance of the knowledge you believe each such person has.

**RESPONSE TO INTERROGATORY NO. 34:**

The BP Parties object to this interrogatory on the grounds that it is cumulative, duplicative, overbroad, unreasonable, and unduly burdensome.

**INTERROGATORY NO. 35:**

Please provide a detailed, itemized list of your economic and non-economic damages that you claim HESI is liable to you for in this litigation.

**RESPONSE TO INTERROGATORY NO. 35:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  The BP Parties further object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that generally Halliburton is liable for:  compensatory and economic damages equal to the amount of costs and expenses incurred by BP to clean up and remediate the oil spill, the amount of claims paid by BP under the Oil Pollution Act, the amount of any judgments BP incurs or pays, the amount of any

39

OPA financial liability that BP is liable for, the lost profits from and/or diminution in value of the Macondo prospect, and all other costs and damages incurred by BP related to the *Deepwater Horizon* Incident and resulting oil spill, plus interest; all damages incurred by BP as a result of Halliburton's negligence (and if established by the evidence at trial, gross fault and/or gross negligence), intentional misrepresentation and concealment in an amount to be determined at trial; and all damages incurred by BP as a result of the *Deepwater Horizon* Incident.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 36:**

Identify all persons with whom you have settled or otherwise resolved any dispute related to the Incident.  For each person identified, explain the terms of the settlement or resolution.

**RESPONSE TO INTERROGATORY NO. 36:**

The BP Parties object to this interrogatory on the grounds that Halliburton's use of the terms "persons" and "person" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it seeks information that is highly confidential, not relevant to the claims or defenses of any party, is protected from disclosure under Federal Rule of Evidence 408, is unreasonable and unduly prejudicial in that the production of responsive documents would be inconsistent with the public policy favoring the settlement of disputes as disclosure of the documents sought would potentially inhibit additional settlements in this case, seeks documents protected from disclosure by one or more privileges, including a common-interest privilege, and imposes an undue and unreasonable burden to the extent it seeks to force BP to undertake to identify privileged written agreements outside the scope of the requirements of PTO #14.

40

**INTERROGATORY NO. 37:**

Identify all Hazard & Operability Studies ("HAZOPS") prepared from January 31, 2010 to April 20, 2010 that relate specifically to the Deepwater Horizon or the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 37:**

The BP Parties object to this interrogatory on the grounds that it is overbroad and unduly burdensome to the extent it seeks documents likely to be more readily available from other parties in this litigation, such as the Transocean Defendants, the owner and operator of the *Deepwater Horizon* rig.

Subject to their specific and general objections, the BP Parties state that they are not aware of any responsive HAZOP studies prepared by BP between January 31, 2010 and April 20, 2010. The BP Parties refer Halliburton to the Transocean Defendants as a potential source of information responsive to this interrogatory and relating to the *Deepwater Horizon*.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 38:**

Identify the well characteristics that BP considers when determining whether a well is included on BP's list of critical wells. In your response, identify all BP wells on that list from April 20, 2010 to the present date. If the Macondo Well was not on the list as of April 20, 2010, identify the characteristics of that well that resulted in or contributed to its exclusion from the list.

**RESPONSE TO INTERROGATORY NO. 38:**

The BP Parties object to this request on the grounds that it is overbroad, unreasonable, and seeks information not relevant to the claims or defenses of any party. Additionally, the BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.

41

Subject to their specific and general objections, the BP Parties state that as of the date of the Incident BP's policy required that all exploration wells be designated as a critical well.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## GENERAL OBJECTIONS

The BP Parties assert the following objections to each and every one of Halliburton's interrogatories, including any definitions or instructions associated therewith (collectively, "Halliburton's Discovery Requests"). These general objections are incorporated by reference into each specific response set forth by the BP Parties and are neither waived nor limited by any specific responses.

1.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the proceeding set to commence in February, 2012 prior to the substantial completion of the BP Parties' efforts to identify and produce documents in response to other requests of Halliburton and other parties to the litigation.

2.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

3.      The BP Parties object to Halliburton's Discovery Requests to the extent they prematurely seek expert discovery. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

4.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.

5.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of the BP Parties and any opposing parties to resolve their disputes in a fair and efficient manner.

6.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information or documents not within the BP Parties' possession, custody, or control.  All responses are made on behalf of the BP Parties only, are limited to information and documents within the BP Parties' possession, custody, or control.

7.      The BP Parties object to Halliburton's Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

8.      The BP Parties object to Halliburton's Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests

43

seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

9.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

10.     The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

11.     The BP Parties object to Halliburton's "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  The BP Parties further object to, and will read and respond to, Halliburton's "Definitions" (labeled to correspond to Halliburton's list) as follows:

        (a)     Halliburton's definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise

specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

(b)     Halliburton's definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

(c)     Halliburton's definition of "Incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

(d)     Halliburton's definition of "oil spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

(e)     Halliburton's definition of "Deepwater Horizon Blowout Preventer" is vague and overbroad; it includes any equipment used to control any well.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

(f)     Halliburton's definition of "clean up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without

regard to whether such releases had anything to do with the incident. The BP Parties will read and respond to Halliburton's requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

(g)     Halliburton's definition of "relevant time period" is overbroad; by extending the definition to "the current date," many of Halliburton's requests, which by their context clearly seek information from the time prior to and including the incident, confusingly seek unrelated information generated after the incident and ignores that it is impossible for the BP Parties to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to Halliburton. The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means January 1, 2008 through April 20, 2010, unless: (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2008 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through November 8, 2010. In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above. Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by the BP Parties.

(h)      Halliburton's definitions of "Defendant," "you," "your," "your company," and "BP" are extremely vague and overbroad; they include a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.  The BP Parties will read and respond to Halliburton's requests with the understanding that the terms you," "your," and "BP" means one or more of the BP Parties, as appropriate.

(i, j, k, l, m)    Halliburton's definitions of "Anadarko," "Cameron," "MOEX," "Transocean," and "HESI" are similarly vague, overbroad, and confusing.  The BP Parties will read and respond to Halliburton's requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(n)      Halliburton's definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "person" means a person.

(o)      Halliburton's definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "employee" means an employee.

(p)      Halliburton's definition of "Investigation Team" is unobjectionable.

(q)      Halliburton's definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."   The BP Parties will read and respond to Halliburton's requests with the

understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(r)     Halliburton's definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(s)     Halliburton's definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved." The BP Parties will read and respond to Halliburton's requests with the understanding that the term "statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(t)     Halliburton's definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "meeting" refers to a gathering of two or more people.   It does not include electronic communications unless specified.

(u)     Halliburton's definition of "document" and "documents" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A). The BP Parties will read and respond to Halliburton's requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(v)      Halliburton's definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(w)      Halliburton's definitions of "relating to," "related to," "referring to," "regarding," "concerning," and "with respect to," are vague and overbroad; they render these and innumerable other words void of any independent meaning.   The BP Parties will read and respond to Halliburton's requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(x)      Halliburton's definitions of "and" and "or" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "and" means and, and the term "or" means or.

(y)      Halliburton's definition of "all" and "any" are vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of Halliburton's requests into nonsensical requests for duplicative information.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "all" means all and the term "any" means any.

(z)      Halliburton's definition of "including" is unobjectionable.

(aa)     Halliburton's definitions of "each" and "every" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning

49

and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "each" means each and the term "every" means every.

(bb)   Halliburton's instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(cc)   Halliburton's instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(dd)   Halliburton's instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(ee)   Halliburton's instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined under instructions to set aside standard English usage.

12.   These responses are made without waiving, in any manner, the BP Parties' right to object to the use of any information or documents provided in response to these requests at

any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

13.     The BP Parties' decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the document requests themselves, should not be construed as:  (a) a stipulation that the material is relevant or admissible, (b) a waiver of the BP Parties' general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

14.     The BP Parties reserve the right to modify, amend, or supplement their responses, which are made based on the current status of their knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.

## VERIFICATION

I, Bill Kirton, an officer of BP America Inc., BP America Production Company, and BP
Exploration & Production Inc., having undertaken a reasonable inquiry under the
circumstances into the process by which the foregoing response to interrogatories were
compiled, hereby certify, under penalty of perjury, that, to the best of my knowledge,
information, and belief, the foregoing response accurately reflects the information available
to BP America Inc., BP America Production Company, and BP Exploration & Production
Inc. as specified therein.

_Bill 784_

State of Texas        :
                      :    ss.
County of Harris  :

Sworn and ascribed to before me
this 1st day of _August_ , 2011

_Laura M. Riddler_
Notary Public

```
LAURA M. RIDDLER
MY COMMISSION EXPIRES
May 11, 2015
```

Dated:  August 1, 2011

Respectfully submitted,

**AS TO RESPONSES TO
INTERROGATORIES**
By: /s/ Bill Kirton_____
BP America Inc.
501 Westlake Park Blvd.
Houston, Texas 77079

*BP America Inc., BP America Production
Company, and BP Exploration &
Production Inc.*


By:  /s/ J. Andrew Langan, P.C.

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Timothy A. Duffy, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 1st day of August, 2011.

                                    /s/   J. Andrew Langan, P.C.____

# EXHIBIT 2

LEXISNEXIS® FILE & SERVE
39032614
E-SERVICE
Aug  1 2011
11:46PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |
| …………………………………………….... | : | |

**THE BP PARTIES' RESPONSES AND OBJECTIONS TO HALLIBURTON**
**ENERGY SERVICES, INC.'S FIRST REQUESTS FOR ADMISSION**

Defendants BP Exploration & Production Inc. ("BPXP") and BP America Production Company ("BPAP") (collectively, "BP" or "the BP Parties"), by their undersigned Counsel, and, pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, hereby submit the following responses to Halliburton Energy Services, Inc.'s ("Halliburton" or "HESI") First Requests for Admission.

**SPECIFIC RESPONSES AND OBJECTIONS**

The BP Parties respond as follows to Halliburton's requests for admission, subject to and without waiving their general objections, each and every one of which are specifically incorporated into each individual response below.[1]

**REQUESTS FOR ADMISSION**

1.      Admit that BP determined the number of HESI mud loggers assigned to the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that use of the term "determined" is vague, ambiguous, and undefined.

---

[1] The BP Parties' general objections are set forth at pages 108 - 117.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request, including any particular operational implication of the use of the term "determined," as HESI has not sufficiently explained what it means by the use of the term in the context of this request.

2.     Admit that BP requested that Joseph Keith be assigned by HESI to provide mud logging services on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request because, based upon a reasonable investigation, they have no indication that they requested HESI to assign Joseph Keith to the *Deepwater Horizon*.

3.     Admit that BP requested that Kelly Gray be assigned by HESI to provide mud logging services on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request because, based upon a reasonable investigation, they have no indication that they requested HESI to assign Kelly Gray to the *Deepwater Horizon*.

4.     Admit that in March of 2010, HESI suggested that BP utilize additional mud loggers to monitor wells.

**RESPONSE:**

The BP Parties object to this request on the grounds that use of the phrase "utilize additional mud loggers to monitor wells" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request, including any particular operational implication of the

use of the phrase "utilize additional mud loggers to monitor wells," as HESI has not sufficiently explained what it means by the use of the term in the context of this request.

5.      Admit that BP did not authorize HESI to provide more than two mud loggers at a time on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that the request is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There were multiple instances when there were more than two mud loggers working on the *Deepwater Horizon*.

6.      Admit that from January 31, 2010 to April 20, 2010, BP never requested that HESI provide additional mud loggers to the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There was no indication that the Sperry-Sun mud loggers were not capable of doing so and there was no indication, obligation or responsibility for BP to request additional mud loggers to provide the services contractually agreed upon by HESI and the BP Parties.

7.      Admit that BP was aware that HESI mud loggers' attendance at morning meetings was dependent on rig activity and the necessity of monitoring surface data parameters.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrases "dependent on rig activity" and "necessity of monitoring surface data parameters" are vague and ambiguous.

3

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the mud loggers' ability to attend morning meetings was dependent upon certain rig activities and their monitoring duties.  The BP Parties deny the remainder of this request, including any particular operational implication of the use of the phrases "dependent on rig activity" and "necessity of monitoring."

8.      Admit that BP was aware that HESI mud loggers' attendance at morning meetings was dependent on rig activity and the necessity of monitoring surface data parameters.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrases "dependent on rig activity" and "necessity of monitoring surface data parameters" are vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the mud loggers' ability to attend morning meetings was dependent upon certain rig activities and their monitoring duties.  The BP Parties deny the remainder of this request, including any particular operational implication of the use of the phrases "dependent on rig activity" and "necessity of monitoring."

9.      Admit that the BP well site leader did not timely detect the kick on March 8, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the terms "timely" and "detect."  The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well and detecting kicks.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The

4

Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

10.    Admit that the BP well site leader did not notice the kick on March 8, 2010 for approximately 33 minutes.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the term "notice." The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

11.    Admit that approximately 35-40 barrels of hydrocarbons entered the wellbore during the kick on March 8, 2010, before the BP well site leader and Transocean drilling crew shut in the well with the lower annular preventer.

**RESPONSE:**

The BP Parties object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that, as described more fully in BP's September 8, 2010 Deepwater Horizon Accident Investigation Report, approximately 35-40 barrels of reservoir fluids entered the wellbore during the March 8, 2010 kick event before the Transocean drilling crew shut in the well with the lower annular preventer.  The BP Parties deny the remainder of this request, specifically to the extent it suggests that the BP well site leader was responsible for shutting in the well.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

12. Admit that the BP well site leader responded to the kick on March 8, 2010, slower than BP would have liked.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrases "responded" and "slower than BP would have liked."  The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger. The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

13.   Admit that the BP well site leader did not timely detect the kick on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "timely detect." The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

7

14.     Admit that the BP well site leader responded to the kick on April 20, 2010, slower than BP would have liked.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "slower than BP would have liked."  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

15.     Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:08 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware" and "unanticipated and unexplained" are not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the

Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

16.    Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:14 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware' and "unanticipated and unexplained" are not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

17.    Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:26 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware" and "unanticipated and unexplained" are not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as the Halliburton Sperry Sun mud logger on duty at that time.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

18.    Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:30 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware" and "unanticipated and unexplained" are not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI

10

mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

19.    Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:09 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "investigating" is not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

20.    Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:16 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection,

and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "investigating" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

21.    Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:30 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "investigating" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual,

Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

22.     Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:35 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "investigating" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

23.     Admit that the BP well site leader was having a slug prepared for potential well control on April 20, 2010 by 21:16 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "slug" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

24. Admit that the BP well site leader was having a slug prepared for potential well control on April 20, 2010 by 21:30 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions. The BP Parties further object to this request as vague and ambiguous to the extent "slug" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the HESI mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

14

25.     Admit that BP simultaneously received all rig data that was available to the HESI mud loggers on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that use of the phrases "simultaneously received" and "all rig data that was available to the HESI mud loggers" are vague, ambiguous, and undefined.   The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties admit that they had access to HESI data through INSITE Anywhere on April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

26.     Admit that BP received all rig data that is available to the HESI mud loggers.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that use of the phrases "simultaneously received" and "all rig data that was available to the HESI mud loggers" are vague, ambiguous, and undefined.   The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties admit that they had access to HESI data through INSITE Anywhere on

15

April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

27.     Admit that BP approved the location of HESI's flow-out sensor on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: The BP Parties admit that BP, Halliburton and Transocean agreed upon the location of HESI's flow out sensor on the *Deepwater Horizon*.  As testified by John Gisclair, the Sperry sensor placement was determined by the Sperry personnel who installed it and the Transocean rig crew.

28.     Admit that BP determined the location of HESI's flow-out sensor on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that use of the term "determined" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The BP Parties deny determining the location of the sensors installed on the *Deepwater Horizon*.  As testified by John Gisclair, the Sperry sensor placement was determined by the Sperry personnel who installed it and the Transocean rig crew.

29.     Admit that on April 20, 2010, the BP well site leader had contemporaneous access to the real-time sensor data on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton' use of the phrase "contemporaneous access" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the BP well site leader had access to the real-time sensor data on the *Deepwater Horizon* via the computer terminal located in the well site leader's office; however, it is the responsibility of the Halliburton/Sperry-Sun mud loggers and the Transocean rig crew to continuously monitor the data.  The BP Parties deny the remainder of this request, including any particular operational implication of the use of the phrase "contemporaneous access."

30.     Admit that on April 20, 2010, the BP well site leader had real-time access to all rig data that was available to the HESI mud loggers.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the phrases "all rig data" and "that was available to the HESI mud loggers" is vague, ambiguous, and undefined.

Subject to their general objections, the BP Parties respond as follows: Denied.  The BP Parties admit that the Well Site Leader had access to HESI data through INSITE Anywhere on April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

31.     Admit that on April 20, 2010, the BP well site leader did not inform the HESI mud loggers of planned or actual rig activity after 17:00 hours.

17

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "inform" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties have grounds to believe that the planned rig activities were discussed during the pre-tour and pre-job meetings held on April 20, 2010, which included the HESI mud loggers; further, the HESI mud loggers were aware of planned and actual rig activity after 17:00 hours.  Furthermore, if the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

32.      Admit that on April 20, 2010, the BP well site leader did not provide the HESI mud loggers with written material outlining rig activity to occur that day.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the phrase "written material" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request because the BP Parties have grounds to believe that the HESI mud loggers were provided with written materials outlining the rig activity to occur on April 20, 2010.  Furthermore, if the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

33.      Admit that on April 20, 2010, the BP well site leader did not call the HESI mud loggers after 17:00 hours to inform them of fluid transfers among pits.

18

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to them today, there is no indication that the Well Site Leader called the HESI mud loggers after 17:00 hours on April 20, 2010, however the BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

34.    Admit that on April 20, 2010, the BP well site leader did not call the HESI mud loggers after 17:00 hours to advise them that offloading to the Damon Bankston had stopped.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to them today, there is no indication that the Well Site Leader called the HESI mud loggers after 17:00 hours on April 20, 2010, however the BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

35.    Admit that on April 20, 2010, the BP well site leader did not call the HESI mud loggers after 17:00 hours to advise them of the flow-out readings from Transocean's flow-out sensor.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to them today, there is no indication that the Well Site Leader called the

HESI mud loggers after 17:00 hours on April 20, 2010, however the BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  Further, it is not the Well Site Leaders responsibility to monitor flow-out readings on any sensors, as monitoring the well conditions is the responsibility of the Transocean rig crew and the HESI mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

36.     Admit that on April 20, 2010, the BP well site leader did not announce fluid transfers among pits over the rig PA system.

**RESPONSE:**

Subject to their general objections, the BP Parties state as follows:  Denied.  The BP Parties deny this request to the extent that it asserts the BP Well Site Leader had a responsibility to announce transfers among pits over the rig PA system, which is generally done by the mud engineer, or that the BP Well Site Leader was informed of fluid transfers among pits, which is an operation conducted by the Transocean rig crew and involving the M-I Swaco mud engineer.

37.     Admit that on April 20, 2010, the BP well site leader did not inform the HESI mud loggers of pressure anomalies during the negative pressure test.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.  The BP Parties further object to this request as vague and ambiguous to the extent "pressure anomalies" is undefined.

Subject to their general and special objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig

20

crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the negative pressure test. The Transocean rig crew was also primarily responsible for monitoring pressure anomalies (along with the HESI mud logger who was responsible for continuously monitoring the well), as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

38.    Admit that on April 20, 2010, the BP well site leader set up the negative pressure test to utilize the choke manifold on the BOP.

**RESPONSE:**

The BP Parties object to this request as misleading in that it suggests that the BP well site leader set up the negative pressure test and further that the choke manifold is part of the BOP. The BP Parties further object to this request as the phrase "utilize the choke manifold" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that prior to April 20, 2010 the negative pressure test was designed to be conducted by monitoring the kill line from the BOP and that on April 20, 2010, after a discussion between the well site leader and the Transocean rig crew, the negative pressure test was performed by monitoring the flow from the kill line. The BP Parties deny the remainder of this request.

39.    Admit that on April 20, 2010, BP was aware that the HESI mud loggers did not receive pressure data from the choke manifold on the BOP.

**RESPONSE:**

The BP Parties object to this request as misleading in that it suggests that the choke manifold is part of the BOP.

21

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The Sperry Sun mud loggers, as well as Transocean rig crew, had access to pressure data on the choke/kill lines.

40.    Admit that on April 20, 2010, the BP well site leader declared the negative pressure test successful based on a purported "bladder effect."

**RESPONSE:**

The BP Parties object to this request as misleading in that it suggests that the BP well site leader solely made any conclusions regarding the negative pressure test, rather than the negative pressure test being accepted by the well site leaders and relevant Transocean rig crew members jointly.  The BP Parties further object to this request as misleading in that it suggests that the purported "bladder effect" explanation offered by the Transocean toolpusher was the sole basis for the belief that the negative pressure test was successful, when the acceptance was also based on a lack of flow from what was believed to be an open kill line.

Subject to their specific and general objections, the BP Parties admit that witness accounts state that the "bladder effect" was an explanation offered by the Transocean toolpusher and driller for the 1,400 psi observed on the drill pipe and that the well site leaders and rig crew accepted that explanation.  The BP Parties deny the remainder of this request.

41.    Admit that on April 20, 2010, the BP well site leader understood that by diverting flow-out overboard, the HESI mud loggers were unable to monitor flow-out from the well.

**RESPONSE:**

The BP Parties object to this request as misleading to the extent that it implies that BP's well site leader was responsible for monitoring the well.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring

the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There

was no indication that the Sperry-Sun mud loggers were not capable of doing so at any time.

     42.    Admit that on April 20, 2010, the BP well site leader understood that by diverting flow-out overboard, the HESI mud loggers were unable to monitor the gas content of fluids coming out of the well.

**RESPONSE:**

The BP Parties object to this request as misleading to the extent that it implies that BP's

well site leader was responsible for monitoring the well.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring

the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There

was no indication that the Sperry-Sun mud loggers were not capable of doing so at any time.

     43.    Admit that on April 20, 2010, the BP well site leader understood that the transfer of fluids among pits on the Deepwater Horizon complicated the ability of the HESI mud loggers to monitor pit volume changes.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the term

"complicated" is vague, ambiguous and undefined.  The BP Parties further object to this request

as misleading to the extent that it implies that BP's well site leader was responsible for

monitoring the well.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring

the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There

was no indication that the Sperry-Sun mud loggers were not capable of doing so at any time.

44.    Admit that on March 8, 2010, the HESI mud logger timely advised the BP well site leader of a gain in the active pits suggesting a potential influx from the well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "informed" and "timely advised" are vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There is no indication that the mud logger informed the well site leader as Mr. Murray Sepulvado testified.  The BP Parties further deny this request, including any particular operation implication of the use of the phrase "timely advised."

45. Admit that on March 8, 2010, after Transocean stopped crane activity, the HESI mud logger again timely advised the BP well site leader of a gain in the active pits suggesting a potential influx from the well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "informed" and "timely advised" are vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There is no indication that the mud logger informed the well site leader as Mr. Murray Sepulvado testified.  The BP Parties deny this request, including any particular operation implication of the use of the phrase "timely advised."

46.    Admit that on March 8, 2010, the BP well site leader's response to the HESI mud logger's notice of a potential influx did not comply with BP policy regarding responses to well control events.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "response and "notice" are vague, ambiguous and undefined.  The BP Parties further object to

this request to the extent that "BP policy regarding responses to well control events" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties cannot admit or deny this request as they cannot determine which "policy regarding to responses to well control events" is referenced.  The BP Parties further note that continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

47.     Admit that on March 8, 2010, the BP well site leader's response to the HESI mud logger's notice of a potential influx did comply with BP policy regarding responses to well control events.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "response and "notice" are vague, ambiguous and undefined.  The BP Parties object to this request to the extent that "BP policy regarding responses to well control events" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  BP cannot admit or deny this request as BP cannot determine which "policy regarding responses to well control events" is referenced.  BP further notes that continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for

undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

48.    Admit that BP did not notify HESI of fluctuations in standpipe pressure after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties object to this request as vague and ambiguous to the extent "fluctuations" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

49.    Admit that BP did not notify HESI of an increase in standpipe pressure from 21:01 to 21:08 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

50.     Admit that BP did not notify HESI of an increase in standpipe pressure from 21:09 to 21:14 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud

logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

51.     Admit that BP did not notify HESI of a decrease in standpipe pressure from 21:26 to 21:30 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.   The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

52.     Admit that BP did not notify HESI of an increase in standpipe pressure from 21:30 to 21:34 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.   The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

53.      Admit that at no point after 17:00 hours on April 20, 2010, did BP advise HESI of an increase in flow-out from the well as measured by Transocean's flow-out sensor.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.   The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud

logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

54.    Admit that at no point after 17:00 hours on April 20, 2010, did BP initiate contact with the HESI mud logger on duty.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to it today, there is no indication that the Well Site Leader contacted the HESI mud loggers after 17:00 hours on April 20, 2010, but deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to contact the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

55.    Admit that BP did not keep the HESI mud logger on duty apprised of simultaneous activity on the rig after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "apprised" and "simultaneous activity" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

30

56.    Admit that on April 20, 2010, BP did not provide HESI with written procedures and/or activities planned for that day.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "written procedures and/or activities" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Halliburton personnel onboard the *Deepwater Horizon* on April 20, 2010 received operational plans and participated in pre-tour meetings where the procedures and operations scheduled to be conducted on April 20, 2010 were discussed.

57.    Admit that BP did not maintain the sensors used on the Deepwater Horizon to ensure they were providing accurate real time data to assist the mud loggers on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that the use of the terms "maintain" and "sensors" are vague, ambiguous, and undefined.  The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for maintaining the mud logger sensors.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide expert maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making.

58.    Admit that BP did not advise HESI of any situation developing with safety implications after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "any situation developing with safety implications."  The BP Parties also object to this request as

31

vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties deny that they did not inform HESI of any information with safety implications during the time period in question, because virtually all actions or activities on the well may potentially have safety implications.

59.    Admit that BP directed or instructed others to perform the rig activities to be conducted after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "rig activities to be conducted."

Subject to their specific and general objections, the BP Parties respond as follows: Denied. During the given time frame, there were a number of rig activities conducted without direction or instruction from the BP Parties.

60.    Admit that BP directed Transocean to prepare the pits on the Deepwater Horizon for cleaning on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrases "directed" and "prepare the pits."

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that they provided the Transocean Defendants with a drill plan that included a procedure for cleaning the mud pits prior to moving to the next well. The BP Parties deny the remainder of this request.

32

61.     Admit that BP did not inform HESI of simultaneous rig activities occurring on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "inform" and "simultaneous activity" is vague, ambiguous and undefined.

Subject to their general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to inform HESI of simultaneous rig activities occurring on April 20, 2010.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

62.     Admit that BP understood that the simultaneous rig activities on April 20, 2010 limited the ability of HESI's mud loggers to monitor certain surface data parameters.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "simultaneous activity" and "certain surface data parameters" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

63.     Admit that BP understood that the HESI mud logger would not be able to monitor flow-out or gas content after 21:10 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the term "understood" is vague, ambiguous, and undefined, and that it fails to specify any particular time prior to the incident.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The responsibility to monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers. To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

64.     Admit that BP well site leaders are required to monitor real-time data for potential well control events.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Well Site leaders were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick. The Transocean rig crew was also primarily responsible for kick detection (along with the Halliburton Sperry Sun mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

65.     Admit that the BP well site leader on duty after 17:00 hours on April 20, 2010, was monitoring data for potential well control events.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

66. Admit that BP did not advise HESI of any observed data anomalies after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request because the phrase "data anomalies" is vague, ambiguous, and undefined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Halliburton mud loggers were provided with real time data on the well.  The Transocean rig crew was also primarily responsible for kick

detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that they did not inform HESI of any data anomalies during the time period in question.

67.    Admit that BP was responsible for calibrating the sensors on the Deepwater Horizon that supplied data to the HESI mud loggers.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide expert maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making.

68.    Admit that BP was responsible for maintaining the sensors on the Deepwater Horizon that supplied data to the HESI mud loggers.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide expert maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making.

69.    Admit that BP determined the location of the sensors installed on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The BP Parties deny determining the location of the sensors installed on the *Deepwater Horizon*.  As testified by John Gisclair, the Sperry sensor placement was determined by the Sperry personnel who installed it and the Transocean rig crew.

70.    Admit that prior to April 20, 2010, BP instructed HESI not to utilize data from the Transocean flow-out sensor on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  There was no indication that the Sperry-Sun mud loggers were not capable of doing so and there was no indication, obligation or responsibility for BP to request additional mud loggers to provide the services contractually agreed upon by HESI and the BP Parties.  The BP Parties deny instructing HESI to not utilize data from the Transocean flow-out sensor on the *Deepwater Horizon* as confirmed by the testimony of Kelly Gray.

71.    Admit that simultaneous actions taken by the drilling crew on April 20, 2010, masked flow conditions.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the terms "simultaneous actions," "drilling crew," "masked," and "flow conditions."

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Based on the information and data available for review following the Incident, there

was ample data to identify the signs of a kick prior to the blowout and explosion on the *Deepwater Horizon* on April 20, 2010.

72.     Admit that BP was responsible for the rig activities conducted on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the terms "responsible" and "rig activities."

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties engaged the services of Transocean, Halliburton, MI-Swaco, and other contractors to conduct various activities and operations at the well, and these parties were engaged in activities at the well on April 20, 2010.

73.     Admit that the movement of mud through the pits on the Deepwater Horizon on April 20, 2010, made it difficult for the HESI mud logger to discern any pit volume changes.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the term "difficult" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

74.     Admit that after 21:08 hours on April 20, 2010, there was no flow from the well to the pits on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is vague and ambiguous. Subject to their general objections, the BP Parties respond as follows: The BP Parties admit that after 21:08 hours on April 20, 2010, the flow was diverted overboard and there was no flow into the pits on the *Deepwater Horizon*.

75.     Admit that BP directed the movement of mud through the pits on the Deepwater Horizon on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the term "directed" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  It was not BP's responsibility to direct the movement of mud through the pits on the *Deepwater Horizon*.   The Transocean rig crew, along with M-I Swaco mud personnel, was responsible for directing the movement of mud on the *Deepwater Horizon*.

76.     Admit that BP directed that returns from the well be routed overboard after 21:08 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that the term "directed" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the well plan specified discharge of spacer material overboard if the spacer fluid passed the sheen test.  As stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, the rig crew opened the overboard dump valve on the flow line at

approximately 21:10 hours in preparation for discharging the spacer, and the sheen test began at the same time.  The BP Parties deny the remainder of this request.

      77.    Admit that drill pipe pressure is not a reliable kick indicator.

**RESPONSE:**

    The BP Parties object to this request on the grounds that Halliburton's use of the phrase "reliable kick indicator" is vague, ambiguous and undefined.

    Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  As outlined in the Transocean Well Control Manual, there are multiple kick indicators that need to be monitored and analyzed by the rig crew and the mud loggers.

    78. Admit that once the rig pumps were engaged on the Deepwater Horizon at approximately 21:16 hours on April 20, 2010, the HESI mud logger was unable to identify an increase in standpipe pressure as an indicator of an influx into the well.

**RESPONSE:**

    The BP Parties object to this request as vague and ambiguous to the extent that "engaged" is undefined.

    Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide continuous monitoring of the well.  The HESI mud loggers are required to identify and notify the Transocean rig crew and/or the BP well site leader of any safety concerns.  If the HESI mud loggers are not able to utilize all of their monitoring tools, they have other tools that allow for safe monitoring.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

79.     Admit that the rig activity occurring on the Deepwater Horizon after 17:00 hours on April 20, 2010, inhibited the HESI mud logger's ability to accurately monitor sensor data for indications of a kick.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "inhibited" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide continuous monitoring of the well.  The HESI mud loggers are required to identify and notify the Transocean rig crew and/or the BP well site leader of any safety concerns.  If the HESI mud loggers are not able to utilize all of their monitoring tools, they have other tools that allow for safe monitoring.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

80.     Admit that the rig activity occurring on the Deepwater Horizon after 17:00 hours on April 20, 2010, inhibited the HESI mud logger's ability to monitor drilling operation parameters.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "inhibited" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide continuous monitoring of the well.  The HESI mud loggers are required to identify and notify the Transocean rig crew and/or the BP well site leader of any safety concerns.  If the HESI mud loggers are not able to utilize all of their monitoring tools, they have other tools that allow for safe monitoring.  To the extent that the mud

41

loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

81.  Admit that BP determines the low threshold and high threshold parameters for triggering alarms set on critical variables for HESI's mud logging services.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "threshold parameters" and "critical variables" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  In carrying out their responsibility to continuously monitor the well, the Sperry-Sun mud loggers are responsible for setting their alarms at appropriate thresholds.  Further as Mr. Gray and Mr. Gisclair both testified, the mud loggers set their alarm levels.

82.  Admit that BP determined which low threshold and high threshold parameters for triggering alarms were set on critical variables monitored by HESI's mud loggers on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "threshold parameters" and "critical variables" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  In carrying out their responsibility to continuously monitor the well, the Sperry-Sun mud loggers are responsible for setting their alarms at

appropriate thresholds.  Further as Mr. Gray and Mr. Gisclair both testified, the mud loggers set their alarm levels.

83.    Admit that BP instructed the HESI mud loggers which critical variables to monitor on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "critical variables" and "instructed" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  As set out in the BP/HESI Well Services Contract, HESI is required to provide a monitoring program that displays critical well data and trends.  The individual HESI mud loggers are required to set up their monitoring program, determining which data to display, as well as set appropriate alarms, depending on rig activities, as testified by Kelly Gray.

84.    Admit that BP well site leaders on the Deepwater Horizon had display terminals in their office displaying the data monitored by HESI's mud loggers.

**RESPONSE:**

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties admit that they had access to HESI data through INSITE Anywhere on April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

43

85.     Admit that BP determined the mud logging activities that were to take precedence during each type of operational activity on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "precedence" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  As set out in the BP/HESI Well Services Contract, HESI is required to provide a monitoring program that displays critical well data and trends.  The individual HESI mud loggers are required to set up their monitoring program, determining which data to display, as well as set appropriate alarms, depending on rig activities, as testified by Kelly Gray.

86.     Admit that BP is aware of a hydrocarbon sand in the Macondo Well named "M57B" or "M57_B" with a pore pressure of approximately 14.15 ppg.

**RESPONSE:**

The BP parties object to this request as vague and ambiguous to the extent that "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

87. Admit that a zone of hydrocarbon sand named "M57B" or "M57_B" exists in the Macondo Well at a depth of 17,451 feet to 17,453 feet.

**RESPONSE:**

The BP parties object to this request as vague and ambiguous to the extent that "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.


88.    Admit that "Figure 1" on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" ("Bly Report") does not reflect all of the hydrocarbon zones or sands currently known by BP to exist in the Macondo Well below the depth of 17,000 ft.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  Further, Figure 1 on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" states "Note:  Sands are based on geology known at the time of the accident" and is not intended to reflect all sands currently known, whether hydrocarbon-bearing or not.


89.    Admit that the hydrocarbon sand named "M57B" or "M57_B" is not reflected in "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons. Further, Figure 1 on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" states "Note: Sands are based on geology known at the time of the accident" and is not intended to reflect all sands currently known, whether hydrocarbon-bearing or not.

90.     Admit that BP identified the hydrocarbon sand named "M57B" or "M57_B" in the Macondo Well after April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

91.     Admit that BP knew about the presence of the hydrocarbon sand named "M57B" or "M57_B" in the Macondo Well before the September 8, 2010 release date of the Bly Report.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons. Further, Figure 1 on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" states "Note: Sands are based on geology known at the time of the accident" and is not intended to reflect all sands currently known, whether hydrocarbon-bearing or not.

92.     Admit that BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension* specifies, among other things, that top of cement (TOC) should be 1,000 feet above any distinct permeable zones.

**RESPONSE:**

Subject to their specific and general objections, the BP Parties respond as follows: the BP Parties admit that BP's Engineering Technical Practice (ETP) GP 10-60, titled Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension states:

> "Zonal Isolation design criteria for cementing of primary casing strings to meet well integrity and future abandonment requirements, shall meet one of the following:
>
>         • 30 mTVD (100 ft TVD) above the top of the distinct permeable zone where the top of cement (TOC) is to be determined by a proven cement evaluation technique (Section 5.3).
>
>         • 300 m MD (1000 ft MD) above the distinct permeable zone where the hydraulic isolation is not proven except by estimates of TOC (Section 5.3)."

The BP Parties deny the remainder of this request.

93.     Admit that, as of the time of the cement job on the final production casing, BP claims that the shallowest hydrocarbon sand of which it was aware was the 13.1 ppg sand at approximately 17,788 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "shallowest hydrocarbon sand" and "BP claims that" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Admitted to the extent that this request asks whether the shallowest hydrocarbon sand in the production interval of the Macondo Well was a 13.1 ppg sand at approximately 17,788 feet.  The BP Parties deny the remainder of this request.


94.     Admit that, since the time of the cement job on the final production casing, BP claims it has learned that the shallowest hydrocarbon sand was the 14.15 ppg sand at approximately 17,451 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "BP claims it has learned" and "hydrocarbon sand" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.


95. Admit that the cement program used at the Macondo Well was designed to place top of cement (TOC) at approximately 17,260 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "approximately 17,260 ft." is vague, ambiguous, and undefined.

48

Subject to their specific and general objections, the BP Parties respond as follows: The cement program for the production interval at the Macondo Well was designed to pump enough cement to place the top of cement at least 500 feet above the uppermost hydrocarbon bearing sand in compliance with applicable MMS regulations.  The BP Parties deny the remainder of this request.

96.    Admit that, had BP been aware of the 14.15 ppg sand at approximately 17,451 ft. prior to the cement job on the final production casing, that sand would have been considered the shallowest hydrocarbon sand in the production casing interval of the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "had BP been aware" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

97.    Admit that, had BP been aware of the 14.15 ppg sand at approximately 17,451 ft. prior to the cement job on the final production casing, government regulations would have required top of cement (TOC) to be no lower than 16,951 ft. (or 500 feet above 17,451 ft.).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "government regulations would have required" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

49

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned.

98.    Admit that, had top of cement (TOC) been at 16,951 ft., the annular cement would have been designed to cover the shoe located at 17,168 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "would have been designed" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned.  The BP Parties admit that if the top of cement were at 16,951' there would be cement above the shoe located at 17,168', but deny all other aspects of this request.

99.    Admit that, had annular cement been designed to cover the shoe located at 17,168 ft., BP's internal policies, practices or procedures would have required a re-evaluation of the production casing design used at the Macondo Well in order to mitigate against annular pressure build-up (APB).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "re-evaluation" and "would have been required" are vague, ambiguous, and undefined.  The BP Parties object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned and no further evaluation of the casing design used at the Macondo Well would have been required.

100.   Admit that, had annular cement been designed to cover the shoe located at 17,168 ft., BP's internal policies, practices or procedures would have required a change to the production casing design used at the Macondo Well in order to mitigate against annular pressure build-up (APB).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "would have been required" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks the BP Parties to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have

required a higher top of cement than what was planned and no change in the casing design used at the Macondo Well would have been required.

101.    Admit that, had annular cement been designed to cover the shoe located at 17,168 ft., a sealed annulus would have been created which would have increased the risk of casing collapse or burst due to annular pressure build-up (APB) during production.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "would have been required" is vague, ambiguous, and undefined.  The BP Parties object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned and no change in the casing design used at the Macondo Well would have been required.

102. Admit that BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension* specifies, among other things, that centralization should extend to 100 feet above any distinct permeable zones.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "centralization" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit this request to the extent it asks whether BP's Engineering Technical Practice

(ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension states: "In the event the cement isolation is not to be assessed by proven cement evaluation technique plan for at least 30 m (100 ft) of centralised pipe above the distinct permeable zone." The BP Parties deny the remainder of this request.

103. Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "12.6 ppg Sand: 18,202' – 18,223'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

104. Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "12.6 ppg Sand: 18,104' – 18,175'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

105.    Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "12.6 ppg Sand: 18,051' – 18,073'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension.*

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied.  BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

106.    Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "13.1 ppg Sand: 17,788' – 17,791'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension.*

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

54

Subject to their general and specific objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

107.    Admit that the sand zone reflected in "Figure 1" on page 54 of the Bly Report as "14.1 ppg Sand: 17,684' – 17,693' (brine)" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

108.    Admit that the hydrocarbon sand/zone named "M57B," as reflected on BP-HZN-BLY00173436, constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

109.    Admit that the hydrocarbon zones above the "main hydrocarbon zones" (as that term is used in the sentence quoted in Request for Admission 142) in the Macondo Well were capable of initiating flow into the wellbore.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as there are no sentences quoted in Request for Admission 142 (which is about a different subject) and the term "main hydrocarbon zones" is unclear.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties will supplement this response once Halliburton clarifies which "main hydrocarbon zone" it is referencing.

110.    Admit that the 13.1 ppg sand in the Macondo Well is named or known as "M56A" or "M56_A."

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the extent that it references a single 13.1 ppg sand in the Macondo Well without identifying any depth or additional information.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that there is a sand interval identified as "M56A" or "M56_A" with an estimated pore pressure of 13.1 ppg.

111.    Admit that "the M56A sand" referenced on page 215 of the Bly Report, Appendix G, is the sand depicted and identified as the "13.1 ppg Sand: 17,788' – 17,791'" on "Figure 1" of page 54 of the Bly Report.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that "depicted" and "identified" are vague and ambiguous.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit that the 13.1 ppg sand at the 17,788' - 17,791' on Figure 1 of page 54 of the Bly Report appears to be the same sand labeled as M56A on page 215 of the Bly Report.

112.    Admit that BP's claim that the initial flow of hydrocarbons came from the 13.1 ppg sand.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that the phrase "initial flow" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   The BP Parties refer to, *inter alia*, their September 8, 2010 *Deepwater Horizon* Accident Investigation Report and Appendices.

113.    Admit that BP also claims that once initial flow of hydrocarbons came from the 13.1 ppg sand, the influxing hydrocarbons lightened the hydrostatic column causing the 12.6 ppg sands to begin to flow on the Macondo Well.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that it assumes the BP Parties admit the initial flow of hydrocarbons came from the 13.1 ppg sand.  In addition, the BP Parties object to this request as vague and ambiguous as to the phrase "initial flow" and "influxing hydrocarbons lightened the hydrostatic column."

57

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties refer Halliburton to their response to Request for Admission No. 112.

114. Admit that Appendix G to Bly Report's conclusion that "[t]he 1,400 psi drill pipe pressure observed during the negative-pressure test best matched communication with the M56A sand . . ." reflects BP's position that the initial flow of hydrocarbons came from the 13.1 ppg sand.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "initial flow" is vague and ambiguous.  In addition, the BP Parties object to this request on the grounds that it assumes the BP Parties admit that the initial flow of hydrocarbons came from the 13.1 ppg sand.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties refer Halliburton to their response to Request for Admission No. 112.

115.    Admit that the 13.1 ppg sand in the Macondo Well from which BP believes flow initiated is above the "main hydrocarbon zones" (as that term is used in the sentence quoted in Request for Admission 142).

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "flow initiated" is vague and ambiguous.  The BP Parties also object to this request on the grounds that it assumes the BP Parties admit the initial flow of hydrocarbons came from the 13.1 ppg sand.  In addition, the BP Parties object to this request as vague and ambiguous as to the phrase "main hydrocarbon zones."  Further, the request referenced to provide a definition for that phrase does not include the phrase at issue.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that Figure 1 on page 54 of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report labels the 12.6 ppg sands as the "Primary Reservoir Sands."  The BP Parties

further refers Halliburton to their response to Request for Admission No. 112.  The BP Parties

deny the remainder of this request.

116.    Admit that BP designed the casing for the Macondo Well such that the bottom of
the casing was only 55 feet beneath the lowest hydrocarbon zone.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "lowest

hydrocarbon zone" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied.

The casing shoe was designed to be set at 18,310' and the bottom of the lowest hydrocarbon

zone is more than 55 feet above 18,310' at 18,223'.

117.    Admit that, other than modeling whether particular production casing designs
could be successfully cemented, HESI had no input into the production casing design used by BP
for the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular

casing designs could be successfully cemented" and "input" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied.

HESI personnel were involved in various aspects of the production casing selection process and

provided input into those decisions.

118.    Admit that, other than modeling whether particular production casing designs
could be successfully cemented, BP never requested that HESI review and/or evaluate the
adequacy of the production casing design used by BP at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "adequacy" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. While HESI involvement did not cover all engineering aspects, such as the work conducted by BP's EPT group or BP's engineers, HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well.

119.    Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate whether the production casing design used by BP at the Macondo Well was defective.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "defective" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. While HESI involvement did not cover all engineering aspects, such as the work conducted by BP's EPT group or BP's engineers, HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well.

120.    Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate whether the production casing design used by BP at the Macondo Well was dangerous.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "dangerous" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. While HESI involvement did not cover all engineering aspects, such as the work conducted by BP's EPT group or BP's engineers, HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well.

121.    Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate whether the production casing design used by BP at the Macondo Well should be changed.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "changed" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well, including discussions whether a production long string or another option should be included.

122.    Admit that BP was ultimately responsible for determining, prior to the cement job on the final production casing at the Macondo Well, whether the float collar converted on April 19, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent that "ultimately responsible" is vague and ambiguous.  There were a number of entities involved in determining that the float collar converted on the Macondo Well, including Halliburton, Transocean, Weatherford and BP personnel.  BP sought and relied upon input from the appropriate resources and after discussion, the BP personnel determined that the float collar converted.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that BP personnel determined that the float collar converted on April 19, 2010.

123.   Admit that HESI had no active involvement in the operation to convert the float collar in the Macondo Well on April 19, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent "active involvement" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The operation to convert the float collar relies, in part, upon data collected by the Halliburton cementing unit.

124.   Admit that, on April 19, 2010, HESI had no ability to independently determine whether the float collar in the Macondo Well actually converted during operations to convert the float collar.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "independently determine" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Halliburton had access to data and information from the rig sufficient to analyze the float collar operation.

125.    Admit that the float collar equipment used in the final production casing at the Macondo Well was designed to convert at a flow rate greater than 4 bpm.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that it fails to identify sufficient criteria for BP to respond to this request.  Float collar conversion is dependent on numerous factors, including mud weight used during the float collar operation.  Additionally float collars are designed to convert based on pressure differential.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that at the drilling mud weight density used in the Macondo Well, Weatherford's float collar is designed to convert at a pressure differential of 500 to 700 psi, which likely to occur with a flow rate that is greater than 4 bpm.

126.    Admit that, prior to April 20, 2010, BP never informed HESI of the flow rate at which the float collar equipment in the Macondo Well was designed to convert.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "informed" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. Halliburton was involved in the well operations and was aware of the float collar equipment in the Macondo Well.

127.    Admit that BP cannot conclusively determine that the float collar in the Macondo Well actually converted on April 19, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "conclusively determined" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. All information available to the BP Parties at this time indicates that the float collar in the Macondo Well converted on April 19, 2010.

128.    Admit that BP decided not to use the number of centralizers recommended by HESI in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as Halliburton made multiple recommendations regarding the number of centralizers to be used in the Macondo Well.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit that six centralizers were utilized in the Macondo Well, and that Halliburton did not recommend the use of six centralizers in writing, but that Halliburton was aware of the number of centralizers being utilized before pumping the cement job it designed.

129.    Admit that BP knew that the fifteen centralizers delivered to the Deepwater Horizon were not installed on the production casing.

**RESPONSE:**

The BP Parties object to this request to the extent that it is vague and ambiguous to the extent that it does not reference any time period or even the Macondo Well.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit that the production casing was run with six centralizers on the Macondo Well.

130. Admit that BP authorized execution of the cement job on the production interval of the Macondo Well, knowing that the fifteen centralizers delivered to the Deepwater Horizon were not installed on the production casing.

**<u>RESPONSE:</u>**

Subject to their general objections, the BP Parties state as follows:  The BP Parties admit that they authorized the execution of the cement job designed and recommended by Halliburton.

131.   Admit that the fifteen centralizers delivered to the Deepwater Horizon were the precise centralizers BP ordered.

**<u>RESPONSE:</u>**

The BP Parties object to this request to the extent "precise centralizers BP ordered" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit this request to the extent it asks whether fifteen centralizers were delivered to the *Deepwater Horizon* after BP placed an order.  The BP Parties deny the remainder of this request.

132.   Admit that the fifteen centralizers delivered to the Deepwater Horizon could have been installed on the production casing before it was installed in the Macondo Well.

**<u>RESPONSE:</u>**

The BP Parties object to this request to the extent that "could have been installed" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that it would have been possible to install additional centralizers on the production casing before it was installed in the Macondo Well.

133.   Admit that BP's decision to not run the centralizers available to it was, in part, due to the failure of John Guide to properly asses the utility of the centralizers.

**RESPONSE:**

The BP Parties object to this request to the extent "properly assess the utility of the centralizers" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.

134.    Admit that HESI warned BP not to use only six (6) centralizers.

**RESPONSE:**

The BP Parties object to this request to the extent "warned" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Halliburton was aware of the number of centralizers being utilized before pumping the cement job it designed and proceeded with the operation.

135.    Admit that BP had final decision-making authority with regard to the centralizers in the Macondo Well, including the authority to override HESI's advice to use more than six (6) centralizers.

**RESPONSE:**

The BP Parties object to this request to the extent it is vague and ambiguous regarding "HESI's advice to use more than six centralizers."

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that they made the decision on the number of centralizers to use in the Macondo Well.  The BP Parties deny the remainder of this request because any party can stop the job if it believes there are unsafe conditions.

136.    Admit that BP never responded to Jesse Gagliano's request for confirmation [*See* BPHZN-MBI 00128489-BP-HZN-MBI 00128490] of the number of centralizers BP decided to utilize with final production casing in the Macondo Well.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows:  After a reasonable

inquiry, the BP Parties are unable to either admit or deny this request.  The BP Parties further

respond that BP had informed Nathaniel Chaisson of the decision to run six centralizers on April

16, 2010 – before Mr. Gagliano's request.

137.    Admit that, in preparation for the cement job on the final production casing, BP
did not place any centralizers across the hydrocarbon sand identified and/or depicted as "13.1
ppg Sand: 17,788' – 17,791'" on "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request to the extent that "across the hydrocarbon sand" is

vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The

BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg

Sand on Page 54 of the Bly Report and admits that the centralizer located there would

appropriately centralizer the pipe across the 3' sand interval.  The BP Parties deny the remainder

of this request.

138.    Admit that, in preparation for the cement job on the final production casing, BP
did not place any centralizers above the hydrocarbon sand identified and/or depicted as "13.1
ppg Sand: 17,788' – 17,791'" on "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request to the extent that "across the hydrocarbon sand" is

vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The

BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg

Sand on Page 54 of the Bly Report and that the centralizer located there would appropriately

centralizer the pipe across the 3' sand interval.   The BP Parties deny the remainder of this request.

139.    Admit that, in preparation for the cement job on the final production casing, BP placed the highest centralizer below the hydrocarbon sand identified and/or depicted as "13.1 ppg Sand: 17,788' – 17,791'" on "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows:  The BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg Sand on Page 54 of the Bly Report and that the centralizer located there would appropriately centralizer the pipe across the 3' sand interval.  The BP Parties deny the remainder of this request.

140.    With respect to the following sentence on page 35 of the Bly Report—"Although the decision not to use 21 centralizers increased the possibility of channeling above the main hydrocarbon zones, the decision likely did not contribute to the cement's failure to isolate the main hydrocarbon zones or to the failure of the shoe track cement."—admit that the phrase "main hydrocarbon zones" refers to the three 12.6 ppg sands depicted and identified as "Primary Reservoir Sands" in "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

Subject to their general objections the BP Parties respond as follows:  The BP Parties admit that the main hydrocarbon sands phrase utilized in the Bly Report relates to the three 12.6 ppg sands depicted and identified as Primary Reservoir Sands in Figure 1 on page 54.

141.    Admit that no centralizers were placed across or above the 13.1 ppg sand in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request to the extent "across" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg

Sand on Page 54 of the Bly Report and that the centralizer located there would appropriately centralizer the pipe across the 3' sand interval.   The BP Parties deny the remainder of this request.

142.    Admit that channeling and poor mud erodibility should be expected across the 13.1 ppg sand in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the terms "channeling" and "should be expected" and the phrase "poor mud erodibility" are vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request, including any particular operation implication of the use of the term "channeling" and the phrases "should be expected" and "poor mud erodibility," as HESI has not sufficiently explained what it means by their use of these terms and phrase in the context of this request.  The BP Parties further deny this request because, having conducted a reasonable inquiry, the BP Parties have no indication that channeling and poor mud erodibility should be expected across the 13.1 ppg sand in the Macondo Well.

143.    Admit that BP conducted modeling that shows that the top two centralizers run in the production interval of the Macondo Well provided 65% and 40% standoff, respectively.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "BP conducted modeling" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties did not conduct any modeling of the cement job before April 20, 2010.  Halliburton conducted certain modeling before April 20, 2010.

69

144.   Admit that BP conducted modeling that shows that channeling and poor mud erodibility would be expected across the interval where the top two centralizers were placed in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "BP conducted modeling" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties did not conduct any modeling of the cement job before April 20, 2010. Halliburton conducted certain modeling before April 20, 2010.

145.   Admit that BP would expect channeling across the intervals above the highest centralizer on the production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "across the intervals above the highest centralizer on the production casing" is undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks the BP Parties to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that as you move further above a centralizer, the potential for channeling can increase.

146.   Admit that BP would expect poor mud erodibility across the intervals above the highest centralizer on the production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "across the intervals above the highest centralizer on the production casing" is undefined.   The BP

Parties further object to this request on the grounds that it is ambiguous and confusing, and asks the BP Parties to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that as you move further above a centralizer, the potential for poor mud erodibility can increase.

147. Admit HESI was not responsible for and/or had no duty to analyze the entire temporary abandonment procedure at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "responsible for and/or had no duty to analyze" and "entire temporary abandonment procedure" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton was not responsible for analyzing the portions of the

temporary abandonment procedure for the Macondo Well that did not rely on the validity of the cement that Halliburton was responsible for designing, testing, recommending and pumping.

148.    Admit that BP instructed HESI to perform the cement job despite BP's knowledge that the float collar in the Macondo Well did not perform as expected during attempts to convert it.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "knowledge" and "did not perform as expected" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties state that the consensus opinion on the Deepwater Horizon on April 19, 2010 was that the attempts to convert the float collar were successful.  Post-incident testing has confirmed that the float collar likely converted.

149.    Admit that BP instructed HESI to perform the cement job despite approximately nine attempts to convert the float collar in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "instructed" and "despite approximately nine attempts" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in

the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  BP allowed Halliburton to pump the cement job on April 19, 2010 after the nine attempts to establish circulation and after conversion of the float collar.

150.   Admit that BP was ultimately responsible for determining when to conduct the cement job on the final production casing at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "ultimately responsible" and "determining when to conduct" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  Based on the foregoing, BP allowed Halliburton to pump the cement job after conversion of the float collar and after the circulation specified in Halliburton's cement

procedure.   The cement job is typically pumped after the float collar is converted and after circulation.

151.   Admit that HESI could not commence the cement job on the final production casing on April 19, 2010 without BP's authorization.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "authorization" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows:  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  The BP Parties admit that BP allowed Halliburton to pump the cement job without the information that Halliburton did not provide to BP.  Halliburton could not have pumped with cement job without BP's approval but Halliburton would not have received that approval absent its failures and conduct.  The BP Parties deny the remainder of this request.

152.   Admit that BP authorized HESI to commence the cement job on the final production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "authorized" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  The BP Parties admit that BP allowed Halliburton to pump the cement job without the information that Halliburton did not provide to BP.  Halliburton could not have pumped with cement job without BP's approval but Halliburton would not have received that approval absent its failures and conduct.  The BP Parties deny the remainder of this request.

153.   Admit that HESI was not authorized to commence the cement job on the final production casing in the Macondo Well on April 19, 2010 without BP's approval.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "authorized" and "approval" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at

the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Halliburton did not receive valid authorization because BP allowed Halliburton to pump the cement job without the information that Halliburton did not provide to BP. Halliburton could not have pumped with cement job without BP's approval but Halliburton would not have received that approval absent its failures and conduct.

154.   Admit that BP expected the cement job on the final production casing in the Macondo Well to channel.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "channel" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP did not expect the cement job designed, tested, recommended and pumped by Halliburton at the Macondo Well to fail to contain the hydrocarbons in the formation.

155.   Admit that BP understood that, if the cement job on the final production casing in the Macondo Well channeled, such channeling could be remediated by conducting a cement squeeze job.

76

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "understood," "if the cement job on the final production casing in the Macondo Well channeled" and "such channeling could be remediated" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this requests is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows:  Denied.  BP did not expect the cement job designed, tested, recommended and pumped by Halliburton at the Macondo Well to fail to contain the hydrocarbons in the formation.

156.    Admit that, prior to the cement job on the final production on April 19, 2010, BP understood that if a cement job failed to isolate hydrocarbons as intended, the cement job could later be remediated by conducting a cement squeeze job.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "understood," "if a cement job failed to isolate hydrocarbons as intended" and "the cement job could later be remediated" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this requests is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows:  Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at

77

the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

157. Admit that BP's decision tree specified that a cement bond log would be run if full returns were not observed during execution of the cement job at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "BP's decision tree" and "would be run if full returns were not observed" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the

Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  The Macondo Production casing and TA Forward Planning Decision Tree used multiple criteria including losses while cementing to determine whether a cement bond log was appropriate.  Further, BP conferred with Halliburton and other contractors to determine whether a cement bond log should be performed.

158.   Admit that the perception of full returns during the cement job completed on April 20, 2010, was not a conclusive determination that the cement job isolated all hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "perception of full returns" and "conclusive determination" is vague, ambiguous, and undefined. The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical. The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to

proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

159.   Admit that the perception of full returns during the cement job completed on April 20, 2010, was not a conclusive determination that the slurry had reached its intended location.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "perception of full returns," "conclusive determination," and "intended location" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results

80

that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on top of cement when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

160.    Admit that the lift pressure observed during the cement job completed on April 20, 2010, was not a conclusive determination that the cement job isolated all hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "conclusive determination" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to

discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

161.    Admit that the lift pressure observed during the cement job completed on April 20, 2010, was not a conclusive determination that the slurry reached its intended location.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "conclusive determination" and "intended location" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at

the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on top of cement when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

162.    Admit that the perception of full returns and observations of lift pressure during the cement job completed on April 20, 2010, were not, in combination, a conclusive determination that the cement job isolated hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "perception of full returns," "observations of lift pressure," "conclusive determination" and "isolated hydrocarbon zones as intended" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this requests is premature.  The BP Parties will provide the opinions of their

experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

163.   Admit that the perception of full returns and observations of lift pressure during the cement job completed on April 20, 2010, were not, in combination, a conclusive determination that the slurry reached its intended location.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrases "perception of full returns," "observations of lift pressure," "conclusive determination" and "intended location" are

vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on top of cement when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

164.    Admit that, unless or until a cement bond log (CBL) or other cement evaluation tool is used, the top of cement (TOC) in the annulus can only be estimated.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "unless and until," "or other cement evaluation tool" and "can only be estimated" is vague, ambiguous, and undefined. The BP Parties further object to this request on the grounds that it is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. There are a variety of tools and techniques that provide reasonably accurate information on the top of cement besides a cement bond log.

165. Admit that, unless or until a cement bond log (CBL) or other cement evaluation tool is used, the location of cement at the conclusion of the cement job completed on April 20, 2010 can only be estimated.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "unless and until," "or other cement evaluation tool" and "location of cement" is vague, ambiguous, and undefined. The BP Parties further object to this request on the grounds that it is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. There are a variety of tools and techniques that provide reasonably accurate information on the top of cement.

166.    Admit that a cement bond log (CBL) or other cement evaluation tool was the only way to determine actual top of cement (TOC) after the cement job completed on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "or other cement evaluation tool" and "determine actual top of cement (TOC)" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There are a variety of tools and techniques that provide reasonably accurate information on the top of cement besides a cement bond log.

167.    Admit that a cement bond log (CBL) or other cement evaluation tool was the only way to conclusively determine whether the cement job completed on April 20, 2010 effectively isolated all hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "or other cement evaluation tool," "conclusively determine," and "effectively isolated all hydrocarbon zones as intended" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to

discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well.  A cement bond log can provide data relating to the bond between the cement and the casing and the formation.

168.    Admit that, prior to the completion of the cement job on April 20, 2010, BP hired a service contractor to be available to provide cement bond log (CBL) services after the completion of the cement job for the final production casing.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the

88

Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

169.    Admit that a cement bond log (CBL) service contractor was on the Deepwater Horizon during the cement job on the final production casing and was available to provide CBL services, if requested by BP after the completion of the cement job.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log

should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

170.    Admit that, on April 20, 2010, BP elected not to use the services of the cement bond log (CBL) service contractor available on the Deepwater Horizon to evaluate the cement job on the final production casing.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "elected not to use" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the

90

service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

171.    Admit that personnel of the cement bond log (CBL) service contractor that BP hired to be available to provide CBL services, left the rig on April 20, 2010, without providing such services.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.    Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.   Based on Halliburton's representations and conduct, BP released the service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

172.    Admit that BP never asked HESI before the cement job that was completed on April 20, 2010, whether BP should run a cement bond log (CBL).

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "never asked" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.   Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.   Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.   As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.   Further, based on testimony, Halliburton employees, including Nathaniel Chaisson and Vincent Tabler, were present at a meeting on the *Deepwater Horizon* rig when BP presented its decision tree indicating the plan to not run a CBL if certain cementing criteria were observed.   Fully aware of BP's decision tree and criteria, Halliburton never told BP that it should a run a CBL before the blowout on April 20, 2010.

173. Admit that BP never asked HESI after the cement job that was completed on April 20, 2010, whether BP should run a cement bond log (CBL).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "never asked" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure. And, at minimum, BP sought Halliburton's input on whether BP should run a cement bond log at the morning meeting of April 20, 2010. At no time did Halliburton indicate that a cement bond log should be run despite BP's efforts to seek its input.

174. Admit that BP did not request input from HESI as to whether a cement bond log (CBL) should be run after the cement job that was completed on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "did not request input" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure. And, at minimum, BP sought Halliburton's input on whether BP should run a cement bond log at the morning meeting of April 20, 2010. At no time did Halliburton indicate that a cement bond log should be run despite BP's efforts to seek its input.

175.   Admit that BP was responsible for determining whether a cement bond log (CBL) should be run after the cement job that was completed on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "determining whether a cement bond log (CBL) should be run" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the

Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure.  And, at minimum, BP sought Halliburton's input on whether BP should run a cement bond log at the morning meeting of April 20, 2010.  At no time did Halliburton indicate that a cement bond log should be run despite BP's efforts to seek its input.

176.    Admit that the foamed cement that HESI pumped into the Macondo Well on April 19 and 20, 2010 was engineered to BP's specifications.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "engineered to BP's specifications" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated

the Halliburton-recommended foam cement was unstable and misrepresented the results of the

laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the

Halliburton-recommended cement design and procedure and permitted Halliburton to proceed

with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct.  At

no point did BP specify that it wanted Halliburton to pump an unstable foam cement in the

production interval of the Macondo Well.


     177.    Admit that, prior to the April 19, 2010 cement job on the final production casing,
HESI was not contractually obligated to provide BP with a foam stability test on the slurry used.

**RESPONSE:**

     Subject to their general objections, the BP Parties respond as follows: Denied.  BP

contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.

Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the

ramifications of using various additives on the stability of the foamed cement that Halliburton

recommended.   Further, Halliburton concealed laboratory test results that indicated the

Halliburton-recommended foam cement was unstable and misrepresented the results of the

laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the

Halliburton-recommended cement design and procedure and permitted Halliburton to proceed

with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct.  The

contract further states:

     5.2 Cement and Spacer Sampling and Testing

The final results supplied to COMPANY prior to each job shall be available to COMPANY more than 24 hours before pumping cement and tests shall be completed using actual rig samples and not load out samples unless previously agreed with COMPANY.

178.    Admit that BP authorized commencement of the cement job on the final production casing in the Macondo Well without BP first seeing a foam stability test result on the slurry that was to be used.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "authorized commencement" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Further, Halliburton failed to perform a foam stability test on the slurry that it pumped at the Macondo Well on April 19-20, 2010.   Despite failing to run such a foam stability test, Halliburton did not identify any risks or concerns with proceeding without this test.  As such, BP relied on Halliburton, its cementing contractor, to pump a safe and competent cement job and authorized that work on April 19, 2010, and did not knowingly authorize Halliburton to pump an unstable foam cement job.

179.    Admit that, at the time the cement job on the final production casing in the Macondo Well was commenced, BP knew it was not in possession of a foam stability test result for the slurry that was to be used.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.    Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Further, Halliburton failed to perform a foam stability test on the slurry that it pumped at the Macondo Well on April 19-20, 2010.   Despite failing to run such a foam stability test, Halliburton did not identify any risks or concerns with proceeding without this test.  As such, BP relied on Halliburton, its cementing contractor, to pump a safe and competent cement job and authorized that work on April 19, 2010, and did not knowingly authorize Halliburton to pump an unstable foam cement job.

180.    Admit that BP informed HESI that the cement job was successfully executed.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.   BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.

Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Following the cement job, Halliburton informed BP that the cement job was successfully executed.

181.   Admit that BP was responsible for determining whether a cement bond log would be utilized for the Macondo Well production casing.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "responsible for determining" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As

such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log

should be run.  After Halliburton finished pumping the cement job on April 20, 2010, it informed

BP that the cement job was pumped successfully with no losses, plug bumping on time and lift

pressure.  Halliburton further made a presentation to BP and the other contractors that the cement

job was successfully executed.   At minimum, BP sought the input of Halliburton and other

contractors on whether a cement bond log should be run at the morning meeting of April 20,

2010.  At no time did Halliburton or other parties indicate that a cement bond log should be run

despite BP's efforts to seek its input.


182.    Admit that BP and no other entity had the final decision making authority with
regards to running a cement bond log on April 20, 2010, on the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase

"final decision making authority" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the

Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss

with BP the ramifications of using various additives on the stability of the foamed cement that

Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated

the Halliburton-recommended foam cement was unstable and misrepresented the results of the

laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the

Halliburton-recommended cement design and procedure and permitted Halliburton to proceed

with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As

such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure.  Halliburton further made a presentation to BP and the other contractors that the cement job was successfully executed.  At minimum, BP sought the input of Halliburton and other contractors on whether a cement bond log should be run at the morning meeting of April 20, 2010.  At no time did Halliburton or other parties indicate that a cement bond log should be run despite BP's efforts to seek its input.  Under the various HSSE policies, every contractor, including Halliburton, has the right and obligation for safety.  Any of the contractors had the authority to stop work if it believed that a cement bond log should be run.

183.    Admit that BP was responsible for determining whether bottoms-up circulation would be performed prior to the cement job in the production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "responsible for determining" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct. Before the cement job, BP discussed its circulation plans with Halliburton. Halliburton distributed its cementing procedure which included a circulation plan that did not include a bottoms up.

184.    Admit that the hydrocarbon flow may have come up the annulus of the Macondo Well through the hanger seal assembly.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "may have come up the annulus of the Macondo Well through the hanger seal assembly" is vague, ambiguous, and undefined. The BP Parties further object that this request is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The available evidence indicates that hydrocarbons did not come up the annulus of the Macondo Well or flow through the hanger seal assembly.

185.    Admit that the hydrocarbon flow may have entered the casing from the annulus at the 9 7/8" x 7" crossover.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "may have come up the annulus of the Macondo Well through the hanger seal assembly" is vague, ambiguous, and undefined. The BP Parties further object that this request is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of

Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The available evidence indicates that hydrocarbons did not come up the annulus of the Macondo Well or flow through the hanger seal assembly.

186.    Admit that BP was responsible for determining whether the negative test was successful.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the BP well site leaders participated, along with the Transocean rig crew, in a group decision regarding whether the negative test was successful.  The BP Parties deny the remainder of this request.

187.    Admit that BP did not inform HESI of any problems related to the negative test.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "problems related to the negative test" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties state that the available evidence indicates that no BP employees discussed the negative test with Halliburton.  However, the available evidence indicates that Halliburton's employees

were aware of the problems with the negative test and did not raise those concerns with BP or Transocean management.  The BP Parties deny the remainder of this request.

188.    Admit that BP did not exercise a "stop work" authority based on the negative test.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  As reported in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "[t]he rig crew began the test by monitoring the drill pipe using the method consistent with their regular practice on prior wells.  However, the MMS *Application for Permit to Modify* for the Macondo Well temporary abandonment stipulated that the test should be conducted by monitoring flow from the kill line.  The well site leader observed the discrepancy and stopped the test.  After discussion between the well site leader and the rig crew, the test was resumed by closing the drill pipe and lining up on the kill line (i.e., creating a flow path from the kill line to the cement unit)."

189.    Admit that BP recognized the existence of pressure anomalies during the negative test on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.  The BP Parties further object to this Request because the phrase "pressure anomalies" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit, as stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, that the "[t]he rig crew observed the 1,400 psi pressure on the drill pipe with no flow exiting the kill line. . . .  The rig crew discussed this 1,400 psi pressure abnormality. Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'  The toolpusher and driller reportedly stated that they had observed this phenomenon before.  After discussing this concept, the rig crew and the well site leader concluded that the explanation was plausible."  The BP Parties deny the remainder of this request.

190.    Admit that BP recognized a disparity in standpipe and annulus pressure during the negative test on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.  The BP Parties further object to this request because the phrase "standpipe and annulus pressure" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  As stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "[t]he rig crew observed the 1,400 psi pressure on the drill pipe with no flow exiting the kill line. . . .  The rig crew discussed this 1,400 psi pressure abnormality.  Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'  The toolpusher and driller reportedly stated that they had observed this phenomenon before.  After discussing this concept, the rig

crew and the well site leader concluded that the explanation was plausible." The BP Parties deny the remainder of this request.

191.  Admit that BP determined that the negative test was successful based on a "bladder effect."

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit, as reported in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, that "[t]he rig crew and the well site leaders . . . [reached] the incorrect view that the negative-pressure test was successful and that well integrity had been established. As further stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "the rig crew and well site leaders interpreted no flow coming from the open kill line as a demonstration of well integrity."  The BP Parties deny the remainder of this request.

192.  Admit that in the service contract between BP and HESI, BP agreed to "indemnify, release, defend and hold harmless" HESI for any "blowout, fire, explosion, cratering or any uncontrolled well condition."

**RESPONSE:**

Subject to their specific and general objections, the BP Parties respond as follows:  The Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production Inc. and Halliburton Energy Services, Inc. states in relevant part:

19.6 Other COMPANY Responsibilities

106

Subject to Clauses 19.1 and 19.4(b), but notwithstanding anything contained elsewhere in the CONTRACT to the contrary, COMPANY shall save, indemnify, release, defend and hold harmless CONTRACTOR GROUP against all claims, losses, damages, costs (including legal costs) expenses and liabilities resulting from:

(a) loss or damage to any well or hole (including the cost to re-drill);

(b) blowout, fire, explosion, cratering, or any uncontrolled well condition (including the costs to control a wild well and the removal of debris);

(c) damage to any reservoir, aquifer, geological formation or underground strata or the loss of oil or gas therefrom;

(d) the use of radioactive sources in relation to the WORK or any contamination resulting therefrom (including retrieval and/or containment, clean up and /or containment of contamination from naturally occurring radioactive materials).

The contract further provides limitations on that indemnity:


19.7 Indemnities in their Entirety

All exclusions, releases of liabilities and indemnities given under this Clause (save for those under Clauses 19.3(a) and 19.3(b)) and Clause 21 shall apply irrespective of cause and notwithstanding the negligence or breach of duty (whether statutory or otherwise) of the indemnified PARTY or any other entity or party and shall apply whether or not the claim, liability, damage, or expense in question is:

(a) predicated on sole, joint or concurrent fault, negligence (whether active, passive or gross), strict liability, statutory duty, contractual indemnity or otherwise at law, or

(b) sought directly or indirectly by way of recovery, indemnification, or contribution by any person or entity against COMPANY GROUP, SERVICE COMPANY GROUP, or CONTRACTOR GROUP as the case may be.

The BP Parties deny the remainder of this request.

## <u>GENERAL OBJECTIONS</u>

The BP Parties assert the following objections to each and every one of Halliburton's requests or admission, including any definitions or instructions associated therewith (collectively, "Halliburton's Discovery Requests"). These general objections are incorporated by reference into each specific response set forth by the BP Parties and are neither waived nor limited by any specific responses.

1.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the proceeding set to commence in February, 2012 prior to the substantial completion of the BP Parties' efforts to identify and produce documents in response to other requests of Halliburton and other parties to the litigation.

2.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

3.      The BP Parties object to Halliburton's Discovery Requests to the extent they prematurely seek expert discovery. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

4.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.

5.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at

trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of the BP Parties and any opposing parties to resolve their disputes in a fair and efficient manner.

6.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information or documents not within the BP Parties' possession, custody, or control.  All responses are made on behalf of the BP Parties only, are limited to information and documents within the BP Parties' possession, custody, or control.

7.      The BP Parties object to Halliburton's Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

8.      The BP Parties object to Halliburton's Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

9.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

10.     The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

11.     The BP Parties object to Halliburton's "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  The BP Parties further object to, and will read and respond to, Halliburton's "Definitions" (labeled to correspond to Halliburton's list) as follows:

(a)     Halliburton's definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

(b)     Halliburton's definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

(c)     Halliburton's definition of "Incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

(d)     Halliburton's definition of "oil spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

(e)     Halliburton's definition of "Deepwater Horizon Blowout Preventer" is vague and overbroad; it includes any equipment used to control any well.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

(f)     Halliburton's definition of "clean up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

(g)     Halliburton's definition of "relevant time period" is overbroad; by extending the definition to "the current date," many of Halliburton's requests, which by their context clearly seek information from the time prior to and including the incident, confusingly

seek unrelated information generated after the incident and ignores that it is impossible for the BP Parties to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to Halliburton.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means January 1, 2008 through April 20, 2010, unless:  (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2008 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through November 8, 2010.  In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above.  Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by the BP Parties.

(h)     Halliburton's definitions of "Defendant," "you," "your," "your company," and "Transocean" are extremely vague, overbroad, and nonsensical given these requests were served on the BP Parties and not Transocean, assuming Halliburton meant to substitute BP for Transocean, the term  includes a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.  The BP Parties will read and respond to Halliburton's requests with the

understanding that the terms you," "your," and "BP" means one or more of the BP Parties, as appropriate.

(i, j, k, l, m)   Halliburton's definitions of "Anadarko," "Cameron," "MOEX," "BP," and "HESI" are similarly vague, overbroad, and confusing.  The BP Parties will read and respond to Halliburton's requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(n)      Halliburton's definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "person" means a person.

(o)      Halliburton's definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "employee" means an employee.

(p)      Halliburton's definition of "Investigation Team" is unobjectionable.

(q)      Halliburton's definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(r)      Halliburton's definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.  The BP Parties will read and respond to

Halliburton's requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(s)     Halliburton's definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved." The BP Parties will read and respond to Halliburton's requests with the understanding that the term "statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(t)     Halliburton's definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "meeting" refers to a gathering of two or more people.  It does not include electronic communications unless specified.

(u)     Halliburton's definition of "document" and "documents" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A). The BP Parties will read and respond to Halliburton's requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(v)     Halliburton's definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(w)   Halliburton's definitions of "relating to," "related to," "referring to," regarding," "concerning," and "with respect to," are vague and overbroad; they render these and innumerable other words void of any independent meaning.   The BP Parties will read and respond to Halliburton's requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(x)   Halliburton's definitions of "and" and "or" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "and" means and, and the term "or" means or.

(y)   Halliburton's definition of "all" and "any" are vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of Halliburton's requests into nonsensical requests for duplicative information.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "all" means all and the term "any" means any.

(z)   Halliburton's definition of "including" is unobjectionable.

(aa)   Halliburton's definition of "Kick" is unobjectionable.

(bb)   Halliburton's definition of "Blowout" is unobjectionable.

(cc)   Halliburton's definitions of "each" and "every" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "each" means each and the term "every" means every.

(dd)    Halliburton's instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(ee)    Halliburton's instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(ff)    Halliburton's instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(gg)    Halliburton's instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined under instructions to set aside standard English usage.

12.    These responses are made without waiving, in any manner, the BP Parties' right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

13.    The BP Parties' decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or

116

the document requests themselves, should not be construed as: (a) a stipulation that the material is relevant or admissible, (b) a waiver of the BP Parties' general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

14.     The BP Parties reserve the right to modify, amend, or supplement their responses, which are made based on the current status of their knowledge, understanding, belief, and searches for documents. The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.


Dated:  August 1, 2011                           Respectfully submitted,


                                                 By:  /s/ J. Andrew Langan, P.C.

                                                 Richard C. Godfrey, P.C.
                                                 J. Andrew Langan, P.C.
                                                 Timothy A. Duffy, P.C.
                                                 Kirkland & Ellis LLP
                                                 300 North LaSalle Street
                                                 Chicago, IL 60654
                                                 Telephone: (312) 862-2000
                                                 Facsimile:  (312) 862-2200

                                                 and

                                                 Don K. Haycraft (Bar #14361)
                                                 R. Keith Jarrett (Bar #16984)
                                                 LISKOW & LEWIS
                                                 701 Poydras Street, Suite 5000
                                                 New Orleans, Louisiana 70139-5099
                                                 Telephone: (504) 581-7979
                                                 Facsimile:  (504) 556-4108

                                                 and

                                                 Robert C. "Mike" Brock
                                                 Covington & Burling LLP

1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 1st day of August, 2011.

<u>/s/   J. Andrew Langan, P.C.   </u>

**EXHIBIT 3**

LEXISNEXIS® FILE & SERVE
37510967
E-SERVICE
May 10 2011
5:44PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 |
| | | SECTION: J |
| This Document Relates To: All Actions | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| ……………………………………………... | : | |

**BP EXPLORATION & PRODUCTION INC.'S RESPONSES AND OBJECTIONS TO HALLIBURTON ENERGY SERVICES, INC.'S REQUESTS FOR PRODUCTION**

Defendant BP Exploration & Production Inc. ("BP"), by its undersigned Counsel, and, pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, hereby submits the following responses to Halliburton Energy Services, Inc.'s ("Halliburton") Requests for Production.

**SPECIFIC RESPONSES AND OBJECTIONS**

BP responds as follows to Halliburton's requests for production, subject to and without waiving its general objections, each and every one of which are specifically incorporated into each individual response below.[1]

**REQUEST FOR PRODUCTION NO. 1**

Please produce all documents predating the Incident related to BP's procedures and plans to contain, mitigate, remedy, or otherwise respond to a potential oil spill at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for oil-spill response plans and materials applicable to the Macondo Well submitted by BP to United States agencies, and will produce responsive documents identified as a result of that search.

---

[1] BP's general objections are set forth at pages 29-39.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 2**

Please produce all documents related to meeting(s) with rig members or other employees or persons regarding the drilling, completion, or temporary abandonment of the Macondo Well. This request includes all presentations or materials distributed at such meeting(s).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

BP objects to this request on the grounds that Halliburton's use of the terms "drilling" and "completion" are vague, ambiguous, and overbroad.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the planning of the temporary abandonment of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 3**

Please produce all documents related to bonuses or incentives to rig workers, employees, or other persons for the timely completion of the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

BP objects to this request on the grounds that Halliburton improperly characterizes "bonuses or incentives" to be tied solely to "the timely completion of the Macondo Well."

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to bonuses to rig workers and employees for their

2

performance while drilling the Macondo Well, and will produce responsive documents, if any, identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 4**

Please produce the original open hole electronic log measuring the formation lithology and reservoir data, including all paper logs, digital information, and approvals of well casing design for the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

BP objects to this request on the grounds that Halliburton's use of the terms "paper logs," "digital information," and "approvals" are vague and ambiguous.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents relating to the casing design of the Macondo Well, and will produce responsive documents, if any, identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 5**

Please produce all documents related to the pit-level indicator (or pit-volume-totalizer) electronic data measuring drilling fluid and cement pumped from the Deepwater Horizon at the Macondo Well.

3

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for data related to pit-volumes on April 19-20, 2010, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 6**

Please produce all documents related to all lost circulation zones at the Macondo Well. This Request includes identification of the lost circulation zones, as well as any evaluation and remedy of the lost circulation zones.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents sufficient to show lost circulation zones at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 7**

Please produce all documents related to the April 9, 2010, lost circulation event. Include within your response any analysis or change of procedure resulting from the event.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the April 9, 2010, lost circulation event at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 8**

Please produce all documents related to the kick that occurred in March 2010. Include within your response any analysis or change of procedure resulting from the event.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the kick that occurred in March 2010 at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 9**

Please produce all documents related to the engineering or placement of the casing at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

BP objects to this request on the grounds that Halliburton's use of the terms "engineering" and "placement" are vague, ambiguous, and overbroad.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents relating to the casing design of the Macondo Well, and will produce responsive documents, if any, identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 10**

Please produce all documents related to the annular space between the casing and the open hole at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the annular space between the casing and the open hole for the Macondo Well production interval, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 11**

Please produce all documents related to the characteristics of the geologic formations surrounding the casing and annular space at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the characteristics of the geologic formations

surrounding the casing and annular space for the Macondo Well production interval, and will

produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the

grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not

relevant to the claims or defenses of any party.


**REQUEST FOR PRODUCTION NO. 12**

Please produce all documents related to the comparative analysis and selection of long
string or liner casing at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-

privileged documents for documents related to the selection of long-string casing or liner for the

Macondo Well production interval, and will produce responsive documents identified as a result

of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the

grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not

relevant to the claims or defenses of any party.


**REQUEST FOR PRODUCTION NO. 13**

Please produce all documents related to your evaluation and/or comparative analyses of
any centralizer models considered for the Macondo Well, including the centralizers ultimately
used for the Macondo Well and those rejected for use at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-

privileged documents for documents related to the evaluation of centralizer models considered

for the production casing of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## REQUEST FOR PRODUCTION NO. 14

Please produce all documents related to third party evaluation and/or comparative analyses of any centralizer models considered for the Macondo Well. The documents need not be specifically about placement of the centralizers at the Macondo Well, but should be related to the characteristics and/or use of the type of centralizers considered for use at the Macondo Well.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for evaluations of bowspring and sub-centralizers used for the production interval of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## REQUEST FOR PRODUCTION NO. 15

Please produce the "as run" casing tally of the 7" x 9 7/8" production string at the Macondo Well, including the placement of all casing accessories, such as burst disks, float collar, float show or associated float valves.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for a casing tally of the 9-7/8" x 7" production string at the Macondo Well, and will produce responsive documents, if any, identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 16**

Please produce all documents related to the evaluations of risks of channeling and/or potential gas migration at the Macondo Well under the various engineering designs and/or models considered.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to channeling or potential gas migration in the cementing of the production interval, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 17**

Please produce all documents related to the use and characteristics of the float valve used at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the specifications of the float valve used in the production casing at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 18**

Please produce all documents related to the installation of the float valve at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the installation of the float valve in the production casing at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 19**

Please produce all documents related to the April 19, 2010, procedure in which mud was pumped down and circulated through the casing in preparation for cementing. Include both preparatory and planning documents, as well as any documents describing or evaluating the actual execution of this procedure.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the April 19, 2010 procedure in which mud was circulated before cementing, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 20**

Please produce all documents related to the conversion or attempted conversion of the float valve at the Macondo Well on or about April 19, 2010.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the conversion of the float valve at the Macondo Well on or about April 19, 2010, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 21**

Please provide all documents, including any notes, communications, etc., resulting from any examination of lab results provided by Jesse Gagliano to BP on or about March 8, 2010, including foam stability results.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the lab results provided by Jesse Gagliano to BP on our about March 8, 2010, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 22**

Please produce all documents related to the decision of BP to not perform any additional or different rate of circulation of mud through the production casing before cementing, including a full bottoms up.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

BP objects to this request on the grounds that Halliburton mischaracterizes the decision "to not perform any additional or different rate of circulation of mud before cementing, including a full bottoms up" as BP's.  The cementing program, including circulation, is designed in consultation with Halliburton and others.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the circulation of mud through the production casing, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 23**

Please produce all documents related to the analysis and/or decision of BP to direct cement to be pumped down the Macondo Well at the rate of four barrels or less per minute in the production casing.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

BP objects to this request on the grounds that Halliburton mischaracterizes the decision "to direct cement to be pumped down the Macondo Well at the rate of four barrels or less per minute in the production casing" as BP's.  The cementing program, including circulation, is designed in consultation with Halliburton and others.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the pump rate of cement for the production interval of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 24**

Please produce all documents related to BP's decision to limit the volume of cement to be placed in the Macondo Well. This should include any analysis and/or evaluation of the decision to have the annular column extend only approximately 500 feet above the uppermost hydrocarbon-bearing zone.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

BP objects to this request on the grounds that Halliburton mischaracterizes the decision "to limit the volume of cement to be placed in the Macondo Well" as BP's.  As part of the cement program, Halliburton recommended the cement volume.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the volume of, and top of, cement to be placed in the production interval of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 25**

Please produce all documents related to BP's initial and subsequent evaluation of the production casing cement job at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

BP objects to this request on the grounds that it is overbroad in that it potentially encompasses all analyses relating to the cement job post April 20, 2010.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to Halliburton's execution of the production casing cement job before the Incident, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 26**

Please produce all documents related to the planning and preparation for the temporary abandonment of the Macondo Well, including any changes to the initial plan sequence.

14

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for plans related to the temporary abandonment of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 27**

Please produce all documents related to the decision to replace mud below the mud line with seawater during the temporary abandonment procedure at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to replacing mud below the mud line with seawater during the temporary abandonment procedure at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 28**

Please produce all documents related to your analysis and/or decision regarding placement of the cement plug in the Macondo Well in preparation for temporary abandonment. Include documents related to the analysis and/or decision to place a cement plug, rather than non-cement bridge plugs or other alternatives, as well as the decision as to where within the Macondo Well the cement plug was to be placed.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the placement of the cement plug in the Macondo Well in preparation for temporary abandonment, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 29**

Please produce all documents related to the execution of the temporary abandonment procedure of the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the execution of the temporary abandonment procedure of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 30**

Please produce all documents related to the ability or failure of the annulus cement barrier to isolate hydrocarbons at the Macondo Well. This Request includes any documents related to the annulus cement barrier experiencing nitrogen breakout and migration.

16

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the failure of the cement pumped by Halliburton to isolate hydrocarbons at the production interval of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 31**

Please produce all documents related to any theory, finding, or conclusion related to the flow path of the hydrocarbons released from the Macondo Well, including any theory, finding, or conclusion that the hydrocarbon ingress was through the shoe track and up through the casing.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the failure of the cement pumped by Halliburton to isolate hydrocarbons at the production interval at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 32**

Please produce all documents related to the path of fluids through and exiting the riser at the Macondo Well. Also include documents related to all potential paths, such as through the mud gas separator system or the overboard diverter line, and communications related to decisions directing or failing to direct the fluids through any potential path.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the failure of the cement pumped by Halliburton to isolate hydrocarbons at the production interval at the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 33**

Please produce all documents related to the training of employees and/or the Deepwater Horizon rig crew with regard to responding to well control events, stop work authority, and/or emergency situations.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

BP objects to this request on the grounds that it is overbroad to the extent it calls for all training of all the *Deepwater Horizon* rig crew, without regard as to whether such crew members were employees of BP or present the day of the Incident.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the well control events, stop work authority, and emergency situations training of BP employees stationed on the *Deepwater Horizon* on the day of the Incident, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

18

**REQUEST FOR PRODUCTION NO. 34**

Please produce all documents related to attempts to maintain, inspect, test, activate and/or repair the Deepwater Horizon Blowout Preventer.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

BP objects to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks documents likely more readily available from other parties in this litigation such as Transocean. BP further interprets this request as seeking documents relating to activities occurring on or after April 20, 2010, and responds accordingly.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the any attempt to activate or repair the Deepwater Horizon Blowout Preventer on or after April 20, 2010, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 35**

Please produce all documents related to attempts to plan, design, create, and implement containment domes for use in controlling the Macondo Well and/or remedying or otherwise mitigating the impact of the Oil Spill.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

BP objects to this request on the grounds that Halliburton's use of the terms "implement," "remedying" and "mitigating the impact of the Oil Spill" are vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the use of cofferdams or top hats as a means to contain or collect

hydrocarbons from the Macondo Well on or after April 20, 2010, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 36**

Please produce all documents related to attempts to plan, design, create, and implement relief wells for use in controlling the Macondo Well and/or remedying or otherwise mitigating the impact of the Oil Spill. This Request includes the relief wells actually drilled, as well as potential courses or plans for wells considered by you but not actually drilled.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

BP objects to this request on the grounds that Halliburton's use of the terms "implement," "remedying" and "mitigating the impact of the Oil Spill" are vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the plans submitted to BOEMRE or relied upon by BP personnel for the drilling of relief wells as a means to kill the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 37**

Please produce all documents related to attempts to plan, design, create, and implement the "top kill" procedure for use in remedying or otherwise mitigating the impact of the Oil Spill.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

BP objects to this request on the grounds that Halliburton's use of the terms "implement," "remedying" and "mitigating the impact of the Oil Spill" are vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the use of the "top kill" procedure as a means to kill the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 38**

Please produce all documents related to attempts to plan, design, create, and implement the "junk shot" procedure for use in remedying or otherwise mitigating the impact of the Oil Spill.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

BP objects to this request on the grounds that Halliburton's use of the terms "implement," "remedying" and "mitigating the impact of the Oil Spill" are vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the use of "junk shot" on the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 39**

Please produce all documents related to attempts to plan, design, and implement procedures to capture oil from the Macondo Well after the incident.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

BP objects to this request on the grounds that Halliburton's use of the term "implement" is vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the collection of hydrocarbons through a riser insertion tube tool, the choke and/or kill lines, and free-standing riser systems, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 40**

Please produce all documents related to attempts to plan, design, create, and implement the "static kill" procedure for use in remedying or otherwise mitigating the impact of the Oil Spill.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

BP objects to this request on the grounds that Halliburton's use of the terms "implement," "remedying" and "mitigating the impact of the Oil Spill" are vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents related to the use of a "static kill" as a means to kill the Macondo Well, and produce will responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 41**

Please produce all documents related to the December 23, 2009 event in the North Sea involving the Transocean rig Sedco 711, in which gas entered the riser during completion operations. Include any communications, evaluations, memoranda, training materials, or any other documents referencing the December 23, 2009, event.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

In addition to its general objections, BP objects to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks documents likely more readily available from other parties in this litigation such as Transocean, the company who owned the rig Sedco 711.

**REQUEST FOR PRODUCTION NO. 42**

Please provide any documents related to disagreement with or dissent from statements contained in the September 8, 2010 Deepwater Horizon Accident Investigation Report. This Request includes documents authored by members of the Investigation Team, as well as those from other persons, whether prior to the publication of the Report or after the publication. This Request also includes any response by members of the Investigation Team or employees of BP to such disagreement or dissent.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

In addition to its general objections, BP objects to this request on the grounds that Halliburton implies BP has "[disagreed]" or "[dissented] from" statements contained in the September 8, 2010 Deepwater Horizon Accident Investigation Report, that this report has been the subject of a number of prior requests and document productions, including custodial searches and productions, which makes this request duplicative, cumulative, and argumentative.  BP also

23

objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 43**

If not previously covered, please produce all rig personnel computer activities for the Deepwater Horizon from April 16, 2010, to April 21, 2010.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

In addition to its general objections, BP objects to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks documents likely more readily available from other parties in this litigation such as Transocean as owner and operator of the *Deepwater Horizon.*  BP also objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 44**

Please produce all mud reports for the Macondo Well, including but not limited to, all Fann 70 reports.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 44:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for mud reports for the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 45**

Please produce all software settings and inputs for any OptiCem or similar reports run by you or on your behalf involving the Macondo Well.

24

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

BP objects to this request on the grounds that the phrase "run by you or on your behalf" is vague and ambiguous.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for software settings and inputs for OptiCem simulations, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 46**

Please produce BP recommendations, policies or procedures related to best practices and the mitigation of annular pressure buildup or annular fluid expansion.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

BP objects to this request on the grounds that Halliburton's use of the terms "recommendations," "policies," "procedures," "best practices," "annular pressure buildup," and "annular fluid expansion" are vague and ambiguous.  BP additionally objects that this request is overbroad insofar as it calls for the production of all recommendations, policies, or procedures relating to "annular pressure buildup" or "annular fluid expansion" without regard as to whether such recommendations, policies, or procedures are related to the Macondo Well.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents relating to the casing design of the Macondo Well and will produce responsive documents, if any, identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## REQUEST FOR PRODUCTION NO. 47

Please produce all ranging data and logs for the relief wells associated with the Macondo Well.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 47:

BP objects to this request on the grounds that Halliburton's use of the term "ranging data and logs" is vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents sufficient to show the results of the ranging runs conducted as part of the relief well operations, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## REQUEST FOR PRODUCTION NO. 48

Please produce all notes and documents taken from workers, employees or persons related to the relief wells associated with the Macondo Well.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 48:

BP objects to this request on the grounds that it is unreasonable and unduly burdensome to the extent it can be read to request all documents that were generated by any person who had any minimal contact with the relief wells, whether relevant or not.  BP further objects to the extent that this request calls for documents in the possession of the United States Coast Guard.

26

Subject to its specific and general objections, BP will respond to this request subject to further discussion with Halliburton regarding a reasonable set of custodians and more defined search parameters.

**REQUEST FOR PRODUCTION NO. 49**

Please produce all documents related to communications between BP and Halliburton regarding the Macondo Well from January 1, 2008 through April 21, 2010.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

BP objects to this request on the grounds that it is overbroad, unduly burdensome, and duplicative of previous requests.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for communications between BP and Halliburton regarding the Macondo Well from January 1, 2008 through April 20, 2010, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 50**

Please produce all documents related to internal communications about any Halliburton employee associated with the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

BP objects to this request as overbroad and unduly burdensome.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for communications about Halliburton employees associated with the

Macondo Well, subject to further discussion with Halliburton regarding the scope and manner of such search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 51**

Please produce all communications related to the cement utilized or to be utilized for the production casing of the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for communications related to the cement utilized for the production casing of the Macondo Well, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 52**

Please produce all documents related to the audit or review of any Halliburton lab testing facility.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52:**

BP objects to this requests on the grounds that it is overbroad and unduly burdensome in that it is not limited in geographic scope.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for audits of Halliburton lab testing facilities providing services to the Gulf

28

of Mexico conducted prior to the Incident, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 53**

Please produce all documents and communications related to the presentation and/or centralizer study referenced on BP_HZN_BLY00125468.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53:**

In addition to its general objections, BP objects to the extent this request seeks additional documents beyond those already produced regarding the work and report of the IIT. BP also objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## GENERAL OBJECTIONS

BP asserts the following objections to each and every one of Halliburton's requests for production including any definitions or instructions associated therewith (collectively, "Halliburton's Discovery Requests"). These general objections are incorporated by reference into each specific response set forth by BP and are neither waived nor limited by any specific responses.

1.      BP objects to Halliburton's Discovery Requests to the extent they seek documents or information already requested of and/or produced by BP in this matter on the grounds that such requests improperly seek to impose upon BP and obligation to review, analyze, and explain its prior discovery responses for the benefit of Halliburton.

2.     BP objects to Halliburton's Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the proceeding set to commence in February 2012 prior to the substantial completion of BP's efforts to identify and produce documents response to other requests of Halliburton and other parties to the litigation.

3.     BP objects to Halliburton's Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

4.     BP objects to Halliburton's Discovery Requests to the extent they call for the production of ESI in any manner other than required under Federal Rule of Civil Procedure 34, the Rules and Orders of the Court, and ongoing negotiations and discussions among counsel.

5.     BP objects to Halliburton's Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.  BP will identify specific documents withheld on these grounds in accordance with the schedule set forth in, and provide the information required by, the Court's Pretrial Order #14, and such further Orders of the Court and ongoing negotiations and discussions among counsel. BP incorporates its forthcoming privilege logs and all related information into this general objection to the extent necessary to preserve against any waiver of any applicable privilege or immunity from discovery.

6.     BP objects to Halliburton's Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected

from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of BP and any opposing parties to resolve their disputes in a fair and efficient manner.

7.      BP objects to Halliburton's Discovery Requests to the extent they call for information or documents not within BP's possession, custody, or control.  All responses are made on behalf of BP only, are limited to information and documents within BP's possession, custody, or control.

8.      BP objects to Halliburton's Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

9.      BP objects to Halliburton's Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

10.      BP objects to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

11.     BP objects to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

12.     BP objects to the requests to the extent they seek documents already in the possession of Halliburton or equally available to Halliburton from sources other than BP, including publicly available sources.

13.     BP objects to Halliburton's "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.   BP further object to, and will read and respond to, Halliburton's "Definitions" (labeled to correspond to Halliburton's list) as follows:

(a)     Halliburton's definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.  BP will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

(b)     Halliburton's definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.  BP will read and respond to Halliburton's requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

32

(c)     Halliburton's definition of "Incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.  BP will read and respond to Halliburton's requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

(d)     Halliburton's definition of "Oil Spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  BP will read and respond to Halliburton's requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

(e)     Halliburton's definition of "Deepwater Horizon Blowout Preventer" is vague and overbroad; it includes any equipment used to control any well.  BP will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

(f)     Halliburton's definition of "Clean Up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the incident.  BP will read and respond to Halliburton's requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

(g)     Halliburton's definition of "Relevant time period" is overbroad; by extending the definition to "the current date," many of Halliburton's requests, which by their context clearly seek information from the time prior to and including the incident, confusingly

seek unrelated information generated after the incident and ignores that it is impossible for BP to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to Halliburton.    BP will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means January 1, 2008 through April 20, 2010, unless:   (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2009 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through November 8, 2010.   In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, BP will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above.   Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by BP.

(h)   Halliburton's definitions of "Defendant," "you," "your," "your company," and "BP" are extremely vague and overbroad; they include a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.   BP will read and respond to Halliburton's requests with the understanding that the terms you," "your," and "BP" means BP.

(i, j, k, l)     Halliburton's definitions of "Anadarko," "Cameron," "MOEX," and "Transocean" are similarly vague, overbroad, and confusing.  BP will read and respond to Halliburton's requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(m)     Halliburton's definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  BP will read and respond to Halliburton's requests with the understanding that the term "person" means a person.

(n)     Halliburton's definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.   BP will read and respond to Halliburton's requests with the understanding that the term "employee" means an employee.

(l)     Halliburton's definition of "Investigation Team" is unobjectionable.

(p)     Halliburton's definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."  BP will read and respond to Halliburton's requests with the understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(q)     Halliburton's definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.  BP will read and respond to Halliburton's requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(r)     Halliburton's definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved." BP will read and respond to Halliburton's requests with the understanding that the term "statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(s)     Halliburton's definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.  BP will read and respond to Halliburton's requests with the understanding that the term "meeting" refers to a gathering of two or more people.   It does not include electronic communications unless specified.

(t)     Halliburton's definition of "document" and "documents" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A). BP will read and respond to Halliburton's requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(u)     Halliburton's definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).  BP will read and respond to Halliburton's requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(v)     Halliburton's definitions of "relating to," "related to," "referring to," regarding," "concerning," and "with respect to," are vague and overbroad; they render these and innumerable other words void of any independent meaning.   BP will read and respond to

Halliburton's requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(w)     Halliburton's definitions of "and" and "or" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.  BP will read and respond to Halliburton's requests with the understanding that the term "and" means and, and the term "or" means or.

(x)     Halliburton's definition of "all" and "any" are vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of Halliburton's requests into nonsensical requests for duplicative information.  BP will read and respond to Halliburton's requests with the understanding that the term "all" means all and the term "any" means any.

(y)     Halliburton's definition of "including" is unobjectionable.

(z)     Halliburton's definitions of "each" and "every" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.  BP will read and respond to Halliburton's requests with the understanding that the term "each" means each and the term "every" means every.

(aa)     Halliburton's instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(bb)     Halliburton's instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily

nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(cc)     Halliburton's instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(dd)     Halliburton's instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined under instructions to set aside standard English usage.

14.     These responses are made without waiving, in any manner, BP's right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

15.     To the extent BP states it will produce documents in response to the requests, BP will produce such documents on a rolling basis with such reasonable speed as BP can locate and process them, without sacrificing a meaningful review for responsiveness, privilege, and confidentiality, as this is the only feasible and physically possible method given the scope and breadth of the requests.

16.     To the extent that BP responds that it will search for and produce responsive documents, BP is only undertaking to make a good faith effort to conduct a reasonable search of non-privileged documents of the files and records of those individuals likely to have meaningful

information responsive to a requests as maintained in the ordinary course of business, and/or to apply a reasonable set of search terms to similar available collections of ESI as maintained in the ordinary course of business reasonably likely to yield a meaningful amount of information responsive to a request.  BP is not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of its thousands of employees and agents where any such items are not included within the results of a reasonable search as described above.

17.    BP's decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the document requests themselves, should not be construed as:  (a) a stipulation that the material is relevant or admissible, (b) a waiver of BP's general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

18.    BP reserves the right to modify, amend, or supplement its responses, which are made based on the current status of its knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.


Dated:  May 10, 2011                          Respectfully submitted,


                                              By:  /s/ J. Andrew Langan, P.C.

                                              Richard C. Godfrey, P.C.
                                              J. Andrew Langan, P.C.
                                              Timothy A. Duffy, P.C.

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.*

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 10th day of May, 2011.

<u>/s/   J. Andrew Langan, P.C.___</u>

# EXHIBIT 4

LEXISNEXIS® FILE & SERVE
37854299
E-SERVICE
May 27 2011
10:33PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179<br><br>SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |
| …………………………………………….... | : | |

**BP EXPLORATION & PRODUCTION INC.'S RESPONSES**
**AND OBJECTIONS TO HALLIBURTON ENERGY**
**SERVICES, INC.'S SECOND REQUESTS FOR PRODUCTION**

Defendant BP Exploration & Production Inc. ("BP"), by its undersigned Counsel, and, pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, hereby submit the following responses to Halliburton Energy Services, Inc.'s ("Halliburton") Second Requests for Production.

**SPECIFIC RESPONSES AND OBJECTIONS**

BP responds as follows to Halliburton's requests for production, subject to and without waiving its general objections, each and every one of which are specifically incorporated into each individual response below.[1]

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

Please produce all emails sent to or from any HESI or Sperry Sun employee at any email address provided to that employee by BP (*e.g.*, Jesse.Gagliano@bp.com).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

BP objects to this request on the grounds that it is overbroad, unduly burdensome, and seeks documents not related to the claims or defenses of any party.

---

[1] BP's general objections are set forth at pages 4 - 14.

Subject to its specific and general objections, BP will conduct reasonable searches on accessible e-mails of such individuals in accord with the established protocols for such discovery.  It will not undertake wholesale, indiscriminate production of all documents sent to or received from a given e-mail address.

**REQUEST FOR PRODUCTION NO. 2:**

Please produce all documents, including all communications and correspondence, between BP and the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Subject to its specific and general objections, BP has already produced letters it sent to the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 3:**

Please produce all documents supporting the calculation of your alleged damages or other injury.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

BP objects on the grounds that this request is premature because it calls for work that will be the subject of expert testimony on a subject matter not currently to be addressed in the trial plan contemplated by Judge Barbier.  BP will produce responsive documents pursuant to deadlines put in place by the Court for expert work regarding its damages claims against third parties.

**REQUEST FOR PRODUCTION NO. 4:**

Please produce a copy of the BP Wellsite Leader's Handbook for the Gulf of Mexico. This request includes any functionally-equivalent documents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents responsive to this request, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 5:**

Please produce all documents supporting your claims for fraudulent conduct, fraudulent concealment, negligence, gross negligence, contribution and subrogation against HESI.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

BP objects to this request on the grounds that it is overbroad and unduly burdensome to the extent that it seeks "all" documents related to BP's claims for fraudulent conduct, fraudulent concealment, negligence, gross negligence, contribution and subrogation against HESI.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents supporting BP's claims for fraudulent conduct, fraudulent concealment, negligence (and to the extent that the evidence at trial proves it, gross negligence), contribution and subrogation against HESI, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**REQUEST FOR PRODUCTION NO. 6:**

Please produce all documents related to the testing of cement or slurries similar to that used at the Macondo Well.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

BP objects to this request on the grounds that it is confusing, ambiguous, contains no context or limitation on the terms used.  BP further objects that this request is overbroad and unduly burdensome to the extent that it seeks "any" documents related to the testing of cement or slurries similar to that used at the Macondo Well.  Additionally, BP objects to this request because the phrase "similar to that used at the Macondo Well" is vague, ambiguous, and undefined.

Subject to its specific and general objections, BP will conduct a reasonable search of non-privileged documents for documents related to the testing of cement or slurries used at the Macondo Well and the testing of the simulated cement conducted by CSI Technologies, and will produce responsive documents identified as a result of that search.

To the extent Halliburton's request seeks additional documents, BP objects on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

<u>GENERAL OBJECTIONS</u>

BP asserts the following objections to each and every one of Halliburton's requests for production including any definitions or instructions associated therewith (collectively, "Halliburton's Discovery Requests").  These general objections are incorporated by reference into each specific response set forth by BP and are neither waived nor limited by any specific responses.

1.      BP objects Halliburton's Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the proceeding set to commence in February, 2012 prior to the substantial completion of BP's efforts to identify and produce documents in response to other requests of Halliburton and other parties to the litigation.

4

2.      BP objects to Halliburton's Discovery Requests to the extent they call for the information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

3.      BP objects to Halliburton's Discovery Requests to the extent they call for the production of ESI in any manner other than required under Federal Rule of Civil Procedure 34, the Rules and Orders of the Court, and ongoing negotiations and discussions among counsel.

4.      BP objects to Halliburton's Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.  BP will identify specific documents withheld on these grounds in accordance with the schedule set forth in, and provide the information required by, the Court's Pretrial Order #14, and such further Orders of the Court and ongoing negotiations and discussions among counsel. BP incorporates its forthcoming privilege logs and all related information into this general objection to the extent necessary to preserve against any waiver of any applicable privilege or immunity from discovery.

5.      BP objects to Halliburton's Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of BP and any opposing parties to resolve their disputes in a fair and efficient manner.

6.     BP objects to Halliburton's Discovery Requests to the extent they call for information or documents not within BP's possession, custody, or control.  All responses are made on behalf of BP only, are limited to information and documents within BP's possession, custody, or control.

7.     BP objects to Halliburton's Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

8.     BP objects to Halliburton's Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

9.     BP objects to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

10.    BP objects to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the

Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

11.    BP objects to Halliburton's Discovery Requests to the extent they seek documents already in the possession of Halliburton or equally available to Halliburton from sources other than BP, including publicly available sources.

12.    BP objects to Halliburton's "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.   BP further objects to, and will read and respond to, Halliburton's "Definitions" (labeled to correspond to Halliburton's list) as follows:

(a)    Halliburton's definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.   BP will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

(b)    Halliburton's definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.   BP will read and respond to Halliburton's requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

(c)    Halliburton's definition of "Incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.   BP will read and respond to Halliburton's requests with the understanding that the term "Incident" means the loss of control of the

Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

(d)     Halliburton's definition of "oil spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  BP will read and respond to Halliburton's requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

(e)     Halliburton's definition of "Deepwater Horizon Blowout Preventer" is vague and overbroad; it includes any equipment used to control any well.  BP will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

(f)     Halliburton's definition of "clean up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the incident.  BP will read and respond to Halliburton's requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

(g)     Halliburton's definition of "relevant time period" is overbroad; by extending the definition to "the current date," many of Halliburton's requests, which by their context clearly seek information from the time prior to and including the incident, confusingly seek unrelated information generated after the incident and ignores that it is impossible for BP to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to Halliburton.     BP will read and respond to Halliburton's

8

requests with the understanding that the term "relevant time period" means January 1, 2008 through April 20, 2010, unless:   (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2008 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through November 8, 2010.   In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, BP will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above.   Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by BP.

(h)     Halliburton's definitions of "Defendant," "you," "your," "your company," and "BP" are extremely vague and overbroad; they include a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.  BP will read and respond to Halliburton's requests with the understanding that the terms you," "your," and "BP" means BP.

(i, j, k, l)     Halliburton's definitions of "Anadarko," "Cameron," "MOEX," and "Transocean" are similarly vague, overbroad, and confusing.  BP will read and respond to Halliburton's requests with the understanding that these terms refer to the respective corporate

entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(m)     Halliburton's definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  BP will read and respond to Halliburton's requests with the understanding that the term "person" means a person.

(n)     Halliburton's definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.  BP will read and respond to Halliburton's requests with the understanding that the term "employee" means an employee.

(l)     Halliburton's definition of "Investigation Team" is unobjectionable.

(p)     Halliburton's definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."  BP will read and respond to Halliburton's requests with the understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(q)     Halliburton's definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.  BP will read and respond to Halliburton's requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(r)     Halliburton's definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved."  BP will read and respond to Halliburton's requests with the understanding that the term

10

"statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(s)     Halliburton's definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.  BP will read and respond to Halliburton's requests with the understanding that the term "meeting" refers to a gathering of two or more people.   It does not include electronic communications unless specified.

(t)     Halliburton's definition of "document" and "documents" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A). BP will read and respond to Halliburton's requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(u)     Halliburton's definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).  BP will read and respond to Halliburton's requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(v)     Halliburton's definitions of "relating to," "related to," "referring to," regarding," "concerning," and "with respect to," are vague and overbroad; they render these and innumerable other words void of any independent meaning.  BP will read and respond to Halliburton's requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(w)     Halliburton's definitions of "and" and "or" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.  BP will read and respond to Halliburton's requests with the understanding that the term "and" means and, and the term "or" means or.

(x)     Halliburton's definition of "all" and "any" are vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of Halliburton's requests into nonsensical requests for duplicative information.  BP will read and respond to Halliburton's requests with the understanding that the term "all" means all and the term "any" means any.

(y)     Halliburton's definition of "including" is unobjectionable.

(z)     Halliburton's definitions of "each" and "every" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.  BP will read and respond to Halliburton's requests with the understanding that the term "each" means each and the term "every" means every.

(aa)     Halliburton's instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(bb)     Halliburton's instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(cc)     Halliburton's instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(dd)     Halliburton's instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  BP will read and respond to Halliburton's requests as written, not as imagined under instructions to set aside standard English usage.

13.     These responses are made without waiving, in any manner, BP's right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

14.     To the extent BP states it will produce documents in response to the requests, BP will produce such documents on a rolling basis with such reasonable speed as BP can locate and process them, without sacrificing a meaningful review for responsiveness, privilege, and confidentiality, as this is the only feasible and physically possible method given the scope and breadth of the requests.

15.     To the extent that BP responds that it will search for and produce responsive documents, BP is only undertaking to make a good faith effort to conduct a reasonable search of non-privileged documents of the files and records of those individuals likely to have meaningful information responsive to a requests as maintained in the ordinary course of business, and/or to apply a reasonable set of search terms to similar available collections of ESI as maintained in the

13

ordinary course of business reasonably likely to yield a meaningful amount of information responsive to a request.  BP is not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of its thousands of employees and agents where any such items are not included within the results of a reasonable search as described above.

16.     BP's decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the document requests themselves, should not be construed as:  (a) a stipulation that the material is relevant or admissible, (b) a waiver of BP's general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

17.     BP reserves the right to modify, amend, or supplement its responses, which are made based on the current status of its knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.


Dated:  May 27, 2011                                  Respectfully submitted,


                                                      By: /s/ J. Andrew Langan, P.C.

                                                      Richard C. Godfrey, P.C.
                                                      J. Andrew Langan, P.C.
                                                      Timothy A. Duffy, P.C.
                                                      Kirkland & Ellis LLP
                                                      300 North LaSalle Street
                                                      Chicago, IL 60654
                                                      Telephone: (312) 862-2000
                                                      Facsimile:  (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 27th day of May, 2011.

/s/   J. Andrew Langan, P.C.____

\

# EXHIBIT 5



DALLAS  HOUSTON

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332  Fax

GodwinRonquillo.com

JENNY L. MARTINEZ - SHAREHOLDER
DIRECT DIAL:     214.939.4620
DIRECT FAX:      214.527.3119
JMartinez@GodwinRonquillo.com

July 13, 2011

**BY EMAIL**

Barbara M. Harding
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

> Re:     In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on
> April 20, 2010, MDL No. 2179

Dear Barbara:

I write to request that BP produce documents responsive to the following requests for production,[1] or that it meet and confer with us as soon as possible concerning these requests so that we may attempt to reach a mutually acceptable resolution that avoids the need for motion practice.

1.  **Channeling and/or Potential Gas Migration Evaluations**: Request for Production No. 16 in HESI's March 21, 2011, Discovery Requests to BP seeks "all documents related to the evaluations of risks of channeling and/or potential gas migration at the Macondo Well under the various engineering designs and/or models considered."  BP's response indicates that it intends to produce only documents related to "channeling or potential gas migration in the cementing of the production interval."  BP's May 11, 2011, Resps. & Objs. to HESI's 1st RFPs, p. 9.  BP improperly limited its response to only the cementing production interval.  HESI requests that BP produce all documents in its possession, custody, or control that are related to each casing interval of the Macondo well.

2.  **Placement of Cement Plug**: Request for Production No. 28 in HESI's March 21, 2011, Discovery Requests to BP seeks "all documents related to the analysis and/or decision to place a cement plug, rather than non-cement bridge plugs or other alternatives, as well as the decision as to where within the Macondo Well the cement was to be placed."  BP's

---

[1] BP's responses to HESI's Interrogatories and Requests for Admissions are due, by agreement, August 1, 2011. HESI reserves its right to request a "meet and confer" with BP regarding any outstanding responses or issues that may arise concerning these discovery requests.

July 13, 2011
Page 2

response indicates that it intends to produce only documents related to the "placement of the cement plug in the Macondo Well in preparation for temporary abandonment." *Id.* at 10. BP improperly limited its response to only the placement of the cement plug. HESI requests that BP produce all documents in its possession, custody, or control that are related to this request, including documents related to non-cement bridge plugs or other alternatives used or considered.

3.   **Dissenting or Critical Opinions of the Investigation Report**: Request for Production 42 in HESI's March 21, 2011, Discovery Requests to BP seeks "any documents related to disagreement with or dissent from statements contained in the September 8, 2010 Deepwater Horizon Accident Investigation Report." BP objected that HESI's request is "duplicative, cumulative, and argumentative." *Id.* at 23. These objections are invalid, and HESI requests that BP comply with its obligation to produce documents in its possession, custody, or control that are responsive to this request.

4.   **Rig Personnel Computer Activity on the DWH**: Request for Production 43 in HESI's March 21, 2011, Discovery Requests to BP seeks "all rig personnel computer activities for the Deepwater Horizon from April 16, 2010, to April 21, 2010." BP objected to HESI's request, stating that HESI seeks documents "likely more readily available from other parties in this litigation such as Transocean as owner and operator of the *Deepwater Horizon*." *Id.* at 24. BP is not absolved of its obligation to produce relevant, non-privilege documents simply because HESI could seek a similar category of documents from another party to this litigation, such as Transocean. HESI, therefore, requests that BP comply with its obligation to produce documents in its possession, custody, or control that are responsive to this request.

5.   **BP Internal Communications about Halliburton Employees**: Request for Production 50 in HESI's March 21, 2011, Discovery Requests to BP seeks "all documents related to internal communications about any Halliburton employee associated with the Macondo well." BP objected to HESI's request, stating that it is overbroad and unduly burdensome. *See id.* at 27. HESI is entitled to such documents. HESI will agree to limit the request to communications from January 1, 2010, to the present should BP have a genuine concern about the breadth or burden of this request.

6.   **Centralizer Presentation or Study**: Request for Production 53 in HESI's March 21, 2011, Discovery Requests to BP seeks "all documents and communications related to the presentation and/or centralizer study referenced on BP-HZN-BLY00125468." BP objected to this request, stating that it "seeks documents beyond those already produced regarding the work and report of the IIT." *Id.* at 29. BP also objected to this request as overly broad, unduly burdensome, and irrelevant. *See id.* BP's objections are improper as centralizers are relevant to this litigation. HESI, therefore, requests that BP comply with its obligation to produce documents in its possession, custody, or control that are responsive to this request.

July 13, 2011
Page 3

7.    **BP Wellsite Leader's Handbook for the Gulf of Mexico**: Request for Production 4 in HESI's April 29, 2011, Discovery Requests to BP seeks "a copy of the BP Wellsite Leader's handbook for the Gulf of Mexico."  HESI cannot locate this document in BP's production.  HESI requests that BP produce a copy of the aforementioned handbook or provide HESI with the Bates range assigned to it.

8.    **HESI/Sperry Employees with BP Email Addresses**: Request for Production 1 in HESI's April 29, 2011, Discovery Requests to BP seeks "all emails sent to or from any HESI or Sperry Sun employee at any email address provided to that employee by BP." BP objected, stating the request is overly broad, unduly burdensome, and irrelevant.  *See* BP's May 27, 2011, Resps. & Objs. to HESI's 2nd RFPs, p. 1.  BP further stated that "it will not undertake wholesale, indiscriminate production of all documents sent to or received from a given e-mail address."  *Id.* at 2.  HESI will agree to limit its request to emails related to the Macondo well sent or received from any HESI or Sperry employee that is identified in its Responses and Objections to Plaintiffs' Initial Omnibus Discovery Requests.  *See* HESI's Nov. 15, 2010, Resps. & Objs. to Pls.' Initial Omnibus Disc. Requests, p. 5-12.  HESI, therefore, requests that BP comply with its obligation to produce documents in its possession, custody, or control that are responsive to this request.

9.    **Cement Testing**: Request for Production 6 in HESI's April 29, 2011, Discovery Requests to BP seeks "all documents related to the testing of cement or slurries similar to that used at the Macondo Well."  BP objected to this request, stating that it is "confusing, ambiguous, and contains no context or limitation on the terms used."  *Id.* at 4. Additionally, BP limited its response to only cement testing that CSI Technologies, Inc. conducted.  BP's objections are improper as documents related to such testing are relevant to this litigation.  HESI requests that BP produce all documents in its possession, custody, or control related to cement testing on slurries similar to those that BP used in the Macondo well.

10.    **Communications Regarding GP 10-60**:  HESI requests that BP produce all communications relating to BP's compliance with its internal policy, GP 10-60. Specifically, Daryl Kellingray testified on June 21, 2011, that he prepared a substantive analysis regarding his interpretation of GP 10-60.  (Kellingray Depo., p. 512:11—513:22).  Mr. Kellingray testified that he prepared this analysis in response to Kent Corser's July 17, 2010, request.  *See id.*  HESI cannot locate these documents in BP's production, and requests that BP produce the aforementioned documents or provide HESI with the Bates ranges assigned to them.

11.    **Native EDM Files**: As previously discussed in our July 11, 2011, conference call, HESI requests that BP produce an entire set of "Wells Data" or "Open Wells" files for the Macondo well in ".edm" format.

July 13, 2011
Page 4

12.   **WellCat Data/Temperature Plots**: As previously discussed in our July 11, 2011, conference call, HESI requests that BP produce all WellCat data relating to the Macondo well in ".wcd" format.

If BP has produced all documents responsive to the above-mentioned requests, or if BP knows such documents do not exist, HESI requests that BP affirmatively state such facts.  Thank you for your prompt attention to these matters.  Please feel free to contact me directly should you have any questions or concerns.

Sincerely,

Jenny L. Martinez

JLM:mrb

cc:   Don Godwin
      R. Alan York
      Bruce W. Bowman, Jr.
      Carolyn R. Raines

# EXHIBIT 6



**DALLAS** HOUSTON

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332 Fax

GodwinRonquillo.com

JENNY L. MARTINEZ - SHAREHOLDER
DIRECT DIAL:     214.939.4620
DIRECT FAX:     214.527.3119
JMartinez@GodwinRonquillo.com

August 9, 2011

Barbara M. Harding
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Re:     *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, MDL No. 2179

Dear Barbara,

I write in response to your letter dated July 22, 2011, concerning Halliburton Energy Services, Inc.'s ("HESI") Responses and Objections to BP's First Set of Interrogatories ("HESI's Responses"). I also write to preliminarily respond to the BP Parties' Responses and Objections to Halliburton Energy Services, Inc.'s Interrogatories ("BP's Responses"), which were received on August 1, 2011, at 11:49 p.m.

## DEPOSITION PAGE DESIGNATIONS

BP complains about HESI's citation to deposition testimony in its Responses to Interrogatories No. 1, 2, 4, 15, 19, and 23. However, in BP's Response to Interrogatory No. 15, BP refers HESI to "the deposition testimony of Mike Byrd and Fereidoun Abbassian." In exchange for BP's agreement to provide page designations for testimony responsive to HESI's Interrogatory No. 15, HESI will agree to provide page designations for the depositions cited in response to BP's Interrogatories No. 1, 2, 4, 15, 19, and 23.

## REFERENCES TO RESPONSIVE DOCUMENTS

BP complains about HESI's Responses to the extent that they reference documents. BP's complaint is inconsistent with BP's Interrogatories and with BP's Responses. In BP's Interrogatories (Nos. 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22), BP specifically requests that HESI identify responsive documents. In addition, BP references documents in BP's Responses to Nos. 1, 5, 10, 12, 13, 14, 15, 17, 21, 25, and 26.

Furthermore, HESI's Responses are not improper. Rule 33(d)(1) requires the responding party to specify records "in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." FED. R. CIV. P. 33(d)(1). HESI satisfies

**GODWIN RONQUILLO PC**

Barbara M. Harding
August 9, 2011
Page 2

this requirement by clearly identifying responsive documents by bates-number range.  *See e.g.*
HESI's Resp. No. 3.  BP's suggestion that HESI has "merely referenc[ed] masses of documents"
is incorrect.  All documents identified are responsive, and the number of documents identified is
reasonable given the breadth of BP's Interrogatories.

Moreover, the authorities you cite do not support your criticism of HESI's document
references.  Your quoted description of "references mak[ing] it impossible to determine whether
an adequate answer has been given without an elaborate comparison of the answers" actually
refers to a response only "generally referring" to deposition testimony, including "the depositions
of all witnesses taken in this case and all Discovery responses filed in this matter."  *See Smith v.
Logansport Cmty. Sch. Corp.*, 139 F.R.D. 637, 650 (N.D. Ind. 1991) (quoted in *Scaife v. Boenne*,
191 F.R.D. 590, 594 (N.D. Ind. 2000) (quoted in *United States ex rel. O'Connell v. Chapman
Univ.*, 245 F.R.D. 646, 650 (C.D. Cal. 2007))).  HESI's Responses are complete in themselves,
and they reference specific documents when such documents are responsive.  In contrast, BP's
Responses to Nos. 1, 10, 12, 13, 14, and 25 are more akin to the responses criticized in *Smith*.

BP is also substantially in the same position as HESI to review the documents and
ascertain for itself how they are responsive.  To date, BP has participated in approximately 185
depositions and deposed eighteen HESI employees about the very same issues raised by the
referenced Interrogatories.   BP has proven itself fully capable of reviewing the specific
documents HESI directed it to in May, without being spoon-fed by HESI regarding the exact
relevance of each document.

## IDENTIFYING WITNESSES

Regarding BP's argument that HESI fails to identify "all" witnesses with relevant
knowledge in response to certain Interrogatories, HESI properly objected pursuant to FED. R.
CIV. P. 33(b)(3) because identifying "all" witnesses with relevant knowledge of broad topics
and/or events involving hundreds of people is unduly burdensome (if not impossible).  HESI has
made reasonable and good faith efforts to identify individuals with relevant knowledge in its
Responses to Interrogatories No. 2, 8, 9, 10, 11, 13, and 14.   Further, the Court's case
management process of identifying and winnowing the lists of deponents, experts, and trial
witnesses eliminates the need for exhaustive lists of potential witnesses at this stage in the
litigation.

## INTERROGATORIES NO. 8, 9, and 10

BP also complains that HESI's Responses to Nos. 8, 9, and 10 fail to identify documents.
As with witness identification, BP's request for "all" documents is overly broad and HESI
properly objected.  Interrogatory No. 8 essentially requests HESI to identify all documents
related to the Phase One trial — the cause of the Incident — while Interrogatory No. 10 requests
HESI to identify all documents supporting its contention that it is not at fault.  Despite the over-

**GODWIN RONQUILLO PC**

Barbara M. Harding
August 9, 2011
Page 3

breadth of these interrogatories, HESI provided substantive responses, subject to its objections. The Response to Interrogatory No. 9 directs BP to the applicable standard of the American Petroleum Institute and provides a detailed explanation of HESI's contention that conditioning a cement slurry is appropriate. The Response to No. 8 is likewise substantive. The Response to duplicative Interrogatory No. 10 properly incorporates HESI's Responses to overlapping Interrogatories No. 6, 7, and 8. *Cf. United States ex rel. O'Connell*, 245 F.R.D. at 650 (referencing partial answer to *dissimilar* interrogatory is insufficient). HESI stands by its objections to these Interrogatories and the quality of its Responses.

## INTERROGATORY NO. 11

As for Interrogatory No. 11, BP incorrectly states that the Response references only one document. The Response directs BP to four separate letters from HESI's counsel to the National Commission. These letters provide a detailed description of the factual and legal bases for HESI's criticisms of the National Commission, as well as specific documents, witnesses, testimony, and industry standards. HESI's reference to these detailed letters is a proper response to Interrogatory No. 11. *Cf. Scaife*, 191 F.R.D. at 594 (referencing a document that *does not* answer the question posed is insufficient).

## INTERROGATORIES NO. 16, 17, and 18

Although BP lists HESI's Responses to Interrogatories No. 16-19 as "confusing and evasive," it only offers detailed complaints about Nos. 16-18. Accordingly, HESI presumes the numbering in the heading is a typographical error. Interrogatories No. 16-18 seek irrelevant information about other wells. As stated in my July 26, 2011 letter to you, requests related to wells other than the Macondo Well are a distraction to the parties' preparations for a February 2012 trial. Based upon BP's Responses, it appears to share this view. *See* BP Resp. Nos. 4, 5, 6 (objecting to interrogatories seeking information beyond that "directly related to the Macondo Well"). HESI stands by its multiple objections to these Interrogatories.

## PRELIMINARY ISSUES WITH BP'S RESPONSES TO HESI'S INTERROGATORIES

HESI's preliminary review of BP's Responses raise the following issues:

**Broad references to documents.** Referencing a large document in response to a specific interrogatory is insufficient. An answer to an interrogatory should be complete in itself, and "should not refer to the pleadings, or to depositions or other documents, or to other interrogatories, at least where such references make it impossible to determine whether an adequate answer has been given without an elaborate comparison of answers." *Smith*, 139 F.R.D. at 650 (citing 4A J. Moore, J. Lucas, Moore's Federal Practice § 33.25[1] (2d ed. 1991)). Multiple BP Responses reference large documents broadly, such as:

**G**ODWIN **R**ONQUILLO **PC**

Barbara M. Harding
August 9, 2011
Page 4

- *The Deepwater Horizon Accident Investigation Report*, including "its appendices, and the backup materials and analyses produced in support thereof," *see* BP Resp. to Nos. 1, 12, 13, 14, and 15; *see also* BP Resp. to Nos. 21 and 25 (citing to the Bly Report with a quotation, but not fully answering the question);
- *The IIT Report[1]* and its back up materials, *see* BP Resp. to Nos. 1, 10, 12, 13, 14, and 25;
- BOEMRE publicly available documents, *see* BP Resp. to No. 5;
- The Drilling Contract with Transocean, *see* BP Resp. to No. 27;
- Final Report provided by Det Norske Veritas ("DNV Report"), *see* BP Resp. to Nos. 14 and 15.

Please specify the bates labels for the documents that constitute "back up materials" and those that constitute "analyses in support thereof".  Please also specify which "publicly available" documents are referenced in Response to No. 5.

With respect to the Bly Report, the Drilling Contract, and the DNV Report, if BP believes these documents fully and completely answer a given Interrogatory, *please specify what pages* of the documents contain such answers.  If the document only partially answers the Interrogatory, please clarify and provide a complete response.

Numerous BP Responses reference the DNV Report, but disclaim any accuracy of that report.  *See* BP Resp. to Nos. 14, 15.  Citing to a report, but disclaiming the report's accuracy is meaningless.  If BP believes that certain provisions of the report provide answers to any of the Interrogatories, please identify the relevant page numbers.

**Bly Report Findings.**  HESI asked whether BP, its employees, agents, and consultants agree with the narrative and findings in the Bly Report.  *See* BP Resp. to Nos. 30 and 31.  BP responds by referencing its answer to HESI's Request for Production ("RFP") No. 42; however, BP's response to RFP No. 42 contains only objections.  If BP is aware of any employees, agents, or consultants that do not agree with the Bly Report's narrative and findings, please identify them.  If BP is unaware of any employees, agents, or consultants who disagree with the Bly Report, please state so.  HESI is entitled to verified responses and not mere references to RFP objections.

**References to Pleadings.**  Several of your responses broadly reference your answers, cross-claims, and other pleadings.  *See* BP Resp. to Nos. 1, 12, 13, 15, 29.  For the reasons noted

---

[1] Is the "IIT Report" different than the "Deepwater Horizon Accident Investigation Report"?  BP cites to both reports in its Responses to 1, 12, and 13.  I assume both names refer to the Bly Report.  If I am incorrect, please provide the bates ranges for each report.

**GODWIN RONQUILLO PC**

Barbara M. Harding
August 9, 2011
Page 5

above, such responses are insufficient.   Please provide full and complete answers to these Interrogatories.

**Sands and Pore Pressure.**   BP's Response to No. 10 lists the "estimated sands in the Macondo Well and pressure (in psi)".   This list is contrary to the sand pressure table prepared by Martin Albertin and circulated within BP on April 22, 2010, which identifies the sands located at 17467'-17478' (MD) and 17804'-17806' (MD).   *See* Dep. Ex. 3741.   The list is also contrary to the deposition testimony of Galina Skripnikova, who identified the sands located at 17467'-17478' (MD) and 17804'-17806' (MD).   *See* Skripnikova Depo. Day 1 at 70:16-23; 72:11-73:4; 73:23-74:7; 74:12-15; 207:13-208:5; and 335:21.   Please explain these discrepancies.   If BP's definition of "sands" is the reason for the discrepancies, please provide BP's exact definition of "sands" and explain the difference between that definition and that of Mr. Albertin and Ms. Skripnikova.

**Nitrogen breakout.**   In Interrogatory No. 20, HESI asks BP "what occurred as a result of the instability [of the cement used on the 9 7/8" x 7" production casing]"?   BP's conclusory Response provides that "the foam slurry experienced nitrogen breakout" and that "the nitrogen breakout caused the cement to fail to isolate and prevent the flow of hydrocarbons . . ."   Please provide an explanation as to how nitrogen breakout "caused" the cement to fail to isolate and prevent the flow of hydrocarbons.

**BP Engineers' Roles and Responsibilities.**   In Interrogatory No. 20, HESI asked BP to identify the job roles and responsibilities of the BP engineers as they relate to cementing.   BP's Response references its response to the PSC's Interrogatory No. 28.   BP's response to the PSC's Interrogatory No. 28, however, fails to identify any roles or responsibilities.   This is not surprising since the PSC did not ask BP to identify any roles or responsibilities.   Please supplement your response by identifying such roles and responsibilities.   If BP contends that its engineers had no job roles or responsibilities related to cementing, please state so.

As we review BP's Responses in more detail, I will forward additional requests for complete responses.   In the interest of time and the August 15 deadline for motions to compel, I wanted to send you our concerns as soon as possible to facilitate our meet and confers on these discovery issue.   I look forward to our continuing cooperation.

Best regards,

Jenny L. Martinez

cc:   Donald E. Godwin
      R. Alan York
      Carolyn R. Raines

# EXHIBIT 7

**From:**     Martinez, Jenny
**Sent:**      Thursday, August 18, 2011 11:16 AM
**To:**        'Chen, Philip T.'; 'Mark Nomellini'; Harding, Barbara M.; Raines, Carolyn; Baker, Matt; MacLeod, Michelle
**Cc:**         Godwin, Donald; 'Andrew Langan'; McKeever, Xanath; Leach, Michael; York, R. Alan; Bowman, Bruce
**Subject:**  RE: Actions items from today's meet and confer - JLM Response

Phillip (and Mark ) - please see my comments/clarifications to Philip's notes in red below.

Jenny

Attached are my quick and informal notes from this morning's call.  Please provide any additional thoughts or things that we should be tracking down to the list.

Thanks,
Philip

Jenny will respond to our 8/4 and 8/10 letters in writing today.  We deferred discussing those letters until a written response.  Jenny, Xanath and others have scheduled to talk tomorrow at 3 PM Central.  We provided the letters to BP in advance of the 3:00 call.

Investigation materials – addressed in my prior email to Jenny.  Your summary is not entirely accurate.  Gavin Hill clarified the status of HESI's response with you yesterday in the Chevron depo.

Info on who logged into Viking system – Jenny will send a letter with the names.  HESI will provide the names of the individuals who accessed Viking 24 hours before and after the explosion.

RT data from rig – Jenny will track down the other RT data (nitrogen pump, rig pumps, etc.)  I am looking into this, as BP is looking into the production of "Fann 70" or similar information about mud testing, which is more specifically referenced above.

Escrow agreement –BP to respond to HES redline – one issue was that new software was added into the escrow agreement – Jenny will check if HES has produced the native files for OptiCem RT, WellCat, etc., if so, then there is no need to escrow if the programs are publicly available.  I will attempt to determine the versions utilized during the relevant time period.  It is my understanding that all programs other than the proprietary version of OptiCem are commercially available and thus there is no need for any Escrow Agreement with respect to these programs.  If that is not the case, I will confer with you further.

OptiCem inputs used by Gagliano – Jenny thought we received all inputs from the 4/18 OptiCem report, I indicated that we believe some inputs relating to fluid properties are missing – Jenny to check with client.  Also, Jenny indicated that as soon as the escrow agreement is completed, BP would have access to the 4/18 ADI file and this would alleviate the issue.  Also HES will check if it has Gagliano's earlier OptiCem files, 4/14, 4/15, etc.  I will check with HESI about what data is available.  An Escrow Agreement should moot these issues with respect to the 4/18 data, however, we need to confer about data for dates other than 4/18.

ROV data – Jenny to follow up with Esty – Philip to notify Esty that this is a priority.  Yes, this is a priority. We have been told the data will be ready mid next week, but we would like it sooner if possible and can send a courier to retrieve it.

FANN 70 report – Jenny to follow up with MI Swaco on what was sent to BP – then Jenny to follow up with Mark on whether a FANN 70 report or something called "representative data" is available.  **Mark -**

**HESI requests the following documents for the Macondo well: (1) all Virtual Hydraulics reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud rheology and (2) all reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud static gel strength.   Regarding (1), after M-I informed us that Virtual Hydraulics reports may contain some of the information we need, we located the following 8 BP documents showing VH reports/data: BP-HZN-BLY00173415; <u>BP-HZN-MBI00116135; BP-HZN-2179MDL00246598 (duplicate of MBI00116135); BP-HZN-2179MDL00349785; BP-HZN-2179MDL00349788; and BP-HZN-2179MDL00525453</u>.  The underlined documents were also found in M-I's production.  The following 6 documents showing VH reports/data are in M-I's production, but not BP's: M-I 00001818; M-I 00003839; M-I 00003840; M-I 00005273 (duplicate of M-I 00005273); M-I 00006062; and M-I 00022966.  Please confirm that all VH reports/data for the Macondo well have been produced.  Regarding (2), HESI located Fann 35 reports, however, the Fann 35 instrument cannot test the mud under pressure or at well condition temperatures.  Fann 70, 75, and 77 instruments can do such testing.  Whatever the name of the instrument or test method used, HESI requests that BP produce all data and reports associated with static gel strength and rheology testing of the mud under pressure and at temperature.  It is my understanding that Virtual Hydraulics is not used for determining static gel strength.  If static gel strength was not analyzed, please let me know.**

Search terms – Jenny stated that there was a miscommunication before but HES agrees to produce its search terms, which were previously negotiated with the PSC.  This accurately reflects my understanding.

Dep page cites – BP agreed to identify relevant deposition pages in response to HES Rog 15, and HES agrees to identify pages in its responses to BP Rogs 1, 2, 4, 15, 19, and 23. This accurately reflects my understanding.

Documents cited in response to interrogatories – parties generally agreed that citations to documents was appropriate – however, Jenny mentioned that HES might have a few specific complaints as to specific cites – Jenny to raise issue if necessary.  This accurately reflects my understanding.

BP Rog 8 and 10 – I explained that we want HES's contention and documents they know support their contentions on cause and why they are not at fault.  Jenny agreed to take a look at this and see if HES would supplement.  I am looking into this.

BP Rogs 16-18 – I proposed that non-Macondo discovery should be answered with protocols and standards that would apply to deepwater Gulf of Mexico – Jenny to discuss with HES – I reserved the right to come back on specific items where we think that Halliburton has "opened the door" to additional non-Macondo discovery but we weren't asking for that now.  I will consult with HESI, but our position that non-Macondo information is not relevant has not changed.

HES Rog 10 – I promised an amended response on sand locations.  This accurately reflects my understanding that the chart in BP's response is wrong.

HES Rogs – References to pleadings – I offered and they accepted us pasting in the portions of the pleadings that we are relying upon in the rog response – BP to take a look and amend responses.  This accurately reflects my understanding.  If after receipt of this information, we believe the responses are still inadequate, I will notify you promptly.

HES Rog 20 – Jenny explained that HES wanted an explanation as to "how" unstable foam caused the cement to fail – BP to consider whether it will amend its answer or stand on its position that the response is adequate.  This accurately reflects my understanding.

HES Rog 9 –I indicated that the rog was unclear as to what was being requested – Jenny indicated that a general statement as to roles and responsibilities may be acceptable– Jenny to send clarification.  I don't recall the ball being in my court on this one.  To the extent that BP has knowledge of the roles and responsibilities of the Macondo engineers with respect to cementing, which we believe it does (or can obtain from persons available to

BP), more specific statements are proper.  If such information cannot be obtained, then the roles and responsibilities that apply to all BP engineers with respect to cementing deep water wells may be responsive.

HES Rog 31 – I explained the logistical difficulty with determining whether anyone disagrees with any part of the Bly report – I said this is way oo broad and asked for clarification – Jenny indicated that she would send clarification as to what parts of the Bly report and how they wanted us to comply with that request for BP to consider.  This accurately reflects my understanding of BP's position and I will attempt to narrow the issues.

Philip T. Chen
Kirkland & Ellis LLP
333 South Hope Street · Los Angeles, CA 90071
Tel +1-213-680-8341 · Fax +1-213-680-8500
philip.chen@kirkland.com

*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************

# EXHIBIT 8

**From:** Mark Nomellini [mnomellini@kirkland.com]
**Sent:** Thursday, August 18, 2011 11:24 AM
**To:** Martinez, Jenny
**Cc:** Andrew Langan; York, R. Alan; Bowman, Bruce; Harding, Barbara M.; Raines, Carolyn; Godwin, Donald; Baker, Matt; Leach, Michael; MacLeod, Michelle; Chen, Philip T.; McKeever, Xanath
**Subject:** RE: Actions items from today's meet and confer - JLM Response

Jenny,

Thanks for your e-mail.  There appear to be a number of new requests of BP below.  We will review.

Regarding Fann-70 reports, after conducting a reasonable search, we have not located any Fann-70 reports received by BP from MI-Swaco for the Macondo well.  Have you asked MI-Swaco for these reports?

Regards,

Mark

| | |
|---|---|
| **"Martinez, Jenny" <JMartinez@GodwinRonquillo.com>**<br><br>08/18/2011 11:15 AM | To "Chen, Philip T." <pchen@kirkland.com>, "Mark Nomellini" <mnomellini@kirkland.com>, "Harding, Barbara M." <bharding@kirkland.com>, "Raines, Carolyn" <CRaines@GodwinRonquillo.com>, "Baker, Matt" <MBaker@GodwinRonquillo.com>, "MacLeod, Michelle" <MMacLeod@GodwinRonquillo.com><br><br>cc "Godwin, Donald" <DGodwin@GodwinRonquillo.com>, "Andrew Langan" <alangan@kirkland.com>, "McKeever, Xanath" <xmckeever@kirkland.com>, "Leach, Michael" <MLeach@GodwinRonquillo.com>, "York, R. Alan" <AYork@GodwinRonquillo.com>, "Bowman, Bruce" <Bbowman@GodwinRonquillo.com><br><br>Subject RE: Actions items from today's meet and confer - JLM Response |

Phillip (and Mark ) - please see my comments/clarifications to Philip's notes in red below.

Jenny

Attached are my quick and informal notes from this morning's call.  Please provide any additional thoughts or things that we should be tracking down to the list.

Thanks,
Philip

Jenny will respond to our 8/4 and 8/10 letters in writing today.  We deferred discussing those letters until a written response.  Jenny, Xanath and others have scheduled to talk tomorrow at 3 PM Central.  We provided the letters to BP in advance of the 3:00 call.

Investigation materials – addressed in my prior email to Jenny.  Your summary is not entirely accurate.  Gavin Hill clarified the status of HESI's response with you yesterday in the Chevron depo.

Info on who logged into Viking system – Jenny will send a letter with the names.  HESI will provide the names of the individuals who accessed Viking 24 hours before and after the explosion.

RT data from rig – Jenny will track down the other RT data (nitrogen pump, rig pumps, etc.)  I am looking into this, as BP is looking into the production of "Fann 70" or similar information about mud testing, which is more specifically referenced below.

Escrow agreement –BP to respond to HES redline – one issue was that new software was added into the escrow agreement – Jenny will check if HES has produced the native files for OptiCem RT, WellCat, etc., if so, then there is no need to escrow if the programs are publicly available. I will attempt to determine the versions utilized during the relevant time period.  It is my understanding that all programs other than the proprietary version of OptiCem are commercially available and thus there is no need for any Escrow Agreement with respect to these programs.  If that is not the case, I will confer with you further.

OptiCem inputs used by Gagliano – Jenny thought we received all inputs from the 4/18 OptiCem report, I indicated that we believe some inputs relating to fluid properties are missing – Jenny to check with client.  Also, Jenny indicated that as soon as the escrow agreement is completed, BP would have access to the 4/18 ADI file and this would alleviate the issue.  Also HES will check if it has Gagliano's earlier OptiCem files, 4/14, 4/15, etc.  I will check with HESI about what data is available.  An Escrow Agreement should moot these issues with respect to the 4/18 data, however, we need to confer about data for dates other than 4/18.

ROV data – Jenny to follow up with Esty – Philip to notify Esty that this is a priority. Yes, this is a priority. We have been told the data will be ready mid next week, but we would like it sooner if possible and can send a courier to retrieve it.

FANN 70 report – Jenny to follow up with MI Swaco on what was sent to BP – then Jenny to follow up with Mark on whether a FANN 70 report or something called "representative data" is available. **Mark - HESI requests the following documents for the Macondo well: (1) all Virtual Hydraulics reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud rheology and (2) all reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud static gel strength.   Regarding (1), after M-I informed us that Virtual Hydraulics reports may contain some of the information we need, we located the following 8 BP documents showing VH reports/data: BP-HZN-BLY00173415; BP-HZN-MBI00116135; BP-HZN-2179MDL00246598 (duplicate of MBI00116135); BP-HZN-2179MDL00349785; BP-HZN-2179MDL00349788; and BP-HZN-2179MDL00525453.  The underlined documents were also found in M-I's production.  The following 6 documents showing VH reports/data are in M-I's production, but not BP's: M-I 00001818; M-I 00003839; M-I 00003840; M-I 00005273 (duplicate of M-I 00005273); M-I 00006062; and M-I 00022966.  Please confirm that all VH reports/data for the Macondo well have been produced. Regarding (2), HESI located Fann 35 reports, however, the Fann 35 instrument cannot test the mud under pressure or at well condition temperatures.  Fann 70, 75, and 77 instruments can do such testing.  Whatever the name of the instrument or test method used, HESI requests that BP produce all data and reports associated with static gel strength and rheology testing of the mud under pressure and at temperature.  It is my understanding that Virtual Hydraulics is not used for determining static gel strength.  If static gel strength was not analyzed, please let me know.**

Search terms – Jenny stated that there was a miscommunication before but HES agrees to produce its search terms, which were previously negotiated with the PSC.  This accurately reflects my understanding.

Dep page cites – BP agreed to identify relevant deposition pages in response to HES Rog 15, and HES agrees to identify pages in its responses to BP Rogs 1, 2, 4, 15, 19, and 23. This accurately reflects my understanding.

Documents cited in response to interrogatories – parties generally agreed that citations to documents was appropriate – however, Jenny mentioned that HES might have a few specific complaints as to specific cites – Jenny to raise issue if necessary.  This accurately reflects my understanding.

BP Rog 8 and 10 – I explained that we want HES's contention and documents they know support their

contentions on cause and why they are not at fault. Jenny agreed to take a look at this and see if HES would supplement.  I am looking into this.

BP Rogs 16-18 – I proposed that non-Macondo discovery should be answered with protocols and standards that would apply to deepwater Gulf of Mexico – Jenny to discuss with HES – I reserved the right to come back on specific items where we think that Halliburton has "opened the door" to additional non-Macondo discovery but we weren't asking for that now.  I will consult with HESI, but our position that non-Macondo information is not relevant has not changed.

HES Rog 10 – I promised an amended response on sand locations.  This accurately reflects my understanding that the chart in BP's response is wrong.

HES Rogs – References to pleadings – I offered and they accepted us pasting in the portions of the pleadings that we are relying upon in the rog response – BP to take a look and amend responses.  This accurately reflects my understanding.  If after receipt of this information, we believe the responses are still inadequate, I will notify you promptly.

HES Rog 20 – Jenny explained that HES wanted an explanation as to "how" unstable foam caused the cement to fail – BP to consider whether it will amend its answer or stand on its position that the response is adequate.  This accurately reflects my understanding.

HES Rog 9 – I indicated that the rog was unclear as to what was being requested – Jenny indicated that a general statement as to roles and responsibilities may be acceptable– Jenny to send clarification.  I don't recall the ball being in my court on this one.  To the extent that BP has knowledge of the roles and responsibilities of the Macondo engineers with respect to cementing, which we believe it does (or can obtain from persons available to BP), more specific statements are proper.  If such information cannot be obtained, then the roles and responsibilities that apply to all BP engineers with respect to cementing deep water wells may be responsive.

HES Rog 31 – I explained the logistical difficulty with determining whether anyone disagrees with any part of the Bly report – I said this is way oo broad and asked for clarification – Jenny indicated that she would send clarification as to what parts of the Bly report and how they wanted us to comply with that request for BP to consider.  This accurately reflects my understanding of BP's position and I will attempt to narrow the issues.

Philip T. Chen
Kirkland & Ellis LLP
333 South Hope Street · Los Angeles, CA 90071
Tel +1-213-680-8341 · Fax +1-213-680-8500
philip.chen@kirkland.com

*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# GODWIN RONQUILLO PC

**Jenny Martinez**
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4620 Direct   (800.662.8393 Toll Free)
214.527.3119 Fax
JMartinez@GodwinRonquillo.com
GodwinRonquillo.com

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify Godwin Ronquillo PC immediately by telephone (800.662.8393) and destroy the original message. Messages sent to and from us may be monitored.

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].


************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************

# EXHIBIT 9

**From:**   Martinez, Jenny
**Sent:**    Thursday, August 18, 2011 11:56 AM
**To:**      'Mark Nomellini'
**Cc:**      Godwin, Donald; Andrew Langan; York, R. Alan; Bowman, Bruce; Harding, Barbara M.; Raines, Carolyn; Baker, Matt; Leach, Michael; MacLeod, Michelle; Chen, Philip T.; McKeever, Xanath
**Subject:** RE: Actions items from today's meet and confer - JLM Response

Thanks for the quick response Mark.  HESI requested the mud data in March via its RFP No. 44 ("Please produce all mud reports for the Macondo Well, including but not limited to, all Fann 70 reports.").  I have spoken with M-I and there are no "Fann 70 reports".  Thus, it appears that the Fann 70 instrument may not have used.  If the static gel strength of the mud was tested under pressure and at actual well temperature, an instrument other than the Fann 70 may have been used.  BP and M-I, not HESI, know what testing was done and what instruments were used, if such testing occurred.  If there was no testing, please let me know.  If the testing was done, HESI requests BP to produce the documents associated therewith, regardless of the brand name of the instrument or the testing method used.  Please feel free to give me a call if you would like to discuss further.

Sincerely,

---

**From:** Mark Nomellini [mailto:mnomellini@kirkland.com]
**Sent:** Thursday, August 18, 2011 11:24 AM
**To:** Martinez, Jenny
**Cc:** Andrew Langan; York, R. Alan; Bowman, Bruce; Harding, Barbara M.; Raines, Carolyn; Godwin, Donald; Baker, Matt; Leach, Michael; MacLeod, Michelle; Chen, Philip T.; McKeever, Xanath
**Subject:** RE: Actions items from today's meet and confer - JLM Response

Jenny,

Thanks for your e-mail.  There appear to be a number of new requests of BP below.  We will review.

Regarding Fann-70 reports, after conducting a reasonable search, we have not located any Fann-70 reports received by BP from MI-Swaco for the Macondo well.  Have you asked MI-Swaco for these reports?

Regards,

Mark

| | |
|---|---|
| **"Martinez, Jenny" <JMartinez@GodwinRonquillo.com>** | To "Chen, Philip T." <pchen@kirkland.com>, "Mark Nomellini" <mnomellini@kirkland.com>, "Harding, Barbara M." <bharding@kirkland.com> "Raines, Carolyn" <CRaines@GodwinRonquillo.com>, "Baker, Matt" <MBaker@GodwinRonquillo.com>, "MacLeod, Michelle" <MMacLeod@GodwinRonquillo.com> |
| 08/18/2011 11:15 AM | cc "Godwin, Donald" <DGodwin@GodwinRonquillo.com>, "Andrew Langan" <alangan@kirkland.com>, "McKeever, Xanath" <xmckeever@kirkland.com>, " Michael" <MLeach@GodwinRonquillo.com>, "York, R. Alan" <AYork@GodwinRonquillo.com>, "Bowman, Bruce" <Bbowman@GodwinRonquillo.com> |
| | Subject RE: Actions items from today's meet and confer - JLM Response |

Phillip (and Mark ) - please see my comments/clarifications to Philip's notes in red below.

Jenny

Attached are my quick and informal notes from this morning's call.  Please provide any additional thoughts or things that we should be tracking down to the list.

Thanks,
Philip

Jenny will respond to our 8/4 and 8/10 letters in writing today.  We deferred discussing those letters until a written response.  Jenny, Xanath and others have scheduled to talk tomorrow at 3 PM Central.  We provided the letters to BP in advance of the 3:00 call.

Investigation materials – addressed in my prior email to Jenny.  Your summary is not entirely accurate. Gavin Hill clarified the status of HESI's response with you yesterday in the Chevron depo.

Info on who logged into Viking system – Jenny will send a letter with the names. HESI will provide the names of the individuals who accessed Viking 24 hours before and after the explosion.

RT data from rig – Jenny will track down the other RT data (nitrogen pump, rig pumps, etc.)  I am looking into this, as BP is looking into the production of "Fann 70" or similar information about mud testing, which is more specifically referenced below.

Escrow agreement –BP to respond to HES redline – one issue was that new software was added into the escrow agreement – Jenny will check if HES has produced the native files for OptiCem RT, WellCat, etc., if so, then there is no need to escrow if the programs are publicly available. I will attempt to determine the versions utilized during the relevant time period.  It is my understanding that all programs other than the proprietary version of OptiCem are commercially available and thus there is no need for any Escrow Agreement with respect to these programs.  If that is not the case, I will confer with you further.

OptiCem inputs used by Gagliano – Jenny thought we received all inputs from the 4/18 OptiCem report, I indicated that we believe some inputs relating to fluid properties are missing – Jenny to check with client.  Also, Jenny indicated that as soon as the escrow agreement is completed, BP would have access to the 4/18 ADI file and this would alleviate the issue.  Also HES will check if it has Gagliano's earlier OptiCem files, 4/14, 4/15, etc.  I will check with HESI about what data is available.  An Escrow Agreement should moot these issues with respect to the 4/18 data, however, we need to confer about data for dates other than 4/18.

ROV data – Jenny to follow up with Esty – Philip to notify Esty that this is a priority. Yes, this is a priority. We have been told the data will be ready mid next week, but we would like it sooner if possible and can send a courier to retrieve it.

FANN 70 report – Jenny to follow up with MI Swaco on what was sent to BP – then Jenny to follow up with Mark on whether a FANN 70 report or something called "representative data" is available.  **Mark - HESI requests the following documents for the Macondo well: (1) all Virtual Hydraulics reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud rheology and (2) all reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud static gel strength.   Regarding (1), after M-I informed us that Virtual Hydraulics reports may contain some of the information we need, we located the following 8 BP documents showing VH reports/data: BP-HZN-BLY00173415; BP-HZN-MBI00116135; BP-HZN-**

**2179MDL00246598 (duplicate of MBI00116135); BP-HZN-2179MDL00349785; BP-HZN-2179MDL00349788; and BP-HZN-2179MDL00525453. The underlined documents were also found in M-I's production. The following 6 documents showing VH reports/data are in M-I's production, but not BP's: M-I 00001818; M-I 00003839; M-I 00003840; M-I 00005273 (duplicate of M-I 00005273); M-I 00006062; and M-I 00022966. Please confirm that all VH reports/data for the Macondo well have been produced. Regarding (2), HESI located Fann 35 reports, however, the Fann 35 instrument cannot test the mud under pressure or at well condition temperatures. Fann 70, 75, and 77 instruments can do such testing. Whatever the name of the instrument or test method used, HESI requests that BP produce all data and reports associated with static gel strength and rheology testing of the mud under pressure and at temperature. It is my understanding that Virtual Hydraulics is not used for determining static gel strength. If static gel strength was not analyzed, please let me know.**

Search terms – Jenny stated that there was a miscommunication before but HES agrees to produce its search terms, which were previously negotiated with the PSC.  This accurately reflects my understanding.

Dep page cites – BP agreed to identify relevant deposition pages in response to HES Rog 15, and HES agrees to identify pages in its responses to BP Rogs 1, 2, 4, 15, 19, and 23. This accurately reflects my understanding.

Documents cited in response to interrogatories – parties generally agreed that citations to documents was appropriate – however, Jenny mentioned that HES might have a few specific complaints as to specific cites – Jenny to raise issue if necessary. This accurately reflects my understanding.

BP Rog 8 and 10 – I explained that we want HES's contention and documents they know support their contentions on cause and why they are not at fault. Jenny agreed to take a look at this and see if HES would supplement. I am looking into this.

BP Rogs 16-18 – I proposed that non-Macondo discovery should be answered with protocols and standards that would apply to deepwater Gulf of Mexico – Jenny to discuss with HES – I reserved the right to come back on specific items where we think that Halliburton has "opened the door" to additional non-Macondo discovery but we weren't asking for that now. I will consult with HESI, but our position that non-Macondo information is not relevant has not changed.

HES Rog 10 – I promised an amended response on sand locations. This accurately reflects my understanding that the chart in BP's response is wrong.

HES Rogs – References to pleadings – I offered and they accepted us pasting in the portions of the pleadings that we are relying upon in the rog response – BP to take a look and amend responses. This accurately reflects my understanding. If after receipt of this information, we believe the responses are still inadequate, I will notify you promptly.

HES Rog 20 – Jenny explained that HES wanted an explanation as to "how" unstable foam caused the cement to fail – BP to consider whether it will amend its answer or stand on its position that the response is adequate. This accurately reflects my understanding.

HES Rog 9 –I indicated that the rog was unclear as to what was being requested – Jenny indicated that a general statement as to roles and responsibilities may be acceptable– Jenny to send clarification. I don't recall the ball being in my court on this one. To the extent that BP has knowledge of the roles and responsibilities of the Macondo engineers with respect to cementing, which we believe it does (or can obtain from persons available to BP), more specific statements are proper. If such information cannot be obtained, then the roles and responsibilities that apply to all BP engineers with respect to cementing deep water wells may be responsive.

HES Rog 31 – I explained the logistical difficulty with determining whether anyone disagrees with any part of the Bly report – I said this is way oo broad and asked for clarification – Jenny indicated that she would send clarification as to what parts of the Bly report and how they wanted us to comply with that request for BP to consider. This accurately reflects my understanding of BP's position and I will attempt to narrow the issues.

Philip T. Chen
Kirkland & Ellis LLP
333 South Hope Street · Los Angeles, CA 90071
Tel +1-213-680-8341 · Fax +1-213-680-8500
philip.chen@kirkland.com

*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************

GODWIN RONQUILLO PC

**Jenny Martinez**
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4620 Direct   (800.662.8393 Toll Free)
214.527.3119 Fax
JMartinez@GodwinRonquillo.com
GodwinRonquillo.com

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify Godwin Ronquillo PC immediately by telephone (800.662.8393) and destroy the original message. Messages sent to and from us may be monitored.

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)

promoting, marketing or recommending to another party any transaction or tax-related matter[s].

```
************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************
```

# EXHIBIT 10



A Professional Corporation

DALLAS HOUSTON

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332 Fax

GodwinRonquillo.com

JENNY L. MARTINEZ - SHAREHOLDER
DIRECT DIAL:      214.939.4620
DIRECT FAX:      214.527.3119
JMartinez@GodwinRonquillo.com

August 19, 2011

Barbara M. Harding
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

> Re:   In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on
> April 20, 2010, MDL No. 2179

Dear Barbara,

As referenced in my August 9, 2011, letter, Halliburton Energy Services, Inc.'s ("HESI") has concerns with multiple items in BP's Responses and Objections to HESI's Interrogatories and Requests for Admission ("BP's Responses"). This letter identifies deficiencies in BP's responses and offers clarifications to certain requests.

Many of BP's responses, particularly to the requests for admissions ("RFAs"), fail to answer the question presented and instead make lengthy statements about HESI's responsibilities and obligations. While such comments may be appropriate as objections to questions about BP's or HESI's responsibilities, they do not serve to clarify the accuracy of BP's answers or avoid any unfair inferences to questions about other topics such as engineering protocols or standards. Instead, the statements deflect and avoid answering the interrogatories or RFAs as asked. HESI requests that BP amend certain responses, as identified below.

### BP Responses to Interrogatories

**Interrogatory No. 1 – Exact location of six centralizers**. HESI asked for the "exact location" of every centralizer used on the 9 7/8" x 7" production casing on the Macondo Well. BP responded by citing to the entire Bly Report, its cross-claims against HESI and others, and two documents identified by Bates number that do not (without further explanation) clearly answer the question. Please amend this response to disclose the exact location of the six centralizers, particularly the top and bottom of each.

**Interrogatory No. 6 – BP wells with a full bottoms up prior to cement job.** HESI asked BP to identify "all BP wells wherein BP circulated at least one full bottoms up immediately prior to a final cement job." BP refused to answer in part because the query is beyond the Macondo Well and is not geographically limited. While HESI recognizes that parties

Page 2

should not conduct fishing expeditions, BP appears to take the position that a bottoms up prior to a cement job is not necessary. Thus, this issue of whether a bottoms up should be run before a cement job has become a crucial issue in this case, and this Interrogatory seeks relevant information. HESI will agree to limit the query to wells in the Gulf of Mexico.

**Interrogatory No. 7 – BP negative test protocol.** HESI requested that BP identify the policies and procedures regarding the design and interpretation of negative tests and how those policies are communicated to well site leaders. BP's response references "BP's policy" but does not identify such policy or any document containing this policy. Please identify all policies and procedures and explain how BP well site leaders are provided with this information. If there are no written policies, please state so.

**Interrogatory No. 8 – Safety steps before underbalancing a well.** HESI asked BP to identify the safety steps that should have been taken before underbalancing the Macondo Well. BP's response identifies "relevant BP company policies and procedures" allegedly responsive to the Interrogatory, but only identifies the DWOP. Please identify the other "policies and procedures" referenced in the Interrogatory. Additionally, please identify the specific sections in the documents referenced that BP contends are responsive.

**Interrogatory No. 9 – Roles and responsibilities of cementing engineers.** HESI requested that BP identify the job roles and responsibilities of the BP engineers as they relate to cementing and who filled those roles. BP's response references a chart that only identifies individuals and does not describe the roles and responsibilities of BP engineers as they relate to cementing. Further, BP limits its answer to those "relating to the cementing of the production casing", which is only a subset of the information requested. Please identify the *job roles and responsibilities* of BP engineers as they relate to cementing including, but not limited to, the cementing of the production casing of the Macondo Well.

**Interrogatory No. 10 – Pay zones and sands.** HESI requested that BP identify and describe all pay zones and sands in the Macondo Well and list the pore pressures and depth for each. Thank you for agreeing to amend BP's responses by providing a correct chart. Please note that this Interrogatory is not limited in time, and all known pay zones and sands to date should be identified.

**Interrogatory No. 12 – Flow path.** HESI asked BP to "Describe the flow path of the hydrocarbons from the Macondo Well *starting* on April 20, 2010, and *continuing* until the well was killed." (emphasis added). BP's response improperly references the voluminous Bly Report. Appendix G of the Bly Report states that the flow path was down the annulus and up the casing but "alternative flow paths are possible but much less likely." App. G at 222. Please either confirm that page 222 of Appendix G is responsive or otherwise identify BP's position on the flow path.

**Interrogatory No. 13 – Data to support answer to No. 12.** Like BP's response to No. 12, the response to No. 13 references the voluminous Bly Report and "back up materials and analysis." Please identify all data that supports BP's description of the flow path.

Page 3

**Interrogatory Nos. 14 & 15 – Blowout preventer** – BP's response cites to the DNV Report, but disclaims its accuracy.  In addition to improperly referencing a large document without specifying where the answer might be found, citing a report that may not be accurate is not a response at all.  Please identify the sections of those voluminous documents that BP admits are responsive.  In addition, as discussed in our August 16 conference, provide deposition page citations and identify excerpts of the pleadings cited in BP's response to No. 15.

**Interrogatory No. 17 – When BP learned additives would be used in the slurry.** HESI asked BP when it first learned that the additives addressed in Interrogatory 16 were to be used in the cement slurry on the 9 7/8" x 7" production casing on the Macondo Well.  BP's response references the date HESI first recommended that certain additives be used in the cement slurry by citing one document and referencing other documents sent by Jesse Gagliano to BP without citation.  *When BP first learned* when the additives would be used is not provided. Please identify the date or dates BP first learned that additives would be used.

**Interrogatory Nos. 19 & 20 – Safety of cement.**  As discussed in our August 16 conference, BP will consider whether to amend its answer to No. 20 to explain how the allegedly unstable foam and nitrogen break out could cause the cement to fail.  In addition, BP's answer to No. 19 does not "describe the reasons the cement was unsafe."  Please answer Interrogatories Nos. 19 & 20 and clearly state why "unstable cement" is "unsafe."

**Interrogatory Nos. 30 & 31 – Validity of and disagreements with the Bly Report.**  As HESI raised in its August 9 letter and as we discussed in our August 16 conference, we will narrow the issues in the Bly Report for which we would like confirmation.  Interrogatory No. 31 requests a list of any BP employee, agent, or consultant who was involved in the investigation and drafting of the Bly Report (*i.e.*, a limited universe of individuals) who expressed disagreement with any observations or conclusions in the Report.  HESI requests that BP provide each such name and a detailed description of any disagreements with the following statements in the Bly Report, along with a confirmation or denial of whether BP stands by each statement.

- The initial flow into the well came through the shoe track barriers.  Rpt. at 36-37.

- The flow path was down the annulus and up the casing but "alternative flow paths are possible but much less likely."  App. G at 222; *see also* Interrog. No. 12.

- "... the uplift force during the negative - pressure test did not unseat the seal assembly."  Bly Rpt. at 38.

- It is "highly unlikely" that a casing failure mode contributed to the loss of well control.  Rpt. at 38.

- Note that BP's responses to RFA Nos. 88, 89, and 91 qualify Figure 1 on Bly Report page 54 as based on "geology known at the time of the

Page 4

accident."  Please confirm any disagreement about the accuracy of this Figure.

- The cement was unstable resulting in nitrogen breakout which explains the failure to achieve zonal isolation.  Rpt. at 34-35.

- Nitrogen breakout and migration would have contaminated the shoe track cement causing that barrier to fail.  Rpt. at 77.

- Contamination of the shoe track cement whether from mud in the wellbore, commingling of cement with nitrogen from nitrogen breakout in the cement slurry, swapping of the shoe track cement with the mud in the rathole, or some combination of these factors caused the cement to fail to prevent the ingress of hydrocarbons.  Rpt. at 69-70.

- The failure to use 21 centralizers "likely did not contribute" to the cement's alleged failure.  Rpt. at 35.

### BP's Responses to Requests for Admission

While I address specific RFAs below, I would like to generally address the problem of referencing deposition testimony without specifying page numbers in RFAs Nos. 27 (John Gisclair), 28 (John Gisclair), 44 (Murray Sepulvado), 45 (Murray Sepulvado), 69 (John Gisclair), 70 (Kelly Gray), 81 (Kelly Gray and John Gisclair), 82 (same), 83 (Kelly Gray).  Please provide page and line references for the testimony BP contends is responsive.

**RFA No. 5** – HESI asked BP to admit that it did not authorize HESI to provide more than two mud loggers at a time on the Deepwater Horizon.  BP's response states that "[t]here were multiple instances when there were more than two mud loggers working on the *Deepwater Horizon*."  BP's response does not state whether or not more than two mud loggers at a time was authorized by BP.  Please admit or deny the request as asked.

**RFA No. 10** – HESI asked BP to admit that the BP well site leader did not notice the kick on March 8, 2010 for approximately 33 minutes.  BP's response identifies who BP thinks is responsible for monitoring, but fails to answer whether or not the BP well site leader did not notice the kick on March 8, 2010 for approximately 33 minutes.  *See* Bly Rpt. at 107.  Please admit or deny the request as asked.

**RFAs Nos. 15-24, 37, 41-43** – HESI asked whether the well site leader's response to the HESI mud logger's notice of potential influx complied with BP policy regarding responses to well control events.  BP's responses to these RFAs include lengthy statements about the responsibilities of HESI or other parties, but these requests do not inquire about responsibilities.  These requests ask about the BP well site leader's awareness, understanding, or acts.  Please admit or deny the RFAs as stated.

Page 5

**RFA Nos. 46 & 47** – BP's response states that BP cannot tell what policy is referenced. HESI refers to any BP policies addressing responses to well control events or "kicks."  Please amend your response in light of this clarification.

**RFA No. 53** – HESI asked BP to admit that BP did not advise HESI of an increase in flow-out from the well as measured by Transocean's flow-out sensor after 17:00 hours on April 20, 2010.  BP responded that HESI had real time data on standpipe pressure (an answer to the preceding RFAs), but BP fails to answer this question which is about the *flow-out sensor*.  HESI assumes this answer is a typographical error.  Please admit or deny the RFA as asked.

**RFA No. 58** – BP denied it did not advise HESI of any "situation developing with safety implications after 17:00 hours on April 20, 2010" because "virtually all actions or activities on the well may potentially have safety implications."  While that may philosophically be true, on April 20, 2010, very real safety situations were actively developing and the question is whether or not BP advised HESI of such at the time specified.  Please admit or deny whether *on April 20, 2010 after 17:00 hours* BP advised HESI of any such situation.

**RFA Nos. 61-65, 73, 78-80, 85** – These RFAs ask whether BP informed HESI of certain facts, whether BP understood the status of HESI's ability to monitor, whether BP's well site leader could or did monitor, whether certain activities inhibited HESI's ability to monitor, and whether BP made a decision.  BP's perspective on the responsibilities of mud loggers does not shield it from answering RFAs that do not ask about such responsibilities.  Please admit or deny the questions asked.  In addition, BP's complaint that No. 63 does not specify a time is incorrect - April 20 is specified.

**RFA Nos. 86-87** – BP denied these RFA's while admitting that it is aware of a sand interval labeled M57B with a pore pressure of 14.15 ppg.  Please clarify that BP admits that it is aware of the sand known as M57B and whether or not this sand exists at a depth of 17,451' to 17,453'.

**RFA Nos. 89-90** – BP's comments indicate that RFA No. 89 should be admitted, yet this RFA is denied.  Please clearly admit or deny whether Figure 1 at page 54 of the Bly Report does not reflect the sand interval known as M57B.  RFA No. 90 asks that BP admit that it identified M57B after April 20, 2010, but BP's answer omits any reference to the date provided.  Please fully admit or deny whether BP identified M57B *after April 20, 2010*.

**RFA No. 93** – BP's response improperly rephrases the RFA from what BP claimed it was aware of at the time of the cement job, to what is, as a factual matter, the shallowest sand in the production interval.  In addition, it is unclear what exactly BP is denying in its response.  Please plainly admit or deny that, *as of the time of the cement job* in the production casing, BP claims that the shallowest sand of which it was aware was the 13.1 ppg sand at approximately 17,788'.

**RFA No. 95** – BP's response refers to an MMS standard that top of cement ("TOC") should be 500 feet above the uppermost hydrocarbon bearing sand.  BP's response to No. 93 states that the uppermost sand is at 17,788'.  Because 17,788' less 500' is approximately 17,260',

Page 6

please explain what BP has denied in this RFA and how BP reached its conclusion given BP's statements in No. 93 and in this RFA.

**RFA No. 101** – This RFA asks BP to admit that had annular cement been designed to cover the shoe at 17,168', a sealed annulus would have been created which would have increased the risk of casing collapse due to annular pressure build-up ("APB"). The statements in BP's denial regarding the presence of hydrocarbons in the 14.15 ppg sand interval labeled M57B are irrelevant to the APB inquiry. Please answer the RFA as asked by addressing the APB issue. If the alleged lack of hydrocarbons in the M57B sands impacts your response, please explain.

**RFA Nos. 103-08** – These RFAs ask whether specific sands or zones constitute distinct permeable zones for the purpose of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*. BP's rote quotation of the definition of "distinct permeable zone" is confusing as it does not clarify or support BP's denials. Please admit or deny whether BP believes each described zone or sand meets that definition.

**RFA No. 109** – This request does contain a typographical error for which HESI apologizes. The phrase "main hydrocarbon zones" is quoted in RFA No. 140 (not No. 142) which references BP's use of this phrase in the Bly Report, page 35. (RFA No. 142 asks that BP admit that "main hydrocarbon zones" as it uses the term refers to the three 12.6 ppg sands identified as "Primary Reservoir Sands" in Figure 1, Bly Report, page 54, which BP admitted). Now that HESI has explained that "main hydrocarbon zones" is BP's term, please admit or deny this RFA.

**RFA Nos. 112-14** – HESI has reviewed the Bly Report, and while one may infer that BP's claim is that the initial flow of hydrocarbons came from the 13.1 ppg sand, the Report does not explicitly so state. Consequently, BP's answer to No. 112 is unclear and BP's denial contradicts the citation to the Bly Report. The Report at pages 215 to 216 indicates that BP believes the flow came from the 13.1 ppg sand (also known as M56A). Please clarify BP's response. As BP's Responses to Nos. 113 and 114 reference its response to 112, likewise please clarify those responses.

**RFA No. 115** – This request contains a typographical error and should have referenced RFA No. 140 where BP admits that "main hydrocarbon zones" refers to the 12.6 ppg sands depicted and identified as "Primary Reservoir Sands" in "Figure 1" on page 54 of the Bly Report. Given this clarification, please amend the response.

**RFA No. 131** – BP's response admits only part of the question. Please admit or deny whether the 15 centralizers were what BP ordered (not merely that they were delivered *after* BP placed an order).

**RFA Nos. 137-39, 141** – These responses appear to have a typographical error ("the centralizer located there would appropriately centralizer the pipe"). Please clarify BP's answers to each.

Page 7

**RFA Nos. 143, 144** – BP's responses to these RFAs improperly limit the requests to the time period before April 20, 2010.   Please amend the responses to reflect BP's modeling conducted after April 20, 2010.

**RFA Nos. 158-63** – These RFAs ask an engineering question.   BP's answers do not address the requests, but rather complain about HESI's job performance and that BP "planned" to run a cement bond log when BP returned to complete the well at some unspecified later date. These comments are not responsive to the requests.   Please admit or deny the RFAs as asked.

**RFA No. 179** –This RFA asks whether BP "knew it was not in possession of a foam stability test result for the slurry that was used" at the time of the cement job.   BP's complaints about HESI's job performance are not responsive.   Please amend the response to answer the question about BP's *knowledge*.

**RFA No. 180** – This question asks whether *BP informed HESI* that the cement job was successfully executed, but BP answers that "Halliburton informed BP that the cement job was successfully executed."   BP apparently misunderstood this RFA.   Please amend the response accordingly.

*      *      *

Please let me know if you are available on Monday afternoon to meet and confer about the foregoing.

Best regards,

*Jenny Martinez*

Jenny L. Martinez

JLM/

cc:    Donald E. Godwin
       R. Alan York
       Carolyn R. Raines

# EXHIBIT 11

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Barbara M. Harding
To Call Writer Directly:                                (202) 879-5000                                Facsimile:
(202) 879-5081                                                                                                    (202) 879-5200
barbara.harding@kirkland.com                        www.kirkland.com

August 25, 2011

**Via Electronic Mail**

Jenny Martinez
Godwin Ronquillo PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

Re:     In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on
April 20, 2010, MDL No. 2179

Dear Jenny:

I write to address various discovery issues that have been the subject of prior "meet-and-confer" discussions between our respective teams.  First, I identify below the interrogatory responses that BP agrees to supplement in response to Halliburton's requests.  Second, I address Halliburton's August 18th request for BP to produce Virtual Hydraulics reports and other reports related to mud static gel strength.  Finally, I review the status of our attempts to reach agreement on an OptiCem Software Escrow Agreement to provide BP access to the software and inputs that Halliburton used for the Macondo well.

## I.     INTERROGATORY RESPONSES BP AGREES TO SUPPLEMENT

**Halliburton's complaint relating to "Broad references to documents":**

Based on our discussions and your correspondence, we understand that you have limited your complaint to BP's responses to Halliburton Interrogatory Nos. 14 and 15 relating to the citation to the Final Report provided by Det Norske Veritas ("DNV Report").  Accordingly, BP will amend its responses to clarify the citation to the DNV Report.

**Halliburton's complaint relating to "Bly Report Findings":**

Based on our discussions and your correspondence, we understand that you seek confirmation of the following assertions from the BP Incident Investigation Report (IIT Rpt.) flagged in your August 19, 2011 letter:

Chicago          Hong Kong          London          Los Angeles          Munich          New York          Palo Alto          San Francisco          Shanghai

Jenny Martinez
Godwin Ronquillo PC
Page 2

- "Based on available evidence, hydrostatic pressure calculations, OLGA® well flow modeling and analysis of data from the Macondo well static kill on August 4, 2010, hydrocarbons entered the casing through the shoe track."  [IIT Rpt. at 37]

- "Based on hydrostatic calculations and OLGA® well flow modeling, the hydrocarbon in-flow was most likely caused by flow through the annulus cement barrier and shoe track barriers of the well.  Based on this work, alternative flow paths are possible but much less likely.  The investigation team could not identify an alternative flow path that had both a plausible mechanical failure mode and could be modeled to match the accident timeline from a pressure response perspective.  When this work is combined with analysis of the static well kill results and the other available evidence, in the view of the investigation team there is a compelling case for flow having been through the annulus cement barrier and shoe track barriers."  [IIT Rpt. at App. G at 222].

- "The investigation team has concluded that initial flow into the wellbore was through the shoe track, not through the casing hanger seal assembly.  This supports the conclusion that the uplift forces during the negative-pressure test did not unseat the seal assembly."  [IIT Rpt. at 38].

- "The investigation team concludes that the production casing and components met all the required design conditions and that it is highly unlikely that a casing failure mode contributed to the loss of well control."  [IIT Rpt. at 38].

- That Figure 1 correctly notes "Note: Sands are based on geology known at the time of the accident."  [IIT Rpt. at 54].

- "Based on CSI Technologies' lab results and analysis, the investigation team concludes that the nitrified foam cement slurry used in the Macondo well probably would have experienced nitrogen breakout, nitrogen migration and incorrect cement density, which would explain the failure to achieve zonal isolation of hydrocarbons."  [IIT Rpt. at 35].

- "Nitrogen breakout and migration would have also contaminated the shoe track cement and may have caused the shoe track cement barrier to fail."  [IIT Rpt. at 77].

- "Based on available evidence, hydrostatic pressure calculations, OLGA® well flow modeling and analysis of data from the Macondo well static kill on August 4, 2010, hydrocarbons entered the casing through the shoe track.  Therefore, the shoe track cement and the float collar must have failed to prevent this ingress. The investigation team has not established whether this failure was attributable to the design of the cement, contamination of the cement by mud in the wellbore, commingling of cement with nitrogen due to nitrogen breakout from the foam

Jenny Martinez
Godwin Ronquillo PC
Page 3

cement slurry, swapping of the shoe track cement with the mud in the rathole (bottom of the well), or some combination of these factors."  [IIT Rpt. at 69-70].

- "Although the decision not to use 21 centralizers increased the possibility of channeling above the main hydrocarbon zones, the decision likely did not contribute to the cement's failure to isolate the main hydrocarbon zones or to the failure of the shoe track cement."  [IIT Rpt. at 35].

BP continues to object to this interrogatory for the reasons stated in our original response. Most importantly, this interrogatory seeks information that calls for the opinion of experts and, as such, is not timely.  Discovery related to experts will be disclosed in accordance with the Court's orders.

As for Interrogatory No. 31, the IIT Team's report reflects the IIT team's views.  In formulating the report, individuals may have made any number of inquiries and expressed any number of views, as one would expect in any such investigation.  However, documents and communications among team members have already been the subject of extensive production and questioning.  Accordingly, it is unreasonable to ask BP to reconstruct in an interrogatory response whether any single individual at BP involved in the IIT's investigation ever expressed any sentiment during the investigation that can be in some way considered "disagreement." Accordingly, BP continues to object to this interrogatory on the ground that it is burdensome, vague, and not calculated to lead to the discovery of admissible evidence.

**Halliburton's complaint relating to "References to other Pleadings":**

Based on our discussions and your correspondence, we understand that both parties have agreed to supplement their response to interrogatories with specific page cites.  As such, BP agrees to supplement its response to Halliburton Interrogatory No. 15 with page cites to the depositions of Mike Byrd and Fereidoun Abbassian as appropriate.   BP understands that Halliburton will supplement its responses to BP Interrogatory Nos. 1, 2, 4, 15, 19, 23, 24, 25, and 26.

**Halliburton's complaint relating to "Sands and Pore Pressures"/Halliburton's Interrogatory No. 10:**

We have already indicated to you that BP will provide an amended response related to the chart listing the sand locations and pore pressures.

**Halliburton's complaint relating to "Nitrogen Breakout":**

Halliburton's Interrogatory No. 20 asks two questions:  (a) "Do you contend that the foam cement used on the Macondo Well 9 7/8" x 7" production casing was unstable?"; and (b) "If so, what do you contend occurred as a result of the instability?"  BP responded to both parts: (a) "Based on current information available after the incident, BP contends that the foamed cement that Halliburton designed, tested, recommended and pumped on the production interval

Jenny Martinez
Godwin Ronquillo PC
Page 4

was unstable."; and (b) "Based on currently available information, the foamed cement slurry that Halliburton designed, tested, recommended and pumped on the production interval experienced, among other things, nitrogen breakout due to its instability.  Among other things, the nitrogen breakout caused the cement to fail to isolate and prevent the flow of hydrocarbons down the annulus and up the shoe track resulting in the uncontrolled flow of hydrocarbons and blowout that occurred on April 20, 2010."

Halliburton now asks BP a third question:  (c) "how nitrogen breakout 'caused' the cement to fail to isolate and prevent the flow of hydrocarbons."  That question is different than the first two questions and BP does not believe that the interrogatory, read fairly, covers it. Further, each of these inquiries improperly seeks information that calls for the opinion or experts and, as such, is not timely.  Discovery related to experts will be disclosed in accordance with the Court's orders.

**Halliburton's complaint relating to "BP Engineers' Roles and Responsibilities":**

As indicated during our prior conferences, BP agrees to supplement its response to Halliburton's Interrogatory No. 9 by describing the general roles that BP's engineers have with respect to cementing.

## II. HALLIBURTON'S REQUEST FOR VIRTUAL HYDRAULICS REPORTS AND OTHER REPORTS RELATED TO MUD STATIC GEL STRENGTH

Halliburton's RFP No. 4 seeks the production of "[a]ny FANN 70 reports showing the static gel strength of the mud used at the Macondo well between April 1, 2010 and April 20, 2010."  *See* Halliburton's RFP No. 4.  As explained in our prior "meet-and-confer" discussions, BP has been unable to locate any such FANN 70 reports following a reasonable search.

In light of this fact, on August 18th, Halliburton decided to broaden the scope of what it had previously requested to now include (1) "all Virtual Hydraulics reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud rheology," and (2) "all reports and other documents related to the inputs or data obtained and/or utilized in analyzing mud static gel strength.  *See* J. Martinez 8/18/2011 e-mail to M. Nomellini and P. Chen.  While these are essentially new requests, BP nevertheless agrees to undertake a reasonable search for and produce these documents.  In fact, we have already produced the Virtual Hydraulics reports sought by Halliburton (including at BP-HZN-2179MDL03297348-386) that we have located upon reasonable investigation, and will continue to search for and produce any non-privileged mud static gel strength reports that can be located through reasonable investigation, although we currently are not aware of any that have not been produced.

## III. OPTICEM SOFTWARE AGREEMENT

We have received your redline to the draft software escrow agreement that BP circulated. As discussed on our call on Monday, August 15, 2011 and Tuesday, August 23, 2011, the

Jenny Martinez
Godwin Ronquillo PC
Page 5

primary disagreement appears to be whether Halliburton will escrow its software programs and input files other than OptiCem that were used by its Macondo team.

Accordingly, we have attached two versions of the proposed software escrow agreement to this letter for your further consideration. The first version accepts nearly all of your proposed changes to the draft software escrow agreement and encompasses all of the software used by Halliburton on or before April 20, 2010 for cementing services related to the Macondo well, including OptiCem, WellCat, and CemWin. The second version also accepts nearly all of your proposed changes to the draft software escrow agreement but encompasses only the proprietary version of OptiCem used by Halliburton for cementing services related to the Macondo well.

If Halliburton refuses to escrow any software other than OptiCem, BP will accept the terms set forth in the second version of the draft escrow agreement in order to obtain access to the OptiCem software and will move separately to compel Halliburton to escrow the remaining software programs and inputs at issue. If Halliburton refuses to escrow all of these programs, BP will move to compel and seek copies of the software to be utilized pursuant to the current confidentiality agreement in place in the litigation.

Please let us know how Halliburton intends to proceed, so that we may determine whether or not we will need to file a motion on this subject.

Sincerely,

/s/ Barbara M. Harding
Barbara M. Harding

BMH/djs

# EXHIBIT 12

# HALLIBURTON

**Bp America Prod Co-sorac/gom Ebiz**
**PO Box 22024 - Do Not Mail**
**Tulsa, Oklahoma 74121-2024**

Macondo 1
MISSISSIPPI CANYON Blk: 252

United States of America

# 9 7/8" X 7" Production Casing

Prepared for: Brian Morel

April 15, 2010
Version: 4

Submitted by:
Jesse Gagliano
Halliburton
10200 Bellaire Blvd
Houston, Texas 77072-5299

HALLIBURTON

HIGHLY CONFIDENTIAL                                    HAL_0126063

**HALLIBURTON** _____

*Halliburton appreciates the opportunity to present
this proposal and looks forward to being of service to you.*

## Foreword

Enclosed is our recommended procedure for cementing the casing strings in the referenced well. The information in this proposal includes well data, calculations, materials requirements, and cost estimates. This proposal is based on information from our field personnel and previous cementing services in the area.

Halliburton Energy Services recognizes the importance of meeting society's needs for health, safety, and protection of the environment. It is our intention to proactively work with employees, customers, the public, governments, and others to use natural resources in an environmentally sound manner while protecting the health, safety, and environmental processes while supplying high quality products and services to our customers.

We appreciate the opportunity to present this proposal for your consideration and we look forward to being of service to you. Our Services for your well will be coordinated through the Service Center listed below. If you require any additional information or additional designs, please feel free to contact myself or our field representative listed below.

Prepared and Submitted by:    _____

Jesse Gagliano
Technical Advisor


SERVICE CENTER:          Lafayette, La


SERVICE COORDINATOR:     Danny Mooney
OPER. ENGINEER:          Yarigsa Aviles
PHONE NUMBER:            1-800-444-7830

HIGHLY CONFIDENTIAL                                                    HAL_0126064

# HALLIBURTON

## *Job Information*                    *9 7/8" X 7" Production Casing*

Well Name: Macondo                  Well #: 1

| Riser | 0 - 5067 ft (MD) |
|---|---|
| Outer Diameter | 24.000 in |
| Inner Diameter | 19.500 in |

| 16" Casing | 5067 - 11585 ft (MD) |
|---|---|
| Outer Diameter | 16.000 in |
| Inner Diameter | 14.920 in |
| Linear Weight | 97 lbm/ft |

| 13 5/8" Liner | 11185 - 13100 ft (MD) |
|---|---|
| Outer Diameter | 13.625 in |
| Inner Diameter | 12.375 in |
| Linear Weight | 88.20 lbm/ft |

| 11 7/8" Liner | 12816 - 15113 ft (MD) |
|---|---|
| Outer Diameter | 11.875 in |
| Inner Diameter | 10.711 in |
| Linear Weight | 71.80 lbm/ft |

| 9 7/8" Liner | 14803 - 17163 ft (MD) |
|---|---|
| Outer Diameter | 9.875 in |
| Inner Diameter | 8.625 in |
| Linear Weight | 62.80 lbm/ft |

| 10 1/2" Average Hole Size | 17163 - 18130 ft (MD) |
|---|---|
| Inner Diameter | 10.500 in |
| Job Excess | 0 % |

| 8.88" Average Hole Size | 18130 - 18300 ft (MD) |
|---|---|
| Inner Diameter | 8.880 in |
| Job Excess | 0 % |

| 6 5/8" Drill Pipe | 0 - 5067 ft (MD) |
|---|---|
| Outer Diameter | 6.625 in |
| Inner Diameter | 5.426 in |
| Linear Weight | 32.67 lbm/ft |

| 9 7/8" Casing | 5067 - 12600 ft (MD) |
|---|---|
| Outer Diameter | 9.875 in |
| Inner Diameter | 8.625 in |
| Linear Weight | 62.80 lbm/ft |

| 7" Production Casing | 12600 - 18300 ft (MD) |
|---|---|
| Outer Diameter | 7.000 in |
| Inner Diameter | 6.094 in |
| Linear Weight | 32 lbm/ft |

HIGHLY CONFIDENTIAL                                    HAL_0126065

# HALLIBURTON

| | |
|---|---|
| Water Depth | 4992 feet |
| Air Gap | 75 feet |
| | |
| Mud Type | Synthetic |
| Mud Weight | 14 lbm/gal |
| BHST | 210 degF |
| BHCT | 135 degF |

HIGHLY CONFIDENTIAL

HAL_0126066

**HALLIBURTON** _____

| | |
|---|---|
| *Calculations* | *9 7/8" X 7" Production Casing* |

_____

Mud:  (110.00 ft fill)
      110.00 ft * 0.3585 ft$^3$/ft * 0 %        = 39.43 ft$^3$
      Total Mud        = 39.30 ft$^3$
        = 7.00 bbl

Spacer:
      88.00 ft * 0.3585 ft$^3$/ft * 0 %        = 31.55 ft$^3$
      310.00 ft * 0.1385 ft$^3$/ft * 0 %        = 42.93 ft$^3$
      2050.00 ft * 0.1385 ft$^3$/ft * 0 %        = 283.89 ft$^3$
      137.00 ft * 0.3341 ft$^3$/ft * 0 %        = 45.77 ft$^3$
      Total Spacer        = 404.25 ft$^3$
        = 72.00 bbl

Cement :  (100.00 ft fill)
      100.00 ft * 0.3341 ft$^3$/ft * 0 %        = 33.41 ft$^3$
      Total Lead Cement        = 33.41 ft$^3$
        = 5.95 bbl

      Sacks of Cement        = 24 sks

Cement :  (900.00 ft fill)
      730.00 ft * 0.3341 ft$^3$/ft * 0 %        = 243.87 ft$^3$
      170.00 ft * 0.1628 ft$^3$/ft * 0 %        = 27.68 ft$^3$
      Foamed Tail Cement        = 271.55 ft$^3$
        = 48.36 bbl

Shoe Joint Volume: (200.00 ft fill)
      200.00 ft * 0.2026 ft$^3$/ft        = 40.51 ft$^3$
        = 7.22 bbl

      Tail plus shoe joint        = 312.06 ft$^3$
        = 55.58 bbl

      Total Tail        = 192 sks

Total Pipe Capacity:
      5067.00 ft * 0.1606 ft$^3$/ft        = 813.65 ft$^3$
      7533.00 ft * 0.4057 ft$^3$/ft        = 3056.42 ft$^3$
      5700.00 ft * 0.2026 ft$^3$/ft        = 1154.54 ft$^3$
        = 894.92 bbl

Displacement Volume to Shoe Joint:
      Capacity of Pipe - Shoe Joint        = 894.92 bbl - 7.22 bbl
        = 887.70 bbl

HIGHLY CONFIDENTIAL        HAL_0126067

**HALLIBURTON** _____

---

### *Job Recommendation*          *9 7/8" X 7" Production Casing*

---

Fluid Instructions
Fluid 1: Mud
Base Oil                                      Fluid Density:    6.70 lbm/gal
                                              Volume Behind:    7 bbl

Fluid 2: Water Based Spacer
TUNED SPACER III                              Fluid Density:    14.30 lbm/gal
   0.6 gal/bbl   Dual Spacer Surfactant A (Additive Material)   Fluid Volume:   72 bbl
   0.6 gal/bbl   Dual Spacer Surfactant B (Additive Material)
   0.6 gal/bbl   SEM-8 (Additive Material)
   1 lbm/bbl   WellLife 734 (Additive Material)

Fluid 3: Lead Cement – **Un-foamed**
Premium Cement                                           Fluid Weight:        16.74 lbm/gal
   94 lbm/sk  Premium Cement (Cement)              Slurry Yield:        1.37 ft$^3$/sk
   0.07 %  Halliburton EZ-FLO (Bulk Flow Enhancer)   Total Mixing Fluid:  5.04 Gal/sk
   0.25 %  D-AIR 3000 (Defoamer)               Top of Fluid:        17300 ft
   1.88 lbm/sk  KCL (Additive Material)           Calculated Fill:     100 ft
   20 %  SSA-1 (Additive Material)               Volume:              5.95 bbl
   15 %  Common White-100 Mesh, SSA-2            Calculated Sacks:    24.37 sks
   0.2 lbm/sk  SA-541 (Additive Material)        Proposed Sacks:      30 sks
   0.11 Gal/sk  Zonesealant 2000 (Foamer)
   0.09 Gal/sk  SCR-100L (Retarder)
   **1 lbm/bbl  WellLife 734 (Additive Material) – Add by hand on the down hole side**

Fluid 4: Foamed Tail Cement – **Foamed to average density of 14.5 ppg**
Premium Cement                                           Fluid Weight:        16.74 lbm/gal
   94 lbm/sk  Premium Cement (Cement)              Slurry Yield:        1.37 ft$^3$/sk
   0.07 %  Halliburton EZ-FLO (Bulk Flow Enhancer)   Total Mixing Fluid:  5.04 Gal/sk
   0.25 %  D-AIR 3000 (Defoamer)               Top of Fluid:        17400 ft
   1.88 lbm/sk  KCL (Additive Material)           Calculated Fill:     900 ft
   20 %  SSA-1 (Additive Material)               Volume:              55.58 bbl
   15 %  Common White-100 Mesh, SSA-2            Calculated Sacks:    192.23 sks
   0.2 lbm/sk  SA-541 (Additive Material)        Proposed Sacks:      200 sks
   0.11 Gal/sk  Zonesealant 2000 (Foamer)
   0.09 Gal/sk  SCR-100L (Retarder)
   **1 lbm/bbl  WellLife 734 (Additive Material) – Add by hand on the down hole side**

---

HIGHLY CONFIDENTIAL                                                    HAL_0126068

# HALLIBURTON

Fluid 5: Water Based Spacer
TUNED SPACER III                                       Fluid Density:    14.30 lbm/gal
   0.6 gal/bbl    Dual Spacer Surfactant A (Additive Material)   Fluid Volume:    20 bbl
   0.6 gal/bbl    Dual Spacer Surfactant B (Additive Material)
   0.6 gal/bbl    SEM-8 (Additive Material)


Fluid 6: Mud
Mud                                                    Fluid Density:    14 lbm/gal
                                          Fluid Volume     867.70 bbl

HIGHLY CONFIDENTIAL                                HAL_0126069

## HALLIBURTON

***Job Procedure***                          ***9 7/8" X 7" Production Casing***

### Detailed Pumping Schedule

| Fluid # | Fluid Type | Fluid Name | Surface Density lbm/gal | Estimated Avg Rate bbl/min | Downhole Volume |
|---------|-----------|------------|-------------------------|----------------------------|-----------------|
| 1 | Mud | Base Oil | 6.7 | 4.0 | 7 bbl |
| 2 | Spacer | TUNED SPACER III | 14.3 | 4.0 | 72 bbl |
| 3 | Cement | Cap Cement | 16.7 | 2.0 | 30 sks |
| 4 | Cement | Foamed Tail | 16.7 | 4.0 | 200 sks |
| 5 | Spacer | TUNED SPACER III | 14.3 | 4.0 | 20 bbl |
| 6 | Mud | Mud | 14.0 | 4.0 | 867.70 bbl |

### Foam Output Parameter Summary:

| Fluid # | Fluid Name | Un-foamed Liquid Volume | Beginning Density lbm/gal | Ending Density lbm/gal | Beginning Rate scf/bbl | Ending Rate scf/bbl |
|---------|-----------|-------------------------|---------------------------|------------------------|------------------------|---------------------|
| **Stage 1** | | | | | | |
| 4 | Foamed Tail | 39.72bbl | 14.5 | 14.5 | 521.0 | 521.0 |

### Foam Design Specifications:

|  |  |  |  |
|--|--|--|--|
| Foam Calculation Method: | Constant Gas Flow | Calculated Gas = | 20697.9 scf |
| Backpressure: | 14.70 psig | Additional Gas = | 50000 scf |
| Bottom Hole Circulating Temp: | 210 degF | Total Gas = | 70697.9 scf |
| Mud Outlet Temperature: | 150 degF | | |

Hold Safety Meeting with all personnel to discuss foam cementing operations and possible hazards.

1.  Run the 9 7/8" X 7" casing as per procedures.

2.  Rig up lines for the cementing and nitrogen units while casing is being run, this should be out of the critical path.

3.  When casing lands, have chicksen lines ready to be picked up. Follow proper HSE and JSA requirements for personnel in riding harness. Assure all personnel are away from rig floor and monitoring hand in riding belt while hammering union between chicksen and valve.

4.  Assure Lo-Torc Valve on side door sub is open and top TIW is closed, bottom TIW to be open.

5.  Once personnel are on deck contact cementer and have cementer break circulation.

6.  Assure that returns are identified.

7.  Assure all lines are filled with mud and then have lo-torc valve closed on side door sub.

HIGHLY CONFIDENTIAL                                              HAL_0126070

**HALLIBURTON**

8. Once hand has identified closed lo-torc, all personnel must clear rig floor while testing commences.

9. Make announcement to rig concerning high pressure testing.

10. Test should be performed to 5000 psi and held for at least 3 minutes.

11. Once pressure is on, Zone Seal Specialist should walk line and assure no leaks.

12. Only Zone Seal specialist may bleed line pressure off.

13. Once cement line is tested, Cementer may commence pumping of 72 bbls of 14.3 ppg Tuned Spacer III **@ 4 bpm**. While pumping of spacer, test of nitrogen line can be performed.

14. Clear all personnel from rig floor.

15. Make announcement of test of nitrogen unit.

16. Zone seal specialist must close N2 valve, after cool down Zone seal specialist gives Nitrogen operator permission to test.

17. All personnel must clear area while testing.

18. After test is complete, Zone Seal specialist must walk line to assure no leaks.

19. After test is complete Zone Seal specialist must bleed lines.

20. Cementing may commence once spacer has been pumped.

21. Weight cement up to proper weight as per lab results.

22. Start pumping cement at a rate of **2 bpm**, once surfactant injection is started into cement slurry pump **15 bbls** then slowly bring cement rate up to **4 bpm**. **Do not exceed 4 bpm during cementing operations.**

23. Once 10 bbls of cement has been pumped drop dart to launch bottom plug. Assure indication is seen and reported. This can be done on the fly.

24. Once foamed cement is complete, bring off line nitrogen unit first.

25. Pump shoe slurry, continuing injection of all additives.

26. Drop Dart to launch top plug. Assure indication is seen and reported.

27. Pump 20 bbls of 14.3 ppg Tuned Spacer III behind the cement.

28. Begin pumping displacement with Halliburton unit at **4 bpm**.

29. Halliburton unit will displace until indication of Top plug has launched **(+/- 145 bbls)**.

30. Once top plug has launched turn displacement over to the rig. Rig to displace at **4 bpm.**

31. Look for top plug to land. Pump calculated plus 16 bbls for compressibility.

32. Zone Seal specialist to be on rig floor to bleed off pressure and check floats.

33. Release running tool and P/U one stand. Upon breaking connection place wiper ball in connection and pump through landing string.

HIGHLY CONFIDENTIAL                                                        HAL_0126071

# HALLIBURTON

**Cost Estimate**          **9 7/8" X 7" Production Casing**

## SAP Quote # 0

| Mtrl Nbr | Description | Qty | U/M | Unit Price | Net Amt |
|----------|-------------|-----|-----|-----------|---------|
| 7523 | CMT PRODUCTION CASING BOM | 1 | JOB | | 0.00 |
| | ***Spacer Material*** | | | | |
| 483826 | TUNED SPACER III | 92 | BBL | 122.28 | 11,249.76 |
| 100003664 | DUAL SPACER SURFACTANT A | 56 | GAL | 91.32 | 5,113.92 |
| 100003665 | DUAL SPACER SURF. B | 56 | GAL | 42.88 | 2,401.28 |
| 101235090 | SEM-8 | 56 | GAL | 47.45 | 2,657.20 |
| 101492086 | WELLLIFE$_6$ 734 | 118 | LB | 4.10 | 483.80 |
| | ***Cement Material*** | | | | |
| 100003687 | PREMIUM CEMENT | 230 | SK | 14.72 | 3,385.60 |
| 101002314 | EZ-FLO | 16 | LB | 10.57 | 169.12 |
| 101007446 | D-AIR 3000 | 55 | LB | 4.31 | 237.05 |
| 100001585 | KCL POTASSIUM CHLORIDE | 433 | LB | 0.55 | 238.15 |
| 100003691 | SAND-200 MESH SILICA FLOUR SSA-1 | 4324 | LB | 0.24 | 1,037.76 |
| 100003676 | SAND-COMMON WHITE-100 MESH, SSA-2 | 33 | SK | 24.28 | 801.24 |
| 100009911 | SA-541 SUSPENDING AID - | 46 | LB | 13.20 | 607.20 |
| 101207218 | ZONESEALANT 2000 | 26 | GAL | 77.25 | 2,008.50 |
| 100012238 | SCR-100 L | 21 | GAL | 76.65 | 1,609.65 |
| | ***Personnel*** | | | | |
| 130443 | ZONESEAL CERTIFIED SPECIALIST H/DAY/MO TOTAL NUMBER HR/DAY/WEEK/MTH/YEAR/JOB/RUN | 1 96 | H | 145.24 | 13,943.04 |
| 576784 | CMT, Offshore Engineer, per hr HOURS | 1 96 | EA | 134.32 | 12,894.72 |
| | ***Equipment*** | | | | |
| 583768 | CMT,Foam Cmt Base Rate(3-day)-SORAC | 1 | EA | 24,295.68 | 24,295.68 |
| 583769 | CMT,Addl Day Foam Cmt Day Rate-SORAC | 5 | DAY | 3,100.45 | 15,502.25 |
| | **Total** | **USD** | | | **98,635.92** |

HIGHLY CONFIDENTIAL          HAL_0126072

# HALLIBURTON

**SAP Quote # 0**

| Mtrl Nbr | Description | Qty | U/M | Unit Price | Net Amt |
|----------|-------------|-----|-----|------------|---------|
| 342210 | N2 BOM-Foam Cementing w/o CT | 1 | JOB | | 0.00 |
| 13459 | Nitrogen Charge | 70698 | SCF | 6.60 | 4,666.07 |
| | ***Personnel*** | | | | |
| 576758 | CMT, Equipment Optr, per hr | 2 | EA | 46.62 | 8,951.04 |
| | HOURS | 96 | | | |
| | ***Equipment*** | | | | |
| 583772 | CMT,N2 Base Rate(3day)Foam Cmt Job-SORAC | 1 | EA | 31,745.54 | 31,745.54 |
| 583773 | CMT,Addl N2 Day Rate Foam Cmt Job-SORAC | 5 | DAY | 8,056.40 | 40,282.00 |
| 583837 | CMT,Addl 100ft N2 Iron, ZI Foamed-SORAC | 8 | DAY | 300.00 | 2,400.00 |
| | Total | USD | | | 88,044.65 |

HIGHLY CONFIDENTIAL

**HALLIBURTON**

## *Conditions*

### NOTE

The cost in this analysis is good for the materials and/or services outlined within and shall be valid for 30 days from the date of this proposal.  In order to meet your needs under this proposal with a high quality of service and responsive timing, Halliburton will be allocating limited resources and committing valuable equipment and materials to your area of operations.  Accordingly, the discounts reflected in this proposal are available only for materials and services awarded on a first-call basis.  Alternate pricing may apply in the event that Halliburton is awarded work on any basis other than as a first-call provider.

The unit prices stated in the proposal are based on our current published prices.  The projected equipment, personnel, and material needs are only estimates based on information about the work presently available to us.  At the time the work is actually performed, conditions then existing may require an increase or decrease in the equipment, personnel, and/or material needs.  Charges will be based upon unit prices in effect at the time the work is performed and the amount of equipment, personnel, and/or material actually utilized in the work. Taxes, if any, are not included.  Applicable taxes, if any, will be added to the actual invoice.

It is understood and agreed between the parties that with the exception of the subject discounts, all services performed and equipment and materials sold are provided subject to Halliburton's General Terms and Conditions contained in our current price list, (which include LIMITATION OF LIABILITY and WARRANTY provisions), and pursuant to the applicable Halliburton Work Order Contract (whether or not executed by you), unless a Master Service and/or Sales Contract applicable to the services, equipment, or materials supplied exists between your company and Halliburton, in which case the negotiated Master Contract shall govern the relationship between the parties.  A copy of the latest version of our General Terms and Conditions is available from your Halliburton representative or at: http://www.halliburton.com/terms for your convenient review, and we would appreciate receiving any questions you may have about them.  Should your company be interested in negotiating a Master Contract with Halliburton, our Law Department would be pleased to work with you to finalize a mutually agreeable contract.  In this connection, it is also understood and agreed that Customer will continue to execute Halliburton usual field work orders and/or tickets customarily required by Halliburton in connection with the furnishing of said services, equipment, and materials.
Any terms and conditions contained in purchase orders or other documents issued by the customer shall be of no effect except to confirm the type and quantity of services, equipment, and materials to be supplied to the customer.
If customer does not have an approved open account with Halliburton or a mutually executed written contract with Halliburton, which dictates payment terms different than those set forth in this clause, all sums due are payable in cash at the time of performance of services or delivery of equipment, products, or materials.  If customer has an approved open account, invoices are payable on the twentieth day after date of invoice.

Customer agrees to pay interest on any unpaid balance from the date payable until paid at the highest lawful contract rate applicable, but never to exceed 18% per annum.  In the event Halliburton employs an attorney for collection of any account, customer agrees to pay attorney fees of 20% of the unpaid account, plus all collection and court costs.

HIGHLY CONFIDENTIAL                                                                 HAL_0126074

# EXHIBIT 13

From: Maxie, Doyle
Sent: Tue Apr 20 15:34:08 2010
To: Cocales, Brett W; Haygood, Tab; Guide, John; LeBleu, John B; Jones, Gordon; Lindner, Leo; Hafle, Mark E; Morel, Brian P; Walz, Gregory S
Subject: VH
Importance: Normal
Attachments: image001.gif; image002.png; image003.jpg


Gentlemen,
I have gone through my inputs for VH for the modeling I did for circulating prior to cementing casing.  I have tried several different inputs, and the closest I can get is 480 psi and that is taking out the fann 70 data which is not giving a reasonable estimate of true pressure.  I have had several individuals double check and critiques my inputs and still cannot explain the difference. Looking at predictions from past modeling the pressure is never quite the same when we are drilling so I would not expect them to be the same for this model.  Pressure is one of the hardest numbers to correlate.  I would be interested to see what Landmark would predict as circulating pressures.  I am open to sit down and discuss the inputs with the team.  John and I went through some scenario's this morning and we could not do any better than 480 psi.
Regards,


Project Engineer
Houston District
Office: 281 . 988 . 1809
Cell: 281 . 686 . 7247
Ritefax: 832 . 351 . 4916


cid:image003.jpg@01C7EB1A.0F2F3EA0

---

This email is intended solely for the person or entity to which it is addressed
and may contain confidential and/or privileged information. Copying, forwarding
or distributing this message by persons or entities other than the addressee is
prohibited. If you have received this email in error, please contact the sender
immediately and delete the material from any computer.
This email may have been monitored for policy compliance.   [021216]



EXHIBIT
1814

BP-HZN-MBI 00129100

# EXHIBIT 14

| | |
|---|---|
| **From:** | Jesse Gagliano |
| **Sent:** | Tuesday, February 09, 2010 11:19 AM |
| **To:** | Anthony Cupit; Brett W Cocales (Brett.Cocales@bp.com); Christopher Haire; Danny Mooney; Horizon Forman; Horizon Perf Engineers; Jason Fleming; John Guide; Mike Stidham; Murry Sepulvado; Vincent Tabler; Hafle, Mark E; Morel, Brian P |
| **Subject:** | 16" Info for Macondo |
| **Attachments:** | MC 252_Macondo BoD_16 in Liner_v3_CustomerCopy.pdf; Location Blend BL12-63313.1.pdf |

Attached is the 16" Proposal and lab test.  Let me know if you have any questions.  Thanks!!

**Jesse Gagliano**
Halliburton Energy Services
Account Representative - Cementing
Office - 281-366-6106
Cell - 281-635-4798
Fax - 713-583-9700
E-mail - jesse.gagliano@halliburton.com

Business Confidential

HAL_0024990

Confidential Access Restricted
Business Confidential

*Bp America Prod Co-sorac/gom Ebiz*
*PO Box 22024 - Do Not Mail*
*Tulsa, Oklahoma 74121-2024*

Macondo Prospect 1

United States of America

# 16" Liner

Prepared for:     Brian Morel

Version: 3

Submitted by:
Jesse Gagliano
Halliburton
10200 Bellaire Blvd
Houston, Texas 77072-5299

**HALLIBURTON**

Business Confidential          HAL_0024991

Our allocked Jesslen Prorut.doc
Attorney Plyer Only
Business Confidential

# HALLIBURTON

***Halliburton appreciates the opportunity to present
this proposal and looks forward to being of service to you.***

## *Foreword*

Enclosed is our recommended procedure for cementing the casing strings in the referenced well. The information in this proposal includes well data, calculations, materials requirements, and cost estimates. This proposal is based on information from our field personnel and previous cementing services in the area.

Halliburton Energy Services recognizes the importance of meeting society's needs for health, safety, and protection of the environment. It is our intention to proactively work with employees, customers, the public, governments, and others to use natural resources in an environmentally sound manner while protecting the health, safety, and environmental processes while supplying high quality products and services to our customers.

We appreciate the opportunity to present this proposal for your consideration and we look forward to being of service to you. Our Services for your well will be coordinated through the Service Center listed below. If you require any additional information or additional designs, please feel free to contact myself or our field representative listed below.

Prepared and Submitted by: _____

Jesse Gagliano
Technical Advisor

SERVICE CENTER:          Lafayette, La

SERVICE COORDINATOR:     Danny Mooney
OPER. ENGINEER:          Yarigsa Aviles
PHONE NUMBER:            1-800-444-7830

2 / 9                    Proposal MC 252  Macondo BoD  16 in Liner  v.3

Business Confidential

Business Confidential

# HALLIBURTON

## Job Information                                                    *16" Liner*

Well Name: Macondo Prospect          Well #: 1

Riser                                0 - 5067 ft (MD)
  Outer Diameter                     24.000 in
  Inner Diameter                     19.500 in

22" Casing                           5067 - 7947 ft (MD)
  Outer Diameter                     22.000 in
  Inner Diameter                     19.500 in
  Linear Weight                      277.01 lbm/ft

18" Liner                            7503 - 8983 ft (MD)
  Outer Diameter                     18.000 in
  Inner Diameter                     16.750 in
  Linear Weight                      117 lbm/ft

20" Open Hole                        8983 - 12250 ft (MD)
  Inner Diameter                     20.000 in
  Job Excess                         15 %

Landing String                       0 - 5067 ft (MD)
  Outer Diameter                     6.625 in
  Inner Diameter                     5.375 in

16" Casing                           5067 - 12250 ft (MD)
  Outer Diameter                     16.000 in
  Inner Diameter                     14.850 in

16" Innerstring                      5067 - 12100 ft (MD)
  Outer Diameter                     5.500 in
  Inner Diameter                     4.778 in
  Linear Weight                      21.90 lbm/ft

Water Depth                          4992 feet
Air Gap                              75 feet

Mud Type                             Synthetic
Mud Weight                           11.80 lbm/gal
BHST                                 162 degF

Business Confidential                                                    HAL_0024993

Our related documents.doc
Attorney Eyes Only
Business Confidential

# HALLIBURTON

## *Calculations*                                                    *16" Liner*

Spacer:

| | | |
|---|---|---|
| 1057.00 ft * 0.7854 ft³/ft * 15 % | = | 954.69 ft³ |
| Total Spacer | = | 954.48 ft³ |
| | = | 170.00 bbl |

Cement :  (750.00 ft fill)

| | | |
|---|---|---|
| 600.00 ft * 0.7854 ft³/ft * 15 % | = | 541.92 ft³ |
| 150.00 ft * 0.7854 ft³/ft * 15 % | = | 135.48 ft³ |
| Tail Cement | – | 677.41 ft³ |
| | = | 120.65 bbl |

Shoe Joint Volume: (100.00 ft fill)

| | | |
|---|---|---|
| 100.00 ft * 1.2028 ft³/ft | = | 120.28 ft³ |
| | = | 21.42 bbl |
| Tail plus shoe joint | = | 797.68 ft³ |
| | = | 142.07 bbl |
| Total Tail | = | 735 sks |

Total Pipe Capacity:

| | | |
|---|---|---|
| 5067.00 ft * 0.1576 ft³/ft | – | 798.43 ft³ |
| 7033.00 ft * 0.1245 ft³/ft | = | 875.71 ft³ |
| 150.00 ft * 1.2028 ft³/ft | – | 180.41 ft³ |
| | = | 330.31 bbl |

Displacement Volume to Shoe Joint:

| | | |
|---|---|---|
| Capacity of Pipe - Shoe Joint | = | 330.31 bbl - 21.42 bbl |
| | = | 308.89 bbl |

Proposal MC 252  Macondo BoD  16 in Liner  v.3

Business Confidential                                                    HAL_0024994

Business Confidential

# HALLIBURTON

## *Job Recommendation*                                    *16" Liner*

Fluid Instructions
Fluid 1: Water Based Spacer
TUNED SPACER III - YP = 32                   Fluid Density:    12.50 lbm/gal
   1.3 gal/bbl    SEM-8 (Surfactant)        Fluid Volume:     170 bbl

Fluid 2: Tail Cement
Premium Cement                                Fluid Weight      16.40 lbm/gal
  94 lbm/sk  Premium Cement (Cement)       Slurry Yield:     1.09 ft³/sk
  0.07 %  Halliburton EZ-FLO (Bulk Flow Enhancer)   Total Mixing Fluid:   4.42 Gal/sk
  0.25 %  D-AIR 3000 (Defoamer)            Top of Fluid:     11500 ft
  1.88 lbm/sk  KCL (Clay Control)          Calculated Fill:  750 ft
  0.08 Gal/sk  Halad(R)-344 EXP (Low Fluid Loss Control)   Volume:   142.07 bbl
  0.05 Gal/sk  HR-6L (Retarder)            Calculated Sacks: 735.19 sks
  4.29 Gal/sk  Fresh Water (Mixing Fluid)  Proposed Sacks:   740 sks

Fluid 3: Mud
SBM                                           Fluid Density:    11.80 lbm/gal
                                              Fluid Volume      308.89 bbl

Business Confidential                                    HAL_0024995

Business Confidential

# HALLIBURTON

| *Job Procedure* | *16" Liner* |
|---|---|

## Detailed Pumping Schedule

| Fluid # | Fluid Type | Fluid Name | Surface Density lbm/gal | Estimated Avg Rate bbl/min | Downhole Volume |
|---|---|---|---|---|---|
| 1 | Spacer | TUNED SPACER III - YP = 32 | 12.5 | 7.0 | 170 bbl |
| 2 | Cement | Tail Cement | 16.4 | 5.0 | 740 sks |
| 3 | Mud | SBM | 11.8 | 10.0 | 308.89 bbl |

Hold safety meeting to discuss running and cementing the 16 in liner

1.  Rig up and run 16 in Liner.

2.  Insure that Cement Stand has been prepared and stood back with TIW above and below Side Door sub.

3.  When preparing to P/U cement stand insure that hand is in riding belt to make up chicksen to cement stand.

4.  Once Lines are made up assure that TIW is closed on top of side door sub and lower TIW is open to allow circulation.

5.  Have hand come out of derrick.

6.  Have Cementer break circulation and circulate well.

7.  Once circulation is established shut down and have hand close valve on cement line.

8.  Remove all those from the rig floor and test lines to 5000 psi. Hold test for at least 3 minutes.

9.  After test bleed pressure back and then have hand open valve.

10. Break circulation with spacer and begin injection of surfactant package into spacer.

11. Pump 170bbls of Tuned Spacer @ 12.5 ppg.

12. Once spacer has been pumped begin weight up of cement.

13. Pump 740 sks of Cement @ 16.4 ppg as pr lab results.

14. Begin displacement with mud and bring rate to 10-12 bpm.

Business Confidential      HAL_0024996

Business Confidential

# HALLIBURTON

15.  Slow down to 3 bpm for the last 30 bbls.  Complete displacement and shut down and check floats.

16.  Release running tool and P/U ten stands.  Upon breaking connection place Wiper Ball in connection and pump through landing and inner string.

17.  Once complete POOH.

Proposal MC 252  Macondo BoD  16 in Liner  v.3

Business Confidential                                    HAL_0024997

Our edited tool has cure Macon doc
Attorney Flyer Only
Business Confidential

# HALLIBURTON

## Cost Estimate                                                        16" Liner

**SAP Quote # 0**

| Mtrl Nbr | Description | Qty | U/M | Unit Price | Net Amt |
|---|---|---|---|---|---|
| 7524 | CMT DRILLING LINER BOM | 1 | JOB | | 0.00 |
| | ***Spacer Material*** | | | | |
| 483826 | TUNED SPACER III | 170 | BBL | 122.28 | 20,787.60 |
| 101235090 | SEM-8 | 221 | GAL | 47.45 | 10,486.45 |
| | ***Cement Material*** | | | | |
| 100003687 | PREMIUM CEMENT | 740 | SK | 14.72 | 10,892.80 |
| 101002314 | EZ-FLO | 49 | LB | 10.57 | 517.93 |
| 101007446 | D-AIR 3000 | 174 | LB | 4.31 | 749.94 |
| 100001585 | KCL POTASSIUM CHLORIDE | 1392 | LB | 0.55 | 765.60 |
| 101249405 | HALAD-344 EXP | 60 | GAL | 125.71 | 7,542.60 |
| 100005058 | HR-6L RETARDER | 37 | GAL | 22.89 | 846.93 |
| | **Total** | | **USD** | | **52,589.85** |

Business Confidential                                                   HAL_0024998

Cost Estimate for Macondo.doc
Attorney Work Only
Business Confidential

# HALLIBURTON

## *Conditions*

### NOTE

The cost in this analysis is good for the materials and/or services outlined within. These prices are based on Halliburton being awarded the work on a first call basis. Prices will be reviewed for adjustments if awarded on 2nd or 3rd call basis and/or after 30 days of this written analysis. This is in an effort to schedule our work and maintain a high quality of performance for our customers.

The unit prices stated in the proposal are based on our current published prices. The projected equipment, personnel, and material needs are only estimates based on information about the work presently available to us. At the time the work is actually performed, conditions then existing may require an increase or decrease in the equipment, personnel, and/or material needs. Charges will be based upon unit prices in effect at the time the work is performed and the amount of equipment, personnel, and/or material actually utilized in the work. Taxes, if any, are not included. Applicable taxes, if any, will be added to the actual invoice.

It is understood and agreed between the parties that with the exception of the subject discounts, all services performed and equipment and materials sold are provided subject to Halliburton's General Terms and Conditions contained in our current price list, (which include LIMITATION OF LIABILITY and WARRANTY provisions), and pursuant to the applicable Halliburton Work Order Contract (whether or not executed by you), unless a Master Service and/or Sales Contract applicable to the services, equipment, or materials supplied exists between your company and Halliburton, in which case the negotiated Master Contract shall govern the relationship between the parties. A copy of the latest version of our General Terms and Conditions is available from your Halliburton representative or at:
http://www.halliburton.com/hes/general_terms_conditions.pdf for your convenient review, and we would appreciate receiving any questions you may have about them. Should your company be interested in negotiating a Master Contract with Halliburton, our Law Department would be pleased to work with you to finalize a mutually agreeable contract. In this connection, it is also understood and agreed that Customer will continue to execute Halliburton usual field work orders and/or tickets customarily required by Halliburton in connection with the furnishing of said services, equipment, and materials.
Any terms and conditions contained in purchase orders or other documents issued by the customer shall be of no effect except to confirm the type and quantity of services, equipment, and materials to be supplied to the customer.
If customer does not have an approved open account with Halliburton or a mutually executed written contract with Halliburton, which dictates payment terms different than those set forth in this clause, all sums due are payable in cash at the time of performance of services or delivery of equipment, products, or materials. If customer has an approved open account, invoices are payable on the twentieth day after date of invoice.

Customer agrees to pay interest on any unpaid balance from the date payable until paid at the highest lawful contract rate applicable, but never to exceed 18% per annum. In the event Halliburton employs an attorney for collection of any account, customer agrees to pay attorney fees of 20% of the unpaid account, plus all collection and court costs.

Proposal MC 252 Macondo BoD  16 in Liner  v.3

Business Confidential                                    HAL_0024999

Business Confidential

# HALLIBURTON
## Cementing Gulf of Mexico, Broussard

**LAB RESULTS - Primary**

## Job Information

| | | | | | | |
|---|---|---|---|---|---|---|
| Request/Slurry | 63313/1 | Rig Name | TRANSOCEAN HORIZON | Date | January 28th 2010 |
| Submitted By | Jesse Gagliano | Job Type | 16" Intermediate Liner | Bulk Plant | Fourchon-C-Port I, La, USA |
| Customer | BP | Location | Mississippi Cny | Well | Mississippi Canyon 252 OCS-G-32306 Macondo #1 |

## Well Information

| | | | | | |
|---|---|---|---|---|---|
| Casing/Liner Size | 16" | Depth MD | 12250 ft | BHST | 135 F |
| Hole Size | 20" | Depth TVD | 12250 ft | BHCT | 84 F |

## Drilling Fluid Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mud Company | MI | Type | SOBM | Density | 11.8 PPG | PV/YP | |

## Cement Information - Primary Design

| Conc | UOM | Cement/Additive | Sample Type | Sample Date | Lot No. | Cement Properties | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Slurry Density | 16.399 | PPG |
| | | | | | | Slurry Yield | 1.08 | FT3 |
| 100.00 | % BWOC | Lafarge Class H | Rig | Nov 03, 2009 | | Water Requirement | 4.32 | GPS |
| 0.07 | % BWOC | EZ-FLO | Rig | Nov 03, 2009 | | Total Mix Fluid | 4.42 | GPS |
| 0.25 | % BWOC | D-Air 3000 | Rig | Nov 03, 2009 | | | | |
| 1.88 | lb/sk | KCl (Potassium Chloride) Salt | Rig | Nov 03, 2009 | | | | |
| 0.08 | gps | HALAD-344EXP | Lab | Dec 29, 2009 | | Water Source | Field (Fresh) Water | |
| 0.02 | gps | HR-6L | Lab | Nov 04, 2009 | 165 | Water Chloride | 0 | ppm |
| 4.32 | gps | Field (Fresh) Water | Rig | Dec 29, 2009 | | | | |

## Operation Test Results Request ID 63313/1

### Thickening Time, Request Test ID:701293

| Temp (°F) | Pressure (psi) | Batch Mix (min) | Reached in (min) | Start BC | 30 Bc (hh:mm) | 40 Bc (hh:mm) | 50 Bc (hh:mm) | 70 Bc (hh:mm) |
|---|---|---|---|---|---|---|---|---|
| 84 | 8,428 | 0 | 44 | 20 | 03:12 | 03:24 | 03:41 | 03:57 |

### Mud Balance Density, Request Test ID:701296

| Density (ppg) |
|---|
| 16.4 |

### Mixability (0 - 5) - 0 is not mixable, Request Test ID:701295

| Mixability rating (0 - 5) |
|---|
| 4 |

### UCA Comp. Strength, Request Test ID:701294

| End Temp (°F) | Pressure (psi) | 50 psi (hh:mm) | 500 psi (hh:mm) | 12 hr CS (psi) | 24 hr CS (psi) |
|---|---|---|---|---|---|
| 135 | 8,428 | 03:35 | 04:43 | 1,649 | 1,983 |

### Non API Rheology, Request Test ID:701315

| Test temp (°F) | 600 | 300 | 200 | 100 | 60 | 30 | 20 | 10 | 6 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 80 | 250 | 144 | 108 | 64 | 40 | 32 | 28 | 26 | 26 | 24 |

This report is the property of Halliburton Energy Services and neither it nor any part thereof, nor a copy thereof, is to be published or disclosed without first securing the expressed written approval of Halliburton. It may however be used in the course of regular business operations by any person or concern receiving such report from Halliburton. This report is for information purposes only and the content is limited to the sample described. Halliburton makes no warranties, expressed or implied, as to the accuracy of the contents or results. Any user of this report agrees Halliburton shall not be liable for any loss or damage regardless of cause, including any act or omission of Halliburton, resulting from the use hereof.

Global Customer Report

Page: 1

**Business Confidential**

HAL_0025000

Business Confidential



This report is the property of Halliburton Energy Services and neither it nor any part thereof, nor a copy thereof, is to be published or disclosed without first securing the expressed written approval of Halliburton. It may however be used in the course of regular business operations by any person or concern receiving such report from Halliburton. This report is for information purposes only and the content is limited to the sample described. Halliburton makes no warranties, expressed or implied, as to the accuracy of the contents or results. Any user of this report agrees Halliburton shall not be liable for any loss or damage regardless of cause, including any act or omission of Halliburton, resulting from the use hereof.

Global Customer Report

Business Confidential

HAL_0025001

Business Confidential



This report is the property of Halliburton Energy Services and neither it nor any part thereof, nor a copy thereof, is to be published or disclosed without first securing the expressed written approval of Halliburton. It may however be used in the course of regular business operations by any person or concern receiving such report from Halliburton. This report is for information purposes only and the content is limited to the sample described. Halliburton makes no warranties, expressed or implied, as to the accuracy of the contents or results. Any user of this report agrees Halliburton shall not be liable for any loss or damage regardless of cause, including any act or omission of Halliburton, resulting from the use hereof.

**Business Confidential**                                                                                          HAL_0025002

Business Confidential