# Exhibit A

Page 448

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL           )       MDL NO. 2179
BY THE OIL RIG              )
"DEEPWATER HORIZON" IN      )       SECTION "J"
THE GULF OF MEXICO, ON      )
APRIL 20, 2010              )       JUDGE BARBIER
                            )       MAG. JUDGE SHUSHAN




                    ****************
                        VOLUME 2
                    ****************




        Deposition of Anthony Hayward, taken at
Kirkland & Ellis International, 30 St. Mary Axe, 22nd
Floor, London EC3A 8AF, England, United Kingdom, on the
8th of June, 2011.
```

PURSUANT TO CONFIDENTIALITY ORDER

f43521ab-d719-42e1-aa06-8768f1f9a456

Page 537

1    A.  When we stop the leak, clean up the oil,
2   remediate any environment and damage and get the
3   communities back on their feet.  Correct.
4       (Discussion off the record.)
5           MR. GODFREY:  Have you been ceded more
6   time, or are you --
7           MR. KANNER:  I think I have another
8   minute.  One last exhibit.
9           MR. GODFREY:  Just as long as we keep on
10  the track of the time.
11          MR. KANNER:  Tab 11.
12          MR. GODFREY:  Is he over his time?
13          MR. WEBB:  Someone keep track of time.
14  Okay.
15    Q.  (By Mr. Kanner) This is 6059.  It's an
16  employee communication from Tony Hayward, July 9th.
17  Have you seen this document before?
18    A.  I'm certain at the time I saw it.  I don't
19  recall now, I'm afraid.  But this --
20      (Exhibit No. 6059 marked.)
21    A.  -- these were going out on a regular basis.
22    Q.  (By Mr. Kanner) You say at the -- about this
23  far down, you go -- you say:  "You should also be in
24  no" --
25    A.  Sorry, where are we, please?

Page 538

1    Q.  Right -- right here.  Right before --
2    A.  Okay.  Down at the bottom, yeah.
3    Q.  You say:  "You should also be in no doubt that
4   we fully intend to hold all parties responsible for the
5   cost of the oil spill to their obligations."
6       You see that?
7    A.  I do.
8    Q.  Did you take any actions to hold other parties
9   responsible for their share of the cost?
10          MR. GODWIN:  Object to form.
11   A.  As I said earlier, at this point in time, on
12  the 16 -- or 9th of July, four parties had been named
13  as responsible parties under OPA 1990, and you would
14  therefore expect that they would be paying their share
15  as reference to that.  At this point in time, we had
16  billed other parties.  They had not been forthcoming.
17          MR. GODWIN:  Object to form.
18          MR. KANNER:  Right.  Thank you.  That's
19  my time.
20          THE WITNESS:  Thank you very much.
21          THE VIDEOGRAPHER:  Off the record at 9:11
22  a.m., ending Tape 12.
23      (Recess from 9:11 a.m. to 9:15 a.m.)
24          MR. ROBERTS:  Ready.
25          THE VIDEOGRAPHER:  All set?

Page 539

1       On the record at 9:15 a.m., beginning Tape 13.
2                  EXAMINATION
3   QUESTIONS BY MR. ROBERTS:
4    Q.  Doctor, my name is Steve, and the most
5   important question I'm going to ask you today is:  What
6   do you think of my tie?
7    A.  It looks like a great British tie, to me.
8           MR. ROBERTS:  I just want y'all to hear
9   that:  He likes my tie.
10   Q.  (By Mr. Roberts) Do you know Transocean, sir?
11   A.  I do, yeah.
12   Q.  How do you know it?
13   A.  As one of the world's largest and most
14  respected drilling contractors.
15   Q.  How long have you, in your industry, worked
16  with Transocean?
17   A.  Personally, or as BP -- with BP?  I'm not --
18  I've --
19   Q.  BP.
20   A.  I've -- yeah.  Well, for many years, decades.
21  I mean, since the company was formed through the merger
22  of -- I'm trying to remember who it was formed through.
23   Q.  Global/Santa Fe?
24   A.  Global/Santa Fe and -- was it Global Santa
25  Fe -- Global and Santa Fe, wasn't it?

Page 540

1    Q.  M-h'm.
2    A.  Yeah.
3    Q.  Is -- was BP, at least as of the time you
4   left -- excuse me.
5       Was Transocean, as of the time you left BP,
6   one of the preferred providers throughout the world for
7   BP in drilling its deepwater wells?
8    A.  It was.
9    Q.  Who -- who would be some of the other
10  companies that would have been preferred providers?
11   A.  Pride.
12   Q.  Which is no longer there.
13   A.  Which is no --
14   Q.  Been sold to Ensco?
15   A.  Ensco.  Ensco now.
16   Q.  Now.
17   A.  I'm trying to think of who are the other big
18  deepwater -- give me some names, and I'll tell you
19  whether --
20   Q.  Well, I can't give you the names of my -- my
21  client's competitors.  That -- that would seem
22  inappropriate.
23       But getting back to Transocean, during the
24  period that you were with BP, was Transocean, as a
25  drilling contractor, held in a high regard?

24 (Pages 537 to 540)

Page 541

1  A. Yes, they were.
2  Q. All right. Did anyone in your Senior
3 Management or lower down ever come to you and suggest
4 to you that Transocean, as a corporation, had a
5 philosophy of indifference to the welfare of the
6 environment?
7  A. No.
8  Q. Or that any of its employees were indifferent
9 to the welfare of the environment?
10  A. No.
11  Q. Did anyone in your Senior Management ever come
12 to you and say Transocean was indifferent to the
13 welfare of individuals, the employees and -- and their
14 health?
15  A. No.
16  Q. All right. Have you ever heard that suggested
17 by anyone?
18  A. Not in the time I was at BP.
19  Q. As -- one of the roles that I gathered
20 yesterday from your conversation with one of the
21 lawyers was you were at -- at least over HSSE while you
22 were at BE -- BP?
23  A. Well, I -- the CEO is, by definition, over
24 everything.
25  Q. Yeah. Including depositions.

Page 542

1  A. Including depositions.
2     I was the Chair of the Group Operating Risk
3 Committee, which was the focal point in the company for
4 reviewing safety performance and HSSE matters.
5  Q. If anyone in your company had ever come to you
6 and suggested that Transocean was callous, indifferent,
7 or just didn't plain give a damn about the welfare of
8 the environment or individuals, wouldn't it have been
9 your obligation as CEO to either terminate the
10 relationship with Transocean or appoint someone to look
11 into those allegations?
12     MR. WEBB: Objection, form.
13     MR. GODFREY: Object as to form.
14  A. The reality, of course, that if that was --
15 had been the case, other -- others would have taken
16 action before it got to me, I'm certain.
17  Q. (By Mr. Roberts) Yeah. But you've never heard
18 any of that?
19  A. I haven't heard any of that.
20  Q. Do you know any individuals with Transocean?
21  A. I knew from a -- I knew the Chairman, Bob --
22  Q. Bob Long?
23  A. Bob Long.
24  Q. Okay. Did he seem to be a conscientious
25 individual concerned about the industry you were both

Page 543

1 involved in?
2  A. He did.
3  Q. Did he seem, from your discussions with him,
4 to be concerned about the safety and welfare of both
5 the environment and the people?
6  A. He did.
7  Q. Okay. Did he express the same type of goals
8 that you would want expressed as a partner to BP in the
9 offshore drilling business?
10  A. I -- I -- we -- neither -- Bob and I did not
11 at any point talk in any detail about goals and
12 objectives, but I have no reason to believe that he
13 wouldn't.
14  Q. Okay.
15     MR. ROBERTS: I don't what the next
16 exhibit number is.
17     MR. GODFREY: Is this the new one you
18 were talking about?
19     MR. ROBERTS: Yes, sir.
20     MR. GODFREY: The next exhibit number
21 should be 6060, according to my record. Is that the
22 correct number --
23     MR. ROBERTS: 6060.
24     (Exhibit No. 6060 marked.)
25     THE COURT REPORTER: Mark one of them.

Page 544

1     MR. ROBERTS: Yes, sir.
2     THE COURT REPORTER: No, no, no, not you,
3 not you. I'm talking to my manager.
4     MR. ROBERTS: The court reporters from
5 Houston are testy sorts.
6     THE COURT REPORTER: Objection, form.
7     (Laughter.)
8     MR. ROBERTS: Oh, God, help me.
9     THE COURT REPORTER: Objection, form.
10  Q. (By Mr. Roberts) Doctor, I've handed you a
11 document that's been produced by BP. It -- it appears
12 to be your testimony before -- a transcript of your
13 testimony before the House Representatives' Committee
14 on Energy and Commerce.
15     MR. GODFREY: Excuse me. Do you have
16 another copy that I might have, please?
17     MR. ROBERTS: I'm sorry.
18     MR. GODFREY: His personal counsel has
19 it. The company counsel does not. Do you need this --
20     MR. ROBERTS: No.
21     MR. GODFREY: Okay, thank you.
22     MR. ROBERTS: There's so many BP lawyers
23 here, I just didn't bring enough copies, right?
24  Q. (By Mr. Roberts) Let me go back over this.
25 This appears to be a transcript of your testimony on

25 (Pages 541 to 544)

Page 545

1  June 17 before the House Committee -- Subcommittee on
2  the Oversight and Investigations. And I'm sure you
3  recall that particular day?
4     A.  How could I forget it?
5     Q.  I have highlighted for your attention a -- a
6  couple of parts in that.
7     A.  Yeah.
8     Q.  The first is the paragraph that begins: "When
9  I learned that 11 men had lost their lives in the
10 explosion and fire on the DEEPWATER HORIZON, I was
11 personally devastated." Do you recall making those
12 comments?
13    A.  I do.
14    Q.  It goes on to say: "Three weeks ago I
15 attended a Memorial Service for those men, and it was a
16 shattering moment. I want to offer my sincere
17 condolences to their friends and families. I can only
18 imagine their sorrow." Do you recall saying that, sir?
19    A.  I do.
20    Q.  That -- that service, the Memorial Service you
21 attended, was that the Transocean Memorial Service?
22    A.  It was. It was.
23    Q.  And -- and at that service, you met a number
24 of the families?
25    A.  I did.

Page 546

1     Q.  A number of the people involved in the rig?
2     A.  Yes.
3     Q.  And you at least got a sense of their
4  feelings, their attitudes, and their emotions, correct?
5     A.  I did, yes.
6     Q.  What did you think about those folks?
7     A.  I thought they were great people, and I was
8  deeply touched by the sorrow that they were feeling and
9  the loss that they experienced.
10    Q.  Did you get any inim -- any impression from
11 them that they were callous or hardened people that
12 didn't care about the welfare of others?
13    A.  No.
14    Q.  Quite the contrary, did you -- did you get the
15 impression that those employees that you met were
16 deeply care -- deeply cared about others and their own
17 family?
18    A.  Indeed, yes.
19    Q.  Their own drilling family, I'm talking about.
20    A.  Yeah. I -- I understand your -- entirely your
21 sentiment.
22    Q.  Did you get the impression of how close the
23 family on the drilling rig was; that is, the men that
24 worked together on the --
25    A.  I did.

Page 547

1     Q.  -- drilling rig?
2        Did you get a chance to talk to some of your
3  employees who worked on the DEEPWATER HORIZON with
4  these men?
5     A.  I did.
6     Q.  And did you get the impression that they all
7  considered themselves one big family, even though they
8  were from different companies?
9     A.  Yes.
10    Q.  Do you remember any of the names of the
11 individuals who lost their lives?
12    A.  I -- I remember some of them. Ja -- James
13 Anderson.
14    Q.  Yes, sir.
15    A.  Gordon Clark. Karl Kleppinger, I think.
16    Q.  Yeah. One --
17    A.  I can't remember any more of them, I'm afraid.
18    Q.  On April 20th of this year, BP filed a
19 lawsuit, a legal pleading, claiming, among other
20 things, that these men were callous, indifferent, and
21 grossly negligent in causing this explosion. Are you
22 aware of that, sir?
23    A.  It's after I left the company. I --
24    Q.  Sir?
25    A.  It was after I left the company. I've had no

Page 548

1  involvement in it.
2     Q.  Does April 20 have any significance in your
3  life?
4     A.  Of course, it does.
5     Q.  It's the anniversary of --
6     A.  I know exactly what it is.
7     Q.  It's the anniversary --
8     A.  I remember the anniversary. I spent an hour
9  in the church on my own, reflecting.
10    Q.  As did many.
11    A.  I'm sure that's right.
12    Q.  I -- I gather that you weren't consulted in
13 the decision by BP, on the anniversary of these men's
14 deaths and these many injuries that you knew took
15 place -- you weren't consulted on whether they should
16 be accused of being incompetent, not knowing what they
17 were doing, or grossly negligent?
18    A.  I have --
19        MR. GODFREY: Objection as to form.
20    A.  -- not been consulted on anything with respect
21 to BP since I left the company on the 30th of
22 September.
23    Q.  (By Mr. Roberts) You saw these people at the
24 Memorial Service, and you saw the families of the
25 deceased workers, and you saw the surviving workers and

PURSUANT TO CONFIDENTIALITY ORDER

f43521ab-d719-42e1-aa06-8768f1f9a456

Page 549

1  their families. Can -- can we agree just as humans --
2  can we agree that it would have been insensitive, at
3  the minimum, on the anniversary of these folks' tragic
4  incident, to file a claim saying they were grossly
5  negligent?
6           MR. WEBB: I object to the --
7           MR. GODFREY: Objection as to form.
8           MR. WEBB: -- form of the question.
9     A. I had no part or parcel in any of that. I'm
10 not -- I'm not --
11    Q. (By Mr. Roberts) Oh, I understand that, sir.
12    A. -- prepared to pass any judgment one way or
13 the other as to the sensitivity or not. I don't know
14 the context, I don't know the legal context, so I'm
15 afraid I'm not prepared to pass a judgment.
16    Q. You're not prepared to say that it's
17 insensitive to claim that these dead men were
18 incompetent on the anniversary of their deaths?
19          MR. WEBB: Objection, form.
20    A. As I said, I'm not prepared to pass a judgment
21 because I don't know the context in which that decision
22 was taken.
23    Q. (By Mr. Roberts) Whatever the context the
24 decision was made by BP, are you seriously telling me
25 you're not in a position to say that that would have

Page 550

1  been, at a minimum, insensitive?
2           MR. WEBB: Objection, form.
3           MR. GODFREY: Objection as to form.
4     A. As I said, I was no part of the decision. I
5  had left the company almost nine months, it was.
6     Q. (By Mr. Roberts) You -- you met those wives?
7     A. I did.
8     Q. Can you imagine what it would have been like
9  for them to find out on the year anniversary of the
10 deaths of their husbands and loved ones, that those men
11 are being accused of incompetence?
12          MR. GODFREY: Objection as to form.
13          MR. WEBB: Objection, form.
14          MR. GODFREY: Move on.
15    A. I'm not aware of what they've been accused of.
16 I'm very sorry, but I don't -- I have no basis to
17 make --
18    Q. (By Mr. Roberts) I'm asking you to assume that
19 was the case. If that is the case, can you understand
20 how that might have been at least insensitive?
21          MR. GODFREY: Objection as to form. Move
22 on, please.
23    A. I can --
24    Q. (By Mr. Roberts) Sir?
25    A. I can imagine how -- how, on the anniversary

Page 551

1  of the accident, the families and particularly the
2  wives were very upset. It's the anniversary of the
3  accident.
4     Q. Thank you, sir.
5        Let me make sure -- (tendering).
6     A. Thank you.
7           MR. GODFREY: Is this 6061?
8           MR. ROBERTS: I -- no, no, no. I think
9  we have -- pass 6061. I need one for the court
10 reporter.
11       (Exhibit No. 6061 marked.)
12    Q. (By Mr. Roberts) What I've handed to you is a
13 transcript of a -- it's actually a copy of a "Forbes"
14 magazine interview entitled, "In His Own Words: Forbes
15 Q&A With BP's Tony Hayward," and dated May 18, 2010.
16 Do you see that, sir?
17    A. I do.
18    Q. Do you recall giving this interview?
19    A. I don't, no.
20    Q. Sir?
21    A. I don't recall it, no.
22    Q. You were giving a lot of interviews --
23    A. I was doing lots of -- lots of things.
24    Q. It -- it says: "Last" -- it begins: "Last
25 week Forbes sat down with BP Chief Executive Tony

Page 552

1  Hayward at the company's emergency response center in
2  Houston," then goes on to say something that I am sure
3  is inaccurate: "A well-rested Hayward shared his
4  thoughts..."
5       I can't imagine you were well-rested at that
6  point.
7     A. It's the definition of "well-rested," of
8  course, but at the time I was getting probably four or
9  five hours' sleep a night.
10    Q. Yeah.
11       I want to go to the last page. There's a
12 question that's asked of you beginning at the top:
13 "That makes me think...you didn't mean a real insurance
14 policy of course, but if one was to go to Lloyd's of
15 London and insure against a 25 billion hit to my market
16 cap and 5 billion in punitive damages, what kind of
17 premiums would you have to pay?"
18       The answer that's written down here is: "You
19 can't insure. That's why we're self-insured. You
20 can't insure risks you want to insure. And the things
21 you can insure, premiums are so high that it makes no
22 sense for a company like" P -- "BP to do anything other
23 than self-insure." Do you see that, sir?
24    A. I do.
25    Q. Do you recall giving that answer?

Page 553

1  A.  I -- I don't, but it's -- it's not an
2  unreasonable answer.  I don't recall it, no.
3  Q.  You're not denying that you gave it?
4  A.  No.
5  Q.  You just --
6  A.  Yeah, yeah.
7  Q.  -- don't recall giving it?
8  A.  I don't recall, yeah.
9  Q.  And the answer that is there is certainly
10 consistent with your thought process and your
11 understanding of the situation?
12     MR. GODFREY:  Objection as to form.
13 A.  Certainly that BP is self-insured.  We don't
14 have insurance policies in place, correct.
15 Q.  (By Mr. Roberts) Right.
16 A.  Certainly --
17 Q.  It goes on to say that if you did get
18 insurance, "...the premiums are so high that it makes
19 no sense for a company like BP to do anything other
20 than self-insure."  Is that accurate as well?
21 A.  Can -- sorry.  The -- you -- you mean the next
22 question, or is --
23 Q.  No, the next statement, "...and the things you
24 can insure, the premiums" --
25 A.  I'm sorry.

Page 554

1  Q.  -- "are so high..."
2  A.  I'm sorry.  Yes.  M-h'm, yeah.  Yes.
3  Q.  All right.  Let's start with that.  What does
4  "self-insurance" mean to you, at least when you were
5  CEO of BP?
6  A.  It meant that the company didn't have an
7  insurance policy against the risks it was -- it was
8  undertaking, in essence, and the -- and as it says
9  here, we self-insured and took those risks onto our
10 balance sheet.
11 Q.  Is -- is "self-insured" an -- another way of
12 saying "no insurance"?
13 A.  Yes.  Well, no -- no external third-party
14 insurance, yeah.
15 Q.  All right.
16 A.  Yes.
17 Q.  So BP elected to have no external insurance --
18 A.  M-h'm.
19 Q.  -- for terms of the environmental risks that
20 might be occasioned in connection with deepwater
21 drilling?
22     MR. GODFREY:  Objection as to form.
23 A.  We had no external insurance for anything at
24 BP.
25 Q.  (By Mr. Roberts) For anything at BP?

Page 555

1  A.  That's correct.
2  Q.  Okay.  I don't know about the cars y'all drive
3  or that kind of stuff.  I'm -- I'm only interested in
4  deepwater drilling --
5  A.  Obviously we're think -- thinking of --
6  Q.  -- particularly the Gulf of Mexico.
7  A.  -- any other operational activity.
8  Q.  Okay.  The statement here that the premiums
9  are so high that it makes no sense, like BP, to do
10 anything else other than self-insure, am I right that
11 BP, some years ago, made a corporate decision that the
12 differential between the cost of having insurance in
13 connection with the claims that it was covering were
14 such that BP might as well not have insurance, handle
15 the claims itself, and in the end save itself money?
16 A.  That's cor -- that was a decision taken in
17 about 1991.
18 Q.  And that was still the decision in effect at
19 the time --
20 A.  M-h'm.
21 Q.  -- you undertook your --
22 A.  That's correct.
23 Q.  -- undertook the CEO position?
24 A.  That's correct.
25 Q.  That was still the situation as of Macondo?

Page 556

1  A.  That's correct.
2  Q.  Is there any reason, in your mind, to think
3  that deepwater well pollution insurance, if it's not
4  affordable on a practical level to BP, would be
5  affordable on a practical level to somebody like
6  Halliburton or MI or Dril-Quip or Transocean?
7      MR. WEBB:  Object to the form.
8      MR. GODWIN:  Objection as to form.
9  A.  I don't know anything about the insurance
10 market, I'm afraid, so I can't make that -- take that
11 view.  I think everyone, every company, looks at the
12 risks that they're undertaking, the cost of insurance,
13 and weighs that against the likelihood of occurrence,
14 and makes a decision appropriately.  I -- I'm -- I --
15 but I'm not an expert in the insurance market, so I
16 can't answer your question, I'm afraid.
17 Q.  (By Mr. Roberts) Did you have any expectation
18 that your subcontractors would go out and purchase
19 insurance for you, since you had a -- made a corporate
20 decision not to purchase insurance for yourself?
21     MR. WEBB:  Objection, form.
22     MR. GODFREY:  Same objection.
23 A.  We had no expectation of what our contractors
24 did and did not -- insur -- what insurance our
25 contractors did and did not purchase with respect to

28 (Pages 553 to 556)

Page 557

1  risks that they were undertaking.
2  Q. (By Mr. Roberts) As -- while you were CEO of
3  BP, as between BP, on the one hand, and its contractors
4  that were involved in drilling of wells, in the other
5  hand, was there a normal allocation of environmental
6  risks in the contracts that BP entered into?
7      MR. GODFREY: Object as to form.
8  A. Would you just repeat your question again?
9  Q. (By Mr. Roberts) Sure. You know what
10 environmental risks are?
11 A. Yeah. Yes.
12 Q. All right. And you know that in your
13 contracts with subcontractors, there is an allocation
14 of who's responsible for those risks?
15 A. M-h'm.
16 Q. You're familiar with the term of indem --
17 you're familiar with the term "indemnity"?
18 A. Yes.
19 Q. All right. While you were CEO, what was the
20 policy with respect -- at BP -- as to who would assume
21 environmental risk for blowout pollution, for
22 instance -- BP or its subcontractors?
23     MR. GODFREY: Objection as to form.
24 A. I think the -- it de -- it de -- in the
25 contracts, of course, it's -- I -- I -- I -- I don't

Page 558

1  have a contract in front of me, and I won't remember
2  the right language. But if there was -- if there was
3  reasons to believe that the contractor was at fault,
4  then the indemnity may or may not apply.
5  Q. (By Mr. Roberts) "At fault" meaning what?
6      MR. WEBB: Well, object to the form.
7  Object to the form of the question, without a document.
8      MR. GODFREY: The same objection.
9  A. A -- a -- a -- some sort -- some form of
10 fault. I'm not a lawyer. I'm not going to try and
11 describe a legal description.
12 Q. (By Mr. Roberts) All right. Well, let's --
13 A. I certainly won't try and do it without the --
14 Q. Let's go back up --
15 A. -- without the contract in front of us.
16 Q. Let's go back up to your level, the
17 40,000-foot level of a CEO. And I don't mean that
18 disrespectfully. I understand you don't read the
19 details of every contract -- of all your contracts.
20     But what -- what was the industry -- you
21 talked yesterday at length about the industry. In
22 general, what was the industry allocation of
23 environmental risk between an Operator such as BP and
24 subcontractors who worked for the Operator while
25 drilling wells for the Operator?

Page 559

1      MR. WEBB: Object to form.
2      MR. GODFREY: Same objection.
3      MR. GODWIN: Object to form.
4  A. The industry norm would be, in most
5  circumstance, that the Operator would take that risk.
6  Q. (By Mr. Roberts) Okay.
7  A. But circumstances, of course, differ in time
8  and place.
9  Q. Right. But that was the industry standard?
10 A. M-h'm, yeah.
11 Q. Has been that way for years, hasn't it?
12 A. Yeah, it is.
13     MR. GODFREY: Object to form.
14 Q. (By Mr. Roberts) All right. If you would,
15 that notebook that's in front of you, turn to Tab --
16 let's see if this helps. I've got mine upside down.
17 Tab 4.
18     THE COURT REPORTER: Do you want it
19 marked, Mr. Roberts?
20     MR. ROBERTS: No, sir. It's been
21 previously marked as Exhibit 1488, and it is on the --
22 the disc that everybody has.
23     THE COURT REPORTER: Thank you, sir.
24     MR. ROBERTS: You're welcome, sir.
25 Q. (By Mr. Roberts) Do you have Tab 4, sir?

Page 560

1  A. I do.
2  Q. It is the -- as you can tell, it's Amendment
3  No. 38 to the Drilling Contract. It's dated -- it's
4  for the DEEPWATER HORIZON. It's dated September 28th
5  2009, and it goes into effect, I believe, in September
6  of 2010.
7      So to put this in perspective, it was signed
8  before Macondo, concerning the DEEPWATER --
9  A. M-h'm.
10 Q. -- HORIZON, to go into effect after Macondo.
11 Are you with me, sir?
12 A. I am.
13 Q. The day rates are specified there with
14 Mr. Suttles -- and, by the way, do -- you do know
15 Mr. Suttles?
16 A. Yes, I do. Yes, I do.
17 Q. He was the COO of the company?
18 A. That's correct, yeah.
19 Q. Was he the --
20 A. He was Chief Operating Officer of the
21 Exploration and Production Company.
22 Q. Okay. Was he a direct report to you?
23 A. No.
24 Q. Okay. Who did he directly report to?
25 A. To Mr. Ingalls.