# EXHIBIT A

**UNITED STATES DISTRICT OF COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION: J |
| on APRIL 20, 2010, | § | |
| | § | JUDGE BARBIER |
| Applies to: | § | |
| | § | MAG. JUDGE SHUSHAN |
| All Cases and | § | |
| 2:10-cv-02771 | § | |
| _____ | § | |

<u>**SECOND AMENDED CROSS-CLAIMS OF DEFENDANT**
**HALLIBURTON ENERGY SERVICES INC.**</u>

NOW COMES Defendant Halliburton Energy Services, Inc. ("HESI") acting as cross-plaintiff, and makes and files this, its Second Amended Cross-Claims, and in support thereof, would respectfully show this Court as follows:[1]

## I.
## BACKGROUND

1.      On April 20, 2010, there was a blowout and explosion on board the MODU *Deepwater Horizon* during efforts to temporarily abandon a well in Mississippi Canyon, Block 252, the location known as "Macondo" (the "Macondo Well"). Subsequently, the *Deepwater Horizon* sank into the Gulf of Mexico and oil was released.  Numerous individual and class action lawsuits have been filed in state and federal courts for alleged injuries and damages

---

[1]While HESI has not included any of the Transocean Entities in this particular pleading, HESI has asserted its claims against the Transocean Entities in Halliburton Energy Services Inc.'s Answer to Petitioner's Complaint and Petition for Exoneration From or Limitation of Liability and Original Claim in Limitation (Cross Claim) Against Petitioners, ("HESI's Cross Claim against the Transocean Entities"), a separate pleading filed with this Court.  HESI incorporates herein, as if set out in full, the allegations contained within HESI's Cross Claim against the Transocean Entities.

resulting from the blowout and subsequent remediation and response efforts.  Many of these lawsuits have been transferred to this Court for pretrial proceedings.

2.      Claimants/Plaintiffs have filed a number of claims against HESI and others under maritime law and state common law.  Generally, Claimants/Plaintiffs allege damages resulting from the acts of various defendants, including HESI, that allegedly caused the fire and explosion on board the *Deepwater Horizon*, its sinking, and the subsequent oil spill.  These claims were tendered to HESI by the Transocean Entities' Rule 14(c) Tender, in Civil Action No. 10-2771, (the "Rule 14(c) Tender").  HESI denies that it is liable and/or responsible for any of the alleged injuries and/or damages claimed by Claimants/Plaintiffs.

## II.
## JURISDICTION AND VENUE

3.      This Court has admiralty and maritime jurisdiction of this Cross Action pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.

4.      Venue is proper in this District pursuant to the Order transferring this case to the Eastern District of Louisiana, dated August 16, 2010.

## III.
## THE PARTIES

5.      HESI is a Delaware corporation with its principal place of business in Houston, Texas.

6.      Cross-Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.   BP Exploration was the lessee and the designated operator of the Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Act, Serial No. OCS-G 37306 (the "Lease").   The

Lease was granted by the former Mineral Management Services ("MMS"), which is now re-organized as the Bureau of Ocean Energy Management Regulation & Enforcement ("BOEMRE").   The Lease allowed BP to perform oil exploration, drilling, and production-related operations in Mississippi Canyon, Block 252, where the Macondo Well was located. This Court has personal jurisdiction over BP Exploration because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.   Cross-Defendant BP Exploration has been served with various complaints and summonses as well as the Rule 14(c) Tender.

7.      Cross-Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.   This Court has personal jurisdiction over BP America because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.   Cross-Defendant BP America has been served with various complaints and summonses as well as the Rule 14(c) Tender.

8.      Cross-Defendant BP p.l.c. is a British Limited Company with its corporate headquarters in London, England.   BP p.l.c. is the global parent company of the world-wide business operating under the "BP" logo.   BP p.l.c. operates its various business divisions, such as the "Exploration & Production" division that includes BP Exploration and BP America, through vertical business arrangements.   Cross-Defendants BP Exploration and BP America are wholly owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the US more generally.   This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's Long-Arm General Jurisdiction Provision (13 Louisiana Statute §3201 (B)), in combination with Rule 4(k)(l)(A) of the Federal Rules of Civil Procedure.   This

Court has specific jurisdiction over BP p.l.c. pursuant to Louisiana's Long-Arm Specific Jurisdiction Provision (13 Louisiana Statute §3201(B)), in combination with Rule 4(k)(l)(A) of the Federal Rules of Civil Procedure.  BP p.l.c. regularly does or solicits business, or engages in other persistent courses of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  These acts and/or omissions occurred prior to and after the blowout that occurred on the *Deepwater Horizon*.  Cross-Defendant BP p.l.c. has been served with various complaints and summonses as well as the Rule 14(c) Tender.  The BP Defendants identified in paragraphs 6-8 are collectively referred to as "BP."

9.      Cross-Defendant M-I, LLC a/k/a M-I Swaco ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.  M-I was, at all relevant times, registered to do, and was doing, business in Louisiana and within this district.  M-I supplies drilling and completion fluids and additives, as well as pressure control, vessel instrumentation, and drilling waste management products and services to oil and gas companies in Louisiana and elsewhere.  On the *Deepwater Horizon*, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the Macondo Well.  M-I employed, planned and/or supervised key fluid activities concerning the Macondo Well, such as the mud displacement that was occurring at the time of the April 20, 2010 Macondo Well blowout.  This Court has personal jurisdiction over M-I because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana. Cross-Defendant M-I has been served with various complaints and summonses as well as the Rule 14(c) Tender.

10.     Cross-Defendant Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas.  Cameron is registered to do and does business in the State of Louisiana. Cameron manufactured, designed, supplied, installed, maintained and/or modified the sub-sea emergency well-closure device known as a blowout-preventer ("BOP") on the *Deepwater Horizon* and, at all pertinent times, contracted with Cross-Defendant Transocean Deepwater Drilling, Inc. for the provision of the BOP which was installed at the Macondo wellhead.  This Court has personal jurisdiction over Cameron because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.  Cameron has been served with various complaints and summonses as well as the Rule 14(c) Tender.

11.     Cross-Defendant Anadarko Exploration & Production Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  Anadarko E&P is an oil and gas exploration and production company.  Through various agreements, Anadarko E&P became a co-lessee under the terms the Lease.  As of April 20, 2010, and continuing until at least April 28, 2010, Anadarko E&P held a 22.5% interest in the Lease. This Court has personal jurisdiction over Anadarko E&P because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.  Cross-Defendant Anadarko E&P has previously been served with various complaints and summonses as well as the Rule 14(c) Tender.

12.     Cross-Defendant Anadarko Petroleum Corporation, or ("Anadarko Petroleum") is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Anadarko Petroleum is registered to do and does business in the State of Louisiana.  Anadarko Petroleum is

an oil and gas exploration and production company.  Through various agreements, Anadarko Petroleum became a co-lessee under the terms of the Lease.  As of April 20, 2010, and continuing until at least April 28, 2010, Anadarko Petroleum held a 2.5% interest in the Lease. This Court has personal jurisdiction over Anadarko Petroleum because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana. Cross-Defendant Anadarko Petroleum has been served with various complaints and summonses as well as the Rule 14(c) Tender.

13.     Cross-Defendant MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  Through various agreements, MOEX Offshore became a co-lessee under the terms of the Lease.  As of April 20, 2010, and continuing until at least April 28, 2010, MOEX Offshore held a 10% interest in the Lease.  This Court has personal jurisdiction over MOEX Offshore because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.  Cross-Defendant MOEX Offshore has been served with various complaints and summonses as well as the Rule 14(c) Tender.

14.     Cross-Defendant MOEX USA Corporation ("MOEX USA") is a Delaware corporation with its principal place of business in Houston, Texas.  MOEX USA is the parent company of MOEX Offshore 2007 LLC.  This Court has general jurisdiction over MOEX USA pursuant to Louisiana's Long-Arm Specific Jurisdiction Provision (13 Louisiana Statute §3201 (B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  MOEX USA does business in Louisiana, has continuous and systematic contacts with Louisiana (and the U.S. more generally), and has been served with a Summons and individual Complaints that are the

subject of the Master Claim in Limitation.  This Court has specific jurisdiction over MOEX USA pursuant to Louisiana's Long-Arm Specific Jurisdiction Provision (13 Louisiana Statute §3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  MOEX USA regularly does or solicits business, or engages in other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  These acts or omissions took place before and after the blowout.  Cross-Defendant MOEX USA has been served with various complaints and summonses as well as the Rule 14(c) Tender.

15.     Cross-Defendant Mitsui Oil Exploration Company, Ltd., ("MOECO") is a Japanese corporation with its principal place of business in Tokyo, Japan.  Upon information and belief, MOECO is a corporate parent and/or alter ego of MOEX Offshore, which holds a 10% stake in the Lease.  Cross-Defendant MOECO has been served with various complaints and summonses as well as the Rule 14(c) Tender.

16.     Cross-Defendant Weatherford U.S. L.P., ("Weatherford"), is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas.  At all pertinent times, Weatherford was registered to do, and was doing business, in Louisiana and within this District.  Weatherford designed, manufactured, marketed, sold, and/or distributed the casing components for the Macondo Well, including the float equipment and centralizers, and provided the personnel and equipment for running the casing and casing components into the well bore. This Court has personal jurisdiction over Weatherford because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.  Cross-Defendant Weatherford has been served with various complaints and summonses as well as the Rule 14(c) Tender.

17.     Cross-Defendant Weatherford International, Inc., ("Weatherford International") is a Delaware corporation with its principal place of business in Houston, Texas.  Weatherford International designed, manufactured, marketed, sold and/or distributed the casing components for the Macondo Well, including the float collar, shoes, and centralizers, and provided the personnel and equipment for running the casing and casing components into the well bore.  This Court has personal jurisdiction over Weatherford International because it is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana. Cross-Defendant Weatherford International has been served with various complaints and summonses as well as the Rule 14(c) Tender.

18.     Cross-Defendant Dril-Quip, Inc. ("Dril-Quip") is a Delaware corporation which maintains its principal place of business in Houston, Texas.  Dril-Quip was involved in providing wellhead systems to the *Deepwater Horizon*, including the Macondo Well.  This Court has personal jurisdiction over Dril-Quip because Dril-Quip is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.  Cross-Defendant Dril-Quip has been served with various complaints and summonses as well as the Rule 14(c) Tender.

19.     Cross-Defendant Marine Spill Response Corporation ("MSRC") is a Tennessee non-profit corporation with its principal place of business in Herndon, Virginia.  At all pertinent times, MSRC was doing business in the State of Louisiana.  MSRC participated in the post-blowout remediation and response efforts.  Cross-Defendant MSRC has been served with various complaints and summonses as well as the Rule 14(c) Tender.

20.     Cross-Defendant Airborne Support, Inc., ("ASI"), is a Florida corporation with its principal place of business in Houma, Louisiana.  At all pertinent times, ASI was doing business

in the State of Louisiana.  ASI participated in the post-blowout remediation and response efforts. Cross-Defendant ASI has been served with various complaints and summonses as well as the Rule 14(c) Tender.

21.     Cross-Defendant Airborne Support International, Inc., ("ASI International"), is a Florida corporation with its principal place of business in Houma, Louisiana.  At all pertinent times, ASI International was doing business in the State of Louisiana.  ASI International participated in the post-blowout remediation and response efforts. Cross-Defendant ASI International has been served with various complaints  and summonses as well as the Rule 14(c) Tender.

22.     Cross-Defendant Lynden, Inc. ("Lynden") is a Washington corporation with its principal place of business in Seattle, Washington.  At all pertinent times, Lynden was doing business in the State of Louisiana by virtue of its one hundred percent ownership interest in Lynden Air Cargo, LLC, an Alaskan limited liability company with its principal place of business in Seattle, Washington.  At all pertinent times, Lynden Air Cargo, LLC, (together with Lynden, Inc., "Lynden") was doing business in the State of Louisiana.  Lynden participated in the post-blowout remediation and response efforts.  Cross-Defendant Lynden has been served with various complaints and summonses as well as the Rule 14(c) Tender.

23.     Cross-Defendant Dynamic Aviation Group, Inc., ("Dynamic"), is a Virginia corporation with its principal place of business in Bridgewater, Virginia.  At all pertinent times, Dynamic was doing business in the State of Louisiana.  Dynamic participated in the post-blowout remediation and response efforts.  Cross-Defendant Dynamic has previously been served with various complaints and summonses as well as the Rule 14(c) Tender.

24.     Cross-Defendant International Air Response, Inc., ("IAR") is an Arizona corporation with its principal place of business in Coolidge, Arizona.  At all pertinent times, IAR was doing business in the State of Louisiana.  IAR participated in the post-blowout remediation and response efforts.  Cross-Defendant IAR has been served with various complaints  and summonses as well as the Rule 14(c) Tender.

25.     Cross-Defendant Lane Aviation, ("Lane") is a Texas corporation with its principal place of business in Rosenberg, Texas.  At all pertinent times, Lane was doing business in the State of Louisiana.  Lane participated in the post-blowout remediation and response efforts.  Cross-Defendant Lane has been served with various complaints and summonses as well as the Rule 14(c) Tender.

26.     Cross-Defendant National Response Corporation, ("NRC"), is a Delaware corporation with its principal place of business in Great River, New York.  At all pertinent times, NRC, along with SEACOR Holding, Inc., a Delaware corporation with its principal place of business in Delaware, of which NRC is a wholly-owned subsidiary, was doing business in the State of Louisiana.  NRC participated in the post-blowout remediation and response efforts.  Cross-Defendant NRC has been served with various complaints and summonses as well as the Rule 14(c) Tender.

27.     Cross-Defendant O'Brien Response Management, Inc., ("O'Brien") is a Louisiana corporation with its principal place of business in the Parish of St. Tammany, State of Louisiana.  At all pertinent times, O'Brien was doing business in the State of Louisiana.  O'Brien participated in the post-blowout remediation and response efforts.  Cross-Defendant O'Brien has been served with various complaints and summonses as well as the Rule 14(c) Tender.

28.     Cross-Defendant Tiger Safety, LLC, ("Tiger"), is a Louisiana limited liability company with its principal place of business in the Parish of East Baton Rouge, State of Louisiana. Tiger participated in the post-blowout remediation and response efforts.  Cross-Defendant Tiger has been served with various complaints and summonses as well as the Rule 14(c) Tender.

29.     Cross-Defendant DRC Emergency Services, LLC, ("DRC"), is an Alabama limited liability company.  At all pertinent times, DRC was doing business in the State of Louisiana.  DRC participated in the post-blowout remediation and response efforts.  Cross-Defendant DRC has been served with various complaints and summonses as well as the Rule 14(c) Tender.

30.     Cross-Defendant Nalco Company ("Nalco") is a Delaware corporation.  At all pertinent times, Nalco was doing business in the State of Louisiana.  Nalco is the manufacturer of the chemical dispersants purchased by the BP Defendants for use in connection with the clean-up efforts in response to the blowout.  Cross-Defendant Nalco has been named and served as a Third-Party Defendant in the Rule 14(c) Tender.

31.     The parties identified in paragraphs 6-30 are collectively referred to as Cross-Defendants.

### IV.
### CAUSES OF ACTION

32.     Pursuant to Rule 13(g), Defendant/Third Party Plaintiff HESI alleges the following causes of action against Cross-Defendants:

## COUNT I
## (<u>CONTRIBUTION AND INDEMNITY</u>)

33.     Paragraphs 1 through 32 are incorporated by reference as if fully set forth herein.

34.     Third Party Plaintiff is entitled to contribution and indemnity from Cross-Defendants BP Exploration, BP America, BP p.l.c. (collectively "BP"), M-I, Cameron, Anadarko E&P, Anadarko Petroleum, MOEX Offshore, MOEX USA, MOECO, Weatherford, Weatherford International, Dril-Quip, MSRC, ASI, ASI International, Lynden, Dynamic, IAR, Lane, NRC, O'Brien, Tiger, DRC, and Nalco[2] for any and all sums it may be compelled to pay Claimants/Plaintiffs as a result of the incident made the basis of this proceeding.

35.     Any alleged injuries or damages claimed by Claimants/Plaintiffs were proximately caused by the actions and/or omissions of Cross-Defendants and not by any conduct on the part of HESI. Accordingly, HESI is entitled to a determination of proportionate responsibility and allocation of fault, pursuant to general maritime law, or other applicable law.

36.     HESI reserves its right to amend the allegations against these Cross-Defendants as additional discovery and evidence warrants.

## COUNT II
## (<u>CONTRACTUAL INDEMNITY</u>)

37.     Paragraphs 1 through 36 are incorporated by reference as if fully set forth herein.

38.     HESI is entitled to contractual indemnity as a third party beneficiary from Cross-Defendants M-I, Weatherford, and Weatherford International, for any and all sums it may be compelled to pay Claimants/Plaintiffs relating to certain claims made as a result of the incident made the basis of this proceeding.

---

[2]As referenced collectively herein, the Responder Defendants include: MSRC, NRC, IAR, ASI, ASI International, Lane, Lynden, Dynamic, O'Brien, Tiger, DRC and Nalco.

39.     Certain alleged injuries or damages claimed by Claimants/Plaintiffs were proximately caused by the actions and/or omissions of these Cross-Defendants and not by any conduct on the part of HESI. Accordingly, pursuant to the parties' contractual agreements, to which HESI is a third party beneficiary, HESI is entitled to indemnification for any damages, sums, and/or settlements HESI may be compelled to pay and/or incur relating to certain claims.

40.     HESI reserves its right to amend the allegations against these Cross-Defendants as additional discovery and evidence warrants.

**COUNT III**
**(NEGLIGENCE/GROSS NEGLIGENCE/ NEGLIGENT AND/OR GROSSLY NEGLIGENT MISREPRESENTATION/ WILLFUL MISCONDUCT)**

41.     Paragraphs 1 through 40 are incorporated by reference as if fully set forth herein.

42.     The damages and injuries alleged by Plaintiffs/Claimants occurred as a result of the negligence of BP, Anadarko E&P, Anadarko Petroleum, MOEX Offshore, MOEX USA, MOECO, Cameron, Weatherford, Weatherford International, M-I, Dril-Quip, and the Responder Defendants.  These acts of negligence render these Cross-Defendants liable pursuant to the provisions of 46 USC §30104 and the general maritime law, or other applicable law, for negligence.

**A.     BP**

43.     BP was the primary owner of the Lease and was the sole Operator at the Macondo Well.  In this dual role, BP controlled most, if not all, of the actions of BP's sub-contractors.  BP decided on the well design.  BP decided when to conduct rig activities.  BP decided what products and services to use, and whether to accept or reject its contractors' recommendations regarding those products and services.  BP decided whether critical well integrity tests were

properly conducted and whether it was safe to proceed to the next scheduled rig activity.  BP decided how many rig activities to conduct simultaneously.  BP decided the speed at which the well was drilled and the steps to be taken, or not taken, in order to ensure that the rig stayed as close as possible to its drilling schedule, with every day of delay costing BP at least $500,000.

44.     BP utterly failed to meet its duties and obligations, and BP knew so at the time. BP recklessly sacrificed safety for monetary savings and gain.  BP failed to disclose and/or negligently or grossly negligently misrepresented to HESI critical information relative to the identification of the shallowest  hydrocarbon-bearing sands within the production interval of the Macondo well.  BP failed to exercise reasonable care or was grossly negligent in gathering or communicating this information to HESI, which it supplied for HESI's guidance in formulating the cementing plan for the well.  HESI detrimentally relied on this false information, as BP intended.   BP carelessly ignored failed well integrity test results to move forward with procedures that put the well into an underbalanced condition that led to the blowout.  BP ignored and disregarded HESI's recommendation regarding the necessary number of centralizers and ignored and disregarded HESI's warning that using an inadequate number of centralizers would result in the well having a severe gas flow problem.  BP proceeded in an irresponsible manner with its temporary abandonment plan despite repeated warning signs that there were serious issues with the well.  BP allowed multiple rig activities to be conducted simultaneously, masking subtle indicators of a well control issue.  This callous and grossly irresponsible conduct by BP, whether acting alone or in concert with the actions and inactions of other Cross-Defendants, represents the absolute and undeniable cause of the horrific explosion and blowout that occurred on April 20, 2010, taking the lives of 11 men and injuring many others, as well as the tragic

events that have occurred since that never-to-be forgotten night.  BP knew that its greed and reckless disregard for its responsibilities as the Operator of the Macondo Well might have such tragic consequences.  It should now be held fully accountable for its conduct.

45.   BP was negligent, grossly negligent, and/or acted with willful misconduct in at least the following ways:

> (a)   Failing to exercise ordinary and reasonable care in connection with its drilling design and operations;
>
> (b)   Failing to exercise reasonable care while conducting drilling operations to ensure that a blowout did not occur;
>
> (c)   Failing to exercise reasonable care after blowout to ensure that an oil spill did not occur;
>
> (d)   Failing to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of an oil spill;
>
> (e)   Failing to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico;
>
> (f)   Choosing and implementing a long string well design instead of a liner/tie back design;
>
> (g)   Using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;
>
> (h)   Using too few centralizers to ensure that the casing was centered into the well bore;
>
> (i)   Failing to implement a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job;
>
> (j)   Cancelling the cement bond log test that would have confirmed the integrity of the cement job;
>
> (k)   Failing to deploy a casing hanger lock down sleeve to prevent the wellhead seal from being blown out by pressure from below;

(l)   Failing to properly interpret pressure test results relating to well control and well integrity;

(m)   Failing to train its employees in the management of complex systems like those found on the *Deepwater Horizon*;

(n)   Requiring simultaneous operations in an effort to expedite the project, making it difficult to track fluid volumes in the wellbore;

(o)   Failing to take appropriate action to avoid or mitigate the release of oil into the Gulf of Mexico;

(p)   Failing to timely bring the oil release under control;

(q)   Failing to exercise reasonable care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery efforts following the oil spill;

(r)   Failing to disclose and/or misrepresenting the identification of all hydrocarbon-bearing sands within the production interval of the Macondo well;

(s)   Violating statutory and regulatory standards set forth in the Clean Water Act, the Oil Pollution Act, and other applicable statutes, regulations, and industry standards; and

(t)   Failing to warn others on the rig of an influx of hydrocarbons in the wellbore.

### B.   The Anadarko/MOEX Defendants

46.   At all times material herein, the Joint Operating Agreement ("JOA") entered into by and between Anadarko E&P, Anadarko Petroleum, MOEX Offshore, MOEX USA, and MOECO (collectively, the "Non-Operating Cross-Defendants") and BP required BP to obtain the approval of the Non-Operating Cross-Defendants to proceed with nondiscretionary operations in connection with the Lease by, *inter alia*, seeking their authorization for the expenditure of funds and/or by seeking their election or vote to participate in the next stage of operations. The JOA also provided for the sharing, in amounts proportionate to the working interest of each party, of

any oil and gas discovered in connection with the Lease and of losses resulting from the approved activities.

47.    The JOA further required BP to provide the Non-Operating Cross-Defendants with detailed technical information regarding exploration and other operations performed in connection with the Lease, including applications for and modifications of permits to drill, mud logs, mud checks, and other information.  The Non-Operating Cross-Defendants had the right to and did obtain "real time" data as set forth in Section 5.7 of the JOA.  The Non-Operating Cross Defendants received detailed technical information regarding operations conducted in connection with the Lease and the JOA, including daily reports, access to a secure website containing sampling and other data, and access to real time data from the rig.

48.    The JOA provided for the prompt invoicing by BP of costs incurred under the JOA and prompt payment of their agreed-upon share by the Non-Operating Cross-Defendants, including, based upon information and belief, the costs of the well casing and wellhead and other materials purchased by BP.  The JOA provided the Non-Operating Cross-Defendants with a mechanism to object to, prevent, control, address, and/or abate discharges or health and safety issues in connection with the Lease.

49.    On various dates, the Non-Operating Cross-Defendants each designated BP as their operator and local agent, with full authority to act on their behalf in complying with the terms of the Lease and applicable regulations.

50.     The Non-Operating Cross-Defendants are liable for the acts and omissions of their agent, BP.[3]   The Non-Operating Cross-Defendants were further negligent, grossly negligent, and/or acted with willful misconduct because they approved, authorized, and participated in BP's grossly negligent design and operations of the well.  The Non-Operating Cross-Defendants were further negligent, grossly negligent, and/or acted with willful misconduct because they knew, or should have known, of the presence of hydrocarbons in the well on the evening of April 20, 2010 and failed to warn the drilling vessel crew of the imminent blowout so that the drilling vessel crew could take action.   Alternatively, the Non-Operating Cross-Defendants were negligent, grossly negligent, and/or acted with willful misconduct by entrusting BP to make decisions relative to the Lease and to the *Deepwater Horizon's* drilling operations.

### C.     Cameron

51.     Cameron was negligent in at least the following ways:

(a)     Failing to properly maintain the blowout preventer on the *Deepwater Horizon*;

(b)     Failing to exercise reasonable care in the design, manufacture, supply, and modification of the blowout preventer on the *Deepwater Horizon*;

(c)     Failing to ensure and verify that the blowout preventer it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would reasonably be used during the *Deepwater Horizon*'s drilling and explorations operations;

(d)     Designing the blowout preventer in a dangerous and/or unsafe manner by subjecting it to a single-point failure;

(e)     Failing to install a backup activation system for the blowout preventer;

---

[3]There are factual differences regarding the involvement of MOEX Offshore, Anadarko E&P, and Anadarko Petroleum.  Based on these differences, HESI's allegation of gross negligence and willful misconduct regarding the Non-Operating Cross-Defendants go only to Anadarko E&P and Anadarko Petroleum.

(f)   Failing to provide adequate warnings, instructions, and guidelines on the permissible uses, modifications, and applications of the blowout preventer; and

(g)   Failing to effectively design the blowout preventer with a backup activation system, or provide adequate warnings, instructions and/or guidelines on the permissible uses, modifications, and applications of the blowout preventer.

### D.   The Weatherford Defendants

52.   Weatherford and Weatherford International were negligent, grossly negligent, and/or committed willful misconduct in at least the following ways:

(a)   Failing to exercise ordinary and reasonable care in the design, manufacture, and supply of the *Deepwater Horizon*'s float equipment; and

(b)   Designing and manufacturing a float equipment that failed to seal properly and which allowed hydrocarbon back-flow into the casing.

### E.   M-I

53.   M-I was negligent in at least the following ways:

(a)   Failing to provide, control and monitor the mud and spacer solutions utilized in the drilling operations of the *Deepwater Horizon*;

(b)   Breaching its duties of ordinary and reasonable care in connection with the drilling operations;

(c)   Failing to guard against and/or prevent the risk of an oil spill; and

(d)   Failing to warn those on the *Deepwater Horizon* of an influx of hydrocarbons in the wellbore.

### F.   Dril-Quip

54.   Dril-Quip was negligent in at least the following ways:

(a)   Failing to exercise reasonable care while participating in the drilling operations related to the Macondo Well;

(b)   Failing to exercise reasonable care to ensure that adequate safeguards, protocols, procedures, and resources were available to prevent and/or mitigate the effects of an oil spill; and

(c)    Providing wellhead systems for the Macondo Well which failed to operate, were improperly designed, and/or possessed product defects.

### G.    The Responder Defendants

55.    The Responder Defendants were negligent in at least the following ways:

(a)    Failing to exercise reasonable care in the operation, maintenance, handling, design, implementation, and execution of the response and recovery efforts, including, but not limited to, efforts to control and extinguish the fire aboard the rig, efforts to stop the flow of oil, and efforts to control the flow of oil;

(b)    Failing to warn of the harmful effects of crude oil, chemical dispersants, and hazardous substances to be encountered in connection with the response efforts;

(c)    Failing to train regarding the harmful effects of crude oil, chemical dispersants, and hazardous substances to be encountered in connection with the response efforts;

(d)    Failing to equip and protect against the harmful effects of crude oil, chemical dispersants, and hazardous substances to be encountered in connection with the response efforts;

(e)    Failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk to vessels and crewmembers being exposed to aerial chemical dispersants;

(f)    Failing to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

(g)    Violating statutory and regulatory standards set forth in the Clean Water Act and the Oil Pollution Act;

(h)    Nalco knew or should have known that its Corexit dispersant was unreasonably dangerous to the public;

(i)    The Corexit dispersant was improperly designed and contained defects in that the Corexit was toxic to humans and could cause physical injury, health hazards, and damage to property; and

(j)    The Corexit was defectively inspected, tested, marketed, and sold.

HESI reserves its right to amend the allegations against these Cross-Defendants as additional discovery and evidence warrants.

## COUNT IV
## (STRICT PRODUCTS LIABILITY)

56.     Paragraphs 1 through 55 are incorporated by reference as if fully set forth herein.

57.     Cameron is liable for strict products liability for its actions in defectively designing, manufacturing, marketing, maintaining and/or modifying the blowout preventer on the *Deepwater Horizon*.  Specifically:

(a)     Cameron's blowout preventer was defective in design because its emergency modes of system operation did not provide a fully-independent means of closing the blowout preventer which rendered the blowout preventer abnormally dangerous;

(b)     Cameron's blowout preventer was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades;

(c)     Cameron's blowout preventer was defectively designed and/or manufactured because it failed to operate as intended, if at all;

(d)     Cameron's blowout preventer was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts;

(e)     Cameron's blowout preventer was in a defective condition and unreasonably dangerous;

(f)     The blowout preventer left Cameron's control in a defective condition; and

(g)     The blowout preventer left Cameron's control with over two hundred and sixty (260) known defects and failure modes.

58.     Weatherford and Weatherford International, (collectively "Weatherford"), are liable for strict products liability for their actions in defectively designing, manufacturing, and/or marketing the float equipment on the *Deepwater Horizon*.  Specifically:

---

**SECOND AMENDED CROSS-CLAIMS OF HALLIBURTON ENERGY SERVICES, INC.**                                                                   **PAGE 21**

(a)     Weatherford designed and manufactured the float equipment that failed to seal properly and that allowed hydrocarbon back-flow into the casing;

(b)     Weatherford's float equipment did not seal properly;

(c)     Weatherford's float equipment failed to operate properly or at all;

(d)     Weatherford's float equipment was defective because it failed to operate as intended;

(e)     Weatherford's float equipment was in a defective condition and unreasonably dangerous.

59.     Dril-Quip is liable for strict products liability for its actions in defectively designing, manufacturing, and/or marketing the wellhead system for the *Deepwater Horizon*. Specifically:

(a)     Dril-Quip designed and manufactured the wellhead system that failed to prevent the escape of hydrocarbons;

(b)     Dril-Quip's wellhead system did not act as a barrier to hydrocarbon flow;

(c)     Dril-Quip's wellhead system failed to operate properly or at all;

(d)     Dril-Quip's wellhead system was defective because it failed to operate as intended; and

(e)     Dril-Quip's wellhead system was in a defective condition and unreasonably dangerous.

60.     HESI reserves its right to amend the allegations against these Cross-Defendants as additional discovery and evidence warrants.

## FACTUAL STATEMENT REGARDING FRAUD CLAIMS
## AGAINST BP (COUNTS V AND VI)

61.     The BP Parties owned and operated the Macondo Well.  As such, BP controlled the majority of the data and empirical information relating to actual well conditions, including data used to identify the highest hydrocarbon zone in the production interval of the well.  The location of the highest hydrocarbon zone in the production interval is critical information

necessary to properly design and execute a primary cement job to cement production casing. Further, BP knew that HESI, as a cementing service contractor, would rely, and BP intended HESI to rely, upon this closely-held information that BP supplied in making decisions as to how to effectively proceed with its cementing services. Despite this fact, BP knew, but failed to disclose to HESI, the existence of the highest hydrocarbon-bearing zone in the production interval. After the incident, BP has and continues to affirmatively conceal this same information not only from HESI but also from the public and the governmental investigating bodies.

### The Macondo Well was Drilled Through Pressurized Formations.

62.     The Macondo Well was drilled for the purpose of reaching a potential hydrocarbon reservoir located more than 18,000 feet below sea level. In order to reach that reservoir, the drilling crew of the *Deepwater Horizon*, under BP's direction, drilled downhole from the sea floor a section at a time. These sections are called "intervals." The engineering and technology necessary to drill a deepwater well in the Gulf of Mexico are both significant and complex. However, as a general matter, well sections are drilled out and then reinforced with metal casing or liners that are then cemented into place. Once one interval is drilled, reinforced and cemented, the drilling crew then drills ahead (or down) into the next interval and repeats the process until the wellbore intersects the target reservoir zone. The lowest section in the well where the wellbore intersects the reservoir zone is typically called the "production interval," or the interval from which hydrocarbon from the reservoir zone will later be produced.[4] The interval principally at issue in this case is the Macondo Well's production interval.

---

[4] At the Macondo Well, BP intended to drill the well with the *Deepwater Horizon* rig and then temporarily abandon the well. BP then intended to come back to the Macondo Well with a different rig—a production rig—to "produce" the well, which would have involved perforating the production casing and annular cement in the vicinity of the

63.     When the drilling crew on the *Deepwater Horizon* drilled the production interval, it drilled through geological formations call "sands" that potentially contained a variety of formation fluids (*i.e.*, oil, gas, water).  While the target reservoir zone at the bottom of the production interval was a "sand," the crew had to drill through other thinner sands higher up in the interval to get there.  To the extent these higher sands in the production interval contained hydrocarbons, they were not considered commercially viable (*i.e*., they were not "pay" sands or zones).  Nevertheless, these higher sands were pressurized, and the pore pressure of these sands, if not overcome, would cause their formation fluids to flow into the wellbore.  The unintended influx of hydrocarbons into a wellbore is anathema to sound drilling principles and, therefore, the drilling crew and BP intended to drill while maintaining greater pressure in the production interval in order to overbalance the pressures exerted back by the formation.

64.     To ensure that formation fluids do not influx into the wellbore while drilling, a rig crew generally drills with weighted "drilling mud" in the hole.  The drilling mud is a viscous fluid of engineered density which, among other things, is intended to overbalance and hold back pressurized fluids in the sands.  The drilling mud, and more particularly its density, also needs to be engineered so that the force exerted by it onto the formation does not exceed the formation's "fracture gradient," which is the force or pressure at which the geologic formation would fracture.  Thus, the drilling mud in the wellbore must be of sufficient density to hold back fluids in the formation but not so dense as to fracture the formation geology.

---

reservoir sands thereby allowing hydrocarbons to flow into the production casing and up to the production rig for recovery.

**SECOND AMENDED CROSS-CLAIMS OF HALLIBURTON**
**ENERGY SERVICES, INC.**                                                               **PAGE 24**

## To Prepare for the Primary Cement Job, HESI Justifiably Relied on BP To Identify the Highest Hydrocarbon-Bearing Sand.

65.     After the Macondo Well was drilled to Total Depth ("TD"), BP ran a continuous production casing string into the hole from the sea floor all the way down into the production interval.  Once the production casing was in place, BP authorized HESI, as the cementing contractor on the rig, to execute a "primary" cement job, which is a cement job designed to cement the production casing into place.  A primary cement job has two principal goals.  First, it attempts to place cement into a predetermined or designed location in the production interval.  Second, the cement, once placed, is intended to achieve "zonal isolation" in the production interval.

66.     To execute the primary cement job, cement is pumped from the rig down the inside of the production casing.  When the cement exits the bottom of the production casing in the production interval, pumping pressure causes the cement to turn and flow up into the space between the outside of the production casing and the formation.  This space is called the "annulus" or "annular space."  The principal objective of the primary cement job is to have the cement turn the corner at the bottom of the production casing and flow up into and seal off this annular space such that formation fluids from the production interval's exposed sands cannot flow into the wellbore.  In other words, the cement is intended to hold back the fluids in the formation sands, including hydrocarbons, and prevent them from entering the wellbore.  Successfully sealing off this annular space such that formation fluids in the sands cannot flow into the wellbore is called achieving "zonal isolation."

67.     Prior to executing the primary cement job on the Macondo Well's production casing, HESI and BP engaged in an iterative process to design the cement slurry that would be

used and to finalize a cementing plan for executing the job.  As the owner of the Macondo Well, BP has ownership of, and a proprietary interest in, much of the data associated with the well, including but not limited to data gathered by service contractors regarding certain downhole conditions and the location of potential hydrocarbon-bearing sands in the production interval. Thus, HESI justifiably relied on BP to provide it with certain data inputs for purposes of designing, modeling and executing the primary cement job.  HESI's cementing team does not have access to this information independently and must obtain it from BP.

68.     One of the key data points or parameters for designing a primary cement job is called "top of cement" or "TOC."  TOC refers to the height of the cement column pumped into the annulus.  The TOC is a critical component of the primary cement job design as it is the key driver of the cement volume to be pumped.  The cement column in the annular space should extend a sufficient distance above the *highest* hydrocarbon-bearing zone in the interval in order to properly isolate that zone and the zones below it.  The height of the cement needed to isolate the zones is dependent on a variety of factors that can be modeled, including but not limited to, the pore pressures of those zones.  However, *at a minimum*, federal regulations require that TOC be placed *at least 500 feet above the highest hydrocarbon-bearing zone* in the production interval.  *See* 30 C.F.R. § 250.421.[5]  Therefore, in order to properly determine the designed TOC for zonal isolation and to satisfy the applicable federal regulation regarding TOC, it is critical to know the specific location of the highest hydrocarbon-bearing sand in the production interval

---

[5] Top of cement (TOC) can only be estimated prior to the cement job.  A variety of factors can contribute to TOC not achieving its estimated or theoretical height.  To determine whether the *actual* TOC (where the top of cement is located after the cement job) is consistent with the theoretical TOC (as estimated prior to the cement job), BP, as the well owner, could have run a cement evaluation technique such as a cement bond log ("CBL").  However, despite having a service company on the rig to run a CBL after the primary cement job, BP chose to forego the CBL on the Macondo Well.

and its pore pressure.  As set forth below, BP intentionally concealed the highest hydrocarbon-bearing zone in the production interval from HESI both before and after the incident.

## BP Intentionally Concealed the Higher Hydrocarbon-Bearing Sand From HESI.

69.     BP hired service contractors to run a variety of "logs" during the drilling of the Macondo Well.  These logs are designed to provide preliminary information to BP about the well, including but not limited to the geology and location of sands in the well.  However, after drilling was completed to total depth and before the primary cement job, BP hired Schlumberger to perform a suite of "wireline" logging runs in the open hole of the production interval (*i.e.*, before production casing was run in the hole).  Wireline logging is typically done after drilling is complete to get the most accurate and comprehensive data possible about the location of hydrocarbons in the well.  At the Macondo Well, BP used data gathered from wireline logging to determine the location of the highest hydrocarbon-bearing zone in the production interval.  The wireline logging operation took place on the *Deepwater Horizon* from about April 10 to April 15, 2010.  BP personnel traveled to the rig to observe the wireline logging operations.

70.     One of BP's responsibilities was to identify the hydrocarbon-bearing sands in the production interval.  To discharge this responsibility, BP reviewed wireline data and analysis from the ongoing wireline logging operations.  One of the wireline logs is called a "Triple Combo," so named because it contains three (3) tracks of data—a gamma ray curve, resistivity curves, and the density/neutron curves.  The gamma ray log indicates the presence of a sand formation as distinguished from, for example, a shale formation.  The resistivity curves measure the resistivity of formation fluids in the formation.  Hydrocarbons are non-conductive compared to brine or salt water.  Therefore, the difference in resistivity readings between hydrocarbons and

salt water give a preliminary indication of the potential presence of hydrocarbons in a formation sand. The density/neutron curves plot formation porosity and permeability. The intersection (or crossover) of these two plots is a gas signature, or an indication of the presence of hydrocarbons in a particular sand.

71.     On or about April 13, 2010, BP identified what it claimed was the shallowest/highest hydrocarbon-bearing sand in the production interval and provided that information to its drilling team on the Macondo Well so that it could be used in cement procedure preparations. Relying on the Triple Combo log, the processing of which was complete on April 13, 2010, BP identified that the highest hydrocarbon-bearing zone was located at a certain depth. The depth of this sand was provided to the BP drilling engineers for the specific purpose of planning HESI's cement job. Then, the BP drilling team informed HESI to design a cement job procedure that would place TOC at approximately 500 feet above the sand BP identified as the highest hydrocarbon sand in the production interval.

72.     However, what BP represented to HESI as the highest hydrocarbon-bearing sand in the production interval was wrong. Rather, a higher sand existed that was noted on all three tracks of the log (the "Concealed Sand"). BP never disclosed the Concealed Sand to HESI or disclosed that there was a gas signature in a sand higher than the one previously identified as the highest hydrocarbon-bearing sand. In fact, BP intentionally withheld this information with regard to the Concealed Sand, initially to save time and money, and then later to cover-up BP's culpability for the Blowout.

73.     In the days following April 13, but prior to April 20, BP performed further data analysis and confirmed, on April 20, 2010 (the day of the incident), that the Concealed Sand was

in fact the shallowest hydrocarbon-bearing sand.  Despite confirming that the Concealed Sand was in fact the highest hydrocarbon-bearing sand, and despite knowing that HESI relied on BP's identification of the highest sand to plan the cement job, BP failed to inform HESI that BP knew (or should have known) there was a higher hydrocarbon-bearing sand in the production interval and knew the TOC it provided to HESI (that HESI relied upon to design the cement program) was wrong.  HESI relied on the erroneous information BP provided and planned the cement job with the understanding that the sand BP identified was the highest hydrocarbon-bearing sand, which it was not.

74.     BP had incentive to ignore the hydrocarbons in the Concealed Sand.  If BP identified the Concealed Sand as a hydrocarbon-bearing zone, federal regulations would have required TOC for the production interval to have overlapped into the previously cased section of the well (higher interval), which is contrary to BP's well design protocol and would have required BP to redesign the production interval.  Redesigning the production interval likely would have cost BP millions of additional dollars for a project that was already over budget and behind schedule.  Accordingly, BP did not have the appetite for investing millions of dollars in additional costs in the Macondo well, especially when the costs could be avoided by simply refusing to acknowledge the Concealed Sand as a hydrocarbon-bearing zone, which it was.

75.     Moreover, had HESI known about the Concealed Sand it would not have pumped the primary cement job in the production interval until changes were made to the cement program, changes that likely would have required a redesign of the production casing.  The fact that HESI would not have proceeded with the primary cement job is not *post hoc* speculation.  Prior to the primary cement job, HESI ran computer modeling simulations of the cement job

using a proprietary software program called OptiCem. HESI provided written reports from OptiCem to BP prior to the cement job. HESI generated an OptiCem report using 21 centralizers (devices used to centralize the production casing in the hole to affect the proper and efficient radial flow of cement up the annulus). That OptiCem report predicted that the modeled cement job, among other things, would present a "LOW" gas flow problem. Subsequently, BP decided to use only 6 centralizers. When HESI updated the centralizer information and generated a new OptiCem report on April 18, 2010, modeling 7 centralizers (one more than BP decided to use), the report predicted that the modeled cement job would present a "SEVERE" gas flow problem. In addition, using the very same data included in the April 18, 2010 OptiCem report, but updating the model only to include the Concealed Sand, the OptiCem report would have instructed HESI and BP as follows:

> Based on analysis of the above outlined well conditions, this well is considered to have a CRITICAL gas flow problem. If a gas flow potential of greater than 15 is calculated, then changes should be made….

The gas flow potential in this OptiCem report would have a value higher than fifteen; thus, given this result, HESI would not have gone forward with the cement job unless and until changes were made to the cement program, changes that likely would have required a redesign of the production casing. Simply put, disclosing the Concealed Sand to HESI, or a TOC based on the Concealed Sand, would have forced BP to incur millions of additional dollars in costs associated with the Macondo well and a significant period of additional time before the production interval could have been cemented. Rather than incur these costs, BP chose to not disclose the Concealed Sand to HESI.

## BP's Cover Up Continued Post-Incident

76.     Following the Blowout on the *Deepwater Horizon*, BP petrophysicists continued to review the wireline logs relating to the Macondo Well.  No new wireline logs were run post-incident.  Instead, post-incident review of the previously existing wireline logs—that were fully completed by April 13, 2010 and that were reviewed by BP on the same date for the purpose of initially identifying (erroneously) the highest hydrocarbon zone—confirmed the presence of the Concealed Sand as a hydrocarbon-bearing sand.

77.     Despite knowing about the Concealed Sand both before and after the Macondo Well incident, BP has purposefully hidden it from the public and from HESI.  BP's own internal investigative report, the Bly Report, released to the public on or about September 8, 2010, purports to be an objective analysis of what caused the Blowout and claims to be based "on the information available to the investigative team during the investigation[.]"   Yet, despite information about the Concealed Sand being available to the investigative team, it is nowhere mentioned in the report.  Rather, on page 54 of the Bly Report, BP depicts all other sands (with their corresponding pore pressures) in the production interval *except* the critical Concealed Sand.  Furthermore, the Bly Report cryptically states in fine print:  "Sands are based on geology *known at the time of the accident*."  This statement is patently false.  BP knew about the Concealed Sand even before the Blowout occurred.  However, instead of acknowledging this critical well condition, BP selectively and self-servingly omitted reference to it in the Bly Report in its attempt to cover up BP's knowledge of the Concealed Sand and its own direct culpability for the tragedy.

78.     In public appearances and testimony before the Coast Guard, the United States Congress and the National Commission—all of which were attempting to find out what happened at the Macondo Well—BP never disclosed the existence, importance and impact of the Concealed Sand, despite its awareness that its existence was critical to properly planning the execution of the cement job.   HESI has justifiably relied upon BP's aforementioned misrepresentations in conducting its business since the incident, specifically in how HESI responded to investigations and inquiries from various agencies and entities and in issuing press releases with regard to the tragedy, among others.

79.     HESI did not learn of BP's intentional nondisclosure of the Concealed Sand until a recent deposition in the Blowout Litigation.

80.     BP's tortious conduct has damaged HESI significantly.  As a direct and proximate result of BP's cover up, including but not limited to publication of the Bly Report, HESI has suffered and continues to suffer economic damages in an amount to be determined by the Court. Moreover, BP's aforementioned conduct warrants the imposition of exemplary damages to deter BP from engaging in such egregious conduct in the future.

## COUNT V
## (FRAUD)

81.     Paragraphs 1 through 80 are incorporated by reference as if fully set forth herein.

82.     BP concealed critical and material information regarding the Concealed Sand despite the fact that this information was different from and directly contradicted prior representations to HESI.  BP knew that failing to disclose the Concealed Sand falsely implied that it had provided HESI the actual, highest level of hydrocarbon-bearing sands.

83.     Alternatively, BP made knowing and materially false representations to HESI regarding the actual depth of the highest hydrocarbon-bearing sands at the Macondo Well.

84.     BP intended HESI to rely, and HESI in fact justifiably and detrimentally relied, on BP's nondisclosure or misrepresentation regarding the existence of the Concealed Sand by HESI's formulation of a cementing plan based on the false information BP provided.  Had HESI known of the Concealed Sand, HESI would not have pumped the primary cement job unless and until changes were made to the cement program, changes that likely would have required a redesign of the production casing.  Moreover, despite its actual knowledge regarding the hydrocarbon bearing sands pre-incident, BP failed to fully and adequately apprise HESI, and others, of the geology and geophysics of the Macondo Well.

85.     BP also suppressed or misrepresented the truth with the wrongful intent either to gain an unjust advantage for itself in avoiding the necessary redesign of the well, or to cause HESI to suffer a loss by relying on the erroneous information provided by BP.

86.     As a result of BP's fraud, HESI has suffered and continues to suffer economic damages.  In addition, BP's deafening silence and refusal to disclose information regarding the Concealed Sand warrants the imposition of exemplary damages.

### COUNT VI
### (FRAUD)

87.     Paragraphs 1 through 86 are incorporated by reference as if fully set forth herein.

88.     BP repeatedly made knowing and materially false, post-incident representations regarding the level and location of hydrocarbon bearing sands.  For instance, nowhere within the Bly Report, BP's manufactured, in-house investigation into the purported causes of the Blowout, did BP disclose the Concealed Sand.  Instead, the Bly Report depicts all sands in the production

**SECOND AMENDED CROSS-CLAIMS OF HALLIBURTON**
**ENERGY SERVICES, INC.**                                                              **PAGE 33**

interval *other than* the Concealed Sand and falsely claims this depiction was based on all geology known as of the Blowout.

89.     Because BP deliberately omitted any mention of the Concealed Sands in the Bly Report, its representations in that report regarding the cause or causes of the Blowout were false. In furtherance of BP's cover up, BP has deliberately and intentionally misled the public, members of the United States Government, HESI, and other parties as to the cause(s) of the Blowout.  These false representations (including the false representations in the Bly Report) are fraudulent and were made with the intention that HESI, and others, rely upon those representations.  In fact, HESI justifiably relied on BP's fraudulent conduct in conducting its business post-incident in how it responded to various investigations and inquiries from multiple agencies and entities, in issuing press releases and in making public statements regarding the tragedy, among other things.

90.     As a result of BP's tortious, fraudulent actions, HESI has suffered and continues to suffer economic damages.  BP's actions further entitle HESI to exemplary damages.

WHEREFORE, PREMISES CONSIDERED, Defendant Halliburton Energy Services, Inc. prays that upon the trial of this cause that Claimants/Plaintiffs take nothing by reason of their pleadings and that HESI be entitled to contribution and/or indemnity from Cross-Defendants as to the claims of Claimants/Plaintiffs, that HESI recover against the BP cross-defendants all damages caused by their fraudulent conduct, and that HESI be dismissed and have such other and further relief to which it may show itself justly entitled.

Dated September 1, 2011.

Respectfully submitted,

**GODWIN RONQUILLO PC**

/s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332


and

R. Alan York
ayork@GodwinRonquillo.com
Jerry C. von Sternberg
jvonsternberg@GodwinRonquillo.com
Misty Hataway-Coné
mcone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day a copy of the foregoing Second Amended Cross-Claims of Halliburton Energy Services, Inc. was filed electronically with the Clerk of the Court using the CM/ECF system, and that an electronic version of this document was forwarded by e-mail to all liaison counsel.

/s/ Donald E. Godwin
Donald E. Godwin
