# BINGHAM

Boston
Frankfurt
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
2020 K Street NW
Washington, DC
20006-1806

T +1.202.373.6000
F +1.202.373.6001
bingham.com

Warren Anthony Fitch
Direct Phone: 202.373.6695
Direct Fax: 202.373.6001
tony.fitch@bingham.com

August 31, 2011

**Via E-mail (Sally_Shushan@laed.uscourts.gov)**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
   Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re: **Reply in Support of Anadarko's Motion to Compel Responses to Requests for Admissions Served on the United States in *In Re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179**

Dear Judge Shushan:

Anadarko Petroleum Corporation ("APC") and Anadarko E&P Company LP ("AE&P") (collectively "Anadarko") respectfully submit this letter in response to the United States' opposition letter of August 30, 2011. The United States notes that Anadarko's Requests for Admissions ("RFAs") "address issues relevant to Anadarko's potential culpability in this matter on which the parties have differing views." United States' Opposition, at 1. This is precisely why clear, unambiguous responses to Anadarko's RFAs are so important.

The United States has filed suit against Anadarko alleging that both APC and AE&P violated a number of environmental statutes and other laws including, but not limited to, the Clean Water Act and the Oil Pollution Act. These statutes carry with them the potential for very significant civil penalties -- as the United States points out. United States' Opposition, at 2. Anadarko has the right to know what evidence the United States has in its possession so that Anadarko may attempt to defend itself against the United States' pursuit of these penalties and damages.

The United States' responses to Anadarko's RFAs, and its excuses and rationalizations as set forth in its Opposition are all too familiar in this case. When other parties in this litigation have provided unsupported denials or otherwise inappropriate responses, this Court has compelled them to amend those responses so as to provide proper responses. *See* Order Regarding BP's Motion to Compel Response to Requests for Admission by PSC, June 24, 2011 ("the undersigned finds that BP and Anadarko are entitled to know what the PSC currently contends as to the

facts"). The United States has now placed Anadarko in exactly the same position that the Court has previously ruled to be unacceptable -- Anadarko does not know what the United States "currently contends as to the facts." Accordingly, Anadarko asks that the Court order the United States to provide unambiguous responses, as the United States is required to do under the Federal Rules of Civil Procedure and the prior orders of this Court.

The United States has two primary excuses for its failure to provide admissions to the clearly stated RFAs. First, the United States complains that the RFAs are ambiguous. They are not. Second, the United States argues that someday, in the future, it might uncover evidence that would support a denial. Such speculation is not a proper basis for denying the RFAs.

**I.     United States' Responses to RFA No. 60 and 61.**

As an initial matter, the United States mischaracterizes Anadarko's position regarding the United States' responses to RFA Nos. 60 and 61. Anadarko is not asking the Court to compel the United States to admit RFA Nos. 60 and 61. Rather, Anadarko is asking the Court to compel the United States to forgo the following improper dodge:

> The United States is also aware of numerous informal conversations and email messages between technical personnel at Anadarko and BP regarding the *Deepwater Horizon* and Macondo Well, and it is *possible* that such a conversation or messages were exchanged...

United States' response to RFA No. 61 (emphasis added). This statement, or an essentially identical version of it, can be found in the United States' responses to RFA Nos. 60, 61, 63(b), 63(c), 63(d), 63(e), 63(f), 63(g), 63(h), 63(i), 63(j) and 63(k). For the reasons adduced in our August 22nd submission, these ambiguous and improperly temporizing statements must either be substantiated with specifically identified evidence or be withdrawn because, in their present state, they are nothing more than pure speculation as to the existence of evidence that may support a denial.

**II.    The United States Has Failed to Properly Respond to Anadarko's RFAs, Which          Seek Information Concerning Decision-Making**

Anadarko's RFAs clearly seek admissions regarding the United States' lack of evidence of communications between Anadarko and other parties that led to various decisions. The United States complains that the terms "Communications" and "leading to" are too vague for it to provide an admission. The United States is playing word games. As the face of the requests demonstrate, there is nothing tricky

Honorable Sally Shushan
August 31, 2011
Page 3

about the requests. The United States is merely trying to avoid responding to discovery.

The United States cites RFA No. 63(c) as support for its position. RFA No. 63(c) asks the United States to "[a]dmit that you have no evidence that the Anadarko Non Operating Party Defendants were involved in any Communications leading to these decisions relating to the Macondo Well…(c) Any cement recipe for the Macondo Well." The plain language of this requests seeks to find out whether or not the United States has any evidence that Anadarko had any involvement in the communications pertaining to and culminating in the decision about what cement formulation to use at the Macondo Well.[1] Nevertheless, the United States responded, subject to its objections:

> *Denied*, except as expressly admitted herein. *The United States has no evidence of* any Anadarko employee talking with or receiving a message directly from a BP employee or contractor regarding the decision for any cement recipe for the Macondo Well. *However*, BP informed Anadarko, before cement for the Macondo Well production casing was pumped, of certain aspects of the cement procedure for the production casing. For example, Anadarko received and approved Authorizations for Expenditure for the Macondo Well production casing on April 15, 2010, enabling BP to perform the final failed cement job and install the long-string casing, which has been alleged to be the flow path of the hydrocarbons that were released from the Macondo Well. Anadarko also was provided with and downloaded a Daily Operations Report for April 17, 2010, which informed Anadarko, among other things, the "24 Hr Forecast" was to "RUN 7" X 9 5/8" CASING, CEMENT SAME," and that the "Current Status" was "DISPLACING CEMENT W/ 14.0 PPG MUD." In addition, the Daily Operations Reports dated April 16, 17 and 18, 2010, informed Anadarko, among other things, about "Materials/Consumption" of "Cement Lite Fill," "Cement," "Cement Class G" and "Barite," including the amount of sacks on hand. Further, in the Daily Operations Report dated April 19 and downloaded by Anadarko, there is detailed information about the cement recipe. There were also numerous informal communications between BP and Anadarko, and it is *possible* that someone working for BP talked with

---

[1] We suppose it is theoretically possible that some literary savant with far more eloquence than anyone on the Anadarko team possesses could have come up with a different and "better" delineation of this RFA (at least in the government's eyes), but there comes a point when "is" means "is" and "communication" means "communication," "leading to" means "leading to," and "decisions" means "decisions."

bingham.com

Honorable Sally Shushan
August 31, 2011
Page 4

or sent a message to an Anadarko employee prior to a decision on this subject. (emphasis added).

When this response is parsed, none of the circumstances referred to by the United States reflects any "Communications *leading to [the] decision[]*" regarding the cement recipe. The referenced materials, at best, inform Anadarko as to certain aspects of the cement procedure. This has nothing to do with the decision regarding the cement recipe. The Authorization for Expenditure ("AFE") requested funding for the cement -- it did not discuss or seek input regarding the cement recipe to be used. The Daily Operating Reports ("DOR") of April 17th and 18th also did not reflect any decision-making regarding the cement recipe. They merely informed Anadarko that cementing was to occur -- they did not state what the cement formulation was or how or why that formulation was chosen. The United States' reliance on the after-the-fact April 19th DOR is disingenuous. As the United States knows full well, the DORs provide 24 hour summaries of the previous day's events. Thus, Anadarko received the April 19 DOR *after* the cement job had been poured. *See* Exh. A (Deposition Testimony of Robert Quitzau, at 215:1-221:8). Thus, the DOR indisputably does not and could not provide evidence of "Communications *leading to [the] decision[]*" regarding the cement recipe for the Macondo Well when the decision regarding the cement recipe was made *prior* to April 19th. The United States' reference to "numerous informal communications" and to the "possib[ility] that someone working for BP talked with or sent a message to an Anadarko employee" is nothing more than pure speculation -- which is not admissible evidence. Accordingly, the United States should be compelled to amend its response to RFA No. 63(c) to provide an unqualified admission or a cognizable and supported denial.

The United States' responses to RFA Nos. 63(b), 63(d), 63(e), 63(g), 63(h), 63(i), 63(j), 63(k), and 69 suffer from these same defects. For example, with respect to the important centralizer issue in this case, RFA No. 63(d) asks the United States to "[a]dmit that you have no evidence that the Anadarko Non Operating Party Defendants were involved in any Communications leading to these decisions relating to the Macondo Well...(d) The use of six rather than 21 centralizers on the final long string production casing for the Macondo Well." The United States responded, subject to its objections:

*Denied*, except as expressly admitted herein. *The United States has no evidence* of any Anadarko employee talking with or receiving a message directly from a BP employee or contractor regarding the decision to use six rather than 21 centralizers on the final long string casing for the Macondo Well. *However*, BP informed Anadarko, before cement for the Macondo Well production easing was pumped, of certain aspects of the cement procedure for the production casing. For example, Anadarko received and approved Authorizations for Expenditure for the Macondo Well production casing

on April 15, 2010, enabling BP to perform the final failed cement job and install the long-string casing, which has been alleged to be the flow path of the hydrocarbons that were released from the Macondo Well. In addition, there were numerous informal communications between BP and Anadarko, and it is *possible* that someone working for BP talked with or sent a message to an Anadarko employee prior to a decision on this subject. (emphasis added).

Here again, the evidence purported to support the United States' denial does not do so. BP's "possible" notification to Anadarko of "certain [totally unspecified] aspects of the cement procedure for production casing" does not constitute evidence of "Communications leading to [the] decision[]" to use 6 centralizers instead of 21. In addition -- and, again, as the United States must surely know -- the AFE cited by the United States makes no reference whatsoever to the number of centralizers that were going to be used or to any other operations information. If the alleged communications above do not include the number of centralizers that will be used, how can Anadarko have been involved in "Communications *leading to [the] decision[]*" to use 6 centralizers instead of 21? Here again, the United States is relying on a purely speculative hope in order to avoid having to provide an unqualified admission to or a principled denial of RFA No. 63(d).

One final example: RFA No. 63(e) asks the United States to "[a]dmit that you have no evidence that the Anadarko Non Operating Party Defendants were involved in any Communications leading to these decisions relating to the Macondo Well...(e) The April 19-20 decision not to run a cement bond log even after having Schlumberger personnel present on the rig." The United States responded, subject to its objections:

> *Denied*, except as expressly admitted herein. *The United States has no evidence of* any Anadarko employee talking with or receiving a message directly from a BP employee or contractor regarding the decision not to run a cement bond log. *However*, BP informed Anadarko, before cement for the Macondo Well production casing was pumped, of certain aspects of the cement procedure for the production casing. For example, Anadarko received and approved Authorizations for Expenditure for the Macondo Well production casing on April 15, 2010, enabling BP to perform the final failed cement job and install the long-string casing, which has been alleged to be the flow path of the hydrocarbons that were released from the Macondo Well. In addition, there were numerous informal communications between BP and Anadarko, and it is *possible* that someone working for BP talked with or sent a message to an Anadarko employee prior to a decision on this subject. (emphasis added).

Bingham McCutchen LLP
bingham.com

Honorable Sally Shushan
August 31, 2011
Page 6

The AFE cited by the United States does not even contain the words "cement bond log" or "CBL." It had nothing to do with BP's decision not to run a cement log. The AFE is simply not a "Communication[] *leading to [the] decision[]*" not to run a cement bond log on April 19-20th. The United States' other evidence is once again pure speculation. The United States has provided no evidence in support of its denial.

### III. The United States' Suggestion that this Court Would Not Allow the United States to Amend Its RFA Responses if the United States Discovers New Evidence is Groundless.

The United States balks at providing admissions because, it argues, at some point in the future it *might* discover evidence supporting its denials. The United States then makes the astounding assertion that if it were to provide admissions to some or all of Anadarko's RFAs, it would not then be able to withdraw such an admission if and when it discovers new evidence because this Court might then abuse its discretion in ruling upon such a request. United States' Opposition, at 2, 5. An assertion that this Court would arbitrarily ignore the requirements of Rule 36(b) is, at best, totally untenable and completely out of place. Indeed, if and when the United States or any other party adduces any such evidence in these waning days of Phase One discovery, there will -- of course -- be good cause for permitting the United States to withdraw or amend a related Admission in order to "promote the presentation of the merits of the action." While the United States apparently does not think so, this Court is fully able to rule appropriately with respect to any such development, and Anadarko counsel are not so foolish or irresponsible as to interpose a baseless opposition to the evidentiary use of information that becomes available hereafter, including a supported, well-taken withdrawal of a previous RFA admission.

As the United States acknowledges, RFAs are one way in which parties can narrow the facts at issue. United States' Opposition, at 5. If every party responding to RFAs were allowed to respond as the United States has, by denying relevant inquiries simply because evidence *might* turn up a later date, then no purpose will have been served by the RFAs, summary judgment motions will be rendered pointless, and the trial of the case will drag on interminably. RFAs are not -- and cannot be -- reserved for use on the eve of trial. If the Court felt that it was appropriate to delay responding to RFAs until the eleventh hour and 59th minute before trial, it would have so ordered in its discovery schedule. More than 175 depositions have been completed and millions of pages have been produced. Neither the United States nor any other party should be allowed to shirk its discovery and case management obligations because of the hypothetical possibility that someday new evidence might turn up. For the reasons set forth above, and in Anadarko's letter of August 22, 2011, Anadarko respectfully requests that the United States be compelled to provide unqualified admissions or proper and supported denials to RFA Nos. 60, 61, 63(b), 63(c), 63(d), 63(e), 63(f), 63(g), 63(h), 63(i), 63(j), 63(k), and 69.

Honorable Sally Shushan
August 31, 2011
Page 7

Thank you for your consideration of this submission.

Respectfully submitted,

*[signature]*

Tony Fitch
Tiffany R. Hedgpeth

Enclosures

cc:  Nancy Flickinger, Esq.
     Sarah Himmelhoch, Esq.
     Ky Kirby, Esq.

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  OIL SPILL              MDL NO. 2179
     BY THE OIL RIG
 5   "DEEPWATER HORIZON"            SECTION:  J
     IN THE GULF OF
 6   MEXICO, ON                     JUDGE BARBIER
     APRIL 20, 2010                 MAG. JUDGE SHUSHAN
```

**VOLUME 1**

Deposition of **ROBERT QUITZAU**, 1910 Driscoll Street, Houston, Texas 77019, taken in the Ponchartrain Room, 601 Poydras Street, New Orleans, Louisiana 70130, on Wednesday, May 25th, 2011.

```
 1        Q.    Can I have 27, please.  I'm
 2  going to give you what we're marking as 2639
 3  and it is -- the native is APCSHS2B-000000013
 4  and this is also identified as
 5  BP-HZN-2179MDL00059643 to 59649.  (Handing).
 6        A.    (Reading.)
 7        Q.    This is another daily operations
 8  report partners completion, correct?
 9        A.    Correct.
10        Q.    And it's dated April 19, 2010,
11  correct?
12        A.    Correct.
13        Q.    In the 24-hour forecast, do you
14  see that?
15        A.    Yes, I do.
16        Q.    It says:  "Finish cementing
17  casing string, RD cement tools, set seal
18  ASSY," right?
19        A.    Yes.
20        Q.    "POOH with L/S, P/U CMT
21  stinger," comma, "RH, displace riser, set
22  cement plug," comma, "WOC."
23              Do you see that?
24        A.    Yes.
25        Q.    Can you explain to me what all
```

```
 1  that means?
 2       MR. DAVID:
 3            Object to form.
 4       THE WITNESS:
 5            I can read through it.
 6  EXAMINATION BY MR. FINEMAN:
 7       Q.    Yes, please tell me --
 8       A.    Finish cementing casing string,
 9  Rig down cement tools, set seal assembly,
10  pull out of hole with landing string, pick
11  up cement stinger, run in hole, displace
12  riser, set cement plug and wait on cement.
13       Q.    Do you recall whether you
14  reviewed this operations report and that
15  entry on or about April 19th?
16       A.    I don't recall, but the
17  WellSpace log would suggest that this report
18  was not posted until after my morning
19  meeting.
20       Q.    Okay. So that's -- is that
21  something you discovered during your
22  deposition prep?
23       A.    Yes.
24       Q.    So I'm sorry, what does that
25  mean? What does that tell you?
```

1       A.      That means it's likely I didn't
2  look at it on the 19th.
3       Q.      Do you recall ever seeing this?
4       MS. WILMS:
5               Just to be clear, we may be
6  getting confused on dates. You said the
7  19th, but you probably meant the 20th.
8       THE WITNESS:
9               Correct, I'm sorry.
10 EXAMINATION BY MR. FINEMAN:
11      Q.      I know you said earlier that you
12 didn't know what these bottom left-hand
13 dates were. I think what they mean is in
14 the date, I think that's when the document
15 is actually downloaded. So I think what --
16 your counsel is correct, this is April 20th,
17 2010, 6:27 a.m. looks like when this was
18 downloaded.
19              But you're telling me that you
20 think this was actually downloaded after
21 your morning meeting?
22      A.      That's correct. That's my
23 recollection from the deposition prep.
24      Q.      It's possible that more than one
25 person at Anadarko downloaded the same

1 document, isn't it?
2     A.    Yes, it's possible.
3     Q.    Okay. In any event, do you
4 recall having discussed this 24-hour forecast
5 with anybody at Anadarko on April 20th?
6     A.    I do not.
7     Q.    Do you recall discussing this
8 particular entry in the daily operations
9 report with anybody at BP?
10     A.    I did not.
11     Q.    Do you know whether anybody at
12 Anadarko did?
13     A.    I'm not aware of anybody that
14 did.
15     Q.    All right, if you turn to the
16 third page under the operation notes,
17 operation summary.
18     A.    (Complying.)
19     Q.    Do you see that?
20     A.    Yes.
21     Q.    It looks like the first -- it
22 looks like under these comments we're still
23 running the production casing. Is that
24 correct?
25     MR. DAVID:

```
 1              Object to form.
 2        THE WITNESS:
 3              They run -- they finished running
 4   the production casing.
 5   EXAMINATION BY MR. FINEMAN:
 6        Q.    Okay.  And the -- if you look
 7   down at the entry at 1430 to 1730.
 8        A.    Yes.
 9        Q.    Can you take -- can you take a
10   moment and review this entry and then
11   tell -- so that you can explain to me what
12   all this means.
13        A.    I can't explain to you what all
14   that means.
15        Q.    Starting at the bottom here, it
16   says pressure up to 1,000 psi and going down
17   you can't tell me what that means?
18        A.    I cannot tell you what that
19   means.
20        THE VIDEOGRAPHER:
21              Excuse me, counsel.
22        MR. FINEMAN:
23              Yeah, okay, we need to take a
24   break.
25        THE VIDEOGRAPHER:
```

```
 1              We're going off the record.  This
 2   is the end of videotape No. 4.  It's 2:08.
 3              (Whereupon, a brief recess was
 4   taken.)
 5        THE VIDEOGRAPHER:
 6              We're back on the record.  It's
 7   2:20.  This is the beginning of videotape
 8   No. 5.
 9   EXAMINATION BY MR. FINEMAN:
10        Q.    Mr. Quitzau, we're looking at
11   this April 20 daily operations report and I
12   was asking you if you could tell me what the
13   operation summary for the time period 1430
14   to 1730 was and I believe you testified a
15   moment ago that you could not tell me.  Is
16   that true?
17        A.    This April 19th report and
18   that's correct, I told you that I could not
19   tell what was happening there.
20        Q.    Sorry, it was the April 19
21   report.  If you look -- continue on the next
22   page at twenty to 2200.
23        A.    Yes.
24        Q.    It says: "Perform cement job as
25   follows."
```

1           Do you see that?
2      A.   Yes, I do.
3      Q.   If you could take a look at that
4  entry and let me know if you can tell me
5  what that's about.
6      A.   So they pumped the cement job in
7  that step.
8      Q.   Yes.
9      A.   And they pumped the darts and
10 beyond that -- that's what it looks like to
11 me.
12     Q.   Okay.  Did they put spacer
13 material in also?
14     MR. DAVID:
15          Object to form.
16     THE WITNESS:
17          When I say cement job, that
18 includes a lot of that.  So, yes, they did
19 pump some spacer.
20 EXAMINATION BY MR. FINEMAN:
21     Q.   Do you recall discussing this
22 entry with anybody at Anadarko?
23     A.   I did not discuss this with
24 anybody at Anadarko prior to this or this
25 day or prior to the 20th.

# REPORTER'S CERTIFICATE

I, Diane Tewis Clark, RPR, RMR, CRR, Certified Court Reporter, State of Louisiana, do hereby certify that above-named witness, after having been duly sworn by me to testify to the truth, did testify as hereinabove set forth;

That this testimony was reported by me in the stenotype reporting method and transcribed thereafter by me on computer, and that same is a true and correct transcript to the best of my ability and understanding;

That I am not of counsel, nor related to counsel or the parties hereto, and in no way interested in the outcome of this matter.

_____
Diane Tewis Clark, RPR, RMR, CRR
Certified Court Reporter