# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

333 South Hope Street
Los Angeles, California  90071

Martin Boles
To Call Writer Directly:
(213) 680-8428
martin.boles@kirkland.com

(213) 680-8400

www.kirkland.com

Facsimile:
(213) 680-8500

September 2, 2011

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA  70130

> Re:   BP's Reply in Support of Its Motion to Compel Responses to Discovery
> Requests Served on Anadarko in *In Re: Oil Spill by the Oil Rig*
> *"Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No.
> 2179

Dear Judge Shushan:

BP respectfully submits this reply to Anadarko's letter opposing BP's Motion to Compel Responses to Discovery.

## I.   Drilling Policies of Anadarko US Offshore, f/k/a Kerr-McGee Oil & Gas.

Anadarko says that (A) BP never properly requested the drilling policies of Anadarko US Offshore, formerly known as Kerr-McGee Oil & Gas Corporation; (B) Anadarko never agreed to produce those policies; and (C) the policies are not relevant.  None of these arguments undermines BP's motion.

### A.   Scope of BP's Requests and Anadarko's Duty to Produce.

Anadarko says, in effect, that BP's discovery requests did not technically cover documents or information held by Anadarko US Offshore.  Anadarko suggests that, because BP's discovery requests were served on two other Anadarko corporate entities (APC and AEP), Anadarko US Offshore should not have to respond.  (*See* Aug. 31, 2011 Anadarko Letter Br. at 2–3 & n.2.)  But BP is not asking Anadarko US Offshore to respond; it is asking APC to respond and to provide all information within its possession, custody, or control.  Anadarko does not dispute that Anadarko US Offshore is APC's subsidiary.  And Anadarko's Opposition fails to address the caselaw cited in BP's opening letter holding that a party is deemed to have control over information in the possession of its subsidiary.  (*See* Aug. 25, 2011 BP Letter Br. at 2

Chicago      Hong Kong      London      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 2, 2011
Page 2

(citing, *inter alia, Local No. 1419, ILA v. Smith*, 301 F.2d 791, 795–96 (5th Cir. 1962)).)  BP's discovery requests undisputedly asked Anadarko to provide all documents and information within its "possession, custody, or control."  (*See* Anadarko Exs. C at 15, E at 12.)  Thus the Anadarko US Offshore policies are within the control of MDL Party APC, requested by BP's discovery, and must be produced if responsive and relevant.

### B.  The Parties' Compromise to Produce Their Respective GoM Policies.

Anadarko acknowledges that the parties—in compromise of their dispute regarding each other's discovery requests regarding non-Macondo wells—agreed to provide documents and interrogatory responses defining "company policies, procedures, or standards generally applicable to deepwater Gulf of Mexico wells[.]"  (*See* Aug. 31, 2011 Anadarko Letter Br. at 4.)  But Anadarko protests that it did not agree to produce such policies for Anadarko US Offshore.

Note what Anadarko does *not* assert: that Anadarko said, at the time the parties agreed to the compromise, "except for Anadarko US Offshore."  (*See* Anadarko Ex. H.)  As is shown in Part I.A above, an agreement that is silent as to a subsidiary such as Anadarko US Offshore presumptively includes its documents to the extent they are relevant, since they are deemed to be within the parent control.  Moreover, the history of the parties' discovery meet-and-confers shows that they simply did not get to the issue of Anadarko's objections limiting the corporate scope of its search and production until after BP proposed the non-Macondo deal.  (*Compare* Anadarko Ex. G at 2 (Aug. 2 letter from BP proposing deal on non-Macondo discovery), *with* Anadarko Ex. B at 1, 2–3 (documenting Aug. 9 telephone call at which BP was told "that no documents were searched for or produced from other Anadarko-related entities" besides APC and AEP).  In other words, this issue was not yet addressed, except to the extent that inclusion was implicit in the caselaw that Anadarko has not rebutted.  And when the issue later arose, it led to this motion.  So Anadarko's contention about the compromise agreement not encompassing Anadarko US Offshore is—at best—circular.

### C.  Relevance.

Anadarko contends that the drilling policies of Anadarko US Offshore are not relevant because (1) Anadarko US Offshore "had no involvement" with Macondo;[1] (2) its policies "can

---

[1]  While Anadarko US Offshore was not the Operator of the Macondo Well, under its prior name "Kerr-McGee Oil & Gas Corporation," it became a party to the Macondo Prospect Well Participation Agreement, one of the two contracts executed by Anadarko with the same effective date as its ratification of the Macondo JOA.  (Ex. F at 1, 11.)  Anadarko's Opposition attacks a straw man when it argues that the Anadarko drilling engineers who monitored Macondo were not "responsible for drilling operations."  (*See* Aug. 31, 2011 Anadarko Letter Br. at 5–6.)  BP never contended that they were responsible for drilling operations, but rather that the fact that so

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 2, 2011
Page 3

hardly be said to establish the 'industry standard of care'"; and (3) BP failed to ask any other petroleum company for their policies. (*See* Aug. 31, 2011 Anadarko Letter Br. at 5–6.)  These arguments are red herrings.

**First**, Anadarko argues that Anadarko US Offshore's drilling policies are not relevant because Anadarko US Offshore did not design, drill, or otherwise act as Operator of the Macondo Well.  (*See id.* at 5.)  This argument simply does not address BP's contention in its motion.  BP is not contending that Anadarko US Offshore's drilling policies are relevant because of what Anadarko US Offshore did or did not do at Macondo.  Rather, BP's contention of relevance is based on Anadarko's own boast that its subsidiary Anadarko US Offshore is the leader in GoM deepwater drilling.  (*See* Ex. A (Mar. 10, 2010 Anadarko presentation) ("Anadarko (KMG) Leading the Way in Deepwater Gulf of Mexico Platforms.").)  Thus Anadarko US Offshore's drilling policies are relevant to Anadarko's contention that BP has violated the industry standard of care.

**Second**, Anadarko protests that "Anadarko's and KM's policies can hardly be said to *establish* the 'industry standard.'"  (Aug. 31, 2011 Anadarko Letter Br. at 5 (emphasis added).)  But BP does not have to prove that Anadarko US Offshore policies "establish" the industry standard; only that they are relevant to it.

**Third**, Anadarko asserts that BP's stated basis for relevance is a "pretext" because BP has not sought discovery of such policies from other petroleum companies.  (*See id.* at 5.)  But Anadarko's formulation would turn the norms of discovery on their head, requiring that discovery be obtained from non-parties before it could be obtained from a party.  *See 9 Moore's Federal Practice* § 45.32 (3d ed. 2011) ("If the material sought by subpoena is readily available . . . from a party . . . , obtaining it through subpoena on a nonparty witness often will create an undue burden.").

In summary, the relevance of the drilling policies of Anadarko US Offshore to the industry standard of care is shown by Anadarko's own boast that its "KMG" subsidiary is "leading the way" in GoM deepwater platforms.  Anadarko makes no showing that producing these policies would be an undue burden.  Indeed, the compromise between BP and Anadarko to limit non-Macondo discovery to generally-applicable company policies was meant to eliminate undue burden.  Having failed to address the caselaw holding that Anadarko US Offshore documents are under APC's control for purposes of discovery, and having elected to dodge

---

many of Anadarko's Macondo personnel came from its Kerr-McGee subsidiary suggested that the drilling policies of the latter might well have shaped the former.  (*See* Aug. 25, 2011 BP Letter Br. at 3–4.)

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 2, 2011
Page 4

rather than squarely address BP's showing of relevance, Anadarko should produce the policy documents that it agreed to.[2]

## II.    Anadarko Should Provide Custodial Metadata As Required By Pretrial Order #16.

There is no dispute that Anadarko is in violation of PTO #16, which requires each producing party "to produce metadata (to the extent it exists)." (Dkt. 686 at 2.) Anadarko's opposition is, in effect, a motion for reconsideration of that order.[3] PTO #16 was entered after considerable briefing and argument involving all parties, including Anadarko. Anadarko does not dispute that the custodial metadata required by this order exists 1) on the custodians' laptops and 2) within the ESI collected data set created by Microsoft Robocopy that Anadarko used to facilitate the transfer of the custodians' documents from the custodians' computers into Evault.[4] Nor does Anadarko dispute that, because it has produced documents from Evault without

---

[2]    Anadarko asserts that the parties did not meet and confer with respect to the portion of this motion dealing with interrogatories. But Anadarko's Opposition shows that the parties' compromise agreement dealt with interrogatory responses as well as documents. (*See* Aug. 31, 2011 Anadarko Letter Br. at 4.) Thus, Anadarko's later refusal to provide discovery from Anadarko US Offshore had the same effect on the scope of Anadarko's responses to interrogatories as it did to documents. There was no meet-and-confer regarding interrogatories on a request-by-request basis because BP has agreed to extend Anadarko's deadline for interrogatory responses until September 2. (Ex. G (Sept. 1, 2011 E-mail from D. Beffa to T. Hedgpeth).) But to force BP to bring a new motion on this exact same issue once Anadarko carries out its already-announced intent to refuse to provide information about Anadarko US Offshore in its interrogatory responses would merely waste BP's and the Court's time. Nowhere in Anadarko's Opposition is there even a hint that Anadarko will implement the compromise agreement with a broader scope with respect to interrogatory responses.

[3]    It should be noted that neither of the cases cited by Anadarko in defense of its failure to comply with PTO #16 involved the breach of a court order. *Kentucky Speedway v. NASCAR* did not involve any court order and relies on authority that specifically distinguishes instances in which there is a court order. *Kentucky Speedway*, 2006 WL 5097354, *8 (E.D. Ky. Dec. 18, 2006). *Diesel Machinery, Inc. v. Manitowoc Crane, Inc.* only involved a scheduling order that adopted the parties' agreement on the procedures applicable to the production of electronically stored information, and the court found that the parties later agreed to modify those procedures. *Diesel Mach.*, 2011 WL 677458, *3 (D.S.D. Feb. 16, 2011).

[4]    Anadarko used Microsoft Robocopy to transfer documents from the custodians' Home Directories into Evault. (*See* Ex. C (July 29, 2011 Letter from D. Saunders to M. Nomellini) at 2). The sworn declaration of Tony Abisogun, Anadarko's Legal Technology Project Manager, states that "the source of the documents, which would provide the custodian information, is not brought into Evault." (*See* Anadarko Ex. J at 2). Anadarko thus claims that it properly collected and preserved the custodian information in the ESI collected data set created by Microsoft Robocopy.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 2, 2011
Page 5

custodial metadata, rather than producing copies from individual laptops (identical to the copies that are on Evault) with the custodial metadata, it has failed to comply with PTO #16.

Anadarko also boldly suggests that it will not comply with the Court's order requiring production of custodial metadata *on a going forward basis for productions in 2011*, even though PTO # 16 was entered in November 2010. In other words, although Anadarko apparently expects BP and the other parties to continue to expend the resources necessary to provide custodial metadata on a going-forward basis as required by PTO #16, Anadarko suggests that it alone should not have to do so. Alternatively, Anadarko suggests that while the other parties should be required to provide custodial metadata for all documents, Anadarko should only be required to provide custodial metadata when other parties specifically request it on a document-by-document basis.

But Anadarko cannot have it both ways. If Anadarko is to refuse to provide custodial metadata as required by the Court's order, then the other parties also should not be required to provide such metadata. Likewise, if Anadarko is required to provide metadata only when other parties request it for specific documents, then BP and other parties should only be required to provide it when other parties request it for specific documents. Indeed, that would be the result if Anadarko successfully sought a motion for reconsideration; the Court's order would be modified to provide that custodial metadata need not be produced, or need only be produced when specifically requested. But Anadarko has not filed a motion for reconsideration; rather, Anadarko has simply declared that it alone is entitled to a special exemption from the Court's order.

And what is Anadarko's basis for seeking to be the only party exempt from the Court's order? Anadarko argues that, while custodial metadata is available, it costs money to provide it. But this argument fails to distinguish Anadarko from other parties. It costs all parties money to provide custodial metadata. And BP, too, could save money by not complying with the Court's order regarding custodial metadata. But PTO #16 was negotiated, briefed, and entered by the Court. And Anadarko had an opportunity to argue about this expense before the order requiring custodial metadata was entered in November 2010. Yet Anadarko opportunistically chose not to make that argument in November 2010, and the order was entered. In these circumstances, BP respectfully submits that Anadarko should not be permitted a special exemption from the Court's order on a going forward (or historical) basis.

Anadarko raises two further arguments that require reply. First, it argues that BP has not been prejudiced by Anadarko's failure to produced custodian metadata. And second, it argues that production of custodian metadata would "impose an extreme burden on Anadarko." Both arguments are incorrect.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 2, 2011
Page 6

**A.      Andarko's Failure to Provide Custodian Metadata Has Prejudiced BP.**

As an initial matter, BP should not be required to show prejudice where, as here, Anadarko has refused to comply with a Court order. This is particularly true where Anadarko has stated its intention to continue violating the order for future document production. The other parties have managed to comply with this requirement of PTO #16, and Anadarko has benefitted from that compliance. For example, Anadarko has taken advantage of custodial metadata provided by BP to extensively question BP deponents. (*See* Cocales Dep. excerpts).

In any event, BP *has* suffered prejudice from Anadarko's failure to provide custodian information: BP is without an important piece of metadata related to Anadarko's witnesses and documents. Indeed, the depositions in this case have reinforced that custodial metadata is perhaps the most important piece of metadata: custodial metadata has been referenced 182 times in 53 depositions, through August 29, 2011. Lawyers frequently use custodial metadata in depositions and otherwise, as it may be helpful in determining which documents come from which witnesses' files.

Anadarko has "offered to research custodians for important documents identified by BP," and suggests that this cures any problem. (Aug. 31, 2011 Anadarko Letter Br. at 8.) But, even setting aside the fact that it would be inequitable for Anadarko to have to produce custodial metadata only in select instances while BP and the other parties have to provide it in all instances per the Court's order, this offer is not an adequate remedy for three reasons.

*First*, although Anadarko points to cost, it does not explain why BP should bear the cost of having to review each and every Anadarko document for which no custodial metadata was provided, to determine which are "important" for metadata-related reasons. Anadarko does not bear that cost in its review of BP documents, because BP has provided custodial metadata. This is not a cost that was assigned to the receiving party when the parties negotiated PTO #16. That is, the parties agreed that the *producing* party would bear the cost of providing custodial metadata. There is no basis for Anadarko to shift that burden to BP for Anadarko documents, particularly where Anadarko would not bear that burden for BP documents.

*Second*, unless custodian metadata is provided on a global basis, BP cannot tell which custodial file productions are complete, and which documents should be assigned to which custodians. Providing custodial metadata only for a limited subset of documents would not be sufficient to allow BP and other parties to make that determination.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
September 2, 2011
Page 7

*Third*, an otherwise seemingly unimportant document may become very important if it is known to have been in the possession of a certain witness (if, say, that witness had testified that she had never seen the document). In other words, BP cannot tell whether certain documents are important until it sees the custodial information.

Finally, Anadarko also points to information in the "from" metadata field as relieving some of the prejudice to BP because it supposedly shows "who authored the document." (Aug. 31, 2011 Anadarko Letter Br. at 7 ("Contrary to BP's assertion that the custodial information is needed to determine who authored a document, the "from" metadata field provides the information (for all documents, not just e-mails).").) Not only is the user-manually-entered "from" metadata field often untrustworthy (for example, "Fajita" and "!blitz" are two examples of data produced in the "from" field by Anadarko),[5] but authorship is only one piece of information that is potentially revealed by custodial metadata. Custodian metadata can also reveal who had access to or possession of a document even if they were not the author.

In short, depriving BP of this essential method if investigation and evaluation is greatly prejudicial, and it can only be remedied through the provision of all custodian data.

## B.      Producing Custodial Metadata Would Not Impose An Extreme Burden On Anadarko.

Anadarko has indicated that the custodial metadata was only "lost when the documents were ingested into Evault" after being copied by Microsoft Robocopy. (Ex. C (July 29, 2011 Letter from D. Saunders to M. Nomellini) at 3.) Contrary to Anadarko's assertions, Evault is capable of preserving custodial metadata information when it is set up by a customer to do so. (*See* Symantec Enterprise Vault Discovery Collector User Guide at 4, 26, 39, *available at* http://www.symantec.com/docs/DOC4390). If the custodial metadata was "lost" when the documents were ingested into Evault, Anadarko should be able to simply use the ESI collected data set created by Microsoft Robocopy to correctly reload the documents into Evault.[6] This would admittedly be easier to do than re-collecting from each custodian's computer. This is not to imply that retrieving metadata from laptops is prohibitively expensive, as that is exactly what BP has done with hundreds of thousands of documents.

---

[5]     For example, see ANA-MDL-000031814 (From = "Fajita") and  ANA-MDL-000040978 (From = "!blitz")

[6]     If Anadarko did not retain the collected ESI data set created by Microsoft Robocopy, that would also deviate from standard discovery practices.

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
September 2, 2011
Page 8

Moreover, any additional costs to Anadarko of fulfilling its document collection and production responsibilities are a result of its own failure to ensure collection and preservation of custodian information for the majority of its non-email electronic documents in the first place. Additional costs must be incurred here by someone. If it is not Anadarko, then BP will have to incur substantial costs to comb through tens of thousands of documents to determine which it wants custodial data for, and conduct cost-benefit analyses to decide whether to disclose to Anadarko which documents BP has deemed significant in return for their custodial data. But the burden should fall on the party that caused the situation in the first place, particularly when a Court order has allocated the burden to that party in the first place.

As a less preferred alternative, if Anadarko is only required to provide custodial metadata when requested by parties for specific documents, then BP respectfully submits that the Court's orders should be modified to provide that all parties are only required to provide metadata when requested by parties for specific documents.

**III.   Conclusion**

For the foregoing reasons, as well as those in BP's August 25 letter, BP's Motion to Compel should be granted.

Sincerely,

Martin Boles

cc:   Plaintiffs Liaison Counsel
Defense Liaison Counsel
Mike Underhill
Hon. Attorney General Luther Strange
Cory Maze
Mike O'Keefe
Tiffany Hedgpeth
Dan Saunders
Tony Fitch

# EXHIBIT F

## MACONDO PROSPECT
## WELL PARTICIPATION AGREEMENT
## DEEPWATER GULF OF MEXICO

This Well Participation Agreement (this "Agreement") dated effective as of October 1, 2009 ("Effective Date"), is made by and between **BP Exploration & Production Inc.,** a Delaware corporation ("BP"), **Anadarko Petroleum Corporation**, a Delaware corporation ("APC"), and **Kerr-McGee Oil & Gas Corporation**, a Delaware corporation ("KMG").

### RECITALS

A.    BP is the current owner or holder of an undivided sixty five percent (65%) Record Title Interest in lease OCS-G 32306, Mississippi Canyon Block 252, Deepwater Gulf of Mexico, U.S.A. (the "Macondo Prospect Area"), further described in Exhibit A.

B.    APC owns an undivided twenty five (25%) working interest in the Macondo Prospect Area following execution of the Lease Exchange Agreement (as hereinafter defined) and a subsequent assignment from its Affiliate Anadarko E&P Company, LP ("AEP") of AEP's Record Title Interest in the Macondo Prospect Area.

C.    APC intends to participate in the Initial Exploratory Well (as hereafter defined) as set forth in this Agreement.

D.    BP and KMG are owners of that certain production Platform A (ID# 24130 1), located in Viosca Knoll Block 989 (the "Pompano Platform").

E.    In consideration of the mutual promises set out in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, BP, APC and KMG agree to be bound by the terms of this Agreement.

### AGREEMENT

### 1.    DEFINITIONS, INTERPRETATION AND EXHIBITS

1.1    **Definitions.**    Capitalized terms defined in the Macondo Operating Agreement (as hereafter defined) and not otherwise defined or modified in this Agreement have the meanings defined in the Macondo Operating Agreement. Additionally, the following words and phrases shall have the following meanings:

Page 1 of 11

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

675533

ANA-MDL-000030613

"AFE" means the Well Plan and Authorization for Expenditure attached as Exhibit B.

"Affiliate" means any legal entity which controls, is controlled by, or is under common control with, another legal entity. An entity is deemed to "control" another if it owns directly or indirectly at least fifty percent (50%) of either of the following:

(A)   The shares entitled to vote at a general election of directors of such other entity.

(B)   The voting interest in such other entity if such entity does not have either shares or directors.

"Agreement" means this Well Participation Agreement, including the Recitals and all Exhibits.

"Commenced Drilling Operations" means the start of actual drilling operations.

"Exhibit" means a document referred to in Section 1.3.

"IEW" or "Initial Exploratory Well" means the well currently being drilled by Operator on the Macondo Prospect Area in which APC will participate under the terms of this Agreement. "IEW" and "Initial Exploratory Well" include Substitute Well(s), as defined in the Macondo Operating Agreement, for the IEW. The interest in the IEW assigned to APC consists of all tangible personal property in the well, including the tubular and wellhead costs as set forth in the AFE.

"Lease" or "Macondo Lease" means the oil and gas lease identified on Exhibit A, sometimes referred to herein as the Macondo Prospect Area.

"Lease Exchange Agreement" means the Lease Exchange Agreement dated effective October 1, 2009, wherein BP assigned to APC and AEP a combined undivided twenty five percent (25%) of 8/8ths Record Title Interest in the Macondo Lease pursuant to the terms and conditions therein.

"Macondo Operating Agreement" or "Macondo OA" means that certain operating agreement dated effective October 1, 2009, by and between BP and MOEX Offshore 2007 LLC, attached hereto as Exhibit C.

"Objective Depth" means the first of the following to occur: (a) 19,561' TVD SS; (b) a depth sufficient to encounter the first in-situ occurrence of the foraminfera Roblus L. or its stratigraphic equivalent, as encountered at 24,220' MD in the MC 696 OCS-G 16641 #1 well; or (c) an onset of

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030614

pressure beyond 18,561' TVD SS that requires a new casing string to continue drilling.

"Operator" means BP.

"Party" means BP, APC or KMG, as applicable, and "Parties" means all of them.

"Person" means an individual, corporation, company, state, statutory corporation, government entity or any other legal entity.

"Pompano OA" means that certain operating agreement dated effective May 1, 1988, among BP Exploration Inc. (predecessor-in-interest to BP), KMG (an indirect wholly owned subsidiary of APC) and Kerr-McGee Federal Limited Partnership I-1981, as amended, covering and affecting the following Federal offshore leases: (i) OCS-G 6898 (Viosca Knoll Block 989); (ii) OCG-G 6899 (Viosca Knoll Block 990); (iii) OCS-G 7923 (Mississippi Canyon Block 27); (iv) OCS-G 9771 (Mississippi Canyon Block 28); and (v) OCS-G 6894 (Mississippi Canyon Block 72).

"Record Title Interest" means, as to all depths, with respect to any federal OCS oil & gas lease, the undivided, fractional or percentage share of all right, title, and interest in such lease granted to the original lessee (or lessees) by the MMS, including, without limitation, an equal undivided fractional or percentage share of the operating rights in such lease.

"APC's Working Interest Share" means APC's working interest ownership in the Macondo Prospect Area of twenty five percent (25%) of 8/8ths.

"TVD" means Total Vertical Depth.

"Well Costs" means all costs to drill, evaluate, and abandon the IEW.

1.2     **Incorporation of Provisions from the Macondo OA.** The Macondo OA is incorporated herein by reference, except as specifically modified in this Agreement.

1.3     **Exhibits.**  All of the Exhibits that are attached to the body of this Agreement are an integral part of, and are incorporated by reference into, this Agreement, including:

(A)     Exhibit A – Lease Description

(B)     Exhibit B – Well Plan and Authorization for Expenditure

(C)     Exhibit C – Macondo Operating Agreement

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030615

(D)    Exhibit D -- Form of AMI Assignment

(E)    Exhibit E – Tax Partnership Provisions

1.4    **Conflicts and Enforceability.** If there is a conflict or inconsistency between a provision of this Agreement and that of any Exhibit, the provision of this Agreement will prevail, except insofar as this Agreement has become ineffective by its own terms.

1.5    **Interpretation.** Unless the context expressly requires otherwise, all of the following apply to the interpretation of this Agreement:

(A)    The plural and singular words each include the other.

(B)    The masculine, feminine and neuter genders each include the others.

(C)    The word "or" is not exclusive.

(D)    The word "includes" and "including" shall be construed to mean "including without limitation to the generality."

(E)    The headings in this Agreement are included for convenience and do not affect the construction or interpretation of any provision of, or the rights or obligations of a Party under, this Agreement.

(F)    References to "Sections" shall unless the context provides otherwise be references to sections of this Agreement.

2.    **EFFECTIVE DATE AND TERM.** This Agreement is effective as of the Effective Date and will terminate upon rig release from the IEW or its Substitute Well.

3.    **INITIAL EXPLORATORY WELL (IEW)**

3.1    **Commencement.** BP commenced Drilling Operations for the IEW on October 6, 2009, utilizing the Transocean Marianas Rig. Due to the facts and circumstances surrounding the damages sustained by the Marianas Rig as a result of Hurricane Ida, BP plans to utilize the Transocean Horizon Rig to resume drilling operations of the IEW and will drill the IEW to the Objective Depth subject to the terms of this Agreement. Such resumption of drilling operations of the IEW is expected to occur on or before April 1, 2010, which will be immediately following BP's contemplated plug and abandonment operations at Viosca Knoll 914 which will follow the the conclusion of BP's current well operations at Mississippi Canyon 727.

3.2    **Operating Agreement and Well Participation.** Notwithstanding the fact that BP commenced drilling operations on the IEW at its sole risk and expense on October 6, 2009 without APC's participation and prior to APC

Page 4 of 11

ANA-MDL-000030616

owning an interest in the Macondo Lease, and such operations are ongoing as of the date of execution of this Agreement:

(a) BP and APC agree to continue the drilling of the IEW as follows: APC shall execute and deliver to BP a copy of Exhibit B, the Macondo Well Plan and Authorization for Expenditure, simultaneous with its execution of this Agreement, signifying APC's agreement to participate in the drilling of the IEW and any and all operations in connection with the drilling of the IEW effective October 1, 2009, subject to Section 4 below, and otherwise in accordance with and subject to the provisions of the Macondo OA; and

(b) BP and APC deem that BP's delivery of the Macondo Well Plan and Authorization for Expenditure to APC and APC's execution and delivery thereof to BP is in compliance with the Macondo OA.

BP represents that, as of the date of this Agreement, there are no pending, current, or accrued obligations (other than those that may have occurred in the ordinary course of the planning and drilling of the IEW) pursuant to any agreement regarding the drilling of wells, installation or construction of facilities/platforms, or any other capital expenditure exceeding $100,000 for which BP would be responsible, except as set forth in the AFE.

3.3     The Parties agree that any Development Plan proposed by either APC or BP pursuant to the Macondo OA shall provide for processing and handling of all production from the Macondo Prospect Area via a subsea tieback to the Pompano Platform; provided that BP determines it is safely, technically, and economically feasible to do so. In the event BP determines that it is not safely, technically, and economically feasible to tie-back Macondo Prospect Area production to the Pompano Platform, then any Development Plan proposed by BP that provides for a subsea tieback of Macondo Prospect Area production to any other BP owned and/or operated offshore facility shall require approval by both BP and APC. Further, BP and KMG agree that, pursuant to Article 13 of the Pompano OA, they each hereby consent and approve the construction, installation and operation of Facilities, equipment, pipelines, risers and umbilicals (and any modifications to the Pompano Platform in connection therewith) for use in connection with processing and handling of all production from the Macondo Prospect Area.

## 4.     COST-BEARING INTEREST:

4.1     Pursuant to this Agreement, APC shall pay thirty-three and one-third percent (33.33%) of the Well Costs for the IEW to the Objective Depth as set forth in the AFE, and any Substitute Well therefore, if any, agreed to under the Macondo OA. This obligation shall apply only until the earlier of: (a) the IEW Objective Depth has been drilled and evaluated as set forth in the AFE, (b) if applicable, the IEW has been plugged and abandoned, or (c)

Page 5 of 11

ANA-MDL-000030617

the cumulative Well Costs for the IEW and any agreed-upon Substitute Well, if any, reaches one hundred and ten percent (110%) of the amount set forth in the AFE, excluding overhead (as "overhead" is defined in the COPAS provisions for the Macondo OA); provided that: (i) Section 4.1(b) shall only apply following the expiration of the applicable period for proposing Substitute Well(s) under the Macondo OA, and (ii) an Election by either Party not to participate in a Substitute Well(s) shall be governed by the applicable provisions of Article 16 of the Macondo OA. The AFE includes the estimated costs to drill, evaluate, and abandon the well. Upon the earlier to occur of subsections (a), (b) and (c) above, APC shall only be obligated to pay APC's Working Interest Share of any further operations conducted pursuant to the Macondo OA. APC will execute BP's AFE contemporaneously with the execution of this Agreement. BP shall invoice APC its applicable share of the Well Costs incurred as of the date of execution, in accordance with this Agreement, and APC shall pay the same in accordance with this Agreement and the Macondo OA. Thereafter, BP will invoice APC on a monthly basis as provided in the Macondo OA. BP uses an SAP-based accounting system that cannot automatically track and bill out vendor invoices at different cost interests. Therefore, when an operation reaches the point in which the cost interest should change as provided in the Section 4.1 above, the estimated well cost as reflected in BP's DIMS (Drilling rig cost estimator) at that point will be used as the mechanism for a cost interest change in BP's accounting system. Accordingly, any vendor invoices processed thereafter will be billed to APC at APC's Working Interest Share in accordance with Section 4.1.

4.2     In determining the above-referenced threshold for expenditures, the costs and expenses of the IEW and, if applicable, the agreed-to Substitute Well(s) shall be considered cumulatively. For example, if the Parties expend one hundred percent (100%) of the amount set forth in the AFE in Well Costs on the IEW before abandoning it and then agree to drill a Substitute Well, then, subject to subsections (a), (b) and (c) of Section 4.1, APC's obligation to pay thirty-three and one-third percent (33.33%) of the Well Costs on the Substitute Well shall terminate after ten percent (10%) of the amount set forth in the AFE has been expended in the Substitute Well, with APC paying APC's Working Interest Share thereafter.

5. **LEASE EXCHANGE AGREEMENT AND MACONDO OPERATING AGREEMENT:** Prior to the execution of this Agreement, BP and APC executed the Lease Exchange Agreement and delivered the respective Assignments as defined therein, and APC adopted, ratified, and executed the Macondo Operating Agreement. If there is any conflict between the terms of this Agreement and the Lease Exchange Agreement, the terms of this Agreement shall prevail. If there is any conflict between the terms of this Agreement and the Macondo OA, the terms of this Agreement shall prevail.

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030618

6.  **AREA OF MUTUAL INTEREST:** The Parties agree to establish an area of mutual interest ("AMI"), effective as of the Effective Date until December 31, 2011, as follows:

    6.1  **AMI Area.** Mississippi Canyon, Blocks 208, 209, and 253.

    6.2  **AMI Percentage.**    BP    75.00%
                                APC   25.00%

    6.3  **AMI Terms.** Should either Party ("Acquiring Party") by reason of a farm-in agreement or by purchase from third parties or through purchase pursuant to an OCS lease sale, or by any other means (other than as a result of a merger, reorganization or other Affiliate transfer, as well as transfers between BP and APC, or the acquisition of all or substantially all of a third party's assets located in the Gulf of Mexico) acquire an interest in leasehold record title, leasehold operating rights, production, reserves, facilities, or any other interest within the AMI Area as defined in Section 6.1 herein, then the Acquiring Party shall, within thirty (30) days after such acquisition, give written notice of such acquisition including a description of the right, title, and interest, and all terms and conditions relating thereto or equivalent terms for a non-cash or exchange transaction (other than as excluded above) to the other Party hereto ("Non-Acquiring Party") including  the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash). The Non-Acquiring Party shall have the option for a period of thirty (30) days after such notice is received to elect in writing to the Acquiring Party to acquire its pro rata share of the Acquiring Party's interest.  Such pro rata share shall be equal to each Party's applicable AMI Percentage, as defined in Section 6.2 herein, multiplied by the interest acquired by the Acquiring Party.  Should the Non-Acquiring Party elect to acquire its pro rata share of the Acquiring Party's interest as aforesaid, then within thirty (30) days after its election to acquire its share, it shall reimburse the Acquiring Party for the pro rata share of the costs attributable to the interest and shall assume its respective pro rata share of the Acquiring Party's rights and obligations, if any, attributable to such interest. The Acquiring Party shall assign to the Non-Acquiring Party its proportionate share of the interest to be assigned contemporaneously with the aforementioned reimbursement.  Said assignment shall be in the same form and content in all material respects as the Form of AMI Assignment attached hereto as Exhibit D, modified only insofar as is necessary to reflect the percentage and location of the interest assigned. Any interests acquired by the Non-Acquiring Party pursuant to this Section 6 shall be subject to an operating agreement that designates BP as operator and is otherwise identical in all material respects to the Macondo Operating Agreement, modified only insofar as is necessary to reflect the percentage

ANA-MDL-000030619

and location of the interest assigned; provided, however, if such interest is subject to a pre-existing operating agreement with a third party, the pre-existing operating agreement shall govern such interest. Failure to respond in writing within the time period specified above is deemed to be an election not to participate in such acquisition. Subject to a pre-existing operating agreement with a third party, if any, BP shall be designated Operator of any interest BP acquires pursuant to this AMI provision, In such case, APC will execute the requisite documentation required by the MMS within thirty (30) days of receipt of such documents from BP.

7. **RELATIONSHIP OF THE PARTIES AND TAX PROVISIONS:** It is not the purpose or intention of this Agreement to create, and this Agreement shall not be construed as creating, a joint venture, mining partnership or other relationship whereby any Party will be held liable for the acts or omissions of any other Party, and the liabilities of each of the Parties hereto shall be several and not joint or collective. For Federal Income Tax purposes, however, each Party acknowledges that this Agreement creates a partnership for tax purposes between the Parties with respect to the Initial Exploratory Well which is subject to the application of all provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended (the Code), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. The Parties agree that they shall not elect out of partnership treatment and shall execute and file with the Internal Revenue Service and/or any state taxing authority, any returns or documents necessary to evidence or effectuate this election to be treated as a tax partnership with respect to the Initial Exploratory Well pursuant to all Federal and/or State laws and regulations. The tax partnership created hereunder shall be governed by the Tax Partnership Provisions attached hereto as Exhibit E.

8. **GENERAL PROVISIONS**

   **8.1    Notices.**  All notices and communications required or permitted under this Agreement shall be made in accordance with the Macondo OA.

   **8.2    Public Announcements.**  No Party shall issue a press release concerning this Agreement unless all Parties have approved the issuance and content of the press release.

   **8.3    Prior Agreements.**  This Agreement and all Exhibits attached hereto comprise the complete and exclusive agreement between the Parties regarding the subject matter of this Agreement, and supersede all oral and written communications, negotiations, representations or agreements in relation to that subject matter made or entered into on or before the Effective Date.

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030620

**8.4** **Waiver.** The failure by either Party to pursue remedies for breach of this Agreement does not constitute a waiver by that Party of any breach of this Agreement by the other Party or raise any defense against Claims for breach of this Agreement. The waiver or failure to require the performance of any covenant or obligation contained in this Agreement or to pursue remedies for breach of this Agreement does not waive a later breach of that covenant or obligation.

**8.5** **Preparation.** Preparation of this Agreement has been an effort of the Parties and the resulting Agreement must not be construed more severely against one of the Parties than against the other.

**8.6** **Severability.** Each provision of this Agreement is severable and if any provision is determined to be invalid, unenforceable or illegal under any existing or future law by a court, arbitrator of competent jurisdiction or by operation of any applicable law, such invalidity, unenforceability or illegality does not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

**8.7** **Amendment.** No change to this Agreement is effective unless made in writing and signed by both Parties. Any contemplated assignment or reassignment under this Agreement will be in a form (i) mutually agreeable to all Parties, (ii) approvable by the Minerals Management Service, Gulf of Mexico Region, and (iii) warranted by, through and under each respective Party.

**8.8** **Counterparts.** This Agreement may be executed in any number of duplicate counterparts, each of which will be deemed an original of this Agreement, and which together will constitute one and the same instrument; provided that neither Party will be bound to this Agreement unless and until both Parties have executed a duplicate counterpart.

**8.9** **Survival.** Upon termination as defined in Section 2, the rights and obligations of the Parties with respect to the Macondo Prospect Area shall thereafter be governed by the Macondo OA. Notwithstanding the termination of this Agreement, Sections 6 and 7 shall survive, and all causes of action which arose prior to termination shall survive until, by their respective terms, they are no longer operative or are otherwise limited by an applicable statute of limitations.

**8.10** **Binding Effect.** The terms and conditions of this Agreement shall be governed by the laws of **TEXAS** and shall be binding upon, and shall inure to the benefit of each Party and its respective successors and assigns, but may not be assigned without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030621

8.11 **Further Assurances**. Each of the Parties hereto shall execute, acknowledge and deliver to the other such further documents and take such other action, as may be necessary in order to carry out the purposes of this Agreement. Unless otherwise provided in this Agreement, the Parties agree to prepare and execute such documents within thirty (30) days of receipt of a written request for such documents from the other Party.

8.12 **Representation and Acknowledgement**. BP represents that it owns the record title interest in the Lease set forth in Exhibit A, the Lease is in full force and effect, and BP is in compliance with each of the material terms and conditions of the Lease.

8.13 **Dispute Resolution Procedure**. Any Dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in the Macondo OA.

**The remainder of this page is intentionally left blank.**

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

ANA-MDL-000030622

The Parties have executed this Agreement as evidenced by the following signatures of the authorized representatives of the Parties, but is effective for all purposes as of the Effective Date:

**BP Exploration & Production Inc.**

By: _____

Title: _Attorney in Fact_

Date: _12/17/09_

**Anadarko Petroleum Corporation**

By: _____

Title: _Agent and Attorney-in-Fact_

Date: _December 17, 2009_

**Kerr-McGee Oil & Gas Corporation**

By: _____

Title: _Attorney-in-Fact_

Date: _December 17, 2009_

Macondo Prospect (MC 252)
Well Participation Agreement
BP / APC / KMG

Page 11 of 11

ANA-MDL-000030623

# EXHIBIT G

## Beffa, Darin T.

| | |
|---|---|
| **From:** | Beffa, Darin T. |
| **Sent:** | Thursday, September 01, 2011 10:54 AM |
| **To:** | 'Hedgpeth, Tiffany' |
| **Cc:** | Wilms, Nancy M.; Saunders, Daniel A.; Nomellini, Mark J. |
| **Subject:** | RE: Supplemental Responses to Anadarko's Discovery |

Tiffany,

The extra day won't be a problem for the written responses, but it is still very important that we get the actual documents sufficiently in advance of Dawn Peyton's deposition.

Thanks,
Darin

_____

Darin T. Beffa
KIRKLAND & ELLIS LLP
333 S. Hope Street · Los Angeles, CA 90071
Tel 213-680-8264 · Fax 213-680-8500
Darin.Beffa@kirkland.com

**From:** Hedgpeth, Tiffany [mailto:tiffany.hedgpeth@bingham.com]
**Sent:** Thursday, September 01, 2011 10:15 AM
**To:** Beffa, Darin T.
**Cc:** Wilms, Nancy M.; Saunders, Daniel A.
**Subject:** Supplemental Responses to Anadarko's Discovery

Hi Darin. When we spoke last week, you indicated that BP would be willing to give us an extra day, if needed, to serve the supplemental discovery responses.   It looks like we do need that extra day.  Thanks!

_____

Confidentiality Notice: The information in this e-mail (including attachments, if any) is considered confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of the intended recipient. If you have received this email in error, please notify me immediately by reply email, delete this email, and do not disclose its contents to anyone.

Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this communication is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding any federal tax penalties. Any legal advice expressed in this message is being delivered to you solely for your use in connection with the matters addressed herein and may not be relied upon by any other person or entity or used for any other purpose without our prior written consent.

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4
   IN RE:  OIL SPILL          MDL NO. 2179
5  BY THE OIL RIG
   "DEEPWATER HORIZON"         SECTION:  J
6  IN THE GULF OF
   MEXICO, ON                  JUDGE BARBIER
7  APRIL 20, 2010              MAG. JUDGE SHUSHAN

8

9

10



16

17                **VOLUME 2**

18

19      Deposition of **BRETT WILLIAM COCALES**,

20  17613 Pine Brook Trail, Cypress, Texas 77429,

21  taken in the Pan American Life Center, Bayou

22  Room 1 and 2, 11th Floor, 601 Poydras Street,

23  New Orleans, Louisiana 70130, reported on

24  Tuesday, April 26th, 2011.

25

1    **APPEARANCES:**

2

ON BEHALF OF THE PLAINTIFFS

3

STEERING COMMITTEE:

4

5

6        LAW OFFICES OF RONNIE G. PENTON
         (BY:  RONNIE G. PENTON, ESQUIRE)
         209 HOPPEN PLACE
7        BOGALUSA, LOUISIANA 70427-3827

8

9         LEWIS, KULLMAN, STERBCOW & ABRAMSON
         (BY:  IAN TAYLOR, ESQUIRE)
         601 POYDRAS STREET
10       SUITE 2615
         NEW ORLEANS, LOUISIANA 70130

11

12

13       U.S. DEPARTMENT OF JUSTICE
         TORTS BRANCH, CIVIL DIVISION
         (BY:  DEANNA J. CHANG, ESQUIRE)
14       POST OFFICE BOX 14271
         WASHINGTON, D.C. 20044-4271

15
              ATTORNEYS FOR THE UNITED STATES

16

17       KANNER & WHITELEY, LLC
         (BY:  AMY S. BRYSON, ESQUIRE)
18       701 CAMP STREET
         NEW ORLEANS, LOUISIANA 70130-3504

19
              ATTORNEYS FOR LOUISIANA ATTORNEY
20            GENERAL

21

22

23

24

25

```
1   APPEARANCES (Continued):

2

3       LANCE C. WENGER, ESQUIRE
        ATTORNEY-ADVISOR
4       OFFICE OF THE SOLICITOR
        ROCKY MOUNTAIN REGION
5       U.S. DEPARTMENT OF THE INTERIOR
        755 PARFET STREET
6       SUITE 151
        LAKEWOOD, COLORADO 80215
7
            OBSERVER FOR THE U.S. DEPARTMENT
8           OF THE INTERIOR

9

10      COTCHETT, PITRE & McCARTHY, LLP
        (BY:  VICTOR S. ELIAS, ESQUIRE)
11      SAN FRANCISCO AIRPORT OFFICE
        CENTER
12      840 MALCOLM ROAD, SUITE 200
        BURLINGAME, CALIFORNIA 94010
13
            ATTORNEYS FOR MDL SECURITIES.
14          PLAINTIFFS SUB-CLASS

15      MUNGER, TOLLES & OLSON, LLP
        (BY:  MICHAEL R. DOYEN ESQUIRE)
16            ESTHER H. SUNG, ESQUIRE)
        355 SOUTH GRAND AVENUE
17      25TH FLOOR
        LOS ANGELES, CALIFORNIA 90071-1560
18
            ATTORNEYS FOR TRANSOCEAN
19

20      FRILOT, LLC
        (BY:   PAUL C. THIBODEAUX, ESQUIRE)
21      1100 POYDRAS STREET, SUITE 3700
        NEW ORLEANS, LOUISIANA 70163
22
            ATTORNEYS FOR TRANSOCEAN
23

24

25
```

1    APPEARANCES (Continued):

2

3        JONES, WALKER, WAECHTER, POITEVENT,
         CARRÈRE & DENÈGRE, LLP
4        (BY:  MICHAEL G. LEMOINE, ESQUIRE)
         600 JEFFERSON STREET, SUITE 1600
5        LAFAYETTE, LOUISIANA 70501

6            ATTORNEYS FOR WEATHERFORD

7

8         JONES, WALKER, WAECHTER, POITEVENT,
         CARRÈRE & DENÈGRE, LLP
         (BY:  SARA C. VALENTINE, ESQUIRE)
9        201 ST. CHARLES AVENUE
         NEW ORLEANS, LOUISIANA 70170-5100
10
             ATTORNEYS FOR WEATHERFORD
11

12       KIRKLAND & ELLIS
          (BY:  WALTER R. LANCASTER, ESQUIRE)
13       333 SOUTH HOPE STREET
         LOS ANGELES, CALIFORNIA 90071
14
             ATTORNEYS FOR BP
15

16       KIRKLAND & ELLIS, LLP
         (BY:  ALLAN PIXTON, ESQUIRE
17       300 NORTH LASALLE
         CHICAGO, ILLINOIS 60654
18
             ATTORNEYS FOR BP
19

20       HILDER & ASSOCIATES, P.C.
         (BY:  PHILIP H. HILDER, ESQUIRE
21             SCOTT L. MULLINS, ESQUIRE)
               STEPHANIE McGUIRE, ESQUIRE)
22       819 LOVETT BOULEVARD
         HOUSTON, TEXAS 77006
23
             ATTORNEYS FOR BRETT WILLIAM
24           COCALES

25

1    **APPEARANCES (Continued):**

2

3       GODWIN RONQUILLO
        (BY:  DONALD E. GODWIN, ESQUIRE)
4             R. ALAN YORK, ESQUIRE)
              JENNY L. MARTINEZ, ESQUIRE)
5             STEFANIE K. MAJOR, ESQUIRE)
        1201 ELM STREET
6       SUITE 1700
        DALLAS, TEXAS 75270-2041
7
                ATTORNEYS FOR HALLIBURTON
8

9       BECK, REDDEN & SECREST, LLP
        (BY:  ERIC J.R. NICHOLS, ESQUIRE)
10      ONE HOUSTON CENTER
        1221 McKINNEY STREET
11      SUITE 4500
        HOUSTON, TEXAS 77010-2010
12
                ATTORNEYS FOR CAMERON
13              INTERNATIONAL CORPORATION

14
        MORGAN, LEWIS, LLP
15      BY:  STEVEN A. LUXTON, ESQUIRE)
        1201 LAKE ROBBINS DRIVE
16      THE WOODLANDS, TEXAS 77380-1124

17              ATTORNEYS FOR M-I SWACO, LLC

18
        MORGAN, LEWIS, LLC
19      (BY:  JOHN D. FUNDERBURK, ESQUIRE)
        1000 LOUISIANA STREET, SUITE 400
20      HOUSTON, TEXAS 77002-5006

21              ATTORNEYS FOR M-I SWACO, LLC

22

23

24

25

1    **APPEARANCES (Continued):**

2

3        BINGHAM McCUTCHEN
         (BY:  DIANE C. HERTZ, ESQUIRE)
4              ROBERT C. STILLWELL, ESQUIRE)
         399 PARK AVENUE
5        NEW YORK, NEW YORK 10022-4689

6            ATTORNEYS FOR ANADARKO PETROLEUM
             AND MOEX OFFSHORE 2007, LLC

7

8        WARE, JACKSON, LEE & CHAMBERS, LLP
         (BY:  C. DENNIS BARROW, JR., ESQUIRE)
9        AMERICA TOWER
         2929 ALLEN PARKWAY
10       HOUSTON, TEXAS 77019

11           ATTORNEYS FOR DRIL-QUIP

12

13

14   **ALSO PRESENT:**

15
         GILLEY DeLORIMIER, CLVS, CLVS COUNCIL
16       DEPO-VUE, INC.

17

18

19   **REPORTED BY:**

20       DIANE TEWIS CLARK, RPR, RMR, CRR
         CERTIFIED COURT REPORTER
21       LOUISIANA CERTIFICATE NO. 73005
         ARKANSAS CERTIFICATE NO. 672
22

23

24

25

1  me on April 21st, so --

2      Q.     No, no, but the attachment

3  represents particular data, right?  You just

4  said that's Sperry-Sun data, right?

5      A.     Right.

6      Q.     Can you tell the date on which

7  that data was collected?

8      A.     Yes.  I mean, it has a date

9  here.

10      Q.     Which is?

11      A.     Which is the 20th of April.

12      Q.     That's what I was asking.

13      A.     Oh, okay.

14      Q.     Okay.  So I want to hand you

15  another document which is Tab 79, and it's

16  Bates number ending in 2179MDL00922298, and

17  we're going to mark that as Exhibit 1501.

18          (Exhibit No. 1501 marked for

19  identification.)

20  EXAMINATION BY MS. HERTZ:

21      Q.     Now, this document is entitled

22  "Macondo Time Log Analysis," and it's dated

23  April 22nd, 2010, is that right?

24      A.     Correct, yes.

25      Q.     Can you identify this document

```
 1    for me?
 2         MR. DOYEN:
 3                   What was the number?
 4         MS. HERTZ:
 5                   79.
 6         THE WITNESS:
 7                   Can I identify -- I mean, can you
 8    be more specific?
 9    EXAMINATION BY MS. HERTZ:
10         Q.    No.  Tell me what the document
11    is, if you know.
12         A.    It looks like a -- it looks like
13    a time log from -- mud logging data that
14    would be -- I don't know if it's Sperry
15    mudlogging data, and it's annotated with
16    comments.
17         Q.    Have you ever seen it before?
18         A.    I don't recall that I've seen
19    this before.
20         Q.    You don't recall this document
21    in any iteration at all?
22         A.    No, I don't.
23         MR. HILDER:
24                   Objection.  Form.
25    EXAMINATION BY MS. HERTZ:
```

1      Q.      Would you be surprised to know

2   that the metadata shows that you were the

3   last person to edit this document?

4      MR. LANCASTER:

5              Object to form.

6   EXAMINATION BY MS. HERTZ:

7      Q.      Would you be surprised?

8      A.      No.

9      Q.      You wouldn't be surprised?

10     A.      No, I mean, I don't remember.

11             (Exhibit No. 1502 marked for

12   identification.)

13   EXAMINATION BY MS. HERTZ:

14     Q.      I'm going to show you just so

15   that it's in the record a document we've

16   marked as 1501 -- 1502, excuse me, which is

17   the metadata produced by BP from a document

18   bearing Bates numbers -- it has no Bates

19   number on it.  Sorry.

20   BP-HZN-2179MDL00922298.  I'm just marking

21   this so it's in the record.  So does

22   looking --

23      MR. HILDER:

24              Excuse me, Counsel, I would like

25   a copy.

1     MS. HERTZ:

2          That would be good.

3     EXAMINATION BY MS. HERTZ:

4     Q.     I'm not going to ask you any

5     questions about it, I just was putting it in

6     the record.

7          All right, now that you've taken

8     a look at this document, does it refresh your

9     recollection that you had this up on your

10    screen and were working on this document for

11    a time on the morning of

12    April 22nd?

13    MR. HILDER:

14         Objection.   Form.

15    THE WITNESS:

16         No, I don't.   I don't remember

17    working on this document.

18    EXAMINATION BY MS. HERTZ:

19    Q.     Just drawing a blank?

20    MR. HILDER:

21         Object to form.

22    THE WITNESS:

23         Yeah.   I just don't remember the

24    document.

25    EXAMINATION BY MS. HERTZ:

```
 1            Q.      All right.  Do you remember
 2   seeing any documents with respect to the
 3   Sperry-Sun data that you reviewed when you
 4   were trying to attempt to figure out what had
 5   happened on April 20th?
 6            A.      No, I don't.
 7            Q.      Do you remember discussing with
 8   anyone the information on the second page of
 9   this document which is entitled "Time Log"?
10            A.      This would be -- this page?
11            Q.      It says "Time Log."
12            A.      I'm sorry.  Do I -- please ask
13   the question again.
14            Q.      Certainly.  Do you recall
15   discussing with anyone on the 22nd the
16   contents of this page?
17            A.      No, I don't.
18            Q.      Okay.  Now, I'm happy to pull
19   the document out and show you, but I've got a
20   PowerPoint that says for this plan forward
21   group, you were to meet with John Guide, Mark
22   Hafle and others to look at mudlogging data.
23                    Are you aware that that was your
24   assignment and that was the group of people
25   you were to do it with?
```

1              **REPORTER'S CERTIFICATE**

2

3              I, Diane Tewis Clark, RPR, RMR,

4    CRR, Certified Court Reporter, State of

5    Louisiana, do hereby certify that above-named

6    witness, after having been duly sworn by me

7    to testify to the truth, did testify as

8    hereinabove set forth;

9              That this testimony was reported by

10   me in the stenotype reporting method and

11   transcribed thereafter by me on computer, and

12   that same is a true and correct transcript to

13   the best of my ability and understanding;

14             That I am not of counsel, nor

15   related to counsel or the parties hereto, and

16   in no way interested in the outcome of this

17   matter.

18

19

20

21   _____

22   Diane Tewis Clark, RPR, RMR, CRR

23        Certified Court Reporter

24

25