# KANNER & WHITELEY, L.L.C.
**701 Camp Street**
**New Orleans, Louisiana 70130**
(504) 524-5777
FAX: (504) 524-5763

August 29, 2011

**Via Electronic Mail**:  *Sally_Shushan@laed.uscourts.gov*
The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

    Re: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
       Mexico, on April 20, 2010, MDL No. 2179 – *BP Motion to Compel*

Dear Judge Shushan:

  The State of Louisiana respectfully submits this response to BP's correspondence of August 22, 2011 ("BP's Motion to Compel") [Rec. Doc. 3795], consistent with this Court's Order of 8/24/11. [Rec. Doc. 3810]  BP complains that Louisiana's Responses to its discovery requests are inadequate for purposes of Phase 1 discovery.   As Louisiana has repeatedly advised BP, the State takes issue with BP's overly broad Requests for Production and has produced information related to the State's involvement and activities associated with the fire, explosion and sinking of the Deepwater Horizon during the April 19 through 23 timeframe[1]: the matters which are at issue in the Phase 1 Limitations trial.

  For purposes of the upcoming Phase 1 Limitations trial, slated to begin in February 2012, this Court permitted and encouraged the States, including Louisiana, to adopt and identify documents and information relating to liability issues which had been previously submitted by the PSC and/or produced in the context of government hearings and the discovery efforts to date.  Phase 1, as currently structured, involves Transocean's efforts to limit and/or exonerate itself from liability, as well as the determination of liability and allocation of fault as among the defendants to these proceedings.  The discovery requests served by BP extend far beyond this phase of the Limitations proceeding and in effect seek all documents and information in the

---

[1] With respect to the explosion and sinking of the Deepwater Horizon, as is evident from the materials the State has produced to date, although the State stood ready with vessels and personnel to assist, the US Coast Guard did not utilize these assets in the context of the emergency search and rescue efforts.  Louisiana Production, Bates Range: LA-ST 86-240.  Additionally, the notification (received by the Louisiana State Police at 2:18 pm on April 21, 2010) provided by BP regarding the initial release of oil confirmed that BP represented to the State that it did "not expect any shoreline impact at this time. . . [BP is] working with the MMS and Coast Guard for Response Actions." Louisiana Production, Bates LA-ST 91-92.

possession of virtually every State agency which references BP, the Deepwater Horizon, Macondo, Transocean, etc. These requests are not limited to the issues in the upcoming Phase 1 of the Limitations trial. In addition, BP refuses to accept the adoption of PSC responses as provided for by this Court. Simply put, BP's Motion to Compel seeks to impose discovery obligations on the State of Louisiana that are at best premature, and at worst improper and contrary to the direction of this Court. Moreover, BP's motion to Compel runs far afoul of BP's stated need for discovery from the State: to "avoid surprise" in the upcoming trial on liability and allocation of fault. BP's Motion to Compel should be denied in its entirety.

BP previously argued to this Court that its Phase 1 discovery is limited to the collection of information necessary for the defendants to prepare their expert reports in the context of the determination of the allocation of fault among them (*i.e.* the Limitation action):

> As the Court has stated repeatedly, the pre-July 31 deposition period is meant only for deposing those witnesses whose testimony is necessary for the parties' experts to prepare their expert reports for Phase 1 of the Limitation Trial. See, e.g., J. Barbier, Status Conf. Tr. at 29, Jan 18, 2011 ("What we wanted to make sure is any fact deposition that was necessary for the experts to do their work, do their reports was taken by [the July 31, 2011] deadline."). In fact, on April 20th, after reiterating that "July 31, 2011 is the deadline for the completion of fact discovery required for the expert reports that will be served beginning August 15, 2011"

5/12/11 Corsp. fr. A. Langan to Magistrate Shushan. [Rec. Doc. 2370] At the discovery working group conference on May 15, 2011, BP confirmed that it had issued the April 29, 2011, discovery in an effort to avoid surprise:

> Your Honor, you're very responsive, always, and you got back to us on April 26th and said, answer, yes, if the discovery is required for the first segment of the February 2012 trial, which we have referred to as the *event segment*. So we take Your Honor at her word and said to ourselves, okay, well, it sounds like these people have filed claims in limitation, they've brought cases against us, they've incorporated complaints against us, and the Court says we need to serve discovery on them. So, on April 29th, we did. They are things like asking about standard pretrial discovery to avoid surprise, asking for do you have any documents relating to the incident, do you have any documents relating to the DEEPWATER HORIZON, do you have any witness statements, I mean, so we're not blindsided by this stuff.

Discovery Working Group Conf. 5/15/11 Tr. 27:9-22 (A. Langan, counsel for BP). *See also*, 4/20/11 Order (denying Louisiana's requests for certain depositions within the First Phase of Discovery, stating that July 31, 2011 is the deadline for the completion of fact discovery required for the expert reports that will be served beginning August 15, 2011). [Rec. Doc. 2067]

Consistent with the Phased approach, this Court provided a compromise which would allow the defendants to prepare their expert reports relating to causation and prevent the unfair surprise which concerned defendants but not require the States to respond to extensive discovery in the context of Phase 1 of the Limitations trial. To that end, your Honor's orders, specifically Section 6 of the Working Group Order [Rec. Doc. 2396] and the Order dated 6/15/11, [Rec. Doc. 2763] contemplate and provide for the adoption of PSC responses in connection with the Phase 1 causation issues.[2] As such, the State's adoption of the responses relating to the causes of the fire, explosion and initial release, including reference to the documents and materials produced by the PSC, in addition to documents and materials previously identified by the State and/or produced in connection with the ongoing discovery in this case, are appropriate. With respect to the issues of causation, the State of Louisiana has not conducted an independent assessment into the cause of the explosion, fire and sinking of the Deepwater Horizon. Rather, for purposes of the Phase 1, any responsive materials the State has with respect to the cause of the event would include information already produced in these proceedings, i.e. various federal commissions' investigations, hearings and reports; the investigations and reports prepared by various defendants regarding the cause of the incident; and information the State has learned in connection with the discovery undertaken in this case. To the extent Louisiana had any additional information to present in connection with the liability issues in the Limitations trial of February 2012 (a trial in which Louisiana's role is currently uncertain), the State would have produced such materials and understands its obligation to supplement to the extent additional information is discovered.

Under these circumstances, the limited likelihood of Louisiana having any potentially admissible, non-duplicative and/or relevant information (given that the State has not conducted an independent investigation) is far outweighed by the expense and effort of running an expansive search for terms like "BP", "DWH", "Deepwater Horizon", "Macondo", and/or "Transocean", as demanded by BP, within the over 25 State agencies (and the Attorney General's office) in a purported effort to find information not already known to BP and the other defendants regarding the issues in Phase 1. BP's overly broad requests will result in the needless and wasteful gathering of discovery responses that are not only irrelevant, but also will result in the production of, at a minimum, duplicative evidence, and that will require the State of Louisiana to incur unjustifiable expense and delay as it pertains to Phase 1 of these proceedings. While the State is mindful that in the context of its direct claims against BP for environmental and economic damages, the State will be the subject of much broader discovery obligations, requiring such an invasive search under the current trial framework is premature.

Louisiana advised BP soon after receipt of BP's discovery requests, that they were extremely overbroad and not limited to Phase 1 issues. This is evident when the requests are viewed with BP's search parameters. BP made no effort to limit this breadth either by limiting

---

[2] Although this Court also directed the defendants to coordinate their discovery related to Phase 1 issues, this was not done. *See*, 5/17/11 Discovery Working Group Order [Rec. Doc. 2396]("g. The defendants shall coordinate their discovery to eliminate duplication of discovery requests.) The defendants nonetheless propounded five separate sets of discovery upon the State which included 157 Requests for Production and 50 Interrogatories as well as 78 Requests for Admission.

the number of Requests, the date ranges (generally a two year time frame) for the searches and/or the generalized search terms. A few of BP's Requests evidence this issue:

> REQUEST FOR PRODUCTION No. 1
> All documents referring or relating to the MC252 Well created on or after January 1, 2008.
>
> REQUEST FOR PRODUCTION No. 4
> All documents referring or relating to the Transocean Deepwater Horizon (the "Deepwater Horizon" or "rig").
>
> REQUEST FOR PRODUCTION No. 24
> All documents referring or relating to the explosions and fire aboard the Deepwater Horizon.
>
> REQUEST FOR PRODUCTION No. 26
> All documents referring or relating to personal injury or death that occurred in connection with the Deepwater Horizon Incident.
>
> REQUEST FOR PRODUCTION No. 38
> All documents exchanged between and communications between you and any employee, staff member or other person working for, with or on behalf of the United States government referring or relating to the Deepwater Horizon Incident.
>
> REQUEST FOR PRODUCTION NO. 56
> All documents exchanged between and communications between you and any other party in MDL No. 2179 referring or relating to the Deepwater Horizon Incident or the MC252 Well created on or after April 20, 2010.

The search parameters proposed by BP further evidence the overly expansive nature of BP's requests. For example as evidenced in Attachment B to BP's Motion to Compel (and attached hereto as Exhibit A): BP has almost categorically suggested a more than two year time frame for searches: with a beginning date of 2/1/2009 (in some instances as far back as January of 2008) and an end date of May 2011:

> RFP No. 1 proposed search terms "MC252" or "Mississippi Canyon Block 252" or "Macondo"
>
> RFP No. 4 proposed search terms: "Transocean Deepwater Horizon" or "TO Deepwater Horizon"
>
> RFP No. 24 proposed search terms: ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("explosion" OR "fire")

4

> RFP No. 26 proposed search terms: ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("injury" OR "death" OR "casualty" OR "casualties")
>
> RFP No. 38 proposed search terms: ".gov" and ("Deepwater Horizon" or Macondo or "MC252" or "BP")
>
> RFP No. 56 proposed search terms:  "Moex" or "Transocean" or "BP" or "Anadarko" or "Cameron" or "Triton" or "Halliburton" or "Weatherford" or "Drillquip" or "GMBH" or "MC252".

Running searches with these terms, most notably RFP No. 56, would, in capture *almost anything* associated with not only the *Deepwater Horizon* incident itself but the massive response, recovery and environmental efforts in which Louisiana has had and continues to have substantial involvement.  For example, as described below and as applicable to RFP No. 26, the terms "injury" and "death" will capture almost every natural resource damage assessment document associated with this disaster (in the environmental context the natural resource damage assessment process studies the "injury" to and in many instances the "death" of natural resources).  Similarly, the proposal for RFP No. 38 would capture everything from any Louisiana government employee which has the ".gov" extension in addition to the federal government employees.

By way of example, Louisiana, which has five designated natural resource trustee agencies, has been working since the release of oil with the other Gulf states (and the various trustees for each) along with the various federal trustees to respond, to assess and begin to restore the natural resources which have been injured as a result of the Deepwater Horizon Disaster.  Louisiana has had over a thousand State employees involved in these response, recovery and environmental efforts since the inception of the spill.  It is more likely than not that almost every document or communication associated with these efforts contain the terms "Deepwater Horizon", 'DWH', "BP", "Macondo", or "Transocean".  Additionally, the activities associated with environmental and economic damage assessments and restoration activities are not currently the subject of any of the three Phases of discovery for the Limitations proceedings[3].  As described in the Anadarko proposal, the topics of response activities and assessment of damages, both environmental and economic are not the subject of the current proceedings and would follow a period of discovery appropriate to those issues:

> 14. The Court also intends to try the following sets of issues as part of further proceedings in this case, *following appropriate periods of further discovery*:
> (a) Compensatory (and if appropriate, punitive) damages relating to the wrongful death and personal injury claims

---

[3] Although the Trial Plan for the Limitations Proceedings which are scheduled to begin in February 2012 has not yet been issued the Court has indicated that:   "The Trial Plan will largely adopt the Trial Plan proposed by Anadarko.  Trial will be segregated into three phases: Phase 1, focusing on events leading up to and including the explosion on April 20, 2010; Phase 2, focusing on source control and oil discharge quantification issues; and Phase 3, remaining liability issues (dispersants, cleanup, etc.)."  Minute Order (8/12/11) [Rec. Doc. 3727]

5

> directly arising from the explosion and fire aboard the Deepwater Horizon rig on or about April 20, 2010;
> (b) The events associated with efforts to control the flow of oil after the explosion and fire, and loss of the rig on April 22, 2010, and before its eventual capping, and response efforts undertaken to address the discharge of oil;
> (c) The amount/volume/flow rate of oil discharged;
> (d) The rate, transport and geographic reach of oil released;
> *(e) Economic damages to claimants in these proceedings that may have been proximately caused by the discharge of oil; and*
> *(f) Any fines, penalties, injunctive relief, and Natural Resource Damages, and OPA damages, sought by any governmental or non-governmental party.*

Memorandum of defendants Anadarko Petroleum Corporation, Anadarko E&P Company LP, and Moex Offshore 2007 Regarding Structure of the February 27, 2012 Trial, (4/13/11) Exhibit 1 (emphasis added). [Rec. Doc. 1955]

A few documents demonstrate the inappropriately wide net that BP seeks to cast. The Notice of Intent to Conduct Restoration Planning issued by the state and federal trustees in September of 2010 includes the following preface. Attached as Exhibit B. Those terms which fall within BP's search parameters are highlighted below:

> DISCHARGE OF OIL FROM THE DEEPWATER HORIZON MOBILE OFFSHORE DRILLING UNIT AND THE SUBSEA MACONDO WELL INTO THE GULF OF MEXICO, APRIL 20, 2010
>
> SUMMARY: On or about April 20, 2010, the mobile offshore drilling unit *Deepwater Horizon* experienced a significant explosion, fire and subsequent sinking in the Gulf of Mexico, resulting in discharges of oil and other substances from the rig and from the wellhead on the seabed into the Gulf of Mexico (referred to as the "*Deepwater Horizon* Incident or Incidents"). These discharges are estimated to have been in excess of thousands of barrels of oil per day and continue, along with associated removal activities, to adversely affect and threaten natural resources within the jurisdictions of the United States and the States of Louisiana, Mississippi, Alabama, Florida, and Texas.
>
> Pursuant to section 1006 of the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701, *et seq.,* federal and state trustees for natural resources are authorized to (1) assess natural resource injuries.

This document was drafted over several months and was the subject of extensive correspondence among the employees within the natural resource trustee agencies and their counsel.

Additionally, the Memorandum of Understanding Between BP Exploration & Production, Inc., and the Louisiana Department of Wildlife and Fisheries and the Office of the Lieutenant Governor of the State of Louisiana ("Seafood Safety and Tourism MOU")(attached as Exhibit C), dated November 18, 2010, which was the subject of BP and the State of Louisiana's Joint Motion to Stay Certain Claims (filed 4/21/11) [Rec. Doc. 2196], granted by Order dated 5/27/11, does not address Phase 1 issues, and yet easily falls within the proposed search terms. [Rec. doc. 2549]   The Seafood Safety & Tourism MOU was negotiated over a number of months and is the subject of extensive correspondence among the Louisiana trustee agencies as well as their counsel, includes the following language, typical of the introduction to many documents prepared by or submitted to the State regarding this incident:

> WHEREAS, on or about April 20, 2010, the mobile offshore drilling unit *Deepwater Horizon* experienced an explosion, fire and subsequent sinking in the Gulf of Mexico resulting in a release of oil into the Gulf of Mexico and response actions ("the Oil Spill");
> 11/18/2010 Memorandum of Understanding Between BP Exploration & Production, Inc., and the Louisiana Department of Wildlife and Fisheries and the Office of the Lieutenant Governor of the State of Louisiana, p. 1.

The documents leading up to the finalization of the Seafood Safety & Tourism MOU and each draft (other than those exchanged with BP) would be privileged.  Another example is the correspondence and proposed Sea Turtle Emergency Restoration Plan which was prepared over a several month time frame by the state and federal natural resource trustees.  By correspondence dated January 28, 2011, from the US Department of the Interior (on behalf of all of the natural resource trustees) a proposal regarding Emergency Sea Turtle Restoration Activities for the Deepwater Horizon Oil Spill was transmitted to BP.   The correspondence and attachments (which are part of the Deepwater Horizon Administrative Record) include the following text:

> Because of the criteria established in the regulations, emergency restoration alternatives are developed based on known injury to natural resources. . .
>
> A variety of oil spill response efforts have been implemented on the beaches of Alabama and the Florida Panhandle in response to the BP *Deepwater Horizon* Oil Spill. . ..
>
> Tire ruts from heavy equipment crisscross the beach in some areas and cause impacts to the established and developing dune vegetation, misorient hatchling turtles crawling from the nest to the Gulf, and bird chicks seeking refuge or protection from the wind.

> The program will include education of pet owners and cat colony supporters and target free-roaming cats and fire ant eradication on a case-by-case basis.

1/28/11 Corsp. fr. C. Dohner (DOI) on behalf of the natural resource trustees to R. Bullock (BP Natural Resource Damage Assessment Director), pp. 2, 5 of Sea Turtle Emergency Restoration Plan. Attached as Exhibit D.

The "BP" search term alone produces thousands of hits relating to just these three documents, none of which contribute to the issues which are being tried in the first phase of the limitations proceedings. These examples are representative of thousands of similar documents which would in turn implicate tens of thousands of drafts, copies and correspondence regarding both. In addition to requiring Louisiana to produce an extensive amount of information which bears no relation to the February 2012 trial on defendants' liability and allocation of fault, the amount of privileged information likely to result would also needlessly obligate the State to prepare an extensive privilege log for information which is not the subject of the Limitations proceedings. Absent reasonable limitations in both scope and time frame, for example a date cutoff of April 23, 2010, as Louisiana previously suggested to BP and the subject of Louisiana's searches to date, these requests are unreasonable and unduly burdensome.[4] While BP dismisses the fact that some of its search terms may "cast too wide a net," it suggests to this Court that the State should still be required to gather this information despite the overly expansive nature of the requests under the theory that the State will ultimately have to produce such materials at some point.[5] However, this approach vitiates any limitation on Louisiana's discovery obligations as provided for in the context of this phased limitations proceedings.

BP also complains to this Court regarding Louisiana's statement in the context of its written discovery responses that it was not responding "on behalf of parishes, parish district attorneys, port authorities or cities." BP's Motion to Compel, p. 2.[6] While such entities were included in BP's list of those for which it sought the State to perform searches, these entities have their own counsel and are not represented by the Attorney General absent a specific request for representation.[7] To date, these entities have proceeded, and are represented in these

---

[4] *See*, 8/19/11, Corsp. fr. E. Petersen (Counsel for LA) to A. Bloomer (Counsel for BP). Attached as Exhibit E. *See also*, the State of Louisiana's counter to BP's agency and search parameters as identified in Exhibit D to BP's Motion to Compel.

[5] The State is preparing for the production of materials that will be required in the context of Phase 2 as well as for the State's economic and environmental case. Present estimates indicate that this effort (which BP's Requests would require the State to conduct and complete at this time) will cost the State millions of dollars. By objecting to BP's Requests as to Phase 1, Louisiana does not seek to avoid its discovery obligations; rather, the State seeks clarification that its obligations, at this time, extend only to Phase 1 issues as outlined by this Court.

[6] At a later point in BP's Motion to Compel, BP oddly states that it is "willing to exclude these entities from the State's search." p.5, n3. However, BP's "willingness" is irrelevant under these circumstances given that the State does not represent and does not have custody or control over these entities or their documents.

[7] *See*, La Cons. Art. VI § 5 (providing for Home Rule Charter; all parishes identified by BP except Cameron have adopted a Home Rule Charter); La. R.S. 16:2 (appointing DA as parish council except home rule charters have authority to hire any counsel to represent them); La. R.S. 42:261 (Parish and districts' authority to hire counsel, generally); La. R.S. 42:261(authority of ports and levee districts to hire counsel and independent enabling legislation creating entities as political subdivisions (*e.g.* La. R.S. 34:4 – Port of New Orleans; La. R.S. 34:2471 – South Louisiana; La. R.S. 38:330.1 – SLFPA-E)).

proceedings, with their in house and in some occasions outside counsel.[8]  The undersigned advised BP of this fact soon after receipt of BP's discovery requests.  However, BP continues to argue that the State is required to search entities that are simply not within the State's custody or control.

In addition, in the context of an earlier discussions with BP, the State of Louisiana advised that a search of the Attorney General's office was not appropriate given its role as the law firm for the State of Louisiana and its agencies.  *See* LA. CONST. ARTICLE IV, SECTION 8 (providing that the Attorney General is the chief legal officer of the state). To the extent the Attorney General's office has information which would fall within BP's requests (under the broad search terms proposed by BP) it would either be the subject of privilege, would be duplicative of materials already produced in discovery and/or the government investigations or would also be in the files of the agencies the Attorney General's office represents.

Although BP asserts that the State of Alabama's agreements to certain search parameters, (including a voluntary search of the Alabama Attorney General's office) somehow render the Requests reasonable, these were not agreements made by or on Louisiana's behalf.  Absent justification for such expansive searches, including a search of the Louisiana Attorney General's office, the State believes that the requests made by BP are inappropriate, especially in the context of the Phase 1 discovery efforts.  BP has not identified any rationale for the requested search of the Attorney General's office files.  Accordingly, the State of Louisiana respectfully submits that it has complied with the Court's Orders and has appropriately limited its production to the issues associated with the Phase 1 Limitations proceedings at this time. BP's Motion to Compel should be denied.  Your consideration is greatly appreciated.

Sincerely,

KANNER & WHITELEY, L.L.C.

By: ____/*Elizabeth Petersen*/_____
　　　Elizabeth B. Petersen

Exhibits:
- A. Search Term Parameters Proposed by BP to the State of Louisiana for 70 Requests for Production.
- B. Natural Resource Trustees' Notice of Intent to Conduct Restoration Planning (Issued September 2010)
- C. <u>Memorandum of Understanding Between BP Exploration & Production, Inc., and the Louisiana Department of Wildlife and Fisheries and the Office of the Lieutenant Governor of the State of Louisiana ("Seafood Safety and Tourism MOU")</u> (11/18/2010).

---

[8] Indeed, many of these entities, through their own counsel, filed responses to these discovery requests wherein they adopted the PSC responses.

D.  1/28/11 Corsp. fr. C. Dohner (DOI) on behalf of the natural resource trustees to R. Bullock (BP Natural Resource Damage Assessment Director), with accompanying Sea Turtle Emergency Restoration Plan.
E.  8/19/11, Corsp. fr. E. Petersen (Counsel for LA) to A. Bloomer (Counsel for BP).