## MEMORANDUM OF UNDERSTANDING BETWEEN BP EXPLORATION & PRODUCTION INC., THE LOUISIANA DEPARTMENT OF WILDLIFE AND FISHERIES AND THE OFFICE OF THE LIEUTENANT GOVERNOR OF THE STATE OF LOUISIANA

WHEREAS, on or about April 20, 2010, the mobile offshore drilling unit Deepwater Horizon experienced an explosion, fire and subsequent sinking in the Gulf of Mexico resulting in a release of oil into the Gulf of Mexico and response actions ("the Oil Spill");

WHEREAS, the Louisiana Department of Wildlife and Fisheries ("LDWF") is charged with management of a portion of the state's renewable natural resources including wildlife and aquatic life;

WHEREAS, the Lieutenant Governor of the State of Louisiana ("the Office of the Lieutenant Governor"), as Commissioner of the Louisiana Department of Culture, Recreation and Tourism, is charged with preserving, showcasing and marketing Louisiana's rich cultural heritage to those within and outside of Louisiana;

WHEREAS, BP Exploration & Production Inc. ("BP"), the LDWF and The Office of the Lieutenant Governor (collectively, "the Parties") recognize the importance of the seafood and tourism industries to Louisiana (the "State");

WHEREAS, on May 24, 2010, the U.S. Commerce Secretary declared a Fisheries Failure pursuant to section 312a of the Magnuson-Stevens Act, and the Louisiana Wildlife and Fisheries Department also closed fisheries in State waters due to the Oil Spill;

WHEREAS, a portion of the commercial fisheries in the continental United States are harvested in waters offshore of Louisiana;

WHEREAS, Louisiana's unique coastal wetlands and estuary provide significant habitat for marine species in the Gulf of Mexico;

WHEREAS, the Parties recognize the importance to the seafood industry of assuring the general public that Louisiana and Gulf seafood is safe;

WHEREAS, the Parties support the testing of Louisiana and Gulf seafood and the communication of those results to provide appropriate assurance to the public;

WHEREAS, as of the date of this Memorandum of Understanding ("MOU"), the vast majority of Louisiana's fisheries are open to commercial and recreational harvesting;

1

WHEREAS, the Parties believe that continued testing of seafood and communication of those test results are appropriate measures to take to provide the public with appropriate assurance that Gulf seafood is safe to eat, which could help address impacts to Louisiana's seafood industry, and which are an appropriate response to the Oil Spill;

WHEREAS, the Parties believe that expenditures on marketing of Louisiana Seafood could also help address impacts to Louisiana's seafood industry and are an appropriate response to the Oil Spill; and

WHEREAS, the Parties also believe that expenditures to increase and benefit tourism could help address impacts to Louisiana's tourism industry as a result of the Oil Spill and are an appropriate response to the Oil Spill.

NOW, THEREFORE, in light of the above recitals, the Parties agree as follows:

1.  LDWF will develop and implement a seafood safety testing program ("Testing Program") that includes the parameters outlined in Section 1, herein:

    1. A. Scope:  The Seafood Testing Program is intended to address seafood markets and supporting market industries that may have been negatively affected by the Oil Spill.

       1.A.(i) Seafood Groups - The Testing Program will include finfish and shellfish seafood groups.

       1.A.(ii) Sample Locations - Samples may be collected from State waters, seafood processors, dockside locations, or other appropriate locations.

       1.A.(iii) Sample Sizes - Sample sizes and frequency of sample collections from State waters, seafood processors, dockside or other appropriate locations will be at a level reasonably determined by LDWF, to test the safety of seafood.

       1.A.(iv) Components of Concern - The Testing Program will include tests for oil and its component parts (including polycyclic aromatic hydrocarbons ("PAH'")); dispersants; and, for a portion of samples, heavy metals (nickel and vanadium).  To the extent the State believes other tests should be conducted, the parties agree to confer in good faith regarding testing for additional substances and/or testing to address perceptions in the marketplace that impact the

2

Louisiana seafood industry.

1.A.(v). LDWF may, at its discretion, contract with outside consultants to assist in the developing and/or implementing the Testing Program. LDWF will consult with BP on the appropriate expertise and qualifications for any proposed consultant or the appropriate qualifications and expertise terms that should be contained in an RFP if an RFP is required under state contracting laws. The RFP or any contract shall ensure that the consultant will follow established protocols for accurate sampling and testing.

1. B. Data Collection and Sharing

1.B.(i) Data Collection Protocols - The Parties agree that all data collection will comply with generally accepted protocols applicable to the collection of data, including maintaining proper chain of custody.

1.B.(ii) Production of Data - LDWF agrees to provide BP with all data generated under the Testing Program, including sampling protocols, sampling locations, sample numbers and types, testing protocols, test results, raw data packages, and chain of custody documents. As this data becomes available, LDWF shall provide this data to BP on a monthly basis, in an electronic format. The Parties agree that BP will not be required to submit a public records request to obtain this data.

1.C. Testing Methods

1.C.(i) Polycyclic Aromatic Hydrocarbons - The Testing Program will include the Federal Food and Drug Administration ("FDA") approved LC-Florescence method for polycyclic aromatic hydrocarbons, with confirmation testing by gas chromatography/mass spectrometer ("GCMS") consistent with FDA protocols.

1.C.(ii) Dispersants - When the method is available, the testing program will include FDA-approved methods to test for dispersants in seafood.

1.C.(iii) Heavy Metals - A portion of the samples will be tested for heavy metals (nickel and vanadium) using method(s) identified by FDA as appropriate for response to the Oil Spill.

1.C.(iv)In the event that LDWF believes that testing for other components or characteristics is necessary, the parties agree to confer in good faith regarding the use of additional testing methods necessary to carry out the purpose of this MOU.

3

1. D. Reporting of Results

1.D.(i) Reporting of Results – Actual results will be communicated with an indicator of "Pass" or "Fail". Actual results will be reported as below limit of detection (<LOD), trace (TR), or as a numeric value. An indicator of "Pass" will be used for all results that fall under levels of concern for seafood consumption safety in humans established by the FDA. The indicator of "Fail" will be used for all results that fall above levels of concern for seafood consumption safety for humans established by the FDA.

1.D.(ii) Levels of Concern – To the extent reasonably available, LDWF will publicize information regarding levels of concern for polycyclic aromatic hydrocarbons, dispersants, and heavy metals to aid in interpretation of reported results.

1. E. Length of Testing Program

1.E.(i) Length of Testing Program - The Testing Program will run for three (3) years from the date of execution of this MOU. The Testing Program may be extended in accordance with Paragraph 9.

1.E.(ii) Funding - BP agrees to provide $18,000,000 to the LDWF to fund the Testing Program. Before the Testing Program expires, the Parties agree to work together in good faith to determine whether additional seafood testing consistent with the purposes of this MOU is necessary and whether additional funding is required; provided, however, that nothing in this MOU shall obligate BP to extend the testing program beyond the length of the term of this MOU or provide any funding in excess of the $18,000,000 obligated herein for the Testing Program, except as provided in Paragraph 9. Except as outlined in paragraph 5 of this MOU, this MOU does not prevent the State or any other entity from seeking full relief or compensation, as provided by state, federal or international law, for injuries or damages through administrative or judicial processes, including, without limitation, applicable Natural Resource Damages Assessment procedures. Moreover, this testing is not intended to prevent, limit, or displace additional testing being conducted by the State of Louisiana or any other state, federal, or tribal entity. The parties agree to maximize efficiencies in connection with such testing.

1.F. Final Scope, Budget, and Total Cost

1.F.(i) Final Scope of Testing Program - LDWF will develop more detailed scopes of work for each of the sections 1.A. through 1.E.

that will be attached to this MOU as appendices.

1.F.(ii) Final Budget - LDWF will prepare a preliminary budget and circulate that preliminary budget to BP for review and comment. BP shall provide any comments on the preliminary budget within ten (10) days of receipt of the preliminary budget, and LDWF shall consider those comments in good faith in preparing a final budget. The final budget for the Testing Program will be included as a separate appendix to this MOU. LDWF may alter the budget; however, no alterations shall result in BP's funding the Testing Program in excess $18,000,000, except as provided in Paragraph 1.E.(ii) above and Paragraph 8 below.

1.F.(iii) First Twelve Months of Spending - The Testing Program budget for the first twelve months shall include the funding of all capital outlays for facility improvement, initial staffing, and training. The remaining funds shall be used for in-State sample collection, testing, monitoring and staffing and training, as needed.

1.F.(iv) Total Cost - Total cost for the Testing Program is not to exceed $18,000,000, except as provided in Paragraph 1.E.(ii), above and Paragraph 8, below.

2. LDWF and BP agree that the Louisiana Wildlife and Fisheries Foundation (the "Foundation") and the Louisiana Seafood Promotion and Marketing Board (the "Board") will develop and implement a seafood marketing program ("Seafood Marketing Program") that includes the parameters outlined in Section 2 herein and which shall be subject to review and approval by LDWF. The Foundation and the Board shall agree to develop, implement and administer the Seafood Marketing Program by executing Addendum I to this MOU. In consultation with LDWF and subject to Section 15, the Foundation and the Board may contract with outside consultants to assist in the developing and/or implementing the Marketing Program. LDWF and the Seafood Promotion and Marketing Board will consult with BP on appropriate expertise and qualifications for a proposed consultant or the appropriate qualifications and expertise terms that should be contained in an RFP if an RFP is required under state contracting laws. The RFP or any contract shall ensure that the consultant is familiar with and will follow industry standards.

2.A. Scope - The Seafood Marketing Program, in conjunction with the Seafood Testing Program, is intended to address seafood markets and supporting market industries that may have been negatively affected by the Oil Spill. The Seafood Marketing Program will be developed and implemented in a manner that raises consumer awareness of the Testing Program and its results. The Seafood Marketing Program will use the terms "Louisiana Gulf" and/or "Louisiana Gulf Safe."

2.B. Seafood Marketing Program Reports

2.B.(i) LDWF will provide BP with quarterly updates of the Seafood Marketing Program activities conducted pursuant to this MOU.

2.B.(ii).  To the extent available, LDWF or the Foundation will provide BP with retail, wholesale, industry, and trade association data about the seafood market, including sales volume and pricing, that does not contain confidential and proprietary business information.

2.C. Length of Seafood Marketing Program

2.C.(i) Length of Seafood Marketing Program - The Seafood Marketing Program will run for three (3) years from the date of execution of this MOU. The Seafood Marketing Program may be extended in accordance with Paragraph 9.

2.C.(ii) Funding - BP agrees to provide $30,000,000 to the Foundation to fund the Seafood Marketing Program, which shall be directed to the Board to develop, implement, and administer the Seafood Marketing Program. Before the Seafood Marketing Program expires, the Parties agree to work together in good faith to determine whether market data indicates seafood markets have returned to levels that would have been present but for the Oil Spill, whether additional marketing of Louisiana seafood is warranted, and whether additional funding is required; provided, however, that nothing in this MOU shall obligate BP to extend the Seafood Marketing Program beyond the length of the term of this MOU or provide in excess of $30,000,000 for the Seafood Marketing Program, except as provided in Paragraph 9. Except as outlined in paragraph 5, this MOU does not prevent the State or any other entity from seeking full relief or compensation, as provided by state, federal or international law, for injuries or damages through administrative or judicial processes, including, without limitation, applicable Natural Resource Damages Assessment procedures. Moreover, this testing is not intended to prevent, limit, or displace testing conducted for another purpose by the State of Louisiana or by any other state, federal, or tribal entity.

2.D. Final Scope, Budget and Total Cost

2.D.(i) Final Scope of Seafood Marketing Program - The Foundation and/or the Board will develop more detailed scopes of work for each of the sections 2.A. through 2.C, which shall be attached to this MOU as appendices.

2.D.(ii) Final Budget – In coordination with the Foundation and subject to the approval of LDWF and the Office of

6

Lieutenant Governor, the Board will prepare a preliminary budget and circulate it to BP for review and comment. BP shall provide any comments on the preliminary budget within ten (10) days of receipt, and the Board shall consider those comments in good faith in preparing a final budget. The final budget for the Seafood Marketing Program will be included as a separate appendix to this MOU. The Board may alter the budget to reflect the expenses that are reasonably within the overall scope of approved work; however, no alterations shall result in BP's funding the Seafood Marketing Program in excess $30,000,000 except as provided in Paragraph 2.C.(ii) above and Paragraph 9 below.

2.D.(iii) Total Cost - Total cost for the Seafood Marketing Program shall not exceed $30,000,000, except as provided in Paragraph 2.C.(ii), above and Paragraph 9 below.

3.  The Office of the Lieutenant Governor will develop and implement a tourism program ("Tourism Program") that includes the parameters outlined in Section 3, herein:

3.A Scope - The Tourism Program is intended to address tourism impacted as a result of the Oil Spill.

3.B. Tourism Program Reports

3.B (i).   The Office of the Lieutenant Governor agrees to provide BP with quarterly updates of Tourism Program activities conducted pursuant to this MOU.

3.B (ii)    To the extent available, the Office of the Lieutenant Governor agrees to provide BP with State, industry, and trade association data about the Louisiana tourism market that does not contain confidential and proprietary business information.

3.C. Length of Tourism Program

3.C.(i) Length of Tourism Program - The Tourism Program will run for three (3) years from the date of execution of this MOU. The Tourism Program may be extended in accordance with Paragraph 9.

3.C.(ii) Funding - BP agrees to provide $30,000,000 to develop, implement and administer the Tourism Program. Under the direction of the Office of the Lieutenant Governor, the Community Foundation of Acadiana (CFA) shall hold these funds, which shall be distributed under the direction of the Office of Lieutenant Governor, consistent with the allocations in Exhibit A, B, and C, to develop, implement and administer the Tourism Program. Before the Tourism Program expires, the Parties agree to work together in good faith to

7

determine whether Louisiana tourism has returned to levels
that would have existed but for the Oil Spill, whether additional
expenditures are necessary to achieve those levels through
further efforts to promote Louisiana tourism, and whether
additional funding is required; provided, however, that nothing
in this MOU shall obligate BP to extend the Tourism Program
beyond the length of the term of this MOU or provide more
than the $30,000,000 obligated herein for the Tourism
Program, except as provided in Paragraph 9. Except as
outlined in Paragraph 5, this MOU does not prevent the State
or any other entity from seeking full relief or compensation, as
provided by state, federal or international law, for injuries or
damages through administrative or judicial processes,
including, without limitation, applicable Natural Resource
Damages Assessment procedures.  Moreover, this program is
not intended to prevent, limit, or displace any program or
activity conducted by the State of Louisiana or by any other
state, federal, or tribal entity.

3.D. Final Scope, Plans, and Total Cost

3.D.(i) Final Scope of Tourism Program - Tourism funds shall
be used in a manner that is consistent with the allocations
identified on Exhibit A (by parish), Exhibit B (detailed cost
allocation), and Exhibit C (allocation map) hereto. The Office
of the Lieutenant Governor of the State of Louisiana will
develop more detailed scopes of work for each of the
sections 3.A. through 3.C. and attach those scopes of work to
this MOU as appendices.

3.D.(ii) Final Plans - The Office of the Lieutenant Governor of
the State of Louisiana will prepare preliminary plans and
circulate the plans to BP for review and comment. BP shall
provide any comments within ten (10) days of receipt of the
preliminary plans  and the Office of the Lieutenant Governor
shall consider those comments in good faith in preparing the
final plan.  The final plan for the Tourism Program will be
included as a separate appendix to this MOU. The Office of
the Lieutenant Governor may subsequently alter the plan;
however, no alterations shall result in BP's funding the
Tourism Program in excess of the $30,000,000, obligated
herein, except as provided in Paragraph 3.C.(ii) above and
Paragraph 9 below.

3.D.(iii) Total Cost - Total cost for the Tourism Program shall
not exceed $30,000,000, except as provided in Paragraph
3.C.(ii), above and Paragraph 9, below.

3.E. Delegation - The Office of the Lieutenant Governor shall have
the right to delegate responsibilities set forth in this Section 3
to develop, implement, and administer the Tourism Program

8

to a foundation or other appropriate entity selected by the Office of the Lieutenant Governor and reasonably approved by BP (the "Tourism Program Administrator"). In the event of delegation, the Tourism Program Administrator shall agree to develop, implement, and administer the Tourism Program by executing Addendum II to this MOU.

4. General Terms

4.A Funding Schedule - The funding for the Testing Program, the Seafood Marketing Program, and the Tourism Program as contemplated by Sections 1 through 3 of this MOU shall be made in accordance with a funding schedule to be agreed upon between BP and each entity or Program Administrator charged with developing, implementing, and administering the Program as provided above. In addition, if LDWF, the Office of the Lieutenant Governor, or any Program Administrator fails to provide the data it is required to provide relative to any Program under Paragraphs 1.B.(ii), 2.B. and 3.B. of this MOU or otherwise materially breaches any of the provisions governing such Program as set forth herein or in any appendix hereto, BP shall provide notice and a reasonable opportunity to cure, and BP may delay the payment or application of funding for such Program until the required data has been provided or the breach has been cured.

4.B Each Program Administrator shall keep reasonably detailed records of how the funding provided for such Program has been used and disbursed. At the end of every 90-day period following execution of this Memorandum, each Program Administrator shall send BP a report of expenditures. The report shall be provided within thirty (30) days after the end of each 90-day period. In addition, the Program Administrators shall provide to BP, upon request, supporting documentation for the development, implementation, and administration of each Program and shall have the ability to make reasonable inquiries to the Program Administrator from time to time to monitor the use and disbursement of funding provided hereunder. The Parties further agree that the payment and disbursement of the funding provided hereunder will comply with all applicable laws and regulations and any Program Administrator shall likewise comply.

4.C Payment and Dispute Resolution -

4.C (i) BP reserves the right to dispute and withhold payment of all or part of an invoice submitted under this MOU that contains inaccuracies or that is otherwise inconsistent with the scope of programs authorized by this MOU.

4.C. (ii) Except as discussed in subsection 4.C (i), above, BP shall pay all amounts invoiced within thirty (30) days of receipt thereof. If BP disputes any portion of an invoice or amount for reasons other than those listed in paragraph 4.C(i), then, BP shall pay the invoice in full when due, but shall also notify the Program Administrator of its contest in reasonable detail and describe the issues and amounts

disputed within thirty (30) days of receipt of the disputed invoice.

4.C (iii) BP shall keep an accounting of all funds or portions of invoices it disputes under paragraph 4.C (ii), and BP may withhold any disputed amounts from the final payment of any total amounts agreed to hereunder, if not resolved prior to the end of this three-year commitment. The Parties shall attempt to resolve the dispute through good faith, informal negotiations. In the event that the dispute is not resolved informally, the State, LDWF and/or the Office of the Lieutenant Governor reserve their right to seek reimbursement from BP for any disputed sum that was not paid through any means available, including judicial enforcement of the terms of this MOU. If the State, LDWF and/or the Office of the Lieutenant Governor is successful in obtaining payment of a withheld amount, BP shall pay, in addition to the amount of the disputed invoice, all reasonable costs and attorneys fees incurred by the State, LDWF, the Office of the Lieutenant Governor, and/or the Louisiana Attorney General to resolve the dispute.

4.D. Use of Data/Reservation – The State of Louisiana, through any of its officers or agencies, and BP will have authority to use any data generated under the MOU for any and all purposes consistent with applicable law and regulations. Each Party reserves its right to produce its own independent interpretation and analysis of any data collected pursuant to this MOU. Nothing in this MOU in any way modifies or limits the State, LDWF, or the Office of the Lieutenant Governor's discretion to make management decisions in accordance with applicable statutory and regulatory authorities, including Louisiana's public records law.

4.E. Reservation of Rights - The State, including but not limited to LDWF and the Office of the Lieutenant Governor, reserves all claims it may have against BP arising out of the Oil Spill, including, without limitation, any causes of action or requests for relief, administrative or judicial, under State or federal laws, or any other claims procedures related to the Oil Spill.

4.F. No Third Party Beneficiaries - Nothing in this Agreement is intended or shall be interpreted to benefit or harm any third party not a signatory hereto.

5. Reservation of rights and stay of claims - The State, reserves its right to file suit or to submit a claim against BP within the period of time prescribed by law for claims arising from the Deepwater Horizon Oil Spill, which may include claims for losses associated with tourism or seafood market related revenue. If the State files such a suit or claim, the Parties shall engage in good faith negotiations to attempt to resolve any such claim or suit and shall take all appropriate procedural steps necessary to stay the portion of the suit or claim that involves matters

10

encompassed by this MOU for the duration of this MOU.  If any relevant portion of the claim or suit is not stayed as outlined above, then this agreement shall be subject to termination according to the provisions in Section 10 of this MOU.

6.   The Parties agree and acknowledge that the Testing Program, Seafood Marketing Program, and Tourism Program may mitigate the impacts and help to restore and increase human uses of Louisiana's natural resources, including the use of fish, invertebrates, shellfish, and related recreational and tourist amenities.  BP reserves its rights to seek an appropriate credit or set-off for any restoration actually achieved by the Testing Program, the Seafood Marketing Program and/or the Tourism Program, in response to any claim for natural resource damages asserted against it in connection with the Oil Spill.  Any credit or set-off against a claim by Natural Resources Trustees for the State of Louisiana shall be limited to restoration and/or human use increases actually achieved in Louisiana, or for the benefit of the State of Louisiana or the people of Louisiana.  The Parties agree that the fact that BP is funding the Testing Program, Seafood Marketing Program and Tourism Program as part of this MOU shall not disqualify BP from receiving NRD credit for the Testing Program, the Seafood Marketing Program or the Tourism Program in future negotiations or proceedings.

7.   Nothing in this MOU shall be construed as an admission or concession of any issue of fact or law.

8.   The funding obligations in this MOU are separate from, and in addition to, any prior funding obligations by BP to the State of Louisiana related to the Spill. Except as otherwise provided in this MOU or as may be subsequently negotiated by the parties, BP has no contractual obligation to reimburse LDWF and the Office of the Lieutenant Governor or the State of Louisiana for seafood safety testing, seafood marketing, and tourism efforts incurred during the three (3) year term of this MOU, or any extension thereof.

9.   Extension – The Parties recognize the possibility that additional impacts of oil or dispersants from the Oil Spill may become apparent during or after the completion of the three-year (3) term of this MOU.  In the event of a new fishery closure after the Effective Date of this MOU of either Louisiana waters or Federal waters contiguous with Louisiana waters resulting from the Oil Spill, the Parties agree to expand the funding for this MOU to reflect the additional testing and marketing required to address the presence of the newly discovered oil resulting from Oil Spill. In the event of such closure, the Parties agree to extend the terms and the funding of this MOU for three (3) additional years from the last date of reopening of either Louisiana waters or Federal waters contiguous with Louisiana waters resulting from the Oil Spill.  The costs shall again be based on reimbursement for such

testing, seafood marketing, and tourism promotion.

10. Termination based upon inability to obtain stay: If, pursuant to Paragraph 5 of this MOU, a stay of proceedings is not granted of the relevant portion of the claim or suit, either party may elect to terminate the provisions in this MOU, as set forth below.

   i. On the day when the stay is denied, BP's obligation to fund any Program that is affected by the litigation shall cease, and either party may elect to terminate the MOU for that Program, as set forth below.

   ii. Within ten (10) days after the MOU for any Program terminates, the LDWF and Lieutenant Governor shall return any and all unencumbered funds for that Program to BP.

   iii. Within thirty (30) days after the MOU for any Program terminates, the LDWF and Lieutenant Governor shall provide BP with any and all data that BP is entitled to receive for that Program relating to Program Funds encumbered or spent and work performed by the termination date.

11. Severability - The provisions of any terminated Program shall be severed from this MOU, and the remainder of the MOU shall remain in full force and effect. If all three Programs are terminated under this MOU, then the entire MOU shall terminate, and only the provisions in paragraph 6 of this MOU shall survive the termination and remain in full force and effect.

12. Multiple signature pages - For the convenience of the Parties, this MOU may be signed in one or more counterparts. The combination of all the signed counterparts together shall have the status of an executed original.

13. Effective Date - This MOU shall become effective as of the date of its signing, and shall remain in effect for three (3) years unless extended or terminated as provided herein.

14. Modification -- This MOU may be revised or modified only upon written agreement of the Parties. The Party recommending the revision or modification shall provide the other Party with 30 days written notice of the proposed change.

15. When executing the provisions of this memorandum or taking actions in furtherance thereof, the parties agree to abide by applicable provisions of the Louisiana Procurement Code or other applicable State or local statutes, rules, regulations, or ordinances governing the procurement of professional, personal and consulting services. Also, the parties agree the Louisiana Code of Ethics applies to each public servant, officer, or

contractor executing the provisions of this memorandum or
taking actions in furtherance thereof. Finally, each person
executing the provisions of this memorandum or taking actions
in furtherance thereof shall comply with any applicable State or
local statutes, rules, regulations, or ordinances governing travel
of state employees. Reimbursements for travel expenses will be
in accordance with Louisiana State Travel Rules and
Regulations PPM 49.

Any notice contemplated or required by this MOU shall be sent in writing to:

For LDWF, as to Seafood Testing Program: Robert Barham,
Secretary of the LDWF

For LDWF, as to the Seafood Marketing Program: Robert Barham, Secretary of
the LDWF or his successor.

For the Seafood Promotion and Marketing Board, as to the Seafood Marketing
Program: Harlon Pearce, Chairman of the Seafood Promotion and Marketing
Board or his successor.

For the Office of the Lieutenant Governor of the State of Louisiana, as to the
Tourism Program and the Seafood Marketing Program: Scott Angelle, Lieutenant
Governor of the State of Louisiana or his successor.

For BP, as to the Testing Program: Jeff Morgheim, Director of Planning and
Economics, Gulf Coast Restoration Organization, BP Exploration & Production,
Inc., 501 Westlake Park Boulevard, Houston, TX 77079.

For BP, as to the Marketing Program: Jeff Morgheim, Director of Planning and
Economics, Gulf Coast Restoration Organization, BP Exploration & Production,
Inc., 501 Westlake Park Boulevard, Houston, TX 77079.

For BP, as to the Tourism Program: Jeff Morgheim, Director of Planning and
Economics, Gulf Coast Restoration Organization, BP Exploration & Production,
Inc., 501 Westlake Park Boulevard, Houston, TX 77079.

Agreed to this 18th day of November 2010.

_____
The Honorable Scott Angelle
Lieutenant Governor
State of Louisiana

Witness: _____

Witness: _____

_____
Robert J. Barham
Secretary
Louisiana Department of Wildlife and Fisheries

Witness: _____

Witness: _____

_____
Harlon H. Pearce, Jr.
Chairman
Louisiana Seafood Promotion and Marketing Board

Witness: _____

Witness: _____

14

For BP Exploration & Production, Inc.:

_____
David I Rainey
Vice President Science, Technology, Environment and Regulatory Affairs
Gulf Coast Restoration Organization
BP Exploration & Production, Inc.

Witness: _____

Witness: _____

15

ADDENDUM I

The undersigned hereby agree to develop, implement and administer the Seafood Marketing Program in accordance with the terms of the foregoing Memorandum of Understanding and to comply with all provisions of such Memorandum.

IN WITNESS WHEREOF, the undersigned have signed this Addendum I as of _____, ___, 2010.

The Louisiana Wildlife and Fishery Foundation

By:_____
Name:_____
Title:_____

The Louisiana Seafood Promotion and Marketing Board

By:_____
Name:_____
Title:_____

ADDENDUM II

The undersigned hereby agrees to develop, implement and administer the Tourism Program in accordance with the terms of the foregoing Memorandum of Understanding and to comply with all provisions of such Memorandum.

IN WITNESS WHEREOF, the undersigned have signed this Addendum II as of _____, ___, 2010.

[Name of Delegee]

By:_____
Name:_____
Title:_____

17

# BP Tourism Investment Allocation Plan (Exhibit A)

| | Parish | Amount | Tier |
|---|---|---|---|
| 1 | Acadia Parish | $68,828.96 | 2 |
| 2 | Allen Parish | $19,151.70 | 3 |
| 3 | Ascension Parish | $113,711.62 | 2 |
| 4 | Assumption Parish | $26,392.59 | 2 |
| 5 | Avoyelles Parish | $31,641.13 | 3 |
| 6 | Beauregard Parish | $26,093.86 | 3 |
| 7 | Bienville Parish | $6,223.81 | 4 |
| 8 | Bossier Parish | $45,385.32 | 4 |
| 9 | Caddo Parish | $105,466.55 | 4 |
| 10 | Calcasieu Parish | $211,811.08 | 2 |
| 11 | Caldwell Parish | $4,303.27 | 4 |
| 12 | Cameron Parish | $500,000.00 | 1C |
| 13 | Catahoula Parish | $4,363.80 | 4 |
| 14 | Claiborne Parish | $6,798.30 | 4 |
| 15 | Concordia Parish | $7,956.89 | 4 |
| 16 | De Soto Parish | $10,967.55 | 4 |
| 17 | East Baton Rouge | $493,983.65 | 2 |
| 18 | East Carroll Parish | $3,466.16 | 4 |
| 19 | East Feliciana Parish | $15,631.85 | 3 |
| 20 | Evangeline Parish | $26,940.99 | 3 |
| 21 | Franklin Parish | $8,375.23 | 4 |
| 22 | Grant Parish | $8,249.14 | 4 |
| 23 | Iberia Parish | $500,000.00 | 1C |
| 24 | Iberville Parish | $37,309.62 | 2 |
| 25 | Jackson Parish | $6,320.67 | 4 |
| 26 | Jefferson Parish | $2,166,666.00 | 1A |
| 27 | Jefferson Davis Parish | $35,789.73 | 2 |
| 28 | Lafayette Parish | $235,150.12 | 2 |
| 29 | Lafourche Parish | $2,166,666.00 | 1A |
| 30 | La Salle Parish | $5,862.24 | 4 |
| 31 | Lincoln Parish | $17,770.02 | 4 |
| 32 | Livingston Parish | $133,828.35 | 2 |
| 33 | Madison Parish | $4,950.82 | 4 |
| 34 | Morehouse Parish | $12,017.16 | 4 |
| 35 | Natchitoches Parish | $16,485.35 | 4 |
| 36 | Orleans Parish | $6,000,000.00 | 1B |
| 37 | Ouachita Parish | $62,418.44 | 4 |
| 38 | Plaquemines Parish | $2,166,666.00 | 1A |
| 39 | Pointe Coupee Parish | $16,801.63 | 3 |
| 40 | Rapides Parish | $97,603.60 | 3 |
| 41 | Red River Parish | $3,839.00 | 4 |
| 42 | Richland Parish | $8,545.99 | 4 |
| 43 | Sabine Parish | $9,887.87 | 4 |
| 44 | St. Bernard Parish | $2,166,666.00 | 1A |
| 45 | St. Charles Parish | $59,744.06 | 2 |

| | Parish | Amount | Tier |
|---|---|---|---|
| 46 | St. Helena Parish | $7,968.62 | 3 |
| 47 | St. James Parish | $24,770.53 | 2 |
| 48 | St. John The Baptist Parish | $54,738.99 | 2 |
| 49 | St. Landry Parish | $86,715.96 | 2&3 |
| 50 | St. Martin Parish | $59,292.92 | 2 |
| 51 | St. Mary Parish | $500,000.00 | 1C |
| 52 | St. Tammany Parish | $2,166,666.00 | 1A |
| 53 | Tangipahoa Parish | $109,529.65 | 2&3 |
| 54 | Tensas Parish | $2,448.69 | 4 |
| 55 | Terrebonne Parish | $2,166,666.00 | 1A |
| 56 | Union Parish | $9,507.93 | 4 |
| 57 | Vermilion Parish | $500,000.00 | 1C |
| 58 | Vernon Parish | $35,551.15 | 3 |
| 59 | Washington Parish | $33,705.31 | 3 |
| 60 | Webster Parish | $17,086.14 | 4 |
| 61 | West Baton Rouge Parish | $25,972.43 | 2 |
| 62 | West Carroll Parish | $4,823.48 | 4 |
| 63 | West Feliciana Parish | $11,339.90 | 3 |
| 64 | Winn Parish | $6,484.18 | 4 |
| | **TOTAL** | **$23,500,000.00** | |

The following is a detailed breakdown of the $30 Million tourism investment recently announced by BP as a result of the Deepwater Horizon tragedy.  This provides for a centralized statewide campaign to improve the "Louisiana Brand", provides for a concentrated effort by the coastal parishes to re-energize their tourism opportunities, and recognizes that each parish has suffered from the overall brand damage caused by the spill.

1.   **Louisiana Campaign (including nature based tourism) $10.5 million**
   a.  $5,000,000 million – Department of Culture, Recreation and Tourism
   b.  $2,500,000 million – 6 physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i.  St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche
         1.  ($ 416,666.67 each)

   c.  $500, 000 – 4 other coastal parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i.  Iberia, St. Mary, Vermilion, Cameron
         1.  ($125,000 each)

   d.  $2,500,000 million – remaining 53 parishes (see attached tiering map and spreadsheet)

2.   **Coastal Tourism Response - $6 million**
   a.  $4,500,000 million – 6 physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i.  St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche ($ 750,000 each)

   b.  $1,500,000 million  – 4 other coastal parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i.  Iberia, St. Mary, Vermilion, Cameron
         1.  ($375,000 each)

3.   **Greater New Orleans Response - $6 million**

4.   **Tourism Events –$ 7.5 million**
   a.  $6,000,000 million – 6 physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i.  St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche ($1,000,000 million each)

   b.  $1,500,000 million – Department of Culture, Recreation and Tourism for statewide tourism event support

**Summary:**

11/19/2010                                                                                    Exhibit B

1.  **$13 million or 43.34% of $30 million**
    a.  To the six (6) physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC) - St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche  (each $2,166,000 million)
    b.  For marketing, advertising, tourism event support, charter and recreational fishing support, nature based tourism, fairs and festivals, and grants to parish-selected projects.
    c.  Allows for regional cooperation

2.  **$2 million or 6.67% of $30 million**
    a.  To the four (4) other coastal parishes making up the Louisiana Tourism Coastal Coalition (LTCC) - Iberia, St. Mary, Vermilion, and Cameron (each $500,000)
    b.  For marketing, advertising, tourism event support, charter and recreational fishing support, nature based tourism, fairs and festivals, and grants to parish-selected projects
    c.  Allows for regional cooperation

3.  **$6 million or 20% of $30 million**
    a.  To the City of New Orleans
    b.  For marketing, advertising, tourism event support, conventions, fairs and festivals, etc.
    c.  Allows for regional cooperation

4.  **$2.5 million or 8.33% of $30 million**
    a.  To the remaining fifty-three (53) parishes as per attached tiering map and spreadsheet
    b.  For marketing, advertising, tourism event support, nature based tourism, fairs and festivals
    c.  Allows for regional cooperation

5.  **$5 million or 16.67% of  $30 million**
    a.  To the Department of Culture, Recreation and Tourism in conjunction with Louisiana Travel Promotion Association (LTPA) for marketing and advertising Louisiana as a destination
    b.  Plan to be submitted by Lt. Governor Office

6.  **$1.5 million or 5% of $30 million**
    a.  To the Department of Culture, Recreation and Tourism for statewide tourism event support
    b.  Plan to be submitted by Lt. Governor Office

2

Exhibit B

**NOTES**:

1.  BP has agreed to a funding arrangement of $5 million per quarter as opposed to $10 million per year for three (3) years.  This will allow for a surge of investment, if needed, of $30 million in 18 months.

2.  Parish allocations are direct to parish governments, or their designee(s), including but not limited to the Louisiana Tourism Coastal Coalition and individual tourism commissions.

3.  All plans are subject to approval by BP, require the opportunity for BP to be engaged in plan development, allow for regional cooperation and include potential grants for tourism activities and stabilization at the local level.

11/19/2010

Exhibit B



# BP Tourism Investment Allocation Plan

NOTE: St. Landry Parish and Tangipahoa Parish are split between Tier 2 and Tier 3.

Exhibit C