# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

| | | |
|---|---|---|
| Barbara M. Harding<br>To Call Writer Directly:<br>(202) 879-5081<br>barbara.harding@kirkland.com | (202) 879-5000<br><br>www.kirkland.com | Facsimile:<br>(202) 879-5200 |

August 29, 2011

**Via E-Mail (Sally_Shushan@laed.uscourts.gov)**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the Eastern
District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

      Re:    In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179

Dear Judge Shushan:

      BP Exploration & Production Inc. and BP America Production Co. ("BP") submit this letter pursuant to Federal Rule of Civil Procedure 37 to request an order compelling Halliburton Energy Services, Inc. ("Halliburton") to provide documents and witnesses relating to post-incident investigations conducted by Halliburton employees on the *Deepwater Horizon* incident that were not performed at the direction of counsel or in anticipation of litigation. This discovery is responsive to BP's requests and Halliburton does not contend that it is not relevant to the issues in this case.

      In accordance with Rule 37(a)(1), and in an attempt to resolve these issues without burdening the Court, the parties participated in several meet-and-confer conferences, including one most recently on August 29, 2011. The parties also exchanged correspondence on this matter. The meet-and-confer process has resolved most of the issues between the parties. To be clear, Halliburton has agreed to produce materials relating to the post-incident investigation activities. However, Halliburton has yet to clearly explain the scope of its future production and why certain documents continued to be withheld. And, Halliburton has refused to produce witnesses for deposition on this unprotected post-incident work. Accordingly, BP respectfully requests that the Court issue an order finding that Halliburton's post-incident investigation activities are not protected by the work product doctrine and compelling Halliburton to (1) produce all documents related to the post-incident investigative activities of its employees previously withheld or not gathered and (2) make Marc Edwards, Ronald Sweatman, and Roland Chemali available for deposition concerning such activities.

Chicago     Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai

Honorable Sally Shushan
August 29, 2011
Page 2

## INTRODUCTION

In the weeks and months following the April 20, 2010 *Deepwater Horizon* incident, Halliburton engineers and technical personnel performed numerous highly-relevant investigative tasks related to the incident. At the time, internal Halliburton documents referred to this post-incident work as an "investigation." Now that BP has requested to see the information and materials created in the course of Halliburton's investigation, Halliburton denies that there ever was any "company-directed, non-privileged, post-incident investigation" in the first place. Yet Halliburton's privilege logs are replete with entries withholding solely on work product grounds documents created by Halliburton engineers and technical personnel related to their post-incident work, notwithstanding that there is no indication of any attorney involvement in the creation of those documents.

BP recognizes that the work-product doctrine plays an essential role in litigation. To protect the integrity of the litigation process, the doctrine, *properly applied*, must be safeguarded. But the law demands that the doctrine not be applied where it does not apply. For instance, the Bly Report, commissioned by BP, is a classic example of what is *not* protected by the work-product doctrine. The Bly Report was drafted without the aid or direction of counsel and, thus, was not created in the context of preparing for litigation. Instead, it was prepared to uncover what happened regarding the *Deepwater Horizon* incident. The facts underlying the Bly Report, therefore, are properly subject to discovery.

The same is true of Halliburton's post-incident investigative work. Regardless of how Halliburton now characterizes that work, the burden of establishing work product immunity over its employees' activities (and the materials generated by them in the course of those activities) is solely on Halliburton, and Halliburton cannot satisfy that burden. Indeed, as described below, Halliburton *admits* that certain post-incident investigations by its employees are not privileged or work product. Nonetheless, Halliburton refuses to respond meaningfully to BP's request that it identify the scope of its upcoming production (including what documents it intends to withhold), and provide witnesses to testify about the investigations. In short, Halliburton's actions eviscerate the work product that Halliburton purports to vindicate.

Accordingly, BP respectfully requests that the Court compel Halliburton to (1) produce all documents related to the post-incident investigative activities of its engineers and technical personnel where the sole basis for withholding the document is work product and the work was not performed at the direction of counsel for litigation purposes; (2) review entries on its privilege log relating to post-incident investigative activities to produce responsive documents and provide detailed explanation of the documents that continue to be withheld; and (3) produce for deposition Marc Edwards, Ronald Sweatman, and Roland Chemali, each of whom performed highly relevant, non-privileged, post-incident investigative activities that bear directly on BP's claims and defenses in this matter.

Honorable Sally Shushan
August 29, 2011
Page 3

## BACKGROUND

### (a)  Halliburton's Investigation of the *Deepwater Horizon* Incident

Soon after the explosion at the Macondo Well on April 20, 2010, Halliburton initiated what its witnesses and documents at the time referred to as an "investigation" of the *Deepwater Horizon* incident. *See* Ex. 1 (5/22/2011 Halliburton e-mail) (HAL_0579706); Ex. 2 (Probert Dep. at 328:14-20) (testifying that Halliburton undertook an "investigation" of the *Deepwater Horizon* incident within days of the blowout). Now that discovery is underway and new details about Halliburton's post-incident activities are emerging, some Halliburton witnesses are straining to deny that there ever was an "investigation." *See*, *e.g.*, Ex. 3 (Roth Dep. at 248:5-19 (testifying about the existence of an investigation before the lunch break but denying that an investigation occurred after the lunch break); Ex. 4 (Faul Dep. at 422-430 (denying there was an investigation but admitting there was a group of people who gathered information, conducted interviews, held frequent meetings and prepared presentations and materials for Halliburton's executives to present to investigative bodies).

Contemporaneous documents produced from Halliburton's files confirm that there was an "investigation" and that it was conducted by a team of Halliburton engineers and technical personnel who worked together in the weeks and months following the incident to gather relevant facts and perform technical analyses. *See* Ex. 5 (HAL_0698345) (6/14/2010 Halliburton e-mail re "Tommy Roth Ongoing Gulf Investigation"); Ex. 1 (HAL_0579706) (5/22/2010 Halliburton e-mail identifying "key members" of "team" engaging in post-incident investigative activities); Ex. 6 (HAL_0514477) (6/4/2011 Halliburton e-mail setting forth proposed agenda, including explanation of "assigned tasks and relevant incident information"); Ex. 7 (MDL 2179 Deposition Ex. 0982) (Halliburton presentation entitled "BP Deepwater Horizon Investigation: Preliminary Insights" detailing facts from the Halliburton investigative activities and Halliburton's resulting "insights" regarding BP's internal investigation findings).

BP has the right to discover Halliburton's review of its activities that were conducted post-incident outside the direction of counsel regardless of the label Halliburton attaches to those activities. In any event, Halliburton's own documents refer to its activities as an "investigation." According to recently-produced documents, those working on Halliburton's *de facto* investigation included, at one point or another, each of the following individuals, none of whom are lawyers:

- Tommy Roth, then Halliburton's Vice President of Cementing Products & Service Lines, identified in the documents as the "team leader" (Ex. 1 (HAL_0579706);

- Anthony Badalamenti, Halliburton's Strategic Business Manager, identified in the documents as a "key member" of the investigation team (*id*.);

- Simon Turton, Halliburton's Country Vice President for Russia, also identified in the documents as a "key member" of the investigation team (*id*.);

Honorable Sally Shushan
August 29, 2011
Page 4

- Ronald Sweatman, Halliburton's Chief Technical Professional (*id.*);

- Roland Chemali, Halliburton's Chief Petrophysicist at Sperry Drilling (Ex. 6 (HAL_0514477));

- Marc Edwards, Halliburton's Senior Vice President, Completion and Production (Ex. 8 (HAL_0579779));

- Richard Vargo, Halliburton's Gulf of Mexico Region Manager (Ex. 5 (HAL_0698345)).

Together, these individuals and other technical personnel working with them performed numerous highly relevant tasks and activities in the course of what the documents refer to as the "Tommy Roth Ongoing Gulf ***Investigation***." *See* Ex. 5 (HAL_0698345) (emphasis added)). Among the tasks and activities performed by this group were:

- modeling the gas flow conditions at the Macondo Well (Ex. 1 (HAL_0579706);

- studying the effect of nitrogen breakout (Ex. 9 (HAL_0513986-90));

- analyzing hydrocarbon zones (*id.*); and

- collecting and reviewing real-time Macondo Well data (Ex. 6 (HAL_0514477)).

Evidence indicates that Tommy Roth and others used information obtained through this effort for various business-related purposes, including to develop stop work processes for elevating issues (Ex. 8 (HAL_0579779)); to recommend changes in Halliburton's cementing and mudlogging practices (Ex. 10 (Roth Dep. at 761:4-776:22)); to prepare recommendations to Halliburton President Timothy Probert and the Halliburton Board of Directors (Ex. 11 (Roth Dep. at 393:18-396:22)) and to communicate with the media about the *Deepwater Horizon* incident (Ex. 12 (Roth Dep. at 250:4-19, 254:4-16)). By contrast, no contemporaneous documentary evidence has been unearthed to date indicating that any attorney was involved in, or exerted control over, their investigative efforts.

**(b)   Halliburton's Attempt to Cloak Its Post-Incident Investigative Activities with Work Product Immunity**

Despite the clear evidence that Halliburton conducted an "*investigation*" that was not at the direction of counsel and not in anticipation of litigation, a year later Mr. Probert advanced the opposite view. Specifically, at his May 2011 deposition, Mr. Probert testified that "***any investigation***" conducted by Halliburton into the *Deepwater Horizon* incident—without limitation as to its nature or purpose—was conducted at the direction of counsel. *See*, *e.g.*, Ex. 13 (Probert Dep. at 27:17-28:18; 187:18-25; 306:3-9; 315:7-13; 328:14-329:18) (to the extent Halliburton has conducted "*any*" investigation of the Macondo Well incident, it has been at the direction of counsel).

Honorable Sally Shushan
August 29, 2011
Page 5

Importantly, Tommy Roth testified that before April 20, 2010, he had no knowledge of any information relevant to the Macondo Well. *See* Ex. 14 (7/25/2011 Roth Dep. at 370:9-16). Accordingly, all of his knowledge concerning the *Deepwater Horizon* incident (and Halliburton's respective role in it) that he has presented in public forums is necessarily based on information he learned exclusively through the investigation he led on Halliburton's behalf. Again, no documentary evidence to date indicates that any attorney was involved in, or exerted control over, that investigation.

### (c) Halliburton's Improper Assertion of Privilege Over Documents Related To the Investigation Conducted by Tommy Roth and Other Technical Personnel

Halliburton's privilege logs contain hundreds of entries identifying documents created by Tommy Roth, Ronald Sweatmen, Roland Chemali, and other technical personnel working with them. Among the documents withheld are approximately:

- 138 documents authored by, or sent to, Tommy Roth, without any apparent attorney involvement or control (*see* Ex. 15 (Halliburton privilege logs));

- 130 documents authored by, or sent to, Tim Probert, without any apparent attorney involvement or control (*see* Ex. 15 (Halliburton privilege logs));

- 113 documents authored by, or sent to, Ronald Sweatman, without any apparent attorney involvement or control (*see* Ex. 15 (Halliburton privilege logs));

- 34 documents authored by, or sent to, Ronnie Faul, without any apparent attorney involvement or control (*see* Ex. 15 (Halliburton privilege logs));

- 130 documents authored by, or sent to, John Gisclair, without any apparent attorney involvement or control (*see* Ex. 15 (Halliburton privilege logs)); and

- 39 documents authored by, or sent to, Richard Vargo, without any apparent attorney involvement or control. *See* Ex. 15 (Halliburton privilege logs)).

Most of these documents have no date associated with them, and many are described in ways that simply parrot the legal standard for work product immunity without providing a substantive description. *See*, *e.g.*, Ex. 15-E (Halliburton's Ninth Log, Entry Nos. 29, 63, 70, 82, 85) (identifying "Email communication in anticipation of litigation"). Most notably, all of these documents are being withheld based on **work product protection only**, notwithstanding that there is no indication of any apparent attorney involvement or control. As such, there is no claim made that these documents are attorney-client communications.

Honorable Sally Shushan
August 29, 2011
Page 6

    **(d)**     **Halliburton's Failure to Clearly Explain Its Position on the Extent to Which It Claims Privilege Over Post-Incident Investigative Activities Conducted By Tommy Roth and His Team**

On August 4, 2011, BP wrote to Halliburton asking it to produce all documents relating to its post-incident investigation conducted from approximately April 21, 2010 to November 2010 and to produce for deposition Marc Edwards, Ronald Sweatman, and Roland Chemali, each of whom performed post-incident investigative work. *See* Ex. 16 (8/4/2011 B. Harding Ltr to J. Martinez). BP's letter cited documents and testimony from Halliburton witnesses revealing that Halliburton conducted a non-privileged investigation of the *Deepwater Horizon* incident, notwithstanding Halliburton's attempts to characterize that effort differently now. *See id*. On August 16, 2011, BP wrote a further email to Halliburton attaching documents that described the various post-incident investigations that were being undertaken. *See* Ex. 17 (8/16/2011 P. Chen E-Mail to J. Martinez). Specifically, BP asked Halliburton to assist it "in understanding the criteria used to separate [] which materials will be produced and which materials will be withheld."

Further, BP identified entries on Halliburton's privilege logs that appeared to relate to the post-incident investigations, and asked Halliburton to review those entries. *Id.*

In particular, BP identified numerous entries on Halliburton's privilege logs related to Halliburton's internal investigation where the only claim of privilege is work product, including the following:

- HESI's Third Privilege Log, entry nos. 1-10, 12-31 (Ex. 15-A);

- HESI's Fifth Privilege Log, entry nos. 1-6 (Ex. 15-B);

- HESI's Sixth Privilege Log, entry nos. 1-2 (Ex. 15-C);

- HESI's Ninth Privilege Log, entry nos. 8, 11, 29, 53-56, 58-59, 63-67, 70-72, 74-75, 77-88, 92, 94-95, 98, 100, 101-110, 112-113, 115-119, 122, 124-133, 136-150, 152-159, 161-169, 171-174, 176, 178-183, 185-194, 203, 205, 206-207, 218 (Ex. 15-E);

- HESI's Tenth Privilege Log, entry nos. 2, 49, 132-136, 139, 146, 174, 199, 251-252, 258-260, 272-273, 288, 293, 295, 320, 336, 339, 347, 356, 359, 371, 381, 394,-396, 408, 423-426, 428, 436, 438-442, 447, 449, 466, 468, 471, 506-507, 552-553, 559-561, 563, 567, 573-574, 576-578, 588-589, 593, 595, 597, 607, 618, 620, 624-632, 653, 664-667, 703-704, 706, 710-12, 714-730, 756-757, 765, 766, 768-769, 778, 782-784, 804-806, 810, 818, 846-848, 851-856, 864-865, 874, 884, 891, 893, 909-910, 927, 930, 938, 941, 1027, 1029, 1034, 1037, 1057, 1065, 1067-1068, 1074, 1086, 1108-1110, 1143-1176, 1288, 1289, 1290-91 (Ex. 15-F);

- HESI's Eleventh Privilege Log, entry nos. 78, 134 (Ex. 15-H);

Honorable Sally Shushan
August 29, 2011
Page 7

- HESI's Thirteenth Privilege Log, entry nos. 9, 12, 20, 28, 59 (Ex. 15-J);

- HESI's Fourteenth Privilege Log, entry nos. 1, 3-6 (Ex. 15-K).

Finally, BP asked Halliburton to produce witnesses for deposition. *Id.* Although Halliburton repeatedly promised to respond in writing to the issues raised in BP's August 4 letter and August 16th e-mail, it failed to offer any written explanation of its position with respect to those issues until August 26, 2011, just two weekend days before BP's motion to compel deadline. *See* Ex. 18 (8/26/2011 G. Hill e-mail).

Halliburton's August 26th response asserted that there was no "company-directed, non-privileged, post-incident investigation" but acknowledged that there were multiple individual-led investigations not conducted at the direction of counsel. *See id*. Halliburton conceded that such investigative work was not privileged: "There are certain activities undertaken by individual employees of HESI, not done at the direction of counsel, and not covered by any separate privilege, for which HESI does not assert work product privilege." *See id*.

BP contacted Halliburton over the weekend and received a further response on Monday August 29, 2011 admitting that there was no privilege or work product protecting this material: "HESI has produced many documents concerning the activities undertaken by individual employees of HESI, not done at the direction of counsel, and not covered by any separate privilege ('Non-Privileged Post-Incident Activities'). HESI will produce any additional documents, including those, if any, any currently listed on HESI's privilege logs, concerning Non-Privileged Post-Incident Activities by September 8th." *See* Ex. 19 (8/29/2011 J. Martinez email to P. Chen).

Although Halliburton has agreed to produce the non-privileged, non-work-product material and to review its privilege log, it still has refused to provide BP with any substantive or definite information concerning the criteria used by Halliburton to determine which documents created by its engineers and technical personnel were purportedly directed by counsel and which were not. Further, Halliburton refused to produce for deposition any of the witnesses BP requested testify about the scope of these individual-led investigations. Accordingly, because BP still does not have sufficient information to understand what (if any) previously-withheld documents Halliburton will be producing, BP indicated that it would file the present motion to compel.[1]

---

[1] Halliburton claims it has produced many of the previously withheld documents but it does not specify which documents—and it certainly does not indicate that all the documents previously withheld on work product grounds have now been produced. Regardless, in light of the limited information on the privilege logs, BP has no way to confirm that the documents previously on the privilege logs have now been produced.

Honorable Sally Shushan
August 29, 2011
Page 8

## ARGUMENT

**HALLIBURTON'S INVESTIGATION IS NOT ENTITLED TO WORK PRODUCT PROTECTION.**

The work product doctrine (as codified in Federal Rule of Civil Procedure 26(b)(3)) provides qualified protection for "documents and tangible things prepared by or for a party or that party's representative in anticipation of litigation." *SEC v. Microtune, Inc.*, 258 F.R.D. 310, 318 (N.D. Tex. 2009). The purpose of the doctrine is to "promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *See Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 383 (5th Cir. 1989). Because, however, the doctrine "significantly restricts the scope of discovery," it "must be narrowly construed in order to aid in the search for the truth." *McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 260 (N.D. Ill. 2000). Accordingly, "[t]he party who [seeks] the protection of the work-product doctrine has the burden of proving that the documents were prepared in anticipation of litigation." *See Carroll v. Praxair, Inc.*, No. 2:05-cv-307, 2006 WL 1793656, at *1 (W.D. La. June 28, 2006); *Microtune*, 258 F.R.D. at 318 (same).

For the reasons discussed below, Halliburton cannot meet that burden here.

**(a)    Halliburton Cannot Prove Its Investigation Was Conducted Primarily For Litigation Purposes.**

Only documents "prepared in anticipation of litigation" are entitled to work product protection. *See Microtune*, 258 F.R.D. at 318. "Materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by" the work product doctrine. Fed. R. Civ. Proc. 26, adv. comm. notes; *see also United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (work product doctrine does not protect materials assembled in ordinary course of business, pursuant to regulatory requirements, or for other non-litigation purposes).

Under Fifth Circuit law, a document is "prepared in anticipation of litigation" only if "the primary motivating purpose" behind the document's creation "was to aid in possible future litigation." *See In re Kaiser Aluminum & Chemical Co.*, 214 F.3d 586, 593 (5th Cir. 2000).

Applying these standards here, it is clear for the reasons discussed next that the primary motivation for Halliburton's investigation was not to aid in possible future litigation.

**(b)    The Evidence Fails to Show that Halliburton's Investigation Was Conducted at the Request of or with the Involvement of Counsel.**

At the outset, Halliburton's claim that work-product privilege applies is not supported by the evidence. Indeed, *no* contemporaneous documentary evidence to date indicates that *any* attorney was involved in, or exerted control over, Halliburton's investigative efforts. Halliburton has no legal right under the work product privilege to withhold documents related to its post-

Honorable Sally Shushan
August 29, 2011
Page 9

incident investigative activities where the investigatory efforts were not performed at the direction of counsel for litigation purposes. *See, e.g.*, *Cooper Health Sys. v. Virtua Health, Inc.*, 259 F.R.D. 208, 214 (D.N.J. 2009) ("[T]he work product doctrine does not apply because no attorney work product is implicated. The documents at issue consist of e-mail communications between representatives of Plesser and Star regarding the lawsuit between plaintiff and defendant. The e-mails were not prepared by or for attorneys. Further, no evidence has been presented that when Star and Plesser prepared the e-mails they were acting as agents or consultants for attorneys.").

Despite having numerous opportunities to do so, Halliburton has not explained and documented, as is its burden, how and why the work-product privilege might apply to the contested discovery. Unless it can do so, it has an ironclad duty under the Federal Rules to disclose all the information that BP seeks.

### (c) The Evidence Fails to Show that Halliburton's Investigation Was Conducted Primarily for Litigation Purposes.

The evidence likewise does not support the conclusion that the primary motivation behind Halliburton's investigation was to prepare for litigation rather than to achieve its non-litigation objectives. Here, ample evidence demonstrates that anticipation of litigation was not the "primary motivating purpose" for Halliburton's investigation. This evidence includes:

- **Tommy Roth's Testimony that He "Collected Facts" for Purposes of Making Public Presentations and Business Recommendations**. During his deposition, after answering numerous questions about the "investigation" in the morning session, Tommy Roth, after the lunch break, denied having conducted any "investigation," privileged or not, of the *Deepwater Horizon* incident. *See*, *e.g.*, Ex. 20 (7/25/2011 Roth Dep. at 248:5-250:19; 382:17-25). Instead, Mr. Roth described his post-incident work as collecting facts and information for purposes of making presentations as well as for purposes of making recommendations to improve Halliburton's cementing practices. *See*, *e.g.*, Ex. 21 (Roth Dep. at 248:18-25; 250:25-251:7; 251:19-252:5; 306:3-310:2; 381:16-382; 386:18-387:9; 759:1-5; 760:4-761:23). Where the evidence in the record suggests that litigation concerns were not the primary motivating purpose behind an internal investigation, documents created in the course of that investigation are not subject to work product protection. *See SEC v. Microtune, Inc.*, 258 F.R.D. 310, 318-19 (N.D. Tex. 2009) (documents apparently prepared for business purposes such as developing new corporate practices not protected by work product immunity, regardless of the prospects of litigation); *see also Electronic Data Systems Corp. v. Steingraber*, 2003 WL 21653414, at *4 (work product immunity "does not extend to the underlying facts relevant to the litigation").

- **Ronnie Faul's Testimony that He and Others Working with Tommy Roth Gathered Facts to Help Build Presentations**. Mr. Faul refused to admit having participated in any "investigation," instead characterizing his post-incident work as

    simply gathering information. *See* Ex. 22 (Faul Dep. at 388:9-389:6). Notably, Mr. Faul offered no indication that any of his "fact gathering" efforts were intended to assist counsel in developing confidential litigation theories or strategies. *See Microtune, Inc.*, 258 F.R.D. at 318-19 (documents prepared primarily for business purposes not protected by work product immunity, regardless of litigation); *see also Steingraber*, 2003 WL 21653414, at *4 (work product immunity "does not extend to the underlying facts relevant to the litigation").

- **Documents Detailing Work Being Conducted in Connection with the "Tommy Roth Ongoing Gulf Investigation" With No Indication of Control or Guidance by Attorneys**. As described earlier, Halliburton has produced numerous documents describing post-incident investigative work conducted by Tommy Roth, Ronald Sweatman, and other technical personnel for whom Halliburton has withheld documents on work product grounds, despite there being no indication that any of these individuals performed post-incident activities primarily for litigation purposes. *See*, *e.g.*, Ex. 1, 5, 6, 9 (HAL_0579706; HAL_0698345; HAL_0514477; HAL_0513986-90). Moreover, Halliburton itself has admitted that the "fact gathering" and analyses done by these individuals was not primarily for purposes of litigation and therefore not work product protected. *See* Ex. 18 (8/26/2011 G. Hill e-mail). Yet Halliburton's privilege logs continue to contain hundreds of entries identifying documents created by these individuals in the course of their post-incident investigative activities. *See supra* at 6-7.

  Accordingly, the testimony and documents indicate that Halliburton conducted its investigation without regard to pending litigation. As such, these materials are not entitled to work product protection.

    **(d) Halliburton's Investigation Is Not Privileged, Even If It Was "Conducted at the Direction of Counsel."**

  Finally, the fact that some witnesses have testified that certain portions of Halliburton's investigation were conducted at the direction of counsel does not necessarily cloak any of the investigation with work product immunity—much less all of it. To begin, "the involvement of an attorney is not dispositive of the 'in anticipation of litigation' issue." *Carroll*, 2006 WL 1793656, at *2. The work product doctrine "is not an umbrella that shades all materials prepared by a lawyer, or agent of the client." *Electronic Data Systems Corp. v. Steingraber*, No. 4:02 CV 225, 2003 WL 21653414, at *4 (E.D. Tex. July 9, 2003). Rather, the doctrine focuses solely on materials assembled and brought into being in anticipation of litigation. *Id*. Accordingly, because the evidence here does not indicate that the primary motivation for Halliburton's investigative work was "anticipation of litigation," the investigative work does not become privileged simply because counsel directed it. *Steingraber*, 2003 WL 21653414, at *6.

  Nor does the investigation become privileged merely because Halliburton decided that it would be preferable (or, as Mr. Probert put it, "most prudent") to conduct its investigation in

Honorable Sally Shushan
August 29, 2011
Page 11

secret. *Id.* at *5 ("Not every document generated by an internal investigation is protected by work product 'simply because a company's internal investigation is coexistent with a present or anticipated lawsuit that is the same subject of the litigation.'"). On the contrary, if a party or its attorney prepares a document in the ordinary course of business, "it will not be protected [from discovery] even if the party is aware that the document may also be useful in the event of litigation." *See id.* at *6.

In sum, the evidence fails to demonstrate that the documents Halliburton has withheld on the basis of work product were created primarily to assist in litigation. Consequently, the documents are not entitled to work product protection and must therefore be produced.

## CONCLUSION

In sum, Halliburton should not be allowed to improperly shield on work product grounds information derived from the post-incident, non-privileged investigative activities of its engineers and technical personnel. Accordingly, BP therefore respectfully requests that the Court compel Halliburton to (1) produce all documents related to the post-incident investigative activities of its employees previously withheld or not gathered and (2) make Marc Edwards, Ronald Sweatman, and Roland Chemali available for deposition concerning their post-incident investigative activities.

Thank you for your consideration of this submission.

Sincerely,

/s/ Barbara M. Harding

Barbara M. Harding

BMH/djs