# Exhibit 4

416

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3      IN RE: OIL SPILL        )   MDL NO. 2179

       by the OIL RIG          )

4      "DEEPWATER HORIZON" in  )   SECTION "J"

       the GULF OF MEXICO, ON  )

5      APRIL 20, 2010          )   JUDGE BARBIER

                               )

6                              )   MAG. JUDGE

                               )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  VOLUME 2 OF 2

21

22        Deposition of RONALD RAY FAUL, taken

23     at Pan American Life Center, 601 Poydras

24     Street, Ponchartrain Room, New Orleans,

25     Louisiana, on the 30th of June, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          THE VIDEOGRAPHER:  This begins

2     tape number 10 of the deposition of Ronald

3     Faul in regards to the oil spill of the

4     Deepwater Horizon in the Gulf of Mexico on

5     April 20th, 2010.

6               Today is June 30th, 2011.  The

7     time now is approximately 8:34 a.m., and

8     we are now on the record.

9               RONALD RAY FAUL,

10    having been previously duly sworn,

11    testified as follows:

12                   EXAMINATION

13    BY MR. CHEN:

14        Q.  Good morning, Mr. Faul.  We just

15    introduced ourselves a little while ago,

16    but I'm Philip Chen.  This is my

17    colleague, David Mitchell.  And we're here

18    on behalf of BP to ask you some questions.

19               You understand that you're

20    still under oath from yesterday?

21        A.  Yes, I do.

22        Q.  Okay.  I wanted to follow up on

23    some questions yesterday about the

24    postincident work that you've -- you've

25    done.

**PURSUANT TO CONFIDENTIALITY ORDER**

                    Yesterday, people

1   characterized it as an investigation, but

2   you took issue with that word.  How would

3   you call the -- what would you call the

4   postincident work that you've been doing?

5       A.   Just -- I would characterize it as

6   gathering information to inform, advise

7   our senior executives to prepare them

8   for -- to answer questions, more looking

9   at, you know, what we knew based on the

10  documentation we had.

11      Q.   Okay.  And is there a -- a team of

12  people who are working with you to -- to

13  do this gathering of information?

14          MR. HILL:  Object to form.

15      A.   Not a team, per se, no.  We --

16      Q.   (BY MR. CHEN)  Are there a group

17  of individuals that are all gathering

18  information?

19      A.   We -- we had a couple of people

20  that would meet in a -- a room and put our

21  information together and help.  It was

22  Tommy Roth who would come in, and we would

23  advise him on what we knew and help him

24  build his presentation.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1          Q.  And how often do you meet, this
2      group?
3          A.  Right after the incident, we met
4      pretty regularly for the first couple of
5      weeks, and then -- you know, as -- as
6      required.  You know, we'd either get an
7      e-mail or a phone call and say, you know,
8      we'd like to meet, and just go in and
9      meet.
10         Q.  About how many meetings have you
11     had, if you can tell me?
12         A.  That I attended, maybe 10 or 12.
13         Q.  Okay.  And so -- so it was more
14     frequent right after the incident,
15     correct?
16         A.  Yes.
17         Q.  And are you still having meetings
18     now?
19         A.  No.
20         Q.  Okay.  Was there a point in time
21     that this group that's gathering
22     information no longer continued to gather
23     information?
24         A.  I was probably no longer a part of
25     that group when I started working with
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    counsel a little bit to prepare for Coast

2    Guard hearings.

3         Q.   Okay.  And when was that?

4         A.   I don't remember the date of the

5    first Coast Guard hearing, but that was

6    here in New Orleans in -- sometime in May,

7    I think.

8         Q.   Oh, so you attended 10 to 12

9    meetings between April and May, when you

10   stopped being a part of the group?

11        A.   Yes.

12        Q.   Do you have ongoing responsibility

13   to gather information to advise senior

14   executives?

15        A.   No.

16        Q.   Do you have ongoing duties to work

17   with your counsel to prepare for this

18   litigation?

19        A.   The preparation was for this

20   deposition, and that -- that's -- as far

21   as I know, that's my -- the last of my

22   obligation.

23        Q.   Can you estimate in the number

24   of -- the number of hours that you've

25   spent gathering information about the

1      incident?

2           A.   Just a guesstimate, but if we --

3      you know, we always met for a long time.

4      It was long days, so maybe 10 hours a day

5      for 10 or 12 days, so maybe 100 to 120

6      hours.

7           Q.   But in addition to the meetings,

8      you also reviewed documents and facts,

9      correct?

10          A.   Yes, we -- we did look at some

11     documents and -- and information that was

12     available to us.

13          Q.   And you also conducted interviews,

14     correct?

15          A.   Not until the -- till -- till I

16     was working with counsel.

17          Q.   When -- so yesterday you said you

18     participated in four interviews, with

19     Mr. Tabler, Mr. Haire, Ms. Willis, and

20     Mr. Keith, correct?

21          A.   Yes.

22          Q.   Now that you've had a day to think

23     about it, did you participate in any other

24     interviews, other than those four?

25          A.   That's the only four that I

1    remember.  And we did that for the first

2    Coast Guard hearing.  We did do some

3    preparation work for additional hearings

4    with -- with Jesse and -- and Vince, I

5    think it was, Vince Tabler.

6        Q.  So you were in a room preparing

7    for a hearing with Jesse Gagliano?

8        A.  He was -- he was in the room, yes.

9        Q.  And -- but that was not an

10   interview?

11       A.  I -- I was not part of an

12   interview.  Basically, we -- we were going

13   over preparation for --

14            MR. HILL:  I'm going to

15   instruct the witness that what he's

16   talking about he's already identified to

17   you, was he was present in meetings with

18   counsel with certain witnesses.

19            I'm going to instruct you not

20   to answer any questions that would divulge

21   what happened in the meetings or what was

22   said.  You can tell him that you met and

23   who was there, but that's about it.

24       Q.  (BY MR. CHEN)  Okay.  Do you

25   recall the month that occurred?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.  April, May -- maybe June.

2     Q.  Okay.

3     A.  I don't remember exactly the time.

4  That particular hearing was in Houston.

5     Q.  Okay.  Do you remember who was at

6  that meeting with Mr. Gagliano?

7     A.  Just counsel, our internal

8  counsel.

9     Q.  Okay.

10     A.  Just --

11     Q.  So you were at the meeting?

12     A.  I was at the meeting, Jesse --

13     Q.  Okay.

14     A.  -- and -- and counsel was there.

15     Q.  And when you say counsel, do you

16  know the name of counsel?

17     A.  Don Godwin.  I believe Gavin was

18  there at times.

19     Q.  Okay.

20     A.  Some -- some other people were

21  there as well assisting.

22     Q.  Did Mr. Gagliano have his own

23  counsel at that meeting?

24     A.  No.

25     Q.  Do you remember what documents you

PURSUANT TO CONFIDENTIALITY ORDER

1    reviewed at that meeting?

2        A.   No, I don't really.

3        Q.   Do you remember the general

4    subject matter?

5            MR. HILL:  You're -- I'm going

6    to instruct the -- I'm going to instruct

7    you not to answer that question.  It's

8    privileged.

9            MR. CHEN:  Fair enough.

10       Q.   (BY MR. CHEN)  So at the four

11   interviews, do you recall what month those

12   interviews occurred?

13       A.   The first ones would have probably

14   been in May for the time of the first

15   Coast Guard hearing.

16       Q.   And -- and did these individuals

17   come in as groups, like maybe the two

18   cementers together, or did they come in

19   one by one?

20       A.   One by one.

21       Q.   Okay.  How long did the interviews

22   take?

23       A.   A couple hours.

24       Q.   Okay.  So I'm just going to walk

25   through each of the folks.

1     So when Ryan Haire appeared

2 for his interview, did he have his own

3 counsel there?

4   A. Yes, he did.

5   Q. And when Cathleenia Willis

6 appeared for her interview, did she have

7 her own counsel?

8   A. No, she didn't.

9   Q. What about Joe Keith; did he have

10 his own counsel?

11   A. No.

12   Q. And then Vince Tabler didn't have

13 his own counsel?

14   A. He did not either.

15   Q. As part of your fact gathering,

16 did you -- okay.  We talked about

17 interviewing folks, and then you gathered

18 Halliburton -- what documents Halliburton

19 had, and you reviewed those documents

20 also, right?

21   A. Yes.

22   Q. Did you create timelines?

23   A. Yes, we did.

24   Q. Okay.  And that would have all

25 been in the April/May time frame that you

**PURSUANT TO CONFIDENTIALITY ORDER**

1    did this work?

2        A.   That would have been in April,

3    yes, starting in April.

4        Q.   Okay.  And did you perform any

5    analyses in -- in terms of reports or

6    PowerPoint presentations that were

7    presented to your senior executives?

8        A.   We -- we did not perform any

9    analysis.  We did build some PowerPoint

10   presentations that gave Tommy a message

11   to -- to go with.

12       Q.   Okay.  So when you -- so when

13   your -- you mentioned advising senior

14   executives, you mean Tommy Roth?

15       A.   Tommy Roth, that's correct.

16       Q.   Did you also advise Mr. Probert

17   and give him advice as to what to say?

18       A.   Yes, I had a meeting with

19   Mr. Probert as well.

20       Q.   How many meetings did you have to

21   update Tommy?

22       A.   Tommy would have been the 10 -- 10

23   to 12 meetings.

24       Q.   Okay.  And then what about

25   Mr. Probert?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   Just one with Mr. Probert.

2        Q.   Okay.  And that one meeting with

3    Mr. Probert was the meeting before you

4    went to go talk to Congress?

5        A.   Yes, it was.

6        Q.   As part of your fact

7    investigation, did you do any lab testing?

8        A.   No, not at that time, I did not.

9        Q.   Okay.  So the lab testing that you

10   had conducted, you do not consider that as

11   part of your fact investigation?

12       A.   No, it wasn't.

13       Q.   Did you do any postincident

14   modeling?

15       A.   No, I didn't.

16       Q.   Did you have -- do you know of any

17   postincident modeling that was done,

18   either with OptiCem or any other program,

19   of -- of the cement job?

20            MR. HILL:  I assume you're

21   asking him other than at the direction of

22   counsel, right?

23            Hold on.

24            Right?

25            MR. CHEN:  No.

1      CHANGES AND SIGNATURE

2 WITNESS NAME: RONALD RAY FAUL

3 DATE OF DEPOSITION: JUNE 30, 2011

4 PAGE LINE CHANGE  REASON

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

**PURSUANT TO CONFIDENTIALITY ORDER**

I, RONALD RAY FAUL, have read the

foregoing deposition and hereby affix my

signature that same is true and correct,

except as noted on the attached Amendment

Sheet.

_____

RONALD RAY FAUL

THE STATE OF _____)

COUNTY OF _____)

Before me, _____,

on this day personally appeared

RONALD RAY FAUL, known to me (or proved to

me on the oath of _____ or

through _____) to be the person

whose name is subscribed to the foregoing

instrument and executed the same for the

purposes and consideration therein

expressed.

Given under my hand and seal of office

this _____ day of _____,

2011.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

My commission expires: _____

**PURSUANT TO CONFIDENTIALITY ORDER**

726

```
1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3        IN RE: OIL SPILL       )    MDL NO. 2179

         by the OIL RIG         )

4        "DEEPWATER HORIZON" in  )    SECTION "J"

         the GULF OF MEXICO, ON  )

5        APRIL 20, 2010          )    JUDGE BARBIER

                                 )

6                                )    MAG. JUDGE

                                 )    SHUSHAN

7

8                REPORTER'S CERTIFICATION

9         TO THE ORAL AND VIDEOTAPED DEPOSITION OF

10                  RONALD RAY FAUL

11            I, Therese J. Casterline, Certified

12       Shorthand Reporter in and for the State of

13       Texas and the State of Louisiana, do

14       hereby certify to the following:

15            That the witness, RONALD RAY FAUL,

16       was duly sworn by the officer and that the

17       transcript of the oral deposition is a

18       true record of the testimony given by the

19       witness.

20            That the deposition transcript was

21       submitted on _____, 2011, to the

22       witness or to the attorney for the witness

23       for examination, signature and return to

24       Worldwide Court Reporters, Inc., by

25       _____, 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1          That the amount of time used by each
2     party at the deposition is as follows:
3              Mr. Chen - 1 hour, 04 minutes
4              Mr. Goforth - 2 hours
5              Ms. Polk - 0 hours, 39 minutes
6              Mr. Hill - 0 hours, 20 minutes
7              Mr. Thornhill - 0 hours, 18
8     minutes
9          I further certify that I am neither
10    counsel for, related to, nor employed by
11    any of the parties or attorneys in the
12    action in which this proceeding was taken,
13    and further that I am not financially or
14    otherwise interested in the outcome of the
15    action.
16         Subscribed and sworn to by me this
17    31st day of June, 2011.
18
19    _____
      Therese J. Casterline, CSR, RMR, CRR
20    Texas CSR 5001, Expires 12-31-11
      Louisiana CSR 25014, Expires 12-31-11
21    WORLDWIDE COURT REPORTERS
      3000 Weslayan, Suite 235
22    Houston, Texas 77027
      1-800-745-1101
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

# Exhibit 5

From: Richard Vargo
Sent: Mon Jun 14 11:01:17 2010
To: Charles Kendrick; Jan Erik Klungtveit; Randal Menard; Joshua Malbrough; Peter Duhon; Brad Taff; Phillip Perry
Subject: FW: Review with Tommy Roth Ongoing Gulf Investigation
Importance: Normal

When: Wednesday, June 16, 2010 9:30 AM-10:30 AM (GMT-06:00) Central Time (US & Canada).
Where: CSC - Swamp

*~*~*~*~*~*~*~*~*

You guys may want to attend. Tommy is here to speak to the cementing PSL but you may attend if you desire.

---

**From:**  Richard Vargo

**Sent:**  Monday, June 14, 2010 8:24 AM

**To:**  Richard Vargo; Christi Carter; Christopher Lee; George McNary; Jared Duplichain; Jared Trahan; Jesus Garcia; Kathryn Miller; Leon Harvin; Maria Figueroa; Mike Viator; Joseph Bowman; Butch Washington; Joseph Simmons; Vance Etter; Alan Breaux; Danny Mooney; Keith Savoie; Matt Dauzat; Mike Stidham; Sidney Servat; Bryan Jones; Devon Proctor; Kenneth Brown; Scott Ardoin; Morris Gosserand; Paul Anderson; Robert Yount; Timothy Quirk; Richard Dubois; Tony Angelle; Thomas Roth; Michael Serio

**Subject:**  Review with Tommy Roth Ongoing Gulf Investigation

**When:**  Wednesday, June 16, 2010 9:30 AM-10:30 AM (GMT-06:00) Central Time (US & Canada).

**Where:**  CSC - Swamp

When: Wednesday, June 16, 2010 9:30 AM-10:30 AM (GMT-06:00) Central Time (US & Canada).
Where: CSC - Swamp

*~*~*~*~*~*~*~*~*

Team,

At this time Tommy Roth will be coming to the Gulf Coast to discuss the on-going investigation on the Horizon incident. You are invited to come to this meeting to listen and ask questions.  We will be going to Houma for a similar discussion with our staff there.

Therese - Can you please confirm the Swamp is available at this time?

Thanks.

Richard F. Vargo Jr.
Halliburton
GOM Region Manager - Cementing
100 Capital Dr.
Lafayette La. 70508
Office:  337-266-8249
Cell:    337-315-2582
Fax:     832-553-7811
E-Mail: Richard.Vargo@Halliburton.com

Confidential

# Exhibit 6

From: David Braquet
Sent: Fri Jun 04 10:03:13 2010
To: Ranjan Patel; Robert Mitchell; Emad Bakri; David Hinz; John Gisclair; Mohamed Sati; Randy Lovorn; Ronald Sweatman
Cc: Roland Chemali; Steven Kizziar; Dennis Sullivan
Subject: RE: Modeling Review & Planning
Importance: Normal
Attachments: OCSG32306_001_ST00BP00_MWD.zip; MC252_001_ST00BP01_5MD_COMBO.cgm; MC252_001_ST00BP01_5MD_SHOW_1.cgm

-----Original Appointment-----
**From:** Ranjan Patel
**Sent:** Friday, June 04, 2010 9:59 AM
**To:** Ranjan Patel; Robert Mitchell; Emad Bakri; David Hinz; John Gisclair; Mohamed Sati; Randy Lovorn; Ronald Sweatman
**Cc:** Roland Chemali; Steven Kizziar; Dennis Sullivan; David Braquet
**Subject:** Updated: Modeling Review & Planning
**When:** Friday, June 04, 2010 10:00 AM-3:00 PM (GMT-06:00) Central Time (US & Canada).
**Where:** 3NE 30

**Sent on Behalf of Ron Sweatman**

All,

Please see our proposed agenda below:

- Explain our assigned tasks and relevant incident information (Ron)
  - What we have been asked to model
  - BP's presentation to Congress
  - Key notes on BP's and other testimony to the CG-MMS Joint Investigation Board
  - Summary of our ideas: e.g., how the kick initiated, how the casing moved into the BOP stack, etc
- Review past modeling input/output for casing loads/uplift (Robert presents and leads Q&A)
  - Show casing weight & uplift hand calculations vs WellCat output
  - Describe temperature changes via WellCat
  - Present ideas for kick initiation (How HH reduced by casing hanger seal activation, etc)
  - What can WellCat do and not do to simulate the actual event?
  - How to develop WellCat to fit the new applications?
- Review past modeling input/output for kick simulations (Emad presents and leads Q&A)
  - Present kick simulations with "old" model to understand how kick migrated up hole
  - Describe how the "new" model works better than the old one
  - Present ideas for kick initiation if different than ones from Robert
- Review status to get Sperry data for new input for our models (Roland leads & John calls in to report status)
  - The memory PWD time log
  - 5 inch gamma ray resistivity sonic log
  - BAT VDL QC Plot
  - Final GeoTap RTS Report
  - Is the PWD tool showing 14.2 as the highest pore pressure (EOWR p.49)?
  - Were there any cuttings in the mud column to account for the 0.2 ppg higher ESD than the 14.0 mud wt.?
  - Why only 2 hydrocarbon zones reported by BP vs the 5 indicated on the Sperry log?
  - What are the pore pressures of the 3 unreported hydrocarbon zones?
  - Why 2 top zones were not in BP's plan to locate TOC above them at the required 500 ft of cement fill?
  - Any Sperry log data showing the zones taking the mud losses and their PP/FG?

Highly Confidential                                                      HAL_0514477

- Plan forward (Open discussion)
- Wrap up and summarize action items

Please reply with any changes you want to make to the agenda.

Thanks and regards,

Ron

_____

Ranjan Patel has invited you to a Unified MeetingPlace e-Conference:

**Date/Time:**           JUN 4, 2010 at 10:00 AM America/Chicago

Length:           300

Frequency:           1

**Meeting ID:**           6913

Meeting Password:

**Phone Number (US):**           +12818714999

**Cisco IP Phone Number:**  88-250-4999

**Alternate Regional Phone Numbers:**

Angola-Luanda           +244 222698109

Australia           +61 864244999

Belgium-Brussels           +32 23333599

Brunei           +673 3229298

Canada-Calgary  +1 4032182222

Canada-Mt Pearl +1 7097244333

Canada-Nisku           +1 7809792599

China           +86 1059247099 or +86 8009907099

Egypt           +202 27591180

Germany-Celle           +49 5141999599

India           +65 65112098

Indonesia           +62 2178546610

Italy-Milan           +39 0237012799

Malaysia-Kuala Lumpur   +603 92066911 or +603 21714998

Malaysia-Kemaman   +609 8628111

Malaysia-Labuan +6085 404311 or +603 92066911

Malaysia-Miri   +6085 404311

Malaysia-Senai +607 5974411

Malaysia-TEC   +605 3746811

Netherlands-Rijswijk   +31 703071599

New Zealand   +64 67559275

Norway   +47 51837999

Papua New Guinea   +61 864244999

Russia-Moscow   +7 4957558305

Russia-Nizhnevartovsk   +7 3466292799

Singapore   +65 65112098

Thailand   +66 22788182

UK   +44 1224776999

Vietnam +84 839103914-ext-4999

**To attend the Web Conference:**

1. Go to: http://meetingplace.corp.halliburton.com

2. Enter Meeting ID, and click Attend Meeting.

**For External Data Participants to attend the Web Conference:**

1. Go to: http://meetingplace.halliburton.com

2. When prompted, sign in as a guest, enter Meeting ID and click Attend Meeting.


For more info about this MeetingPlace e-Conference, contact: Ranjan Patel, 281.575.4006

**TEST YOUR BROWSER BEFORE YOU ATTEND YOUR FIRST WEB CONFERENCE**

Visit http://meetingplace.halliburton.com/test/ to test your web browser for compatibility with the web conference.

For more information about using MeetingPlace please visit:

User Help at http://meetingplace.halliburton.com/mpweb/html/help/000/output/index.html

Highly Confidential

Highly Confidential