# Exhibit 10

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3        IN RE: OIL SPILL        )   MDL NO. 2179

         by the OIL RIG          )

4        "DEEPWATER HORIZON" in  )   SECTION "J"

         the GULF OF MEXICO, ON  )

5        APRIL 20, 2010          )   JUDGE BARBIER

                                 )

6                                )   MAG. JUDGE

                                 )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    VOLUME 2 OF 2

21

22        Deposition of THOMAS ROTH, taken at

23    Hilton St. Charles Hotel, 333 St. Charles

24    Avenue, Le Moyne Room, New Orleans,

25    Louisiana, on the 26th of July, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    PowerPoint that does have page numbers

2    that run through page -- page 8.

3              And the third is a Halliburton

4    document, 1126188, and it's a PowerPoint

5    that has pages attached to it that run

6    through page 5.

7              Hopefully Emily can give to

8    you the -- the documents, and we can talk

9    about them.

10              MR. HILL:  Emily, can I get a

11    set?

12       Q.  (BY MR. THORNHILL)  While those

13    are being distributed to you, let me ask

14    you a couple of background questions.

15              Are you familiar with the

16    documents to which we've made reference

17    and -- and identified?

18       A.  Yes, sir.

19              MR. THORNHILL:  We'll give

20    each of those documents an exhibit number,

21    and they will be labeled by Emily at the

22    end, just so we'll make sure we've got the

23    right numbers.  But they'll be Exhibit

24    Numbers 4357-359.

25       Q.  (BY MR. THORNHILL)  While Emily's

**PURSUANT TO CONFIDENTIALITY ORDER**

1    distributing that, let me ask you about

2    the -- the purpose of these documents that

3    you drew.

4            After the blowout, I

5    understand that you did what I've called

6    an investigation research analysis of

7    facts.

8            MR. HILL:  Do you want him to

9    have them?

10           MR. THORNHILL:  Yes.  He'll

11   have the three, and we'll make sure that

12   we've got the identified pages.

13       Q.  (BY MR. THORNHILL)  When you

14   prepared these documents, Mr. Roth, my

15   understanding is you prepared them for

16   presentation to the president of

17   Halliburton -- or one of the presidents of

18   Halliburton, Mr. Probert?

19       A.  I actually prepared two of these

20   documents.  I prepared the one titled

21   Observations.  I prepared this document

22   stating cementing corporate review, which

23   is in this format.

24       Q.  Okay.  And just for the record,

25   the two documents that you identify by

1       Bates page numbers that you prepared were

2       1126190 --

3                  MR. THORNHILL:  Which, Emily,

4       we're going to give a -- a number as 4357.

5       I'll do that for you.

6                  MR. HILL:  What's the exhibit

7       number, I'm sorry, for that one?

8                  MR. THORNHILL:  4357.

9                  (Exhibit Number 4357 marked.)

10                  MS. HARDING:  Bates number

11       190?

12                  MR. THORNHILL:  190, yes.

13          Q.  (BY MR. THORNHILL)  And then the

14       second one which you said you -- I believe

15       you said you prepared is the one that's a

16       PowerPoint styled Cementing Corporate

17       Review, Tim Probert.  Is that correct?

18          A.  Yes, sir.

19          Q.  All right.  And so that one, 187

20       is the last three digits, and we'll give

21       that 4358.

22                  (Exhibit Number 4358 marked.)

23          Q.  (BY MR. THORNHILL)  And the third

24       document which is here ends with 188, and

25       we're going to give that 4359.

PURSUANT TO CONFIDENTIALITY ORDER

1          (Exhibit Number 4359 marked.)

2          Q.  (BY MR. THORNHILL)  Okay.  Now,

3     can we start with the first one, 4357?

4          A.  Yes, sir.

5          Q.  Okay.  You prepared these

6     documents that are styled Observations for

7     presentation to Mr. Probert, as I

8     understand it.  Correct?

9          A.  I did.

10         Q.  Now, this was after your initial

11    investigation of the facts postblowout,

12    right?

13         A.  This first document, number 4357,

14    this was generated in probably the

15    October/November time frame --

16         Q.  Okay.

17         A.   -- of 2010.

18         Q.  Now, I'd like to ask you just a

19    few questions, if I can, about that,

20    because I see under the section called

21    Basis of Design at the top --

22         A.  Yes, sir.

23         Q.  -- I see some comments that I want

24    to explore with you.

25              Do I understand correctly that

**PURSUANT TO CONFIDENTIALITY ORDER**

1        you wrote these -- I'm going to call them

2        bullet points because there's a -- there's

3        a little dot in front of each set of -- or

4        each paragraph, if you will.  You wrote

5        these, right?

6            A.  I did, sir.

7            Q.  And the first one, no formal basis

8        of design standard, parenthesis, BOD,

9        close parenthesis, exists today.  BOD, or

10       basis of design, to formalize agreement

11       with the client of the challenges to be

12       addressed by cementing service

13       recommendation during the well planning.

14               The BOD, or basis of design,

15       to provide site for capture and

16       documentation of well hazards, parens, red

17       flags, close parens, identified during

18       well construction.

19               Did I read it correctly?

20           A.  You did, sir.

21           Q.  All right.  At the time that you

22       wrote this in October of 2010,

23       approximately, as you told us, that was

24       the state of affairs at Halliburton,

25       correct?

PURSUANT TO CONFIDENTIALITY ORDER

1     A.   That's correct.

2     Q.   Since then, have there -- have

3     there been implemented new bases of

4     design?

5     A.   I don't know.

6     Q.   All right.   The second bullet

7     point, BOD, or basis of design, to provide

8     means to continuously assess fitness of

9     purpose of cementing recommendation by

10    engineering interpretation against client

11    challenges and well hazards, parens, red

12    flags, close parens, encountered while

13    drilling.

14             Did I read it correctly?

15    A.   You did.

16    Q.   Do you know if since -- well,

17    first, do you know at the time of the

18    blowout and up till October 2010 if that

19    reflects the state of affairs at

20    Halliburton?

21             MR. HILL:   Object to form.

22    A.   It does.

23    Q.   (BY MR. THORNHILL)   Okay.   And

24    since then, has there been developed an

25    assessment of the fitness of the purpose

**PURSUANT TO CONFIDENTIALITY ORDER**

1       of the cementing recommendation?

2           A.  I don't know.

3           Q.  All right.  Third bullet point, no

4       formal management of change standard,

5       parens, MOC, exists today where

6       engineering interpretation concludes well

7       challenges or hazards reduce probability

8       of success of cementing service,

9       recommendation to an acceptable level,

10      formal MOC action to be taken and

11      documented.

12                  Did you write that?

13          A.  I did.

14          Q.  And I read it correctly?

15          A.  You did.

16          Q.  And is that a bullet that

17      reflected at the time of the blowout up

18      until October of 2010 the state of affairs

19      at Halliburton?

20          A.  Yes, sir.

21          Q.  Now, are you familiar with the

22      investigation by BP of the lab at

23      Broussard before the blowout?

24          A.  I'm aware that an audit of the

25      Lafayette -- the Broussard lab was

**PURSUANT TO CONFIDENTIALITY ORDER**

1      conducted.

2          Q.  Thank you.  The audit's a better

3      word, because I think that's what it's

4      called, is an --

5          A.  I think --

6          Q.  -- actual audit.

7          A.  -- it is, yes.

8          Q.  And in that audit, would there be

9      any reason for BP not to know about these

10     issues as you just explained them in these

11     three bullet points?

12             MS. HARDING:  Objection, form.

13         A.  It would be dependent upon the

14     standard that the audit was conducted to

15     as to where that investigation would lead.

16         Q.  (BY MR. THORNHILL)  Okay.  At the

17     time of the blowout, did your

18     investigation or analysis of the facts

19     show that BP knew the requirements of

20     Halliburton in its best practices

21     documents?

22             MS. HARDING:  Object to the

23     form.

24         A.  I don't know.

25         Q.  (BY MR. THORNHILL)  Okay.  Did you

PURSUANT TO CONFIDENTIALITY ORDER

768

1    attempt to investigate whether BP had

2    available to it, and provided to

3    Halliburton in exchange, similar best

4    practices?

5         A.   I don't know.

6         Q.   Has anyone at Halliburton

7    undertaken to provide a basis of design as

8    suggested in your document that we're

9    looking at?

10              MR. HILL:  Object to form.

11        A.   I'm aware that the basis of design

12   was prepared for the Macondo well -- the

13   cementing basis of design was prepared for

14   Macondo.

15        Q.   (BY MR. THORNHILL)  Before the

16   well blew out?

17        A.   Yes, sir.

18        Q.   What was that basis of design?

19        A.   I didn't specifically review it,

20   but I am aware that one was prepared.

21        Q.   And was that the OptiCem report?

22        A.   No, sir.  I think this would be a

23   separate document that would basically go

24   through what was identified for a basis of

25   design to be a -- a repository for

**PURSUANT TO CONFIDENTIALITY ORDER**

1    identification of specific challenges and

2    requirements that the cementing would be

3    expected to address.

4        Q.  Was that document prepared in 2009

5    by BP and Halliburton engineers together?

6        A.  I think it was 2010, and that

7    would be the typical procedure that --

8    that would be used.

9        Q.  And it was prepared, to your

10   recollection, before the well was drilled

11   and before the cement on the 7-inch

12   production casing?

13       A.  I think that's correct.

14       Q.  All right.  Your recommendations

15   at the bottom, in the bottom two bullet

16   points, include engaging a consultant for

17   format and layout.  Do you know if a

18   consultant has been engaged?

19       A.  I don't know.

20       Q.  Your recommendation to consult

21   with the customers to comprehend their

22   design documentation, do you know if a

23   program to do that has been put in place?

24       A.  I don't know.

25       Q.  Was the implementation by

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Halliburton of the process of having a

2     technical adviser at the customer's

3     office, as Mr. Gagliano was at the office

4     of BP, intended to make for a

5     customer/contractor interface at the

6     primary level?

7          A.  That's the purpose of that

8     arrangement for a close working

9     relationship.

10          Q.  Okay.  Do I understand correctly

11     that you have been unable to discuss with

12     Mr. Gagliano the details of the interface

13     between he and the drilling engineers at

14     BP?

15          A.  That's correct.

16          Q.  Okay.  Your second point is to

17     identify resources.  And one of the first

18     is to initiate a leader.

19               I see in these documents a

20     change in the organization that is

21     suggested to include a design engineering

22     manager.

23               Do you know if Halliburton has

24     changed its organization to now include a

25     design engineering manager?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.  I -- I don't know if a specific

2    design engineering manager has been put in

3    place.  I know that there have been some

4    structure changes that were at least

5    partially driven by this work.

6       Q.  Okay.  The next section that you

7    have is the design authority

8    qualification.

9            And this talks in particular

10   in the second bullet point about

11   education.  Let's look at it carefully.

12            It says, technical staff

13   development is generally completion of

14   two-year development program.  There is no

15   continuing technical education, continuing

16   professional development requirement

17   thereafter.

18            And under that it says --

19   excuse me -- assignment to increasingly

20   demanding projects is generally the

21   development process.

22            Did I read it correctly?

23       A.  That's correct.

24       Q.  Since you made these

25   recommendations in October of 2010, has

PURSUANT TO CONFIDENTIALITY ORDER

772

1    there been implemented at Halliburton a

2    change in the educational requirements?

3         A.  I don't know.

4         Q.  Do you know if BP was given access

5    to the background information on

6    Mr. Gagliano at the time that he was

7    placed in the offices of BP?

8         A.  I don't know.

9         Q.  Is there at Halliburton any

10   resistance to providing to the operator

11   complete background information on the

12   experience and qualifications of persons

13   that are the technical advisers placed in

14   the customer's office?

15        A.  Oftentimes customers will request

16   a CV or a resume of experience of those

17   individuals.  It's routinely provided.

18        Q.  Is it routine for the customer to

19   be able to ask Halliburton to remove

20   anyone that they're not satisfied with for

21   any reason whatsoever if they're operating

22   in the offices of BP or the Halliburton --

23   by the B -- I'm sorry, I said that wrong.

24   It ran on.  Forgive me.  Let me rephrase

25   it.

PURSUANT TO CONFIDENTIALITY ORDER

```
 1                    Is it routine for BP, the
 2          operator, in cases like this to have the
 3          option to ask for removal of someone with
 4          whom they're dissatisfied?
 5               A.  That routinely occurs.
 6               Q.  Okay.  Do you know if, in this
 7          case, BP asked for Mr. Gagliano to be
 8          removed?
 9               A.  I'm not aware of any such
10          requests.
11               Q.  Okay.  Is it fair for me to say
12          that as with all other aspects of
13          preparing for, planning for and drilling
14          an oil and gas well, the operator --
15          vis-a-vis Halliburton, a cement
16          contractor -- is in control; the operator
17          is in control of all issues?
18                    MS. HARDING:  Object to form.
19               A.  The operator is in control, not
20          the service company.
21               Q.  (BY MR. THORNHILL)  Right.  In
22          this case, did you see in your
23          investigation or analysis of the facts
24          afterward that there were any points of
25          interest that would be normal for drilling
```

PURSUANT TO CONFIDENTIALITY ORDER

1    engineers that indicated that the drilling

2    engineers for BP were not in complete

3    control of the decision-making process for

4    the Macondo well?

5        A.  I saw no evidence of that.

6        Q.  Okay.  Let's go to the next page

7    on cementing design workflow.

8            I'd like to go down to the

9    recommendations on this, if I may -- may.

10           You wrote these

11   recommendations, right?

12       A.  I did.

13       Q.  Let's look at first one.  It says,

14   defined the workflow to bridge the basis

15   of design through the laboratory design

16   verification.

17           What are you recommending

18   there?  Can you explain that, please?

19       A.  Yeah.  There should be a formal

20   process that would allow you to

21   continuously maintain a link between your

22   basis of design, which would indicate all

23   the specific hazards that were to be

24   addressed with their being satisfied by

25   actual laboratory results to confirm that

775

1      good engineering practice was used to

2      address those challenges and then to

3      document that through the laboratory

4      testing.

5          Q.  Okay.  On the next page there's --

6      it's styled laboratory material

7      verification.  And under the

8      recommendations, the fourth bullet point

9      there is a point, develop enhanced

10     laboratory reporting capabilities.  Manage

11     intermediate data, weigh-up sheets,

12     technician notes, et cetera, and structure

13     reporting to provide statement of

14     cementing materials' fitness for purpose

15     to provide for job requirements defined

16     within the basis of design.

17              Did you write that?

18         A.  I did.

19         Q.  And I read it correctly?

20         A.  You did.

21         Q.  Explain to us that which you are

22     recommending in this section.

23         A.  With the Macondo incident and with

24     our review of not only the published

25     laboratory reports, but also the -- the

**PURSUANT TO CONFIDENTIALITY ORDER**

1      weigh-up sheets and the technicians'

2      notes, it was determined -- or I

3      determined that there could be

4      improvements in that area, to be able to

5      bring that information to the forefront

6      such that rather than consider it in any

7      postjob review, it would be part of the

8      design process.

9                  That information would be used

10     in support to ensure that cementing

11     materials that are recommended as part of

12     a treatment recommendation would be fit

13     for their purpose all the way through

14     satisfying the requirements of the basis

15     of design.

16          Q.  Are your recommendations that we

17     just reviewed in this document 4357

18     intended to enhance the performance of

19     Halliburton vis-a-vis its customer?

20          A.  Yes, sir.

21          Q.  All right.  Now, was your

22     investigation or analysis of the facts

23     after the blowout and your recommendations

24     intended to be conclusions with respect to

25     deficiencies of Halliburton which caused

1      or led to the blowout?

2          A.  No, sir.

3          Q.  In this case, have you seen in

4      your investigation or analysis of the

5      facts after the blowout, the e-mails that

6      showed that Ms. Yilmaz -- and I may have

7      pronounced her name incorrectly -- at BP,

8      Mr. Kellingray and Mr. Cunningham were all

9      intimately involved with the performance

10     of evaluating -- with evaluation, rather,

11     the performance of the Halliburton

12     employees and equipment prior to the

13     blowout?

14              MS. HARDING:  Object to form.

15         A.  I don't recall that -- that

16     e-mail.

17         Q.  (BY MR. THORNHILL)  Okay.  So if I

18     were to ask you detailed questions about

19     e-mail comments criticizing Halliburton's

20     employees and performance before the

21     blowout, and those criticisms having come

22     from either Messrs. Cunningham or

23     Kellingray or Ms. Yilmaz, you would not be

24     familiar with those, correct?

25         A.  Not without seeing the document.

**PURSUANT TO CONFIDENTIALITY ORDER**

CHANGES AND SIGNATURE

WITNESS NAME:  THOMAS ROTH

DATE OF DEPOSITION:  JULY 26, 2011

PAGE  LINE  CHANGE      REASON

1

2

3

4

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1        I, THOMAS ROTH, have read the

2   foregoing deposition and hereby affix my

3   signature that same is true and correct,

4   except as noted on the attached Amendment

5   Sheet.

6                  _____

7                          THOMAS ROTH

8   THE STATE OF _____)

9   COUNTY OF _____)

10       Before me, _____,

11  on this day personally appeared

12  THOMAS ROTH, known to me (or proved to me

13  on the oath of _____ or through

14  _____) to be the person whose

15  name is subscribed to the foregoing

16  instrument and executed the same for the

17  purposes and consideration therein

18  expressed.

19       Given under my hand and seal of office

20  this _____ day of _____,

21  2011.

22                  _____

23                  NOTARY PUBLIC IN AND FOR

24                  THE STATE OF _____

25                  My commission expires: _____
```

**PURSUANT TO CONFIDENTIALITY ORDER**

795

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3    IN RE: OIL SPILL        )   MDL NO. 2179
      by the OIL RIG          )
 4    "DEEPWATER HORIZON" in  )   SECTION "J"
      the GULF OF MEXICO, ON  )
 5    APRIL 20, 2010          )   JUDGE BARBIER
                              )
 6                            )   MAG. JUDGE
                              )   SHUSHAN
 7
 8              REPORTER'S CERTIFICATION
 9      TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10                    THOMAS ROTH
11          I, Therese J. Casterline, Certified
12    Shorthand Reporter in and for the State of
13    Texas and the State of Louisiana, do
14    hereby certify to the following:
15          That the witness, THOMAS ROTH, was
16    duly sworn by the officer and that the
17    transcript of the oral deposition is a
18    true record of the testimony given by the
19    witness.
20          That the deposition transcript was
21    submitted on _____, 2011, to the
22    witness or to the attorney for the witness
23    for examination, signature and return to
24    Worldwide Court Reporters, Inc., by
25    _____, 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          That the amount of time used by each
 2     party at the deposition is as follows:
 3               Ms. Harding - 1 hour, 39 minutes
 4               Mr. Goforth - 2 hours, 14 minutes
 5               Ms. Schell - 0 hours, 45 minutes
 6               Mr. Lembrich - 0 hours, 10 minutes
 7               Mr. Zeringue - 0 hours, 7 minutes
 8               Mr. Barrow - 0 hours, 3 minutes
 9               Mr. Hill - 0 hours, 16 minutes
10               Mr. Thornhill - 0 hours, 55
11     minutes
12          I further certify that I am neither
13     counsel for, related to, nor employed by
14     any of the parties or attorneys in the
15     action in which this proceeding was taken,
16     and further that I am not financially or
17     otherwise interested in the outcome of the
18     action.
19          Subscribed and sworn to by me this
20     26th day of July, 2011.
21     Therese J. Casterline
       _____
       Therese J. Casterline, CSR, RMR, CRR
22     Texas CSR 5001, Expires 12-31-11
       Louisiana CSR 25014, Expires 12-31-11
23     WORLDWIDE COURT REPORTERS
       3000 Weslayan, Suite 235
24     Houston, Texas 77027
       1-800-745-1101
25

**PURSUANT TO CONFIDENTIALITY ORDER**