# Exhibit 16

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth St., N.W.
Washington D.C. 20005-5793

Barbara M. Harding
To Call Writer Directly:
(202) 879-5081
barbara.harding@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

August 4, 2011

**<u>Via Electronic Mail</u>**                                                                                       **CONFIDENTIAL**

Don Godwin
Godwin Ronquillo PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

> Re:   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179

Dear Don:

I write to request that Halliburton immediately provide additional discovery, including documents and depositions, concerning its post-incident investigation conducted from approximately April 21, 2010 through the conclusion of the investigation (which we believe was in November 2010 based on Tommy Roth's recent testimony), including the drafting, reporting and discussion of the recommendations from Tommy Roth and others to the Halliburton Board of Directors. Based on Halliburton's recently-produced documents and recent deposition testimony from Halliburton witnesses, including Tommy Roth, it is clear that Halliburton conducted a non-privileged investigation of the *Deepwater Horizon* incident. As detailed below, there can be no privilege or work product attached to this investigation because it was conducted with the intent that it be made public and without any expectation of confidentiality and, further, selective portions have been made public. BP hereby requests that Halliburton immediately produce all documents discussing, reflecting, or relating to its post-incident investigation. BP further requests that Halliburton immediately produce Marc Edwards, Ronald Sweatman, and Roland Chemali for deposition.

Halliburton has previously attempted to protect its post-incident investigation by claiming that it was performed at the direction of counsel and therefore privileged. However, it is now plain that Tommy Roth and other Halliburton employees did not conduct their post-incident investigation work at the direction of counsel, or with the intent that it remain privileged and confidential. Halliburton cannot cloak its investigation with *post hoc* privilege when (1) Halliburton directors have testified that they intended for the investigation to be made public, (2) Halliburton has produced documents detailing the investigation, and (3) Halliburton witnesses have testified about the investigation at their depositions.

Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai     Washington, D.C.

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 2

*First*, Halliburton employees, including Tim Probert and Tommy Roth, have testified that they intended for the investigation to be made public.  During his testimony before the Senate Committee on Energy and Natural Resources on May 11, 2010, Tim Probert testified under oath that Halliburton was conducting an investigation and would share the results of that investigation:

> Q. I know each of you are conducting your own investigations.  And I'm just curious, will the results and the analysis, as well as any testimony you generate your companies, will that be available to the federal government, to the Congress?
>
> A. [W]e will . . . share any information and hopefully use it as a basis for ensuring that the industry is safe and environmentally sound ....[1]

During his deposition, Mr. Probert reiterated under oath that the investigation was intended to be shared with the public:

> Q. You intended on May 11th for your investigation to be public and shared with the public, correct?
>
> A. Yes. My intent at that time was for us to learn from the incident. I think, as I told you just now, you know, as the lawsuits started to fly it became clear to us that any investigation needed to be under the guidance of counsel.[2]

Similarly, Tommy Roth stated his understanding that the investigation would be shared publicly:

> Q. [D]id you believe that . . . Halliburton would be making its investigation public?
>
> A. … Halliburton has worked in a transparent manner with multiple investigations . . . and so I guess the answer is yes.[3]

This testimony, in addition to other testimony, demonstrates that Halliburton conducted its investigation with the expectation that it would be made public.  In other words, this

---

[1] May 11, 2010 Tim Probert Testimony before Senate Committee on Energy and Natural Resources, Panel 2, 2010 WL 186079 (F.D.C.H.) at p. 22-23.

[2] May 9, 2011 Tim Probert  Deposition Tr. 353:3-5, 10-15.

[3] July 26, 2011 Tommy Roth Deposition Tr. 522:9-11, 15-25.

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 3

investigation was conducted with no expectation of privacy or confidentiality.  As such, no attorney-client privilege or work product can attach to this investigative work.  *See United States v. Robinson*, 121 F.3d 971, 976 (5th Cir. 1997) ("The assertor of the privilege must have a reasonable expectation of confidentiality, either that the information disclosed is intrinsically confidential, or by showing that he had a subjective intent of confidentiality."); *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976) ("Thus, courts have refused to apply the privilege to information that the client intends his attorney to impart to others, or to communications made in the presence of third parties[.]") (internal citations omitted); *In re Stone Energy Corp.*, No. 05-2088, 2008 WL 4868086 at *6 (W.D.La. Nov. 4, 2008) (broad provision in protective order that allowed government agency to exercise discretion in disclosing alleged work product to third parties "gave little expectation of privacy" to assertor of privilege, who therefore "waived its work product protection.").

**Second,** Halliburton has produced documents detailing post-incident investigation work and revealing portions of that work.  For example:

- A May 22, 2010 email from Ronald Sweatman details the investigation team's efforts to model the gas kick and provides a list of outstanding issues to investigate.[4]  The "key members" of a Halliburton's investigation team are identified as Tommy Roth (team leader), Anthony Badalamenti, and Simon Turton.  The email references a second investigation team, comprised of Rod Roberts, Joe Hess, and Nishant Raizada, that was working on "helping us understand the forces and effects on the longstring."  Mr. Roth's team is "simulate[ing] the gas kick to help us better understand the situation":[5]

> Please advise whether or not you can simulate the gas kick to help us better understand the situation and answer the following questions:
> ➢ The time period for the gas to bubble up the longstring/hole annulus to the wellhead? Also annular pressure vs time below casing hanger/packoff?
> ➢ Would gas pressure fail shoe track (float valves) and gas flow up the inside of the casing? What time and pressure to reach closed rams?
> ➢ Your ideas or model results on how gas could percolate up through the well fluid to blowout the well when the DP rams opened and fluid hit the crown?
> ➢ Knowing the casing moved into the BOP stack, when did it start to move and with what type of initiation force?
> ➢ How an uplift force may have increased vs. time as the gas continued to flow out of the reservoir and further decreased or increased relevant casing loads?
> ➢ Could the gas kick have caused the casing to part anywhere?
> ➢ Could the gas accumulate below the rams and limited the casing uplift until they were opened?
> ➢ Any ideas you have to add to the list?

---

[4] HAL_0579706.

[5] HAL_0579706.

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 4

- A June 10, 2010 email from Emad Bakri regarding a "DW Horizon modeling review meeting" contains an agenda for a meeting on modeling relating to the incident.  The agenda notes various investigation tasks, including:  modeling on "kick simulation, HC zones PP/FG, crossflows when & where, mud losses & where, casing liftoff, temp 'geothermal' profiles vs time, HH losses & when, N2 breakout effect," analysis of BP documents submitted to Congress and notes on BP witness testimony, review of Sperry data, a timeline of Halliburton employees on the rig, and analysis of nitrogen breakout.[6]

- A June 14, 2010 email from Richard Vargo with the Subject: "Review with Tommy Roth Ongoing Gulf Investigation" indicates that Halliburton held meetings to discuss its "on-going investigation on the Horizon incident."[7]

- A July 1, 2010 Energy and Commerce Committee Staff Briefing by Tommy Roth presents several findings from Halliburton's investigation including:  the "Solution" to the challenges of the well was to "Engineer foam cement system"; that "Pre-job testing confirmed the Macondo 9 7/8" x 7" cementing design provided a stable foam slurry"; "The given geological and mechanical conditions for the Macondo 8 7/8" x 7" hole section indicate a compressible foam cement system as an appropriate solution"; the "Foam cement mixed and placed in Macondo 9 7/8" x 7" production casing was as per design"; "Cement system was designed to meet well owner's requirements"; "Foam cement has a long, successful track record and was a robust design choice for the given Macondo well conditions (potential losses & influxes)"; the "Macondo production casing cement system was designed as per industry standards and practices"; and the "Job was executed as per design."[8]

- A September 26, 2010 National Academy of Engineering briefing by Tommy Roth and John Gisclair titled "BP Deepwater Horizon Investigation:  Preliminary Insights" provided Halliburton's insights into its own work at the Macondo well, as well as the "BP Design" and "BP Operational Decisions." Specifically, Halliburton provided conclusions that its own work was adequate:  "Using rig cement, additives, and rig water, a stable foam cement system was designed, tested, delivered and quality assured on location."

---

[6] HAL_0579573.

[7] HAL_0507998.

[8] HAL_0569569- HAL_0569587.

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 5

And, Halliburton offered further findings relating to the shoe track design and well monitoring.[9]

- Based on Halliburton's investigation, Tommy Roth drafted recommendations for Halliburton cementing that were presented to senior management, Tim Probert and Marc Edwards.[10]  Mr. Roth's recommendations were recently produced during his deposition,[11] and include the need to create a Basis of Design that is "updated on incurring hazards (red flags) during well construction" and ensuring "laboratory process quality through sampling, material testing, observation and interpretation of measurements and reporting of results confirms that material performance satisfies design requirements."[12]

These documents reveal that Halliburton was actively investigating the incident and that the results of that investigation were incorporated into public disclosures.  For example, Tommy Roth testified that he had no involvement with the Macondo Well and all of the information that he presented before the National Academy of Engineering and to the Energy and Commerce Committee, among others, was learned through Halliburton's post-incident investigation.[13] Halliburton cannot use its investigation as both a sword and a shield.  It cannot disclose only some portions of its investigation while refusing to disclose other portions under the veil of privilege.

*Third*, Halliburton witnesses have divulged facts about the investigation in sworn testimony, including, but not limited to, the following examples:

- On May 11, 2010, Tim Probert testified before the Senate Committee on Energy and Natural Resources that Halliburton would share the results of its investigation:  "[W]e will . . . share any information and hopefully use it as a basis for ensuring that the industry is safe and environmentally sound."[14]  Mr. Probert further provided critical

---

[9] MDL 2179 Deposition Ex. 0982.

[10] HAL_1126190; HAL_1126187.

[11] HAL_1126187, HAL_1126188, and HAL_1126190 were not produced as part of Tommy Roth's custodial file. Instead, these were produced on July 14, 2011 as Halliburton documents without custodial information.  The existence of these documents was discovered during Mr. Roth's deposition on July 25-26, 2011, and Halliburton counsel acknowledged the production error.

[12] HAL_1126187.

[13] 7-25-2011 Tommy Roth Deposition Tr. 370:9-16.

[14] May 11, 2010 Tim Probert Testimony before Senate Committee on Energy and Natural Resources, Panel 2, 2010 WL 186079 (F.D.C.H.) at p. 22-23.

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 6

commentary on the incident based on his discussions with Mr. Roth and Mr. Faul, both of which were involved in Halliburton's investigation.

- Tommy Roth, a leader of Halliburton's investigation, likewise believed that the results of the investigation would be made public: "Q. Did you believe that . . . Halliburton would be making its investigation public? A. … I guess the answer is yes."[15]  Mr. Roth testified before Congress and other venues on the findings of Halliburton's investigation team, for which he was a team leader.  Mr. Roth also testified at his deposition on his involvement in the investigation team and recommendations that he made coming out of Halliburton's investigation.

- Tim Quirk testified in his deposition that he performed post-incident foam stability tests on a pilot slurry mixed using the Macondo recipe.  Mr. Quirk performed these tests at the direction of senior management, such as Ronald Faul, Anthony Badalamenti, and Simon Turton, rather than any attorney, and results from Mr. Quirk's testing have been produced in this litigation.[16]  Mr. Quirk further testified, however, that he "got rid of" of his own notes from the testing and discarded the actual test samples.[17]

- Mr. Faul likewise testified at his deposition on his involvement in the Halliburton investigation team and the post-incident testing conducted by Halliburton.

As with the documents reflecting Halliburton's investigation, Halliburton has allowed its witnesses to testify concerning its investigation and the findings of the investigation.  Halliburton cannot now shield the remainder of that investigation simply because the findings may be adverse to Halliburton.

Based on the foregoing, BP hereby requests that Halliburton immediately produce all documents discussing, reflecting, or relating to its post-incident investigation.  Such documents are the proper subject of discovery in this litigation and are not privileged because Halliburton had no expectation of confidentiality over this material when it was created.

---

[15] July 26, 2011 Tommy Roth Deposition Tr. 522:9-11, 15-25.

[16] March 21, 2011 Tim Quirk Deposition Tr. 388-394.

[17] March 21, 2011 Tim Quirk Deposition Tr. 393:21.

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 7

Based on recent deposition testimony and documents produced for Tommy Roth's deposition, BP further requests the depositions of the following Halliburton witnesses who were involved in post-incident investigation work:

1. **Marc Edwards**. Mr. Edwards is the Senior Vice President in the Completion & Production Division at Halliburton, and Tommy Roth's supervisor.  Mr. Edwards was involved with Halliburton's post-incident investigation and is on correspondence relating to the investigation.  Mr. Edwards has information relating to Halliburton's investigation, among other things, including information on developing a stop work process for elevating issues to an operator for issues like centralization and GFP; drafting media statements; causes for the incident; and potential flow paths.  Mr. Edwards also edited cementing recommendations drafted by Mr. Roth in October 2010 that were created based on Halliburton's post-incident investigation.

2. **Ronald Sweatman.**  Mr. Sweatman is a Chief Technical Professional at Halliburton. Mr. Sweatman conducted post-incident investigation work for Halliburton on a team led by Tommy Roth.  Mr. Sweatman's investigation work included work on modeling a gas kick, the effect of nitrogen breakout, and hydrocarbon zones.

3. **Roland Chemali.**  Mr. Chemali is the Chief Petrophysicist at Halliburton Sperry Drilling.  Mr. Chemali conducted post-incident investigation work analyzing Sperry data and hydrocarbon zones.

Please confirm that Halliburton will produce the documents and witnesses identified above by August 19, 2011.  If Halliburton is unwilling to provide this discovery, BP requests that the parties meet and confer no later than August 10, 2011, pursuant to Federal Rule of Civil Procedure 37.

Please feel free to contact me with any questions or concerns.

Very truly yours,

/s/ Barbara M. Harding

cc:    Bruce W. Bowman
       Alan R. York

# KIRKLAND & ELLIS LLP

Don Godwin
August 4, 2011
Page 8


Plaintiffs Liaison Counsel
Defense Liaison Counsel
Mike Underhill, Esq.
Hon. Attorney General Luther Strange
Cory Maze
James P. Roy
Stephen J. Herman
Mike O'Keefe
Robert Cunningham

# Exhibit 17

**Chen, Philip T.**

| | |
|---|---|
| **From:** | Chen, Philip T. |
| **Sent:** | Tuesday, August 16, 2011 5:44 PM |
| **To:** | Martinez, Jenny |
| **Cc:** | dgodwin@godwinronquillo.com; Harding, Barbara M.; McKeever, Xanath |
| **Subject:** | Identification of Halliburton investigation subject areas |
| **Attachments:** | HAL_0513893.pdf; HAL_0513986.pdf; HAL_0514103.pdf; HAL_0515366.pdf; HAL_0698345.pdf |

Jenny,

Thank you for trying to clarify Halliburton's position on its investigation of the *Deepwater Horizon* incident during our call today.  As I understand, Halliburton does not assert privilege over any "fact gathering" conducted by its employees and will produce all of that material.

First, as requested, we attach documents from Halliburton's production detailing the types of activities that those involved in Halliburton's investigation appear to have performed.  As shown, Tommy Roth, Ron Sweatman, Anthony Badalamenti, Roland Chemali, and others working in conjunction with them *both* collected facts and performed technical analyses all as part of the investigation, which was referred to as the "Tommy Roth Ongoing Gulf Investigation."  Based on the documents, we believe that materials pertaining to the following activities by the investigation team are discoverable and should be produced:

- any modeling of conditions at the Macondo well as described in the attached documents;

- any modeling of flow path of the hydrocarbons;

- any kick modeling;

- any analyses of the effect of nitrogen breakout;

- any analyses of sand zones;

- any cement testing conducted by the team;

- any timelines created by the team;

- any information or data gathered for purposes of recommending changes in Halliburton's cementing or mudlogging practices or for improving overall safety; and

- any information or data gathered for the purpose of public presentation (to an investigative body, public relations, or otherwise).

Of course, we have identified these categories from the documents (and the documents present the investigation work streams in more detail).  I understand that you are confirming the scope of the "fact gathering" with Halliburton employees and may learn of additional areas of investigation that will also be provided.  At minimum, please confirm that you will produce any documents pertaining to the above-referenced categories as soon as possible.

Second, I understand that Mr. Godwin will send us a letter shortly that details the scope of what Halliburton expects to produce.  However, I am still unclear after our discussion and ask that Mr. Godwin clarify in his letter whether Halliburton is asserting privilege and/or work product over any post-incident analyses.

Specifically, are there still portions of the investigation that you will be withholding?  If so, could you assist us in understanding the criteria used to separate the which materials will be produced and which materials will be withheld.  In particular, we would like to call your attention to the following entries from your privilege logs that may be related to Halliburton's investigation:

- **HESI's Third Privilege Log**, entry nos. 1-10, 12-31;

- **HESI's Fifth Privilege Log**, entry nos. 1-6;

- **HESI's Sixth Privilege Log**, entry nos. 1-2;

- **HESI's Ninth Privilege Log**, entry nos. 8, 11, 29, 53-56, 58-59, 63-67, 70-72, 74-75, 77-88, 92, 94-95, 98, 100, 101-110, 112-113, 115-119, 122, 124-133, 136-150, 152-159, 161-169, 171-174, 176, 178-183, 185-194, 203, 205, 206-207, 218;

- **HESI's Tenth Privilege Log**, entry nos. 2, 49, 132-136, 139, 146, 174, 199, 251-252, 258-260, 272-273, 288, 293, 295, 320, 336, 339, 347, 356, 359, 371, 381, 394,-396, 408, 423-426, 428, 436, 438-442, 447, 449, 466, 468, 471, 506-507, 552-553, 559-561, 563, 567, 573-574, 576-578, 588-589, 593, 595, 597, 607, 618, 620, 624-632, 653, 664-667, 703-704, 706, 710-12, 714-730, 756-757, 765, 766, 768-769, 778, 782-784, 804-806, 810, 818, 846-848, 851-856, 864-865, 874, 884, 891, 893, 909-910, 927, 930, 938, 941, 1027, 1029, 1034, 1037, 1057, 1065, 1067-1068, 1074, 1086, 1108-1110, 1143-1176, 1288, 1289, 1290-91;

- **HESI's Eleventh Privilege Log**, entry nos. 78, 134;

- **HESI's Thirteenth Privilege Log**, entry nos. 9, 12, 20, 28, 59;

- **HESI's Fourteenth Privilege Log**, entry no. 1, 3-6.

Each of the privilege log entries referenced above is too vague to allow us to adequately assess your privilege claim.  It may be that many, if not all, of these documents will be part of Halliburton's future production.  However, to the extent that any of these documents will not be produced, please provide further description for the documents so that we can adequately evaluate your basis for withholding them.

Finally, please let us know if you will agree to produce Marc Edwards, Ron Sweatman, Roland Chemali, Anthony Badalamenti and Simon Turton, who were involved in Halliburton's post-incident investigation to gather facts and analyze relevant technical information, for deposition.  In considering our request, please keep in mind that numerous Halliburton witnesses were previously instructed not to answer questions concerning Halliburton's post-incident investigative work.  BP is, however, entitled to answers to questions about the nature and scope of Halliburton's post-incident investigative work for all of the reasons set forth in our previous correspondence and calls.

As always, we look forward to receiving your response and continuing to work with you cooperatively to reduce the number of disputed discovery issues remaining.

Sincere regards,
Philip.

Philip T. Chen
Kirkland & Ellis LLP
333 South Hope Street · Los Angeles, CA 90071

Tel +1-213-680-8341 · Fax +1-213-680-8500
philip.chen@kirkland.com

# Exhibit 18

**Chen, Philip T.**

---

| | |
|---|---|
| **From:** | Hill, Gavin [GHill@GodwinRonquillo.com] |
| **Sent:** | Friday, August 26, 2011 12:35 PM |
| **To:** | Harding, Barbara M.; Chen, Philip T. |
| **Cc:** | Hill, Gavin; jmartinez@GodwinRonquillo.com; Raines, Carolyn |
| **Subject:** | HESI's response to BP's August 4th letter |
| **Importance:** | High |

Barbara and Philip:  I hope you're doing well.  Please see Halliburton's email letter/response below to BP's August 4th letter:

Regards,
Gavin
———

   This email responds to BP's letter, dated August 4, 2011, in which BP demands, among other things, that Halliburton "immediately produce all documents discussing, reflecting, or relating to its post-incident investigation."  At the outset, let me be clear and re-explain what several Halliburton witnesses have explained clearly in their depositions.  Unlike BP and Transocean, Halliburton did not conduct a company-directed, non-privileged, post-incident investigation into the purported root cause(s) of the Macondo incident.  BP's contrary assertion is simply wrong and ignores the sworn testimony of several Halliburton witnesses.

   To the extent BP has taken Mr. Tommy Roth's deposition testimony out-of-context to assert that Halliburton did conduct an internal, post-incident investigation only to later withhold disclosure of such work under a claim of privilege, you are again mistaken.  During the time period referenced in your letter (immediately after the April 20, 2010 incident until approximately November 2010), Mr. Roth expressly testified that any "investigation" that he and his "presentation team" may have conducted pertained to gathering publicly available facts and other information for the purpose of preparing *presentations* to various governmental and quasi-governmental bodies.  (Tommy Roth Dep., 213:10-214:4; 250:25-252:5).  The deposition testimony of Messrs. Tim Probert and Ronnie Faul confirm the same.  (*See* Tim Probert Dep., 341:15-342:25; Ronnie Faul Dep., 193:8-21; 248:9-249:1; 388:9-389:2; 422:1-11).  Halliburton has produced these presentations and other related documents, and Messrs. Roth, Probert and Faul answered numerous questions about them in their respective depositions.  Mr. Roth's "investigation" during this timeframe, and the activities of others who gathered facts to help facilitate those presentations, did not involve the type of root cause analysis that BP might dub an internal "investigation" similar to what BP purported to undertake with the Bly Report.  Halliburton witnesses have been very clear about that point despite other parties' attempts to play semantic games with the term "investigation."  (*See* Tommy Roth Dep., 248:5-25; Tim Probert Dep., 466:1-467:11; Ronnie Faul Dep., 193:8-21, 248:9-249:1, 572:11-25).  More importantly, Halliburton's witnesses have already testified as to their personal knowledge of these "fact finding" or "investigative" activities during the relevant timeframe, and non-privileged documents pertaining to these activities have been produced by Halliburton without a claim of work product privilege.

   BP's letter also erroneously implies that Halliburton has inadvertently produced certain documents—*i.e.*, a May 22, 2010 email from Ron Sweatman, documents regarding certain post-incident cement tests requested by individual Halliburton employees, etc.—and that Halliburton witnesses have testified about similar subject matters, all to suggest that these documents and this testimony evidence a larger internal Halliburton investigation not done at the direction of counsel that

has yet to be fully disclosed. That suggestion also is incorrect. Subject to privilege for direct communications between Halliburton employees and counsel, Halliburton has produced documents pursuant to previously agreed-upon search terms where inquiry or analysis was requested or performed that was not requested or performed at the direction of counsel. Halliburton's production of the documents referenced immediately above demonstrates that.

BP's assertion that Halliburton is "shielding" disclosure of a non-privileged, internal investigation is without basis in light of the documents produced by Halliburton and the testimony of Halliburton witnesses to date. For example, Mr. Faul testified that he personally requested certain post-incident testing for his own informational purposes, but not as part of any internal Halliburton investigation. (Ronnie Faul Dep., 705:25-706:9). Both Messrs. Faul and Quirk, the individuals personally knowledgeable about such testing, testified about it at length, and any available documents related to such testing were produced by Halliburton without a claim of privilege or work product, belying BP's allegations that Halliburton is shielding work or activity that was not conducted at the request of counsel. (Ronnie Faul Dep., 299:16-300:16, 386:10-388:8, 705:25-706:1; Tim Quirk Dep., 88:22-90:19, 120:12-121:19, 213:7-220:17, 499:19-502:23). Indeed, no fewer than four Halliburton witnesses have testified openly about such post-incident testing. (*See also* Richard Dubois Dep., 99:13-104:4; Tommy Roth Dep., 346:10-347:15).

Similarly, the May 22, 2010 email from Ronald Sweatman that Halliburton produced also suggests that a team was organized internally to investigate certain issues related to the Macondo incident. However, this organizational effort was initiated by a few individuals within Halliburton and not at the request of the company, *see* Tommy Roth Dep. 306:3-308:2. Documents relating to the "fact gathering" or analysis done by these Halliburton employees, including the emails referenced in Mr. Roth's quoted testimony above, have already been produced pursuant to previously agreed upon search terms.

Halliburton has produced documents in the MDL directly responsive to the requests made in your letter; namely, documents regarding any "investigative" activities (even loosely defined) by Halliburton employees that were not conducted at the direction of counsel. As set forth herein, numerous Halliburton witnesses have testified about such activities. To the extent BP requests additional depositions from witnesses pertaining to the same matters, Halliburton objects to the same as unnecessarily duplicative given that Halliburton's witnesses already have testified extensively on the subject. Further, Halliburton has and will continue to withhold documents relating to any post-incident investigation activities conducted at the direction of counsel and/or to which a legitimate expectation of privilege attaches.

To summarize Halliburton's position:

1. There are certain activities HESI undertook post-incident at the direction of counsel that it claims as privileged, and Halliburton further denies that it has waived any such privilege.

2. There are certain activities undertaken by individual employees of HESI, not done at the direction of counsel, and not covered by any separate privilege, for which HESI does not assert work product privilege. HESI has and continues to produce those documents pursuant to the previously agreed upon search terms.

3. There is no "official" HESI "post-incident investigation" or "root cause analysis" done at the direction of counsel or the company for which HESI is claiming privilege. Instead, Halliburton's claim of privilege relates to fact finding and analysis done specifically at the direction of counsel and in

anticipation of litigation, or to matters involving direct communication with counsel.  And again, Halliburton denies that we have waived any privilege attached to those activities.

GODWIN RONQUILLO PC

Gavin E. Hill
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4685 Direct   (800.662.8393 Toll Free)
214.527.3102 Fax
GHill@GodwinRonquillo.com
GodwinRonquillo.com

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify Godwin Ronquillo PC immediately by telephone (800.662.8393) and destroy the original message. Messages sent to and from us may be monitored.

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

# Exhibit 19

**Chen, Philip T.**

| | |
|---|---|
| **From:** | Martinez, Jenny [JMartinez@GodwinRonquillo.com] |
| **Sent:** | Monday, August 29, 2011 12:37 PM |
| **To:** | Chen, Philip T.; Raines, Carolyn; Harding, Barbara M.; McKeever, Xanath; Nomellini, Mark J. |
| **Cc:** | dgodwin@godwinronquillo.com; MMacLeod@godwinronquillo.com; Leach, Michael; York, R. Alan; jmartinez@GodwinRonquillo.com |
| **Subject:** | RE: Status of Meet and Confer on BP discovery requests |

Barbara: below is in response to your letter of yesterday.

Escrow Agreement: HESI agrees to the OptiCem only proposal that BP provided on 8/25. Please send a clean copy for execution. Please also send me BP's proposed list of escrow agents. Until an agent is agreed upon, I cannot confirm whether or not the software can be deposited by 9/3. Because HESI cannot determine which version(s) of WellCat was used by Mr. Gagliano, HESI cannot agree that it "will not contest that BP is utilizing the appropriate version(s) of the software." How can HESI agree that BP is using an "appropriate" version, if that version is unknown?

Interrogatories 174-178: HESI did not agree to remove the second to last sentence of these responses. Rather, HESI agreed to remove any ambiguity related to instructions by BP to not do certain testing.

Interrogatories 24 and 25: HESI will supplement these responses with references to testimony.

Search Terms: Consistent with the Court's orders, HESI negotiated search terms with the PSC. This lengthy and laborious process resulted in "agreed upon" search terms. Having undertaken a similar process, and limiting its production to its agreed upon search terms with the PSC, BP is quite familiar with this process and is in no way surprised by it. In fact, HESI's objections to BP's 1st RFP specifically provide: "To the extent HESI responds that they will search for and produce responsive documents, HESI undertakes to make a good faith effort to conduct a reasonable search of nonprivileged, responsive documents and/or to apply a reasonable set of search terms. HESI is not offering or promising to search for and produce every document or piece of information that may exist in the possession, custody, or control of any of its thousands of employees and agents where any such items are not included within the results of a reasonable search as described above." Also, during our meet and confer on 7/18, we specifically discussed HESI's production via search terms.

Post-Incident Analyses: As you were informed previously, there is no "official" HESI "post-incident investigation" or "root cause analysis" that was done at the direction of counsel or the company for which HESI is claiming privilege. Instead, Halliburton's claim of privilege relates to fact finding and analysis done specifically at the direction of counsel and in anticipation of litigation, or to matters involving direct communication with counsel. HESI has produced many documents concerning the activities undertaken by individual employees of HESI, not done at the direction of counsel, and not covered by any separate privilege ("Non-Privileged Post-Incident Activities"). HESI will produce any additional documents, including those, if any, any currently listed on HESI's privilege logs, concerning Non-Privileged Post-Incident Activities by September 8th.

Interrogatories 8 and 10: I cannot locate any agreement by BP to supplement its response to HESI's Interrogatory No. 29 ("Describe the factual basis for any contention that BP is not fully at fault for the Incident. Include in your response any contention that other persons or entities are fully or partially at fault and the portions of fault attributable."). If BP has not agreed to supplement this response, it seems disingenuous for BP to seek court intervention on its Interrogatories 8 and 10 (especially since HESI actually responded to 8 and 10 and BP didn't respond to 29). Please let me know if I am mistaken about BP's supplementation of its response to HESI's Interrogatory No. 29.

Interrogatories 16-18: With respect to "protocols and standards" for which these Interrogatories do not ask for, HESI previously produced relevant documents in response to the PSC's Interrogatory No. 22 and RFPs 32, 35, and 37. If BP believes something is missing, please let me know.

Sincerely,

**From:** Chen, Philip T. [mailto:pchen@kirkland.com]
**Sent:** Sunday, August 28, 2011 2:41 PM
**To:** Raines, Carolyn; Harding, Barbara M.; McKeever, Xanath; Nomellini, Mark J.; Chen, Philip T.
**Cc:** Martinez, Jenny; Baker, Matt; MacLeod, Michelle; Leach, Michael
**Subject:** Status of Meet and Confer on BP discovery requests

Jenny and Carolyn:

Please see the attached letter from Barbara Harding summarizing the status of the meet-and-confer efforts on BP's discovery.

Thank you,
Philip.

Philip T. Chen
Kirkland & Ellis LLP
333 South Hope Street · Los Angeles, CA 90071
Tel +1-213-680-8341 · Fax +1-213-680-8500
philip.chen@kirkland.com

**From:** Raines, Carolyn [mailto:CRaines@GodwinRonquillo.com]
**Sent:** Thursday, August 25, 2011 4:11 PM
**To:** Harding, Barbara M.; Chen, Philip T.
**Cc:** jmartinez@GodwinRonquillo.com; Baker, Matt; MMacLeod@godwinronquillo.com; Leach, Michael
**Subject:** HESI's Search Term List

Barbara,

Per our discussions during the last meet and confer, attached is the list of search terms HESI used for its document productions.

Thanks

Carolyn

# GODWIN RONQUILLO PC

**Carolyn R. Raines**
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4452 Direct   (800.662.8393 Toll Free)
214.527.3137 Fax
CRaines@GodwinRonquillo.com
GodwinRonquillo.com

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information

that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify Godwin Ronquillo PC immediately by telephone (800.662.8393) and destroy the original message. Messages sent to and from us may be monitored.

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

```
************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************
```

# Exhibit 20

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3      IN RE: OIL SPILL        )   MDL NO. 2179

        by the OIL RIG          )

 4      "DEEPWATER HORIZON" in  )   SECTION "J"

        the GULF OF MEXICO, ON  )

 5      APRIL 20, 2010          )   JUDGE BARBIER

                                )

 6                              )   MAG. JUDGE

                                )   SHUSHAN

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20                   VOLUME 1 OF 2

21

22      Deposition of THOMAS ROTH, taken at

23   Hilton St. Charles Hotel, 333 St. Charles

24   Avenue, Le Moyne Room, New Orleans,

25   Louisiana, on the 25th of July, 2011.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    2:07 p.m., and we're off the record.

2              (Recess 2:07-2:27 p.m.)

3              THE VIDEOGRAPHER:  The time is

4    2:27 p.m., and we're back on the record.

5         Q.  (BY MR. THORNHILL)  Mr. Roth, the

6    investigation of the facts regarding the

7    blowout and the preblowout activities, I

8    see in the e-mails that you were being

9    asked to describe for the press and -- and

10   others issues regarding the negative and

11   the positive tests that were run on -- on

12   this well, particularly the 7 S production

13   casing job.

14             Do you remember that?

15        A.  I recall that, but I would like to

16   make one clarification to the information

17   that you just raised and that's the fact

18   that Halliburton never did conduct an

19   investigation, per se.

20             We basically developed a

21   series of presentations to information

22   that was requested over a series of -- of

23   multiple months, but there never was an

24   investigation that was actually led and

25   directed by Halliburton in this effort.

PURSUANT TO CONFIDENTIALITY ORDER

1     additional information that was gathered

2     in the time frame from probably April to

3     November.

4         Q.  (BY MS. HARDING)  And then you've

5     also been working on it post-November as

6     well; is that right?

7         A.  Only in a very limited capacity.

8         Q.  Okay.  So most of the time that

9     you devoted to the -- to the -- to

10    researching and understanding and learning

11    about the incident occurred from April

12    21st till sometime in November?

13        A.  That's correct.

14        Q.  And then you've had a limit --

15    limited role post-November?

16        A.  Yes, ma'am.

17        Q.  Okay.  Earlier today, you

18    clarified some previous testimony --

19    and -- and I'm paraphrasing, so tell me if

20    I've got it wrong -- but you wanted to

21    make it clear that you hadn't done an

22    investigation; is that right?

23        A.  Halliburton has not conducted an

24    investigation, and I have not conducted an

25    investigation.

**PURSUANT TO CONFIDENTIALITY ORDER**

1                    CHANGES AND SIGNATURE

2        WITNESS NAME:  THOMAS ROTH

3        DATE OF DEPOSITION:  JULY 25, 2011

4        PAGE  LINE  CHANGE      REASON

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1         I, THOMAS ROTH, have read the

 2    foregoing deposition and hereby affix my

 3    signature that same is true and correct,

 4    except as noted on the attached Amendment

 5    Sheet.

 6                   _____

 7                         THOMAS ROTH

 8    THE STATE OF _____)

 9    COUNTY OF _____)

10         Before me, _____,

11    on this day personally appeared

12    THOMAS ROTH, known to me (or proved to me

13    on the oath of _____ or through

14    _____) to be the person whose

15    name is subscribed to the foregoing

16    instrument and executed the same for the

17    purposes and consideration therein

18    expressed.

19         Given under my hand and seal of office

20    this _____ day of _____,

21    2011.

22                   _____

23                   NOTARY PUBLIC IN AND FOR

24                   THE STATE OF _____

25                   My commission expires: _____
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3    IN RE: OIL SPILL        )   MDL NO. 2179

     by the OIL RIG          )

4    "DEEPWATER HORIZON" in  )   SECTION "J"

     the GULF OF MEXICO, ON  )

5    APRIL 20, 2010          )   JUDGE BARBIER

                             )

6                            )   MAG. JUDGE

                             )   SHUSHAN

7

8              REPORTER'S CERTIFICATION

9     TO THE ORAL AND VIDEOTAPED DEPOSITION OF

10                   THOMAS ROTH

11         I, Therese J. Casterline, Certified

12    Shorthand Reporter in and for the State of

13    Texas and the State of Louisiana, do

14    hereby certify to the following:

15         That the witness, THOMAS ROTH, was

16    duly sworn by the officer and that the

17    transcript of the oral deposition is a

18    true record of the testimony given by the

19    witness.

20         That the deposition transcript was

21    submitted on _____, 2011, to the

22    witness or to the attorney for the witness

23    for examination, signature and return to

24    Worldwide Court Reporters, Inc., by

25    _____, 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      That the amount of time used by each

2   party at the deposition is as follows:

3          Mr. Thornhill - 4 hours, 07

4   minutes

5          Ms. Sullivan - 1 hour, 22 minutes

6          Ms. Harding - 0 hours, 48 minutes

7      I further certify that I am neither

8   counsel for, related to, nor employed by

9   any of the parties or attorneys in the

10   action in which this proceeding was taken,

11   and further that I am not financially or

12   otherwise interested in the outcome of the

13   action.

14      Subscribed and sworn to by me this

15   25th day of July, 2011.

16

17   _____

    Therese J. Casterline, CSR, RMR, CRR

18   Texas CSR 5001, Expires 12-31-11

    Louisiana CSR 25014, Expires 12-31-11

19   WORLDWIDE COURT REPORTERS

    3000 Weslayan, Suite 235

20   Houston, Texas 77027

    1-800-745-1101

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**