# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

333 South Hope Street
Los Angeles, California 90071

| Martin Boles<br>To Call Writer Directly:<br>(213) 680-8428<br>martin.boles@kirkland.com | (213) 680-8400<br>www.kirkland.com | Facsimile:<br>(213) 680-8500 |
|---|---|---|

August 25, 2011

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court
500 Poydras Street, Room B345
New Orleans, LA 70130

Re: BP's Motion to Compel Responses to Discovery Requests Served on Anadarko in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179

Dear Judge Shushan:

Through several months of discussions, BP and Anadarko have worked to resolve many of their discovery disputes. There remain two issues, however, that BP feels are important enough to bring to the Court in this Motion to Compel.

The first dispute relates to the agreement reached between BP and Anadarko to produce certain documents—and answer interrogatories—related to each company's wells in the Gulf of Mexico other than Macondo. Specifically, BP and Anadarko agreed that each would produce documents reflecting its company policies and standardized procedures for GoM wells, provided that such documents were responsive to an outstanding discovery request. An analogous agreement was made regarding interrogatories. The present dispute arises because Anadarko refuses to produce documents or provide interrogatory responses reflecting its GoM drilling policies for an entity known as Anadarko US Offshore. Anadarko cannot dispute that Anadarko US Offshore conducts a substantial part of its GoM deepwater drilling. Indeed, a month before the *Deepwater Horizon* incident, Anadarko touted the deepwater drilling industry leadership of Anadarko US Offshore, then known as Kerr-McGee Oil & Gas Corporation, or "KMG": "Anadarko (KMG) Leading the Way in Deepwater Gulf of Mexico Platforms." (Ex. A (Mar. 10, 2010 presentation).) Anadarko has publicly branded itself as one of the industry's most "successful" deepwater explorers in the Gulf of Mexico, claiming to have discovered 30-plus fields and to have interests in hundreds of lease blocks. (*See id.*) Its practices and procedures on those wells are relevant to the industry standard of care. The deepwater drilling policy documents and interrogatory responses being sought by this motion are a modest subset of

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 2

discrete documents, are highly relevant, and are under the control of Anadarko as a matter of law. *See* Part I *infra*.

And second, Anadarko's document production to date has been largely devoid of custodian information. BP requests that Anadarko provide the custodial metadata for the documents it has produced and will produce. Pretrial Order #16 requires disclosure of this metadata. BP's request is not unduly burdensome, and is calculated to yield evidence that is directly relevant to the claims pending against BP. *See infra* Part II.

Under Rule 26 of the Federal Rules of Civil Procedure, BP has the right to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). And as the party resisting discovery, Anadarko bears the burden of justifying each of its objections to the requested discovery and showing specifically how each request is irrelevant, overly broad, unduly burdensome, or oppressive. *See McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990); *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005). As demonstrated below, Anadarko cannot satisfy this burden for any of the requested discovery.

I.   **Anadarko Should Provide Documents and Interrogatory Responses Regarding the Agreed-Upon Categories of GoM Offshore Drilling Policies.**

Anadarko and BP have agreed that each would provide documents or interrogatory responses describing policies, procedures, and standards generally applicable to deepwater Gulf of Mexico wells. But Anadarko has refused to produce those policies if they are in the possession of Anadarko US Offshore, contending that those documents are not in its "possession, custody, or control." And Anadarko has also refused to provide interrogatory responses regarding Anadarko US Offshore's policies, contending that they are not relevant. Neither contention is correct.

   A.   **Anadarko Is in "Control" of the Documents in Anadarko US Offshore's Possession.**

There is no dispute that Anadarko US Offshore is a subsidiary of APC. Because Anadarko US Offshore is an Anadarko subsidiary, its documents are in Anadarko's "control" for purposes of discovery. Federal courts have long held that a parent corporation has "control" over documents in the possession of its subsidiaries, and therefore the obligation to search for and produce such documents. *Local No. 1419, ILA v. Smith*, 301 F.2d 791, 795–96 (5th Cir. 1962); *see United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("A corporation must produce documents possessed by a subsidiary that the parent

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 3

corporation owns or wholly controls."); *Laserdynamics, Inc. v. Asus Computer Int'l*, 2009 WL 153161, at *3 (E.D. Tex. Jan. 1, 2009) ("To the extent that such information resides with [the defendant's] subsidiary or affiliated company, the court orders it to be produced, and finds that such information is within the control of [the defendant]."). In *Smith*, the Fifth Circuit affirmed the district court's decision ordering the defendant to make the books and records of its subsidiary corporations available for inspection. It did not matter that the subsidiary corporations were not parties to the action. *Smith*, 301 F.2d at 795–96; *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 545 (N.D. Cal. 2005) ("[I]f [the Defendant] or any other wholly-owned subsidiary bank of [the defendant] has possession and custody of documents responsive to Plaintiffs' requests, then [the defendant] has legal control of the documents through its control of the subsidiary bank and must produce any which are responsive to Plaintiffs' Rule 34 requests.").

      **B.**    **Anadarko Touts Anadarko US Offshore as "Leading the Way in Deepwater Gulf of Mexico Platforms," so Its Policies and Procedures on Those Wells Are Relevant to the Industry Standard of Care.**

Anadarko has accused BP of not meeting its duty of care in operating at the Macondo Well. Policies and procedures of other leading GoM offshore drillers are relevant to the industry standard of care. *See In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 n.10 (5th Cir. 2010) ("[I]n admiralty, the duty of care may be derived from [inter alia] custom[.]" (internal quotation marks omitted)); *Orthopedic & Sports Injury Clinic v. Labs., Inc.*, 922 F.2d 220, 228 (5th Cir. 1991) ("We are dependent on the industry's standards of care to determine both whether there was a departure from the standard and, if so, how egregious that nonconformity was."); *Frazier v. Cont'l Oil Co.*, 568 F.2d 378, 382 n.11 (5th Cir. 1978) (reversing the district court's ruling that evidence regarding the petroleum industry's standard of care was inadmissible, and holding that "evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence" (internal quotation marks omitted)).

Anadarko has publicly branded itself as one of the industry's most "successful" deepwater explorers in the Gulf of Mexico, claiming to have discovered 30-plus fields and to have interests in hundreds of lease blocks. (*See* Ex. A) Its practices and procedures on those wells are relevant to the industry standard of care. Indeed, Anadarko specifically points to Anadarko US Offshore, formerly known as Kerr-McGee,[1] in touting its leadership: "Anadarko

---

[1] According to the Texas Secretary of State, Anadarko US Offshore changed its name on August 19, 2011. (Ex. B (Tex. Sec'y of State's Bus. Orgs. Inquiry) (reflecting change of name).)

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 4

(KMG) Leading the Way in Deepwater Gulf of Mexico Platforms." (*See id.* at 4.) Likewise, a number of Anadarko witnesses who served in drilling engineering and other technical roles on the Macondo Well came from the Anadarko US Offshore (f/k/a "Kerr McGee") organization. (*See* Chandler Dep. 16:12–14 ("I started with Anadarko, which actually had been merged with Kerr-McGee."); Bryan Dep. 14:19–21 ("Well, in 2006. I was with Kerr-McGee, and they were acquired by Anadarko Petroleum."); Huch Dep. 18:9–12 ("I started . . . when Anadarko bought Kerr-McGee, which would have been effectively August of 2006, I believe."); Quitzau Dep. 24:11–15 ("I began with Kerr-McGee in Houston. When Kerr-McGee was combined with Anadarko, I just continued my role on through the merger and have continued with Anadarko ever since."); Hollek Dep. 13:12–16 ("[I was at Kerr McGee u]ntil 2006 . . . . Until we were acquired at that point with Anadarko.").)

Anadarko has not articulated any reason why Anadarko US Offshore's GoM deepwater drilling policies are not relevant. Anadarko has agreed to produce the policies of APC, and it has sought and obtained BP's agreement to provide GoM drilling policies from BP. Anadarko does not claim that there is an undue burden in producing this discrete subset of documents or responding to these precise interrogatories. Anadarko should therefore be ordered to provide the responsive documents and interrogatory responses regarding the GoM deepwater drilling policies and procedures of Anadarko US Offshore, f/k/a Kerr-McGee Oil & Gas Corporation, or the analogous documents and information from any other wholly-owned subsidiary which operates deepwater drilling wells or rigs in the Gulf of Mexico.

**II.     Anadarko Should Provide Custodial Metadata As Required By Pretrial Order #16.**

BP also respectfully requests that the Court order Anadarko to provide custodian metadata—for both documents that Anadarko has and for those it will produce—as required by the Court's orders. In Pretrial Order #16, the Court ordered the parties to produce documents with metadata:

> E-mail will be produced as image files with related searchable text, metadata (to the extent it exists) and bibliographic information, as described in Metadata & Family Record Specifications, US DOJ, Antitrust Division ("DOJ Specifications") . . . .
>
> Other electronic documents including word-processing documents, spreadsheets, presentations and all other electronic documents not specifically discussed elsewhere will be produced as image files with related searchable text, metadata (to the extent it exists) and bibliographic information as described in the DOJ Specifications . . . .

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 5

One of the metadata fields that the Court required the parties to produce is the "CUSTODIAN" field, containing the "Custodian(s) / source(s)" of the document. (Dkt. 686 (Pretrial Order No. 16) at 10.)

Of the various types of metadata, custodian metadata is particularly important. Since the beginning of e-discovery, and even in the paper environment before that, providing such information so that the receiving party can place the document into context, search it, organize it, and make proper use of it in a discovery context has been an important consideration. (John Jessen Decl. ¶ 16.). Custodian metadata information, such as the identity of the person from which the data was collected and/or the location of such information, is at the heart of the discovery process of identifying, locating, retrieving, and analyzing potentially relevant information. (*Id.* ¶ 15.) Custodian metadata tells the receiving party whose files a document comes from. For example, if a Microsoft Word or PowerPoint document is stored as a stand-alone document and not attached to an e-mail, custodian metadata may tell the receiving party who authored the document and/or who had access to it. Similarly, custodian metadata may be useful in identifying who authored and/or received a handwritten or hard-copy document.

Custodian metadata is particularly important in this case. PTO 17 states:

Certificate of Completeness – Custodial File Production. At least seven (7) days prior to the deposition of any person currently or formerly employed by any of the defendants, said defendant shall provide Plaintiffs' Liaison Counsel with a written certification that it has completed production of documents from that witness's custodial files which are responsive to requests for production of documents and relevant to the litigation.

(Dkt. 740 at 10–11.) Without custodial metadata, it can be extremely difficult to determine whether a hard-copy document, handwritten document, or stand-alone Word, Excel, or PowerPoint document belongs to a particular "custodial file." Without custodial metadata, it can likewise be extremely difficult to determine whether a custodial file is complete. This is particularly true in a case such as this one involving hundreds of witnesses and millions of documents.

Anadarko has argued that it is not required to provide custodial metadata. In a letter dated July 29, 2011, Anadarko stated:

It appears that the *original folder structure (which would identify the original source of the document) was lost when the documents were ingested into Evault,* and therefore the custodian metadata field was created to denote the particular search (each of which included documents from all identified

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 6

> custodians) that yielded the document rather than the original source. All other file metadata values relating to the documents—including author, date created, date last modified, date last printed, size, etc.—were preserved. Thus, ***metadata has been produced to the extent it exists, consistent with the terms of PTO No. 16***.

(Ex. C (July 29, 2011 Letter from D. Saunders to M. Nomellini) at 3.) (emphasis added) Anadarko is incorrect when it claims that "metadata has been produced to the extent it exists, consistent with the terms of PTO No. 16." PTO 16 does require the parties to produce custodian metadata "to the extent it exists." And custodian metadata does exist at Anadarko—it is just that Anadarko has not produced it. Two examples of relevant documents are stand-alone PowerPoint and Word documents on custodians' hard drives. BP and other parties have with relatively few exceptions produced those documents with custodian metadata, so that the receiving party can tell whose computer the document comes from. Anadarko could have used the same process and provided the same custodian metadata, and it still has the ability to do so today. Anadarko could provide that custodian metadata by producing the copy of the document that resides on the custodian's laptop (which has the custodian metadata intact). Instead Anadarko chose to produce the duplicate copies of these same documents that reside on Anadarko's Evault (duplicate copies that supposedly have been stripped of metadata). From an e-discovery perspective, it is unreasonable for Anadarko to not provide this information for the vast majority of non-email documents. (John Jessen Decl. ¶ 16.). And there is no reason why Anadarko should be permitted to produce the Evault copies of documents without the custodian metadata as opposed to the hard-drive copies, which still have the custodian metadata.

Anadarko also incorrectly suggests that its failure to produce this critical metadata is excused by virtue of the fact that its collection efforts occurred prior to the issuance of PTO 16. Anadarko states:

> Once potentially responsive data had been identified by the processes discussed above, extraction of that data to the network was completed between July 7 and July 12, 2010. Ingestion of the extracted data into the Evault was completed by August 9, 2010. We note that this was several months before the Court issued its ESI order on November 8, 2010, requiring production of metadata "to the extent it exists."

(Ex. D (Aug. 15, 2011 Letter from D. Saunders to M. Nomellini) at 3.) Respectfully, this is beside the point. Anadarko is not restricted to using the copies of documents that were extracted into Evault and therefore stripped of metadata. Rather, Anadarko should use the still-extant copies of documents from custodians' hard drives that have metadata intact.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 7

Moreover, during a call on August 25, 2011, Anadarko's attorneys confirmed that Anadarko's use of the metadata-stripping Evault process continued beyond PTO 16 (entered in November 2010), at least though the spring of 2011. Indeed, Anadarko is continuing to use the metadata-stripping Evault process for upcoming deposition custodians. When the parties conferred on August 25, Anadarko stated that it has not priced out an alternative to the Evault process for the future.

To the extent there are any documents that exist only in Anadarko's Evault but no longer exist on the relevant custodians' hard drives, it is unfortunate that the relevant custodian metadata has been discarded, and it is not clear what can be done to restore that information. Only Anadarko can confirm whether such documents exist. But, for the majority of documents produced by Anadarko, custodial metadata still exists, because a duplicate copy of many of the Evault documents very likely still exists on custodian hard drives.

Anadarko also argues that, in the case of e-mails or attachments to e-mails, custodian information is unnecessary because the e-mail identifies who received the document. But this argument does not apply to the many documents that are not e-mails or attachments to e-mails: e.g., hard-copy documents, handwritten documents, and stand-alone PowerPoint, Word, and Excel documents.

Finally, this is not merely an "e-discovery issue"; it has real-world implications. For example, BP has asked Anadarko whether it produced documents (that are not e-mails or attachments) from Anadarko CEO James Hackett's H:\ drive. Anadarko responded that, because of "the lack of custodian metadata," it could not determine whether it has produced documents (that are not e-mails or attachments) from its CEO's H:\ drive. (Ex. E (Aug. 19, 2011 e-mail from D. Saunders to M. Nomellini) ("As to whether any documents from Mr. Hackett's H:\ drive resulted from that search, *we cannot answer that question because the lack of custodial metadata precludes us from identifying the drive that was the original source of a particular document*. However, to the extent that any non-privileged post-incident documents were attached to e-mails (and we believe that most, if not all, such documents were), they have been produced and you should be able to identify whether such e-mails were sent or received by Mr. Hackett.").) (emphasis added) The same issues exist for Anadarko's other custodians and witnesses.

Accordingly, BP respectfully requests that Anadarko be required to provide custodial metadata information for the documents it has produced, and continue to provide that information for future productions.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 25, 2011
Page 8

### III. Conclusion

For the foregoing reasons, the BP's Motion to Compel should be granted.

Sincerely,

Martin Boles

cc: Plaintiffs Liaison Counsel
Defense Liaison Counsel
Mike Underhill
Hon. Attorney General Luther Strange
Cory Maze
Mike O'Keefe
Tiffany Hedgpeth
Dan Saunders
Tony Fitch