# EXHIBIT A



# Anadarko's GOM Operator Experience and Views on the Challenges of Integrated IOR/EOR Capabilities into Green Field Developments

**Presented by Frank H. Lim,  Senior Reservoir Engineering EOR Advisor**

**Anadarko Petroleum Corporation**
**1201 Lake Robbins Drive, The Woodlands, TX  77380**
**Direct: (832) 636-3010   Email: Frank.Lim@Anadarko.com**

**US-Norway Technology Partnership**
**Improved Oil Recovery (IOR)**
**Reservoir Characterization and Downhole Technologies**
**March 10, 2010, Norris City Centre Conference Center, Houston**

# Why Anadarko is Well-Suited to Apply EOR in Deepwater Gulf of Mexico

\* Extensive DWGOM operational and development experience/expertise coupled with extensive EOR operational and development experience/expertise in US onshore applications.

\* Recent evaluation of EOR application to the K2 field has provided sound realistic assessment of reservoir, operational, and economic risks for implementing pilot and expansion of EOR processes in DWGOM.

\* Many risks, challenges, and barriers were identified that prevent actively pursuing EOR in K2 at this time.

\* Anadarko and its K2 partners (ConocoPhillips, ENI Petroleum, Ecopetrol, Nippon Oil, and MCX) pursuing artificial lift while monitoring production with regular history match simulations to improve reservoir models.

2

# Anadarko's Deepwater GOM Production Growth Trend



# Anadarko (KMG) Leading the Way in Deepwater Gulf of Mexico Platforms


Neptune

➢ **First producing spar development  (1,930' Neptune 1996)**

➢ **First Truss Spar (3,149' Gunnison 2003)**


Gunnison

➢ **Deepest TLP at Time**

   **(4,300' Marco Polo 2003)**


Marco Polo

➢ **First Cell Spar (5,300' Red Hawk 2004)**


Red Hawk

➢ **First Deep Draft Semi-submersible  (Independence Hub 2007)**
   **World's deepest platform in 8,000' of water**
   **World's deepest subsea prod tree in 9,000' of water**
   **World's deepest flowline installation**
   **World's largest offshore natural gas processing facility**


Independence Hub

# Anadarko's Deepwater Gulf of Mexico Position

### *Premier Deepwater Position*

- ✓ **Acreage:  Average 64% WI in  ~ 600 Blocks**
- ✓ **Track Record:  Ownership in 26 Producing Fields**
- ✓ **Infrastructure:  11 Hubs and 27 Subsea Systems**
- ✓ **Project-Management Skills:  Industry Leader**
- ✓ **Robust E&P Plan:  New Developments & Discoveries**



# Notable Wells of the GOM Subsalt Play (from Fall 2008 SLB Oilfield Review)

| Protraction Area | Block Number | Total Depth | | Water Depth | | Year Drilled | Field Name | Remarks |
|---|---|---|---|---|---|---|---|---|
| | | feet | meters | feet | meters | | | |
| Ship Shoal | 366 | 8,203 | 2,500 | 453 | 138 | 1983 | — | Dry hole. Targeted a direct hydrocarbon indicator (DHI); drilled through salt. |
| South Marsh Island | 200 | 13,500 | 4,115 | 475 | 145 | 1986 | — | Dry hole. DHI target proved to be salt; however, 1,000 ft [305 m] of wet, reservoir-quality sand lay beneath it. |
| Mississippi Canyon | 211 | 12,763 | 3,890 | 4,356 | 1,328 | 1990 | Mica | First significant occurrence of hydrocarbons in five thin pay zones beneath salt. |
| Ship Shoal | 349 | 16,563 | 5,048 | 372 | 113 | 1993 | Mahogany | Put on line before Mica. Became the first commercial development in the Gulf of Mexico subsalt play.   1st Commercial Subsalt by APC |
| Garden Banks | 128 | 18,454 | 5,625 | 705 | 215 | 1994 | Enchilada | Salt weld discovery. |
| Garden Banks | 127 | 14,730 | 4,490 | 630 | 192 | 1995 | Chimichanga | Second commercial subsalt discovery; drilled 1,300 ft [396 m] of salt, tested at 2,100 bbl/d [334 m³/d] of oil and 20 MMcf/d [566,337 m³/d] of gas. |
| Mississippi Canyon | 292 | 17,976 | 5,479 | 3,405 | 1,038 | 1995 | Gemini | Third commercial discovery of the play, in Pliocene-Miocene sands. |
| Green Canyon | 699 | 19,525 | 5,951 | 6,133 | 1,869 | 1998 | Atlantis | Deepest moored floating oil and gas production facility in the world and also one of the largest. |
| Grand Isle | 116 | 21,600 | 6,584 | 323 | 98 | 1998 | Hickory | Penetrated 8,000 ft [2,438 m] of salt.   APC |
| Eugene Island | 346 | 11,833 | 3,607 | 314 | 96 | 1998 | Tanzanite | First well tested 1,917 bbl/d [305 m³/d] of oil and 29.7 MMcf/d [841,100 m³/d] of gas, one of the highest rates in the shallow-water Gulf of Mexico.   APC |
| Mississippi Canyon | 778 | 23,531 | 7,172 | 6,050 | 1,844 | 1999 | Thunder Horse | Largest field in the Gulf of Mexico. |
| Garden Banks | 783 | 16,867 | 5,141 | 4,668 | 1,423 | 1999 | Magnolia | Tension leg platform (TLP) installed in record water depth for TLPs. |
| Green Canyon | 562 | 25,624 | 7,810 | 3,979 | 1,213 | 1999 | K2 | Drilled through 10,000-ft [3,048-m] salt canopy of the Miocene fold trend.   APC |
| Green Canyon | 782 | 22,826 | 6,957 | 4,420 | 1,347 | 2001 | Mad Dog | 300 ft [91 m] of net pay discovered in Mississippi Fan fold belt. |
| Garden Banks | 877 | 23,500 | 7,163 | 5,300 | 1,615 | 2001 | Redhawk | Produced from the world's first truss spar facility.   APC |
| Green Canyon | 640 | 26,804 | 8,170 | 4,017 | 1,224 | 2002 | Tahiti | Middle Miocene trap beneath 11,000-ft [3,353-m] salt canopy. |
| Walker Ridge | 678 | 29,066 | 8,859 | 7,036 | 2,145 | 2003 | St. Malo | First subsalt well of the Wilcox trend, drilled through 10,000 ft [3,048 m] of Sigsbee salt canopy, with 450 ft [137 m] of net pay. |
| Walker Ridge | 759 | 28,175 | 8,588 | 6,850 | 2,088 | 2004 | Jack | Wilcox test: deepest extended drillstem test in deepwater Gulf of Mexico history. |
| Keathley Canyon | 292 | 32,500 | 9,906 | 5,860 | 1,786 | 2006 | Kaskida | First Wilcox subsalt wildcat located significantly inboard of the Sigsbee Escarpment, northern frontier of Wilcox prospects. Found 800 ft [244 m] of net pay. |
| Green Canyon | 726 | 25,680 | 7,827 | 4,700 | 1,433 | 2007 | West Tonga | Discovered 350 ft [107 m] of net oil in three Miocene sands.   APC |



175 Miles

## K2 Field and Reservoir Data Summary

### Field Data
175 miles South of New Orleans
Green Canyon Offshore Blocks
518, 561, 562, 563, 605, 606, 607
4,300 ft Water Depth
Subsalt, 25,000 to 30,000 feet Well Depths
8 Subsea Production Wells with 8 miles Tieback
  to Marco Polo Platform in GC Block 608
40,000 bopd Peak Production in 2006

M14 (100' Maximum Gross Pay) – High Asphaltenes
700 md (100 to 1,500 md), 23% Porosity (22 to 26%)

M20 (200' Maximum Gross Pay) – Low Asphaltenes
1500 md (100 to 10,000md), 22% Porosity (17 to 28%)

# K2 Field Development Map - Anadarko 2nd Quarter 2008 Operations Report



# K2 EOR Challenges Observed
# for GOM Deepwater Reservoirs

* **Onshore EOR vs Offshore Deepwater Paradigms**
  Staffing, Priorities, Workflows are Different for Each
  Need Paradigm Shift for Successful Economic DW EOR

* **Operational Technology Challenges & Gaps**
  Onshore EOR Assumes Low Operations Costs/Risk
  All DW Offshore Operations Carry Huge Costs/Risk
  DW Costs/Risks are Largest Economic Barrier to EOR

* **Reservoir Technology Challenges & Gaps**
  Onshore EOR has Much Log/Core Data & Well Controls
  Offshore DW Relies Heavily on Seismic Modeling
  EOR Flood Processes are Sensitive to Sub-Seismic Prop
  DW Reservoir Models too Uncertain for Low-Risk EOR

* **Resources, Regulatory and EH&S Challenges**
  Offshore EOR Requires More Additional Work

9

# K2 Lessons Learned ( 1 Page Project Summary ) Identified Many Cost, Risk, & Technology Gaps

**Cost Gaps:**

(1) New Well Capital Costs ($200mm each DC&E)

(2) Well intervention Costs ($1mm per day due to subsea wells)

(3) Onshore Injectant Source (added transportation & offshore facilities costs)

(4) High Pilot EOR Floods ($50mm alone just for barged N2 for 30 day injection test)

**Risk Gaps:**

(1) Unproven Well Drilling, Completion, & Intervention Technologies

(2) Potential Huge Well Costs with Potential H2S & O2 Corrosion/Souring Fluids

(3) Applying Proven Onshore EOR to Offshore with High RC Uncertainty

(4) Gas Injection Asphaltene Deposition Causing Reservoir Damage & Well Failures

(5) Water Injection Well Completion & Formation Damage and Injectivity Issues

**Technology Gaps:**

(1) Better RC (Reservoir Characterization) with Much Less Data than Onshore Wells

(2) How to Apply Onshore EOR Processes to Offshore Circumstances

   Example: Gas injection must exceeds gravity stable rates due to large well
            spacing and need to economically process the reservoir or lose NPV

   Example: If we can obtain lower BHFP for 30,000' deep wells, we could obtain
            10 to 30% more oil recovery just from primary recovery mechanisms !

(3) How Bridge the Huge Gap Between Actual Field Execution Results & Design Plans

10

## How Do I Find Out More About K2 and DWGOM Improved Recovery ?

**OTC Paper 19624**

**> Good Overview of K2 Field Development History**

**> Details of Initial Fluid EOR (N2) & Flow Assurance Lab Studies**

**OTC 19624**

**Design and Initial Results of EOR and Flow Assurance Laboratory Fluid Testing for K2 Field Development in the Deepwater Gulf of Mexico**

Frank Lim, Eulalia Munoz, and Brad Browning, Anadarko Petroleum Corporation;
Nikhil Joshi, Moulinex Business Services;  Cuong Jackson and Stefan Smuk, Schlumberger

**K2 Data from OTC 19624 and Lessons Learned from EOR Evaluation are being contributed to the US-DOE's RPSEA Project DW1701 on Improved Recovery Phase 1 (Ultra-Deepwater Gulf of Mexico Program)**

**Primary Contractor:  Knowledge Reservoir (Joe Lach)**
**Other Participants:  Deepstar Resr Engr Committee, LSU, and Anadarko**

## Comparison of Anadarko's Salt Creek and K2 Field, Main Reservoirs

| | | |
|---|---|---|
| Field Name | Salt Creek | K2 |
| Geographic Location | Casper, WY | Offshore, LA |
| Main Reservoir | Frontier (WC-2) | Miocene (M14) |
| Lithology | Sandstone | Sandstone |
| Deposition | Offshore Bar | Turbidite Sheet |
| | | |
| Area, acres | 15,000 | |
| Depth, feet | 1500 to 2500 | 25,000 to 30,000 |
| Thickness, feet | 50 to 100 | 50 to 100 |
| Porosity, pct | 18 to 20 | 22 to 26 |
| Permeability, md | 5 to 500 | 100 to 1500 |
| Original Pressure, psi | 500 to 1000 | 12,500 to 14,000 |
| Temperature, deg F | 90 to 110 | 190 to 215 |
| Oil Gravity, deg API | 36 to 39 | 24 to 28 |
| Asphaltenes, pct | <1 | 15 |

## Comparison of Anadarko's Salt Creek and K2 Field, Main Reservoirs

| | Salt Creek | K2 |
|---|---|---|
| Field Name | Salt Creek | K2 |
| Reservoir | Frontier (WC-2) | Miocene (M-14) |
| Primary Recovery | Solution Gas Drive | Oil Expansion |
| | Gravity Drainage | Limited Water Influx |
| Secondary Recovery | Gas Injection | Artificial Lift |
| | Waterflooding | |
| Tertiary Recovery | CO2 WAG | |
| OOIP, mmbo | 1100 | |
| P+S Recovery, mmbo | 465 (42%RF) | |
| Current Total Wells | 660 | 2 |
| Completed Well, mm$ | 0.500 | 200 |
| Major Workover, mm$ | 0.050 | 50 |

# CARBON DIOXIDE FLOODING

This method is a miscible displacement process applicable to many reservoirs. A $CO_2$ slug followed by alternate water and $CO_2$ injections (WAG) is usually the most feasible method.

*Viscosity of oil is reduced providing more efficient miscible displacement.*



# Anadarko's Illustration for Proper IOR/EOR Perspective of DWGOM Fields



Cognac 1978  Bullwinkle 1988  Auger 1993  Mars 1996  Ram-Powell 1997  Bonga 2005  Ormen Lange 2007  Ursa 1999  Gumusut-Kakap In Progress  Mensa 1997  BC-10 In Progress  Na Kika 2003  Perdido In Progress

2,000'

7,000'

Subsalt

30,000'

**Complete Integrated Project Assessment** **of Reservoir & G&G (RC, Flow Processes), Operations (Wells, Tiebacks, Facilities, Flowlines) with Robust Economics are Needed to Properly Evaluate Development**

**We Need to Get the Oil from Reservoir to Sales !**

Drive Water | $CO_2$ | Water | $CO_2$ | Miscible Zone | Oil Bank | Additional Oil Recovery

# Anadarko's Wyoming EOR Assets

**Fields**
- Monell Patrick Draw
- Salt Creek / Sussex

**Pipelines**
- 33 mile, 8"
- 125 mile, 16"

**CO₂ Supply**
- Exxon Mobil Shute Creek Plant



# Salt Creek Field and Reservoir Overview

**Salt Creek Field**
- **Asymmetrical Anticline**
- **1680 MMBO OOIP**
- **Cum Production 683 MMBO**
- **11 productive intervals & over 4000 wells**
- **Anadarko acquired 2002**

**Wall Creek 2 (Primary Horizon)**
- **1099 MMBO OOIP**
- **Cum Production 465 MMBO**
- **Completed 6 of 16 development phases**
- **Currently developing Phase 7**



# Development Statistics

| | Ph 1 & 2 | Ph 3 & 4 | Ph 5 | Ph 6 |
|---|---|---|---|---|
| Pattern Size | 20 & 40 acre | 20 acre | 20 acre | 20 acre |
| Patterns | 82 | 68 | 42 | 62 |
| WAG Injectors | 83 | 68 | 42 | 62 |
| Water Injectors | 14 | 29 | 9 | 6 |
| Producers | 102 | 73 | 52 | 67 |
| Observation Wells | 28 | 9 | 12 | 4 |
| Total Well Count | 227 | 179 | 115 | 139 |
| First CO2 Injection | Jan-04 | Jan-07 | Apr-08 | Mar-09 |

- **254 Patterns**
- **660 Active Wells**
- **~8,500 BOPD from $CO_2$**



# ~ 10 MMBO Produced from SALT CREEK CO2 Flood





# Anadarko's GOM Operator Experience and Views on the Challenges of Integrated IOR/EOR Capabilities into Green Field Developments

**Presented by Frank H. Lim,  Senior Reservoir Engineering EOR Advisor**

**Anadarko Petroleum Corporation**
**1201 Lake Robbins Drive, The Woodlands, TX  77380**
**Direct: (832) 636-3010   Email: Frank.Lim@Anadarko.com**

**US-Norway Technology Partnership**
**Improved Oil Recovery (IOR)**
**Reservoir Characterization and Downhole Technologies**
**March 10, 2010, Norris City Centre Conference Center, Houston**

# EXHIBIT B

# TEXAS SECRETARY of STATE
# HOPE ANDRADE

**UCC** | **Business Organizations** | **Trademarks** | **Notary** | **Account** | **Help/Fees** | **Briefcase** | **Logout**

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 11719306 | **Entity Type:** | Foreign For-Profit Corporation |
| **Original Date of Filing:** | September 22, 1997 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 17605443575 | **FEIN:** | |

| | |
|---|---|
| **Name:** | Anadarko US Offshore Corporation |
| **Address:** | PO BOX 1330 |
| | Houston, TX 77251-1330 USA |
| **Fictitious Name:** | N/A |
| **Jurisdiction:** | DE, USA |
| **Foreign Formation Date:** | N/A |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES |
|---|---|---|---|---|---|

| Name | Name Status | Name Type | Name Inactive Date | Consent Filing # |
|---|---|---|---|---|
| KERR-MCGEE OIL & GAS CORPORATION | Prior | Legal | August 19, 2011 | 0 |
| Anadarko US Offshore Corporation | In use | Legal | | 0 |

[ Order ]  [ Return to Search ]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

# EXHIBIT C

**BINGHAM**

Daniel A. Saunders
Direct Phone: 310.255.9087
Direct Fax:    310.907.2087
daniel.saunders@bingham.com

July 29, 2011

**Via Email**

Mark J. Nomellini
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60054
mark.nomellini@kirkland.com

**Re: Response to BP's Concerns and Questions Regarding
Anadarko's Collection and Production Process**

Dear Mr. Nomellini:

I write in response to your letter to Carl Solomont dated July 11, 2011, to address BP's concerns and questions raised therein regarding Anadarko's document collection and production process. We will continue to communicate with you separately regarding the issues raised in Part III of your letter regarding BP's responses to Anadarko's discovery requests.

For ease of reference, the subject headings in parts I and II of your letter are reproduced below, along with Anadarko's responses.

**I.    Concerns Regarding Anadarko's Collection and Production Process**

    **A.    Custodial Self Collection**

Your letter reflects your belief that electronic documents not attached to email were collected from Anadarko custodians' hard drives only if the custodians identified them as relevant. This is incorrect.

All documents created on Anadarko's computer system are by default saved to the user's "My Documents" folder. That folder (along with any subfolders) is automatically synchronized with the user's "Home Directory" (H drive) on the server. As part of the document search protocol, all identified custodians' Home Directories were collected and placed in the centralized Evault prior to search terms being utilized to identify relevant documents.

The document questionnaire distributed to all Anadarko custodians in connection with the legal hold notice asked custodians whether any responsive electronic data, records, files, documents, spreadsheets or information was stored on their office computer's hard drive in any folder other than "My Documents," or on any group share

Boston
Frankfurt
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
The Water Garden
North Tower, Fourth Floor
1620 26th Street
Santa Monica, CA
90404-4060

T +1.310.907.1000
F +1.310.907.2000
bingham.com

A/74444023.2

Mark J. Nomellini
July 29, 2011
Page 2

drive. Where custodians stated that they used another folder or a share drive, that folder
or drive was searched according to the same search terms and protocols.

Thus, no "self collection" – in the sense of custodians picking and choosing
which documents were responsive – occurred. Rather, custodians simply identified
where their user-created documents were saved in response to a commonly implemented
form of questionnaire, and those locations were then searched pursuant to generally
applicable search terms. Given that each custodian's default save location ("My
Documents") was already synced with the network through his or her Home Directory,
this was a reasonable means of identifying additional locations to search without
engaging in a time-consuming (and largely redundant) wholesale imaging of each
custodian's individual hard drive.

## B. Text Messages and Instant Messages

Anadarko uses Microsoft Office Communicator, and previously used Microsoft
Messenger, as its instant messaging system. We previously had the understanding that
Anadarko had no centralized server for storing instant messages, nor were the messages
saved automatically to the user's hard drive. In further investigating this issue in
response to your letter, however, we have learned that there is a dedicated server that
stores instant messages in raw text file format and that those files have not previously
been moved into Evault or made available for searching. Because the data is not indexed
and may only be searched by a single custodian at one time, searches are extremely time-
consuming. We are currently investigating how best to search that server and how to
produce any resulting instant messages in a readily reviewable format. We will keep you
informed of our efforts in this regard.

Please note that instant messages are not automatically saved to the user's hard
drive in addition to the dedicated server; rather, the user must affirmatively elect to save
an instant message conversation to his or her hard drive. Should the user so elect,
messages are saved by default as text files in the user's "My Documents" folder, though
the user can save to another location. If the user instead saves instant messages to his or
her email, they will appear in the "Conversation History" folder of the user's Outlook
mailbox. Instant messages saved to either "My Documents" or Outlook would be
synchronized with the network and would have been identified had they contained
responsive terms.

With regard to text messaging, Anadarko does not issue mobile devices for its
employees, and therefore does not retain or have access to its employees' text messages.

## C. Metadata Issues

As part of its document collection protocol, Anadarko used Microsoft Robocopy
to copy documents from the Home Directories (and, where identified by custodians,
group shares) and move them to Evault. Those documents were then searched using the
same search terms and search platform as the emails, in order to ensure consistency of

Mark J. Nomellini
July 29, 2011
Page 3

search results. It appears that the original folder structure (which would identify the original source of the document) was lost when the documents were ingested into Evault, and therefore the custodian metadata field was created to denote the particular search (each of which included documents from all identified custodians) that yielded the document rather than the original source. All other file metadata values relating to the documents – including author, date created, date last modified, date last printed, size, etc. - were preserved. Thus, metadata has been produced to the extent it exists, consistent with the terms of PTO No. 16.

### D. Production of Board Minutes

Pre-incident board minutes were included in the documents searched and did not yield any results in response to the utilized search terms.

### E. Production of Documents From the Files of Anadarko CEO James Hackett

Documents from Mr. Hackett's files have been produced to the extent that they were responsive to BP's requests and the utilized search terms.

### F. Production of Files From Home Shares

As discussed above, the custodians' home shares (H drives) were included within the centralized Evault prior to search terms being utilized to identify relevant documents and e-mails.

### G. Bates Range Gaps

We have checked the first 100 of the approximately 6,000 Bates range gaps identified on your list, and they all show up in the production. Recommind conducted its own spot checks and also did not find any gaps. The problem therefore appears to be a technical one on your end. We suggest arranging a conference call between our respective technical support personnel to try to figure out why you are seeing gaps in the productions.

### H. Blank Text Files

Of the three documents you identified as not including OCR text files, ANA-MDL-000029633 includes OCR'd text and should be searchable. We have confirmed that the other two documents are scanned PDF documents that have not been OCR'd and do not have text. In response to our inquiry, Recommind has identified approximately 150 PDF documents in Anadarko's production that need to be OCR'd. We will be addressing this issue and promptly re-producing those documents to you including OCR'd text.

Mark J. Nomellini
July 29, 2011
Page 4

### I.        Missing Native Files

Of the 10 files you identify as not being produced in native format, seven are
.wav files that we will re-produce to you in native format. ANA-MDL-000065156 is
password protected: we have not been able to view it ourselves but are working with
Anadarko to obtain the password, and once we do so we will re-produce the document in
native format if it is found to be responsive and non-privileged. We have confirmed that
the remaining two documents were not produced in native format and reflect that they
could not be imaged; we will review those documents and re-produce them if they are
found to be responsive and non-privileged.

### J.        Text File Naming Issues

There is no way to tag a native document as "Confidential" or give it a Bates
label within the native document itself without changing the original contents of the
document. Accordingly, we have preserved the integrity of the native files by including
the Bates numbers and "Confidential" designation for those files within the file name.
Moreover, all native files are produced with a corresponding image (.tiff) file, which you
should be able to load into your document review database. Accordingly, we cannot
accommodate your unreasonably burdensome request to separately mark over 6,000
native files with a "Confidential" stamp (and then re-OCR those files) or to add a
"Confidential" tag to the metadata.

### K.        Corrupt Image Files and Formatting Issues

The two .tiff files that you identify as corrupt appear intact in our review. This
appears to be another area for our respective technical support teams to confer. Of
course, we will re-produce the files if the problem cannot be identified.

The delimiters contained in the produced DAT files (" | " and "^") are industry
standard delimiters, and no other party has stated any objection or expressed any
difficulty with their Concordance reviews. We will consider the feasibility of modifying
the delimiters for future productions, but we have concerns that such modification might
create difficulties for other parties.

With respect to Bates range ANA-MDL-000030959 – ANA-MDL-000030965,
you state that it consists of zip files each containing multiple folders and electronic files.
That range was intended to be a blank "place holder" between the omnibus productions
and the discovery productions, and there should be no substantive documents associated
with those Bates numbers. Please provide us with whatever you have within that range
so that we can review and determine if any error has been made.

Mark J. Nomellini
July 29, 2011
Page 5

## II.    Other Questions Regarding Anadarko's Collection and Production Process

### A.    Search Terms

Anadarko ran the following search terms to identify responsive documents:

> Deepwater Horizon
> Deep Water Horizon
> DWH
> DW Horizon
> Marianas
> Macondo
> Mississippi Canyon 252
> Mississippi Canyon Block 252
> Canyon*252
> Blk 252
> Blk. 252
> MC252
> MC 252
> MC*252
> MC**252

All responsive, non-privileged documents that fell within the scope of "Phase I Discovery" as defined in Case Management Order No. 1 (Pretrial Order No. 11) were produced.

### B.    Custodians

The custodians from whom relevant email or non-email documents were obtained are identified below:

1. Algranti, Sam
2. Allbritton, Roberta
3. Beattie, Mike
4. Bosworth, Steve
5. Bryan, Jim
6. Bump, David
7. Burton, Forrest
8. Byrd, Jerry
9. Campbell, Becky
10. Cantu, Carlos
11. Chandler, Paul
12. Conrad, Mark
13. Daniels, Bob

Mark J. Nomellini
July 29, 2011
Page 6

14. Dean, Tim
15. Durkee, Todd
16. Folger, Derek
17. Foster, Steve
18. Gaspar, Clay
19. Harris, David
20. Hedley, Richard
21. Holifield, Mark
22. Hollek, Darrell
23. Huch, Nick
24. Isbell, Rebecca
25. Kamm, John
26. Keelan, Dick
27. Kelly, Gennifer
28. Kemp, Sally
29. Kirkland, Rodney
30. Kunning, Jim
31. McBride, David
32. McDaniel, Dennis
33. Meloy, Chuck
34. Miller, James
35. Montgomery, Todd
36. Nichols, Josh
37. O'Donnell, Alan
38. O'Neill, Brian
39. Peyton, Dawn
40. Pfister, Mike
41. Quitzau, Bob
42. Raney, Glenn
43. Reeves, Bobby
44. Schlirf, Paul
45. Schluender, Grant
46. Sease, Diane
47. Seiler, Nancy
48. Strife, Stuart
49. Theriot, Rickie
50. Trautman, Tim
51. Vasentine, Drew
52. Watson, Pat
53. Woelfel, Steve

The balance of the 108 individuals who were initially identified as potential custodians were found not to have any relevant information.

Mark J. Nomellini
July 29, 2011
Page 7


     I hope that the above responses are sufficient to address BP's concerns and
questions raised in your letter.  Please contact me if you need any further information.

Sincerely,

Daniel A. Saunders

# EXHIBIT D

# BINGHAM

Daniel A. Saunders
Direct Phone:  310.255.9087
Direct Fax:     310.907.2087
daniel.saunders@bingham.com

August 15, 2011

**Via Email mark.nomellini@kirkland.com; darin.beffa@kirkland.com**

Mark J. Nomellini
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60054

Darin T. Beffa
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60054

Re:   **Further Response to BP's Questions and Concerns Regarding
        Anadarko's Collection and Production Process**

Dear Mark and Darin:

       I am writing as a follow-up to my letter of July 29, 2011, our meet and confer on
August 9, 2011, and Darin's letter of August 12, 2011, to address BP's remaining
questions regarding Anadarko's document collection and production process.  The
information contained herein supplements our prior communications and represents our
best understanding at this time, based on our recent conversations with knowledgeable
Anadarko personnel.

1.     <u>Collection and Search Process</u>

       Based on further inquiry into Anadarko's document collection and search
process, we have learned that the legal hold questionnaires discussed in my July 29 letter
represented only a part of the process by which potentially responsive documents were
identified, collected, and searched.  At the outset of that process, Anadarko created,
through interviews and other investigation, a broad and over-inclusive list of 108
employees who might have had some involvement with the Macondo project and might
potentially have relevant documents or emails.  Each of those 108 individuals received
and completed a questionnaire identifying locations, if any, in which they believed they
might have responsive electronic or other data.  Follow-up interviews of all custodians
with documents or emails and of other personnel were then conducted to determine
whether any additional locations might contain responsive data.  Anadarko further
identified all share drives used by the various groups (project development, network
operations, planning, drilling, land, etc.) that might have had any involvement with the
Macondo project or might otherwise possess responsive data.

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
The Water Garden
North Tower, Fourth Floor
1620 26th Street
Santa Monica, CA
90404-4060

T +1.310.907.1000
F +1.310.907.2000
bingham.com

A/74484123.1

Mark Nomellini

August 15, 2011
Page 2

The Home Directories (H: \ drives) of <u>all 108</u> identified potential custodians - not only the 53 who provided affirmative responses on the questionnaire - were ingested into the Evault, along with any other drives or folders identified in the questionnaire responses or through the company's follow-up investigation.[1]  Then, in addition to a targeted search of the Home Directories and other locations identified on the questionnaires, Anadarko conducted a full search of the entire Evault based on the search terms previously disclosed to you.  That search included:  (1)  the H:\ drives of all 108 identified potential custodians (and of any other Anadarko employee subject to a legal hold in any other matter, which would also have been in the Evault); (2) all share drives and other locations identified on the questionnaires or through the company's follow-up interviews and investigation; and (3) all emails company-wide.  The date limiters on those searches were January 1, 2007 to March 31, 2011 for documents of Anadarko personnel who were deposed, and January 1, 2007 to November 21, 2010 otherwise.  Thus, the document search and recovery process was not driven by the responses on the legal hold questionnaires; rather, the questionnaires were part of Anadarko's due diligence and constituted one of several means by which Anadarko identified possible repositories of responsive documents.

In response to the specific questions that you raised in our August 9 conversation, Anadarko does not have any official policy regarding employees saving their documents to My Documents as opposed to some other location on their hard drives.  However, My Documents is the default save location for all documents created on a user's computer.  Although a user can affirmatively elect to save documents to a different location, users do not have administrative rights and cannot change their default save location.

We cannot identify with certainty those custodians from whom non-email and non-My Documents files were collected.  The most we can do is identify those who indicated on their questionnaires that they had potentially relevant non-email and/or non-My Documents files.  As discussed above, however, those questionnaires represented only part of Anadarko's due diligence and were supplemented by interviews and other further investigation.  Thus, in some instances where employees initially believed that they might have potentially responsive documents, further investigation revealed that

---

[1] In response to the inquiry in Darin's letter, we have confirmed that the list of 108 potential custodians whose Home Directories were ingested and searched included Debra Broussard, Sara Chapman, Barbara Dunbar, Mike Lemker, Mike Pearl, Vera Wells, Leigh Whittington, and James Hackett.

Mark Nomellini

August 15, 2011
Page 3

they did not in fact have such documents, in which case nothing would have been collected.[2]

2.      Metadata

        In response to your questions about Anadarko's use of Evault as it relates to the custodial metadata issue, we have learned that Anadarko set up its Evault in 2007.  Once potentially responsive data had been identified by the processes discussed above, extraction of that data to the network was completed between July 7 and July 12, 2010. Ingestion of the extracted data into the Evault was completed by August 9, 2010.  We note that this was several months before the Court issued its ESI order on November 8, 2010, requiring production of metadata "to the extent it exists."

3.      James Hackett Files

        As noted above, Mr. Hackett was one of the 108 potential custodians initially identified.  He received and completed a legal hold questionnaire and was interviewed. His H:\ drive was ingested into Evault and searched according to the processes described above, and he was found to have no relevant pre-incident documents.  Post-incident documents were collected and reviewed, and he was found to have no non-privileged post-incident documents.  Neither the search of Mr. Hackett's files nor the search of any other identified custodian's files was limited to pre-incident documents; rather, searches were conducted according to the date limiters set forth above.

4.      Instant Messages and Text Messages

        We have confirmed that Anadarko's policy is not to issue mobile devices to its employees, and therefore we do not believe that the company has access to or control over its employees' text messages.  Should we learn of any additional information on this subject, we will let you know.

        With respect to instant messages, as we previously informed you, we recently learned that Anadarko has a dedicated server that stores instant messages in raw text files. That data is not indexed, and searching it is extremely cumbersome and time-consuming. Specifically, we have learned that searches can be conducted by identifying a single

---

[2] For this reason, the list of 53 custodians in Part II.B of my July 29 letter was incorrectly identified as containing names of those "from whom relevant email or non-email documents were obtained."  More accurately, the list represents those whose questionnaire responses indicated that they believed they might have relevant email or non-email documents.

Bingham McCutchen LLP
bingham.com

A/74484123.1

Mark Nomellini

August 15, 2011
Page 4

person and single date or by a single search term and single date, but cannot be conducted across multiple dates, users, or terms.  Given the volume of data on the server, Anadarko's IT personnel believe this search would take many months at a minimum. Moreover, extracting all instant messaging files into Evault for searching would take the same amount of time as searching the files individually.  We are continuing the process of investigating whether there is any way to search and produce instant messages without undue burden, and we will keep you informed of any further information in this regard.

5.      Search Terms

        Darin's letter of August 12 includes several pages of proposed search terms that BP believes Anadarko should use to conduct additional searches.  Most of those proposed terms appear to mirror BP's search terms in response to Anadarko's RFPs.  As previously explained in my July 29 letter, however, Anadarko has already conducted searches for all emails and documents containing "Macondo," "MC252," "Deepwater Horizon," and a number of related terms and variants – searches far broader and more inclusive than any that BP has performed.  Although your letter conclusively states that Anadarko's search terms "are deficient in several ways," it fails to identify any deficiency, and we can see none.

        We believe that Anadarko's extremely broad search terms, unrestricted by any connectors, would have already captured any documents responsive to your proposed search terms that have any relevance to the MDL.  Your proposed additional terms, were they to exclude the terms that Anadarko has already searched, would likely yield only irrelevant, non-Macondo-related documents.  If you have reason to believe that any of your proposed search terms would yield relevant and responsive documents not already captured by Anadarko's broad and unrestricted search terms, please provide us with term-specific explanations of your position, and we will carefully consider your requests.

        We hope that the above responses satisfactorily address BP's remaining questions about Anadarko's document collection and production process.  Please contact me if any further clarification is needed.

Sincerely,

*/s/ Daniel A. Saunders*

Daniel A. Saunders