**UNITED STATES DISTRICT OF COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL | § MDL No. 2179 |
| RIG "DEEPWATER HORIZON" | § |
| IN THE GULF OF MEXICO, | § SECTION: J |
| ON APRIL 20, 2010 | § |
| | § JUDGE BARBIER |
| | § MAG. JUDGE SHUSHAN |

**THIS DOCUMENT RELATES TO ALL CASES**

**UNITED STATES' STATUS REPORT ON EFFORTS TO RESPOND**
**TO DISCOVERY SERVED ON THE UNITED STATES BEFORE JULY 1, 2011**

Since April 20, 2010 the United States has deployed massive resources to respond to the oil spill and its effects. It has also deployed massive resources to prepare for and respond to the discovery requests anticipated and served in this multi-district litigation. As described below, in response to the discovery served by BP and the Anadarko Defendants the United States has spent millions of dollars to identify, search for, collect, review, and produce over seventeen million pages of documents. The United States has made diligent and expedited efforts to comply with the accelerated discovery schedule, but it is far from completing its responses to these discovery requests. The details of its efforts and the time frames for completing the major outstanding tasks are set forth below. Because the status of discovery is highly dependent on the nature and volume of information held by each agency, the United States has organized this status report by federal agency.[1]

---

[1] Undersigned counsel prepared this report in consultation with agency counsel. Every effort has been made to provide accurate information, but given the press of time the United States has not prepared declarations and has been forced, in some instances, to make estimates based on limited information. The United States reserves the right to update and correct the information contained in this report as it continues to monitor, evaluate, and complete its discovery responses.

I.      **Summary of Discovery Served Upon the United States as of July 31, 2011**

As of July 31, 2011, the United States had been served with nine sets of discovery requests.  The United States has served formal responses to each of these requests.  *See* Attachment 1.

In preparing its responses to these requests, the United States met and conferred with the parties to determine the intended scope, nature, and priority of the requests.  As a result of these early conferences, the parties divided the requests into three categories:  Event, Source Control & Quantification, and Subsequent Phases.  The category into which each request was placed is identified in Attachment 2.  The United States also worked with the responding agencies and the requesting parties to identify which agencies would respond to which requests.

The discovery requests included interrogatories, requests for admission, and requests for production.  To date, BP and MOEX have not challenged the adequacy of the United States responses to their respective interrogatories or requests for admission.  The Anadarko Defendants have challenged the adequacy of the United States' responses to interrogatories and requests for admission.  This Court has ruled upon the Anadarko Defendants' challenge to the United States' responses to the requests for Admission.  *See* Order (Sept. 2, 2011) (Doc. No. 3905).  The United States is currently conferring with the Anadarko Defendants' regarding their challenge to the adequacy of the United States' responses to the Anadarko Defendants' interrogatories relating to Source Control & Quantification.  *See* Hedgpeth, Letter to Himmelhoch (Aug. 25, 2011) (Attachment 3).  The remainder of this report, therefore, will

address the status of the United States' production of documents and electronically stored information for the Event and Source Control & Quantification Phases.[2]

## II.      Status of Document Production by Federal Agency

The United States has worked extensively with both BP and the Anadarko Defendants to refine the search terms for collecting relevant information and to identify custodians reasonably likely to have possession of responsive information.  The result of these months of negotiations are represented in the list of custodians the United States agreed to search (Attachment 4)[3] and the search terms for those agencies employing search terms (Attachments 6-11).

Many of these search terms and custodians were added or changed at the request of BP and/or Anadarko after the United States commenced its collection efforts, which has increased the complexity of the United States' collection efforts.  For example, on August 25, 2011 more than two months after the United States identified its proposed search terms, the Anadarko Defendants requested additional changes to the search terms, as did BP on August 22, 2011. *See* Hedgpeth, Letter to Himmelhoch (Aug. 25, 2011) (Attachment 3); Gasaway, Letter to Himmelhoch (Aug. 22, 2011) (Attachment 12).  Obviously, the United States' additional searches in response to the requested changes in these letters will require additional time to complete.

After nearly four months of negotiating search terms and custodians, the United States believes it is time to end the Sisyphean nature of its responses and conclude the negotiations

---

[2] The United States has tabled responses to the "Subsequent Phases" discovery until it has completed responses to Phase I and II discovery and greater clarity is provided regarding the scope of Phase III discovery.

[3] BP proposed a number of additional custodians that the United States has not agreed to search. Attachment 2 identifies those custodians and provides a brief statement of the reason for the United States' refusal.

regarding custodians and search terms for the already served discovery requests.  To the extent parties identify gaps in the documents they are seeking, the appropriate action would be to serve follow up discovery that is targeted to collect that information, rather than continued changes to the ongoing searches.[4]  Accordingly, the custodians set forth in Attachment 4 and the search terms set forth in Attachments 6-11 represent the final custodians and search terms to which the United States will agree for the already propounded discovery requests.

### A.      Department of the Interior

The Department of the Interior ("DOI") has committed to search the files of 139 custodians in the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") and thirty-nine custodians in other bureaus and offices.  BOEMRE, as the successor to the Minerals Management Service, has custody of extensive records spanning the entire period covered by the discovery requests – from April 20, 2005 to January 31, 2011 and beyond.  In addition, the U.S. Geological Survey, the Fish & Wildlife Service, and the National Park Service were involved in response activities, while the Office of the Secretary and the Office of Congressional and Legislative Affairs were involved in monitoring spill response, responding to congressional inquiries, and monitoring investigation of the causes of the Event.

DOI has expended approximately $1,120,000 thus far to acquire software, equipment, and vendor services (planning, collection, hosting, and review) in the course of collection and review.  DOI expects to expend at least an additional $1,180,000 to complete the effort, not

---

[4] On Labor Day, September 5, 2011, BP sent the United States a letter raising issues with respect to the "form of production" from the United States and seeking an extension of time until October 15, 2011 to file motions to compel between the United States and BP with respect to Event related to discovery.  The United States is willing to agree to that extension and will respond to the most recent letter during the week of September 6, 2011.

including the salaries and benefits of previously existing federal and contract support staff whose

work has been redirected to plan, manage, and conduct all aspects of the discovery effort.  DOI

currently has approximately twenty contract staff engaged in document review, four federal staff

primarily dedicated to management and collection for the discovery effort, and at any given time,

is receiving significant support from an additional five to twenty federal staff.

### 1.    BOEMRE

Because the DOI records relating to the Event phase of this case were centralized in

BOEMRE, DOI began by focusing on collection from the 139 custodians located within

BOEMRE as well as appropriate centralized files.  DOI has made significant progress on the

production of BOEMRE data.

With respect to the individual custodians, DOI has collected and culled the live e-mail

environment of 100% of the BOEMRE custodians and provided all of that data to the

Department of Justice ("DOJ") for production.  DOI is currently reviewing those documents

withheld as potentially privileged and will continue to release emails and other documents

determined to have been inadvertently withheld during the privilege review.

The only remaining dispute between the parties with respect to BOEMRE's electronic

mail is the question of the off-line contracted archive known as the "Autonomy" or "Zantaz"

server.  As the United States informed this Court and the parties, the Department of the Interior

has encountered a problem with searching an offline archive established in 2001 to capture all

email sent or received by employees in certain bureaus, including the Bureau of Ocean Energy

Management, Regulation and Enforcement ("BOEMRE") and the Secretary's Office.[5]  As set forth in more detail in a letter to BP, the United States has determined that retrieval of responsive emails from this offline archive will be both too costly and require too much time to be appropriate.  *See* Himmelhoch, Letter to Gasaway (Aug. 3, 2011) (Attachment 13).  BP and the United States are engaged in productive discussions to determine whether BP agrees with the United States' conclusion.

DOI has also collected the vast majority of the electronic information held by the identified custodians.  It has searched the home network drives of 95% (132) of the BOEMRE custodians and produced the responsive information from 60% (84) to DOJ.  DOI is working diligently to complete the remaining searches, with the exception of three custodians who are members of the Joint Investigation Team. Because of the statutory and regulatory protection afforded the deliberations of JIT members DOI intends to await completion of the JIT report prior to collection from these three custodians.  If the JIT announces another delay in the issuance of its final report, DOI will reassess the search and production from these three custodians.

In addition, DOI has collected data from the hard drives of 69% (96) of the custodians.  For 11% (15) of the custodians, the data has been culled and provided to DOJ.  DOI is currently collecting paper documents from the individual custodians and confirming that its paper production is complete.

DOI has not limited its collection efforts to individual custodians.  DOI prioritized certain centralized collections, including data relating to the Event that was collected by Nick Wetzel in

---

[5] The Secretary's Office has since ceased sending emails to the Autonomy archive.  Based upon information and belief, DOI indicates that the Office of the Secretary ceased sending emails to the Autonomy archive before President Obama took office.

the immediate aftermath of the explosion.  DOI has also collected and culled data from the central network file locations for the Houma District Office, Lake Charles District Office, Lafayette District Office, and New Orleans District Office, as well as the Field Operations network share. The Houma and Lake Charles District Office and Field Operations shares have been provided to DOJ.  DOI still must collect the central network file locations for the Lake Jackson District Office, Herndon, Washington, D.C., and additional file locations in New Orleans.

With respect to centralized files, DOI and BP are also in productive discussions regarding production of BOEMRE's "TIMS" database.  The TIMS database is an enterprise database established by BOEMRE to track leasing, production, and safety data related to oil exploration. The database houses publicly available information, as well as privileged information related to enforcement activities and highly sensitive proprietary information of BP's competitors. BOEMRE made several attempts to export responsive information to a database for BP, each of which BP challenged as inadequate.  Accordingly, the United States has arranged for BP to visit the Gulf of Mexico Regional offices of BOEMRE to access the TIMS database directly on September 6-7, 2011.

DOI has also collected paper documents from the Office of Resource Evaluation, the Office of Field Operations, the New Orleans District Office, the Houma District Office, the Lake Charles District Office, the Lake Jackson District Office, the Lafayette District Office, the Office of Production and Development, the Office of Leasing and Environment, the Office of Information management Services, and the Public Information Resources Section.  Because these records were not digitized, DOI relied upon knowledgeable individuals to search for and produce responsive documents.  The results of these searches have been provided to DOJ.

7

Further, DOI has collected and produced all paper and electronic documents that were released pursuant to FOIA requests or requests from Congress.

DOI expects to complete the collection and culling of outstanding BOEMRE non-privileged electronically stored information by October 15, 2011.  DOJ expects to produce all information currently at DOJ by September 16, 2011.[6]  DOI also expects to complete collection of outstanding paper documents by October 1, 2011.

Given the collection timeframes, however, DOI does not expect to complete privilege review by October 15, 2011. DOI cannot reliably provide an estimated completion date, as it is still attempting to determine the volume of potentially privileged information contained in the e-mail collections, which are expected to be the largest volume of potentially privileged information.  DOI is hopeful that privilege review can be completed by November 1, 2011.[7]

### 2.    Other DOI Custodians

DOI has collected and culled data from the hard drives, home network, and shared network drives of 87% (34) of its non-BOEMRE custodians. None of this data has been provided to DOJ, yet, but DOI expects to provide it for production by September 9, 2011.  DOI is also in the process of collecting paper documents for all of the non-BOEMRE custodians.

DOI has yet to collect data from the e-mail environments for any of the remaining DOI custodians.  The thirty-four USGS custodians are in a Lotus Notes e-mail environment. DOI's in-house collection and culling software is unable to search e-mail that is in a Lotus Notes

---

[6] Depending on the volume of information DOJ receives in any given week, it generally takes two weeks from receipt of the documents at DOJ to production of the documents to the parties.

[7] Should it be determined that DOI must collect and review e-mail from the Autonomy e-mail archive for all BOEMRE custodians, completion of privilege review would be dependent on the time frames for data retrieval, and would likely extend into 2012.

format. Furthermore, USGS does not archive e-mail to a digital safe. DOI possesses a software tool that will convert Lotus Notes (.nsf) e-mails to Microsoft Outlook (.pst) format. DOI intends to use that tool, SysTools Export Notes, to convert the emails so that they may be searched with existing software. Export Notes retains folders, attachments, calendar items, task items, encrypted files and e-mails, and relevant metadata.

DOI has also created and maintained a mirror of the USGS "Cassini" server, which hosts imaging information gathered from the NASA AVIRIS system, Flow Rate Technical Group calibration of that data and derived map products from the data. Also included are spectra collected by the USGS imaging spectroscopy group, and software used to make the products. The server also contains satellite data used for planning the AVIRIS flights and used in tracking the oil spill.  All USGS field images from calibration and sampling are also on the server.  DOI will work with BP and the other parties to determine the best means of providing this data for other parties to access as necessary.

DOI expects to complete collection of documents, whether electronic or paper, from the Secretary and Deputy Secretary of the Interior by September 21, 2011.  DOI expects to complete the collection and culling of outstanding ESI from its other non-BOEMRE custodians by October 8, 2011.  DOI expects to complete collection of outstanding paper documents from these custodians by October 1, 2011.  Once collection is completed, the documents will be delivered to DOJ for production.

Given the collection timeframes, DOI does not expect to complete privilege review by October 15, 2011. DOI is hopeful that privilege review of these post-event materials will be completed by November 15, 2011, but cannot provide a firm date for completing the review until

it has a better sense of the volume and nature of responsive information found in these custodial files.

    **B.**      **The Department of Homeland Security**

        **1.**      **The Coast Guard**

The Coast Guard has faced perhaps the most challenging document production issues of any of the federal agencies because it has the largest volumes of both paper and electronic data for this response than it has ever handled in its history. To establish an electronic spill archive and production system, the Coast Guard had to obtain hardware and purchase software to collect between ten and twenty terabytes of data, establish a search, review, and production system within a highly sensitive information technology environment, and sort and organize upwards of twenty-seven million pages of paper. To date, approximately three million dollars has been expended, not including Coast Guard personnel costs. At various times, the Coast Guard estimates that it has had between fifty and one hundred people working on various aspects of the documentation and electronic spill archiving efforts.

With respect to Event phase discovery, the Coast Guard has relied upon searches by knowledgeable individuals and in known collections, rather than electronic search terms. The Coast Guard has produced all responsive information, with the exception of any small quantity of pre-spill information that may be found in the post-spill archive that is still being compiled. The Coast Guard has completed its privilege review of the Event related documents and DOJ anticipates producing the privilege log for this information on or before September 15, 2011. The only remaining event related discovery the Coast Guard anticipates completing is the production of the custodial files for the three individuals designated as Rule 30(b)(6) witnesses for the United States. The Coast Guard anticipates completing the production of non-privileged

documents from these custodians no fewer than ten days before the scheduled depositions.  The Coast Guard will prepare any necessary privilege log as soon as practical after the completion of the custodial productions.

With respect to the information responsive to the Source Control & Quantification phase of discovery, the Coast Guard has completed the infrastructure for its electronic spill archive. Unlike the other federal agencies, which have relied upon searches of individual custodial files for the majority of their searches, the Coast Guard's primary searches will be conducted within the consolidated spill archive and will not be limited by custodian.  Because the procedure for establishing the spill archive calls for the collection of the information documenting the Coast Guard's actions and decisions during the response, the Coast Guard will not conduct custodial collections outside of the spill archive except for good cause shown.

Forensically sound collection of data for the spill archive is underway.  Of the twenty-two servers that were used in the response, fourteen have been sent to Mandeville and twelve have been processed to date into the archive.  The other eight servers are still in use by the Coast Guard. The Coast Guard has collected 1,300 laptops from the response and has processed 515 into the archive. The collection of data from active servers has been underway with a priority on collection of witness and deponent data.  In addition, the Coast Guard estimates it will take months to complete the scanning of the paper documents generated during the response. Approximately 1,900 boxes of paper remain to be sorted and prepared for scanning.  This number, while not static, does not decrease significantly due to the ongoing, weekly collection of boxes of paper documents still being generated by the ongoing response. It is important to note that the response is still ongoing, though significantly scaled back.  Accordingly, new information is being generated on a daily basis.  To date approximately 2,800 boxes of paper has

been sorted and organized; scanning has produced an approximate 250 gigabytes of digitized images with related OCR text per week for uploading to the database.  In all, the Coast Guard has uploaded approximately 2.5 terabytes of information into its newly minted incident documentation system.

Now that final search terms have been established and the Coast Guard's system is operational, the Coast Guard anticipates beginning electronic searches on the data and scanned documents already loaded to the system over the next two weeks.  Though the Coast Guard believes the total volume of data generated in the response could be as much as ten to twenty terabytes, it does not yet have any reliable estimate of the total volume of responsive information, or the percentage of that responsive information that is privileged.  Accordingly, it is not yet in a position to provide the parties or this Court with a reliable estimate of the time required to complete production of the responsive documents.

### 2.       The Secretary of Homeland Security

To date, the Secretary's office has identified close to 700 pages of documents for review by the Office of the General Counsel (OGC).  Upon information and belief, the Secretary's Office is still in the process of searching for and identifying responsive documents.  The Secretary does not have an email account and generally does not maintain electronic files regarding Deepwater Horizon. As a result, the Department cannot conduct electronic searches using search terms in order to identify responsive documents within the custodial files of the Secretary.

The Secretary's staff must conduct a manual search of her records, some of which are stored chronologically rather than according to subject, so that documents regarding Deepwater Horizon are maintained alongside documents regarding other Department business.  Given the

sensitive nature of the materials handled by the Secretary of Homeland Security, the number of personnel who can be deployed to conduct this search is limited.

The Department's Office of General Counsel has begun to review documents for responsiveness and privilege. Based on a cursory review of those documents, a significant percentage will be privileged and a significant percentage of those privileged documents may need to be shared with counsel for the Executive Office of the President or other agencies to determine their status.

None of the Secretary's records have been produced to date.  The Department reports that it will work as diligently as possible to conduct the privilege review and prepare a log by October 15, 2011, but may require additional time depending on the ultimate volume of documents to be produced.

### C.       Department of Commerce

#### 1.       National Oceanic & Atmospheric Administration

Like BOEMRE and the Coast Guard, NOAA was faced with a daunting task in identifying, collecting, reviewing, and producing information responsive to the parties' discovery requests.  NOAA had both pre-spill and post-spill responsive information and a large number of custodians.  In all, NOAA has agreed to search the custodial files of over two hundred individuals.  To date, NOAA estimates it has expended $4,620,231 on the identification, collection, review and production of information responsive to the pending discovery requests. These costs include employee time, payments under interagency agreements with DOJ, and over three million dollars in contractor costs.

NOAA has completed the collection of all custodial files but one and expects to complete the collection of this one remaining individual this week.  In addition to the individual custodial

files, NOAA has collected and searched seventeen Functional Email Accounts used within the

NOAA Incident Coordination Center, one Weather Service (Mobile, AL) functional Email

Account, ten laptop computers used within the NOAA Incident Coordinator Center, file shares

on Local Area Networks at six NOAA locations, all responsive FOIA responses, and all

responses to Congressional requests relating to the Incident.

Approximately eighty-nine percent of the information NOAA has collected has been

processed and loaded to a review platform.  In all, NOAA collected twelve terabytes of data.

The use of the search terms followed by de-duplication yielded 6,400,000 documents,

representing 15,300,000 pages loaded to the review platform thus far.  NOAA expects that

362,705 documents, or 852,000 pages remain in process toward the review platform.  To date,

DOJ has produced 173,410 pages of the responsive, non-privileged information.

NOAA, like DOI, has relied upon search terms to segregate potentially privileged

documents and is currently investing significant resources in the review and, to the extent

required by PTO 14, logging of the privileged documents. NOAA has assigned twelve full time

attorneys for more than two months to conduct the privilege review.  Because of the breadth of

the parties' discovery requests, the potentially privileged documents touch on numerous topics

and privilege review has been complicated by the need to consult a number of offices to

determine the status of certain documents.  Despite its significant commitment of resources to

the task, NOAA is not likely to complete its privilege review and logging until November 15,

2011.

### 2.      National Institutes of Standards and Technology

NIST has agreed to search the custodial files of one individual (in addition to the

members of the Flow Rate Technical Group discussed below).  NIST used the same search terms

employed by NOAA and, with the exception of the new search terms agreed to by the United

States in response to the most recent requests by the parties, has completed its collection.  DOJ is

currently processing the resulting collection and anticipates production will be complete by

September 30, 2011.  NIST also relied upon search terms to segregate potentially privileged

information and anticipates completing the review of these potentially privileged documents by

October 15, 2011.

> ### D.      Environmental Protection Agency

EPA had significant post-spill involvement in the response activities, and at the request of

BP, has agreed to search for certain categories of pre-spill information.  Though not facing

discovery tasks quite as daunting as those of BOEMRE, the Coast Guard, or NOAA, discovery

of EPA has also been quite extensive.  EPA has spent approximately $570,000 in contractor

resources and employed approximately fifty-five EPA document reviewers and twenty additional

EPA staff to respond to discovery to date.

EPA began its responses to discovery by collecting data from electronic collections

created specifically in response to the Incident.  With one small exception, EPA has collected

one hundred percent of the data from all known electronic databases that it created specifically

for the purpose of storing Deepwater Horizon documents.[8]

The Deepwater-specific databases EPA had collected as of September 1, 2011 total

approximately 600 gigabytes in size and mostly contain e-mail messages and attachments from

shared position-specific mailboxes (e.g., emergency operations center managers or others on

---

[8] The one known exception is a small Deepwater e-mail database from EPA's Region V Chicago offices, which contains approximately 1,500 e-mail messages and which will be collected during the week of September 6, 2011.

duty).  Also contained in these Deepwater-specific databases is potentially relevant information from seventy-four individual custodians who deposited into a database their "lastname.firstname@epa.gov" e-mail messages, e-mail attachments, and loose files as part of a FOIA collection effort. EPA's collection also includes approximately 30 gigabytes of raw sampling data and a small amount of hard copy documents for scanning.[9]

Beginning during the week of September 6, 2011, EPA plans to collect electronic and hard copy documents from additional key custodians that it or BP has identified. These additional custodian-based collections will capture additional documents for review and processing, but EPA expects that many of the documents to be collected are likely to be duplicates of information already collected. Although EPA has purchased new software for search and collection (EnCase by Guidance Software), it is not currently installed and available for use in this case. EPA, thus, historically has had very limited search and collection tools. Given the large number of potential custodians in this matter, EPA developed in 2010 and 2011 several in-house tools specifically to manage discovery in this case.

One such tool that EPA expects to implement beginning during the week of September 6, 2011 would transform the existing user-conducted e-mail search and collection process into an automated process that not only will save enormous time but which also will minimize the potential for inconsistent or erroneous results.  Rather than each custodian manually inputting search criteria into the e-mail database and then manually uploading documents to a collection database, users will click on a newly created button that is programmed with the search criteria and upload commands already entered. EPA expects to complete this search and collection

---

[9] The hard drive containing this raw data was produced to the parties on August 31, 2011.

process for key custodians by October 15, 2011, and for less significant custodians by November 15, 2011. These search and collection efforts must be phased in order to ensure no adverse impacts on EPA's network services which could occur if all searches and collections are completed at the same time.

As of August 31, 2011, EPA had produced to DOJ approximately 120 gigabytes of data equaling approximately 420,000 documents and over a million pages. This includes documents from centralized FOIA and congressional databases, and documents from the Deepwater-specific databases responsive to numerous requests for production.  The United States has produced to the parties all the FOIA and congressional materials along with the first round of custodian documents for a total to date of 73,600 pages.  DOJ currently has additional custodial files it is processing and will produce before September 16, 2011.  EPA has approximately 200,000 more documents from its collection of Deepwater-specific databases that it needs to produce to DOJ. Most of this has been reviewed and EPA estimates that approximately twenty-five percent of those will be withheld as privileged, resulting in production of more than 100,000 additional documents in September 2011.

EPA expects to be able to complete by October 15, 2011 most of the privilege logs for documents designated as withheld thus far. There are likely to be a small universe of already-reviewed documents requiring additional time, perhaps until November 15, 2011. This is based on EPA estimates that approximately 3,500 documents will need to be redacted, approximately 2,800 will need concurrence from additional reviewers, and EPA needs to review family members of parents marked as privileged and complete privilege justifications for documents in which those are missing or need to be supplemented.

### E.     Department of Defense

#### 1.     Navy

Though not insignificant, the Navy faced a relatively smaller discovery scope in this phase of the litigation.  The Navy agreed to produce its FOIA responses, Congressional responses, and the custodial files of five individuals:  Richard Buckingham, Michael Dean, Patrick Keenan, Derek Robins, and Thomas Stroschein.  In performing the search, collection, review, and production, the Navy has expended at least $168,296 in contractor costs and has used three different Navy attorneys in the review, two of them full time during peak review.

The Navy has completed its production of non-privileged documents from the custodial files of all but two of the custodians.  DOJ anticipates that these non-privileged documents will be produced no later than September 16, 2011.  With respect to the two remaining custodians, the Navy expects to produce the non-privileged custodial records of Capt. Derek Robins to DOJ on September 8, 2011 and of Capt. Thomas Stroschein on September 30, 2011.

With respect to all of the custodians, the Navy collected all Deepwater Horizon related information, rather than limit its collection to information responsive to the pending discovery requests.  With respect to Mr. Buckingham, the Navy produced only those documents that were identified using the terms set forth in Attachment 11.

The Navy has completed its privilege review of the documents collected from all custodians except Captain Stroschein, though certain documents will need to be reviewed by other agencies before a final call can be made on certain potentially privileged documents.  The United States anticipates producing the privilege log for the few documents already determined by the Navy to be privileged on or before September 15, 2011.  The Navy is hopeful it can complete the privilege review and, to the extent required by PTO 14, privilege log for Captain

Stroschein's documents on or before October 15, 2011.  The United States' review of the remaining documents is discussed below in the section addressing Executive Office of the President communications.

### 2. Army Corps of Engineers

The Army Corps of Engineers has collected information from all but two of its custodians in the Headquarters, the Engineer Research and Development Center (ERDC, a Corps lab), the South Atlantic Division, the Mobile District and the New Orleans District.  That information has been sent to DOJ or is being sent today.  To the extent the data has been provided to DOJ, it will be produced on or before September 16, 2011.

The Army Corps is evaluating whether it can complete its privilege review by October 15, 2011 and the United States will apprise the parties shortly as to whether the Corps can meet this deadline.

### E. Department of Energy

The Department of Energy played a prominent role in addressing the difficult scientific and technical issues that arose when the United States attempted to seal the well.  From the Secretary himself through well over one hundred individuals at the Department's National Laboratories, experienced scientists from a wide array of disciplines offered analysis, advice, and plans, thereby generating large quantities of information responsive to the discovery requests.  In addition, as the sponsoring agency for the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, the Department of Energy gained custody of the records of that Commission at its expiration.  The Department's discovery efforts have been spread between several national laboratories and component offices and it has not yet developed an estimate of its total discovery costs.  As an example of the expenditures the Department has undertaken for

19

purposes of responding to discovery, however, the United States notes that Sandia National

Laboratories reports that it alone has expended over $200,000 in responding to the discovery

served to date.

In the hopes of minimizing the number of collections required from Department of

Energy custodians, the Department elected to collect all Deepwater Horizon related information

from the identified custodians, rather than rely on search terms or other methods to limit the

collection to the discovery requests currently pending.  To date, the Department has searched for

and collected post-incident records from the following custodians in response to BP's discovery

requests in the Deepwater Horizon litigation:[10]

>       Secretary Chu (all)[11]
>       Executive Secretariat (reasonable search)
>       Arun Majumdar, ARPA-E (all)
>       Darren Mollot, Fossil Energy (all)
>       aRobert Corbin, Fossil Energy (all)
>       Michael Slanders, Fossil Energy (all)
>       Guido Dehoratiis, Fossil Energy (all)
>       FOIA Office (reasonable search)
>       Public Affairs (search terms)
>       Congressional (search terms)
>       Oil Spill Commission (all)

The Department of Energy also instructed the following National Laboratoriess to

conduct searches for all related records, including all those custodians who were correctly

identified on BP's lists as working on Deepwater related matters for those labs (and others

identified by the Laboratories during their search):

>       Oak Ridge

---

[10] Although the Department requested that each of these custodians provide all responsive documents and has received a response from each custodian, it is seeking final confirmation from every custodian to ensure completeness.

[11] For the Secretary, "all" means email as previously described in the U.S. Response to RFP 77.

> Pacific Northwest
> National Energy Technology
> Lawrence Berkeley

The National Nuclear Security Administration laboratories also were asked to produce Deepwater Horizon related records including those custodians who were correctly identified on BP's lists as working on Deepwater Horizon matters for those labs (as well as other custodians identified during the laboratories' searches):

> Sandia
> Los Alamos
> Lawrence Livermore

Collection of these records is nearly complete and the Department has transmitted all records collected to date to DOJ for processing and production. DOJ anticipates completing production of documents already received from the Department of Energy on or before September 14, 2011. The Department of Energy reports that it expects to complete privilege review of the records from all the custodians except those at Sandia, Los Alamos, and Lawrence Livermore National Laboratories by October 15, 2011. With respect to the custodians at these three National Laboratories, the Department hopes to complete the privilege review by December 15, 2011.

With respect to the National Commission, the completion date is less certain. DOJ has run privileged search terms against the collection to segregate potentially privileged documents and has completed production of the non-privileged information. This production represented a significant quantity of documents because BP requested "[a]ll documents constituting, referring or relating to any working papers or reports created by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling or its staff." DOJ is currently attempting to

identify the resources necessary to complete the review of the approximately 500,000 potentially privileged records found within the working papers of the National Commission.

### F.      Executive Office of the President Communications

Within each of the collections described above, there are significant communications between the federal agencies and the Executive Office of the President ("EOP").  As set forth in earlier briefing to this court, these communications implicate privilege concerns and require review by counsel in the Executive Office of the President before they can be identified as privileged or non-privileged.  As the agencies have scrambled to collect and produce their records, DOJ has segregated documents likely to contain these communications for review by the EOP.   Experience with the agency collections indicated that the volume of these communications would be quite high, particularly before de-duplication.

To minimize the disruption of the vital functions of the EOP, DOJ determined it would be most efficient to collect all of the agency records, de-duplicate the information, and then submit the EOP communications for review by the EOP.  DOJ expects to make the first round of documents available for EOP review the week of September 6, 2011.  Once the EOP has begun its review of the records and has a better sense of the time that will be required to review the records, the United States will report to the parties an estimated time frame for completing the EOP review of the records already collected.  Given the unknown timeframe for collection of the Coast Guard records, however, it will be impossible to provide a firm end date for completing the EOP review of those documents.

### G.    Others

#### 1.    Science Advisors

During the response, the Secretary of Energy assembled a team loosely identified as the "Science Team Advisors."  The United States agreed to contact these advisors and, to the extent possible, collect any Deepwater Horizon information in their possession.  Accordingly, DOJ (at the request of the Department of Energy) contacted the following individuals and collected responsive information from them:

> Alex Slocum
> Richard Garwin
> George Cooper
> Ray Merewether
> Jonathan Katz[12]

The Department of Energy used search terms to segregate potentially privileged documents contained in these records.  Non-privileged documents have been or will be produced before September 16, 2011.  The Department of Energy anticipates completing the privilege review of the potentially privileged documents before October 15, 2011.

#### 2.    Flow Rate Technical Group

Finally, the United States agreed to collect the Deepwater Horizon related documents of members of the Flow Rate Technical Group who were not federal employees (or even contractors).  These records have been collected and are being reviewed for privilege by NOAA and DOI.  Non-privileged documents (identified through the use of privilege search terms) have been or will be produced before September 16, 2011.  Privilege review is subject to the schedules set forth above for NOAA and DOI.

---

[12] Dr. Katz responded that he did not keep any, was only an advisor for a few days, the few emails he sent are actually preserved in the other collections such as that of Secretary Chu.

## III.     Conclusion

The United States recognizes the Court's imperative that discovery be completed expeditiously.  It has committed nearly unprecedented resources to the identification of custodians as well as the collection, review, and production of huge volumes of information.  As of September 6, 2011, the United States has produced over seventeen million pages of documents (*see* Attachment 14) and three privilege logs (*see* Attachment 15).  As noted in correspondence with BP, the United States has collected and produced more records that any other party in this litigation, despite the fact that serious discovery upon the United States did not commence until April 7, 2011.  The United States will make every effort to continue its extensive productions as quickly as practicable and to work cooperatively with the parties to identify and address priorities and concerns.  The United States asks, however, that this Court and the parties bear in mind the significant financial and practical restraints on the United States' ability to move any faster than it has.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources
   Division

TONY WEST
Assistant Attorney General
Civil Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Litigation Counsel
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
MATT LEOPOLD
Trial Attorneys

PETER F. FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
DAVID PFEFFER
MALINDA LAWRENCE
Trial Attorneys

Environment & Natural Resources Division          Torts Branch, Civil Division
P.O. Box 7611                                                         P.O. Box 14271
Washington, DC 20044-7611                              Washington, D.C. 20044-4271

/s/ Sarah D. Himmelhoch
STEVEN O'ROURKE                                           R. MICHAEL UNDERHILL, T.A.
Senior Attorney                                                    Attorney in Charge, West Coast Office
Environmental Enforcement Section                  Torts Branch, Civil Division
SARAH D. HIMMELHOCH                               U.S. Department of Justice
Senior Litigation Counsel for E-Discovery        7-5395 Federal Bldg., Box 36028
Environment & Natural Resources Division        450 Golden Gate Avenue
U.S. Department of Justice                                 San Francisco, CA 94102-3463
P.O. Box 7611                                                     Telephone: 415-436-6648
Washington, D.C. 20044                                    Facsimile: 415-436-6632
Telephone: 202-514-2779/202-514-0180           E-mail: mike.underhill@usdoj.gov
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov
          sarah.himmelhoch@usdoj.gov

JIM LETTEN
United States Attorney
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 on this 6th day of September 2011.

/s/ Sarah D. Himmelhoch