# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Robert Gasaway
To Call Writer Directly:
Sender's Direct Dial Number
robert.gasaway@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200
Dir. Fax: Sender's Dir Fax No.

August 22, 2011

**BY ELECTRONIC MAIL**

Sarah Himmelhoch
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Re:   MDL 2179 -- Search Criteria

Dear Sarah:

The Court has urged the parties to attempt to finalize search terms in connection with Phase II. To that end, we request that you please incorporate the search term changes set forth in the attached spreadsheet.

In addition, with respect to certain search criteria contained in my July 17 letter, which you responded to in your letter of July 19, there are several points I would like to address in more detail:

1.   Please confirm that you will re-run the searches from my letter of July 17 that you agreed to revise in your letter of July 19, as discussed in Point 3 of your August 4 e-mail to Mark Nomellini.

2.   BP respectfully requests that the United States search the records of the Coast Guard and the EPA for documents and materials responsive to RFPs 21-26. The Coast Guard and EPA are just as likely as, if not more likely than, BOEM and NOAA, to have unique documents and materials responsive to these RFPs.

RFP 26 calls for "documents referring or relating to the preparation for an oil spill response by the Area Committees in the areas affected by the Incident" and RFP 25 calls for "documents referring or relating to the preparation, review, or approval of Area Contingency Plans for areas affected by the Incident . . . ." The Coast Guard and EPA (not BOEM or NOAA) are given the responsibility of directing, supervising, reviewing, and approving the Area Committee's efforts to prepare Area Contingency Plans and to make other preparations for an oil

Hong Kong    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai    Washington, D.C.

**KIRKLAND & ELLIS LLP**

August 22, 2011
Page 2

spill response. *See* 33 U.S.C. § 1321(j)(4); 40 C.F.R. § 300.105(c)(4), 300.120(b), (c), (e); Executive Order 12777, 56 F.R. 54757, 54759-60 (Oct. 22, 1991). The Coast Guard and EPA (not BOEM or NOAA) also co-chair the Regional Response Teams, which "provide[] guidance" to the Area Committees in their response planning activities, particularly the preparation of Area Contingency Plans. *See* 40 C.F.R. § 300.115(a)(2), (b)(1), (c), (g), (i); Executive Order 12777, 56 F.R. at 54758. In short, the Coast Guard and EPA should have significant, unique, and important documents responsive to RFPs 26 and 25.

RFP 24 calls for "documents that constitute, contain, describe or refer to any guideline, policy, or practice for use in determining the adequacy of the conduct or actions of a Responsible Party in connection with the requirements of the Oil Pollution Act of 1990 related to the response to an incident for which that Act creates legal obligations." The Coast Guard and EPA are given the authority and responsibility under the Oil Pollution Act (and related regulations and executive orders) to direct both the planning and implementation of response activities. *See supra* at p. 1; *see also* 33 U.S.C. § 1321(c), (d)(2)(k), (j)(4); 40 C.F.R. § 300.120. BP seeks these agencies' guidelines, policies or practices for use in determining the adequacy of a Responsible Party's conduct or actions.

RFP 23 calls for "documents referring or relating to the application and requirements of the Oil Pollution Act of 1990 or any other federal law, or any regulations or practices to implement that Act or any such law, in determining the adequacy of an oil spill response plan," and RFP 21 calls for "documents referring or relating to the preparation, review or approval of BP's Oil Spill Response Plan for the Gulf of Mexico Region . . . ." 33 U.S.C. § 1321(j)(5)(d)(1) requires OSRPs to be "consistent with the requirements of . . . Area Contingency Plans." Given the intersection of OSRPs and Area Contingency Plans, it is likely that the Coast Guard and EPA (who have central roles in the Area Committees and creation of Area Contingency Plans) will have unique documents responsive to RFPs 23 and 21. *See, e.g.,* 40 §§ C.F.R. 300.205(g); 300.210(c)(3)(I); 300.211.

Finally, RFP 22 calls for "documents referring or relating to review, studies, or assessments required by [NEPA] or by regulations or practices to implement that Act" in connection with exploration of the MC252 well. Were EPA or Coast Guard involved in any NEPA discussions, consultations, or review in connection with the exploration of the MC252 well? If you can confirm that they were not, we will agree to limit RFP 22 searches to BOEM and NOAA. Otherwise, we maintain our request that EPA and the Coast Guard be included in the search to the extent either of those entities was involved in the NEPA-related review process.

    3.    Please add "OR burn" to RFPs 73, and 78-85, and "OR control* burn" to RFP 26. Documents relating to in-situ burn are relevant to Phase II. The amount of oil burned is relevant

# KIRKLAND & ELLIS LLP

August 22, 2011
Page 3

to various models that can be or might be used to quantify the amount of oil released from the well early in the spill. And the amount of oil burned depends on a variety of factors that are or may be uncovered or discussed in documents possessed by the government, including but not limited to area of burns, type of fire boom used, duration of burns, burn rates, and burning process employed by the Unified Command. The United States has included "in situ" in the search terms it used for RFP 26. "In situ burn" and "controlled burn" are used interchangeably.

    4.    "Dispersant" OR "Dispersants" OR "control* burn" OR berm should be added to RFP 26. Similar to controlled burns, dispersants are relevant to Phase II. The amount of oil eliminated by the use of dispersants (subsurface and surface) is relevant to various models that can be or might be used to quantify the amount of oil released from the well early in the spill. And the amount of oil eliminated by dispersants depends on a variety of factors that are or may be uncovered or discussed in documents possessed by the government, including but not limited to amount of dispersants approved and used, efficacy and effect of dispersants in general, and timing of dispersant use.

You have stated the dispersant topic "is covered by later searches." Respectfully, RFP 26 is designed to elicit documents created, reviewed, or discussed by Area Committees in planning for oil spills *before* the incident at issue in this litigation. The applicable date range for RFP 26 is 4/20/2005-4/20/2010. The documents that will be discovered here are different from the documents sought in RFPs 127-137, which are date limited from 4/20/2010 to 9/19/2010, and focus on the actual implementation of the response at issue (as opposed to pre-response planning documents).

    5.    Please delete all terms through "corexit" in RFPs 123-137 (which focus on dispersants). You have stated that the proposed revision would be "too broad a search without some terms limiting [the search] to the actual response in question." Respectfully, this objection does not take into account the fact that RFPs 123-137 are date-limited to the time period of the DWH response (4/20/10 to 9/19/2010). If NOAA, BOEM, USGS, CG, EPA,[1] or the Army Corps of Engineers were preparing, reviewing, discussing, or transmitting documents concerning Corexit (the specific dispersant used in the DWH response) during this short time period, it is likely that such documents would be responsive regardless of whether they specifically included the limiting words adopted by the United States. Use of the United States' limiting words

---

[1] In the chart in the body of your July 19 letter, EPA is not listed as one of the agencies to be searched for documents responsive to RFPs 127-137. I assume this is merely a typographical error, since EPA is listed as one of the agencies to be searched (in connection with RFPs 123-137) in the longer chart you append to the letter. Please confirm, however, that you will be searching EPA for documents responsive to RFPs 123-137.

# KIRKLAND & ELLIS LLP

August 22, 2011
Page 4

unnecessarily risks exclusion of important documents discussing Corexit during the short time frame of the DWH response.

6. Please confirm that Department of Interior and Department of Energy files will be searched with regard to RFP Nos. 62, 68-69 and 71-72.

Finally, I am copying Corey Maze and Anthony Irpino because, depending on the Phase II discovery search criteria used by the United States, we will ask the States and the PSC to run some or all of the same searches.

**United States Custodians**

We appreciate the additional responses you provided regarding custodians in your most recent letter, which contained the remaining MDL 2179 custodians. For ease of review, we have maintained the format and content topical order you adopted in the letter, separating the custodians into categories for the purpose of clarifying their status.

a. BP Has Withdrawn Request

We agree with your understanding that BP has withdrawn the discovery request for the following custodians:

Richard Bullman, NASA;

William Haynie, American Bureau of Shipping;

Steve Mann, ExxonMobil; and

Tim Nedwed, ExxonMobil.

As we stated in our August 9, 2011 letter, notwithstanding the removal of any custodian from this list, we reserve the right to seek discovery of the relevant custodian's documents and files should further information suggest it is appropriate.

b. Court Has Denied These Custodians Without Prejudice

In your letter, you assert that the United States will not search the files of the following custodians:

Carol Browner, EOP; and

# KIRKLAND & ELLIS LLP

August 22, 2011
Page 5

Jerry Miller, OSTP, EOP.

In Magistrate Judge Shushan's Order (Rec. Doc. No. 3377, the "Order") BP's request for limited document discovery of certain EOP employees was denied. The Order, however, maintained BP's right to re-urge its discovery request, and BP reserves its right to seek such discovery.

c.   Custodians Allegedly Outside United States Custody or Control

  DNV Custodians

  BP reserves its rights with respect to DNV custodians.

  Timothy Crone

  BP reserves its rights with respect to Mr. Crone's documents.

d.   Individuals with No Responsive Information

In your recent letter, you state that based on "an employee survey, review of time records, knowledge of the NOAA litigation team, and consultation with the supervisors" the United States has no reason to believe that the following NOAA custodians have any electronically stored information or paper documents related to Quantification, Source Control, the Event, or communications with Congress, or the EOP.

Jean de Marignac, NOS, NOAA;

Lt. Paul Hemmick, OMAO, NOAA;

Scott Kathey, NOS, NOAA;

Jim Kelley, OMAO, NOAA;

Michael Levine, NOS, NOAA;

Brian Prestcott, OMAO, NOAA;

Andrea Proie, OMAO, NOAA;

Adam Reed, NOS, NOAA; and

KIRKLAND & ELLIS LLP

August 22, 2011
Page 6

Jan Roletto, NOS, NOAA.

We have conducted targeted searches in documents already collected by BP, both internally and through third party subpoenas, and affirm our discovery request for Lt. Paul Hemmick, Jim Kelley, Michael Levine, Andrea Proie, and Adam Reed. These document searches included the names of the respective custodians in conjunction with certain search terms for Quantification, Source Control, and the Event. However, from the list above, we withdraw our current discovery request for Jean de Marignac, Scott Kathey, Brian Prescott, and Jan Roletto. BP reserves its right to seek discovery from the files of these custodians should further information suggest it is appropriate.

Your letter also referenced certain custodians that "did not retain any information" on account that "they left it on the vessel or location where they performed their Deepwater Horizon related work." Furthermore, you stated that these custodians indicated that they did not have laptops with them at the time. Such custodians are:

Karen Earwaker, NOS, NOAA; and

Colleen Fanelli, NOS, NOAA.

Again, we have conducted targeted searches in documents already collected by BP, both internally and through third party subpoenas, and withdraw our current discovery request for Ms. Earwaker's and Ms. Fanelli's documents and custodial files. BP reserves its right to seek discovery from the files of these custodians should further information suggest it is appropriate.

For the following custodians, you stated, to the extent such custodians performed work on laptops assigned during the response, the laptops were connected to Coast Guard servers and any information continued therein is part of the Coast Guard archive. You added that the Coast Guard "anticipates beginning to search" the archive on August 22, 2011. The relevant custodians are as follows:

Becky Shortland, NOS, NOAA; and

John Wang, NOS, NOAA.

The Coast Guard has made progress with the archive and you were correct to respond that the archive includes more that just hard copy documents. Nonetheless, we are not certain about your statement that the archive will be searchable by August 22. It is our understanding that Coast Guard has contracted with a vendor to run document verification and quality controls to essentially "clean up" the electronic data and paper documents currently uploaded to the

# KIRKLAND & ELLIS LLP

August 22, 2011
Page 7

archive. The vendor is scheduled to provide a sample test run to the Coast Guard on August 22. The test sample does not include all of the documents currently in the archive, rather just a sample of those documents. Thus, the amount of data included in this test sample is uncertain. Of the nineteen servers that were used in the response, fourteen have been sent to Mandeville for processing into the archive. The other five servers are still in use by the Coast Guard. Twelve of the fourteen servers in Mandeville, Louisiana have been uploaded. Many of the laptops are on site in Mandeville, but approximately only thirty percent have been uploaded to date.

Is it possible to confirm whether Ms. Shortland's and/or Mr. Wang's laptops are included in the thirty percent that has been uploaded to date? If so, is it possible to confirm whether each of their data has been included in the sample test run that is scheduled to be presented to the Coast Guard on August 22?

Under this "no responsive information" subsection, your letter also identified Ms. Jennifer Clark, a former NOAA oceanographer, who received calls about the Deepwater Horizon incident, but claims "was never a contractor to NOAA during that time." We refine our request to discovery of any communications the United States may have had with Ms. Clark.

In your letter, you listed several NOAA personnel that work on ERMA during the Deepwater Horizon response. You state that such personnel served as "software support for individuals handling data that was being stored in ERMA" and that NOAA reports that it has no reason to believe that these individuals "generated information that would be responsive." The custodians that you identified as working on ERMA in such capacity are as follows:

Michelle Johnston, NOS, NOAA;

Chad King, NOS, NOAA;

Joey Lecky, NOS, NOAA;

Tony Reyer, NOS, NOAA;

Lasha Salbosa, NOS, NOAA;

Daniel Turner, NOS, NOAA; and

John Wagner, NOS, NOAA.

ERMA (Emergency Response Mapping Application) is a system developed out of federal funds for storing geographic information. ERMA contains dynamic mapping applications,

# KIRKLAND & ELLIS LLP

August 22, 2011
Page 8

which are publically available, and additional geographic maps (e.g., flight lines, etc.) that are available to responders with NOAA sponsored access. At this time, based on our current knowledge of ERMA and the information obtained through preliminary document searches, we affirm our discovery request for Michelle Johnston, Chad King, Daniel Turner, and John Wagner. However, we withdraw our discovery request for Joey Leckey, Tony Reyer, and Lasha Salbosa; again, we reserve the right to seek discovery from these custodians should further information suggest it is appropriate.

e.  Outstanding

You indicated that you would provide an update on the custodians listed below; please let us know if we have missed it:

Richard L. Court, NASA;

Col. Alvin Lee, Army Corps of Engineers; and

Ken Lee, Army Corps of Engineers.

f.  Relevant Records Are Being Searched

Lastly, with respect to custodians, you mention that the United States is searching the ICC records, where "all of Lt. Commander Deborah Barr's potentially responsive information is likely to reside," and that no further search appears to be necessary.

We have been informed that the ICC records are part of the Coast Guard archive, in Mandeville. As we explained above, the archive currently consists of electronic data from twelve out of nineteen servers and approximately thirty percent of laptops used in the Deepwater Horizon response. If such ICC records are hard copy, and already in Mandeville, approximately fifty percent have been reviewed, and approximately fifty percent of such reviewed documents have been scanned into the archive.

Please feel free to contact me to discuss this letter further.

## KIRKLAND & ELLIS LLP

August 22, 2011
Page 9

Sincerely,

Robert Gasaway

Cc: Corey Maze
    Anthony Irpino

ACTIVEUS 90366083v1
K&E 19628430.1