# KANNER & WHITELEY, L.L.C.

**701 Camp Street**
**New Orleans, Louisiana 70130**
(504) 524-5777
FAX: (504) 524-5763

August 29, 2011

**Via Electronic Mail**: *Sally_Shushan@laed.uscourts.gov*
The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re:     In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
        Mexico, on April 20, 2010, MDL No. 2179 – *BP Motion to Compel*

Dear Judge Shushan:

The State of Louisiana respectfully submits this response to BP's correspondence of August 22, 2011 ("BP's Motion to Compel") [Rec. Doc. 3795], consistent with this Court's Order of 8/24/11. [Rec. Doc. 3810]  BP complains that Louisiana's Responses to its discovery requests are inadequate for purposes of Phase 1 discovery.   As Louisiana has repeatedly advised BP, the State takes issue with BP's overly broad Requests for Production and has produced information related to the State's involvement and activities associated with the fire, explosion and sinking of the Deepwater Horizon during the April 19 through 23 timeframe[1]: the matters which are at issue in the Phase 1 Limitations trial.

For purposes of the upcoming Phase 1 Limitations trial, slated to begin in February 2012, this Court permitted and encouraged the States, including Louisiana, to adopt and identify documents and information relating to liability issues which had been previously submitted by the PSC and/or produced in the context of government hearings and the discovery efforts to date. Phase 1, as currently structured, involves Transocean's efforts to limit and/or exonerate itself from liability, as well as the determination of liability and allocation of fault as among the defendants to these proceedings.  The discovery requests served by BP extend far beyond this phase of the Limitations proceeding and in effect seek all documents and information in the

---

[1] With respect to the explosion and sinking of the Deepwater Horizon, as is evident from the materials the State has produced to date, although the State stood ready with vessels and personnel to assist, the US Coast Guard did not utilize these assets in the context of the emergency search and rescue efforts.  Louisiana Production, Bates Range: LA-ST 86-240.  Additionally, the notification (received by the Louisiana State Police at 2:18 pm on April 21, 2010) provided by BP regarding the initial release of oil confirmed that BP represented to the State that it did "not expect any shoreline impact at this time. . . [BP is] working with the MMS and Coast Guard for Response Actions." Louisiana Production, Bates LA-ST 91-92.

possession of virtually every State agency which references BP, the Deepwater Horizon, Macondo, Transocean, etc. These requests are not limited to the issues in the upcoming Phase 1 of the Limitations trial. In addition, BP refuses to accept the adoption of PSC responses as provided for by this Court. Simply put, BP's Motion to Compel seeks to impose discovery obligations on the State of Louisiana that are at best premature, and at worst improper and contrary to the direction of this Court. Moreover, BP's motion to Compel runs far afoul of BP's stated need for discovery from the State: to "avoid surprise" in the upcoming trial on liability and allocation of fault. BP's Motion to Compel should be denied in its entirety.

BP previously argued to this Court that its Phase 1 discovery is limited to the collection of information necessary for the defendants to prepare their expert reports in the context of the determination of the allocation of fault among them (*i.e.* the Limitation action):

> As the Court has stated repeatedly, the pre-July 31 deposition period is meant only for deposing those witnesses whose testimony is necessary for the parties' experts to prepare their expert reports for Phase 1 of the Limitation Trial. See, e.g., J. Barbier, Status Conf. Tr. at 29, Jan 18, 2011 ("What we wanted to make sure is any fact deposition that was necessary for the experts to do their work, do their reports was taken by [the July 31, 2011] deadline."). In fact, on April 20th, after reiterating that "July 31, 2011 is the deadline for the completion of fact discovery required for the expert reports that will be served beginning August 15, 2011"

5/12/11 Corsp. fr. A. Langan to Magistrate Shushan. [Rec. Doc. 2370] At the discovery working group conference on May 15, 2011, BP confirmed that it had issued the April 29, 2011, discovery in an effort to avoid surprise:

> Your Honor, you're very responsive, always, and you got back to us on April 26th and said, answer, yes, if the discovery is required for the first segment of the February 2012 trial, which we have referred to as the *event segment*. So we take Your Honor at her word and said to ourselves, okay, well, it sounds like these people have filed claims in limitation, they've brought cases against us, they've incorporated complaints against us, and the Court says we need to serve discovery on them. So, on April 29th, we did. They are things like asking about standard pretrial discovery to avoid surprise, asking for do you have any documents relating to the incident, do you have any documents relating to the DEEPWATER HORIZON, do you have any witness statements, I mean, so we're not blindsided by this stuff.

Discovery Working Group Conf. 5/15/11 Tr. 27:9-22 (A. Langan, counsel for BP). *See also*, 4/20/11 Order (denying Louisiana's requests for certain depositions within the First Phase of Discovery, stating that July 31, 2011 is the deadline for the completion of fact discovery required for the expert reports that will be served beginning August 15, 2011). [Rec. Doc. 2067]

Consistent with the Phased approach, this Court provided a compromise which would allow the defendants to prepare their expert reports relating to causation and prevent the unfair surprise which concerned defendants but not require the States to respond to extensive discovery in the context of Phase 1 of the Limitations trial.  To that end, your Honor's orders, specifically Section 6 of the Working Group Order [Rec. Doc. 2396] and the Order dated 6/15/11, [Rec. Doc. 2763] contemplate and provide for the adoption of PSC responses in connection with the Phase 1 causation issues.[2]  As such, the State's adoption of the responses relating to the causes of the fire, explosion and initial release, including reference to the documents and materials produced by the PSC, in addition to documents and materials previously identified by the State and/or produced in connection with the ongoing discovery in this case, are appropriate.  With respect to the issues of causation, the State of Louisiana has not conducted an independent assessment into the cause of the explosion, fire and sinking of the Deepwater Horizon.  Rather, for purposes of the Phase 1, any responsive materials the State has with respect to the cause of the event would include information already produced in these proceedings, i.e. various federal commissions' investigations, hearings and reports; the investigations and reports prepared by various defendants regarding the cause of the incident; and information the State has learned in connection with the discovery undertaken in this case. To the extent Louisiana had any additional information to present in connection with the liability issues in the Limitations trial of February 2012 (a trial in which Louisiana's role is currently uncertain), the State would have produced such materials and understands its obligation to supplement to the extent additional information is discovered.

Under these circumstances, the limited likelihood of Louisiana having any potentially admissible, non-duplicative  and/or relevant information (given that the State has not conducted an independent investigation) is far outweighed by the expense and effort of running an expansive search for terms like "BP", "DWH", "Deepwater Horizon", "Macondo", and/or "Transocean", as demanded by BP, within the over 25 State agencies (and the Attorney General's office) in a purported effort to find information not already known to BP and the other defendants regarding the issues in Phase 1.  BP's overly broad requests will result in the needless and wasteful gathering of discovery responses that are not only irrelevant, but also will result in the production of, at a minimum, duplicative evidence, and that will require the State of Louisiana to incur unjustifiable expense and delay as it pertains to Phase 1 of these proceedings. While the State is mindful that in the context of its direct claims against BP for environmental and economic damages, the State will be the subject of much broader discovery obligations, requiring such an invasive search under the current trial framework is premature.

Louisiana advised BP soon after receipt of BP's discovery requests, that they were extremely overbroad and not limited to Phase 1 issues.  This is evident when the requests are viewed with BP's search parameters.  BP made no effort to limit this breadth either by limiting

---

[2] Although this Court also directed the defendants to coordinate their discovery related to Phase 1 issues, this was not done.  *See*, 5/17/11 Discovery Working Group Order [Rec. Doc. 2396]("g. The defendants shall coordinate their discovery to eliminate duplication of discovery requests.)  The defendants nonetheless propounded five separate sets of discovery upon the State which included 157 Requests for Production and 50 Interrogatories as well as 78 Requests for Admission.

the number of Requests, the date ranges (generally a two year time frame) for the searches and/or the generalized search terms. A few of BP's Requests evidence this issue:

REQUEST FOR PRODUCTION No. 1
All documents referring or relating to the MC252 Well created on or after January 1, 2008.

REQUEST FOR PRODUCTION No. 4
All documents referring or relating to the Transocean Deepwater Horizon (the "Deepwater Horizon" or "rig").

REQUEST FOR PRODUCTION No. 24
All documents referring or relating to the explosions and fire aboard the Deepwater Horizon.

REQUEST FOR PRODUCTION No. 26
All documents referring or relating to personal injury or death that occurred in connection with the Deepwater Horizon Incident.

REQUEST FOR PRODUCTION No. 38
All documents exchanged between and communications between you and any employee, staff member or other person working for, with or on behalf of the United States government referring or relating to the Deepwater Horizon Incident.

REQUEST FOR PRODUCTION NO. 56
All documents exchanged between and communications between you and any other party in MDL No. 2179 referring or relating to the Deepwater Horizon Incident or the MC252 Well created on or after April 20, 2010.

The search parameters proposed by BP further evidence the overly expansive nature of BP's requests. For example as evidenced in Attachment B to BP's Motion to Compel (and attached hereto as Exhibit A): BP has almost categorically suggested a more than two year time frame for searches: with a beginning date of 2/1/2009 (in some instances as far back as January of 2008) and an end date of May 2011:

RFP No. 1 proposed search terms "MC252" or "Mississippi Canyon Block 252" or "Macondo"

RFP No. 4 proposed search terms: "Transocean Deepwater Horizon" or "TO Deepwater Horizon"

RFP No. 24 proposed search terms: ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("explosion" OR "fire")

RFP No. 26 proposed search terms: ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("injury" OR "death" OR "casualty" OR "casualties")

RFP No. 38 proposed search terms: ".gov" and ("Deepwater Horizon" or Macondo or "MC252" or "BP")

RFP No. 56 proposed search terms: "Moex" or "Transocean" or "BP" or "Anadarko" or "Cameron" or "Triton" or "Halliburton" or "Weatherford" or "Drillquip" or "GMBH" or "MC252".

Running searches with these terms, most notably RFP No. 56, would, in capture *almost anything* associated with not only the *Deepwater Horizon* incident itself but the massive response, recovery and environmental efforts in which Louisiana has had and continues to have substantial involvement. For example, as described below and as applicable to RFP No. 26, the terms "injury" and "death" will capture almost every natural resource damage assessment document associated with this disaster (in the environmental context the natural resource damage assessment process studies the "injury" to and in many instances the "death" of natural resources). Similarly, the proposal for RFP No. 38 would capture everything from any Louisiana government employee which has the ".gov" extension in addition to the federal government employees.

By way of example, Louisiana, which has five designated natural resource trustee agencies, has been working since the release of oil with the other Gulf states (and the various trustees for each) along with the various federal trustees to respond, to assess and begin to restore the natural resources which have been injured as a result of the Deepwater Horizon Disaster. Louisiana has had over a thousand State employees involved in these response, recovery and environmental efforts since the inception of the spill. It is more likely than not that almost every document or communication associated with these efforts contain the terms "Deepwater Horizon", 'DWH", "BP", "Macondo", or "Transocean". Additionally, the activities associated with environmental and economic damage assessments and restoration activities are not currently the subject of any of the three Phases of discovery for the Limitations proceedings[3]. As described in the Anadarko proposal, the topics of response activities and assessment of damages, both environmental and economic are not the subject of the current proceedings and would follow a period of discovery appropriate to those issues:

14. The Court also intends to try the following sets of issues as part of further proceedings in this case, *following appropriate periods of further discovery*:
        (a) Compensatory (and if appropriate, punitive) damages relating to the wrongful death and personal injury claims

---

[3] Although the Trial Plan for the Limitations Proceedings which are scheduled to begin in February 2012 has not yet been issued the Court has indicated that: "The Trial Plan will largely adopt the Trial Plan proposed by Anadarko. Trial will be segregated into three phases: Phase 1, focusing on events leading up to and including the explosion on April 20, 2010; Phase 2, focusing on source control and oil discharge quantification issues; and Phase 3, remaining liability issues (dispersants, cleanup, etc.)." Minute Order (8/12/11) [Rec. Doc. 3727]

directly arising from the explosion and fire aboard the
Deepwater Horizon rig on or about April 20, 2010;
(b) The events associated with efforts to control the flow of
oil after the explosion and fire, and loss of the rig on April
22, 2010, and before its eventual capping, and response
efforts undertaken to address the discharge of oil;
(c) The amount/volume/flow rate of oil discharged;
(d) The rate, transport and geographic reach of oil released;
*(e) Economic damages to claimants in these proceedings
that may have been proximately caused by the discharge of
oil; and*
*(f) Any fines, penalties, injunctive relief, and Natural
Resource Damages, and OPA damages, sought by any
governmental or non-governmental party.*

Memorandum of defendants Anadarko Petroleum Corporation, Anadarko E&P Company LP,
and Moex Offshore 2007 Regarding Structure of the February 27, 2012 Trial, (4/13/11)  Exhibit
1 (emphasis added). [Rec. Doc. 1955]

A few documents demonstrate the inappropriately wide net that BP seeks to cast.  The
Notice of Intent to Conduct Restoration Planning issued by the state and federal trustees in
September of 2010 includes the following preface. Attached as Exhibit B.  Those terms which
fall within BP's search parameters are highlighted below:

DISCHARGE OF OIL FROM THE DEEPWATER HORIZON
MOBILE OFFSHORE DRILLING UNIT AND THE SUBSEA
MACONDO WELL INTO THE GULF OF MEXICO, APRIL 20,
2010

SUMMARY:  On or about April 20, 2010, the mobile offshore
drilling unit *Deepwater Horizon* experienced a significant
explosion, fire and subsequent sinking in the Gulf of Mexico,
resulting in discharges of oil and other substances from the rig and
from the wellhead on the seabed into the Gulf of Mexico (referred
to as the "*Deepwater Horizon* Incident or Incidents").  These
discharges are estimated to have been in excess of thousands of
barrels of oil per day and continue, along with associated removal
activities, to adversely  affect and threaten natural resources within
the jurisdictions of the United States and the States of Louisiana,
Mississippi, Alabama, Florida, and Texas.

Pursuant to section 1006 of the Oil Pollution Act ("OPA"), 33
U.S.C. §§ 2701, *et seq.,* federal and state trustees for natural
resources are authorized to (1) assess natural resource injuries.

6

This document was drafted over several months and was the subject of extensive correspondence among the employees within the natural resource trustee agencies and their counsel.

Additionally, the <u>Memorandum of Understanding Between BP Exploration & Production, Inc., and the Louisiana Department of Wildlife and Fisheries and the Office of the Lieutenant Governor of the State of Louisiana ("Seafood Safety and Tourism MOU")</u>(attached as Exhibit C), dated November 18, 2010, which was the subject of BP and the State of Louisiana's Joint Motion to Stay Certain Claims (filed 4/21/11) [Rec. Doc. 2196], granted by <u>Order</u> dated 5/27/11, does not address Phase 1 issues, and yet easily falls within the proposed search terms. [Rec. doc. 2549]   The Seafood Safety & Tourism MOU was negotiated over a number of months and is the subject of extensive correspondence among the Louisiana trustee agencies as well as their counsel, includes the following language, typical of the introduction to many documents prepared by or submitted to the State regarding this incident:

> WHEREAS, on or about April 20, 2010, the ==mobile offshore drilling unit== *Deepwater Horizon* experienced an ==explosion, fire== and subsequent ==sinking== in the Gulf of Mexico resulting in a ==release== of ==oil== into the Gulf of Mexico and response actions ("the Oil Spill"); 11/18/2010 <u>Memorandum of Understanding Between ==BP Exploration & Production==, Inc., and the Louisiana Department of Wildlife and Fisheries and the Office of the Lieutenant Governor of the State of Louisiana</u>, p. 1.

The documents leading up to the finalization of the Seafood Safety & Tourism MOU and each draft (other than those exchanged with BP) would be privileged.   Another example is the correspondence and proposed Sea Turtle Emergency Restoration Plan which was prepared over a several month time frame by the state and federal natural resource trustees.  By correspondence dated January 28, 2011, from the US Department of the Interior (on behalf of all of the natural resource trustees) a proposal regarding Emergency Sea Turtle Restoration Activities for the Deepwater Horizon Oil Spill was transmitted to BP.   The correspondence and attachments (which are part of the Deepwater Horizon Administrative Record) include the following text:

> Because of the criteria established in the regulations, emergency restoration alternatives are developed based on known ==injury== to natural resources. . .

> A variety of oil spill response efforts have been implemented on the beaches of Alabama and the Florida Panhandle in response to the ==BP== *Deepwater Horizon* ==Oil Spill==. . ..

> Tire ruts from heavy equipment crisscross the beach in some areas and ==cause impacts== to the established and developing dune vegetation, misorient hatchling turtles crawling from the nest to the Gulf, and bird chicks seeking refuge or protection from the wind.

> The program will include education of pet owners and cat colony supporters and target free-roaming cats and ==fire== ant eradication on a case-by-case basis.

1/28/11 Corsp. fr. C. Dohner (DOI) on behalf of the natural resource trustees to R. Bullock (BP Natural Resource Damage Assessment Director), pp. 2, 5 of Sea Turtle Emergency Restoration Plan. Attached as Exhibit D.

The "BP" search term alone produces thousands of hits relating to just these three documents, none of which contribute to the issues which are being tried in the first phase of the limitations proceedings. These examples are representative of thousands of similar documents which would in turn implicate tens of thousands of drafts, copies and correspondence regarding both. In addition to requiring Louisiana to produce an extensive amount of information which bears no relation to the February 2012 trial on defendants' liability and allocation of fault, the amount of privileged information likely to result would also needlessly obligate the State to prepare an extensive privilege log for information which is not the subject of the Limitations proceedings. Absent reasonable limitations in both scope and time frame, for example a date cutoff of April 23, 2010, as Louisiana previously suggested to BP and the subject of Louisiana's searches to date, these requests are unreasonable and unduly burdensome.[4] While BP dismisses the fact that some of its search terms may "cast too wide a net," it suggests to this Court that the State should still be required to gather this information despite the overly expansive nature of the requests under the theory that the State will ultimately have to produce such materials at some point.[5] However, this approach vitiates any limitation on Louisiana's discovery obligations as provided for in the context of this phased limitations proceedings.

BP also complains to this Court regarding Louisiana's statement in the context of its written discovery responses that it was not responding "on behalf of parishes, parish district attorneys, port authorities or cities." BP's Motion to Compel, p. 2.[6] While such entities were included in BP's list of those for which it sought the State to perform searches, these entities have their own counsel and are not represented by the Attorney General absent a specific request for representation.[7] To date, these entities have proceeded, and are represented in these

---

[4] See, 8/19/11, Corsp. fr. E. Petersen (Counsel for LA) to A. Bloomer (Counsel for BP). Attached as Exhibit E. See also, the State of Louisiana's counter to BP's agency and search parameters as identified in Exhibit D to BP's Motion to Compel.

[5] The State is preparing for the production of materials that will be required in the context of Phase 2 as well as for the State's economic and environmental case. Present estimates indicate that this effort (which BP's Requests would require the State to conduct and complete at this time) will cost the State millions of dollars. By objecting to BP's Requests as to Phase 1, Louisiana does not seek to avoid its discovery obligations; rather, the State seeks clarification that its obligations, at this time, extend only to Phase 1 issues as outlined by this Court.

[6] At a later point in BP's Motion to Compel, BP oddly states that it is "willing to exclude these entities from the State's search." p.5, n3. However, BP's "willingness" is irrelevant under these circumstances given that the State does not represent and does not have custody or control over these entities or their documents.

[7] See, La Cons. Art. VI § 5 (providing for Home Rule Charter; all parishes identified by BP except Cameron have adopted a Home Rule Charter); La. R.S. 16:2 (appointing DA as parish council except home rule charters have authority to hire any counsel to represent them); La. R.S. 42:261 (Parish and districts' authority to hire counsel, generally); La. R.S. 42:261(authority of ports and levee districts to hire counsel and independent enabling legislation creating entities as political subdivisions (e.g. La. R.S. 34:4 – Port of New Orleans; La. R.S. 34:2471 – South Louisiana; La. R.S. 38:330.1 – SLFPA-E)).

proceedings, with their in house and in some occasions outside counsel.[8]   The undersigned advised BP of this fact soon after receipt of BP's discovery requests.  However, BP continues to argue that the State is required to search entities that are simply not within the State's custody or control.

In addition, in the context of an earlier discussions with BP, the State of Louisiana advised that a search of the Attorney General's office was not appropriate given its role as the law firm for the State of Louisiana and its agencies.  *See* LA. CONST. ARTICLE IV, SECTION 8 (providing that the Attorney General is the chief legal officer of the state). To the extent the Attorney General's office has information which would fall within BP's requests (under the broad search terms proposed by BP) it would either be the subject of privilege, would be duplicative of materials already produced in discovery and/or the government investigations or would also be in the files of the agencies the Attorney General's office represents.

Although BP asserts that the State of Alabama's agreements to certain search parameters, (including a voluntary search of the Alabama Attorney General's office) somehow render the Requests reasonable, these were not agreements made by or on Louisiana's behalf.  Absent justification for such expansive searches, including a search of the Louisiana Attorney General's office, the State believes that the requests made by BP are inappropriate, especially in the context of the Phase 1 discovery efforts.  BP has not identified any rationale for the requested search of the Attorney General's office files.  Accordingly, the State of Louisiana respectfully submits that it has complied with the Court's Orders and has appropriately limited its production to the issues associated with the Phase 1 Limitations proceedings at this time. BP's Motion to Compel should be denied.  Your consideration is greatly appreciated.

Sincerely,

KANNER & WHITELEY, L.L.C.

By:_____/Elizabeth Petersen/_____
        Elizabeth B. Petersen

Exhibits:
   A.  Search Term Parameters Proposed by BP to the State of Louisiana for 70 Requests for Production.
   B.  Natural Resource Trustees' Notice of Intent to Conduct Restoration Planning (Issued September 2010)
   C.  Memorandum of Understanding Between BP Exploration & Production, Inc., and the Louisiana Department of Wildlife and Fisheries and the Office of the Lieutenant Governor of the State of Louisiana ("Seafood Safety and Tourism MOU") (11/18/2010).

---

[8] Indeed, many of these entities, through their own counsel, filed responses to these discovery requests wherein they adopted the PSC responses.

D.  1/28/11 Corsp. fr. C. Dohner (DOI) on behalf of the natural resource trustees to R. Bullock (BP Natural Resource Damage Assessment Director), with accompanying Sea Turtle Emergency Restoration Plan.

E.  8/19/11, Corsp. fr. E. Petersen (Counsel for LA) to A. Bloomer (Counsel for BP).

| RFP | Request | Search Terms | Beginning Date | Ending Date | Custodians |
|---|---|---|---|---|---|
| 1 | All documents referring or relating to the MC252 Well created on or after January 1, 2008 | "MC252" OR "Mississippi Canyon Block 252" OR "Macondo" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 2 | All documents referring or relating to any application for the MC252 Well filed by BP. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("APD" OR "Application for Permit to Drill") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 3 | All documents referring or relating to the ownership structure of the MC252 Well. | ("MC252" OR "Mississippi Canyon Block 252" OR "Macondo") AND (("ownership" OR "lease" OR "sale") OR ("BP" OR "British Petroleum" OR "Anadarko Petroleum" OR "MOEX")) | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 4 | All documents referring or relating to the Transocean Deepwater Horizon (the "*Deepwater Horizon*" or "rig"). | "Transocean Deepwater Horizon" OR "TO Deepwater Horizon" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 5 | All documents referring or relating to Transocean's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | "Transocean Deepwater Horizon" OR "TO Deepwater Horizon" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 6 | All documents referring or relating to the equipment and safety devices on Transocean's *Deepwater Horizon* rig, including but not limited to the blowout preventer. | ("Transocean Deepwater Horizon" OR "TO Deepwater Horizon") AND ("Blowout Preventer" OR "BOP" OR "Blind Shear" OR "Deadman Switch" OR "Solenoid" OR "Cameron" OR "Wellbore Valve" OR "Uncontrolled flow" OR "Formation Kick" OR "Subsea Stack" OR "Control pods" OR "Hydraulic Ram" OR "Transducer" OR "Annular" OR "Riser" OR "Drill string" OR "redundant" OR "fail-safe" OR "drilling fluid" OR "drilling mud" OR "Cement" OR "Casing" OR "Drill Pipe" OR "Well Integrity" OR "Gate valve") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 7 | All documents referring or relating to the crew and personnel of Transocean's *Deepwater Horizon* rig. | ("Transocean Deepwater Horizon" OR "TO Deepwater Horizon") AND ("crew" OR "personnel") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 8 | All documents referring or relating to regulations, industry standards, or government oversight which apply or relate to Transocean, the *Deepwater Horizon*, or its crew. | ("Transocean" OR "Deepwater Horizon") AND ("regulat*" OR "practice" OR "implement*" OR "standard" OR "review") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 9 | All documents referring or relating to standard policies or procedures, including but not limited to manuals, used by or applying to Transocean's *Deepwater Horizon*. | ("Transocean Deepwater Horizon" OR "TO Deepwater Horizon") AND ("Standard Operating Procedures" OR "SOP" OR "Guidelines" OR "Policies" OR "Policy" OR "Manual") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 10 | All documents relating or referring to any inspection or audit of Transocean's rigs utilized in the Gulf of Mexico from 2008 through today. | ("Transocean Deepwater Horizon" OR "TO Deepwater Horizon") AND ("INC" OR "Incident of Non compliance" OR "Incident of Noncompliance" OR "Enforcement Action" OR "Audit" OR "Inspec*" OR "Infraction" OR "Violation" OR "Corrective Action" OR "American Bureau of Shipping" OR "ABS") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 11 | All documents relating or referring to any inspection, audit or certification of blowout preventers utilized on Transocean's rigs in the Gulf of Mexico created on or after January 1, 2008. | ("Transocean Deepwater Horizon" OR "TO Deepwater Horizon") AND (("BOP" OR "Blowout Preventer") AND "Certif*")) | 1/1/2008 | 4/30/2011 | |

| 12 | All documents relating or referring to any citations, warnings, notices, Incidents of Noncompliance ("INCs"), admonishments or violations issued to Transocean relating to its operations or training of personnel in the Gulf of Mexico created on or after January 1, 2008. | ("Transocean" OR "TOI" OR "TO Rig") AND ("Audit" OR "Inspection" OR "INC" OR "Incident of Non-compliance" OR "Incidence of noncompliance" OR "Enforcement Action" OR "Engineering Review" OR "Examination" OR "Classification" OR "Surve*" OR "Certificat*" OR "SEMS" OR "Safety Environmental Management System" OR "Admonis*" OR "Violation" OR "Finding" OR "Suspension" OR "Shutdown" OR "Warning" OR "Notice" OR "Corrective Action" OR "Citation" OR "Training" OR "Education" OR "Penalty" OR "Fine" OR "Investigation" OR "Disciplinary Action" OR "Termination" OR "Suspect" OR "Reprimand" OR "Punis*" OR "IG" OR "Liability") | 1/1/2008 | 4/30/2011 | |
| 13 | All documents relating or referring to drilling design, planning, or operations, for deepwater drilling in the Gulf of Mexico, including but not limited to the use or consideration of long string liners, liners with a tie back production casing, lock down sleeves, surface cement plugs, spacers, centralizers, tubular or casing design, drilling fluids, circulation of drilling mud, foam cement slurry, mud gas separators, alternative diverter pipes, acoustic triggers for shutoff valves, and temporary abandonment procedures. | ("Gulf of Mexico" OR "GOM" OR "DWOP" OR "Deepwater Operating Plan") AND ("API Well Design" "Exploration Plan" OR "EP" OR "Long String" OR "Liner" OR ("Tie Back" NEAR "Casing") OR "LDS" OR "Lock Down Sleeve" OR "Cement Plug" OR "Surface Plug" OR ("Spacer" NEAR ("Drilling" OR "Mud" OR "Riser" OR "Negative" Or "Calculations") OR "Centralize*" OR "Centering" OR "Casing Design" OR "Casing Program" OR "Isolating Potential Flow Zones" OR "Tubular" OR "Drilling Flui*" OR "Drilling Mud" OR "Isolating Potential Flow Zones" OR "Borehol*" OR "Hydrostatic Pressure" OR "Formation Fluid" OR "Formation Damage" OR "Drill String" OR "Polymer" OR "Bentonite" OR "Water-Based Mud" OR "Viscosity" OR "Thixotropic" OR "Permeability" OR "Mud Filtrate" OR "Capping" OR "Plugging" OR "Foam Cement" OR "Foamed Cement" OR "mud gas separator" OR ("divert*" NEAR "pipe" OR "acoustic trigger" OR "shutoff valve" OR ("TA" OR "Temporary Abandonment") NEAR ("Guidelin*" OR "Procedur*" OR "Polic*" OR "Practic*" OR "Standar*" OR "Directi*" OR "Repor*" OR "Summar*" OR "Analys*") | 4/20/2005 | 4/20/2010 | |
| 14 | All documents relating or referring to any defendant's or party's alleged failure to remotely monitor well conditions and well data for the MC252 Well. | ("DWH" OR "Deepwater Horizon" OR "MC252" OR "BP" OR "Transocean" OR "TO" OR "GOM" OR ("Gulf" AND "spill")) AND (("testing" OR "monitor!" OR "analysis" OR "study") NEAR (remot*)) | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 15 | All documents relating or referring to the drilling design or planning of the MC252 Well. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("API Well Design" "Exploration Plan" OR "EP" OR "Long String" OR "Liner" OR ("Tie Back" NEAR "Casing") OR "LDS" OR "Lock Down Sleeve" OR "Cement Plug" OR "Surface Plug" OR "Spacer" NEAR ("Drilling" OR "Mud" OR "Riser" OR "Negative" Or "Calculations") OR "Centralize*" OR "Centering" OR "Casing Design" OR "Casing Program" OR "Isolating Potential Flow Zones" OR "Tubular" OR "Drilling Flui*" OR "Drilling Mud" OR "Isolating Potential Flow Zones" OR "Borehol*" OR "Hydrostatic Pressure" OR "Formation Fluid" OR "Formation Damage" OR "Drill String" OR "Polymer" OR "Bentonite" OR "Water-Based Mud" OR "Viscosity" OR "Thixotropic" OR "Permeability" OR "Mud Filtrate" OR "Capping" OR "Plugging" OR "Foam Cement" OR "Foamed Cement" OR "mud gas separator" OR ("divert*" NEAR "pipe") OR "acoustic trigger" OR "shutoff valve" OR ("TA" OR "Temporary Abandonment") NEAR ("Guidelin*" OR "Procedur*" OR "Polic*" OR "Practic*" OR "Standar*" OR "Directi*" OR "Repor*" OR "Summar*" OR "Analys*") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |

| 16 | All documents referring or relating to drilling fluids used in or in connection with the MC252 Well. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("Drilling Flui*" OR "Drilling Mud" OR "Isolating Potential Flow Zones" OR "API Well Design" OR "Borehol*" OR "Hydrostatic Pressure" PR "Formation Fluid" OR "Formation Damage" OR "Drill String" OR "Polymer" OR "Bentonite" OR "Water-Based Mud" OR "Viscosity" OR "Thixotropic" OR "Permeability" OR "Mud Filtrate") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 17 | All documents referring or relating to the drilling operations for the MC252 Well. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("Drilling Operation") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 18 | All documents relating or referring to cementing procedures for deepwater wells, including the design, testing and execution of foamed cement, in the Gulf of Mexico, including all owner, operator or contractor submissions, permit applications, responses to permit applications or other filings reflecting well design details, and all internal or external standards, procedures, policies, best practices, guidelines, directions, instructions, reports, summaries, or analyses. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo" OR "APD" OR "Application for Permit to Drill" OR "RPD" OR "APM" OR "Application for Permit to Modify" OR "ABP" OR "Application to By-pass" OR "RBP" OR "AST" OR "RST") AND ("Cement*" OR "Capping" OR "Plugging" OR "Foam Cement" OR "Foamed Cement" OR "API Well Design") | 4/20/2005 | 4/20/2010 | |
| 19 | All documents referring or relating to the cementing of the MC252 Well, including any documents relating to the process of cementing the MC252 Well and the components of the cement slurry. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("Cement*" OR "Foamed Cement" OR "thickening time" OR "foam density" OR mixability" OR "compressive strength" OR "cement placement" OR ("slurry" NEAR ("component" OR "composition")) | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 20 | All documents relating or referring to policies and procedures for testing and evaluating the stability of a well, including but not limited to the use of positive and negative pressure tests and cement bond logs. | ("DWOP" OR "Deepwater Operating Plan" OR ("well" NEAR "test*")) AND ("Pressure Test" OR "Casing Test" OR "Negative Test" OR "Cement Bond") | 4/20/2005 | 4/0/2010 | |
| 21 | All documents relating or referring to stability tests and evaluations, including but not limited to positive and negative pressures tests and cement bond logs, performed or considered in connection with the MC252 Well. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("Pressure Test" OR "Casing Test" OR "Negative Test" OR "Cement Bond") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 22 | All documents relating or referring to responses to well control events in the Gulf of Mexico. | ("Gulf of Mexico" OR "GOM" OR "DWOP" OR "Deepwater Operating Plan") AND ("Drilling Well Control Even*" OR "Deepwater Well Control Even*" OR "API Well Control Standards" OR (("Blowout" OR "Wild Well" OR "Gusher" OR "BOP") AND ("Response" OR "Contain" OR "OSRP" OR "Contingency"))) | 4/20/2005 | 4/20/2010 | |
| 23 | All documents relating or referring to response to well control events for the MC252 Well. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND ("Drilling Well Control Even*" OR "Deepwater Well Control Even*" OR "API Well Control Standards" OR (("Blowout" OR "Wild Well" OR "Gusher" OR "BOP") AND ("Response" OR "Contain" OR "OSRP"))) | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 24 | All documents referring or relating to the explosions and fire aboard the *Deepwater Horizon*. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("explosion" OR "fire") | 4/20/2010 | 4/30/2011 | |
| 25 | All documents referring or relating to firefighting, emergency response, and rescue efforts in response to the Incident on the *Deepwater Horizon*. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("Rescue" OR "Search" OR "SAR" OR "Firefighting" OR "Fire fighting") | 4/20/2010 | 4/30/2011 | |

| 26 | All documents referring or relating to personal injury or death that occurred in connection with the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("injury" OR "death" OR "casualty" OR "casualties") | 4/20/2010 | 4/30/2011 | |
| 27 | All documents referring or relating to any effort to cap, seal or collect hydrocarbons from the MC252 Well from April 20, 2010 up to and including April 22, 2010. | (MC252 OR "Mississippi Canyon Block 252" OR "Macondo") AND "hydrocarbons" AND ("cap" OR "collect" OR "seal" OR "relief well" OR "recover*" OR "contain*") | 4/20/2010 | 4/30/2011 | |
| 28 | All documents referring or relating to any efforts to activate the *Deepwater Horizon's* blowout preventer, its Emergency Disconnect System, or any other device used to address kicks, well control events, or emergencies. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("emergency disconnect system" OR "emergency disconnect sequence" OR "EDS" OR "automatic mode function" OR "AMF" OR "remotely operated vehicles" OR "ROV" OR "hot stab" OR "autoshear" OR "Formation Kick") | 10/1/2009 | 4/30/2011 | |
| 29 | All documents referring or relating to Halliburton's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND "Halliburton" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 30 | All documents referring or relating to Cameron's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND "Cameron" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 31 | All documents referring or relating to MI-LLC's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("MI-LLC" OR "M-I Swaco") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 32 | All documents referring or relating to Dril-Quip, Inc.'s involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND "Dril-Quip" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 33 | All documents referring or relating to Weatherford's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND "Weatherford" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 34 | All documents referring or relating to Anadarko's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND "Anadarko" | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 35 | All documents referring or relating to MOEX's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Deep water Horizon" OR "Macondo" OR "DWH" OR "MC252") AND ("MOEX" OR "Mitsui") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 36 | To the extent not required by other requests, all documents referring or relating to any other party's involvement, participation or conduct with respect to the *Deepwater Horizon* Incident. | Reasonable search | | | |
| 37 | All documents requested by, or produced in response to, requests for production and interrogatories served on you by any other party in MDL No. 2179. | Reasonable search | | | |
| 38 | All documents exchanged between and communications between you and any employee, staff member or other person working for, with or on behalf of the United States government referring or relating to the *Deepwater Horizon* Incident. | IN EMAILS ONLY:  "*.gov" AND ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") | 4/20/2010 | 4/30/2011 | |

| | | | | |
|---|---|---|---|---|
| 39 | All documents exchanged between and communications between you and any member, committee, employee, staff member or other person working on behalf of the United States Congress referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after January 1, 2010. | IN EMAILS ONLY:  ("*senate.gov" OR "*house.gov") AND ("deepwater" OR "Macondo" OR "BP" OR "DWH" OR "MC252") | 4/20/2010 | 4/30/2011 | |
| 40 | All documents exchanged between and communications between you and any person working in the Executive Office of the President of the United States relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after January 1, 2010. | IN EMAILS ONLY:  "*eop.gov" AND ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") | 4/20/2010 | 4/30/2011 | |
| 41 | All documents exchanged between and communications between you and any member, employee, staff member or other person working on behalf of the National Academy of Engineering or National Research Counsel referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010. | IN EMAILS ONLY:  ("*nau.edu" OR "*nas.edu")  AND ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") | 4/20/2010 | 4/30/2011 | |
| 42 | All documents exchanged between and communications between you and any member, employee, staff member or other person working on behalf of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("National Commission" OR "Presidential Commission" OR "Chief Counsel") | 4/20/2010 | 4/30/2011 | |
| 43 | All documents exchanged between and communications between you and any member, employee, staff member or other person working on behalf of the Chemical Safety Board referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("Chemical Safety Board") | 4/20/2010 | 4/30/2011 | |
| 44 | All documents exchanged between and communications between you and any member of the media or press or any person or entity affiliated with any media publication, including, but not limited to, any reporter, investigator, journalist, author, or publisher, referring or relating to the *Deepwater Horizon* Incident or the MC252 Well. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("*.tv.com" or "press" or "media" or "news" OR "NBC" OR "CBS" OR "ABC" OR "CNN" OR "New York Times" OR "Washington Post" OR "Wall Street Journal" OR "Associated Press" or "Reuters" OR "TV" OR "newspaper" OR "blog" OR "reporter" OR "journalist" OR "website") | 4/20/2010 | 4/30/2011 | |
| 45 | All documents exchanged between and communications between you and any member, employee, staff member or other person working on behalf of Det Norske Veritas referring or relating the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("Det Norske Veritas" OR "DNV" OR "*dnv.com") | 4/20/2010 | 4/30/2011 | |

| | | | | | |
|---|---|---|---|---|---|
| 46 | All documents provided to and other communications sent by you to the United States, the United States Congress, the Chemical Safety Board, the Marine Board of Investigation, the Incident Specific Preparedness Review, the National Commission on the Deepwater Horizon Oil Spill, or any other entity or proceeding relating to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("Chemical Safety Board" OR "Marine Board of Investigation" "Joint Investigation Team" or "JIT" or "MBI" OR "Incident Specific Preparedness Review" OR "National Commission on the Deepwater Horizon Oil Spill") | 4/20/2010 | 4/30/2011 | |
| 47 | All documents exchanged between and communications between you and any official, officer, representative, or employee of any interagency body, municipal authority or political subdivision, including but not limited to the Caernarvon Interagency Advisory Committee and the Southeast Louisiana Flood Protection Authority-East, referring or relating to the *Deepwater Horizon* Incident created on or after April 20, 2010. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("Caernarvon Interagency Advisory Committee" OR "CIAC" OR "Southeast Louisiana Flood Protection Authority-East" OR "SLFPAE" OR "*.slfpae.com") | 4/20/2010 | 4/30/2011 | |
| 48 | All documents exchanged between and communications between you and any state or local government official, officer, representative, or employee in Alabama, Florida, Louisiana, Mississippi, Texas, or Mexico referring or relating to the *Deepwater Horizon* Incident created on or after April 20, 2010. | IN EMAILS ONLY:  ("*louisiana.gov" OR "*fl.us" OR "*alabama.gov" OR "*mississippi.gov" OR "*texas.gov") AND ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") | 4/20/2010 | 4/30/2011 | |
| 49 | All documents exchanged between and communications between you and any official of the federal government of Mexico referring or relating to the *Deepwater Horizon* Incident created on or after April 20, 2010. | IN EMAILS ONLY:  ("*gob.mx") AND ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") | 4/20/2010 | 4/30/2011 | |
| 50 | All documents referring or relating to Coastal Zone Management Act consistency determinations for activities conducted by BP in the Mississippi Canyon area of the Outer Continental Shelf. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP" OR "Mississippi Canyon") AND ("Coastal Zone Management Act" OR "CZMA" OR "Office of Ocean and Coastal Resource Management" OR "OCRM") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 51 | All documents referring or relating to any communications between you and any employee or officer of BP on or after April 20, 2010 relating to the *Deepwater Horizon* Incident or the MC252 Well. | IN EMAILS ONLY:  "*bp.com" | 4/20/2010 | 4/30/2011 | |
| 52 | All documents exchanged between and communications between you and any other party in MDL No. 2179 referring or relating to the *Deepwater Horizon* Incident or the MC252 Well created on or after April 20, 2010. | "Moex" or "Transocean" or "BP" or "Anadarko" or "Cameron" or "Triton" or "Halliburton" or "Weatherford" or "Drillquip" or "GMBH" or "MC252" | 4/20/2010 | 4/30/2011 | |
| 53 | All documents referring or relating to the "Macondo:  The Gulf Oil Disaster - Chief Counsel's Report" from the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, released in 2011. | ("Macondo: The Gulf Oil**" OR "Chief Counsel" OR "national commission" OR "Presidential Commission") AND "Report" | 4/20/2010 | 4/30/2011 | |

| 54 | All documents referring or relating to any report, presentation, conference, meeting or public statement from the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, including the final report, "Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling," released on January 11, 2011. | ("National Commission" OR "Presidential Commission") AND ("Deepwater" OR "DWH") AND ("report" OR "Chief Counsel's Report" OR "Amount and Fate" OR "Fate of the Oil") | 4/20/2010 | 4/30/2011 | |
| 55 | All documents referring or relating to BP's "Deepwater Horizon:  Accident Investigation Report," dated September 8, 2010. | ("Bly" or "BP") AND "Report" OR ("Accident" and "Investigat*") AND ("2010" OR "2011") | 4/20/2010 | 4/30/2011 | |
| 56 | All documents constituting, referring or relating to any working papers or reports created by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling or its staff. | ("National Commission" OR "Presidential Commission") AND ("Deepwater" OR "DWH") AND ("report" OR "Chief Counsel's Report" OR "Amount and Fate" OR "Fate of the Oil") | 4/20/2010 | 4/30/2011 | |
| 57 | All documents constituting, referring or relating to any research reports submitted by any Person to the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling or its staff. | ("National Commission" OR "Presidential Commission") AND ("Deepwater" OR "DWH") AND ("report" OR "Chief Counsel's Report" OR "Amount and Fate" OR "Fate of the Oil") | 4/20/2010 | 4/30/2011 | |
| 58 | All documents constituting, referring or relating to requests made pursuant to the Freedom of Information Act, the Louisiana Public Records Act, Alabama Code Section 36-12-40, or similar statutes or ordinances that have sought records relating to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("FOIA" OR "Freedom of Information Act" OR "Louisiana Public Records Act" OR "Public Records Act of Louisiana" OR "36-12-40" OR "Rights of citizens to inspect and copy public writings") | 4/20/2010 | 4/30/2011 | |
| 59 | All documents produced by you under the Freedom of Information Act, the Louisiana Public Records Act, Alabama Code Section 36-12-40, or similar statutes or ordinances relating to the *Deepwater Horizon* Incident. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("FOIA" OR "Freedom of Information Act" OR "Louisiana Public Records Act" OR "Public Records Act of Louisiana" OR "36-12-40" OR "Rights of citizens to inspect and copy public writings") | 4/20/2010 | 4/30/2011 | |
| 60 | All documents provided to and other communications sent or received by you relating to the *Deepwater Horizon* Incident. | Reasonable search | | | |
| 61 | All documents referring or relating to any investigation by you into the cause or causes of the *Deepwater Horizon* Incident. | Reasonable search | | | |
| 62 | All documents referring or relating to any investigation performed for you into the cause or causes of the *Deepwater Horizon* Incident. | Reasonable search | | | |
| 63 | All documents mentioned or referenced in any pleading, motion or brief filed by you in this action. | Reasonable search | | | |

| | | | | | |
|---|---|---|---|---|---|
| 64 | All documents relating to any allegations in your Complaint, including but not limited to: (a) all documents relating to whether BP knew or should have known that the *Deepwater Horizon* drilling operation would damage you or your property; (b) all documents supporting any allegations in your Complaint that the *Deepwater Horizon* or the MC252 Well (i) were in the custody and care of BP or (ii) had a vice or defect that caused damage to you or your property, and all documents bearing on whether BP knew or should have known of the alleged vice or defect; (c) all documents supporting any allegation in your Complaint that BP engaged in abnormally dangerous or ultrahazardous activity; and (d) all documents supporting any allegation in your Complaint that BP fraudulently concealed or misrepresented material facts concerning (i) its safety procedures or (ii) the safety and condition of its respective materials and equipment. | ("Deepwater Horizon" OR "Macondo" OR "MC252" OR "BP") AND ("Safety Procedure*" OR "abnormally danger*" OR "ultrahazardous") OR ("fraud*" OR "misrepresent*" OR "untrue") | 10/20/2009 (AL) 2/1/2009 (LA) | 4/30/2011 | |
| 65 | All documents that you may use or seek to introduce into evidence at any trial or hearing in this action. | Reasonable search | | | |
| 66 | All documents that relate to any expert testimony or opinions, or have been considered by any expert witness that may testify on your behalf at any trial or hearing in this action. | Reasonable search | | | |
| 67 | All documents which relate to the anticipated testimony of any person that you may call as a witness at any trial, hearing or deposition in this matter. | Reasonable search | | | |
| 68 | To the extent not required by other requests, all documents including but not limited to written, audio or visual recordings that comprise, transcribe, refer or relate to interviews of, or statements given by, persons with knowledge of the *Deepwater Horizon* Incident or the cause or causes of the Incident, including but not limited to any such interviews or statements given or taken on board the *Damon B. Bankston* . | Reasonable search | | | |
| 69 | All documents identified in your responses to the Interrogatories below. | Reasonable search | | | |
| 70 | All documents that you consulted in responding to the Interrogatories below and/or that provide support for your responses to the Interrogatories. | Reasonable search | | | |



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
**Office of General Counsel**
**Suite 4470**
**501 West Ocean Boulevard**
**Long Beach, CA 90802**

**September 27, 2010**

Brian D. Israel
Arnold & Porter LLP
555 12th Street, NW
Washington, D.C.  20004-1206
**On behalf of:**
BP Exploration & Production, Inc.

James J. Dragna
Bingham McCutchen
355 South Grand Avenue, Suite 4400
Los Angeles, CA  90071-3106
**On behalf of:**
Anadarko Petroleum Corp.
Anadarko E&P Company, LP
MOEX Offshore 2007 LLC

Kerry J. Miller
Frilot LLC
1100 Poydras Street, Suite 3700
New Orleans, LA 70163
**On behalf of:**
Transocean Holdings LLC
Transocean Deepwater Inc.
Transocean Offshore Deepwater Drilling Inc.
Triton Asset Leasing GmbH

Re:  Notice of Intent to Conduct Restoration Planning for the Deepwater Horizon Oil Spill and
Invitation to Participate in Natural Resource Damage Assessment.

Dear Counsel:

I am writing on behalf of state and federal agencies charged with public trust responsibilities for
natural resources injured and threatened by the above-referenced oil spill.

On or about April 20, 2010, the mobile offshore drilling unit Deepwater Horizon experienced an
explosion and subsequently sank, resulting in discharges of oil and other substances into the Gulf

of Mexico. These discharges, along with associated cleanup activities, are adversely affecting and/or threatening natural resources subject to the jurisdictions of the United States and the States of Louisiana, Mississippi, Alabama, Florida, and Texas. Accordingly, the designated state and federal trustees (collectively the "Trustees") for these affected and potentially affected resources have begun to undertake a natural resource damage assessment ("NRDA") pursuant to section 1006 of the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701, et seq., and applicable state law. Under the OPA, the Trustees are authorized to undertake a NRDA to (1) assess natural resource injuries resulting from a discharge of oil or the substantial threat of a discharge and response activities and (2) develop and implement a plan for restoration of such injured resources.

Based on information collected during Preassessment in accordance with state regulations and the OPA NRDA regulations at 15 C.F.R. Part 990, Subpart D, the Trustees have determined to conduct Restoration Planning in accordance with 15 C.F.R. Part 990, Subpart E, and corresponding state regulations. The details of this determination and the Trustees' associated findings are contained in the enclosed Notice of Intent to Conduct Restoration Planning.

The OPA NRDA regulations at 15 C.F.R. 990.14(c) direct the Trustees to invite Responsible Parties to participate in this process. As your clients' organizations have been identified as RPs, the Trustees hereby invite your participation in the NRDA process. This invitation to identified RPs is made without prejudice to the Trustees' ability to include or proceed against any additional parties who may have responsibility and/or liability associated with the Deepwater Horizon Oil Spill and associated response activities under any state or federal laws.

Please be advised that, pursuant to 15 C.F.R. 990.14(c)(4), the nature and extent of RP participation in the NRDA is at the sole discretion of the Trustees. Furthermore, should the Trustees determine that the participation of any RP is interfering with the Trustees' ability to fulfill their responsibilities to the public under OPA, the Trustees may end that RP's participation.

Please respond to this invitation in writing on your clients' behalf to the undersigned within 30 days of the date of this letter. If you fail to do so, the Trustees will assume that your client's organization has declined this invitation and does not intend to participate in the NRDA.

Sincerely,

Christopher J. Plaisted
Attorney-Advisor

cc:   Harriet M. Deal, U.S. Department of the Interior
      Patricia R. Collins, U.S. Department of the Air force
      William A. Gunter, Alabama Department of Conservation and Natural Resources
      Larry Morgan, Florida Department of Environmental Protection

2

Stephanie C. Morris, Louisiana Oil Spill Coordinator's Office
Lisa Thompson Ouzts, Mississippi Department of Environmental Quality
Christa McLintock, Texas Commission on Environmental Quality

**Notice of Intent to Conduct Restoration Planning (pursuant to 15 C.F.R. Section 990.44) - DISCHARGE OF OIL FROM THE DEEPWATER HORIZON MOBILE OFFSHORE DRILLING UNIT AND THE SUBSEA MACONDO WELL INTO THE GULF OF MEXICO, APRIL 20, 2010**

**SUMMARY:** On or about April 20, 2010, the mobile offshore drilling unit *Deepwater Horizon* experienced a significant explosion, fire and subsequent sinking in the Gulf of Mexico, resulting in discharges of oil and other substances from the rig and from the wellhead on the seabed into the Gulf of Mexico (referred to as the "*Deepwater Horizon* Incident or Incidents"). These discharges are estimated to have been in excess of thousands of barrels of oil per day and continue, along with associated removal activities, to adversely affect and threaten natural resources within the jurisdictions of the United States and the States of Louisiana, Mississippi, Alabama, Florida, and Texas.

Pursuant to section 1006 of the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701, *et seq.,* federal and state trustees for natural resources are authorized to (1) assess natural resource injuries resulting from a discharge of oil or the substantial threat of a discharge and response activities, and (2) develop and implement a plan for restoration of such injured resources. The federal trustees are designated pursuant to the National Contingency Plan, 40 C.F.R. Section 300.600 and Executive Order 12777. State trustees are designated by the Governors of each state pursuant to the National Contingency Plan, 40 C.F.R. Section 300.605. The following agencies are designated natural resources trustees under OPA and are currently acting as trustees for this Incident(s): the United States Department of the Interior ("DOI"), as represented by the National Park Service, United States Fish and Wildlife Service, Bureau of Indian Affairs, and Bureau of Land Management; the National Oceanic and Atmospheric Administration ("NOAA"), on behalf of the United States Department of Commerce; the United States Department of Defense ("DOD"); the State of Louisiana's Coastal Protection and Restoration Authority, Oil Spill Coordinator's Office, Department of Environmental Quality, Department of Wildlife and Fisheries and Department of Natural Resources; the State of Mississippi's Department of Environmental Quality; the State of Alabama's Department of Conservation and Natural Resources and Geological Survey of Alabama; the State of Florida's Department of Environmental Protection; and the State of Texas' Parks and Wildlife Department, General Land Office and Commission on Environmental Quality, (collectively, the "Trustees"). In addition to acting as trustees for this Incident(s) under OPA, the States of Louisiana, Mississippi, Alabama, Florida and Texas are also acting pursuant to their applicable state laws and authorities, including the Louisiana Oil Spill Prevention and Response Act of 1991, La. R.S. 30:2451 *et seq.*, and accompanying regulations, La. Admin. Code 43:101 *et seq.*; the Texas Oil Spill Prevention and Response Act, Tex. Nat. Res. Code, Chapter 40, Section 376.011 *et seq.*, Fla. Statutes, and Section 403.161, Fla. Statutes; the Mississippi Air and Water Pollution Control Law, Miss. Code Ann. §§ 49-17-1 through 49-17-43; and Alabama Code §§ 9-2-1 *et seq.* and 9-4-1 *et seq.*;.

The Responsible Parties ("RPs") identified for this Incident(s) thus far are BP Exploration and Production, Inc. ("BP"); Transocean Holdings Inc. ("Transocean"); Triton Asset Leasing GmbH

1

("Triton"); Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"); Transocean Deepwater Inc. ("Transocean Deepwater"); Anadarko Petroleum ("Anadarko"); Anadarko E&P Company LP ("Anadarko E&P"); and MOEX Offshore 2007 LLC ("MOEX"). Pursuant to 15 C.F.R. 990.14(c), concurrent with the publication of this Notice, the Trustees are inviting the RPs identified above to participate in a Natural Resource Damage Assessment ("NRDA"). The Trustees have coordinated with BP representatives on activities undertaken to date as part of the NRDA process.

The Trustees began the Preassessment Phase of the NRDA in accordance with 15 C.F.R. § 990.40, to determine if they had jurisdiction to pursue restoration under OPA, and, if so, whether it was appropriate to do so. During the Preassessment Phase, the Trustees collected and analyzed and are continuing to collect and analyze the following: (1) data reasonably expected to be necessary to make a determination of jurisdiction or a determination to conduct restoration planning, (2) ephemeral data, and (3) information needed to design or implement anticipated emergency restoration and assessment activities as part of the Restoration Planning Phase.

Under the NRDA regulations applicable to OPA, 15 C.F.R. Part 990 ("NRDA regulations"), the Trustees prepare and issue a Notice of Intent to Conduct Restoration Planning ("Notice") if they determine conditions that confirm the jurisdiction of the Trustees and the appropriateness of pursuing restoration of natural resources have been met.

Pursuant to 15 C.F.R. § 990.44, this Notice announces that the Trustees have determined to proceed with restoration planning to fully evaluate, assess, quantify and develop plans for restoring, replacing or acquiring the equivalent of natural resources injured and losses resulting from the *Deepwater Horizon* Incident or Incidents. The restoration planning process will include collection of information that the Trustees determine is appropriate for identifying and quantifying the injuries and losses of natural resources, including resource services, and to determine the need for, and type and scale of restoration actions.

**SUPPLEMENTARY INFORMATION:**

**Determination of Jurisdiction**

The Trustees have made the following findings pursuant to 15 C.F.R. § 990.41:

1. The explosion on the mobile offshore drilling unit *Deepwater Horizon* on April 20, 2010, and other associated occurrences, resulted in discharges of oil into and upon navigable waters of the United States, including the Gulf of Mexico, as well as adjoining shorelines, all of which constitute an "Incident" or "Incidents" within the meaning of 15 C.F.R. § 990.30.

2. The ongoing discharges are not permitted pursuant to federal, state, or local law; are not from a public vessel; and are not from an onshore facility subject to the Trans-Alaska Pipeline Authority Act, 43 U.S.C. §§ 1651 *et seq*.

2

3.  Natural resources under the trusteeship of the Trustees have been and continue to be injured and/or threatened as a result of discharged oil and associated removal efforts.  The discharged oil is harmful to natural resources exposed to the oil, including aquatic organisms, birds, wildlife, vegetation, and habitats.  Discharged oil and the response activities to address the discharges of oil have resulted in adverse effects on natural resources in and around the Gulf of Mexico and along its adjoining shorelines, and impaired services that those resources provide.  The full extent of potential injuries is currently unknown, and may not be known for many years; however, current natural resources and resource services that have been impacted due to the discharged oil include but are not limited to the following (as of August 19, 2010):

- Over 950 miles of shoreline habitats, including salt marshes, sandy beaches, and mangroves.
- A variety of wildlife, including birds, sea turtles, and marine mammals.  As of June 29, 2010:
    - Over 1,900 oiled birds captured and over 1,850 visibly oiled dead birds collected.
    - Over 400 oiled sea turtles captured and 17 visibly oiled dead sea turtles collected.
    - 5 visibly oiled dead marine mammals collected.
- Lost human use opportunities associated with various natural resources in the Gulf region, including fishing, swimming, beach-going and viewing of birds and wildlife.
- Waters of the Gulf of Mexico and adjoining coastal states.
- Various other biota, including benthic communities and fish.
- Water column habitat.

Accordingly, the Trustees have determined they have jurisdiction to pursue restoration under the OPA.

**Determination to Conduct Restoration Planning**

Pursuant to 15 C.F.R. § 990.42(a), the Trustees determined that:

1.  Observations and data collected pursuant to 15 C.F.R. § 990.43 demonstrate that injuries to natural resources and the services they provide have resulted from the Incident or Incidents; however, the nature and extent of such injuries has not been fully determined at this time.  The Trustees have identified numerous categories of impacted and potentially impacted resources, including fish, shellfish, marine mammals, turtles, birds and other sensitive resources as well as their habitats, such as wetlands, marshes, beaches, mudflats, bottom sediments, corals and the water column as well as effects to human use resulting from the impacts on the resources.  The Trustees have been conducting and continue to conduct, activities to evaluate injuries and potential injuries within these categories.  More information on these resource categories will be available in the Administrative Record ("AR," as defined below), including assessment work plans developed jointly by the Trustees and BP and information gathered during the

3

preassessment. The full nature and extent of injuries will be determined during the injury assessment phase of restoration planning.

2. Response actions employed for this spill include in situ burning, dispersant applications, containment and skimming of oil, and removal operations. These response actions have not addressed and are not expected to address all injuries resulting from the discharges of oil. Although response actions were initiated soon after the explosion and continue to date, they have been unable to prevent injuries to many natural resources, and the size, nature and location of the discharges have prevented recovery of most of the oil. In addition, some of these response actions have caused or are likely to cause injuries to natural resources and the services they provide, including destruction of sensitive marshes, beaches, and other habitats and impacts to human uses of resources. While injured natural resources may eventually naturally recover to the condition they would have been in had the discharges not occurred, interim losses have occurred, or are likely to occur in the future, and these will continue until baseline conditions are achieved. In addition, there have been and will continue to be losses of and diminution of human uses of the resources resulting from the impacts to the natural resources and from the response actions themselves.

3. Feasible restoration actions exist to address the natural resource injuries and losses, including lost human uses, resulting from the discharges of oil. Assessment procedures are available to scale the appropriate amount of restoration required to offset these ecological and human use service losses. During the restoration planning phase, the Trustees will evaluate potential projects, determine the scale of restoration actions needed to make the environment and the public whole, and release a draft Restoration Plan for public review and comment.

Based upon these determinations, the Trustees intend to proceed with restoration planning for the Incident or Incidents.

**Administrative Record**
The United States Department of the Interior, acting on behalf of the Trustees, is in the process of establishing and opening an Administrative Record ("AR") in compliance with 15 C.F.R. § 990.45 and applicable state authorities. The AR will be publicly accessible and include documents considered by the Trustees during the preassessment, assessment, and restoration planning phases of the NRDA performed in connection with the Incident or Incidents. The AR will be augmented with additional information over the course of the NRDA process. The availability of the AR will be addressed in one or more future notices and announcements. State-specific ARs may also be kept and will be made available by state trustees in their normal course of business.

**Opportunity to Comment**
The Trustees invite the public to participate in restoration planning for this Incident or Incidents in accordance with 15 C.F.R. § 990.14(d) and state authorities. The Trustees will be providing substantial opportunities for public involvement in the restoration planning for this Incident or

Incidents.  The opportunities for public involvement will be addressed in future notices and announcements.

**Adoption By Natural Resource Trustees**

The undersigned, on behalf of their agencies as designated natural resource Trustees, hereby adopt the foregoing.  This document may be signed in counterparts.  A copy with all original executed signature pages affixed shall constitute the original.

**SIGNATURES:**

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: 9 | 2, 2010

**UNITED STATES DEPARTMENT OF THE INTERIOR**

By:

Cindy Dohner
Southeast Regional Director
U.S. Fish and Wildlife Service

6

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: _Jul 30_, 2010

**NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION**

By: _[signature]_

David G. Westerholm
Director
Office of Response and Restoration

7

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: _____, 2010

**UNITED STATES DEPARTMENT OF DEFENSE**

By:   **SIGNATURE PENDING**

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: 6/2-1 , 2010

**GEOLOGICAL SURVEY OF**
**ALABAMA**

By:

Dr. Berry H. Tew, Jr.
State Geologist

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: 9/2, 2010

**ALABAMA DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES**

By: _____

M. Barnett Lawley
Commissioner

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: 8/30 , 2010

**FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION**

By:        *Lee Edmiston*

        Lee Edmiston
        Director
        Office of Coastal and Aquatic
          Managed Areas

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: _09/07_, 2010

**LOUISIANA COASTAL PROTECTION
AND RESTORATION AUTHORITY**

By: _____

Garret Graves
Chair

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: _30 aug_, 2010

**LOUISIANA OIL SPILL
COORDINATOR'S OFFICE**

By:

Roland Guidry
Louisiana Oil Spill Coordinator

13

Dated: 8-30, 2010

**LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY**

By:

Peggy Hatch
Secretary

14

Dated: 9·7          , 2010

**LOUISIANA DEPARTMENT OF
WILDLIFE AND FISHERIES**


By:

Robert Barham
Secretary

15

Dated: _8/30_ , 2010

**LOUISIANA DEPARTMENT OF
NATURAL RESOURCES**

By: _____

Bob Harper
Acting Secretary

16

Dated: _9/2_ , 2010

**MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY**

By: _____

Trudy D. Fisher
Executive Director

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: 13 Sept. 2010

**TEXAS PARKS AND WILDLIFE
DEPARTMENT**

By: *[signature]*

Carter Smith
Executive Director

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: 8/26, 2010

**TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY**

By:

     Mark R. Vickery, P.G.
     Executive Director

19

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

Dated: _9/8_ , 2010        **TEXAS GENERAL LAND OFFICE**

By:

    Larry L. Laine
    Deputy Land Commissioner
     & Chief Clerk

Deepwater Horizon Oil Spill – Notice of Intent to Conduct Restoration Planning

**MEMORANDUM OF UNDERSTANDING BETWEEN BP EXPLORATION &
PRODUCTION INC., THE LOUISIANA DEPARTMENT OF WILDLIFE AND
FISHERIES AND THE OFFICE OF THE LIEUTENANT GOVERNOR OF
THE STATE OF LOUISIANA**

WHEREAS, on or about April 20, 2010, the mobile offshore drilling
unit Deepwater Horizon experienced an explosion, fire and subsequent
sinking in the Gulf of Mexico resulting in a release of oil into the Gulf of
Mexico and response actions ("the Oil Spill");

WHEREAS, the Louisiana Department of Wildlife and Fisheries
("LDWF") is charged with management of a portion of the state's renewable
natural resources including wildlife and aquatic life;

WHEREAS, the Lieutenant Governor of the State of Louisiana ("the
Office of the Lieutenant Governor"), as Commissioner of the Louisiana
Department of Culture, Recreation and Tourism, is charged with preserving,
showcasing and marketing Louisiana's rich cultural heritage to those within
and outside of Louisiana;

WHEREAS, BP Exploration & Production Inc. ("BP"), the LDWF and
The Office of the Lieutenant Governor (collectively, "the Parties") recognize
the importance of the seafood and tourism industries to Louisiana (the
"State");

WHEREAS, on May 24, 2010, the U.S. Commerce Secretary
declared a Fisheries Failure pursuant to section 312a of the Magnuson-
Stevens Act, and the Louisiana Wildlife and Fisheries Department also
closed fisheries in State waters due to the Oil Spill;

WHEREAS, a portion of the commercial fisheries in the continental
United States are harvested in waters offshore of Louisiana;

WHEREAS, Louisiana's unique coastal wetlands and estuary provide
significant habitat for marine species in the Gulf of Mexico;

WHEREAS, the Parties recognize the importance to the seafood
industry of assuring the general public that Louisiana and Gulf seafood is
safe;

WHEREAS, the Parties support the testing of Louisiana and Gulf
seafood and the communication of those results to provide appropriate
assurance to the public;

WHEREAS, as of the date of this Memorandum of Understanding
("MOU"), the vast majority of Louisiana's fisheries are open to commercial
and recreational harvesting;

1

WHEREAS, the Parties believe that continued testing of seafood and communication of those test results are appropriate measures to take to provide the public with appropriate assurance that Gulf seafood is safe to eat, which could help address impacts to Louisiana's seafood industry, and which are an appropriate response to the Oil Spill;

WHEREAS, the Parties believe that expenditures on marketing of Louisiana Seafood could also help address impacts to Louisiana's seafood industry and are an appropriate response to the Oil Spill; and

WHEREAS, the Parties also believe that expenditures to increase and benefit tourism could help address impacts to Louisiana's tourism industry as a result of the Oil Spill and are an appropriate response to the Oil Spill.

NOW, THEREFORE, in light of the above recitals, the Parties agree as follows:

1. LDWF will develop and implement a seafood safety testing program ("Testing Program") that includes the parameters outlined in Section 1, herein:

1. A. Scope: The Seafood Testing Program is intended to address seafood markets and supporting market industries that may have been negatively affected by the Oil Spill.

1.A.(i) Seafood Groups - The Testing Program will include finfish and shellfish seafood groups.

1.A.(ii) Sample Locations - Samples may be collected from State waters, seafood processors, dockside locations, or other appropriate locations.

1.A.(iii) Sample Sizes - Sample sizes and frequency of sample collections from State waters, seafood processors, dockside or other appropriate locations will be at a level reasonably determined by LDWF, to test the safety of seafood.

1.A.(iv) Components of Concern - The Testing Program will include tests for oil and its component parts (including polycyclic aromatic hydrocarbons ("PAH'")); dispersants; and, for a portion of samples, heavy metals (nickel and vanadium). To the extent the State believes other tests should be conducted, the parties agree to confer in good faith regarding testing for additional substances and/or testing to address perceptions in the marketplace that impact the

2

Louisiana seafood industry.

1.A.(v). LDWF may, at its discretion, contract with outside consultants to assist in the developing and/or implementing the Testing Program. LDWF will consult with BP on the appropriate expertise and qualifications for any proposed consultant or the appropriate qualifications and expertise terms that should be contained in an RFP if an RFP is required under state contracting laws. The RFP or any contract shall ensure that the consultant will follow established protocols for accurate sampling and testing.

1. B. Data Collection and Sharing

1.B.(i) Data Collection Protocols - The Parties agree that all data collection will comply with generally accepted protocols applicable to the collection of data, including maintaining proper chain of custody.

1.B.(ii) Production of Data - LDWF agrees to provide BP with all data generated under the Testing Program, including sampling protocols, sampling locations, sample numbers and types, testing protocols, test results, raw data packages, and chain of custody documents. As this data becomes available, LDWF shall provide this data to BP on a monthly basis, in an electronic format. The Parties agree that BP will not be required to submit a public records request to obtain this data.

1.C. Testing Methods

1.C.(i) Polycyclic Aromatic Hydrocarbons - The Testing Program will include the Federal Food and Drug Administration ("FDA") approved LC-Florescence method for polycyclic aromatic hydrocarbons, with confirmation testing by gas chromatography/mass spectrometer ("GCMS") consistent with FDA protocols.

1.C.(ii) Dispersants - When the method is available, the testing program will include FDA-approved methods to test for dispersants in seafood.

1.C.(iii) Heavy Metals - A portion of the samples will be tested for heavy metals (nickel and vanadium) using method(s) identified by FDA as appropriate for response to the Oil Spill.

1.C.(iv)In the event that LDWF believes that testing for other components or characteristics is necessary, the parties agree to confer in good faith regarding the use of additional testing methods necessary to carry out the purpose of this MOU.

3

1. D. Reporting of Results

1.D.(i) Reporting of Results – Actual results will be communicated with an indicator of "Pass" or "Fail". Actual results will be reported as below limit of detection (<LOD), trace (TR), or as a numeric value. An indicator of "Pass" will be used for all results that fall under levels of concern for seafood consumption safety in humans established by the FDA. The indicator of "Fail" will be used for all results that fall above levels of concern for seafood consumption safety for humans established by the FDA.

1.D.(ii) Levels of Concern – To the extent reasonably available, LDWF will publicize information regarding levels of concern for polycyclic aromatic hydrocarbons, dispersants, and heavy metals to aid in interpretation of reported results.

1. E. Length of Testing Program

1.E.(i) Length of Testing Program - The Testing Program will run for three (3) years from the date of execution of this MOU. The Testing Program may be extended in accordance with Paragraph 9.

1.E.(ii) Funding - BP agrees to provide $18,000,000 to the LDWF to fund the Testing Program. Before the Testing Program expires, the Parties agree to work together in good faith to determine whether additional seafood testing consistent with the purposes of this MOU is necessary and whether additional funding is required; provided, however, that nothing in this MOU shall obligate BP to extend the testing program beyond the length of the term of this MOU or provide any funding in excess of the $18,000,000 obligated herein for the Testing Program, except as provided in Paragraph 9. Except as outlined in paragraph 5 of this MOU, this MOU does not prevent the State or any other entity from seeking full relief or compensation, as provided by state, federal or international law, for injuries or damages through administrative or judicial processes, including, without limitation, applicable Natural Resource Damages Assessment procedures. Moreover, this testing is not intended to prevent, limit, or displace additional testing being conducted by the State of Louisiana or any other state, federal, or tribal entity. The parties agree to maximize efficiencies in connection with such testing.

1.F. Final Scope, Budget, and Total Cost

1.F.(i) Final Scope of Testing Program - LDWF will develop more detailed scopes of work for each of the sections 1.A. through 1.E.

4

that will be attached to this MOU as appendices.

1.F.(ii) Final Budget - LDWF will prepare a preliminary budget and circulate that preliminary budget to BP for review and comment. BP shall provide any comments on the preliminary budget within ten (10) days of receipt of the preliminary budget, and LDWF shall consider those comments in good faith in preparing a final budget. The final budget for the Testing Program will be included as a separate appendix to this MOU. LDWF may alter the budget; however, no alterations shall result in BP's funding the Testing Program in excess $18,000,000, except as provided in Paragraph 1.E.(ii) above and Paragraph 8 below.

1.F.(iii) First Twelve Months of Spending - The Testing Program budget for the first twelve months shall include the funding of all capital outlays for facility improvement, initial staffing, and training. The remaining funds shall be used for in-State sample collection, testing, monitoring and staffing and training, as needed.

1.F.(iv) Total Cost - Total cost for the Testing Program is not to exceed $18,000,000, except as provided in Paragraph 1.E.(ii), above and Paragraph 8, below.

2. LDWF and BP agree that the Louisiana Wildlife and Fisheries Foundation (the "Foundation") and the Louisiana Seafood Promotion and Marketing Board (the "Board") will develop and implement a seafood marketing program ("Seafood Marketing Program") that includes the parameters outlined in Section 2 herein and which shall be subject to review and approval by LDWF. The Foundation and the Board shall agree to develop, implement and administer the Seafood Marketing Program by executing Addendum I to this MOU. In consultation with LDWF and subject to Section 15, the Foundation and the Board may contract with outside consultants to assist in the developing and/or implementing the Marketing Program. LDWF and the Seafood Promotion and Marketing Board will consult with BP on appropriate expertise and qualifications for a proposed consultant or the appropriate qualifications and expertise terms that should be contained in an RFP if an RFP is required under state contracting laws. The RFP or any contract shall ensure that the consultant is familiar with and will follow industry standards.

2.A. Scope - The Seafood Marketing Program, in conjunction with the Seafood Testing Program, is intended to address seafood markets and supporting market industries that may have been negatively affected by the Oil Spill. The Seafood Marketing Program will be developed and implemented in a manner that raises consumer awareness of the Testing Program and its results. The Seafood Marketing Program will use the terms "Louisiana Gulf" and/or "Louisiana Gulf Safe."

5

2.B. Seafood Marketing Program Reports

2.B.(i)  LDWF will provide  BP  with quarterly updates of the Seafood Marketing Program activities conducted pursuant to this MOU.

2.B.(ii).    To the extent available, LDWF or the Foundation will provide  BP  with retail, wholesale, industry, and trade association data about the seafood market, including sales volume and pricing, that does not contain confidential and proprietary  business information.

2.C. Length of Seafood Marketing Program

2.C.(i) Length of Seafood Marketing Program - The Seafood Marketing Program will run for three (3) years from the date of execution of this MOU. The Seafood Marketing Program may be extended in accordance with Paragraph 9.

2.C.(ii) Funding - BP agrees to provide $30,000,000 to the Foundation to fund the Seafood Marketing Program, which shall be directed to the Board to develop, implement, and administer the Seafood Marketing Program. Before the Seafood Marketing Program expires, the Parties agree to work together in good faith to determine whether market data indicates seafood markets have returned to levels that would have been present but for the Oil Spill, whether additional marketing of Louisiana seafood is warranted, and whether additional funding is required; provided, however, that nothing in this MOU shall obligate BP to extend the Seafood Marketing Program beyond the length of the term of this MOU or provide in excess of $30,000,000 for the Seafood Marketing Program, except as provided in Paragraph 9. Except as outlined in paragraph 5, this MOU does not prevent the State or any other entity from seeking full relief or compensation, as provided by state, federal or international law, for injuries or damages through administrative or judicial processes, including, without limitation, applicable Natural Resource Damages Assessment procedures.  Moreover, this testing is not intended to prevent, limit, or displace testing conducted for another purpose by the State of Louisiana or by any other state, federal, or tribal entity.

2.D. Final Scope, Budget and Total Cost

2.D.(i) Final Scope of Seafood Marketing Program - The Foundation and/or the Board will develop more detailed scopes of work for each of the sections 2.A. through 2.C, which shall be attached to this MOU as appendices.

2.D.(ii) Final Budget – In coordination with the Foundation and subject to the approval of LDWF and the Office of

6

Lieutenant Governor, the Board will prepare a preliminary budget and circulate it to BP for review and comment. BP shall provide any comments on the preliminary budget within ten (10) days of receipt, and the Board shall consider those comments in good faith in preparing a final budget. The final budget for the Seafood Marketing Program will be included as a separate appendix to this MOU. The Board may alter the budget to reflect the expenses that are reasonably within the overall scope of approved work; however, no alterations shall result in BP's funding the Seafood Marketing Program in excess $30,000,000 except as provided in Paragraph 2.C.(ii) above and Paragraph 9 below.

2.D.(iii) Total Cost - Total cost for the Seafood Marketing Program shall not exceed $30,000,000, except as provided in Paragraph 2.C.(ii), above and Paragraph 9 below.

3. The Office of the Lieutenant Governor will develop and implement a tourism program ("Tourism Program") that includes the parameters outlined in Section 3, herein:

3.A Scope - The Tourism Program is intended to address tourism impacted as a result of the Oil Spill.

3.B. Tourism Program Reports

3.B (i). The Office of the Lieutenant Governor agrees to provide BP with quarterly updates of Tourism Program activities conducted pursuant to this MOU.

3.B (ii) To the extent available, the Office of the Lieutenant Governor agrees to provide BP with State, industry, and trade association data about the Louisiana tourism market that does not contain confidential and proprietary business information.

3.C. Length of Tourism Program

3.C.(i) Length of Tourism Program - The Tourism Program will run for three (3) years from the date of execution of this MOU. The Tourism Program may be extended in accordance with Paragraph 9.

3.C.(ii) Funding - BP agrees to provide $30,000,000 to develop, implement and administer the Tourism Program. Under the direction of the Office of the Lieutenant Governor, the Community Foundation of Acadiana (CFA) shall hold these funds, which shall be distributed under the direction of the Office of Lieutenant Governor, consistent with the allocations in Exhibit A, B, and C, to develop, implement and administer the Tourism Program. Before the Tourism Program expires, the Parties agree to work together in good faith to

7

determine whether Louisiana tourism has returned to levels that would have existed but for the Oil Spill, whether additional expenditures are necessary to achieve those levels through further efforts to promote Louisiana tourism, and whether additional funding is required; provided, however, that nothing in this MOU shall obligate BP to extend the Tourism Program beyond the length of the term of this MOU or provide more than the $30,000,000 obligated herein for the Tourism Program, except as provided in Paragraph 9. Except as outlined in Paragraph 5, this MOU does not prevent the State or any other entity from seeking full relief or compensation, as provided by state, federal or international law, for injuries or damages through administrative or judicial processes, including, without limitation, applicable Natural Resource Damages Assessment procedures. Moreover, this program is not intended to prevent, limit, or displace any program or activity conducted by the State of Louisiana or by any other state, federal, or tribal entity.

3.D. Final Scope, Plans, and Total Cost

3.D.(i) Final Scope of Tourism Program - Tourism funds shall be used in a manner that is consistent with the allocations identified on Exhibit A (by parish), Exhibit B (detailed cost allocation), and Exhibit C (allocation map) hereto. The Office of the Lieutenant Governor of the State of Louisiana will develop more detailed scopes of work for each of the sections 3.A. through 3.C. and attach those scopes of work to this MOU as appendices.

3.D.(ii) Final Plans - The Office of the Lieutenant Governor of the State of Louisiana will prepare preliminary plans and circulate the plans to BP for review and comment. BP shall provide any comments within ten (10) days of receipt of the preliminary plans  and the Office of the Lieutenant Governor shall consider those comments in good faith in preparing the final plan.  The final plan for the Tourism Program will be included as a separate appendix to this MOU. The Office of the Lieutenant Governor may subsequently alter the plan; however, no alterations shall result in BP's funding the Tourism Program in excess of the $30,000,000, obligated herein, except as provided in Paragraph 3.C.(ii) above and Paragraph 9 below.

3.D.(iii) Total Cost - Total cost for the Tourism Program shall not exceed $30,000,000, except as provided in Paragraph 3.C.(ii), above and Paragraph 9, below.

3.E. Delegation - The Office of the Lieutenant Governor shall have the right to delegate responsibilities set forth in this Section 3 to develop, implement, and administer the Tourism Program

8

to a foundation or other appropriate entity selected by the Office of the Lieutenant Governor and reasonably approved by BP (the "Tourism Program Administrator"). In the event of delegation, the Tourism Program Administrator shall agree to develop, implement, and administer the Tourism Program by executing Addendum II to this MOU.

4. General Terms

4.A Funding Schedule - The funding for the Testing Program, the Seafood Marketing Program, and the Tourism Program as contemplated by Sections 1 through 3 of this MOU shall be made in accordance with a funding schedule to be agreed upon between BP and each entity or Program Administrator charged with developing, implementing, and administering the Program as provided above. In addition, if LDWF, the Office of the Lieutenant Governor, or any Program Administrator fails to provide the data it is required to provide relative to any Program under Paragraphs 1.B.(ii), 2.B. and 3.B. of this MOU or otherwise materially breaches any of the provisions governing such Program as set forth herein or in any appendix hereto, BP shall provide notice and a reasonable opportunity to cure, and BP may delay the payment or application of funding for such Program until the required data has been provided or the breach has been cured.

4.B Each Program Administrator shall keep reasonably detailed records of how the funding provided for such Program has been used and disbursed. At the end of every 90-day period following execution of this Memorandum, each Program Administrator shall send BP a report of expenditures. The report shall be provided within thirty (30) days after the end of each 90-day period. In addition, the Program Administrators shall provide to BP, upon request, supporting documentation for the development, implementation, and administration of each Program and shall have the ability to make reasonable inquiries to the Program Administrator from time to time to monitor the use and disbursement of funding provided hereunder. The Parties further agree that the payment and disbursement of the funding provided hereunder will comply with all applicable laws and regulations and any Program Administrator shall likewise comply.

4.C Payment and Dispute Resolution -

4.C (i) BP reserves the right to dispute and withhold payment of all or part of an invoice submitted under this MOU that contains inaccuracies or that is otherwise inconsistent with the scope of programs authorized by this MOU.

4.C. (ii) Except as discussed in subsection 4.C (i), above, BP shall pay all amounts invoiced within thirty (30) days of receipt thereof. If BP disputes any portion of an invoice or amount for reasons other than those listed in paragraph 4.C(i), then, BP shall pay the invoice in full when due, but shall also notify the Program Administrator of its contest in reasonable detail and describe the issues and amounts

9

disputed within thirty (30) days of receipt of the disputed invoice.

4.C (iii)  BP shall keep an accounting of all funds or portions of invoices it disputes under paragraph 4.C (ii), and BP may withhold any disputed amounts from the final payment of any total amounts agreed to hereunder, if not resolved prior to the end of this three-year commitment.  The Parties shall attempt to resolve the dispute through good faith, informal negotiations.  In the event that the dispute is not resolved informally, the State, LDWF and/or the Office of the Lieutenant Governor reserve their right to seek reimbursement from BP for any disputed sum that was not paid through any means available, including judicial enforcement of the terms of this MOU. If the State, LDWF and/or the Office of the Lieutenant Governor is successful in obtaining payment of a withheld amount, BP shall pay, in addition to the amount of the disputed invoice, all reasonable costs and attorneys fees incurred by the State, LDWF, the Office of the Lieutenant Governor, and/or the Louisiana Attorney General to resolve the dispute.

4.D. Use of Data/Reservation – The State of Louisiana, through any of its officers or agencies, and BP will have authority to use any data generated under the MOU for any and all purposes consistent with applicable law and regulations. Each Party reserves its right to produce its own independent interpretation and analysis of any data collected pursuant to this MOU. Nothing in this MOU in any way modifies or limits the State, LDWF, or the Office of the Lieutenant Governor's discretion to make management decisions in accordance with applicable statutory and regulatory authorities, including Louisiana's public records law.

4.E. Reservation of Rights - The State, including but not limited to LDWF and the Office of the Lieutenant Governor, reserves all claims it may have against BP arising out of the Oil Spill, including, without limitation, any causes of action or requests for relief, administrative or judicial, under State or federal laws, or any other claims procedures related to the Oil Spill.

4.F. No Third Party Beneficiaries - Nothing in this Agreement is intended or shall be interpreted to benefit or harm any third party not a signatory hereto.

5. Reservation of rights and stay of claims - The State, reserves its right to file suit or to submit a claim against BP within the period of time prescribed by law for claims arising from the Deepwater Horizon Oil Spill, which may include claims for losses associated with tourism or seafood market related revenue.  If the State files such a suit or claim, the Parties shall engage in good faith negotiations to attempt to resolve any such claim or suit and shall take all appropriate procedural steps necessary to stay the portion of the suit or claim that involves matters

10

encompassed by this MOU for the duration of this MOU. If any relevant portion of the claim or suit is not stayed as outlined above, then this agreement shall be subject to termination according to the provisions in Section 10 of this MOU.

6.  The Parties agree and acknowledge that the Testing Program, Seafood Marketing Program, and Tourism Program may mitigate the impacts and help to restore and increase human uses of Louisiana's natural resources, including the use of fish, invertebrates, shellfish, and related recreational and tourist amenities. BP reserves its rights to seek an appropriate credit or set-off for any restoration actually achieved by the Testing Program, the Seafood Marketing Program and/or the Tourism Program, in response to any claim for natural resource damages asserted against it in connection with the Oil Spill. Any credit or set-off against a claim by Natural Resources Trustees for the State of Louisiana shall be limited to restoration and/or human use increases actually achieved in Louisiana, or for the benefit of the State of Louisiana or the people of Louisiana. The Parties agree that the fact that BP is funding the Testing Program, Seafood Marketing Program and Tourism Program as part of this MOU shall not disqualify BP from receiving NRD credit for the Testing Program, the Seafood Marketing Program or the Tourism Program in future negotiations or proceedings.

7.  Nothing in this MOU shall be construed as an admission or concession of any issue of fact or law.

8.  The funding obligations in this MOU are separate from, and in addition to, any prior funding obligations by BP to the State of Louisiana related to the Spill. Except as otherwise provided in this MOU or as may be subsequently negotiated by the parties, BP has no contractual obligation to reimburse LDWF and the Office of the Lieutenant Governor or the State of Louisiana for seafood safety testing, seafood marketing, and tourism efforts incurred during the three (3) year term of this MOU, or any extension thereof.

9.  Extension – The Parties recognize the possibility that additional impacts of oil or dispersants from the Oil Spill may become apparent during or after the completion of the three-year (3) term of this MOU. In the event of a new fishery closure after the Effective Date of this MOU of either Louisiana waters or Federal waters contiguous with Louisiana waters resulting from the Oil Spill, the Parties agree to expand the funding for this MOU to reflect the additional testing and marketing required to address the presence of the newly discovered oil resulting from Oil Spill. In the event of such closure, the Parties agree to extend the terms and the funding of this MOU for three (3) additional years from the last date of reopening of either Louisiana waters or Federal waters contiguous with Louisiana waters resulting from the Oil Spill. The costs shall again be based on reimbursement for such

11

testing, seafood marketing, and tourism promotion.

10. Termination based upon inability to obtain stay: If, pursuant to Paragraph 5 of this MOU, a stay of proceedings is not granted of the relevant portion of the claim or suit, either party may elect to terminate the provisions in this MOU, as set forth below.

   i. On the day when the stay is denied, BP's obligation to fund any Program that is affected by the litigation shall cease, and either party may elect to terminate the MOU for that Program, as set forth below.

   ii. Within ten (10) days after the MOU for any Program terminates, the LDWF and Lieutenant Governor shall return any and all unencumbered funds for that Program to BP.

   iii. Within thirty (30) days after the MOU for any Program terminates, the LDWF and Lieutenant Governor shall provide BP with any and all data that BP is entitled to receive for that Program relating to Program Funds encumbered or spent and work performed by the termination date.

11. Severability - The provisions of any terminated Program shall be severed from this MOU, and the remainder of the MOU shall remain in full force and effect. If all three Programs are terminated under this MOU, then the entire MOU shall terminate, and only the provisions in paragraph 6 of this MOU shall survive the termination and remain in full force and effect.

12. Multiple signature pages - For the convenience of the Parties, this MOU may be signed in one or more counterparts. The combination of all the signed counterparts together shall have the status of an executed original.

13. Effective Date - This MOU shall become effective as of the date of its signing, and shall remain in effect for three (3) years unless extended or terminated as provided herein.

14. Modification -- This MOU may be revised or modified only upon written agreement of the Parties. The Party recommending the revision or modification shall provide the other Party with 30 days written notice of the proposed change.

15. When executing the provisions of this memorandum or taking actions in furtherance thereof, the parties agree to abide by applicable provisions of the Louisiana Procurement Code or other applicable State or local statutes, rules, regulations, or ordinances governing the procurement of professional, personal and consulting services. Also, the parties agree the Louisiana Code of Ethics applies to each public servant, officer, or

12

contractor executing the provisions of this memorandum or taking actions in furtherance thereof. Finally, each person executing the provisions of this memorandum or taking actions in furtherance thereof shall comply with any applicable State or local statutes, rules, regulations, or ordinances governing travel of state employees. Reimbursements for travel expenses will be in accordance with Louisiana State Travel Rules and Regulations PPM 49.

Any notice contemplated or required by this MOU shall be sent in writing to:

For LDWF, as to Seafood Testing Program: Robert Barham, Secretary of the LDWF

For LDWF, as to the Seafood Marketing Program: Robert Barham, Secretary of the LDWF or his successor.

For the Seafood Promotion and Marketing Board, as to the Seafood Marketing Program: Harlon Pearce, Chairman of the Seafood Promotion and Marketing Board or his successor.

For the Office of the Lieutenant Governor of the State of Louisiana, as to the Tourism Program and the Seafood Marketing Program: Scott Angelle, Lieutenant Governor of the State of Louisiana or his successor.

For BP, as to the Testing Program: Jeff Morgheim, Director of Planning and Economics, Gulf Coast Restoration Organization, BP Exploration & Production, Inc., 501 Westlake Park Boulevard, Houston, TX 77079.

For BP, as to the Marketing Program: Jeff Morgheim, Director of Planning and Economics, Gulf Coast Restoration Organization, BP Exploration & Production, Inc., 501 Westlake Park Boulevard, Houston, TX 77079.

For BP, as to the Tourism Program: Jeff Morgheim, Director of Planning and Economics, Gulf Coast Restoration Organization, BP Exploration & Production, Inc., 501 Westlake Park Boulevard, Houston, TX 77079.

Agreed to this 18th day of November 2010.

_____
The Honorable Scott Angelle
Lieutenant Governor
State of Louisiana

Witness: _____

Witness: _____

_____
Robert J. Barham
Secretary
Louisiana Department of Wildlife and Fisheries

Witness: _____

Witness: _____

_____
Harlon H. Pearce, Jr.
Chairman
Louisiana Seafood Promotion and Marketing Board

Witness: _____

Witness: _____

14

For BP Exploration & Production, Inc.:

_____

David I Rainey
Vice President Science, Technology, Environment and Regulatory Affairs
Gulf Coast Restoration Organization
BP Exploration & Production, Inc.

Witness: _____

Witness: _____

ADDENDUM I

The undersigned hereby agree to develop, implement and administer the Seafood Marketing Program in accordance with the terms of the foregoing Memorandum of Understanding and to comply with all provisions of such Memorandum.

IN WITNESS WHEREOF, the undersigned have signed this Addendum I as of _____, __, 2010.

The Louisiana Wildlife and Fishery Foundation

By:_____
Name:_____
Title:_____

The Louisiana Seafood Promotion and Marketing Board

By:_____
Name:_____
Title:_____

16

ADDENDUM II

The undersigned hereby agrees to develop, implement and administer the Tourism Program in accordance with the terms of the foregoing Memorandum of Understanding and to comply with all provisions of such Memorandum.

IN WITNESS WHEREOF, the undersigned have signed this Addendum II as of _____, ___, 2010.

[Name of Delegee]

By:_____
Name:_____
Title:_____

17

# BP Tourism Investment Allocation Plan (Exhibit A)

| | Parish | Amount | Tier |
|---|---|---|---|
| 1 | Acadia Parish | $68,828.96 | 2 |
| 2 | Allen Parish | $19,151.70 | 3 |
| 3 | Ascension Parish | $113,711.62 | 2 |
| 4 | Assumption Parish | $26,392.59 | 2 |
| 5 | Avoyelles Parish | $31,641.13 | 3 |
| 6 | Beauregard Parish | $26,093.86 | 3 |
| 7 | Bienville Parish | $6,223.81 | 4 |
| 8 | Bossier Parish | $45,385.32 | 4 |
| 9 | Caddo Parish | $105,466.55 | 4 |
| 10 | Calcasieu Parish | $211,811.08 | 2 |
| 11 | Caldwell Parish | $4,303.27 | 4 |
| 12 | Cameron Parish | $500,000.00 | 1C |
| 13 | Catahoula Parish | $4,363.80 | 4 |
| 14 | Claiborne Parish | $6,798.30 | 4 |
| 15 | Concordia Parish | $7,956.89 | 4 |
| 16 | De Soto Parish | $10,967.55 | 4 |
| 17 | East Baton Rouge | $493,983.65 | 2 |
| 18 | East Carroll Parish | $3,466.16 | 4 |
| 19 | East Feliciana Parish | $15,631.85 | 3 |
| 20 | Evangeline Parish | $26,940.99 | 3 |
| 21 | Franklin Parish | $8,375.23 | 4 |
| 22 | Grant Parish | $8,249.14 | 4 |
| 23 | Iberia Parish | $500,000.00 | 1C |
| 24 | Iberville Parish | $37,309.62 | 2 |
| 25 | Jackson Parish | $6,320.67 | 4 |
| 26 | Jefferson Parish | $2,166,666.00 | 1A |
| 27 | Jefferson Davis Parish | $35,789.73 | 2 |
| 28 | Lafayette Parish | $235,150.12 | 2 |
| 29 | Lafourche Parish | $2,166,666.00 | 1A |
| 30 | La Salle Parish | $5,862.24 | 4 |
| 31 | Lincoln Parish | $17,770.02 | 4 |
| 32 | Livingston Parish | $133,828.35 | 2 |
| 33 | Madison Parish | $4,950.82 | 4 |
| 34 | Morehouse Parish | $12,017.16 | 4 |
| 35 | Natchitoches Parish | $16,485.35 | 4 |
| 36 | Orleans Parish | $6,000,000.00 | 1B |
| 37 | Ouachita Parish | $62,418.44 | 4 |
| 38 | Plaquemines Parish | $2,166,666.00 | 1A |
| 39 | Pointe Coupee Parish | $16,801.63 | 3 |
| 40 | Rapides Parish | $97,603.60 | 3 |
| 41 | Red River Parish | $3,839.00 | 4 |
| 42 | Richland Parish | $8,545.99 | 4 |
| 43 | Sabine Parish | $9,887.87 | 4 |
| 44 | St. Bernard Parish | $2,166,666.00 | 1A |
| 45 | St. Charles Parish | $59,744.06 | 2 |

| | Parish | Amount | Tier |
|---|---|---|---|
| 46 | St. Helena Parish | $7,968.62 | 3 |
| 47 | St. James Parish | $24,770.53 | 2 |
| 48 | St. John The Baptist Parish | $54,738.99 | 2 |
| 49 | St. Landry Parish | $86,715.96 | 2&3 |
| 50 | St. Martin Parish | $59,292.92 | 2 |
| 51 | St. Mary Parish | $500,000.00 | 1C |
| 52 | St. Tammany Parish | $2,166,666.00 | 1A |
| 53 | Tangipahoa Parish | $109,529.65 | 2&3 |
| 54 | Tensas Parish | $2,448.69 | 4 |
| 55 | Terrebonne Parish | $2,166,666.00 | 1A |
| 56 | Union Parish | $9,507.93 | 4 |
| 57 | Vermilion Parish | $500,000.00 | 1C |
| 58 | Vernon Parish | $35,551.15 | 3 |
| 59 | Washington Parish | $33,705.31 | 3 |
| 60 | Webster Parish | $17,086.14 | 4 |
| 61 | West Baton Rouge Parish | $25,972.43 | 2 |
| 62 | West Carroll Parish | $4,823.48 | 4 |
| 63 | West Feliciana Parish | $11,339.90 | 3 |
| 64 | Winn Parish | $6,484.18 | 4 |
| | **TOTAL** | **$23,500,000.00** | |

The following is a detailed breakdown of the $30 Million tourism investment recently announced by BP as a result of the Deepwater Horizon tragedy. This provides for a centralized statewide campaign to improve the "Louisiana Brand", provides for a concentrated effort by the coastal parishes to re-energize their tourism opportunities, and recognizes that each parish has suffered from the overall brand damage caused by the spill.

1. **Louisiana Campaign (including nature based tourism) $10.5 million**
   a. $5,000,000 million – Department of Culture, Recreation and Tourism
   b. $2,500,000 million – 6 physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i. St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche
         1. ($ 416,666.67 each)

   c. $500, 000 – 4 other coastal parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i. Iberia, St. Mary, Vermilion, Cameron
         1. ($125,000 each)

   d. $2,500,000 million – remaining 53 parishes (see attached tiering map and spreadsheet)

2. **Coastal Tourism Response - $6 million**
   a. $4,500,000 million – 6 physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i. St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche ($ 750,000 each)

   b. $1,500,000 million – 4 other coastal parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i. Iberia, St. Mary, Vermilion, Cameron
         1. ($375,000 each)

3. **Greater New Orleans Response - $6 million**

4. **Tourism Events –$ 7.5 million**
   a. $6,000,000 million – 6 physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC)
      i. St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche ($1,000,000 million each)

   b. $1,500,000 million – Department of Culture, Recreation and Tourism for statewide tourism event support

**Summary:**

1

1. **$13 million or 43.34% of $30 million**
    a. To the six (6) physically impacted parishes making up Louisiana Tourism Coastal Coalition (LTCC) - St. Tammany, St. Bernard, Plaquemines, Jefferson, Terrebonne, Lafourche (each $2,166,000 million)
    b. For marketing, advertising, tourism event support, charter and recreational fishing support, nature based tourism, fairs and festivals, and grants to parish-selected projects.
    c. Allows for regional cooperation

2. **$2 million or 6.67% of $30 million**
    a. To the four (4) other coastal parishes making up the Louisiana Tourism Coastal Coalition (LTCC) - Iberia, St. Mary, Vermilion, and Cameron (each $500,000)
    b. For marketing, advertising, tourism event support, charter and recreational fishing support, nature based tourism, fairs and festivals, and grants to parish-selected projects
    c. Allows for regional cooperation

3. **$6 million or 20% of $30 million**
    a. To the City of New Orleans
    b. For marketing, advertising, tourism event support, conventions, fairs and festivals, etc.
    c. Allows for regional cooperation

4. **$2.5 million or 8.33% of $30 million**
    a. To the remaining fifty-three (53) parishes as per attached tiering map and spreadsheet
    b. For marketing, advertising, tourism event support, nature based tourism, fairs and festivals
    c. Allows for regional cooperation

5. **$5 million or 16.67% of $30 million**
    a. To the Department of Culture, Recreation and Tourism in conjunction with Louisiana Travel Promotion Association (LTPA) for marketing and advertising Louisiana as a destination
    b. Plan to be submitted by Lt. Governor Office

6. **$1.5 million or 5% of $30 million**
    a. To the Department of Culture, Recreation and Tourism for statewide tourism event support
    b. Plan to be submitted by Lt. Governor Office

11/19/2010

Exhibit B

**NOTES**:

1. BP has agreed to a funding arrangement of $5 million per quarter as opposed to $10 million per year for three (3) years. This will allow for a surge of investment, if needed, of $30 million in 18 months.

2. Parish allocations are direct to parish governments, or their designee(s), including but not limited to the Louisiana Tourism Coastal Coalition and individual tourism commissions.

3. All plans are subject to approval by BP, require the opportunity for BP to be engaged in plan development, allow for regional cooperation and include potential grants for tourism activities and stabilization at the local level.



# BP Tourism Investment Allocation Plan

Tier 4

Tier 3

Tier 2

Tier 1-A

Tier 1-B

Tier 1-C

Exhibit C

NOTE: St. Landry Parish and Tangipahoa Parish are split between Tier 2 and Tier 3.



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
1875 Century Boulevard
Atlanta, Georgia 30345

In Reply Refer To:
FWS/R4/RD

JAN 2 8 2011

Robin Bullock
NRDA Director
BP- GCRO
501 Westlake Park Boulevard
Houston, Texas  77079
**On behalf of:**
BP Exploration & Production, Inc.

Re: Emergency Sea Turtle Restoration Activities for the *Deepwater Horizon* Oil Spill

Dear Ms Bullock:

This letter is written on behalf of the state and federal Natural Resource Trustee agencies charged with public trust responsibilities for natural resources injured and threatened by the *Deepwater Horizon* Oil Spill (the "Oil Spill").  As we indicated in our letter of October 14, 2011 concerning the subject of emergency restoration, the Trustees have continued to consider potential preventive measures to avoid or reduce losses and dangers to natural resources resulting from the Oil Spill, including those caused by response actions.  In your reply letter of November 4, 2010, BP expressed its interest in working with the Trustees in this effort, and the parties have made good progress since then.  This letter is to propose another emergency restoration project, in addition to those upon which we are now working together.

Enclosed is a short plan briefly describing four emergency restoration actions that the Trustees, at their meeting of January 20, 2011, approved in an attempt to minimize potential ongoing injuries to Sea Turtles.  Please be advised that the cost figures for the proposed activities are estimates and actual costs may vary once planning, design, and implementation begin.  Further, of course, the emergency restoration activities address only certain resources and potential injuries and do not represent the full scope or extent of actual natural resource injuries and losses that may have occurred and may be continuing to occur as a result of the Oil Spill and removal actions.

In order to expedite discussions concerning this additional project, the Trustees request that BP, through its counsel, contact counsel for DOI (Holly Deal or Chuck McKinley).  If BP decides not to provide funding for these emergency restoration activities, the Trustees would appreciate being so informed at your earliest opportunity so that we may avoid unnecessary delay in filing a



Ms. Bullock                                                                                          2

claim with the National Pollution Fund Center, should the Trustees opt to seek funding for these activities through that alternative mechanism.

Thank you for your consideration of this matter.

Sincerely yours,

Cynthia K. Dohner
Regional Director, FWS Southeast Region
Authorized Official for DOI
On behalf of the Trustees

Enclosure

cc (electronic):

Troy Baker (NOAA)
Dr. Nick Tew (Geological Survey of Alabama)
M. Barnett Lawley (Alabama Department of Conservation and Natural Resources)
Lee Edminston (Florida Department of Environmental Quality)
Garret Graves (Louisiana Coastal Protection and Resource Authority)
Roland Guidry (Louisiana Oil Spill Coordinator's Office)
Peggy Hatch (Louisiana Department of Environmental Quality)
Robert Barham (Louisiana Department of Wildlife and Fisheries)
Bob Harper (Louisiana Department of Natural Resources)
Trudy D. Fisher (Mississippi Department of Environmental Quality)
Don Pitts (on behalf of Texas Trustees)
Harriet M. Deal (DOI)
Charles McKinley (DOI)
John Carlucci (DOI)
Christopher Plaisted (NOAA)
M. E. Rolle (NOAA)
Will Gunter (ALDCNR)
Bennett Bearden (GSA)
Stephanie Morris (LOSCO)
Drue Banta (LACP&R)
Lisa Ouzts (MSDEQ)
Christa McLintock (behalf of Texas Trustees)

Brian Israel (BP)

### *SEA TURTLE EMERGENCY RESTORATION PLAN*

**Project Name:**            Emergency Restoration of Sea Turtles in the Gulf of Mexico

**Project Location:**        Beaches in Alabama, Florida, Mississippi, and Texas

**States Impacted:**         Alabama, Florida, Mississippi, and Texas

**Lead Agency:**             U.S. Fish and Wildlife Service

**Supporting Agencies:**     National Park Service, Texas Parks and Wildlife Department

**Agency Points of Contact:**  Ann Marie Lauritsen
                               U.S. Fish and Wildlife Service
                               (904) 525-0661
                               ann_marie_lauritsen@fws.gov

                               Don Pitts
                               Texas Parks and Wildlife Department
                               (512) 658-1309
                               don_pitts@tpwd.state.tx.us

                               Donna Shaver
                               National Park Service
                               (361) 949-8173 x226
                               donna_shaver@nps.gov

                               Tom Shearer
                               U.S. Fish and Wildlife Service
                               (361) 994-9005
                               tom_shearer@fws.gov

**Background:**

Pursuant to the regulations for conducting NRDA under OPA, 15 CFR Part 990, emergency restoration may be undertaken if:

1. The action is needed to avoid irreversible loss of natural resources, or to prevent or reduce continuing danger to natural resources or similar need for emergency action
2. The action will not be undertaken by the lead response agency
3. The action is feasible and likely to succeed
4. Delay of the action to complete the restoration planning process established in this part would likely result in increased natural resource damages
5. The cost of the action is not unreasonable

Because of the criteria established in the regulations, emergency restoration alternatives are developed based on known injury to natural resources.  The natural resource trustees for the Deepwater Horizon (DWH) NRDA have identified Kemp's ridley, loggerhead, green, leatherback, and hawksbill sea turtles as resources that have experienced known injury and for which emergency restoration actions should be undertaken prior to the next nesting season to prevent further injury.  Sources of injury to breeding adult and hatchling sea turtles include exposure to oil, exposure to dispersants, and physical impacts to beach nesting habitat due to response activities.  The projects described within this document are intended to reduce or prevent further injuries by enhancing the breeding success of oil-exposed sea turtles during the 2011 breeding season.

**Proposed Restoration Actions:**

- <u>Predator control on sea turtle nesting beaches in AL, FL, and MS</u>:  Increased human presence as a result of the oil spill response effort has likely attracted and will continue to attract an increased number of predators to beaches in the northern Gulf of Mexico. Increased amounts of trash left by response workers, failure to maintain existing refuse control efforts, vehicle tracks, and removal of existing fences can all serve to attract generalist predators and enhance their ability to locate and depredate sea turtle nests. The proposed program will expand upon existing USDA/APHIS predator control efforts, and will involve trapping and removing coyotes, red foxes, gray foxes, raccoons, and feral cats.  Predator-proof trash receptacles will also be installed and maintained at designated beach access points. *Note: this action is being submitted concurrently to National Incident Command for funding under removal activities.  This activity should begin as soon as feasible in order to reduce or prevent further injuries to sea turtles, and would continue until September 2011.*

- **Restoration of beach access areas in AL, FL, and MS:** Dune and beach access areas impacted by oil and/or response efforts will be re-graded to restore suitable sea turtle nesting habitat. Each dune and beach access area impacted will be assessed and restored on a case-by-case basis. *Note: this action is being submitted concurrently to National Incident Command for funding under removal activities. Beach access restoration should begin as soon as feasible in order to reduce or prevent further injuries to sea turtles; this activity would be suspended 1 May 2011 to prevent disturbance to nesting sea turtles.*

- **Kemp's ridley sea turtle detection and protection on the Texas Gulf Coast:** Support would be provided for efforts to find and protect nesting Kemp's ridley turtles and their nests at Padre Island National Seashore, the most important Kemp's ridley nesting beach in the U.S. as well as on beaches along the Texas coast. A multi-agency recovery program has been on-going at Padre Island since 1978 to form a secondary nesting colony as a safeguard against extinction. In 2009, 117 Kemp's ridley nests were found at Padre Island National Seashore. More than half the Kemp's ridley nests found in the U.S. each year are located at Padre Island National Seashore, and about 70% are cared for there. Another 13 nests were detected along the upper Texas coast in 2009. Specific emergency restoration actions to be implemented would include enhanced support of nest detection and protection activities and construction of two base camps to decrease response time to construct protective corrals and improve nest detection and protection at Padre Island National Seashore, particularly in the remote southern end. *This activity should begin as soon as feasible in order to reduce or prevent further injuries to sea turtles, and would continue until December 2011.*

- **Construction of a Kemp's ridley egg incubation facility addition at Padre Island National Seashore:** Support would be provided to construct an incubation facility addition and support rooms, to protect and increase the survivability of hatchlings by holding and hatching more Kemp's ridley eggs. This activity will avoid irreversible loss to this natural resource by increasing the hatching success of eggs obtained from breeding-age females exposed to DWH spill event oil in 2010. This project can be completed on a near-term basis and will have a beneficial impact on the recruitment of Kemp's ridley hatchlings. *This activity should begin as soon as feasible in order to reduce or prevent further injuries to sea turtles, and would continue until December 2011.*


**Resources Benefited:**

      Kemp's ridley turtle (*Lepidochelys kempii*)
      Loggerhead turtle (*Caretta caretta*)
      Green turtle (*Chelonia mydas*)
      Leatherback turtle (*Dermochelys coriacea*)
      Hawksbill turtle (*Eretmochelys imbricata*)

**Relevance to Injury and Justification:**

*Kemp's ridley sea turtle*

More Kemp's ridley sea turtles were documented oiled as a result of the DWH spill event than any other sea turtle species. The projects will help reduce further injury to the population through detection and protection of nesting turtles and nests on Gulf of Mexico beaches, and by enhancing the recruitment of hatchlings. The spill location overlaps with the known distribution of important Kemp's ridley foraging and migratory habitat. Many of the adult females that were equipped with satellite tags after nesting in Texas and Mexico during 2010 moved to the vicinity of the spill and were likely exposed to oil in the marine environment.

Pursuant to the Oil Pollution Act (OPA) for justification of emergency restoration:

- (1) The action is needed to avoid irreversible loss of natural resources, or to prevent or reduce any continuing danger to natural resources or similar need for emergency action;

    o The proposals will avoid irreversible loss to this natural resource by protecting nests in the upcoming nesting season, and increase survivability of the hatchlings. Nest detection and protection activities are high priority recovery task items in the Kemp's Ridley Sea Turtle Endangered Species Act Recovery Plan. The projects can be completed on a near term basis and will have a beneficial impact on the survivability of the hatchlings of female turtles that were likely exposed to DWH oil during 2010.

- (2) The action will not be undertaken by the lead response agency;

    o The U.S. Coast Guard will not undertake these proposals.

- (3) The action is feasible and likely to succeed;

    o More than 30 years of expertise has built the population of nesting females by putting more people on the beach to detect and protect nesting Kemp's ridley sea turtles and the nests, eggs, and hatchlings.

- (4) Delay of the action to complete the restoration planning process established in this part likely would result in increased natural resource injuries.

    o The proposals are to protect the nests and enhance the breeding success of Kemp's ridley females that were exposed to DWH oil during 2010 and are attempting to breed for the first time since that exposure occurred. The result of not implementing the proposals is an increase in the loss of nests and hatchlings due to the adverse effects of oil exposure, which will result in further injuries to the species.

4

- (5) The costs of the action are not unreasonable.
  - o This proposed budget for the two projects is $825,000 and is reasonable.

*Loggerhead, Green, Leatherback, and Hawksbill sea turtles*

A variety of oil spill response efforts have been implemented on the beaches of Alabama, Mississippi, and the Florida Panhandle in response to the DWH spill event. Mechanical equipment has been used to rake and sift sand in an effort to recover oil reaching these important sea turtle nesting beaches. Tire ruts from heavy equipment crisscross the beach in some areas and cause impacts to the established and developing dune vegetation, disorient hatchling turtles crawling from the nest to the Gulf. A considerable amount of sand has also been removed from the beach as the oil was removed. These physical changes and loss of plant cover caused by vehicles on vegetated areas or dunes can lead to various degrees of instability and cause dune migration. As vehicles move over the sand, sand is displaced downward, lowering the substrate and compacting otherwise suitable potential nesting sites. Vehicular traffic on the beach or through dune breaches or low dunes may cause acceleration of overwash, erosion and loss of nesting habitat. Collectively, these activities will require re-grading and dune and b each access restoration at select locations.

Increased oil spill response activity on the beach can attract predators to the beach. Predation by a variety of predators can considerably decrease sea turtle nest hatching success. The most common sea turtle predators in the southeastern U.S. are ghost crabs (*Ocypode quadrata*), raccoons (*Procyon lotor*), feral hogs (*Sus scrofa*), foxes (*Urocyon cinereoargenteus* and *Vulpes vulpes*), coyotes (*Canis latrans*), armadillos (*Dasypus novemcinctus*), and fire ants (*Solenopsis invicta*). In the absence of sea turtle nest protection programs in a number of locations throughout the southeast U.S., raccoons may depredate up to 96 percent of all nests deposited on a beach. As sea turtle nesting habitat dwindles and stressors such as the DWH spill event occur, it is essential that nest production be naturally maximized so that Endangered Species Act recovery goals can be attained.

Pursuant to the Oil Pollution Act (OPA) for justification of emergency restoration:

- (1) The action is needed to avoid irreversible loss of natural resources, or to prevent or reduce any continuing danger to natural resources or similar need for emergency action;
  - o The proposals will avoid irreversible loss to this natural resource by restoring nesting habitat, protecting nests in the upcoming nesting season, and increasing survivability of hatchlings. The projects can be completed on a near term basis and will have a beneficial impact on the breeding success of female turtles that were likely exposed to DWH oil during 2010.
- (2) The action will not be undertaken by the lead response agency;

5

- o   As of this writing, the U.S. Coast Guard will not undertake these proposals.

- (3) The action is feasible and likely to succeed;

  - o   These proposals are an expansion of ongoing efforts that have proven successful for increasing sea turtle nesting success in the northern Gulf of Mexico.

- (4) Delay of the action to complete the restoration planning process established in this part likely would result in increased natural resource injuries.

  - o   The proposals are to protect the nests and enhance the breeding success of loggerhead, green, leatherback, and hawksbill sea turtle females that were exposed to DWH oil during 2010 and are attempting to breed for the first time since that exposure occurred. The result of not implementing the proposals is an increase in the loss of nests and hatchlings due to the adverse effects of response actions and oil exposure, which will result in further injuries to the species.

- (5) The costs of the action are not unreasonable.

  - o   This proposed budget for the two projects is $925,000 and is reasonable.

**Estimated Project Costs:**

| TASK | DESCRIPTION | COST |
|---|---|---|
| Ecologically sound predator control programs | Install and maintain predator-proof trash receptacles at designated beach access points. Identify and remove targeted predators on a case-by-case basis on coastal public and private lands of Alabama, Mississippi, and the Florida Panhandle. | $175,000 |
| Restoration of beach and dune access areas | Re-grading and restoring beach access points on a case-by-case basis in Alabama, Mississippi, and the Florida Panhandle. | $750,000 |
| Kemp's ridley nest detection and protection on the Texas Gulf Coast | Construction of two base camps on Padre Island National Seashore, corralling of nests, and nest detection and protection program operations. | $425,000 |
| Kemp's ridley egg incubation facility addition, Padre Island National Seashore | Construction of an addition to an existing egg incubation facility to improve egg care and increase hatchling production. | $400,000 |
| **ESTIMATED TOTAL COST** | | **$1,750,000** |

**Additional Material to Facilitate Environmental Project Consideration:**

- Permits/Consultations (if required):  Florida Department of Environmental Protection permit, Alabama Department of Environmental Management permit, Mississippi Department of Environmental Quality permit, Intra-Service Section 7 consultations (FWS Regions 2 and 4), NEPA compliance for construction activities on Padre Island National Seashore.

- Time to Implementation:  The project will be on-going from February 2011 to December 2011; beach and dune access restoration will cease in May 2011 to prevent disturbance to nesting sea turtles.

**Lili Petersen**

| | |
|---|---|
| **From:** | Lili Petersen |
| **Sent:** | Friday, August 19, 2011 5:10 PM |
| **To:** | 'Andrew Bloomer' |
| **Cc:** | Andrew Langan; Allan Kanner; Don K. Haycraft; Robert E. Holden; Tim Duffy; Beth Larsen |
| **Subject:** | RE: Search Term and Custodian Lists |

Andrew – Below please find a link to the additional materials I mentioned which we had not thought would be ready until Monday.

http://kanner-law.brickftp.com/f/536838cf5

With respect to the issue of the breadth of the requests, Louisiana maintain our disagreement with the suggestion that these requests are limited to Phase 1 issues. A few examples:

REQUEST FOR PRODUCTION No. 1
All documents referring or relating to the MC252 Well created on or after January 1, 2008.

REQUEST FOR PRODUCTION No. 4
All documents referring or relating to the Transocean Deepwater Horizon (the "Deepwater Horizon" or "rig").

REQUEST FOR PRODUCTION No. 38
All documents exchanged between and communications between you and any employee, staff member or other person working for, with or on behalf of the United States government referring or relating to the Deepwater Horizon Incident.

The search parameters proposed by BP further evidence this breadth For example – BP has almost categorically suggested a beginning date of 2/1/2009 and an end date of May 2011 (which BP will presumably extend) for these searches. In addition, for those Requests identified above, BP's proposed search terms would arguably capture any document associated with not only the event but all matters which have ensued thereafter as a result:

RFP No. 1 proposed search terms "MC252" or "Mississippi Canyon Block 252" or "Macondo"
RFP No. 4 proposed search terms: "Transocean Deepwater Horizon" or "TO Deepwater Horizon"
RFP No. 38 proposed search terms: ".gov" and ("Deepwater Horizon" or Macondo or "MC252" or "BP") [we note that this search would pull everything from a Louisiana government employee which has the ".gov" extension in addition to the federal government employees.

Running these types of searches would, in practice capture *almost anything* associated with not only the incident itself but the extensive response, recovery and environmental efforts in which Louisiana has had substantial involvement. Absent reasonable limitations (for example a date cutoff of April 23, 2010 as Louisiana has suggested) these requests are unreasonable and unduly burdensome. Requiring the State to gather this information despite the overly expansive nature of the requests under the theory that the State will ultimately have to produce such materials at some point vitiates any limitation imposed by the Magistrate's orders.

Specifically, the Magistrate provided a compromise which would prevent the unfair surprise which concerned defendants but not require the States to respond to this extensive discovery in the context of Phase 1 of the limitations trial. To that end, the Magistrate's 5/17/11 Discovery Working Group Order (Rec. Doc. 2396)

expressly permits the States to adopt the responses of the PSC to the discovery which had been issued.  At the discovery working group conference on 5/15/11 BP confirmed that it had issued the 4/29/11 discovery in an effort to avoid surprise:

> Your Honor, you're very responsive, always, and you got back to us on April 26th and said, answer, yes, if the discovery is required for the first segment of the February 2012 trial, which we have referred to as the *event segment*.  So we take Your Honor at her word and said to ourselves, okay, well, it sounds like these people have filed claims in limitation, they've brought cases against us, they've incorporated complaints against us, and the Court says we need to serve discovery on them. So, on April 29th, we did.  They are things like asking about standard pretrial discovery to avoid surprise, asking for do you have any documents relating to the incident, do you have any documents relating to the DEEPWATER HORIZON, do you have any witness statements, I mean, so we're not blindsided by this stuff.

Discovery Working Group Conf. 5/15/11 27:9-22 (A. Langan, counsel for BP).  To this end, Magistrate Shushan's orders, specifically Section 6 of the Working Group Order (Rec Doc 2396) and the Order dated 6/15/11 (Rec. Doc. 2763) contemplate and provide for the adoption of PSC responses in connection with the Phase 1 causation issues.  As such, the State's adoption of the responses relating to the causes of the fire, explosion and initial release, including reference to the documents and materials produced by the PSC in addition to documents and materials previously identified by the State and/or produced in connection with the ongoing discovery in this case, are appropriate.   To the extent Louisiana had any additional information to present in connection with the liability issues in the Limitations trial of February 2012 (a trial in which Louisiana's role is currently uncertain) the State would have produced such materials and understands its obligation to supplement to the extent additional information is discovered.

At present no agencies beyond the 5 identified have been searched.  However, the State has begun the task of gathering the electronic and other materials of all of the State's agencies in order to begin working through possible responses to the Phase 2 discovery which is upcoming.  The State of Alabama's agreements with respect to these discovery requests, including its agreement to search its Attorney General's office, were not agreements made by Louisiana and absent justification for such expansive searches as well as a search of the Attorney General's office, the State cannot commit to these requests at this time.

Please let me know if you wish to discuss.  I will advise shortly of the status of our supplemental search per the search terms as provided previously.

Lili Petersen
Kanner & Whiteley
(504) 524 - 5777

---

**From:** Andrew Bloomer [mailto:abloomer@kirkland.com]
**Sent:** Thursday, August 18, 2011 9:17 PM
**To:** Lili Petersen
**Cc:** Andrew Langan; Allan Kanner; Don K. Haycraft; Robert E. Holden; Tim Duffy; Beth Larsen
**Subject:** Re: Search Term and Custodian Lists

Lili:

Please let us know the estimated quantity of documents to be produced on Monday.

BP's discovery requests to the State and local government entities were specifically limited to Phase One issues, consistent with the Court's orders and directions, so we cannot agree to Louisiana's unilateral decision to search for documents responsive to only 5 of BP's 70 requests, and to limit searches to a period of only a few days in all but one case. You do not identify any of BP's requests that the State contends are not directed to Phase One issues. In addition, despite your assertion that Phase One issues are limited to "the explosion, fire, sinking and initial release," and to the narrow period of time when those events occurred, it is clear that relevant documents related to those events and their causes will have been created both before and after the event itself. As you know, the State of Alabama searched for documents responsive to all of BP's requests; we believe Louisiana should do the same.

With respect to the state agencies to be searched, you indicate that the State is searching five agencies "which were the initial agencies associated with Phase 1 issues." Please let us know whether the State has conducted any search of the other agencies on the May 20, 2010 agency list that BP provided at Louisiana's request, in order to determine whether those agencies also have responsive Phase One documents.

Finally, BP cannot agree to exclude the Attorney General's office from the State's discovery obligations. If there are non-privileged documents responsive to Phase One issues in the possession, custody or control of the Attorney General's office, they should be produced. The State has not represented to BP (or to the Court) that it has conducted a reasonable and diligent search and determined that no such documents exist. Given that the State of Alabama complied with the obligation to search its Attorney General's office, we are at a loss to understand why Louisiana's responsibility would be different.

If you have any questions, please let me know. I am available to talk on Friday or over the weekend. If we cannot reach an agreement regarding these matters, we will submit them to the Court for resolution.

Thanks for your attention to this matter.

Andrew

Andrew B. Bloomer, P.C. | Kirkland & Ellis LLP
300 North LaSalle Street | Chicago, IL 60654
312.862.2482 Phone | 312.862.2200 Fax |
773.456.5688 Cell | andrew.bloomer@kirkland.com

---

**From:** Lili Petersen [e.petersen@kanner-law.com]
**Sent:** 08/18/2011 10:52 PM GMT
**To:** Andrew Bloomer
**Cc:** Andrew Langan; Allan Kanner <a.kanner@kanner-law.com>; "Don K. Haycraft" <dkhaycraft@liskow.com>; "Robert E. Holden" <reholden@liskow.com>; Tim Duffy; Beth Larsen
**Subject:** RE: Search Term and Custodian Lists

Andrew –

　　　　To confirm, Louisiana has to date provided materials associated with the consistency determination for the Macondo drilling lease as well as the official notification of the DWH emergency. Additionally we have

just received further materials associated with explosion, fire and initial release during the April 20 through 23rd time frame which we will be able to provide to BP on Monday of next week.  We are also conducting, as referenced in my email of August 8, the search within the following agencies which were the initial agencies associated with Phase 1 issues:  Louisiana Department of Environmental Quality; Louisiana Department of Public Safety; Louisiana Oil Spill Coordinator's Office; Louisiana Department of Wildlife and Fisheries; and the Louisiana Department of Natural Resources.  Our searches include all custodians within these agencies (however, to the extent attorney client information is recovered, that will be withheld).   Our search parameters at this point include those identified on the attached.  Given that Louisiana's discovery obligations are currently limited to Phase 1, the breadth of the search terms and time frames proposed by BP are simply overbroad.  We hope to have additional materials resulting from this search shortly.

The State has, accordingly, limited its current searches to those requests specifically addressing the explosion, fire, sinking and initial release.  While BP has provided proposed search terms and timeframes for the 70 Requests for Production it issued to the State of Louisiana, those requests cover far more than that which is contemplated for Phase 1.  As such, while the State is currently assessing the logistics (as well as associated burdens) of searching, reviewing and producing materials from all of the State's agencies consistent with upcoming Phase 2 obligations, we cannot at this time commit to the actual searches but instead intend to propose alternate search terms and time frames consistent with the State's obligations as we move forward.   Without further narrowing of the Requests as issued by BP, the protections provided by the Magistrate's Orders limiting the States' obligations at this time and in the context of the Limitations trial would be meaningless.

With respect to the files of the Attorney General's office, as noted in our Phase 1 Objections and Responses to Discovery Requests, (6/20/11): "Further, the State of Louisiana does not include responses herein on behalf of the Office of its Attorney General given the many privileges associated with this office."  BP has provided no rationale or justification for a search of the offices of the State's chief legal officer given the privileges associated therewith and the likelihood that any non privileged responsive information from that office will be contained in the files of the State agencies it represents.

We hope to be able to work through BP's discovery requests consistent with the Court's orders and associated time frames as well as the reasonable discovery obligations of the State under these circumstances.  I am available to discuss this further either tomorrow or at your convenience.

Lili Petersen
Kanner & Whiteley
(504) 524 - 5777


**From:** Andrew Bloomer [mailto:abloomer@kirkland.com]
**Sent:** Friday, August 12, 2011 4:25 PM
**To:** Lili Petersen
**Cc:** Andrew Langan; Allan Kanner; Don K. Haycraft; Robert E. Holden; Tim Duffy; Beth Larsen
**Subject:** RE: Search Term and Custodian Lists

Lili:

Thanks for your email.  We have the following questions/comments in response:

--It appears from your spreadsheet that the State of Louisiana is searching only six of the agencies/departments from the list we provided to the State in May 2011.  Please confirm whether the State is conducting a search of

any other agencies/departments.

--For the agencies/departments that the State is searching, are the files of the individuals on the custodian list we previously sent you being searched?

--Is the State conducting a search of the Attorney General's office?

--It appears that the State is searching for documents in response to only five (24, 25, 50, 61, 62) of BP's seventy document requests.  Please confirm whether the State is conducting a search for Phase 1-related documents in response to all of the requests in BP's April 29, 2011 First Set of Document Requests, which are specifically tailored to Phase 1 issues.

--BP cannot agree to the limited time frames set forth in your spreadsheet.  These time frames are far too narrow.  In particular, BP cannot agree to a cutoff date of April 23, 2010.

    While BP has attempted to work with the State on its responses to BP's Phase 1 discovery, including providing a list of agencies to be searched, as well as search term and custodian lists, months ago, the State has not been responsive and the process has only dragged on.  Unless we can reach a resolution of these issues by Monday, August 15, 2011, which is the deadline for motions to compel, BP will be prepared to address the matter with Magistrate Judge Shushan.

    I am available this afternoon, over the weekend, on Monday to discuss.

    Thanks.

Andrew


Andrew B. Bloomer, PC | Kirkland & Ellis LLP
300 North LaSalle Street | 38th Floor | Chicago IL 60654
Direct: 312.862.2482 | Fax: 312.862.2200
Email: andrew.bloomer@kirkland.com



**Lili Petersen <e.petersen@kanner-law.com>**

08/08/2011 06:36 PM

To 'Andrew Bloomer' <abloomer@kirkland.com>, Allan Kanner <a.kanner@kanner-law.com>

cc "Robert E. Holden" <reholden@liskow.com>, "Don K. Haycraft" <dkhaycraft@liskow.com>, Andrew Langan <alangan@kirkland.com>, Tim Duffy <tduffy@kirkland.com>

Subject RE: Search Term and Custodian Lists


Andrew – As an update, we are currently running searches, in the context of Phase 1,  as identified on the attached.  As you will see we have endeavored to limit the time frames as well as the agencies which are covered at this point.  We hope to have additional materials and information for you within the week and are working through the longer search term proposal you provided.  I am available to discuss this at your

convenience.

Lili Petersen
Kanner & Whiteley
(504) 524 - 5777

---

**From:** Lili Petersen [e.petersen@kanner-law.com]
**Sent:** 07/19/2011 08:03 PM GMT
**To:** Andrew Bloomer; Allan Kanner <a.kanner@kanner-law.com>
**Cc:** Robert Holden <reholden@liskow.com>; Don Haycraft <dkhaycraft@liskow.com>; Andrew Langan; Tim Duffy
**Subject:** RE: Search Term and Custodian Lists

Andrew,
Apologies, we are continuing to try to work through logistics of searching as well as search term and custodian issues with our agencies and hope to have some more certainty to report back to you this week.   We appreciate your patience.

Lili Petersen
Kanner & Whiteley
(504) 524 - 5777

**From:** Andrew Bloomer [mailto:abloomer@kirkland.com]
**Sent:** Friday, July 15, 2011 3:46 PM
**To:** Allan Kanner; Lili Petersen
**Cc:** Robert Holden; Don Haycraft; Andrew Langan; Tim Duffy
**Subject:** Fw: Search Term and Custodian Lists

Allan and Lili:

    We will receive a response to these questions?

    Thanks

--Andrew


Andrew B. Bloomer, PC | Kirkland & Ellis LLP
300 North LaSalle Street | 38th Floor | Chicago IL 60654
Direct: 312.862.2482 | Fax: 312.862.2200
Email: andrew.bloomer@kirkland.com


----- Forwarded by Andrew Bloomer/Chicago/Kirkland-Ellis on 07/15/2011 03:44 PM -----

**Andrew**

**Bloomer/Chicago/Kirkland-Ellis**

07/07/2011 05:28 PM

To "Allan Kanner" <A.Kanner@kanner-law.com>, "Lili Petersen"
    <e.petersen@kanner-law.com>

cc "Robert Holden" <reholden@liskow.com>, "Don Haycraft"
    <dkhaycraft@liskow.com>, "Langan, Andrew"
    <alangan@kirkland.com>, Tim Duffy/Chicago/Kirkland-Ellis

Subject Fw: Search Term and Custodian Lists

Allan and Lili:

I write to follow up on my email below.

Please let us know whether the State of Louisiana will produce documents from the list of agencies you previously requested and which we provided back on May 20.

Also, please let us know the State's position regarding search terms, start/end dates, and custodians for both the Louisiana Attorney General's office and the state agencies to be searched.

If we cannot resolve these issues by agreement, we will need to raise them with the Court.

Many thanks.

--Andrew


Andrew B. Bloomer, PC | Kirkland & Ellis LLP
300 North LaSalle Street | 38th Floor | Chicago IL 60654
Direct: 312.862.2482 | Fax: 312.862.2200
Email: andrew.bloomer@kirkland.com


----- Forwarded by Andrew Bloomer/Chicago/Kirkland-Ellis on 07/07/2011 05:14 PM -----

**Andrew Bloomer/Chicago/Kirkland-Ellis**

06/30/2011 09:58 PM

To "Corey Maze" <CMaze@ago.state.al.us>

cc "Allan Kanner" <A.Kanner@kanner-law.com>, "Robert E. Holden"
    <reholden@liskow.com>, "Greg L. Johnson"
    <gljohnson@liskow.com>, "Buddy Cox"
    <wcox@lightfootlaw.com>, "Davis, Jim"
    <JimDavis@ago.state.al.us>, "Nummy, Alan"
    <AlanNummy@ago.state.al.us>, Tim Duffy/Chicago/Kirkland-

Ellis@K&E, "Don K. Haycraft" <dkhaycraft@liskow.com>, Andrew
Langan/Chicago/Kirkland-Ellis@K&E, "Lili Petersen"
<e.petersen@kanner-law.com>, Marty Basu/Chicago/Kirkland-
Ellis@K&E, "Sinclair, Win" <WSinclair@ago.state.al.us>
    Subject Re: Search Term and Custodian Lists Link

Corey and Allan:

I am still digging out of emails after returning from a business trip abroad but wanted to get back to Corey and also raise a couple of other issues.

Corey, I think we can agree to an April 20, 2009 start date for the Alabama Attorney General office search. We can also agree to exclude the electronically mailed media stories of the sort you described.

However, we cannot agree to an August 12, 2010 cutoff date. If there are responsive, non-privileged Phase 1 documents in the possession of the Attorney General's office that post-date August 12, 2010, or came into the Attorney General's possession after that date, we believe they should be produced. We would thus propose a cutoff of January 31, 2011, which is consistent with the end date utilized with the DOJ on similar requests. If the State of Alabama does not agree, the parties can raise the issue with Magistrate Judge Shushan.

Allan and Lili, we have not heard from the State of Louisiana on the issue of search terms, dates, or custodians for both the Louisiana Attorney General's office and an agreed-to list of state agencies to be searched. Please get back to us on these issues.

Finally, both the State of Alabama and the State of Louisiana "incorporate" the PSC's discovery responses in the States' responses to BP's discovery. However, the PSC's responses state that the PSC will not produce documents it provided to other parties or that are in the possession of other parties, which would include the States. We would like to know if the States are relying on the PSC's response (or, more accurately, non-response) to withhold documents responsive to BP's requests. We would appreciate it if Alabama and Louisiana would let us know where they stand on this issue.
If you would like to discuss, please let us know. We are happy to do so.

Many thanks.

-Andrew

Andrew B. Bloomer, P.C. | Kirkland & Ellis LLP
300 North LaSalle Street | Chicago, IL 60654
312.862.2482 Phone | 312.862.2200 Fax |
773.456.5688 Cell | andrew.bloomer@kirkland.com

---

  **From:** "Maze, Corey" [CMaze@ago.state.al.us]
**Sent:** 06/30/2011 07:32 PM EST
**To:** Andrew Bloomer
**Cc:** "Allan Kanner" <A.Kanner@kanner-law.com>; "Robert E. Holden" <reholden@liskow.com>; "Greg L. Johnson"
<gljohnson@liskow.com>; "Buddy Cox" <wcox@lightfootlaw.com>; "Davis, Jim" <JimDavis@ago.state.al.us>; "Nummy, Alan"

<AlanNummy@ago.state.al.us>; Tim Duffy; "Don K. Haycraft" <dkhaycraft@liskow.com>; Andrew Langan; "Lili Petersen"
<e.petersen@kanner-law.com>; Marty Basu; "Sinclair, Win" <WSinclair@ago.state.al.us>
**Subject:** Re: Search Term and Custodian Lists

Yes, I apologize.  August 12, 2010.

Makes me look a tad silly now, and it's too far removed to blame the London jet lag.

Sent from my iPad

On Jun 30, 2011, at 7:06 PM, "Andrew Bloomer" <abloomer@kirkland.com> wrote:

Corey - I assume you mean August 12, 2010 as the end date?

Andrew

Andrew B. Bloomer, P.C. | Kirkland & Ellis LLP
300 North LaSalle Street | Chicago, IL 60654
312.862.2482 Phone | 312.862.2200 Fax |
773.456.5688 Cell | andrew.bloomer@kirkland.com

---

  **From:** "Maze, Corey" [CMaze@ago.state.al.us]
**Sent:** 06/30/2011 10:26 AM EST
**To:** Andrew Bloomer; "Allan Kanner" <A.Kanner@kanner-law.com>
**Cc:** "Robert E. Holden" <reholden@liskow.com>; "Greg L. Johnson" <gljohnson@liskow.com>; "Buddy Cox"
<wcox@lightfootlaw.com>; "Davis, Jim" <JimDavis@ago.state.al.us>; "Nummy, Alan" <AlanNummy@ago.state.al.us>; Tim Duffy;
"Don K. Haycraft" <dkhaycraft@liskow.com>; Andrew Langan; "Lili Petersen" <e.petersen@kanner-law.com>; Marty Basu;
"Sinclair, Win" <WSinclair@ago.state.al.us>
**Subject:** RE: Search Term and Custodian Lists

For the AG Office search, Alabama will agree to the following date range, dependent on the caveat below:

Start Date:  April 20, 2009 (one year before)

End Date: August 12, 2011 (the day we filed our complaint)

Caveat:  We will not produce emails that are simply electronically mailed media stories re: the explosion and
Spill.

Our IT director has run a sample search using your terms and our dates, and over 90% of the hits are
automatically generated emails sent to our employees with media stories about the Spill.  There are no
comments, no exchanges, no non-media information, just the newspaper/web article itself arriving in an
inbox—like when we wake up in the morning to find the Lexis File & Serve Daily Report of the previous day's
filings.



As long as BP agrees that we do not have to produce these emailed articles, we will conduct the search with the date range listed above.

To be blunt, we will not go any further on either date absent an order from the Magistrate.

--

Also, to be clear, this date range applies only to Alabama.  It does not apply to Louisiana.  Louisiana may well offer an end date that is earlier than Alabama's, to which Alabama will have no objection.

Corey L. Maze

*Deputy Attorney General, State of Alabama*

(334) 353-4336

"**Confidentiality Notice**:  The information contained in this email and the documents attached hereto contain confidential information intended only for the use of the intended recipients.  If the reader of the message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained herein is strictly prohibited.  If you have received this communication in error, please immediately notify me by reply email."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************


*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************


*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************


*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of

Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************