1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
2

3    IN RE:  OIL SPILL          )     MDL NO. 2179
     by the OIL RIG,            )
4    DEEPWATER HORIZON in       )     SECTION "J"
     the GULF OF MEXICO,        )
5    April 20, 2010             )     JUDGE BARBIER
                                )
6                               )     MAG. JUDGE
                                )     SHUSHAN
7

8


14

15           * * * * * * * * * * * * *
16                   VOLUME 1
             * * * * * * * * * * * * *
17

18

19
             Deposition of TIM PROBERT, taken
20   at Pan-American Building, 601 Poydras
     Street, 11th Floor, New Orleans, Louisiana,
21   70130, on May 9, 2011.

22

23

24

25

                    GAUDET KAISER, L.L.C.
              Board-Certified Court Reporters


EXHIBIT 6
Page 1 of 4

601 Poydras Street, Suite 1720 ∘ New Orleans, Louisiana 70130
(504) 525-9100 ∘ 1 (888) 525-9100

1  between April 20 and May the 11th or 12th,

2  and as I can recall, most everything else

3  has been subject to discussion with

4  counsel.

5       Q.    So everything that you learned

6  post May 11th, you've learned via

7  discussion with counsel.  Is that right?

8       A.    No.  I'm sure that's not the

9  case.  There has been a tremendous amount

10  of information written in the press, there

11  has been, you know, information which has

12  been being provided by a variety of

13  parties.  So it would not be -- that would

14  not be a correct assertion, no.

15       Q.    Okay.  It's fair to say, though,

16  based on your testimony to Congress that at

17  least between the time of the incident,

18  April 20th, and your testimony to

19  Congress -- which is -- which I think was

20  on May 11th and 12th?

21       A.    And 12th.

22       Q.    And the 12th, right?  That the

23  investigation that was conducted by

24  Halliburton from April 20th to May 12th,

25  that your view of that investigation was

1    that would be -- that was a public

2    investigation and not intended to be

3    privileged, correct?

4         A.     Between -- I'm sorry, you'll

5    have to -- I'm sorry, you'll have to -- so

6    you're saying between the 20th --

7         Q.     April 20th when the incident

8    occurred --

9         A.     And May the 11th.

10        Q.     -- and May 12th when you

11   testified --

12        A.     Yeah.

13        Q.     -- it was your understanding and

14   your view and intent that the investigation

15   that Halliburton was conducting into the

16   incident would be public, correct?

17        MR. BOWMAN:  Objection; form.

18        A.     No, I wouldn't say that.  It was

19   not my intention.  It was simply the

20   requirement to testify in front of Congress

21   and the requirement to pull information

22   together to put ourselves in a position

23   that we could at least talk cogently about

24   what took place.  That was, I would say, my

25   driving force.

1          REPORTER'S CERTIFICATE

2

3          I, **TAMARA CHAPMAN**, Certified

4     Court Reporter, State of Texas, do hereby

5     certify that the above-mentioned witness,

6     after having been first duly sworn by me to

7     testify to the truth, did testify as

8     hereinabove set forth;

9          That the testimony was reported

10    by me in shorthand and transcribed under my

11    personal direction and supervision, and is

12    a true and correct transcript, to the best

13    of my ability and understanding;

14         That I am not of counsel, not

15    related to counsel or the parties hereto,

16    and not in any way interested in the

17    outcome of this matter.

18

19    *Tamara Chapman*
      _____
20    Tamara Chapman
      Certified Court Reporter
21    State of Texas, CSR No. 7248
      GAUDET KAISER, LLC
22    601 Poydras, Suite 1720
      New Orleans, Louisiana 70130
23    T: (504) 525-9100
      F: (504) 525-9109

24

25

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3    IN RE: OIL SPILL          )   MDL NO. 2179

     by the OIL RIG           )

4    "DEEPWATER HORIZON" in   )   SECTION "J"

     the GULF OF MEXICO, ON   )

5    APRIL 20, 2010            )   JUDGE BARBIER

                               )

6                              )   MAG. JUDGE

                               )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    VOLUME 1 OF 2

21

22        Deposition of RONALD RAY FAUL, taken

23    at Pan American Life Center, 601 Poydras

24    Street, Ponchartrain Room, New Orleans,

25    Louisiana, on the 29th of June, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 1 of 9

1    of this Macondo incident any information

2    that would show that BP told Halliburton

3    not to run the specific tests which you've

4    acknowledged were not run on the Macondo

5    production casing job?

6         A.   I have no knowledge that they

7    would have told us to not run some tests.

8         Q.   Okay.  And do you have in your

9    investigation or review of those facts any

10   indication that when Halliburton and you

11   investigated and found out the tests were

12   not run, that they issued to BP any

13   correspondence, any communication in any

14   form commenting upon Halliburton not

15   having run those tests?

16        A.   I'll object to the fact that we

17   did not conduct an investigation.  We

18   merely gathered information and, you know,

19   passed it on, but I didn't see anything in

20   there that said BP told us not to do

21   certain things.

22        Q.   Well I'm particularly interested

23   in the tests.  I don't know, my question

24   may have been poorly phrased, and I know

25   after lunch we sometimes get a little

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 2 of 9

1      Q.   Okay.   Now, it looks like in this

2    case you guys are trying to -- to get a --

3    a listing of all the cement used on the

4    various Macondo jobs, right?

5      A.   Yeah.   It looks like that he's

6    trying to get some -- some handle on how

7    much materials were delivered during that

8    process.

9      Q.   All righty.   Now, in your

10   investigation of what happened with --

11   what went wrong -- put it that way --

12   what -- in your investigation of what went

13   wrong on the production casing job, did

14   you guys look at this issue of the cement

15   degradation -- that's what I'm going to

16   call it -- the cement having gotten wet

17   and it perhaps not being mixable?

18     A.   We -- we never conducted an

19   investigation -- I never conducted an

20   investigation or was part of one that

21   would have been conducted to find out

22   what -- what went wrong.   We gathered

23   information to get timelines and -- and

24   just gather facts.   And I don't know if we

25   did an investi- -- well, I know we didn't

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 3 of 9

1    do an investigation.

2              As far as looking at aging of

3    cement, until these reports by Ricky, I

4    did -- I never looked at any of that.

5         Q.  Okay.  Now, I don't think I asked

6    you whether you read the Chevron report.

7    Did you read the Chevron report, testing

8    the cement that was used on the Macondo

9    production casing job?

10        A.  Yes, I did read that report.

11        Q.  You did read it?  In fact, I think

12   I've got it here in a binder.  It's

13   probably number 63, just for completeness.

14              MR. THORNHILL:  Have we

15   previously introduced this into evidence?

16              MS. GEBHARDT:  Not this big

17   copy.

18              MR. THORNHILL:  Okay.  This is

19   Halliburton's document 569605 through 641.

20   And for the record, we'll give it a

21   number, 3108.  That's tab 63.

22              (Exhibit Number 3108 marked.)

23        Q.  You say you've read this report,

24   and you're looking at it now.  Tell me,

25   Mr. Faul, is this what you read as the

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 4 of 9

1    that.  But my question is, did you

2    specifically tell Mr. Quirk not to

3    generate a report in connection with the

4    foam stability test he was running for you

5    after the blowout?

6         A.  He would have had to put it in

7    Viking to do that, and I asked him not to

8    put it in Viking.

9         Q.  And I know today you've talked

10   about -- and just so I understand, you've

11   talked quite a bit about information

12   gathering, that you -- you were -- you

13   were conducting these tests after the fact

14   so you could gather facts and information,

15   and you used some of that information to

16   brief and educate some of the -- the other

17   people at Halliburton about what had

18   happened on Macondo; is that right?

19        A.  To give information to them so

20   that they could build -- we could build

21   presentations and they could go to

22   Washington and -- and present that

23   information.

24             We specifically did not do any

25   investigation.  We didn't look into how it

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 5 of 9

1    happened or why it happened, just what

2    happened, and that's it.

3         Q.  So you were -- you were handling

4    gathering factual information?  That was

5    what your job was?

6         A.  I was one of the people, yes.

7         Q.  Okay.  Well, I'm a little

8    confused, so I wanted to let you look at

9    an e-mail that I have behind tab 20.  And

10   maybe you can help clear this up for me.

11            You're not a -- you're not a

12   recipient of this e-mail, but this is an

13   e-mail dated June 12th, 2010 from Ronald

14   Sweatman.

15        A.  Yes.

16        Q.  Is he a Halliburton employee?

17        A.  Yes, he is.

18        Q.  And what's his position?

19        A.  Ron is on the GBTS, global

20   business and technical solutions, team.

21        Q.  Okay.  And he's sending an e-mail

22   to several folks, and he -- and this

23   e-mail's about kick and casing modeling

24   teams.  And it's my appreciation, after

25   reviewing this e-mail -- and particularly

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 6 of 9

1              Yesterday, people

2    characterized it as an investigation, but

3    you took issue with that word.  How would

4    you call the -- what would you call the

5    postincident work that you've been doing?

6         A.   Just -- I would characterize it as

7    gathering information to inform, advise

8    our senior executives to prepare them

9    for -- to answer questions, more looking

10   at, you know, what we knew based on the

11   documentation we had.

12        Q.   Okay.  And is there a -- a team of

13   people who are working with you to -- to

14   do this gathering of information?

15             MR. HILL:  Object to form.

16        A.   Not a team, per se, no.  We --

17        Q.   (BY MR. CHEN)  Are there a group

18   of individuals that are all gathering

19   information?

20        A.   We -- we had a couple of people

21   that would meet in a -- a room and put our

22   information together and help.  It was

23   Tommy Roth who would come in, and we would

24   advise him on what we knew and help him

25   build his presentation.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 7 of 9

```
 1                 UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF LOUISIANA
 3      IN RE: OIL SPILL        )    MDL NO. 2179
        by the OIL RIG          )
 4      "DEEPWATER HORIZON" in   )    SECTION "J"
        the GULF OF MEXICO, ON   )
 5      APRIL 20, 2010           )    JUDGE BARBIER
                                 )
 6                               )    MAG. JUDGE
                                 )    SHUSHAN
 7
 8                  REPORTER'S CERTIFICATION
 9      TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10                    RONALD RAY FAUL
11          I, Therese J. Casterline, Certified
12      Shorthand Reporter in and for the State of
13      Texas and the State of Louisiana, do
14      hereby certify to the following:
15          That the witness, RONALD RAY FAUL,
16      was duly sworn by the officer and that the
17      transcript of the oral deposition is a
18      true record of the testimony given by the
19      witness.
20          That the deposition transcript was
21      submitted on July 29        , 2011, to the
22      witness or to the attorney for the witness
23      for examination, signature and return to
24      Worldwide Court Reporters, Inc., by
25      September 19 , 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 7
Page 8 of 9

412

1    I, RONALD RAY FAUL, have read the

2    foregoing deposition and hereby affix my

3    signature that same is true and correct,

4    except as noted on the attached Amendment

5    Sheet.

6    _Ronald Ray Faul_

7                          RONALD RAY FAUL

8    THE STATE OF _Texas_ )

9    COUNTY OF _Harris_ )

10   Before me, _Ranjan Patel_ ,

11   on this day personally appeared

12   RONALD RAY FAUL, known to me (or proved to

13   me on the oath of _____ or

14   through _____ ) to be the person

15   whose name is subscribed to the foregoing

16   instrument and executed the same for the

17   purposes and consideration therein

18   expressed.

19   Given under my hand and seal of office

20   this _7/22/2011_ day of _2011_ ,

21   2011.

22   _Ranjan Patel_

23   NOTARY PUBLIC IN AND FOR

24   THE STATE OF _Texas_

25   My commission expires: _5/13/2012_

RANJAN PATEL
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXPIRES 05-13-2012

PURSUANT TO CONFIDENTIALITY ORDER

EXHIBIT 7
Page 9 of 9

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3      IN RE: OIL SPILL        )   MDL NO. 2179

       by the OIL RIG         )

4      "DEEPWATER HORIZON" in  )   SECTION "J"

       the GULF OF MEXICO, ON  )

5      APRIL 20, 2010          )   JUDGE BARBIER

                               )

6                              )   MAG. JUDGE

                               )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    VOLUME 1 OF 2

21

22         Deposition of RONALD RAY FAUL, taken

23      at Pan American Life Center, 601 Poydras

24      Street, Ponchartrain Room, New Orleans,

25      Louisiana, on the 29th of June, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 8
Page 1 of 5

1    test that you gave -- that you requested

2    that Mr. Quirk do, did you ever request or

3    tell Mr. Quirk to throw away any

4    documentation regarding that test?

5              MR. CHEN:  Objection, form.

6        A.  I -- I don't recall ever telling

7    him -- I don't recall ever telling Tim to

8    do that.  The only thing I remember asking

9    him to do was not to input the results

10   into Viking.

11       Q.  (BY MR. HILL)  Okay.  Do you

12   recall any further communication between

13   you and Mr. Quirk about the presentation

14   of those results?

15       A.  No, I don't.

16       Q.  Okay.  In your job, do you have

17   occasion to request testing from the

18   laboratory that is not sourced through the

19   Viking system?

20       A.  Yes, I do.  I -- as the -- the

21   fact that the lab reports to me, I feel

22   like I have a certain latitude to call and

23   ask him to do testing for me and give me

24   some results, usually simple things.

25       Q.  Did anybody at Halliburton ask you

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 8
Page 2 of 5

1     to request that test?

2        A.  No, I was not requested by anybody

3     to do that.

4        Q.  So why did you do it?

5        A.  I just wanted to gain the

6     information.

7        Q.  Okay.  Informational for your own

8     personal -- purpose?

9        A.  Yes.

10        Q.  Okay.

11              MR. HILL:  All right.  That's

12     all I have.  I'm going to turn the time

13     over to plaintiffs' counsel.

14              THE VIDEOGRAPHER:  The time

15     now is approximately 4:12 p.m., and we are

16     now off the record.

17             (Recess 4:12-4:14 p.m.)

18              THE VIDEOGRAPHER:  The time

19     now is approximately 4:14 p.m., and we are

20     back on the record.

21                EXAMINATION

22     BY MR. THORNHILL:

23        Q.  Mr. Faul, I just have a couple

24     follow-up questions, and -- you've been

25     asked by others whether or not your

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 8
Page 3 of 5

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF LOUISIANA
 3    IN RE: OIL SPILL        )    MDL NO. 2179
      by the OIL RIG          )
 4    "DEEPWATER HORIZON" in   )    SECTION "J"
      the GULF OF MEXICO, ON   )
 5    APRIL 20, 2010           )    JUDGE BARBIER
                               )
 6                             )    MAG. JUDGE
                               )    SHUSHAN
 7
 8              REPORTER'S CERTIFICATION
 9    TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10                 RONALD RAY FAUL
11         I, Therese J. Casterline, Certified
12    Shorthand Reporter in and for the State of
13    Texas and the State of Louisiana, do
14    hereby certify to the following:
15         That the witness, RONALD RAY FAUL,
16    was duly sworn by the officer and that the
17    transcript of the oral deposition is a
18    true record of the testimony given by the
19    witness.
20         That the deposition transcript was
21    submitted on July 29     , 2011, to the
22    witness or to the attorney for the witness
23    for examination, signature and return to
24    Worldwide Court Reporters, Inc., by
25    September 19 , 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 8
Page 4 of 5

412

1    I, RONALD RAY FAUL, have read the

2    foregoing deposition and hereby affix my

3    signature that same is true and correct,

4    except as noted on the attached Amendment

5    Sheet.

6

7                         RONALD RAY FAUL

8    THE STATE OF _Texas_ )

9    COUNTY OF _Harris_ )

10   Before me, _Ranjan Patel_ ,

11   on this day personally appeared

12   RONALD RAY FAUL, known to me (or proved to

13   me on the oath of _____ or

14   through _____) to be the person

15   whose name is subscribed to the foregoing

16   instrument and executed the same for the

17   purposes and consideration therein

18   expressed.

19   Given under my hand and seal of office

20   this _7/22/2011_ day of _2011_ ,

21   2011.

22

23   NOTARY PUBLIC IN AND FOR

24   THE STATE OF _Texas_

25   My commission expires: _5/13/2012_

RANJAN PATEL
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXPIRES 05-13-2012

PURSUANT TO CONFIDENTIALITY ORDER

EXHIBIT 8
Page 5 of 5

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3     IN RE: OIL SPILL          )   MDL NO. 2179

      by the OIL RIG           )

4     "DEEPWATER HORIZON" in   )   SECTION "J"

      the GULF OF MEXICO, ON   )

5     APRIL 20, 2010           )   JUDGE BARBIER

                               )

6                              )   MAG. JUDGE

                               )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  VOLUME 1 OF 2

21

22        Deposition of RONALD RAY FAUL, taken

23     at Pan American Life Center, 601 Poydras

24     Street, Ponchartrain Room, New Orleans,

25     Louisiana, on the 29th of June, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 1 of 10

299

1    to somebody at Halliburton about

2    anything -- doesn't matter who's there --

3    that's fair game.  So that's what I want

4    to know about.

5             Did anybody at Halliburton

6    tell you that there was testing or did you

7    participate in any testing -- do you know

8    of any testing of any kind that was

9    conducted by anybody that would show

10    issues with respect to the stability of

11    the foam cement job on the production

12    casing?

13    A.  There were -- to my knowledge,

14    there were no additional tests done in

15    relation to foam stability.

16    Q.  Were there any tests regarding

17    anything else regarding the cement on this

18    job?

19    A.  Yes.  One -- an individual in

20    Halliburton, Anthony Badalamente requested

21    a static gel strength test, again, using

22    lab stock materials, retarders, everything

23    that would have been in the lab.  He

24    requested those results -- those --

25    testing.  I was not aware of it until --

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 2 of 10

1   until I got the results of it.  He -- once

2   he got the results of the test, he sent me

3   a copy of the lab test.

4       Q.  All right.  And do you have those

5   lab test results on your hard drive?

6       A.  Yes, I do.

7       Q.  And I'm assuming you turned over

8   those results?

9       A.  They have been turned over, that's

10  correct.

11      Q.  Okay.  And who performed those

12  tests for him, the gel strength tests?

13      A.  The -- the lab in Broussard

14  performed it.  The correspondence was with

15  Tim Quirk.  So I don't know who actually

16  did perform the test, but --

17      Q.  Okay.  Other than having received

18  the information on your hard drive, looked

19  at it briefly, and then turned it over to

20  counsel, did you involve yourself with the

21  details of the analysis in the gel

22  strength test?

23      A.  No, I didn't.

24      Q.  Did you discuss the analysis of

25  the gel strength test with anyone?

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 3 of 10

1    requested the retarder concentration be

2    increased?

3        A.  No, I don't really -- I don't

4    really know that.

5        Q.  Do you know -- I think earlier you

6    spoke with Mr. Thornhill about some

7    additional testing that was done after the

8    blowout.

9        A.  Yes.

10       Q.  We know that you worked on some

11   foam stability testing and then some

12   contamination testing that you did with

13   the foam and you also -- and also the

14   conductivity and resistivity testing that

15   was done at the Duncan labs.  I'm not

16   going to go back into that because he

17   covered those areas pretty well.

18            I do want to know about the

19   clean foam stability without the

20   contamination.  I know you asked Mr. Quirk

21   to run that test.  Correct?

22       A.  I asked Mr. Quirk to perform a

23   foam stability test with lab stock

24   materials to repeat the test that was

25   given on the final BP report.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 4 of 10

387

1       Q.  And I know you were asked earlier

2   today whether or not you told Mr. Quirk to

3   destroy his -- his notes or any results

4   that he had gotten.  You testified that

5   you didn't instruct him to do that at all.

6       A.  I don't remember instructing him

7   to destroy any -- any work that he had

8   done.  I did ask him not to put it in the

9   Viking system because it was not

10  associated with a customer need.  It was

11  internal Halliburton information.

12      Q.  Okay.  So you told him not to put

13  it into the Viking system --

14      A.  That's correct.

15      Q.  -- which is an -- that's an

16  electronic sort of process, isn't it?

17      A.  Yes.

18      Q.  Did you also instruct him not to

19  generate a report in connection with the

20  testing he was conducting?

21      A.  He gave me all the information

22  that I wanted when -- over the phone call.

23  I didn't tell him to -- to generate a

24  report.

25      Q.  Okay.  But that -- I appreciate

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 5 of 10

1    that.  But my question is, did you

2    specifically tell Mr. Quirk not to

3    generate a report in connection with the

4    foam stability test he was running for you

5    after the blowout?

6        A.  He would have had to put it in

7    Viking to do that, and I asked him not to

8    put it in Viking.

9        Q.  And I know today you've talked

10   about -- and just so I understand, you've

11   talked quite a bit about information

12   gathering, that you -- you were -- you

13   were conducting these tests after the fact

14   so you could gather facts and information,

15   and you used some of that information to

16   brief and educate some of the -- the other

17   people at Halliburton about what had

18   happened on Macondo; is that right?

19       A.  To give information to them so

20   that they could build -- we could build

21   presentations and they could go to

22   Washington and -- and present that

23   information.

24           We specifically did not do any

25   investigation.  We didn't look into how it

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 6 of 10

1     test that you gave -- that you requested

2     that Mr. Quirk do, did you ever request or

3     tell Mr. Quirk to throw away any

4     documentation regarding that test?

5               MR. CHEN:  Objection, form.

6          A.  I -- I don't recall ever telling

7     him -- I don't recall ever telling Tim to

8     do that.  The only thing I remember asking

9     him to do was not to input the results

10    into Viking.

11         Q.  (BY MR. HILL)  Okay.  Do you

12    recall any further communication between

13    you and Mr. Quirk about the presentation

14    of those results?

15         A.  No, I don't.

16         Q.  Okay.  In your job, do you have

17    occasion to request testing from the

18    laboratory that is not sourced through the

19    Viking system?

20         A.  Yes, I do.  I -- as the -- the

21    fact that the lab reports to me, I feel

22    like I have a certain latitude to call and

23    ask him to do testing for me and give me

24    some results, usually simple things.

25         Q.  Did anybody at Halliburton ask you

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 7 of 10

1      to request that test?

2           A.  No, I was not requested by anybody

3      to do that.

4           Q.  So why did you do it?

5           A.  I just wanted to gain the

6      information.

7           Q.  Okay.  Informational for your own

8      personal -- purpose?

9           A.  Yes.

10          Q.  Okay.

11               MR. HILL:  All right.  That's

12     all I have.  I'm going to turn the time

13     over to plaintiffs' counsel.

14               THE VIDEOGRAPHER:  The time

15     now is approximately 4:12 p.m., and we are

16     now off the record.

17               (Recess 4:12-4:14 p.m.)

18               THE VIDEOGRAPHER:  The time

19     now is approximately 4:14 p.m., and we are

20     back on the record.

21                    EXAMINATION

22     BY MR. THORNHILL:

23          Q.  Mr. Faul, I just have a couple

24     follow-up questions, and -- you've been

25     asked by others whether or not your

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 8 of 10

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3    IN RE: OIL SPILL        )    MDL NO. 2179
      by the OIL RIG          )
 4    "DEEPWATER HORIZON" in  )    SECTION "J"
      the GULF OF MEXICO, ON  )
 5    APRIL 20, 2010          )    JUDGE BARBIER
                              )
 6                            )    MAG. JUDGE
                              )    SHUSHAN
 7
 8              REPORTER'S CERTIFICATION
 9    TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10              RONALD RAY FAUL
11         I, Therese J. Casterline, Certified
12    Shorthand Reporter in and for the State of
13    Texas and the State of Louisiana, do
14    hereby certify to the following:
15         That the witness, RONALD RAY FAUL,
16    was duly sworn by the officer and that the
17    transcript of the oral deposition is a
18    true record of the testimony given by the
19    witness.
20         That the deposition transcript was
21    submitted on _July 29_____, 2011, to the
22    witness or to the attorney for the witness
23    for examination, signature and return to
24    Worldwide Court Reporters, Inc., by
25    _September 19_, 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 9
Page 9 of 10

412

1   I, RONALD RAY FAUL, have read the

2   foregoing deposition and hereby affix my

3   signature that same is true and correct,

4   except as noted on the attached Amendment

5   Sheet.

6   _Ronald Ray Faul_

7   RONALD RAY FAUL

8   THE STATE OF _Texas_ )

9   COUNTY OF _Harris_ )

10   Before me, _Ranjan Patel_ ,

11   on this day personally appeared

12   RONALD RAY FAUL, known to me (or proved to

13   me on the oath of _____ or

14   through _____) to be the person

15   whose name is subscribed to the foregoing

16   instrument and executed the same for the

17   purposes and consideration therein

18   expressed.

19   Given under my hand and seal of office

20   this _7/22/2011_ day of _2011_ ,

21   2011.

22   _Ranjan Patel_

23   NOTARY PUBLIC IN AND FOR

24   THE STATE OF _Texas_

25   My commission expires: _5/13/2012_

RANJAN PATEL
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXPIRES 05-13-2012

PURSUANT TO CONFIDENTIALITY ORDER

EXHIBIT 9
Page 10 of 10

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2
     IN RE:  OIL SPILL      MDL NO.  2179
3    BY THE OIL RIG
     "DEEPWATER HORIZON"    SECTION:   J
4    IN THE GULF OF
     MEXICO, ON APRIL       JUDGE BARBIER
5    20, 2010               MAG. JUDGE SHUSHAN

6

7

8



14

15
             Videotaped deposition of **TIMOTHY
16   L. QUIRK,** 202 Founder Street, Lafayette,
     Louisiana 70508, taken in the Pan American
17   Life Center, Bayou Room, 11th Floor, 601
     Poydras Street, New Orleans, Louisiana
18   70130, on Monday, March 21, 2011.

19   **APPEARANCES**:

20   ON BEHALF OF THE PLAINTIFFS
     STEERING COMMITTEE
21

22

23   CUNNINGHAM BOUNDS, LLC
     By:  Robert T. Cunningham, Esquire
24   1601 Dauphin Street
     Mobile, Alabama 36604
25

**GAUDET, KAISER, L.L.C.**
Board-Certified Court Reporters

EXHIBIT 10
Page 1 of 19

```
 1    at that I was looking at the -- the testing
 2    performed in April.
 3    BY MR. PALMINTIER:
 4         Q.    Understood.  Did you eventually
 5    go back before April?
 6         A.    Yes.
 7         Q.    Okay.  All right.  If I
 8    understood your testimony correctly, you
 9    are saying that on your own, without any
10    instruction from your supervisors, you
11    looked at these materials you just
12    described to me, correct?
13         A.    I think that's a correct
14    statement.
15         Q.    Do you recall having gotten a
16    directive from your immediate supervisor or
17    anyone higher up to begin to look at slurry
18    design and testing results and -- and other
19    aspects of this project?
20         A.    You -- specifically just
21    evaluating the slurry design?
22         Q.    I understand.  Let me -- let me
23    make it simpler.  Do you recall having
24    gotten a directive from above saying we
25    want you to look at this cement job because
```

```
 1    of this blowout?

 2         A.    Yes.

 3         Q.    Who contacted you?

 4         A.    Ronnie Faul.

 5         Q.    Okay.  And what did Mr. Faul

 6    say?

 7         A.    He just asked me to -- to foam

 8    the, you know, foam the slurry and -- and

 9    take a look at using lab stock additives.

10    And --

11         Q.    And did he give you a reason why

12    he wanted you to foam the slurry using lab

13    stock additives?

14         A.    He said that -- that they had

15    performed a test in -- in Duncan, Oklahoma

16    and that he wanted me to mix the slurry up

17    and see if, you know, see how it compared

18    to what they were seeing up there.

19         Q.    Okay.

20         A.    Mix it and -- and perform

21    stability.  This was, you know, a foam

22    stability test and looking at different

23    concentrations of mud contamination with

24    the -- and the effects on cement --

25         Q.    Okay.  All right.
```

EXHIBIT 10
Page 3 of 19

1        A.      Using lab stock additives.

2        Q.      Understood.  Do you recall when

3    Mr. Faul communicated that request to you?

4        A.      I don't remember the exact date.

5    I would -- I would estimate maybe a few

6    weeks after April 20th.

7        Q.      Okay.  Now, who -- who did the

8    testing to which Mr. Faul referred up in

9    Duncan, Oklahoma?

10       A.      I don't know who actually

11   performed the tests.  I'm trying to think

12   of the gentleman's name.  His name -- I

13   don't work very much with these guys.  I

14   just can't -- I can't recall his name right

15   now.

16       Q.      That's okay.

17       A.      If I would see his name I could

18   confirm it.  I just can't think of his name

19   right now.

20       Q.      But is the Duncan, Oklahoma,

21   another -- that location, is it another

22   Halliburton lab?

23       A.      Yes.  Yes.

24       Q.      All right.  And you from time to

25   time through the years you have --

1  to become qualified?

2       A.    I don't have any plans to become

3  qualified.

4       Q.    All right.  Now, let's talk

5  about facts a little.  There were some

6  facts that you might be called upon to

7  testify about, weren't there?

8       A.    Okay.

9       Q.    And that is after the

10 explosion --

11      A.    Okay.  What --

12      Q.    -- correct?  For example, the --

13 you actually ordered in response to

14 Mr. Faul's and the other two gentlemen's

15 request that certain slurry testing be

16 done, correct?

17      A.    Yes, that's correct.

18      Q.    All right.  Now, did you look at

19 the results of those experimental tests,

20 those post accident tests?

21      A.    Yes, I did.

22      Q.    All right.  Did you form any

23 conclusions regarding those test results?

24      A.    I just looked at the test

25 results and I don't know as far as forming

1   conclusions, I don't know what you are

2   referring to, but I mean, I looked at the

3   data.  I looked at the information that was

4   obtained.

5        Q.    Did the test results that you

6   saw demonstrate the likelihood of

7   instability of the cement?

8        A.    The test results that -- what

9   I -- what I looked at, I did not, in my

10  opinion, I did not feel the slurry was --

11  was unstable.

12       Q.    Oh, there's that word, you see,

13  opinion.  And that's what I was looking

14  for.  So you -- there -- you do have an

15  opinion based on the test results that you

16  looked at, correct?

17       A.    On the test results, right.

18       Q.    I understand.

19       A.    Not the well conditions.

20       Q.    Okay.  So we're just limited --

21  limiting our discussion to lab results,

22  correct?

23       A.    That -- that's correct.

24       Q.    Now, later we'll talk about the

25  specific results.  But suffice it to say

EXHIBIT 10
Page 6 of 19

1   checked with the court reporter previously,

2   but that was the number we had been given.

3   Thank you.

4           (Ex. 802 was marked for

5   identification.)

6   BY MS. MCCLELLAN:

7       Q.      Now I would like to turn to the

8   testing that was conducted after the

9   explosion of DEEPWATER HORIZON on April the

10  20th.  How many tests did you, Mr. Quirk,

11  request be conducted after the DEEPWATER

12  HORIZON exploded?

13      A.      In relation to that design?  In

14  other words, specific to just -- specific

15  to -- you mean as follow up to that test?

16  What are you --

17      Q.      After the explosion of the

18  DEEPWATER HORIZON I believe you earlier

19  testified that there was an unreported foam

20  cement test that was conducted.

21      A.      Right.  Right.

22      Q.      Did you request any other tests

23  be conducted at the Broussard lab?

24      A.      I didn't request any -- any

25  tests to be performed.  I -- I was

214

```
 1    instructed to perform, you know, the foam
 2    stability tests and -- and the transition
 3    time tests.
 4        Q.    Okay.  Any other tests besides
 5    the foam stability and the static gel or
 6    the transition time test that you were
 7    requested to have -- be conducted?
 8        A.    No.  Those were the -- those
 9    were the two tests.
10        Q.    And with respect to the foam
11    stability tests, Mr. Faul requested that
12    test be performed, correct?
13        A.    Right.  It was foam stability
14    tests to include some contamination of mud
15    with foam -- foam cement also.  I think I
16    stated that earlier.
17        Q.    And you didn't recall the
18    densities that were produced from that
19    test; is that correct?
20        A.    I don't recall the densities.
21    It was -- it was a modified test procedure
22    where the -- we were contaminating mud with
23    foam spacer and I know I ran several tests
24    with different mud contaminations.  I don't
25    recall exactly.  I gave that information
```

EXHIBIT 10
Page 8 of 19

```
 1    to -- to Ronnie Faul.
 2         Q.     How many tests did you conduct?
 3         A.     I would say three to four,
 4    possibly five contaminated tests.
 5         Q.     And were the results of each of
 6    those tests a stable foam slurry?
 7         A.     The -- the
 8    slurry would -- essentially we had
 9    different amounts of mud contamination and
10    I don't recall the numbers.  The -- every
11    time that you add, you know, in a situation
12    where you contaminate oil based mud into --
13    into foam cement, the oil in the mud will
14    degrade the foam somewhat.  And I don't
15    recall exactly what those numbers were.  I
16    know that the more I increased the mud, I
17    remember that the -- it had an effect on
18    the -- on the foam slurry.  I just don't
19    remember the values.  I reported the
20    numbers.
21         Q.     Did you make any notes of the
22    numbers?
23         A.     I gave them to Ronnie Faul.
24         Q.     And to your recollection those
25    numbers indicated a stable foam?
```

```
 1          A.     Well, the -- the -- in
 2   concentrations of mud, I remember that
 3   there was an effect.  I -- I don't know
 4   what would be considered stable or
 5   non-stable in -- in -- in regards to mud
 6   contamination.
 7          Q.     You also testified that you
 8   requested a May 28th test or a static gel
 9   test be conducted; is that correct?
10          A.     I was requested to perform,
11   right.
12          Q.     If you could turn to tab 12,
13   please.  Who --
14          A.     A request was made to me.
15          Q.     Who made that request?
16          A.     That was Anthony Badalamenti and
17   -- and Simon Turton.  It was a conference
18   call that involved both of those people,
19   both of those individuals.
20          Q.     And that request was made on the
21   telephone?
22          A.     Yes.
23          Q.     And do you recall approximately
24   when that telephone conversation occurred?
25          A.     I don't -- I can't recall
```

Board-Certified Court Reporters

EXHIBIT 10
Page 10 of 19

217

1    exactly when that was.  It would -- I would

2    say somewheres of within a month after.  So

3    I don't recall exactly when it was.

4         Q.    Looking at tab 12, who does --

5    HAL_DOJ 21, this test was submitted by who

6    in this case?

7         A.    Well, it has my name on it

8    because the individuals that spoke to me

9    would not be in Viking system because they

10   are not associated with the lab.  So I put

11   my name on it to have a contact

12   information.  But this is -- this is the

13   test -- so this was -- this was May 28th,

14   so that would have been --

15        Q.    Is that around the time you

16   spoke on the phone with them?

17        A.    That would have been right

18   around the time.  So I guess a little

19   bit -- a little bit longer than a month.

20        Q.    And as opposed to other tests,

21   did you actually perform this test as well?

22        A.    I didn't perform this test.

23        Q.    Do you know who did perform this

24   test?

25        A.    I know that Chad Broussard, one

EXHIBIT 10
Page 11 of 19

218

1    of our lab techs, was involved.  I would

2    have to look at the weigh sheets, the

3    cement lab weigh sheets to maybe get a

4    better -- give you more information on

5    that.

6         Q.    Well, if you turn to tab 13,

7    does that give you any indication as to who

8    conducted this test?  There's both the May

9    28th and May 29th weigh-up sheet, the very

10   beginning of tab 13.

11        A.    Okay.  I'm trying to see the

12   second page of that.  There are no initials

13   on this paperwork but I think that Chad --

14   I think I spoke to Chad Broussard about it

15   because I think that he was working at the

16   time.

17        Q.    Did you speak to him on the

18   phone or in person?

19        A.    I -- I really don't remember.

20        Q.    Do you -- did you give him any

21   instructions with respect to this test?

22        A.    Just -- just to run the test and

23   I told -- go back and look.  I think we had

24   him run it on -- on -- either run it twice

25   or run it on two different machines to try

1   to make sure that we, you know, got a good

2   representative number.

3        Q.     And did you monitor this test as

4   it was run by Mr. Broussard?

5        A.     As it was being performed?

6        Q.     Correct.

7        A.     I don't recall, you know,

8   sitting there monitoring it.  I remember,

9   you know, looking at the results, but I

10  don't -- I can't recall whether or not I

11  was there monitoring the test as it was --

12  as it was running.

13       Q.     Who decided which of the

14  additives and particular cement would be

15  used for this test?

16       A.     That was Anthony Badalamenti and

17  Simon.  They had -- as I stated earlier

18  this morning, they had requested that I use

19  the samples that were from the rig.  But we

20  were instructed that we couldn't use it, so

21  we used the lab stock.

22       Q.     So was it your understanding at

23  the time this test was conducted that this

24  was the same slurry from the rig?

25       A.     Same design.

220

1          Q.      Same design.

2          A.      That's correct, right.

3          Q.      But this -- this was a pilot

4     test so that these were chemicals used from

5     the lab as opposed to those actually --

6          A.      That's correct, yes.

7          Q.      And with respect to the

8     temperatures that were used in this test,

9     210 for the bottom hole stack temperature

10    and 135 for the bottom hole circulating

11    temperature, who determined that those were

12    the temperatures to be used?

13         A.      Well, I think it -- that was

14    just a case where we were repeating or

15    running the tests based on the well

16    conditions from the previous test.  I

17    don't --

18         MR. CHEN:

19                    Objection, form.

20    BY MS. MCCLELLAN:

21         Q.      Are there any protocols in the

22    lab for running static gel strength tests?

23         A.      Protocols?

24         Q.      If you could describe to me how

25    the test is run.

499

```
 1              A.      Yes.
 2              Q.      Do you know how big the mixing
 3      containers are on -- onboard?
 4              A.      I don't.
 5              Q.      Is that relevant in any way to
 6      the consistency of the cement job?
 7              A.      Is it relevant?
 8              Q.      Yeah.  Does it matter how big
 9      the containers are?
10              A.      Not that I'm aware of.
11              Q.      Does Halliburton have any
12      guidance on that?
13              A.      I don't know.
14              Q.      Not something that's part of
15      your job --
16              A.      Right.
17              Q.      -- to worry about?
18              A.      Right.
19              Q.      I may have gotten this wrong,
20      especially because it was hard to hear the
21      long last names yesterday when I was
22      listening from out there.  But I think you
23      said you were asked by Anthony
24      Badalamenti --
25              A.      Yes.
```

500

```
 1          Q.      -- and Simon Turton --
 2          A.      Yes.
 3          Q.      -- to conduct the static gel
 4    test post blowup, correct?
 5          A.      Yes.
 6          Q.      I think you indicated that when
 7    you were asked by Mr. Faul to conduct the
 8    stability test and the contamination test,
 9    he mentioned some testing they had done in
10    Oklahoma where they got some settling?
11          A.      Yes.
12          Q.      And that was the reason he was
13    asking you to conduct this additional
14    stability testing, correct?
15          A.      Yes, from my memory.
16          Q.      And did Mr. -- I'm going to call
17    them Anthony and Simon.  Is that all right?
18          A.      That's fine.
19          Q.      You'll know who I am talking
20    about?
21          A.      Yes.
22          Q.      Did Anthony and Simon explain to
23    you why they wanted you to run static gel
24    test post blowout?
25          A.      I don't recall an explanation
```

**GAUDET, KAISER, L.L.C.**
Board-Certified Court Reporters

EXHIBIT 10
Page 16 of 19

501

```
 1    why.
 2         Q.     Did they tell you that
 3    Halliburton had not run any static gel test
 4    before the blowout?
 5         A.     They may have.
 6         Q.     Did you know that at that time?
 7         A.     At that time I may have known
 8    that, if I -- if I looked at the lab weigh
 9    sheets, I would say that I was aware that
10    they didn't run it.
11         Q.     But the suggestion to run that
12    test didn't come from you; is that correct?
13         A.     That's correct.
14         Q.     You were asked yesterday whether
15    or not any other tests were run by the lab
16    and you said not on the cement design.  Do
17    you recall that?
18         A.     Yes, I'm sure I said that.
19         Q.     And -- and does -- is that
20    qualification important?  Were there some
21    other tests that you were aware of that
22    weren't on the cement design?
23         A.     I don't -- I don't recall the
24    specifics of the question.
25         Q.     I'm not so much asking the
```

502

1    question.  I'm not trying to go back and

2    ask you what you testified to yesterday.

3         A.    Okay.

4         Q.    So let's do it this way.

5         A.    Okay.

6         Q.    After the blowout you conducted

7    some -- or after having conducted some

8    static gel tests, correct?

9         A.    Correct.

10        Q.    And you also conducted yourself

11   some foam stability tests, correct?

12        A.    Yes.

13        Q.    And contamination tests?

14        A.    Yes.

15        Q.    Are you aware of any other tests

16   done by the lab concerning the Macondo

17   cement after the blowout?

18        A.    No, I'm not aware of any other.

19        Q.    Are you aware of any tests

20   performed by anybody else at Halliburton

21   relating to the Macondo blowout after the

22   blowout?

23        A.    I'm not.

24        Q.    We have had a lot of discussion

25   over the last couple of days about testing

REPORTER'S CERTIFICATE

1

2

3      I, **SANDRA D. FILES**, Certified Court

4  Reporter, do hereby certify that the

5  above-named witness, after having been

6  first duly sworn by me to testify to the

7  truth, did testify as hereinabove set

8  forth;

9      That the testimony was reported by

10  me in shorthand and transcribed under my

11  personal direction and supervision, and is

12  a true and correct transcript, to the best

13  of my ability and understanding;

14      That I am not of counsel, not

15  related to counsel or the parties hereto,

16  and not in any way interested in the

17  outcome of this matter.

18

19

20

21  _____

22  SANDRA D. FILES, CCR
    CERTI____ __ ____ _____TER.

23

24                    OFFICIAL SEAL
                    SANDRA D. FILES
              Certified Court Reporter
            In and for the State of Louisiana
               Certificate Number  86157
               Certificate expires 12-31-11

25

**GAUDET, KAISER, L.L.C.**
Board-Certified Court Reporters

EXHIBIT 10
Page 19 of 19

1          UNITED STATES DISTRICT COURT

           EASTERN DISTRICT OF LOUISIANA

2

3     IN RE:  OIL SPILL        )     MDL NO. 2179

      by the OIL RIG,          )

4     DEEPWATER HORIZON in      )     SECTION "J"

      the GULF OF MEXICO,       )

5     April 20, 2010            )     JUDGE BARBIER

                                )

6                               )     MAG.  JUDGE

                                )     SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

                   Videotaped deposition of RICHARD

22    DUBOIS, taken at Pan-American Building, 601

      Poydras Street, 11th Floor, New Orleans,

23    Louisiana, 70130, on the 19th of July, 2011.

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 1 of 9

1         A.      Yes.

2         Q.      With whom have you discussed it

3    with?

4         A.      Timothy Quirk.

5         Q.      What did -- what did you tell

6    Mr. Quirk?

7         A.      I think we were -- again, we

8    were trying to determine who -- what person

9    performed each test.

10        Q.      Anybody else?  Did you talk to

11   anybody else about it?

12        A.      I can't recall that I did.

13        Q.      Okay.  Now, I understand

14   Mr. Quirk performed some tests after the

15   blowout; is that correct?

16        A.      Yes.

17        Q.      Were you part of those?  Did you

18   help him?

19        A.      No.

20        Q.      Did you see him perform them?

21        A.      No.

22        Q.      Were you with him when he

23   reported to Mr. Faul the results?

24        A.      No.

25        Q.      Did you discuss with Mr. Quirk

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 2 of 9

1     the results?

2          A.     Yes.

3          Q.     What did he tell you?

4          A.     He showed me the results.

5          Q.     And were they written down on a

6     piece of paper or typed into Viking?  Where

7     were they?

8          A.     They were handwritten on a sheet

9     of paper.

10         Q.     What were the results?

11         A.     I can't remember what the exact

12    results were other than the test was stable.

13         Q.     Now, did he tell you he had done

14    the tests, or did he say somebody else in the

15    lab had done the tests?

16         A.     He performed the tests.

17         Q.     Did you see him perform the

18    tests?

19         A.     No.

20         Q.     Did anyone else see him perform

21    the tests?

22         MR. HARTLEY:  Object to form.

23         A.     I cannot answer that question.

24    I don't know.

25         Q.     So did you talk to anyone else

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 3 of 9

1     in the lab who saw Mr. Quirk perform these

2     tests?

3          A.     No.

4          Q.     When you say you saw numbers

5     written down, what were the numbers?

6          A.     I do not recall what the numbers

7     were.

8          Q.     What would be the numbers, if

9     you were looking for stability, of a foam

10    cement test?

11         A.     I can't answer that question --

12    or can you repeat it?

13         Q.     Well, sure.  You told me, as I

14    understood it, that you and Mr. Quirk talked

15    about the results of the test he performed

16    for Mr. Faul immediately after the blowout

17    and he wrote something down, he showed it to

18    you.

19                What did he show you?

20         A.     He showed me numbers.

21         Q.     What would be those numbers that

22    would show that the -- the tests were stable?

23         A.     The numbers that would be on a

24    stability test would be typically specific

25    gravity.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 4 of 9

1        Q.    What was the specific gravity

2  that you saw?

3        A.    I do not recall.

4        Q.    And -- and what would it be

5  about that number that made you think it was

6  stable?

7        A.    The --

8        Q.    Do you understand the question?

9        A.    Yes.

10        Q.    Okay.  Go ahead.

11        A.    Yeah.  The numbers, depending on

12  what density the slurry was foamed to and

13  when it -- once the set samples are -- or

14  once the cement's allowed to set and you cut

15  the samples and you use -- you weigh them

16  using our Archimedes' principal, and you

17  weigh -- you determine a specific gravity of

18  the set cement samples, that will tell me if

19  the sample was stable or not for that

20  particular test.

21        Q.    Did you write down the -- the

22  test results that Mr. Quirk showed you?

23        A.    No.

24        Q.    Did you enter them into Viking?

25        A.    No.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 5 of 9

1     Q.     Did anyone else?

2     MR. HARTLEY:  Object to form.

3     A.     Not that I'm aware of.

4     Q.     Did anyone else memorialize

5  those test results for any purpose

6  whatsoever?

7     MR. HARTLEY:  Object to form.

8     A.     Not that I'm aware of.

9     Q.     Did you talk to Mr. Faul about

10 them?

11     A.     No.

12     Q.     Did you talk to anyone else

13 besides Mr. Quirk?

14     MR. HARTLEY:  Or lawyers.

15     Q.     And your lawyer, Mr. Hartley?

16     A.     No.

17     Q.     All right.  Now, do you remember

18 when that test was run by Mr. Quirk?  Was it

19 a day after or a week after?

20     A.     I think it was sometime towards

21 the end of May, best of my recollection.

22     Q.     End of May?

23     A.     Best of my recollection.

24     Q.     Okay.  Did Mr. Quirk tell you

25 that Mr. Faul had requested the test?

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 6 of 9

1       A.      Yes.

2       Q.      Did he tell you that before he

3   performed the test?

4       A.      Yes.

5       Q.      Did you see any of the test

6   results at all besides that sheet of paper?

7       A.      No.

8       Q.      Did you see Mr. Quirk performing

9   the test?

10      A.      No.

11      Q.      Did he actually cut cement

12  samples with a saw?

13      A.      I do not know.  I didn't -- I

14  didn't witness the testing.

15      Q.      Did -- did someone else witness

16  the testing?

17      MR. HARTLEY:  Object to form.

18      A.      Again, I do not know who -- I do

19  not know.

20      Q.      Okay.  Now -- now, looking at

21  this exhibit 811 here, I see a listing of --

22  of KCL right below the D-Air 3000, which we

23  talked about.  I see KCL in parenthesis,

24  potassium chloride.

25              Do you see that?

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 7 of 9

```
1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2
3    IN RE:  OIL SPILL       )    MDL NO. 2179
     by the OIL RIG,         )
4    DEEPWATER HORIZON in     )    SECTION "J"
     the GULF OF MEXICO,      )
5    April 20, 2010           )    JUDGE BARBIER
                              )
6                             )    MAG. JUDGE
                              )      SHUSHAN
7
              REPORTER'S CERTIFICATION
8             DEPOSITION OF RICHARD DUBOIS
                 TAKEN JULY 19, 2011
9
          I, Thu Bui, Certified Shorthand Reporter
10   in and for the State of Texas, hereby certify
     to the following:
11
          That the witness, RICHARD DUBOIS, was
12   duly sworn by the officer and that the
     transcript of the oral deposition is a true
13   record of the testimony given by the witness;
          That the deposition transcript was
14   submitted on _____, 2011, to the
     witness or to Attorney _____for
15   examination, signature and return to
     Worldwide Court Reporters, Inc., by
16   _____, 2011.
          That the amount of time used by each
17   party at the deposition is as follows:
18   Mr. Thornhill -  2:40
     Mr. Cernich   -  0:46
19   Mr. Kraus     -  0:17
     Mr. Goforth   -  0:53
20   Mr. Hartley   -  0:05
     Mr. Guidry    -  0:16
21   Mr. Ganucheau -  0:19
     Ms. Yang      -  1:24
22
23        I further certify that I am neither
     counsel for, related to, nor employed by any
24   of the parties in the action in which this
     proceeding was taken, and further that I am
25   not financially or otherwise interested in
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 8 of 9

```
 1        SUBSCRIBED AND SWORN to by me this _____ day

    of _____, 2011.

 2

 3

 4

           _____

 5        THU BUI, CSR, RPR

          CSR NO. 7618; Expiration Date: 12-31-11

 6        Worldwide Court Reporters

          Firm Registration No. 223

 7        3000 Weslayan, Suite 235

          Houston, TX 77027

 8        (713) 572-2000

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 11
Page 9 of 9

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3     IN RE: OIL SPILL        )   MDL NO. 2179

      by the OIL RIG          )

4     "DEEPWATER HORIZON" in  )   SECTION "J"

      the GULF OF MEXICO, ON  )

5     APRIL 20, 2010          )   JUDGE BARBIER

                              )

6                             )   MAG. JUDGE

                              )   SHUSHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20                 VOLUME 1 OF 2

21

22        Deposition of THOMAS ROTH, taken at

23     Hilton St. Charles Hotel, 333 St. Charles

24     Avenue, Le Moyne Room, New Orleans,

25     Louisiana, on the 25th of July, 2011.

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 12
Page 1 of 5

1    static temperature, what the time frame

2    will be from -- from the increase of

3    circulating temperature to static

4    temperature?  Is that another application

5    that WelCat -- or a calculation that

6    WelCat can make?

7        A.  I don't know.

8        Q.  You don't know?

9        A.  I've never run it.

10        Q.  Are you aware of the -- the

11    postincident testing that Mr. Faul

12    requested that Tim Quirk perform on -- on

13    some of the slurries that were run on the

14    Macondo well?

15        A.  In October, I was made aware of a

16    set of compatibility tests that Mr. Faul

17    ran, and then in April of 2011, I was made

18    aware of additional postincident testing

19    that Mr. Faul performed.

20        Q.  Okay.  What additional posttesting

21    are you referring to?

22        A.  It was my understanding that

23    somewhere in the process, Mr. Faul

24    requested an additional foam stability

25    test of the cement that was used on the

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 12
Page 2 of 5

1    Macondo well.

2         Q.  Were you made aware of the results

3    of those tests from --

4         A.  No, I was not.

5         Q.  You didn't ask Mr. Faul what the

6    test results indicated?

7         A.  No, I did not.  I have not had a

8    conversation with Mr. Faul since that test

9    was identified to me by Halliburton legal

10   staff.

11        Q.  So you haven't seen any -- any

12   written results or any -- any indications

13   as to what the results of those tests

14   were?

15        A.  I have not.

16        Q.  Have you asked for them?

17        A.  I have not.

18        Q.  Are you interested to know what

19   the results are?

20             MR. HILL:  Objection, form.

21        A.  No, I'm not.

22        Q.  (BY MS. SULLIVAN)  Why is that?

23        A.  I'm not an active spokesman on

24   behalf of the company.  I have no more

25   work in this area.  I'm -- I have no need

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 12
Page 3 of 5

```
 1                UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF LOUISIANA
 3       IN RE: OIL SPILL        )   MDL NO. 2179
         by the OIL RIG          )
 4       "DEEPWATER HORIZON" in  )   SECTION "J"
         the GULF OF MEXICO, ON  )
 5       APRIL 20, 2010          )   JUDGE BARBIER
                                 )
 6                               )   MAG. JUDGE
                                 )   SHUSHAN
 7
 8                REPORTER'S CERTIFICATION
 9        TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10                     THOMAS ROTH
11           I, Therese J. Casterline, Certified
12       Shorthand Reporter in and for the State of
13       Texas and the State of Louisiana, do
14       hereby certify to the following:
15           That the witness, THOMAS ROTH, was
16       duly sworn by the officer and that the
17       transcript of the oral deposition is a
18       true record of the testimony given by the
19       witness.
20           That the deposition transcript was
21       submitted on _____, 2011, to the
22       witness or to the attorney for the witness
23       for examination, signature and return to
24       Worldwide Court Reporters, Inc., by
25       _____, 2011;
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 12
Page 4 of 5

```
 1          That the amount of time used by each
 2     party at the deposition is as follows:
 3              Mr. Thornhill - 4 hours, 07
 4     minutes
 5              Ms. Sullivan - 1 hour, 22 minutes
 6              Ms. Harding - 0 hours, 48 minutes
 7          I further certify that I am neither
 8     counsel for, related to, nor employed by
 9     any of the parties or attorneys in the
10     action in which this proceeding was taken,
11     and further that I am not financially or
12     otherwise interested in the outcome of the
13     action.
14          Subscribed and sworn to by me this
15     25th day of July, 2011.
16
17     _____
       Therese J. Casterline, CSR, RMR, CRR
18     Texas CSR 5001, Expires 12-31-11
       Louisiana CSR 25014, Expires 12-31-11
19     WORLDWIDE COURT REPORTERS
       3000 Weslayan, Suite 235
20     Houston, Texas 77027
       1-800-745-1101
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 12
Page 5 of 5