

# GODWIN RONQUILLO
A Professional Corporation

**DALLAS  HOUSTON**

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332 Fax

GodwinRonquillo.com

JENNY L. MARTINEZ - SHAREHOLDER
DIRECT DIAL:   214.939.4620
DIRECT FAX:    214.527.3119
JMartinez@GodwinRonquillo.com

August 16, 2011

Barbara M. Harding
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Re:  In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, MDL No. 2179

Dear Barbara,

I write in response to your letter dated August 4, 2011, concerning Halliburton Energy Services, Inc.'s ("HESI") Responses and Objections to BP's Second Set of Interrogatories and First Requests for Admissions ("HESI's Responses"). My responses will track the organization of your letter.

## PART I – HESI'S RESPONSES AND OBJECTIONS TO BP'S SECOND SET OF INTERROGATORIES

**Interrog. No. 24 – Mud logging equipment.**

**1.  References to deposition transcripts.** As explained in my prior correspondence to you, HESI will agree to provide page numbers to deposition references in exchange for BP's agreement to do the same.

**2.  References to Documents.** You complain about HESI's reference to HAL0006918, HAL0050595, HAL0051030, and HAL0050681. The reference is proper and in compliance with Federal Rule of Civil Procedure 33. It is not HESI's responsibility to explain in meticulous detail how each responsive document satisfies BP's request. Moreover, it is overly broad and unduly burdensome for BP to request "all witnesses with knowledge of the events, and all statements, documents and other materials that describe or reflect the events." Nonetheless, I will direct you to where responsive information is contained in each of these documents.

**HAL0006918:** Contrary to the statement in your letter that HAL0006918 only lists the equipment used aboard the *Deepwater Horizon* without reference to how the mud logging equipment was used, the document contains the following responsive sections:

Page 2

Section 1.4 lists "Logging Services Supplied," including a subsection listing "Services supplied by Sperry Drilling Services." This section describes "in detail the operation of the mud logging equipment used by the Halliburton employees aboard the *Deepwater Horizon* in April 2010" as this Interrogatory requested.

Section 1.5 lists "Monitored Parameters" by the Sperry employees operating the equipment listed. This section describes the monitoring procedures routinely employed by Sperry.

Section 3 describes in great detail the actions of Sperry employees aboard the *Deepwater Horizon* over the requested time period, including a detailed description of the various tests performed.

**HAL0050595:** HAL0050595 is indeed a "Sperry User's Manual for Series 8800 total Hydrocarbon Analyzer" from 2002. This document describes how the mud logging equipment aboard the *Deepwater Horizon* operated aboard the vessel.

**HAL0051030:** HAL0051030 describes the training procedures for mud logging personnel operating aboard the *Deepwater Horizon*.

**HAL0050681:** HAL0050681 describes the training procedures for mud logging personnel operating aboard the *Deepwater Horizon*.

The individuals and documents identified are responsive to Interrogatory No. 24 and thus HESI stands by its references.

**Interrog. No. 25 – Conversations with Jesse Gagliano.** You complain that HESI's response to this Interrogatory is insufficient, but given the circumstances — that individuals who may have knowledge responsive to this Interrogatory have retained separate counsel and are not available to assist HESI in responding — HESI's response is sufficient.

  1. **Objections.** You complain about HESI's objections to your request that HESI "[i]dentify the date, time, and parties involved in any and all conversations with Jesse Gagliano on or after April 1, 2010, discussing, reflecting, or relating to the cement slurry for the production interval of the Macondo Well." HESI's position is not that requests for oral communications are *per se* improper, but rather that under the circumstances here — with Jesse Gagliano officing exclusively with BP employees — HESI does not have any more information available to it than BP does to answer this query; and it is likely that BP has more access to responsive information as any such conversations with Jesse Gagliano were likely with BP employees.

  2. **References to testimony.** BP complains that HESI's response referenced the entire transcript from Jesse Gagliano's August 24, 2010 "testimony from the Coast Guard

Page 3

Hearings." As with HESI's response to Interrogatory No. 24 above, HESI will provide page numbers in exchange for BP's agreement to do the same.

3. **Completeness of the response.** HESI has provided voluminous responsive information to BP through document production and witness testimony. Some individuals who may have knowledge responsive to this Interrogatory have retained separate counsel and are not available to assist HESI in responding. Accordingly, HESI stands by its objections and response in this regard.

**Interrog. No. 26 – Monitoring of real time well data.** Subject to and without waiving the objections in its original response, as explained in Alan York's email of June 8, 2011, Melissa Bergman's April 21, 2010 email, Exhibit 2011, introduced in the deposition of Tim Probert, contains incorrect information. As Exhibit 2011 states, Melissa Bergman does make the statement that "[a]t the time of the incident we were monitoring the well activities at our Real Time Operations Center." However, preceding that statement, Ms. Bergman states, "[h]ere are the details as I have been told by the Region HSE manager Phillip Perry." As explained in Mr. York's prior email to you, Ms. Bergman's email was simply reporting what Mr. Perry told her. She has no independent knowledge of anything to do with monitoring well activities at the Real Time Operations Center.

Further, Mr. Perry, who provided the information that Ms. Bergman references in Exhibit 2011, received that information from someone at Sperry. He does not remember who that individual was. Like Ms. Bergman, Mr. Perry has no independent knowledge of anything to do with monitoring well activities at the Real Time Operations Center.

Mr. York's June 8, 2011 email also directs BP to the best source of information as to who was logged in to monitor real time data - the previously produced InSite Anywhere user logs (HAL0050546-HAL0050563, HAL0502725-HAL0502730), which are referenced in HESI's Response to Interrogatory No. 26. In addition, responsive information is contained in the testimony of Jesse Gagliano before the Marine Board of Investigation and the deposition testimony of John Gisclair, for which HESI will agree to provide page and line references. In all other respects, HESI stands by its objections and response.

**Interrog. No. 30 – Identification of fact witnesses.** BP complains that HESI's references to witness lists filed with the court are insufficient. HESI would like to direct BP to its responses to similar HESI discovery requests, namely Interrogatories No. 32 and No. 34, in BP's Responses and Objections to HESI's Interrogatories, served on August 1, 2011. In BP's response to No. 34, which is comparable to BP's somewhat broader Interrogatory No. 30 to HESI, BP offers only objections. In BP's response to HESI's Interrogatory No. 32, BP defers any response. As such, HESI stands by its response to Inferrogatory No. 30. Should BP continue to claim that HESI's response is insufficient, HESI is happy to confer with BP about a mutually agreeable format for BP's responses to HESI's Interrogatory Nos. 32 and 34, as well as HESI's response to BP's Interrogatory No. 30.

**Interrog. No. 31 – List of damages.** BP complains about HESI's objection that this Interrogatory is premature given the phased discovery established by the Court. Given BP's

Page 4

similar response to HESI's Interrogatory No. 32, HESI is somewhat surprised by BP's position here. HESI stands by its response and will supplement at the appropriate time.

### PART II – HESI'S RESPONSES AND OBJECTIONS TO BP'S FIRST REQUESTS FOR ADMISSIONS

**RFA Nos. 1, 3, 5, 6 – Cement job and modeling.** BP complains that the facts expressed in HESI's responses are materially different than those expressed in these requests. HESI's responses are proper because the "facts" that BP references in these RFAs are materially different than reality. Additionally, such "facts" are unfairly inferred, untrue or not established. HESI answered these questions as accurately as possible, admitted as much of the requests as was true, and denied the remainder. *See* 8A FED. PRAC. & PROC. § 2260. HESI stands by its objections and responses to these RFAs.

**RFA Nos. 10, 11, 34 – Events of April 20, 2010.** HESI agrees to supplement its responses by directing BP to the deposition testimony of Joseph Keith and John Gisclair for information regarding warnings issued to the crew about the increasing pipe pressure around 21:26 to 21:30 on April 20, 2010.

**RFA Nos. 15-18 – Hydrocarbon flow path.** HESI stands by its responses to these RFAs. BP's requests assume facts that are not established. These unestablished facts persist in BP's requests despite the clarification provided. HESI may amend its responses as expert discovery progresses.

**RFA No. 35 – Rig activities and monitoring returns.** HESI stands by its denial, and would deny this RFA even if it had no objections.

**RFA No. 55 – Tieback junction.** HESI stands by its denial of this RFA. HESI's objection is hardly an "epistemological doubt." By asking whether a production casing has "a potential leak path at the tieback junction," BP's request assumes that a production casing has a tieback junction. If, as you state in your letter, "it does not have such a leak path because it dos [sic] not have a tie back junction," then BP cannot be surprised that HESI denied this RFA.

**RFA Nos. 75-78 – Cement job.** HESI stands by its denials of these RFAs. Individuals who may have knowledge responsive to this request have retained separate counsel and are not available to assist HESI in responding. Accordingly, there is no need for HESI to amend its responses to these RFAs.

**RFA No. 80 – Cement bond log.** Individuals who may have knowledge responsive to this request have retained separate counsel and are not available to assist HESI in responding. There is no need for HESI to amend its responses to these RFAs because, after a reasonable inquiry, information known to or readily obtainable by HESI is insufficient to enable HESI to admit or deny whether the discussion at that meeting included the content suggested by this request and, therefore, HESI denies it.

Page 5

**RFA No. 96 – Monitor pressure tests.** BP's use of the word "monitor" in this request renders the entire request vague and ambiguous. There are a number of factors monitored during pressure tests in and around oil and gas wells, both on and off shore. For the same reason, HESI also objects to BP's use of the term "pressure test" in this request. Without a request concerning the monitoring of a discernable factor, in addition to the vagueness and ambiguity surrounding whether BP's request concerns a negative pressure test or not, HESI stands by its denial.

**RFA No. 108 – April 2010 logging data.** BP clarified that when it asked whether HESI had access to "logging data" for Macondo before April 18, 2010, it meant "logging while drilling data," "GeoTap data," "MDT data," and the "triple log data among other things acquired for the open hole section in April 2010." Notwithstanding this clarification, HESI stands by its admission that it had certain caliper log and directional data for the Macondo well before April 18, 2010.

**RFA No. 109 – Wellspace.** This RFA incorrectly assumes that HESI had full access to the Wellspace software for all activities taking place aboard the *Deepwater Horizon*. HESI stands by its denial of this request.

**RFA No. 113 – April 18, 2010 OptiCem report.** HESI stands by its response to this request.

*   *   *

Please feel free to contact me if you have any questions regarding these responses.

Best regards,

*Jenny Martinez*

Jenny L. Martinez

JLM/MWL

cc: Donald E. Godwin
R. Alan York
Carolyn R. Raines

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Barbara M. Harding
To Call Writer Directly:
(202) 879-5081
barbara.harding@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

August 25, 2011

**Via Electronic Mail**

Jenny Martinez
Godwin Ronquillo PC
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

      Re:    In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179

Dear Jenny:

      I write to address various discovery issues that have been the subject of prior "meet-and-confer" discussions between our respective teams. First, I identify below the interrogatory responses that BP agrees to supplement in response to Halliburton's requests. Second, I address Halliburton's August 18th request for BP to produce Virtual Hydraulics reports and other reports related to mud static gel strength. Finally, I review the status of our attempts to reach agreement on an OptiCem Software Escrow Agreement to provide BP access to the software and inputs that Halliburton used for the Macondo well.

## I.    INTERROGATORY RESPONSES BP AGREES TO SUPPLEMENT

**Halliburton's complaint relating to "Broad references to documents":**

      Based on our discussions and your correspondence, we understand that you have limited your complaint to BP's responses to Halliburton Interrogatory Nos. 14 and 15 relating to the citation to the Final Report provided by Det Norske Veritas ("DNV Report"). Accordingly, BP will amend its responses to clarify the citation to the DNV Report.

**Halliburton's complaint relating to "Bly Report Findings":**

      Based on our discussions and your correspondence, we understand that you seek confirmation of the following assertions from the BP Incident Investigation Report (IIT Rpt.) flagged in your August 19, 2011 letter:

Jenny Martinez
Godwin Ronquillo PC
Page 2

- "Based on available evidence, hydrostatic pressure calculations, OLGA® well flow modeling and analysis of data from the Macondo well static kill on August 4, 2010, hydrocarbons entered the casing through the shoe track." [IIT Rpt. at 37]

- "Based on hydrostatic calculations and OLGA® well flow modeling, the hydrocarbon in-flow was most likely caused by flow through the annulus cement barrier and shoe track barriers of the well. Based on this work, alternative flow paths are possible but much less likely. The investigation team could not identify an alternative flow path that had both a plausible mechanical failure mode and could be modeled to match the accident timeline from a pressure response perspective. When this work is combined with analysis of the static well kill results and the other available evidence, in the view of the investigation team there is a compelling case for flow having been through the annulus cement barrier and shoe track barriers." [IIT Rpt. at App. G at 222].

- "The investigation team has concluded that initial flow into the wellbore was through the shoe track, not through the casing hanger seal assembly. This supports the conclusion that the uplift forces during the negative-pressure test did not unseat the seal assembly." [IIT Rpt. at 38].

- "The investigation team concludes that the production casing and components met all the required design conditions and that it is highly unlikely that a casing failure mode contributed to the loss of well control." [IIT Rpt. at 38].

- That Figure 1 correctly notes "Note: Sands are based on geology known at the time of the accident." [IIT Rpt. at 54].

- "Based on CSI Technologies' lab results and analysis, the investigation team concludes that the nitrified foam cement slurry used in the Macondo well probably would have experienced nitrogen breakout, nitrogen migration and incorrect cement density, which would explain the failure to achieve zonal isolation of hydrocarbons." [IIT Rpt. at 35].

- "Nitrogen breakout and migration would have also contaminated the shoe track cement and may have caused the shoe track cement barrier to fail." [IIT Rpt. at 77].

- "Based on available evidence, hydrostatic pressure calculations, OLGA® well flow modeling and analysis of data from the Macondo well static kill on August 4, 2010, hydrocarbons entered the casing through the shoe track. Therefore, the shoe track cement and the float collar must have failed to prevent this ingress. The investigation team has not established whether this failure was attributable to the design of the cement, contamination of the cement by mud in the wellbore, commingling of cement with nitrogen due to nitrogen breakout from the foam

Jenny Martinez
Godwin Ronquillo PC
Page 3

> cement slurry, swapping of the shoe track cement with the mud in the rathole (bottom of the well), or some combination of these factors." [IIT Rpt. at 69-70].

- "Although the decision not to use 21 centralizers increased the possibility of channeling above the main hydrocarbon zones, the decision likely did not contribute to the cement's failure to isolate the main hydrocarbon zones or to the failure of the shoe track cement." [IIT Rpt. at 35].

BP continues to object to this interrogatory for the reasons stated in our original response. Most importantly, this interrogatory seeks information that calls for the opinion of experts and, as such, is not timely. Discovery related to experts will be disclosed in accordance with the Court's orders.

As for Interrogatory No. 31, the IIT Team's report reflects the IIT team's views. In formulating the report, individuals may have made any number of inquiries and expressed any number of views, as one would expect in any such investigation. However, documents and communications among team members have already been the subject of extensive production and questioning. Accordingly, it is unreasonable to ask BP to reconstruct in an interrogatory response whether any single individual at BP involved in the IIT's investigation ever expressed any sentiment during the investigation that can be in some way considered "disagreement." Accordingly, BP continues to object to this interrogatory on the ground that it is burdensome, vague, and not calculated to lead to the discovery of admissible evidence.

**Halliburton's complaint relating to "References to other Pleadings":**

Based on our discussions and your correspondence, we understand that both parties have agreed to supplement their response to interrogatories with specific page cites. As such, BP agrees to supplement its response to Halliburton Interrogatory No. 15 with page cites to the depositions of Mike Byrd and Fereidoun Abbassian as appropriate. BP understands that Halliburton will supplement its responses to BP Interrogatory Nos. 1, 2, 4, 15, 19, 23, 24, 25, and 26.

**Halliburton's complaint relating to "Sands and Pore Pressures"/Halliburton's Interrogatory No. 10:**

We have already indicated to you that BP will provide an amended response related to the chart listing the sand locations and pore pressures.

**Halliburton's complaint relating to "Nitrogen Breakout":**

Halliburton's Interrogatory No. 20 asks two questions: (a) "Do you contend that the foam cement used on the Macondo Well 9 7/8" x 7" production casing was unstable?"; and (b) "If so, what do you contend occurred as a result of the instability?" BP responded to both parts: (a) "Based on current information available after the incident, BP contends that the foamed cement that Halliburton designed, tested, recommended and pumped on the production interval

Jenny Martinez
Godwin Ronquillo PC
Page 4

was unstable."; and (b) "Based on currently available information, the foamed cement slurry that Halliburton designed, tested, recommended and pumped on the production interval experienced, among other things, nitrogen breakout due to its instability. Among other things, the nitrogen breakout caused the cement to fail to isolate and prevent the flow of hydrocarbons down the annulus and up the shoe track resulting in the uncontrolled flow of hydrocarbons and blowout that occurred on April 20, 2010."

Halliburton now asks BP a third question: (c) "how nitrogen breakout 'caused' the cement to fail to isolate and prevent the flow of hydrocarbons." That question is different than the first two questions and BP does not believe that the interrogatory, read fairly, covers it. Further, each of these inquiries improperly seeks information that calls for the opinion or experts and, as such, is not timely. Discovery related to experts will be disclosed in accordance with the Court's orders.

**Halliburton's complaint relating to "BP Engineers' Roles and Responsibilities":**

As indicated during our prior conferences, BP agrees to supplement its response to Halliburton's Interrogatory No. 9 by describing the general roles that BP's engineers have with respect to cementing.

## II. HALLIBURTON'S REQUEST FOR VIRTUAL HYDRAULICS REPORTS AND OTHER REPORTS RELATED TO MUD STATIC GEL STRENGTH

Halliburton's RFP No. 4 seeks the production of "[a]ny FANN 70 reports showing the static gel strength of the mud used at the Macondo well between April 1, 2010 and April 20, 2010." *See* Halliburton's RFP No. 4. As explained in our prior "meet-and-confer" discussions, BP has been unable to locate any such FANN 70 reports following a reasonable search.

In light of this fact, on August 18th, Halliburton decided to broaden the scope of what it had previously requested to now include (1) "all Virtual Hydraulics reports and other documents related to the inputs or data obtained and/or utilized in analyzing the mud rheology," and (2) "all reports and other documents related to the inputs or data obtained and/or utilized in analyzing mud static gel strength. *See* J. Martinez 8/18/2011 e-mail to M. Nomellini and P. Chen. While these are essentially new requests, BP nevertheless agrees to undertake a reasonable search for and produce these documents. In fact, we have already produced the Virtual Hydraulics reports sought by Halliburton (including at BP-HZN-2179MDL03297348-386) that we have located upon reasonable investigation, and will continue to search for and produce any non-privileged mud static gel strength reports that can be located through reasonable investigation, although we currently are not aware of any that have not been produced.

## III. OPTICEM SOFTWARE AGREEMENT

We have received your redline to the draft software escrow agreement that BP circulated. As discussed on our call on Monday, August 15, 2011 and Tuesday, August 23, 2011, the

Jenny Martinez
Godwin Ronquillo PC
Page 5

primary disagreement appears to be whether Halliburton will escrow its software programs and input files other than OptiCem that were used by its Macondo team.

    Accordingly, we have attached two versions of the proposed software escrow agreement to this letter for your further consideration. The first version accepts nearly all of your proposed changes to the draft software escrow agreement and encompasses all of the software used by Halliburton on or before April 20, 2010 for cementing services related to the Macondo well, including OptiCem, WellCat, and CemWin. The second version also accepts nearly all of your proposed changes to the draft software escrow agreement but encompasses only the proprietary version of OptiCem used by Halliburton for cementing services related to the Macondo well.

    If Halliburton refuses to escrow any software other than OptiCem, BP will accept the terms set forth in the second version of the draft escrow agreement in order to obtain access to the OptiCem software and will move separately to compel Halliburton to escrow the remaining software programs and inputs at issue. If Halliburton refuses to escrow all of these programs, BP will move to compel and seek copies of the software to be utilized pursuant to the current confidentiality agreement in place in the litigation.

    Please let us know how Halliburton intends to proceed, so that we may determine whether or not we will need to file a motion on this subject.

                                                        Sincerely,

                                                        /s/ Barbara M. Harding
                                                        Barbara M. Harding

BMH/djs