UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG       "DEEPWATER HORIZON" in the       GULF OF MEXICO, on       APRIL 20, 2010 | : : : : : | MDL NO. 2179    SECTION:  J    JUDGE BARBIER    MAG. JUDGE SHUSHAN |
| THIS DOCUMENT RELATES TO ALL CASES | : : : | JURY TRIAL DEMANDED |

. . .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..

**BRIEF OF CAMERON INTERNATIONAL CORPORATION
CONCERNING PENDING DISMISSAL MOTIONS**

Cameron International Corporation ("Cameron") respectfully submits this brief in response to the Court's Order of September 1, 2011 (Doc. 3891), in order to discuss the "effect" that the Court's Order and Reasons of August 26, 2011 (Doc. 3830; the "B1 Order") "has on other Motions to Dismiss pending in this MDL." By submitting this briefing, Cameron does not waive any argument asserted in its motions to dismiss the B1 master pleading or in any other briefing before this Court.

**Summary of Argument**

1.      The governmental entities with complaints in Bundle C stand in essentially the same position as the B1 plaintiffs. The holdings of the B1 Order can therefore be applied directly to resolve in identical fashion the various motions to dismiss the Local Government Entity Master Complaint (Doc. 1510), the First Amended Complaint of the State of Alabama (Doc. 1872), and the First Amended Complaint of the State of Louisiana (Doc. 2031). In short, the effect of the B1 order is that all claims of governmental entities other than OPA and maritime law claims can be dismissed.

- 1 -

2. The holdings of the B1 order also can be applied to resolve Cameron's motion to dismiss the unresolved lawsuits remaining in Bundle A. Giving effect to the B1 Order, all remaining Bundle A claims other than maritime claims should be dismissed. Furthermore, for the reasons explained in Cameron's prior briefing and reiterated below, the maritime claims of the remaining Bundle A plaintiffs should be dismissed for failure to state a claim upon which relief can be granted against Cameron. What Plaintiffs allege – that hydrocarbons had already flowed past and above the BOP into the riser before any attempt was made to activate the BOP – shows that no feature of the BOP was in the causal chain of events leading to the explosions on the rig. *See In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 214 (5th Cir. 2010) (upholding dismissal of maritime claims for failure to allege facts adequate to show "substantial cause").

3. The B1 Order can likewise be applied to deny the motions filed by certain co-defendants to dismiss the cross-claims of Cameron (and others). The B1 Order determines that claims of B1 plaintiffs will proceed against all defendants. Giving effect to the B1 Order, all cross-claims for contribution based on those underlying claims should likewise proceed. The Court should therefore deny the motions to dismiss those cross-claims.

### Argument

**1. Government Complaints in Bundle C**

Along with others, Cameron has moved to dismiss the Local Government Entity Master Complaint and the operative pleadings of the States of Alabama and Louisiana. (Docs. 2636, 2627, 2639.) Like the Bundle B1 master pleading, the Bundle C pleadings seek to recover economic losses based on OPA, maritime law and state law. (Docs. 1510, 1872, 2031.)

1069198v.1

The B1 Order determines that state law claims cannot be sustained under the facts of this case. The B1 Order further determines that, despite OCSLA, "adjacent state" law is not applicable. These holdings can be applied directly to the Bundle C pleadings. Giving effect to the B1 Order, all state law claims of the States of Louisiana and Alabama and local government entities should be dismissed.

The B1 Order determines that OPA claims and maritime claims may proceed and that the maritime claims are not displaced by OPA, but that the maritime claims are subject to the rule of *Robins Dry Dock*. Cameron submits, of course, that any maritime claims for oil spill compensation are expressly displaced by the OPA oil spill compensation regime. With that caveat, the holdings of the B1 Order can be applied to analogous claims of the Bundle C governmental entities. Giving effect to the B1 Order, the OPA and maritime claims of the governmental entities would remain in the litigation. As provided in the B1 Order, purported maritime claims against Cameron and other defendants who are not defined "responsible parties" under OPA would be subject to the rule of *Robins Dry Dock*, and individual governmental entities would have to prove an applicable exception to the economic loss doctrine to pursue a purported maritime law claim.

**2.     Remaining Bundle A Complaints**

Cameron filed an omnibus motion to dismiss then pending Bundle A pleadings. (Doc. 1154.) Certain of those injury and death claims have been settled and are now dismissed. (Docs. 1024 [minute entry], 1029, 1618, 1809, 2608, 2724, 2755, 3624, 3633, 3636, 3637, 3695.)

The remaining Bundle A pleadings against Cameron do not assert claims under OPA, and are not governed by OPA. (Case Nos. 10-1423, 10-1501, 10-1540, 10-3168

[intervenors], 10-3815, 10-4211, 10-4226, 10-4252, 10-4360, 10-4427, 11-261, 11-262, 11-263.) The OPA and OPA displacement rulings of the B1 Order, therefore, do not have any effect on these remaining Bundle A pleadings or on Cameron's motion to dismiss them.

The B1 Order determined that maritime law rather than state law applied to torts asserted for the events of April 20, 2010. And the B1 Order determined that "adjacent state" law could not be borrowed as surrogate federal law under OCSLA. Although Cameron disagrees with these rulings, these holdings can be applied to the Bundle A complaints. Giving effect to the B1 order, the state law claims asserted in the Bundle A complaints can be dismissed.

Giving further effect to the B1 Order, maritime law claims would be litigated in the remaining Bundle A complaints. In order to resolve Cameron's motions to dismiss those remaining claims under the B1 Order, the allegations against Cameron in the Bundle A pleadings must therefore be analyzed under maritime law. A maritime tort, of course, requires adequate allegations of proximate cause. *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010) (upholding dismissal of maritime claims for failure to allege facts adequately showing "substantial cause").

In its Bundle A dismissal briefing, Cameron demonstrated that the Bundle A pleadings all failed to allege specific facts from which it could be plausibly shown that any act or omission of Cameron was a "but for" cause of any death or personal injury alleged in the Bundle A pleadings. (Doc. 1980.) In order to facilitate resolution of its dismissal motion with respect to maritime law (or any other potentially applicable law), Cameron recounts in even greater detail the factual allegations made by the Plaintiffs' Steering Committee in this case.

In the operative B1 pleading (Doc. 1128; the "B1 Complaint"), the PSC alleges that in completing the Macondo well for abandonment, "Drilling Defendants" made numerous bad "decisions about well design, cementing, and well integrity testing." *Id.* ¶¶ 303-68. "Drilling Defendants" do not include Cameron. *id.* ¶ 239. No one has alleged that Cameron had any role in these decisions. The remaining operative Bundle A pleadings all allege instead that Cameron sold flow control equipment – referred to as the blowout preventer or "BOP."

Critically, moreover, asserting the only specific factual allegations relevant to the Bundle A pleadings, the PSC alleges fateful decisions about well control made on April 20, 2010, by persons other than Cameron. Importantly, Plaintiffs allege that those persons repeatedly failed to take necessary protective measures when they received results from negative pressure tests revealing pressure in the well and therefore indicating that the final cement job had likely failed. Complaint ¶¶ 369-80. Plaintiffs further allege that, beginning at 9:00 p.m. on April 20th, those persons failed to take necessary protective measures in response to evidence of pressure in the Macondo well – evidence revealing an influx of hydrocarbons into the well from the reservoir. *Id.* ¶¶ 387-402. According to the PSC, the response – of persons other than Cameron – was "too little too late." *Id.* ¶¶ 403-410.

Plaintiffs point out that "[i]n the event of an influx of hydrocarbons into the well, closure of the BOP rams," if activated timely, "can prevent a 'kick' – a small leak of hydrocarbons into the well – from escalating into a 'blowout.'" Complaint ¶ 265. For this purpose, the BOP "can be activated manually." *Id.*

According to the PSC, "first indications of hydrocarbons flowing into the well started at 8:52 p.m.," Complaint ¶ 389, and further evidence of hydrocarbon influx into the well

was revealed over the next fifty minutes, *id.* ¶¶ 391, 393.  The PSC alleges, however, that "[i]t was not until 9:41 p.m." that anyone reacted – after drilling mud visibly gushed onto the rig floor.  *Id.* ¶ 406.

The PSC further alleges that according to post-casualty modeling, hydrocarbons had begun to enter the well at 8:52 p.m.  Complaint ¶ 390.  By 9:30 p.m., 300 barrels had flowed into the Macondo well.  *Id.* ¶ 393.  By 9:38 p.m., hydrocarbons had "passed through the wide-open BOP into the riser."  *Id.*  In other words, the BOP had been left wide open throughout the fifty-minute influx of hydrocarbons.  Put another way, no feature of the BOP was in the causal chain permitting hydrocarbons into the riser.  There is no allegation, nor could there be, that any automatic function of the BOP had anything to do with this release of hydrocarbons into the riser.

The expanding hydrocarbons released from the well overwhelmed the mud-gas separator on the *Deepwater Horizon*.  Complaint ¶ 408.  Flow paths for hydrocarbons blowing out of the well through the riser were created through "seals and systems" on the drilling unit.  *Id.* ¶ 409.

Sometime after 9:41 p.m., in reaction to the gusher of drilling mud, steps were finally taken to activate non-shearing rams on the BOP.  Complaint ¶ 410.  Activation of the BOP succeeded in temporarily sealing the well at 9:47.  *Id.*

Upon activation of the BOP, "all flow paths from the well to the" *Deepwater Horizon* "were sealed off except for the drill pipe," and hydrocarbons were contained in the drill pipe.  Complaint ¶ 410.  "With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill pipe, the blowout could have been contained at this point" were it not

for the gas that had already been allowed to pass through the open BOP and up the marine riser connecting the *Deepwater Horizon* to the Macondo well.  *Id.*  Before any explosion, therefore, the BOP had functioned to contain the blowout.  However, gas that had been released into the riser above the BOP **before the BOP was activated** had by this time reached the *Deepwater Horizon*.

According to the PSC, at 9:48 p.m., that gas ignited.  Complaint ¶¶ 414.  There were two explosions, and the flow paths through the unit's disabled seals and flow control systems allowed additional hydrocarbons from the Macondo well to reach the *Deepwater Horizon* and fuel a continuing fire.  *Id.*  Eleven workers perished, and numerous others were injured during evacuation.  *Id.*

These allegations make crystal clear that nothing about the BOP itself, and no conduct or omission of Cameron, could have been a "but for" cause of any injury or death on the *Deepwater Horizon*.  The explosions and fires were caused by a failure of persons other than Cameron to ensure that the BOP was activated in time.  When activated before the explosions, the BOP functioned.  According to the allegations of Complaint ¶ 410, at the time of the fatal and injurious explosions, the BOP had successfully sealed the well, and would have successfully contained the blowout except for those explosions.  The explosions were caused instead by the release of gas through the BOP into the riser, and that release resulted because persons other than Cameron had left the BOP "wide open" despite clear evidence of a "kick."

Given these specific factual allegations by the PSC, the conclusory allegations in the Bundle A pleadings do not show how any Cameron conduct or any Cameron equipment, much less any unspecified defect in the equipment, could plausibly have been a cause of the

1069198v.1

injuries and deaths alleged. In these circumstances, any maritime claims against Cameron in the Bundle A pleadings should also be dismissed. *In re Great Lakes Dredge & Dock Co.*, 624 F.3d at 214 (upholding dismissal of maritime claims for failure to plead specific facts showing that an individual defendant's conduct was a "substantial cause" of the alleged injury).

Giving effect to the B1 Order (as well as the arguments made by Cameron), all of the Bundle A claims against Cameron should be dismissed.

### 3. Motions to Dismiss Cross-Claims

BP, Transocean, Halliburton and Cameron have filed answers to one another's cross-claims, but certain other defendants filed motions to dismiss other defendants' cross-claims, including the cross-claims of Cameron. (*E.g.,* Docs. 2896, 2934, 2946, 2955.)

Under the B1 Order, the B1 Plaintiffs may pursue maritime and/or OPA claims against all named defendants under the allegations of the B1 master pleading. That result can be applied directly to resolve the motions to dismiss the cross-claims of Cameron and others. The effect of the B1 Order is to accept as adequate the allegations of liability in the underlying pleadings with respect to all defendants. Giving effect to the B1 Order, there are adequate allegations to support the cross-claims arising from those underlying allegations.

Moreover, the motions to dismiss the cross-claims ignore the explicit provisions of FED. R. CIV. P. 13(g). "A pleading may state as a crossclaim any claim by one party against a coparty" in specified circumstances. "The cross-claim *may include a claim* that the coparty is *or may be* liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant." (Emphasis added.) In other words, Rule 13(g) permits contribution cross-claims without imposing any "statement of a claim" obligation comparable to Rule 8(a)(2). A

contribution claim can be based on the mere assertion that a coparty "may be liable" for some part of the underlying claim. Giving effect to the B1 Order, all cross-defendants may be liable "for all or part of the" claims asserted against Cameron.

Giving effect to the B1 Order, therefore, all the motions to dismiss Cameron's cross-claims should be dismissed.

### Additional Effects of the B1 Order

One important effect of the B1 Order is to disclose an apparent lack of clarity concerning Cameron's position on key issues. With the Court's indulgence, Cameron respectfully takes this opportunity to attempt to provide that clarity.

Cameron agrees and affirmatively submits that, ***for purposes of general maritime law***, the *Deepwater Horizon* was a "vessel." Cameron agrees and affirmatively submits that, as a matter of maritime law, its flow control equipment was sold to Transocean or a predecessor as an appurtenance to and equipment for the *Deepwater Horizon* as a "vessel." The equipment was unquestionably transported from well to well in the Gulf as an appurtenance to and as equipment for the vessel.

For purposes of its dismissal motions and legal arguments, however, Cameron's position is that the undoubted status of the *Deepwater Horizon* as a "vessel" ***for purposes of general maritime law*** does not resolve whether the *Deepwater Horizon* is an OCS "situs" ***for purposes of OCSLA***. This position is unequivocally established by the Fifth Circuit's decision in *Demette v. Falcon Drilling Co.*, 280 F.3d 492 (5th Cir. 2002). There, the Fifth Circuit majority held that the jack-up rig at issue was ***a vessel*** "***within the meaning of admiralty law***." *Id.* at 498 n.18 (emphasis added). The majority nevertheless concluded that the "***situs requirement of***

1069198v.1

*[OCSLA]* section 1333(a)(1) *is met*." *Id.* at 498 (emphasis added).  One party had argued "that since the Fal-Rig # 85 is a vessel, the OCSLA cannot apply to this case." *Id.*  The Fifth Circuit explicitly held that "[t]his argument has no merit." *Id.*  Cameron's position, therefore, conforms precisely to these holdings in *Demette*.  A "vessel" can be an "OCS situs."

The B1 Order, p. 10, assumed that when latched up and connected to drill a well, the *Deepwater Horizon* qualified as an OCS situs.  In response to footnote 4 of the B1 Order, Cameron would add an additional point.  Because the BOP was an appurtenance of the *Deepwater Horizon* and the BOP was undeniably erected on the seafloor for purposes of drilling the Macondo well from the *Deepwater Horizon*, there should be no doubt that an essential part of the *Deepwater Horizon* was "erected on" the seafloor within the meaning of *Demette*.  In any event, it appears that the B1 Order and Cameron's position are in line.  Though a vessel for maritime law purposes, the *Deepwater Horizon* could well have been an OCS situs for OCSLA choice of law purposes.

Given this clarification of its position, Cameron submits that an important effect of the B1 Order is to facilitate prompt resolution of the indemnity claims asserted by Cameron.  A delay in resolution of indemnity issues enables an indemnifying party to violate its agreements and evade its indemnity obligations during the delay.  Cameron therefore requests that the Court entertain a summary judgment motion from Cameron on indemnity issues by formally establishing a schedule for the motion, briefing of the motion, and an oral hearing for resolution of the motion.

Respectfully submitted,

| | |
|---|---|
| David J. Beck, T.A.<br>    dbeck@brsfirm.com<br>Joe W. Redden, Jr.<br>    jredden@brsfirm.com<br>David W. Jones<br>    djones@brsfirm.com<br>Geoffrey Gannaway<br>    ggannaway@brsfirm.com<br><br>BECK, REDDEN & SECREST, L.L.P.<br>One Houston Center<br>1221 McKinney, Suite 4500<br>Houston, TX  77010-2010<br>713-951-3700<br>713-951-3720 (fax) | */s/ Phillip A. Wittmann*<br>Phillip A. Wittmann, 13625<br>    pwittmann@stonepigman.com<br>Carmelite M. Bertaut, 3054<br>    cbertaut@stonepigman.com<br>Keith B. Hall, 24444<br>    khall@stonepigman.com<br>Jared Davidson, 32419<br>    jdavidson@stonepigman.com<br><br>STONE PIGMAN WALTHER WITTMANN L.L.C.<br>546 Carondelet Street<br>New Orleans, Louisiana  70130<br>504-581-3200<br>504-581-3361 (fax)<br><br>**ATTORNEYS FOR DEFENDANT CAMERON INTERNATIONAL CORPORATION** |

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Brief of Cameron International Corporation Concerning Pending Dismissal Motions has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of September, 2011.

>    */s/ Phillip A. Wittmann*
>    Phillip A. Wittmann

1069198v.1