THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" In the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * * * * * | CIVIL ACTION  MDL NUMBER:   2179  SECTION:   "J"-(1)  JUDGE: CARL J. BARBIER |
| This document relates to: 10-CV-3895, 10-CV-3896, 10-CV-3897, 10-CV-4168 10-4169 and 11-0058 and All Cases in Pleading Bundle B4 | * * * * * | MAGISTRATE JUDGE: SALLY SHUSHAN |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MEMORANDUM IN RESPONSE TO COURT'S ORDER INVITING BRIEFING ON IMPACTED B1 OPINION ON OTHER MOTIONS TO DISMISS**</u>

Robin Plaintiffs (Bundle "B-4") file this Memorandum in response to the Court's Order of September 1, 2011 inviting briefing as to what affect the Court's Order and Reasons of August 26, 2011 has on other motions to dismiss pending before the Court. Robin Plaintiffs filed an opposition to Motion to Dismiss their Bundle B-4 claims filed by the "responder defendants." In its Order and Reasons of August 26, 2011, the Court noted that the Oil Pollution Act ("OPA") provides remedies to plaintiffs who would otherwise not have a cause of action due to the restrictions on recovery imposed by *Robins Dry Dock*. In other words, OPA acts as a "gap-filler" for claims ordinarily not allowed by maritime law. Of course, OPA's displacement of general maritime law limitations only applies to parties designated responsible parties under that act. Claims against alleged tortfeasors who have not been designated responsible parties do not

1

<mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark><mark>

get the gap-filling benefits of OPA. The Robin Plaintiffs have alleged a cause of action against various responder defendants that, if true, would mean that those defendants' actions contributed to the oil spill. But because the Coast Guard did not designate the responder defendants responsible parties, applying *only* general maritime law would mean that any plaintiffs who did not meet the *Robins Dry Dock* criteria would not have a way to recover for the torts of the responder defendants. Thus, the claims of all B-1 plaintiffs could be addressed (via the gap-filling OPA), but the non-*Robins Dry Dock* claims of the B-4 plaintiffs would have no remedy. The solution is the application of the surrogate state law—in this case Louisiana—to supplement the Outer Continental Shelf Lands Act ("OCSLA") and general maritime law.

## Introduction

The responder defendants continue to refer to themselves as "emergency responders" though as the Robin Plaintiffs pointed out in their original opposition, the BANKSTON was the emergency responder. The responder defendants have been sued because they negligently engaged in a fire fighting operation that contributed to the sinking of the DEEPWATER HORIZON. As such, the responder defendants should not be grouped with the BANKSTON.

The responder defendants' allegations that the sinking of the Deepwater Horizon and the resulting massive oil spill was not anticipated by the responding vessels is meritless. The Chouest vessels, at the time of the explosion aboard the Deepwater Horizon, are alleged to be, and were, under charter by BP in connection with its operations. The Seacor vessels were under charter by SMIT and/or Transocean specifically to respond to the fire and to engage in salvage operations. These vessels have the most sophisticated firefighting capabilities in the offshore oil field industry. These vessels are experienced and knowledgeable in fighting offshore vessel fires and are fully aware of the danger of buoyancy and the sinking of said vessels. These vessels are,

and Robin Plaintiffs have alleged they are, primarily designated for offshore oil drilling and production. These defendants are experienced and knowledgeable in the dangers of oil spills related to deepwater drilling. These have vessel firefighting protocol that they are to follow in connection with vessel fires and vessel fires involving oil under pressure. The responder vessels have regular training in fighting fires as what occurred on the DEEPWATER HORIZON, and know of the potential of affecting the buoyancy by the water they place on the fire which is captured by the vessel, and know other potential sinking of the vessel. The responder vessels were fully aware that part of the DEEPWATER HORIZON engaged in oil extraction and was connected via a riser to the ocean bed 5,000 feet below. The responder vessels knew that a vessel, *i.e.* the DEEPWATER HORIZON, would sink from water being placed on it and that that sinking would make the riser would more likely break at the ocean bed which would cause a massive oil spill.

  Not only did the responder defendants know of the importance of the buoyancy issue and the need for the vessel to stay afloat, but that these defendants were again instructed on this issue while they were pumping water on the DEEPWATER HORIZON for at least thirty-six hours after the explosion. The vessels were specifically instructed to only place water on the columns during their firefighting. Instead, the responder defendants continued to pour massive amounts of water into the hull of the DEEPWATER HORIZON even after it began to visibly lose its buoyancy. The responder vessels watched over a twelve hour period—after the rescue had been completed—as the DEEPWATER HORIZON lost buoyancy, listed, and began to slowly sink.

  In the Robin Plaintiffs' original Brief, they pointed out that even land-based firefighters are made aware of buoyancy and stability issues in fighting fires by placing massive amounts of waters on a vessel. These responders were not land based responders, but special marine

responders who have training and experience in fighting offshore oil fires under pressure on vessels. Robin Plaintiffs, in their original Brief, proved that legally the responder defendants would be liable for damages even if some damages were remote and not anticipated. *See* Robin Plaintiffs' original Brief on Memorandum in Opposition to responder defendants' Motion to Dismiss. But because of the responder defendants' experience in offshore drilling and production, they are well aware of the difficulty of an oil spill coming from a drilling operation 5,000 feet down. They are aware of the potential of the millions of gallons of oil that would be spilled from such a drilling operation. They are well aware of the massive environmental and economic impact that would come from such a spill. Even a lay person in a post EXXON VALDEZ world has become aware of the potential massive environmental and economic impact of oil spills. It is simply not believable for experts in offshore oil drilling production, oil spill control, and salvage to claim ignorance or to argue that their actions could contribute to the sinking of the DEEPWATER HORIZON was not foreseeable. Because of the responder defendants' expertise in firefighting, their actions must be considered gross negligence.

Plaintiffs only address this forseeability issue because responder defendants chose to re-urge the issue of foreseeability in their response to the Court's Order and Reasons as to the Motions to Dismiss the B1 Master Complaint and the fact that the Court did not address that issue.

### 1. The OCSLA and Surrogate State Law

The Court in its ruling relative to Bundle B1, held OPA did not preempt, or displace, general maritime law claims against non-responsible parties. Since the Coast Guard is a federal agency that designates who is, and who is not, a responsible party, it is assumed that as of this date the responding vessels are not considered responsible parties. But this Court has determined

that the Deepwater Horizon is a vessel and that the riser attached to the vessel and the sea bed 5,000 feet below, is part of the vessel.  The Court also ruled that the Outer Continental shelf Lands Act (OCSLA) is a basis for jurisdiction as well as general maritime law.  While limiting their application to the B1 claims, the Court examined the legislative history of OPA, and the language of its two savings provisions, and recognized that Congress intended to preserve general maritime law as well as preserve the State's authority with respect to discharge of oil or oil pollution.  Offshore oil exploration drilling and production includes oil spills which are a regular byproduct of said activity, remedies are available under the OCSLA.

The Court rejected the B1 Plaintiffs' reliance on *Yamaha Motor Corp. v. Calhoun*[1] and that case's adoption of surrogate state law as the accident in that case occurred within state territorial waters.  In holding that state law was preempted, the Court expressed its concerns about "giving States the power to govern out-of-state conduct affecting multiple states."[2]  But this is not a situation in which the Plaintiffs are asserting that Louisiana law regulates out-of-state behavior affecting people in multiple states.  Indeed, the Court is correct that Congress did not give states the power to regulate this out-of-state activity, nor do the Robin Plaintiffs dispute that the OCSLA is an area of exclusive federal jurisdiction.  *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 (1981) (citing 42 U.S.C. § 1331(a)(1)).

Rather, 42 U.S.C. §1333(a)(2)(A) provides that the adjacent state law becomes federal law[3] (provided the other requirements are met such as not being inconsistent with existing federal law).  *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355-56 (1969)(holding "[t]hat this law [the OCSLA] was to be federal law of the United States, applying state law only as

---

[1] 516 U.S. 375 (1970).
[2] Order & Reasons at 15.
[3] Provided the three requirements of the *PLT* test are met.  *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043 (5th Cir. 1990).

federal law and then only when not inconsistent with applicable federal law is made clear by the language of the act."). Adopting the law of the adjoining states—even outside state territorial waters—is necessary as "federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems…." *Id*. at 357. Thus, were the Court to adopt Louisiana state law as the surrogate law under the OCSLA, the tenants of federalism are not adversely impacted. True, had this oil spill occurred on the Outer Continental Shelf of Alabama, the results could differ to the extent that the state laws of Louisiana and Alabama may differ, but that scenario was envisioned by Congress when it allowed the adoption of surrogate state law to fill in the gaps of the OCSLA and federal law.

The legislative history shows that Congress recognized the adjoining state's interest and the need in certain situations to adopt state law to "fill federal voids" in the OCSLA. *Rodrigue*, 395 U.S. 358. The Supreme Court in *Rodrigue* cites at length the legislative history of the OCSLA provision adopting adjacent state law, including:

> 'the fact that the full development of the estimated values in the shelf area will require the efforts and the physical presence of thousands of workers on fixed structures in the shelf area. Industrial accidents, accidental death, peace, and order' present problems requiring a body of law for their solution. Since 'as every Member of the Senate knows, the Federal Code was never designed to be a complete body of law in and of itself….'

> *Id*. at 358-59 (quoting 99 Cong.Rec. 6962-6963)(comments of Senator Gordon).

State law adopted under the OCSLA is not a surrender of federal authority over the Outer Continental Shelf, but rather "'[t]hese [state] laws, by the terms of the act, are enacted as Federal law.'" *Id*. at 359. The adopted state law becomes "federal law federally enforced." *Id*. at 365. In other words, state law is federalized for that particular dispute over the Outer Continental

Shelf and is as much federal law as if it had been adopted by Congress.[4]

Here, the adoption of surrogate state law not inconsistent with any applicable federal law does not run afoul of the Constitution. Indeed, it is appropriate given the limited body of federal law and the language of the statute itself, as well as the legislative history. The OCSLA is not the comprehensive statute that OPA is (for defendants designated responsible parties). Thus, the Court is free to apply and should apply Louisiana state law to address the gaps in remedies faced by the B4 plaintiffs.

### 2. The Need to Fill the Gap

For surrogate state law to be able to fill in the gaps of OCSLA, a three part test must be met. In *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, the Fifth Circuit held

> As we articulated the *Rodrigue* test in *PLT*[5] for state law to apply as surrogate federal law, three conditions must be met: "(1) [t]he controversy must arise on a situs covered by OCSLA (i.e. the subsoil seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law."

589 F.3d 778, 783 (2009).

Although the Court in its Order and Reasons did not reach a decision as to whether state law was inconsistent with federal law and it expressed doubt that the situs requirement was met,[6] the

---

[4] This adoption of state law to supplement a federal statute is, of course, not limited to the OCSLA. For instance, the statute of limitation for a civil rights action brought under 42 U.S.C. § 1983 adopts the tort statute of limitation in state in which the court is brought. *Shaw v. McCorkle*, 537 F.2d 1289, 1292 n. 5 (5th Cir. 1976). Thus, a plaintiff filing in federal court in Louisiana has one year to bring such an action and a plaintiff in neighboring Mississippi has three years to bring a civil rights claim in a Mississippi federal court. *See* La. Civ. Code 3492; Miss. Code. 15-1-49. Federal law does not always provide uniform rights or remedies.

[5] 895 F.2d 1043 (5th Cir. 1990).

[6] The Robin Plaintiffs respectfully assert the situs requirement is met. The riser was attached to the floor of the Outer Continental Shelf and the DEEPWATER HORIZON was situated over the Outer Continental Shelf. Citing the legislative history, the Fifth Circuit has broadly construed the situs requirement to find OCSLA jurisdiction. *Laredo Offshore Constructors, Inc. v. Hunt Oil, Co.*, 754 F.2d 1223, 1229 (1985) ("federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production." (internal

Court held that maritime law applied and that barred the state law claims of the B1 claimants. But with the B4 claimants, general maritime does not recognize the claims of any non-*Robins Dry Dock* plaintiffs. Thus, there is no application of general maritime law for those claimants.

Under maritime law, when a gap exists between the recoveries available under state law versus under maritime law, the courts have filled the existing gap and recovery under maritime law with state law. These gap-filling incidents usually grow out of inequities that exist as a result of the limitations of recovery traditionally imposed by general maritime law. For Bundle B1, since OPA applies and because OPA provides a complete remedy for all those who are damaged, there is no gap as to plaintiffs who have sued entities designated Responsible Parties by the Coast Guard. But for Bundle B4 Plaintiffs who might not meet the *Robins Dry Dock* requirement of suffering a physical invasion to property in which they have a proprietary interest or who are oyster fishermen, there is no remedy. The mere application of maritime law would create an enormous gap for the thousands of significantly damaged individuals and entities. In essence with the single application of maritime law, there is no remedy for the vast majority of B4 plaintiffs by virtue of the Court's adherence to the limitations of *Robins Dry-Dock*. The Court, in its reasoning with regard to Bundle B1, recognizes the need to close any gaps that exist. With the recognition of OCSLA as a basis for jurisdiction, the Court cannot deny the logic or rationale in making the adjoining state, Louisiana, surrogate Federal law under OCSLA.

Adopting adjacent state law is not limited to the OCSLA. Courts have repeatedly found ways to adopt or apply state law to give a plaintiff a remedy when the maritime law offered none. For instance, in *Aircrash off Long Island, New York, on July 17, 1996*, 209 F.3d 200 (2d Cir. 2000), the Second Circuit discussed whether the Death on the High Seas Act (DOHSA) and

---

citations omitted)). The riser was connected to the Outer Continental Shelf and the riser connected with the DEEPWATER HORIZON, which of course, was there to drill for oil.

its limits on recovery for an airplane crash approximately eight miles offshore. The *Aircrash* court remarked recognized that

> [t]he federal courts initially recognized a right of action for wrongful death in general maritime law, based largely on humanitarian considerations: 'certainly, it better becomes the humane and liberal character of proceedings in admiralty to give them to withhold the remedy, when not required to withhold it by established and inflexible rules.'"

> *Id*. at 203 (quoting *The Seagull*, 21 F.Cas. 909, 910 (C.C. Md. 1865)).

In finding that DOHSA (and its limitations on recovery) did not apply in federal territorial waters, the Second Circuit relied heavily on *Moragne v. States Marine lines, Inc.*, 398 U.S. 375 (1970), in which a remedy for wrongful death under general maritime law was established. There, the Supreme Court recognized the application of state law as surrogate Federal law under general maritime law. 398 U.S. at 397-98.

The Supreme Court in *Rodrigue*, held that Louisiana law, namely Article 2315 of the Civil Code, was the adjoining state law that applied to an incident on the outer continental shelf. Though the case involved a fixed platform, the Supreme Court held that this adoption

> was done in part because men working on these islands are closely tied to the adjacent State to which they often commute and on which their families live, unlike transitory seaman to whom a more generalized admiralty law is appropriate. Since the Seas Act does not apply of its own force under admiralty principle, and since the Lands Act [OCSLA] deliberately eschewed the application of admiralty principles to those novel structures, Louisiana law is not ousted by the Seas Act, and under the Lands Act it is made applicable.

> *Id*. at 355.

The Supreme Court in *Rodrigue* court continued to differentiate the relative spheres of maritime law and the OCSLA, the adjoining State law, Louisiana, must be made applicable. In *Rodrigue*, the court states ruled out the strict application of maritime law as the drilling platforms in question were, "islands, all be it, artificial ones, and the accident had no more connection with

the ordinary stuff of admiralty than do accidents on piers." *Id*. at 360.  Application of the OCSLA (and surrogate state law) is not limited to the confines of artificial islands or drilling platforms: activities not confined to the oil producing structure itself can be included under the OCSLA umbrella.  *Laredo Offshore Constructors, Inc., v. Hunt Oil, Co.*, 754 F.2d 1223 (5th Cir. 1985) (citing *In re Dearborn Marine Serv., Inc*. 499 F.2d 263, 273 (5th Cir. 1974)).

Here we have the unique technology allowing a vessel in deepwater do what fixed platforms do offshore.  We have the special relationship between the men working on the Deepwater Horizon with the adjacent shore to which they commute to visit their families. This scenario is exactly what is stated by Congress in the *Rodrigue* court which motivated Congress to adopt the adjoining State law under OCSLA.  *See Rodrigue*, *supra*, 395 U.S. at 357.  Even though the firefighting activities of the responder defendants occurred on water, they were contributing to the sinking of a drilling platform with a direct physical connection to the Outer Continental Shelf.

The Court should not, and cannot, leave this enormous gap for those thousands whose sustained damage.  The Court, in its reasoning with regard to Bundle B1, recognizes the need to close any gaps that exist.  The dual existence of maritime law does not close any gap for any non-*Robins Dry Dock* plaintiffs against any party not designated a responsible party.  With the recognition of OCSLA as a basis for jurisdiction, the Court cannot deny the logic or rationale in making the adjoining state, Louisiana, surrogate Federal law under OCSLA.

3. **OPA Responsible Party.**

Seacor and Chouest would be isolated from exposure under OPA if they are the agents of responsible parties.  Should Seacor and Chouest deny this specific agency relationship they had with BP and Transocean, they could potentially be considered responsible parties.  If Seacor is

actually an agent of SMIT and not Transocean, they could be potentially considered an OPA responsible party. A federal court has power to determine whether a party is a responsible party under the OPA. *See e.g. In re Petition of Settoon Towing*, 722 F.Supp.2d 710 (E.D. La. 2010). BP, Transocean, et al., caused the explosion; the responder defendants through gross negligence contributed to the sinking of the DEEPWATER HORIZON, the massive oil spill, and the enormous damage to the economy. Absent agency and after discovery with Robin Plaintiff's experts' testimony, Plaintiffs will request such designation. Because of indemnification agreements, its assumed BP and Transocean have interest in pursuing third-party claims against responder defendants.

## **CONCLUSION**

The application of surrogate state law does not give states the power over the Outer Continental Shelf. As it has done with other federal statutes, Congress did not provide a full body of federal law, but instead mandated that adjacent state law be adopted to fill in the gaps. As such, the Outer Continental Shelf remains an area of "exclusive federal jurisdiction." The adopted state law is simply made into federal law. Congress contemplated the potential for different results in different jurisdictions by allowing the supplementation of the OCSLA, which by definition is outside the territorial waters of any state, with the law of the adjoining state.

Next, although the Court has already expressed its doubts that the situs requirement of the OCSLA has been met, the Fifth Circuit, in cases such as *Laredo* has held that it was Congress' desire for the OCSLA to encompass any location having anything to do with oil production. As the DEEPWATER HORIZON was physically attached to (and extracting oil from) the Outer Continental Shelf, the situs requirement is met.

Finally, there is nothing contrary to the application of Louisiana state law to the non-Robins Dry Dock plaintiffs in bundle B4. Maritime law is only a void for those plaintiffs. The application of the law of the adjacent state merely provides a remedy where none exists.

What the Court created in *Aircrash off Long Island, New York,* for the elite beneficiaries of the deceased, does not help the family of the brave men who lost their lives, or were seriously injured in the Deepwater Horizon explosion. The plane crashed occurred approximately 8 miles offshore. According to the Court's own analysis, because an incident does not occur in state waters, *Yamaha Motor Corp.,* does not apply, and there would be no supplement of maritime law with adjoining state law. As the Outer Continental Shelf is outside state territorial waters and the OCSLA allows the adoption of surrogate state law, there is no requirement as implied in the Court's Order and Reasons that an incident must occur in state waters for state law to be adopted as federal law. Equity demanded relief in the *Aircrash off Long Island, New York* and with commercial fisherman. Maritime law is on the equity side of federal jurisdiction and the survivors of the dead and the injured in the Deepwater Horizon are entitled to the benefit of Louisiana Law as surrogate Federal Law, supplementing maritime law and the OSCLA.

Respectfully submitted,

s/ Lloyd Frischhertz
**Lloyd N. Frischhertz, (#5749)**
Marc L. Frischhertz, (#29194)
Dominick F. Impastato, III, (#29056)
FRISCHHERTZ & ASSOCIATES, L.L.C.
1130 St. Charles Avenue
New Orleans, LA  70130
Telephone:  (504) 523-1500
Facsimile:   (504) 581-1670

And

        /s/ F.Gerald Maples_____
F. Gerald Maples, (#25960)
Carl D. "Todd" Campbell, III, (#31084)
F. Gerald Maples, P.A.
365 Canal Street, Suite 2650
New Orleans, Louisiana 70113
Telephone: (504) 569-8732
Facsimile: (504) 525-6932

Counsel for Plaintiffs Terry Robin et al.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of September, 2011.

        /s/ Lloyd Frischhertz_____
        Lloyd Frischhertz