UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig<br>"Deepwater Horizon" in the Gulf<br>of Mexico, on April 20, 2010 | MDL No. 2179<br>SECTION: J |
| This Pleading applies to:<br>2:10-CV-04182 (Alabama v. BP PLC)<br>2:10-CV-04183 (Alabama v. Transocean, et al) | JUDGE BARBIER<br>MAGISTRATE SHUSHAN |

THE STATE OF ALABAMA'S
BRIEF ON THE EFFECTS OF THE COURT'S B(1) ORDER AND REASONS

The State of Alabama respectfully submits this brief in response to the Court's September 1, 2011 invitation. *See* Doc. 3890.

### HOW THE B(1) ORDER AFFECTS ALABAMA'S CLAIMS

While Alabama respectfully disagrees with portions of the Court's B(1) order, particularly the state-law preemption analysis, *see* B(1) Order at 8-18, we respect the Court's opinion, and its call to apply the B(1) rationale to our claims in this brief. We do so below. In crafting this brief within the parameters of the B(1) order and reasons, however, Alabama does not waive its appellate rights to our previous, primary arguments.

1.  **OPA Claims:** *Viable against RP's*. Under the B(1) order, Alabama can seek removal costs and compensatory damages under OPA from designated "Responsible Parties" ("RP's"), but not non-RP's. *See* B(1) Order at 26. OPA's presentment requirement does not warrant dismissal of Alabama's OPA damage claims because Alabama "sufficiently alleged presentment" in the same manner as "some of the [B(1)] Claimants." B(1) Order at 31; *compare* Doc. 1128 at ¶689 (B(1) complaint) *with* Doc. 1872 at ¶217 (Alabama complaint). Furthermore, dismissal of Alabama's OPA claims is not required because Presentment is a "mandatory

1

conditional precedent," not a jurisdictional bar.  B(1) Order at 31.  Any deficiency in Alabama's presentment should be excused because, as this Court acknowledged, the full extent of our damages "may not be known for many years," years after this MDL will end.[1]  *Id.* at 31, n.16.

2. **General Maritime Claims:**  *All Viable against Non-RP's, Some against RP's*.  Alabama suffered and pleaded physical injury to State proprietary interests.  *See, e.g.* Doc. 1872 at ¶92.  Thus, Alabama's general maritime claims against non-RPs are viable.  *See* B(1) Order at 26.  To the extent that maritime law supplements what the State can recover from RP's under OPA, "supplemental" maritime claims are viable against *all* Defendants.

3. **State-Law Compensatory Damage and Removal Costs Claims:**  *Preempted*.  Applying the B(1) preemption analysis, with which we disagree, Alabama's state-law claims for compensatory damages and removal costs are subject to dismissal to the extent that they do not supplement our federal claims that seek similar recovery.

4. **State Statutory Penalty Claims:**  *Viable*.  Unlike recovery of damages and removal costs, Alabama's penalty claims are not provided for by federal statute or maritime law.  Alabama's statutory penalties therefore supplement federal law and are not preempted.  Furthermore, Congress expressly saved a State's right to impose an additional "penalty (whether criminal or civil in nature)" for unlawful spills in OPA.  *See* 33 U.S.C. §2718(c).

5. **Punitive Damages:**  *Viable*.  Alabama fits within the class of Plaintiffs who can "assert plausible claims for punitive damages against Responsible and non-Responsible parties" because we pleaded viable claims under maritime law.  B(1) Order at 27.  Furthermore, Alabama's Water Pollution Control Act properly supplements federal law by allowing the

---

[1] With tar balls still washing ashore, as recently as last week, the full extent of Alabama's damages will likely be unknown long after the Court's April 20, 2011 monitions date and February 27, 2012 trial date pass, meaning that Alabama's OPA damage claims could never be part of this MDL under the Defendants' reading of OPA.  But our removal costs and maritime claims could, *see* 33 U.S.C. §2717(f)(2), B(1) Order at 31, n.15, resulting in fractured litigation that Congress surely never intended.

sovereign State (but not private citizens) to seek punitive damages from polluters in the case of "willful or wanton conduct." Ala. Code §22-22-9(m).

### THE UNANSWERED STATE-LAW QUESTION: PRIVATE DAMAGES VS. STATE PENALTIES

The Court's dismissal of state-law claims in the B(1) order was necessarily limited to the private plaintiffs' "state common-law claims for nuisance, trespass, and fraudulent concealment, as well as Plaintiffs' FPDPCA claims" for economic damages. B(1) Order at 18. The Court did not dismiss State statutory penalty claims because the private B(1) plaintiffs' did not, and could not, raise them. Below, we show how and why the Court can consistently rule that Alabama's statutory penalty claims remain viable: Exerting our sovereign police power, Alabama has the right to regulate, prevent, and punish pollution in our waters and on our land, and unlike the B(1) plaintiffs' damages claims, our penalties supplement federal law and thus do not disrupt the unity and predictability of admiralty law.[2]

### ARGUMENT

**I.  Unlike the B(1) Private Damage Claims, Alabama's Penalty Claims Are Not Conflict Preempted Because They Supplement Federal Maritime Law.**

Conflict Preemption was this Court's primary reason for dismissing the B(1) Plaintiffs' state-law damage claims. While they exist concurrently, *see* Part II *infra*, maritime and State laws don't always live in harmony. Often, state and maritime law possess differing liability standards for the same act. When they do, courts hold that State law must give way to ensure a predictable, uniform federal maritime system. But when State law instead supplements federal law, thereby avoiding conflict, both apply:

---

[2] The Court acknowledged (at least implicitly) that some State-law claims might not be preempted. *See* B(1) Order at 13 ("[T]o the extent that state law could apply to conduct outside state waters, in this case it must yield to the needs of a uniform federal maritime law"*)*; *Id*. at 17 ("[J]ust as the Supreme Court limited the state-law claims preserved by the CWA savings clause [in *International Paper v. Ouellette*], this Court finds it appropriate to limit state-law claims purportedly saved by OPA.").

- "When neither statutory nor judicially created maritime principles provide an answer to a specific legal question, federal courts may apply state law, provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." 2 Am. Jur. 2d, Admiralty §108;

- "The Supremacy Clause of the Constitution serves to prevent a state remedy from diluting or diminishing a right, or adding a liability, existing under maritime law. On the other hand, federal maritime law or policies may be supplemented or modified by state law, leaving the states a wide scope." 2 C.J.S. Admiralty §12.

Application of conflict preemption to promote uniformity and predictability in federal law explains the divergent holdings in the primary cases cited by the parties: *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 337 (1973); *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996); and *International Paper Co. v. Oullette*, 479 U.S. 481 (1987). As this Court rightly pointed out, the Supreme Court found preemption in *Oullette* because, even though the CWA expressly allows State law to apply, the Court could not allow every affected States' regulations to apply to the same permittee because "application of the affected State's law to an out-of-state source would … undermine the important goals of efficiency and predictability in the permit system." B(1) Order at 16, *quoting Oullette*, 479 U.S. at 496. As this Court also correctly noted, the Supreme Court found no preemption of Florida's oil spill law in *Askew* because "there was no overlap between the relevant federal and state statutes at issue[;]" "there was no available federal statutory remedy for the damages sought in *Askew*." B(1) Order at 17. Furthermore, this Court correctly read *Yahama Motor Corp.* to reject preemption because the State's wrongful death action filled a "substantive gap" in the federal maritime law. *Id.* at 14.

Here, the Court found that the B(1) state-law damage claims sought "remedies [that] are available under both OPA and general maritime law." *Id.* As a result, the Court dismissed the private damage claims because they do not supplement federal law, and cherry-picking among various state standards would disrupt the desired uniformity in maritime law. *Id.* at 11-18.

4

But federal law does not provide for State statutory penalties; State penalties are wholly supplemental to the general maritime law. Accordingly, our supplementary penalty statutes do not disrupt the uniformity of federal maritime law and are thus not conflict preempted. And because Congress specifically preserved a State's right to assess criminal and civil penalties on top of federal liability, *see* 33 U.S.C. §2718(c), Alabama's statutory penalties are in no way preempted—expressly, impliedly, or via conflict. Furthermore, ruling that Alabama's statutory penalties are viable alongside OPA and maritime liability would bring this Court in line with numerous Supreme Court opinions that saved supplemental State laws from claims of preemption by maritime law. *See*, *e.g.*, *Askew*, *supra* (oil pollution); *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715 (1980) (workers' compensation); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960) (air pollution); *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955) (marine insurance); *Just v. Chambers*, 312 U.S. 668 (1941) (wrongful death).

## II.     The Constitution Respects and Preserves the State's Police Power to Enact and Enforce Laws regarding Oil Pollution within our Borders.

The Court's conflict preemption analysis provided a sufficient basis to dismiss all of the B(1) state-law damage claims. But the Court added an additional discussion of Constitutional versus Congressional power at pages 15-16 and footnote 9 of the B(1) order that implies that the Constitution bars State law from applying in a ship-to-shore oil pollution case if the spill commenced in federal waters. Respectfully, we show why this implication is incorrect and should be treated as dicta, leaving intact the Court's sufficient conflict preemption analysis.

1. *The Constitution & the States' Police Power over Ship-to-Shore Injuries*:  As this Court recognized in the B(1) order, "ship-to-shore pollution control is 'historically within the police powers of the States.'"  B(1) Order at 17, *quoting Askew*, 411 U.S. at 337.  That police

power grants Alabama the right to protect our lands, our resources, and our citizens from harm within our borders, harm that includes introducing in our waters and on our land.

Contrary to the implication of the B(1) order, the Framers did not strip the States' police power over seaward events that impacted State borders when they vested the federal Supreme Court with maritime jurisdiction in Article III, §2. Quite the contrary. For more than a century, State/local law—not federal maritime law—governed cases in which events commencing on navigable waters inflicted damage upon the States' land because, like other torts, the locality test for maritime jurisdiction depends on the **site of the injury**, not the site of origination:

- "That [admiralty] jurisdiction in cases of tort depends upon the locality of the injury. It does not extend to injuries caused by a vessel to persons or property on the land. Where the cause of action arises upon the land, the state law is applicable." *The Admiral Peoples* 295 U.S. 649, 651 (1935);

- "[T]he simple fact that it originated there [on navigable waters], but, the whole damage done upon land, the cause of action not being complete on navigable waters, affords no ground for the exercise of the admiralty jurisdiction." *The Plymouth*, 70 U.S. 20, 36 (1865);

- "Under the locality test, a tort occurs 'where the alleged negligence took effect,' rather than where the negligent acts or omissions occurred." *Miles v. Melrose*, 882 F.2d 976, 991 (5th Cir. 1989).[3]

As the Supreme Court put it, not even admiralty's "strongest advocate" would have claimed that shooting "a rocket or torpedo [from a boat] into the city" meant that admiralty jurisdiction applied over state law for claims for burnt buildings, *The Plymouth*, *supra* at 36-37, just as no one would argue against Alabama's right to criminally prosecute someone who fired bullets from a gun in Mississippi that killed someone in Alabama. *See* Ala. Code § 15-2-4 (extending criminal liability to offenses commenced outside the State). In the Framers' minds, and in the

---

[3] *See also* Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 3-5 (2001 4th ed.) ("the tort occurs where the negligent or intentional act takes effect, not where the act occurred"); 2 C.J.S. Admiralty §71 ("the tort is deemed to occur, not where the wrongful act or omission has its inception, but where the impact of the act or omission produces an injury as to give rise to a cause of action").

6

Courts' rulings interpreting their Constitution, if injuries occurred on State land, State law would apply. Maritime law wouldn't.

  2. *Congress' Power*:   Congress—not the Constitution—changed that.  First, Congress extended admiralty jurisdiction to limitation actions regarding land-based injuries (like this one) with the 1884 Amendments to the Limitation of Liability Act. *See Richardson v. Harmon*, 222 U.S. 96, 101-06 (1911). Congress later passed the Admiralty Extension Act, 46 U.S.C. §30101, to extend federal courts' admiralty jurisdiction to all incidents on navigable waters that caused injury upon State land (like this one). *See Askew*, 411 U.S. at 341; 2 Am. Jur. Admiralty §73.

  Congress' extension, of course, created federalism friction: Federal admiralty law now applied where State law historically governed damages suffered on State territory, including ship-to-shore oil spillage. When confronted with this friction in *Askew*, the Supreme Court noted that Congress' passage of the AEA did not "swallow most of the police power of the States over oil spillage." *Askew*, 411 U.S. at 325.   Instead, the Court noted that

> while Congress has extended admiralty jurisdiction beyond the boundaries contemplated by the framers, it hardly follows from the constitutionality of that extension that we must sanctify the federal courts with exclusive jurisdiction to the exclusion of powers traditionally within the competence of the States.

*Id.* at 341.  The Court respected the States' historic police power and "declined … to oust state law from any situations involving shoreside injuries by ships on navigable waters; [t]he Admiralty Extension Act does not pre-empt state law in those situations." *Id.* at 344.

  Accordingly, the notion that the Constitution bars Congress from allowing State law to apply in a maritime case involving sea-to-shore oil pollution has it backwards. The Constitution *preserved* State laws' application over maritime incidents that damaged the State's territory.[4]

---

[4] Although oil clearly hit Alabama's coast, our police power would be just as protected if the Spill had entered our territorial waters without touching our shores. *See* 2 C.J.S. Admiralty §68 ("Where the **injury** occurs in the

Congress changed things by vesting district courts with admiralty jurisdiction in cases like this; thus, the proper question is whether *Congress* intended to strip State laws of their applicability in a case like this. Congress' intent is clear. As the Supreme Court held in *Askew*, Congress did not strip the States' police power over ship-to-shore pollution with the AEA. And as has been fully briefed before, Congress expressly reserved the States' right to impose additional spill-related liability and penalties in both OPA, 33 U.S.C. §2718, and the CWA §311, 33 U.S.C. §1321(o)(2), as well as former OCSLA Title III, 43 U.S.C. §1820(c) (repealed August 18, 1990), which previously governed spills originating on the Outer Continental Shelf.

     3.   *Distinguishing the B(1) Private Damage Claims*:  For the above reasons, we respectfully request the Court treat its B(1) Constitutional framework passage as dicta, rendered unnecessary by its sufficient conflict preemption analysis. That said, we understand the Court's federal versus state waters concern, so we offer three ways the Court can hold that it does not matter to the State's police power that the present Spill commenced in federal waters.

- <u>Site of the Injury</u>:  As detailed in subpart I, jurisdiction hinges on the locale of the injury, not the point of origin. Thus, it does not matter that the Spill originated in federal water because all of Alabama's pleaded injuries occurred within Alabama's borders. While we believe this is the correct analysis, we understand that the same could be said of the vast majority of the B(1) state-law claims that the Court previously dismissed. So, we offer below a situs distinction between the State's penalty claims and the B(1) state-law damage claims.

- <u>Elements of the Offense</u>:  The B(1) state-law damage claims included an element(s) that focused on (in)action at the DWH site; for example, negligence on the rig. But the same is not true of our penalty claims, which penalize action solely within our borders. For example,

---

territorial waters of the State, the general rule is that admiralty will give broad recognition to the authority of the states to create right and liabilities with respect to conduct within their borders.") (emphasis added).

Alabama's Water Pollution Control Act penalizes "the addition [or] introduction … of any sewage, industrial waste, pollutant, or other wastes into waters of the state." Ala. Code § 22-22-1(8); 22-22-9(m). Accordingly, Alabama is not penalizing the Defendants for acts that occurred at the DWH site, or in any federal waters. Consistent with our police power, Alabama only seeks penalties for the introduction of oil into *Alabama* waters. Thus, Alabama's statutory penalties do not exert a "power to govern out-of-state conduct" that concerned the Court. B(1) Order at 15.

- "Maritime but Local": Finally, the Court could rule that a sovereign State's police power over matters of local interest allows the State to statutorily penalize polluters who soil the State's land or territorial waters, regardless of where the Spill originated. *See, e.g.,* 2 Am. Jur., Admiralty § 6 ("where the subject is local the states may legislate so long as their legislation is not inconsistent with valid federal legislation and does not interfere with the proper harmony or uniformity of federal law); *Admiralty and Maritime Law, supra* §4-2 at 164-65 (outlining the "maritime but local" principle).

Under any of these rationales, the Court could hold that Alabama has the sovereign right to enact and enforce laws that govern oil pollution that enters our territorial boundaries. Of course, this Court will still have admiralty jurisdiction over our claims (thanks to the AEA), and the Court could rule consistently with the B(1) order that only those state-law claims that supplement the recovery allowed by general maritime law and OPA may go forward—claims like Alabama's statutory penalties.

### III.     Alabama's Punitive Claims Are Not Subject to Dismissal for Multiple Reasons.

Finally, Alabama's Water Pollution Control Act ("WPCA") also exerts the State's police power by allowing the State alone to seek punitive damages for water pollution resulting from "willful and wanton conduct." Ala. Code §22-22-9(m). Accordingly, there are at least three

9

ways that our punitive damage claims survive the motions to dismiss. First is our primary argument: OPA expressly saves additional State-law liability/penalties, so our state-law punitive claims are viable. *See* 33 U.S.C. §2718(a, c). Second, because Alabama suffered and pleaded physical injury to its proprietary interest, Alabama fits within the class of Plaintiffs who this Court held could "assert plausible claims for punitive damages against Responsible and non-Responsible parties" under maritime law. B(1) Order at 27. Third, Alabama's WPCA properly supplements federal law by filling in any gaps or voids in federal maritime law with regard to the imposition of punitive damages by a sovereign State exercising its police power. *See Yahama Motor Corp*, 516 U.S. 199 (remanding for application of state law to punitive damage claim, among others); *Admiralty & Maritime Law*, *supra*, §5-17 at 245 ("In an admiralty case, punitive damages may be awarded as a supplemental remedy under state law"). Because the only question presently before the Court is whether to dismiss our claims for punitive damages, we go no further. For the time being, the Court should simply deny the motions to dismiss our punitive claims and save for another day/court the intricacies of which punitive law applies to what claim(s).

## CONCLUSION

Preserving our previous arguments to the contrary, application of the Court's B(1) order and reasons would result in the following: (1) Denial of the MTD Alabama's OPA damage and removal costs claims against RPs, (2) Denial of the MTD our general maritime claims against non-RPs, (3) Granting the MTD our state-law claims that seek to recover the same compensatory damages and removal costs as our federal claims, (4) Denial of the MTD our State statutory penalty claims, and (5) Denial of the MTD our punitive damage claims.

September 12, 2011

Respectfully Submitted,

LUTHER STRANGE
*Attorney General, State of Alabama*
*States' Coordinating Counsel*

  /s/ Corey L. Maze                            .
COREY L. MAZE
*Special Deputy Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
Phone: (334) 242-7300
Fax:    (334) 242-4891
Email:  lstrange@ago.state.al.us
              cmaze@ago.state.al.us

Attorneys for the State of Alabama

# CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and the foregoing was also electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send notice of electronic filing in accordance with the procedures established in MDL 2179, on this the 12th day of September, 2011.

  /s/ Corey L. Maze                            .
COREY L. MAZE
  *Special Deputy Attorney General*