## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | |
| "DEEPWATER HORIZON" IN THE | * | MDL NO. 2179 |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | SECTION J |
| | * | |
| Relates to:  No.10-8888 Doc. Ref. No. 63576 | * | JUDGE BARBIER |
| | * | |
| Vessel of Opportunity (VoO) Contract Disputes | * | MAG. JUDGE SHUSHAN |
| | * | |

*******************************************

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR BREACH OF MASTER VESSEL CHARTER AGREEMENT, VESSEL OF OPPORTUNITY PROGRAM

# **Table of Contents**

I. INTRODUCTION ...........................................................................................................1

II. BACKGROUND OF THE VOO PROGRAM .........................................................2

    A.  BP Was Required by Law to Maintain an Adequate Fleet of Response Vessels .........2

    B.  A Massive Response Capability was Required by the Massive Nature of the Spill......4

III. STANDARD APPLICABLE TO A MOTION FOR SUMMARY JUDGMENT ..................6

IV. LAW GOVERNING THE MASTER VESSEL CHARTER AGREEMENTS .......................7

V. THE TERMS OF THE MASTER VESSEL CHARTER AGREEMENT ................................8

    A. The Master Vessel Charter Agreement Is A Time Charter............................................8

    B. The Master Charter Agreement Provides that the Charter Term Commences
       When the Vessel is Made Available for BP's Exclusive Us…………………………10

    C. The Charter Term Terminates On Off-Hire Dispatch Notification, Final
       Decontamination and Return to Moorings..................................................................13

    D. Hire Is Owed Daily From The Beginning To The End Of The Charter Term………………16

VI. APPLICATION OF THE CHARTER TO HOI NGUYEN .....................................................19

VII. CONCLUSION ........................................................................................................................24

# Table of Authorities

**Cases**

*City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, (1995) ...........................................24

*Condrey v. Sun Trust Bank of Ga.*, 429 F.3d 556, (5th Cir. 2005) ............................................................8

*Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, (5th Cir.1995) ......................24

*Dimiceli v. Univ. Healthcare Sys.*, 2011 WL 1671332, (E.D. La. May 3, 2011) ........................................6

*Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, (5th Cir.1995)……………………………..........7

*International Marine Towing, Inc. v. Southern Leasing Partners, LTD,* 722 F.2d 126, (5th Cir. 1983)....10

*Little v. Liquid Air Corp.,* 37 F.3d 1069, (5th Cir.1994)..............................................................................6

*Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc.,* 791 F.2d 1227, (5th Cir. 1986)...............7

*Raby v. Livingston*, 600 F.3d 552, (5th Cir. 2010)........................................................................................7

*Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888, (5th Cir.1994) .....................................................................7

*Southwestern Eng'g Co. v. Cajun Elec. Power Co-op., Inc.,* 915 F.2d 972 (5th Cir.1990) ........................8

*The Rice Company (Suisse), S.A. v. Precious Flowers Ltd.,* 523 F.3d 528, (5th Cir. 2008).......................9

*Thyssen v. Nobility MV,* 421 F.3d 295, 2 (5th Cir. 2005) ............................................................................9

*Weathersby v. Conoco Oil Co.,* 752 F.2d 953, (5th Cir. 1984)..................................................................6,8

*Weber v. Roadway Express, Inc.,* 199 F.3d 270, (5th Cir.2000)..................................................................6

*Zapata Marine Serv. v. O/Y Finnlines, Ltd.,* 571 F.2d 208, (5th Cir.1978) ...............................................8

**Statutes**

30 C.F.R. § 250.219 .......................................................................................................................................2

30 C.F.R. § 254.5 ...........................................................................................................................................3

33 U.S.C. § 1321(c)(3)(B) .............................................................................................................................3

33 U.S.C. § 1321(j)(5)(D)(iii) ........................................................................................................................2

33 U.S.C. § 1321(j)(5)(D)(iv) .........................................................................................................................2

33 U.S.C. §1321(j)(5)(A)...............................................................................................................................2

33 U.S.C. §1321(j)(5)(D)……………………………………………………………….......................14

30 C.F.R. § 400………………………………………………………………….……...........................14

Clean Water Act, Section 311(b)(10), 33 U.S.C. § 1321(b)(10) ................................................................13

Oil Pollution Act, 33 U.S.C. § 2702(a)......................................................................................................13

**Rules**

Fed. R. Civ. 56(c) ..........................................................................................................................................9

INTRODUCTION

As the responsible party for the MC252 drilling project and the massive oil spill that resulted, BP was legally required to identify and retain a fleet of spill response vessels with sufficient capacity to contain the "worst case discharge" of oil flowing into the Gulf.  To meet this obligation, and to mitigate the spill's economic impact, BP solicited commercial fishermen and other vessel owners to train their crews and dedicate their vessels to the MC252 oil spill response effort.  Almost 6000 local fishermen and marine workers enlisted in the so-called "Vessels of Opportunity" (VOO) program, choosing to undertake difficult and often dangerous spill response work rather than sit idle and watch an outmatched response fail.  Of that number, at least 3500 actually deployed.

In order to participate in the VOO program, BP required fishermen to sign a "Master Vessel Charter Agreement" (sometimes called the "MVCA" or "the BP Charter"), which was drafted exclusively by BP.  This time charter agreement exclusively governed participation in the VOO program and the financial relationship between participating vessel owners and BP.  The BP Charter required vessel owners to deliver trained crews exclusively dedicated to BP's service, 24 hours a day.  This exclusive dedication ended only when the "Charter Term" was ended by "redelivery" into the service of the Owner.  Redelivery was accomplished when three conditions were met: (1) the owner received formal "off-hire dispatch notification," and (2) the vessel returned to port (3) after final decontamination.  The beginning and end of dedicated service to BP's spill response mission framed the vessel's "Charter Term" under BP's Charter Agreement. In return for the dedicated, exclusive service of the vessel, BP obliged itself to pay vessel "Hire" for each day during the entirety of the "Charter Term."

BP failed to pay vessel owners like movant Hoi Nguyen hire for each day within the full "Charter Term" as provided in the BP Charter Agreement. Instead, BP paid only for days when the vessel was sent to perform spill-related work on the water. By deviating from the plain terms of the charter that it drafted, BP shifted the cost of maintaining vessels and crew on standby, dedicated to BP's exclusive use, to vessel owners like Hoi Nguyen. As a practical matter, BP found a way to maintain its legally required operational readiness and response capacity without paying for it.

In this Motion for Partial Summary Judgment on Liability, the Plaintiffs' Steering Committee requests that the Court interpret and apply the BP Master Vessel Charter Agreement's commencement, suspension, and termination provisions, and pronounce BP liable for breach of its obligation to fully pay daily hire to movant Hoi Nguyen.

## II. BACKGROUND OF THE VOO PROGRAM

### A. BP Was Required by Law to Maintain an Adequate Fleet of Response Vessels

The Clean Water Act and Minerals Management Service regulations require a pre-approved offshore Oil Spill Response Plan ("OSRP") as a condition to gaining a federal permit to drill an exploratory well on the Outer Continental Shelf. 33 U.S.C. §1321(j)(5)(A); 30 C.F.R. § 250.219. Approved OSRPs "identify and ensure by contract or other means, approved by the President, the availability of private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge… and to mitigate or prevent a substantial threat of such a discharge." 33 U.S.C. § 1321(j)(5)(D)(iii); 30 C.F.R. § 254 et seq. Furthermore, the OSRP must describe the "training, equipment testing, periodic unannounced drills, and response actions… to be carried out under the plan." 33 U.S.C. § 1321(j)(5)(D)(iv).

In the event of an actual spill, "[A]n owner or operator… shall act in accordance with the National Contingency Plan and the *applicable response plan* required under subsection (j) of this section…" 33 U.S.C. § 1321(c)(3)(B) (emphasis supplied). "The [facility/vessel] response plan must provide for response to an oil spill from the facility. You must immediately carry out the provisions of the plan whenever there is a release of oil from the facility." 30 C.F.R. § 254.5.

In BP's applicable OSRP, BP estimated a "worst case discharge" of 250,000 barrels of oil per day associated with the MC252 well. [Exhibit 1, App. H, p. 30, BP *Regional Oil Spill Response Plan* (Revised, June 30, 2009)]. BP calculated the companies BP hired (called "Oil Spill Response Organizations" or "OSROs") could recover 491,721 barrels of spilled oil per day. *Id.* at 32. "The OSROs can provide personnel, equipment and materials in sufficient quantities and recovery capacity to respond effectively to oil spills from the facilities and leases covered by this plan, including the worst case discharge scenarios." [Exhibit 1, Sec. 14, p. 1.]

The key to oil response is speed and capacity. BP's OSRP stated: "BP puts emphasis on a rapid response to releases of all sizes… Pre-planned response objectives and strategies have been developed… to ensure an effective and timely response to an oil spill of any magnitude." [Exhibit 1, Sec. 14, p. 1.] To meet its "rapid response" obligation, BP contracted for National Response Corporation's "Vessel of Opportunity Skimming Systems" (VOSS), "to ensure *availability* of personnel, services and equipment on a 24 hour per day basis." *Id.* With "vessels located throughout the Gulf Coast," BP told the MMS that the VOSS was in "road-ready condition and available to be transported on short notice to the nearest predetermined staging areas(s). The 'road-ready condition' ensures the shortest possible response times for transporting equipment to the staging areas." *Id.* As BP's spill response plan makes clear, the response time

for the deployment of VOSS in the event of an actual oil spill was measured in hours, not days. [*Id.*, Sec. 14, p.2 and App. H.]

      As set out above, it is clear that a road-ready supply of trained, on-call response vessels was the centerpiece of BP's OSRP and a legally required element of BP's response to an oil spill. It is equally clear that BP's assessment of its capacity to respond to a spill was grossly overestimated.

      *B. A Massive Response Capability was Required by the Massive Nature of the Spill*

      Soon after the Deepwater Horizon exploded and sank, BP cascaded offshore response vessels to the area in response to the spill.  However, as the magnitude of the disaster continued to grow, and BP and its paid OSROs were clearly unable to contain and remove the escaping oil in sufficient quantities, it became clear that vessels beyond what the private OSRO contractors could provide would be required.

      To meet demand for response capacity as required by law and as assured in BP's OSRP, BP borrowed from the Exxon Valdez response and established a community-based VOO fleet of offshore, nearshore and inshore responders.  These vessels performed "critical functions such as boom deployment and tending, skimming oil, gathering tar balls, assisting in the capture of oiled wildlife, delivering cargo and providing surveillance."  [Exhibit 2, BP's *Vessels of Opportunity, Guardians of the Gulf* (August 17, 2010).]  The fleet provided BP "a proven *capability* to rapidly deploy a vetted and trained fleet of near shore responders with a deep knowledge and passion for protecting shorelines and communities."  [Exhibit 3 at 38-39, BP *Deepwater Horizon Containment and Response: Harnessing Capabilities and Lessons Learned* (September 1, 2010).]

As early as May 2, BP stated it hired 500 commercial fishing vessels to deploy boom, monitor and skim oil in response to the spill.  [Exhibit 4, BP Fact Sheet (May 2, 2010)].  By July 7, over 5000 vessels were under contract with BP, "in our pool available to put onto the water," with an average of 3000 vessels actively deployed.  [Exhibit 5, BP Fact Sheet (July 7, 2010).]  On September 1, 2010, BP touted the "5,800 vessels employed in the Vessels of Opportunity Program" as a "fleet of committed shoreline and community responders fully integrated into the overall effort."  BP continued: "The response effort has fully embedded and greatly benefited from ... [t]he establishment of a 5,800-vessel VOO fleet..."  [Exhibit 3 at 38-39].

BP entered into time charter agreements with vessel owners because it needed trained emergency response capacity to comply with its legal obligations under federal law and its required OSRP.  Having capacity ready to deploy immediately was a specific commitment of BP's OSRP and a specific legal requirement of BP drilling on federal leases in the Gulf of Mexico.  BP likely needed response capacity in excess of that which might be actually deployed at any given time, since the volume and location of observed oil was unknown and the spill could have actually worsened to the "worst case discharge" scenario.

The profits from successful drilling on federal leases in the Gulf would obviously belong to BP or its partners alone.  Having the emergency response capability set out in its OSRP was a business cost that BP was required to pay in order to have this opportunity for private profit.  BP's failure to pay for dedicated response capability under BP's Charter Agreement is a *de facto* shifting of response costs onto those whose VOO vessels served as "assigned equipment" that BP "fully embedded and greatly benefited from," vessels BP called "the backbone of the nation's ocean-going response to the Deepwater Horizon oil spill."  [Exhibits 2 and 3.]

As set out in the Statement of Undisputed Material Facts and below, BP did not pay vessel owner Hoi Nguyen the agreed charter hire rate for all days within the entire Charter Term. Specifically, BP did not pay for time spent at the dock awaiting further instructions, and did not pay for time spent awaiting final decontamination after Mr. Nguyen received off-hire dispatch notification.  BP's failure to pay constitutes a breach of the Master Vessel Charter Agreement.

III.    STANDARD APPLICABLE TO A MOTION FOR SUMMARY JUDGMENT

The basic legal standards applicable to summary judgment are well-established and were recently summarized by this Court as follows:

> Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citing Fed. R. Civ. Proc. 56(c)). The moving party bears the initial burden of demonstrating to the court that there is an absence of genuine factual issues. *Id.* Once the moving party meets that burden, the non-moving party must go beyond the pleadings and designate facts showing that there is a genuine issue of material fact in dispute. *Id.* "A factual dispute is 'genuine' where a reasonable jury could return a verdict for the non-moving party. If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment is proper." *Weber v. Roadway Express, Inc.,* 199 F.3d 270, 272 (5th Cir.2000) (citations omitted). The non-moving party's burden "is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. [The courts] resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *[The courts] do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.*" *Little,* 37 F.3d at 1075 (emphasis in original) (citations omitted).

*Dimiceli v. Univ. Healthcare Sys.*, 2011 WL 1671332, at *1 (E.D. La. May 3, 2011).

The real issue in this motion is simply the application of the terms of the Master Vessel Charter Agreement.  The construction of a contract presents a question of law for the Court. *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 956 (5th Cir. 1984) ("Interpretation of the terms of a contract is a matter of law.").  While BP will almost certainly argue that it needs discovery

about various factual issues in order to respond to this motion, the *material* facts necessary to interpret the Master Vessel Charter Agreement and determine the commencement and termination of BP's obligation to pay charter hire are straightforward and cannot be disputed. Discovery will not produce any facts that will allow BP to withstand this motion for partial summary judgment on liability.  *See, e.g.*, *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) ("If it appears that further discovery will not provide evidence creating a genuine issue of material fact, the district court may grant summary judgment.").

## IV.    LAW GOVERNING THE MASTER VESSEL CHARTER AGREEMENTS

The entire Master Vessel Charter Agreement drafted by BP and presented to Hoi Nguyen is included as Attachment A to the Declaration of Hoi Nguyen.  [Exhibit 6.][1]  Pursuant to the choice of law provision in Article 19, the Master Vessel Charter Agreement "shall in all respects be governed and enforced in accordance with the general maritime laws of the United States.  In the event, but only in the event, the maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern."   This choice of law provision comports with the rule that "[c]onstruction of maritime contracts is governed by federal maritime law."  *Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888, 894 (5th Cir.1994).  "[T]o the extent that it is not inconsistent with admiralty principles, state contract law may be applicable to maritime contracts."  *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir.1995).  *See also Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc.,* 791 F.2d 1227, 1234 (5th Cir. 1986).

---

[1] The BP Charter which was provided to Hoi Nguyen was a standard form prepared by BP.  The signed copy of the Master Vessel Charter Agreement which BP provided to Hoi Nguyen, as well as those copies which BP produced in discovery, had blank pages in place of pages 2, 4, 6, and 8.  This appears to have been some sort of reproduction error.  There is no issue that the missing pages contained the terms found in the standard form of the agreement. The exhibit attached to Hoi Nguyen's declaration therefore has the missing pages replaced with the corresponding pages from BP's form charter agreement.

A maritime contract should be read as a whole and its words given their plain meaning unless the provision is ambiguous.  *Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 955 (5th Cir. 1984).  In addition, each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole.  *Southwestern Eng'g Co. v. Cajun Elec. Power Co-op., Inc.*, 915 F.2d 972 (5th Cir.1990).  "[W]hen a contract provision is subject to opposing, yet reasonable interpretation, an interpretation is preferred which operates more strongly against the party from whom the words proceeded."  *Zapata Marine Serv. v. O/Y Finnlines, Ltd.,* 571 F.2d 208, 209 (5th Cir.1978) (per curiam).

The BP Master Vessel Charter contains what is commonly referred to as an integration clause:

ARTICLE 24. ENTIRE AGREEMENT; SUCCESSORS

A.      This CHARTER includes any and all Exhibits referenced in this CHARTER and constitutes the entire agreement between the Parties with respect to this CHARTER. This CHARTER cancels and supersedes all prior negotiations, representations or agreements, both written and oral, including any proposals submitted by VESSEL OWNER. The Parties have not been induced by any representation, statements or agreements other than those expressed in this CHARTER. No changes, alterations, or modifications to this CHARTER will be effective unless made in writing and signed by both Parties.

An integration clause "is a 'provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.'"  *Condrey v. Sun Trust Bank of Ga.*, 429 F.3d 556, 564 (5th Cir. 2005) (quoting Black's Law Dictionary 683 (6th ed. 1983)).  In other words, a contract including such a clause represents the entire agreement of the parties.

V.      THE TERMS OF THE MASTER VESSEL CHARTER AGREEMENT

     *A.      The Master Vessel Charter Agreement Is A Time Charter*

As set out below, the Master Vessel Charter Agreement BP provided to Hoi Nguyen has specific provisions defining (1) the commencement of the Charter Term, (2) the termination of the Charter Term, and (3) the daily rate owed for each day during the Charter Term to be employed in an oil spill response.  Given that these terms constitute the law between the parties, and the indisputable underlying facts found in Capt. Nguyen's declaration, determining the amount owed is essentially a mathematical exercise.

A "charter party" such as the Master Vessel Charter Agreement "is 'a specialized form of contract for the hire of an entire ship, specified by name.' … [A] time charter provides for the charterer to obtain the vessel for a fixed period of time, and under a voyage charter, the charterer obtains the vessel for the length of a voyage."  *The Rice Company (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 531 (5th Cir. 2008) (citations omitted).

The Fifth Circuit has succinctly defined the differences between a time charter and a voyage charter as follows:

> A time charter is a contract whereby a vessel is let to a charterer for a stipulated period, in exchange for a remuneration known as hire - a monthly rate per ton deadweight or a daily rate. The charterer is free to employ the vessel as it thinks fit within the terms as agreed, but the ship owner continues to manage his own vessel through the master and crew who remain his servants.
>
> *     *     *
>
> A voyage charter is a contract under which the ship owner agrees to carry an agreed quantity of cargo from a specified port or ports to another port or ports for a remuneration called freight, which is calculated according to the quantity of cargo loaded, or sometimes at a lump sum freight.

*Thyssen v. Nobility MV,* 421 F.3d 295, 297 nn.1, 2 (5th Cir. 2005).

The Master Vessel Charter Agreement used in the VOO program is a time charter.  The Charter is for a period of time, called a "Charter Term," rather than for a particular voyage: "During each Charter Term, the Vessel shall be employed exclusively for Charterer's use…" and the "Vessel Owner shall at all times man the Vessel."  [Exhibit 7, Attachment A, Arts. 2, 6.]  The

Charter provides for payment of "hire" over the course of a Charter Term.  [*Id.* Art. 10 and App. A.]  The Charter allows BP to employ the vessel as it sees fit:  "The vessel shall be available at "Charterer's disposal for operation twenty four hours per day," [*Id.*, Art. 2], to "perform all voyages without delay," [*Id.*, Art. 3], and the "vessel shall not be used for any other purpose other than performance of services during the charter term," [*Id.*, Art. 2].

The Master Vessel Charter Agreement's provisions regarding the commencement and termination of the "Charter Term" are the central issues of law raised by this motion.

> B.     *The Master Charter Agreement Provides that the Charter Term Commences When the Vessel is Made Available for BP's Exclusive Use*

Article 1 provides the following regarding the commencement of the Charter Term:

> VESSEL OWNER agrees to let and CHARTERER agrees to hire the VESSEL from time to time as may be requested by CHARTERER. VESSEL OWNER shall deliver or otherwise make available the VESSEL to CHARTERER and place the VESSEL at CHARTERER'S disposal at a mutually agreed location. The term of the CHARTER shall commence on the date of the departure of the Vessel from the mutually agreed location of delivery into the service of Charterer, and shall be referred to as the "CHARTER TERM."

[Exhibit 6, Attachment A, p. 1.]

"Delivery of the vessel commences the performance of the time charter . . . ."

*International Marine Towing, Inc. v. Southern Leasing Partners, LTD,* 722 F.2d 126, 131 n.8 (5th Cir. 1983).  The "date of the departure of the Vessel . . . into the service of the Charterer" is the date when the owner "delivers or otherwise makes available" the vessel and places the vessel at BP's "disposal."[2]  [Exhibit 6, Attachment A, p. 1.]  The Charter Term thus commences on the

---

[2] The vessel need not physically depart from the dock for the charter term to commence.  A vessel and crew on stand-by, for instance, waiting for exact instructions from Unified Command based on observations of where the oil is, would nonetheless be in the exclusive service of BP and contractually unable to perform any other function.

date BP told the Vessel Owner to bring his or her vessel to a specified location at BP's instruction or was told by BP to keep the vessel in place to await further instruction.

The BP Charter provides that when a vessel is instructed to commence training, the Charter Term has begun.  Article 2 of the Master Vessel Charter Agreement requires the "Vessel" to undergo training "during each Charter Term":  "The VESSEL shall be required to attend training, participate in training exercises and drill to receive the necessary oil spill cleanup credentials as appropriate, to develop skills and procedures for oil spill response and containment."  [Exhibit 6, Attachment A, p. 1.]

The revision of Article 2 that resulted from the lawsuit of the United Commercial Fisherman's Association (E.D. La. 10-CV-1316) makes it even more explicit that training takes place during the Charter Term.  According to BP, Article 2.A. was "revised to make the CHARTER more favorable to the Vessel Owner" and contains the following additional language:

> BP, in cooperation with OSHA and the U.S. Coast Guard, has developed a training and safety program ("HORIZON Response Program" or "HRP") for VESSELS and VESSEL crews *engaged in oil spill response activities under this CHARTER*. The HRP was approved by OSHA on May 7, 2010 and received approval from the U.S. Coast Guard on May 8, 2010. Per OSHA and U.S. Coast Guard directives, the HRP is subject to continuous improvement processes. As of May 10, 2010, BP will ensure that all VESSEL crews *engaged in oil spill response activities* (1) receive all necessary training for such activities as per the HRP, (2) receive all necessary credentials for such activities as per the HRP, and (3) receive all necessary protective equipment for such activities as per the HRP.

[E.D. La. 10-CV-1316, Rec. Doc. 6.]  Revised Article 2 allows no other interpretation but that the crew members undergoing training are engaged in oil spill response activities during a Charter Term.

"Article 10. HIRE" provides further support that training is intended to occur after commencement of the Charter Term. Article 10.B. provides: "CHARTERER shall pay Hire for the VESSEL and the SERVICES to be provided by the VESSEL OWNER *for each CHARTER TERM* in accordance with the following provisions."  One such "following provision" is Article 10.B.5, which provides that training "defined and approved in advance by the CHARTERER" is a vessel service falling within the above-referenced Charter Term.  Article 10.B.5 further provides that during training "[t]he VESSEL shall not be considered under HIRE *for insurance purposes,* therefore insurance shall not be provided during these times." (emphasis supplied.) This limitation on the scope of the hire is reasonable since the vessel will not be underway when the crew is in training.  However, the express limitation of hire for insurance purposes indicates that the vessel *is* on hire for every other purpose.  Had BP intended to exempt another purpose—such as training—it could have stated so explicitly.

Attendance at BP's approved training as required by the Master Vessel Charter Agreement either commenced the Charter Term, or occurred during the Charter Term if it already commenced. While the crew and vessel were undergoing mandated training or waiting for further instructions after that training, they were required to give up other employment and opportunities.  Under the terms of the Charter, BP had hired, and the owner had delivered, exclusive control of the uses of the vessel when the "vessel" underwent training.

As explained in the next section of this memorandum, while BP paid for the day or days the vessel and crew actually trained, BP did not make another payment to vessel owners such as Hoi Nguyen until the vessel physically left the dock to carry out work for BP.  BP's apparent interpretation is that the Charter Term commences when the vessel physically pulls away from the dock.

BP's interpretation is directly inconsistent with the Charter provisions requiring training and exclusivity of use and readiness of vessel and crew while on stand-by.  This interpretation does, however, allow BP to comply with the legal requirement for response capacity mandate, and benefit from the vessel's mandated "road-ready" capability, without compensating its "fleet of committed shoreline and community responders," despite the provisions of law that call for response cost compensation.[3]  Whatever BP's intention may have been, the practical effect was to leave vessel owners out-of-pocket for the cost of maintaining readiness while the vessel awaited BP's instruction.[4]  This approach violated the terms of the Charter.  Furthermore, as BP itself drafted the contract, any ambiguity that may exist must be resolved in favor of Vessel Owner and against BP.

Plaintiff Hoi Nguyen requests a ruling setting forth the meaning of commencement of the Charter Term under the Master Vessel Charter Agreement as a matter of law.

C.   *The Charter Term Terminates On Off-Hire Dispatch Notification, Final Decontamination and Return to Moorings*

The MVCA contains two provisions, Articles 1 and 10, which clearly and simply address the termination of the Charter Term.

First, Article 1.A provides: "CHARTERER may terminate the CHARTER at any time and the CHARTER TERM will terminate as set out in Paragraph B of this Article 1."  The termination mechanism for the Charter Term provided in paragraph B states:

> The VESSEL shall be redelivered to VESSEL OWNER at the close of each CHARTER TERM to the original point of delivery by CHARTERER, as determined by off-hire dispatch notification, unless VESSEL OWNER elects not to return directly to the point of dispatch, in which case, the CHARTER TERM shall cease immediately upon such election.

---

[3] *See* Clean Water Act, Section 311(b)(10), 33 U.S.C. § 1321(b)(10); Oil Pollution Act, 33 U.S.C. § 2702(a).
[4] Many vessel owners made modifications to their vessels to accommodate the response, modifications that further negated the opportunities of other uses.

Article 10.E. contains a more specific provision establishing when the redelivery of the Vessel to the Vessel Owner to the original point of delivery occurs.  As with the commencement provisions, the physical departure and return of the vessel to its original point of delivery is not determinative of Charter Term termination.  Under this Article, the time of redelivery depends on whether the vessel participated in a drill or exercise,[5] or, as was the case in the VOO program, in an oil spill response:

> The termination of the CHARTER TERM (termination of dispatch) is determined by the time the VESSEL is secure in its moorings at the original point of delivery during drills and exercises, and **secure at its mooring after final decontamination** after an oil spill response (which process shall be promptly undertaken without delay).

[Exhibit 6, Attachment 1, Art. 10.E (emphasis supplied)].

Thus, the termination mechanism of the Charter Term provided by the Master Vessel Charter Agreement is by "off-hire dispatch notification" (Article 1), and the close of the Charter Term is the redelivery of the vessel following this notification (Article 10).  In the case of an actual oil spill response, the Charter Term does not end until the vessel has received "final decontamination" and is returned to its moorings.  [Exhibit 7, *Sector Mobile AL Deep Draft Vessel Evaluation and Cleaning Plan* at p. 9;  Exhibit 8, GCIMT's *Mississippi Canyon 252 Vessel Evaluation and Decontamination Plan* (May 6, 2010) at p. 18 (both exhibits providing: "For this incident, a vessel owner's representative must obtain the State and Coast Guard Verifying Officer's final verification of decontamination.")]

---

[5] Companies that undertake oil and gas exploration and production are required to participate in oil spill response drills and exercises under the terms of their respective OSRPs, MMS regulations, the Clean Water Act and the National Contingency Plan.  See, 33 U.S.C. § 1321(j)(5)(D); 30 C.F.R. § 400 et seq.

Thus, for VOO vessels, the termination of the Charter Term occurs when three events have taken place:  (1) the appropriate off-hire dispatch notification is given, (2) the vessel undergoes a final decontamination, and (3) the Vessel is secure at its moorings at the original point of delivery.   The order in which these events occur is not legally significant, but under Articles 1 and 10 all three must occur before the Charter Term is terminated.

Article 18 of the MVCA specifies the contact information for each party, and provides that "[a]ll notices and communications from VESSEL OWNER to CHARTERER and from CHARTERER to VESSEL OWNER shall be addressed as follows..."   As more fully discussed below, BP provided off-hire dispatch notification to VOO participants, including movant Hoi Nguyen, by letters delivered to the address stated in the Charter Agreement:

> Please be advised that pursuant to the terms of the Master Vessel Charter Agreement ("MVCA") BP is providing this "Off-Hire Dispatch Notification" which terminates the MVCA immediately as of the date noted below.
>
> If you have not had your vessel properly decontaminated and an off-hire survey performed please immediately contact your local Vessel of Opportunity coordinator to schedule your off-hire survey and decontamination as soon as possible.

[Exhibit 6, Attachment B (excerpted)].

This letter directly tracks the language of the BP Charter.   It specifies that "Charterer: BP Exploration & Production Inc." is providing "off hire dispatch notification" under the terms of the MVCA.  The addresses of Charterer, BP, and Vessel Owner, Hoi Nguyen, are those provided in the Notices provision of Article 18 of the BP Charter.

BP intentionally chose this formal "Off Hire Dispatch Notification" process as a prerequisite to ending the Charter Term.  Proof of BP's intent is found by comparing the BP termination provision to the provision regarding a vessel owner's right to terminate the Charter

Term.  Article 10(E) provides:  "If termination is by VESSEL OWNER, termination of dispatch shall be as mutually agreed by Charterer's Group Supervisor and VESSEL OWNER."  BP could have given itself the same informality, BP's Group Supervisors the same binding authority, to allow informal or oral dockside Charter Term terminations.  For reasons unknown, BP did not.  BP is bound to the notification process it elected and actually followed.

Again, while the order in which the three events necessary for the Charter Term to end is not significant, all of the events must occur.  For example, if BP sent the appropriate off-hire dispatch notification as required by the Charter, the vessel had to wait two weeks to be decontaminated, and the vessel then took an additional day to return to the point of delivery, Charter Hire would be owed for an additional 15 days following the off-hire dispatch notification.   This makes sense, because the vessel could not be used for anything else until after it was finally decontaminated and returned to its home port.

 In a different factual scenario, if the vessel had been through final decontamination, proceeded back to the original point of delivery to await further instruction from the Charterer, and then fourteen days later received the required off-hire dispatch notification, Charter Hire would be owed for an additional fourteen days following the final decontamination.  Again, the vessel would have to be "employed exclusively for Charterer's use" 24 hours a day during this period.

BP counts days on hire as if the Charter Term ended daily with each deployment.  As stated above, this ignores both the contract and the benefits received by BP for vessels on standby.  Plaintiff Hoi Nguyen requests a ruling setting forth the meaning of the termination provisions of the Charter Term under the Master Vessel Charter Agreement as a matter of law.

D.    *Hire Is Owed Daily From The Beginning To The End Of The Charter Term*

As explained above, the Master Vessel Charter Agreement is a time charter. BP could separately negotiate the performance and compensation for special services under Charter Article 10.B.7, but the basic unit of compensation is derived from the length of the vessel and the number of days in the Charter Term. Article 10. HIRE provides:

> B. **CHARTERER shall pay Hire for the VESSEL *and* the SERVICES** to be provided by the VESSEL OWNER for each CHARTER TERM in accordance with the following provisions….
> 1. For a CHARTER TERM during an actual oil spill the rate is (as stated in Exhibit "A") a day rate.

[Exhibit 6, Attachment A].

Charter Exhibit "A," "[a]ttached to and made part of the Master Vessel Charter Agreement" provides the day rate applicable during the Charter Term.  "As full and complete compensation to VESSEL OWNER for SERVICES satisfactorily performed *and for assuming obligations hereunder*, CHARTERER, for and on behalf of OWNERS, will pay VESSEL OWNER on the basis of the fixed rates (FIXED RATES), set forth below in PARAGRAPH 2."  [*Id.* (emphasis supplied).] Charter Agreement Exhibit A, Paragraph 2 sets forth a schedule of day rates.  For vessels like the *My Angel II* that are greater than 65 feet in length that rate is $3,000 per day.  In addition, Paragraph 2 provides that rate for crew services will be $200 per 8 hour day per crew member.  In the event a 12 hour day was worked the crew member rate was $300 per day.

Article 12 of the Master Vessel Charter Agreement includes specific provisions detailing the circumstances in which, because the vessel itself cannot provide services, compensation is not owed.  These circumstances include breakdowns that are not the fault of the Charterer, collisions, deficiency of crew and stores, refusal to sail, and "any other similar accident or event whatsoever either hindering or preventing the full working of the VESSEL."  Absent from the Article 12 list is any intimation that BP could keep a vessel available and at its disposal, but

suspend payment simply because **BP** decided not to use the vessel for some period during the Charter Term, regardless of whether that decision was based on weather conditions, Coast Guard instructions, delay during information gathering, non-appearance of oil or any other reason. Article 12's clear enunciation of reasons for suspending compensation serves to emphasize the clear requirement that BP must pay compensation daily throughout the Charter Term absent one of the articulated reasons.  In short, BP owes the fixed compensation rate to the vessel owner for every day following commencement until the termination of the Charter Term.

The provisions establishing a continuity of hire from commencement at training to termination after notification and decontamination make sense considering the obligations that the Vessel Owner undertakes in these charters.  The central obligation of the Vessel Owner during the Charter Term is to be prepared to conduct clean-up operations for BP and to hold the vessel ready exclusively for BP's use. Article 2.A  provides:

> During each CHARTER TERM, the VESSEL shall be employed exclusively for CHARTERER'S use.…The VESSEL *shall be available and at CHARTERER's disposal for operation twenty-four (24) hours per day*. *The VESSEL shall not be used for any purpose other than performance of SERVICES during the CHARTER TERM.*

Again, Article 16, CHARTERER'S USE OF VESSEL, provides:

> During the CHARTER TERM the VESSEL OWNER shall not make any other use of the VESSEL without CHARTERER's prior authorization.

The obligation to hold the vessel available and ready for BP's exclusive use is real and valuable consideration.  As set out in the Factual Background, the MC252 spill was a huge oil spill of indeterminate trajectory, and BP was required to contract a fleet of commensurate size to meet its obligations under Section 311 of the Clean Water Act.  BP bargained for, and publicly touted, the Vessel Owner's charter obligation to serve in a "fleet of committed responders" with "assigned equipment" in a "road-ready" capacity.  BP could not meet its regulatory mandate to

provide dedicated vessels without chartering, and paying for, the exclusive use of the private vessels covered by the Master Vessel Charter Agreement.  BP mobilized a fleet of private citizens and property that were obligated to be ready to jump when BP said so. That sort of response capacity is not free, as BP well knew when it entered these Charter Agreements. The Charter obligation to pay for that benefit only ends with the occurrence of the above-described charter-terminating events.

## VI.    APPLICATION OF THE CHARTER TO HOI NGUYEN

BP clearly violated the terms of the charter with respect to Hoi Nguyen.   The following facts are undisputed, and confirm that BP has not paid Mr. Nguyen for the entire Charter Term.

Hoi Nguyen is a shrimper and the owner of the fishing vessel *My Angel II*, home-ported in Biloxi, Mississippi.  [Exhibit 6, Declaration of Hoi Nguyen.]  On May 12, 2010 Hoi Nguyen signed a Master Vessel Charter Agreement with BP Production Company Americas, Inc. for the hire of the *My Angel II*.  Mr. Nguyen only reads very simple English and the terms of the agreement were explained in Vietnamese at a meeting at Point Cadet, Biloxi, Mississippi.  This Master Vessel Charter Agreement was assigned the number 58060.   [Exhibit 6, attachment A.] The Agreement was supplied by BP and presented to Hoi Nguyen for signature.  *Id. ¶* 2.

Under the terms of the Master Charter Agreement the hire for the *My Angel II* was $3,000 per day.  [Exhibit 6, Attachment A.]

Under the terms of the Master Charter Agreement the vessel was paid for crew members at $200 per 8 hour day, and $300 per 12 hour day.  [Exhibit 6, Attachments A and C.]

From the date of signing forward, Hoi Nguyen held the *My Angel II* prepared and ready for use by BP.  [Exhibit 6 ¶ 3-4.]

On or about May 14, 2010, Hoi Nguyen and the members of his crew attended a four hour safety training class in Biloxi, Mississippi in preparation for undertaking their obligations under the Master Charter Agreement.  The date that the vessel received this training marked the date that the vessel was in the exclusive service of BP, and started the Charter Term.  Following this class, the *My Angel II* was at all times in the exclusive service of BP.

On May 30, 2010, Hoi Nguyen was instructed by BP to depart Biloxi, Mississippi.  From May 31 until mid-July, 2010, the *My Angel II* was out on the Gulf of Mexico, or was back at the dock.  The *My Angel II* got instructions over the radio about what to do.  *Id.* ¶ 5.

In mid-July the *My Angel II* was in Mobile Bay, and Hoi Nguyen was instructed to "get your boat cleaned and go home" to Biloxi.  En route back to Biloxi he received a gross decontamination from a barge located near the Dauphin Island Bridge.  He did not observe any Coast Guard personnel present.  The area in which the boat was cleaned was not boomed off.  Mr. Nguyen did not receive a certificate or other document.  In fact, oil remained on the vessel and its lines following this gross decontamination.  *Id.* ¶ 6.

About July 18, 2010, *My Angel II* returned to Biloxi, Mississippi.  Mr. Nguyen was apparently given a document to sign which is titled "Off-hire Deactivation Check Sheet."  This document was filled out by someone other than Mr. Nguyen.  Mr. Nguyen confirms that his signature appears on this document, but does not recall the document or how it was provided.  Mr. Nguyen can read only limited English.  *Id.* ¶ 7.

After July 20 the *My Angel II* remained in Biloxi.  Pursuant to the terms of the Master Charter Agreement, Hoi Nguyen did not use the *My Angel II* or hire her to any third party, but held the vessel in readiness for the exclusive use of BP.  Mr. Nguyen continued to send invoices under the Charter Agreement.  *Id.* ¶ 8.

Mr. Nguyen did not receive any further instructions as to the disposition of *My Angel II* or its operations under the Master Charter Agreement until he received a letter at the address stated in the Charter Agreement which stated that it was "Off Hire Dispatch Notification" and the charter was terminated as of August 27, 2010 "pursuant to the terms of the Master Charter Agreement." *Id.* ¶ 9, attachment D.  The notice further instructed Mr. Nguyen that "if you have not had your vessel properly decontaminated and an off-hire survey performed please immediately contact your local Vessel of Opportunity Coordinator to schedule your off-hire survey and decontamination as soon as possible."

Shortly after the Off Hire Dispatch Notification was received, Hoi Nguyen was informed that the *My Angel II* was on a list at the Point Cadet Marina in Biloxi for decontamination in Bayou La Batre, Alabama on September 16, 2010.  Capt. Nguyen called a person he knew to be working with BP and confirmed that the *My Angel II* was scheduled for final decontamination on that date.  *Id.* ¶ 9.

On September 16, 2010, the *My Angel II* was decontaminated in Bayou La Batre and received a Verification of Final Decontamination from the United States Coast Guard.  *Id.* ¶ 9, Attachment E.  At the time of this final decontamination he was instructed to take the lines that had oil on them off the boat, bag them and dispose of them.  *Id.* ¶ 9.

On September 17, 2010, the *My Angel II* returned to Biloxi and was safely moored.  *Id.* ¶ 9.

A few days later somebody apparently connected with the VOO program called Mr. Nguyen and instructed him to send an invoice for ten days.  However, Mr. Nguyen had already sent invoices for his time per the terms of the Charter Agreement.  *Id.* ¶ 10.

As set out above, the "date of the departure of the Vessel . . . into the service of the Charterer" is the date when the owner "delivers or otherwise makes available" the vessel and places the vessel at BP's "disposal."  With respect to Mr. Nguyen and the *My Angel II,* this date was May 14, 2010, when the vessel and crew received their training.  Mr. Nguyen was paid the charter hire for one day for the training that the vessel and crew received, and for the period of May 31, 2010 through July 20, 2010.  This payment for the training and daily hire totaled $208,340.  *Id.* ¶ 11.  However, Mr. Nguyen was not paid charter hire for the period May 15 through May 30, 2010.

The Charter Term ended on September 17, 2010, because that was the date on which the *My Angel II* had (1) received "Off-Hire Dispatch Notification," (2) received final decontamination, and (3) was secure at its moorings in Biloxi, Mississippi following the final decontamination.  In October 2010, BP paid Mr. Nguyen an additional $34,200.  This amount is equal to 9 days of the vessel hire rate with four crew members working an 8 hour day.  In March 2011, BP paid Mr. Nguyen another $7,600.  This was equal to two days of the vessel hire rate with four crew members working an 8 hour day.  In other words, for the period from July 21 through September 17, Mr. Nguyen was paid the agreed upon charter hire for only 11 days, rather than the 58 days in this period.

Thus, Mr. Nguyen was not paid charter hire for two periods when the *My Angel II* was within the Charter Term as defined by the BP Charter Agreement.   These periods were May 15-30, 2010, and 47 of the 58 days in the period July 21 through September 17, 2010, for a total of

61 days.  Under Article 10 the "VESSEL OWNER *shall* be compensated at the end of the CHARTER TERM."[6]

Based on its behavior, BP apparently considered July 20, 2010 the Charter Term's end date; after all, the company paid Mr. Nguyen through July 20.   However, it is clear that the *My Angel II* did not receive final decontamination at this point, nor did it receive any off-hire dispatch notification per the terms of the BP Charter Agreement.  Final decontamination – as clearly documented by the Verification of Final Decontamination - did not occur until September 16, 2010.  This was the point at which the Coast Guard certified the final decontamination, and the oiled equipment was removed from the vessel for disposal per the terms of BP's decontamination protocol.  Oiled lines and other equipment were left on the vessel after the interim decontamination in July.  [Exhibit 6 ¶ 6.]

BP may argue that the "Off-hire Deactivation Check Sheet" constitutes proof that the Charter Term ended on or before July 20, since in the blank for "Off hire date" that form contains the date "7-19-10."  In addition, the word "yes" is circled on the form next to the phrase "please confirm decontamination procedure was completed."  However, this form cannot overcome the clear language of the contract, which was drafted by BP, regarding the start and finish of the Charter Term.  It is undisputed that final decontamination occurred on September 16, 2010, and BP is liable under the contract for payments through that date.

In short, Mr. Nguyen was owed charter hire for each day from the beginning of the Charter Term to the end.  In addition, a vessel owner who was not paid timely under the terms of a charter agreement is owed reasonable interest on the amounts owed from the date that the

---

[6] If the vessel term is longer than 14 days, the vessel owner has the option of invoicing every two weeks rather than waiting for the end of the charter term. Many owners took advantage of the invoicing option at times throughout the charter term, but it did not change the requirement that compensation *shall* be paid at the end of the charter term.

payment was due. *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204

(5th Cir.1995); *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995).

Capt. Nguyen is owed interest until paid.

VII.     CONCLUSION

        Plaintiff Hoi Nguyen, and many others in his situation, continue to suffer from BP's

refusal to honor the clear terms of its own Master Vessel Charter Agreement.  Under the

unambiguous terms of the Master Charter, the Charter Term ended with return to moorings, a

written notice and decontamination.  The Court should find BP liable to pay its dedicated "vessel

of opportunity" fleet the daily rate for the entirety of the Charter Term.  Reserving all rights to

claim damages and compensation for recovery of removal costs under OPA90 and the Clean

Water Act, Section 311(b)(10) incurred by "vessel of opportunity" plaintiffs, the Plaintiffs

Steering Committee requests that the Court provide finality on the three contractual issues

posited herein.


        This 15ᵗʰ day of September, 2011.


Respectfully submitted,


    /s/   Stephen J. Herman              /s/ James Parkerson Roy
Stephen J. Herman, La. Bar No. 23129    James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP         DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                      556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113            Lafayette, Louisiana 70501
Telephone: (504) 581-4892               Telephone: (337) 233-3033
Fax No. (504) 569-6024                  Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*            *Plaintiffs Liaison Counsel*

*Of Counsel*:
**JOEL WALTZER, ESQ.**
**ROBERT WIYGUL, ESQ.**
**CLAY GARSIDE, ESQ.**
*Counsel for Plaintiff, Hoi Nguyen; and,*
*On Brief.*

## PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS,<br>MITCHELL, ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office:  (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY  10003<br>Office:  (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail:  rgreenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER & IMPREVENTO<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office:  (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN,<br>PORTIS & MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office:  (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail:  rhon.jones@beasleyallen.com |
| Elizabeth J. Cabraser<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA  94111-3339<br>Office:  (415) 956-1000<br>Telefax: (415) 956-1008<br>E-Mail: ecabraser@lchb.com | Matthew E. Lundy<br>LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>501 Broad Street<br>Lake Charles, LA  70601<br>Office:  (337) 439-0707<br>Telefax: (337) 439-1029<br>E-Mail:  mlundy@lundylawllp.com |
| Philip F. Cossich, Jr.<br>COSSICH, SUMICH, PARSIOLA & TAYLOR<br>8397 Highway 23, Suite 100<br>Belle Chasse, LA  70037<br>Office:  (504) 394-9000<br>Telefax: (504) 394-9110<br>E-Mail: pcossich@cossichlaw.com | Michael C. Palmintier<br>deGRAVELLES, PALMINTIER,<br>HOLTHAUS & FRUGE'<br>618 Main Street<br>Baton Rouge, LA  70801-1910<br>Office:  (225) 344-3735<br>Telefax: (225) 344-0522<br>E-Mail:  mpalmintier@dphf-law.com |

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum will be filed into the record using the Clerk's ECF electronic filing system, and will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, this 15th day of September, 2011.

/s/ Stephen J. Herman and James Parkerson Roy