

39032614

Aug  1 2011
11:46PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| …………………………………………….... | : | |

### THE BP PARTIES' RESPONSES AND OBJECTIONS TO
### HALLIBURTON ENERGY SERVICES, INC.'S INTERROGATORIES

Defendants BP Exploration & Production Inc. ("BPXP") and BP America Production Company ("BPAP") (collectively, "BP" or the "BP Parties"), by their undersigned Counsel, and, pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, hereby submit the following responses to Halliburton Energy Services, Inc.'s ("Halliburton" or "HESI") Interrogatories.

### SPECIFIC RESPONSES AND OBJECTIONS

The BP Parties respond as follows to Halliburton's interrogatories, subject to and without waiving their general objections, each and every one of which are specifically incorporated into each individual response below.[1]

### INTERROGATORIES

## INTERROGATORY NO. 1:

Identify the exact location of every centralizer you used on the 9 7/8" x 7" production casing on the Macondo Well.

---

[1] The BP Parties' general objections are set forth at pages 42- 51.

**RESPONSE TO INTERROGATORY NO. 1:**

The BP Parties object to this request on the grounds that it seeks information already in Halliburton's possession.  The BP Parties additionally object that the term "exact location" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties refer to, *inter alia*, the September 8, 2010 *Deepwater Horizon* Accident Investigation Report and Appendices.  In addition, the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, and the BP Parties therefore refer Halliburton to, *inter alia*, documents previously produced at BP-HZN-2179MDL00317443, BP-HZN-BLY-00167748, the BP Parties' Cross-Claims against Halliburton, Cameron, Transocean, served on all counsel April 20, 2011, as well as document productions (the IIT Report and the backup materials and analyses produced in support thereof), in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 2:**

Were any unused centralizers delivered to the Deepwater Horizon returned to Weatherford?  If so, state the date, time and method of return.

**RESPONSE TO INTERROGATORY NO. 2:**

The BP Parties object that the terms "delivered," "returned," and "method of return" are vague and ambiguous.  The BP Parties further object to this interrogatory to the extent it seeks information that is likely more readily available from other parties in this litigation, such as Weatherford.

Subject to their specific and general objections, the BP Parties state that they are aware of fifteen centralizers provided by Weatherford to the United States government and that are currently in the possession, custody and control of the United States government. To the extent those are the fifteen centralizers sent to the *Deepwater Horizon*, they would have been sent back to Weatherford as a part of BP's normal business operations, which includes transport from the *Deepwater Horizon* to Houma and then returned to Weatherford.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 3:**

Identify the BP representatives who communicated with Weatherford about the design or type of centralizers and/or stop collars to be used on the 9 7/8" x 7" production casing on the Macondo Well. Identify the date of such communications and the method of communication.

**RESPONSE TO INTERROGATORY NO. 3:**

The BP Parties object that this request is unduly burdensome insofar as it requires the BP Parties to provide information concerning each and every communication between BP and Weatherford about centralizers and stop collars. The BP Parties additionally object that the term "BP representatives" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties state that there are numerous communications between BP and Weatherford concerning the centralizers and/or stop collars for the production casing for the Macondo well. The BP Parties identify the following communications between Brian Morel, Brett Cocales and Weatherford concerning the centralizers and stop collars for the Macondo Well. Among other communications, Mr. Morel and Bryan Clawson at Weatherford exchanged correspondence concerning the availability of

centralizers for the Macondo Well.  Mr. Cocales and Mr. Clawson exchanged correspondence on March 31, 2010 concerning the availability of centralizers for the Macondo Well.  Mr. Cocales and Mr. Clawson spoke on April 15, 2010 regarding the availability of centralizers for the Macondo well.  Mr. Clawson emailed Mr. Cocales on April 15, 2010 concerning the availability of 31 centralizers with newly-designed stop collars.  Mr. Morel then emailed Mr. Clawson on April 16, 2010 to ask for drawings of the stop collars.  *See e.g.* BP-HZN-DHTF00262460; BP-HZN-DHTF00072620.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 4:**

Identify all BP wells since 2005 wherein BP utilized the Weatherford bow spring centralizers of the type/design BP ordered for the 9 7/8" x 7" casing on the Macondo Well.  For each well, identify the number of centralizers used and the depth of the well.

**RESPONSE TO INTERROGATORY NO. 4:**

The BP Parties object that the phrase "centralizers of the type/design BP ordered" is vague and ambiguous.  The BP Parties further object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 5:**

Identify all BP wells in the Gulf of Mexico since 2005 wherein a long string production casing without a tie back was not used.

**RESPONSE TO INTERROGATORY NO. 5:**

The BP Parties object to identifying all instances in the last six years in which BP chose not to use a long string production casing. The BP Parties additionally object that the term "long string production casing without a tie back" is vague and ambiguous. The BP Parties further object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to their specific and general objections, the BP Parties state that the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, therefore, in accordance with Federal Rule of Civil Procedure 33(d), the BP Parties refer Halliburton to documents containing information concerning well design in the Gulf of Mexico which are publicly available through the BOEMRE. Further, the BP Parties refer Halliburton to documents previously produced at BP-HZN-BLY00000001 to BP-HZN-BLY00000372 as well as the database of information produced by the United States Government in these proceedings.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 6:**

Identify all BP wells wherein BP circulated at least one full bottoms up immediately prior to a final cement job.

**RESPONSE TO INTERROGATORY NO. 6:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome in that it is not limited in geographic scope. The BP Parties further object to

this interrogatory on the grounds that Halliburton's use of phrase "immediately prior to a final cement job" is vague, ambiguous, and undefined.  Additionally, the BP Parties object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 7:**

Explain BP's policies and procedures regarding the design and interpretation of negative tests, and how such policies and procedures are communicated to BP well site leaders.

**RESPONSE TO INTERROGATORY NO. 7:**

The BP Parties object to this interrogatory as vague, ambiguous and overbroad as to "BP's policies and procedures regarding the design and interpretation of negative tests," because that phrase may be interpreted to apply to a range of policies and procedures that apply to these topics in various ways and because the details of the development and communication of any particular negative test may be different depending on the circumstances.  The BP Parties further object to this interrogatory to the extent that it calls for information likely in the possession of other parties, *e.g.,* the Transocean or other drilling contractors that worked to set up, monitor, perform and interpret negative tests.  The BP Parties further object to this interrogatory to the extent that it implies that BP or its well site leaders are responsible for designing and interpreting negative tests.

Subject to their specific and general objections, the BP Parties state that BP's policy specified the requirement to conduct a negative pressure test.  The negative test procedures used at various wells would have been developed by a combination of the drilling contractor and the BP engineering and operations teams depending upon the particular circumstances of a given

well. Specifically at the Macondo Well, BP, Transocean, MI Swaco and other contractors were involved in designing and interpreting the negative test.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 8:

What safety steps should be undertaken before underbalancing a well, and in particular, what safety steps should have been taken before underbalancing the Macondo Well on April 20, 2010?

## RESPONSE TO INTERROGATORY NO. 8:

The BP Parties object to this interrogatory as vague, ambiguous and overbroad as to the phrases "safety steps," "should be undertaken," and "should have been undertaken." The BP Parties also object to this interrogatory as misleading to the extent that it suggests that certain required actions were not taken prior to underbalancing the Macondo Well on April 20, 2010. The BP Parties further object to this interrogatory to the extent that it calls for information likely in the possession of other parties, *e.g.,* the Transocean or other drilling contractor rig crews that establish policies and procedures outlining steps to be taken prior to underbalancing a well. Additionally, the BP Parties object to this interrogatory to the extent that it implies that BP or its engineers are responsible for cementing or, in particular, cementing the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that the steps taken prior to underbalancing a well are determined by a combination of the drilling engineering and operations teams depending upon the particular circumstances of a given well, including input from BP, Transocean and other rig personnel as appropriate, as well as compliance with

applicable regulations, industry standards, and company standards.  On the Macondo Well, such operations were conducted in accordance with: (1) relevant BP company policies and procedures, including but not limited to the Drilling and Well Operations Practice (DWOP) and other relevant Engineering Technical Practices referenced therein, and (2) relevant Transocean company policies and procedures, including but not limited to the Transocean Operations Manual, the Transocean Field Operations Handbook, and the Transocean Well Control Handbook.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 9:**

Identify the job roles and responsibilities of the BP engineers as they relate to cementing, and in particular, the cementing of the production casing in the Macondo Well. In your response, identify the engineers who had such roles and responsibilities for the Macondo Well production casing.

**RESPONSE TO INTERROGATORY NO. 9:**

The BP Parties object to this interrogatory as vague, overbroad, and ambiguous as to the meaning of the phrases "roles and responsibilities," "BP engineers," and "relate to cementing." The BP Parties further object to this request to the extent that it calls for information likely in the possession of other parties, *e.g.,* Halliburton, which was responsible for designing and executing the cement job of the production casing in the Macondo Well.  The BP Parties further object to this interrogatory to the extent that it implies that BP or its engineers are responsible for cementing or, in particular, cementing the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties refer HESI to their response to Interrogatory No. 28 in The BP Parties' Responses and Objections to Plaintiffs'

Interrogatories, Requests for Production, and Requests for Admission ("December 8th Responses"), served on all counsel December 8, 2010, regarding the employees involved in operations relating to the cementing of the production casing in the Macondo Well.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 10:**

Identify and describe all pay zones and sands in the Macondo Well and list the pore pressures and depth for each.

**RESPONSE TO INTERROGATORY NO. 10:**

The BP Parties object to this interrogatory as "pay zone" and "sands" are vague and ambiguous.  The BP Parties further object to this interrogatory as overbroad and unduly burdensome in that it seeks information that is available from Sperry-Sun data; materials in Halliburton's possession, custody and control and from various depositions in this case.  The BP Parties further object to this interrogatory to the extent that it is vague and ambiguous as to time as downhole conditions can change after well flow.

Subject to these specific and general objections, the BP Parties respond that there are multiple methodologies of measuring downhole pressures and estimating downhole pore pressures.  Not every sand in the well had a direct measurement of the pore pressure and some of the following numbers are estimated pore pressures, subject to the uncertainties of downhole estimations.  Further, the following pore pressure and depth information is the reasonable estimate of well conditions prior to April 20, 2010.  The estimated sands in the Macondo Well and pressure (in psi) include:

| TVDSS - Top | TVDSS - Bottom | Estimated Pressure Formation (psig) |
|---|---|---|
| 5,120 | 5,249 | 2,276 |
| 5,928 | 5,931 | 2,651 |
| 5,951 | 5,959 | 2,664 |
| 5,964 | 5,971 | 2,671 |
| 6,209 | 6,240 | 2,807 |
| 6,643 | 6,647 | 3,059 |
| 6,741 | 6,781 | 3,118 |
| 6,785 | 6,796 | 3,145 |
| 6,927 | 6,935 | 3,230 |
| 7,497 | 7,500 | 3,606 |
| 8,145 | 8,189 | 4,101 |
| 8,277 | 8,335 | 4,210 |
| 8,772 | 8,776 | 4,635 |
| 8,789 | 8,857 | 4,650 |
| 8,862 | 8,867 | 4,714 |
| 8,958 | 9,009 | 4,797 |
| 12,899 | 12,970 | 8,424 |
| 13,043 | 13,049 | 8,574 |
| 13,142 | 13,145 | 8,676 |

| TVDSS - Top | TVDSS - Bottom | Estimated Pressure Formation (psig) |
|---|---|---|
| 13,250 | 13,262 | 8,788 |
| 13,498 | 13,502 | 9,045 |
| 13,596 | 13,665 | 9,147 |
| 14,213 | 14,217 | 9,786 |
| 14,222 | 14,226 | 9,795 |
| 14,337 | 14,362 | 9,915 |
| 14,518 | 14,522 | 10,085 |
| 14,835 | 14,844 | 10,370 |
| 15,005 | 15,007 | 10,529 |
| 15,144 | 15,148 | 10,662 |
| 15,206 | 15,209 | 10,722 |
| 15,285 | 15,287 | 10,797 |
| 15,334 | 15,336 | 10,844 |
| 15,458 | 15,460 | 10,962 |
| 16,409 | 16,446 | 11,865 |
| 16,681 | 16,683 | 12,091 |
| 16,755 | 16,758 | 12,153 |
| 16,762 | 16,763 | 12,158 |
| 16,965 | 16,991 | 12,342 |

| TVDSS - Top | TVDSS - Bottom | Estimated Pressure Formation (psig) |
|---|---|---|
| 17,381 | 17,383 | 12,847 |
| 17,612 | 17,623 | 13,011 |
| 17,718 | 17,720 | 12,038 |
| 17,893 | 17,896 | 11,905 |
| 17,901 | 17,903 | 11,899 |
| 17,944 | 17,945 | 11,866 |
| 17,981 | 18,003 | 11,837 |
| 18,034 | 18,105 | 11,841 |
| 18,131 | 18,134 | 11,872 |
| 18,146 | 18,152 | 11,875 |

Further analysis of sands and their estimated depths and pore pressures are contained in various other locations, including the Sperry-Sun data collected and evaluated by the Sperry-Sun mud loggers, Schlumberger's wireline data and interpretation of the data, and IIT Report.  The burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, and the BP Parties therefore refer Halliburton to document productions (including the IIT Report and documents produced in support of that analysis; the Sperry-Sun mud logging data; the Schlumberger laminated sands analysis and wireline data among other documents) served on all counsel in MDL 2179, in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 11:**

Who identified sand M57B (*See* BP-HZN-BLY00173436) as a possible hydrocarbon zone, and when and how in connection with the Macondo Well?

**RESPONSE TO INTERROGATORY NO. 11:**

The BP Parties object to this interrogatory as vague and ambiguous to the extent "when and how in connection with the Macondo Well is undefined.

Subject to their specific and general objections, the BP Parties respond that based upon the data available to date, the BP Parties have determined that the M57B sand is not a hydrocarbon bearing zone. During the course of the investigation of the causes of the accident, BP's internal investigation team and certain petrophysicists continued to evaluate the downhole conditions to determine the various sand layers. As reported in the Technical Memorandum Pst Well Subsurface Description of Macondo Well MC0252_1BP1 V.3 dated July 26, 2010 (BP-HZN-BLY00197188-197228) various people worked on the downhole analysis, including Galina Skripnikova, Martin Albertin, Chuck Bondurant, Kelly McNaughan, Binh van Nguyen, Bryan Richie, and Craig Scherschel. That Technical Memorandum contains a reference to the M57B as a potential hydrocarbon zone. BP further incorporates the testimony of Galina Skripnikova regarding the post-incident analysis of the M57B sand. As Galina Skripnikova testified at her deposition, analysis began on April 21, 2010 and there was no analysis of the M57B sands until after the Incident.

> Q. Okay. Was any further analysis conducted from -- between April 13th and April 21st on whether or not [M57B] was hydrocarbon bearing?

A. No.

July 8, 2011 Deposition Testimony of Galina Skripnikova at 440:23-441:1.   Galina Skripnikova further testified that between April 13 and April 20, she did not do any analysis of the M57B sand.  July 8, 2011 Deposition Testimony of Galina Skripnokova at 441:11-17.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.


**INTERROGATORY NO. 12:**

Describe the flow path of the hydrocarbons from the Macondo Well starting on April 20, 2010, and continuing until the well was killed.

**RESPONSE TO INTERROGATORY NO. 12:**

The BP Parties object to this interrogatory as vague and ambiguous as to the phrase "flow path of the hydrocarbons from the Macondo Well starting on April 20, 2010, and continuing until the well was killed."  The BP Parties further object to this interrogatory as overbroad and unduly burdensome in that it seeks information that is available from the BP Parties' various complaints, answers, cross-claims and document productions served on all counsel and is otherwise not susceptible to a response via interrogatory.

Subject to their specific and general objections, the BP Parties refer to, *inter alia*, the September 8, 2010 *Deepwater Horizon* Accident Investigation Report and Appendices.  In addition, the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Halliburton as it is for the BP Parties, and the BP Parties therefore refer Halliburton to, *inter alia*, the BP Parties' Cross-Claims against Halliburton, Cameron, Transocean, and other parties served on all counsel April 20, 2011, as well as document productions (including Appendices G and W to the IIT Report, and the backup materials and analyses produced in

14

support thereof) served on all counsel in MDL 2179, in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 13:**

Identify all data that supports your answer to the preceding interrogatory.

**RESPONSE TO INTERROGATORY NO. 13:**

The BP Parties object to this interrogatory as vague and ambiguous as to the phrase "all data." The BP Parties further object to this interrogatory as overbroad and unduly burdensome in that it seeks information that is available from the BP Parties' various complaints, answers, cross-claims and document productions served on all counsel and is otherwise not susceptible to a response via interrogatory.

Subject to their specific and general objections, the BP Parties refer Halliburton to their response to Interrogatory No. 12.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 14:**

Identify the time of each activation of the Blowout Preventer ("BOP") on the Macondo Well on April 20, 2010, and describe the portions of the BOP that were actually activated.

**RESPONSE TO INTERROGATORY NO. 14:**

The BP Parties object to this request as premature to the extent information responsive to this request may not be identified until all fact and expert discovery is complete.  The BP Parties further object to this request on the grounds that the use of the terms "time and each activation of the Blowout Preventer" and "describe the portions of the BOP" are vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks information beyond BP's control or knowledge, and seeks information likely more readily available from other parties in this litigation such as Transocean, the owner and operator of the blowout preventer utilized by the *Deepwater Horizon* at the Macondo Well, whose personnel would have been responsible for any activation of the blowout preventer on April 20, 2010.

Subject to their specific and general objections, the BP Parties state that, to the best of their knowledge at this time, information responsive to this interrogatory may be found in the *Deepwater Horizon* Accident Investigation Report dated September 8, 2010 prepared by BP's incident investigation team.  The BP Parties refer Halliburton to the investigation report, its appendices, and the backup materials and analyses produced in support thereof served on all counsel in MDL 2179, in accordance with Federal Rule of Civil Procedure 33(d).  The BP Parties further state that information responsive to this interrogatory may be found in the Forensic Examination of Deepwater Horizon Blowout Preventer, Final Report for United States Department of the Interior, Bureau of Ocean Energy Management, Regulation, and Enforcement, dated March 20, 2011, prepared by Det Norske Veritas ("DNV "Report").  The BP Parties do not take any position regarding the accuracy of the information contained in the DNV Report by citing it in response to this interrogatory.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 15:**

Why did the BOP fail to prevent the blowout on April 20, 2010 on the Macondo Well, and in particular, what feature failed to stop the blowout?

**RESPONSE TO INTERROGATORY NO. 15:**

The BP Parties object to this request as premature to the extent information responsive to this request may not be identified until all fact and expert discovery is complete.  The BP Parties further object to this interrogatory on the grounds that the use of the term "fail to prevent the blowout" is vague, overbroad, ambiguous, and undefined.  The BP Parties additionally object to this request on the grounds that it is overbroad, unreasonable, and unduly burdensome to the extent it purports to require the identification of each and every cause of, or the failure to control, the blowout on the Macondo Well on April 20, 2010.  The BP Parties further object to this request on the grounds that it is unreasonable and unduly burdensome in that it seeks information beyond BP's control or knowledge, and seeks information likely more readily available from other parties in this litigation such as Transocean, who owned and operated the blowout preventer utilized by the *Deepwater Horizon* at the Macondo Well on April 20, 2010, and Cameron International Corporation, the manufacturer of the blowout preventer.  The BP Parties further object to this request to the extent it suggests that any single particular feature of the blowout preventer failed to stop the blowout on April 20, 2010; because the blowout occurred, each feature of the blowout preventer did not stop the blowout.  Finally, the BP Parties object to this interrogatory to the extent that it suggests that any feature of the BOP, or the BOP as a whole, was the sole cause of the failure to prevent, control or stop the blowout.

Subject to their specific and general objections, the BP Parties state that, to the best of their knowledge at this time, information responsive to this interrogatory may be found in the *Deepwater Horizon* Accident Investigation Report dated September 8, 2010 prepared by BP's internal incident investigation team, as well as in the Forensic Examination of Deepwater Horizon Blowout Preventer, Final Report for United States Department of the Interior, Bureau of Ocean Energy Management, Regulation, and Enforcement, dated March 20, 2011, prepared by Det Norske Veritas.  BP does not take any position regarding the accuracy of the information contained in the DNV Report by citing it in response to this interrogatory.

Further information responsive to the subject matter of this interrogatory may be found in the deposition testimony of Mike Byrd and Fereidoun Abbassian.  Further responding, the BP Parties refer Halliburton to the allegations concerning defective design and/or manufacture of the blowout preventer on the *Deepwater Horizon* and the negligent maintenance of the blowout preventer that are contained in BP Exploration & Production Inc.'s Third-Party Complaint Against Cameron International Corp., BP's Cross-Claim Against Cameron International Corp., and The BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, all of which were served on all counsel April 20, 2011.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 16:**

Do you contend that any additives should not have been used in the cement slurry for the 9 7/8" x 7" production casing on the Macondo Well? If your answer is yes, describe all such additives and state why they should not have been used.

**RESPONSE TO INTERROGATORY NO. 16:**

The BP Parties object to this interrogatory on the grounds that it is overbroad, unreasonable, and unduly burdensome.  The BP Parties further object to this interrogatory on the grounds that Halliburton's use of phrase "should not have been used" is vague, ambiguous, and undefined.  Additionally, the BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties also object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of their experts in accordance with Rule 26 and the Pre Trial Orders of this Court.  The BP Parties further object to this interrogatory to the extent that it implies that BP is responsible for designing the cement slurry for the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state in response to subpart 16(a), "Do you contend that any additives should not have been used in the cement slurry for the 9 7/8" x 7" production casing on the Macondo Well," that the BP Parties contend certain additives in the Halliburton-designed slurry should not have been used in the quantities recommended by Halliburton absent adequate laboratory testing and disclosure of the risks to BP.

Subject to their specific and general objections, the BP Parties state in response to subpart 16(b) , "If your answer is yes, describe all such additives," that the following additives should not have been used in the quantities recommended by Halliburton in the Halliburton-designed cement slurry for the production interval at the Macondo Well absent adequate laboratory testing and disclosure of the risks to BP:  D-Air 3000, EZ-FLO, potassium chloride and SCR-100L.

Subject to their specific and general objections, the BP Parties state in response to subpart 16(c), "If your answer is yes, … state why they should not have been used,"  that these additives that could destabilize the foamed cement slurry and should not have been used in Halliburton-designed slurry that was pumped in the production interval at the Macondo Well.  Specifically, D-Air 3000 is a defoamer that can destabilize a foam cement slurry, and EZ-FLO, potassium chloride and SCR-100L are dispersants that can destabilize a foam cement slurry.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 17:**

For any additives listed above, when did you first learn they were to be used in the cement slurry on the 9 7/8" x 7" production casing on the Macondo Well?

**RESPONSE TO INTERROGATORY NO. 17:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  The BP Parties further object to this interrogatory on the grounds that Halliburton's use of phrase "first learn they were to be used in the cement slurry" is vague, ambiguous, and undefined.  The BP Parties further object to this interrogatory to the extent that it implies that BP is responsible for designing the cement slurry for the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-

recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not appreciate the significance of the additives used in the Halliburton-recommended slurry.  However, the date that Halliburton first recommended these additives to BP can be determined from documents and correspondence sent by Jesse Gagliano, including at Bates No. HAL_0126063 and other documents sent by Jesse Gagliano to BP that are in the possession of Halliburton, and the burden of deriving or ascertaining the specific date is substantially the same for Halliburton as it is for the BP Parties, therefore they refer Halliburton to these documents in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 18:**

Identify all BP representatives who participated in the decision to proceed with the cement job for the 9 7/8" x 7" production casing on the Macondo Well without having received a foam stability test during the month of April 2010.  Include in your response the reasons each representative made such decisions.

**RESPONSE TO INTERROGATORY NO. 18:**

The BP Parties object to this interrogatory as vague and ambiguous as to the phrases "foam stability test" and "participated in the decision."  The BP Parties also object to this interrogatory to the extent that it mischaracterizes the facts as to the cement testing that was performed by Halliburton and/or provided to BP and characterizes any decision made with respect to the cement job for the 9 7/8" x 7" production casing on the Macondo Well as having been made with conscious awareness or consideration of not having received a foam stability test during the month of April 2010.  Additionally, the BP Parties object to this interrogatory to the extent that it suggests that the BP Parties were solely responsible for making a decision to

21

proceed with the cement job for the 9 7/8" x 7" production casing on the Macondo Well. Finally, the BP Parties object to this interrogatory to the extent that it implies that BP is responsible for designing the cement slurry for the production casing at the Macondo Well.

Subject to their general and specific objections, the BP Parties state that Halliburton was hired as a specialized cement contractor to design, test, and pump the cement job for the well, and the BP Parties relied on Halliburton to properly execute a stable cement job. Halliburton performed the cement slurry tests for the 9 7/8" x 7" production casing on the Macondo Well, did not identify to the BP Parties any issues with foam stability identified in connection with those tests, and recommended the cement procedure to be run on the 9 7/8" x 7" production casing. Moreover, Halliburton personnel was directly involved in executing that cement recommendation at the Macondo Well and did not warn the BP Parties of any risks with respect to the foam stability testing (or the lack thereof), nor did they attempt to stop the job as they were entitled to do. The following BP personnel were involved in allowing Halliburton to proceed with the cement job for the 9 7/8" x 7" production casing on the Macondo Well based on the information and recommendation provided by Halliburton: Brian Morel, Robert Kaluza and Don Vidrine.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 19:**

Do you contend that the cement used on the 9 7/8" x 7" production casing on the Macondo Well was unsafe? If so, describe the reasons the cement was unsafe.

**RESPONSE TO INTERROGATORY NO. 19:**

The BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties further object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome.  Additionally, the BP Parties object to this interrogatory on the grounds that Halliburton's use of the phrase "unsafe" is vague, ambiguous, and undefined.  The BP Parties also object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

Subject to the foregoing, the BP Parties respond to subpart (a):  Based on information available through discovery after the Incident, the BP Parties contend that the foamed cement that Halliburton designed, tested, recommended and pumped on the production interval was defective and introduced risks that were unknown to BP before the incident due to Halliburton's failures and conduct.

Subject to the foregoing, the BP Parties respond to subpart (b):  Halliburton's failures and conduct increased the risk at the Macondo Well because Halliburton knowingly pumped a foamed cement that was unstable and failed to disclose that information to BP and others.  BP was unable to assess this risk and to take actions to reduce this risk or to mitigate its consequences due to Halliburton's misconduct.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 20:**

Do you contend that the foam cement used on the Macondo Well 9 7/8" x 7" production casing was unstable? If so, what do you contend occurred as a result of the instability?

**RESPONSE TO INTERROGATORY NO. 20:**

The BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties additionally object to this interrogatory on the grounds that Halliburton's use of the phrase "occurred as a result of the instability" is vague, ambiguous, and undefined.  The BP Parties further object to the extent that this interrogatory calls for a narrative of all events occurring as a result of Halliburton's cement failing and allowing hydrocarbons to flow down the annulus and up the casing.  The BP Parties further object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of

using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

Subject to the foregoing, the BP Parties respond to subpart (a):  Based on current information available after the incident, BP contends that the foamed cement that Halliburton designed, tested, recommended and pumped on the production interval was unstable.

Subject to the foregoing, the BP Parties respond to subpart (b):  Based on currently available information, the foamed cement slurry that Halliburton designed, tested, recommended and pumped on the production interval experienced, among other things, nitrogen breakout due to its instability.  Among other things, the nitrogen breakout caused the cement to fail to isolate and prevent the flow of hydrocarbons down the annulus and up the shoe track resulting in the uncontrolled flow of hydrocarbons and blowout that occurred on April 20, 2010.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 21:

With the annular BOP closed and the fact that the drill pipe was sealed on the Macondo Well, did approximately 15 barrels return at approximately 17:26 on April 20, 2010 and if so, what caused this?

**RESPONSE TO INTERROGATORY NO. 21:**

The BP Parties object to this interrogatory as vague and ambiguous as to the terms "annular BOP," "closed," "sealed," "return" and "caused." The BP Parties further object to this interrogatory in that it seeks information likely more readily available from other parties in the litigation, such as Transocean and Cameron.

Subject to their specific and general objections, the BP Parties refer Halliburton to BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, which states: "After adjustment of the regulator hydraulic pressure for the annular preventer, an effective seal was established. The residual pressure of 1,260 psi in the drill pipe was bled off from the well. According to witness accounts, 15 bbls of fluid returns were taken. The investigation team's analysis indicates that approximately 3.5 bbls should have been expected. This excess flow from the drill pipe, with the well in an underbalanced condition, should have indicated to the rig crew a communication flow path with the reservoir through failed barriers."

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 22:**

Explain why it took multiple attempts to convert the float collar in the 9 7/8" x 7" production casing of the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 22:**

The BP Parties object that the term "multiple attempts to convert the float collar" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties state that based on available information, there was a blockage that prevented circulation from being established.

There were nine attempts to establish circulation.  Once circulation was established, available information shows that the float collar converted.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 23:**

Describe when and how you contend contamination of cement occurred in the shoe track during and/or after the cement job on the 9 7/8" x 7" production casing on the Macondo Well was pumped.

**RESPONSE TO INTERROGATORY NO. 23:**

The BP Parties object to this interrogatory because the term "contamination" is vague, ambiguous, and undefined.  The BP Parties additionally object to this interrogatory on the grounds that it is premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

Subject to the foregoing, the BP Parties respond that, based on the testimony of Halliburton witnesses that the wiper plugs bumped on time, the evidence does not indicate that much if any contamination occurred during the cement job itself.  Further, the BP Parties do not believe that much if any contamination occurred following the cement job based on the slight difference in density between the shoe cement and the mud in the rat hole, the gelled nature of the mud in the rat hole, and the restriction in flow imposed by the reamer shoe.  The BP Parties further states that Halliburton failed to conduct contamination testing on the cement slurry that it recommended despite that it was required by contract and industry practice to conduct such testing.  As such, even if there were contamination, it is unknown what the effect of any contamination may have had due to Haliburton's failure to conduct contamination testing.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 24:**

Did any part of the 9 7/8" x 7" production casing in the Macondo Well fail or separate, thereby allowing hydrocarbons to enter the well, and if so, where?

**RESPONSE TO INTERROGATORY NO. 24:**

The BP Parties object that Halliburton's use of the phrases "any part," and "fail or separate, thereby allowing hydrocarbons to enter the well" is vague and ambiguous.  The BP Parties further object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.

Subject to their specific and general objections, the BP Parties state that the 9-7/8" x 7" production casing in the Macondo Well did not "fail or separate" in a manner that allowed hydrocarbons to enter the casing through a breach in the casing.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 25:**

Why was the negative test on the Macondo Well on April 20, 2010 considered successful?  What persons declared it successful?

**RESPONSE TO INTERROGATORY NO. 25:**

The BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.  The BP Parties further object to the extent this interrogatory purports to call upon the BP Parties to provide information as to the state of mind of individual persons, including persons not employed by the BP Parties.

Subject to their general and specific objections, the BP Parties state that as reported in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "the lack of flow from what was believed to be an open kill line, coupled with the erroneous explanation for the 1,400 psi on the drill pipe, led the well site leaders and the rig crew to the incorrect view that the negative-pressure test was successful. . . .  The rig crew discussed this 1,400 psi pressure abnormality.  Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'  The toolpusher and the driller reportedly stated that they had observed this phenomenon before.  After discussing this concept, the rig crew and well site leader reportedly concluded that the explanation was plausible. . . .  'According to witnesses, the rig crew and well site leaders interpreted no flow coming from the open kill line as a demonstration of well integrity.  This

indication of no flow from an open kill line contributed to the incorrect conclusion that well integrity had been achieved.'"

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 26:

Describe all warnings that BP gave to HESI or anyone else concerning the Macondo Well, including any warning that the design or operations were unsafe. As part of your response, please identify all witnesses with knowledge of such warnings, and all statements, documents and other materials that describe or reflect such warnings.

## RESPONSE TO INTERROGATORY NO. 26:

The BP Parties object to this interrogatory on the grounds that Halliburton's use of the phrases "warnings that BP gave to HESI or anyone else," "any warning that the design or operations were unsafe" and "warnings" is vague, ambiguous, and undefined. The BP Parties further object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome. For example, this interrogatory appears to call for a narrative of all information relating to the Macondo Well that the BP Parties provided to Halliburton or any other party before the Incident that may have be understood as a "warning" alone or in conjunction with other facts known by Halliburton or any other party, or in light of information obtained subsequent to the Incident. The BP Parties further object to this interrogatory to the extent that it implies that BP is responsible for designing, testing and/or pumping the cement program for the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state Halliburton was contracted to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with the BP Parties the ramifications of

using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to the BP Parties.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

The BP Parties further state that the BP Macondo Well team provided Halliburton with information concerning the design of the Macondo Well and operations at the Macondo Well that may be responsive to this interrogatory.  Individuals that may have knowledge include the following Macondo Well team members:  Marty Albertin, Jonathan Bellow, Bobby Bodek, Todd Boesiger, Chuck Bondurant, John Brannen, Allison Crane, Brent Cocales, Erick Cunningham, Keith Daigle, Pierre Depret, Scherie Douglas, Trent Fleece, Wayne Fletcher, Tanner Gansert, George Gray, John Guide, Mark Hafle, Cynthia Holik, Bob Kaluza, Brian Morel, Steven Morey, Eric Mueller, Joe Neumeyer, Binh Vin Nguyen, Kate Paine, Bryan Richie, Maniram Sankar, Craig Schershel, Tomieka Searcy, Samina Sewani, David Sims, Galina Skripnikova, Jay Thorseth, Jimmy Adams, Darell Boudreaux, Mack Parker, Shawn Southworth,  Don Vidrine, Greg Walz. The conversations and documents are too numerous to identify and would include every communication between BP and Halliburton.  The BP Parties state that various Halliburton employees would have received these communications, including Jesse Gagliano, Paul Anderson, Nathaniel Chaisson, Vincent Tabler, Anthony Cupit, Danny Mooney, and Chris Haire.  However, Halliburton would have the best information on the identity of Halliburton employees with information on the design and operations of the Macondo Well.  The BP Parties

also respond that BP posted information on WellSpace concerning the design and operations of

the Macondo Well.  The WellSpace materials were produced at BP-HZN-MBI00190522 through

BP-HZN-MBI00192367;  BP-HZN-MBI00193200  through  BP-HZN-MBI00193440;  BP-HZN-

2179MDL00058168 through BP-HZN-2179MDL00269030; and BP-HZN-2179MDL00058151

through BP-HZN-2179MDL00058857, and the burden of deriving or ascertaining the substance

of those communications is substantially the same for Halliburton as it is for the BP Parties,

therefore the BP Parties refer Halliburton to these documents in accordance with Federal Rule of

Civil Procedure 33(d).  Halliburton maintains WellSpace and has superior information on who

from Halliburton accessed the WellSpace information.

To the extent this interrogatory seeks additional information, the BP Parties object on the

grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not

relevant to the claims or defenses of any party.


**INTERROGATORY NO. 27:**

Describe the division of responsibilities between BP and Transocean in operating the
Deepwater Horizon and conducting drilling operations at the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 27:**

The BP Parties object to this interrogatory as vague and ambiguous, particularly the term

"division of responsibilities" which is undefined and subject to multiple meanings.  The BP

Parties will respond to this interrogatory using their understanding of that term.  The BP Parties

further object to this interrogatory to the extent that it implies that the BP Parties were

responsible for operating the *Deepwater Horizon* or conducting drilling operations at the

Macondo Well, or to the extent that it implies that other contractors were not involved.  Various

other parties, including Halliburton, also had responsibilities regarding the *Deepwater Horizon*

and drilling operations at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that the Drilling Contract between BPAP (as successor to Vastar Resources, Inc.) and Transocean Holdings LLC (as successor to R&B Falcon Drilling Co.), Contract No. 980249, dated December 9, 1998 (the "Drilling Contract"), sets forth the responsibilities of BP and Transocean regarding operating the *Deepwater Horizon*, and pursuant to Federal Rule of Civil Procedure 33(d) the BP Parties refer Halliburton to the Drilling Contract.  The BP Parties further state that Transocean was solely responsible for the operation of the *Deepwater Horizon*, including such operations on board the *Deepwater Horizon* as may have been necessary or desirable for its safety.  Transocean was responsible for the safety of its operations, was responsible for using all reasonable means to control and prevent fires and blowouts, and for testing and maintaining the *Deepwater Horizon's* blowout prevention equipment.  Transocean also represented, and was responsible for ensuring, that the *Deepwater Horizon* satisfied all applicable laws, rules, requirements and regulations of U.S. federal, territorial possession, state, municipal, or local governments having jurisdiction over the operations in U.S. federal waters.  BPAP had no direction or control over Transocean or its employees and agents except in the results to be obtained.

The BP Parties further state that BPXP and/or BPAP's responsibilities regarding drilling operations at the Macondo Well included:  (i) communicating with and receiving the necessary approvals from the Minerals Management Services ("MMS"), now known as the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"); (ii) selecting contractors to provide products and perform services regarding drilling operations; (iii) providing the well design, which includes drilling parameters such as well depth, drilling location, and other well-related requirements; and (iv) complying with all applicable laws and regulations.  Transocean's responsibilities included: (i) the activities set forth in the Drilling Contract and/or

33

in the preceding paragraph; (ii) drilling the Macondo Well; and (iii) complying with all applicable laws and regulations.   Other parties, including Halliburton, were responsible for aspects of the drilling operations at the Macondo Well.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 28:**

Describe BP's pre-Incident plan for containing and remedying a potential blowout and oil spill at the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 28:**

The BP Parties object to this interrogatory on the grounds that Halliburton's use of the terms "plan" and "containing" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties state that the burden of deriving or ascertaining this answer is the same for Halliburton as it is for the BP Parties, therefore the BP Parties refer Halliburton to the Regional Oil Spill Response Plan - Gulf of Mexico (BP-HZN-CEC 000025-607) and Initial Exploration Plan - Mississippi Canyon Block 252 (BP-HZN-2179MDL00001095-1218), in accordance with Federal Rule of Civil Procedure 33(d).

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 29:**

Describe the factual basis for any contention that BP is not fully at fault for the Incident. Include in your response any contention that other persons or entities are fully or partially at fault and the portions of fault attributable.

**RESPONSE TO INTERROGATORY NO. 29:**

The BP Parties object to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and not susceptible to response via interrogatory.

Subject to their specific and general objections, the BP Parties refer to the BP Parties' various answers and defenses to the Complaints served in these cases, as well as their cross-claims against Halliburton, Cameron, Transocean, and other parties, served on all counsel April 20, 2011, and the documents produced by the BP Parties and the other parties in connection with this litigation, all of which have been served on all counsel.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 30:**

Do you agree with the narrative of events and findings as set forth in the *Deepwater Horizon Accident Investigation Report* dated September 8, 2010? If not, please explain in detail each element of the Report with which you do not agree.  Include an explanation of those items for which you do not believe you have sufficient information to agree.

**RESPONSE TO INTERROGATORY NO. 30:**

The BP Parties object to this interrogatory as vague, ambiguous, overbroad and unduly burdensome to the extent that it purports to call for BP to provide a line-by-line, page-by-page analysis of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report.

Subject to their specific and general objections, the BP Parties refer Halliburton to their objections and response to Request for Production No. 42 in BP Exploration & Production Inc.'s

Responses and Objections to Halliburton Energy Services Inc.'s Requests for Production, served on all counsel on May 10, 2011.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 31:**

Did any person at BP or its employees, agents or consultants involved in the investigation and drafting of the *Deepwater Horizon Accident Investigation Report* dated September 8, 2010, express disagreement with or otherwise not fully agree or accept any observation or conclusion included within the Report? If so, please name each person expressing such disagreement and describe the disagreement in detail.

**RESPONSE TO INTERROGATORY NO. 31:**

The BP Parties object to this interrogatory as vague and ambiguous as to the phrases "express disagreement," "not fully agree or accept," and "observation or conclusion." The BP Parties further object to this interrogatory to the extent that it purports to call for the BP Parties to conduct an inquiry into the feelings -- both expressed or unexpressed -- of potentially thousands of individuals as to agreement -- including disagreement, not full agreement or acceptance, etc. -- of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report.

Subject to their specific and general objections, the BP Parties refer Halliburton to their objections and response to Request for Production No. 42 in BP Exploration & Production Inc.'s Responses and Objections to Halliburton Energy Services Inc.'s Requests for Production, served on all counsel on May 10, 2011.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 32:**

Identify each person you intend to call or may call as a witness in this matter and, for each person identified, state the subject of their expected testimony.

**RESPONSE TO INTERROGATORY NO. 32:**

The BP Parties object to this interrogatory on the grounds that it seeks the premature identification of witnesses, including experts that the BP Parties may use at trial in accordance with Rule 26(a)(2)(A)-(D) and 26(b)(4)(A).

Subject to their specific and general objections, the BP Parties state that they will provide a list of testifying experts and other testifying witnesses in accordance with Rule 26(a) and (b) of the Federal Rules of Civil Procedure and upon the schedule established for such discovery set by the Court in this litigation.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 33:**

Identify each person who has or may have knowledge or information relating to the allegations in BP's claims against HESI, including, but not limited to, each person with knowledge or information relating to your allegations concerning HESI's alleged duty to indemnify BP. For each person identified, state the subject area of his or her knowledge.

**RESPONSE TO INTERROGATORY NO. 33:**

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and unduly burdensome. For example, the interrogatory asks that the BP Parties identify each person with knowledge when many of the persons with knowledge are not employees of BP and those third parties would be in better position to identify persons with knowledge. The BP parties also object to the extent that this interrogatory calls for persons with second-hand and/or post-incident

knowledge relating to the allegations in BP's claims against Halliburton.  The BP Parties also object to this interrogatory on the grounds that it is premature.  The BP Parties will identify their experts in accordance with Rule 26 and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  But for Halliburton's multiple acts of fraud and other misconduct, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

The BP Parties further state that Halliburton failed to disclose, concealed, and misrepresented its misconduct and the persons having factual information underlying BP's claims against Halliburton pre-incident are Halliburton employees.  On information and belief, those Halliburton employees include Richard Vargo, Ronnie Faul, Jesse Gagliano, Nathanial Chaisson, Vincent Tabler, Quang Nguyen, Paul Anderson, Anthony Cupit, Danny Mooney, Chris Haire, Timothy Quirk, Richard Dubois and various lab technicians.  The BP Parties state

that Halliburton is in a better position to identify the persons with knowledge or information

relating to the factual allegations underlying BP's claims against Halliburton.

To the extent this interrogatory seeks additional information, the BP Parties object on the

grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not

relevant to the claims or defenses of any party.

## INTERROGATORY NO. 34:

Identify all persons with knowledge of any fact relevant to any and all claims you are
asserting in this litigation involving issues related to the Incident, the Oil Spill, or the Oil Spill
Response, and indicate for each person the nature and relevance of the knowledge you believe
each such person has.

## RESPONSE TO INTERROGATORY NO. 34:

The BP Parties object to this interrogatory on the grounds that it is cumulative,

duplicative, overbroad, unreasonable, and unduly burdensome.

## INTERROGATORY NO. 35:

Please provide a detailed, itemized list of your economic and non-economic damages that
you claim HESI is liable to you for in this litigation.

## RESPONSE TO INTERROGATORY NO. 35:

The BP Parties object to this interrogatory because it is overbroad, unreasonable, and

unduly burdensome.  The BP Parties further object to this interrogatory on the grounds that it is

premature.  The BP Parties will provide the opinions of its experts in accordance with Rule 26

and the Pre Trial Orders of this Court.

Subject to their specific and general objections, the BP Parties state that generally

Halliburton is liable for:  compensatory and economic damages equal to the amount of costs and

expenses incurred by BP to clean up and remediate the oil spill, the amount of claims paid by BP

under the Oil Pollution Act, the amount of any judgments BP incurs or pays, the amount of any

OPA financial liability that BP is liable for, the lost profits from and/or diminution in value of the Macondo prospect, and all other costs and damages incurred by BP related to the *Deepwater Horizon* Incident and resulting oil spill, plus interest; all damages incurred by BP as a result of Halliburton's negligence (and if established by the evidence at trial, gross fault and/or gross negligence), intentional misrepresentation and concealment in an amount to be determined at trial; and all damages incurred by BP as a result of the *Deepwater Horizon* Incident.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 36:

Identify all persons with whom you have settled or otherwise resolved any dispute related to the Incident.  For each person identified, explain the terms of the settlement or resolution.

## RESPONSE TO INTERROGATORY NO. 36:

The BP Parties object to this interrogatory on the grounds that Halliburton's use of the terms "persons" and "person" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it seeks information that is highly confidential, not relevant to the claims or defenses of any party, is protected from disclosure under Federal Rule of Evidence 408, is unreasonable and unduly prejudicial in that the production of responsive documents would be inconsistent with the public policy favoring the settlement of disputes as disclosure of the documents sought would potentially inhibit additional settlements in this case, seeks documents protected from disclosure by one or more privileges, including a common-interest privilege, and imposes an undue and unreasonable burden to the extent it seeks to force BP to undertake to identify privileged written agreements outside the scope of the requirements of PTO #14.

**INTERROGATORY NO. 37:**

Identify all Hazard & Operability Studies ("HAZOPS") prepared from January 31, 2010 to April 20, 2010 that relate specifically to the Deepwater Horizon or the Macondo Well.

**RESPONSE TO INTERROGATORY NO. 37:**

The BP Parties object to this interrogatory on the grounds that it is overbroad and unduly burdensome to the extent it seeks documents likely to be more readily available from other parties in this litigation, such as the Transocean Defendants, the owner and operator of the *Deepwater Horizon* rig.

Subject to their specific and general objections, the BP Parties state that they are not aware of any responsive HAZOP studies prepared by BP between January 31, 2010 and April 20, 2010. The BP Parties refer Halliburton to the Transocean Defendants as a potential source of information responsive to this interrogatory and relating to the *Deepwater Horizon*.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

**INTERROGATORY NO. 38:**

Identify the well characteristics that BP considers when determining whether a well is included on BP's list of critical wells. In your response, identify all BP wells on that list from April 20, 2010 to the present date. If the Macondo Well was not on the list as of April 20, 2010, identify the characteristics of that well that resulted in or contributed to its exclusion from the list.

**RESPONSE TO INTERROGATORY NO. 38:**

The BP Parties object to this request on the grounds that it is overbroad, unreasonable, and seeks information not relevant to the claims or defenses of any party. Additionally, the BP Parties object to this interrogatory on the grounds that it is comprised of multiple discrete subparts that count as individual interrogatories under Fed. R. Civ. P. 33.

41

Subject to their specific and general objections, the BP Parties state that as of the date of the Incident BP's policy required that all exploration wells be designated as a critical well.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## GENERAL OBJECTIONS

The BP Parties assert the following objections to each and every one of Halliburton's interrogatories, including any definitions or instructions associated therewith (collectively, "Halliburton's Discovery Requests"). These general objections are incorporated by reference into each specific response set forth by the BP Parties and are neither waived nor limited by any specific responses.

1.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the proceeding set to commence in February, 2012 prior to the substantial completion of the BP Parties' efforts to identify and produce documents in response to other requests of Halliburton and other parties to the litigation.

2.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

3.      The BP Parties object to Halliburton's Discovery Requests to the extent they prematurely seek expert discovery. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

4.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.

5.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of the BP Parties and any opposing parties to resolve their disputes in a fair and efficient manner.

6.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information or documents not within the BP Parties' possession, custody, or control.  All responses are made on behalf of the BP Parties only, are limited to information and documents within the BP Parties' possession, custody, or control.

7.      The BP Parties object to Halliburton's Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

8.      The BP Parties object to Halliburton's Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests

seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

9.     The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

10.     The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

11.     The BP Parties object to Halliburton's "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  The BP Parties further object to, and will read and respond to, Halliburton's "Definitions" (labeled to correspond to Halliburton's list) as follows:

(a)     Halliburton's definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise

specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

   (b) Halliburton's definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

   (c) Halliburton's definition of "Incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

   (d) Halliburton's definition of "oil spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

   (e) Halliburton's definition of "Deepwater Horizon Blowout Preventer" is vague and overbroad; it includes any equipment used to control any well.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

   (f) Halliburton's definition of "clean up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without

regard to whether such releases had anything to do with the incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

       (g)    Halliburton's definition of "relevant time period" is overbroad; by extending the definition to "the current date," many of Halliburton's requests, which by their context clearly seek information from the time prior to and including the incident, confusingly seek unrelated information generated after the incident and ignores that it is impossible for the BP Parties to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to Halliburton.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means January 1, 2008 through April 20, 2010, unless:  (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2008 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through November 8, 2010.  In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above.  Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by the BP Parties.

(h)      Halliburton's definitions of "Defendant," "you," "your," "your company," and "BP" are extremely vague and overbroad; they include a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.  The BP Parties will read and respond to Halliburton's requests with the understanding that the terms you," "your," and "BP" means one or more of the BP Parties, as appropriate.

(i, j, k, l, m)    Halliburton's definitions of "Anadarko," "Cameron," "MOEX," "Transocean," and "HESI" are similarly vague, overbroad, and confusing.  The BP Parties will read and respond to Halliburton's requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(n)      Halliburton's definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "person" means a person.

(o)      Halliburton's definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "employee" means an employee.

(p)      Halliburton's definition of "Investigation Team" is unobjectionable.

(q)      Halliburton's definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."   The BP Parties will read and respond to Halliburton's requests with the

understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(r)     Halliburton's definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(s)     Halliburton's definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved." The BP Parties will read and respond to Halliburton's requests with the understanding that the term "statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(t)     Halliburton's definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "meeting" refers to a gathering of two or more people.   It does not include electronic communications unless specified.

(u)     Halliburton's definition of "document" and "documents" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A). The BP Parties will read and respond to Halliburton's requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(v)      Halliburton's definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(w)      Halliburton's definitions of "relating to," "related to," "referring to," regarding," "concerning," and "with respect to," are vague and overbroad; they render these and innumerable other words void of any independent meaning.   The BP Parties will read and respond to Halliburton's requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(x)      Halliburton's definitions of "and" and "or" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "and" means and, and the term "or" means or.

(y)      Halliburton's definition of "all" and "any" are vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of Halliburton's requests into nonsensical requests for duplicative information.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "all" means all and the term "any" means any.

(z)      Halliburton's definition of "including" is unobjectionable.

(aa)      Halliburton's definitions of "each" and "every" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning

and inconsistent with standard English usage.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "each" means each and the term "every" means every.

(bb)   Halliburton's instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(cc)   Halliburton's instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(dd)   Halliburton's instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(ee)   Halliburton's instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined under instructions to set aside standard English usage.

12.   These responses are made without waiving, in any manner, the BP Parties' right to object to the use of any information or documents provided in response to these requests at

any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

13.     The BP Parties' decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or the document requests themselves, should not be construed as:  (a) a stipulation that the material is relevant or admissible, (b) a waiver of the BP Parties' general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

14.     The BP Parties reserve the right to modify, amend, or supplement their responses, which are made based on the current status of their knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.

## VERIFICATION

I, Bill Kirton, an officer of BP America Inc., BP America Production Company, and BP Exploration & Production Inc., having undertaken a reasonable inquiry under the circumstances into the process by which the foregoing response to interrogatories were compiled, hereby certify, under penalty of perjury, that, to the best of my knowledge, information, and belief, the foregoing response accurately reflects the information available to BP America Inc., BP America Production Company, and BP Exploration & Production Inc. as specified therein.

State of Texas        :
                      :        ss.
County of Harris  :

Sworn and ascribed to before me
this ⸏st⸏ day of August , 2011

LAURA M. RIDDLER
MY COMMISSION EXPIRES
May 11, 2015

Notary Public

Dated:  August 1, 2011

Respectfully submitted,

**AS TO RESPONSES TO
INTERROGATORIES**
By: /s/ Bill Kirton_____
BP America Inc.
501 Westlake Park Blvd.
Houston, Texas 77079

*BP America Inc., BP America Production
Company, and BP Exploration &
Production Inc.*


By:  /s/ J. Andrew Langan, P.C.

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Timothy A. Duffy, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile:  (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 1st day of August, 2011.

<u>/s/   J. Andrew Langan, P.C.___</u>