LEXISNEXIS® FILE & SERVE
39032614
E-SERVICE
Aug 1 2011
11:46PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 |
| | | SECTION: J |
| This Document Relates To: All Actions | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| …………………………………………….... | : | |

## THE BP PARTIES' RESPONSES AND OBJECTIONS TO HALLIBURTON ENERGY SERVICES, INC.'S FIRST REQUESTS FOR ADMISSION

Defendants BP Exploration & Production Inc. ("BPXP") and BP America Production Company ("BPAP") (collectively, "BP" or "the BP Parties"), by their undersigned Counsel, and, pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, hereby submit the following responses to Halliburton Energy Services, Inc.'s ("Halliburton" or "HESI") First Requests for Admission.

## SPECIFIC RESPONSES AND OBJECTIONS

The BP Parties respond as follows to Halliburton's requests for admission, subject to and without waiving their general objections, each and every one of which are specifically incorporated into each individual response below.[1]

## REQUESTS FOR ADMISSION

1.     Admit that BP determined the number of HESI mud loggers assigned to the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that use of the term "determined" is vague, ambiguous, and undefined.

---

[1] The BP Parties' general objections are set forth at pages 108 - 117.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request, including any particular operational implication of the use of the term "determined," as HESI has not sufficiently explained what it means by the use of the term in the context of this request.

2.      Admit that BP requested that Joseph Keith be assigned by HESI to provide mud logging services on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request because, based upon a reasonable investigation, they have no indication that they requested HESI to assign Joseph Keith to the *Deepwater Horizon*.

3.      Admit that BP requested that Kelly Gray be assigned by HESI to provide mud logging services on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request because, based upon a reasonable investigation, they have no indication that they requested HESI to assign Kelly Gray to the *Deepwater Horizon*.

4.      Admit that in March of 2010, HESI suggested that BP utilize additional mud loggers to monitor wells.

**RESPONSE:**

The BP Parties object to this request on the grounds that use of the phrase "utilize additional mud loggers to monitor wells" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties deny this request, including any particular operational implication of the

2

use of the phrase "utilize additional mud loggers to monitor wells," as HESI has not sufficiently

explained what it means by the use of the term in the context of this request.

     5.    Admit that BP did not authorize HESI to provide more than two mud loggers at a time on the Deepwater Horizon.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that the request is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There were multiple instances when there were more than two mud loggers working on the *Deepwater Horizon*.

     6.    Admit that from January 31, 2010 to April 20, 2010, BP never requested that HESI provide additional mud loggers to the Deepwater Horizon.

**<u>RESPONSE:</u>**

Subject to their general objections, the BP Parties respond as follows: Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There was no indication that the Sperry-Sun mud loggers were not capable of doing so and there was no indication, obligation or responsibility for BP to request additional mud loggers to provide the services contractually agreed upon by HESI and the BP Parties.

     7.    Admit that BP was aware that HESI mud loggers' attendance at morning meetings was dependent on rig activity and the necessity of monitoring surface data parameters.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that the phrases "dependent on rig activity" and "necessity of monitoring surface data parameters" are vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the mud loggers' ability to attend morning meetings was dependent upon certain rig activities and their monitoring duties.  The BP Parties deny the remainder of this request, including any particular operational implication of the use of the phrases "dependent on rig activity" and "necessity of monitoring."

8.      Admit that BP was aware that HESI mud loggers' attendance at morning meetings was dependent on rig activity and the necessity of monitoring surface data parameters.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrases "dependent on rig activity" and "necessity of monitoring surface data parameters" are vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the mud loggers' ability to attend morning meetings was dependent upon certain rig activities and their monitoring duties.  The BP Parties deny the remainder of this request, including any particular operational implication of the use of the phrases "dependent on rig activity" and "necessity of monitoring."

9.      Admit that the BP well site leader did not timely detect the kick on March 8, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the terms "timely" and "detect."  The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well and detecting kicks.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The

4

Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

10.     Admit that the BP well site leader did not notice the kick on March 8, 2010 for approximately 33 minutes.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the term "notice." The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

11.     Admit that approximately 35-40 barrels of hydrocarbons entered the wellbore during the kick on March 8, 2010, before the BP well site leader and Transocean drilling crew shut in the well with the lower annular preventer.

**RESPONSE:**

The BP Parties object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that, as described more fully in BP's September 8, 2010 Deepwater Horizon Accident Investigation Report, approximately 35-40 barrels of reservoir fluids entered the wellbore during the March 8, 2010 kick event before the Transocean drilling crew shut in the well with the lower annular preventer.  The BP Parties deny the remainder of this request, specifically to the extent it suggests that the BP well site leader was responsible for shutting in the well.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

12. Admit that the BP well site leader responded to the kick on March 8, 2010, slower than BP would have liked.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrases "responded" and "slower than BP would have liked."  The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

13.    Admit that the BP well site leader did not timely detect the kick on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "timely detect."  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

14.    Admit that the BP well site leader responded to the kick on April 20, 2010, slower than BP would have liked.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "slower than BP would have liked."  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

15.    Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:08 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware" and "unanticipated and unexplained" are not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the

Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

16.     Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:14 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware' and "unanticipated and unexplained" are not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

17.     Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:26 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware" and "unanticipated and unexplained" are not defined. The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

18.     Admit that the BP well site leader was aware of unanticipated and unexplained readings in standpipe pressure on April 20, 2010, by 21:30 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "aware" and "unanticipated and unexplained" are not defined. The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI

mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

19.  Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:09 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "investigating" is not defined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

20.  Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:16 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection,

and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "investigating" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

21.    Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:30 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "investigating" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual,

Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

22.     Admit that the BP well site leader was investigating the amount of standpipe pressure on April 20, 2010, by 21:35 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "investigating" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

23.     Admit that the BP well site leader was having a slug prepared for potential well control on April 20, 2010 by 21:16 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties further object to this request as vague and ambiguous to the extent "slug" is not defined.

13

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

24. Admit that the BP well site leader was having a slug prepared for potential well control on April 20, 2010 by 21:30 hours.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions. The BP Parties further object to this request as vague and ambiguous to the extent "slug" is not defined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the HESI mud logger on duty at that time. The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

14

25.     Admit that BP simultaneously received all rig data that was available to the HESI mud loggers on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that use of the phrases "simultaneously received" and "all rig data that was available to the HESI mud loggers" are vague, ambiguous, and undefined. The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties admit that they had access to HESI data through INSITE Anywhere on April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

26.     Admit that BP received all rig data that is available to the HESI mud loggers.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that use of the phrases "simultaneously received" and "all rig data that was available to the HESI mud loggers" are vague, ambiguous, and undefined. The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties admit that they had access to HESI data through INSITE Anywhere on

April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

27.     Admit that BP approved the location of HESI's flow-out sensor on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: The BP Parties admit that BP, Halliburton and Transocean agreed upon the location of HESI's flow out sensor on the *Deepwater Horizon*.  As testified by John Gisclair, the Sperry sensor placement was determined by the Sperry personnel who installed it and the Transocean rig crew.

28.     Admit that BP determined the location of HESI's flow-out sensor on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that use of the term "determined" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The BP Parties deny determining the location of the sensors installed on the *Deepwater Horizon*.  As testified by John Gisclair, the Sperry sensor placement was determined by the Sperry personnel who installed it and the Transocean rig crew.

29.     Admit that on April 20, 2010, the BP well site leader had contemporaneous access to the real-time sensor data on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton' use of the phrase "contemporaneous access" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the BP well site leader had access to the real-time sensor data on the *Deepwater Horizon* via the computer terminal located in the well site leader's office; however, it is the responsibility of the Halliburton/Sperry-Sun mud loggers and the Transocean rig crew to continuously monitor the data. The BP Parties deny the remainder of this request, including any particular operational implication of the use of the phrase "contemporaneous access."

30. Admit that on April 20, 2010, the BP well site leader had real-time access to all rig data that was available to the HESI mud loggers.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the phrases "all rig data" and "that was available to the HESI mud loggers" is vague, ambiguous, and undefined.

Subject to their general objections, the BP Parties respond as follows: Denied. The BP Parties admit that the Well Site Leader had access to HESI data through INSITE Anywhere on April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

31. Admit that on April 20, 2010, the BP well site leader did not inform the HESI mud loggers of planned or actual rig activity after 17:00 hours.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "inform" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties have grounds to believe that the planned rig activities were discussed during the pre-tour and pre-job meetings held on April 20, 2010, which included the HESI mud loggers; further, the HESI mud loggers were aware of planned and actual rig activity after 17:00 hours.  Furthermore, if the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

32.    Admit that on April 20, 2010, the BP well site leader did not provide the HESI mud loggers with written material outlining rig activity to occur that day.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the phrase "written material" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request because the BP Parties have grounds to believe that the HESI mud loggers were provided with written materials outlining the rig activity to occur on April 20, 2010.  Furthermore, if the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

33.    Admit that on April 20, 2010, the BP well site leader did not call the HESI mud loggers after 17:00 hours to inform them of fluid transfers among pits.

18

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to them today, there is no indication that the Well Site Leader called the HESI mud loggers after 17:00 hours on April 20, 2010, however the BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

34.     Admit that on April 20, 2010, the BP well site leader did not call the HESI mud loggers after 17:00 hours to advise them that offloading to the Damon Bankston had stopped.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to them today, there is no indication that the Well Site Leader called the HESI mud loggers after 17:00 hours on April 20, 2010, however the BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

35.     Admit that on April 20, 2010, the BP well site leader did not call the HESI mud loggers after 17:00 hours to advise them of the flow-out readings from Transocean's flow-out sensor.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to them today, there is no indication that the Well Site Leader called the

HESI mud loggers after 17:00 hours on April 20, 2010, however the BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  Further, it is not the Well Site Leaders responsibility to monitor flow-out readings on any sensors, as monitoring the well conditions is the responsibility of the Transocean rig crew and the HESI mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

36.     Admit that on April 20, 2010, the BP well site leader did not announce fluid transfers among pits over the rig PA system.

**RESPONSE:**

Subject to their general objections, the BP Parties state as follows:  Denied.  The BP Parties deny this request to the extent that it asserts the BP Well Site Leader had a responsibility to announce transfers among pits over the rig PA system, which is generally done by the mud engineer, or that the BP Well Site Leader was informed of fluid transfers among pits, which is an operation conducted by the Transocean rig crew and involving the M-I Swaco mud engineer.

37.     Admit that on April 20, 2010, the BP well site leader did not inform the HESI mud loggers of pressure anomalies during the negative pressure test.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.  The BP Parties further object to this request as vague and ambiguous to the extent "pressure anomalies" is undefined.

Subject to their general and special objections, the BP Parties respond as follows: Denied. Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig

20

crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the negative pressure test. The Transocean rig crew was also primarily responsible for monitoring pressure anomalies (along with the HESI mud logger who was responsible for continuously monitoring the well), as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

38.     Admit that on April 20, 2010, the BP well site leader set up the negative pressure test to utilize the choke manifold on the BOP.

**RESPONSE:**

The BP Parties object to this request as misleading in that it suggests that the BP well site leader set up the negative pressure test and further that the choke manifold is part of the BOP. The BP Parties further object to this request as the phrase "utilize the choke manifold" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that prior to April 20, 2010 the negative pressure test was designed to be conducted by monitoring the kill line from the BOP and that on April 20, 2010, after a discussion between the well site leader and the Transocean rig crew, the negative pressure test was performed by monitoring the flow from the kill line. The BP Parties deny the remainder of this request.

39.     Admit that on April 20, 2010, BP was aware that the HESI mud loggers did not receive pressure data from the choke manifold on the BOP.

**RESPONSE:**

The BP Parties object to this request as misleading in that it suggests that the choke manifold is part of the BOP.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The Sperry Sun mud loggers, as well as Transocean rig crew, had access to pressure data on the choke/kill lines.

40.    Admit that on April 20, 2010, the BP well site leader declared the negative pressure test successful based on a purported "bladder effect."

**<u>RESPONSE:</u>**

The BP Parties object to this request as misleading in that it suggests that the BP well site leader solely made any conclusions regarding the negative pressure test, rather than the negative pressure test being accepted by the well site leaders and relevant Transocean rig crew members jointly. The BP Parties further object to this request as misleading in that it suggests that the purported "bladder effect" explanation offered by the Transocean toolpusher was the sole basis for the belief that the negative pressure test was successful, when the acceptance was also based on a lack of flow from what was believed to be an open kill line.

Subject to their specific and general objections, the BP Parties admit that witness accounts state that the "bladder effect" was an explanation offered by the Transocean toolpusher and driller for the 1,400 psi observed on the drill pipe and that the well site leaders and rig crew accepted that explanation. The BP Parties deny the remainder of this request.

41.    Admit that on April 20, 2010, the BP well site leader understood that by diverting flow-out overboard, the HESI mud loggers were unable to monitor flow-out from the well.

**<u>RESPONSE:</u>**

The BP Parties object to this request as misleading to the extent that it implies that BP's well site leader was responsible for monitoring the well.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties contracted with Sperry-Sun to provide mud logging services requiring

the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There

was no indication that the Sperry-Sun mud loggers were not capable of doing so at any time.


42.    Admit that on April 20, 2010, the BP well site leader understood that by diverting flow-out overboard, the HESI mud loggers were unable to monitor the gas content of fluids coming out of the well.

**RESPONSE:**

The BP Parties object to this request as misleading to the extent that it implies that BP's

well site leader was responsible for monitoring the well.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring

the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There

was no indication that the Sperry-Sun mud loggers were not capable of doing so at any time.


43.    Admit that on April 20, 2010, the BP well site leader understood that the transfer of fluids among pits on the Deepwater Horizon complicated the ability of the HESI mud loggers to monitor pit volume changes.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the term

"complicated" is vague, ambiguous and undefined.  The BP Parties further object to this request

as misleading to the extent that it implies that BP's well site leader was responsible for

monitoring the well.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties contracted with Sperry-Sun to provide mud logging services requiring

the Sperry-Sun mud loggers to be capable of continuously monitoring the well conditions.  There

was no indication that the Sperry-Sun mud loggers were not capable of doing so at any time.

44.     Admit that on March 8, 2010, the HESI mud logger timely advised the BP well site leader of a gain in the active pits suggesting a potential influx from the well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "informed" and "timely advised" are vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There is no indication that the mud logger informed the well site leader as Mr. Murray Sepulvado testified.  The BP Parties further deny this request, including any particular operation implication of the use of the phrase "timely advised."

45. Admit that on March 8, 2010, after Transocean stopped crane activity, the HESI mud logger again timely advised the BP well site leader of a gain in the active pits suggesting a potential influx from the well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "informed" and "timely advised" are vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There is no indication that the mud logger informed the well site leader as Mr. Murray Sepulvado testified.  The BP Parties deny this request, including any particular operation implication of the use of the phrase "timely advised."

46.     Admit that on March 8, 2010, the BP well site leader's response to the HESI mud logger's notice of a potential influx did not comply with BP policy regarding responses to well control events.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "response and "notice" are vague, ambiguous and undefined.  The BP Parties further object to

24

this request to the extent that "BP policy regarding responses to well control events" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties cannot admit or deny this request as they cannot determine which "policy regarding to responses to well control events" is referenced.  The BP Parties further note that continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

47.     Admit that on March 8, 2010, the BP well site leader's response to the HESI mud logger's notice of a potential influx did comply with BP policy regarding responses to well control events.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "response and "notice" are vague, ambiguous and undefined.  The BP Parties object to this request to the extent that "BP policy regarding responses to well control events" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  BP cannot admit or deny this request as BP cannot determine which "policy regarding responses to well control events" is referenced.  BP further notes that continuous well monitoring and kick detection at the Macondo Well were the responsibility of the Transocean rig crew and the Halliburton Sperry Sun mud logger.  The Transocean rig crew was also primarily responsible for

undertaking well control actions in response to any kick or other well control event, as set forth in the contractual documents and manuals applicable to the Macondo Well, including but not limited to Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

48.     Admit that BP did not notify HESI of fluctuations in standpipe pressure after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  The BP Parties object to this request as vague and ambiguous to the extent "fluctuations" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

49.     Admit that BP did not notify HESI of an increase in standpipe pressure from 21:01 to 21:08 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

50.    Admit that BP did not notify HESI of an increase in standpipe pressure from 21:09 to 21:14 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud

logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

51.    Admit that BP did not notify HESI of a decrease in standpipe pressure from 21:26 to 21:30 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.   The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

52.    Admit that BP did not notify HESI of an increase in standpipe pressure from 21:30 to 21:34 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.   The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

53.     Admit that at no point after 17:00 hours on April 20, 2010, did BP advise HESI of an increase in flow-out from the well as measured by Transocean's flow-out sensor.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at that time. The Halliburton mud loggers were provided with real time data on standpipe pressure.   The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud

logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

54.     Admit that at no point after 17:00 hours on April 20, 2010, did BP initiate contact with the HESI mud logger on duty.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Based on the information available to it today, there is no indication that the Well Site Leader contacted the HESI mud loggers after 17:00 hours on April 20, 2010, but deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to contact the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

55.     Admit that BP did not keep the HESI mud logger on duty apprised of simultaneous activity on the rig after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "apprised" and "simultaneous activity" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to call the mud loggers.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

56.     Admit that on April 20, 2010, BP did not provide HESI with written procedures and/or activities planned for that day.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "written procedures and/or activities" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Halliburton personnel onboard the *Deepwater Horizon* on April 20, 2010 received operational plans and participated in pre-tour meetings where the procedures and operations scheduled to be conducted on April 20, 2010 were discussed.

57.     Admit that BP did not maintain the sensors used on the Deepwater Horizon to ensure they were providing accurate real time data to assist the mud loggers on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that the use of the terms "maintain" and "sensors" are vague, ambiguous, and undefined. The BP Parties further object to this request as misleading to the extent it suggests that the BP Parties were responsible for maintaining the mud logger sensors.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted with Halliburton to provide expert maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making.

58.     Admit that BP did not advise HESI of any situation developing with safety implications after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "any situation developing with safety implications." The BP Parties also object to this request as

vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties deny that they did not inform HESI of any information with safety implications during the time period in question, because virtually all actions or activities on the well may potentially have safety implications.

59.    Admit that BP directed or instructed others to perform the rig activities to be conducted after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrase "rig activities to be conducted."

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  During the given time frame, there were a number of rig activities conducted without direction or instruction from the BP Parties.

60.    Admit that BP directed Transocean to prepare the pits on the Deepwater Horizon for cleaning on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the phrases "directed" and "prepare the pits."

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that they provided the Transocean Defendants with a drill plan that included a procedure for cleaning the mud pits prior to moving to the next well.  The BP Parties deny the remainder of this request.

61.     Admit that BP did not inform HESI of simultaneous rig activities occurring on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "inform" and "simultaneous activity" is vague, ambiguous and undefined.

Subject to their general objections, the BP Parties respond as follows: Denied.  The BP Parties deny this request to the extent it is based on the assertion that the BP Well Site Leaders had an obligation or requirement to inform HESI of simultaneous rig activities occurring on April 20, 2010.  If the HESI mud loggers were uncertain of any rig activities, it is their responsibility to contact the Transocean rig crew or the Well Site Leader as Mr. Keith testified.

62.     Admit that BP understood that the simultaneous rig activities on April 20, 2010 limited the ability of HESI's mud loggers to monitor certain surface data parameters.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "simultaneous activity" and "certain surface data parameters" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

63.     Admit that BP understood that the HESI mud logger would not be able to monitor flow-out or gas content after 21:10 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the term "understood" is vague, ambiguous, and undefined, and that it fails to specify any particular time prior to the incident.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

64.     Admit that BP well site leaders are required to monitor real-time data for potential well control events.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Well Site leaders were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Transocean rig crew was also primarily responsible for kick detection (along with the Halliburton Sperry Sun mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

65.    Admit that the BP well site leader on duty after 17:00 hours on April 20, 2010, was monitoring data for potential well control events.

**RESPONSE:**

The BP Parties object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Transocean rig crew was also primarily responsible for kick detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

66. Admit that BP did not advise HESI of any observed data anomalies after 17:00 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request because the phrase "data anomalies" is vague, ambiguous, and undefined.  The BP Parties further object to this request as vague, ambiguous and misleading to the extent it suggests that the BP Parties were responsible for monitoring the Macondo Well, kick detection, and well control actions.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  The Halliburton mud loggers were provided with real time data on the well.  The Transocean rig crew was also primarily responsible for kick

detection (along with the HESI mud logger who was responsible for continuously monitoring the well) and for undertaking well control actions, as set forth in, among other sources, Transocean's Well Control Manual, Operations Manual, Emergency Response Manual, and its Drilling Contract, as well as in Halliburton's contract for services with BP applicable to the Macondo Well.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that they did not inform HESI of any data anomalies during the time period in question.

67.     Admit that BP was responsible for calibrating the sensors on the Deepwater Horizon that supplied data to the HESI mud loggers.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide expert maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making.

68.     Admit that BP was responsible for maintaining the sensors on the Deepwater Horizon that supplied data to the HESI mud loggers.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide expert maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making.

69.     Admit that BP determined the location of the sensors installed on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.   BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.   The BP Parties deny determining the location of the sensors installed on the *Deepwater Horizon*.   As testified by John Gisclair, the Sperry sensor placement was determined by the Sperry personnel who installed it and the Transocean rig crew.

70.   Admit that prior to April 20, 2010, BP instructed HESI not to utilize data from the Transocean flow-out sensor on the Deepwater Horizon.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.   BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.   There was no indication that the Sperry-Sun mud loggers were not capable of doing so and there was no indication, obligation or responsibility for BP to request additional mud loggers to provide the services contractually agreed upon by HESI and the BP Parties.   The BP Parties deny instructing HESI to not utilize data from the Transocean flow-out sensor on the *Deepwater Horizon* as confirmed by the testimony of Kelly Gray.

71.   Admit that simultaneous actions taken by the drilling crew on April 20, 2010, masked flow conditions.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the terms "simultaneous actions," "drilling crew," "masked," and "flow conditions."

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   Based on the information and data available for review following the Incident, there

was ample data to identify the signs of a kick prior to the blowout and explosion on the *Deepwater Horizon* on April 20, 2010.

72.   Admit that BP was responsible for the rig activities conducted on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the terms "responsible" and "rig activities."

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties engaged the services of Transocean, Halliburton, MI-Swaco, and other contractors to conduct various activities and operations at the well, and these parties were engaged in activities at the well on April 20, 2010.

73.   Admit that the movement of mud through the pits on the Deepwater Horizon on April 20, 2010, made it difficult for the HESI mud logger to discern any pit volume changes.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the term "difficult" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

74.   Admit that after 21:08 hours on April 20, 2010, there was no flow from the well to the pits on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is vague and ambiguous. Subject to their general objections, the BP Parties respond as follows: The BP Parties admit that after 21:08 hours on April 20, 2010, the flow was diverted overboard and there was no flow into the pits on the *Deepwater Horizon*.

75.    Admit that BP directed the movement of mud through the pits on the Deepwater Horizon on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that it is ambiguous and confusing. The BP Parties further object to this request on the grounds that Halliburton's use of the term "directed" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  It was not BP's responsibility to direct the movement of mud through the pits on the *Deepwater Horizon*.  The Transocean rig crew, along with M-I Swaco mud personnel, was responsible for directing the movement of mud on the *Deepwater Horizon*.

76.    Admit that BP directed that returns from the well be routed overboard after 21:08 hours on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that the term "directed" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the well plan specified discharge of spacer material overboard if the spacer fluid passed the sheen test.  As stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, the rig crew opened the overboard dump valve on the flow line at

39

approximately 21:10 hours in preparation for discharging the spacer, and the sheen test began at the same time.  The BP Parties deny the remainder of this request.

77.     Admit that drill pipe pressure is not a reliable kick indicator.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "reliable kick indicator" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Well monitoring at the Macondo Well was primarily the responsibility of the Transocean rig crew, as well as of the Halliburton Sperry Sun mud logger on duty at the time of the kick.  As outlined in the Transocean Well Control Manual, there are multiple kick indicators that need to be monitored and analyzed by the rig crew and the mud loggers.

78. Admit that once the rig pumps were engaged on the Deepwater Horizon at approximately 21:16 hours on April 20, 2010, the HESI mud logger was unable to identify an increase in standpipe pressure as an indicator of an influx into the well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "engaged" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide continuous monitoring of the well.  The HESI mud loggers are required to identify and notify the Transocean rig crew and/or the BP well site leader of any safety concerns.  If the HESI mud loggers are not able to utilize all of their monitoring tools, they have other tools that allow for safe monitoring.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

79.     Admit that the rig activity occurring on the Deepwater Horizon after 17:00 hours on April 20, 2010, inhibited the HESI mud logger's ability to accurately monitor sensor data for indications of a kick.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "inhibited" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide continuous monitoring of the well.  The HESI mud loggers are required to identify and notify the Transocean rig crew and/or the BP well site leader of any safety concerns.  If the HESI mud loggers are not able to utilize all of their monitoring tools, they have other tools that allow for safe monitoring.  To the extent that the mud loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

80.     Admit that the rig activity occurring on the Deepwater Horizon after 17:00 hours on April 20, 2010, inhibited the HESI mud logger's ability to monitor drilling operation parameters.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "inhibited" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with Halliburton to provide continuous monitoring of the well.  The HESI mud loggers are required to identify and notify the Transocean rig crew and/or the BP well site leader of any safety concerns.  If the HESI mud loggers are not able to utilize all of their monitoring tools, they have other tools that allow for safe monitoring.  To the extent that the mud

loggers were not able to safely conduct their responsibilities, it was their duty to stop the job, which they did not do.

81.    Admit that BP determines the low threshold and high threshold parameters for triggering alarms set on critical variables for HESI's mud logging services.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "threshold parameters" and "critical variables" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  In carrying out their responsibility to continuously monitor the well, the Sperry-Sun mud loggers are responsible for setting their alarms at appropriate thresholds.  Further as Mr. Gray and Mr. Gisclair both testified, the mud loggers set their alarm levels.

82.    Admit that BP determined which low threshold and high threshold parameters for triggering alarms were set on critical variables monitored by HESI's mud loggers on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "threshold parameters" and "critical variables" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  In carrying out their responsibility to continuously monitor the well, the Sperry-Sun mud loggers are responsible for setting their alarms at

appropriate thresholds.  Further as Mr. Gray and Mr. Gisclair both testified, the mud loggers set their alarm levels.

83.     Admit that BP instructed the HESI mud loggers which critical variables to monitor on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "critical variables" and "instructed" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  As set out in the BP/HESI Well Services Contract, HESI is required to provide a monitoring program that displays critical well data and trends.  The individual HESI mud loggers are required to set up their monitoring program, determining which data to display, as well as set appropriate alarms, depending on rig activities, as testified by Kelly Gray.

84.     Admit that BP well site leaders on the Deepwater Horizon had display terminals in their office displaying the data monitored by HESI's mud loggers.

**RESPONSE:**

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties admit that they had access to HESI data through INSITE Anywhere on April 20, 2010, but note that various other information or data is available to the mud loggers in their location on the rig that would not be available to the BP Parties, such as the mud logger's audible and visual alarms.

43

85.     Admit that BP determined the mud logging activities that were to take precedence during each type of operational activity on the Deepwater Horizon.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "precedence" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted with HESI to provide expert mud logging services, including continual monitoring of well data.  The responsibility to safely monitor the well was the responsibility of the Transocean rig crew and the Sperry-Sun mud loggers.  As set out in the BP/HESI Well Services Contract, HESI is required to provide a monitoring program that displays critical well data and trends.  The individual HESI mud loggers are required to set up their monitoring program, determining which data to display, as well as set appropriate alarms, depending on rig activities, as testified by Kelly Gray.

86.     Admit that BP is aware of a hydrocarbon sand in the Macondo Well named "M57B" or "M57_B" with a pore pressure of approximately 14.15 ppg.

**RESPONSE:**

The BP parties object to this request as vague and ambiguous to the extent that "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

87. Admit that a zone of hydrocarbon sand named "M57B" or "M57_B" exists in the Macondo Well at a depth of 17,451 feet to 17,453 feet.

**RESPONSE:**

The BP parties object to this request as vague and ambiguous to the extent that "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

88.    Admit that "Figure 1" on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" ("Bly Report") does not reflect all of the hydrocarbon zones or sands currently known by BP to exist in the Macondo Well below the depth of 17,000 ft.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons. Further, Figure 1 on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" states "Note: Sands are based on geology known at the time of the accident" and is not intended to reflect all sands currently known, whether hydrocarbon-bearing or not.

89.    Admit that the hydrocarbon sand named "M57B" or "M57_B" is not reflected in "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  Further, Figure 1 on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" states "Note:  Sands are based on geology known at the time of the accident" and is not intended to reflect all sands currently known, whether hydrocarbon-bearing or not.

90.    Admit that BP identified the hydrocarbon sand named "M57B" or "M57_B" in the Macondo Well after April 20, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

91.    Admit that BP knew about the presence of the hydrocarbon sand named "M57B" or "M57_B" in the Macondo Well before the September 8, 2010 release date of the Bly Report.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that the phrase "hydrocarbon sand" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  Further, Figure 1 on page 54 of BP's "*Deepwater Horizon Accident Investigation Report*" states "Note:  Sands are based on geology known at the time of the accident" and is not intended to reflect all sands currently known, whether hydrocarbon-bearing or not.

92.     Admit that BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension* specifies, among other things, that top of cement (TOC) should be 1,000 feet above any distinct permeable zones.

**RESPONSE:**

Subject to their specific and general objections, the BP Parties respond as follows:  the BP Parties admit that BP's Engineering Technical Practice (ETP) GP 10-60, titled Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension states:

> "Zonal Isolation design criteria for cementing of primary casing strings to meet well integrity and future abandonment requirements, shall meet one of the following:
>
> • 30 mTVD (100 ft TVD) above the top of the distinct permeable zone where the top of cement (TOC) is to be determined by a proven cement evaluation technique (Section 5.3).
>
> • 300 m MD (1000 ft MD) above the distinct permeable zone where the hydraulic isolation is not proven except by estimates of TOC (Section 5.3)."

The BP Parties deny the remainder of this request.

93.     Admit that, as of the time of the cement job on the final production casing, BP claims that the shallowest hydrocarbon sand of which it was aware was the 13.1 ppg sand at approximately 17,788 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "shallowest hydrocarbon sand" and "BP claims that" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Admitted to the extent that this request asks whether the shallowest hydrocarbon sand in the production interval of the Macondo Well was a 13.1 ppg sand at approximately 17,788 feet. The BP Parties deny the remainder of this request.

94.     Admit that, since the time of the cement job on the final production casing, BP claims it has learned that the shallowest hydrocarbon sand was the 14.15 ppg sand at approximately 17,451 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "BP claims it has learned" and "hydrocarbon sand" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

95. Admit that the cement program used at the Macondo Well was designed to place top of cement (TOC) at approximately 17,260 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "approximately 17,260 ft." is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: The cement program for the production interval at the Macondo Well was designed to pump enough cement to place the top of cement at least 500 feet above the uppermost hydrocarbon bearing sand in compliance with applicable MMS regulations.  The BP Parties deny the remainder of this request.

96.     Admit that, had BP been aware of the 14.15 ppg sand at approximately 17,451 ft. prior to the cement job on the final production casing, that sand would have been considered the shallowest hydrocarbon sand in the production casing interval of the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "had BP been aware" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.

97.     Admit that, had BP been aware of the 14.15 ppg sand at approximately 17,451 ft. prior to the cement job on the final production casing, government regulations would have required top of cement (TOC) to be no lower than 16,951 ft. (or 500 feet above 17,451 ft.).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "government regulations would have required" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

49

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned.

98.   Admit that, had top of cement (TOC) been at 16,951 ft., the annular cement would have been designed to cover the shoe located at 17,168 ft.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "would have been designed" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned.  The BP Parties admit that if the top of cement were at 16,951' there would be cement above the shoe located at 17,168', but deny all other aspects of this request.

99.   Admit that, had annular cement been designed to cover the shoe located at 17,168 ft., BP's internal policies, practices or procedures would have required a re-evaluation of the production casing design used at the Macondo Well in order to mitigate against annular pressure build-up (APB).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "re-evaluation" and "would have been required" are vague, ambiguous, and undefined.  The BP Parties object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned and no further evaluation of the casing design used at the Macondo Well would have been required.

100.    Admit that, had annular cement been designed to cover the shoe located at 17,168 ft., BP's internal policies, practices or procedures would have required a change to the production casing design used at the Macondo Well in order to mitigate against annular pressure build-up (APB).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "would have been required" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks the BP Parties to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have

required a higher top of cement than what was planned and no change in the casing design used at the Macondo Well would have been required.

101.    Admit that, had annular cement been designed to cover the shoe located at 17,168 ft., a sealed annulus would have been created which would have increased the risk of casing collapse or burst due to annular pressure build-up (APB) during production.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "would have been required" is vague, ambiguous, and undefined.  The BP Parties object to this request on the grounds that it is ambiguous and confusing, and asks BP to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties are aware of a sand interval labeled M57B that has a pore pressure of approximately 14.15 ppg at the Macondo Well but, based on all available information, that sand interval does not have hydrocarbons.  As such, applicable MMS regulations would not have required a higher top of cement than what was planned and no change in the casing design used at the Macondo Well would have been required.

102. Admit that BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension* specifies, among other things, that centralization should extend to 100 feet above any distinct permeable zones.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "centralization" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit this request to the extent it asks whether BP's Engineering Technical Practice

52

(ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension states: "In the event the cement isolation is not to be assessed by proven cement evaluation technique plan for at least 30 m (100 ft) of centralised pipe above the distinct permeable zone." The BP Parties deny the remainder of this request.

103.    Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "12.6 ppg Sand: 18,202' – 18,223'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

104.    Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "12.6 ppg Sand: 18,104' – 18,175'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

105.    Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "12.6 ppg Sand: 18,051' – 18,073'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension.*

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied.  BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

106.    Admit that the hydrocarbon sand/zone reflected in "Figure 1" on page 54 of the Bly Report as "13.1 ppg Sand: 17,788' – 17,791'" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension.*

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

107.   Admit that the sand zone reflected in "Figure 1" on page 54 of the Bly Report as "14.1 ppg Sand: 17,684' – 17,693' (brine)" constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied. BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

108.   Admit that the hydrocarbon sand/zone named "M57B," as reflected on BP-HZN-BLY00173436, constitutes a distinct permeable zone for purposes of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "constitutes a distinct permeable zone for purposes of interpreting" is vague, ambiguous, and undefined.

Subject to their general and specific objections, the BP Parties respond as follows: Denied.  BP's Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements during Drilling Operations and Well Abandonment and Suspension defines a "distinct permeable zone" as "A group of permeable zones which were originally in the same pressure regime and where flow between zones can be shown to be acceptable."

109.    Admit that the hydrocarbon zones above the "main hydrocarbon zones" (as that term is used in the sentence quoted in Request for Admission 142) in the Macondo Well were capable of initiating flow into the wellbore.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as there are no sentences quoted in Request for Admission 142 (which is about a different subject) and the term "main hydrocarbon zones" is unclear.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties will supplement this response once Halliburton clarifies which "main hydrocarbon zone" it is referencing.

110.    Admit that the 13.1 ppg sand in the Macondo Well is named or known as "M56A" or "M56_A."

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as to the extent that it references a single 13.1 ppg sand in the Macondo Well without identifying any depth or additional information.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that there is a sand interval identified as "M56A" or "M56_A" with an estimated pore pressure of 13.1 ppg.

111.    Admit that "the M56A sand" referenced on page 215 of the Bly Report, Appendix G, is the sand depicted and identified as the "13.1 ppg Sand: 17,788' – 17,791'" on "Figure 1" of page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request on the grounds that "depicted" and "identified" are vague and ambiguous.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit that the 13.1 ppg sand at the 17,788' - 17,791' on Figure 1 of page 54 of the Bly Report appears to be the same sand labeled as M56A on page 215 of the Bly Report.

112.    Admit that BP's claim that the initial flow of hydrocarbons came from the 13.1 ppg sand.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "initial flow" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   The BP Parties refer to, *inter alia*, their September 8, 2010 *Deepwater Horizon* Accident Investigation Report and Appendices.

113.    Admit that BP also claims that once initial flow of hydrocarbons came from the 13.1 ppg sand, the influxing hydrocarbons lightened the hydrostatic column causing the 12.6 ppg sands to begin to flow on the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that it assumes the BP Parties admit the initial flow of hydrocarbons came from the 13.1 ppg sand.  In addition, the BP Parties object to this request as vague and ambiguous as to the phrase "initial flow" and "influxing hydrocarbons lightened the hydrostatic column."

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties refer Halliburton to their response to Request for Admission No. 112.

114. Admit that Appendix G to Bly Report's conclusion that "[t]he 1,400 psi drill pipe pressure observed during the negative-pressure test best matched communication with the M56A sand . . ." reflects BP's position that the initial flow of hydrocarbons came from the 13.1 ppg sand.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "initial flow" is vague and ambiguous.  In addition, the BP Parties object to this request on the grounds that it assumes the BP Parties admit that the initial flow of hydrocarbons came from the 13.1 ppg sand.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  The BP Parties refer Halliburton to their response to Request for Admission No. 112.

115.   Admit that the 13.1 ppg sand in the Macondo Well from which BP believes flow initiated is above the "main hydrocarbon zones" (as that term is used in the sentence quoted in Request for Admission 142).

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "flow initiated" is vague and ambiguous.  The BP Parties also object to this request on the grounds that it assumes the BP Parties admit the initial flow of hydrocarbons came from the 13.1 ppg sand.  In addition, the BP Parties object to this request as vague and ambiguous as to the phrase "main hydrocarbon zones."  Further, the request referenced to provide a definition for that phrase does not include the phrase at issue.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that Figure 1 on page 54 of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report labels the 12.6 ppg sands as the "Primary Reservoir Sands."  The BP Parties

58

further refers Halliburton to their response to Request for Admission No. 112.  The BP Parties

deny the remainder of this request.

116.    Admit that BP designed the casing for the Macondo Well such that the bottom of
the casing was only 55 feet beneath the lowest hydrocarbon zone.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "lowest

hydrocarbon zone" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied.

The casing shoe was designed to be set at 18,310' and the bottom of the lowest hydrocarbon

zone is more than 55 feet above 18,310' at 18,223'.

117.    Admit that, other than modeling whether particular production casing designs
could be successfully cemented, HESI had no input into the production casing design used by BP
for the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular

casing designs could be successfully cemented" and "input" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied.

HESI personnel were involved in various aspects of the production casing selection process and

provided input into those decisions.

118.    Admit that, other than modeling whether particular production casing designs
could be successfully cemented, BP never requested that HESI review and/or evaluate the
adequacy of the production casing design used by BP at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "adequacy" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. While HESI involvement did not cover all engineering aspects, such as the work conducted by BP's EPT group or BP's engineers, HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well.

119.   Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate whether the production casing design used by BP at the Macondo Well was defective.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "defective" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. While HESI involvement did not cover all engineering aspects, such as the work conducted by BP's EPT group or BP's engineers, HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well.

120.   Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate whether the production casing design used by BP at the Macondo Well was dangerous.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "dangerous" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. While HESI involvement did not cover all engineering aspects, such as the work conducted by BP's EPT group or BP's engineers, HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well.

121.    Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate whether the production casing design used by BP at the Macondo Well should be changed.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented," "review and/or evaluate" and "changed" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. HESI personnel were involved in the review and evaluation of the production casing design and provided input into whether that production casing could be successfully installed in the well, including discussions whether a production long string or another option should be included.

122.    Admit that BP was ultimately responsible for determining, prior to the cement job on the final production casing at the Macondo Well, whether the float collar converted on April 19, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent that "ultimately responsible" is vague and ambiguous.  There were a number of entities involved in determining that the float collar converted on the Macondo Well, including Halliburton, Transocean, Weatherford and BP personnel.  BP sought and relied upon input from the appropriate resources and after discussion, the BP personnel determined that the float collar converted.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that BP personnel determined that the float collar converted on April 19, 2010.

123.    Admit that HESI had no active involvement in the operation to convert the float collar in the Macondo Well on April 19, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent "active involvement" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The operation to convert the float collar relies, in part, upon data collected by the Halliburton cementing unit.

124.    Admit that, on April 19, 2010, HESI had no ability to independently determine whether the float collar in the Macondo Well actually converted during operations to convert the float collar.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "independently determine" is undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. Halliburton had access to data and information from the rig sufficient to analyze the float collar operation.

125.    Admit that the float collar equipment used in the final production casing at the Macondo Well was designed to convert at a flow rate greater than 4 bpm.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that it fails to identify sufficient criteria for BP to respond to this request. Float collar conversion is dependent on numerous factors, including mud weight used during the float collar operation. Additionally float collars are designed to convert based on pressure differential.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that at the drilling mud weight density used in the Macondo Well, Weatherford's float collar is designed to convert at a pressure differential of 500 to 700 psi, which likely to occur with a flow rate that is greater than 4 bpm.

126.    Admit that, prior to April 20, 2010, BP never informed HESI of the flow rate at which the float collar equipment in the Macondo Well was designed to convert.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "informed" is undefined.

Subject to their specific and general objections, the BP Parties state as follows: Denied. Halliburton was involved in the well operations and was aware of the float collar equipment in the Macondo Well.

127.    Admit that BP cannot conclusively determine that the float collar in the Macondo Well actually converted on April 19, 2010.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "conclusively determined" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. All information available to the BP Parties at this time indicates that the float collar in the Macondo Well converted on April 19, 2010.

128.   Admit that BP decided not to use the number of centralizers recommended by HESI in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous as Halliburton made multiple recommendations regarding the number of centralizers to be used in the Macondo Well.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit that six centralizers were utilized in the Macondo Well, and that Halliburton did not recommend the use of six centralizers in writing, but that Halliburton was aware of the number of centralizers being utilized before pumping the cement job it designed.

129.   Admit that BP knew that the fifteen centralizers delivered to the Deepwater Horizon were not installed on the production casing.

**RESPONSE:**

The BP Parties object to this request to the extent that it is vague and ambiguous to the extent that it does not reference any time period or even the Macondo Well.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit that the production casing was run with six centralizers on the Macondo Well.

130. Admit that BP authorized execution of the cement job on the production interval of the Macondo Well, knowing that the fifteen centralizers delivered to the Deepwater Horizon were not installed on the production casing.

**RESPONSE:**

Subject to their general objections, the BP Parties state as follows:  The BP Parties admit that they authorized the execution of the cement job designed and recommended by Halliburton.

131.   Admit that the fifteen centralizers delivered to the Deepwater Horizon were the precise centralizers BP ordered.

**RESPONSE:**

The BP Parties object to this request to the extent "precise centralizers BP ordered" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties admit this request to the extent it asks whether fifteen centralizers were delivered to the *Deepwater Horizon* after BP placed an order.  The BP Parties deny the remainder of this request.

132.   Admit that the fifteen centralizers delivered to the Deepwater Horizon could have been installed on the production casing before it was installed in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request to the extent that "could have been installed" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that it would have been possible to install additional centralizers on the production casing before it was installed in the Macondo Well.

133.   Admit that BP's decision to not run the centralizers available to it was, in part, due to the failure of John Guide to properly asses the utility of the centralizers.

**RESPONSE:**

The BP Parties object to this request to the extent "properly assess the utility of the centralizers" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.

134.    Admit that HESI warned BP not to use only six (6) centralizers.

**RESPONSE:**

The BP Parties object to this request to the extent "warned" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  Halliburton was aware of the number of centralizers being utilized before pumping the cement job it designed and proceeded with the operation.

135.    Admit that BP had final decision-making authority with regard to the centralizers in the Macondo Well, including the authority to override HESI's advice to use more than six (6) centralizers.

**RESPONSE:**

The BP Parties object to this request to the extent it is vague and ambiguous regarding "HESI's advice to use more than six centralizers."

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that they made the decision on the number of centralizers to use in the Macondo Well.  The BP Parties deny the remainder of this request because any party can stop the job if it believes there are unsafe conditions.

136.    Admit that BP never responded to Jesse Gagliano's request for confirmation [*See* BPHZN-MBI 00128489-BP-HZN-MBI 00128490] of the number of centralizers BP decided to utilize with final production casing in the Macondo Well.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows:  After a reasonable inquiry, the BP Parties are unable to either admit or deny this request.  The BP Parties further respond that BP had informed Nathaniel Chaisson of the decision to run six centralizers on April 16, 2010 – before Mr. Gagliano's request.

137.    Admit that, in preparation for the cement job on the final production casing, BP did not place any centralizers across the hydrocarbon sand identified and/or depicted as "13.1 ppg Sand: 17,788' – 17,791'" on "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request to the extent that "across the hydrocarbon sand" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg Sand on Page 54 of the Bly Report and admits that the centralizer located there would appropriately centralizer the pipe across the 3' sand interval.  The BP Parties deny the remainder of this request.

138.    Admit that, in preparation for the cement job on the final production casing, BP did not place any centralizers above the hydrocarbon sand identified and/or depicted as "13.1 ppg Sand: 17,788' – 17,791'" on "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

The BP Parties object to this request to the extent that "across the hydrocarbon sand" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg Sand on Page 54 of the Bly Report and that the centralizer located there would appropriately

centralizer the pipe across the 3' sand interval.   The BP Parties deny the remainder of this request.

139.    Admit that, in preparation for the cement job on the final production casing, BP placed the highest centralizer below the hydrocarbon sand identified and/or depicted as "13.1 ppg Sand: 17,788' – 17,791'" on "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows:  The BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg Sand on Page 54 of the Bly Report and that the centralizer located there would appropriately centralizer the pipe across the 3' sand interval.  The BP Parties deny the remainder of this request.

140.    With respect to the following sentence on page 35 of the Bly Report—"Although the decision not to use 21 centralizers increased the possibility of channeling above the main hydrocarbon zones, the decision likely did not contribute to the cement's failure to isolate the main hydrocarbon zones or to the failure of the shoe track cement."—admit that the phrase "main hydrocarbon zones" refers to the three 12.6 ppg sands depicted and identified as "Primary Reservoir Sands" in "Figure 1" on page 54 of the Bly Report.

**RESPONSE:**

Subject to their general objections the BP Parties respond as follows:  The BP Parties admit that the main hydrocarbon sands phrase utilized in the Bly Report relates to the three 12.6 ppg sands depicted and identified as Primary Reservoir Sands in Figure 1 on page 54.

141.    Admit that no centralizers were placed across or above the 13.1 ppg sand in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request to the extent "across" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that the top centralizer was below the bottom of the sand depicted as 13.1 ppg

Sand on Page 54 of the Bly Report and that the centralizer located there would appropriately centralizer the pipe across the 3' sand interval.   The BP Parties deny the remainder of this request.

142.   Admit that channeling and poor mud erodibility should be expected across the 13.1 ppg sand in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the terms "channeling" and "should be expected" and the phrase "poor mud erodibility" are vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   The BP Parties deny this request, including any particular operation implication of the use of the term "channeling" and the phrases "should be expected" and "poor mud erodibility," as HESI has not sufficiently explained what it means by their use of these terms and phrase in the context of this request.   The BP Parties further deny this request because, having conducted a reasonable inquiry, the BP Parties have no indication that channeling and poor mud erodibility should be expected across the 13.1 ppg sand in the Macondo Well.

143.   Admit that BP conducted modeling that shows that the top two centralizers run in the production interval of the Macondo Well provided 65% and 40% standoff, respectively.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "BP conducted modeling" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   The BP Parties did not conduct any modeling of the cement job before April 20, 2010. Halliburton conducted certain modeling before April 20, 2010.

144.    Admit that BP conducted modeling that shows that channeling and poor mud erodibility would be expected across the interval where the top two centralizers were placed in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "BP conducted modeling" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties did not conduct any modeling of the cement job before April 20, 2010. Halliburton conducted certain modeling before April 20, 2010.

145.    Admit that BP would expect channeling across the intervals above the highest centralizer on the production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "across the intervals above the highest centralizer on the production casing" is undefined.  The BP Parties further object to this request on the grounds that it is ambiguous and confusing, and asks the BP Parties to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows:  The BP Parties admit that as you move further above a centralizer, the potential for channeling can increase.

146.    Admit that BP would expect poor mud erodibility across the intervals above the highest centralizer on the production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "across the intervals above the highest centralizer on the production casing" is undefined.   The BP

Parties further object to this request on the grounds that it is ambiguous and confusing, and asks the BP Parties to admit facts based on a hypothetical situation.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that as you move further above a centralizer, the potential for poor mud erodibility can increase.

147. Admit HESI was not responsible for and/or had no duty to analyze the entire temporary abandonment procedure at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "responsible for and/or had no duty to analyze" and "entire temporary abandonment procedure" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. Halliburton was not responsible for analyzing the portions of the

temporary abandonment procedure for the Macondo Well that did not rely on the validity of the cement that Halliburton was responsible for designing, testing, recommending and pumping.

148.    Admit that BP instructed HESI to perform the cement job despite BP's knowledge that the float collar in the Macondo Well did not perform as expected during attempts to convert it.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "knowledge" and "did not perform as expected" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The BP Parties state that the consensus opinion on the Deepwater Horizon on April 19, 2010 was that the attempts to convert the float collar were successful.  Post-incident testing has confirmed that the float collar likely converted.

149.    Admit that BP instructed HESI to perform the cement job despite approximately nine attempts to convert the float collar in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "instructed" and "despite approximately nine attempts" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in

the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  BP allowed Halliburton to pump the cement job on April 19, 2010 after the nine attempts to establish circulation and after conversion of the float collar.

150.    Admit that BP was ultimately responsible for determining when to conduct the cement job on the final production casing at the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "ultimately responsible" and "determining when to conduct" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  Based on the foregoing, BP allowed Halliburton to pump the cement job after conversion of the float collar and after the circulation specified in Halliburton's cement

procedure.   The cement job is typically pumped after the float collar is converted and after circulation.

151.   Admit that HESI could not commence the cement job on the final production casing on April 19, 2010 without BP's authorization.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "authorization" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows:   BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.   Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.   Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.   The BP Parties admit that BP allowed Halliburton to pump the cement job without the information that Halliburton did not provide to BP.   Halliburton could not have pumped with cement job without BP's approval but Halliburton would not have received that approval absent its failures and conduct.   The BP Parties deny the remainder of this request.

152.   Admit that BP authorized HESI to commence the cement job on the final production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "authorized" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. The BP Parties admit that BP allowed Halliburton to pump the cement job without the information that Halliburton did not provide to BP. Halliburton could not have pumped with cement job without BP's approval but Halliburton would not have received that approval absent its failures and conduct. The BP Parties deny the remainder of this request.

153. Admit that HESI was not authorized to commence the cement job on the final production casing in the Macondo Well on April 19, 2010 without BP's approval.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "authorized" and "approval" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test, recommend and pump the cement slurry at

the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  Halliburton did not receive valid authorization because BP allowed Halliburton to pump the cement job without the information that Halliburton did not provide to BP.  Halliburton could not have pumped with cement job without BP's approval but Halliburton would not have received that approval absent its failures and conduct.

154.   Admit that BP expected the cement job on the final production casing in the Macondo Well to channel.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "channel" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP did not expect the cement job designed, tested, recommended and pumped by Halliburton at the Macondo Well to fail to contain the hydrocarbons in the formation.

155.   Admit that BP understood that, if the cement job on the final production casing in the Macondo Well channeled, such channeling could be remediated by conducting a cement squeeze job.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "understood," "if the cement job on the final production casing in the Macondo Well channeled" and "such channeling could be remediated" is vague, ambiguous, and undefined. The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical. The BP Parties further object that this requests is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP did not expect the cement job designed, tested, recommended and pumped by Halliburton at the Macondo Well to fail to contain the hydrocarbons in the formation.

156. Admit that, prior to the cement job on the final production on April 19, 2010, BP understood that if a cement job failed to isolate hydrocarbons as intended, the cement job could later be remediated by conducting a cement squeeze job.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "understood," "if a cement job failed to isolate hydrocarbons as intended" and "the cement job could later be remediated" is vague, ambiguous, and undefined. The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical. The BP Parties further object that this requests is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test, recommend and pump the cement slurry at

the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.

157. Admit that BP's decision tree specified that a cement bond log would be run if full returns were not observed during execution of the cement job at the Macondo Well.

**<u>RESPONSE:</u>**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "BP's decision tree" and "would be run if full returns were not observed" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the

Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  The Macondo Production casing and TA Forward Planning Decision Tree used multiple criteria including losses while cementing to determine whether a cement bond log was appropriate.  Further, BP conferred with Halliburton and other contractors to determine whether a cement bond log should be performed.

158.    Admit that the perception of full returns during the cement job completed on April 20, 2010, was not a conclusive determination that the cement job isolated all hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "perception of full returns" and "conclusive determination" is vague, ambiguous, and undefined. The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical. The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to

proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. Halliburton reported to BP and other contractors that the cement job had been executed successfully. Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well. After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

159. Admit that the perception of full returns during the cement job completed on April 20, 2010, was not a conclusive determination that the slurry had reached its intended location.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "perception of full returns," "conclusive determination," and "intended location" is vague, ambiguous, and undefined. The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical. The BP Parties further object that this request is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results

that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on top of cement when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

160.    Admit that the lift pressure observed during the cement job completed on April 20, 2010, was not a conclusive determination that the cement job isolated all hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "conclusive determination" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to

discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

161.    Admit that the lift pressure observed during the cement job completed on April 20, 2010, was not a conclusive determination that the slurry reached its intended location.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "conclusive determination" and "intended location" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at

82

the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on top of cement when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

162.    Admit that the perception of full returns and observations of lift pressure during the cement job completed on April 20, 2010, were not, in combination, a conclusive determination that the cement job isolated hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "perception of full returns," "observations of lift pressure," "conclusive determination" and "isolated hydrocarbon zones as intended" is vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this requests is premature.  The BP Parties will provide the opinions of their

83

experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. Halliburton reported to BP and other contractors that the cement job had been executed successfully. Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well. After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

163. Admit that the perception of full returns and observations of lift pressure during the cement job completed on April 20, 2010, were not, in combination, a conclusive determination that the slurry reached its intended location.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrases "perception of full returns," "observations of lift pressure," "conclusive determination" and "intended location" are

vague, ambiguous, and undefined.  The BP Parties object to this request to the extent it calls for an opinion based on a hypothetical.  The BP Parties further object that this request is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre-Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on top of cement when it later returned to complete the well.  After the cement job, Halliburton reported to BP that there were full returns and lift pressure, and that the plugs bumped on schedule.

164.    Admit that, unless or until a cement bond log (CBL) or other cement evaluation tool is used, the top of cement (TOC) in the annulus can only be estimated.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "unless and until," "or other cement evaluation tool" and "can only be estimated" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There are a variety of tools and techniques that provide reasonably accurate information on the top of cement besides a cement bond log.

165. Admit that, unless or until a cement bond log (CBL) or other cement evaluation tool is used, the location of cement at the conclusion of the cement job completed on April 20, 2010 can only be estimated.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "unless and until," "or other cement evaluation tool" and "location of cement" is vague, ambiguous, and undefined.  The BP Parties further object to this request on the grounds that it is premature.  The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  There are a variety of tools and techniques that provide reasonably accurate information on the top of cement.

166.    Admit that a cement bond log (CBL) or other cement evaluation tool was the only way to determine actual top of cement (TOC) after the cement job completed on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrases "or other cement evaluation tool" and "determine actual top of cement (TOC)" is vague, ambiguous, and undefined. The BP Parties further object to this request on the grounds that it is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. There are a variety of tools and techniques that provide reasonably accurate information on the top of cement besides a cement bond log.

167.    Admit that a cement bond log (CBL) or other cement evaluation tool was the only way to conclusively determine whether the cement job completed on April 20, 2010 effectively isolated all hydrocarbon zones as intended.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "or other cement evaluation tool," "conclusively determine," and "effectively isolated all hydrocarbon zones as intended" is vague, ambiguous, and undefined. The BP Parties further object to this request on the grounds that it is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to

discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP planned to run a cement bond log to provide information on zonal isolation when it later returned to complete the well.  A cement bond log can provide data relating to the bond between the cement and the casing and the formation.

168.    Admit that, prior to the completion of the cement job on April 20, 2010, BP hired a service contractor to be available to provide cement bond log (CBL) services after the completion of the cement job for the final production casing.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the

Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

169.    Admit that a cement bond log (CBL) service contractor was on the Deepwater Horizon during the cement job on the final production casing and was available to provide CBL services, if requested by BP after the completion of the cement job.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log

should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

170.   Admit that, on April 20, 2010, BP elected not to use the services of the cement bond log (CBL) service contractor available on the Deepwater Horizon to evaluate the cement job on the final production casing.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "elected not to use" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the

service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

171.    Admit that personnel of the cement bond log (CBL) service contractor that BP hired to be available to provide CBL services, left the rig on April 20, 2010, without providing such services.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.    Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.    As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Halliburton reported to BP and other contractors that the cement job had been executed successfully.  Based on Halliburton's representations and conduct, BP released the service contractor that it had available on the *Deepwater Horizon* to run a cement bond log had Halliburton reported lost returns or identified any problems with the cement job.  The BP Parties deny the remainder of this request.

172.    Admit that BP never asked HESI before the cement job that was completed on April 20, 2010, whether BP should run a cement bond log (CBL).

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "never asked" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test, recommend and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  Further, based on testimony, Halliburton employees, including Nathaniel Chaisson and Vincent Tabler, were present at a meeting on the *Deepwater Horizon* rig when BP presented its decision tree indicating the plan to not run a CBL if certain cementing criteria were observed.  Fully aware of BP's decision tree and criteria, Halliburton never told BP that it should a run a CBL before the blowout on April 20, 2010.

173. Admit that BP never asked HESI after the cement job that was completed on April 20, 2010, whether BP should run a cement bond log (CBL).

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "never asked" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure. And, at minimum, BP sought Halliburton's input on whether BP should run a cement bond log at the morning meeting of April 20, 2010. At no time did Halliburton indicate that a cement bond log should be run despite BP's efforts to seek its input.

174.    Admit that BP did not request input from HESI as to whether a cement bond log (CBL) should be run after the cement job that was completed on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "did not request input" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run. After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure. And, at minimum, BP sought Halliburton's input on whether BP should run a cement bond log at the morning meeting of April 20, 2010. At no time did Halliburton indicate that a cement bond log should be run despite BP's efforts to seek its input.

175.   Admit that BP was responsible for determining whether a cement bond log (CBL) should be run after the cement job that was completed on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "determining whether a cement bond log (CBL) should be run" is vague, ambiguous and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the

Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure.  And, at minimum, BP sought Halliburton's input on whether BP should run a cement bond log at the morning meeting of April 20, 2010.  At no time did Halliburton indicate that a cement bond log should be run despite BP's efforts to seek its input.

176.    Admit that the foamed cement that HESI pumped into the Macondo Well on April 19 and 20, 2010 was engineered to BP's specifications.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "engineered to BP's specifications" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated

the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  At no point did BP specify that it wanted Halliburton to pump an unstable foam cement in the production interval of the Macondo Well.

177.    Admit that, prior to the April 19, 2010 cement job on the final production casing, HESI was not contractually obligated to provide BP with a foam stability test on the slurry used.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct.  The contract further states:

5.2 Cement and Spacer Sampling and Testing

The final results supplied to COMPANY prior to each job shall be available to COMPANY more than 24 hours before pumping cement and tests shall be completed using actual rig samples and not load out samples unless previously agreed with COMPANY.

178.   Admit that BP authorized commencement of the cement job on the final production casing in the Macondo Well without BP first seeing a foam stability test result on the slurry that was to be used.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "authorized commencement" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.   Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.   Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Further, Halliburton failed to perform a foam stability test on the slurry that it pumped at the Macondo Well on April 19-20, 2010.   Despite failing to run such a foam stability test, Halliburton did not identify any risks or concerns with proceeding without this test.   As such, BP relied on Halliburton, its cementing contractor, to pump a safe and competent cement job and authorized that work on April 19, 2010, and did not knowingly authorize Halliburton to pump an unstable foam cement job.

179.   Admit that, at the time the cement job on the final production casing in the Macondo Well was commenced, BP knew it was not in possession of a foam stability test result for the slurry that was to be used.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.   BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.   Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.   As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.   Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Further, Halliburton failed to perform a foam stability test on the slurry that it pumped at the Macondo Well on April 19-20, 2010.   Despite failing to run such a foam stability test, Halliburton did not identify any risks or concerns with proceeding without this test.   As such, BP relied on Halliburton, its cementing contractor, to pump a safe and competent cement job and authorized that work on April 19, 2010, and did not knowingly authorize Halliburton to pump an unstable foam cement job.

180.   Admit that BP informed HESI that the cement job was successfully executed.

**RESPONSE:**

Subject to their general objections, the BP Parties respond as follows: Denied.   BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.

Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton cement job because it was unaware of those risks due to Halliburton's failures and conduct. Following the cement job, Halliburton informed BP that the cement job was successfully executed.

181. Admit that BP was responsible for determining whether a cement bond log would be utilized for the Macondo Well production casing.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "responsible for determining" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well. Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended. Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP. As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job. Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As

such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log

should be run.  After Halliburton finished pumping the cement job on April 20, 2010, it informed

BP that the cement job was pumped successfully with no losses, plug bumping on time and lift

pressure.  Halliburton further made a presentation to BP and the other contractors that the cement

job was successfully executed.  At minimum, BP sought the input of Halliburton and other

contractors on whether a cement bond log should be run at the morning meeting of April 20,

2010.  At no time did Halliburton or other parties indicate that a cement bond log should be run

despite BP's efforts to seek its input.

182.    Admit that BP and no other entity had the final decision making authority with regards to running a cement bond log on April 20, 2010, on the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase

"final decision making authority" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows:

Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the

Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss

with BP the ramifications of using various additives on the stability of the foamed cement that

Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated

the Halliburton-recommended foam cement was unstable and misrepresented the results of the

laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the

Halliburton-recommended cement design and procedure and permitted Halliburton to proceed

with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct.  As

such, at minimum, it was Halliburton's responsibility to inform BP whether a cement bond log should be run.  After Halliburton finished pumping the cement job on April 20, 2010, it informed BP that the cement job was pumped successfully with no losses, plug bumping on time and lift pressure.  Halliburton further made a presentation to BP and the other contractors that the cement job was successfully executed.  At minimum, BP sought the input of Halliburton and other contractors on whether a cement bond log should be run at the morning meeting of April 20, 2010.  At no time did Halliburton or other parties indicate that a cement bond log should be run despite BP's efforts to seek its input.  Under the various HSSE policies, every contractor, including Halliburton, has the right and obligation for safety.  Any of the contractors had the authority to stop work if it believed that a cement bond log should be run.

183.    Admit that BP was responsible for determining whether bottoms-up circulation would be performed prior to the cement job in the production casing in the Macondo Well.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "responsible for determining" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  BP contracted for Halliburton to design, test and pump the cement slurry at the Macondo Well.  Halliburton failed to perform adequate laboratory testing and failed to discuss with BP the ramifications of using various additives on the stability of the foamed cement that Halliburton recommended.  Further, Halliburton concealed laboratory test results that indicated the Halliburton-recommended foam cement was unstable and misrepresented the results of the laboratory testing to BP.  As such, BP did not fully appreciate the risks involved in the Halliburton-recommended cement design and procedure and permitted Halliburton to proceed with the cement job.  Further, BP was unable to mitigate those risks related to the Halliburton

cement job because it was unaware of those risks due to Halliburton's failures and conduct. Before the cement job, BP discussed its circulation plans with Halliburton. Halliburton distributed its cementing procedure which included a circulation plan that did not include a bottoms up.

184.   Admit that the hydrocarbon flow may have come up the annulus of the Macondo Well through the hanger seal assembly.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "may have come up the annulus of the Macondo Well through the hanger seal assembly" is vague, ambiguous, and undefined. The BP Parties further object that this request is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The available evidence indicates that hydrocarbons did not come up the annulus of the Macondo Well or flow through the hanger seal assembly.

185.   Admit that the hydrocarbon flow may have entered the casing from the annulus at the 9 7/8" x 7" crossover.

**RESPONSE:**

The BP Parties object to this request on the grounds that Halliburton's use of the phrase "may have come up the annulus of the Macondo Well through the hanger seal assembly" is vague, ambiguous, and undefined. The BP Parties further object that this request is premature. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of

Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  The available evidence indicates that hydrocarbons did not come up the annulus of the Macondo Well or flow through the hanger seal assembly.

186.    Admit that BP was responsible for determining whether the negative test was successful.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that the BP well site leaders participated, along with the Transocean rig crew, in a group decision regarding whether the negative test was successful.  The BP Parties deny the remainder of this request.

187.    Admit that BP did not inform HESI of any problems related to the negative test.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "problems related to the negative test" is vague, ambiguous, and undefined.

Subject to their specific and general objections, the BP Parties state as follows:  The BP Parties state that the available evidence indicates that no BP employees discussed the negative test with Halliburton.  However, the available evidence indicates that Halliburton's employees

were aware of the problems with the negative test and did not raise those concerns with BP or Transocean management.  The BP Parties deny the remainder of this request.

188.    Admit that BP did not exercise a "stop work" authority based on the negative test.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.  As reported in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "[t]he rig crew began the test by monitoring the drill pipe using the method consistent with their regular practice on prior wells.  However, the MMS *Application for Permit to Modify* for the Macondo Well temporary abandonment stipulated that the test should be conducted by monitoring flow from the kill line.  The well site leader observed the discrepancy and stopped the test.  After discussion between the well site leader and the rig crew, the test was resumed by closing the drill pipe and lining up on the kill line (i.e., creating a flow path from the kill line to the cement unit)."

189.    Admit that BP recognized the existence of pressure anomalies during the negative test on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.  The BP Parties further object to this Request because the phrase "pressure anomalies" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit, as stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, that the "[t]he rig crew observed the 1,400 psi pressure on the drill pipe with no flow exiting the kill line. . . .   The rig crew discussed this 1,400 psi pressure abnormality. Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'   The toolpusher and driller reportedly stated that they had observed this phenomenon before.  After discussing this concept, the rig crew and the well site leader concluded that the explanation was plausible."  The BP Parties deny the remainder of this request.

190.    Admit that BP recognized a disparity in standpipe and annulus pressure during the negative test on April 20, 2010.

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests.  The BP Parties further object to this request because the phrase "standpipe and annulus pressure" is vague and ambiguous.

Subject to their specific and general objections, the BP Parties respond as follows: Denied.   As stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "[t]he rig crew observed the 1,400 psi pressure on the drill pipe with no flow exiting the kill line. . . .   The rig crew discussed this 1,400 psi pressure abnormality.  Witnesses indicated that the toolpusher proposed that the high pressure on the drill pipe was caused by a phenomenon referred to as 'annular compression' or 'bladder effect.'   The toolpusher and driller reportedly stated that they had observed this phenomenon before.   After discussing this concept, the rig

105

crew and the well site leader concluded that the explanation was plausible." The BP Parties deny the remainder of this request.

191.    Admit that BP determined that the negative test was successful based on a "bladder effect."

**RESPONSE:**

The BP Parties object to this request to the extent that it purports to characterize the BP employees involved with the negative pressure tests at the Macondo Well on April 20, 2010, as the ultimate decision makers with respect to the negative tests

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit, as reported in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, that "[t]he rig crew and the well site leaders . . . [reached] the incorrect view that the negative-pressure test was successful and that well integrity had been established. As further stated in BP's September 8, 2010 *Deepwater Horizon* Accident Investigation Report, "the rig crew and well site leaders interpreted no flow coming from the open kill line as a demonstration of well integrity."  The BP Parties deny the remainder of this request.

192.    Admit that in the service contract between BP and HESI, BP agreed to "indemnify, release, defend and hold harmless" HESI for any "blowout, fire, explosion, cratering or any uncontrolled well condition."

**RESPONSE:**

Subject to their specific and general objections, the BP Parties respond as follows:  The Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production Inc. and Halliburton Energy Services, Inc. states in relevant part:

19.6 Other COMPANY Responsibilities

Subject to Clauses 19.1 and 19.4(b), but notwithstanding anything contained elsewhere in the CONTRACT to the contrary, COMPANY shall save, indemnify, release, defend and hold harmless CONTRACTOR GROUP against all claims, losses, damages, costs (including legal costs) expenses and liabilities resulting from:

(a) loss or damage to any well or hole (including the cost to re-drill);

(b) blowout, fire, explosion, cratering, or any uncontrolled well condition (including the costs to control a wild well and the removal of debris);

(c) damage to any reservoir, aquifer, geological formation or underground strata or the loss of oil or gas therefrom;

(d) the use of radioactive sources in relation to the WORK or any contamination resulting therefrom (including retrieval and/or containment, clean up and /or containment of contamination from naturally occurring radioactive materials).

The contract further provides limitations on that indemnity:


19.7 Indemnities in their Entirety

All exclusions, releases of liabilities and indemnities given under this Clause (save for those under Clauses 19.3(a) and 19.3(b)) and Clause 21 shall apply irrespective of cause and notwithstanding the negligence or breach of duty (whether statutory or otherwise) of the indemnified PARTY or any other entity or party and shall apply whether or not the claim, liability, damage, or expense in question is:

(a) predicated on sole, joint or concurrent fault, negligence (whether active, passive or gross), strict liability, statutory duty, contractual indemnity or otherwise at law, or

(b) sought directly or indirectly by way of recovery, indemnification, or contribution by any person or entity against COMPANY GROUP, SERVICE COMPANY GROUP, or CONTRACTOR GROUP as the case may be.

The BP Parties deny the remainder of this request.

## GENERAL OBJECTIONS

The BP Parties assert the following objections to each and every one of Halliburton's requests or admission, including any definitions or instructions associated therewith (collectively, "Halliburton's Discovery Requests"). These general objections are incorporated by reference into each specific response set forth by the BP Parties and are neither waived nor limited by any specific responses.

1.    The BP Parties object to Halliburton's Discovery Requests to the extent they seek documents or information not related to the issues to be tried in the proceeding set to commence in February, 2012 prior to the substantial completion of the BP Parties' efforts to identify and produce documents in response to other requests of Halliburton and other parties to the litigation.

2.    The BP Parties object to Halliburton's Discovery Requests to the extent they call for information, seek discovery, or attempt to impose any obligations beyond that permitted or authorized by the Federal Rules of Civil Procedure or the Rules and Orders of this Court.

3.    The BP Parties object to Halliburton's Discovery Requests to the extent they prematurely seek expert discovery. The BP Parties will provide the opinions of their experts in accordance with the Federal Rule of Civil Procedure 26 and the Pre Trial Orders of this Court governing expert discovery and disclosures.

4.    The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other applicable privilege, exemption, or immunity.

5.    The BP Parties object to Halliburton's Discovery Requests to the extent they seek information or documents relating to the settlement or potential settlement of disputes on the grounds that such information is not relevant to any party's claim or defense, is not admissible at

trial and not reasonably calculated to lead to the discovery of admissible evidence, is protected from disclosure and dissemination under Federal Rule of Evidence 408, and that discovery of such information would be prejudicial to the efforts of the BP Parties and any opposing parties to resolve their disputes in a fair and efficient manner.

6.      The BP Parties object to Halliburton's Discovery Requests to the extent they call for information or documents not within the BP Parties' possession, custody, or control.  All responses are made on behalf of the BP Parties only, are limited to information and documents within the BP Parties' possession, custody, or control.

7.      The BP Parties object to Halliburton's Discovery Requests to the extent they are unduly burdensome, duplicative, premature, oppressive, and/or overbroad, including, without limitation, as to subject matter and/or time period, and where compliance with specific requests would be unreasonably difficult as well as prohibitively expensive or time-consuming.

8.      The BP Parties object to Halliburton's Discovery Requests to the extent they are not limited to information or documents relevant to any party's claim or defense, or to the extent they seek discovery of information or documents not admissible at trial and not reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, requests seeking information or documents concerning other incidents, accidents, or other events at BP facilities or locations other than the Macondo Well or that are otherwise unrelated to the *Deepwater Horizon*.

9.      The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that contain or constitute trade secrets, proprietary information, or other confidential business information without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

10.     The BP Parties object to Halliburton's Discovery Requests to the extent they seek the disclosure of information or documents that would violate the rights of privacy of third parties, or any similar judicially recognized protection or privilege, including, but not limited to, restrictions imposed in connection with proceedings before the MBI, and the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), or that would result in disclosure of any confidential information or conduct without appropriate restrictions on disclosure and dissemination that are embodied in a protective order entered by the Court.

11.     The BP Parties object to Halliburton's "Definitions" to the extent they seek to impose any meaning or interpretation onto the requests other than that evident from the plain and ordinary meaning of the words used therein.  The BP Parties further object to, and will read and respond to, Halliburton's "Definitions" (labeled to correspond to Halliburton's list) as follows:

(a)     Halliburton's definition of "Deepwater Horizon" is vague and overbroad; it includes any equipment used in connection with the exploration for or production of oil.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon" means the vessel of that name and that, unless expressly otherwise specified, concerns the operation of the *Deepwater Horizon* in connection with the Macondo Well.

(b)     Halliburton's definition of "Macondo Well" is vague and overbroad; it includes a broad geographic area and is not limited to any well, much less the well at issue in this litigation.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Macondo Well" means the MC 252 #1 Macondo Well.

(c)     Halliburton's definition of "Incident" is overly narrow; it is limited to the explosion that occurred on the *Deepwater Horizon*.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Incident" means the loss of control of the Macondo Well and the explosions and fire aboard, and resulting sinking of, the *Deepwater Horizon*.

(d)     Halliburton's definition of "oil spill" is vague and overbroad; it includes any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the Incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "oil spill" means the oil released from the Macondo Well as a result of the Incident.

(e)     Halliburton's definition of "Deepwater Horizon Blowout Preventer" is vague and overbroad; it includes any equipment used to control any well.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "Deepwater Horizon blowout preventer" means a blowout preventer like the one in use at the Macondo Well at the time of the incident.

(f)     Halliburton's definition of "clean up" is vague and overbroad; it includes any clean up efforts from any release of hydrocarbons over a large geographic area, without regard to whether such releases had anything to do with the incident.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "clean up" means any efforts to clean up the oil spill.

(g)     Halliburton's definition of "relevant time period" is overbroad; by extending the definition to "the current date," many of Halliburton's requests, which by their context clearly seek information from the time prior to and including the incident, confusingly

seek unrelated information generated after the incident and ignores that it is impossible for the BP Parties to provide meaningful responses without some cut-off date to allow for locating and processing information in order to provide it to Halliburton.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means January 1, 2008 through April 20, 2010, unless:  (i) the request clearly seeks specific, available, relevant information that pre-dates January 1, 2008 (*e.g.*, rig audits of the *Deepwater Horizon*); and (ii) the request clearly seeks relevant information or documents that post-date the incident, in which case and to which extent, the time period is, or includes as the context requires, April 20, 2010 through November 8, 2010.  In addition, when used in reference to the operation of the *Deepwater Horizon*, the *Transocean Marianas*, the blowout preventer, or any other equipment that was used in connection with work that did not involve the Macondo Well, The BP Parties will read and respond to Halliburton's requests with the understanding that the term "relevant time period" means the period of time during which the rig or equipment referred to was used at the site of the Macondo Well, prior to and including April 20, 2010 as stated above.  Unless otherwise specified, all requests and responses are deemed to be limited to the relevant time period as defined above by the BP Parties.

(h)     Halliburton's definitions of "Defendant," "you," "your," "your company," and "Transocean" are extremely vague, overbroad, and nonsensical given these requests were served on the BP Parties and not Transocean, assuming Halliburton meant to substitute BP for Transocean, the term  includes a vast array of entities that have had no involvement whatsoever in the events giving rise to this litigation, and confusingly and improperly sweep in hundreds of thousands of individuals as opposed to the corporate entities that have been named as defendants in this litigation.  The BP Parties will read and respond to Halliburton's requests with the

understanding that the terms you," "your," and "BP" means one or more of the BP Parties, as appropriate.

(i, j, k, l, m)   Halliburton's definitions of "Anadarko," "Cameron," "MOEX," "BP," and "HESI" are similarly vague, overbroad, and confusing.  The BP Parties will read and respond to Halliburton's requests with the understanding that these terms refer to the respective corporate entities commonly referred to by these names that have been named in this litigation and played some role in the events relevant to this litigation.

(n)   Halliburton's definition of "person" is vague and overbroad; it includes any number of things that are not people in any sense of the word.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "person" means a person.

(o)   Halliburton's definition of "employee" is vague and overbroad; it includes any number of persons who were or are not employees.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "employee" means an employee.

(p)   Halliburton's definition of "Investigation Team" is unobjectionable.

(q)   Halliburton's definition of "government" is vague and overbroad; it includes a bewildering array of entities as well as any number of people who are "the government."   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "government" means the U.S. federal government or the government of a U.S. state, including any branch or agency thereof.

(r)   Halliburton's definition of "communication" is vague and overbroad; it includes practically everything written or said by any person, regardless of whether it was actually communicated in any meaningful sense.  The BP Parties will read and respond to

Halliburton's requests with the understanding that the term "communication" means talking to someone or sending them a message of some sort.

(s)     Halliburton's definition of "statement" is vague and overbroad; it may or may not include any speech or writing depending on what is meant by "adopted and approved." The BP Parties will read and respond to Halliburton's requests with the understanding that the term "statement" means a recorded statement authenticated by its maker or the circumstances of its recording.

(t)     Halliburton's definition of "meeting" is vague and overbroad; it includes any number of things that no person would reasonably conclude constitute a meeting, such as a casual greeting exchanged in a hallway, sending an e-mail, or posting a message on a bulletin board.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "meeting" refers to a gathering of two or more people.  It does not include electronic communications unless specified.

(u)     Halliburton's definition of "document" and "documents" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A). The BP Parties will read and respond to Halliburton's requests with the understanding that the term "document" means the items listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(v)     Halliburton's definition of "electronically stored information" or "ESI" is improper to the extent it includes items outside the scope of Federal Rule of Civil Procedures 34(a)(1)(A).   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "electronically stored information" or "ESI" means the electronically stored information listed in Federal Rule of Civil Procedure 34(a)(1)(A).

(w)     Halliburton's definitions of "relating to," "related to," "referring to," regarding," "concerning," and "with respect to," are vague and overbroad; they render these and innumerable other words void of any independent meaning.  The BP Parties will read and respond to Halliburton's requests with the understanding that these terms have their plain and ordinary meaning in standard English usage.

(x)     Halliburton's definitions of "and" and "or" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "and" means and, and the term "or" means or.

(y)     Halliburton's definition of "all" and "any" are vague, overbroad, and confusing; it renders the word unnecessarily ambiguous and necessarily converts many of Halliburton's requests into nonsensical requests for duplicative information.  The BP Parties will read and respond to Halliburton's requests with the understanding that the term "all" means all and the term "any" means any.

(z)     Halliburton's definition of "including" is unobjectionable.

(aa)    Halliburton's definition of "Kick" is unobjectionable.

(bb)    Halliburton's definition of "Blowout" is unobjectionable.

(cc)    Halliburton's definitions of "each" and "every" are vague, overbroad, and confusing; they render the words equivalent and therefore deprive them of independent meaning and inconsistent with standard English usage.   The BP Parties will read and respond to Halliburton's requests with the understanding that the term "each" means each and the term "every" means every.

(dd)    Halliburton's instruction to treat all nouns and pronouns as plural nouns and pronouns is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(ee)    Halliburton's instruction to treat all verbs as possessing all possible tenses is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(ff)    Halliburton's instruction to treat all terms of a specific gender as referring to all genders is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined to give the "broadest possible application."

(gg)    Halliburton's instruction to treat all terms as if they encompass all grammatical variations of the term is vague, overbroad, and confusing; it renders many of Halliburton's requests unnecessarily nonsensical, contorted, and duplicative.  The BP Parties will read and respond to Halliburton's requests as written, not as imagined under instructions to set aside standard English usage.

12.    These responses are made without waiving, in any manner, the BP Parties' right to object to the use of any information or documents provided in response to these requests at any trial or evidentiary hearing on grounds of privilege, relevance, materiality, authenticity, hearsay, or any other ground permitted by any applicable law or rule.

13.    The BP Parties' decision, now or in the future, to provide information or documents notwithstanding the objectionable nature of any of the definitions or instructions, or

the document requests themselves, should not be construed as:  (a) a stipulation that the material is relevant or admissible, (b) a waiver of the BP Parties' general objections or the objections asserted in response to specific requests, or (c) an agreement that requests for similar information will be treated in a similar manner.

14.     The BP Parties reserve the right to modify, amend, or supplement their responses, which are made based on the current status of their knowledge, understanding, belief, and searches for documents.  The investigation of facts and information relating to these requests is continuing, and, therefore, these responses are not intended as an admission or a representation that additional information or documents do not exist.

Dated:  August 1, 2011                              Respectfully submitted,


                                                    By:  /s/ J. Andrew Langan, P.C.

                                                    Richard C. Godfrey, P.C.
                                                    J. Andrew Langan, P.C.
                                                    Timothy A. Duffy, P.C.
                                                    Kirkland & Ellis LLP
                                                    300 North LaSalle Street
                                                    Chicago, IL 60654
                                                    Telephone: (312) 862-2000
                                                    Facsimile:  (312) 862-2200

                                                    and

                                                    Don K. Haycraft (Bar #14361)
                                                    R. Keith Jarrett (Bar #16984)
                                                    LISKOW & LEWIS
                                                    701 Poydras Street, Suite 5000
                                                    New Orleans, Louisiana 70139-5099
                                                    Telephone: (504) 581-7979
                                                    Facsimile:  (504) 556-4108

                                                    and

                                                    Robert C. "Mike" Brock
                                                    Covington & Burling LLP

1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 1st day of August, 2011.

<u>/s/   J. Andrew Langan, P.C.___</u>