# Exhibit A

this interrogatory on the grounds that Halliburton's use of phrase "immediately prior to a final cement job" is vague, ambiguous, and undefined. Additionally, the BP Parties object on the grounds that this interrogatory expressly seeks information beyond that directly related to the Macondo Well, is not relevant to the issues in this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 7:

Explain BP's policies and procedures regarding the design and interpretation of negative tests, and how such policies and procedures are communicated to BP well site leaders.

## RESPONSE TO INTERROGATORY NO. 7:

The BP Parties object to this interrogatory as vague, ambiguous and overbroad as to "BP's policies and procedures regarding the design and interpretation of negative tests," because that phrase may be interpreted to apply to a range of policies and procedures that apply to these topics in various ways and because the details of the development and communication of any particular negative test may be different depending on the circumstances. The BP Parties further object to this interrogatory to the extent that it calls for information likely in the possession of other parties, *e.g.,* the Transocean or other drilling contractors that worked to set up, monitor, perform and interpret negative tests. The BP Parties further object to this interrogatory to the extent that it implies that BP or its well site leaders are responsible for designing and interpreting negative tests.

Subject to their specific and general objections, the BP Parties state that BP's policy specified the requirement to conduct a negative pressure test. The negative test procedures used at various wells would have been developed by a combination of the drilling contractor and the BP engineering and operations teams depending upon the particular circumstances of a given

well.  Specifically at the Macondo Well, BP, Transocean, MI Swaco and other contractors were involved in designing and interpreting the negative test.

To the extent this interrogatory seeks additional information, the BP Parties object on the grounds that it is overbroad, unreasonable, unduly burdensome, and seeks information not relevant to the claims or defenses of any party.

## INTERROGATORY NO. 8:

What safety steps should be undertaken before underbalancing a well, and in particular, what safety steps should have been taken before underbalancing the Macondo Well on April 20, 2010?

## RESPONSE TO INTERROGATORY NO. 8:

The BP Parties object to this interrogatory as vague, ambiguous and overbroad as to the phrases "safety steps," "should be undertaken," and "should have been undertaken."  The BP Parties also object to this interrogatory as misleading to the extent that it suggests that certain required actions were not taken prior to underbalancing the Macondo Well on April 20, 2010. The BP Parties further object to this interrogatory to the extent that it calls for information likely in the possession of other parties, *e.g.,* the Transocean or other drilling contractor rig crews that establish policies and procedures outlining steps to be taken prior to underbalancing a well. Additionally, the BP Parties object to this interrogatory to the extent that it implies that BP or its engineers are responsible for cementing or, in particular, cementing the production casing at the Macondo Well.

Subject to their specific and general objections, the BP Parties state that the steps taken prior to underbalancing a well are determined by a combination of the drilling engineering and operations teams depending upon the particular circumstances of a given well, including input from BP, Transocean and other rig personnel as appropriate, as well as compliance with

# Exhibit B



# GODWIN RONQUILLO
## A Professional Corporation

DALLAS  HOUSTON

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332 Fax

GodwinRonquillo.com

JENNY L. MARTINEZ - SHAREHOLDER
DIRECT DIAL:     214.939.4620
DIRECT FAX:      214.527.3119
JMartinez@GodwinRonquillo.com

August 19, 2011

Barbara M. Harding
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Re:    In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on
       April 20, 2010, MDL No. 2179

Dear Barbara,

As referenced in my August 9, 2011, letter, Halliburton Energy Services, Inc.'s ("HESI") has concerns with multiple items in BP's Responses and Objections to HESI's Interrogatories and Requests for Admission ("BP's Responses"). This letter identifies deficiencies in BP's responses and offers clarifications to certain requests.

Many of BP's responses, particularly to the requests for admissions ("RFAs"), fail to answer the question presented and instead make lengthy statements about HESI's responsibilities and obligations. While such comments may be appropriate as objections to questions about BP's or HESI's responsibilities, they do not serve to clarify the accuracy of BP's answers or avoid any unfair inferences to questions about other topics such as engineering protocols or standards. Instead, the statements deflect and avoid answering the interrogatories or RFAs as asked. HESI requests that BP amend certain responses, as identified below.

## BP Responses to Interrogatories

**Interrogatory No. 1 – Exact location of six centralizers.** HESI asked for the "exact location" of every centralizer used on the 9 7/8" x 7" production casing on the Macondo Well. BP responded by citing to the entire Bly Report, its cross-claims against HESI and others, and two documents identified by Bates number that do not (without further explanation) clearly answer the question. Please amend this response to disclose the exact location of the six centralizers, particularly the top and bottom of each.

**Interrogatory No. 6 – BP wells with a full bottoms up prior to cement job.** HESI asked BP to identify "all BP wells wherein BP circulated at least one full bottoms up immediately prior to a final cement job." BP refused to answer in part because the query is beyond the Macondo Well and is not geographically limited. While HESI recognizes that parties

Page 2

should not conduct fishing expeditions, BP appears to take the position that a bottoms up prior to a cement job is not necessary. Thus, this issue of whether a bottoms up should be run before a cement job has become a crucial issue in this case, and this Interrogatory seeks relevant information. HESI will agree to limit the query to wells in the Gulf of Mexico.

**Interrogatory No. 7 – BP negative test protocol.** HESI requested that BP identify the policies and procedures regarding the design and interpretation of negative tests and how those policies are communicated to well site leaders. BP's response references "BP's policy" but does not identify such policy or any document containing this policy. Please identify all policies and procedures and explain how BP well site leaders are provided with this information. If there are no written policies, please state so.

**Interrogatory No. 8 – Safety steps before underbalancing a well.** HESI asked BP to identify the safety steps that should have been taken before underbalancing the Macondo Well. BP's response identifies "relevant BP company policies and procedures" allegedly responsive to the Interrogatory, but only identifies the DWOP. Please identify the other "policies and procedures" referenced in the Interrogatory. Additionally, please identify the specific sections in the documents referenced that BP contends are responsive.

**Interrogatory No. 9 – Roles and responsibilities of cementing engineers.** HESI requested that BP identify the job roles and responsibilities of the BP engineers as they relate to cementing and who filled those roles. BP's response references a chart that only identifies individuals and does not describe the roles and responsibilities of BP engineers as they relate to cementing. Further, BP limits its answer to those "relating to the cementing of the production casing", which is only a subset of the information requested. Please identify the *job roles and responsibilities* of BP engineers as they relate to cementing including, but not limited to, the cementing of the production casing of the Macondo Well.

**Interrogatory No. 10 – Pay zones and sands.** HESI requested that BP identify and describe all pay zones and sands in the Macondo Well and list the pore pressures and depth for each. Thank you for agreeing to amend BP's responses by providing a correct chart. Please note that this Interrogatory is not limited in time, and all known pay zones and sands to date should be identified.

**Interrogatory No. 12 – Flow path.** HESI asked BP to "Describe the flow path of the hydrocarbons from the Macondo Well *starting* on April 20, 2010, and *continuing* until the well was killed." (emphasis added). BP's response improperly references the voluminous Bly Report. Appendix G of the Bly Report states that the flow path was down the annulus and up the casing but "alternative flow paths are possible but much less likely." App. G at 222. Please either confirm that page 222 of Appendix G is responsive or otherwise identify BP's position on the flow path.

**Interrogatory No. 13 – Data to support answer to No. 12.** Like BP's response to No. 12, the response to No. 13 references the voluminous Bly Report and "back up materials and analysis." Please identify all data that supports BP's description of the flow path.

Page 3

**Interrogatory Nos. 14 & 15 – Blowout preventer** – BP's response cites to the DNV Report, but disclaims its accuracy. In addition to improperly referencing a large document without specifying where the answer might be found, citing a report that may not be accurate is not a response at all. Please identify the sections of those voluminous documents that BP admits are responsive. In addition, as discussed in our August 16 conference, provide deposition page citations and identify excerpts of the pleadings cited in BP's response to No. 15.

**Interrogatory No. 17 – When BP learned additives would be used in the slurry.** HESI asked BP when it first learned that the additives addressed in Interrogatory 16 were to be used in the cement slurry on the 9 7/8" x 7" production casing on the Macondo Well. BP's response references the date HESI first recommended that certain additives be used in the cement slurry by citing one document and referencing other documents sent by Jesse Gagliano to BP without citation. *When BP first learned* when the additives would be used is not provided. Please identify the date or dates BP first learned that additives would be used.

**Interrogatory Nos. 19 & 20 – Safety of cement.** As discussed in our August 16 conference, BP will consider whether to amend its answer to No. 20 to explain how the allegedly unstable foam and nitrogen break out could cause the cement to fail. In addition, BP's answer to No. 19 does not "describe the reasons the cement was unsafe." Please answer Interrogatories Nos. 19 & 20 and clearly state why "unstable cement" is "unsafe."

**Interrogatory Nos. 30 & 31 – Validity of and disagreements with the Bly Report.** As HESI raised in its August 9 letter and as we discussed in our August 16 conference, we will narrow the issues in the Bly Report for which we would like confirmation. Interrogatory No. 31 requests a list of any BP employee, agent, or consultant who was involved in the investigation and drafting of the Bly Report (*i.e.*, a limited universe of individuals) who expressed disagreement with any observations or conclusions in the Report. HESI requests that BP provide each such name and a detailed description of any disagreements with the following statements in the Bly Report, along with a confirmation or denial of whether BP stands by each statement.

- The initial flow into the well came through the shoe track barriers. Rpt. at 36-37.

- The flow path was down the annulus and up the casing but "alternative flow paths are possible but much less likely." App. G at 222; *see also* Interrog. No. 12.

- "... the uplift force during the negative - pressure test did not unseat the seal assembly." Bly Rpt. at 38.

- It is "highly unlikely" that a casing failure mode contributed to the loss of well control. Rpt. at 38.

- Note that BP's responses to RFA Nos. 88, 89, and 91 qualify Figure 1 on Bly Report page 54 as based on "geology known at the time of the

Page 4

accident." Please confirm any disagreement about the accuracy of this Figure.

- The cement was unstable resulting in nitrogen breakout which explains the failure to achieve zonal isolation. Rpt. at 34-35.

- Nitrogen breakout and migration would have contaminated the shoe track cement causing that barrier to fail. Rpt. at 77.

- Contamination of the shoe track cement whether from mud in the wellbore, commingling of cement with nitrogen from nitrogen breakout in the cement slurry, swapping of the shoe track cement with the mud in the rathole, or some combination of these factors caused the cement to fail to prevent the ingress of hydrocarbons. Rpt. at 69-70.

- The failure to use 21 centralizers "likely did not contribute" to the cement's alleged failure. Rpt. at 35.

### BP's Responses to Requests for Admission

While I address specific RFAs below, I would like to generally address the problem of referencing deposition testimony without specifying page numbers in RFAs Nos. 27 (John Gisclair), 28 (John Gisclair), 44 (Murray Sepulvado), 45 (Murray Sepulvado), 69 (John Gisclair), 70 (Kelly Gray), 81 (Kelly Gray and John Gisclair), 82 (same), 83 (Kelly Gray). Please provide page and line references for the testimony BP contends is responsive.

**RFA No. 5** – HESI asked BP to admit that it did not authorize HESI to provide more than two mud loggers at a time on the Deepwater Horizon. BP's response states that "[t]here were multiple instances when there were more than two mud loggers working on the *Deepwater Horizon*." BP's response does not state whether or not more than two mud loggers at a time was authorized by BP. Please admit or deny the request as asked.

**RFA No. 10** – HESI asked BP to admit that the BP well site leader did not notice the kick on March 8, 2010 for approximately 33 minutes. BP's response identifies who BP thinks is responsible for monitoring, but fails to answer whether or not the BP well site leader did not notice the kick on March 8, 2010 for approximately 33 minutes. *See* Bly Rpt. at 107. Please admit or deny the request as asked.

**RFAs Nos. 15-24, 37, 41-43** – HESI asked whether the well site leader's response to the HESI mud logger's notice of potential influx complied with BP policy regarding responses to well control events. BP's responses to these RFAs include lengthy statements about the responsibilities of HESI or other parties, but these requests do not inquire about responsibilities. These requests ask about the BP well site leader's awareness, understanding, or acts. Please admit or deny the RFAs as stated.

Page 5

**RFA Nos. 46 & 47** – BP's response states that BP cannot tell what policy is referenced. HESI refers to any BP policies addressing responses to well control events or "kicks." Please amend your response in light of this clarification.

**RFA No. 53** – HESI asked BP to admit that BP did not advise HESI of an increase in flow-out from the well as measured by Transocean's flow-out sensor after 17:00 hours on April 20, 2010. BP responded that HESI had real time data on standpipe pressure (an answer to the preceding RFAs), but BP fails to answer this question which is about the *flow-out sensor*. HESI assumes this answer is a typographical error. Please admit or deny the RFA as asked.

**RFA No. 58** – BP denied it did not advise HESI of any "situation developing with safety implications after 17:00 hours on April 20, 2010" because "virtually all actions or activities on the well may potentially have safety implications." While that may philosophically be true, on April 20, 2010, very real safety situations were actively developing and the question is whether or not BP advised HESI of such at the time specified. Please admit or deny whether *on April 20, 2010 after 17:00 hours* BP advised HESI of any such situation.

**RFA Nos. 61-65, 73, 78-80, 85** – These RFAs ask whether BP informed HESI of certain facts, whether BP understood the status of HESI's ability to monitor, whether BP's well site leader could or did monitor, whether certain activities inhibited HESI's ability to monitor, and whether BP made a decision. BP's perspective on the responsibilities of mud loggers does not shield it from answering RFAs that do not ask about such responsibilities. Please admit or deny the questions asked. In addition, BP's complaint that No. 63 does not specify a time is incorrect - April 20 is specified.

**RFA Nos. 86-87** – BP denied these RFA's while admitting that it is aware of a sand interval labeled M57B with a pore pressure of 14.15 ppg. Please clarify that BP admits that it is aware of the sand known as M57B and whether or not this sand exists at a depth of 17,451' to 17,453'.

**RFA Nos. 89-90** – BP's comments indicate that RFA No. 89 should be admitted, yet this RFA is denied. Please clearly admit or deny whether Figure 1 at page 54 of the Bly Report does not reflect the sand interval known as M57B. RFA No. 90 asks that BP admit that it identified M57B after April 20, 2010, but BP's answer omits any reference to the date provided. Please fully admit or deny whether BP identified M57B *after April 20, 2010.*

**RFA No. 93** – BP's response improperly rephrases the RFA from what BP claimed it was aware of at the time of the cement job, to what is, as a factual matter, the shallowest sand in the production interval. In addition, it is unclear what exactly BP is denying in its response. Please plainly admit or deny that, *as of the time of the cement job* in the production casing, BP claims that the shallowest sand of which it was aware was the 13.1 ppg sand at approximately 17,788'.

**RFA No. 95** – BP's response refers to an MMS standard that top of cement ("TOC") should be 500 feet above the uppermost hydrocarbon bearing sand. BP's response to No. 93 states that the uppermost sand is at 17,788'. Because 17,788' less 500' is approximately 17,260',

Page 6

please explain what BP has denied in this RFA and how BP reached its conclusion given BP's statements in No. 93 and in this RFA.

**RFA No. 101** – This RFA asks BP to admit that had annular cement been designed to cover the shoe at 17,168', a sealed annulus would have been created which would have increased the risk of casing collapse due to annular pressure build-up ("APB"). The statements in BP's denial regarding the presence of hydrocarbons in the 14.15 ppg sand interval labeled M57B are irrelevant to the APB inquiry. Please answer the RFA as asked by addressing the APB issue. If the alleged lack of hydrocarbons in the M57B sands impacts your response, please explain.

**RFA Nos. 103-08** – These RFAs ask whether specific sands or zones constitute distinct permeable zones for the purpose of interpreting BP's *Engineering Technical Practice (ETP) GP 10-60 Zonal Isolation Requirements During Drilling Operations and Well Abandonment and Suspension*. BP's rote quotation of the definition of "distinct permeable zone" is confusing as it does not clarify or support BP's denials. Please admit or deny whether BP believes each described zone or sand meets that definition.

**RFA No. 109** – This request does contain a typographical error for which HESI apologizes. The phrase "main hydrocarbon zones" is quoted in RFA No. 140 (not No. 142) which references BP's use of this phrase in the Bly Report, page 35. (RFA No. 142 asks that BP admit that "main hydrocarbon zones" as it uses the term refers to the three 12.6 ppg sands identified as "Primary Reservoir Sands" in Figure 1, Bly Report, page 54, which BP admitted). Now that HESI has explained that "main hydrocarbon zones" is BP's term, please admit or deny this RFA.

**RFA Nos. 112-14** – HESI has reviewed the Bly Report, and while one may infer that BP's claim is that the initial flow of hydrocarbons came from the 13.1 ppg sand, the Report does not explicitly so state. Consequently, BP's answer to No. 112 is unclear and BP's denial contradicts the citation to the Bly Report. The Report at pages 215 to 216 indicates that BP believes the flow came from the 13.1 ppg sand (also known as M56A). Please clarify BP's response. As BP's Responses to Nos. 113 and 114 reference its response to 112, likewise please clarify those responses.

**RFA No. 115** – This request contains a typographical error and should have referenced RFA No. 140 where BP admits that "main hydrocarbon zones" refers to the 12.6 ppg sands depicted and identified as "Primary Reservoir Sands" in "Figure 1" on page 54 of the Bly Report. Given this clarification, please amend the response.

**RFA No. 131** – BP's response admits only part of the question. Please admit or deny whether the 15 centralizers were what BP ordered (not merely that they were delivered *after* BP placed an order).

**RFA Nos. 137-39, 141** – These responses appear to have a typographical error ("the centralizer located there would appropriately centralizer the pipe"). Please clarify BP's answers to each.

Page 7

**RFA Nos. 143, 144** – BP's responses to these RFAs improperly limit the requests to the time period before April 20, 2010.  Please amend the responses to reflect BP's modeling conducted after April 20, 2010.

**RFA Nos. 158-63** – These RFAs ask an engineering question.  BP's answers do not address the requests, but rather complain about HESI's job performance and that BP "planned" to run a cement bond log when BP returned to complete the well at some unspecified later date. These comments are not responsive to the requests.  Please admit or deny the RFAs as asked.

**RFA No. 179** –This RFA asks whether BP "knew it was not in possession of a foam stability test result for the slurry that was used" at the time of the cement job.  BP's complaints about HESI's job performance are not responsive.  Please amend the response to answer the question about BP's *knowledge*.

**RFA No. 180** – This question asks whether *BP informed HESI* that the cement job was successfully executed, but BP answers that "Halliburton informed BP that the cement job was successfully executed."  BP apparently misunderstood this RFA.  Please amend the response accordingly.

*     *     *

Please let me know if you are available on Monday afternoon to meet and confer about the foregoing.

Best regards,

*Jenny Martinez*

Jenny L. Martinez

JLM/

cc:   Donald E. Godwin
      R. Alan York
      Carolyn R. Raines

1732336 v1-24010/0002 CORR

# Exhibit C

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties refer Halliburton to their response to Request for Admission No. 112.

114. Admit that Appendix G to Bly Report's conclusion that "[t]he 1,400 psi drill pipe pressure observed during the negative-pressure test best matched communication with the M56A sand . . ." reflects BP's position that the initial flow of hydrocarbons came from the 13.1 ppg sand.

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "initial flow" is vague and ambiguous. In addition, the BP Parties object to this request on the grounds that it assumes the BP Parties admit that the initial flow of hydrocarbons came from the 13.1 ppg sand.

Subject to their specific and general objections, the BP Parties respond as follows: Denied. The BP Parties refer Halliburton to their response to Request for Admission No. 112.

115. Admit that the 13.1 ppg sand in the Macondo Well from which BP believes flow initiated is above the "main hydrocarbon zones" (as that term is used in the sentence quoted in Request for Admission 142).

**RESPONSE:**

The BP Parties object to this request on the grounds that the phrase "flow initiated" is vague and ambiguous. The BP Parties also object to this request on the grounds that it assumes the BP Parties admit the initial flow of hydrocarbons came from the 13.1 ppg sand. In addition, the BP Parties object to this request as vague and ambiguous as to the phrase "main hydrocarbon zones." Further, the request referenced to provide a definition for that phrase does not include the phrase at issue.

Subject to their specific and general objections, the BP Parties respond as follows: The BP Parties admit that Figure 1 on page 54 of its September 8, 2010 *Deepwater Horizon* Accident Investigation Report labels the 12.6 ppg sands as the "Primary Reservoir Sands." The BP Parties

58

further refers Halliburton to their response to Request for Admission No. 112.  The BP Parties deny the remainder of this request.

116.   Admit that BP designed the casing for the Macondo Well such that the bottom of the casing was only 55 feet beneath the lowest hydrocarbon zone.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent that "lowest hydrocarbon zone" is undefined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. The casing shoe was designed to be set at 18,310' and the bottom of the lowest hydrocarbon zone is more than 55 feet above 18,310' at 18,223'.

117.   Admit that, other than modeling whether particular production casing designs could be successfully cemented, HESI had no input into the production casing design used by BP for the Macondo Well.

**RESPONSE:**

The BP Parties object to this request as vague and ambiguous to the extent "particular casing designs could be successfully cemented" and "input" are not defined.

Subject to their specific and general objections, the BP Parties state as follows:  Denied. HESI personnel were involved in various aspects of the production casing selection process and provided input into those decisions.

118.   Admit that, other than modeling whether particular production casing designs could be successfully cemented, BP never requested that HESI review and/or evaluate the adequacy of the production casing design used by BP at the Macondo Well.

# Exhibit D

Analysis 5A. Well Integrity Was Not Established or Failed

## 2 Annulus Cement Barrier

The annulus cement barrier failed to prevent hydrocarbons from entering the annulus after cement placement. The investigation team assessed possible failure modes and paths that led to hydrocarbon migration from the formation into the wellbore. (Refer to Figure 1.)



**Figure 1.** Hydrocarbon Zones and Potential Flow Paths.

A combination of factors could have contributed to the loss of well integrity, if hydrocarbons entered the wellbore before, during or after cement placement.

To evaluate whether hydrocarbons could have entered the wellbore before cement placement, the investigation team conducted a detailed analysis of actual downhole mud density, fluid volume pumped, and swab and surge pressures while running casing. A volumetric analysis indicated that even if hydrocarbons were present in the wellbore, they would have been circulated out of the well prior to the loss of well control. Data analysis gave no indication that hydrocarbons entered the wellbore prior to cement placement.