UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : : : | MDL NO. 2179  SECTION: J |
| THIS DOCUMENT RELATES TO: ALL CASES | : : | JUDGE BARBIER MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . .

### BP'S OPPOSITION TO HALLIBURTON'S MOTION FOR LEAVE TO FILE SECOND AMENDED CROSS-CLAIM

On September 1st, Halliburton filed an Opposed Motion for Leave To File Second Amended Cross-Claims (Dkt. 3893) ("HESI Mot."), seeking to add ten pages of new allegations and two fraud claims against BP (the "New Claims"). Halliburton's motion comes *more than three months after the deadline to file cross-claims* and after virtually every relevant deadline for written discovery and depositions on these new allegations has passed—and long after Halliburton first learned of the facts that form the basis of this fictitious, alleged fraud. Halliburton's motion should be denied for two independent reasons.

First, the motion should be denied because Halliburton cannot meet its burden of proof under Rule 16 for modifying the scheduling order. Allowing the New Claims at this late stage requires the Court, at a minimum, to re-open Phase 1 fact discovery and, if necessary, allow BP to amend its own cross-claim against other defendants—who may themselves require additional discovery or need to amend their cross-claims. Halliburton cannot show "good cause" for its late amendment because it was not diligent in investigating and bringing the New Claims. The basic facts underlying Halliburton's claims were known to Halliburton within weeks of the Macondo

well explosion.  Halliburton could have pursued discovery and brought the New Claims months ago.  But it did not.  It should not now be allowed to disrupt the Court's schedule for a February trial—to the detriment of BP, the other MDL parties, and the Court.

Second, the motion should be denied for the independent reason that Halliburton cannot meet its burden of proof under Rule 15 for leave to amend.  Halliburton has unduly delayed in seeking this amendment, and allowing the New Claims at this time would prejudice BP.  In an attempt to justify its late amendment, Halliburton makes the unsubstantiated claim that it "only became aware of BP's knowledge regarding the shallower hydrocarbon zones during the deposition of Galina Skripnikova in July 2011."  HESI Mot. at 2.  But this is demonstrably untrue.  As described below, the documents that Halliburton used in Ms. Skripnikova's deposition were produced months before her deposition and Halliburton questioned at least one witnesses on this purported hydrocarbon interval.  *Indeed, Halliburton's internal documents show that it had identified this potential argument back in May of 2010*.  At this late stage, Halliburton's undue delay would severely prejudice BP if the New Claims were allowed.  Halliburton's proposed amendment brings ten pages of new allegations after the close of fact discovery—late enough to preclude BP from obtaining fulsome discovery to defend itself from those claims but early enough to force BP to prepare for trial on the New Claims in a Phase 1 schedule that is already expedited.

For these two independent reasons, the Court should deny Halliburton's motion for leave to amend.

## I.    BACKGROUND

### A.    <u>Procedural Background</u>

Since October 19, 2010, when the Court entered Case Management Order No. 1 (Dkt. 569) setting a February 2012 trial date for Phase 1 of the Limitation Action and the framework

for pre-trial proceedings, it has been clear that this case would be a massive undertaking conducted over a relatively short period of time.  As a result, the Discovery Working Group has regularly met with the Court to discuss discovery and briefing schedules to move the case along in an orderly fashion.  Along those lines, the Court set May 20, 2011 as the deadline for the parties to bring their cross-claims.  Pre-Trial Order ("PTO") 31 (Dkt. 1501).

Halliburton filed its original Cross-Claim on April 21, 2011, bringing 4 claims against 25 entities.  (Dkt. 436).  It then filed its First Amended Cross-Claim on May 20, 2011, the pleading deadline.  (Dkt. 445).  The BP Parties answered Halliburton's First Amended Cross-Claim on June 20, 2011.  (Dkt. 2945).

On September 1st, more than three months after the Court's deadline to assert cross-claims and at the end of Phase 1 discovery, Halliburton moved to amend its cross-claim to add two fraud counts against BP.  (Dkt. 3893-1).  Halliburton asserts that "the facts relative to [the New Claims] are encompassed within Halliburton's already existing negligence claims against the BP entities."  HESI Mot. at 6.  But this assertion is belied by the fact that the proposed pleading includes *ten pages of new allegations* related to the New Claims, including pages of allegations concerning BP's post-incident conduct.  (Dkt. 3893-1 at ¶¶ 61-80).  If allowed, the New Claims would expand the scope of this litigation, require additional discovery by BP and other parties, and perhaps delay the start of the Phase 1 trial.

Between the time that Halliburton filed its original Cross-Claim and its current motion, numerous discovery deadlines for Phase 1 have passed.  The deadline for requesting Phase 1 documents passed on April 29, 2011.  (Dkt. 1908).  The deadline to serve Phase 1 written discovery without leave of the Court passed on July 18, 2011.  (Dkt. 3354).[1]  The deadline to

---

[1]    The Court should recall that Halliburton filed a motion for protective order on July 14, 2011 to preclude BP from serving a third set of written discovery, arguing incorrectly that BP had served discovery ***three days*** late under

request Phase 1 witnesses for deposition passed on August 5, 2011.  (Dkt. 3457).  And the deadline for BP and the other 14(c) defendants to submit expert reports is rapidly approaching on October 17th.  (Dkt. 3126).  While certain depositions and limited on-going Phase 1 fact discovery continues, the current schedule neither contemplates nor can it accommodate an entire new round of discovery on brand new issues in the case, such as the pre-Incident and post-Incident fraud claims now alleged by Halliburton.  This is particularly true where the party seeking to add the new allegations appears to have deliberately delayed filing the claims in order to obfuscate its intent to pursue the issues at trial.

In the compressed pre-trial schedule of this case, where parties have necessarily made difficult offensive and defensive discovery choices and have often forgone otherwise potentially relevant discovery due to time constraints, this type of litigation tactic should not be tolerated. BP relied on Halliburton's First Amended Cross-Claim when forming its litigation strategy and its decisions relating to discovery.  If Halliburton had brought the New Claims by the May 20, 2011 deadline, as it clearly could have, BP would have altered the focus of its discovery efforts in order to meet these serious, albeit false, allegations, and taken the necessary discovery on these claims within the pre-trial schedule set out by the Court.

### B.  Factual Background of the M57B Zone

On April 3, 2010, the *Deepwater Horizon* drilled through the M57B interval and reached a depth of 17,761'.  The M57B sand refers to a thin two-foot sand located at approximately 17,467'.  In contrast, the target "pay sands" were 22 feet (M56D) and 64 feet (M56E) thick. Drilling data from that day did not provide indications that the M57B sand was hydrocarbon-

---

the "mailbox rule."  (Dkt. 3318, 3318-1).  BP notes that Halliburton's current request seeks to amend its cross-claim **over three months** after the Court's deadline.

bearing.  From the observed data, the geologist on the rig determined that there were no good candidates worthy of additional sampling at or near 17,467'.[2]

After reaching the final depth on April 9, 2010, Schlumberger ran wireline equipment to log the production interval.  One wireline operation was running a "triple-combo tool" to obtain gamma ray intensity, resistivity, density, and porosity data on the formation.  This information can be interpreted to identify zones of interest and their contents.   While on the rig, Galina Skripnikova, a BP petrophysicist, evaluated printouts of the "triple-combo tool" logs (as digital data was available only after the wireline operations were completed).[3]  Ms. Skripnikova noticed that the M57B sand displayed resistivity, which indicates the potential for hydrocarbons or the invasion of oil-based mud into the formation.  *See* Ex. A, Skripnikova Tr. at 484:19-485:12.  Ms. Skripnikova concluded that the interval was "wet sand"—sand that contained water—and that the increased resistivity of the sand on the Logging While Drilling ("LWD") data were due to the oil based drilling mud invading the formation in the six days between the trip-in and the trip-out measurements.  *See id.* at 193:4-194:13; 438:3-439:7.

In addition to the resistivity, Ms. Skripnikova focused on the formation density and neutron porosity data to determine whether there could have been gas in the M57B interval.  *See id.* at 413:19-415:6, 445:18-25.  Generally, the presence of gas produces a crossover between this data when overlaid.  However, Ms. Skripnikova saw only the formation density and neutron porosity curves touching.  *See id.* at 446:7-13, 486:4-9.  This indicated to her that gas was not at that interval.  *See id.* at 438:13-23, 440:8-22.  In addition to the resistivity analysis, Ms.

---

[2]        BP-HZN-2179MDL00034323 (Bennett Apr. 3, 2010 email "Macondo Update"); BP-HZN-MBI00198704 (Bennett Apr. 3, 2010 email "Macondo Update 5:30 am") produced in MDL 2179 around November 15, 2010.  Ex. B (BP-HZN-2179MDL00058504) (Daily Geological Report Apr. 3, 2010) produced in MDL 2179 around November 15, 2010.
[3]        The wireline data, including the "triple-combo tool" data, was produced in MDL 2179 around November 15, 2010.

Skripnikova further eliminated the possibility of oil by reviewing the information on the drill cuttings from that interval, which showed no presence of oil and concluded that the M57B sand was water-bearing.  *See id.* at 437:20-438:2, 439:2-7.

On April 13, 2010, Bobby Bodek, the Geological Operations Coordinator for the Macondo well, asked Ms. Skripnikova to provide the Macondo team the depth of the shallowest hydrocarbon-bearing zone.[4]  Ms. Skripnikova responded that, based on her analysis, the top hydrocarbon-bearing zone was at 17,803'.  *See id.*  Mr. Bodek agreed with Ms. Skripnikova's assessment based on his own analysis that the 17,803' sand was the shallowest sand with a legitimate crossover of the density and porosity data.  *See id.*  Other contemporaneous documents memorialize BP's belief at the time that the shallowest zone of interest was no higher than 17,700'.[5]  As such, BP and Halliburton used this information to plan the top of cement for the cement job.

Although Halliburton alleges that BP concealed that the M57B interval was hydrocarbon-bearing, there is no evidence that BP held the pre-Incident belief that the sand was hydrocarbon-bearing, or that it had any intent to conceal.  At the deposition of Ms. Skripnikova, Halliburton counsel repeatedly attempted to establish that she had reconsidered her April 13, 2010 conclusions *before the blowout* but Ms. Skripnikova rebuffed such characterizations.  For example, Ms. Skripnikova testified that once she had made the decision that the 17,803' sand was the shallowest hydrocarbon-bearing zone on April 13, she did not revisit the M57B interval *until the day after the explosion on April 21*.  *See* Ex. A, Skripnikova Tr. at 440:23-441:17, 492:24-493:10.  Specifically, she clarified the time frame of her evaluation for Halliburton counsel because she believed he had misunderstood her testimony from the previous day:

---

[4]     *See* Ex. C, MDL 2179 Dep. Ex. 3512, (BP-HZN-2179MDL00249267) produced in MDL 2179 around December 8, 2010.

[5]     *See*, *e.g.*, Ex. D (BP-HZN-2179MDL00005587) produced in MDL 2179 around November 15, 2010.

Q. Okay. Was any further analysis conducted from—between April 13th and April 21st on whether or not M56B [sic] was hydrocarbon bearing?

A. No.

Q. So yesterday when you said that there was a determination that it was and that determination was made by the date of the incident what were you referring to?

A. I was referring to the data after the incident. I probably kind of didn't made it clear. So the first—when I came back from—from the rig and started working with the—with the logs, **I didn't work with that sand [M57B]. My focus was on the—on the evaluating of production sands.**

And so after the incident happened, next day we had this meeting with other petrophysicists in the room looking at the big screen, and that's where it was highlighted. So…

*Id.* at 440:23-441:17 (emphasis added). During this pre-incident period, she did not alter her conclusion regarding the 17,803' sand because she was certain the M57B interval did not contain hydrocarbons. *See id.* at 440:8-22. And, as the petrophysicist assigned to the Macondo well, it is unlikely that anyone other than Ms. Skripnikova would have reviewed the data before the Incident. *See id.* at 539. Accordingly, it is unclear what testimony from Ms. Skripnikova's deposition could support any good faith basis for Halliburton to allege that BP believed the M57B interval was hydrocarbon-bearing before the Incident or that BP concealed any such belief from Halliburton.[6]

Contrary to Halliburton's assertion that BP "concealed" the M57B sand, BP shared the wireline data with its co-owners—Anadarko and MOEX—on April 15, 2010.[7] And, it is

---

[6] Many of the deposition exhibits that Halliburton used during Ms. Skripnikova's deposition were produced well in advance. For example, Exhibit 3536 was produced in MDL 2179 around May 27, 2011; Exhibit 3537 was produced in MDL 2179 on February 15, 2011; and Exhibits 3538 and 3539 were produced in MDL 2179 around on December 8, 2010 with MDL Bates.

[7] *See* Ex. E (BP-HZN-2179MDL00002647) (notifying co-owners that the proprietary wireline data was available) produced in MDL 2179 around November 15, 2010.

possible that Jesse Gagliano of Halliburton had access to or knowledge of this data based on his work alongside the BP Macondo well team in BP's Westlake offices.  Indeed, Mr. Gagliano regularly met with the BP engineers in a large conference room dedicated to the Macondo well where data from the well was displayed and discussed.  As the Court is aware, however, Mr. Gagliano has invoked his Fifth Amendment privilege to not testify in MDL 2179.

In any event, Ms. Skripnikova testified that she did not review data related to the M57B interval again until April 21, 2010, when she and other BP petrophysicists met to review the data for the well.  *See* Ex. A, G. Skripnikova Tr. at 441:7-18, 573:9-18.  At that time, they observed a slight crossover at the M57B interval when a digital copy of the "triple-combo tool" data was magnified.  *See id.* at 441:7-442:25, 445:7-15.  They also analyzed the magnetic and sonic imaging data, but that data was of marginal use because the two-foot M57B interval fell below the resolution of those imaging tools.  *See id.*at 444:6-13.  Although Ms. Skripnikova personally believed the interval was wet sand, the post-Incident group felt that some uncertainty existed and could not rule out the possibility that the sand contained gas.  *See id.* at 517:23-518:6; *see, also, id.* at 518:14-25.  Therefore, as a precaution, the team took the more conservative interpretation and labeled the interval a "gas" sand requiring further investigation.  *See id.* at 433:20-434:3.  Contemporaneous documents reflect the team's decision to call the M57B interval a gas sand.[8]

On May 25, 2010, the BP subsurface team issued a draft technical memorandum analyzing the geological data of the Macondo well, including the M57B interval.  Maintaining a conservative position, this technical memorandum labeled the M57B interval a "gas" sand.[9] **This document, showing BP engineers labeling the M57B sand as gas, was produced in MDL 2179 around January 29, 2011.**  Multiple versions of this memorandum, which labeled

---

[8]      *See* Ex. F (Dep. Ex. 3741) (4/22/2010 email documenting the 4/21/2010 meeting) produced in MDL 2179 around February 10, 2011.

[9]      *See* Ex. G (BP-HZN-BLY00107771) produced in MDL 2179 around January 29, 2011.

the M57B a gas sand, were produced in MDL 2179 many months ago.[10] They have been available to Halliburton for use in written discovery and depositions throughout Phase 1 discovery.

In June 2010, more information on the M57B interval became available. Schlumberger, the company that ran the wireline tools across the production interval, provided its ELAN analysis of the wireline data. This ELAN analysis was performed using sophisticated modeling software to identify hydrocarbon zones. The Schlumberger ELAN analysis concluded that the M57B interval was water-bearing, not gas-bearing.[11] Accordingly, this analysis confirmed Ms. Skripnikova's original analysis that the M57B interval manifested higher resistivity due to oil-based mud invading the formation. Based on the ELAN report, the final July 26, 2010 draft of the technical subsurface memorandum changed its characterization of the M57B sand from "gas" to "probable gas."[12]

During its investigation, the BP Incident Investigation Team ("IIT") learned of the subsurface team's work. Contrary to Halliburton's allegations of some vast conspiracy to conceal, the IIT immediately included the M57B zone in its analysis and, further, asked its consultants, including add energy ("ae") and CSI, to do modeling assuming that the M57B sand were gas-bearing.[13] Analyses performed by both the IIT and by ae found that the M57B, even if it were gas-bearing, did not contribute to the Incident.[14] As the IIT concluded that the M57B

---

[10]      BP-HZN-2179MDL00337365 (version 2 produced around December 23, 2010); Ex. I (BP-HZN-BLY00082874) (version 3 produced around January 10, 2011).

[11]      BP-HZN-2179MDL02912087 produced in MDL 2179 around July 2, 2011; BP-HZN-2179MDL02912088 (Power Point slide with ELAN excerpt) produced in MDL 2179 around July 2, 2011.

[12]      BP-HZN-BLY00082874.

[13]      BP-HZN-BLY00135356 (email chain with CSI) produced in MDL 2179 around February 3, 2011; MDL Exhibit No. 7278 (email chain with add energy) produced in MDL 2179 around June 17, 2011.

[14]      6/24/2011 Emilsen Dep. at 418-19; BP-HZN-BLY00048343 ("Analysis of Cementing Operations on the Deepwater Horizon and Possible Contributing Factors to Loss of Well Control" July 15, 2010) produced in MDL 2179 around February 12, 2011. *See, also,* Ex. K (BP-HZN-BLY00175745) produced in MDL 2179 on February 15, 2011; Ex. L (BP-HZN-BLY00196056) produced in MDL 2179 on February 15, 2011.

sand was not causal, and in light of the Schlumberger ELAN analysis, the IIT decided not to include the M57B interval in the Bly Report because it believed that inclusion would cause confusion on an issue that was unrelated to the cause of the Incident.  The CSI report concerning OptiCem modeling included analysis of the M57B sand and was made available early on with other IIT materials to the MDL 2179 parties and at least by mid- February, 2011—several months before the cross-claim deadline.[15]  It is noteworthy that, prior to the cross-claims deadline, thirty-four current or former BP employees—including fourteen members of the IIT— were produced for deposition and Halliburton only questioned one of them (Mr. DeFranco, discussed below) about the M57B sand and did not question any of them about the alleged "concealment."

BP has neither concealed documents addressing the M57B interval nor has it refused to provide information relating to it.  In fact, as early as April 24, 2010—just four days after the explosion—BP instructed Halliburton and Schlumberger to release BP's proprietary logging data, including the wireline and LWD data, to the MMS.[16]  And, in the relief efforts, BP distributed information regarding the production interval, including the wireline data covering the M57B interval, to the government and various third parties, such as Wild Well Control and other contractors who were assisting BP and the government to model and analyze the various scenarios the relief teams could encounter.[17]

It is unclear how Halliburton can allege that BP attempted to hide the M57B interval when BP has produced, on a number of occasions, documents relating to the M57B interval to

---

[15]     BP-HZN-BLY00174922 ("Analysis of Cementing Operations on the Deepwater Horizon and Possible Contributing Factors to Loss of Well Control" July 15, 2010) produced in MDL 2179 around February 12, 2011.
[16]     Ex. M (BP-HZN-2179MDL01200137) produced in MDL 2179 around April 22, 2011.
[17]     BP-HZN-2179MDL00676600 produced in MDL 2179 around March 11, 2011.

investigative bodies.[18]   For example, on October 22, 2010, BP produced to the National Academy of Engineering (NAE) documents containing geophysical data relating to the M57B sand.[19]   On October 30, 2010, BP wrote to the Presidential Commission identifying documents produced by BP addressing the M57B interval, including the wireline data stored in WellSpace and the three drafts of the Subsurface Technical Memorandum.[20]

### C.    Factual Background of Halliburton's Allegations

Halliburton's motion asserts that its New Claims are based on information that it "learned, for the first time" during the July 7-8, 2011 deposition of Galina Skripnikova, namely Halliburton's claim that BP knew of a "shallower hydrocarbon-bearing zone" in the well both pre-Incident and post-Incident, but withheld this information from Halliburton.  HESI Mot. at 2, 4.  Setting aside the truth of Halliburton's allegations, which BP disputes, the New Claims are based on underlying information that has been available for many months and in some cases well over a year.

First, Halliburton had access to data underlying its allegations even before the Incident and was aware of this potential argument in the week following the Incident—nearly sixteen months ago.  Before the Incident, Halliburton had access to the LWD Data, from which it could and, in fact, did identify the purportedly "concealed" hydrocarbon sand.  Indeed, Halliburton documents show that immediately after the Incident—no later than May 7, 2010—Halliburton analyzed the LWD Data for the production interval at the Macondo well and identified "Potential Hydrocarbon Zones," including the M57B zone.[21]   In other words, Halliburton's own documents show that it believed that the M57B zone might be hydrocarbon-bearing back in May 2010.

---

[18]    BP-HZN-2179MDL00337971; BP-HZN-OSC00005378;BP-HZN-NAE00001340.
[19]    Letter from Wilmer Hale to National Academy of Engineering, Oct. 22, 2010.
[20]    Letter from Wilmer Hale to National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Oct. 30, 2010.
[21]    *See* Ex. N (HAL_0530587); Ex. O (HAL_0530589).

Halliburton could have sought discovery in the intervening sixteen months to confirm its suspicion and certainly could have made the allegation of alleged concealment in its April 2011 cross-claim based upon it's own analysis of the data which it had performed a year before the cross-claim deadline.

Second, even without doing its own analysis, Halliburton received the IIT's analysis on this purported hydrocarbon zone more than 6 months ago.  During the IIT's investigation in the summer of 2010, it learned that the relief well teams identified the M57B zone as a potential gas zone and incorporated this new information into its analyses.  Among other things, the IIT had at least two "Notes to File" that addressed the effect of the M57B zone, assuming that it was hydrocarbon-bearing, on the Incident.  The IIT also identified the M57B zone for its outside consultants, CSI Technologies and add energy, to consider.  In addition to this IIT analysis, Schlumberger's analysis showed that the M57B zone was water-bearing.  Importantly, the "Notes to File," the communications with outside consultants, and the Technical Subsurface Memoranda were produced to various investigative bodies and to the MDL 2179 parties more than six months ago.[22]  From these documents, Halliburton knew that the M57B zone was potentially gas-bearing well before the May 20, 2011 deadline for cross-claims.

Third, the evidence shows that Halliburton did pursue this argument as a potential line of defense.  In March of 2011, a month-and-a-half before the cross-claims deadline, Richard Vargo, Halliburton's corporate designee concerning Halliburton's modeling for BP (including regarding "the underlying assumptions, information, and/or data BP provided to Halliburton"), testified as to many of the purported "facts" underlying Halliburton's New Claims.  Specifically, Mr. Vargo testified that a review of the IIT documents showed that there was a potential hydrocarbon zone

---

[22]    *See, e.g.*, BP-HZN-2179MDL00337365, produced in MDL 2179 around December 23, 2010; BP-HZN-BLY00082874, produced in MDL 2179 around January 10, 2011.

at 17.400'.[23]   Mr. Vargo further testified (in his capacity as Halliburton's corporate representative on "information and/or data that BP provided to Halliburton") about the allegation that Halliburton now seeks leave to add belatedly:  that BP had failed to provide information about hydrocarbon-bearing zones.   Ex. P, R. Vargo Tr. at 479:16-481:6 ("Q. Okay. What information do you think that -- that Halliburton was provided by P -- by BP that was not accurate?  A. The zones, where the zones were coming in and the pore pressures.  Q. So you think that the zones -- the -- the location of the zones?  A. Yes.").

Fourth, Halliburton's discovery further demonstrates its awareness of this argument before the May 20 cross-claim deadline.  For example, at the deposition of Samuel DeFranco, an IIT member, on April 12, 2011, Halliburton questioned Mr. DeFranco on the M57B sand and the review of that sand.  Ex. Q, S. Defranco Tr. at 399:24-402:5 ("Q. Okay.  Well, assuming we can take it at its word, there is a reference here that says that this M57B sand is identified as hydrocarbon on June 2010, you see that?  A. Yes, I do.").  This questioning was based upon a document produced to Halliburton months before the cross-claim deadline on February 15, 2011.

Fifth, there is no evidence of concealment by BP of any hydrocarbon zone.  As discussed above, BP provided this data to its partners before the Incident.  Following the Incident, BP worked closely with and shared information concerning the M57B sand with the government and other parties in the relief well efforts.  BP also produced this information to various government investigations and in MDL 2179.

---

[23]   *See* Ex. P, 3/30/2011 Vargo Dep. at 83:16-84:8 ("From some of the Bly documents, this was cement review that was done by BP around June, I believe it was, or they indicated that in June they found another hydrocarbon-bearing zone, although it may be small, another hydrocarbon-bearing zone.  I don't remember the exact depth, 17,400 some odd feet, in that area. . . .").

## II.      LAW AND ARGUMENT

### A.      Halliburton Cannot Show "Good Cause" Under Rule 16 To Amend Its Cross-Claim

Under Rule 16(b)(4), "a schedule may be modified only for good cause and only with the judge's consent." Fed. R. Civ. P. 16(b)(4).  In the Fifth Circuit, Rule 16(b) "governs amendment of pleadings once a scheduling order has been issued by the district Court."  *Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003); *see, also, Anderson v. La. ex rel. Louisiana Dept. of Public Safety & Corr.*, No. 09-0075-JJB-DLD, 2010 WL 2545817, at *1 (M.D. La. May 24, 2010) ("[C]ourts have routinely found that such leave is not warranted where good cause has not been shown to modify a scheduling order under Rule 16(b)(4).").

Contrary to the befuddling assertion that bringing the New Claims against BP "will not require additional discovery," HESI Mot. at 4, permitting Halliburton to litigate its belated fraud claims at this late stage in the proceedings will require modification of the Case Management Order (Dkt. 1506-1) to allow for significant additional Phase 1 fact discovery.  Specifically, in order to adequately defend itself, BP would need to conduct fact depositions and serve written discovery on Halliburton regarding numerous aspects of Halliburton's newly-asserted claims, including, but not limited to:

- The data to which Halliburton had access to before the Incident;

- The discussions between Halliburton and BP concerning the location of the top hydrocarbon interval;

- The materials received by Halliburton during the relief well efforts;

- Halliburton's post-Incident analysis of the data it received before the Incident, during the relief well operations, and during litigation;

- When Halliburton knew or had reason to know of the alleged basis for its claims;

- Whether Halliburton directly notified investigative bodies of the purportedly "concealed" hydrocarbon zone;

- Whether any facts or evidence exist to support Halliburton's contention that BP deliberately made knowingly false representations concerning the location of hydrocarbon zones in the Macondo well;

- The extent of any damages Halliburton has allegedly suffered as a result of the allegations it is claiming; and

- The intent of each person allegedly involved in the concealment of material information regarding hydrocarbon zones.

This additional fact discovery would overlap with a crowded expert deposition period at a time when the parties are also preparing for the Phase 1 trial and working through Phase 2 discovery. Moreover, it is likely that BP would need to amend its own pleadings to assert additional claims against other parties in light of Halliburton's New Claims—which raises the possibility that other MDL 2179 parties would also move to amend their own pleadings and seek additional discovery.

Because its proposed Second Amended Cross-Claim would disrupt the current pre-trial schedule, Halliburton must first show good cause for amending its Cross-Claim under Rule 16(b)(4). *S&W Enters. LL.C. v. SouthTrust Bank of Ala. N.A., 315 F.3d 533, 536 (5th Cir. 2003)* ("Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave."). In order to meet its burden under Rule 16, Halliburton must prove that it could not have brought its New Claims by the May 20 deadline despite exercising diligence. *See, e.g.*, *Marathon Fin. Ins., Inc., RRG v. Ford Motor Co.*, 591 F.3d 458 (5th Cir. 2009) (The Rule 16(b)(4) good cause

standard "requires a party to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.") (internal citations omitted). This requirement is particularly important in complex multidistrict litigation cases. *See, e.g.*, *In re Enron Corp.*, 610 F. Supp. 2d 600, 652-654 (S.D. Tex. 2009) (Denying movant's motion for leave to amend a pleading that would have modified the pre-trial schedule because it was being offered after the deadline for amending pleadings and because "allow[ing] amendment at this stage . . . would involve reopening discovery in this massive multidistrict litigation.").

The Fifth Circuit considers four factors when evaluating good cause under Rule 16(b)(4): "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Sw. Bell Tel. Co.,* 346 F.3d at 546. Halliburton cannot show good cause under these factors and the Court should deny Halliburton's motion.

Under the first factor, Halliburton does not have good cause for failing to timely move for leave to amend. As described above, its failure to include this claim in its Original or First Amended Cross-Claim is due to its own lack of diligence in pursuing this claim for over a year and/or a tactical decision not to file the claim back in May when Halliburton clearly knew of sufficient facts to make the claims as it proposes to do here. Halliburton's own documents show that it identified the M57B sand as a potential hydrocarbon zone in May 2010 from data in its possession from before the Incident. Even accepting Halliburton's assertion that it first learned of the alleged "concealment" in July 2011, failing to seek discovery on the issue for *fourteen months* cannot be considered diligence. Moreover, Halliburton had developed this theory no later than March 2011. As described above, Mr. Vargo appeared as Halliburton's corporate designee on communications between BP and Halliburton in March 2011—and testified that he

believed BP failed to provide Halliburton with information on the location of the hydrocarbon zones.  And BP documents from shortly after the Incident describing the zone as containing gas were available to Halliburton, the government and other parties, for months before the cross-claim deadline.

Most importantly, thirty-four depositions of BP witnesses took place before the cross-claim deadline.  With the exception of Mr. DeFranco's deposition, BP cannot locate a single question of a BP witness on this issue.  Numerous BP engineers with knowledge of pre-incident facts were deposed prior to the cross-claim deadline and BP cannot locate a single question on this issue.  Further, fourteen IIT team members were deposed prior to the cross-claim deadline.  Again, with the exception of Mr. DeFranco, BP cannot locate any questioning of those witnesses about the IIT's supposed concealment of this zone.  These facts raise the question of whether Halliburton chose for strategic reasons related to the litigation not to pursue questioning or discovery along this line, because Halliburton clearly knew about the issues and potential claims during each of those thirty-four BP depositions that were held prior to the cross-claim deadline.  As such, Halliburton cannot now claim surprise based on Ms. Skripnikova's deposition testimony, particularly when her testimony only confirms what the previously disclosed documents already revealed: that BP engineers called into question the characteristics of the M57B zone post-incident.

Under the third factor, BP would be prejudiced by Halliburton's late amendment.  Given its knowledge of the underlying circumstances, Halliburton had sufficient opportunity to bring its New Claims before the cross-claims deadline had it exercised at least some diligence in pursuing its purported "concealment" theory, which it has held since May 2010.  If Halliburton had pled the New Claims by the cross-claims deadline, BP and other MDL 2179 parties could have

incorporated these claims into their Phase 1 deposition and written discovery.   Instead, Halliburton delayed in making these claims and allegations until after the MDL 2179 parties could no longer propound written discovery or request depositions.   Accordingly, Halliburton's delay substantially prejudices BP, who will not have a reasonable opportunity to defend itself should Halliburton's New Claims be allowed.   The last factor—the availability of a continuance to allow BP to conduct needed discovery—also weighs against allowing Halliburton's amendment.   The Court has repeatedly made clear that it has no interest in delaying the start of Phase 1 of the Limitation Action.   Because Halliburton cannot show that it was unable to timely bring the New Claims despite its diligent efforts, it cannot meet the good cause requirement of Rule 16(b)(4) and its motion must be denied.

### B.   Halliburton's Motion Also Independently Fails Under Rule 15 Based On Undue Delay And Significant Prejudice To BP

Even under the more liberal standard of Rule 15, Halliburton's motion still fails.   Rule 15(a) motions are "by no means automatic."   *Parish v. Frazier*, 195 F.3d 761, 763 (5th Cir. 1999).   Rather, they are subject to the Court's power to effectively manage the case, *Shivangi v. Dean Witter Reynolds, Inc*., 825 F.2d 885, 891 (5th Cir. 1987), and should be denied when there is "undue delay [or] . . . undue prejudice to the opposing party by virtue of allowance of the amendment . . . "   *Foman v. Davis*, 371 U.S. 178, 182 (1962).   Courts routinely deny leave to amend when Plaintiffs do not exercise diligence when pleading and fail to provide any explanation for their delay—particularly when the proposed amendment does not comply with the Court's scheduling order.   *See, e.g., Love v. Ford Motor Co.*, 2006 WL 3826991, at *2 (5th Cir. 2006) (affirming refusal to allow amended complaint when plaintiff offered no reason for delay and significant time had passed after the scheduling order's deadline for pleading amendments); *S&W Enters.*, 315 F.3d at 535 (same).

First, Halliburton unduly delayed bringing its fraud claims. "Among the acceptable justifications for denying leave to amend [is] undue delay . . ." *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985). To determine whether a delay is "undue," courts consider whether the facts underlying the amended pleading were known when the prior pleading was filed. *Southmark Corp. v. Schultz Roth & Zabel,* 88 F.3d 311, 316 (5th Cir. 1996). When there is sufficient evidence in the record to allege a claim, a delay may be undue even if direct evidence is not discoverable at an earlier date. *See Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994-995 (5th Cir. 2005) (upholding denial of leave to amend where plaintiff did not discover direct evidence to support retaliation claim until deposition testimony).

Halliburton knew of the alleged facts in the New Claims on May 20, 2011 when it filed its First Amended Cross-Claim. As shown above, Halliburton possessed data underlying the New Claims even before the Incident. And, no later than May 2010, Halliburton had come up with the theory of the New Claims based on information in its possession at that time, sixteen months ago. In other words, Halliburton had knowledge of facts and arguments underlying its New Claims regarding the alleged concealed hydrocarbon zone for fourteen months before the deposition of Ms. Skripnikova. As such, with any degree of diligence, Halliburton could have taken any necessary discovery earlier and met the pleading deadline. Indeed, Halliburton's corporate representative, Mr. Vargo, was sufficiently confident in this theory that he testified under oath in March 2011 that BP had withheld information about the hydrocarbon zones from Halliburton. In short, there is no doubt that Halliburton had the sufficient information available to pursue the New Claims had it done so diligently. Whether due to strategic considerations or a lack of diligence, Halliburton chose not to bring the New Claims at the cross-claims deadline.

Either way, Halliburton's delay until September 1, 2011 to bring its amended pleading is undue and the Court should deny Halliburton's Motion.

Second, Halliburton's undue delay in bringing its fraud claims will prejudice BP. Moreover, it is also proper for the Court to deny a motion to amend if granting it would prejudice the opposing party. *Mayeaux v. La. Health Serv. and Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004). An opposing party is prejudiced if granting the motion would force the defendant to reopen discovery and prepare a defense for a new claim. *Id.* at 427; *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004).

BP would be prejudiced if Halliburton is allowed to amend its Cross-Claim at this late stage in the proceedings. First, due to the late amendment, BP would not have an opportunity to investigate Halliburton's claims because the deadlines for written and deposition discovery has passed. This precludes BP from obtaining exculpatory evidence from Halliburton as well as from governmental investigative bodies and other third parties involved in the *Deepwater Horizon* Incident. Contrary to Halliburton's allegations, BP has provided information to numerous governmental and private parties over the course of the last year-and-a-half that discloses BP's internal analysis and discussions on the M57B sand. Second, BP may need to amend its cross-claim to include claims against other parties in light of Halliburton's late New Claims. Third, BP would need to prepare a trial defense to the New Claims on short notice before the beginning of the Phase 1 trial—a period which already includes, among many other things, completing fact deposition; filing expert reports; completing as many as 85 expert depositions; finalizing the trial exhibit list, including addressing authenticity and other challenges; submitting BP's deposition designations and responding to designations from other parties; filing and arguing pre-trial motions, and preparing for trial. And the foregoing list does

not even include the Phase 2 discovery now underway.  For these additional reasons, Halliburton cannot meet the independent burden of amending its pleading under Rule 15 because it has unduly delayed bringing its amendment and, if Halliburton's proposed amendment is allowed, BP would be significantly prejudiced.  As such, the Court should further deny Halliburton's motion under Rule 15.

## CONCLUSION

As demonstrated above, Halliburton cannot show good cause under Rule 16 for modifying the scheduling order because it failed to exercise diligence in pursuing its belated New Claims.  Nor should Halliburton obtain leave under Rule 15 to amend its Cross-Claims given the circumstances showing that Halliburton unduly delayed in seeking to assert its New Claims to BP's detriment.  For all of the foregoing reasons, BP respectfully requests that this Court deny Halliburton's Motion for Leave to File Second Amended Cross-Claim (Doc. 3893).


Dated: September 19, 2011                    Respectfully submitted,

                                             By: /s/ Don K. Haycraft

                                             Don K. Haycraft (Bar #14361)
                                             R. Keith Jarrett (Bar #16984)
                                             LISKOW & LEWIS
                                             One Shell Square
                                             701 Poydras Street, Suite 5000
                                             New Orleans, Louisiana  70139-5099
                                             Telephone:  (504) 581-7979
                                             Facsimile:  (504) 556-4108

                                             Richard C. Godfrey, P.C.
                                             (richard.godfrey@kirkland.com)
                                             J. Andrew Langan, P.C.
                                             (andrew.langan@kirkland.com)
                                             Kirkland & Ellis LLP
                                             300 North LaSalle Street
                                             Chicago, Illinois  60654
                                             Telephone: (312) 862-2000

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

***Attorneys for BP Exploration & Production Inc. &
BP America Production Company***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of September, 2011.

_____/s/ Don K. Haycraft_____