# Exhibit A

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA

2

3    IN RE:  OIL SPILL        )   MDL NO. 2179
     BY THE OIL RIG           )
4    "DEEPWATER HORIZON" IN   )   SECTION "J"
     THE GULF OF MEXICO, ON   )
5    APRIL 20, 2010           )   JUDGE BARBIER
                              )   MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17              * * * * * * * * * * * * * * * * *
                        VOLUME 1
18              * * * * * * * * * * * * * * * * *

19

20

                    Deposition of GALINA
21   SKRIPNIKOVA, taken at Pan-American Building,
     601 Poydras Street, 11th Floor, New Orleans,
22   Louisiana, 70130, on the 7th day of July,
     2011.

23

24

25

PURSUANT TO CONFIDENTIALITY ORDER

```
 1   you can -- you can interpret.  This picture

 2   is not saying this is a loss zone.

 3        Q.     Okay.

 4        A.     This is showing the difference

 5   between the resistivity and people who are

 6   using the information drillers who -- it was

 7   sent to Brian Morel on his request for --

 8   I -- it was my job -- I would do this plot,

 9   anyway.

10        Q.     Okay.

11        A.     I sent it to him showing that

12   there is a difference between trip in and

13   trip out resistivity.

14        Q.     And what does that tell you when

15   there is a difference between trip in and

16   trip out resistivity?

17        A.     It means that the zone is --

18        Q.     Losing returns?

19        A.     -- however, it's changed -- the

20   resistivity reading over time changed.  So it

21   means that -- to me, I interpreted it as mud

22   filtrate invades the rocks, and that's why

23   later on LWD measurements, there is a high

24   number.  That's how this technique works.

25        Q.     So what you did is you overlaid
```

01:21  5
01:22  10
01:22  15
01:22  20
01:22  25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   the in -- the trip in with the trip out.  You
 2   had different permeability reason --
 3   readings, right?
 4        A.     It's not reading of
 5   permeability.  It's --
 6        Q.     It's resistivity?
 7        A.     It's resistivity reading.
 8        Q.     Okay.  And the difference in the
 9   resistivity can be explained by what
10   phenomenon?
11        A.     Invasion of oil-based mud into
12   the -- into the formation, into the
13   formation.
14        Q.     Okay.
15        A.     In the permeable formation,
16   tight formation --
17        Q.     Sure.
18        A.     -- it doesn't invade it.
19        Q.     So --
20        A.     And the reading in and reading
21   out is supposed to be the same.
22        Q.     But this was not the same when
23   you went in as opposed to when you went out
24   with respect to these readings, right?
25        A.     In some of the areas the window
```

01:23 — 5
01:23 — 10
01:23 — 15
01:23 — 20
01:23 — 25

**PURSUANT TO CONFIDENTIALITY ORDER**

1                    UNITED STATES DISTRICT COURT

                     EASTERN DISTRICT OF LOUISIANA

2

3    IN RE:  OIL SPILL        )   MDL NO. 2179

     BY THE OIL RIG           )

4    "DEEPWATER HORIZON" IN   )   SECTION "J"

     THE GULF OF MEXICO, ON   )

5    APRIL 20, 2010           )   JUDGE BARBIER

                              )   MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17               * * * * * * * * * * * * * * * *

                          VOLUME 2

18               * * * * * * * * * * * * * * * *

19

20

                     Deposition of GALINA

21   SKRIPNIKOVA, taken at Pan-American Building,

     601 Poydras Street, 11th Floor, New Orleans,

22   Louisiana, 70130, on the 8th day of July,

     2011.

23

24

25

PURSUANT TO CONFIDENTIALITY ORDER

1      A.    It's not triple combo has plots,

2    triple combo measures gamma rays.

3      Q.    Okay.  One of the things -- one

4    of the things that triple combo measures is

5    gamma ray, right?

6      A.    One of the sensors in the water.

7      Q.    Another one it measures is

8    resistivity, correct?

9      A.    There's several -- multiple

10   amount of receivers that measures

11   resistivity.

12     Q.    And I'm just trying to make sure

13   we're on the same page when I say we're

14   talking about triple combo gamma measurement

15   or the resistivity measurement that we are

16   talking about the same triple combo log, so

17   far are we on the same page?

18     A.    Yes.

19     Q.    Okay.  And the other -- one of

20   the other sensors or one of the other things

21   that the triple combo can measure is

22   something called the density neutron

23   crossover, correct?

24     A.    No, no, not crossover.

25     Q.    I'm sorry?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.      It doesn't -- it doesn't measure

2   crossover.

3       Q.      What does it measure?

4       A.      It measures density of the

5   formation and neutron porosity formation.

6       Q.      Okay.  And where the graphs for

7   density and neutron actually crossover you've

8   never referred that -- never heard that

9   referred to as crossover?

10      MR. LANCASTER:  Object to form.

11      A.      These two plots you mentioned

12  can be plot together in one --

13      Q.      (BY MR. HILL)  Track?

14      A.      In one track in the scale that

15  they overlay each other.

16      Q.      Right.

17      A.      There is negative crossover and

18  positive crossover.

19      Q.      Okay.  And positive cross --

20      A.      Or no crossover.

21      Q.      Okay.  So where they -- where

22  those two data graphs do crossover there is a

23  crossover there that helps indicate the

24  potential for hydrocarbons, correct?

25      A.      One is positive crossover, which

1   is -- I reference as a to positive crossover,

2   its low density and low density measurement

3   and low porosity -- relatively new -- low

4   neutral porosity measurement.  The shade, the

5   zone between them plotting in special scale

6   you can identify hydrocarbon --

7        Q.     Okay.

8        A.     -- hydrocarbons.

9        Q.     We'll talk a little bit more

10  specifically about that in a few minutes.  I

11  guess one of the things that I would like to

12  know is based on this work order can you

13  determine other than a triple crossover what

14  data sets or logs were made available by the

15  wireline logging conducting by Schlumberger?

16       A.     On the rig?

17       Q.     No, to you.  I assume your group

18  orders the wireline logging and then

19  evaluates it, correct?

20       MR. LANCASTER:  Object to form.

21       A.     Can you please repeat the

22  question.

23       Q.     (BY MR. HILL)  Sure.  I would

24  like to know that at the end of this

25  seven-day period where Schlumberger was

1    the formation fluids in those sands, correct?

2         A.    Yes.

3         Q.    And sitting here today, this is

4    your best understanding of what the formation

5    fluids are in the sands in the open hole at

6    Macondo, right?

7         A.    About most of the sands.

8         Q.    I'm sorry?

9         A.    About most of the sands, not all

10   of them.

11        Q.    Which ones aren't accurate?

12        A.    So it's accurate to extend this

13   upper probable gas sand is -- it's a very

14   uncertain evaluation of it.

15        Q.    Okay.

16        A.    So as many petrophysicists can

17   look at that and have his -- its own opinion

18   because on- -- it's only for the sand.

19        Q.    Okay.

20        A.    I would call -- we call it

21   probable.  So evolution, if it's fluid type

22   of this sand, kind of within those several

23   memorandums was from -- is from gas, which

24   was initial -- which was identified the day

25   after incident with the groups -- group of

1 petrophysicists.  It's a very uncertain

2 evaluation highlighted to make sure that

3 there is civility, we called it gas.

4      Q.     Okay.  We'll talk about that.  I

5 guess what I really want to know is right

6 now, it is BP's considered judgment after

7 relying on the experience, opinions of its

8 own engineers, that the sand named M57B is a

9 gas-bearing sand, correct?

10      MR. LANCASTER:  Objection; form.

11      MR. MONICO:  Objection; form.

12      A.     I can't talk for BP.  I can talk

13 about myself.

14      Q.     (BY MR. HILL)  Is it your

15 understanding that the M56B is a gas-bearing

16 sand?

17      MR. LANCASTER:  Object to form.

18      A.     It's probable gas.

19      Q.     (BY MR. HILL)  Probable gas.

20      A.     Likely -- it's probable gas.

21      Q.     So when you say "probable gas,"

22 it is a formation that we need to assume is

23 hydrocarbon-bearing?

24      MR. LANCASTER:  Object to form.

25      A.     There is a high uncertainty in

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Q.     (BY MR. HILL)  If you feel like

2     I'm stepping on you -- your answer, my

3     apologies, okay?  I don't do that

4     intentionally.

5               I want to make sure that I'm

6     clear, though.  Based on the triple combo log

7     that was generated that you saw out on the

8     rig, it is pretty clear that there is a sand

9     at 17,467 feet, but the only question is

10    whether or not it was hydrocarbon bearing; is

11    that accurate?

12         A.     There is -- I -- at -- at the

13    rig and my still understanding is a

14    low-porosity sand.

15         Q.     Okay.  But it's a sand, right?

16         A.     It's a low-porosity sand.

17         Q.     Low-porosity sand.  A sand,

18    though, nonetheless?

19         MR. LANCASTER:  Object to form.

20         A.     Same deformation.  It's -- well,

21    there is a -- when I'm talking about sand,

22    the only information about sand I can --

23    about the lithology is from descriptions from

24    the mud log.

25         Q.     (BY MR. HILL)  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.      And from cuttings, and they

2     do -- do describe sand within the section.

3          Q.      Okay.  So on April 13th when we

4     looked at the e-mail where you were asked on

5     April 13th to identify where the shallowest

6     hydrocarbon-bearing sand was in the open

7     hole --

8          A.      Yes.

9          Q.      -- you identified it as -- and

10    based on this chart, I think you identified

11    it as the M56A sand, correct?

12         A.      Yes.

13         Q.      All right.  And at that time,

14    you were aware that there was a, did you say

15    low-porosity sand at 17,467 feet?

16         A.      Yes, I saw at that sand.

17         Q.      Okay.  But you had --

18         A.      I looked at that sand.

19         Q.      Okay.  So you knew there was a

20    sand there; you didn't know, however, whether

21    or not it was hydrocarbon bearing?

22         A.      My interpretation was it's wet

23    sand.  There was wet sand.

24         Q.      Okay.  So you did not know if it

25    was hydrocarbon bearing at that time?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      MR. LANCASTER:  Object to form.

2      A.     To the tech- -- to the -- at the

3  data I had at the rig, looking at the

4  printout, I considered and report -- did not

5  report that sand at 14,467 as a

6  hydrocarbon-bearing sand because I thought it

7  was -- it -- it was a wet -- wet sand.

8      Q.     No.  I understand that.

9            Now, you testified yesterday

10  that after sending that e-mail or responding

11  to the April 13th e-mail from Mr. Bodek

12  asking you to identify the shallowest

13  hydrocarbon-bearing sand, that there was a

14  period of a few days or a weekend that you

15  thought additional analysis was needed to

16  determine whether the M57B sand was

17  hydrocarbon bearing.  Is that an accurate

18  characterization of what you testified?

19      MR. LANCASTER:  Object to form.  If

20  I -- could I have that question read back?  I

21  didn't track it.

22      THE REPORTER:  I'm sorry.

23      MR. HILL:  I can re-ask it.

24      A.     Can you, please?

25      Q.     (BY MR. HILL)  Yeah, it's a long

**PURSUANT TO CONFIDENTIALITY ORDER**

1    question.

2         MR. HILL:  I'll strike it and re-ask

3    it, if you like.

4         MR. LANCASTER:  That would be --

5    appreciate that.

6         MR. HILL:  All right.  Withdraw that

7    question.

8         Q.    (BY MR. HILL)  Let me ask you

9    this.  Do I understand from yesterday -- from

10   your testimony yesterday that after you told

11   or responded to the April 13th e-mail from

12   Mr. Bodek in which you identified the

13   shallowest hydrocarbon-bearing sand as being

14   the M56A sand, that you at least had enough

15   question in your mind to conduct further

16   analysis on whether M57B was hydrocarbon

17   bearing?

18        MR. LANCASTER:  Object to form.

19        A.    I did not.

20        Q.    (BY MR. HILL)  You did not what?

21        A.    I did not have doubts about that

22   sand.

23        Q.    Okay.  Was any further analysis

24   conducted from -- between April 13th and

25   April 21st on whether or not M56B was

1    hydrocarbon bearing?

2         A.      No.

3         Q.      So yesterday when you said that

4    there was a determination that it was and

5    that determination was made by the date of

6    the incident, what were you referring to?

7         A.      I was referring to the data

8    after the incident.  I probably kind of

9    didn't made it clear.  So the first -- when I

10   came back from -- from the rig and started

11   working with the -- with the logs, I didn't

12   work with that sand.  My focus was on the --

13   on the evaluating of production sands.

14              And so after the incident

15   happened, next day we had this meeting with

16   other petrophysicists in the room looking at

17   the big screen, and that's where it was

18   highlighted.  So...

19        Q.      In that meeting after the

20   incident, what data was available to that

21   room that wasn't available to you

22   pre-incident?

23        A.      The data -- first -- there were

24   several factors.  First of all --

25        Q.      Please answer my question.  I

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    asked you what data was available.

 2         MR. LANCASTER:  Again, you can answer

 3    the question as you need to answer the

 4    question.

 5              I would respectfully ask counsel

 6    to stop interrupting the witness.  It's rude.

 7         A.    There were much more detail

 8    available right at that time.  For the

 9    analysis with other petrophysicists, we used

10    process only data, we looked at CMR data all

11    together, and triple combo -- final version

12    of triple combo.  And I'm not saying that all

13    of that were contributed into our

14    considerations and our discussion, like --

15    like, for instance, CMR data did not

16    contribute much into -- into helping.  Or,

17    for instance, sonic data, we looked at that.

18    But, unfortunately, it was below the

19    resolution of the sonic tool to get much

20    more information about that.

21              But since it was on the big

22    screen, we zoomed in into depths and into

23    scale, which we did see that neutron density,

24    there was 2-foot sand and they actually do

25    form one data point crossover.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    together.  So there was a big --

2         Q.      Okay.

3         A.      -- plot-out on the big screen

4    looking into the detail in every sand.

5         Q.      Okay.

6         A.      That's how it was.  So I'm not

7    saying everything is contributed to it.  So

8    my biggest expectation would be sonic, but it

9    was below the resolution.  So -- and it was

10   the opinion in the room, it was very

11   difficult to identify the saturation of this

12   sand to highlight uncertainty respecting the

13   crossover be- -- with the sand.

14        Q.      Now, so that the record's clear

15   and so that the Court understands, when I

16   asked you earlier about the triple combo log,

17   one of the things I asked you about was the

18   density neutron crossover, right?  That's the

19   crossover you're talking about right now?

20        A.      I am talking about the crossover

21   on the density neutron log, yes.

22        Q.      And you're -- and I think I

23   understand your testimony to be that

24   post-incident, when you guys looked a little

25   bit close -- when you and your group or

**PURSUANT TO CONFIDENTIALITY ORDER**

1    whoever was in that room evaluating looked

2    closer at the triple combo log, you could

3    tell that there was a small crossover

4    indicating the potential presence of

5    hydrocarbon at 17467, correct?

6         MR. MONICO:  Objection; form.

7         A.    You could see that crossover on

8    that screen only with a big magnification.

9    And there was one point -- but, yes, there

10   was density going to the left, showing a low

11   density.  And there was very minor.  That's

12   why I didn't see it on the rig, because it's,

13   like, touching.  It's one point.  But to

14   highlight this uncertainty, we put it as a

15   gas --

16        Q.    (BY MR. HILL)  Okay.

17        A.    -- at that point.

18        Q.    So I want to make sure I'm

19   clear.  When you looked at the log, the

20   triple combo log pre-incident to determine

21   what the shallowest hydrocarbon-bearing sand

22   was, one of the things you looked at was

23   whether or not there was crossover on the --

24   the density neutron track, right?

25        A.    Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.      Okay.

2      A.      One of them was that.

3      Q.      Okay.  And you're telling me

4  that post-incident you determined there was a

5  small crossover, right, but that you couldn't

6  see that based on whatever conditions you had

7  at the rig when you looked at that log?

8      A.      When I looked at the printout of

9  that log --

10      Q.      Okay.

11      A.      -- the difference is printout,

12  which is printed out on a paper and lying

13  down in front of you on a table, you cannot

14  zoom in.  You cannot zoom -- do anything.

15  You can only look at every sand -- every

16  possible sand and see -- compare them

17  together to each other and understand what

18  the -- what the fluid -- what the fluid type

19  is.

20      Q.      Understood.

21      A.      When -- if -- when it's -- when

22  you're onshore at -- in the office, you can,

23  first of all, zoom it in as much as you can

24  and look at it.

25      Q.      Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

484

1  there, I think your chart that you're

2  confirming my work with, indicates that it's

3  a brine?  Or is determined it's a brine?

4      A.    There is not only crossover, but

5  certain important parameter how big the

6  density is.  So if you can identify the

7  porous -- porous laminar within the sand.

8      Q.    All right.  And you're

9  comfortable looking at this as well as any

10  backup confirmation that you did as

11  identifying M57C as a brine sand?

12      MR. LANCASTER:  Object to form.

13      A.    It's not brine.  It's uncertain.

14      Q.    (BY MR. HILL)  Uncertain?

15      A.    Yes, it's uncertain.

16      Q.    On your chart does it say

17  uncertain?

18      A.    Yes.

19      Q.    Okay.  All right.  Now, I'm

20  moving up to the area that was called outpost

21  incident at 17467.  And so that the Court

22  understands, similar to what we've done with

23  these other sands, we look here and there is

24  a excursion to the left on the gamma at 17467

25  that indicates a potential sand, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.      Yes.

2        Q.      And to the right there is an

3   excursion to the right that indicates a

4   potential hydrocarbon gas, correct?

5        A.      It indicates either potential

6   hydrocarbons --

7        Q.      Okay.

8        A.      -- within a virgin formation --

9        Q.      Fair enough.

10        A.      -- or invade -- invasion of

11   oil-based mud into the formation, what we

12   call resistive invasion.

13        Q.      All right.  Regardless of what

14   you think caused the reading, you would agree

15   that this is M57B sand, right?

16        A.      It is M57B.

17        Q.      All right.  Now, when we go over

18   to the right you see a small crossover, don't

19   you?

20        A.      I see the -- I see them touch.

21   So if you want me, I can give you my analysis

22   what it's based on.

23        Q.      I'd like for you to answer my

24   question.  Do you see a crossover?

25        A.      In this final thing I don't see

1 the crossover because crossover should be

2 expressed with yellow color, and I don't see

3 it.

4   Q.  Do you see the red and the blue

5 lines crossing and intersecting?

6   A.  I see them touching and one

7 point of -- of the neutron log point to the

8 right, but there is no crossover which is

9 shaded with yellow how I see here.

10   Q.  All right.  So you agree that

11 the lines intersect so you see that

12 crossover, but that crossover is not big

13 enough to be shaded yellow --

14   MR. LANCASTER:  Object --

15   Q.  (BY MR. HILL)  -- is that fair?

16   MR. LANCASTER:  Objection; form.

17   A.  I don't see it at all.

18   Q.  (BY MR. HILL)  You don't see the

19 crossover of the red and the blue color?

20 Now, so that I'm clear and so the Court's

21 clear on this precise area I'm talking about,

22 I'm going to circle that.  Is that fair?

23   A.  Yes.

24   Q.  Okay.  So I'm going to circle

25 this right here.  And I want to know what

**PURSUANT TO CONFIDENTIALITY ORDER**

1    incident somebody did just that and they

2    printed it up and blew it up just like we did

3    here on this ELMO machine, right?

4          A.     No, we did not print out.

5          Q.     Okay.

6          A.     When you -- when you have u a

7    printout you can't do anything with it.

8    You -- you can't stretch it.  So that's the

9    luxury of having it in a software.  You can

10   zoom in.  You can do the scale bigger.  You

11   can do the tracks wider, and then you can see

12   it.  That's how we saw it.

13         Q.     Fair enough.  So on April 13th

14   when you came back you could have used your

15   software to stretch the scale or do whatever

16   to find out if those two plots actually

17   intersected at M57B?  Question, you could

18   have done it, right?

19         MR. LANCASTER:  Object to form.

20         A.     Theoretical, yes, I could.  But

21   I'm not sure at the point of reference to

22   April 13, I'm not sure I had the final data

23   from Schlumberger, final LS file.

24         Q.     (BY MR. HILL)  I understand.

25   I'm saying anytime between April 13th and

1   April 20th, you had the final data in that

2   period, right?

3        A.     Yes, at that time -- in that

4   time, yes.

5        Q.     You could have done it, but you

6   didn't, right?

7        A.     I'm not required to.

8        Q.     That wasn't my question.  You

9   could have, but you didn't?

10        A.     I did not.

11        MR. LANCASTER:  Object to form.

12        Q.     (BY MR. HILL)  Now, have you

13   ever heard of a laminated sands log?

14   Laminated analysis sand -- let me try that

15   again.  Strike.

16               A laminated sands analysis.

17        A.     I know about laminated sands

18   analysis.

19        Q.     All right.

20        A.     Are we done with it?

21        Q.     Yes, you can sit that away for

22   now.  We'll pull it back out in a minute.

23        A.     I will look at that --

24        Q.     Your counsel can ask you

25   questions if they want.  Okay.  I'm done with

1  take that -- it's two different things.

2  Let's take it in steps.

3            Do you disagree with

4  Mr. Corser's representation in the e-mail

5  that M57B is a gas-bearing sand?

6       MR. LANCASTER:  Object; form.

7       A.    Mr. Corser took this gas from

8  this table and...

9       Q.    (BY MR. HILL)  Regardless of

10  where he got it, do you agree or disagree

11  with the statement that M57B is a gas-bearing

12  sand?

13       A.    At the date of Friday, June

14  15 -- 27, when there was -- there was no --

15  at the -- at that date that sand was

16  interpreted by BP petrophysicist team as gas.

17       Q.    Okay.  So to the extent the

18  investigation team is feeding this

19  information as gas to outside experts are you

20  telling me that that is bad information that

21  they should not rely on?

22       MR. LANCASTER:  Objection; form.

23       A.    It is a high uncertainly to over

24  that gap, over that zone.  And we wanted to

25  highlight it as real uncertainty and we want

**PURSUANT TO CONFIDENTIALITY ORDER**

1 people to. How else will you do it?

2      Q.    And would you --

3      A.    So that's why we called it gas,

4 and he uses it so kind of to in- -- include

5 it with whatever analysis we did that there

6 is uncertainty.

7      Q.    Okay. And would you agree with

8 me, though, if there is uncertainty about

9 whether or not it is a gas-bearing sand, you

10 better treat it as gas-bearing if you have to

11 isolate it according to regulations with

12 cement?

13      MR. LANCASTER: Object to form.

14      A.    That sand was identified on the

15 rig as wet sand, and therefore later with

16 more information available it was -- it was

17 identified as -- as a wet sand.

18      Q.    (BY MR. HILL) Okay. So you

19 didn't --

20      A.    Let me finish. And so then with

21 more information available and more people in

22 the room we called it gas sand.

23      Q.    All right. So --

24      A.    So there is -- I think it's wet

25 sand, personally. They -- this is

**PURSUANT TO CONFIDENTIALITY ORDER**

1  responsibility.

2      A.      Okay.

3      Q.      Okay.  And is my understanding

4  correct that you were the lead petrophysicist

5  on the Macondo well team?

6      A.      There was no lead.  There was

7  just petrophysicists.

8      Q.      Were there other petrophysicists

9  that were considered part of the Macondo

10 team?

11     A.      As peers only, not officially.

12     Q.      Okay.  You were the only one

13 that was officially assigned to a team?

14     A.      Yes.

15     Q.      And had you ever served as the

16 sole petrophysicist assigned to a drilling --

17 to a -- to a well team before?

18     A.      Can you, please, repeat the

19 question?

20     Q.      Had you ever served the same

21 role as a petrophysicist on any other wells

22 prior to Macondo where you were the member on

23 the team, the sole petrophysicist on the

24 team?

25     A.      Operations?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.      Yes.

2          Q.      All right.  And -- and best to

3  your recollection, that was -- that would

4  have been the day after, so that would have

5  been April 21st; is that right?

6          A.      Yes.

7          Q.      All right.

8          A.      To my best recollection.

9          Q.      And when you got together after

10  the accident on April 21st do you remember

11  approximately how many petrophysicists came

12  together for that meeting and -- and who they

13  were, if you remember?

14          A.      Two or three.  Do you want me to

15  tell the names?

16          Q.      Yes, if you remember.

17          A.      Ray Widrinski, Bruce Wachner,

18  and Rob Caston.

19          Q.      Okay.  And where did you-all

20  meet specifically at BP?  Where did you meet?

21          A.      Eastern team -- it was usually

22  eastern team room with the big screens or our

23  central team room.  I don't recollect right

24  now.

25          Q.      All right.

**PURSUANT TO CONFIDENTIALITY ORDER**