**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179**<br>**SECTION: J** |
| **This Pleading applies to: ALL CASES** | **JUDGE BARBIER**<br>**MAGISTRATE SHUSHAN** |

**THE STATES' BRIEF ON**
**CIVIL PENALTIES AND THE SOVEREIGN POLICE POWER**


LUTHER STRANGE
*Attorney General, State of Alabama*
*States' Coordinating Counsel*

COREY L. MAZE
*Special Deputy Attorney General, State of Alabama*

Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130

Phone: (334) 242-7300
Fax: (334) 242-4891
Email: cmaze@ago.state.al.us


September 23, 2011

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ ii

SUMMARY OF THE ARGUMENT ........................................ 1

ARGUMENT ........................................ 1

I. The States have both the power and the duty to punish and deter oil pollution. ........................................ 1

II. The States can apply their police power to events that occur outside the three-mile border if the States' territory is impacted and federal law is not in conflict. ........................................ 4

III. The States' penalty claims are viable because the States suffered injury within our borders and federal law preserves state-law penalties. ........................................ 6

IV. The States' punitive damage claims are viable because they also invoke the States' police power to punish and deter injurious conduct. ........................................ 7

V. Neither of the concerns expressed at oral argument warrant divestiture of the States' police power to impose penalties in this case. ........................................ 9

CONCLUSION ........................................ 10

CERTIFICATE OF SERVICE ........................................ 11

ATTACHMENT: CHART ........................................ 12

# TABLE OF AUTHORITIES

**Cases**

*Askew v. Am. Waterways Operators Inc.*,
411 U.S. 325 (1973) ..... 2, 4, 8

*Avenal v. Louisiana*,
886 So. 2d 1085 (La. 2004) ..... 3

*Bass v. Louisiana*,
34 La. Ann. 494 (La. 1882) ..... 3

*BMW v. Gore*,
517 U.S. 559 (1996) ..... 10

*Ex parte Hagar*,
104 U.S. 520 (1881) ..... 5

*Gillis v. Louisiana*,
294 F.3d 755 (5th Cir. 2002); 294 F.3d ..... 5

*Givens v. Town of Ruston*,
55 So. 2d 289 (La. App. 2 Cir. 1951) ..... 3

*Hamilton v. Kentucky Distilleries & Warehouse Co.*,
251 U.S. 146 (1919) ..... 1

*Huron Portland Cement Co. v. Detroit*,
362 U.S. 440 (1960) ..... 2

*Kesler v. Dep't of Pub. Safety*,
369 U.S. 153 (1962) ..... 2

*Louis Pizitz Dry Goods Co. v. Yeldell*,
104 So. 526 (Ala. 1925) ..... 7

*Missouri v. Portfolio Recovery Assoc., Inc.*,
686 F.Supp.2d 942 (E.D. Mo. 2010) ..... 3

*Moragne v. States Marine Lines, Inc.*,
398 U.S. 375 (1970) ..... 8

*Offshore Logistics Inc. v. Tallentire*,
477 U.S. 207 (1986) ..... 8

*Pacific Merchant Shipping Ass'n v. Goldstene*,
639 F.3d 1154 (9th Cir. 2011) ....................................................................................4

*Swift & Co. v. Wickham*,
382 U.S. 111 (1965)..........................................................................................................2

*U.S. v. Locke*,
529 U.S. 89 (2000)............................................................................................................1

*Wiltz v. Bayer CropScience*,
645 F.3d 690 (5th Cir. 2011) ....................................................................................7, 8

**Constitutitions**

U.S. Const., Article VI.......................................................................................................2
La. Const. art. 9, §1............................................................................................................2

**Statutes**

United States Code
33 U.S.C. §§ 1321(o)(2), -2718(c)......................................................................................1
33 U.S.C. §2718..................................................................................................................1
33 U.S.C. §2718 (c) ...........................................................................................................6
46 U.S.C. §8501(a) ............................................................................................................5

Alabama Code
§ 9-12-22............................................................................................................................2
§ 9-2-2................................................................................................................................2
§ 22-22-9(m) ....................................................................................................8, 9, 10, 12
§ 22-22A-5(18) ................................................................................................................12
§ 22-22A-5(18)(c)...............................................................................................................9

Louisiana Revised Statutes
La. R.S. 29:721 ...................................................................................................................3
La. R.S. 30:2025(E)(3)(a) .................................................................................................10

## SUMMARY OF THE ARGUMENT

A sovereign State may exert its police power in response to an oil spill that commences outside the 3-mile border if (1) the spill impacts the State within its borders and (2) the State's law/action does not conflict with federal law. Both States' penalty claims are viable because both States suffered territorial injuries and Congress expressly preserved our right to impose state penalties on top of federal penalties. *See* 33 U.S.C. §§ 1321(o)(2), -2718(c). Alternatively, our penalty claims are viable because they punish conduct occurring solely within our borders.

## ARGUMENT

Sovereign States are different than the B(1) plaintiffs. Granted, like private claimants, the States seek remuneration for the present spill, and federal law provides that compensation. *See* B(1) Order at 8-26. But, unlike private claimants, the States also have a constitutionally-protected right, and a correlative duty, to deter the *next spill* from decimating our waters, our land, our wildlife, and our economy. Neither OPA nor maritime law vindicates the States' right to punish and deter; application of the States' penalty statutes does. And as the Supreme Court acknowledged in *U.S. v. Locke*, Congress expressly preserved this right in OPA: "The evident purpose of the savings clauses is to preserve state laws which … establish liability rules and financial requirements relating to oil spills." 529 U.S. 89, 105 (2000) *citing* 33 U.S.C. §2718.

### I. The States Have Both the Power and the Duty to Punish and Deter Oil Pollution.

1. *The Police Power*: The historic police power was "reserved to the states by the Tenth Amendment." *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 156 (1919). It is potent, and not easily dispatched: "[T]he 'police power' of a State, especially when exerted for the protection of life and limb, is as pervasive as any of the reserved powers of

the States and should be respected unless there is a clear collision with a national law which has the right of way under the Supremacy Clause of Article VI." *Kesler v. Dep't of Pub. Safety*, 369 U.S. 153, 172 (1962), *overruled in part by Swift & Co. v. Wickham*, 382 U.S. 111 (1965).

The Supreme Court has held that the States' police power applies to pollution commencing on navigable waters, whether it's oil spillage or smoke from vessels. *See Askew v. Am. Waterways Operators Inc.*, 411 U.S. 325 (1973) ("ship-to-shore pollution control is historically within the police powers of the States"); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"). In both cases, the Supreme Court upheld the State's exertion of its police power to regulate and deter pollution because the State's law supplemented, rather than conflicted with, the concurrent federal statutory or maritime law. *See Askew*, *supra* at 341-43; *Huron*, *supra* at 446-48.

2. *The Public Trust Duty*: The States employ this police power to fulfill our state-law obligations to maintain and protect our "public trust" lands and wildlife. Alabama's public trust obligations are statutory. *See, e.g.*, Ala. Code §§9-2-2 (requiring Alabama's DCNR "[t]o protect, conserve, and increase the wildlife of the state"); 9-12-22 (vesting the State with ownership of the "beds and bottoms" of Alabama waters "to be held in trust for the people"). Louisiana's are constitutional. *See* La. Const. art. 9, §1 ("The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people").

3. *Application of the Police Power*: When the States battle oil pollution that threatens the public trust, where the spill originated is irrelevant. Our waters are just as oily. Our beaches are just as soiled. Our fish and wildlife are just as dead. Thus, our duty to protect the States' resources is the same wherever the spill starts—as is our police power to respond.

As we've previously briefed, the States' police power is triggered if a spill *impacts* the State, regardless of its origin. We use that power in a variety of ways. Most obvious, the States respond to and clean up the Spill, often invoking the police power to take, use, or even destroy private property.[1] In addition, the police power allows us to financially penalize corporations and individuals to punish the present spill and deter future spills, just as the police power allows us to criminally prosecute the responsible individuals to punish and deter. *Missouri v. Portfolio Recovery Assoc., Inc.*, 686 F.Supp.2d 942, 948 (E.D. Mo. 2010) ("Civil penalties are punitive in nature and fall within the State's police powers.")

No one argues that the States unconstitutionally invoked their police powers to respond to the present Spill because it started in federal waters. Nor has anyone questioned that the State could criminally prosecute the individuals responsible for our damage, simply because the Spill started in federal waters. To the contrary, the Defendants have acknowledged our right to prosecute extraterritorial events in response to the Court's "rocket" hypothetical. OA Tran. at 16.

How, then, can the Defendants question whether the States can invoke the police power to levy financial penalties for the Spill? The same Tenth Amendment preserves the States' right to clean up a spill and to criminally prosecute and financially penalize the polluters. It's the

[1] For example, La. R.S. 29:721 *et. seq.* confers emergency powers upon the Governor to deal with emergencies and disasters to ensure that the State can adequately preserve the natural resources, lives, and property of its People. Governor Jindal invoked that power on April 29, 2010, declaring a state of emergency caused by the Spill. *See* Proc. No. 20 BJ 2010. Louisiana caselaw establishes that, when invoking the police power thusly, the State may take, control, or destroy private property if done for the best interests of the People. *See, e.g.*, *Bass v. Louisiana*, 34 La. Ann. 494 (La. 1882); *Givens v. Town of Ruston*, 55 So. 2d 289 (La. App. 2 Cir. 1951); *Avenal v. Louisiana*, 886 So. 2d 1085, 1106 (La. 2004).

same police power. As long as the States' penalty law does not "clear[ly] conflict" with federal law under the Supremacy Clause, the States' police power to impose penalties is just as constitutionally protected. *Askew*, 411 U.S. at 341 ("Even though Congress has acted in the admiralty area, state regulation is permissible, absent a clear conflict with the federal law.").

In short, the States' police power extends beyond the issuance of civil penalties. Taken to its logical conclusion, the Defendants' argument would force State responders to sit idly by as injuries rained upon us from federal waters. We would have to trust the federal government to appropriate and lay out boom, to build berms, and to prosecute polluters that decimated *our* land. Fortunately, as shown below, courts have held that States can regulate, punish, and deter injurious matters in federal waters, as long as we do not conflict with federal law.

## II. The States Can Apply their Police Power to Events that Occur Outside the Three-Mile Border if the States' Territory is Impacted and Federal Law is not in Conflict.

Caselaw shows that a State can invoke its police power to events occurring outside the 3-mile border as long as (1) the State suffered (or will suffer) an injury to a protected interest and (2) the State law in question does not conflict with federal law.

The Ninth Circuit's recent decision in *Pacific Merchant Shipping Ass'n v. Goldstene* is on-point. 639 F.3d 1154 (9th Cir. 2011). To "reduce air pollutants affecting the State of California," California law regulates the type of fuels burned by vessels up to 24 miles off of California's coast. *Id.* at 1158. Vessel operators challenged the state regulations with similar arguments to the ones levied by the Defendants here: (1) the Submerged Lands Act statutorily preempts all state laws beyond the 3-mile border, (2) the Commerce Clause bars state regulation over federal waters, and (3) general maritime law preempts state law. Recognizing the State's "especially powerful interest in controlling the harmful effects of air pollution," *id.* at 1180-81, the Court of Appeals rejected them all, upholding the State's police power to "enact reasonable

regulations to monitor and control extraterritorial conduct substantially affecting its territory," if the State's regulations do not conflict with federal law. *Id.* at 1170. In the process, the court discussed a litany of cases—including Supreme Court and Fifth Circuit cases—in which a State regulated or punished conduct occurring outside its territorial border:

- *Supreme Court*: Florida could prosecute a violation of its sponge-protection statute that occurred outside the 3-mile border because a State can "govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." *Skiriotes v. Florida*, 313 U.S. 69, 76-78 (1941);

- *Supreme Court*: South Carolina could enforce its shrimp-trawling statute against citizens of other States, even though the States' territorial border ended at the low water mark at the time, because there was "no conflict between South Carolina's regulatory scheme and any assertion of federal power." *Toomer v. Witsell*, 334 U.S. 385, 393-94 (1948);

- *Fifth Circuit*: Louisiana can enforce its river pilot regulations 33 miles into the Gulf because (1) a Congressional statute allows it and (2) "Louisiana has a significant interest in securing the safety of ships traveling through the CSC to and from the Port of St. Charles." *Gillis v. Louisiana*, 294 F.3d 755, 760-62 (5th Cir. 2002);

- *First Circuit*: Rhode Island can similarly impose its pilot regulations beyond the 3-mile border.[2] *Warner v. Dunlop*, 532 F.2d 767 (1st Cir. 1976);

- *Florida*: Florida could prosecute a man for sexual battery that occurred on a vessel approximately 100 miles off its coast because (1) Florida's law did not conflict with any federal law (including Article III's admiralty jurisdiction provision) and (2) extraterritorial application of Florida law fell under the State's traditional police power via the "Effects Doctrine." *Florida v. Stepansky*, 761 So. 2d 1027 (Fla. 2000);

- *Alaska*: Alaska can prosecute someone for unlawfully fishing for scallops nine miles off Alaskan shores because Alaska was properly exercising its "police power" based on its "legitimate state interest" in regulating scallop fishing. *Alaska v. Sieminski*, 556 P.2d 929, 933 (Alaska 1976). The same is true of Alaska's crabbing regulations. *See Alaska v. Bundrant*, 546 P.2d 530 (Alaska 1976); and,

[2] Pilotage issues fall within admiralty jurisdiction. *Ex parte Hagar*, 104 U.S. 520 (1881). The same year the Constitution was ratified (1789), the first Congress passed a statute mandating that pilots "shall continue to be regulated in conformity with the existing laws of the States." *Gillis*, 294 F.3d at 755. While its language has been tweaked over the years, the same law exists today. *See* 46 U.S.C. §8501(a). This is further proof that the Framers gave Congress the choice to allow substantive state law to govern maritime activities, despite vesting admiralty jurisdiction with federal courts in Article III. *Contra* B(1) Order at 16, n.9.

- *California*: California could exercise "penal control" over swordfishing 10 miles off its coast because (1) federal law did not regulate swordfishing and (2) "[t]he United States Supreme Court has held that in matters affecting its legitimate interests a state may regulate the conduct of its citizens upon the high seas where no conflict with federal law is presented." *California v. Weeren*, 607 P.2d 1279, 1285-86 (Cal. 1980) *citing Skiriotes*, 313 U.S. at 77.

In every case, including cases from the Supreme Court and Fifth Circuit, the State's police power to regulate and penalize conduct beyond its territorial border was affirmed because two conditions were met: (1) the conduct impacted a legitimate state interest and (2) the state law did not conflict with federal law. The Court should apply the same rule here.

## III. The States' Penalty Claims Are Viable Because the States Suffered Injury within our Borders and Federal Law Preserves State-law Penalties.

The Court can uphold the viability of the States' civil penalties for either of two reasons.

1. The penalties sought by Alabama and Louisiana meet the 2-part test for applying the State's police power over extraterritorial conduct: (1) Both States suffered extensive damage to our territorial waters, land, and wildlife and (2) state civil penalties do not conflict with federal law because "adding" obligations, by definition, does not create conflict. And, providing definitive proof that there is no conflict, OPA expressly saves a sovereign State's right "to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature)," 33 U.S.C. §2718 (c), a provision that places zero relevance on where the oil was initially discharged.

2. As we have previously briefed, the location of the DWH explosion is of no concern to our penalty claims. The States are penalizing conduct that occurred solely within our borders—*i.e.* the addition of oil pollution to State waters, land, and wildlife. So, as far as civil penalties are concerned, there is no need to apply the 2-part test for extraterritorial application of the police power because the States are not penalizing an extraterritorial event.

## IV. The States' Punitive Damage Claims Are Viable Because They Also Invoke the States' Police Power to Punish and Deter Injurious Conduct.

Because punitive damages are civil penalties within our police power, punitive damages are available to the States absent a direct conflict with federal law.[3] *See supra* Parts I-II.

1. Both States suffered physical injury to our proprietary interest; thus, both States fit within the class of Plaintiffs this Court has held to "assert plausible claims for punitive damages against Responsible and non-Responsible parties." B(1) Order at 27. BP (seemingly alone) asks the Court to presently sift through and split our claims along injury lines, dismissing the States' punitive damage claims that do not "directly flow from the physical injury." *See* Doc. 4000 at 5.

Because the States fit within the Court's 'punitive class', and the States have the police power to seek punitive damages for injuries within our borders, the Court need go further than to deny the Defendants' motion to dismiss the States' punitive damage claims at this stage. The task of sifting through our claims to look for physical injuries, if legally necessary, can be saved for a more appropriate time—after physical injury is proved or disproved, for example.

2. If the Court agrees with the timing and substance of BP's claim-splitting argument, it should rule that Alabama can recover punitive damages for economic losses unrelated to physical injury under a state statute that applies solely to the sovereign. As the Fifth Circuit has held, where *Robin's Dry Dock* fails to create a maritime cause of action for economic losses unrelated to physical injury, States can fill in the gap by creating state-law actions for economic losses unrelated to physical injury. *See Wiltz v. Bayer CropScience*, 645 F.3d 690, 697 (5th Cir. 2011) ("Louisiana is free, of course, to accept, reject, or modify the economic-loss rule in its own tort and products-liability law."). In the same manner, the Supreme Court has noted that state

[3] *See, e.g., BMW v. Gore*, 517 U.S. 559, 568 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."); *Louis Pizitz Dry Goods Co. v. Yeldell*, 104 So. 526, 526 (Ala. 1925) ("[I]t is within the police power of the state to fix punitive damages by way of punishment.").

statutes properly "supplement[ed]" maritime law by creating causes of action for wrongful death before they were recognized by federal law in DOHSA and *Moragne v. States Marine Lines, Inc.* 398 U.S. 375 (1970). *Offshore Logistics Inc. v. Tallentire*, 477 U.S. 207, 224 (1986) ("It had been recognized that States could 'modify' or 'supplement' the federal maritime law by providing a wrongful death remedy enforceable in admiralty for accidents on territorial waters.").

This Court has recognized that OPA fills *Robin's Dry Dock's* gap for compensatory damages. B(1) Order at 20-21. Alabama law fills the same gap for punitive damages. Invoking the police power, Alabama Code § 22-22-9(m) allows the sovereign State (alone) to recover both compensatory and punitive damages for *all* spill-related losses, not just those tied to physical injury. Accordingly, even if BP is correct that punitive damages can be split along injury lines, all of Alabama's punitive claims remain viable: injury-related claims subject to maritime law, the remaining punitive claims subject to Alabama's statute that "supplements" maritime law.[4]

Ruling that Alabama's punitive claims remain viable via state statute would not "eviscerate" *Robin's Dry Dock*. OA Trans. at 30. Because Alabama's oil spill statute only applies to the sovereign State, and Louisiana law follows *Robin's Dry Dock*, *see Wiltz, supra* at 698, only 1 of 130,000+ claimants would be affected: the State of Alabama. *Robin's* would still limit the number of claimants who can seek compensatory damages from non-RPs and punitive damages from anyone under the B(1) order. And, most importantly, ruling that Alabama's statute "supplements" maritime law is correct under Supreme Court precedent, *see Askew*, *supra*, and it largely mirrors Congress' supplementation of *Robin's Dry Dock* in OPA.

3. To be clear, we do not believe that the Court needs to determine which State claims are subject to what punitive damage law at the motion to dismiss stage. We believe the Court

---

[4] To assist the Court, we attach a chart that demonstrates how Alabama's statutes fill the gaps under BP's reading of federal law, similar to the one shown at oral argument.

should simply deny the motions to dismiss our punitive damage claims because (a) the States suffered and pleaded physical injury, thereby fitting within the B(1) order's 'punitive class' and/or (b) punitive damages are proper exercises of the sovereign police power. If the Court wishes to rule on BP's argument now, however, the Court should rule that Alabama Code § 22-22-9(m) properly invokes the sovereign's police power by filling in the gap in federal law.

## V. Neither of the Concerns Expressed at Oral Argument Warrant Divestiture of the States' Police Power to Impose Penalties in this Case.

In addition to *Robin's Dry Dock's* viability, the Court and/or the Defendants raised two concerns with a ruling that sovereign States may impose civil penalties in this case.

1. *Uniformity*: The Defendants' argument that imposing state civil penalties would destroy the "uniformity of maritime law" is a red herring. OA Trans. at 16. Post-spill penalties in no way affect the uniformity or predictability of *pre-spill* permits and regulations, which were the focus of *Ouellette*. Nor do state penalties conflict with the federal penalty regime or make it unpredictable. To the contrary, the rule envisioned by OPA and the CWA is simple: Don't spill more oil than is allowed by permit/law. If you do, stop the progression of oil, because you will be penalized by every jurisdiction who suffers injury from your unpermitted discharge.[5]

2. *Limitation on State Penalties*: Imposing injured States' penalties is not only allowed by OPA, it's the point: financially incentivize the removal of oil pollution before it spreads across borders. But we understand the Court's concern over post-trial awards of per-day penalties if oil remains in State waters for 10+ years. *See* OA Trans. at 25. Four considerations should alleviate the Court's concerns. First, the awarding court is given discretion in determining the amount, with guiding factors. *See* Ala. Code §22-22A-5(18)(c); La. R.S.

[5] Using a simple example, "uniformity" is destroyed by a road sign that says the speed limit is both 55mph and 75mph (*i.e.* conflicting standards), not by a sign that says the fine for speeding is $50 to the State and $20 to the city (*i.e.* multiple fines).

30:2025(E)(3)(a). Second, as the oil dissipates with time, so may the Defendants' per-day liability because the severity of the spill and the polluter's efforts to minimize its effects are among the award factors. *See id.* Third, "grossly excessive" civil penalty awards may violate the Constitution, thereby alleviating concerns that the award will be unreasonably large. *See, e.g.*, *BMW v. Gore*, 517 U.S. 559, 575, 585-86 (1996). Fourth, a polluter can avoid an award of 10+ years of per-day penalties by negotiating the penalty amount with the State; just as an alleged felon can plea bargain against a maximum 30-year sentence. The States' doors are open.

The true concern lies in denying a sovereign State's penalties. In the case of a massive spill like this, the United States will seek the CWA's per-barrel penalties, which pay no regard to where spillage travels or how long it stays there. As a result, State penalties—not federal penalties—provide drillers on the OCS with the financial incentive to prevent spills from breaching the 3-mile border, inside of which pollution has its most devastating effects, and removing the oil as soon as possible. As BP and others prepare to drill even deeper in the Gulf, knowledge of penalties for allowing spillage to cross States' borders will incentivize better spill response plans—plans, we hope, that will shame BP's pre-Macondo official response plan of drilling relief wells for several months while oil spewed all over the Gulf and our beaches.

**CONCLUSION**

Reserving our appellate rights to all previous arguments, for the reasons stated above, the Court should deny the motions to dismiss both States' civil penalty claims. The Court should also deny the motions to dismiss both States' punitive damages claims. However, if the Court agrees with BP that maritime law splits punitive damages based on physical injury, the Court should deny the motion to dismiss Alabama's punitive damage claims that are unrelated to physical injury based on Alabama Code § 22-22-9(m).

Respectfully Submitted,

LUTHER STRANGE
*Attorney General, State of Alabama*
*States' Coordinating Counsel*

/s/ Corey L. Maze
COREY L. MAZE
*Special Deputy Attorney General, State of Alabama*

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130

Phone: (334) 242-7300
Fax: (334) 242-4891
Email: cmaze@ago.state.al.us

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on **September 23, 2011**.

/s/ Corey L. Maze
COREY L. MAZE
*Special Deputy Attorney General, State of Alabama*

## EXAMPLE: ALABAMA'S CLAIMS UNDER BP'S CLAIM-SPLITTING THEORY

| | ECONOMIC LOSS -PHYSICAL INJURY | ECONOMIC LOSS -NON-PHYSICAL INJURY |
|---|---|---|
| **COMPENSATORY DAMAGES** | **OPA**<br>**Maritime**<br>**~~State Law~~** | **OPA**<br><br>**~~State Law~~** |
| **PUNITIVE DAMAGES** | **Maritime**<br>**~~State Law~~** | **State Law**[1] |
| **CIVIL PENALTIES** | **State Law**[2] | |

[1] Ala. Code § 22-22-9(m)
[2] Ala. Code § 22-22A-5(18)