**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to: | * * | |
| *All Cases* | * * * | Honorable CARL J. BARBIER |
| | | Magistrate Judge SHUSHAN |
| | * * | |

---

**DEFENDANTS' JOINT SUPPLEMENTAL BRIEF CONCERNING THE EFFECT**
**OF THE B1 ORDER ON THE PENDING STATE AND LGE MOTIONS TO DISMISS**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Catherine L. Fitzpatrick
Elizabeth A. Larsen
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Jeffrey Bossert Clark
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:     (202) 879-5200

*ADDITIONAL COUNSEL LISTED*
*ON SUCCESSIVE PAGES*

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:     (504) 581-7979
Facsimile:      (504) 556-4108


Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:     (202) 662-5985

*Counsel for BP*

John F. Pritchard
Edward Flanders
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
Telephone:   (212) 858-1000
Facsimile:   (212) 858-1500

Christopher McNevin
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:   (213) 488-7507
Facsimile:   (213) 629-1033

*Counsel for MOEX Offshore 2007 LLC*

Jack McKay
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
Telephone:   (202) 663-8439
Facsimile:    (202) 663-8007

*Counsel for MOEX USA Corporation*


Hugh E. Tanner
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:   (713) 890-5000
Facsimile:   (713) 890-5001

*Counsel for M-I L.L.C.*

Glenn G. Goodier (Bar #06130)
Richard D. Bertram (Bar #17881)
Lance M. Sannino (Bar #29409)
JONES, WALKER, WAECHTER,
  POITEVENT, CARRÈRE & DENÈGRE,
  L.L.P.
201 St. Charles Avenue. 48th Floor
New Orleans, Louisiana  70170-5100
Telephone:   (504) 582-8174
Facsimile:    (504) 589-8174

Michael G. Lemoine, T.A. (Bar #8308)
Gary J. Russo (Bar #10828)
Douglas C. Longman, Jr. (Bar #8719)
JONES, WALKER, WAECHTER,
  POITEVENT, CARRÈRE & DENÈGRE,
  L.L.P.
600 Jefferson Street, Suite 1600
Lafayette, Louisiana  70501-5100
Telephone:    (337) 262-9024

*Counsel for Weatherford U.S., L.P.*

Donald E. Godwin
Bruce W. Bowman, Jr.
Jenny L. Martinez
Floyd R. Hartley, Jr.
Gavin E. Hill
GODWIN RONQUILLO PC
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone:      (214) 939-4400
Facsimile:      (214) 760-7332

R. Alan York
Jerry C. von Sternberg
Misty Hataway-Coné
GODWIN RONQUILLO PC
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:      (713) 595-8300
Facsimile:      (713) 425-7594

***Counsel for Halliburton Energy Services, Inc.***

Steven L. Roberts
Rachel Giesber Clingman
Kent C. Sullivan
Teri L. Donaldson
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone:     (713) 470-6100
Facsimile:     (713) 654-1301

Kerry J. Miller (Bar  #24562)
FRILOT, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone:     (504) 599-8169
Facsimile:     (504) 599-8154

Edwin G. Preis, Jr. (Bar #0703)
Edward F. Kohnke, IV (Bar #07824)
PREIS & ROY PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone:     (337) 237-6062
Facsimile:     (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone:     (504) 581-6062
Facsimile:     (504) 522-9129

Of Counsel:

John M. Elsley
ROYSTON, RAYZOR, VICKERY &
  WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone:     (713) 224-8380
Facsimile:     (713) 225-9945

Daniel O. Goforth
GOFORTH GEREN EASTERLING LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone:     (713) 650-0022
Facsimile:     (713) 650-1669

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone:     (213) 683-9100
Facsimile:      (213) 683-5180, (213) 683-4018

*Counsel for Triton Asset Leasing GmbH.,
Transocean Holdings LLC, Transocean
Offshore Deepwater Drilling Inc. and
Transocean Deepwater Inc.*

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................1

1.    Preemption:  ...................................................................................................1

      a.    The Clean Water Act ("CWA") Preempts State and Local Claims........................1

      b.    OCSLA and the CWA Preempt Multi-State Attempts to Regulate the Shelf.........2

2.    No Gaps:  ........................................................................................................5

      a.    Federal Law Remedies Are Comprehensive...........................................................5

      b.    Alabama's and Louisiana's Theory Would Foment Conflicts ...............................6

3.    Enclaves:  .......................................................................................................7

      a.    States Have No Police Powers in Federal Enclaves ................................................7

      b.    State Police Powers Can Be Extended to Federal Enclaves Only Via A Clear Statement................................................................................................8

4.    The "Effects Doctrine" Cannot Save the State Penalty Claims...........................................9

CONCLUSION

APPENDIX.......................................................................................................... A-1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Alaska Packers Ass'n v. Industrial Accident Comm'n*,
　294 U.S. 532 (1935) ................................................................................................10

*Arkansas v. Oklahoma*,
　503 U.S. 91 (1992) ..............................................................................................1, 2

*Askew v. American Waterways Operators, Inc.*,
　411 U.S. 325 (1973) ..................................................................................................5

*Bartholomew v. CNG Prod. Co.*,
　862 F.2d 555 (5th Cir. 1989) ....................................................................................6

*Black Hills Power & Light Co. v. Weinberger*,
　808 F.2d 665 (8th Cir. 1987) ....................................................................................9

*BMW of N. Am., Inc. v. Gore*,
　517 U.S. 559 (1996) ................................................................................................10

*Byrd v. Napoleon Ave. Ferry Co.*,
　125 F. Supp. 573 (E.D. La. 1954), *aff'd*, 227 F.2d 958 (5th Cir. 1955) ................6

*Continental Oil Co. v. London Steam-Ship Owners' Mut. Ins. Ass'n.*,
　417 F.2d 1030 (5th Cir. 1969) ..................................................................................5

*Exxon Shipping Co. v. Baker*,
　554 U.S. 471 (2008) ..................................................................................................7

*Geier v. American Honda Motor Co.*,
　529 U.S. 861 (2000) ..................................................................................................7

*Gillis v. Louisiana*,
　294 F.3d 755 (5th Cir. 2002) ................................................................................2, 3

*Hughes Tool Co. v. TWA, Inc.*,
　409 U.S. 363 (1973) ..................................................................................................3

*International Paper Co. v. Ouellette*,
　479 U.S. 481 (1987) ............................................................................................1, 4, 9

*Knickerbocker Ice Co. v. Stewart*,
　253 U.S. 149 (1920) ............................................................................................4, 5

*Law v. GM Corp.*,
    114 F.3d 908 (9th Cir. 1997)...........................................................................................6

*Lord v. Local Union No. 2088*,
    646 F.2d 1057 (5th Cir. Unit B 1981) ............................................................................9

*Mississippi River Fuel Corp. v. Cocreham*,
    382 F.2d 929 (5th Cir. 1967) ["*Cocreham I*"]...............................................................8, 9

*Mississippi River Fuel Corp. v. Cocreham*,
    390 F.2d 34 (5th Cir. 1968) ["*Cocreham II*"] ................................................................9

*Mobil Oil Exploration & Prod. S.E., Inc. v. United States*,
    530 U.S. 604 (2000) ....................................................................................................1

*Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*,
    2009 WL 1974298 (E.D. Va. Apr. 3, 2009) ...................................................................7

*North Carolina ex rel. Cooper v. TVA*,
    615 F.3d 291 (4th Cir. 2010) .......................................................................................4

*Oceanic Butler, Inc. v. Nordahl*,
    842 F.2d 773 (5th Cir. 1988).........................................................................................5

*Offshore Logistics, Inc. v. Tallentire*,
    477 U.S. 207 (1986) ....................................................................................................8

*Ouellette v. Int'l Paper Co.*,
    602 F. Supp. 264 (D. Vt.), *aff'd*, 776 F.2d 55 (2d Cir. 1985),
    *rev'd*, 479 U.S. 481 (1987).........................................................................................2

*Pacific Coast Dairy v. Department of Agric. of Cal.*,
    318 U.S. 285 (1943) ............................................................................................8, 9, 10

*PMSA v. Goldstene*,
    517 F.3d 1108 (9th Cir. 2008) ["*PMSA I*"] ...................................................................3

*PMSA v. Goldstene*,
    639 F.3d 1154 (9th Cir. 2011) ["*PMSA II*"]............................................................2, 3, 4, 8

*Torrens v. Lockheed Martin Servs. Grp., Inc.*,
    396 F.3d 468 (1st Cir. 2005) ........................................................................................8

*Western Union Telegraph Co. v. Brown*,
    234 U.S. 542 (1914) ....................................................................................................10

*Western Union Telegraph Co. v. Chiles*,
    214 U.S. 274 (1909) ....................................................................................................10

**U.S. Constitution**

U.S. Const., art I, § 8, cl. 17 ........................................................................................................8


**Federal Statutes**

*Omnibus Budget Reconciliation Act of 1986*

26 U.S.C. § 9509 .............................................................................................................6

*Oil Pollution Act of 1990*

33 U.S.C. § 2701(18) ......................................................................................................7

33 U.S.C. § 2702 .............................................................................................................5

33 U.S.C. § 2702(b)(2)(A) ..............................................................................................5

33 U.S.C. § 2702(b)(2)(D) ..............................................................................................5

33 U.S.C. § 2702(b)(2)(F) ...............................................................................................5

33 U.S.C. § 2704 .............................................................................................................7

*Outer Continental Shelf Lands Act*

43 U.S.C. § 1332(1) .........................................................................................................8

43 U.S.C. § 1333(a)(1) .....................................................................................................8

*Current Codification of Successor to Lighthouse Act of 1789*

46 U.S.C. § 8501(a)..........................................................................................................3


**Federal Regulation**

33 C.F.R. § 135.201(b)(3)..............................................................................................7

This Court has already held in the B1 Order that private plaintiffs cannot bring state-law claims for damages arising out of the oil spill.  The States' penalty and punitive damage claims are no different.  Such claims (1) are beyond the territorial sovereignty of Alabama and Louisiana, (2) are preempted by the Clean Water Act, OCSLA, and federal maritime law, and (3) would invade a federal enclave.  Critically, these conclusions are also mutually reinforcing.  The CWA, OCSLA, and maritime law each preempt state law in their own right.  But the cumulative effect of those laws, especially as to their operation within an enclave subject to exclusive federal jurisdiction, further demonstrates that no "gaps" in federal law exist for state environmental statutes or regulations to fill.[1]

## ARGUMENT

**1.a.**     **PREEMPTION:  The Clean Water Act ("CWA") Preempts State and Local Claims**.

In the B1 Order, the Court held that *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), strongly supported its ruling that maritime law preempts private state law economic loss claims. B1 Order at 16.  That same reasoning applies to the State and local claims for civil penalties. Indeed, *Ouellette* specifically labeled any form of state regulation (direct or through private nuisance actions) as impermissibly "penalizing" out-of-State conduct.   479 U.S. at 495 (emphasis added) (quoted in the margin).[2]  *Ouellette* holds that impacted States cannot directly regulate out-of-state water pollution sources *or indirectly regulate their effects*.  *Arkansas v.*

---

[1]  These federal statutes (and numerous others) fit together with maritime law to form a comprehensive and highly reticulated whole.  [*See, e.g.,* Doc. 1440-1 at 7-13; Doc. 2645-1 at 56 (citing *Mobil Oil Exploration & Prod. S.E., Inc. v. United States*, 530 U.S. 604, 609-10 (2000) (summarizing four pillars of the comprehensive regime).]

[2]  "If a New York source were liable for *violations of Vermont law*, that law could effectively override both the permit requirements and the policy choices made by the source State.  *The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State.  Such penalties* would compel the source to adopt different control standards …. [Hence, International Paper] would have to change its methods of doing business and controlling pollution to avoid the threat of ongoing liability.  [A]n affected state court also could require the source to cease operations by ordering immediate abatement ….  The inevitable result of such suits would be that Vermont and other States could do indirectly what they could not do directly — regulate the conduct of out-of-state sources."

*Oklahoma*, 503 U.S. 91 (1992), makes clear that *Ouellette* is not limited to private tort claims. *See id.* at 100-01 (violations of Oklahoma's water standards by Arkansas sewage plant ***not*** enforceable where EPA had issued a permit to the plant).  The private claims in *Ouellette* failed not because they were private claims or because a damages remedy was sought, but because they rested on an *ultra vires* assertion of Vermont's power to affect out-of-state sources.

The States have no answer to *Ouellette*.  Cases about pilotage (*Gillis v. Louisiana*, 294 F.3d 755 (5th Cir. 2002)) and the regulation of air emissions from ship fuel (*PMSA v. Goldstene*, 639 F.3d 1154 (9th Cir. 2011) ["*PMSA II*"]) are far afield and do not remotely approach ***the controlling specificity*** of *Ouellette* as to discharges of water pollution occurring outside of state borders.  The States argue that *Ouellette* concerns permitting, but it is about far more than that. It is about the authority — or, more critically, ***lack of authority*** — of one State to regulate water pollution originating in another State, even if the pollution takes place upstream from the State seeking to regulate it and where the currents make it inevitable pollution will cross state lines.[3]

**1.b.    PREEMPTION:  OCSLA and the CWA Preempt Multi-State Attempts to Regulate the Shelf.**  The *DWH* incident occurred on the Shelf, where federal law governs exclusively. The law of ***a single determinate State*** can be borrowed, ***as surrogate federal law***, ***but only to fill "substantial gaps" or "voids" in federal law***.  [Doc. 1440-1 at 2, 7-9, 26-29, 34-35][4]  Not only are there no gaps here, *see* Point 2 below, but the States' and localities' call for the application of state law would unleash the very chaos of multiple regulatory regimes enclaves must be free of.

The States' new cases, *Gillis* and *PMSA II*, are irrelevant to the analysis required by

---

[3] Moreover, it is unquestionable that BP's and Transocean's operations on the Shelf were subject to EPA CWA general permit 290000.  Recognizing this, Louisiana argues most recently that *Ouellette* is distinguishable because International Paper was discharging ***in compliance*** with its NPDES permit.  [Doc. 4001 at 8]  Louisiana's argument is demonstrably false.  *See* BP's B1 Reply (Doc 2312) at 30 (noting that *Ouellette* plaintiffs argued that International Paper was ***violating*** its NPDES permit) (citing *Ouellette v. Int'l Paper Co.*, 602 F. Supp. 264, 266 (D. Vt. 1985).)  Hence, the preemptive effect of *Ouellette* that unavoidably follows from the NPDES permit cannot be disputed.

[4] Application of Alabama's law is a non-starter under OCSLA (as would be Florida's, Mississippi's, or Texas's).

OCSLA.  These cases do not involve: (1) OCSLA, (2) the CWA, (3) multiple States, (4) federal enclaves, (5) accidental discharges, or (6) areas of regulation in which there is no history of a strong state presence tolerated by the federal sovereign.  *Gillis* held that the Submerged Lands Act did not preempt pilotage regulation.  But state pilotage authority is venerable, going back to the Lighthouse Act of 1789.  *See Gillis*, 294 F.3d at 791.  Indeed, federal law continues to allow States to regulate in that area.[5]  What States lack is a history of regulating subsea oil drilling activities in the ocean both because of OCSLA's exclusive federal occupation of that field and because such drilling, especially in deep water, is a very modern phenomenon.

Furthermore, in *PMSA II* a State was merely allowed to impose in-use[6] fuel requirements **on ships calling on California ports**.  By contrast, the *DWH* activities did not involve pilotage into Louisiana or Alabama ports (*Gillis*), nor did they involve a vessel that was being regulated for in-state effects occurring while it was engaged in visits to a State's ports to deliver or pick up containers in commercial trade (*PMSA II*).  *Compare PMSA II*, 639 F.3d at 1158 (rules generally "only cover vessels calling at a California port").  This factor also distinguishes the *DWH* from the Court's hypothetical about a rocket launched from Shelf waters into a State.  [*See also* Doc. 4003 at 6 (Alabama's example of a bullet).]  This incident was an accident, not a purposeful decision akin to navigating into the Port of Lake Charles, Louisiana as in *Gillis* or calling on the

---

[5] 46 U.S.C. § 8501(a) ("Except as otherwise provided in this subtitle, **pilots** in bays, rivers, harbors, and ports of the United States **shall be regulated only in conformity with the laws of the States**.") (emphasis added).

[6] The Ninth Circuit had previously held that California's regulations of ship emissions (not fuel formulation) **was preempted** by the Clean Air Act in *PMSA v. Goldstene*, 517 F.3d 1108 (9th Cir. 2008) ["*PMSA I*"].  *PMSA II did not* disturb *PMSA I*.  This underscores why vague generalities about state police powers are of little use in resolving this case.  Instead, a tight focus is required on the precise federal statutes involved.  The fact that Alabama and Louisiana are trying to avoid CWA and OCSLA preemption by citing cases that involve neither statute is telling.  Alabama's first PowerPoint slide from September 16, 2011 is reductionist and facile (*PMSA II* — "24 miles off coast"; *Gillis* — "33 miles off coast").  Those cases involved different statutes, different regulated conduct, and did not involve the oil and gas exploration activities on the federal Shelf enclave lying at OCSLA's core.  The States claim that they can regulate based on the "effects doctrine," but they ignore that **there is a CWA-specific, anti-effects doctrine embedded in** Ouellette **and** Arkansas, providing that affected States have no authority at all to regulate pollution sources originating in other States.  Finally, whether the Supreme Court denies *certiorari* in *PMSA II* is immaterial.  Denials of *certiorari* are not precedential, *Hughes Tool Co. v. TWA, Inc.*, 409 U.S. 363, 365, n.1 (1973).

full span of California's ports as in *PMSA II*.  *See* Tr. 22:13 (9/16/11) ("THE COURT:  But we don't have any cases like that [i.e., the rocket hypothetical].").  More importantly, the conduct here on the Shelf was ***fully contained within that federal enclave***.  This means that the effects of such conduct elsewhere are in the exclusive realm of the federal government to regulate or punish.  *See* Points 3-4 below.

Alabama and Louisiana suggest that dismissing their penalty claims would somehow undermine state sovereignty.  But upholding *Ouellete* preemption actually vindicates their sovereignty because it means that only the home State can regulate industrial and other sources therein, and that downstream States cannot regulate water pollution and downwind States cannot regulate air pollution originating elsewhere.  *North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 306-07 (4th Cir. 2010) (applying *Ouellette* to the Clean Air Act).  A Pandora's box would be flung open if the States could penalize activities that take place outside their boundaries.

**1.c.  PREEMPTION:  State Penalty Claims Are Preempted by the Uniformity Demanded by Maritime Law.**  The Court has held: (1) maritime law generally demands uniformity; (2) States can supplement admiralty law, but only with respect to conduct within their borders; and (3) "this case does not concern conduct within state borders (waters)."  B1 Order at 12.  The States have no answers to where the Court's syllogism leaves their penalty claims.  Instead, at the oral argument, the States could only reiterate their flawed argument that supplementation can occur, even as to conduct occurring outside of state boundaries.  *See* Tr. 30:9-20 (9/16/11).

The States argue that they possess police power (which is false as to enclaves even if enclave conduct causes in-state effects, *see* Points 3-4 below).  But this ignores the Court's ruling that maritime uniformity denied them this power as well.  B1 Order at 12 n.7 (quoting *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 160 (1920) (emphasis added) (Constitution

"***took from the states all power***, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of [maritime] law or to interfere with its proper harmony and uniformity in its international and interstate relations"). *Knickerbocker*'s age does nothing to diminish its force here.  As the Supreme Court said in *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 339 (1973) (emphasis added), state power to supplement maritime law only applies "on land and water ***within its limits***."

Finally, there is no basis to distinguish this Court's B1 ruling on private claims from the state penalty and punitive claims at issue here.  It remains equally true that "multiple states' laws are asserted," B1 Order at 12, and that federal remedies remain available, *id.* at 14.  And most fundamentally, as the Court emphasized in the B1 Order, "State … create[d] rights and liabilities" were unavailable for conduct arising outside their territorial purview.  *Id.* at 12.

**2.a.   NO GAPS:   Federal Law Remedies Are Comprehensive.**[7]   Federal law is comprehensive on the subject of oil spills, admitting of no gap.  Congress created compensatory remedies for private plaintiffs, *see* OPA, 33 U.S.C. § 2702, as well as remedies made available only to States or localities.   *See* 33 U.S.C. § 2702(b)(2)(A) (natural resource damages), § 2702(b)(2)(D) (revenue losses), and § 2702(b)(2)(F) (costs of providing public services).  Civil penalties are also fully provided for by CWA Section 311.  For purposes of assessing whether there is a gap within the meaning of OCSLA or maritime law, this intricate set of federal laws covers the waterfront by providing all the rights Congress wanted to establish.

Fifth Circuit case law makes clear that in OCSLA situations, a spill enforcement and remedial regime of this nature has no gaps.  In *Oceanic Butler, Inc. v. Nordahl*, 842 F.2d 773,

---

[7] Even if the Court were to apply a maritime choice of law analysis to the States' claims for civil penalties, both Alabama and Louisiana concede that state law may only apply in an ordinary admiralty case to fill gaps in federal law.  Ala. Opp'n [Rec. Doc. 3203] at 7-8; La. Opp'n [Rec. Doc. 3213] at 7-8; *see also Continental Oil Co. v. London Steam-Ship Owners' Mut. Ins. Ass'n.*, 417 F.2d 1030, 1035 (5th Cir. 1969) (application of Louisiana law to tort on the Shelf neither "needed [n]or permitted" because "there was a fully effective maritime right and remedy").

777 n.4 (5th Cir. 1988), the federal Longshore and Harbor Workers' Compensation Act ("LHWCA") was held not to contain any OCSLA gaps.[8]  Yet Alabama argues that after the B1 Order a gap exists both as to those who cannot recover maritime punitive damages given *Robins Dry Dock* restrictions and because the CWA, OPA, and OCSLA do not provide state penalties.

These are not "gaps." Proper gap analysis asks only whether an "***issue***" has been addressed in some fashion by federal law.  *Bartholomew v. CNG Prod. Co.*, 862 F.2d 555, 557 (5th Cir. 1989).  If an issue is addressed by federal law, the States have no ability to change the result by supplementation with state law just because they find their own law preferable.  For this reason, Congress's choices to protect state interests through damages claims under OPA and to require that federal CWA penalties go exclusively to the United States do not leave "gaps" for state law to fill.[9]  Rather, those features of the statutes Congress enacted to comprehensively balance state and federal interests related to the development of oil and gas resources on the Shelf represents a considered choice that this Court must apply and the States must respect.[10]

**2.b.  NO GAPS: Alabama's and Louisiana's Theory Would Foment Conflicts.**  The States' theory would effectively grant regulatory authority over the Shelf for significant spills to whatever nearby State has the strictest standards.  In turn, this would effectively deny authority to federal regulators (such as EPA, which can readjust NPDES general permits for discharges, or BOEMRE, which can readjust drilling safety regulations), even when regulating enclave activity.

---

[8] *See also Byrd v. Napoleon Ave. Ferry Co.*, 125 F. Supp. 573, 577 (E.D. La. 1954), *aff'd*, 227 F.2d 958 (5th Cir. 1955) (per curiam) (maritime gap exists only where "there is no right to recover" for an injury under federal law).

[9] Penalties recovered by the United States under CWA Section 311 are paid to the Oil Spill Response Trust Fund, and are then available, pursuant to 26 U.S.C. § 9509, to be used to pay response costs in connection with other oil spills, including response costs of States, and to pay damages from other oil spills, including damages of States.

[10] By Alabama's logic, the LHWCA would have to be considered riddled with gaps because such holes exist whenever a particular state cause of action or chosen remedy does not have a ***precise counterpart*** in federal law. *Contrast, e.g., Law v. GM Corp.*, 114 F.3d 908, 912 (9th Cir. 1997) (by design "almost every worker's compensation scheme" caps damages and disallows punitive damages).

6

Instead, the most aggressive States in the relevant coastal region where drilling was occurring could dictate safety practices by establishing penalties to deter discharges that they could arguably posture as having a potential to reach state shores, as well by reaching out on the same basis to try to incentivize any other conduct on drilling rigs that could reduce the risk of spills.

The unstated idea behind the States' arguments is that more enforcement is always better — more penalties, more injunctions, etc.  But this ignores that complex regulatory regimes (including the CWA, OPA, and OCSLA) are carefully calibrated and internally balanced.  OPA provides for limited compensatory liability via its liability caps.  33 U.S.C. § 2704.  Mindful of their powers in federal enclaves, Congress made deliberate choices in 1990 as to what penalties to establish.  If States can impose penalties that exceed Congress's choices and effectively make them operative in the Shelf enclave, the conflict is inherent in that all calibrations done at the federal level to set down rules for the enclave are for naught.  *See, e.g., Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) (state law duty to include airbags in cars preempted because it disregarded ***the balance*** set in a federal regulation to require airbags only in some cars).[11]

**3.a.  ENCLAVES:  States Have No Police Powers in Enclaves.**  The Shelf is a federal enclave, and this includes the *DWH* mobile offshore drilling unit ("MODU"), which at the time of the accident was in contact with the well.  33 U.S.C. § 2701(18); 33 C.F.R. § 135.201(b)(3).[12]

---

[11]  Moreover, applying multiple penalty laws here would destroy maritime law's uniformity.  Engrafting state punitive damages or penalty remedies onto maritime law would be improper and conflict with the limits placed on punitive damages and their predictability in *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502-03 (2008).  In *Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*, 2009 WL 1974298 (E.D. Va. Apr. 3, 2009), the court, relying on *Baker*, denied effect to a state triple-damages provision where grossly negligent conduct caused damage to the property of a public service corporation.  *Baker*'s "predictability" is "not served when a party may be subject to one level of damages for harming property within Virginia, but damaging similar property in another state would be subject to a different level of damages."  *Norfolk*, 2009 WL 1974298, at *4.  Likewise, allowing multiple States to impose their disparate penalty regimes could far exceed *Baker's* 1:1 ratio and frustrate predictability.  The Appendix compares the penalty provisions of the CWA, Alabama, Louisiana, and Florida.  We include Florida because it shows that the Court's dismissal of claims under the FPDPCA (a Florida police power statute itself housing authority for both penalties and private claims) applies equally to private damages and state penalty claims.

[12]  "A mobile offshore drilling unit is considered an offshore facility from the moment a drill shaft or other device

*See generally* 43 U.S.C. §§ 1332(1), 1333(a)(1); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986); *see also* B1 Order at 12 ("This casualty occurred over the Outer Continental Shelf — an area of 'exclusive federal jurisdiction' — on waters deemed to be the 'high seas'").

The States also cannot rely on any "presumption against preemption" of the sort described in *PMSA II*, 639 F.3d at 1167. This is because enclaves are areas of exclusive federal control where the presumption is not only inapplicable, but where the States, by definition, ***have no police powers in the first place***. *See, e.g., Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 470 (1st Cir. 2005).[13] In federal enclaves, "Congress has the combined powers of a general and a state government." *Pacific Coast Dairy v. Department of Agric. of Cal.*, 318 U.S. 285, 294 (1943). Within enclaves, only the United States wields police powers.

**3.b.  ENCLAVES:  State Police Powers Can Be Extended to Federal Enclaves Only Via A Clear Statement.**  The Fifth Circuit has long held that state regulation within federal enclaves requires a clear and express congressional statement ***and that the exclusion of state power from enclaves does not depend at all on whether federal and state law conflict or not***:

> When Congress has wished to allow a State to exercise jurisdiction to levy certain taxes within a federal enclave ***it has specifically so stated*** …. The Court thereby reaffirmed the ***long line of decisions that a state may not legislate for a federal enclave even if the legislation does not conflict with a regulation of Congress or interfere with a federal function or instrumentality.***

*Mississippi River Fuel Corp. v. Cocreham*, 382 F.2d 929, 937 (5th Cir. 1967) (emphasis added) ["*Cocreham I*"]; *see also id.* at n.17.  State regulation that would in essence ***affect*** conduct

---

connected to the unit first touches the seabed or connects to a well for the purposes of exploration, development, or production of oil until drilling is completed and the unit is no longer attached to the well or drill hole by any device." At the moment of the accident, the rig was thus engaged in a core OCSLA function — exploratory drilling.

[13] These land-based enclave cases specifically involve the three-part test for a State to ***cede*** control of its territory to the federal government and for such control to be used for certain specified purposes as established by the Enclave Clause.  U.S. Const., art I, § 8, cl. 17.  OCSLA establishes that the Shelf, which is owned by the United States, is to be treated like an Enclave Clause jurisdiction.  Of course, the three-part cession test is itself inapplicable because the Shelf was never the States' territory to cede, as *PMSA II* (one of the States' authorities) details.  *See PMSA II*, 639 F.3d at 1163-64 (describing the Supreme Court's "paramountcy doctrine" concerning submerged lands).

occurring within an enclave is impermissible:  "Here the critical fact is that the incidence of taxation, the reduction of fugitive oil and gas to possession and ownership, takes place within the exclusive jurisdiction of the United States."  *Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (per curiam) ["*Cocreham II*"].   The key activity here was Shelf exploratory drilling.   *Ouellette* recognizes that state penalties would alter how business is conducted and so on these facts that such penalties would effectively regulate extraterritorially.

The *Cocreham I* and *II* rulings are not limited to the tax area.  In *Black Hills Power & Light Co. v. Weinberger*, 808 F.2d 665 (8th Cir. 1987), the court held that a State had no right to include an enclave within a utility territory for purposes of regulating electricity sales.  And in *Lord v. Local Union No. 2088*, 646 F.2d 1057 (5th Cir. Unit B 1981), the Fifth Circuit held that Florida could not apply its right-to-work laws to enclaves.  State power "extends [ ] only in the area over which the state has power to legislate.  The Supreme Court has made it clear that ***states retain no such power with regard to federal enclaves*** even though they are physically located within their territory."  *Id.* at 1062 (emphasis added).  OCSLA is precise about when and how state law can apply on the Shelf.  No State is at liberty to bring state law in through the back door by reading additional spheres of state authority into OCSLA.

**4.  The "Effects Doctrine" Cannot Save the State Penalty Claims.**  In *Pacific Coast Dairy*, the Supreme Court dealt with state regulation that attempted to set wholesale milk prices for a federal enclave.  California sought refuge in the "effects doctrine."  The Court was unmoved: "[R]eliance is placed upon the settled doctrine that a state is not disenabled from policing its own concerns, by the mere fact that its regulations may beget effects on those living beyond its borders.  We think, however, that ***it is without application here***, because of the authority granted the Federal Government over Moffett Field."  318 U.S. at 295 (emphasis added).

Moreover, not only is the "effects doctrine" unavailable to allow States to reach into the regulation of federal enclaves, the Supreme Court has made clear that the "effects doctrine" is unavailable at all in tort-like situations.  *Pacific Coast Dairy* was a case about sales contracts. *See* 318 U.S. at 295 n.14 (citing *Alaska Packers Ass'n v. Industrial Accident Comm'n*, 294 U.S. 532, 541 (1935) ("fact that the contract is to be performed elsewhere does not of itself put these incidents beyond reach of the power which a state may constitutionally exercise")).  For present purposes, the *DWH* incident involves tort-like situations.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-85 (1996) (civil penalties are analogous to aggravated damages for tortious conduct).  *Alaska Packers* goes on in the next paragraph to state that "similar [state] power to control the legal consequences of a ***tortious act*** committed elsewhere has been ***denied***, *Western Union Telegraph Co. v. Brown*, 234 U.S. 542, 547 [(1914)]; *Western Union Telegraph Co. v. Chiles*, 214 U.S. 274, 278 [(1909)]." *Alaska Packers*, 294 U.S. at 541 (emphasis added).

In the *Western Union* cases, failures ***within enclaves*** to deliver telegrams triggered tort suits based on laws operative in the sending States.  In *Brown*, a District of Columbia resident brought a successful suit in South Carolina under that State's law to recover for emotional distress because a telegram sent to her from South Carolina was not delivered, causing her to miss her sister's funeral there.  The Supreme Court reversed, holding that South Carolina could not apply its law to a District tort:  "[W]hen a state attempts in this manner to affect conduct outside its jurisdiction, ***or the consequences of such conduct***, and to infringe upon the power of the United States, it must fail."  234 U.S. at 547 (emphasis added).  *Chiles* is similar, but involved a penal statute.  214 U.S. at 278-79 ("The record presents the single question whether a law of the state of Virginia imposing a penalty has any effect or operation within the limits of the navy yard.  [The affirmative holding] was ***clearly erroneous*** ….") (emphasis added).

10

## CONCLUSION

For the foregoing reasons, the state and local penalty and punitive damage claims should be dismissed.

Date:  September 23, 2011

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Catherine L. Fitzpatrick
Elizabeth A. Larsen
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Jeffrey Bossert Clark
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Respectfully submitted,

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Counsel for BP*

John F. Pritchard
Edward Flanders
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
Telephone:    (212) 858-1000
Facsimile:    (212) 858-1500

Christopher McNevin
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:    (213) 488-7507
Facsimile:    (213) 629-1033

**_Counsel for MOEX Offshore 2007 LLC_**

 Jack McKay
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
Telephone:    (202) 663-8439
Facsimile:     (202) 663-8007

**_Counsel for MOEX USA Corporation_**


Hugh E. Tanner
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:    (713) 890-5000
Facsimile:    (713) 890-5001

**_Counsel for M-I L.L.C._**

Glenn G. Goodier (Bar #06130)
Richard D. Bertram (Bar #17881)
Lance M. Sannino (Bar #29409)
JONES, WALKER, WAECHTER,
 POITEVENT, CARRÈRE & DENÈGRE,
 L.L.P.
201 St. Charles Avenue. 48th Floor
New Orleans, Louisiana  70170-5100
Telephone:    (504) 582-8174
Facsimile:     (504) 589-8174

Michael G. Lemoine, T.A. (Bar #8308)
Gary J. Russo (Bar #10828)
Douglas C. Longman, Jr. (Bar #8719)
JONES, WALKER, WAECHTER,
 POITEVENT, CARRÈRE & DENÈGRE,
 L.L.P.
600 Jefferson Street, Suite 1600
Lafayette, Louisiana  70501-5100
Telephone:    (337) 262-9024

**_Counsel for Weatherford U.S., L.P._**

Donald E. Godwin
Bruce W. Bowman, Jr.
Jenny L. Martinez
Floyd R. Hartley, Jr.
Gavin E. Hill
GODWIN RONQUILLO PC
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone:     (214) 939-4400
Facsimile:     (214) 760-7332

R. Alan York
Jerry C. von Sternberg
Misty Hataway-Coné
GODWIN RONQUILLO PC
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:     (713) 595-8300
Facsimile:     (713) 425-7594

***Counsel for Halliburton Energy Services, Inc.***

Steven L. Roberts
Rachel Giesber Clingman
Kent C. Sullivan
Teri L. Donaldson
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone:     (713) 470-6100
Facsimile:     (713) 654-1301

Kerry J. Miller (Bar  #24562)
FRILOT, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone:     (504) 599-8169
Facsimile:     (504) 599-8154

Edwin G. Preis, Jr. (Bar #0703)
Edward F. Kohnke, IV (Bar #07824)
PREIS & ROY PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone:     (337) 237-6062
Facsimile:     (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone:     (504) 581-6062
Facsimile:     (504) 522-9129

Of Counsel:

John M. Elsley
ROYSTON, RAYZOR, VICKERY &
  WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone:     (713) 224-8380
Facsimile:     (713) 225-9945

Daniel O. Goforth
GOFORTH GEREN EASTERLING LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone:     (713) 650-0022
Facsimile:     (713) 650-1669

Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
MUNGER TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone:    (213) 683-9100
Facsimile:     (213) 683-5180, (213) 683-4018

*Counsel for Triton Asset Leasing GmbH.,
Transocean Holdings LLC, Transocean
Offshore Deepwater Drilling Inc. and
Transocean Deepwater Inc.*

# Appendix

**Penalties Sought by the United States, Alabama, and Louisiana, and Similar Provisions in the
Florida Pollution Discharge Prevention and Control Act (Statute Held Preempted in B1 Master Complaint)**

| Clean Water Act | Alabama | Louisiana | Florida |
|---|---|---|---|
| • Reserving all of the defenses in applicable answers, Defendants note that the United States is seeking to impose civil penalties of up to *$1,100 per barrel of oil* that has been discharged, or up to $*4,300 per barrel of oil* that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct. (DOJ Compl. ¶ 75.) | • Although defendants do *not* concede that Alabama's methodology is correct, under its reasoning, Alabama seeks to impose *over $1 million per day in penalties* on each defendant ((43 X $25,000) + $25,000 + $50,000 = $1,150,000 (adding up the penalties for the alleged violations of certain statutes described below)).  If the State could successfully penalize corporate officers — which again defendants do *not* concede that they could — then that number could be doubled, tripled, or multiplied by an even greater number.<br><br>• Separate penalties under the Alabama Water Pollution Control Act ("AWPCA") are said to apply for each of at least *43 different subdivisions* of water.  (Ala. Compl. ¶ 293.)<br><br>• Each and every time that a discharged resulted in *new or increased pollution* in any of the 43 or more subdivisions, it constitutes a separate violation of the AWPCA.  (Ala. Compl. ¶ 298.)<br><br>• Each day that each violation continues constitutes a *separate and additional* violation of the AWPCA.[†]  (Ala. Compl. ¶ 293.) | • Although defendants do *not* concede that Louisiana's methodology is correct, under its reasoning, Louisiana seeks to impose *over $1 million per day in penalties* on each defendant.  Louisiana's methodology for reaching the total daily penalties is very different than Alabama's.<br><br>• Louisiana seeks civil penalties against each Defendant of up to *$32,500 for each day* of violation of the Louisiana Environmental Quality Act.  (La. Compl. ¶ 188.)<br><br>• Louisiana also seeks up to *$50,000* against certain Defendants *for each day* of violation of a compliance order issued by Louisiana Department of Environmental Quality.  (La. Compl. ¶ 188.) | • Pollution violations "shall be punishable by a civil penalty of up to *$50,000 per violation per day* to be assessed by the department."  Fla. Stat. § 376.16 |

[†] Indeed, Alabama appears to suggest that it may impose multiple $25,000 penalties per day for pollution in any of the 43 subdivisions if there is "new or increased pollution" at any time during the day.  Ala. Compl. ¶ 296 ("Such discharges resulted in new and increased pollution in each of the waters of the State enumerated above and others *multiple times each day* beginning on April 20, 2010, and continuing to the present.") (emphasis added).

| | | | |
|---|---|---|---|
| • The Clean Water Act also provides that penalties may be assessed on a per day basis instead of on a per barrel basis in an amount up to *$37,500 per day* of violation, or up to *$140,000 per day* in the event of gross negligence or willful misconduct.  33 U.S.C. § 1321(b)(7)(A) & (D), as adjusted for inflation by 40 C.F.R. § 19.4. | • ***For each such AWPCA violation, and for each day that each such violation continues***, Defendants are liable to the State of Alabama for a civil penalty of up to $25,000.  (Ala. Compl. ¶ 293.)<br><br>• And ***each responsible corporate officer*** of Defendants (and the corporation on their behalf) is ***liable for the same civil penalty***.  (Ala. Compl. ¶ 293.)<br><br>• Alabama also seeks *$25,000 per day* in penalties for violations of the Alabama Air Pollution Control Act.  (Ala. Compl. ¶ 316.)<br><br>• Alabama also seeks *$50,000 per day* in penalties for violations of the Alabama Hazardous Wastes Management Act.  (Ala. Compl. ¶ 323.)<br><br>• Alabama also seeks *$200 per day* in penalties for violations of the Alabama Solid Wastes Disposal Act.  (Ala. Compl. ¶ 327.) | • Louisiana also seeks an additional penalty of up to *$1,000,000 per day* for each day that the violation continues because it alleges that the violation resulted in a discharge or disposal which caused irreparable or severe damage to the environment or that the substance discharged was one which endangers human life or health.  (La. Compl. ¶ 186-88.)<br><br>• Certain Louisiana District Attorneys are seeking penalties for wildlife allegedly taken due to the actions of defendants.  (*E.g.*, Compl. of Terrebonne Parish DA.)  These penalties are calculated ***per fish, bird, or animal***, with the penalties varying by type of wildlife or aquatic life, and in some cases by weight or length.  *See* La. Admin Code. tit. 76, pt. I, § 315 (penalty schedule in effect as of April 20, 2010) (examples include $524.54 per deer; $42.01 per goose; $2,210.00 per marine mammal; $9.77 per pound for frogs; $2,762.50 per animal for most endangered species; $1.30 per pound for shrimp; $2.72 per pound for swordfish; and $10.16 for a 12-inch red drum). | |

A-3

**NOTES**

1.  The Court has already held the B1 Plaintiffs' claims preempted under the same Florida statute that houses that State's penalty authority.

2.  The United States, Alabama, Louisiana, and Florida penalty systems all use different methodologies.

3.  The United States is seeking Clean Water Act Section 311 penalties, which itself authorizes use of different methodologies.

4.  The methodology for calculating the wildlife penalties sought by the Louisiana District Attorneys is wholly unlike any of the other penalty regimes.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of September 2011.


<u>/s/ Don K. Haycraft        </u>
       Don K. Haycraft