# Exhibit 1

**From:** Andrew Langan [mailto:alangan@kirkland.com]
**Sent:** Thursday, May 19, 2011 12:05 PM
**To:** Sally_Shushan@laed.uscourts.gov
**Cc:** mike_o'keefe@laed.uscourts.gov; Defense Committee MDL 2179; James Roy; Herman, S; robert cunningham; Paul M. Sterbcow; michael underhill; Corey Maze
**Subject:** MDL 2179 -- Additional Deponents Requested by BP for Phase 1 Trial , and Certain Objections

Dear Judge Shushan:

As requested in your May 17 order, BP makes this submission regarding additional deponents it believes are needed to properly prepare for the Phase 1 trial. Most of these listed below need to be taken by the July 31 cutoff although we can also understand that some of these may need to slide into August 2011 as non essential for expert development work. I should also note that the names below are in addition to the names already on the priority deposition list for which dates are still to be scheduled, of which there are many (we think there are as many as 19 Transocean and 4 Halliburton witnesses on the priority list that have not yet been scheduled).

**Background.** As the Court knows, BP has, to date, produced more deponents than all the other parties and non parties combined. As of today, we estimate that depositions have been completed of 31 BP deponents, compared to 30 of all other parties and non parties combined (the 30 for other parties includes 10 for Transocean, 10 for Halliburton). On the schedule through July 31 are depositions of 35 more BP deponents, compared to 48 for all other parties and non parties combined (the 48 scheduled for other parties includes 28 for Transocean and 5 for Halliburton).

And so for phase 1 through July 31, if no other additions to the deponent list were allowed, BP would still have produced **at least 66 deponents** (almost all for 2 full days) compared to 15 for Halliburton and 38 for Transocean scheduled so far.

We emphasize this history and the upcoming schedule for context on why BP should be allowed to add deponents to the deposition list while at the same time, the other parties should not have unbridled discretion to seek an endless stream of more BP deponents, as the recent submissions from the PSC, USA and others seem to suggest they may seek. If any more BP deponents are to be allowed, strict limits should be placed on any such additions -- perhaps no more than 4 additional BP depositions in this phase. Otherwise, with the very busy upcoming schedule, including weeks of UK depositions in June and July, and the important custodial file production obligations arising from that schedule, BP's ability to meet its PTO 17 and 27 production obligations will be placed at some risk. For these reasons, we respectfully request that the Court impose a strict limit on the number of additional BP deponents for phase 1, if the Court is inclined to allow any at all.

Finally, below we also state our objection to certain parties seeking to depose BP litigation consultants at this time.

**Depositions requested by BP for the pre July 31 phase:**

**Depositions of Transocean**

**Steven Newman, TO CEO** -- Mr. Newman is the Chief Executive Officer of Transocean, and is responsible for the approval and implementation of Transocean's policies and procedures. Specifically, Mr. Newman participated in Safety Steering Committee meetings, has direct relevant knowledge concerning Transocean's compliance with the International Safety Management (ISM) code, and was directly involved in the creation and approval of significant documents that govern Transocean's safety and operations, not the least of which is Transocean's Subsea Maintenance Philosophy that bears directly on Transocean's policies concerning the maintenance of Transocean blowout preventers (BOPs) and other subsea equipment necessary for effective well control.

**Bill Sannan, General Manager TO NAM** -- Mr. Sannan is the General Manager for Transocean's North American Division (NAM). In this role, Mr. Sannan has significant relevant knowledge of the implementation of Transocean policies and procedures in connection with the Deepwater Horizon and other Transocean vessels operating in the Gulf of Mexico, including maintenance, safety and operation. Mr. Sannan was also the individual with final authority to resolve issues or disagreements between the Asset and Performance managers that were responsible for the Deepwater Horizon.

**David Young, chief mate DWH** -- Mr. Young was the chief mate onboard the Deepwater Horizon and was on duty at the time of the incident. Mr. Young testified at the MBI hearings, and has significant relevant knowledge concerning both the events on the day of the incident, as well as the maintenance and operation of the Deepwater Horizon. Mr. Young was also responsible for firefighting duties aboard the Deepwater Horizon, and will likely provide significant, relevant information regarding the onboard firefighting efforts and capabilities.

**Jimmy Moore, "Designated Person" for DWH** -- Mr. Moore, the Director of Quality, Health, Safety and Environmental Services for Transocean, is the "Designated Person (DP)" under the International Safety Management (ISM) Code. As the DP, Mr. Moore is the onshore "direct contact between the company between the company and the MODU with access to the highest levels of management." Mr. Moore is therefore in perhaps the best position to address at the corporate level the very serious questions relating to the implementation of, and compliance with, the ISM Code in connection with Transocean's operation of the Deepwater Horizon. Mr. Moore was called to testify during several of the MBI hearings, but never appeared before the panel.

**Buddy Trahan** -- Mr. Trahan was Transocean's Division Manager, Assets and was one of two Transocean representatives that were part of the leadership visit to the rig on the day of the incident. Mr. Trahan was scheduled to testify during the MBI hearings but never appeared before the panel. In addition to his knowledge of the events aboard the Deepwater Horizon on April 20, 2010, Mr. Trahan has significant relevant knowledge of the shore-based management of the Deepwater Horizon, including but not limited to direct knowledge of the maintenance, safety, and performance of the Deepwater Horizon.

**Yancey Keplinger (DPO)** -- Mr. Keplinger was a Dynamic Positioning Officer (DPO) on the Deepwater Horizon, and has significant relevant information concerning the operation of the vessel and emergency procedures generally, specific information and knowledge concerning the operation and functionality of the various alarm systems on board the Deepwater Horizon, and the events of April 20, 2010. In particular, Mr. Keplinger was stationed on the bridge at the time of the incident and has knowledge of the actions of the personnel located on the bridge immediately following the blowout and the actions that were taken in response to the various alarms on the bridge.

**Deposition of MI LLC**

**Doyle Maxie.** Maxie was an on shore supervisor of the mud engineers on board the Deepwater Horizon and participated in various M-I Swaco decisions and recommendations regarding the lost circulation materials used

downhole.

## Depositions of Weatherford

**Bryan Clawson** - Mr. Clawson is a Weatherford Cementation Sales Representative. Mr. Clawson was involved in the requisition of the six centralizers and float collar used on the Macondo Well. He was also contacted by Brett Cocales regarding the availability and acquisition of additional centralizers. Mr. Clawson was consulted on April 19, 2010 during attempts to convert the float collar and advised BP that more pressure could be applied to convert the floats.

**Daniel Oldfather** - Mr. Oldfather is a Weatherford Service Operator and testified at the Marine Board Investigation hearing. Mr. Oldfather was sent to the DWH to install the additional 15 centralizers which were never installed.

**Brent Lirette** - Mr. Lirette is the Product Line Engineering Manager of Cementing Products for Weatherford and was contacted during the BP Internal Investigation. Mr. Lirette was copied on pre-incident email discussing problems with the Allamon tool used on the Macondo Well.

Please note: Messrs. Clawson and Lirette are already 30(b)(6) designees for Weatherford.

## Deposition of Cameron

**Ed Gaude**. Mr. Gauge is a Cameron engineer whose role has been more fully identified through recent review of Cameron documents, is a necessary fact witness. Mr. Gaude was involved in the design and construction of the control system of the *Deepwater Horizon* blowout preventer. While other Cameron witnesses can speak to the design, construction, and maintenance of the BOP in general, Mr. Gaude can testify about the control system in particular. Testimony about the control system of the BOP is necessary to continue evaluation of whether the BOP control system contributed to the failure of the BOP to work as expected during the incident.

## Depositions of Halliburton

**Melissa Bergman** - Ms. Bergman was identified by Tim Probert during his deposition as the head of HSE and someone who could testify about Halliburton HSE training materials on various topics, including stop work authority. She is also the author of an email stating that Halliburton was remotely monitoring the realtime data during the incident and may be able to provide information concerning that Halliburton monitoring.

**Karl Blanchard** - Mr. Blanchard is a Halliburton Vice President in charge of the Cementing Service line and also Richard Vargo's direct supervisor. Mr. Probert testified by Mr. Blanchard would have information relating to Halliburton's cement training and guidance materials, including on the design and testing of cement slurries.

**Jim Prestidge** - Vice president of health, safety, environment and service quality. Mr. Probert identified Mr. Prestidge as having information on the practices and standards governing Halliburton's provision of services to customers, including any process safety standards for Halliburton's work.

**Richard Dubois** - Mr. Dubois is the Broussard cement lab manager under Tim Quirk. Mr. Quirk identified Mr. Dubois as knowledgeable in the cement lab testing. Mr. Quirk also stated that he believed Mr. Dubois spoke with Jesse Gagliano about the cement lab testing for the Macondo well.

**Simon Turton** (or **Anthony Badalamenti**) - Mr. Quirk testified that these individuals contacted him after the incident for additional lab testing on the cement slurry used at Macondo. It is believed that they have information concerning Halliburton's post-incident cement testing and investigation.

**Jim Brown** - Mr. Brown is Halliburton's president responsible for Western Hemisphere operations. Mr. Probert testified that Mr. Brown would know if any guidance was issued to Halliburton's engineers after the

Deepwater Horizon incident. Mr. Brown is also the sender of an October 28, 2010 email to Halliburton employees sharing information on Halliburton's post-incident investigation, and may have information concerning Halliburton's investigation.

**James Bement** - Mr. Bement is the Vice President of Sperry, and is responsible for the Halliburton's Sperry Drilling product service line. Mr. Bement has knowledge of factual issues surrounding the Sperry Drilling performance issues and non-productive time on the Deepwater Horizon.

## Depositions of Non Party Chevron

**Craig Gardner (Chevron)** - Mr. Gardner is a Team Leader in Cementing at Chevron and authored the Chevron testing report to the Presidential Commission. Mr. Gardner has knowledge of Chevron's report on cement testing, including the cement testing procedures and results, the quality assurance to ensure the validity of the test results, and the chain of custody of materials for the testing from Halliburton to Chevron.

**Chevron 30(b)(6)** - A Chevron 30(b)(6) witness is requested to address Chevron's post-incident cement testing report, including the testing procedures and results, the quality assurance to ensure the validity of the test results, and the chain of custody of testing materials.

## Objections to Certain Requests Relating to BP affiliated deponents.

In addition to BP's general objections stated above about any significant increase in the number of BP deponents the Court may allow, BP specifically notes that some of the requested deponents should not be deposed at this time, in this phase (before or after July 31) in any event. In particular:

Cameron has requested to depose Ralph Linenberger and Mark Childers, BP litigation consultants who have attended the BOP forensic inspection in Michoud, Louisiana. Messrs. Linenberger and Childers have never been employed by BP and neither had any involvement with the *Deepwater Horizon* or the Macondo well. Mr. Linenberger was initially retained by BP after the incident to provide consulting services for the BP Internal Investigation Team, but since October 2010, has been retained exclusively to provide technical support to BP's legal team for the *Deepwater Horizon* litigation and related matters. Mr. Childers, on the other hand, never performed any consulting services for BP other than to provide technical support to BP's legal team. Since late 2010, Messrs. Linenberger and Childers were designated as BP's technical representatives in the "Technical Working Group," a group that the Joint Investigation Team for the Marine Board Investigation formed with respect to the BOP forensic inspection. The Technical Working Group included technical representatives from various of the MDL litigants, including Plaintiffs, Department of Justice, Transocean, Cameron, Halliburton, and BP, but many of these representatives have not been requested for deposition.

Cameron now asks to depose Messrs. Childers and Linenberger, who are presently BP litigation consultants. They operate, therefore, under a non testifying consultant role, in assisting counsel in the litigation. Because neither Mr. Childers not Mr. Linenberger worked for BP prior to the incident, and neither had any involvement with the Macondo well or the *Deepwater Horizon,* the only reason to depose Messrs. Childers and Linenberger seemingly would be to conduct expert discovery. But expert discovery has not yet begun under the Court's scheduling order, and neither Mr. Childers nor Mr. Linenberger have been designated as a testifying expert. We respectfully suggest such discovery is not permitted under Federal Rule 26(b)(4)(D).

*******************************************

We thank the Court for its consideration.

Respectfully submitted,

Andy Langan

**J. Andrew Langan, P.C.| Kirkland & Ellis LLP**
300 NORTH LASALLE STREET
CHICAGO, IL 60654-3406
(312) 862-2064 **DIRECT** | (312) 862-2200 **FAX**
andrew.langan@kirkland.com

****************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
****************************************************