UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| Applies to: | * | JUDGE BARBIER |
| B3 Master Complaint | * | |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORDER AND REASONS
[As to Motions to Dismiss the B3 Master Complaint]

NATURE OF MOTION, PROCEDURAL HISTORY, AND BACKGROUND FACTS:

Before the Court are multiple Motions to Dismiss the B3 Master Complaint, one of several

Master Complaints in this multi-district litigation ("MDL") (Rec. Docs.  1388, 1397, 1399, 1404,

1406, 1409, 1416, 1436, 2208, and 2466).

This MDL consists of hundreds of consolidated cases, with thousands of claimants, pending

before this Court.  These cases arise from the April 20, 2010 explosion, fire, and sinking of the

DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), and the subsequent discharge

of millions of gallons of oil into the Gulf of Mexico before it was finally capped approximately three

months later.  The consolidated cases include claims for the death of eleven individuals, numerous

claims for personal injury, and various claims for environmental and economic damages.

The Plaintiffs' Steering Committee ("PSC") filed a B3 Master Complaint (Rec. Doc. 881)

and First Amended B3 Master Complaint (Rec. Doc. 1812; collectively, the "B3 Master

Complaint")[1] asserting personal injury claims on behalf of persons "exposed to harmful chemicals, odors and emissions" found within or emanating from oil, dispersants (chemicals used break up an oil slick by making oil more soluble in water), or a mixture of oil and dispersants (Rec. Doc. 1812, ¶ 21).   The B3 Master Complaint alleges the oil and/or dispersants caused some Plaintiffs headaches, nausea, vomiting, respiratory problems, eye irritation, rashes, lesions, and burns.  (*Id.* ¶¶ 159-161).  Moreover, it is claimed that exposure "may lead to serious problems, diseases, and medical conditions" and Plaintiffs are at a "significantly increased risk of contracting a serious latent disease" (*Id.* ¶¶ 232, 307).[2]

Claims under general maritime law and state law are asserted for negligence, negligence per se, strict products liability, nuisance, and battery.  Plaintiffs pray for, *inter alia*, compensatory damages for present and past injuries (including past medical costs), future medical monitoring (either in the form of monetary damages or as an injunction requiring Defendants to implement and fund a medical monitoring program), and attorney fees.  Plaintiffs also seek a declaratory judgment that any settlement provisions purporting to release or affect the calculation of punitive damages without a judicial determination of reasonableness are invalid. Claims are ***not*** brought under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 et seq., because it does not provide a cause of action for personal injuries.

---

[1] Pretrial Order 11/Case Management Order 1 (Rec. Doc. 569) consolidated and organized claims into several "pleading bundles."  As clarified by Pretrial Order 25 (Rec. Doc. 983), the "B3" pleading bundle includes "all claims, of any type, relating to post-explosion clean-up efforts asserted against Defendants not named in the B1 Master Complaint, as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."

[2] For example, the B3 Master Complaint alleges chemicals in crude oil are known carcinogens, kidney damage, toxic gastritis, etc.   Similarly, Plaintiffs assert that chemicals in the dispersants are known to cause immune system damage, cardiac arrhythmia, cardiovascular damage, etc. (Rec. Doc. 1812 ¶¶ 165-168).

B3 Plaintiffs are divided into five groups.  "VoO Plaintiffs" are vessel captains and crew claiming exposure to oil and/or dispersants while engaged in clean-up activities pursuant to BP's "Vessels of Opportunity" program—a program where BP hired private vessels to deploy and retrieve booms, support *in situ* oil burning, and conduct oil skimming.[3]  "Vessel Plaintiffs" are vessel captains and crew engaged in clean-up activities outside the VoO program.  "Decontamination Plaintiffs" are workers responsible for cleaning vessels soiled by oil and/or dispersants.  "Onshore Plaintiffs" are workers involved in clean-up activities along shorelines and intercoastal and intertidal zones.  Finally, "Resident Plaintiffs" are individuals claiming exposure by virtue of their proximity to coastal waters (e.g., coastal residents or individuals on vacation).

Multiple Defendants are named, including BP Exploration & Production, Inc. and its affiliated entities (collectively, "BP"), Transocean Ltd. and its affiliated entities (collectively "Transocean"), Anadarko and Anadarko E&P (collectively "Anadarko"), MOEX Offshore and MOEX USA (collectively "MOEX"), and Mitsui Oil Exploration Co., Ltd. ("MOECO").  The B3 Master Complaint asserts BP was the majority operating lease holder of the Mississippi Canyon Block 252; Andarko, MOEX, and MOECO held minority interests in this lease.  Transocean was the owner and/or operator of the DEEPWATER HORIZON MODU.  The Master Complaint sometimes collectively refers to these Defendants as the "Drilling Defendants."[4]

Also named as defendants are certain "Clean-Up Defendants," entities alleged to have

---

[3] The B3 Master Complaint also asserts breach of contract claims against BP and the Clean-Up Defendants (described below) arising out of the VoO program.  Those claims are not subject to this Order.

[4] Though not initially named as a defendant to the B3 Master Complaint, Halliburton Energy Services, Inc. ("Halliburton") was tendered to the Plaintiffs by virtue of Transocean's Rule 14(c) in the Limitation Action (*See* 10-md-2179, Rec. Doc. 1320). When Plaintiffs amended the B3 Master Complaint, Halliburton was included as one of the "Drilling Defendants."  (Rec. Doc. 1812 ¶ 60).  Halliburton filed Motion to Dismiss (Rec. Doc. 2466).

conducted spill response efforts, particularly the application of chemical dispersants. Clean-Up Defendants include Marine Spill Response Corporation ("MSRC"), Airborne Support, Inc., ASI International, Lynden, Inc., Lynden Air Cargo, LLC, Dynamic Aviation Group, Inc., International Air Response, Inc., Lane Aviation, National Response Corporation ("NRC"), O'Brien Response Management, Inc. ("O'Brien"), The Modern Group, Ltd. and its affiliated entities, and DRC Emergency Services, LLC ("DRC").[5]

Nalco Company ("Nalco") is named as the Defendant who allegedly manufactured and sold the chemical dispersants Corexit® 9500 and 9527 (collectively, "Corexit® "). Finally, claims are also alleged against unknown Defendants.

## PARTIES' ARGUMENTS:

Defendants assert that state law is preempted by maritime law. Certain defendants also argue they are immune to suit and/or that all claims are preempted by the Clean Water Act and the National Contingency Plan. Other arguments were raised respecting the sufficiency of the allegations pled with respect to the claims asserted.

## LEGAL STANDARD:

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that

---

[5] Defendant DRC Emergency Services, LLC filed an answer incorporating other motions.

the defendant is liable for the misconduct alleged." *Id.* at 1949. A court "must . . . accept all factual allegations in the complaint as true" and "must draw all reasonable inferences in the plaintiff's favor." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). The Court is not, however, bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S. Ct. at 1949-50.

## DISCUSSION:

### Issues Resolved by the B1 Order

This Court previously issued an Order and Reasons respecting the B1 Master Complaint ("B1 Order"), which concerned claims by private parties for economic loss and property damage resulting from the oil spill. (Rec. Doc. 3830); *In re Oil Spill by the Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, - - F. Supp. 2d - -, 2011 WL 3805746 (Aug. 26, 2011 E.D. La.). The claims asserted in the B3 Master Complaint are in many ways analogous to the B1 claims, particularly in that they are brought by private parties for damages (personal injury) resulting from the discharge of oil and subsequent response actions. Moreover, several issues raised by the instant motions are identical to issues addressed in the B1 Order. Therefore, the Court finds certain arguments are resolved by virtue of the B1 Order.

The B1 Order held that maritime law applied to the B1 claims to the exclusion of state law. Consequently, the claims for negligence, negligence per se, products liability, nuisance, and battery which are asserted under state law are preempted by maritime law. The claim for future medical monitoring under Florida law is also preempted, but is discussed separately, below. The claim for declaratory relief is also identical to the one dismissed by the B1 Order; it is dismissed.

The B1 Order also dismissed general maritime negligence claims against Anadarko and MOEX, but preserved claims brought under OPA against these Defendants. The B3 Master Complaint alleges identical maritime law negligence claims against Anadarko and MOEX, but does not assert any OPA claims. Accordingly, all B3 claims against Anadarko and MOEX are dismissed.

The Court turns to Defendants' remaining arguments.

**Immunity[6]**

Some of the Clean-Up Defendants and Nalco[7] argue the claims against them should be dismissed because they have derivative immunity. Their contention begins with the premise that the federal government would be immune from liability arising from its decisions and actions taken in response to the oil spill. Defendants argue that because the federal government authorized and directed the use of Corexit® and other dispersants, Nalco (who produced Corexit®) and the Clean-Up Defendants (who applied Corexit®) are similarly entitled to immunity.

Defendants point to two statutes as the source of their derivative immunity. The first is the immunity provision in the Clean Water Act ("CWA"), which states, "The United States Government is not liable for any damages arising from its actions or omissions relating to any response plan required by this section." 33 U.S.C. § 1321(j)(8). Defendants assert this statute provides absolute immunity to the federal government, and Defendants are entitled to the same scope of protection.[8]

---

[6] At the outset, it is noted that some Defendants asserted immunity defenses as motions under Rule 12(b)(1) (lack of subject matter jurisdiction), as well under Rule 12(b)(6). It is the rule of this Circuit that derivative immunity will not divest a court of subject matter jurisdiction. *See Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009). The Court denies these 12(b)(1) motions, and considers the arguments as 12(b)(6) motions.

[7] For brevity, the Clean-Up Defendants and Nalco will sometimes be referred to as "Defendants."

[8] There is also an immunity provision that protects those who respond to an oil spill, but not when the claim is for personal injury, such as the B3 claims. 33 U.S.C. § 1321(c)(4). Thus, this provision is not at issue.

The second statute is the "discretionary function exception" to the Federal Tort Claims Act ("FTCA"), which protects the federal government from

> Any claim based . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Intertwined with Defendants' arguments is the doctrine of "government contractor immunity" ("GCI defense").

The Supreme Court outlined the concept of derivative immunity in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). There a private entity that built dikes in the Missouri River pursuant to a contract with the federal government was subsequently sued by land owners claiming the project changed the river's current, eroding their land. The Court stated that a contractor is entitled to immunity when (1) it performed acts pursuant to a valid authorization of Congress and (2) the contractor did not exceed the scope of that authority. *Id.* at 20-21. *See also In re: Katrina Canal Breaches Lit.*, 620 f.3d 455, 465 (5th Cir. 2010) (stating that the GCI defense, "'[s]tripped to its essentials,' is fundamentally a claim that '[t]he Government made me do it.'"). Because both of these prongs were met, the contractor was immune.

The Fifth Circuit recently applied *Yearsley* when it affirmed a district court's decision to grant defendants' Rule 12(c) motion for judgment on the pleadings. *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009). There private entities dredged the Mississippi River Gulf Outlet ("MRGO") under a contract with the Army Corps of Engineers, and were later sued by area residents who sustained damages during Hurricane Katrina. The plaintiffs alleged dredging caused damage to protective wetlands, which amplified the hurricane's storm surge. *Id.* at 202-03.

Plaintiffs did not allege, however, that Congress lacked authority to develop or maintain the MRGO; nor did they allege that the defendants acted without government authority, deviated from or exceeded this authority, or committed some other separate act of negligence.  Because these claims attacked only "Congress' policy of creating and maintaining the MRGO," the *Ackerson* court held the case fit squarely within *Yearsley* and defendants were immune.  *Id.* at 207.

The Supreme Court further explored the contours of derivative immunity in *Boyle v. United Technologies Corp.,* which concerned a state-law products liability suit (defective design) against a private entity that designed and built a helicopter pursuant to a government procurement contract. 487 U.S. 500 (1988).  *Boyle* described derivative immunity in terms of preemption: "Displacement [of state law] will occur only where . . . a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation.'" *Id.* at 507 (citations omitted); *see also In re: Katrina Canal Breaches Lit.*, 620 F.3d 455, 459 (5th Cir. 2010).   After determining that the government's ability to procure equipment was an identifiable federal interest, the Court created a three-part test based on the FTCA's discretionary function exception to determine whether state law would create a "significant conflict":

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."

*Id.* at 512.[9]  The first and second prongs of the test were intended to determine whether the design

---

[9] The Fifth Circuit has further explained that "approval" under the first prong of the *Boyle* test "requires more than a rubber stamp" from the government.  *Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1480 (5th Cir. 1989)

feature in question was within the area where the policy of discretionary function would be frustrated (as opposed to a decision made by the contractor, which would not implicate government discretion). The final prong is intended to avoid creating an incentive for manufacturers to withhold knowledge of risks.

*Ackerson* made clear that *Yearsley* is still good law after *Boyle*. It appears that *Yearsley* might apply when "discretion" is not at issue.

Turning to the instant matter, the CWA and its corresponding regulations require government authorization before any dispersants are used. *See* 33 U.S.C. § 1321(d)(G)(I); 40 C.F.R. § 300.910 (a), (b). If the government authorized the Clean-Up Defendants to use a particular dispersant, and the Clean-Up Defendants did not exceed the scope of their authorization, then the Clean-Up Defendants would appear to be entitled to immunity. In light of this, the B3 Master Complaint alleges, in pertinent part:

> After the disaster, BP began implementing a disaster response plan to prevent oil from escaping the blown out well, to manually contain the oil, and to disperse oil in the water using Nalco's chemical dispersants. (*Id.* ¶ 102)

> As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO"). (*Id.* ¶ 103)

> In addition to directing vessels at sea, BP coordinates and directs aircraft owned and/or operated by [Clean-Up Defendants] and others that fly out over the gulf to

---

("When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government is exercising discretion."). Furthermore, "reasonably precise specifications" under *Boyle* requires that "the specifications address, in reasonable detail, the product design feature alleged to be defective." *In re: Katrina Canal Breaches Lit.*, 620 F.3d at 461.

spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf. (*Id.* ¶ 122)

Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured by Defendant Nalco to the resulting oil slicks and sheens on the surface of the Gulf. (*Id.* ¶ 125)

On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit® dispersants BP had been using. (*Id.* ¶ 130)

On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would continue using Nalco's Corexit®.  (*Id.* ¶ 131)

Upon information and belief, when VoOs spot oil slicks, they are instructed to contact BP directly and to provide BP with the coordingates of the slick.  Upon receiving this information, Clean-Up Defendants dispatch a spray plane from an airfield to coordinates given and instruct the pilot to spray the chemical dispersant from its cargo hold." (*Id.* ¶ 151)

BP and Clean-Up Defendants used and, upon information and belief, continue to use the dispersants Corexit® 9500 and 9527 (more than 1.8 million gallons to date) to disperse the crude oil . . . (*Id.* ¶ 169)

BP has taken control and directs all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date. . . . (*Id.* ¶ 241)

The B3 Master Complaint further alleges that BP and/or certain Clean-Up Defendants (MSRC, O'Brien, Modern Group, DRC, and NRC) engaged Onshore Plaintiffs and Decontamination Plaintiffs to clean beaches, etc. and vessels, respectively (*Id.* ¶¶ 123-24).

Accepting the allegations as true and drawing all reasonable inferences in the Plaintiffs' favor, the Defendants did not receive government approval to use Corexit®.  Rather, the allegations

lead to the inference that **BP** was in control of response actions. This inference is fatal to the derivative immunity claims, because it prevents Defendants from establishing the first prong of *Yearsley* or *Boyle.* A permissible alternative inference from the allegations is that if BP had government authority to use Corexit®, it exceeded or deviated from the scope of that authority (*see id.* ¶¶ 130-31), which defeats the second prongs of *Yearsley* and *Boyle*.  Thus, unlike *Ackerson* where the "the applicability of *Yearsley* [was] established on the face of the Plaintiffs' complaint," here the derivative immunity argument fails under any test.  589 F.3d at 207.

Defendants' reliance on the CWA's provisions requiring the President (through the Federal On-Site Coordinator ("FOSC")) to direct oil spill response efforts and response work to comply with the National Contingency Plan (discussed below), does not lead to the conclusion that FOSC *actually* directed the Clean-Up Defendants, or that Defendants acted in accordance with these directives. This conclusion can only be reached by inference, which would require ignoring the allegations quoted above and the inferences they create, which the Court cannot do on a 12(b)(6) motion.  For identical reasons, the two paragraphs in the Complaint relied on by Defendants do not render a different result: "The U.S. Coast Guard is responsible for. . . responding to oil spills and supervising and/or coordinating response actions," and "Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep.  The Coast Guard's Federal On Site Coordinator . . . must approve BP's request to use chemical dispersants" (Rec. Doc. 1812, ¶¶ 100, 126).  Finally, Defendants' contentions independent of the Complaint that the government approved and directed the application of Corexit® requires the Court to consider facts outside the Complaint, which it generally cannot

do on a motion to dismiss.[10]

Accordingly, the derivative immunity defenses cannot succeed at this time.  Because this decision is not based on the merits of Defendants' arguments, however, Defendants are not prejudiced from reasserting this defense at a later time.  In light of this, the Court will further address two of the plaintiffs arguments.

First, Plaintiffs raised the argument that the CWA's immunity provision is unavailable to Defendants because it is restricted to the federal government.  Plaintiffs also asserted that the GCI defense and any other forms of derivative immunity are limited to *government* contractors, which the Clean-Up Defendants and Nalco were not.

As to the GCI defense, while the cases discussed above involve government contractors, the rationale underlying derivative immunity does not suggest that only government contractors are entitled to it.  *Boyle* discussed derivative immunity in terms of preemption, which is triggered when a significant conflict exists between an identifiable federal interest or policy and state law.  *Boyle* 487 U.S. at 507.  The purpose of derivative immunity is protecting a federal interest, not the contractor. *See also In re World Trade Ctr. Disaster Site Lit.* (*WTC*), 521 F.3d 169, 194 (2d Cir. 2008) ("The rationale for [the contractor defense fashioned in *Boyle*] is not to protect the contractor

───────────────

[10] Defendants invite the Court to take judicial notice of certain "working papers" and report produced by an advisory commission established by an Executive Order to examine the DEEPWATER HORIZON incident. Although a court may consider facts of which it may take judicial notice when considering a Motion to Dismiss, this material does not fall within the scope of Evidence Rule 201.  The documents concern the exact matters that are the subject matter of this MDL, and thus are not the kind of facts that are "not subject to reasonable dispute." *See* Fed. R. Evid. 201(b).

Defendants also note that the Court has previously taken notice that "[BP and Transocean] do not unilaterally direct the cleanup activities in the Gulf; such activities have been under the control of the National Incident Commander, Federal On Scene Coordinator, Unified Area Command, and the Coast Guard in cooperation with other federal agencies." (Rec. Doc. 2784).  This statement was contained in an Order on June 16, *2011*, and focused on the state of clean-up activities at that time.  However, what role the government, BP, and Clean-Up Defendants played during the intense weeks following April 20, *2010* is an issue subject to reasonable dispute.

as a contractor, but solely as a means of protecting the government discretionary authority over areas of significant federal interest." (quotations omitted)).  It follows, then, that contractual privity with the government is not a pre-requisite to derivative immunity.

Notably, the Second Circuit applied this reasoning when it determined whether local government and private entities could derive immunity from the Stafford Act, which provides immunity to the federal government for discretionary functions (similar to the FTCA).  *See WTC*, 521 F.3d at 195-97.  The court explained that the purpose of the Stafford Act implicated a unique federal interest—coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects—which would be directly affected if a private or local government entity did not follow federal directives for fear of state liability.  *Id.* at 197.  The court concluded derivative immunity was available to the defendants, ***including*** entities contracted by the city, and not the federal government.

Turning to Plaintiffs' argument that governmental immunity may not be derived under the CWA, it is plain from the face of the Act that the government has a strong federal interest in responding to water pollution:   The CWA declares that "it is the policy of the United States that there should be no discharge of oil or hazardous substances into or upon the navigable waters of the United States . . . ."  33 U.S.C. § 1321(b)(1).  The CWA also requires the President to "ensure effective and immediate removal" of all discharges, and—in the event of a major discharge—"***direct*** all Federal, State, ***and private actions*** to remove the discharge."  *Id.* §§ 1321 1321(c)(1)(A), (c)(2) (emphasis added).[11]  *See also* 40 C.F.R. § 300.105(d) ("The basic framework

_____

[11] In the case of smaller oil spills, the President must ensure their immediate removal, but may choose to merely monitor, rather than direct, removal actions.  33 U.S.C. § 1321(c)(1).  However, when the discharge is "of such a size or character as to be a substantial threat to the public health or welfare of the United States," the President ***must*** direct

for the response management structure is a system (e.g., a unified command system) that brings together the functions of the Federal Government, the state government, ***and the responsible party*** to achieve an effective and efficient response, where the OSC maintains authority." (emphasis added)).  This unique federal interest would be directly affected if private parties (which the CWA anticipates will be involved in response actions) refused to follow a federal directive for fear of liability.  Therefore, private entities can derive immunity from the government under the CWA, irrespective of contractual privity.[12]   To conclude, it seems at this point that if the facts revealed that the Clean-Up Defendants were using dispersants as directed by the federal government, then they would be entitled to derivative governmental immunity.  A different analysis might apply to Nalco, however.  This is because Nalco was the manufacturer of Corexit®, and thus appears to fit into the context of the procurement contract that was at issue in *Boyle*.  If that is the case, then the third prong of the *Boyle* test would appear particularly relevant.[13]


**<u>Preemption</u>**

Clean-Up Defendants and Nalco also assert the CWA preempts the B3 Plaintiffs' claims. Defendants argue that Plaintiffs' claims are "conflict preempted" because the Defendants were required under the CWA to comply with the NCP and the government's directives regarding spill response activities, including the use of Corexit®, and accordingly could not  comply with other

---

removal actions.  *Id.* § 1321(c)(2).

[12] The Court does not address whether the scope of the Defendant's immunity derived from the CWA is equal to the government's immunity under the CWA.

[13] As explained above, the third prong is necessary to avoid creating an incentive for a manufacturer to withhold knowledge of risks.  *See Boyle*, 487 U.S. at 512.

standards.  Thus, they assert that tort law is preempted either because it directly conflicts with the CWA/NCP or it creates an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  Defendants also assert that all claims are "field preempted" by OPA, CWA, and NCP, because the scheme of federal regulation is so pervasive that Congress left no room for supplementation.

Defendants' preemption arguments, while certainly plausible, do not succeed here for the same reasons as the immunity arguments.[14]  Defendants can only avail themselves of preemption if they show that the complained-of activity fell within the scope of the CWA/NCP.[15]  Defendants will not be prejudiced from reasserting these arguments, however.

**Medical Monitoring Costs**

Defendants argue that neither the Jones Act nor general maritime law permit claims for future medical monitoring absent a manifest injury, and therefore Plaintiffs' claims for relief should be dismissed.  Plaintiffs counter that the Jones Act does not apply because the B3 claims are, for the most part, not asserted against employers.  Further, Plaintiffs argue that general maritime law is silent on this issue, and therefore Florida law, which does not require physical injury in order to seek medical monitoring costs, *see Petito v. A.H. Robins Co., Inc.,* 750 So. 2d 103, 104 (Fla. Dist. Ct. App. 1999), should be adopted as a "gap filler" in this respect.  Alternatively, Plaintiffs argue that they have alleged a discernable physical injury, and thus are entitled to medical monitoring costs.

---

[14]  As noted above, *Boyle* characterized the contractor's immunity in terms of preemption, indicating, that in this instance, the issues of preemption and derivative immunity are identical.

[15]  Similarly, the CWA states a non-responsible party who renders care during a discharge is not liable for any damages or removal costs resulting from his actions, so long as his actions were "consistent with the [NCP] or as otherwise directed by the President."  33 U.S.C. § 1321(c)(4).

In *Metro-North Commuter Railroad Co. v. Buckley*, the Supreme Court considered whether an employee who was exposed to dust containing asbestos, but exhibited no symptoms of asbestos-related disease, could recover "lump-sum" medical monitoring costs under the Federal Employers' Liability Act ("FELA").  521 U.S. 424, 438-444 (1997).  The Court held a claim for medical monitoring costs is not an independent cause of action, and thus not recoverable in that instance. *Id.* at 438-440.  However, the Court acknowledged that "a plaintiff whose 'injury' consists of a disease, a symptom, or those sorts of emotional distress that fall within the FELA's definition of 'injury,'" might be able to recover medical monitoring costs as an ***element of damages***. *Id.*

Because FELA and the Jones Act are interpreted similarly, *Buckley*'s holding applies to claims under the Jones Act as well.  *See Kernan v. Am. Dredging Co.,* 355 U.S. 426, 439 (1958). It is also significant that *Buckley*'s analysis relied heavily on general common law, rather than a position adopted by a single state or a minority of states, because it leaves little doubt that *Buckley* applies to claims brought under general maritime law as well.  *See* 521 U.S. at 440, 444.  Such analysis is consistent with the tenet that, where there is no established rule under general maritime law on an issue, a court should adopt general common law if applying a particular state law would "impair the uniformity and simplicity which is a basic principle of the federal admiralty law." *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (quotations and citations omitted).  Therefore, Florida law, which is clearly inconsistent on this issue, may not be used.[16]

Dismissing all claims for medical monitoring is not warranted, however.  In *Hagerty v. L &*

---

[16] This conclusion is bolstered by the fact that the laws of the other Gulf States require physical injury to recover medical monitoring costs, and those states have at least an equal interest in this matter, if not more so.  *See* La. Civ. Code art. 2315(B); *Hinton ex rel. v. Monsanto* Co., 813 So. 2d 827, 831-32 (Ala. 2001); *Paz v. Brush Eng'red Materials, Inc.*, 949 So. 2d 1, 5-6 (Miss. 2007); *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 665 (W.D. Tex. 2006).

*L Marine Services, Inc.*, the Fifth Circuit held that a seaman who was accidently soaked with toxic chemicals could recover future medical monitoring costs, though he exhibited no present symptoms of disease.  788 F.2d 315, 319 (5th Cir. 1986).  There the district court had granted summary judgment for the defendant because it concluded no cause of action had "accrued."  The Fifth Circuit reversed, explaining that a cause of action accrues when the fact of the injury occurs, provided that the victim discovers the injury. *Id.* at 316.  Because the plaintiff claimed to experience dizziness, leg cramps, and a stinging sensation in his feet and fingers following contact with the chemicals, which "suggest some harm or injury" to the plaintiff, there existed a factual issue as to whether the plaintiff incurred an injury.  *Id.* at 317.  Furthermore, if the plaintiff succeeded on remand, medical monitoring costs could be available as a form of damages.  *Id.* at 319.[17]  *Hagerty* and *Buckley* are not in conflict, because there was nothing to "suggest" an injury occurred in *Buckley*.

The B3 Master Complaint alleges that Plaintiffs physically contacted and/or inhaled fumes from oil and dispersants.  At least some Plaintiffs are alleged to have suffered headaches, nausea, vomiting, respiratory problems, rashes, lesions, chemical burns, etc.  These affects are similar to what occurred in *Hagarty*, which were found to "suggest some harm or injury" had occurred.  Therefore, Plaintiffs who allegedly suffered these affects have sufficiently pled an "injury," giving rise to a cause of action.  Moreover, these Plaintiffs who have pled an injury may be entitled to medical monitoring as an element of their damages.

On the other hand, no action has accrued in favor of those Plaintiffs who have not alleged an injury.  Therefore, these Plaintiffs have failed to state a cause of action, and all personal injury

---

[17] The *Hagerty* court also noted that the "maximum recovery" rule under maintenance and cure would not bar recovery for future medical costs. *Id.* at 319 n.2.

claims asserted by such Plaintiffs must be dismissed (including the request for medical monitoring).[18]

Furthermore, although Plaintiffs only assert monitoring relief for the VoO Plaintiffs (and only against BP) and "Florida Plaintiffs," (against all Defendants) the Court holds all Plaintiffs that have alleged an "injury" under general maritime law may seek medical monitoring as an element of their damages.

## Products Liability, Negligence, Gross Negligence, and Negligence Per Se under General Maritime Law

As explained in the B1 Order, general maritime law recognizes a cause of action for negligence and products liability (Red. Doc. 3830). As explained in the immediately preceding section, those plaintiffs who have not alleged a physical "injury," must be dismissed because their cause of action has not accrued. As to those Plaintiffs that have alleged an injury, the Court further finds that the complaint sufficiently alleges facts to state a claim of negligence, and gross negligence. The Court further finds the Complaint states a plausible products liability claim against Nalco.

Plaintiffs also plead that Defendants violated Section 311 of the CWA, 33 U.S.C. § 1321(imposing penalties for unlawful discharges and establishing a federal response system), some of its corresponding regulations, 40 C.F.R. § 300 App. E (containing the National Contingency Plan ("NCP")); 30 C.F.R. Part 254 (relating to Offshore Facility Response Plans), as well as OPA, 33

---

[18] The Court does not address at this time whether the Plaintiffs have proven any other element necessary to recover medical monitoring costs. For present purposes, Plaintiffs who have alleged an injury have met their burden of stating a claim for medical monitoring costs.

U.S.C. § 2717(b).  Plaintiffs assert that these violations establish that Defendants were negligent per se, relieving them of the burden of having to establish negligence.

To state a claim for negligence per se, Plaintiffs must identify a "violation of a statute which is intended to protect the class of persons to which [the plaintiffs] belong[] against the risk of the type of harm which has in fact occurred."  *Marshall v. Isthmian Lines, Inc.,* 334 F.2d 131, 134 (5th Cir. 1964).  Plaintiffs' citation to OPA Section 2717(b) is irrelevant—OPA does not pertain to personal injury claims and Section 2717(b) is jurisdictional statue.  As to the CWA, to the extent Plaintiffs assert their claim under § 1321(b) or similar subsection prohibiting discharges and/or imposing penalties, Plaintiffs have failed to state a claim for negligence per se:

> [A] fundamental requirement in applying the doctrine of negligence per se is that the party asserting negligence per se be a member of the class intended to be protected by the statute or regulation.
>
> Courts considering whether to recognize negligence per se based on violation of broad environmental and public health statutes and regulations . . . have approached this issue ***by determining whether, in enacting the statute, the legislature intended to create a private right of action.***

*Miller v. E.I. DuPont de Nemours & Co.*, 880 F. Supp. 474, 479 (S.D. Miss. 1994) (citation omiited). The Supreme Court has held that, outside the citizen-suit provision allowing a private party to seek an injunction against a polluter, CWA does not give rise to a private right of action.  *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14-15.

However, some of the regulations regarding the NCP-imposed requirements that are intended address specific harms and protect particular classes of individuals.  For example,

> In a response action taken by a responsible party, the responsible party must assure that an occupational safety and health program consistent with 29 CFR 1910.120 is made available for the protection of workers at the response site.

40 C.F.R. § 300.150.  Regulations such as these were not the focus of *Sea Clammers*.  These regulations **could** form the basis of negligence per se, because they create a standard of care designed to prevent a particular type of harm to a particular class of individual.  To this extent Plaintiffs may be able to state a plausible  negligence per se claim, though it requires clarification to give notice to Defendants of which regulations are claimed to be violated (and permit a determination of whether the elements of negligence per se are satisfied).  Plaintiffs' references to the Code of Federal Regulations does not fulfill this requirement.

Accordingly, the Court dismisses the claim of negligence per se, but allows Plaintiffs an opportunity to amend their Complaint if they wish to assert a more definite statement of the claim for negligence per se.[19]

## Punitive Damages

Defendants assert that those B3 Plaintiffs who are "seamen" under the Jones Act (potentially the VoO and Vessel Plaintiffs) may not recover punitive damages, regardless of whether those damages are sought from an employer or non-employers.[20]   Fifth Circuit precedent states that the "uniformity principal" expressed in *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), prevents a seaman from recovering non-pecuniary damages, regardless of whether their claims are asserted against employers or non-employers.  *Scarborough v. Clemco Indus.*, 391 F.3d 660, 668 (5th Cir. 2004); *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1506 (5th Cir. 1995); *Murray v. Anthony*

---

[19] The Court notes that to the extent Plaintiffs are able to rely on these federal regulations as the basis of a negligence per se claim, it is questionable whether such regulations would implicate anyone other than the parties who conducted response activities, i.e., BP and the Clean-Up Defendants.

[20] Plaintiffs' oppositions did not directly address this argument, but the Court will consider Plaintiffs' arguments raised in the context of the B1 Master Complaint, which would similarly apply here.

*J. Bertucci Constr. Co.*, 958 F.2d 127, 131 (5th Cir. 1992).  Because punitive damages are treated as non-pecuniary in nature, *see Neal v. Barisich, Inc.*, 707 F. Supp. 862, 873 (E.D. La. 1989), it follows that punitive damages are not available to injured Plaintiffs who are seamen.  Though this conclusion is not without doubt given the Supreme Court's recent decision in *Atlantic Sounding Co. v. Townsend*, - - U.S. - -, 129 S. Ct. 2561 (2009) (holding punitive damages are available under general maritime law for refusal to pay maintenance and cure),[21] the Court cannot assume the Fifth Circuit has changed its position on claims falling outside the scope of *Townsend*.  Accordingly, the claims for punitive damages asserted by B3 Plaintiffs who qualify as seamen under the Jones Act (ostensibly the VoO and Vessel Plaintiffs) are dismissed.

The Court does not agree, however, with Defendants' assertion that *Miles*' uniformity principle precludes punitive damages for injuries to non-seamen Plaintiffs. Counsel cite to no binding authority on this matter, and the Court finds none.  As explained in *Townsend* (see footnote 18), neither the Jones Act nor the Death on the High Seas Act speaks to negligence claims asserted by non-seamen under general maritime law, and punitive damages have long been available at common law.   The Court finds punitive damages are available to B3 Plaintiffs who are not seamen.

**Battery and Nuisance under Maritime Law**

As mentioned above, maritime law preempts Plaintiffs' B3 state-law claims.  The B3 Master Complaint pleads claims for nuisance and battery without specifying whether they are sought under

---

[21] As previously discussed in the B1 Order (Rec. Doc. 3830 at 24), *Townsend* explained that *Miles* did not allow punitive damages for a wrongful death claim because it was only as a result of federal legislation that a cause of action for wrongful death existed in general maritime law.  It would have been inappropriate, then, to expand on the remedies Congress chose to enact.  However, because the cause of action at issue in *Townsend* (refusal to pay maintenance and cure) and the remedy (punitive damage) predated and is not addressed by Congressional enactments, the *Townsend* Court concluded punitive damages were still available.

state law or maritime law.    To the extent nuisance was pled under maritime law, that claim is dismissed. *See State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1030-32 & n.13 (5th Cir. 1985) (en banc); *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1014 (E.D. La. 1993).

Maritime law recognizes a cause of action for battery, though in that instance courts simply use common law to fill what is otherwise a substantive gap in maritime law. *See Baggett v. Richardson*, 342 F. Supp. 1024, (E.D. La. 1972); 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* §5-11 (5th ed. 2011). Plaintiffs' battery claim states that Defendants "intentionally sprayed, and/or directed spraying, chemical dispersants [from aircraft] in the immediate vicinity of VoO Plaintiffs or Vessel Plaintiffs" causing some to be exposed to harmful chemicals resulting in injury. (Rec. Doc. 1812 ¶¶ 295-298). This fails to meet the intent element. Although the Complaint reflects that one or more Defendants willfully choose to apply dispersant to an area that was "in the vicinity" of some Plaintiffs, it does not state or suggest that the pilot "desired" that his spraying would cause an offensive or harmful touch to the Defendants. *See Restatement (Second) of Torts* § 8A, 18.  The battery claims are dismissed.


**<u>Personal Jurisdiction Arguments</u>**

Lynden, Inc. argues the Court lacks personal jurisdiction because only its subsidiary, Lynden Air Cargo, LLC, participated in response activities, and it is not alleged that this was Lynden, Inc.'s alter-ego.   International Air Response, Inc. ("IAR") also challenged personal jurisdiction (in addition to its 12(b)(6) arguments), but raised a different argument than Lynden, Inc.  Pretrial Order 11 (Rec. Doc. 569) permits limited discovery when a challenge to personal jurisdiction is raised,

which Plaintiffs' requested in their opposition (Rec. Doc. 1815 at 58). The court defers ruling on Lynden, Inc.'s motion, but will grant the request for limited discovery. The Court defers ruling on IAR's motion.

## Dril Quip, Inc. and Halliburton Energy Service, Inc.

Dril Quip, Inc. and Halliburton Energy Services, Inc. filed Motions to Dismiss (Rec. Docs. 2108, 2466) due of the procedural effect of Transocean's Rule 14(c) tender. Similar to the B1 Order, Dril-Quip and Halliburton remain 14(c) Defendant as to the claims preserved by this Order. Given their posture as 14(c) Defendants, and the complex nature of this MDL, Dril Quip and Halliburton's arguments which are particular to them and have not been addressed in this Order or the B1 Order are preserved.

## SUMMARY

In summary, the Court holds:

1.    State-law claims are preempted by maritime law and dismissed. The claim for a declaratory judgment is dismissed.

2.    Anadarko and MOEX are dismissed as Defendants to the B3 Master Complaint.

3.    Derivative immunity and preemption are not established on the face of the Complaint. These arguments are preserved and may be re-asserted.

4.    The claims of Plaintiffs who have not alleged an "injury" as recognized in *Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315, 319 (5th Cir. 1986), are dismissed.

5.    Medical monitoring costs are available as a form of damages under maritime law.

6.      Plaintiffs have stated claims for negligence, gross negligence, and product liability (only asserted against Nalco and other unknown chemical manufacturers) under maritime law.

7.      Negligence per se claims are dismissed; Plaintiffs may amend the B3 Master Complaint if they wish to assert a more definite statement of the claim for negligence per se.

8.      Plaintiffs who are seamen are not entitled to punitive damages.  Non-seamen Plaintiffs may seek punitive damages.

9.      Claims for battery and nuisance asserted under maritime law are dismissed.

10.     The Court defers ruling on Lynden, Inc.'s Rule 12(b)(2) Motion; Plaintiffs may engage in limited jurisdictional discovery pursuant to Pretrial Order 11, para. IV(B) (Rec. Doc. 569). IAR's Rule 12(b)(2) Motion is deferred.

11.     Dril Quip's arguments that are particular to it and which have not been addressed in this Order or the B1 Order are preserved.

        **IT IS ORDERED** that Defendants' Motions to Dismiss the B3 Master Complaint (Rec. Docs.  1388, 1397, 1399, 1404, 1406, 1409, 1416, 1436,  2208, and 2466) are **GRANTED IN PART AND DENIED IN PART.**

        New Orleans, Louisiana, this 30th day of September, 2011

_____
UNITED STATES DISTRICT JUDGE