UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| This Document Applies to: | * | JUDGE BARBIER |
| Pleading Bundle "B4"(10-3895, 10-3896, | * | |
| 10-3897, 10-4168, 10-4169, and 11-0058) | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**ORDER AND REASONS**
[As to the B4 Pleading Bundle]

Before the Court is a Joint Motion to Dismiss (Rec. Doc. 2707[1]) under Rules 12(b)(6) and 12(c) filed by Seacor Holdings, Inc., Seacor Offshore LLC, Seacor Marine, LLC, Seacor Worldwide, Inc., Siemens Financial, Inc., Island Ventures II, LLC, Nautical Solutions, LLC, Monica Ann, L.L.C., JNB Operating, L.L.C., and Gulf Offshore Logistics, L.L.C., who move to dismiss all claims falling within the "B4" pleading bundle, one of several pleading bundles in this multi-district litigation ("MDL").[2] Also before the Court is a Motion for Reconsideration of Order Dispensing with Oral Argument for Motion to Dismiss the Bundle B-4 Cases (Rec. Doc. 3816).

**BACKGROUND AND PROCEDURAL HISTORY**

This MDL consists of hundreds of consolidated cases, with thousands of claimants, pending before this Court. These cases arise from the April 20, 2010 explosion, fire, and sinking of the

---

[1] Unless stated otherwise, citations to Court documents are to Case No. 10-md-2179.

[2] Pretrial Order 11/Case Management Order 1 (Rec. Doc. 569) consolidated and organized claims filed in this MDL into several "pleading bundles." The "B4" bundle includes "all claims against the alleged owners and/or operators of rescue vessels that answered the Deepwater Horizon distress call and responded to the emergency after the explosion."

DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), and the subsequent discharge of millions of gallons of oil into the Gulf of Mexico before it was finally capped approximately three months later.  The consolidated cases include claims for the deaths of eleven individuals, numerous claims for personal injury, and various claims for environmental and economic damages.

The genesis of the instant Motions is a complaint filed in July 2010 by Terry Robin and twelve other plaintiffs (purporting to represent three classes of plaintiffs: Louisiana landowners, commercial fishermen/oystermen/etc., and employees in the oil and gas industry) that asserted claims for property damage and/or economic losses resulting from the discharge of oil against six vessels[3] and their owners and/or operators (collectively, "Defendant Vessels" or "Defendants") that responded to the explosion aboard the DEEPWATER HORIZON and attempted to extinguish the fire with their fire monitors (water cannons) (*See* Case No. 10-1986, Rec. Doc. 1 (hereinafter "Robin Complaint")).  The Robin Complaint alleged, in pertinent part:

> As the Defendants' fire boats continued to blast water onto the rig, its upper compartments began to fill, resulting in a shift of the center of gravity of the rig. This caused the *Deepwater Horizon* to turn on its pontoons.  As a result of the flooding of the rig by the fireboats, the rig began to sink.  When the rig turned and began to sink, the pipe connected to the wellhead collapsed and fell to the sea floor.

(*Id.* ¶ 16).  The Complaint stated that Defendants' actions were "independent of the fire and are separate and distinct causes of the resulting mega-spill of oil."  (*Id.* ¶ 25).  Claims were asserted under general maritime law negligence, the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702, and negligence under Louisiana law (as surrogate federal law under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333(a)(2)(A)).

Each of the Defendant Vessels subsequently filed a complaint in limitation pursuant to 46

---

[3] The vessels are the M/V SEACOR LEE, M/V SEACOR VANGUARD, M/V SEACOR WASHINGTON, M/V JOE GRIFFIN, M/V MR. SIDNEY, and M/V MONICA ANN.

2

U.S.C. § 30505, *et seq.*, and Supplemental Rule F of the Federal Rules of Civil Procedure, each of which was consolidated in this MDL (Case Nos.10-3895, 10-3896, 10-3897, 10-4168, 10-4169, and 11-0058).[4]  Pursuant to Supplemental Rule F(3), the Court enjoined all claims against Defendants, including the Robin Complaint, and required claims to be filed directly in the limitation proceedings by April 20, 2011.  Sixty-six individuals have since filed claims in the limitation proceedings ("Claimants" or "B4 Claimants").  All Claimants adopted the allegations of the Robin Complaint, and all-but-three seek damages for economic losses resulting from the oil spill, similar to claims in the B1 pleading bundle.[5]  The other three claimants also bring personal injury claims resulting from exposure to dispersants, similar to claims asserted in the B3 pleading bundle.[6]

## PARTIES' ARGUMENTS

Defendants' primary argument is that Defendants owed no legal duty to the B4 Claimants, because it was not legally foreseeable that the act of spraying water onto and around a burning rig could cause the loss of control of the Macondo Well and, in turn, the damages Claimants allege.  Defendants rely on *In re: Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201(5th Cir. 2010) and the cases cited therein to support their argument.  Claimants contend that under *In re Signal International, LLC*, 579 F.3d 478, 493 (5th Cir. 2009), Defendants need only foresee general sorts of harm (as opposed to specific risks) that are within the "scope of danger" created by their negligent conduct.  Claimants argue that Defendants had or should have had knowledge that continually

---

[4] For ease of reading, this Order shall continue to refer to Petitioners-in-Limitation as "Defendant Vessels" or "Defendants."

[5] *See* Order and Reasons [as to Motions to Dismiss the B1 Master Complaint], Rec. Doc. 3830.

[6] *See* Amended Order and Reasons [as to Motions to Dismiss the B3 Master Complaint], Rec. Doc. 4209.  The three claimants who assert personal injury claims from exposure to dispersants are Sergio Alvarado, Aiman Abdel, and Rafael Lopez (*See, e.g.*, Case No.10-3897, Rec. Docs. 30, 39, 25).

pumping large amounts of water on a MODU for thirty-six hours could cause the rig to sink and that its uncapped riser pipe could leak tremendous amount of oil into the Gulf of Mexico.

## LEGAL STANDARD

"A motion under Rule 12(c) for failure to state a claim is subject to the same standards as a motion to dismiss under Rule 12(b)(6)." *In re: Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (citations omitted).

> To avoid dismissal, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. To be plausible, the complaint's factual allegations must be enough to raise a right to relief above the speculative level. In deciding whether the complaint states a valid claim for relief, [the Court must] accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. [However, the Court does] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.

*Id.* (citations and quotations omitted).

## DISCUSSION

At the outset, the Court finds the OPA claim must be dismissed. OPA provides a cause of action for removal costs and damages against a "responsible party for a vessel or a facility ***from which oil is discharged***." 33 U.S.C. § 2702(a) (emphasis added). Here, the Robin Complaint states that oil discharged from the DEEPWATER HORIZON, not the Defendant Vessels:

> Defendants are liable [to] Plaintiffs pursuant to 33 U.S.C. § 2702, in that they are responsible for oil spilling/leaking ***from the Deepwater Horizon***, and the leaking oil has caused Plaintiffs damages which are covered under the act, and Plaintiffs are persons or entities that are entitled to pursue a cause of action under the act.

(10-1986, Rec. Doc. 1 ¶ 28) (emphasis added). Although OPA also provides that certain third parties (as defined in 33 U.S.C. § 2703(a)) can be "treated as the responsible party" when the discharge and resulting removal costs and damages are caused "solely" by the third party, *see* 33

4

U.S.C. § 2702(d)(1)(A), Claimants do not urge that this exception applies, nor does it appear to apply.[7]  Accordingly, the B4 Claimants have not stated a cause of action against Defendants under OPA.

The Court also holds, for reasons stated in the Order and Reasons respecting the Motions to Dismiss the B1 Master Complaint ("B1 Order"), that this case falls within its admiralty jurisdiction and substantive maritime law applies (Rec. Doc. 3830, Pt. D).  Furthermore, as the B1 Order held, state law is not adopted as surrogate federal law under OCSLA and is preempted by maritime law.  Accordingly, the Court dismisses the negligence claim asserted under Louisiana law.

Turning to the remaining claim[8] under general maritime law negligence, there are four elements that must be met to establish a negligence claim: first, that the defendant owed a duty to the plaintiff; second, that the defendant breached that duty; third, that the plaintiff sustained injury; and fourth, that there is a causal connection between the defendant's conduct and the plaintiff's injury.  *In re: Great Lakes Dredge & Dock Co.*, 624 F.3d at 211 (citing *Canal Barge Co. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir. 2000)).  As to the first requirement, determining the defendant's duty is a question of law and thus a function of the court, as opposed to determining whether there

---

[7] Claimants argue that the Defendants were hired, engaged, or chartered by BP (*see* Rec. Docs. 3338 at 2, 3343 at 3), which would exclude Defendants from the class of third parties defined in Section 2703(a). Claimants also do not assert that Defendants "solely" caused the discharge, and, in fact, allege that oil was discharging before Defendants began any response actions (Case No. 10-1986, Rec. Doc. 1 ¶ 13 ("Initial damage estimates were low, with the overwhelming majority of the oil burning and not spilling into the ocean.")). Finally, although the issue is not before the Court, it is questionable whether anyone other than the responsible party may invoke the Section 2702(d) exception. *See* 33 U.S.C. § 2702(d)(1)(A) ("[I]n any case in which a ***responsible party establishes*** that a discharge . . . [was] caused solely by an act or omission of one or more third parties . . . the parties shall be treated as the responsible party or parties . . . ." (emphasis added)).

[8] The Robin Complaint also briefly asserted as an alternative claim under maritime law that Defendants were liable under Article 8.1 of the 1989 International Convention on Salvage (*See* Case No. 10-1986, Rec. Doc. 1 ¶ 27). However, Claimants fail to respond to Defendants' arguments that the Convention is inapplicable to this matter. (Rec. Doc. 2707-1 at 5 n.9). Accordingly, claims asserted under the 1989 International Convention on Salvage are dismissed.

was a breach of a duty, which is a question for the trier of fact. *Id.* (citing *In re Signal Int'l LLC*, 579 F.3d at 490); *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978).

"Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." *In re: Great Lakes Dredge & Dock Co.*, 624 F.3d at 211 (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)). "The determination of the existence and scope of a duty 'involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party.' Duty 'may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct.'" *Id.* (quoting *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)). Thus, if the damages claimed to be sustained as a result of the Defendants' alleged negligence were not "foreseeable," then Defendants owed no duty to the Claimants and are not liable as a matter of law.

The Fifth Circuit Court of Appeals has outlined the following test to determine whether harm was foreseeable:

> In the context of maritime torts, we have considered harm to be a foreseeable consequence of an act or omission "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a ***probable result*** of the act or omission, considering the interplay of natural forces and likely human intervention."

*Id.* (quoting *Consol. Aluminum*, 833 F.2d at 68)(emphasis added). The court also noted that when the causal connection between the alleged negligence and the resulting harm is "too attenuated," it falls outside the "scope of risk" created by that conduct and is unforeseeable as a matter of law. *Id.* at 212 (citing *Consol. Aluminum*, 833 F.2d at 67).

Three cases illustrate harm that is "unforeseeable." First, in *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, the Fifth Circuit held that a dredge which struck and ruptured a natural gas

6

pipeline while dredging a ship channel was not liable for physical and economic damage to the plaintiff's (Consolidated's) aluminum reduction plant located several miles away. 833 F.2d 65 (5th Cir. 1988). When the pipeline was struck, the pipeline owner (Texaco) closed the nearest upline block valve to prevent further loss of gas. This terminated Consolidated's only energy source for its generators, which caused substantial physical damage to the plant's generators and works-in-progress, as well as other economic losses. In holding that the defendant dredge owed no duty to Consolidated, the court contrasted the harm suffered by Texaco (and hypothetical plaintiffs) with the harm suffered by Consolidated:

> Injury to property and persons from the escaping gas, or from a fire which might have ensued, would be examples of consequences that would be foreseeable. The damages sustained by Texaco obviously were foreseeable. But the damage arising from the loss of natural gas supply, in turn causing the shut down of electric turbines, in turn causing a loss of electric power vital to the aluminum reduction process, with the ultimate result being substantial damage to equipment and product-in-process, goes beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers.

*Id.* at 68 (footnote omitted)..

In *Lloyd's Leasing Ltd. v. Conoco*, the Fifth Circuit considered foreseeability in the context of an oil spill. 868 F.2d 1447, 1448 (5th Cir. 1989) (per curiam). There, the M/V ALVENUS grounded eleven nautical miles from the Louisiana coast and spilled over 65,000 barrels of crude oil into the Gulf of Mexico. The oil then traveled seventy miles west where it washed up on beaches in Galveston, Texas. Beachgoers then tracked oil from the beach into local businesses, which, in turn, brought claims against the shipowner for damages caused by the oil. The Fifth Circuit affirmed the district court's decision that the harm to these claimants was not foreseeable. It explained that only about 60 of the 340 miles of coastline that could have been affected by the oil was developed. Thus, "[w]hile the [defendant shipowner] might reasonably anticipate that the oil would probably

7

wash ashore somewhere, it had no reason to have anticipated that the oil would probably wash ashore in a heavily populated area and then be tracked into businesses and homes." *Id.* at 1449. The court concluded, "To be found liable, a defendant must have 'knowledge of a danger, ***not merely possible but probable***.'" *Id.* at 1449-50 (quoting *Consol. Aluminum Corp.*, 833 F.2d at 68) (emphasis added).

Finally, in *In re: Great Lakes Dredge & Dock Co.*, the Fifth Circuit held that defendants hired to dredge the Mississippi River Gulf Outlet were not liable for flood damage that later occurred when the levee system failed in the face of Hurricane Katrina's storm surge. 624 F.3d at 213. After distinguishing the case from *In re: Signal International, LLC*, discussed *infra*, the court reasoned,

> Furthermore, it cannot be said that any dredger could have foreseen that performing its dredging activities negligently . . . would probably result in the series of events culminating in the catastrophic damages that occurred during Hurricane Katrina. No reasonable dredger could have anticipated that its negligence would make the difference between the levee systems holding or failing in the event of a hurricane.

*Id.*

In contrast to *Lloyd's Leasing*, *Consolidated Aluminum*, and *Great Lakes Dredge & Dock,* the Fifth Circuit in *In re: Signal International, LLC*, held the harm suffered by the plaintiff fell within the scope of duty owed by the defendant. 579 F.3d 478 (5th Cir. 2009). There, the defendant's barges broke free of their moorings during Hurricane Katrina and floated 4.7 miles where they allided with plaintiff's bridge. Noting that "[t]he test for foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated," the court explained that the approaching hurricane, its anticipated storm surge, and the topology of the river basin (all of which the defendant was aware) made the allision a foreseeable

consequence of negligently mooring the barges. *Id.* at 493-94. Thus, "[w]hile the distance that these barges covered and the exact allision point were undoubtedly 'surprising' to those involved," the court found the damage was within the scope of duty owed to the bridge owner. *Id.* at 495-96. Notably, the court distinguished the facts before it from *Consolidated Aluminum,* and *Lloyd's Leasing*, stating, "In each case, the harm was not of the type risked by the negligent acts, and the party at fault was able to identify events that would not have been foreseen by a reasonable person." *Id.* at 495 n.19.

Considering the allegations of the Robin Complaint with the above cases, the Court finds the instant matter is analogous to *Lloyd's Leasing*, *Consolidated Aluminum*, and *Great Lakes Dredge & Dock* and distinguishable from *In re: Signal International, LLC*. In *Signal International*, there was no question that the defendant foresaw the risk that its barges might escape the mooring site during a large storm; the court merely found the defendant framed the scope of its risk too narrowly. *Id.* at 494-95 ("In asking us to hold that it had a duty only if it could have foreseen the 'specific risk' of allision with this particular portion of the Interstate 10 bridge, [defendant] proposes too narrow of an inquiry."). Unlike that case, here the general sort of harm allegedly suffered by persons in the general class as the Claimants (property damage[9] and/or economic losses allegedly suffered by property owners, commercial fishermen/oystermen/etc., and those employed in the oil and gas industry) would not have been anticipated by a reasonably thoughtful person in Defendants' position, as a ***probable*** result of the negligent act, considering the interplay of natural forces and likely human intervention.

---

[9] As discussed below, *see infra* note 10, it appears from the claims filed in the limitation proceedings that none of the Claimants actually suffered physical property damage due to oil. Regardless, the Court will assume for present purposes that at least one of the Claimants suffered property damage.

9

Defendants were *not* the owners or operators of the MODU from which the oil discharged, but instead were owner/operators of vessels that *responded to* the explosion aboard the DEEPWATER HORIZON. This immediately distinguishes Defendants from the defendant in *Lloyd's Leasing*, which owned the discharging vessel but nevertheless did not owe a duty of care to the onshore business owners. Further, even assuming Defendants' actions fell below the standard of care, a reasonable person in Defendants' situation would not foresee that spraying water from one vessel onto another vessel in apparent hopes of extinguishing a fire would cause oil to discharge continuously from the latter vessel's drill pipe, which would *probably* result in the economic and property damages allegedly incurred by onshore Plaintiffs over fifty miles away. In order to foresee such a result, the Defendants would have had to have anticipated that spraying water on the MODU would probably cause the vessel to capsize, and would probably cause the connecting pipe to collapse, and the blowout preventer would probably not control the flow of hydrocarbons, and the discharge would probably flow unabated for three months, and that oil would probably flow fifty miles inland. Moreover, as to those Claimants who assert physical injury damages from chemical dispersant, the harm is even further removed from Defendants' scope of duty, given that the decision to use an allegedly toxic dispersant appears to have been made by parties other than Defendants (i.e., the decision to use a toxic dispersant does not fall within the scope of "likely human intervention" vis-à-vis Defendants).

Stated another way, when a salvor vessel negligently uses a water monitor in an attempt to extinguish a fire on a vessel in distress, it *is* foreseeable that use of the water monitor would probably cause physical damage directly to the latter vessel or perhaps to other persons or property in the vicinity. Here, however, the harm results from pollution damage, which is conceptually

10

distinct and geographically removed from the physical damage one would expect from the negligent use of a fire monitor. Thus, the alleged harm is "not of the type risked by the negligent act," *see In re: Signal International, LLC*, 579 F.3d at 495 n.19, and is "too attenuated to be foreseeable as a matter of law," *In re: Great Lakes Dredge & Dock Co.*, 624 F.3d at 213 (citing *Consol. Aluminum Corp.*, 833 F.2d at 67). To conclude otherwise goes "'beyond the pale of general harm which reasonably might have been anticipated by negligent [responders].'" *In re: Great Lakes Dredge & Dock Co.*, 624 F.3d at 213 (quoting *Consol. Aluminum Corp.*, 833 F.2d at 68).

Additionally, the Court notes that maritime salvage law has long embraced a public policy encouraging seamen to render prompt service in future emergencies, which is generally unknown in land-based common law. *See* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 8-1, at 521 (2nd ed. 1975) ("On land the person who rushes in to save another's property from damage is an officious intermeddler . . . . At sea the person who saves property receives a reward which is generously computed in light of 'the fundamental public policy at the basis of awards of salvage—the encouragement of seamen to render prompt service in future emergencies.'" (quoting *Kimes v. United States*, 207 F.2d 60, 63 (2d Cir. 1953)). Although the Court's holding is not based on this policy, it is certainly consistent with this policy and thus bolstered by it.[10]

## CONCLUSION

As discussed above, to defeat a motion to dismiss the complaint must contain sufficient

---

[10] The Court also notes that with the exception of four claims asserted in the limitation actions, none of the Claimants appear to satisfy the rule from *Robins Dry Dock*, which prohibits most claims for economic loss in the absence of a physical damage to a proprietary interest. *See Louisiana v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985). Consequently, *Robins Dry Dock* provides alternative grounds for dismissing most of the B4 Claimants. Claimant Terry G. Robin appears to fall within the commercial fisherman exception to *Robins Dry Dock*. The personal injury claims of Aiman Abdel, Sergio Alvarado, and Rafael Lopez from exposure to chemical dispersant do not appear to be subject to *Robins Dry Dock*.

11

factual matter to state a claim to relief that is plausible on its face; i.e., the allegations must be enough to raise a right to relief above the speculative level. Because the Robin Complaint does not reflect that the alleged harm was "foreseeable" to Defendants under Fifth Circuit precedent, the Court finds the Defendants did not owe a legal duty to the B4 Claimants. Thus, the Defendants are not liable to the B4 Claimants as a matter of law. Accordingly,

**IT IS ORDERED** that the Motion to Dismiss (Rec. Doc. 2707) is **GRANTED**. Subject to the exception below regarding DuWayne Mason, the claims asserted by the B4 Claimants in limitation actions Nos. 10-3895, 10-3896, 10-3897, 10-4168, 10-4169, and 11-0058 are **DISMISSED WITH PREJUDICE**. This Order does not affect the personal injury claim of DuWayne Mason, an alleged member of the crew of the M/V SEACOR VANGUARD, which Defendant Seacor specifically excepted from the Motion to Dismiss (*See* Rec. Doc. 2701-1 at 3).[11] This Order does not prejudice a B4 Claimant from filing a complaint in the B1 or B3 pleading bundle or joining in the B1 or B3 Master Complaint.

**IT IS FURTHER ORDERED** that the Motion for Reconsideration of Order Dispensing with Oral Argument for Motion to Dismiss the Bundle B-4 Cases (Rec. Doc. 3816) is **DENIED AS MOOT**.

New Orleans, Louisiana, this 12th day of October, 2011.

_____
UNITED STATES DISTRICT JUDGE

---

[11] The Court notes that although DuWayne Mason did not file his claim directly in the limitation proceeding, it was filed in MDL 2179 with reference to Case No. 10-3896.