<pre>
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3


 4


 5    IN RE:  OIL SPILL BY THE OIL RIG    *   10-MD-2179-CJB-SS
                DEEPWATER HORIZON IN THE    *
 6              GULF OF MEXICO ON           *
                APRIL 20, 2010              *   October 7, 2011
 7                                          *
                                            *
 8    Applies to:  All Cases               *   9:30 a.m.
      * * * * * * * * * * * * * * * * * *

 9


10


11                   DISCOVERY STATUS CONFERENCE
                 BEFORE THE HONORABLE SALLY SHUSHAN
12                 UNITED STATES MAGISTRATE JUDGE

13


14    Appearances:

15

      For the Plaintiffs:          Domengeaux Wright Roy
16                                    & Edwards, LLC
                                    BY:  JAMES P. ROY, ESQ.
17                                  556 Jefferson Street, Suite 500
                                    Post Office Box 3668
18                                  Lafayette, Louisiana 70502

19

      For the Plaintiffs:          Herman Herman Katz & Cotlar, LLP
20                                  BY:  STEPHEN J. HERMAN, ESQ.
                                    820 O'Keefe Avenue
21                                  New Orleans, Louisiana 70113

22

      For the Plaintiffs:          Williamson & Rusnak
23                                  BY:  JIMMY WILLIAMSON, ESQ.
                                    4310 Yoakum Boulevard
24                                  Houston, Texas 77006

25
</pre>

1    Appearances:

2

3    For the Plaintiffs:              Levin Papantonio Thomas Mitchell
                                         Rafferty & Proctor
                                      BY:  BRIAN H. BARR, ESQ.
4                                     316 South Baylen Street, Suite 600
                                      Post Office Box 12308
5                                     Pensacola, Florida 32591

6

7    For the Federal                  U.S. Department of Justice
     Government Interests:            BY:  R. MICHAEL UNDERHILL, ESQ.
                                           SARAH D. HIMMELHOCH, ESQ.
8                                     450 Golden Gate Avenue, Rm. 7-5395
                                      San Francisco, California 94102

9

10   For the State Interests:         Attorney General of Alabama
                                      BY:  COREY L. MAZE, ESQ.
11                                    500 Dexter Avenue
                                      Montgomery, Alabama 36130

12

13   For the Defendant:               Liskow & Lewis, APLC
                                      BY:  DON K. HAYCRAFT, ESQ.
14                                    701 Poydras Street, Suite 5000
                                      New Orleans, Louisiana 70139

15

16   For the Defendant:               Kirkland & Ellis, LLP
                                      BY:  J. ANDREW LANGAN, ESQ.
17                                         MARK J. NOMELLINI, ESQ.
                                           BRIAN A. KAVANAUGH, ESQ.
18                                    300 N. Lasalle
                                      Chicago, Illinois 60654

19

20   For the Defendant:               Kirkland & Ellis, LLP
                                      BY:  ROBERT R. GASAWAY, ESQ.
21                                    655 Fifteenth Street NW
                                      Washington, DC 20005

22

23   For the Defendant:               Frilot, LLC
                                      BY:  KERRY J. MILLER, ESQ.
24                                    1100 Poydras Street, Suite 3700
                                      New Orleans, Louisiana 70163

25

1    <u>Appearances</u>:

2

3    For the Defendant:          Sutherland Asbill & Brennan, LLP
                                 BY:  RACHEL GIESBER CLINGMAN, ESQ.
4                                1001 Fannin Street, Suite 3700
                                 Houston, Texas 77002

5

6    For the Defendant:          Stone Pigman Walther Wittmann, LLC
                                 BY:  PHILLIP A. WITTMANN, ESQ.
7                                     CARMELITE M. BERTAUT, ESQ.
                                 546 Carondelet Street
8                                New Orleans, Louisiana 70130

9    For the Defendant:          Godwin Ronquillo, PC
                                 BY:  DONALD E. GODWIN, ESQ.
10                               1201 Elm Street, Suite 1700
                                 Dallas, Texas 75270

11

12   For the Defendant:          Godwin Ronquillo, PC
                                 BY:  R. ALAN YORK, ESQ.
13                               1331 Lamar, Suite 1665
                                 Houston, Texas 77010

14

15   For the Defendant:          Kuchler Polk Schell
                                   Weiner & Richeson, LLC
16                               BY:  DEBORAH D. KUCHLER, ESQ.
                                 1615 Poydras Street, Suite 1300
17                               New Orleans, Louisiana 70112

18

19   For the Defendant:          Bingham McCutchen, LLP
                                 BY:  WARREN A. FITCH, ESQ.
20                               2020 K Street NW
                                 Washington, DC 20006

21

22   For the Defendant:          Jones Walker
                                 BY:  E. DIRK WEGMANN, ESQ.
23                               201 St. Charles Avenue
                                 New Orleans, Louisiana 70170

24

25

Appearances:

For the Defendant:                 Latham & Watkins
                                   BY:  THOMAS J. HEIDEN, ESQ.
                                   233 S. Wacker Drive, Suite 5800
                                   Chicago, Illinois 60606

Official Court Reporter:           Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
                                   (504) 589-7778


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

**PROCEEDINGS**

**(October 7, 2011)**

**THE DEPUTY CLERK:**  All rise.

**THE COURT:**  Good morning, everybody.  Have a seat.

Cory, can you put the phone on for me, please.

**MR. MAZE:**  Yes.

**THE COURT:**  Thank you.  Good morning, phone participants.  Can you hear me okay?

**MS. HIMMELHOCH:**  Yes, Your Honor.

**THE COURT:**  Sarah, you made it home?

**MS. HIMMELHOCH:**  Yes, I did, Your Honor.

**THE COURT:**  Good.  Glad to hear it.  You ran for the hills, huh?

**MS. HIMMELHOCH:**  I did, indeed.

**THE COURT:**  I think we are going to have a pretty, hopefully, quick meeting today unless somebody like Deb has new agenda items.  We should be able to roll through it pretty quickly.

Starting off with the BOP issues, we have had another little feeding frenzy of people wanting to go out and do visual inspections.  It's okay by me.  I would like to know about who wants to go out and then refer you over to Captain Englebert to coordinate calendars.  She's got a lot going on next week.  She has to make arrangements to, as she explains it to me, flip the capping stack, which is a two-crane operation,

1   to lay the thing on its side for first an inspection that Rob,

2   I think, is working on, and then perhaps scanning thereafter.

3                    Is that correct, Rob?

4              **MR. GASAWAY:**  Rob Gasaway for BP.  That's exactly

5   correct, Your Honor.  You remember, we had a lot of discussion

6   about laser scanning of the capping stack, and where we ended

7   up on that issue was to take it in two stages.  Stage 1 is

8   really to just turn it over, look at it, see what the actual

9   technical limitations of the scanning are.  Step 2 will then be

10  to come back to the Court with a proposal and a protocol for

11  doing the scanning after the inspection.  So this is

12  preliminary.

13             **THE COURT:**  Yeah.  She had also suggested that

14  perhaps photography might be of assistance to you, and you-all

15  are considering that, huh?

16             **MR. GASAWAY:**  Yes, we are.

17             **THE COURT:**  Is there anything else on that we need to

18  get an update on?  The only thing I was going to ask, guys, is

19  that she is trying to finish up her active duty service and

20  trying to coordinate all of the site inspections, so that if we

21  could get more than one client in there at a time, it would be

22  helpful to her on time usage, also save expenses.  But the

23  expenses are not, in the overall scheme of things, of any

24  magnitude.

25             **MR. GASAWAY:**  Understood, Your Honor.  I know that

 1    both for this and for the BOP issue that you referred to

 2    earlier, we are trying to coordinate with the various parties

 3    and minimize the burden on Captain Englebert.

 4              THE COURT:  I have no problem with further requests.

 5    It's just that I thought we had moved past that.  Every time I

 6    think I've moved past something, I'm back again.

 7              MR. WILLIAMSON:  No problem, Judge.  Jimmy Williamson

 8    for the PSC.  I don't think anybody on our team got put in the

 9    e-mail chain regarding all this BOP inspection.  We would

10    almost definitely want to be there during the capping stack

11    inspection, and so we would request again that we be included

12    in the e-mail chain.  We are not intending to object, but we

13    want to be included.  If there is an inspection, we will almost

14    definitely want to have someone there.

15              THE COURT:  You know, Jimmy, every time you tell me

16    that, I think it's a reasonable request.

17              MR. WILLIAMSON:  Thank you.

18              THE COURT:  Guys, whoever is communicating about the

19    BOP or inspections, please make sure that Jimmy and the PSC is

20    on the distribution list on the e-mail chain so that he doesn't

21    have to stand up and have me tell him that it's a reasonable

22    request.

23              MR. WILLIAMSON:  Thank you, Judge.

24              MR. LANGAN:  Your Honor, it's Andy Langan.  I think I

25    included Mr. Roy and Mr. Herman.  I'm pretty sure I did.

1          THE COURT:  Okay.

2          MR. HERMAN:  I think this is probably a *mea culpa* on

3   my part.

4          THE COURT:  Jimmy has, on BOP issues, asked to be

5   included.

6          MR. LANGAN:  I'm going back to the appointment of

7   liaison counsel and the purpose of liaison counsel.

8          THE COURT:  Well, I know, and we have a *mea culpa*

9   going here.

10          MR. LANGAN:  Anyway, we did include the PSC, but I

11   will try to include Mr. Williamson directly as well.

12          THE COURT:  That would be good because the PSC

13   doesn't keep up with its liaison counsel obligations.  Mr. Roy

14   is ignoring me.

15          MR. MILLER:  See what that one-year reappointment

16   gets him.

17          THE COURT:  Exactly.  Now he can just sit there and

18   tippy-tap on his iPad.  He doesn't care.

19          Okay.  I'm going to get an order out today on

20   Captain Englebert's protocol for requesting access to the

21   Michoud site.  It's nothing new.  It's the same old thing, but

22   now that the Court is the custodian, we thought we would go

23   ahead and put that out.  I don't think it's anything that

24   you-all need to worry about.

25          I don't know who for Transocean wants to report

1    to us about the ROV at the well site.  Anything on that?

2            **MS. CLINGMAN:**  Yes, Your Honor.  Rachel Clingman for

3    Transocean.  We did send an ROV down and surveyed the area and

4    determined there are no hydrocarbons leaking from any of the

5    equipment on the seafloor.  That's been reported to the

6    Coast Guard.  They are going to confirm that publicly probably

7    by early next week.

8                    As to a sheen, at the time that we went out, the

9    seas were too high to look for a sheen, but the Coast Guard

10   agreed that it had no longer been detected and also agreed the

11   seas were too high to do any further evaluation.  So we

12   consider that concluded.

13           **THE COURT:**  Good.  Thank you.

14           Andy.

15           **MR. LANGAN:**  Your Honor, just as a follow-up, we made

16   a request for the ROV footage.

17           **THE COURT:**  Yes, and you will get it.

18           **MR. LANGAN:**  I'm just wondering about the timing on

19   that, if we could ask counsel.

20           **MS. CLINGMAN:**  We actually tendered it to the

21   Coast Guard and are expecting our copies.  As soon as we can

22   duplicate it and send it to anybody who requests it, we will.

23           **MR. LANGAN:**  Your Honor, if I could ask counsel to

24   report on:  Is this HD?

25           **THE COURT:**  Oh, was it HD?

1    **MS. CLINGMAN:**  I don't know, and I don't think
2    Spielberg was involved.
3    **MR. LANGAN:**  Finally, was the entire riser videoed?
4    Whether Spielberg was involved or not, can we get some idea
5    about the scope of the examination?
6    **MR. HAYCRAFT:**  Or James Cameron.
7    **THE COURT:**  Sure.  I assume you don't know the answer
8    to that, but when you-all transmit copies of the video, would
9    you give them a little summary of what was videoed.
10   **MS. CLINGMAN:**  Happy to, Your Honor.  I would also
11   say the video likely speaks for itself as to what was surveyed.
12   To the extent we can provide a text explanation as well, we can
13   do that.
14   **THE COURT:**  Good.  Good report.  Thank you.
15   Okay.  To give you an update, Sarah and Rob are
16   working on completion of the production by the United States,
17   and I think they are making good progress.  We should have
18   something from them, I think, by Tuesday or Wednesday of next
19   week.
20   Is that right, Rob?
21   **MR. GASAWAY:**  Rob Gasaway for BP.  That's correct,
22   Your Honor.
23   **THE COURT:**  I appreciate you-all working together.
24   Thank you, Sarah.
25   **MS. HIMMELHOCH:**  My pleasure, Your Honor.

1      **THE COURT:**  Okay.  How are we coming on the issue of

2  BP's written discovery to the United States?  Have you-all made

3  progress on that, Rob?

4      **MR. GASAWAY:**  We have, Your Honor.  We have gotten

5  comments from the other defendants.  It didn't go out

6  yesterday.  It will go out today.

7      **THE COURT:**  Great.  Sarah, you know, we'll talk about

8  response dates.  I haven't seen the discovery.

9          Maybe, Rob, when it does go out, you can serve

10  Mike and me.  We will take a look at it and just keep ourselves

11  advised.

12      **MR. GASAWAY:**  We will do that, Your Honor.

13      **THE COURT:**  That would be great.  Then the 30(b)(6)

14  deposition issues, U.S. and BP were working on that.

15      **MR. GASAWAY:**  We are.  Is Tim Duffy on the line?

16      **MR. LANGAN:**  I might be able to speak to this.

17  Here's the status as I understand it.  I think the parties have

18  compiled a list -- it's been supplemented a little bit -- of

19  the entities for which notices will be directed.

20      **THE COURT:**  Okay.

21      **MR. LANGAN:**  Secondly, I think, through Tim's work

22  and others, the defendants and the other parties have divided

23  up the initial drafting responsibilities for, I think, just

24  about everybody on that list.  I think the plan is to very soon

25  start sharing drafts, so we are making progress.

1          **THE COURT:**  Good, good, good, good, good.  I think

2    that will help crystallize in everybody's mind where we intend

3    to go on this next phase.  Even though we are still waiting on

4    document production, I think it will be helpful.  So that's

5    good.  Okay.

6          **MR. LANGAN:**  I think that's everything on that.

7          **MR. BARR:**  Your Honor, Brian Barr for the PSC.  I

8    just wanted to confirm what Andy was saying.  We have 23

9    entities on the list of 30(b)(6) depositions and we have

10   divided up responsibility.  The parties have worked real well

11   together to get that divided up, and it's divided fairly

12   equally amongst everybody.  We expect to be exchanging drafts

13   shortly.

14         **THE COURT:**  Good, good, good, good.  Good progress.

15             Okay.  The issue of the Transocean document

16   production for the Operations Integrity Case, Well Specific

17   Operating Guidelines, and the Vessel Drift-Off and Watch Circle

18   Program, how do we stand on that, guys?

19         **MR. HAYCRAFT:**  The last item on the Vessel Drift-Off

20   we got last week.

21         **THE COURT:**  Okay.

22         **MR. HAYCRAFT:**  We received the numerous chapters of

23   the Operations Integrity Case and were informed by Carter

24   Williams that it was a draft and never formally adopted.  There

25   are, nevertheless, within the internal documents apparent

1   sections that one would reasonably assume -- for example,

2   there's a Section 2 and a Section 4, but there's not a

3   Section 3.  Then the document itself refers to a Section 7, 8,

4   and 9 which have not been produced.

5            I spoke with Ms. Clingman for Transocean shortly

6   before the conference began.  She said they are looking to see

7   if drafts of those chapters exist, and they will produce them

8   if they do.

9            **THE COURT:**  Good.

10           **MR. HAYCRAFT:**  The other document, the first one you

11  mentioned, the Well Specific Operating Guidelines (WSOG) is a

12  specific document that's been the subject of numerous e-mails

13  between me and Mr. Williams over the last month or so.  Plus, I

14  have raised it in several Transocean depositions.  I know the

15  document exists.  If it doesn't exist, that will be a serious

16  matter, but we need to know that the document exists.

17           Finally, the last point is:  In the deposition

18  of Jimmy Moore this past week, when the OIC was -- prior to his

19  deposition, when it was produced just prior to his deposition,

20  he said that the custodians or owners of that document, the

21  people responsible for producing it in the first place and then

22  presumably determining that it would never go any further than

23  November of 2008, those owners are Bill Sannon, the general

24  manager, who was deposed two or three months ago, and Duan

25  Winslow, operations manager, who was deposed in April.

1         There may be an interest and I may make an
2    inquiry and a request -- I'm not doing it at this moment -- to
3    take a brief deposition of those two individuals on what
4    happened to the OIC, why was it not finalized.
5         THE COURT:  Okay.  All right.  Anything on
6    Transocean's end that you want to comment or update on?
7         MS. CLINGMAN:  No, other than the clear statement
8    that we are not agreeing to any additional depositions, but
9    that was correctly stated.  We do have some additional sections
10   of the OIC to be produced.  They are in the production stages.
11   I don't know that we will locate all of them because it was
12   never completed.
13         The same with the Well Specific Operating
14   Guidelines:  If we find them, they will be produced; if we
15   can't, they won't.  I don't think any testimony is needed.
16         THE COURT:  Okay.  Thanks.  We entered the order on
17   de-designation of confidentiality as Pretrial Order 47.  That
18   finally got off all of our collective desks, so that's good.
19   Let's move into Phase One fact deposition scheduling.
20         Oh, I'm sorry.  Andy, you have something
21   further?
22         MR. LANGAN:  No, no.
23         THE COURT:  Just coming up?
24         MR. LANGAN:  I am, on Heather Powell, which I think
25   may be first on your list.

1      THE COURT:  Second on my list, but we'll go for

2  Heather.

3      MR. LANGAN:  Okay.  The baby has been delivered

4  safely.

5      THE COURT:  We have been waiting on that.

6      MR. LANGAN:  It actually may have happened four or

7  five weeks ago, and I'm sorry, which is a lifetime in 2179.  I

8  realize that.

9      THE COURT:  It is, but it's still okay.

10      MR. LANGAN:  Okay.  Two points here.  We have a

11  request from Ms. Powell through her personal counsel that if

12  she is deposed -- and I guess she will be -- that it be done in

13  Houston.  With a newborn infant at home, I think it's best.  We

14  have accommodated some other people, so we make that request.

15  Secondly, I'm told that the 27th or 28th of October would be

16  available dates.

17      THE COURT:  Let's take a look.

18      MR. MAZE:  So not the 20th?

19      THE COURT:  Not the 20th, which was tentative.  So

20  does anybody care about the 27th or 28th?  Nobody cares.  Oh,

21  wait.  Mr. Williamson may care.

22      MR. WILLIAMSON:  The 28th might be a little better,

23  Judge.

24      THE COURT:  Why don't we go for the 28th.  Andy, you

25  will confirm it to her?

1          **MR. LANGAN:**  Yes.  Houston is okay?

2          **THE COURT:**  Houston is okay.

3          **MR. LANGAN:**  Thank you.

4          **THE COURT:**  Now, we postponed the deposition of

5   Steve Sutton, who is a U.S. Coast Guard 30(b)(6) deponent, and

6   I assume we don't have dates available for rescheduling.

7          **MS. HIMMELHOCH:**  Your Honor, this is Sarah.  We do

8   have two alternatives on the dates for Mr. Sutton.

9   Lieutenant Houck we don't, but for Mr. Sutton we do have two

10  sets of proposed dates.

11         **THE COURT:**  Okay.

12         **MS. HIMMELHOCH:**  He is available the 8th or 9th of

13  December or the 15th or 16th of -- I'm sorry.  November.  8th

14  or 9th or 15th or 16th of November.

15         **THE COURT:**  Okay.  Does the PSC have any druthers on

16  that?

17         **MR. FITCH:**  8th or 9th?

18         **THE COURT:**  If we go the 8th or 9th, we will stay

19  away from the expert depositions.

20         **MR. MAZE:**  That's a one-day?

21         **THE COURT:**  That's a one-day deposition.

22         **MR. MAZE:**  9th?

23         **THE COURT:**  Looks good to me.  Nobody else is on the

24  9th.  Sarah, let's go for the 9th.

25         **MS. HIMMELHOCH:**  Okay.  On Lieutenant Houck, we are

1    working out the custodial file issue with Transocean.  We will

2    have a new date as soon as we know what requests Transocean has

3    and what answer we have on the question relating to command

4    center e-mails.  So that will be next week at the earliest that

5    we will have that date for you.

6            THE COURT:  Good.  That's fine.  Sarah, if we could

7    avoid the period of time commencing with the expert

8    depositions, that would be helpful because people are going to

9    be quite busy during that period.

10                   Carmelite.

11            MS. BERTAUT:  Can we ask the government -- I know

12   there was a discussion on the conference call about the

13   lieutenant's -- I think it was Lieutenant Odom's deposition for

14   Tuesday.  Sarah said that there was an issue with TO, I think,

15   as to whether that production was complete.  Sarah had promised

16   a status report on Monday afternoon.  I'm wondering if it would

17   be possible to ask for that report earlier on Monday so that we

18   can avoid travel if that deposition is, in fact, canceled.

19            MS. HIMMELHOCH:  I could even give it now if you

20   would like.

21            THE COURT:  Why don't you.  That would be good.

22            MS. HIMMELHOCH:  The question that Transocean posed

23   to me was whether the command center record questions, which

24   are the e-mails and the SIPR instant messaging system, would

25   affect Lieutenant Commander Odom's custodial production.  The

1   answer is no.  Lieutenant Commander Odom was never stationed at

2   the command center during the relevant time period.  We believe

3   his custodial production is complete, and we believe his

4   deposition can and should go forward on Tuesday.

5           **THE COURT:**  Okay.  Thank you for the update.

6               Just a quick question on the deposition of

7   Mr. McKay.  We had asked the question as to whether or not

8   Nalco still needs time for his deposition in view of

9   Judge Barbier's ruling on that bundle.  Anybody on the line for

10  Nalco?

11          **MR. HEIDEN:**  Good morning, Judge.  This is Tom

12  Heiden.

13          **THE COURT:**  Hi, Tom.  How are you doing?

14          **MR. HEIDEN:**  I'm doing fine.  I think the truth is

15  that we are derelict, but we can get an answer to you on this

16  in the next five or ten minutes.  I apologize.

17          **THE COURT:**  That will be fine.  If you can't get it

18  in the next five or ten, why don't you get it to us by e-mail

19  sometime today.  That would be fine.

20          **MR. HEIDEN:**  Thank you, Judge.

21          **MS. HIMMELHOCH:**  Your Honor, may I interrupt the

22  flow?  This is Sarah Himmelhoch.  I just got an e-mail

23  indicating that we have found 70 pages of notes from Lieutenant

24  Commander Odom, which we will get out tonight to the parties.

25  We don't think it's any new information, but my statement to

1    you that we had completed his custodial production turns out to

2    be slightly if not completely inaccurate.

3              **THE COURT:**  Well, not completely.  Partially.

4              **MS. HIMMELHOCH:**  I apologize.

5              **THE COURT:**  No problem.  Go ahead and get that out.

6    We are still all systems go for Odom unless somebody tells us

7    to the contrary.

8                   We were working on dates for Richard Coronado.

9    Any update on that?  No.  BP and Cameron were working on that.

10   We'll pass that.

11             **MR. WITTMANN:**  I have no report from Cameron.

12             **MR. LANGAN:**  I think the ball is in Cameron's court,

13   I believe, although I could be wrong.

14             **THE COURT:**  I think the ball, then, is in Cameron's

15   court.  Phil, if you guys would check on Richard Coronado for

16   next week.  If you get something earlier than that, that would

17   be great too.

18             **MR. WITTMANN:**  We will do it, Judge.

19             **THE COURT:**  Okay.  Thanks.

20                   We have got the written deposition questions

21   posed to Don Vidrine.  Have you-all heard back from Don's

22   attorney?

23             **MR. MILLER:**  Kerry Miller for Transocean.  Yes, I did

24   speak with Bob Habans either yesterday or the day before.  He

25   has gotten the questions.  He told me he has a trial in

1   Greenville, Mississippi coming up, I think, on Monday, so he
2   was going to try and get those to Vidrine's treating physician
3   yesterday.  I didn't hear back from him yesterday.  Maybe I
4   will follow up with him this afternoon before he leaves for
5   Mississippi.  He said he would ask for the treating physician
6   to give us a written determination on whether Mr. Vidrine is
7   able to answer those questions.  I told him we would take it
8   from there.
9           THE COURT:  Okay.  I appreciate it.  Good.
10              All right.  We have got the order relative to
11  the deposition designations track out with an immediate
12  amendment this week.  I want to make sure that everybody has
13  looked at it and thinks it looks okay.  Good.
14          MR. NOMELLINI:  Your Honor, it's Mark Nomellini.
15  Good morning.
16          THE COURT:  Good morning, Mark.
17          MR. NOMELLINI:  One issue with respect to deposition
18  designations is that sometimes when parties are designating
19  excerpts, there's a document included.  We were talking with
20  Mr. Herman and the PSC yesterday trying to figure out how to
21  deal with that issue in terms of whether that document comes
22  in, how we deal with the objection process, etc.
23              We think the solution is that if somebody
24  designates a portion of a deposition and they want the exhibit
25  that's included in that to be admitted, then they can just

1    include that in the exhibit list to be exchanged on

2    November 14, and then we can handle it that way rather than

3    obstructing the deposition designation process.

4                **THE COURT:**  In my view, that's six to one, a half

5    dozen to the other.  If you-all reach agreement on it, I think

6    it's fine.  Why don't you-all consider that.  We'll maybe come

7    back to it this week by e-mail.  Alan looks like he wants to

8    say something.

9                **MR. YORK:**  Good morning, Your Honor.  Alan York for

10   Halliburton.

11               It's entirely possible that I have missed an

12   e-mail or two because I have been reading -- I think all of us

13   have -- 300 VoO plaintiff profile forms a day that have been

14   coming across LexisNexis.

15               **THE COURT:**  What is that all about?  Would you-all

16   just book more bets so we can come back to VoO.  I'm adding it

17   to my agenda now.

18               **MR. YORK:**  Mr. Godwin and I counted them and,

19   literally, I think yesterday we got 300, at least, of those.

20               **MR. HAYCRAFT:**  Or more.

21               **THE COURT:**  I'm sure it's been fascinating reading.

22               **MR. YORK:**  But you have to read every one of them to

23   make sure that there's not something in it.  I know that I saw

24   some e-mails at some point where there was a discussion that

25   objections were not intended to be a part of it, and I'm just

 1   not clear.  Is it objections to the deposition testimony, is it
 2   objections -- because at one point we had talked about
 3   hyperlinking objections so that the judge can see --
 4            THE COURT:  We have got that in the test.  We have
 5   got that in the test.  Remember, you posed an objection to one
 6   exhibit in the test Hayward deposition cut.  I looked at it
 7   this morning and sure enough it's there.
 8            MR. YORK:  I guess what I'm just trying to get -- and
 9   we all have teams back at the ranch trying to get all these
10   things done.  If objections is not something they need to be
11   concerned about at this point, then I think they may breathe a
12   little bit easier.  But if it is, we need to make it --
13   especially as we move forward in the schedule, and I will say
14   we do have a concern when we start getting to points where
15   there's 30 depositions a week that we are supposed to be
16   designating on.  We'll deal with it and do whatever the Court
17   needs us to do, but there is a timing concern.
18            THE COURT:  Okay.  Stay right there and let's hear
19   from Steve, and maybe we can get this resolved today.
20            MR. HERMAN:  Steve Herman for the plaintiffs.  My
21   recollection from when we met with Judge Barbier in one of
22   these settings was that he was not inclined to have a situation
23   where all of the objections and responses to all of the
24   testimony was spelled out for him and would prompt, perhaps, a
25   ruling on every one.  I think it was his feeling that a lot of

1  it could just go to the weight, a lot of it probably would be

2  irrelevant to his ultimate -- he wouldn't rely on it for his

3  ultimate decision.

4          My understanding was that ultimately,

5  particularly given the technological limitations, that the

6  defendants -- or maybe sometimes the plaintiffs, although I

7  don't think we are going to object to anything -- would note

8  their objections somehow, either by underlining or red in the

9  margins, so that the judge would know this is objected to.  He

10  could probably figure out what the objection was and take it

11  for whatever it was worth.

12          If Judge Barbier wanted to know, you know, "I'm

13  really bothered by this exchange.  I would like to hear from

14  Halliburton as to what the objection is, and I would like to

15  hear from the PSC or the US what their response is," then he

16  would somehow elicit that from us.  Then we would provide him

17  our bases, and he would rule on them to the extent he had to.

18          We weren't envisioning -- we did originally.  In

19  the first meeting, we asked Fontana, "Can you do this with all

20  the hyperlinks?" and the judge would say whether it's

21  sustained.  But I thought that through the process of, A,

22  meeting with Fontana and, B, meeting with Judge Barbier, we

23  kind of put that to the side.

24          **THE COURT:**  Okay.  I will tell you what my

25  recollection is.  It's amazing how we can all attend the same

1   meeting and come out with 50 different recollections.

2           My recollection is that anyone who wanted to

3   assert an objection to an exhibit could do so in the deposition

4   transcript itself, and we have provided for that in the Hayward

5   test case.  It's a little yellow hyperlink over the exhibit

6   number.  If Judge Barbier chooses to click on it, it will say,

7   "Objection:  Hearsay," or whatever the objection is.  If he

8   chooses not to click on it, he keeps reading.

9           That was my understanding.  You're not obligated

10  to object.  If you want to preserve your objections for an

11  in limine motion, you may do so.  If you want to preserve your

12  objections to the final objection list, you may do so.  But if

13  you want to object in the deposition designation, we can do so

14  technologically.

15          Alan, is that your understanding?

16      **MR. YORK:**  That's my memory with regard to exhibits.

17      **MR. HERMAN:**  I apologize.  I may have been mixing

18  apples and oranges.  I was talking about the actual testimony

19  not necessarily exhibits.

20      **MR. YORK:**  My understanding is no one waives an

21  objection to an exhibit because the intention is we can raise

22  those in motions in limine.  But if you want to note them in

23  the deposition transcript, you can.

24          What I was seeing in the e-mail traffic was

25  whether we are going to note objections to the deposition

1    testimony itself and, if so, how we are going to do that.  I

2    think everyone provided a spreadsheet of deposition testimony

3    objections to Worldwide.  I haven't seen the package, so I

4    don't know how they actually link to that.

5           **THE LAW CLERK:**  They haven't seen the package --

6           **THE COURT:**  No, no, no, no.  I'm not asking about why

7    they haven't seen the package.

8               It is part of the electronic bundle that comes

9    as a package to Judge Barbier.  So there are Volume 1, Volume 2

10   of the Hayward deposition, then there are the summaries

11   submitted by each party, and then there are the objections to

12   testimony, is my recollection, separate documents.

13          **MR. YORK:**  If we are going down the path of not

14   tendering objections to the testimony, putting on my appellate

15   lawyer hat, my concern is that we have evidence going in to the

16   judge that's being considered pretrial, that's being submitted

17   to the judge without objection, and I just don't want to create

18   the potential situation of having them argue that there's a

19   waiver of an objection to the deposition testimony.

20              I don't think Judge Barbier, once he has read

21   through the Tony Hayward deposition, is going to want to reread

22   it again at the end of the 200th deposition to look at it for

23   objections.  We are happy to do it however --

24          **THE COURT:**  Well, I guess the question, Alan, in my

25   mind is:  Do you think that the spreadsheet of objections to

1   testimony is protective enough?

2        **MR. YORK:**  I believe that if we all have an agreement

3   that as long as we have submitted those objections -- and

4   recognizing the Court wants them to be limited.  I think that

5   if we all have an agreement that that's sufficient to preserve

6   any objection to the deposition testimony, then I don't think

7   we have a problem with it.

8        I know that you guys have been talking more

9   about it, so I don't want to overstep.

10       **THE COURT:**  All right.  Let's hear more.

11       **MR. KAVANAUGH:**  Brian Kavanaugh for BP.

12       **THE COURT:**  Good morning, Mr. Kavanaugh.

13       **MR. KAVANAUGH:**  Good morning.  I will try to keep my

14  e-mails to the Court to a minimum.

15       **THE COURT:**  You just kind of joined the club last

16  week.

17       **MR. KAVANAUGH:**  Baptism by fire.

18       **MR. FITCH:**  A not very exclusive one.

19       **MR. KAVANAUGH:**  There are a couple things that we

20  wanted to raise, Your Honor.  One we will take up with the PSC

21  and others who may have designated the testimony.  There's one

22  deposition within the first bundle of 15 -- I know we are not

23  at the objection stage yet, but there was testimony designated

24  concerning a document that was the subject of a BP clawback

25  that was brought to Your Honor.  Your Honor ruled that it was

1    privileged.  The document was clawed back.  We now have

2    deposition testimony related to that document, and I guess

3    perhaps the exhibit itself is being designated to go to the

4    judge.  We will take up with the other parties.  Hopefully we

5    can work it out, but that might be an issue we need to bring to

6    the Court's attention prior to the first bundle going to

7    Judge Barbier.

8               The second thing I wanted to raise was I sent an

9    e-mail around yesterday or the day before about maybe getting

10   agreement among the parties to exchange their designations in

11   an Excel electronic format.  I have had a number of

12   conversations with Jordan Ray from inData.  It will not

13   guarantee that they can meet the schedule that we have, but it

14   will certainly help them along.  It will help us along.

15              I haven't heard any objection to that request.

16   I know some other defendants joined in it.  Hopefully we can

17   agree to do that.  I understand it might not be possible for

18   what's due today but perhaps going forward.

19          **THE COURT:**  Going forward.  I think that's a

20   reasonable request.  I was not surprised that the request was

21   made.  Has anybody got objections to that?

22          **MR. YORK:**  No objection, Your Honor.  Alan York for

23   Halliburton.  No objection, but I will tell you that

24   technologically we are still trying to figure it out.  We are

25   using a -- and we now, by the way, jump officially into an area

1  where I can say the words but I have no idea what I'm saying.

2            We are using TextMap software, which allows us

3  to run a report that would show highlighted testimony or to run

4  a line/page designation.  Somehow our IT people tell us that

5  there may be a way to convert the line/page table into an Excel

6  format and just push buttons and the computer does it all.

7            **THE COURT:**  Speak to Mr. Kavanaugh.  He is nodding

8  his head yes.  I bet you he can lend you some assistance on how

9  to do this.

10           **MS. KUCHLER:**  So can the Bingham folks, Judge.  We

11  are using TextMap also.  It produces it in Word, but Bingham

12  has somehow figured out how to convert that to Excel, but then

13  you need a quality control check because it's not a perfect

14  conversion.  If Alan wants to call, we can put him in touch

15  with the folks who are working on that on our end.  It can be

16  done.  It's not perfect, but it can be done.

17           **MR. KAVANAUGH:**  Your Honor, I think we can all get

18  together because I think we have figured out how to go straight

19  to Excel.

20           **THE COURT:**  Straight to Excel without quality

21  control?

22           **MR. KAVANAUGH:**  Well, I think there's always a need

23  for quality control.

24           **THE COURT:**  I was hoping to get rid of quality

25  control.

 1          **MR. KAVANAUGH:**  Lastly, in terms of, I guess, the

 2    issue that brought us up here, objections from BP's

 3    perspective, I think we would prefer having the spreadsheets

 4    that we have submitted with objections to the testimony

 5    hyperlinked.  I think that was our understanding as to what

 6    inData was going to do so that that's available to

 7    Judge Barbier if he chooses to view it.  If he chooses not to,

 8    so be it.  Our concern was that if there had to be an

 9    additional step by the Court of then soliciting from the

10    parties what that information was, it would potentially slow

11    the process down.

12          **THE COURT:**  Okay.  We will talk to Jordan this

13    afternoon.  I need to speak to him anyway about the package he

14    got us on the Hayward test bundle.  We will add that to our

15    list of things we need to talk about.

16                    Carmelite.

17          **MS. BERTAUT:**  Judge, I don't believe that Jordan Ray,

18    when he sent those documents to the Court for Hayward --

19    Judge Barbier, that is -- copied the parties.

20          **THE COURT:**  No, he didn't.

21          **MS. BERTAUT:**  I think we would all like to see what

22    the finished product looks like.  We can deal with Mr. Ray

23    directly and not ask --

24          **THE COURT:**  Well, what I want to do is use today to

25    make sure we have got the package put together the way we are

1    envisioning it.  There are some glitches still.  I will ask him

2    to distribute it maybe this evening, as soon as we have had our

3    work-through with it.  We only got it in full this morning.

4              **THE LAW CLERK:**  Right.

5              **THE COURT:**  It came in early this morning.  We will

6    be glad to share it, no problem, but let me work through some

7    of the glitches with him before he distributes it.  It will not

8    go to Judge Barbier probably until Tuesday morning sometime,

9    probably midmorning.

10             **MR. WITTMANN:**  Phil Wittmann for Cameron, Your Honor.

11   I just have a question.  I may have missed part of this earlier

12   on.  When we get to the final product after Judge Barbier has

13   read all of these excerpts and considered the objections, how

14   do we know for appellate purposes what he has excluded, what he

15   has considered, that sort of thing?

16             **THE COURT:**  I think what he has said is that his

17   final findings are going to tell you what he relied on.  I

18   believe that his findings will also say, "Unless relied on,

19   I've either not considered or I have overruled the objection."

20   Does anybody recall that my recollection is correct?

21             **MR. LANGAN:**  Your Honor, it's Andy Langan.  That was

22   discussed the day we met with him in chambers -- I think

23   August?

24             **THE COURT:**  Uh-huh.

25             **MR. LANGAN:**  That's what Your Honor has said and was

1   my understanding.

2          **THE COURT:**  That is my recollection.  I will talk to

3   him about that again.

4          **MR. WITTMANN:**  I must have missed that meeting.

5          **THE COURT:**  Whoops.

6          **MR. LANGAN:**  Your Honor, with the occasion of a

7   package going to Judge Barbier of Mr. Hayward's testimony,

8   there's an issue that I wanted to raise and, frankly, seek

9   guidance on.  Again, this also goes back to the August meeting,

10  I think, with His Honor, and that is what is the purpose of the

11  two-phase summary.  We now have seen some examples, and they

12  kind of run the gamut.

13         **THE COURT:**  They do.

14         **MR. LANGAN:**  I have mentioned this to Mr. Roy.  We

15  have a preference, but we really are looking for guidance.

16  What I mean by that is every lawyer in this room representing

17  every party is capable of doing a two-page summary that is, in

18  essence, closing argument.

19         I think, frankly, the PSC has done a closing

20  argument about Mr. Hayward, their summary of Mr. Hayward.  I

21  will tell you there are other two-page summaries that are much

22  more in line with here's what the man said with page cites, and

23  there's some in between.

24         We question whether or not Judge Barbier really

25  wants as part of this exercise, if there's going to be 150

1   deposition exceptions, 150 mini closing arguments multiplied by

2   every party that submits one.  I don't think that's what he

3   wants.

4           Before we get too far down the road, we really

5   would like to urge that we stop using adverbs, stop calling

6   everybody liars, and just sort of what did the man say as

7   opposed to a thousand two-page closing arguments, which I think

8   is going to get very old very fast and really not the purpose

9   here.

10           I just want to put that out here before

11   everybody spends a lot of time with this.  I think between

12   Your Honor and your clerk, we are going to get some feedback,

13   and I really think we need it.

14         **THE COURT:**  I have read them all.

15         Jim, do you want to comment?

16         **MR. ROY:**  I don't want to interrupt you.

17         **THE COURT:**  No, no, no.  Come on.

18         **MR. ROY:**  Your Honor, first of all, with all

19   deference to Andy's characterization as mini closing arguments,

20   I think that it is more appropriate to say that they are mini

21   pretrial briefs.  If we were writing a brief to the Court

22   pretrial and we were arguing -- yes, the A-word, *argue* -- say,

23   "We believe, Your Honor, the evidence will show the following

24   because of X, Y, and Z," it is not as dry as it would be to a

25   jury in an opening statement, but it is a bench trial.  The

1    bench is the one that requested these pieces.  We believe that

2    it serves a purpose, as apparently do a great number of the

3    other parties in their own individual -- whether you call them

4    summaries, advocacy pieces, or whatever.

5              We take the position that the judge had

6    requested and we are responding saying, "This is what we

7    believe it shows.  This is how it fits into the overall

8    picture."  It's footnoted.  It's referenced.  If we offend the

9    Court, then shame on us.  To characterize it just blatantly as

10   mini closing arguments, I would submit, is not correct.  We

11   will do whatever the Court wants.

12        **THE COURT:**  What I thought we would do, Andy, is run

13   the test case past Judge Barbier, let him comment is he getting

14   what he wants, does he want modification.  That did occur to me

15   whether it should just be a deposition summary, whether it

16   should be broader than that and include some argument.

17        **MR. LANGAN:**  You know, I frankly harken back to the

18   trial plan order procedure in which Judge Barbier said, "You

19   know what?"  As much as it pains me to say it, "I really like

20   the Anadarko work."  Maybe he is going to say, "For this test

21   case, I really like the X summary."

22        **THE COURT:**  Don't be surprised if it's Anadarko

23   again.

24        **MR. LANGAN:**  Okay.

25        **THE COURT:**  No, but I think that's right.  So I'm

1   hoping that we will be able to sit down with Judge Barbier on

2   Tuesday, get him to see if he likes the bundle, and either that

3   afternoon or evening read the summaries and give us some

4   feedback.  I'm going to try to see if we can't get some

5   feedback by Wednesday.

6           **MR. LANGAN:**  Great.  I guess that's the whole point

7   here.  All I'm raising is, I think to us at least, some

8   guidance about what's the purpose of the two-page summary would

9   be very helpful.

10          **THE COURT:**  I will put that on my list of discussion

11   items with him for Tuesday and Wednesday.

12          **MR. LANGAN:**  Thank you.

13          **MR. UNDERHILL:**  If you are going to be my spokesman,

14   could I give you what I would like to present to Judge Barbier?

15          **THE COURT:**  Absolutely, Mike.

16          **MR. UNDERHILL:**  I think that examples help, so I will

17   use one of mine from Hayward's as an example.  There's a

18   provision in there where I cited BP profits over a certain

19   number of years.  If I simply cited that, say, Exhibit X said

20   they made $20 billion in a certain year, I can see the judge

21   go, "Well, that's a nice back plot.  I know they make a lot of

22   money, but so what, Underhill?"

23          I thought it was useful, not necessarily in an

24   argumentative sense -- it could be taken that way -- but it

25   would be useful to the judge.  "Okay.  Why is he saying that's

1    relevant?"  The relevancy in that particular context is that

2    they are engaged in cost-cutting at the same time.  Now, maybe

3    the judge thinks that's significant, maybe he doesn't, but I

4    thought it was beneficial to say to the Court I'm not just

5    throwing it out there to say they made a lot of money, but it

6    has relevance to at least our view of the case.

7              Reading Jim's and some of the others and

8    Steve's, I would like to think that's the purpose of why we did

9    it.  Whether that's viewed as pretrial argument as Jim said or

10   trying to aid the judge, I was trying to aid the judge.

11             **THE COURT:**  Okay.  Good.

12             Steve.

13        **MR. HERMAN:**  Steve Herman for the PSC.  On the

14   objections -- because I think we maybe never really closed the

15   loop -- it seems to me there's two issues.  One is presentation

16   to the Court.  The other issue is preserving the issue for

17   appeal.

18             In terms of presentation to the Court, we will

19   obviously do whatever the Court wants.  In terms of preserving

20   the record for appeal, I think there was something that was

21   lingering out there and they were waiting for us to stipulate.

22   We have absolutely no problem for record appeal preservation

23   issues to say, "Okay.  Your spreadsheets will be submitted into

24   the record, and that will reserve your objections."

25        **THE COURT:**  Those are your objections.

1          **MR. HERMAN:**  The only thing I think we would ask is

2     that we are not, in our process, responding to the defendants'

3     objections objection by objection.  If there is some intent or

4     desire from the Court for us to do that, we would like to know

5     about it sooner rather than later so we can start putting those

6     into whatever form we need to put them into.

7          **THE COURT:**  Okay.

8          **MR. HERMAN:**  In terms of the exhibits, I don't know

9     if Your Honor really wants to get there.  Mark kind of brought

10    up the issue a little bit.

11          We have had a few meet-and-confers with BP,

12    Cameron, and I think maybe Transocean.  So I guess I could make

13    a report to the Court and then -- you know, I'm not sure how

14    helpful it would be because we have so many balls in the air at

15    the same time.

16          On authenticity what I would say, based on the

17    meet-and-confers we have had so far and what we have looked at,

18    is I think that the procedure Your Honor put in place did a

19    very good job of aiding the parties and kind of smoking out the

20    issues and seeing where we have true authenticity issues versus

21    things that are easily correctable either because it needs to

22    be replaced with something that's legible or doesn't have

23    marginalia.  There's some completeness objections where we have

24    said, "Well, put in the whole document.  We don't care," stuff

25    like that that's easily correctable.

1            There are some what I call true authenticity
2    issues.  What I think Mark was getting to is what we kind of
3    came to yesterday on the phone was, you know, why would we
4    fight about this if it's never going to go into evidence.  So
5    why don't we wait at least until the point at which it's part
6    of a deposition designation or it's on an expert reliance list
7    or otherwise goes into evidence, and then we will fight about
8    it to the extent that we have to.  Otherwise, why waste the
9    time and why waste the Court's time.
10           So that's kind of where at least Mark and I kind
11   of are on the authenticity stuff.  I don't know how that
12   dovetails with the current deadlines of them having to formally
13   move to strike things and stuff like that.
14           Now, on actual evidentiary issues that go beyond
15   authenticity, one of the issues that I think the Court might
16   want to consider -- and I'm not conceding that this is a valid
17   objection.  An objection that I think a lot of the defendants
18   want to make -- let's say it's a TO document.  Cameron or BP
19   might say, "Well, that's admissible as to TO, but it's hearsay
20   as to us."  So the document is clearly going to go into
21   evidence, but some of the defendants might want some kind of
22   qualifying language or admission on that.
23           So I guess the question for the Court is:
24   What's the process by which those types of objections are
25   lodged?  From our point of view, that's not really a battle

1   that we want to fight unless we have to.

2            **THE COURT:**  Okay.

3            **MR. HERMAN:**  Then you have got just a plethora of

4   objections that are made to what we think are clearly a

5   combination of business records, admissions, things that show

6   notice, intent, state of mind, etc., for the most part hearsay

7   objections, and I really don't know an effective way for the

8   Court to rule on those.

9            Mark and I spent a lot of time yesterday going

10  back and forth.  It really, frankly, on those kind of things

11  wasn't productive because for everything that was really what

12  we saw to be a BP business record or a TO business record, we

13  thought it should come in and really didn't want to debate the

14  finer points of whether one sentence was arguably hearsay or

15  whether it was an admission or whatever.  So I don't know what

16  process, if any, the Court wants to incorporate.  Maybe it's

17  just a call it as you see it for Judge Barbier.

18           Some of the things that I do think can be teed

19  up effectively on kind of an across-the-board basis are there's

20  going to be some documents that we are going to claim fall

21  under one of those exceptions for either public records or

22  government documents or government reports that some or all of

23  the defendants are going to say are hearsay.  So I think that's

24  an issue that can be briefed and kind of decided en masse, so

25  to speak.

1          **THE COURT:**  Okay.

2          **MR. HERMAN:**  Then you have a lot of issues that

3   revolve around the MBI proceedings.  One of the issues is if in

4   a document -- and one example that leaps to mind is the Bly

5   report.  BP, who authored the Bly report, says, "We don't have

6   any problem with it coming in, but we want to redact, because

7   of the statutory exclusion, references to" -- I don't know if

8   it's everything that was mentioned in the MBI or if it's just

9   things in the MBI report, but they want to redact stuff in

10  other documents if they have references to the MBI something.

11  So that's one issue.

12          Then you have got what we say is -- or what I

13  think we are going to advocate.  We would just like to submit a

14  brief on it.  One of the issues, I think, that's going to cut

15  across a lot of things is does the statutory exclusion just

16  apply to the report itself or does it apply to testimony,

17  exhibits, and everything that was submitted to the MBI.

18          One issue, I think, is going to be:  Well, we

19  understand that the statute is talking about the Coast Guard,

20  but what about to the extent that this is an MMS report or a

21  BOEMRE report or a Department of Interior report or something

22  like that?

23          Then what about testimony of, in particular,

24  witnesses who were cross-examined by a number of different

25  parties at the MBI proceedings and then are now either

1    unavailable and/or, in fact, have taken the Fifth Amendment?

2         THE COURT:  Right.

3         MR. HERMAN:  I think we are going to advocate that

4    that type of testimony is admissible, and I think some or all

5    of the defendants are going to say it isn't.  So there's

6    probably four or five issues that all revolve around MBI things

7    that can probably all be briefed kind of en masse.

8              Then the last issue that I kind of detected --

9    and I really don't know how the Court wants to deal with this

10   or how it can be done efficiently.  Maybe it can't.  Maybe it

11   has to be call them as you see them.  Several of the defendants

12   have made essentially 702 objections to things within

13   documents.  One thing that comes to mind, I think, if I

14   remember correctly, Halliburton says that some of the things in

15   the Bly report they consider to be 702 things.

16              I'm not really sure of an effective mechanism by

17   which those alleged opinions can be identified and argued about

18   and whether the Court wants briefing on all those.  Based on

19   the few meet-and-confers that we have had, I think that's where

20   we are kind of on the exhibits.

21        THE COURT:  Well, let's start with your list, Steve,

22   of things that you think you can bring on in globo.  I would

23   suggest to you that the business records issue -- the example

24   you gave was a Transocean document.  Transocean says, "You're

25   correct.  That is our document.  It comes in," but other

1   defendants object that it not be used against them is another

2   in globo issue that you could add to your list.

3           MR. HERMAN:  Okay.

4           THE COURT:  I do think we should bring those on.  If

5   we can resolve them once it's brought on, great.  But if we

6   can't, we will have teed it up.  So let's talk about when you

7   would like to file -- and you could do one brief with sections

8   for each one of these in globo issues if you want.

9           MR. HERMAN:  I mean, it's not like we don't have

10  anything else on our plate.

11          THE COURT:  I'm not trying to break your neck, but I

12  do think we should bring them up.

13          MR. HERMAN:  I mean, I think the earlier the better

14  because once the issues are resolved, then that's going to make

15  the depo cut process and the exhibit designation process and

16  everything flow a lot better.  I think that's why the Court

17  wanted to do the example of 300 to exactly do this, narrow the

18  issues and try to get it resolved on the front end.

19          THE COURT:  I agree.

20          MR. HERMAN:  Can we do it in a week, Jim, do you

21  think?

22          THE COURT:  Jim can do anything.

23          MR. HERMAN:  Well, Jim and I aren't going to be doing

24  it.  We will commit our troops.

25          MR. NOMELLINI:  Your Honor, it's Mark Nomellini.

1    Just a couple of suggestions.

2               I think the session with Mr. Herman yesterday

3    was a good session.  I think that there are some issues that I

4    think we have teed up as something that the parties disagree

5    on; the MBI testimony, for example.  There are some other

6    issues that I think we are making good progress on either

7    because one or the other side might agree as to the 300.

8               I think that perhaps early next week we might be

9    able to further negotiate and narrow down the issues.  I do

10   think it's helpful to try to crystallize them as much as

11   possible before we go ahead and cloud things with the Court.  I

12   think that in the existing order, the date may be October 17.

13   What I would suggest is that for the 300 that October 17 remain

14   as the date unless we start to see that as an impediment to

15   compromise.

16          THE COURT:  Mark, you know that I'm very much in

17   favor of narrowing issues through a meet-and-confer, and I'm

18   not trying to break anybody's neck.  On the other hand, if the

19   brief is filed and then we can moot some issues out, that's

20   good too.  The 17th is otherwise the date.

21          MR. HERMAN:  Maybe we will just file something on the

22   17th and the --

23          THE COURT:  I would suggest that the 17th, which

24   doesn't give you that much time, would be the date that you

25   file your brief.  You-all could meet and confer in the interim.

1    If you can moot something out before you file your brief,

2    great.  You can moot it out after you file your brief.

3                  Kerry, you wanted to comment on this issue; is

4    that right?

5              **MR. MILLER:**  I just wanted to ask Steve a question.

6                  What are your in globo categories in?  MBI

7    testimony, No. 1, and you mentioned one company's records

8    against another company.

9              **MR. HERMAN:**  Public records, government docs, for

10   example, the Oil Spill Commission report.

11             **MR. MILLER:**  Okay.  Separate from MBI?

12             **THE COURT:**  Right.  He has testimony of witnesses at

13   some of the hearings where they later become either unavailable

14   or invoke the Fifth Amendment, 702 objections of things

15   contained within reports.

16             **MR. HERMAN:**  I, frankly, don't know how that can be

17   addressed on an in globo basis.  We can try to do it, but I'm

18   not sure how we could.

19             **THE COURT:**  Well, I assume that that's been raised in

20   the group of 300.

21             **MR. HERMAN:**  It has.  For example, the Bly report --

22   I don't know exactly what opinions they are talking about.

23             **THE COURT:**  Maybe you use the Bly report as your

24   exemplar.  You discuss it in connection with the Bly report,

25   and then let the defendants come back and use that to explain

1   how they assert a 702 objection.

2         **MR. HERMAN:**  We can do that.  It's not going to be

3   monolithic because BP wants it in, for example, and Halliburton

4   may want some of it in.  They just don't them taking shots at

5   Halliburton.

6         **THE COURT:**  At least we raise the issue with

7   Judge Barbier at that point.

8         **MR. HERMAN:**  We will do our best.  Not to pick on BP

9   necessarily, but many of the other defendants really kind of

10  said, "We are just going to fight about stuff that we really

11  want to fight about."  BP, at least initially -- and I

12  understand we are trying to work through it -- kind of objected

13  to everything.

14              So, I mean, we can brief, I guess, all 100 BP

15  exhibits as to why we think this is a business record, we think

16  this is an admission, we think this is for notice, not admitted

17  for the truth of the matter.

18        **THE COURT:**  No, I liked your earlier suggestion,

19  which is that you have some in globo issues, many of which will

20  apply to BP's objections, don't you think?

21        **MR. HERMAN:**  Yeah.  I'm just thinking forward that --

22  I don't think that there's -- there's a 17th date for the

23  defendants.  I'm not sure if there is right now a date for us

24  to necessarily respond to those.  I just want to make sure that

25  by not briefing, you know, an individual document that we are

1    not waiving.  If we put it on the list, we probably want it --

2         **THE COURT:**  The way the deadline is now -- and you

3    are correct -- is that the 17th is the deadline for the

4    defendants to file motions to strike.  What you're suggesting

5    is that we vary that.  To the extent that you see in globo

6    issues that you want to bring to Judge Barbier, you would use

7    that same deadline to raise those in globo issues.

8         **MR. HERMAN:**  That's fine.  I think that will move

9    things along faster.  The only thing that I'm thinking of,

10   let's say there's 50 exhibits that we clearly consider to be

11   some combination of business records and/or admissions by a

12   party and/or to some extent some of the statements don't go for

13   the truth of the matter asserted.  They are for notice, intent,

14   state of mind, etc.  You know, we don't want to waive our

15   responses to whatever the objections are.

16        **THE COURT:**  Well, that's right, and so let's do this.

17   We have got the 17th date as the deadline for the defendants to

18   file their motions to strike.  Why don't we stick with that

19   deadline.  Then if you-all want to respond to the individual

20   motions to strike, that's how you are going to preserve them.

21        **MR. HERMAN:**  Okay.

22        **THE COURT:**  Is that fair?

23        **MR. HERMAN:**  Yep.

24        **THE COURT:**  Okay.

25        **MR. NOMELLINI:**  Your Honor, I just want to respond to

1  the other things Mr. Herman said.  As to the 300, the deadline

2  is going to be October 17.  As to the authenticity objections,

3  I think he had a good suggestion, which was, you know, as we

4  were going through the authenticity objections, those were

5  lodged as to all deposition exhibits.  As we were going

6  through, Mr. Herman was saying, for example, "We don't know

7  whether this one is going to be on our exhibit list or many of

8  these."  So his suggestion was to go forward on the 300 but to

9  defer the authenticity objections on all the deposition

10  exhibits until at least the parties have had a chance to

11  formulate their deposition exhibits.  I agree with Mr. Herman

12  on that.

13         THE COURT:  Okay.  Does anybody disagree with

14  Mr. Herman on that as to authenticity?  It seems reasonable.

15            Mike.

16         MR. UNDERHILL:  A brief suggestion to maybe take one

17  off the in globo list.  As far as the hearsay within, say, the

18  Bly report, that's really the Court's to solve, I think,

19  through a limiting instruction.  It seems fairly simple that

20  the document can be admitted as an admission or for whatever

21  basis -- using the Bly report example -- against BP with a

22  limiting instruction that it will not be considered an

23  admission or necessarily admissible against Halliburton or

24  Transocean.  It would go for Transocean's report, the flip

25  side.  That seems a fairly simple solution.

1    **THE COURT:**  I think that should be a suggestion

2    that's made to the judge.  I don't think he has to instruct

3    himself.

4    **MR. UNDERHILL:**  For the satisfaction of our brothers

5    that don't want to be on the receiving end of the Bly report.

6    **THE COURT:**  Right.  I understand.

7    **MR. LANGAN:**  Your Honor, Andy Langan.  I rise just

8    briefly.  I think I heard Steve say that although he didn't

9    want to pick on BP, he said something about BP seemed to object

10   to everything.  For the record, of the 300 or so, whatever the

11   number, that involve BP, I think the number we objected to was

12   something in the 30 or 33 percent range, so far from

13   everything.  Now, I know that Steve thinks 33 percent is a very

14   big number.

15   **THE COURT:**  He does.

16   **MR. LANGAN:**  It's far from everything.

17   **THE COURT:**  Okay.  As you know, I commented last week

18   I was really pleasantly surprised at how moderate everyone was

19   in their assertion of objections.

20   **MR. LANGAN:**  Right.  Thank you, Your Honor.

21   **THE COURT:**  Okay.

22   **THE LAW CLERK:**  Do we need to confirm for Mark that

23   the defendants don't have to make a motion on authenticity on

24   the 17th?

25   **THE COURT:**  Yes.  I confirm, Mark, that the

1   defendants do not have to assert objections or motions to
2   strike based on authenticity on the 17th.
3            MR. NOMELLINI:  Thank you, Your Honor.
4            THE COURT:  Okay.  Carmelite.
5            MS. BERTAUT:  Judge, I'm looking at Document 3916
6   and --
7            THE COURT:  I have no idea what 3916 is.
8            MS. BERTAUT:  3916 was the one that dealt with the
9   Phase One exhibits and expert discovery production and set the
10  deadlines for the authenticity objections.  Actually, if I'm
11  reading this and it's still in place -- and I believe it is --
12  those deadlines for authenticity objections were to be made
13  today, October 7.  So those are the ones that you have taken
14  off --
15           MR. HERMAN:  We extended it last week.
16           MS. BERTAUT:  You extended it?  Okay.  Thank you.
17           THE COURT:  We extended it.  The motion to strike
18  deadline for the defendants is October 17.
19           MS. BERTAUT:  That's now gone.
20           THE COURT:  For authenticity it's gone.  It's not
21  gone for anything else.  If you have other reasons to strike an
22  exhibit, October 17 remains the deadline.
23           MS. BERTAUT:  Thank you.
24           MR. NOMELLINI:  Your Honor, Mark Nomellini.  I hate
25  to retread old ground, but I just want to circle back to one

1  thing, and that is whether the exhibits included as part of the

2  deposition designations are going to be objected to as part of

3  the deposition designation process or as part of the exhibit

4  process.  You know, we want to do what's most efficient and

5  works for everyone.  I think that's just something we need to

6  take offline and work with the other defendants on and get a

7  solution to Your Honor to.

8                My understanding -- and others who have been

9  involved in the deposition designation process can correct me

10  if I'm wrong -- is that so far people have not been making

11  objections to exhibits in connection with the deposition

12  designation process.  We will confer with others offline on

13  that.

14              THE COURT:  Okay.  Alan, come on up because you

15  certainly look like you want to comment on that.

16              MR. YORK:  I just hate to carry something over that I

17  think we have already resolved.  I think the resolution is that

18  if a party wants to file an early motion in limine, somehow

19  wants to raise an early objection to a deposition exhibit, they

20  are free to do so, but they are not required to do so.  You

21  don't waive anything if you want to wait until the motion in

22  limine filing deadline to raise an objection to a deposition

23  exhibit.  That's how I understand --

24              THE COURT:  That is my understanding as well, that

25  everybody preserves their objections until the various

1    deadlines occur.  But if you feel strongly about an exhibit

2    that's referenced in a deposition, you have the right to have a

3    hyperlink to that objection, and you can file an early

4    in limine with the judge asking that that exhibit be excluded.

5              **MR. NOMELLINI:**  Okay.  That makes good sense,

6    Your Honor.  I guess that those exhibits from the depositions

7    would just go on the deposition exhibit list with all the other

8    exhibits.  If we needed to deal with them in the ordinary

9    course, we could deal with them that way.

10             **THE COURT:**  That's right.

11             **MR. NOMELLINI:**  That makes sense.

12             **THE COURT:**  As to objections to testimony, I will

13   speak to Jordan this afternoon about that as well as responses

14   to objections and how he intends to handle that, if he intends.

15   Okay.  We'll get back to you on that.

16                   Tony, here you are.

17             **MR. FITCH:**  Here I am, Judge.  Tony Fitch for

18   Anadarko.

19                   Deb and I got lost in the authenticity

20   discussion.  Those objections for authenticity, are they now

21   completely off the table or they remain for the 14th?

22             **THE COURT:**  They are off the table for the time being

23   because we think that we have got the opportunity to work many

24   of those out.

25             **MR. FITCH:**  That's right.  Okay.

1      **THE COURT:**  You won't have to file motions to strike.

2   If you want to object to them on your table, you preserve your

3   objections, but you don't have to file motions to strike on

4   authenticity.

5      **MR. FITCH:**  Thanks, Judge.

6      **MR. HERMAN:**  Steve Herman for the plaintiffs.  I

7   think that there is a process in place -- I think Kerry Miller

8   circulated a long e-mail.  Unless that's been amended in some

9   way, there is a process in place for what I will call not true

10   authenticity objections but just things that need to be cleaned

11   up or the correct document to be submitted.

12      **THE COURT:**  Correct.  Where a document was incomplete

13   is an example of that.

14      **MR. MILLER:**  Incomplete, with notes, or separate

15   documents that were stapled together as one deposition exhibit

16   and you would separate them and identify them through numbers

17   and a small letter.  That's what we had proposed, and I think

18   Worldwide is on board for that.

19      **MR. UNDERHILL:**  I'm not sure just about the last

20   part.  Let's say there's an exhibit with three e-mails in a

21   string.  Kerry had suggested that we do the first e-mail A, B,

22   C.  Our concern is that if that's the way the document came to

23   us as a production as distinguished from I put together three

24   and made it an exhibit, we are concerned that we are undoing a

25   legitimate exhibit.

1          So we would prefer that after we clean up the

2    marginalia that we keep the exhibit as received and as

3    submitted, to keep it the same rather than breaking it down.  I

4    think otherwise we are redoing the wheel after we have already

5    had the testimony.

6          **MR. MILLER:**  I think with that clarification, if the

7    e-mail came as a thread, you wouldn't want to break that apart.

8    Now, I think with respect to authenticity, if you did it that

9    way and a certain party had an objection to a portion of the

10   thread -- it didn't come from its company, so it's not a

11   company business record -- we could reserve that portion of the

12   objection and deal with it a different day.

13         **MR. UNDERHILL:**  Sounds good.

14         **THE COURT:**  That objection would come up as part of

15   Steve's in globo motion to Judge Barbier about portions of a

16   document not being used against --

17         **MR. MILLER:**  I think that's a different category, but

18   it may be a good item to include on the list of in globo.  On

19   the issue of in globo, I really think Steve is on to something.

20   I think we are going to have to separate out -- I don't care if

21   we do it through a motion to strike and then you extract out

22   the in globo issues from the motion to strike.  But I think in

23   terms of Court involvement and Court time, we are going to want

24   to deal with the in globo issues and we can deal with that.

25   Beyond that, it's going to be a very case-by-case, you know,

1    meet-and-confer, take-it-up-with-you kind of thing.  I think
2    you want to separate them out, I really do.
3                   **THE COURT:**  I agree.
4                   **MR. HERMAN:**  Steve Herman for the plaintiff.  Just to
5    that last point, this is actually something that I wasn't going
6    to brief, but I guess we could if we wanted to because this is
7    something that came up with BP yesterday.
8                        You know, if you have an e-mail string and some
9    of the people on the string are not company employees, I think
10   in general terms we believe that that was still a business
11   record of the company.  Not only that, that whatever was said
12   by the other person would still be admitted at least -- at the
13   very least not for the truth of the matter asserted
14   necessarily, but at least for notice and state of mind
15   purposes, etc.
16                        I guess we could try to brief that issue.  It's
17   hard for me to imagine that the Court wouldn't have to look at
18   those documents.  Whatever you want us to do, we will do.
19                   **THE COURT:**  You come up with your own list of
20   in globo exhibits.  I'm not going to try to manage that.  You
21   know better than I know what you think Judge Barbier can deal
22   with on a global rather than a document-by-document basis.
23   Okay?
24                   **MR. HERMAN:**  Okay.
25                   **THE COURT:**  Yes, sir.  Come on up.

1          **MR. FITCH:**  Judge, will we have about a week to

2     respond to that?  Is that the idea?

3          **THE COURT:**  Right, something along those lines.  I'm

4     not going to crack your head over it, but --

5          **MR. FITCH:**  I take your point.

6          **MR. WEGMANN:**  Good morning, Your Honor.  Dirk Wegmann

7     on behalf of Weatherford, filling in for Mr. Goodier this

8     morning.

9          **THE COURT:**  Good morning.

10         **MR. WEGMANN:**  Could you help clarify something with

11    respect to the deposition cut process?  As I understand it, the

12    plaintiffs make designations, and then all the defendants

13    collectively make their own designations with respect to that

14    single deposition.  The question I have is:  If the PSC, for

15    example, identifies 99 percent of the deposition as something

16    they have selected, are the defendants supposed to just adopt

17    that, if you will, as being in the record and then merely have

18    to designate any remaining portions that weren't designated?

19              In other words, there's been some discussion

20    that, no, even if the plaintiffs identify 99 percent of the

21    deposition that for some reason each defendant must go in and

22    also designate portions of the deposition that's already been

23    designated.  That seems to me to be crazy.

24         **THE COURT:**  Crazy, I tell you.  You don't have to do

25    anything.  Some of the defendants said they wanted to do that

1    because they wanted to make a record of what they designated in

2    their cases.  So they're choosing to do that, but you're not

3    compelled to do that.

4              If you want to say, "In addition to what the

5    plaintiff has designated, here are my two or three little

6    designations," in my view that's fine.  Some of the defendants

7    felt as though they wanted to, on their table of designations,

8    leave a firm record of the testimony they are submitting in

9    their case.

10             **MR. WEGMANN:**  What I'm trying to understand, Judge,

11   is how this fits in with the trial.  In a normal case, a party

12   submits designations.  Here, in this instance, you're a

13   defendant.  Okay.  I guess you could be a cross-claimant.  You

14   know, there's a procedure that goes forward that the

15   plaintiffs' witnesses are going to testify first.  So once that

16   witness testifies, whether live or in a deposition, that

17   testimony is in the record.  So what difference would it make

18   whether each defendant then raised their hand and said, "I will

19   take this part," or this part or this part?

20             **THE COURT:**  It makes a difference to them.  To me it

21   doesn't make a difference.  The judge is not going to read the

22   testimony five times if five defendants have designated it.  He

23   is going to read it one time.

24             **MR. WEGMANN:**  Is the judge going to know or is the

25   judge -- when he sees the collective designations of all the

1    parties, is the judge going to have a legend on the side that

2    says --

3              THE COURT:  No.  He will have a table that he can

4    refer to that will show all of the parties' designations.  If

5    he wants to see what Halliburton designated, he can turn to

6    that table and see if Halliburton designated that testimony.

7    He can choose to look at that table or not choose to look at

8    that table.  I won't comment on whether I think he is going to

9    choose to look at that table.

10             MR. WEGMANN:  Okay.  I'm just confused, Judge, as to

11   why anybody would -- not anybody but why the Court would, for

12   lack of a better term, adopt that process where that's not the

13   way it works at trial.  So why would it be relevant to a judge

14   to know that one party, if they had called that witness that

15   has already testified in the plaintiffs' side of the case,

16   selects that part of the testimony?  It seems that we are

17   creating more work for ourselves then we need to do.

18             THE COURT:  Again, you're not obligated to do that.

19   Some of the defendants thought it was an important issue for

20   them.  I personally don't think it's an important issue.  But

21   if they want to do it, they can.  You certainly do not have to.

22   You can say, "Here's the additional little portions I want to

23   designate," and that will be that.

24                  You're right.  When Judge Barbier gets the

25   transcript once it's been collated, it will be one continuous

1    read for him.  He is not going to read those designations five

2    times if five parties designated the same testimony.

3              MR. WEGMANN:  Okay.  Thank you.

4              MR. FITCH:  Doesn't a lot of this get sorted out in

5    the proposed findings of fact and conclusions of law that we

6    are all going to have to submit at the end of the case?

7              THE COURT:  Right, right.

8              Alan.  You're the person I kept looking at,

9    Alan.

10             MR. YORK:  Alan York for Halliburton.  The only thing

11   that I wanted to put out for Mr. Wegmann's benefit also is that

12   the schedule changes going forward.  We originally set it up

13   where the PSC was designating first, then all the defendants

14   were designating second.  The schedule has now changed somewhat

15   such that all nonpresenting parties present at the same time

16   and then the presenting party presents second.

17             Now, Carmelite can probably speak to this.  I

18   think there was a conversation between her and Steve that I

19   think the PSC graciously has agreed that they will continue to

20   try to present theirs first, but I just don't want anyone to

21   fall into a trap of thinking they will always have the PSC

22   designations to work off of first.

23             THE COURT:  Gotcha.

24             MR. HERMAN:  Steve Herman for the plaintiffs.  I

25   think what's important for the process is the deadline.  That

1    was of significant importance to BP that there be a deadline by

2    which all the nonpresenting designations were due.

3              **THE COURT:**  Right.

4              **MR. HERMAN:**  As a practical matter, we have no

5    intention of slowing down.  I don't know where we are.  Jim

6    probably knows.  I think we are over 120, 130.  We are going to

7    keep going until we are done.  I would assume that that's going

8    to be way ahead of whatever the deadlines for all of the other

9    nonpresenting parties are.

10             **THE COURT:**  Good.  Thank you.  Anything else on that

11   issue?  Jimmy?

12             **MR. WILLIAMSON:**  None on that.

13             **THE COURT:**  All right.  Okay, guys.  We have been

14   talking about motions in limine for a long time.  We looked at

15   the time line and it looks to us like the deadline for motions

16   in limine should be, for Phase One, January 23, 2012.  So what

17   we are going to do is we will get an order out setting that

18   date as the in limine final pretrial motion deadline.  We will

19   vacate the other deadline that had been in there for final

20   pretrial motions, which none of us knew what it meant.

21   Remember all that discussion?  So we will take care of cleaning

22   all that up.

23             Speaking of cleaning up, let's talk about the

24   cleanup responder defendants.  We had an initial telephone

25   discovery conference this week following Judge Barbier's ruling

1    on the B3 master complaint.  We have a further telephone
2    conference set for October 20 right before the Swizzle Stick
3    get-together, which I thought would kind of dovetail nicely.
4                    The parties are going to work on a joint
5    discovery order.  I did forget to ask that Mark Lanier be
6    included in our discussions with regard to joint discovery,
7    etc.  I'm going to get an e-mail out giving everybody his
8    contact information.  We will add him to the distribution list
9    as well.  I did want to say that.
10                   Have you got something else, Steve?
11       **MR. HERMAN:**  Yes, Your Honor.  Steve Herman for the
12   plaintiffs.  Jim and Robin told Jim and I about the call.  I
13   just want to confirm that we do intend to amend the B3 master
14   complaint.  Obviously, we have no objection to extending the
15   time to answer or otherwise respond for however many days after
16   that.
17                   Maybe I should send an e-mail to Ben or
18   something, but I'm just wondering if the judge wants to impose
19   a deadline on us for doing that.  We'll try to do it within the
20   next few weeks or whatever.
21       **THE COURT:**  I will ask him about that.
22       **MR. HERMAN:**  I just want to let the Court know that
23   we do intend to amend.  I know that there was an issue out
24   there.  We have no problem extending whatever deadlines.
25       **THE COURT:**  That's fine.  I'm not going to impose a

```
 1    deadline now, but obviously as we move forward with development
 2    of the discovery plan, we want to include any new allegations
 3    in the plan.  I think that will be fine.
 4                    Let's talk about what's going on with the VoO
 5    plaintiffs.
 6              MR. HEIDEN:  Judge, this is Tom Heiden.  Could I
 7    interrupt for 30 seconds?
 8              THE COURT:  Certainly.
 9              MR. HEIDEN:  Since you were just talking about the
10    proceedings after the judge's ruling on the B3 complaint, we
11    did ask back on August 29 for some time for the November 3
12    and 4 Lamar McKay deposition.  I think given the B3 ruling and
13    the contemplated proceeding, Nalco would like to withdraw that
14    request.
15              THE COURT:  Well, that's what I figured, but I wanted
16    to make sure you were comfortable with that.
17              MR. LANGAN:  Are we back to one day?
18              THE COURT:  No.  No, Andy, we are not.
19              MR. LANGAN:  I thought that was my chance.
20              THE COURT:  Good try.  Good try.
21                    I appreciate that.  I didn't want to bind you to
22    that, but it occurred to me that that might affect your
23    request.  I appreciate you withdrawing it.
24              MR. HEIDEN:  Well, thank you, Judge.
25              THE COURT:  Okay.  Steve, you want to comment on VoO?
```

1    **MR. HERMAN:**  I can.  This is Steve Herman for the

2    plaintiffs.  Just to whoever is out there who may be listening

3    or whatever because there's apparently some confusion despite

4    Jim and our best attempts to send out memos and e-mails, etc.,

5    as well as the Court's orders, but the VoO plaintiffs by and

6    large have three types of claims.

7              They have economic loss and property damage type

8    claims which are being litigated as part of the B1 bundle, and

9    I assume to whatever extent will be adjudicated in Phase One

10   and/or Phase Two.  Many of them have personal injury and/or

11   medical monitoring claims subject to the Court's order.  I

12   assume that those claims will be litigated in Phase Three,

13   whenever that occurs.

14             Then many of them also have pure breach of

15   contract or alleged breach of contract charter agreement

16   claims.  The process that was agreed to with respect to only

17   those claims or only those elements of the overall VoO claims

18   was that we would create a pilot program.  That would hopefully

19   allow both BP and/or perhaps some of the other cleanup

20   defendants and the plaintiffs to do some limited discovery on

21   the contract issues -- that might bleed ever a little into some

22   other Phase Two and/or Phase Three issues but for the most part

23   contract issues -- and to tee up perhaps some legal issues for

24   the Court.  We have filed a motion for partial summary judgment

25   on some of the contract interpretation issues.

 1          And then to allow those six test plaintiffs --

 2   three selected by BP, three selected by the plaintiffs -- to go

 3   to mediation and see how that progressed.  Maybe we can't make

 4   any headway.  Maybe those six get mediated along lines that

 5   makes it predictable how the rest of the mediations will go.

 6          Then I think the Court was concerned that

 7   because of the way -- this is probably our fault or my fault.

 8   Because of the way the original short forms, etc., were done,

 9   we probably didn't really have a clear distinction of the VoO

10   contract cases.  They probably should have gone to B1 instead

11   of B3.

12          Hindsight is 20/20, but the bottom line is I

13   think the Court and maybe BP and maybe the plaintiffs wanted to

14   try to get a census of how many of these VoO contract cases

15   were out there.  So what the Court did was impose a deadline --

16   I'm not sure if it's a true deadline but a deadline for VoO

17   contract workers to file or -- not to file.  Not to file.  To

18   serve as discovery PPFs on their VoO contract cases.

19          The deadline was yesterday.  I think there were

20   about 1,300 or 1,400 filed.  That should give everyone -- the

21   Court, the plaintiffs, BP, the other responder defendants --

22   kind of a decent census of the kinds of claims that are out

23   there, maybe more that are either unrepresented or whatever.

24          You know, this will be up to the parties, but I

25   think the hope is that once the six test plaintiffs go through,

1   maybe the Court rules, maybe the cases can be mediated without
2   a ruling or a partial ruling, but that there would be some type
3   of voluntary or supervised or mass resolution program for at
4   least the contract elements of the claims.  So it's in place,
5   and six months from now it may be moving, it may not be, but I
6   think that's kind of the overview.
7           THE COURT:  Gotcha.  That's all the activity that
8   Alan was referring to --
9           MR. HERMAN:  Clogging our BlackBerrys.
10          THE COURT:  Right.  Exactly.  He spent a wonderful
11  evening reading --
12              How many, Alan?
13          MR. YORK:  300, at least, yesterday.
14          THE COURT:  At least 300 VoO contract claim PPFs.
15          MR. LANGAN:  Mr. Herman has described the situation
16  accurately.
17          THE COURT:  Okay.  It's a good reminder because,
18  Steve, I have to tell you I did remember the voluntary
19  mediation portion of the agreement.  I didn't remember the rest
20  of it.
21          MR. LANGAN:  Your Honor, did we skip over the expert
22  discovery order?
23          THE COURT:  Oh, perhaps.
24          MR. LANGAN:  It's okay.  Just a quick update.
25  Point 8 of your order of October 3 --

1          **THE COURT:**  It's now 10 on today's agenda.

2          **MR. LANGAN:**  Just for Your Honor's benefit, a week

3    ago or so we got comments from the PSC and Mr. Underhill.  I

4    think on Tuesday we sent them a draft back that adopted, I

5    think, if not everything, close.  So that's out there in a

6    red-line and clean version.  I think Mr. Underhill is

7    continuing to consider that.  So we are still talking I guess

8    is the bottom line, and hopefully we can reach resolution.

9    That's the report.

10          **THE COURT:**  Good report.  We also skipped over

11   Mr. Birch.  I assume everybody has no objection to Andy's

12   proposal that as long as Mr. Birch isn't called at trial, BP

13   does not intend to depose Mr. Birch.  Any objection?

14          **MS. CLINGMAN:**  Rachel Clingman for Transocean.

15   Clearly, we are not designating him as a primary expert.  We

16   won't be calling him in that capacity.  Our deadline for

17   rebuttal experts is not yet due.  So I think there's a

18   possibility he might be named as a rebuttal expert, in which

19   case BP and the other parties would be allowed to depose him as

20   a rebuttal expert.

21          So we can absolutely agree that he is no longer

22   designated as a primary expert.  If anyone would like to

23   attempt to subpoena him, we are happy to provide contact

24   information.

25          **MR. LANGAN:**  Or a fact witness.

1    **THE COURT:**  Or a fact witness.  Called in any form of

2    witness, fact or expert.

3    **MS. CLINGMAN:**  As of now, pending any designation as

4    a rebuttal expert, that's correct.  We can provide contact

5    information if anyone is willing to bring him over.

6    **THE COURT:**  Okay.  Sounds good.  Thank you.

7    Thank you, Andy, for pointing out I had skipped

8    a couple of agenda items.  I thought this was going to be a

9    really fast meeting today.

10   **MR. WILLIAMSON:**  Judge, Jimmy Williamson for

11   plaintiffs.  One item of housekeeping.  I had requested Heather

12   Powell on the 28th.  When I looked at travel to Houston for

13   whoever is going to take it, the 27th would be better.  If that

14   is still available, we would request the 27th.

15   **THE COURT:**  Any objection?

16   **MR. LANGAN:**  That's fine with us.

17   **MR. WILLIAMSON:**  Thank you.

18   **MR. LANGAN:**  While we are talking housekeeping, I

19   think our working assumption can be at Liskow's office in

20   Houston?

21   **MR. WILLIAMSON:**  That's fine with us.

22   **THE COURT:**  Jimmy doesn't have a better offer, so he

23   will take it.

24   **MR. WILLIAMSON:**  My office.

25   **MR. LANGAN:**  Would you rather do that?

1        **MR. WILLIAMSON:**  No, no.  Liskow is fine.

2        **THE COURT:**  We have the issue of BP's motion to

3   compel Halliburton to provide investigation materials.  You-all

4   were supposed to meet and confer and see if you-all could

5   resolve that.  How does that stand?  Anything to report?

6        **MR. LANGAN:**  I think we are still working on it.

7        **MR. GODWIN:**  We are, Judge.

8        **THE COURT:**  That's a report.  Thank you.

9        **MR. GODWIN:**  One other thing, Judge, if I might.

10  Andy and I are working on the outcome.

11       **THE COURT:**  Okay.

12       **MR. GODWIN:**  Thank you, Judge.  Your Honor, with

13  regard to your order of September 27 ordering the depositions

14  of Ronald Sweatman and Roland Chemali, Andy and I have talked

15  this morning.  We are going to provide him early this coming

16  week, Monday or Tuesday, a date for the deposition of

17  Mr. Chemali.  We are continuing to talk about the depo of

18  Mr. Sweatman.  BP and Andy are not by any means waiving

19  anything there, but we are talking about that depo.  No

20  decision has actually been made yet regarding a date, but we

21  will be in touch.

22            One last point, Your Honor, is Andy and I met

23  this morning about another witness that I may want to depose

24  about another subject.  I'm not ready to discuss the terms of

25  it here yet.  Andy and I are working through that and making

1  headway.  If we have anything to report, we will be back to you

2  next week.

3          **THE COURT:**  Sounds good, Don.  Thank you.

4          **MR. GODWIN:**  Thank you, Your Honor.

5          **THE COURT:**  All right.  Do we have any further

6  Phase One issues, written discovery or otherwise, that we need

7  to take up?  Alan.

8          **MR. YORK:**  Alan York for Halliburton.  Only as a

9  placeholder, your Honor.  We have had discussions with

10  Mike Underhill and Scott Cernich about getting a deposition

11  date, one-day deposition, for the best person to talk about the

12  JIT testing results.  If they have agreed to provide someone,

13  *mea culpa.*  I just haven't followed up with Scott.  Just as a

14  placeholder, we may still be plugging that in somewhere.

15          **THE COURT:**  In the works.

16              Is there any report on the Phase One stipulation

17  track?

18          **MR. HERMAN:**  Your Honor, I'm working on it.  I

19  apologize.  Hopefully Monday.

20          **THE COURT:**  Okay.  No problem.  Just an update is

21  fine.  Don't forget to get it to Mike and me because we are

22  going to want to look at it to make sure that they are not

23  overreaching.

24          **MR. HERMAN:**  Well, actually, this is a list of things

25  that they have twisted our arm to admit to, so it won't be

1   overreaching on our part.

2          **THE COURT:**  Good.  Good.  Then we want to look at it

3   to make sure they are not overreaching.  How about that?

4          Okay.  Is there anything else that we need to

5   discuss today relative to trial planning, anything else that we

6   want to talk about other than the Swizzle Stick?

7          **MS. KUCHLER:**  That's all done.  It's all planned.

8          **THE COURT:**  Loved the invitation.

9          Alan.

10         **MR. YORK:**  Two very quick points, Your Honor.  Number

11  one is housekeeping.  I don't think there's an objection from

12  anybody who is here, but I'm not sure if MOEX's counsel -- I'm

13  sorry I didn't get a chance to visit with you.

14         Next Tuesday, according to the dates the Court

15  had entered, would be the date for responses to 12(b) motions

16  on cross-claims.  I have talked with Dril-Quip and M-I and

17  Andarko.  Again, I apologize for not speaking with MOEX.  We

18  are going to talk about the possibility of pushing that date

19  back a little bit.  I had originally said Friday, but I wasn't

20  thinking that we are going to have 30 different deposition

21  designations going on on that Friday.  Would anyone have a

22  problem with us pushing it to the following Monday?

23         **MR. LANGAN:**  That would be the 17th of October.

24         **THE COURT:**  Right.

25         **MR. LANGAN:**  It's fine with us.

1          **THE COURT:**  I don't hear any objections.

2          **MR. LANGAN:**  That is a Judge Barbier issue, but --

3          **THE COURT:**  17th.

4          **MR. LANGAN:**  Thank you.

5          **MR. YORK:**  The second thing, Your Honor, last Friday

6    we talked about the letter briefs that would be due today

7    relating to any party who believed that Judge Barbier has a red

8    cape and super subpoena powers.

9          **THE COURT:**  Well, he has a red cape.

10         **MR. YORK:**  I just wanted to clarify.  If a party does

11   not file a letter brief today, they would still have an

12   opportunity to file a response to any letter briefs that are

13   filed today, correct?

14         **THE COURT:**  Correct, correct, correct.

15         **MR. LANGAN:**  On that point, Your Honor, BP was

16   thinking about a letter today that says we think the Court

17   should follow the rules, whatever the rules are, and then reply

18   in a week if somebody says that he has a red cape and --

19         **THE COURT:**  He does have a red cape.  I want to know

20   whether he has a bigger subpoena power than you contend.

21         **MR. LANGAN:**  Okay.  Very well.  Okay.  So that would

22   be okay if we took two bites of the apple?

23         **THE COURT:**  Yes, yes.

24         **MR. HERMAN:**  We will file the letter today.

25         **THE COURT:**  Okay.  Thank you.  It will be

1    interesting.  Okay.  Anything else?  Because my very short

2    meeting is longer than I was hoping.  We are going to get you

3    to lunch on time, Don.

4              **MR. GODWIN:**  Yes.  That's important.  I told Alan to

5    sit down.

6              **THE COURT:**  Thanks, guys.  I appreciate it.  Another

7    good meeting.  We'll see you next week.  Thank you.

8              **THE DEPUTY CLERK:**  All rise.

9              (WHEREUPON the Court was in recess.)

10                            * * *

11                        <u>**CERTIFICATE**</u>

12             I, Toni Doyle Tusa, CCR, FCRR, Official Court

13    Reporter for the United States District Court, Eastern District

14    of Louisiana, do hereby certify that the foregoing is a true

15    and correct transcript, to the best of my ability and

16    understanding, from the record of the proceedings in the

17    above-entitled and numbered matter.

18

19

20                              <u>s/ Toni Doyle Tusa</u>
                              Toni Doyle Tusa, CCR, FCRR
21                              Official Court Reporter

22

23

24

25