```
1              UNITED STATES DISTRICT COURT

2             THE EASTERN DISTRICT OF LOUISIANA

3                    AT NEW ORLEANS

4

5   IN RE:  OIL SPILL BY THE OIL RIG    *    10-MD-2179-CJB-SS
             DEEPWATER HORIZON IN THE    *
6            GULF OF MEXICO ON           *
             APRIL 20, 2010              *    October 14, 2011
7                                        *
                                         *
8   Applies to:   All Cases             *    9:30 a.m.
    *************************************

9

10

11                 DISCOVERY STATUS CONFERENCE

12            BEFORE THE HONORABLE SALLY SHUSHAN

13               UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19
    SUSAN A. ZIELIE, RPR, FCRR
20  Official Court Reporter
    HB 406
21  500 Poydras Street
    New Orleans, Louisiana 70130
22  susan_zielie@laed.uscourts.gov
    504.589.7791
23

24
    Proceedings Recorded by Computer-aided Stenography Transcription
25  Software.
```

```
 1    APPEARANCES:

 2

 3    For the Plaintiffs:          Breit Drescher Imprevento & Walker
                                   BY:   JEFFREY A. BREIT, ESQ.
 4                                 1000 Dominion Tower
                                   999 Waterside Drive
 5                                 Lafayette LA 70502

 6    For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                                   BY:   BRIAN H. BARR, ESQ.
 7                                 316 South Baylen Street, Suite 600
                                   Pensacola, FL 32502
 8

 9    For the Plaintiffs:          Herman Herman Katz & Cotlar LLP
                                   BY:   STEPHEN J HERMAN, ESQ.
10                                 820 O'Keefe Avenue
                                   New Orleans, LA 70113
11
      For the Plaintiffs:          Williamson & Rusnak
12                                 BY:   JIMMY WILLIAMSON, ESQ.
                                   4310 Yoakum Boulevard
13                                 Houston TX 77006

14    For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                                     Rafferty & Proctor
15                                 BY:   BRIAN H. BARR, ESQ.
                                   316 South Baylen Street, Suite 600
16                                 Post Office Box 12308
                                   Pensacola, FL 32591
17
      For the Federal              US Department of Justice
18    Government Interests:        BY:   R. MICHAEL UNDERHILL, ESQ.
                                   SARAH D. HIMMELHOCK, ESQ.
19                                 450 Golden Gate Avenue, Rm. 7-5395
                                   San Francisco CA 94102
20
      For the United States        Environmental Enforcement Section
21    Of America:                  US Department of Justice
                                   BY:   STEVE O'ROURKE, ESQ.
22                                 PO Box 7611
                                   Washington DC 20044
23
      For the State Interests:     Attorney General of Alabama
24                                 BY:   COREY L. MAZE, ESQ.
                                   500 Dexter Avenue
25                                 Montgomery, Al 36130
```

```
 1    APPEARANCES:

 2    For the Defendant:            Liskow & Lewis, APLC
                                    BY:  DON K. HAYCRAFT, ESQ.
 3                                  701 Poydras Street, Suite 5000
                                    New Orleans LA 70139
 4
      For the Defendant:            Kirkland & Ellis, LLP
 5                                  BY:  J. ANDREW LANGAN, ESQ.
                                         MARK J. NOMELLINI, ESQ.
 6                                       BRIAN A. KAVANAUGH, ESQ.
                                    300 N. Lasalle
 7                                  Chicago, IL 60654

 8
      For the Defendant:            Kirkland & Ellis, LLP
 9                                  BY:  ROBERT R. GASAWAY, ESQ.
                                    655 Fifteenth Street NW
10                                  Washington DC 20005

11    For the Defendant:            Frilot, LLC
                                    BY:  KERRY J. MILLER, ESQ.
12                                  1100 Poydras Street, Suite 3700
                                    New Orleans LA 70163
13
      For the Defendant:            Sutherland Asbill & Brennan, LLP
14                                  BY:  RACHEL GEISBER CLINGMAN, ESQ.
                                    1001 Fannin Street, Suite 3700
15                                  Houston TX 77002

16    For the Defendant:            Stone Pigman Walther Wittman, LLC
                                    BY:  PHILLIP A. WITTMAN, ESQ.
17                                  546 Carondelet Street
                                    New Orleans LA 70130
18
      For the Defendant:            Godwin Ronquillo, PC
19                                  BY:  DONALD E. GODWIN, ESQ.
                                    1201 Elm Street, Suite 1700
20                                  Dallas TX 75270

21    For the Defendant:            Godwin Ronquillo, PC
                                    BY:  R. ALAN YORK, ESQ.
22                                  1331 Lamar, Suite 1665
                                    Houston TX 770101
23
      For the Defendant:            Kuchler Polk Schell Weiner
24                                    & Richeson, LLC
                                    BY:  DEBORAH D. KUCHLER, ESQ.
25                                  1615 Poydras Street, Suite 1300
                                    New Orleans LA 70112
```

```
 1    APPEARANCES:

 2    For the Defendant:          Bingham McCutchen, LLP
                                  BY:  WARREN A. FITCH, ESQ.
 3                                2020 K Street NW
                                  Washington DC 20006
 4
      For the Defendant:          Ware, Jackson, Lee & Chambers
 5                                BY:  C. DENNIS BARROW, JR, ESQ.
                                  2929 Allen Parkway, 42nd Floor
 6                                Houston TX 77019

 7    For the Defendant:          Galloway Johnson Tompkins Burr
                                     & Smith
 8                                BY:  JOHN E. GALLOWAY, ESQ.
                                  One Shell Square
 9                                701 Poydras Street, 40th Floor
                                  New Orleans LA 70139
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          NEW ORLEANS, LOUISIANA; FRIDAY, OCTOBER 14, 2011

2                          9:30 A.M.

3          THE COURT:  Hello, telephone participants.

4          MS. HIMMELHOCK:  Hello, Your Honor.

5          MR. NOMILLINI:  Morning, Judge.

6          THE COURT:  How is everybody?

7          MR. NORMILLINI:  Good, Your Honor.  How are you?

8          THE COURT:  Hello, Mr. Normillini.  I just got your

9    email.

10          Okay.  We've got a big day today.  I don't know how

11    things got so busy, but we're busy today.  So let's roll.

12          Did you all notice that we have a visitor?  You did

13    notice?

14          Could the visitor approach the podium?  Rachel, you can

15    go up with her.

16          (Discussion held off the record.)

17          THE COURT:  All right, guys.  Reminder to the phone

18    participants, please don't type while you are on the phone.  And

19    please, for goodness sakes, don't put us on hold.  Just mute your

20    phone if you need to walk away.

21          Update on the BOP.  There is a group of about 27 people

22    going out on Wednesday, the 19th, for a further inspection of the

23    capping stack, which is going to be a video inspection.

24          And then Captain Englebert is going to bring people out

25    to the evidence yard for a visual inspection.  She's going to do

1     it in groups of ten; unless she can get more help from NASA,

2     which she does not expect to happen.  So ten at a time.  Bring

3     your sandwiches out.  It sounds like it's going to be a long day.

4           Is there anything further that we need to talk about

5     with regard to Michoud?  We know that the capping stack protocol

6     is still in process.  Anything else that we need to talk about?

7           Mr. Gasaway.

8           MR. GASAWAY:  Rob Gasaway for BP.  Just one thing, Your

9     Honor.  I wanted to make sure that everybody knew that the laser

10    scan of the transition spool which is occurring in Houston in a

11    private warehouse is complete.  So that laser scan of the

12    transition spool has now been completed.

13          THE COURT:  Okay.  And available for viewing on an

14    Internet site?  Or how are we going to disseminate?

15          MR. GASAWAY:  People should send requests for David

16    Grasmick.  This was a combined effort of David and the Department

17    of Justice.  So I just wanted to let everybody know on the record

18    it has been completed.  David and Scott coordinated that.  And,

19    if they're interested in that, David and Scott can follow up.

20          THE COURT:  Good.  Thanks for the update.  That's good.

21          Anything further that we need to know from Transocean

22    relative to the well site, guys?

23          MS. CLINGMAN:  No, Your Honor.

24          THE COURT:  Should I take that off the agenda?

25          MS. CLINGMAN:  I think so.

1          THE COURT:  Document production by the United States.

2          We are going to enter an order probably around the close

3   of business on Monday relative to the rolling schedule for

4   document production.  There's been some very fruitful discussions

5   relative to that.  We expect that all document production and

6   privilege review will be done by no later than mid-January with

7   the substantial amount of discovery being produced prior to that.

8   We anticipate starting the 30(b)(6) depositions for Phase Two

9   after Martin Luther King Day, which is January 16th of 2012.  So

10  that's kind of the timeline we're looking at.

11         And what we can do is we can start with the 30(b)(6)

12  deponents who'll be testifying to matters where the bulk of the

13  production has already taken place and then move from there.  So

14  that's kind of what we're thinking about right now.

15         Next up is completion of document production by the

16  State of Louisiana.  I was not happy at the state of affairs that

17  was reported to me this week relative to document production by

18  the State.  I would like to see a representative of the State in

19  chambers after today's conference.  Who'll be taking the lead for

20  BP on that?

21         MR.  LANGAN:  I guess that would fall to me.

22         THE COURT:  Guess I need to see you in chambers after

23  the meeting as well.

24         MR.  LANGAN:  Thank you.

25         THE COURT:  Thank you.

1          Okay.  Let's get an update on the 30(b)(6) deposition

2    notice work that was going on for Phase Two.  That was a joint

3    effort from the United States and BP.

4          MR. UNDERHILL:  Your Honor, I was not paying attention.

5    I apologize.

6          THE COURT:  I knew that, but that's why I brought it up.

7          MR. UNDERHILL:  I know.  So what am I supposed to

8    respond to?

9          THE COURT:  I think Phase Two --

10         MR. UNDERHILL:  I used to do this in class all the time

11   so it's nothing new.

12         THE COURT:  Phase Two, discovery efforts to formulate

13   30(b)(6) notices.

14         MR. UNDERHILL:  Where's my -- we have a BP partner up

15   here, PSC partner.  Brian wasn't asleep.  Mike Underhill for the

16   US.

17         MR. BARR:  Brian Barr for the PSC.  We are, as we

18   reported last week, we've divided up the entities amongst all the

19   specific parties that have drafted in writing or are in the

20   writing process at this point.  We've drafted several of ours.

21   We have yet to exchange, the relevant parties, at this point in

22   time, but we're getting close.  Hopefully, by end of the next

23   week, we'll have drafts over and everybody can start reviewing

24   those topics.

25         MR.  LANGAN:  Andy Langan for BP.  I agree with Mr.

1    Barr, that's where we are.

2            MR. UNDERHILL:  And I agree with both of them.

3            THE COURT:  Mr. Underhill, you did a great job.  Great

4    job.

5            MR. FITCH:  Judge, Tony Fitch.  Would it be helpful to

6    have a firm deadline?

7            THE COURT:  Come on up so the phone participants can

8    hear you.

9            MR. FITCH:  Would it be helpful to have a firm deadline,

10   so before I kick my people into gear a little bit --

11           THE COURT:  I'd love to kick your people into gear.

12           MR. BARR:  I think next Thursday should work.

13           THE COURT:  Why don't we have a deadline of next

14   Thursday; so, if there are any issues, we can discuss them on

15   Friday.

16           MR. FITCH:  That's the deadline for exchanging with

17   other parties.

18           THE COURT:  Correct.

19           MR. LANGAN:  I think there's as much as 23 of them.  Do

20   you want to do next Thursday for all 23?

21           THE COURT:  Do you want to do a rolling production?

22           MR. LANGAN:  23 may be a little ambitious.

23           MR. WILLIAMSON:  Jimmy Williamson for PSC.  I agree with

24   Mr. Langan.

25           THE COURT:  Whatever sized batch you want.

1          MR. FITCH:  Anadarko has two.  We'll do our two by next

2    Thursday.

3          THE COURT:  Then why don't you look at the next batch

4    for a week from Thursday will perfect.

5          MR. BARR:  I tried to be more aggressive.  Sorry, Your

6    Honor.  I tried to get them to work.

7          THE COURT:  Feel like I'm behind the eight-ball today.

8    I don't know why I feel that way, but I do.

9          Okay.  BP and Anadarko served their discovery on the

10   United States on October the 7th.

11         Mike, approximately 30 days?  Do we need more than that?

12   What are we looking at?

13         MR. UNDERHILL:  Is Sarah on the phone?

14         MS. HIMMELHOCH:  If I can stick my nose in this.  I sent

15   a request to BP that we get a series of dates ending -- the

16   request for production of documents served a response earlier,

17   but we've asked for December 13th for the RFAs at the

18   interrogatories.  And that's consistent roughly with the

19   extension we gave BP in terms of proportion of time relative to

20   when the request was served.

21         MR. GASAWAY:  And, Sarah, this is Rob Gasaway for BP.  I

22   saw that email come in, and I didn't have a chance to get to it.

23   But that December 13th date is agreeable with BP.

24         MR. FITCH:  Tony Fitch from Anadarko.  My colleagues

25   tell me that is okay with them.

```
 1           THE COURT:  Good.  So that will be the date.
 2           Any update on any parties that have served Phase Two
 3   written discovery, or is what came out from BP and Anadarko
 4   substantially it?
 5           MR. LANGAN:  Your Honor, certainly discovery has been
 6   served on us, and we're working through it.
 7           THE COURT:  We knew that.
 8           MR. WILLIAMSON:  The PSA has answered some of the
 9   written discovery that has been propounded to us, we served it on
10   all counsel yesterday.
11           MR. MAZE:  It was yesterday.  And we'd talked about
12   bringing up today about at what point do you want the states to
13   cooperate or add.
14           THE COURT:  You can adopt it, seems to me, within
15   seven days.
16           MR. MAZE:  So next Thursday, the 20th.
17           THE COURT:  I think that will work fine.
18           MR. MAZE:  We'll do that.
19           THE COURT:  Okay?
20           MR. MAZE:  Yes.
21           THE COURT:  Okay.  I have not seen anything further
22   relative to the BP Clawback claim.  Don, you want to update?
23   Wasn't that your issue?
24           I guess that's Andy's issue.
25           MR.  LANGAN:  Andy Langan.  The Clawback relating to
```

1    trial testimony?

2         THE COURT:  We got a letter of October 2nd from the PSE

3    stating that the PSE did not believe you had the right to claw --

4         MR. LANGAN:  I'm sorry, have we not submitted a response

5    to that?

6         THE COURT:  You haven't.

7         MR. LANGAN:  We have one ready to go.

8         MR. HERMAN:  You did.

9         THE COURT:  I'm sure I must have missed it.

10        MR. LANGAN:  I know it was prepared.

11        THE COURT:  Mr. Herman thinks you all served.

12        MR. HERMAN:  I could be wrong.  I've been wrong before.

13        THE COURT:  So have I.

14        So we'll take that up when we see it.

15        Let's get an update from Transocean on your document

16   production.  Have we taken care of all of that?

17        MS. CLINGMAN:  Rachel Clingman for Transocean.

18        I think we're good.  A couple of things.

19        The ROV footage, as I understand, is either going out by

20   FedEx or about to go out.  It takes quite awhile apparently to

21   copy that many hour's worth of video footage.

22        With respect to the operational integrity case, we have

23   now produced all the sections of the documents that we were able

24   to locate.  I think Section 7 remains one that we don't think was

25   ever drafted.  But the other sections are out.  If they haven't

 1   been received by the parties, they would be today or tomorrow.

 2   They're in a FedEx truck.

 3          The other issue is the Well Specific Operating

 4   Guideline.  We have not located that document.  We reported back

 5   to Don that our best information, Judge, is that it was posted on

 6   the rig floor and the bridge and lost with the rig.

 7          It is, there's some references that it would be sent to

 8   the rig manager back on shore.  We have done an exhaustive search

 9   of all email and video files.  We have not located the document.

10          We also asked of -- BP procedure would be that a company

11   man would sign it.  We've asked for that copy as well.

12          THE COURT:  Okay.  Good.

13          Don.

14          MR. HAYCRAFT:  We asked for a copy ourselves.  However,

15   our documents indicated that, if it's there, it wasn't emailed to

16   the rig manager, as well as other onshore personnel of

17   Transocean.

18          Assuming that no search discloses the Well Specific

19   Operating Guidelines, which are required by procedure at

20   Transocean, we would suggest that we have good cause to propound

21   a single request for admission, after both sides complete a

22   search, that Transocean has been unable to, despite diligent

23   search, locate said document.  And then we can use that piece of

24   evidence for whatever purpose we wish.

25          THE COURT:  Okay.

1      MS. CLINGMAN:  Your Honor, we think that's

2  inappropriate.  And there are documents that all the parties have

3  not been able to locate.  BP didn't do a risk assessment on the

4  changes of the risk management.  We're not seeking admission that

5  they cannot be located.  Everybody can argue to Judge Barbier

6  that there's not a document to be produced.  He certainly can

7  take that into account.  But admission on what was or was not

8  done, BP people have been deposed, these documents have been

9  produced.  If BP wants to file a motion to compel, we'll answer a

10  motion to compel.  But I don't think any request for admission on

11  documents is appropriate.

12      MR. HAYCRAFT:  If I might respond, Your Honor?  The

13  difference here is that this is a document that only became

14  disclosed after every single TO witness has been deposed.  So we

15  have no opportunity to ask the brig manager, performance, the

16  operations manager, let alone anybody on the operation itself:

17  Did you do a Well Specific Operating Guideline.  So we have no

18  way to put in evidence before Judge Barbier:  Here's the

19  requirement that they're supposed to do one, here's the request

20  for admission response, despite diligent searching they could not

21  find one.  And then the judge can draw whatever inference he

22  wishes to draw from that.  The difference here is it wasn't

23  produced, it wasn't produced.  The absence wasn't noted until we

24  get through the depositions.

25      THE COURT:  Okay.  We'll cross that bridge.  I mean,

 1    seems to me, there's a couple of ways to handle it.

 2          You all could do a certification that, after diligent

 3    search, you've been unable to locate the document.  Which happens

 4    all the time on requests for production of documents.  We might

 5    be able to handle it that way.  And then you'll have that

 6    certification, that it's not been located after diligent search.

 7          I have a couple of other ideas about how we might handle

 8    it.  Okay?  So we'll cross that bridge when we get to it.  We've

 9    got enough cans that we can kick this one down the road.

10          Mr. Underhill.

11          MR. UNDERHILL:  Mike Underhill, US.  Can we go back for

12    a second just to the 30(b)(6)?  This is for the guys on Andy's

13    team.

14          There's an issue that came up, and I think we're trying

15    to work it out.  We had assumed that certain contractors, if you

16    want to call them that, would be subject to BP's control for a

17    30(b)(6), and BP takes a different view.  And I'm not arguing

18    whether they're right or wrong.  But we had not added certain

19    contractors to the 30(b)(6) list at separate entities.  So I just

20    wanted to make that marker if we need to add those.  We'd ask the

21    Court's indulgence, and we'll work with Andy and his gang to

22    figure it out.

23          THE COURT:  Yeah, I think that's right.

24          MR. LANGAN:  As long as we're talking about a reasonable

25    number.  I don't think 23 was any kind of court-mandated limit,

```
 1   and we'll be reasonable on that.  I'm sure that door swings both

 2   ways.

 3           THE COURT:  It does.  It does.

 4           And, Mike, if you'll put your list together, and why

 5   don't you circulate that to everybody for their consideration.

 6           MR. UNDERHILL:  Be glad to.

 7           THE COURT:  As to whether they'll be produced or whether

 8   we'll have to do a separate notice and deposition.

 9           MR. UNDERHILL:  Be glad to.

10           THE COURT:  Okay, thanks.

11           Mr. Maze, you ready to do Phase One fact depositions?

12           MR. MAZE:  Yes.

13           THE COURT:  Good.  Okay, first up is Richard Coronado,

14   and that is Cameron working on a date for us.

15           MR. LANGAN:  Your Honor, Andy Langan for BP.  I asked

16   for an update on Coronado, and I don't have one.

17           I do have one retread issue I need to raise when the

18   Court's ready.

19           THE COURT:  Phil, do you have an update on Richard

20   Coronado?

21           MR. WITTMAN:  Yes, I do, Your Honor.  It's the same as

22   last week.  The parties are still negotiating a date and expect

23   to get a report on Monday.

24           MR. WILLIAMSON:  May I chime in on that, Judge?

25           THE COURT:  Yes, sure.
```

1        MR. WILLIAMSON:  The expert witnesses on BP are set for

2   deposition in November, including the PSC expert on the BOP.

3   Cameron's witnesses specifically deferred Mr. Coronado on certain

4   aspects of BOP design.  I certainly understand counsel, we're

5   good with whatever the Court and counsel want to do.  Any

6   expedition of that deposition would be appreciated, given that.

7        THE COURT:  Phil, we would like to get Mr. Coronado's

8   scheduled and deposed before the expert deposition starts.  So I

9   assume that's on your radar.

10        MR. WITTMAN:  It is.  And I understand that's being

11   worked on by the parties, both on the BP side and on the

12   government side.

13        THE COURT:  If you get a date next week, before next

14   Friday, would you let everybody know what the date is?  And we'll

15   just slide them in.

16        MR. WITTMAN:  I will, Judge.

17        THE COURT:  Thank you.

18        What did you need, Andy?

19        MR. LANGAN:  I have a couple of things to report, Your

20   Honor.

21        First, in terms of progress, at page 46 of your last

22   order, Mr. Chemali, C-H-E-M-A-L-I, Mr. Godwin's office has kindly

23   confirmed November 3rd for that, I believe in New Orleans.

24        MR. GODWIN:  That's correct.

25        THE COURT:  November 3rd.

 1          MR. LANGAN:  Mr. Sweatman and Mr. Godwin are working on

 2   that, and is going to get back to us with a date next week.

 3          MR. GODWIN:  That's all correct, Judge.

 4          THE COURT:  Thank you, Don.

 5          MR. LANGAN:  Your Honor, I need to revisit the Heather

 6   Powell, who was set last week for October 27th at my request.

 7          We had plea from a young mother, who frankly I think

 8   once she and her personal counsel focused on what's going to be

 9   involved here, was hoping to push it into Mid-November on the

10   theory that being away from the infant for a whole day would be

11   much more manageable.  We're hoping November 17th.  And, again,

12   this is a six-week old baby.

13          THE COURT:  And a young mother.

14          MR. WILLIAMS:  Certainly, we can accommodate that

15   request, without question.

16          Having said that, may I make the same point I make with

17   Mr. Coronado?  It would be nice -- Ms. Powell is a BP regulatory

18   person who we believe has information that would be relevant and

19   could potentially be relevant to the experts.  Expert

20   depositions, I was just looking at them, I believe start -- PSE

21   expert depositions start on November 14th.  We would appreciate a

22   date in advance of that.

23          THE COURT:  I'm wondering whether, Andy, we would ask

24   Ms. Powell if she could accommodate that request and go for like

25   the 11th, the 10th or the 11th, so that we can get the testimony

1   under our belt before the start of the next deposition.  If we

2   can't, we can't.

3           MR. LANGAN:  I understand.

4           Can I promise you this?  We will check.  In fact, I

5   anticipated this issue in conversation with her personal counsel

6   for that reason.

7           THE COURT:  Alternatively, she can bring the baby to the

8   deposition.

9           MR. WILLIAMSON:  Fine with us.  There's been several

10  babies at these depositions.

11          THE COURT:  And do you have anyone in particular you're

12  referring to?

13          MR. WILLIAMSON:  Nothing comes to mind right now.

14          MR. LANGAN:  So, Your Honor, as a way forward, can I

15  suggest November 17th tentative, and take back the request, can

16  we do it a week earlier?  I mean, that's what I'd like to

17  suggest.

18          THE COURT:  It doesn't have been to be a week earlier.

19  How about four working days earlier, whatever -- just so that

20  everybody gets that testimony prior to the commencement of expert

21  depositions.

22          MR. LANGAN:  Okay.

23          THE COURT:  And I'm serious about the baby, if she wants

24  to bring the baby.

25          MR. LANGAN:  It might be a life-altering thing.

```
 1          THE COURT:  That's true.  I hadn't thought about the

 2   psychological impact on the infant.

 3          MR. LANGAN:  All right, Your Honor, thank you.  That's

 4   all I have on the discovery issues.

 5          THE COURT:  All right.

 6          Now, next up, we have the issue of Mr. Vidrine.  Have we

 7   heard anything back from them?  And am I supposed to follow-up on

 8   that, Kerry?

 9          MR. MILLER:  No.  Kerry Miller for Transocean.

10          There was no need for you to follow up based on my

11   discussion with Bob Habans.  I think we haven't heard back from

12   Mr. Habans because he was flipping the information to Mr.

13   Vidrine's physician, number one.  And, number two, Mr. Habans is

14   in trial in Greenville, Mississippi.  I will follow up with him

15   on Monday or Tuesday to get an update.  But he didn't think there

16   is any need why you had to get involved.

17          THE COURT:  Okay, good.

18          Next up is -- Sarah, I believe this is you, Lieutenant

19   Houck.

20          MS. HIMMELHOCH:  Yes, Your Honor.  We were asked two

21   questions, and we've asked Transocean one.

22          We were asked whether there were command center emails.

23   We continue to search through our backup tapes to make sure that

24   we haven't missed any command center emails in that process.  I

25   don't have a date for completing that.  But I have assured the
```

 1    Coast Guard that it is urgent to complete that process.

 2          The next question was whether we'd used the SIPR, which

 3    is essentially an instant messaging system.  And I was told by

 4    the Coast Guard after conferring with the folks that this was not

 5    used in the response to the Deepwater Horizon incident.  So we

 6    will not have anything to produce from the SIPR system for Mr.

 7    Houck's deposition.

 8          And the third thing was that I had asked Transocean to

 9    identify any other gaps thought in the video conference

10    deposition so we could adequately address those before the video

11    deposition.  I don't believe I've gotten anything from Transocean

12    identifying what additional inquiry if any they wish to perform.

13          So, at this point, I'm pushing the Coast Guard on the

14    command center email issues, and waiting for Transocean to get

15    back to me.

16          MR. MILLER:  We'll make sure by Monday or Tuesday that

17    there is no gap; or, if there is a gap, what the gap is.

18          And, certainly, we would like to thank Sarah for all the

19    hard work she did, I think over a holiday weekend, with her in

20    connection with Lieutenant Commander Houck.  She did yoman's

21    work, and we certainly appreciate the cooperation.

22          THE COURT:  How do you like that, Sarah?

23          MS. HIMMELHOCH:  My head is swelling by the moment.

24          THE COURT:  So we'll cover him again next week.

25          MS. HIMMELHOCH:  Yes, Your Honor.

```
1              THE COURT:  Next up is the issue of Michael Viator.  Is

2    that correctly pronounced?

3              MR. GODWIN:  Yes, Your Honor.

4              THE COURT:  Come on up, Don.

5              MR. GODWIN:  His lawyer, Lori Mince, had asked to be

6    here and be heard.  She said she was going to be in a hearing I

7    think at 9 this morning.  I told her you started court at 9:30.

8    And she did want to be heard on that.  And I'm ready.  And do you

9    want to wait a little bit so she's here?  That would be fine with

10   me.

11             THE COURT:  Sure.  We can come back to that.

12             All right.

13             MR. GODWIN:  Andy, do you know whether she's coming?

14             MR. LANGAN:  I think I know what Don knows, she had a

15   hearing at 9 o'clock, and she's going to get her as soon as she

16   can.

17             THE COURT:  Here in this court?

18             MR. LANGAN:  I think the parish court.

19             THE COURT:  If you tell me it's Civil District Court,

20   she won't be here before we adjourn for the day.

21             MR. LANGAN:  She had a 9 o'clock hearing in state court.

22             THE COURT:  Yeah.  And the judge usually shows up at

23   about 11:30.

24             MR. LANGAN:  Can we just give a little bit of time?

25             THE COURT:  I'm not exaggerating.  I mean, we will be
```

```
1    well adjourned before that happens.
2            MR. LANGAN:  Can we just give her a little bit of time?
3            THE COURT:  Sure.  Happy to give her a little bit of
4    time.  But I'm not optimistic about the chances of her making it
5    here.
6            MR. GODWIN:  Thank you, Judge.
7            THE COURT:  Am I exaggerating, Steve?
8            You're not going on the record on that.
9            MR. HERMAN:  I'll take the Fifth.
10           MR. WITTMAN:  They are much better than they used to be
11   in the old days.
12           THE COURT:  I'm not going to comment on that.
13           MR. HERMAN:  He would know that better than I would.
14           MR. MILLER:  You mean, the old days?
15           THE COURT:  Exactly.
16           Okay.  Do we need to bring up the issue of Sarah
17   Sanders?  Do we need to discuss that?
18           MR. YORK:  Alan York for Halliburton.  I don't think so,
19   Your Honor.  The email that we sent said that we were going to
20   produce her.
21           THE COURT:  Yes.
22           MR. YORK:  We did it with some notification to the
23   parties and to the Court.
24           THE COURT:  Correct.
25           MR. YORK:  We disagreed with some of the things that
```

1  were contained in the letter that was filed last night, but those

2  things will be coming out at the deposition on Tuesday.

3         THE COURT:  That's why I asked do we need to discuss it.

4         MR. LANGAN:  Your Honor, Andy Langan for BP.  We'd like

5  to proceed with Ms. Sanders.  If they add a new witness to their

6  witness list, I guess we'll visit that at that time.

7         THE COURT:  But Alan is producing Ms. Sanders, so that

8  seems to make it a moot issue.  Very good.

9         Lamar McKay.

10         MR. MAZE:  Judge, I am as tired of arguing about Mr.

11  McKay as you're tired of hearing it.  So, if you read everything,

12  I won't say anything, unless you have questions.

13         THE COURT:  I did.  I have read everything.

14         MR. MAZE:  We just wanted to work something out.  If the

15  Court or BP is willing to bring him back some day, we'll drop it.

16  If not, we'll work it out.

17         THE COURT:  I think there are a couple of things to do

18  to work around the issue, Corey.  It seems to me that we are

19  starting our Phase Two and hopefully our Phase Three discovery

20  with 30(b0(6) depositions.

21         MR. MAZE:  Correct.

22         THE COURT:  So we may be able to handle it that way.

23         MR. MAZE:  Okay.

24         THE COURT:  If we can't handle it that way, and for good

25  cause shown, we'll talk about whether or not Mr. McKay has to

 1   come back.  But I think the 30(b)(6) should be the work-around on

 2   how we tackle the issue.

 3           MR. MAZE:  Okay.

 4           THE COURT:  I'm not inclined to modify the search terms

 5   this close to the deposition.  I just think that puts an undue

 6   burden on BP at this point, to go out and do search terms and

 7   make certifications that may or may not be accurate.

 8           MR. MAZE:  Understood.  Can we just, as this stage, just

 9   reserve our right to argue good cause shown for bringing him

10   back, including that we didn't have the discovery at the time?

11   And, note, it's still ongoing, all of this frustration is still

12   ongoing.  So it's impossible for us to even know every question

13   to ask as of the first week of November.

14           THE COURT:  Yes.  You can reserve, with Andy's objection

15   to your reservation.

16           MR. MAZE:  Then we understand.

17           THE COURT:  Thank you.

18           MR. UNDERHILL:  Mike Underhill, US.  My colleague, Mr.

19   O'Rourke, is cattle-prodding me via email.

20           Just to make -- hopefully make clear to the parties

21   that, we seem to be having NRD being used synonymously with Phase

22   Three.  It's not.  At least, to my understanding.  I think Judge

23   Barbier has made that clear.  There is not even a phase yet for

24   NRD.

25           MR. LANGAN:  We agree.

1          MR. UNDERHILL:  So discovery is continuing.

2          THE COURT:  How about this, a future phase?  If you want

3    to talk about it that way.

4          MR. UNDERHILL:  Good.  Although, I have to say, it was

5    tempting to pin Andy's team and Mr. Nomillini down to say I guess

6    we're done with NRD discovery; aren't we?  So, when we get your

7    request for production, we can say no.

8          But, in fairness, we think that that's not the way to

9    approach it.  So we just wanted to make clear to the Court and to

10   the parties.

11         THE COURT:  Okay.  Why don't we just, from now on, talk

12   about the NRD phase?

13         MR. UNDERHILL:  As long as it's this amorphous thing

14   that does not have a Roman numeral after it yet.

15         The purpose of that --

16         THE COURT:  We're not using Roman numerals.

17         MR. UNDERHILL:  Arabic.  I don't care.  Gregorian

18   calendar.

19         In any event, we just don't want the parties to go down

20   that path.

21         MR. MAZE:  Corey Maze for the states.  That was always

22   our point, was that we've never even contemplated discovery for

23   an NRD phase.  So, if we're going to be trapped into asking our

24   NRD questions now, that's why we were trying to expand the scope,

25   if that's what everybody's understanding of what the deposition

1    is.  We'll reserve the right to say for good cause shown we'll

2    get additional discovery for an NRD deposition for Mr. McKay at a

3    later date.

4            THE COURT:  Okay.  Understood.

5            MR. LANGAN:  Andy Langan for BP, Your Honor.  A couple

6    of points here.

7            We obviously reserve our right to resist any good cause

8    shown.

9            As we tried to say in our letter, the points Mr. Maze is

10    talking about are the inevitable results of a phased approach

11    discovery and having depositions occur before all the documents

12    are produced for all phases.  It just comes with the territory.

13    It's true for witnesses produced by other parties, it's true for

14    witnesses produced by the US, it's true for witnesses produced by

15    BP, including Mr. McKay.  And that's just the way it is.  It's no

16    surprise to anybody that somebody might get deposed before

17    there's been a full production about Phase Three or NRD.  That's

18    the way it is.  Mr. McKay shouldn't be treated any differently

19    than anybody else in the case.

20            THE COURT:  As I say, I think we've got some ideas for a

21    work-around.  And, if that doesn't work, for good cause shown,

22    we'll discuss it.

23            MR. LANGAN:  Thank you.

24            THE COURT:  All right.

25            MR. LANGAN:  So we are not modifying the search terms?

```
 1          THE COURT:  We are not modifying the search terms, Mr.

 2   Langan.  As least, prior to Mr. McKay's deposition as currently

 3   scheduled.

 4          MR. LANGAN:  Understood.  Thank you, Your Honor.

 5          THE COURT:  Okay.  Now, this next topic that I've got on

 6   my agenda is the deposition designation track.

 7          And I've come to find out this morning, thank you to Mr.

 8   York, that we've had a couple of bumps in the road this week,

 9   which I want to consider bumps.

10          We have reviewed the Hayward test deposition transcript,

11   and I thought it was a fabulous product.  I emailed and called

12   Jordan of inData on Monday and asked him to get it out to you

13   all, and I assumed that had happened.  I find out today that you

14   all did not get it.  So I apologize.  I don't know what happened.

15   But you should have had four working days to look at it and see

16   that you all liked it and that you agree it is a good product.

17   So I don't know what to say about that, other than we've got

18   another call in to Jordan to ask him what happened on that.

19          I also, based on our review of the test deposition, gave

20   him the go-ahead to do the first bundle, the first 15 batch.  And

21   I've not heard back from him on that.

22          But, in the interim, we heard from Alan that there was a

23   processing error, which should be a one-time issue.

24          And, Alan, come on up and explain to the group what this

25   issue is.  And, hopefully, it will be a one-timer.
```

1          MR. YORK:  Yes, Your Honor.  Alan York for Halliburton.

2          And, actually, after we spoke, we got an email from

3    Jordan that there is actually another problem.  So I'll advise

4    the Court of that as well.

5          The processing error that happened was, as we reported

6    last week, there is a back-end fix that I don't really understand

7    where you can use TextMaps to directly export to Excel to create

8    a load file.  We weren't prepared to do that last week, but now

9    are.  We've gotten with BP's IT people, and we appreciate that

10   assistance in working out that back-end fix.

11         So, last week, we provided PDFs of our line-page

12   designations to inData.  Jordan took those and created their own

13   load file.  But, in doing so, they had several typographical

14   errors.  Where, for example, we had designated page 300, line 17,

15   to page 300, line 19, on Sir William Castel, they typed it as

16   page 30, line 17, to line 300, line 19.  So 200 pages of

17   deposition transcript got blocked designated that shouldn't have

18   been designated, including colloquy of counsel, objections,

19   everything else.

20         So we discovered this last night.  We have sent an email

21   to Jordan letting him know that there is a problem.  And we are

22   going back inhouse to compare what we sent them with what they

23   actually loaded to try to give them the corrections.

24         But that is going to create an issue, I think, because

25   now the transcript that everyone has been working off of to do

1    counter-designations is not the proper transcript that reflects

2    the actual designations.  So that's that issue.

3           The second issue that --

4           THE COURT:  So let's stop with that issue.

5           So everybody, at least as to Sir William Castel, you all

6    have counter-designated 270 pages that were not really

7    designated.  So, just think through that issue, and we may just

8    have to resubmit Halliburton's designations and let you all then

9    counter-designate again.  I'm not telling you how to do it, but

10   you need to think about that one in particular.

11          MR. YORK:  And we will of course copy all counsel on the

12   email that corrects the load files that were created by inData so

13   that everyone knows we have confirmed that what we submitted was

14   correct.

15          THE COURT:  Yeah.  I knew that.

16          MR. YORK:  It's just on the back-end.

17          The other issue that has come up was we got an email

18   just before the hearing started on the Walter Guillot transcript

19   -- and I'm not exactly sure how this happened -- but evidently

20   there were two versions of that deposition transcript, an

21   original version and an amended version.  Not surprisingly, half

22   the people designated from the original version and half of the

23   people have designated from the amended version.  Which means

24   that there are lines -- that transcript is also not correct.

25          THE COURT:  What deposition is that?

 1            MR. YORK:  Walter Guillot.  I believe I'm saying that

 2    correctly.

 3            MR. MILLER:  Would be Guillot.

 4            MR. YORK:  Guillot.  Thank you, Kerry.

 5            Obviously, all the parties' counter-designations for

 6    Group 1 are due today.

 7            THE COURT:  What more can you say?

 8            MR. YORK:  I just wanted to put the Court and counsel on

 9    notice.

10            And I believe there were some load file errors also at

11    the beginning of the week.  I think there were a couple of other

12    parts, I think those got corrected during the week.  But those

13    are the issues.

14            THE COURT:  Thank you, Alan.  You are the bearer of bad

15    news again.

16            MS. KUCHLER:  So, Judge, can we have an agreement that

17    the Guillot deposition designations are not due today?  Because I

18    tried as late as 11 o'clock last night, and it's just impossible.

19            THE COURT:  Yes.  How many of these transcripts do we

20    have that are corrected transcripts?  Does anybody know?  And

21    maybe what we can do is get Worldwide to circulate a list of

22    depositions that have been corrected, and just everybody be

23    careful about that and make sure you're working off your

24    corrected transcripts.

25            MS. KUCHLER:  I don't know, but I'd be happy to have my

1    legal assistant work with them to figure that out and send around

2    a list.

3            Also, we noted that originally the USA had designated

4    big long slabs of testimony with all of the objections still in

5    it.  TO's designations are done that way as well.  So, in the

6    end, the judge is still going to end up with page after page of

7    testimony that's got objections and colloquy in it.  So I just

8    raise that.  I sent Kerry an email separately yesterday.

9            But, unless everybody cuts out the objections and the

10   colloquy, if only one person designates it, the judge gets it.

11   And so, those of us who are meticulously going throughout and

12   taking all that out, it's going to make for a lot of unnecessary

13   reading.  So I think everybody needs to be on the same page, no

14   objections to form, no colloquy.

15           THE COURT:  Really, guys, that's so important.  If we're

16   going to get Judge Barbier to read 150 deposition transcripts,

17   please, please don't put in the colloquy and the objections to

18   form.  He's just going to lose his mind over it.

19           MR. UNDERHILL:  That's fine.  There may be a disconnect

20   here.  Because, when this issue first came up, I think with the

21   Hayward deposition, it was brought to our attention.

22           And, by the way, it was not just us -- not us, it was

23   me.  Because, actually, I did the Hayward depo.

24           THE COURT:  I'm not accusing anyone.

25           MR. UNDERHILL:  I don't know if this is important.  I

1    actually felt it was improper for me to not include objections.

2    If somebody doesn't like my question, then I need to have their

3    objection.  But if the consensus or the Court's order was take it

4    out ...

5           What we did next, though, is rather -- because, by that

6    time, the PSC and the US were way down the road in designations,

7    and I got confirmation from Jordan's team that they could do

8    basically an electronic search and yank the objections out of the

9    transcript.  And that was my understanding of what happened.  And

10   I have not gone back and checked.  Once it was brought to our

11   attention, I told my team:  Pull colloquy.  And we've done that.

12   Pull objections.  And I believe we've done that.

13          THE COURT:  Let me ask this question.  What is our

14   communications line with inData?  How are we going through

15   Worldwide to get to them?  We're communicating directly with

16   inData?

17          MR. UNDERHILL:  On this one issue, I communicated

18   directly with Jordan at inData, and got a confirmation that it

19   was doable and it would be done.

20          THE COURT:  Maybe what we need to do is do a conference

21   call with inData and talk these issues through, because it sounds

22   like we've had a wheel come off.

23          MS. KUCHLER:  The problem is that we haven't gotten the

24   end result.  We haven't even gotten Hayward's.  So, if Jordan did

25   pull the US's objections out, we didn't get that.

1          So, when we look at it in TextMap, all the objections to

2    form are noted in their designations and TO's designations.   So

3    almost the whole transcript is colored on the screen when we're

4    trying to do designations.

5          So, if I look 10 years older from blurry eyes --

6          THE COURT:  You look good, Deb.

7          MS. KUCHLER:  Thank you, Judge.

8          It's just really been a really hard logistical process.

9    And, by the time all the designations are done, almost the whole

10   transcript is designated anyway.  So we're spending huge amounts

11   of time to eliminate maybe 20 percent of the transcript.

12         THE COURT:  So what we need to do, it seems to me, is

13   get inData to eliminate objections before they split.

14         MR. KAVANAUGH:  Your Honor, Brian Kavanaugh from BP.  I

15   had a couple of conversations directly with Mr. Ray as well, and

16   I think the Court's suggestion of a conference call with him is a

17   very good idea.

18         I have a different understanding, I think, than Mr.

19   Underhill of the inData's capability.  We had a couple of form

20   objections in the original Hayward test run that they took out as

21   well.  And my understand was, one, that it was a fairly manual

22   process for them.  They were able to do it in the case of the

23   Hayward test run.  Whether they can replicate that on a

24   going-forward basis, I have serious doubt about that.  And, in

25   fact, we found errors in, at least as to our designations, the

1     end-product, after they attempted to strip out the objections.

2            So there's an issue I have -- and Mr. York and

3     Halliburton obviously have the unfortunate luck of going first --

4     but there's a significant issue here in terms of inData's ability

5     to QC their own work at the pace that we're moving.

6            The issues that we have, we have outlined for Mr. Giot's

7     deposition.  And we also don't know how many of the transcripts,

8     other than Sir William Castel's, are impacted by the processing

9     error and the Halliburton designations.

10           So it's unclear to me today how many of these

11    transcripts are good transcripts or designations are good

12    designations that we can rely on in terms of what we have to

13    submit today.  And, I think there's a number of old issues, but

14    one issue that is permeating across them is the inData ability or

15    manpower, whatever it is, to quality control what's happening.  I

16    mean, they seem to be catching things several days later, but

17    we've only got five-day intervals in between each round.  So, if

18    they find something on the third or fourth day, it's not very

19    helpful to us.

20           THE COURT:  No.  And let me ask you, Brian, the

21    transcript that you're using as an example, did you use Excel to

22    get to inData, or was this non-Excel?

23           MR. KAVANAUGH:  The one where I discovered the

24    processing errors with ours?

25           THE COURT:  Yes.

```
 1          MR. KAVANAUGH:  That was before we -- before anybody was

 2   using Excel.  I believe it was during the Hayward trial run.  And

 3   it was just looking at their attempt to strip out the form

 4   objections from the PSC and USA and in view of the defendant's

 5   designations.  And, when we went to do the Hayward real run this

 6   week -- I guess it was last week, before the first submissions --

 7   we went back to look at what they had done to take out the form

 8   objections, and discovered that there were three or four errors

 9   in at least the conversion for us.  That's why, last week, we had

10   submitted something slightly different for Hayward in the

11   official Hayward run, as opposed to what we did on the trial run.

12          THE COURT:  Okay.  What I'd like everybody to do is

13   email me, cc to Mike, and tell me who your designee is for a

14   conference call with inData, and we will put together a

15   conference call, dial-in instructions.  I would like to try to

16   get it done as soon as maybe Monday.  I've got criminal duty next

17   week, that's always fun.  Maybe Monday lunch time or early

18   afternoon.  And see if we can get things lined up and ironed out.

19          So, if you'll let me know who the designee is, we'll go

20   ahead and set something up today.

21          Anything else on this issue?

22          It's disheartening, because I was so pleased with the

23   Hayward test run.  And I wanted you all to see how good it

24   looked.  And I feel like we took a couple of steps back.

25          MR. UNDERHILL:  Mike Underhill, US.  I know you don't
```

1    want a cattle call on the conference, you want to keep it down.

2    To avoid this issue we have with this next meeting with Judge

3    Barbier, I'm happy to be on the call, but I think this also

4    requires technical expertise.  So if we could have a techie and

5    an attorney to do that.

6         THE COURT:  Absolutely.  And, as a matter of fact, you

7    don't have to tell me, other than who the contact person is for

8    purposes of getting out the dialing information and telling you

9    when it is.  If you get on the phone, Mike, and you want two

10   techies on the phone, that's fine with me.  I think techies are

11   helpful.  We can all shut up and let the techies talk.

12        MR. KAVANAUGH:  Brian Kavanaugh for BP.  I guess one

13   last thing with respect to the designations that are due today.

14   The Halliburton issue and apparently the Guillot issues are

15   obviously eliminated in the Group 1 designations.

16        We have some Group 2 designations that are due today, so

17   I don't think those are going to be impacted.  So I don't believe

18   there should be an issue with respect to timing on those.

19        With respect to Group 1, I guess my head is spinning a

20   little bit here.  We're trying to wrap things up and get out

21   designations and materials submitted, and a great deal of that is

22   essentially impacted by the problem.  And I'm actually concerned

23   that submitting something now and then go back and resubmitting

24   just creates confusion.

25        I'm wondering whether it makes sense, if Alan thinks

 1   that he'll have a list of the impacted depositions by mid-day

 2   today, perhaps we can agree to hold off on those until this

 3   problem gets corrected and then submit the ones that weren't

 4   impacted by the issues.

 5          THE COURT:  I think that makes sense, Brian.  I don't

 6   see any reason to struggle with transcripts that we know were not

 7   collated properly.  So I think that makes sense.

 8           Also, going forward, do we all agree that attorney

 9   colloquy and objections to form should be cut out of your

10   designations so that we don't bore Judge Barbier with that kind

11   of reading material?  He doesn't want it.  So can we agree, going

12   forward, that, whether Underhill thinks he wants to put that in,

13   that we won't put it in?

14          MR. WILLIAMSON:  PSC agrees.

15          MR. GODWIN:  Halliburton agrees, Your Honor.

16          MS. KUCHLER:  We definitely agree.

17          THE COURT:  So, Underhill, you're outvoted.

18          MS. KUCHLER:  Judge, this probably goes along with the

19   solutions that you're coming up with, but can we have an

20   agreement that there is a measure of grace inserted in this

21   process that we might have to come back a week or two after the

22   deadline and say we need to designate these three lines and take

23   these three out and give a final QC to the judge?  But, with all

24   this going on, it's so hard to make sure we're doing everything

25   we're supposed to do.

 1          THE COURT:  Yes.  We've got to get it straight soon.

 2          Alan?

 3          MR. YORK:  Alan York for Halliburton.  So just for

 4  clarification, are we going forward with the 15 designations for

 5  Group 2 today, but holding on counter-designations until we get

 6  the issues with the Group 1 transcripts resolved?

 7          THE COURT:  I think that makes sense.  And, if anybody

 8  is making designations in Group 2 that include objections to form

 9  and colloquy, then they are granted an extension to take that

10  out.  So that what goes to inData doesn't have to be purged of

11  objections and colloquy by them.  I don't think we should rely on

12  them for that.

13          MR. YORK:  So the deadline today is the highlighted

14  exhibits for Group 1 and the deposition cuts for Group 2?

15          THE COURT:  Right.

16          And then I'm hoping, on Monday, we will have our

17  conference call and iron out whatever is causing these other

18  problems.

19          MR. KAVANAUGH:  Your Honor, Brian Kavanaugh for BP

20  again.  I hate to have to keep jumping in here, but I think the

21  problem with holding out Group 1 with the counter-designations is

22  going to impact highlighted exhibits as well.  For example, if

23  we're counter-designated in response of 270 plus pages of Castel

24  that were designated in error, there may be highlighted exhibits

25  that fall within that range that are then implicated.  So I think

 1    that the question of designations and exhibits go hand-in-hand

 2    for any particular group of depositions.

 3            THE COURT:  Steve Herman disagrees with you.

 4            MR. HERMAN:  Steve Herman for the plaintiffs.  I don't

 5    understand the problem.  It seems to me that, if something was

 6    designated and now it's undesignated, than the exhibit that goes

 7    along with that testimony will simply be removed.

 8            THE COURT:  Well, I think maybe what we can do on that

 9    is -- Alan, do you have the page sites, the correct page sites to

10    the Castel deposition?  Why don't you give it to everybody, and

11    then everybody can work off that little snip, rather than 270

12    pages.

13            MR. YORK:  Actually, when I sent them to Jordan with

14    inData last Friday, I copied all counsel.  So everyone should

15    have the PDF line-page designations that we sent that are

16    correct.

17            THE COURT:  So, Brian, if you could work off the correct

18    designations, I think it's about less than a page -- you said you

19    went from a page 31 --

20            MR. YORK:  Yes.  But I cite that as one example.  I

21    don't know whether it crosses all 14 depositions.  I don't know

22    whether it's multiple times in the same deposition.  We just

23    learned about it, figured out what the issue was last night.  So

24    we have someone going back and doing a line-by-line comparison.

25            THE COURT:  I'll tell you what we're going to do, guys.

```
 1    We're going to hold off on Group 1 entirely.
 2          On Group 2, go ahead and make your designations, but
 3    stop there.
 4          Does that help you, Brian?
 5          MR. KAVANAUGH:  That's fine, Your Honor.  I don't
 6    believe there's an issue with Group 2.  So we're happy with that.
 7          THE COURT:  All right.
 8          Jimmy?
 9          MR. WILLIAMSON:  Nothing, Judge.
10          THE COURT:  We got the draft order from Andy relative to
11    discovery of experts, and I thought it looked real good.  Does
12    anybody have any comment on his proposed order regarding
13    non-discoverability of certain expert related documents?
14          MR. UNDERHILL:  I think that we've worked -- Mike
15    Underhill, US.  And click and clack, Mike and Rob.
16          MR. GASAWAY:  Rob Gasaway for BP.
17          MR. UNDERHILL:  I think we've worked it out, Your Honor.
18          Did you want any clarifications to that, Rob?
19          MR. GASAWAY:  Just one clarification.  There was in the
20    email mention of a privilege issue that is currently the subject
21    of a meet-and-confer between the United States and BP.  That
22    issue has not come before the Court, Your Honor.
23          There were some suggestions at some points that perhaps
24    this order would impact that.  And we just wanted to make that
25    clear on the record that we've decided to put that privilege
```

 1    discussion on a separate track.

 2              THE COURT:  Okay.

 3              MR. GASAWAY:  And I greatly appreciate Mike's

 4    cooperation with that.

 5              And Sarah has been very cooperative in a different way

 6    on that discussion.

 7              So we greatly appreciate their help.

 8              THE COURT:  Okay.  Are there any other comments on the

 9    proposed order?

10              So the proposed order but for the proposed is ready to

11    roll?

12              MR. UNDERHILL:  Yes.

13              THE COURT:  Just take proposed off and we can do it.

14    Okay.  Good enough.

15              Is there anything we need to update relative to moving

16    into expert depositions?  Does anybody have any issues?  I'm not

17    looking for trouble, but does anybody have any issue?

18              We have an issue.

19              MR. BARROW:  It doesn't relate to deposition, but this

20    might be a good time.  Dennis Barrow for Dril-Quip.  I'd like to

21    see if I can get a clarification on an issue related to expert

22    depositions.

23              A couple of weeks ago, we had discussion about whether

24    or not it was necessary to designate as experts with employees of

25    other parties or consultants of other parties.  I believe

 1    Transocean did that a few weeks back.

 2            My recollection is, is that the general agreement was

 3    you need to designate retained experts, and you need to designate

 4    in-house employees of your client as experts.  But, for example,

 5    I would not need to designate a BP witness as an expert, even

 6    though I think that some of the testimony of the BP witness is

 7    opinion testimony.  I think there was agreement, but I don't

 8    recall whether it was on the record or not.

 9            THE COURT:  I don't recall it being on the record.

10            But does anybody have a problem with Dennis's statements

11    of a party's obligation to designate experts?

12            MR. BARROW:  And, specifically, what I'm thinking of is

13    witnesses who have testified by deposition, whether they are

14    employees of other parties or they're consultants of other

15    parties.  I want to make sure that there's no need to designate

16    them as an expert if we think that certain testimony is opinion

17    testimony.

18            MR. MILLER:  I think Dennis's understanding of the

19    conversation we had two conferences ago -- I think this was on

20    the record, by the way.  Alan paid us all those compliments, and

21    I framed it.

22            THE COURT:  I think it's a correct statement; but what

23    I'm asking for is, does anyone have a problem with Dennis's

24    statement?

25            Steve, you're standing up.

```
 1              MR. HERMAN:  No.  I think it was on the record.  I think
 2    everybody agreed.  I think we took TO's filing to be an abundance
 3    of caution.  And I think everyone can read that it was on the
 4    record.
 5              THE COURT:  Good.
 6              So, for instance, you want to designate a witness who
 7    says I know nothing wrong with what Dril-Quip did?
 8              MR. BARROW:  Absolutely.  I don't want to have to
 9    designate that witness, but I'd like to be able to use that
10    expert testimony because they are clearly qualified.
11              THE COURT:  You're going to qualify them as experts; is
12    that correct?  I think that is a correct statement, Dennis.
13              All right.  Does anybody want to take a bathroom break,
14    because now we're going into the authenticity objections and the
15    300 exhibits.  Which I take to be a longer discussion, a yet
16    longer discussion.
17              MR. UNDERHILL:  I think it's a great suggestion, but can
18    we knock this off first?  I have one additional witness for you.
19              THE COURT:  Sure.
20              MR. UNDERHILL:  Is Mr. O'Rourke on the line?
21              MR. O'ROURKE:  I am.
22              Steve O'Rourke for the United States.  I'm sorry, I
23    didn't realizes you were moving off topic.  We had one more
24    witness to put on the deposition schedule for next month.
25              THE COURT:  You do.  Who is that?
```

1          MR. O'ROURKE:  And that's Mr. Garrison.  He's the man

2     that was hired by the joint investigating team to do some cement

3     testing.  Either Halliburton or Transocean requested his

4     deposition.

5          THE COURT:  Yeah, I remember that.  Okay.  So Mr.

6     Garrison --

7          MR. O'ROURKE:  We have two things I want to say for him.

8          First is the proposed date is going to be November 4th.

9     And I think I just heard somebody is being scheduled for

10    November 3rd for Halliburton, so I think that is probably

11    convenient.

12         The second point I want to make about Garrison is that

13    Garrison was employed by the joint investigating team, so we

14    intend to treat him exactly the way we've treated the DND.  You

15    may recall back in June, you issued a protective order regarding

16    DND's discovery.

17         THE COURT:  Yes.

18         MR. O'ROURKE:  You allowed us to enforce instructions

19    not to answer and withhold documents that related to

20    deliberations or communications with the JIT and JIT supporting

21    agency personnel with the expert.  And we intend to do the same

22    thing, without asking for a new protective order.  We just wanted

23    to announce that we would be using the same principles.

24         THE COURT:  Okay.  So was everybody paying attention?

25         I don't think, Steve, that anybody in the courtroom paid

```
 1   any attention to what you just said.

 2          MR. O'ROURKE:  What else is new?

 3          THE COURT:  Exactly.

 4          If anybody has a problem with Steve's statement relative

 5   to the deposition of Mr. Garrison, would you please call it to my

 6   attention well prior to the November 4th date.

 7          MR. O'ROURKE:  And, Your Honor, I can also announce that

 8   the date of your order was June 28th, 2011, and it's document No.

 9   3071 if anybody needs to read it.

10          THE COURT:  It's 3071.

11          And what is Mr. Garrison's first name?

12          MR. O'ROURKE:  Greg.

13          THE COURT:  Greg Garrison.  Okay.

14          And I see that Ms. Mince made it, and so she has proved

15   me wrong again.

16          Who did you appear before this morning, Mr. Mince?

17          MS. MINCE:  Judge Griffin.

18          THE COURT:  Oh, that's good.  You had a good draw this

19   morning.

20          MS. MINCE:  I did.

21          THE COURT:  Why don't you come up.  Don, why don't you

22   come up.  And we're going to go back to Mr. Viator.

23          MS. MINCE:  Thank you for allowing me to do that first.

24          THE COURT:  I was betting you weren't going to make it.

25          MS. MINCE:  We were No. 2 on the little sign-in sheet.
```

1    But then, they started off with No. 26, and then went to 16.   And

2    then, finally, at 10:15, I said to the clerk:   Could you just do

3    No. 2?   And she obliged.

4         THE COURT:   Usually, they don't accommodate requests

5    like that from me.

6         Okay.   So I was going to ask Don to present his case

7    first, if you don't mind, Lori, since he seems to be the one

8    moving.   And then you can get up and oppose.   Okay?

9         MR. GODWIN:   Thank you, Your Honor.   May it please the

10   Court, Don Godwin for Halliburton.

11        Judge, may I approach and give you another document here

12   that I think might be helpful?

13        THE COURT:   I've got Mr. Viator's affidavit.

14        MR. GODWIN:   I'd provided the affidavit.

15        I'm going to hand you a Discovery Escrow Services

16   Agreement between Halliburton and the Iron Mountain LLC Property

17   Company, as well as a document here which provides the names of

18   individuals at BP who is proposing to have access to

19   Halliburton's information maintained at a vault at Iron Mountain.

20        I'll also give Lori a copy of these same two documents I

21   just handed you, Your Honor.

22        I did give Lori yesterday, Your Honor, as well as you

23   and others, the affidavit.

24        Mr. Viator was for several years an employee of

25   Halliburton and very involved with OptiCem and very knowledge

1    about the OptiCem and all the proprietary and confidential trade

2    secret information that Halliburton would keep within its OptiCem

3    program.

4            Prior to leaving Halliburton, he gained access to

5    information pertaining to Jesse Gagliano, who, as you know,

6    designed the cement job, Your Honor, the foam slurry to the condo

7    well.  And he gained access to that information through the

8    OptiCem programs at Halliburton.

9            While he was with Halliburton, Your Honor, he met on at

10   least one occasion with one of the senior members of my firm who

11   is involved in depositions and preparing the defense for

12   Halliburton, Mr. Gavin Hill, and talked to him about matters

13   pertaining to the OptiCem, the work that was done by Jesse, the

14   information that was used in preparing the foam slurry.

15           He also, in addition to meeting with Mr. Hill on at

16   least one occasion in person, he talked on at least one occasion

17   and perhaps more with another senior member of our firm, Mr.

18   Bruce Bowman, who many people in here know has also been very

19   involved in depositions.  And, during that conversation, and I

20   believe it perhaps was even more than one but certainly the one,

21   they talked about matters, information that Jesse had used in

22   arriving at the design for the foam slurry, the information that

23   was confidential, proprietary to Halliburton, that was included

24   during the OptiCem.

25           After he left Halliburton, on or about April 14th, he

1  joined CSI.

2        And CSI, as you'll recall, Your Honor, is a company that

3  was designated by BP to serve as a fact witness and as a 30(b)(6)

4  witness with regard to cement matters and modeling matters as it

5  pertained to the foam slurry.

6        I deposed Mr. Fred Sabins, as you recall, who is the

7  president and CEO of CSI.  Also deposed Mr. David Brown, another

8  senior member of the CSI team.  And we expect that those

9  gentlemen with CSI may likely show up as experts for BP, either

10 as testifying experts; and perhaps, if not, certainly as

11 consulting experts.  Because they were represented to be and held

12 themselves out during their fact deposition, and Mr. Sabins in

13 his 30(b)(6), as people working for BP, giving them guidance on

14 all matters including the Bly report and things of that nature.

15       We'd learned -- Your Honor, everything went along

16 smooth.  We've been providing to BP information that they've

17 requested.  And, you will see, Your Honor, there's an agreement

18 entitled Discovery Escrow Services Agreement between Iron

19 Mountain and Halliburton Energy Services, Inc.  And it pertains

20 to a vault that Halliburton has there at Iron Mountain that's a

21 third party vendor to Halliburton where there's secure

22 information in a room that is only accessed by permission.  It's

23 under lock and key.  Halliburton must know who goes in and who

24 comes out.  Iron Mountain must know who goes in and comes out.

25 And Halliburton must always have a representative there when

1    anybody goes in there.

2            In that vault, Your Honor, are three laptops.  And

3    contained on those laptops is highly proprietary and confidential

4    information with Halliburton with regard to these OptiCem

5    programs and models, the information that Jesse Gagliano used in

6    arriving at the program for the design of the slurry, as well as

7    other modeling information, other modeling information.

8            Halliburton and BP entered into an agreement that BP, as

9    the only other party that could go in there other than

10   Halliburton, would be allowed to go in there with permission so

11   long as we knew in advance who they were going to be allowing and

12   requesting to have permission to go in.

13           You will see here, Your Honor, the second document that

14   I've given to you, with a copy to Lori this morning, is an email

15   from Jenny Martinez, my partner, dated September 27th, and Neil

16   Connelly and Sarah Hicks at Halliburton and the legal department.

17   Do you have that, Judge?

18           THE COURT:  Oh, yeah, I do have that.  That's a cover

19   page for the schedule.

20           MR. GODWIN:  Yes, Your Honor.  It's a two-paged

21   document.

22           THE COURT:  I see it.

23           MR. GODWIN:  This is an email from Jenny stating that

24   attached is BP's list of individuals who will have access to

25   OptiCem per escrow agreement.  BP is using CSI to do the

 1    modeling.

 2          If you'd turn to page 2 of that, Your Honor, which is

 3    designated as Exhibit 2, it lists there the individuals that BP

 4    prior to September 27th said they wanted to have access to that

 5    vault and that highly confidential and proprietary information of

 6    Halliburton.

 7          As you go down the list, Your Honor, you'll see what

 8    appears to be four Kirkland Ellis attorneys, no problem there.

 9    And then other CSI employees, including Mr. Sabins, Mr. Waters,

10    Mr. Febbraro, Jessica Bassett, David Brown.  And then, lastly,

11    Mike Viator.

12          Therein lies the rub.  They're asking that Mr. Viator be

13    allowed to go in there and have access to our highly proprietary

14    and confidential information that he only gained knowledge of

15    while he was at Halliburton.

16          Of course, that concerned our client considerably, that

17    here we're going to be allowing, in effect, a fox in a henhouse.

18    That's just something that was never contemplated and would never

19    be allowed by agreement by Halliburton.  So I contacted Andy and

20    told him that we had a concern about that.

21          He told me that, while he understood, he disagreed with

22    the concern.  And we talked about it.  It was constructive.  He

23    then informed me that Lori Mince would be representing CSI, as

24    they did before, and Mr. Viator.

25          And I contacted Lori, and we talked.  And, again, in a

1   constructive way, about our need to take a short deposition of

2   Mr. Viator.  I'm estimating maybe an hour and half, Your Honor,

3   for my side of it.  Perhaps even shorter.  I'm not looking to

4   dragging it out.

5       I've got some suggested dates that I would propose when

6   we get to that point that I would like -- that I would suggest

7   taking the deposition.  And, again, it's to find out the

8   information that Mr. Viator took with him; did he disclose to

9   anybody at CSI and/or BP and/or representatives of BP; what has

10  he said to anybody at CSI about any of the work that he did at

11  Halliburton.  And I told these things to Lori.  And we were

12  concerned that confidential information, proprietary information,

13  may have left Halliburton with Mr. Viator and gone to the other

14  side, gone to BP and its folks working for it, with regard to

15  cementing.

16      Lori suggested, as did Andy briefly, she suggested

17  perhaps we do an affidavit.

18      I said:  Well, I'll take a look at it, although I don't

19  think an affidavit is going to suffice, because I need to be able

20  to ask this man some questions that he won't necessary design or

21  have designed for him by the lawyer or lawyers drafting the

22  affidavit.

23      And she said:  Well, let me take a crack at it.

24      She did put together an affidavit, Your Honor, which you

25  have here.  I assume she did.  It was sent to me.  And I've read

1    the affidavit over.  And Lori said that this is what they wanted

2    to do, they didn't see any need for a deposition.  She felt my

3    statement about the fact we believe he'd taken information was

4    conclusory.

5             And I've read through the affidavit, Your Honor.  And

6    the affidavit doesn't answer the questions that I need to have

7    asked and I want to ask.

8             And I can do so in a very efficient, professional

9    manner, inside of an hour and a half.

10            The affidavit, without going into great detail about it,

11   if you look at the affidavit at paragraph No. 3:  I've not

12   disclosed any confidential information.

13            Well, that's asking us to assume that he knows what's

14   confidential information and agree that his interpretation of

15   that or his understanding comports with our understanding.

16            No. 4, Your Honor, he's not disclosed any confidential

17   information.

18            Well, how do we know that?  We don't know that, other

19   than he tells us that.  And I'm not satisfied with that.

20            No. 5, he says:  Other than a general disclosure that I

21   performed work for Halliburton related to the Deepwater Horizon

22   oil spill.

23            We want to know what general disclosure he made to whom

24   and when.  We think those are very critical things to our process

25   of deciding whether or not we're going to object to CSI being

```
 1    involved at all in this, now that they have one of our employees
 2    over there that perhaps gave them information that never should
 3    have gotten there but through this employee.
 4         This is not going to delay the trial, not going to delay
 5    anything, Judge.  It's a short deposition to find out if there's
 6    any basis for our concern.  If it's not, you know me and the way
 7    I do depositions, you've seen us, you know, we're going to be
 8    forthright and say no problem, move on.  But, if we think there
 9    is a problem, we will have to decide whether or not the race is
10    worth the trophy.  Do we bring it up, do we make an issue of it;
11    and, if so, when and how.
12         The next point, Your Honor, is over on page 6 of the
13    affidavit.  Paragraph 6, excuse me.  I'm aware that employees of
14    CFI have performed certain work for BP.  I've not participated in
15    that work.
16         Well, you know, we want to know what work have they
17    performed, how did he become aware of it, what information did he
18    share with them.  And it could be that, when he says:  I didn't
19    participate in that work -- well, you don't necessarily have to
20    participate in actually doing the work.  If you've got the
21    information and you've given it to somebody else in one form or
22    fashion, while you didn't participate directly, you've
23    participated indirectly.
24         He did say in paragraph No. 7 that Mr. Fred Sabins had
25    asked him to do some work between September 19th of '11 and
```

```
 1   October 4th of '11 regarding some scientific journals, the
 2   literature related to pressure affects on cement slurries.
 3   Again, that's exactly what we're talking about.  And we think
 4   that a short deposition is in order.
 5          After we made our objection and lodged it with BP and
 6   with Lori Mince to his -- for being over there and wanting to
 7   take the deposition, my client learned in the industry, Your
 8   Honor, that Mr. Viator perhaps is looking to relocate from CSI.
 9   And, again, that's something we want to ask about, that if he was
10   hired over there to provide them information about Halliburton's
11   OptiCem and now they can no longer use him, because, as I
12   understand it, they put a wall around him.  When Jenny talked to
13   one of the lawyers at BP about it, they said:  Oh, we put a wall
14   around him so he can't do anything.  Well, our concern is, well,
15   what happened before the wall went up?  And so we have a grave
16   concern here, very serious concern, about what he's doing.
17          We want to know if in fact, if he is going to be
18   leaving, was he asked to leave?  Or has he been told that,
19   because you can no longer provide information about OptiCem, you
20   can't go into the vault over at Halliburton, where he would have
21   access, is that a reason that perhaps he's looking?
22          I don't know definitively that he's looking, but one of
23   the senior people at Halliburton has heard from others in the
24   industry that Michael Viator is looking to join one of our
25   competitors.
```

1          Your Honor, we would ask that you have give me a brief

2   deposition, a short deposition, for an hour and a half.  And, if

3   you think it ought to be shorter, whatever you think is

4   appropriate, I'll do.  We'll do it right here in New Orleans.  If

5   for some reason Lori thinks it needs to be in Houston, I'll do it

6   whenever he wants to do it.

7          I would suggest these dates when I'm available to do it.

8   I'll do it any time on any of these dates.  October 27th, Judge.

9   October 31st.  November 1st.  Or November 2nd.

10         If none of those four dates work for Mr. Viator and Lori

11  Mince, then I will rearrange my schedule to be there whenever he

12  will be available.  And thank you for your time.

13              THE COURT:  Thanks, Don.

14              MR. GODWIN:  Thanks, Judge.

15              THE COURT:  All right, Lori, your second appearance of

16  the day.

17              MS. MINCE:  Good morning.  Lori Mince on behalf of CSI

18  and Mr. Viator.

19              Mr. Viator, as Mr. Godwin said, left Halliburton I

20  believe in March, and joined CSI about four weeks later as a

21  research engineer.  And he has had no involvement in CSI 's work

22  for BP, with the exception of some scientific journal research

23  that he did as background, you know, published research, that he

24  was asked to do during that time period in his affidavit.

25              He was an employee at CSI, left the company, and his

1   name was put in on this list to go to the vault.  He's never been

2   to the vault, he's never reviewed any Halliburton documents while

3   at CSI, but his name got put on that list.  Which immediately

4   raised a concern on the part of Halliburton, which they

5   immediately expressed.  And which we acknowledged was a concern

6   that they had.  And so he will not be participating in any visit

7   to the vault.  He will not be performing any work.  And he hasn't

8   in the past performed any work.

9         His affidavit, I went through -- I went through with him

10  carefully what he had done while at CSI and asked him whether he

11  had disclosed any information about his work at Halliburton on

12  Macondo or related to Macondo.

13        And so, I think if you look at paragraph 5 of the

14  affidavit, it's not limited to Mr. Viator's own interpretation of

15  what is or is not confidential.  Which, as you and I know,

16  sometimes one person's definition of confidential may not comport

17  with anothers.  But I was very careful to go through with Mr.

18  Viator:  Have you discussed your work with Halliburton related to

19  Macondo?  Confidential or not confidential, have you discussed it

20  all?

21        And he said:  No, I have not, other than on the first

22  day of my employment or in my interview I informed Mr. Sabins,

23  who was interviewing me for the position, that I have done some

24  work on it so that he would know that going into it.  And Mr.

25  Sabins responded:  Okay, thank you for telling me you did that

1    work, don't tell me anything about what it was.

2         So what we have here is a concern that is based

3    exclusively on the fact that Mr. Viator's name ended up on that

4    list.  That was done, you know, two weeks ago.  His name is on

5    the list, the concern is raised, we immediately said:  Nope, he's

6    not going, he won't go to the vault.  And that's the sole basis

7    of the concern.

8         In order to allay the concerns, we obtained the

9    affidavit.

10        I have also personally reviewed Mr. Viator's time

11   records at CSI to confirm that the only time he has logged is for

12   the scientific literature literature review.

13        Mr. Sabins has been a consulting expert to CSI in this

14   case, and he may or has been designated as a testifying expert in

15   the case.  And so the issue before this Court at some point might

16   be an argument by Halliburton that Mr. Sabins should be

17   disqualified on the basis of his having confidential information

18   of Halliburton or some impropriety.  And the way for Halliburton

19   -- there's no evidence of that at this point.  And Halliburton,

20   if Mr. Sabins is designated as a testifying expert, Halliburton

21   will have the opportunity to depose Mr. Sabins to ask him whether

22   or not he obtained any confidential information during the time

23   that Mr. Viator was employed at CSI.  So they will have their

24   ability to cross examine the expert, which is the person that

25   they're concerned about.

1          And so, under all of these facts, I would say that there

2    just has been no good cause showing to take Mr. Viator away from

3    his work and cause him to have to appear for a deposition in this

4    case.

5          Mr. Godwin has said that these don't answer his

6    questions, he still has questions.  And I have invited him to

7    tell me what are the questions.  I mean, do you want to see his

8    time records?  What is the fact that you want to know that's not

9    in this affidavit, and maybe I can answer it for you.

10          But, based on what we have in front of us, there just

11    has been no good cause showing to require a deposition from a

12    witness who has not been designated as a fact witness in this

13    case.

14          MR. GODWIN:  Judge, may I respond?

15          MR. LANGAN:  I think I have something to say.  I think

16    BP is a stakeholder.

17          THE COURT:  Go ahead.  Andy, I've never denied you an

18    opportunity to be heard.

19          MR. LANGAN:  Mr. Sabins is our expert.  We obviously

20    endorse what Ms. Mince has said.

21          I just want to add a sort of institutional process here.

22    We're all way too busy in this case getting ready for a trial to

23    have a frolicking detour based on frankly what is speculation and

24    frankly paranoia by counsel for Halliburton.  If we're going to

25    go down the road of chasing every rabbit down the rabbit horn

 1   based on this kind of speculation, it's going to be a total waste

 2   of time for everybody.

 3          Are we going to start deposing everybody's staff of all

 4   the testifying experts in this case?  I think we're going to be

 5   deposing about 100 experts.  There's no time for this kind of

 6   nonsense.

 7          Thank you, Your Honor.

 8          THE COURT:  Okay.  Thanks.

 9          Come on, Don.

10          MR. GODWIN:  Thank you, Judge.

11          Your Honor, I've been accused of a lot of things over

12   the years, but frolicking down a discovery trail is not one of

13   them.  And I'd suggest that Your Honor knows me well enough to

14   know that I'm not going to here.

15          THE COURT:  But I do know you frolic.

16          MR. GODWIN:  Well, from time to time.  Usually it's in a

17   good restaurant in New Orleans.

18          Judge, in terms of what Mr. Viator has given to CSI, Mr.

19   Sabins and/or Ms. Brown, we'll never know.  And we're entitled to

20   ask the man who worked for us what he gave them, how he described

21   it.

22          with regard to paragraph No. 7, when he was asked by Mr.

23   Sabins:  I want you to go through these scientific journals and

24   look at them and then give me your report about how these

25   pressures will affect cement slurries, that was after he had met

1    with two of my lawyers.  He had met with Gavin Hill for a law

2    meeting in person, he'd talk with Bruce Bowman by phone on at

3    least one occasion, and he knew what our defense was going to be,

4    he knew where we were going to go with the slurry, he knew what

5    we were going to say about Jesse Gagliano's use of the OptiCem

6    model.  So he's reading these journals and deciding, okay, now

7    I'm going to give Fred Sabins a report on how the pressures might

8    affect the cement slurries.

9            Judge, we'll only know what was given by him to Mr.

10   Sabins, and we're the best ones to judge whether or not that

11   violated any rights that we have.

12           We're not talking wasting time.  I don't have it to

13   waste any more than anyone else.  But, if I were to let this

14   pass, my client -- there would be no way we can allow this to go

15   unaddressed in view of BP trying to put this man in our secure

16   vault, where nobody should be in there without our permission,

17   and here's a guy going in with all of the knowledge of having

18   worked with all of that information.  If he was going in there,

19   it was going to be with the intent that he was going to have

20   prior knowledge and be able to help BP and direct them where they

21   ought to go to look to do the things to aid them the most.

22           You haven't heard me ask for anybody's staff or anybody

23   else outside of fact witnesses.  But this is a very, very serious

24   concern, and I ask you to please give me this short deposition.

25           THE COURT:  Okay, guys, look, I'm not as concerned about

1   the vault issue as I am concerned about knowledge that Mr. Viator

2   may have had and may have communicated to Mr. Sabins and the

3   other CSI employees.

4          I am going to allow an hour and a half deposition in

5   Houston so that Mr. Viator can give his deposition in Houston and

6   go back to work, if that's the concern.

7          I do think that, because of his former employment with

8   Halliburton, that this is a lot different, Andy, than taking the

9   deposition of a staff member or of any consultant expert.  I

10  think it can be distinguished on that basis.

11         So, Lori, I'm going to ask you to speak to Mr. Viator,

12  and pick any of one of those dates, October 27, 31, or November 1

13  or 2, and let Don know what time is good for you.

14         Don, do you want to do it at your office?  Or how do you

15  want to handle that?

16         MR. GODWIN:  Your Honor, we can do it at our Houston

17  office.

18         THE COURT:  Unless, Lori, you would have some place else

19  that you would prefer to do it.

20         MR. GODWIN:  I'll make arrangements with Kim to have

21  somebody there at Houston.

22         THE COURT:  Exactly.  But it will be an hour and a half

23  deposition, and you can let Don inquire as to what the

24  communications were and move from there.  Okay?

25         MR. GODWIN:  Thank you, Your Honor.

1         MS. MINCE:  To clarify, the deposition will be limited

2    to the issues of concerns about disclosure of information that

3    Mr. Viator may have acquired while he was working at Halliburton

4    to individuals at CSI?

5         THE COURT:  Well, and also the circumstances by which,

6    if he has knowledge, of how he got on the list to go into the

7    vault.

8         MR. GODWIN:  Yes, Your Honor.

9         And I'm not going to be going into other matters that

10   are private to Mr. Viator or personal.  But I want to make clear,

11   so they don't get over and play games with me, talking about

12   frolicking, if you will, I don't want to be limited what I can

13   ask that man.  And, if they think I got out of line, they've got

14   your phone number.  So I'd like for you to tell them that we're

15   not going to go ahead and go into, although Don knows what he's

16   going to be doing.

17        THE COURT:  I think Don's going to be pretty focused.

18   He's got an hour and a half to figure out what if anything, how

19   if at all Mr. Viator's employment at Halliburton impacted his

20   employment at CSI and CSI's consultative role for BP.  And so

21   that whole area is open.

22        MR. GODWIN:  Thank you, Your Honor.

23        THE COURT:  Okay.

24        All right.  Now do you want to take a break?

25        Is that a yes?  A collective yes?

1        Okay.  Why don't we come back at 11:15.  And, we're

2   going to go off the record; so, phone participants, you also may

3   go take a break.

4        And you're leaving?  You should.

5        (Proceedings in Recess.)

6        THE COURT:  Let me update you.  We have an email from

7   Jordan Ray at inData to presumably everybody that is on his

8   distribution list saying as follows:  Throughout this past week

9   we have received numerous requests from multiple parties for,

10  quote, fixes to the files we are sending out.  We are happy to

11  continue to, quote, fix these files as needed.  Keep in mind, we

12  are simply taking the files we received from each of the parties,

13  organizing the files, renaming the filings, creating a transcript

14  and sending them to all of the other parties.  Each of the,

15  quote, fixes that we've done this week were because the files we

16  received were incorrect.  These fixes can be eliminated if we

17  receive the correct designations from the parties.  Please make

18  sure your designations are correct before they are sent in to

19  inData.  We have ensured that each of the parties receive correct

20  designations in return from inData.

21       So that will just be on the agenda for our conference

22  for Monday.

23       MR. HERMAN:  That's what I wanted to address, Your

24  Honor.  Hopefully the conference call will be helpful.  The only

25  thing I wanted to say I guess on the PSEs behalf is that, you

1    know, I think we anticipated that, with so much work to do, with

2    so many moving parts, that there would be glitches, whether they

3    are our inadvertent mistakes or inData's mistakes or the

4    defendant's or some combination thereof.  And I think the Court

5    was appropriate in setting such an aggressive schedule.  Because,

6    there's going to be glitches, and it's only by setting an

7    aggressive schedule and holding people's feet to the fire, that

8    we find out about the glitches now and have time to correct them,

9    rather than delay things.  There's going to be glitches anyway.

10   It's better to be fixing them now than trying to fix them in

11   December.

12        THE COURT:  Totally agree.  And we're going to hopefully

13   get this back on track on Monday.  So this is a bump in the road

14   that I am disappointed about, but I do think by next week we can

15   have them fixed and on track.

16        And, by the way, you sounded just like Jim today.

17        MR. WILLIAMSON:  Is that a compliment?

18        MR. HERMAN:  Thank you.

19        I'm standing here in case you want to interrogate me

20   about the list of 300 and those issues.  I thought we had pretty

21   clear guidance at the end of last week.  I know what we're going

22   to do.  I don't know how they want to respond.

23        THE COURT:  Let's talk about it, guys.

24        Andy raised an issue that I don't think we anticipated.

25   Which is, the effect of the deadline of October the 17th on

1  bringing in-limine motions, which deadline we had set for

2  January 23rd.

3          Now, we've suspended the October 17th deadline in order

4  that we can talk about the issue, because it's an issue that we

5  just clearly didn't anticipate.  The thought with regard to the

6  300 was to help crystalize in your mind and in our mind what the

7  issues are and hopefully bring before the Court issues that can

8  be defined, is what we've talked about as in-globo issues.

9          So, when we sat down, after getting Andy's email this

10  week, we thought about it, and we do not intend to bring the

11  in-limine motion forward to October the 17th.

12          On the other hand, if we wait until January 23rd to

13  bring all of the in-limine motions, Judge Barbier is not going to

14  be able to get them all done.  So there's got to be some happy

15  middle ground that we can all live with it, seems to me.

16          Now, one of the things that, when we went through the

17  group of 300 that we identified as an in-globo issue, by way of

18  example is the MBI issue, everybody knows it's out there,

19  hovering above.  It relates to both exhibits and presumably it

20  relates to testimony.

21          MR. HERMAN:  I think it does, yes.  Particularly in

22  cases where somebody testified before the MBI and then has

23  subsequently taken the Fifth and presumably will continue to take

24  the Fifth through trial.

25          THE COURT:  So we've got two discrete issues there.

1    First is the exhibit issue, which is what the group of 300 was

2    designed to bring to the fore.   And second is the testimony

3    issue, which we all know is out there.

4           It occurred to me that, if we could, at least as to

5    exhibits and possibly as to testimony, identify the in-globo

6    issues and do a staggered schedule, getting us through

7    January 23rd on these big issues that we all can see in the group

8    of 300, that might be the best way to approach it.

9           So what I'd like you all to do -- and if you want to

10   bring anything, Steve, you're not precluded.   I am going to give

11   BP time to respond to anything you choose to bring, because I did

12   not mean to bring the in-limine motion that far forward.   But, if

13   you want to go ahead and identify the issues by either filing a

14   motion or by sharing a list of those in-globo issues, I think

15   we'll put you all on a briefing schedule and tee them up

16   sequentially, so that they can be disposed of in an orderly

17   manner.   It will give Judge Barbier time to work on them, rather

18   than have him have a window of opportunity, all motions

19   January 23rd with trial February 27th.   Which doesn't make a lot

20   of sense to me either.   But we can't anticipate all the

21   in-limines and we can't anticipate all final pretrials, so that

22   date still applies.

23          Now, with that being said, comments from you, Steve.

24   And then, Andy, let's hear what you think.

25          MR. HERMAN:   Steve for the PSC.   I mean, I think that

 1    makes sense.  What we had planned to do -- and, if we're wrong,

 2    you can tell us, but I think it's kind of a no harm/no foul

 3    approach -- what we were planning to do is we'd identified about

 4    eight different issues that we were going to submit, I think --

 5    unless you wanted us to do something differently -- we were going

 6    to submit letter briefs addressed to Judge Barbier similar to

 7    what we did with the Boots and Coots report, and cc you of course

 8    and all defense counsel.  And it seemed to us that there was no

 9    harm in having those out there.

10           To my knowledge, there wouldn't have been a date,

11    frankly, for the defendants to respond.  It would have been up to

12    the Court to say:  Okay, I want to look at these issues, or I

13    want to put those off.  Or, some of these issues, frankly, the

14    Court may say:  I can't really decide this on an in-globo basis,

15    I have to see it document by document.  That's a possibility for

16    several of them.  Or the Court might be able to say:  Look, as a

17    general matter, this is kind of the way I feel.  There might be

18    exceptions, I don't know.  But we figured that it was -- there

19    was only upside to at least try to -- and we weren't going to go

20    document by document and brief all of the documents, or even try

21    to identify all the documents that fell within a certain issue.

22    What we were going to do is say:  This is an issue that we see is

23    going to apply to a representative number of exhibits, we have a

24    few in the list of 300 that are examples.  And then --

25           THE COURT:  And then you'll attach those to your letter

1   brief?

2            MR. HERMAN:  We can.

3            And then it would be up to the Court to decide how to

4   elicit further responses from the defendants on whatever

5   timetable.  And we thought that that was a good way of getting

6   the ball rolling.

7            THE COURT:  I think it is a good way of getting the ball

8   rolling.  And what caused us to suspend the deadline was Andy's

9   concern, which I think is justified, which is are we moving all

10  in-limine dates up to the 17th.  And the answer is clearly no, I

11  think.

12           Andy.

13           MR. LANGAN:  Your Honor, thank you.  Andy Langan for BP.

14  What Your Honor has said makes sense to us.  Mr. Nomillini is on

15  the line, too, and he can jump in here as well.  But I take it

16  what Steve says makes some sense.

17           I was going to suggest, frankly, that maybe we come back

18  next week with a short list of in-globo issues.  They and us and

19  anyone else who wants to.

20           THE COURT:  I think that's fine.  You're going to have

21  their short list on the 17th.

22           MR. HERMAN:  Yes, Your Honor.  I think I had mentioned

23  some of them last week in court.  I can probably recall most of

24  them if you wanted them now.

25           MR. LANGAN:  My point was, we put together a similar

1   list, and then we can just put our head together about is there a

2   logical way to brief these.  If they want to file a bunch of

3   letter briefs in advance, there is no harm to us.  It just gives

4   us an earlier peak of what they're doing, and that's fine.

5           THE COURT:  I think that's a good way to proceed.  I

6   have no problem, Steve, with your filing your letter briefs.  If

7   you want to rattle them off today, that's fine, to the extent

8   that you can recall them.

9           And, then, anybody else who has what I would call

10  in-globo issues with regard to the group of 300 exhibits, why

11  don't you be prepared next week, circulate to everybody by email.

12  When is the 17th?  Monday.  So, by Monday, you'll know what's on

13  PSE's mind.  All you have to do is come up with additional

14  things.  And then we can talk about a briefing schedule.

15          I have no reason to believe that Judge Barbier is not

16  going to agree to any briefing schedule we agree to.

17          MR. NOMILLINI:  Your Honor, Mark Nomillini.  I think

18  what's been said makes sense.

19          One thing I would I would add is, last week, when we

20  conferred with the plaintiffs, we promised to get back to each

21  other and carefully consider each other's issues.  And we'll be

22  sending the plaintiffs our revised objections in light of the

23  meet-and-confer this afternoon.  So it's just a heads-up that

24  that's something to be taken into account, and I think it will

25  narrow the issue.

 1          And I think that plaintiffs also were looking at

 2    narrowing some of the issues, and we look forward to hearing from

 3    them on that.

 4          THE COURT:  Good.

 5          Any other comments on that?  And, Andy, thank you for

 6    bringing it up.  It's just something that had not occurred to us.

 7    And I hope that clarifies.

 8          MR. MILLER:  Your Honor, in terms of comments, to

 9    endorse the approach, I can tell you, in our 50 exhibits of the

10    300, we've had a couple of meet-and-confers with Jeff Breit, and

11    we narrowed the objections down to only six exhibits.  Of the six

12    exhibits, a third are Coast Guard MBI issue, and the remainder

13    are ad hoc.  And so I really think it makes sense to cover these

14    in-globo issues, get those resolved.  And, so, come January 23rd,

15    we're just going to be dealing with ad hoc issues.

16          THE COURT:  Right.

17          MR. MILLER:  And I think that mini experience was useful

18    for that purpose because that's what we found out.

19          THE COURT:  Totally agree.  But I wanted to clarify

20    because it was a legitimate concern.

21          Steve.

22          MR. HERMAN:  Would it be helpful to read the list?

23          THE COURT:  Sure.  Why don't you read the list.

24          Everybody, get your pens out.

25          MR. HERMAN:  One is what are alleged to be subsequent

1   remedial measures.

2         One is what we discussed last week, which is where it's

3   clearly admissible as to one defendant but a different defendant

4   says:  Well, it's hearsay as to us.

5         There is things that we consider to be public records or

6   government documents.  You asked us to try to do in-globo where

7   an exhibit is alleged to include Daubert 702 type of opinions

8   within the document.

9         One thing we may have discussed last week, but there are

10  email strings which are clearly the business record of one

11  defendant, maybe there are communications between two defendants,

12  but what happens with the part of the email string that's not a

13  producing party?  So we're going to try to deal with that.

14        Then you have other incidents or prior bad acts.

15        And one thing that's kind of -- I don't know if it's

16  really an in-globo evidentiary issue, but there are a whole

17  series of statements, transcripts, notes, et cetera, that were

18  taken during the Bly investigation, which we believe are business

19  records, and they've been objected to on various different

20  grounds.  So we were going to try to deal with it, with the Bly

21  interview notes, et cetera, as one topic.

22        And then, as Your Honor pointed out, you have the MBI

23  issues which has a few different subsets.  I think we asked the

24  person doing the letter brief to really break it down into about

25  six or seven different sub-topics.  Because you have testimony

1    versus the reports.  You have the what we consider the Coast

2    Guard report perhaps versus the MS report.  And then you have

3    what happens to the testimony if the person takes the Fifth.  So

4    there's a bunch of sub-issues within the in-globo MBI issue.

5           That's what we had kind of intended to present to the

6    defendants and the Court in some type of common way on Monday,

7    and hopefully that will get the ball rolling.

8           Just as a caveat, it might take us a little bit of time

9    to actually put exhibits together.  We might get the letters in

10   and then find some way to get to the Court the exhibits maybe on

11   a CD or something.

12          THE COURT:  Okay.  And if you want to -- yeah, either

13   way is fine.  If you want to get the letter briefs in and then

14   supplement with example exhibits, that's fine.  If you want to

15   hold off for a couple of days on the letter briefs, put it all in

16   at once.  Doesn't matter.

17          MR. HERMAN:  Thank you.

18          THE COURT:  Okay.  Any other comments on that issue?

19          Does everybody think that that's a reasonable way to

20   proceed from here?  Okay.

21          We've got an email communication from Suzie Wilson last

22   night, the hardest working paralegal in the city of New Orleans.

23   10:29 p.m., which was early for Suzie.

24          MR. MILLER:  She was just starting her day.

25          THE COURT:  She was just warming up.

 1          And she points out on behalf of Kerry that we've got a

 2    new authenticity issue.

 3          You want to explain it to everybody?

 4          MR. MILLER:  I will sure do.  In the wee hours in the

 5    morning, I think Steve, you know, exchanged some Kenner ideas.

 6    But here's the issue as I understand it.

 7          Last week, we talked about deposition exhibits -- so it

 8    relates to Category One from your trial exhibit order -- that

 9    were marked as exhibits but actually multiple documents with a

10    single exhibit number for deposition purposes.  So now that the

11    deposition exhibits are being converted into trial exhibits --

12    and, by the way, this excludes the multi-thread email that Mike

13    Underhill and I talked about last week.  That will be one

14    exhibit.  This truly is a series of documents marked with one

15    exhibit number.

16          And what we said last week was that we would separate

17    those, separate the deposition exhibit into multiple exhibits

18    such that deposition Exhibit 1 was actually four documents.  So

19    it would now be trial Exhibit 1A, 1B, 1C, 1D.

20          We thought we solved the problem last week.

21          Apparently what has happened is multiple participants

22    are going ahead and separating the document or the exhibit into

23    the 1A, 1B, 1C and 1D.  And what Worldwide is getting is they're

24    getting different versions of 1A, 1B, 1C, 1D, either because

25    people are perceiving the page breaks differently, or using

1    different versions of exhibits.  Some have handwriting on it, you

2    know.  Some have marginalia.  Some are missing a page.  So on and

3    so forth.  So we're looking for a solution.  And, I got to say,

4    we are buried in the weeds here.

5         But, apparently, Worldwide does not want to go forward

6    marking these exhibits without some resolution on what the issue

7    is, because they're kind of stuck with the Transocean version, a

8    PSC version, an Anadarko version of the same document, with three

9    different break-ups.

10        So, anyway, I think there are four proposed solutions up

11   for consideration.

12        It seems like the consensus one, maybe the one I like

13   the most, is you set up a very small mini-group to deal with the

14   multiple documents, single exhibit identified as universal

15   documents, and they submit to Worldwide what the consensus break

16   is for those multi-exhibits.

17        I know Steve had some other proposals.  I think one had

18   been rejected by BP, where the producing party does it or the

19   requesting party does it.

20        But, at any rate, those are the options.  If anybody

21   else has a better idea, I think we're all open to it.  But it is

22   a bottleneck.

23        THE COURT:  And it needs to be resolved.

24        So who else wants to chime in on this issue?  We've

25   heard from Steve.  Steve suggested that whoever produced the

1   document originally cures it by submitting the exhibit in full as

2   produced.  Or, number two, whoever designates the exhibit cures

3   the problem.

4        Andy.

5        MR. LANGAN:  Mark may be in a better position on this

6   than I am.  But, just in terms of Steve's solution and why we

7   rejected it, it's probably based upon this.  It's probably mostly

8   BP documents at issue, and I don't think we created the issue.

9   We want the examining parties at a deposition that used the

10  deposition exhibit that had somebody's handwriting on it.

11       THE COURT:  So that would be Steve's solution B, whoever

12  designates the exhibit cures the problem.

13       MR. LANGAN:  Whoever first marked it as an exhibit at

14  the deposition.

15       THE COURT:  That's what I think you mean by designating.

16       MR. LANGAN:  It shouldn't be on BP to clean up

17  somebody's mess, which is essentially what that is, frankly.

18       Mark, do I have that right?

19       MR. NOMILLINI:  Yes, that's right.

20       THE COURT:  Steve, your solution B, you say whoever

21  designates the exhibit cures the problem.  By that, you mean,

22  whoever marked the exhibit for the deposition?

23       MR. HERMAN:  No.  What I actually meant was, Your

24  Honor -- Steve Herman for the plaintiffs -- was we're providing

25  cuts to inData that eventually go to the defendants, and those

 1    cuts include in some cases exhibits that go with the

 2    designations.  And so, essentially, we're trying to offer that

 3    exhibit into evidence with the depo.  And, if we're doing that,

 4    it should be our responsibility to make sure the exhibit's right.

 5    And that then goes to Halliburton, and Halliburton designates a

 6    different page that has a different exhibit.  And they're

 7    essentially offering it into evidence.  Then Halliburton, I

 8    guess, would be responsible for making sure of that designation.

 9         MR. MILLER:  The issue is I think with overlapping

10    exhibits, where the exhibits fall within the same testimony as

11    Halliburton and PSC, so you have three sets of exhibits being

12    broken apart and being submitted to Worldwide.

13         MR. LANGAN:  Isn't the issue that, in the context of

14    those depositions, a deposition exhibit is marked and it's on

15    your list, and we say:  We're fine with that except there's

16    marginalia on it, there's handwriting on it, we object to it for

17    that.  And you come back and say:  Fine, will you stipulate a

18    clean copy?  We say:  Yeah.  Whose responsibility is it to get

19    the clean copy to roll with?

20         THE COURT:  You're right, and I am not suggesting that

21    BP needs to do this.  This is something that needs to be

22    corrected by the party using the exhibit at the deposition.

23         MR. LANGAN:  Right.

24         MR. HERMAN:  Maybe -- somebody might kill me for saying

25    this -- why don't we just take the responsibility for all the

1     exhibits?

2             THE COURT:  There's your subcommittee.

3             MR. UNDERHILL:  He's right, somebody's just about to

4     kill him.

5             MR. BREIT:  May I stand?

6             THE COURT:  No, Mr. Breit.

7             MR. LANGAN:  Let me think.

8             Mr. Nomillini, how do we feel about Mr. Herman?

9             MR. GODWIN:  He liked it, Judge.  He adopted it.

10            THE COURT:  Mr. Breit, come on up.

11            MR. LANGAN:  And, Mr. Nomillini, we should be thinking

12     about how do we feel about it.  Maybe it's okay.

13            MR. NOMILLINI:  I think Mr. Herman's suggestion is a

14     fine one.

15            THE COURT:  Because we all trust Mr. Herman and Mr.

16     Breit.

17            MR. BREIT:  Yes.  As you should.  Jeffry Breit for the

18     PSC.

19            One of the issues that's come up -- and I think Steve is

20     correct, we don't mind doing it.  In each deposition, some of the

21     lawyers introduced Exhibit No. 87, and introduced 127 pages of

22     the exhibit.  It turns out, when we go back to find the original

23     exhibit, because it had marginalia, it's 131 pages and not 127.

24     It had not been produced in toto.

25            In our meets-and-greets, we decided we would find the

1   original and introduce the original exhibit on our -- whatever we

2   thought was the original maximum.  And, every once in awhile,

3   because documents went back and forth between defendants in

4   emails, et cetera, there may be extra pages.  And we're trying to

5   say we'll do it.

6          If you have a problem on a specific exhibit that has

7   more pages than what we thought, call us up and tell us.

8          I've tried not to add things from a deposition

9   introduction because it wasn't there at the time.  And somebody

10  would complain to Cheryl if we add stuff.

11         But we're going back to the original and putting in the

12  whole original that we can find from a document dump from one of

13  the defendants.  If they have a problem with it specifically,

14  then we should do individual meets-and-greets.

15         Is that okay, Kerry?

16         MR. MILLER:  Yeah.  I think the only gap here may be

17  what happens if an exhibit falls within designation testimony

18  that the PSC has not designated, who then would be responsible

19  for the cure of that exhibit?

20         MR. HERMAN:  I'm saying, just to eliminate confusion,

21  we'll look at the finals of all the exhibits.

22         MR. MILLER:  Even if it's not one that you designated?

23         MR. HERMAN:  Yeah.

24         THE COURT:  Yeah.  So our subcommittee has just been

25  formed.

1          MR. MILLER:  Subcommittee of one.

2          MR. HERMAN:  Feel free, if it comes back to us, after

3  you all have made your designations a week after ours, and we

4  notice that there are four new exhibits on there that we didn't

5  have, we'll go find the originals and send it off to Worldwide.

6          THE COURT:  And that will make it easier for Worldwide,

7  because they only have to speak to one person.

8          MR. MILLER:  Maybe this afternoon we can do a call to

9  Worldwide, or Monday.

10         MR. BREIT:  Let's do it Monday, because Sue and Regina I

11  need, and both of them are out today.

12         MR. MILLER:  My impression is they've been called a lot

13  this week.

14         MR. BREIT:  We'll do it on the same call, we'll do it on

15  Monday.

16         MR. HERMAN:  And my understanding -- maybe we can clear

17  this up on Monday -- is that, with the exhibits, perhaps as being

18  with the depo cuts, we seem to get emails about the exhibits are

19  posted on a shared vault or some type of thing that everybody has

20  access to it.  Am I right about that?  So, when we post what we

21  think is the final exhibit, my suspicion is that anyone else can

22  go on there and look at it and confirm that that's the correct,

23  authentic document.  And, if it isn't, we'll deal with it at that

24  time.  I think that's the way it works.

25         MR. MILLER:  Let's proceed.

1        THE COURT:  Let me ask you, Kerry, the Monday call that

2  you referred to, is that the call with me --

3        MR. MILLER:  No.  This is really I think just a call to

4  make sure that Worldwide is clear on what the direction is.  It

5  doesn't need to be with you.  I think it would be a very small

6  group.

7        THE COURT:  Good.  No problem.

8        MR. MILLER:  Make sure they understand and that we're

9  going to represent to them that the Court has supported this

10  solution to their problem.  I think that's all we want to do.

11        THE COURT:  And, listen, PSC, thank you for

12  volunteering.

13        MR. BREIT:  Thanks, Steve, as he leaves to go do

14  something.

15        But most of our authenticity objections that we got from

16  you all already and after the meet-and-greets, we've already now

17  posted up what we believe are the clean copies.  There's four or

18  five that we can't find, but we'll come to the original.

19        MR. MILLER:  This is purely a Worldwide document

20  separation issue, which may include some old authenticity issues

21  that I think we've resolved for the most part.

22        MR. BREIT:  Correct.

23        THE COURT:  Okay.  All right.

24        Next up, clean up responder defendants.

25        We had a telephone discovery conference with the

1   responder defendants on October the 5th.  We're having a further

2   follow-up conference on October the 20th.  The parties were asked

3   to work on a joint discovery order.  So I think that that's all I

4   have to update you all on.  Unless you all have something you

5   want to raise with that?  Hopefully, we're getting in shape on

6   that.

7           Kerry, you had raised the issue of the Final Four,

8   inability to get hotel rooms on April 2nd and 3rd.  Judge Barbier

9   has suggested that he will host several people at his home.

10          MR. MILLER:  That's what I was trying to avoid.

11          THE COURT:  That's exactly right.  He understands it, he

12  doesn't like it.  He's going to defer anything with regard to

13  that.  But, if you can't find a hotel room, we understand.

14          I also wanted to point out that that week, Friday is

15  Good Friday.  So you've got Monday and Tuesday being the Final

16  Four, and Friday being Good Friday.  Just a notation.

17          Where do we stand on BP's motion to compel Halliburton

18  to provide investigation material?  And, if you're not ready to

19  talk to me, tell me.

20          MR. LANGAN:  I think we're still talking, and they're

21  still producing.

22          I did want to mention that, as Halliburton goes through

23  the process of producing documents that were briefly withheld on

24  privilege, that we're looking at those.  There's quite a number.

25  And we may at some point come back to the Court and say:  You

1    know what, now that we see these documents, they should have been

2    produce and never asserted the privilege, we want to have

3    reopeners.  But we're not there yet.  But I just don't want that

4    to be a surprise.

5            THE COURT:  Okay.

6            MR. GODWIN:  Don Goodwin for Halliburton.  Your Honor,

7    Andy did mention that to me in the last day or two.  And I don't

8    want it to go unaddressed, as:  Oh, Halliburton agrees with what

9    Andy said.

10           When the objections were made based on privilege, they

11   were made in good faith and based upon information we had

12   available.  And, if we have, as responsible lawyers for

13   Halliburton, have determined since the objections were made the

14   privilege no longer applies, we have a duty to the Court to so

15   inform.  We've done that.  And at no time do we want Andy or

16   anybody else thinking, by doing that, we're willing to be

17   punished or sanctioned or whatever, as a result of having taken

18   objections that pertain to privilege that we have later

19   determined possibly should have been made at that time.

20           And we'll continue to do that, Your Honor, where we

21   think we need to change a position.  We're going to continue to

22   inform the Court and other parties as well.

23           THE COURT:  Okay.

24           MR. GODWIN:  Thank you, Judge.

25           MR. LANGAN:  Your Honor, it's Andy Langan.  I did not

 1   use the P word or the S word.  I did not say punished or

 2   sanctioned.

 3           Although, frankly, that might be appropriate, we won't

 4   go there today.

 5           What I was talking about was, if we've deposed witnesses

 6   of Halliburton that we didn't take a full examination of because

 7   documents were improperly withheld on privilege, that is PTO 17,

 8   good cause.  And all I want to put is a placeholder --

 9           THE COURT:  May be.

10           MR. LANGAN:  May be.  That will be up to Your Honor.

11   That will be up to Your Honor.  That's all.

12           THE COURT:  Okay.

13           MR. GODWIN:  Judge, Don Godwin for Halliburton.  It

14   seems as more pressure is put on BP by other parties, Andy

15   becomes more vitriolic in some of his positions.  This business

16   about sanctions and whatever because --

17           THE COURT:  He didn't use those words.

18           MR. GODWIN:  He didn't use the P word and S word.

19           So the point being, Judge, is that we all have a duty to

20   change positions when they think that it's the right thing to do.

21   And Andy takes that as some tacit admission that we have done

22   something wrong.  And I just suggest to him that I don't think

23   that doing that is constructive in terms of what we're all trying

24   to do.  Nobody's been that way before.  He's gone down these

25   rabbit trails today of frolicking and using other things like

1    that.   And I just suggest to him that he not be so personal on

2    the way he's dealing with my client.

3              THE COURT:  I think what Andy is doing is giving us what

4    he calls a placeholder.

5              Is that correct, Andy?

6              MR. GODWIN:  What he's given is a bunch of nonsense.

7              MR. LANGAN:  Placeholder.  Thank you.

8              THE COURT:  Placeholder.  Thank you.

9              MR. GODWIN:  Thank you, Your Honor.

10             THE COURT:  Okay.  I hate asking these open-ended

11   questions.  Are there any outstanding issues that we need to talk

12   about relative to completion of Phase One written discovery?

13             MR. WILLIAMSON:  Well, it's not an issue for you today,

14   but we're still in the process of dealing with Cameron on the

15   ESI.  That process is going cooperatively.  So, that issue is

16   still outstanding, but there's nothing to address with the Court

17   today.

18             THE COURT:  Okay.  All right.

19             Now, guys, let me ask you, that is the end of my regular

20   agenda, before I get to the trial planning group agenda.  Does

21   anybody have anything they want to discuss before we get to trial

22   planning?

23             Alan, come on up.

24             MR. YORK:  Alan York for Halliburton.  Just one quick

25   follow-up from the working group conference order last week.  The

```
1    PSC had said that they were going to amend their B-3 complaint,

2    and you said that you were going to check with Judge Barbier to

3    make sure that he was okay with that extending the 30-day

4    timeline for the defendants to answer the amended complaint.

5              THE COURT:  He's fine with it.

6              MR. YORK:  Just wanted to confirm.  Thank you.

7              MR. LANGAN:  This may be trial planning, Your Honor, but

8    working report also talked about seeking guidance about the two

9    page summaries.

10             THE COURT:  That's on my trial plan.

11             MR. LANGAN:  Very good.

12             MR. WITTMAN:  Your Honor, I have a question for Cameron.

13   Phil Wittmann for Cameron.  As I understand it, by next Friday,

14   we're supposed to identify depositions not on PSE's list of whom

15   we want to designate testimony.  My understanding -- and this is

16   the question -- what if a deposition is on PSE's list, they don't

17   designate anyone next Friday?  If it is, we may not know the

18   PSE's decision until either just before or maybe even after the

19   deadline.  Are we still in line to be able to go back and go

20   beyond that deadline of next Friday?

21             MR. HERMAN:  Well, it's okay with us.  At least as to

22   the depos that were taken through July 31st, our plan -- to the

23   extent we haven't already, and I think we're most of the way

24   there -- is to put in designations for all I think it's either

25   186 or 187.
```

1          Now, we don't necessarily mean that we're going to offer

2   all those in evidence at the end of the day.  But, just to do the

3   deposition cut process, to get the ball rolling, we're putting

4   them all in to the chain.  So I think, at least for those 186 or

5   187, they're all designated.

6          As to the ones that were taken after July 31st, I think

7   we're designating, you know, some of them.

8          Some of the depos that are being taken now, frankly,

9   seem to be retreading some old ground, based on my very

10  superficial reading of the summary.  So you might want to look at

11  those more closely, or the proposed August 31st ones.

12         But I think, for the ones that were taken as of July

13  31st, I think you can consider all of those designated, at least

14  for this process.

15         THE COURT:  And, Phil, relative to your case, if you

16  have depositions that you want to designate, then go ahead and

17  make your designations.  You don't need to wait for anybody.  If

18  they haven't designated for those depositions taken by July, you

19  go can ahead and, if you want to designate, make your

20  designations.

21         MR. WITTMAN:  Thank you, Judge.

22         THE COURT:  No problem.

23         MR. YORK:  Just for clarification, so do we need to file

24  the list that's referenced in the order by next Friday?  Or are

25  you saying, no, we just, as we go along, designate.

 1          THE COURT:   No. I think that you go ahead and file your

 2   list, and everybody knows what your list is.

 3          MR. YORK:   Okay.

 4          THE COURT:   Okay?

 5          MR. WITTMAN:   My question was a little different than

 6   that, Judge.   My question is, if the deposition's on the PSE's

 7   list but they don't designate anything, we won't know that until

 8   maybe next Friday.

 9          THE COURT:   And my answer to that, Phil, was --

10          MR. WITTMAN:   Do we have time to designate after that?

11          THE COURT:   Well, Steve says he doesn't have any

12   objection to that.

13          My thought is, I don't have any objection to that.   But,

14   if you want to designate that testimony yourself, go ahead and do

15   it.

16          MR. WITTMAN:   Okay.

17          MR. HERMAN:   I think there's two different timelines.

18   One is a timeline for just advising the Court and the parties

19   essentially which depositions you're going use.   And the other

20   timeline is Your Honor's order of last week that sets when the

21   designations need to be done.

22          THE COURT:   Cross-designations.

23          MR. HERMAN:   But, just as a factual matter, I think for

24   the depo cut process, we're designating something, and the first

25   186, first 187.

1          THE COURT:  Okay.

2          MR. YORK:  So, I'm sorry, I just want to make sure.  I

3    don't want to send the wrong list.  So my understanding is, we

4    have a list right now, Steve, of 189 depositions prioritized by

5    the PSC.  That's the last list that we have.

6          MR. HERMAN:  That sounds right.

7          THE COURT:  That sounds right.

8          MR. WITTMAN:  My understanding of next week's list was

9    we would compare that against the lists of all depositions that

10   had been taken; and, if there were any that have been taken that

11   are not on the 189, that we should provide that list of

12   additional depo cuts that we will eventually want to get to.  And

13   I think that's in the latter phase, that's the list that we're

14   looking for.

15         THE COURT:  That's right.

16         Okay.  Now, anything else before we move on to trial

17   planning?  And I don't think trial planning has to be on the

18   record.  Do you guys?

19         So we can say good-bye to the court reporter and

20   everybody, and we can work through it from there.

21         (11:56 a.m., Proceedings concluded.)

22

23

24

25

1                              CERTIFICATE

2


3

        I, Susan A. Zielie, Official Court Reporter, do hereby
4   certify that the foregoing transcript is correct.

5


6
                            /S/ SUSAN A. ZIELIE, FCRR
7                           _____
                                 Susan A. Zielie, FCRR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25