# Exhibit A

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**Jun 16, 2010**

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § § | MDL No. 2179 |

## HALLIBURTON'S RESPONSE IN SUPPORT OF TRANSFER OF ACTIONS TO THE SOUTHERN DISTRICT OF TEXAS FOR COORDINATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

Pursuant to Rule 7.2(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation (the "Panel" or "JPML"), Halliburton Energy Services, Inc. ("HESI") and Halliburton Company[1] (collectively, "Halliburton") hereby submit their response to the Pending Motions to Transfer and for Consolidation of Pretrial Proceedings Pursuant to 28 U.S.C. § 1407.[2]

---

[1] HESI is a one-hundred percent (100%) wholly-owned subsidiary of Halliburton Company. Halliburton Company is publicly traded on the New York Stock Exchange. Halliburton Company is not a proper party to any of the outstanding litigation related to the Deepwater Horizon Incident. Additionally, Sperry-Sun Drilling Services, Inc. ("Sperry"), has also been improperly named as a defendant in certain Related Actions. Sperry was dissolved in October 1997 and its assets and liabilities were ultimately transferred to HESI in January 1999. Today, Sperry operates as an operating group of HESI.

[2] According to the JPML Docket Report, as of June 3, 2010, three motions for transfer have been filed in MDL No. 2179. *First,* on May 6, 2010, Plaintiffs Acy J. Cooper and Ronnie Louis Anderson, individually and on behalf of themselves and all others similarly situated, filed their Motion of Plaintiffs for Transfer of Actions to the Eastern District of Louisiana Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (the "First Motion"). [Dkt. #1] *Second,* on May 19, 2010, Plaintiff Nova Affiliated S.A. ("Nova") filed its Motion to (1) Transfer to the Southern District of Texas Pursuant to 28 U.S.C. § 1407 and (2) Format and Caption Consolidated MDL Proceeding to Include Expanded Claims (the "Second Motion"). [Dkt. # 9] *Third,* on May 20, 2010, BP Exploration & Production Inc. ("BP") filed its Motion to Transfer to the Southern District of Texas for Coordinated or Consolidated Pretrial Proceedings Under 28 U.S.C. § 1407 (the "Third Motion"). [Dkt. #13] In addition to these motions, on June 1, 2010, Plaintiffs Brent J. Rodrigue, Sr., Randy John Picou, Donald Weaver, and Roland Michael Lyons, individually, and on behalf of themselves and all others similarly situated, filed their Amendment to Motion

-1-

Halliburton agrees that transfer and consolidation of these cases is appropriate under Section 1407 and respectfully requests that the Panel transfer all actions presently before it and all related actions identified by Parties in Notices of Related Actions and Potential Tag-Along Actions to the Southern District of Texas, Houston Division.[3]

## I.   Summary of Argument

Halliburton agrees that pretrial coordination before a single court is appropriate for all the actions related to the Deepwater Horizon Incident. Further, the Southern District of Texas, Houston Division, is the most appropriate and efficient transferee forum for the following reasons: (1) Transocean filed its limitation of liability action in that District; (2) the main defendants in this litigation are headquartered and/or have principal offices located in that District, and the relevant documents and witnesses will likely be primarily located there; (3) it is a convenient location for the parties and witnesses; and (4) it can efficiently handle the consolidated proceeding.

## II.   Background[4]

The cases addressed by the Pending Motions are cases arising out of or related to the April 20, 2010, explosion and fire aboard the Deepwater Horizon, an offshore drilling rig owned and operated by Transocean and/or its affiliates ("Transocean"), and the ensuing oil spill (the "Deepwater Horizon Incident") from a BP well located on Mississippi Canyon Block 252

---

for Transfer substituting themselves as the moving Plaintiffs in the original filed motion. [Dkt. # 31] Halliburton's Response addresses all of these pending transfer requests.

[3] To date, in its Notice to All Involved Counsel, the Panel identified 78 actions that were presently before it. [Dkt. #16]. Several parties to this litigation have also filed Notices of Related Actions and Potential Tag-Along Actions listing additional lawsuits not named in the Notice of All Involved Counsel. On May 18, 2010, HESI filed its Notice of Potential Tag-Along Actions noting 16 additional actions. [Dkt. #7]. On May 24, 2010, BP filed its Notice of Related Actions noting 25 additional actions. [Dkt. #25]. On June 3, 2010, BP filed a second Notice of Related Actions noting 27 additional actions. [Dkt. #36].

[4] J.P.M.L. Rule 7.1(b) requires responses to averments in motions to be made in numbered paragraphs that correspond to the number of paragraphs of the motion to which the responsive paragraph is directed. Plaintiffs Acy J. Cooper, Ronnie Louis Anderson, and Nova Affiliated S.A., however, did not comply with J.P.M.L Rule 7.1(a). Therefore, Halliburton is unable to comply with J.P.M.L. Rule 7.1(b) in its Response.

("MC252"). BP America Production Company (an affiliate of BP) hired Transocean to use the Deepwater Horizon to drill an exploration well on MC252 in the Gulf of Mexico approximately 130 miles southeast of New Orleans.

HESI provided cementing services to BP on the Deepwater Horizon. Cameron International Corp. and/or its affiliates ("Cameron") manufactured the blowout preventer used on the MC252 exploration well. HESI and Cameron have been named as co-defendants along with BP and Transocean in many of the cases addressed by the Pending Motions.

## III.  Procedural Background

In the months following the Deepwater Horizon Incident, over 140 separate lawsuits have been filed in federal and state courts throughout Texas, Louisiana, Mississippi, Alabama, Florida, Tennessee, Kentucky, Georgia, and Delaware. The lawsuits rely on the same general operative facts—the explosion, the resulting injuries, and the subsequent oil spill—though they are based on separate legal theories (e.g., negligence, environmental pollution, federal class action, derivative, and personal injury). Each of the Related Cases and Potential Tag Along Actions are in their initial stages. Because no case is substantially farther advanced than any other, all cases are ripe for transfer and consolidation.

The First Motion filed by Acy Cooper and Ronnie Louis Anderson, representing certain plaintiffs, requests a transfer to the Eastern District of Louisiana of all actions "based on the . . . design, maintenance, and use of products and devices that allowed the contamination of the Gulf of Mexico, its adjoining coastal and marine environments, and subsequent damage to the marine industry." [Dkt. #1].

The Second Motion filed by Nova, a separate plaintiff, requests a transfer of all related actions based on negligence, environmental claims, economic claims, injunctive relief issues,

and all applicable international law claims to the Southern District of Texas. [Dkt. #9]. The Second Motion further urges the Panel to format and caption the present MDL proceeding in a manner that captures additional, expanded claims stemming from the same incident. *Id.*

The Third Motion filed by BP requests an MDL proceeding that consolidates and coordinates "all" of the Related Cases involving one or more common questions of fact. [Dkt. #13]. BP further argues that the First Motion is unnecessarily limited to transfer of cases sounding in products liability, and that the MDL action should be transferred to a single judge in the Southern District of Texas who can formulate a single pretrial program that addresses the various issues raised by all the related litigation. *Id.*

Halliburton agrees that the Panel should transfer all of the Related Cases, including those listed in subsequently filed Notices of Related Actions and Potential Tag-Along Actions, to a single district court for consolidation and coordination of pre-trial proceedings pursuant to 28 U.S.C. § 1407.[5]

## IV.    **Consolidation and Coordination of Pretrial Proceedings is Proper**

The Panel recognizes that the "efficient handling of cases arising from the spill is critical." [Dkt. #3]. Pursuant to 28 U.S.C. § 1407, the transfer of actions to a single jurisdiction for coordinated or consolidated pretrial proceedings is proper when the civil actions pending in various districts involve one or more common questions of fact, and transfer and consolidation will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. 28 U.S.C. § 1407(a). Transfer and consolidation is appropriate here.

The Deepwater Horizon Incident and the related litigation present common, yet "complex questions of fact." *In re First Nat'l Bank, Heavener, Okla. Sec. Litig.,* 451 F. Supp. 995, 997

---

[5] Halliburton anticipates that additional plaintiffs will file new actions after the date of this filing. Halliburton will continue to update the Panel via Notices of Related Actions to ensure that all actions related to the Deepwater Horizon Incident are properly before the Panel.

(J.P.M.L. 1978) (granting transfer where common "complex factual questions" made consolidation of actions "necessary"). Although there are certain legal and factual differences among the cases, all relate to the same underlying issue: the cause of the Deepwater Horizon explosion, the resulting injuries, and the oil spill. As the Panel has previously recognized, "transfer under Section 1407 . . . does not require a complete identity or even a majority of factual or legal issues as a prerequisite to transfer." *In re Merscorp Inc. et al., Real Estate Settlement Procedures Act (RESPA) Litig.,* 560 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008).

Here, "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery, avoid inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." *In re Vioxx Prods. Liab. Litig.,* 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (consolidating 148 actions pending in 41 federal districts). Halliburton requests the Panel to transfer and consolidate *all* of the Related Cases, including those raised by the Notices of Related Actions and Potential Tag-Along Actions, as requested by the Second Motion and the Third Motion, to "a single judge who can formulate a pretrial program that: (1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues; and (2) ensures that pretrial proceedings will be conducted in a manner leading to a just and expeditious resolution of all actions to the overall benefit of the parties." *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.,* 543 F. Supp. 2d 1376, 1378 (J.P.M.L. 2008).

The vast majority of the Related Cases filed in federal court are class actions. The Panel has long recognized that overlapping and parallel class actions asserting similar claims for recovery are particularly well-suited for consolidation. *See, e.g., In re Hawaiian Hotel Room Rate Antitrust Litig.,* 438 F. Supp. 935, 936 (J.P.M.L. 1977) ("Section 1407 centralization is especially important to ensure consistent treatment of class action issues.").

With respect to the personal injury cases, the Panel recently commented on the desirability of transferring personal injury and wrongful death cases along with the economic damage cases in *In re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*. The Panel specifically noted:

> [W]e are initially persuaded that the centralized proceedings should eventually include the related personal injury and wrongful death actions. The liability discovery in all the cases will certainly overlap. By their very nature, the personal injury and wrongful death claims will require considerable individual discovery in addition to the common discovery in each case. We are confident that the transferee judge can design the kind of distinct discovery tracks often employed to address these concerns. In our experience, these are recurring issues that transferee judges regularly and successfully coordinate.

*See In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Practices & Prods. Liab. Litig.*, MDL No. 2151, 2010 U.S. Dist. LEXIS 35471, at *5 (J.P.M.L. Apr. 9, 2010). Consolidation of the personal injury cases is even more compelling in this instance since a primary focus of these cases will be the cause of the Deepwater Horizon Incident.[6]

Similarly, the Panel should also consolidate the derivative cases identified on the Notices of Related Actions and Potential Tag-Along Actions to this proceeding because those cases will also center around the cause of the Deepwater Horizon Incident and, thus, share a common factual basis.[7] *Merscorp*, 560 F. Supp. 2d at 1372.

---

[6] *In re Toyota* involved personal injury cases that were raised in subsequent notice of potential tag-along actions, but not by the motion to transfer pursuant to 28 U.S.C. § 1407. Though the Court was initially persuaded that the related personal injury and wrongful death actions should be consolidated with the economic damages cases, the Panel noted that the disposition of those actions could always turn on the individual characteristics of the case.

[7] For example, in *Goldman v. Hayward*, Cause No. 2:10-cv-01470-MLCF-ALC, Plaintiff states:

> On April 20, 2010 . . . a mass of oil . . . erupted . . . in the Gulf of Mexico . . . engulfing the Deepwater Horizon oil rig . . . in fire . . . . The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled oil leak in the Gulf . . . . The disaster threatens to become the worst oil spill in history . . . . The liability of the various defendants herein is clear. The BP Defendants have a long history of ignoring crucial safety issues related to the operation of offshore submersible rigs such as the Deepwater Horizon rig, including problems with the crucial blowout

Accordingly, Halliburton requests that the Panel consolidate all of the Related Cases, including those listed or to be listed in subsequently filed Notices of Related Actions and Potential Tag-Along Actions, to a single district court for coordination of pre-trial proceedings.

**V.      The Southern District of Texas is the Most Appropriate Venue for the Transfer of these Actions**

In deciding the proper transferee court, the Panel has considered: (1) the location of any related limitation of liability actions; (2) where the defendants are headquartered; (3) the location of the relevant documents and witnesses; (4) whether the transferee district is easily accessible to parties and witnesses; and (5) whether the transferee court has the capacity to devote sufficient resources to complex consolidated proceedings.  All of these factors favor the Southern District of Texas, Houston Division.

*A.      Transocean filed its Limitation of Liability Action in the Southern District of Texas, Houston Division.*

On May 13, 2010, Transocean Offshore Deepwater Drilling Inc., Triton Asset Leasing GmbH, Transocean Holdings LLC, and Transocean Deepwater Inc., (collectively, "Petitioners") filed their Complaint and Petition for Exoneration from or Limitation of Liability in the United States District Court for the Southern District of Texas (the "Limitation of Liability Action"). Petitioners in the Limitation of Liability Action are the Owner, Managing Owners, Owners *Pro Hac Vice* and/or Operators of the Deepwater Horizon who seek the protections afforded by the Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.*   Three of the four Petitioners in the

---

preventer devices that so spectacularly failed during this disaster.  Despite repeated incidents serving as 'red flags' of the possibility of a major explosion and oil spill in the Gulf of Mexico, the BP Defendants elected to cut costs, including safety and maintenance expenditures, in pursuit of profitable results to report to Wall Street . . . .  Plaintiff brings this action not only against the BP Defendants . . . but also against the third parties who may be held responsible for the effects of the disaster, including Transocean . . . Cameron . . . and Halliburton . . . .  Whatever the liability of these defendants to third parties—and it will be enormous—these parties are liable to BP for their own negligence and other misconduct in causing the disaster."

*See* Verified Shareholder Derivative Compl., attached hereto as Exhibit A.

Limitation of Liability Action have their principal office in Houston, Texas, within the Southern District of Texas. For the sake of judicial efficiency and concentrating proceedings in one central location, the MDL should likewise be placed in the Southern District of Texas. *See In re Oil Spill by the "Amoco Cadiz" off the Coast of Fr. on Mar. 16, 1978*, 471 F. Supp. 473 (J.P.M.L. 1979).

*Amoco Cadiz* is instructive on this issue. On March 16, 1978, the tanker Amoco Cadiz went aground on rocks off the coast of France while under tow. *Id.* at 474. The disabled ship broke apart on the rocks and disgorged its cargo of approximately 220,000 tons of crude oil. *Id.* The litigation that followed consisted of six actions pending in three districts in the United States. *Id.* The owners and operators of the vessel, referred to as the "Amoco parties," brought an action in the Northern District of Illinois for exoneration from or limitation of liability related to the event. *Id.* at 475. The remaining five actions, three in the Southern District of New York and two in the Eastern District of Virginia, included various claims for economic losses and clean-up costs from various plaintiffs, including the Republic of France, municipal and governmental entities in France, trade unions, hotels, environmental groups, and fishermen groups, among others. *Id.* at 475-77.

In making its determination to center the MDL proceeding in the Northern District of Illinois, the MDL Panel considered the merits of the various locations. Several considerations in favor of the Southern District of New York were its proximity to the location of the shipwreck, its accessibility to foreign parties, and its proximity to Washington, D.C., where documents relating to the federal investigation of the disaster were located. *Id.* at 478. The Panel chose the Northern District of Illinois because many defendants were located in the Chicago area, the

District was familiar with the litigation through the limitation of liability proceeding, and that District could easily coordinate the related state court proceedings. *Id.* at 478-79.

Following the guidance in *Amoco Cadiz*, the Southern District of Texas should preside over this MDL proceeding. The Limitation of Liability Action is currently pending in the Southern District of Texas. *See id.* Importantly, Judge Keith P. Ellison ordered all claims against Petitioners to be filed in his court. *See* Exhibit B. Judge Ellison further ordered:

> [T]he beginning or continued prosecution of any and all suits, actions or legal proceedings in any jurisdiction other than this Court against Petitioners, the Deepwater Horizon, *in rem,* their agents, officers, representatives, and their underwriters or against any employee or property of Petitioners arising out of the voyage of the Deepwater Horizon that began on January 30, 2010, in federal waters at or near Mississippi Canyon Block 727, and which ended on or about April 22, 2010, at or near Mississippi Canyon Block 252, with the sinking of the Deepwater are hereby ENJOINED, STAYED and RESTRAINED until the hearing and termination of this proceeding.

*Id.* Transfer to the Southern District of Texas will permit efficient coordination between the MDL action and the Limitation of Liability Action.

Certain Plaintiffs argue in their Combined Memorandum in Support of Transfer and Coordination in the Eastern District of Louisiana ("Combined Memorandum") that the "Limitations Proceeding is *not* designed to provide complete relief to all parties" and that the Limitation of Liability Act is preempted by the Oil Pollution Act of 1990 ("OPA"). [Dkt. # 27]. No party, however, has argued that the Limitation of Liability Action was filed in order to avoid claims under the OPA. Indeed, Judge Ellison specifically held that "[t]his injunction does not apply to any direct claims asserted against Petitioners under the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.*" *See* Exhibit B. BP, as the designated Responsible Party under the OPA, has not sought any relief in the Limitation of Liability Action. Further, the Combined Memorandum

relies on a case that explicitly states that the Limitation of Liability Act "remains in force for general maritime claims such as maritime tort actions for harm to persons or vessels." *In re Metlife Capital Corp.*, 132 F.3d 818, 822 (1st Cir. 1997). Moreover, proximity to the location of the disaster and the federal investigation do not bear the weight that Plaintiffs' claim, and are not primary considerations for the location of the MDL proceeding. *See Amoco Cadiz,* 471 F. Supp. at 478.

In a separate attempt to challenge the venue of the Limitation of Liability Action, certain claimants ("Claimants") filed motions to transfer that proceeding to the Eastern District of Louisiana based on *forum non conveniens* objections. Transocean filed the Limitation of Liability Action in the Southern District of Texas pursuant to 28 U.S.C. § 1333, which provides: "the district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333. Further, Rule 9(h) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure permits the filing of the Limitation of Liability Action in "any district in which the owner has been sued with respect to any such claim." Fed. R. Civ. P. Supp. R. F(9). There are presently several lawsuits pending against Transocean (as well as other defendants, including Halliburton) in the Southern District of Texas. Accordingly, although the Claimants believe that the location of the suit is inconvenient, Transocean properly filed the Limitation of Liability Action in the Southern District of Texas.

All of this, however, is a deviation from the sole consideration at this time of *where* the MDL should be located. Having the MDL proceeding in the same location as the Limitation of Liability Action would coordinate an efficient proceeding and promote judicial economy—the

-10-

fundamental considerations of MDL. Accordingly, the MDL should be in the Southern District of Texas.

    B.    *Halliburton, BP, Transocean, and Cameron are Headquartered in Houston or have Principal Offices Located There and, Accordingly, More Relevant Documents and Witnesses Will Likely Be Located Within the Southern District of Texas than in Any Other Proposed Transferee District.*

The presence of a defendant's corporate headquarters or other principal place of business in a forum strongly favors transfer to that forum because it "implies that relevant witnesses and documents are likely to be found there." *In re UICI "Association Group" Ins. Litig.*, 305 F. Supp. 2d 1360, 1362 (J.P.M.L. 2004). Indeed, the Panel has recently transferred MDL proceedings to the district where a common defendant has its headquarters. *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Practices & Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 35471, at *5 (finding that the MDL proceeding will be transferred to the Central District of California because the defendant "maintains its . . . corporate headquarters within this district, and relevant documents and witnesses are likely located there").

As outlined by the Third Motion, BP, Transocean, HESI, and Cameron—the four primary defendants in this litigation—each have corporate headquarters or principal offices located in Houston, Texas, which favors transfer to the Southern District. *See In re Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L. 2008) (transferring case to common district where multiple defendants are located). Correspondingly, many of the key documents and witnesses will also be found in Houston. *See, e.g., In re Delta Air Lines, Inc.*, 170 F. Supp. 2d 1359, 1360 (J.P.M.L. 2001) (noting that "pertinent documents and witnesses are likely located" at the defendant's "principal place of business").

Moreover, transfer to the Southern District of Texas would provide logistical efficiencies. Whereas each Plaintiff group has one action to prosecute, the Defendants in these matters are

called upon to defend over 140 actions, making the Southern District of Texas the one location that can clearly provide the most efficiency to the parties in these MDL proceedings. This factor, thus, also weighs in favor of transfer to the Southern District of Texas.

      C.    *The Southern District of Texas, Houston Division is a Convenient Location for the Parties and Witnesses.*

Two of the three movants have requested that all cases related to MDL No. 2179 get transferred to the Southern District of Texas. The Panel has repeatedly recognized the benefits of transferring cases to districts in large "metropolitan" areas, such as Houston. *See, e.g., In re Trasylol Prods. Liab. Litig.*, 545 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008) (transferring to a district that "offers an accessible metropolitan location"). Indeed, "a litigation of this scope will benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office accommodations, and offers a well-developed support system for legal services." *In re Worldcom, Inc. Sec. & ERISA Litig.*, 226 F. Supp. 2d 1352, 1355 (J.P.M.L. 2002). Houston is a large metropolitan city that amply meets these criteria. Further, Houston is easily accessible to parties and witnesses nationwide.

Moreover, although there are a number of major U.S. cities that can be easily and quickly reached by air travel from anywhere within the United States, Houston has the added benefit of facilitating international travel. International parties are involved in this litigation and it is possible that the oil spill will eventually hit international waters. Given the international scope of the litigation, transferring the proceedings to a city with a large and well-developed international airport hub is a factor that adds to the convenience of all involved parties. *In re Parmalat Sec. Litig.*, 350 F. Supp. 2d 1356, 1357 (J.P.M.L. 2004) (noting that transferee district is "relatively conveniently located for parties and witnesses and their counsel located both in the United States and abroad").

*D.*     *The Southern District of Texas can Efficiently Handle Large Consolidated Proceedings.*

In selecting the most appropriate transferee forum for multidistrict litigation transfer, the Panel should also consider the speed and efficiency with which alternative districts manage their respective case loads. *See In re Preferential Drug Prods. Pricing Antitrust Litig.,* 429 F. Supp. 1027, 1029 (J.P.M.L. 1977) (transferring cases based in part upon transferee court's low median time between filing and disposition in civil actions). With a median time from filing to disposition of 6.9 months and a median time from filing to trial of 19 months, transferring these cases to the Southern District of Texas will ensure that the consolidated pretrial proceedings are resolved in a timely manner. *See* Exhibit C.[8] The Eastern District of Louisiana, on the other hand, has a median time from filing to disposition of 13.2 months and a median time from filing to trial of 22.3 months. *See id.*

In addition to being a convenient transferee district for parties and witnesses, the Southern District of Texas also has the capacity and judges with the experience to accommodate these proceedings.[9] Further, the Panel on Multidistrict Litigation's Distribution of Pending MDL Dockets (as of May 10, 2010) reports that there are currently only three multidistrict litigation cases pending in the Southern District of Texas. *See* Exhibit D;[10] *see also Trasylol,* 545 F. Supp. 2d at 1358 (transferring MDL proceeding to district with a "relatively low number of MDL dockets"). To the contrary, presently, the Eastern District of Louisiana is handling six MDL proceedings:

---

[8] Available at: http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics.aspx.

[9] For example: (1) Judge Nancy Atlas presided over MDL-1994; (2) Judge Vanessa Gilmore presided over MDL-1646; (3) Judge Sim Lake presided over MDL-1886; (4) Judge Hughes is presiding over MDL-1609, which presently has 1 action pending; (5) Judge Harmon is presiding over MDL-1446, which presently has 37 actions pending; and (6) Judge Rosenthal is presiding over MDL-2046, which presently has 30 actions pending.

[10] Available at: http://www.jpml.uscourts.gov/Pending_MDL_Dockets-May-2010.pdf.

(1)   Judge Carl J. Barbier; MDL 2116 *In Re: Apple iPhone 3G and 3GS "MMS" Marketing and Sales Practice Litigation* (21 actions now pending);

(2)   Judge Kurt D. Engelhardt; MDL 1873 *In Re: FEMA Trailer Formaldehyde Products Liability Litigation* (2,210 actions now pending);

(3)   Judge Eldon E. Fallon; MDL 1355 *In Re: Propulsid Products Liability Litigation* (277 actions now pending);

(4)   Judge Eldon E. Fallon; MDL 1657 *In Re: Vioxx Marketing, Sales Practices and Products Liability Litigation* (7,763 actions now pending);

(5)   Judge Eldon E. Fallon; MDL 2047 *In Re: Chinese-Manufactured Drywall Products Liability Litigation* (275 actions now pending); and

(6)   Judge Martin L.C. Feldman; MDL 1984 *In Re: DirecTech Southwest, Inc., Fair Labor Standards Act (FLSA) Litigation* (3 actions now pending).

*See* Exhibit D. Furthermore, several judges in the Eastern District of Louisiana have recused themselves from Deepwater Horizon Incident litigation, thus, reducing the number of judges available to preside over this MDL proceeding.

As noted above, several judges in the Southern District of Texas have experience handling multidistrict litigation dockets, yet they are not presently "overtaxed" by other multidistrict litigation. *In re Serzone Prod. Liab. Litig.*, 217 F. Supp. 2d 1372, 1374 (J.P.M.L. 2002). While it is understandable that Louisiana counsel would urge the Panel to transfer this MDL proceeding to the Eastern District of Louisiana, the MDL docket conditions of the Southern District of Texas make it more likely that this matter will be resolved expeditiously.[11] Thus, this factor also favors transfer to the Southern District of Texas.

## VI.   **Conclusion**

---

[11] Certain plaintiffs have also requested that the Panel transfer this action to the Northern District of Florida. *See, e.g.,* Dkt. ## 26, 43. While Halliburton believes that the Southern District of Texas is the most appropriate venue, it does note that the Northern District of Florida presently is not handling any MDL proceedings. *See* Exhibit D. Further, its median time from filing to disposition is 8 months and its median time from filing to trial is 16 months. *See* Exhibit C. Accordingly, transferring this action to the Northern District of Florida would also result in an expeditious resolution of this matter.

Pursuant to 28 U.S.C. § 1407, centralization of the cases raised by the Pending Motions is appropriate because these cases raise similar factual and legal issues, and because consolidation will result in convenience to the parties, increased judicial efficiency, avoidance of duplicative discovery and inconsistent pretrial rulings.

Halliburton further joins the requests that the Panel transfer these cases to the Southern District of Texas, Houston Division for coordinated pretrial proceedings. On balance, the Southern District of Texas will be the most convenient forum for all parties and is well-equipped to handle litigation of this scope. Moreover, the Southern District of Texas is the district where the Limitation of Liability Action is pending, where defendants are headquartered, and where a significant portion of discoverable documents and witnesses will likely be located.

Dated June 10, 2010.

Respectfully Submitted,

**GODWIN RONQUILLO PC**

By: /s/ Donald E. Godwin
Donald E. Godwin
dgodwin@godwinronquillo.com
Bruce W. Bowman, Jr.
bbowman@godwinronquillo.com
Jenny L. Martinez
jmartinez@godwinronquillo.com

1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

and

R. Alan York
ayork@godwinronquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR HALLIBURTON ENERGY
SERVICES, INC. AND HALLIBURTON
COMPANY**

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**Jun 16, 2010**

FILED
CLERK'S OFFICE

# EXHIBIT A

Case 2:10-md-02179-CJB-DPC   Document 4318-1   Filed 10/17/11   Page 19 of 45
Case MDL No. 2179   Document 108   Filed 06/10/10   Page 18 of 96
Case 2:10-cv-01470-KDE-ALC   Document 1   Filed 05/13/10   Page 1 of 40

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| FRANCES O. GOLDMAN, Derivatively on Behalf of BP PLC, | Case No. |
| Plaintiff, | Section |
| v. | Magistrate |
| ANTHONY B. HAYWARD, IAIN C. CONN, ROBERT W. DUDLEY, BYRON E. GROTE, ANDY G. INGLIS, CARL-HENRIC SVANBERG, PAUL M. ANDERSON, ANTONY BURGMANS, CYNTHIA B. CARROLL, SIR WILLIAM M. CASTELL, GEORGE DAVID, IAN DAVIS, DOUGLAS J. FLINT, DEANNE S. JULIUS, H. LAMAR MCKAY, TRANSOCEAN LTD., TRANSOCEAN DEEPWATER, INC., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., CAMERON INTERNATIONAL CORPORATION, HALLIBURTON ENERGY SERVICES INC., "A, B, AND C" INSURANCE COMPANIES AS INSURERS OF TRANSOCEAN, "L, M, AND N" INSURANCE COMPANIES AS INSURERS OF CAMERON INTERNATIONAL, AND "X, Y, AND Z" INSURANCE COMPANIES AS INSURERS OF HALLIBURTON, | **Jury Trial Demanded** |
| Defendants, | |
| and | |
| BP PLC, | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

- 1 -

Plaintiff Frances O. Goldman, by her undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant BP Plc ("BP" or the "Company") against certain directors and officers of BP and other defendants (collectively, "Defendants"). Plaintiff bases her allegations on actual knowledge as to her own acts and on information and belief as to all other allegations after due investigation by her counsel.

## SUMMARY OF THE ALLEGATIONS

1.       On April 20, 2010, at approximately 9:45 p.m. CST, a mass of oil or natural gas erupted from the wellhead at the Macondo prospect site in the Gulf of Mexico off the shores of Louisiana, engulfing the Deepwater Horizon oil rig managed by BP in fire and sinking the rig 36 hours later. The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled oil leak in the Gulf, covering at least 3,850 square miles of fragile ocean and wetlands marine life. The disaster threatens to become the worst oil spill in history—far worse than the famous 1989 Exxon *Valdez* disaster—endangering the coasts of Louisiana, Mississippi, Alabama, and Florida for generations to come and wiping out the habitat of hundreds of species of marine and oceanic life. More than 400 species, including whales and dolphins, face a dire threat from the spill, along with Louisiana's barrier islands and marshlands.

2.       Prior to its destruction, the rig was an ultra-deepwater dynamic-positioned, semi-submersible oil rig. It was owned and operated by Transocean and leased to BP through September 2013. BP leased the rig to drill an exploratory well at the Macondo prospect site in Mississippi Canyon Block 252, located on the outer continental shelf off the coast of Louisiana. The rig was positioned about 50 miles southeast of Venice, Louisiana, in water nearly 5,000 feet

deep. At the time of the explosion, drilling was being conducted at over 22,000 feet—2,000 feet deeper than allowed by federal permitting.

3.      The leak is spilling, by conservative estimates, over 5,000 barrels of petroleum—equivalent to over 200,000 gallons—into the Gulf of Mexico each day. At the time of the commencement of this action, some estimates place the discharge at 25,000 barrels (or 1,100,000 gallons) per day. According to BP's own prospectus filed with the MMS, if the pipe system at the rig eroded completely, the leakage could escalate to ***163,000 barrels per day*** (6,800,000 gallons), a truly cataclysmic figure.

4.      There had been numerous previous spills and fires on the Deepwater Horizon rig, which had been issued citations for "acknowledged pollution source" by the United States Coast Guard some 18 times in the last 11 years. The Deepwater Horizon rig has had many serious incidents in the recent past, including a 2008 incident where 77 persons were evacuated from the rig after it listed over and began to sink after a section of pipe was accidentally removed from the rig's ballast system.

5.      The financial consequences to BP from the explosion and oil spill will be tabulated in the tens of billions of dollars—together with liability for damages to property and commercial interests affected by the spill. These damages include estimated losses to the fishing industry of no less than $2.5 billion and to the tourism industry of no less than $3 billion. BP's efforts to try to stop the oil spill and remediate its effects has cost BP $450 million so far, with BP accruing additional costs of at least $10 million per day. Following the disaster, BP's stock price has dropped by over 19 percent, wiping out over ***$37 billion*** of BP's market value.

6.      The consequences of this disaster will be felt by the families of the killed and injured workers, commercial fishermen, Gulf Coast property owners, and the environment at

large for generations—for which losses the affected parties have, understandably, commenced legal actions against the culpable parties. The tragic losses of these persons are deeply felt by Plaintiff herein, who is a shareholder of BP. Acknowledging the tragedy that has befallen these persons, Plaintiff brings this action on behalf of the Company and its shareholders for the specific injuries done to the Company itself by the culpable parties. These parties include the Board of Directors and key officers of BP, who recklessly disregarded accidents and safety warnings for years related to the operations of the Deepwater Horizon rig, as well as third parties whose own misconduct was a substantial factor in the disaster, including the owner/operator of the rig, Transocean Ltd. and its subsidiaries, Cameron International Corporation, which manufactured the blowout preventer, the key piece of safety equipment that failed when the blowout occurred, and Halliburton Energy Services Inc., which was installing the cement casing on the well-head at the time of the explosion.

7.      The liability of the various defendants herein is clear. The BP Defendants have a long history of ignoring crucial safety issues related to the operation of offshore submersible rigs such as the Deepwater Horizon rig, including problems with the crucial blowout preventer devices that so spectacularly failed during this disaster. Despite repeated incidents serving as "red flags" of the possibility of a major explosion and oil spill in the Gulf of Mexico, the BP Defendants elected to cut costs, including safety and maintenance expenditures, in pursuit of profitable results to report to Wall Street. These defendants also lobbied the federal and state governmental authorities to remove or decrease the extent of safety and maintenance regulation of the Company's Gulf operations, claiming, against all evidence, that "voluntary compliance" would suffice to address safety and environmental concerns. Even after a 2006 shareholder derivative proceeding brought as a last resort to require BP to address safety concerns was

4

voluntarily settled out-of-court by the BP Defendants, these defendants continued to ignore and disregard safety issues concerning the Company's deepwater operations, making purely cosmetic changes at the corporate level while ignoring the substance of the safety violations and the threat they posed to the entirety of the Gulf, commercial and private property, and the Company's own survival as a going concern.

8.     Plaintiff brings this action not only against the BP Defendants, who are officers and directors of the Company who disregarded their fiduciary duties of loyalty, care, oversight, and good faith with respect to the Company's very existence, but also against the third parties who may be held responsible for the effects of the disaster, including Transocean Ltd., the owner/operator of the rig, Cameron International Corporation, which manufactured the malfunctioning blowout preventer at issue, and Halliburton Energy Services, Inc., which was servicing the cement casing to seal off the wellhead at the time of the explosion. Whatever the liability of these defendants to third parties—and it will be enormous—these parties are liable to BP for their own negligence and other misconduct in causing the disaster. Plaintiff asserts these claims because the BP Defendants themselves, including the Board of Directors, cannot and will not do so.

## PARTIES

9.     Plaintiff is a current shareholder of BP, having held American Depositary Receipts of BP since 1999. Plaintiff is a citizen of Ohio.

10.     Nominal Defendant BP Plc ("BP") is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England. BP is one of the three largest integrated energy services companies in the world, with more than

100,000 employees and operations in more than 100 countries on six continents.  BP is the largest U.S. oil and gas producer.  BP does business in Louisiana and within this District.

11.     BP is incorporated under English law, which permits this action to be maintained based on the allegations herein.  Moreover, due to BP's extensive U.S. and Louisiana operations, the large number of BP shareholders in the U.S., and the situs of the wrongdoing, this District is manifestly the most appropriate venue for this action.

12.     BP's ties to—and impact on—the U.S. is highlighted by the following:

- 39 percent of BP's worldwide shareholders reside in the U.S.

- BP has approximately 34,000 employees in the U.S., one third of its total worldwide employees and more than in any other country.

- BP produces more crude oil in the U.S. than in any other country.

- BP produces more natural gas in the U.S. than in any other country.

- BP's capital expenditures in the U.S. are larger than in any other country, and BP has more operating capital employed in the U.S. than in any other country.

13.     Defendant Anthony B. Hayward is the Chief Executive Officer and a member of the Board of Directors of BP.  He has served as Chief Executive Officer since 2007 and as an Executive Director since 2003.  Before becoming Chief Executive Officer, Hayward, who joined BP in 1982, served as the Chief Executive Officer of Exploration and Production from 2002 to 2007.  In exchange for his purported trust, loyalty, and fidelity to BP, Hayward received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £2,509,000 in 2008 and £3,158,000 in 2009.  He is a citizen of the United Kingdom.

14.     Defendant Iain C. Conn has served as BP's head of refining and marketing since 2007 and as an Executive Director of the Board of Directors since 2004.  He joined BP in 1986 and served in a variety of roles, including group vice president of BP's refining and marketing business from 2000 to 2002, chief executive of petrochemicals from 2002 to 2004, and group

6

executive officer from 2004 to 2007, before being appointed head of refining and marketing. In exchange for his purported trust, loyalty, and fidelity to BP, Conn received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £1,586,000 in 2008 and £1,840,000 in 2009. He is a citizen of the United Kingdom.

15.     Defendant Robert W. Dudley has served as BP's Managing Director and Executive Director on the Board of Directors since April 2009. Dudley joined the Amoco Corporation, which merged with BP in 1998, in 1979. Before he was appointed Director, following a variety of posts, Dudley served as president and chief executive officer of a BP subsidiary from 2003 until 2008. In exchange for his purported trust, loyalty, and fidelity to BP, Dudley received a salary, performance bonus, non-cash benefits and other emoluments in the amount of $2,179,000 in 2009. He is a citizen of Texas.

16.     Defendant Byron E. Grote is Chief Financial Officer and a member of the Board of Directors. Grote joined BP in 1987 following the acquisition of The Standard Oil Company of Ohio, where he had worked since 1979. He was appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002. In exchange for his purported trust, loyalty, and fidelity to BP, Grote received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of $3,090,000 in 2008 and $3,458,000 in 2009. He is a citizen of the United Kingdom.

17.     Defendant Andy G. Inglis is an Executive Director and Chief Executive of Exploration and Production. He has worked for BP in various capacities since 1980 and has held his current positions since 2007. In exchange for his purported trust, loyalty, and fidelity to BP, Inglis received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of £2,055,000 in 2008 and £2,217,000 in 2009. He is a citizen of the United Kingdom.

18.     Defendant Carl-Henric Svanberg is the Chairman of the Board of Directors of BP. He was appointed a Non-Executive Director of BP in September 2009 and became Chairman in January 2010. Svanberg also heads the Chairman's Committee and is a member of BP's Nomination Committee. In exchange for his purported trust, loyalty, and fidelity to BP, Svanberg was paid £30,000 in 2009. Svanberg is a citizen of Sweden.

19.     Defendant Paul M. Anderson is a Non-Executive member of the Board of Directors. He joined the Board in February 2010 and is a member of the Chairman's Committee and the Safety, Ethics and Environment Assurance Committee. He is a citizen of Texas.

20.     Defendant Antony Burgmans joined BP's Board of Directors in 2004. He is a member of the Chairman's, Remuneration, and Safety, Ethics and Environment Assurance Committees. In exchange for his purported trust, loyalty, and fidelity to BP, Burgmans was paid £90,000 in 2008 and £93,000 in 2009. He is a citizen of the Netherlands.

21.     Defendant Cynthia B. Carroll is a member of BP's Board of Directors. Carroll has served on the Board since 2007 and is a member of the Chairman's and Safety, Ethics and Environment Assurance Committees. In exchange for her purported trust, loyalty, and fidelity to BP, Carroll was paid £93,000 in 2008 and £90,000 in 2009. She is a citizen of Texas.

22.     Defendant Sir William M. Castell has been a member of BP's Board of Directors since 2006. Castell is a member of the Chairman's and the Nomination Committees and is Chairman of the Safety, Ethics and Environment Assurance Committee. In exchange for his purported trust, loyalty, and fidelity to BP, Castell was paid £108,000 in 2008 and £115,000 in 2009. He is a citizen of the United Kingdom.

23.     Defendant George David is member of BP's Board of Directors. He joined the Board in 2008 and is a member of the Chairman's, Audit and Remuneration Committees. In

8

exchange for his purported trust, loyalty, and fidelity to BP, David was paid £100,000 in 2008 and £118,000 in 2009. He is a citizen of Connecticut.

24.     Defendant Ian Davis is a member of BP's Board of Directors. He joined in the Board in April 2010 and is a member of the Chairman's Remuneration, and Audit Committees. He is a citizen of the United Kingdom.

25.     Defendant Douglas J. Flint has served as a Non-Executive Director on BP's Board since 2005. He is a member of the Chairman's and Audit Committees. In exchange for his purported trust, loyalty, and fidelity to BP, Flint was paid £90,000 in 2008 and £85,000 in 2009. He is a citizen of the United Kingdom.

26.     Defendant DeAnne S. Julius has served as a Non-Executive Director of BP since 2001. She is a member of the Chairman's and Nomination Committees and is Chairman of the Remuneration Committee. In exchange for her purported trust, loyalty, and fidelity to BP, Julius was paid £110,000 in 2008 and £105,000 in 2009. She is a citizen of the United Kingdom.

27.     Defendant H. Lamar McKay is Chairman and President of BP America, Inc. In 1980, McKay started with Amoco, which was acquired by BP in 1998, occupying a variety of positions until being appointed to his current roles in 2009. He is a citizen of Texas.

28.     The defendants set forth in paragraph 13-26 above are referred to as the "Director Defendants"

29.     The defendants set forth in paragraphs 13-27 above are referred to as the "BP Defendants."

30.     The BP Defendants have fiduciary duties to the Company. These include the common-law obligations of trust, loyalty, good faith, oversight, and due care. The BP Defendants were and are required to use their utmost ability to control and manage BP in a fair,

just, honest and equitable manner. The BP Defendants were entrusted to use their abilities faithfully to ensure the Company's best interests in the long term.

31. In addition, the BP Defendants had duties under section 172 of the British Companies Act of 2006 as follows:

(1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to—

(a) the likely consequences of any decision in the long term,
(b) the interests of the company's employees,
(c) the need to foster the company's business relationships with suppliers, customers and others,
(d) the impact of the company's operations on the community and the environment,
(e) the desirability of the company maintaining a reputation for high standards of business conduct, and
(f) the need to act fairly as between members of the company.

32. Defendant Transocean Ltd. is a leading international provider of offshore contract drilling services for oil and gas wells. Transocean Ltd. is organized and existing under the laws of Switzerland with its principal place of business in Vernier, Switzerland. Transocean Ltd. does business in Louisiana and within this District.

33. Defendant Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd. It is organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas. Transocean Deepwater, Inc. does business in Louisiana and within this District.

34. Defendant Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd. It is organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas. Transocean Offshore Deepwater Drilling, Inc. does business in Louisiana and within this District.

35.     Transocean Ltd., Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc. are collectively referred to herein as "Transocean." As of February 2, 2010, Transocean owned, had partial ownership interests in or operated 138 mobile offshore drilling units. Transocean owns and operates the Deepwater Horizon rig, which it leases it to BP. At the time of the explosion, Transocean and BP were both in control of the rig, with BP employees providing instructions as to where and how to drill.

36.     Defendant Cameron International Corporation ("Cameron") is a leading provider of flow equipment products, systems and services to worldwide oil, gas and process industries. Cameron manufactured the blowout preventer on the Deepwater Horizon rig that failed to function correctly. After the Deepwater Horizon explosion and leak, Cameron immediately filed an insurance claim and received over $400 million in proceeds from its insurance carriers. Cameron is organized and existing under the laws of Delaware with its principal place of business in Houston, Texas. Cameron does business in Louisiana and within this District.

37.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a leading provider of oilfield technology, including fluid management and technologies to assist in the drilling and construction of oil and gas wells. Halliburton was a subcontractor to the Deepwater Horizon rig, providing services to cement the well head to the sea floor, as supervised by BP employees under the direction and control of the BP Defendants. Halliburton is organized and existing under the laws of Delaware with its principal place of business in Houston, Texas. Halliburton does business in Louisiana and within this District.

38.     Defendants "A, B, and C" are insurance companies which provided policies of insurance to Transocean covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

11

39.     Defendants "L, M, and N" are insurance companies which provided policies of insurance to Cameron covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

40.     Defendants "X, Y, and Z" are insurance companies which provided policies of insurance to Halliburton covering losses for which it might be liable to BP arising from the acts and omissions set forth herein.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000.

42.     The Court has personal jurisdiction over each of the Defendants because each either does business in Louisiana or has sufficient minimum contacts with Louisiana to justify this State's exercise of personal jurisdiction over him consistent with the laws of Louisiana and the United States Constitution.

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred here, and Defendants have received substantial compensation and other transfers of money in this District by doing business here and engaging in activities having an effect here.

## FACTUAL ALLEGATIONS

### Background:  The BP Defendants' Disregard of Risks Prior to 2009

44.     In recent years, the BP Defendants have sought to change the Company's image from just another oil company into one of "Beyond Petroleum"—i.e., a company that was

environmentally conscious and wanted to develop alternative energy sources like solar and wind power.

45.     However, in devising clever new ways to brand the Company, the BP Defendants recklessly let the crucial values of maintenance and safety fall into deep desuetude. Safety and maintenance problems were endemic throughout the Company, including at the Deepwater Horizon rig. Moreover, additional safety mechanisms, technologies, and precautions were known and available to all Defendants, but Defendants chose not to employ them on the rig.

46.     In 2005, an explosion and fire ripped through a tower at a BP refinery in Texas City, Texas, killing 15 people, injuring 170 others, and costing the Company over $1 billion to remediate. Investigators determined that BP had ignored its own protocols on operating the tower, which was filled with gasoline, and that a warning system had been disabled. The Company was forced to plead guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency. In addition, BP officers signed a settlement with federal safety inspectors vowing to institute improvements, but in 2009 the federal Occupational Safety and Health Administration imposed an $87 million fine—the largest in its history—on the Company for failing to correct the safety violations at the Texas City plant. OSHA declared that BP had a "serious systematic safety problem" across the Company.

47.     In 2006, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline. The Company had been warned to check the pipeline in 2002, but did not do so, only discovering four years later that a six-mile length of pipeline was hopelessly corroded. The Company was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines. Moreover, a Congressional committee later determined that BP had ignored opportunities to prevent the spill and that

"draconian" cost-saving measures had led to shortcuts in its operations. The incident led to the resignation under fire of The Lord John Browne of Madingley, BP's aristocrat-former CEO.

48. The risks of offshore drilling were well known to the BP Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to serious accidents. The Deepwater Horizon rig itself was badly burned by an accidental fire in 2005, and the accidental opening of a valve in May 2008 flooded the rig with seawater, causing very substantial damage.

**The BP Defendants' Continued Disregard of Risks**

49. When current CEO Defendant Anthony Hayward took office in 2007, he promised to change the Company's culture, with a renewed commitment to safety. The record shows this promise to have been an empty one, as Hayward and the other BP Defendants have led the Company on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures heedless of safety and environmental concerns.

50. Indeed, in 2009, when the federal Minerals Management Service ("MMS") proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years, the BP Defendants lodged a formal objection on behalf of BP. That same agency is also investigating charges by a whistle-blower that the Company was caused to discard important records from its Atlantis Gulf platform.

51. Moreover, the BP Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting, against all evidence, that voluntary compliance would suffice. In 2009, the BP Defendants caused the Company to spend $16 million lobbying the federal government on issues

14

including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and the BP Defendants' knowledge of the high risks involved in such drilling.

52.     The BP Defendants' stance has had its predictable consequences in the appalling safety record of the Company in 2009 alone. In the months before the Deepwater Horizon rig sank in a ball of fire, the Company had four close calls on pipelines and facilities it operates in Alaska, as detailed in a January 14, 2010, letter written by two U.S. Congressmen, Rep. Bart Stupak and Rep. Henry Waxman to the president of BP's Alaskan operations. These congressmen's letter specifically noted that the Company's efforts to cut costs could imperil safety at BP facilities. The letter, which was accompanied by a congressional document request and was referred to BP's legal department and the safety, ethics and environment assurance committee of its Board of Directors, raised an unmistakable "red flag" that went ignored by the BP Defendants.

53.     Indeed, in the year before the accident, BP had repeatedly and aggressively cut costs. A reorganization stripped 5,000 jobs from its payroll, saving BP more than $4 billion in operating costs. Indeed, on April 27, 2010—the same day that the U.S. Coast Guard worked with BP engineers to guide remote control submarines nearly a mile underwater in a futile effort to close the shut-off valve on the Deepwater Horizon—BP officers bragged to investors that the Company's most recent quarterly earnings had beaten analysts' expectations by a large margin.

54.     The congressmen had been investigating BP since the Prudhoe Bay incident in 2006. In their letter, the congressmen noted "several significant events" in BP's Alaskan operations in the previous 15 months:

- September 29, 2008: An 8-inch high pressure gas line at the Y-Pad location "separated," sending 3 pieces of pipe to the tundra. Two segments of the pipe

measuring 14 feet and 28 feet in length landed 900 feet from the pipeline. Roughly 30 minutes later, a second and unrelated incident occurred on the S-Pad, causing a gas release.

- January 15, 2009:  A disc cleaning "pig" became lodged and lost in a 34-inch Oil Transit Line during de-oiling, allowing gas to pass around the pig and travel through Skid 50 to Pump Station 1, causing significant venting of gas to the atmosphere and the complete, temporary shutdown of the TAPS.

- October 10, 2009:   At the Central Compressor Plant, low pressure flare staging valves stuck closed, causing gas to travel to the backup low pressure flare valves, which activated and caused gas to vent improperly into the atmosphere.  This incident could have caused an explosion.  In a briefing, you reported to Committee staff that the pilot on the backup flare was not lit and that cameras, while on, were not pointed at the flare location, which prevented BP staff from knowing the pilot was out.

- November 29, 2009:  An 18-inch pipe near the Lisburne Production Center that was carrying a mixture of crude oil, produced water, and natural gas ruptured, spraying its contents over an estimated 8,400 square feet area.

In addition to these four events, BPXA has experienced a number of personnel incidents involving serious injury or death, including two within three weeks of each other in which individuals were crushed by their own vehicles.  A vehicle incident at Prudhoe Bay's North Gas Injection Pad on November 18, 2009 resulted in the death of a BP contract employee.

55.     The letter continued: "*At the same time these events are occurring, Committee staff have received reports that proposed budget cuts by BP may threaten the company's ability to maintain safe operations.*"  (Emphasis added.)

56.     The incidents described in the congressmen's letter did not amount to disasters on the scale of the Deepwater Horizon rig explosion, but the risks they posed were equally grave, as reported in a May 4, 2010, article entitled "Congressmen Raised Concerns About BP Safety Before Gulf Oil Spill" featured on the weblog *ProPublica: Journalism in the Public Interest:*[1]

In the most dangerous of the incidents last year in Alaska, safety backstops also failed. On Oct. 10, 2009, a staging valve stuck closed at a large

---

[1]     *See* http://www.propublica.org/article/congressmen-raised-concerns-about-bp-safety-in-months-before-gulf-spill (last visited May 10, 2010).

central compressor station in Prudhoe Bay where gas is captured for re-injection back underground. According to the congressional letter, the blockage caused gas to back up on another series of valves. A backup flare meant to burn off that collection of gas was not lit at the time, and cameras, installed so BP's staff could monitor the flare's functions in real time, were not pointed in the right direction. There was no explosion; the gas vented out before anything could ignite it.

Robert Bea, a professor at University of California Berkeley's department of civil and environmental engineering who has worked for both Shell and BP on Alaska's North Slope, said the situation at the compressor station sounded like a ticking bomb.

"It's hard to describe these explosions in terms that people can understand," he said. "It would rival the biggest ones that we have ever had in the history of the oil and gas industry."

Bea said a blast zone could reach 300 feet and leave a crater 90 feet wide. He likened the potential scenario to a gas valve error that led to the massive explosion of an offshore drilling platform called Piper Alpha in the North Sea in 1988, in which 167 workers were killed.

In a Sept. 29, 2008, incident cited in the congressional memo, a high-pressure gas line blew apart without igniting, sending a 28-foot long piece of metal 900 feet through the air and spewing gas.

"Let's just call them lucky," Bea said. "Even the steel bouncing around can ignite sparks to erupt the gas."

On Jan. 15, 2009, a cleaning pig -- a bullet-shaped device that runs diagnostics inside the pipeline -- got stuck and let large amounts of gas leak into a pump station.

And on Nov. 29, 2009, an 18-inch pipe carrying a mixture of oil, natural gas and waste water ruptured, spraying its flammable contents.

BP has a recent history of disasters stemming from incomplete maintenance and faulty equipment, including the 2005 blast at a refinery in Texas City, Texas, where 15 workers died after a fuel tower was powered up without following protocol. Then there was the 2006 Alaskan pipeline spill, which occurred four years after BP had been warned about corroded pipelines. The company pleaded guilty to felony counts in the first incident and a misdemeanor charge in the second, tallying fines in excess of $62 million.

The Committee on Energy and Commerce, now chaired by Waxman, has oversight authority for the Trans-Alaska pipeline. In congressional hearings after the 2006 Prudhoe Bay spill, BP management was accused of making "draconian" budget cuts that affected safety and health, including limiting the use of a corrosion inhibitor inside the pipeline, a step that could have prevented the deterioration that led to the 2006 spill. In his most recent letter, Waxman repeats the concern that the company is cutting corners.

**Deepwater Horizon: Safety and Maintenance Concerns at their Lowest**

57. The BP Defendants' reckless inattention to safety and maintenance issues reached its nadir at the Deepwater Horizon oil rig.

58. At the time of the explosion, the rig was not producing any oil. The rig had drilled a well in the sea floor and was in one of the last phases of the exploratory operation prior to turning the well into a production well. In this final phase, Halliburton workers on the rig, under the supervision and control of BP employees, were attempting to create a cement seal to plug off the wellhead. BP employees under the supervision and control of one or more of the BP Defendants had authority over the Halliburton workers to determine the type and amount of cement to be used.

59. Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well. Indeed, the BP Defendants knew that the work being performed at the Deepwater Horizon rig was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the rig was doing when it exploded. This information was known to BP's safety, ethics and environment assurance committee, which took no steps to act on it.

60. Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with alarming regularity, and most frequently of all in the Gulf of Mexico. Cementing was a factor in 18 of 39 well blowouts between 1992 and 2006. Nearly all of the blowouts examined occurred in the Gulf.

61. Indeed, Halliburton was responsible for cementing a well off the coast of Australia that blew in August 2009, leaking oil for ten weeks before it was plugged. The MMS is investigating that incident, and an MMS official has testified that a poor cement job likely

caused the blowout. This information was known to BP's safety, ethics and environment assurance committee, which took no steps to act on it.

62. Moreover, a blowout preventer manufactured by Cameron and another company was the subject of a dispute between BP and Transocean in June 2000. In that incident, BP issued a notice of default to Transocean concerning the functioning of one of Transocean's oil rigs, in which the blowout preventer was the subject of concern. Defendant Hayward acknowledged the existence of this dispute in public comments on May 4, 2010. This information was known to BP's safety, ethics and environment assurance committee, which took no steps to act on it.

63. In addition, the BP Defendants were aware of an August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site. This information was known to BP's safety, ethics and environment assurance committee, which took no steps to act on it.

64. The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling in 5,000 feet of water, to a total depth in excess of 20,000 feet. The BP Defendants were well aware of the high risk of blowouts from such deep drilling.

65. Not only did the blowout preventer on the Deepwater Horizon rig fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.

66.     Worse, the BP Defendants failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

67.     First, the BP Defendants consciously elected not to install an acoustically-activated remote-control shut-off valve, costing only $500,000,[2] to the well.  Indeed, such acoustic switches are mandated in countries like Brazil and Norway, and are routinely employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of the BP Defendants themselves as well as their counterparts at other companies.

68.     Second, the BP Defendants chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor. Much like blowout preventers, devices that are meant to seal leaks, this valve could have served as a cutoff of last resort in explosions.

69.     The BP Defendants ignored these precautions despite being well aware of the increased risk, from deep-sea drilling, of a failure of the primary blowout safety mechanism, the blowout preventer.   This information was known to BP's safety, ethics and environment assurance committee, which took no steps to act on it.

70.     A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes necessary to drill at such great depths.  Only three of 14 rigs studied had blowout preventers able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.  "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said.

---

[2]     By contrast, the replacement cost of the Deepwater Horizon rig as a whole is $560 million.  Moreover, BP has so far incurred $450 million and is incurring at least an additional $10 million per day to try to contain the spill, and the total expenses of containment and clean-up could reach up to $12.5 billion.

20

Moreover, the study singled out defendant Cameron, the manufacturer of the Deepwater Horizon's blowout preventer, for relying on faulty calculations to determine the necessary strength for its blowout preventer equipment of function properly at greater depths. This information was known to BP's safety, ethics and environment assurance committee, which took no steps to act on it.

71.     The operation of the rig, and particularly the installation of the final cement casing at the well-head prior to the conclusion of the exploratory phase of the well, was also carried out by Halliburton and the BP Defendants with extreme recklessness. As the *New York Times* reported (May 3, 2010):

> More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well — a possible factor that could have contributed to the explosion.
>
> * * * *
>
> The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily. BP planned to return to the well later to set up a permanent rig and start producing oil.
>
> Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks.
>
> The concrete involved is highly specialized. It needs to be blended and stirred properly. It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal.
>
> The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said. But idling a rig to address such a problem can cost huge sums. . . . [L]awyers said that supervisors either missed or ignored the signals and proceeded with the job.
>
> When workers released the last valves that were holding back the natural gas that had built up inside the well, the gas shot up the pipe and sprayed into the drilling rig, igniting the fireball that caused the deaths of 11 workers, injured others and sank the rig . . . .

72.     The *New York Times* has similarly reported, citing lawyers for environmental groups, oil rig workers, and commercial fishermen, that: "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said

the rig had been drilling deeper than 22,000 feet, *even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep . . . . "* (Emphasis added.)

**The Explosion and Sinking of the Rig and the BP Defendants' Lackluster Response**

73.     The explosion occurred at approximately 10 p.m. on April 20, 2010.  The rig caught fire and sank two days later, at approximately 10 a.m. on April 22, 2010.  Eleven workers were killed, and three seriously injured.

74.     The rig had been connected to the wellhead on the seal floor by a 5,000-foot pipe called a rise.  As Deepwater Horizon sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape underwater, now snakes along the ocean floor and in the deepest waters slightly above it.  Oil is leaking from the open end of the riser and from three places along its length, including one location almost at the wellhead.

75.     The BP Defendants' response to the disaster was lackluster and only intensified the damage.

76.     After the explosion, the BP Defendants attempted to downplay and conceal the severity of the oil spill.  An initial leak estimate of 1,000 barrels (42,000 gallon) per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels (200,000 gallons) per day.  Moreover, the BP Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

77.     At the time of this filing, the BP Defendants have not capped the wellhead, and the flow of oil continues unabated into the Gulf waters.  The ever-expanding oil slick made landfall on the fragile Louisiana coastline on Friday morning, April 30, 2010, and balls of tar

began washing up on an island three miles off the coast of Alabama on Saturday, May 8, 2010. The oil spill will continue to affect more and more of the Gulf coastline as it is driven landward by currents and winds. BP's attempt over the weekend of May 8-9, 2010, to contain a majority of the oil continuing to spill by using a specially-engineered "dome" over the wellhead failed and was aborted. In light of the failure, BP has resumed injecting dispersants into the gusher a mile below the Gulf of Mexico, as it weighs other ideas to plug the well or siphon off the spewing oil, including a smaller containment box, dubbed a "top hat," and injecting debris including shredded rubber into the well as a stopper, called a "junk shot." It is far from clear, however, that such renewed efforts will be successful, and any relief will take 60 to 90 days to complete while oil continues to spew forth from the well.

78.    Indeed, while the news media have compared this spill to the 1989 Exxon *Valdez* disaster, one crucial difference is that the *Valdez* was an oil tanker with a limited supply of oil. Experts have estimated that the volume of the continuous gush of oil into the Gulf will eclipse that of the *Valdez* spill within 50 days. In contrast, current relief efforts will most likely take 60 to 90 days to complete, virtually ensuring this spill's classification as the worst oil spill in history.

79.    Worse, the floating booms that the Company has been caused to set in place, to block the oil from reaching the coastline, may be too low and/or be placed too far out to sea to be useful. Experts report that anything higher than a three-foot wave will clear the boom, lifting the oil slick over the barriers along with it. In the first few days of May, the Gulf experienced seven-to ten-foot swells, making the booms all but useless.

80.    As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi,

Alabama, and Florida, destroying the habitats where countless species of fish and marine life breed, spawn, and mature. The timing of this disaster makes it even more damaging, as May is spawning season for much seal life and migration time for the young of many species of shrimp and various pelagic fish species. Such devastation of so many species will severely damage and perhaps even destroy the livelihoods of many commercial fishing interests in the area. The National Oceanographic and Atmospheric Administration may soon declare a 6,800-square-mile area a "fisheries disaster."

81.     In addition, the Gulf accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output. Nearly a third of all marine recreational fishing trips, including those part of the $1 billion-per-year sport fishing industry, take place on Gulf waters. In 2008, the 3.2 million recreational fishermen in the Gulf took 24 million fishing trips. All of these activities and business are now in serious jeopardy.

**Further Evidence Emerges of the BP Defendants' Misconduct as to Safety Issues**

82.     In the aftermath of the explosion and spill, Congress, as well as the federal MMS, has commenced separate investigations of allegations that BP failed to keep proper documentation about how to perform an emergency shutdown of the Atlantis, another Gulf oil platform similar to Deepwater Horizon.

83.     As reported in the *Guardian* ("Whistleblower accuse BP over rig documents: A contract worker at BP raised safety concerns after accusing it of failing to keep key documents for its Atlantis rig," Apr. 27, 2010):

> The Guardian has learned a separate MMS investigation into the Atlantis rig allegations is being launched. MMS said it would complete its report by the end of next month. Atlantis, 190 miles south of New Orleans, is the world's largest platform of its kind and began operating in 2007 in the Gulf of Mexico at one of the deepest depths in the world.

A whistleblower employed by a contractor working for BP leaked internal emails from staffers dated August 2008 which appear to reveal concerns that BP may not have been keeping a complete accurate record of drawings of the components used to build the Atlantis platform.

Final "as-built" drawings show how generic parts are modified when they are assembled. They can be crucial to assess how such a complex structure operates in practice. It is federal law for rig operators to keep complete, up-to-date "as-built" drawings. If BP assumed the drawings were accurate and up-to-date, "this could lead to catastrophic operator errors", a BP executive involved in the project warned colleagues, according to one email.

At the end of February, the powerful House committee on natural resources wrote to MMS demanding it investigate the claims. The agency, which declined to provide further details to the Guardian , promised to launch the inquiry soon afterwards.

The Deepwater Horizon accident has reinforced environmental concerns in the US about offshore oil drilling and will put pressure on the MMS to ensure standards are fully met by all operators, particularly in the deep waters of the Gulf of Mexico.

US environmental consumer campaign group Food and Water Watch also passed to the Guardian what appears to be an official reply to the whistleblower from BP's office of the ombudsman, which was set up to investigate internal safety concerns following the Texas refinery explosion of 2005. Dated 13 April 2010, deputy ombudsman Billie Pirner Garde is quoted responding to the whistleblower's concerns over BP's 'Project Execution Plan' over Atlantis, centring on the alleged lack of documentation. "Your concerns about the project not following the terms of its own Project Execution Plan were substantiated, and addressed by a BP Management of Change document," he is quoted as writing.

### The Consequences to BP:  Calamity

84.     BP has already incurred $450 million in costs and is incurring additional costs of $10 million per day to attempt to stop the oil leak and remediate the effects of the spill.  The total estimated impact to BP is in the tens of billions of dollars.

85.     Pursuant to the Oil Pollution Act of 1990, the federal government has assigned responsibility for the cleanup to BP.  The Act provides for the recovery, among other things, of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

25

86.  .  Although liability under federal law is capped under the Act at $75 million,
legislation is moving through Congress as this complaint is finalized that would raise the liability
cap $10 billion and make that change retroactive—i.e., fully applicable to BP with respect to the
Deepwater Horizon leak.

87.    Moreover, even before legislative efforts were initiated to raise the cap,
Defendant Hayward—in an implicit admission of liability—announced that BP would
voluntarily pay in excess of the liability cap imposed by the Act to remediate the problem.

88.    BP is also exposed to statutory liability pursuant to the Louisiana Oil Spill
Prevention and Response Act ("LOSPRA").  Pursuant to LOSPRA, the party responsible for an
oil spill is liable for up to $350 million in damages arising from the discharge, and must pay all
pollution removal costs and damages, regardless of any defenses it may assert.

89.    In addition to statutory liability, dozens of lawsuits, including class actions, have
been filed, which will expose BP to hundreds of millions, if not billions, of dollars in additional
liability to private parties, including families of the workers, environmental groups, commercial
fishermen, and property owners along the Louisiana, Mississippi, Alabama, and Florida coasts.

90.    Perhaps the greatest damage from Defendants' misconduct will be to BP's
reputation and good will.

91.    Indeed, as the *New York Times* reported (Apr. 29, 2010):

> But regardless of the out-of-pocket costs, the long-term damage to BP's
> reputation — and possibly, its future prospects for drilling in the Gulf of Mexico
> — is likely to be far higher, according to industry analysts.
>     The magnitude of the Deepwater Horizon disaster seems to be finally
> sinking in with investors. BP's stock plunged more than 8 percent Thursday in
> American trading in an otherwise strong day for stocks. Since the accident, the
> American depositary receipts of the company have fallen about 13 percent,
> closing Thursday at $52.56.
>     For Tony Hayward, who has led BP for the last three years, the accident
> threatens to overshadow all of the efforts he has made to burnish the tattered

reputation of the company after a refinery explosion in Texas in 2005 and a pipeline leak in Alaska in 2006.

As Mr. Hayward said to fellow executives in his London office recently, "What the hell did we do to deserve this?"

A BP spokesman said no executives were available for an interview Thursday. But in response to a written question, Mr. Hayward said, "Reputationally, and in every other way, we will be judged by the quality, intensity, speed and efficacy of our response."

## **DERIVATIVE ALLEGATIONS**

92.     Plaintiff brings this action derivatively in the right and for the benefit of BP to redress injuries suffered, and to be suffered, by BP as a direct result of the BP Defendants' breaches of fiduciary duties by virtue of the wrongs alleged herein and the misconduct of the other defendants.  The claims herein arise from an actual or proposed act or omission involving negligence, default, breach of duty, and/or breach of trust by directors and/or former directors of BP, as well as the misconduct of other defendants.  BP is named as a nominal defendant solely in a derivative capacity.  Plaintiff seeks to assert solely causes of action vested in BP and seeks relief solely on behalf of BP.  Plaintiff has no individual standing to pursue the claims herein as direct claims against any of the Defendants.

93.     Plaintiff will adequately and fairly represent the interests of BP in enforcing and prosecuting its rights.

94.     Prosecution of this action, independent of the BP Board, is in the best interests of the Company.

95.     This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to correct the wrong that has been done to the Company.  Plaintiff has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative