# Exhibit H

Filed 11 September 1 P2:52
Chris Daniel - District Clerk
Harris County
ED101J016477714
By: Nelson Cuero

2011-52580 / Court: 234

CAUSE NO. _____

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., <br>     Plaintiff <br><br> v. <br><br> BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION Co., and BP p.l.c. <br>     Defendants. | § § § § § § § § § § § | IN THE DISTRICT COURT OF <br><br><br> HARRIS COUNTY, TEXAS <br><br><br> \_\_\_\_ JUDICIAL DISTRICT |

## PLAINTIFF HALLIBURTON ENERGY SERVICES, INC.'S ORIGINAL PETITION

Plaintiff Halliburton Energy Services, Inc. ("HESI") files its Original Petition against Defendants BP Exploration and Production, Inc. ("BP Exploration"), BP America Production Company, ("BP America"), and BP p.l.c. (collectively "BP" or the "BP Parties"), and in support of its causes of action, respectfully shows the following:

### I.
### NATURE OF THE CASE

1.    On April 20, 2010, a blowout occurred on the *Deepwater Horizon* in the Gulf of Mexico at the Macondo well (the "Blowout") that killed 11 people, injured many others, caused an extensive oil spill, and resulted in arguably the largest civil litigation in United States' history (the "Blowout Litigation"). Since the Blowout, and in a transparent attempt to minimize its liability, BP, the operator and leaseholder for the Macondo well, has intentionally and continually misrepresented its role in the Macondo tragedy by concealing its own conduct that caused the incident and the actions BP failed to take to prevent it. Specifically, BP published a self-serving report that supposedly took into account all of the then-known facts surrounding the tragedy including, among other things, the location of all hydrocarbon-bearing zones in the well (the "Bly Report"). In essence, the Bly Report categorizes HESI's primary cement job as a root

cause of the Blowout purportedly lending support to the allegations against HESI in the hundreds of lawsuits that comprise the Blowout Litigation. The Bly Report, however, intentionally and deliberately omits the critical fact that BP knew or should have known about an additional hydrocarbon zone in the well that BP failed to disclose prior to HESI's designing the cement program for the Macondo Well and that BP, unsurprisingly, failed to disclose after the Blowout.

2. Because BP did not disclose this upper hydrocarbon zone to HESI, HESI was unable to account for it when formulating the cement program that was intended to isolate the well from the influx of gas and oil. BP was solely responsible for identifying all hydrocarbon-bearing zones in the well and for identifying where the designed top of cement ("TOC") should be located in order to isolate all such zones. When BP identified the TOC for purposes of HESI's cement program, HESI justifiably relied on BP to identify the TOC in relation to the highest hydrocarbon-bearing zone in the production interval and/or otherwise disclose the location of the highest hydrocarbon-bearing zone to HESI. BP failed to disclose this information and as a result, has significantly damaged HESI. The motive behind BP's intentional nondisclosure of this upper hydrocarbon-bearing zone is apparent—profit and greed. Had BP disclosed the higher hydrocarbon zone to HESI, HESI would not have pumped the cement program unless and until changes were made to the cement program, changes that likely would have required a redesign of the production casing. Such changes would have cost BP millions of dollars on a well that was already painfully over budget and behind schedule. Regrettably, and consistent with its mantra that "every dollar counts," BP chose to not stop work and redesign the well before going forward with its temporary abandonment procedures, in favor of saving time and money at the expense of safety, resulting in the death of 11 men, countless other injuries and an unprecedented oil spill.

3. As it did before the incident, BP has made every effort to conceal this fact from

HESI and the public following the Blowout. In addition to intentionally omitting this information from the Bly Report, BP also purposely withheld the value and impact of this information from the various investigative bodies, including the Coast Guard, the Department of Justice, the United States Congress and the Presidential Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("National Commission"), that interviewed and solicited testimony from BP as part of their investigations into what caused the Blowout. In fact, HESI only recently learned of BP's cover up scheme during discovery in the Blowout Litigation. BP's conduct should not be countenanced. Indeed, BP's malicious and intentional failure to disclose this critically important information after the incident in hopes of covering up its own culpability, and its actual publication of false statements with regard to it, is tortious, has damaged HESI, and warrants the imposition of exemplary, punitive damages.

## II.
## DISCOVERY CONTROL PLAN

4. HESI intends to conduct discovery under Tex. R. Civ. P. 190.4 (Level 3).

## III.
## THE PARTIES

5. HESI is a Delaware corporation with its principal place of business in Texas.

6. BP Exploration is a Delaware corporation with its principal place of business in Harris County, Texas. BP Exploration may be served through its registered agent for process at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas, 75201.

7. BP America is a Delaware corporation with its principal place of business in Houston, Texas. BP America may be served through its registered agent for process at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas, 75201.

8. BP p.l.c. is a British public limited company with its corporate headquarters in

London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which both BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Texas and the U.S. more generally. This Court has jurisdiction over BP p.l.c. pursuant to Texas' long-arm general jurisdiction statute, Tex. Civ. Prac. & Rem. Code §17.042. BP p.l.c. does business in Texas, has had continuous and systematic contacts with Texas (and the U.S. more generally). Service of process on BP p.l.c. is proper through the means authorized by the Hague Convention On the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

## IV.
## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over HESI's claims against the BP Parties because the relief sought falls within the jurisdictional limits of this Court pursuant to Tex. Civ. Prac. & Rem. Code § 37.003.

10. Venue is proper in this judicial district pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(3) because BP's principal office is located in Harris County, Texas.

## V.
## FACTS

11. The BP Parties owned and operated the Macondo Well. As such, BP controlled the majority of the data and empirical information relating to actual well conditions, including data used to identify the highest hydrocarbon zone in the production interval of the well. The location of the highest hydrocarbon zone in the production interval is critical information necessary to properly design and execute a primary cement job to cement production casing.

Page 4

Further, BP knew that HESI, as a cementing service contractor, would rely, and BP intended HESI to rely, upon this closely-held information that BP supplied in making decisions as to how to effectively proceed with its cementing services. Despite this fact, BP knew, but failed to disclose to HESI, the existence of the highest hydrocarbon-bearing zone in the production interval. After the incident, BP has and continues to affirmatively conceal this same information not only from HESI but also from the public and the governmental investigating bodies.

### The Macondo Well was Drilled Through Pressurized Formations.

12. The Macondo Well was drilled for the purpose of reaching a potential hydrocarbon reservoir located more than 18,000 feet below sea level. In order to reach that reservoir, the drilling crew of the *Deepwater Horizon*, under BP's direction, drilled downhole from the sea floor a section at a time. These sections are called "intervals." The engineering and technology necessary to drill a deepwater well in the Gulf of Mexico are both significant and complex. However, as a general matter, well sections are drilled out and then reinforced with metal casing or liners that are then cemented into place. Once one interval is drilled, reinforced and cemented, the drilling crew then drills ahead (or down) into the next interval and repeats the process until the wellbore intersects the target reservoir zone. The lowest section in the well where the wellbore intersects the reservoir zone is typically called the "production interval," or the interval from which hydrocarbon from the reservoir zone will later be produced.[1] The interval principally at issue in this case is the Macondo Well's production interval.

13. When the drilling crew on the *Deepwater Horizon* drilled the production interval, it drilled through geological formations call "sands" that potentially contained a variety of formation fluids (*i.e.*, oil, gas, water). While the target reservoir zone at the bottom of the

---

[1] At the Macondo Well, BP intended to drill the well with the *Deepwater Horizon* rig and then temporarily abandon the well. BP then intended to come back to the Macondo Well with a different rig—a production rig—to "produce" the well, which would have involved perforating the production casing and annular cement in the vicinity of the reservoir sands thereby allowing hydrocarbons to flow into the production casing and up to the production rig for recovery.

production interval was a "sand," the crew had to drill through other thinner sands higher up in the interval to get there. To the extent these higher sands in the production interval contained hydrocarbons, they were not considered commercially viable (*i.e.*, they were not "pay" sands or zones). Nevertheless, these higher sands were pressurized, and the pore pressure of these sands, if not overcome, would cause their formation fluids to flow into the wellbore. The unintended influx of hydrocarbons into a wellbore is anathema to sound drilling principles and, therefore, the drilling crew and BP intended to drill while maintaining greater pressure in the production interval in order to overbalance the pressures exerted back by the formation.

14. To ensure that formation fluids do not influx into the wellbore while drilling, a rig crew generally drills with weighted "drilling mud" in the hole. The drilling mud is a viscous fluid of engineered density which, among other things, is intended to overbalance and hold back pressurized fluids in the sands. The drilling mud, and more particularly its density, also needs to be engineered so that the force exerted by it onto the formation does not exceed the formation's "fracture gradient," which is the force or pressure at which the geologic formation would fracture. Thus, the drilling mud in the wellbore must be of sufficient density to hold back fluids in the formation but not so dense as to fracture the formation geology.

## To Prepare for the Primary Cement Job, HESI Justifiably Relied on BP To Identify the Highest Hydrocarbon-Bearing Sand.

15. After the Macondo Well was drilled to Total Depth ("TD"), BP ran a continuous production casing string into the hole from the sea floor all the way down into the production interval. Once the production casing was in place, BP authorized HESI, as the cementing contractor on the rig, to execute a "primary" cement job, which is a cement job designed to cement the production casing into place. A primary cement job has two principal goals. First, it attempts to place cement into a predetermined or designed location in the production interval. Second, the cement, once placed, is intended to achieve "zonal isolation" in the production

interval.

16.   To execute the primary cement job, cement is pumped from the rig down the inside of the production casing. When the cement exits the bottom of the production casing in the production interval, pumping pressure causes the cement to turn and flow up into the space between the outside of the production casing and the formation. This space is called the "annulus" or "annular space." The principal objective of the primary cement job is to have the cement turn the corner at the bottom of the production casing and flow up into and seal off this annular space such that formation fluids from the production interval's exposed sands cannot flow into the wellbore. In other words, the cement is intended to hold back the fluids in the formation sands, including hydrocarbons, and prevent them from entering the wellbore. Successfully sealing off this annular space such that formation fluids in the sands cannot flow into the wellbore is called achieving "zonal isolation."

17.   Prior to executing the primary cement job on the Macondo Well's production casing, HESI and BP engaged in an iterative process to design the cement slurry that would be used and to finalize a cementing plan for executing the job. As the owner of the Macondo Well, BP has ownership of, and a proprietary interest in, much of the data associated with the well, including but not limited to data gathered by service contractors regarding certain downhole conditions and the location of potential hydrocarbon-bearing sands in the production interval. Thus, HESI justifiably relied on BP to provide it with certain data inputs for purposes of designing, modeling and executing the primary cement job. HESI's cementing team does not have access to this information independently and must obtain it from BP.

18.   One of the key data points or parameters for designing a primary cement job is called "top of cement" or "TOC." TOC refers to the height of the cement column pumped into the annulus. The TOC is a critical component of the primary cement job design as it is the key driver of the cement volume to be pumped. The cement column in the annular space should

extend a sufficient distance above the *highest* hydrocarbon-bearing zone in the interval in order to properly isolate that zone and the zones below it. The height of the cement needed to isolate the zones is dependent on a variety of factors that can be modeled, including but not limited to, the pore pressures of those zones. However, *at a minimum*, federal regulations require that TOC be placed *at least 500 feet above the highest hydrocarbon-bearing zone* in the production interval. *See* 30 C.F.R. § 250.421.[2] Therefore, in order to properly determine the designed TOC for zonal isolation and to satisfy the applicable federal regulation regarding TOC, it is critical to know the specific location of the highest hydrocarbon-bearing sand in the production interval and its pore pressure. As set forth below, BP intentionally concealed the highest hydrocarbon-bearing zone in the production interval from HESI both before and after the incident.

### BP Intentionally Concealed the Higher Hydrocarbon-Bearing Sand From HESI.

19. BP hired service contractors to run a variety of "logs" during the drilling of the Macondo Well. These logs are designed to provide preliminary information to BP about the well, including but not limited to the geology and location of sands in the well. However, after drilling was completed to total depth and before the primary cement job, BP hired Schlumberger to perform a suite of "wireline" logging runs in the open hole of the production interval (*i.e.*, before production casing was run in the hole). Wireline logging is typically done after drilling is complete to get the most accurate and comprehensive data possible about the location of hydrocarbons in the well. At the Macondo Well, BP used data gathered from wireline logging to determine the location of the highest hydrocarbon-bearing zone in the production interval. The wireline logging operation took place on the *Deepwater Horizon* from about April 10 to April

---

[2] Top of cement (TOC) can only be estimated prior to the cement job. A variety of factors can contribute to TOC not achieving its estimated or theoretical height. To determine whether the *actual* TOC (where the top of cement is located after the cement job) is consistent with the theoretical TOC (as estimated prior to the cement job), BP, as the well owner, could have run a cement evaluation technique such as a cement bond log ("CBL"). However, despite having a service company on the rig to run a CBL after the primary cement job, BP chose to forego the CBL on the Macondo Well.

15, 2010. BP personnel traveled to the rig to observe the wireline logging operations.

20. One of BP's responsibilities was to identify the hydrocarbon-bearing sands in the production interval. To discharge this responsibility, BP reviewed wireline data and analysis from the ongoing wireline logging operations. One of the wireline logs is called a "Triple Combo," so named because it contains three (3) tracks of data—a gamma ray curve, resistivity curves, and the density/neutron curves. The gamma ray log indicates the presence of a sand formation as distinguished from, for example, a shale formation. The resistivity curves measure the resistivity of formation fluids in the formation. Hydrocarbons are non-conductive compared to brine or salt water. Therefore, the difference in resistivity readings between hydrocarbons and salt water give a preliminary indication of the potential presence of hydrocarbons in a formation sand. The density/neutron curves plot formation porosity and permeability. The intersection (or crossover) of these two plots is a gas signature, or an indication of the presence of hydrocarbons in a particular sand.

21. On or about April 13, 2010, BP identified what it claimed was the shallowest/highest hydrocarbon-bearing sand in the production interval and provided that information to its drilling team on the Macondo Well so that it could be used in cement procedure preparations. Relying on the Triple Combo log, the processing of which was complete on April 13, 2010, BP identified that the highest hydrocarbon-bearing zone was located at a certain depth. The depth of this sand was provided to the BP drilling engineers for the specific purpose of planning HESI's cement job. Then, the BP drilling team informed HESI to design a cement job procedure that would place TOC at approximately 500 feet above the sand BP identified as the highest hydrocarbon sand in the production interval.

22. However, what BP represented to HESI as the highest hydrocarbon-bearing sand in the production interval was wrong. Rather, a higher sand existed that was noted on all three tracks of the log (the "Concealed Sand"). BP never disclosed the Concealed Sand to HESI or

Page 9

disclosed that there was a gas signature in a sand higher than the one previously identified as the highest hydrocarbon-bearing sand. In fact, BP intentionally withheld this information with regard to the Concealed Sand, initially to save time and money, and then later to cover-up BP's culpability for the Blowout.

23. In the days following April 13, but prior to April 20, BP performed further data analysis and confirmed, on April 20, 2010 (the day of the incident), that the Concealed Sand was in fact the shallowest hydrocarbon-bearing sand. Despite confirming that the Concealed Sand was in fact the highest hydrocarbon-bearing sand, and despite knowing that HESI relied on BP's identification of the highest sand to plan the cement job, BP failed to inform HESI that BP knew (or should have known) there was a higher hydrocarbon-bearing sand in the production interval and knew the TOC it provided to HESI (that HESI relied upon to design the cement program) was wrong. HESI relied on the erroneous information BP provided and planned the cement job with the understanding that the sand BP identified was the highest hydrocarbon-bearing sand, which it was not.

24. BP had incentive to ignore the hydrocarbons in the Concealed Sand. If BP identified the Concealed Sand as a hydrocarbon-bearing zone, federal regulations would have required TOC for the production interval to have overlapped into the previously cased section of the well (higher interval), which is contrary to BP's well design protocol and would have required BP to redesign the production interval. Redesigning the production interval likely would have cost BP millions of additional dollars for a project that was already over budget and behind schedule. Accordingly, BP did not have the appetite for investing millions of dollars in additional costs in the Macondo well, especially when the costs could be avoided by simply refusing to acknowledge the Concealed Sand as a hydrocarbon-bearing zone, which it was.

25. Moreover, had HESI known about the Concealed Sand it would not have pumped the primary cement job in the production interval until changes were made to the cement

program, changes that likely would have required a redesign of the production casing. The fact that HESI would not have proceeded with the primary cement job is not *post hoc* speculation. Prior to the primary cement job, HESI ran computer modeling simulations of the cement job using a proprietary software program called OptiCem. HESI provided written reports from OptiCem to BP prior to the cement job. HESI generated an OptiCem report using 21 centralizers (devices used to centralize the production casing in the hole to affect the proper and efficient radial flow of cement up the annulus). That OptiCem report predicted that the modeled cement job, among other things, would present a "LOW" gas flow problem. Subsequently, BP decided to use only 6 centralizers. When HESI updated the centralizer information and generated a new OptiCem report on April 18, 2010, modeling 7 centralizers (one more than BP decided to use), the report predicted that the modeled cement job would present a "SEVERE" gas flow problem. In addition, using the very same data included in the April 18, 2010 OptiCem report, but updating the model only to include the Concealed Sand, the OptiCem report would have instructed HESI and BP as follows:

> Based on analysis of the above outlined well conditions, this well is considered to have a CRITICAL gas flow problem. If a gas flow potential of greater than 15 is calculated, then changes should be made....

The gas flow potential in this OptiCem report would have a value higher than fifteen; thus, given this result, HESI would not have gone forward with the cement job unless and until changes were made to the cement program, changes that likely would have required a redesign of the production casing. Simply put, disclosing the Concealed Sand to HESI, or a TOC based on the Concealed Sand, would have forced BP to incur millions of additional dollars in costs associated with the Macondo well and a significant period of additional time before the production interval could have been cemented. Rather than incur these costs, BP chose to not disclose the Concealed Sand to HESI.

## BP's Cover Up Continued Post-Incident

26.     Following the Blowout on the *Deepwater Horizon*, BP petrophysicists continued to review the wireline logs relating to the Macondo Well. No new wireline logs were run post-incident. Instead, post-incident review of the previously existing wireline logs—that were fully completed by April 13, 2010 and that were reviewed by BP on the same date for the purpose of initially identifying (erroneously) the highest hydrocarbon zone—confirmed the presence of the Concealed Sand as a hydrocarbon-bearing sand.

27.     Despite knowing about the Concealed Sand both before and after the Macondo Well incident, BP has purposefully hidden it from the public and from HESI. BP's own internal investigative report, the Bly Report, released to the public on or about September 8, 2010, purports to be an objective analysis of what caused the Blowout and claims to be based "on the information available to the investigative team during the investigation[.]" Yet, despite information about the Concealed Sand being available to the investigative team, it is nowhere mentioned in the report. Rather, on page 54 of the Bly Report, BP depicts all other sands (with their corresponding pore pressures) in the production interval *except* the critical Concealed Sand. Furthermore, the Bly Report cryptically states in fine print: "Sands are based on geology *known at the time of the accident*." This statement is patently false. BP knew about the Concealed Sand even before the Blowout occurred. However, instead of acknowledging this critical well condition, BP selectively and self-servingly omitted reference to it in the Bly Report in its attempt to cover up BP's knowledge of the Concealed Sand and its own direct culpability for the tragedy.

28.     In public appearances and testimony before the Coast Guard, the United States Congress and the National Commission—all of which were attempting to find out what happened at the Macondo Well—BP never disclosed the existence, importance and impact of the Concealed Sand, despite its awareness that its existence was critical to properly planning the

execution of the cement job. HESI has justifiably relied upon BP's aforementioned misrepresentations in conducting its business since the incident, specifically in how HESI responded to investigations and inquiries from various agencies and entities and in issuing press releases with regard to the tragedy, among others.

29. HESI did not learn of BP's intentional nondisclosure of the Concealed Sand until a recent deposition in the Blowout Litigation.

30. BP's tortious conduct has damaged HESI significantly. As a direct and proximate result of BP's cover up, including but not limited to publication of the Bly Report, HESI has suffered and continues to suffer economic damages in an amount to be determined by the Court. Moreover, BP's aforementioned conduct warrants the imposition of exemplary damages to deter BP from engaging in such egregious conduct in the future.

## VI.
## CAUSES OF ACTION

### COUNT 1
### (Negligent/Grossly Negligent Misrepresentation)

31. Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

32. BP made numerous post-incident false representations regarding the Macondo Well hydrocarbon-bearing sands to HESI for the guidance of HESI's business (and also failed to disclose the existence, importance and impact of the Concealed Sand to Congress, the public, and various governmental agencies). BP failed to exercise reasonable care with regard to the statements made in its Bly Report and with regard to other representations and statements pertaining to the Blowout and what caused it. In conducting its business by, among other things, responding to various investigations and inquiries as to the cause of the Blowout, issuing press releases and making other public statements, HESI justifiably relied, and BP intended that HESI rely, upon BP's representations regarding the shallowest hydrocarbon-bearing sands and the

resultant necessary top of cement. BP's failure to exercise reasonable care in making its various statements and conclusions related to the Blowout proximately caused HESI injury and damages, including pecuniary losses.

33.  BP's negligent/grossly negligent misrepresentations also warrant the imposition of exemplary damages.

## COUNT 2
### (Defamation/Common Law Libel/Slander)

34.  Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

35.  BP, through its agents, employees and representatives, has made false and defamatory statements and representations of fact as to HESI. These statements have been made repeatedly to the general public, including in BP's Bly Report, and in testimony provided to the Department of the Interior Joint Investigation Team, Congress and other governmental agencies.

36.  BP made these false statements about HESI with actual malice, knowing they were false, or with reckless disregard for their truth or veracity. These false, defamatory representations have harmed HESI's business ventures, its reputation and character, and have caused other special damages.

37.  As a proximate result of BP's intentional, malicious, and/or reckless conduct, HESI has suffered damages within the jurisdictional limits of this Court. BP's conduct in this regard warrants the imposition of exemplary damages.

## COUNT 3
### (Business Disparagement)

38.  Paragraphs 1 through 37 are incorporated by reference as if fully set forth herein.

39.  BP, through publication of its Bly Report and various public testimony, made false representations regarding the identification and location of the hydrocarbon-bearing sands

in the Macondo Well and HESI's alleged failures with regard to cementing and sealing these sands that disparaged HESI's business. BP's failure to disclose the identity of the Concealed Sand has directly affected HESI's character and reputation in the oil and gas services industry and HESI's business, and its disparaging statements about HESI are not privileged.

40. BP committed this business disparagement maliciously, with the specific intent to cover up BP's own tortious conduct and shift blame to HESI.

41. As a result, HESI has suffered actual and special damages including, but not limited to, lost profits, additional administrative expenses, and incidental damages. Additionally, BP's malicious conduct entitles HESI to recover exemplary damages in a sum to be determined by the trier of fact.

42. HESI reserves its right to amend these allegations as additional discovery and evidence warrant.

## VII.
## REQUEST FOR DISCLOSURE

43. Pursuant to Tex. R. Civ. P. 194, HESI requests that BP disclose, within 50 days of service of this Petition and request, the information or material described in Tex. R. Civ. P. 194.2.

## VIII.
## DEMAND FOR JURY TRIAL/PAYMENT OF JURY FEE

44. HESI demands a jury trial and tenders the appropriate fee with this Petition.

## IX.
## CONDITIONS PRECEDENT

45. All conditions precedent necessary for HESI to recover its damages have occurred or will occur.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff HALLIBURTON ENERGY SERVICES, INC. prays that the BP Parties be cited to appear and answer and that the Court award HESI judgment for:

    a.    all economic, actual and consequential damages;

    b.    exemplary damages;

    c.    prejudgment and post-judgment interest;

    d.    costs and attorneys' fees; and

    e.    all other relief to which HESI is entitled, whether legal or equitable, general or special.

**Respectfully submitted**

**GODWIN RONQUILLO PC**

/s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
ayork@GodwinRonquillo.com
State Bar No. 22167500
Jerry von Sternberg
jvonsternberg@GodwinRonquillo.com
State Bar No. 20618150
Misty Hataway-Coné
mcone@GodwinRonquillo.com
State Bar No. 24032277
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

ATTORNEYS FOR HALLIBURTON ENERGY SERVICES, INC.