IN RE: DEEPWATER HORIZON LITIGATION
MDL NO. 2179

JAMES PARKERSON ROY
Domengeaux Wright Roy & Edwards LLC
556 Jefferson St. Suite 500
Lafayette, LA 70501
E-Mail: jimr@wrightroy.com
Telephone: (337) 233-3033
Direct: (337) 593-4190
Fax: (337) 233-2796

STEPHEN J. HERMAN
Herman, Herman Katz & Cotlar, LLP
820 O'Keefe Ave.
New Orleans, LA 70113
E-Mail: sherman@hhkc.com
Telephone: (504) 581-4892
Direct: (504) 680-0554
Fax: (504) 561-6024

October 17, 2011

**BY HAND**

The Honorable Carl J. Barbier
United States District Judge
500 Poydras Street, Room C-268
New Orleans, Louisiana 70130

Re: Subsequent Remedial Measures

Dear Judge Barbier:

Plaintiffs respectfully provide the Court with the following submission to address the admissibility of ten Trial Exhibits from the "List of 300" to which BP has objected on the basis that they are allegedly "subsequent remedial measures" under Federal Rule of Evidence 407.[1]

The primary basis which underlies Rule 407 is the "social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed. R. Evid. 407, ADVISORY COMMITTEE NOTE (1972).

Rule 407, at the same time, provides for clear, specific exclusions. These exclusions will apply when the evidence is being offered for a purpose other than to provide negligence, such as "proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." FED. R. EVID. 407. For each one of the challenged Trial Exhibits, Rule 407 either does not apply in the first instance, or an exclusion precludes its application.

---

[1] "When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does *not* require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." FED. RULE EVID. 407, (emphasis supplied).

**Rule 407 Does Not Apply to Exhibits that Pre-Date the Macondo Blowout.**

BP challenges a June 7, 2005 email (Exhibit 3861) and an April 11, 2010 email (Exhibit 4479) on the basis of Rule 407. Because both of these exhibits pre-date the Macondo Blowout, they are not "subsequent" measures and, as such, Rule 407 does not apply. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343-44 (5th Cir. 1978). *See also Diehl v. Blaw-Knox*, 360 F.3d 426, 433 (3rd Cir. 2004). Rule 407 does not apply even if the remedial measures discussed in the pre-accident document had not yet been implemented by the time of the accident. *In re Air Crash Disaster*, 86 F.3d 498, 529 (6th Cir. 1996).

**Rule 407 Does Not Apply to Exhibits that Do Not Identify a Specific "Remedial Measure."**

Rule 407 does not apply to post-accident admissions of liability that do not identify any particular "remedial measure." Without an identified remedial measure, the document is simply an admission. *See Robinson v. Diamond Offshore Management Co.*, 2006 WL 197010, *3 (E.D. La. 10/26/06) (Barbier, J.) (allowing the admission of an investigative report that recommends remedial measures, as they "are not themselves remedial measures and are not excluded by Fed.R.Evid. 407").

BP challenges five exhibits which do not specifically discuss an actual "remedial measure" but rather provide admissions that it failed to manage risk, that it failed to maintain an appropriate management culture, or that the Bly Report failed to address systemic causes of the Macondo Blowout.

**Exhibit 6254.**

In the minutes of the BP Governance Issues (Exhibit 6254) no remedial measures are discussed. Instead, two general comments are made. The first comment reads as follows:

> Met with Paul Anderson at Sofitel Hotel 8 to 9 a.m. Paul felt that the company needed a fundamental change in culture and *that it would need to move from doing things the BP way to the best way*.

TRIAL EXHIBIT 6254 (emphasis supplied). This is a statement summarizing two people's conversation, not an internal BP document discussing the implementation of new measures. Rule 407 does not exclude evidence of a general statement that there needs to be a change in culture without a remedial measure. It is simply a free-standing admission.

The second statement in Exhibit 6254 reads:

> Tony Burgmans called me to encourage me that we needed a full scope cultural review of the underlying causes of the Horizon tragedy. He pointed out that Mark Bly had indicated that he was taking a narrow review of what happened and not the systemic causes of the incident.

TRIAL EXHIBIT 6254. Again, this is a statement summary of two peoples' conversation (not a discussion of implementing a new protocol) and, as such, an admission that the Bly Report failed to conduct a systemic review of the Macondo Blowout.

**Exhibit 6250.**

Next, BP challenges the September 23, 2010 Minutes between BP and Hermes (Equity Ownership Services) (Exhibit 6250) as a "subsequent remedial measure". However, the minutes do not discuss any specific remedial measure but general admissions of liability. These are minutes of a meeting between an investor and BP in which Sir William Castell is answering a series of questions. The important portions include the following:

- "BP is absolutely responsible for events in the Gulf of Mexico;"
- "Feel Board should now look at catastrophic risk and interrogate directly;"
- "Look at process engineering and have to have a set of safety standards for all subcontractors;"
- "Also how higher level of supervision works;"
- "Think BP has been unlucky;"
- "Surprised that BP could outsource catastrophic risk;"
- "Need to remember US is a litigious place – any unprivileged reports on culture would expose BP to more litigation."

TRIAL EXHIBIT 6250. None of the above statements identify any remedial measure. These statements are general commentary, not internal measures on how to monitor drilling operations in deepwater. These statements bear upon admissions of liability and state of mind.

**Exhibits 6253 and 6249.**

Next BP challenges two more minutes – one from a meeting of BP plc Board of Directors (Exhibit 6253) and the other from BP plc Safety, Ethics, and Environment Assurance Committee ("SEEAC") (Exhibit 6249). The Board of Directors' Minutes center upon statements made by Tony Hayward about the status of the Bly investigation and the possible causes of the Macondo Blowout. There are no statements that center upon any specific remedial measures that need to be taken because of the Macondo Blowout. .

The minutes from the SEEAC meeting center upon its role as the presiding safety authority over the Gulf of Mexico drilling operations. While implementation of the Bly report recommendations are discussed, the Rule 407 exception of "control" is implicated. Here is a high-level BP plc meeting (in which Mr. Hayward is identified as being in attendance) in which BP plc is confirming that it, not only has the authority, but should exercise control over the safe drilling of the GoM. The exhibit states that "[i]t would be appropriate for SEEAC, given its assurance role on behalf of the Board, to monitor the implementation of these recommendations." *Id.* at BP-HZN-2179MDL02004527.

Exhibit 6249 also summarizes Mr. Hayward's statements that the recommendations in the Bly report were "narrow" and that additional actions were being taken by BP plc such as organizational change, "a review of the management of high consequence risk, a process safety assessment of drilling, and a review of the oversight of contractors." *Id.* These statements again demonstrate that Rule 407's exception of control applies. BP plc, through Mr. Hayward, is admitting that it exercises control over GoM drilling safety.

**Exhibit 3866.**

Exhibit 3866 is a May 12, 2010 email chain and attachment concerning the manner in which BP managed risk in the GoM *at the time* of the Macondo Blowout. The originating email

was prepared by John Baxter to other BP officers to prepare a "short brief for Tony Hayward at SEEAC 20 May (and will use it if necessary at GORC) on how we apply 'risk management' and how we are using ETPs in GoM." *Id.* at BP-HZN-2179MDL02206786. Mr. Baxter then requests of the email recipients to put together some written explanation "to cover risk assessment of drilling where it is within the BP Operation (eg. Thunderhorse) and where it is outside a BP Operation (eg. Drilling Contractor exploring on BP Acreage)." *Id.*

The attachment is called "Gulf of Mexico SPU Risk Management SEEAC Brief" and describes GoM Mexico risk management activities in the areas of ETPs, MAR analysis, overall hazard and risk management, and the risk matrix at the time of the Blowout. *Id.* at BP-HZN-2179MDL02206788. The email was sent just over 3 weeks after the Macondo Blowout. The Bly Report would not be issued for another number of months. At that time, BP had not created any understanding as to the cause of the Blowout and, as such, was not in any position to issue remedial measures to cure what it perceived to be the cause(s). As such, Rule 407 does not apply because no "remedial measure" is discussed.

**Rule 407's Exceptions of Feasibility and/or Control Apply to the Remaining Exhibits.**

Recognized exceptions to Rule 407 include when the evidence is being used to demonstrate that a defendant has control over the item and/or that the subsequent remedial measure was feasible pre-accident.

**Exhibits 4244, 1987, 20007.**

In a July 15, 2011 letter from James Dupree (BP America Production Company) to the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"), BP outlines the numerous "specific new performance standards applicable to its deepwater offshore drilling operations in the Gulf of Mexico." TRIAL EXHIBIT 4244, at 1. The new guidelines include the following: (1) requiring its contractors to use subsea BOPs equipped with no fewer than two blind shear ram and a casing shear ram on all drilling rigs under contract; (2) requiring that a third party vender verify the testing and maintenance of BOPs when brought to the surface; (3) requiring that a BP competent engineer or third party cement provider conduct or witness the lab testing of cement slurries; (4) requiring its Oil Spill Response Plan to include more specific information about supplies of dispersants, necessary equipment, shoreline protection strategy, and source control; (5) establishing a real-time drilling operations monitoring center in Houston; (6) providing additional support and guidance to industry response capabilities; (6) sharing its ROV and SIMOPS monitoring capabilities with the industry; (7) collaborating with regulatory groups to improve BOP systems; and (8) improving its assessments of its own employees. *Id.* at 2-4.

On December 15, 2010, BP implemented new interim testing guidelines in a document titled Wellbore Positive and Negative Pressure Testing Interim Guidance. TRIAL EXHIBIT 1987. The guidelines include the following: (1) requiring that new wellbore positive and negative testing procedures *be in writing*, state the purpose of the test, define the barriers, clearly define success/failure criteria, identify and evaluate consequences of failure, and include a contingency plan; (2) requiring a negative differential test on all subsea wellbores prior to the BOP removal, with a successful test result showing that there is no flow or pressure build up on any of the monitoring lines; and (3) requiring the Wells Team Leader to approve all wellbore positive and negative pressure tests prior to operations continuing, with unsuccessful tests requiring reporting to the RPU VP Wells.

Also on December 15, 2010, BP implemented interim guidelines for subsea BOP ram configuration, emergency system requirements, testing, verification and shear ram requirements. TRIAL EXHIBIT 20007. These new guidelines include those identified in Exhibit 4244 as well as the following: (1) requiring that all deepwater rigs shall contain Deadman and Autoshear systems; (2) requiring the live testing of the Deadman, Autosheer, ROV, and EDS systems; (3) requiring third party verification of BOP certification; and (4) requiring specific, uniform shear ram calculation methodology. *Id.* at BP-HZN-2179MDL00647737-40.

Exhibits 4244, 1987, and 20007 are admissible because they establish that each of the new measures were feasible at the time of the Macondo Blowout. In the absence of a formal, binding stipulation as to feasibility, the exhibits should be admissible. *See Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 184-85 (7th Cir. 1992) (upholding the admissibility of a subsequent remedial measure where the defendant refused to enter into a trial stipulation or include it as an admission in the pre-trial order).

These three exhibits also are being introduced to show control - namely, that BP maintained absolute, final control over the operation, maintenance, and certification of the BOP, as well as the design, implementation, and interpretation of the negative and positive pressure testing. The control issue also applies to the new cementing protocols identified in Exhibit 4244. BP is expected to argue at trial that other defendants exercised control over the BOP, the negative test, and the cementing operations. These three exhibits bear upon the issue that at the end of the day, the buck stopped with BP. *See Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1428-29 (5th Cir. 1986) (finding that the subsequent remedial measure was not excluded under Rule 407 where the defendant argued at trial that another party had final authority over what to warn the customer about the use of the product).

Finally, to the extent that these standards were promulgated or required by BOEMRE, Plaintiffs question whether Rule 407 even applies. The evidentiary rule is designed to encourage the negligent party to take remedial action; where the remedial measure is adopted or imposed by a third party, the underlying policy concerns would not seem to apply.

**Impeachment.**

Rule 407 specifically states that subsequent remedial measures can be used for impeachment. *See In re Air Crash* Disaster, 86 F.3d 498, 529-30 (6th Cir. 1996) (upholding admissibility of subsequent remedial measure for impeachment purposes where defendant expert argued that certain airplane equipment was state of the art, when, in fact, more advanced equipment was available pre-accident but implemented by defendant post-accident). In the event the Court may find that an exhibit is precluded by Rule 407, the PSC respectfully requests that the Court nonetheless provide that the exhibits can be used for impeachment.

Since these evidentiary issues are being determined before the entry of a pre-trial order and before the reports and depositions of defense experts, it is impossible to get a clear sense at this time of BP's final theory of the case for trial.

Even once a trial starts, testimony can make a previously inadmissible exhibit, admissible. *See Wood v. Morbark Indust., Inc.*, 70 F.3d 1201, 1206-07 (11th Cir. 1995) (upholding the trial court's reversal of an earlier decision to exclude evidence of subsequent remedial measure when counsel for defendant put it at issue in opening statement); *Muzyka v. Remington Arms Co., Inc.*, 774 F.2d 1309, 1313 (5th Cir. 1985) (finding that the trial court

committed prejudicial error by not allowing evidence of subsequent remedial measures where defense counsel's opening and closing argument placed it at issue).  As such, the PSC should be able to use these exhibits – if and as appropriate - for impeachment at trial.

  As always, we appreciate the Court's time and consideration in this matter.

                Respectfully submitted,

                JAMES PARKERSON ROY
                STEPHEN J. HERMAN
                *Plaintiffs' Liaison Counsel*

cc: Hon. Sally Shushan (*via* E-Mail)
  DEFENSE LIAISON COUNSEL  (*via* E-Mail)
  Mike Underhill, Esq. (*via* E-Mail)
  Hon. Luther Strange (*via* E-Mail)
  Ben Allums (*via* E-Mail)
  Mike O'Keefe (*via* E-Mail)