# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG     *

      "DEEPWATER HORIZON" in the     *    **MDL NO. 2179**

      GULF OF MEXICO, on APRIL 20, 2010    *

        *    **SECTION J**

      Relates to:  No. 10-8888 Doc. Ref. No. 63576    *

        *    **JUDGE BARBIER**

        *

**Vessel of Opportunity (VoO) Contract Disputes**    *    **MAG. JUDGE SHUSHAN**

        *

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***    *

## <u>BP PARTIES' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR BREACH OF MASTER VESSEL CHARTER AGREEMENT, VESSEL OF OPPORTUNITY PROGRAM</u>

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................1

BACKGROUND ..................................................................................................2

ARGUMENT .......................................................................................................6

I.      Legal Standard. ........................................................................................6

II.     The MVCA is a Master Time Charter Allowing For Multiple Charter
        Terms. ........................................................................................................6

III.    Charter Terms Under the MVCA Commenced On the Date of the Vessel's
        Departure from the Mutually Agreed Location into the Charterer's Service. ............9

IV.     Each Charter Term Terminated on the Vessel's Redelivery to the Original
        Point of Delivery..........................................................................................13
        A.      The MVCA required BP to provide decontamination only to Vessels that
                were contaminated and promptly sought decontamination. ...................14
        B.      The MVCA does not require written notice to terminate a Charter Term............16

V.      BP Is Only Obligated To Pay Hire For A Vessel During A Charter Term,
        With The Commencement And Termination Dates Determined As
        Described Above........................................................................................18

VI.     Hoi Nguyen Has Already Been Paid All He Is Owed Under the MVCA...................20
        A.      BP paid Mr. Nguyen for attending training exactly the MVCA specified. ...........21
        B.      Mr. Nguyen's first Charter Term commenced on May 31 after BP
                requested and he agreed to begin the Charter Term. ...............................21
        C.      Mr. Nguyen's first Charter Term ended on July 19 after being placed off-
                hire, receiving prompt decontamination, and being given a day to return
                to his original point of dispatch. .........................................................22
        D.      Mr. Nguyen and BP agreed to another Charter Term in order for him to
                get decontaminated again................................................................23

CONCLUSION ...................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Chembulk Trading LLC v. Chemex Ltd.*,
  393 F.3d 550 (5th Cir. 2004)..........................................................................7
*Daughdrill v. Ocean Drilling & Exploration Co.*,
  702 F. Supp. 1267 (E.D. La. 1988) ...............................................................9
*International Marine Towing*,
  722 F.2d 126 (5th Cir. 1983)........................................................................10
*Johnson v. SEACOR Marine Corp.*,
  404 F.3d 871 (5th Cir. 2005)......................................................................8, 9
*McGill v. Republic Fire & Cas. Ins. Co.*,
  2008 WL 4792720 (E.D. La. Oct. 28, 2008)..................................................6
*Morales v. Boyd*,
  304 F. App'x 315 (5th Cir. 2008)..................................................................6
*Nexen Petroleum U.S.A., Inc. v. SEA MAR Div. of Pool Well Servs. Co.*,
  497 F. Supp. 2d 787 (E.D. La. 2007) ............................................................9
*Ridings v. Danos & Curole Marine Contractors*,
  723 So. 2d 979 (La. App. 4th Cir. 1998)........................................................9
*Tidewater Inc. v. United States*,
  565 F.3d 299 (5th Cir. 2009)..........................................................................7
*United Fire & Cas. Co. v. Hixson Bros., Inc.*,
  453 F. 3d 283 (5th Cir. 2006).........................................................................6

**Statutes**

33 U.S.C. § 1321(c)(2)(A) (2011) ......................................................................2
33 U.S.C. § 1321(c)(3)(A) (2011) ......................................................................2
33 U.S.C. § 1321(c)(3)(B) (2011)......................................................................3
33 U.S.C. § 1321(d)(1) (2011)...........................................................................2
Pub. L. No. 101-380, § 4115, 104 Stat. 484 (Aug. 18, 1990).............................2

**Other Authorities**

2 Admiralty & Mar. Law § 11-11 (5th ed.) ......................................................19
22 Williston on Contracts § 58:8 (4th ed.).......................................................19
Oil Pollution Act of 1990....................................................................................2
Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW, § 9.2 (4th ed. 2004)......................10

**Rules**

40 C.F.R. § 300.105(d) (2011)............................................................................3
40 C.F.R. Part 300 (2011)....................................................................................2

## INTRODUCTION

Plaintiffs' basic argument in support of their Motion for Partial Summary Judgment (the "Motion") is that the Master Vessel Charter Agreement ("MVCA") is a time charter with a single term commencing when the Vessel is first "made available to BP" by the Vessel Owner and terminating only after the Vessel receives a written off-hire dispatch notification, final decontamination, and is returned to its moorings—and that the Vessel Owner must be paid full hire for this entire period *regardless of what happens in between*.  Plaintiffs are wrong on all accounts.   In their Motion, Plaintiffs selectively quote and often ignore the MVCA's basic provisions, which explicitly refute their positions. Plaintiffs ignore the fact that the MVCA, by its clear terms, is a *master* time charter that contemplates multiple Charter Terms.  Moreover, their position is contradicted by Fifth Circuit law, the basic facts regarding how the Vessels of Opportunity ("VoO") program worked, and the testimony of the Focus Plaintiffs themselves.

The MVCA is a master time charter agreement that provides the terms and conditions for BP and the Vessel Owner to agree to one or more individual time charters (referred to in the MVCA as "Charter Terms") quickly and easily.  The MVCA has clear provisions governing when a Vessel is placed "on-hire" to commence a Charter Term and when it is placed "off-hire" to terminate that Charter Term.   Specifically, under Article 1.A, a Charter Term will "commence" only if BP requests that a Vessel Owner go "on-hire" to perform VoO activities, the Vessel Owner agrees, and the Vessel then departs from a "mutually agreed" location of delivery into BP's service.  Ex. A, MVCA.  Similarly, under Article 1.B, a Charter Term generally terminates once BP notifies the Vessel Owner that the Vessel is being put off-hire and the Vessel is secure in its moorings at its original point of dispatch.   If the Vessel was contaminated while performing VoO activities, BP would pay the Vessel Owner until the Vessel received decontamination—so long as the Vessel sought decontamination "promptly" as

required by Article 10.E of the MVCA.  If the Vessel was not contaminated, the MVCA does not require decontamination as a prerequisite to being put off-hire.

BP fully performed its obligations and responsibilities in the VoO program, paying over $600,000,000.00 to VoO participants across the Gulf Coast.  In the context of this specific motion, BP also completely met its obligation under the terms of the MVCA to pay VoO Focus Plaintiff Hoi Nguyen for his participation in the VoO program.  Mr. Nguyen was paid more than $250,000.00 to attend safety training, perform approximately 49 days of VoO activities, and have his Vessel decontaminated twice.  Both Plaintiffs' reading of the MVCA and their arguments about how it applies to Mr. Nguyen's circumstances find no support in the MVCA's actual provisions.  The Court should, therefore, deny Plaintiffs' Motion in full.

## BACKGROUND

**A.     The VoO Program Was Conceived And Implemented As Part Of The Unified Command's Integrated Response to the Oil Spill.**

Under the Oil Pollution Act of 1990 ("OPA"), when a "discharge" of oil is "a substantial threat to the public health or welfare of the United States," the President (or his designee) "shall direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge."  33 U.S.C. § 1321(c)(2)(A)  (part of OPA session law (Pub. L. No. 101-380, § 4115, 104 Stat. 484, 524 (Aug. 18, 1990), (but codified as part of the Clean Water Act).  To prepare for a potential oil spill, the OPA directs the President to prepare and publish a National Contingency Plan ("NCP").  *See* 33 U.S.C. § 1321(d)(1); *see also* 40 C.F.R. Part 300.  In the course of responding to an oil spill, "[e]ach Federal agency, State, owner or operator, or other person participating in efforts . . . shall act in accordance with the [NCP] or as directed by the President."  33 U.S.C. § 1321(c)(3)(A).  The NCP establishes a "basic framework for the response management structure" in the form of a "unified command system" to "brin[g]

together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response, where the [Federal On-Scene Coordinator] maintains authority."  40 C.F.R. § 300.105(d).  Those "participating in" removal efforts "shall act in accordance with the [NCP] and the applicable [Area] response plan . . . , or as directed by the President, except that . . . deviat[ion] from the applicable response plan [is possible] if the President or Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to the spill."   33 U.S.C. § 1321(c)(3)(B).

In the wake of the *Deepwater Horizon* spill, the federal Government established a "Unified Command" structure under the NCP to manage spill response.  Ex. B, Kissinger Decl. at ¶ 5.  The Unified Command brought together the federal and state governments, as well as "responsible parties" (such as BP) under OPA, to take action to counter the oil spill consistent with the NCP.  *Id.*  The Federal On-Scene Coordinators from the United States Coast Guard retained ultimate decision-making authority at all times over the Unified Command.  *Id.*

As part of its integrated response, the Unified Command set up the VoO program as a means of engaging local communities in the affected areas and providing a source of income to commercial mariners directly impacted by the oil spill.[1]  Under the VoO program, BP, as a Unified Command participant, entered into MVCAs with Vessel Owners to facilitate the potential use of their Vessels in connection with the Unified Command's response to the spill. *Id*. at ¶ 8.

---

[1] Plaintiffs spend nearly four pages of their Memorandum discussing BP's Oil Spill Response Plan ("OSRP") and requirements under the Clean Water Act and related regulations, Ex. C, Plfs.' Mem. at 2-6, but the VoO program was neither a part of nor called for by BP's OSRP (nor was it required to be).  Rather, it was a part of the integrated response implemented by the Unified Command.  As Plaintiffs admit, "[t]he real issue in this motion is simply the application of the terms of the Master Vessel Charter Agreement."  *Id.* at 6.  Plaintiffs' attempts to distract the Court with a lengthy discussion of BP's OSRP are wholly irrelevant to the interpretation of the MVCA and should be ignored.

3

**B.      How the Vessels of Opportunity Program Worked in Practice.**

Shortly after the *Deepwater Horizon* incident, informational meetings were held throughout Gulf Coast communities in order to raise awareness of the VoO program and to distribute MVCAs to local mariners who were considering taking part in the program.  *Id*. at ¶ 11.  Vessel Owners seeking to participate in the VoO program could, as an initial step and at their discretion, sign and return an executed MVCA to BP.  BP assigned a unique "MVCA Number" to each Vessel covered by an executed MVCA.  *Id*.

**1.      The Commencement and Termination of Charter Terms under the MVCA.**

The purpose of the MVCA was to provide the terms that would govern the legal relationship between BP and the Vessel Owner ***if and when*** BP requested the Vessel to perform VoO-related "Services" as described in Article 2.A of the MVCA.  *Id*. at ¶ 12.  As such, the MVCA supplied the terms that would govern any future Charter Terms.  The MVCA created a mechanism for BP to contact a Vessel Owner to "request" that a Vessel begin a Charter Term.  If the Vessel Owner agreed to BP's request, the "Charter Term" commenced when the Vessel departed from a "mutually agreed" location into BP's service.  *Id*. at ¶ 13.

In practice, to commence a Charter Term, a BP employee or representative called a selected Vessel Owner and requested that the Vessel Owner bring the Vessel to an appointed place at a specified time.  At that point, the Vessel Owner could accept or reject BP's request. If the Vessel Owner accepted BP's request, a Charter Term would commence as of the date the Vessel departed from the mutually agreed delivery point.  *Id*.

The safety of VoO participants was one of BP's top priorities throughout the response. Accordingly, BP, in conjunction with the United States Coast Guard and the Occupational Safety and Health Administration, developed a safety program that included, among other things, the provision of training to VoO workers in order to ensure those workers were aware of

the hazards they might encounter and the procedures to control such hazards. *Id*. at ¶ 14. Before any Vessel was eligible to begin a Charter Term, the Vessel's captain and crew were required to participate in a safety training class. This class generally consisted of a four-hour training module. Pursuant to the MVCA, BP compensated those in the VoO program $200.00 (not the full on-hire rate) for attending such training. *Id*. at ¶ 15. Training is a distinct concept from a Charter Term under the MVCA. Attending training does not commence a Charter Term.

To terminate a Vessel's Charter Term, a BP representative would inform the Vessel Owner or captain—typically over the phone or the Vessel's radio system or in person—that the Vessel was being placed "off-hire." If a Vessel was contaminated while performing VoO activities, either: (1) the Vessel was directed to a BP-provided decontamination facility; or (2) the Vessel Owner could "promptly" take the Vessel to a private decontamination facility. Under the MVCA, if the Vessel Owner used a private decontamination facility, BP would reimburse the Vessel Owner for the "actual cost of . . . decontamination." The Charter Term would then terminate either once the Vessel returned to its original dispatch point or when the Vessel Owner elected not to return directly to that point. *Id*. at ¶ 17.

### 2.    Payments Under the MVCA for Charter Hire.

The amount a Vessel Owner was compensated for each day during a Charter Term is set forth in Exhibit A to the MVCA and depended principally upon the length of the Vessel. Vessel Owners could submit an invoice for time worked every fourteen days. BP, through a contractor, then paid Vessel Owners at the applicable rate for each day worked during a Charter Term, as defined herein. Additionally, BP would reimburse Vessel Owners for fuel used during the pendency of a Charter Term in accordance with Exhibit A, Paragraph 3 of the MVCA and for other expenses as set forth in the MVCA.

Approximately 4,800 total Vessels participated in the VoO program. To date, BP has paid Vessel Owners over $600,000,000.00 for their participation in the VoO program.

## ARGUMENT

### I. Legal Standard.

In order to grant Plaintiffs' Motion, the Court must find that there are no genuine issues of material fact and that Plaintiffs are entitled to judgment as a matter of law after evaluating all facts in the light most favorable to and resolving all controversies in favor of the non-moving party—in this instance, BP. *United Fire & Cas. Co. v. Hixson Bros., Inc*., 453 F. 3d 283 (5th Cir. 2006); *Morales v. Boyd*, 304 F. App'x 315, 317-318 (5th Cir. 2008); *McGill v. Republic Fire & Cas. Ins. Co.*, CIV.A. No. 07-4025, 2008 WL 4792720 (E.D. La. Oct. 28, 2008).

### II. The MVCA is a Master Time Charter Allowing For Multiple Charter Terms.

Plaintiffs attempt to argue that the MVCA, itself, creates a single-term time charter, specifying a single start date and single end date, that requires BP to pay the Vessel Owner the maximum rate for all time in between—regardless of what happens between those dates and regardless of whether the Vessel ever actually performed VoO activities. Their argument is based on a demonstrably false and wholly unsupported assumption: that the MVCA creates a time charter simply because it does not create a voyage charter. Based on this false assumption, Plaintiffs reason that, because the MVCA is a time charter, it must necessarily create only a single charter term. Ex. C, Plfs.' Mem. at 9-10. But this false dichotomy, which serves as the basis for Plaintiffs' entire Motion, is contradicted by the MVCA's explicit language and is contrary to well-established Fifth Circuit law. The name, structure, and specific terms of the MVCA plainly rebut Plaintiffs' single time charter argument. Understanding the structure of the MVCA as a master agreement is the key to understanding why Plaintiffs' contentions regarding the agreement are wrong.

*First*, rather than creating a single time charter, and as the name *Master* Vessel Charter Agreement implies, the MVCA is a *master* time charter contract meant to supply the legal and commercial framework through which BP and a Vessel Owner could quickly and conveniently agree to subsequent, individual time charters—referred to as "Charter Terms" in the MVCA.[2]

The nature of the MVCA is clearly set out in its very first Article, which states:

> Subject to the availability (*as mutually agreed upon between CHARTERER and VESSEL OWNER*) of the vessel described in Exhibit "A" . . . VESSEL OWNER agrees to let and CHARTERER agrees to hire the VESSEL *from time to time as may be requested* by CHARTERER.

MVCA, Article 1.A. (emphasis added).  In other words, the MVCA provides that, "from time to time," BP "may" request a Vessel be put on-hire and commence a Charter Term.  If the Vessel Owner agrees to BP's request to place the Vessel on-hire, the Charter Term will commence when the Vessel departs from the "mutually agreed" delivery point into BP's service.  If the parties "mutually agreed" to commence a Charter Term, the MVCA's specific provisions related to operations, manning requirements, payment, provisions, maintenance requirements, and others are in effect for that Charter Term.

*Second*, the MVCA's provisions clearly contemplate multiple Charter Terms.  For example, Article 2.A states that, during "each CHARTER TERM," the Vessel must be employed exclusively for BP's use.  (emphasis added).  Under Article 8, the Vessel Owner is required to provide provisions for the Vessel for three days "at the start of any CHARTER TERM," and BP is required to provide provisions for the Vessel "for remainder of each CHARTER TERM."  (emphasis added).  At the conclusion of "each CHARTER TERM," unless the Vessel Owner elects to return to a different location, the Vessel must be redelivered

---

[2] When interpreting the MVCA, the Court must consider the MVCA's specific provisions and the relationship that it creates between the parties.  *See, e.g.*, *Tidewater Inc. v. United States*, 565 F.3d 299, 303 (5th Cir. 2009); *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550 (5th Cir. 2004).

to the owner at the original point of delivery.  Article 1.B (emphasis added).  Further, BP agrees to pay the Vessel Owner for "each CHARTER TERM or SERVICES satisfactorily performed." Article 10.A (emphasis added).  To find that the MVCA creates only a single time charter, the Court would have to ignore the plain language of each of these provisions.

*Third*, the MVCA distinguishes the duration of a "Charter Term" from the duration of the MVCA itself.  This distinction is laid out most clearly in Article 1.A, which states that BP "may terminate the CHARTER at any time and the CHARTER TERM will terminate as set out in Paragraph B of this Article 1."  To accept Plaintiffs' single time charter argument, the Court would have to ignore this contractual provision; if the MVCA creates a single time charter, termination of the Charter Term and the MVCA itself would be one and the same.

*Finally*, this Court and the Fifth Circuit have recognized master charter agreements that contemplate multiple Charter Terms—exactly as the MVCA does.  Plaintiffs' argument that the MVCA creates a single time charter is based solely on its contention that the MVCA does not constitute a voyage charter.  Ex. C, Plfs.' Mem. at 9.  But this false dichotomy—between a voyage charter and a single-term time charter—ignores the applicable law.  The Fifth Circuit has recognized that parties can create a "blanket time-charter agreement" that is "subject to unilateral cancellation by either party" and sets "the general terms that would apply to future vessel charters."  *Johnson v. SEACOR Marine Corp.*, 404 F.3d 871, 873 (5th Cir. 2005).  Such an agreement, dependent on its provisions, creates "no obligation on the part of either party to enter into a charter for a vessel," but merely creates the legal framework for entering into a charter should the parties decide to do so.  *Id.*[3]  Just as in the cases and references cited, the

---

[3] *See also Nexen Petroleum U.S.A., Inc. v. SEA MAR Div. of Pool Well Servs. Co.*, 497 F. Supp. 2d 787, 789 (E.D. La. 2007) (recognizing a ***"Master Time Charter"*** that "governed the use of the vessel" when the parties agreed to a charter through the use of a "Short Form Time Charter." (emphasis added)); *Daughdrill v. Ocean Drilling & Exploration Co.*, 702 F. Supp. 1267, 1269 (E.D. La. 1988) (recognizing the parties' ability to "enter[] into a letter

VoO MVCA served as a "Master Time Charter" setting the terms for the parties to, should they choose, enter into select time charters throughout the pendency of the MVCA.

III.     **Charter Terms Under the MVCA Commenced On the Date of the Vessel's Departure from the Mutually Agreed Location into the Charterer's Service.**

Despite clear contractual language describing when a Vessel's Charter Term commences, Plaintiffs strain to interpret the Charter Term as beginning at the earliest possible moment by ignoring the MVCA's plain language, conflating distinct contractual provisions, citing to a single inapplicable case, and making an argument flatly contradicted by their own selected Focus Plaintiff, Hoi Nguyen.  Highlighting the weakness of their argument, Plaintiffs actually make two distinct, contradictory claims regarding when a Charter Term commences.

First, on page 10 of their Memorandum, Plaintiffs argue that the Charter Term commences when the Vessel Owner "delivers or otherwise makes available" the Vessel, regardless of any communication with or request from BP, the Charterer.  To make this argument, Plaintiffs selectively quote from Article 1, specifically omitting the critical language that contradicts their argument: that BP may "from time to time" make a "request[]" to the Vessel Owner to commence a Charter Term.  Plaintiffs' attempt to read this language out of the MVCA highlights the weakness of their position regarding a Charter Term's commencement.

To support their strained argument, Plaintiffs cite the Fifth Circuit's *International Marine Towing* case.  But that case interpreted a ***bareboat charter***, which, unlike the MVCA, allows the charterer to take "possession, command, and navigation" of the Vessel from the Vessel Owner for a specified period.  Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW, § 9.2 (4th ed. 2004).  *International Marine Towing* is thus irrelevant to this dispute.  In

---

agreement for the time charter of the [Vessel] to [Charterer] pursuant to the terms and conditions of the Master Service Contract."); *Ridings v. Danos & Curole Marine Contractors*, 723 So. 2d 979, 983 (La. App. 4th Cir. 1998) (a master agreement provides only framework for a contract; the master agreement – as supplemented by the purchase order – creates a contract for the work).

fact, because the *International Marine Towing* Court was interpreting a bareboat charter, it found that cases involving non-bareboat charters, like the MVCA, were "not controlling." 722 F.2d 126, 131 (5th Cir. 1983) ("We find that none of these cases involves the breach of a bareboat charter by the owner and thus the cases are not controlling.").

Second, Plaintiffs assert that a Charter Term commences "when a vessel is instructed to commence training." Ex. C, Plfs.' Mem. at 11. To support this proposition, Plaintiffs cite to the fact that a Vessel's captain and crew were required to undergo safety training before participating in the VoO program and to a consent decree in which BP agreed to provide safety training for VoO participants—neither of which have anything to do with when a Charter Term commences under the MVCA. Plaintiffs do not cite any provisions of the MVCA stating that a Charter Term commences when a Vessel's captain and crew attend training, let alone "when a Vessel is instructed to commence training." Nor could they; there is no such provision. Under the MVCA, training and the commencement of the Charter Term are *separate events*. The MVCA explicitly sets forth a different payment rate for attending safety training than for performing VoO services during a Charter Term. To accept Plaintiffs' contention that attending safety training actually commences the Charter Term would render Paragraph 2.B's separate fixed-rate payment for training completely superfluous—or would somehow require BP to pay a Vessel Owner the full on-hire amount (ranging from $1,200 to $3,000 per day) *plus* an additional $200 per day for attending the training under Paragraph B of Exhibit A.

Further, Plaintiffs' own hand-selected Focus Plaintiff, Hoi Nguyen, contradicted Plaintiffs' position that the Charter Term commenced with training. During his deposition, Mr. Nguyen acknowledged the distinction between attending training and beginning a Charter Term, stating that he understood that he had to attend safety training to receive "a safety permit

before [he could] go and work," and acknowledging that he received $200.00 from BP for attending the safety training—not the normal full hire rate.  Ex. D, Nguyen Tr. at 42:3-22, 40:6-20.  Consistent with this understanding, Mr. Nguyen separately invoiced BP for the proper amount ($200.00) for attending safety training on May 14, **_and did not invoice BP for the 16 days between that training and when his Vessel was actually placed "on-hire," and began to work in the VoO program on May 31_**.  *Id.* at 45:12-47:3; Ex. E, Nguyen Invoice 7.05.2010.

Contrary to Plaintiffs' attempts to confuse the issue by citing everything but the actual provisions dealing with the commencement of a Charter Term, Article 1, entitled "Term of Charter" clearly states when a Charter Term begins.  Article 10, which Plaintiffs misleadingly cite when making their overreaching arguments, does not address the commencement of a Charter Term.

Article 1 has two provisions related to the commencement of a Charter Term.  Under Article 1.A, both BP and the Vessel Owner must agree to put a Vessel on-hire for a Charter Term to commence.  Specifically, if BP "requested" to hire a Vessel, as it may "from time to time," and the Vessel Owner agrees to go on-hire, the Charter Term commences "on the date of the departure of the Vessel from the mutually agreed location of delivery into the service of Charterer."  Article 1.B qualifies Article 1.A by specifying the condition in which the Vessel should be delivered: "fully tanked with fuel, hydraulic fluid, lubricated, manned, provisioned and ready in all respects to perform SERVICES as required by this CHARTER."  These are the **_only_** two provisions in the MVCA specifying when and how a Vessel's Charter Term commences.  They clearly provide that a Charter Term commences **_only_** after BP requests that a Vessel begin a Charter Term, the Vessel Owner accepts, and the Vessel departs from the "mutually agreed location."  No provision of the MVCA states that the Vessel is on-hire from

the point the Vessel Owner theoretically makes the Vessel "available" to BP or when the Vessel

Owner either participates in safety training or is asked to participate in safety training—which,

itself, is a pre-requisite to a Vessel being eligible to be placed on-hire.[4]

Plaintiffs cite to various provisions of Article 10 to support their position that a Vessel's

Charter Term commences at training.  But Article 10 does not address the commencement of a

Charter Term.  It only delineates how to calculate the amount owed to a Vessel Owner ***once a***

***Charter Term commences under Article 1***.   Contrary to Plaintiffs' argument, *none of the*

*provisions in Article 10 even remotely touch upon when a Charter Term commences*.  Plaintiffs'

reliance on Article 10's provisions is nothing more than a thinly-veiled attempt to avoid the

clear contractual language in Article 1 setting forth when a Vessel's Charter Term commences.

Plaintiffs also argue the Vessel Owner must be paid hire "from commencement at

training" because the Vessel must be kept at BP's disposal "twenty-four (24) hours per day"

after undergoing safety training.  Ex. C, Plfs.' Mem. at 18.  There is no support for this position

in the MVCA.  In fact, both provisions Plaintiffs cite to support this argument—Article 2.A and

Article 16—conclusively rebut their position.  Article 2.A provides that:

> ***During each CHARTER TERM***, the VESSEL shall be employed exclusively for
> CHARTERER'S use . . .   The VESSEL *shall be available and at CHARTERER's*
> *disposal for operation twenty-four (24) hours per day.  The VESSEL shall not be used for*
> *any purpose other than performance of SERVICES during the CHARTER TERM.*

And Article 16 provides:

> ***During the CHARTER TERM*** the VESSEL OWNER shall not make any other use of
> the VESSEL without CHARTERER's prior authorization.

(emphasis added in both).  In each case, the MVCA is explicit that these provisions are only in

effect ***during a Charter Term***—which commences only after the Vessel Owner accepts BP's

---

[4] Notably, Plaintiffs cite and attach as an exhibit a BP document stating: "Before boat owners are called to duty, they all must take safety training, and advanced spill response training is given to many vessel operators."  *See* Ex. F, Guardians of the Gulf.

request that the Vessel go on-hire and the Vessel departs from the mutually agreed location. The Charter Term does not commence immediately upon attending training. The first time Plaintiffs cite to Article 2.A, they omit the phrase "During each CHARTER TERM" from the quote. Ex. C, Plfs.' Mem. at 10. The second time, they cite Article 2.A, but ignore the qualification that the provision is only in effect after the parties have agreed to commence a Charter Term. The clear terms of the MVCA provide that neither the twenty-four hour availability nor the exclusive use clause take effect *until a Charter Term begins*.[5]

Contrary to Plaintiffs suggestions to the contrary, an MVCA Charter Term commences when: (1) BP requests the Vessel begin a Charter Term; (2) the Vessel Owner agrees to BP's request; and (3) the Vessel departs from the mutually agreed location into BP's service.

## IV. Each Charter Term Terminated on the Vessel's Redelivery to the Original Point of Delivery.

Plaintiffs similarly overreach and misconstrue the MVCA when they argue that every Vessel Owner who signed an MVCA—regardless of whether the Vessel even went out on the water at all—can only be placed off-hire after: (1) the Vessel Owner received a written off-hire dispatch notification; (2) the Vessel underwent "final" decontamination; and (3) the Vessel was secure in its moorings at the original point of delivery. Ex. C, Plfs.' Mem. at 15. There is no support for this position in the MVCA. Rather than facing this undeniable reality, Plaintiffs take the kitchen-sink approach, relying on portions of MVCA provisions unrelated to ending a Charter Term in order to make the termination process as onerous as possible. Of Plaintiffs' three asserted requirements for terminating a Charter Term, only two apply—*some* of the time. First, Charter Terms end when a Vessel returns to its moorings, unless the Vessel Owner elects

---

[5] Moreover, further contradicting Plaintiffs' argument regarding the application of Article 2.A, Robert Gams (one of Plaintiffs' hand-selected Focus Plaintiffs) testified that he took his Vessel (Cool Breeze) out for four, paid charter trips in November, 2010—while he contends he was still on-hire and is owed the full daily rate by BP. Ex. G, Plaintiff Robert Stephen Gams' Interrogatory Responses at Resp. 5; Ex. H, Gams Tr. at 125:20-126:24.

not to return to the original dispatch point.  Second, under the MVCA, a Charter Term continues through decontamination **only if** the Vessel was contaminated during VoO activities **and** the Vessel Owner seeks decontamination "promptly" after being taken off-hire.  Decontamination is not required for Vessels that were not contaminated.  Moreover, the MVCA never requires written off-hire notification to terminate a Charter Term.

Article 1.B is the operative provision relating to a Charter Term's termination.[6]  It contemplates two different methods of ending a Charter Term.  First, if BP notifies a Vessel Owner that the Vessel is "off-hire" and that Vessel returns directly to the original point of departure, the Charter Term terminates once the Vessel reaches that point.  Second, if the Vessel Owner "elects not to return directly to the point of dispatch," the Charter Term ends once that election is made.  Despite Plaintiffs' attempt to tie unrelated contractual provisions into the termination process, those are the **only** two methods of determining the end-date of a Charter Term.

### A.     The MVCA required BP to provide decontamination only to Vessels that were contaminated and promptly sought decontamination.

Plaintiffs similarly argue that, for every Vessel Owner who signed an MVCA, the Charter Term did not end until after they received "final decontamination."  Once again, their position is not supported by the relevant provisions of the MVCA.  The concept of decontamination does not appear in Article 1, the primary provision governing the commencement and termination of a Charter Term.  Decontamination appears twice later in the MVCA.  First, in Article 10.E:

---

[6] MVCA Article 1.B states: "The VESSEL shall be redelivered to VESSEL OWNER at the close of each CHARTER TERM to the original point of delivery by CHARTERER, as determined by off-hire dispatch notification, unless VESSEL OWNER elects not to return directly to the point of dispatch, in which case, the CHARTER TERM shall cease immediately upon such election."

> The termination of the CHARTER TERM (termination of dispatch) is determined by the time the VESSEL is secure in its moorings at the original point of delivery during drills and exercises, and secure at its mooring after final decontamination after an oil spill response **(which process shall be promptly undertaken without delay)**. . .

Second, in Article 9:

> VESSEL OWNER shall maintain the VESSEL'S hull and machinery in a seaworthy condition. . . . CHARTERER shall provide or otherwise reimburse VESSEL OWNER'S actual cost of hull and gear cleaning and decontamination **if VESSEL requires such cleaning as a direct result of SERVICES under this CHARTER**.

(emphasis added to both).

From the plain text of these provisions, it is clear that the MVCA speaks to two scenarios.  First, if a Vessel is not contaminated while participating in VoO activities, its Charter Term terminates either when the Vessel is "secure in its moorings at the original point of delivery" under Article 10.E or at the time that the Vessel Owner "elects not to return directly to the point of dispatch" under Article 1.B.  Second, if a Vessel is contaminated, the Charter Term ends when the Vessel is secure in its moorings and has undergone decontamination, so long as the decontamination is "promptly undertaken without delay."  Article 10.E.  Under Article 9, the Vessel Owner can have the Vessel decontaminated at either a BP-provided decontamination facility *or* at another, private facility.  If the Vessel Owner chooses the latter option, BP will reimburse the Vessel Owner's "actual cost of hull and gear cleaning and decontamination if VESSEL requires such cleaning as a direct result of SERVICES under this CHARTER."

This reading of the MVCA is not only clear from the only two provisions that mention "decontamination," but it also makes practical sense.  If a Vessel does not contact oil while performing VoO activities, then decontamination is not necessary and, under both Article 10.E and Article 1.B, the Vessel's Charter Term terminates when the Vessel is "secure at its moorings at the original point of delivery" (or upon election by the Vessel Owner otherwise).

Under Plaintiffs' theory, Vessels that were never contaminated must be kept on-hire until they receive unnecessary decontamination.  Even more absurdly, if the Court accepts Plaintiffs' argument that a Vessel's Charter Term begins whenever the Vessel Owner theoretically makes the Vessel available and does not end until receiving final decontamination (among other things), Vessels that never participated in VoO activities—and, therefore, were never even on the water—would be paid hundreds of thousands of dollars for performing no work at all.

If a Vessel was contaminated during VoO activities, the Vessel Owner could have either had the Vessel decontaminated by BP or through other means at BP's expense—and BP would continue paying the Vessel Owner the daily hire rate until the Vessel was decontaminated—so long as the Vessel Owner sought decontamination "promptly."  The purpose of the "prompt" decontamination requirement is also clear: a Vessel Owner should not be able to continue getting paid up to $3,000.00 per day after being placed off-hire by purposely avoiding decontamination.

**B.      The MVCA does not require written notice to terminate a Charter Term.**

Plaintiffs also argue that, under the MVCA, BP was required to provide a Vessel Owner written notice that it was terminating a given Charter Term.  Ex. C, Plfs.' Mem. at 15   But Plaintiffs do not and cannot point to a single contractual provision for support.  Plaintiffs attempt to find support for their argument in MVCA Article 18,which contains a notice provision.  Article 18, however, does not create any requirement to terminate a Charter Term through written notification.[7]  First, as evidenced by the fact that Article 18 includes space for a phone number, in addition to physical and electronic mail addresses, it does not mandate that any communication between BP and the Vessel Owner be in writing.  Second, had BP intended

---

[7] Article 18 states that "all notices and communications from VESSEL OWNER to CHARTERER and from CHARTERER to VESSEL OWNER shall be addressed as follows," and then provides an area for the Vessel Owner to provide their physical address, facsimile number, e-mail address, and phone number.

a mandatory writing requirement, it could have written that requirement into the MVCA, as it did in Article 7.[8]  Third, implying a writing requirement where none exists in order to terminate a Charter Term does not make sense.  It would be pointless to send a written termination notification to the Vessel Owner's home address or place of business when, during a Charter Term, most Vessels were on the water performing VoO Activities.

Plaintiffs additionally point to a form letter sent by BP to Vessel Owners typically entitled "Notice of Non-renewal of Master Vessel Charter" both as alleged "proof" of a writing requirement to end a Vessel's Charter Term and as a pre-requisite to terminate a Charter Term.  First, according to its plain text, the letter "terminates the MVCA immediately as of the date noted below."  Ex. I, Notice of Non-Renewal Letter.  As shown above, Article 1.A distinguishes between terminating the MVCA as a whole and merely terminating a specific Charter Term.[9]  The purpose and effect of these letters was to terminate the MVCA so that there would be no contract or legal agreement between BP and the Vessel Owners going forward.  The letters had no effect on the termination of any individual Charter Terms.

Moreover, even assuming *arguendo* that the Plaintiffs are correct—that the letter provided additional notice to the Vessel Owner that BP terminated a Charter Term—their conclusion must still be rejected.  First, just because BP provided a written termination notification in at least some cases does not mean that a written notification was ***required*** to end a Charter Term under the MVCA.  It was not.  Second, in virtually all cases in which a Notice of Non-renewal letter was sent, BP had already provided notice to the Vessel Owner that it was terminating the Vessel's Charter Term (if a Charter Term had commenced) weeks, and in some

_____

[8] Under Article 7, if a Vessel Owner does not have the proper radio equipment aboard as set forth in the paragraph during a charter term, "CHARTERER may terminate this CHARTER upon twenty-four (24) hours written notice."
[9] Article 1.A states that BP "may terminate the CHARTER at any time and the CHARTER TERM will terminate as set out in Paragraph B of this Article 1."

cases months, earlier.  BP's decision to reiterate that a Charter Term was terminated by sending out a mass form letter would not render the earlier, proper and sufficient termination of the Charter Term ineffective just as deciding to wear suspenders in addition to a belt does not render the belt ineffective.  Third, the MVCA does contemplate circumstances requiring written notice.  Specifically, if a Vessel Owner fails to comply with Article 7 of the MVCA (specifying the required radio communications equipment for each Vessel), BP may terminate the Charter "upon twenty-four (24) hours written notice."  This is the only circumstance in the entire MVCA that requires BP to provide written notice and it demonstrates that when the MVCA intends to require written notice from BP for a specific event, it does so explicitly.

Because the MVCA does not require written notification of the termination of a Charter Term and because Plaintiffs' arguments regarding the Notice of Non-renewal letters are specious, Plaintiffs' contention that a written off-hire dispatch notification was required to terminate a Charter Term must be rejected.

## V.     BP Is Only Obligated To Pay Hire For A Vessel During A Charter Term, With The Commencement And Termination Dates Determined As Described Above.

Plaintiffs' argument, as best it can be deciphered, is that the MVCA: (1) creates a single time charter; (2) commences either when the Vessel Owner makes a Vessel available to BP or "when a vessel is instructed to commence training;" (3) in all cases, ends only after a written off-hire dispatch notification, final decontamination, and the Vessel is returned to its moorings; and (4) requires BP to pay the Vessel the maximum on-hire rate each day in between number 2 and number 3 above, regardless of what occurs in between and—in fact—regardless of whether

the Vessel was ever asked to go out on the water to perform VoO services.[10]  As shown above, the MVCA's plain language refutes Plaintiffs' arguments on all accounts.

Article 10 is the primary provision concerning how a Vessel Owner is compensated for his services.  It states that "CHARTERER shall pay Hire for the VESSEL and the SERVICES to be provided by the VESSEL OWNER for each CHARTER TERM," with the Charter Term's commencement defined in Article 1.A, as set forth in Section III above, and the Charter Term's termination defined in Articles 1.B and 10.E, as described in Section IV above.  In practice, these provisions meant that an individual Charter Term would commence once BP or a BP representative called the Vessel Owner to request that the Vessel Owner bring the Vessel to a specified location to participate in VoO activities, the Vessel Owner agreed, and the Vessel departed from a mutually agreed location into BP's service.  The Charter Term would continue until BP or a BP representative informed the Vessel Owner the Vessel was off-hire—typically through a phone call or over the Vessel radio system or in person—and the Vessel had sufficient time to return to its delivery point.  If a Vessel needed to undergo decontamination, BP typically provided details on where and when the Vessel could be decontaminated.  If the Vessel Owner sought decontamination promptly, as is required by the MVCA, then BP would pay the Vessel Owner through the decontamination date.  If the Vessel Owner did not seek prompt decontamination, the Vessel would be considered off-hire as of the time that it was secure in its

---

[10] To support this final argument, Plaintiffs claim that Article 12 contains "specific provisions detailing the circumstances in which, because the vessel itself cannot provide services, compensation is not owed." Ex. C, Plfs.' Mem. at 17-18.  Once again, Plaintiffs simply misread the MVCA and their argument misses the mark.  Article 12 is titled "Breakdown: Deficiency of Crewing or Stores," and  simply sets forth that BP is not required to pay a Vessel the full hire rate if, during a Charter Term, the Vessel breaks down for any reason "not due to fault of CHARTERER."  This type of provision is common in maritime time charters and recognized under maritime law. *See, e.g.*, 22 Williston on Contracts § 58:8 (4th ed.) ("Another clause peculiar to time charters is the 'breakdown' or 'cesser for hire' clause.  This clause halts the payment of hire by the charterer during periods when the charterer is unable to use the vessel due to specified reasons."); 2 Admiralty & Mar. Law § 11-11 (5th ed.) ("Time charters typically contain an off-hire clause… This clause recognizes that what the charterer has bargained for in a charter is the use of the vessel, and where he is deprived of that use, there is no obligation to pay hire.  When one of the listed events in the off-hire clause deprives the charterer of the vessel's use, the hire is automatically suspended without regard to fault on the part of the shipowner.").

moorings at the original point of departure (unless the Vessel Owner elected otherwise).  If a Vessel was later determined to need decontamination, even simply out of an abundance of caution, BP would start a new Charter Term for the Vessel to be transported to a decontamination facility, receive decontamination, and be moved back to its original location. BP would pay the full on-hire rate during that period of time.

BP has taken its responsibilities under the MVCA seriously and complied with them fully throughout the pendency of the VoO program.  Indeed, BP has already paid over $600,000,000.00 to VoO participants.  Plaintiffs' kitchen-sink strategy seeking to expand the Charter Term—including arguing that safety training sessions must be compensated at the full on-hire rate, rather than the $200 per day rate set out explicitly in Exhibit A, Paragraph 2.B— wildly overreaches and should be rejected.

## VI.    Hoi Nguyen Has Already Been Paid All He Is Owed Under the MVCA.

Hoi Nguyen and his Vessel, *My Angel II*, were on the water performing VoO activities for a total of 49 days.  He spent a few additional days transporting his Vessel to a decontamination center, receiving a second round of decontamination, and returning to his home port, and spent four hours attending a mandatory safety training program prior to commencing his first Charter Term.  For that work, Mr. Nguyen received $250,140 from BP.[11] Under Plaintiffs' unsupportable reading of the MVCA, Mr. Nguyen is now asking for either an additional $182,400 or $277,400, depending on whether you look at his Plaintiff Fact Sheet or his Interrogatory Responses, for time that he admits he did not work or perform any VoO activities.  Ex. J, Plaintiff Fact Sheet; Ex. K, Plaintiff Hoi Nguyen's Interrogatory Responses at

---

[11] According to his own testimony, he also received $148,000 from the Gulf Coast Claims Facility, likely for lost income, and at least several monthly payments of $5,000 each.  Ex. D, Nguyen. Tr. at 11:10-12:17.

Resp. 2.   As shown below, BP fully compensated Mr. Nguyen for the time that he spent working in the VoO program.  Mr. Nguyen is not entitled to any additional payment.

### A.   BP paid Mr. Nguyen for attending training exactly the MVCA specified.

Mr. Nguyen received safety training in Biloxi, Mississippi on May 14, 2011, twelve days after signing his MVCA.  In accordance with Paragraph B of Exhibit A to the MVCA, BP paid Mr. Nguyen $200.00 for attending the training program.  Mr. Nguyen understood that he would be paid at this separate rate for training. Ex. D, Nguyen Tr. at 40:6-20. ("Q. Okay. And were you paid for this training? A. Yes, but -- afterwards is when I received the 200. Q. So not the same rate as the daily hire pay for your boat, right? A. No, it's -- it's only 200.").

Mr. Nguyen also understood he had to receive the proper safety training *before* he could be eligible to take part in the VoO program. *Id.* at 42:20-22 ("It was at the meeting where they say you have to go through this training before you can work."); *see also id*. at 42:3-17; Ex. L, H. Nguyen Decl. at ¶ 4.  In other words, not only does Plaintiffs' argument that the Charter Term commenced when the Vessel's captain or crew underwent training not find any support in the MVCA, their own hand-selected Focus Plaintiff contradicted it during his recent deposition.[12]  As Mr. Nguyen admitted, BP paid him fully and properly for attending the VoO training program.  Ex. D, Nguyen Tr. at 39:18-40:20.

### B.   Mr. Nguyen's first Charter Term commenced on May 31 after BP requested and he agreed to begin the Charter Term.

On May 30, 2010, a Vietnamese-speaking BP representative called Mr. Nguyen and requested that he begin a Charter Term on that day, as is required by Article 1.A of the MVCA. *Id*. at 52:16-53:7.  Mr. Nguyen did not agree to BP's request.  Rather, he agreed to take his

---

[12] This argument is further diminished by the fact that VoO Focus Plaintiff Steven Tran admitted to attending — and being compensated for—safety training prior to signing an MVCA. Ex. M, Tran Tr. at 33:13-34:23.  Indeed, if Plaintiffs' argument that training commenced a Charter Term were correct, then Mr. Tran and all others who attended VoO safety training would be owed hire *before* they entered into an MVCA.

Vessel out on May 31, after picking up supplies.  *Id.* at 52:16-20, 53:8-11.[13]  In accordance with Article 1.A of the MVCA, Mr. Nguyen's first Charter Term commenced on May 31, 2010, the day Mr. Nguyen agreed to put his Vessel on-hire for a Charter Term and departed from the "mutually agreed location."  *Id.* at 55:24-56:3.

Mr. Nguyen's invoices and testimony prove that he understood how an MVCA Charter Term commences.  While Plaintiffs argue that Mr. Nguyen must be paid for the time between his May 14 training and when he actually met the MVCA's on-hire requirements on May 31, Mr. Nguyen apparently did not think so at the time.  In fact, other than the $200 payment for attending safety training on May 14, 2010, the earliest that Mr. Nguyen invoiced BP was for work beginning on May 31, the date the Charter Term commenced by agreement of the parties. Ex. E, Nguyen Invoice 7.5.2010.  When asked why he did not invoice for the time between May 15 and May 30, as the Plaintiffs suggest he should have, Mr. Nguyen responded: "Because -- because from what people say, you only invoice for the days that you go out, so I didn't go out for that day, so I can't -- I can't turn in any -- any invoice."  Ex. D, Nguyen Tr. at 55:5-12.

C.     **Mr. Nguyen's first Charter Term ended on July 19 after being placed off-hire, receiving prompt decontamination, and being given a day to return to his original point of dispatch.**

After commencing his first Charter Term on May 31, 2010, Mr. Nguyen's Charter Term terminated on July 19 after BP told him that he was being placed off-hire and his Vessel received decontamination.  Mr. Nguyen admits BP informed him on July 16 that his Charter Term was going to terminate.  He was given the location of a decontamination facility and, according to Mr. Nguyen, "I'd go to that location, I'd decontaminate that boat, and then I go home." Ex. D, Nguyen Tr. at 66:5-7.  Mr. Nguyen's Vessel was decontaminated promptly on

---

[13] This exchange between Mr. Nguyen and the BP employee, in which Mr. Nguyen declined to go on-hire on May 30 as requested, also proves that the Vessel Owner had to agree to go on-hire in order for a Charter Term to commence.

July 18.  Mr. Nguyen was then given a day—until July 19—to travel from the decontamination facility to his home port.  At that point, Mr. Nguyen had received notification from BP that his Charter Term was over, had received decontamination, and was given the opportunity to return to his original departure point.  Therefore, Mr. Nguyen's first Charter Term ended as of July 19.  Indeed, after receiving decontamination on July 18, 2010, Mr. Nguyen helped fill-out and signed an "Off-Hire Deactivation Checklist" form showing that his on-hire date was May 31, 2010, his off-hire date was July 19, 2010, and that his Vessel had received decontamination.  Ex. N, Off-Hire Deactivation Check Sheet.  BP paid Mr. Nguyen the full on-hire rate for his entire May 31-July 19, 2010 Charter Term, a total of over $200,000.00.[14]

**D.    Mr. Nguyen and BP agreed to another Charter Term in order for him to get decontaminated again.**

At the time he received decontamination on July 18, Mr. Nguyen did not tell anyone that he did not think his Vessel had been fully cleaned—despite admitting that he talked with the BP contractors performing the decontamination.  Ex. D, Nguyen Tr. at 67:15-18 ("Q. Did you talk to anyone who was decontaminating your boat? A. Yes, I spoke to the people who decontaminate the boats."); *Id*. at 71:24-72:1 ("Q. Okay. But you didn't tell them you thought your boat was still dirty, right? A. Yes, I didn't say it.").  Mr. Nguyen now testifies that, following the July 18 decontamination, his Vessel still had oil on the anchor, several lines that he pulled boom with, and oil on the Vessel—"little specks here and there, but it wasn't – it wasn't really a lot."  *Id*. at 69:7-9.  Rather than seeking additional decontamination "promptly" and "without delay," as is required by Article 10.E of the MVCA, Mr. Nguyen never informed anyone at BP or affiliated with the VoO program that he believed that his Vessel was still

---

[14] On August 27, 2010, BP sent Mr. Nguyen a letter formally terminating Mr. Nguyen's MVCA.  Ex. I, Notice of Non-Renewal Lette*r*.  This letter did not affect the length of Mr. Nguyen's first Charter Term, which ended under the terms of the MVCA on July 19, 2010.

contaminated.  *Id*. at 98:6-8 ("Q. Did you tell anyone that you needed additional decontamination? A. No.").  Nor did he take his Vessel to get cleaned privately, for which BP would have reimbursed Mr. Nguyen under MVCA Article 9 if the additional cleaning was necessary.  Instead, he remained silent for weeks and, as a result, now seeks between $182,400 or $277,400 from BP based on an erroneous reading of the MVCA and his failure to promptly seek additional decontamination.[15]

Out of an abundance of caution, BP later asked Mr. Nguyen to bring his Vessel back in for an additional decontamination session on September 16, 2010.  In doing so, BP requested that Mr. Nguyen begin a new Charter Term and deliver his Vessel to Bayou La Batre, Louisiana, to undergo an additional decontamination session.  Mr. Nguyen agreed and took his Vessel to the Bayou La Batre decontamination station, where he received additional cleaning and decontamination of his Vessel.  Following this decontamination, Mr. Nguyen once again took his vessel back to its homeport in Biloxi, Mississippi. And once again, BP paid Mr. Nguyen in full for all days he was placed on hire for his vessel to receive this additional decontamination—an additional $38,000.

As shown above, BP paid Mr. Nguyen in complete accordance with the provisions of the MVCA.  He received payment for the safety training that he attended as set out in Paragraph 2.B of Exhibit A to the MVCA.  He received all payment for his first Charter Term, which began on May 31, 2010, and ended on July 19, 2010.  Then, more than just providing Mr. Nguyen with a second decontamination session in mid-September, BP agreed to pay

---

[15] Importantly, not only did Mr. Nguyen receive decontamination on July 18, 2010, but—because he was in sole possession of his vessel—he was the only one who would have known that his vessel was allegedly still contaminated from the period of July 18 onward.  Accordingly, to the extent Plaintiffs are correct in their assertion that Mr. Nguyen's first Charter Term did not end until after his vessel was decontaminated again on September 16, Mr. Nguyen's recovery must be off-set by his abject failure to mitigate his damages either by informing BP that it needed to provide additional decontamination or by seeking private decontamination and billing the expense.

Mr. Nguyen full hire for the time it took him to transport his Vessel to and from the decontamination facility.  For attending safety training, spending forty-nine days on the water performing VoO activities, and receiving a second decontamination session, Mr. Nguyen was paid over $250,000.00, notwithstanding the other money that he has collected from the Gulf Coast Claims Facility for loss of income.  Although hand-picked by the Plaintiffs from more than 1600 VoO claimants who have decided to participate in the limited discovery and mediation program created by the Court's July 8 VoO Case Management Order, Mr. Nguyen's story illustrates that the MVCA operated as a master time charter contemplating multiple Charter Terms—in this case, an initial Charter Term covering the period between May 31 - July 19, 2010 and a second Charter Term covering his second decontamination session between September 7 – September 16, 2010—and that BP fulfilled its obligations under the MVCA. Because BP paid Mr. Nguyen in accordance with the MVCA for the work that he did in the VoO program, Mr. Nguyen is not entitled to any additional payment.

<u>**CONCLUSION**</u>

For the foregoing reasons, BP respectfully requests that this Court deny in full Plaintiffs' Partial Motion for Summary Judgment related to both its erroneous interpretation of the Master Vessel Charter Agreement and its proposed application to Mr. Hoi Nguyen's participation in the Vessels of Opportunity Program.

Dated: October 27, 2011                    Respectfully submitted,

                                           By: /s/ Don K. Haycraft

                                           Don K. Haycraft (Bar #14361)
                                           R. Keith Jarrett (Bar #16984)
                                           LISKOW & LEWIS
                                           One Shell Square
                                           701 Poydras Street, Suite 5000
                                           New Orleans, Louisiana  70139-5099
                                           Telephone:  (504) 581-7979
                                           Facsimile:  (504) 556-4108

                                           Richard C. Godfrey, P.C.
                                           (richard.godfrey@kirkland.com)
                                           J. Andrew Langan, P.C.
                                           (andrew.langan@kirkland.com)
                                           Kirkland & Ellis LLP
                                           300 North LaSalle Street
                                           Chicago, Illinois 60654
                                           Telephone:  (312) 862-2000

                                           Robert C. "Mike" Brock
                                           (mbrock@cov.com)
                                           Covington & Burling LLP
                                           1201 Pennsylvania Avenue, NW
                                           Washington, DC 20004-2401
                                           Telephone:  (202) 662-5985

                                           *Attorneys for BP Exploration & Production Inc.*
                                           *& BP America Production Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of October, 2011.

 /s/ Don K. Haycraft