# Exhibit D

1     UNITED STATES DISTRICT COURT

      EASTERN DISTRICT OF LOUISIANA

2

3 IN RE:  OIL SPILL  ) MDL NO. 2179

 BY THE OIL RIG   )

4 "DEEPWATER HORIZON" IN ) SECTION "J"

 THE GULF OF MEXICO, ON )

5 APRIL 20, 2010   ) JUDGE BARBIER

         ) MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17     * * * * * * * * * * * * * * * *

      VOLUME 1 of 1

18     * * * * * * * * * * * * * * * *

19

20

      Deposition of HOI NGUYEN, taken at

21 Pan-American Building, 601 Poydras Street, 11th

 Floor, New Orleans, Louisiana, 70130, on October

22 6, 2011.

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.      (Through the interpreter)   For

2      emergency?

3      EXAMINATION BY MR. ESBROOK:

4          Q.      For anything.

08:37  5          A.      I -- I -- I applied for some

6      emergency funds, that's, like, from month to

7      month and for -- for every six months or so.

8          Q.      And how much did you request from

9      the GCCF?

08:38  10         A.      Every month they gave me -- I

11     requested 5,000, and every six months they gave

12     me a -- a sum for 148, 148,000.

13         Q.      So every month -- or strike that.

14         A.      They only gave -- they gave it to me

08:38  15     for a few months.  They only gave me 5,000 a

16     month for about five -- four or five months.

17         Q.      Which months did they pay you $5,000

18     a month for?

19         A.      May, June, July, maybe August.  I

08:39  20     don't remember.

21         Q.      And you said they also paid you a

22     lump sum of $148,000?

23         A.      The 148,000 was the one when I

24     applied at six months.

08:39  25         Q.      So when did you apply and request

**PURSUANT TO CONFIDENTIALITY ORDER**

1        the $148,000?

2             A.      My -- I don't remember the day, but

3        it's -- it's within a few months afterwards.

4             Q.      And what documentation did you

08:40  5        submit to the GCCF when you requested the

6        emergency payments and the lump sum?

7             A.      I -- I don't -- I don't remember.

8        I -- I -- I don't remember.

9             THE INTERPRETER:

08:41  10            He just repeats himself.

11        EXAMINATION BY MR. ESBROOK:

12             Q.      Do you remember how much you

13        requested from the GCCF?

14             A.      I know that I received something

08:41  15        with the 5,000 a month payment, I guess,

16        something around 30 something thousand and the

17        148,000 lump sum at six months.

18             Q.      Did you request this money as a way

19        to replace the income you lost during these

08:41  20        months?

21             A.      That's correct.

22             Q.      Okay.  And did this replace the

23        income you lost during these months?

24             A.      I -- I really can't answer that,

08:42  25        because some years you would make a little, some

```
 1              A.      Yes.

 2              Q.      Great.

 3                      So let's talk a little bit about the

 4      training that you underwent, okay?

 5              A.      Okay.

 6              Q.      I'm probably not going to ask any

 7      more questions about what's in front of you, so

 8      you can put it away if you want.  Don't worry

 9      about it.

10              MR. WIYGUL:

11                      Are we going to attach those?

12              MR. ESBROOK:

13                      Uh-huh, yeah.  At the very end we

14      should keep -- give them to the court reporter.

15      Why don't we just put them in front of her and

16      we'll put them like this.  Perfect.

17      EXAMINATION BY MR. ESBROOK:

18              Q.      So did you receive training to

19      participate in the VoO program?

20              A.      Yes, I -- I got some training.

21              Q.      Okay.  When?

22              A.      I -- I think it's around the 14th of

23      May.

24              Q.      Okay.  And where?

25              A.      In Biloxi.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        Q.      And what were you trained on?

2        A.      They just -- it's -- the first day

3   they showed some videos about how to set the

4   boom, pull the booms and take care of the booms

09:43   5   and stuff like that.

6        Q.      Okay.  And were you paid for this

7   training?

8        A.      Yes, but -- afterwards is when I

9   received the 200.

09:43  10        Q.      So not the same rate as the daily

11   hire pay for your boat, right?

12        A.      No, it's -- it's only 200.

13        Q.      Okay.  And why is that?

14        A.      They just say that it's -- going to

09:43  15   training is like going to work for eight hours,

16   so they only pay you 200.

17        Q.      Okay.  But it's different than the

18   amount of pay you would get for having your boat

19   on the water?

09:44  20        A.      Yes.

21        Q.      I'm going to hand you a copy of a

22   declaration that you signed and your lawyers

23   filed with the court.

24              (Exhibit 3 marked.)

09:44  25   EXAMINATION BY MR. ESBROOK:

**PURSUANT TO CONFIDENTIALITY ORDER**

1    this day I go to -- for training at a mall.

2    EXAMINATION BY MR. ESBROOK:

3        Q.    Uh-huh.  And the second sentence

4    says, "This was the training we were told we had

09:46  5    to get to work under the charter agreement."

6            Do you understand that sentence?

7        A.    Yeah, they -- yes, they -- at the

8    meeting they did mention this.

9        Q.    Good.

09:47  10           What did they tell you exactly?

11       A.    They -- they said that before I can

12   work, I need to get a -- a safety permit before I

13   can go and work.

14       Q.    Okay.  Is that what you mean when

09:47  15   you say in your declaration that we were told we

16   had to get to work under the charter agreement?

17       A.    Yes.

18       Q.    Okay.  Do you remember who told you

19   this?

09:48  20       A.    It was at the meeting where they say

21   you have to go through this training before you

22   can work.

23       Q.    Do you remember who said this?

24       A.    It's -- it's the same group of

09:48  25   people, and -- and my friends tell me -- told me

**PURSUANT TO CONFIDENTIALITY ORDER**

45

1    the -- the course, from the time I had finished

2    the course.

3              Q.       Including this time that you were

4    just waiting around in Biloxi, right?

09:58   5              A.       Yes.  Yes, that's that period I

6    stayed at home.

7              Q.       Did you believe that at -- during

8    this period from May 14th to May 30th?

9              A.       I -- I -- from the -- from the 14th

09:58  10    or 15th when I took the class to the 30 or 31st

11    is when they called me to come and work.

12              Q.       Right.  I'm not talking about the

13    31st yet.  I'm just talking about the period of

14    time from May 14, 2010, to May 30, 2010.

09:59  15              A.       Yes, I just -- at that period I just

16    stayed home and wait for BP to give me a call.

17              Q.       Right.  Did you believe at that time

18    that you were owed money for staying home and

19    waiting for BP to give you a call?

09:59  20              A.       Yes, according to contract, they --

21    they have to pay me.

22              Q.       Did you believe that at that time

23    during May 14, 2010, to May 30, 2010?

24              MR. WIYGUL:

09:59  25                        Object to the form of the question.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.    Yes.

2    EXAMINATION BY MR. ESBROOK:

3    Q.    So when you were sitting at your

4    house waiting for BP to call, you thought you

10:00    5    should be -- you were earning $3,000 a day?

6    A.    Because I was under the impression

7    that I was supposed to take this class in order

8    to go to work, and after I took the class, I just

9    stayed home to wait for them to call me and go to

10:00    10    work.

11    Q.    I understand that.

12    What I'm asking you is:  While you

13    were staying home waiting to be called to go to

14    work, did you think that you were being paid

10:00    15    $3,000 a day?

16    A.    Yes, that's -- according to

17    contract, that's what -- that's what -- that's --

18    that's what they should pay me.

19    Q.    Okay.  And you thought that at that

10:01    20    time?

21    A.    Yes.

22    Q.    Okay.  But you didn't invoice BP for

23    that time, right?

24    A.    No.

10:01    25    Q.    Why?

         1          A.      Because they say once I start

         2   working, that's when I can invoice in. I can put

         3   the invoice in.

         4          Q.      And who told you that?

10:01    5          A.      From people who have worked at --

         6   and -- and -- and from people who translate for

         7   me, they -- they all said the same thing.

         8          Q.      Okay.  And who specifically?

         9          A.      It's the same group of people I work

10:02   10   with.  And -- and they say that when -- once you

        11   go to work, that -- that's -- that's when you do

        12   it.

        13          Q.      And who are these people, their

        14   names?

10:02   15          A.      There's a Captain Thanh and

        16   something like LUCKY TOMMY and maybe another

        17   eight or ten vessels, something like that.

        18          Q.      And these are the -- are those

        19   people or are those boats?

10:02   20          THE WITNESS:

        21          Boats.

        22          A.      (Through the interpreter)  Boats.

        23   EXAMINATION BY MR. ESBROOK:

        24          Q.      LUCKY TOMMY is not a person?  No?

10:03   25          A.      It's -- it's -- it's a boat.  It's

52

|    |    |
|----|----|
|    | 1 |

                    Yeah.

2          A.      You -- you -- you pull trolling

3     nets.

4     EXAMINATION BY MR. ESBROOK:

10:10   5          Q.      So you pull nets, and that's what

6     catches the shrimp?

7          A.      Yes.

8          Q.      And then what do you do?  You pull

9     them on the boat, and then you sell them

10:10  10     wholesale at a market or something?

11          A.      Yes, yes, at a dock.

12          Q.      And how do they pay you, by, like,

13     the pound?

14          A.      It depends also on the size of the

10:10  15     shrimp.

16          Q.      Let's talk about May 30, 2010.  On

17     May 30, 2010, you got a call from someone who

18     told you to leave the dock and go out and get

19     instructions about work, right?

10:11  20          A.      Yes.

21          Q.      It was -- who -- who called you?

22          A.      It's a Vietnamese person.

23          Q.      Do you know the name?

24          A.      Anna or something like that.

10:11  25          Q.      Anna or something like that?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.     It's something -- something like

2     Anna, Anna.

3          Q.     And was this a representative of the

4     VoO program?

10:12  5          A.     I -- I -- I -- I don't know if

6     that's the case, but they asked me if I can bring

7     my boat out that day.

8          Q.     And what did you say?

9          A.     And I said it was -- it was dark and

10:12 10     was too late, and I could go tomorrow after I go

11     and pick up some supplies.

12          Q.     Okay.  So you declined -- or strike

13     that.

14               You said no to her offer to go out

10:12 15     on May 30th?

16          MR. WIYGUL:

17               Object to the form of the question.

18          A.     Yes.

19     EXAMINATION BY MR. ESBROOK:

10:12 20          Q.     Because you could say no if you

21     wanted to?

22          A.     Because it -- it was too late, and I

23     had no supplies, no food supplies, so I asked if

24     I could go out tomorrow after I go and make a run

10:13 25     for food supplies.

PURSUANT TO CONFIDENTIALITY ORDER

1    2010?

2         THE INTERPRETER:

3              I'm sorry?

4    EXAMINATION BY MR. ESBROOK:

10:15  5         Q.    Did you invoice for May 30, 2010?

6         A.    No.

7         Q.    No.

8              Why not?

9         A.    Because -- because from what people

10:15  10   say, you only invoice for the days that you go

11   out, so I didn't go out for that day, so I

12   can't -- I can't turn in any -- any invoice.

13         Q.    Do you know what time she called

14   you?

10:15  15         A.    Around 4:00 or 5:00 o'clock.

16         Q.    Okay.  And so that day you went and

17   you bought food and supplies and all of that

18   stuff?

19         A.    Yes, and I left 6:00 o'clock that

10:16  20   morning.

21         Q.    Okay.  Where did you go?

22         A.    I -- I went out to, I guess, BP's

23   ship.

24         Q.    So did the dispatcher tell you where

10:16  25   to go on May 31, 2010?  Is that how you knew

PURSUANT TO CONFIDENTIALITY ORDER

56

1    where to go?

2         A.    Yes, they gave us, I guess, the

3    NORAD number or VHF number.

4         Q.    Okay.  And what's that?

10:16  5         A.    All -- all I know is that that's --

6    that boat is at that location.

7         Q.    Okay.  So the woman you spoke with

8    told you to go to a particular location?

9         A.    Yes.

10:17  10         Q.    Right.  And she told you that on

11    May 30, 2010, right?

12         A.    Yes, they called, and I said, I

13    can't make it out there right away on the 30th,

14    but I have to be -- be out there by 7:00 a.m. the

10:17  15    next morning.

16         Q.    Right.  I -- I just want to make

17    sure this woman that you spoke with on May 30,

18    2010, instructed you where to go to get

19    instructions the next day about what to do for

10:17  20    the VoO program, right?

21         A.    Okay.

22         Q.    Right?

23         A.    Yes.

24         Q.    Okay.  And where did she tell you to

10:18  25    go?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.      Yes, gave me a LORAN number, LORAN

2    number.  Does that make sense?

3        Q.      Yes, it does.

4    MR. WIYGUL:

10:18  5            Yes, it makes sense.

6    EXAMINATION BY MR. ESBROOK:

7        Q.      It absolutely makes sense.

8            Can you tell me what a NORAD number

9    is?  Does that describe a particular vocation or

10:18  10    something?

11    THE INTERPRETER:

12            It's --

13    MR. WIYGUL:

14            It's LORAN.

15    MR. ESBROOK:

16            Oh, LORAN, L-O-R-A-N?

17    MR. HEBERT:

18            It's GPS.

19    MR. ESBROOK:

10:18  20            GPS.  Is this like latitude and

21    longitude?

22    THE REPORTER:

23            One at a time, please.

24    EXAMINATION BY MR. ESBROOK:

10:18  25        Q.      So this woman gave you the

**PURSUANT TO CONFIDENTIALITY ORDER**

66

 1    told me to go there and -- and de --

 2    decontaminate my boat, and that was it.

 3         Q.    Okay.  And so what'd you do?

 4         A.    They did the same thing we always

10:42  5    do, they gave me a LORAN number.  I'd go to that

 6    location, I'd decontaminate that boat, and then I

 7    go home.

 8         Q.    Okay.  Well -- so you went and got

 9    your boat decontaminated, right?

10:42 10         A.    Yes.

11         Q.    Okay.  Where was this?

12         A.    Close to Mobile or close to Mobile

13    bridge, Dauphin Island, something like that.

14         Q.    Okay.  And can you tell me what they

10:42 15    did to decontaminate your boat?

16         A.    They would tell me to get there

17    and -- and -- and -- and wait.  And when I got

18    there, there was a boat in front of me, and when

19    that boat had finished, I pulled my boat in to

10:43 20    get decontaminated.

21         Q.    Okay.  I don't know a lot about the

22    decontamination process.  Can you tell me what

23    they did to decontaminate your boat?

24         A.    They -- I would -- I would get close

10:43 25    to the side and they would come up on top and

**PURSUANT TO CONFIDENTIALITY ORDER**

1    they would pressure wash my boat down, kind of

2    like a car wash.

3         Q.    Okay.  So it's cleaning your boat,

4    essentially?

10:43 5         A.    Yeah, that's -- that's all they did.

6    They told me to go home right afterwards.

7         Q.    So they -- they pressure washed the

8    side of your boat?

9         A.    Yes, both sides.

10:44 10        Q.    Both sides.

11              Did they do anything else?

12        A.    That's it.

13        Q.    Did they come on board your boat?

14        A.    No.

10:44 15        Q.    Did you talk to anyone who was

16   decontaminating your boat?

17        A.    Yes, I spoke to the people who

18   decontaminate the boats.

19        Q.    And what did you say?

10:44 20        A.    I just -- just -- just petty

21   conversation, how are you, stuff like that, while

22   I'm waiting.

23        Q.    Did you talk to them aboard your

24   boat or were they on a separate boat or where

10:44 25   were you and where were they?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.     It was light enough to see that

2   there was oil on the boat, though, right?

3      A.     Yes.

4      Q.     Okay.  Well, then, why didn't you

10:46 5   tell any -- why didn't you say anything to the

6   people decontaminating your boat?

7      A.     Well, they -- it wasn't a lot.  It

8   was just, you know, little specks here and there,

9   but it wasn't -- it wasn't really a lot.

10:47 10      Q.     So do you feel that your boat was

11   fully clean after that decontamination?

12   MR. WIYGUL:

13           Object to the form.

14      A.     Well, according to me, it's -- it's

10:47 15   not clean.  But if they say to go home, I just go

16   home.

17   EXAMINATION BY MR. ESBROOK:

18      Q.     So you didn't feel your boat was

19   clean after decontamination on July 16, 2010?

10:47 20      A.     That -- the first time that -- that

21   day, that first time you're talking about that

22   they -- they cleaned the boat?

23      Q.     Talking about the decontamination on

24   July 16, 2010.

10:48 25      A.     Yes, because it's still very dirty

**PURSUANT TO CONFIDENTIALITY ORDER**

1    right?

2         MR. WIYGUL:

3              Objection to the form of the

4    question.

10:49  5         A.    But BP said that you do whatever

6    they say.  You can't argue with them.

7    EXAMINATION BY MR. ESBROOK:

8         Q.    What I'm asking you, though, is that

9    you certainly could have told them that your boat

10:50 10   was still dirty, right?

11         A.    Well, it's -- it's -- it's true, but

12   the thing is BP told us that we have to do what

13   they say, and we can't argue with what they say.

14   So if they say -- tell us to go home, we have to

10:50 15   go home.

16         Q.    But it's true you could have told

17   them?

18         MR. WIYGUL:

19              Objection to the form.

10:51 20         A.    Because -- we could have said it,

21   but then if we argue with them, they may -- they

22   might not call us back to work.

23   EXAMINATION BY MR. ESBROOK:

24         Q.    Okay.  But you didn't tell them you

10:51 25   thought your boat was still dirty, right?

PURSUANT TO CONFIDENTIALITY ORDER

|     |     |     |
| --- | --- | --- |
|     | 1   | A.      Yes, I didn't say it. |
|     | 2   | Q.      Okay.  So what did you do after you |
|     | 3   | left the decontamination sect? |
|     | 4   | A.      I went home. |
| 10:51 | 5 | Q.      Did you first talk to someone -- |
|     | 6   | strike that. |
|     | 7   | (Exhibit 5 marked.) |
|     | 8   | EXAMINATION BY MR. ESBROOK: |
|     | 9   | Q.      Okay.  Mr. Nguyen, I've handed you |
| 10:52 | 10 | what's marked as Exhibit 5. |
|     | 11  | Do you see that? |
|     | 12  | A.      Yes. |
|     | 13  | Q.      Do you recognize this? |
|     | 14  | A.      Yes. |
| 10:53 | 15 | Q.      Can you look at the bottom of the |
|     | 16  | page, please? |
|     | 17  | Do you see your signature? |
|     | 18  | THE WITNESS: |
|     | 19  | Yes. |
| 10:53 | 20 | A.      (Through the interpreter)  Yes. |
|     | 21  | EXAMINATION BY MR. ESBROOK: |
|     | 22  | Q.      Okay.  That's your signature? |
|     | 23  | THE WITNESS: |
|     | 24  | Yes. |
| 10:12 | 25 | A.      (Through the interpreter)  Yes. |

**PURSUANT TO CONFIDENTIALITY ORDER**

98

```
 1              Q.      Sorry.
 2                      Did you try to do anything to get
 3      your boat decontaminated?
 4              A.      No, I just docked -- docked right
11:35  5      there and wait.
 6              Q.      Did you tell anyone that you needed
 7      additional decontamination?
 8              A.      No.
 9              Q.      And that's a long period of time.
11:35 10      That's nearly -- well, let's see, it's, you know,
11      a month and a half around about.  That's not a
12      question.
13                      So for that period of time, why
14      didn't you try to get it cleaned?
11:35 15          MR. WIYGUL:
16                      Object to the form.
17              A.      Because I was still under the
18      impression that I was on standby and still
19      working, so we -- we just had to -- to wait --
11:35 20      wait for them on standby.
21          EXAMINATION BY MR. ESBROOK:
22              Q.      And why were you under that
23      impression?
24              A.      Because there is -- because there is
11:36 25      no paperwork that says that we have been
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

     IN RE:  OIL SPILL      )  MDL NO. 2179
3    by the OIL RIG,        )
     DEEPWATER HORIZON in   )  SECTION "J"
4    the GULF OF MEXICO,    )
     April 20, 2010         )  JUDGE BARBIER
5                           )
                            )  MAG. JUDGE SHUSHAN
6                           )
7                     REPORTER'S CERTIFICATION
                      DEPOSITION OF HOI NGUYEN
8                       TAKEN OCTOBER 6, 2011
9              I, Rene White Moarefi, Certified
     Shorthand Reporter in and for the State of Texas,
10   hereby certify to the following:
11             That the witness, HOI NGUYEN, was duly
     sworn by the officer and that the transcript of
12   the oral deposition is a true record of the
     testimony given by the witness;
13             That the deposition transcript was
     submitted on _____, 2011, to the
14   witness or to Attorney _____for
     examination, signature and return to Worldwide
15   Court Reporters, Inc., by _____,
     2011.
16             That the amount of time used by each
     party at the deposition is as follows:
17
               MR. CHRISTOPHER J. ESBROOK - 04:18
18             MR. ROBERT B. WIYGUL - 00:04
19             I further certify that I am neither
     counsel for, related to, nor employed by any of
20   the parties in the action in which this
     proceeding was taken, and further that I am not
21   financially or otherwise interested in the
     outcome of the action.
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          SUBSCRIBED AND SWORN to by me this

2    6th day of October, 2011.

3

4

5    _____
     RENE WHITE MOAREFI, CSR, CRR, RPR

6    CSR NO. 3070; Expiration Date: 12-31-12

     Worldwide Court Reporters

7    Firm Registration No. 223

     3000 Weslayan, Suite 235

8    Houston, TX 77027

     (713) 572-2000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**