# Executive Summary of Findings

The Macondo blowout happened because a number of separate risk factors, oversights, and outright mistakes combined to overwhelm the safeguards meant to prevent such an event. The Chief Counsel's team identified a number of technical risk factors in the design, execution, and testing of the Macondo well. The team was also able to trace all of these failures back to an overarching failure of management. Better management of personnel, risk, and communications by BP and its contractors would almost certainly have prevented the blowout. The Macondo disaster was not inevitable.

## Technical Findings

The root technical cause of the blowout is now clear: The cement that BP and Halliburton pumped to the bottom of the well did not seal off hydrocarbons in the formation. While we may never know for certain the exact reason why the cement failed, several factors increased the risk of cement failure at Macondo. They include the following: First, drilling complications forced engineers to plan a "finesse" cement job that called for, among other things, a low overall volume of cement. Second, the cement slurry itself was poorly designed—some of Halliburton's own internal tests showed that the design was unstable, and subsequent testing by the Chief Counsel's team raised further concerns. Third, BP's temporary abandonment procedures—finalized only at the last minute—called for rig personnel to severely "underbalance" the well before installing any additional barriers to back up the cement job.

BP missed a key opportunity to recognize the cement failure during the negative pressure test that its well site leaders and Transocean personnel conducted on April 20. The test clearly showed that hydrocarbons were leaking into the well, but BP's well site leaders misinterpreted the result. It appears they did so in part because they accepted a facially implausible theory suggested by certain experienced members of the Transocean rig crew. Transocean and Sperry Drilling rig personnel then missed a number of further signals that hydrocarbons had entered the well and were rising to the surface during the final hour before the blowout actually occurred. By the time they recognized a blowout was occurring and activated the rig's blowout preventer, it was too late for that device to prevent an explosion. By that time, hydrocarbons had already flowed past the blowout preventer and were rushing upward through the riser pipe to the rig floor.

## Management Findings

The Chief Counsel's team concluded that all of the technical failures at Macondo can be traced back to management errors by the companies involved in the incident. BP did not fully appreciate all of the risks that Macondo presented. It did not adequately supervise the work of its contractors, who in turn did not deliver to BP all of the benefits of their expertise. BP personnel on the rig were not properly trained and supported, and all three companies failed to communicate key information to people who could have made a difference.

Among other things:

- BP did not adequately identify or address risks created by last-minute changes to well design and procedures. BP changed its plans repeatedly and up to the very last minute, sometimes causing confusion and frustration among BP employees and rig personnel.
- When BP did send instructions and procedures to rig personnel, it often provided inadequate detail and guidance.
- It is common in the offshore oil industry to focus on increasing efficiency to save rig time and associated costs. But management processes must ensure that measures taken to save time and reduce costs do not adversely affect overall risk. BP's management processes did not do so.
- Halliburton appears to have done little to supervise the work of its key cementing personnel and does not appear to have meaningfully reviewed data that should have prompted it to redesign the Macondo cement slurry.
- Transocean did not adequately train its employees in emergency procedures and kick detection, and did not inform them of crucial lessons learned from a similar and recent near-miss drilling incident.

What the men and women who worked on Macondo lacked—and what every drilling operation requires—was a culture of leadership responsibility. In remote offshore environments, individuals must take personal ownership of safety issues with a single-minded determination to ask questions and pursue advice until they are certain they get it right.

# Regulatory Findings

The Commission's full report examines in depth the history of Minerals Management Service (MMS) regulatory programs and makes specific recommendations for regulatory reform of what is now the Bureau of Offshore Energy Management, Regulation, and Enforcement (BOEMRE). The Chief Counsel's team found that the MMS regulatory structure in place in April 2010 was inadequate to address the risks of deepwater drilling projects like Macondo. Then-existing regulations had little relevance to the technical and management problems that contributed to the blowout. Regulatory personnel did not have the training or experience to adequately evaluate the overall safety or risk of the project.

MOBILE SOLUTIONS FOR BUSINESS — Enterprise Mobile Access Solutions from AT&T.
- Integrates mobile solutions with your existing infrastructure
- Allows mobile workforce to access network tools remotely
- Provides stringent data security to protect sensitive information
FIND OUT MORE



Interview

# In His Own Words: Forbes Q&A With BP's Tony Hayward

Christopher Helman, 05.18.10, 3:50 PM ET

*Last week Forbes sat down with BP Chief Executive Tony Hayward at the company's emergency response center in Houston. A well-rested Hayward shared his thoughts on BP's response to the spill ("extraordinarily successful"), blowout preventers (need more redundancy), what he would have done differently the past three years (nothing), and how there is no limit on what BP will spend to make sure this kind of accident doesn't happen again. For analysis of Hayward's thoughts, check out "After the Spill, Big Oil Plots Its Comeback."*

*What follows is an edited transcript of the interview.*

**Forbes: So are you sleeping at night?**

Hayward: Yeah, of course. Of course I am.

**Is that the mark of a true leader, that you can delegate your worry, delegate your panic to your subordinates?**

It's not a good idea to delegate panic, that doesn't help anyone. I do think being calm, clear and focused is important. We're very clear in each stage of this what our objectives are. In the subsea it's eliminate the leak--multiple options being deployed in parallel to eliminate the leak.

On the surface, it's called containment. Deploy everything we can get our hands on at containing the in the far offshore. Which thus far has been extraordinarily successful as almost none of this has gotten to shore.

On the shore, it's called defend the beaches. We've got now 10,000 people, 4,000 fishing boats defending the beaches. I have resorted on occasion to some Churchillian statements. The analogy with Normandy is quite good. It is like the Normandy landing. We don't know when we'll be successful but we will be successful. We will prevail. We can't predict exactly when that will be. I've also resorted to Churchill in the matter of: "When in hell, keep going" [chuckling].

**Have you been cracking the spines of some Churchill tomes recently?**

He's probably my all-time idol in terms of leadership. I've read a number of his books.

**Who else do you go to for counsel in times like this? It must be lonely at the top of this giant company. The buck stops with you.**

Everyone has big networks. In all walks of life at all levels you have a network friends, colleagues, acquaintances. I've got people I talk to. Some to share ideas, some to shoot the breeze.

**How has BP's response to this spill helped you think differently about what you've accomplished in the past three years? Before this the conventional wisdom was that Tony has done a pretty good job turning around this company since John Browne left; he's learned lessons from the Texas City disaster and put changes into place. Now all that understanding, all that wisdom, is being tested. What have you learned?**

I've thought from the moment I heard about this that we would be judged by our response. And what I said previously about how we're trying to respond by doing the right thing the right way in every dimension is absolutely the case.

Do I feel that anything I've done I would have done differently? Not at all. What we've done is as good now as it was. In reality,

the company is much better able to sustain this sort of incident than it could possibly have been able to three years ago.

**What changed?**

Because we've had such a focus on safe and reliable operations. Such a focus on moving operating capability to the front of the company. Such a focus on making all those things absolutely important. We've built an enormous capability of doing that. We've trained thousands of people, recruited thousands of people. So the company is much better able to deal with this magnitude of challenge than it would have been three or four years ago.

It's clearly much better able to deal with it in a financial sense. It's running actually very, very well. This last year the financial performance has been very strong. And it's not accounting magic. It's been driven by operating performance. Very strong operating performance. We're much better able to deal with this.

---

**What would have been different in BP's response had it happened three or four years ago? What changes have you put into place?**

We would have been much less able to respond to the scale. With the focus we have and the intensity we have, we have mounted the biggest response--period--to an incident of this type that anyone working with us has ever seen. The guys in the Coast Guard say they've never seen scale of this response. I don't think the company had the ability to do that four years ago.

**And yet the fact that BP had to call on Shell and Exxon and Petrobras and Aramco Services for help, shows that you weren't prepared for this kind of spill.**

That's a very sensible thing to do when faced with the first of any situation. This is an industry first. Not in the history of the industry since we began exploring, developing and producing in deepwater, which was 20 years ago, has the industry had to deal with this issue. So we have an industry effort trying to solve an industry problem, which is a well leaking in 5,000 feet of water.

**So BP passed your tests. The organization has shown you that that the changes you have put into place were successful?**

I would say successful in terms of the capability of the response. I don't hear anyone faulting us on our response. We'd like to get the lynch off (laughing), but you know the intensity of the response is enormous. We're going to have Ken Salazar and Steven Chu here again tomorrow to …

**To put their boots on your neck?**

There's a bit of public rhetoric, what's actually happening in real life is something different.

**Once the spill is over, once the cleanup has commenced, what changes will you put in place at BP to make yourself even better capable of responding to this in the future.**

Of course all of that ultimately awaits the results of the investigation, determining what went wrong and how it went wrong. It would be foolish to speculate too much at this point, but I think there are some leading indicators where you would expect changes to occur. From my perspective there are two principal ones. First is this whole issue of the ultimate safety device, the blowout preventer failing. If the blowout preventer had functioned as intended, we would be dealing with a very serious industrial accident, but we wouldn't be dealing with an oil spill.

The second area as an industry we need to look at is what sort of emergency subsea intervention response do we hold as an industry? The reason we're seeing extraordinary success on the surface in terms of containment and preventing oil from getting to the beach is because after Valdez the industry put together a pretty phenomenal response capability and we practiced and drilled it every year for 20-odd years. And we have a very rigorous plan. The Gulf of Mexico spill response plan is four inches thick. It's approved every two years. The BP plan was last approved in June of last year. What you're seeing is the consequence of that, the planning and foresight and equipment being available and ready to go if there is an issue.

Clearly, as the story is told one of the big lessons will be that we need to create the same sort of capability for subsea intervention. As it happens, because of the scale of what BP is doing, we had all the kit. We had all the ROVs [remote operated vehicles] because of the scale of our subsea operations in the Gulf of Mexico. We had two drilling rigs that we could move immediately to the location. Almost no one else would be able to mobilize as much equipment for the subsea operation as fast as BP has been able to. The industry will want to and should and will probably be required to put in place the same sort of capability to respond in the subsea as we have created on the surface.

**What would be good new regulation vs. bad new regulation?**

Good new regulation should do two things: It should introduce subsea response capability. It should probably require greater redundancy in safety systems. And it should primarily be focused on risk reduction. What we need to be careful to avoid is new regulation that we believe has reduced risk, but hasn't actually done anything to reduce risk at all.

**For example?**

You can imagine regulation that was intended to reduce risk but actually doesn't reduce risk, and you've led yourself into a false sense of security. You need to be thoughtful about understanding the risk and that's going to come from the investigation. That goes back to the blowout preventer. Does the blowout preventer testing regime need to go further or not? Probably yes, because it was tested 10 days before this incident.

How much redundancy should be built into a blowout preventer? I think it would be reasonable to say more than we had in the current system. In this blowout preventer there were three layers of protection. There was the switch on the rig, a remote activation in the BOP itself, in the pod, which was activated should the pod detect the rig was no longer there…

**The dead man's switch?**

---

Yeah, the dead man switch. As soon as the circuitry went dead with the fire, it should have fired. It didn't. And the third intervention was the manual intervention of the ROV. All three failed to get the desired result.

**What I understand is that the shear rams closed but the oil is somehow still getting out around it…**

Until we get the BOP off the floor I wouldn't speculate on that. I'd say belief, but it's based on diagnostics; it's not based on certainty.

**What changes have you already ordered on your deepwater projects around the world?**

We have implemented a much, much more expansive testing program for BOPs. Far and above what has already been very sensibly introduced by the MMS. They've issued two safety alerts requiring further testing. We've gone beyond that. As understanding emerges from this we will undoubtedly take further action. It is this notion--you want to be certain you're eliminating risk, not deluding yourself into thinking you've eliminated risk.

**What other changes have you made? The blowout preventer seems to be the first place, but how about the order in which well completion techniques are done?**

It's too early to say, but there's no evidence at this stage that there was any sort of major issue there. We'll have to wait for the investigation…

**Certainly, though the speculation in the last couple days has been that it was BP engineers who said let's replace the drilling mud with seawater before we finish the plug.**

The reality is there are going to be so many red herrings. You always do that (laughing nervously), that's always the procedure, right?

**What other changes do you anticipate considering? I'm talking across the organization, reconsidering all your maintenance regimes or the way in which you approach drilling.**

We will probably look harder at our relationships with some of our key contractors and satisfy ourselves that our oversight of their activities is as intense as it need to be. But the sequence here is: respond, investigate, learn, make changes. And trying to jump ahead and believing you've done something when in fact you've not addressed the risk, is important not to do because you delude yourself into a false sense of security.

The task today is the response. The task tomorrow is to investigate. Consequent of the investigation is to make changes that will reduce risk, introduce redundancy and make it much less likely to happen, and if it did ever happen we'd be in a better place to deal with it.

**BP will be a stronger company as a result of this; safer, better prepared?**

Absolutely.

**But if you ask the man on the street what they think about BP--it's reputational integrity will obviously suffer. Just like it did after Texas City. How are you going to regain that?**

Step one is how we respond. By doing the right thing the right way. Whether it's responding to the spill, or responding to the claims, dealing with the communities, ensuring that fishermen who can't fish today are getting money when they need it. It's those sort of things. I believe ultimately that if we can win the hearts and minds of the communities that are impacted, then we have the potential to enhance our reputation rather than have it damaged.

It's a big aspiration, but it's absolutely the way in which I and my team think about it. How do we actually demonstrate what real corporate responsibility is. This isn't about textbooks, this is real corporate responsibility. A company stepping up and taking absolute responsibility to do the right thing, to deal with a very serious situation, in all dimensions. Whether it's stopping the leak, cleaning up the beaches, hopefully preventing it from getting to the beaches, but if it does make sure it is properly cleaned up. And thirdly, dealing with the impact this has had on the communities.

**In the past three years you've been more or less reticent about doing interviews; now you're doing them everyday, all day long. That new sense of transparency and openness, how has that been for you?**

---

I'm a great believer that when things are going not well the leader should step forward and be seen to be present and take responsibility. And demonstrating to the world, and more important to his team, how the team is going to deal with it. It's part of the role when things are not going well. When they are going well I don't need to be out there--I'm not interested in being an iconic CEO, that's the last thing …

**Is that right? Check the ego at the door?**

I'm just not in that game. It's not me. But now there is a requirement for the face that is the leader of the organization to be seen. To be seen saying we are going to do the right thing. I wouldn't say I particularly enjoy it, but that's the role. Once things turn around I will disappear again.

**Your thoughts and beliefs about the need to step up, and the need for BP to show responsibility and transparency, this wasn't just hatched into your mind overnight--I'm sure this is something that you have evolved into over your career, watching the industry, watching how your predecessor responded to disasters, learning from Exxon Valdez and all that. Can you tell me how you formed these notions about what your role needs to be in this time?**

Not really. I've never thought about it.

**[Laughing] Really?**

Not in a deep profound way. If I'm honest, I'm following my instinct, actually. But I believe my instinct is absolutely aligned with what BP as an enterprise believes to be important. I must be careful I don't get misquoted like some of my fellow CEOs, but I believe that business can be a force for good. And it's times like this that we need to demonstrate exactly that. Not when it's hunky-dory and everything's wonderful, but actually when you're faced with this sort of challenge. Now demonstrate that you can be a force for good. In this situation it's doing the right thing, the right way, communicate openly and transparently about what we're trying to do.

**How do you overcome the cynicism?**

At the end of the day, actions speak louder than words. I can say this stuff forever and ever, but when it turns up on the ground-- and you go talk to the fishermen, like I did three days ago, and talk to the parish president--they're saying you guys are doing a fantastic job, you're doing a great job. You're taking care of our people, taking care of our environment, you're doing what we want to see a company do. We have to keep doing that time and time again. If we do, maybe the message will get out. There will always be some cynicism, of course.

**Everyone always thinks: Big Oil is evil, and we should stop drilling in the deepwater altogether. What's the message you have for those people out there who don't know the extent to which we rely on deepwater oil and the Gulf of Mexico to keep this country going? What's your message for the average guy on the street who needs to be convinced of the importance of deepwater drilling not only here but worldwide?**

Oil is an important part of America's energy security. It's part of a diverse energy mix that runs from coal to solar and everything in between. And when it comes to oil, then the deepwater today is between 25% and 30% of America's domestic oil production. And over the next 10 or 20 years it will rise to probably closer to 50% as conventional sources continue to decline and the industry continues to further develop the deepwater.

The industry will continue to develop the deepwater. The space program was not canceled because of Apollo 13. People didn't stop flying because the Air France plane coming out of Brazil went into the south Atlantic. We need to learn the lessons from this and make certain they're applied to reduce the likelihood of it ever happening again.

The industry has had a bloody good track record for 20 years now. We first went into the deepwater in the late 1980s. The number of wells drilled globally is between 4,000 and 5,000 in water depths greater than 1,000 feet. In deepwater Gulf of Mexico we have 1,500 wells drilled in deeper than 1,000 feet, and never has this happened. The track record to date has been actually pretty good. But clearly we now have a potentially catastrophic incident we need to learn from.

**Will it be another generation before the U.S. government allows E&P companies to drill in the outer continental shelf areas of the Atlantic coast?**

That's really going to be for the legislators to debate in light of what is learned from this incident.

**Was there anything that you did following the Prudhoe Bay spill that you can point to, any specific changes in health and safety and environmental practices?**

Prudhoe Bay was a failure to fully understand the risk. It was a gap in our risk assessment. We've done a lot of work in terms of enhancing risk assessment and ensuring it's very holistic.

**What does that mean, holistic risk assessment?**

---

It's having the aperture very wide rather than narrow.

**Like in thinking about whether cutting capex [capital expenditures] could really lead to a problem?**

There's no evidence that Alaska was anything about cutting capex, actually. It was just a risk that frankly was not identified. People just didn't expect that what they thought was perfectly pure oil actually had some water in it, and therefore you could get corrosion. It sounds simple, but it was an aperture that was too narrow in terms of thinking about the risk.

**Back to the Gulf of Mexico, in recent days have you thought or learned anything about deepwater projects that were similar kinds of "no duh" realizations? The fact that water in oil can mix and corrode a pipeline--in hindsight that makes sense. Is there anything about deepwater …**

I think it's too early. We really need to understand and get the results of the investigation.

**It really is too early, huh? I appreciate that you can't discuss …**

My focus has been on responding, not in trying to figure out how we got here. My focus has been on responding. We have an investigation ongoing. Others have investigations ongoing. Our focus for the moment is responding. Eliminate the leak, contain the oil on the surface, defend the beaches. There will be time to really understand fully what's happened and therefore what we need to do differently.

**Three months, six months?**

The BOP is still on the seabed; the rig is still on the seabed. So putting all this together is quite a piece of forensic science.

**Would you try to raise the rig? No, that's too big, right?**

We won't. But it's possible the Marine Board might determine it's an important piece of evidence. More dramatic things have been done. The BOP is subpoenaed. It will be brought off the seabed and will be one of the key pieces of evidence.

**So you can't do anything to it?**

We're doing things to it, but we have to document everything we do.

**Someone suggested detonating a thermite bomb in the BOP that would melt all the iron into a mass that would plug up the hole for sure. I imagine you won't get clearance for that? Red Adair, the famous wild well firefighter said something to the effect of, "If you think it's expensive to hire professionals, just try hiring amateurs to do the job." You're getting all these suggestions from amateurs, how do you manage that?**

We have a process that screens all the suggestions … thousands and thousands from all over the world. People interested in trying to help. You never know when one of them might be a good idea that no one's thought of.

The approach is to be open and engaging with everyone who might be able to help.

In this building we've got every oil company you can think of. Every service company. The Department of Defense, the Navy, Department of Energy, NASA, NOAA. This is now an industry problem that the industry is dealing with, plus some of the greatest technical minds in the U.S.

**Well with all that brain power you guys should have this solved by the weekend, right?**

---

We'll see. What we do know is that we'll solve it.

**Will you solve it before the relief well is drilled?**

Speculation. We have lots of options. We are creating many options all the time. We're loading bullets to go in the chamber, and after next week we will be firing bullet after bullet after bullet. And we'd all like to think that one of them will be successful. We just can't guarantee it. And in the meantime we have the insurance policy, the ultimate resolution will be in the relief well.

**That makes me think… you didn't mean a real insurance policy of course, but if one was to go to Lloyd's of London and insure against a $25 billion hit to my market cap and $5 billion in punitive damages, what kind of premiums would you have to pay?**

You can't insure. That's why we're self-insured. You can't insure risks you want to insure. And the things you can insure, the premiums are so high that it makes no sense for a company like BP to do anything other than self-insure.

**But if you could figure out--if someone were willing to insure against a disaster like this--what the premiums would be, and whatever the premium might be, that would be on the order of what you would want to spend in a year to mitigate this kind of risk?**

I don't think that's the way you think about it. You can't think about safe, reliable operations in terms of how much you want to spend a year. You have to think in terms of absolute risk elimination. That's what we're trying to do.

**I'm surprised to hear that, because a lot of people would say this is a question of much you would be willing to spend to eliminate risk to a satisfactory degree.**

That's not how we think about it.

**So the sky is the limit on the dollar value that will be put into making sure that this kind of thing doesn't happen again?**

Until we understand how it's happened, clearly you want to eliminate this occurring again, period.



May 10, 2010

Honorable Robert Menendez
U.S. Senator
528 Senate Hart Office Building
Washington, DC 20510

Dear Senator Menendez:

We are retail insurance brokers. Among our clients are offshore contractors, operators and non-operators, both small and large market cap independent entities, with interests in the US Gulf of Mexico. Our clients are involved in almost every aspect of offshore exploration and development work. We have been asked to comment upon the amount of insurance that is available from the commercial insurance market for third party pollution liability for operators and non-operators before and after the Macondo well incident. Prior to the incident, we estimate the maximum working capacity available in the commercial insurance market (i.e., the limit which could be purchased) was $1.5 billion (for 100% interest – i.e. the limit to be shared between operators and non-operators in any common endeavor). Subsequent to the Macondo incident, we believe the available working capacity has reduced by ~15% and the cost involved in procuring this capacity is and will be significantly higher than the pricing prior to the incident.

If, as we understand, there is legislation under consideration which would materially increase the liability cap for economic damages from its current level of $75 million, based on our experience operators and non-operators in the US Gulf of Mexico will be unable to obtain adequate protection from insurance. The increase of the liability cap will impact the economic structure of Gulf of Mexico operations. If the liability cap is increased to the levels we understand are under consideration, the fact that adequate insurance protection is not available will dramatically limit the participants in ongoing exploration and production activities – in our view only major oil companies and NOCs (National Oil Companies) will be financially strong enough to continue current exploration and development efforts.

Yours very truly,

Benjamin D. Wilcox
Executive Vice President and
Director Marine and Energy

BDW:jb

cc: Honorable Barbara Boxer
    Chairman
    Senate Committee on Environment & Public Works
    410 Dirksen Senate Office Building
    Washington, DC 20510

    Honorable James M. Inhofe
    Ranking Member
    Senate Committee on Environment & Public Works
    456 Dirksen Senate Office Building
    Washington, DC 20510

    Honorable Jeff Bingaman
    Chairman
    Senate Committee on Energy a& Natural Resources
    304 Dirksen Senate Office Building
    Washington, DC 20510

    Honorable Lisa Murkowski
    Ranking Member
    Senate Committee on Energy a& Natural Resources
    304 Dirksen Senate Office Building
    Washington, DC 20510



12th May 2010

Honourable Robert Menendez
U.S. Senator
528 Senate Hart Office Building
Washington, DC 20510
United States of America

Dear Sir

**RE:   PROPOSAL TO AMEND THE OIL POLLUTION ACT 1990 (OPA 90) AND THE INTERNAL REVENUE CODE OF 1986**

Executive Summary

The energy insurance market has limited financial capacity for pollution. What protection it can offer, sees many terms and conditions contained in the language of the policies issued. These limitations can range from whether a policy covers pollution originating from a reservoir, the absence of a definition for environmental damage, the sharing of limits with other heads of claims, to whether there is negligence on the part of the entity making the claim.

Insurers' ability to issue an insurance certificate to provide a company with its evidence of financial responsibility under OPA 90 is similarly limited. Our current estimates point to a maximum insurance financial capacity of approximately US$250 million for this exposure, with a further US$1.5 billion subject to the exclusions mentioned above.

We detail below many of the areas that need to be considered carefully in this assessment. It is quite clear to us that the ability to transfer any increased risk to the insurance market is very constrained. The extent to which oil companies, other than the super majors, will be able to provide alternative security, must be questionable.

About INDECS

INDECS is an independent insurance consultancy with over 20 years' experience working across more than thirty countries including the USA. We assist global businesses to achieve a more effective insurance and risk management strategy. INDECS does not sell insurance, we are not a broker, but provide independent advice to our clients on their insurance and risk management needs.

The Proposed Bill

We understand that two bills have been drafted, in the wake of the Deepwater Horizon catastrophe:

1. To amend the limits of liability for offshore facilities under OPA 90 from US$75 million to US$10 billion
2. To remove the limit of US$1 billion expenditures from the Oil Spill Liability Trust Fund, and to permit advances to be made to the Fund



Current Insurance Protection

Under OPA 90, holders of leases or permits for offshore facilities are liable for up to US$ 75 million per spill plus removal costs.

Under Section 1016 the holder was initially required to provide evidence of financial responsibility of between US$10 million and US$35 million depending on whether the facility is located seaward or landward of the seaward boundary of the State. This has subsequently increased to the maximum allowed by the act of US$150 million.

There are various methods of evidencing financial responsibility including surety bonds, guarantees, letters of credit and self insurance, but the most common and the one that is most commercially available to all is by means of an insurance certificate. The certificate issued must identify a limit not less than that required under Section 1016.

While there are certain defences under OPA 90, insurers are put in the position of being a guarantor and may not have the ability to rely on the normal general conditions of the policy. Some insurers may also consider that it imposes a more "strict liability" on the insured, and, moreover, enables claims to be made directly against the insurer in certain circumstances. They therefore treat OPA certification distinctly from other insurance that may be available for this type of risk. The potential capacity for this type of insurance, which is the broadest available specifically focusing on OPA obligations and liabilities, is approximately US$150 to US$250 million.

Outside the realms of strict liability and OPA, an insured will be able to obtain coverage for sudden and accidental seepage and pollution by way of its Operators Extra Expense (OEE) and Excess Liability insurances. OEE coverage provides a combined single limit for well control, well redrilling and sudden and accidental seepage and pollution and clean-up. Therefore pollution liability and clean-up cost is subject to the apportionment of this combined single limit over respective risks. In practice the limit would be made available first for control measures (i.e. hiring in specialist well control experts and, if necessary, relief well drilling), with any balance of the limit then being reserved for redrilling and pollution. It is possible to prioritise the use of the limit for compliance with OPA Financial Responsibility provisions, but this would be impractical in relation to the urgency by which oil companies will need to address the well control situation.

We consider that the OEE policy provides the widest cover and is most "user friendly" to oil companies. The pollution element of the cover responds to costs which the insured company is obligated to pay by law or under the terms of the lease/license for the cost of remedial measures or as damages in compensation for third party property damage and third party injury claims. In respect of clean-up and containment, or attempt thereat, the policy pays such costs, including where incurred to divert pollution from shore, and is not on a "liability" basis. It should be noted that there is no definition of environmental damage – claims are recoverable to the extent of damages for third party bodily injury and loss of or damage to, or loss of use of tangible property. This coverage can therefore respond on a "strict liability" basis, where the law or license agreement specifies that such remedial costs or compensation is payable if emanating from the insured's facilities, irrespective of negligence. This contrasts starkly with the coverage available under most Excess Liability policies.



Excess Liability insurance responds to all legal liabilities incurred. Sudden and accidental pollution would be included in any limit provided. In respect of pollution from wells the limit available under these policies sits excess of the OEE policy referred to above (but is subject to its own policy form insuring conditions which are not as wide as OEE policies). In respect of pollution from hydrocarbons stored or being produced from or through facilities such as fixed and floating platforms and pipelines, the limit is from "the ground-up", or in excess of a specific local general liability policy.

Excess Liability Policy forms vary but the market "standard" coverage offers quite limited pollution cover. Some actually specifically exclude pollution from wells. Basically pollution liabilities are excluded from all policies, but within the exclusion is a limited "buy-back", which requires that the pollution event is sudden, accidental and unintended and subject to strict discovery and reporting requirements. However, and significantly, the cover excludes *"…. actual or alleged liability to evaluate, monitor, control, remove, nullify and/or clean-up seeping, polluting or contaminating substances to the extent such liability arises solely from any obligations imposed by any statute, rule, ordinance, regulation or imposed by contract".*

We regard this wording as too draconian and would always counsel oil companies to include a specific "pollution endorsement" that overrides this phrasing and would provide legal and statutory liability coverage, including costs incurred under lease block obligations for removal. We think this distinction in cover is important as it will impact capacity. Our figure below of US$1 to US$ 1.5 billion is based upon insurers subscribing to the standard market cover. If an alternative wording is utilised, or the pollution endorsement used, it could have the effect of reducing capacity by about 25 to 35%.

As with the OEE policy, the coverage is geared to damages for compensation in respect of third party bodily injury and third party property loss or damage or loss of use. There is similarly no concept of "environmental damage" expressed in the policy.

Insurance Capacity

The immediate effect of the Deepwater Horizon loss is that capacity will, for a time, be fluid. Most insurers had not factored in to their risk aggregations that the net is spread very wide indeed in respect of responsible parties under OPA. They are now seeing the implications of multi party actions against operators, drilling contractors, cementing engineers and their various sub-contractors arising out of a single incident such as the "Deepwater Horizon" loss. This is because the insurance limits are available to each separate party, so will stack up if three different entities are sued.

In this context the lease block holders constitute one entity (their insurance policies may be separate covering their respective equity interests, but the capacity available is assessed upon 100% interest).

Inevitably the recent loss has increased the demand for higher limits, and has consequently affected the overall aggregate exposures to insurers. This will likely reduce the available limits in the immediate future. At least one insurer has let it be known that its capacity has reduced. Others are reviewing their positions and it is most likely that June renewals will be subject to some reduction in overall capacity. This could be between 25 and 30% reduction, affecting all above policies, except Protection and Indemnity entries. INDECS has close relationships with the Energy



Insurance Market including its insurers and brokers. Based on our knowledge and these relationships we would opine that the following represents the maximum per occurrence capacity in this market currently:

**Operators' Extra Expense (OEE)**

The available global market capacity for the OEE cover is between US$500 million and US$750 million per event on 100% basis. This means that the total limit purchased is shared out between the co-owners of the lease block (the licensees) according to their equity interest in the venture (as per the Joint Operating Agreement).

In addition to this capacity, oil companies who are members of the mutual, Oil Insurance Ltd (OIL), Bermuda, (which includes a number of US based E&P companies) can claim up to a further US$ 250 million for each companies' equity interest, limited to US$ 750 million per event, but this limit is also applied on a combined single limit basis, inclusive not only of control of well cost and redrilling, but also property damage and wreck removal.

**Excess Liabilities**

The global commercial market limits available are between US$1 billion and US$1.5 billion per event on 100% basis (meaning that the limit is effectively reduced to reflect each of the oil companies' equity interests). This would include capacity available under any specific local general liability policy (normally limited to USD50m per event). This total would be inclusive of capacity from the Bermuda reinsurance market and specifically from Oil Casualty Insurance Ltd (OCIL), which is a sister organisation to OIL. This limit operates on an Ultimate Nett Loss basis, meaning that it must also respond to injuries and fatalities to third parties (but not employees) and to third party property damage and consequential financial loss.

One final issue to consider for the commercial market is that In the event that the pollution arises from a named hurricane there would be a sub-limit agreed in the policy, which may not be more than US$200 million per oil company, and this would be inclusive of all insurable exposures (i.e. property damage, control of well, redrilling, wreck removal and pollution).

**Protection and Indemnity Clubs (P&I)**

One further area that merits comment is P&I, which provides cover in respect of pollution from mobile drilling units, heavy-lift vessels, pipelaying vessels and, to the extent that they may ultimately be more widely used in the Gulf of Mexico, Floating Production, Storage and Offtake units (FPSOs).
The limit purchased is generally between US$ 300million and US$ 500 million, but US$ 1 billion per event is theoretically available. However, most US drilling contractors are not insured by the P and I Clubs. US drilling contractors generally rely upon commercial marine liability insurers, whose capacity would be limited to between US$ 500 million and US$ 750 million per event referred to above.



Effects of increasing the OPA 90 limits

In conclusion, if the intention is to increase the limit required under OPA90 to US$10 billion and also the required evidence of financial responsibility to something similar, then quite simply the energy insurance market will no longer be an option. Its capacity lies far below this limit and even then has a number of restrictions contained in it which we have discussed above.

Companies, with the exception of super majors and foreign state owned companies, operating in the United States are highly unlikely to be able to provide any alternative method of financial responsibility such as bonds and lines of credit. The cost of these methods or ability to self insure these risks will far exceed their capabilities, preventing their management from fulfilling their fiduciary liability and presenting a barrier to acquiring new or even servicing existing permits in the future.

If we have understood the proposals correctly, then it would appear to us that the proposed Bill will not act as "Big Oil Bailout Prevention Liability Act of 2010", rather making it impossible for anyone other than "Big Oil" to operate.


Yours sincerely,

**Paul King
Director**

CC:    David Sharp, INDECS

       Honourable Barbara Boxer
       Chairman Senate Committee on Environment & Public Works
       410 Dirksen Senate Office Building
       Washington, DC 20510

       Honourable James M. Inhofe
       Ranking Member
       Senate Committee on Environment & Public Works
       456 Dirksen Senate Office Building
       Washington, DC 20510

       Honourable Jeff Bingaman
       Chairman Senate Committee on Energy & Natural Resources
       304 Dirksen Senate Office Building
       Washington, DC 20510

       Honourable Lisa Murkowski
       Ranking Member
       Senate Committee on Energy & Natural Resources
       304 Dirksen Senate Office Building
       Washington, DC 20510