In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported By:
KEVIN DENNIS LACY                    June 1, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"        SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL           JUDGE BARBIER
20, 2010                   MAG. JUDGE SHUSHAN




Volume 1


     Deposition of KEVIN DENNIS LACY, P.O.

Box 7888, The Woodlands, Texas 77387, taken

in the Pan American Life Center, Mardi Gras

Room, 11th Floor, 601 Poydras Street, New

Orleans, Louisiana 70130, reported on

Wednesday, June 1st, 2011.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6009      Board-Certified Court Reporters    Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010
KEVIN DENNIS LACY                    June 1, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR



Page 398

Page 399

20        Q.    Did Transocean stand out to you
21   as one of the contractors with a worse safety
22   record?
23        MR. ROTH:
24            Objection to form.
25        THE WITNESS:

Page 400

1             I would not define that they had
2    a materially different safety performance or
3    concerning.

Page 401

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6009    Board-Certified Court Reporters   Facsimile: (504) 525-9109

7c38ef19-00fb-4fa6-a5fc-e5557666e4f1



## WITNESS CERTIFICATE

I, **KEVIN DENNIS LACY ,** have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

_July 7 2011_

(Date Signed)

_[signature]_

(Signature)

✓  Signed with corrections as attached.

_____  Signed with no corrections noted.

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                               Reported By:
KEVIN DENNIS LACY VOL. II        June 2, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR

Page 422

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"        SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL           JUDGE BARBIER
20, 2010                   MAG. JUDGE SHUSHAN


VOLUME 2


       Deposition of KEVIN DENNIS LACY, P.O.

Box 7888, The Woodlands, Texas 77387, taken

in the Pan American Life Center, Mardi Gras

Room, 11th Floor, 601 Poydras Street, New

Orleans, Louisiana 70130, reported on

Thursday, June 2nd, 2011.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6009     Board-Certified Court Reporters    Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported By:
KEVIN DENNIS LACY VOL. II        June 2, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR



Page 479

Page 481

```
 4                     I want to see if you recall a
 5   meeting with -- first of all, are you
 6   familiar with Robert Saltiel?
 7        A.   I know Rob very well, yes.
 8        Q.   He was the executive vice
 9   president of performance at Transocean?
10        A.   Yes.
11        Q.   Do you recall meeting with
12   Mr. Saltiel, and perhaps others, in or around
13   February of 2009, where you discussed with
14   him Transocean's safety record as of that
15   time?
16        MS. KARIS:
17            Object to form.
18        THE WITNESS:
19            Would this have been a meeting
20   in the Gulf of Mexico specifically or a
21   separate -- I -- know I had a couple of
22   lunches with Rob.  I know we had at least one
23   meeting relative to the Gulf of Mexico rigs
24   between BP and Transocean.  There was a
25   global business review that would have
```

Page 480

Page 482

```
 1   occurred in possibly May of '09.
 2   EXAMINATION BY MR. ROTH:
 3        Q.   This was actually a meeting at
 4   which you gave some feedback about
 5   performance, and Mr. -- Mr. Neil Shaw was
 6   present as well.
 7        A.   Okay, yes.  Okay.
 8        Q.   You have a --
 9        A.   So now I remember, that Neil had
10   asked that -- he did not know Rob, and Rob
11   would have been the primary person to
12   discuss -- if we had concerns about
13   performance.  So I think I facilitated that
14   meeting so Neil would have an introduction to
15   Rob, and we would have discussion.
16        Q.   Do you recall telling
17   Mr. Saltiel during that meeting that you were
18   happy with the strong safety results as of
19   that time on the Transocean rigs?
20        A.   At what date was that?
21        Q.   In February 2009, February 25th
22   in particular?
23        A.   Oh, if -- if -- if it was
24   specific to the Gulf of Mexico rigs, I
25   absolutely would have.  We had not had a
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6009   Board-Certified Court Reporters   Facsimile: (504) 525-9109

6059634f-db81-433c-99cc-ec3ee9c54994

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                Reported By:
KEVIN DENNIS LACY VOL. II        June 2, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR



Page 483

1    lost-time incident since February of '08.
2        Q.    And you recall indicating that
3    the best safety year was 2008?
4        A.    In the Gulf of Mexico, probably
5    so.
6        Q.    Do you recall referencing the
7    strong efforts -- the strong recovery efforts
8    on the MARIANAS rig at that meeting?
9        A.    Absolutely, yes.
10       Q.    And do you recall mentioning, in
11   particular, the strong consistent performance
12   with respect to safety on the Deepwater
13   Horizon?
14       A.    Yes, it had not had a personal
15   safety incident during my time there.

Page 484

Page 485

Page 486

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6009    Board-Certified Court Reporters    Facsimile: (504) 525-9109

6059634f-db81-433c-99cc-ec3ee9c54994



601 Poydras Street, Suite 1720      New Orleans, Louisiana 70130
Phone: (504) 525-9100          Fax: (504) 525-9109
BOARD-CERTIFIED COURT REPORTERS & LITIGATION SUPPORT

## WITNESS CERTIFICATE

I, **KEVIN DENNIS LACY**, have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

_July 7 2011_

(Date Signed)

_Kev Dennisfuzy_

(Signature)

____✓____ Signed with corrections as attached.

_____ Signed with no corrections noted.

1748 Brickyard Avenue, Suite A-4      PHONE (225) 291-3411
Baton Rouge, Louisiana 70816         FAX    (225) 291-7950
263 W. Causeway Approach             PHONE (504) 525-9100
Mandeville, Louisiana 70471          FAX    (504) 525-9109

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

LEE LAMBERT                 May 9, 2011        THU BUI, CCR, RPR

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL     )     MDL NO. 2179
by the OIL RIG,       )
DEEPWATER HORIZON in  )     SECTION "J"
the GULF OF MEXICO,   )
April 20, 2010        )     JUDGE BARBIER
                      )
                      )     MAG.  JUDGE
                      )     SHUSHAN




         ***************
            VOLUME 1
         ***************



         Deposition of LEE LAMBERT, taken
at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 9th of May, 2011.


601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile:(504) 525-9109

7261a512-0365-473b-8b4d-71a006e07bdc

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010    Reported by:
LEE LAMBERT          May 9, 2011      THU BUI, CCR, RPR



Page 170

16    Q.   And go to the e-mail dated
17  Sunday, April 18, at the top.
18          I'm going to mark it as
19  2146.
20          (Exhibit Number 2146 marked.)
21    Q.   It starts with -- it's actually
22  two pages.  Keep going.  That's it.
23          It's 1217915 and 1217916.
24  I'm marking them together.
25          It looks like it starts

Page 171

1   April 7th at the bottom, it begins the
2   string.  It's from Cory Davis to G Gulf of
3   Mexico SPU all.  Functional organization
4   milestones.  And then Crystal sends you an
5   e-mail about the -- about that very
6   document.
7     A.   Okay.
8     Q.   And then you write back.  You
9   say, Oh, no.  I hate the Q.  I hope this
10  changes.
11          What are you saying there?
12    A.   The THUNDER HORSE production
13  drilling quarters.  It's a rig.  That's
14  where, according to the org chart -- charts
15  that they sent out, which were sent out
16  prematurely, I guess.  I was assigned to
17  the PDQ.  I don't particularly care for
18  that rig.  Just the way it's set up.
19    Q.   I understand.
20    A.   Personal preference.
21    Q.   And then she says, LOL.  I've
22  never been to HORIZON either.  Oh, no.
23          Do you know what she's
24  saying there?  Do you under -- did you
25  understand what she was saying there?

Page 172

1     A.   Apparently she was, according to
2   those org charts, assigned to the HORIZON.
3   She'd never been to the HORIZON before.
4     Q.   Okay.  And you, HORIZON's not
5   too bad actually.  Second to the
6   ENTERPRISE.  How's the 2 treating you?
7          So the ENTERPRISE is your
8   favorite rig?
9     A.   That's correct.
10    Q.   What about it makes it your
11  favorite rig?  Just out of curiosity.
12    A.   I just like the crews on it and
13  the way the ship shape is set up.  It's
14  just personal preference of how the rig is
15  laid out.

Page 173

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile:(504) 525-9109

7261a512-0365-473b-8b4d-71a006e07bdc

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

LEE LAMBERT                     May 9, 2011        THU BUI, CCR, RPR

Page 306



23    Q.   Now, I take it that in your
24  capacity as a wellsite leader of the future
25  or trainee, you had the opportunity to --

Page 307

1   opportunity to observe the drill crews on
2   the rig while they're performing operation;
3   is that right?
4       A.   Yes, sir.
5       Q.   Okay.  And would this include
6   the drill crew that was on tour on the
7   night of April 20th, 2010?
8       A.   Yes, sir.
9       Q.   All right.  And you had the
10  chance to observe the rig's OIM, Mr. Jimmy
11  Harrell, working aboard the rig?
12      A.   Yes, sir.
13      Q.   How about the senior toolpusher,
14  Mr. Randy Ezell, had you had a chance to
15  observe him working on the rig?
16      A.   Yes, sir.
17      Q.   What about the toolpusher that
18  was on tour, Mr. Jason Anderson?  You had
19  to observed him performing operations as
20  well, right?
21      A.   That's correct.  Yes, sir.
22      Q.   Okay.  Were these men well
23  respected on the rig?
24      A.   In my opinion, they were.  Yes.
25      Q.   Okay.  During your time aboard

Page 308

1   the rig, did you ever see at anytime any
2   one of these men act in such a way that
3   would lead you to believe they were callous
4   or indifferent toward safety of the crew or
5   the environment?
6       A.   No, sir.
7       Q.   Did you get a chance to observe
8   the other members of the drill crew that
9   were on tour on the night of April 20th,
10  2010, while they were performing
11  operations?
12      A.   By other members of the drill
13  crew, you're speaking of everyone else on
14  the rig?
15      Q.   Well, no.  Let me -- let me be
16  specific then.
17           The driller, Mr. Dewey
18  Revette?
19      A.   Yes, sir.
20      Q.   Okay.  The AD, Mr. Steven
21  Curtis?
22      A.   Yes, sir.
23      Q.   The other AD, Mr. Don Clark?
24      A.   Yes, sir.
25      Q.   Okay.  Have you ever witnessed

Page 309

1   them engage in any behavior or conduct that
2   you would describe as callous or
3   indifferent towards the safety of the crew
4   or the environment?
5       A.   No, sir.
6       Q.   What about Captain Curt Kuchta,
7   did you ever have a chance to observe him
8   during operations on the rig?
9       A.   Yes, sir.  But let me just
10  clarify that he's not -- the marine
11  department is not necessarily involved in
12  the drilling operations.  But, yes, I had
13  dealings with Mr. Kuchta.
14      Q.   And I absolutely understand
15  that.  And I just want to ask you if you
16  had ever observed him acting in such a way
17  that would lead you to believe that he was
18  indifferent or callous towards safety of
19  other individuals or the environment.
20      A.   No, sir.
21      Q.   Did you have any safety concerns
22  whatsoever with any member of the crew, not
23  only on the -- the drill crew, but any crew
24  member on the rig while you were working
25  and sleeping on that rig?

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters   Facsimile:(504) 525-9109

7261a512-0365-473b-8b4d-71a006e07bdc

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010

Reported by:

LEE LAMBERT            May 9, 2011        THU BUI, CCR, RPR

Page 310

1     A.   No, sir.  I mean there's, of
2  course, minor incidents that -- you know,
3  there's always room for improvement.
4  Nobody's perfect.  But I wouldn't say that
5  I would single somebody out and say that,
6  you know, this guy is kind of a problem
7  area.  Not at all, no.
8     Q.   Okay.  What about -- same
9  question with regard to equipment.  Did --
10 did you have any concerns about the safety
11 of equipment while you were working and
12 sleeping aboard the rig?
13    A.   To my knowledge, no.

Page 312

Page 311

Page 313

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile:(504) 525-9109

7261a512-0365-473b-8b4d-71a006e07bdc

1
2
3
4
5
6
7            <u>WITNESS' CERTIFICATE</u>
8
9
10
11            I, **LEE LAMBERT**, read or have had
12    the foregoing testimony read to me and
13    hereby certify that it is a true and
14    correct transcription of my testimony, with
15    the exception of any attached corrections
16    or changes.
17
18
19
20
21
22            **LEE  LAMBERT**
23
24
25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

RECEIVED 06/28/11

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:

PHILIP EARL LEE          June 1, 2011    SANDRA D. FILES, CCR

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"   SECTION:   J
IN THE GULF OF
MEXICO, ON APRIL      JUDGE BARBIER
20, 2010              MAG. JUDGE SHUSHAN

          Volume 1 of 2 of the Videotaped
Deposition of PHILIP EARL LEE, 842 SCR 76,
Bay Springs, Mississippi 39422, taken in
the Pan American Life Center, 11th Floor,
601 Poydras Street, New Orleans, Louisiana
70130, on Wednesday, June 1, 2011.

APPEARANCES:

DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
By:  Michael C. Palmintier, Esquire
and Jonathan Williams, Esquire
618 Main Street
Baton Rouge, LA 70801-1910
        (Attorneys for Plaintiffs
        Steering Committee)

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:

PHILIP EARL LEE        June 1, 2011    SANDRA D. FILES, CCR

Page 382



Page 384

```
 1    A.   Yes.
 2    Q.   Did they show professionalism?
 3    A.   Yes.
 4    Q.   To your knowledge, did they have
 5  an exemplary track record as Transocean
 6  employees aboard the Deepwater Horizon?
 7    A.   Yes.
 8    Q.   Were they all hard-working,
 9  decent men?
10    A.   Yes.
11    Q.   Would you serve with all of
12  these men again if given the opportunity?
13    A.   Yes.
14    Q.   Some of them, of course, are
15  deceased now.
16    A.   Well, I mean, if given the
17  opportunity.
```

Page 383

```
16    Q.   Did you ever have any reason to
17  make a critical report of any of the
18  crewmen employed by Transocean on the
19  Deepwater Horizon?
20    A.   Not that I can recall.
21    Q.   Did you observe that these were
22  all experienced men at what they did?
23    A.   Yes.
24    Q.   Did they demonstrate a high
25  level of skill?
```

Page 385

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C    Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                     Reported by:

PHILIP EARL LEE        June 1, 2011    SANDRA D. FILES, CCR

Page 386

10    Q.   Did you have any -- ever have
11  any problems with either Jimmy Harrell,
12  Randy Ezell, Captain Kuchta, Jason
13  Anderson, Dewey Revette, Steve Curtis or
14  Don Clark?
15    A.   No.
16    Q.   Did you ever experience any
17  indication that any of them were
18  indifferent or callous toward the safety of
19  individuals or the environment?
20    A.   No.
21    Q.   And based on your experience,
22  did they have a good attitude towards the
23  safety of individuals and the environment?
24    A.   Yes.
25    Q.   Do you feel that either Paul

Page 387

1   Johnson, Jimmy Harrell or Randy Ezell or
2   Jason Anderson or Dewey Revette or Stephen
3   Curtis, Don Clark or Captain Kuchta were in
4   need of training to demonstrate competence?
5     MS. O'CONNOR:
6         Object to form.
7     THE WITNESS:
8         Personal opinion, no, sir.
9   BY MR. CLEMENTS:
10    Q.   Would you disagree with such a
11  statement if one was made, based on your
12  personal experience with these men?
13    A.   Yes.
14    Q.   You had the authority to stop
15  work if you had any undue concerns about
16  the crew or their ability to perform, did
17  you not?
18    A.   Yes, sir.
19    Q.   You never exercised that
20  authority based on any deficiency in these
21  crewmen, did you?
22    A.   No, sir.
23    Q.   Were you aboard, sir, on March
24  8th during the -- the kick that was
25  described earlier today?

Page 388

1     A.   Yes, sir.
2     Q.   I believe you said this was a
3   Monday night event and you left the rig on
4   Wednesday morning?
5     A.   That's correct.
6     Q.   Okay.  In your view, did the
7   driller respond appropriately?
8     A.   Yes.
9     Q.   Do you recall what he did?
10    A.   No.  I -- I wasn't on the floor
11  when it happened, but I --
12    Q.   Okay.
13    A.   -- I think he responded
14  appropriately.
15    Q.   Are you aware of any criticism
16  of how the driller handled this event?
17    A.   No, sir.
18    Q.   You described or were questioned
19  about an event in early April, a lost
20  circulation event.  I -- I think it was
21  referred to in questioning as a kick.
22        Do you have any criticism of the
23  Transocean driller in connection with that
24  event?
25    A.   No, sir.

Page 389

1     Q.   Did you ever hear any or know of
2   any criticism by anyone towards the
3   driller?
4     A.   No, sir.
5     Q.   Did you ever hear of any
6   criticism towards any member of the
7   Transocean crew in connection with either
8   of these kicks?
9     A.   No, sir.



601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C         Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:

PHILIP EARL LEE          June 1, 2011    SANDRA D. FILES, CCR

Page 390

15    Q.    ████████    Following the
16  audit in September 2009, in the subsequent
17  months after the audit, were you aware of
18  any safety critical items identified in the
19  audit which were not addressed?
20    A.    Not that -- not that I remember,
21  no, sir.
22    Q.    Certainly, if there were any
23  such safety critical items which were not
24  addressed, you would have a duty to report
25  those, would you not?

Page 391

1    A.    Yes.
2    Q.    And if they were truly safety
3  critical, to stop work, that would be part
4  of your work scope, would it not --
5    A.    Yes, sir.
6    Q.    -- or your duties?
7    A.    Yes, sir.
8    Q.    And you didn't do that?
9    A.    No, sir.
10    Q.    And you have never shut down the
11  rig because there were any safety critical
12  items which had been unaddressed?
13    MS. O'CONNOR:
14         Object to form.
15    THE WITNESS:
16         No, sir, not that I
17  remember.

Page 392

Page 393

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C    Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:

PHILIP EARL LEE          June 1, 2011   SANDRA D. FILES, CCR

Page 398

25    Q.                            Did you

Page 399

1    report in writing to Mr. Guide or anyone
2    else onshore that there were critical items
3    on the Deepwater Horizon that required
4    immediate attention?
5        A.   No, sir, I don't recall doing
6    that.
7        Q.   You never asked that the blowout
8    preventer be taken out of service, did you?
9        A.   No, sir.
10       Q.   And I take it you had no
11   concerns about the blowout preventer while
12   it was on the seabed?
13       A.   No, sir.

Page 400

Page 401

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C          Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

PHILIP EARL LEE VOL. II   6/2/2011
IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010
Reported by: SANDRA D. FILES, CCR, RPR



**640**

1        Objection to form.
2      A.   I don't know what Bob Kaluza
3   did.  I can't analyze what Bob Kaluza did
4   because I don't know what he did.  I can't
5   answer that.
6      Q.   Well, assume with me that he did
7   not consult a toolpusher.
8   MS. O'CONNOR:
9        Object to form.
10      A.   I'm not going to assume what Bob
11   did.  I don't know what he did.
12      Q.   Well, I'm not asking you to do
13   that independently, I'm telling you to
14   assume with me hypothetically that he did
15   do that; that he did not consult a tool
16   pusher.  Now, I'm asking you, as a well
17   site leader, with all of the experience of
18   your 42 years, wouldn't you agree with me
19   that he wouldn't have been performing the
20   task that he was supposed to have if he
21   didn't consult a tool pusher?
22   MS. O'CONNOR:
23        Objection to form.
24      A.   I don't know how many negative
25   tests Bob Kaluza's done.  He might not have

**641**

1   deemed that he needed to talk to the tool
2   pusher.  I don't know Bob Kaluza.  So I
3   don't know what he should have done.
4      Q.   Okay.  I accept that.  I
5   understand.
6   MR. PALMINTIER:
7        Thank you, sir.
8   THE WITNESS:
9        Thank you.
10   VIDEOGRAPHER:
11        We're going off the record.
12   It's 1:19.  Videotape number 4.
13        (The deposition is concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

RECEIVED
JUL 1 2 2011

**642**

1
2        WITNESS' CERTIFICATE
3
4
5        I, PHILLIP EARL LEE, have read or
6   have had the foregoing testimony read to me
7   and hereby certify that it is a true and
8   correct transcription of my testimony, with
9   the exception of any attached corrections
10   or changes.
11
12
13
14
15
16                     PHILLIP EARL LEE
17
                     (Check One)
18
                     ( ) NO CORRECTIONS.
19       ( ✱ ) CORRECTIONS; ERRATA SHEET(S)
             ENCLOSED.
20
21
22
23
24
25

**643**

1        REPORTER'S CERTIFICATE
2
3        I, SANDRA D. FILES, Certified Court
4   Reporter, do hereby certify that the
5   above-named witness, after having been
6   first duly sworn by me to testify to the
7   truth, did testify as hereinabove set
8   forth;
9        That the testimony was reported by
10   me in shorthand and transcribed under my
11   personal direction and supervision, and is
12   a true and correct transcript, to the best
13   of my ability and understanding;
14        That I am not of counsel, not
15   related to counsel or the parties hereto,
16   and not in any way interested in the
17   outcome of this matter.
18
19
20
21
22   SANDRA D. FILES, CCR
     CERTIFIED COURT REPORTER
23
24
25

601 Poydras Street, Suite 2003        GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130        Board-Certified Court Reporters        Facsimile: (504) 525-9109

Received 07/12/13

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:

PHILIP EARL LEE VOL. II June 2, 2011      SANDRA D. FILES, CCR

Page 431

            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

    IN RE:  OIL SPILL    MDL NO. 2179
    BY THE OIL RIG
    "DEEPWATER HORIZON"   SECTION:  J
    IN THE GULF OF
    MEXICO, ON APRIL      JUDGE BARBIER
    20, 2010              MAG. JUDGE SHUSHAN




            Volume 2 of 2 of the Videotaped
    Deposition of PHILIP EARL LEE, 842 SCR 76,
    Bay Springs, Mississippi 39422, taken in
    the Pan American Life Center, 11th Floor,
    601 Poydras Street, New Orleans, Louisiana
    70130, on Thursday, June 2, 2011.

    APPEARANCES:




    DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
    By:  Michael C. Palmintier, Esquire
    and Jonathan Williams, Esquire
    618 Main Street
    Baton Rouge, LA 70801-1910
            (Attorneys for Plaintiffs
            Steering Committee)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C        Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

94bd242c-c603-4d6f-95f5-b816d48c4c3b

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                          Reported by:

PHILIP EARL LEE VOL. II June 2, 2011      SANDRA D. FILES, CCR



Page 576

Page 578

24      Q.   Are you aware of any instances
25   where continuous improvement plans were

Page 577

Page 579

1    implemented on the Deepwater Horizon?
2      A.   Well, it's a day-to-day deal to
3    continuously improve.  So I mean, it takes
4    into account the rig personnel and everyone
5    being involved to improve.
6           The Horizon had a good safety
7    record, so if you are going to improve on
8    safety, it was just stay focused on the
9    things you're doing right.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C      Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

94bd242c-c603-4d6f-95f5-b816d48c4c3b

PHILIP EARL LEE VOL. II    6/2/2011
IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010
Reported by: SANDRA D. FILES, CCR, RPR



**640**

1        Objection to form.
2     A.   I don't know what Bob Kaluza
3  did. I can't analyze what Bob Kaluza did
4  because I don't know what he did.  I can't
5  answer that.
6     Q.   Well, assume with me that he did
7  not consult a toolpusher.
8  MS. O'CONNOR:
9        Object to form.
10    A.   I'm not going to assume what Bob
11  did.  I don't know what he did.
12    Q.   Well, I'm not asking you to do
13  that independently, I'm telling you to
14  assume with me hypothetically that he did
15  do that; that he did not consult a tool
16  pusher.  Now, I'm asking you, as a well
17  site leader, with all of the experience of
18  your 42 years, wouldn't you agree with me
19  that he wouldn't have been performing the
20  task that he was supposed to have if he
21  didn't consult a tool pusher?
22  MS. O'CONNOR:
23        Objection to form.
24    A.   I don't know how many negative
25  tests Bob Kaluza's done.  He might not have

**641**

1  deemed that he needed to talk to the tool
2  pusher.  I don't know Bob Kaluza.  So I
3  don't know what he should have done.
4     Q.   Okay.  I accept that.  I
5  understand.
6  MR. PALMINTIER:
7        Thank you, sir.
8  THE WITNESS:
9        Thank you.
10  VIDEOGRAPHER:
11        We're going off the record.
12  It's 1:19.  Videotape number 4.
13        (The deposition is concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

RECEIVED
JUL 1 2 2011

**642**

1
2        WITNESS' CERTIFICATE
3
4
5        I, PHILLIP EARL LEE, have read or
6  have had the foregoing testimony read to me
7  and hereby certify that it is a true and
8  correct transcription of my testimony, with
9  the exception of any attached corrections
10  or changes.
11
12
13
14
15
16  PHILLIP EARL LEE
17
    (Check One)
18
    ( ) NO CORRECTIONS.
19  ( ) CORRECTIONS; ERRATA SHEET(S)
    ENCLOSED.
20
21
22
23
24
25

**643**

1        REPORTER'S CERTIFICATE
2
3        I, SANDRA D. FILES, Certified Court
4  Reporter, do hereby certify that the
5  above-named witness, after having been
6  first duly sworn by me to testify to the
7  truth, did testify as hereinabove set
8  forth;
9        That the testimony was reported by
10  me in shorthand and transcribed under my
11  personal direction and supervision, and is
12  a true and correct transcript, to the best
13  of my ability and understanding;
14        That I am not of counsel, not
15  related to counsel or the parties hereto,
16  and not in any way interested in the
17  outcome of this matter.
18
19
20
21
22  SANDRA D. FILES, CCR
    CERTIFIED COURT REPORTER
23
24
25

Received 07/12/13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )    MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     )    SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             )    JUDGE BARBIER
                           )    MAG. JUDGE SHUSHAN


*****************************************
ORAL AND VIDEOTAPED DEPOSITION OF
IAN LITTLE
JUNE 10, 2011
VOLUME 2
*****************************************


       ORAL AND VIDEOTAPED DEPOSITION of IAN LITTLE,

produced as a witness at the instance of the Plaintiffs'

Steering Committee, and duly sworn, was taken in the

above-styled and numbered cause on June 10, 2011, from

8:34 a.m. to 5:53 p.m., before PHYLLIS WALTZ, CSR, TCRR,

RPR, CRR, recorded by machine shorthand, at the offices

of Kirkland & Ellis International, 30 St. Mary Axe,

22nd Floor, London EC3A 8AF, England, United Kingdom,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto; that

the deposition shall be read and signed before any

Notary Public.

7bc78d2c-7144-4efa-a133-c3a7f08463cf



Page 380

Page 382

Page 381

Page 383

17      Q.  What was your impression of the
18   professionalism of the Transocean personnel onshore and
19   on the rigs that you dealt with?
10:26  20         MR. FIELDS:  Objection; form.
21      A.   I -- I have no particular issues around the --
22   the Transocean people I was working with.  I -- I had a
23   good relationship with the ones that I worked with.
24      Q.  (BY MR. ROBERTS)  Did they appear competent to
10:32  25   you?

21 (Pages 380 to 383)

7bc78d2c-7144-4efa-a133-c3a7f08463cf



Page 384

1     A.  I had no reason to question the competencies
2  of -- of what they were doing.
3     Q.  Did they ever appear indifferent to the safety
4  of other individuals to you?
10:32  5     A.  I don't know what you mean by "indifferent."
6     Q.  They just didn't give a damn if people got
7  hurt or if the environment was hurt?
8     A.  I don't -- I didn't see that.

Page 386

Page 385

Page 387

Worldwide Court Reporters, Inc.
(800) 745-1101

1           I, IAN LITTLE, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.
3
4    _____
       IAN LITTLE, VOLUME 2
5    Country of ENGLAND.
6    ~~STATE OF TEXAS~~    )
 ~~COUNTY~~ OF  EGHAM.   )
7    Town
8           Before me, NICHOLAS D. JAMISON.   , on
this day personally appeared IAN LITTLE, known to me, or
9    proved to me under oath or through UK Driving Licence.  )
(description of identity card or other document)), to be
10   the person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
11   same for the purposes and consideration therein
expressed.
12
       Given under my hand and seal of office on
13   this, the 14th day of  July    , 2011.
14
15   _____
16          NOTARY PUBLIC ~~IN AND FOR THE~~
       ~~STATE OF TEXAS.~~
17
My Commission Expires: On death.   ____
18
19                  14 2nd
20              July 2011.
21
22
23
24
25

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          )      MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     )      SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             )      JUDGE BARBIER
                           )      MAG. JUDGE SHUSHAN


*****************
VOLUME 1
*****************


        Deposition of John Mogford, taken at
Kirkland & Ellis International, 30 St. Mary Axe,
22nd Floor, London EC3A 8AF, England, United Kingdom,
on the 28th of June, 2011.

PURSUANT TO CONFIDENTIALITY ORDER

Page 254



Page 256

1    Q.  Okay.  And that includes the men who
2  tragically lost their lives April 20th, you -- you
3  never met any of them that you recall?
4    A.  Not as far as I'm aware.
5    Q.  Okay.  Had -- had you ever been aboard the
6  DEEPWATER HORIZON?
7    A.  No.
8    Q.  Okay.  And what about the DEEPWATER HORIZON
9  shore-base Management, do you know any individuals
10  employed by Transocean in those roles?
11    A.  Not as far as I'm aware.
12    Q.  Just throw out some names and see if you
13  recognize anyone.  Paul Johnson, you recognize that
14  name?
15    A.  No.
16    Q.  Don Winslow?
17    A.  No.
18    Q.  Buddy Trahan?
19    A.  No.
20    Q.  James Kent?
21    A.  No.
22    Q.  Okay.  Given your responses, then, I -- I
23  guess I would be correct in stating you've got no
24  evidence, based on your personal knowledge, to share
25  with the Court or a Jury about the competency or

Page 255

Page 257

1  training of the DEEPWATER HORIZON crew; is that fair?
2    A.  That's totally fair.
3    Q.  Okay.  And I -- I -- I would be correct in
4  stating that you don't intend to offer any criticism in
5  your testimony today, or at Court, if you were to come
6  to Court to testify, about the DEEPWATER HORIZON Rig
7  Management; is that true?
8    A.  I intend to ask -- answer your questions
9  fairly and completely.
10    Q.  Okay.  But -- but based on your personal
11  knowledge, you don't have any evidence that would
12  suggest --
13    A.  I told you, I don't know any of them, so --
14    Q.  Good.  I just want to make sure.  And you've
15  got no knowledge regarding the condition of the
16  DEEPWATER HORIZON Rig or it's equipment; is that true?
17    A.  None at all.
18    Q.  Okay.  Now, you left the company in June of
19  2009; is that correct?
20    A.  That's correct, yeah.
21    Q.  Okay.  And prior to the time you left, you
22  were in the role of Group Vice President of HSS&E?
23    A.  The year -- 18 months before I left -- or a
24  year before I left the company I was in charge of
25  refining and U.S. Downstream business.

23      Do you know or have you ever met any member of
24  the DEEPWATER HORIZON crew?
25    A.  Not as far as I'm aware.

PURSUANT TO CONFIDENTIALITY ORDER

f1e7a73f-33fc-4abf-b8c0-61a786bdd8bf

Page 258

1    Q.  Okay.  What was your title when you actually
2  left the company?
3    A.  Executive Vice President and COO of Refining
4  and U.S. Fuels Value Chain.
5    Q.  Okay.  And just prior to that, what was your
6  actual title?
7    A.  Executive Vice President of Safety and
8  Operations.
9    Q.  Okay.  In that role, when you were in that
10  role, did anyone ever express concerns to you about the
11  competency of the DEEPWATER HORIZON Rig crew?
12    A.  No.
13    Q.  Okay.  How about in any role that you ever had
14  with BP, did anyone ever express concerns to you about
15  the training or competency of the DEEPWATER HORIZON Rig
16  crew?
17    A.  No.
18    Q.  Okay.  In the role as Executive Vice President
19  that we were discussing, did anyone ever express
20  concerns to you about the condition of the rig or its
21  equipment?
22    A.  No.



Page 260

Page 259

Page 261

PURSUANT TO CONFIDENTIALITY ORDER

f1e7a73f-33fc-4abf-b8c0-61a786bdd8bf

373



1
2     I, JOHN MOGFORD, have read the foregoing
3 deposition and hereby affix my signature that same is
4 true and correct, except as noted on the attached
5 Amendment Sheet.

6
7     ~~JOHN MOGFORD~~

8
9 ~~THE STATE OF~~ **England & Wales** )
10     **City of London**
 ~~COUNTY OF~~ )
11
12     Before me, EMMA WILKINSON , on
 this day personally appeared JOHN MOGFORD, ~~known to me~~
13 (or proved to me ~~on the oath of~~
 ~~or~~ through UK PASSPORT )
14 to be the person whose name is subscribed to the
 foregoing instrument and executed the same for the
15 purposes and consideration therein expressed.
     GIVEN UNDER my hand and seal of office
16 day of AUGUST , 2011.
17
18     Notary Public in a
19 The ~~State~~ of CITY
20 NOTAR
21 LONDO AND
22 E NSON
23 n expires with Life)

EESWRIGHTS
NOTARIES PUBLIC

RSUANT TO CONFIDENTIALITY ORDER

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN RE:** OIL SPILL        )  MDL NO. 2179
**BY THE** OIL RIG          )
"DEEPWATER HORIZON" IN  )  SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010          )  JUDGE BARBIER
                        )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Patrick Leon
O'Bryan, Ph.D. as a Corporate Representative,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 14th day of July, 2011.

---

**2**

```
 1        A P P E A R A N C E S
 2
 3   APPEARING FOR THE PLAINTIFFS' STEERING
     COMMITTEE:
 4     Mr. Paul M. Sterbcow
       Ms. Beth Abramson
 5   LEWIS, KULLMAN, STERBCOW & ABRAMSON
       601 Poydras Street, Suite 2615
 6     New Orleans, Louisiana 70130
 7
     APPEARING FOR BP, INC.:
 8     Ms. Hariklia "Carrie" Karis
     KIRKLAND & ELLIS
 9     300 North LaSalle
       Chicago, Illinois 60654
10
       Ms. Karen K. Gase
11     Managing Attorney
       BP AMERICA INC.
12     501 Westlake Park Boulevard
       Houston, Texas 77079
13
14   APPEARING FOR TRANSOCEAN:
       Mr. Richard J. Hymel
15     PREIS & ROY
       Versailles Centre, Suite 400
16     102 Versailles Boulevard
       Lafayette, Louisiana 70501
17
       Mr. Paul C. Thibodeaux
18     FRILOT
       1100 Poydras Street, Suite 3600
19     New Orleans, Louisiana 70163
20
     APPEARING FOR ANADARKO PETROLEUM COMPANY:
21     Ms. Deborah D. Kuchler
       Mr. Thomas A. Porteous
22   KUCHLER POLK SCHELL WEINER & RICHESON
       1615 Poydras Street, Suite 1300
23     New Orleans, Louisiana 70112
24
25
```

---

**3**

```
 1   APPEARING FOR MOEX:
       Mr. Christopher J. McNevin
 2   PILLSBURY WINTHROP SHAW PITTMAN
       725 South Figueroa Street, Suite 2800
 3     Los Angeles, California 90017-5408
 4
     APPEARING FOR CAMERON INTERNATIONAL
 5   CORPORATION:
       Ms. Kathleen A. Gallagher
 6   BECK, REDDEN & SECREST
       One Houston Center
 7     1221 McKinney Street, Suite 4500
       Houston, Texas 77010-2010
 8
 9   APPEARING FOR WEATHERFORD:
       Mr. Michael G. Lemoine
10   JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
11     600 Jefferson Street, Suite 1600
       Lafayette, Louisiana 70501
12
       Ms. Sara C. Valentine
13   JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
14     201 St. Charles Avenue
       New Orleans, Louisiana 70170-5100
15
16   APPEARING FOR DRIL-QUIP, INC.:
       Mr. C. Dennis Barrow, Jr.
17   WARE, JACKSON, LEE & CHAMBERS
       America Tower, 42nd Floor
18     2929 Allen Parkway
       Houston, Texas 77019-7101
19
20   APPEARING FOR M-I SWACO:
       Mr. Steven A. Luxton
21   MORGAN, LEWIS & BOCKIUS, LLP
       1111 Pennsylvania Avenue, NW
22     Washington, D.C. 20004
23
24
25
```

---

**4**

```
 1   APPEARING FOR HALLIBURTON:
       Mr. Donald E. Godwin
 2     Ms. Stefanie K. Major
       Mr. James E. Johanns
 3   GODWIN RONQUILLO
       1201 Elm Street, Suite 1700
 4     Dallas, Texas 75270-2041
 5
     APPEARING FOR SEACOR:
 6     Mr. Jeremy T. Grabill
     WEIL, GOTSHAL & MANGES
 7     767 Fifth Avenue
       New York, New York 10153-0119
 8
 9   APPEARING FOR IAR:
       Mr. H. Carter Marshall
10   CHRISTOVICH & KEARNEY
       601 Poydras Street, Suite 2300
11     New Orleans, Louisiana 70130
12
13   APPEARING FOR THE UNITED STATES:
       Mr. A. Nathaniel Chakeres
14   U.S. DEPARTMENT OF JUSTICE
       ENVIRONMENTAL & NATURAL
15     RESOURCES DIVISION
       601 D Street, N.W.
16     Washington, D.C. 20004
17   APPEARING FOR THE STATE OF ALABAMA:
       Mr. Corey L. Maze
18     Special Deputy Attorney General
       Mr. James W. Davis
19   OFFICE OF THE ATTORNEY GENERAL
       STATE OF ALABAMA
20     501 Washington Avenue
       Montgomery, Alabama 36104
21
22   APPEARING FOR THE STATE OF LOUISIANA:
       Mr. Henry Dart
23     510 North Jefferson Street
       Covington, Louisiana 70433
24
25
```

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



17

1    Q.   Okay.  So would -- would April
2  20, 2010 have been the first and only
3  opportunity you had to visit the rig?
4    A.   As far as a scheduled visit,
5  that's correct.  I -- I could have gone out
6  if I wanted to try to make a visit prior to
7  that, but that was the first scheduled
8  opportunity.
9    Q.   Okay.  And Mr. Sims accompanied
10  you out there, if I read this correctly?
11    A.   That's correct.

5 (Pages 17 to 20)

**PURSUANT TO CONFIDENTIALITY ORDER**



21

22

23

1  these visits would occur every two months,
2  and it was a dedicated helicopter to -- to
3  take us out.  And usually on these visits,
4  there were two rigs that we would go and
5  visit, and on this particular trip we were
6  visiting the DDIII, or the HORIZON, and I was
7  asked prior to -- about a week or two prior
8  to the trip, which rig I wanted to go to, and
9  the HORIZON was a rig that I -- I selected
10 because it was, in our fleet, the
11 best-performing rig from a safety and a
12 drilling performance standpoint,
13 best-performing rig in the fleet, and it also
14 was one of the better-performing rigs in the
15 Transocean fleet.  And so being new to the
16 role and having -- this being my first trip
17 offshore, I wanted to go out and visit and
18 see kind of what "good" looked like, based
19 upon, you know, the -- the performance and
20 the safety on the rig and -- and discuss the
21 culture and -- and kind of what was, you
22 know -- what made them successful.

24

17    Q.    All right.  My understanding is,
18 is that you went to the rig to actually -- I
19 don't know if it's present an award, but to
20 acknowledge the rig crew for safe practices;
21 is that fair?
22    A.    No.  The -- the visit that I
23 went on, we have regularly scheduled rig
24 visits by Leadership for both -- not only BP
25 but also Transocean.  And this particular --

PURSUANT TO CONFIDENTIALITY ORDER

473

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN  )  SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010        )  JUDGE BARBIER
                      )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Continuation of the deposition
of Patrick Leon O'Bryan, Ph.D. as a Corporate
Representative, taken at Pan-American
Building, 601 Poydras Street, 11th Floor, New
Orleans, Louisiana, 70130, on the 15th day of
July, 2011.

---

474

```
 1        A P P E A R A N C E S
 2
 3   APPEARING FOR THE PLAINTIFFS' STEERING
     COMMITTEE:
 4     Mr. Paul M. Sterbcow
       LEWIS, KULLMAN, STERBCOW & ABRAMSON
 5     601 Poydras Street, Suite 2615
       New Orleans, Louisiana 70130
 6
     APPEARING FOR BP, INC.:
 7     Ms. Hariklia "Carrie" Karis
       KIRKLAND & ELLIS
 8     300 North LaSalle
       Chicago, Illinois 60654
 9
     APPEARING FOR TRANSOCEAN:
10     Mr. Richard J. Hymel
       PREIS & ROY
11     Versailles Centre, Suite 400
       102 Versailles Boulevard
12     Lafayette, Louisiana 70501
13     Mr. Paul C. Thibodeaux
       FRILOT
14     1100 Poydras Street, Suite 3600
       New Orleans, Louisiana 70163
15
     APPEARING FOR ANADARKO PETROLEUM COMPANY:
16     Ms. Deborah D. Kuchler
       Mr. Thomas A. Porteous
17     KUCHLER POLK SCHELL WEINER & RICHESON
       1615 Poydras Street, Suite 1300
18     New Orleans, Louisiana 70112
19     Mr. Warren Anthony Fitch
       BINGHAM MCCUTCHEN
20     2020 K Street, Northwest
       Washington, D.C. 20006-1806
21
     APPEARING FOR MOEX:
22     Mr. Christopher J. McNevin
       PILLSBURY WINTHROP SHAW PITTMAN
23     725 South Figueroa Street, Suite 2800
       Los Angeles, California 90017-5408
24
25
```

---

475

```
 1   APPEARING FOR CAMERON INTERNATIONAL
     CORPORATION:
 2     Ms. Kathleen A. Gallagher
       BECK, REDDEN & SECREST
 3     One Houston Center
       1221 McKinney Street, Suite 4500
 4     Houston, Texas 77010-2010
 5   APPEARING FOR WEATHERFORD:
       Mr. Michael G. Lemoine
 6     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
 7     600 Jefferson Street, Suite 1600
       Lafayette, Louisiana 70501
 8
       Mr. Wayne G. Zeringue, Jr.
 9     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
10     201 St. Charles Avenue
       New Orleans, Louisiana 70170-5100
11
       Mr. Brett S. Venn
12     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
13     201 St. Charles Avenue
       New Orleans, Louisiana 70170-5100
14
15   APPEARING FOR DRIL-QUIP, INC.:
       Ms. Margaret Bryant
16     WARE, JACKSON, LEE & CHAMBERS
       America Tower, 42nd Floor
17     2929 Allen Parkway
       Houston, Texas 77019-7101
18   APPEARING FOR M-I SWACO:
       Mr. Lucas T. Elliot
19     MORGAN, LEWIS & BOCKIUS, LLP
       1000 Louisiana Street, Suite 4200
20     Houston, Texas 77002-5006
21   APPEARING FOR HALLIBURTON:
       Mr. Donald E. Godwin
22     Ms. Stefanie K. Major
       Ms. Jenny L. Martinez
23     Mr. James E. Johanns
       Mr. Jon-Bernard Schwartz
24     GODWIN RONQUILLO
       1201 Elm Street, Suite 1700
25     Dallas, Texas 75270-2041
```

---

476

```
 1     Ms. Gwen E. Richard
       GODWIN RONQUILLO
 2     1331 Lamar, Suite 1665
       Houston, Texas 77010-3133
 3
     APPEARING FOR SEACOR:
 4     Mr. Jeremy T. Grabill
       WEIL, GOTSHAL & MANGES
 5     767 Fifth Avenue
       New York, New York 10153-0119
 6
     APPEARING FOR THE UNITED STATES:
 7     Mr. A. Nathaniel Chakeres
       U.S. DEPARTMENT OF JUSTICE
 8     ENVIRONMENTAL & NATURAL
       RESOURCES DIVISION
 9     601 D Street, N.W.
       Washington, D.C. 20004
10
     APPEARING FOR THE STATE OF LOUISIANA:
11     Mr. Henry Dart
       510 North Jefferson Street
12     Covington, Louisiana 70433
13     Ms. Phyllis E. Glazer
       Assistant Attorney General
14     Litigation Division
       LOUISIANA DEPARTMENT OF JUSTICE
15     400 Poydras Street, Suite 1600
       New Orleans, Louisiana 70130-3220
16
       Mr. Lambert J. "Joe" Hassinger, Jr.
17     GALLOWAY, JOHNSON, TOMPKINS, BURR
       AND SMITH
18     701 Poydras Street, 40th Floor
       New Orleans, Louisiana 70139
19
     APPEARING FOR PATRICK LEON O'BRYAN, PH.D.:
20     Mr. Richard T. Simmons, Jr.
       Mr. W. Glenn Burns
21     HAILEY, MCNAMARA, HALL, LARMANN & PAPALE
       One Galleria Boulevard, Suite 1400
22     Metairie, Louisiana 70001
23
     ALSO PRESENT:
24     Mr. Mark Hendrix, Videographer
25
```

1 (Pages 473 to 476)

**PURSUANT TO CONFIDENTIALITY ORDER**



14    Q.    Okay.  With regard to
15  Mr. Winslow, since you knew him, did you ever
16  experience any indication that he was
17  indifferent or callous towards safe --
18  towards the safety of individuals or the
19  environment?
20    A.    Not at all.
21    Q.    Okay.  You'd agree it was just
22  the opposite?
23    A.    I -- I -- I never heard him say
24  anything that led me to believe that he
25  wasn't totally focused on safety and -- and

**PURSUANT TO CONFIDENTIALITY ORDER**

481

1  the environment.
2      Q.   Okay.  Did you ever experience
3  any indication that anyone with Transocean
4  was indifferent or callous towards the safety
5  of individuals or the environment?
6      A.   No.  I've had good working
7  relationships with many folks at Transocean.

482

3      Q.   On April 20th, 2010, were you
4  aware of any problems with the BOP?
5      A.   None that I was aware of, no.
6      Q.   Did anybody at BP ever tell you
7  that the BOP was not functioning properly?
8      A.   No.
9      Q.   Did anybody at BA -- BP ever
10 tell you that the BOP had not been properly
11 maintained?
12     A.   No.
13     Q.   You slept on that rig while the
14 BOP was on the seabed, correct?
15     A.   No, I never did get a chance --
16     Q.   Oh, that's true.
17     A.   -- to go to sleep.
18     Q.   You didn't get a chance to sleep
19 on the rig.  Good point --
20     A.   I was just about to go to bed,
21 but --
22     Q.   Yeah.
23     A.   -- circumstances changed.
24     Q.   Good point.
25          You testified yesterday that the

483

1  DEEPWATER HORIZON was the best-performing rig
2  in BP's fleet; is that correct?
3      A.   That's correct.
4      Q.   And both from a performance
5  standpoint and a safety standpoint?
6      A.   That's correct.
7      Q.   You remember giving an interview
8  with the Bly Team on April 24th of 2010?
9      A.   I believe it was Saturday
10 morning, if that was the 24th.  I think it
11 was the 25th.
12     Q.   And in that interview, there's
13 notes written by someone -- I can't remember
14 exactly who -- who the notes were.  But the
15 notes basically say that the DEEP --
16 DEEPWATER HORIZON was the best-performing rig
17 and safest.  It represented what good looks
18 like.
19          Is that something that you
20 recall telling the --
21     A.   That's --
22     Q.   -- Bly Investigators?
23     A.   That's correct.  That's the
24 reason why I visited the rig on this
25 particular rig visit.

484

20          One of the reasons you wanted to
21 go out to the DEEPWATER HORIZON was to look
22 at the culture and so forth to determine how
23 they did what they did, so you could apply it
24 to other BP rigs?
25     A.   That's correct.



3 (Pages 481 to 484)

**PURSUANT TO CONFIDENTIALITY ORDER**

485

1     Q.    Turn to Tab 3, please.  Tab 3 is
2  a PowerPoint Presentation.  I believe it was
3  cre -- created by Mr. Sims.  Do you recall
4  who created this PowerPoint Presentation?
5     A.    I don't know who created it, but
6  I believe that this is the PowerPoint
7  Presentation -- can I look at it real quick?
8     Q.    Sure.
9     A.    (Reviewing document.) I believe
10 this is the -- the presentation that David
11 gave me some datapoints or -- presentation or
12 around -- for our rig visit out to the
13 HORIZON.
14    Q.    Okay.
15    A.    I don't know who -- I don't know
16 if he was the one that personally put it
17 together, though.
18    Q.    All right.  The document is
19 BP-HZN-MBI00129014, and I want you to turn to
20 the third page, where it talks about "Talking
21 Points for the Horizon Rig Visit," and
22 there's a number of things listed there
23 that -- "Hallmarks of Horizon team," and the
24 first one is:  "Genuine concern for the
25 health, safety and environment - not just

487

1  to speed from his thoughts.



486

1  ticking the box."  Did you agree with that?
2     A.    That was one of the things
3  that -- from David's perspective, that was
4  one of the things he felt like that they had.
5  And -- and, again, that was what I wanted to
6  go out and visit with the Team about.
7     Q.    Okay.  So these -- the -- the
8  statements in here are -- are David's
9  perspectives, and you wanted to go out to
10 the -- to the rig to determine whether they
11 were, in fact, true?
12    A.    Yes.  As I said yesterday and
13 have said throughout all of this, I had the
14 opportunity to go to either the DDIII or the
15 HORIZON, and I wanted to go out to the
16 HORIZON because it was the best-performing
17 rig we had, from a safety and a drilling
18 performance standpoint, and wanted to
19 understand -- again, as any Leader, I think,
20 would -- what good looks like, so that we can
21 apply lessons to our other rigs.
22    Q.    Okay.
23    A.    And so these were his -- his
24 things that he put together to kind of
25 facilitate the conversation and bring me up

488



**PURSUANT TO CONFIDENTIALITY ORDER**

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL         )    MDL NO. 2179
BY THE OIL RIG          )
"DEEPWATER HORIZON" IN   )    SECTION "J"
THE GULF OF MEXICO, ON   )
APRIL 20, 2010           )    JUDGE BARBIER
                         )    MAG. JUDGE SHUSHAN

*********************************************
ORAL AND VIDEOTAPED DEPOSITION OF
VINCENT PRICE
JUNE 20, 2011
*********************************************

Deposition of VINCENT PRICE, taken at Pan
American Life Center, 601 Poydras Street, Room
Bayou 1/2, New Orleans, Louisiana, on the 20th of June,
2011.

**2**

1   A P P E A R A N C E S
2
3   APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
4       Mr. Michael C. Palmintier
        Mr. Jonathan Williams
        DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGÉ
5       618 Main Street
        Baton Rouge, Louisiana 70801-1910
6
7   APPEARING FOR BP, INC.:
        Mr. Walter R. Lancaster
8       KIRKLAND & ELLIS
        333 South Hope Street
        Los Angeles, California 90071
9
10      Ms. Alyssa Qualls
        KIRKLAND & ELLIS
        300 North LaSalle
11      Chicago, Illinois 60654
12  APPEARING FOR TRANSOCEAN:
        Mr. Paul C. Thibodeaux
13      Ms. Mary K. Klinefelter
        FRILOT
14      1100 Poydras Street, Suite 3600
        New Orleans, Louisiana 70163
15
16  APPEARING FOR ANADARKO PETROLEUM COMPANY:
        Mr. Patrick A. Harvey
17      Mr. Warren Anthony Fitch
        BINGHAM MCCUTCHEN
        2020 K Street, Northwest
18      Washington, D.C. 20006-1806
19  APPEARING FOR HALLIBURTON:
        Mr. Gavin Hill
20      Mr. Prescott Smith
        GODWIN RONQUILLO
21      1201 Elm Street, Suite 1700
        Dallas, Texas 75270-2041
22
        Ms. Carmelite M. Bertaut
23      Ms. Lauren Godshall
        STONE PIGMAN WALTHER WITTMAN
24      546 Carondelet Street
        New Orleans, Louisiana 70130-3588
25

**3**

1   A P P E A R A N C E S (Continued)
2
3   APPEARING FOR WEATHERFORD:
        Mr. Wayne G. Zeringue, Jr.
4       JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
        DENEGRE, L.L.P.
5       201 St. Charles Avenue
        New Orleans, Louisiana 70170
6
    APPEARING FOR DRIL-QUIP, INC.:
7       Ms. Margaret Bryant
        WARE, JACKSON, LEE & CHAMBERS
8       America Tower, 42nd Floor
        2929 Allen Parkway
9       Houston, Texas  77019-7101
10  APPEARING FOR MOEX OFFSHORE 2007, L.L.C., and MOEX USA:
        Mr. Edward Flanders
11      PILLSBURY
        1540 Broadway
12      New York, New York  10036
13  APPEARING FOR M-I SWACO:
        Mr. John C. Funderburk
14      MORGAN, LEWIS & BOCKIUS, L.L.P.
        1000 Louisiana Street, Suite 4000
15      Houston, Texas 77002-5006
16  APPEARING FOR THE UNITED STATES:
        Mr. Stephen G. Flynn
17      U.S. DEPARTMENT OF JUSTICE
        TORT BRANCH, CIVIL DIVISION
18      1425 New York Avenue, N.W.
        Suite 10100
19      Washington, D.C.  20005
        Post Office Box 14271
20      Washington, D.C.  20044-4271
21  APPEARING FOR BOB KALUZA:
        Mr. Dane Ball
22      GERGER & CLARKE
        1001 Fannin Street, Suite 1950
23      Houston, Texas  77002
24  ALSO PRESENT:
        Mr. Mark Hendrix, Videographer
25

**4**

1                   INDEX
2
    VIDEOTAPED ORAL DEPOSITION OF
3               VINCENT PRICE
            JUNE 20, 2011
4
5                               PAGE
    Appearances . . . . . . . . . . . . . . . . .  2
6
    VINCENT PRICE
7   Examination by Mr. Palmintier . . . . . . . . . .  6
    Examination by Mr. Thibodeaux . . . . . . . . . 130
8   Examination by Mr. Hill . . . . . . . . . . 184
    Examination by Mr. Fitch . . . . . . . . . 235
9   Examination by Mr. Flanders . . . . . . . . . 240
    Further Examination by Mr. Palmintier . . . . . . . 242
10
    Signature and changes . . . . . . . . . . . . . 290
11  Reporter's Certificate . . . . . . . . . . . . . 292
12
13                  EXHIBITS
14                               PAGE
    EXHIBIT NO. 3056 . . . . . . . . . . . . . . . 185
15      Module 1: Weather; Location: Deepwater
        Horizon; Dates of Observation: 3/31/2010 -
        4/14/2010; Candidate: Vincent Price; Mentor
16      or WSL: Earl Lee, Murray Sepulvado, Ronnie
        Sepulvado; Coach: Martin Breazeale;
17      BP-HZN-2179MDL02307175,07176,07178, 07180
        07182
18
    EXHIBIT NO. 3057 . . . . . . . . . . . . . . . 185
19      April 10, 2010 E-mail from Murry Sepulvado
        with attachment; BP-HZN-2179MDL02307033 -
20      07035
21  EXHIBIT NO. 3058 . . . . . . . . . . . . . . . 201
        Deepwater Cementing Guidelines;
22      BP-HZN-2179MDL00779762 - 79794
23  EXHIBIT NO. 3059 . . . . . . . . . . . . . . . 223
        Gulf of Mexico SPU; Recommended Practice
24      for Cement Design and Operations in DW GoM;
        BP-HZN-2179MDL02222199 - 22234
25

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



18   Q.        In your time on the -- on the Deepwater
19   Horizon, you had an opportunity to get to know some of
20   the Transocean personnel on the rig, correct?
21   A.  That's correct, yeah.
22   Q.  Did you know Paul Johnson?
23   A.  Name doesn't -- doesn't strike -- ring a bell
24   with me.
25   Q.  You didn't know Paul Johnson.  Do you know

34 (Pages 133 to 136)

**PURSUANT TO CONFIDENTIALITY ORDER**



137

1    **Jimmy Harrell?**
2    A.  I do.
3    **Q.  And -- and who was Jimmy?**
4    A.  He was the -- one of the OIMs.
5    **Q.  Okay.  Do you know Randy Ezell?**
6    A.  I know the name.  I've never met the guy.
7    **Q.  Do you know what his job was?**
8    A.  If I'm not mistaken, he was a tool pusher,
9    senior tool pusher, something like that.
10   **Q.  Do you know Jason Anderson?**
11   A.  I just know the name.  I never met him.
12   **Q.  Never met him.  Do you know Dewey Revette?**
13   A.  I do.
14   **Q.  What was his job?**
15   A.  He was a driller.
16   **Q.  Do you know Stephen Curtis?**
17   A.  I do.
18   **Q.  What was his job?**
19   A.  He was an assistant driller.
20   **Q.  Do you know Don Clark?**
21   A.  Yes.
22   **Q.  What was his job?**
23   A.  Assistant driller.
24   **Q.  Do you know Captain Kuchta?**
25   A.  "Curt," is that --

139

11   **Q.  Okay.  And you never raised any issues with --**
12   **with anybody from Transocean regarding any of the rig**
13   **crew, correct?**
14   A.  I did not.
15   **Q.  No member of the Transocean rig crew while you**
16   **were on board the Deepwater -- Deepwater Horizon**
17   **exhibited behavior that led you to believe that they**
18   **were callus or indifferent as to the safety of**
19   **individuals or the environment, correct?**
20   A.  That is correct.

138

1    **Q.  Yeah.**
2    A.  Yes.
3    **Q.  "Captain Curt."  Okay.  In your time that you**
4    **spent on the Deepwater Horizon, you were comfortable**
5    **with the comp- -- competency of the rig crew, correct?**
6    A.  I was.
7    **Q.  You didn't have any complaints about the --**
8    **the gentlemen I just mentioned, correct?**
9    A.  The ones that I know, I didn't have any
10   complaints.  The ones that I haven't met, I don't have
11   an opinion one way or the other.
12   **Q.  Okay.  As a well site leader, in fact, if you**
13   **weren't comfortable with the competency of anyone on**
14   **board the Deepwater Horizon, you could have shut the job**
15   **down, correct?**
16   A.  As a Well Site Leader of the Future on board
17   the Deepwater Horizon, yes.

140

**PURSUANT TO CONFIDENTIALITY ORDER**



141

143

15    Q.        So when you left the rig on
16  approximately April 11th, 2010 you weren't aware of any
17  outstanding safety critical audit items that had not
18  been addressed yet, correct?
19      A.   That's correct.

142

144

**PURSUANT TO CONFIDENTIALITY ORDER**

291

1          I, VINCENT PRICE, have read the foregoing

deposition and hereby affix my signature that same is

2 true and correct, except as noted above.

3

4               _____

               VINCENT PRICE

5

6 STATE OF T E X A S       )

  COUNTY OF _Victoria____ )

7

8          Before me, _Michael Ashton_____, on

this day personally appeared VINCENT PRICE, known to me,

9 or proved to me under oath or through

  ___TXDL_____} (description of identity card or

10 other document)), to be the person whose name is

subscribed to the foregoing instrument and acknowledged

11 to me that they executed the same for the purposes and

consideration therein expressed.

12

         Given under my hand and seal of office on

13 this, the _1_ day of _August_____, _2011_.

14

15

      _____

16       NOTARY PUBLIC IN AND FOR THE

      STATE OF TEXAS

17

My Commission Expires: _6/20/2012_____

18

19

20           MICHAEL ASHTON

          Notary Public, State of Texas

          My Commission Expires

21           June 20, 2012

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

In Re: OIL SPILL by the "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010                                   Reported by:
DAVID A. RICH                      June 1, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 1

            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA


    IN RE:  OIL SPILL     MDL NO. 2179
    BY THE OIL RIG
    "DEEPWATER HORIZON"   SECTION:   J
    IN THE GULF OF
    MEXICO, ON APRIL      JUDGE BARBIER
    20, 2010              MAG. JUDGE SHUSHAN




        Deposition of DAVID A. RICH, taken
    in the Pan American Life Center, Bayou
    Room, 11th Floor, 601 Poydras Street, New
    Orleans, Louisiana 70130, on Wednesday,
    June 1, 2011.


    APPEARANCES:



        LEGER & SHAW
        (By:  Walter J. Leger Jr., Esquire
              and Christine E. Sevin,
              Esquire)
        600 Carondelet Street
        Suite 900
        New Orleans, Louisiana  70130-3519
            (Attorneys for Plaintiff's
             Steering Committee)

In Re: OIL SPILL by the "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010          Reported by:
DAVID A. RICH          June 1, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 378

18     Q.   Specifically, are you aware of
19  any evidence that would support a
20  conclusion that any Transocean employee or
21  manager involved in the Macondo Prospect
22  ever deliberately wanted to cause injury to
23  the environment or any person?
24     A.   Can you repeat the question
25  again?  They're kind of getting all rolled

Page 379

1   into the same thing.
2      Q.   Well, it is.  It's the same
3   question, but this is specifically limited
4   to Transocean employees or management.
5      A.   Sure.  Okay.
6      Q.   Are you aware of any evidence
7   that would support a conclusion that any
8   Transocean employee or manager deliberately
9   wanted to cause injury to the environment
10  or to any person?
11     A.   No, sir.
12     Q.   Same question with regard to any
13  Transocean employee or manager acting
14  maliciously, or not caring about causing
15  injury to another human or the environment?
16     A.   No, sir.
17     Q.   The same question with regard to
18  any Transocean employee or manager
19  willfully inflicting harm on any person or
20  on the environment?
21     A.   No, sir.

Page 380

Page 381

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile: (504) 525-9109

fcef76a1-133f-42a1-877a-ea5d46bee3c5

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL     )   MDL NO. 2179
by the  OIL RIG,     )
DEEPWATER HORIZON in  )   SECTION "J"
the GULF OF MEXICO,   )
April 20, 2010     )   JUDGE BARBIER
                   )
                   )   MAG. JUDGE
                   )   SHUSHAN

***************

VIDEOTAPED DEPOSITION OF ANGEL RODRIGUEZ

Deposition of Angel Rodriguez, taken
at the Hilton Conference Center, 333 St. Charles
Avenue, New Orleans, Louisiana, 70130, on Friday,
July 29, 2011.

REPORTED BY:
    MELISSA L. MAGEE, CSR, RPR, RMR
    Certified Shorthand Reporter
    Registered Professional Reporter
    Registered Merit Reporter

---

2

1       A P P E A R A N C E S
2   Mr. Jim E. Lavine
    ZIMMERMANN, LAVINE
3   770 South Post Oak Lane, Suite 620
    Houston, Texas  77056
4       APPEARING FOR THE WITNESS
5   Mr. Jonh W. deGravelles
    DEGRAVELLES PALMINTIER, HOLTHAUS & FRUGE
6   618 Main Street
    Baton Rouge, Louisiana 70801
7       APPEARING FOR THE
        PLAINTIFFS' STEERING COMMITTEE
8
    Mr. Paul Collier
9   Ms. Emily Dempsey
    KIRKLAND & ELLIS
10  300 North LaSalle Street
    Chicago, Illinois  60654
11      APPEARING FOR BP, INC.
12  Ms. Marilee J. Allan
    BINGHAM MCCUTCHEN, LLP
13  Three Embarcadero Center
    San Francisco, California  94111
14      APPEARING FOR ANADARKO
15  Mr. Robert Kallam
    PREIS & ROY
16  601 Poydras Street, Suite 1700
    New Orleans, Louisiana  70130
17      APPEARING FOR TRANSOCEAN
18  Mr. Daniel Johnson
    SUTHERLAND ASBILL & BRENNAN, LLP
19  First City Tower
    1001 Fannin, Suite 3700
20  Houston, Texas  77002
        APPEARING FOR TRANSOCEAN
21
    Mr. Gavin Hill
22  GODWIN RONQUILLO
    1201 Elm Street, Suite 1700
23  Dallas, Texas 75270-2041
        APPEARING FOR HALLIBURTON
24
25

---

3

1   Mr. Alex Roberts
    BECK REDDEN & SECREST
2   One Houston Center
    1221 McKinney Street, Suite 4500
3   Houston, Texas  77010
        APPEARING FOR CAMERON
4
    Mr. Lucas Elliot
5   Ms. Lauren Mitchell
    MORGAN LEWIS
6   1000 Louisiana Street, Suite 400
    Houston, Texas  77002
7       APPEARING FOR M-I SWACO
8   Ms. Wendy Ware Bishop
    WARE JACKSON LEE & CHAMBERS
9   2929 Allen Parkway, 42nd Floor
    Houston, Texas  77019
10      APPEARING FOR DRIL-QUIP
11  Mr. Henry Dart
    ATTORNEYS AT LAW
12  510 North Jefferson Street
    Covington, Louisiana  70443
13      APPEARING FOR STATE OF LOUISIANA
14  Mr. Micheal Cangelois
    GIEGER LABORDE
15  701 Poydras Street, Suite 480
    New Orleans, Louisiana  70139
16      APPEARING FOR DYNAMIC AVIATION
17  Mr. Andy Dupre
    FLANAGAN PARTNERS, LLP
18  201 St. Charles Avenue, Ste 2405
    New Orleans, Louisiana  70170
19      APPEARING FOR DRC
20  Mr. Lance Wenger
    Attorney-Advisor
21  Office of the Solicitor
    U.S. DEPARTMENT OF THE INTERIOR
22  755 Parfet Street, #151
    Lakewood, Colorado  80226
23      APPEARING FOR UNITED STATES
24  ALSO PRESENT:
25  Kayla Barnes, Videographer

---

4

1

INDEX

2       PAGE

3   Style Page.................................. 1
4   Appearances Page............................ 2
5   Index Page.................................. 4
6   Exhibits Page............................... 4
7

Examination of Angel Rodriguez:
8       By Mr. deGravelles.............. 6
        By Mr. Dart.................... 97
9       By Mr. Johnson................. 132
        By Ms. Allan.................. 193
10      By Mr. Collier................ 203
        By Mr. deGravelles............. 205
11

Witness' Certificate..................... 226
12

Reporter's Certificate................... 228

---

**PURSUANT TO CONFIDENTIALITY ORDER**



133

134

2      Q.   Now, I understand from your
3   testimony earlier today that you had been on the
4   Deepwater Horizon on two occasions.  Is that
5   right, sir?
6      A.   That is correct.
7      Q.   Once in October of 2009 and then
8   again in late March 2010; is that right?
9      A.   That is correct.
10      Q.   Okay.  Did you ever sleep on the
11   rig?  In other words, were they just day trips,
12   or did you spend the night?
13      A.   We spent the night on both
14   occasions.
15      Q.   Okay.  Did you feel safe when you
16   were onboard the rig, sir?
17      MR. DART: Objection to form.
18      COURT REPORTER: I'm sorry?
19      MR. DART: Object to the form.
20      COURT REPORTER: Remind me your name,
21   please.
22      MR. DART: Dart.
23      THE WITNESS: Yes.
24   BY MR. JOHNSON:
25      Q.   Okay.  When you boarded the rig, did

135

1   you receive an orientation?
2      A.   On my October visit, yes.
3      Q.   And that's because that was your
4   first time on the trip, and you understand, then,
5   when people board the rig for the first time,
6   they have to go through an orientation, right?
7      A.   Yes.  That's Transocean's policy.
8      Q.   Okay.  In your view, was that
9   orientation conducted in a professional manner?
10      A.   Yes.
11      Q.   As part of that orientation, were
12   you provided information regarding emergency and
13   evacuation procedures on the rig?
14      A.   Yes.  We were given a pamphlet with
15   regards to what state room we were in and which
16   were our primary and secondary lifeboat stations.
17      Q.   Okay.  And were you satisfied from
18   that orientation, including the materials that
19   you got, that those procedures were thorough and
20   that they prepared you in the event there was an
21   emergency on the rig?
22      A.   Yes.
23      Q.   Okay.  Now, in your two experiences
24   on the rig, did you ever see what you considered
25   to be what you felt was an unsafe operation that

136

1   endangered yourself or any of the members on the
2   rig?
3      A.   No.
4      Q.   Did you ever see any member of the
5   Deepwater Horizon crew acting in a way that was
6   reckless with regard to the safety of other human
7   beings?
8      A.   I did not see that behavior.
9      Q.   I'm going to go through a series of
10   these questions, and I appreciate your patience.
11   They may sound somewhat similar, but they're
12   going to be a little different.  So if you have
13   any questions about them, let me know.
14      A.   I sure will.
15      Q.   How about with respect to the
16   environment, did you ever see a member of the
17   crew acting recklessly toward the environment in
18   any way?
19      A.   No, sir.
20      Q.   Have you ever heard anyone at BP say
21   that they saw any member onboard the Deepwater
22   Horizon act in a way that was reckless with
23   regard to the safety of other human beings?
24      A.   No, sir.
25      Q.   And is the same true with respect to

**PURSUANT TO CONFIDENTIALITY ORDER**

137

1    the environment, never heard anyone say that --
2    anything about environment, either; is that
3    right?
4        A.    That is correct.
5        Q.    Okay.  Now, on any of your -- on
6    your two visits to the Deepwater Horizon, did you
7    ever see any member of the Deepwater Horizon crew
8    act with what you would regard as malice or
9    indifference towards the safety of other human
10   beings?
11       MR. HILL:  Object to the form.
12       THE WITNESS:  No.
13   BY MR. JOHNSON:
14       Q.    And same with respect to the
15   environment, did you ever see any member of the
16   Deepwater Horizon crew on your visits act in a
17   way that you would consider characterized as
18   malice or indifference toward the environment?
19       MR. HILL:  Object to the form.
20       THE WITNESS:  No.
21   BY MR. JOHNSON:
22       Q.    Did ever anyone characterize any
23   action on any member of the Deepwater Horizon
24   crew in such a way that it would be considered
25   malicious or indifferent toward the safety of

138

1    other human beings?
2        A.    No.
3        MR. HILL:  Object to the form.
4    BY MR. JOHNSON:
5        Q.    And what about environment, did you
6    ever hear anybody say that?
7        MR. COLLIER:  Object to the form.
8        THE WITNESS:  Can I just clarify this?
9    This is pertaining to my visits?
10   BY MR. JOHNSON:
11       Q.    Yeah.  Did you ever hear anyone else
12   say that?
13       A.    No.
14       Q.    Okay.  Now, I know during your
15   visits, you had the opportunity to interact with
16   some members of the Deepwater Horizon crew.  Is
17   that right?
18       A.    That is correct.
19       Q.    Okay.  And had you ever had occasion
20   to meet a gentleman by the name of Jimmy Harrell?
21       A.    Yes.  He was the OIM --
22       Q.    Okay.
23       A.    -- at the time.
24       Q.    Was he the OIM on both of your -- in
25   other words, was he the OIM onboard the rig

139

1    during both of your visits?
2        A.    It so happened, yes.
3        Q.    Okay.  I mean, I know that there's
4    different hitches, and so --
5        A.    Absolutely.
6        Q.    -- just wanted to clarify.  He was
7    the one out there during both trips, as best you
8    recall?
9        A.    That is correct.
10       Q.    Okay.  Did he seem professional in
11   your interactions with him?
12       A.    Yes.
13       Q.    Okay.  Did he strike you as
14   knowledgeable about his job in the manner in
15   which he interacted with you?
16       A.    Can you -- can you just rephrase
17   that question?
18       Q.    Yes.
19       A.    Specify it.
20       Q.    Yeah.  Just -- and I know you may
21   not know all the aspects of his job, and I
22   wouldn't ask you to comment on that.  But just in
23   his dealings with you and any discussions you had
24   about the rig, did he seem knowledgeable?
25       MR. DART:  Object to the form.

140

1        THE WITNESS:  In my conversations with him
2    concerning the marine items, I felt he was
3    knowledgeable.
4    BY MR. JOHNSON:
5        Q.    Okay.  Did he ever strike you as
6    nonchalant about safety or acted as if he didn't
7    care about safety?
8        A.    I did not observe that behavior from
9    him.
10       Q.    In terms of the audit work and the
11   follow-up issues that you were on the rig for, in
12   your interactions with him, did you feel as if
13   those were issues that were important to him?
14       A.    In my dealings with not only the OIM
15   and the captain and the rest of the staff
16   onboard, I did not see any indication that they
17   did not take the findings -- the marine findings
18   serious.  They were really intent on addressing
19   those findings.
20       Q.    What about -- did you ever have
21   occasion -- and I appreciate that response, and
22   it was broader than the OIM.  I'm going to ask
23   about some specific people, and you may have
24   meant to address them in that answer.
25       A.    Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

141

1     Q.    I just wanted to clarify for the
2 record.
3     A.   Understood.
4     Q.    Did you ever have occasion to
5 interact with a person named Curt Kuchta?
6     A.   Yes.  He was the captain.
7     Q.    Okay.  Do you recall if he was the
8 captain -- because I know there are different
9 hitches.
10     A.   Sure.
11     Q.    Was he onboard the rig during both
12 of your visits, the one in October and then the
13 one in March?
14     A.   Yes, he was.
15     Q.    Okay.  So just coincidentally, he
16 happened to be there on both of those visits,
17 like Jimmy Harrell was, right?
18     A.   Correct, sir.
19     Q.    Okay.  And based on your
20 interactions with Captain Kuchta, did you find
21 him to be professional?
22     A.   Yes, he was professional.
23     Q.    In your interactions with him -- and
24 I'm not asking you to comment about anything
25 broader than that.  Just based on your

142

1 interactions with him, did you find him to be
2 someone that struck you as knowledgeable about
3 his job?
4     A.   Yes.
5     Q.    Okay.  Based on your interactions
6 with him, did you ever have any reason to believe
7 that safety was something that wasn't important
8 to Captain Kuchta?
9     A.   No, I did not observe that behavior
10 from him.
11     Q.    And the same question I asked with
12 respect to the OIM Jimmy Harrell, in the context
13 of your interactions with Captain Kuchta with
14 your -- with the follow-up efforts and verifying
15 that certain items in the audits were closed out,
16 did you find Captain Kuchta's approach to those
17 issues to reflect that he considered them
18 important?
19     A.   Yes.
20     Q.    Okay.  Based on your personal
21 interactions -- and I understand he was on the
22 rig during your two visits.
23     A.   Yes.
24     Q.    And then as I understood your
25 testimony -- and there may be some documents that

143

1 suggest this we'll go through in a minute.  But
2 you had some interactions with him beyond just
3 those two visits on the rig; is that fair?
4     A.   Yeah.  On several occasions, I would
5 get updates from him via telephone --
6     Q.    Okay.
7     A.   -- after some of the morning
8 meetings that were held at the office.
9     Q.    And some of those updates, those
10 would have been -- because you made two visits
11 out rig, one in October, one in late March.
12 These were updates in between those periods so
13 that --
14     A.   That is correct.
15     Q.    -- you could keep tabs on the
16 progression of closing items out.  Is that a fair
17 characterization?
18     A.   That is a fair characterization,
19 yes.
20     Q.    In any of your interactions with
21 Captain Kuchta, either on the rig or in
22 conversations with him, was there ever anything
23 that led you to question his competency or
24 fitness for the job?
25     A.   No.

144

1     Q.    Now, more generally --
2     A.   Okay.
3     Q.    During your experiences with the rig
4 management, did you feel confident that the
5 people in charge of the rig, whether Captain
6 Kuchta, Jimmy Harrell, or the shore-based
7 management, Paul Johnson, who I think you said
8 you had interacted with, did you, in your
9 interactions with them, feel that this rig was
10 being managed by people that were safety
11 conscious?
12     MR. COLLIER:  Object to the form.
13     THE WITNESS:  They were safety conscious.
14 BY MR. JOHNSON:
15     Q.    Now, I want to ask you a little bit
16 about the crew of the Deepwater Horizon.  And I
17 know that you're not going to know every member
18 of the crew, and there will be some aspects of
19 the Deepwater Horizon crew which you may not have
20 any knowledge of.  And so if I ask you something
21 that you don't have any knowledge of, I know
22 you'll tell me.
23     A.   Okay.
24     Q.    But I think, based on your testimony
25 earlier today and some of the documents that I've

**PURSUANT TO CONFIDENTIALITY ORDER**

145

1  read, you had occasion to deal not only with
2  Mr. Harrell and Captain Kuchta --
3      A.   Yes.
4      Q.   -- and Paul Johnson, but I think
5  that you also -- and you tell me if I'm wrong.  I
6  think you also had occasion to deal with the
7  chief mate and the maintenance supervisor.  Is
8  that right?
9      A.   Can you state their names?
10     Q.   Well, do you recall any of the names
11 of any of the individuals beyond those that we've
12 talked about?
13     A.   I remember interacting with Michael
14 Dowd, who was the chief mate.
15     Q.   All right.  Do you remember
16 interacting with a gentleman named Steve Bertone
17 at any time?
18     A.   I don't recall, sir.
19     Q.   Okay.
20     A.   I do not recall.
21     Q.   If I suggested to you that the
22 maintenance supervisor was a gentleman named
23 Steve Bertone, does that refresh your memory at
24 all?
25     A.   No.

146

1      Q.   Fair enough.  Do you know if you
2  interacted with the maintenance supervisor, even
3  though you may not recall a name or a face?
4      A.   Yes, I did.
5      Q.   Okay.  Now, with respect to Mr.
6  Dowd, you said that was the chief mate that you
7  recall having some interaction with; is that
8  right?
9      A.   Yes, on both visits.
10     Q.   So he -- like Mr. Harrell, like
11 Captain Kuchta, he was someone that was on the
12 rig during both of your visits, the one in
13 October and the one in March, right?
14     A.   That is correct.
15     Q.   Okay.  Now, in terms of Mr. Dowd and
16 your interactions with him, did he ever give you
17 any reason to believe that he wasn't competent?
18     A.   No.
19     Q.   Did he ever give you any reason to
20 believe that he didn't take safety seriously?
21     A.   No, I did not observe that behavior.
22     Q.   In fact, did you -- in your
23 interactions with him, would it be fair to say
24 that you believe he was someone that was safety
25 conscious?

147

1      A.   Yes.
2      Q.   With regard to the maintenance
3  supervisor. . .
4      A.   Okay.
5      Q.   And I may not be able to get too
6  detailed, since you don't have a specific name in
7  mind.  But was there anything that stands out,
8  that you're aware of today, that caused you
9  concerns about the competency of the maintenance
10 supervisor that you had interactions with?
11     A.   No, I can't speak to that.
12     Q.   Okay.  As far as you know, your
13 interactions with him didn't lead you to any
14 other conclusions other than they were also
15 safety conscious; is that fair?
16     MR. DEGRAVELLES: Object to the form.
17     MR. HILL: Object to the form.
18 BY MR. JOHNSON:
19     Q.   They didn't like that question.
20     A.   Can repeat your question one more
21 time?
22     Q.   I'll accept the first one I got from
23 you.  It will be fine.
24     A.   Okay.
25     Q.   We talked a little bit about

148

1  Paul Johnson.
2      A.   Yeah.
3      Q.   And he was the rig manager for
4  operations for Transocean; is that right?
5      A.   That's correct.
6      Q.   And in addition to interacting with
7  the individuals that were on the rig, you had
8  fairly regular communication with Mr. Johnson
9  throughout this process of completing audit items
10 after the September 2009 BP audit; is that right?
11     A.   That is correct.
12     Q.   Was he -- based on your experiences
13 with him, was he someone that was supportive of
14 the rig and the efforts to close out these items?
15     A.   Yes, he was.
16     Q.   Was he receptive to your comments
17 and your looking to him for feedback on how to
18 get these items closed?
19     A.   Yes, he was.
20     Q.   Okay.  You felt like he was
21 cooperative and constructive in trying to address
22 these issues; is that fair?
23     A.   Yes.
24     Q.   And I think you may have answered
25 this, but he was someone that struck you as a

37 (Pages 145 to 148)

**PURSUANT TO CONFIDENTIALITY ORDER**



149

1    safety conscious individual; is that right?
2       A.    Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**



153

6     Q.    Fair enough.  At the time the rig
7  went back into service, were you personally aware
8  of any condition on the rig, based on any
9  knowledge that you had from any source, that
10  rendered it unsafe?
11     A.    No.  I -- no.

155

154

156

25     MR. JOHNSON: Yeah.

**PURSUANT TO CONFIDENTIALITY ORDER**



161

162

163

164

5     Q.    Okay.  Now, as part of your visit on
6  October the 20th, 2009, you obviously met with
7  what you refer to as the leadership team onboard
8  the Deepwater Horizon.  Did I read that
9  correctly?
10     A.    Yes, that's correct.
11     Q.    Now, as part of this visit, you went
12  and you obtained personal knowledge about the
13  updates you had been receiving following the
14  decision by BP in September of 2009; is that
15  right?
16     A.    Yes.
17     Q.    Okay.
18     A.    Yes.
19     Q.    And according to your e-mail, based
20  on your personal observations, you concluded that
21  the rig crew had been rigorously closing out the
22  findings, isn't that right, Mr. Rodriguez?
23     A.    Yes.  I stand by that, yes.
24     Q.    Now, for the items that had not --
25  and I understand not all the items had been

41  (Pages 161 to 164)

**PURSUANT TO CONFIDENTIALITY ORDER**

165

1  closed out by that point.  True?
2      A.    No.  There were a great majority
3  that weren't.
4      Q.    Now, you left satisfied, though,
5  that those items that had not been closed out,
6  there was a commitment and path forward to get
7  those resolved.  True?
8      A.    Yes, there was.  I saw that
9  commitment through my dealings with the crew
10  onboard the Horizon.
11      Q.    They seemed -- and you addressed
12  those individually with them, did you not, sir?
13      A.    Absolutely I did.
14      Q.    And you walked away convinced when
15  you left the rig that if those items had not been
16  remedied, that Transocean gave you a clear path
17  to how they were going to fix those, right?
18      A.    Right.  They had action plans in
19  place.



PURSUANT TO CONFIDENTIALITY ORDER



169

170

12          You go out to that rig, and you've
13   got a list of things that you're going to verify.
14   And I understand that's that primarily what you
15   do.  Right?
16      A.    Yes.
17      Q.    Now, you don't have -- you don't
18   have blinders on, true?
19      A.    That is correct.
20      Q.    Now -- and I know you're not looking
21   specifically for other things.  But my question
22   to you, sir, is, since you're out there on behalf
23   of BP, if you saw something marine related that
24   maybe wasn't on your checklist, but it was marine
25   related, and you said, "That's unsafe," you

171

1   wouldn't hesitate to raise that, would you, sir?
2      A.    No, I would not.
3      Q.    And you didn't see anything that
4   made you concerned, did you?
5      A.    No, not at that time.
6      Q.    Okay.  And you didn't during the
7   March 29th trip, did you?
8      A.    No.

172

**PURSUANT TO CONFIDENTIALITY ORDER**

177



179

4      Q.    But my question, like the October
5    visit before, was, in your role, you would not
6    hesitate to bring up an issue if you felt there
7    was an unsafe marine condition that you saw, even
8    if it was outside of that spreadsheet; is that
9    true?
10      A.    That is true.
11      Q.    And you didn't see anything on your
12   tour of the vessel; is that fair?
13      A.    Not on my March visit, no.

25                        One of the things you say in your

178

180

1    March the 30th, 2010, e-mail after you boarded
2    the rig, had this meeting, took a tour throughout
3    the vessel, is, you indicate, "I wanted to
4    mention that the Horizon's crew completed 63 out
5    of 70 findings in a five-month period, which is
6    commendable." Did I read that right?
7      A.    Yes, you did.
8      Q.    Now, the reason I printed the
9    checklist out in color, or the spreadsheet,
10   rather, is because the next sentence says, "The
11   remaining findings that are highlighted in yellow
12   are awaiting parts that are on order with
13   attached order numbers are tracked in the RMS II
14   system." Did I read that right?
15      A.    That is correct.
16      Q.    Okay.  So it's kind of helpful to
17   have a sheet that's got some color on it as --
18      A.    Yes, sir.
19      Q.    -- opposed to black and white?
20              What I'd like for you to do is to
21   look through -- and I know we've kind of gone
22   through some of them already, so I don't know how
23   long it will take.  But just kind of look through
24   and familiarize yourself a little bit with those
25   items that are highlighted in yellow.

**PURSUANT TO CONFIDENTIALITY ORDER**

181

```
 1        A.    Okay.
 2        Q.    Just to kind of get a feel for what
 3   they are, and then I'll pose my questions to you.
 4        A.    (Reviews document.)  Okay.
 5        Q.    After I ask my question, if you need
 6   to go back and look at those in any more detail,
 7   we can do that.
 8        A.    Okay.
 9        Q.    Would it be fair to say,
10   Mr. Rodriguez, that you were satisfied that those
11   seven items, though unresolved, had a sufficient
12   action plan to get them taken care of?
13        A.    Yes.
14        Q.    Okay.  And would it also be fair to
15   say that you were satisfied that those issues,
16   though unresolved, didn't mean the rig was going
17   to be unsafe or unseaworthy?
18        A.    No.
19        Q.    It will be fair to say that you were
20   satisfied the rig could operate safely and be
21   seaworthy, even despite these issues not being
22   resolved; is that true?
23        MR. DART: Object to the form.
24        THE WITNESS: Yes.
```



**PURSUANT TO CONFIDENTIALITY ORDER**



189

191

190

192

13    Q.    How many DB vessels have you ever
14  been on?
15    A.    MODUs?  In general?
16    Q.    Drill ships, anything.  Anything of
17  that nature, vessels, that conduct drilling
18  operations.
19    A.    Over 20.
20    Q.    Have you ever been on a rig -- or
21  any of those 20 vessels that was in perfect
22  condition?
23    A.    No.
24    Q.    The Deepwater Horizon, on the two
25  visits you made, it wasn't in perfect condition,

48  (Pages 189 to 192)

**PURSUANT TO CONFIDENTIALITY ORDER**



193

1    either, was it?
2        A.    No.  And I don't believe any rig is
3    in perfect condition.
4        Q.    But despite not being in perfect
5    condition, based on the two trips that you made,
6    would it be fair to say that you what you saw
7    with your own eyes led you to believe that that
8    rig could operate in a safe manner?
9        A.    From a marine standpoint, yes.

PURSUANT TO CONFIDENTIALITY ORDER

227

SIGNATURE PAGE

     I, ANGEL RODRIGUEZ, have read the
foregoing deposition and hereby affix my
signature that same is true and correct, except
as noted on the correction page.



                    ANGEL RODRIGUEZ

**PURSUANT TO CONFIDENTIALITY ORDER**

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010

Reported by:

MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR

Page 483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )      MDL NO. 2179
by the OIL RIG,        )
DEEPWATER HORIZON in   )      SECTION "J"
the GULF OF MEXICO,    )
April 20, 2010         )      JUDGE BARBIER
                       )
                       )      MAG.  JUDGE
                       )      SHUSHAN


**************
VOLUME 2
**************


Deposition of MURRY SEPULVADO,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 12th of May, 2011.

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
MURRY SEPULVADO VOL. II May 12, 2011            THU BUI, CCR, RPR



Page 524

Page 526

Page 525

Page 527

18     Q.        . In your position as the
19  wellsite leader on the DEEPWATER HORIZON,
20  you got to know the crew pretty well?
21     A.   Yes, sir.
22     Q.   Okay.  You were asked some
23  questions about Paul Johnson who was the
24  rig manager, and you didn't know Paul that
25  well?

12  (Pages 524 to 527)

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:
MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR

Page 528

1      A.   Paul Johnson had just came on as
2  the manager for the DEEPWATER HORIZON a few
3  months earlier.  And I've met him one time
4  and shook his hand.  But I didn't know him
5  that well.
6      Q.   Okay.  Did you know Jimmy
7  Harrell?
8      A.   Yes, I knew Jimmy Harrell.
9      Q.   Okay.  Did you know Randy Ezell?
10     A.   Yes, I know Randy Ezell.
11     Q.   Did you know Jason Anderson?
12     A.   Yes, I know Jason.
13     Q.   Did you know Dewey Revette?
14     A.   Yes, sir.
15     Q.   Steven Curtis?
16     A.   Yes, sir.
17     Q.   Don Clark?
18     A.   Yes, sir.
19     Q.   Did you know Captain Kuchta?
20     A.   Yes, sir.
21     Q.   Now, you told us that
22  Ms. Martinez, Dennis Martinez's wife, was
23  actually -- actually called you and told
24  you about the casualty, correct?
25     A.   She actually called me and told

Page 529

1  me of the event of the rig was on fire.
2      Q.   Okay.  Now, knowing the
3  competency of the crew and the condition of
4  the rig, did it surprise you when you
5  learned what occurred?
6      A.   Totally.
7      Q.   And why?
8      A.   Had lots of questions, couldn't
9  understand how that -- how that could have
10  happened.  Didn't know any of the facts.
11     Q.   This rig was your home away from
12  home, correct?
13     A.   That's correct.
14     Q.   If you had any concerns about
15  the safety of this rig, would you have
16  slept on it?
17     A.   No, sir.
18     Q.   The men we discussed earlier,
19  did any of them seem like men that would
20  lie to you?
21     A.   No, sir.
22     Q.   Did they ever seem like men that
23  would themselves hide issues that would
24  subject them or anyone else to safety
25  issues on that rig?

Page 530

1      A.   From what I know of these
2  gentlemen, they -- they would not have.
3      Q.   They would not have?
4      A.   From -- from -- with me, they
5  wouldn't have, no.
6      Q.   I just want to make sure the
7  record's clear.  Would not?
8          You -- you say wouldn't
9  kind of quick.
10     A.   Yeah, would not.
11     Q.   Were you comfortable with Jimmy
12  Harrell as the OIM of the DEEPWATER
13  HORIZON?
14     A.   Yes, I was.
15     Q.   Okay.  Did you ever experience
16  any indication that he was indifferent or
17  callous towards the safety of individuals
18  or the environment?
19     A.   No, I didn't.
20     Q.   Okay.  You would agree with me
21  that it was just the opposite?
22     A.   He was a very conscientious OIM.
23     Q.   From your experience with
24  Mr. Harrell, what was his attitude towards
25  the safety of individuals and the

Page 531

1  environment?
2      A.   Mr. Harrell was always on top of
3  safety and safety was always number one.
4      Q.   Okay.  Were you comfortable with
5  Randy Ezell as the senior toolpusher on the
6  DEEPWATER HORIZON?
7      A.   Yes, sir.  He was one of the
8  best toolpushers I've probably ever worked
9  with.
10     Q.   Did you ever experience any
11  indication that he was indifferent and
12  callous towards the safety of individuals
13  or the environment?
14     A.   No, sir.
15     Q.   Was it just the opposite with
16  Mr. Ezell?
17     A.   Same.
18     Q.   Okay.  From your experience with
19  him, what was his attitude toward the
20  safety of individuals and the environment?
21     A.   Safety came first, the
22  environment and personnel.
23     Q.   Jason Anderson, were you
24  comfortable with him as one of the
25  toolpushers?

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile:(504) 525-9109

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR

Page 532

1     A.   He was an excellent toolpusher.
2     Q.   Okay.  Did you ever experience
3  any indication that he was indifferent or
4  callous towards the safety of individuals
5  or the environment?
6     A.   No.
7     Q.   Was it just the opposite with
8  Mr. Anderson, as well?
9     A.   That's right, just the opposite.
10    Q.   Okay.  From your experience with
11 him, what was his attitude toward the
12 safety of individuals and the environment?
13    A.   Safety first, environment first.
14 Then the job came third.
15    Q.   Dewey Revette, were you
16 comfortable with him as the -- the driller
17 on the DEEPWATER HORIZON?
18    A.   Yes, I was.
19    Q.   Did you ever experience any
20 indication that he was indifferent or
21 callous towards the safety of individuals
22 or the environment?
23    A.   No.
24    Q.   Was it just the opposite with
25 him, as well?

Page 533

1     A.   That's right.
2     Q.   From your experience with him,
3  what was your (sic) attitude toward the
4  safety of individuals and the environment?
5     A.   It was a bit Transocean culture
6  out there for safety first, environment,
7  and then the task at hand, and everybody
8  supported that.
9     Q.   Mr. Revette was onboard with
10 that culture?
11    A.   He was onboard with that
12 culture.
13    Q.   Stephen Curtis, he was an
14 assistant driller, correct?
15    A.   That's -- that's correct.
16    Q.   Were you comfortable with him as
17 an assistant driller?
18    A.   Yes, I was.
19    Q.   Did you ever experience any
20 indication that he was indifferent or
21 callous toward the safety of individuals or
22 the environment?
23    A.   No.
24    Q.   Was it just the opposite with
25 him, as well?

Page 534

1     A.   That's true.
2     Q.   From your experience with him,
3  what was his attitude toward the safety of
4  individuals and the environment?
5     A.   Safety first, job second.
6     Q.   Okay.  Don Clark was another
7  assistant driller?
8     A.   Yes, sir.
9     Q.   And were you comfortable with
10 him as an assistant driller on the
11 DEEPWATER HORIZON?
12    A.   Yes, I was.
13    Q.   Did you ever experience any
14 indication that he was indifferent or
15 callous toward the safety of individuals or
16 the environment?
17    A.   No.
18    Q.   You'd agree it was just the
19 opposite with him, as well?
20    A.   That's right.
21    Q.   From your experience with him,
22 what was his attitude toward the safety of
23 individuals and the environment?
24    A.   Safety first, environment, task
25 at hand.

Page 535

1     Q.   And Captain Kuchta, were you
2  comfortable with him as the captain on the
3  DEEPWATER HORIZON?
4     A.   Yes, I was.
5     Q.   Did you ever experience any
6  indication that he was indifferent or
7  callous towards the safety or individuals
8  or the environment?
9     A.   No, sir.
10    Q.   You'd agree it was just the
11 opposite with him?
12    A.   Yes, sir.
13    Q.   And from your experience with
14 him, what was his attitude toward the
15 safety of individuals and the environment?
16    A.   Individual safety first,
17 environment, and then the task at hand.
18    Q.   Did you ever have any problems
19 with any of the individuals we just talked
20 about in terms of their competency while
21 you worked as a well -- well team leader --
22 or wellsite leader assigned to the
23 DEEPWATER HORIZON?
24    A.   No, sir.
25    Q.   Did you ever have any problems

14 (Pages 532 to 535)

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010

Reported by:

MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR

Page 536

1  with any of these individuals we just
2  talked about in terms of their safety
3  consciousness while you worked as a
4  wellsite leader on the DEEPWATER HORIZON?
5      A.   Never had.
6      Q.   Okay.  If you could turn back
7  the clock and if you could work on a rig
8  with these guys again, would you have any
9  problem working on a rig with these guys?
10     A.   It would be my -- be my
11 pleasure.
12     Q.   I want you to turn to the Bly
13 report, which I have brought you a copy.
14 It's -- it's attached as Exhibit 1, but I
15 brought a copy just in case.  That's it
16 right there, sitting in this binder right
17 here.
18          I want you to turn to
19 Page 43.  There's one -- there's the last
20 paragraph just two sentences down at the
21 bottom.  And the first sentence of that
22 last paragraph is, Key members of the rig
23 crew need to be trained and demonstrate
24 competency.
25          Do you see that?

Page 537

1      A.   Yes, sir, I see that.
2      Q.   Okay.  Now, I'm -- am I safe in
3  assuming that based upon everything we just
4  talked about, you never told the Bly
5  investigation that any of the guys we just
6  talked about needed to be trained and
7  demonstrate competency?
8      A.   No, sir.
9      Q.   Okay.  So whoever the Bly
10 report -- Bly investigation is talking
11 about in this -- in this sentence we just
12 read, it may be some other group, but it's
13 not the guys we just talked about, based on
14 your experience?
15     A.   That's true.
16     Q.   Did the -- did anybody with the
17 Bly investigation ever talk with you when
18 you had conversations with them and ask you
19 about the competency of the individuals we
20 just talked about?
21     A.   When I talked to the Bly
22 Commission, I was totally confident in the
23 personnel that was on the rig.
24     Q.   Okay.  And that's what you told
25 them?

Page 538

1      A.   Yes.
2      Q.   If you had any problem with the
3  competency of any of the individuals we
4  just talked about, you could have done
5  something about it, correct?
6      A.   Yes.



Page 539

15 (Pages 536 to 539)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters   Facsimile:(504) 525-9109

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0



**GAUDET KAISER, L.L.C.**

601 Poydras Street, Suite 1720          New Orleans, Louisiana 70130
Phone: (504) 525-9100                    Fax: (504) 525-

BOARD-CERTIFIED COURT REPORTERS & LITIGATION

RECEIVED
JUL 2 7 2011

## WITNESS CERTIFICATE

I, **MURRY SEPULVADO,** have read or have had
the foregoing testimony read to me and hereby
certify that it is a true and correct transcription
of my testimony, with the exception of any
attached corrections or changes.

_7 - 5 - 2011_                    _Murry Sepulvado_
(Date Signed)                      (Signature)

____✓____  Signed with corrections as attached.

_____  Signed with no corrections noted.

11745 Bricksome Avenue, Suite A-4          PHONE   (225) 291-3411
Baton Rouge, Louisiana 70816              FAX     (225) 291-7990

263 W. Causeway Approach                  PHONE   (504) 525-9100
Mandeville, Louisiana 70448               FAX     (504) 525-9109

Website: www.gaudetkaiser.com            ALL EMAIL:

Page 413

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"   SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL      JUDGE BARBIER
20, 2010              MAG. JUDGE SHUSHAN

VOLUME II

    Deposition of RONALD W. SEPULVADO,
taken in the Pan American Life Center,
Bayou Room, 11th Floor, 601 Poydras Street,
New Orleans, Louisiana 70130, on Friday,
March 11, 2011.

APPEARANCES:

    LEWIS, KULLMAN, STERBCOW
    & ABRAMSON
    (By:  Paul M. Sterbcow, Esquire)
    601 Poydras Street
    Suite 2616
    New Orleans, Louisiana  70130
        (Attorneys for the Plaintiffs
         Steering Committee)

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010
RONALD W. SEPULVADO VOL. II      March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR



Page 462

Page 464

Page 463

Page 465

10     Q.   Let me go to the drill crew for
11 a few minutes.  You were on that rig eight
12 years.  You mentioned before it was your
13 home away from home.
14     A.   Yes, sir.

21     Q.   You knew those people well, you
22 knew the condition of the rig as of
23 April 16th.  Was that the day you left it?
24     A.   Yes, sir.  April 16th.
25     Q.   You knew the condition of the

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

Page 466

1  rig, you knew the competency of the people
2  out there. I'm assuming that you knew
3  Jimmy well?
4      A.  Yes, I did.
5      Q.  Jimmy Harrell?
6      A.  Yes, sir.
7      Q.  I'm assuming you knew Randy
8  Ezell?
9      A.  I did.
10     Q.  Jason Anderson?
11     A.  Yes, sir.
12     Q.  Dewey Revette?
13     A.  Yes, sir.
14     Q.  Stephen Curtis?
15     A.  Yes, sir.
16     Q.  Mr. Clark, Donald Clark?
17     A.  Yes, sir.
18     Q.  You've known them for years?
19     A.  Yes, sir.
20     Q.  I read something, and I could be
21 wrong, but I read something where you
22 learned of the explosion and fire from your
23 son calling you?
24     A.  Yes, sir. That's right.
25     Q.  Did it surprise you that that

Page 467

1  had occurred?
2      A.  It did.
3      Q.  Knowing the competency and the
4  condition of the rig, did it stun you when
5  you turned on the TV and saw what had
6  occurred?
7      A.  Yes, it did.
8      Q.  Why?
9      A.  Because, you know, I knew who
10 was on tour at the time and they were good
11 hands. I just couldn't -- you know,
12 couldn't imagine, you know, what would
13 cause that.
14     Q.  Well, you received a lot of
15 questions yesterday about audits and
16 serious issues and nonserious issues. For
17 half of your life you had to live on that
18 rig?
19     A.  Yes, sir.
20     Q.  Whatever the conditions that the
21 rig was, that was your home?
22     A.  Yes, sir.
23     Q.  And I'm assuming that if you had
24 felt that there was anything unsafe about
25 any aspect of that rig, you would not be

Page 468

1  sleeping on it?
2      A.  That's right. Anything that I
3  knew about.
4      Q.  All right. Did any of these men
5  that I just mentioned, including Captain
6  Kuchta, ever in your experience with them
7  seem like men that would lie to you?
8      A.  No.
9      Q.  Did they ever seem like men that
10 would themselves hide issues that would
11 subject them or anyone else to safety
12 issues out on that rig?
13     A.  No.
14     Q.  Tell me a little bit about Dewey
15 Revette. What was your experience with
16 him?
17     A.  Dewey had been on the rig, I
18 guess, since it came out of the shipyard.
19 I can't remember exactly because I didn't
20 go on there for two years after it was out
21 of the shipyard.
22         But he came up, when I knew
23 Dewey he was doing safety, he was safety
24 personnel on the rig. He was -- he did
25 performance, he was a performance, what we

Page 469

1  call a performance engineer. He did that
2  for a while and he had been -- he went to
3  AD and then he went to drilling.
4         And I can't recall exactly how
5  long he had been drilling. Probably two or
6  three years. And that's an estimate.
7      Q.  What did you think about his
8  capabilities as a driller?
9      A.  Well, you know, he was
10 experienced in taking kicks.
11     Q.  You feel like he knew what he
12 was doing?
13     A.  Yeah.
14     Q.  Were you confident and
15 comfortable with him up on the drill floor?
16     A.  Yes, I was.
17     Q.  Did he ever seem to you like the
18 guy that would be indifferent toward the
19 safety of other individuals or the
20 environment?
21     A.  No.
22     Q.  Did he seem to you just the
23 opposite?
24     A.  Yeah. He was a good -- I
25 considered him a good driller.

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

Page 470

1     Q.   What was his attitude towards
2  safety?
3     A.   He was -- he thought about
4  safety as safety first.
5     Q.   Jason Anderson, do you know him?
6     A.   Yes, sir.
7     Q.   Tell me about Jason.
8     A.   I didn't do a whole lot of work
9  with Jason because he was on -- he was on a
10  different hitch than I was on until
11  Transocean went to 21 and seven and I
12  started catching some time with him.  Not a
13  whole lot, but the time I did spend with
14  him, he seemed like a competent toolpusher.
15     Q.   Did he ever indicate to you that
16  he was indifferent or callous toward safety
17  of other individuals or the environment?
18     A.   No, he didn't.
19     Q.   From your experience with him on
20  the rig, what was his attitude toward
21  safety?
22     A.   He had a good attitude toward
23  safety.
24     Q.   Mr. Jimmy, as everybody seems to
25  call him, Jimmy Harrell?

Page 471

1     A.   Yes, sir.
2     Q.   You knew him the entire time you
3  were out on the rig?
4     A.   He was, I think Jimmy's been on
5  there about five years.
6     Q.   Worked with him a lot?
7     A.   Yes, I did.
8     Q.   In fact, this crew that was out
9  there when the rig blew up, you had more
10  experience with Jimmy than anybody else on
11  that crew, I assume?
12     A.   Yes, sir.  And Don Clark.  Don
13  Clark was one of the ADs.  He's been out
14  there since the rig come out of the
15  shipyard.  Stephen Curtis was pretty new at
16  the AD position.  He came from being a deck
17  foreman to an AD.
18     Q.   Well, tell me about Jimmy and
19  then I'll get to Curtis and Clark.  Tell me
20  about Jimmy and your observations of him as
21  an OIM.
22     A.   I didn't have any problems with
23  Jimmy at all.
24     Q.   You think he knew what he was
25  doing?

Page 472

1     A.   Yes, sir.  He did.
2     Q.   Were you comfortable with him as
3  the OIM?
4     A.   Yes, I was.
5     Q.   Did you ever experience any
6  indication that he was indifferent or
7  callous toward the safety of individuals or
8  the environment?
9     A.   No, I did not.
10     Q.   From your experience out there
11  with him for years, what was his attitude
12  toward the safety of individuals or the
13  environment?
14     A.   Safety was his number one
15  priority.
16     Q.   You mentioned Stephen Curtis.
17  Tell me about Mr. Curtis.
18     A.   Stephen, I didn't work that much
19  with Steve.  When he was a deck foreman he
20  worked on the opposite hitch from me.  I
21  did start catching him a few hitches once
22  he went into the AD tier and really didn't
23  work with Steve a whole lot.
24     Q.   When you did work with him, what
25  was his attitude toward safety?

Page 473

1     A.   He had a good attitude.
2     Q.   Do you ever experience any
3  indication in Mr. Curtis that he was
4  reckless or callous or indifferent toward
5  the safety of other men or the environment?
6     A.   No.
7     Q.   Was it just the opposite?
8     A.   He was good.  You know, he was
9  training at the AD position but, you know,
10  they got two ADs there so the other AD, Don
11  Clark, was training him.
12     Q.   And you knew Don for a long
13  time?
14     A.   Yes.  I knew Don for a long
15  time.
16     Q.   And tell me about Don.
17     A.   Don's the same way.  You know,
18  he's a good competent person and I enjoyed
19  working with him.
20     Q.   Ever have any concern about his
21  attitude toward safety?
22     A.   No, sir.
23     Q.   Any indication in all the years
24  you worked with him that he was reckless or
25  indifferent toward the safety of others or

16 (Pages 470 to 473)

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010                    Reported by:
RONALD W. SEPULVADO VOL. II       March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 474

1    the environment?
2        A.   No, sir.
3        Q.   You know Captain K?
4        A.   Kuchta?
5        Q.   Yes.
6        A.   Yes, sir.  I did know him.
7        Q.   Did you have any run-ins or
8    problems with him?
9        A.   No, I didn't.  You know, he was
10   on the rig as chief mate for a long time
11   and then he went to, they sent him to
12   another rig and then promoted him to
13   captain and then he came back to the
14   HORIZON as a captain.
15       Q.   How long altogether did you know
16   Captain K?  Well, he's still alive so you
17   still know him?
18       A.   Yes.  But three, four years,
19   probably.
20       Q.   Any problems with him and his
21   attitude toward safety?
22       A.   No.
23       Q.   Any attitudes -- any concern
24   that you had about whether he was reckless
25   or indifferent towards the safety of other

Page 475

1    individuals or the environment?
2        A.   No, sir.
3        Q.   Randy Ezell, you knew Randy?
4        A.   I knew Randy.  I guess he came
5    out with the rig, too.  He had been on the
6    rig ever since it came out of the shipyard.
7    He was a driller and I worked some with him
8    as a driller.  And when they promoted him
9    to pushing tools he was kind of on the
10   opposite hitch from me until they went to
11   the 21-day hitches and then I started
12   catching him on a week or so.
13       Q.   And sort of a bittersweet
14   moment, he, after the rig sank he was a
15   recipient of the first award, the award
16   from Transocean for tremendous work effort.
17   Were you aware of that?
18       A.   No, I wasn't.
19       Q.   Let me back up.  From your
20   observations of Randy, what kind of worker
21   was he?
22       A.   He was a good worker.
23       Q.   Did you have any concerns about
24   his attitude toward the safety of the
25   environment or other individuals?

Page 476

1        A.   No.
2        Q.   Did you ever feel like he was
3    callous or reckless or indifferent --
4        A.   No.
5        Q.   -- toward the safety of other
6    individuals or for the environment?
7        A.   No.
8        Q.   Did you have any problems with
9    any of these men, ever, in terms --
10       A.   No.
11       Q.   -- of their competency to be on
12   a rig that you were the company man for?
13       A.   I thought they all were good
14   people, good -- you know, good workers and
15   good safety people.
16       Q.   For those that are alive today
17   and those that are dead today, if we can
18   turn back the clock, even knowing what we
19   know now, if they were put on a different
20   rig, would you feel comfortable being the
21   company man on a different rig with every
22   one of these men?
23       A.   Yes.  I would feel comfortable.
24       Q.   There's a section in the Bly
25   report that I want to show you.  And I know

Page 477

1    yesterday you didn't -- you were not
2    involved in the Bly commission at all
3    except for giving an interview?
4        A.   Yes.  Two telephone calls at
5    different times.
6        Q.   I'm going to hand you page 43
7    and there's a statement that said key
8    members of the rig crew need to be trained
9    and demonstrate competency.
10       You see that?  I've highlighted
11   it for you on page 43 of that Bly report.
12       A.   Yes, I see that.
13       Q.   Am I safe in assuming, based
14   upon everything that we've just gone over,
15   that you're definitely not the one that
16   said you felt like Jimmy Harrell or Randy
17   Ezell or Jason Anderson or Dewey Revette or
18   Steve Curtis, Don Clark, Captain K, you
19   never said they needed training to
20   demonstrate competency?
21       A.   I don't know where this came
22   from.
23       Q.   But it didn't come from you?
24       A.   It didn't come from me.
25       Q.   Because you felt and still feel

17 (Pages 474 to 477)

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010                    Reported by:
RONALD W. SEPULVADO VOL. II      March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 478

 1   that they were competently trained and they
 2   performed their jobs competently while you
 3   were on board the rig?
 4        A.   Yes, I do.  I don't agree with
 5   that.  I don't know who did it or who
 6   they're talking about but, you know, the
 7   people that were on tour when that
 8   happened, you know, I don't agree with
 9   that.
10        Q.   Well, if Mr. Bly on page 43 is
11   talking about this crew, you don't agree
12   with it?
13        A.   No.
14        Q.   He may be talking about somebody
15   else but if he is talking about this
16   crew --
17        A.   The crew that was on tour.
18        Q.   -- Mr. Bly got it wrong?
19        A.   Yeah.  I don't agree with
20   whoever said this.

Page 480

Page 479

Page 481

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters  Facsimile: (504) 525-9109

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010
RONALD W. SEPULVADO VOL. II       March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR



Page 670

Page 672

Page 671

Page 673

10      Q.   And you were asked a number of
11  questions about your observations of the
12  Transocean personnel.  And to the best of
13  your knowledge and experience and ability
14  of evaluating these gentlemen, they -- your
15  view was they were qualified and competent
16  for the jobs they were doing; is that
17  correct?
18      A.   Yes, they were.

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

## GAUDET KAISER, L.L.C.

601 Poydras Street, Suite 1720    New Orleans, Louisiana 70130
Phone: (504) 525-9100    Fax: (504) 525-9109

**BOARD-CERTIFIED COURT REPORTERS & LITIGATION SUPPORT**



## WITNESS CERTIFICATE

I, **RONALD W. SEPULVADO,** have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

_4/19/11_
(Date Signed)

_Ronald W. Sepulvado_
(Signature)

_Sworn to And Subscribed to before me this undersigned Notary Public on this the 19th day of April 2011_
_Notary Public._

____✓____ Signed with corrections as attached.

_____ Signed with no corrections noted.

**Buffy L. King**
Notary Public ID#054084
Sabine Parish, Louisiana
Commission is for life.

11745 Bricksome Avenue, Suite A-4
Baton Rouge, Louisiana 70816

263 W. Causeway Approach
Mandeville, Louisiana 70448

Website: www.gaudetkaiser.com

PHONE  (225) 291-3411
FAX      (225) 291-7990

PHONE  (504) 525-9100
FAX      (504) 525-9109

ALT. EMAIL:
Gkp2003@aol.com & gkp@gaudetkaiser.com

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )   MDL NO. 2179
by the  OIL RIG,      )
DEEPWATER HORIZON in   )   SECTION "J"
the GULF OF MEXICO,   )
April 20, 2010   )   JUDGE BARBIER
                  )
                  )   MAG. JUDGE
                  )   SHUSHAN

Videotaped deposition of JOHN
SHAUGHNESSY, taken at Pan-American Building,
601 Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 27th of September,
2011.

**Page 2**

A P P E A R A N C E S

Ms. Robin Greenwald
Ms. Erika Heyder
WEITZ & LUXENBERG
700 Broadway
New York, New York 10003

        APPEARING FOR THE PLAINTIFFS'
        STEERING COMMITTEE
Mr. Michael C. Occhiuzzo
Ms. Ashley James
KIRKLAND & ELLIS, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Phone: 202-879-5205 Fax: 202-879-5200

        APPEARING FOR BP, INC.

Ms. Deanna Chang
U.S. DEPARTMENT OF JUSTICE
Civil Division, Torts Branch
1425 New York Avenue, Northwest
Suite 10100
Washington, D.C. 20005
Phone: 202-616-4037 Fax: 202-616-4159

        APPEARING FOR THE UNITED
        STATES

Mr. David Magee
BINGHAM McCUTCHEN, LLP
One Federal Street
Boston, Massachusetts 02110
        APPEARING FOR ANADARKO

**Page 3**

APPEARANCES: (Continued)
Mr. Richard J. Hymel
Mr. Robert Blankenship
PREIS & ROY, PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70509
Phone: 337-237-6062

        APPEARING FOR TRANSOCEAN

Mr. Eric Nichols
BECK, REDDEN & SECREST
515 Congress, Suite 1750
Austin, Texas 78701
        APPEARING FOR CAMERON
Mr. Don Godwin
Ms. Stefanie Major
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
        APPEARING FOR HALLIBURTON
Mr. David A. Pote
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, Louisiana 70130
Phone: 504-524-5777 Fax: 504-524-5763

        APPEARING FOR THE STATE OF
        LOUISIANA

Mr. Dennis Barrow
WARE, JACKSON, LEE & CHAMBERS
4929 Allen Parkway, 42nd Floor
Houston, Texas 77019
        APPEARING FOR DRIL-QUIP

**Page 4**

APPEARANCES: (Continued)

Mr. Lucas T. Elliott
MORGAN LEWIS
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006
Phone: 713-890-5185 Fax: 713-890-5001

        APPEARING FOR M-I SWACO

Mr. Edward D. Wegmann
JONES WALKER
201 St. Charles Avenue
New Orleans, Louisiana 70170
Phone: 504-582-8322 Fax: 504-589-8322
        APPEARING FOR WEATHERFORD
ALSO PRESENT:
Mary Elizabeth Gaasch, videographer
REPORTED BY:

        THU BUI, CCR, RPR
        Certified Court Reporter
        State of Louisiana
        State of Texas

1 (Pages 1 to 4)

PURSUANT TO CONFIDENTIALITY ORDER



12    Q.    Okay.  At any time, did you ever
13  get the impression that anyone at Transocean
14  was callous or consciously indifferent to the
15  safety of individuals or the environment?
16        MR. OCCHUIZZO: Objection to form.
17        A.    In my experience with
18  Transocean, that would be with the Discoverer
19  Seven Seas in the '80s, the Discoverer 534 in
20  the '90s and in this last decade, with the
21  DD-II and DD-III, and it's my -- my
22  experience that the answer is no.
23        Q.    Okay.  Did you ever hear that
24  anyone at Transocean was callous or
25  consciously indifferent to the safety of

PURSUANT TO CONFIDENTIALITY ORDER



193

1
2

individuals or the environment?
    A.   No.

195

194

196

**PURSUANT TO CONFIDENTIALITY ORDER**

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                                     Reported by:
DAVID C. SIMS VOL. II           April 7, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 333

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL     MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"   SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL      JUDGE BARBIER
20, 2010              MAG. JUDGE SHUSHAN



VOLUME II

Deposition of DAVID C. SIMS, taken
in the Pan American Life Center, Bayou
Room, 11th Floor, 601 Poydras Street, New
Orleans, Louisiana 70130, on Thursday,
April 7, 2011.


APPEARANCES:


WILLIAMS LAW GROUP, LLC
(By:  J. Christopher Zainey, Jr.,
     Esquire)
909 Poydras Street
Suite 1650
New Orleans, Louisiana  70112
     (Attorneys for MDL plaintiffs)

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010          Reported by:

**DAVID C. SIMS VOL. II          April 7, 2011 JOSEPH R. KAISER, JR., CCR, RPR**



381

382

24      Q.   Okay.  All right.  Why did you
25   go to the rig on April 20th?

383

1      A.   There was a planned early in the
2   year that the leadership teams, the
3   drilling ops managers, BP's directors would
4   attend, make a rig visit at least once a
5   month.  And the rig visit for the HORIZON
6   was originally scheduled some other earlier
7   dates but because of conflicts had gotten
8   changed.
9           The idea was also for
10   contractor, whichever rig we were going to,
11   for that contractor leadership personnel to
12   also, to attend with the BP leadership.
13   And we call those leadership visits.
14           The idea was to do that once a
15   month, go to, go to one or two rigs.  And
16   there was, there were a list of different
17   types of things that would, that we were
18   encouraged and expected to do while we were
19   there.
20      **Q.   Let me ask you this, sir:  Prior**
21   **to the April 20th visit had you been to the**
22   **HORIZON rig at any time?  You, personally.**
23      A.   Prior to that, I believe I had
24   been there six times.  It could be more.
25      **Q.   Okay, sir.  And you and Mr. Pat**

384

1   **O'Bryan went out together, along with**
2   **others if you will, but the two of you were**
3   **from BP that went out on April 20th;**
4   **correct?**
5      A.   That's correct.

**601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.          Telephone: (504) 525-9100**
**New Orleans, LA 70130-6029     Board-Certified Court Reporters          Facsimile: (504) 525-9109**

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010

DAVID C. SIMS VOL. II        April 7, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Reported by:



**Page 450**

**Page 452**

```
 1    A.   To the extent that I knew
 2  everyone there, I didn't know everyone so I
 3  can't say that everyone was knowledgeable.
 4    Q.   Well, let's put it this way:
 5  You trusted the crew?
 6    MS. KARIS:
 7        Object to form.
 8    THE WITNESS:
 9        From what I knew of the rig and
10  I -- in the general sense, yes, I would
11  have trusted the crew.
```

**Page 451**

```
 7        I want to first ask you about,
 8  about the Transocean crew and management
 9  that were present on the Macondo well.
10        You are not aware, are you, sir,
11  of any performance concerns with Transocean
12  during the drilling of the Macondo well;
13  correct?
14    A.   What are you referring to?  The
15  HORIZON?
16    Q.   Yes.  I'm sorry.
17    A.   I'm not aware of any.  Not what
18  I would call performance concerns.
19    Q.   All right.  In fact, I think
20  you've said before that the Transocean crew
21  was a good crew; correct, sir?
22    A.   I believe that, yes, sir.
23    Q.   They were skilled?
24    A.   Yeah.
25    Q.   Knowledgeable?
```

**Page 453**

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported by:
DAVID C. SIMS VOL. II                April 7, 2011      JOSEPH R. KAISER, JR., CCR, RPR



Page 474

Page 476

Page 475

Page 477

18      Q.        Are you aware, sir, of
19  anyone, including in my interest here the
20  Transocean personnel or management that
21  were involved in the Macondo prospect and
22  in connection with the Macondo prospect of
23  deliberately wanting to cause injury to the
24  environment, or to any person?
25      A.   No, sir.

37 (Pages 474 to 477)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile: (504) 525-9109

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010

DAVID C. SIMS VOL. II          April 7, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Reported by:

Page 478

1      Q.   Of acting maliciously or not
2   caring in any way about causing injury to
3   another human, or the environment?
4      A.   No, sir.
5      Q.   Of willfully inflicting harm on
6   any person or on the environment?
7      A.   No, sir.
8      Q.   You were on the DEEPWATER
9   HORIZON on April the 20th when the event,
10  as you referred to it, occurred.
11         Did you witness any Transocean
12  employee or manager deliberately wanting to
13  cause injury to the environment, or any
14  person?
15     A.   No, sir.
16     Q.   Of acting maliciously or not
17  caring about causing injury to another
18  person, or the environment?
19     A.   No, sir.
20     Q.   Of willfully inflicting harm on
21  any person or on the environment?
22     A.   No, sir.
23     Q.   Did you witness any Transocean
24  employee, or anyone, to your knowledge, out
25  there acting in what you would consider to

Page 479

1   be a negligent fashion?
2      A.   No, sir.
3      Q.   Of performing their work in what
4   you would consider to be a negligent
5   fashion?
6      A.   No, sir.



Page 480

Page 481

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010                           Reported by:
CINDI K. SKELTON VOL. II          May 26, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 355

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL      MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"    SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL       JUDGE BARBIER
20, 2010               MAG. JUDGE SHUSHAN



VOLUME II

     Deposition of CINDI K. SKELTON,
taken in the Pan American Life Center,
Bayou Room, 11th Floor, 601 Poydras Street,
New Orleans, Louisiana 70130, on Thursday,
May 26, 2011.


APPEARANCES:


     BRUNO & BRUNO
     (By:  Joseph M. Bruno, Esquire and
           Melissa A. DeBarbieris,
           Esquire)
     855 Baronne Street
     New Orleans, Louisiana  70113
           (Attorneys for Plaintiff's
           Steering Committee)


601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010          Reported by:
CINDI K. SKELTON VOL. II          May 26, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 512



Page 514

1      Q.   Are you aware of any evidence
2   that Transocean personnel in connection
3   with the DEEPWATER HORIZON willfully
4   inflicted harm on any person or the
5   environment?
6      A.   I have no evidence.
7      Q.   Are you aware of any evidence of
8   negligence by Transocean in connection with
9   the DEEPWATER HORIZON?
10     A.   I am not aware of any materials,
11   anything that would relate to that.

Page 513

14     Q.   Are you aware of any evidence
15   that any Transocean personnel in connection
16   with the DEEPWATER HORIZON deliberately
17   wanted to cause injury to the environment
18   or any person?
19     A.   I have no evidence.
20     Q.   Do you have any evidence that
21   any Transocean personnel in connection with
22   the DEEPWATER HORIZON was malicious or
23   didn't care in any way about causing injury
24   to another human, or the environment?
25     A.   I have no evidence on that.

Page 515

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

2075e666-d75c-482d-a11d-5f6b8f3bf335