UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN RE:** OIL SPILL ) MDL NO. 2179
**BY THE** OIL RIG )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010 ) JUDGE BARBIER
) MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of Troy James Hadaway, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 12th day of July, 2011.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
Mr. William E. Bonner
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street
Mobile, Alabama 36604

APPEARING FOR BP, INC.:
Ms. Bridget K. O'Connor
KIRKLAND & ELLIS
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
Ms. Emily R. Dempsey
KIRKLAND & ELLIS
300 North LaSalle
Chicago, Illinois 60654

APPEARING FOR TRANSOCEAN:
Mr. Carter L. Williams
SUTHERLAND ASBILL & BRENNAN
1001 Fannin, Suite 3700
Houston, Texas 77002-6760
Mr. Matthew O. Gatewood
SUTHERLAND ASBILL & BRENNAN
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

APPEARING FOR ANADARKO PETROLEUM COMPANY:
Mr. Warren E. George
Ms. Marilee J. Allan
BINGHAM MCCUTCHEN
Three Embarcadero Center
San Francisco, California 94111-4067

APPEARING FOR MOEX:
Mr. Jack Reynolds
PILLSBURY WINTHROP SHAW PITTMAN
2 Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010-1018

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
Ms. Kathleen A. Gallagher
BECK, REDDEN & SECREST
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010

APPEARING FOR WEATHERFORD:
Mr. Michael G. Lemoine
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
600 Jefferson Street, Suite 1600
Lafayette, Louisiana 70501

APPEARING FOR DRIL-QUIP, INC.:
Ms. Wendy Ware Bishop
WARE, JACKSON, LEE & CHAMBERS
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019-7101

APPEARING FOR M-I SWACO:
Mr. Christopher C. Loeber
MORGAN, LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, New Jersey 08540-6241

APPEARING FOR HALLIBURTON:
Ms. Aimee L. Williams
Ms. Laci M. Dreher
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

APPEARING FOR THE UNITED STATES COAST GUARD:
Lt. Brooke Grant
Lt. Jeremy Greenwood
UNITED STATES COAST GUARD
Eighth District Legal
500 Poydras Street
New Orleans, Louisiana 70130

APPEARING FOR THE STATE OF LOUISIANA:
Mr. Henry Dart
510 North Jefferson Street
Covington, Louisiana 70433
Ms. Phyllis E. Glazer
LOUISIANA DEPARTMENT OF JUSTICE
400 Poydras Street, Suite 1600
New Orleans, Louisiana 70130-3220

ALSO PRESENT:
Mr. Mark Hendrix, Videographer

**PURSUANT TO CONFIDENTIALITY ORDER**



25

Q. Now, how many years total were you on the DEEPWATER HORIZON?

A. Almost five years.

26

27

28

PURSUANT TO CONFIDENTIALITY ORDER

**Q.** **All right. Let's talk about when individuals come to the rig for the first time, whether they're visitors or new to the rig in some way, can you describe the process that they go through upon arrival to the rig?**

A. Yes, ma'am.

**MR. WILLIAMS:** Object to form.

A. Yes, ma'am. They -- it depends if you're a short-stay visitor or you're actually going to be there. And the short-stay visitor just says if you're just coming out for a couple of hours and you're going to leave within a couple of hours is different than somebody that's going to be staying overnight. They still go through an orientation, but the orientation is a little bit shorter, and they are required to have somebody -- a full-time employee on the rig with them at all times. They cannot wonder off or venture off by themselves or anything like that.



When somebody's coming on that's going to be staying overnight, everybody goes through an orientation. That orientation is required every time you come to the rig, except if you've been there -- the only time it's required is if you haven't ever been there -- this is your first time -- and if you did come beforehand and you -- it's been longer than six months, you have to repeat the orientation again.

**Q. (By Ms. O'Connor) Okay. And when they arrive, it's my understanding that they watch a safety video?**

A. They watch different videos, depending on what's going on in the operations themselves.

Transocean has required orientation video that talks about our processes themselves, our Mission Statement, our goals, so forth like that

**Q. So that video, is that a Transocean video that's shown on all -- all Transocean rigs? It's not specific to the DEEPWATER HORIZON?**

A. Yes, ma'am, it's -- it's



Transocean worldwide.

**Q. Okay. And what does that video show?**

**Whoops.**

A. Like I said, the Transocean processes, like a basic overview of THINK, START, Time Out For Safeties, a Management of Change, or our Mission Statements, and so forth. And then we'll go into a little bit other details on -- on some minor concerns. Not concerns, that's the wrong word. Dealing with just a general brief orientation, you know, like reporting incidences. If you get sick or something or you get injured, you must report that to the medic and to the Supervisors, things like that.

**Q. Okay. And then I also understand that visitors receive a safety card at some point during their orientation; is that correct?**

A. It's a welcome aboard card.

**Q. Okay.**

A. And that card entails -- it's a fold-up card that they can carry with them. First off, it's just like a -- it -- it has



PURSUANT TO CONFIDENTIALITY ORDER

177

your room number and your emergency stations and lifeboat assignments that are assigned to you. It also has a copy of the station bill and what to do in emergencies and what the alarms sound like.

**Q. Okay. And there will be some rig-specific information on that card that you just mentioned, room numbers, emergency stations, et cetera. Is the format of that card consistent on all Transocean rigs?**

A. The format will be the same, but some of the information in it will be different, because the card is rig -- rig-specific versus -- you know, we were a semi versus other semis in the fleet or a drillship. Those -- that -- that stuff will be different.

**Q. Okay. But the purpose of the card would be the same in terms of why you're giving it to visitors and what information they should have on a rig?**

A. Yes, ma'am.

[redacted]

178

[redacted]

179

[redacted]

**Q. Okay? And put -- putting that aside, but as somebody who works and sleeps**

180

**on the rig, did you have any concerns about the competency of any of the Transocean rig crew at the time of the April 20th accident?**

A. No, ma'am.

**Q. And just going through some of the specific individuals that I suspect you probably know given your time on the rig, did you know the OIM, Mr. Jimmy Harrell?**

A. Yes, ma'am.

**Q. And did you view him to be an experienced OIM?**

A. Yes, ma'am.

**Q. And did you view him -- consider him to be competent for that position?**

A. Yes, ma'am.

**Q. Same for Randy Ezell, the Senior Toolpusher, did you view him as experienced in that position?**

A. Yes, ma'am.

**Q. And did you consider him to be competent for the Toolpusher position?**

A. Very competent.

**Q. Did you know Jason Anderson, also a Toolpusher on the rig?**

A. Yes, ma'am.

PURSUANT TO CONFIDENTIALITY ORDER

181

**Q. And did you consider him to be experienced in that position?**

A. Yes, ma'am.

**Q. And competent for that position?**

A. Yes, ma'am.

**Q. Dewey Revette, the Driller, did you know him?**

A. Yes, ma'am.

**Q. Did you understand him to also be experienced in his position?**

A. Yes, ma'am.

**Q. And consider him to be competent for that position?**

A. Yes, ma'am.

**Q. The last one I'll ask you about is Wyman Wheeler, did you know him?**

A. Yes, ma'am.

**Q. And did you consider him to be experienced in his position?**

A. Yes, ma'am.

**Q. And also competent in that position?**

A. Yes, ma'am.

**Q. Okay. If you'd had any concerns about the competency of any of those**

182

**individuals to fulfill their particular job duties, would you have raised that with someone?**

A. Yes, ma'am.

**Q. And you didn't have occasion to do that because you didn't have concerns about their competency?**

A. Correct.

183

184

PURSUANT TO CONFIDENTIALITY ORDER



233

235

234

A. All personnel were required to attend weekly Safety Meetings with Transocean. That's usually conducted on their off time, after they get off tour. So the Departments would each hold their individual Safety Meetings in correspondence to when the personnel get off tour. So Maintenance will have theirs at a different time than, say, the Drilling Department will, because they work a different tour.

236

PURSUANT TO CONFIDENTIALITY ORDER

I, TROY JAMES HADAWAY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the attached Amendment Sheet.

TROY JAMES HADAWAY

THE STATE OF Texas)

COUNTY OF Galveston)

Before me, , on this day personally appeared TROY JAMES HADAWAY, known to me (or proved to me on the oath of or through ____ ) to be the person whose name is subscribed to the foregoing instrument and executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office this 20 day of July , 2011.

Carla M. Menendez

Notary Public in and for
The State of Texas

Carla M Menendez
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 08/18/2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN RE:** OIL SPILL ) MDL NO. 2179
**BY THE** OIL RIG )
"DEEPWATER HORIZON" IN ) SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010 ) JUDGE BARBIER
) MAG. JUDGE SHUSHAN

Deposition of DEREK HART, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 7th day of October, 2011.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
Mr. Guy E. Matthews
MATTHEWS, LASON & JOHNSON
200 Bering Drive, Suite 700
Houston, Texas 77057-3778

APPEARING FOR BP, INC.:
Ms. Sylvia N. Winston
KIRKLAND & ELLIS
300 North LaSalle
Chicago, Illinois 60654

APPEARING FOR TRANSOCEAN:
Mr. Jack Massey (via videoconference)
Mr. Robert A. Lemus
Mr. Mark Thibodeaux (via videoconference)
SUTHERLAND ASBILL & BRENNAN
1001 Fannin, Suite 3700
Houston, Texas 77002-6760

APPEARING FOR ANADARKO PETROLEUM COMPANY:
Ms. Marilee J. Allan
BINGHAM MCCUTCHEN
Three Embarcadero Center
San Francisco, California 94111-4067

APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
Mr. Brad Coffey
BECK, REDDEN & SECREST
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010

A P P E A R A N C E S (Continued)

APPEARING FOR WEATHERFORD:
Mr. William J. Joyce
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170

APPEARING FOR M-I SWACO:
Mr. R. Sean Brennan, Sr.
MORGAN, LEWIS & BOCKIUS, LLP
1000 Louisiana Street, Suite 4200
Houston, Texas 77002-5006

APPEARING FOR HALLIBURTON:
Mr. Floyd R. Hartley, Jr.
Ms. Jill J. Prudhomme
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

APPEARING FOR THE UNITED STATES:
Ms. Rachel Hankey
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL & NATURAL RESOURCES DIVISION
601 D Street, N.W.
Washington, D.C. 20004

APPEARING FOR THE STATE OF LOUISIANA:
Mr. Lambert J. "Joe" Hassinger, Jr.
GALLOWAY, JOHNSON, TOMPKINS, BURR AND SMITH
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139

ALSO PRESENT:
Mr. Peter Jennings, Logistics Supervisor
Mr. James "Chad" Paris, Videographer
Mr. Danny Damiani

INDEX
VIDEOTAPED ORAL DEPOSITION OF
DEREK HART
OCTOBER 7, 2011

PAGE
Appearances .............. 2
Examination by Mr. Matthews ...... 14
Examination by Ms. Hankey ....... 68
Examination by Mr. Hassinger ...... 86
Examination by Ms. Winston ....... 95
Examination by Mr. Hartley ....... 228
Examination by Ms. Allan ........ 254
Examination by Mr. Massey ....... 267
Signature and changes ......... 279
Reporter's Certificate ......... 281

EXHIBITS

PAGE
EXHIBIT NO. 5700 ............ 35
Curriculum Vitae of Derek Hart, dated April 2009, TRN-MDL-02863933 through 935

EXHIBIT NO. 5701 ............ 37
Distribution List Name: DW Horizon Investigation Team, TRN-MDL-02855017

EXHIBIT NO. 5702 ............ 38
DWH Investigation - Sharepoint, dated June 18, 2010, TRN-INV-03329057 through 059

EXHIBIT NO. 5703 ............ 38
Work Tasks, Time Required & Plan for Completion of DWH Investigation, TRN-INV-03472780

EXHIBIT NO. 5704 ............ 70
Interviewing Form/Keelan Adamson, dated August 10, 2010, TRN-INV-00000001 through 007

PURSUANT TO CONFIDENTIALITY ORDER

145

[redacted]

146

[redacted]

147

[redacted]

**Q. And from the Transocean investigation report you guys decided against investigating safety culture on board the DWH?**

**MR. MASSEY:** Objection; form.

A. The -- the conclusion that we came to and as -- was that that was not something that had an impact on the -- on the incident. So we did not investigate safety culture, per se...

**Q. (BY MS. WINSTON) And how did you guys come to that conclusion, that it didn't have an impact on the incident if you guys didn't even investigate it?**

**MR. MASSEY:** Objection; form.

A. Well, two things I would say: A, it's not as part of the remit that was set

148

out in our executive summary. But through our undertaking of interviews and looking at the -- such as the Lloyd's report, neither Mr. Myers or I made a thought that this was something that needed to be investigated. There was a very strong -- in our opinion, it was a very strong safety culture on the Deepwater Horizon, and I think -- I don't think I know that that is what's reflected in the Lloyd's report.

[redacted]

PURSUANT TO CONFIDENTIALITY ORDER



217

219

218

220

A. I believe that the crew of the Deepwater Horizon did a tremendous job in safely evacuating 115 survivors from -- from the rig in a very, very difficult circumstances.

**PURSUANT TO CONFIDENTIALITY ORDER**

253

254

255

**Earlier this afternoon you were asked about possible investigation or lack of investigation of the safety culture at Transocean. I'm just setting that as a -- a topic here or a -- an area of exploration. I'd like you and your counsel to turn to tab 1 of the documents we've provided. I'm going to mark that as Exhibit 5766, which has Bates No. TRN-MDL-01007255.**

A. Yes, I have that in front of me yes.

**Q. Okay. I would like you to turn to the Bates number that -- the page that ends in Bates No. 7261.**

**Are you -- let me back up one second. Are you aware of Transocean performing from time to time performance monitoring audit and assessment or PMAA?**

A. Yes, I am.

**Q. Okay. And then turning to 7261.**

A. Yes, I have that in front of me.

256

**Q. Okay. Down at the bottom of that page under the general heading of "Policies & procedures" there is a heading -- sub heading saying, "Client," colon, and it reads, "Everything from" --**

A. Yes, I have that.

**Q. And it reads, Everything from the client company man indicated that BP was very happy with the rig performance, comma, safety culture and moral, perhaps meaning morale, of the crews. He did indicate there was inconsistence with the catering crew. He said, BP is making a concerted effort to adopt the Transocean Company Management System.**

**Do you see that?**

A. Yes, I do.

**Q. In your investigations for Transocean did you ever have any indication that BP was not happy with the safety culture of the Deepwater Horizon.**

A. I -- I found no indication of that, and I think the reflection of that is with the exception of one well, the -- the Deepwater Horizon worked continuously for BP



PURSUANT TO CONFIDENTIALITY ORDER

since it was built.

**Q. And this self-audit and other audits seem to indicate that BP was happy with the safety culture and performance of Transocean up to the time of the incident; is that correct?**

A. That is correct.

**Again, you've had no indications in your investigations that BP was anything but happy with Transocean's safety management system?**

A. I -- I found no indication in my areas of investigation that BP was in any way unhappy with the safety management of the Tran- -- sorry, of the Deepwater Horizon.

**Q. And you would expect that if there was unhappiness, that that would have been brought up prior to the time of the incident and would have been something that you would have investigated as part of your investigation?**

A. I say I found no in- -- we found no indication of that, and if there -- along with a lot of other data that we analyzed, if there had been any way -- complaint on record from BP, then, yes, we would certainly have investigated that.

PURSUANT TO CONFIDENTIALITY ORDER



269

271

270

272

**Q. Did you reach any conclusions over the course of your investigation as to why 115 people escaped the Deepwater Horizon safely, despite these difficult conditions?**

A. I did.

**Q. What were your conclusions?**

A. My conclusions were that -- that those involved on the night of the 20th, particularly the supervisors of the Deepwater Horizon crew did a tremendous job in organizing that safe evacuation from the rig,

PURSUANT TO CONFIDENTIALITY ORDER

and that is also backed up by some of our service partners that were also on the rig, that the effectiveness and the quality of the training that both the Transocean crew had received and, also, the -- some of our service partners were a major contributor to the successful evacuation and safe recovery of 115 people.

**Q. In a similar vein, Mr. Hart, do you recall -- I think you've testified today, but do you recall reading the Lloyd's report on the Deepwater Horizon safety culture during the course of the investigation?**

A. I -- I've already testified earlier today that I'm -- I've read that report, yes.

**Q. And in your view, having been involved in operations on rigs for more than 20 years and having been a -- in many ways, a specialist in QHSE issues, was that report positive or negative about the safety culture on the Deepwater Horizon?**

A. In my opinion, that -- the overall conclusion of that report was very positive about the Deepwater Horizon.

There -- if you look at the summary to the report, it lists a number of positives that were found by Mrs. -- Mrs. Annand and Mr. Moon.

**Q. Mr. Hart, I'm going to hand you a document that's been previously marked as Exhibit 4261, which is the Lloyd's Register safety management systems and safety culture document for the closeout meeting. And starting on Page TRN-INV-16754, will you please list the strengths that the Lloyd's auditor found regarding the Deepwater Horizon safety culture?**

A. It reads, There was a strong leadership on the rig, in brackets, the OIM and his team, including supervisors, closed brackets, and on the beach, and in brackets it says RMP, which stands for rig manager performance. In particular, people recognize and appreciate the rig manager performance efforts to get the rig back to basics.

**Q. And do you agree with that finding?**

A. I have no -- I -- I found nothing within my investigation to dispute

that finding.

**Q. Another strength is the use of the Think plan, correct?**

A. That is correct.

**Q. And do you have any reason to disagree with that finding?**

A. I do not.

**Q. The report also lists a strength as empowerment. Do you see that?**

A. I do.

**Q. And what does it mean when it says that the rig was empowered or the rig crew were empowered?**

A. This -- empowerment within Transocean means that people will take actions and undertake things, based on self motivation, that they don't necessarily have to be told or led to do things.

**Q. Okay. What is the next strength?**

A. It says, strong safety culture. It was clear that the crews understood their responsibility and accountability for safety and the crews they work with. This is led from the top. And there is a genuine belief

in keeping each other safe and using the tools and processes they have got to do that.

**Q. We are moving pretty briskly here. So what are the last two strengths you see here in the -- in the document?**

A. The HSE policies and awareness and resources for safety.

**Q. You interviewed the Lloyd's auditors during the course of your investigation; did you not?**

A. That's correct, I interviewed both Ms. Annand and Mr. Moon.

**Q. And it was these two individuals who developed the report which lists these rig's strengths, correct?**

A. That -- that is correct.

**Q. And it is these two individuals that agreed that the rig had a strong safety culture?**

A. Yes, and they -- they -- I interviewed them on the issues that they raised in their report, and they -- they confirmed that.

PURSUANT TO CONFIDENTIALITY ORDER