**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL    )  MDL NO. 2179
BY THE OIL RIG    )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010    )  JUDGE BARBIER
    )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Yancy Jacob Keplinger,
taken at the Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 12th day of September, 2011.

**2**

1  
2  
3     A P P E A R A N C E S
4  APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
      Mr. Matthew E. Lundy
5     LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
      501 Broad Street
6     Lake Charles, Louisiana  70601
7  
   APPEARING FOR BP, INC.:
8     Mr. Don K. Haycraft
      LISKOW & LEWIS
9     One Shell Square
      701 Poydras Street, Suite 5000
10    New Orleans, Louisiana 70139-5099
11    Ms. Margaret J. Jantzen
      KIRKLAND & ELLIS
12    300 North LaSalle
      Chicago, Illinois  60654
13  
14  APPEARING FOR TRANSOCEAN:
      Mr. John Kinchen
15    HUGHES ARRELL KINCHEN
      Norfolk Tower
16    2211 Norfolk, suite 1110
      Houston, Texas  77098
17  
      Mr. Daniel O. Goforth
18    GOFORTH GEREN EASTERLING
      4900 Woodway, Suite 750
19    Houston, Texas  77056
20    Mr. Richard J. Hymel
      PREIS & ROY
21    Versailles Centre, Suite 400
      102 Versailles Boulevard
22    Lafayette, Louisiana  70501
23  
24  
25

**3**

1  APPEARING FOR ANADARKO PETROLEUM COMPANY:
      Mr. Warren E. George
2     BINGHAM MCCUTCHEN
      Three Embarcadero Center
3     San Francisco, California 94111-4067
4  
5  APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
      Mr. Brad Coffey
      BECK, REDDEN & SECREST
6     One Houston Center
      1221 McKinney Street, Suite 4500
7     Houston, Texas  77010-2010
8  
   APPEARING FOR WEATHERFORD:
9     Mr. Edward D. Wegmann
      JONES, WALKER, WAECHTER, POITEVENT,
10    CARRERE & DENEGRE, LLP
      201 St. Charles Avenue
11    New Orleans, Louisiana  70170-5100
12  
   APPEARING FOR DRIL-QUIP, INC.:
13    Ms. Wendy Ware Bishop
      WARE, JACKSON, LEE & CHAMBERS
14    America Tower, 42nd Floor
      2929 Allen Parkway
15    Houston, Texas  77019-7101
16  
   APPEARING FOR M-I SWACO:
17    Mr. Patrick Elkins
      MORGAN, LEWIS & BOCKIUS, LLP
18    1000 Louisiana Street, Suite 4200
      Houston, Texas 77002-5006
19  
20  APPEARING FOR HALLIBURTON:
      Mr. Donald E. Godwin
21    Ms. Stefanie K. Major
      GODWIN RONQUILLO
22    1201 Elm Street, Suite 1700
      Dallas, Texas 75270-2041
23  
24  
25

**4**

1  APPEARING FOR SEACOR:
      Ms. Sylvia E. Simson
2     WEIL, GOTSHAL & MANGES
      767 Fifth Avenue
3     New York, New York  10153-0119
4  
5  APPEARING FOR THE STATE OF LOUISIANA:
      Ms. Phyllis E. Glazer
6     Assistant Attorney General
      Litigation Division
7     LOUISIANA DEPARTMENT OF JUSTICE
      400 Poydras Street, Suite 1600
8     New Orleans, Louisiana 70130-3220
9  APPEARING FOR THE WITNESS YANCY JACOB KEPLINGER:
      Mr. Todd Elias
10    GORDON, ELIAS & SEELY
      1811 Bering, Suite 300
11    Houston, Texas  77057
12  
   ALSO PRESENT:
13    Mr. Peter Jennings, Videographer
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



173

175

18    Q.         Did you ever sacrifice safety to
19  get a bonus?
20    A.  You never sacrifice safety.
21    Q.  Oh.  So the answer to my question is
22  "No"?
23    A.  No.
24    Q.  Did you -- did you have Stop Work
25  Authority on the DEEPWATER HORIZON?

174

176

1    A.  Yes.
2    Q.  Okay.
3    A.  Everyone did.
4    Q.  Did you feel you had not only the right
5  but the obligation to stop work if you thought an
6  ongoing operation was unsafe?
7    A.  It was my obligation to stop the job.

44  (Pages 173 to 176)

**PURSUANT TO CONFIDENTIALITY ORDER**



177

19    Q.  On the four days you were on the
20  DEEPWATER HORIZON immediately before the disaster
21  struck, did you feel that everything was going
22  normally?
23    A.  Yeah.
24    Q.  Did you have any indication that there
25  was anything unsafe about any of the operations

178

1  on the rig during those four days?
2    A.  No, because I thought it was just --
3  everything was going normal, pretty -- pretty
4  safe.  Everybody was doing what they had to do
5  safely.

179

180

**PURSUANT TO CONFIDENTIALITY ORDER**



221

223

16    When you were on the DEEPWATER HORIZON,
17  Mr. Keplinger, was safety a priority for you?
18    A.  Yes.
19    Q.  Was it the No. 1 priority for you?
20    A.  Yes.
21    Q.  What about your fellow crew members, as
22  far as you knew and observed during your time
23  there, was safety a priority for them?
24    A.  In my opinion, yes.
25    Q.  Okay.  Did you ever, during your time

222

224

1  there, see any of your fellow crew members have a
2  callous or indifferent attitude toward the safety
3  of their fellow crew members?
4    A.  I'm not sure I can answer that.  That's,
5  you know, opinion stated.
6    Q.  It's -- I'm asking for you -- you never
7  saw anything, though, that -- that -- that --
8  that -- that to you suggested --
9    A.  Not to my -- not to my recollection.

56  (Pages 221 to 224)

**PURSUANT TO CONFIDENTIALITY ORDER**

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported By:
JAMES BRENT MANSFIELD          May 12, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"        SECTION:  J
IN THE GULF OF
MEXICO, ON                 JUDGE BARBIER
APRIL 20, 2010             MAG. JUDGE SHUSHAN


        Deposition of JAMES BRENT MANSFIELD,

8510 Watch Tower Street, San Antonio, Texas

78254, taken in the Pan American Life Center,

Bayou Room, 11th Floor, 601 Poydras Street,

New Orleans, Louisiana 70130, reported on

Thursday, May 12th, 2011.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6009     Board-Certified Court Reporters   Facsimile: (504) 525-9109

943fb35b-f3d1-4856-8f5e-b57b7191629e

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported By:
JAMES BRENT MANSFIELD              May 12, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR



Page 94

Page 96

Page 95

Page 97

3        Q.    I'm going to begin with some
4    questions that I think may be difficult for
5    you.  Did you know Jason Anderson?
6        A.    (Nodding head affirmatively)
7    yes, sir.
8        Q.    Based on what you knew of
9    Mr. Anderson, was he a hard working employee,
10   sir?
11       A.    Yes, sir.
12       Q.    Did you consider him to be a
13   safety conscious employee, sir?
14       A.    Yes, sir.
15       Q.    Were you aware of anything that
16   suggested that Mr. Anderson would ever take
17   risks that would endanger the life of the
18   crew of the DEEPWATER HORIZON?
19       A.    No, sir.
20       Q.    Based on your experiences, he
21   wasn't the type of person to become
22   complacent in his job, was he, sir?
23       A.    No, sir.
24       Q.    Did you know Mr. Dewey Revette,
25   Mr. Mansfield?

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.       Telephone: (504) 525-9100
New Orleans, LA 70130-6009      Board-Certified Court Reporters  Facsimile: (504) 525-9109

943fb35b-f3d1-4856-8f5e-b57b7191629e

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported By:
JAMES BRENT MANSFIELD          May 12, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR

---

**Page 98**

1    A.   Yes, sir.
2    Q.   Based on what you knew of
3  Mr. Revette, was he a hard-working
4  individual?
5    A.   Yes, sir.
6    Q.   Was he safety conscious?
7    A.   Yes, sir.
8    Q.   Was he the type of person to act
9  in a way to endanger the life and the safety
10 of the crew?
11   A.   No, sir.
12   Q.   Did you like these gentlemen?
13   A.   Yes, sir.
14   Q.   You know Jimmy Harrell, don't
15 you, sir?
16   A.   Yes, sir.
17   Q.   He was the OIM aboard the
18 DEEPWATER HORIZON at the time of the
19 incident?
20   A.   Yes, sir.
21   Q.   And you had worked with
22 Mr. Harrell when he was the OIM during your
23 time on the DEEPWATER HORIZON from the time
24 you started; correct?
25   A.   Yes, sir.

---

**Page 99**

1    Q.   He had an open-door policy?
2    A.   Correct.
3    Q.   Good fellow?
4    A.   Yes, sir.
5    Q.   Safety conscious?
6    A.   For sure.
7    Q.   Worked hard at it?
8    A.   Yes, sir.
9    Q.   Detail oriented?
10   A.   Yes, sir.
11   Q.   Supportive of you and the crew
12 and your concerns?
13   A.   Always.
14   Q.   Do you know Randy Ezell?
15   A.   Uh-huh (indicating
16 affirmatively).
17   Q.   She is taking it down,
18 sometimes --
19   A.   Yes, sir.
20   Q.   I appreciate that.  Good fellow?
21   A.   Yes, sir.
22   Q.   Hard working guy?
23   A.   Yes, sir.
24   Q.   Knowledgeable about his job as
25 far as you know?

---

**Page 100**

1    A.   Yes, sir.
2    Q.   Was Mr. Ezell someone that
3  people looked up to on the rig?
4    A.   Yes, sir.
5    Q.   Mr. Bertone, you worked with him
6  quite a bit, didn't you, sir?
7    A.   Yes, sir.
8    Q.   Hard-working guy?
9    A.   Yes, sir.
10   Q.   Safety conscious?
11   A.   Yes, sir.
12   Q.   Have you ever seen anything that
13 Mr. Bertone did that would suggest to you
14 that he was putting the crew in an unsafe or
15 dangerous position?
16   A.   Never.  No, sir.
17   Q.   He worked hard on safety issues,
18 didn't he?
19   A.   Yes, sir.
20   Q.   And you worked hard with him,
21 isn't that true?
22   A.   Yes, sir.

---

**Page 101**

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6009     Board-Certified Court Reporters     Facsimile: (504) 525-9109

943fb35b-f3d1-4856-8f5e-b57b7191629e

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                Reported By:
JAMES BRENT MANSFIELD                May 12, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR



Page 102

6        Q.    I read something I think you
7    wrote and I want to see if you remember it,
8    in May of 2009, these are comments that I
9    believe you might have said -- I want you to
10   listen to me and tell me if you recall maybe
11   saying something like this.
12            Quote:  "I take pride in being a
13   Transocean employee and being part of the
14   team DEEPWATER HORIZON.  Everyone on this rig
15   has treated me with respect starting the
16   first day that I came aboard.  I will
17   continue to do my best in whatever position
18   that I may hold with Transocean," end quote.
19            Do you recall writing those
20   words?
21       A.    Yes, sir.
22       Q.    You meant them, didn't you?
23       A.    Yes, sir.
24       Q.    And you still mean them, is that
25   right?

Page 103

1        A.    Yes, sir.
2        Q.    You worked hard to meet your
3    responsibilities, didn't you?
4        A.    Yes, sir.
5        Q.    And you understood your
6    responsibilities, didn't you, Mr. Mansfield?
7        A.    Yes, sir.

Page 104

Page 105

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6009      Board-Certified Court Reporters   Facsimile: (504) 525-9109

943fb35b-f3d1-4856-8f5e-b57b7191629e

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010

Reported By:

JAMES BRENT MANSFIELD          May 12, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR



Page 106

Page 107

11      Q.      Have you ever heard the phrase
12   "time out for safety"?
13      A.      Yes, sir.
14      Q.      What does that phrase mean to
15   you, Mr. Mansfield?
16      A.      It means if anybody at any time
17   identifies something that is going to
18   jeopardize the safety of the job, they can
19   call -- you know, take a timeout and say,
20   let's fix it before we continue.
21      Q.      And that was something that you
22   had invoked before, isn't that true?
23      A.      Yes, sir.
24      Q.      That's something you've seen
25   your colleagues invoke?

Page 108

1      A.      Correct.
2      Q.      And that is something that
3   Mr. Harrell supported; isn't that right?
4      A.      Correct.
5      Q.      Did you ever see anybody get
6   fired or reprimanded for calling time out for
7   safety?
8      A.      No, sir.
9      Q.      What is a think plan?
10      A.      A think plan.  Well, three types
11   of them, a written think plan, basically,
12   what it is is an analysis of a job, it's an
13   overview of the job you're going to do.  If
14   it's a big enough job, determining if --
15   depending on how involved it is, you might
16   write it all down and go through with every
17   member of the team.  If it's an individual
18   job, you're just going to go do, you might
19   just do a mental think plan to yourself, go
20   through all the hazards, identify hazards and
21   what's your -- the steps you're going to take
22   to get the job done.  And then if it's a -- a
23   verbal think plan is also another style.  You
24   can just talk about it with everybody that's
25   involved and required for every job.

Page 109

1      Q.      That was whether it was written
2   or mental or verbal, that was part of
3   Transocean's policies and procedures to
4   ensure things were conducted in a safe
5   manner?
6      A.      Correct.
7      Q.      And those were policies and
8   procedures that you followed, is that
9   correct?
10      A.      Yes, sir.
11      Q.      And you expected the people that
12   you oversaw to follow?
13      A.      Yes, sir.
14      Q.      In fact, you would make sure
15   they followed the safety procedures?
16      A.      Correct.
17      Q.      And you supported the people
18   that worked under you if they needed to call
19   a time out for safety?
20      A.      By all means.
21      Q.      You let them know that, hey, I
22   will support you and this rig management team
23   will support you?
24      A.      That's right, yes, sir.

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6009     Board-Certified Court Reporters   Facsimile: (504) 525-9109

943fb35b-f3d1-4856-8f5e-b57b7191629e

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )   MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )   SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010      )   JUDGE BARBIER
                    )   MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Captain John B. MacDonald,
taken at the Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 30th day of September, 2011.

**2**

```
 1        A P P E A R A N C E S
 2
 3
 4   APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
 5      Mr. Andrew A. Lemmon
        LEMMON LAW FIRM
 6      650 Poydras Street, Suite 2335
        New Orleans, Louisiana  70130
 7      Mr. Alexander H. Caron
        FOOTE, MEYERS, MIELKE & FLOWERS
 8      3 North Second Street, Suite 300
        St. Charles, Illinois  60174
 9
10   APPEARING FOR BP, INC.:
11      Mr. Don K. Haycraft
        LISKOW & LEWIS
12      One Shell Square
        701 Poydras Street, Suite 5000
13      New Orleans, Louisiana  70139-5099

14      Mr. Micha C. E. Osgood
        KIRKLAND & ELLIS
15      555 California Street
        San Francisco, California  94104
16
17   APPEARING FOR TRANSOCEAN:
        Mr. Robert M. Kallam
18      PREIS & ROY
        Versailles Centre, Suite 400
19      102 Versailles Boulevard
        Lafayette, Louisiana  70501
20      Mr. John Kinchen
        HUGHES ARRELL KINCHEN
21      Norfolk Tower
        2211 Norfolk, suite 1110
22      Houston, Texas  77098
23      Mr. David G. Dickman
        VENABLE
24      575 7th Street, NW
        Washington, D.C.  20004
25
```

**3**

```
 1   APPEARING FOR ANADARKO PETROLEUM COMPANY:
        Ms. Rianne Rocca
 2      BINGHAM MCCUTCHEN
        Three Embarcadero Center
 3      San Francisco, California 94111-4067
 4
 5   APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
        Mr. Jim Taylor
 6      BECK, REDDEN & SECREST
        One Houston Center
 6      1221 McKinney Street, Suite 4500
 7      Houston, Texas  77010-2010
 8
 9   APPEARING FOR WEATHERFORD:
        Mr. William J. Joyce
10      JONES, WALKER, WAECHTER, POITEVENT,
        CARRERE & DENEGRE, LLP
10      201 St. Charles Avenue
11      New Orleans, Louisiana  70170-5100
12
13   APPEARING FOR M-I SWACO:
        Mr. Robert Sean Brennan, Jr.
14      MORGAN, LEWIS & BOCKIUS, LLP
        1111 Pennsylvania Avenue, NW
14      Washington, D.C.  20004
15
16   APPEARING FOR HALLIBURTON:
        Mr. Jerry C. von Sternberg
17      GODWIN RONQUILLO
        1331 Lamar, Suite 1665
18      Houston, Texas  77010-3133
19      Mr. Israel R. Silvas
        GODWIN RONQUILLO
20      Renaissance Tower
        1201 Elm Street, Suite 1700
21      Dallas, Texas 75270-2041
22
23
24
25
```

**4**

```
 1   APPEARING FOR THE UNITED STATES:
        Ms. Abigail E. André
 2      U.S. DEPARTMENT OF JUSTICE
        ENVIRONMENTAL & NATURAL
 3      RESOURCES DIVISION
        Post Office Box 7611
 4      Ben Franklin Station
        Washington, D.C.  20044-7611
 5
        Mr. A. Nathaniel Chakeres
 6      U.S. DEPARTMENT OF JUSTICE
        ENVIRONMENTAL & NATURAL
 7      RESOURCES DIVISION
        601 D Street, N.W.
 8      Washington, D.C.  20004
 9
10   APPEARING FOR THE STATE OF LOUISIANA:
        Mr. Douglas R. Kraus
        Attorneys for Louisiana Attorney General
11      KANNER & WHITELEY
        701 Camp Street
12      New Orleans, Louisiana  70130-3504
13
14   ALSO PRESENT:
        Mr. Peter Jennings, Videographer
        Ms. Tracey Bamberger
15
16
17
18
19
20
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**



18     Q.  So -- so it sounds like, from the
19  response standpoint, your conclusion from the
20  interviews you conducted is that they did what
21  every -- what they could do.
22     A.  What I hear -- what I hear over and over
23  from people, here and afterwards, is that the 115
24  people that survived the initial explosions, the
25  blowout, and the fact that they're all home with

12 (Pages 45 to 48)

**PURSUANT TO CONFIDENTIALITY ORDER**

49

```
1   their families, it's almost unheard of, and --
2   and they feel blessed, and they all miss and they
3   feel terrible for the 11 lost and -- and the 17
4   injured.
5        But, overall, I mean, they -- yes, I
6   think they did an excellent job, and I haven't
7   talked to anybody who's -- who's -- who's
8   different in opinion, anybody that I talked with.
```



**PURSUANT TO CONFIDENTIALITY ORDER**



69

71

70

8      The Time Out For Safety, Transocean is
9  huge on empowering people to do -- to stop the
10  job, Time Out For Safety.  Even if the job
11  doesn't need to be stopped for a Safety reason,
12  if somebody perceives it, they have the
13  opportunity.  And maybe they find a better way to
14  do something, too, you know.

72

**PURSUANT TO CONFIDENTIALITY ORDER**

293

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6      Do you recall your testimony earlier
7   where Counsel for BP went through a number of
8   interviews that you conducted of the Marine crew
9   aboard the HORIZON?
10      Do you remember that line of testimony?
11   A. Yes.
12   Q. All right. I believe you indicated that
13   there were about 12 or 13 individuals within the
14   Marine Department that you sat down, spoke to,
15   and actually conducted interviews; is that right?
16   A. Yes.
17   Q. All right. Each of those interviews took
18   about -- approximately how long?
19   A. Ah, I think they varied.
20   Q. Okay. Short end of 20 to 30 minutes or
21   an hour?
22   A. I'd say somewhere in that area --
23   Q. Okay.
24   A. -- between 20 minutes and an hour, so --
25   Q. The longest being an hour and a half to

294

1   two hours, perhaps?
2   A. Oh, I don't think there are any that --
3   well, I -- I'm not positive.
4   Q. All right. So in any event, it appears
5   you spent probably four to twelve hours sitting
6   down with crew members aboard the HORIZON,
7   talking to them about the events that took place
8   on the night in question?
9      MR. HAYCRAFT: Object to form.
10   Q. (By Mr. Kallam) Is that -- is that
11   correct?
12   A. Sounds -- yeah.
13   Q. All right. And I believe Counsel for
14   Halliburton asked you if you had formulated any
15   opinions or conclusions as to the efforts, the
16   work, and the actions of those crew members that
17   night; is that correct?
18   A. Yes.
19   Q. All right. Can you describe for us the
20   conclusions that you reached concerning the
21   activities of the Marine crew in general on the
22   night of April 20, 2010, when they were faced
23   with what they were faced with?
24      MR. HAYCRAFT: Object to form.
25   A. My -- my thoughts, based on my experience

295

1   and talking with all the people about all the
2   things that they -- they were fighting, and had
3   to -- to do to save themselves and their -- the
4   crew members is that they did -- many, many
5   people did many, many heroic things. They acted
6   as I would expect Transocean people, or -- or
7   people in another industry, I mean if people that
8   are well trained and care about one another.
9      And everybody on the Bridge, everybody
10   making the -- the rescues with the stretchers,
11   keeping the people calm in the boats, getting the
12   stretcher into the life raft, the people on the
13   Bridge, how quickly they -- they reacted in terms
14   of getting out the VHF, the Mayday, and the GMBSS
15   distress, telling the boat to clear, making the
16   PAs and the general alarms, to get all those
17   people out there, and get them onto the two boats
18   when they had nothing back aft, and people were
19   coming from -- that -- that's a very big rig,
20   very big vessel.
21      So I just know from my experience there
22   could have been people anyplace, you know, way
23   down the columns had to get up and things, and
24   that they get everybody off, except for the
25   people who, you know, may -- except for the

296

1   people who may not have perished dur -- during
2   the explosion, or asphyxiation, whatev -- what --
3   I don't know what would have done it, but I think
4   that all those people to get off, it just speaks
5   volumes for the training, the training that they
6   had.
7      And I can -- I can tell you after the
8   fact, talking to guys that used to work with our
9   company, I can tell you from working with people
10   in our industry that I've known for 20 and 30
11   years, they -- they -- they all say, "Our
12   training was a huge part of it."
13      Because I -- I talk to guys on other
14   vessels who, you know, get your basic Coast Guard
15   training when you get your License. And the
16   drills, the fact that they -- they did the
17   drills, they took them seriously.
18      Everybody knew the alarm signals, you
19   know, what the differences between, you know,
20   whether it's abandon, or fire and emergency or
21   tox -- or H -- H2S, the ones they hear every
22   week, those things made a huge difference --
23   Q. (By Mr. Kallam) I appreciate that.
24   A. -- and saved people's lives.
25   Q. Did you question each Marine crew member

PURSUANT TO CONFIDENTIALITY ORDER



297

1 that you interviewed concerning the safety
2 culture of Transocean in general, but more
3 particularly on the DEEPWATER HORIZON?
4 A. Yes.
5 MR. CHAKERES: Objection, form.
6 Q. (By Mr. Kallam) Can -- can you tell the
7 Court what the conclusions were, factually, that
8 you reached concerning the safety culture and
9 safety environment aboard the HORIZON in
10 particular, but among Transocean in general?
11 MR. HAYCRAFT: Object, form.
12 A. I -- excuse me. I -- my conclusion was
13 that they had very good teamwork. They had
14 respect for one another; that their -- that their
15 training and safe -- their safety culture was
16 very good. I mean, they're -- they're telling me
17 about -- I don't know how long ago it was, you
18 know, getting an award from BP, and the -- I
19 can't remember. I remember days without lost
20 time acc -- incidents, but I do remember that it
21 was pretty impressive. I can't -- you know,
22 that's not -- my memory, that part of my memory
23 is not -- not coming to me right now, but --
24 Q. (By Mr. Kallam) All right. Based upon
25 the interviews that you conducted and the

298

1 information that you received, was it fair to say
2 that none of the Transocean crew members were
3 acting callous or indifferent towards safety?
4 MR. HAYCRAFT: Objection, form.
5 MR. CHAKERES: Objection, form.
6 MR. VON STERNBERG: Objection, form.
7 A. Yes. I think they -- they were all --
8 they embraced safety. I mean, that -- they --
9 they were proud to be -- you know, all the
10 opportunities they had and the training that the
11 Company offers them.
12 And a lot of people have told me in the
13 interviews, and outside of it, they're very happy
14 about Transocean's safety culture, and the
15 ability of Transocean to provide a lot of the
16 classes that they do for people, like the THINK,
17 the START, the Focus, you know, Time Out For
18 Safety. All those type of things where they
19 empower people and train people, teach people,
20 and improve their situational awareness, that's
21 why a hundred -- 115 people got home with their
22 families.

299

300

**PURSUANT TO CONFIDENTIALITY ORDER**

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )  MDL NO. 2179
BY THE OIL RIG        )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010      )  JUDGE BARBIER
                     )  MAG. JUDGE SHUSHAN

*****************
VOLUME 1
*****************

Deposition of Paul James Meinhart, III,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 28th day of July, 2011.

**Page 2**

1
2
3        A P P E A R A N C E S
4   APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
5        Mr. Matthew E. Lundy
         LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
6        501 Broad Street
         Lake Charles, Louisiana  70601
7        Ms. Lauren Lundy Adcock
         LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
8        300 North College Avenue, Suite 309
         Fayetteville, Arkansas  72701
9
10  APPEARING FOR BP, INC.:
         Mr. David W. Leefe
11       LISKOW & LEWIS
         One Shell Square
12       701 Poydras Street, Suite 5000
         New Orleans, Louisiana  70139-5099
13
14  APPEARING FOR TRANSOCEAN:
         Mr. Daniel Johnson
15       SUTHERLAND ASBILL & BRENNAN
         1001 Fannin, Suite 3700
16       Houston, Texas  77002-6760
17       Mr. Robert M. Kallam
         PREIS & ROY
18       Versailles Centre, Suite 400
         102 Versailles Boulevard
19       Lafayette, Louisiana  70501
20
21  APPEARING FOR ANADARKO PETROLEUM COMPANY:
         Ms. Monique M. Weiner
22       Ms. Janika D. Polk
         KUCHLER POLK SCHELL WEINER & RICHESON
23       1615 Poydras Street, Suite 1300
         New Orleans, Louisiana 70112
24
25

**Page 3**

1   APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
         Ms. Kathleen A. Gallagher
2        BECK, REDDEN & SECREST
         One Houston Center
3        1221 McKinney  Street, Suite 4500
         Houston, Texas  77010-2010
4
5   APPEARING FOR WEATHERFORD:
         Mr. William J. Joyce
6        JONES, WALKER, WAECHTER, POITEVENT,
         CARRERE & DENEGRE, LLP
7        201 St. Charles Avenue
         New Orleans, Louisiana  70170-5100
8
9   APPEARING FOR DRIL-QUIP, INC.:
         Mr. Jay Nelson
10       WARE, JACKSON, LEE & CHAMBERS
         America Tower, 42nd Floor
11       2929 Allen Parkway
         Houston, Texas  77019-7101
12
13  APPEARING FOR M-I SWACO:
         Ms. Denise Scofield
14       MORGAN, LEWIS & BOCKIUS, LLP
         1000 Louisiana Street, Suite 4200
15       Houston, Texas 77002-5006
16
17  APPEARING FOR HALLIBURTON:
         Mr. Prescott W. Smith
18       GODWIN RONQUILLO
         1201 Elm Street, Suite 1700
         Dallas, Texas 75270-2041
19
         Mr. Daniel T. Zwart
20       GODWIN RONQUILLO
         1331 Lamar, Suite 1665
21       Houston, Texas  77010-3133
22
23
24
25

**Page 4**

1   APPEARING AS OBSERVER FOR THE
    U.S. DEPARTMENT OF THE INTERIOR:
2        Mr. Lance C. Wenger
         OFFICE OF THE SOLICITOR
3        ROCKY MOUNTAIN REGION
         U.S. DEPARTMENT OF THE INTERIOR
4        755 Parfet Street, Suite 151
         Lakewood, Colorado  80215
5
6   APPEARING FOR THE STATE OF LOUISIANA:
         Mr. Henry Dart
7        510 North Jefferson Street
         Covington, Louisiana  70433
8
9   APPEARING FOR PAUL JAMES MEINHART, III:
         Mr. Geoff L. Womack
10       GUY WOMACK & ASSOCIATES
         402 Main Street, Sixth Floor
11       Houston, Texas  77002
12       Mr. Cory D. Itkin
         ARNOLD & ITKIN
13       1401 McKinney Street, Suite 2550
         Houston, Texas  77010
14
15  ALSO PRESENT:
         Mr. Mark Hendrix, Videographer
16
17
18
19
20
21
22
23
24
25

**PURSUANT TO CONFIDENTIALITY ORDER**



177

179

23  Did you fear reprisal for reporting an unsafe
24  condition aboard the DEEPWATER HORIZON?
25      A. No.

178

180

1       Q. Do you know other crew members who did?
2       A. No.

6       Q. Were -- there was a statement that those
7   General Safety Meetings were ineffective to
8   communicate safety because they concentrated more
9   on statistics than on safety.  Do you agree with
10  that statement?
11      A. No.
12      Q. You paused.  What -- what were you
13  thinking about?
14      A. What was I thinking about?  Safety,
15  again, is how you deal with it.  I mean, if you
16  want, you can -- you can argue any side of any
17  argument.  If you want to argue that it's bad,
18  there's some people that no amount of information
19  is going to convince them opposite of what they
20  think.
21      Q. M-h'm.
22      A. So do I feel that the Safety Meetings
23  were good for me, and that they helped identify
24  conditions that could possibly be hazardous that
25  I may not have thought of, yes --

45 (Pages 177 to 180)

**PURSUANT TO CONFIDENTIALITY ORDER**



257

258

2    Q.  Okay.  Now, in terms of the DEEPWATER
3  HORIZON, as I understand it, you were transferred
4  to the HORIZON in December of '09?
5    A.  Yeah, roughly December 10th of '09.
6    Q.  Okay.  So -- now, my math may be
7  bad here -- a little less than five months; is
8  that -- that accurate --
9    A.  H'm --
10    Q.  -- that you -- that you were on the
11  HORIZON?
12    A.  Yeah.  Maybe four months.
13    Q.  Okay.
14    A.  Yeah.
15    Q.  Now, during the time during that four,
16  four and a half, however long it was, fair to say
17  you spent about half your life on the rig?  In
18  other words, you were -- you -- you were on
19  hitch, and then you were off hitch?
20    A.  Half my life -- or half -- half of the
21  time, yes, was spent on the rig, but --
22    Q.  Yeah.
23    A.  -- a quarter of that time, spent
24  working --
25    Q.  Right.  I gotcha.

259

1    A.  -- of the whole --
2    Q.  You -- you -- you lived on the rig for
3  half your life during that period, but you only
4  worked for part of that time when you were on the
5  rig; is that --
6    A.  Yes.
7    Q.  -- right?  Okay.  And during that time,
8  you never noticed any safety issues or safety
9  problems aboard the rig; is that true?
10    A.  There was no safety issues that I was
11  concerned about, no.
12    Q.  Okay.  In fact, it's fair to say that --
13  that safety was something that was constantly
14  emphasized onboard the DEEPWATER HORIZON; isn't
15  that true?
16    A.  Yes.

260

6    Q.  Now, I gather in -- in addition to these
7  pre-tour meetings, there were weekly Safety
8  Meetings on Saturday; is that right?
9    A.  Yes.
10    Q.  All right.  Now, on these weekly Sat --
11  Saturday meetings, was that -- was that
12  crew-wide, or were you in individual departments?
13    A.  Like Maintenance Department, the
14  Mechanics, Electricians, the ET, and the
15  Engineers were together, and then the Drilling
16  side was together.
17    Q.  Okay.  So in terms of the meetings,
18  they -- they -- there was some division in terms
19  of -- of subject matter areas, so to speak?
20    A.  Yes.
21    Q.  So that, you know, on the Drilling side,
22  they may have been having Safety Meetings for --
23  for the Drilling crew, but on your side it was
24  kind of focused on the things that the members
25  of -- of your crew -- things that y'all did; is

65  (Pages 257 to 260)

**PURSUANT TO CONFIDENTIALITY ORDER**



261

1    that right?
2        A.  Yes.
3        Q.  Okay.  And as -- as far as you know, the
4    par -- people that participated in these meetings
5    took them seriously, didn't they, sir?
6        A.  Yes.
7        Q.  And you took them seriously?
8        A.  Yes.

263

262

264

**PURSUANT TO CONFIDENTIALITY ORDER**



265

267

266

268

22   Q.        And I want to throw some names out
23   there I think you talked a little bit.  I think
24   I've covered this.  I just want to make sure.
25        You know and worked with Willie Stoner?

67 (Pages 265 to 268)

**PURSUANT TO CONFIDENTIALITY ORDER**

269

1      A.  Yes.
2      Q.  You know and you worked with Terry
3  Sellers?
4      A.  Yes.
5      Q.  Ronnie Arnold?
6      A.  Yes.
7      Q.  Brent Mansfield?
8      A.  Yes.
9      Q.  Doug Brown?
10      A.  Yes.
11      Q.  These men take their job seriously?
12      A.  Very much.
13      Q.  Okay.  They work hard?
14      A.  Very much.
15      Q.  As far as you know, safety conscious?
16      A.  Very -- yes.
17      Q.  Okay.  I want to take you back to the
18  evening of April -- and -- and by the way, you
19  were asked some questions earlier about -- and I
20  think you responded, and you said -- and I want
21  you to tell me if I'm wrong here, but I think you
22  were -- you said something like if someone's
23  lazy, then, yeah, an unsafe situation could occur
24  in terms of the lockout procedures.  Do you
25  recall saying something like that?

270

1      A.  Yeah.
2      Q.  All right.  Were these the type of folks
3  that were lazy, as far as you know?
4      A.  The group that I worked with were all
5  very safety conscious and did everything as
6  per procedure.
7      Q.  Now, I know that you didn't work on the
8  drill crew, but as far as you know, do you know a
9  gentleman named Dewey Revette?
10      A.  I had met him once or twice.
11      Q.  Okay.  And as far as you knew, do you
12  have any reason to believe that Mr. Revette was a
13  lazy individual?
14      A.  I do not.  And from what I've heard of
15  Dewey, he was a very highly respected man on the
16  rig.
17      Q.  And let me ask you about Jason Anderson.
18      A.  Okay.
19      Q.  Do you -- do you have any knowledge about
20  how -- how he was thought of?
21      A.  None -- no personal.  I don't -- don't
22  recall ever really meeting him.  But, again,
23  another person that from everybody I talked to
24  was very highly respected.
25      Q.  No reason to believe that Mr. Revette and

271

1  Mr. Anderson were the type to be complacent or
2  place the -- the lives or the safety of people in
3  jeopardy?
4      A.  To the best of my knowledge, they were
5  not those.



272

**PURSUANT TO CONFIDENTIALITY ORDER**

1

2      I, PAUL JAMES MEINHART, III, have read

3 the foregoing deposition and hereby affix my

4 signature that same is true and correct, except

5 as noted on the attached Amendment Sheet.

6

7

              PAUL JAMES MEINHART, III

8

9

10    Notary: 8-17-2011

11    C H Lapee

12

13    C H LAPEE
       NOTARY PUBLIC
       State of Texas
14    Comm. Exp. 08-24-2012

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**