**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL      )   MDL NO. 2179
by the  OIL RIG,        )
DEEPWATER HORIZON in  )  SECTION "J"
the GULF OF MEXICO,    )
April 20, 2010      )   JUDGE BARBIER
                  )
                  )  MAG. JUDGE
                  )  SHUSHAN

Videotaped deposition of SKIP
CLARK, taken at Hilton Hotel, 333 St. Charles
Avenue, 5th Floor, New Orleans, Louisiana,
70130, on the 29th of July, 2011.

**Page 2**

A P P E A R A N C E S

Mr. Tom Thornhill
THORNHILL LAW FIRM
1309 Ninth Street
Slidell, Louisiana 70458
Phone: 800-989-2707 Fax: 985-641-5011

Ms. Emily Gebhardt
THORNHILL LAW FIRM
1309 Ninth Street
Slidell, Louisiana 70458
Phone: 800-989-2707 Fax: 985-641-5011

APPEARING FOR THE PLAINTIFFS'
STEERING COMMITTEE

Ms. Gina Spiegleman
KIRKLAND & ELLIS, LLP
153 East 53rd Street
New York, New York 10022
Phone: 212-446-5931 Fax: 212-446-6460

Mr. Erring Tao
KIRKLAND & ELLIS, LLP
333 South Hope Street
Los Angeles, California 90071
Phone: 213-680-8167 Fax: 213-680-8500

APPEARING FOR BP, INC.

Mr. Robert Guidry
KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
Phone: 504-592-0691

Mr. Terrance Prout
KUCHLER, POLK, SCHELL, WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112

APPEARING FOR ANADARKO

**Page 3**

APPEARANCES:(Continued)

Ms. Stephany LeGrand
SUTHERLAND, ASBILL & BRENNAN, LLP
1001 Fannin, Suite 3700
Houston, Texas 77002
Phone: 713-470-6100 Fax: 713-654-1301
          APPEARING FOR TRANSOCEAN

Mr. Brad Coffey
BECK, REDDEN & SECREST
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Phone: 713-951-3700 Fax: 713-951-3720
          APPEARING FOR CAMERON

Mr. Floyd R. Hartley, Jr.
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Phone: 214-939-4617 Fax: 214-527-3122

Mr. Tim Alford
GODWIN RONQUILLO
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
          APPEARING FOR HALLIBURTON

Mr. Steven Luxton
MORGAN LEWIS
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: 202-739-3000 Fax: 202-739-3001
          APPEARING FOR M-I SWACO

Ms. Margaret Bryant
WARE, JACKSON, LEE, CHAMBERS
2929 Allen Parkway, 42nd Floor
Houston, Texas 77019
Phone: 713-659-6400 Fax: 713-659-6262
          APPEARING FOR DRIL-QUIP

**Page 4**

APPEARANCES:(Continued)

Mr. Wayne Zeringue
JONES WALKER
201 St. Charles Avenue
New Orleans, Louisiana 70170
Phone: 504-582-8448
          APPEARING FOR WEATHERFORD

Mr. A. Nathaniel Chakeres
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
601 D Street, N.W.
Washington, D.C. 20004
Phone: 202-616-6537 Fax: 202-514-8395

          APPEARING FOR THE UNITED STATES

Mr. Lambert J. Hassinger, Jr.
GALLOWAY, JOHNSON, TOMPKINS, BURR AND SMITH
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
Phone: 504-525-6802 Fax: 504-525-2456

          APPEARING FOR LOUISIANA

ALSO PRESENT:
James Deel, videographer
REPORTED BY:

THU BUI, CCR, RPR
Certified Court Reporter
State of Louisiana
State of Texas

1  (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



241

243

16  Q.          And as a businessman who
17 enters into these contracts and -- and looks
18 at these contracts and -- you would agree
19 that they should be enforced as they're
20 written, right?
21  A.    Again, I would have to -- I
22 would have to say that you fall back on what
23 is happening on location at the time, and if
24 we are able, as far as rig activities, to
25 perform our contractual obligations or if our

242

244

1 duties are impeded by any type of rig
2 activity that would be happening at that
3 time.

PURSUANT TO CONFIDENTIALITY ORDER



249

5   Q.   Because when you enter into a
6   contract, you expect that it's going to be
7   enforced the way that it's written, correct?
8   A.   On this particular -- on this
9   particular subject on lost-in-hole tools,
    yes.

250

251

252

63  (Pages 249 to 252)

**PURSUANT TO CONFIDENTIALITY ORDER**

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| **BP** | | | | | | | |
| B-1 | John Baxter | BP | Group Head of Engineering and Process Safety | June 21-22, 2011 | John Baxter was not aware of any evidence that would support an allegation that anyone from Transocean acted with indifference or willful disregard for the safety of others or the environment in connection with the Macondo 252 well. | Volume 2: 43:6-15 | |
| B-2 | Mark Bly | BP | Executive Vice President of Safety and Operations<br><br>Team Leader, BP Internal Investigation | February 17-18, 2011 | The *Deepwater Horizon* was "one of the best rigs in the fleet" and "had as much precaution and technology that exists in the industry". The crew aboard the *Deepwater Horizon* had all "the requisite training records." BP's investigation uncovered no evidence that any company or person maliciously, deliberately, or intentionally caused injury to other humans or to the environment. Mark Bly saw no malicious intent in anything he observed. | 231:24-232:3 644:19-24 660:15-661:18 | |
| B-3 | Martin Breazeale | BP | Manager of Well Site Leader of the Future Program<br><br>former Trainer for the Well Site Leader of the Future Program | May 16-17, 2011 | During visits to the *Marianas* and *Deepwater Horizon*, Martin Breazeale did not observe anything that caused him to be concerned about the safety of Macondo drilling and well operations. It appeared both BP and Transocean personnel on the *Marianas* were following BP's policies and practices for safe drilling and well operations. All but one of the Well Site Leader of the Future candidates were assigned to the *Deepwater Horizon* at one point or another. None of the BP candidates in the Well Site Leader of the Future Program assigned to the *Deepwater Horizon* reported to Breazeale that safety critical equipment was in poor condition or disrepair. No candidates reported to him that the *Deepwater Horizon* crew was incompetent or poorly trained or that the rig had an inadequate safety culture. Neither Breazeale nor the BP candidates observed any behavior by any crew member of the *Deepwater Horizon* that could be considered callous or indifferent to the safety of others or the environment. | 287:14-290:2 291:1-6 337:15-338:5 352:15-356:6 | |
| B-4 | Sir William Castell | BP | Senior Independent Director<br><br>Chairman of the Safety, Ethics and Environment Assurance Committee | June 22-23, 2011 | Sir William Castell testified BP used Transocean rigs extensively in its drilling operations. To effectively respond to the April 20, 2010 blowout, BP chose to use Transocean rigs and Transocean crew in the relief efforts. According to Castell, BP "held Transocean in a high regard for its activities." | 285:10-286:25 287:16-21 | |
| B-5 | Brett Cocales | BP | Operations Engineer | April 25-26, 2011 | When operations commenced at the Macondo well, Brett Cocales was personally satisfied the *Deepwater Horizon* and its equipment were in a safe operating condition. He also was personally satisfied the personnel on the rig were trained and competent. As of March 2010, 90% of the September 2009 BP rig audit findings were cleared, with the remaining items awaiting parts. In light of this progress, Cocales was satisfied with the equipment and personnel aboard the *Deepwater Horizon* at the end of March 2010. He was satisfied the personnel on the rig were trained and competent to handle the drilling and well operations that were anticipated from Macondo. Cocales was not aware of anyone at BP who was not satisfied in this regard. | 461:25-462:11 485:5-486:8 487:10-488:19 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-6 | Gillian Cowlam | BP | Engineering Manger for Sangachal Terminal<br><br>Member, BP Internal Investigation | June 7, 2011 | During her involvement in the Macondo investigation, Gill Cowlam never encountered no evidence suggesting any maintenance issue or deficiency resulted in an ignition source for the incident.  She also never learned of any evidence that indicated Transocean employees aboard the *Deepwater Horizon* were indifferent toward the safety of others or the environment.  No one has ever made such statements to her. | 109:1-111:3 | |
| B-7 | Neil Cramond | BP | Area Operations Manager, Na Kia Oil and Gas Production Facility<br><br>former SPU Marine Authority, Gulf of Mexico | April 25, 2011 | At no point between September 2009 and April 2010 did Neil Cramond have to report to his supervisors any safety concerns regarding the *Deepwater Horizon*.  The assessment team did a thorough job in terms of performing the September 2009 BP audit of the rig.  "The assessment protocol is a thorough protocol as prescribed by the industry."  As of September 22, 2009, the *Deepwater Horizon* did not pose an unacceptable marine safety risk from the standpoint of BP.  If it posed such a risk, Cramond would not have permitted it to return to work.  BP's process of verifying audit items were closed out "was full and complete."  Cramond had authority to suspend operations on the *Deepwater Horizon* if he felt progress was not being made to rectify issues identified by the audit.  He received no information between September 2009 and April 2010 requiring he take such action. | 198:21-199:13<br>290:18-25<br>297:14-25<br>302:6-25<br>313:12-314:16<br>319:4-19<br>321:22-322:17<br>324:23-326:10 | |
| | Neil Cramond (continued) | BP | Area Operations Manager, Na Kia Oil and Gas Production Facility<br><br>former SPU Marine Authority, Gulf of Mexico | April 25, 2011 | As of February 22, 2010, neither Cramond nor BP had any concerns from a marine standpoint that the *Deepwater Horizon* posed a safety risk.  Corrective actions "seem[ed] to be progressing in a timely manner."  After Angel Rodriguez's trip to the rig on March 29-30, 2010, Cramond was not made aware of any pending safety issues identified in the September 2009 BP marine assurance audit which had not been rectified.  He was not aware of any items from the assessment that were outstanding and that were related directly to the incident on April 20, 2010.  Cramond received no information between September 2009 and April 20, 2010 that caused him to consider a safety stand-down on the *Deepwater Horizon*.  He fully expected to be informed, as the Gulf of Mexico marine authority, if there were any safety concerns aboard the rig involving marine integrity. | | |
| B-8 | Keith Daigle | BP | Wells Operations Advisor, Gulf of Mexico | July 19, 2011 | Keith Daigle confirmed he had been on the *Deepwater Horizon* 4 to 6 times during his career, including twice in 2009.  During this time, he never experienced any indication that any of the crew members were indifferent or callous towards safety.  While aboard the *Deepwater Horizon*, he had no concerns regarding safety of the rig.  Because the *Deepwater Horizon* was "a good-performing rig" and "very safety-oriented", Daigle always considered it "one of the leaders of the pack."  He agreed many BP well site leaders requested transfers to work on the *Deepwater Horizon*. | 212:17-214:5<br>214:15-18<br>215:1-216:4<br>217:2-218:3 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-9 | Mike Daly | BP | Executive Vice President of Exploration | September 21-22, 2011 | Mike Daly was unaware of anyone at Transocean acting in a manner that reflected a willful disregard for the environment or for the safety of other humans.  He was not concerned about using the *Deepwater Horizon* to finish the Macondo well.  No one ever reported to him any concerns about the *Deepwater Horizon* and its use on the Macondo well.  Daly could not recall any BP weekly drilling report that contained criticism of the *Deepwater Horizon* or its crew.  He could not disagree with the statement that rig crews aboard the *Deepwater Horizon* safely managed previous kicks.  He, likewise, could not disagree with the statement that rig crews effectively managed multiple loss circulation events during the drilling of the Macondo well. | Volume 2: 9:5-18 11:21-12:8 15:22-16:7 55:4-56:3 | |
| B-10 | Scherie Douglas | BP | Regulatory Compliance Team Leader | October 11, 2011 | As Regulatory Compliance Team Leader, Scherie Douglas was notified when one of her rigs was issued an incident of noncompliance (INC).  She testified the *Deepwater Horizon* was not issued an INC while it was on the Macondo well. | 288:5-15 | |
| B-11 | James Dupree | BP | Senior Vice President for the Gulf of Mexico | June 16-17, 2011 | In his dealings with Transocean personnel, James Dupree "thought they were quite professional and did a good job."  At no time did any Transocean personnel indicate they were indifferent to the health and welfare of individuals that worked on its drilling rigs.  Likewise, Dupree never observed any indifference to the welfare of the environment on the part of Transocean.  No one from BP suggested to Dupree the *Deepwater Horizon* be taken off line.  He never heard anyone suggest Transocean be removed from BP's preferred provider list. | 389:15-390:6 393:22-395:15 | |
| B-12 | Steven Flynn | BP | Vice President of Health, Safety, Security and Environment (HSSE) | June 29, 2011 | No one ever suggested to Steven Flynn that Transocean, as a corporation, had a philosophy of indifference towards the welfare of the environment or individuals.  No one ever suggested to Flynn that Transocean's employees were indifferent to the welfare of the environment or the welfare of individuals. | 193:11-194:8 | |
| B-13 | Cheryl Grounds | BP | Chief Engineer of Process and Process Safety | May 4, 2011 | Cheryl Grounds agreed there was no indication the Transocean *Deepwater Horizon* crew (1) deliberately wanted to cause harm to the environment or others; (2) maliciously tried to cause injury to the environment or another person; or (3) simply was indifferent about the safety of the environment or others.  She was not aware of any negligent conduct on behalf of Transocean or its crew aboard the *Deepwater Horizon* on April 20, 2010. | 350:5-351:12 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-14 | John Guide | BP | Drilling Engineer Team Leader, Angola<br><br>former Wells Team Leader | May 9-10, 2011 | In John Guide's opinion, Transocean had a very good safety management system that included risk assessments.  Transocean was making very good progress in addressing the September 2009 BP audit items.  Knowing the competency of the crew and the condition of the *Deepwater Horizon*, Guide was surprised when he learned of the explosion.  He spent the night on the rig in 2010 and admitted that if he had any concerns about the safety of the *Deepwater Horizon*, he would not have slept on it.  The crew did not seem like the type that would hide issues that would subject them or anyone else to danger.  Paul Johnson "had a good attitude towards safety and the environment."  Guide was comfortable with Johnson, Jimmy Harrell, Randy Ezell, Jason Anderson, Dewey Revette, and Donald Clark performing their respective job duties. | 197:10-17<br>482:14-491:19<br>498:1-9 | |
| | John Guide (continued) | BP | Drilling Engineer Team Leader, Angola<br><br>former Wells Team Leader | May 9-10, 2011 | He never experienced any indication from these gentlemen that they were indifferent or callous towards the safety of individuals or the environment.  In fact, Guide felt these individuals were not in need of any additional training.  He agreed that if he could turn back the clock, he would be comfortable serving as the wells team leader for the *Deepwater Horizon* with the same exact crew.  Guide opined Transocean is very good at managing its safety management system. | | |
| B-15 | Anthony Hayward | BP | former Chief Executive Officer | June 6, 2011<br>June 8, 2011 | During Tony Hayward's time at BP, no one in Senior Management ever came to him and said Transocean or its employees had a philosophy of indifference to the welfare of the environment or the health of individuals.  It was never suggested Transocean was callous, indifferent, or just didn't plain give a damn about the welfare of the environment or individuals.  Hayward admitted if that had been the case, "others would have taken action before it got to [him], [he is] certain."  He also acknowledged that Transocean is "one of the world's largest and most respected drilling contractors", and as of the time he left BP, one of the preferred providers throughout the world for BP in drilling its deepwater wells.  Hayward offered his impression of the crew assigned to the *Deepwater Horizon* after meeting many of them at the Transocean Memorial Service. | 539:10-14<br>540:3-8<br>541:2-18<br>542:5-16<br>545:20-547:9 | |
| | Anthony Hayward (continued) | BP | former Chief Executive Officer | June 6, 2011<br>June 8, 2011 | He "thought they were great people, and [he] was deeply touched by the sorrow that they were feeling and the loss that they experienced."  Hayward got the impression they all considered themselves one big family, even though they were from different companies. | | |
| B-16 | Curtis Jackson | BP | former Director of Health, Safety, Security and Environment (HSSE), Gulf of Mexico | July 21, 2011 | During Curtis Jackson's time as HSSE director, no one ever suggested to him Transocean had a philosophy of indifference or callous disregard for the environment or for the safety of others.  If he had learned of such information, it would have been his duty, at a minimum, to make sure his manager was informed. | 175:5-24 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-17 | Kevin Lacy | BP | former Vice President of Drilling and Completions, Gulf of Mexico | June 1-2, 2011 | Transocean's safety performance was not materially different from other contractors.  Kevin Lacy recalled telling Rob Saltiel, Vice President of Performance at Transocean, in February 2009, he was happy with the strong safety results of Transocean rigs in the Gulf of Mexico.  He also recalled mentioning the consistent safety performance of the *Deepwater Horizon*.  The rig "had not had a personal safety incident during [Lacy's] time there." | 399:20-400:3 481:4-483:15 | |
| B-18 | Lee Lambert | BP | Well Site Leader  former Well Site Leader of the Future | May 9-10, 2011 | As a Well Site Leader of the Future, Lee Lambert had the opportunity to observe the drill crews on the *Deepwater Horizon* while they were performing operations.  This included the drill crew on tour the night of April 20, 2010.  Lambert never observed any member of the drill crew act in a fashion that indicated callous disregard for the safety of others or the environment.  Jimmy Harrell, Randy Ezell, and Jason Anderson were well-respected on the rig.  He had no safety concerns with any member of the *Deepwater Horizon* crew or the equipment onboard the rig.  Lambert liked working on the *Deepwater Horizon*, and that insofar as rigs, it was his second choice behind the *Enterprise*.  This preference was based on how the rig was laid out. | 170:16-172:15 306:23-310:13 | |
| B-19 | Philip Earl Lee | BP | Well Site Leader | June 1-2, 2011 | The *Deepwater Horizon* had a good safety record.  Philip Lee never had a reason to make a critical report on any crewman employed by Transocean on the *Deepwater Horizon*.  The crew was highly-skilled, professional, and hard-working.  Given the opportunity, he would serve with these men again.  Jimmy Harrell, Randy Ezell, Jason Anderson, Dewey Revette, Stephen Curtis, Donald Clark, and Curt Kuchta were not indifferent or callous towards the safety of individuals or the environment.  In Lee's opinion, none of these men were in need of training and would disagree with such a statement if one was made.  He agreed he had the authority to stop work if he had any undue concerns about the crew or their ability to perform.  Lee never exercised that authority. | 383:16-384:17 386:10-389:9 390:15-391:17 398:25-399:13 578:24-579:9 | |
| | Philip Earl Lee (continued) | BP | Well Site Leader | June 1-2, 2011 | Lee was onboard the *Deepwater Horizon* during the March 8, 2010 kick.  In his view, the driller responded appropriately.  Lee was not aware of any criticism of how the driller or any other Transocean crew member handled this kick.  Likewise, he never heard any criticism of the *Deepwater Horizon* Transocean crew in connection with the lost circulation event in early April 2010.  In the subsequent months following the September 2009 BP audit, Lee could not recall any safety critical items identified by the audit which were not addressed.  He agreed he had a duty to report such items.  Lee was never forced to shut down the *Deepwater Horizon* because of unaddressed safety critical items.  When Lee left the rig on April 7, 2010, he had no maintenance items to report that required immediate attention.  He had no concerns about the blowout preventer or ever asked that it be taken out of service. | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-20 | Ian Little | BP | Vice President of Wells, North Africa<br><br>former Wells Manager for Exploration and Appraisal Drilling, Gulf of Mexico | June 9-10, 2011 | Ian Little had a "good relationship" with the Transocean personnel he worked with. He had no reason to question their competency. Little agreed that they never appeared indifferent to the safety of other individuals or the environment. | 383:17-384:8 | |
| B-21 | John Mogford | BP | former Executive Vice President of Safety Operations | June 28-29, 2011 | At no point during John Mogford's career at BP did anyone ever express concerns to him about the training or competency of the *Deepwater Horizon* rig crew. While Executive Vice President, no one ever expressed concerns to Mogford regarding the condition of the *Deepwater Horizon* or its equipment. | 255:23-258:22 | |
| B-22 | Patrick O'Bryan | BP | Vice President of Wells, BP America<br><br>former Vice President of Drilling and Completions, Gulf of Mexico Deepwater | July 14-15, 2011 | Patrick O'Bryan visited the *Deepwater Horizon* on April 20, 2010 because "it was, in [BP's] fleet, the best-performing rig from a safety and a drilling performance standpoint ... and it also was one of the better-performing rigs in the Transocean fleet." Being new to his role as Vice President of Drilling and Completions and with this being his first trip offshore, O'Bryan selected the *Deepwater Horizon* to see "what 'good' looked like". He also wanted to discuss the *Deepwater Horizon*'s culture and determine what made the rig and its crew successful in hopes he could apply it to other BP rigs. O'Bryan echoed these same sentiments when interviewed by members of BP's internal investigation team post-incident. Prior to his visit, David Sims provided O'Bryan with a PowerPoint presentation entitled "Talking Points for the Horizon Rig Visit". The presentation stated the *Deepwater Horizon* team had a "genuine concern for the health, safety and environment — not just ticking the box". O'Bryan testified this is what he wanted to go and visit with the team about. | 22:17-23:22<br>480:14-481:7<br>482:3-483:25<br>484:20-487:1 | |
| | Patrick O'Bryan (continued) | BP | Vice President of Wells, BP America<br><br>former Vice President of Drilling and Completions, Gulf of Mexico Deepwater | July 14-15, 2011 | O'Bryan never heard Daun Winslow say anything that led him to believe that Winslow was not totally focused on safety and the environment. O'Bryan never experienced any indication anyone within Transocean was indifferent or callous towards the safety of individuals or the environment. No one from BP ever told O'Bryan the *Deepwater Horizon* was not safe to perform its mission. O'Bryan agreed he felt comfortable sleeping on the rig on April 20, 2010. He was unaware of any problems with the blowout preventer (BOP) on April 20, 2010. No one from BP ever told O'Bryan the BOP was not functioning properly or it had not been properly maintained. O'Bryan "had good working relationships with many folks at Transocean." | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-23 | Vincent Price | BP | Well Site Leader<br><br>former Well Site Leader of the Future | June 20, 2011 | Vincent Price was satisfied with the competency of the rig crew, including Jimmy Harrell, Dewey Revette, Stephen Curtis, Donald Clark, and Captain Kuchta.  Price recognized he could have stopped work at any time if he was not comfortable with the competency of anyone onboard the *Deepwater Horizon*.  He never raised any issues with Transocean regarding any of the rig crew.  Price did not think the crew of the *Deepwater Horizon* was callous or indifferent as to the safety of individuals or the environment.   When Price left the rig on April 11, 2010, he was not aware of any outstanding safety critical audit items which had not been addressed. | 136:18-138:17<br>139:11-20<br>141:15-19 | |
| B-24 | David Rich | BP | Wells Manager, Gulf of Mexico Deepwater | June 1-2, 2011 | David Rich was not aware of any evidence that would support a conclusion that any Transocean employee or manager deliberately or willfully inflicted injury on the environment or another person.  In the same regard, he was not aware of any evidence that Transocean acted maliciously. | 378:18-379:21 | |
| B-25 | Angel Rodriguez | BP | Marine Advisor | July 29, 2011 | Angel Rodriguez visited the *Deepwater Horizon* in October 2009 and then again in late March 2010.  Based on these 2 trips, Rodriguez believed the *Deepwater Horizon* could operate in a safe manner, at least from a marine standpoint.  Rodriguez felt safe when he was onboard the *Deepwater Horizon*.  When he arrived on the rig in October, he received an orientation in accordance with Transocean policy.  Rodriguez testified the orientation was conducted in a professional manner.  During orientation, he received a pamphlet which included his primary and secondary lifeboat stations.  Rodriguez agreed the orientation prepared him in the event of an emergency on the rig.  During his time on the *Deepwater Horizon*, Rodriguez never witnessed any unsafe operations.  He never witnessed any action by any member of the *Deepwater Horizon* crew that would be considered reckless, malicious, or indifferent towards the safety of others or the environment.  He never heard anyone make comments along these lines. | 134:2-149:2<br>153:6-11<br>164:5-165:19<br>170:12-171:8<br>179:4-13<br>179:25-181:24<br>192:13-193:9 | |
| | Angel Rodriguez (continued) | BP | Marine Advisor | July 29, 2011 | Jimmy Harrell was knowledgeable about his job and was not nonchalant about safety.  Based on his interactions with Captain Kuchta, Rodriguez had no reason to question Kuchta's competency or fitness.  He had no reason to believe Michael Dow was not competent.  Rodriguez testified the rig was being managed by safety conscious individuals.  At the time the *Deepwater Horizon* went back into service, Rodriguez was not personally aware of any condition on the rig that rendered it unsafe.  Paul Johnson was supportive of the *Deepwater Horizon* and efforts to close out the items identified in the September 2009 BP audit.  The crew as a whole took the marine findings from the BP audit seriously.  "They were really intent on addressing those findings." | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | Angel Rodriguez (continued) | BP | Marine Advisor | July 29, 2011 | When Rodriguez left the rig in October 2009, he was satisfied there was a plan in place to close out any remaining audit items. Rodriguez witnessed first-hand the *Deepwater Horizon* crew's commitment to closing out these items. Within 5 months, the crew completed 63 out of 70 findings, which was commendable. Despite the unresolved audit items, which were awaiting parts, Rodriguez was satisfied the *Deepwater Horizon* could operate safely and was seaworthy. | | |
| B-26 | Murry Sepulvado | BP | former Well Site Leader | May 11-12, 2011 | The *Deepwater Horizon* was Murry Sepulvado's home away from home. If he had any concerns regarding safety, he would not have slept on the rig. In terms of Transocean's culture, "safety first, environment and then the task at hand". According to Sepulvado, "everybody supported that." Sepulvado trusted the crew. He was comfortable with Jimmy Harrell, Randy Ezell, Jason Anderson, Dewey Revette, Stephen Curtis, Donald Clark, and Captain Kuchta in their respective positions. He agreed he never experienced any indication from these gentlemen that they were indifferent and callous towards the safety of individuals or the environment. Harrell "was always on top of safety and safety was always number one." Ezell "was one of the best toolpushers [Sepulvado] ever worked with." | 527:18-538:6 | |
| | Murry Sepulvado (continued) | BP | former Well Site Leader | May 11-12, 2011 | Anderson "was an excellent toolpusher." Sepulvado had no issues with the *Deepwater Horizon* crew's competency or safety consciousness. He agreed that it would be a pleasure to work with the crew again on a rig. When Sepulvado spoke with the Bly Commission, he told them he was "totally confident in the personnel that was on the rig." He acknowledged that if he had any problems with the rig crew, he could have done something about it. | | |
| B-27 | Ronald Sepulvado | BP | former Well Site Leader | March 10-11, 2011 | The *Deepwater Horizon* was Ronnie Sepulvado's "home away from home". He worked on the rig for more than 8 years. Sepulvado trusted the *Deepwater Horizon* crew and believed they were "good people, ... good workers and good safety people", who would not lie or hide safety issues. Dewey Revette, Jason Anderson, Jimmy Harrell, Stephen Curtis, Curt Kuchta, and Randy Ezell were competent and had a good attitude towards safety. They were not callous, reckless, or indifferent towards the safety of others or the environment. Revette and Harrell held safety as a number one priority. If the crew, dead and alive, were on a different rig today, Sepulvado would feel comfortable working with every one of these men. He testified he did not agree with the section of the Bly report stating the crew needed training to demonstrate competency. To the best of his knowledge and experience, the Transocean personnel aboard the *Deepwater Horizon* were qualified and competent for the jobs they were doing. | 465:10-14 465:21-478:20 673:10-18 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-28 | John Shaughnessy | BP | former Well Control Technical Authority, Gulf of Mexico | September 27, 2011 | John Shaughnessy never got the impression anyone at Transocean was callous or consciously indifferent to the safety of individuals or the environment.  He never heard that anyone at Transocean was callous or consciously indifferent to the safety of individuals or the environment. | 192:12-193:2 | |
| B-29 | David Sims | BP | Operations Manager, Gulf of Mexico Deepwater | April 6-7, 2011 | David Sims was unaware of any performance concerns with Transocean during the drilling of the Macondo well.  The crew was skilled, knowledgeable, and trustworthy.  When he visited the *Deepwater Horizon* on April 20, 2010, Sims never witnessed any Transocean employee aboard the *Deepwater Horizon* performing work in a negligent fashion.  He is unaware of any Transocean personnel or management involved with the Macondo prospect deliberately or willfully wanting to inflict harm on any person or the environment.  He never witnessed any Transocean personnel or management acting maliciously towards others or the environment. | 451:7-452:11 477:18-479:6 | |
| B-30 | Cynthia Skelton | BP | Vice President of Safety and Operational Risk, Gulf of Mexico  former Vice President of Health, Safety, Security and Environment (HSSE) and Engineering, Gulf of Mexico | May 25-26, 2011 | Cindy Skelton agreed she had no evidence that any Transocean personnel in connection with the *Deepwater Horizon* (1) deliberately wanted to cause harm to the environment or others; (2) maliciously tried to cause injury to the environment or another person; or (3) willfully inflicted harm on any person or the environment.  She was not aware of any evidence of negligence by Transocean in connection with the *Deepwater Horizon*. | 513:14- 514:11 | |
| B-31 | Jonathan Sprague | BP | Vice President of Organizational Capability for Global Wells Organization  former Drilling Engineering Manager, Gulf of Mexico | March 21-22, 2011 | John Sprague was never advised of any problems with the *Deepwater Horizon* or its crew.  No one from BP ever reported to him the rig was operating in an unsafe manner or the crew was incompetent.  No one from the BP wells team informed him about any maintenance concerns that made them want to shutdown operations on the *Deepwater Horizon*.  Sprague was never approached by anyone who voiced concerns that the crew deliberately wanted to cause injury to the environment or to another person or that felt the crew was indifferent or malicious in terms of trying to cause harm to the environment or another person. | 511:8-514:5 | |
| B-32 | Doug Suttles | BP | former Chief Operating Officer | May 19-20, 2011 | BP employed three Transocean rigs during the response — *Enterprise*, *DD II*, and *DD III*.  From Doug Suttles' perspective, BP was working very closely with Transocean in terms of the relief well and containment activities.  The individuals Suttles "dealt with at Transocean were professional, knowledgeable industry executives".  He agreed Transocean was not indifferent or callous to the health and welfare of rig personnel or the environment in connection with its drilling operations.  If he had concerns regarding Transocean's commitment to safety, he would have taken some form of action.  As of April 20, 2010, no one had ever suggested to Suttles the *Deepwater Horizon* should be taken off-line, or Transocean as a company should be put in timeout. | 365:17-366:5 753:5-754:18 759:9-19 795:4-14 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-33 | Henry "Harry" Thierens | BP | former Vice President of Drilling and Completions Operations | June 9-10, 2011 | Harry Thierens was not aware of any evidence that would suggest any member of the *Deepwater Horizon* crew (1) was indifferent or did not care about the safety of others or the environment; (2) deliberately wanted to injure another human being or damage the environment; or (3) acted with malice toward others or the environment. During his visits to the rig in November 2007 and late 2009, Thierens participated in a safety orientation.  During the orientation, he was acquainted with the *Deepwater Horizon*'s emergency and evacuation procedures.  He testified the orientation was conducted in a professional manner and "was comprehensive."  At the time, Thierens agreed he was comfortable with Transocean's safety processes and practices.  He could not recall any concerns regarding safety or seaworthiness of the vessel from his visit to the *Deepwater Horizon* in late 2009.  He did not see any deficiencies aboard the rig during this visit. | 425:1-426:17 427:16-432:20 | |
| B-34 | Jay Thorseth | BP | Vice President of Exploration and Appraisal, Angola<br><br>former Exploration Manager, Gulf of Mexico Deepwater | September 20, 2011 | The safety orientation Jay Thorseth received on the *Deepwater Horizon* "was a good overview."  The orientation included evacuation processes and procedures.  Thorseth agreed the *Deepwater Horizon* achieved 7 years with no lost time incidents.  At no time during the drilling of the Macondo well did Thorseth observe or learn of any malicious acts or willful or intentional misconduct towards human safety or the environment by the *Deepwater Horizon* crew. | 302:16-304:16 | |
| B-35 | David Wall | BP | Vice President of Risk, Learning, Health and Safety<br><br>former Vice President of Health, Safety, Security and Environment (HSSE) and Integrity Management for Upstream | June 27, 2011 | Despite David Wall's opinion that the gas could have been safely diverted overboard, he spoke highly of Transocean's crew.  He believed that the decision was left to the individuals onboard the *Deepwater Horizon*, and they reacted in a manner they felt was appropriate.  Wall testified the crew "stayed right to the end, trying to fight and — and shut the well in." | 119:23-120:14 | |
| B-36 | O. Kirk Wardlaw | BP | Senior Negotiator for the Western Hemisphere<br><br>former Chief Land Negotiator, Gulf of Mexico | June 9, 2011 | Kirk Wardlaw heard within BP the *Deepwater Horizon* was one of the stellar rigs in the fleet.  He does not disagree with this statement. | 177:13-178:5 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-37 | Norman Wong | BP | Manager of Rig Audit Group | June 13-14, 2011 | Norman Wong was not aware of any evidence that any member of the *Deepwater Horizon* crew (1) was indifferent or did not care about the safety of others or the environment; (2) deliberately wanted to injure another human being or damage the environment; or (3) acted with malice towards others or the environment.  BP was convinced the rig could operate safely when it allowed it to go back into service on September 22, 2009.  Wong testified he had no evidence the *Deepwater Horizon* was in an unsafe condition on September 22, 2009.  No information from the September 2009 BP audit indicated the *Deepwater Horizon* crew was incompetent.  No information from the audit indicated the blowout preventer would not function properly.  Wong agreed the rig began rigorously closing out audit findings during the month following the audit. | 312:6-313:10 319:15-320:5 320:15-321:9 325:18-326:10 328:12-18 | |
| B-38 | Barbara Lowery-Yilmaz | BP | former Technical Vice President of Drilling and Completions | July 26, 2011 | Barbara Yilmaz never got the impression in her dealings with Transocean that the company did not care about the safety of the environment or individuals. She never heard from any of the employees within the BP organization that they felt as though Transocean was consciously indifferent toward the safety of individuals or the environment. | 412:20-413:9 | |
| **Halliburton / Sperry Sun** | | | | | | | |
| B-39 | Paul Anderson | Halliburton | Service Supervisor III, Gulf of Mexico | April 27-28, 2011 | The Transocean crew on the *Deepwater Horizon* was skilled, knowledgeable, and trustworthy.  Paul Anderson had no knowledge of any negligent or grossly negligent acts or omissions by Transocean in connection with the Macondo prospect. | 450:1-453:15 | |
| B-40 | James Bement | Halliburton | Vice President of Sperry Drilling | September 20, 2011 | None of the Transocean employees James Bement dealt with indicated they were indifferent to the health and welfare of individuals working on Transocean drilling rigs or were indifferent to the environment in connection with Transocean drilling operations.  He never received feedback from his employees that Transocean employees were conducting their jobs in a manner that indicated they were indifferent to the health and welfare of other individuals on Transocean rigs.  If Bement had received complaints or concerns of this nature, he would have taken action to protect his own employees. | 238:5-240:4 | |
| B-41 | Ronald Faul | Halliburton | Technology Manager, Gulf of Mexico Region, Cementing | June 29-30, 2011 | Ronald Faul testified that he had nothing bad to say about Transocean.  He was not aware of any evidence that a Transocean employee or manager was negligent in performing his or her job in connection with the Macondo prospect.  Faul was not aware of any Transocean employee or manager involved with the Macondo prospect (1) deliberately wanting to cause injury to the environment or to any person; or (2) acting maliciously or not caring about causing injury to another human or the environment. | 548:14-20 643:20-644:18 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-42 | Kelly Gray | Halliburton | Senior Surface Data Logging Field Specialist / INSITE Specialist | April 14-15, 2011 | Every person aboard the *Deepwater Horizon* had authority to stop a job.  The personnel aboard the rig were committed to safety.  The rig's performance showed that commitment.  Kelly Gray worked closely with Jason Anderson, Stephen Curtis, Donald Clark, and Dewey Revette and agreed these men were skilled at their jobs and knowledgeable.  With regards to these specific individuals, Gray testified, "We had an excellent relationship".  He never witnessed them or any of the Transocean crew perform their jobs negligently.  He never witnessed the *Deepwater Horizon* crew act maliciously towards the environment or other individuals.  He never saw any Transocean employee on the *Deepwater Horizon* willfully inflict harm on any person or the environment.  Similarly, Gray agreed that no Transocean employee aboard the *Deepwater Horizon* deliberately wanted to cause injury to another person or the environment. | 525:13-526:9 526:20-22 531:3-533:13 | |
| B-43 | Joseph Keith | Halliburton | Mud Logger | March 28, 2011 | Even after the final casing string and cement were set and the negative pressure test complete, "[e]verybody was still watching everything."  Joe Keith was never placed in a situation while aboard the *Deepwater Horizon* where he thought he should halt drilling operations.  He cannot recall ever seeing anyone who felt uncomfortable halting drilling activities by calling a time-out for safety.  Keith personally knew Dewey Revette, Jason Anderson, and Stephen Curtis and believed each was trustworthy and competent.  On the evening of April 20, 2010, he did not witness any acts or omissions by these men or other rig members he would classify as negligent.  There was no indication any Transocean rig crew members were indifferent or malicious in terms of human health or safety or environmental safety.  Keith never saw any evidence the Transocean crew aboard the *Deepwater Horizon* was callous.  He knew the Transocean rig crew well.  They were good men. | 148:10-22 187:24-189:15 303:15-308:5 | |
| B-44 | Kurt Kronenberger | Halliburton | Operations Leader<br><br>Service Coordinator for the Sperry SDL Product Service Line | August 2, 2011 | During his time on the *Deepwater Horizon* in 2003, Kurt Kronenberger did not see the crew act negligently in any way.  He is unaware of any Transocean employee or manager involved in the Macondo prospect (1) deliberately wanting to cause injury to the environment or to any other person; (2) acting maliciously or not caring about causing injury to another person or the environment; or (3) willfully inflicting harm on any person or the environment.  Kronenberger was unaware of any evidence the crew lacked knowledge about their jobs. | 216:25-218:11 219:8-11 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-45 | James "Jim" Prestidge | Halliburton | Vice President of Health, Safety and Environment (HSE) and Service Quality | September 21, 2011 | Jim Prestidge was unaware of any evidence that any Transocean personnel, in connection with the *Deepwater Horizon*, was malicious, did not care, or deliberately wanted to cause injury to another human or to the environment.  He was unaware of any evidence that any Transocean personnel, in connection with the *Deepwater Horizon*, willfully inflicted harm on any person or on the environment.  Prestidge never received feedback from Halliburton employees that Transocean employees were conducting their jobs in a way that indicated they were indifferent to the health and welfare of other individuals on the rig.  Halliburton would not have sent its employees to work on the *Deepwater Horizon* if it did not believe the rig's safety systems were adequate to protect its employees. | 305:22-306:21 307:15-308:2 | |
| B-46 | Thomas Roth | Halliburton | Vice President of Cementing Product/Services Line | July 25-26, 2011 | Tommy Roth was not aware of any Transocean employee or manager involved in the Macondo prospect (1) negligently performing his or her job; (2) deliberately wanting to cause injury to the environment or any person; (3) acting maliciously or not caring about causing injury to another human or the environment; or (4) willfully inflicting harm on any person or on the environment. | 655:7-656:24 | |
| B-47 | Michael Serio | Halliburton | Lead Technical Professional | April 28-29, 2011 | Mike Serio had no concerns with the ability of the *Deepwater Horizon* to safely perform its duties at the Macondo well or the competency of the crew aboard the rig.  He was unaware of anyone within Halliburton who had concerns regarding the *Deepwater Horizon* or its crew. | 459:2-20 | |
| B-48 | Vincent Tabler | Halliburton | Cementer—Service Supervisor Three | June 13-14, 2011 | Vincent Tabler was assigned to the *Deepwater Horizon* from February 2009 to April 20, 2010.  The Transocean crew aboard the *Deepwater Horizon* was skilled, knowledgeable, and trustworthy.  In Tabler's opinion, Transocean performed its job correctly, as did the Transocean rig crew assigned to the *Deepwater Horizon*.  He never saw Jason Anderson, Dewey Revette, Stephen Curtis, and Donald Clark perform their jobs on the *Deepwater Horizon* in a negligent fashion.  Tabler was not aware of any Transocean employee or manager involved in the Macondo prospect ever (1) deliberately wanting to cause injury to the environment or any other person; (2) acting maliciously or not caring about causing injury to another human or the environment; or (3) willfully inflicting harm on any person or the environment. | 528:18-533:19 | |
| B-49 | Richard Vargo | Halliburton | Cementing Regional Manager, Gulf of Mexico | March 30, 2011 | Richard Vargo was unaware of any mistakes made by Transocean rig crew members onboard the *Deepwater Horizon* with regard to the cement pumping job.  Displacement of the cement by Transocean was conducted efficiently and accurately. | 586:12-17 591:15-20 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| **MMS / BOEMRE and U.S. Coast Guard** | | | | | | | |
| B-50 | Bryan Domangue | MMS / BOEMRE | District Manager, Houma | September 21, 2011 | The BOEMRE tries to inspect each rig monthly.  In 2010, the MMS inspected the *Deepwater Horizon* approximately 8 to 10 times.  Bryan Domangue agreed the MMS did not issue an incident of noncompliance (INC) during its April 1, 2010 inspection of the *Deepwater Horizon*.  He was not personally aware of any INC issued to the *Deepwater Horizon* by the MMS prior to the incident.  If the MMS had any concerns re Transocean's maintenance, an INC would have been issued and noted on the inspection form under "Enforcement Actions".  No such Enforcement Actions were ever annotated by MMS during the relevant period. | 165:13:166:8 167:10-170:3 | |
| B-51 | Eric Neal | MMS / BOEMRE | Production Inspector | July 21, 2011 | Eric Neal inspected the *Deepwater Horizon* on two occasions in 2010.  He considered the *Deepwater Horizon* to be "one of the best" in terms of safety and performance.  He never observed any problems or issues with crew competency.  As a whole, Transocean was very safety conscious.  Neal agreed Transocean strives to remain in full compliance with all MMS regulations.  During his inspections of the rig, Neal found no issues regarding noncompliance with any federal regulations. | 131:7-132:24 | |
| B-52 | Robert Neal | MMS / BOEMRE | Drilling Rig Inspector | July 19, 2011 | According to Robert Neal, the safety culture onboard the *Deepwater Horizon* "was as good as any other rig."  During his inspections of the *Deepwater Horizon* in February 2010 and March 2010, Neal did not note any deficiencies that warranted an incident of noncompliance (INC).  No deficiencies were included in his inspection reports.  Neal did not see anything that gave him cause or concern that the crew was not well-trained and competent to respond to a well control situation.  Based upon his review of IADC reports and documents, Neal believed the *Deepwater Horizon* crew properly responded to prior loss circulation and well control events.  He could not recall observing any safety hazards or concerns during his inspections of the rig.  Neal felt Jimmy Harrell was a knowledgeable and capable OIM, as well as "very conscientious" in terms of safety. | 168:19-169:16 175:20-176:12 177:11-178:11 178:23-1-182:8 184:21-25 | |
| | Robert Neal (continued) | MMS / BOEMRE | Drilling Rig Inspector | July 19, 2011 | Dewey Revette, Jason Anderson, Randy Ezell, and Harrell were properly trained and competent to respond to a well control event.  He had no reason to believe these gentlemen would not respond quickly and conscientiously to a well control event.  Based upon his examination of the blowout preventer (BOP) and the test records for the BOP, the BOP on the *Deepwater Horizon* was in compliance with all MMS regulations from an operational standpoint, a maintenance standpoint, and a testing standpoint.  No INCs associated with the *Deepwater Horizon*'s BOP were included in Neal's February 2010 or March 2010 inspection reports. | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-53 | Frank Patton | MMS / BOEMRE | Drilling Engineer, New Orleans | July 13-14, 2011 | During the drilling of the Macondo well, Frank Patton never became aware of any incidents of noncompliance (INC) by Transocean.  No one, including BP, ever complained to Patton about any aspect of Transocean's operations with respect to the Macondo well.  He was not aware of any regulatory violations committed by Transocean with respect to the *Deepwater Horizon*.  MMS inspectors, who inspected the *Deepwater Horizon* monthly, never reported to Patton that Transocean was in violation of any MMS requirements.  He does not recall Transocean ever being issued an INC. | 351:21-353:22 | |
| B-54 | Michael Saucier | MMS / BOEMRE | Deputy Regional Supervisor for Field Operations, New Orleans | July 27-28, 2011 | During the drilling of the Macondo well, Michael Saucier never became aware of any incident of noncompliance (INC) with respect to any regulatory requirements applicable to Transocean.  No one from the MMS ever reported to him that he or she thought Transocean was not in compliance with any regulatory requirements imposed on it in connection with the drilling of the well.  The MMS did not issue any INCs to Transocean during the drilling of the Macondo well.  Prior to the Macondo blowout, all of the blowout preventer (BOP) testing that was conducted aboard the *Deepwater Horizon* was deemed acceptable by the MMS.  Likewise, the MMS did not raise any issues with Transocean regarding the configuration of the BOP.  No regulatory compliance issues were raised by the MMS with Transocean regarding maintenance of the *Deepwater Horizon* or the rig's crew.  Saucier was never informed by anyone from the MMS that Transocean or any of its employees on the *Deepwater Horizon* exhibited a callous disregard for the safety of individuals or the environment. | 314:20-316:13 | |
| B-55 | David Trocquet | MMS / BOEMRE | District Manager, New Orleans | September 23, 2011 | As of April 19, 2010, there was no determination by the MMS that Transocean violated MMS regulations in connection with the Macondo well.  As of May 2010 when MMS representatives testified before the Marine Board of Inquiry, there was no determination by MMS that Transocean violated MMS regulations in connection with the Macondo well.  At the time of Dave Trocquet's deposition on September 23, 2011, BOEMRE still had not issued any violations of applicable regulations related to the Macondo well.  During the drilling of the Macondo well, Trocquet was not aware of any incident of noncompliance (INC) with respect to any regulatory requirement related to Transocean.  No one reported to Trocquet that they believed Transocean was not in compliance with applicable regulatory requirements.  The MMS never issued INCs or warnings to Transocean during the drilling of the Macondo well. | 74:14-75:9 77:18-24 200:21-203:11 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | David Trocquet (continued) | MMS / BOEMRE | District Manager, New Orleans | September 23, 2011 | Prior to April 20, 2010, Trocquet did not consider Transocean to have a callous disregard for the safety of individuals or the environment.  He was not aware of anyone within the MMS that considered Transocean to have a callous disregard for the safety of individuals or the environment.  The MSS never raised any regulatory issues with Transocean regarding the blowout preventer as a result of its inspections of the *Deepwater Horizon*.  Trocquet testified the MMS inspectors were adequately trained to inspect drilling rigs like the *Deepwater Horizon* and certain components of the rig, such as the BOP.  He agreed the MMS inspectors that inspected the *Deepwater Horizon*, including Eric and Robert Neal,  were competent. | | |
| B-56 | Michael Odom | U.S. Coast Guard | Chief of Inspections Division, Delaware Bay, Philadelphia, PA

former Chief of Prevention, Marine Safety Unit, Port Arthur, TX | October 11, 2011 | Lieutenant Commander Michael Odom, along with two others, were the last three Coast Guard officers to conduct an exam for compliance on the *Deepwater Horizon*.  The *Deepwater Horizon* had no outstanding discrepancies when they boarded the vessel, and it had no discrepancies when they left the vessel on July 27, 2009.  As part of the examination, a drill or mock simulation was performed with the *Deepwater Horizon* crew.  Odom testified the crew responded "satisfactorily."  He did not note any problems at all that would cause him any concern regarding the competency of the crew to respond to the simulation.  "[T]hey were expert in their ability to use the equipment and respond to the drill that we initiated."  Odom did not note any deficiencies or issues from a safety standpoint associated with the (1) preventative maintenance system; (2) cranes; or (3) electrical equipment in hazardous areas on July 27, 2009.  The emergency generator was in satisfactory condition, and the fire boundary doors were operating properly. | 11:22-12:8 17:13-21 146:4-147:1 149:1-12 150:4-19 153:5-24 155:8-17 156:24-160:4 160:17-161:21 162:13-164:6 166:19-167:8 | |
| | Michael Odom (continued) | U.S. Coast Guard | Chief of Inspections Division, Delaware Bay, Philadelphia, PA

former Chief of Prevention, Marine Safety Unit, Port Arthur, TX | October 11, 2011 | Odom testified the *Deepwater Horizon* crew was competent and well-trained.  He did not find them indifferent or callous towards safety.  Odom further testified that the crew's "knowledge of the equipment on board was exceptional".  He agreed the rig had an outstanding safety culture.  As a result of the July 2009 exam and inspection, Odom found the *Deepwater Horizon* to be seaworthy and fit for route and service. | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| **Independent Auditors** | | | | | | | |
| B-57 | William Haynie | American Bureau of Shipping | Principal Surveyor | June 27, 2011 | William Haynie was onboard the *Deepwater Horizon* in 2003 for an annual survey, in 2005 for an "annual, flag change" survey, and for an underwater inspection in lieu of dry-dock (UWILD) extension survey in 2009.  To the best of his knowledge and from a reading of his reports, Haynie did not discover any serious deficiencies onboard the rig or recommend the rig suspend operations.  Likewise, to the best of his knowledge, no ABS colleagues ever suggested to Transocean or BP that the *Deepwater Horizon* ought to suspend operations.  Haynie never recommended to the Marshall Islands to pull the rig's statutory certificates.  He never communicated to anyone at BP that he believed the rig was incapable of safe operations.  Haynie agreed that when he was aboard the *Deepwater Horizon* performing surveys he underwent a safety orientation, knew he possessed stop-work authority, and never exercised that authority because he never witnessed a safety concern warranting such action. | 51:8-52:5 184:12-188:1 253:12-255:14 276:3-278:12 | |
| | William Haynie (continued) | American Bureau of Shipping | Principal Surveyor | June 27-28, 2011 | He also never identified any safety concerns in terms of the rig's safety culture.  Haynie agreed that based on his personal knowledge, Transocean's preventative maintenance system for the engines and equipment was being carried out satisfactorily.  At no point in time did he uncover any deficiency or evidence Transocean was failing to keep the *Deepwater Horizon* in compliance with ABS rules and regulations. | | |
| B-58 | David McKay | Det Norske Veritas | Regional Chief Surveyor for MODUs, North America Region | May 11, 2011 | From April 2005 to April 2009, David McKay audited the safety management system of Transocean's corporate office.  He also had the opportunity to audit the *Deepwater Horizon* in 2005 and 2007.  McKay's experience with Transocean was it was "pretty serious about safety management."  During the May 2007 ISPS audit of the *Deepwater Horizon*, some minor observations were made but no non-conformities were found.  Overall, McKay "was generally pretty satisfied with the implementation of the safety management system" onboard the rig.  He testified that it appeared "the safety management system was well implemented, [] the rig was in pretty good condition, and the personnel were competent."  McKay agreed the Transocean corporate safety management system was in compliance with ISM Code between April 2005 and April 2009. | 100:23-101:22 121:17-25 124:1-10 300:19-301:21 311:2-11 312:23-313:24 316:13-317:13 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | David McKay (continued) | Det Norske Veritas | Regional Chief Surveyor for MODUs, North American Region | May 11, 2011 | With regard to personnel in Transocean's corporate office, he testified "they're professional, they're dedicated to their jobs, and they're [] pretty focused on safety management." He thought the safety culture in the Transocean corporate office was good. McKay agreed the Transocean safety management system was well-prepared, robust, and well-implemented. With regard to the *Deepwater Horizon*, McKay testified, "The [] vessel appeared to be well maintained to me on both visits, as far as I can remember. It was clean, tidy. There wasn't apparent safety hazards. The maintenance system was by and large up to date. There was some minor problems, which I think I reported in 2007. The crew were very professional about how they [] regarded making sure that they did what they were supposed to do with regard to their duties. So it seemed to be a well-run operation from my perspective." | | |
| B-59 | Victor Martinez | ModuSpec | Subsea Surveyor (Independent Contractor) | April 14, 2011 | When Victor Martinez first boarded the *Deepwater Horizon* for inspection on April 2, 2010, he received a safety orientation from the crew, which included information regarding evacuation plans. According to Martinez, the orientation was conducted in a thorough and professional manner. He found Owen McWhorter, the Subsea Supervisor on the *Deepwater Horizon*, to be both competent and professional, as well as very knowledgeable about the subsea equipment on the *Deepwater Horizon*. | 268:18-269:13 270:3-16 | |
| B-60 | Kristofer Millsap | ModuSpec | Well Control Equipment Surveyor | May 12-13, 2011 | When Kris Millsap boarded the *Deepwater Horizon* for inspection in April 2010, he received training and orientation. Millsap agreed the staff that conducted the orientation took it seriously. | 324:1-9 | |
| B-61 | Alan Schneider | ModuSpec | Surveyor | June 23, 2011 | Transocean employs ModuSpec to perform "completely unbiased" assessments of its rigs. The goal is to obtain "a true condition assessment of the vessel, the bottom line. [Transocean] want[ed] to know the real condition of the rig." During his two visits to the *Deepwater Horizon*, Alan Schneider participated in an orientation process, which included a safety briefing and a rig tour. The safety orientation and drills aboard the *Deepwater Horizon* were thorough and professionally conducted. Schneider also was provided with instructions he had authority to stop work if he saw something he felt was unsafe. At no point while he was aboard the rig did he feel like a condition posed such an imminent danger he needed to exercise his stop work authority. A ModuSpec equipment rating (MER) report was prepared subsequent to the April 2010 rig assessment survey. Schneider agreed the MER report reflected an overall favorable rating for the *Deepwater Horizon*. | 33:11-34:10 370:22-374:21 415:18-418:6 | |
| B-62 | Peter Sierdsma | ModuSpec | President | February 2, 2011 February 16, 2011 | Transocean pays ModuSpec for surveys that are over and above those required by various laws and regulations that apply to rigs. This includes the survey performed on the *Deepwater Horizon* in April 2010. The April 2010 survey was a voluntary effort on Transocean's part to understand the condition of the *Deepwater Horizon* in order to remedy any deficiencies. | Volume 2: 115:2-11-116:1 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| **Others** | | | | | | | |
| B-63 | Paul Chandler | Anadarko | Project Geologist Advisor | May 4, 2011 | Paul Chandler was not aware of anyone at Anadarko who had any concerns with the ability of the *Deepwater Horizon* or its crew to competently and safely drill the Macondo well.  He personally did not have these concerns. | 320:9-18 | |
| B-64 | Dawn Peyton | Anadarko | Senior Reservoir Engineer | September 8, 2011 | Dawn Peyton has never heard anyone question the competency of the *Deepwater Horizon* rig crew.  Peyton agreed operations can be dangerous despite all the safety systems.  Anadarko personnel, including Peyton, flew over the *Deepwater Horizon*, circling over the rig for approximately 20 seconds, a week before the incident.  There were no discussions regarding size, orientation, or condition of the *Deepwater Horizon* during the flight.  Peyton could not recall any discussions regarding integrity of the Macondo well or safety concerns. | 57:5-11 213:20-25 225:13-227:14 228:4-10 | |
| B-65 | Robert Quitzau | Argonauta | Drilling Engineer | May 25-26, 2011 | While tracking progress of the Macondo well, Robert Quitzau, in his role as drilling engineer, never reviewed any material that caused him concern regarding the safety of operations. | 403:10-404:1 | |
| B-66 | William LeNormand | Cameron | Senior Field Service Technician | June 20-21, 2011 | Based on his interactions with Transocean employees Mike Fry and Billy Stringfellow, William LeNormand testified both men did a good job.  They were knowledgeable about Cameron blowout preventers (BOPs), including service and maintenance.  LeNormand agreed Transocean was proactive about getting Cameron involved to help service its BOPs.  Transocean would call Cameron if it had problems or needed help.  Transocean made safety a priority on its rigs.  Every time LeNormand went aboard a Transocean rig, the crew provided him with a thorough and comprehensive orientation, which addressed safety and evacuation of the rig.  He had no complaints about how Transocean handled its safety orientations.  He also participated in safety drills, which were conducted "sometimes at night and sometimes during the day." | Volume 2: 87:14-90:20 91:20-92:11 121:15-122:4 126:5-128:14 | |
| B-67 | Steven Johnson | M-I Swaco | Drilling Fluids Specialist | September 27, 2011 | Based on Steven Johnson's experience with Transocean personnel assigned to the *Deepwater Horizon*, he never got the impression any of them deliberately wanted to cause injury to the environment or to any person.  Johnson never got the impression they were malicious or did not care about causing injury to another human or to the environment.  The Transocean rig crew aboard the *Deepwater Horizon* made safety a priority.  Johnson felt Transocean was a safety conscious company.  He felt the Transocean crew aboard the *Deepwater Horizon* was competent.  While onboard the rig, Johnson participated in both weekly safety drills and well control drills.  From the well control drills, Johnson knew what his responsibilities were in the case of a well control event.  He agreed he was adequately trained to handle such an event.  Johnson had no complaints about the safety drills he participated in while onboard the *Deepwater Horizon*. | 104:16-105:23 106:10-107:15 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-68 | Leo Lindner | M-I Swaco | Mud Engineer / Drilling Fluid Specialist | September 14-15, 2011 | When he went to bed on the evening of April 20, 2010, Leo Lindner had "complete trust" in the *Deepwater Horizon* crew to deal with whatever situation came up as the displacement process was completed.  He left his personal safety in their hands.  He "trusted every crew" on the *Deepwater Horizon*.  Lindner had no reason to think the rig crew would take any unnecessary risk during negative testing or final displacement.  He "believe[d] they did their best" to control the well. | 358:16-359:10 | |
| B-69 | Gregory Meche | M-I Swaco | Compliance Specialist | October 6, 2011 | Gregory Meche never got the impression any Transocean personnel aboard the *Deepwater Horizon* deliberately wanted to harm the environment or another person.  He never got the impression the Transocean rig crew was malicious or simply did not care about causing injury to the environment or another person.  Meche agreed Transocean was a safety conscious company.  The Transocean crew aboard the *Deepwater Horizon* made safety a priority.  Meche believed the crew was competent.  At a minimum, Meche participated in safety drills once a week while aboard the rig.  Based on his participation in these drills, he felt he knew his responsibilities in the event of an emergency.  Meche testified he was adequately trained on Transocean safety procedures.  He had no complaints regarding the safety drills. | 175:10-176:24 177:3-14 261:3-22 | |
| | Gregory Meche (continued) | M-I Swaco | Compliance Specialist | October 6, 2011 | Meche was aware he had authority, along with everyone else on the rig, "to completely shut down an operation for unsafe acts, or anything of the like."  Everyone on the *Deepwater Horizon* was familiar with this procedure.  Meche testified he, along with the rest of *Deepwater Horizon* crew, were serious about safety. | | |
| B-70 | Stuart Lacy | QO, Inc. | Well Site Geologist | September 23, 2011 | Whether visiting the *Deepwater Horizon* or working aboard the rig, Stuart Lacy received a safety orientation given by Transocean crew members.  The orientation included evacuation and emergency procedures.  At no time during the drilling of the Macondo well did Lacy observe any willful or intentional misconduct towards human safety or the environment on the part of any Transocean crew member.  Lacy was aware he had authority to call a time-out for safety if he observed any unsafe condition.  Many times in the past, Lacy stopped drilling if the crew "was not sure about something."  He agreed work would not commence again until everybody was on the same page and felt it was safe to proceed. | 165:8-167:20 | |
| B-71 | Katharine Paine | Quadril Energy | Pore Pressure Analyst | April 18-19, 2011 | During her time on the *Deepwater Horizon*, Kate Paine never felt unsafe.  She did not feel like the Transocean rig crew was going faster than they should to safely drill the Macondo well.  Prior to March 8, 2010, Kate did not think the drilling rate was unsafe.  After the kick on March 8th, the Transocean rig crew continued to drill the well safely. | 512:4-21 521:20-23 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-72 | Victor Emanuel | Schlumberger | former Deepwater Coordinator, Gulf of Mexico | September 27, 2011 | Victor Emanuel was on the *Deepwater Horizon* 10 to 20 times between 2005 and 2010.  He testified he worked on the *Deepwater Horizon* for a long time and "never had a problem."  "[E]verything was always fine" when he interacted with Transocean personnel aboard the rig.  Emanuel confirmed the rig always had safety meetings, and as a third party he was required to attend.  A safety meeting was held before an operation was started to discuss job safety procedures.  The purpose was to "get everybody involved so everybody knows their task" in an attempt "to avoid any accident or incident."  As the job progressed, additional safety meetings were held.  In April 2010, Emanuel never experienced any Transocean personnel doing something that was unsafe.  He testified when someone first visits the *Deepwater Horizon* or has not been on the rig for a long period of time, he or she attends a rig orientation.  The orientation includes watching a video about safety procedures and evacuation. | 106:1-20 135:21-138:11 | |
| B-73 | Douglas Martin | SMIT Salvage | Chief Executive Officer | September 14, 2011 | Bringing the Macondo well under control was under BP's purview.  Based on Doug Martin's involvement in the response, he had no criticism of any Transocean personnel involved in the response efforts or of those individuals from Transocean who worked directly with him. | 48:17-25 136:7-14 | |
| B-74 | Ross Skidmore | Swift | Subsea Well Supervisor | May 18, 2011 | Ross Skidmore agreed the safety orientation for the *Deepwater Horizon* was comprehensive.  "The crew did an outstanding job" demonstrating the rig's safety features.  He remains thankful that he was schooled up on these features prior to April 20, 2010. | 267:6-268:10 | |
| B-75 | Bryan Clawson | Weatherford | Technical Sales Representative | June 6-7, 2011 | Bryan Clawson testified he had nothing bad to say about Transocean.  He agreed he had good things to say about Transocean. | 446:25-447:6 | |
| **Transocean** | | | | | | | |
| B-76 | Bill Ambrose | Transocean | Managing Director, North America Division | July 18-19, 2011 | | 751:3-16 761:9-762:18 766:16-767:2 | Transocean 741:3-753:4 (Confidential) 758:16-766:5 (Confidential) 766:16-768:13 (Confidential) |
| B-77 | Craig Breland | Transocean | Crane Operator | May 18, 2011 | While on the *Deepwater Horizon*, Craig Breland did not notice any activities by Transocean he felt were unsafe.  He did not feel any pressure to speed up operations or cut corners because they were behind schedule. | 84:16-85:9 85:23-86:2 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-78 | Douglas Brown | Transocean | Second Engineer | May 3, 2011 | The men on tour with Doug Brown in the mechanical department were hard working, conscientious, and safety-oriented.  If he had any hesitations about their abilities, he would have reported the situation to his supervisor or handled it himself.  Brown agreed this never occurred.  BP did not exercise its right to shutdown the *Deepwater Horizon* at any point in 2010 because of safety concerns.  Jimmy Harrell was "a very, very controlled and thorough man."  With him it was "the safe way or no way."  Brown respected Jason Anderson and Dewey Revette and believed both men performed their jobs safely and were not risk-takers. | 292:20-293:8 295:11-20 297:21-299:7 | |
| B-79 | Micah Burgess | Transocean | Driller | April 20, 2011 | Micah Burgess never heard any complaints from BP about the Transocean safety culture on the *Deepwater Horizon*.  He is not aware of any Transocean personnel receiving complaints, either orally or in writing, from BP regarding work performance.  Burgess relied on and trusted in Dewey Revette's abilities. He felt Revette was professional and "took everything to the top level."  He agreed Jason Anderson was good at his job and professional.  He learned a lot from Anderson.  When Burgess went to bed on the night of April 20th, he had confident in the fact Anderson was at the helm. | 255:7-25 482:10-484:24 | |
| B-80 | Gerald Canducci | Transocean | Quality, Health, Safety and Environment (QHSE) Manager, North America | March 23-24, 2011 | The *Deepwater Horizon* "had good safety performance and good operational performance".  The rig was recognized for having a "very high quality crew".  Transocean celebrates when employees execute a time-out for safety.  For example, Transocean management recognizes those who call time-outs for safety through the "I Made a Difference" campaign, which starts with a documented time-out for safety on a rig.  Canducci testified the corporate office "choose[s] one that is noteworthy and they distribute it throughout the company saying, trying to show people that calling a time-out for safety is nothing to be frightened to do.  We encourage it every day, all the time."  At no time prior to the April 20, 2010 explosion  did anyone at BP complain to Jerry Canducci about the equipment or the training that Transocean provided to the crew aboard the *Deepwater Horizon*.  No one from BP ever complained to Canducci that Transocean's training of its employees was somehow derelict or that its employees did not know how to conduct well control. | 434:9-435:1 575:25-576:17 662:9-17 685:7-13 | |
| B-81 | Miles "Randy" Ezell | Transocean | Senior Toolpusher | April 27-28, 2011 | At all times during the drilling of the Macondo well, Randy Ezell believed operations aboard the *Deepwater Horizon* were safe.  If he felt operations were unsafe or too risky, he would have intervened by stopping the job. | 491:5-24 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-82 | Daniel Farr | Transocean | Director of Special Projects<br><br>Lead of Transocean Macondo Investigation | August 24-25, 2011 | | Volume 1:<br>124:15-125:2<br>335:23-336:5 | Transocean<br>123:10-126:5 (Confidential)<br>331:21-336:10 (Confidential) |
| B-83 | David Hackney | Transocean | Master | July 25, 2011 | | 114:9-17<br>173:10-177:1<br>177:9-22 | Transocean<br>173:14-174:21 (Confidential)<br>176:10-15 (Confidential)<br>177:10-15 (Confidential) |
| B-84 | Troy Hadaway | Transocean | Rig Safety Training Coordinator | July 12, 2011 | Troy Hadaway  was assigned to the *Deepwater Horizon* for almost 5 years.  He testified in detail regarding the orientation process upon arrival at a Transocean rig.  Orientation is required for both short-stay visitors and those staying overnight.  A video providing a basic overview of THINK, START, time-outs for safety, and Transocean's Mission Statements is shown.  A welcome card is also provided which includes assignments for emergency stations and lifeboats.  It also has a copy of the station bill for the rig.  He had no concerns about the competency of the Transocean rig crew as of April 20, 2010.  Hadaway believed Jimmy Harrell, Randy Ezell, Jason Anderson, Dewey Revette, and Wyman Wheeler were experienced and competent in their respective positions.  If he had any concerns about the competency of these individuals, he would have raised these concerns with someone.  Hadaway testified all personnel were required to attend weekly safety meetings. | 25:23-25<br>174:4-177:22<br>179:24-182:8<br>234:13-22 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-85 | Derek Hart | Transocean | Manager of Quality, Health, Safety and Environment (QHSE), North Sea<br><br>Macondo Investigation Team Lead, Gas Dispersion and Evacuation | October 7, 2011 | Through post-incident interviews and a review of documents, such as the Lloyd's Report, Derek Hart and Steve Meyers were of the opinion the *Deepwater Horizon* had "a very strong safety culture". They determined the rig's safety culture did not impact the events of April 20, 2010. Hart testified, "I believe that the crew of the *Deepwater Horizon* did a tremendous job in safely evacuating 115 survivors from — from the rig in a very, very difficult circumstances." He further testified, "[T]hose involved on the night of the 20th, particularly the supervisors of the *Deepwater Horizon* crew did a tremendous job in organizing that safe evacuation from the rig, and that is also backed up by some of our service partners that were also on the rig, that the effectiveness and the quality of the training that both the Transocean crew had received and, also, the — some of our service partners were a major contributor to the successful evacuation and safe recovery of 115 people." During his investigation, he found no indication that BP was unhappy with the safety culture or safety management | 147:9-148:10<br>220:6-10<br>255:5-257:7<br>259:18-260:12<br>272:15-276:23 | |
| | Derek Hart (continued) | Transocean | Manager of Quality, Health, Safety and Environment (QHSE), North Sea<br><br>Macondo Investigation Team Lead, Gas Dispersion and Evacuation | October 7, 2011 | Hart agreed with the strengths identified by the Lloyd's auditors regarding the safety culture onboard the *Deepwater Horizon*. In his opinion, "the overall conclusion of that report was very positive about the *Deepwater Horizon*." | | |
| B-86 | Mark Hay | Transocean | Senior Subsea Supervisor | June 29-30, 2011 | | Volume 2:<br>176:2-180:23 | Transocean:<br>Volume 2:<br>174:18-179:5 (Confidential) |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-87 | Caleb Holloway | Transocean | Floorhand | May 19, 2011 | Caleb Holloway was proud to serve on the *Deepwater Horizon*. From the time he arrived on the *Deepwater Horizon* until April 20, 2010, he never saw anything that presented a safety hazard. Safety was a priority on the rig, and Transocean stressed the importance of a safe working environment. Dewey Revette, Jason Anderson, Donald Clark, Stephen Curtis, Randy Ezell, and Jimmy Harrell were all safety conscious. Holloway does not recall ever seeing anything during his entire time on the *Deepwater Horizon* that suggested the crew was not taking maintenance of the equipment seriously. He was not aware of any unsafe conditions on the rig on April 20, 2010. Holloway felt comfortable using time-outs for safety and was supported by rig management. He was a awarded a silver watch from Jimmy Harrell for exercising a time-out for safety. | 129:19-21<br>141:21-153:21<br>154:18-21<br>155:15-19 | |
| | Caleb Holloway (continued) | Transocean | Floorhand | May 19, 2011 | Safety was the primary topic during both pre-tour meetings and weekly drill crew meetings. Holloway testified he had the necessary training to perform his duties as a floorhand. He never heard anyone from Transocean onboard the Deepwater Horizon complain they were not receiving proper training. | | |
| B-88 | Dustin Johnson | Transocean | Roustabout | July 27, 2011 | | 136:18-137:4<br>139:20-143:15<br>169:1-22<br>172:24-173:24<br>177:4-178:16<br>188:25-197:5 | Transocean<br>171:9-176:19 (Confidential) |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | Dustin Johnson (continued) | Transocean | Roustabout | July 27, 2011 | | | |
| B-89 | Paul Johnson | Transocean | Operations Manager | March 28-29, 2011 | The men and women aboard the *Deepwater Horizon* took pride in their work, were well-trained, and maintained a good safety culture.  Stephen Curtis, Donald Clark, Dewey Revette, and Jason Anderson — the men responsible for well control — were well-trained and competent.  These men were not the type of workers, based on Paul Johnson's experience, that would have become complacent in doing their jobs.  BP never criticized any Transocean personnel with regard to well control.  He described Jimmy Harrell as a "very experienced" OIM and similarly stated Ezell was a "very experienced" senior toolpusher.  Johnson stated, "I pushed tirelessly on safety, that was kind of my number one priority in building the culture.  You can fix everything else, okay, you can fix downtime, you can fix everything but you can't fix safety.  If you hurt somebody, you can't take it back.  So it was high on my list and we talked about safety every day. | 193:12-194:4 208:10-14 304:22-305:11 546:2-549:4 552:4-23 559:2-560:12 567:2-25 | |
| | Paul Johnson (continued) | Transocean | Operations Manager | March 28-29, 2011 | And it was the start of our conversations, it was the start of our meetings, it was in the forefront of everything we did."  His highest priority was the safety of the men and women aboard the *Deepwater Horizon*.  Johnson testified he would never have allowed the *Deepwater Horizon* to operate if he believed the rig was unsafe.  Following the September 2009 BP audit, he felt Transocean management backed him on his decision not to allow the rig back into service until an issue with the pipe racking system was resolved, despite being new to his position.  Johnson received positive feedback from BP personnel regarding Transocean's efforts to close out the audit items.  BP was very satisfied with Transocean's performance in this regard. | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-90 | Jonathan Keeton | Transocean | Rig Manager | August 17-18, 2011 | Transocean never cut corners to save money and compromise safety.  All Transocean employees assigned to the *Deepwater Horizon* were empowered to make their own safety calls.  "If they felt the job was not safe, they had the right to stop the job."  In fact, the crew had an obligation to stop the job.  Jonathan Keeton "empowered all of them do that."  "Safety was always paramount".  Keeton testified Transocean "[would] not compromise safety for performance."  He further testified safety was a "core value" for himself and for Transocean.  He never observed any actions on the part of Transocean during his tenure on the *Deepwater Horizon* that led him to believe that was not a core value of the company.  While assigned to the *Deepwater Horizon* from April 2001 to August 2009, "[s]afety [was] part of [Keeton's] day all day and even in the night."  During this time period, Keeton never received any complaints from BP concerning the condition of the *Deepwater Horizon* not being safe and seaworthy. | 273:19-22 317:3-21 320:14-16 321:25-322:4 638:18-641:19 642:14-645:8 | |
| | Jonathan Keeton (continued) | Transocean | Rig Manager | August 17-18, 2011 | He never received any complaints from BP that the blowout preventer was not functioning properly.  He never received any complaints from BP that the crew onboard the *Deepwater Horizon* was not adequately trained.  He never received any complaints that the crew was not competent to complete their job duties and responsibilities.  He never received any complaints that the *Deepwater Horizon* crew was not trained or experienced in well control.  In Keeton's opinion, the drilling crew aboard the *Deepwater Horizon* was "very competent" and included some of "the best of the best."  They appeared "to be very professional and on top of what they were doing."  Neither Dewey Revette nor Jason Anderson were risk takers.  Both "were very professional and on top of their game."  He never witnessed either "do anything that wasn't what they were supposed to do in well control". | | |
| B-91 | James Kent | Transocean | Rig Manager Asset | June 21-22, 2011 | | Volume 1: 375:24-376:11 390:17-391:19  Volume 2: 160:2-25 197:13-14 | <u>Transocean</u> Volume 1: 369:17-376:11 (Confidential) 384:4-399:20 (Confidential)  Volume 2: 176:20-198:8 (Confidential) |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-92 | Yancy Keplinger | Transocean | Senior Dynamic Positioning Officer | September 12, 2011 | Yancy Keplinger never sacrificed safety to get a bonus.  "It was [his] obligation to stop the job" if he thought an ongoing operation was unsafe.  During the four days prior to the incident, Keplinger believed "everything was going pretty normal" on the rig.  "Everybody was doing what they had to do safely."  Safety was the # 1 priority for Keplinger and his fellow crew members on the *Deepwater Horizon*.  He never witnessed any of the crew have a callous or indifferent attitude towards the safety of their fellow crew members. | 175:18-176:7 177:19-178:5 223:16-224:9 | |
| B-93 | James Mansfield | Transocean | First Assistant Engineer | May 12, 2011 | Jason Anderson, Dewey Revette, Jimmy Harrell, Randy Ezell, and Steve Bertone were hard-working and safety conscious.  Anderson and Revette were not the type to act in a way that may endanger the lives and safety of the crew of the *Deepwater Horizon*.  Harrell was supportive of James Mansfield and the rest of the Transocean crew.  Other crew members onboard the *Deepwater Horizon* looked up to Ezell.  Mansfield was proud to be part of the *Deepwater Horizon* team.  Mansfield, as a supervisor in the maintenance department, required his employees to follow Transocean safety policies and procedures, including THINK process planning and time-outs for safety.  Mansfield, himself, and his colleagues called time-outs for safety.  He agreed he never witnessed anyone get reprimanded or fired after calling a time-out for safety.  He, along with rig management, supported and encouraged time-outs for safety. | 97:3-100:22 102:6-103:7 107:11-109:24 | |
| B-94 | John MacDonald | Transocean | Manager, AMU Marine Operations  Transocean Macondo Investigation Team | September 30, 2011 | Captain John MacDonald interviewed members of the Transocean marine crew aboard the *Deepwater Horizon* following the April 20, 2010 incident.  MacDonald heard over and over from those who survived the initial explosions and the blowout that they felt blessed but of course missed the 11 crew members who lost their lives.  Based on these interviews, MacDonald believes the *Deepwater Horizon* crew "did an excellent job" and has not spoken to anyone who holds a different opinion.  He testified that "Transocean is huge on empowering people to do — to stop the job, Time Out For Safety.  Even if the job doesn't need to be stopped for a Safety reason if somebody perceives it, they have the opportunity."  He concluded "many people did many, many heroic things" that evening.  The fact 115 crew members safely evacuated the rig "speaks volumes for the training." | 48:18-49:8 70:8-14 293:6-298:22 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | John MacDonald (continued) | Transocean | Manager, AMU Marine Operations<br><br>Transocean Macondo Investigation Team | September 30, 2011 | MacDonald determined the Transocean safety culture aboard the *Deepwater Horizon* "was very good." The Transocean crew respected one another and "embraced safety". MacDonald testified that "a lot of people have told [him] in the interviews, and outside of it, they're very happy about Transocean's safety culture, and the ability of Transocean to provide a lot of the classes that they do for people, like the THINK, the START, the Focus, you know, Time Out For Safety. All those type of things where they empower people and train people, teach people, and improve their situational awareness, that's why a hundred — 115 people got home with their families." | | |
| B-95 | Paul Meinhart | Transocean | Motorman | July 28, 2011 | Paul Meinhart did not fear reprisal for reporting an unsafe condition aboard the *Deepwater Horizon*. He was not aware of any other crew members with this concern. Meinhart felt the safety meetings aboard the rig "were good for [him], and that they helped identify conditions that could possibly be hazardous that [he] may not have thought of". During his four months on the rig from December 2009 until April 2010, "[t]here were no safety issues that [Meinhart] was concerned about." Safety was constantly emphasized onboard the *Deepwater Horizon*. The crew who participated in safety meetings took them seriously, including Meinhart. The group Meinhart worked with "were all very safety conscious and did everything as per procedure." This included Willie Stoner, Terry Sellers, Ronald Arnold, Brent Mansfield, and Doug Brown. Dewey Revette "was a very highly respected man on the rig." Revette and Jason Anderson were not the type to be complacent or place the lives or the safety of others in jeopardy. | 179:23-180:2<br>180:6-25<br>258:2-259:16<br>260:6-261:8<br>268:22-271:5 | |
| B-96 | Jimmy Moore | Transocean | former Director of Quality, Health, Safety and Environment (QHSE) | October 4, 2011 | ██████████████████████ | 247:17-248:15 | Transocean<br>247:17-250:1 (Confidential) |
| B-97 | Steven Newman | Transocean | Chief Executive Officer & President | September 30, 2011 | Steven Newman testified that stop work authority is a key component of Transocean's safety management system. If a Transocean employee feels inadequately informed about a job, "[he or she] ought to exercise stop work authority". "No matter what the individual's relative ranks or levels of responsibility or supervision, that — that obligation of stop work authority, that principle of stop work authority is all inclusive. It goes — it cuts across chains of command. It cuts across departmental roles and responsibility. It's — if you see something unsafe, you're supposed to stop it." Newman testified this is the kind of culture he tries to instill in all Transocean employees every time he meets with them. The stop work authority (or time-out for safety) applies to anyone on Transocean drilling rigs, regardless of the customer. BP never complained about Transocean's safety management system, its well control procedures, or its blowout preventer procedures. | 160:15-161:4<br>162:12-164:24<br>357:3-358:6<br>360:5-25 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-98 | Jay Odenwald | Transocean | Subsea Supervisor | July 27, 2011 | ████████████████████████████████████████████ | 163:14-164:4 195:15-196:20 264:4-266:18 | Transocean 264:20-265:2 (Confidential) 265:13-266:18 (Confidential) |
| B-99 | Christopher Pleasant | Transocean | Subsea Supervisor | March 14-15, 2011 | "[The *Deepwater Horizon*] was a safe rig.  Real safe."  Chris Pleasant "felt comfortable getting in [his] bed every morning going to sleep on that rig."  Safety was emphasized on the *Deepwater Horizon*.  Pleasant testified, "Before every job, you had a pre-job meeting and you discussed the hazards of that job.  Before you even go to work, they had safety meetings. They have weekly safety meetings as well."  He also participated in weekly safety drills while aboard the *Deepwater Horizon*.  Both Pleasant and Transocean management took the safety drills seriously.  Pleasant was familiar with the Transocean THINK plan and START cards.  He spent over all of his life on the *Deepwater Horizon* and felt safe living there.  If Pleasant saw something unsafe related to the blowout preventer, he would make Mark Hay, his supervisor, aware of those things.  This was his practice and habit aboard the *Deepwater Horizon*. | 35:13-36:9 653:15:656:8 656:15-23 658:25-661:22 665:5-15 | |
| | Christopher Pleasant (continued) | Transocean | Subsea Supervisor | March 14-15, 2011 | Pleasant agreed he received quality training from Transocean to become a subsea supervisor.  Transocean always supported his desire to get additional education and training.  Never once did Transocean tell Pleasant he could not receive additional training. | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-100 | Adrian Rose | Transocean | Director of Quality, Health, Safety and Environment (QHSE) | April 25-26, 2011 | At no point during Service Quality Appraisals (SQAs) did BP complain about the safety practices of Transocean aboard the *Deepwater Horizon*. Instead, BP was "highly complimentary." Adrian Rose testified regarding the three key processes Transocean uses to manage safety onboard its rigs — the THINK planning process, START process, and time-out for safety. According to Rose, "[e]verybody onboard the rig has input into the THINK planning process. Everybody coming onboard the rig is inducted into it and has an orientation outlining the THINK planning process." In fact, "[Transocean's] clients actively encourage, support and participate in THINK and START onboard the rig." As for Transocean's stop work authority, known as a time-out for safety, "it's an obligation of everybody to interrupt an operation if they see something that they believe is unsafe." This obligation extends to Transocean's customers. | 97:23-99:7 108:18-112:24 117:24-118:7 118:23-119:8 | |
| | Adrian Rose (continued) | Transocean | Director of Quality, Health, Safety and Environment (QHSE) | April 25-26, 2011 | In 2009, Transocean proactively and voluntarily engaged an independent consultant—Lloyd's Register—to conduct a comprehensive review of the effectiveness of Transocean's safety management approach. This included an assessment of the Deepwater Horizon, among other rigs. | | |
| B-101 | Stuart "Bill" Sannan | Transocean | General Manager, North America | July 27-28, 2011 | Bill Sannan "believe[d] that the safety performance of the *Deepwater Horizon* was very good." Transocean reports showing rig performance statistics routinely ranked the *Deepwater Horizon* very high at the top, if not at the top. Sannan testified that "[i]f [Transocean] had a condition that was deemed unsafe to the safety of the people on the rig, we would correct the condition or we might take the equipment out of service to ensure it was not used." "We would not expose our people to conditions that we [knew] violated their safety." When Sannan spoke with Jimmy Harrell on April 20, 2010 while aboard the *Deepwater Horizon*, Harrell never made any statements to Sannan that suggested he was worried about the activities on the rig or believed anything was unsafe. | 31:4-32:5 74:11-75:1 179:24-180:13 181:12-17 181:21-182:6 | |
| B-102 | Newton Pharr Smith | Transocean | former Vice President of Engineering and Technical Support | June 27-28, 2011 | Safety was a major part of Pharr Smith's job description. "[I]n general, safe operations is one of the primary core values of Transocean." Smith testified, "the [*Deepwater*] *Horizon* was generally such a top performer that it was really off my personal radar screen." He agreed if necessary, Transocean will incur rig downtime costs to perform maintenance relating to safety and will conduct preventative maintenance to keep its rigs safe. According to Smith, senior management at Transocean "would be committed to getting the maintenance done regardless of the impact it might have on earnings." In terms of Transocean's polices and procedures regarding prevention of catastrophic events, Smith testified Transocean "was unique in his experience because they concentrated both on behavioral safety and on major event avoidance." | Volume 1: 22:10-19 210:14-211:8 293:4-294:7  Volume 2: 39:2-40:14 42:22-43:2 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | Newton Pharr Smith (continued) | Transocean | former Vice President of Engineering and Technical Support | June 27-28, 2011 | Audits were conducted on a regular basis that focused on major hazards and during those audits, auditors "would go from compartment to compartment" looking specifically for big picture hazards.  In addition to the major hazards audit, there was also an overreaching audit that looked at policies, procedures, and company management systems to help identify major hazards and either eliminate or mitigate them.  Smith agreed BP had authority to stop operations if it felt any of the *Deepwater Horizon* maintenance was undermining the safety of the rig. | | |
| B-103 | Carl Taylor | Transocean | former Radio Operator | July 14, 2011 | Prior to the incident on April 20, 2010, Carl Taylor never heard anyone say that drilling the Macondo well was too dangerous.  No one ever said in either words or substance that the well could not be drilled safely.  Taylor never got the impression from what he observed on the *Deepwater Horizon* that the job was being rushed or was not being done properly. | 156:11-157:19 | |
| B-104 | Robert Tiano | Transocean | Maintenance Supervisor<br><br>Transocean Macondo Investigation Team | August 25, 2011 | Robert Tiano felt safe on the *Deepwater Horizon*.  The men he knew on the rig were not the type of people who would endanger the lives of any of their coworkers.  Tiano was not aware of any rig crew member who had become complacent in doing their jobs. | 312:21-313:4<br>315:2-16 | |
| B-105 | Buddy Trahan | Transocean | Division Manager Asset | September 28, 2011 | The safety culture aboard the *Deepwater Horizon* was consistent with other Transocean rigs.  Buddy Trahan could not provide one example relating to the years 2009 and 2010 where something was done on the *Deepwater Horizon* that did not fit with the way Transocean did things on other rigs.  He could not recall any conversations with Transocean employees regarding concerns about Transocean's maintenance program.  He could not recall anyone expressing concerns to him regarding the drilling personnel on the *Deepwater Horizon* or any other Transocean rig. | 155:11-156:5<br>157:7-13<br>237:17-22 | |
| B-106 | Nick Watson | Transocean | Roustabout | July 14, 2011 | Nick Watson spent 3 years on the *Deepwater Horizon* prior to April 20, 2010.  Most of the workers were proud to serve on the *Deepwater Horizon*.  The rig was referred to as "the mighty *Horizon*."  Watson, himself, had no issues working on the rig.  The rig crew took pride in the *Deepwater Horizon* and could depend on fellow crew members.  "It didn't matter who gave [a] directive."  As a crew, "you wanted to look good."  Watson testified the crew members "were family."  If anyone needed something, whether it be a third party or Transocean personnel, "[they] went and helped them."  He felt comfortable reporting safety issues to his supervisors and did not fear any consequences for making such a report to Transocean.  Watson felt he had the information and training necessary to perform his job safely.  In terms of the safety culture on the *Deepwater Horizon*, safety policies and procedures were "pretty much law" and were strict. | 13:13-14:16<br>48:17-49:9<br>49:19-23<br>136:8-19<br>150:21-151:15<br>164:22-167:25<br>168:16-171:19<br>183:3-6 | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| | Nick Watson (continued) | Transocean | Roustabout | July 14, 2011 | Dale Burkeen, Jimmy Harrell, Randy Ezell, Jason Anderson, and Dewey Revette were all good men.  Each was hard-working and safety conscious.  Watson never heard or saw anything that indicated Anderson would jeopardize his co-workers' lives.  He never saw Revette do anything he deemed unsafe.  "[Revette] was by the book."  If Watson saw something unsafe, he would not hesitate to call a time-out for safety.  That was the policy on the *Deepwater Horizon*.  He witnessed other crew members call time-outs for safety.  The purpose of the weekly safety meetings was to discuss safety issues.  During morning meetings on the rig, safety was a big topic that was emphasized.  Regular emergency drills were conducted on the *Deepwater Horizon*.  Watson testified he and the rest of the crew took the drills seriously.  The drills prepared Watson for an actual emergency. | | |
| B-107 | Michael Williams | Transocean | Chief Electronics Technician | July 20, 2011 | Up until the time of the April 20, 2010 incident, Michael Williams liked working on the *Deepwater Horizon*.  He had no concerns or quarrels with the abilities of others working either above or below him in his department.  His supervisors, along with those working directly under him, were competent. | 223:19-23 264:10-19 | |
| B-108 | Daun Winslow | Transocean | Operations Manager | April 20-21, 2011 | Daun Winslow testified 70% of his time was dedicated to safety.  He focused on " dropped objects, possible hand injuries, communicating to the rig managers and the crews."  According to Winslow, "[e]very conversation is about safety in one way or the other."  In his conversations with various Transocean rigs, "[e]very rig manager talks about safety first.  What — what the crews have done and how many work permit audits they've done, how many times out for safety or people that participate in the process."  Jimmy Harrell was "compassionate about safety" and about his people.  He was a hard worker and a safety conscious manager.  Prior to BP filing a lawsuit against Transocean, no one from BP voiced concerns regarding the condition of the *Deepwater Horizon* or the competency of its crew as of April 20, 2010.  Winslow testified on the contrary, he "heard more praise about the machines and the crews of the [*Deepwater*] *Horizon*." | 604:1-606:1 624:2-625:12 626:19-629:5 | |
| | Daun Winslow (continued) | Transocean | Operations Manager | April 20-21, 2011 | BP has the right to stop work on the rig if it believed an unsafe condition existed.  Winslow was unaware of BP ever requesting Transocean to stop work because of an unsafe condition on the *Deepwater Horizon* during the drilling of Macondo well.  Dewey Revette was a "very safe worker."  He was conscientious and knowledgeable.  No one from BP ever expressed any concerns with Revette's competency or training. | | |

| Appendix No. | Witness | Employer | Position(s) | Deposition Date(s) | Summary of Favorable Testimony | Pages:Lines | Confidentiality Designations |
|---|---|---|---|---|---|---|---|
| B-109 | David Young | Transocean | Chief Mate | September 22, 2011 | David Young agreed Dewey Revette, Jason Anderson, and Jimmy Harrell were competent and safety-conscious in their respective positions onboard the *Deepwater Horizon*.  He worked with the *Deepwater Horizon* drill crew regularly for approximately four and a half years.  Young considered the *Deepwater Horizon* to be a safe rig.  He had no concerns about maintenance of the rig.  Safety was a top priority for both Young and his fellow crew members.  In terms of the *Deepwater Horizon*'s safety culture, Young testified it "was a top-down safety culture.  It … really worked in both directions.  You had — the Supervisors were ... there to .. teach everybody about the expectations.  And at the same time, you were able to — the ... guys at the lower end were able to stop jobs and ... bring up safety issues that would be addressed by the upper level management."  Young never observed a Transocean crew member on the *Deepwater Horizon* being callous or indifferent about the safety of others or the environment. | 287:4-14<br>287:20-25<br>322:17-20<br>322:25-324:1<br>324:19-23 | |