Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

United States District Court,
D. Massachusetts.
In re ALEX C CORP.
SEABOATS, INC., Plaintiff,
v.
ALEX C CORP., Bay State Towing Company, Inc., Posavina Shipping Company and Sociedad Naviera Ultragas, Ltd., Defendants.
POSAVINA SHIPPING COMPANY, and Sociedad Naviera Ultragas, Ltd., Plaintiffs,
v.
ALEX C CORP., and Bay State Towing Company, Inc., Defendants.

Nos. Civ.A. 01-12184-DPW, Civ.A. 01-12186-DPW, Civ.A. 00-12500-DPW.
Jan. 30, 2003.

*MEMORANDUM AND ORDER*
WOODLOCK, J.

**\*1** This trio of actions presents claims arising out of a major oil spill in Boston Harbor and its subsequent clean-up. Motions for summary judgment have been presented in two of the cases.

In Civil Action No. 01-12184, plaintiff Seaboats, Inc. ("Seaboats"), seeks recovery under the federal Oil Pollution Act of 1990 (the "OPA"), 33 U.S.C. § 2701 et seq., the Massachusetts Oil and Hazardous Material Release Prevention and Response Act (the "Massachusetts Release Act"), Mass. Gen. Laws ch. 21E, and other state and general maritime law, for physical damage the oil spill allegedly inflicted upon two of its vessels. Seaboats also seeks economic losses allegedly suffered as a consequence. In its Complaint, Seaboats names as defendants the two parties responsible for the oil tanker that discharged oil into the harbor, the Posavina Shipping Company ("Posavina") and Sociedad Naviera Ultragas, Ltd. ("SNU"), and the two parties responsible for one of the tug boats that was assisting the tanker at the time, the Alex C Corp. ("Alex C") and the Bay State Towing Company, Inc. ("Bay State"). Seaboats now moves for partial summary judgment on the limited question whether defendants Posavina and SNU are liable for Seaboats' claims under the OPA. Posavina and SNU have already satisfied the demands of other claimants and have covered removal costs and other damages in connection with the spill, pursuant to their designation as the "responsible parties" under the OPA.

In Civil Action No. 01-12186, plaintiffs Posavina and SNU allege that the Tug ALEX C, owned and operated by defendants Alex C and Bay State, was at fault for the spill, and seek recovery of Posavina and SNU's resulting damages, including both expenses paid out pursuant to the OPA and direct physical and economic damages.

I. BACKGROUND
A. *Factual History*

On June 8, 2000, while assisting in the undocking of the oil tanker M/T POSAVINA from an East Boston terminal, the Tug ALEX C collided with and punctured the hull of the tanker, causing some 60,000 gallons of fuel oil to spill into Chelsea Creek portion of Boston Harbor. The M/T POSAVINA was owned by Posavina and operated by SNU (collectively "Posavina/SNU"), both foreign entities. The ALEX C was owned by Alex C and operated by Bay State (collectively "Alex C/Bay State"), both Massachusetts corporations.

In the aftermath of the spill, Posavina/SNU undertook cleanup and recovery actions, reimbursed government expenses, and paid third-party damages, all pursuant to their designation as the "responsible parties" by the U.S. Coast Guard for purposes of the OPA.[FN1] Taking direct damages Posavina/SNU allegedly sustained into account as well-including damage to the hull of the M/T POSAVINA, economic losses, and the loss of the fuel oil-Posavina/SNU allege that they have incurred approximately $6,000,000.00 in costs and

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

damages as a result of the spill. Additional costs are anticipated.

> FN1. The OPA defines a "responsible party," liable for removal costs and damages in the immediate aftermath of an oil spill, as the owner or operator of the vessel or facility from which oil was discharged. 33 U.S.C. §§ 2701(32), 2702(a).

One third-party claim remaining is that of Seaboats, a Massachusetts corporation that owned and operated two vessels in the vicinity of the spill, the Tug CARL RAY and the Barge SAN JUAN. Seaboats alleges that both vessels were contaminated by fuel oil from the spill and consequently prohibited by the U.S. Coast Guard from departing from Chelsea Creek for some period of time. Seaboats seeks recovery for the physical damage, as well as various economic losses said to have been incurred as a result (including lost profits, lost charters, crew and operational expenses, demurrage, detention, and lost business opportunities). Seaboats submitted its claims to Posavina/SNU on or about September 20, 2000, and to Alex C/Bay State on February 28, 2001.

B. *Procedural History*

**\*2** In Civil Action No. 00-12500, the initiatory law suit for this litigation, Alex C/Bay State filed for limitation of their potential liability for the oil spill to the value of the ALEX C itself ($241,000). In their Complaint, they sought to limit their liability pursuant to the Limitation of Shipowner's Liability Act of 1851 (the "1851 Limitation Act"), 46 U.S.C.App. § 181 et seq., as implemented by Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule F"). On December 8, 2000, I entered an order, pursuant to Rule F, directing issuance of notice of Alex C/Bay State's limitation action, setting a schedule for claims to be filed, and restraining the prosecution of claims in any other fora. Both Posavina/SNU and Seaboats filed claims in Alex C/Bay State's limitation proceeding. On December 13, 2001, I entered an order noting the default of all other potential claimants.

Posavina/SNU's claim in the limitation proceeding sought recovery under the OPA, the Massachusetts Release Act, and general maritime law of their cumulative costs and damages arising from the oil spill. Posavina/SNU also sought to dismiss the limitation action with respect to its claims under the OPA and the Massachusetts Release Act, in order to lift the 1851 Limitation Act's cap on Alex C/Bay State's potential liability as to those claims.

Posavina/SNU reasoned that the OPA superceded the 1851 Limitation Act with respect to claims arising under the OPA or analogous state law, such as the Massachusetts Release Act. At the same time, Posavina/SNU conceded that the OPA and the Massachusetts Release Act only supported Posavina/SNU's recovery of amounts paid as the "responsible parties" for OPA purposes, which included removal costs, government expenses, and third-party damages. They conceded that the two acts did not support recovery for their direct physical and economic damages, which included damage to the hull of the M/T POSAVINA, consequent economic losses, and the loss of the fuel oil. Posavina/SNU further appeared to concede that recovery under general maritime law for their direct physical and economic damages remained subject to Alex C/Bay State's limitation proceeding.

At the hearing on November 21, 2001, Alex C/Bay State reversed their initial position and acknowledged that the 1851 Limitation Act does not apply to Posavina/SNU's claims for recovery of their removal costs and damages under the OPA, whether those claims were asserted by means of subrogation or contribution under the relevant OPA provisions. Accordingly, I directed Posavina/SNU to file a new complaint setting forth their claims for recovery of their removal costs and damages from Alex C/Bay State. Posavina/SNU have done so by commencing Civil Action No. 01-12186. At the same time, Posavina/SNU amended their Claim in Alex C/Bay State's limitation proceeding, Civil Action No. 00-12500, to focus on the direct physical and economic damages they allege they have sus-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

tained as a result of the spill.

**\*3** At the hearing on November 21, I also considered the status of Seaboats' outstanding claims. Because Seaboats' third-party claims appeared properly focused on Posavina/SNU, the designated "responsible parties" under the OPA, I directed Seaboats to file a complaint setting forth its claims for recovery from Posavina/SNU. Seaboats' Complaint, Civil Action No. 01-12184; names as defendants both Posavina/SNU and Alex C/Bay State, and in addition to recovery for physical damage and economic losses seeks punitive damages, costs, and attorneys' fees.

C. *Current Motions*

1. In Civil Action No. 01-12184, Seaboats now moves for partial summary judgment on the limited question of Posavina/SNU's liability for Seaboats' claims under the OPA.

2. In Civil Action No. 01-12186, Alex C/Bay State has filed a partial motion for summary judgment and a motion to dismiss, and Posavina/SNU has filed a motion to strike an affirmative defense. The parties' cross-motions concern the proper legal support for Posavina/SNU's claims and what limitation, if any, applies to Alex C/Bay State's alleged liability.

Notwithstanding their prior representations, Posavina/SNU's Complaint not only seeks recovery under the OPA and the Massachusetts Release Act for removal costs and damages paid, but also seeks recovery under general maritime law for the direct physical and economic damages allegedly sustained by Posavina/SNU themselves. Posavina/SNU's claims for removal costs and damages paid also appear to be premised on broader grounds than previously suggested; they include not only claims under the OPA and the Massachusetts Release Act, but also on the Massachusetts contributory negligence statute, Mass. Gen. Laws ch. 231B, and on general maritime law. Posavina/SNU's Complaint seeks, first, recovery of removal costs and damages paid in the aftermath of the spill, on the basis of the OPA (Counts VI and VII), the Massachusetts Release Act (Count II), the Massachusetts contributory negligence statute (Count VIII), maritime law contribution (Count IX), and maritime law indemnity (Count X). Second, the Complaint seeks recovery for the direct physical and economic damages they allege were sustained, on the basis of general maritime law theories of breach of contract (Count I), unseaworthiness (Count III), negligence (Count IV), and gross negligence (Count V).[FN2]

> [FN2]. Although Posavina/SNU characterize these latter causes of action as federal maritime law claims, they also state that they would have no objection to treatment of them as state common law claims instead.

Alex C/Bay State first move to dismiss all of Posavina/SNU's non-OPA causes of action, contending that the OPA governs Posavina/SNU's recovery of the amounts they paid as "responsible parties" under the OPA and that Posavina/SNU did not incur (and thus cannot recover costs associated with) any additional liability under Massachusetts law. Alex C/Bay State's motion does not directly address the question whether Posavina/SNU may seek recovery, outside of the limitation proceeding, for their alleged direct physical and economic damages.

Alex C/Bay State also move for partial summary judgment on the issue of their potential liability for removal costs and damages paid by Posavina/SNU under the OPA. The same question is posed from a different angle by Posavina/SNU's cross-motion to strike Alex C/Bay State's sixth affirmative defense, in which Alex C/Bay State assert that their liability is limited pursuant to § 2704 of the OPA.

II. THE OPA

**\*4** Analysis of the issues must begin with a brief review of the OPA and its key provisions. The Act was the culmination of an extended congressional effort to address the problem of marine oil

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

pollution, with the Exxon Valdez disaster serving as its immediate impetus. *See generally* Lawrence I. Kiern, *Liability, Compensation, and Financial Responsibility under the Oil Pollution Act of 1990: A Review of the First Decade,* 24 Tul. Mar. L.J. 481, 481-507 (2000). Frustration over the "fragmented" federal and state legal framework governing this area, and the resultant failure to compensate victims fully for the costs of oil pollution, greatly informed the legislation's drafting. *See* S.Rep. No. 101-94, at 2-3 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 723-24.

The OPA's comprehensive compensation and liability scheme begins with the imposition of strict liability upon the "responsible party," 33 U.S.C. § 2701(32), for removal costs and damages, *id.* § 2702. Absent a finding of gross negligence, willful misconduct, or violation of an applicable federal regulation, § 2704(c), the responsible party's total liability under the OPA is limited to a predictable amount under § 2704, based on the weight of the vessel.[FN3] If the sum of removal costs and damages paid by the responsible party under the OPA exceeds this limit, § 2708 entitles the responsible party to reimbursement of the difference from the Oil Spill Liability Trust Fund (the "Fund") established by the OPA pursuant to § 2712.

> FN3. If the oil was discharged from a tank vessel, like the M/T POSAVINA, this amount is calculated with reference to the vessel's weight, and in particular is set at:
>
> (1) ... the greater of-
>
> (A) $1,200 per gross ton; or
>
> (B) (i) in the case of a vessel greater than 3,000 gross tons, $10,000,000; or (ii) in the case of a vessel of 3,000 gross tons or less, $2,000,000[.]
>
> 33 U.S.C. § 2704(a)(1).

If the responsible party establishes that the oil spill was caused solely by a third party with whom it had no contractual relationship, then the responsible party is afforded a complete defense to liability under the OPA,[FN4] and the third party will be treated as the responsible party for purposes of determining liability under the Act. 33 U.S.C. §§ 2702(d)(1)(A), 2703(a)(3).

> FN4. The responsible party's complete defense to liability is subject to certain preconditions including, *inter alia,* that the responsible party had exercised due care with respect to the oil concerned, taken precautions against foreseeable acts or omissions of the third party, 33 U.S.C. § 2703(a)(3)(A-B), and, in the aftermath of the spill, provided "all reasonable cooperation and assistance requested by a responsible official in connection with removal activities," 33 U.S.C. § 2703(c)(2).

The OPA permits a responsible party that has paid out removal costs and damages under the Act to bring a civil action for contribution against any other party "who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709. The OPA also recognizes subrogation rights for a responsible party who has paid claimants pursuant to the OPA as to "all rights, claims, and causes of action" enjoyed by those claimants "under any other law." 33 U.S.C. § 2715.

Finally, the OPA expressly preserves state authority to impose additional liability and requirements "with respect to ... the discharge of oil or other pollution by oil" within its boundaries, regardless of liability limits under the OPA or, for example, the 1851 Limitation Act. 33 U.S.C. §§ 2718(a), 2718(c). The OPA also includes a savings provision directed at general admiralty and maritime law, stating that the Act does not affect this larger body of federal law "[e]xcept as otherwise provided." 33 U.S.C. § 2751(e).

### III. CIVIL ACTION NO. 01-12184
*The Seaboats Claims*

**\*5** As a third-party claimant under the OPA,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

Seaboats has sought recovery for the alleged physical contamination of two of its vessels by oil from the spill. Seaboats also seeks recovery for economic losses stemming from the U.S. Coast Guard's alleged prohibition against Seaboats' contaminated vessels leaving Chelsea Creek for some period of time after the spill. Both types of damage are compensable under the OPA. In particular, the Act supports compensation *inter alia* for "damages for injury to, or economic losses resulting from destruction of, real or personal property," § 2702(b)(2)(B), as well as for "damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources," § 2702(b)(2)(D). Having first presented its claims to Posavina/SNU, as the designated responsible parties, and been denied recovery, Seaboats is eligible under § 2713(c) to bring this action.

In opposing Seaboats' motion for partial summary judgment, Posavina/SNU offer two arguments that can be rejected outright. First, Posavina/SNU suggest that § 2702(b)(2) only addresses economic losses due to physical injury that prevents a vessel from sailing. The argument is made without any accompanying support, and I do not read the plain language of the statute to be constrained in this fashion. Second, Posavina/SNU contend that the First Circuit's interpretation of § 2702(b)(2) in *South Port Marine, L.C. v. Gulf Oil Limited Partnership,* 234 F.3d 58, 66-67 (1st Cir.2000) limits the provision to damages resulting from "physical injury" to property and economic loss as a result of that injury. In *South Port Marine,* the First Circuit reinstated a jury verdict for lost profits resulting from a delay in the plaintiff's plans to expand the marina, parts of which had sustained physical damage as a result of an oil spill. *Id.* at 66. Here, Seaboats seeks recovery for lost profits resulting from its inability to utilize its contaminated vessels while they were being detained. I fail to see how the lost profits damages recognized in *South Port Marine* are distinguishable in any meaningful fashion from those asserted by Seaboats here.

Far more compelling is Posavina/SNU's argument that discovery regarding Seaboats' alleged physical and economic injuries remains incomplete. Given Seaboats' meager evidentiary submissions, consisting of the conclusory affidavit of the President of Seaboats, Donald C. Church, and some photographs of the hulls of Seaboats' two vessels after the spill, I agree that partial summary judgment in Seaboats' favor would be premature at this stage. Accordingly, I will deny Seaboats' motion for failure adequately to establish the existence of the damages claimed.

IV. CIVIL ACTION NO. 01-12186
*The Posavina/SNU Claims*

The parties' motions in this action raise the following questions: First, on the basis of which OPA provision(s) can Posavina/SNU seek recovery of removal costs and damages? Second, would Alex C/Bay State's potential liability in this regard be subject to the OPA's weight-based limitation provision, 33 U.S.C. § 2704, as applied to the tug ALEX C or as applied to the oil tanker M/T POSAVINA? Third, can Posavina/SNU seek recovery on non-OPA grounds of removal costs and damages they paid in the aftermath of the spill, and if so, with what, if any, limitations? I will consider each of these questions in turn, together with a fourth implicated but not expressly addressed in the submissions regarding Alex C/Bay State's motion to dismiss Posavina/SNU's non-OPA causes of action: can Posavina/SNU seek recovery, outside of Alex C/Bay State's still extant limitation proceeding, for alleged direct physical and economic damages?

A. *What is the Statutory Basis for Posavina/SNU's OPA Claims?*

*6 In their Complaint, Posavina/SNU seek recovery of removal costs and damages paid on two separate OPA grounds: by contribution under § 2709 (Count VII), and by subrogation of claimants' rights under § 2715 (Count VI). As an initial matter, I must consider Alex C/Bay State's contention that Posavina/SNU's claims should instead proceed by means of subrogation of claimants' rights under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

§ 2702(d)(1)(B).<sup>FN5</sup>

> FN5. Alex C/Bay State's apparent motivation in making this argument is not merely a concern with observing some technical distinction between §§ 2709 and 2715 and § 2702(d)(1)(B). The application of § 2702(d)(1)(B) to Posavina/SNU could potentially be a convenient stepping stone to a result limiting liability for Alex C/Bay State pursuant to § 2702(d)(2)(A). Alex C/Bay State seek to have their potential liability limited to an amount based on the weight of the ALEX C, as calculated under § 2704, rather than the weight of the larger M/T POSAVINA. If Alex C/Bay State fall under the third-party limitation of liability found in 2702(d)(2)(A), their liability would presumably be reduced to the less burdensome weight of the ALEX C. If the general contribution (§ 2709) or subrogation (§ 2715) provisions apply without such limitations, Alex C/Bay State's liability would be based on the more burdensome weight of the M/T POSAVINA under § 2702(d)(2)(B). Alex C/Bay State appear to argue for the application of § 2702(d)(1)(B) in the hopes that if (d)(1)(B) applies to them (d)(2)(A) will as well.

To return to preliminary matters, I begin analysis of this issue by recognizing § 2702(d)(1)(A) provides that if the designated responsible party can establish that the oil spill was caused solely by a third party with whom it had no contractual relationship, then that sole-cause third party will be treated as the responsible party for purposes of determining liability under the Act. In that situation, the initially designated responsible party qualifies for a complete defense from liability under the OPA. This provision is prefaced, however, with the qualifier "[e]xcept as provided in subparagraph (B)."

Section 2702(d)(1)(B) in turn provides that:

If the responsible party alleges that the discharge or threat of a discharge was caused solely by an act or omission of a third party, the responsible party-

(i) in accordance with [§ 2713], shall pay removal costs and damages to any claimant; and

(ii) shall be entitled by subrogation to all rights of the United States Government and the claimant to recover removal costs or damages from the third party or the Fund paid under this subsection.

The parties do not dispute that the ALEX C had been assisting the M/T POSAVINA pursuant to contractual arrangement prior to the spill. Thus, § 2702(d)(1)(A) clearly does not apply to this case. Alex C/Bay State contend, however, that § 2702(d)(1)(B) does apply, on the theory that it contemplates a broader class of sole-cause third parties, regardless of contractual privity with the discharging party. Alex C/Bay State read § 2702(d)(1)(B) as setting forth a general rule as to how initially designated responsible parties ought to proceed with respect to all manner of alleged sole-cause third parties, using § 2702(d)(1)(A) as a very narrow exception.

Posavina/SNU, for their part, argue that § 2702(d)(1)(A) and (d)(1)(B) apply to the same subset of sole cause third parties: those not in contractual privity with the responsible party. Under this reading, § 2702(d)(1)(A) applies where a responsible party "establishes" the third-party's role in the spill while (d)(1)(B) applies where a responsible party only "alleges" the third-party's involvement.<sup>FN6</sup>

> FN6. I note that one court has interpreted the OPA to suggest that a discharging vessel or facility may entirely avoid payment of removal costs and damages by quickly *establishing,* as opposed to merely *alleging,* that the oil spill was caused solely by a third party with whom it had no contractual relationship. See *Marathon Pipe*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

*Line Co. v. LaRoche Industries, Inc.,* 944 F.Supp. 476, 479 (E.D.La.1996).

Alex C/Bay State's reading of § 2702(d)(1) is supported neither by the text nor the legislative history of the Act. I find nothing in the plain language of § 2702 which suggests a reason to interpret sections (1)(A) and (1)(B) as applying to different subsets of third parties. That interpretation turns the qualifier to subsection (A) on its head by treating subsection (A) as an exception to subsection (B). Subsection (A)'s language of "[e]xcept as provided in subparagraph (B)" clearly directs the reverse.

***7** Likewise, § 2702(d)(2)(A) applies to the same subset of third parties as § 2702(d)(1). Subsection (d)(2)(A) appears within § 2702(d), which permits a discharging party to either escape, under § 2702(d)(1)(A), or fully recoup, under § 2702(d)(1)(B), payment of removal costs and damages *only* on account of a sole-cause third party with whom it had no contractual relationship. That there are only two subsections in § 2702(d), and that the subsection on limitation of liability, section (d)(2), immediately follows a general discussion of liability of certain third parties in section (d)(1) also leads me to conclude that, without any textual indication to the contrary,[FN7] sections (d)(1) and d(2) refer to the same subset of third parties. The OPA could have located § 2702(d)(2)(A) in a more independent context; alternatively, it could have cross-referenced the provision with the bases for Posavina/SNU's OPA claims in this case, §§ 2709 and 2715. It did neither and I find that was for the reason that the third-party limitation of § 2702(d)(2)(A) does not apply by terms to either § 2709 or § 2915. Cf. *Marathon Pipe Line Co. v. LaRoche Industries, Inc.,* 944 F.Supp. 476, 478-79 (E.D.La.1996) ("Throughout the OPA, Congress included cross-references between different provisions.... The Court can only conclude that where it did not include such a cross-reference in a particular provision, Congress did not intend for another provision to apply.").

FN7. Subsection 2702(d)(2)(B) provides just such a contrary textual indication with its prefatory heading "Other cases." The heading is followed by the introductory qualifier, "In any other case ..." which I find is meant to distinguish that subsection from the principal concern of § 2702(d) with non-contracting sole-cause third parties.

The interpretation of the text of § 2702(d) as integrated and self-contained seems consistent with the House and Senate Conference Committee's explanation that "Subsection (d)(2) describes the liability of a third party *under this section."* H.R. Conf. Rep. 101-653, at 104, *reprinted in* 1990 U.S.C.C.A.N. 779, 782 (*emphasis supplied* ). The third party under that section is the sole cause non-contracting third party. The Conference Committee Report also appears to anticipate a reading of § 2702(d)(1) as applying to a single subset of third parties by recognizing subsection (A) as setting forth a general principle of liability and subsection (B) as providing the practical mechanics. H.R. Conf. Rep. No. 101-653, at 104 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 782 (explaining that under subsection (d) "a responsible party can establish that the removal costs and damages resulting from an incident were caused solely by the act or omission of a third party," but that *"[i]n such a case,* the responsible party is still required to settle claims in accordance with [§ 2713]," after which it "shall be entitled by subrogation, to the extent of any claim paid, to all rights of the claimant to recover costs or damages from the third party or the Fund." (emphasis supplied)). This reading, of course, advances the goal of "quick, efficient cleanup" that fairly can be said to have animated the passage of the OPA. *See* S.Rep. No. 101-94, at 2, *reprinted in* 1990 U.S.C.C.A.N. 722, 723.

**8** The policy choice in support of a reading that treats § 2702(d)(1) as applying only to third parties who are not agents of or contracting with the responsible party is evident in the Senate Report accompanying the OPA, which explains that third-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

party defenses under the Act are limited to circumstances "only where the third party had not entered into a contractual relationship with the defendant." S. Rep. 101-94, at 13, *reprinted in* 1990 U.S.C.C.A.N. 722, 734. This constitutes a departure from the third-party liability provision of the Federal Water Pollution Control Act (the "FWPCA"), 33 U.S.C. § 1321(g), in order "to preclude" responsible party defendants "from avoiding liability by claiming a third party was responsible, when that third party had a contractual relationship with the defendant and was acting, in essence, as an extension of the defendant." S.Rep. 101-94, at 13, *reprinted in* 1990 U.S.C.C.A.N. 722, 734. To permit discharging vessels or facilities absolute recovery of removal costs and damages paid under the OPA-as § 2702(d)(1)(B)'s reference to the Fund suggests-even when in contractual privity with sole-cause third parties would nullify an important distinction made as part of a fully considered policy choice.

Accordingly, I find that Posavina/SNU's OPA claims for recovery of removal costs and damages paid by them in the aftermath of the spill may properly proceed on the grounds listed in their Complaint, under § 2709 for contribution and under § 2715 for subrogation, and are not within the scope of § 2702(d)(1)(B).

B. *What is the Extent of Any Limitation on Alex C/Bay State's Potential Liability for Posavina/SNU's OPA Claim?*

I turn next to the question whether Alex C/Bay State's potential liability for Posavina/SNU's OPA claims would otherwise be subject to the OPA's limitation provision, 33 U.S.C. § 2704. As a preliminary matter, I reiterate that Alex C/Bay State have conceded that Posavina/SNU's OPA claims are not subject to the 1851 Limitation Act or its implementing procedure. I briefly note that this view appears consistent with First Circuit precedent. See Metlife Capital Corp. v. M/V EMILY S., 132 F.3d 818, 822-24 (1st Cir.1997).

Even if the 1851 Limitation Act does not apply to Posavina/SNU's OPA claims, however, Alex C/Bay State maintain that the OPA's own limitation provision does. In particular, Alex C/Bay State note that § 2702(d)(2)(A) provides that:

If the act or omission of a third party that causes an incident occurs in connection with a vessel or facility owned or operated by the third party, the liability of the third party shall be subject to the limits provided in [§ 2704] as applied with respect to the vessel or facility.

Looking, then, to § 2704(a)(2)'s weight-based limitation of liability, for a vessel like the ALEX C, FN8 Alex C/Bay State contend that their potential liability pursuant to Posavina/SNU's § 2709 contribution and § 2715 subrogation actions ought to be capped at $500,000.

> FN8. Section 2704(a)(2) provides that, for any vessel other than a tank vessel, liability is capped at "$600 per gross ton or $500,000, whichever is greater."

*9 As numerous commentators have observed, however, and as outlined in Section IV.A., *supra,* § 2702(d)(2)(A) does not appear on its face to have been directed to third-party liability outside of the context of the non-contracting sole-cause third party identified under § 2702(d)(1). *See, e.g.,* 3 BENEDICT ON ADMIRALTY, ch. IX, § 112(a)(6) (7th ed. 1997) ("Curiously, [ § 2702(d) does] not specify whether the limits apply to any third party or only to a sole-cause third party. The legislative history sheds no light on this language ."); Kiern, 24 Tul. Mar. L.J. at 528 ("[Certainly,] OPA's third-party liability provisions are not a model of clarity.")

The only reported decision that appears to have touched on this question is that of the district court in National Shipping Company of Saudi Arabia v. Moran Mid-Atlantic Corp., 924 F.Supp. 1436 (E.D.Va.1996) (*"National Shipping I"* ), which was affirmed in an unpublished decision by the Fourth Circuit at 122 F.3d 1062, 1997 WL 560047 (4th Cir. Sept. 9, 1997) (*"National Shipping II"* ). In

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

*National Shipping I,* the district court concluded that § 2702(d)(2)(A) does apply to a responsible party's contribution action under § 2709-and by implication, to a subrogation action under § 2715-directed at an alleged sole-cause third-party tug with whom it was in contractual privity. *National Shipping I,* 924 F.Supp. at 1446-47. Accordingly, the court capped the third-party tug's liability for the nearly $1,000,000 in removal costs and damages paid by the discharging party at $500,000, the limit set by the tug's weight. *Id.* The *National Shipping I* court did not engage in any textual analysis in this regard, however. It offered in support of its conclusion only that the OPA was designed to place "the greatest exposure upon those who are in a position to obtain the most benefit from maritime commerce." *Id.* at 1447 n. 6.[FN9]

> FN9. The Fourth Circuit's subsequent unpublished affirmance, for its part, found that § 2702(d)(2)(A) applied in the case on the basis of a mistaken supposition that the third-party tug's liability there was premised on § 2702(d)(1). *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,* 122 F.3d 1062, 1997 WL 560047 at *2 (4th Cir. Sept. 9, 1997) ( *"National Shipping II"* ). That is not what the District Court concluded. *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,* 924 F.Supp. 1436, 1446 n .4 (E.D.Va.1996) ( *"National Shipping I"* ) ("[S]ection 2702(d)(1)(B) is not the proper vehicle for [the plaintiff's] recovery.").

The application of § 2702(d)(2)(A) in the *National Shipping* litigation has come under some criticism by commentators. *See, e.g.,* Kiern, 24 Tul. Mar. L.J. at 528-29; John M. Woods, *Third-Party Liability under OPA 90: Have the Courts Veered Off Course?,* 73 Tul. L.Rev. 1863, 1869-73 (1999). On the other hand, a leading treatise had endorsed the application of § 2702(d)(2)(A) to all manner of third parties on the view that "[a] construction which creates OPA limits for a sole-cause third party but none for a joint-fault third party is both illogical and unfair." 3 BENEDICT ON ADMIRALTY, ch. IX, § 112(a)(6). Ultimately, this is the argument upon which Alex C/Bay State rely.

As set forth more fully in Section IV.A., *supra,* I construe § 2702(d)(2)(A) as by terms applying the § 2704 limitation of liability only to that class of third parties contemplated under § 2702(d)(1): sole-cause third parties not in contractual privity with the discharging party. I thus decline to follow in the wake of *National Shipping I.* The responsibility of a third party contracting with the responsible party cannot be fit by judicial tailoring to the Procrustean Bed of § 2702(d).

*10 My reading is consistent to Congress's stated goal of precluding discharging parties from avoiding liability by claiming that a contractually related third party was responsible, S. Rep. 101-94, at 13, *reprinted in* 1990 U.S.C.C.A.N. 722, 734. Although this objective places third parties in contractual relationships with discharging parties at a comparative disadvantage with non-contractual sole cause third parties,[FN10] the OPA's endorsement of indemnification agreements at § 2710 affords parties contemplating contractual arrangements with a tank vessel or oil facility a potential avenue to redistribute the costs of liability not available to the non-contracting sole cause third parties governed by § 2702(d). Perhaps even more disadvantaged are a class of third parties, not involved here: those who are neither in a contractual relation with the discharging party nor the *sole* cause of the discharge. These third parties may neither claim the limitation of § 2704 nor can they seek to make indemnification a part of a contractual arrangement.

> FN10. I note that it may also have implications for the Oil Spill Liability Trust. Counsel for Posavina/SNU suggested at a status conference in this case on January 21, 2003, that in circumstances in which the discharging vessel originally paid out, as responsible party, monies in excess of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

what the sole cause third party can claim as limits, once responsible party status has shifted from the discharging tanker to the third party, the initially responsible tanker party could properly claim from the Fund all expenses paid in excess of the limitation provided for the sole cause third party. Whether initially responsible discharging parties would be able to claim from the Fund any shortfalls in recoveries from other classes of third parties is a question with substantial implications for the Fund.

A review of the expressed congressional purpose in setting the limitations on liability under § 2704 suggests concerns principally to ensure that the Oil Spill Liability Trust Fund would be sufficient to avoid diminishment in compensation over time and further to provide that among those vessels which carried oil there would be no competitive disadvantage established between different sized vessels.

According to legislative history of the OPA, "[t]he limits on liability provided in section 102[(a); § 2704(a) ] are based on existing Federal law or limits contained in the conventions currently pending before the Senate.... In several of the existing Federal laws on oil spills, the liability limits have not been increased in 10 years so that, in real dollars, the liability limits have been decreasing over time. In order to prevent further diminution of compensation, section 102[ (d)(4); 2704(d)(4) ] requires the President to adjust the limits on liability by regulation not less often than every three years to take into account significant increases in the Consumer Price Index." S. Rep. 101-94, at 13, *reprinted in* 1990 U.S.C.C.A.N. 722, 735.FN11

> FN11. As to the reasoning behind subjecting tankers to higher limits on liability, the legislative history of the OPA provides: "The bill defines 'tankers' as vessels constructed or adapted for the carriage of oil in bulk or in commercial quantities as cargo. Higher liability limits then apply to tankers than apply to other vessels." S. Rep. 101-94, at 11, *reprinted in* 1990 U.S.C.C.A.N. 722, 733.

> The House Conference Report on the OPA notes that the House and the Senate passed different dollar limits on liability, and the "Conferees retained the dollar limits in the House bill for tank vessels and other vessels but deleted the House language dividing liability between vessel owners or operators and cargo owners." H.R. Conf. Rep. 101-653, at 106, *reprinted in* 1990 U.S.C.C.A.N. 779, 784.

One of the federal laws upon which the limits of liability were based is section 311 of the Clean Water Act. *See* S. Rep. 101-94, at 4-5, *reprinted in* 1990 U.S.C.C.A.N. 722, 726. The legislative history of the OPA reviewed the limitations of liability under the Clean Water Act at the time of the passage of the OPA and sought to remedy past shortcomings in the CWA's level, extent and allocation of liability limits among vessels.FN12

> FN12. As the OPA legislative history noted, under the Clean Water Act as it then existed, "a vessel is liable up to $150 per gross ton (or $250,000 if that is more, where carrying oil or a hazardous substance as cargo); an inland oil barage [sic] is liable up to $125 per gross ton (or $125,000 if that is more), and a facility is liable up to $50 million. These amounts are only for removal costs, including restoration of natural resources damages. The new limits of liability under the reported bill include both removal costs and compensation for damages." S. Rep. 101-94, at 5, *reprinted in* 1990 U.S.C.C.A.N. 722, 726. *See* Federal Water Pollution Control Act (the "Clean Water Act" or "CWA") (Section 311(f) of the CWA), 33 U.S.C. § 1321(f). These particular dollar limits were added to the CWA in 1977. Pub.L. 95-217,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC Document 4457-41 Filed 11/01/11 Page 11 of 19

Page 11

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

91 Stat. 1566 (1977).

Prior to 1977, the CWA had limited liability to "$100 per gross ton of such vessel or $14,000,000, whichever is lesser." See Pub.L. 95-217, 91 Stat. 1566 (1977). The legislative history for the CWA 1977 amendments reveals the reasoning behind this change:

The amendment removes the total dollar ceiling on liability for oil spills from vessels. The ceiling served no useful purpose, inadvertently subsidizing large tankers and thus enhancing their competitive position over smaller vessels. According to testimony, the $150 per ton limit should be adequate for cleanup of all but the most catastrophic spills. The $14 million limit in existing law is totally inadequate to deal with an oilspill of any magnitude from the size of tanker that is expected to be plying the waters of the United States. The committee also established a maximum liability for small vessels carrying oil as cargo of $150 per gross ton or $500,000, whichever is greater. Again, according to testimony from the Coast Guard (the agency charged with the responsibility for cleaning up oilspills) very often spills from small tankers and other sources are among the most difficult to clean up because they occur in areas where the water is moving and the urgency of the application of cleanup techniques is most pronounced. Additionally the first cost of any cleanup activity is the most costly. The per ton limit on smaller vessels is not adequate to provide liability commensurate with the costs of cleanup which have been experienced with such spills. The committee was particularly concerned with the soundness of the contingency fund. As a result of the 1970 act, $35 million was appropriated to that fund. Most of that has now been depleted.... The new minimum liability for smaller oil tankers and the removal of the upper limit should make the fund more sound.

...

S. Rep. 95-379, at 64-65 (1977). The Senate version of the bill was subsequently altered to include a distinction between inland oil barges and other vessels with respect to the amount of liability, which it changed to $125 per gross ton, or $125,000, whichever is greater, for inland oil barges and "$150 per gross ton unless the vessel carries oil or hazardous substances in which case it is $250,000 whichever amount is the greater." H.Conf. Rep. 95-830, at 91, reprinted in 1977 U.S.C.C.A.N. 4424, 4466.

As the controversy among the commentators suggests, any choice of liability limits involves complex policy judgments. This is particularly so in calibrating liability limitations applicable to the several classes of third parties in contractual relationships with discharging parties.

As my discussion in Section IV.A. *supra* indicates, Congress appears to have established distinctive liability limits in § 2702(d) only for sole cause third parties not in contractual relationship with the responsible discharging party. At least one commentator has urged that courts should interpret "Section 2702(d)(2) as applying to all third parties." William M. Ducan, *The Oil Pollution Act of 1990's Effect on the Shipowner's Limitation of Liability Act,* 5 U.S.F.Mar. L.J. 303, 319 (1993). Lower court judges, however, "are not as free as the commentators to enact our policy preferences." *Massachusetts v. Mosbacher,* 785 F.Supp. 230, 235 n. 2 (D.Mass.) (3 judge court) *rev'd on other grounds, sub. nom Franklin v. Massachusetts,* 505 U.S. 788 (1992). As the First Circuit observed in *South Port*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-41   Filed 11/01/11   Page 12 of 19

Page 12

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

*Marine,* "the resolution of [the] difficult policy questions" in this area "is better suited to the political mechanisms of the legislature than to [the judiciary's] deliberative process." 234 F.3d at 66.

**\*11** Consequently, I find that Alex C/Bay State's potential liability for Posavina/SNU's OPA claims is not subject to the OPA's limitation provisions under § 2704 calculated by the weight of the ALEX C. Rather under § 2702(d)(2)(B) Alex C/Bay State's potential liability is coincident with that of Posavina/SNU. Accordingly, I will deny Alex C/Bay State's motion for partial summary judgment in this regard, and as a corollary grant Posavina/SNU's motion to strike Alex C/Bay State's sixth affirmative defense.

### C. *Are There Non-OPA Grounds for Posavina/SNU's Recovery of Removal Costs and Damages Paid?*

Posavina/SNU also seek recovery of removal costs and damages paid by them in the aftermath of the spill on the basis of the Massachusetts Release Act, the Massachusetts contributory negligence statute, Mass. Gen. Laws ch. 231B, maritime law contribution, and maritime law indemnity.

To the extent that Posavina/SNU seek recovery on any of these grounds for removal costs and damages paid under the OPA, my preceding analysis renders the claims superfluous. Posavina/SNU have not, in any event, alleged that they have incurred any additional liability for removal costs and damages under state tort law. Whether they have incurred additional damages under the Massachusetts Release Act is a disputed issue of fact. If such damages are established, they may be pursued.FN13

> FN13. Again, I note the OPA's savings provisions preserve state authority to impose additional liability and requirements "with respect to ... the discharge of oil or other pollution by oil" within its boundaries, without reference to liability limits derived from either the OPA or the 1851 Limitation Act. 33 U.S.C. §§ 2718(a), 2718(c); *see also United States v. Locke,* 529 U.S. 89, 104-07 (2000).

Accordingly, I will dismiss Posavina/SNU's Counts seeking recovery under Mass. Gen. Laws ch. 231B (Count VIII), maritime law contribution (Count IX), and maritime law indemnity (Count X), but not Count II, seeking recovery under the Massachusetts Release Act.

### D. *May Posavina/SNU Pursue Claims for Direct Physical and Economic Damages?*

To the extent that Alex C/Bay State have also moved to dismiss Counts stating causes of action under general maritime law theories of breach of contract (Count I), unseaworthiness (Count III), negligence (Count IV), and gross negligence (Count V), I must consider whether the purpose apparently served by these Counts-namely, attempted recovery outside of Alex C/Bay State's still extant 1851 Limitation Act proceeding for the direct physical and economic damages that Posavina/SNU allege to have sustained-is a valid one. I undertake this inquiry notwithstanding the fact that Alex C/Bay State do not address this question in their memorandum in support of their motion to dismiss Posavina/SNU's non-OPA causes of action.

Posavina/SNU's rationale in support of recovery in this action for the direct physical and economic damages they allege is premised foremost on the OPA's savings provision for general admiralty and maritime law, § 2751 ("Except as otherwise provided in this chapter, this chapter does not affect-(1) admiralty and maritime law[.]"). That provision makes no mention of the 1851 Limitation Act, however, and can hardly be read to repeal that Act with respect to the universe of general admiralty and maritime claims. *See Metlife,* 132 F.3d at 822 (noting that the 1851 Limitation Act remains in force for general maritime claims arising from "an incident in which oil pollution occurs," such as "maritime tort actions for harms to persons or vessels.")

**\*12** Accordingly, I will dismiss Counts I, III,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-41   Filed 11/01/11   Page 13 of 19

Page 13

Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256
**(Cite as: 2003 WL 203078 (D.Mass.))**

IV, and V of Posavina/SNU's Complaint, noting that recovery of the physical and economic damages they allege under those theories remains subject to Alex C/Bay State's 1851 Limitation Act proceeding.

### V. CONCLUSION

For the reasons set forth more fully above;

In Civil Action No. 01-12184, I DENY plaintiff Seaboats' motion for partial summary judgment with respect to defendant Posavina/SNU's liability for Seaboats' claims under the OPA, on the ground that Seaboats' claimed physical and economic damages are not adequately supported on the current state of the record;

In Civil Action No. 01-12186,

(1) I GRANT defendant Alex C/Bay State's motion to dismiss Counts I (breach of contract), III (unseaworthiness), IV (negligence), V (gross negligence), VIII (Mass. Gen. Laws ch. 231B), IX (maritime law contribution), and X (maritime law indemnity) of plaintiff Posavina/SNU's Complaint;

(2) I DENY defendant Alex C/Bay State's motion to dismiss Count II (Mass. Gen. Laws ch. 21E);

(3) I DENY defendant Alex C/Bay State's motion for partial summary judgment, on the ground that the potential liability of Alex C/Bay State for plaintiffs' OPA claims would not be subject to the OPA limitations of § 2704; and, for the same reason,

(4) I GRANT plaintiff Posavina/SNU's motion to strike defendants' sixth affirmative defense.

### VI. PROCEDURAL ORDER

As I observed to counsel at the Scheduling Conference in this matter on January 21, 2003, I have found the process of determining the limitation of liability under the OPA available to the several classes of third parties to be exceptionally challenging. This is because I have concluded the OPA only provides a distinct limitation for a sole cause third party having no contractual relationship with a discharging vessel.

My best reading of the scope of the OPA limitations is as set forth above. Nevertheless, I am sufficiently concerned regarding this reading that I believe the parties and a legal representative of the Oil Spill Liability Trust Fund (whose legal interests may be implicated by the reading given the OPA, in particular, for example, in Note 10, *supra,* at 26) should be allowed to brief the matter further. Accordingly, my resolution of the limitation issue under the OPA as applies to Alex C/Bay State is made without prejudice to any party submitting a request for reconsideration within 45 days from the date of this Memorandum and Order. In addition, a legal representative of the Oil Spill Liability Trust Fund is hereby invited to submit a brief *amicus curiae* addressing the Fund's view with respect to the question of limitation of liability for third parties. I recognize that the effect of my determination is to some degree counterintuitive in that it leaves the partially responsible third party subject to greater potential liability than a solely responsible third party. Whether this is good policy is less the issue for a court than whether this is the policy Congress intended to adopt. It is as to this larger question whether the reading I give the statute embodies the enacted intention of the Congress that I invite the view of any party and the *amicus curiae,* after they have had the opportunity to reflect on the resolution provided in this Memorandum and Order.

D.Mass.,2003.
Seaboats, Inc. v. Alex C Corp.
Not Reported in F.Supp.2d, 2003 WL 203078 (D.Mass.), 56 ERC 1498, 2003 A.M.C. 256

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986
**(Cite as: 54 F.3d 111)**

United States Court of Appeals,
Second Circuit.
MONTAUK OIL TRANSPORTATION CORP.,
Plaintiff-Appellant,
v.
TUG "EL ZORRO GRANDE", her engines, boilers, etc., in rem, Turecamo Coastal & Harbor Towing Corp. and Turecamo Maritime, Inc., in personam, Defendants-Appellees.

No. 607, Docket 94-7436.
Argued Oct. 26, 1994.
Decided May 5, 1995.

Barge owner brought action against tug and tug owner to recover indemnity for liabilities imposed against it as result of oil spill. The United States District Court for the Southern District of New York, John S. Martin, Jr., J., dismissed claims. Barge owner appealed. The Court of Appeals, Van Graafeiland, Circuit Judge, held that: (1) barge owner forfeited indemnity claim because it failed to establish amount of tug owner's liability, and (2) barge owner was entitled to indemnity for $3,500 penalty.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Indemnity 208 ⟲80**

208 Indemnity
   208III Indemnification by Operation of Law
      208k80 k. Notice of Settlement. Most Cited Cases
   (Formerly 208k13.4)

If indemnitee fails to give to indemnitor notice of proposed settlement and meaningful opportunity to assume defense, settling indemnitee is not entitled to indemnification unless it can establish amount of indemnified liability.

**[2] Indemnity 208 ⟲79**

208 Indemnity
   208III Indemnification by Operation of Law
      208k79 k. Notice in General. Most Cited Cases
   (Formerly 208k13.4)

**Indemnity 208 ⟲80**

208 Indemnity
   208III Indemnification by Operation of Law
      208k80 k. Notice of Settlement. Most Cited Cases
   (Formerly 208k13.3)

**Indemnity 208 ⟲81**

208 Indemnity
   208III Indemnification by Operation of Law
      208k81 k. Accrual of Liability. Most Cited Cases
   (Formerly 208k13.3)

Owner of barge involved in oil spill forfeited indemnity claim against tug and tug owner, where tug and tug owner were not afforded the opportunity to defend against New York's claim against group of companies including barge owner, where tug and tug owner were not afforded opportunity to participate in barge owner's settlement with New York Department of Environmental Conservation (DEC), and where barge owner failed to establish amount of the settlement attributable to the spill.

**[3] Indemnity 208 ⟲74**

208 Indemnity
   208III Indemnification by Operation of Law
      208k73 Scope and Extent of Liability
      208k74 k. In General. Most Cited Cases
   (Formerly 208k13.2(7))

Barge owner that paid $3,500 penalty for oil spill was entitled to indemnity from tug and tug owner that were responsible for the accident. Federal Water Pollution Control Act Amendments of

54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986
**(Cite as: 54 F.3d 111)**

1972, § 311(b)(6), (h), as amended, 33 U.S.C.A. § 1321(b)(6), (h).

**[4]** Towage 380 4

380 Towage
    380k4 k. Relation and Duties of Tug to Tow in General. Most Cited Cases

When tug undertook towage of barge, it assumed obligation of performing task in workmanlike manner.

**[5]** Environmental Law 149E 223

149E Environmental Law
    149EV Water Pollution
        149Ek223 k. Penalties and Fines. Most Cited Cases
    (Formerly 199k25.7(23) Health and Environment)

As between federal government and barge owner, issue of fault for oil spill does not determine liability. Federal Water Pollution Control Act Amendments of 1972, § 311(b)(6), as amended, 33 U.S.C.A. § 1321(b)(6).

**\*111** Raymond A. Connell, New York City (Connell, Losquadro & Zerbo, New York City, of counsel), for plaintiff-appellant.

Stephen J. Buckley, New York City (Kenny & Stearns, New York City, of counsel), for defendants-appellees.

Before: VAN GRAAFEILAND, McLAUGHLIN and LEVAL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Montauk Oil Transportation Corp., owner of the oil barge CIBRO PHILADELPHIA, appeals from a judgment of the United States District Court for the Southern District of New York (Martin, J.) dismissing Montauk's in rem claim against the tug EL ZORRO GRANDE and its in personam claim against the tug's owner Turecamo Coastal & Harbor Towing Corp., which merged into Turecamo Maritime, Inc. Montauk seeks indemnification for payments it made to New York State pursuant to New York's Environmental Conservation Law and Navigation Law and to the United States pursuant to the Federal Water Pollution Control Act. The alleged basis for these payments was an oil spill in the Hudson River caused by the negligent operation of the EL ZORRO **\*112** GRANDE while towing the CIBRO PHILADELPHIA on September 15, 1989. Montauk's cause of action based on the New York payment was dismissed following a non-jury trial. Its claim based on the federal payment was dismissed by a summary judgment order which became part of the final judgment on appeal. We affirm the district court's decision dealing with the New York payment but reverse that part dealing with the federal payment.

### THE NEW YORK PAYMENT

Article 17 of New York's Environmental Conservation Law contains numerous general and specific provisions aimed at preventing water pollution; Article 12 of New York's Navigation Law contains specific provisions against the discharge of petroleum. On March 26, 1991, New York's Department of Environmental Conservation (the "DEC") instituted a proceeding against six related Cibro companies (collectively, the "Cibro Group"), which included Montauk as owner of the CIBRO PHILADELPHIA, alleging thirty causes of action for violations of these laws and requesting an award of $7.5 million. Twenty-eight of the claims involved violations associated with land-based oil storage facilities. The remaining two involved oil spills from the CIBRO PHILADELPHIA that occurred on September 15, 1989 and December 15, 1989. A settlement agreement subsequently was reached under which the Cibro Group agreed to pay $2.5 million in satisfaction of the claim. The first installment payment under the agreement was to be in the amount of $500,000 and was to be made with two $250,000 checks, one of which was to be payable to the New York State Department of Environmental Conservation Environmental Enforcement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986
**(Cite as: 54 F.3d 111)**

Account and the other to the New York Environmental Protection and Spill Compensation Fund. Two such checks were delivered by Montauk, apparently on behalf of all the involved Cibro companies. It appears that no further payments were made thereafter because the Cibro companies, other than Montauk, filed for Chapter 11 relief. No allocation of the $500,000 payment among the thirty claims was made.

Montauk then brought this suit against Turecamo and EL ZORRO GRANDE seeking indemnification for that portion of the fine attributable to the September 15, 1989 spill. Turecamo admitted that its negligence in operating EL ZORRO GRANDE caused the spill. Most of the trial focused on ascertaining what portion of the fine paid by Montauk was due to the September spill. One of the Cibro Group's attorneys testified that a DEC official had told him the amount that the DEC had allocated to the two CIBRO PHILADELPHIA spills. The attorney stated that he was not sure of the exact figure because his recollection of the conversation was "slightly unclear," but that it was $200,000, $220,000, or $225,000. Another lawyer for the Cibro Group opined that allocating $225,000 of the settlement to the two spills was "reasonable" and that a 50-50 sub-allocation between the two spills was "appropriate." The DEC attorney involved in negotiating the Cibro Group settlement stated that, if he had provided any allocation of the penalties, he could not remember the exact amounts. However, he did recall that any apportionment figures discussed were based on the $7.5 million demand rather than the $2.5 million settlement. Moreover, he believed that when viewed in relation to the amount assigned to the total alleged violations, the allocation of $225,000 to the two CIBRO PHILADELPHIA spills seemed excessive. Defendants also introduced testimony to the effect that most, if not all, of any allocation should be attributed to the December 1989 spill. Defendants' witness, an oil-spill cleanup manager who observed both spills, testified that the December 1989 spill involved at least ten times more fuel than the September 1989 spill. Moreover, Montauk's own witness admitted on cross-examination that, because of the Cibro Group's failure to clean up contamination caused by the December spill, it faced allegations of continuing violations of New York environmental laws which might make it subject to potentially enormous penalties.

The district court found that Montauk failed to prove that the DEC set $225,000 as the amount to be paid for the two spills. Furthermore, assuming that such allocation was made, Montauk failed to prove how the **\*113** $225,000 was divided between the two spills, which had substantially different disastrous results. It therefore dismissed the cause of action based on the New York payments. There was no error here.

[1][2] If an indemnitee fails to give the indemnitor notice of a proposed settlement and meaningful opportunity to assume the defense, the settling indemnitee is not entitled to indemnification unless it can establish the amount of the indemnified liability. *See Atlantic Richfield Co. v. Interstate Oil Transport Co., 784 F.2d 106, 113 (2d Cir.), cert. denied, 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986); B.S. Livingston Export Corp. v. M/V Ogden Fraser, 727 F.Supp. 144, 148 (S.D.N.Y.1989).* Because the Turecamo defendants were not afforded an opportunity to defend New York's claim against the Cibro Group or to participate in the settlement with the DEC, Montauk was required to establish the amount of its liability for the September spill to avoid forfeiting its indemnity claim. It failed to do so. The district court therefore had no alternative save to dismiss Montauk's claim for indemnification related to that loss.

### THE FEDERAL PENALTY

[3] In addition to the state penalties assessed against Montauk and her sister companies, Montauk alone was assessed a fine of $3,500 for violating the Federal Water Pollution Control Act Amendments of 1972 (the "Act"), Pub.L. No. 92-500, § 311(b)(3) & (6), 86 Stat. 816, 864-65 (codified as amended at 33 U.S.C. § 1321(b)(3) &

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-41   Filed 11/01/11   Page 17 of 19

Page 4

54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986
**(Cite as: 54 F.3d 111)**

(6)) and also 40 C.F.R. § 110.3. These statutory provisions provide in substance that the owner, operator or person in charge of a vessel from which oil is harmfully discharged shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense.

Section 1321(h) of 33 U.S.C. provides in part:

*Rights against third parties who caused or contributed to discharge*

The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel ... may have against any third party whose acts may in any way have caused or contributed to such discharge....

The district court, relying on the case of *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907 (S.D.N.Y.1977), *aff'd in part on other grounds and rev'd in part on other grounds,* 584 F.2d 1151 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979), held that, although section 1321(h) provides generally for indemnity, it does not apply to fines imposed pursuant to section 1321(b)(6). We have examined the appellate briefs of the parties in the *Tug Ocean Prince* case and find no arguments addressed to the merits of this blanket statement. That case involved a collision between a Pittston Marine Transport barge under tow by the OCEAN PRINCE and a rock in the Hudson River. Tug Ocean Prince, Inc. brought an action for exoneration from or limitation of liability pursuant to 46 App.U.S.C. § 183. After Pittston filed a claim in the limitation proceeding for damages to the barge and its cargo, Tug Ocean Prince brought a third-party action against the United States alleging negligent maintenance of a buoy. Pittston then cross-claimed against the United States for the amount of its damages, and the United States counterclaimed for the amount of its cleanup costs. The United States also brought a separate action against the tug and the barge for its cleanup expenses. The district court found that Tug Ocean Prince was entitled to limit its liability and that Pittston was entitled to a judgment in this limited amount. It dismissed the Government's claim against Pittston. It dismissed both Tug Ocean Prince's and Pittston's claims against the Government. It remanded a $5,000 fine levied against Pittston to the Coast Guard for reconsideration and dismissed Pittston's claims against Tug Ocean Prince for indemnity. 436 F.Supp. at 926-27.

Pittston appealed from so much of the court's decision "which permitted Plaintiffs to limit their liability to the value of the 'OCEAN PRINCE.'" (Defendant-Appellant's Brief at 3). Tug Ocean Prince, arguing that the Government's negligence was a contributing cause of the accident, stated "[t]he **\*114** decision below should therefore be reversed on this single issue." (Cross-Appellants' Brief at 9). The merits of Pittston's claim of indemnity for payments made under section 1321(b)(6) were not addressed.

As a general rule, a Court of Appeals will not pass upon issues that were not presented in the appellants' briefs. *See, e.g.,* Fed.R.App.P. 28(a)(3)-(5); *NLRB v. Star Color Plate Serv.,* 843 F.2d 1507, 1510 n. 3 (2d Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,* 605 F.2d 648, 653 n. 3 (2d Cir.1979); *Calvert v. Katy Taxi, Inc.,* 413 F.2d 841, 850 (2d Cir.1969). Although visiting Senior District Judge Mehrtens wrote an 11-page opinion of affirmance in *Tug Ocean Prince,* he confined his remarks almost entirely to the issues designated in the appellate briefs and did not consider the issue presently before us. Accordingly, we are free to address the issue on this appeal. *See Dunbar v. Henry Du Bois' Sons Co.,* 275 F.2d 304, 306 (2d Cir.), *cert. denied,* 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960).

The fines, penalties and recoveries provided for in section 1321 fall into two separate and distinct categories, the first dealing with the act of spillage and the second dealing with the cost of cleanup. Section 1321(b)(6), the spillage section, provides in substance that the owner, operator or person in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-41   Filed 11/01/11   Page 18 of 19

Page 5

54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986
**(Cite as: 54 F.3d 111)**

charge of a vessel from which oil is harmfully discharged shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. Section 1321(f)(1), dealing with cleanup costs, provides in pertinent part that except where an owner or operator can prove that the discharge of oil was caused solely by the act or omission of a third party, such owner shall be liable for cleanup costs in certain specified amounts.

Each of the above-described categories stands on its own. The penalty provided in the first category is not predicated upon the cost of removal, but upon the happening of the discharge. The determinative factor in category one is the discharge of oil, not its cleanup. *United States v. W.B. Enterprises, Inc.,* 378 F.Supp. 420, 422 (S.D.N.Y.1974). *See also United States v. General Motors Corp.,* 403 F.Supp. 1151, 1164 (D.Conn.1975). If the discharge in the instant case was caused by the negligence of defendants-appellees, established equitable principles of admiralty and tort should provide Montauk with a third-party claim against them.

[4] The concept of indemnity is as old as the proverbial hills and long has been recognized in the law of admiralty. *See, e.g., Jones v. Waterman S.S. Corp.,* 155 F.2d 992, 999 (3d Cir.1946). Former Admiralty Rule 59, recodified in 1921 as Admiralty Rule 56, and subsequently codified in substance as Fed.R.Civ.P. 14(c), has furnished procedural support for the exercise of this concept through interpleader. *See Marubeni-Iida (America), Inc. v. Toko Kaiun Kabushiki Kaisha,* 327 F.Supp. 519, 521-22 (S.D.Tex.1971). When in the instant case the EL ZORRO GRANDE undertook the towage of Montauk's barge, it assumed the obligation of performing this task in a workmanlike manner. *See Fairmont Shipping Corp. v. Chevron Int'l Oil Co.,* 511 F.2d 1252, 1259-60 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975). Its conceded negligence should make it responsible for the damage sustained by the barge owner, in this instance the civil penalty imposed under section 1321(b)(6).

[5] Had Congress intended to eliminate this traditional rule of equitable indemnity in cases involving federal penalties for oil spillage, it easily could have done so. Instead, it strengthened the traditional rule by specifically providing for indemnity. *See* 33 U.S.C. § 1321(h). The word "liabilities" as used in section 1321(h) is broad enough to encompass the civil penalties that are imposed under section 1321(b)(6). In *Black's Law Dictionary,* "liability" is defined as a "broad legal term", of "the most comprehensive significance", including "penalt[ies]." (Rev'd 4th ed.) (citations omitted). As we see it, the absence of section 1321(f)(1)'s third-party liability defense in section 1321(b)(6) spillage cases does no more than insure that the penalty ($5,000 or less) will be paid regardless of fault and regardless of whether the government incurs cleanup costs. *See W.B. Enterprises, supra,* 378 F.Supp. at 422-23. **\*115** In other words, as between the federal government and the barge owner, the issue of fault for oil spillage is not a liability-determinative issue. However, as between the tug and the barge it is a very material issue. If the tug's improper conduct caused loss to the barge, the latter should be indemnified. *See McDermott v. City of New York,* 50 N.Y.2d 211, 216-17, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). Because the defendants-appellees concede their responsibility for the accident, Montauk is entitled to indemnification for the $3,500 liability that resulted. We therefore reverse the district court's denial of this recovery and remand to that court for entry of a judgment in favor of Montauk in the sum of $3,500.

Affirmed as to the dismissal of the claim of indemnity for the payments to the State of New York. Reversed and remanded as to the federal penalty. No costs to either party.

C.A.2 (N.Y.),1995.
Montauk Oil Transp. Corp. v. Tug El Zorro Grande
54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

54 F.3d 111, 1995 A.M.C. 2217, 25 Envtl. L. Rep. 20,986
**(Cite as: 54 F.3d 111)**


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.