

LEXISNEXIS® FILE & SERVE
E-SERVICE
37159959
Apr 20 2011
7:00PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : MDL No. 2179<br>:<br>: SECTION: J |
| | : |
| This Document Relates To: All Cases and No. 2:10-cv-2771 (*In re The Complaint And Petition Of Triton Asset Leasing GmbH, et al.*) | : JUDGE BARBIER<br>: MAGISTRATE JUDGE SHUSHAN<br>:<br>: |
| ……………………………………………... | : |

## BP PARTIES' COUNTER-COMPLAINT, CROSS-COMPLAINT AND THIRD PARTY COMPLAINT AGAINST TRANSOCEAN AND CLAIM IN LIMITATION

Counter-, cross-, and/or Third-Party Plaintiffs BP Exploration & Production Inc. ("BPXP") and BP America Production Company ("BPAP") (collectively, the "BP Parties") bring this action under Federal Rules of Civil Procedure 13 and 14 against Transocean Ltd., Transocean, Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (collectively, "Transocean"). The BP Parties further submit this Claim in Limitation pursuant to Federal Rule of Civil Procedure Supplemental Rule F(5) in response to the Complaint for Exoneration from or Limitation of Liability filed by Petitioners Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc. in Case No. 2:10-cv-2771.

## INTRODUCTION

1.      Transocean owned and operated the *Deepwater Horizon*, a mobile offshore drilling unit or rig.  On April 20, 2010, the *Deepwater Horizon* was in the process of completing an exploratory drilling well in the Gulf of Mexico when it exploded and caught fire.  Lives were lost and people were injured.  Two days later, on April 22, 2010, the vessel sank and from that

point forward, until July 15, 2010, oil flowed out of the well and into the Gulf of Mexico.  The BP Parties bring this action to hold Transocean accountable for having caused the blowout, explosion, fire, deaths and personal injuries, and subsequent oil spill.  But for Transocean's improper conduct, errors, omissions, and violations of maritime law, there would not have been any blowout of the exploratory well in Mississippi Canyon, Block 252 ("MC252," commonly referred to as the Macondo prospect).  Nor, but for Transocean's misconduct, would there have been any explosion and fire on the *Deepwater Horizon*, or any deaths and personal injuries, or an oil spill in the Gulf of Mexico.  ***The simple fact is that on April 20, 2010, every single safety system and device and well control procedure on the Deepwater Horizon failed, resulting in the casualty.***  Accordingly, the BP Parties seek at least $40 billion in damages and contribution from Transocean for the costs, expenses, injuries and damages that BP has incurred, continues to incur, and will incur as a result of the *Deepwater Horizon* incident and oil spill caused by Transocean's multiple failures.

2.     Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (the "Transocean *Deepwater Horizon* Companies") have alleged that they are the *Deepwater Horizon's* owners, managing owners, owners *pro hac vice*, and/or operators.  Each of these Transocean entities therefore is directly liable for the improper conduct, errors, omissions, and violations of maritime law related to the *Deepwater Horizon*.  Transocean's top level corporate entities, Transocean Ltd. and Transocean Inc., dominate, control, or are otherwise the alter egos of the Transocean *Deepwater Horizon* Companies.  Transocean Ltd. and Transocean Inc. are also directly responsible for the policies and practices that led to the MC252 well blowout.

3.     The BP Parties bring this Complaint and Claim in Limitation pursuant to this Court's Case Management Order No. 1 ("CMO 1").  The BP Parties acknowledge that BPAP and Transocean Holdings LLC are parties to a Drilling Contract with an arbitration provision. That arbitration provision does not apply here because, among other reasons, Transocean and Transocean Holdings LLC through their conduct in these proceedings have waived any rights to arbitrate any aspects of the disputes between the BP Parties and Transocean relating to the *Deepwater Horizon* incident and resulting oil spill.

4.     By filing this Complaint and Claim in Limitation, the BP Parties do not waive, but instead expressly reserve, every objection or argument that the BP Parties' claims are not subject to Limitation of Liability pursuant to 46 U.S.C. § 30501, *et seq.*, and/or Rule F of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

## THE PARTIES

5.     BPXP is a Delaware corporation with its principal place of business at 501 Westlake Park Boulevard, Houston, Texas, 77079.

6.     BPAP is a Delaware corporation with its principal place of business at 4101 Winfield Road, Warrenville, Illinois, 60555.

7.     Transocean Offshore Deepwater Drilling Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Houston, Texas, 77046-0400.

8.     Transocean Deepwater Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

9.     Transocean Holdings LLC is a Delaware limited liability company with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

10.     Triton Asset Leasing GmbH is a Swiss Confederation limited liability company with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.

11.     Transocean Inc. is a Cayman Islands corporation with principal places of business at 4 Greenway Plaza, Houston, Texas, 77046, and 70 Harbour Drive, Grand Cayman, Cayman Islands, KY1-1003.  Transocean Inc. is the direct or indirect parent of the Transocean *Deepwater Horizon* Companies.

12.     Transocean Ltd. is a Swiss Confederation corporation with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.  Transocean Ltd. owns 100% of defendant Transocean Inc., and is the ultimate parent and controlling entity of the Transocean *Deepwater Horizon* Companies.

## JURISDICTION

13.     This action arises out of and in connection with drilling operations by the *Deepwater Horizon*, a vessel.  This Court has jurisdiction pursuant to 28 U.S.C. § 1333.  The claims presented in this Counter-Complaint, Cross-Complaint and Third-Party Complaint are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and the BP Parties designate this case as an admiralty or maritime case as provided in that Rule.

14.     In addition, the Transocean *Deepwater Horizon* Companies have filed a Rule 14(c) Third-Party Complaint against the BP Parties, among other defendants, tendering the third-party defendants to the plaintiffs/claimants.  This Court has jurisdiction over the Transocean *Deepwater Horizon* Companies' Rule 14(c) Third-Party Complaint pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.  The BP Parties also are named as defendants in admiralty, maritime and other complaints pending before this Court.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)-(c).

## RULE 14(C) TENDER OF TRANSOCEAN LTD. AND TRANSOCEAN INC.

16. The Transocean *Deepwater Horizon* Companies have filed a Complaint and Petition for Exoneration from or Limitation of Liability, Civil Action No. 10-2771 ("Limitation Action"). Plaintiffs/Claimants have filed claims against the Transocean *Deepwater Horizon* Companies in the Limitation Action. On February 18, 2011, the Transocean *Deepwater Horizon* Companies filed a Rule 14(c) Third-Party Complaint against the BP Parties, among others, to implead them into the Limitation Action and tender them to the Plaintiffs/Claimants.

17. Pursuant to Rule 14(c), and as part of their Third-Party Complaint, the BP Parties implead Transocean Ltd. and Transocean Inc. and hereby tender them to the Plaintiffs/Claimants in the Limitation Action. Accordingly, Transocean Ltd. and Transocean Inc. must defend against the Plaintiffs/Claimants' claims, and the action proceeds as if the Plaintiffs/Claimants had sued Transocean Ltd. and Transocean Inc. Fed. R. Civ. P. 14(c)(2). The BP Parties demand judgment in the Plaintiffs/Claimants' favor against Transocean Ltd. and Transocean Inc. pursuant to Rule 14(c)(2) for the reasons alleged by Plaintiffs/Claimants against the Transocean entities in the pleading bundles and complaints filed in MDL No. 2179 and the Limitation Action. Such reasons include, but are not limited to, that Transocean Ltd. and Transocean Inc. (as well as Transocean as a whole) were negligent in:

- Failing to properly operate the *Deepwater Horizon*;

- Operating the *Deepwater Horizon* in such a manner that explosions and a fire occurred onboard, causing it to sink and resulting in the oil spill in the Gulf of Mexico;

- Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purposes;

- Failing to properly assess the risk of failure of key safety and emergency equipment;

- Acting in a careless and negligent manner without due regard for the safety of others;

- Failing to implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so implemented and enforced, would have averted the blowout, explosions, fire, personal injuries, deaths, sinking, and spill;

- Operating the *Deepwater Horizon* with untrained or insufficiently trained personnel;

- Negligently hiring, retaining and/or training personnel;

- Failing to take appropriate action to avoid or mitigate the incident;

- Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

- Failing to warn in a timely manner;

- Failing to timely bring the well and oil release under control;

- Failing to provide appropriate accident prevention equipment;

- Failing to observe and read gauges that would have indicated excessive pressures in the well;

- Failing to properly and timely control the well;

- Failing to properly and timely activate emergency and safety equipment; and

- Failing to react to danger signs.

18.     The BP Parties also bring their own claims directly against Transocean Ltd. and Transocean Inc., as well as the Transocean *Deepwater Horizon* Companies, as described in this Complaint.

## FACTS COMMON TO ALL CLAIMS

19.     BPXP obtained a lease for Mississippi Canyon, Block 252, commonly known as the Macondo prospect.  BP, like other oil companies, contracts with and relies upon third parties experienced and expert in the drilling and provision of other services and products for the exploration, drilling, and development of deepwater wells.  Pursuant to a Drilling Contract between BPAP and Transocean Holdings LLC, Transocean was hired to drill the MC252 well using the *Deepwater Horizon* mobile offshore drilling unit ("MODU").  Triton Asset Leasing

GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc. admit that they are the owners, managing owners, owners *pro hac vice*, and/or operators of the *Deepwater Horizon*.

**A.     Transocean's Duties And Obligations.**

20.     Transocean had numerous express obligations under the Drilling Contract, including:

- Transocean "shall be solely responsible for the operation of the Drilling Unit" and "shall act at all times as an independent contractor."

- Transocean "shall exercise due diligence to prevent the well from blowing out." Transocean's manuals specify that "Detection of a kick (intrusion of liquid or gas into the wellbore) is the responsibility of the Driller," a Transocean employee, and that "It is the responsibility of the Driller (or person performing the Driller's role) to shut-in the well as quickly as possible if a kick is indicated or suspected."

- Transocean was responsible for "maintain[ing] the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract," and "agree[d] to ensure that the Drilling Unit and all equipment and materials furnished by [Transocean] are adequately maintained and in such condition as to permit their continuous and efficient operation."

- Transocean "shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder."

- Transocean "represents that all of [Transocean's] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith."

- Transocean "represents that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters."

21.     The provisions of the Drilling Contract should have reflected the operational realities onboard the *Deepwater Horizon* and Transocean's duties under the law.  For example,

as a vessel owner, Transocean had non-delegable legal duties with respect to seaworthiness and providing a properly trained crew and Captain.

22.  Transocean also was required by law and contract to comply with certain international conventions and codes. The Marshall Islands, the flag state of the *Deepwater Horizon*, is a signatory to the International Convention for the Safety of Life at Sea, 1974 ("SOLAS"), and its flagged vessels must comply with SOLAS's safety regulations. Exhibit B-1 of the Drilling Contract, which contains the specifications for the drilling unit, specifies that SOLAS is an applicable rule and regulation for the rig. SOLAS in turn incorporates the International Safety Management Code ("ISM") (2002), which sets forth requirements for safely operating ships and preventing pollution.

**B.   Transocean's Equipment And Maintenance Practices.**

23.  The *Deepwater Horizon* carried various appurtenances to drill subsea wells and to protect the vessel during drilling. These included a blowout preventer ("BOP"), a specialized assembly of valves, annular preventers, and ram preventers, that sits atop the well on the sea floor and is used to monitor, seal, and control the well during drilling operations. The *Deepwater Horizon's* BOP also was equipped with an Emergency Disconnect System ("EDS"), which was supposed to activate the BOP's blind shear rams and separate the rig from the riser that connected it with the BOP, allowing the rig to seal the well and disconnect from it. The BOP also had an automatic mode or "deadman" function that should have closed the BOP's blind shear rams, shearing the drill pipe and sealing the open hole, if hydraulic and electrical power and communication with the rig were lost. This deadman function depended on two identical, independent control pods (yellow and blue) having sufficient battery charge and hydraulic fluid to activate the blind shear rams if the BOP lost connection with the rig.

8

24.     Other rig protection equipment included an alarm system that was supposed to activate when gas was detected on the rig; the emergency shutdown system ("ESD") designed to cut off ventilation and electricity in areas where gas was detected; rig savers that should have prevented gas flow to the engine control room and shut down the rig's engines if combustible gas was detected; and overspeed controls designed to shut down the engines when their rotational speed significantly increased, preventing sparking that could ignite gas.

25.     All of the *Deepwater Horizon's* safety equipment depended on frequent, competent, and quality maintenance for its operation.  The BOP in particular, because it contained a number of complex and redundant hydraulic and electrical systems, required extensive and diligent maintenance by Transocean and its contractors.

26.     Audits and inspections of the *Deepwater Horizon*, and the investigations to date, have discovered a number of problems with Transocean's maintenance programs for the *Deepwater Horizon* and its equipment.  These audits and inspections as well as Transocean's maintenance problems provided Transocean with actual knowledge of the problems related to the *Deepwater Horizon's* equipment and maintenance.

27.     These problems included Transocean's failure to perform necessary and appropriate BOP inspections.[1]  Transocean's own deficient inspection and maintenance practices, of which Transocean had actual knowledge, caused the *Deepwater Horizon*'s BOP to have numerous leaks that impaired its functions.  Transocean also made various unauthorized (and, in many cases, undocumented) modifications to the BOP, or failed to properly perform

---

[1] The BP Parties understand that Cameron International Corporation ("Cameron") conducted certain maintenance on or modifications to the BOP at Transocean's request.  Thus, all allegations in this Complaint concerning maintenance of or modifications to the BOP are made either directly or vicariously against Transocean, which was responsible for the BOP.

approved modifications.  In addition to the BOP, various other critical systems on the *Deepwater Horizon* also experienced problems because of Transocean's maintenance practices.

### C.   Transocean's Captain And Crew.

28.    Transocean's training and organization of the *Deepwater Horizon's* captain and crew was plainly inadequate.  Under maritime law, SOLAS, and the ISM, a vessel's captain (also known as the master) should have ultimate decision-making authority and responsibility over the vessel at all times.   Yet, for the *Deepwater Horizon* (and apparently other rigs as well), Transocean divided authority between the captain and the offshore installation manager ("OIM") as a matter of corporate policy.  Transocean policies designated the OIM as the person-in-charge when the vessel was in drilling mode, sowing confusion as to who was the ultimate commander of the vessel.

29.    Concerns about Transocean's drilling rig crew are not limited to the Captain. Prior to April 20, 2010, Transocean's management has acknowledged that it was diluting its crews, leading to close calls that put rigs and their crews in danger.  Indeed, just a few months before the *Deepwater Horizon* incident, a Transocean rig drilling the Shell 711 well in the North Sea suffered a blowout whose pattern and loss of well control was strikingly similar to what would occur a short time later to the *Deepwater Horizon*.

30.    Audits of the *Deepwater Horizon* confirmed that it experienced high crew turnover.  Interviews by an outside consultant reviewed by Transocean management revealed that many supervisors were concerned over the crew's ability to identify hazards and understand the relevant risks.   This concern increased after March 8, 2010, when the MC252 well experienced a kick that went unidentified by the Transocean drilling crew for approximately 33 minutes.

D. **Transocean's Errors And The *Deepwater Horizon's* Unseaworthiness Caused The April 20 Blowout, Explosion And Fire, As Well As The Tragic Deaths, Personal Injuries, And Resulting Oil Spill.**

31.    On April 20, 2010, Transocean's *Deepwater Horizon* was executing a temporary abandonment procedure on the MC252 well, which involved capping the well so that offshore oil and gas production could begin at a later date. As part of this process, the crew installed casing — a large diameter pipe — that reached to the bottom of the wellbore. A contractor (Halliburton Energy Services, Inc.) then cemented the casing to the wellbore. In addition to casing and cementing, Transocean and other contractors removed from the wellbore dense drilling fluid or "mud" used to contain hydrocarbons such as oil and gas during drilling procedures. When the kick began on April 20, Transocean's drillers and other crew members were in the process of removing this drilling fluid and displacing it with seawater.

1. **Transocean Failed To Identify And React To Warning Signs That The Well Was Flowing.**

32.    On April 20, 2010, from approximately 20:00 until the incident began, Transocean's drilling crew was displacing drilling fluid with seawater. Although the explosion on the *Deepwater Horizon* occurred at approximately 21:49, clear and obvious warnings of a well control incident had begun almost an hour earlier.

33.    To fulfill his duties in monitoring the well to detect kicks and to shut in the well when necessary, the *Deepwater Horizon* driller typically ran three data screens in the driller cabin. The screens would have displayed, among other things, the drill pipe pressure and the volume of drilling fluids. Transocean's drillers could (and should) be able to identify a kick in a well by monitoring the flow of drilling fluids into and out of the well, and the pressure on the drill pipe.

34.     At approximately 20:52 hydrocarbons began flowing into the wellbore.  The first indications of a kick occurred between 20:58 and 20:59, when the flow out of the well nearly doubled while the flow into the well decreased—a standard indication of a kick.  A few minutes later, at 21:01, the drill pipe pressure increased from 1250 psi to 1350 psi while the pump rate remained constant.  This occurred while mud was being removed from the wellbore and replaced with lighter seawater, which should have resulted in a *decrease* in pressure, not the increase that went undetected.  Over the next half hour, high drill pipe pressure and flow out of the well continued to indicate a kick.  Notwithstanding these clear kick indications, Transocean did nothing.

35.     Gas did not pass from the well into the riser until approximately 21:38 — 46 minutes after the well began flowing and long after indications of flow should have been apparent to Transocean.  If Transocean had closed the BOP around the drill pipe at any time before 21:38 — and if Transocean's poorly maintained BOP had shut in the well — the flow of hydrocarbons into the riser would have been eliminated.

36.     But without any well control action taken by Transocean, by 21:38 hydrocarbons had headed up the riser and onto the rig.  At 21:40, the expanding gas pushed out drilling fluid and spewed mud onto the rig floor.  One minute later, mud shot through the *Deepwater Horizon's* derrick.

37.     At 21:41, Transocean took its first well control action, apparently attempting to close the lower annular preventer.  This was *over forty minutes after* the initial indications that the well was flowing.  Transocean's failure to identify the kick during this period resulted from its inadequate policies and training, and led directly to gas reaching and then flowing onto the rig.

### 2. Transocean Failed To Properly Monitor The Well To Detect Whether It Was Flowing.

38. Transocean's failure to monitor the "mud pits" also is likely to have contributed to its failure to recognize that a kick was in progress (though the changes in drill pipe pressure and flow in versus flow out each gave clear, sufficient indications of a kick). The amount of return and loss of drilling fluids is a key indicator of well integrity. Upon being displaced from the well, these fluids are discharged into mud pits. Comparing changes in pit volumes to seawater volume pumped into the well is one way to determine whether the well was experiencing a kick during displacement. Any discrepancy in the two volumes could indicate that the well was flowing.

39. Transocean failed to monitor the return and loss of drilling fluids from the well. Instead, it transferred mud to another vessel without measuring its volume and discharged drilling fluids directly overboard. These procedures prevented Transocean and other contractors upon whom the BP Parties relied to accurately measure the volume of pit gains and thus removed another data set, in addition to drill pipe pressure and flow in versus flow out, that would have shown that a kick was in progress.

### 3. Transocean's Belated Well Control Actions Dispersed Gas Onto The Rig, Causing The Explosions.

40. Even with gas coming up through the riser, the blowout still could have been controlled by a properly trained crew. But Transocean's manuals do not address or explain to its crews how to handle a continuous and uncontrolled flow of gas from a well. As a consequence, and due to a lack of training, Transocean's crew used the wrong equipment at the wrong times to attempt to control the blowout.

41. The *Deepwater Horizon* was equipped with a diverter system that provided two alternate paths for gas or gas-bearing mud reaching the rig from the well. The first path was

through the mud-gas separator ("MGS"), which is designed to remove gas from relatively small quantities of mud. The second diverter path sends flow directly overboard through two 14-inch pipes, one starboard and one portside.

42. The obvious question is which path—the MGS or overboard diverters—should be used when mud and hydrocarbons are proceeding up the riser to the rig. Transocean's shut-in protocols do not fully address or explain how to respond to high flow emergency situations, and, in fact, provide contradictory instructions. On the night of April 20, 2010, the drilling crew chose to use the MGS, which was almost immediately overwhelmed, causing gas to spray onto the center of the rig rather than over the side of the vessel through the diverters.

43. Transocean's protocols also do not fully address or explain how to respond to a loss of well control. There are no instructions on how to handle continuous well flow, such as by closing the BOP's blind shear rams. Nor is there any mention of whether or when to activate the EDS in response to a well control emergency.

44. On April 20, 2010, Transocean's attempts to activate the BOP came far too late to successfully shut in the well. Transocean's crew did not attempt to activate the BOP until 21:41, when they triggered the BOP's annular preventer. The lower annular apparently failed to seal until approximately five minutes later, at 21:47. During this time, highly combustible gas continued to spew onto the rig.[2]

### 4. The *Deepwater Horizon's* ESD, Rig Savers, And Overspeed Controls Failed.

45. Because of Transocean's decision to use the MGS rather than the overboard diverter, gas quickly covered the rig. Although the *Deepwater Horizon* had multiple safety

---

[2] In addition to activating the annular preventer, Transocean's drilling crew may have belatedly attempted to activate one or more of the variable bore rams at approximately 21:46. While it is possible that these rams may have temporarily sealed the well, they did not shut it in.

devices designed to prevent that gas from igniting, these devices—some of which had malfunctioned before and all of which were subjected to Transocean's poor maintenance practices—failed when they were needed most. Transocean had actual knowledge of the inadequate maintenance on these safety devices from audits and inspections.

46.     The first such device was the rig's emergency shutdown system ("ESD"), which should cut off ventilation and electricity in areas where gas is detected. But on April 20, 2010, Transocean's ESD safety systems failed to prevent gas from reaching the rig's engine spaces.

47.     The next safety device was the rig savers, which should have prevented gas flow to the engine spaces and tripped or shut down the engines if combustible gas was detected. The rig savers failed to function on April 20, 2010 when gas from the well entered the engine spaces.

48.     The *Deepwater Horizon*'s engines themselves had yet another safety device that failed. Engines 3 and 6, which were on-line at the time of the incident, were equipped with two independent sets of overspeed controls designed to shut down the engines when their rotational speed significantly increased. These devices should have prevented the engines from igniting any gas reaching the rig. But on April 20, 2010, the overspeed controls failed when gas from the blowout reached the engines, causing them to overspeed significantly and trigger the explosions on the vessel.

> **5.     The Rig's Power Generators Failed To Operate After The Explosion, Rendering The Vessel And Its Crew Helpless.**

49.     Engines supplied all of the electrical power to the *Deepwater Horizon*, including to the rig's six primary generators. These primary generators shut down after the first explosion, when engine 3 likely blew up. Yet none of the other primary generators started up, leaving the vessel dead in the water and without power. Three Transocean crew members attempted to start the vessel's backup generator, which was necessary to power the rig's emergency and

firefighting equipment, but that generator also would not start. This rendered the rig's firefighting systems inoperable, as the lack of power disabled the electric pump that drives the watering system. Although the three crew members who attempted to start the vessel's backup generator did their best, they had not been trained by Transocean in how to start the vessel's backup generator.

### 6. Transocean's Divided Command Structure, Combined With The Failures Of Its Captain, Compounded The Effects Of The Casualty.

50. Transocean's split command led to confusion during the well control incident. Who was in charge of the vessel was unclear. When disaster struck on the evening of April 20, 2010, neither the *Deepwater Horizon's* Captain nor its OIM gave clear orders to crew members and passengers. Instead, following the explosions, the crew scattered throughout the rig. Transocean's Captain — who by law should have been in control of the vessel — never took the measures necessary to secure the vessel or the well. The Captain's actions (and, more importantly, his inactions) demonstrate that he underestimated the severity of the incident, even after the emergency was obvious to everyone else.

### 7. Transocean And Its Captain Erred In Delaying To Activate The Blowout Preventer and EDS.

51. Transocean's Captain inexplicably delayed when it came to the vessel's ultimate safety device: the EDS. Transocean personnel on the bridge — particularly the Captain — could and should have taken decisive action to save the vessel and shut in the well by immediately activating the EDS. Instead, the Captain delayed ordering that the EDS be triggered until several minutes after the explosion, when it was too late. Even then, the Captain did not order activation of the EDS until he had first conferred with the OIM. In the meantime, in the midst of the emergency and before the OIM arrived on the bridge following the explosions, the Captain expressly forbade the crew from activating the EDS. Transocean's inadequate training of the

Captain and failure to identify when the EDS should be operated in well control situations caused these errors.

### 8. Transocean's EDS And Blowout Preventer Malfunctioned, Failing To Shut In The Well.

52. When Transocean finally activated the EDS and BOP, these safety devices failed. Given the loss of control over the BOP, its deadman functionality should have automatically activated, closing the blind shear rams, shearing the drill pipe, and sealing the open hole. But despite the rig losing control of the BOP, the deadman failed to operate.

53. Investigation after the casualty revealed that, of the two independent control pods on the BOP, a valve in one did not function when tested and the battery in the other was insufficiently charged to activate the deadman. A number of different leaks in the BOP pods also were identified, which may also have compromised their ability to generate sufficient hydraulic power to activate the BOP.

### 9. Transocean's Uncoordinated Fire-Fighting Attempts Allowed The Rig To Burn For Over 36 Hours And Then Sink Into The Gulf of Mexico.

54. After the *Deepwater Horizon* was set ablaze on April 20, 2010, Transocean not only failed to undertake its own fire-fighting efforts onboard the vessel, but also abdicated its responsibility to coordinate efforts of the response vessels that arrived on the scene shortly after the explosions. As a result, the *Deepwater Horizon* burned for over thirty-six hours before sinking into the Gulf of Mexico.

### E. The Claims, Lawsuits, And Expenses Asserted Against BP As Result Of The *Deepwater Horizon* Incident.

55. Because of Transocean's misconduct and multiple errors, both before, on and after April 20, 2010, oil and gas flowed from the MC252 well into the Gulf of Mexico until July 15, 2010, when BP sealed the well. The scale of BP's response program was massive and

unprecedented. Under the dictates of and as required by the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.* ("OPA"), BP has committed to paying all legitimate claims for damages pursuant to the requirements and terms of OPA, while reserving its right to seek reimbursement, contribution, and indemnification from Transocean and other responsible parties. Because of Transocean's conduct, BP faces hundreds of lawsuits and thousands of claims arising out of the *Deepwater Horizon* incident.

56. The total amounts that will ultimately be paid by BP under OPA or otherwise in relation to the incident are subject to significant uncertainty. The ultimate exposure and cost to BP will depend on many factors, including the amount of claims that become payable by BP, the amount of fines ultimately levied against BP (including any determination of negligence by BP), the outcome of lawsuits and claims, and any costs arising from any longer-term environmental consequences of the oil spill.

57. As of the end of 2010, BP's incurred costs relating to the incident were $17.7 billion. BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill.

**F.    Transocean's Domination And Control Of Its Corporate Subsidiaries.**

58. Transocean Ltd. is the holding company of an international group of companies involved in offshore contract drilling services for oil and gas wells, oil and gas drilling management services, drilling engineering services and drilling project management services, and oil and gas exploration and production activities. Transocean Ltd. conducts its business through a tightly controlled labyrinth of subsidiaries and related entities owned by Transocean Ltd. in whole or in significant part, and through joint ventures with other entities. Transocean Ltd. has no assets or operations independent from its wholly owned subsidiary Transocean Inc. Transocean Inc. itself holds interests in a variety of Transocean operating companies, and is the

direct or indirect parent company of defendants Transocean Offshore Deepwater Drilling Inc. and Triton Asset Leasing GmbH.  Transocean Offshore Deepwater Drilling Inc., in turn, is the direct corporate parent of defendants Transocean Deepwater Inc. and Transocean Holdings LLC.

59.     Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies.  Together, the Transocean entities operated as a *de facto* single economic enterprise and the affairs of the junior subsidiaries were conducted for the sole benefit of their direct or indirect corporate owners.

60.     Corporate formalities are on the whole not observed and/or are moot given the senior entities' direct or indirect control over the selection of and leverage over the officers and directors of their subsidiaries.

61.     On information and belief, Transocean subsidiaries were owned and controlled by and for the benefit of their corporate owners in various ways, including but not limited to the following:

- common or overlapping stock ownership;

- de facto control and leverage over the selection of the Transocean subsidiaries' officers and directors, which overlapped with the officers and directors of other Transocean entities;

- common and/or de facto ownership of significant assets such as, for example, the *Deepwater Horizon* (in which four of the defendants claim an interest, for purposes of limiting their liability, as "Owner, Managing Owners, Owners *Pro Hac Vice*, and/or Operators");

- formal or informal agreements under which one Transocean entity pays the wages and salaries of Transocean employees working on or in connection with an asset owned by another entity;

- shared facilities and services pursuant to formal or informal agreements;

- common or consolidated financial and shareholder reporting and income tax and securities filings, which deceive the public about the true financial condition of the various Transocean entities, individually and collectively;

- formal or informal agreements under which significant business decisions could not be made without consultation with and/or approval of the corporate parent, either directly or indirectly;

- formal and informal intracorporate loans;

- intermingled daily operations and treating property of the junior subsidiaries as the property of their owners;

- providing the sole or a significant source of the subsidiaries' financing; and

- company-wide policies relating to the operation and maintenance of drilling rigs and the training and performance of their crews.

62.     On information and belief, junior Transocean subsidiaries had unreasonably small capital relative to the significant risk of their various operations, which prejudiced the entities' creditors, including those injured by the subsidiaries' operations and those to which the subsidiaries owe indemnity and/or contribution obligations.

63.     Transocean entities intentionally represented the independence of their direct or indirect subsidiaries, which had in effect no independent existence.  An adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the Transocean entities to escape liability arising out of operations conducted for the benefit of the senior entities or the collective economic enterprise.

## THE BP PARTIES' CLAIMS AGAINST TRANSOCEAN

## CLAIM I:  BREACH OF CONTRACT

64.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

65.     The Drilling Contract is a valid and enforceable contract.

66.     BPAP has substantially performed its obligations under the Drilling Contract.

67.     The Drilling Contract imposes a series of duties on Transocean Holdings LLC.

The Drilling Contract requires that Transocean Holdings LLC:

- "shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts . . . ." Drilling Contract ¶ 15.2.

- "exercise due diligence to prevent the well from blowing out, and to enable the efficient drilling, logging, and testing of all formations without caving or formation contamination." *Id.* ¶ 15.6.

- "shall take all measures necessary or proper to protect the personnel and facilities." *Id.* ¶ 17.1.

- "shall place the highest priority on safety while performing the work." *Id.*

- "shall observe all of [BP's] safety rules and guidelines . . . and the requirements contained in Exhibit D." *Id.*

- represent that its personnel "shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith." *Id.* ¶ 3.1.4.

- "maintain the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract." *Id.* ¶ 14.1.

- represent that "it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, … it will use sound technical principles where applicable, [and] … it will perform the Work in compliance with this Contract." *Id.* ¶ 14.1.1.

- "represent[] that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters." *Id.* ¶ 14.5.

- shall comply with SOLAS, including the ISM.  *Id.* Ex. B-1 at 6.

68.     Transocean materially breached its contractual duties in its actions and inactions

leading to the loss of well control, the explosion, and the loss of life and injuries onboard the

*Deepwater Horizon*, as well as the resulting oil spill.  Specifically, Transocean breached its contractual duties by the following acts and omissions, among others:

- Transocean did not adequately maintain the *Deepwater Horizon* and persistently delayed maintenance on the vessel.

- Transocean did not properly maintain the BOP.

- Transocean failed to conduct appropriate inspections of the BOP.

- Transocean had prior failures of the engine overspeed controls, which were not properly fixed.

- Because of Transocean's poor maintenance, the rig savers on the vessel failed to function to shut down the engines.

- After the explosion and the on-line primary generators shut down, other generators failed to function.

- Transocean made numerous unapproved (and, in many cases, undocumented) changes to the BOP.

- Authority for the vessel was improperly and unlawfully divided between Transocean's Captain and OIM.

- Transocean's Captain was not trained to use the rig's EDS, the vessel's ultimate safety device.

- The actions and inactions of Transocean's Captain showed that he underestimated the severity of the incident.

- Transocean had diluted its crews on the rigs and had experienced high levels of turnover.

- Transocean failed to properly coordinate efforts to fight the fires on board the *Deepwater Horizon* from April 20 to 22, 2010.

- Transocean failed to provide a seaworthy vessel, and also failed to provide proper training and a well-trained crew for the *Deepwater Horizon*.

- Before the well blew out on April 20, 2010, Transocean frustrated a safety check by transferring to another vessel drilling fluid displaced from the well and by discharging drilling fluids directly overboard.

- Transocean failed to properly train its drilling crews in how to handle blowouts.

- Transocean's drilling crew failed to promptly identify and address the kick that caused the incident.

As investigations into the incident continue, and once the BP Parties obtain discovery from Transocean, the BP Parties believe that the evidence may support additional breaches of the Drilling Contract. In general, Transocean repeatedly breached the Drilling Contract in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

69.    These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

70.    Transocean's breach of its contractual duties has directly and proximately caused harm, loss, injuries, and damages to the BP Parties—as well as the harm, loss, injuries and damages to others.

## CLAIM II:  UNSEAWORTHINESS

71.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

72.    Respondents Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc., as the owner and/or operators of the *Deepwater Horizon* vessel, owed the BP Parties the duty to maintain the vessel in a seaworthy condition. This duty requires that Transocean provide a vessel that is staunch and strong, fitted out with all proper equipment and in good order, and that carries a sufficient and competent crew and complement of officers. A vessel owner's obligation to supply a seaworthy

vessel extends to the vessel's appurtenances, including but not limited to the BOP, as well as the captain and crew of the vessel.

73.     Transocean breached its duties to supply a seaworthy vessel.  Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 23-54 and 68.  As investigations into the incident continue, and once the BP Parties obtain discovery from Transocean, the BP Parties believe that the evidence is likely to provide additional examples of the *Deepwater Horizon's* unseaworthiness.  In general, Transocean caused the *Deepwater Horizon* to be unseaworthy in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

74.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

75.     The *Deepwater Horizon's* unseaworthiness has directly and proximately caused harm, loss, injuries, and damages to the BP Parties—as well as the harm, loss, injuries and damages to others.

## CLAIM III:  NEGLIGENCE—DEVIATIONS FROM STANDARD OF CARE AND/OR LAWS AND REGULATIONS

76.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

77.     Transocean owed the BP Parties various duties to use reasonable care related to the *Deepwater Horizon* vessel.  These included, though are not limited to, the duty to use reasonable care in:

- Operating the *Deepwater Horizon* rig and drilling wells;

- Maintaining and repairing the vessel;

- Maintaining and repairing the appurtenances of the vessel, including the BOP;

- Not making modifications to the BOP that would impair its functions;

- Properly and promptly operating the BOP;

- Responding to kicks encountered while operating the vessel;

- Preventing blowouts;

- Safely operating the vessel;

- Properly maintaining and using all safety equipment on board the vessel;

- Providing a competent and qualified crew;

- Providing proper and necessary training to the crew and Captain of the vessel;

- Properly maintaining the vessel;

- Providing proper well monitoring and well control training;

- Providing a seaworthy vessel and crew; and

- Complying with SOLAS, including the ISM.

78.     Transocean breached these duties of care and acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence. Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 23-54 and 68.  As investigations into the incident continue, and once the BP Parties obtain discovery from Transocean, the BP Parties believe that the evidence is likely to provide additional examples of Transocean's negligent acts

and omissions by Transocean.  In general, Transocean acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

79.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

80.     Transocean's negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in operating the *Deepwater Horizon* has directly and proximately caused harm, loss, injuries, and damages to the BP Parties—as well as the harm, loss, injuries and damages to others.

## CLAIM IV:  CONTRIBUTION

81.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

82.     The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

83.     Transocean is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, personal injuries, deaths, and other damages for the reasons explained in the preceding allegations.

84.     As a result, the BP Parties are entitled to contribution under admiralty law from Transocean for all or a part of the damages resulting from the *Deepwater Horizon* incident, resulting oil spill, and related damages.

## CLAIM V: CONTRIBUTION UNDER OPA

85.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

86.    The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

87.    OPA states that a "person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."  33 U.S.C. § 2709.

88.    Transocean is liable or potentially liable under "[OPA] or another law" for the *Deepwater Horizon* incident, resulting oil spill, personal injuries, deaths, and other damages for the reasons explained in the preceding allegations.

89.    As a result, the BP Parties are entitled to contribution under OPA from Transocean for all or a part of the damages resulting from the *Deepwater Horizon* incident, resulting oil spill, and related damages.

## CLAIM VI:  SUBROGATION

90.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

91.    The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

92.    BPXP has a statutory duty to pay, has paid, and will continue to pay damages to resolve claims brought against BP resulting from the casualty and oil spill.

93.    Transocean is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, personal injuries and deaths, and other damages for the reasons explained in the preceding allegations.

94.     Accordingly, the BP Parties are entitled to recover from Transocean reimbursement for all or a part of the damages related to the *Deepwater Horizon* incident and resulting oil spill that the BP Parties have paid or will pay.

## CLAIM VII:  SUBROGATION UNDER OPA

95.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

96.     OPA states that "Any person … who pays compensation pursuant to this Act [OPA] to any claimant for removal costs or damages shall be subrogated to all rights, claims, and cause of action that the claimant has under any other law."  33 U.S.C. § 2715(a).

97.     The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

98.     BPXP has a statutory duty to pay, has paid, and will continue to pay damages to resolve claims brought against BP resulting from the casualty and oil spill.

99.     Transocean is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, personal injuries and deaths, and related damages for the reasons explained in the preceding allegations.

100.     Accordingly, the BP Parties are entitled to recover from Transocean reimbursement for all or a part of the damages related to the *Deepwater Horizon* incident and resulting oil spill that the BP Parties have paid or will pay.

## CLAIM VIII:  DECLARATORY JUDGMENT REGARDING TRANSOCEAN'S RESPONSIBILITY FOR THE *DEEPWATER HORIZON* INCIDENT AND OIL SPILL

101.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

102.    Transocean is wholly or partly at fault for the *Deepwater Horizon* incident and resulting damages for the reasons explained in the preceding allegations.

103.    The BP Parties have paid, and will continue to pay, various costs related to the casualty and oil spill.

104.    Transocean has not reimbursed the BP Parties for damages, costs, and expenses related to the blowout of the MC252 well, the resulting explosion and fire onboard the *Deepwater Horizon*, the effort to regain control of the MC252 well, the oil spill that ensued before control of the MC252 well could be regained, and claims related to the *Deepwater Horizon* incident and oil spill.

105.    The BP Parties are entitled to financial recovery from Transocean for the *Deepwater Horizon* incident and oil spill.  Transocean, however, is not entitled to any such financial recovery from or finding of liability against BP resulting from the *Deepwater Horizon* incident and oil spill.

106.    Transocean caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all resulting damages incurred by the BP Parties.  The BP Parties, however, are not liable in contribution or indemnification or other forms of monetary payment to Transocean with regards to liabilities arising from the *Deepwater Horizon* incident under OPA, the Drilling Contract (including but not limited to Articles 21 through 25), or any applicable law.

107.    An actual and justiciable controversy has arisen and now exists between the BP Parties and Transocean as to the parties' duties and obligations, if any.  As a result, the BP Parties seek a declaratory judgment that Transocean is wholly and/or partly responsible for the *Deepwater Horizon* incident, resulting oil spill, and related damages, costs and expenses;

determining Transocean's proportionate responsibility for the *Deepwater Horizon* incident, resulting oil spill, and related damages; and requiring Transocean to pay its proportionate share of all damages, costs and expenses related to the *Deepwater Horizon* incident and resulting oil spill.

## PRAYER FOR RELIEF

WHEREFORE, the BP Parties respectfully ask that this Court:

A.      Enter judgment in the BP Parties' favor against Transocean.

B.      Order that the Plaintiffs/Claimants assert their claims directly against Transocean Ltd. and Transocean, Inc.

C.      Award the BP Parties, in proportion to Transocean's fault, compensatory and economic damages for costs and expenses incurred by the BP Parties to clean up and remediate the oil spill, the amount of claims paid by the BP Parties under OPA, the amount of any judgments or settlements that the BP Parties incur or pay, the amount of any OPA financial liability that the BP Parties are liable for, the lost profits from and/or diminution in value of the Macondo prospect, and all other costs and damages incurred by the BP Parties related to the *Deepwater Horizon* incident and resulting oil spill, plus interest.

D.      Declare that Transocean caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all damages incurred by the BP Parties related to the *Deepwater Horizon* incident and resulting oil spill, and that the BP Parties are not liable in contribution, indemnification, or otherwise to Transocean for damages, costs, or other expenses arising from the *Deepwater Horizon* incident and resulting oil spill under any applicable law or contract.

E.      Find that Transocean breached the Drilling Contract, causing the BP Parties to suffer damages in an amount to be determined at trial.

F.      Find that Transocean's *Deepwater Horizon* vessel was unseaworthy, causing the BP Parties to suffer damages in an amount to be determined at trial.

G.      Find that Transocean committed negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, causing the BP Parties to suffer damages in an amount to be determined at trial

H.      Award the reasonable costs and attorneys' fees incurred by BP in prosecuting this action.

I.      Award such other relief as the Court may deem appropriate and just.

Dated:  April 20, 2011

Respectfully submitted,

/s/ Don K. Haycraft
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985
Facsimile: (202) 662-6291

Attorneys for BP Exploration & Production Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 |

| | | |
|---|---|---|
| This Document Relates To: 2:10-cv-04536-CJB-SS (*United States v. BP Exploration & Production Inc., et al.*) | : : : | SECTION: J |

In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 : : : : MDL No. 2179

SECTION: J

This Document Relates To: 2:10-cv-04536-CJB-SS (*United States v. BP Exploration & Production Inc., et al.*) : : JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

…………………………………………………...

## BPXP'S CROSS-CLAIM AND
## THIRD PARTY COMPLAINT AGAINST TRANSOCEAN

Defendant/Third-Party Plaintiff BP Exploration & Production Inc. ("BPXP") hereby brings this third-party complaint for contribution pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, against Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH and Third-Party Defendants Transocean Ltd. and Transocean, Inc. (collectively, "Transocean"), as set forth below, for the monetary recovery, if any, obtained by the United States pursuant to OPA and as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident.

## INTRODUCTION

1.     Transocean owned and operated the *Deepwater Horizon*, a mobile offshore drilling unit or rig.  On April 20, 2010, the *Deepwater Horizon* was in the process of completing an exploratory drilling well in the Gulf of Mexico when it exploded and caught fire.  Lives were lost and people were injured.  Two days later, on April 22, 2010, the vessel sank and from that point forward, until July 15, 2010, oil flowed out of the well and into the Gulf of Mexico.  The *Deepwater Horizon* was owned and operated by Transocean.  But for Transocean's improper conduct, errors, omissions, and violations of maritime law, there would not have been any

blowout of the exploratory well in Mississippi Canyon, Block 252 ("MC252," commonly referred to as the Macondo prospect). Nor, but for Transocean's misconduct, would there have been any explosion and fire on the *Deepwater Horizon*, or any deaths and personal injuries, or an oil spill in the Gulf of Mexico. ***The simple fact is that on April 20, 2010, every single safety system and device and well control procedure on the Deepwater Horizon failed, resulting in the casualty.***

2.     Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (the "Transocean *Deepwater Horizon* Companies") have alleged that they are the *Deepwater Horizon's* owners, managing owners, owners *pro hac vice*, and/or operators. Each of these Transocean entities therefore is directly liable for the improper conduct, errors, omissions, and violations of maritime law related to the *Deepwater Horizon*. Transocean's top level corporate entities, Transocean Ltd. and Transocean Inc., dominate, control, or are otherwise the alter egos of the Transocean *Deepwater Horizon* Companies. Transocean Ltd. and Transocean Inc. are also directly responsible for policies and practices that led to the MC252 well blowout.

3.     Transocean's breaches of contract, negligence, and the unseaworthiness of the *Deepwater Horizon*, were causes, in whole or in part, of the blowout of the Macondo well and the ensuing oil spill in the Gulf of Mexico. As a result of such blowout and ensuing oil spill, BP has incurred, and will continue to incur, substantial costs in containing and cleaning up the oil spill and responding to the myriad claims and lawsuits that have been filed.

4.     On December 15, 2010, the United States of America filed a complaint (the "DOJ Complaint") against BPXP, Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum"), MOEX Offshore 2007 LLC

("MOEX"), Triton Asset Leasing GmbH ("Triton"), Transocean Holdings LLC ("Transocean Holdings"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Transocean Deepwater Inc. ("Transocean Deepwater"), and QBE Underwriting Ltd., Lloyd's Syndicate 1036 ("Lloyd's") seeking, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants [BPXP], Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for, *inter alia*, removal costs and damages in this action and in any such subsequent action or actions."

5.     BPXP acknowledges that BP America Production Company and Transocean Holdings LLC are parties to a Drilling Contract with an arbitration provision.  That arbitration provision does not apply here because, among other reasons, Transocean and Transocean Holdings LLC through their conduct have waived any rights to arbitrate any aspects of the disputes between any BP entities and Transocean relating to the *Deepwater Horizon* incident and resulting oil spill.

### THE PARTIES

6.     BPXP is a Delaware corporation with its principal place of business at 501 Westlake Park Boulevard, Houston, Texas, 77079.

7.     Transocean Offshore Deepwater Drilling Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Houston, Texas, 77046-0400.

8.     Transocean Deepwater Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

9.     Transocean Holdings LLC is a Delaware limited liability company with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

10. Triton Asset Leasing GmbH is a Swiss Confederation limited liability company with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.

11. Transocean Inc. is a Cayman Islands corporation with principal places of business at 4 Greenway Plaza, Houston, Texas, 77046, and 70 Harbour Drive, Grand Cayman, Cayman Islands, KY1-1003. Transocean Inc. is the direct or indirect parent of the Transocean *Deepwater Horizon* Companies.

12. Transocean Ltd. is a Swiss Confederation corporation with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland. Transocean Ltd. owns 100% of defendant Transocean Inc., and is the ultimate parent and controlling entity of the Transocean *Deepwater Horizon* Companies.

## JURISDICTION

13. The United States of America has filed a complaint against BPXP, among other defendants, seeking a declaratory judgment that BPXP and other defendants are liable under OPA for, *inter alia*, removal costs and damages incurred and that will be incurred by the United States.

14. BPXP is named in the United States' Complaint as a defendant in admiralty and maritime claims that are pending before this Court.

15. Because of the acts and omissions described herein, Transocean is wholly or partly liable to the United States and/or to BPXP for OPA financial liability. Accordingly, pursuant to Federal Rule of Civil Procedure 13(g), BPXP brings cross-claims against Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH. Pursuant to Federal Rule of Civil Procedure 14(c)(2), BPXP impleads Transocean Ltd. and Transocean, Inc. and hereby tenders them to the United States. Accordingly, Transocean Ltd. and Transocean, Inc. must defend against the United States'

claims for OPA financial liability, and the action proceeds as if the United States had sued Transocean Ltd. and Transocean, Inc. BPXP also brings its own third-party claims directly against Transocean Ltd. and Transocean, Inc.

16. This Court has jurisdiction over this complaint pursuant to 28 U.S.C. § 1333 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c).

### FACTS COMMON TO ALL CLAIMS

18. BPXP obtained a lease for Mississippi Canyon, Block 252, commonly known as the Macondo prospect. BP, like other oil companies, contracts with and relies upon third parties experienced and expert in the drilling and provision of other services and products for the exploration, drilling, and development of deepwater wells. Pursuant to a Drilling Contract between BP America Production Company ("BPAP") and Transocean Holdings LLC, Transocean was hired to drill the MC252 well using the *Deepwater Horizon* mobile offshore drilling unit ("MODU"). Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc. admit that they are the owners, managing owners, owners *pro hac vice*, and/or operators of the *Deepwater Horizon*.

#### A. Transocean's Duties And Obligations.

19. Transocean had numerous express obligations under the Drilling Contract, including:

- Transocean "shall be solely responsible for the operation of the Drilling Unit" and "shall act at all times as an independent contractor."

- Transocean "shall exercise due diligence to prevent the well from blowing out." Transocean's manuals specify that "Detection of a kick (intrusion of liquid or gas into the wellbore) is the responsibility of the Driller," a Transocean employee, and that "It is the responsibility of the Driller (or person performing the Driller's role) to shut-in the well as quickly as possible if a kick is indicated or suspected."

- Transocean was responsible for "maintain[ing] the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract," and "agree[d] to ensure that the Drilling Unit and all equipment and materials furnished by [Transocean] are adequately maintained and in such condition as to permit their continuous and efficient operation."

- Transocean "shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder."

- Transocean "represents that all of [Transocean's] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith."

- Transocean "represents that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters."

20.     The provisions of the Drilling Contract should have reflected the operational realities onboard the *Deepwater Horizon* and Transocean's duties under the law.  For example, as a vessel owner, Transocean had non-delegable legal duties with respect to seaworthiness and providing a properly trained crew and Captain.

21.     Transocean also was required by law and contract to comply with certain international conventions and codes.  The Marshall Islands, the flag state of the *Deepwater Horizon*, is a signatory to the International Convention for the Safety of Life at Sea, 1974 ("SOLAS"), and its flagged vessels must comply with SOLAS's safety regulations.  Exhibit B-1 of the Drilling Contract, which contains the specifications for the drilling unit, specifies that SOLAS is an applicable rule and regulation for the rig.  SOLAS in turn incorporates the International Safety Management Code ("ISM") (2002), which sets forth requirements for safely operating ships and preventing pollution.

### B.      Transocean's Equipment And Maintenance Practices.

22.      The *Deepwater Horizon* carried various appurtenances to drill subsea wells and to protect the vessel during drilling.  These included a blowout preventer ("BOP"), a specialized assembly of valves, annular preventers, and ram preventers, that sits atop the well on the sea floor and is used to monitor, seal, and control the well during drilling operations.  The *Deepwater Horizon's* BOP also was equipped with an Emergency Disconnect System ("EDS"), which was supposed to activate the BOP's blind shear rams and separate the rig from the riser that connected it with the BOP, allowing the rig to seal the well and disconnect from it.  The BOP also had an automatic mode or "deadman" function that should have closed the BOP's blind shear rams, shearing the drill pipe and sealing the open hole, if hydraulic and electrical power and communication with the rig were lost.  This deadman function depended on two identical, independent control pods (yellow and blue) having sufficient battery charge and hydraulic fluid to activate the blind shear rams if the BOP lost connection with the rig.

23.      Other rig protection equipment included an alarm system that was supposed to activate when gas was detected on the rig; the emergency shutdown system ("ESD") designed to cut off ventilation and electricity in areas where gas was detected; rig savers that should have prevented gas flow to the engine control room and shut down the rig's engines if combustible gas was detected; and overspeed controls designed to shut down the engines when their rotational speed significantly increased, preventing sparking that could ignite gas.

24.      All of the *Deepwater Horizon's* safety equipment depended on frequent, competent, and quality maintenance for its operation.  The BOP in particular, because it contained a number of complex and redundant hydraulic and electrical systems, required extensive and diligent maintenance by Transocean and its contractors.

25.     Audits and inspections of the *Deepwater Horizon*, and the investigations to date, have discovered a number of problems with Transocean's maintenance programs for the *Deepwater Horizon* and its equipment.  These audits and inspections as well as Transocean's maintenance problems provided Transocean with actual knowledge of the problems related to the *Deepwater Horizon's* equipment and maintenance.

26.     These problems included Transocean's failure to perform necessary and appropriate BOP inspections.[1]  Transocean's own deficient inspection and maintenance practices, of which Transocean had actual knowledge, caused the *Deepwater Horizon*'s BOP to have numerous leaks that impaired its functions.  Transocean also made various unauthorized (and, in many cases, undocumented) modifications to the BOP, or failed to properly perform approved modifications.  In addition to the BOP, various other critical systems on the *Deepwater Horizon* also experienced problems because of Transocean's maintenance practices.

### C.     Transocean's Captain And Crew.

27.     Transocean's training and organization of the *Deepwater Horizon's* captain and crew was plainly inadequate.  Under maritime law, SOLAS, and the ISM, a vessel's captain (also known as the master) should have ultimate decision-making authority and responsibility over the vessel at all times.  Yet, for the *Deepwater Horizon* (and apparently other rigs as well), Transocean divided authority between the captain and the offshore installation manager ("OIM") as a matter of corporate policy.  Transocean policies designated the OIM as the person-in-charge when the vessel was in drilling mode, sowing confusion as to who was the ultimate commander of the vessel.

---

[1]  The BPXP understands that Cameron International Corporation ("Cameron") conducted certain maintenance on or modifications to the BOP at Transocean's request.  Thus, all allegations in this Complaint concerning maintenance of or modifications to the BOP are made either directly or vicariously against Transocean, which was responsible for the BOP.

28.     Concerns about Transocean's drilling rig crew are not limited to the Captain. Prior to April 20, 2010, Transocean's management has acknowledged that it was diluting its crews, leading to close calls that put rigs and their crews in danger.  Indeed, just a few months before the *Deepwater Horizon* incident, a Transocean rig drilling the Shell 711 well in the North Sea suffered a blowout whose pattern and loss of well control was strikingly similar to what would occur a short time later to the *Deepwater Horizon*.

29.     Audits of the *Deepwater Horizon* confirmed that it experienced high crew turnover.  Interviews by an outside consultant reviewed by Transocean management revealed that many supervisors were concerned over the crew's ability to identify hazards and understand the relevant risks.  This concern increased after March 8, 2010, when the MC252 well experienced a kick that went unidentified by the Transocean drilling crew for approximately 33 minutes.

**D.     Transocean's Errors And The *Deepwater Horizon's* Unseaworthiness Caused The April 20 Blowout, Explosion And Fire, As Well As The Tragic Deaths, Personal Injuries, And Resulting Oil Spill.**

30.     On April 20, 2010, Transocean's *Deepwater Horizon* was executing a temporary abandonment procedure on the MC252 well, which involved capping the well so that offshore oil and gas production could begin at a later date.  As part of this process, the crew installed casing — a large diameter pipe — that reached to the bottom of the wellbore.  A contractor (Halliburton Energy Services, Inc.) then cemented the casing to the wellbore.  In addition to casing and cementing, Transocean and other contractors removed from the wellbore dense drilling fluid or "mud" used to contain hydrocarbons such as oil and gas during drilling procedures.  When the kick began on April 20, Transocean's drillers and other crew members were in the process of removing this drilling fluid and displacing it with seawater.

9

### 1. Transocean Failed To Identify And React To Warning Signs That The Well Was Flowing.

31.     On April 20, 2010, from approximately 20:00 until the incident began, Transocean's drilling crew was displacing drilling fluid with seawater.  Although the explosion on the *Deepwater Horizon* occurred at approximately 21:49, clear and obvious warnings of a well control incident had begun almost an hour earlier.

32.     To fulfill his duties in monitoring the well to detect kicks and to shut in the well when necessary, the *Deepwater Horizon* driller typically ran three data screens in the driller cabin.  The screens would have displayed, among other things, the drill pipe pressure and the volume of drilling fluids.  Transocean's drillers could (and should) be able to identify a kick in a well by monitoring the flow of drilling fluids into and out of the well, and the pressure on the drill pipe.

33.     At approximately 20:52 hydrocarbons began flowing into the wellbore.  The first indications of a kick occurred between 20:58 and 20:59, when the flow out of the well nearly doubled while the flow into the well decreased—a standard indication of a kick.  A few minutes later, at 21:01, the drill pipe pressure increased from 1250 psi to 1350 psi while the pump rate remained constant.  This occurred while mud was being removed from the wellbore and replaced with lighter seawater, which should have resulted in a *decrease* in pressure, not the increase that went undetected.  Over the next half hour, high drill pipe pressure and flow out of the well continued to indicate a kick.  Notwithstanding these clear kick indications, Transocean did nothing.

34.     Gas did not pass from the well into the riser until approximately 21:38 — 46 minutes after the well began flowing and long after indications of flow should have been apparent to Transocean.  If Transocean had closed the BOP around the drill pipe at any time

10

before 21:38 — and if Transocean's poorly maintained BOP had shut in the well — the flow of hydrocarbons into the riser would have been eliminated.

35.     But without any well control action taken by Transocean, by 21:38 hydrocarbons had headed up the riser and onto the rig.  At 21:40, the expanding gas pushed out drilling fluid and spewed mud onto the rig floor.  One minute later, mud shot through the *Deepwater Horizon's* derrick.

36.     At 21:41, Transocean took its first well control action, apparently attempting to close the lower annular preventer.  This was *over forty minutes after* the initial indications that the well was flowing.  Transocean's failure to identify the kick during this period resulted from its inadequate policies and training, and led directly to gas reaching and then flowing onto the rig.

### 2.     Transocean Failed To Properly Monitor The Well To Detect Whether It Was Flowing.

37.     Transocean's failure to monitor the "mud pits" also is likely to have contributed to its failure to recognize that a kick was in progress (though the changes in drill pipe pressure and flow in versus flow out each gave clear, sufficient indications of a kick).  The amount of return and loss of drilling fluids is a key indicator of well integrity.  Upon being displaced from the well, these fluids are discharged into mud pits.  Comparing changes in pit volumes to seawater volume pumped into the well is one way to determine whether the well was experiencing a kick during displacement.  Any discrepancy in the two volumes could indicate that the well was flowing.

38.     Transocean failed to monitor the return and loss of drilling fluids from the well.  Instead, it transferred mud to another vessel without measuring its volume and discharged drilling fluids directly overboard.  These procedures prevented Transocean and other contractors

upon whom BP relied to accurately measure the volume of pit gains and thus removed another data set, in addition to drill pipe pressure and flow in versus flow out, that would have shown that a kick was in progress.

>     **3.      Transocean's Belated Well Control Actions Dispersed Gas Onto The Rig, Causing The Explosions.**

39.     Even with gas coming up through the riser, the blowout still could have been controlled by a properly trained crew.  But Transocean's manuals do not address or explain to its crews how to handle a continuous and uncontrolled flow of gas from a well.  As a consequence, and due to a lack of training, Transocean's crew used the wrong equipment at the wrong times to attempt to control the blowout.

40.     The *Deepwater Horizon* was equipped with a diverter system that provided two alternate paths for gas or gas-bearing mud reaching the rig from the well.  The first path was through the mud-gas separator ("MGS"), which is designed to remove gas from relatively small quantities of mud.  The second diverter path sends flow directly overboard through two 14-inch pipes, one starboard and one portside.

41.     The obvious question is which path—the MGS or overboard diverters—should be used when mud and hydrocarbons are proceeding up the riser to the rig.  Transocean's shut-in protocols do not fully address or explain how to respond to high flow emergency situations, and, in fact, provide contradictory instructions.  On the night of April 20, 2010, the drilling crew chose to use the MGS, which was almost immediately overwhelmed, causing gas to spray onto the center of the rig rather than over the side of the vessel through the diverters.

42.     Transocean's protocols also do not fully address or explain how to respond to a loss of well control.  There are no instructions on how to handle continuous well flow, such as by

closing the BOP's blind shear rams.  Nor is there any mention of whether or when to activate the EDS in response to a well control emergency.

43.     On April 20, 2010, Transocean's attempts to activate the BOP came far too late to successfully shut in the well.  Transocean's crew did not attempt to activate the BOP until 21:41, when they triggered the BOP's annular preventer.  The lower annular apparently failed to seal until approximately five minutes later, at 21:47.  During this time, highly combustible gas continued to spew onto the rig.[2]

### 4.     The *Deepwater Horizon's* ESD, Rig Savers, And Overspeed Controls Failed.

44.     Because of Transocean's decision to use the MGS rather than the overboard diverter, gas quickly covered the rig.  Although the *Deepwater Horizon* had multiple safety devices designed to prevent that gas from igniting, these devices—some of which had malfunctioned before and all of which were subjected to Transocean's poor maintenance practices—failed when they were needed most.  Transocean had actual knowledge of the inadequate maintenance on these safety devices from audits and inspections.

45.     The first such device was the rig's emergency shutdown system ("ESD"), which should cut off ventilation and electricity in areas where gas is detected.  But on April 20, 2010, Transocean's ESD safety systems failed to prevent gas from reaching the rig's engine spaces.

46.     The next safety device was the rig savers, which should have prevented gas flow to the engine spaces and tripped or shut down the engines if combustible gas was detected.  The rig savers failed to function on April 20, 2010 when gas from the well entered the engine spaces.

---

[2] In addition to activating the annular preventer, Transocean's drilling crew may have belatedly attempted to activate one or more of the variable bore rams at approximately 21:46.  While it is possible that these rams may have temporarily sealed the well, they did not shut it in.

47.     The *Deepwater Horizon*'s engines themselves had yet another safety device that failed.  Engines 3 and 6, which were on-line at the time of the incident, were equipped with two independent sets of overspeed controls designed to shut down the engines when their rotational speed significantly increased.  These devices should have prevented the engines from igniting any gas reaching the rig.  But on April 20, 2010, the overspeed controls failed when gas from the blowout reached the engines, causing them to overspeed significantly and trigger the explosions on the vessel.

> **5.     The Rig's Power Generators Failed To Operate After The Explosion, Rendering The Vessel And Its Crew Helpless.**

48.     Engines supplied all of the electrical power to the *Deepwater Horizon*, including to the rig's six primary generators.  These primary generators shut down after the first explosion, when engine 3 likely blew up.  Yet none of the other primary generators started up, leaving the vessel dead in the water and without power.  Three Transocean crew members attempted to start the vessel's backup generator, which was necessary to power the rig's emergency and firefighting equipment, but that generator also would not start.  This rendered the rig's firefighting systems inoperable, as the lack of power disabled the electric pump that drives the watering system.  Although the three crew members who attempted to start the vessel's backup generator did their best, they had not been trained by Transocean in how to start the vessel's backup generator.

> **6.     Transocean's Divided Command Structure, Combined With The Failures Of Its Captain, Compounded The Effects Of The Casualty.**

49.     Transocean's split command led to confusion during the well control incident.  Who was in charge of the vessel was unclear.  When disaster struck on the evening of April 20, 2010, neither the *Deepwater Horizon's* Captain nor its OIM gave clear orders to crew members and passengers.  Instead, following the explosions, the crew scattered throughout the rig.

Transocean's Captain — who by law should have been in control of the vessel — never took the measures necessary to secure the vessel or the well. The Captain's actions (and, more importantly, his inactions) demonstrate that he underestimated the severity of the incident, even after the emergency was obvious to everyone else.

### 7.    Transocean And Its Captain Erred In Delaying To Activate The Blowout Preventer and EDS.

50.    Transocean's Captain inexplicably delayed when it came to the vessel's ultimate safety device: the EDS. Transocean personnel on the bridge — particularly the Captain — could and should have taken decisive action to save the vessel and shut in the well by immediately activating the EDS. Instead, the Captain delayed ordering that the EDS be triggered until several minutes after the explosion, when it was too late. Even then, the Captain did not order activation of the EDS until he had first conferred with the OIM. In the meantime, in the midst of the emergency and before the OIM arrived on the bridge following the explosions, the Captain expressly forbade the crew from activating the EDS. Transocean's inadequate training of the Captain and failure to identify when the EDS should be operated in well control situations caused these errors.

### 8.    Transocean's EDS And Blowout Preventer Malfunctioned, Failing To Shut In The Well.

51.    When Transocean finally activated the EDS and BOP, these safety devices failed. Given the loss of control over the BOP, its deadman functionality should have automatically activated, closing the blind shear rams, shearing the drill pipe, and sealing the open hole. But despite the rig losing control of the BOP, the deadman failed to operate.

52.    Investigation after the casualty revealed that, of the two independent control pods on the BOP, a valve in one did not function when tested and the battery in the other was insufficiently charged to activate the deadman. A number of different leaks in the BOP pods

also were identified, which may also have compromised their ability to generate sufficient hydraulic power to activate the BOP.

### 9. Transocean's Uncoordinated Fire-Fighting Attempts Allowed The Rig To Burn For Over 36 Hours And Then Sink Into The Gulf of Mexico.

53. After the *Deepwater Horizon* was set ablaze on April 20, 2010, Transocean not only failed to undertake its own fire-fighting efforts onboard the vessel, but also abdicated its responsibility to coordinate efforts of the response vessels that arrived on the scene shortly after the explosions. As a result, the *Deepwater Horizon* burned for over thirty-six hours before sinking into the Gulf of Mexico.

### E. The Claims, Lawsuits, And Expenses Asserted Against BP As Result Of The *Deepwater Horizon* Incident.

54. Because of Transocean's misconduct and multiple errors, both before, on and after April 20, 2010, oil and gas flowed from the MC252 well into the Gulf of Mexico until July 15, 2010, when BP sealed the well. The scale of BP's response program was massive and unprecedented. Under the dictates of and as required by the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq*. ("OPA"), BP has committed to paying all legitimate claims for damages pursuant to the requirements and terms of OPA, while reserving its right to seek reimbursement, contribution, and indemnification from Transocean and other responsible parties. Because of Transocean's conduct, BP faces hundreds of lawsuits and thousands of claims arising out of the *Deepwater Horizon* incident.

55. The total amounts that will ultimately be paid by BP under OPA or otherwise in relation to the incident are subject to significant uncertainty. The ultimate exposure and cost to BP will depend on many factors, including the amount of claims that become payable by BP, the amount of fines ultimately levied against BP (including any determination of negligence by BP),

the outcome of lawsuits and claims, and any costs arising from any longer-term environmental consequences of the oil spill.

56. As of the end of 2010, BP's incurred costs relating to the incident were $17.7 billion. BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill.

57. The DOJ Complaint seeks, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants [BPXP], Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for removal costs and damages in this action and in any such subsequent action or actions."

58. The DOJ Complaint also alleges that: "'natural resources,' as that term is defined in OPA, 33 U.S.C. § 2701(2), have been injured, destroyed, or lost;" the "amount of damages and the extent of injuries sustained by the United States as a result of the Deepwater Horizon Spill are not yet fully known, but far exceed $75,000,000;" and that "[a]s a result of the Deepwater Horizon Spill, the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, 'removal costs' and 'damages,' within the meaning of OPA, 33 U.S.C. § 2702(b)."

## F. Transocean's Domination And Control Of Its Corporate Subsidiaries.

59. Transocean Ltd. is the holding company of an international group of companies involved in offshore contract drilling services for oil and gas wells, oil and gas drilling management services, drilling engineering services and drilling project management services, and oil and gas exploration and production activities. Transocean Ltd. conducts its business through a tightly controlled labyrinth of subsidiaries and related entities owned by Transocean

Ltd. in whole or in significant part, and through joint ventures with other entities. Transocean Ltd. has no assets or operations independent from its wholly owned subsidiary Transocean Inc. Transocean Inc. itself holds interests in a variety of Transocean operating companies, and is the direct or indirect parent company of defendants Transocean Offshore Deepwater Drilling Inc. and Triton Asset Leasing GmbH. Transocean Offshore Deepwater Drilling Inc., in turn, is the direct corporate parent of defendants Transocean Deepwater Inc. and Transocean Holdings LLC.

60.     Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies. Together, the Transocean entities operated as a *de facto* single economic enterprise and the affairs of the junior subsidiaries were conducted for the sole benefit of their direct or indirect corporate owners.

61.     Corporate formalities are on the whole not observed and/or are moot given the senior entities' direct or indirect control over the selection of and leverage over the officers and directors of their subsidiaries.

62.     On information and belief, Transocean subsidiaries were owned and controlled by and for the benefit of their corporate owners in various ways, including but not limited to the following:

- common or overlapping stock ownership;

- de facto control and leverage over the selection of the Transocean subsidiaries' officers and directors, which overlapped with the officers and directors of other Transocean entities;

- common and/or de facto ownership of significant assets such as, for example, the *Deepwater Horizon* (in which four of the defendants claim an interest, for purposes of limiting their liability, as "Owner, Managing Owners, Owners *Pro Hac Vice*, and/or Operators");

- formal or informal agreements under which one Transocean entity pays the wages and salaries of Transocean employees working on or in connection with an asset owned by another entity;

- shared facilities and services pursuant to formal or informal agreements;

- common or consolidated financial and shareholder reporting and income tax and securities filings, which deceive the public about the true financial condition of the various Transocean entities, individually and collectively;

- formal or informal agreements under which significant business decisions could not be made without consultation with and/or approval of the corporate parent, either directly or indirectly;

- formal and informal intracorporate loans;

- intermingled daily operations and treating property of the junior subsidiaries as the property of their owners;

- providing the sole or a significant source of the subsidiaries' financing; and

- company-wide policies relating to the operation and maintenance of drilling rigs and the training and performance of their crews.

63.   On information and belief, junior Transocean subsidiaries had unreasonably small capital relative to the significant risk of their various operations, which prejudiced the entities' creditors, including those injured by the subsidiaries' operations and those to which the subsidiaries owe indemnity and/or contribution obligations.

64.   Transocean entities intentionally represented the independence of their direct or indirect subsidiaries, which had in effect no independent existence.  An adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the Transocean entities to escape liability arising out of operations conducted for the benefit of the senior entities or the collective economic enterprise.

**G.    Transocean Breached It Duties Under The Drilling Contract.**

65.   The Drilling Contract imposes a series of duties on Transocean Holdings LLC. The Drilling Contract requires that Transocean Holdings LLC:

19

- "shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts . . . ." Drilling Contract ¶ 15.2.

- "exercise due diligence to prevent the well from blowing out, and to enable the efficient drilling, logging, and testing of all formations without caving or formation contamination." *Id.* ¶ 15.6.

- "shall take all measures necessary or proper to protect the personnel and facilities." *Id.* ¶ 17.1.

- "shall place the highest priority on safety while performing the work." *Id.*

- "shall observe all of [BP's] safety rules and guidelines . . . and the requirements contained in Exhibit D." *Id.*

- represent that its personnel "shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith." *Id.* ¶ 3.1.4.

- "maintain the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract." *Id.* ¶ 14.1.

- represent that "it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, … it will use sound technical principles where applicable, [and] … it will perform the Work in compliance with this Contract." *Id.* ¶ 14.1.1.

- "represent[] that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters." *Id.* ¶ 14.5.

- shall comply with SOLAS, including the ISM. *Id.* Ex. B-1 at 6.

66.    Transocean materially breached its contractual duties in its actions and inactions leading to the loss of well control, the explosion, and the loss of life and injuries onboard the *Deepwater Horizon*, as well as the resulting oil spill.  Specifically, Transocean breached its contractual duties by the following acts and omissions, among others:

- Transocean did not adequately maintain the *Deepwater Horizon* and persistently delayed maintenance on the vessel.

- Transocean did not properly maintain the BOP.

- Transocean failed to conduct appropriate inspections of the BOP.

- Transocean had prior failures of the engine overspeed controls, which were not properly fixed.

- Because of Transocean's poor maintenance, the rig savers on the vessel failed to function to shut down the engines.

- After the explosion and the on-line primary generators shut down, other generators failed to function.

- Transocean made numerous unapproved (and, in many cases, undocumented) changes to the BOP.

- Authority for the vessel was improperly and unlawfully divided between Transocean's Captain and OIM.

- Transocean's Captain was not trained to use the rig's EDS, the vessel's ultimate safety device.

- The actions and inactions of Transocean's Captain showed that he underestimated the severity of the incident.

- Transocean had diluted its crews on the rigs and had experienced high levels of turnover.

- Transocean failed to properly coordinate efforts to fight the fires on board the *Deepwater Horizon* from April 20 to 22, 2010.

- Transocean failed to provide a seaworthy vessel, and also failed to provide proper training and a well-trained crew for the *Deepwater Horizon*.

- Before the well blew out on April 20, 2010, Transocean frustrated a safety check by transferring to another vessel drilling fluid displaced from the well and by discharging drilling fluids directly overboard.

- Transocean failed to properly train its drilling crews in how to handle blowouts.

- Transocean's drilling crew failed to promptly identify and address the kick that caused the incident.

As investigations into the incident continue, and once BPXP obtains discovery from Transocean,

BPXP believes that the evidence may support additional breaches of the Drilling Contract.  In

general, Transocean repeatedly breached the Drilling Contract in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

67.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

68.     Transocean's breach of its contractual duties has directly and proximately caused harm, loss, injuries, and damages to BPXP—as well as the harm, loss, injuries and damages to others.

### H.     Transocean Caused the Deepwater Horizon To Be Unseaworthy.

69.     Respondents Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc., as the owner and/or operators of the *Deepwater Horizon* vessel, owed BPXP the duty to maintain the vessel in a seaworthy condition.  This duty requires that Transocean provide a vessel that is staunch and strong, fitted out with all proper equipment and in good order, and that carries a sufficient and competent crew and complement of officers.  A vessel owner's obligation to supply a seaworthy vessel extends to the vessel's appurtenances, including but not limited to the BOP, as well as the captain and crew of the vessel.

70.     Transocean breached its duties to supply a seaworthy vessel.  Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 22-53 and 66.  As investigations into the incident continue, and once BPXP obtains discovery from Transocean, BPXP believes that the evidence is likely to provide additional examples of the *Deepwater Horizon's* unseaworthiness.  In

general, Transocean caused the *Deepwater Horizon* to be unseaworthy in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

71.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

72.     The *Deepwater Horizon's* unseaworthiness has directly and proximately caused harm, loss, injuries, and damages to BPXP—as well as the harm, loss, injuries and damages to others.

### I.     Transocean Was Negligent Through Deviating From The Standard Of Care And/Or Laws And Regulations.

73.     Transocean owed BPXP various duties to use reasonable care related to the *Deepwater Horizon* vessel.  These included, though are not limited to, the duty to use reasonable care in:

- Operating the *Deepwater Horizon* rig and drilling wells;

- Maintaining and repairing the vessel;

- Maintaining and repairing the appurtenances of the vessel, including the BOP;

- Not making modifications to the BOP that would impair its functions;

- Properly and promptly operating the BOP;

- Responding to kicks encountered while operating the vessel;

- Preventing blowouts;

- Safely operating the vessel;

- Properly maintaining and using all safety equipment on board the vessel;

- Providing a competent and qualified crew;

- Providing proper and necessary training to the crew and Captain of the vessel;

- Properly maintaining the vessel;

- Providing proper well monitoring and well control training;

- Providing a seaworthy vessel and crew; and

- Complying with SOLAS, including the ISM.

74.     Transocean breached these duties of care and acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence. Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 22-53 and 66.  As investigations into the incident continue, and once BPXP obtains discovery from Transocean, BPXP believes that the evidence is likely to provide additional examples of Transocean's negligent acts and omissions by Transocean.  In general, Transocean acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

75.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

76.     Transocean's negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in operating the *Deepwater Horizon* has directly and proximately caused harm, loss, injuries, and damages to BPXP—as well as the harm, loss, injuries and damages to others.

### BPXP'S CLAIM AGAINST TRANSOCEAN

### CLAIM I:   CONTRIBUTION UNDER THE OIL POLLUTION ACT OF 1990

77.     BPXP realleges, adopts and incorporates by reference the allegations contained in Paragraphs 1-76, as if fully set forth herein.

78.     Section 1009 of OPA, 33 U.S.C. §2709, provides in pertinent part: "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."

79.     The DOJ Complaint alleges that, as a result of the *Deepwater Horizon* incident, natural resources have been injured, destroyed, or lost; the amount of damages and the extent of injuries sustained by the United States are not yet fully known; and the United States has expended and/or sustained and/or will expend or sustain, inter alia, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).  The DOJ Complaint also seeks a declaratory judgment that BPXP and the other defendants are liable for removal costs and damages in this action and in any such subsequent action or actions.

80.     If the United States successfully obtains and/or will obtain a monetary recovery from BPXP pursuant to OPA as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident, including but not limited to the removal costs and damages alleged in the DOJ Complaint, such OPA financial liabilities to the United States on the part of BPXP would not primarily be due to any fault or negligence on the part of BPXP.

81.     Transocean is wholly or partly at fault for the *Deepwater Horizon* incident and any resulting OPA financial liability incurred and/or to be incurred by the United States for the reasons explained above.

82.     If BPXP is held liable to the United States for all or part of any monetary recovery under OPA obtained and/or to be obtained by the United States, including but not limited to the

removal costs and damages alleged in the DOJ Complaint, Transocean is liable in contribution to BPXP under Sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709 and 2717.

83.     An actual controversy currently exists between BPXP and Transocean with regard to Transocean's liability to BPXP for any monetary recovery from BPXP obtained and/or to be obtained by the United States in connection with the *Deepwater Horizon* incident.  A declaratory judgment is therefore appropriate to define Transocean's liability in contribution to BPXP for BPXP's liabilities to the United States under OPA, if any, and bind Transocean in any subsequent action or actions that BPXP may bring.

## PRAYER FOR RELIEF

WHEREFORE, BPXP respectfully asks that this Court:

A.     Enter judgment in BPXP's favor against Transocean.

B.     Order that the United States assert its claims for OPA financial liability directly against Transocean Ltd. and Transocean, Inc.

C.     Award BPXP, in proportion to Transocean's fault, the amount of any OPA financial liability for which BPXP is determined to be liable, if any, plus interest.

D.     Declare pursuant to 28 U.S.C. § 2201 that Transocean caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all damages incurred under OPA by BPXP related to the *Deepwater Horizon* incident and resulting oil spill, and that BPXP is not liable in contribution, indemnification, or otherwise to Transocean for damages, costs, or other expenses arising from the *Deepwater Horizon* incident and resulting oil spill under any applicable law or contract.

E.     Award the reasonable costs and attorneys' fees incurred by BPXP in prosecuting this action.

F.     Award such other relief as the Court may deem appropriate and just.

Dated:  April 20, 2011

Respectfully submitted,

/s/ Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985
Facsimile: (202) 662-6291

Attorneys for BP Exploration & Production
Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft_____

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

▷

United States Court of Appeals,
First Circuit.
LA ESPERANZA DE P.R., INC., Plaintiff, Appel-
lant,
v.
PEREZ Y CIA. DE PUERTO RICO, INC., Defend-
ant, Appellee.
LA ESPERANZA DE P.R., INC., Plaintiff, Ap-
pellee,
v.
PEREZ Y CIA. DE PUERTO RICO, INC., Defend-
ant, Appellant.

Nos. 96-1904, 96-1905.
Heard May 7, 1997.
Decided Aug. 13, 1997.

Shipyard commenced collection action for al-
legedly unpaid work performed on vessel pursuant
to contract. Shipowner brought separate action for
damages resulting from shipyard's alleged negli-
gence and breach of contract. Actions were consol-
idated for bench trial. The United States District
Court for the District of Puerto Rico, Gilberto Gier-
bolini-Ortiz, S.J., 899 F.Supp. 861, awarded
shipyard $10,999 and awarded shipowner
$220,000. Both parties appealed. The Court of Ap-
peals, Stahl, Circuit Judge, held that: (1) damage to
ship was caused by shipyard's negligence and
breach of contract; (2) shipyard's efforts to repair
vessel were not grossly negligent, as would vitiate
red letter clause in repair contract; and (3) evidence
supported damage awards.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟐850.1**

170B Federal Courts
　170BVIII Courts of Appeals
　　170BVIII(K) Scope, Standards, and Extent

　　　170BVIII(K)5 Questions of Fact, Verdicts
and Findings
　　　　170Bk850 Clearly Erroneous Findings
of Court or Jury in General
　　　　　170Bk850.1 k. In General. Most
Cited Cases

District court's bench trial findings of fact are
reviewed for clear error. Fed.Rules Civ.Proc.Rule
52(a), 28 U.S.C.A.

**[2] Federal Courts 170B ⟐853**

170B Federal Courts
　170BVIII Courts of Appeals
　　170BVIII(K) Scope, Standards, and Extent
　　　170BVIII(K)5 Questions of Fact, Verdicts
and Findings
　　　　170Bk850 Clearly Erroneous Findings
of Court or Jury in General
　　　　　170Bk853 k. Definite and Firm
Conviction of Mistake. Most Cited Cases

Appellate court deems finding to be clearly er-
roneous only when, after reviewing entire record, it
is left with definite and firm conviction that mistake
has been committed.

**[3] Federal Courts 170B ⟐866**

170B Federal Courts
　170BVIII Courts of Appeals
　　170BVIII(K) Scope, Standards, and Extent
　　　170BVIII(K)5 Questions of Fact, Verdicts
and Findings
　　　　170Bk855 Particular Actions and Pro-
ceedings, Verdicts and Findings
　　　　　170Bk866 k. Negligence and Per-
sonal Injury Cases. Most Cited Cases

Questions of negligence decided in bench trial
are reviewed under clearly erroneous standard.

**[4] Admiralty 16 ⟐14**

16 Admiralty
　16I Jurisdiction
　　16k9 Contracts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

16k14 k. Repairs and Supplies. Most Cited Cases

While contract to construct ship falls outside federal admiralty jurisdiction because it is contract made on land, to be performed on land, contracts for repairs to vessel or for its substantial reconstruction come under scope of admiralty jurisdiction.

**[5] Admiralty 16 ⟜1.11**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.11 k. In General. Most Cited Cases

In absence of relevant statute, judicially developed norms of general maritime law, an amalgam of traditional common-law rules, modifications of those rules, and newly created rules, govern actions in admiralty.

**[6] Shipping 354 ⟜76**

354 Shipping
  354V Rights and Liabilities of Vessels and Owners in General
    354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

Ship repairer who performs vessel repairs improperly may be liable in contract for breach of his expressly assumed obligations or for breach of implied warranty of workmanlike performance that attaches to admiralty contracts.

**[7] Shipping 354 ⟜76**

354 Shipping
  354V Rights and Liabilities of Vessels and Owners in General
    354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

Ship repairer who performs vessel repairs improperly may be liable for maritime tort of negligence, in addition to any contract-based liability.

**[8] Admiralty 16 ⟜1.15**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.15 k. Torts. Most Cited Cases

Negligence causes of action in admiralty invoke principles of maritime negligence, not those of common law.

**[9] Shipping 354 ⟜75**

354 Shipping
  354V Rights and Liabilities of Vessels and Owners in General
    354k75 k. Contracts in General. Most Cited Cases

While implied warranty of workmanlike performance parallels negligence standard rather than imposing strict liability that attaches to implied warranties in land-based contracts, shipowner may receive indemnity from marine contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence.

**[10] Admiralty 16 ⟜1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Federally developed maritime law applies both when court construes terms of ship repair contract and when it construes standard of performance due thereunder.

**[11] Shipping 354 ⟜76**

354 Shipping
  354V Rights and Liabilities of Vessels and Owners in General
    354k76 k. Supplies, Repairs, and Advances. Most Cited Cases

Damage to ship was caused by shipyard's negligence and breach of contract, rather than by any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

failure of shipowner to see that repairs were completed, where ship came in for repairs under its own power, shipyard workers cut into hull without knowing what type of steel they were dealing with, method of cutting they employed caused damage to ship, even more damage resulted from attempts to patch holes, and shipyard then refloated ship, which was in worse condition than when it came in, without ever completing repairs, and attempted to evade responsibility by recommending special welding consultant.

**[12]** Shipping 354 ⇱76

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases
    Where shipyard held itself out as competent shipyard skilled in doing type of work requested by shipowner, the latter had right to rely on expertise of shipyard and had reason to expect stable seaworthy vessel upon completion of repairs, regardless of condition of vessel prior to repairs.

**[13]** Shipping 354 ⇱76

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances. Most Cited Cases
    While shipyard's efforts to repair vessel were negligent, they were not grossly negligent, as would vitiate red letter clause in repair contract that precluded recovery for loss of use and loss of profit, though shipyard initially did not know quality of steel on ship's hull and ultimately abandoned any effort at repair, in light of shipyard's reasonable belief that it could perform repairs, its efforts to devise acceptable welding procedures and its attempts to remedy damage it caused.

**[14]** Shipping 354 ⇱75

**[15]** Shipping 354 ⇱75

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k75 k. Contracts in General. Most Cited Cases
    Exculpatory, or red letter, clauses in marine contracts are enforceable, but may not provide for total absolution of liability; rather, prospective wrongdoer's potential liability should be enough to deter negligence.

**[15]** Shipping 354 ⇱75

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
      354k75 k. Contracts in General. Most Cited Cases
    Exculpatory, or red letter, clause may not limit liability on marine contract for gross negligence because harm wilfully inflicted or caused by gross or wanton negligence operates to invalidate exemption from liability.

**[16]** Damages 115 ⇱96

115 Damages
   115VI Measure of Damages
    115VI(A) Injuries to the Person
      115k96 k. Discretion as to Amount of Damages. Most Cited Cases

Damages 115 ⇱104

115 Damages
   115VI Measure of Damages
    115VI(B) Injuries to Property
      115k104 k. Discretion as to Amount of Damages. Most Cited Cases

Damages 115 ⇱119

115 Damages
   115VI Measure of Damages
    115VI(C) Breach of Contract
      115k119 k. Discretion as to Amount of Damages. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

Page 4

**Federal Courts 170B** ⟨⟩**871**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
     170BVIII(K)5 Questions of Fact, Verdicts
and Findings
       170Bk870 Particular Issues and Questions
       170Bk871 k. Damages and Extent
of Relief. Most Cited Cases

    Trial court, as fact-finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error.

**[17] Damages 115** ⟨⟩**222**

115 Damages
   115X Proceedings for Assessment
     115k219 Verdict and Findings
      115k222 k. Findings by Court or Referee.
Most Cited Cases

    As threshold requirement, trial court must expose measure of damages and method of computation, both to inform litigants of basis for its findings and to afford appellate court possibility of intelligent review.

**[18] Shipping 354** ⟨⟩**76**

354 Shipping
   354V Rights and Liabilities of Vessels and
Owners in General
     354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases

    Damage award of $10,999 to shipyard for repair work performed on ship was supported by shipyard's invoice, as adjusted to disallow any recovery for hull replacement work that shipyard either failed to do or negligently performed.

**[19] Evidence 157** ⟨⟩**571(10)**

157 Evidence
   157XII Opinion Evidence
     157XII(F) Effect of Opinion Evidence
     157k569 Testimony of Experts

    157k571 Nature of Subject
     157k571(10) k. Damages. Most
Cited Cases

    Damage award of $220,000 to shipowner for shipyard's negligence and breach of contract, in connection with hull replacement work that shipyard either failed to do or negligently performed, was supported by expert testimony of marine surveyor regarding valuation and cost of repairs.

**[20] Damages 115** ⟨⟩**67**

115 Damages
   115III Grounds and Subjects of Compensatory
Damages
     115III(C) Interest
     115k66 Interest
      115k67 k. Element of Damages in
General. Most Cited Cases

**Shipping 354** ⟨⟩**76**

354 Shipping
   354V Rights and Liabilities of Vessels and
Owners in General
     354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases

    Damage award of $220,000 to shipowner for shipyard's negligence and breach of contract, in connection with hull replacement work that shipyard either failed to do or negligently performed, was not erroneous to extent it did not limit recovery to scrap value or did not award additional damages for interest, loans, and loss of use.

***12** Harry A. Ezratty, for La Esperanza de P.R., Inc.

Juan A. Lopez-Conway, with whom Paul E. Calvesbert and Calvesbert, Alfaro & Lopez-Conway, were on brief, for Perez y Cia. de Puerto Rico, Inc.

Before STAHL, Circuit Judge, ALDRICH, Senior Circuit Judge, and CYR, Senior Circuit Judge.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

STAHL, Circuit Judge.

This consolidated admiralty case involves a dispute between a shipowner and a shipyard over repairs to a vessel, S/V LA ESPERANZA, that were begun but never completed. It comes to us on cross-appeals following a bench trial in which the district court entered judgment, first, in favor of Perez y Cia de Puerto Rico, Inc. ("the shipyard" or "Perez") in the amount of $10,999 in its collection action for unpaid work performed pursuant to contract, and, second, in favor of La Esperanza de Puerto Rico, Inc. ("the shipowner") in the amount of $220,000 in its separately brought action for damages resulting from Perez's negligence and breach of contract. *See Perez Y Cia. de P.R., Inc. v. S/V La Esperanza,* 899 F.Supp. 861 (D.P.R.1995).

On appeal, Perez argues that the district court's findings of fact and conclusions of law are erroneous. It contends that the district court erred in finding that it was negligent and in breach of its contractual obligations and argues both that the shipowner's contributory negligence caused the damages that are in issue here and that the ship was worthless when it first arrived at the shipyard, thereby obviating the district court's award of damages in favor of the shipowner.[FN1] For its part, the shipowner accepts the district court's findings of fact, but seeks to ascribe error to the district court's conclusions of law. Its argument on appeal is that the court erred in enforcing a "red letter clause" in the ship repair contract that limited the shipyard's liability by precluding recovery for loss of use and loss of profits in the event of a breach. The shipowner argues that the liability limitation clause was vitiated on the facts found by the district court because the shipyard's actions, on such facts, constituted gross negligence, not ordinary negligence as the district court concluded. Finally, both parties take issue with the district court's measure of damages. The shipyard argues that the district court erred by ordering it to pay too much; the shipowner, on the contrary, argues that the district court erred by not ordering the shipyard to pay more.

FN1. We note that LA ESPERANZA was sold at public auction by the U.S. Marshals Service in July 1996 pursuant to its status as the *in rem* defendant in the Perez shipyard's cause of action. The district court granted the shipyard's motion for confirmation of sale and ordered the Marshals Service to issue a bill of sale conveying title to LA ESPERANZA to one Jose L. Novas Debien. Our use of the word "shipowner" in this opinion refers exclusively to La Esperanza de Puerto Rico, Inc.

As we do not believe that the district court's determinations were clearly erroneous, we affirm.

### Background and Prior Proceedings

We state the facts consistent with the district court's findings. *See id.* at 862-65.

The S/V LA ESPERANZA ("the vessel" or "the ship") is an eighty-eight foot, steel-hulled, diesel-powered, auxiliary sail schooner**13** built in 1896 in Antwerp, Belgium.[FN2] Her hull consists of an older type of steel, akin to wrought iron, that is no longer used in the construction of ships. The seams of the ship's hull and frames are rivetted and welded.

FN2. The district court's opinion lists the ship's length as 122 feet. However, the Coast Guard certificate of inspection and the relevant marine surveys of the vessel contained in the record indicate a length of eighty-eight feet. While our review fails to account for the discrepancy between these figures, we note that it is of no consequence to the legal result in this case.

Julio R. Matos and Enrique Cardona (the principals of La Esperanza de Puerto Rico, Inc.) bought LA ESPERANZA in 1990 for $40,000 with the apparent purpose of refitting her as a passenger vessel for use as a tourist attraction and for sightseeing harbor tours of San Juan, Puerto Rico. To this end, the ship underwent extensive reconstruction and re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

pairs at Vaello Shipyard in Puerto Rico from 1990 to 1992. This work was overseen and approved by the U.S. Coast Guard, which is charged by law to inspect passenger vessels and to certify them for operation. Among the many other things done while the ship was at Vaello, the thickness of the ship's hull was tested in accordance with applicable Coast Guard guidelines by drilling holes at various points to determine those areas that were "wasted" (i.e., excessively deteriorated or corroded) and in need of either immediate or eventual replacement.[FN3] This drillhole gauging indicated that various parts of the hull were in fact wasted. On the basis of these findings, eight hull plates were replaced in accordance with welding procedures developed by Vaello, which had the responsibility for designing the procedures for Coast Guard approval.[FN4]

> FN3. The Coast Guard considers deficiencies in the thickness of hull plating to be a safety concern for steel-hulled vessels because such deterioration, much like buckling, cracks, or fractures, "may affect the strength or integrity of the hull to an extent which would make it unseaworthy." *See* United States Coast Guard, *Navigation and Vessel Inspection Circular No. 7-68; Enclosure (1)-Notes on Inspection and Repair of Steel Hulls* at 1 (1968) [hereinafter *NAVIC* ]. Coast Guard inspection guidelines provide that the present thickness of hull plates is to be compared to their original thickness as a means of gauging their present condition. *Id.* at 3-4. "Wastage" refers to the percentage of the original thickness that has deteriorated. Thus, a plate with twenty-five percent wastage has lost twenty-five percent of its original thickness. *Id.* at 4.

> Under Coast Guard guidelines, "a local thickness deterioration of up to about 25 percent may be accepted before replacement is necessary," *id.* at 7, but this is not a hard-and-fast rule. "[I]n the applic-

ation of this percentage, considerable judgment is called for depending upon the location and extent of wasted material. Localized wastage of some portions of plates ... in excess of 25 percent may be accepted in many cases, if the condition of the adjacent material is sufficiently good to maintain an adequate margin of strength." *Id.* Indeed, Coast Guard inspectors are afforded a wide latitude of discretion in dealing with the various hull deficiencies they may encounter upon inspection of a vessel. They must "first evaluate if seaworthiness is compromised or not" by these deficiencies, a decision that calls for "considerable discretion because the line of demarcation between what is seaworthy and what is not, is necessarily approximate and subject to some range of interpretation." *Id.* at 2. Among the factors that Coast Guard inspectors "must" weigh in evaluating a particular vessel's hull is "[w]hether the repair work contemplated is necessary to restore seaworthiness or is a maintenance measure to insure prolonged utilization of the vessel." *Id.* "In the first case, repair must be required. In the second case, the details of the condition should be reconsidered at a future inspection and, possibly, called to the attention of the owner so that he may exercise his own good judgement." *Id.*

> FN4. Coast Guard guidelines require that hull replacements, and in particular, the welding and rivetting procedures used in marrying new steel plates to existing older plates, conform with applicable standards and gain Coast Guard approval. *See, e.g., NAVIC* at 24-35 (discussing proper welding and rivetting procedures).

LA ESPERANZA's overhaul was completed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

during the summer of 1992. The total cost of the re-fitting was financed by loans totalling almost $2,175,000. The refurbished ship had a replacement value of $4.8 million, a physical value of $3.5 million, and an estimated value of $2.8 million. For accounting purposes, the vessel's book value was listed as $1,704,000.

The Coast Guard issued a certificate of inspection for the vessel, which indicated the route that LA ESPERANZA was permitted to run and conditions on the manner of her operation. Specifically, the Coast Guard limited LA ESPERANZA, *inter alia,* to carrying no more than seventy-five passengers **14** and restricted her passage to "the protected waters of Bahia de San Juan ... within one mile of shore .... [and] to the waters shoreward of buoys 5 and 6 of the Anegado Channel." The certificate of inspection further provided that the ship, when operating its sails, could only set her inner and outer jibs while passengers were on board, but also indicated that up to 150 passengers were allowed on deck when the ship "operate[d] as a moored attraction vessel."

Under these conditions, the vessel thereafter began its passenger service around San Juan Bay. On average, LA ESPERANZA made two trips per day on weekdays and made three or four daily runs on weekends. She was also available for rent for private events.

On March 4, 1994 the shipowner took LA ESPERANZA to the Perez shipyard in San Juan for repairs to her rudder deemed necessary by the Coast Guard. Seeing as the vessel would be dry-docked for the rudder repair, the shipowner decided to accelerate an overall hull inspection that was scheduled for the following month. The Coast Guard inspected the hull and, on March 10, indicated that all hull plates with wastage in excess of fifty percent had to be replaced. The shipyard subcontracted with another firm to perform ultrasonic gauging of the hull in order to identify the candidate plates for replacement. This audio gauging revealed that eighty percent of the ship's hull was

wasted twenty-five percent or more from its original thickness. In view of the test results, the Coast Guard required that eighty percent of the hull be replaced, but agreed to allow the shipowner to do the replacement work in stages. As an immediate matter, the shipowner was required to replace the twelve hull plates that were wasted fifty percent or more.

On March 17, the shipowner and the shipyard signed a contract for repairs, with the shipowner paying a deposit of $40,000. The shipyard's quoted estimate of $71,947.20 included, among other things to be done, the replacement of twelve hull plates. The contract encompassed an attached list of conditions. Under section 3(a) of that list, "[t]he Yard commits itself to use materials and execute work to standard ship repair practice." Section 3(b) provided the shipyard the right to "make good at its own workshops and expense any defective work or material [that it] supplied," although the shipowner retained an option to demand, in lieu of such performance, "a sum equal to the cost of such repair." Finally, section 5 provided that "[t]he yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel."

The shipowner hired welders to do the hull replacement work. Despite the fact that the welders did not know the type of steel used in LA ESPERANZA's hull, or the fact that it was an older type of steel no longer used in ship construction, on March 18 they began cutting into the ship's hull with torches in order to remove five of the twelve plates slated for replacement. This work caused a fire with resulting damage to the ship's electrical system. While the method used to remove the hull plates did not require Coast Guard approval, the method for their replacement did. After initial plans were rejected by the Coast Guard, the shipyard's contract manager, Miguel Nin, together with the yard's welding subcontractor, drafted another set of welding procedures that they gave to the shipowner to present to the Coast Guard for approval, but the Coast Guard did not approve the newly submitted

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

procedures. As a consequence, all hull replacement work on the vessel stopped pending development of new welding procedures.

It rapidly became apparent, however, that the Perez shipyard did not possess the ability to perform the hull replacement work on LA ESPERANZA. Nevertheless, on April 6, the shipyard welded five temporary doubler plates onto the hull areas where plates had already been removed. This welding was done too quickly and with excessive heat, causing the older steel of the hull to crack and rivets to loosen.

During this period, the shipowner and shipyard met to discuss the welding procedure problem. The parties met one last time on May 20, 1994 to discuss what arrangements would be made for the vessel in light of the welding difficulties. Although no solution to LA ESPERANZA's predicament was **\*15** forthcoming, the shipyard produced a bill for $73,999 for the unfinished hull work and other repairs that it had already done on the ship. Subtracting the $40,000 deposit that the shipowner had previously paid, the shipyard demanded payment for the remaining balance of $33,999.

The shipowner refused to pay. On May 22, 1994, anxious to get other ships into its only dry dock facility, which LA ESPERANZA had now occupied for some two months, the shipyard moved the ship from the dry dock and refloated it. Perez then moved the vessel, operating under its own power, to its tender dock area, an area akin to a floating junk yard. The shipyard recommended two welding experts that the shipowner could hire to develop a welding plan for Coast Guard approval. The shipyard hired one of the two recommended experts, but the expert failed to produce a plan.

Meanwhile, the refloated vessel was taking on water through the cracks in her hull caused by the faulty plate removal and the welding of the temporary plates. The ship was once again removed from the water, water was pumped out, and soft patches using rubber and metal were used to plug leaks,

though these too soon began to develop cracks. Surveys conducted at about this time, May and June 1994, revealed that the vessel was tilting to one side because the ballast initially removed in order to gain access to the hull plates for the removal operation had never been replaced. Indeed, when the shipyard refloated LA ESPERANZA, it had placed concrete blocks on the upper deck in lieu of the ship's ballast. During this period, the damaged upper deck itself collected about an inch of water. The surveys revealed that the cost of repairing the vessel to correct the problems with the hull, to repair the damaged upper deck, and to replace damaged wiring, electrical equipment, and carpeting would be between $180,000 and $220,000, not including any possible hidden damages that could not be readily detected while the ship was still in the water.

The shipyard subsequently filed a collection action in federal district court, *in personam* against the shipowner and *in rem* against the vessel itself, for the money it alleged it was owed for the repair work it had performed on LA ESPERANZA. The shipowner filed a separate action against the shipyard for the damages it alleged it suffered as a result of the shipyard's negligence in performing the repair contract. A consolidated trial before the district court sitting in admiralty without a jury was held in September 1995. The court awarded the shipyard $10,999 on its contract collection claim, an amount corresponding to the work that the shipyard actually did on the vessel, minus the amount billed for the defective hull replacement work. The court similarly awarded the shipowner $220,000 for the damages it sustained as a result of the shipyard's negligence in performing the repair work, an amount corresponding to the cost needed to repair the damages to the vessel and to return LA ESPERANZA to the condition it was in before it entered the Perez shipyard. The parties filed motions for additional findings of fact and conclusions of law that were denied by the court. These cross-appeals followed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

### Standard of Review

[1][2] We review a district court's bench trial findings of fact for clear error. *See* Fed.R.Civ.P. 52(a); *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7-8, 99 L.Ed. 20 (1954); *Puerto Rico Ports Auth. v. M/V Manhattan Prince,* 897 F.2d 1, 3 (1st Cir.1990). We deem a finding to be clearly erroneous "only when, after reviewing the entire record, we are 'left with the definite and firm conviction that a mistake has been committed.' " *Clement v. United States,* 980 F.2d 48, 53 (1st Cir.1992) (quoting *Deguio v. United States,* 920 F.2d 103, 105 (1st Cir.1990) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948))).

[3] Likewise, "[w]e review questions of negligence" decided in a bench trial "under the clearly erroneous standard." *Id.* (citing *Goudy & Stevens, Inc. v. Cable Marine, Inc.,* 924 F.2d 16, 19 (1st Cir.1991)), *Deguio,* 920 F.2d at 105, and *Obolensky v. Saldana Schmier,* 409 F.2d 52, 54 (1st Cir.1969). In using this standard, our practice accords with the Supreme Court's characterization of negligence*16 and causation as issues of fact, *see McAllister,* 348 U.S. at 20-23, 75 S.Ct. at 7-9, and is consonant with the rule applied in virtually all our sister circuits, which similarly treat a bench trial finding that a party was negligent as a question of fact, or mixed question of fact and law, and thus do not reverse such a finding unless clearly erroneous. *See generally* Charles Alan Wright & Arthur Miller, 9A *Federal Practice and Procedure* § 2590 at 620-28 (2d. ed.1995) (discussing cases); Steven Alan Childress & Martha S. Davis, 1 *Federal Standards of Review* § 2.28 at 2-220 to 2-227 (2d. ed.1992) (same). *But see Mamiye Bros. v. Barber S.S. Lines, Inc.,* 360 F.2d 774, 776-78 (2d Cir.1966) (per Friendly, J.) (distinguishing *McAllister* as a causation case and holding that clear error standard does not apply to trial court's determination of negligence).

### Negligence, or No Negligence?

On appeal, the shipyard contends that the district court erred in finding that it was negligent and in breach of contract. It argues that the shipowner is really to blame for the damages to LA ESPERANZA and for the fact that the hull repairs were never completed. It thus contends that the shipowner was not entitled to the $220,000 awarded by the district court. Even if it was negligent, the shipyard insists, the ship is worthless, thus making the district court's measure of damages erroneous.

The shipowner counters that the district court's error consists in not realizing that the facts it found constituted gross negligence, not ordinary negligence. Because the district court incorrectly decided the gross negligence issue, the shipowner argues, it also incorrectly concluded that the shipyard's liability did not extend to loss of the vessel's use and loss of profit because of the red letter clause contained in the repair contract. That clause, the shipowner argues, precludes recovery for loss of the vessel's use and loss of profits in instances involving ordinary negligence, but not in circumstances involving gross negligence.

[4][5] We address the parties' various claims under federal maritime law because "[a]dmiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law." *In re Ballard Shipping Co. v. Beach Shellfish,* 32 F.3d 623, 625 (1st Cir.1994) (citing *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 864, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986)); *see also Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, ----, 116 S.Ct. 619, 623, 133 L.Ed.2d 578 (1996). While a contract to construct a ship falls outside federal admiralty jurisdiction because it is "a contract made on land, to be performed on land," *People's Ferry Co. v. Beers,* 61 U.S. (20 How.) 393, 402, 15 L.Ed. 961 (1857), contracts for repairs to a vessel or for its substantial reconstruction come under the scope of admiralty jurisdiction. *See Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961) (contrasting ship repair and construction); *New Bedford Dry Dock Co. v. Purdy,* 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922); *see also* 28 U.S.C. § 1333

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

(granting exclusive federal jurisdiction in "[a]ny civil case of admiralty"); *cf.* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* at 111-12 (2d ed.1994). In the absence of a relevant statute, the judicially-developed norms of the general maritime law, "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," govern actions in admiralty. *East River S.S., 476 U.S. at 865, 106 S.Ct. at 2299.*

[6][7][8][9][10] We thus must evaluate the merits of the parties' claims against "substantive rules and precepts peculiar to the law of the sea." Schoenbaum, *supra,* at 156 (discussing cases). Under this body of law, a shipowner may sue in either tort or contract for negligent repairs to his vessel. *See Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 412 (5th Cir.1982); Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir.1967).* A ship repairer potentially faces three sources of liability for repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of *\*17Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). See Alcoa S.S. Co.* at 50; *see also Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n. 17 (5th Cir.1989).* A ship repairer may also be liable for the maritime tort of negligence. *See Alcoa S.S., 383 F.2d at 50. See generally* Schoenbaum, *supra,* at 183-84 (collecting cases). Importantly, negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law. *See Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408-09, 74 S.Ct. 202, 204-04, 98 L.Ed. 143 (1953).* Moreover, while the implied warranty of workmanlike performance "parallel[s] a negligence standard rather than imposing [the] strict liability" that attaches to implied warranties in land-based contracts under the Uniform Commercial Code, *see Employers Ins., 866 F.2d at 763 n. 17,* "a shipowner may receive indemnity from a marine contractor for

breach of implied warranty of workmanlike service, albeit that such performance was done without negligence." *SS Amazonia v. New Jersey Export Marine Carpenters, Inc., 564 F.2d 5, 8 (2d Cir.1977)* (citing *Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964)* and *Ryan, 350 U.S. at 133, 76 S.Ct. at 237).* Finally, federally developed maritime law applies both when a court construes the terms of a repair contract and when it construes the standard of performance due thereunder. *See Alcoa S.S., 383 F.2d at 50* (citing *Booth S.S. Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2d Cir.1958)* and *Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947 (5th Cir.1956)).*

[11] In this case, the shipyard argues that it was not negligent or in breach of contract because the shipowner, not it, was really at fault for the fact that the hull repairs were never completed. The crux of the shipyard's theory is that the Coast Guard did not disapprove the welding plans for the twelve plates it was supposed to replace because of the method by which the shipyard proposed to do the job, but rather because, at the insistence of the shipowner, an insufficient number of plates were to be removed. The shipyard argues that it cannot be faulted for the fact that the Coast Guard found the scope of the hull replacements inadequate or for the fact that the shipowner failed to provide the Coast Guard with a comprehensive plan detailing how and when a full eighty percent of the hull with wastage of twenty-five percent or more would be replaced-as the Coast Guard was requiring. The shipyard's theory, in short, is that it could not act to repair the vessel until the Coast Guard approved the repairs, and the Coast Guard would not approve the repairs until the shipowner acted by submitting a comprehensive plan for replacing eighty percent of the hull, not just the twelve plates scheduled for removal and replacement under the contract.

The record simply does not support this argument. In the first place, contrary to the shipyard's contentions, the record does not substantiate the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

view that the Coast Guard disapproved the welding procedures notwithstanding the shipyard's submission of proper welding procedures. Neither does the record support the shipyard's alternative argument that the Coast Guard "neither approved or disapproved" welding procedures that it submitted because the Coast Guard was not about to deliberate in the absence of a comprehensive plan for additional repairs to LA ESPERANZA. In his deposition, Lt. Comdr. Randal B. Sharpe, the Coast Guard officer in charge of marine safety in San Juan during the relevant period of this dispute, was asked to describe the purpose of the welding procedures submitted to the Coast Guard.[FN5] He answered that "the purpose of that document was to show us, the Coast Guard, how the shipyard intended to weld the new plate to the old iron hull." When asked whether that proposal met Coast Guard requirements, Lt. Comdr. Sharpe responded, "Parts of the proposal do, yes; parts of the proposal do not." The parts of the proposal that were acceptable, he continued, were those above the load water line, thereby indicating that those below the water line (which presumably were of **18** greater significance to the vessel's seaworthiness) were not acceptable. Thus, even if Lt. Comdr. Sharpe's deposition substantiates the uncontroverted fact that no comprehensive plan was submitted (which it does in parts not reproduced here), it also substantiates other record evidence that the shipyard's method of work, in any event, did not pass muster.

> FN5. We note that both parties took Lt. Comdr. Sharpe's deposition knowing that he would be unavailable to testify at trial.

Furthermore, Lt. Comdr. Sharpe's deposition supports the view of other witnesses at trial that the shipyard bore the responsibility of furnishing the Coast Guard with appropriate welding procedures because it was a matter of "technical nature," meaning that it was something that "would normally have been submitted either by the shipyard or by the welding contractor who was going to perform the work." Finally, his deposition supports a find-

ing that the shipyard's inability to devise appropriate welding procedures precluded the shipowner from submitting a comprehensive repair plan for the ship's hull with the Coast Guard, not the other way around. "Basically what we were looking for," Sharpe explained in discussing the requirements for approval of the repairs to LA ESPERANZA, "was a proposal on *how* to repair all of the wasted steel.... [T]hat repair proposal ... was supposed to include *what* areas of plate would be replaced; a *time-line* for replacement, and *how* the plate would be replaced." (emphasis added). Because neither the shipyard nor its welding contractor ever devised a welding plan that was acceptable to the Coast Guard on the issue of how the first set of hull plates would be replaced, it is difficult to see how the shipowner, the shipyard, or anyone else could have compiled a comprehensive plan detailing a schedule for the more protracted process of taking out and replacing yet other hull sections. It would thus appear that the shipyard's successful development of a welding procedure acceptable to the Coast Guard was a constructive condition precedent to formulation of a comprehensive plan, and overall Coast Guard approval, rather than vice versa. In any event, we detect no clear error in the district court's implicit allocation of blame on this issue.

Accordingly, the shipyard's contention that it was not liable for negligent performance of the contract cannot withstand close scrutiny. Here, one witnesses a ship that came in for repairs under her own power. Pursuant to a valid, written contract, the shipyard began to make the repairs, but somewhere, somehow, something went wrong. Although the shipyard manager, Miguel Nin, knew that LA ESPERANZA's hull was of an older type steel, and despite the fact that the undisputed evidence revealed that the special quality of LA ESPERANZA's steel should have been readily apparent to any reasonably competent ship repair professional, the welders that Perez hired to cut into LA ESPERANZA did not know what type of steel they were dealing with when they cut into the ship's hull with torches. The method of cutting they employed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

caused damage to the ship and, to condense a long story, the contracted-for repairs were never completed. Instead of remedying the error and giving the vessel back to the shipowner, the shipyard patched the holes it had already made by welding on temporary plates, causing even more damage to the hull. The shipyard then refloated the ship, which by now was in worse condition than it was prior to arriving for repairs, and placed the ship in its tender dock area. Finally, seeking to extricate itself from a predicament of its own making, the shipyard told the shipowner, essentially, that it (the shipowner) had a problem on its hands, and maybe it should consider hiring a special welding consultant.

[12] This attempt to evade responsibility and escape liability is unavailing. Where the shipyard, like Perez here, "held itself out as a competent shipyard skilled in" doing the type of work requested by the shipowner, the latter "had a right to rely on the expertise of [the shipyard] and had reason to expect a stable seaworthy vessel upon completion of the repairs, regardless of the condition of the boat[ ] prior to repairs." *Empacadora Del Norte, S.A., v. Steiner Shipyard, Inc.,* 469 F.Supp. 954, 962 (S.D.Ala.1979). The contract between the parties does not evince any manifestation of an intent to deviate from this principle. On the contrary, under section 3(a) of the appended list of conditions, "[t]he Yard commit[ted] itself to use materials**19** and execute work to standard ship repair practice." This contractual clause manifests an intent to bind the shipyard expressly to the otherwise implied warranty of workmanlike performance in marine contracts. In any event, "[t]his warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to *complete the task.* " *Little Beaver Enters. v. Humphreys Rys., Inc.,* 719 F.2d 75, 78 (4th Cir.1983) (emphasis added) (citing *Coffman v. Hawkins & Hawkins Drilling Co.,* 594 F.2d 152 (5th Cir.1979) and *Tebbs v. Baker-Whiteley Towing Co.,* 407 F.2d 1055 (4th Cir.1969)). The shipyard's failure to complete the hull replacement repairs

thus constituted a breach of an express and implied contractual obligation, particularly in view of the fact that evidence in the record substantiates that similarly situated ship repairers could have devised appropriate welding procedures and replaced the hull plates in question. On this record, we cannot ascribe any clear error to the district court's determination that the shipyard was negligent in its manner of performing the contracted-for repairs.

### Negligence or Gross Negligence?

[13] We turn next to the shipowner's argument that the shipyard's actions amounted to gross negligence, not ordinary negligence, and thereby vitiated the red letter clause in the contract limiting the shipyard's liability by precluding recovery for loss of the vessel's use and loss of profit. Whatever else may be said here, we are not convinced that the district court committed clear error when it determined that the shipyard, though negligent, was not grossly negligent in how it undertook to repair the vessel or in how it dealt with it while in its custody.

[14][15] While exculpatory clauses-commonly referred to as red letter clauses-were traditionally disfavored by courts sitting in admiralty, *see, e.g., Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) (refusing to enforce a clause absolving a towing company from all liability for its negligent acts), such clauses are today routinely enforceable. *See East River S.S.,* 476 U.S. at 873, 106 S.Ct. at 2303 (indicating that a marine contractor "can restrict its liability *within limits* by disclaiming warranties or limiting remedies" (emphasis added)). Accordingly, courts today will enforce red letter clauses that are expressed clearly in contracts entered into freely by parties of equal bargaining power, provided that the clause not provide for a total absolution of liability. *See Edward Leasing Corp. v. Uhlig & Assocs., Inc.,* 785 F.2d 877, 888 (11th Cir.1986); *Todd Shipyards,* 674 F.2d at 410; *Alcoa S.S.,* 383 F.2d at 46. The rationale for upholding such clauses, "so long as no overreaching is found," *Edward Leasing,* 785 F.2d at 888, "is predicated upon the consideration that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk [and allocation of price] than the law would otherwise allow." *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171, 176 (5th Cir.1975). However, parties may not totally absolve themselves of all liability and, more substantively, the prospective wrongdoer's " 'potential liability' " should be enough to " 'deter negligence.' " *Edward Leasing,* 785 F.2d at 888 (quoting *Alcoa S.S.,* 383 F.2d at 55). A red letter clause, finally, may not limit liability on a marine contract for gross negligence because " 'harm wilfully inflicted or caused by gross or wanton negligence,' " operates to "invalidate an exemption from liability." *Todd Shipyards,* 674 F.2d at 411 (quoting 6A Corbin On Contracts § 1472 (1964 ed.)).

The shipowner submits that the shipyard knew that LA ESPERANZA was made of older steel, but nevertheless hired welding subcontractors who proceeded to cut into the vessel's hull without knowing the nature of the steel they were working on, causing damage to the ship. Moreover, after the shipyard failed to provide welding plans acceptable to the Coast Guard and after it became apparent that the shipyard did not have the expertise to devise such plans (as the district court found), the shipyard nonetheless proceeded to weld temporary plates onto LA ESPERANZA's hull to cover the holes that had been already made, thereby rendering even more damage to the ship by causing the steel in the hull to crack and rivets to loosen. **\*20** The shipyard then refloated the vessel to get it out of dry dock, repairs still uncompleted, and moored it with cracks that allowed water to seep into the hull. The shipowner also argues that the shipyard, among other things, improperly moored the vessel without shock-absorbing fenders, improperly secured it against vandals who made off with several radios and liquor from the ship's liquor cabinet, and improperly protected the ship's decks from damaging debris from a sandblasting operation performed near LA ESPERANZA.

As our previous discussion indicates, there was no clear error on the district court's part in determining that such actions breached the shipyard's duty of care to the shipowner. A more difficult question to be resolved is the finding necessary to the district court's determination that the liability limitation clause in question was enforceable, *viz.,* that the shipyard's actions did not amount to gross negligence. While the district court concluded that the Perez shipyard "did not have the expertise to perform the hull replacement work adequately," we cannot say that it was clearly erroneous for the court to conclude that Perez did not act in such a way as to wilfully inflict harm on LA ESPERANZA or to cause her damage in wanton and gross disregard of the vessel or the shipowner's interests in it. *See Todd Shipyards,* 674 F.2d at 411.

The shipyard's subcontracted welders admittedly did not know the quality of the steel on which they were working when they cut into LA ESPERANZA, and because of that failed to adopt the proper heat mixture, causing damage to the ship. But, the record substantiates that the circumstances of this misstep more closely approximate a failure to exercise due care, rather than some modicum of reckless abandon. Nor did the shipyard completely ignore its contractual duties. All indications in the record are that it strove in good faith to devise acceptable welding procedures, even if it was unsuccessful and ultimately unable to do so. Moreover, it is not clear that it was unreasonable for the shipyard to believe that it could repair the ship's hull. The shipyard manager, Miguel Nin, had considerable training and experience in marine repair, including advanced degrees in relevant fields of naval architecture. Moreover, as indicated above, at least some portions of the plans that the shipyard submitted met Coast Guard requirements. In addition, while the shipyard damaged the ship's hull somewhat when it welded on temporary plates, it attempted to rectify the short-term damage to the vessel's seaworthiness by applying soft patches to plug leaks and coordinated efforts with the ship's captain to remove water that succeeded in entering

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

the vessel. This feature of the record, too, militates against a finding of gross negligence. Finally, while it became apparent that the shipyard eventually abandoned any effort to make good on its contractual undertaking to repair the vessel, we cannot agree that a material breach of contract is tantamount in this case to gross negligence.

Because nothing in our full review convinces us that a finding of gross negligence was necessitated on these facts, we cannot ascribe clear error to the district court's determination that the liability limitation clause in the contract between the parties was enforceable on its terms. Thus, no recovery was available to the shipowner for loss of the vessel's use or loss of profits because the contract unambiguously provides that "[t]he yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel." FN6

> FN6. We need not consider at any great length the shipowner's argument that the district court erred in refusing rebuttal testimony to that of the shipyard's manager, Miguel Nin. The shipowner sought to have a former Perez employee, Carlos Claudio, testify that he had informed Nin of the special qualities of LA ESPERANZA's steel and had given Nin a welding plan, which Nin rejected and ignored. The purpose of rebuttal testimony is to meet and reply to any new evidence offered by an opponent. *See United States v. Tejada,* 956 F.2d 1256, 1266-67 (2d Cir.1992). Determinations regarding what constitutes proper rebuttal evidence are committed to the "sound discretion" of the trial court. *See Lubanski v. Coleco Indus., Inc.,* 929 F.2d 42, 47 (1st Cir.1991). Here, we can discern no apparent error because Nin, who testified that he was in fact aware that the vessel's hull was made of a special older-type steel, never testified that Claudio had not informed him of the steel's quality nor did he testify that Claudio had

not presented him with a welding plan.

### *21 Damages

Having determined the liability issues as to the parties, we turn finally to the question of remedies, where all of the parties "unite in attacking the district court's basis for assessing damages." *Todd Shipyards,* 674 F.2d at 412. On our full review of the record we find no merit in either party's challenge to the damages awarded by the district court.

[16][17] We note that "[t]he trial court, as a fact-finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error." *Little Beaver Enters.,* 719 F.2d at 79 (citing *Thompson v. National R.R. Passenger Corp.,* 621 F.2d 814, 823 (6th Cir.1980)). As a threshold requirement, however, the trial court "must expose 'the measure of damages and method of computation,' both to inform the litigants of the basis for its findings and to afford the appellate court 'a possibility of intelligent review.' " *Id.* at 79-80 (quoting *Safer v. Perper,* 569 F.2d 87, 100 (D.C.Cir.1977)).

[18] We turn first to consider the $10,999 awarded the shipyard. While the shipowner on appeal asks whether the district court erred in granting the shipyard this relief, the shipowner does not succeed in demonstrating that the court's action in doing so was clearly erroneous. On the contrary, the shipowner concedes that the district court differentiated between negligent work performed and work properly done to the vessel and awarded the shipyard $10,999 for satisfactorily completed non-hull repair work. In fact, the district court's opinion stated that it would disallow any recovery by the shipyard for the hull replacement work that it either failed to do or negligently performed and would allow recovery only for the other work that it had adequately performed pursuant to the contract. It thus deducted $23,000 from the shipyard's $33,999 invoice, an amount equal to what the shipyard was seeking for hull replacement work, and determined that the shipyard was entitled to recovery on its collection action in the amount of $10,999. *See Perez y*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 F.3d 10, 1998 A.M.C. 21
**(Cite as: 124 F.3d 10)**

*Cia. de P.R.,* 899 F.Supp. at 866. This determination was not clearly erroneous and, therefore, the shipowner's argument is unavailing.

[19] Similarly, we see no clear error in the court's decision to award the shipowner $220,000. For its part, the shipyard argues that the district court erred in accepting valuations of the ship's worth from the shipowner's expert witness, rather than its own expert witness, who testified that LA ESPERANZA was only worth her "scrap value," i.e., was basically worthless. The gist of the shipyard's contention here is that its expert was more qualified to render an appraisal value than the shipowner's expert, who was not an appraiser *per se,* but rather a marine surveyor. The record substantiates, however, that marine surveyors like the shipowner's expert routinely inspect and value ships for insurance coverage purposes, prospective sales, and so forth, and are fully competent to offer their professional opinion as to what a vessel is worth. This is a classic case of dueling experts and it is not reversible error that the district court was more persuaded by the range of valuations offered by the shipowner's expert rather than the other way around.

[20] The shipowner, meanwhile, argues that the district court should have awarded more than $220,000 because it was entitled to loss of use and interest paid on loans taken out to refit and repair LA ESPERANZA. The shipowner's expert opined that the cost of repairs to the vessel would have been in the range of $180,000 to $220,000 plus possible "hidden damages" that were not easily ascertained while the ship was still in the water. The district court did not commit reversible error in accepting the range of figures offered to it by the shipowner's expert, in selecting the upper-most figure in that range, and then declining to exceed that figure based on speculation about costs to repair damage that might or might not exist. To the extent that the shipowner is heard to complain that it should not bear the burden of interest, loans, and loss of use, we believe that the red letter clause and

the district court's generous award as to actual damages **\*22** precludes a determination of clear error on appeal.

### *Conclusion*

Having carefully reviewed the record in this case, we believe that the district court's determinations as to liability and the proper measure of damages recoverable by the respective parties in this dispute were not clearly erroneous. We thus discern no cause to disturb the judgments rendered below.

*Affirmed.* **No costs.**

C.A.1 (Puerto Rico),1997.
La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.
124 F.3d 10, 1998 A.M.C. 21

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. Louisiana,
Lafayette Division.
Seth A. BECKER
v.
TIDEWATER, INC., et al.

Civil Action No. 99-1198.
Oct. 30, 2007.
As Amended Nov. 14, 2007.

James Parkerson Roy, Jamie D. Parker, Domengeaux
Wright et al., Lafayette, LA, Carla M. Perron, Houston,
TX, for Seth A. Becker.

Cliffe E. Laborde, III, James D. Hollier, Laborde &
Neuner, Edwin G. Preis, Jr., Jennifer E. Michel, Joseph
Edward Lee, III, Preis & Roy, Tammy Scelfo, Allen &
Gooch, Lafayette, LA, Delos Edward Flint, Jr., Robert
R. Johnston, Lawrence Raymond DeMarcay, III, Fowler
Rodriguez & Chalos, New Orleans, LA, Christine Z.
Carbo, Strasburger & Price, Houston, TX, for Tidewa-
ter, Inc., et al.

***REASONS FOR JUDGMENT***

RICHARD T. HAIK, SR., Chief United States District
Judge.

**\*1** On June 8, 1999, Seth A. Becker was working
for Baker Hughes, Inc ., assisting in a gravel pack oper-
ation aboard the jack-up R & B Falcon/Cliffs Rig 153,
when he was horrifically injured. The plaintiff filed suit
against several defendants under the General Maritime
Law and Jones Act and, alternatively, under the Long-
shore and Harbor Worker's Compensation Act. A Jury
Trial was held in July 2001, concluding in a verdict
finding plaintiff to be a Jones Act seaman and awarding
him damages. The jury apportioned fault among the de-
fendants assigning each a percentage. On appeal, the
United States Court of Appeals for the Fifth Circuit re-
versed the jury's finding and held the plaintiff to be a
longshoreman, set aside liability and damage findings,

and remanded the case to this Court for further proceed-
ings. *Becker v. Tidewater, Inc.,* 335 F.3d 376, (5th
Cir.2003). Following various procedural matters, a lim-
ited second trial as held as an admiralty action, tried
without a jury, pursuant to Federal Rule of Civil Pro-
cedure 9(h). The Court has now completed a full review
of the record, including all exhibits and memorandums,
and fully consideration of the arguments of counsel and
the applicable law.

The following issues were raised by the parties and
are ruled on as follows:

1. Discovery and Admissibility of the Written Set-
tlement Agreement (Doc. # 676)-the Court finds the set-
tling parties complied with existing law by revealing the
existence of a sharing agreement. The specifics of the
agreement need not be revealed at this time, not even to
the Court. Tidewater presented its arguments and parti-
cipated in the trial of this matter without knowledge of
the information contained in the Settlement Agreement.
To reveal said information following the trial would not
change the record or the arguments made. The Court
finds there is no prejudice to Tidewater by denying the
admissibility of the Settlement Agreement at issue in
this matter.

2. Motion to Exclude Evidence of Baker's Employ-
er Fault and/or For Judgment as a Matter of Law that
Baker is Free from Fault in its Capacity as Time Char-
terer of the M/V Republic Tide (Doc. # 662) is
DENIED. The Court will consider all relevant evidence
and apportion fault accordingly.

3. Baker Hughes' Objection to Tidewater's Intro-
duction of Certain Expert Reports (Doc. # 682) is
GRANTED. The Court finds the expert reports in ques-
tion contain information that go beyond the scope of
this Court's rulings regarding new information and bey-
ond the scope of the original reports of Dr. Kenneth
Boudreaux and Dr. Robert Meier. Thus, the evidence
will not be considered.

4. Baker's Deposition Designations are ADMIT-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

TED and will be considered out of an abundance of caution in light of the Fifth Circuit's ruling, to the extent they are relevant to the issue of gross negligence.

It is noted that, for the remainder of this Ruling, Baker Hughes, Inc. And Baker Oil Tools, a division of Baker Hughes Oilfield Operations, Inc. will be referred to as "Baker" and Tidewater Inc., Tidewater Marine, LLC, Twenty Grand Offshore, Inc., Pental Insurance Company and Cerain Underwriters at Lloyds, Subscribing Risk No. LE0106200 will be referred to as "Tidewater".

### FINDINGS OF FACT

**\*2** The general facts of this case were determined at the original trial of this matter and summarized by the appellate court. Consequently, this Court will not revisit each and every detail previously established, but will, instead, discuss only those pertinent matters.

In June 1999, Seth Becker, a 22 year old student at Montana Tech University, was working as a full time intern for Baker Hughes. On June 7, 1999, Seth boarded the M/V Republic Tide as a member of a six man crew to assist in a gravel pack operation aboard the jack up rig R & B Falcon/Cliffs Rig 153. Upon boarding the vessel, Seth was given a short orientation, lasting approximately 10 or 15 minutes. (Trans.Vol.II, P. 113-114). During the orientation, neither Seth nor the other members of the Baker team were instructed on operating, maintaining, or safely handling an emergency situation with the Baker equipment, in violation of Baker's safety program. (Trans.Vol.III, P. 460). The MTV Republic Tide was owned and operated by Tidewater and was working for Baker pursuant to a Blanket Time Charter Agreement. The Blanket Time Charter Agreement was signed on January 23, 1998 and was in effect at the time of the accident. The jack up rig vessel was owned by Cliff's Drilling Company and operated by R & B Falcon USA, Inc.

The M/V Republic Tide was outfitted with various pieces of Baker equipment required to perform the work at hand, including a Coflex hose reel. The Coflex hose/Coflex hose reel was a piece of equipment owned and operated by Baker and used in the course of its busi-

ness. The Coflex hose was used to pump materials from the vessel directly into the wellhead. (Trans.Vol.II, Pp. 176-177, Trans.Vol.III, P. 411). The vessel was also outfitted with an iron sleeve, fabricated by Baker, referred to as the "blue shoe". The steel Coflex hose at issue was run from the M/V Republic Tide, over the rig's handrail through the blue shoe, to the drill floor. The hose was then chained to various objects by which it passed. The positioning, securing, and use of the Coflex hose was solely within the discretion and control of Baker.

In order to obtain the Cofex hose system, Baker contracted with Coflexip Stena Offshore for the hose and power unit. Coflexip subcontracted with Hydra Rig, which provided the reel, and obtained a power pack from Hydradyne. (Trans.Vol.III, Pp. 539-540). This project was overseen on behalf of Baker by Charles Knighton, a non-engineer who lacked experience on offshore pumping vessels. (Trans.Vol.III, Pp. 485-486). This was Knighton's first experience with a Coflex reel system. (Trans.Vol.III, P. 493). An important feature of the Coflex hose system was a quick release valve, which released the brake and opened the jaws in order to release the hose. The system would not work properly unless the hose was completely unwrapped from the reel. If there were wraps remaining on the spool, the boat would have to pull away to unwrap the hose from the reel and release it. (Trans.Vol.VIII, P. 1618). Neither this information, nor the fact that the quick release took approximately 15 seconds to work, was conveyed by Baker to the crew on the M/V Republic Tide. (Trans.Vol.III, Pp. 525-527). The crew lacked proper training and instruction as to how to work the Coflex hose and reel system and were lacking pertinent information about the system. (Trans. Vol. II, Pp. 174-176; Trans. Vol. III, P. 350, 353, 422-423, 430, Trans. Vol. VIII, Pp. 1442-1443, 1449).

**\*3** Additionally, Baker made its own modifications to the Coflex reel assembly, including the addition of a back up power system using Baker owned auxiliary skid and hard piping which ran from the hydraulic unit to the Coflexip unit. (Trans.Vol.III, Pp. 419-422, 516-517, 531, 537). The changes in the system involved Baker

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

drilling through the rear of the console, causing the once closed system to be open to contamination. (Trans.Vol.III, P. 420). Following these modifications, which actually caused a change in the structure of the unit itself, Baker failed to test the system and failed to flush the system. (Trans.Vol.III, Pp. 421, 522, 546). In addition to the modifications to the system itself, Baker also installed the aforementioned "blue shoe", which was attached to a handrail with chains. The blue shoe was fabricated by Baker employees without the assistance or advice of an engineer. (Trans.Vol.III, P. 375). It was used in conjunction with the Coflex hose system as a part of Baker's operations. In addition to not testing the modified Coflex system as a whole, Baker also failed to test the blue shoe and what it could safely handle. (Trans.Vol.V, Pp. 910-911).

Under the Time Charter, Baker was responsible for maintaining and operating the well stimulation equipment it installed on the M/V Republic Tide. (Trans.Vol.III, Pp. 349-350, 456, 462). Tidewater was in charge of the operation and navigation of the vessel, including maintenance. The Charter specifically states:

The vessel shall be delivered to CHARTERER at the port previously agreed upon with clear decks and being on her delivery properly equipped and in every respect seaworthy and in good running order and in every way fit and ready for CHARTERER'S use and for the employment intended, so far as the exercise of due diligence can make her; and OWNER undertakes to so maintain the vessel during the period of service under this Charter. (Charter, Section III).

The Charter also contained an indemnity provision requiring Baker to indemnify Tidewater for:

injury to, illness or death of the personnel or employees of CHARTERER, of CHARTERER'S invitees, or CHARTEREs sublessee(s) of the vessel, or of CHARTERER'S contractors or subcontractors (other than any of the OWNER INDEMNITEES), however said injury, illness or death arises or occurs, whether through the negligence in whole or in part of any of the OWNER INDEMNITEES, unseaworthiness of any vessel or otherwise; and CHARTER shall protect,

defend, indemnify, and hold harmless the OWNER INDEMNITEES from and against all claims, suits, losses, liabilities, expenses, demands, costs (including reasonable attorneys' fees) and/or damages as a result of such illness, injury, or death. (Charter, Section XIV).

Turning to the date of the accident, the M/V Republic Tide left the Port of Fourchon heading for the R & B Falcon jack-up drilling rig/Cliffs 153 located in East Cameron Block 38 in the Gulf of Mexico. At some point during the journey, communication between the M/V Republic Tide and the rig was had. Although there is widely differing testimony as to the issue, Daniel Ray Sibley, an independent party and contractor for Ambar, testified that he was present when a person of authority on the M/V Republic Tide stated over the radio to Mickey Hoffpauir, the company man, that the vessel had had a bow thruster problem, but that the problem had been fixed. (Depo., Pg.15) Mr. Sibley also testified that, during the exchange, it was agreed that the vessel could drop its anchor and back up to the rig. Given that Mr. Sibley is an independent party with no interest in the outcome of this case, the Court finds this testimony to be credible. However, on this subject, the Court also notes that Tidewater employees Clarence Polk, Daniel Givens, and Steven Lachney, as well as Baker Employees Kenneth Credeur, Brandon Latiolais, and David Orsak, all testified that the vessel had not experienced any prior bow thruster problems before the accident. (Trans. Vol. VIII, P. 1473; Vol. II, Pp. 161-162, 219-220, 294, and Vol. III Pp. 340, 390). The boat had been commissioned approximately 15 or 16 months before the accident. (Trans.Vol.III, P. 374). Additionally, the bow thruster had been replaced on the M/V Republic Tide only six months before this occurrence, in January 1999. (Trans.Vol.II, P. 161).

**\*4** Upon arrival at the rig, the M/V Republic Tide attempted to drop its anchor only to find, after it had dropped approximately 10 feet, that the anchor windlass had a hydraulic oil leak. The leak was discovered by Tidewater's Chief Engineer Clarence Polk and reported to Captain Givens. (Trans.Vol.II, P. 98). Upon learning this information, Captain Givens told Mr. Polk to pull

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

the anchor back up (Trans.Vol.II, P. 99). Captain Givens did so in order to avoid the possibility of not being able to retrieve the anchor if a seal became loose from the leak and also out of concern for pollution laws which he may have violated by allowing hydraulic fluid to leak into the Gulf of Mexico. (Trans.Vol.II, P. 100). They instead tied the vessel off with ropes. Captain Givens chose the method of tying the boat in order to give the vessel more pivotability. (Trans.Vol.II, P. 165). Although Captain Givens did not remember if he notified anyone of the anchor problem, Baker supervisor Kenneth Credeur was, prior to the accident, aware of the fact that the M/V Republic Tide was operating without an anchor and was not concerned because "we used the bow thruster all the time". (Trans.Vol.III, P. 405). Baker employee Brandon Latiolais was also aware of the situation when he boarded the rig to start the job. (Trans.Vol.III, P. 344). It was not abnormal to work without the anchor because the water is often too deep or contained too many pipelines. (Trans.Vol.II, P. 102). Although Mr. Credeur, Baker's supervisor, met with all supervisory personnel aboard the rig, he did not inform them of the vessel's anchor failure. (Trans.Vol.II, P. 376-377). Knowing that the vessel was not anchored, and knowing that its customers and other rig personnel were not fully apprised of the situation, Baker made the decision to proceed with the job. Baker could have refused to proceed with the job under the circumstances, but did not do so. (Trans.Vol.II, P. 159). There is no evidence to show that Tidewater objected to proceeding with the job either.

Prior to the anchor problem experienced at the job site described above, Clarence Polk, Tidewater's Chief Engineer, testified that there had been no problems with the anchor before that and that he had personally inspected and provided routine maintenance to the anchor on May 22 and May 25, 1999. During this time, he added approximately 10 gallons of hydraulic fluid to the system. (Trans.Vol.VIII, Pp. 1475-1477). He supported this testimony with his written logs. The Court finds his testimony to be credible. Although it is a fact that Tidewater did not have evidence of an anchor inspection on the two quarterly inspection reports prior to the accident, as is required normal procedure under the United

States Coast Guard's Streamlined Inspection Program, Tidewater's engineer did, in fact, inspect the anchor in the interim period. (Trans.Vol.II, Pp. 246-251). The Court finds that, although the inspection was not done at the proper time, it was actually completed.

**\*5** After securing the boat, the Baker crew began rigging up for the gravel pack job. At some point shortly thereafter, the M/V Republic Tide encountered a problem when it lost its bow thruster. When the bow thruster problem arose, Captain Lachney sent the vessel's engineer Clarence Polk to investigate the problem and he called the rig, and spoke to the crane operator, to inform them of the bow thruster failure. (Trans.Vol.II, P. 259). The urgency of the situation was compounded by the strong current present in the Gulf of Mexico that day. Moments later, as the boat was drifting toward the starboard stern leg of the vessel, the port line holding the vessel broke. Sometime thereafter, Captain Lachney powered up the vessel's port throttle in forward and starboard throttle in reverse in order to avoid making contact with the other leg on the rig and to break the starboard line holding the vessel. He did not inform any person on the rig of his actions before doing so. (Trans.Vol.II, Pp. 261-265). Also, sometime during this time period but before he broke the second line, Captain Lachney told the Baker employees on the rig that he was experiencing a bow thruster problem and that someone needed to disconnect the Coflex hose from the boat. Baker employees Brandon Latiolais and Jason Foreman responded to the situation by attempting to disconnect the hose. (Trans. Vol. VIII, P. 1422; Trans. Vol. III, P. 333; Trans. Vol. II, P. 271). A point later arose where the boat was no longer secured to the rig with ropes, but was attached only by the Coflex hose.

Upon arriving at the Coflex hose reel, several discoveries were made. Namely, the hose was not completely unspooled from the reel; the quick disconnect button was not releasing the hose; and the Baker employees were unable to manually move the reel. The jaws holding the hose were opening, but the hose was not free wheeling and releasing. At some point, they then recruited the assistance of Clarence Polk, who had more mechanical knowledge, to help resolve the prob-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

lem. Through trial and error, Clarence Polk eventually fixed the problem by bleeding air off of the system and they were able to reel in the hose. The hose was, at that time, disconnected on the rig end, but still attached at the reel end on the vessel. (Trans. Vol. III, Pp. 352-357; Trans. Vol. VIII, Pp. 1423-1428; Trans. Vol. II, P. 273).

At some point during the time while those individuals aboard the vessel were attempting to operate the quick release and drop the hose from that end, Mr. Credeur, who was on the rig and had been advised of the bow thruster malfunction by the crane operator John Corkem (through Falcon OIM Don Frederick, who answered the call), ordered Troy Broussard, David Orsak, and Seth Becker, an inexperienced summer intern, to disconnect the Colfex hose at the hammer union on the rig. This instruction came after a second call to the rig by Captain Lachney informing them that the hose was going to have to be disconnected from the rig because the boat was unable to do so. (Trans.Vol.II, P. 265). Knowing that the situation was an emergency and knowing that, if the boat moved, it would pull the massive Coflex hose, Mr. Credeur, Baker's supervisor, sent the men into that situation without checking the status of the vessel or the level of danger into which he was sending them. (Trans.Vol.III, Pp. 386, 401). Donald Frederick, Falcon's employee, also failed to keep track of the vessel and hose locations. (Trans.Vol.IV, P. 633). Donald Frederick, Falcon's OIM, John Corkern, the crane operator and Kenneth Credeur, Baker's supervisor, all knew the situation was an emergency. (Trans.Vol.IV, Pp. 646, 657, 664). No one warned Seth Becker, the summer intern, of the possibility of harm he was facing in that situation where he was not needed and should not have been placed. (Trans.Vol.III, P. 397).

**\*6** Several minutes after the bow thruster failed and the vessel notified John Corkern of the situation, and while the three Baker employees were attempting to disconnect the hose on the rig, directly in harm's way, Captain Lachney powered up the boat and broke the starboard line. He did so without warning to the rig and with full knowledge that the boat would move and pull the Coflex hose with it. (Trans.Vol.II, P. 311). When

the boat moved, the hose was pulled taut and dragged across the deck into the plaintiff, Seth Becker, who was caught between the hose and the backstop aboard the rig. The accident caused the plaintiff horrific injuries, resulting in the total amputation of both of his leg below the knee. The accident further resulted in mental and emotional injuries to this young plaintiff, resulting from both the experience itself as well as massive blood loss.

After the accident, Baker project specialist Gerald Blanchard inspected the Coflex reel system to determine the problem. He found that the auxiliary unit worked properly, but when the main console was used, air was introduced into the system causing it to lock up. (Trans.Vol.VIII, P. 1495). Upon further inspection, he found that a clamp on a line hose was loose, which allowed air into the hydraulic system. Once the clamp was tightened, the system worked properly. (Trans.Vol.VIII, Pp. 1496-1498). Baker personnel were the last people to work inside of the console housing the loose clamp. Baker personnel were also periodically in this console to change the filter in the system. (Trans.Vol.VIII, P. 1501). It would have been simple for Baker personnel to check the connections while changing the filter.

The Court finds it is a fact that the negligence of both Tidewater and Baker caused the plaintiff's injuries. And that, although other parties aboard the vessel should have warned of the danger of the situation or taken more proactive measures, that fault was not the cause of the damage in this case.

### *CONCLUSIONS OF LAW*

In accordance with the Fifth Circuit's Ruling in *Becker v. Tidewater, Inc.,* 335 F.3d 376, 5th Cir.2003, it has been established that the plaintiff is a maritime worker covered under the Longshore and Harbor Worker's Compensation Act (LHWCA) and that the LHWCA governs any recovery at trial. Section 905(a) of the LHWCA precludes an employee from suing his employer in tort. Consequently, Baker can not be held liable to Seth Becker in its capacity as his employer. It can, however, be held liable under section 905(b) if at fault in its capacity as the time charterer of the M/V Republic Tide. *Kerr McGee v. Corp. v. Ma-Ju Marine Services,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

*Inc., 830 F.2d 1332 (5th Cir.1987).* Section 905(b) of the LHWCA provides the exclusive remedy for longshoreman against a vessel. The *Kerr McGee* court stated that a time charter can be liable under section 905(b) if the harm caused is "within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement."

**\*7** Under a traditional time charter agreement, the time charterer directs the vessel's commercial activities. *Moore v. Phillips Petroleum Co., 912 F.2d 789 (5th Cir.1990).* In this case, the Charter Agreement also shifted other responsibilities to Baker. According to the testimony of Baker's employees at trial, as well as the language of the Charter, which included allowing Baker to install equipment and maintain ownership, Baker was responsible for and retained control over the equipment it installed on the vessel. The equipment was installed to assist Baker's performance of specialized services on oil and gas wells. As such, the Coflex hose, Coflex hose reel assembly, blue shoe and pumping operations associated with this equipment were within Baker's exclusive control under the Charter. Tidewater was in control of the operation, navigation, and maintenance of the vessel.

Under Section 905(b) of the LHWCA, the liability of the vessel is for negligence and is not based on the warranty of seaworthiness. In *Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981),* the United States Supreme Court outlined three main duties owed by the vessel for which 905(b) liability may be imposed:

1. The "turnover duty" which requires the shipowner to exercise ordinary care to insure the ship and its equipment are turned over to an outside contractor in such condition that an experienced stevedore will be able to, with the exercise of ordinary care, carry on its cargo operations. A vessel must warn a stevedore of dangers that are known to it, or should be known through the exercise of reasonable care.

2. The "active control duty" which requires a shipowner to exercise reasonable care to prevent injur-

ies to longshoreman in areas that remain within the active control of the ship owner.

3. The "duty to intervene" which requires the shipowner to warn or intervene when he becomes aware that the ship or its gear pose a danger to the longshoremen or that the stevedore is acting unreasonably in failing to protect the longshoreman against danger.

In *Moore,* the Fifth Circuit Court of Appeals stated the "traditional allocation of duties between the employer, time charterer, and vessel owner places liability for harm on the party that is most directly responsible for the dangerous condition that caused the harm." In the instant case, one thing is strikingly clear-no one party was solely responsible for the dangerous conditions that resulted in the grave harm that befell Seth Becker. With that, the Court will allocate fault between the parties for their roles in the various dangerous conditions that, when brought together, caused the resulting harm to the plaintiff. The Court recognizes, as set forth by the Supreme Court in *Kerr-McGee,* that Baker's two duties, one as employer and the other as time charter, are separately owed and do not affect each other.

Both Tidewater, who retained control over the operation and navigation of the vessel, and Baker, who controlled the commercial activities of the vessel, decided to proceed with the job fully armed with the knowledge that the anchor on the M/V Republic Tide had not been deployed. Either party could have prevented the commencement of the job at that point. Although this may not have been completely out of the ordinary because the bow thruster was often used to hold the boat in these operations, it was, on this day with rather strong currents, a negligent decision by both parties. Additionally, neither party notified ERT and/or Falcon, of the anchor situation. Baker is held to be responsible for this negligence, in its capacity as time charter for directing the commercial activities of the vessel and as the party responsible for well stimulations under the Charter, because it was informed of the situation by Tidewater, but failed to pass the information along to its customers and crew. Both Kenneth Credeur and Brandon Latiolais, Baker employees, testified to the fact that they were aware of the vessel's failure to an-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

chor, but did not inform any other parties even though they met with their customers prior to starting the job.

**\*8** With respect to the Coflex reel system, the Court finds Baker to be negligent under 33 U.S.C.A. section 905(b) as the time charter responsible for the installation and maintenance of its equipment installed aboard the M/V Republic Tide. Baker negligently modified the Coflex hose system and, subsequently, failed to test, clean or properly maintain the equipment. Additionally, Baker failed to properly train and instruct its crew on the operation of the system it installed. This led to a failure to completely unwrap the hose from the reel, so that the quick disconnect feature could properly function. The failure to maintain the system properly led to the introduction of air into the system which caused a lock up that prevented the crew from manually reeling, or unreeling, the system. These negligent actions caused the hose to remain attached to a vessel that was unable to maintain its position, causing unthinkable danger to the crew and, ultimately, incredible damage to the plaintiff.

Baker is not responsible for these actions as an employer, it is responsible as the time charterer who installed, and maintained ownership and control of, the equipment on the vessel. The Court agrees with Steve Killingsworth, plaintiff's expert, who testified that the way Baker chose to deploy the reel rendered the system "unreasonably dangerous" and "defective" and that, if any of this very sophisticated company's engineers had done a functionality test, it would have observed that the quick disconnect could not work if the hose was not completely unreeled. (Trans.Vol.V, P. 927, 928). Baker's actions and inactions violated its turnover duty to maintain its Coflex reel system in such condition that a reasonable stevedore could, through the exercise of reasonable care, carry on its operations. Additionally, Baker failed to warn as it could have, through the exercise of reasonable care, discovered that the hose must be completely unspooled in order for the quick disconnect emergency system to work and that there was a loose clamp in the console which caused excess air to enter the system. Further, Baker violated its active control duty by failing to exercise reasonable care with re-

spect to its workers who were operating the Coflex hose system. The Coflex system and the area surrounding it were in the active control of Baker. The failure to maintain the system and provide proper training on its use demonstrates a lack of reasonable care to prevent injuries to the plaintiff. Finally, although Baker was fully aware that the situation was an emergency and posed a danger to people aboard the rig, it failed to warn Seth Becker of the gravity of the situation. This lack of action is a violation of Baker's duty to intervene.

In addition to the installation of the Coflex hose system, Baker also designed, built, and installed the blue shoe on the M/V Republic Tide. The blue shoe, created without the assistance of an engineer, was designed to guide the Coflex hose over the handrails and hold it in place. It was chained to the handrail with small chains. Like the Coflex hose system, Baker failed to test the blue shoe's capabilities and functionality prior to the accident. The Court again agrees with the plaintiff's expert, Mr. Killingsworth, that the blue shoe was "an accident waiting to happen" and was both unreasonably dangerous and defective at the time of the accident. (Trans.Vol.V.927).

**\*9** Like the Coflex hose, the blue shoe was an appurtenance installed on the vessel by Baker as the time charterer. It remained in Baker's ownership and control at all times. The dangerous and defective object created a hazard to the crew and violated Baker's turnover duty. The crew could not, with reasonable care, conduct operations safely with such an object. Additionally, had Baker performed any testing, it could have, with reasonable care, discovered that the blue shoe was a useless and dangerous object which created a false sense of security for those working with it. This failure was a violation of its duty to warn. Baker's negligent fabrication and installation of the blue shoe, and its failure to test the object which it maintained control over, also amount to a violation of its active control duty because it did not exercise reasonable care with respect to the safety of Seth Becker. Finally, these actions and inactions, as owner and controller of the equipment, constitute a violation of Baker's duty to intervene to protect the plaintiff.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

The Court holds that the failures of the Coflex hose system and blue shoe, which were solely caused by and in control of Baker, are negligence within Baker's realm as time charterer and a legal cause of the plaintiff's injuries. Although Baker is also negligent for sending Seth Becker down to unhook the Coflex hose on the rig, that action was taken as its employer. That is the only action taken by Baker as an employer. All other actions were taken by Baker as the time charterer, owner and control of its equipment. Had Baker warned Seth of the dangers presented by its Coflex hose and blue shoe system; installed, tested and maintained its equipment with any reasonable care so that it could be operated safely; maintained and operated its equipment, which it actively controlled, in a manner which provided safety to the plaintiff; trained its employees on the proper use of the equipment, which is essential to its safe operation for all parties in its presence; and/or intervened when it was aware of the emergency situation, the plaintiff would not have been injured.

Baker, however, was not alone in its negligence. Tidewater also played a star role in this tragic accident that so drastically altered a young man's life. Tidewater, at all times, maintained active and complete control over the vessel's operation and maintenance. As previously stated, Tidewater shares the responsibility for the negligent decision to proceed with the job without an anchor in rough waters. That shared decision is a legal cause of the plaintiff's injuries. In addition to that, Captain Lachney's decision to break starboard line, the only line holding the vessel at all steady, without warning the rig or any other party of his actions was negligence. Even though the Court understands that Captain Lachney took that action in an effort to avoid alliding with the rig and putting those individuals aboard both the vessel and the rig in danger, doing so without warning was negligent. This action violated Tidewater's active control duty, as it failed to exercise reasonable care with respect to the safety of the men working on the vessel and rig, and its duty to intervene, as it failed to protect the workers after becoming aware of a dangerous situation. Further, Tidewater failed to warn the plaintiff and other men aboard the rig and vessel that it was about to take a drastic action which it knew would cause the

Coflex hose to move. That movement of the Coflex hose resulted in the drastic injuries sustained by the plaintiff. This negligence was a legal cause of the plaintiffs injuries.

**\*10** Based on the evidence presented, the Court finds that an inspection of the anchor should have been completed at the proper quarterly intervals. The failure to do so does amount to a lack of reasonable care and, consequently, negligence as a violation of its active control duty. Tidewater retained control over its own anchor system, but failure to perform timely inspections resulted in a threat to the safety of the plaintiff. Although the anchor was inspected and maintained in the interim, this does not relieve Tidewater of its negligence in failing to follow its own procedures. It does, however, lessen the degree of negligence because the evidence shows that there was no report or evidence of an anchor problem before the accident. Consequently, it has not been proven that the vessel was unseaworthy because of an anchor condition upon delivery. Further, as stated, an inspection and maintenance did, in fact, take place shortly before the accident. Additionally, although the vessel would normally anchor in shallow water which is free from obstructions, it is not abnormal to proceed on this type of job without an anchor. Had the site been in deep water or contained more obstructions, the job would have proceeded just as it did. Additionally, the testimony of both Baker and Tidewater personnel shows that the lack of an anchor was of no moment in deciding to proceed with the job at hand.

Based on the foregoing, the anchor malfunction and negligent failure to perform the quarterly inspection does not rise to the level of acts so consequential that they render the Charter null and void. There is no proof that the vessel was delivered to the charterer in an unseaworthy condition due to the anchor or that Tidewater had knowledge of the anchor problem before the accident. Routine maintenance by Tidewater's engineer in May 1999, only two weeks before the accident, revealed no problems with the anchor. And, because it was not abnormal to proceed without an anchor and the decision to do so here was, in fact, made jointly by Baker and Tidewater, the anchor malfunction and failure to per-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

form a quarterly inspection are of no consequence with respect to Baker's indemnity obligation and the Blanket Time Charter.

With respect to Tidewater's bow thruster, the Court finds there is not enough evidence to prove a problem existed immediately prior to the accident which could render Tidewater liable for such knowledge. The Court notes there was testimony from both R & B Falcon and ERT that the boat was delayed due to a bow thruster problem and a denial of this allegation by Tidewater. The conflicting testimony does not weigh as heavily as the testimony of Daniel Sibley, a truly independent party. Although the Court believes Mr. Sibley's testimony concerning the communication which took place between the rig and the vessel while it was in route, it notes that Mr. Givens only *thought* the boat was running late on its way to the rig because of a bow thruster problem, he never actually heard this particular fact communicated over the radio. In fact, that issue was never established. Additionally, Tidewater employees Clarence Polk, Daniel Givens, and Steven Lachney, as well as Baker Employees Kenneth Credeur, Brandon Latiolais, and David Orsak, all testified that the vessel had not experienced any prior bow thruster problems before the accident. Given all of this information as a whole, the Court finds that a bow thruster problem was, in fact, discussed during the M/V Republic Tide's trip to the rig, but that it is unclear whether the problem mentioned was recent or something that existed before the bow thruster was replaced only six months earlier. There is overwhelming testimony from both Tidewater and Baker employees that there had been no bow thruster problems before this accident. Additionally, and importantly, the Court finds that, based on Mr. Sibley's independent testimony, the M/V Republic Tide had reported that any bow thruster problem that had existed was, at that time, resolved. Given the testimony as a whole, the Court can not logically find that Tidewater had immediate knowledge of a bow thruster problem, prior to its arrival at Rig 153, which would have directly impacted this accident. The testimony clearly shows that any problem that might have existed was believed to be resolved and the boat was in working order. Additionally, once the bow thruster failed, Captain Lachney immedi-

ately notified the rig and, once it was determined that the hose could not be released from the vessel end and he was having trouble maintaining his position, he again made the rig aware of this information. His notifying the rig that the hose would have to be released from the rig end, not the vessel end, was a responsible act. His notifying the rig that he had lost his bowthruster was, in fact, a fulfillment of Tidewater's obligation to warn and protect the safety of individuals aboard the rig. He did, in fact, give the rig the pertinent information it needed. Unfortunately, shortly thereafter, his actions became negligent when he moved the boat without checking the situation on the rig and/or giving warning.

**\*11** The bow thruster failure did amount to unseaworthiness of the vessel during the operations, but not necessarily upon delivery, but this is of no moment with respect to the plaintiff as an action under section 905(b) of the LHWCA is for negligence, not unseaworthiness. The Court further finds that the failure of the bow thruster does not rise to the level of a breach of contract that would render the indemnity provisions of the contract null and void. Even if the vessel became unseaworthy during the operations or was unseaworthy at any point in this scenario, Baker agreed to indemnify Tidewater for damages that resulted therefrom.

In *Marquette Transportation Company, Inc. v. Louisiana Machinery Company, Inc.,* 367 F.3d 398 (5th Cir.2004), the Court advised than an indemnitee's obligations under a contract are relevant to the determination of its entitlement to indemnity. Additionally, the *Marquette* court emphasized reading the language of the Agreement at issue and noted that, in that case, as in our case, the indemnification agreement provided for indemnification regardless of the negligence of any indemnitee. The Blanket Time Charter in effect between Baker and Tidewater on the date of the accident specifically states that Tidewater would have no liability for "injury to, illness or death of the personnel or employees of Charterer ... however said injury, illness or death occurs, whether through the negligence in whole or in part of any of the Owner Indemnitees, unseaworthiness of any vessel, or otherwise." Despite any negligence or unseaworthiness attributable to Tidewater, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

indemnity agreement if fully enforceable.

Additional issues raised are Tidewater negligence in that Captain Givens led personnel aboard the rig to believe the M/V Republic Tide would be anchored, rendering the issue of vessel movement moot, but then failed to do so. Instead, he relied solely on the bow thruster, which eventually malfunctioned. This argument would carry more weight had the Baker personnel not been aware of the fact that the vessel was not anchored. Once Tidewater informed them of the situation, it fulfilled its duty to notify its customer and can not be said that its actions were negligent. Also, the issue of a breach of contract for failure to use due diligence in providing a seaworthy vessel due to the failure of the Dynamic Positioning System (DPS) was raised, but carries little weight. According to Baker's own testimony, it was aware of the inoperable DPS system and had never used it since its installation on the vessel. The vessel was not being used as a DPS capable vessel.

Based on the foregoing, the Court finds there is no breach of the contract provisions that would vitiate the contract and relieve Baker of its obligation to indemnify Tidewater. Tidewater had an obligation to provide and maintain a seaworthy vessel, fit for its intended use, through the exercise of due diligence. Established law dictates that a maritime contract is interpreted using the general rules of contract construction and interpretation. That is, the Court must read the contract as a whole. The Court finds, after considering the totality of the evidence, that Tidewater exercised due diligence with respect to its obligations to Baker and that any failures to do so did not rise to a level which would relieve Baker of its contractual obligations. Even if the vessel was, or became, unseaworthy during the pertinent times or Tidewater acted in a negligent manner, the indemnification provisions of the Blanket Time Charter in effect at the time of the accident absolve Tidewater from any liability for its negligence or unseaworthiness that resulted in injury to Seth Becker, Baker's employee.

**\*12** For the same reasons discussed above, the Court also finds that Tidewater's actions fall short of gross negligence. A finding of gross negligence could vitiate the indemnity obligations set forth in the Time

Charter Agreement. Under Louisiana law, gross negligence is willful, wanton, and reckless conduct that falls between intent to do wrong and ordinary negligence. The *Houston Exploration Company v. Halliburton Energy Services, Inc.,* 269 F.3d 528 (5th Cir.2001). Tidewater's negligent actions in failing to inspect the anchor during its quarterly inspections, proceeding with the gravel packing job in rough seas without a functioning anchor, and moving the boat without warning fall within the realm of ordinary negligence. The most egregious conduct, that of moving the boat without warning, was taken in an effort to avoid an allision between the vessel and the rig. Although Captain Lachney was aware that such action would move the hose on the vessel, there is no evidence to show that his actions rise to the level of gross negligence. Allowing the vessel to allide with the rig and possibly cause catastrophic harm to all involved might have. Additionally, for the reasons previously stated, the failures of the anchor and bow thruster also do not rise to the level of gross negligence. There is simply not enough evidence to prove that Tidewater's deficiencies were anything more than ordinary negligence. As stated by the *Marquette* Court, "Under Louisiana law, contracts limiting liability are generally valid and enforceable." It is held that the contract provisions doing so in this case are just that.

### ALLOCATION OF FAULT

For the foregoing reasons, and after full consideration of the record and all evidence presented, the Court allocates fault between Tidewater and Baker as follows:

**BAKER: 55%**

**TIDEWATER: 45%**

As previously discussed, Falcon is found to be free from liability in this matter. Additionally, it is noted that the Fifth Circuit affirmed the determination of no liability as to the component manufacturers. *Becker v. Tidewater, Inc.,* 335 F.3d 376, (5th Cir.2003)

### DAMAGES

Tidewater, as owner of the M/V Republic Tide, and Baker, as time charterer of the vessel, are both liable to the plaintiff under section 905(b) of the Longshore and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

Harbor Worker's Compensation Act. The damages recoverable under this section are generally the same as those under general maritime law. Damages available to the plaintiff include past and future medical costs; past and future loss of wages/benefits; pain and suffering; mental/emotional injuries; and loss of enjoyment of life. *Williams v. Chevron,* 875 F.2d 501 (5th Cir.1989).

A full, detailed recitation of the massive injuries suffered by Seth Becker is not necessary, as the extent of this young man's damages is uncontested and well documented throughout the record of this case. The damages suffered by this young man are horrific and extreme. Following the butchering of his legs by the steel Coflex hose, Seth laid on the main deck of the rig, in his own blood, for almost two hours before being evacuated. It is important to note that, during this time period, he lost approximately 8-9 pints of blood without losing consciousness and remained on the deck with his own leg on his chest. His right leg was openly amputated and his left leg was attached only by tissue threads.

**\*13** Following his evacuation, he endured nine surgeries and a near death episode of tachycardia, which led to massive blood transfusions. His in-folded and irregularly scarred stumps have, according to uncontroverted medical testimony, caused great concern for future new problems. It is undisputed that the condition of his stumps will only get worse with time and that future surgeries are a certainty. Any new additional problem and/or surgical procedure will certainly give rise to a cause for refitting Seth's artificial limbs-a costly and painful process. Shortly after the accident, Seth also contracted osteomyelitis, a threatening disease hidden in the bones of his stumps. Osteomyelitis can cause severe infection, permanent bone damage, and can lead to

death. This condition can be maintained, but is incurable. The osteomyelitis caused dire problems for Seth and led to extreme treatments, including the intravenous administration of powerful antibiotics through a catheter inserted from his collar bone into the center of his chest. This treatment lasted several months. It is almost certain that this condition will recur.

Additionally, Seth suffered severe mental and emotional problems as a result of the accident and the massive blood loss. He has suffered such atrocities as agonizing phantom pain and nightmares involving maggots coming from his chest and other horrors. It has been confirmed that he suffered cognitive brain damage as a result of the blood loss and that the brain damage reflects significant impairments to the frontal lobe, the most fragile area of the brain. This brain damage is permanent. Further, Seth suffers from chronic pain disorder, chronic depression and post traumatic stress disorder. The list is seemingly endless.

The totality of the harm suffered by Seth Becker, a faultless young man, has impacted his life in ways that are hard to imagine. His life is forever altered. Every day is now a struggle for him and will remain so until his last day. There is no aspect of his life that remained untouched or will remain untouched by the horrendous events of June 8, 1999.

After a thorough review the evidence of damages submitted to the Court in the original trial, as well as the updated information supplied at the second (limited) trial of this matter, the Court holds that the Plaintiff has sustained damages in the following amounts:

| | |
|---|---|
| **Stipulated Past Medical Expenses:** | **$661,351.55** |
| **Future Medical Expenses:** | **$15,334,440.00** |
| **Past Lost Wages:** | **$362,435.00** |
| **Impairment of Earning Capacity or ability in the future, including impairment in the normal progress of plaintiff's earning capacity due to his physical or mental condition** | **$3,393,532.00** |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)
**(Cite as: 2007 WL 3231655 (W.D.La.))**

| | |
|---|---|
| **Past physical pain and suffering, including physical disability and impairment, past loss of enjoyment of life, and inconvenience in the normal pursuits and pleasures of life** | **$4,000,000.00** |
| **Future physical pain and suffering, including physical disability and impairment, future loss of enjoyment of life and effects of the injuries and inconvenience on the normal pursuits and pleasures of life** | **$5,000,000.00** |
| **Past mental anguish and suffering including feelings of economic insecurity** | **$3,000,000.00** |
| **Future mental anguish and suffering, including feelings of economic insecurity (includes quality of life items in the amount of $2,034,121.00)** | **$4,000,000.00** |

**\*14** As noted by the Fifth Circuit Court of Appeals in *Marathon Pipe Line Co. v. M/V Sea Level II,* 806 F.2d 585 (5th Cir.1986), an award of prejudgment interest is committed to the sound discretion of the district court. It is held that Seth Becker is entitled to an award of prejudgment interest on his past damages from the date of the accident, June 8, 1999 until entry of this judgment, at a stipulated rate of 6.052% per annum. The plaintiff is also entitled to an award of post-judgment interest on the entire judgment until payment is made in full.

W.D.La.,2007.
Becker v. Tidewater, Inc.
Not Reported in F.Supp.2d, 2007 WL 3231655 (W.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



2005 WL 2891044 (W.D.La.)                                                                                    Page 1

For Opinion See 2007 WL 3231655

United States District Court, W.D. Louisiana.
Seth A. BECKER,
v.
TIDEWATER, INC., Baker Hughes, Inc., R&B Falcon Drilling USA, Inc., and Cliffs Drilling Company.
Civil Action No. 1198.
September 1, 2005.

Section L-O

Baker Hughes' Reply Memorandum on Motion for Summary Judgment as to Defense and Indemnity Based on
Tidewater's Breach of the Blanket Time Charter

Judge Richard T. Haik, Sr.

Magistrate C. Michael Hill.

MAY IT PLEASE THE COURT:

Tidewater denies neither that it (1) contracted to provide to Baker a seaworthy vessel nor (2) neglected to follow its
own procedure for inspecting the very equipment that failed and rendered the vessel unseaworthy. Tidewater instead
asks the Court to adopt a reading of the Blanket Time Charter which would allow any vessel owner to agree to pro-
vide a seaworthy vessel, knowingly breach that contractual obligation, and still take advantage of the contract's in-
demnity provision.

Baker respectfully submits that the undisputed fact of Tidewater's admitted failure to inspect the anchor windlass
under its Coast Guard Streamlined Inspection Program requires summary judgment dismissing their claims for de-
fense and indemnity. At the very least, the arguments advanced by Tidewater do nothing more than create a fact
issue for trial as to their compliance or not with their contractual undertakings which were conditions precedent to
Baker's alleged defense and indemnity duties to Tidewater.

I. *FACTS*

Tidewater cannot and does not contest that it failed to perform the scheduled inspection of the anchor windlass unit
in March 1999. It instead suggests that Engineer Clarence Polk's adding of hydraulic fluid to the windlass in May
1999 is evidence of both a sufficient inspection and the absence of any leak. Both assertions are disingenuous.

First, there is no evidence in the Polk trial testimony cited by Tidewater that he performed the sort of inspection re-
quired by Tidewater's Streamlined Inspection Program. In particular, the ANCH 02 inspection requires that the fol-
lowing steps be followed:
A. Verify that bitts, cleats, and fair leads are not excessively corroded or grooved, and that there is no scale build-up.
B. Verify that bitt and cleat horns are not missing, broken, or excessively bent.
C. Verify that foundations are not fractured.
D. Verify that all guy wires are taunt and free of fraying, and not broken and wire clamps are not wasted.[FN1]

FN1. See Tidewater's Streamlined Inspection Program procedure ANCH 02, attached as Exhibit "U".

There is simply no evidence that this sort of thorough inspection of the anchor equipment was performed either in March or May of 1999. Though Tidewater makes light of the time that elapsed between the scheduled (but never performed) March 1999 inspection and the accident, there is an obvious reason behind the Tidewater inspection schedule - ensuring that maintenance is performed on a preventive, rather than post-catastrophic, basis.

Second, Tidewater neglects to cite Polk's deposition testimony or the portion of his logs which indicates just how much hydraulic fluid he added to this crucial piece of equipment. Polk testified that he added at least ten gallons of fluid during his May 1999 "inspection."[FN2] If anything, the volume of fluid added is evidence that indeed there was a problem, one that a proper inspection of the equipment might well have uncovered. Yet Polk dismissed the addition of such a volume of fluid as not suggestive of any problem.[FN3] This is questionable at best.

FN2. See Deposition of Clarence Polk, excerpts attached as Exhibit "V", pp. 284-285.

FN3. See Deposition of Clarence Polk, p. 286.

## II. *LAW AND ARGUMENT*

### A. *TIDEWATER'S READING OF THE BLANKET TIME CHARTER IS CONTRARY TO THE MOST BASIC PRINCIPLES OF MARITIME CONTRACT INTERPRETATION*

Tidewater asserts that "[a]ccepting Baker's argument would virtually eviscerate contractual indemnity in maritime actions[.]"[FN4] The gloss that Tidewater proposes, however, flies in the face of the most basic contractual-interpretation principles. Simply put, the Tidewater interpretation would completely read out of the contract Tidewater's duly-bargained-for duty to provide and maintain a seaworthy vessel for Baker's well-stimulation operations.

FN4. See Tidewater Opposition Memorandum at p. 9.

In *Computalog U.S.A. Inc. v. Mallard Bay Drilling, Inc.,*[FN5] Judge Porteous concisely reviewed the well-settled and axiomatic concepts that govern maritime contract interpretation in the Fifth Circuit:

FN5. 21 F.Supp. 620 (E.D.La. 1998).

A maritime contract must be interpreted according to the general rules of contract, construction and interpretation. Each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole. Finally, each provision of a contract must be given a meaning which renders it, along with all other provisions, effective rather than meaningless.[FN6]

FN6. 21 F.Supp.2d at 624 (internal citations omitted) (emphasis added).

Tidewater's proposed interpretation of the Blanket Time Charter would render meaningless Tidewater's express assumption in Article III of the obligation to provide and maintain the REPUBLIC TIDE in a seaworthy condition. The *only* way to give effect to this provision is to conclude that Tidewater must live up to its basic obligations to maintain the vessel before it can take advantage of the indemnity language in Article XIV, *i.e.* render Tidewater's seaworthiness obligation "effective rather than meaningless." Otherwise, Tidewater would have absolutely no incentive to live up to its bargained-for obligation to provide and maintain a seaworthy vessel, and instead would remain comfortable in the knowledge that, regardless of injury or damage caused by its breach of that duty, it could seek

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defense and indemnity from Baker. Such an absurd result cannot have been contemplated and certainly does not give effect to Tidewater's obligations under the Blanket Time Charter. It would also be against public policy.

   B. *THE FIFTH CIRCUIT'S OPINION IN MARQUETTE REQUIRES A FURTHER EXAMINATION OF THE EF-FECT OF TIDEWATER'S BREACH ON ITS ABILITY TO CALL FOR DEFENSE AND INDEMNITY FROM BAKER*

Dismissing important statements in Marquette as mere dicta,

Tidewater urges the Court to end its inquiry with *Fontenot*.[FN7] First, the Marquette Court's statements are not dicta. They went directly to the issue of whether the indemnity requirement operated to completely override the defendant's warranty obligations; the Court rightly concluded that it did not.[FN8] This analysis was directly applicable to the consideration of whether the indemnity provision was an improper exculpatory clause, and thus was not dicta.[FN9]

          FN7. *See* Tidewater's Opposition Memorandum at p. 10.

          FN8. See *Marquette Transp. Co., Inc. v. Louisiana Machinery Co., Inc.* 367 F.3d 398, 408 (5th Cir. 2004).

          FN9. "A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law." *International Truck and Engine Corp. v. Bray,* 372 F.3d 717, 721 (5th Cir. 2004).

Second, regardless of Tidewater's semantics, the Fifth

Circuit's statements in *Marquette* are illuminating and require careful consideration of Tidewater's breach of its duties under the Blanket Time Charter. Unlike the obligation in *Fontenot,* on which Tidewater would have the Court exclusively rely, Tidewater's obligation to provide and maintain a seaworthy vessel is not merely implied but rather is expressly set forth in the Blanket Time Charter. The parties, in negotiating, bargaining for, and apportioning the various liabilities and advantages in the Blanket Time Charter, thought Tidewater's duty to provide and maintain the REPUBLIC TIDE in a seaworthy condition important enough to formalize that duty in Article III. Tidewater's assertion that the Blanket Time Charter should be read as though Article III - and its own duty thereunder - simply does not exist, cannot withstand either the basic principles of maritime contract interpretation or the Fifth Circuit's reasoning in *Marquette.*

Furthermore, it cannot be overlooked that the party seeking to enforce the implied warranty of workmanlike performance in *Fontenot* was doing so for the purpose of establishing an implied right to recover indemnity against the one allegedly in breach of that warranty.[FN10] In contrast, BAKER is not seeking to create an implied indemnity agreement in its own favor by virtue of TIDEWATER's breach, but rather is simply seeking to enforce the general proposition that a party who is in breach of a contract cannot demand performance from others.[FN11] In addition, where, as here, the breach materially increased the scope of risk of injury and the severity of that injury and thereby the potential liability of BAKER under the indemnity provision, TIDEWATER's breach was material, thereby discharging BAKER from any liability under the indemnity contract.[FN12]

          FN10. *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1218 (5th Cir. 1986).

          FN11. *Hattiesburg Lumber Co. v. Herrich,* 121 F. 834, 967 (5th Cir. 1914).

          FN12. *Hiern v. St. Paul-Mercury Indemnity Co.,* 262 F.2d 526, 528 (5th Cir. 1959); *General Ins. Co. of America v. Fleeger,* 389 F.2d 159, 161 n.3 (5th Cir. 1968); *Denton v. Fireman's Fund Indemnity Co.,* 352 F.2d 95, 96, 99 (10th Cir. 1965); *American Cas. Co. of Redding, Pennsylvania v. Idaho First Nat'l Bank,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

328 F.2d 138, 142-143 (9th Cir. 1954); *Dana Corp. v. Fireman's Fund Ins. Co.,* 169 F.Supp.2d 732, 743 (N.D. Ohio 1999); *Hudson v. Forest Oil Corp.,* 2003 WL 21276385 at *4 (E.D. La. 2003); *United States Fidelity & Guar. Co. v. Hathaway,* 394 S.E.2d 764, 767-768 (W.Va. 1990); *Unisys Corp. v. Legal Counsel, Inc.,* 768 F.Supp. 6, 8 (Dist. D.C. 1991).

III. *TIDEWATER ITSELF HAS ARGUED IT SHOULD BE RELEASED FROM CONTRACTUAL OBLIGATIONS DUE TO NON-PERFORMANCE BY THE OTHER PARTY*

In response to another pending motion, TIDEWATER strongly relied upon the *Landry v. Oceanic Contractors, Inc.*[FN13] decision. Of interest, the predecessor company of TIDEWATER, Tidex,[FN14] therein argued that the party with which it contracted, Oceanic, breached the contract by using a vessel it had bareboat chartered for purposes other than those contemplated by the agreement.

FN13. 731 F.2d 299 (5th Cir. 1984).

FN14. See Louisiana Secretary of State database printout, attached hereto as Exhibit "W."

According to Tidex TIDEWATER its contractual obligation to provide insurance coverage for Oceanic was nullified by Oceanic's breach. TIDEWATER's contention here, that it had no obligation to comply with its contractual undertakings before indemnity might be sought against BAKER, is thereby directly in conflict with the position taken by TIDEWATER in the *Landry* case.[FN15] If TIDEWATER sought relief from its contractual obligations after breach by the other party there, TIDEWATER should not be heard to call for denial of such relief to BAKER here, where TIDEWATER itself is guilty of such a breach. Clearly then, TIDEWATER's attempts to argue that performance of its end of the bargain is irrelevant should be rejected.

FN15. Tidex there was found to have waived its right to complain about the breach as it failed to make use of a protest clause in the contract and more importantly by continuing to accept performance from Oceanic with knowledge that the contract had been breached. 731 F.2d 299, 303-304.

IV. *CONCLUSION*

The Blanket Time Charter simply cannot be read to absolve Tidewater of any obligation to maintain the REPUBLIC TIDE in a seaworthy condition, especially when TIDEWATER has tried to avoid contractual obligations itself when the other party to its contract breached its obligations. To permit this would be to adopt a rule allowing the indemnitee to willy-nilly increase the scope of the indemnitor's indemnity obligation with no risk whatsoever.

The Fifth Circuit in *Marquette* acknowledged compliance with warranties is a prerequisite to recovering indemnity, notwithstanding the distinguishable *Fontenot* decision. The fact remains that TIDEWATER did not comply with its SIP procedures, breaching its contractual warranties and entitling BAKER to Summary Judgment dismissing their claims and those of TIDEWATER's UNDERWRITERS for indemnity. At the very least, Tidewater's breach of its duty to provide and maintain a seaworthy vessel presents an issue for the Court to consider as fact-finder at the December trial.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.