723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

⚑

United States Court of Appeals,
Third Circuit.
The FIRST JERSEY NATIONAL BANK, Appellee
in No. 82-5620, Appellant in No. 82-5662,
v.
DOME PETROLEUM LIMITED and Dome En-
ergy Limited, Appellants in No. 82-5620, Appellees
in No. 82-5662.

Nos. 82-5620, 82-5662.
Argued July 15, 1983.
Decided Dec. 19, 1983.
Rehearing and Rehearing In Banc Denied Jan. 17,
1984.

Bank serving as depositary for tender offer
funds brought action against tender offeror for in-
demnification. The United States District Court for
the District of New Jersey, Herbert J. Stern, J.,
granted partial summary judgment directing offeror
to indemnify bank, and offeror appealed. The Court
of Appeals, Seitz, Chief Judge, held that: (1) bank's
breach of the depositary agreement was not
"deliberate and intentional misconduct" within
meaning of exclusion from indemnification provi-
sion, and (2) Court of Appeals lacked jurisdiction
over bank's appeal from district court order denying
bank's claim for legal fees and disbursements where
bank filed its notice of appeal before district court
disposed of bank's motion for reconsideration.

Partial summary judgment affirmed; bank's ap-
peal dismissed.

Joseph S. Lord, III, District Judge, sitting by
designation, filed a dissenting opinion.

West Headnotes

**[1] Federal Courts 170B ⇒668**

170B Federal Courts
    170BVIII Courts of Appeals

170BVIII(E) Proceedings for Transfer of
Case

170Bk665 Notice, Writ of Error or Cita-
tion

170Bk668 k. Time for Filing in Gener-
al. Most Cited Cases

Court of Appeals has no jurisdiction to hear ap-
peal if appellant files its notice of appeal while
there is pending timely motion to alter or amend
judgment. Fed.Rules Civ.Proc.Rules 4(a), 59, 59(e),
28 U.S.C.A.

**[2] Federal Courts 170B ⇒668**

170B Federal Courts
    170BVIII Courts of Appeals

170BVIII(E) Proceedings for Transfer of
Case

170Bk665 Notice, Writ of Error or Cita-
tion

170Bk668 k. Time for Filing in Gener-
al. Most Cited Cases

Where bank filed its notice of appeal from or-
der denying its claim for legal fees and disburse-
ments before district court disposed of bank's
timely motion for reconsideration of that order, no-
tice of appeal was a nullity and Court of Appeals
lacked jurisdiction over the appeal. Fed.Rules
Civ.Proc.Rules 4(a), 59, 59(e), 28 U.S.C.A.

**[3] Federal Courts 170B ⇒766**

170B Federal Courts
    170BVIII Courts of Appeals

170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General

170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from

170Bk766 k. Summary Judgment.
Most Cited Cases

**Federal Courts 170B ⇒802**

170B Federal Courts
    170BVIII Courts of Appeals

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

170BVIII(K) Scope, Standards, and Extent
170BVIII(K)3 Presumptions
170Bk802 k. Summary Judgment.
Most Cited Cases

On review of summary judgment, Court of Appeals determines whether record as it stands reveals any disputed issue of material fact, assumes resolution of any such issue in favor of nonmovant, and determines whether movant is then entitled to judgment as matter of law.

**[4] Contracts 95 ⬤―1**

95 Contracts
95I Requisites and Validity
95I(A) Nature and Essentials in General
95k1 Nature and Grounds of Contractual Obligation. Most Cited Cases

Under New Jersey law, parties to commercial transaction have great latitude in their preferred allocation of risks of loss.

**[5] Indemnity 208 ⬤―31(4)**

208 Indemnity
208II Contractual Indemnity
208k31 Construction and Operation of Contracts
208k31(4) k. Subject-Matter in General. Most Cited Cases
(Formerly 208k8(1))

Under New Jersey law, broadly worded indemnification clause need not also recite specific sorts of loss within its coverage.

**[6] Indemnity 208 ⬤―33(2)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(2) k. Contract Liability. Most Cited Cases
(Formerly 208k8(3))

Under indemnification provision in depositary agreement between tender offeror and bank serving as depositary for funds with which to pay tender of-

fer, provision clearly and unambiguously covered loss resulting from bank's breach of contract in that, even though the provision did not specifically refer to breaches of contract by bank, it did refer to misconduct by bank when it explicitly excluded from coverage bank's intentional and deliberate misconduct.

**[7] Indemnity 208 ⬤―33(2)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(2) k. Contract Liability. Most Cited Cases
(Formerly 208k8.1(2.1), 208k8.1(2))

Under indemnification provision in depositary agreement between tender offeror and bank serving as depositary of funds with which to pay the tender offer which excluded from coverage bank's "deliberate and intentional misconduct," unintentional results of bank employees' intentional acts of stopping time stamping of acceptance letters by tendering shareholders and permitting issuance of checks to tendering shareholders despite knowledge of protest of shareholders whose timely acceptance of the tender offer had been rejected by the bank did not constitute "deliberate and intentional misconduct."

**[8] Indemnity 208 ⬤―111**

208 Indemnity
208VI Rights and Remedies of Indemnitor
208k111 k. Discharge. Most Cited Cases
(Formerly 208k12)

Tender offeror's obligation to indemnify bank serving as depositary for tender offer funds when bank breached the agreement by failing to include shareholders whose acceptances were received on last day of proration period in determining amounts to be paid to accepting shareholders was not discharged by bank's failure to attempt to recover overpayments made to the other accepting shareholders where tender offeror did not condition its indemnification on requirement that bank take par-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

ticular steps to remedy loss, tender offeror expressly declined to direct bank's choice of remedy after the harm occurred, and bank acted with advice of its counsel in choosing its course of action.

**[9] Subrogation 366 ☞41(4)**

366 Subrogation
    366k41 Actions and Other Proceedings for Enforcement
        366k41(4) k. Parties. Most Cited Cases

Question whether tender offeror's liability as indemnitor of bank serving as depositary for tender offer funds for bank's breach of the agreement should be offset by offeror's subrogation to bank's insurance claim against its liability carrier could not be determined in suit to which the carrier was not a party since, because subrogation claim involved carrier's liability, carrier was indispensable party to resolution of the claim.

**\*336** Lee N. Abrams (Argued), Lynne M. Raimondo, Mayer, Brown & Platt, Chicago, Ill., for appellants in No. 82-5620 and appellees in No. 82-5662.

Morrill J. Cole, Steven R. Klein, Cole, Schotz, Bernstein, Meisel & Forman, P.A., Rochelle Park, N.J., for appellants in No. 82-5620 and appellees in No. 82-5662.

Joseph J. Fleischman (Argued), Bronna G. Levin, Robert P. Zoller, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J., for appellee in No. 82-5620 and appellant in No. 82-5662.

Before SEITZ, Chief Judge, SLOVITER, Circuit Judge and LORD, District Judge. FN*

    FN* Honorable Joseph S. Lord, III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

**OPINION OF THE COURT**

SEITZ, Chief Judge.

I.

In this diversity case, Dome Petroleum Limited and Dome Energy Limited ("Dome") appeal an order granting a partial summary judgment which directs Dome to indemnify The First Jersey National Bank ("First Jersey"). Dome also appeals **\*337** the district court's order denying its motion for permission to file a counterclaim against First Jersey for breach of a depositary agreement. The district court certified both orders under Fed.R.Civ.P. 54(b). This court has jurisdiction over Dome's appeals under 28 U.S.C. § 1291 (1976).

First Jersey appeals the district court's order denying First Jersey's claim for legal fees and out-of-pocket disbursements incurred in negotiating the depositary agreement and in litigating this action in the district court. The district court denied this motion by an order dated October 20, 1982. It also certified the order under Fed.R.Civ.P. 54(b). On October 21, 1982, First Jersey served a timely notice of its motion for reconsideration. First Jersey filed a notice of appeal from the district court's order with respect to fees and disbursements on October 27, 1982. The district court denied First Jersey's motion for reconsideration on December 8, 1982.

[1][2] This court has no jurisdiction to hear an appeal if the appellant files its notice of appeal while there is pending a timely motion made pursuant to Fed.R.Civ.P. 59. *Griggs v. Provident Consumer Discount Company*, 459 U.S. 56, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982); *Dougherty v. Lehman*, 711 F.2d 555, 558-60 (3d Cir.1983). Although Rule 59 does not explicitly mention motions for reconsideration, this court has held that for purposes of Rule 4(a), a motion for reconsideration qualifies as a motion under Rule 59(e) to alter or amend a judgment. *Richerson v. Jones*, 572 F.2d 89, 93 (3d Cir.1978). Because First Jersey filed its notice of appeal before the district court disposed of First Jersey's timely motion for reconsideration, this premature notice of appeal was a "nullity." *Griggs,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

103 S.Ct. at 403. First Jersey did not file a notice of appeal after the district court denied its motion for reconsideration. We will therefore dismiss First Jersey's appeal for want of jurisdiction.

### II.

This action for indemnification arises from a complex and unfortunate chain of events. Dome made a public offering to buy between 14 and 22 million shares of Conoco, Inc. ("Conoco"). First Jersey served as the depositary for the tender offer. Under the depositary agreement (the "Agreement"), First Jersey had numerous duties, including the duty to time-stamp incoming letters of transmittal and other documents, and the duty to transfer the tendered shares to Dome and to pay the tenderors in accordance with the terms of Dome's offer to purchase.

Conoco shareholders deluged First Jersey with tenders in response to Dome's offer. On May 26, 1981, the number of Conoco shares tendered was more than twice as great as the maximum number of 22 million shares that Dome offered to purchase. In such circumstances, section 14(d)(6) of the Securities Exchange Act, 15 U.S.C. § 78n(d)(6) (1976), requires a tender offeror to purchase an equal percentage of each tenderor's shares, if those shares were tendered prior to the expiration of the proration period.

May 26 was the last day of the proration period for Dome's offer to purchase, which explicitly provided for proration in the event of oversubscription. As part of First Jersey's contractual duty to deliver the Conoco shares to Dome and to pay the tendering shareholders, First Jersey determined which shares were validly tendered before the proration period expired and calculated the proration factor. On June 10, 1981, First Jersey mailed checks to the approximately 9,000 shareholders who had tendered their Conoco shares before the expiration of the proration period. The amount paid to each shareholder depended on the number of shares that Dome purchased from the shareholder, based on First Jersey's proration calculations.

On the last day of the proration period, First Jersey had stopped stamping the incoming letters of transmittal and other documents to indicate the date and time of receipt. The unstamped tenders included approximately 605,000 shares tendered by the State Street Bank and approximately 116,000 shares tendered by seventeen others.**\*338** We will refer collectively to these tenderors as the "State Street Group." Because these shares were properly tendered on May 26, First Jersey should have included them in its calculation of the proration factor, transferred a percentage of the State Street Group's shares to Dome, and sent checks to the State Street Group on June 10. First Jersey did none of these things. Instead, the shares that Dome should have purchased from the State Street Group were purchased in a pro rata proportion from 9,000 other tenderors, and the amounts properly due the State Street Group were scattered in 9,000 directions.

Under the incorrect formula that First Jersey employed, Dome purchased at the offering price 40.26% of the shares tendered by each of the 9,000 shareholders, whereas it should have purchased 39.74% of these shares, plus 39.74% of the shares tendered by each member of the State Street Group. While the offering price was $65 per share, the market price at the time of Dome's purchase was $53. Thus, each of the 9,000 tenderors received a benefit of $12 per share for the .52% of their tendered shares that Dome should not have purchased. This benefit totalled approximately $3.5 million.

One or two days before First Jersey mailed the checks to the other timely tenderors, State Street Bank had called First Jersey to protest First Jersey's return of State Street Bank's shares as untimely tenders. Teresa Ernst, an Administrative Assistant in First Jersey's Special Services Department, checked First Jersey's records, and on the following day, she told State Street Bank that she had found no record of their claimed May 26 delivery. The next day, which Ernst identified as the day on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

which First Jersey mailed the checks, State Street Bank told Ernst that it would send a copy of its Brink's receipt for the delivery of the shares. This receipt arrived the day after the checks went out, and it was then that First Jersey determined that the tender had been timely.

First Jersey immediately notified its insurance carrier and Dome, and these parties and counsel discussed various possible remedies. Counsel contacted the Securities and Exchange Commission to advise them of the problem and the proposed solutions. The SEC's primary concern seems to have been that all timely tenderors be treated equally.

First Jersey decided to pay the State Street Group the difference between the offering price and the market price for a portion of the shares tendered by each member of the Group. This portion was determined by the same incorrect proration factor (40.26%) that First Jersey had applied to all the other timely tenderors. First Jersey mailed checks totalling approximately $3.5 million to the State Street Group and demanded reimbursement from Dome pursuant to the indemnification clause in paragraph 16.1 of the Agreement.

When Dome refused to pay, First Jersey entered into a loan receipt agreement with its insurer, Employer's Insurance of Wausau, which provided that the insurer would loan First Jersey approximately $3.5 million, to be repaid only to the extent that First Jersey is able to recover from a third party (Dome). First Jersey instituted this action for indemnification to recover the amounts paid to the State Street Group.[FN1]

FN1. Although by the terms of the loan receipt agreement, First Jersey's insurer has an interest in any recovery, it is not suggested that this action is not being maintained in the name of the real party in interest.

[3] On review of a summary judgment, we do as the district court was required to do: we determine whether the record as it stands reveals any disputed issue of material fact, assume the resolution of any such issue in favor of the non-movant, and determine whether the movant is then entitled to judgment as a matter of law. *See, e.g., Hollinger v. Wagner Mining Equipment Company,* 667 F.2d 402, 405 (3d Cir.1981).

III.

First Jersey does not dispute that it breached an explicit contractual requirement when it stopped time-stamping **\*339** tenders received before the proration period expired. For purposes of reviewing the partial summary judgment, we assume that First Jersey's failure to time stamp, or its failure to ascertain before it mailed checks to the 9,000 tenderors that State Street Bank's tender was timely, caused it to calculate the erroneous proration factor and caused the erroneous purchases and payments.[FN2] We will also assume that these mispayments breached First Jersey's duty under the Agreement to deliver shares to Dome and to deliver the purchase price to timely tenderors, pursuant to the terms of Dome's offer to purchase. The question is whether under an indemnification clause in the Agreement, Dome must bear the loss caused by First Jersey's "misconduct."

FN2. Because we must assume disputed issues of material fact in Dome's favor, we need not consider First Jersey's contention that the loss occurred at least in part because Dome rushed First Jersey through the proration calculations to make certain that Dome would be able to close a deal with Conoco on June 10.

The parties agreed that the Agreement would be construed and enforced in accordance with New Jersey law.

A. *Indemnification for Breaches of Contract.*

Dome contends that the meaning of the indemnification clause is a question of fact, wrongly resolved in First Jersey's favor on the motion for summary judgment before the district court. Al-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

though this court would agree with Dome that as a general rule the meaning of a contract is a question of fact, *Landtect Corporation v. State Mutual Life Assurance Company,* 605 F.2d 75, 79 (3d Cir.1979), New Jersey courts apparently begin from a different premise, *see Trucking Employees of North Jersey Welfare Fund v. Vrablick,* 177 N.J.Super. 142, 148, 425 A.2d 1068, 1071 (App.Div.1980) ("The construction of a written agreement is ordinarily a matter for the court ...."). Both courts agree, however, that a clear and unambiguous contractual provision raises no factual issue. *Landtect,* 605 F.2d at 79; *Vrablick,* 177 N.J.Super. at 148, 425 A.2d at 1071.

The indemnification clause under which First Jersey brought this action provides:

[Dome] hereby covenants and agrees to indemnify and hold [First Jersey] harmless from and against any and all claims, actions, judgments, damages, losses, liabilities, costs and expenses of any nature whatsoever (including without limitation attorney's fees), arising directly or indirectly from, out of or incident to this Agreement and/or oral instructions delivered to [First Jersey] pursuant to this Agreement. This indemnity shall exclude only intentional and deliberate misconduct on [First Jersey's] part. [Dome] shall be subrogated to, and entitled to assert, any claim which [First Jersey] may have against any third party with respect to any items reimbursed to [First Jersey] hereunder by [Dome].

Agreement ¶ 16.1.

Dome claims that paragraph 16.1 is ambiguous because it does not explicitly state that Dome indemnifies First Jersey for a loss resulting from First Jersey's breach of the Agreement. In the alternative, Dome argues that if paragraph 16.1 is unambiguous, it does not cover First Jersey's breaches of the Agreement.

[4][5] Under a clear line of contemporary New Jersey cases, parties to a commercial transaction

have great latitude in their preferred allocation of risks of loss. *See, e.g., Berry v. V. Ponte & Sons,* 166 N.J.Super. 513, 517, 400 A.2d 114, 116 (App.Div.1979), *cert. denied,* 84 N.J. 389, 420 A.2d 317 (1980); *Buscaglia v. Owens-Corning Fiberglas,* 68 N.J.Super. 508, 172 A.2d 703, 707 (App.Div.1961), *aff'd on other grounds,* 36 N.J. 532, 178 A.2d 208 (1962); *Cozzi v. Owens Corning Fiber Glass Corporation,* 63 N.J.Super. 117, 125, 164 A.2d 69, 74 (App.Div.1960); *Doloughty v. Blanchard Construction Company,* 139 N.J.Super. 110, 115, 352 A.2d 613, 616 (Law Div.1976).[FN3] Furthermore, **\*340** under New Jersey law a broadly worded indemnification clause need not also recite the specific sorts of loss within its coverage. As the *Cozzi* court explained, because commercial parties now commonly shift their contractual risk of loss to insurance companies, strict construction of an indemnity provision is anachronistic. 63 N.J.Super. at 125, 164 A.2d at 74.

> FN3. Dome supposes that these cases do not apply to losses resulting from the indemnitee's actions. *See* Brief for Appellants at 32. To the contrary, the indemnitee's actions were the sole cause of the harm in *Cozzi* and the concurrent cause of the harm in *Doloughty.*

Under the indemnity clause in *Cozzi,* a contractor indemnified a company (the "Owner") against damages resulting from accidents that might befall the contractor or its employees while they worked on the Owner's property, " 'whether occasioned by said Contractor or his employees or by Owner or his employees or any other person or persons....' " 63 N.J.Super. at 122, 164 A.2d at 72. The contractor argued that the clause was inapplicable to losses resulting from accidents caused by the Owner's negligence. The *Cozzi* court held that because the clause referred to accidents caused by the Owner, it clearly and unambiguously covered accidents caused by the owner's negligence even though it did not specifically refer to such accidents. *Id.* We recognize that *Cozzi* discusses indemnification

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443

**(Cite as: 723 F.2d 335)**

against negligence, not indemnification against breaches of contract. Nevertheless, it is a useful example of how New Jersey courts will find unambiguous an indemnification clause that does not specifically state the kinds of harm that it covers.

[6] Paragraph 16.1 of the Agreement does not specifically refer to breaches of contract by First Jersey. It does, however, refer to misconduct by First Jersey when it explicitly excludes from its coverage "*only* [First Jersey's] intentional and deliberate misconduct ...." (Emphasis added.) We therefore hold that paragraph 16.1, clearly and unambiguously, covers a loss resulting from First Jersey's breach of contract, provided that First Jersey did not engage in intentional and deliberate misconduct.

Dome relies on a case from the Supreme Court of New Jersey and calls to our attention the fact that cases such as *Berry, Buscaglia,* and *Cozzi* were decided by the Appellate Division. In *George M. Brewster & Son v. Catalytic Construction Company,* 17 N.J. 20, 109 A.2d 805 (1954), the lessee of a heavy duty crane boom indemnified the lessor " 'against all loss, damage, expense and penalty arising from any action on account of personal injury or damage to property occasioned by the operation and handling of this equipment....' " 17 N.J. at 25, 109 A.2d at 807. The *Brewster* court held:

The significant words would seem to be "operation and handling" .... And this postulates as an inherent term of the contract the provision of a crane and boom reasonably suitable and safe for the stipulated use when delivered to the indemnitor, and certainly a breach of this condition prerequisite, rendering the indemnitee directly liable in damages for his own negligence, would not be within the coverage of the indemnity clause, absent a clear and unequivocal expression to that end.

17 N.J. at 32, 109 A.2d at 811.

Dome points out that paragraph 16.1 of the Agreement covers losses "arising directly and indir-

ectly from, out of or incident to this Agreement and/or oral instructions delivered to [First Jersey] pursuant to this Agreement." Dome argues that under *Brewster,* these words require, as a condition prerequisite to indemnification, that First Jersey act in accordance with the Agreement. This argument ignores the *Brewster* court's acknowledgment that indemnification for breaches of contract may be provided by "a clear and unequivocal expression to that end." 17 N.J. at 33, 109 A.2d at 811. Because we hold that paragraph 16.1 clearly and unequivocally covers a loss that results from a breach of the Agreement by First Jersey, we agree with the district court that *Brewster* is consistent with the imposition of liability on Dome.

B. *First Jersey's Culpability and Dome's Liability.*

[7] Paragraph 16.1 explicitly exempts indemnification against First Jersey's "intentional and deliberate misconduct." Dome argues that whether First Jersey's misconduct was intentional and deliberate **\*341** is a disputed issue of material fact. Dome offers evidence that Anthony Rotella, an Assistant Manager at First Jersey, intentionally ordered First Jersey employees to stop time-stamping on the last day of the proration period even though he was aware of the importance of the procedure. Dome also offers evidence to show that Teresa Ernst, the Administrative Assistant to whom State Street Bank complained, intentionally permitted First Jersey to issue the checks on June 10, even though she knew that if State Street Bank's protest were justified, the payments would be inaccurate.

Accepting Dome's contentions as true for the purposes of reviewing the summary judgment, we nevertheless agree with the district court that First Jersey's misconduct was not intentional and deliberate.[FN4] The court in *Lyons v. Hartford Insurance Group,* 125 N.J.Super. 239, 310 A.2d 485 (App.Div.1973), *cert. denied,* 64 N.J. 322, 315 A.2d 411 (1974), held that New Jersey's public policy of denying insurance indemnity for losses resulting from intentional wrongdoing did not preclude indemnification against "the unintended res-

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

ults of an intentional act." 125 N.J.Super. at 245, 310 A.2d at 488. "[T]he distinction between intended and unintended results of intentional acts is well recognized," Lyons, 125 N.J.Super., at 247, 310 A.2d at 489, and this distinction requires Dome to indemnify First Jersey, under the terms of paragraph 16.1, for the unintentional results of Rotella's and Ernst's intentional acts.FN5 Because Dome does not claim that First Jersey intended to overpay some tenderors or to fail to pay others, no factual issue with respect to intentional misconduct precludes summary judgment for First Jersey.

> FN4. Dome's counsel filed an affidavit with the district court to show why Dome could not present facts essential to its opposition to First Jersey's motion for partial summary judgment. See Fed.R.Civ.P. 56(f). On appeal, Dome protests that the district court abused its discretion by denying Dome's request for adjournment of the hearing on First Jersey's motion pending the completion of Dome's discovery. Given the assumptions that are made in Dome's favor, we cannot say that the district court abused its discretion by refusing to adjourn so that Dome could further explore how and why the mispayment occurred.

> FN5. The rule in Lyons won the explicit approval of Justice Pashman in Ambassador Ins. Co. v. Montes, 76 N.J. 477, 488-90, 388 A.2d 603, 609-10 (1978) (Pashman, J., concurring), and it is routinely applied in the Appellate Division, see, e.g., Garden State Fire & Cas. Co. v. Keefe, 172 N.J.Super. 53, 57, 410 A.2d 718, 720 (App.Div.), cert. denied, 84 N.J. 389, 420 A.2d 317 (1980).

Dome argues in the alternative that even if First Jersey's conduct was not intentional and deliberate, it was reckless, willful, or grossly negligent. Dome contends that public policy requires courts to void the contractual indemnification of such conduct. It is not clear that Dome raised this particular public

policy argument in the district court. We address it only because it is strongly akin to (if not an amalgamation of) two other public policy arguments which the district court answered and which Dome does not pursue. We will assume for purposes of reviewing the partial summary judgment that First Jersey's conduct was reckless, willful, or grossly negligent.

The district court noted the vital distinction between exculpation and indemnification and held that while public policy may preclude contractual exculpation for reckless, willful, or grossly negligent conduct, it is not offended by indemnification against such conduct. See 6A Corbin on Contracts § 1472 n. 52 (Supp.1964); cf. Hanover Insurance Group v. Cameron, 122 N.J.Super. 51, 298 A.2d 715 (Chanc.Div.1973) (insurance for negligent and wanton conduct). The loss at issue is the $3.5 million loss suffered by the State Street Group. We will assume for purposes of reviewing the summary judgment that First Jersey's gross negligence or willful misconduct caused this loss. First Jersey did not deny its liability to the State Street Group or seek exculpation. Rather, having made good the loss, it sought indemnification from Dome for a loss to a third party for which First Jersey was liable but which it *342 did not intentionally or deliberately cause. In such circumstances, paragraph 16.1 requires indemnity.

The most persuasive case in Dome's favor is Swisscraft Novelty Company v. Alad Realty Corporation, 113 N.J.Super. 416, 274 A.2d 59 (App.Div.1971). Under the commercial lease in Swisscraft the lessee both exculpated the lessor and indemnified it for losses occurring on the leased premises. However, only the lessee (and not some third party) had been injured, and the court focused exclusively on the exculpatory provision when it remanded on public policy grounds to permit a new action for gross negligence and willful and wanton misconduct. Thus, Swisscraft is inapposite.FN6

> FN6. We need not decide whether indemnification would be contrary to public

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

policy if First Jersey's acts constituted gross negligence or willful misconduct and First Jersey were a defendant in an action under the federal securities laws.

C. *Discharge of the Obligation to Indemnify.*

[8] Dome argues that First Jersey had a legal obligation to attempt to recover the overpayments to the 9,000 tenderors. According to Dome, First Jersey's failure to minimize the loss in this manner discharged Dome's obligations as an indemnitor under paragraph 16.1 because First Jersey's course of action increased Dome's risk of loss.

First Jersey did nothing to prejudice Dome's rights or increase its risk of loss, as these terms are used in the cases that Dome cites. *See, e.g., General Insurance Company of America v. Fleeger,* 389 F.2d 159, 161 & n. 3 (5th Cir.1968) (in inducing indemnification, indemnitee misrepresented the degree of risk; indemnitee also increased indemnitor's risk by continuing to issue bonds to defaulting contractors); *American Casualty Company v. Idaho First National Bank,* 328 F.2d 138 (9th Cir.1964) (indemnification given on condition that indemnitor receive a security interest in certain property, which indemnitee subsequently dissipated); *Hiern v. St. Paul-Mercury Indemnity Company,* 262 F.2d 526 (5th Cir.1959) (indemnitor agreed to indemnify against payments that indemnitee might make as surety on contracts; indemnitor learned that funds due as payments under the contracts were being diverted; indemnitor requested indemnitee to take steps to halt the diversion, and indemnitee falsely told indemnitor it had done so). In each of these cases, the indemnitor had good reason to believe that the potential loss it was risking was less than the loss that actually occurred. If an indemnitee is responsible for putting the indemnitor in such a precarious position, the indemnification may be discharged.

Nothing in the Agreement suggests that Dome conditioned its indemnification on the requirement that First Jersey take particular steps to remedy a loss, and Dome does not contend that First Jersey

made misrepresentations to Dome about the course of action that First Jersey decided to pursue. Dome argues, however, that First Jersey failed to follow Dome's instructions in the wake of the disaster.

After First Jersey discovered the overpayments, First Jersey and Dome discussed two recovery plans that First Jersey might follow: it could stop payment on the checks sent to 9,000 tenderors and issue new checks for a lesser amount; or it could refuse to return the tenderors' unpurchased shares until they repaid the overpayments. We will assume for the purposes of reviewing the summary judgment that First Jersey and Dome also considered whether First Jersey might recover the overpayments by simply requesting their return. The parties also discussed the possibility of making the State Street Group whole, without attempting to recover the overpayments.

In its correspondence through counsel, Dome took great pains "not [to] presume to direct [First Jersey] to follow any particular course of action." Although Dome then stated that retention of the unpurchased shares pending the return of the overpayments "appears to be most consistent with the instructions given [First Jersey] in the Depositary Agreement....," *id.* at 703, we have examined the Agreement, and we see no indication whatsoever that the Agreement**343** required First Jersey to refuse to return unpurchased shares in the event of an overpayment. After the harm occurred, Dome expressly declined to direct First Jersey's choice of a remedy. Under these circumstances, Dome cannot be heard to say that First Jersey prejudiced Dome's rights or increased its risk of loss.

Furthermore, we agree with the district court that because Dome and Dome's counsel failed to instruct First Jersey to follow any particular course of action, and because First Jersey acted with the advice of its counsel, First Jersey is indemnified under paragraph 12.7 of the Agreement against the consequences of its chosen remedy. Paragraph 12.7 provides:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

[First Jersey] may consult with counsel satisfactory to [First Jersey] (including Mayer, Brown & Platt, United States counsel for [Dome], and Bennett Jones, Canadian counsel for [Dome] ), and the advice or opinion of such counsel shall be deemed full and complete authorization by [Dome], which shall protect and indemnify [First Jersey] in respect of any action taken, suffered or omitted by [First Jersey] hereunder in good faith and in accordance with such advice or opinion of such counsel; ...

Given Dome's refusal to direct First Jersey's choice of a remedy, it cannot be said that First Jersey did not act in good faith in choosing one of the several remedies that it had discussed with Dome.

Dome also refers to First Jersey's duty to mitigate or minimize the loss by attempting to recover the overpayments. Assuming without deciding that First Jersey had such a duty, New Jersey courts would not require First Jersey to have done more than was reasonable or prudent under the circumstances. *See, e.g., McDonald v. Mianecki,* 79 N.J. 275, 298, 398 A.2d 1283, 1295 (1979); *Stark v. National Research and Design Corporation,* 33 N.J.Super. 315, 323, 110 A.2d 143, 147 (App.Div.1954).* Given First Jersey's compliance with the prerequisites for indemnification under paragraph 12.7, it cannot be said that a reasonable or prudent party would have done more than First Jersey did.

D. *Dome's Counterclaim for Breach of Contract.*

After the district court granted First Jersey's motion for partial summary judgment, Dome moved for leave to file a counterclaim against First Jersey for First Jersey's breach of the Agreement. The district court denied the motion because it considered the counterclaim to be equivalent to the defenses that Dome raised and the court rejected in First Jersey's action. We agree.

E. *Subrogation to First Jersey's Insurer.*

[9] Paragraph 16.1 of the Agreement provides that Dome "shall be subrogated to, and entitled to assert, any claim which [First Jersey] may have

against any third party with respect to any items reimbursed to [First Jersey] hereunder by [Dome]." Dome argued in the district court, as it argues here, that if Dome is liable as First Jersey's indemnitor, its liability should be offset by its subrogation to First Jersey's insurance claim against Employer's of Wausau. Dome also argues that if a settlement between First Jersey and its insurer has barred Dome's subrogation claim, the settlement discharges Dome's liability under the indemnity clause.

The district court held that Dome's interpretation of the subrogation clause is not plausible because if Dome were subrogated to First Jersey's right against its insurer, it would defeat the parties' intent that Dome, as indemnitor, bear the risk of loss. We disagree. It is at least arguable that the parties intended Dome to indemnify First Jersey only against losses not covered by First Jersey's insurance policy. However, the posture in which this issue is presented precludes its resolution.

Dome did not plead its subrogation claim or move to join Employer's of Wausau. Thus, we cannot reach the "merits" of the subrogation claim. Nor do we believe that the so-called offset claim can be recognized in this action.

***344** We conclude that the subrogation claim must be asserted in an action to which the insurance carrier is a party. The subrogation claim involves the insurer's possible liability, and we deem it an indispensable party to the resolution of such a claim.

As to Dome's contention that the settlement between the insurance carrier and First Jersey effected a discharge of Dome's liability, the short answer is that the merits of that claim can only be effectively determined in an action to which the insurance carrier is a party. Otherwise, the insurance carrier will not have the opportunity to advance its position with respect to the legal effect of its agreement with First Jersey.FN7

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

FN7. Dome protests that the district court abused its discretion by denying Dome's request for adjournment of the hearing on First Jersey's motion for partial summary judgment pending the completion of Dome's discovery with respect to First Jersey's insurer and insurance broker. Our disposition of the subrogation issue moots this contention.

IV.

We will affirm the partial summary judgment for indemnification. We will affirm the order denying Dome's motion for leave to file a counterclaim. We will dismiss for want of jurisdiction First Jersey's premature appeal from the order denying its claim for attorney's fees.

JOSEPH S. LORD, III, District Judge, dissenting.

I agree with the conclusions of the majority (1) that we have no jurisdiction to consider First Jersey's appeal; (2) that the indemnification clause covers breach of contract; (3) that First Jersey was under no duty to minimize its losses; (4) that the denial of leave to Dome to file a counterclaim was proper; (5) that there is no basis on this record for us to consider the merits of Dome's subrogation claim.

However, I would deny plaintiff's motion for summary judgment because I believe that there is a jury question as to whether Rotella's and Ernst's activities constituted "intentional and deliberate misconduct."

The majority's reliance on the standard enunciated in *Lyons v. Hartford Insurance Group,* 125 N.J.Super. 239, 310 A.2d 485 (App.Div.1973), *cert. denied,* 64 N.J. 322, 315 A.2d 411 (1974), in my judgment, is misplaced. In *Lyons,* the court reiterated the public policy of New Jersey that an insurer will not indemnify an individual for damages caused by his own intentional wrongdoing. The obvious purpose of this policy is to avoid any incentive to the insured to commit wrongful acts. A competing policy that runs throughout the *Lyons* opin-

ion as well as that in *Ambassador Insurance Company v. Montes,* 76 N.J. 477, 388 A.2d 603 (1978), and which governs the results in those cases, is that insurance companies should provide broad coverage to innocent victims of insureds.

In order to reconcile these competing policies, the *Lyons* court articulated a definition of intent differing from that appearing in § 8A of the Restatement (Second) of Torts. *Lyons* held that even where there is an exclusionary clause for the intentional wrongdoing of the insured, insurance coverage exists for "the unintended results of an intentional act, but not for damages assessed because of an injury which was intended to be inflicted." Thus, Judge Meanor in *Lyons* would not deny coverage to the innocent victim of an insured who fired a revolver with the intention to shoot over the victim's head. In his concurring opinion in *Ambassador,* Justice Pashman explained that the heightened intent standard adopted by Judge Meanor in *Lyons* would grant insurance coverage to the victims of an insured who, having no subjective intent to injure the victims, set fire to his property in order to collect the insurance money, knowing that it was extremely likely that the victims were asleep in the building. Justice Pashman rejected the use of the Restatement's definition of intent for insurance policy cases. He defended his use of the *Lyons'* "intent" rather than the Restatement definition in insurance cases because the *Lyons* definition is the prevailing one used by the courts in that class of case and, **\*345** more importantly, because the *Lyons* definition of intent furthers public policy. He stated:

Since one purpose of such insurance is to protect injured third parties, as between the liability insurer of a culpable actor and an innocent third party it is the better policy to place the risk of loss with the insurer where intent to injure is unclear.

*Ambassador Insurance Co. v. Montes,* 76 N.J. 477, 489, 388 A.2d 603, 609 (1978) (Pashman, J., concurring).

Justice Pashman's reasoning and language

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

clearly limit the use of the *Lyons* definition to cases involving the liability of insurance companies under insurance policies. The majority in *Ambassador,* although not adopting Justice Pashman's opinion, stressed that its purpose for granting coverage was a public policy one-compensation of innocent third party victims where the insured, the wrongdoer, did not benefit from the protection afforded by the insurance. *Ambassador Insurance Co. v. Montes,* 76 N.J. 477 at 486, 388 A.2d at 606. We do not have the *Ambassador* situation in the case before us. In *First Jersey* there is no innocent third party who is an injured victim. Moreover, the very "wrongdoer" is the party seeking compensation. Therefore, extending New Jersey law to apply the *Lyons* definition of intent to this case will further no public policy. Moreover, such an extension would contravene the principle of freedom of contract.

The insurance industry and insurance coverage itself are suffused with public interest. Companies are regulated by the state; the language, coverages and exclusions are governed by state law. Insurance is generally a contract of adhesion and, most important, while ostensibly designed to protect the insured from harm, is in reality, to compensate an innocent and injured victim. In the interpretation of insurance policies, there is a public policy factor in the whole process. None of these considerations is present here.

In the case before us, there is an arm's length contract between two entities of equal bargaining power. Nor does the state have any policy interest in the indemnity clause. In this situation, it is clear that the parties could choose to allocate the risk of loss to whichever party they pleased.[FN1]

> FN1. There is ample legal precedent for treating insurance contracts differently from other contracts entered into by entities with equal bargaining power. "It is settled that any ambiguity or contradiction in an insurance policy *must* be construed against the insurer, and in a manner which

is more favorable to coverage." *Buntin v. Continental Insurance Company,* 583 F.2d 1201, 1207 (3d Cir.1978) (emphasis in original).

Applying the principle of contract interpretation that words having "a generally prevailing meaning", will be interpreted "in accordance with that meaning", Restatement (Second) of Contracts § 202(3)(a), the exclusion of indemnification for losses resulting from "intentional and deliberate misconduct" on First Jersey's part does not justify the application of the *Lyons* definition of intent.

First of all, the language in the clause in question here does not focus on the injury, but rather it requires that the *misconduct* be intentional and deliberate. Furthermore, even if there were a question as to whether the contract required that the injury be specifically intended, since First Jersey drafted the indemnification clause, any ambiguity must be construed against First Jersey. *In re F.H. McGraw and Company,* 473 F.2d 465, 469 (3d Cir.1973).

Consequently, I would apply the definition of intent normally employed in civil cases. As set forth in § 8A of the Restatement (Second) of Torts, the word "intent" is used "to denote that the actor desires to cause the consequences of his act, *or that he believes that the consequences are substantially certain to result from it,*" (emphasis added).

According to the Restatement definition, therefore, if a party knows that an intentional act will have a given result or that the result is substantially certain, and that party nevertheless proceeds to act, a jury **\*346** could find that the result was intentional. In the absence of the need to protect innocent third parties, I think that New Jersey would hold that the intentional act with foreseeable, if not foreseen consequences, falls within the exclusion in the contract.

It is clear that First Jersey stopped time-stamping the incoming tendered materials twice: once in the middle of the offer period and on May

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

723 F.2d 335, 38 Fed.R.Serv.2d 443
**(Cite as: 723 F.2d 335)**

26, 1981, the last day of the period. It is also undis-
puted that Jan Viise, the vice-president in charge of
marketing plaintiff's depositary services, told An-
thony Rotella, the supervisor of floor operations on
First Jersey's depositary projects, that all tendered
materials had to be time-stamped. Rotella admits
that he ordered his personnel to discontinue time-
stamping on May 26, 1981. Teresa Ernst, a super-
visor of the Dome depositary project, admits that
she was aware that the time-stamping was stopped
on May 26, and that State Street notified her before
she mailed out the prorated checks on June 10,
1981 that it had a Brinks receipt dated May 26,
1981 to prove that more than 600,000 shares
tendered by it had been rejected improperly. Fur-
thermore, Ernst admitted that when she sent out the
checks on June 10, 1981, she was aware of the con-
sequences that would occur if State Street's tenders
were rejected improperly. Thus, Ernst knew that
there would be an overpayment if State Street's
claim was valid, and she nevertheless mailed the
checks. From these facts, a jury could conclude that
she intended that there be an overpayment because
she knew that overpayment was "substantially cer-
tain to result" from her intentional act of mailing
out the payments. I believe that a jury should have
the opportunity to determine First Jersey's right to
indemnity.

C.A.N.J.,1983.
First Jersey Nat. Bank v. Dome Petroleum Ltd.
723 F.2d 335, 38 Fed.R.Serv.2d 443

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

641 N.E.2d 395                                                                                              Page 1
161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

⬚

Supreme Court of Illinois.
DIXON DISTRIBUTING COMPANY, Appellee,
v.
HANOVER INSURANCE COMPANY et al.
(International Insurance Company, Appellant).

No. 75675.
May 26, 1994.
Rehearing Denied Oct. 3, 1994.

Employer being sued for retaliatory discharge brought declaratory judgment action against its insurers. The Circuit Court, Madison County, Daniel J. Stack, J., entered summary judgment in favor of insurers, and the Appellate Court affirmed in part, reversed in part and remanded, 244 Ill.App.3d 837, 183 Ill.Dec. 919, 612 N.E.2d 846. Leave to appeal by one insurer was allowed. The Supreme Court, Miller, J., held that provisions of liability policy excluding coverage for offenses committed with actual malice could not be construed to exclude coverage for retaliatory discharge, because actual malice is not an element of retaliatory discharge.

Affirmed.

West Headnotes

**[1] Insurance 217 ⬚═⊃2914**

217 Insurance
    217XXIII Duty to Defend
        217k2912 Determination of Duty
            217k2914 k. Pleadings. Most Cited Cases
    (Formerly 217k514.10(1))
Insurer's duty to defend is determined by comparing allegations in underlying complaint to relevant provisions of insurance policy.

**[2] Insurance 217 ⬚═⊃2914**

217 Insurance
    217XXIII Duty to Defend

        217k2912 Determination of Duty
            217k2914 k. Pleadings. Most Cited Cases
    (Formerly 217k514.10(1))
Insurer's duty to defend arises if complaint alleges facts that fall within, or potentially within, policy's coverage.

**[3] Insurance 217 ⬚═⊃2914**

217 Insurance
    217XXIII Duty to Defend
        217k2912 Determination of Duty
            217k2914 k. Pleadings. Most Cited Cases
    (Formerly 217k514.10(1))
Refusal to defend is unjustifiable unless it is clear from face of underlying complaint that allegations fail to state facts that bring case within, or potentially within, policy's coverage.

**[4] Insurance 217 ⬚═⊃2275**

217 Insurance
    217XVII Coverage--Liability Insurance
        217XVII(A) In General
            217k2273 Risks and Losses
                217k2275 k. Accident, Occurrence or Event. Most Cited Cases
    (Formerly 217k435.32)
Complaint against insured employer alleging that employee's wrongful termination was "intentional" could not be construed to allege actual malice so as to exclude coverage under provisions of liability policy defining covered "occurrence" to exclude any offense committed with actual malice.

**[5] Insurance 217 ⬚═⊃1832(1)**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
                217k1832 Ambiguity, Uncertainty or Conflict
                    217k1832(1) k. In General. Most

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

Cited Cases

(Formerly 217k146.7(8))

Although ambiguities in insurance policy will be construed against insurer, courts will not distort language of policy to create an ambiguity where none exists.

**[6] Insurance 217 ☞2275**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2275 k. Accident, Occurrence or Event. Most Cited Cases

(Formerly 217k435.32)

Complaint against insured employer alleging that employee's termination was in retaliation for filing workers' compensation claims could not be construed to allege that employer acted with actual malice so as to exclude coverage under provisions of liability policy defining covered "occurrence" to exclude any offense committed with actual malice.

**[7] Insurance 217 ☞2275**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2275 k. Accident, Occurrence or Event. Most Cited Cases

(Formerly 217k435.32)

Provisions of employer's liability policy excluding coverage for offenses committed with actual malice could not be construed to exclude coverage for retaliatory discharge, because actual malice is not an element of retaliatory discharge.

**[8] Labor and Employment 231H ☞771**

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(A) In General
      231Hk770 Exercise of Rights or Duties; Retaliation

       231Hk771 k. In General. Most Cited Cases

(Formerly 255k30(6.10) Master and Servant)

To state valid claim for retaliatory discharge, plaintiff must establish that he was discharged, in retaliation for his activities, and that discharge violated clear mandate of public policy.

**[9] Labor and Employment 231H ☞773**

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(A) In General
      231Hk770 Exercise of Rights or Duties; Retaliation

       231Hk773 k. Motive, Intent, and Pretext in General. Most Cited Cases

(Formerly 255k30(6.10) Master and Servant)

Actual malice is not an element of a retaliatory discharge claim.

**[10] Insurance 217 ☞2261**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2261 k. Public Policy Limitations in General. Most Cited Cases

(Formerly 217k139)

**Insurance 217 ☞2318**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(B) Coverage for Particular Liabilities
      217k2317 Employers' Liabilities
       217k2318 k. In General. Most Cited Cases

(Formerly 217k139)

Interpreting employer's liability policy as providing coverage against retaliatory discharge claims did not violate any established public policy in Illinois.

**[11] Insurance 217 ☞2102**

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261

**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

217 Insurance
   217XV Coverage--in General
      217k2096 Risks Covered and Exclusions
         217k2102 k. Willful, Intentional or
Wrongful Conduct. Most Cited Cases
    (Formerly 217k139)

Contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy, and courts will not enforce such a contract.

**[12]** Appeal and Error 30 &#x21d0;1082(2)

30 Appeal and Error
   30XVI Review
      30XVI(L) Decisions of Intermediate Courts
       30k1081 Questions Considered
         30k1082 Scope of Inquiry in General
           30k1082(2) k. Considering Questions Not Raised or Passed Upon in Intermediate Court. Most Cited Cases

Insurer, by failing to raise it in Appellate Court, waived argument on appeal to Supreme Court that retaliatory discharge claim alleged willful violation of penal statute and thus was not a covered "occurrence" under employer's liability policy.

**\*\*396 \*\*\*172 \*435** Jeffrey S. Hebrank and Donald J. Ohl, Burroughs, Hepler, Broom, MacDonald & Hebrank, Chicago, for appellant.

John Dale Stobbs, James S. Sinclair and John D. Stobbs II, Stobbs & Sinclair, Alton, for appellee.

Justice MILLER delivered the opinion of the court:

This appeal involves a coverage dispute between plaintiff, Dixon Distributing Co. (Dixon), and one of its insurers. The dispute originated between the parties when Patrick Hanneken filed a retaliatory discharge action against Dixon. Dixon thereafter sought a declaratory judgment that defendants, Commercial Union Insurance Company (Commercial), Hanover Insurance Company (Hanover), Massachusetts Bay Insurance Company

(Massachusetts), and International Insurance Company (International), must defend and indemnify it against the underlying retaliatory discharge action. The circuit court entered summary judgment in favor of defendants, finding there could be no insurance coverage for the underlying claim and, hence, no duty to defend on the part of the various insurance companies. The appellate court affirmed in part, reversed in part and remanded. ( 244 Ill.App.3d 837, 183 Ill.Dec. 919, 612 N.E.2d 846.) We allowed International's **\*436** petition for leave to appeal (134 Ill.2d R. 315(a)) and now affirm the judgment of the appellate court.

FACTS

The facts in this case are not in dispute. Hanneken filed a retaliatory discharge action against Dixon, alleging that he had suffered two work-related injuries during his employment with Dixon and had filed separate workers' compensation claims for each. Hanneken further alleged that Dixon's president, who was also a named defendant, "exhibited bias and prejudice against [him] in the exercise of his rights as an employee under the Worker's Compensation Act," and his discharge from employment was a "wilful, intentional and wrongful" act in violation of section 4(h) of the Workers' Compensation Act (Act) ( Ill.Rev.Stat.1985, ch. 48, par. 138.4(h)) and the public policy of Illinois. The complaint sought Hanneken's reinstatement to a "suitable position" and compensatory and punitive damages. This complaint **\*\*397 \*\*\*173** was later dismissed, and Hanneken filed an amended complaint. The amended complaint alleged that Hanneken's discharge and Dixon's refusal to rehire him was "intentional and in retaliation of and solely for the exercise of [his] rights under the Illinois Worker's Compensation Act in violation of the * * * public policy of the State of Illinois." This complaint again sought Hanneken's reinstatement to a "suitable position" and compensatory and punitive damages.

Following initiation of the suit, Dixon tendered defense of the underlying action to defendants un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

der a package of comprehensive commercial insurance policies that it had purchased simultaneously from defendants. Hanover initially defended Dixon, under a reservation of rights, but later withdrew and discontinued all defense. International and Massachusetts refused entirely to defend Dixon, contending that their policies excluded from coverage the tort of retaliatory discharge **\*437** and, even if their policies did not exclude it, the public policy of Illinois would preclude insurance against such an act. Although Commercial represented Dixon in connection with the workers' compensation claims, it similarly refused to defend Dixon in the instant action. Because of defendants' refusal to defend it, Dixon instituted this declaratory judgment action, seeking a declaration that one or all of defendant insurance companies had a duty to defend and indemnify it in the underlying retaliatory discharge action.

Relying primarily on the Seventh Circuit's opinion in *United States Fire Insurance Co. v. Beltmann North American Co.* (7th Cir.1989), 883 F.2d 564, which held that actual malice was a component of a retaliatory discharge claim in Illinois and that an insurance policy excluding offenses committed with actual malice necessarily excluded coverage for a retaliatory discharge claim, the circuit court ruled in favor of defendants on the parties' cross-motions for summary judgment. Following the opinion in *Beltmann,* the circuit judge found there could be no insurance coverage for damages involved in a retaliatory discharge action. With no possibility of coverage for the underlying claim, the judge found no duty to defend on the part of defendants.

Dixon appealed the judgment, except as it applied to Commercial, and the appellate court affirmed in part, reversed in part, and remanded. ( 244 Ill.App.3d 837, 183 Ill.Dec. 919, 612 N.E.2d 846.) It summarily upheld the circuit court's ruling granting summary judgment in favor of Hanover and Massachusetts, reasoning that it was clear from their policies that neither included any possibility

of coverage for the tort of retaliatory discharge. ( 244 Ill.App.3d at 841, 183 Ill.Dec. 919, 612 N.E.2d 846.) The appellate court, however, found that the insurance policy issued by International potentially covered the tort of retaliatory discharge. In reaching this determination, the court disagreed with *Beltmann* and held that **\*438** actual malice was not an element of the tort. ( 244 Ill.App.3d at 849, 183 Ill.Dec. 919, 612 N.E.2d 846.) Consequently, International could not rely on the definition of "occurrence" in its policy, which excluded coverage for offenses committed with actual malice, to exclude coverage. The court then went on to consider whether this potential coverage violated public policy. For various reasons, it concluded it did not. ( 244 Ill.App.3d at 850-53, 183 Ill.Dec. 919, 612 N.E.2d 846.) As a result, the appellate court held International breached its duty to defend Dixon in the action. (244 Ill.App.3d at 853-54, 183 Ill.Dec. 919, 612 N.E.2d 846.) While the appeal was pending, the underlying retaliatory discharge action was dismissed pursuant to a settlement agreement. (See 244 Ill.App.3d at 840, 183 Ill.Dec. 919, 612 N.E.2d 846.) The appellate court did not reach the indemnification issue.

We allowed International's petition for leave to appeal (134 Ill.2d R. 315(a)) and, for the reasons that follow, affirm the judgment of the appellate court. The primary issues on appeal are whether, under the terms of International's insurance policy, International owed a duty to defend Dixon against the retaliatory discharge claim, and if so, whether public policy prohibits such coverage. Because the appellate court found Hanover and Massachusetts did not have a duty to defend and Dixon did not appeal this ruling, we are **\*\*398 \*\*\*174** not called upon to decide whether coverage existed under these policies.

DISCUSSION

A. Duty to Defend

[1][2][3] In Illinois, an insurer's duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

the insurance policy. ( *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill.2d 90, 107-08, 180 Ill.Dec. 691, 607 N.E.2d 1204; *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill.2d 64, 73, 161 Ill.Dec. 280, 578 N.E.2d 926.) An insurer's duty to defend arises if the complaint alleges facts that fall within, or potentially **\*439** within, the policy's coverage. ( *Wilkin,* 144 Ill.2d at 73, 161 Ill.Dec. 280, 578 N.E.2d 926; *Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill.2d 23, 52, 112 Ill.Dec. 684, 514 N.E.2d 150.) Refusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the allegations fail to state facts that bring the case within, or potentially within, the policy's coverage. *Wilkin,* 144 Ill.2d at 73, 161 Ill.Dec. 280, 578 N.E.2d 926.

Turning to the policy at issue here, International's policy is a commercial umbrella policy that insures against general liability claims asserted by third parties in excess of the coverage provided by Dixon's general liability insurance carriers. While International's policy is an excess policy, it acts as primary insurance where the claim falls within the policy's coverage, but not under any other primary policy issued to Dixon. Under the policy, coverage is provided for:

   "(a) Bodily Injury Liability,

   (b) Personal Injury Liability,

   (c) Property Damage Liability, or

   (d) Advertising Liability, arising out of an occurrence."

Of the four areas of liability listed, only the category of personal injury liability is relevant to the present appeal. "Personal Injury" is defined as an:

   "injury, such as but not limited to, libel, slander, defamation of character, discrimination, false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or hu-

miliation which occurs during the policy sustained by a natural person, but excluding any such injury included within the definition of advertising liability."

With respect to personal injury, the policy defines "occurrence" as "an offense which results in Personal Injury, other than an offense committed with actual malice or the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured." The policy does not include a definition of actual malice. Finally, the policy also undertakes to provide a defense:

   **\*440** "With respect to any occurrence covered by the terms and conditions of this policy, but not covered, as warranted, by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured, the company shall:

   (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

[4] International first argues that because the complaint alleged that Hanneken's termination was "wilful, intentional and wrongful," actual malice was alleged. Therefore, International contends coverage is excluded under the policy's definition of "occurrence."

While International in its argument focuses on the language of the original complaint, containing the allegations of a willful, intentional and wrongful termination, the original complaint was dismissed, and an amended complaint was filed. The allegations contained in the original complaint are therefore of no relevance, and the focus should be on the allegations in the amended complaint. See *Pfaff v. Chrysler Corp.* (1992), 155 Ill.2d 35, 61, 182 Ill.Dec. 627, 610 N.E.2d 51; see also *Bowman v. County of Lake* (1963), 29 Ill.2d 268, 272, 193

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

N.E.2d 833.

**\*\*399 \*\*\*175** [5] Nowhere in the amended complaint is the term "actual malice" used, nor can actual malice be inferred from the remaining allegations in the complaint. The amended complaint characterized Hanneken's termination as "intentional and in retaliation of and solely for the exercise of [his] rights under the Illinois Worker's Compensation Act." Intentionally means "[t]o do something purposely, and not accidentally." (Black's Law Dictionary 810 (6th ed. 1990).) An act can be done intentionally without being considered done with actual malice. Moreover, included in the definition of personal injury are acts that contain the element of intent. Were **\*441** we to equate intentional conduct with actual malice, coverage for certain intentional conduct would be provided under the definition of personal injury and then be taken away under the definition of occurrence. This would render the definition of personal injury superfluous and would create an ambiguity where none exists. Although ambiguities in an insurance policy will be construed against the insurer, courts will not distort the language of a policy to create an ambiguity where none exists. *Outboard,* 154 Ill.2d at 108-09, 180 Ill.Dec. 691, 607 N.E.2d 1204; *Wilkin,* 144 Ill.2d at 74, 161 Ill.Dec. 280, 578 N.E.2d 926; see *Allstate Insurance Co. v. Boston Whaler, Inc.* (1987), 157 Ill.App.3d 785, 790, 110 Ill.Dec. 149, 510 N.E.2d 1180.

[6] Likewise, the allegation that Hanneken's termination was in retaliation for filing workers' compensation claims cannot be construed to mean actual malice. An essential predicate of a claim for retaliatory discharge is an allegation that the employer's conduct be in retaliation for the employee's activities. The retaliatory nature of the discharge, in this context, does not mean that the discharge was committed with actual malice, but merely that the discharge was causally related to the filing of the workers' compensation claim. (See *Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill.2d 526, 529, 116 Ill.Dec. 694, 519 N.E.2d 909.) Since the allegations in the amended complaint cannot be construed to mean actual malice, they do not fall beyond the scope of the policy's coverage.

[7] International next argues that it did not have a duty to defend Dixon because actual malice is an element of retaliatory discharge. In order to recover under a claim of retaliatory discharge, International maintains, a plaintiff must show the employer acted with actual malice. Therefore, International argues the definition of "occurrence," which excludes coverage for offenses committed with actual malice, excludes coverage for retaliatory discharge. In support of this argument, International cites *Beltmann,* and urges this court to follow our circuit court in adopting *Beltmann* 's analysis.

**\*442** In *Beltmann,* the Seventh Circuit Court of Appeals construed an insurance policy to determine whether it covered the defense of the insured in a retaliatory discharge action. The insurance policy's coverage extended to "personal injury" arising out of an "occurrence." In all relevant aspects, the policy defined these terms the same as International's policy. The insurer in *Beltmann* contended that it had no duty to defend the suit because of the policy provision excluding offenses committed with actual malice.

To resolve this issue, the *Beltmann* court first turned to the language of the policy. Like International's policy, the policy in *Beltmann* failed to define the term "actual malice." Because of Illinois' choice of law, Minnesota law governed the construction of the term since the policy was issued in Minnesota. After reviewing Minnesota case law construing malice, the court concluded:

"Both actual and simple malice require that the defendant acted intentionally with knowledge that her conduct was wrongful. Actual malice entails the further component of an intent on the part of the defendant to injure the plaintiff by the wrongful act, or an affirmative[,] conscious and intentional disregard of the specific consequences which are certain to injure the plaintiff as a result

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

of the wrongful act." *Beltmann,* 883 F.2d at 568.

Because the alleged tort occurred in Illinois and the underlying tort action was filed there, the court turned to Illinois law to determine whether that meaning of actual malice was an element of retaliatory discharge. The *Beltmann* court found that if actual malice existed within the elements of **\*\*400 \*\*\*176** retaliatory discharge it was contained within the second element, which required that the discharge be in retaliation for plaintiff's activities. The court then held that the retaliatory nature of the discharge manifested an intent to injure or harm the plaintiff. Moreover, even if it could be argued that an employer did not intend to harm the employee,**\*443** the employer knowingly disregarded the direct consequences of its improper conduct by improperly discharging the employee, thus falling under the umbrella of actual malice. *Beltmann,* 883 F.2d at 569.

Accordingly, the court found actual malice was subsumed within the elements of a retaliatory discharge claim. While it may not be an independent factor, the *Beltmann* court found that actual malice was proved by satisfying the formal elements of the tort. Because actual malice was a necessary component of retaliatory discharge and the insurance policy expressly excluded from coverage acts committed with actual malice, the court found that the insurance company had no duty to defend or indemnify the named insured. *Beltmann,* 883 F.2d at 569.

[8] We disagree with *Beltmann* 's conclusion that, under Illinois law, once a plaintiff proves that his discharge was in retaliation for exercising a protected right, he has *de facto* proved actual malice. To state a valid claim for retaliatory discharge, a plaintiff must establish that he was (1) discharged, (2) in retaliation for his activities, and (3) that the discharge violated a clear mandate of public policy. ( *Hartlein v. Illinois Power Co.* (1992), 151 Ill.2d 142, 160, 176 Ill.Dec. 22, 601 N.E.2d 720; *Beckman v. Freeman United Coal Mining Co.* (1988), 123 Ill.2d 281, 287, 122 Ill.Dec. 805, 527 N.E.2d 303; *Hinthorn,* 119 Ill.2d at 529, 116 Ill.Dec. 694,

519 N.E.2d 909; *Palmateer v. International Harvester Co.* (1981), 85 Ill.2d 124, 134, 52 Ill.Dec. 13, 421 N.E.2d 876.) As the *Beltmann* court concluded, if actual malice exists, it must be contained within the second element.

[9] Nothing in Illinois case law, however, suggests that actual malice is incorporated within the second element. As we previously noted, the requirement that the discharge be in retaliation for plaintiff's activities merely requires that plaintiff allege the causal relationship between the employee's activities and the discharge. ( *Hinthorn,* 119 Ill.2d at 532, 116 Ill.Dec. 694, 519 N.E.2d 909.) Showing such a causal relationship**\*444** does not require showing the discharge was committed with actual malice. Therefore, we find actual malice is not an element of a retaliatory discharge claim.

International, however, contends a finding that actual malice is not an element of retaliatory discharge is inconsistent with this court's ruling in *Kelsay v. Motorola, Inc.* (1978), 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, that punitive damages should be considered in the basic retaliatory discharge action. Since International argues it would be impossible to make out a retaliatory discharge case without proving one of the elements necessary to obtain punitive damages, International maintains actual malice is *de facto* proven in every retaliatory discharge case.

The fundamental flaw in International's argument is the assumption that punitive damages are required in every retaliatory discharge action. In *Kelsay,* this court permitted punitive damages to be awarded in cases of retaliatory discharge, but only "[u]nder such circumstances, when the facts permit." ( *Kelsay,* 74 Ill.2d at 187, 23 Ill.Dec. 559, 384 N.E.2d 353.) Neither *Kelsay* nor any other case mandate a punitive damages award. Evidence may be sufficient to support a finding of an employer's impermissible conduct, based upon evidence of a causal connection between the discharge and an employee's activities, but not support the level of conduct necessary to sustain an award of punitive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

damages. Permitting punitive damages in retaliatory discharge actions affects only the damages available in the case. It does not affect the cause of action itself or make an award of punitive damages a necessary consequence of the tort. Therefore, no inconsistency results in a finding that the tort of retaliatory discharge does not contain an element of actual malice, but to recover punitive damages, actual malice or a sufficient level of wilful and wanton conduct must be shown.

**\*\*401 \*\*\*177 \*445** B. Violation of Public Policy

[10] International makes the additional argument that if we determine, as we have, that Hanneken's claim of retaliatory discharge potentially falls within the coverage of its policy that such coverage violates public policy. It contends that since *Kelsay* found acts of retaliatory discharge offend public policy, insurance coverage against that offense must also violate public policy. It further argues that such coverage is against public policy because it insures against intentional misconduct. In making this argument, International primarily relies on *Rubenstein Lumber Co. v. Aetna Life & Casualty Co.* (1984), 122 Ill.App.3d 717, 78 Ill.Dec. 541, 462 N.E.2d 660.

In *Rubenstein*, the appellate court considered whether a workers' compensation insurance policy provided coverage for the defense of a retaliatory discharge action. After finding that the language of the insurance policy did not cover such an action, the court stated in *dictum:*

"Moreover, even if the policy was written to expressly require defendant to defend and indemnify plaintiff in the retaliatory discharge action, we believe that such a provision would be void as against public policy, for it would be an attempt to indemnify and insure the company for damages resulting from its voluntary misconduct. An agreement to indemnify or insure against one's voluntary, not accidental, misconduct is against public policy and unenforceable. See *Davis v. Commonwealth Edison Co.* (1975), 61 Ill.2d 494, 500-01, 336 N.E.2d 881 \* \* \*." *Rubenstein,* 122

Ill.App.3d at 719, 78 Ill.Dec. 541, 462 N.E.2d 660.

At the outset, we note that the statement in *Rubenstein* to which International relies is *dictum.* Moreover, *Davis* does not support the proposition attributed to it in *Rubenstein* that insurance agreements indemnifying an insured for voluntary misconduct are against public policy. Although *Davis* states that an agreement to indemnify against wilful misconduct, would as a general rule, be contrary to public policy, the authority it cites **\*446** for this proposition only prohibits a party from exempting oneself from tort liability for harm caused intentionally. Therefore, the agreement in *Davis* must have been seen by the court as exempting a party from liability, and does not support a rule prohibiting an agreement by a third person to indemnify a party against liability in tort. See *Davis v. Commonwealth Edison Co.* (1975), 61 Ill.2d 494, 500-01, 336 N.E.2d 881; Restatement (Second) of Contracts § 195, Comment *b,* at 66; 6A A. Corbin, Corbin on Contracts § 1472, at 146 (Supp.1993); 15 S. Williston, Contracts § 1750A (3d ed. 1972).

[11] While *Rubenstein* does not support International's argument, we recognize that it is generally held that a contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy and courts will not enforce such a contract. (See 9 Couch on Insurance 2d § 39:15 (M. Rhodes rev. 1985); 6B J. Appleman & J. Appleman, Insurance Law & Practice § 4252, at 5 (1979); *Solo Cup Co. v. Federal Insurance Co.* (7th Cir.1980), 619 F.2d 1178, 1187; *Hartford Life Insurance Co. v. Title Guarantee Co.* (D.C.Cir.1975), 520 F.2d 1170, 1175; *Industrial Sugars, Inc. v. Standard Accident Insurance Co.* (7th Cir.1964), 338 F.2d 673, 676; *Northwestern National Casualty Co. v. McNulty* (5th Cir.1962), 307 F.2d 432, 442; *Isenhart v. General Casualty Co. of America* (1962), 233 Or. 49, 53, 377 P.2d 26, 27.) Other than the *dictum* in *Rubenstein,* International, however, does not cite any Illinois case, statute or legislative directive spe-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-54   Filed 11/01/11   Page 22 of 36

641 N.E.2d 395                                                                                                                          Page 9
161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261
**(Cite as: 161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171)**

cifically holding that providing insurance coverage against liability for injuries resulting from intentional acts is void as against the public policy of Illinois, nor does it advance any arguments for us to find that it does. (See *University of Illinois v. Continental Casualty Co.* (1992), 234 Ill.App.3d 340, 359, 175 Ill.Dec. 324, 599 N.E.2d 1338 (finding there is no Illinois public policy prohibiting insuring for damages caused by **\*447** one's intentional acts, except to the extent that the insured wrongdoer may not be the person who recovers the policy proceeds).) In the absence of clearly articulated arguments or authority, we decline to adopt the public policy against insuring for damages resulting from intentional misconduct here.   Therefore,**\*\*402 \*\*\*178** we conclude that interpreting International's policy as providing coverage against retaliatory discharge claims does not violate any established public policy of this State. Further, we do not believe that allowing insurance coverage for retaliatory discharge will undermine the recognition of the tort of retaliatory discharge established in *Kelsay.*

### C. Violation of a Penal Statute

[12] Finally, International argues that retaliatory discharge is not a covered "occurrence" because it involves the "willful violation of a penal statute." Because International did not argue that retaliatory discharge is a "willful violation of a penal statute" when Dixon raised that argument in the appellate court, International has waived the argument here. See *Hammond v. North American Asbestos Corp.* (1983), 97 Ill.2d 195, 209-10, 73 Ill.Dec. 350, 454 N.E.2d 210.

### CONCLUSION

For the foregoing reasons, we conclude that the retaliatory discharge action potentially falls within the coverage of International's policy. As a result, International breached its duty to defend, as stated in the policy, by refusing to defend Dixon. The judgment of the appellate court is therefore affirmed.

*Affirmed.*

Ill.,1994.
Dixon Distributing Co. v. Hanover Ins. Co.
161 Ill.2d 433, 641 N.E.2d 395, 204 Ill.Dec. 171, 9 IER Cases 1261

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Caution
As of: Sep 09, 2011

IN THE MATTER OF HORIZON VESSELS, INC., AS OWNER, and HORIZON
OFFSHORE CONTRACTORS, INC., HORIZON OFFSHORE, INC., and TEXAS
OFFSHORE CONTRACTORS CORP., AS OWNERS, OPERATORS, OWNERS
PRO HAC VICE, of the L/B GULF HORIZON, PRAYING FOR EXONERATION
FROM OR LIMITATION OF LIABILITY REGARDING THE INCIDENT OF
FEBRUARY 27, 2003

CIVIL NO. H-03-3280

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION

*2005 U.S. Dist. LEXIS 42110*

**November 18, 2005, Filed**

**SUBSEQUENT HISTORY:** Affirmed in part and modified in part by, Adopted by, in part, Request denied by *In re Horizon Vessels, Inc., 2005 U.S. Dist. LEXIS 42117 (S.D. Tex., Dec. 22, 2005)*

**COUNSEL:** [*1] For Horizon Vessels Inc, In the Matter of Horizon Vessels Inc, as owner, and Horizon Offshore Contractors, Inc., Horizon Offshore, Inc., and Texas Offshore Contractors Corp., as Owners Operators, Owners Pro Hac Vice, of the L/B Gulf Horizon, Horizon Offshore Contractors Inc, Texas Offshore Contractors Corp, Horizon Offshore Inc, Plaintiffs: Charles A Cerise, Jr, Adams Reese LLP, New Orleans, LA; Daryl G Dursum, Adams and Reese, LLP, Houston, TX; Edwin C Laizer, Attorney at Law, New Orleans, LA.

For Iroquois Gas Transmission System LP, Defendant: Michael Burke Hughes, McLeod Alexander Powel & Apffel, Galveston, TX; Richard V Singleton, Healy & Baillie LLP, New York, NY.

For The Power Authority of the State of New York, Long Island Lighting Company doing business as LIPA, Claimants: James H Hohenstein, u, Holland Knight LLP, New York, NY; Mark Cohen, Richard Lee Gorman, Cohen Gorman et al, Houston, TX; Vincent J Foley, Holland Knight, New York, NY.

For Iroquois Gas Transmission System LP, Claimant: Michael Burke Hughes, McLeod Alexander Powel & Apffel, Galveston, TX; Richard V Singleton, Healy & Baillie LLP, New York, NY.

For Thales GeoSolutions Inc, Claimant: Alan [*2] F Kaufman, Amie S Murphy, Brendan E Zahner, John P Doherty, John M Woods, Thacher Proffitt et al, New York, NY; R Laurence Macon, Akin Gump Strauss Hauer & Feld, LLP, San Antonio, TX.

For Factory Mutual Insurance Company, Claimant: Mark Cohen, Richard Lee Gorman, Cohen Gorman et al, Houston, TX; Robert F Cossolini, Budd Larner PC, Short

Hills, NJ; Robert B Meola, Budd Larner, Short Hills, NJ.

For Iroquois Gas Transmission Systems, L.P., Iroquois Gas Transmission Systems, L.P., Claimant: Michael Burke Hughes, McLeod Alexander Powel & Apffel, Galveston, TX; Richard V Singleton, Healy & Baillie LLP, New York, NY.

For Thales Geosolutions Inc, Counter Claimant: Alan F Kaufman, Amie S Murphy, Brendan E Zahner, John P Doherty, John M Woods, Thacher Proffitt et al, New York, NY; R Laurence Macon, Akin Gump Strauss Hauer & Feld, LLP, San Antonio, TX.

For Horizon Vessels Inc, Horizon Offshore Contractors Inc, Texas Offshore Contractors Corp, Horizon Offshore Inc, Counter Defendants: Charles A Cerise, Jr, Adams Reese LLP, New Orleans, LA; Daryl G Dursum, Adams and Reese, LLP, Houston, TX; Edwin C Laizer, Attorney at Law, New Orleans, LA.

For Horizon Vessels Inc, Horizon [*3] Offshore Contractors Inc, Texas Offshore Contractors Corp, Horizon Offshore Inc, Counter Claimants: Charles A Cerise, Jr, Adams Reese LLP, New Orleans, LA; Daryl G Dursum, Adams and Reese, LLP, Houston, TX; Edwin C Laizer, Attorney at Law, New Orleans, LA.

For Thales Geosolutions Inc, Counter Defendant: Alan F Kaufman, Amie S Murphy, Brendan E Zahner, John P Doherty, John M Woods, Thacher Proffitt et al, New York, NY; R Laurence Macon, Akin Gump Strauss Hauer & Feld, LLP, San Antonio, TX.

For Iroquois Gas Transmission System LP, Counter Defendant: Richard V Singleton, Richard V Singleton, Healy & Baillie LLP, New York, NY.

For Thales GeoSolutions Inc, Cross Defendant: Brendan E Zahner, Thacher Proffitt et al, New York, NY.

For Thales GeoSolutions Inc, Cross Claimant: Brendan E Zahner, Thacher Proffitt et al, New York, NY.

**JUDGES:** Nancy K. Johnson, United States Magistrate Judge.

**OPINION BY:** Nancy K. Johnson

**OPINION**

**MEMORANDUM, RECOMMENDATION AND ORDER**

Presently pending before the court [1] is the motion of Horizon Vessels, Inc., Horizon Offshore Contractors, Inc., Horizon Offshore, Inc., and Texas Offshore Contractors Corp. (collectively "Horizon") for partial summary [*4] judgment against Thales Geosolutions, Inc. ("Thales") [2], Thales' cross motion for summary judgment against Horizon [3], Thales' motion for a continuance of Horizon's motion for partial summary judgment [4], and Thales' motion for leave to file a third-party action against North Bank Towing Corporation ("North Bank"). [5] The court has reviewed the motions, all relevant filings by the parties, and the applicable law. After doing so, the court **RECOMMENDS** that Horizon's motion for partial summary judgment be **GRANTED IN PART AND DENIED IN PART** and that Thales' motion for summary judgment be **DENIED**. The court further **DENIES** Thales' motion for continuance and Thales' motion for leave to file a third-party action against North Bank.

1   This case was referred to the undersigned magistrate judge pursuant to *28 U.S.C. § 636(b)(1)(A) and (B)*, the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and *Federal Rule of Civil Procedure 72. See* Docket Entry No. 16.
2   Docket Entry No. 121.
3   Docket Entry No. 133.

[*5]

4   Docket Entry No. 132.
5   Docket Entry No. 150.

**I. Case Background**

The court previously set out the factual backdrop of this case in its Order denying two motions to transfer venue and its Order denying the motion of the Power Authority of the State of New York ("NYPA") and Factory Mutual Insurance Company ("FMIC") for partial summary judgment (liability) against Iroquois Gas Transmission Systems, L.P. ("Iroquois"). [6] Nevertheless, a brief summary is warranted here for the sake of clarity.

6   Docket Entry Nos. 77, 107.

In April 2002, Iroquois hired Horizon to serve as the general contractor for the Eastchester Extension Project

(the "Project"). [7] The Project called for the construction of an extension to an existing sub-sea gas pipeline that extended from North Port on Long Island, New York, through the Long Island Sound, to an area adjacent to the border between Westchester and Bronx Counties. [8] On January 8, 1999, Horizon [*6] entered into "Master Service Agreement No. 9803083" (the "MSA") with Racal NCS, Inc. ("Racal"). [9] Pursuant to the MSA, Racal agreed to perform pre-installation work and to act as the positioning surveyor for the Project. [10] Racal also agreed to perform this work as an independent contractor. [11] In that respect, the MSA states that Horizon did not have the "right or authority to supervise or give instructions to the employees, agents, or representatives of [Racal]" and that "such employees, agents or representatives at all times shall be under the direct and sole supervision of [Racal]." [12] Subsequent to the execution of the MSA, Racal changed its name to Thales. [13]

7  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 3, Affidavit of David A. Kyle, ¶¶ 1-2.

8  *See* Exhibits to Claimant Thales Geosolutions, Inc.'s Opposition to Petitioner's Motion for Partial Summary Judgment Against Thales and Cross-Motion for Summary Judgment ("Thales' Cross-Motion"), Docket Entry No. 131, Ex. B to the Sworn Affidavit of John P. Doherty, Survey Procedure.

[*7]

9  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 1, MSA.

10  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 3, Affidavit of David A. Kyle, P 9.

11  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 1, MSA.

12  *Id.*

13  *See* Petitioner's Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 2, letter agreement substituting Thales for Racal NCS, Inc., as the proper party to the MSA. This change was made effective on April 12, 2001.

On October 22, 2002, Horizon issued to Thales the

Survey Procedure for the Project, the purpose of which was to provide Thales with its "scope of work" for the Project. [14] The Survey Procedure expressly stated that the information supplied by Horizon superseded all Thales documentation relating to the Project. [15] It further sets forth Thales' survey positioning expectations for the Project, [*8] as follows:

**4.3 Normal Laying**

During Pipelay operations, the survey positioning requirements for the Thales personnel comprises all aspects of positioning the lay barge, anchor handling and the pipelay process, including the following:

. Control and log the drop and recovery positions of all lay barge anchors, lay down heads, etc[.], ensuring that anchors are not laid within the 'safety zone' of any pipeline, cable or any other hazard. . . .

. Monitor closely all barge and anchor handling tug/vessel positions, especially during critical operations. Record positions of anodes, field joints.

. Supply positioning information to barge winch operators and anchor handling-tugs/vessels.

. Inform barge staff of the approach of any crossings, boundaries, and any other known hazards and obstructions.

. Record accurately the times of all events (whether routine or critical) as they occur. [16]

This provision unambiguously imposes upon Thales an obligation to be involved in certain aspects of anchor-handling, including, but not limited to, logging and controlling the drop and recovery positions of the anchors on the Project, monitoring the positions [*9] of the anchor-handling vessels on the Project, and supplying positioning information to the barge winch operator and the anchor-handling tugs and vessels. [17]

14  *See* Exhibits to Thales' Cross-Motion, Docket

Case 2:10-md-02179-CJB-DPC   Document 4457-54   Filed 11/01/11   Page 26 of 36

Page 4
2005 U.S. Dist. LEXIS 42110, *9

Entry No. 131, Ex. B to the Sworn Affidavit of John P. Doherty, Survey Procedure, § 1.4.

15  *Id.*

16  *Id.* at § 4.3.

17  *Id.* 4

In order to complete its work on the Project, Horizon utilized the GULF HORIZON to install and cover the pipeline under the seabed. [18] The GULF HORIZON required the use of anchors and two tugboats, the MISS JESSICA and KRISTINA A., to assist her in moving along the pipeline route. [19] On February 27, 2003, during a trip down the pipeline route, the GULF HORIZON allegedly dragged an anchor more than 1,000 feet and damaged the "Y-49 Cable" that was owned by the NYPA. [20] Earlier that evening, Horizon dropped a 30,000 pound central port ("CPI") anchor beyond the NYPA cables. [21] The tensionometer on the CPI anchor was not working at that time. [22] The [*10] GULF HORIZON began to turn left as it moved along the pipeline route until, at approximately 8:11 p.m., the GULF HORIZON'S P2 anchor cable broke due to excessive tension on its anchor wire. [23] At 9:41 p.m., the Y-49 Cable had tripped off-line. [24] At 11:58 p.m., the NYPA electric systems operator informed the NYPA representative onboard the GULF HORIZON that the NYPA cable tripped off-line earlier that evening. [25]

18  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 3, Affidavit of David A. Kyle, P 4.

19  *Id.* at PP 4-5.

20  *See* Thales' Cross-Motion, Docket Entry No. 133, p. 4.

21  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. D to the Sworn Affidavit of John P. Doherty, Sworn Affidavit of Mark Dreyer, P 22.

22  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. L to the Sworn Affidavit of John P. Doherty, Iroquois Incident Report, § 4.0.

23  *Id.* at § 2.0.

24  *Id.*

25  *Id.*

[*11] Horizon filed this action seeking exoneration from or, alternatively, limitation of liability with respect to the cable strike incident. [26] On April 29, 2005, Horizon filed a motion for summary judgment against Thales

seeking indemnification for the damages associated with the cable strike incident pursuant to an indemnification provision in the MSA. [27] On June 13, 2005, Thales filed its response and cross-motion for summary judgment. [28]

26  Docket Entry No. 1.

27  Docket Entry No. 121.

28  Docket Entry No. 131.

## II. Summary Judgment Standard

A grant of summary judgment under the federal rules is proper only when the evidence before the court fails to raise any genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving [*12] party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *TIG Ins. Co. v. Sedgwick James of Washington, 276 F.3d 754, 759 (5th Cir. 2002)*.

The movant bears the initial burden of informing the court of the basis for a grant of summary judgment by identifying relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, and affidavits on file that demonstrate the absence of a genuine issue of material fact. *Fed. R. Civ. P. 56(c)*; *Celotex Corp., 477 U.S. at 323*; *Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992)*. Upon a showing that there is an absence of evidence to support an essential element of the non-movant's cause, the burden shifts to the non-movant to produce evidence demonstrating that a genuine issue of material fact does exist which must be resolved by a trier of fact. *Fed. R. Civ. P. 56(e)*; *Celotex, 477 U.S. at 324*. To satisfy this burden, the non-movant's evidence must raise more than mere "metaphysical doubt" about the material facts. *Thomas v. Great Atl. and Pac. Tea Co., 233 F.3d 326, 331 (5th Cir. 2000)*. [*13] Therefore, the non-movant's conclusory allegations, unsubstantiated assertions, improbable inferences, and speculation are insufficient to raise a fact issue for trial. *Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)*. When determining whether the evidence in the record creates a fact issue, the court resolves all doubts and views all reasonable inferences drawn from the evidence in favor of the non-movant. *Liberty Lobby, 477 U.S. at 255*; *Boston Old Colony Ins. Co. v. Tiner Assocs., Inc., 288 F.3d 222, 227 (5th Cir. 2002)*.

## III. Analysis

Horizon argues that it is entitled to summary judgment on its counterclaim for indemnification against Thales. Horizon contends the indemnification clause in the MSA requires Thales to indemnify and defend Horizon and Iroquois for any "third-party property damage claims that are incident to or connected with the performance of Thales' work under the contract, the breach thereof, or the presence of Thales' personnel and equipment at the location and work site, regardless of fault." [29] According to Horizon, this provision clearly and unambiguously requires Thales to indemnify, defend [*14] and hold harmless Horizon and Iroquois for all damages resulting from the February 27, 2003, incident. [30] In response, Thales contends that it has no obligation to defend or indemnify Horizon or Iroquois because 1) Thales' work did not cause or contribute and was not otherwise incident to or connected with the cable strike incident; and 2) even if it was, Horizon is solely responsible for the damage associated with the incident because it acted recklessly in anchoring the barge, in failing to monitor its dragging anchor and in failing to ensure that the winch tensionometers of the CPI anchor were properly functioning. [31]

[29] *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, pp. 12-13.

[30] *Id.*

[31] *See* Thales' Cross-Motion, Docket Entry No. 133.

### A. *The MSA's Indemnification Clause*

Thales' indemnity obligations are set forth as follows in Paragraph 7.2 of the MSA:

SUBCONTRACTOR SHALL BE LIABLE IN ANY CASE OF [*15] ILLNESS, INJURY OR DEATH TO EMPLOYEES AND OTHER PERSONNEL OF SUBCONTRACTOR OR ITS CONTRACTORS OR SUBCONTRACTORS [OF] ANY TIER OR IN ANY CASE OF LOSS OR LOSS OF USE OR DAMAGE TO ITS OR THEIR EQUIPMENT OR OTHER PROPERTY OR PROPERTY OF THIRD PARTIES. SUBCONTRACTOR SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS COMPANY FROM AND AGAINST ANY LOSS, COST, CLAIM, OBLIGATION TO INDEMNIFY ANOTHER, LIABILITY, SUIT, JUDGMENT, AWARD OR DAMAGE, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENSES, ON ACCOUNT OF SUCH ILLNESS, INJURY, DEATH, LOSS OR DAMAGE, OR FOR REMOVAL OF WRECK OR DEBRIS WHETHER OR NOT COMPULSORY BY LAW, OR FOR POLLUTION CAUSED BY SUBCONTRACTOR'S PERFORMANCE OF THE WORK OR EMANATING FROM SUBCONTRACTOR'S EQUIPMENT, WHICH ARE INCIDENT TO OR CONNECTED WITH THE PERFORMANCE OF THE WORK UNDER THIS AGREEMENT OR BREACH HEREOF OR THE PRESENCE OF EMPLOYEES, VESSELS, OR EQUIPMENT AT ANY WORKSITE OR LOCATION OR TRANSPORTATION THEREOF TO OR FROM ANY WORKSITE OR LOCATION, REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO BY NEGLIGENCE OR OTHER FAULT (INCLUDING SOLE, JOINT, CONCURRENT OR GROSS NEGLIGENCE) [OF] ANY OF THE PARTIES INDEMNIFIED HEREIN OR THEIR CONTRACTORS OR SUBCONTRACTORS OF ANY [*16] TIER OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY, DEFECT IN PREMISES, MATERIALS, OR EQUIPMENT, "RUIN", OR THE UNSEAWORTHINESS OR OTHER FAULT OF ANY VESSEL, OR DEFECT IN ANY PREMISES, MATERIAL, OR EQUIPMENT, OR ANY OTHER ANTICIPATED OR UNANTICIPATED EVENT OR CONDITION, AND REGARDLESS OF WHETHER PRE-EXISTING THE EXECUTION OF THIS AGREEMENT. AS USED

HEREIN, "COMPANY" SHALL MEAN COLLECTIVELY COMPANY, ITS SUBSIDIARIES, AFFILIATES, AND INTERRELATED COMPANIES, AND THEIR CUSTOMERS AND THEIR JOINT VENTURERS AND CO-LESSEES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND UNDERWRITERS, AND ANY AND ALL VESSELS OWNED, CHARTERED, MANAGED, OR OPERATED BY ANY OF THE FOREGOING. THE PARTIES INDEMNIFIED HEREIN SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY INDEMNIFIED CLAIMS AT THEIR OWN EXPENSE. [32]

This clause unambiguously requires Thales to defend and indemnify Horizon and its customers for property damage claims that are incident to or connected with Thales' work under the MSA or the presence of Thales' employees at the work site. Horizon argues that this provision makes Thales responsible for the damages arising from the February 2003 cable [*17] strike incident. [33] The court agrees.

> [32] *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 1, MSA, P 7.2.
>
> [33] *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, p.13.

The plain language of the indemnity provision requires Thales to indemnify Horizon only in the event that the claims asserted against Horizon are incident to or connected with Thales' work on the Project. The Fifth Circuit has consistently broadly construed language, such as "in connection with", "incident to" and "arising under," in the context of indemnity agreements. *See Fontenot v. Mesa Petroleum Co., 791 F.2d 1207 (5th Cir. 1986)*. In fact, the *Fontenot* court cites to a "long line of Fifth Circuit decisions" that have implemented this broad construction. *Id. at 1214*. By way of example, in *Hobbs v. Teledyne Movible Offshore, Inc., 632 F.2d 1238 (5th Cir. 1980)*, [*18] the court held that an injury sustained by a contractor's employee while being transported by a crane from the drilling rig to the crew boat "arose out of" the contractor's performance of its drilling services contract.

In *Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817 (5th Cir. 1975)*, the court held that an injury to a subcontractor's roustabout occurred "in connection with" the subcontractor's performance of its work even though the activity that caused the injury was not related to the subcontractor's duties and occurred outside of the premises described by the subcontractor's work orders. Horizon contends that Thales' work is clearly connected to the cable strike incident, particularly if this broad construction applies.

In its cross-motion, Thales argues that this court should follow the Fifth Circuit's reasoning in *Marathon Pipe Line Co. v. M/V SEAL LEVEL II, 806 F.2d 585 (5th Cir. 1986)*, where the court appears to apply a more narrow construction to the "in connection with" language. In *Marathon Pipe Line*, Oceanonics, a survey company, was hired to locate and mark submerged pipelines in connection with a maritime construction [*19] project. *Id. at 587*. The captain of the vessel assisting with the project decided to reposition the vessel and asked an Oceanonics employee to verify the position of one of the buoys. *Id.* The Oceanonics employee advised against dropping the anchor less than 1,000 feet away from the pipeline. *Id. at 587-88*. The captain chose to ignore this advice and, instead, dropped the anchor an estimated 400 feet away from the pipeline. *Id.* The anchor subsequently damaged the pipeline. *Id.*

The vessel owner sought indemnity from Oceanonics pursuant to an indemnity clause in the parties' contract. *Id. at 590*. The provision required Oceanonics to indemnify the vessel owner for any "loss of property occurring in connection with, arising out of, or in any wise incident or related to Contractor's [Oceanonics'] performing services and operations under this Contract, regardless of whether caused by negligence of Company, and/or Primary Contractor, and/or contractors or subcontractors of either of said parties; . . . ." *Id. at 590-91*. The court made clear that a contractor could not be required to "protect other subcontractors [*20] from their own negligence when that negligence was independent of the performance of [contractor's] contract." [34] The court further held that the limit of a contractor's potential liability extends only to accidents that might occur during the contractor's performance of its contractual services. *Id. at 591*. Thus, the court appears to restrict the reach of the in connection with language to cover incidents that might occur during the contractor's performance of its contractual services.

34   *Id.*

In light of the applicable Fifth Circuit precedent set forth above, to prevail in its motion for summary judgment, Horizon must proffer sufficient evidence to show that the damage to the NYPA cable occurred in connection with Thales' work on the Project. To that end, Horizon argues in its motion that the damage relating to the accident "is directly connected with the performance of Thales' work under the contact" because "it is alleged to have been caused by one of the anchors of the L/B GULF HORIZON [*21] coming into contact with the cable while Thales was serving as the positioning surveyor for the barge and its anchors pursuant to the MSA." [35]

35   *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, p. 14.

### B. *Thales' Scope of Work on the Project*

The court agrees with Horizon that the alleged incident occurred in connection with Thales' work on the Project. The Survey Procedure, which Horizon distributed to Thales, expressly states that its purpose is "to describe the specific survey methods and procedure to fulfill the scope of work" on the Project. [36] Section 4.3 of the Survey Procedure makes Thales responsible for, among other things, controlling and logging the drop and recovery positions of the anchors, monitoring the barge and anchor-handling tug/vessel positions, supplying positioning information to the barge winch operators and anchor-handling vessels/tugs, and informing barge staff of the approach to any crossings, boundaries, [*22] and any known hazards and obstructions. [37] Even under *Marathon Pipe Line's* more narrow construction of the "in connection with" language, the damage to the NYPA cable occurred well within Thales' scope of work for the Project and, thus, was connected with the performance of Thales' work on the Project.

36   *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. B to the Sworn Affidavit of John P. Doherty, Survey Procedure, § 1.4.
37   *Id.* at § 4.3.

In addition to submitting the Survey Procedure into evidence, Horizon argues that Thales was responsible for "providing the positioning and survey information necessary for the safe placement and recovery of the anchors of the various vessels." [38] This task included monitoring the positions of the vessels and their anchors and notifying GULF HORIZON personnel of any obstructions located in the areas where work was being performed. [39] Horizon further argues that Thales' survey/positioning personnel and equipment were aboard the barge and [*23] the anchor-handling tugs at the time of the accident. [40] Finally, Horizon notes that Thales agreed to defend and indemnify Horizon and Iroquois in a separate anchor/cable damage action relating to this Project and involving the same indemnification provision. [41]

38   *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, p.10. Horizon refers to the Survey Procedure as the technical procedures for the Project.
39   *Id.*
40   *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, p. 14.
41   *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, p. 16. Thales acknowledges that it agreed to defend and indemnify Horizon and Iroquois with respect to another cable strike incident that occurred in November 2002. *See* Thales' Cross-Motion, Docket Entry No. 133, p. 16, n.5. However, Thales argues that, with respect to that action, Thales admitted liability solely because the vessel placed an anchor in the middle of another cable field in violation of project guidelines and Thales' survey system failed to depict the cables. *Id.* Thus, Thales contends that the facts of this case are materially different.

[*24] Thales argues that its scope of work on the Project was more limited than the guidelines set out in the Survey Procedure. Specifically, in his affidavit, Thales surveyor, Mark Dreyer ("Dreyer") asserts that Thales' was solely responsible for ensuring that: 1) its survey equipment, which consisted of a computer and other electronic equipment, was in proper working order; 2) its surveyor would identify and monitor the position and heading of Horizon's barge, the GULF HORIZON, on a continuous basis; 3) its surveyor would operate and maintain the Thales computer system in the GULF HORIZON tower; 4) its surveyor would calculate

proposed anchor drop locations based on the data provided by the Horizon anchor foreman and display those positions on the computer screen; and 5) its surveyor would record the positions where anchors were dropped and recovered. [42]

> 42  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. D to the Sworn Affidavit of John P. Doherty, Sworn Affidavit of Mark Dreyer, 1! 9-13. In his affidavit, Mark Dreyer ("Dreyer") explains that the Thales survey system could display several types of data onto a computer screen, including, but not limited to, "(1) the positions of the GULF HORIZON and her support tug boats in the Long Island Sound in real time; (2) the locations where the GULF HORIZON'S anchors had been dropped and proposed anchor drops; (3) the pipeline route; and (4) the features of the sea floor in the pipeline corridor, like boulders, shipwrecks, and power cables." *Id.* at P 10.

[*25] In addition, Dreyer surmised that Horizon had the ability to monitor the anchor locations on the date of the incident, in that at least four Thales monitors were located in the GULF HORIZON tower that day. [43] Dreyer recounts that Walter Dunham ("Dunham"), the Horizon anchor foreman, Tony Doyle ("Doyle") and Don Ramsey ("Ramsey"), the Horizon anchor winch operators, and Glen Chaffey ("Chaffey"), the Iroquois surveyor, all had access to a Thales survey monitor. [44] These monitors were located at the Thales surveyors' work station, the Horizon anchor foreman's work station, the winch operators' work station and the plow operators' work station. [45] Dreyer testified there were also additional Thales computer monitors located in the bridges of the tugs. [46]

> 43  *Id.*
> 44  *Id.* at P 19.
> 45  *Id.* at P 10.
> 46  *Id.*

Thales offers further evidence that its scope of work on the Project was restricted to surveying the location for anchor pick up and drop locations. First, Thales introduces the [*26] deposition of Michael Ballard ("Ballard"), the Construction Manager for the Project. [47] He testifies that not only were Thales' obligations with respect to the Project limited to monitoring the pick up and drop locations of the anchors, but that the anchor

foreman was the individual on the GULF HORIZON who was primarily responsible for monitoring anchor relocation. [48] Thomas Rybarski, one of the investigators who prepared the cable strike incident report, likewise testifies that Thales was not capable of tracking the position of the anchors via its survey monitors and, thus, could not have possibly determined whether the anchors were dragging that day. [49] In addition, Thales introduces Horizon's Anchor/Mooring Procedures, which provide that the tower foreman was "responsible for all anchor-handling activities". [50] These procedures likewise provide that the anchor operators were responsible for operating the anchor winches; monitoring anchor positions relative to the GULF HORIZON via tension meters, footage counters and survey positions; and advising the tower foreman of extraordinary anchor requirements or any problems with the holding station or barge movement. [51] It is noteworthy [*27] that the Horizon Anchoring/Mooring procedures make the surveyor, Thales in this instance, responsible for advising the tower foreman when approaching avoidance targets, logging all anchor drop and recovery systems, assuring compliance with the anchor drop position and assuring compliance with the "no anchor" zones. [52] In other words, even these procedures impose upon Thales an obligation to ensure that the GULF HORIZON's anchors were properly handled.

> 47  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. G to the Sworn Affidavit of John P. Doherty, Deposition of Michael Ballard, and Ex. B, Survey Procedure, § 1.4.
> 48  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. G to the Sworn Affidavit of John P. Doherty, Deposition of Michael Ballard, pp. 225-26.
> 49  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. J to the Sworn Affidavit of John P. Doherty, Deposition of Thomas Rybarski, pp. 233-34.
> 50  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. H to the Sworn Affidavit of John P. Doherty, Horizon's Anchor/Mooring Procedures, Appendix
> [*28]
> 51  *Id.*
> 52  *Id.*

Thales further contends its personnel did not: 1) supervise or control anchoring operations; 2) decide

where anchors should be placed; 3) operate the anchor winches or otherwise maintain the anchor equipment; 4) have the authority to order that an anchor be dropped or retrieved; 5) oversee or approve anchor recovery or otherwise provide advice regarding when an anchor should be recovered; or 6) have the obligation to know when an anchor was dragging or holding. [53] In fact, Thales asserts it "did not have any specific responsibilities in connection with recovering GULF HORIZON's anchors, other than to record the position of the [GULF] HORIZON tug retrieving that anchor." [54] Despite Thales' repeated contentions that the cable strike incident was not related to its work on the Project, the court finds that Thales was required to adhere to its scope of work as defined by the Survey Procedure for the Project. The Survey Procedure unambiguously required Thales to take responsibility for certain aspects of anchor-handling on the GULF HORIZON. Thus, the damage to the [*29] NYPA cable occurred in connection with or was otherwise incident to Thales' work on the Project.

53  See Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. D to the Sworn Affidavit of John P. Doherty, PP 14-18.

54  Id. at P 15.

### C. The Indemnification Provision in the MSA Requires Thales to Indemnify Horizon For Horizon's Sole Negligence

Thales argues that it should not be obligated to indemnify Horizon because Horizon was solely responsible for the cable strike incident. First, Thales notes that the tensionometer of the CP1 anchor, which gauges the tension on an anchor wire and is used to determine whether the anchor is holding or dragging, was not properly functioning at the time of the alleged incident. [55] Thales further argues that Horizon should have been on notice that the CP1 anchor could potentially drag because the GULF HORIZON's anchors had dragged repeatedly on the date of the alleged incident. [56]

55  See Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. E to the Sworn Affidavit of John P. Doherty, Deposition of Larry Blalock, pp. 173-75.

[*30]

56  See Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. D to the Sworn Affidavit of

John P. Doherty, Sworn Affidavit of Mark Dreyer, P 20.

According to Thales, Horizon had an obligation to monitor the location of the anchor between the time that it was placed on the seabed and the time that it was recovered. Thales argues that it properly recorded the location for the placement of the CP1 anchor and that this location was approved by both the Horizon anchor foreman and the Iroquois surveyor. [57] Subsequent to that point, Horizon's anchor foreman and winch operators had access to Thales' monitoring devices at all times and failed to notice the dragging CP1 anchor. [58] Thales contends that this failure to monitor the anchors makes Horizon solely responsible for the cable strike incident. [59]

57  Id. at P 22.

58  Id. at P 19.

59  See Thales' Cross-Motion, Docket Entry No. 133, pp. 10-11.

[*31] Thales submits Dreyer's affidavit in support of its argument that Horizon had sole control of the GULF HORIZON and its anchors. In his affidavit, Dreyer testifies that, at approximately 9:52 p.m., he heard the Horizon anchor foreman, Dunham, order the MISS JESSICA to recover the CP1 anchor. [60] Dreyer had observed that the tugboat's position was close to one of the NYPA cables and notified Dunham of that fact. [61] Dreyer recounts that Dunham was a few feet away from the survey screen, which displayed the locations of the MISS JESSICA and the NYPA cables, and that Dunham told him he was aware of the situation. [62] According to Dreyer, Dunham then "put his finger to his mouth and told [Mr. Dreyer] to 'shush.'" [63] Dreyer proceeded to recover the CP1 anchor without discussing the implications with the Iroquois surveyor, the GULF HORIZON superintendent or the captain of the MISS JESSICA. [64] The CP1 anchor was recovered at 9:52 p.m. 65 Although the evidence appears to indicate that the NYPA cable strike incident occurred prior to the time that the CPI anchor was recovered, Thales points to the encounter between its surveyor and the Horizon anchor foreman as a clear indication that [*32] Horizon was solely in control of the GULF HORIZON's anchors. [66]

60  See Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. D to the Sworn Affidavit of John P. Doherty, Sworn Affidavit of Mark Dreyer, P 24.

61  Id.

62  *Id.*

63  *Id.*

64  *Id.* at P 25.

65  *See* Thales' Cross-Motion, Docket Entry No. 131, Ex. L to the Sworn Affidavit of John P. Doherty, Iroquois Incident Report, § 2.0.

66  *Id.* The incident report makes clear that the damage to the NYPA cable occurred eleven minutes prior to the time that Thales recorded the pickup location of the cable and also prior to the commencement of MISS JESSICA'S anchor recovery operations.

Thales also submits into evidence Iroquois' answers to Thales' interrogatories, in which Iroquois states that Horizon was "responsible in whole for the damage to the Y-49 cable", that Horizon was solely responsible for anchor-handling and that Horizon's crew was "in sole control of the vessel and her anchors when the event [*33] occurred" aboard the GULF HORIZON. 67

67  *See* Exhibits to Thales' Cross-Motion, Docket Entry No. 131, Ex. I to the Sworn Affidavit of John P. Doherty, Iroquois' Response to NYPA's Interrogatories, p.11.

Despite Thales' repeated allegations that it is not obligated to indemnify Horizon because it was solely responsible for the GULF HORIZON and its anchors, the MSA requires Thales to indemnify Horizon even for Horizon's sole negligence so long as the damage occurred in connection with or was otherwise incident to Thales' work on the Project. As stated above, the court finds that the cable strike incident occurred in connection with the performance of Thales' work on the Project because the Survey Procedure delegates at least a portion of the anchor-handling responsibilities on the GULF HORIZON to Thales. Accordingly, the court finds that Thales' scope of work was clearly defined in the Survey Procedure and that it unambiguously required Thales to monitor the location of the GULF HORIZON anchors.

[*34]  **D. _The Indemnification Provision in the MSA Requires Thales to Indemnify Horizon For Horizon's Reckless Conduct_**

Thales contends that even if the court finds that Thales' work is related to the incident, Thales still does not have a duty to defend and indemnify Horizon and Iroquois because the MSA's indemnity provision does not cover Horizon's reckless conduct. 68 Specifically, Thales

argues that it is required to indemnify Horizon and Iroquois only with respect to "negligence or other fault (including sole, joint, concurrent or gross negligence)," but that its obligation does not include a duty to indemnify Horizon or Iroquois for Horizon's reckless conduct. 69 The court finds that Horizon mischaracterizes the plain language of the MSA. More specifically, the indemnity provision requires Thales to indemnify Horizon for any damage "caused or contributed to by negligence or other fault (including sole, joint, concurrent or gross negligence) . . . strict liability . . . or any other theory of legal liability . . . ." 70

68  *Id.* at p. 20.

69  *Id.* at pp. 20-21. Thales argues that both Texas and maritime law distinguish reckless conduct from negligent conduct, noting that "reckless conduct 'requires a conscious choice of action, either with knowledge of serious danger to others or with knowledge of facts which would disclose the danger to a reasonable person." *Id.*

[*35]

70  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 1, MSA, P 7.2. Thales cites an unreported decision, *In Matter of Torch, Inc., 1996 U.S. Dist. LEXIS 5053, Nos. 94-2300, 95-1982, 1996 WL 185765 (E.D. La. 1996)*, for the proposition that the indemnity provision in the case at bar does not require Thales to indemnify Horizon for Horizon's reckless conduct. The provision in *Torch*, however, required indemnification in the case of the "contractor's sole fault or liability, the concurrent fault or liability of contractor and Texaco, or Texaco's sole fault and liability, whether such fault is based on a theory of negligence, strict liability, or both." *Id.* at * 8. The court finds that the *Torch* indemnity provision is significantly narrower than the provision in the case at bar and, thus, finds *Torch* inapplicable to this matter.

The plain language of this provision unambiguously imposes upon Thales an obligation to defend and indemnify Horizon even if Horizon engaged in reckless conduct with respect to the alleged incident. Although [*36] Thales offers sufficient evidence that Horizon failed to monitor the location of the dragging CP1 anchor and that Horizon failed to utilize a properly functioning tensionometer, the court cannot adequately determine

whether Horizon's conduct rises to the level of recklessness. Moreover, the court finds that Thales agreed to indemnify Horizon even if it engaged in such reckless conduct.

### E. *The Indemnification Provision Requires Thales to Indemnify Horizon and Iroquois for their Contractual Obligations to Indemnify Others*

Thales argues that even if it is obligated to indemnify Horizon and Iroquois under the MSA, it is not obligated to indemnify Horizon for its contractual obligations to Iroquois or Iroquois for its contractual obligations to NYPA. The court once again disagrees with Thales' argument. The plain language of the indemnification provision provides that Thales must indemnify Horizon "against any loss, cost, claim, *obligation to indemnify another*, liability, suit, judgment, award or damage, including reasonable attorney's fees and expenses," arising out of or occurring in connection with Thales' work on the Project. [71]

> [71]  *See* Petitioners' Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, Ex. 1, MSA, P 7.2.

[*37] It is clear from the plain language of this provision that Thales and Horizon did not intend to limit in any way Thales' duty to defend and indemnify Horizon and Iroquois. *See Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333 (5th Cir. 1981)* (finding that an indemnification provision did not cover contractual obligations where it required indemnification "against all claims, suits, liabilities and expenses on account of injury or death of persons . . ." because such damages sound exclusively in tort). Furthermore, although the indemnification provision in the MSA does not expressly reference the terms "contract" or "contractual obligation", the Fifth Circuit has made clear that a contract need not contain these "magic" words in order to create a right of indemnity for independent contractual liabilities. *Id.*; *see also Sumrall v. Ensco Offshore Co., 291 F.3d 316 (5th Cir. 2002)*. The indemnification provision at issue unambiguously requires Thales to indemnify Horizon and Iroquois once either party becomes obligated to indemnify a third party. Accordingly, based on the applicable Fifth Circuit precedent, the court finds that Thales and Horizon [*38] have expressed a clear intention that Thales indemnify Horizon and Iroquois for their contractual obligations.

### F. *Horizon's Entitlement to Attorneys' Fees Under the MSA's Indemnification Provision*

With respect to attorneys' fees, Horizon argues that it is entitled to partial summary judgment awarding Horizon and Iroquois "all attorneys' fees and costs expended to date and to be expended in the future in defending the claims for which Thales owes defense and indemnity," as well as all reasonable attorneys' fees and costs associated with the enforcement of the defense and indemnity provision in the MSA. [72] The Fifth Circuit has held that a contract of indemnity includes an obligation to pay the costs and attorneys' fees of the indemnitee against a third party, but not the right to costs and fees expended in connection with establishing the right to indemnification unless expressly stated. *See Lirette v. Popich Bros. Water Transport, Inc., 699 F.2d 725, 728 (5th Cir. 1983)* (stating that the duty to indemnify includes the payment of costs and attorneys' fees); *Weathersby v. Conoco Oil Co., 752 F.2d 953, 959 (5th Cir. 1984)* (stating, "Under [*39] a general indemnity agreement . . ., the indemnitee enjoys no right to recover its legal fees incurred in establishing its right to indemnification."). Accordingly, pursuant to the indemnification provision in the MSA, the court finds that Horizon and Iroquois are entitled to an award of attorneys' fees and costs for defending the claims for which Thales owes defense and indemnity. The court declines to award attorneys' fees and costs that arose in connection with enforcement of the defense and indemnity provision in the MSA.

> [72]  *See* Petitioner's Motion for Partial Summary Judgment Against Thales Geosolutions, Inc., Docket Entry No. 121, p. 18.

Based on the foregoing, the court **RECOMMENDS** that Horizon's motion for partial summary judgment be **GRANTED IN PART AND DENIED IN PART** and that Thales' cross-motion for summary judgment be **DENIED**.

## IV. Thales' Motion for a Continuance of Petitioner's Motion for Summary Judgment Against Thales

Thales moves to continue consideration of Horizon's [*40] motion for summary judgment in order to depose the Horizon and Iroquois representatives that were on duty in the GULF HORIZON tower on the date of the alleged incident. [73] Thales argues that these individuals have "knowledge of Thales' limited role on the GULF

HORIZON and of the warning from the Thales surveyor to the Horizon anchor foreman." [74]

> 73    *See* Claimant Thales GeoSolutions, Inc.'s Motion for a Continuance of Petitioner's Motion for Partial Summary Judgment Against, Docket Entry No. 132.
> 74    *Id.*

Although the court agrees that Horizon may have engaged in a careless course of conduct on the date of the alleged incident, Thales is bound by its agreement with Horizon, including the scope of work defined in the Survey Procedure. Thus, the court finds that any further discovery with respect to the cause of the cable strike incident is unnecessary because the damages relating to the incident clearly occurred in connection with Thales' work on the Project. Accordingly, the court **DENIES** Thales' [*41] Motion to Continue.

## V. Thales' Motion for Leave to File Third-Party Action Against North Bank

On August 1, 2005, Thales filed its motion for leave to file a third-party action against North Bank. [75] In this motion, Thales argues that it has legitimate claims against North Bank, the owner of the MISS JESSICA, because it is currently in dispute whether MISS JESSICA's retrieval of the CP1 anchor caused the damage to the power cable. [76] Thales likewise asserts that it has timely filed this motion because it was not aware of North Bank's potential liability as it relates to this action until April 2005, when a former Thales employee informed Thales' counsel that the MISS JESSICA may have had a survey system onboard that could detect the position of the tug relative to the NYPA cable on the date of the incident. [77] Finally, Thales argues that the parties will not be prejudiced by the filing of a third-party action because the discovery deadline for this action is on April 10, 2006, months away from the time that Thales filed its motion. [78]

> 75    Docket Entry No. 150.
> 76    *Id.* at pp. 2-3. Thales makes clear its belief that although "the evidence in this case demonstrates that the anchor had already damaged the power cable [eleven] minutes earlier, certain parties to this action have asserted that the MISS JESSICA's retrieval of the CPI anchor at 9:52 p.m. may have caused damage to the power cable and, on that basis, North Bank should be a party."

> *Id.*
> [*42]
> 77    *Id.* at p.8.
> 78    Docket Entry No. 179, Amended Docket Control Order. Thales incorrectly asserts in its motion that the discovery deadline is February 10, 2004. *See* Defendant Thales Geosolutions, Inc.'s Motion for Leave to File Third Party Action Against North Bank Towing Corporation and Memorandum in Support, Docket Entry No. 150, p.10.

NYPA, The Long Island Lighting Company d/b/a LIPA and FMIC (collectively the "Utility Claimants") filed a response, in which they argue that granting Thales' untimely motion will result in undue delay and prejudice to the parties. [79] Specifically, the Utility Claimants contend that the joinder of North Bank at this stage of the litigation will result in months of delay because counsel for North Bank will likely seek to re-depose the factual witnesses that have already been examined and will require additional time to review the approximately 200,000 documents that have been produced by the parties to date. [80] The Utility Claimants further contend that Thales "failed to conduct any meaningful investigation to determine whether evidence exist[ed] [*43] to pursue a claim for contribution and/or indemnification against North Bank" even though it should have been aware that the MISS JESSICA contained survey monitors on the date of the alleged incident because such equipment "was installed by Thales' personnel *prior* to the commencement of the project in November 2002." [81] Finally, the Utility Claimants contend that Thales has no basis to pursue a claim against North Bank in good faith because the evidence does not suggest that the MISS JESSICA caused or contributed to the cable damage, nor is Thales able to identify any party that has claimed that the MISS JESSICA is somehow responsible for the incident. [82]

> 79    Docket Entry No. 160.
> 80    *Id.*
> 81    *Id.* at p. 7 and Ex. E, Deposition of Mark Dreyer, pp. 351-53.
> 82    *Id.* at pp. 7-8.

Federal courts have discretion to allow a party to file a third-party action against a "person not a party to the action who is or may be liable" for all or a part of the plaintiff's claim. [83] Although Thales [*44] asserts that

Case 2:10-md-02179-CJB-DPC   Document 4457-54   Filed 11/01/11   Page 35 of 36

Page 13
2005 U.S. Dist. LEXIS 42110, *44

the "MISS JESSICA acted improperly and in contravention of good maritime practice in recovering the CP1 anchor and, in doing so, may have damaged the NYPA Cable," Thales fails to present any evidence that the MISS JESSICA is in any way responsible for the damages associated with the alleged incident. [84] Instead, Thales merely states in its motion that "certain parties to this action have asserted that the MISS JESSICA's retrieval of the CPI anchor at 9:52 p.m., may have caused damage to the power cable." [85] Thales' conclusory statement, unsupported by any evidence in the record, fails to raise a genuine issue of fact. Accordingly, the court **DENIES** Thales' motion for leave to file a third-party action against North Bank.

> 83    *FED. R. CIV. P. 14(a)*. This practice is available in admiralty and maritime actions as well. *See FED. R. CIV. P.14(c)*.
> 84    *See* Defendant Thales Geosolutions, Inc.'s Motion for Leave to File Third Party Action Against North Bank Towing Corporation and Memorandum in Support, Docket Entry No. 150, p.7.

[*45]

> 85    *Id.* at p.3.

**VI. Conclusion**

For the reasons discussed above, the court **RECOMMENDS** that Horizon's motion for partial summary judgment be **GRANTED IN PART AND DENIED IN PART** and that Thales' cross-motion for summary judgment be **DENIED**. The court further **DENIES** Thales' motion for a continuance Thales' motion for leave to file third-party action against North Bank.

The Clerk shall send copies of this Memorandum, Recommendation and Order to the respective parties, who have ten days from the receipt thereof to file written objections thereto pursuant to General Order 2002-13. Failure to file written objections within this time period shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Court Clerk, P.O. Box 61010, Houston, Texas, 77208. Copies of any such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk Avenue, Suite 7019, Houston, Texas, 77002.

Nancy K. Johnson

United States Magistrate [*46]  Judge

100366

********** Print Completed **********

Time of Request: Friday, September 09, 2011  20:12:10 EST

Print Number:    2829:305494769
Number of Lines: 671
Number of Pages: 13

Send To:  MUNSON, DAN
          MUNGER TOLLES & OLSON - TRANS
          355 S GRAND AVE FL 35
          LOS ANGELES, CA 90071-1560