--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
ENERGY XXI, GOM, LLC, Plaintiff,
v.
NEW TECH ENGINEERING, L.P., Defendant.

Civil Action No. H–10–00110.
April 15, 2011.

**Background:** Owner of off-shore well brought action against service company, asserting claims for negligence, gross negligence, and breach of master service agreement (MSA) in connection with accident during recompletion operation allegedly caused by company's consultants. Company counterclaimed for breach of MSA's indemnity provision. Defendant moved for summary judgment. Plaintiff moved to file amended complaint.

**Holdings:** The District Court, Gray H. Miller, J., held that:

(1) contract pursuant to which company provided consultants to owner was maritime contract;

(2) contract's indemnity clause required owner to indemnify company for contract breach arising from damage to owner's property allegedly caused by consultant;

(3) indemnity clause precluded owner's ordinary negligence claims;

(4) indemnity clause was unenforceable to the extent that clause precluded owner's gross negligence claims;

(5) consultant was owner's borrowed servant;

(6) Louisiana's dual-employer doctrine applied to gross negligence claim;

(7) genuine issue of material fact existed as to whether owner and company were dual employers of consultant; and

(8) good cause existed to permit amendment of complaint.

Defendant's motions for summary judgment granted in part and denied in part, plaintiff's motion for leave to amend granted.

West Headnotes

**[1] Federal Civil Procedure 170A ⟲2543**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2542 Evidence
        170Ak2543 k. Presumptions. Most Cited Cases

**Federal Civil Procedure 170A ⟲2552**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2547 Hearing and Determination
        170Ak2552 k. Ascertaining Existence of Fact Issue. Most Cited Cases

On motion for summary judgment, the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Admiralty 16 ⟲1.20(1)**

16 Admiralty
   16I Jurisdiction
     16k1.10 What Law Governs
      16k1.20 Effect of State Laws
       16k1.20(1) k. In General. Most Cited

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

Cases

Under the OCSLA, in determining as to whether state law or federal maritime law should apply, court sitting in admiralty considers: (1) whether controversy arises on a situs covered by OCSLA, i.e., the subsoil seabed, or artificial structures permanently or temporarily attached thereto; (2) whether federal maritime law applies of its own force; and (3) whether state law is inconsistent with federal law. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[3] Admiralty 16 ⚡1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Under the "focus-of-contract test," a contract dispute arises on an OCSLA situs, as required for application of state law, if a majority of the work called for by the contract is on stationary platforms or other enumerated OCSLA situses. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[4] Admiralty 16 ⚡1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Under the focus-of-contract test, when determining whether contract dispute arises on an OCSLA situs, if the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or state law is applicable to the interpretation and enforceability of the contract's provisions. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[5] Admiralty 16 ⚡1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Under the focus-of-contract test, when determining whether a contract dispute arises on an OCSLA situs, as required for application of state law, unless a contrary intent is reflected by the master contract and the work order, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[6] Admiralty 16 ⚡1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Jack-up drilling rig that was attached to Outer Continental Shelf was an OCSLA situs, as required for application of state law to service company's contractual indemnity claim against off-shore well owner in action arising from accident on rig that was allegedly caused by company's wellsite consultant during well recompletion operations. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[7] Admiralty 16 ⚡1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

There are two parts to court's inquiry whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)

**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

contract is maritime, precluding application of state law to contract dispute under OCSLA: an examination of the historical treatment in the jurisprudence, and a six-factor fact-specific inquiry, but if the historical treatment is clear enough, court need not engage in the fact-specific inquiry. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[8] Admiralty 16 ☞1.20(2)**

16 Admiralty
   16I Jurisdiction
     16k1.10 What Law Governs
      16k1.20 Effect of State Laws
       16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

When conducting fact-specific inquiry to determine whether contract is maritime, precluding application of state law to contract dispute under OCSLA, court considers: (1) what the specific work order in effect at the time of injury provided; (2) what work the crew assigned under the work order actually did; (3) whether the crew was assigned to work aboard a vessel in navigable waters; (4) to what extent the work being done related to the mission of that vessel; (5) the principal work of the injured worker; and (6) what the injured worker was actually doing at the time of injury. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[9] Admiralty 16 ☞1.20(2)**

16 Admiralty
   16I Jurisdiction
     16k1.10 What Law Governs
      16k1.20 Effect of State Laws
       16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

When conducting fact-specific inquiry to determine whether contract is maritime, precluding application of state law to contract dispute under OCSLA, the maritime or non-maritime status of the contract ultimately depends on its nature and character, not on its place of execution or performance.

Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[10] Admiralty 16 ☞1.20(2)**

16 Admiralty
   16I Jurisdiction
     16k1.10 What Law Governs
      16k1.20 Effect of State Laws
       16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Historical jurisprudence did not clearly dictate outcome as to whether contract to provide wellsite consultant to oversee off-shore well recompletion operation on jack-up drilling rig was maritime contract, thus requiring court to conduct fact-specific inquiry to determine whether contract was maritime, as would preclude application of state law to service company's contractual indemnity claim against well owner in action arising from accident during well recompletion operation that was allegedly caused by consultant provided by company. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[11] Admiralty 16 ☞1.20(2)**

16 Admiralty
   16I Jurisdiction
     16k1.10 What Law Governs
      16k1.20 Effect of State Laws
       16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

Service company's contract to provide consultant to oversee off-shore well recompletion on jack-up drilling rig was maritime contract, and maritime law, not state law, thus applied under OCSLA to company's contractual indemnity claim against well owner in action arising from accident allegedly caused by consultant; recompletion was not maritime in nature, as it could be performed at a well on land, but consultant was assigned to work aboard rig, which was a vessel, in navigable waters, and work was integral to vessel's mission, as work required use of vessel and its crew. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

1356.

**[12] Admiralty 16 ☞1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(2) k. Contracts in General; Insurance. Most Cited Cases

OCSLA is itself a Congressionally mandated choice of law provision, and if the contract at issue in an admiralty action is not a maritime contract, OCSLA requires that the substantive state law of the adjacent state is to apply to interpretation of the contract even in the presence of a choice of law provision in the contract to the contrary. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[13] Indemnity 208 ☞104**

208 Indemnity
  208V Actions
    208k104 k. Questions for Jury. Most Cited Cases

The interpretation of a contractual indemnity provision in maritime contract is a question of law.

**[14] Indemnity 208 ☞33(8)**

208 Indemnity
  208II Contractual Indemnity
    208k33 Particular Cases and Issues
      208k33(8) k. Maritime Cases. Most Cited Cases

**Indemnity 208 ☞35**

208 Indemnity
  208II Contractual Indemnity
    208k34 Scope and Extent of Liability
      208k35 k. In General. Most Cited Cases

Under federal maritime law, a contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

**[15] Indemnity 208 ☞33(8)**

208 Indemnity
  208II Contractual Indemnity
    208k33 Particular Cases and Issues
      208k33(8) k. Maritime Cases. Most Cited Cases

Indemnity clause in service company's maritime contract with off-shore well owner required owner to indemnify company for contract breach arising from damage to owner's property allegedly caused by consultant who was provided by company pursuant to contract, despite contention that indemnity would render meaningless contract's workmanlike-manner clause; although indemnity clause did not contain words "breach of contract", it covered "any and all" claims for property damage, and company could breach workmanlike-manner clause in ways that did not fall under indemnity clause, such as breach that resulted only in economic loss.

**[16] Indemnity 208 ☞27**

208 Indemnity
  208II Contractual Indemnity
    208k26 Requisites and Validity of Contracts
      208k27 k. In General. Most Cited Cases

Under maritime law, a contract need not contain any special words to evince an intention to create a right of indemnity for independent contractual liabilities, rather, the contract simply must clearly express such a purpose.

**[17] Contracts 95 ☞143.5**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k143.5 k. Construction as a Whole.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

Most Cited Cases

Court must interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous.

**[18] Indemnity 208 ☞33(8)**

208 Indemnity
   208II Contractual Indemnity
      208k33 Particular Cases and Issues
         208k33(8) k. Maritime Cases. Most Cited Cases

Indemnity clause in service company's maritime contract with off-shore well owner to provide consultant to oversee well recompletion precluded owner's ordinary negligence claims seeking recovery for damage to owner's property that was allegedly caused by company's and consultant's failure to comply with owner's procedure for recompletion operation; plain language of indemnity clause required owner to hold company harmless for property damage claims resulting from "the negligence or strict liability ... of [company]."

**[19] Indemnity 208 ☞30(8)**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(8) k. Maritime Cases. Most Cited Cases

Indemnity clause in offshore oil well service agreement covering service company's "negligence...[or] any other means, relationship or cause, without limitation whatsoever," was broad enough to encompass gross negligence, and was, to that extent, unenforceable under maritime law.

**[20] Indemnity 208 ☞30(8)**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(8) k. Maritime Cases. Most Cited Cases

Under maritime law, contractual indemnification for an indemnitee's own negligence must be clearly and unequivocally expressed.

**[21] Indemnity 208 ☞33(8)**

208 Indemnity
   208II Contractual Indemnity
      208k33 Particular Cases and Issues
         208k33(8) k. Maritime Cases. Most Cited Cases

Maritime contract indemnity clause's reference to "any and all claims" with no mention of negligence is not broad enough to encompass the negligence of an indemnitee.

**[22] Indemnity 208 ☞30(8)**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
         208k30 Indemnitee's Own Negligence or Fault
            208k30(8) k. Maritime Cases. Most Cited Cases

The phrase "without regard to the cause or causes thereof or the negligence of any party," in indemnity clause of maritime contract, satisfies the clear and unequivocal test for indemnification of indemnitee's own negligence.

**[23] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases

The issue of whether a relationship of borrowed servant existed between off-shore well own-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)

**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

er and consultant was a matter of law for the district court to determine, on service company's motion for summary judgment that it could not be held vicariously liable for damage to owner's property allegedly caused by consultant, despite contract with owner to provide consultant to oversee well recompletion operation. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[24] Labor and Employment 231H ⇒3038(2)**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
            231HXVIII(B)1 In General
                231Hk3028 Relation of Parties
                    231Hk3038 Borrowed Servants
                        231Hk3038(2) k. Particular Cases. Most Cited Cases

Extent of control that off-shore oil well owner had over consultant's work weighed strongly in favor of finding that consultant was owner's borrowed servant, as would preclude vicarious liability of service company that provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant; owner had power to direct consultant's actual work while consultant was working at wells, and in fact did so, and this power was not outweighed by company's control over employment details such as issuance of paychecks and contractual requirement that consultant perform work for owner in good and workmanlike manner.

**[25] Labor and Employment 231H ⇒3038(2)**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
            231HXVIII(B)1 In General
                231Hk3028 Relation of Parties
                    231Hk3038 Borrowed Servants
                        231Hk3038(2) k. Particular Cases. Most Cited Cases

Service company's maritime contract with off-shore well owner to provide consultant to oversee well recompletion weighed against finding that consultant was owner's borrowed servant, as would preclude vicarious liability of service company that provided consultant, in owner's action seeking recovery for property damage allegedly caused by consultant; contract stated that company's personnel were not owner's employees, that owner did not have "right to control or direct the details of the work performed" by company.

**[26] Labor and Employment 231H ⇒3038(2)**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
            231HXVIII(B)1 In General
                231Hk3028 Relation of Parties
                    231Hk3038 Borrowed Servants
                        231Hk3038(2) k. Particular Cases. Most Cited Cases

Consultant's agreement to behave as off-shore well owner's employee, although not technically classified as such, weighed in favor of finding that consultant was owner's borrowed servant, as would preclude vicarious liability of service company that provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant.

**[27] Labor and Employment 231H ⇒3038(2)**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
            231HXVIII(B)1 In General
                231Hk3028 Relation of Parties
                    231Hk3038 Borrowed Servants
                        231Hk3038(2) k. Particular Cases. Most Cited Cases

Fact that service company did not temporarily terminate its relationship with consultant while consultant worked for off-shore well owner weighed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

against finding that consultant was borrowed servant, as would preclude vicarious liability of company, which provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant.

**[28]** Labor and Employment 231H ⇐3038(2)

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
     231HXVIII(B) Acts of Employee
      231HXVIII(B)1 In General
       231Hk3028 Relation of Parties
        231Hk3038 Borrowed Servants
         231Hk3038(2) k. Particular Cases. Most Cited Cases

    Off-shore well owner provided consultant with place of performance of work and well recompletion procedure, weighing in favor of finding that consultant was borrowed servant, as would preclude vicarious liability of service company that provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant's failure to follow recompletion procedure; company did not provide any supplies or equipment to consultant for actually performing his job at owner's well.

**[29]** Labor and Employment 231H ⇐3038(2)

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
     231HXVIII(B) Acts of Employee
      231HXVIII(B)1 In General
       231Hk3028 Relation of Parties
        231Hk3038 Borrowed Servants
         231Hk3038(2) k. Particular Cases. Most Cited Cases

    Duration of consultant's work for off-shore well owner weighed in favor of finding that consultant was owner's borrowed servant, as would preclude vicarious liability of service company that provided consultant pursuant to maritime contract,

in owner's action seeking recovery for property damage allegedly caused by consultant during well recompletion operation; consultant worked continuously for owner for period of eight months, performing essentially the same job on other wells on which he worked prior to well that he was working on when accident occurred.

**[30]** Labor and Employment 231H ⇐3038(2)

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
     231HXVIII(B) Acts of Employee
      231HXVIII(B)1 In General
       231Hk3028 Relation of Parties
        231Hk3038 Borrowed Servants
         231Hk3038(2) k. Particular Cases. Most Cited Cases

    Even if consultant was performing service company's work, this did not weigh against finding that consultant was off-shore well owner's borrowed servant, as would preclude vicarious liability of company, which provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant during well recompletion operation; although company and consultant were both in the business of providing consulting services, consultant was performing operation at well owned, operated, and controlled by owner.

**[31]** Labor and Employment 231H ⇐3038(2)

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
     231HXVIII(B) Acts of Employee
      231HXVIII(B)1 In General
       231Hk3028 Relation of Parties
        231Hk3038 Borrowed Servants
         231Hk3038(2) k. Particular Cases. Most Cited Cases

    Off-shore well owner's authority to terminate the work that consultant was actually doing weighed in favor of finding that consultant was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)

**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

owner's borrowed servant, as would preclude vicarious liability of service company that provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant during well recompletion project; although only company had the right to discharge consultant from company's employ, owner had the right, and in fact exercised the right, to discharge consultant from project following incident.

**[32] Labor and Employment 231H ☜3038(2)**

231H Labor and Employment
    231HXVIII Rights and Liabilities as to Third Parties
        231HXVIII(B) Acts of Employee
        231HXVIII(B)1 In General
          231Hk3028 Relation of Parties
          231Hk3038 Borrowed Servants
            231Hk3038(2) k. Particular Cases. Most Cited Cases

Service company's role in payment of consultant did not weigh against finding that consultant was off-shore well owner's borrowed servant, as would preclude vicarious liability of company, which provided consultant pursuant to maritime contract, in owner's action seeking recovery for property damage allegedly caused by consultant during well recompletion project; although consultant received paycheck from company, company's role in paying consultant was essentially administrative, since company billed owner for consultant's work and owner thus ultimately paid consultant's salary.

**[33] Admiralty 16 ☜1.20(5)**

16 Admiralty
    16I Jurisdiction
        16k1.10 What Law Governs
        16k1.20 Effect of State Laws
          16k1.20(5) k. Torts in General; Workers' Compensation. Most Cited Cases

Conflict existed between Louisiana law, which recognized dual-employer exception to borrowed servant doctrine, and maritime law, which did not, thus requiring district court to conduct choice-of-law analysis with respect to borrowing employer's claims alleging that lending employer was vicariously liable for gross negligence of borrowed consultant who allegedly damaged borrowing employer's property during recompletion project for off-shore well.

**[34] Admiralty 16 ☜1.20(1)**

16 Admiralty
    16I Jurisdiction
        16k1.10 What Law Governs
        16k1.20 Effect of State Laws
          16k1.20(1) k. In General. Most Cited Cases

Court sitting admiralty need not engage in a choice-of-law analysis if there is no conflict between state law and maritime law.

**[35] Admiralty 16 ☜17.1**

16 Admiralty
    16I Jurisdiction
        16k17 Torts
        16k17.1 k. In General. Most Cited Cases

**Admiralty 16 ☜22**

16 Admiralty
    16I Jurisdiction
        16k17 Torts
        16k22 k. Torts Partly Committed or Causing Damage on Land or Nonnavigable Waters. Most Cited Cases

Under the OCSLA, party seeking to invoke federal admiralty jurisdiction over tort claim must satisfy location test, which requires that the tort must have occurred on navigable water or, if it occurred on land, it must have been caused by a vessel on navigable water. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[36] Admiralty 16 ☜17.1**

16 Admiralty

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

16I Jurisdiction
  16k17 Torts
    16k17.1 k. In General. Most Cited Cases

Under the OCSLA, party seeking to invoke federal admiralty jurisdiction over tort claim must satisfy connection test, which involves two queries: (1) whether the type of incident involved has the potential to disrupt maritime commerce, and (2) whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

**[37] Admiralty 16 &#9901;1.20(5)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(5) k. Torts in General; Workers' Compensation. Most Cited Cases

Although borrowed employee's alleged gross negligence occurred while drilling rig was attached to Outer Counter Shelf, not under sail, location of tort was nevertheless on navigable water, as required under OCSLA for application of maritime law, rather than Louisiana law, to determine whether dual-employer doctrine permitted borrowing employer's claim that lending employer was vicariously liable for property damage allegedly caused by employee during recompletion project on borrowing employer's off-shore well. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[38] Admiralty 16 &#9901;1.20(5)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(5) k. Torts in General; Workers' Compensation. Most Cited Cases

Maritime law did not apply of its own force to borrowed employer's claim, as required under OCSLA for application of Louisiana's dual-employer doctrine to permit claim alleging that lending em-

ployer was vicariously liable for property damage allegedly caused by borrowed employee's gross negligence during off-shore well recompletion project; employee himself was not injured, rather, injury was to borrowing employer's well located on Outer Continental Shelf, and development of Outer Continental Shelf was not traditional maritime activity. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[39] Admiralty 16 &#9901;1.20(5)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(5) k. Torts in General; Workers' Compensation. Most Cited Cases

The fact that the tort occurred on a vessel does not under OCSLA require application of maritime rather than state law when the damage is property damage rather than personal injury. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[40] Admiralty 16 &#9901;1.20(5)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
      16k1.20 Effect of State Laws
        16k1.20(5) k. Torts in General; Workers' Compensation. Most Cited Cases

Louisiana law was not inconsistent with federal law, and Louisiana's dual-employer doctrine was therefore applicable under OCSLA to borrowed employer's claim that lending employer was vicariously liable for property damage allegedly caused by borrowed employee's gross negligence during recompletion project on borrowing employer's off-shore well; although maritime law did not recognize dual-employer doctrine, maritime law did not apply to gross negligence claim, and there was no other federal law that applied.

**[41] Admiralty 16 &#9901;1.20(1)**

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

16 Admiralty
   16I Jurisdiction
      16k1.10 What Law Governs
         16k1.20 Effect of State Laws
            16k1.20(1) k. In General. Most Cited Cases

Court does not consider variations in discrete aspects of federal and state remedies when determining whether there is an inconsistency between federal maritime and state law that precludes application of state law under OCSLA. Outer Continental Shelf Lands Act, §§ 2-30, 43 U.S.C.A. §§ 1331-1356.

**[42] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases

Genuine issue of material fact existed as to whether borrowing employer and lending employer were dual employers under Louisiana law, precluding summary judgment on ground that borrowed servant doctrine precluded lending employer's vicarious liability for damage to borrowing employer's off-shore well that was allegedly caused by borrowed employee's gross negligence.

**[43] Federal Civil Procedure 170A ☞392**

170A Federal Civil Procedure
   170AII Parties
      170AII(J) Defects, Objections and Amendments
         170Ak392 k. Amendments. Most Cited Cases

**Federal Civil Procedure 170A ☞1935.1**

170A Federal Civil Procedure
   170AXIV Pre-Trial Conference

      170Ak1935 Order
         170Ak1935.1 k. In General. Most Cited Cases

Off-shore well owner reasonably believed that service company was vicariously liable for consultant's actions, weighing in favor of finding good cause to permit amendment of complaint, after scheduling order deadline, to add consultants and their separate corporate identities as defendants, in action against company seeking recovery for property damage allegedly caused by consultants during well recompletion; although company's borrowed servant defense should have put owner on notice of potential need to add consultants as defendants, consultants fell within definition of company's employees in contract pursuant to which company provided consultants to owner. Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

**[44] Federal Civil Procedure 170A ☞392**

170A Federal Civil Procedure
   170AII Parties
      170AII(J) Defects, Objections and Amendments
         170Ak392 k. Amendments. Most Cited Cases

**Federal Civil Procedure 170A ☞1935.1**

170A Federal Civil Procedure
   170AXIV Pre-Trial Conference
      170Ak1935 Order
         170Ak1935.1 k. In General. Most Cited Cases

Importance of amendment to add consultants and their separate corporate identities weighed in favor of finding good cause required to permit amendment of complaint, after scheduling order deadline, in off-shore well owner's action against service company seeking recovery for property damage to well that was allegedly caused by consultants, who were provided by company to owner pursuant to contract; status of consultants was unclear as result of limited discovery, and if future discovery revealed that consultants were independ-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

ent contractors, then consultants could be liable for damage that owner had attributed to company on theory that consultants were company employees. Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

**[45] Federal Civil Procedure 170A ⚖═392**

170A Federal Civil Procedure
   170AII Parties
      170AII(J) Defects, Objections and Amendments
         170Ak392 k. Amendments. Most Cited Cases

**Federal Civil Procedure 170A ⚖═1935.1**

170A Federal Civil Procedure
   170AXIV Pre-Trial Conference
      170Ak1935 Order
         170Ak1935.1 k. In General. Most Cited Cases

Potential prejudice did not preclude finding of good cause required to permit amendment of complaint, after scheduling order deadline, to add consultants and their separate corporate identities as defendants, in off-shore well owner's action against service company seeking recovery for property damage to well that was allegedly caused by consultants, who were provided by company to owner pursuant to contract; adding consultants as defendants did not change the players in the case, it merely changed their status, and parties would need to explore consultants' roles whether they were defendants or not. Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

Brendan Patrick Doherty, Kenneth H. Laborde, Leo R. McAloon, III, Gieger Laborde & Laperouse, LLC, New Orleans, LA, for Plaintiff.

Charles Clayton Conrad, Brown Sims PC, Houston, TX, for Defendant.

**ORDER**

GRAY H. MILLER, District Judge.

**\*1** Pending before the court is defendant New

Tech Engineering, L.P.'s ("New Tech") motion for summary judgment on its counterclaim and request for declaratory relief (Dkt. 16), plaintiff Energy XXI, GoM, LLC's ("Energy XXI") motion for leave to file its second supplemental and amended complaint (Dkt. 15), New Tech's motion for summary judgment on Energy XXI's affirmative claims (Dkt. 22), Energy XXI's motion for a continuance, which is contained within its response (Dkt. 24) to New Tech's motion for summary judgment on Energy XXI's affirmative claims, and New Tech's objection to Energy XXI's summary judgment evidence, which is contained within its reply in support of its motion for summary judgment on Energy XXI's affirmative claims (Dkt. 25). Having considered the motions, the various responses and replies relating to the motions, the supplemental briefing concerning the choice-of-law issue, and the applicable law, the court is of the opinion New Tech's motion for summary judgment on its counterclaim (Dkt. 16) should be GRANTED IN PART AND DENIED IN PART, Energy XXI's motion for leave to file a second amended complaint (Dkt. 15) should be GRANTED, New Tech's motion for summary judgment on Energy XXI's affirmative claims (Dkt. 22) should be DENIED, Energy XXI's motion for a continuance (Dkt. 24) should be DENIED AS MOOT, and New Tech's objection to Energy XXI's summary judgment evidence (Dkt. 25) should be OVERRULED.

**I. BACKGROUND**

Energy XXI owns and operates South Timbalier 21, No. 138 well (the "Gouda Well"), which is located off the coast of Louisiana on the Outer Continental Shelf. Dkts. 15, 16. New Tech and Energy XXI are parties to a Master Service Agreement ("MSA"), which governs work ordered by Energy XXI and accepted by New Tech, including work on the Gouda Well. The MSA defines the rights, obligations, and liabilities of both parties. Dkt. 16, Exh. 3(MSA).

In January 2009, Energy XXI was performing a recompletion operation on the Gouda Well. Dkt. 16.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

The recompletion operation was being conducted from the Hercules 203, a jack-up drilling rig that was attached to the Outer Continental Shelf at the time of the incident. Dkt. 33. Tony Hines and Jim Simon were working at the Gouda Well as wellsite consultants, or "company men," through New Tech, and they were responsible for overseeing the operation. Dkt. 15, Exh. 1.

On or about January 15, 2009, a workstring became stuck in the Gouda Well. *Id.* Energy XXI claims that the workstring became stuck because its procedures were not followed-namely, using reverse circulation of excess cement after cementing work is performed below the retainer. *Id.* Energy XXI claims that it spent 37 days attempting to recover the string before the recompletion project could be completed, resulting in an expenditure of approximately $9,000,000. *Id.*

Energy XXI filed a claim in this court against New Tech for negligence relating to the January 15, 2009 incident, and it later added claims for gross negligence and breach of the MSA. Dkts. 1, 8. New Tech filed a counterclaim for breach of the MSA, claiming that Energy XXI breached the MSA because it failed to indemnify and hold New Tech harmless for its work as required by the MSA. Dkt. 6. Additionally, New Tech seeks a declaratory judgment stating that Energy XXI is contractually obligated under the MSA to indemnify New Tech against damages arising from the incident giving rise to this claim. *Id.* Finally, New Tech requests an award of attorneys' fees it has incurred as a result of this lawsuit. *Id.*

*2 New Tech filed a motion for summary judgment on its counterclaim and request for declaratory relief requesting that all of Energy XXI's claims be dismissed because they are subject to the indemnity clause. Dkt. 16. New Tech has also filed a motion for summary judgment on Energy XXI's affirmative claims for relief. Dkt. 22. New Tech argues that it cannot be held vicariously liable for Hines's alleged negligence or gross negligence because Hines was a borrowed servant of Energy

XXI, and that it cannot be held liable for contract damages because Energy XXI cannot show that it is entitled to damages for breach of the MSA, which specifically limits the types of damages recoverable. Dkt. 22. Energy XXI claims that Hines was solely New Tech's employee during the pertinent time period and that the section of the contract limiting liability does not apply. Dkt. 24. Alternatively, Energy XXI argues that if the court finds that the borrowed servant defense is applicable, it should not dismiss Energy XXI's affirmative claims because Energy XXI and New Tech are dual employers. *Id.* In the second alternative, Energy XXI requests a continuance under Federal Rule of Civil Procedure 56. *Id.*

New Tech alleged its borrowed servant affirmative defense with respect to Hines in its answer, but Energy XXI claims that it believed this affirmative defense was mere surplusage. According to Energy XXI, the MSA indicates that Hines and Simon were New Tech's employees and that New Tech was responsible for their actions, so it did not feel a need to add Hines or Simon as defendants. It therefore did not attempt to add them before the deadline to amend its complaint. Additionally, Energy XXI claims that it only recently became aware, through discovery, of the corporate identities associated with Hines and Simon. Energy XXI requests leave to amend its complaint so that it can add Hines, Simon, and their respective corporate identities, as defendants.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Carrizales v. State Farm Lloyds,* 518 F.3d 343, 345 (5th Cir.2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an ab-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

sence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408, 411 (5th Cir.2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.,* 463 F.3d 388, 392 (5th Cir.2006).

**\*3** The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322, 106 S.Ct. 2548. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.* "For any matter on which the non-movant would bear the burden of proof at trial ..., the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *see also Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

[1] When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envl. Conservation Org. v. City of Dallas, Tex.,* 529 F.3d 519, 524 (5th Cir.2008). The court must review all of the evidence in the record, but make no

credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.,* 233 F.3d 871, 874 (5th Cir.2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du–Ra–Kel Corp.,* 569 F.2d 869, 872 (5th Cir.1978); *see also Galindo v. Precision Am. Corp.,* 754 F.2d 1212, 1221 (5th Cir.1985).

## III. ANALYSIS

The court will first address New Tech's motion for summary judgment on its counterclaim for indemnification and request for declaratory relief. It will then consider New Tech's motion for summary judgment on Energy XXI's affirmative claims. The court will decide whether to grant Energy XXI's motion for a continuance and motion to amend its complaint after determining whether summary judgment is warranted.

### A. Motion for Summary Judgment on New Tech's Counterclaim

**\*4** New Tech claims that the MSA requires Energy XXI to defend, indemnify, and hold New Tech harmless for damage to Energy XXI's property caused by Hines. Dkt. 16. Energy XXI argues that the indemnity clause does not apply to claims for gross negligence and breach of contract. The court therefore must interpret the clause to determine which party is correct. However, in order to properly interpret the clause, the court must first determine which law to apply.

### 1. Choice of Law

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

[2] Under the Outer Continental Shelf Lands Act ("OCSLA"), federal courts sitting in admiralty apply state law as surrogate federal law in certain circumstances. In making the determination as to whether state law or maritime law should apply, courts consider the factors enunciated in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.:* "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil seabed, or artificial structures permanently or temporarily attached thereto)"; "(2) Federal maritime law must not apply of its own force"; and "(3) The state law must not be inconsistent with Federal law." 895 F.2d 1043, 1047 (5th Cir.1990).

[3][4][5] *a. OCSLA Situs.* In a case involving a contractual dispute, courts in the Fifth Circuit use the "focus-of-contract test" to determine if the controversy arises on an OCSLA situs. *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 787 (5th Cir.2009). Under this test, a controversy arises on an OCSLA situs "if a majority of the work called for by the contract is on stationary platforms or other enumerated OCSLA situses." *Id.* If "the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions." *Davis & Sons v. Gulf Oil Corp.,* 919 F.2d 313, 315–17 (5th Cir.1990). "Generally, each work order is for a discrete, relatively short-term job. Unless a contrary intent is reflected by the master contract and the work order, in determining the situs in a contract case ..., courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract." *Grand Isle Shipyard,* 589 F.3d at 787 n. 6.

[6] Here, the recompletion operations were being conducted on a jack-up drilling rig that was attached to the Outer Continental Shelf. Dkt. 33. In the Fifth Circuit, a jack-up drilling rig that is jacked up is an OCSLA situs. *See Demette v. Falcon*

*Drilling Co.,* 280 F.3d 492, 498 (5th Cir.2002), *overruled on other grounds, Grand Isle Shipyard,* 589 F.3d at 788 (5th Cir.2009) (finding that a rig that was jacked up met the second category of OC-SLA situses because it "was a device temporarily attached to the seabed, which was erected on the OCS for the purpose of drilling for oil"). Thus, the majority of the work for this job was being performed on an OCSLA situs.

**\*5 *b. Maritime Law.*** Under the second PLT factor, the court must determine whether the contract is a maritime contract. If it is a maritime contract, then the court should interpret the contract under federal maritime law. However, if it is not a maritime contract, the court must apply Louisiana law. *See Hoda v. Rowan Cos., Inc.,* 419 F.3d 379, 380 (5th Cir.2005) (noting that Louisiana law is applicable if a contract is "non-maritime"). New Tech argues that the recompletion services at the Gouda Well were "inextricably intertwined with maritime activities" because they necessarily required the use of a vessel, and the jack-up drilling rig is a vessel. Dkt. 36. Energy XXI argues that the recompletion services are not maritime in nature because they could just as easily be performed at a land-based facility as at sea. Dkt. 35.

[7] Courts in the Fifth Circuit use the test set forth in *Davis & Sons, Inc. v. Gulf Oil Corp.* to determine whether a contract is a maritime contract. *Hoda,* 419 F.3d at 381. "Under *Davis,* there are two parts to the inquiry—an examination of the 'historical treatment in the jurisprudence' and a six-factor 'fact-specific inquiry.' " *Id.* (quoting *Davis,* 919 F.2d at 316). If the historical treatment is clear enough, courts need not engage in the fact-specific inquiry. *Id.* (citing *Demette,* 280 F.3d at 500).

[8][9] The second part of the *Davis* test requires courts to weigh the following factors:

(1) what does the specific work order in effect at the time of injury provide?

(2) what work did the crew assigned under the

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

work order actually do?

(3) was the crew assigned to work aboard a vessel in navigable waters?

(4) to what extent did the work being done relate to the mission of that vessel?

(5) what was the principal work of the injured worker? and

(6) what work was the injured worker actually doing at the time of injury?

*Davis,* 919 F.2d at 316 (formatting added); *Hoda,* 419 F.3d at 381 (quoting these factors). What constitutes a maritime contract is a case-by-case determination that "is not determinable by rubric." *Davis,* 919 F.2d at 316. "The maritime or non-maritime status of the contract ultimately depends on its 'nature and character,' *not* on its place of execution or performance." *Hoda,* 419 F.3d at 381 (quoting *Davis,* 919 F.2d at 316). "A specialty services contract related to oil and gas exploration takes on a salty flavor when the performance of the contract is more than incidentally related to the execution of the vessel's mission." *Domingue v. Ocean Drilling & Exploration Co.,* 923 F.2d 393, 396 (5th Cir.1991).

[10] **i) Historical Jurisprudence.** The court must first consider the historical jurisprudence relating to contracts for oil and gas exploration services occurring on vessels in the Gulf of Mexico. The parties have pointed to no cases specifically addressing whether a contract to provide a "company man" to oversee a recompletion operation on a jack-up drilling rig is a maritime contract. The cases that address whether a contract for specialty services relating to oil exploration is a maritime contract teach that neither the fact that the contract called for services to be performed on a jack-up drilling rig, which is a vessel, nor the fact that the services are traditionally non-maritime in nature, is determinative. For example, in *Campbell v. Sonat Offshore Drilling, Inc.,* the Fifth Circuit

determined that a contract between a casing service contractor and an oil company involving driving casing into the seabed on the Outer Continental Shelf, which is "inherently non-maritime in nature," was a maritime contract because the work "was 'inextricably intertwined with maritime activities since it required the use of a vessel[, a jack-up drilling rig,] and its crew.' " *Campbell,* 979 F.2d 1115, 1123 (5th Cir.1992), *superseded by statute on other grounds.* The use of a jack-up drilling rig, however, does not always transform a contract for traditionally non-maritime services into a maritime contract. In *Domingue v. Ocean Drilling & Exploration Co.,* for example, the Fifth Circuit determined that a contract for wireline services, which is also a non-maritime activity, was *not* a maritime contract because, while the work was performed on a jack-up drilling rig, the rig's vessel status was "nothing more than incidental to its purpose here of serving as a work platform for the execution of this particular service contract." 923 F.2d at 397. "The fact that the [jack-up drilling rig] is a vessel [did] not decisively affect the nature or character of the [contract]." *Id.*

**\*6** [11] The historical jurisprudence does not clearly dictate a specific outcome when considering the basic facts of this case. Thus, the court must weigh *Davis* factors to determine if the contract at issue is a maritime contract. The court only considers the first four factors because the last two factors of the *Davis* test inquire about the work of the "injured worker." Here, there is no injured worker, so the last two factors are not relevant to the analysis.

**ii) The First Two *Davis* Factors.** There is no need to differentiate between the first two *Davis* factors in this case. Under the first *Davis* factor, the court must consider what work was required under the specific work order in effect at the time of the incident, and under the second factor, the court must consider what work the crew assigned under the order actually did. Here, the specific work order was for a "company man" to oversee the recomple-

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

tion of a well. " '[R]ecompletion' is defined as '[r]edrilling the same well bore to reach a new reservoir after production from the original reservoir has been abandoned.' " *Burns v. La. Land & Exploration Co.,* 870 F.2d 1016, 1021 (5th Cir.1989) (quoting Williams & Meyers, *Manual of Oil and Gas Terms* 160, 163 (7th ed.1987)) (second alteration in original). This type of work is not maritime in nature, as it could as easily be performed at a land-based well as at sea. However, the company man who was provided for this project was tasked with overseeing the recompletion of a well using a jack-up drilling rig—a vessel—offshore. The use of a vessel lends a salty flavor to this otherwise nonmaritime activity.

**iii) The Third *Davis* Factor.** The answer to the third *Davis* factor, was the crew assigned to work aboard a vessel in navigable waters, is yes. In the Fifth Circuit, a jack-up drilling rig is considered a vessel, and the rig was jacked up in the Gulf of Mexico. The third factor therefore weighs in favor of the application of maritime law.

**iv) The Fourth *Davis* Factor.** The fourth factor inquires into the extent to which the work done under the work order contributed to the mission of the vessel. New Tech, citing *Hoda v. Rowan Companies, Inc., Campbell, Davis, Gilbert v. Offshore Production & Salvage,* No. 95–122, 1997 WL 149959, 1997 U.S. Dist. LEXIS 3592 (E.D.La. Mar. 21, 1997), and *Samson Contour Energy E & P, LLC v. Leam Drilling Systems, Inc.,* No. 10–00671, 2010 WL 5092966, 2010 Dist. LEXIS 129016 (S.D.Tex. Dec. 7, 2010) (Werlein, J.), argues that the primary purpose of the jack-up drilling rig was to perform the recompletion operation and that Hines's work supervising the operation was an integral part of that mission. Energy XXI, relying on *Domingue v. Ocean Drilling and Exploration Co.,* 923 F.2d 393 (5th Cir.1991) and *Thurmond v. Delta Well Surveyors,* 836 F.2d 952 (5th Cir.1988), claims that the recompletion operation could have been completed without the vessel and that Hines's services were only incidentally related

to the mission of the vessel.

***7** In *Hoda v. Rowan Companies, Inc.,* the plaintiff was injured when he tripped on a hose on the deck of a jack-up drilling rig at a wellhead on the Outer Continental Shelf. 419 F.3d at 381. He was torquing nuts on the blow-out preventer on the wellhead pursuant to the work order. *Id.* The MSA under which he worked covered " 'hydrostatic testing, hydraulic torque wrench service, nut splitters, casing cutting, pipeline/production and miscellaneous rental tool equipment.' " *Id.* (quoting the MSA). This work "did not require the use of the vessel, her personnel or equipment, but [the employer] would have had nothing to do had [the drilling company's] personnel not used the rig's equipment to set the blow-out preventers in place, align them, place the bolts on them, and place the nuts on the bolts for tightening .... Moreover, [the employer's] work was sequenced with and delayed by [the drilling company] with gravel packing operations that [the drilling company] was separately undertaking on the well." *Id.* The Fifth Circuit determined that the plaintiff's employer's work was " 'inextricably intertwined' with the activity of the rig," and that the work was " 'an integral part of drilling, which is the primary purpose of the vessel.' " *Id.* at 383 (quoting *Demette,* 280 F.3d at 501).

Energy XXI attempts to distinguish *Hoda* by noting that the "linchpin of the decision in *Hoda* was that the activities being undertaken at the time of the incident *could not be performed* in the absence of a vessel." Dkt. 35 (citing *Hoda,* 419 F.3d at 383) (emphasis in original). Energy XXI contends that the recompletion procedure in this case *could* have been completed without a vessel. Dkt. 35. New Tech takes issue with this characterization of the evidence, noting that the Gouda Well is in fact "in the middle of the Gulf of Mexico" and that the recompletion operation could not have taken place "without the use of the vessel and its crew." Dkt. 36. New Tech points out that it "was not possible for Tony Hines to supervise and carry out the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

recompletion operation, which [Energy XXI] admits consists of operations thousands of feet below the ocean floor, without the [jack-up drilling rig's] drilling equipment and its crew." *Id.*

The court finds that, like the work in *Hoda,* Hines's work as the "company man" was an integral part of the primary purpose of a vessel.[FN1] His position was to supervise the recompletion operation, and the record demonstrates that the purpose of the vessel, which was positioned above the Gouda Well at the beginning of the recompletion operation, demobilized when the fishing operation was terminated in February 2009, and returned to the Gouda Well to perform the sidetrack operation, was to perform the recompletion operation. Dkt. 36; *see also* Dkt. 20, Exh. B–1 (Expert Report of Jeffrey R. Hughes) (noting that the rig "performed the work"). Moreover, Hines testified that the purpose of the rig was to perform the recompletion procedure.[FN2] Dkt. 37, Exh. A at 205.

**\*8** The other cases cited by New Tech lend support to the court's conclusion that Hines's work contributed to the mission of that vessel.[FN3] Dkt. 34. In *Campbell,* the contract at issue involved the provision of casing services. 979 F.2d at 1123. The crew used a jack-up drilling rig's derrick and draw works to accomplish the vessel's mission—"which was to drill oil and gas wells over navigable waters." *Id.* The Fifth Circuit held that this work "was 'inextricably intertwined with maritime activities since it required the use of a vessel and its crew.' " *Id.* (quoting *Davis,* 919 F.2d at 317). In *Davis,* the Fifth Circuit held that a barge that served as a "mobile maintenance unit" was more than a mere work platform, and its crew, which provided maintenance services, "served in a capacity that contributed to the accomplishment of its mission in the same way that a surgeon serves as a member of the crew of a floating hospital." *Davis,* 919 F.2d at 317. In *Gilbert,* the federal district court for the Eastern District of Louisiana determined that a jack-up drilling rig engaged in tie-back and completion work "was not a mere work platform for some in-

cidental service contract" and that the supervision of a company man who was overseeing the work "centered around the work for which the [jack-up drilling rig] had specifically been chartered." *Gilbert,* 1997 WL 149959, at *6, 1997 U.S. Dist. LEXIS 3592, at *21–22,. Likewise, in *Samson,* the court determined that directional drilling work "related directly to the mission" of a jack-up drilling rig and "required use of the drilling vessel as more than a mere platform." *Samson,* 2010 WL 5092966, at *6, 2010 U.S. Dist. LEXIS 129016, at *19.

Here, like in *Davis, Gilbert,* and *Samson,* the work being performed required the use of the drilling vessel as more than a mere platform. Though a recompletion operation, in general, can be performed on land as well as at sea, it could not have been performed without a vessel in this case. The recompletion operation was performed at sea using a vessel, which was specifically brought to the site so that this work could be performed. Hines's supervision of the recompletion operation was, therefore, "inextricably intertwined with maritime activities since it required the use of a vessel and its crew." *Davis,* 919 F.2d at 317.

The cases that Energy XXI cites in support of its position that Hines's work was only incidentally related to the mission of the vessel are not on point because the contracts in those cases were for wireline services, which do not involve the use of a vessel. In *Thurmond,* the Fifth Circuit held that a contract to perform wireline services from a barge was not a maritime contract. *Thurmond,* 836 F.2d at 956. Similarly, in *Domingue,* the Fifth Circuit determined that a contract to provide wireline services from a jack-up drilling rig was non-maritime. *Domingue,* 923 F.2d at 397. Wireline operations involve servicing partially drilled oil and gas wells, and "they do not concern the operation of a vessel." *Thurmond,* 836 F.2d at 955; *Domingue,* 923 F.2d at 394 n. 3, 396. In *Domingue,* the Fifth Circuit stated that the jack-up drilling rig was merely serving as a work platform.[FN4] *Id.*

**\*9** [12] After weighing these factors, the court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

concludes that the contract at issue is a maritime contract. Thus, federal maritime law applies, and there is no need to address the third *PLT* prong.[FN5]

### 2. Analysis Under Maritime Law

[13] New Tech's motion for summary judgment on its counterclaim depends on the indemnity provision contained within the MSA ("Indemnity Clause"). "The interpretation of a contractual indemnity provision is a question of law." *Becker v. Tidewater, Inc.,* 586 F.3d 358, 369 (5th Cir.2009). The Indemnity Clause states:

Energy XXI shall be responsible, and Contractor [New Tech] shall never be liable, for property damage of ... Energy XXI ... and Energy XXI agrees to defend, indemnity [sic.] and hold harmless, Contractor, against any and all such claims, demands, losses or suits, (including, but not limited to, claims, demands or suits for property damage ...) which may be brought against Contractor by Energy XXI, any employee of Energy XXI or the legal representative or successor of any such employee, in anywise arising out of or incident to work being performed on or about Energy XXI's property or jobsite, irrespective of whether such claims, demands or suits are based on the relationship of master and servant, third party, or otherwise, and even though occasioned, brought about, caused by, arising out of or resulting from Energy XXI's work, or its acts, activities, or presence on any location, structure or vessel, or travel to and from such location, structure, or vessel, the unseaworthiness or unairworthiness or [sic.] vessels and craft, or the negligence or strict liability, in whole or in part, of Contractor, or by or from any other means, relationship or cause, without limitation whatsoever.[FN6]

Dkt. 16, Exh. C(MSA). According to New Tech, Energy XXI's claims for negligence, breach of contract, and gross negligence all fall within this contractual provision because they all involve property damage arising from work performed during the recompletion of the Gouda Well. Dkt. 16. Energy XXI argues that the Indemnity Clause does not cover its breach of contract or gross negligence claims. Energy XXI does not address New Tech's arguments relating to its negligence claim.

[14][15] *a. Breach of Contract Claim.* Energy XXI claims that New Tech breached the MSA by "failing to perform in the manner set forth in the MSA." Dkt. 20 at 7. New Tech argues that Energy XXI must indemnify it for any alleged contractual breach because the Indemnity Clause in the MSA is broad enough to encompass Energy XXI's breach of contract claim, which arises from damage to Energy XXI's property. Under federal maritime law, a "contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir.1081).

**\*10** Energy XXI argues that its breach of contract claim was not within the contemplation of the parties because (1) there is no mention of the word "contract" in the Indemnity Clause, even though it specifically mentions negligence and strict liability; and (2) if the Indemnity Clause does cover a breach of contract, then the provision of the contract requiring New Tech to perform work "with due diligence and in a safe, good and workmanlike manner," which is the provision Energy XXI claims New Tech breached, would be meaningless. Dkt. 20 at 5, 8 (quoting Dkt. 16, Exh. C(MSA)). New Tech claims, on the other hand, that the Indemnity Clause is "extremely broad" and that "indemnity for breach of contract 'reasonably appears to have been within the contemplation of the parties.' " Dkt. 21 at 3.

[16] With regard to Energy XXI's first argument, under maritime law, the "contract need not contain any special words to evince an intention to create a right of indemnity for independent contrac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

tual liabilities." *Corbitt,* 654 F.2d at 334. The contract simply "must clearly express such a purpose." *Id.* The Indemnity Clause does not contain the words "breach of contract," but it does expressly state that it covers "any and all such claims, demands, losses or suits, (including, but not limited to, claims, demands or suits for property damage ...) which may be brought against [New Tech] by Energy XXI ... in anywise arising out of or incident to work being performed on or about Energy XXI's property or jobsite." It is without question that the breach of contract claim arises out of work being performed at Energy XXI's jobsite. Thus, the language in the Indemnity Clause is broad enough to encompass contractual obligations.

Energy XXI claims that interpreting the broad language of the indemnity clause as covering breach of contract claims stands in conflict with the Fifth Circuit precedent indicating that a broad indemnity clause covering "all claims" does not include contractual obligations. Dkt. 20. Energy XXI cites *Corbitt,* 654 F.2d at 333 and *Ingalls Shipbuilding v. Federal Ins. Co.,* 410 F.3d 214, 221 (5th Cir.2005), in support of this argument. In *Corbitt,* Shell Oil Company ("Shell") and the defendant, Diamond M. Drilling Company ("Diamond M"), had a contract relating to the provision of labor and materials for drilling, working over, or deepening wells on Shell's leaseholds. The Shell/Diamond M contract had an indemnity clause whereby Shell agreed to indemnify Diamond M for claims for personal injuries by Shell employees arising out of work performed by Diamond M. *Corbitt,* 654 F.2d at 331. Diamond M likewise agreed to indemnify Shell for personal injury claims brought by Diamond M employees. *See id.* Shell was also a party to a purchase contract with a third party, Sladco, Inc. ("Sladco"), for personnel, equipment, and supplies, as required by Shell. *See id.* The Shell/Sladco contract had the same indemnification provision. *See id.* A Sladco employee, Harvey Corbitt, suffered an injury while working on one of Diamond M's drilling rigs. *See id.* Corbitt sued Diamond M for negligence. Diamond M sought indem-

nity from Shell, which in turn sought indemnification from Sladco under the terms of the Shell/Sladco purchase order. *See id.* Diamond M and Shell settled with Corbitt, and Sladco moved for summary judgment on Shell's indemnity claim, asserting that its indemnity agreement with Shell did not require it to indemnify Shell for Shell's contractual liability to Diamond M. *See id.*

**\*11** The Fifth Circuit held that the indemnity clause in the Shell/Sladco purchase order "does not expressly provide that Sladco will indemnify Shell for Shell's contractual liability to third persons." *Id.* at 333. The indemnity clause in the purchase order provided for indemnity " 'against all claims, suits, liabilities and expenses on account of personal injury ... arising out of or in connection with performance of this Order.' " *Id.* (quoting the Shell/Sladco purchase order). The Fifth Circuit found that Shell's liability to Diamond M, for which it requested indemnity, was not "on account of personal injury." Shell's liability arose out of its agreement with Diamond M, which was a separate agreement.

The *Corbitt* contract and facts are clearly distinguishable from the instant case. In *Corbitt,* Shell's liability was not on account of personal injury, which is the type of injury for which the indemnification provision expressly provided. Here, the liability that Energy XXI hopes to impose upon New Tech is exactly the type of injury expressly contemplated by the contract as it relates to "claims, demands or suits for *property damage ...* brought about, caused by, arising out of or resulting from ... the negligence or strict liability, in whole or in part, of Contractor." Dkt. 16, Exh. C (emphasis added). Moreover, Energy XXI's claims do not arise out of the breach of a separate agreement like the claims in *Corbitt.* Energy XXI claims that New Tech breached the same contract in which the Indemnity Clause is found—the MSA. *See* Dkt. 20.

In *Ingalls,* the Fifth Circuit found that the indemnity provision at issue did not encompass the contractual claims presented, but it specifically noted that the indemnity provision did not include

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

"expansive phrases such as 'whatsoever nature or character.' " *See* Ingalls, 410 F.3d at 222 (distinguishing *Sumral v. Ensco Offshore Co.,* 291 F.3d 316, 318–19 & n. 4 (5th Cir.2002)). Here, the Indemnity Clause *does* include expansive phrasing. Specifically, the instant clause states that "Energy XXI agrees to defend, indemnify [sic.] and hold harmless [New Tech] against any such claims ... in anywise arising out of or incident to work being performed on or about Energy XXI's property or jobsite, irrespective of whether such claims ... are based on ... the negligence or strict liability, in whole or in part, of [New Tech] or by or from any other means, relationship or cause, without limitation whatsoever." Dkt. 16, Exh. C. Thus, while the use of the term "all claims" in an indemnity clause may preclude indemnification for contractual claims if it is used in isolation, the use of a similar term in the Indemnity Clause here does not preclude contractual claims due to the expansive language used with the clause and the lack of limiting language.

[17] Energy XXI's second argument relating to New Tech's request for indemnification for Energy XXI's contractual claim is that an interpretation requiring indemnification for breach of contract claims would render meaningless the part of the contract requiring that New Tech " 'perform all such services or work with due diligence and in a safe, good and workmanlike manner, in accordance with all laws, regulations and rules valid and applicable, and to the full and complete satisfaction of ENERGY XXI' " (hereinafter "Good and Workmanlike Manner Clause"). Dkt. 20 (quoting Dkt. 16, Exh. C). A "basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." Chembulk Trading LLC v. Chemex Ltd., 393 F.3d 550, 554 (5th Cir.2004) (citations omitted). Thus, interpreting the contract to require indemnity for breach of contract in this case would be contrary to the rules of contract interpretation if doing so rendered the Good and Workmanlike Manner

Clause meaningless.

**\*12** However, interpreting the Indemnity Clause as covering claims for breach of contract does not render the Good and Workmanlike Manner Clause in the MSA meaningless. The indemnity provision makes Energy XXI responsible for "*property damage of, personal injury to, or death of* Energy XXI and any of Energy XXI employees." Dkt. 16, Exh. C (emphasis added). Here, the injury associated with the alleged breach of the Good and Workmanlike Manner Clause is property damage. There are, however, certainly scenarios in which New Tech could breach the Good and Workmanlike Manner Clause that do not fall under the indemnity provision. For instance, if a breach of the Good and Workmanlike Manner Clause resulted only in economic loss as opposed to property damage, personal injury, or death, Energy XXI may have a valid claim for breach, and New Tech would not be protected by the Indemnity Clause. Thus, the court's interpretation of the Indemnity Clause as requiring indemnity in this case does not render the Good and Workmanlike Manner Clause meaningless in all cases.

[18] *b. Negligence Claim.* Energy XXI claims that "New Tech and Hines failed to comply with [its reverse circulation procedure], and negligently caused a workstring to become stuck in the [Gouda Well]." Dkt. 1. New Tech claims that the Indemnity Clause precludes Energy XXI's negligence claims. Energy XXI did not address the regular (as opposed to gross) negligence claims in its response, likely because the plain language of the Indemnity Clause indicates that Energy XXI agreed to hold New Tech harmless for property damage claims resulting from "the negligence or strict liability ... of [New Tech]." Dkt. 16, Exh. C. Because the Indemnity Clause precludes Energy XXI from bringing claims against New Tech for damage to its property resulting from New Tech's negligence, New Tech's motion for summary judgment with regard to Energy XXI's negligence claim is GRANTED. Energy XXI breached the agreement by bringing a negligence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

claim against New Tech for the damage to Energy XXI's property, and New Tech is not responsible for any damages to Energy XXI's property that may have resulted, in whole or in part, by New Tech's ordinary negligence.

***c. Gross Negligence Claim.*** Energy XXI argues that the Indemnity Clause cannot be interpreted to require Energy XXI to indemnify New Tech for New Tech's gross negligence and that, even if the Indemnity Clause could so be construed, it would be unenforceable. Dkt. 20 at 9. New Tech argues that the contract's language is broad enough to encompass gross negligence and that even if the contract were required to specifically state that the clause covered gross negligence, the Indemnity Clause's delineation of "negligence" includes gross negligence.

[19][20][21][22] ***I. Interpretation of Clause.*** Under maritime law, "indemnification for an indemnitee's own negligence [must] be clearly and unequivocally expressed." *Seal Offshore, Inc. v. Am. Standard, Inc.,* 736 F.2d 1078, 1081 (5th Cir.1984). A reference to "any and all claims" with no mention of negligence is not broad enough to encompass the negligence of an indemnitee. *See id.* However, the phrase "without regard to the cause or causes thereof or the negligence of any party" does satisfy the "clear and unequivocal" test. *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 540 (5th Cir.1986). The phrase "shall be responsible for all ... causes of action of every kind ... arising in connection herewith ... of ... Operator's invitees on account of bodily injury ... without regard to cause" also satisfies the standard. *East v. Premier, Inc.,* 98 Fed.Appx. 317, 321 (5th Cir.2004) (unpublished).

**\*13** Energy XXI first argues that the Indemnity Clause cannot cover gross negligence because it does not specifically include the term "gross negligence." Energy XXI cites *In re TT Boat Corp.,* No. Civ. A 98–0494, 98–1109, 1999 WL 1442054 (E.D.La. Sept. 8, 1999), in support of this contention. In *TT Boat Corp.,* the federal district court for the Eastern District of Louisiana noted that the

Fifth Circuit requires that the court "be firmly convinced that the exculpatory provision reflects the intention of the parties" before enforcing an indemnification clause for the indemnitee's own negligence. *TT Boat Corp.,* 1999 WL 1442054, at *6. The *TT Boat* indemnity provision excluded liability caused by " 'negligence, strict liability, products liability and/or unseaworthiness.' " *Id.* The court noted that "the requirement of specificity in an indemnity contract is axiomatic, and this indemnity provision is silent with respect to gross negligence ...." *Id.* It ultimately declined to read "gross negligence" into the indemnity provision. *Id.*

The clause in *TT Boat Corp.* was not as expansive as the clause in this case. The *TT Boat Corp.* clause *limits* the types of claims to "negligence, strict liability, products liability and/or unseaworthiness." Here, the clause covers "negligence ... [or] any other means, relationship or cause, *without limitation whatsoever.* " The plain language of this clause evinces an intent by both parties not to limit the types of claims that the indemnity provision covers. The present Indemnity Clause is therefore broad enough to encompass gross negligence. However, as discussed below, to the extent the clause could be interpreted to encompass gross negligence, it is unenforceable.

***ii. Enforceability of Clause.*** Energy XXI claims that "gross negligence invalidates any type of exemption from liability." Dkt. 20 at 9. Energy XXI cites *Todd Shipyards Corp. v. Turbine Serv. Inc.,* 674 F.2d 401, 411 (5th Cir.1982), *AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.,* 920 F.Supp. 1330, 1341 (S.D.Tex.1996) (Crone, J.), and *In re TT Boat Corp.,* 1999 WL 1442054, in support of this argument. In *Todd Shipyards,* the Fifth Circuit ultimately held that the appellee was not guilty of gross negligence, but during its analysis, it stated that gross negligence will invalidate an exemption from liability. *Todd Shipyards Corp.,* 674 F.2d at 411 (citing 6A CORBIN ON CONTRACTS § 1472 (1964 ed.)). The *AGIP Petroleum Co. Inc.,* which relied, in part, on *Todd Shipyards,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

considered whether a clause limiting damages "based on negligence, unseaworthiness, breach of warranty, breach of contract, strict liability or otherwise" was valid and enforceable under maritime law. *AGIP,* 920 F.Supp. at 1341. The court noted that "clauses limiting liability for negligence and strict liability are valid and enforceable," but "[s]uch clauses .... may not limit liability for conduct rising to the level of gross negligence." *Id.* (citing *Todd Shipyards Corp. v. Turbine Serv. Inc.,* 674 F.2d 401, 411 (5th Cir.1982)).

**\*14** New Tech asserts that parties may properly indemnify each other on claims of gross negligence, citing *In re Horizon Vessels, Inc.,* H–03–3280, 2005 U.S. Dist. LEXIS 42110, at \*34 (S.D.Tex. Nov. 18, 2005). Dkt. 21. In *Horizon Vessels,* the federal district court for the Southern District of Texas found that an indemnity clause that specifically required indemnification for damage "caused or contributed to by negligence or other fault (including sole, joint, concurrent or gross negligence) ... strict liability ... or any other legal liability" imposed a duty to indemnify for reckless conduct. *In re Horizon,* No. 4:03–cv–03280, Dkt. 186, at \*22–23. The party seeking to avoid enforcement of the indemnification clause in *Horizon Vessels* argued that the plain language of the clause only required it to indemnify the party seeking to enforce the clause for "negligence or other fault (including sole, joint, concurrent or gross negligence,)" not for reckless conduct. *Id.* at 22. There is no indication that the party seeking to avoid enforcement of the clause argued that a clause exempting a party from its own gross negligence or recklessness was unenforceable. *See id.* The district court adopted the magistrate judge's order, in which the magistrate judge found that the clause's "plain language ... unambiguously impose[d] ... an obligation to defend and indemnify ... even if [the party seeking to enforce the clause] engaged in reckless conduct with respect to the alleged incident." *In re Horizon,* No. 4:03–cv–03280, Dkts. 186, 196. The party seeking to avoid enforcement of the clause appealed, but the parties settled before the Fifth Circuit could address

the validity of the clause. *See In re Horizon,* No. 4:03–cv–03280, Dkts. 391, 392. While the *Horizon Vessels* court did enforce an indemnity provision that sought to encompass gross negligence and even held that it was broad enough to encompass reckless conduct, there is no indication that it was presented with the argument that Energy XXI makes—that the clause was unenforceable. Thus, while *Horizon Vessels* is helpful with regard to the interpretation of the clause, it is not persuasive with regard to New Tech's position that the clause is enforceable.

New Tech also argues that even courts that require an express negligence clause do not require that the clause expressly state it applies to *gross* negligence claims in order to cover such claims. Dkt. 21 at 9. Indeed, under Texas law, which requires an express negligence clause, a clause purporting to require indemnification "to the greatest extent allowed by Texas law, regardless of any negligence, misconduct or strict liability of any Indemnified party" was held to be broad enough to encompass gross negligence; it was not necessary that the clause specifically state that it covered "gross negligence" because "gross negligence is not a separate cause of action from negligence." *RLI Ins. Co. v. Union Pac. Ry. Co.,* 463 F.Supp.2d 646, 649 (S.D.Tex.2006) (Hittner, J.); *see also Webb v. Lawson–Avila Constr., Inc.,* 911 S.W.2d 457, 460–61 (Tex.App.-San Antonio 1995, writ dism'd) (noting that, under Texas law, when "the parties to an agreement use the term 'negligence' it is assumed they mean all shades of negligence" and concluding that the indemnifying party intended to indemnify "from the consequences of all shades and degrees of its own negligence, including gross negligence"). However, the indemnity provision here must be interpreted pursuant to maritime law, not Texas law, and the court therefore does not find the Texas cases persuasive.

**\*15** There is more support for the position that, under maritime law, an indemnification clause purporting to exempt a party from liability for its own

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

gross negligence is invalid than for the position that such clauses are an appropriate means of risk shifting. First, though *Todd Shipyards* did not directly *hold* that an exemption from liability for gross negligence is contrary to public policy, it did state, in dicta, that gross negligence "will invalidate an exemption from liability." *Todd Shipyards,* 674 F.2d at 411. The Fifth Circuit cited section 1472 of the 1964 edition of *Corbin on Contracts* for this concept. *Id.* That section states that "[c]ourts do not enforce agreements to exempt parties from tort liability if the liability results from that party's own gross negligence, recklessness, or intentional conduct." 15 *Corbin on Contracts* § 85.18 (2003 ed.) (formerly 6A *Corbin on Contracts* § 1472 (1964 ed.)).

Caselaw from other circuits and secondary sources also provide support for Energy XXI's position. The First and Ninth Circuits have, relying in part on *Todd Shipyards,* both instructed that a red letter clause may not limit liability for gross negligence in a maritime contract. *See Royal Ins. Co. of Am. v. Sw. Marine,* 194 F.3d 1009, 1016 (9th Cir.1999) ("We are persuaded ... that a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence." (citing *Todd Shipyards, La Esperanza de P.R., Inc. v. Perez y Cia de Puerto Rico, Inc.,* 124 F.3d 10 (1st Cir.1997); *Rest.2d Contracts § 195(1)* & cmt. a (1979); 6A *Corbin on Contracts* § 1472 (1962 ed. & Supp.1999); 8 *Williston on Contracts § 19:23 (4th ed.1998);* and Prosser & Keeton, *Torts* § 68, at 484 (5th ed.1984))); *La Esperanza,* 124 F.3d at 19 ("A red letter clause ... may not limit liability on a marine contract for gross negligence because harm willfully inflicted or caused by gross or wanton negligence operates to invalidate an exemption from liability." (internal quotation omitted) (quoting *Todd Shipyards*)). And, various secondary sources support the position that an exemption from liability for gross negligence in a maritime contract is contrary to public policy. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016 (citing various secondary sources); Daniel B. Shilliday *et al., Con-*

*tractual Risk–Shifting in Offshore Energy Operations,* 81 Tulane L.Rev. 1579, 1604 (2007) ("Courts sitting in admiralty are clear that it is against public policy for a party to a maritime contract to be indemnified for its own gross negligence."); Matthew J. Bauer, *Making Sense of Maritime Exculpation Clause Jurisprudence,* 22 Thomas M. Cooley L.Rev. 309, 309 (2006) ("[C]ourts will not permit a party to use an exculpation clause to limit its liability for gross negligence or intentional torts."); 57A Am.Jur.2d *Negligence* § 58 (Westlaw, updated Nov. 2010) ("It has been held that a person may not exonerate himself or herself for liability for intentional torts, for willful or wanton misconduct, or for gross negligence by the use of exculpatory language; such a provision is void as against public policy." (footnotes omitted)). *But see* Daniel B. MacLeod, *The Use and Enforceability of Exculpatory (Red Letter) Clauses in Ship Repair Contracts,* 6 Univ. of San Francisco Maritime Law J. 473, 492–500 (1994) (disagreeing with the view that the enforcement of exculpatory clauses should be predicated on "degrees of negligence"). In accord with these authorities, the court finds that the indemnity provision in this case, to the extent it encompasses claims for gross negligence, is unenforceable. New Tech's motion for summary judgment relating to the gross negligence claim is therefore DENIED.

**B. Motion for Summary Judgment on Energy XXI's Affirmative Claims**

**\*16** New Tech also moves for summary judgment on Energy XXI's affirmative claims based on its borrowed servant affirmative defense and a provision of the MSA that allegedly bars Energy XXI from recovering damages for breach of the MSA. Dkt. 22. Since the court is dismissing the breach of contract claim due to the indemnification clause, it need not address the damage limitation issue. As to the borrowed servant defense, New Tech claims that it cannot be held vicariously liable for Hines's conduct at the Gouda Well because its only involvement at the Gouda Well was to provide payroll services for Hines. *Id.* According to New Tech, Energy XXI directed and controlled Hines's

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

work at the Well, and "the ability to exercise authoritative control over the individual's work performance ... is the centerpiece of the borrowed servant analysis." [FN7] *Id.* New Tech therefore claims that Hines is the borrowed servant of Energy XXI and that it cannot be held vicariously liable. *Id.* Energy XXI argues that there are questions of fact with regard to whether Hines was its borrowed servant. Dkt. 24. Additionally, Energy XXI argues that even if Hines was its borrowed servant, New Tech is not entirely relieved of liability because Louisiana law should be applied, and, under Louisiana law, New Tech and Energy XXI were dual employers.

[23] **1. Borrowed Servant Analysis.** The " 'issue of whether a relationship of borrowed servant existed is a matter of law' for the district court to determine." *Melancon v. Amoco Prod. Co.,* 834 F.2d 1238, 1244 (5th Cir.1988) (quoting *Gaudet v. Exxon Corp.,* 562 F.2d 351, 357 (5th Cir.1977)). Both parties agree that, whether maritime or Louisiana law applies, the court should apply the factors enunciated in *Ruiz v. Shell Oil Co.,* 413 F.2d 310, 313 (5th Cir.1969) to determine if summary judgment is appropriate with regard to New Tech's borrowed servant defense. In *Ruiz,* the Fifth Circuit set forth the following factors for courts to consider when determining whether a borrowed-servant relationship exists:

(1) the amount of control the borrower has over the servant and the work he or she performs;

(2) whether there is an agreement, understanding, or meeting of the minds between the borrower and the lender;

(3) agreement or acquiescence by the servant that he be employed by the borrower;

(4) temporary termination by the general employer of its relationship with the servant;

(5) furnishing by the borrower of the necessary instruments and the place for performance of the

work in question;

(3) employment of the servant over a considerable length of time;

(7) the fact that work being performed is that of the temporary employer;

(8) customary right to discharge the servant; and

(9) obligation for payment of the servant's wages.

*Ruiz,* 413 F.2d at 312–13. "No one factor or combination of factors is decisive and no test has been fixed to determine the existence of a borrowed servant relationship." *Trevino v. Gen. Dynamics Corp.,* 865 F.2d 1474, 1488 (5th Cir.1989) (citing *Alday v. Patterson Truck Line, Inc.,* 750 F.2d 375, 376 (5th Cir.1985)).

**\*17 a. Extent of control Energy XXI had over Hines's work.** In the Fifth Circuit, "the question of who has control over the employee and the work he is performing, has [often] been considered the central issue of 'borrowed employee' status." *Melancon,* 834 F.2d at 1244–45 (citation omitted). However, this factor is "not necessarily determinative." *Id.* "In considering whether the power exists to control and direct a servant, a careful distinction must be made 'between authoritative direction and control, and mere suggestions as to details ....' " *Ruiz,* 413 F.2d at 313 (quoting *Standard Oil Co. v. Anderson,* 212 U.S. 215, 222, 29 S.Ct. 252, 53 L.Ed. 480 (1909)).

[24] Energy XXI argues that it is the *right* to control the work as opposed to actual control that matters. Dkts. 27–4, 39. Energy XXI focuses on New Tech's overall control of Hines's employment situation as opposed to control over the actual work he was doing at the Gouda Well. Energy XXI claims that, when considering the areas of Hines's employment over which New Tech had control, "there is absolutely no distinction between Hines' employment with New Tech and any other ordinary employment relationship." Dkt. 39. New Tech performed a background and reference check before

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

engaging Hines as a consultant, and it conducted a series of telephone interviews. Dkts. 27–4; 39. New Tech conducted drug testing on Hines two or three times, though Hines does not recall whether these tests were "preemployment or not." Dkt. 39. New Tech marketed Hines to oil companies, and it helped find him new projects after existing projects were completed. Dkt. 24. New Tech's contract with Hines requires him to perform his work with "due diligence in a workmanlike manner and according to accepted industry practices," and it contains specific provisions with regard to how Hines could submit his time and how he would be paid. Dkt. 39. New Tech also generally kept track of its consultants, and Energy XXI contends that Hines would have to call New Tech before taking a day off or leaving a job. Dkt. 24. New Tech required Hines to maintain automobile insurance, and it provided him with liability insurance. Dkt. 39. New Tech also gave Hines specific requirements relating to his invoices, and, of course, it issued his paychecks. Dkt. 24. Energy XXI, on the other hand, had no control over how Hines was paid, and Hines never received any direct payments from Energy XXI. Dkt. 39.

New Tech focuses on Energy XXI's control over Hines's work at the Gouda Well and New Tech's relative lack of control of the work being performed, rather than the overall employment relationship. Hines worked under the direct supervision of Art Craighead, an Energy XXI superintendent, for eight months prior to the incident. Dkt. 37; 40–1. Hines would report to and receive directions from Craighead. Dkt. 37. Hines was in daily communication with Energy XXI regarding operations at Energy XXI's jobsites, and he moved from job to job with the Energy XXI drilling crew over the eight months. *Id.;* Dkt. 22. Hines did not consult with anyone at New Tech about these moves and, with the exception of his notations regarding his location on his timesheets, did not even inform New Tech about the changes. Dkt. 37, Exh. A at 203, 211. After the incident, Hines consulted with Tim Walker, Energy XXI's completions engineer, about how to handle the situation. Dkt. 37 & Exh.

A at 140–42. He also spoke with Craighead, Steve Nelson, and Mark Magner—all Energy XXI employees. Hines did not talk with anyone at New Tech about what to do on the well following the incident. Dkt. 37. Moreover, Hines testified that New Tech had no involvement with his work at Energy XXI's well. *Id.*

**\*18** While New Tech initially hired Hines, conducted drug tests, controlled how Hines would receive his paychecks, and contractually required him to perform his work for Energy XXI in a good and workmanlike manner, it did not exercise control over the actual work Hines performed at Energy XXI's wells. Testimony from Energy XXI officials demonstrates that Energy XXI exercised control over Hines's work. When asked if "Energy XXI was controlling and defining the scope of the work that Hines was expected to perform on behalf of Energy XXI," Steve Nelson of Energy XXI responded, "Absolutely." Dkt. 25, Exh. B at 29. Additionally, Nelson agreed that the communications between Hines and Craighead and Walker were "frequent." *Id.* at 30. Moreover, when asked if Walker and Craighead were reviewing what Hines was doing, Nelson again responded, "Absolutely." *Id.* at 31–32. Finally, when Tim Walker was asked during his deposition if Hines "was basically working at the sole direction and control of Energy XXI," including Walker and Craighead, Walker replied, "Yes." Dkt. 25, Exh. D at 33–34. Thus, Energy XXI, not New Tech, controlled Hines's actual work at the Gouda Well.

New Tech also did not have a significant *right* to control the actual work Hines was performing at the Gouda Well. While Hines was contractually obligated to perform his work in a good and workmanlike manner and there is some testimony indicating that, in general, a company man can contact his main employer when he has substantive questions about his work, according to Craighead and Nelson, Hines could not contact New Tech for advice relating to operations at the Gouda Well without Energy XXI's permission; if Hines did call

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

New Tech's engineers, New Tech would bill Energy XXI for the engineers' time. Dkt. 22, Exhs. E at 19–22, F at 12–14. Moreover, New Tech's Vice President Jeffrey R. Cummins and Hines both testified that Hines was not an "employee" of New Tech; rather, he was an independent consultant. Dkt. 25, Exh. E.; Dkt. 37, Exh. A.

Hines worked for Energy XXI for eight months, so New Tech's absence of control over Hines's day-to-day work was significant. This is very similar to the factual situation the Fifth Circuit addressed in *Lemaire v. Danos & Curole Marine Contractors, Inc.,* 265 F.3d 1059, 2001 WL 872840 (5th Cir.2001) (unpublished, per curium decision). The Fifth summarily affirmed the district court and attached the district court's memorandum opinion as an exhibit. *See id.* In that memorandum opinion, the district court noted that the employee had been employed by Steen for four or five months, and he had reported directly to Texaco's platform for three of those months. *See id.* at *5. During this time, the employee would submit his work log to Steen, and he received his paycheck from Steen. *See id.* Otherwise, he was instructed by Texaco's employees. *See id.* The district court found that Texaco had control over the employee and the work he was performing. Here, it is clear that Energy XXI, like Texaco, had the power to control and direct Hines's work during the time Hines was working at Energy XXI's wells and, in fact, did so. The control New Tech had over other details of Hines's overall employment (as opposed to this job) do not outweigh Energy XXI's control. The court finds that this factor weighs strongly in favor of finding that Hines was Energy XXI's borrowed servant.

**\*19** **[25]** **b. Agreement between borrower and lender.** The MSA states that New Tech's personnel are not employees of Energy XXI. *See* Dkt. 37, Exh. D. It also states that "Energy XXI shall not have the right to control or direct the details of the work performed by Contractor." This factor, thus, weighs in favor of Energy XXI's position that Hines was not its borrowed servant. However, it does not outweigh the first *Ruiz* factor because the "reality at the work site and the parties' action in carrying out the contract ... can impliedly modify, alter, or waive express contract provisions." *Melancon,* 834 F.2d at 1245.

**[26]** **c. Agreement by employee that he was employed by borrower.** During the relevant time period, Hines officially "classified" himself as a senior drilling supervisor for New Tech Engineering. Dkt. 39; Dkt. 37, Exh. A at 35–36. Energy XXI points out that Hines testified that he had "worked for New Tech"—as opposed to Energy XXI—since 2006. Dkt. 39; Dkt. 37, Exh. A. This testimony, however, is easily misconstrued. Counsel asked Hines the following question, to which opposing counsel objected to form: "Since January of 2009, you've been with New Tech?" Dkt. 37, Exh. A at 38. Hines stated, "I would've assumed I would have been, but, I mean, I didn't work at all. So, I mean, there was no work, so I was putting my name out there. I worked *through* a lot of different firms." *Id.* at 39 (emphasis added). Counsel then asked, "What other firms have you worked *for,* say 2008 to present?" *Id.* (emphasis added). Hines testified, "Well, 2008 through 2009, was strictly New Tech." *Id.* The testimony goes on as follows:

Q: How about 2007?

A: New Tech.

Q. Any others?

A: No. I haven't worked *through* others until—the way an independent petroleum consultant does is, we go to—we basically go to the highest bidder. Basically is, if a company calls us and says, I need a drilling foreman, if we're available and not working a the time, I will contract to them.

...

I have several—I mean, my name is just out there, just like a—like a building contractor, basically. You know, anybody can pick me up.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

Q: In 2007, 2008, 2009, the only company that you worked with or that had picked you up was New Tech?

A: Correct.

Dkt. 37, Exh. A at 39–41 (emphasis added). Thus, when viewed in context, Hines actually testified that he worked *through* New Tech, not *for* New Tech.

Regardless of his actual position with New Tech, Hines clearly testified that he did not consider himself to be an "employee" of Energy XXI. Dkts. 37, 39. This is, however, all semantics. Hines stated that he was not an "employee," he was a "representative." Dkt. 37. He said his job was "to represent the oil company." *Id.* Then he said, "[I]t doesn't matter whether I'm a consultant or an employee; I still get labeled as 'Energy XXI representative.' " *Id.* When asked if he ever considered himself to be "an Energy XXI direct employee?" Hines answered, after an objection to form, "We conducted ourselves like we were, yes." Dkt. 37, Exh. A at 93–94. He further explained, "We conducted ourselves as if we were an employee protecting the interest of that company *because that's who we're working for, is them.* And a good consultant always tries to put himself in the environment or in a position with an oil company *as if he is an employee,* to protect their interests.... So, you know, we take the best interest of every company we *work for as if we are their employee,* and that's the way it's supposed to be." Dkt. 37, Exh. A at 94 (emphasis added). Thus, while he knew that he was not technically classified as an employee, he certainly agreed to behave as an employee. Cf. *Capps v. N.L. Baroid–NL Industs., Inc.,* 784 F.2d 615, 617 (5th Cir.1986) (finding that an employee who worked for a company that loaned temporary employees acquiesced to new work situations when he agreed to work for the loaning company). This factor thus weighs in favor of New Tech's position that Hines was Energy XXI's borrowed servant.

[27] **d. Temporary termination of general**

**employer's relationship with employee.** New Tech did not temporarily terminate its relationship with Hines while Hines worked at Energy XXI's jobsites. This factor weighs in favor of Energy XXI's position that Hines was not its borrowed servant.

**\*20** [28] **e. Furnishing by borrower of instruments and location of work.** Energy XXI claims that this factor is "inconclusive" because, while it supplied the place of performance for work, New Tech provided Hines with the tools that were necessary for him to be paid. Dkt. 24. New Tech points out that Energy XXI provided not only the workplace but also the recompletion procedure, which is what is at issue in this lawsuit. Dkt. 18. Hines testified that the only "thing" he got from New Tech relating to the Energy XXI job was the billing template. Dkt. 37, Exh. A. New Tech did not provide any supplies or equipment to Hines for actually performing his job at the Gouda Well. *Id.* The court finds that this factor weighs in favor of New Tech's position that Hines was Energy XXI's borrowed servant.

[29] **f. Employment of the servant over a considerable length of time.** Energy XXI contends that the court should consider only the length of time that Hines was employed at the Gouda Well, not the entire length of time that he worked on Energy XXI jobs. Dkt. 24. New Tech points out that Hines had initially started working for Energy XXI, through New Tech, in June 2008. Dkt. 37. He worked for Energy XXI continuously for the next eight months, moving from job to job. *Id.* According to Timothy Walker, Hines was basically performing the same job on the Energy XXI wells on which he worked prior to the Gouda Well. Dkt. 22, Exh. C at 27. Thus, while Energy XXI asserts that the court should consider only the time at the Gouda Well because "a recompletion job such as the one at issue here is finite in duration and cannot reasonably be characterized as an ongoing employment situation," the court finds that Hines' continued work with Energy XXI performing essentially

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

the same tasks for eight months weighs in favor of New Tech's position that Hines was Energy XXI's borrowed servant.

[30] **g. Whose work was being performed.** Energy XXI claims that Hines' job was to provide consulting services for New Tech, which is in the business of providing consulting services. Dkt. 24. As such, Energy XXI asserts that Hines was performing New Tech's work. New Tech, on the other hand, contends that it is preposterous for Energy XXI to claim that Hines, who was performing a re-completion operation at a well owned, operated, and controlled by Energy XXI, was not performing Energy XXI's work. Dkt. 25. The court is inclined to agree with New Tech; however, even if one were to agree that Hines was performing New Tech's work because he was performing consulting services, this factor would not weigh in favor of Energy XXI's position. At best, it would be neutral, because Hines was also performing Energy XXI's work.

[31] **h. Customary right to discharge the servant.** Energy XXI contends that only New Tech had the right to discharge Hines from New Tech's employ, whereas New Tech argues that Energy XXI had the right, and indeed exercised the right, to discharge Hines from his work on Energy XXI's project. Energy XXI officials testified that Energy XXI terminated Hines's job at the Gouda Well. Dkt. 25, Exhs. D, G. Hines testified that Art Craighead released him from the job following the incident, not New Tech. Dkt. 37, Exh. A. Then, once Hines was back onshore, he called New Tech to tell New Tech that he had been released. *Id.* Additionally, Hines testified that Craighead had the right to terminate his position with Energy XXI at any time. *Id.* When asked to clarify what he meant by "terminated," Hines stated, "I was released of duty, fired, whatever you want to call it." He was "told to pack [his] things and get off the rig." *Id.* He did not receive a termination notice from New Tech. *Id.* While New Tech certainly had the authority to terminate Hines's relationship with New Tech, Energy

XXI clearly had the authority to terminate the work Hines was actually doing at the time of the incident-working as a company man overseeing the re-completion procedure at the Gouda Well. This is the authority that is at issue. *See, e.g.,* Billizon v. Conoco, Inc., 993 F.2d 104, 105 (5th Cir.1993) (noting that the borrowing company "did not have the right to terminate the [borrowed servant's] employment with [the lending employer], but it had the right to end [the borrowed servant's] association with [the borrowing company]", and ultimately finding that the only factor weighing against borrowed servant status was the meeting of the minds factor); Melancon, 834 F.2d at 1246 (holding that the borrowing employer's "right to terminate [the servant's] services in the ... field satisfied this requirement" (citing Capps, 784 F.2d at 618)). This factor thus weighs in favor of a finding that Hines was Energy XXI's borrowed servant.

**\*21** [32] **I. Obligation for payment of servant's wages.** Energy XXI points out that New Tech paid Hines's salary the entire time he worked on Energy XXI projects. It is undisputed that Hines received his paycheck from New Tech. However, New Tech billed Energy XXI for Hines's work, and Energy XXI ultimately paid Hines's salary. Hines testified that he worked through New Tech and companies like New Tech rather than working directly for the oil company because he can get paid quickly without having to "worry about sending billing to major companies and trying to collect money 30, 60, 90 days later." Dkt. 37, Exh. A. Additionally, it was easier for Hines if another company dealt with workers' compensation and general liability insurance, which he considered a "headache." *Id.* Since New Tech's role in paying Hines was, essentially, administrative, and Energy XXI was ultimately responsible for paying Hines's wages for the work performed on its wells, this factor does not weigh against a finding that Hines was Energy XXI's borrowed servant. *See, e.g.,* Billizon, 993 F.2d at 105 (noting that, while the borrowed servant was paid by the lending employer, his pay was based on time tickets verified by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

borrowing employer, and determining that this factor did not support the borrowing employer's contention that the servant was not borrowed); *Melancon,* 834 F.2d at 1246 (finding that, when the borrowing employer paid the servant's wages "via" the lending employer based on the number of hours the servant worked for the borrowing employer, the fact that the lending employer "kept a percentage of the amount [the borrowing employer] was charged is not relevant" because the borrowing employer "furnished the funds from which" the lending employer paid the servant); *Capps,* 784 F.2d at 618 (finding, when the lending employer had the obligation to pay the borrowed servant but it received the funds to do so from the borrowing employer, that this factor did "not detract from the district court's ruling" that the employee was a borrowed servant).

In sum, most of the factors weigh in favor of New Tech's position that Hines was Energy XXI's borrowed servant, and the factors that either weigh in Energy XXI's favor or are neutral do not outweigh the factors in New Tech's favor. Accordingly, the court finds, as a matter of law, that Hines was Energy XXI's borrowed servant.

[33] **2. Dual–Employer Doctrine.** Energy XXI argues that Louisiana law applies to the tort claims and, under Louisiana law, even if Hines is a "borrowed servant," New Tech could still be held liable under the "dual-employer" doctrine. Dkt. 24 (citing *Morgan v. ABC Mfr.,* 710 So.2d 1077, 1078 (La.1998)). Energy XXI also argues that even if the court were to determine that maritime and not Louisiana law applies, courts sitting in admiralty in the Fifth Circuit have recognized the dual-employer doctrine. Dkt. 28–4. New Tech, on the other hand, argues that it is not a dual employer because maritime law does not recognize the "dual-employer" doctrine, and maritime law applies to the tort claims. Dkt. 25. Moreover, according to New Tech, even if Louisiana law applies, the dual-employer doctrine does not apply under the facts of this case.

**\*22** [34] While the court need not engage in a choice-of-law analysis if, as with the borrowed servant test, there is no conflict between the law of the different forums, here each party claims that both Louisiana law and maritime law support their opposite positions. So, the court must determine first whether there is a conflict between Louisiana and maritime law or whether one of the two parties is correct in its assertion that there is no difference between Louisiana and maritime law as applied in this case. This requires an analysis of the applicability of the dual-employer doctrine under both Louisiana law and maritime law.

***a. Louisiana Law.*** Energy XXI asserts that New Tech's business of providing consulting services was furthered by Hines's work at Energy XXI's wells and that, therefore, the dual employer doctrine should render New Tech liable for Hines's torts. *In Morgan v. ABC Manufacturer,* the Louisiana Supreme Court held, "where a general employer is engaged in the business of hiring out its employees under the supervision of another employer, the general employer remains liable for the torts of the borrowed employees." *Morgan,* 710 So.2d at 1078. Under this doctrine, a general employer is liable for its employee's torts even if it does not control the employee's work because its business is furthered when it loans or hires out the employee. *Id.* at 1083.

In *Morgan,* Worktec Temporaries, Inc. ("Worktec"), provided temporary employees for Goldin Industries of Louisiana, Inc. ("Goldin"). 710 So.2d at 1078. Under the agreement between Goldin and Worktec, Worktec provided administrative services, recruited, screened, tested, provided orientation, assigned, and continually monitored the employees it provided. *Id.* Worktec also provided insurance for the employees. *Id.* Goldin provided tools and equipment for the employees provided by Worktec and gave the employees instructions. *Id.* Goldin could dismiss Worktec's employees from its "yard," but only Worktec could hire and fire the employees. *Id.* One of Goldin's employees was injured when a piece of scrap iron that was hooked to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

a crane fell on him. *Id.* The iron was allegedly negligently hooked to the crane by an employee of Worktec. *Id.* Worktec argued that the employee that hooked the iron to the crane was Goldin's borrowed servant and that it was therefore relieved of liability. *Id.* at 1079.

The case reached the Louisiana Supreme Court, which specifically noted that numerous courts and commentators had "expressed concern regarding the continued applicability of the borrowed employee doctrine" as courts tended to apply the doctrine inconsistently. *Id.* at 1081–82. It outlined its previous jurisprudence relating to the "dual-employer" doctrine, noting that "modern justification for employer liability is not based so much on the employer's control of the employee's actions, but on the concept of 'enterprise liability.'" *Id.* at 1083. Under this concept, "'a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.'" *Id.* (quoting *Ermert v. Hartford Ins. Co.,* 559 So.2d 467, 476 (La.1990)). The court stated that the relevant inquiry is not whether the borrowed servant defense should apply when the lending employer does not retain supervisory control but rather whether the defense extends to a situation wherein "temporary agencies who are in the business of lending their employees under the supervision of others should receive the benefit of tort immunity." *Id.* at 1082. It noted that loaned employees were Worktec's "stock in trade" and that "a significant feature of [Worktec's] business is to pass control of the details of the work to its customers." *Id.* at 1083. Worktec, however, retained "ultimate and overriding authority over its loaned workers." *Id.* The court found that both Worktec and Goldin "had contemporaneous control over [the servant], and both contemporaneously benefitted from his labor." *Id.* It therefore held that, given the "overlapping control and shared financial interest," it was appropriate for the two companies to "share liability." *Id.*

**\*23** Here, New Tech, like Worktec, is in the

business of lending its "employees" to others, who controlled the details of the employees' work. New Tech, like Worktec, provided insurance for its "employees." New Tech and Energy XXI, like Worktec and Goldin, benefitted contemporaneously from the labor of the loaned "employees." Additionally, Energy XXI, like Goldin, had the power to dismiss the borrowed servant from its worksite, but only New Tech, like Worktec, could actually terminate the servants' relationship with it. Thus, like Worktec, New Tech's "failure to exercise direct supervisory control over [Hines] should not," if Louisiana law applies, "preclude its liability." *Id.* at 1084.

New Tech argues that the Fifth Circuit, applying Louisiana law, has limited the application of the dual-employer doctrine, and, as such, it is not a "dual employer" even if Louisiana law applies. New Tech claims that it had no control of Hines's activities relating to the underlying incident and that Energy XXI therefore must bear responsibility for Hines's actions. Dkt. 25. New Tech cites *Boston Old Colony Ins. Co. v. Tiner Associates Inc.,* 288 F.3d 222, 229 (5th Cir.2002), in support of its arguments.

In *Boston Old Colony,* the Fifth Circuit, applying Louisiana law, noted that the borrowed servant doctrine "has been modified somewhat by the dual employer doctrine, according to which both the special and general employer may be found jointly liable for the torts of a borrowed employee." FN8 *Boston Old Colony,* 288 F.3d at 229. However, the doctrine applies only "in circumstances where the employee's negligent acts were 'done in pursuance of duties designated for him by his [general] employer, in whose pay he continued and who had the sole right to discharge him.'" *Id.* (quoting *LeJeune v. Allstate Ins. Co.,* 365 So.2d 471, 481 (La.1978)). If the "'general employer is engaged in the business of hiring out its employees under the supervision of another employer, the general employer remains liable for the torts of the "borrowed" employees.'" *Id.* (quoting *Morgan v. ABC Manufac-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

turer, 710 So.2d 1077 (La.1998)).

In *Boston Old Colony,* a television tower collapsed and was completely destroyed because a work crew that was repairing the tower failed to use a temporary brace to support the tower while they were removing diagonal rods that prevented the structure from twisting. *Id.* at 226. Tiner Associates, Inc. ("Tiner") was a company that provided repair and maintenance services for towers. *Id.* Tiner entered into an agreement with HRC Armco, Inc., which was later assigned to Allied Resource Management, Inc. ("Allied"), whereby Allied would "lease" employees to Tiner in exchange for a fee and a percentage of the employees' wages. *Id.* at 228. Tiner actually recruited and hired the work crew, but Allied had the power to refuse to "employ" them in certain narrow circumstances, such as failure of a drug test or lack of proper immigration forms. *Id.* Allied did not have the power to terminate the employees' employment. *Id.*

**\*24** The Fifth Circuit noted that the work crew was under the control of Tiner at the time of the negligent action and that, even if Allied were considered the "general employer," the dual-employer doctrine did not apply "because Allied's function was primarily that of dealing with paperwork related to the employees"; it was "not in the business of providing tower repair services to companies," so the crew could not be said to be "performing the business of Allied." *Id.* at 229. Additionally, the work crew was working under the direct supervision of Tiner, and Allied did not have actual hiring or firing power. *Id.*

While New Tech's business, like Allied's, was "primarily that of dealing with paperwork relating to employees," unlike Allied, New Tech recruited and marketed its contractors to its clients. Allied, for the most part, simply rubber-stamped Tiner's employee choices. New Tech's role was more similar to Worktec's role than Allied's role. While New Tech differs from Worktec in that the evidence in the record does not demonstrate that New Tech continually monitored its employees like Worktec,

the facts are otherwise analogous. Thus, there is no indication that the Fifth Circuit has limited *Morgan* enough to preclude the application of the dual-employer doctrine in this case, if Louisiana law applies.

**b. Maritime Law.** New Tech argues that the dual-employer doctrine is not applicable in cases decided under maritime law. Dkt. 25. Energy XXI claims that the dual-employer doctrine is "not foreign to maritime law." Dkt. 28–4. Energy XXI cites *Barthelemy v. Phillips Petroleum Co.,* No. Civ. A. 96–2226, 1999 WL 65024 (E.D.La. Feb. 9, 1999), and *Nunez v. B & B Dredging,* 108 F.Supp.2d 656, 663 n. 11 (E.D.La.2000), rev'd on other grounds, 288 F.3d 222 (5th Cir.2002), in support of this contention. In *Barthelemy,* the district court held that the general employer, or lending employer, had "failed to prove that a borrowed servant relationship existed so as to limit the liability of" the special, or borrowing, employer. 1999 WL 65024, at \*6. It then noted that it agreed with and adopted the "dual employer" rule from Morgan and that the lending employer's liability, consequently, should not be severed. *Id.* While the *Barthelemy* district court agreed with the dual-employer rule, it clearly stated, before doing so, that the general employer had not proven the borrowed servant relationship, anyway. Thus, the outcome would have been the same whether the district court adopted the doctrine or not. The court therefore is not persuaded that it should follow the *Barthelemy's* court lead and adopt the doctrine because in this case New Tech has shown that Hines was Energy XXI's borrowed servant.[FN9]

In *Nunez,* the district court held that a seaman was a borrowed servant but that the general or lending employer never abandoned its relationship with the servant, so both employers were jointly and severally liable. 108 F.Supp.2d at 661–63. In a footnote, it stated that "the rule in several jurisdictions is that both the general and special employer may be held liable for the employee's tort," citing *Morgan* and other cases. *Id.* at 663 n. 11. On appeal, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

Fifth Circuit held that the employee was not a Jones Act seaman. *Nunez v. B & B Dredging, Inc.,* 288 F.3d 271 (5th Cir.2002). The lending employer had filed a cross-appeal on the district court's finding of joint liability, but the Fifth Circuit did not find it necessary to address this issue because the Jones Act finding rendered the cross-appeal irrelevant. *Id.* at 274 n. 2. Thus, while the district court adopted and applied the doctrine in the admiralty context, the Fifth Circuit has not.

**\*25** Energy XXI has failed to provide the court with any binding authority applying the dual-employer doctrine under maritime law, and the court has found none. There is, however, substantial authority applying the borrowed servant defense and precluding liability of the lending employer when it proves that its employee was the borrowed servant of the borrowing employer. The court is bound by this authority and is not inclined to adopt a rule that has not been adopted by the Fifth Circuit. As such, if maritime law applies, the dual-employer doctrine does not.

***c. Choice of Law.*** Since there is a conflict between maritime law and Louisiana law, the court must engage in a choice-of-law analysis for the gross negligence claim. As noted above, the court must consider the *PLT* factors: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil seabed, or artificial structures permanently or temporarily attached thereto)"; "(2) Federal maritime law must not apply of its own force"; and "(3) The state law must not be inconsistent with Federal law." *PLT,* 895 F.2d at 1047. The first prong is easily met because in the Fifth Circuit a jack-up drilling rig that is jacked up is an OCSLA situs. *See Demette,* 280 F.3d at 498. The second and third prongs, however, require more analysis.

[35][36] As to the second factor, "a party seeking to invoke federal admiralty jurisdiction ... over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534, 115 S.Ct. 1043, 130

L.Ed.2d 1024 (1995). To satisfy the location test, the tort must have "occurred on navigable water or," if it occurred on land, it must have been "caused by a vessel on navigable water." *Id.* The connection test involves "two queries: (1) whether the type of incident involved has the potential to disrupt maritime commerce and (2) 'whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.' " *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co., Inc.,* 448 F.3d 760, 770–71 (5th Cir.2006) (quoting *Jerome B. Grubart, Inc.,* 513 U.S. at 534, 115 S.Ct. 1043 and *Scarborough v. Clemco Indus.,* 391 F.3d 660, 663 (5th Cir.2004)).

[37][38] Here, the location test is met. *See, e.g., Strong v. B.P. Exploration & Prod., Inc.,* 440 F.3d 665, 669 (5th Cir.2006) (stating that the location requirement is satisfied even when the vessel is jacked up and not under sail). As far as the connection, New Tech argues that the recompletion services at the Well were "inextricably intertwined with maritime activities" because they necessarily required the use of a vessel, and the jack-up drilling rig is a vessel. Dkt. 36. Energy XXI argues that the recompletion services are not maritime in nature because they could just as easily be performed at a land-based facility at sea. Dkt. 35. Energy XXI points out that the events giving rise to this lawsuit were confined to a jack-up rig, that was jacked up, and the well beneath it, arguing that these events did not affect the navigability of the waters surrounding the well or otherwise affect maritime commerce. Dkt. 33. Moreover, Energy XXI argues that there is no substantial relationship to traditional maritime activity.

**\*26** Energy XXI is correct that "exploration and development of the Continental Shelf are not themselves maritime commerce." *Herb's Welding v. Gray,* 470 U.S. 414, 422, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). The court, however, must determine whether the fact that the work on the Continental Shelf here involved supervision of work be-

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

ing performed by a vessel sufficiently connects this otherwise nonmaritime activity into a maritime activity for the purpose of applying maritime law. The parties do not point to any cases that are directly on point, but there are two cases that are similar enough to provide guidance.

In *Texaco Exploration & Production, Inc.,* Texaco Exploration & Production, Inc. had a contract with J. Ray McDermott, Inc. requiring J. Ray McDermott, Inc. to design, fabricate, install, and construct a special platform on the Outer Continental Shelf that would be permanently attached to the seabed but could flex with the waves and produce 60,000 barrels of oil and 100 million cubic feet of natural gas per day. *Texaco Exploration,* 448 F.3d 760, 765 (5th Cir.2006). McDermott chartered and operated a barge to use for the construction project. *Id.* at 765–66. During the installation of one of the deck modules, a crane's wire rope load line failed, and the module was dropped to the sea floor. *Id.* at 766. Texaco sued various entities, asserting negligence and products liability causes of action and alleging that the case should be governed by general admiralty law. *See id.* Texaco had, however, demanded a jury trial. *See id.* at 767. Another party moved to strike Texaco's jury demand, and the trial court granted the motion, finding that it did not have jurisdiction pursuant to OCSLA; rather, it determined that it had jurisdiction pursuant to general admiralty law, which does not give rise to a right to a jury trial. *Id.* The case proceeded to a bench trial, which lasted 24 days. *Id.* After the trial court issued its ruling, Texaco appealed, arguing that the trial court erred in denying a jury trial because it had jurisdiction under OCSLA. *Id.* at 768. On appeal, the Fifth Circuit determined that "the parties were undeniably involved in the development of the Outer Continental Shelf" and the "harm alleged by Texaco arises directly from the construction of ... a fixed platform expressly covered by OCSLA's terms, and would not have occurred but for the development of the Outer Continental Shelf in the form of the [platform's] construction." *Id.* at 769. The Fifth Circuit held that the district court erred in

basing its jurisdiction in admiralty, which did not apply, and that it should have applied OCSLA. *Id.* at 771.

After determining that jurisdiction rested solely on OCSLA, the Fifth Circuit noted that it must determine which substantive law should apply—maritime or the adjacent state's. *Id.* It conducted the *PLT* analysis. It noted that the torts in the complaint arose on an OCSLA situs because they were inextricably linked to the construction of a platform permanently attached to the Outer Continental Shelf. It then reasoned that maritime law did not apply of its own force "because there [was] insufficient connection between the underlying torts and traditional maritime activity." *Id.* at 774. "The damages allegedly caused by a defectively designed or maintained *portion* of the crane ... are not the stuff of traditional maritime activity on the high seas." *Id.* It found that the barge's involvement "and other elements of maritime activity that precede or surround the [platform's] construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law." *Id.* at 775. The Fifth Circuit held that Texaco's claims were governed by OCSLA, not maritime law, and that the law of the adjacent state, rather than admiralty law, should have been applied. *Id.*

**\*27** *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113 (5th Cir.1995), is a factually similar case in which the Fifth Circuit determined that maritime law applied. In *Coats,* Earl Wayne Coats worked on a jack-up drilling rig located in the territorial waters of the United Arab Emirates. *Coats,* 61 F.3d at 1117. He was conducting pressure testing aboard the rig when Penrod Drilling Corp.'s bullplug failed, and fluid under pressure erupted. *Id.* Coats suffered severe and disabling injuries to his knee. *Id.* Coats eventually filed a lawsuit in federal court, asserting diversity jurisdiction and admiralty jurisdiction. *See id.* Several motions were filed by the parties before trial. *Id.* In response to one of the motions, the district court applied United States

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

law, found that Coats qualified as a *Sieracki* seaman, and therefore allowed him to sue under the warranty of seaworthiness. *Id.* On appeal after trial, the Fifth Circuit specifically addressed the choice-of-law issue. *See id.*

The *Coats* defendant argued that the district court lacked admiralty jurisdiction because the activity giving rise to the accident was not sufficiently connected to traditional maritime activity and that the case should have been decided either under United Arab Emirates law or Mississippi law. FN10 *See id.* The Fifth Circuit applied *Grubart* to determine whether there was a "substantial relationship to traditional maritime activity." First, it noted that the repair and maintenance of oilfield and marine vessels in navigable waters "can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel." *Id.* at 1119. Then, it noted that the injury occurred "aboard a vessel on navigable waters" and that "[p]roviding compensation for shipboard injuries is a traditional function of the admiralty laws." *Id.* The court, noting that there is a distinction between personal injury and property damage, held that Coats' activity had a sufficient connection to traditional maritime activity to support admiralty tort jurisdiction. *Id.*

[39] *Texaco,* like this case, involved property damage. *Coats* did not. *Coats,* like this case, involved a tort occurring on a jack-up drilling rig that was temporarily attached to the seabed. Texaco did not. Thus, neither case is *directly* on point. However, the court can extract a rule for this case from *Texaco* and *Coats.* In *Texaco,* the property damage occurred because of an equipment failure occurring on a barge, which is a vessel. While the Fifth Circuit found the fact that Coats's injury occurred on a vessel significant in *Coats,* the fact that the property damage occurred by way of a vessel in *Texaco* did not convince the Fifth Circuit that the tort was sufficiently connected to maritime activity. Thus, the fact that the tort occurred on a vessel is not determinative of the choice-of-law issue when

the damage is property damage rather than personal injury. If Hines had been physically performing the recompletion, had somehow been injured in the process, and had brought suit, then it is likely that the court would apply maritime law, relying on *Coats.* However, Hines was not injured; the injury here was to Energy XXI's property, and, specifically, to its well. Operation of an oil well on the Outer Continental Shelf is development of the Outer Continental Shelf, not traditional maritime activity. *See Herb's Welding,* 470 U.S. at 422, 105 S.Ct. 1421. Thus, since the tort occurred during a recompletion procedure and the injury was damage to an oil well, OCSLA governs, not maritime law, notwithstanding the fact that a jack-up drilling rig was involved.

**\*28** [40] Since maritime law does not apply of its own force, the court must address the third prong of the *PLT* test—whether Louisiana law is "inconsistent" with Federal law. Under OCSLA, Louisiana law is thus adopted unless it is inconsistent with any federal law that does apply. Here, maritime law does not apply to the gross negligence claim, and there is no other federal law that applies. Thus, the court will apply Louisiana law.

[41] While it seems like a contradiction to find that there is a conflict between Louisiana law and maritime law requiring a choice-of-law analysis and then to hold that there is no inconsistency between the two, courts do not consider variations in discrete aspects of the federal and state remedies when determining whether there is an inconsistency precluding the application of state law under OCSLA. When OCSLA borrows a remedy provided by state law, it makes " 'the entire state cause of action *applicable* federal law, enforceable as federal law.' " *Olsen v. Shell Oil Co.,* 708 F.2d 976, 983 (5th Cir.1983) (quoting and approving of *Gulf Offshore Co. v. Mobil Oil Corp.,* 628 S.W.2d 171, 174 (Tex.App.-Houston [14th Dist.] 1982), *cert. denied* 459 U.S. 945, 103 S.Ct. 259, 74 L.Ed.2d 202 (1982)). The Supreme Court, in *Chevron Oil Co. v. Huson,* explained that Congress, in enacting OC-

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

SLA, "recognized that 'the Federal Code was never designed to be a complete body of law in and of itself' and thus that a comprehensive body of state law was needed.... If Congress' goal was to provide a comprehensive and familiar body of law, it would defeat that goal to apply only certain aspects of a state personal injury remedy in federal court." *Chevron Oil Co. v. Huson,* 404 U.S. 97, 102–03, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), *overruled on other grounds by Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (quoting *Rodrigue v. Aetna Cas. & Surety Co.,* 395 U.S. 352, 358, 361, 365, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)). The Supreme Court therefore rejected an argument that the federal common law doctrine of laches should apply rather than a one-year statute of limitations under Louisiana law in a case involving personal injury occurring on a rig on the Outer Continental Shelf, even though Louisiana otherwise applied as surrogate federal law under OCSLA. *Id.* Since *Huson,* the Fifth Circuit has "consistently rejected attempts of litigants to have 'federal common law' override rules of Louisiana tort law in actions arising on fixed platforms on the Outer Continental Shelf." *Fontenot v. Dual Drilling Co.,* 179 F.3d 969, 977 (5th Cir.1999) (citing *Marcel v. Placid Oil Co.,* 11 F.3d 563, 570–71 (5th Cir.1994) and *Olsen,* 708 F.2d at 976). Here, federal law is not "inconsistent" with state law with regard to Energy XXI's gross negligence claim, notwithstanding the fact that there is a difference in whether the dual-employer doctrine applies, which is only one aspect of the law.

[42] Therefore, applying Louisiana state law, the court finds that, under *Morgan,* Energy XXI has raised an issue of material fact with regard to whether it and New Tech were dual employers. Thus, the borrowed servant doctrine would not completely eviscerate New Tech's potential liability for Hines's action. New Tech's motion for summary judgment as to its affirmative defense is accordingly DENIED.

**C. Objection to Energy XXI's Summary Judgment Evidence**

**\*29** Contained within New Tech's reply to Energy XXI's response to New Tech's motion for summary judgment on Energy XXI's affirmative claims is an objection by New Tech to Energy XXI's summary judgment evidence. Dkt. 25. New Tech objects to Exhibit J to Energy XXI's response to its motion, which is a copy of a Linked–In webpage in which Hines identifies himself as an independent consultant. *See id.;* Dkt. 24, Exh. J. New Tech claims that the document is hearsay. Dkt. 25. The court found no need to rely on this exhibit, as Hines testified that he considered himself to be an independent consultant. Thus, New Tech's objection to this evidence is moot, and the objection is OVERRULED.

**D. Motion for Continuance**

Energy XXI requested a continuance under Federal Rule of Civil Procedure 56 if the court found that New Tech met its summary judgment burden with respect to its motion for summary judgment on Energy XXI's affirmative claims and did not believe that Energy XXI raised an issue of material fact. Dkt. 24. Specifically, Energy XXI wanted to have more time to depose Hines and Simon. Since the court has denied New Tech's motion for summary judgment with respect to Energy XXI's affirmative claims and because Hines has now been deposed, Energy XXI's motion for a continuance (Dkt. 24) is DENIED AS MOOT.

**E. Motion for Leave to File Second Amended Complaint and Jury Demand**

[43] Energy XXI has also filed a motion to amend its complaint, as it would like to add Hines and Simon as defendants, as well as two companies for which Hines and Simon allegedly work and of which Energy XXI has recently become aware. New Tech is opposed to the motion because it claims that Energy XXI knew about Hines's and Simon's involvement from the beginning of the lawsuit and adding them at this late date would prejudice New Tech by further delaying the resolution of this matter. Dkt. 17.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

The scheduling order, which was issued on May 6, 2010, required that amendments to pleadings be made on or before July 15, 2010. Dkt. 12. Since Energy XXI filed its motion to amend after the deadline stated in the scheduling order, Federal Rule of Civil Procedure 16(b) applies. *Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir.2003). Under Rule 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's consent." Fed.R.Civ.P. 16(b)(4). "The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.' " *Sw. Bell*, 346 F.3d at 546 (quoting *S & W Enters. LLC v. Southtrust Bank of Ala.*, 315 F.3d 533, 535 (5th Cir.2003)). The court considers the following factors when determining whether "good cause" exists: " '(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice.' " *Id.* (quoting *S & W Enters.*, 315 F.3d at 536). If the court, upon weighing these factors, determines that good cause exists, the more liberal amendment standards of Rule 15(a) apply. *See S & W Enters.*, 315 F.3d at 536.

**\*30** New Tech argues that the amendment is untimely because Energy XXI knew about Hines's and Simon's involvement well before the deadline to amend pleadings contained within the scheduling order. Dkt. 17. Specifically, Energy XXI's initial pleading mentioned Tony Hines, and its discovery responses to New Tech on July 29, 2010, indicated that both Hines and Simon were "company men" during the recompletion operation. *Id.* Energy XXI agrees that it was aware that Hines and Simon were involved in the incident prior to the amendment deadline, but asserts it did not know about their separate corporate entities until well after the deadline. Dkt. 18. Additionally, Energy XXI claims that it believed that both Hines and Simon were direct employees of New Tech and that New Tech was vicariously liable for their actions pursuant to the

terms of the MSA during the relevant time period. *Id.* The MSA provides that persons on New Tech's payroll are considered New Tech "employees." *See* Dkt. 18 at 3 (quoting the MSA). New Tech argues that this explanation is not reasonable because Energy XXI was on notice that New Tech intended to assert the borrowed servant defense as soon as New Tech answered; New Tech specifically asserted independent contractor and borrowed servant defenses in its answer. Dkt. 17. Energy XXI claims that it believed these defense were "mere surplusage." Dkt. 18. And, regardless, Energy XXI claims that it could not have named the corporate entities associated with Hines and Simon prior to the deadline even if it gave credence to the defenses because it had no knowledge of the corporate entities. *Id.*

Energy XXI cites *Goodman Mfg. Co. v. Field Warehousing Corp.*, No. H–06–3042, 2007 WL 2446807 (S.D.Tex. Aug. 23, 2007) in support of its position. In *Goodman*, Judge Atlas noted that the plaintiffs "did not understand the nature of the relationship between [the defendant and proposed new defendant] until after the deadline for amendments." *Goodman*, 2007 WL 2446807, at *1. The defendant had identified the proposed new defendant during initial disclosures, but the "exact relationship between the two parties ... remain[ed] unclear." *Id.*

While the borrowed servant and independent contractor defenses should have put Energy XXI on notice with regard to a potential need to add Hines and Simon as defendants, the court finds that Energy XXI's belief that New Tech was vicariously liable for Hines's and Simon's actions due to the definition of "employee" under the MSA was not unreasonable, particularly since New Tech's counterclaim relies on the terms of the MSA. *See* Dkt. 6. This factor therefore weighs in favor of amendment, though it does not lend substantial weight because Energy XXI was on notice of New Tech's defense even if its actual applicability was unclear.

[44] The second factor in the Rule 16(b) ana-

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

lysis is the importance of the amendment. Energy XXI claims that the status of Hines and Simon is unclear, mainly because the parties had intentionally limited discovery prior to Energy XXI's motion to amend in the hopes of reaching a settlement. *See* Dkt. 18. However, if future discovery reveals that Hines and Simon were independent contractors, then Hines, Simon, and their respective corporate entities may be liable for at least some of the damages that Energy XXI currently attributes to New Tech. *Id.* New Tech claims that the amendment is not important because Hines, Simon, and their respective companies would be entitled to indemnification under the clauses discussed above. Dkt. 16. However, since the court has found that the indemnification clause does not extend to gross negligence, this argument is partially without merit. This amendment could be extremely important in the event that New Tech is not vicariously liable for Hines's and Simon's actions and Hines and Simon are found to be grossly negligent. Thus, this factor weighs in favor of amendment.

**\*31** [45] The third and fourth factors are potential prejudice and the ability to obtain a continuance. New Tech argues that adding new parties at this stage will cause prejudice because it will incur expenses to conduct additional discovery and research and the trial will likely be delayed. Dkt. 17. Energy XXI claims that if leave to amend is denied, it will file separate suits against Hines and Simon because their contracts with New Tech likely require New Tech to indemnify them for their actions and omissions in connection with this lawsuit. Dkt. 18. Thus, Hines, Simon, and their respective companies will likely file third-party complaints against New Tech for indemnity, leading to more litigation and expense between the same parties relating to the facts alleged herein. *Id.*

The court agrees that there likely will be some additional delay associated with allowing the amendment at this late date. However, the dismissal of the breach of contract and negligence claims should streamline the issues in this case. Moreover,

adding Hines, Simon, and their respective companies does not change the players in this case, it merely changes their status. The parties will need to explore Hines's and Simon's roles whether they are defendants or not.

The court finds that, on balance, there is good cause to allow the amendment. The court also finds that leave to amend is appropriate under Rule 15(a), which mandates that leave should be freely given if justice so requires. Fed.R.Civ.P. 15(a)(2). Thus, the court GRANTS Energy XXI's motion to amend (Dkt. 15). Energy XXI shall file a second amended complaint pursuant to this order within ten (10) days of the date of this order.[FN11] The parties shall filed an agreed scheduling order within thirty (30) days of the date of this order.

### IV. CONCLUSION

In sum, New Tech's motion for summary judgment on its counterclaim and request for declaratory relief (Dkt. 16) is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** with regard to Energy XXI's negligence and breach of contract claims. Energy XXI is contractually obligated to indemnify New Tech for the negligence and breach of contract claims relating to the alleged damage to the Gouda Well. Energy XXI's negligence and breach of contract claims against New Tech are therefore **DISMISSED WITH PREJUDICE.** The motion is **DENIED** with respect to Energy XXI's gross negligence claim. New Tech's Motion for Summary Judgment on Energy XXI's affirmative claims (Dkt. 22) is **DENIED.** New Tech's objection to Energy XXI's summary judgment evidence (Dkt. 25) is **OVERRULED.** Energy XXI's motion for a continuance (Dkt. 24) is **DENIED AS MOOT.** Energy XXI's motion to amend it complaint (Dkt. 15) is **GRANTED.** Energy XXI shall file an amended complaint within ten (10) days of the date of this order, and the parties shall file an agreed scheduling order setting forth new deadlines within thirty (30) days of the date of this order.

FN1. This analysis focuses on the work of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

Hines rather than Simon because the record contains scant information about Simon.

FN2. Specifically, the rig was moved onto the Gouda Well, which did not have a permanent platform, and it was placed there to "reenter this well and pull the ... bad tubing out of it and recomplete this; squeeze the zone, bottom zone off, move up to the top zone, perforate it, recomplete it." Dkt. 37, Exh. A at 204.

FN3. New Tech also cites various Jones Act cases to support this assertion.

FN4. In a later, unpublished opinion, the Fifth Circuit noted that it "deemed the wireline contract in *Domingue* ... non-maritime because the need for a vessel arose purely from the lack of a fixed platform." *Devon La. Corp. v. Petra Consultants, Inc.,* 247 Fed.Appx. 539, 545 (5th Cir.2007).

FN5. The court notes that New Tech also argues that maritime law should apply because the choice-of-law provision in the contract requires the application of maritime law. However, "OCSLA is itself a Congressionally mandated choice of law provision," and if the contract is not a maritime contract, it requires "that the substantive state law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary." *PLT,* 895 F.2d at 1050; *see also Grand Isle Shipyard,* 589 F.3d at 789 n. 10 (same). Thus, the choice-of-law provision contained within the contract does not weigh into the court's analysis.

FN6. In the actual MSA, this text is in all capital letters, bold, and underlined. The court has used a regular font for ease of reading.

FN7. New Tech claims that Energy XXI also directed Simon's work at the Well. However, the live complaint does not contain claims relating to Simon, and the live answer does not contain an affirmative defense asserting that Simon is a borrowed servant. *See* Dkts. 1, 8, 10. Thus, any claims relating to Simon's status are premature.

FN8. In some cases, the lending employer is called the "general employer," and the borrowing employer is called the "special employer."

FN9. Energy XXI attempts to make this case more persuasive by pointing out that the Fifth Circuit affirmed the district court's holding. Dkt. 28–4 (citing *Barthelemy v. Phillips Petroleum Co.,* 211 F.3d 594, 2000 WL 329383 (5th Cir. Mar. 24, 2000) (unpublished decision)). However, the Fifth Circuit opinion does not mention the dual-employer doctrine or *Morgan,* so the fact that the Fifth Circuit affirmed does not necessarily mean that it agreed with the district court's opinion relating to the dual-employer doctrine.

FN10. If the court lacked admiralty jurisdiction, then it should have applied Mississippi's choice-of-law rules to decide whether foreign or Mississippi law should be applied. *Coats,* 61 F.3d at 1117.

FN11. Energy XXI filed a proposed second amended complaint with its motion to amend. The proposed complaint, however, contains claims against New Tech that this order dismisses with prejudice.

S.D.Tex.,2011.
Energy XXI, GoM, LLC v. New Tech Engineering, L.P.
--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

--- F.Supp.2d ----, 2011 WL 1458638 (S.D.Tex.)
**(Cite as: 2011 WL 1458638 (S.D.Tex.))**

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.