For Opinion See 269 F.3d 528

United States Court of Appeals,

Fifth Circuit.

THE HOUSTON EXPLORATION COMPANY, Plaintiff-Appellee,

v.

HALLIBURTON ENERGY SERVICES, INC., Defendant-Appellant.

No. 00-30724.

December 21, 2000.

Appeal from a Final Judgment in Cause No. 98-CV-1302-J, in the United States District Court for the Eastern District of Louisiana the Honorable Carl J. Barbier, Presiding

Brief of Appellant Halliburton Energy Services, Inc.

Barry A. Chasnoff, Akin, Gump, Strauss, Hauer & Feld, L.L.P., 300 Convent, Suite 1500, San Antonio, Texas 78205, Telephone: (210) 281-7000.James F. Holmes, Mary Beth Meyer, Christovich & Kearney, L.L.P., Suite 2300, Pan American Life Center, 601 Poydras, New Orleans, LA 70130-6078, Telephone: (504) 561-5700.Charles "Chuck" R. Lane, Halliburton Energy Services, Suite 1600, Pan American Life Center, 601 Poydras Street, New Orleans, LA 70130, Telephone: (504) 593-6791, Attorneys for Appellant Halliburton Energy Services, Inc.

## *IV STATEMENT REGARDING ORAL ARGUMENT

Oral argument is needed. The district court entered judgment against appellant Halliburton Energy Services, Inc. ("Halliburton") for gross negligence, even though the district court found that any damage resulting from Halliburton's conduct was the result of an innocent and understandable mistake, which occurred despite the good intentions of Halliburton's employees. The district court also ignored ample evidence that the negligence of the plaintiff, The Houston Exploration Co. ("THEC") and non-party R&B Falcon Drilling (U.S.), Inc. contributed to the damages suffered by it, unjustifiably depriving Halliburton of the defense of comparative fault. Because of the importance of the issues before the Court, and because oral argument may help clarify the issues presented, Defendant-Appellant Halliburton respectfully requests the opportunity to be heard at oral argument.

## *v TABLE OF CONTENTS

Certificate of Interested Persons ... i

Statement Regarding Oral Argument ... iv

Table of Contents ... v

Table of Authorities ... viii

Statement of Jurisdiction ... 1

Statement of Issues ... 1

Statement of the Case ... 3

Statement of Facts ... 4

A. The Indemnification Contract Between Halliburton and THEC ... 5

B. The Blowout of Well C-1 ... 7

C. THEC's and Falcon's Actions That Caused, or Contributed to the Well Blow out ... 14

1. THEC and Falcon failed to maintain primary control of the well through the use of drilling fluid by failing to create a sufficient overbalance in hydrostatic pressure to keep the gas in the formation from flowing to the surface ... 17

2. THEC and Falcon failed to detect and respond to changes in the well ... 17

3. THEC failed to use appropriate equipment to prevent the blowout ... 18

Summary of the Argument ... 19

Standard of Review ... 23

*vi Argument and Authorities ... 23

I. The District Court Erred in Finding the Actions of Halliburton's Employees Grossly Negligent ... 23

A. The Legal Standards for Finding Gross Negligence Are Not Satisfied in This Case ... 24

B. The Evidence Does Not Support a Finding of Gross Negligence ... 26

1. Lemaire and Costlow had no reason to know the IPO valve had only one pin ... 27

2. There is no evidence that Costlow and Lemaire should have expected a well blowout to occur ... 29

II. The District Court Erred in Refusing to Enforce the Indemnity Contract ... 31

A. Indemnity Contracts Are Enforceable ... 31

B. THEC's Other Defenses to the Clause Fail as a Matter of Law ... 34

1. Authority ... 34

2. Notice ... 35

III. The District Court Erroneously Failed to Apply the Doctrine of Comparative Fault ... 36

A. The District Court Improperly Failed to Determine the Relative Fault for the Blowout of All Involved ... 37

B. Halliburton's Comparative Fault Defense Is Not Defeated by the Superseding Cause Doctrine ... 38

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

IV. The District Court Deprived Halliburton of Its Right to a Jury Trial *IF* OCSLA Applies ... 41

V. The District Court's Reliance on Expert Evidence of Lost **\*vii** Production Disclosed Immediately Before Trial Unfairly Prejudiced Halliburton ... 43

Conclusion ... 45

Certificate of Service ... 47

Revised Certificate of Compliance ... 48

**\*viii** TABLE OF AUTHORITIES

*Allied Chem. Corp. v. Hess Tankship Co.,* 661 F.2d 1044 (5TH CIR. 1981) ... 38

*Ambrose v. New Orleans Police Dep't Ambulance Serv.,* 639 So. 2d 216 (La. 1994) ... 24

*Barber v. Texaco, Inc.,* 720 F.2d 381 (5th Cir. 1983) ... 25

*Bennett v. Pippin,* 74 F.3d 578 (5th Cir. 1996) ... 42

*Bereslavsky v. Kloeb,* 162 F.2d 862 (6th Cir. 1947) ... 42

*Book v. Nordrill,* 826 F.2d 1457 (5th Cir. 1987) ... 44

*Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 323 (7th Cir. 1993) ... 42

*Campbell v. Sonat Offshore Drilling, Inc.,* 979 F.2d 1115 (5th Cir. 1992) ... 32, 35

*Clement v. Frey,* 666 So. 2d 607 (L a. 1996) ... 37

*Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577 (5th Cir. 1986) ... 31, 34, 35

*Computalog U.S.A., Inc. v. Blake Drilling and Workover Co., Inc.,* 1996 WL 720761 (E.D. La. Dec. 9, 1996) ... 25, 29

*Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329 (5th Cir. 1981) ... 33

*Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995 (5th Cir. 1984) ... 23

**\*ix** *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646 (5th Cir. 1992) ... 38

*Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 116 S. Ct. 1813 (1996) ... 38

*F&S Offshore, Inc. v. KO Steel Castings, Inc.,* 662 F.2d 1104 (5th Cir. 1981) ... 44

*Falkowski v. Maurus,* 637 So. 2d 522 (La. App. 1st Cir. 1993) ... 25

*Fontenot v. Dual Drilling Co.,* 179 F.3d 969 (5th Cir. 1999) ... 38

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ford v. Pennzoil,* 974 F. Supp. 559 (E.D. La. 1997) ... 39

*Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207 (5th Cir. 1986) ... 41

*Gebreyesus v. F.C. Schaffer & Assocs., Inc.,* 204 F.3d 639 (5th Cir. 2000) ... 23

*Grillet v. Sears, Roebuck & Co.,* 927 F.2d 217 (5th Cir. 1991) ... 35

*Hal Antillen N. V. v. Mount Ymitos MS,* 147 F.3d 447 (5th Cir. 1998) ... 37

*Harvey v. T.H.E. Ins. Co.,* 764 So. 2d 354 (La. Ct. App. 2000) ... 37

*Henderson v. Norfolk Southern Corp.,* 55 F.3d 1066 (5th Cir. 1995) ... 30

*Hendry Corp. v. Aircraft Rescue Vessels,* 113 F. Supp. 198 (E.D.La.1953) ... 26

**\*x** *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.,* 436 F. Supp. 597 (E.D. Tex. 1977) ... 35

*Jennings v. McCormick,* 154 F.3d 542 (5th Cir. 1998) ... 41

*Jigg the Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171 (5th Cir. 1975) ... 32

*Labbe v. Chemical Waste Mgt., Inc.,* 756 So. 2d 613 (La. Ct. A pp. 2000) ... 37

*Mendoza v. Mashburn,* 747 So. 2d 1159 (La. Ct. App. 1999) ... 39, 40

*Micele v. CPC of La., Inc.,* 709 So. 2d 1065 (La. Ct. App. 1998) ... 37

*Miles v. Melrose,* 882 F.2d 976 (5th Cir. 1989) ... 24, 25

*Nicor Supply Ships Assocs. v. General Motors Corp.,* 876 F.2d 501 (5th Cir. 1989) ... 31

*Nunley v. M/V Dauntless Colocotronis,* 727 F.2d 455 (5th Cir. 1984) ... 38

*Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207 (1986) ... 38

*Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.,* 922 F.2d, 220 (5th Cir. 1991) ... 24, 30

*Perkins v. Rubicon, Inc.,* 563 So. 2d 258 (La. 1990) ... 31

*Pennzoil Prods. Co. v. Offshore Express, Inc.* 943 F.2d 1465 (5th Cir. 1991) ... 37

**\*xi** *Polozola v. Garlock, Inc.,* 343 So. 2d 1000 (La. 1977) ... 31

*Smith v. Penrod Drilling Corp.,* 960 F.2d 456 (5th Cir. 1992) ... 41

*State v. Vinzant,* 7 So. 2d 917 (La. 1942) ... 25

*Todd Shipyards Corp. v. Turbine Serv., Inc.,* 674 F.2d 401 (5th Cir. 1982) ... 25, 32

*United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S. Ct. 1708 (1975) ... 37

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*United States v. Singer Mfg. Co.,* 374 U.S. 174, 83 S. Ct. 1773 (1963) ... 23

*Walker v. Braus,* 995 F.2d 77 (5th Cir. 1993) ... 23

*Young v. City of New Orleans,* 751 F.2d 794 (5th Cir. 1985) ... 44

FEDERAL STATUTES

28 U.S.C. §§ 1291, 1294 ... I

28 U.S.C. § 1333(1) ... 1

Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq* ... 41

43 U.S.C. § 1333(a)(2); ... 37

Other Authorities:

LA. GOV. CODE ANN. art. 2323 ... 37

FED. R. APP. P. 32 (a)(7) ... 48

FED. R. CIV. P. 9(h) ... 3, 42

**\*1 STATEMENT OF JURISDICTION**

Jurisdiction in the district court was founded on admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333(1). Jurisdiction in this Court is proper under 28 U.S.C. §§ 1291, 1294, which provide for appellate review of final decisions of the United States district courts.

STATEMENT OF ISSUES

Halliburton appeals from a judgment for gross negligence, entered by the district court after a three-day bench trial, even though the district court found that Halliburton committed a "mistake," despite its own good intentions. The district court's findings cannot support a judgment for gross negligence, based on well-established precedents stating that gross negligence requires a mental state more culpable that mere inadvertence or mistake. Additionally, the district court disregarded evidence that the negligence of The Houston Exploration Company and/or its drilling contractor caused a portion of the damages, but disregarded such evidence based on a mistaken view of the doctrine of intervening and superseding cause. Accordingly, the issues on appeal are:

1. May Halliburton be held liable for gross negligence, even though the district court found that Halliburton had only committed a "mistake," that Halliburton intended in good faith to perform its services proficiently, and even though the **\*2** district court found no evidence that Halliburton disregarded a risk of serious harm or property damage?

2. Whether Halliburton may be deprived of its defense of release, even though the release executed by plaintiff expressly released Halliburton from liability for its own negligence, even though the release is enforceable under Louisiana and federal law, and even though Halliburton did not commit gross negligence?

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. Whether Halliburton may be deprived of its right to assert a defense of comparative fault, even though the district court found evidence of fault on the part of the plaintiff, and even though the district court erroneously interpreted the doctrine of intervening and superseding cause to preclude Halliburton's defense of comparative fault?

4. Whether the court committed reversible error by effectively denying Halliburton a right to a jury trial by basing its findings and conclusions on the Outer Continental Shelf Lands Act ("OCSLA"), even though the court assumed jurisdiction under federal maritime law?

5. Whether the district court abused its discretion when it admitted and relied on expert testimony disclosed shortly before trial in violation of its court-ordered deadline?

**\*3 STATEMENT OF THE CASE**

The Houston Exploration Company ("THEC"), the plaintiff-appellee, filed this lawsuit against Halliburton Energy Services, Inc. ("Halliburton"), seeking damages in excess of five million dollars for Halliburton's actions that allegedly caused a gas well blowout on a drilling rig in the Gulf of Mexico off the Louisiana coast. (CR 245)[FN1] THEC brought its action under Rule 9(h) of the Federal Rules of Civil Procedure, invoking the court's admiralty jurisdiction. THEC later amended its complaint to assert the claims of its subrogated insurers for five million dollars paid to THEC as reimbursement for its claims, and subsequently amended a second time to allege that Halliburton's negligence or gross negligence caused the blowout. (CR 228, 497)

> FN1. The following record references are used in this brief: "CR" refers to the clerk's record; "TR" refers to the trial transcript; "doc" refers to docket number; and "RE" refers to Record Excerpts.

Halliburton denied it was responsible for the losses and asserted the claims were barred by the unambiguous terms of the contract between Halliburton and THEC, which required that THEC release, defend and indemnify Halliburton. (CR 215) Pursuant to Rule 14(c), Halliburton asserted a third-party claim for indemnity or contribution against the drilling contractor, R&B Falcon Drilling (U.S.), Inc. ("Falcon"). (CR 202) Falcon, in turn, asserted a counterclaim for defense and indemnity against THEC. (CR 176) Halliburton dismissed its third-party claim **\*4** against Falcon prior to trial, but continued to assert that Falcon's negligence caused or contributed to the blowout. (CR 76)

Halliburton filed a motion for judgment on partial findings pursuant to Rule 52(c) at the close of THEC's case, asserting that the indemnity contract was valid and enforceable, and that the evidence did not show gross negligence as a matter of law. (CR 252) At the close of all the evidence, the district court took the matter under consideration on the submission of post-trial briefs.

On April. 18, 2000, the district court entered Findings of Fact and Conclusions of Law, finding the actions of Halliburton's employees were grossly negligent and the sole proximate cause of the blowout. (CR 506-29; RE "D") The trial court concluded that the indemnity clause of the parties' contract was unenforceable to protect Halliburton from liability for its gross negligence. In its second amended judgment of May 12, 2000, the court entered final judgment in favor of THEC and its insurers for $6,991,948, including $1,991,948 for loss of production, prejudgment interest, and costs. (CR 751; RE "C") Halliburton timely filed its notice of appeal on June 12, 2000. (CR 660; RE "B")

STATEMENT OF FACTS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The district court so blurred the line between ordinary negligence and gross negligence that the substantive distinction, intended to differentiate between negligent actions that call for compensation and those that demand punishment of *5 the actor, has been lost. In fact, a close reading of the district court's findings, assuming them to be completely accurate, reveals that Halliburton's actions were not negligent, but, rather, were entirely consistent with the exercise of ordinary care. At worst, the actions rise only to the level of ordinary negligence.

If the actions of Halliburton's employees were the sole proximate cause of the accident--which Halliburton emphatically denies--the actions were merely simple inadvertence untainted by the intent, willfulness, or recklessness necessary to support a finding of gross negligence. To deprive Halliburton of its bargained-for indemnification by equating these actions with gross negligence erases the barrier that has long divided negligent acts, simple inadvertence, or acknowledged oversight from the heedless and wanton disregard of responsibility required to support a finding of gross negligence. Indeed, the district court described Halliburton's conduct as a "mistake," which occurred despite Halliburton's best intentions. (CR 512)

### A. The Indemnification Contract Between Halliburton and THEC

Halliburton provides services and specialized test tools to the oil and gas exploration industry. (TR 21, 22, 33, 156, 195) Halliburton plays a small role in the overall venture of bringing in an oil or gas well, consisting of supplying personnel and valves, gauges, packers, and other tools that are used in drill-stem test strings or bottomhole assemblies. (TR 32-33) As is customary, and as found *6 by the district court, THEC contracted with Halliburton for the drill-stem testing operations in this case pursuant to a work order agreement.[FN2] (CR 508; Joint Exh. 15; TR 24-25, 76-78, 153, 323) Halliburton charged THEC a total of $78,500 for all three phases of testing services and equipment on the C-1 well, charging only $416 per day for use of the IPO valve at issue. (Joint Exh. 35, p. 1, item 6)

FN2. No Master Service Agreement existed between THEC and Halliburton. (TR 152)

The clear, unequivocal, and conspicuous terms and conditions of the work order contract, which THEC's company men are authorized to sign (TR 153, doc. 90-Sessions depo. at 16), required THEC to release, indemnify, and hold Halliburton harmless for property damage and loss resulting from loss of well control, including any property damage and loss occurring as a result of any negligence on the part of Halliburton. (Joint Exh. 15; TR 120-21)[FN3] The contract *7 further provided that, in any event, the exclusive remedy, and Halliburton's sole liability, would be limited to the replacement cost of services and materials. (CR 132, Def. Exh. 15)

> FN3. The language in Section "C" of the terms and conditions, printed in large and conspicuous red type, is clear and unequivocal:
> Release and Indemnity - customer agrees to release Halliburton Group from any and all liability for any and all damages whatsoever to property of any kind owned by, in the possession of, or leased by customer and those persons and entities customer has the ability to bind by contract. Customer also agrees to defend, indemnify and hold Halliburton Group harmless from and against any and all liability, claims, costs, expenses, attorney's fees and damages whatsoever for personal injury, illness, death, property damage and loss resulting from: Loss of well control; devices to control a wild well whether underground or above the surface; reservoir or underground damage, including loss of oil, gas, other mineral substances or water; surface damage arising from underground damage; damage to or loss of the well bore; subsurface trespass or any action in the nature thereof; fire; explosion; subsurface pressure; radio activity; and pollution and its clean-up and control.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Customer's release, defense, indemnity and hold harmless obligations will apply even if the liability and claims are caused by the sole, concurrent, active or passive negligence, fault, or strict liability of one or more members of the Halliburton Group, in seaworthiness of any vessel, or any defect in the data, products, supplies, materials or equipment furnished by Halliburton Group, whether in the design, manufacturer, maintenance or marketing thereof or from a failure to warn of such defect... Customer's release, defense, indemnity and hold harmless obligations apply whether the personal injury, illness, death, property damage or loss is suffered by ... customer, or any other person or entity and the customer will support such obligations assumed herein with liability insurance to the maximum extent allowed by applicable law.

Section "E" of the terms and conditions, also in red, sets forth Halliburton's express warranty, limits the implied warranties and limits its liability and available remedies and provides, in relevant part, that "Halliburton's sole liability and Customer's exclusive remedy in any cause of action (whether in contract, tort, breach of warranty or otherwise) arising out of the sale, lease or use of any equipment, products or materials is expressly limited to the replacement of such on their return to Halliburton or, at Halliburton's option, to the allowance to Customer of credit for the cost of such items. In no event shall Haliburton be liable for special, incidental, indirect, consequential, or punitive damages...."

Because the district court erroneously determined that Halliburton was guilty of gross negligence, it refused to enforce the indemnity terms of the contract between THEC and Halliburton.[FN4]

    FN4. The trial court did not address the issue of whether the contract was otherwise valid and enforceable. (CR 522-23 n.8; RE "D")

### B. The Blowout of Well C-1

THEC owned a natural gas well, designated C-1, which was located on the Outer Continental Shelf in the Gulf of Mexico, offshore of Louisiana. (CR 246) In *8 May 1997, THEC had drilled and completed the well, using the mobile drilling vessel PHOENIX II, which was owned and operated by R&B Falcon Drilling (US), Inc. (TR 32) THEC contracted with various vendors to provide services for different aspects of the project. (TR 32-33) For example, the drilling contractor, Falcon, furnished well-control safety devices such as blowout preventers to arrest any gas "kick" in the well, which results from pressured gas rising to the surface. (TR 32-33, 230)

THEC contracted with Halliburton to provide downhole equipment for use in subsurface testing procedures for the three levels of natural gas formations that had been discovered. (TR 33) This testing equipment included circulating valves and backup circulating valves, which are not designed as well-control devices. (TR 195-96, 559) The principal Halliburton circulating valve is the OMNI valve, which circulates mud or fluid through the well in the course of the well-testing operations. (TR 156)

Another Halliburton circulation valve is the "Internal Pressure Operating" or "IPO" valve, which serves as a back-up if the OMNI valve becomes inoperable. (TR 23; 559; doc. 90-Sessions depo. 67-68) The IPO valve is designed to operate when there is a difference between pressure inside and outside the drill pipe. During normal drilling operations, the pressure in the well inside and outside of the drill pipe is the same. There is no differential pressure. The IPO activates when *9 pins placed in the valve shear under pressure. (TR 157-158) Each pin in the valve is designed to withstand a differential pressure of up to 610 psi. In this case, the bottom hole pressure of the well was approximately 2700 psi so the IPO valve was pinned with five pins to withstand pressure of up to 3050 psi. In order for the drill crew to activate the IPO valve and circulate through it, it was necessary to in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

crease pressure inside the drill pipe so that the psi inside the pipe exceeded 3050 psi. (TR 165) At that pressure, the pins shear, and the IP valve ports open, allowing the well fluid to circulate inside and outside the drill stem.

On May 16, Halliburton sent two OMNI and two IPO valves to the well site. (TR 175; Exh. 5) Halliburton's tool operator, David Lemaire, was responsible for checking the tools, supervising the assembly of the tools into the tool string, and monitoring their use during the testing. (TR 155) Mr. Lemaire has been with Halliburton for twenty-six years, and was an experienced tool operator. (TR 195) According to Halliburton procedure, Mr. Lemaire set the IPO valve with five pins.[FN5] During the first test on May 27, the OMNI valve became clogged with sand. (TR 161-62) To activate the IPO valve, THEC intentionally increased pressure in the well to a level that sheared the five pins in the IPO valve, and the valve performed its backup function of circulating the fluid in the well. (TR 161-62) At the **10** conclusion of the test, this IPO valve was retrieved but could no longer be used, and was returned to Halliburton's yard. (TR 172) The second, unused IPO valve remained on the rig. (TR 175) Halliburton sent a third IPO valve to the rig to replace the first sheared one. (TR 172, 175)

> FN5. For safety reasons, Halliburton sends all valves to the work site with one pin. The tool man at the site was responsible for inserting the proper number of pins, a procedure that also required the tool operator to physically inspect the valve at the worksite. (TR 292-93; 296)

On May 28, the second test was performed. (TR 189) Lemaire selected and aligned an OMNI and an IPO valve for the drill crew to connect to the drill string. (TR 33, 176) Following Halliburton's standard policies and procedures and specifications for this particular job, Lemaire made certain that he inserted five pins in the IPO valve.[FN6] (TR 176, 207) Before these valves and other Halliburton tools were connected to the string and lowered into the hole, however, a delay occurred. (TR 176-77) Because he was not needed on the floor, Lemaire stepped away. (TR 176-77) In his absence, the drilling crew, which was not under his supervision, moved his tools and equipment. (TR 176-77) When Lemaire came back, he picked up what he believed was the properly pinned IPO valve and inserted it in the test string. (TR 177, 201) Because the drilling crew had moved **11** the tools, however, Lemaire mistakenly picked and inserted the remaining IPO valve with only one pin installed, rather than the valve with five pins. (TR 179-80) The drilling crew lowered this IPO valve, along with the OMNI, into the well and ran the second test. (TR 33) During the second test, the OMNI did not become clogged, and therefore the backup IPO valve was not activated. (TR 193, 198) Because the differential pressure on the IPO valve never exceeded 610 psi, the single pin did not shear. (TR 193, 198) The second test was completed successfully, and the crew retrieved the assembled Halliburton tools from the hole, leaving the assembly intact in readiness for the third and final test. (TR 206)

> FN6. The trial court first appeared to cast doubt upon whether Mr. Lemaire actually pinned an IPO valve with five pins before the second test by twice repeating that Mr. Lemaire "claimed" to have dressed the valve with five pins. The court later, however, noted that "*it was intended by all concerned, including Halliburton,* that the IPO valve ... would be dressed with five pins." (CR 512), a finding that belies the court's ultimate conclusion that Halliburton acted with utter disregard. Moreover, the evidence conclusively showed that Mr. Lemaire had, indeed, pinned a valve with five pins before the second test. Mr. Costlow testified that the properly pinned valve was returned to Halliburton and was later traced to another job. (TR 207)

After the second test, Lemaire left the rig and was replaced by Phillip Costlow, another experienced Halliburton tool operator. (TR 180) Before Costlow left Halliburton's offices, he met with Lemaire, who told Costlow that the IPO valve already installed in the pipe assembly and used in the second test, had five pins in it, had not been

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

activated during the second test and thus could be used for the third test. (TR 180, 206-07) Both Costlow and Lemaire were cognizant of, and duly concerned with, the need for proper pinning of the IPO. (TR 180, 206-07) After Costlow arrived on the rig on May 30, he reasonably relied on Lemaire's statement that the IPO valve already connected to the assembly was pinned correctly. (TR 180, 206-07)

**\*12** On May 31, 1997, the previously assembled test string was lowered into the well for the third test. (TR 211) Costlow did not request a breakdown of the test string so he could open the IPO valve and re-inspect to determine whether it had five pins in it. (TR 210-11) Costlow was present for the third test. (TR 210-216) Prior to completion of the test, Costlow advised Tom Sessions, the THEC company man, to reverse circulate below the OMNI valve, but Sessions failed or refused to do so. (TR 227-28, 230) THEC's negligent failure to circulate beneath the OMNI valve at this point during the third test allowed the gas to accumulate, ultimately causing the pressure or "kick" that blew the well out later that day. (TR 576-77) In any event, because the OMNI valve did not clog up during the third test, the IPO valve was not activated. (TR 577-78) Again, the differential pressure on the IPO valve was not sufficient to shear the single pin in the valve. Upon completion of the third test, Halliburton's job was completed.

At approximately 3:30 in the afternoon, the drilling crew began to pull the pipe and the Halliburton valves out of the hole. (TR 216) But having already failed to properly circulate below the OMNI, (TR 227-28), THEC and Falcon compounded the consequences of that error during the "trip out." For example, THEC and Falcon failed to maintain proper hydrostatic pressure in the well and failed to recognize and act upon early warning signals that the well was **\*13** unbalanced, including inconsistent volumes of fluid required to compensate as the drill pipe was removed from the well. (TR 542-63)

At or about 7:15 PM, the Petron well flow charts indicated gas had begun to flow into the well, but THEC and Falcon did not immediately recognize or respond to this flow. (TR 349, 553, 575) At approximately 7:30 PM, a Halliburton employee alerted the drill crew that the well was flowing. (TR 98-100, 555-56) In that 15 minute interval, the drilling crew had raised the IPO valve above the level of the drill floor and had begun to break the IPO valve out of the tool string. (TR 218-19; Doc. 88 - Morgan depo. at 54) But before the IPO valve could be removed, the gas that had accumulated in the well began to flow and created a "kick," causing the pipe to rise four feet and strike the top drive, and actually forcing the pipe to "bow." (TR 220; doc. 88- Morgan depo. at 18-19) Had the drilling crew properly monitored or detected the well flow, the well could have been shut in when the IPO valve was below the surface. (TR 556-59) If that had occurred, the IPO pin would not have been sheared. (TR 400-01)

When the gas in the well began flowing, the drilling crew reacted to the kick and rook steps to shut in the well by closing the blowout preventers and hydril, which sealed off the annulus. (TR 220-21, 229) The drilling crew then reconnected the tool string, including the IPO valve. (TR 101-02, 219-21) At that point, the well appeared to be under control. (TR 221) Over the next hour and a **\*14** half, the rig personnel pumped fluid into the well, bled off some of the gas to relieve pressure, and monitored the well. (TR 102-03, 220-21) During this time, the pressure in the well rose to approximately 960 psi, at which time the single pin in the IPO valve sheared--and the well blew out. (TR 221) Within a few minutes, all of the personnel on the rig evacuated in an escape capsule and were rescued unharmed. (TR 221-22)

The district court found the blow-out resulted from the "mistake" of Lemaire and Costlow in failing to use the IPO which Lemaire had properly pinned despite their intention to do so. (CR 521) While the court found this mistake endangered not only the well, but also the lives of all the personnel on the rig, the district court cited no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

juncture at which either Lemaire or Costlow disregarded this danger. Indeed, Lemaire and Costlow were present on the rig for the tests. To assume (without evidence) that they disregarded the risk of danger to those around them on the rig is to assume (equally without foundation) that they also knowingly endangered their own lives. No evidence supports such the extraordinary conclusion that Lemaire and Costlow lacked the basic urge for self-preservation.

### C. THEC's and Falcon's Actions That Caused, or Contributed to, the Well Blowout

The district court's factual findings give short shrift to the wealth of evidence showing that THEC and Falcon were negligent in discharging their responsibilities to monitor the well and keep the gas pressure in check to avert the **15** risk of a blowout. In fact, the district court pointedly declined to absolve THEC and Falcon of their negligence in causing the "kick" in the well. (CR 521, 526) Instead, the court relied on its intervening and super-seding cause analysis to place the blame for the accident on Halliburton. (CR 526)

During the drilling, completion, and testing of a well, the risk of the well's gas rising to the surface inadvertently is a serious one. (TR 543) The gas pressure in the well is controlled by a column of fluid whose total weight, combined with the pipe in the hole, equals or exceeds the pressure from the underground formations. (TR 544; 549) When this formation pressure exceeds the weight of the fluid and pipe, a blowout can occur. (TR 578-79) The responsibility of keeping the gas pressures in check rests with the operator of the well (THEC), the operator's company men, and the drilling crew. (TR 118-19, 196, 227-29, 554-57, doc. 88-Morgan depo. at 23-24) THEC had two company men on board the PHOENIX II, Tom Sessions, an employee, and James Hileman, an outside consultant. (TR 94; doc. 90-Sessions depo. at 23-24)

To monitor the stability of the well, THEC rented a Petron chart system. (TR 240) This highly sophisticated system monitors critical factors, such as temperature, volumes, and pressures, which are displayed on screens in the offices of the THEC company man and Falcon's toolpusher, and at the driller's console. (TR 239-41, 554-55) Additional safety measures include warning lights and **16** alarms at the driller's console if well instability is detected. (TR 554-55) It is the driller's responsibility to calibrate the system to the specific well conditions. (TR 563)

The C-1 well had characteristics that made it susceptible to instability because the drilling fluid used to stabilize the well was being lost in the formation. (TR 547-48) In other words, the weight of the fluid or mud that kept the bottom hole gas in check was constantly diminishing, and had to be replaced periodically. (TR 551) In addition to this risk factor, THEC overbalanced the bottom hole upward pressures with only 70 psi rather than the customary 200-300 psi, leaving a razor-thin margin of error, especially in light of the need for constant replenishment of the fluid. (TR 544-54)

Witnesses for both THEC and Halliburton testified the THEC company man wielded the ultimate authority and responsibility for operations concerning the well bore. (TR 119; 196-97; doc. 88-Morgan depo. at 35; doc. 90-Sessions depo. at 12) Moreover, the drilling contractor in this case, Falcon, furnished the well-control safely devices to arrest any gas kick, including blowout preventers and the top drive. Both THEC and Falcon were negligent in discharging their duties to ensure well safety, and this negligence was a proximate cause of the well blowout and resulting loss.

**17** 1. THEC and Falcon failed to maintain primary control of the well through the use of drilling fluid by failing to create a sufficient overbalance in hydrostatic pressure to keep the gas in the formation from flowing to the surface.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-57   Filed 11/01/11   Page 12 of 68

A number of factors within THEC's control contributed to the loss of hydrostatic pressure in the well bore, ultimately resulting in the blowout. (TR 542-63) Against Halliburton's advice, THEC failed to circulate the well below the OMNI valve, which left a column of gas in the well when THEC began to extract the test string out of the well (the "trip"). (TR 227-30) Moreover, THEC failed to maintain a safety factor of at least 200 psi above equilibrium. (TR 554, 349, 399) The crew began the trip even though the well was losing fluid and thereby decreasing the margin of pressure sufficient to safely suppress the gas. (TR 557, 549-55)

### 2. THEC and Falcon failed to detect and respond to changes in the well

By about 7:15 PM, the Petron well flow charts indicated gas had begun to flow into the well, but THEC and Falcon failed to act on this information. (TR 349, 553, 575) Had they noticed the developing problem reflected in the charts, they could have closed the well when the IPO valve was still below the surface and below the blowout preventers. (TR 556-57) Several early warnings that significant **18** changes were occurring in the well bore were either missed or ignored by the crew. (TR 555-56, Exh. 19 at 18, 558-60)

By the time overflowing water from the trip tank alerted the drilling crew to the flow of gas around 7:30 PM, they had raised the IPO to a height approximately eight feet above the drilling floor. (TR 98-101, doc. 88-Morgan depo at 20-21; doc. 90-Sessions depo. at 66) The crew had already disconnected the IPO valve from the tool string, and were preparing to remove it, when pressure from the surge of gas pushed the IPO valve and tool string up the derrick and into the bottom of the top drive. (doc 88-Morgan depo at 17-20, Exh. 2 at 48, Exh. 3 at 47).

Contrary to the district court's findings, THEC and Falcon never fully regained control of the well. Had THEC responded quickly by closing off the well by other available means at this point, the well would not have blown. Instead, THEC risked using the IPO valve as a blowout preventer, though it was not designed or built for that purpose.

### 3. THEC failed to use appropriate equipment to prevent the blowout.

THEC ignored clear signs that the well still had a gas kick in it. After shut in, the crew measured 500 pounds of surface pressure on the well. (TR 102, 576) While the well was obviously unstable, THEC chose to refasten the IPO valve connections and let the IPO remain above the rig floor, unprotected, outside the safe and intended operating pressures within the hole. (TR 558-59, 473-74) Thus, **19** THEC improperly placed the IPO valve in the role of blowout protector instead of using sheer rams or other appropriate blowout preventers to shut in the well. (TR 577-78) THEC and Falcon waited for the pressure to stabilize before attempting to regain control by "bullheading," or pumping fluid down the drill stem. (doc 88-Morgan depo. at 21, 41) During this time, the pressure inside the drill stem and exposed IPO continued to increase. (TR 221) When the pressure reached 960 pounds, the pin in the IPO sheared, causing the ports to open and allowing gas to escape-the blowout. (TR 221)

The cumulative effect of THEC's and Falcon's negligent actions in failing to discharge their responsibilities over the drilling operation caused, or substantially contributed to, the blowout and subsequent losses. The district court clearly erred when it found THEC's and Falcon's actions too remote to cause or contribute to the blowout.

SUMMARY OF THE ARGUMENT

The district court's findings of fact and conclusions of law--on their face-- reveal the court's failure to distinguish between ordinary negligence and gross negligence. The facts are essentially undisputed. Halliburton's em-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ployee made an inadvertent mistake by substituting an IPO valve that had not been prepared for one that he had previously properly prepared. When the IPO valve was pressed into service for a purpose for which it was not intended, it failed. The district court equated an honest oversight with the reckless, virtually willful actions that are punishable as gross negligence. In doing so, the court erased a fundamental, legally defined distinction between the mental state required for gross negligence--a wanton and reckless disregard or want of care--and the mere inadvertence of mistake. Rather than showing gross neglect, the most the facts show is that the Halliburton employees had no reason to suspect the valve had only one pin. Moreover, they had no reason to suspect or know that the likely result of the failure to insert pins in the valve was a well blowout. Thus, there was no reason the employees knew of or disregarded a risk of a blowout. They also had no reason to expect the valve would be required to withstand well pressure after the test was complete and the valve had been extracted from the well.

As a result of the court's finding of gross negligence, the court excused the plaintiff, THEC, from its "red letter" indemnity contract with Halliburton, based on the narrow exception that such contracts do not cover intentional misconduct or gross negligence. Because Halliburton's actions were not grossly negligent, the court's failure to enforce the clear, unambiguous terms of the parties' agreement constitutes legal error. Contracts that limit liability for negligence are valid and enforceable. In this case, two sophisticated business entities chose to allocate the risk of loss of a well blowout through the work order contractual provisions, or "red letter" clauses, a common practice in the industry. THEC's claim that its "company man," the person in charge of the well project, did not have authority to bind the company is meritless. On the contrary, case law holds that a person in such a position, with implied authority, can bind the company to this type of contract. Accordingly, THEC cannot avoid the terms of the contract. Moreover, THEC had ample notice of Halliburton's indemnity provision. The language of indemnification is conspicuously printed in red, and referred to on the front of the work order immediately above the signature line.

The district court also failed to apply the doctrine of comparative fault to allocate the responsibility for the blowout, as required under both maritime and Lousiana law. The district court failed to make findings of the comparative fault of Halliburton, THEC and Falcon and apportion the damages, even though there was evidence--which the court recognized--implicating THEC and Falcon in causing the blowout. Instead, the court erroneously interpreted the doctrine of intervening and superseding cause to preclude Halliburton's defense of comparative fault. Under the court's factual findings, Halliburton's actions were, at most, a contributing cause of the blowout. The negligence of THEC and Falcon caused the "kick" in the well in the first place. Even if THEC and Falcon's conduct is not considered a superseding cause absolving Halliburton from all liability, THEC's and Falcon's proportionate fault must be determined because their actions were an "intervening" cause that, when combined with Halliburton's actions, resulted in the blowout.

Although THEC brought this case under the admiralty statute and both parties throughout most of the case considered the case as arising under maritime law, the district court based its findings and conclusions on the Outer Continental Shelf Lands Act ("OCSLA"). If OCSLA applied to this dispute, then the district court lacked admiralty jurisdiction.

Under admiralty law, a party is not entitled to a jury; under OCSLA, the court applies the law of the nearest state and a jury trial is available. If, indeed, OCSLA applies, then Halliburton was deprived of the fundamental right to request a jury trial. The district court's conclusion at the end of the trial that OCSLA applied, as reflected in the conclusions of law, did not give Halliburton a fair and sufficient opportunity to demand and enforce its right to a jury trial before the trial.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Finally, the trial court abused its discretion when it admitted and relied on expert testimony to determine THEC's claimed damages for lost production, evidence that was produced immediately before trial in violation of a court-ordered deadline. Because THEC changed its damage calculation at the last minute, Halliburton was unfairly surprised and was denied the opportunity to test THEC's evidence and rebut it with its own experts.

**\*23 STANDARDS OF REVIEW**

On appeal from a judgment after a bench trial, the appellate court reviews the findings of fact for clear error and the legal issues de novo. *Gebreyesus v. F.C. Schaffer & Assocs., Inc.,* 204 F.3d 639, 642 (5th Cir. 2000). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Walker v. Braus,* 995 F.2d 77, 80 (5th Cir. 1993). Factual findings made under an erroneous view of controlling legal principles, however, are reviewed de novo. *Id.; Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995, 1000 (5th Cir. 1984). Moreover, applying legal principles to "essentially undisputed facts" is subject to de novo review. *United States v. Singer Mfg. Co.,* 374 U.S. 174, 194, 83 S. Ct. 1773, 1783 (1963); *Walker,* 995 F.2d at 80.

ARGUMENT AND AUTHORITIES

I. THE DISTRICT COURT ERRED IN FINDING THE ACTIONS OF HALLIBURTON'S EMPLOYEES GROSSLY NEGLIGENT

In this case, the district court misapplied the legal principles distinguishing between ordinary and gross negligence to the essentially undisputed facts of this case. Whether the conduct found by the court rises, as a matter of law, to the level of gross negligence, requires de novo review by this Court. Even under the less **\*24** stringent clearly erroneous standard, the district court clearly erred in finding the conduct of Halliburton's employees to be grossly negligent.

*A. The Legal Standards for Finding Gross Negligence Are Not Satisfied in This Case*

The district court did not correctly apply the legal standard pertaining to gross negligence to Halliburton's conduct. While this is a contract action, the distinction between ordinary negligence and gross negligence is critical, as the district court excused THEC from its "red letter" indemnity contract with Halliburton, based on the narrow exception that such contracts do not cover intentional misconduct or gross negligence.

Even accepting the district court's predicate findings of fact, and considering all the circumstances as evidenced in the record, the district court erred when it equated an honest oversight with the reckless, virtually willful actions that are punishable as gross negligence. Plainly, the actions of Halliburton's employees, as found by the district court, are not actions that fit the legal definitions of gross negligence used by courts, *i.e,* "reckless and wanton misconduct," "entire absence of care," "complete neglect," "utter disregard." *See, e.g., Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.,* 922 F.2d, 220, 224 n.3. (5th Cir. 1991); *Miles v. Melrose,* 882 F.2d 976, 989 (5th Cir. 1989); *Ambrose v. New Orleans Police Dep't Ambulance Serv.,* 639 So. 2d 216, 219-220 (La. 1994).

**\*25** Regardless of whether federal or Louisiana law applies, gross negligence has a well-defined legal meaning distinctly separate, and different, from ordinary negligence. In maritime cases, the Fifth Circuit has defined gross negligence as reckless and wanton misconduct. *See Miles,* 882 F.2d at 989 (applying maritime law). Gross negligence is distinguished from ordinary negligence in that it encompasses harm that is "willfully inflicted" or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

is caused by the wanton or reckless disregard for the safety of others. *See Todd Shipyards Corp. v. Turbine Serv., Inc.,* 674 F. 2d 401, 411 (5th Cir. 1982).

Stated differently, "[o]rdinary negligence is based on the fact that one ought to have known the results of his acts, while 'gross negligence' rests on the assumption that one knew the results of his acts." *Computalog U.S.A., Inc. v. Blake Drilling and Workover Co., Inc.,* 1996 WL 720761 at *2 (E.D. La. Dec. 9, 1996) (applying maritime law) (citation omitted) (RE "H").[FN7] Likewise, Louisiana state courts have defined gross negligence as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." *E.g., State v. Vinzant,* 7 So. 2d 917 (La. 1942). "There is often no clear distinction between willful, wanton, or reckless conduct and gross negligence and the two have tended to merge and take on the same meaning." *26Falkowski v. Maurus,* 637 So. 2d 522 (La. Ct. App. 1993) (citation omitted); *accord, Hendry Corp. v. Aircraft Rescue Vessels,* 113 F. Supp. 198 (E.D. La.1953) (gross negligence described as ... "entire absence of care" ... "utter disregard ... "complete neglect").

> FN7. *See also Barber v. Texaco, Inc.,* 720 F.2d 381, 384 (5th Cir. 1983) (reversing jury finding of gross negligence and stating that "[g]ross negligence is differentiated from simple negligence by the mental attitude of the defendant: a plaintiff must show that the defendant knew about the danger, but demonstrated by his acts or omissions that he didn't care.") (applying Texas law).

Here, the trial court's finding does not properly apply the fundamental principle that gross negligence embraces a mental state that does not exist for ordinary negligence. The evidence in this case exhibits a glaring absence of the *conscious disregard,* equivalent to knowledge that harm will occur, that must exist for a proper finding of gross negligence with respect to the actions of Halliburton's employees, Costlow and Lemaire. Affirmance of the district court's finding will open the door to unjustified nullification of indemnity terms in commercial maritime contracts and punitive damage awards in cases where mere inadvertence or oversight leads to an accident.

### B. The Evidence Does Not Support a Finding of Gross Negligence.

David Lemaire made a simple mistake due to an unexpected mix up of the IPO tools, an honest mistake that any person could have made under the circumstances. Phil Costlow understandably relied on Lemaire for information that the test string, including the IPO valve, was adequately prepped for the third test. Although the court emphasized noncompliance with Halliburton's "policies" *27 on drilling rigs, it is uncontroverted that Lemaire correctly pinned an IPO valve, at the site, in accordance with Halliburton's practices. (TR 176-77, 180, 190-91, 198-99, 207) Thereafter, nothing occurred that should have caused either man to doubt that the IPO valve used was pinned correctly.

### 1. Lemaire and Costlow had no reason to know the IPO valve had only one pin

The district court's finding of gross negligence is largely premised on its conclusion that Lemaire and Costlow should have visually inspected or otherwise re-confirmed they were using the properly pinned IPO valve at some point after Lemaire correctly pinned an IPO valve for use in the second test. There is insufficient evidence, however, to support a finding that either man had reason to know something was amiss, or that the IPO valve would be called upon to prevent a blowout.

Lemaire knew that he had correctly pinned an IPO valve, a fact which is not contradicted. Even though the Falcon crew moved the tools used in the test string, Lemaire testified that he *believed* that he picked up the same IPO valve that he correctly pinned only a few hours earlier (TR 179-80, 198-99, 201), and there is no evidence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that shows his honestly held belief amounts to "reckless or wanton disregard." Indeed, the second well test went off without a hitch. (TR 193) In addition, Costlow had no reason to doubt Lemaire's word that the IPO valve, **\*28** which was already incorporated into the test string, was properly pinned.[FN8] And, because the differential pressures in the second surge test apparently did not exceed even 610 psi, Costlow and Lemaire had no reason to suspect that the IPO valve, which they believed to contain five shear pins, had sustained damage. (TR 193) The third test also did not create differential pressures exceeding the capacity of the IPO valve; the actions of THEC and Falcon as the crew removed the test string from the well hole created the pressure differential that triggered the blowout.

> FN8. If Tom Sessions' assumption that Costlow had "circulated the well"-- which was Sessions' responsibility as THEC's company man in charge of the well operation--is not even an act of negligence, Costlow's reliance on Lemaire's assurance that the IPO valve was properly pinned cannot possibly be "gross negligence." (TR 227-28; CR 518 n.7)

The evidence established that Lemaire and Costlow did not know, expect or intend to use the wrong IPO valve. (TR 176-77; 180; 190-91, 198-99, 206-07, 210-11) Additionally, the court's finding that Costlow could have easily rechecked the IPO valve overlooks evidence that Costlow would have had to disconnect and reassemble the tool string, which was already prepared for the test, to make such an inspection (TR 206-07) Costlow had no reason to believe that was necessary.

**\*29** 2. There is no evidence that Costlow and Lemaire should have expected a well blowout to occur

The record also fails to demonstrate that Lemaire and Costlow had any reason to suspect or know that the likely result of failure to insert five pins in the IPO valve was a well blowout. There was no evidence of past blowouts involving IPO valves or incorrectly pinned valves of any kind. It does not follow, from the evidence of Halliburton's policy of pinning IPO valves onsite, that its employees knew of and disregarded the risk that a blowout could result.

In fact, due to the negligent actions of THEC and Falcon, the IPO valve was pressed into service as a surrogate blowout preventer, a purpose for which it is not intended. (TR 196, 559-60) Moreover, Costlow and Lemaire had no reason to expect the IPO valve would be required to withstand pressure at the well surface *after* the test was complete. Rather, after the first test, Costlow and Lemaire had reason to believe the IPO valve would be withdrawn from the well with open ports, after operating as intended and as it did in the first test. Absent the unusual, unexpected, and unintended use of the IPO valve as an above-surface blowout preventer, Lemaire's oversight would have been harmless. Further, had the IPO valve been activated, as it was in the first test, it could not have been utilized as a stop-gap measure once the well "kick" occurred. (TR 576-78)

**\*30** Not surprisingly, case law that addresses the issue of ordinary versus gross negligence demonstrates that Halliburton's actions do not rise above ordinary negligence. In *Wang*, for example, defendants obtained summary judgment on the gross negligence issue, even though a Wang employee used the Plaintiffs only backup disk to test a malfunctioning computer and thereby destroyed five years of medical and accounting data. 922 F.2d at 224; *cf Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1071 (5th Cir. 1995) (applying Texas gross negligence principles, this Court reversed a district court finding of gross negligence where failure to inspect a tractor-trailer was the legal cause of a fatal accident); *Computalog U.S.A., Inc. v. Blake Drilling and Workover Co., Inc.*, 1996 WL 720761 at \*2 (E.D. La. Dec. 9, 1996) (granting summary judgment enforcing an indemnity provision under maritime law, despite negligent acts that caused an accident on a drilling rig). Similarly, in this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

case, there is no evidence that Lemaire and Costlow knew that a blowout was likely to result from the failure to properly pin the IPO valve. The IPO valve is neither designed nor intended to operate above the drilling surface as a makeshift blowout preventer.

The district court's legal conclusion that the undisputed facts revealed that Halliburton's employees' actions constituted gross negligence is in error and should be reversed. In the alternative, the trial court's factual findings concerning **\*31** the gross negligence of Halliburton's employees are clearly erroneous, and Halliburton is entitled to reversal on the finding of gross negligence.

## II. THE DISTRICT COURT ERRED IN REFUSING TO ENFORCE THE INDEMNITY CONTRACT.

The district court's failure to enforce the parties' work order contract, including the indemnification and limitation of liability clauses, constitutes legal error. As set forth above, the gross negligence exception is not implicated by the district court's factual findings. THEC's other defenses to enforcing the contract fail as a matter of law, based on the undisputed evidence. Accordingly, this Court should enforce the applicable terms of the parties' contract.

### A. Indemnity Contracts Are Enforceable.

Contracts limiting liability for negligence are generally valid and enforceable. *See, e.g., Nicor Supply Ships Assocs. v. General Motors Corp.,* 876 F.2d 501, 504 (5th Cir. 1989) (upholding limit under general maritime law); *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 580-83 (5th Cir. 1986) (same); *see generally Perkins v. Rubicon, Inc.,* 563 So. 2d 258, 259-60 (La. 1990); *Polozola v. Garlock, Inc.,* 343 So. 2d 1000, 1003-04 (La. 1977). Because no valid exception exists to excuse enforcement of the parties' agreement, the district court erred by declaring the provision of the parties' contract limiting liability invalid and by refusing to enforce it.

**\*32** Parties choose to limit their liability to one another for a variety of reasons, including the allocation of risk of loss. *See, e.g., Jigg the Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171, 176 (5th Cir. 1975) (holding that parties may allocate risk of loss in rational manner). The parties in this case expressly allocated the risk of loss of a well blowout. The release and indemnity provision protects Halliburton from liability for "property damage and loss resulting from: Loss of well control." (Exh. 15). Insurance was obtained accordingly and the risk allocation is common in the industry; in fact, in this very case THEC honored a similar provision in its contract with Falcon. (TR 152)

Similar "red letter" clauses have been upheld in similar circumstances. For example, in *Todd Shipyards Corp. v. Turbine Serv., Inc.,* 674 F.2d 401 (5th Cir. 1982), this Court upheld a limitation of liability clause when there was no dispute that the parties were sophisticated business entities with no disparity in relative bargaining power. *Id.* at 410. Both Halliburton and THEC are sophisticated business parties. In addition, Halliburton and THEC had used similar work order contracts previously, which militates in favor of enforcing the clause.[FN9] *See Campbell v. Sonat Offshore Drilling, Inc.,* 979 F.2d 1115, 1120 (5th Cir. 1992) **\*33** (reasoning that standard provision from prior dealings were binding). Indeed, the record shows that THEC was aware of the indemnity provision and acquiesced to it.[FN10] As the parties in this case contemplated and addressed the risk, their agreements should be respected. *See Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1214 (5th Cir. 1986) ("[a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties") (citing *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir. 1981)).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> FN9. THEC contracted with Halliburton and signed Halliburton work orders containing limitations clauses on numerous occasions. (TR 24) (THEC's drilling superintendent signed close to 100 Halliburton work orders) (TR 121); (THEC signed Halliburton work orders before and after the blowout); TR 127; 152-153 (THEC officer testified that Halliburton did work under work orders for years).

> FN10. THEC's Westmoreland testified that THEC and Halliburton could not reach agreement on a master service agreement, because the parties could not agree on indemnity provisions. (TR 132). Nevertheless, THEC continued to use Halliburton, using Halliburton work orders, as Halliburton required. (TR 152-153). In fact, during December 1999 and January 2000, THEC personnel were told not to sign Halliburton work orders, but that order was later withdrawn, as THEC relented because it wanted Halliburton to work on THEC's wells. (TR 78). Thus, THEC made a conscious decision to accept the limitations inherent in the indemnity agreement.

While courts are reluctant to enforce limitation of liability clauses to excuse gross negligence or intentional misconduct, under both maritime and Louisiana law Halliburton's conduct in this instance did not rise to that level as a matter of law, as discussed *infra* in Part I. The record evidence did not support the district court's finding that Halliburton's employees Lemaire and Costlow had the required mental state to constitute gross negligence. Because this was the district court's sole basis for disregarding Halliburton's release and indemnity provision, the judgment below should be reversed.

> **\*34** *B. THEC's Other Defenses to the Clause Fail as a Matter of Law.*

While THEC raised many other defenses to the contract, the district court declined to address them. (CR 522, FF 25 n.8). None of the defenses is supported by the record. Accordingly, the district court's legal conclusions regarding the release and indemnification contract should be reversed, and judgment rendered in favor of Halliburton or, in the alternative, the case should be remanded for any necessary factual findings relating to the enforceability of the release.

### 1. Authority

THEC claimed that its own "company man" did not have authority to bind it. This Court rejected a similar argument in comparable circumstances in *Coastal Iron Works,* 783 F.2d 577, 582-83 (5th Cir. 1986), holding that a ship's captain had implied authority, as master of the ship, to enter a repair contract containing an indemnity clause. In the present case, THEC's "company man" at the rig, James Hileman, signed the contract after negotiations between THEC's drilling manager William Wright and Halliburton's salesman Mark Favret. (TR 34-36; 78-80; 120). Hileman was in charge of overseeing the general operation of the well and had ultimate authority over the well bore subject to the blowout, as well as the contractors. (TR 95; 119).[FN11] Accordingly, THEC cannot avoid the terms of the **\*35** contract. *See Grillet v. Sears, Roebuck & Co.,* 927 F.2d 217, 220 (5th Cir. 1991) ("A party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligation imposed by the contract.")

> FN11. Hileman admitted that he believed he had the authority to sign the work orders, (TR 122-123). THEC's officer also admitted that "company men" like Hileman are authorized to sign work orders. (TR 153)

### 2. Notice

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

As stated above, THEC was aware both of Halliburton's indemnity provision and Halliburton's unwillingness to perform services without one. *See supra* n. 11. Further, the mere fact that the indemnity provision was on the reverse side of the work order does not nullify the clause. *See Coastal Iron Works,* 783 F.2d at 582; (CR 522 n.8). Similar to the contract enforced in *Coastal Iron Works,* the Halliburton work order states, above the signature line, that the release and indemnity provisions are contained on the reverse side. (Exh. 15; TR. 19-120; RE "E"). This language is printed in red, to set it apart from remaining text on the front of the work order, which is printed in black. (Exh. 15; TR 120-121; RE "E"). Accordingly, THEC had notice of the indemnity provisions as a matter of law. *See Hudson Waterways Corp. v. Coastal Marine Serv., Inc.,* 436 F. Supp. 597, 604-05 (E.D. Tex. 1977)* (past business dealings provided sufficient notice to vessel owner that release of liability clause was part of every repair contract) (cited with approval in *Campbell,* 979 F.2d at 1120).

Based on the clear, unambiguous terms of the indemnity contract between Halliburton and THEC, this Court should reverse and render a take-nothing **\*36** judgment against THEC. In the alternative, if the Court finds that fact issues concerning the enforceability of the indemnity provision exist, the Court should reverse and remand to the district court for a determination of the contract issue.

### III. THE DISTRICT COURT ERRONEOUSLY FAILED TO APPLY THE DOCTRINE OF COMPARATIVE FAULT.

Halliburton raised the defense of comparative fault and was entitled to relief if Halliburton could show that THEC and Falcon were responsible for a portion of the damages suffered by THEC. Halliburton put on ample proof that THEC and/or Falcon were responsible, wholly or in part, for the blowout. The sole basis on which the district court deprived Halliburton of its affirmative defense was its erroneous application of the law of intervening and superseding causes. In fact, the doctrine of intervening and superseding causes, properly applied in this case, supported, rather than defeated, Halliburton's defense of comparative fault.

The district court failed to apply the comparative fault doctrine to allocate responsibility for the blowout, as required under maritime law and Louisiana state law. In general, when an injury results from the negligence of more than one party, the comparative fault of all involved must be determined and the damages must be apportioned accordingly. The district court failed to make findings of the comparative fault of Falcon, THEC, and Halliburton, and it failed to apply the comparative fault doctrine to apportion liability, based on an erroneous interpretations of the "superseding" cause doctrine.

**\*37** *A. The District Court Improperly Failed to Determine the Relative Fault for the Blowout of All Involved.*

The comparative fault doctrine has applied in maritime cases for 25 years. The United States Supreme Court, in *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S. Ct. 1708 (1975), held that "when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of fault." *Id.* at 411, 95 S. Ct. at 1715-16. *See also Hal Antillen N.V. v. Mount Ymitos MS,* 147 F.3d 447, 452 (remanding case for a determination of comparative fault and apportionment of liability); *Pennzoil Prod. Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1469 (5th Cir. 1991). Louisiana also applies comparative fault principles. *See La. Civ. Code Ann. art. 2323.*[FN12] *See also Clement v. Frey,* 666 So.2d 607, 611 (La. 1996); *Harvey v. T.H.E. Ins. Co.,* 764 So.2d 354, 361 (La. Ct. App. 2000). The district court erred as a matter of law by failing to allocate liability among THEC, Falcon, and Halliburton, according to their respective share of the blame.

FN12. While art. 2323(c) states that comparative negligence does not apply where the injury is caused

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

by an intentional tortfeasor, gross negligence is not considered an intentional tort under Louisiana law. *See Labbe v. Chemical Waste Management, Inc.,* 756 So.2d 613, 617 (La. Ct. App. 2000); *Micele v. CPC of Louisiana, Inc.,* 709 So.2d 1065, 1068 (La. Ct. App. 1998). Moreover, as set forth in part -- below, Louisiana does not apply because this case is covered by maritime law.

**\*38** *B. Halliburton's Comparative Fault Defense Is Not Defeated by the Superseding Cause Doctrine.*

The district court apparently rejected Halliburton's defense of comparative negligence based on a misinterpretation of the intervening and superseding cause doctrine. The doctrine does not apply in this case to relieve THEC and Falcon of liability for their negligent acts, which occurred after the negligent installation of the IPO valve by Halliburton and which, combined with the IPO valve, resulted in the blowout.

Under both federal maritime law and Louisiana law, an intervening and superseding cause severs the causal chain linking prior conduct to an injury. Even if a defendant's conduct is a "cause-in-fact" or "but for" cause, a subsequent superseding cause may be the sole "legal," or "proximate" cause of an injury. *See generally Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 116 S. Ct. 1813 (1996); *Nunley v. M/V Dauntless Colocotronis,* 727 F.2d 455, 464 (5th Cir. 1984) (en banc) (adopting principles set forth in *Restatement (Second) of Torts* when determining whether intervening force "supersedes" prior negligence and thereby precludes finding of proximate cause); *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 649 (5th Cir. 1992) ("Under the general maritime law, a party's negligence is actionable only if it is a legal cause of the plaintiffs injuries."); *Allied Chemical Corp. v. Hess Tankship Co.,* 661 F.2d 1044, 1060 (5th Cir. 1981) **\*39** ("A subsequent negligent act does not excuse prior negligence except in the most unusual circumstances. It would only mean that all actors, past and present, must divvy up the liability."); *see also, e.g., Ford v. Pennzoil,* 974 F. Supp. 559, 566 (E.D. La. 1997), *aff'd,* 200 F.3d 816 (5th Cir. 1999) (table).

Under the facts found by the district court, Halliburton's conduct on May 28 and early on May 31 is, at most, a contributing cause of the blowout. Accordingly, while Halliburton may be subject to liability for its comparative fault, its conduct was not the sole proximate cause of the blowout and Halliburton cannot be solely responsible for THEC's damages. The negligence of THEC and Falcon caused the kick in the first place. Even if THEC and Falcon's conduct is not considered a superseding cause that operates to shield Halliburton from all liability, THEC and Falcon's proportionate fault must be determined because their actions were an "intervening" cause that, when combined with Halliburton's actions, resulted in the blowout. *See* Conclusion of Law No. 5.

The district court improperly relied on *Mendoza v. Mashburn,* 747 So.2d 1159 (La. App. 5th Cir. 1999), in holding Halliburton completely and solely responsible for the blowout, notwithstanding Falcon and THEC's acknowledged fault in causing the kick. *See, e.g.,* Conclusion of Law No. 5. Despite the district court's reliance on *Mendoza,* its holding supports the application of comparative fault. *Mendoza* involved a traffic accident that resulted in multiple injuries. The **\*40** trial court disregarded the jury's assessment of comparative fault, concluding that one actor's negligence was superseded by the later negligent acts of others. *Id.* at 1163. The appellate court reversed and reinstated the jury's findings regarding comparative fault. *Id.* at 1169. Thus, the *Mendoza* court's statement, "[a]n initial tortfeasor will not be relieved of the consequences of his negligence unless the intervening cause superseded the original negligence and alone produced the injury," quoted by the district court in this case, does not require imposition of all liability on the initial tortfeasor in the absence of a superseding cause. *See id.* at 1168. Rather, the *Mendoza* court merely held that comparative negligence principles will apply in situations involving multiple tortfeasors where proximate cause is not severed by a superseding cause. Accordingly, this Court should reverse the judgment of the district court and remand the case for an assessment of the propor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion of liability of all of the actors involved in the events underlying the May 31 blowout, and apportion responsibility for THEC's damages accordingly.

The record shows, and the district court acknowledged, that the blowout occurred due to the combination of THEC's and Falcon's negligence, which created the kick and caused the IPO valve to be used for the unintended purpose of a blowout preventer, and Halliburton's negligence in installing the wrong IPO valve. Accordingly, the Court should reverse the judgment, due to the district court's erroneous application of law, and remand the case for an apportionment of **41** comparative fault of the blowout and a proper apportionment of liability for damages.

## IV. THEE DISTRICT COURT DEPRIVED HALLIBURTON OF ITS RIGHT TO A JURY TRIAL IF OCSLA APPLIES.

THEC brought this suit alleging jurisdiction under federal maritime law. (CR 245) During the course of the litigation, the parties presumed the application of federal law, relying on statutory and case law. *See, e.g.,* 43 U.S.C. § 1333(a)(2); *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459 (5th Cir. 1992). In its findings of fact and conclusions of law, however, the district court ultimately applied the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* (OCSLA).

If the district court properly applied OCLSA, then it committed reversible error by effectively denying Halliburton its right to a jury trial. If OCLSA applies to the dispute between THEC and Halliburton, then the district court lacked admiralty jurisdiction. *See Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 218 (stating that the underlying operative assumption of OCSLA is that "admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA").

In the absence of admiralty jurisdiction, Halliburton was entitled to a jury trial. *See Fontenot v. Dual Drilling Co.,* 179 F.3d 969, 972-73 (5th Cir. 1999). Halliburton did not knowingly or intentionally waive its right to a jury trial. *See Jennings v. McCormick,* 154 F.3d 542 (5th Cir. 1998) (stating that the "right to jury **42** trial is too important ... to find a knowing and voluntary relinquishment of the right in a doubtful situation.") This Court has held that a party has not waived its right to a jury trial if it has "an insufficient opportunity to assert its rights." *Bennett v. Pippin,* 74 F.3d 578, 587 (5th Cir. 1996). In *Bennett,* a county which had been previously dismissed was reinstated only one hour before the bench trial began. The Court held that the county's participation in the bench trial did not constitute a waiver of its right to a jury trial, given that one hour before trial was an "insufficient opportunity" to request a jury trial. *Id.*

In *Bennett,* the complaint contained a jury demand. *Id.* at 586. This relieved the county from any obligation to demand a jury. *Id.* Conversely, in the present case, the plaintiff pleaded and the Court proceeded under admiralty jurisdiction. (CR 245). This was essentially an election not to have a jury, and Halliburton had no basis for demanding a jury, as it believed the district court had admiralty jurisdiction. *See Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 323, 326 (no jury trial when plaintiff has pleaded under FED. R. CIV. P. 9(h)). The district court's conclusion that OCSLA applied, as reflected in its conclusions of law issued after the trial, did not give Halliburton a fair and sufficient opportunity to demand and enforce its jury trial right before the trial. *See Bereslavsky v. Kloeb,* 162 F.2d 862, 864 (6th Cir. 1947) (holding that party cannot "waive a right [to jury trial] when there is not basis for choice"). Accordingly, the **43** Court should reverse the judgment and remand the case for a new trial, *if* it determines that OCSLA applies.

## V. THE DISTRICT COURT'S RELIANCE ON EXPERT EVIDENCE OF LOST PRODUCTION DISCLOSED

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

IMMEDIATELY BEFORE TRIAL UNFAIRLY PREJUDICED HALLIBURTON.

The district court admitted and relied upon expert testimony disclosed by THEC shortly before trial in violation of a prior court-ordered deadline. (TR 5) (denying Halliburton's motion in limine) THEC presented its calculations of lost production to Halliburton on February 15, 2000, a month before trial, even though the district court's order required disclosure earlier and Halliburton had outstanding discovery requests covering this information. Halliburton objected to the lost production evidence at a pre-trial conference the next day, on February 16, and the district court stated that it would exclude the lost production evidence if it required expert testimony.

Notwithstanding the district court's ruling, THEC's damages witness, James Westmoreland, testified in his deposition that he relied upon the calculations of an engineer in order to prepare the lost production evidence. (CR 278; Ex. B at 42-43). On March 8, days before trial, THEC changed its damage calculation and claimed that lost production amounted to $2,037,848.00. Halliburton renewed its objection to the evidence through a motion *in limine,* seeking to enforce the district court's February 16 ruling and on grounds of unfair surprise. (CR 278). The *44 district court, however, relied on the testimony when awarding $1,991.948.00 in damages for lost production.[FN13] In doing so, Halliburton was unfairly prejudiced and was denied a full and fair opportunity to test this evidence and present conflicting testimony.

> FN13. The lost production figure was reduced based on an admission that $45,900.00 in operating costs could be required to produce the gas.

It is within the sound discretion of the trial court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, delay, or unfair surprise. *F&S Offshore, Inc. v. KO Steel Castings, Inc.,* 662 F.2d 1104 (5th Cir. 1981). *See Book v. Nordrill,* 826 F.2d 1457, 1460-61 (5th Cir.1987) (affirming district court's exclusion of testimony on an expert report exchanged one business day before trial); *Young v. City of New Orleans,* 751 F.2d 794 (5th Cir. 1985) (affirming trial court's exclusion of medical testimony where plaintiffs counsel failed to disclose the report until the last business day prior to trial).

Accordingly, the district court abused its discretion in admitting the late-produced evidence. The portion of the district court's judgment concerning lost production should be reversed and THEC should not be permitted to recover such damages. In the alternative, the Court should remand the issue to the district court to permit a full and fair opportunity to litigate its merits.

## *45 CONCLUSION

Halliburton Energy Services, Inc., respectfully requests that the Court reverse and render judgment that The Houston Exploration Company take nothing on their claims against Halliburton. In the alternative, Halliburton requests that the Court reverse and remand to the district court for a determination of the validity of the indemnity contract or, in the alternative, for a determination of the comparative fault of the parties and Falcon, and grant it whatever other relief to which it is entitled.

THE HOUSTON EXPLORATION COMPANY, Plaintiff-Appellee, v. HALLIBURTON ENERGY SERVICES, INC., Defendant-Appellant.

2000 WL 33988457 (C.A.5 ) (Appellate Brief )

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

591 So.2d 1278
**(Cite as: 591 So.2d 1278)**

▷

Court of Appeal of Louisiana,
Third Circuit.

SEVARG CO., INC., Plaintiff-Appellant,
v.
ENERGY DRILLING CO., Defendant-Appellee.

No. 90-668.
Dec. 18, 1991.
Rehearing Denied Jan. 29, 1992.
Writ Denied April 3, 1992.

Operator of oil well brought action against drilling contractor for breach of contract, alleging that contractor failed to comply with mud control program and that such failure was intentional or result of gross fault. The 7th Judicial District Court, Parish of Concordia, W.C. Falkenheiner, J., partially maintained exception of no cause of action, and operator appealed. The Court of Appeal, Yelverton, J., held that: (1) operator stated viable cause of action, and (2) contract's indemnity provisions were null to extent that they, in advance, excluded or limited contractor's liability for intentional or gross fault that caused damage to operator.

Reversed.

West Headnotes

**[1] Mines and Minerals 260 ⇌109**

260 Mines and Minerals
   260III Operation of Mines, Quarries, and Wells
      260III(C) Rights and Liabilities Incident to Working
         260k109 k. Contracts for Testing or Working. Most Cited Cases

Oil well operator had viable cause of action against drilling contractor for breach of contract based on allegations that parties had contract, that contractor breached contract by maintaining mud weight and water loss rates at unacceptable levels, and that such breach caused damages in form of contract price, remedial costs, and lost income, and by further alleging that breach was intentional or was result of gross fault. LSA-C.C.P. art. 856; LSA-C.C. art. 3556, subd. 13 (Repealed).

**[2] Pleading 302 ⇌34(1)**

302 Pleading
   302I Form and Allegations in General
      302k34 Construction in General
         302k34(1) k. In General. Most Cited Cases

Pleadings must be construed reasonably so as to afford litigants their day in court, to arrive at truth, and to do substantial justice.

**[3] Pleading 302 ⇌228.9**

302 Pleading
   302V Demurrer or Exception
      302k228.8 Peremptory Exceptions
         302k228.9 k. In General; Relating to Forms. Most Cited Cases
   (Formerly 302k228.8)

When it can reasonably do so, court should maintain petition against peremptory exception so as to afford litigant opportunity to present his evidence.

**[4] Pleading 302 ⇌228.11**

302 Pleading
   302V Demurrer or Exception
      302k228.8 Peremptory Exceptions
         302k228.11 k. No Cause of Action. Most Cited Cases

**Pleading 302 ⇌228.17**

302 Pleading
   302V Demurrer or Exception
      302k228.16 Hearing and Matters Considered
         302k228.17 k. In General. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

591 So.2d 1278
**(Cite as: 591 So.2d 1278)**

(Formerly 302k228.16)

**Pleading 302 ⟲228.19**

302 Pleading
   302V Demurrer or Exception
     302k228.16 Hearing and Matters Considered
       302k228.19 k. Admissions in General.
Most Cited Cases

**Pleading 302 ⟲228.20**

302 Pleading
   302V Demurrer or Exception
     302k228.16 Hearing and Matters Considered
       302k228.20 k. Facts. Most Cited Cases

Purpose of exception of no cause of action is to determine sufficiency in law of petition and is triable on face of papers; for purpose of determining issues raised by such exception, well-pleaded facts in petition and any annexed documents must be accepted as true.

**[5] Pleading 302 ⟲228.11**

302 Pleading
   302V Demurrer or Exception
     302k228.8 Peremptory Exceptions
       302k228.11 k. No Cause of Action. Most Cited Cases

General rule is that where petition states cause of action as to any ground or portion of demand, exception of no cause of action should be denied; only recognized exception to such rule is when separate and distinct causes of action are included in one petition.

**[6] Indemnity 208 ⟲30(5)**

208 Indemnity
   208II Contractual Indemnity
     208k26 Requisites and Validity of Contracts
       208k30 Indemnitee's Own Negligence or Fault
         208k30(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases
    (Formerly 208k3)

Indemnity provisions of oil well drilling contract were null to extent that they, in advance, excluded or limited liability of contractor for intentional or gross fault that caused damage to operator. LSA-C.C. art. 2004.

**[7] Pleading 302 ⟲18**

302 Pleading
   302I Form and Allegations in General
     302k18 k. Certainty, Definiteness, and Particularity. Most Cited Cases

Malice, intent, knowledge, and other conditions of mind of person may be alleged generally. LSA-C.C.P. art. 856.

***1279** Liskow & Lewis, Joseph C. Giglio, Lafayette, for plaintiff-appellant.

Gold, Weems, Bruser, Sues & Rundell, Dee D. Drell, Alexandria, for defendant-appellee.

Before LABORDE, YELVERTON and KNOLL, JJ.

YELVERTON, Judge.

Sevarg Co., Inc., as operator, entered into a contract with Energy Drilling Co., as contractor, for Energy to drill an oil well for Sevarg in Rapides Parish. The well was not a success. Sevarg filed suit against Energy for damages based on a breach of contract. Sevarg alleged in its petition that the breach was the failure to comply with the mud control program specified in the contract. The contract was attached to the petition. Sevarg alleged that the failure to comply with the terms of the contract resulted in skin damage, which in turn inhibited production. Sevarg alleged that Energy intentionally maintained deficient mud properties in order to accelerate the drilling process and to save money for itself. Sevarg further alleged that the skin damage was caused by the defendant through its intentional and bad faith breach of the contract. Damages were itemized: (a) the price paid under the contract, $193,100; (b) the costs of completing, equipping,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

591 So.2d 1278
**(Cite as: 591 So.2d 1278)**

operating, reworking the well and attempting to remedy the defective performance, $400,000 +; and (c) the lost production income and profits, $325,000 +.

The written contract contained certain indemnity obligations. Energy filed an exception of no cause of action grounded on **\*1280** these obligations in the contract. The trial judge partially maintained the exception by ordering the last two items of damages stricken from the petition, overruling the exception as to Item (a) of damages, the claim for $193,100 for the return of the price paid under the contract.

Sevarg appealed. We reverse the judgment which partially maintained the exception of no cause of action, and overrule the exception in its entirety.

Energy also filed an exception of no right of action in the trial court. That exception was overruled. By answer to the appeal, Energy appealed the overruling of its exception of no right of action, as well as the trial court's decision overruling the exception of no cause of action as to Item (a) of damages. We dismiss Energy's answer to the appeal. The rulings appealed by Energy were interlocutory and are not appealable. La.C.C.P. art. 2083; *Bank of Jena v. Clark,* 452 So.2d 428 (La.App. 3rd Cir.), writ denied, 458 So.2d 476 (La.1984).

EXCEPTION OF NO CAUSE OF ACTION

[1] Although the trial court did not give reasons for judgment, its apparent reason for partially maintaining the exception of no cause of action was the asserted ground for that exception: Energy based its exception on the ground that Sevarg had agreed to indemnify it for liability for the very damages claimed in this lawsuit. Energy argued that because the indemnity agreement was contained in the contract, and because the contract was attached to the petition, on the face of the papers the plaintiff did not have a cause of action for the damages itemized as (b) and (c), above.

The sections of the contract said to preclude a cause of action were 18.8, 18.14, and 18.15. These sections read as follows:

**18.8 Underground Damage:** Operator agrees to defend and indemnify Contractor for any and all claims against Contractor resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

**18.14 Consequential Damages:** Neither party shall be liable to the other for special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit or business interruptions, however same may be caused.

**18.15 Indemnity Obligation:** Except as otherwise expressly limited herein, it is the intent of parties hereto that all indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including without limitation, paragraphs 18.1 through 18.14 hereof, be without limit and without regard to the cause or causes thereof (including pre-existing conditions), the unseaworthiness of any vessel or vessels, strict liability, or the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive. The terms and provisions of paragraphs 18.1 through 18.14 shall have no application to claims or causes of action asserted against Operator or Contractor by reason of any agreement of indemnity with a person or entity not a party hereto.

[2][3][4] Pleadings must be construed reasonably so as to afford litigants their day in court, to arrive at the truth, and to do substantial justice.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

591 So.2d 1278
**(Cite as: 591 So.2d 1278)**

*Kuebler v. Martin,* 578 So.2d 113 (La.1991). When it can reasonably do so, the court should maintain a petition against a peremptory exception so as to afford the litigant an opportunity to present his evidence. *Id.* The purpose of an exception of no cause of action is to determine the sufficiency in law of the petition and is triable on the face of the **\*1281** papers; for the purpose of determining the issues raised by this exception, the well pleaded facts in the petition and any annexed documents must be accepted as true. *Id.*

[5] The general rule is that where a petition states a cause of action as to any ground or portion of a demand, the exception of no cause of action should be denied. *Ward v. Tenneco Oil Co.,* 564 So.2d 814 (La.App. 3rd Cir.1990). The only exception to this rule that has been recognized is when separate and distinct causes of action are included in one petition. *Id.*

Sevarg's petition clearly set forth a cause of action for breach of contract. The three items of damage stated were the alleged elements of damages suffered as a result of the breach. Sevarg alleged the existence of a contract, attaching it to the petition. Sevarg alleged a breach, specifically that the mud weight and water loss rates were maintained at unacceptable levels. Sevarg alleged damages as a result of the breach, particularizing the damages.

[6] In addition, Sevarg alleged that Energy's breach was intentional or was the result of gross fault. Malice, intent, knowledge and other conditions of mind of a person may be alleged generally. LSA-C.C.P. art. 856; *Zeagler v. Town of Jena,* 503 So.2d 1137 (La.App. 3rd Cir.1987). Therefore, Sevarg's allegation that Energy's breach relative to the mud supply program was intentional sets forth a well-pleaded fact, as is the allegation that the breach was the result of Energy's gross fault. Gross fault is defined as "that which proceeds from inexcusable negligence or ignorance; it is considered as nearly equal to fraud." LSA-C.C. art. 3556(13). The petition's allegations must be accepted as true when ruling on an exception of no cause of action.

[7] Finally, Energy cannot interpose the indemnity provisions of the contract as effectively canceling Sevarg's cause of action. Sections 18.8, 18.14, and 18.15 of the contract, given the interpretation espoused by Energy, are null, because they, in advance, exclude or limit the liability of Energy for intentional or gross fault that causes damage to Sevarg. La.C.C. art. 2004 provides in part:

"Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party."

*Ramirez v. Fair Grounds Corp.,* 575 So.2d 811 (La.1991).

For the foregoing reasons, the judgment of the trial court is reversed, and the exception of no cause of action is overruled, at Energy's costs.

REVERSED.

La.App. 3 Cir.,1991.
Sevarg Co., Inc. v. Energy Drilling Co.
591 So.2d 1278

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 S.Ct. 68

Page 1

123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63
**(Cite as: 123 U.S. 67, 8 S.Ct. 68)**

**C**

Supreme Court of the United States
ORIENT MUT. INS. CO.
v.
ADAMS and another.

October 24, 1887.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

**\*\*68** This writ of error brings up for review a judgment against the Orient Mutual Insurance Company of New York, upon a policy whereby that company insured the defendants in error in the sum of $5,000 on the steamer Alice, of the agreed valuation of $27,000, against perils 'of the seas, lakes, rivers, canals, fires, and jettisons that should come to the damage of said vessel or any part thereof.' The policy provided, among other things, that the company should be free from all claim for loss or damage 'arising from or caused by * * * barratry, * * * or occasioned by the bursting of boilers, the collapsing of flues, explosion of gunpowder, the derangement or breaking the engine or machinery, or any consequence resulting therefrom, **\*\*69** unless the same be caused by unavoidable external violence;' that there should be 'no abandonment as for a total loss on account of said vessel grounding or being otherwise detained, or in consequence of any loss or damage, unless the injury sustained be equivalent to fifty per centum of the agreed value in this policy; that the aforesaid vessel is, and shall be at all times during the continuance of this policy, tight and sound, sufficiently found in tackle and appurtenance thereto, competently provided with masters, officers, and crew, and in all things and means for the safe employment thereof;' and that 'in no case whatever shall the assured have the right to abandon until it shall be ascertained that the recovery and repairs of said vessel are impracticable, nor sell the wreck, or any portion thereof, without the consent of the company.' The insured sued as for a

total loss arising from one of the perils specified in the policy. The company pleaded *non assumpsit* and payment, with leave to give in evidence the matters set forth in its affidavit of defense, which was adopted as a special plea. Those matters will sufficiently appear from the facts which will now be stated.

According to the bill of exceptions, there was evidence in behalf of the plaintiffs tending to show that, without willfulness or design on the part of her captain, the vessel was carried, April 28, 1880,-before the expiration of the policy,-over the falls of the Ohio river, at Louisville, Kentucky, and sunk, receiving damage in a sum equal to 50 per cent. of her agreed value; and that on the eighteenth of May, 1880, it being apparently impracticable to float her off and repair her, the vessel was abandoned to the insurers as a total loss, and the sum due under the policy demanded.

The evidence introduced by the company tended to establish these facts: The master of the Alice was C. F. Adams, one of the assured, and a son of the other plaintiff. Before the sailing of the vessel he had the reputation of being a 'drinking' man, and of that fact his father was informed. On her arrival at Louisville, on the morning of April 28, 1880, the master gave the usual signal (which was transmitted to the engineer) that he had no present need of the engines. The joint of the mud-value was out of order, threatening damage to the freight, and making repairs necessary. The steam was thereupon blown off in order to make repairs. The captain, coming on board, saw that repairs were going on, and knew that the mud-valve connected with the boiler needed repairs. The work of repairing made in necessary to blow off steam. The captain subsequently went on deck, and, without making inquiry of the engineer as to the condition of the steam or receiving any notice from him that the steam was ready, tapped his bell at 8:30 A. M. as a signal to let go the boat. At that time there was not sufficient steam to propel the vessel. It is the cus-

123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63
**(Cite as: 123 U.S. 67, 8 S.Ct. 68)**

tom of the river, for the master, before giving the order to let go, to inquire of the engineer as to the condition of the steam, and await his reply that steam is ready before giving the order to let go. At the time of the accident the vessel was in a position to be carried over the falls, if she was let go without steam on. Upon being let go she was carried by the current down the river and over the falls, and, striking a pier, was badly damaged; in consequence of which she sunk soon thereafter below the bridge in about eighteen feet of water. There was also evidence in behalf of the company, tending to show that the vessel was but slightly injured, and, in the spring of 1881, was floated and removed from the place at which she sunk, and put in the condition in which she was before sinking, for a sum little less than $6,000; that when she was raised the plaintiffs refused to pay the expense thereof; that after May 18, 1880, the plaintiffs sold her furniture and apparel without the company's consent, and that on or about the twenty-eighth of April, 1880, they put her into the possession of the Cincinnati Underwriters' Wrecking Company, which thereafter had the right of possession until the vessel was seized by the United States marshal under process, in December, 1880, upon maritime liens. To further maintain the issues on its **70 behalf the defendant-the bill of exceptions states-produced in evidence an exemplification of the record of a certain cause, entitled '*Cincinnati Underwriters' Company* against *The Steamer Alice*,' etc., in the United States district court for the district of Kentucky, as tending to show that after the eighteenth May, 1880, the claimants, by the answers and petitions in that suit, claimed to be the owners of the vessel, her furniture and apparel; that the Alice was subject to maritime liens, in a considerable sum, existing on the eighteenth of May, 1880; that she was sold under a decree to satisfy the same, the plaintiffs receiving a part of the proceeds of sale; that the plaintiffs admitted that she was slightly damaged, and they had refused, after she was raised, to pay the expense of raising her. Thereupon the plaintiffs offered evidence tending to show that 'it was the custom of the river that the engineer should give notice to the

captain before exhausting steam, and that it was not the custom for the captain to have notice from the engineer that steam was ready before giving the order to let go.' The plaintiffs, in further reply, offered to prove by the plaintiff C. F. Adams 'that the steamer, at the time of loss, was insured in seven companies for a total insurance of eighteen thousand dollars, and, after the notice of abandonment, six of them, representing an insurance of $13,000, settled with the insured, and, as part of the settlement, released to the latter all interest in the steamer as she lay; that, after the marshal's sale of the boat, the plaintiffs claimed to own the 13-18 of the proceeds of sale, and that when the claim for the entire proceeds was made it was, as to form, under the advice of counsel; but the plaintiffs did not intend thereby to waive the abandonment theretofore made, or to keep, as against the Orient Insurance Company, the 5-18 of the proceeds of sale.' This was offered as bearing upon the question of waiver of abandonment of the Alice; to which offer the defendant objected; but the objection was overruled, and the testimony of the witness admitted. The defendant excepted to the overruling of the objection, and to the admission of the testimony.

West Headnotes

**Insurance 217 ⊂⟩⟩2254**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2250 Evidence
                217k2254 k. Admissibility. Most Cited
Cases
    (Formerly 217k658)

**Insurance 217 ⊂⟩⟩2255**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2250 Evidence
                217k2255 k. Weight and Sufficiency.
Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63

**(Cite as: 123 U.S. 67, 8 S.Ct. 68)**

(Formerly 217k492.1)

The fact that a vessel abandoned as a total loss was recovered and repaired a year later is not "the best evidence" that it was practicable to recover and repair it at the time of the loss.

## Insurance 217 ⌬2230

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(D) Ocean Marine Insurance
        217k2218 Risks Covered and Exclusions
          217k2230 k. Proximate Cause. Most Cited Cases

(Formerly 217k413)

Upon the arrival of the insured steamboat at Louisville, Ky., it was found that the joint of the mud valve was out of order. Steam was blown off to make repairs, and upon the return of the captain, who knew that repairs were going on, there was not sufficient steam to propel the vessel. The captain, without inquiring as to the condition of the steam, according to the custom of the river, gave the signal to let go. This was done, and the boat was carried by the current down the river, and over the falls, and, striking a pier, was sunk, and abandoned as a total loss. At the time of the accident the vessel was in a position to be carried over the falls if she was let go without steam on. Held that, the proximate cause of the loss being a peril of the river against which the vessel was insured, the misconduct of the master was no defense to an action on the policy, in the absence of proof that it was affected by fraud or design.

## Insurance 217 ⌬2230

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(D) Ocean Marine Insurance
        217k2218 Risks Covered and Exclusions
          217k2230 k. Proximate Cause. Most Cited Cases

(Formerly 217k413)

A policy provided that the company should be free of all claim for loss or damages occasioned by "the derangement or breaking of the engine or machinery, or any consequence resulting therefrom." Held, that the "consequence" referred to was an immediate or proximate, and not a remote, consequence, and that, even if the mud valve could be considered part of the machinery, the derangement of it, which appeared to have been repaired before the order to let go was given, was not a proximate cause of the loss.

## Insurance 217 ⌬2237

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(D) Ocean Marine Insurance
        217k2233 Losses and Amounts Payable
          217k2237 k. Abandonment. Most Cited Cases

(Formerly 217k470)

A policy provided that there should be "no abandonment as for a total loss, * * * unless the injury sustained be equivalent to 50 per cent. of the agreed value." That value was $27,000. The vessel was carried over the falls at Louisville, Ky., and sunk, April 28, 1880. She was abandoned as a total loss May 18, 1880. The company raised her in the spring of 1881, and put her in the condition she was in before the accident, at an expense of less than $6,000. Held, that the right to abandon was to be determined by the facts as they existed May 18, 1880, and that if it was then impracticable to recover and repair the boat, the place where she lay, the uncertainty as to when, if at all, a rise would come to float her off, and all the other attendant circumstances, being taken into consideration, the subsequent floating off of the vessel would not change the result.

**\*68 James Lowndes**, for plaintiff in error.

*D. T. Watson*, for defendants in error.

Mr. Justice HARLAN, after stating the facts in the foregoing language, delivered the opinion of the court.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63
**(Cite as: 123 U.S. 67, 8 S.Ct. 68)**

**\*71** The first assignment of error relates to the instructions upon the general question whether the insured, by anything done or **\*72** omitted to be done, had defeated their right to recover on the policy. The court, at the request of the plaintiffs, and against the objections of the company, instructed the jury that 'where a loss under a policy of insurance, such as the one in suit, happens from the perils of the river, it is not a defense to the insurance company that the remote cause of loss was the negligence of the insured or his agents;' and that 'the mere fault or negligence of the captain of the vessel by which the Alice was drifted into the current, and drawn over the falls, will not constitute a defense for the company, unless the jury should be satisfied that the captain acted fraudulently or willfully, with design in so doing.' The theory of the defense was disclosed by the request to instruct the jury that if they 'are satisfied from the evidence that the accident and loss was caused by the misconduct of Capt. Charles F. Adams, that then the plaintiff cannot recover.' This request was denied, but the court said to the jury: 'This is true if the jury is satisfied that the conduct of the captain is properly characterized. If he designedly or recklessly exposed the vessel to the dangers of navigation at the falls, knowing that she was not in a condition to encounter them, he was guilty of misconduct such as would relieve the defendant from liability; but if the proximate cause of the loss was the stranding of the vessel, this was covered by the policy, and the defendant is not relieved from liability by showing that the loss was remotely ascribable to the negligence of the captain or the other officers or employes.' We do not perceive anything **\*\*71** in these instructions of which the insurance company can rightfully complain. The court proceeded upon the ground that, if the efficient and, therefore, proximate cause of the loss was a peril of the river, the company could not escape liability by showing that the loss was remotely caused by mere negligence in not ascertaining, before giving the signal to let the vessel go, that she had steam enough for her proper management. The court committed no error in so ruling. In *Insurance Co.* v. *Lawrence*, 10 Pet. 517,

which was a case of insurance against fire on land, the court said that 'a loss by fire, occasioned by the mere fault **\*73** or negligence of the assured, or his servants or agents, and without fraud or design, is a loss within the policy, upon the general ground that the fire is the proximate cause of the loss, and also upon the general ground that express exceptions in policies against fire leave this within the scope of the general terms of such policies.' In the subsequent case of *Waters* v. *Insurance Co.*, 11 Pet. 224, it was said in reference to the case of *Insurance Co.* v. *Lawrence*, that 'the court then thought that in marine policies, whether containing the risk of barratry or not, a loss whose proximate cause was a peril insured against, is within the protection of the policy, notwithstanding it might have been occasioned remotely by the negligence of the master and mariners.' To the same effect are *Insurance Co.* v. *Coulter*, 3 Pet. 237; *Insurance Co.* v. *Sherwood*, 14 How. 352; and *Insurance Co.* v. *Transportation Co.*, 117 U. S. 325, 6 Sup. Ct. Rep. 750, 1176. But it is insisted that the court should have granted the request of the company, to the effect that it was not liable if the accident and loss were caused by the 'misconduct' of the master. Had that request been granted, in the form asked, the jury might have supposed that the company was relieved from liability if the master was chargeable with what is sometimes described as gross negligence, as distinguished from simple negligence. Hence the court properly said, in effect, that the misconduct of the master, unless affected by fraud or design, would not defeat a recovery on the policy. The principle upon which the court below acted was that expressed by Chief Justice GIBSON in *Insurance Co.* v. *Insley*, 7 Pa. St. 229, when he said that 'public policy requires no more than that a man be not suffered to insure against his own knavery, which is not to be protected or encouraged by any means; for though the maxim *respondeat superior* is applicable to the responsibility of a master for the acts of his servants, yet the insured, so long as he acts with fidelity, is answerable neither for his servants nor for himself.' *Williams* v. *Insurance Co.*, 3 Sum. 276.

123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63

**(Cite as: 123 U.S. 67, 8 S.Ct. 68)**

The next assignment of error is that the court erred in ruling that the loss was not within the express exceptions of the *74 policy. The specification, under this assignment, is that the loss was the consequence of the derangement of the mud-valve, and, therefore, within the exception that the company should be free of all claim for loss or damage occasioned by 'the derangement or breaking of the engine or machinery, or any consequence resulting therefrom.' The 'consequence' here referred to is an immediate or proximate, not a remote, consequence. Even if the mud-valve is a part of the machinery of the vessel, within the meaning of the policy, its derangement cannot be said to have been the proximate cause of the loss. So far as the bills of exception show, the repairs of the mud-valve had been completed before the order was given to let the vessel go.

It is also contended that the court erred in its instructions as to the abandonment of the vessel by the plaintiffs. The court told the jury, in substance, that the assured were entitled to abandon the vessel, if, on May 18, 1880, it was impracticable to recover and repair it, and if the damage from the perils of the river amounted to 50 per cent. of the agreed value; that the right to abandon was to be determined from the facts as they existed on that day; that if the right then existed, and the plaintiffs availed themselves of it, the subsequent floating off of the vessel in the winter or spring of 1881 would not **72 change the result; and that in determining whether the injuries to the vessel from the perils of the river were to the extent of 50 per cent. of her agreed value, the jury should take into consideration the 'place where the Alice lay, and the uncertainty as to when (if at all) a rise would come to float her off, and all other circumstances in the case.' The argument in behalf of the company is that these instructions disregarded the express terms of the contract between the parties; that while the rule laid down by the court made the probability of the stipulated loss, at the time of abandonment, the test of the right to abandon, the policy made the actual existence of the stipulated proportion of loss

the ground of the exercise of that right. We do not think the court mistook the meaning of the contract, or erroneously instructed the jury. The jury were distinctly told that the right to *75 abandon depended upon the fact that it was impracticable to recover and repair the vessel. But how were the jury to determine the existence of that fact? The contract provided as a condition precedent to the right to abandon that it be 'ascertained that the recovery and repairs of said vessel are impracticable.' But in what mode ascertained? How was the insured to determine whether the recovery and repair of the vessel was impracticable at the time of abandonment? Why, manifestly, as the jury were told, by taking into consideration where the vessel lay, the uncertainty as to when (if at all) a rise would come to float her off, and all the other attendant circumstances. While the damage must at the time have been equivalent to 50 per cent. of the agreed value, and while the fact that the repairs subsequently made amounted to only $6,000 tended to show that the actual damage was not so great as claimed, that fact is not decisive of the right to abandon. For as said in *Bradlie* v. *Insurance Co.*, 12 Pet. 378, 397; 'If the abandonment when made is good, the rights of the parties are definitely fixed, and do not become changed by subsequent events; if, on the other hand, the abandonment when made is not good, subsequent circumstances will not affect it, so as, retroactively, to impart to it a validity which it had not at the origin.' *Rhinelander* v. *Insurance Co.*, 4 Cranch, 29; *Marshall* v. *Insurance Co.*, Id., 202. Again: 'In many cases of stranding, the state of the vessel at the time may be such, from the imminency of the peril, and the apparent extent of expenditures required to deliver her from it, as to justify an abandonment; although by some fortunate occurrence she may be delivered from her peril without an actual expenditure of one-half of her value after she is in safety. Under such circumstances, if, in all human probability, the expenditures which must be incurred to deliver her from her peril are, at the time, so far as any reasonable calculations can be made, in the highest degree of probability, beyond half value, and if her distress and peril be such as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63
**(Cite as: 123 U.S. 67, 8 S.Ct. 68)**

would induce a considerate owner, uninsured, and upon the spot, to withhold any attempt to get the vessel off, because of **\*76** such apparently great expenditures, the abandonment would doubtless be good.' In the same case the court quote with approval the following language of Kent: 'The right of abandonment does not depend upon the certainty, but on the high probability, of a total loss, either of the property or of the voyage, or both. The insured is to act, not upon certainties, but upon probabilities, and if the facts present a case of extreme hazard, and of probable expense exceeding half the value of the ship, the insured may abandon; though is should happen that she was afferwards recovered at a less expense.' 3 Kent, Comm. 321.

In this connection it is assigned for error that the court erred in ruling that the fact of the actual repair of the vessel for less than 50 per centum of her agreed value was not evidence relevant to the issue as to the amount of damage done to the Alice. This statement as to the ruling of the court is scarcely accurate. The court refused, and properly, to tell the jury that the fact that the vessel was recovered and repaired was 'the best evidence' that it was practicable to recover and repair it. That fact, however, went to the jury as evidence, and they were at liberty, under the instructions, to give it due **\*\*73** weightin connection with all the other circumstances, in determining whether the recovery and repair of the vessel were, within the principles announced in other instructions, impracticable at the time of the abandonment.

Upon the whole case we are of opinion that no error of law was committed to the prejudice of the company, and the judgment is affirmed.

U.S. 1887
Orient Mut Ins Co v. Adams
123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

United States Court of Appeals Second Circuit.
NEW YORK, NEW HAVEN AND HARTFORD
RAILROAD COMPANY, Libelant-Appellant,
v.
William Stanger GRAY, one of the Lloyd's under-
writers, and Orion Insurance Company, Ltd., Insur-
ance Company Member of the Institute of London
Underwriters, Respondent-Appellees.

No. 86, Docket 24187.
Argued Dec. 7, 1956.
Decided Jan. 16, 1957.

Insured brought action against insurers on two
policies of marine insurance to recover for loss sus-
tained when railroad cars with insured goods rolled
off car float as result of listing of car float, which
had taken on water. The United States District
Court for the Southern District of New York, Cash-
in, J., 144 F.Supp. 356, entered a decree dismissing
the libel, and the insured appealed. The Court of
Appeals, Frank, Circuit Judge, held that alleged
gross negligence of insured in placing railroad cars
and insured goods on car float, which had taken on
water and was listing, so that cars slid into river,
did not constitute 'wilful misconduct' which would
bar recovery on policies on marine insurance.

Decree reversed with direction to enter a de-
cree in favor of insured.

West Headnotes

**[1] Insurance 217 ⟶2220(1)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2220 Perils of the Sea
                    217k2220(1) k. In General. Most
Cited Cases
    (Formerly 217k403)

Where water from river leaked into car float,
causing car float to list and settle, and the listing
and settling caused some of the railroad cars on the
car float with their cargo to slide into the river, loss
resulted from a "peril of the seas" within meaning
of policies of marine insurance.

**[2] Insurance 217 ⟶2220(1)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2220 Perils of the Sea
                    217k2220(1) k. In General. Most
Cited Cases
    (Formerly 217k403)

Loss results from a "peril of the seas" within
meaning of a policy of marine insurance, if damage
is done by fortuitous action of the sea.

**[3] Insurance 217 ⟶2220(1)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2220 Perils of the Sea
                    217k2220(1) k. In General. Most
Cited Cases
    (Formerly 217k403)

Fact that the sea is calm when loss occurs does
not prevent the loss from resulting from a "peril of
the seas" within meaning of policy of marine insur-
ance.

**[4] Insurance 217 ⟶2231**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2231 k. Negligence. Most Cited
Cases
    (Formerly 217k416)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

**Insurance 217 ☞2232**

217 Insurance
    217XVI Coverage--Property Insurance
     217XVI(D) Ocean Marine Insurance
      217k2218 Risks Covered and Exclusions
       217k2232 k. Wrongful Acts. Most Cited Cases
    (Formerly 217k416)

Negligence, whether or not gross, but for which accident would not have occurred, will not serve as a defense to an action on a policy of marine insurance, and only wilful misconduct, measuring up to knavery or design, will suffice.

**[5] Insurance 217 ☞2232**

217 Insurance
    217XVI Coverage--Property Insurance
     217XVI(D) Ocean Marine Insurance
      217k2218 Risks Covered and Exclusions
       217k2232 k. Wrongful Acts. Most Cited Cases
    (Formerly 217k417)

Alleged gross negligence of insured in placing railroad cars and insured goods on car float, which had taken on water and was listing, so that cars slid into river, did not constitute "wilful misconduct" which would bar recovery on policies of marine insurance.

**[6] Admiralty 16 ☞118.7(1)**

16 Admiralty
    16XII Appeal
     16k118 Review
      16k118.7 Findings of Court
       16k118.7(1) k. In General. Most Cited Cases

Determinations by judge of federal District Court of the existence of negligence and wilful misconduct were not findings of fact but were legal conclusions, and were therefore not binding on Court of Appeals on appeal.

**[7] Insurance 217 ☞2230**

217 Insurance
    217XVI Coverage--Property Insurance
     217XVI(D) Ocean Marine Insurance
      217k2218 Risks Covered and Exclusions
       217k2230 k. Proximate Cause. Most Cited Cases
    (Formerly 217k413)

In action on policies of marine insurance, the niceties of the doctrine of so-called "proximate cause," employed in negligence suits, applied in a limited manner only.

**[8] Insurance 217 ☞2255**

217 Insurance
    217XVI Coverage--Property Insurance
     217XVI(D) Ocean Marine Insurance
     217k2250 Evidence
      217k2255 k. Weight and Sufficiency. Most Cited Cases
    (Formerly 217k417.1, 217k665(4))

In action on policies of marine insurance for loss sustained when insured's railroad cars rolled off car float and into river as result of listing of car float, evidence was insufficient to sustain finding that gross negligence of insured was the sole cause of the loss.

**[9] Insurance 217 ☞2255**

217 Insurance
    217XVI Coverage--Property Insurance
     217XVI(D) Ocean Marine Insurance
     217k2250 Evidence
      217k2255 k. Weight and Sufficiency. Most Cited Cases
    (Formerly 217k417.1, 217k665(4))

In action on policies of marine insurance for loss sustained when insured's railroad cars rolled off car float and into river as result of listing of car float, evidence was insufficient to sustain finding that loss was inevitable because of the way the car float was loaded and her condition.

**[10] Insurance 217 ☞2997**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

217 Insurance
   217XXIV Avoidance
      217XXIV(B) Particular Kinds of Insurance
         217k2995 Ocean Marine Insurance
            217k2997 k. Seaworthiness of Vessel.
Most Cited Cases
    (Formerly 217k273)

   In action on policies of marine insurance for loss sustained when insured's railroad cars rolled off car float and into river as result of listing of car float, insurers correctly disclaimed the defense of an implied warranty of seaworthiness, where the policies were time policies.

**[11] Insurance 217 ⟜2997**

217 Insurance
   217XXIV Avoidance
      217XXIV(B) Particular Kinds of Insurance
         217k2995 Ocean Marine Insurance
            217k2997 k. Seaworthiness of Vessel.
Most Cited Cases
    (Formerly 217k273)

   Rule codified in the English Marine Insurance Act that where, with privity of assured, ship is sent to sea in an unseaworthy state, insurer is not liable for any loss attributable to unseaworthiness; did not relieve insurers from liability for loss which occurred when railroad cars and insured goods rolled off car float and into river, where the car float had not been "sent to sea" but was still moored at the time of the accident.

   **\*461** The appellees, underwriters, issued to appellant two policies of marine insurance,**\*462** identical in form, covering railroad cars and their contents while afloat on appellant's carfloats. The printed portion of each policy stated the coverage in part as follows: 'Touching the Adventures and Perils which we the Assurers are contented to bear and do take upon us in this Voyage, they are, of the Seas * * * and all other Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said goods and Merchandises and Ship, &c., or any Part thereof * * *'

   A typewritten rider read in part as follows: '\$500,000 in all any one accident with limits as below on all goods, wares, merchandise, baggage, and other property; including articles excepted in the printed part of this policy; and on advanced charges and on freight charges up to point of occurrence of loss; belonging to the assured or held by it in trust or custody as carrier or forwarder, and for which it may be liable, while same is in or on cars on Floats owned or employed by said Railroad Company, and/or while said cars are being hauled on or off said vessels; and on cars belonging to the assured or in its use or possession, while the same are on said floats or being hauled on or off of said vessels. While said floats are conveying said cars in and through the waters of New York Harbor, or to and from Mott Haven on the Harlem River and, to and from Oak Point on the East River, or to and from Jersey City on the North River, or while lying in said harbor, or in any of said waters, or while being loaded or unloaded. * * * This policy covers accidents occurring between 1st January, 1951 and the 31st September, 1951, both days inclusive, Eastern Standard Time.'

   Appellant brought suit against appellees in admiralty on the policies. After a trial, the judge entered a decree dismissing the libel. His findings of fact and legal conclusions and opinion read as follows: 'On February 9, 1951 libelant's steel Carfloat No. 60, a three track float, approximately 327 feet long, with a depth of 10 feet 6 inches, a draft (light) of 3 feet and divided into 17 separate compartments, was located in the Harlem River Basin off libelant's Mott Haven Yard. On the carfloat were fastened thirteen empty gondola cars, five on the starboard side, five on the portside and three in the middle track. On the morning of February 9th libelant's employees commenced loading the gondola cars with steel concrete reinforcing rods. Sometime after 2:00 P.M. libelant's employees became aware that the bow of the carfloat was settling and libelant's Assistant Marine Superintendent and Marine Supervisor, among others, were duly informed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

'Sometime after 3:00 o'clock the Marine Supervisor inspected the float and found water in the various compartments as follows: Compartments No. 1- 4 feet; No. 2- 1 1/2 feet; No. 4- 2 feet; No. 7- 1 foot; No. 8- 2 1/2 feet; No. 12- 2 feet. The carfloat was needed the next day in its regular transfer business and the loading operation was continued until 6:00 P.M. at which time 801 tons of steel had been loaded into twelve of the thirteen cars on the float. One of the cars located on the portside of the stern end of the float was empty, and the one alongside of it was only partly filled. Libelant's Marine Supervisor and Assistant Marine Superintendent, when loading operations ceased, knew the carfloat was down at the bow with a free-board of less than ten inches with a list to the port; had water in four of its compartments and that it was scheduled to be towed to Oak Point sometime during the night.

'Libelant's Marine Supervisor and Assistant Marine Superintendent went home for the day at 6:00 P.M. leaving instructions that the carfloat was to be towed stern end first. During the course of the evening the carfloat's bow continued to settle and this fact was reported to libelant's office.

'Sometime after 11:00 o'clock a floatman (from libelant's tug Transfer II which had been dispatched to move the float) discovered that the forward end of the float was under water which was pouring through the ventilators into the **\*463** No. 3 compartment. The tug did not attempt to move the float in this condition. At about 12:30 A.M. on February 10th the gondola cars on the starboard side of the float broke their chains and rolled forward off the float into the river and five cars on the portside fell off the side of the float by reason of the backlash. According to stipulation the damage to the cargo and railroad cars amounted to $42,438.85. An examination of the float after the accident revealed a small hole in the port bow corner and a number of loose rivets in the lower bow angle.

'Conclusions of law.

'Libel is dismissed.

'It is our view that this case is determined by the fact that the losses incurred were not caused by 'Perils of the Sea.' On the facts in this case it is the Court's opinion that the immediate cause, and the only cause of the accident, was libelant's gross negligence. On February 9th, as early as 3:00 P.M., libelant's managing agents had full knowledge of a situation which merely had to continue to exist in order to result in the accident which eventually did occur and could have been worse. Libelant's Marine Supervisor and Assistant Marine Superintendent with full knowledge of the facts, and in the face of a series of warnings, apparently in the interest of speed deliberately continued to load a listing carfloat with a heavy cargo of steel. The only order which we believe they gave in the interest of safety was that the carfloat was to be towed stern first.

'The libelant in this case went to great pains to show that a certain amount of leakage in a vessel of the Carfloat No. 60 type was usual and to be expected. There is not a scintilla of evidence that anything happened other than this leakage from the time the loading of the steel ceased and the time when the vessel lost its cargo, which could properly be described as a 'Peril of the Sea.' Libelant, by 6:00 P.M., through the gross negligence of its managing employees had rendered the Carfloat No. 60 unseaworthy and had placed the railroad cars and the goods insured by respondents in such a perilous position that loss was inevitable in the absence of remedial action. Libelant's failure to take any action in the face of repeated warnings from 6:00 P.M. to 12:30 A.M. was a continuation of the same type of negligent conduct which created the situation.

'Although it is the tendency of the courts to construe insurance policies strictly against the insurer, Henjes v. Aetna Ins. Co. (2 Cir.), 132 F.2d 715, the insured cannot, by their own wilful misconduct, enlarge the insurers' risk to include the ordinary and inevitable action of the sea with respect to an unseaworthy vessel.  Union Insurance Co. v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497; Western Assurance Co. of Toronto, Canada v.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

Shaw, 3 Cir., 1926, 11 F.2d 495.'

Kirlin, Campbell & Keating, New York City, Edward L. Smith, New York City, for libelant-appellant.

Dow & Symmers, New York City, for respondent-appellees, Daniel L. Stonebridge and Raymond W. Mitchell, New York City, of counsel.

Before CLARK, Chief Judge, and FRANK and LUMBARD, Circuit Judges.

FRANK, Circuit Judge.

The trial judge denied recovery because he held that the loss incurred was not caused by any 'peril of the seas.' As his findings show, the loss occurred as follows: The 'sea' (i.e., water from the river) leaked into the carfloat; this caused the vessel to list and settle; this, in turn, caused some of the railroad's cars and their cargo to slide into the river; then the vessel lurched and other cars and their cargo also fell into the river. The judge held that railroad's employees had been guilty of 'gross negligence' which was 'the immediate cause and the only cause of the accident.' The 'gross negligence' consisted of taking a chance that the carfloat could be towed in spite of its known condition.

**\*464** [1][2][3][4][5] The loss resulted from a 'peril of the seas.' 'It is enough that damage be done by the fortuitous action of the sea. For instance, where cargo was damaged by the incursion of seawater through a hole in a pipe gnawed by rats, the House of Lords held this to be a peril of the seas.[FN1] That the sea is calm makes no difference.[FN2] Negligence, whether or not 'gross,'[FN3] but for which the accident would not have occurred, will not serve as a defense to such a policy. Only 'wilful misconduct,' measuring up to 'knavery' or 'design,' will suffice; and neither the evidence nor the judge's findings of fact show such conduct. True, the judge, in the last paragraph of his opinion, referred to the gross negligence as if it constituted wilful misconduct. There we think he erred. In Orient Insurance Co. v. Adams, 123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63, the master, before his vessel had steam up, negligently gave orders to cast off into the current of a river; as a result, the vessel was carried over a waterfall and sank. In affirming a judgment, on a verdict in favor of the plaintiffs, under a policy insuring them against 'perils of the seas,' the Court said, 123 U.S. at page 73, 8 S.Ct. at page 71: 'But it is insisted that the court should have granted the request of the company, to the effect that it was not liable if the accident and loss were caused by the 'misconduct' of the master. Had that request been granted, in the form asked, the jury might have supposed that the company was relieved from liability if the master was chargeable with what is sometimes described as gross negligence, as distinguished from simple negligence. Hence the court properly said, in effect, that the misconduct of the master, unless affected by fraud or design, would not defeat a recovery on the policy. The principle upon which the court below acted was that expressed by Chief Justice Gibson in American Ins. Co. v. Insley, 7 Pa.St. 223, 230, when he said that 'public policy requires no more than that a man be not suffered to insure against his own knavery, which is not to be protected or encouraged by any means;[FN3A] for though the maxim respondeat superior is applicable to the responsibility of a master for the acts of his servants, yet the insured, so long as he acts with fidelity, is answerable neither for his servants nor for himself.'' See also Dudgeon v. Pembroke, 2 A.C. 284; Trinder, Anderson & Co. v. Thames and Mersey Mar. Ins. Co. (1895), 2 Q.B. 114; Waters v. Merchants' Louisville Ins. Co., 11 Pet. 213, 221-223, 9 L.Ed. 691.

In Olympia Canning Co. v. Union Marine Ins. Co., 9 Cir., 10 F.2d 72, 74, the court said: 'In Davidson v. Burnand, L.R. 4 C.P. 117, the policy included perils of the sea. While the vessel was loading in the harbor her draft was increased by the weight of cargo until the discharge pipe was brought below the surface of the water. The cock of that pipe had been negligently left open. Water flowed into the hold causing injury to cargo. Willes, J., could find no distinction between loss

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

from an accident happening through the negligence of the crew of another vessel and loss from accident happening from the negligence of the crew of the vessel on which the loss was occasioned, all such distinction having been swept aside by Dixon v. Sadler, 5 M. & W. 405. Keating, J., was of the same opinion, as was also Brett, J., who, speaking of the manner in which the injury occurred said: 'The water got in, not by the happening of any ordinary occurrence in the ordinary course of the **\*465** voyage, but by the accidental circumstances of some cock having been left open by the negligence of the crew. This is, in my opinion, sufficient to make the underwriter liable. Cases of like purport are Devaux v. J'Anson, 5 Bing. (N.C.) 515, and Walker v. Maitland, 5 Barn. & Ald. 171.' We find no case which overrules or calls in question the doctrine of the foregoing authorities. Guided thereby, we reach the conclusion that by the maritime laws and customs of England the loss in the case at bar was proximately caused by the overturning of the vessel under the impulse of tidal and river currents, although the accident would not have occurred, but for the negligent loading of cargo taken on board at Tacoma; that the overturning of the vessel was a peril of the sea, within the provisions of the insurance contract; and that the action of the sea was the immediate cause of the accident. In Smith v. Scott, 4 Taunt. 125, Lord Mansfield said: 'I do not know how to make this out not to be a peril of the sea. What drove the Margaret against the Helena? The sea. What was the cause that the crew of the Margaret did not prevent her from running against the other? Their gross and culpable negligence; but still, the sea did the mischief."

[6][7] A determination by a trial judge of the existence of negligence is not a finding of fact but a legal conclusion.[FN4] So, too, is a determination as to 'wilful misconduct.' Accordingly, the judge's statement as to such conduct is not binding on us. And, as this is not a tort action, the horrendous niceties of the doctrine of so-called 'proximate cause,' employed in negligence suits,[FN5] apply in a limited manner only to insurance policies.[FN6]

[8][9] We do not agree with the trial judge that the libelant's gross negligence was the sole cause of the accident. Nor do we agree with his conclusion that the 'loss was inevitable' because of the way the carfloat was loaded and of her condition.[FN7] The evidence shows a concatenation of fortuitous circumstances (including misunderstanding by the dispatcher of some of the reports made to him about the vessel's listing).

**\*466** Cases cited by appellees are inapposite: Union Ins. Co. v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497, related to a policy which expressly excepted perils 'consequent upon' and 'arising from' or 'caused by incompetency of the master' or 'want of ordinary care and skill in navigating said vessel,' and 'all unseaworthiness.'[FN8] Diethelm & Co. v. The Flying Trader, D.C.S.D.N.Y., 141 F.Supp. 271, involved no insurance policy; it was a suit against an ocean carrier which defended on the ground that bills of lading excluded damage due to perils of the sea (and which was nevertheless required to pay for damage to cargo injured in a moderate gale). In Chicago S.S. Lines v. U.S. Lloyds, D.C.N.D.Ill., 2 F.2d 767, affirmed, 7 Cir., 12 F.2d 733, the policy contained an express warranty against the master's negligence.[FN9] Henjes v. Aetna Ins. Co., 2 Cir., 132 F.2d 715, 720, also related to a breach of an express warranty.

Western Assur. Co. of Toronto, Canada v. Shaw, 3 Cir., 11 F.2d 495, a case cited by the trial judge, concerned a policy expressly excepting all claims arising 'from the want of ordinary care and skill in loading and stowing the cargo.' Such, or related cases, we need not consider, since appellees close their brief with the statement: 'It has never been maintained by the insurers that the policies in suit contain an express or implied warranty of seaworthiness; neither has it been maintained that they contain an express 'due care' warranty.'

[10][11] Appellees correctly disclaimed defense of an implied warranty of seaworthiness, since these are time policies.[FN10] However, appellees, referring to the Engligh Marine Insurance

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

Act (1906) as purporting to codify the English 'case law,' cite Section 39(5) of that Act which provides: 'In a time policy there is no implied warranty that the ship shall be seaworthy at any state of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness.' Appellees contend that the emphasized words relieve them of liability here. We think not. We assume, arguendo, (1) that the evidence showed the 'privity of the assured' and (2) that, in each of the numerous trips made by this busy carfloat, it was 'sent to sea' when it left its moorings. Even so, we reject appellees' contention. For, when the loading occurred and when the accident happened, the carfloat had not been 'sent to sea' but was still moored. The rider to the policy expressly provides that the insurance applies while **\*467** the vessel is thus moored and 'while being loaded.'

We reverse with directions to enter a decree in favor of appellant for its stipulated loss, together with interest and costs.

FN1. 2 Arnold, Marine Insurance (14th ed.) Section 812.

FN2. Judge Rifkind in Compania T. Centro-Americana v. Alliance Ass. Co., D.C., 50 F.Supp. 986, 991; Olympia Canning Co. v. Union Marine Ins. Co., 9 Cir., 10 F.2d 72.

FN3. For criticism of the differentiation between 'negligence' and 'gross negligence,' see, e.g., Kelly v. Malott, 7 Cir., 135 F. 74, 76; The New World v. King, 16 How. 469, 474, 14 L.Ed. 1019.

FN3A. Cf. P. Samuel & Co. v. Dumas (1924), A.C. 431, 446, 453, where the ship was wilfully scuttled by the direction of the owner.

FN4. Barbarino v. Stanhope S.S. Co., 2 Cir., 151 F.2d 535, 555; Kreste v. United States, 2 Cir., 158 F.2d 575, 577-578; Dale v. Rosenfeld, 2 Cir., 229 F.2d 855, 858.

FN5. See discussion of 'proximate cause' in Hentschel v. Baby Bathinette Corp., 2 Cir., 215 F.2d 102, 105 ff. (dissenting opinion).

FN6. See, e.g., Green, Proximate and Remote Cause, in Green, Essays on Tort and Crime (1933) 1 at 15-16.

FN7. There is much to be said for the following statement made in its brief by appellant: 'It was also the result of the actions of the sea upon her in that condition, the place and way she was moored, the words chosen by those reporting her trim to the dispatcher, and a thousand other circumstances. As a matter of hindsight, every happening is the inevitable result of its causes, but as a matter of foresight, no one can predict what causes will be operating at any given moment. Therein lies the element of fortuity that must form an element of a recoverable insurance loss. * * * It is against the unpredictable happenstance of loss through whatever set of circumstances * * * that men take out insurance policies. * * * Loss was not inevitable until water started pouring down Carfloat 60's ventilators less than a half hour before the loss occurred. Many unpredictable circumstances brought about the failure to restore the float to an even and level keel by pumping some water into the stern compartments or taking any of the other steps which would have prevented the accident to which the district court decision refers as a failure to take 'remedial action.' An easily rectified maladjustment in trim occurring in the course of loading, failure to set brakes or the existence of controllable leakage * * * did not render the loss nonfortuitous nor bar a recovery from the underwriters therefor in the absence of a war-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

240 F.2d 460, 1957 A.M.C. 616
**(Cite as: 240 F.2d 460)**

ranty of seaworthiness or against negligence. The law of insurance is not like the law of torts to be used as an instrument of coercion upon assureds to improve operating practices. Assureds do not go into the insurance market to buy themselves an overseer.'

FN8. Moreover, the court affirmed a judgment for the plaintiff.

FN9. The case related to an alleged abandonment and the correct interpretation of the 'Inchmaree' clause in a hull insurance policy; the loss resulted from a defective condition of the hull created by a repair in drydock, a cause outside the coverage unless within an 'Inchmaree' clause. The question was whether the assured had brought itself within the express condition precedent to coverage under that clause, i.e., the exercise of due diligence to guard against latent defects.

FN10. There are statements in the following cases that the rule may be somewhat different in this country, i.e., that, although there may be no implied warranty of seaworthiness in a time policy, yet if the vessel is in port where repairs may be made, the insured cannot recover for any loss subsequently occurring when the vessel is at sea which is caused by the want of diligence in making the repairs; Union Ins. Co. v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497; New York & P.R.S.S. Co. v. Aetna Ins. Co., 2 Cir., 204 F. 255, 258; Henjes v. Aetna Ins. Co., 2 Cir., 132 F.2d 715, 719. However, as pointed out supra, the statement in the Union Ins. Co. case was obiter for the case involved an express warranty against unseaworthiness. That this was obiter is noted in the New York & P.R.S.S. Co. case, 204 F. 255, 258 (and had been noted by Judge Learned Hand in the district court, 192 F. 212, 214-215).

The statement of the so-called American rule in 204 F. at page 258 was also obiter, since the court found no want of diligence. So too was the statement in the Henjes case supra, where there was a breach of an express promissory warranty.

C.A.2 1957.
New York, New Haven and Hartford R. Co. v. Gray
240 F.2d 460, 1957 A.M.C. 616

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

H

United States Court of Appeals Fifth Circuit.
TROPICAL MARINE PRODUCTS, Inc., Appellant,
v.
BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, Appellee.

No. 16071.
Aug. 13, 1957.
Rehearing Denied Sept. 11, 1957.

Shipowner brought action against insurer to recover for loss of vessel which was insured under an American Institute Time Hull Policy containing an Inchmaree clause. The United States District Court for the Southern District of Florida, Emett C. Choate, J., entered judgment adverse to the shipowner, and the shipowner appealed. The Court of Appeals, John R. Brown, Circuit Judge, held that where there was no explanation as to what caused leak, which resulted in sinking and loss of vessel, the loss was within the coverage of the policy, whether the defect could have been discovered and therefore resulting unseaworthiness was due to the negligence of the master, or whether the defect was not discoverable by the master or shipowner and therefore was latent.

Judgment reversed and rendered for shipowner.

West Headnotes

**[1] Insurance 217 ⬚2997**

217 Insurance
    217XXIV Avoidance
        217XXIV(B) Particular Kinds of Insurance
            217k2995 Ocean Marine Insurance
                217k2997 k. Seaworthiness of Vessel.
Most Cited Cases
        (Formerly 217k273)
    Where there was no showing that shipowner or any one in privity with shipowner knew of alleged

fact that vessel which sank was in an allegedly unseaworthy condition, there was no breach of limited warranty of seaworthiness in American Institute Time Hull Policy containing an Inchmaree clause, and the insurance was effective.

**[2] Insurance 217 ⬚2228**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2228 k. Inherent Causes. Most Cited Cases
        (Formerly 217k416)

**Insurance 217 ⬚2231**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2231 k. Negligence. Most Cited Cases
        (Formerly 217k416)
    Where there was no explanation as to what caused leak, which resulted in sinking and loss of vessel insured under an American Institute Time Hull Policy containing an Inchmaree clause, the loss was within the coverage of the policy, whether defect could have been discovered, so that resulting unseaworthiness was due to negligence of master, or whether the defect was not discoverable by the master or shipowner and was therefore a latent defect.

**[3] Insurance 217 ⬚2231**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2231 k. Negligence. Most Cited Cases
        (Formerly 217k416)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

Negligence of assured or his agent is no defense to a marine policy.

**\*116** Wilbur E. Dow, Jr., New York City, Arthur L. Willner, Miami, Fla., for appellant.

Douglas D. Batchelor, David W. Dyer, Miami, Fla., for appellee, Smathers, Thompson & Dyer, Miami, Fla., of counsel.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal by the shipowner tests the correctness of the adverse judgment of the District Court after a trial without a jury denying recovery under an American Institute Time Hull Policy for a sinking from unknown causes. So uncontradicted are the facts, as found or as controlling, that the District Judge's findings of fact were an almost verbatim adoption of those proposed by the plaintiff Shipowner, the losing party. The case turned finally in the Judge's analysis upon successive presumptions.

Except for a few editorial changes involving no matter of substance, ours is a **\*117** direct recital, with an occasional paraphrase, of the Judge's findings.

The policy was for the period August 14, 1953 to August 14, 1954. The vessel was valued at $30,000. The Sea Pak was a wooden hull vessel originally built for the United States Coast Guard. She was 71'7' long, 13'6' wide was drew 4'6' of water. In the summer of 1953, she had been overhauled[FN1] in Miami and in August 1953 was in good condition and seaworthy. She Left Miami in August 1953 and was operated from that time until her loss in and around Caicos Islands in the Bahamas. She had not been hauled out of the water subsequent to August 1953, although she had been placed in shallow water and her bottom scrubbed on several occasions while she remained afloat.

The Sea Pak left Cockburn Harbour, South Caicos Islands, on August 9, 1954. It proceeded to a fishing anchorage in the lee of Long Key.[FN2] This was a distance of about eight miles. The fishing anchorage was protected from the prevailing winds and from the sea and the water, and the anchorage remained calm all the time the Sea Pak was anchored there. The vessel remained at anchor in about 15 feet of water in this protected area until approximately 5:00 a.m. on August 13. During this time the vessel was collecting conch from small skiffs that were fishing in that area.

At about noon on August 12, the Master noticed that the Sea Pak was beginning to take on an unusual amount of water and that the automatic pump was working more than normally necessary. During that afternoon and night the leaking became progressively worse. An inspection of the vessel revealed that the water was coming from underneath a refrigerated space in the forward part of the ship. Because of the construction of the interior of the vessel, the bilge underneath this area was inaccessible. Shortly before daylight on August 13, the Master felt that the leak had developed to such an extent that he should attempt to return to Cockburn Harbour.

As soon as it was daylight, or about 5:00 a.m., on Friday the 13th, the anchor was raised and the boat proceeded around the south end of Long Key into the open waters of Turks Island Passage in an effort to return to Cockburn Harbour. At this time, the sea on the wind-ward side of Long Key was choppy and there was a moderate breeze. These conditions were not unusual for that area and were not such as would ordinarily have caused the vessel any difficulty.

After the vessel got underway, the leak continued to get progressively worse and before the ship could reach Cockburn Harbour, the leak had progressed to such an extent that the vessel's engine was drowned out. The vessel then drifted back along the shoreline of Long Key until the Master ordered the crew to abandon her. The four men on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

board then rowed ashore in a 14' rowboat which was being towed astern of the Sea Pak and the Sea Pak eventually sank outside the 100 fathom curve. Because of **118** the depth of the water, no salvage attempt was made.

The Court concluded, as both plaintiff and defendant urged and as the physical loss which destroyed all evidence required, that 'there is no explanation as to what caused the leak which resulted in the loss of the vessel.'

Proceeding apparently then from an implied application which was not spelled out of a presumption FN3 of unseaworthiness because the vessel developed a leak in these calm waters in the lee of Long Key, the Court held as a legal conclusion that in the face of this presumption, there was not a counter presumption FN4 that the loss came within the perils covered by the policy. The Shipowner contended that even though the sinking of the vessel in calm protected waters might give rise to an inference of unseaworthiness, proof of seaworthiness, here admitted, as of the inception of the risk, was sufficient upon which the usual presumption FN5 would operate that, in the absence of a showing that it occurred from an excepted peril, the loss was caused by a peril insured against.

The Underwriter argues that, accepting these cases urged by the Shipowner, the counter presumption that the loss was from an insured peril, does not arise unless the owner proves that immediately before the loss the vessel was in a seaworthy condition. On this it emphasizes that the Court held as a fact that the Shipowner had not shown that the vessel was seaworthy immediately prior to the developing of the leak.

But we think that the difficulty with this decision stems from the fact that, like the underwriter, the Court assumed that the policy only insured '* * * the vessel against loss from extraordinary occurrences and does not insure her against those ordinary perils which vessels must encounter * * *.' In the quaint language which persists in this ancient

policy form, the Calmar Steamship Corp. v. Scott, 345 U.S. 427, 73 S.Ct. 739, 97 L.Ed. 1125, 1953 A.M.C. 952, with its 'Pirates, Rovers, Assailing Thieves * * * and Detainments of * * * Princes * * *,' the Court's opinion makes it plain that all he thought involved was the initial insuring clause which he quoted:

'Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, & c. or any part thereof.'

This was to overlook a substantial insurance undertaking which, history shows, The Spot Pack, Saskatchewan Government Insurance Office v. Spot Pack, Inc., 5 Cir., 242 F.2d 385, 1957 A.M.C. 655; Ferrante v. Detroit Fire & Marine Insurance Co., D.C.Cal., 125 F.Supp.**119** 621, 1954 A.M.C. 2026, was added voluntarily by underwriters, (with successive amendments to meet like conditions) to expand protection to shipowners and thereby overcome court decisions favorable to an underwriter but which, the underwriting fraternity thought unrealistic and a denial of coverage reasonably needed. Personified by the name of the vessel giving rise to the decision, The Inchmaree clause, with almost ritualistic uniformity provides generally, and here, specifically:

'This insurance also specially to cover * * * loss of or damage * * * directly caused by the following:-

'Breakdown of motor generators or other electrical machinery and and electrical connections thereto, bursting of boilers, breakage of shafts, or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);

'Negligence of Master, Charterers other than an Assured, Mariners, Engineers or Pilots;

'Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. * * *'

This affords both an additional series of perils insured against and markedly affects the warranties of seaworthiness between Shipowner and Underwriter.

The Court here apparently labored, as did so many so long under some sort of notion that the owner owed the duty to keep and maintain the vessel in seaworthy condition and consequently, to recover, the owner must establish this as a fact. Indeed, the point of departure[FN6] between the plaintiff's proposed and the Court's findings adopted was over the seaworthiness[FN7] of the vessel immediately prior to the loss.

But as we, The Spot Pack, Saskatchewan Government Insurance Office v. Spot Pack, Inc., supra, and the Second Circuit, New York, New Haven and Hartford R. Co. v. Gray, 2 Cir., 240 F.2d 460, 1957 A.M.C. 616, certiorari denied 77 S.Ct. 1050, 1 L.Ed.2d 915, by almost simultaneous decisions have recently pointed out, the owner's obligation under a Time Policy, as was this one, is extremely limited: the vessel is seaworthy at the attachment of the insurance, but henceforth it is a sort of negative warranty, i.e., the owner or those in privity with him will not knowingly send the vessel to sea in a deficient condition.

Here the most that was determined as to unseaworthiness of the MV Sea Pak was the Court's negative finding that the owner had not sustained its burden of proving seaworthiness. This is far from the opposite holding that the vessel was unsea-

worthy. On that, the Court did not make such a finding and perhaps for the reason that, on the record before him, it was doubtful that there was sufficient proof.[FN8] There was **\*120** evidence that two fishermen skindivers (not ship repairmen) made an underwater inspection a month or so before and drove in a few wooden plugs, but whether in blanked off auxiliary openings or elsewhere was extremely vague. One diver, who asserted that the bottom 'was all right,' also said that 'there was no paint on it, no paint that you would call paint.' But except for the prior inconsistent statements of the two crew members, note 8, supra, the evidence was uncontradicted from the current master and his immediate predecessor (who had left the vessel two weeks before her sinking for a vacation) that there were only the usual leaks one expects in a wooden hull vessel. The equivocal[FN9] evidence of the underwater activity of the skindivers was a circumstance which, with other evidence, could be used in drawing the competing inference that, on the one hand, this showed careful, prudent diligence in the maintenance of the vessel or, on the other hand, the existence of an unseaworthy condition. But standing alone, it was insufficient to prove unseaworthiness and the remainder of the record would not overcome this deficiency.

The only thing of substance, pressed so hard and successfully by the Underwriter on the Court, was a presumption, note 3, supra, not evidence, that when a vessel sinks in a calm protected harbour the cause, unless otherwise satisfactorily explained, must have been unseaworthiness.

[1] But even though it is assumed that this rule would apply when the leak develops while the vessel is at sea and after it has left port, the Court attributed unwarranted consequences to it. On the findings, the leak developed after the vessel had been out three and one-half days. If it is assumed arguendo that when the Sea Pak left Cockburn Harbour on August 9, she was in an unseaworthy condition there is absolutely none that the Shipowner or anyone in privity with it knew of that. There was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

thus no breach of the limited warranty of seaworthiness nor of the insurance and it was effective. The Spot Pack, Saskatchewan Government Insurance, office v. Spot Pack, Inc., supra. When, as the Court found, the unseaworthy condition (leak) developed, after the vessel was at sea and there were then no means by which to remedy it, what happens to the insurance? Does it terminate at the very moment it is needed most? Cf. Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715, 1943 A.M.C. 27, certiorari denied 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711.

Indeed, far from voiding the policy, it was as to just such unseaworthiness that the policy was meant to apply. The Inchmaree clause insures against damage or loss occasioned by latent defects in machinery or hull. Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull, cannot comply with the classic definition of 'reasonably suitable' for the purposes intended. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Compania de Navegacion, etc., v. Fireman's Fund Insurance Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787. The only limitation on **\*121** this is that the defect be latent and one not known or discoverable by the owner or one in privy with him. This is so because, as we held in Spot Pack Saskatchewan Government Insurance Office v. Spot Pack, Inc., supra, the phrase 'Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners, or Managers of the Vessel' does not include acts of the master or crew members merely imputed on notions of respondent superior.

Here, of course, the owner was in the United States and on this record all was left to the master. There is no evidence that the nonresident owner had personal knowledge of this condition, whatever existed, or the necessity for any detailed drydocking, bottom inspection, scraping or repainting. The policy, as is so often the case, did not prescribe any requirement for drydocking or a routine period for drydocking. That there might have been testimony that the bottom paint was gone, and one surveyor

faintly suggested that he thought the vessel should have been hauled out every six months or so to avoid action by wood-destroying worms (an opinion expressed without knowledge of the practice following in the Caicos Islands where the evidence indicated an absence of such wood borers) was not of that caliber essential to a holding that the Shipowner personally failed to take prudent steps.

The defect was certainly latent in a practical sense. The Court found that that is 'no explanation as to what caused the leak.' And all are unanimous that it was and could not be determined. As the leak was increasing, the master and engineer determined that it had to be coming from that part of the hull in way of the freezer compartment. There was positively no means of checking the inside of the hull in this space and, of course, lying at anchor eight miles from port, there were no facilities established for a worthwhile inspection or repair over the side.

Since cases should be decided on practicalities and not theoreticals, the fact that this record stands uncontradicted that the hull did not leak in this way, at this place, or in this quantity prior to departure from port August 9, or on any one of the intervening days up to the afternoon of August 12, demonstrates also that if, as some theorize, a butt (the joinder of the ends of two of the hull planks) sprung to permit the leak, there is no[FN10] basis for concluding that the defect could then have been discovered.

And if the matter is approached from the viewpoint that the Shipowner, without the benefit of any presumptions, must affirmatively establish that the particular defect was latent within the classic[FN11] meaning of the term, the result is the same. Since the Underwriter's assertion**\*122** of unseaworthiness is a claim that the hull was defective, it was either latent or not latent. If it was not discoverable prior to departure for sea by all known and customary tests, it was latent and covered under the policy. If, on the other hand, it is claimed that the proof showed that it was discoverable by prudent inspections, or that the proof failed to show that prudent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

inspection could not have revealed it, the result is that the defect was one which in prudence ought to have been discovered. On this hypothesis, it was the Master who should have discovered it. If the Master knew of the leak or the conditions likely to give rise to leaks, or if the Master, not knowing that, knew enough that he ought to have discovered this condition, it was his clear duty to his Shipowner to do all that prudence required to ascertain and correct such conditions. The record is uncontradicted that the Master was responsible for the current upkeep, maintenance and repair of the vessel while she was in the Islands, and that the Shipowner had approved all of this maintenance requirements. The Master's failure in carrying out this duty to his Shipowner was negligence and, under the Inchmaree clause, this too was specifically covered.

[2] If the defect could have been discovered the resulting unseaworthiness was due to the Master's negligence; if it was not discoverable by him or Shipowner, it was latent. Either way the Underwriter turns, the loss is within his expanded coverage.

To be remembered also is the fact that this vessel did not sink in a calm sea or in the harbour-like protection of the lee of Long Key. A leak developed there, and the leak became increasingly worse. But the sinking of the ship was the direct action of substantial seas with wind abeam, while running off the exposed precipitous coast of Long Key in the effort to make the port of haven. It was undisputed that with the butt sprung, the action of the vessel being pushed ahead by her own power, working against the seas, would open up the planks even further. While it is true that these seas were not tempestuous, it is just as true that it was the cruel sea working on a troubled hull which changed a possible sinking in fifteen feet of water at the fishing anchorage into an inevitable total loss as she sunk to the watery grave outside the 100 fathom curve.

[3] When the leak was discovered the vessel, as we said above, still had insurance. Likewise, there was no duty owed the Underwriter not to attempt to make a port of haven. Negligence of the assured or his agent is no defense to a marine policy. New York, New Haven and Hartford R. Co. v. Gray, supra, 240 F.2d at page 464; Orient Mutual Insurance Co. v. Adams, 123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63; Columbia Insurance Co. of Alexandria v. Lawrence, 10 Pet. 507, 35 U.S. 507, 9 L.Ed. 512; Waters v. Merchants' Louisville Insurance Co., 11 Pet. 213, 36 U.S. 213, 9 L.Ed. 691; Patapsco Insurance Co. v. Coulter, 3 Pet. 222, 28 U.S. 222, 7 L.Ed. 659. And if it is assumed that to attempt the voyage in the exposed sea with the vessel in this weakened condition was a negligent act, it inevitably was negligence of the master then in sole command who alone determined whether to attempt the perilous run for sanctuary rather than risk sinking in fifteen feet of water, or pressing her bow onto the sand shoals. But there again, the more palpable was the master's negligent choice of these alternatives, the more categorical it makes the Inchmaree liability for 'negligence of master.'

We cannot emphasize too strongly that, as was the purpose of the underwriters in making the change, the Inchmaree clause is an expansion of coverage of considerable magnitude. Unlike so many cases, **\*123**Union Insurance Co. of Philadelphia v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497; Continental Insurance Co. of City of New York v. Patton-Tully Transportation Co., 5 Cir., 212 F.2d 543, 1954 A.M.C. 889; Ideal Cement Co. v. Home Insurance Co., 5 Cir., 210 F.2d 937, 1954 A.M.C. 663; Hanover Fire Insurance Co. v. Holcombe, 5 Cir., 223 F.2d 844, 1955 A.M.C. 1531, certiorari denied 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787, where each policy contained an express warranty of continuing seaworthiness and an exclusion of losses caused by unseaworthiness, a Time Hull Policy with no warranty of continuing seaworthiness but with an Inchmaree clause does in fact underwrite unseaworthiness of many types.

If a vessel has become unseaworthy due to the negligence of master or engineer in the mainten-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

ance of the vessel, in putting to sea without adequate equipment, fuel or stores, or without making required repairs at outports where the master is the sole principal representative of the owners, the 'cause' is negligence and this is expressly underwritten. If there is an undiscoverable defect in hull or machinery, the resulting unseaworthiness or the damage caused by it [FN12] is nonetheless covered.

Consequently, this is not the simple case in which a loss due to unseaworthiness affords a double-barreled reason for nonpayment- a defense based upon the breach of the warranty, express or implied, or as automatic proof that the loss arose from this rather than a specified peril (perils of the sea) insured against. For if the vessel really sank because the hull was unseaworthy, or by reason of the action of the sea on that unseaworthy hull, as distinguished from the action of the sea alone, this no longer automatically denies recovery. Recovery is denied now only if that unseaworthiness is one not caused or brought about by the various elements of the Inchmaree clause.

The judgment denying recovery is therefore reversed and here rendered for the plaintiff Shipowner.

Reversed and rendered.

FN1. She was rebuilt in Miami under the immediate supervision of the underwriter's surveyor who unqualifiedly recommended her for insurance for the annual term and without any recommendations or requirements for drydocking, bottom inspection, repainting or the like. The surveyor testified:

'The hull was checked. A lot of new planks were put in the ship. The caulking was re-caulked. * * * Her stuffing boxes were checked and repacked. The vessel was completely overhauled to my satisfaction.'

Her intended trade was known and the policy expressly stated:

'Navigation Limits: Warranted confined to inland and coastal waters of the Bahamas, with occasional trips to the Florida East Coast for repairs.'

FN2. Because of intervening sand and coral shoals between the fishing ground and Cockburn Harbour, the vessel had to go outside into the Atlantic Ocean and coast well off the seaward side of Long Key, a coral key about five miles long rising precipitously from the water to a height of fifty feet or so and exposed to seas which occasionally broke over the top of these high rocky cliffs.

FN3. Paddock v. Franklin Fire Ins. Co., 11 Pick.Mass., 227; Swift v. Union Mutual Marine Ins. Co., 122 Mass. 573; Watson v. Providence Washington Ins. Co., D.C.N.C., 106 F.Supp. 244, 1952 A.M.C. 1812, appeal dismissed, 4 Cir., 201 F.2d 736, 1953 A.M.C. 337.

FN4. The Court cited: Watson v. Providence Washington Ins. Co., D.C., 106 F.Supp. 244, opinion approved 4 Cir., 201 F.2d 736; Klein v. Globe & Rutgers Fire Ins. Co., 3 Cir., 2 F.2d 137; Jahn v. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546; Long Dock Mills Elevator Co. v. Mannheim Ins. Co., D.C., 116 F. 886; Swift v. Union Mutual Marine Insurance Co., 122 Mass. 573.

FN5. The Shipowner relies principally upon: Mattson v. Connecticut Fire Ins. Co. of Martford, D.C.Minn., 80 F.Supp. 101; Boston Insurance Co. v. Dehydrating Process Co., 1 Cir., 204 F.2d 441, 1953 A.M.C. 1364; Land v. Franklin National Ins. Co., 225 S.C. 33, 80 S.E.2d 420; Glens Falls Ins. Co. v. Long, 195 Va. 117, 77

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

S.E.2d 457, 1953 A.M.C. 1841.

FN6. On the specific issue of the cause of the loss, there is no real difference. The court found:

'7. There is no explanation as to what caused the leak which resulted in the loss of the vessel.'

Whereas the plaintiff Shipowner proposed this finding:

'10. The precise cause and nature of the leak remained unknown.'

FN7. The Court found:

'8. The Plaintiff has not shown that the vessel was seaworthy immediately prior to the developing of the leak which resulted in the loss of the vessel.'

The plaintiff Shipowner proposed the exact opposite:

'11. Defendants have not shown that the vessel was unseaworthy immediately prior to her last voyage nor has there been any showing of want of due diligence on the part of the assured and owners of the Sea Pak to make her so.'

FN8. To be sure the Underwriter offered as impeachment the statements of two native crewmembers, a 17-year-old Engineer and the Cook who could 'write but not read' and who claimed he was intoxicated as well. These statements were given after each was escorted by a local policeman and taken before the British Commissioner of South Caicos as he sat on his dais flanked by the Underwriter's American lawyer and an investigator surveyor. These statements, sharply contradicting their deposition evidence that the vessel had had no appreciable leaks, stated that the Sea

Pak during the six weeks prior to her sinking had leaked extensively. The Underwriter's brief asserts 'the trial judge was certainly free to give the statement such weight as he saw fit.' Of course, that is true as to destroying the credibility of these witnesses to prove seaworthiness. But the prior inconsistent statements were the only word testimony of unusual abnormal leaks, and they were not admissible to prove that fact. 58 Am.Jur., Witnesses, § 770.

FN9. The Underwriter's surveyor as an expert testified:

'The Court: The question is whether an adequate inspection could be made by divers while the ship is in the water?

'The Witness: In my opinion, no, sir.'

FN10. The Underwriter's expert testified:

'Q. What would cause a butt to spring?

'A. A poor fastening.

'Q. What?

'A. A poor fastening, or the wood is soft around the fastening.'

He did not, of course, undertake to say that such poor fastening would have been discoverable. In any event, his testimony was uncontradicted that at least one plausible cause might not show up (be discoverable) for some time:

'Q. She might have strained a butt in the seaway at some previous date, which showed up later?

'A. That could happen.'

FN11. 'A latent defect is one that could not be discovered by any known and custom-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

247 F.2d 116, 1957 A.M.C. 1946
**(Cite as: 247 F.2d 116)**

ary test.' The West Kyska, Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687, at page 691, 1946 A.M.C. 997, at page 1003, certiorari denied 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656, and '* * * is a hidden defect and generally involves the material out of which the thing is constructed as distinguished from the results of wear and tear.' Ferrante v. Detroit Fire & Marine Insurance Co., D.C.Cal., 125 F.Supp. 621, at page 624, 1954 A.M.C. 2026, at page 2030. It is 'A hidden defect * * * not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as from sight; * * * a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection * * * by any known and customary test.' 26A C.J.S. Defect. p. 133. Mellon v. Federal Ins. Co., D.C.N.Y., 14 F.2d 997; The Bill, D.C.Md., 47 F.Supp. 969, 1942 A.M.C. 1607, affirmed Lorentzen v. Brazil Oitici-ca, Inc., 4 Cir., 145 F.2d 470, 1945 A.M.C. 108.

FN12. Add to this the endless possibilities for other specific Inchmaree coverages not quoted in the excerpt above: 'Accidents in loading, discharging or handling cargo, or inbunkering,' e.g., damage to hull from use of unseaworthy winch, booms or cargo gear; damage to vessel during loading or discharging operations resulting from the unseaworthiness brought about by such operations, e.g., listing, faulty trim, overloading. 'Explosions on shipboard or elsewhere,' e.g., from accumulations of gases from unseaworthy valves or tanks, malfunctioning of pressure relief valves on air tanks, manifold headers, etc. 'Breakdown of motor generators or other electrical machinery and electrical connections thereto.' e.g., collision damage from failure of un-

seaworthy electrical steering engine.

C.A.5 1957.

Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa.

247 F.2d 116, 1957 A.M.C. 1946

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

H

United States Court of Appeals Second Circuit.
ALLEN N. SPOONER & SON, INC., Libelant-
Appellant,
v.
The CONNECTICUT FIRE INSURANCE CO.,
Respondent-Appellee.

No. 239, Docket 27881.
Argued Feb. 1, 1963.
Decided March 11, 1963.

Action by insured on a policy of marine hull insurance. The United States District Court for the Southern District of New York, Richard H. Levet, J., 206 F.Supp. 495, dismissed the action, and insured appealed. The Court of Appeals, Hays, Circuit Judge, held that swells which were caused by a passing freighter and which caused derrick on insured crane to buckle constituted a 'peril of the sea' within meaning of policy on the barge, where barge was engaged in a delicate salvage operation and shipping above and below site of the operations had been held up to prevent swells.

Reversed and remanded with instructions to enter judgment for libelant.

West Headnotes

**[1] Insurance 217 ⬅⟳1834(1)**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1830 Favoring Insureds or Benefi-
ciaries; Disfavoring Insurers
                217k1834 Particular Types of Cover-
age
                    217k1834(1) k. In General. Most
Cited Cases
        (Formerly 217k146.7(2.1), 217k146.7(2))
    Generally, where language of a policy may reasonably be construed in more than one way,

meaning beneficial to the insured is to be given effect by resolving doubts against insurer, and such rule is particularly applicable to a time policy of marine insurance.

**[2] Insurance 217 ⬅⟳2220(1)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2220 Perils of the Sea
                    217k2220(1) k. In General. Most
Cited Cases
        (Formerly 217k403)
    Swells which were caused by a passing freighter and which caused a derrick on insured crane barge to buckle constituted a "peril of the sea" within meaning of a marine hull policy on the crane barge, where barge was engaged in a delicate salvage operation and shipping above and below site of the operations had been held up to prevent swells.

**[3] Insurance 217 ⬅⟳2231**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2231 k. Negligence. Most Cited
Cases
        (Formerly 217k416)

**Shipping 354 ⬅⟳141(3)**

354 Shipping
    354VII Carriage of Goods
        354k139 Limitation of Liability by Contract
or Bill of Lading
            354k141 Exemption from Particular Risks
or Causes of Loss
                354k141(3) k. Perils of the Seas. Most
Cited Cases
    A shipowner-carrier defending against a cargo

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

claim can rely on a perils of the sea exception in a bill of lading only if he establishes that neither he nor the ship's personnel was negligent, but a perils of the sea clause in a marine hull policy covers loss caused or contributed to by such negligence.

**[4] Insurance 217 ☞2231**

217 Insurance
   217XVI Coverage--Property Insurance
     217XVI(D) Ocean Marine Insurance
       217k2218 Risks Covered and Exclusions
         217k2231 k. Negligence. Most Cited Cases
   (Formerly 217k416)

Inchmaree clause of a marine policy, extending coverage to loss through negligence of the master provided such loss or damage did not result from want of due diligence by owners of the ship, insured against negligence of the master even though also the charterer of the vessel and excluded from coverage damage due to shoreside failure of the owner's managerial staff properly to prepare or equip the vessel for service, and therefore damage to a crane barge resulting from operational negligence of charterer while acting as master was covered by marine policy containing such clause.

**[5] Insurance 217 ☞3191(7)**

217 Insurance
   217XXVII Claims and Settlement Practices
     217XXVII(B) Claim Procedures
       217XXVII(B)2 Notice and Proof of Loss
         217k3187 Insurer's Waiver or Estoppel
           217k3191 Implied Waiver or Estoppel
             217k3191(7) k. Denial of Liability. Most Cited Cases
   (Formerly 217k559(2))

Insurer under a hull policy waived proof of loss by denying all liability before suit was brought.

**[6] Insurance 217 ☞2231**

217 Insurance

217XVI Coverage--Property Insurance
   217XVI(D) Ocean Marine Insurance
     217k2218 Risks Covered and Exclusions
       217k2231 k. Negligence. Most Cited Cases
   (Formerly 217k416)

A provision in a marine policy that insured submit in its proof of loss proof that it used diligence to prevent loss or damage was diligence required by Inchmaree and perils clauses of the policy, and such provision did not add new exclusions to coverage of the policy.

**\*753** Kenneth H. Volk, of Burlingham, Underwood, Barron, Wright & White, New York City (Hervey C. Allen, New York City, of counsel), for libelant-appellant.

Sheldon A. Vogel, of Bigham, Englar, Jones & Houston, New York City (Joseph J. Magrath, 3d, New York City, of counsel), for respondent-appellee.

Before LUMBARD, Chief Judge, and SMITH and HAYS, Circuit Judges.

**\*754** HAYS, Circuit Judge.

This is an action on a policy of marine hull insurance. The district court held that the loss on which appellant sued was not within the coverage of the policy and dismissed the libel. We reverse and direct that judgment be entered for the libelant.

Appellant takes no exception to the district court's findings of fact and we accept those findings as supported by the evidence. We disagree with the district court's application of the law to the facts as found.

Libelant's claim arises out of the loss of its crane barge, called Pulling Machine No. 12, while the barge was bareboat chartered to Richard W. Stasch, doing business as R. W. Stasch & Company Stasch chartered the barge for the purpose of raising the sunken tanker Empress Bay from the East River where it lay in about 60' of water approxim-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

ately mid-channel between the Brooklyn and Manhattan bridges.

Pulling Machine No. 12 consisted of a tower, or leader frame, about 75 feet in height mounted on a wooden barge 139' long and 38' wide. At all times prior to the accident in question the barge was well found and seaworthy.

On July 24, 1958 Pulling Machine No. 12 was engaged in lifting the Empress Bay. It was operating under the direction of Stasch who took a position on the bow of the No. 12 and transmitted orders by microphone. While the vessel was so engaged one of the guy wires supporting the crane parted and the crane collapsed and was lost over the side. The hull of the barge was so severely damaged by the collapse of the crane that it was concededly a constructive total loss.

The parting of the guy wire which resulted in the collapse of the crane was caused by the tilting of the barge while the lifting operation was in progress. The tilting of the barge was caused by the swells from a large vessel which passed the No. 12 just as it was engaged in the lifting operation. FN1

The loss of the crane could have been prevented by the use of side slings with which the No. 12 was equipped and which would have controlled the 'hoist load' so that the guy wire would not have been subjected to the breaking stress. Stasch was negligent in failing to use the side slings.

The district court did not make clear whether, in its view, the proximate cause of the loss of the barge was the negligence of Stasch or the swells from the passing tanker, although it characterized the latter as 'a culminating factor in causing the accident'. It is not necessary for us to resolve the issue because in our view the insurance company is liable on its policy in either case.

The No. 12 was covered by a marine insurance policy issued by appellee, two clauses of which are here involved.

The 'Perils' clause provides:

'Touching the adventures and perils which we, the said Insurers, are contented to bear and take upon us, they are of the Harbors, Bays, Sounds, Seas and other waters as above named, and Fire, it being the intent of these Insurers to indemnify the Assured for these Insurers' proportion of General Average and/or Salvage Charges and/or loss, damage, detriment or hurt to the said vessel arising from perils aforementioned for which these Insurers may be liable under this policy; it is a condition precedent, however, to any liability under this policy, that the Assured establish that any claim, whether for general average charges, salvage expenses or loss, damage, detriment or hurt to said vessel, has been directly caused by a peril insured against as aforesaid, and that the Assured further *755 establish that such general average charges, salvage expenses or loss, damage, detriment or hurt has not arisen from or been caused by, either directly or indirectly, any of the following or other excluded causes, namely: incompetency of the master or insufficiency of the crew, or want of ordinary care in loading or unloading, stowing or broaching the cargo of the vessel; rottenness, inherent defects, or other unseaworthiness; theft, barratry, or robbery. It is further mutually agreed that this policy does not cover bursting or exploding of boilers, collapsing of flues or injury, derangement or breakage of machinery and/or any expense in consequence thereof or any loss of or damage to any such parts and/or to any other parts of the vessel directly or indirectly resulting from such occurrences, unless the Assured shall establish that such occurrences were caused solely by sinking, stranding, collision with another vessel or burning. No loss is to be paid when such loss arises from failure to keep the vessel well pumped out.'

The 'Inchmaree' clause provides:

'This insurance also specially to cover (subject to the average and all other conditions of this policy not conflicting herewith) loss of or damage to hull or machinery through the negligence of master,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859

**(Cite as: 314 F.2d 753)**

mariners, engineers or pilots, or through bursting or explosion of boilers, breakage of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship, or any of them, or by the manager, but free from any claim for the part in which latent defect existed.'

It is stipulated that libelant's provable damage under the policy is $32,020 with statutory interest from July 24, 1958.

Appellee was duly notified of the charter party and agreed to add 'R. W. Stasch & Co.' as a named assured for the period of the charter.

The District Court concluded that the loss of the No. 12 was not covered by either the 'Perils' clause or the 'Inchmaree' clause because, in its view, (1) the swells created by the passing of a large vessel were not 'perils of the sea' within the 'Perils' clause; and (2) because Stasch was on 'owner' for purposes of the proviso in the 'Inchmaree' clause barring recovery for loss resulting from want of due diligence by an owner. We hold that the District Court erred on both points.

[1] In determining the meaning of the terms of the policy we are guided by what was said in Henjes v. Aetna Ins. Co., 132 F.2d 715, 719 (2d Cir.), cert. denied, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711 (1943):

'It is a general rule of construction that where the language of a policy of insurance may reasonably be construed in more than one way the meaning beneficial to the insured is to be given effect by resolving fair doubts against the insurer who chose the language which created them. Ashenbrenner ( Aschenbrenner) v. United States F. & G. Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; DeHart v. Illinois Casualty Co., 7 Cir., 116 F.2d 685. That is particularly applicable to a time policy of marine insurance.'

I. PERILS OF THE SEA

This court interpreted and applied the 'Perils' clause in New York, N.H. & H.R.R. v. Gray, 240 F.2d 460 (2d Cir.), cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957). There the insured recovered for losses sustained when water leaked into a moored carfloat causing the vessel to list and settle, with a resultant loss of certain cargo. We held that:

'The loss resulted from a 'peril of the seas.' 'It is enough that damage be done by the fortuitous action of **756** the sea. For instance, where cargo was damaged by the incursion of seawater through a hole in a pipe gnawed by rats, the House of Lords held this to be a peril of the seas.'* That the sea is calm makes no difference.** Negligence, whether or not 'gross' but for which the accident would not have occurred, will not serve as a defense to such a policy. '*2 Arnold, Marine Insurance (14th ed.) Section 812. '**Judge Rifkind in Compania T. Centro-Americana v. Alliance Ass. Co., D.C., 50 F.Supp. 986, 991; Olympia Canning Co. v. Union Marine Ins. Co., 9 Cir., 10 F.2d 72.'

240 F.2d at 464.FN2 The Gray case governs the present case. See also Cary v. Home Ins. Co., 235 N.Y. 296, 300, 139 N.E. 274 (1923); Petrie v. Phenix Ins. Co., 132 N.Y. 137, 144, 30 N.E. 380 (1892); James A. McAllister & Co. v. Western Assurance Co., 218 App.Div. 564, 218 N.Y.S. 658 (1st Dept. 1926); Borgemeister v. Union Ins. Soc'y, 127 Misc. 9, 214 N.Y.S. 548 (City Ct. 1926).

[2][3] The Swells which caused the derrick on the No. 12 to buckle were a 'fortuitous action of the sea,' and therefore within the scope of the 'Perils' clause.

Appellee cites us to Continental Ins. Co. v. Patton Tully Transp. Co., 212 F.2d 543 (5th Cir., 1954) and Western Assur. Co. v. Shaw, 11 F.2d 495 (3d Cir.), cert. denied, 273 U.S. 698, 47 S.Ct. 93, 71 L.Ed. 846 (1926), which contained language to the effect that ordinary swells are not perils of seas or harbors within the meaning of marine insurance policies. The passages relied on by appellee contain

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

alternate holdings at best, since in both cases, the foundered vessels were unseaworthy. Moreover, both decisions rest on findings that swells and waves were not extraordinary under the circumstances. Both rest on the rule that 'There must be some casualty, something which could not be foreseen as one of the necessary incidents of the adventure. The purpose of the policy is to secure an indemnity against accidents which may happen, not against events which must happen.' The Xantho, 12 App.Cas. 503, 509 (1887).

Whether the loss resulted from a 'necessary incident' of the venture- i.e. from ordinary wear and tear- or from an accident which could not be foreseen depends, of course, on the nature of the vessel and operation involved. Compania de Navegacion Interior, S.A. v. Fireman's Fund Ins. Co., 277 U.S. 66, 80, 48 S.Ct. 459, 72 L.Ed. 787 (1928); Klein v. Globe & Rutgers Fire Ins. Co., 2 F.2d 137 (3d Cir., 1924). In the present case, Stasch was engaged in an extremely delicate operation. Without the use of side slings, the No. 12 could tilt only three degrees without danger to the derrick. Shipping above and below the site of operations was held up, so as to prevent swells. Under these circumstances, the swells caused by the **757** passing freighter were unanticipated and extraordinary, and constituted a 'peril of the sea' within the meaning of the policy. FN3

## II. 'INCHMAREE' CLAUSE

The 'Inchmaree' clause was first included in marine insurance policies to overcome the effects of a decision of the House of Lords which was adverse to the assured. FN4 Its purpose was, and is, 'to broaden, not restrict, to expand, not withdraw coverage.' Saskatchewan Government Ins. Office v. Spot Pack, Inc., 242 F.2d 385, 391 (5th Cir., 1957). It is with this beneficial purpose in mind that the clause must be interpreted.

The issue as to coverage under the 'Inchmaree' clause is whether such coverage is excluded because Stasch's negligence was 'want of due dili-

gence by the owners of the ship, or any of them, or by the manager.'

Although the district court included no express finding that Stasch was the 'master' of the No. 12 at the time of the accident, its general findings comport such a conclusion, and we hold that Stasch was acting as 'master' of the No. 12.

There is considerable doubt in our minds as to whether he was also the 'owner' or 'manager' within the meaning of the clause, although, as the district court found, his status was that of 'owner' for a number of other purposes. It seems to us quite likely that the reason for appellant's informing the insurance company of the charter and for having Stasch added as a named assured was precisely to bring Stasch's negligence under the coverage of the policy, as well as to protect him from a claim of subrogation in case of loss through his negligence. Certainly Stasch himself could **758** have had no claim for the loss of the vessel.

But assuming, arguendo, that Stasch was an owner or manager for purposes of the exclusion clause, we are persuaded that that exclusion was not intended to apply to the negligence of an owner who is acting as master in the operation of a vessel at sea.

Although we have found no authority directly in point, the few decisions interpreting the words 'owner' and 'master' lend support to our conclusion. In Read v. Agricultural Ins. Co., 219 Wis. 580, 236 N.W. 632 (1935), where plaintiff sued on a policy of marine insurance containing an 'inchmaree' clause, the court said:

'There seems to us to be a clear distinction between the activities of a person acting on behalf of the owner in conditioning and launching the boat and those of a master or other officer acting professionally in the handling of the vessel at sea. If the conditioning operations culminate in launching the vessel in an unseaworthy condition, it is clear to us that there is no coverage. If there is negligence in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

the discharge of some professional duty in connection with handling the boat during the voyage, the 'Inchmaree' clause appears to apply.'

263 N.W. at 636. See also Founders' Ins. Co. v. Rogers, 281 F.2d 332 (9th Cir., 1960); Baggaley v. Aetna Ins. Co., 111 F.2d 134 (7th Cir., 1940); Wigle v. Aetna Cas. & Sur. Co., 177 F.Supp. 932 (E.D.Mich.1959); Yacht Buccaneer, 1940 Am.Mar.Cas. 1397 (arbitration, Chicago, 1940); Baxendale v. Fane, 66 Lloyd's List L.R. 174, 181 (1940).

Where the owner or charterer of the vessel also acts as its master, the distinction drawn by the clause can be given effect only if it is read as referring to the function that owner-master is performing when the acts causing the accident take place. The interpretation urged by the appellee would render the assumption of liability for 'negligence of (the) master' totally ineffective in the present case.

[4] The language of the clause as a whole reflects a recognition of the different treatment to be accorded seagoing and preparational carelessness. There is no other explanation for the use of the term 'negligence' in referring to the master, and of the term 'want of due diligence' in referring to the owner. Clearly the draftsman had quite different operations in mind. We conclude that the Inchmaree clause was designed to insure against seagoing or operational negligence of the master (whether or not he is also the charterer or owner), and to exclude from coverage damage due to the shoreside failure of the shipowner's managerial staff properly to prepare or equip the vessel for the voyage or service she is about to perform.

Since the accident resulted from the operational negligence of Stasch while he was acting as master of the No. 12, appellant was entitled to recover under the policy.

Finally, appellee contends that recovery is precluded by the proof of loss provision of the policy. This provision required the assured to submit proof

of loss 'that the Assured has used due diligence to prevent * * * loss or damage' as a condition precedent to any right of action of the assured.

[5][6] Not only was the point not raised in the court below, but it is wholly without merit. Even if we assume, contrary to authority, O'Boyle v. Northwestern Fire & Marine Ins. Co., 49 F.2d 713 (2d Cir., 1931), that the insurer did not waive such proof of loss by denying all liability before suit was brought, the 'due diligence' of the assured to which the proof of loss provision refers is obviously that diligence required by the 'Inchmaree' and 'Perils' clauses. Clearly the proof of loss provision was not designed to add substantial new exclusions from the coverage of the policy. 'Courts, in giving effect to that provision in an insurance policy, have never **\*759** treated the requirement for a proof of loss as a mere trap for the unwary.' Id. at 716.

Reversed and remanded with instructions to enter judgment for libelant.

FN1. Appellee disputes this finding as well as the finding that the tug used by Stasch for the lifting operation did not cause or contribute to the accident. On the basis of the evidence in the record we cannot say that findings are clearly erroneous.

FN2. Appellee attempts to distinguish the Olympia Canning Co. and Compania T. Centro-Americana cases on the ground that they were decided under English law.

A reading of these cases makes clear that the English courts have consistently given the 'perils' clause a broad reading. Several early decisions in this country departed from this view, and held that 'perils of the sea' pertained only to extraordinary and calamitous occurrences. See e.g. Hazard's Administrator v. New England Marine Ins. Co., 8 Pet. 557, 583, 33 U.S. 557, 583, 8 L.Ed. 1043 (1834); Arbib & Houlberg, Inc. v. Second Russian Ins. Co., 294

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

F. 811, 816 (2d Cir., 1923).

We see no reason why we should not seek guidance from English authorities. In so doing, we follow, as we did in Gray, a course recently approved by the Supreme Court:

'* * * We and other American courts have emphasized the desirability of uniformity in decisions here and in England in interpretation and enforcement of marine insurance contracts. Especially is uniformity desirable where, as here, the particular form of words employed originated in England.' Standard Oil Co. v. United States, 340 U.S. 54, 59, 71 S.Ct. 135, 138, 95 L.Ed. 68 (1950).

FN3. Appellee cites us to several cases interpreting the phrase 'perils of the sea' as used in bills of lading. E.g., Duche v. Thomas & John Brocklebank Ltd., 40 F.2d 418 (2d Cir., 1930; The Rosalia, 264 F. 285 (2d Cir., 1920); The Giulia, 218 F. 744 (2d Cir., 1914); The Warren Adams, 74, F. 413 (2d Cir.), cert. denied, 163 U.S. 679, 16 S.Ct. 1199, 41 L.Ed. 316 (1896); Diethelm & Co. v. S.S. The Flying Trader, 141 F.Supp. 271 (S.D.N.Y. 1956), aff'd 244 F.2d 542 (2d Cir., 1957).

But there is a basic difference between those cases and the present case. A shipowner-carrier defending against a cargo claim can rely on a 'perils of the seas' exception in a bill of lading only if he establishes that neither he nor the ship's personnel was negligent- i.e. that the loss resulted from force majeure. But the 'Perils' clause in a marine hull insurance policy covers loss caused or contributed to by such negligence.

This distinction was explained by the Supreme Court in Liverpool & Great Western

Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788 (1889):

'Collision or stranding is, doubtless, a peril of the seas; and a policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them. (Cases cited.) But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere, held, an exception, in the bill of lading, of perils of the sea or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed.'

129 U.S. at 438, 9 S.Ct. at 470. See also Arbib & Houlberg, Inc. v. Second Russian Ins. Co., 294, F. 811, 816 (2d Cir., 1923).

To the extent that the language in Hecht, Levis & Kahn Inc. v. New Zealand Ins. Co., 121 F.2d 442 (2d Cir., 1941) fails to recognize this distinction, we deem it to have been overruled by New York, N.H. & H.R.R. v. Gray, 240 F.2d 460, 466 (2d Cir.), cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957), where we distinguished the Flying Trader case, supra, on the ground that it involved bills of lading rather than marine insurance.

FN4. Thames & Mersey Marine Ins. Co. v. Hamilton, Fraser & Co., 12 App.Cas. 484 (1887). The clause takes its name from the Steamship Inchmaree involved in that case.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 F.2d 753, 1963 A.M.C. 859
**(Cite as: 314 F.2d 753)**

C.A.N.Y. 1963.
Allen N. Spooner & Son, Inc. v. Connecticut Fire
Ins. Co.
314 F.2d 753, 1963 A.M.C. 859

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

H

Court of Appeal of Louisiana,
Fourth Circuit.

Steven Christopher GRIFFIN, et al.
v.
TENNECO OIL COMPANY and XYZ Insurance
Company.

Nos. 91-CA-2475, 92-CA-0247.
Sept. 30, 1993.
Writ Denied Jan. 7, 1994.

Injured employee of construction company brought action against oil company for which he was performing construction services for injuries suffered in fire. The 34th Judicial District Court, St. Bernard Parish, David S. Gorbaty, J., held that oil company was not liable for exemplary damages and that construction company was not required to indemnify oil company for expenses incurred in defending injured worker's suit for exemplary damages. Injured worker and oil company appealed. The Court of Appeal, Lobrano, J., held that: (1) oil company's safety and loss control director was properly allowed to provide lay testimony on issue of safety and prevention; (2) injured worker waived objections to closing argument by not objecting at that time; and (3) construction company had to indemnify oil company for costs of defending action.

Affirmed in part; reversed in part; and remanded.

West Headnotes

**[1] Pretrial Procedure 307A ⚷753**

307A Pretrial Procedure
   307AV Pretrial Conference
      307Ak749 Effect
         307Ak753 k. Competency of Undisclosed Witnesses. Most Cited Cases
   Oil company's safety and loss control director

was properly allowed to testify in action brought by injured construction worker regarding what industry in general was doing with regard to hot work permits procedures, even though he was not designated as expert in pretrial order, where plaintiff knew safety and loss control director's position, knowledge and expertise prior to trial and called him as his own witness, and thus was not "ambushed" by testimony.

**[2] Pretrial Procedure 307A ⚷748**

307A Pretrial Procedure
   307AV Pretrial Conference
      307Ak747 Order and Record or Report
         307Ak748 k. Amendment or Modification. Most Cited Cases
   Trial judge has much discretion in determining whether pretrial order should be modified.

**[3] Trial 388 ⚷43**

388 Trial
   388IV Reception of Evidence
      388IV(A) Introduction, Offer, and Admission of Evidence in General
         388k43 k. Admission of Evidence in General. Most Cited Cases
   Trial judge has great discretion in deciding whether to receive or refuse testimony objected to on grounds of failure to abide by rules of civil procedure, but any doubt must be resolved in favor of receiving testimony.

**[4] Evidence 157 ⚷498.5**

157 Evidence
   157XII Opinion Evidence
      157XII(A) Conclusions and Opinions of Witnesses in General
         157k498.5 k. Determination of Question of Competency. Most Cited Cases
   (Formerly 157k4981/2)

**Evidence 157 ⚷546**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

157 Evidence
  157XII Opinion Evidence
    157XII(C) Competency of Experts
      157k546 k. Determination of Question of Competency. Most Cited Cases

Trial court is vested with broad discretion in determining which opinion testimony shall be received into evidence, and whether opinion testimony will be received as "lay" or "expert" testimony.

**[5] Evidence 157 ⟅⟆474(6)**

157 Evidence
  157XII Opinion Evidence
    157XII(A) Conclusions and Opinions of Witnesses in General
      157k474 Special Knowledge as to Subject-Matter
        157k474(6) k. Due Care and Proper Conduct in General. Most Cited Cases

Trial court properly allowed defendant oil company's safety and loss control director to opine on issue of safety and prevention on cross-examination based on his experience in refining industry as lay witness in personal injury action arising out of fire, where director was called as witness by plaintiff who asked series of questions regarding witness' experience in refining industry, and director possessed suitable information, experience and training in field to provide lay opinion on subject. LSA-C.E. art. 701.

**[6] Witnesses 410 ⟅⟆331.5**

410 Witnesses
  410IV Credibility and Impeachment
    410IV(A) In General
      410k331.5 k. Competency of Impeaching Evidence in General. Most Cited Cases
      (Formerly 410k3311/2)

Witness' interest in outcome of lawsuit has no bearing on admissibility of his testimony.

**[7] Trial 388 ⟅⟆140(1)**

388 Trial
  388VI Taking Case or Question from Jury
    388VI(A) Questions of Law or of Fact in General
      388k140 Credibility of Witnesses
        388k140(1) k. In General. Most Cited Cases

Credibility of witnesses is for trier of fact to determine.

**[8] Appeal and Error 30 ⟅⟆207**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k207 k. Arguments and Conduct of Counsel. Most Cited Cases

Trial court's comment to parties in personal injury action that they should limit objections during closing argument to those things critical to their cases did not forbid counsel to object, and thus, where plaintiff failed to object to any comments made during closing argument he waived right to complain on appeal.

**[9] Contracts 95 ⟅⟆206**

95 Contracts
  95II Construction and Operation
    95II(C) Subject-Matter
      95k206 k. Legal Remedies and Proceedings. Most Cited Cases

Duty to defend lawsuit should be determined by examining language of agreement between parties and allegations of petition.

**[10] Indemnity 208 ⟅⟆33(5)**

208 Indemnity
  208II Contractual Indemnity
    208k33 Particular Cases and Issues
      208k33(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases
      (Formerly 208k9(2))

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

**Indemnity 208 ⚷ 36**

208 Indemnity
    208II Contractual Indemnity
        208k34 Scope and Extent of Liability
            208k36 k. Costs and Expenses. Most
Cited Cases
     (Formerly 208k9(2))

  Construction company was required to indemnify oil company for costs of defense of personal injury action brought by employee of construction company injured in fire at refinery, where agreement provided that construction company would indemnify oil company for all claims arising out of work performed by construction company and exclusion in indemnity agreement for injuries intentionally caused by willful misconduct of employees was limited to intentional acts, and thus plaintiff's allegations of wanton and reckless disregard for his safety did not preclude indemnification.

**\*1091** Ernest E. Barrow, II,Grant & Barrow, Gretna, for appellants Steven C. Griffin and Lynn Griffin.

Shelley Hammond Provosty, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for appellee, MRO Services, Inc.

John G. Gomila, Jr., David R. Nicholson, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for appellant Tenneco Oil Co.

Before BARRY, BYRNES and LOBRANO, JJ.

LOBRANO, Judge.

  On October 1, 1985, Steven Griffin was employed by MRO Services, Inc. working at the Chalmette Refinery operated by Tenneco Oil Company. Tenneco contracted with MRO to perform certain construction and expansion activities at the refinery. During operations designed to clear all flammable materials from the plant's fuel gas line prior to cutting the line so that it could be rerouted, a fire broke out and Griffin, along with two other employees, was burned.

*PROCEDURAL HISTORY:*

  All three employees filed suit against Tenneco for compensatory damages. Those suits were ultimately settled. Griffin subsequently amended his petition demanding exemplary damages alleging Tenneco's wanton and reckless disregard for public safety in the handling, transportation or storage of hazardous substances pursuant to Civil Code Article 2315.3. Tenneco filed a third party claim against MRO seeking indemnity pursuant to the service contract between them. MRO denied indemnity for either defense costs or damages.[FN1]

    FN1. Prior to the compensatory damage claims being settled MRO also denied it owed Tenneco any indemnity. This Court held that indemnity for the compensatory damage claims was owed. *Griffin v. Tenneco Oil Company,* 519 So.2d 1194 (La.App. 4th Cir.1988), writ denied 521 So.2d 1154 (La.1988).

  Griffin's suit for exemplary damages proceeded to trial on December 10, 1990.[FN2] The third party demand by Tenneco against MRO was severed to be tried separately. **\*1092** The jury returned a verdict in favor of Tenneco. Cross-motions for summary judgment were then filed by MRO and Tenneco relating to the indemnity issue. The issue presented in those motions was whether MRO must indemnify Tenneco for the costs and expenses incurred in defending Griffin's suit for exemplary damages. MRO's motion was granted and Tenneco's was denied. Both Griffin and Tenneco appeal.

    FN2. This matter was originally tried in January of 1990 and Tenneco was cast in judgment. However a new trial was granted.

  Griffin asserts the following errors:

  1) The trial court erred in allowing Mr. Lawrence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

Raymond Hess to testify as to his opinion about industry standards;

2) The trial court erred in qualifying Mr. Hess as a "Lay Expert;"

3) The trial court erred in instructing counsel not to object during closing argument;

4) The trial court erred in allowing defense counsel, in closing argument, to repeatedly equate the term "care" to "reckless and wanton;"

5) The trial court erred in refusing to order a new trial considering the errors cited in assignment of error 1 and 4, above;

In its appeal, Tenneco argues that the trial court erred in denying its indemnity claim against MRO for defense costs.

*ASSIGNMENTS OF ERROR 1 AND 2:*

Plaintiff asserts the trial court erred by allowing Lawrence Raymond Hess to give "expert" testimony as to industry standards. Plaintiff argues that Hess was called as a fact witness and during cross examination, defense counsel announced he would offer Hess as an expert. Plaintiff's counsel objected on two grounds. First, Hess was not identified in the Court's pre-trial order as an expert witness and therefore plaintiff was "ambushed" in that he had no opportunity for pre-trial discovery. Second, plaintiff complains that Hess, as an employee of Tenneco at the time of the accident, had an interest in preserving his reputation as Supervisor of Safety and Loss Control and thus was not qualified to testify.

During plaintiff's case in chief, Mr. Lawrence Hess, Tenneco's Supervisor of Safety and Loss Control, was called by plaintiff as a fact witness. On cross-examination by Tenneco, the following transpired with respect to plaintiff's first complaint.

"BY MR. GOMILA: (Tenneco's attorney)

Q. Before October 1 of '85, are you aware of

what the industry in general was doing insofar as hot work permits procedures?

MR. BARROW:

Objection, Your Honor, He's calling for an expert opinion and conclusion.

BY THE COURT:

Not necessarily. If he has the particular knowledge, Mr. Barrow. I understand his position over there is safety manager-I don't know. I forgot the exact terminology.

MR. GOMILA:

Safety and loss control director.

BY THE COURT:

Safety and loss control director.

MR. BARROW:

That doesn't necessarily qualify him as an expert.

BY THE COURT:

He's not asking for an opinion at this time. He's asking for a fact.

MR. BARROW:

Yes, sir.

BY THE COURT:

As I understand it, all he wants to know is a particular fact. If he gets to asking an opinion, then, of course, I will sustain your objection.

MR. GOMILA:

I may seek to qualify him at that time.

BY THE COURT:

Go ahead. You can ask him a fact question.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

\* \* \* \* \* \*

BY MR. GOMILA:

Q. Were you aware of what the industry was doing?

MR. BARROW:

Now, we're talking about an opinion.

MR. GOMILA:

I asked a question that asks for his awareness.

**\*1093** BY THE COURT:

No, I'm going to sustain that particular portion of it. I think Mr. Barrow is right. I think you crossed the line now.... and now I think what you're asking for is an opinion of what the standard was.

MR. GOMILA:

Not exactly, but I would like to explore that with this witness if you will allow me to qualify him.

BY THE COURT:

You may attempt it.

(Whereupon, Mr. Gomila lays Mr. Hess' qualifications before the jury.)

\* \* \* \* \* \*

MR. GOMILA:

Your Honor, at this time I would offer Mr. Hess as an expert in safety and control loss procedures, fire prevention and fire fighting.

MR. BARROW:

Two objections: one, this witness was never listed, nor was any notice given prior to the moment that he would be an expert witness. Two, now, at the time of this fire, he was in the employ of the defendant and has at the very least risk his opin-

ion and his performance at that time. He certainly has an interest in this matter. In that regard and as such, cannot be regarded as an independent expert and must be regarded as part of the-

MR. GOMILA:

I would suggest that argument, Judge, and that has not been brought out on cross-examination.

BY THE COURT:

Gentlemen, this is the way I feel about it: It think that under 701-I don't have my code in front of me.

MR. BARROW:

704, Your Honor, I believe.

BY THE COURT:

I think it's been displayed by this Court that under 701 certainly, Mr. Hess has suitable information and experience and training in the field of safety and prevention to give at least a lay opinion, because I believe that information is sufficient-

MR. BARROW:

And that he not be qualified as an expert.

BY THE COURT:

Would you listen to me, Mr. Barrow.-is suitable to provide the jury with information; and without misleading the jury, I believe he qualifies under all the provisions of 701, and I will qualify him as a lay witness and not as an expert witness.

MR. GOMILA:

Your Honor, I would request that you review 704. I believe you have the number right, whatever the article may be. An expert, as I understand it, is one who has particular training, education and experience sufficient to be of bene-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

fit to the trier of fact. I don't think that can be disputed about this witness.

BY THE COURT:

I'm going to qualify him as 701, not 704. You can conduct your examination.

\* \* \* \* \* \*

... Under 701, if a witness is not testifying as an expert, his testimony in the form of opinion is limited to those opinions which are rationally based on conception of the witness and helpful to a clearer understanding for the trier of facts.

MR. BARROW:

That is correct.

BY THE COURT:

I have just declared that I feel that upon hearing the list of qualifications and the information and experience and education that Mr. Hess has benefitted, I feel that he meets that criteria and will be able to render opinion based on the qualifications under Article 701, but not 704. Do we understand?

*PRE-TRIAL ORDER:*

[1][2][3] Louisiana Code of Civil Procedure Article 1551 allows the trial court to hold pre-trial conferences and to render orders that control "the subsequent course of the action, unless modified at the trial to prevent manifest injustice." In this regard, the trial judge has much discretion in determining whether an order should be modified. *Neff v. Rose,* 546 So.2d 480 (La.App. 4th Cir.1989), writ denied 551 So.2d 1322 (La.1989). **\*1094**Article 1551 does not require that the witnesses be designated as fact or expert and does not require a listing of the subject matter of the testimony. *Curry v. Johnson,* 590 So.2d 1213 (La.App. 1st Cir.1991). If a party objects to the offered testimony, a trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the

grounds of failure to abide by the rules, but any doubt must be resolved in favor of receiving the testimony. *Abdon Callais Boat Rentals, Inc. v. Louisiana Power and Light Company,* 555 So.2d 568 (La.App. 1st Cir.1989), cert. denied, 558 So.2d 583 (La.1990).

In our opinion there was no abuse of discretion in allowing Hess' testimony despite the fact he was not designated an "expert" on the pre-trial order. Plaintiff was not "ambushed" since he called Hess as his own witness. Certainly he was aware of Hess' position, knowledge and expertise prior to trial.[FN3]

> FN3. On direct, Hess was asked: whether or not it was necessary for an individual who was steaming a fuel gas line to secure a hot work permit; what procedure should be reviewed to determine whether or not a line was being steamed properly in compliance with Tenneco's directives; what workers are allowed to do pursuant to Tenneco's hot work permits and what is necessary for hot work to resume if a hot work permit is canceled; whether it was "proper" pursuant to Tenneco's "rules and guidelines" for a stillman to issue an order to resume hot work without checking certain factors. After being directed to answer the question, Hess expressed his opinion as to the proper procedure for resuming hot work without a new written hot work permit.

*EXPERT TESTIMONY:*

Louisiana Code of Evidence Article 701 limits a non-expert witness' testimony to those opinions or inferences which are:

(1) Rationally based on the perception of the witness; and

(2) Helpful to a clear understanding of his testimony or *the determination of a fact in issue.* (emphasis added).

Article 701 rides in tandem with Article 602

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

and is subject to the balancing test of Article 403.
FN4 See, C.E. Article 701, comments (c) and (d).

FN4. Code of Evidence Article 602 states:

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This Article is subject to the provisions of Article 703, relating to opinion testimony by expert witnesses."

Code of Evidence Article 403 states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

[4] The trial court is vested with much discretion in determining first, which opinion testimony shall be received into evidence and second whether it will be received as "lay" or "expert" testimony.

[5] In the instant case, the record shows that Hess was initially called by plaintiffs, not by Tenneco, and that counsel for plaintiff asked a series of opinion questions relative to Hess' experience in the refining industry, safety and loss control in particular.

On cross-examination, defense counsel also asked questions relative to the issue of safety and prevention based on Hess' experience in the refining industry. Over plaintiff's objection, the trial court allowed Hess to give opinion testimony as a "lay witness" pursuant to Article 701 and not as an "expert" pursuant to Article 704.FN5 We find no error in this ruling.

FN5. Plaintiff makes much of the fact that in the court reporter's first transcript, the judge referred to Hess as a "lay expert" thus causing the jury to give his testimony more weight in determining the ultimate issue of the case. We disagree. The trial court gave a clear explanation in the presence of the jury as to why Hess was allowed to testify. The trial court clearly stated that Hess was not being qualified as an expert. Thus, we do not find that the trial court's reference to Hess as a "lay expert" led the jury to give more weight to Hess' testimony as opposed to that of other witnesses.

The record supports the conclusion that Hess possessed suitable information, experience and training in the field of safety and prevention to provide a "lay opinion" to the jury. His testimony was certainly relevant in that he possessed direct and personal knowledge of the facts and circumstances **1095** leading to plaintiff's injuries and there is no doubt that it was helpful in the determination of a fact in issue.

[6][7] Plaintiff's assertion that Hess should not have been allowed to give opinion testimony because of his employment with Tenneco is not supported by any authority. A witnesses' interest in the outcome of a lawsuit has no bearing on the admissibility of his testimony. The jury was well aware of Hess' employment status. The credibility of witnesses is for the trier of fact to determine. *Dominici v. Wal-Mart Stores, Inc.,* 606 So.2d 555 (La.App. 4th Cir.1992).

ASSIGNMENTS OF ERROR 3, 4 AND 5:

[8] Plaintiff asserts the following cumulative errors require that he be granted a new trial:

1) The trial court instructed trial counsel not to object during closing argument thus eliminating counsel's right to participate fully in the trial;

2) The trial court allowed defense counsel during closing argument to repeatedly equate the term "care" to "reckless and wanton" an improper and

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

misleading reference.

3) The trial court allowed defense counsel during closing argument to refer to Mr. Hess' testimony comparing it and his qualifications with that of another witness, John Kennedy;

4) The trial court qualified Mr. Hess as a "lay expert" thus confusing the jury as to the weight of Hess' testimony;

Louisiana Code of Civil Procedure provides the following grounds for granting a new trial:

*Article 1972: Peremptory grounds*

A new trial shall be granted, upon contradictory motion of any party, in the following cases:

(1) When the verdict or judgment appears clearly contrary to the law and the evidence.

(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

*Article 1973: Discretionary grounds*

A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.

Plaintiff has produced no evidence to support the granting of a new trial. Plaintiff's complaints relative to Mr. Hess' testimony are without merit. Plaintiff's complaints regarding closing argument are equally without merit.

At the motion for a new trial, the trial court explained what he said at trial; "I generally do not like objections during the closing argument ... The only time I ask that you would voice an objection is if you think it is something critical to your case, ...

and I ask the lawyers to keep objection to a minimum." Clearly, there was no instruction by the trial court tantamount to an order forbidding counsel to object. The record shows that plaintiff failed to object to any comments made during closing argument and thus plaintiff has waived his right to complain on appeal. *Bush v. Winn-Dixie of Louisiana, Inc.,* 573 So.2d 508 (La.App. 4th Cir.1990), writ denied 578 So.2d 930 (La.1991). Furthermore, even had objections been made, we find nothing improper in Tenneco's closing argument.

These assignments of error are without merit.

*TENNECO'S APPEAL:*

The issue raised by Tenneco is whether MRO, pursuant to its contract with Tenneco, had an obligation *to defend* Tenneco against plaintiff's exemplary damage claims and therefore must reimburse Tenneco for its litigation expenses in that regard.

[9] The duty to defend is to be determined by an examination of the language of the agreement between the parties and the allegations of the petition. *American Home Ins. Co. v. Czarniecki,* 255 La. 251, 230 So.2d 253 (La.1969); **\*1096***Micelotti v. Karno,* 542 So.2d 734 (La.App. 4th Cir.1989). FN6

> FN6. We recognize that both of these cases deal with the *insurer's* duty to defend, however we believe the determination of a duty to defend under an indemnification agreement is the same.

[10] The applicable portions of the indemnity agreement between MRO and Tenneco read as follows: FN7

> FN7. These provisions are found in Exhibit A-2 attached to the construction contract.

"4. *Reciprocal Indemnification for Claims of Employees*-Notwithstanding any other provision of this Agreement, OWNER and CONTRACTOR agree to the following indemnification obligations for all losses, costs, and expenses (including

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

but not limited to all defense costs and attorney's fees) of alleged or actual legal liabilities and negotiated settlements for personal injuries, illnesses, or deaths sustained by employees, *including liabilities and settlements based on occurrences caused or alleged to be caused by the other party's sole negligence or gross negligence, or involving the concurrent negligence of the other party:* (emphasis in original)

\* \* \* \* \* \*

PROVIDED, HOWEVER, that these indemnity obligations shall not apply in cases of injuries, illnesses, or deaths *intentionally caused by willful misconduct of employees of either party to this Agreement.* (emphasis added)

\* \* \* \* \* \*

6. *Defense*-Each party to this Agreement agrees to investigate, handle, respond to, provide defense for, and defend any claim or other potential legal liability for which it is responsible under this Agreement's indemnification provisions at its sole expense, and agrees to bear all other related costs and expenses, even if such claim, etc., is groundless, false or fraudulent."

In his third supplemental and amended petition, plaintiff added the following allegation:

"Petitioner, Steven Christopher Griffin, was injured in this explosion due to the *wanton and reckless disregard for his safety* and the safety of the public in the storage, handling and transportation of this hazardous substance that ignited, and due to the wanton and reckless disregard for the safety of Steven Christopher Griffin, he is entitled to exemplary damages in the sum of FIVE MILLION AND NO/100 ($5,000,000.00) DOLLARS, said damages should be awarded as the authority of LSA-C.C. Art. 2315.3 which provides for the award of exemplary damages for the *wanton and reckless disregard of* the defendant herein for public safety in the storage, hand-

ling or transportation of hazardous or toxic substances." (emphasis added)

While the contract of indemnity clearly extends a reciprocal defense obligation for employees' injuries caused or alleged to be caused by either party's negligence, it excludes those situations in which the injuries are "intentionally caused by willful misconduct of employees" of either party.

MRO argues that the term "willful misconduct" as used in the exclusion clause of the indemnity agreement is the operative language to be considered. It equates that language with the "wanton and reckless" allegations in plaintiff's petition and thus argues there should be no indemnity obligation. We disagree.

When faced with Tenneco's exception of no cause of action to the claim for exemplary damages, this Court held that the terms "willful" "wanton" and "reckless" apply to fault which lies between intent to do wrong and the reasonable risk of harm associated with mere negligence. *Griffin v. Tenneco,* 531 So.2d 498 (La.App. 4th Cir.1988). In *Bourgeois v. State Farm Mutual Automobile,* 562 So.2d 1177 (La.App. 4th Cir.1990), writ denied 567 So.2d 611 (La.1990) we defined the term "wanton and reckless" as used in Civil Code Article 2315.4 [FN8] to mean conduct somewhere between an intent to do wrong and mere negligence.

> FN8. Civil Code Article 2315.4 provides for exemplary damages where injuries are sustained by the wanton or reckless disregard of the safety of others by an intoxicated driver.

An intentional tort has been defined by our Supreme Court as being one where the actor **\*1097** consciously desires the physical result of his act or knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to the result. *Bazley v. Tortorich,* 397 So.2d 475 (La.1981). This is the conduct which we conclude is excluded from the indemnity agreement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

In order to reach this conclusion, it is necessary that the entirety of the indemnity provisions be considered together. C.C. Art. 2059. The general indemnity provisions in paragraph 17.1 [FN9] provides that Tenneco will be indemnified by MRO for all claims brought as a result of MRO's contract work. There is no doubt that this includes claims based on negligence and gross negligence. The reciprocal indemnity provision in paragraph 4, cited supra, for employees' claims specifically includes claims based on negligence or gross negligence. Thus because all forms of negligence are subject to indemnification, it logically follows that to give the exclusionary clause a sensible meaning, it must be interpreted as excluding intentional acts by the employees of either party.

FN9. Paragraph 17.1 is found in Exhibit "A" to the contract. It provides:

"The CONTRACTOR agrees to protect, indemnify and hold the OWNER free and harmless from and against *any and all claims, liens, demands, and causes of action of every kind and character,* including the amounts of judgments, penalties, interest, court costs and legal fees incurred by the OWNER in defense of same arising in favor of governmental agencies or third parties (*including employees of the CONTRACTOR or subcontractor*) on account of taxes, claims, liens, debts, *personal injuries,* death, or damages to rented equipment or other property, *and without limitation by enumeration, all other claims or demands of every character occurring or in anywise incident to, in connection with or arising out of the work to be performed by the CONTRACTOR hereunder, except insofar as responsibility may be expressly assumed by the OWNER under the* provisions of this Contract." (emphasis added)

In determining what constitutes an excluded intentional act, we cannot isolate the phrase "willful

misconduct" as MRO suggests. In our opinion, and within the context of the agreement before us, death or injury "intentionally caused by willful misconduct" means an intentional act as defined in *Bazley,* supra, and not the exemplary damage allegations of plaintiff's petition. Any other interpretation would result in a conflict with the other indemnity provisions of the contract. All claims resulting from negligence and/or gross negligence are included. It seems reasonable that the injuries resulting from intentional acts was intended to be excluded. Plaintiff's claim is not one for intentional acts, but for punitive damages for conduct falling somewhere between simple negligence and intentional wrong doing. Although it did not specifically say so, it is highly probable that the legislature meant that conduct to be gross negligence, which is specifically included in the indemnity provisions.

MRO also argues that because a claim for exemplary damages is not specifically described in the indemnity provisions, there can be no implied intent to include it. [FN10] We disagree.

FN10. MRO cites *Polozola v. Garlock, Inc.,* 343 So.2d 1000 (La.1977) in support of its assertion that if exemplary damages are not expressly included in an indemnity agreement, they must be found to be excluded. We disagree. Polozola does not apply. Exemplary damages were not the subject matter of *Polozola.* Rather, the Court found that a contract of indemnity will not be construed to include losses resulting *from one's own negligence* unless such intention was expressed in unequivocal terms.

As we previously noted, paragraph 17.1 provides indemnity for any and all claims and causes of action of any kind. The language of the agreement is clear and without ambiguity. The all inclusive language satisfies us of the parties intent to include every type of claim except a claim resulting from an employee's intentional act.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

625 So.2d 1090
**(Cite as: 625 So.2d 1090)**

Accordingly, the judgment of the trial court in favor of Tenneco and against plaintiff is affirmed. The judgment in favor of MRO is reversed and summary judgment is granted in favor of Tenneco on its third party indemnity claim for defense costs.

The matter is remanded for further proceedings.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

La.App. 4 Cir.,1993.
Griffin v. Tenneco Oil Co.
625 So.2d 1090

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.