Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In the Matter of TORCH, INC., Owner or the L/B
Torch I and Operator of the M/V Chantel Lynn for
Exoneration From or Limitation of Liability.

Civ.A. Nos. 94-2300, 95-1982.
April 16, 1996.

*ORDER AND REASONS*

DUVAL, District Judge.

**\*1** Texaco Exploration and Production Inc. ("TEPI") filed a Motion for Summary Judgment on its claim against Torch, Inc. ("Torch") for contractual defense and indemnity pursuant to a Master Work Agreement allegedly entered into between TEPI and Torch. Torch filed its own Motion for Summary Judgment seeking judgment that it is not contractually obligated to defend or indemnify TEPI, Texaco, Inc. and/or Texaco Pipeline, Inc. (collectively "Texaco entities"). The motions were heard on March 20, 1996. For the reasons that follow, the Court finds that the TEPI-Torch contract at issue herein is a maritime contract that allows for the indemnification of TEPI; however, the breadth of that agreement does not include indemnification for punitive damages or for TEPI's own "wanton and reckless" actions or its own gross negligence. Furthermore with respect the issue of whether TEPI breached the contract and the effect that breach on the indemnification agreement, material questions of fact are present that prevent the entry of summary judgment in that regard.

Background

These consolidated limitation of liability actions concern an accident which occurred in the Delta Duck Club Field between Main Pass and Octave Pass of the Mississippi River delta. On July 6, 1994, Torch was laying pipe for TEPI using the spud barge TORCH I. In order to lay the pipe, the barge was towed into place by the M/V CHANTEL

LYNN; the barge then dropped its spuds in a "freefall" which was apparently done to prevent the barge from moving out of position. (TEPI Exhibit 9, Coast Guard Report).

While dropping the spuds, each of which weighed approximately 9000 pounds, one struck and ruptured a pressurized gas line. Corry Giroir, a worker, had just lit his propane torch which then apparently ignited the natural gas causing an explosion and fire. Giroir was killed and a number of other members of the crew were injured. In addition to the subject suits, personal injury suits against TEPI have been filed in Civil District Court for the Parish of Orleans.

TEPI contends that under the Master Work Agreement 88-159 ("MWA") signed on May 9, 1988, Torch agreed to hold it harmless and to indemnify it even if the injury to its employees was caused by TEPI's negligence. Furthermore, TEPI contends that the Louisiana Offshore Indemnity Act, La. Rev. Stat. 9:2780 is not implicated, because it maintains that the contract between Torch and TEPI is a maritime contract.

On the other hand, Torch argues that (1) the MWA is not applicable to their dealings; (2) the agreement for work on July 6, 1994, was non-maritime and any alleged indemnity language is void under the Louisianan Oilfield Indemnity Act ("LOIA"); (3) the MWA does not provide indemnity if TEPI was willful and wanton or grossly negligent; and (4) TEPI cannot benefit from the indemnity agreement as TEPI breached its agreement to mark pipelines, and this material breach effectively prevented Torch from safely performing the work requested by TEPI.

Standard for Motion for Summary Judgment

**\*2** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco,* 76 F.3d 651 (5th Cir. Feb. 29, 1996), (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 912-13 (5th Cir.) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The non-moving party must come forward with "specific facts showing that there is a *genuine issue for trial.* " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir. 1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986). Finally, the court notes that the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The court now turns to the merits of the TEPI and Torch motions with these standards in mind.

**Louisiana Rule of Professional Conduct 4.2 Allows Ex Parte Communications With Former Employees Where No Privileged Information is Implicated.**

The Court must first address the admissibility of certain affidavits presented by TEPI of two former Torch vice-presidents which Torch contends should be excluded because "they are incomplete

and misleading and they were obtained in violation of the Louisiana Rules of Professional Conduct." (Memorandum in Opposition to TEPI's Motion for Summary Judgment at 7). These affidavits concern these employees' knowledge with respect to the interrelation of the MWA and the verbal work orders for work performed by Torch in the Delta Duck Field. The affidavits do not concern any attorney-client or privileged communications.

Apparently, no Louisiana court has squarely addressed the issue of whether an opposing party's counsel may contact a former employee of an adverse party corporation without consulting the former employer's counsel. Furthermore, the jurisprudence is far from clear whether the relevant rule permits such communications. *Compare Action Air Freight, Inc. v. Pilot Air Freight Corp.,* 769 F. Supp. 899 (E.D.Pa. 1991) (Pennsylvania's rule of professional conduct restricting *ex parte* communication between attorney and party represented by another attorney allowed defense counsel to make *ex parte* contacts with plaintiff's former employees) *with Public Serv. Elec & Gas v. Associated Elec & Gas,* 745 F. Supp. 1037, 1039 (D.N.J. 1990) (*ex parte* communications with former employees of adverse party corporation prohibited).

**\*3** The rule implicated by this question is Louisiana Rule of Professional Conduct 4.2 which provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer had the consent of the other lawyer or is authorized by law to do so. A lawyer shall not effect the prohibited communication through a third party, including the lawyer's client.[FN1]

Torch relies on *In re Shell Oil Refinery,* 143 F.R.D. 105, 107 (E.D.La. 1992) and *Public Serv. Elec & Gas v. Associated Elec & Gas,* 745 F. Supp. 1037, 1039 (D.N.J. 1990) for its prohibitory interpretation of this rule. It maintains that under Rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

4.2 TEPI was barred from speaking to these past employees.

In the *Shell Oil Refinery* case, plaintiffs' counsel obtained proprietary corporate documents concerning the defendant corporation through a then current employee. The court examined Rule 4.2 in trying to discern whether plaintiff had a right to *ex parte* communication with the employee in question; however, it focused on the fact that plaintiffs' counsel's actions were inappropriate and contrary to fair play because of their circumvention of the discovery process. Thus, in order to preserve the integrity of the judicial proceeding, the district court prohibited plaintiffs' counsel from using these documents. This case is inapposite to the one before this Court, where the persons interviewed in this case are past employees of Torch, and there is no exchange of proprietary information being made.

The *Public Service* case is likewise less than persuasive. It does stand for the proposition that the American Bar Association Model Rule 4.2 prohibits any informal contacts with an adverse party's former employee; however, the case has not been widely followed and predates an ABA Formal Opinion which contradicts the holding of the *Public Service* case.

A more compelling analysis and one which the Court adopts herein is found in *Action Air Freight,* 769 F. Supp. at 903-04 which relies heavily on *Hanntz v. Shiley, Inc.* 766 F. Supp. 258, 265-69 (D.N.J. 1991).[FN2] The *Hanntz* court found that " Rule 4.2 does not generally bar *ex parte* contacts with former employees. Rather the rule permits *ex parte* contacts but proscribes inquiry by opposing counsel into matters subject to the attorney-client privilege." Thus, an attorney can investigate the underlying facts leading up to the disputed matter, but he must forgo inquiry into attorney-client communication during the contact.

The *Action Air,* a Pennsylvania federal district court, citing to the *Hanntz* decision continued:

The *Hanntz* court indicated three primary reasons for its decision. We find these reasons persuasive. First, Rule 4.2's underlying policies do not justify the wholesale exclusion of former employees from the discovery process. *Id.* While Rule 4.2 preserves the posture of the adversarial system and the attorney-client relationship, it should not necessarily chill the flow of harmful information *Id.; see also Curley v. Cumberland Farms,* 134 F.R.D. 77, 83 (D.N.J. 1991). "The interest in preventing inadvertent disclosure of privileged material does not justify a blanket ban on communication with the opposing party's former employees." *Polycast Technology Corp. V. Uniroyal,* 129 F.R.D. 621, 627-28 (S.D.N.Y. 1990).

**\*4** Second the Standing Committee of the American Bar Association probably intended the phrase "any other person" in the official comment[FN3] to apply to other current agents and servants of the employer. The comment's drafting history bears out this more restrictive interpretation. Preliminary drafts limited the scope of a Rule 4.2 party to managerial employees....

Third, the commentary's language reads most consistently if the phrase "any other person whose act ... may be imputed to the corporation" imputes liability based on the agency principle. The two other tests for a represented party discussed in the comments--persons whose managerial responsibilities or admissions bind the corporation--rely on this principle. Because former employees do not qualify as agents of the corporation, they do not fall within the comment's imputation language.

Further support for this position is found in the American Bar Association's Formal Opinion 91-359 (March 22, 1991) which stated:
While the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former corporate employers, the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

such coverage was intended. Especially where, as here, the effect of the Rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation.

(TEPI Supplemental Memorandum, Exhibit "B", *ABA/BNA Lawyers' Manual on Professional Conduct,* 1001:104, No. 116 at 64 (3-25-92).

Finally, in *Dubois v. Gradco Systems, Inc.,* 136 F.R.D. 341 (D.Conn. 1991), the court noted the persuasive reasoning found in *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621 (S.D.N.Y. 1991). The court noted:

The court in *Polycast* pointed out that to the extent that Rule 4.2 and D.R. 7-104(A)(1) [its predecessor] were formulated to preserve the integrity of the attorney-client relationship, there would be no current attorney-client relationship to jeopardize in the case of a former employee. *Polycast,* 129 F.R.D. at 625. The court in *Polycast* also observed that there was nothing in Rule 4.2 or the comment to justify departing from "the traditional view... that employees are not encompassed within the term 'party'... and so may be contacted without notice to the corporation's attorney." *Id.* at 626; *see also id.* at 627. "Whatever the right of the corporation to 'barricade' against ex parte contact those potential witnesses who are current employee, ... former employees are outside the ramparts. There is therefore no ethical bar against [plaintiff's attorneys having ex parte communication with [[[the former employee].…" *Id.* at 628.

*Id.* at 344.

This analysis has equal force is it applies to the affidavits of Edward Holland and George Ingle. The affidavits will not be stricken and will be considered by the Court. However, the Court will not consider anything in these affidavits as an

"admission against interest" as Holland and Ingle were not agents of Torch at the time of their averments. However, their understanding of the working relationship between Torch and TEPI is subject to discovery by TEPI without the necessity of Torch's approval. There is no evidence that their conclusions are based on any privileged communication with corporate counsel. Rather, these affidavits contain their perception of the relationship between a contractor and an oil company, and as such are relevant to this case.[FN4]

**\*5** Our next inquiry is to determine whether the terms of the MWA apply to the subject work being performed by Torch in the Delta Duck Field.

The Master Work Agreement Applies to this Dispute.

Torch contends that the MWA did not apply to the work performed for TEPI in July of 1994, because (1) the MWA did not include TEPI by its terms and (2) "Texaco" did not "direct" and the Contractor did not "agree" as required by Paragraph 5.G. of the MWA to do the job for TEPI. Both of these arguments are without merit.

The relevant contractual language upon which Torch relies is as follows:

The preamble to the MWA states:

This Agreement, made this 18th day of April 1988, in New Orleans, Louisiana, between Texaco Inc., a Delaware Corporation with offices in New Orleans, Louisiana (Texaco) and Torch, Inc., a Louisiana corporation, with offices in Belle Chasse, Louisiana (Contractor).

Thus, Texaco, Inc. is referred to as "Texaco" in the contract.

Paragraph 1.A. states:

1. CONTRACTOR'S BASIS SERVICES, WARRANTY, STATUS AND SUBCONTRACTORS.

A. *Work to Be Performed*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

.... Contractor agrees that all work performed for Texaco's New Orleans Operations Division shall be in accordance with this Agreement.

Paragraph 5.G. states:

G. *Subsidiaries* - Contractor agrees to perform work, whenever Texaco directs and Contractor agrees, under the terms of this Agreement, for the following Texaco Inc. subsidiaries:

Texaco Producing Inc.

Getty Oil Company

all Delaware corporations.

Contractor further agrees that these subsidiaries are separate parties to this Agreement, and in this regard, wherever the word "Texaco" appears in this Agreement, it shall be considered to mean the party for whom the work is being performed, whether Texaco Inc. or these subsidiaries. Accordingly, Contractor agrees that the rights, duties and obligations of Texaco Inc. and each of these subsidiaries to the Contractor, and the rights, duties and obligation of the Contractor to Texaco Inc. and each of these subsidiaries are separate and distinct.

Contractor further agrees to provide each of these subsidiaries with additional insured and waiver of subrogation endorsements to the same extent that these endorsements were provided Texaco Inc. in accordance with Paragraph 4.D.

(TEPI Exhibit 1, MWA No. 88-159) (emphasis added).

As noted, Torch argues that because TEPI was not specifically included in the Paragraph 5.G. of the contract, it was not a party and thus is not entitled to the benefits of the MWA. It is undisputed that the corporate name of Texaco Producing Inc. was changed on December 24, 1990 to Texaco Exploration and Production Inc. ("TEPI"). These two companies are one and the same.

"The corporation, upon [a] name change in its name, is in no sense a new corporation, nor the successor of the original one, but remains and continues to be the original corporation. It is the same corporation with a different name, and its character is in no respect changed." 6 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 2456 at 264-5 (rev. perm. ed. 1989). As stated in *Alley v. Miramon,* 614 F.2d 1372, 1384 (5th Cir. 1980), "[t]he change of a corporation's name is not a change of the identity of a corporation and has no effect on the corporation's property, rights, or liabilities." *See National Union Fire Ins. Co. v. Stauffer Chemical Co.,* 1991 WL 138431 (Del Super. July 15, 1991).

**\*6** To claim that Torch, which had been doing work and accepting payment from TEPI since that name change, was unaware of the change or that it abrogated the terms of the MWA is disingenuous at best, and the Court rejects Torch's contentions. The Court's findings are further supported by the plain language of Paragraph 5.G. which continues, "Contractor further agrees that these subsidiaries are separate parties to this Agreement, and in this regard, wherever the word "Texaco" appears in this Agreement, it shall be considered to mean the party for whom the work is being performed, whether Texaco Inc. or these subsidiaries." (emphasis added).

Torch's second argument is similarly faulty. It argues that "Torch is only required to indemnify certain Texaco subsidiaries where Texaco so directs and Torch agrees." In other words, Torch asserts that the phrase, "whenever Texaco directs and Contractor agrees," requires a specific offer and acceptance with respect to any work done for a Texaco subsidiary.

As noted, the language following the specific phrase relied upon by Torch for this proposition belies such an interpretation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
(Cite as: 1996 WL 185765 (E.D.La.))

A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous. *Lirette v. Popich Bros. Water Transport, Inc.,* 699 F.2d 725, 728 (5th Cir. 1983) (applying federal maritime law); *Ogea v. Loffland Bros. Co.,* 622 F.2d 186, 189 (5th Cir. 1980) (applying Louisiana law); *see also Day v. Ocean Drilling & Exploration Co.,* 353 F. Supp. 1350, 1351 (E.D.La. 1973)(Rubin, J.).

*Weathersby v. Conoco Co.,* 752 F.2d 953, 955-56 (5th Cir. 1984). Looking at the contract as a whole, it is clear that Torch's obligations under the contract ran to TEPI in equal measure as its obligations to Texaco Producing, Inc. The MWA applies to the work performed that is the subject of these suits. FN5

The MWA and Verbal Work Orders Constitute a Maritime Contract.

The next inquiry is whether the MWA and the verbal work orders constitute a maritime contract controlled by maritime law rendering the Louisiana Oilfield Indemnity Act FN6 inapplicable and allowing the enforcement of the indemnity provisions of the MWA. *See Lewis v. Glendell Drilling Co.,* 898 F.2d 1083, 1085 n.5 (5th Cir. 1990).

Again, this area of the law provides no "bright line" test particularly where a contract is linked to offshore gas and oil production. Indeed, as noted in *Davis & Sons, Inc. v. Gulf Oil Corp.,* 919 F.2d 313 (5th Cir. 1990), the contract in question can consist of two parts, a blanket contract followed by later work orders. In such a case, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions. Indeed, "[i]f an injury occurs in the performance of a separable maritime obligation even though it is provided for by an initial blanket contract that is principally non-maritime, the complete contract is nevertheless subject to maritime law." *Id.* at 315.

*7 Six factors outlined in the *Davis* case are used in characterizing a contract. They are as follows:

(1) What does the specific work order in effect at the time of injury provide?

(2) What work did the crew assigned under the work order actually do?

(3) Was the crew assigned to work aboard a vessel in navigable waters?

(4) To what extent did the work being done relate to the mission of that vessel?

(5) What was the principal work of the injured worker?

(6) What work was the injured worker actually doing at the time of injury?

The MWA states that the work to be performed was to:

[i]nstall list, bury and clean pipelines and risers, install connection piping to wellheads and perform as built surveys at various leases and/or properties in Texaco's New Orleans Operations Division. Work shall be performed as set forth in the attached Exhibit "A" and in accordance with any Texaco issued specification and/or written instructions, if applicable.

(TEPI Exh. 1, MWA, ¶ 1.A.). Exhibit "A" contains a list of barges and tugs and their hourly rates including the TORCH I and the CHANTEL LYNN to be used in accomplishing these tasks. FN7

With respect to the specific Delta Duck Field job at which the accident occurred, TEPI had requested that Torch lay the subject pipeline using a tug and barge. (Dep. of Lyle Stockstill, 30(B)(6) Torch Witness, pp. 57-58). Torch was being paid by TEPI for furnishing a crew and barge. *Id.* at 93. Raymond Alesich, the Torch superintendent, foreman, and owner of the CHANTEL LYNN, also

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
(Cite as: 1996 WL 185765 (E.D.La.))

testified in his deposition that (1) Torch employees "drove" the CHANTEL LYNN; (2) the TORCH I was a barge and that it did pipelaying work; (3) it had living quarters and one of the members of the crew served as cook at the time of the accident; (4) the water at the accident site was 15 feet deep; and (5) while laying the pipe, the pipe ran straight off the stern of the barge into the water. (TEPI's Exhibit 13, Dep. of Alesich, at 28, 45, 48, 49, 50, 51, 109, 117).

With these facts at hand, it is clear that the specific work order in effect at the time of the injury contemplated the use of two vessels in navigable water which were integral to the performance of the work--that is laying pipe. The crew not only welded pipe and dropped the pipe into fifteen foot water, they navigated the vessels and indeed one member even cooked on board the TORCH I. They apparently slept on TORCH I as well. As such, the work being done was integral to the mission of the vessel. The person killed, Corry Giroir was welding the subject pipe, but it must be remembered that the boat itself was the pivotal instrument being used for this mission. The pipe was actually laid directly from the stern of the boat. In other words, without the TORCH I and the CHANTEL LYNN, no pipe could be laid. Bearing these facts in mind, the Court finds that the subject contract between TEPI and Torch is maritime in nature, and thus, maritime law will apply.

**\*8** This result is supported in the jurisprudence as well. *See Dupre v. Penrod Drilling Corp.,* 993 F.2d 474 (5th Cir. 1993) (contract for supply and use of vessel for drilling, completing and tying back oil wells was "maritime contract"); *Campbell v. Offshore Pipeline, Inc.,* 1993 WL 302623 (E.D.La. Aug. 5, 1993) (Sear, J.) (contract for lay barge to weld together and lay pipe was maritime contract); *Smith v. Penrod Drilling Corp.,* 960 F.2d 456 (5th Cir. 1992) (principal determinant is the relation the contract bears to the ship; where main piece of equipment to be supplied by the contractor was a vessel, contract is determined to focus upon

the use of vessel in a maritime transaction and is a maritime contract governed by maritime law.).

Because maritime law applies to this contract, the declaration that all agreements to indemnify a party for death or bodily injury caused by that indemnitee contained in the Louisiana Oilfield Indemnity Act. La. Rev. Stat. 9:2780 is inapplicable. Torch has pressed this Court to utilize the analysis contained in *Meloy v. Conoco,* 504 So. 2d 833 (La. 1987) (LOIA nullifies completely any provision in any agreement to which the statute is applicable which requires defense and/or indemnification where there is any negligence or fault on part of indemnitee) and *Matte v. Zapata Offshore Co.,* 784 F.2d 628 (5th Cir. 1986) (in OCLSA setting, choice of law provisions violate Louisiana public policy and are therefore void where state law would otherwise apply) to render the indemnification agreement void. However, as maritime law applies, these cases are without force.

### The Indemnity Language is Sufficiently Clear to Encompass Coverage for TEPI's Liability Based on its Own Negligence and/or Strict Liability. However, the Language at Issue Does not Include Indemnity for Gross Negligence, TEPI's Alleged Wanton or Reckless Behavior, or Punitive Damages.

Under federal maritime law, indemnity contracts are construed "to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." But a contract of indemnity "should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1214 (5th Cir. 1986), *citing Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir. 1981).

The indemnity provisions of the MWA provide:

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

4. RISK ALLOCATION, INDEMNITY, FORCE MAJEURE, INSURANCE, POLLUTION CONTROL

B. *Indemnity.*

(1) Contractor agrees to indemnify, defend, and hold Texaco, its subsidiaries and affiliated companies, .. harmless from all claims, causes of action, costs (including attorney's fees and court costs), damages, judgment, or liabilities which may be asserted by Contractor, its agents, employees subcontractors and persons for whom Contractor is responsible (Contractor), Texaco or any third parties, on account of personal injury, death, or property damage caused by, arising out of, or incidental to, Contractor's performance whether such personal injury, death or property damage was caused by Contractor's sole fault or liability, the concurrent fault or liability of contractor and Texaco, *or Texaco's sole fault or liability, and whether such fault or liability is based on a theory of negligence, strict liability, or both.*

**\*9** TEPI has been sued in state court under La. Civ. Code art. 2315.3 which provides in relevant part:

In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.

TEPI seeks indemnity for these punitive damages sought in the Civil District Court suits. "The determination as to whether defense or indemnification is due must be made at the outset of the litigation by reference solely to the relevant pleadings and pertinent contractual provisions." *Sharp v. Freeport Sulphur Company,* 1991 WL 280069 (E.D.La. Dec. 18, 1991), *citing Sullen v. Missouri Pacific R.R. Co.,* 750 F.2d 428 (5th Cir. 1985).

The Court neither has been provided nor has

found a single case on point. However, the requirement of specificity in an indemnity contract is axiomatic, and this indemnity provision is silent with respect to gross negligence, wanton and reckless behavior, and punitive damages on the part of Texaco. "Before enforcing an indemnification clause for an indemnitee's own negligence, a court must be firmly convinced that the exculpatory provision reflects the intention of the parties." *Orduna S.A. v. Zen-Noh Grain Corp.,* 913 F.2d 1149 (5th Cir. 1990), *citing United States v. Seckinger,* 397 U.S. 203, 211-12, 90 S. Ct. 880, 885-86, 25 L. Ed.2d 224 (1970)(4-3 decision)(courts are reluctant "to cast the burden of negligent action upon those who were not actually at fault"); *see also Branch v. Fidelity & Cas. Co.,* 783 F.2d 1289, 1294 (5th Cir. 1986) ("To secure indemnification from one's own negligence ... the intent of the parties must be expressly and specifically manifested.").

TEPI relies on *Griffin v. Tenneco Oil Co.,* 625 So. 2d 1090 (La. App. 4th Cir. 1993) for the proposition that the subject indemnity agreement would cover "gross negligence" and "wanton and reckless" actions on the part of TEPI. However, the case is inapposite. The indemnity language at issue in *Griffin* specifically excluded "willful misconduct" and included "gross negligence." The *Griffin* court determined that "wanton and reckless" behavior did not qualify as the type of intentional tort excluded under that agreement. Thus, the indemnity provision was enforceable in *Griffin.*

Contrarily, in the case at bar, the MWA indemnity agreement is silent with respect to gross negligence and/or liability for wanton and reckless behavior. Such silence dictates its exclusion. Thus, this Court finds that the above-quoted indemnity language does not include coverage for the gross negligence of TEPI, its alleged wanton and reckless behavior or any award for punitive or exemplary damages awarded.

There is a line of cases beginning with *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580 (5th Cir. 1971) which Torch would have the Court follow. In

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

Lanasse, a crew member on a vessel under a time charter was injured while offloading cargo from the vessel onto a Chevron platform. The crane was mounted on the platform. Chevron sought indemnification from the vessel owner pursuant to a clause in the charter agreement covering liability "arising in any way directly or indirectly connected with the possession, navigation, management, and operation of the vessel." *Id.* at 582 n.4. No indemnity was warranted because the injury had nothing to do with the operation of the vessel. In *Smith v. Tenneco Oil Co.,* 803 F.2d 1386 (5th Cir. 1986), likewise the court refused to indemnify Tenneco when the sole cause of injury to Smith was a crane operator's negligence. As such the court found that the liability did not arise out of the performance of the charter agreement.

**\*10** Relying on a recent application of these principles found in *Gaspard v. Offshore Crane and Equipment,* 1995 WL 144592 (E.D.La. March 31, 1995), Torch has argued that it should not be required to indemnify TEPI. In *Gaspard,* a roughneck working for a drilling contractor was offloading drillcollars from the vessel, when he was injured because part of a crane that was on Chevron's platform fell on him. He sued Chevron under La. Civ. Code art. 2322 for the "ruin" of its immovable platform. Chevron sought indemnity from the vessel whose charter party included the following language requiring indemnity for liability:

> arising out of or in any way directly or indirectly connected with the performance of service under this agreement or the ownership, maintenance, management, operation, transportation of passengers, carrying of cargo, loading or unloading of cargo, loading or unloading of passengers or navigating of the vessel.

The Court found the second part of this indemnity clause a "redundancy." Then, based on the above cited Fifth Circuit precedent wherein the courts had found that the "arising out of or in anyway directly or indirectly connected with the performance" language did not cover injury caused by

platform crane negligence during cargo operations aboard the chartered vessel, the Court found that the vessel owner in *Gaspard* owed no indemnity to Chevron.

Torch claims that using the same analysis, it should be relieved from indemnity in the case at bar. The problem with this position is that it ignores the fact that it was the TORCH I spud that hit the gas line. The case before the Court is not one where the person against whom indemnity is being sought has absolutely no active involvement in the accident such as the *Lanasse* line would allow. Thus, this argument too must be rejected.

**Whether TEPI Breached the Contract With Respect to its Duty of Cooperation and Alleged Requirement To Show Where Pipelines Were is a Material Question of Fact Precluding Summary Judgment on Issue.**

Torch argues that TEPI breached their contract because (1) it failed to provide "required surveying services necessary to locate and mark the route of the proposed line and all pipeline, cables or obstructions in the work area;" and (2) for its failure to cooperate. The first duty allegedly arises under the terms of the verbal contract; the second duty allegedly arises under Paragraph 6.A. of the MWA. Whether these duties exist; whether they have been breached; and whether such a would have an effect on the duty to indemnify present questions of fact which preclude summary judgment. Accordingly,

IT IS ORDERED that TEPI's Motion for Summary Judgment is GRANTED to the extent that the contract between TEPI and Torch includes the MWA and require indemnity for TEPI's negligence and strict liability; however, it is DENIED with respect to indemnity for its own reckless and wanton behavior, its gross negligence, and punitive damages.

**\*11** IT IS ALSO ORDERED that Torch's Motion for Summary Judgment is DENIED in all respects save that the MWA does not require indemnity for TEPI's wanton and reckless actions or its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

gross negligence

FN1. This rule is modeled on the ABA Model Rules of Professional Conduct 4.2. It is interesting to note that the model rule was amended in the summer of 1995. It now reads, "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. As of December 1995, no state has adopted this "new" rule. The effect of this change is unclear. *See* T. Sonde & H. Gettman, "'Ex Parte' Interviews and 'Inadvertent' Disclosures--some Traps for the Unwary", CA27 ALI-ABA 249, 260.

FN2. It should be noted that the Supreme Court of New Jersey, in *In the Matter of Opinion 668 of the Advisory Committee on Professional Ethics,* 134 N.J. 294, 633 A.2d 959 (N.J. 1993), promulgated an interim rule which prohibits the interviewing of former control group employees or former employees whose conduct, in and of itself, establishes an organization's liability. However, the rule is an interim measure, and the court ordered the matter to be reviewed by a special committee to assess the effects of such a rule. That committee's findings are unknown to the Court. The subject ruling did not examine the reasons cited in *Hanntz* and as such, this federal district court in Louisiana is neither bound by the ruling, nor persuaded that it is the correct result.

FN3. Louisiana apparently did not adopt the Official Comment. The text to which the court refers in pertinent part is as follows:

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

The *Action Air* court noted that the ABA Official Comment defines three categories of people that qualify as a represented 'party' of a corporation: "1) persons with managerial responsibilities, 2) persons whose acts may be imputed to the corporation; and 3) persons whose statements constitute an admission by the corporation." As this text makes no specific mention of former employees, there lies the source of the confusion.

Nonetheless, the *Action Air* court notes that because a former managerial employee lacks an existing agency relationship with the corporation, he cannot bind the corporation. *Action Air,* 769 F. Supp. at 903 *citing Anderson v. United States* 417 U.S. 211, 218-19 n.6, 94 S. Ct. 2253, 2260 n.6 (1974). Thus, a statement by a former employee cannot be introduced as an admission of the corporation. Fed. R. Evid. 801(d)(2)(D). The *Action Air* court reasoned, "The first and third categories of represented parties, therefore, indicated in the comment, cannot be interpreted to include former employees. As a result, the outcome of this case turns on whether the second category of Rule 4.2, i.e. persons whose acts may be imputed to the corporation applies to former employees." The *Action Air* court found that Rule 4.2 did not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)
**(Cite as: 1996 WL 185765 (E.D.La.))**

apply to former employees.

FN4. While the Court has made much as to whether these affidavits are admissible, the Court notes that they are not critical to the finding that the MWA is applicable to Torch's work in the Delta Duck Field.

FN5. Even in the deposition of Edward Holland taken after the confection of the TEPI affidavit, he states that it is standard operating procedure in the oil field that master work agreements are signed and they apply to whatever work is done for that company. Indeed, Holland admitted that the Texaco-Torch MWA is "about the same" as other oil company's master agreements. (Torch Exhibit B to its Opposition, Sworn Statement of Holland, pp.9-10). Mr. Ingle in his post-affidavit deposition also explained with respect to his averment that when a verbal work request was made, it was understood the master work agreement would apply, that statement meant "when you are working for a major oil company, you will not work for them unless you have a signed master service agreement." (Sworn Statement of Ingle at 9).

FN6. This Act found prohibits the type of contractual indemnity sought here. La. Rev. Stat. 9:2780.

FN7. Edward Holland signed the MWA in question for Torch. (TEPI Exhibit No. 1).

E.D.La.,1996.
In Matter of Torch, Inc.
Not Reported in F.Supp., 1996 WL 185765 (E.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

▷

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In the Matter of TT BOAT CORPORATION, et al

Nos. Civ.A. 98-0494, Civ.A. 98-1109.
Sept. 8, 1999.

*ORDER AND REASONS*

DUVAL, J.

**\*1** Before the court is the motion of Island Operating to set the value of the litigious rights which Tidewater acquired from Global in their settlement agreement dated April 16, 1999. Pursuant to that settlement agreement, Global assigned to Tidewater all of its claims against Island. Under the terms of the April 16, 1999 agreement, however, the value of the assignment was unliquidated. Island has requested that the court set such value in order that Island might exercise its option to redeem those rights from Tidewater pursuant to Louisiana Civil Code article 2652.[FN1]

FN1. In its Order and Reasons entered August 23, 1999, the court determined that Louisiana's law regarding the redemption of litigious rights is applicable. Louisiana Civil Code article 2652.

Both parties have suggested methods of valuing the assigned rights. Both Tidewater and Island have submitted written briefs. In addition, Tidewater has submitted to the court, for its in camera inspection, a letter containing its retrospective valuation of the assigned rights. George Gilly, counsel for Global at the time of the settlement, acquiesced in Tidewater's valuation. The letter was submitted in camera as some of the information discussed in the letter relates to evaluations, perceptions of liability, and other legal strategy which would be unduly prejudicial to Tidewater if made available to its opponents in this litigation. Island offered the expert opinion of the esteemed Saul Litvinoff on

the valuation of litigious rights. Finally, a sealed hearing was conducted on September 7, 1999, and the court heard the testimony of two witnesses, George Gilly and Steven Roberts, counsel for the Walter Oil & Gas claimants.

At the hearing, Gilly testified as to Global's perceptions at the time of its settlement with Tidewater, and Roberts testified as to Walter's perception of its unrelated settlement with Tidewater. The thrust of Gilly's testimony was that Tidewater initially offered sixty percent of the damages to the Cherokee, but ultimately Tidewater agreed to ninety percent, with Global assigning its rights against Island to Tidewater. The thrust of Roberts' testimony was that Walter settled with Tidewater for seventy-five percent of its property damage. He discounted the claim twenty-five percent-ten percent of that related to Tidewater's potential ability to limit its liability and fifteen percent to Island's potential negligence. Walter did not assign its rights against Island and Roberts admitted Walter had no claim against Island by virtue of a contractual provision.

1. The Tidewater-Global Settlement Agreement

Counsel for both Tidewater and Global assert that they had reached a settlement prior to March 27, 1999. Both Tidewater and Global maintain that their original agreement was unaffected by the court's April 14 ruling on Tidewater's inability to limit its liability. The settlement agreement, memorialized in the letter dated April 16, 1999, reads in pertinent part:

A. Global agrees that it will:

1. Release Tidewater and the M/V GULF CAJUN from all liability for damages of any types or nature arising out of or relating to the allision on February 16, 1998 with the Walter platform, including but without limitation damages to the Barge CHEROKEE, damages to the KINGFISH, loss of use of those or any other vessels, and any other consequential damages suffered or sustained by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4457-58   Filed 11/01/11   Page 13 of 23


Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

Global or any of its related or subsidiary compan-
ies.

**\*2** 2. Assign to Tidewater an interest in all of
its claims for damages of any kind arising out of or
relating to the aforesaid allision with the Walter
platform, including particularly but without limita-
tion, those damages set forth in Global's Claim filed
against Tidewater in this proceeding.

3. Assign to Tidewater the sole right to prosec-
ute said claims in Global's name and to compromi-
ise, settle or otherwise adjust and conclude said
claims for a sum and on such terms and conditions
as Tidewater in its sole discretion shall determine is
appropriate ...

5. Agree that any recovery by way of settle-
ment or otherwise from the claims prosecuted as set
forth in the preceding subsections shall be paid as
follows:

(a) All costs and attorneys fees incurred in pro-
secuting the above-described claims shall first be
satisfied;

(b) Reimbursement in full of the amounts ex-
pended by Tidewater pursuant to paragraph B(1)
below shall be paid to Tidewater;

(c) Any amounts in excess of those described
in subparagraphs (a) and (b) shall be paid to Global
...

B. In consideration for the foregoing released
ans assignment by Global, Tidewater agrees that it
will:

1. Pay a sum to Global equal to 90% of the leg-
ally recoverable CHEROKEE physical damages
and related repair expenses such as towage, dry-
dock, survey and similar incidental repair expenses
resulting from the allision on February 16, 1998.
However, as reflected by Paragraph 17 of the Mas-
ter Time Charter Agreement between the parties,
the sum referred to in this paragraph shall not in-
clude indirect, special or consequential damages,

including but without limitation, loss of use, loss of
profit or business interruption of any kind at any-
time.

2. Prospectively defend, indemnify and hold
harmless Global and the CHEROKEE for liability
to the personal injury claimants, including the
pending suits in state court against Global employ-
ees.

3. As of March 27, 1999, assume liability for
any prospective maintenance and cure obligations
of Global to personal injury claimants which are in-
curred subsequent to march 26, 1999.

4. Reimburse reasonable out-of-pocket ex-
penses (such as mileage, travel, etc.) incurred by
Global employees or other Global personnel whose
presence is requested by Tidewater in connection
with the litigation ...

2. The Court's Method of Evaluating the Value of
the Assigned Rights

Under the terms of the Tidewater-Global settle-
ment agreement, Tidewater received both an as-
signment of Global's rights against Island and
Global's release of it's claims against Tidewater. In
exchange, Tidewater agreed to pay to Global 90%
of the provable damages to the CHEROKEE and to
indemnify Global for liability to personal injury
claimants, among other things. In essence, Tidewa-
ter purchased Global's claims against Island.
However, the settlement agreement recited no price
for the assignment.

So that Island may exercise its option to re-
deem the rights assigned to Tidewater, the court
must apportion the price paid by Tidewater. In sev-
eral instances, under Louisiana's law of contracts,
the court is called upon to fix a price. For example,
the Louisiana Civil Code contemplates that it is the
court's responsibility to determine the reasonable
price in a contract of sale when the parties have left
its determination to a third person who is unable to
do so. La.Civ.Code article 2465. Additionally, in
*Slocum-Stevens Ins. v. International,* 666 So.2d 352

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

(La.App.2d Cir.1995), the Second Circuit concluded that when a litigious right is transferred together with a non-litigious right for a lump sum, an apportionment of the price must be made in order to determine the part paid for the litigious right.

**\*3** Island expressed some concern as to the timing of fixing the value of the rights assigned, as Tidewater has settled with some of the personal injury claimants and taken assignments from them. According to Professor Litvinoff, the court should value the rights assigned as of the date of the assignment, in essence, the "original price," and the value of the assigned rights was unaffected by subsequent settlements of Tidewater and certain personal injury claimants. The court agrees with Professor Litvinoff.

Therefore, to determine the value of the rights assigned to Tidewater, the court will engage in a "reasonable person" analysis. That is, prior to March 27, when the settlement agreement was reached, what would reasonable parties have agreed was the value paid by Tidewater for the claims of Global against Island? The total reasonably estimated value that Tidewater paid to Global minus the reasonable value of Global's release of Tidewater equals the value of the assignment. The Court does not make this analysis in a vacuum. The Court has been intimately involved with all aspects of this complex limitation proceeding as the result of numerous motions, a bifurcated trial to determine Tidewater's ability to limit, and multiple conferences.

3. The Total Value Paid by Tidewater Under the Terms of the Agreement, as Perceived by the Parties at the Time of Settlement

The first issue to be addressed by the court is what reasonable parties would have believed was the total amount of legally recoverable physical damages to the CHEROKEE. To fix the redemption value, the Court must ascertain the parties' intentions at the time of the settlement agreement. Based on material submitted for the court's in camera review and the briefs of the parties, the court con-

cludes that on March 27, 1999, the reasonable fixed value of provable loss to the CHEROKEE damages totals $2,778,932. Tidewater agreed to pay ninety percent of the provable loss to the CHEROKEE, that is, $2,500,103.

Next, the court must value Tidewater's indemnification of Global for the personal injury claims. The court finds that, as of March 27, 1999, the reasonably anticipated value of all personal injury claims which might have been asserted against Global was $2,200,000. Tidewater and Global could reasonably have believed that Global's portion of the exposure to personal injury claimants was forty percent of $2,200,000, or $880,000. At the time of the settlement, the parties knew the number of personal injury claimants and generally the potential exposure to the respective claims. However, discovery as to the extent of the injuries was not extensive at that time.[FN2]

> FN2. Global was relieved of liability for the allision per this court's Order and Reasons, entered March 3, 1999. Therefore, at the time of settlement, the only personal injury claimants with potential claims against Global were the Global employees and others injured on the CHEROKEE. Approximately eighteen of the personal injury claimants could have asserted claims against Global. Island has requested that the court assign some value to the claims which were settled and which remain unsettled, solely to facilitate settlement discussions. Even at the time of the Tidewater-Global settlement, the personal injury claimants who eventually settled (with the exception of Henry Leonard) had fairly minimal claims, which might have been reasonably approximated at $250,000. With Henry Leonard's claim, the total reasonably estimated value of the settled personal injury claims was $500,000.

The court does not comment on the legal effect, if any, of the subsequent settle-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

ments on Island's rights.

Furthermore, Tidewater implicitly agreed to bear the costs associated with the personal injury claims. If Global had to defend itself against the claims of the personal injury claimants, it would have incurred substantial defense costs, including the trial of this multi-claimant case. The sum of $150,000 is a reasonable value to Global in view of the circumstances involved in this case.

**\*4** Additionally, Tidewater purchased Global's claims against Island for loss of use of the Cherokee and damages to the KINGFISH. The KINGFISH was another drilling barge which was in distress and was the impetus for the voyage which ended in the allision. However, pursuant to the agreement, Global will receive all damages recovered in excess of Tidewater's payments and costs incurred as a result of the agreement. The right to pursue Global's claims against Island relating to the loss of use of the CHEROKEE and damage to the KINGFISH were apparently of minimal value to Global. One of Global's experts, Guy Clark, had opined in an expert opinion submitted to the Court that Island's failure to sound the foghorn was not causally related to the allision. Perhaps Tidewater placed a greater value on these assignment rights, but an estimate of $100,000 in payment for these claims is more than reasonable considering the circumstances at the time the settlement was completed.

In addition to its agreement to indemnify Global for the personal injury claims, Tidewater agreed to pay Global's prospective maintenance and cure and reimburse Global's out-of-pocket expenses. On March 27, 1999, it would have been reasonable to anticipate that Global would owe $100,000 in prospective maintenance and cure and that Global would spend $10,000 in out-of-pocket expenses in assisting in this litigation.

By adding these figures, we arrive at the reasonable value of Tidewater's compromise, or $3,740,103.

4. The Value of Global's Release of Tidewater

Global released its claims against Tidewater for the physical damage and loss of use of the CHEROKEE. As of March 27, 1999, the reasonable value of those claims was $2,084,199. This is computed by taking seventy-five percent of the $2,778,932.00 sum. In addition, Global released its claims against Tidewater for the physical damage and loss of use of the KINGFISH, as well as loss of use of the Cherokee. Tidewater could have reasonably estimated its exposure for these claims to be $500,000. Hence, the total value of Global's release of Tidewater was $2,584,199.

5. The Value of the Rights Assigned to Tidewater

By subtracting the value of Global's release ($2,584,199) from the total amount paid by Tidewater ($3,740,103), we are left with the value of the assigned rights, or $1,115,904. Accordingly,

IT IS ORDERED that Island must state its intention to redeem the rights assigned to Tidewater for $1,115,904 within 24 hours of issuance of this ruling.

IT IS FURTHER ORDERED that if Island so state its intention to redeem the rights assigned to Tidewater, payment is due within 30 days.

Before the Court is a Motion to Reconsider filed by Tidewater Marine Inc. ("Tidewater"). Tidewater requests the Court to reconsider its Order and Reasons, entered September 8, 1999. The Court has reconsidered its ruling and finds some merit in Tidewater's motion. In its Order and Reasons, the Court set the value of Global's release of the claims of the loss of use of the Cherokee and the KINGFISH damages at $500,000. After reconsideration, the Court concludes that the value of the release should be reduced to $250,000. Additionally, the court erred in its calculation of the amount paid by Tidewater for the release and assignment. The total value given by Tidewater shall be reduced by $100,000.

**\*5** In support of its Motion for Reconsidera-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

tion, Tidewater asserts that Clause 17 of the Master Time Charter Agreement specifically limits its liability for consequential damages arising out of the Charter. Tidewater argues that, at the time of settlement, Global had no plausible claims against Tidewater for the loss of use of the CHEROKEE and the KINGFISH damages, and therefore, that portion of the release should be valued at $0. Global relies on the provisions of the relevant Master Time Charter for this proposition. The Court disagrees with this valuation for the reasons set forth below.

1. The Master Time Charter Agreement Between Global and Tidewater

Tidewater points to the language of the Master Time Charter Agreement in support of its Motion for Reconsideration. Clause 17 of the Master Time Charter Agreement reads in pertinent part:

OWNER and CHARTERER mutually waive any right to claim against the other, their insurers and employees for any indirect, special, or consequential damages, including, without limitation, loss of use, loss of profit, or business interruption of any kind, at any time, even if allegedly or actually caused, in whole or in part, by negligence, strict liability, products liability and/or unseaworthiness attributable to the released parties. The sole restriction on the above is that the claims for such damages must have allegedly or actually arisen out of, be related to, and/or be incidental to the chartering of a vessel pursuant to this Master Time Charter Agreement.

Based on this provision, Tidewater asserts that Global had no claim against it for the loss of use of the CHEROKEE and the KINGFISH damages.

2. Global's Claims Tidewater Prior to the Settlement

As explained in its Order and Reasons entered September 9, 1999, the Court contemplated what the parties reasonably perceived to be the value of the released claims at the time of the settlement. At the time of the Global-Tidewater settlement, Global had asserted claims against Tidewater of approxim-

ately $16,000,000 for the CHEROKEE loss of use and KINGFISH damages. Tidewater had not, at that time, moved the Court for summary judgment on the issue of its liability for the consequential damages sought by Global.

The Court accepts as fact that, at the time of settlement, Tidewater was aware of Clause 17 and intended to assert it as a defense. Global, too, may have anticipated that Tidewater would raise such a defense. Thus, for this and other reasons, the parties could not have reasonably believed that Tidewater would be liable for the entire $16,000,000. On the other hand, because the Court had not yet interpreted Clause 17, Tidewater could not be certain that the Court would interpret the clause so as to relieve Tidewater of liability for the loss of use of the CHEROKEE and KINGFISH damages. Thus, at the time of settlement, Tidewater's reasonably anticipated exposure for the consequential damages would have been somewhere between $0 and $16,000,000.

3. Global's Defense to Clause 17

**\*6** Considering the circumstances leading up to the allision, Tidewater was arguably grossly negligent FN1 with respect to the loss of use of the CHEROKEE and KINGFISH damages. Had Tidewater moved for summary judgment on the issue of consequential damages, Global would have likely urged that Tidewater was grossly negligent in causing the loss.

> FN1. The Court is not expressing an opinion that Tidewater was grossly negligent in causing the allision, or even that Tidewater was the proximate cause of the sinking of the KINGFISH. Rather, at the time of the Global-Tidewater settlement, gross negligence was a defense that Global could have raised to the contractual exclusion of liability.

Global would have pointed out that Clause 17 does not specifically exclude liability for consequential damages caused by gross negligence. The clause only excludes liability for consequential

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

damages caused by "negligence, strict liability, products liability and/or unseaworthiness," and is silent with respect to acts of gross negligence. This Court has ruled that when an indemnity provision does not include coverage for gross negligence, such silence dictates its exclusion. As this Court found *In the Matter of Torch, Inc.,* 1996 WL 185765,* 8-9 (E.D.La.):

> Under federal maritime law, indemnity contracts are construed "to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." But a contract of indemnity "should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1214 (5th Cir.1986), *citing Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir.1981)....FN2

> > FN2. The Court then cited in its entirety the relevant indemnity provision which like the provision at bar was silent with respect to gross negligence

> "The determination as to whether defense or indemnification is due must be made at the outset of the litigation by reference solely to the relevant pleadings and pertinent contractual provisions." *Sharp v. Freeport Sulphur Company,* 1991 WL 280069 (E.D.La. Dec. 18, 1991), *citing Sullen v. Missouri Pacific R.R. Co.,* 750 F .2d 428 (5th Cir.1985).

The Court neither has been provided nor has found a single case on point. However, the requirement of specificity in an indemnity contract is axiomatic, and this indemnity provision is silent with respect to gross negligence, wanton and reckless behavior, and punitive damages on the part of Texaco. "Before enforcing an indemnification clause for an indemnitee's own negligence, a court must be firmly convinced that the exculpatory pro-

vision reflects the intention of the parties." *Orduna S.A. v. Zen-Noh Grain Corp.,* 913 F.2d 1149 (5th Cir.1990), *citing United States v. Seckinger,* 397 U.S. 203, 211-12, 90 S.Ct. 880, 885-86, 25 L.Ed.2d 224 (1970)(4-3 decision)(courts are reluctant "to cast the burden of negligent action upon those who were not actually at fault"); *see also Branch v. Fidelity & Cas. Co.,* 783 F.2d 1289, 1294 (5th Cir.1986) ("To secure indemnification from one's own negligence ... the intent of the parties must be expressly and specifically manifested.").

*Id* at * 8-9. In other words, the Court will not read "gross negligence" into an indemnity provision in which it is not specifically covered.

4. The Reasonable Value of the Release

**\*7** Because the contractual limit on Tidewater's liability was not briefed by the parties, and only tangentially mentioned at the September 3, 1999 hearing, the Court did not consider the effect of Clause 17 in its September 8 Order and Reasons. Clause 17 certainly reduces Tidewater's potential exposure for consequential damages. Nonetheless, the parties could not have reasonably anticipated that Tidewater would be completely relieved of liability. Consequently, Tidewater's potential exposure, as reasonably perceived by the parties at the time of settlement, should be reduced from $500,000 to $250,000.

5. Adjustment to the Value Tidewater Paid for the Assignment and Release

In its Response to Tidewater's Motion for Reconsideration, Island argues that the court erred in valuing the assignment to Tidewater at $100,000. Island is correct, and the court finds that the value of the assignment is the excess of the amount actually paid by Tidewater over the value of the release. Accordingly,

IT IS ORDERED that Tidewater's Motion for Reconsideration is GRANTED and that the Order and Reasons of September 8, 1999 is AMENDED to provide that the value of the value of Global's release of Tidewater for the loss of use of the CHER-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)
**(Cite as: 1999 WL 1442054 (E.D.La.))**

OKEE and the KINGFISH damages at $250,000 rather than $500,000 as previously set forth in the September 8, 1999 decision. Thus the total value of Global's release of Tidewater is $2,334,199.

IT IS FURTHER ORDERED that the Order and Reasons of September 8, 1999 is AMENDED to provide that the total value paid by Tidewater for the release and assignment is $3,640,103. Therefore, the value of the assignment of Global's rights against Tidewater is properly fixed at $1,305,904. FN3

> FN3. The court recognizes that it made a typographical error in its Order and Reasons of September 8, 1999. The original estimated value of the assigned rights should have been $1,155,904, rather than $1,115,904. The value of the assigned rights has since been adjusted to $1,305,904.

E.D.La.,1999.
In re TT Boat Corp.
Not Reported in F.Supp.2d, 1999 WL 1442054 (E.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

972 F.2d 666, 1994 A.M.C. 607
**(Cite as: 972 F.2d 666)**

**H**

United States Court of Appeals,
Fifth Circuit.
Albert TAYLOR, Jr., et al., Plaintiffs,
Mrs. Albert Taylor, Jr., Plaintiff-Appellant,
v.
LLOYDS UNDERWRITERS OF LONDON, et al.,
Defendants,
Stewart Arthur Holmes, as representative of Certain
Underwriters at Lloyds, London, Defendant-Appellee.

No. 91-3629.
Sept. 24, 1992.
Rehearing and Rehearing En Banc Denied Oct. 23,
1992.

Injured seaman brought action seeking judicial
declaration that earlier federal court punitive damages award in his favor and against company that
chartered liftboat which capsized was recoverable
from the company's insurer. The United States District Court for the Eastern District of Louisiana,
Lansing L. Mitchell, J., granted the insurer's motion
for summary judgment concluding that general
maritime law prohibited the collection of punitive
damages from insurer. Seaman appealed. The Court
of Appeals, Emilio M. Garza, Circuit Judge, held
that law of state having greatest interest in resolution of issue should have been applied, rather than
general maritime law, when determining whether
injured seaman could recover punitive damages
from insurer.

Reversed and remanded.

West Headnotes

**Admiralty 16 🗝1.20(5)**

16 Admiralty
   16I Jurisdiction
      16k1.10 What Law Governs
         16k1.20 Effect of State Laws

            16k1.20(5) k. Torts in general; workers' compensation. Most Cited Cases

**Insurance 217 🗝1113**

217 Insurance
   217III What Law Governs
      217III(B) Preemption; Application of State
or Federal Law
         217k1102 Particular Laws or Activities
            217k1113 k. Maritime matters. Most
Cited Cases
      (Formerly 217k512(1))

**Insurance 217 🗝2261**

217 Insurance
   217XVII Coverage--Liability Insurance
      217XVII(A) In General
         217k2261 k. Public policy limitations in
general. Most Cited Cases
      (Formerly 217k512(1))

   Law of state having greatest interest in resolution of issue should have been applied, rather than
general maritime law, when determining whether
injured seaman could recover punitive damages
from insurer for company that chartered liftboat
which capsized, injuring seaman; there is no specific and controlling federal rule disallowing recovery
of punitive damages from an insurer in general
maritime law cases.

**\*666** Michel P. Wilty, Robert Burke Keaty, Keaty
& Keaty, Lafayette, La., for Mr. & Mrs. Albert
Taylor, Jr.

Paul N. Vance, Winston Edward Rice, Jon Wesley
Wise, Rice, Fowler, Kingsmill, Vance, Flint &
Booth, New Orleans, La., for appellees.

Appeal from the United States District Court for the
Eastern District of Louisiana.

Before SMITH and EMILIO M. GARZA, Circuit

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

972 F.2d 666, 1994 A.M.C. 607
**(Cite as: 972 F.2d 666)**

Judges, and RAINEY, [FN*] District Judge.

> [FN*] District Judge of the Southern District of Texas, sitting by designation.

**\*667** EMILIO M. GARZA, Circuit Judge:

This is an appeal from a summary judgment. Albert Taylor, Jr. and his wife [FN1] originally filed suit against Lloyd's Underwriters, Institute of London Underwriters, and Underwriters at Lloyd's, London (collectively "Lloyd's") in Louisiana state court, which Lloyd's later removed to federal court. In this action, Taylor sought a judicial declaration that an earlier federal court punitive damages award in his favor and against Drynorth (USA), Inc. was recoverable from Lloyd's, Drynorth's insurer. The district court, concluding that general maritime law prohibits the collection of punitive damages from an insurance company, granted Lloyd's motion for summary judgment. Taylor now appeals. Finding that the district court erred in applying general maritime law to this dispute, we reverse and remand.

> FN1. Mr. Taylor has since passed away, and Mrs. Taylor is pursuing this action. The plaintiffs will be referred to as "Taylor".

I

On October 16, 1985, the DMC-1-a liftboat chartered to Drynorth-capsized in the Gulf of Mexico. As a result of the capsize, Taylor and several other seamen were injured. Alleging that the DMC-1 was unseaworthy, Taylor brought suit against Drynorth in federal court under general maritime law. Following trial, the jury returned a verdict, assessing $751,780 in compensatory damages and $500,000 in punitive damages against Drynorth. Drynorth has not operated since 1986 and, at all times relevant to the events surrounding this dispute, Drynorth has been insolvent. Accordingly, Drynorth's insurers paid the majority of the compensatory damages award and will be responsible for the payment of any punitive damages award.

Taylor subsequently filed a declaratory judgment action in Louisiana state court against Lloyd's, seeking a declaration that the three insurance policies [FN2] Lloyd's issued to Drynorth provide coverage for punitive damages and that Lloyd's is required to pay the damages award assessed against Drynorth. Lloyd's removed the case to federal court, and the parties filed cross motions for summary judgment. Lloyd's argued that coverage for punitive damages does not exist under any of the three insurance policies covering Drynorth at the time of the DMC-1's capsize. Taylor maintained, however, that the Comprehensive General Liability Insurance (CGL) policy provides coverage for punitive damages. [FN3]

> FN2. The three insurance policies are: (i) Policy/Certificate number 22191-the Comprehensive General Liability Insurance policy; (ii) Policy/Certificate number 11877-the Excess Marine Liability Insurance policy; and (iii) Policy/Certificate number 22188-the Protection and Indemnity Insurance policy.

> FN3. The CGL policy states in part that:

>> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [a] bodily injury or [b] property damages to which this insurance applies, caused by an occurrence ..., but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

>> Record Excerpts at tab 5, *Taylor v. Lloyd's,* No. 91-3629 (5th Cir. filed Oct. 22, 1991).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

972 F.2d 666, 1994 A.M.C. 607
**(Cite as: 972 F.2d 666)**

Although the district court set forth the language of the CGL policy in its Order and Reasons, the district court did not analyze the language of any of the insurance policies to determine whether the language provided coverage for punitive damages; instead, the district court concluded that it had to first determine whether to apply Louisiana state law or general maritime law to the dispute. Concluding that general maritime law applies and that maritime law disallows the recovery of punitive damages from an insurance company, the district court granted Lloyd's motion for summary judgment.

## II

Taylor argues that, because Lloyd's removed this case to federal court on the basis of diversity jurisdiction, the district court, in its capacity as an *Erie*[FN4] court, **\*668** should have applied Louisiana law. Taylor argues that the district court erred in applying maritime law and in granting Lloyd's motion for summary judgment. Lloyd's, on the other hand, maintains that the dispute is a maritime matter, and contends that the district court properly applied general maritime law to disallow the collection of the punitive damages award from Lloyd's.

FN4. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

In determining the applicable law governing the interpretation of the CGL policy, our analysis begins with *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).[FN5] In *Wilburn Boat,* the Supreme Court determined that there was no federal admiralty rule regarding the breach of warranties in marine insurance policies and that the Court would not fashion one, but would instead apply state law. *Id. at 315-16, 75 S.Ct. at 371.* Since 1955, this court, in addressing maritime cases, has interpreted *Wilburn Boat* to require "the application of state insurance law principles if there is no specific and controlling federal rule." *Truehart v. Blandon,* 884 F.2d at 226, *citing Transco Exploration Co. v. Pacific Employers Ins. Co.,* 869 F.2d 862, 863 (5th Cir.1989); *see*

*also Ingersoll-Rand Fin. Corp. v. Employers Ins.,* 771 F.2d 910, 911-12 (5th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 573 (1986) ("[T]he interpretation of a contract of marine insurance is-in the absence of a specific and controlling federal rule-to be determined by reference to appropriate state law."), *citing Wilburn Boat, supra.*

FN5. Because the CGL policy "insures against certain maritime risks and losses," it provides maritime insurance within the meaning of *Wilburn Boat, supra. See Truehart v. Blandon,* 884 F.2d 223, 226 (5th Cir.1989) (Because the "policy insures against certain maritime risks and losses ... we conclude that it provides maritime insurance within the meaning of *Wilburn Boat....*").

Lloyd's has presented this court with three cases in support of the proposition that general maritime law prohibits the collection of punitive damages from an insurance company. *See Dubois v. Arkansas Valley Dredging Co.,* 651 F.Supp. 299 (W.D.La.1987); *Smith v. Front Lawn Enterprises, Inc.,* No. 83-5147, 1987 AMC 1130 (E.D.La., Sept. 29, 1986); *Northwestern Nat'l Casualty Co. v. McNulty,* 307 F.2d 432 (5th Cir.1962). However, these cases do not establish a specific and controlling federal rule disallowing the recovery of punitive damages from an insurance company.

In *Smith,* the district court considered whether the Protection & Indemnity policy provided coverage for punitive damages claims and, after examining the insurance policy, the court found that the insurance policy in question did not provide coverage for punitive damage claims.[FN6] The *Smith* court based its decision to disallow the recovery of punitive damages on the specific language of the insurance policy at issue, reasoning that "the clear language of this portion of the policy is that payment will be made for injury or illness, thus suggesting compensatory damages." *Smith,* 1987 AMC at 1130. The district court addressed the question whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

972 F.2d 666, 1994 A.M.C. 607
**(Cite as: 972 F.2d 666)**

public policy should permit an insurance company to pay for punitive damages only in the penultimate paragraph of the two-page opinion. That paragraph states: "In conclusion, the Court notes that it has been held, in relation to an automobile liability policy, that public policy forbids an insurer and an insured to enter into an insurance contract covering punitive damages." *Id.* at 1131, *citing McNulty,* 307 F.2d at 432.

> FN6. The policy in *Smith* did not expressly enumerate coverage for punitive damage liability. The policy language read in part:
>
>> this Company hereby undertakes to pay such sums as the assured ... shall have become legally liable to pay and shall have paid on account of: Loss of life of, or injury to, or illness of, any person.
>
> *Smith,* 1987 AMC at 1130.

The issue whether punitive damages may be collected from an insurance company was also addressed by the district court in *Dubois v. Arkansas Valley Dredging Co.,* 651 F.Supp. 299 (W.D.La.1987). The *Dubois* court hypothesized that all requisites to a recovery of punitive damages were satisfied-that is, that the assured's actions were willful and wanton and that the **\*669** insurance policy provided coverage for punitive damages-but then held that, in any event, "enforcement of the insuring provisions of the policy would be contrary to public policy." *Id.* at 302. Relying on *McNulty* and *Smith,* the *Dubois* court concluded that general maritime law prohibits the collection of punitive damages from an insurance company, reasoning that public policy disallows recovery of punitive damages from an insurance company. *Id.* at 302-03.

Both district court cases rely heavily on *McNulty* FN7 to arrive at their conclusion that punitive damages are not recoverable against an insurance company under general maritime law. The thirty-year old *McNulty* decision did not even involve fed-

eral law; it was a diversity case, where the district court interpreted the public policy of Virginia and Florida. Additionally, *McNulty,* involved automobile insurance, not maritime insurance. The *Smith* court, then, while purporting to rely on *McNulty,* nevertheless primarily based its decision on the express policy language, buttressing its opinion with a citation to *McNulty.* Similarly, in *Dubois,* the court relied on both *McNulty* and *Smith* to reach its conclusion that maritime law prohibits the recovery of punitive damages from an insurance company. *See Dubois,* 651 F.Supp. at 299.

> FN7. In *McNulty,* after examining an automobile liability policy in a diversity case, the court articulated the policy behind disallowing wrongdoers to insure themselves against punitive damages, stating:
>
>> It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.
>
> *McNulty,* 307 F.2d at 440.

We find that these cases have not established a specific and controlling federal rule disallowing the recovery of punitive damages from an insurance company. The district court, therefore, should have applied the law of the state having the greatest interest in the resolution of the issues. *See Truehart v. Blandon,* 884 F.2d 223, 226 (5th Cir.1989) ("In identifying the appropriate state law to apply, we look to the state having the greatest interest in the resolution of the issues."), *citing Transco Exploration Co. v. Pacific Employers Ins. Co.,* 869 F.2d 862, 863 (5th Cir.1989). Accordingly, we find that the district court erred in granting summary judgment in favor of Lloyd's on the basis of maritime law.

III

For the foregoing reasons, we REVERSE and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

972 F.2d 666, 1994 A.M.C. 607
**(Cite as: 972 F.2d 666)**

REMAND to the district court to determine wheth-
er punitive damages may be recovered under the
appropriate state law.

C.A.5 (La.),1992.
Taylor v. Lloyd's Underwriters of London
972 F.2d 666, 1994 A.M.C. 607

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.