13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**



United States Court of Appeals,
Fifth Circuit.
Barbara S. RANDALL, On Her Own Behalf and as
Personal Representative of the Estate of the De-
cedent, Theodore F. Randall, Jr., and on the Behalf
of the Children, Rod Anthony Randall and Holly
Leann Randall, Plaintiff-Appellee,
v.
CHEVRON U.S.A., INC., et al., Defendants,
Sea Savage, Inc., Defendant-Appellant.

No. 91-9567.
Feb. 11, 1994.

Estate of time charterer's employee sued time
charterer and vessel owner for negligence resulting
in employee's death, and, after judgment was
entered for estate, time charterer sought indemnific-
ation from vessel owner and moved court to recon-
sider ruling that charterer was not covered by mar-
ine insurance policy. The United States District
Court for the Eastern District of Louisiana, Morey
L. Sear, Chief Judge, 788 F.Supp. 1391, found that
charterer was entitled to indemnification, and at
788 F.Supp. 1398, ordered insurance coverage. Ap-
peals were taken. The Court of Appeals, King, Cir-
cuit Judge, held that: (1) employee injured while
transiently or fortuitously on actual navigable wa-
ters was covered under Longshore and Harbor
Workers' Compensation Act (LHWCA); (2) evid-
ence supported assignment of 75 percent of fault in
employee's death to vessel sent to attempt evacu-
ation of fixed platform; and (3) time charterer was
not entitled to indemnification from vessel for dam-
ages which were attributable to time charterer's
own negligence.

Affirmed in part; reversed and remanded in
part.

Robert M. Parker, District Judge, sitting by
designation, filed opinion concurring in part and

dissenting in part.

West Headnotes

**[1] Federal Courts 170B ☞776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial de novo. Most Cited
Cases

**Federal Courts 170B ☞850.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)5 Questions of Fact, Verdicts
and Findings
        170Bk850 Clearly Erroneous Findings
of Court or Jury in General
          170Bk850.1 k. In general. Most
Cited Cases
  (Formerly 170Bk850)
  Reviewing court accepts factual findings of
district judge unless they are clearly erroneous, but
reviews de novo district judge's conclusions of law.

**[2] Federal Courts 170B ☞776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial de novo. Most Cited
Cases
  Interpretation of indemnity clause and insur-
ance policy is reviewed de novo on appeal.

**[3] Admiralty 16 ☞1.20(2)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

16k1.20 Effect of State Laws

16k1.20(2) k. Contracts in general; insurance. Most Cited Cases

Construction of maritime contracts is governed by federal maritime law.

**[4] Admiralty 16 ⟺1.20(2)**

16 Admiralty

16I Jurisdiction

16k1.10 What Law Governs

16k1.20 Effect of State Laws

16k1.20(2) k. Contracts in general; insurance. Most Cited Cases

Although federal law governs interpretation of marine insurance contracts, court applies law of state in which marine insurance contract was issued and delivered if there is no federal law, legislative or judicial, relating to question.

**[5] Workers' Compensation 413 ⟺260**

413 Workers' Compensation

413V Employees Within Acts

413V(B) Particular Classes of Persons in General

413k260 k. Seamen, fishermen, stevedores, and other maritime employees. Most Cited Cases

For purposes of compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA), "employee" is any person engaged in maritime employment, including any longshoreman or other person engaged in longshoreman operations, and any harbor worker including ship repairman, shipbuilder, and ship-breaker. Longshore and Harbor Workers' Compensation Act, § 2(3), 33 U.S.C.A. § 902(3).

**[6] Workers' Compensation 413 ⟺2085**

413 Workers' Compensation

413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses

413XX(A) Between Employer and Employee

413XX(A)1 Exclusiveness of Remedies

Afforded by Acts

413k2085 k. Federal acts. Most Cited Cases

As general rule, Longshore and Harbor Workers' Compensation Act (LHWCA) imposes on employer liability for benefits payable to injured worker, and employer is thus generally immune from injured worker's potential tort suits. Longshore and Harbor Workers' Compensation Act, §§ 2(3), 4(a), 7-9, 33 U.S.C.A. §§ 902(3), 904(a), 907-909.

**[7] Shipping 354 ⟺50**

354 Shipping

354III Charters

354k50 k. Expenditures and liabilities incurred. Most Cited Cases

**Shipping 354 ⟺84(1)**

354 Shipping

354V Rights and Liabilities of Vessels and Owners in General

354k78 Torts

354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees

354k84(1) k. In general; liability. Most Cited Cases

**Workers' Compensation 413 ⟺2085**

413 Workers' Compensation

413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses

413XX(A) Between Employer and Employee

413XX(A)1 Exclusiveness of Remedies Afforded by Acts

413k2085 k. Federal acts. Most Cited Cases

Under Longshore and Harbor Workers' Compensation Act (LHWCA), injured longshoreman lacks right to bring unseaworthiness claim but has right to recover for negligence of a "vessel," which includes vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, of-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

ficer, or crew member. Longshore and Harbor Workers' Compensation Act, §§ 2(21), 5(b), 33 U.S.C.A. §§ 902(21), 905(b).

**[8] Shipping 354 ☞84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
        354k84(1) k. In general; liability. Most Cited Cases

Accident is covered by Longshore and Harbor Workers' Compensation Act (LHWCA) if injury occurs at covered location or "situs" and if injured party is person engaged in "maritime employment." Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[9] Shipping 354 ☞84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
        354k84(1) k. In general; liability. Most Cited Cases

Coverage under Longshore and Harbor Workers' Compensation Act (LHWCA) is available for workers injured while transiently or fortuitously on actual navigable waters. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[10] Shipping 354 ☞84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees

        354k84(1) k. In general; liability. Most Cited Cases

Mechanic who was killed while being evacuated from fixed platform in Gulf of Mexico met "status" requirement of maritime employment for coverage under Longshore and Harbor Workers' Compensation Act (LHWCA) where he was injured and killed during attempted evacuation from platform to vessel even if he was only "transiently or fortuitously" on actual navigable waters. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[11] Shipping 354 ☞50**

354 Shipping
   354III Charters
     354k50 k. Expenditures and liabilities incurred. Most Cited Cases

**Shipping 354 ☞84(1)**

354 Shipping
   354V Rights and Liabilities of Vessels and Owners in General
     354k78 Torts
       354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
        354k84(1) k. In general; liability. Most Cited Cases

Under Longshore and Harbor Workers' Compensation Act (LHWCA), injured longshoreman could bring suit against vessel and against charter or bare boat charterer. Longshore and Harbor Workers' Compensation Act, § 2(21), 33 U.S.C. § 902(21).

**[12] Shipping 354 ☞50**

354 Shipping
   354III Charters
     354k50 k. Expenditures and liabilities incurred. Most Cited Cases

**Shipping 354 ☞84(5)**

354 Shipping

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

354V Rights and Liabilities of Vessels and Owners in General
354k78 Torts
354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
354k84(5) k. Contributory or comparative negligence; assumption of risk. Most Cited Cases

Finding that negligence was committed by one entity defined as "vessel" in Longshore and Harbor Workers' Compensation Act (LHWCA) does not preclude finding that another such entity, such as a charterer, was also contributorily negligent. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[13] Shipping 354 ⟨50**

354 Shipping
354III Charters
354k50 k. Expenditures and liabilities incurred. Most Cited Cases

Time charterer may be held liable under Longshore and Harbor Workers' Compensation Act (LHWCA) for injuries to longshoremen resulting from vessel being put to sea in dangerous weather at order of charterer; charterer may breach duty of care if it forces vessel under charter out in treacherous conditions. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[14] Shipping 354 ⟨86(2.5)**

354 Shipping
354V Rights and Liabilities of Vessels and Owners in General
354k78 Torts
354k86 Actions
354k86(2.1) Evidence
354k86(2.5) k. Weight and sufficiency. Most Cited Cases

Evidence supported assignment of 75 percent of fault in employee's death to vessel sent to attempt evacuation of fixed platform; captain did not post crewmembers near vessel's stern where em-

ployees would be boarding, no life ring was easily accessible, and captain moved vessel so far from employee that seaman would not throw him life ring. Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.

**[15] Shipping 354 ⟨84(5)**

354 Shipping
354V Rights and Liabilities of Vessels and Owners in General
354k78 Torts
354k84 Injuries to Stevedores and Other Independent Contractors and Their Employees
354k84(5) k. Contributory or comparative negligence; assumption of risk. Most Cited Cases

It was not erroneous for district court to assign no degree of fault to employee who drowned after failed attempt to evacuate him from fixed platform in light of eyewitness testimony that employee swung from platform properly and that vessel moved away from employee as soon as he fell overboard.

**[16] Federal Courts 170B ⟨871**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)5 Questions of Fact, Verdicts and Findings
170Bk870 Particular Issues and Questions
170Bk871 k. Damages and extent of relief. Most Cited Cases

Trial judge's assessment of damages is finding of fact and is reviewed under clearly erroneous standard.

**[17] Damages 115 ⟨127.3**

115 Damages
115VII Amount Awarded
115VII(A) In General
115k127.3 k. Excessive damages in gen-

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

eral. Most Cited Cases

(Formerly 115k128)

Award is disproportionate to injury sustained if it is so large that it shocks judicial conscience or indicates passion, prejudice, corruption, bias, or another improper motive.

**[18] Federal Civil Procedure 170A ⚷2377**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(C) Proceedings
      170Ak2377 k. Remittitur. Most Cited Cases

If award is disproportionate to injury, remittitur will be ordered in accordance with "maximum recovery rule," which requires that award be reduced to maximum amount jury could properly have awarded.

**[19] Death 117 ⚷99(2)**

117 Death
  117III Actions for Causing Death
    117III(H) Damages or Compensation
      117k94 Measure and Amount Awarded
      117k99 Excessive Damages
        117k99(2) k. Suffering of deceased. Most Cited Cases

Award of $1,000,000 for pain and suffering of mechanic who drowned during attempted evacuation of fixed platform in Gulf of Mexico had to be reduced to $500,000; mechanic's pain and suffering, although extreme, could have lasted no longer than 25 minutes.

**[20] Death 117 ⚷88**

117 Death
  117III Actions for Causing Death
    117III(H) Damages or Compensation
      117k80 Elements of Compensation
        117k88 k. Loss of society. Most Cited Cases

In action brought under Longshore and Harbor Workers' Compensation Act (LHWCA), family of

longshoreman who was killed during attempted evacuation of fixed platform during treacherous weather could be awarded damages for loss of society.

**[21] Death 117 ⚷88**

117 Death
  117III Actions for Causing Death
    117III(H) Damages or Compensation
      117k80 Elements of Compensation
        117k88 k. Loss of society. Most Cited Cases

**Husband and Wife 205 ⚷209(3)**

205 Husband and Wife
  205VI Actions
    205k206 Rights of Action by Husband or Wife or Both
      205k209 For Torts
        205k209(3) k. Personal injuries to wife resulting in loss of services or consortium, impairment of earning capacity, or expenses. Most Cited Cases

**Husband and Wife 205 ⚷209(4)**

205 Husband and Wife
  205VI Actions
    205k206 Rights of Action by Husband or Wife or Both
      205k209 For Torts
        205k209(4) k. Personal injuries to husband. Most Cited Cases

Loss of society damages which relatives of injured or killed longshoremen may recover are not unequivocally limited to children who are financially dependent on deceased parent.

**[22] Death 117 ⚷88**

117 Death
  117III Actions for Causing Death
    117III(H) Damages or Compensation
      117k80 Elements of Compensation
        117k88 k. Loss of society. Most Cited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

Cases

District court's finding that adult son of deceased longshoreman was financially dependent on the longshoreman, and thus could recover loss of society damages, was not clearly erroneous in view of evidence that the son had dropped out of college, was living at home, and had worked for his father, notwithstanding the fact that he was not claimed as a dependent on the father's income tax returns.

**[23] Death 117 🔑32**

117 Death
    117III Actions for Causing Death
        117III(A) Right of Action and Defenses
            117k32 k. Persons for whose benefit suit may be maintained. Most Cited Cases

**Death 117 🔑88**

117 Death
    117III Actions for Causing Death
        117III(H) Damages or Compensation
            117k80 Elements of Compensation
                117k88 k. Loss of society. Most Cited Cases

When family unit is maintained by dependence on single-family member, each dependent may recover for losses including loss of society in wrongful death claim under general maritime law.

**[24] Admiralty 16 🔑1.20(2)**

16 Admiralty
    16I Jurisdiction
        16k1.10 What Law Governs
            16k1.20 Effect of State Laws
                16k1.20(2) k. Contracts in general; insurance. Most Cited Cases

As maritime contract, time charter is governed by federal law.

**[25] Indemnity 208 🔑27**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts

            208k27 k. In general. Most Cited Cases
    (Formerly 208k3)

Indemnity agreements are valid and enforceable under federal law.

**[26] Indemnity 208 🔑31(5)**

208 Indemnity
    208II Contractual Indemnity
        208k31 Construction and Operation of Contracts
            208k31(5) k. Liberal or strict construction. Most Cited Cases
    (Formerly 208k6)

Indemnity provisions are not construed more generously in favor of indemnity under federal law than under Louisiana law.

**[27] Insurance 217 🔑2260**

217 Insurance
    217XVII Coverage--Liability Insurance
        217XVII(A) In General
            217k2260 k. In general. Most Cited Cases
    (Formerly 217k433.1, 217k433(1))

Damages caused by indemnitee's own negligence are not covered by indemnity provision of insurance contract.

**[28] Indemnity 208 🔑33(8)**

208 Indemnity
    208II Contractual Indemnity
        208k33 Particular Cases and Issues
            208k33(8) k. Maritime cases. Most Cited Cases
    (Formerly 208k8.1(2.1))

Time charterer was not entitled to indemnification from vessel for damages owed family of longshoreman killed during evacuation attempt where damages were attributable to time charterer's own negligence in ordered rescue by vessel in treacherous weather.

**[29] Insurance 217 🔑2272**

217 Insurance

© 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

217XVII Coverage--Liability Insurance
217XVII(A) In General
217k2272 k. Persons covered. Most Cited Cases
(Formerly 217k416)

Time charterer's liability for death of longshoreman was incurred as "owner" within meaning of protection and indemnification policy issued to vessel naming time charterer as additional insured, even though definition of "owner" within meaning of policy was different from definition under Longshore and Harbor Workers' Compensation Act (LHWCA), where charterer exercised right to direct vessel's movements.

**[30] Insurance 217 ⬡2367**

217 Insurance
217XVII Coverage--Liability Insurance
217XVII(B) Coverage for Particular Liabilities
217k2365 Ocean Marine Liabilities
217k2367 k. Scope of coverage. Most Cited Cases
(Formerly 217k416)

Time charterer commits negligence "as owner" of vessel within meaning of marine protection and indemnification policy where time charterer negligently exercises right to direct vessel's movement.

**[31] Indemnity 208 ⬡33(8)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(8) k. Maritime cases. Most Cited Cases
(Formerly 208k9(2), 208k8.1(2.1))

**Indemnity 208 ⬡36**

208 Indemnity
208II Contractual Indemnity
208k34 Scope and Extent of Liability
208k36 k. Costs and expenses. Most Cited Cases

(Formerly 208k9(2))

**Indemnity 208 ⬡37**

208 Indemnity
208II Contractual Indemnity
208k34 Scope and Extent of Liability
208k37 k. Attorney fees. Most Cited Cases
(Formerly 208k9(2))

Time charterer was not entitled to indemnification from vessel for any losses suffered by time charterer as result of its own negligence, including costs and attorneys' fees incurred in connection with claims by longshoreman's widow for punitive damages.

**[32] Insurance 217 ⬡2269**

217 Insurance
217XVII Coverage--Liability Insurance
217XVII(A) In General
217k2267 Insurer's Duty to Indemnify in General
217k2269 k. Insured's liability for damages. Most Cited Cases
(Formerly 217k512(1))

Under Louisiana law, applied in absence of controlling federal rule, punitive damages were covered by protection and indemnification policy issued to vessel with time charterer listed as additional insured so that time charterer could recover its costs and attorney fees expended in defending claim for punitive damages brought against it by longshoreman's widow.

**[33] Federal Courts 170B ⬡714**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(H) Briefs
170Bk714 k. Specification of errors; points and arguments. Most Cited Cases

Bald assertion by vessel that time charterer's attorney fees were excessive was not sufficient to allow review of award of fees; vessel had to give

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

reasons and logical argument as well as state claim.

**\*891** J. Frederick Kessenich, John F. Emmett, Emmett, Cobb, Waits & Kessenich, New Orleans, LA, for American Home Assur. Co. and Sea Savage, et al.

Randy J. Ungar, Jennifer F. Nicaud, New Orleans, LA, for Randall.

Neal D. Hobson, John R. Santa Cruz, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, LA, for Chevron.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before KING and JOLLY, Circuit Judges and PARKER,[FN*] District Judge.

> FN* Chief Judge of the Eastern District of Texas, sitting by designation.

KING, Circuit Judge:

Theodore F. Randall, an employee of Chevron, U.S.A., Inc. ("Chevron"), drowned after unsuccessfully attempting a swing rope transfer from a fixed platform in the Gulf of Mexico to the M/V SEA SAVAGE. Randall's widow, Barbara Randall, brought suit individually, on behalf of Randall's estate, and on behalf of their children against Chevron and Sea Savage, Inc. ("Sea Savage"). The matter was tried to the court, and the court entered judgment against the defendants. This appeal followed.[FN1]

> FN1. After the parties filed their briefs, the Randalls settled with Sea Savage and its underwriters and assigned their claims to them. Thus, Sea Savage and its underwriters have taken the place of the Randalls on this appeal. As will be seen, however, they have not adopted all the legal positions taken by the Randalls at trial.

## I.

### Factual Background

This case arises from the tragic death of Theodore F. Randall, a mechanic employed by Chevron on its fixed platforms in the Gulf of Mexico. On July 31, 1989, Randall was on Chevron's West Delta Field Block 27 P-1 platform, a fixed structure located off the coast of Louisiana but within Louisiana territorial waters. At the time, a tropical storm was known to be approaching the West Delta area.

The M/V SEA SAVAGE was a 100-foot vessel owned and operated by Sea Savage and certified by the United States Coast Guard as a passenger vessel. Chevron entered into a time charter with Sea Savage on January 1, 1989, to obtain the services of the vessel in the operation of Chevron's platforms in the West Delta Block 27 oil field. The time charter provided that Sea Savage would man, operate, and navigate the vessel, while Chevron would assign the vessel its tasks. Sea Savage was required to provide liability insurance naming Chevron as an additional insured, and Sea Savage did in fact procure some $5,000,000 of protection and indemnity coverage naming Chevron as an additional insured.

At 2:30 a.m. on July 31, 1989, the SEA SAVAGE set out on its regularly scheduled cargo run in the West Delta field. Captain Dalton Parker was in command of the vessel. By 10:06 a.m., the tropical storm had been upgraded to a hurricane, and Chevron's operations manager ordered an evacuation of the West Delta field. Before proceeding to the **\*892** P-1 platform, the SEA SAVAGE carried personnel to other platforms to secure them in preparation for evacuation. Several swing rope transfers to and from these platforms were safely accomplished. As weather conditions deteriorated, it became unsafe to make further swing rope transfers to and from the smaller satellite platforms. Captain Parker testified that he requested to be released from further tasks in the field because he thought his mission had been completed. Jim Howell, the area foreman in the West Delta field, asked Captain Parker to proceed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217

**(Cite as: 13 F.3d 888)**

to West Delta Field Block 27 to provide any necessary assistance in the evacuation.

The SEA SAVAGE arrived at the P-1 platform at approximately 10:45 a.m. Witnesses estimated that the seas were between six and eight feet at the time and that the winds were some 35 miles per hour. Three workers, including Randall, were waiting to be evacuated. Captain Parker backed the SEA SAVAGE next to the platform and, following standard procedures, held the stern at an angle to the platform. Randall was the first to attempt the swing transfer. He grasped the swing rope and swung to the deck of the vessel. What happened next is not clear, but it appears that Randall landed on his feet as the vessel rose with a swell, causing the swing rope to go slack. Randall continued to hold onto the rope, and as the vessel fell with the waves the rope went taut. Randall was then pulled back off the vessel. Randall lost his grip on the rope and fell into the water.

Deckhand Paul Nash witnessed the episode and immediately ran some fifty feet to the rear of the SEA SAVAGE's pilothouse to retrieve the life ring. Captain Parker was aware of Randall's fall and immediately put the vessel into gear, moving the vessel forward and away from Randall. He testified that moving towards Randall would have risked sucking Randall into the propellers or crushing him against the platform. Randall, a strong swimmer, managed to swim to one of the platform's legs. He clung to the leg as best he could in the rough water for some twenty-five minutes. Efforts to save Randall with a life ring thrown from the SEA SAVAGE were unsuccessful. At last Randall let go of the platform, slumped over, and drowned. He floated out from under the platform and was recovered by deckhand Nash. His body was lacerated, apparently from being thrown against the barnacle-encrusted leg of the platform by the waves. The remaining Chevron employees were evacuated by helicopter.

*Procedural History*

On October 2, 1989, Barbara Randall, both individually and as personal representative of the es-

tate of her deceased husband and their two children, commenced this action in the United States District Court for the Eastern District of Louisiana seeking wrongful death and survival damages under the Jones Act, 46 U.S.C.App. § 688, and the general maritime law against Chevron and the SEA SAVAGE. Sea Savage filed a complaint for exoneration from or limitation of liability, claiming it was entitled to limit its liability to the value of the SEA SAVAGE and her pending freight. On January 25, 1990, this matter was consolidated with the Randall lawsuit for trial. Chevron answered and filed a cross-claim against Sea Savage seeking indemnification, costs, and attorneys' fees in connection with the Randall lawsuit. Chevron also filed a third-party complaint against the underwriters supplying the insurance coverage to Chevron as an additional insured pursuant to Chevron's time charter with Sea Savage.

On March 30, 1990, Chevron moved for summary judgment on plaintiff's Jones Act and punitive damages claims. By minute entry dated July 26, 1990, the district court dismissed the Jones Act claims, finding that Randall could not be considered a Jones Act seaman because he was never assigned to any vessel and worked exclusively on fixed platforms. The court did not dismiss plaintiff's general maritime or punitive damages claims.

On March 26, 1991, Chevron moved for partial summary judgment, arguing that the court should dismiss all of the plaintiff's claims except for those claims stated under § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.,* and/or the exclusive remedy provisions of the Louisiana Workers' **\*893** Compensation Statute. Barbara Randall and Sea Savage opposed Chevron's motion. Following oral argument on October 30, 1991, the district court found "that Mr. Randall was a longshoreman or harbor worker within the meaning of the Longshore and Harbor Workers' Compensation Act." FN2 The district court also granted the underwriters' motions

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

to dismiss Chevron's claims against them prior to trial on the ground that the insurance policies naming Chevron as an additional insured did not cover the claims being asserted against Chevron.

> FN2. Strangely, the pre-trial order filed on November 5, 1991, listed as a contested issue of law "[w]hether Louisiana, General Maritime and/or LSHWA Law applies" ("LSHWA" being another acronym occasionally used in lieu of "LHWCA"). However, after judgment was entered in favor of Mrs. Randall, the district court reiterated that it had "previously held that Mr. Randall was covered by the Longshore and Harbor Worker's Compensation Act." *Randall v. Chevron U.S.A., Inc.,* 788 F.Supp. 1391, 1397 (E.D.La.1992).

The bench trial commenced on November 12, 1991. At the conclusion of the trial on November 14, 1991, the district court rendered oral reasons for judgment from the bench. The court found Sea Savage and the crew of the SEA SAVAGE 75% liable in causing the accident. Among other things, the district court found that Sea Savage was negligent in failing to train the captain and crew of the SEA SAVAGE properly in lifesaving procedures, in failing to place a life ring near the jump station of the vessel, and for the failure of the SEA SAVAGE's captain and crew to follow accepted rescue procedures after Randall fell into the water. The court further held that Sea Savage was not entitled to its requested limitation of liability because of its failure to properly train the captain and crew of the vessel, to require drills in rescue procedures, and to ensure that the captain was competent. The court held Chevron 25% liable for directing the vessel to remain in and encounter the treacherous weather conditions that then existed.

With respect to damages, the district court made the following awards to the Randalls: $66,725 for past lost wages; $309,177 for lost future support; and $30,395 for loss of personal services. Under the heading of "loss of society" damages, the court awarded $300,000 to Mrs. Randall, $100,000 to Randall's adult son Rod Randall, and $150,000 to Randall's daughter Holly Randall. The court awarded $1,000,000 for Randall's pain and suffering and $3,897 for funeral expenses. The claim for punitive damages was denied.

The district court took under advisement Chevron's claim against Sea Savage for contractual indemnity. By minute entry filed February 19, 1992, the district court ruled that Chevron was entitled to contractual indemnity from Sea Savage under the terms of the time charter. This decision is reported as *Randall v. Chevron U.S.A., Inc.,* 788 F.Supp. 1391 (E.D.La.1992). The district court based its decision on the holding that Chevron's liability arose in its capacity as time charterer of the vessel, thus coming within the indemnity provision in the time charter. *Id.* at 1395. Chevron had also moved post-trial for reconsideration of the dismissal of its claims against the underwriters for insurance coverage, and on March 16, 1992, the district court ruled that the plaintiff's claims against Chevron did come within the insurance coverage provided to Chevron by the underwriters. This decision is reported as *Randall v. Chevron U.S.A., Inc.,* 788 F.Supp. 1398 (E.D.La.1992).

On March 19, 1992, judgment was entered in favor of Chevron for indemnity and insurance coverage. The district judge referred the issue of the appropriate amount of costs and attorneys' fees to award Chevron to a magistrate judge. On July 7, 1992, the district court found that the fees and expenses incurred by Chevron in defending the plaintiff's claims were fair and reasonable and awarded reimbursement for those fees. The court denied reimbursement, however, for those fees and expenses spent in defense of the punitive damages claim.

After the notices of appeal and briefs were filed, Sea Savage and its various insurance underwriters entered into a settlement agreement with the plaintiff on April 22, 1993, which included a complete assignment of all plaintiff's claims in this mat-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

ter to Sea Savage and its underwriters. Thus, Sea Savage**\*894** and its underwriters now stand in the place of Mrs. Randall vis-a-vis Chevron. FN3

> FN3. According to Sea Savage, the only issue mooted by the settlement is Sea Savage's claim before the district court that it was entitled to limit its liability as vessel owner.

## II.

*Standard of Review and Choice of Law*

[1][2] This court accepts the factual findings of the district judge unless they are clearly erroneous. However, we may review de novo a district court's conclusions of law. *Halferty v. Pulse Drug Co.,* 864 F.2d 1185, 1188 (5th Cir.1989). Interpretation of the indemnity clause that is involved in this action presents a matter of law that is reviewable de novo on appeal. *Smith v. Tenneco Oil Co.,* 803 F.2d 1386, 1388 (5th Cir.1986) (citing *Kemp v. Gulf Oil Corp.,* 745 F.2d 921, 924 (5th Cir.1984)). District court interpretations of insurance policies are also reviewed de novo. *Harbor Ins. Co. v. Urban Constr. Co.,* 990 F.2d 195, 199 (5th Cir.1993).

[3][4] Construction of maritime contracts is governed by federal maritime law. *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 538 (5th Cir.1986). Although federal law governs the interpretation of marine insurance contracts, we apply the law of the state where the marine insurance contract was issued and delivered if there is no federal law, legislative or judicial, relating to the question. *Elevating Boats, Inc. v. Gulf Coast Marine, Inc.,* 766 F.2d 195, 198 (5th Cir.1985).

## III.

A. *Was Randall a "maritime employee" within the meaning of the LHWCA?*

The first issue presented for our decision is whether the district court correctly held that Randall was a "maritime employee" and thus that his widow was entitled to proceed under the LHWCA rather than under Louisiana's workers' compensation statute. Both Chevron and Sea Savage argue

that the district court erred and that Randall was not covered by the LHWCA. Mrs. Randall, before she settled out of this case, argued the opposite position. FN4

> FN4. The threshold determination of whether Randall was covered by the LHWCA may have an impact on the outcome of several other issues in this case. The availability of loss of society damages may depend on whether or not Randall was a longshoreman. Sea Savage, although it now stands in Mrs. Randall's shoes for our purposes, has chosen to continue to argue against LHWCA coverage in the apparent belief that reversal on this issue would necessitate a remand for redetermination of its and Chevron's comparative negligence. We note, however, that the district court apportioned 100% of the liability between Chevron in its capacity as "vessel" and Sea Savage, suggesting that Chevron was not liable in any other capacity and that no reapportionment of negligence would be necessary. Chevron argues against LHWCA coverage in the apparent belief that Louisiana workers' compensation law would provide the exclusive remedy to the Randalls should we decide that the LHWCA does not apply. *But see Thibodaux v. Atlantic Richfield Co.,* 580 F.2d 841, 846-47 (5th Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). We express no view on the merits of these various arguments.

[5][6] A brief overview of the LHWCA is in order. The coverage section of the LHWCA provides that compensation shall be payable upon the disability or death of an employee "if the disability or death results from an injury occurring on the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). With certain exclusions not relevant to the instant case, the term "employee" is defined as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." *Id.* § 902(3). As a general rule, the LHWCA imposes liability for benefits payable to an injured worker upon the employer. *Id.* § 904(a). This is the exclusive liability of the employer *qua* employer, so the employer is generally immune from the injured worker's potential tort suits. *Id.* § 905(a). The specific benefits to which the injured longshoreman is entitled are defined in the LHWCA. *Id.* §§ 907-09.

**\*895** [7] Prior to 1972, a worker covered by the LHWCA who was injured while loading or unloading a ship was entitled both to compensation payments and to judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence. *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 164, 101 S.Ct. 1614, 1620, 68 L.Ed.2d 1 (1981). Section 905(b) of the LHWCA, added in the 1972 Amendments to that statute, abolishes the injured longshoreman's unseaworthiness claim but preserves his right to recover for the "negligence of a vessel." 33 U.S.C. § 905(b); *Scindia,* 451 U.S. at 165, 101 S.Ct. at 1621; *May v. Transworld Drilling Co.,* 786 F.2d 1261, 1264 (5th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986). The term "vessel" in this context includes the vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member. *Id.* § 902(21). Thus, "[w]hen an employer acts in a dual capacity as vessel owner, the entity retains its immunity for acts taken in its capacity as an employer, but may still be sued 'qua vessel' for acts of vessel negligence." *Levene v. Pintail Enters., Inc.,* 943 F.2d 528, 531 (5th Cir.1991) (citing *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 532, 103 S.Ct. 2541, 2548, 76 L.Ed.2d 768 (1983); *Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc.,* 830

F.2d 1332, 1339 (5th Cir.1987)), *cert. denied,* --- U.S. ----, 112 S.Ct. 2274, 112 S.Ct. 2274, 119 L.Ed.2d 201 (1992).

[8] The issue of whether Randall's accident is one covered by the LHWCA turns on whether he satisfies the two-pronged test set forth in that statute. First, his injury must have occurred at a covered location or "situs." *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 415-16, 105 S.Ct. 1421, 1423, 84 L.Ed.2d 406 (1985). Second, he must meet the "status" test of being a person engaged in "maritime employment," a term not defined by the LHWCA. *Id.* The "status" test is the source of difficulty in the instant case.

Our analysis of the "status" issue begins with the Supreme Court's decision in *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). In that case, plaintiff Carmelo Blundo was employed as a "checker," or one responsible for checking and recording cargo as it was loaded onto or unloaded from vessels, barges or containers. *Id.* at 252-53, 97 S.Ct. at 2351-52. While working on a pier, Blundo slipped on some ice and was injured. *Id.* at 253, 97 S.Ct. at 2352. Plaintiff Ralph Caputo was a member of a longshoring "gang," and he was injured while loading a truck with cargo that had been discharged from a vessel. *Id.* at 254-55. The Court held that both plaintiffs satisfied the "status" test under the LHWCA, Blundo because the task was "an integral part of unloading process" and Caputo because "he was injured in the old-fashioned process of putting goods already unloaded from a ship or container into a delivery truck." *Id.* at 256, 271-72, 103 S.Ct. at 2353, 2361. Thus, as it would in future cases, the Court focused on the nature of the workers' employment and its connection with the loading and unloading of vessels as a key issue in deciding whether the "status" test was met.

The next case in which the Supreme Court addressed the "status" test was *Director, Office of Workers' Compensation Programs v. Perini N. River Assocs.,* 459 U.S. 297, 103 S.Ct. 634, 74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

L.Ed.2d 465 (1983). The injured worker in *Perini,* Raymond Churchill, was employed in the construction of a sewage treatment plant extending over the Hudson River. *Id.* at 300, 103 S.Ct. at 638. His job was to supervise operations on a cargo barge, and he was injured while standing on the deck of the barge. *Id.* The Court held that Churchill, as an employee injured upon navigable waters in the course of his employment, could meet the "status" test without showing that his employment possessed a direct or substantial relation to navigation or commerce. *Id.* at 318-19, 103 S.Ct. at 647-48. Although the Court expressly recognized that "the status requirement is occupational and the situs test is geographic," *id.* at 324 n. 32, 103 S.Ct. at 651 n. 32, it went on to hold that "when a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement," assuming that the other requirements of the LHWCA are met. *Id.* at 324, 103 S.Ct. at 651. The Court emphasized that such workers are "engaged in maritime**896** employment" both because they are injured in historically maritime locales and because they are required to perform employment duties upon navigable waters. *Id.* Finally, the Court expressed no opinion on the issue of "whether such coverage extends to a worker injured while transiently or fortuitously upon actual navigable waters, or to a land-based worker injured on land who then falls into actual navigable waters." *Id.* at 324 n. 34, 103 S.Ct. at 651 n. 34. Under *Perini,* then, a special "status" test applies to workers who are injured while upon actual navigable waters: such a worker satisfies the "status" test simply by showing that he was injured on actual navigable waters in the course of his employment on those waters. *Id.* at 324, 103 S.Ct. at 651.

The Court again considered the contours of the "status" test in *Herb's Welding,* in which a welder employed on a fixed offshore drilling platform was injured on such a platform and sought LHWCA benefits. *Herb's Welding,* 470 U.S. at 416, 105 S.Ct. at 1423. The Court held that the welder, Robert Gray, was outside the *Perini* rule because fixed off-

shore platforms are legally equivalent to islands, *id.* at 422 & n. 6, 105 S.Ct. at 1426, and thus Gray was not "injured on navigable waters." *Id.* at 424-25 n. 10, 105 S.Ct. at 1428 n. 10. Gray was thus required to meet a different test, adumbrated by *Caputo,* based on whether Gray's employment had some connection with the loading, unloading, repair, or construction of ships. *Id.* at 423-24, 105 S.Ct. at 1427-28. As the Court recounted at length,

Gray was a welder. His work had nothing to do with the loading or unloading process, nor is there any indication that he was even employed in the maintenance of equipment used in such tasks.... He built and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment, particularly since the exploration and development of the Continental Shelf are not themselves maritime commerce.

*Id.* at 425, 105 S.Ct. at 1428 (footnote omitted). Because Gray could not meet the "status" test, the Court held that Gray was excluded from LHWCA coverage without addressing the "situs" test. *Id.* at 427, 105 S.Ct. at 1429. Again the Court expressly reserved the issue of whether the LHWCA applies to a worker injured while "transiently or fortuitously" upon navigable waters, although it noted in passing a "substantial difference between a worker performing a set of tasks requiring him to be both on and off navigable waters, and a worker whose job is entirely land-based but who takes a boat to work." *Id.* at 427 n. 13, 105 S.Ct. at 1429 n. 13.

The instant case falls within that grey area left open for later decision by the Supreme Court in *Perini* and *Herb's Welding.* Chevron and Sea Savage argue that the circumstances of Randall's death place him outside the LHWCA's ambit under *Brockington v. Certified Elec., Inc.,* 903 F.2d 1523 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991), and *West v. Chevron U.S.A., Inc.,* 615 F.Supp. 377

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

(E.D.La.1985). Mrs. Randall, on the other hand, argued that this court's decision in *Fontenot v. AWI, Inc.,* 923 F.2d 1127 (5th Cir.1991), compels the conclusion that Randall was covered by the LHWCA. We turn to the *Fontenot* case first, as we are constrained to follow indistinguishable decisions by other panels of our court absent an intervening precedent by our court sitting en banc or by the Supreme Court. *Campbell v. Sonat Offshore Drilling, Inc.,* 979 F.2d 1115, 1121 n. 8 (5th Cir.1992).

In *Fontenot,* the plaintiff, Joseph Fontenot, was a "wireline operator" employed by an oil field service company as a "pipe recovery specialist." *Fontenot,* 923 F.2d at 1128. He testified that he spent roughly equal amounts of time working on shore, on fixed platforms, and on oil exploration and production vessels. *Id.* Returning to shore from an inland barge rig located in Louisiana state waters, Fontenot was injured while unloading his equipment from the deck of a crewboat onto the dock. *Id.* The parties agreed that Fontenot satisfied the "situs" test for LHWCA coverage, because he was on the crewboat and thus the navigable waters of **\*897** the United States when he was injured, but Fontenot, desiring to pursue claims potentially more favorable than those available under the LHWCA, argued that he did not satisfy the "status" prong of the *Herb's Welding* test. *Id.* at 1129. The court held that Fontenot was a covered employee, applying the *Perini* test rather than the *Herb's Welding* test because Fontenot was injured while upon actual navigable waters in the course of his employment. *Id.* at 1133. Mrs. Randall argued that *Fontenot* is squarely on point, and that her husband's accident was covered by the LHWCA. Chevron argues that *Fontenot* is distinguishable.

[9] We believe that *Fontenot* answers, although only implicitly, the question left open in *Perini* and *Herb's Welding* in favor of LHWCA coverage for the worker injured while transiently or fortuitously on actual navigable waters. The *Fontenot* court relied on *Perini* in reaching the conclusion that Fontenot came within the ambit of the LHWCA,

stating,

> [I]f the employee was injured while on actual navigable waters, in the course of his employment, then he is engaged in maritime employment and satisfies the status test under *Perini*....

> In this case, Fontenot injured himself while on the crewboat. The crewboat was docked in actual navigable waters. Therefore, under [*Perini* ], Fontenot, at the time of his injury, satisfied the *status* requirement of the LHWCA.

*Id.* at 1130 (emphasis added). We have some difficulty with this analysis, specifically in the *Fontenot* court's conspicuous omission of the "in the course of his employment" element of *Perini* in its application of *Perini* to Fontenot's case. Part of the difficulty, however, stems from the language of *Perini* itself. In one passage in *Perini,* the Supreme Court strongly suggested that even workers who are injured on navigable waters are required to show that "they are required to perform their employment duties upon navigable waters." *Perini,* 459 U.S. at 324, 103 S.Ct. at 651 (footnote omitted); *see also Herb's Welding,* 470 U.S. at 424 n. 10, 105 S.Ct. at 1428 n. 10 (pointing out that *Perini* was "carefully limited" to coverage of an employee injured while performing his job upon actual navigable waters). Yet, at the same time, the *Perini* Court insisted that the addition of the "status" test to the LHWCA by the 1972 Amendments did not diminish the LHWCA's traditionally broad coverage of workers injured on actual navigable waters. *Perini,* 459 U.S. at 315, 323-24, 103 S.Ct. at 646, 650-51; *see also* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 428 (2d ed. 1975) (observing that, at least before the 1972 Amendments, "[w]orkers who are not seamen but who nevertheless suffer injury on navigable waters are no doubt (or so the courts have been willing to assume) engaged in 'maritime employment' ").

Had the *Fontenot* court relied on the fact that Fontenot was employed on vessels, i.e., on actual navigable waters, some thirty percent of the time as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

well as on the day of his accident, its holding would be within the *Perini* rule. Instead, the court chose to rely solely on the situs of Fontenot's injury:

> The Court [in *Herb's Welding* ] did not address the status of an oil field employee injured while in transit on navigable waterways, or one who spent a substantial period of his time working on drilling vessels, rather than fixed platforms.

> This case presents both issues. Fontenot injured himself while on a vessel in navigable waters. And Fontenot spent thirty percent of his time working on oil production vessels, and was returning from a job on such a vessel when he injured himself. We hold that *the first fact* satisfies the status test for coverage under the LHWCA, and address *but leave open* the question of whether the second would satisfy the status test.

*Id.* at 1130 (emphasis added). We understand "the first fact" to be the fact that "Fontenot injured himself while on a vessel in navigable waters." *Id.* By holding that the occurrence of an injury on actual navigable waters satisfies the "status" test, the *Fontenot* court answered the question of whether LHWCA coverage extends to workers injured while transiently or fortuitously upon actual navigable waters in the affirmative.

**\*898** Chevron's reliance on the concurring opinion in *Fontenot* is understandable but ultimately futile. The concurring judge asserted that the court was not reaching the case "of injury in transit on navigable waters of a worker on fixed platforms." *Id.* at 1134 (Higginbotham, J., concurring). The concurrence also suggests that the court's holding is based in part on Fontenot's employment on vessels and the fact that he was injured while returning from a vessel. *Id.* (Higginbotham, J., concurring). We cannot agree. The passages from the court's opinion quoted *supra* make it clear that the court relied solely on the fact that Fontenot was injured on navigable waters in finding LHWCA coverage. *See also id.* at 1132 ("Because he was on 'navigable waters', as that term was defined prior to

the 1972 Amendments to the LHWCA, Fontenot satisfied both the status and situs tests."). The court thus went beyond a mere application of *Perini* and decided the question left open in that case and in *Herb's Welding:* in this circuit, workers injured while transiently or fortuitously upon actual navigable waters are covered by the LHWCA. We are bound to follow the *Fontenot* court's determination. FN5

> FN5. *Fontenot* 's interpretation of the LHWCA conflicts with that of the Eleventh Circuit. In *Brockington v. Certified Elec., Inc.,* 903 F.2d 1523, 1528 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991), the court held that an electrician whose employment was entirely landbased but who was injured while riding in a motorboat to an island jobsite was not covered by the LHWCA. The court's remark that Brockington's "only connection with the water was the fact that he happened to be traveling over it *incidental* to land-based employment," *id.,* is equally true of Randall. Nevertheless, *Fontenot* remains binding precedent in this circuit and must be followed unless changed by a decision of this court en banc or the United States Supreme Court, or by future amendments to the LHWCA itself.

[10] Applying *Fontenot* to the instant case, we think it beyond cavil that Randall was injured "on navigable waters" within the meaning of *Perini* and the LHWCA. The accident occurred during Randall's attempt to return to shore. The instant case is thus on all fours with *Fontenot,* and we must therefore conclude that Randall was covered by the LHWCA.

### B. *Apportionment of Fault*
#### 1. *Time Charterer Liability*

[11] We next consider the district court's apportionment of liability between Chevron and Sea Savage. The court apportioned fault because, under § 905(b) of the LHWCA, a longshoreman injured

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

by the negligence of a "vessel" is entitled to bring an action against that vessel. The court determined that Chevron constituted a "vessel" because the term "vessel" is defined by the LHWCA to include not only the vessel's owner but also a "charter or bare boat charterer." 33 U.S.C. § 902(21). Thus a time charterer may be liable under § 905(b) if the cause of the harm is "within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement." *Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc.,* 830 F.2d 1332, 1343 (5th Cir.1987); *see also Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1041-42 (5th Cir.1983) (holding that a time charterer could be liable under § 905(b) of the LHWCA for ordering a worker to unload equipment from a vessel to a platform during rough weather); *cf.* 2 Alex L. Parks, *The Law and Practice of Marine Insurance and Average* 884-85 (1987) ("[The body of law governing time charterer liability in § 905(b) cases] is just now developing; it is confusing and it is inconclusive.").

[12] We begin by noting that the LHWCA casts a wide net in defining parties potentially liable in the event of injury caused by vessel negligence. The statute provides that

[U]nless the context requires otherwise, the term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.

33 U.S.C. § 902(21). Nothing in the statute suggests that a finding that negligence was committed by one entity defined as a "vessel" in § 902(21), such as the vessel's owner, precludes**899** a finding that another such entity, such as a charterer, was also contributorily negligent. Indeed, holding each such entity liable in proportion to its degree of fault advances the purpose underlying the LHWCA, which is to provide longshoremen with the benefits

of workers' compensation without depriving them of the right to be compensated for their injuries caused by the negligence of third parties or eliminating the incentive for third parties to provide longshoremen with a safe place to work. *Perez v. Arya Nat'l Shipping Line, Ltd.,* 468 F.Supp. 799, 802 (S.D.N.Y.1979), *aff'd mem.,* 622 F.2d 575 (2d Cir.1980), *aff'd sub nom. Rodriguez v. Compass Shipping Co.,* 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981). It is also beyond dispute that time charterers are among those third parties included in the definition, although they are not specifically mentioned. *Kerr-McGee Corp.,* 830 F.2d at 1338.

Chevron argues that there was no evidence that it was negligent in its capacity as time charterer of the SEA SAVAGE. In his oral findings, the district judge found Chevron negligent for "direct[ing] the vessel to remain in, and to encounter the treacherous weather conditions that existed in the Gulf." Chevron argues that there is no duty on the part of a time charterer to determine whether the missions it assigns can be accomplished safely. In Chevron's view, this duty rests solely with the vessel captain unless specific contractual provisions shift duties onto the time charterer. Sea Savage takes the opposite position, arguing that the district court correctly held that a time charterer may be held liable for damages that result from directing a vessel to encounter dangerous natural conditions.

Sea Savage cites several cases in its favor, beginning with the *Helaire* case cited above. In that case, Edmond Helaire was employed by Mobil as a roustabout and was ordered to unload casing onto a fixed platform from a supply vessel during rough weather. *Helaire,* 709 F.2d at 1032-33. He slipped and injured his knee, *id.* at 1034, and sued both Mobil, which was the time charterer of the vessel, and the vessel owner under the LHWCA. In a jury trial, Mobil was found 100% liable and the vessel owner was exonerated, and the district court granted Mobil recovery from the vessel owner's underwriters pursuant to protection and indemnity insurance that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

named Mobil as an additional insured. *Id.* Mobil and the underwriters then engaged in a dispute over whether Mobil's negligence had been committed in its capacity as platform owner or as time charterer. *Id.* at 1041. We held that the district court properly predicated Mobil's negligence on its actions as time charterer, based on Mobil's acts or omissions in permitting the unloading of cargo from the vessel to continue "despite the obvious danger created by the poor weather conditions." *Id.* at 1042.

There are other precedents for the district court's assignment of fault to Chevron as time charterer. In *Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 378 (5th Cir.1987), Chevron had time chartered the M/V STAR II to service equipment in the Gulf. Chevron dispatched the STAR II into the Gulf at a time when it was aware of a forecast of dangerous weather conditions, and the vessel capsized, killing one and injuring three others. *Id.* at 387, 378. The district court found that Chevron's negligence as time charterer in failing to inform the vessel's captain of the weather forecast and in dispatching and failing to recall the vessel was 30% responsible for the injuries and losses sustained. *Id.* at 387. We affirmed this finding. *Id.* Likewise, in *In re P & E Boat Rentals, Inc.,* 872 F.2d 642, 646-47 (5th Cir.1989), in which two vessels collided, we affirmed a finding that Chevron as time charterer was liable for its negligence in ordering the captain of one vessel to operate his vessel at high speeds in heavy fog. *See also Kerr-McGee Corp.,* 830 F.2d at 1341 ("The time-charterer directs where and when the vessel will travel, so if it forces it out in hurricane weather or similarly treacherous conditions, it may be liable under section [905(b) of the LHWCA].").

Chevron counters by referring this court to our decision in *M.O.N.T. Boat Rental Servs., Inc. v. Union Oil Co.,* 613 F.2d 576 (5th Cir.1980). In that case, Union Oil chartered the vessel BOBBY O from M.O.N.T. to transport personnel and supplies off the coast of Nicaragua. *Id.* at 577. A crew **\*900** member was injured after the BOBBY O put to sea

on Union Oil's orders, and he recovered against M.O.N.T. under a claim of Jones Act negligence. *Id.* at 577-78. M.O.N.T. then sued Union Oil, and the district court dismissed. We affirmed, first noting that the time charter contained the usual understanding that the vessel captain could refuse to carry out tasks without breaching the charter if his refusal was based on a good faith belief that the task was unsafe. *Id.* at 578. Thus, we held that, if Union Oil's order was at all negligent, it could not be "active or primary negligence relative to M.O.N.T.'s negligence in bringing about [plaintiff's] injuries." *Id.* at 581-82. Thus, M.O.N.T. was not entitled to tort indemnity from Union Oil. *Id.* at 582.

Chevron also directs our attention to *Smith v. Southern Gulf Marine Co. No. 2, Inc.,* 791 F.2d 416 (5th Cir.1986). The time charterer in that case ordered a vessel to deliver personnel to a platform in rough seas. *Id.* at 418. Just before leaving the vessel, the plaintiff, Ronald Smith, slipped and fell. *Id.* He sued several parties, including the time charterer of the boat (his employer, McMoran Offshore Exploration Co.), and the trial court ruled in favor of McMoran. *Id.* at 419. We affirmed, holding that Smith could not recover from McMoran on the theory that McMoran was responsible for any injuries occurring as a consequence of its decision to transport workers by crewboat, because the ultimate decision about whether to proceed rested with the crewboat captain. *Id.* However, we also agreed with the trial court that "the decision to proceed by crewboat was not unreasonable." *Id.*

[13] The trend of our more recent decisions, as demonstrated by Sea Savage, plainly favors imposing a duty of care on a time charterer who orders the vessel he has hired to put to sea in dangerous weather. We distinguished *M.O.N.T. Boat Rental* in *Graham,* noting that *M.O.N.T. Boat Rental* "implicitly recognizes that there is a distinction between a time charterer's potential liability under the time charter and independent tort liability which is not governed by the time charter." *Graham,* 824

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

F.2d at 388. Additionally, the concepts of active and passive negligence have fallen by the wayside with the advance of the comparative negligence doctrine. *See Hardy v. Gulf Oil Corp.,* 949 F.2d 826, 834 n. 13 (5th Cir.1992); *Loose v. Offshore Navigation, Inc.,* 670 F.2d 493, 500-02 (5th Cir.1982). The force of the language in *Smith* suggesting that the time charterer was not responsible for injuries resulting from sending the vessel into rough seas is undercut by that court's agreement with the district court that the time charterer's decision was "not unreasonable." *Smith,* 791 F.2d at 419.

We think it clear that a time charterer may breach its duty of care if it "forces [the vessel under charter] out in hurricane weather or similar treacherous conditions." *Kerr-McGee Corp.,* 830 F.2d at 1341; *see also Moore v. Phillips Petroleum Co.,* 912 F.2d 789, 791-92 (5th Cir.1992); *Graham,* 824 F.2d at 388; *Helaire,* 709 F.2d at 1041-42. The district court was correct to hold that Chevron could be held negligent in its capacity as time charterer and that such negligence was negligence committed as a "vessel" within the meaning of the LHWCA.

### 2. *Sufficiency of the Evidence*

Sea Savage argues that it was clearly erroneous for the district court to assign 75% of the liability for Randall's death to Sea Savage. Specifically, Sea Savage contends that the district court should have assigned more than 25% of the liability to Chevron for its role in ordering the evacuation of the platform by vessel instead of by helicopter, and that the district court should have found Randall himself contributorily negligent.

[14] We reject both of Sea Savage's contentions. There was ample evidence to support the district court's assignment of 75% of the fault to Sea Savage, based on the acts and omissions of the crew of the SEA SAVAGE. We list only a few of the pertinent factual findings by the district court, all of which were supported by the evidence. The captain of the SEA SAVAGE failed to post any crew members near the stern of the vessel where

platform personnel would be boarding, despite the rough weather conditions. No life ring was easily accessible at the stern of the vessel, and to retrieve a life ring deckhand Nash had to leave the stern of **\*901** the vessel, run approximately fifty feet to the rear of the pilothouse (impeded by an obstructing hatch), and return to the stern of the vessel. Without determining Randall's whereabouts, the captain put the vessel into gear and moved away, thereby pushing Randall so far from the vessel that Nash could not throw him the life ring. The district court also cited several other departures from man overboard procedures posted on the SEA SAVAGE, as well as the failure of Sea Savage to train the vessel's crew properly in rescue procedures. The apportionment of 75% of the liability to Sea Savage and only 25% to Chevron for its role in ordering the evacuation was not clearly erroneous.

[15] Neither was it clearly erroneous for the district court to assign no fault to Randall himself. There was eyewitness testimony that Randall's swing was not improperly done. Because the SEA SAVAGE began to move away from Randall as soon as he fell overboard, his decision to swim beneath the platform and cling to its legs for support could be found to be reasonable under the circumstances. We find no error in the district court's apportionment of fault in this case.

### C. *Damages*

Chevron challenges two elements of the district court's damages award. First, Chevron argues that it was clear error for the district court to award $1,000,000 for Randall's pain and suffering. Second, Chevron argues that the district court's award of loss of society damages was improper under the LHWCA.

### 1. *Pain and Suffering*

[16][17][18] A trial judge's assessment of damages is a finding of fact and is reviewed under the clearly erroneous standard. *Wheat v. United States,* 860 F.2d 1256, 1259 (5th Cir.1988); *Sosa v. M/V Lago Izabal,* 736 F.2d 1028, 1035 (5th Cir.1984). In the context of jury verdicts, we have held that an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

award is disproportionate to the injury sustained if it is so large that it shocks the judicial conscience or indicates passion, prejudice, corruption, bias, or another improper motive. *Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1427 (5th Cir.1992). If we determine that an award is disproportionate to the injury, we will order a remittitur in accordance with the maximum recovery rule, which mandates that the award be reduced to the maximum amount the jury could properly have awarded. *Id.* at 1427-28.

[19] After careful consideration, we conclude that the $1,000,000 award for Randall's pain and suffering must be reduced to $500,000. We recognize that "[o]ur reassessment of [pain and suffering] damages cannot be supported entirely by rational analysis, but is inherently subjective, involving experience and emotions as well as calculation." *Dixon v. International Harvester Co.,* 754 F.2d 573, 590 (5th Cir.1985). Randall's pain and suffering, although extreme, was mercifully brief. The district court's award of $1,000,000 translates into $40,000 per minute of pain and suffering, or almost $60,000,000 per day. In the *Sosa* case, we suggested that $1,000,000 approached the maximum amount that could be awarded to a burn victim who sustained severe burns over eighty percent of his body and who would endure discomfort and disability for the rest of his life. *Sosa,* 736 F.2d at 1035. Likewise, in *Stratis v. Eastern Air Lines, Inc.,* 682 F.2d 406 (2d Cir.1982), the court reversed a $1,200,000 pain and suffering award to a plane-crash victim who spent forty-two days in a hospital burn unit and emerged a quadriplegic. *Id.* at 415 (noting that "in anyone's calculations [an award of approximately $29,000 per day] has to be excessive").

The instant case is distinguishable from *Wellborn,* in which we affirmed a $1,000,000 award for pain and suffering to the estate of a fourteen year-old boy who died after being pinned beneath an automatic garage door. *Wellborn,* 970 F.2d at 1422-23, 1428. Randall clearly suffered no more

than roughly twenty-five minutes, while the evidence in *Wellborn* showed that the decedent could have been alive and conscious for up to several hours while pinned beneath the door. *Id.* at 1428. Additionally, Randall was a mature adult rather than a young child. We do not find *Wellborn* to be controlling.

**\*902** We believe that $500,000 for Randall's pain and suffering would be reasonable. Should Sea Savage, now the real party in interest (see note 1, *supra* ), refuse to accept the reduction of the pain and suffering award, it will be entitled to a new trial on damages alone. *Dixon,* 754 F.2d at 590.

### 2. *Loss of Society*

[20] We next address Chevron's challenge of the district court's awards for loss of society. Under this heading, the district court awarded $300,000 to Randall's widow, $100,000 to Randall's adult son Rod Randall, and $150,000 to Randall's daughter Holly Randall. It appears that both of Randall's children lived at home and that Rod Randall worked for his father. Chevron argues that non-pecuniary damages such as for loss of society are not available as a matter of law in the instant case. We disagree.

The availability of loss of society damages in maritime cases is an issue that has led the courts to weave an intricate web of case law. We begin our analysis with the seminal case of *Sea-Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). In *Gaudet,* the Supreme Court held that the widow of a longshoreman could maintain a wrongful death action based on the death of her husband from injuries suffered while aboard a vessel in navigable waters, even though the decedent recovered damages during his lifetime for his injuries. *Id.* at 574-75, 94 S.Ct. at 809-10. The Court further held that compensation for loss of society is available in such cases. *Id.* at 585-90, 94 S.Ct. at 814-17. The Court eventually extended the *Gaudet* rule in *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 276, 100 S.Ct. 1673, 1675, 64 L.Ed.2d 284 (1980), to allow recovery of loss of so-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

ciety damages by the spouse of a longshoreman who is injured but not killed.

In a case not involving longshoremen, however, the Supreme Court took a less expansive view of the remedies available under maritime law. In *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), the Court considered whether the survivors of a helicopter pilot who crashed in the Gulf of Mexico outside state territorial waters could recover loss of society damages. The Court held that they could not, noting that *Gaudet* applied only to coastal waters, while the *Higginbotham* case concerned an accident on the high seas and was governed by the Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 762. *Id.* at 623-24, 98 S.Ct. at 2014. Because DOHSA plainly limited recovery to "pecuniary loss[es]," the Court held that the federal courts were not free to "supplement" the congressional directive to the point of meaninglessness. *Id.* at 625, 98 S.Ct. at 2015. Significantly, the Court observed that "DOHSA should be the courts' primary guide as they refine the *nonstatutory* death remedy, both because of the interest in uniformity and because Congress' considered judgment has great force in its own right." *Id.* at 624, 98 S.Ct. at 2014 (emphasis added).

After *Alvez,* the maritime rules regarding loss of society damages in this circuit developed somewhat unevenly. In light of *Gaudet* and *Alvez,* we took a friendly view of loss of society damages in *Cruz v. Hendy Int'l Co.,* 638 F.2d 719 (5th Cir.1981) (overruling in part *Christofferson v. Halliburton Co.,* 534 F.2d 1147 (5th Cir.1976)). In that case a seaman suffered personal injuries while his vessel was in Louisiana territorial waters. *Id.* at 721. His wife sued for loss of consortium and loss of society under the Jones Act and general maritime law. *Id.* at 722. We held that the spouse of a person entitled to recover for vessel unseaworthiness has a cause of action for loss of society, whether the injured person was injured on the high seas or in territorial waters. *Id.* at 725. On the other hand, we

held that the non-dependent parents of a seaman killed in territorial waters and survived by a spouse or children could not recover loss of society damages under the general maritime law in *Sistrunk v. Circle Bar Drilling Co.,* 770 F.2d 455, 460-61 (5th Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986). Applying the general maritime law to an accident that occurred on Lake Pontchartrain, the court in *Truehart v. Blandon,* 672 F.Supp. 929, 930 (E.D.La.1987), extended *Sistrunk* to bar loss of society recovery to non-dependent parents of a non-seaman **\*903** killed on navigable waters and leaving no surviving spouse or children.

In 1990, the Supreme Court again turned its attention to this complex area of the law. In *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), a seaman had been stabbed to death by a fellow crew member, and the decedent's mother sued the vessel owner for compensation, including loss of society damages. *Id.* at 21-22, 111 S.Ct. at 320. The issue before the Court was whether loss of society damages are recoverable in a suit brought under the general maritime law for the death of a Jones Act seaman. *Id.* at 21, 111 S.Ct. at 320. The Court held that such damages are not recoverable, extending the rule established in *Higginbotham* for DOHSA cases to "all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." *Id.* at 33, 111 S.Ct. at 326. The Court limited *Gaudet* to its precise facts. *Id.* at 31, 111 S.Ct. at 325 ("The holding of *Gaudet* applies only in territorial waters, and it applies only to longshoremen.").[FN6]

> FN6. The limitation of the *Gaudet* rule to longshoremen injured in state territorial waters has been scrupulously observed. *See Robertson v. Arco Oil and Gas Co.,* 766 F.Supp. 535, 539 (W.D.La.) (holding that a dependent of a longshoreman injured on the outer continental shelf rather than in state territorial waters may not recover damages for loss of the longshoreman's consortium), *aff'd,* 948 F.2d 132 (5th

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

Cir.1991).

Thus, *Gaudet* remains good law, even though its application has been severely limited. This case comes squarely within its ambit. Randall, we have held, was a longshoreman within the meaning of the LHWCA, and his accident occurred within Louisiana state territorial waters. *Miles,* therefore, does not preclude loss of society damages as a matter of law in the instant case. The continued vitality of *Gaudet* and *Alvez* on their facts has been noted. *See Ferrara v. Fukuoka Senpaku K.K.,* 1991 A.M.C. 2249, 2252, 1991 WL 50040 (D.Mass.1991) (holding that an injured longshoreman suing under the LHWCA may still bring claims for loss of consortium on behalf of his spouse under *Alvez* even after *Miles* ). We note, as did the *Ferrara* court, that the LHWCA does not explicitly limit damages recoverable to "pecuniary damages," as do the DOHSA and the Jones Act. *Id.* We hold that, under *Gaudet,* Randall's survivors were entitled to recover loss of society damages.

Chevron argues in the alternative that the district court erred in awarding loss of society damages to Randall's adult son because only financial dependents may recover such damages and there was no evidence that Rod Randall was dependent upon his father. In our view, the law of this circuit does not unequivocally limit recovery of loss of society damages for the wrongful death of a parent to children who are financially dependent on the deceased parent. The case of *Skidmore v. Grueninger,* 506 F.2d 716 (5th Cir.1985), clearly holds that adult offspring are within the class of plaintiffs entitled to loss of society damages in a *Moragne* wrongful death action. *Id.* at 729 n. 11. Financial dependence was not mentioned in *Skidmore* as a prerequisite to recovery of loss of society damages by an adult child, and in dicta we have characterized *Skidmore* as allowing an adult, non-dependent child to recover for loss of her mother's society. *Sistrunk,* 770 F.2d at 458 n. 2. More recently, however, we have noted that the district court in *Skidmore* explicitly found that the adult child seek-

ing loss of society damages was in fact dependent on the decedent. *Miles v. Melrose,* 882 F.2d 976, 987 (5th Cir.1989), *aff'd sub nom. Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

[21][22][23] In any event, we need not unravel this tangled skein of case law today. In ruling on Sea Savage's post-trial motion to amend the judgment, the district court specifically found that Rod Randall was financially dependent on his father. Both Sea Savage and Chevron argue in their briefs that there was no evidence to support this finding, making much ado about the fact that Randall did not declare his son as a dependent on his income tax returns. However, other credible evidence supports the district court's finding. As Rod Randall testified, he had dropped out of college and was living at **\*904** home when his father died.[FN7] It appears that he had lived at home for most of his life; indeed, he was only twenty-one at the time of his father's death. He worked for his father, helping maintain the family's farm and trucking equipment. The district court's finding of dependence was not clearly erroneous. When a family unit is maintained by dependence on a single family member, each of the dependents may recover for his losses including loss of society in a *Moragne* wrongful death claim under general maritime law. *In re Complaint of Patton-Tully Transp. Co.,* 797 F.2d 206, 213 (5th Cir.1986).

FN7. The court below also held, in the alternative, that a presumption of dependency exists whenever a child continues to live at home with his parents, adopting the reasoning found in *Truehart v. Blandon,* 672 F.Supp. 929, 937 (E.D.La.1987). Because we affirm the court's finding that Rod Randall was in fact dependent upon his father, we need not address the validity of this presumption.

We affirm the district court's awards of loss of society damages.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

D. *Indemnity and Insurance*

As is often the case in this type of dispute, the most hotly contested issue is not whether the accident victim or his family should be compensated but rather who should ultimately bear the cost of that compensation. The district court decided that Chevron was entitled to both indemnification for its liability from Sea Savage and insurance coverage for its liability from the underwriters of the insurance procured for Chevron by Sea Savage. We address these holdings in turn.

1. *Indemnity*

Sea Savage mounts a two-pronged attack on the district court's holding that it was liable to indemnify Chevron in this case. First, Sea Savage argues that the language of the indemnity clause contained in its time charter with Chevron does not entitle Chevron to indemnification for damages arising out of Chevron's own negligence. Second, Sea Savage argues that Chevron's liability in this case does not arise out of the "management or control" of the SEA SAVAGE as required by the time charter. Because Sea Savage's first argument is meritorious, we do not reach Sea Savage's second point.

[24][25] We begin our analysis with the words of the time charter themselves. That contract provides, in pertinent part, as follows:

Owner shall man, operate, and navigate the vessel. The vessel shall prosecute its trips and perform its services with dispatch, as directed by the charterer, but responsibility for the management and navigation and operation of the vessel shall remain at all times in the owner, same as when trading for owner's account; and nothing herein contained shall be construed as making this a demise.... Owner hereby agrees to defend, indemnify and hold harmless Chevron against all claims for taxes or for penalties or fines, as well as against any and all claims for damages, whether to person or property, and howsoever arising in any way directly or indirectly connected with the possession, navigation, management, and opera-

tion of the vessel.

As a maritime contract, the time charter is governed by federal law. *Thurmond v. Delta Well Surveyors,* 836 F.2d 952, 952 (5th Cir.1988). Indemnity agreements are valid and enforceable under federal law. *Id.*

Sea Savage argues that *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580 (5th Cir.1971), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972), is dispositive. In that case, a crane operator on an offshore oil platform owned by Chevron accidently injured Porphire Lanasse, a crew member on a vessel receiving equipment from the platform. *Id.* at 582. Chevron argued, as it argues here, that the indemnity provision of its time charter with the vessel owner shifted all liability for the incident onto the vessel owner. *Id.* at 583. Examination reveals that the indemnity provision at issue in the instant case is essentially identical to the one at issue in *Lanasse,* from which we quote:

Owner shall man, operate, and navigate the vessel. * * * Responsibility for the management and navigation and operation of the vessel shall remain at all times in the owner. * * * Owner hereby agrees to **\*905** indemnify and hold harmless [Chevron] against all claims * * * as well as against any and all claims for damages, whether to person or property, and howsoever arising in any way directly or indirectly connected with the possession, navigation, management, and operation of the vessel.

*Id.* at 582 n. 4 (emphasis deleted). The court held that the language of this indemnity agreement could not be stretched so far as to reach the negligence of Chevron's crane operator, as this negligence was "not even remotely related to the operation, navigation or management of the vessel." *Id.* at 583. We also held that, even if the crane accident were covered under the "operation of the vessel" clause, the indemnity provision could not be construed to entitle Chevron to indemnification for liability arising from the negligence of its own em-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

ployees. *Id.* at 583-84 (stating that contractual in-demnity for one's own negligence arises only from the "plainly expressed intention of the parties, manifested by language couched in unmistakable terms").

The district court relied on *In re Incident Aboard D/B Ocean King, 758 F.2d 1063 (5th Cir.1985),* in reaching its conclusion that this in-demnity provision did include an agreement that Sea Savage would indemnify Chevron for losses arising out of Chevron's own negligence. That case involved a gas blow out and fire aboard a jackup drilling rig off the coast of Texas. *Id.* at 1065. The operator of the rig had agreed to bear all costs and liability in the event of a blow out "from any cause," and the contract provided that Louisiana law applied. *Id.* at 1067 & n. 5. Noting that this contract involved an "allocation of risk provision" rather than an "indemnity" provision, we held that, under Louisiana law, the language was broad enough to require the operator to bear the risk of the owner's negligence. *Id.* at 1067 (citing *Polozola v. Garlock, Inc., 343 So.2d 1000 (La.1977),* and *Polozola v. Garlock, Inc., 376 So.2d 1009 (La.Ct.App.1979), cert. denied, 379 So.2d 1103 (La.1980)).*

Sea Savage argues that *Ocean King* is inappos-ite because it involved the application of Louisiana law rather than federal law. The district court reached the opposite conclusion, using the follow-ing reasoning: (1) Louisiana law requires more spe-cificity than federal law in order for an indemnity provision to include indemnification for an indem-nitee's own negligence; (2) the instant indemnity provision would include indemnification for Chev-ron's own negligence under Louisiana law; and (3) therefore the instant indemnity provision includes indemnification for Chevron's own negligence un-der federal law. *Randall, 788 F.Supp. at 1396.*

[26] We are not convinced that the district court's basic assumption-that federal law construes indemnity provisions more generously in favor of the indemnitee than Louisiana law-is correct. Our

cases reveal many instances in which we have held that "[l]ong-established general principles of inter-preting indemnity agreements require that indemni-fication for an indemnitee's own negligence be clearly and unequivocally expressed." *Theriot, 783 F.2d at 540* (quoting *Seal Offshore, Inc. v. Americ-an Standard, Inc., 736 F.2d 1078, 1081 (5th Cir.1984)); see also United States v. Seckinger, 397 U.S. 203, 211, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970)* (interpreting a government contract accord-ing to the principle that "a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties"); *Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1153 (5th Cir.1990)* ("Before enforcing an indemnification clause for an indemnitee's own negligence, a court must be firmly convinced that the exculpatory pro-vision reflects the intention of the parties." (citations omitted)). Our interpretation of Louisiana law has been consistent with these principles. *See Amoco Production Co. v. Forest Oil Corp., 844 F.2d 251, 253 (5th Cir.1988)* ("Under Louisiana law, however, an indemnification agreement will not be construed to cover losses arising from the in-demnitee's negligence unless a mutual intent is ex-pressed in unequivocal terms." (footnote omitted)); *Ocean King, 758 F.2d at 1068.* The applicable standard thus seems to be the same under both Louisiana and federal law.

It may be that the *Ocean King* case, relied upon by the district court, is properly distinguished**\*906** from the instant case. Our case is somewhat similar to *Amoco Production, 844 F.2d at 256,* in which the court confronted a contractual provision in which the parties agreed that the "specific operation" in question would be conducted at the "sole cost, risk and expense" of one party. The court declined to follow *Ocean King* and instead held that the provi-sion did not demonstrate with sufficient clarity a mutual intent to provide indemnification for Amoco's negligence. *Id. at 254.* In distinguishing *Ocean King,* the court first noted that the indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

provision in *Ocean King* was much more specific than the general indemnity provision at issue in *Amoco Production. Id.* at 256. The same may be said of the indemnity provision at issue in the instant case. We do not believe that Sea Savage's duty to indemnify Chevron for losses "howsoever arising" is sufficiently clear and unequivocal to shift liability for Chevron's negligence onto Sea Savage. As the *Amoco Production* court also noted, the result in *Ocean King* seems to have been based in part on the fact that the agreement in that case was the product of extensive negotiations, *id.* at 257 n. 9; the time charter in the instant case seems to be a form contract prepared and provided by Chevron. Finally, we note that indemnity contracts are to be strictly construed. *Smith v. Tenneco Oil Co.,* 803 F.2d at 1388.

[27][28] In the final analysis, however, we need not decide whether *Ocean King* is distinguishable because *Lanasse* is controlling. Confronting the indemnity provision in *Lanasse* we held that damages caused by the indemnitee's own negligence were not covered. *Lanasse,* 450 F.2d at 582 n. 4, 583-84. There are no legally significant differences between that indemnity provision and the one in the instant case-indeed, both appear to be derived from Chevron's own form contracts. Even if *Lanasse* and *Ocean King* are in conflict, we are bound to follow *Lanasse* as the earlier precedent. *Luna v. United States Dep't of Health and Human Servs.,* 948 F.2d 169, 172 (5th Cir.1991). If proof of the continuing vitality of *Lanasse* were required, it would be provided by our disposition in *Lavergne v. Chevron U.S.A., Inc.,* 782 F.Supp. 1163, 1172 (W.D.La.1991), *aff'd mem.,* 980 F.2d 1444 (5th Cir.1992), in which the district court confronted language identical to the indemnity provision in the instant case and held that it did not require indemnification for Chevron's (the indemnitee's) own negligence. Thus, in light of *Lanasse* and our disposition in *Lavergne,* we hold that the district court erred in holding that Chevron was entitled to indemnification from Sea Savage for those damages attributable to Chevron's own negligence.

## 2. *Insurance*

Although we have concluded that Chevron was not entitled to indemnification from Sea Savage under the terms of the time charter, Chevron may still avoid bearing the ultimate cost for its negligence through the protection and indemnification policy (P & I policy) procured by Sea Savage naming Chevron as an additional insured. Sea Savage was required to provide Chevron with such insurance protection by the terms of the time charter, the relevant portion of which reads as follows:

> During the life of this charter, owner will, at its own expense, provide and maintain insurance covering all liabilities which might arise from the possession, management, manning, navigation and operation of the vessel, which said policies shall be in form and amount, and with companies as required and approved by Chevron; and on which policies Chevron shall be included as party assured and all rights of subrogation against Chevron shall be waived.

Sea Savage obtained primary insurance coverage from Royal Insurance Company, among others, and excess coverage from American Home Insurance Company (collectively, "the underwriters").

The underwriters moved for summary judgment on Chevron's claims against them before trial. The district court granted these motions on the grounds that Randall's accident fell outside the scope of the P & I policy. *Randall,* 788 F.Supp. at 1399-1400. After trial, the court reconsidered its decision and reversed itself, holding that the accident was within the scope of the policy and that Chevron was entitled to insurance coverage. *See id.* at 1406. The court found **\*907** that no prejudice to the underwriters resulted from their absence from the trial. *Id.* at 1400-01. The underwriters challenge the district court's holding that Chevron is entitled to insurance coverage for its share of the liability for Randall's death.

[29] The pertinent provision in the P & I policy issued to Chevron reads as follows:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

The Assurer hereby undertakes to make good to the Assured ... all such loss and/or damage and/or expense as the Assured shall *as owners of* the vessel named herein have become liable to pay and shall pay on account of ... liability for loss of life of, or personal injury to, or illness of, any person....

(emphasis added). The underwriters argue that Chevron's negligence in this case was not committed in the capacity of "owner" of the SEA SAVAGE, and that Chevron thus lacks coverage under the policy. Chevron argued to the district court that this clause had been deleted, but the district court disagreed, *see Randall,* 788 F.Supp. at 1401-03, and Chevron does not challenge this finding on appeal.

The question presented for our decision, quite simply, is whether the district court correctly held that the liability incurred by Chevron in its capacity as time charterer was incurred "as owner" within the meaning of the insurance policy. The court's reasoning, it appears, was largely based on the assumption that the term "owner" has the same meaning in the insurance policy as it does in § 902(21) in the LHWCA. *Randall,* 788 F.Supp. at 1405 ("Because the LHWCA treats a time charterer as a vessel owner and because Chevron's negligence arose from its status as time charterer, Chevron incurred its liability 'as owner' of the vessel."). The underwriters' argument that "owner" does not necessarily mean the same thing in the insurance context as it does in the LHWCA is well-taken. We proceed to our de novo review of this issue of insurance contract interpretation, tracing the jurisprudence of this circuit on this recurring question.

Both Chevron and the underwriters acknowledge that *Lanasse* is the seminal case in this area of the law. In *Lanasse,* Chevron claimed it was entitled to insurance coverage "as owner" of the vessel on which the victim was injured by the negligence of Chevron's crane operator. *Lanasse,* 450 F.2d at 583. The court disagreed. In the words of Chief Judge Brown,

There must be some causal operational relation between the vessel and the resulting injury. The line may be a wavy one between coverage and non-coverage, especially with industrial complications in these ambiguous amphibious operations plus those arising from the personification of the vessel as an actor in a suit in rem. But where injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury.

*Id.* at 584 (footnote omitted). Although the phrase "causal operational relation" does little to clarify the meaning of the phrase "as owner" in the instant case, *Lanasse* clearly suggests that a time charterer may become eligible for insurance coverage "as owner" under some circumstances.

The underwriters direct our attention to *Graham v. Milky Way Barges, Inc.,* 590 F.Supp. 721 (E.D.La.1984), *aff'd in part and rev'd in part,* 824 F.2d 376 (5th Cir.1987). In that case, the court held Chevron responsible in its capacity as time charterer for its negligence in dispatching a vessel in rough weather, leading to the capsizing of the vessel. *Id.* at 728-29. The court also held that Chevron was not entitled to insurance coverage because its liability arose out of its acts as platform owner rather than as owner or operator of the vessel. *Id.* at 730. We expressed approval of the district court's ruling that Chevron's negligence was independent of any negligence arising from the "maintenance or operation" of the vessel, *Graham,* 824 F.2d at 388, which suggests that Chevron's negligence in dispatching the SEA SAVAGE may have lacked any connection to the operation of the vessel, and thus that the requisite "causal operational relation" to the death of Randall may be absent. However, we did not deny insurance coverage based on Chevron's status or non-status "as owner," but rather decided instead that insurance coverage was not available because Chevron had violated the navigational and operational limits imposed by the policy. *Id.* at 384. **\*908** *Graham* thus does not represent an absolute repudiation of our statement in *Lanasse* that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

time charterers may be covered by insurance policies "as owner" in some circumstances.

Chevron cites the *Helaire* case in support of the proposition that any negligence it may have committed as time charterer is within the "as owner" language of the insurance policy. As we have seen, the time charterer in that case was held liable for injuries suffered by a worker who was unloading equipment from a vessel to a platform under § 905(b) of the LHWCA. *Helaire,* 709 F.2d at 1033, 1041-42. The district court in *Helaire* ruled that the time charterer was entitled to insurance coverage under a policy essentially identical to the instant policy, and we affirmed. *Id.* at 1041, 1042 & n. 17. However, as the underwriters point out, we also noted that the words "as owner of the vessel" had been deleted from the policy, so the time charterer was entitled to coverage regardless of the capacity in which it was sued. *Id.* at 1042. The opinion also appears to conflate the meaning of "owner" under the policy with the definition of "vessel owner" in the LHWCA, although this is not clear. *Id.* at 1041-42.

Chevron also relies on *Texas E. Transmission Corp. v. Garber Bros.,* 547 F.Supp. 821 (E.D.La.1982). In that case, Union Oil Company entered into a time charter with Garber Bros. for the use of a vessel; during operations the vessel's anchor collided with a pipeline owned by Texas Eastern Transmission Corporation. Union Oil was named as an additional insured, and the policy apparently included the same "as owner" language as the policy in issue in the instant case. *Id.* at 822. Although the claims against Union Oil were dismissed, Union Oil sought reimbursement for its expenses under the terms of the policy. *Id.* Union Oil argued that it had been sued by Texas Eastern for directing the vessel to undertake the operations that damaged the pipeline and for failing to assist the vessel when the risk of collision became apparent, that these charges were made against Union Oil in its capacity as charterer of the vessel, and that insurance coverage was thus available. *Id.* The dis-

trict court in *Garber Bros.* reasoned that vessel-related negligence by a party comes within the "as owner of" provision, while negligence committed as platform owner does not. *Id.*

Sea Savage and its underwriters argue that *Garber Bros.* was implicitly overruled by this court's decision in *Texas E. Transmission Corp. v. McMoRan Offshore Exploration Co.,* 877 F.2d 1214 (5th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 321 (1989). In that case, McMoRan was one of multiple parties that had hired towing services from Faustug Marine Corporation. *Id.* at 1217, 1226. During the towing of a semi-submersible drilling rig that McMoRan had acquired by assignment, an anchor of the towing vessel supplied by Faustug damaged a pipeline owned by Texas Eastern. *Id.* at 1217-19. McMoRan's liability for its role in ordering the retrieval of the anchor was assessed at 10%. *Id.* at 1220-21. In the course of discussing whether the contract between Faustug and McMoRan required Faustug to insure McMoRan against this kind of liability, the court noted that "[t]he usual form of Protection & Indemnity insurance, which 'insures only against liability resulting from *vessel ownership,*' would not provide coverage for McMoRan, a non-ship-owner." *Id.* at 1227 (footnote omitted).

We do not agree with the position urged by Sea Savage and its underwriters. Their interpretation of *McMoRan* would make it virtually, if not completely, impossible for a time charterer ever to receive insurance coverage under any circumstances, and if *McMoRan* did have such an effect we might be forced to disregard it as inconsistent with our earlier opinion in *Lanasse.* This is not necessary, however, as the underwriters have overstated the breadth of the holding in *McMoRan.* As that court clearly stated,

Any P & I insurance that Faustug might have obtained would not have covered McMoRan's negligence, since McMoRan's negligence did not arise out of the ownership of a vessel, but out of the operation of an anchor retrieval process in which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

the vessel was only "the inert locale of the injury."

**\*909** *Id.* at 1228 (quoting *Lanasse,* 450 F.2d at 584). *McMoRan* thus does not completely foreclose the possibility that a time charterer can be covered under an insurance policy protecting an insured "as owner" on a proper set of facts.

Additionally, as we have suggested, the interpretation of the insurance policy urged by Sea Savage and its underwriters would render the insurance coverage virtually meaningless. Sea Savage argues that, as owner of the SEA SAVAGE, it retained control of the navigation, management, and operation of the vessel. Sea Savage also argues that "by contract and tradition, Chevron could not act as a manager or operator of the vessel," and that "as a matter of common sense it could not commit fault 'as owner' of the vessel." If this were true, then the insurance policy providing coverage for Chevron's liability "as owner" of the vessel could never come into effect. Under this interpretation, no time charterer could ever satisfy the "causal operational relationship" requirement so as to qualify for insurance coverage "as owner" of the vessel. We will not construe an insurance policy in such a way that it provides no coverage whatsoever to the insured.

[30] The only connection a time charterer typically has with the vessel it hires is the right to direct the vessel's movements. We find persuasive the reasoning of the court below and that of the court in *Garber Bros.* that when the time charterer exercises this right negligently, it has committed negligence "as owner" of the vessel within the meaning of that phrase in a marine insurance policy. This type of negligent conduct, it seems to us, has the requisite "causal operational relationship" to the vessel, even though the time charterer wholly lacks the authority to direct the minutiae of the vessel's day-to-day operations. "In this action, Chevron's contribution to Randall's death, ordering the vessel to encounter dangerous seas, clearly is related to the vessel." *Randall,* 788 F.Supp. at 1403. The district court correctly ordered the underwriters to provide insur-

ance coverage to Chevron.

### 3. *Chevron's Expenses Incurred Defending Mrs. Randall's Punitive Damages Claim*

[31] Chevron argues that the district court erred by refusing to award Chevron costs and attorneys' fees incurred in connection with Mrs. Randall's claims for punitive damages. Chevron contends that it is entitled to reimbursement for these expenses under both the indemnity provision of the time charter and the P & I policies. The claim based on the indemnity provision of the time charter must fail because, as we have already held, Chevron is not entitled to indemnification from Sea Savage for any losses suffered by Chevron as a result of its own negligence. We must now consider whether Chevron may recover its costs and attorneys' fees from Sea Savage's underwriters.

As has been observed, the seminal question in resolution of this coverage issue is the choice of law to be applied. 2 Parks, *supra,* at 1039. We have recently resolved this issue in favor of state law. In *Taylor v. Lloyds Underwriters,* 972 F.2d 666, 667 (5th Cir.1992), *cert. denied,* 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993), several seaman were injured when their lifeboat capsized in the Gulf of Mexico, and they recovered compensatory and punitive damages against the boat's charterer in an action brought under general maritime law. The charterer was insolvent, and the plaintiffs sought to recover against three insurance policies, including a comprehensive general liability policy and a P & I policy. *Id.* The district court granted the insurer's motion for summary judgment, holding that the general maritime law disallows the recovery of punitive damages from an insurance company. *Id.* We reversed, holding that no specific and controlling federal rule disallowed such recovery. *Id.* at 669. We held that the district court should have applied the law of the state having the greatest interest in the resolution of the issues, and we remanded so that the district court could make that determination. *Id.* In this case, Louisiana law provides the rule of decision.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

The P & I policy in question insures Chevron with respect to "[c]osts, charges, and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the **\*910** vessel named herein." FN8 Thus, if punitive damages are liabilities covered by the P & I policy, Chevron is entitled to recover from the underwriters the attorneys' fees it spent defending against the punitive damages claim. Chevron cites several Louisiana cases for the proposition that liability insurance contracts provide coverage for claims for punitive damages unless specifically excluded by the policy. *See Sharp v. Daigre,* 555 So.2d 1361, 1363 (La.1990) (holding that exemplary damages may be recovered from an insurer on a policy reading "We will pay damages which a covered person is legally entitled to recover ... because of bodily injury...."); *Creech v. Aetna Casualty & Sur. Co.,* 516 So.2d 1168, 1171 (La.Ct.App.1987), *cert. denied,* 519 So.2d 128 (La.1988). Thus, argues Chevron, because the underwriters would have been obligated to cover any award of punitive damages against Chevron, they must provide coverage for the costs and attorneys' fees Chevron incurred in defending the claim for punitive damages.

> FN8. We refer, as do the parties, only to the primary P & I policy, because the excess P & I policies cover the same liabilities as the primary policy.

The underwriters argue that punitive damages, and by extension expenses incurred in defending against such damages, are excluded from coverage under the policy. They contend that punitive damages are not liabilities "for loss of life of ... any person" as are covered by the policy. For support the underwriters cite *Smith v. Front Lawn Enters.,* 1987 A.M.C. 1130, 1130-31 (E.D.La.1986), in which the court held that an essentially identical policy did not provide coverage for a claim for punitive damages based on unseaworthiness and refusal to pay maintenance and cure. In *Taylor,* however, we took note of the view expressed in *Smith* and declined to

interpret it as establishing a controlling federal rule, holding instead that state law should provide the rule of decision. *Taylor,* 972 F.2d at 668-69; *see also* 2 Parks, *supra,* at 1041 (noting that no federal cases exist regarding the coverage of punitive damages issue).

[32] Although the *Sharp* case, decided by the Louisiana Supreme Court, deals with uninsured motorist insurance only, there is nothing in the opinion to suggest that its holding would not apply with equal force to other types of insurance. P & I policies are, strictly speaking, indemnity policies rather than liability policies, but the indemnity is itself basically against liabilities, 2 Parks, *supra,* at 1004, and in general indemnity policies are construed like any other insurance policy. *Id.* at 839. Sea Savage's underwriters have not directed our attention to any Louisiana cases suggesting that the application of *Sharp* should be limited in any way, nor does our research uncover any. The policy language at issue in *Sharp,* which covered damages arising "because of bodily injury, sickness, or disease," is not more general or all-encompassing than the "[l]iability for loss of life of, or personal injury to, or illness of, any person" language in the instant P & I policy. We therefore hold that under Louisiana law, applied in the absence of a controlling federal rule, punitive damages are covered by the P & I insurance policy at issue in the instant case. Chevron is therefore entitled to recover its costs and attorneys' fees expended in defending Mrs. Randall's claim for punitive damages. The district court's holding to the contrary is reversed.

*E. Attorneys' Fees*

Our final task on this appeal is to review the district court's award of attorneys' fees to Chevron. The district court referred Chevron's claim for attorneys' fees to a magistrate judge, who made several recommendations that Chevron's claims be reduced in amount. Specifically, the magistrate judge recommended that the hourly rate of Chevron's lead trial counsel be reduced from $175 to $150 and that the total number of hours billed by Chevron's attor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 F.3d 888, 1994 A.M.C. 1217
**(Cite as: 13 F.3d 888)**

neys be reduced by 30%. The district court heard oral argument and refused to adopt these recommendations, instead finding the hours and rates requested by Chevron to be reasonable. Sea Savage asks this court to reverse the decision of the district court and to enforce the recommendations of the magistrate judge.

**\*911** [33] Our review of the award is hampered by Sea Savage's utter failure to present any authority in its brief for its position that the award is excessive. Sea Savage does not point out any errors made by the district court. Neither does Sea Savage address the standard of review the district court should have applied to the magistrate judge's recommendations, or for that matter the appropriate standard of review applicable on this appeal. In essence, Sea Savage's argument boils down to a bald assertion that the magistrate judge's recommendation was correct and the district court's ultimate award was not, plus a request that we "review Chevron's billings" ourselves. This does not satisfy the requirements of Federal Rule of Appellate Procedure 28(a)(5), which requires the argument section of the appellant's brief to contain not only the party's contentions but also its "reasons therefor, with citations to the authorities, statutes and parts of the record relied on." In the absence of logical argumentation or citation to authority, we decline to reach the merits of Sea Savage's contention. *See United States v. Ballard,* 779 F.2d 287, 295 (5th Cir.) (holding that claims made "without citing supporting authorities or references to the record" are considered abandoned on appeal), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *Kemlon Prods. and Dev. Co. v. United States,* 646 F.2d 223, 224 (5th Cir.) (refusing to reach the merits of a party's claims when that party's brief addressed neither the merits of its own claims nor the reasoning of the district court), *cert. denied,* 454 U.S. 863, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981).

IV.

For the foregoing reasons, we REVERSE the district court's award for pain and suffering and RE-

MAND for the granting of a remittitur to $500,000 or a new trial on damages at Sea Savage's option. We REVERSE the district court's holding that Chevron is entitled to indemnification from Sea Savage under the time charter. We also REVERSE the district court's denial of attorneys' fees to Chevron for its defense of the claim for punitive damages and REMAND for determination of those fees. In all other respects, the judgment of the district court is AFFIRMED. Costs shall be borne by Chevron and Sea Savage.

ROBERT M. PARKER, District Judge, concurring in part, dissenting in part:

I concur with the majority opinion, with the exception of the remittitur portion contained in Section III., C., 1., *Damages; Pain and Suffering.* I am persuaded that the district court's assessment of the facts of this case as it relates to the award of damages in the amount of $1,000,000.00 for pain and suffering is not only not clearly erroneous, but falls within the bounds of reasonable compensation under the circumstances. I therefore limit my dissent to the remittitur ordered.

C.A.5 (La.),1994.
Randall v. Chevron U.S.A., Inc.
13 F.3d 888, 1994 A.M.C. 1217

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.