Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,

USG CORPORATION, a Delaware corporation;
and USG Interiors, Inc., a Delaware corporation,
Plaintiffs,

v.

Donald A. BROWN, and individual; Donald A.
Brown, as trustee of the Revocable Living Trust
dated September 29, 1976; and Manufacturers Na-
tional Bank of Detroit, as trustee of the Irrevocable
Trust dated July 22, 1976, Defendants.

No. 89 C 2874.
Feb. 25, 1997.

*MEMORANDUM AND ORDER*

MORAN, Senior District Judge.

*1 In this diversity case plaintiffs USG Corpor-
ation and USG Interiors, Inc. (USG) seek indemni-
fication from defendants (Brown) pursuant to a
merger agreement, for costs incurred as a result of
alleged violations of environmental laws and regu-
lations prior to the merger date. On October 26,
1992, this court granted in part and denied in part
USG's motion for summary judgment on the issue
of liability under Article 4(d) of the indemnity
agreement. *USG Corp. v. Brown,* 809 F.Supp. 573,
574 (N.D.Ill.1992) (USG I). Based on this order,
USG now moves for summary judgment claiming
that it is entitled to recover $864,030 in damages
for expenses resulting from defendants' pre-merger
noncompliances with environmental laws. In re-
sponse, Brown submits a counter-motion for sum-
mary judgment claiming that USG is not entitled to
any damages pursuant to the indemnity agreement.
For the reasons below, USG's motion is denied.
Brown's counter-motion is granted in part and
denied in part.

*BACKGROUND*

Brown owned D.A.B. Holding Company, the
parent of Donn Corporation (Donn) and American
Metal Company (AMC).[FN1] Donn and AMC oper-
ated manufacturing facilities in Westlake, Ohio
(Westlake). On June 25, 1980, Donn filed a notific-
ation of hazardous waste activity for its Westlake
facility with the U.S. Environmental Protection
Agency (USEPA). During Brown's ownership of
DAB., a portion of the waste from the manufactur-
ing process in Westlake was stored in three surface
impoundments and various hazardous waste con-
tainers. In 1982 AMC decided to close the three
surface impoundments. In order to effect closure of
the impoundments AMC was required to comply
with Ohio's environmental laws because at that time
the Ohio environmental agency (OEPA) was the
RCRA-authorized state agency for the USEPA.[FN2]
AMC undertook a "clean" closure of the surface
impoundments which required removal of all con-
taminated soil.

> FN1. Throughout this opinion, we will
> refer to defendants when we mean pre-
> merger AMC or Donn, or when we mean
> defendants currently.

> FN2. As of July 15, 1983, the OEPA had
> official "interim authorization" to oversee
> the closure of the three surface impound-
> ments.

On November 15, 1982, AMC submitted its
closure plan to the OEPA. AMC then started the
physical cleanup and closure process without hav-
ing received formal approval from the OEPA. On
September 24, 1984, the OEPA informally ap-
proved AMC's closure as a "clean" closure. The
OEPA suggested that AMC conduct one year of ad-
ditional monitoring for lead only, which was done.
On October 30, 1984, an independent engineer per-
formed the site check and agreed that the closure
had been completed consistent with the closure
plan. However, the OPEA had still not issued form-
al approval because it never completed its notice

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

and comment requirements. Then, in January 1986, the OPEA lost its delegated regulatory jurisdiction to administer the closure program. It is undisputed that the effect of this was that the closures were now to be approved by USEPA.

On April 9, 1986, after the OEPA had been stripped of its interim status and before defendants received formal approval for the closure from USEPA, USG acquired Westlake in a merger with D.A.B. and its subsidiaries. As a part of the merger, the parties executed an indemnity agreement in which defendants agreed to indemnify USG for any loss, liability or expense resulting from any pre-merger noncompliance with environmental laws and regulations under certain conditions. Specifically, Article 4 of the agreement states that defendants

**\*2** shall indemnify and hold harmless USG ... with respect to any loss, liability or expense ... incurred in connection with: ... (d) any noncompliance prior to the Merger Date (whether noticed, cited or otherwise) with applicable environmental laws, ordinances, and regulations....

Article 7 of the agreement, however, relieved Brown of liability for any obligation or claim if USG did not provide written notice to defendants by "the third anniversary of the Merger Date," April 9, 1989.

Subsequently, on September 30, 1986, the OEPA issued a formal approval of AMC's plan to close the three surface impoundments but told AMC that it would have to seek USEPA approval for formal closure. In compliance with federal law, AMC (now owned by USG) submitted its closure plan to the USEPA on October 6, 1986. The federal agency delayed review of the closure plan until more stringent regulations for and interpretations of contaminated soil were issued on March 19, 1987. Pursuant to these new regulations AMC elected to conduct a risk-based clean closure, which entailed the performance of monitoring and risk assessments.[FN3] USG incurred the costs of those risk as-

sessments and in June, 1987, USEPA rejected AMC's closure plan for failure to comply with the stricter standards. AMC submitted a revised version of the plan and on September 10, 1987, the USEPA approved AMC's closure plan subject to completion of risk assessments and groundwater monitoring requirements.

> FN3. In our November 17, 1995 Order, we held that USG was not entitled to indemnification for the cost of risk-assessments undertaken pursuant to federal closure requirements since AMC committed no pre-merger noncompliances with applicable closure laws that resulted in USG's costs. *USG Corp. v. Brown,* No. 89-C-2874, at 14 (N.D.Ill. Nov. 17, 1995) (USG IV). Specifically, we found that defendants could not be held liable under the indemnity clause for the USEPA's post-merger tightening of the closure laws on March 19, 1987. *Id.*

On January 3, 1989, the USEPA issued a Complaint and Compliance Order against AMC pursuant to § 3008(a)(1) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(a)(1), alleging violations due to the surface impoundments. The administrative complaint charged AMC with the following violations of the RCRA and operating standards promulgated thereunder:

f. Failure to implement a ground water monitoring program capable of determining impacts on the groundwater from the surface impoundments as required by 40 CFR 265.90 through 265.94 and OAC 3745-65-90 through 94 (September 9, 1987); and

g. Failure to manage containers, as required by 40 CFR 265.171, 265.171(a), and 265.174 and OAC 3745-66-71, 73(A), and 74 (May 25, 1984, March 11, 1985, September 5, 1986, and May 11, 1987).

(Pl.Ex. 2 at 7). The USEPA proposed a civil

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

penalty of $69,555 for the RCRA violations. On February 22, 1990, the USEPA and AMC (with USG's approval) entered into a consent order (Order I), under which AMC agreed to perform certain actions to bring Westlake into compliance with applicable hazardous waste laws, including instituting a groundwater monitoring program. Specifically, Order I provided in relevant part as follows:

E. Respondent shall implement a groundwater monitoring program capable of determining the facility's impact on the quality of groundwater in the uppermost aquifer. The program shall fully comply with the requirements of OAC 3745-65-90 through 94 (40 CFR 265.90 through 265.94). Respondent submitted a groundwater monitoring program entitled "Sampling and Analysis Plan" to U.S. EPA and OEPA on July 10, 1989. U.S. EAP approved with one (1) condition, the Sampling and Analysis Plan on July 28, 1989. Upon approval or approval with modifications by OEPA, Respondent shall implement the above mentioned groundwater monitoring program within thirty (30) days....

**\*3** (Pl.Ex.4 at 4.) Also as part of Order I, USG negotiated and paid a lower penalty of $45,000.

On March 13, 1990, after this lawsuit was filed, the USEPA issued a Consent Order requiring corrective action at Westlake (Order II). Order II was issued because of information indicating releases of hazardous substances at Westlake. Order II required AMC to perform a RCRA facility investigation to determine the nature and extent of any releases of hazardous wastes or constituents, and a corrective measures study (CMS) to evaluate alternatives for mitigating any migration or releases of hazardous wastes or constituents.

After these orders were issued, USG incurred substantial costs in implementing a groundwater monitoring system that complied with RCRA requirements. USG also incurred costs in cleaning up contaminated soil and groundwater in the drum storage area at Westlake and bringing the hazardous waste containers into compliance with RCRA oper-

ating standards.

In its original motion for summary judgment USG claimed that it was entitled to indemnification pursuant to the merger agreement for those costs arising from Orders I and II, since they resulted from environmental law violations by Brown occurring before the April 9, 1986 merger date. On October 26, 1992, this court issued a Memorandum and Order in which it granted USG's motion in part and denied in part. USG I, 809 F.Supp. at 574. Specifically, this court made two holdings with respect to USG's Order I claims that are the subject of the current dispute over damages. First, we held that USG was entitled to indemnification for those expenses incurred as a result of Brown's pre-merger noncompliance with RCRA groundwater monitoring requirements. Id. at 582. Second, we found that USG was entitled to indemnification for those expenses incurred as a result of defendants' pre-merger noncompliance with RCRA operating standards. Id. at 583. In reaching these conclusions this court found that USG had properly notified defendants as to its Order I claims pursuant to Article 7 of the agreement.[FN4] id. at 577-78. With respect to USG's Order II claims, we held that USG did not show as a matter of law that it provided Brown with full and fair notice of pre-merger noncompliances. Id. at 579.[FN5] start

FN4. Specifically, this court found that USG had sent a letter to defendants via certified mail on January 11, 1989 which spelled out in detail what the USEPA was seeking and which contained a copy of the January 4, 1989 USEPA complaint. USG I, 809 F.Supp. at 578.

FN5. In our April 22, 994 Order, we found that it did not matter whether or not defendants were "prejudiced" by the lack of notice, since the issue was simply whether USG notified defendants before the agreed upon limitation date. USG Corp. v. Brown, No. 89-C-2874 (N.D.Ill. April 22, 1994) (USG II). In our November 15, 1994 Or-

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

der, we again found that USG had failed as a matter of law to establish that it adequately notified defendants of pre-merger noncompliances with environmental law which resulted in the issuance of the USEPA's Order II. USG *Corp. v. Brown,* No. 89-C-2874 (N.D.Ill. Nov. 15, 1994) (USG III).

Based on our holdings in USG I, plaintiffs now move this court for summary judgment arguing that it is entitled to $864,030 in indemnification costs for 1) the penalty paid pursuant to Order I for AMC's pre-merger noncompliances; 2) the costs incurred in rectifying AMC's pre-merger noncompliance with the RCRA groundwater monitoring requirements; and 3) the costs associated with AMC's pre-merger noncompliances with RCRA operating requirements. Defendants dispute this claim and submit a counter-motion for summary judgment, arguing that USG should be denied any recovery.

### DISCUSSION
I. *Summary Judgement Standard*

A motion for summary judgment may be granted when there are no issues of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990). The movant must point to those portions of the record that demonstrate the absence of any genuine issue of material fact, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and all reasonable inferences are drawn in favor of the non-movant, *see e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bank Leumi Le-Isreal, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). Summary judgment should be granted when it is clear that the plaintiff could not carry his burden of persuasion at trial on one or more elements. *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

II. *Damages for Pre-Merger Noncompliance with RCRA Subpart F Groundwater Monitoring Re-quirements*

**\*4** Although the issue of liability was ostensibly decided in *USG I,* it is clear from the briefs in this case that there is considerable confusion over our previous holdings that needs to be addressed here before the issue of damages can be resolved. Therefore, we first address the extent of defendants' liability under the standard we previously articulated:

"[f]or defendants to be liable under Article 4(d) of the Indemnity Agreement, three elements must be present: (1) a pre-merger noncompliance with environmental law, (2) that this noncompliance resulted [in EPA action], and (3) that USG gave defendants full and fair written notice of the noncompliance within three years of the merger date. These three elements must occur simultaneously."

*USG III,* No. 89-C-2874, (N.D.Ill. Nov. 15, 1994). After clarifying liability, we then determine whether a damage award is appropriate on summary judgment.

A. *Extent of Defendants' Liability for Noncompli-ance with Groundwater Monitoring Requirements*

The first question presented by these motions for summary judgment is as follows: What, if any, expenses incurred by USG in implementing a groundwater monitoring system are attributable to defendants' pre-merger noncompliance with RCRA groundwater monitoring requirements set forth at 40 CFR §§ 265.90 *et seq.,* (Subpart F) applicable to Westlake's surface impoundments? This issue has been framed by the parties as a disagreement over the scope of this court's previous rulings.

Plaintiffs cite *USG I,* in which we granted plaintiffs' motion for summary judgment as to expenses incurred as a result of defendants' pre-merger noncompliance with RCRA groundwater monitoring requirements. 809 F.Supp. at 582. Based on *USG I,* plaintiffs argue that they are entitled to over $200,000 in costs associated with implementing a groundwater monitoring system, as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

well as that portion of the Order I penalty attribut-able to monitoring violations.

Defendants, on the other hand, point to *USG IV,* in which we held that defendants were in com-pliance with applicable closure laws prior to the merger and therefore were not liable for the costs of risk assessments performed by USG in connection with the post-merger closure of surface impound-ments. *USG IV,* No. 89-C-2874, at 14. We made this finding despite the fact that OPEA had its fed-erally-delegated authority to administer the RCRA revoked prior to the merger without having form-ally approved USG's closure. We also held that AMC was in pre-merger compliance even though the USEPA rejected AMC's closure plan after the merger, based on more stringent closure regulations that were passed on March 19, 1987. Defendants contend that once they were in compliance with the OPEA's closure requirements in 1984, their ground-water monitoring obligations ceased. Defendants thus argue that they are not liable for any of USG's costs of developing or implementing a groundwater monitoring system pursuant to Subpart F since those costs were associated with closure (for which they were not liable under *USG IV* ) and caused solely by a post-merger change in the applicable environmental laws. FN6

> FN6. Alternatively, defendants argue that even if they are liable for some of USG's costs associated with the groundwater monitoring system, there is a genuine issue of material fact with respect to the amount of damages to which USG is entitled.

**\*5** However, plaintiffs argue that prior to the merger AMC had a monitoring obligation pursuant to Subpart F that existed independent of any monit-oring requirements related to closure. Therefore, even if AMC was in pre-merger compliance with closure laws it was never in compliance with its in-dependent monitoring obligations. In USG I we noted that AMC had failed to implement a ground-water monitoring program in compliance with § 265.90 *et seq.,* for a period of six years, as indic-ated in the EPA complaint leading to Order I. 809 F.Supp. at 582. On this basis plaintiffs now urge this court to find that Brown is responsible for the implementation of a monitoring system that should have been implemented pre-merger, in compliance with their independent Subpart F obligations.

Defendants rejoin that whatever this independ-ent obligation was, they were never properly noti-fied pursuant to Article 7 of the merger agreement and are therefore not liable. Specifically, they con-tend that they are only liable for noncompliances cited in Order I since it is only for those noncompli-ances that they were afforded proper notice. Order I required AMC to implement a groundwater monit-oring system based on a Sampling and Analysis Plan (SAP) already developed by plaintiffs in con-nection with its closure obligations. Therefore, de-fendants argue that they were only properly notified of groundwater monitoring violations *in connection with closure* and since we have already held that they are not responsible for non-compliance with pre-merger closure laws, they are not liable for this category of costs.

This disagreement raises the following ques-tions: (1) what was the relationship between the OPEA's closure regulations and the USEPA's Sub-part F groundwater monitoring requirments, given the OPEA's status as RCRA-authorized state agency for the USEPA; and (2) if defendants were in fact under an obligation to perform groundwater monitoring, were they properly notified of their pre-merger failure to comply with this obligation in such a way as to give rise to liability?

First, it is necessary to determine precisely what the federal and state requirements at issue were at the time of the merger. Generally, the RCRA, 42 U.S.C. §§ 6901 *et seq.,* prohibits the storage, treatment and disposal of solid and hazard-ous waste materials at both private and govern-mental facilities without a permit issued by EPA or an authorized state. 42 U.S.C. § 6925(a). Recogniz-ing that the EPA could not issue permits to all ap-plicants before November 19, 1980, the RCRA's ef-

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

fective date, Congress provided that a facility could obtain "interim status" to allow it to operate pending final administrative action on its permit application. 42 U.S.C. § 6925(e)(1); *see also U.S. v. Ekco Housewares, Inc.,* 62 F.3d 806, 809 (6th Cir.1995). It is not disputed in this case that at all relevant times Westlake was an "interim status" facility (Pl.Ex.2, at 4).

Having obtained interim status, Westlake was required to comply with certain operating standards promulgated by the USEPA pursuant to the RCRA. 40 C.F.R. § 265.1 *et seq.* These regulations define "the acceptable management of hazardous wastes during the period of interim status," 40 C.F.R. § 265.1(a), and are applicable "until applicable part 265 closure and post-closure responsibilities are fulfilled ..." 40 C.F.R. § 265.1(b). At issue in this case are the groundwater monitoring requirements set forth in Subpart F. 40 C.F.R. S § 265.90-265.94. Specifically, Subpart F provides that "the owner or operator of a surface impoundment, landfill, or land treatment facility which is used to manage hazardous waste must implement a ground-water monitoring program capable of determining the facility's impact on the quality of ground water in the uppermost aquifer underlying the facility...." 40 C.F.R. § 265.90(a). Therefore, pursuant to federal regulations AMC was under an obligation to conduct groundwater monitoring until its closure responsibilities were fulfilled. 40 C.F.R. § 265.1(b).

**\*6** However, during the pre-merger period AMC was operating under a regulatory regime administered by the OPEA, acting pursuant to federally-delegated authority. The RCRA allows states to administer and enforce their own hazardous waste programs. 42 U.S.C. § 6926. Under the original version of the RCRA a state like Ohio could obtain interim authorization to carry out its own hazardous waste program. 42 U.S.C. § 6926(c)(1). Such an interim state program operated "in lieu of" the federal program for a period ending no later than January 31, 1986. *Id.* Once a state program is authorized, any action taken by the state "shall have

the same force and effect as action taken by the Administrator." § 6926(d); *see also Aurora National Bank v. Tri Star Marketing, Inc.,* No. 96-C-4175, at 3 (N.D.Ill. Jan.6, 1997). However, this is true only to the extent that the state program is no less stringent than the federal program, *Dydio v. Hesston Corp.,* 887 F.Supp. 1037, 1040 (N.D.Ill.1995). Further, a facility operating in a state which has been delegated federal authority remains subject to the RCRA and the USEPA is authorized to override the state program when necessary to enforce compliance with that statute. *Waste Management of Illinois, Inc. v. U.S. E.P.A.,* 714 F.Supp. 340, 341 (N.D.Ill.1989).[FN7]

> [FN7]. "For example, the Administrator may revoke a state-issued permit if the permittee fails to comply with RCRA sections 3004 and 3005, 42 U.S.C. §§ 6924-6925. See 42 U.S.C. § 6925(d) (1982). In addition, the Administrator may take enforcement action in a state with its own hazardous waste program, as long as he informs the state before taking action. *Id.* § 6928(a)(1), (2). Finally, if the Administrator determines that the state is not administering its program in accordance with the RCRA, he shall notify the state; if appropriate action is not taken, the Administrator is required to withdraw authorization from the state program." *Waste Management of Illinois, Inc.,* 714 F.Supp. at 341.

It is not disputed that until three months prior to the merger OPEA had official interim status to carry out its own state hazardous waste program in lieu of the federal program. The Ohio regulations substantially conformed to the federal regulations, as required by RCRA § 6926(c)(1).[FN8] Under the OPEA administrative regulations in effect at that time an owner or operator of a surface impoundment was required to "implement a ground water monitoring program capable of determining the facility's impact on the quality of groundwater in the uppermost aquifer underlying the facility...." Ohio

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

Admin. Code § 3745-65-90(A). This obligation applied "during the active life of the facility...." Ohio Admin. Code § 3745-65-90(B). A facility could cease to be active by complying with the applicable closure requirements. Ohio Admin. Code §§ 3745-56-01-3745-56-09. We have already held in USG IV that defendants were in compliance with these requirements prior to the merger. Therefore, the Ohio regulatory scheme, like the federal scheme, required AMC to maintain a groundwater monitoring system up until the date of closure.[FN9]

> FN8. Defendants have previously asserted that Ohio's regulations were equivalent to the federal scheme. *USG IV*, at 3.

> FN9. AMC was not required to continue monitoring after completing its clean closure. The state code provided that a "groundwater monitoring program shall be carried out during the active life of the facility, and for disposal facilities, during the post-closure care period as well." Ohio Admin. Code § 3745-65-90(B). However AMC was not a disposal facility within the meaning of the statute since it planned to remove the sludge stored in the surface impoundments. *See* Ohio Admin. Code. 3745-50-10(A)(25); P1.Ex.5A at 3. Therefore, its groundwater monitoring requirements ended when its closure plan was approved. 40 C.F.R. § 265.1(b).

The only liability issue left to be resolved is the precise time frame for which AMC was in violation of monitoring laws. Facilities such as Westlake were required to comply with groundwater monitoring requirements by November 19, 1981, under the state regulations. Ohio Admin. Code § 3745-65-90(A). Defendants have offered no evidence that they were ever in compliance with these regulations. On September 24, 1984, the OPEA informally approved AMC's clean closure and told AMC that it could backfill the surface impoundments. Since Ohio at that time was endowed with interim authority to enforce its scheme in lieu of

federal law, and since we have already held that AMC acted in compliance with the state's surrogate scheme, we find here that as of September 24, 1984, AMC was no longer obligated to maintain a monitoring system.[FN10] Thus, we find that AMC was out of compliance with applicable groundwater monitoring laws from the period beginning on November 19, 1981, and ending with the date of OPEA's informal approval of AMC's closure plan, on September, 24, 1984. The first prong of the liability test-noncompliance with applicable environmental law-is thus satisfied.

> FN10. Nothing we said in *USG I* is to the contrary. Although there we found that AMC was out of compliance with monitoring regulations for six pre-merger years, we later clarified that this "only means that U.S. EPA found [defendants] out of compliance in 1987 according to the 1987 laws and regulations." *USG IV*, at 11. Therefore, after the 1984 closure and before the merger, AMC was not out of compliance with applicable environmental laws.

**\*7** The second prong of the liability test is also satisfied since it is not disputed that AMC's non-compliances resulted in the USEPA issuing Order I, which assessed a civil penalty and mandated the implementation of a groundwater monitoring system (Pl.Ex.4, at 3).

Having determined that Westlake was in violation of Ohio's groundwater monitoring requirements prior to the merger and that this violation resulted in USEPA action, we now turn to whether defendants were properly notified of this noncompliance pursuant to Article 7. Defendants argue that since they are only responsible for noncompliances cited in Order I, they are liable for groundwater monitoring costs only to the extent described in Order I. In Order I, the USEPA directed USG to implement the groundwater monitoring program entitled "Sampling and Analysis Plan," which was submitted by USG and approved by USEPA on July 28, 1989. Defendants contend that the SAP was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

conducted as a condition of complying with USEPA clean closure requirements (Pl.Ex.5B at 1). Therefore, to the extent that Order I only discusses closure-related monitoring requirements, defendants now claim that they were never properly notified about the pre-merger nonclosure-related monitoring obligations and therefore cannot be held liable under Article 7 of the indemnity agreement.

In response, plaintiffs claim that they conducted the SAP pursuant to Subpart F requirements applicable to all facilities, regardless of their closure status. 40 C.F.R. § 265.92. Therefore, they argue, the Order I notification of noncompliance related generally to any monitoring violations and not simply those specifically connected to closure.

Our decision in *USG I* dictates that we find defendants were adequately notified of AMC's pre-merger groundwater violations. In USG I we held that defendants were properly notified of indemnification claims for expenses relating to Order I. We explicitly found that a letter sent from USG to defendants on January 11, 1989, which contained a copy of the EPA complaint, adequately informed defendants of the claims against them. *Id.* at 577-78. It was the letter and EPA complaint, not Order I, which formed the basis for proper notification under Article 7. In the EPA complaint, the USEPA specifically found that AMC had failed "to implement a groundwater monitoring program capable of determining impacts on the groundwater from the surface impoundments as required by 40 CFR 265.90 through 265.94 and OAC 3745-65-90 through 94 (September 9, 1987) ..." (Pl.Ex.2, at 7). Although it is true that Order I directed AMC to remedy the monitoring deficiencies by implementing the SAP already developed in compliance with the USEPA's closure requirements, the EPA complaint was broad enough to adequately notify defendants of any pre-merger groundwater monitoring violations which were not related to closure. The EPA complaint did not make any distinction between closure- and non-closure-related monitoring. The language of the EPA complaint clearly put

defendants on notice of plaintiffs' claim that AMC had committed pre-merger violations of its groundwater monitoring obligations.

**\*8** Since defendants were out of compliance with its pre-merger monitoring obligations under both federal and state law, and since defendants were properly notified of plaintiffs' claims based on these noncompliances, we find that defendants are liable under the indemnity agreement for costs incurred by plaintiffs in connection with remedying the violations which occurred during the time period indicated above.[FN11]

> FN11. Our opinion in USG IV is not to the contrary. There we found that defendants were in compliance with applicable closure laws at the time of the merger and therefore USG was not entitled to recover costs associated with closure. That finding, however, does not lead to the defendants, conclusion that they are therefore not liable for groundwater monitoring expenses. This is because, as we have already noted, AMC was under an obligation explicitly provided for in the OPEA regulations to implement a groundwater monitoring system and to maintain that system prior to closure. Since they were properly notified of these pre-merger violations in the EPA Complaint, defendants cannot now try to avoid damages by arguing that USG IV relieved them of liability for closure costs and then trying to cast its groundwater monitoring obligations as inextricably connected to closure, when in fact they were not.

B. *Order I Penalty*

Defendants' groundwater monitoring violation constituted the largest portion of the civil penalty assessed in Order I. In the EPA complaint, which formed the basis for the Order, the USEPA found that violations of Subpart F warranted a civil penalty of $44,218 out of the total penalty assessed at $69,655, which is 63%. Although the period in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

question covers approximately six years between July 1982 and September 1987, the only date cited in the EPA complaint is September 9, 1987, which was after the merger date. Plaintiffs argue that they are entitled to the full penalty cost. While they admit that some post-merger violations may have occurred between the merger date and September 1987, they argue that the portion of the penalty associated with those costs was more than compensated for by the reduction in the penalty they negotiated with the USEPA.[FN12] Defendants argue that they are only liable for that portion of the penalty corresponding to violations from the initial inspection date in 1982 to closure in 1984, since after that period the EPA found no violations of Subpart F.[FN13]

FN12. Plaintiffs successfully negotiated a reduction of the civil penalty to $45,000 in Order I.

FN13. Defendants assert that they since they were liable only from July 1982 to October 1984 and plaintiffs were liable from March 1987 to September 1987, defendants should only be assessed 80% of the penalty. They further contend that this amount should be reduced by 65% to correspond with the reduction negotiated by plaintiffs. Using this approach, they conclude that the total portion of the penalty allocable to Brown is no more than $28,528. (Def. Counter-Mot. at 15).

This issue of apportionment must ultimately be determined on the basis of a factual record more fully developed than we have before us now. For instance, we would need to know what portion of the final penalty was attributable to noncompliance with groundwater monitoring requirements and we would need more information to determine the appropriate weight to be accorded AMC's pre- and post-merger violations. Therefore, although we hold that plaintiffs are entitled to indemnification of a portion of the $45,000 civil penalty, we find that the extent of the penalty allocable to defendants is

an issue of fact that we cannot resolve on this motion for summary judgment. Plaintiffs' motion on this issue is denied.

C. *Expenses Associated with Development of Groundwater Monitoring System*

Plaintiffs contend that AMC's failure to implement and maintain a groundwater monitoring system in compliance with federal and state law cost them $221,120, which they are now entitled to as damages. Specifically, they argue that as a result of pre-merger noncompliances they were forced to hire AGI Technologies (AGI) to conduct hydrogeological studies, develop a sampling and analysis plan (SAP), and implement a groundwater monitoring program in accordance with Subpart F. They claim to be entitled to the full costs of developing this system since we have already found defendants liable for the pre-merger violations.

In response, defendants argue that a finding of liability does not lead to the conclusion that plaintiffs are entitled to the full damages they are seeking. First, they contend that in computing the costs associated with 42 U.S.C. § 265 Subpart F monitoring, the plaintiffs have erroneously included unrelated costs. For example, defendants claim that in estimating Subpart F costs plaintiffs included closure costs as well as expenses associated with its hazardous waste monitoring requirements under 42 U.S.C. § 26,4 Subpart F. Plaintiffs do not persuasively respond to this assertion, arguing only that any § 264 monitoring it did was at the insistence of the USEPA. While this may be true, it does not follow that defendants are responsible for defraying costs not associated with groundwater monitoring requirements, even if imposed by the USEPA. Therefore, to the extent that plaintiffs' calculation of damages associated with monitoring did include extraneous expenses, the award plaintiffs seek should be reduced accordingly. Second, defendants argue that plaintiffs were obligated to conduct their own Subpart F monitoring after the merger until the surface impoundments were certified by the USEPA as clean-closed and therefore it is unfair to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

shift the full costs to defendants. They correctly point out that plaintiffs were required as a condition of closure under the post-merger USEPA standards to conduct groundwater monitoring (Def.Ex.9). We therefore find that to the extent that USG would have incurred monitoring costs irrespective of defendants' pre-merger violations, the damage award also should be reduced accordingly.FN14

> FN14. Defendants' expert, Mr. Hespen, has calculated that the total costs of Subpart F monitoring that USG might have avoided after the merger if AMC had conducted pre-merger monitoring activities is only $73,173. While we do not necessarily accept this figure, it demonstrates that there is a genuine issue of material fact relating to the calculation of damages.

**\*9** However, we are not prepared at this stage to precisely allocate the amount of monetary damages related to the development and implementation of USG's groundwater monitoring program. We think the precise allocation of costs between 264 and 265, and the amount plaintiffs would have incurred irrespective of defendants' pre-merger violations, are factual issues that cannot be resolved on summary judgment. Therefore, plaintiffs' motion for summary judgment is denied.

II. *Damages for Pre-Merger Noncompliances with RCRC Operating Standards*

A. *Extent of Defendants' Liability for Noncompliance with RCRA Operating Standards*

The second question presented by these summary judgment motions is what if any expenses USG is entitled to as a result of defendants pre-merger violation of RCRA operating standards. In *USG I* we granted "summary judgment as to those expenses incurred as a result of defendants' pre-merger noncompliance with operating standards" set forth at 40 C.F.R. Subparts 262 and 265. 809 F.Supp. at 583. The costs at issue relate to USG's clean-up of contaminated soil and groundwater in the drum storage area of the Westlake facility. According to plaintiffs this clean-up was undertaken in response to AMC's pre-merger violations of the federal and state regulations governing the use and management of hazardous waste containers. 40 C.F.R. 265.171 *et seq.;* Ohio Admin. Code 3745-66-71 *et seq.*

USG argues that it has incurred approximately $596,910 in remediating contaminated soil and groundwater in the drum storage area as a result of AMC's pre-merger noncompliances (cited by OPEA) with the operating standards applicable to the hazardous waste containers stored in the drum storage area. Defendants respond that they cannot be held liable for these costs since none of the elements of the three-part liability test has been satisfied. Specifically, they contend that (1) there was never a noncompliance with pre-merger environmental laws that required the clean-up of the drum storage area; (2) USG never gave defendants proper and timely notice of this claim; and (3) Order I never contemplated the costly clean-up of the paint storage area that USG undertook since it merely recorded citations of minor waste-handling infractions and imposed a civil penalty. We will evaluate each of these arguments in turn.

First, we reject defendants' argument that AMC was in compliance with applicable environmental law since we have already held in *USG I* that defendants committed pre-merger violations of RCRA operating standards. The EPA complaint resulting in Order I indicates that AMC was cited for their failure to properly manage its hazardous waste containers on two dates prior to the merger (Pl.Ex.2, at Attach. 1). The fact that AMC was never explicitly cited for soil contamination is not relevant to the issue of whether defendants were in pre-merger compliance with applicable environmental law.

Second, plaintiffs assert that the EPA complaint and Order I adequately notified defendants of the drum storage clean-up costs they are now seeking. We agree. In *USG I* we made it clear that plaintiffs could recover all costs associated with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

pre-merger violations cited in the EPA complaint and Order I.[FN15] In Order I the USEPA stated that USG was required to "achieve and maintain compliance with the standards applicable to generators of hazardous waste ..." (Pl.Ex.4, at 3). Order I was based on violations cited in the preceding EPA complaint, which indicated, among other things, that AMC's failure to properly manage its hazardous waste containers constituted a violation of several state and federal regulations.[FN16] We find that this citation adequately notified defendants of plaintiffs' claim for clean-up costs. Although Order I did not explicitly cite AMC for soil contamination and order a clean-up, its finding of container violations should have adequately alerted defendants of the potential for hazardous waste leakages from the faulty containers which would require remediation.[FN17]

> FN15. There we stated as follows:

>> [T]here is the problem that some of the dates given as dates of violation are pre-merger and some are post-merger. USG seems not to address the problem, just claiming that all costs associated with Order I are recoverable. This may ultimately prove to be the case, but on this motion, and without much development from USG, we cannot say as a matter of law that all of the penalties assessed in Order I for noncompliance with operating standards are due to pre-merger noncompliance.

> 809 F.Supp. at 583.

> FN16. In the USEPA's Penalty Summary it noted violations of 40 C.F.R §§ 265.171, 265.173(a), and 265.174, as well as Ohio Admin. Code §§ 3745-66-71, 3745-66-73(A), and 3745-66-74. The dates cited were May 25, 1984, March 11, 1985, September 5, 1986, and May 11, 1987. The penalty suggested was $5,000. (Pl.Ex.2).

> FN17. Defendants argue that in *USG I* we held that plaintiffs are entitled to recover only for those categories of costs which resulted in "the specific infractions identified in the administrative complaint which gave rise to Order I" (Def.Reply at 2). Therefore, they assert that since the USEPA and the OEPA never cited AMC for contaminating the soil, only for maintaining leaky storage units, plaintiffs cannot recover the cleanup costs. Specifically, they contend that the only documented reference to spillage in the drum storage area occurred in the March 29, 1985 inspection report of the OPEA (Pl.Ex.7, at 3). This violation was explicitly omitted from the EPA complaint that provided the basis for Order I. Defendants contend that this omission shows that the spillage was cleaned up before Order I. On this basis defendants argue that they were never adequately notified of its liability for cleanup costs associated with soil contamination. We find this reading of *USG I* too narrow. Where the defendants' pre-merger failure to properly store waste resulted in leakages that contaminated the soil and necessitated removal, we think liability is established irrespective of whether soil contamination was specifically cited in Order I.

**\*10** Finally, defendants argue that there is no connection between AMC's pre-merger violations and the costly clean-up that USG undertook purportedly in response to Order I. Specifically, they contend that they should not be held liable for over $500,000 in clean-up costs since Order I simply assessed a small penalty for minor container-handling violations, some of which occurred after the merger. Plaintiffs argue that it is irrelevant whether Order I explicitly required the clean-up costs at issue since the indemnity agreement clearly states that AMC must pay USG for all costs "incurred *in connection with* any noncompliance prior to the Merger Date (*whether noticed, cited or otherwise* )

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

(emphasis added)." Based on this language, plaintiffs assert that its drum storage remediation costs are clearly connected with AMC's pre-merger noncompliances, of which defendants had adequate notice.[FN18]

> [FN18]. Specifically, plaintiffs assert that defendants were notified of AMC's violations by a letter from the OPEA dated March 29, 1985 (Pl.Ex.6), and from a memorandum submitted to AMC in October 1985 by its own consultant, Lion Technology (Pl.Ex.8).

Defendants, in response, argue that under the contract a loss can be "connected with" a noncompliance only if USG is required by law to pay a penalty or provide a remedy for noncompliance. They state that the contractual language merely provides that a pre-merger noncompliance did not have to be identified by governmental regulators before the merger for liability to attach after the merger.

This is a question of contract interpretation, which in this case is governed by Ohio law.[FN19] Under Ohio law it is well established that if a term is clear and unambiguous a "court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146, 149 (Ohio 1978). The "rules of contract construction require that common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Fireman's Fund Ins. Co. v. Mitchell-Peterson, Inc.,* 63 Ohio App.3d 319, 578 N.E.2d 851, 855 (Ohio.Ct.App.1989). In the absence of ambiguity, therefore, the terms of a contract must simply be applied without engaging in construction. *Santana v. Auto Owners Ins. Co.,* 91 Ohio App.3d 490, 632 N.E.2d 1308, 1311 (Ohio.Ct.App.1993). Generally, the interpretation of a contract term which is clear on its face is a

"matter of law and there is no issue of fact to be determined." *Nationwide Mutual Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 652 N.E.2d 684, 686 (Ohio 1995) (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.,* 15 Ohio St.3d 321, 474 N.E.2d 271, 272 (Ohio 1984).) However, contracts which are ambiguous or subject to various meanings are normally questions of fact for the jury. *Clarke v. Hartley,* 7 Ohio App.3d 147, 454 N.E.2d 1322, 1326 (Ohio.Ct.App.1982). The test for determining whether language used in a contract is ambiguous is whether that language is reasonably susceptible of more than one interpretation. *Santana,* 632 N.E.2d at 1311.

> [FN19]. It is well settled that a federal court sitting in diversity should apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) Therefore, we must apply Illinois conflicts rules in determining which state's substantive law should apply in this case. Illinois courts rely on the principles enunciated in the Restatement (Second) of Conflict of Laws in resolving conflict-of-law questions. *In re Marriage of Adams,* 133 Ill.2d 437, 141 Ill.Dec. 448, 551 N.E.2d 635 (Ill.App.Ct..1990); *International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co.,* 209 Ill.App.3d 144, 154 Ill.Dec. 9, 568 N.E.2d 9 (Ill.App.Ct.1990), *appeal denied,* 141 Ill.2d 542, 162 Ill.Dec. 490, 580 N.E.2d 116 (Ill.1991). The "Illinois law of conflicts requires the application of the law of the situs of the land in determining the validity, construction, force and effect of an instrument affecting real estate ..." *Matter of Morris,* 30 F.3d 1578, 1582 (7th Cir.1994).

**\*11** Based on the authority submitted by the parties we find that the "in connection with" lan-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

guage of Article 4 is not ambiguous and therefore we here articulate its clear meaning as a matter of law. The indemnification clause in question must be read in light of the background environmental laws. Specifically, under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.,* a private plaintiff can seek contribution for clean-up costs from "any other person who is liable or potentially liable." 42 U.S.C. § 9613(f)(1). A person seeking to establish the liability of another must demonstrate that:

(1) the site in question is a "facility" as defined by CERCLA;

(2) the Defendant is a "responsible person" for the spill as defined by CERCLA;

(3) there was a release of hazardous substances; and

(4) such a release caused the Plaintiff to incur response costs.

*Premium Plastics v. LaSalle National Bank,* 904 F.Supp. 809, 812 (N.D.Ill.1995); 42 U.S.C. § 9607(a). Although the Seventh Circuit has not definitively decided the issue, many courts have held that a plaintiff need not prove a causal connection between the defendant's waste and the plaintiff's response costs since CERCLA imposes a strict liability scheme, *see United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 264-66 (3rd Cir.1992); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1152-54 (1st Cir.1989); *United States v. Monsanto,* 858 F.2d 160, 168-71 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042-47 (2nd Cir.1985); *Premium Plastics,* 904 F.Supp. at 814; *but see Farmland Indus. v. Morrison-Quirk Grain Corp.,* 987 F.2d 1335, 1339 (8th Cir.1993). However, this is an area of some contention that we do not need to resolve here. It suffices for our purposes to note that for CERCLA

liability to attach a plaintiff must at the very least show some connection between the defendants, the hazardous waste release in question, and the clean-up costs incurred.[FN20]

> FN20. For instance, it would seem that even under CERCLA's strict liability regime, a plaintiff who was unambiguously responsible for a hazardous waste release would be hard pressed to impute liability to a prior owner who had absolutely no connection with the incident in question.

As the Seventh Circuit has established, indemnification agreements made "under the shadow of potential CERCLA liability" are assumed to create indemnitor liability "for the full range of CERCLA liability." *Taracorp, Inc. v. NL Industries, Inc.,* 73 F.3d 738 (7th Cir.1996) (construing Illinois law). Given the broad potential CERCLA liability in this case, we must read the indemnification provision expansively. Therefore, we find that Article 4 clearly contemplates indemnification for the type of clean-up costs plaintiff is seeking here, provided that plaintiff can show the costs at issue are generally connected with AMC's pre-merger violations of the hazardous waste container regulations, 40 C.F.R. 265.171 *et seq.;* Ohio Admin. Code 3745-66-71 *et seq.*

We thus have to determine whether there was a connection between AMC's pre-merger violations, the release of solvents into the ground in the drum storage area, and the clean-up costs at issue. Defendants claim that the clean-up activity in question was not related to the pre-merger hazardous waste container violations cited in Order I. Specifically, defendants argue that the location of the containers cited for violations in the EPA complaint is nowhere near the location of the 1994 clean-up. Our reading of the EPA complaint and the remedial action plan developed by AGI for cleaning up the spillage area (Def.Exh. 6), leads us to conclude that the location of the containers cited for pre-merger violations is ambiguous. There is simply no clear reference made to the location of the cited hazard-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

ous waste containers in the EPA complaint. While the area of clean-up is well defined (Def.Ex.6, at Fig. 2), neither side has definitely demonstrated that the waste containers referenced in the EPA complaint were located either clearly inside or outside the clean-up area.[FN21] While defendants would be liable for clean-up costs associated with spillage in the area referred to in the EPA complaint, they are clearly not liable for clean-up costs in other areas. The location of the faulty hazardous waste containers is thus an issue of fact that we cannot resolve on summary judgment.

> FN21. Defendants argue that the location of the alleged container violations was in an area known as "S-2" (Pl.Exh. 8, Fig.1), which is east and south of the clean-up area. In making this claim, defendants seem to misconstrue one of plaintiffs' notice arguments. Plaintiff claimed that defendants had been notified of the spillage by their own internal auditor, Lion Technology, Inc., which compiled a pre-merger report that indicated contamination in the S-2 area. (Pl. Exh. 9, at 21). Defendant asserts that by making this argument, plaintiffs have admitted that area S-2 was where the container violations occurred. We think defendants misread plaintiffs' brief. Plaintiffs were simply stating that defendants knew about spillages prior to the merger and thus were properly notified. They were not, as defendants argue, conceding that the relevant waste containers were located in area S-2. As a result, we find that the location of the faulty waste containers cited in the EPA Complaint is an undetermined issue of fact.

**\*12** Further, defendants state that it was the 1993 discovery of a serious oil spill near the paint storage area that precipitated the clean-up (Def.Ex.6, at 1). Plaintiffs respond that the clean-up activity was directed to the remediation of soils contaminated with solvents which were discovered after the observation of oil-stained vegetation. They further contend that the clean-up focused on a large area of solvent-based contamination that was much broader than the well-defined areas associated with oil-stained soils. However, Appendix D of the soil removal report prepared by AGI for plaintiffs clearly indicates that remediation of oil-stained soil was at least a component of the overall clean-up effort (Def.Ex.6). Under the contract plaintiffs cannot recover for an oil spill that has no relation to defendants' pre-merger operating standards violations. Plaintiffs have not adequately rebutted defendants' contention that there were at least some oil-related clean-up costs that would not be recoverable by plaintiffs. Therefore, we find that there is a genuine issue of material fact as to whether the clean-up costs USG is now claiming were in fact incurred in connection with the removal of soil contaminated by solvents which resulted from AMC's pre-merger storage violations. To the extent that the soil and water contamination was caused by AMC's failure to properly maintain its hazardous waste containers prior to the merger, defendants are liable for the clean-up costs. However, since there are issues of fact with respect to the location of the hazardous waste containers and the fraction of the clean-up costs allocable to solvent remediation, we must deny plaintiffs' motion for summary judgment on this point.

B. Order *I Penalty*

As we indicated in USG I, plaintiffs have offered no evidence disaggregating the pre- and post-merger operating standard violations that would allow us to conduct an accurate accounting of the damages to which they are entitled. Therefore, insofar as there is a factual dispute about the proper allocation of the penalty with respect to operating standard violations, plaintiffs' motion for summary judgment is denied.

C. *Costs Associated with Remediation of Drum Storage Area*

As discussed above, plaintiffs are only entitled to recover clean-up costs connected to AMC's pre-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)
**(Cite as: 1997 WL 89229 (N.D.Ill.))**

merger violations of the hazardous waste container-handling regulations cited in the EPA complaint resulting in Order I (Pl.Ex.2, Attach.1). Since plaintiffs have failed to offer any evidence that would allow us to make this calculation at this point, we find that a genuine issue of material fact exists and therefore deny plaintiffs' motion for summary judgment with respect to this issue.

### III. *The Applicability of the $100,000 Credit*

Under Article 8 of the indemnity agreement Brown is entitled to a "$100,000 limitation" on liability determined under Article 4(d) (Pl.Ex.12, at 6). Both sides agree that this limitation establishes a $100,000 credit for costs within the indemnification provisions at issue in this case. However, they disagree over whether this credit has already been used up in the course of this case. Specifically, defendants contend that none of this credit has yet been used and therefore it should apply to this case as a matter of law. Plaintiffs respond that defendants have exhausted the credit in reaching a 1989 settlement agreement that satisfied all claims relating to Articles 4(d) and (e) of the indemnity agreement, except those relating to the on-site waste disposal operations at Westlake (McElroy Aff. at 1).

**\*13** Plaintiffs' argument is based on the affidavit of Christopher McElroy who was senior corporate counsel for USG and represented USG in the settlement negotiations. Plaintiffs offer no other evidence of its credit exhaustion claim and the settlement agreement does not make any reference to the use of the $100,000 credit. Defendants argue that McElroy's affidavit should be struck as inadmissible under Fed.R.Civ.P. 56(e) and as contrary to the explicit terms of the agreement. Although we do not think that McElroy's statement that the credit was previously exhausted is inadmissible under Fed.R.Civ.P. 56(e), we do think that it constitutes parol evidence contrary to the clear and unambiguous terms of the integrated settlement agreement and thus will not be admitted for the purposes of varying the terms of the agreement. *See Ed Shory & Sons, Inc. v. Society Natl. Bank,* 75 Ohio St. 433,

440 (1995).[FN22] As a result, we grant defendants' counter-motion for summary judgment to the extent that it claimed the $100,000 credit provided for in Article 8 should apply to reduce the damages award here. However, because we have not determined the exact amount of defendants' liability for damages under the indemnity agreement, we cannot say as a matter of law that the $100,000 credit fully offsets any damages owed by defendants.

> FN22. The settlement agreement states as follows:
>
> > This Settlement Agreement, and the Exhibits hereto, constitute the entire agreement among the parties hereto with respect to the subject matter hereof, and there are no understandings or agreements, oral or written, among the parties with respect thereto which are not set forth herein.
>
> (Settlement Agreement, at 3).

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is denied and defendants' motions for summary judgment is granted in part and denied in part.

N.D.Ill.,1997.
USG Corp. v. Brown
Not Reported in F.Supp., 1997 WL 89229 (N.D.Ill.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

United States District Court,
N.D. Texas,
Fort Worth Division.

UNITED STATES of America
v.
GENERAL DYNAMICS CORPORATION.

Civ. A. No. CA4-87-312-A.
Jan. 2, 1991.
Supplemental Order Jan. 9, 1991.

United States sued for permanent injunctive relief and civil penalties based on aircraft manufacturer's alleged violations of Texas State Implementation Plan (SIP) promulgated pursuant to Clean Air Act. Both parties moved for summary judgment. The District Court, McBryde, J., held that: (1) Texas Air Control Board's interpretation of Texas SIP, as contained in court order, was inconsistent with Clean Air Act inasmuch as order would encourage, rather than discourage, uncontrolled use of volatile organic compound (VOC)-emitting solvents; (2) interpretation of SIP to allow plant-wide averaging of VOC emissions contradicted specific language of SIP which required each distinct surface coating operation to comply with VOC emission limits; (3) chemical milling maskant operation was surface coating process governed by rule requiring calculation of pounds of VOC emissions per gallon of coating applied; and (4) genuine issues of material fact existed as to whether manufacturer declined opportunity to install VOC emission control equipment at facility when offered by United States Air Force precluding summary judgment in favor of manufacturer on its indemnification counterclaim.

United States' motions for summary judgment granted as to liability; cross motions for summary judgment with respect to counterclaim denied.

West Headnotes

**[1] Environmental Law 149E ⟋282**

149E Environmental Law
  149EVI Air Pollution
    149Ek275 Particular Pollutants
      149Ek282 k. Volatile Organic Compounds. Most Cited Cases
      (Formerly 199k25.6(5.1), 199k25.6(5) Health and Environment)
   Texas Air Control Board's interpretation of Texas State Implementation Plan (SIP), as contained in Board's order, was not consistent with Clean Air Act, where order would have encouraged, rather than discouraged, uncontrolled use of volatile organic compound-emitting solvents (VOCs) by allowing plant-wide averaging of VOC emissions and including solvent washings in calculating VOC's emitted per gallon of surface coating used. Clean Air Act, §§ 101-403, as amended, 42 U.S.C.A. §§ 7401-7642.

**[2] Environmental Law 149E ⟋258**

149E Environmental Law
  149EVI Air Pollution
    149Ek257 Implementation of Federal Standards
      149Ek258 k. In General. Most Cited Cases
   (Formerly 199k25.6(4) Health and Environment)
   Federal agency should defer to state's interpretation of terms of its air pollution control plan when such interpretation is consistent with Clean Air Act. Clean Air Act, §§ 101-403, as amended, 42 U.S.C.A. §§ 7401-7642.

**[3] Environmental Law 149E ⟋282**

149E Environmental Law
  149EVI Air Pollution
    149Ek275 Particular Pollutants
      149Ek282 k. Volatile Organic Compounds. Most Cited Cases
      (Formerly 199k25.6(5.1), 199k25.6(5) Health

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

and Environment)

Because effect of agreed order of Texas Air Control Board was to raise volatile organic compound (VOC) emissions limitations set by Texas State Implementation Plan, order required approval by United States to be effective; unless and until such approval was given, operator of aircraft manufacturing facility was required to abide by emissions limitations of Texas State Implementation Plan.

**[4] Environmental Law 149E ☞700**

149E Environmental Law
　149EXIII Judicial Review or Intervention
　　149Ek699 Injunction
　　　149Ek700 k. In General. Most Cited Cases
　(Formerly 199k25.15(2.1), 199k25.15(2) Health and Environment)

United States was entitled to enjoin aircraft manufacturer's violations of volatile organic compound (VOC) emissions limits by epoxy prime line, where manufacturer did not contest violations of limits on line.

**[5] Environmental Law 149E ☞282**

149E Environmental Law
　149EVI Air Pollution
　　149Ek275 Particular Pollutants
　　　149Ek282 k. Volatile Organic Compounds. Most Cited Cases
　(Formerly 199k25.6(5.1), 199k25.6(5) Health and Environment)

Chemical milling maskant operation at aircraft manufacturer's facility was surface coating process subject to rule requiring calculation of pounds of volatile organic compound (VOC) emissions per gallon of coating applied, even though maskant was temporary coating used during production process and not permanent coating protecting finished product.

**[6] Environmental Law 149E ☞700**

149E Environmental Law
　149EXIII Judicial Review or Intervention
　　149Ek699 Injunction
　　　149Ek700 k. In General. Most Cited Cases
　(Formerly 199k25.15(2.1), 199k25.15(2) Health and Environment)

United States was entitled to enjoin violations of Texas State Implementation Plan promulgated pursuant to Clean Air Act with respect to adhesive prime line at aircraft manufacturer's facility, where adhesive prime line was extreme performance coating and emitted in excess of 3.5 pounds of volatile organic compounds (VOCs) per gallon of coating applied.

**[7] Indemnity 208 ☞64**

208 Indemnity
　208III Indemnification by Operation of Law
　　208k63 Particular Cases and Issues
　　　208k64 k. In General. Most Cited Cases
　(Formerly 208k13.1(2.1), 208k13.1(2))

Aircraft manufacturer was entitled to assert against United States, by way of recoupment, indemnification claim in United States' action for permanent injunctive relief and civil penalties based on manufacturer's alleged violation of Texas State Implementation Plan promulgated pursuant to Clean Air Act, where United States Air Force controlled all activities at manufacturer's facility and was responsible for compliance with Act. Clean Air Act, §§ 101-403, as amended, 42 U.S.C.A. §§ 7401 -7642.

**[8] United States 393 ☞130(6.1)**

393 United States
　393IX Actions
　　393k130 Set-Off and Counterclaim
　　　393k130(6) Against United States
　　　　393k130(6.1) k. In General. Most Cited Cases
　(Formerly 393k130(6))

When United States institutes action, defendant can assert by way of recoupment any claim arising

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

**[9] Federal Civil Procedure 170A** ⟷**2492**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
       170Ak2492 k. Contract Cases in General. Most Cited Cases

Genuine issue of material fact existed as to whether United States Air Force made available to aircraft manufacturer certain funds to install volatile organic compound (VOC) emissions control equipment at manufacturer's facility precluding summary judgment in favor of manufacturer on its indemnification counterclaim to action by United States for permanent injunctive relief and civil penalties based on manufacturer's alleged violations of Texas State Implementation Plan promulgated pursuant to Clean Air Act, even though Air Force controlled all activities at manufacturer's facility and was responsible for compliance with Clean Air Act. Clean Air Act, §§ 101-403, as amended, 42 U.S.C.A. §§ 7401-7642.

***721** F. Henry Habicht II, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Linda C. Anderson, Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Evan L. Pearson, Asst. Regional Counsel, U.S. E.P.A., Region VI, Dallas, Tex., Wayne Hughes, Asst. U.S. Atty., Fort Worth, Tex., Peter R. Mounsey, Steven Novick, Trial Attys., Richard B. Stewart, Asst. Atty. Gen., Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Ken Harmon, Office of Enforcement and Compliance Monitoring, U.S. E.P.A., Ashley Doherty, Environmental Defense Section, Environment & Natural Resources Div., Stuart M. Gerson, J. Patrick Glynn, Leslie Yu, Stephen Doyle, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Michael Lowenberg and Antonie Wells Whittie, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., Herbert L. Fenster, Tami Lyn Azorsky, McKenna & Cuneo, Washington, D.C., Michael T. Kavanaugh, McKenna & Cuneo, Los Angeles, Cal., for defendant.

ORDER

McBRYDE, District Judge.

Pending before the court are five motions for summary judgment, three filed by plaintiff, United States of America, and two filed by defendant, General Dynamics Corporation. The court, having considered the morass of pleadings in this action, makes the following determination:

Plaintiff filed its original complaint on May 7, 1987, under 42 U.S.C. § 7413 for permanent injunctive relief and civil penalties based on defendant's alleged violations of the Texas State Implementation Plan ***722** ("SIP") promulgated pursuant to the Clean Air Act, 42 U.S.C. §§ 7401-7642. After having its motion to dismiss denied, defendant filed its answer and counterclaim on July 15, 1988.

Defendant operates Air Force Plant No. 4 in Tarrant County, Texas, at which F-16 aircraft are produced. The facility is owned by plaintiff and all activities at the facility are controlled by the United States Air Force ("USAF"). Plaintiff's complaint alleges that certain operations conducted at the facility emitted or emit volatile organic compounds ("VOCs") in excess of the limits set by the SIP, Texas Air Control Board Regulation V, Rules 115.191 and 115.194. In particular, plaintiff complains of (a) the chemical milling maskant operation, utilized from January 1, 1983, through the present; (b) the epoxy (or PRC) prime line, operated from January 1, 1983, through March 31, 1986; and (c) the adhesive prime line operated since February 1, 1986. FN1

    FN1. Plaintiff's complaint alleges that the adhesive prime line has been in operation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

since November 1, 1985. Apparently the parties have determined through discovery that the start date was actually February 1, 1986. *See, e.g.,* Memorandum in Support of Plaintiff's Motion for Summary Judgment on the Issue of Liability, at 20.

Pursuant to the Clean Air Act and the Texas SIP, all affected persons within certain named counties, including Tarrant County, were required to comply with emissions standards set by the Texas Air Control Board ("TACB") as soon as practicable, but not later than December 31, 1982. The provision relevant to defendant's operations at Air Force Plant No. 4 is set forth in TACB Regulation V, Rule 115.191(9)(A)(iii):

(A) Volatile organic compound emissions from the coating (prime and topcoat, or single coat) of miscellaneous metal parts and products shall not exceed the following limits for each surface coating type:

. . . . .

(iii) 3.5 pounds per gallon (0.42 kg/liter) of coating (minus water) applied as an extreme performance coating....

On June 3, 1985, the TACB issued a notice of violation for VOC emissions at Air Force Plant No. 4 in excess of the Texas SIP limit of 3.5 pounds of VOCs per gallon of surface coating (minus water). On or about July 11, 1985, the Regional Administrator of the Environmental Protection Agency ("EPA") Region V issued a notice of violation to defendant pursuant to 42 U.S.C. § 7413(a)(1). Thereafter, TACB, defendant, USAF, and others, with the knowledge of EPA, met on several occasions and worked out a plan of compliance. An agreed board order was entered on January 17, 1986, which purported to provide for the full resolution of all violations alleged in the notices of violation issued by TACB and EPA. A second notice of violation was issued by EPA on February 24, 1987, alleging that the adhesive prime line exceeded emissions limits.

[1] The dispositive issue as to plaintiff's claims in this action is the effect of the agreed board order of January 1986. The parties agree that defendant has complied with the order. The dispute arises because plaintiff contends that the order is a departure from the requirements of the Texas SIP.FN2 Defendant claims that the order is within the Texas SIP and that TACB's interpretation of the Texas SIP must be given deference by the EPA.

FN2. As the court has previously determined, plaintiff has standing to bring this action. *See General Motors Corp. v. United States,* 496 U.S. 530, ----, 110 S.Ct. 2528, 2533-34, 110 L.Ed.2d 480, 490 (1990).

[2] Defendant correctly points out that a federal agency should defer to a state's interpretation of the terms of its air pollution control plan when such interpretation is consistent with the Clean Air Act. *Florida Power and Light Co. v. Costle,* 650 F.2d 579, 588 (5th Cir.1981). The court finds, however, that TACB's interpretation of the Texas SIP is not consistent with the Clean Air Act because the agreed board order would encourage, rather than discourage, the uncontrolled use of VOC-emitting solvents. In other words, the agreed board order does not fall within the parameters of the Texas SIP. First, the order allows plantwide averaging of emissions of **\*723** VOCs to determine whether VOC emissions exceed 3.5 pounds per gallon of coating applied. Second, the order allows gallons of solvent washings used to be included in the total gallons of surface coating for the purposes of determining the number of gallons of coating applied.

The facts in this case are analogous to those in *American Cyanamid Company v. U.S. Environmental Protection Agency,* wherein the plaintiff proposed the application of a so-called "bubble concept" or plantwide averaging of VOC emissions to determine its compliance with Louisiana emissions standards. 810 F.2d 493 (5th Cir.1987). Under the proposed plan, emissions from one source with-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

in the plant could exceed emissions limits as long as emissions from another source were low enough to offset the noncompliance. *Id.* at 497. The Louisiana Office of Environment Affairs ("Louisiana OEA") accepted the bubble concept and proposed to EPA that the Louisiana SIP be amended to allow use of averaging. The EPA's regional office recommended that the SIP revision be denied and issued plaintiff a notice of violation. Plaintiff appealed, alleging that the bubble concept was a "device" utilized to lower VOC emissions. The EPA determined that the bubble concept was not a device within the meaning of the Louisiana SIP. Louisiana OEA disagreed. The Fifth Circuit upheld the EPA's determination because it was not clearly wrong or unreasonable and did not contradict the Louisiana SIP's plain meaning. *Id.* at 498.

Likewise, in this case, the court determines that plaintiff's objection to plantwide averaging of VOC emissions is not clearly wrong or unreasonable and is therefore binding. *Id.* The TACB interpretation of the Texas SIP to allow plantwide averaging is unreasonable, because it contradicts specific language of the SIP, which requires each distinct surface coating operation to comply with VOC emissions limits. [FN3] In this case, the summary judgment evidence reflects, and the court finds, that the three lines at issue are separate and distinct.

> [FN3]. TACB Regulation V, Rule 101.1 defines surface coating processes as "continuous or assembly-line surface coating operations using solvent-containing liquids."

The second clearly nonsensical portion of the agreed board order allows defendant to include solvent washings in its calculations of VOCs emitted per gallon of surface coating used. Rule 115.191(9)(A) refers specifically to "[pounds of VOC emissions] per gallon of coating applied." Solvent washings are solvents used to clean parts and to clean up generally after coating operations are completed. Haltmeyer depo. at 18-23. Solvents are not part of the coating applied. Moreover, even

if solvents were included as "coating", the agreed board order does not limit the solvents included to those associated with coating operations. Rather, the order allows all general purpose cleaners used at Air Force Plant No. 4 to be included in the calculations.

The intent that gallons of solvent used not be included in the determination of gallons of coating applied is further made clear by Rule 115.191(9)(C), which provides that if solvent washings are directed into closed containers (so that VOC emissions are controlled rather than being discharged into the atmosphere) those emissions do not count as part of the coating operation. The rule would not make sense if gallons of solvent were included in calculating gallons of coating, because there would be no incentive for running solvents into closed containers. If the interpretation urged by defendant were allowed to prevail, defendant and others would actually be encouraged to use more uncontrolled VOC emitting solvents rather than fewer solvents.

[3] Because the effect of the agreed board order is to raise the emissions limitations set by the Texas SIP, the order requires approval by plaintiff to be effective. *United States v. Arkwright,* 690 F.Supp. 1133, 1141 (D.N.H.1988). Unless and until such approval is given, defendant must abide by the limitations of the Texas SIP. *General Motors,* 496 U.S. at ----, 110 S.Ct. at 2533-34, 110 L.Ed.2d at 490-91 .

[4] Having determined that defendant's compliance with the agreed board order is not the equivalent of compliance with the **\*724** Texas SIP, the court next considers whether the three lines individually complied or comply with the SIP. Plaintiff contends that, at the very least, it is entitled to judgment with regard to the epoxy prime line for violations of the Texas SIP between January 1, 1983, and March 31, 1986. In response, defendant makes excuses for, but does not contest, the violation of emissions limits by the epoxy prime line. Accordingly, the court finds that plaintiff is entitled to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

summary judgment on this issue.

[5] The next issue is whether the chemical milling maskant operation is a surface coating process governed by Rule 115.191. The maskant application is an intermediate step in the process of manufacturing airplane parts and is used to protect parts that are to be etched. Parts are dipped in a mixture of maskant and solvent, then dried. Areas on the parts that are to be etched are then unmasked by hand using templates. After the etching process, the remaining maskant is removed and the parts proceed to a machining area for final preparation. The maskant process results in the emission of VOCs.

Plaintiff argues that the maskant is a coating within the definition of Rule 115.191. Defendant argues that the maskant is not a "coating that will protect the airplane part in the environment in which it will be used" and, further, that the rule applies only to the process of finishing parts and not to intermediate steps, i.e. permanent and not temporary coatings. Defendant bases its arguments on the following passage from EPA's Control Technology Guidelines:

The coatings are a critical constituent of the metal coating industry. In many cases the coatings must provide aesthetic appeal, but in all cases, they must protect the metal from the atmosphere in which it will be used. Adverse conditions may include moisture, sunlight, extreme temperature, abrasion and corrosive chemicals.

Nothing in the rule or the CTG passage states that a coating is a substance that protects only finished products. The maskant clearly protects metal from the atmosphere of corrosive chemicals during the production process. Accordingly, plaintiff's conclusion that the maskant is a step of the coating process subject to Rule 115.191 is not clearly wrong or unreasonable and is entitled to deference. *American Cyanamid,* 810 F.2d at 498. Summary judgment will, therefore, be rendered for plaintiff on this issue.

[6] The third surface coating process is the adhesive prime line, which has been in operation since February 1, 1986. The parties agree that the adhesive prime line is an extreme performance coating. Moreover, defendant admits that the adhesive prime line emits in excess of 3.5 pounds of VOCs per gallon of coating applied. Accordingly, plaintiff is entitled to summary judgment on this issue as well.

[7] The final issue to be considered is whether either party is entitled to summary judgment on defendant's counterclaim. The counterclaim essentially alleges that defendant is entitled to be indemnified by plaintiff because USAF controls all activities at Air Force Plant No. 4 and is responsible for compliance with the Clean Air Act. Plaintiff claims that it is immune from suit in this instance.

[8] The law is clear that when the United States institutes an action, a defendant can assert by way of recoupment any claim arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the government's recovery. *United States v. U.S. Fidelity and Guaranty Co.,* 309 U.S. 506, 511, 60 S.Ct. 653, 655-56, 84 L.Ed. 894 (1940); *United States v. Shaw,* 309 U.S. 495, 501, 60 S.Ct. 659, 661-62, 84 L.Ed. 888 (1940); *Livera v. First National State Bank of New Jersey,* 879 F.2d 1186, 1196 (3rd Cir.1989). Therefore, the court denies plaintiff's motions for judgment on defendant's counterclaim.

[9] As for defendant's motion for summary judgment on its counterclaim, the court finds that defendant has failed to show that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law. As previously *725 discussed in the order of June 9, 1988, the record reflects that, at one time, USAF made available to defendant certain funds to install VOC emission control equipment at Air Force Plant No. 4. However, defendant declined the opportunity to install the equipment. Thus, a genuine issue of material fact exists with respect to defendant's entitlement to the relief sought.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785
**(Cite as: 755 F.Supp. 720)**

The court ORDERS, ADJUDGES and DE-CREES that plaintiff's motion for summary judgment be and is hereby granted as to the liability issues set forth herein. The court will hear arguments at the pretrial conference regarding the granting of the injunctive relief sought by plaintiff and the timing thereof. Plaintiff's request for penalties will be tried separately. The court further ORDERS that the cross-motions for summary judgment with regard to defendant's counterclaim be and are hereby denied. The court further ORDERS that the pretrial order submitted by the parties shall include a separate section specifying legal and fact issues to be presented to the court with regard to the imposition and amount of penalties, if any.

To the extent that this order conflicts with any prior orders of the court, such prior orders are hereby vacated.

SUPPLEMENTAL ORDER

On January 2, 1991, this court entered an order finding that General Dynamics (GD) violated the Texas SIP with respect to the maskant, adhesive prime, and epoxy primer surface coating processes operated by GD at Air Force Plant No. 4 in Fort Worth, Texas. GD previously brought the epoxy primer surface coating process into compliance with the emission limitations set forth in the Texas SIP. Accordingly, injunctive relief is necessary with respect to the maskant and adhesive prime processes only. Upon consideration of the arguments of counsel for the United States and counsel for General Dynamics, the court issues the following order and injunctive relief against General Dynamics.

On or about October 12, 1990, General Dynamics and the United States Air Force (USAF) submitted a site-specific SIP revision request to the Texas Air Control Board (TACB) for the purposes of modifying the Texas SIP requirements pertaining to Air Force Plant No. 4 in Fort Worth, Texas. This site-specific SIP revision request contains provisions, which, if approved and adopted, will regulate both the maskant and adhesive prime coating processes.

Accordingly, during the pendency of the SIP revision request, GD is ORDERED to submit progress reports to the USAF and EPA every six months disclosing the progress made toward controlling emissions from the maskant process and implementing the SIP revision request.

If the emissions from the maskant are not reduced to the level required by the then applicable SIP provision at the end of three years from the date of this order, GD is enjoined from any further operation of that process in Plant No. 4 after that date. Similarly, GD is enjoined from any further operation of the adhesive prime process at the end of three years from the date of this order, unless the emissions from that process will not exceed the level of the then applicable SIP provision.

GD is further ORDERED to cooperate fully with the USAF and EPA with respect to all matters covered by this order as long as this order is in effect; provided, however, the level of cooperation required by GD shall take into account the level of cooperation given to GD by USAF and EPA with respect to such matters.

The United States may request the court to accelerate the effective date of the injunction that prohibits further operation of the maskant and the adhesive prime processes based on progress disclosed by GD in its bi-annual progress reports.

N.D.Tex.,1991.
U.S. v. General Dynamics Corp.
755 F.Supp. 720, 32 ERC 1916, 21 Envtl. L. Rep. 20,785

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

**H**

United States District Court,
W.D. Wisconsin.
UNITED STATES of America, Plaintiff,
v.
Peter THORSON, Managed Investments Inc., Construction Management, Inc. and Gerke Excavating Inc., Defendants,
Acuity and Rural Mutual Insurance Company, Intervening Defendants.

No. 03-C-00740-C.
Dec. 29, 2003.

**Background:** United States government brought action under Clean Water Act (CWA) against developers and excavator, seeking to permanently enjoin unauthorized discharge of pollutants. Insurers for developers and excavator intervened, seeking determinations that they were not under duty to defend.

**Holdings:** On developers' insurer's motion for declaratory judgment, and on excavator's insurer's motion for summary judgment, the District Court, Crabb, Chief Judge, held that:

(1) developers could not recover for any punitive damages incurred under CWA, and

(2) alleged discharges of dredged and fill material would not fall within scope of "property damage" coverage.

Motions granted.

West Headnotes

**[1] Federal Civil Procedure 170A ⚡︎2501**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2501 k. Insurance Cases. Most Cited Cases

**Insurance 217 ⚡︎2942**

217 Insurance
  217XXIII Duty to Defend
    217k2942 k. Questions of Law or Fact. Most Cited Cases
    Under Wisconsin law, existence of duty to defend is question of law, and thus may be resolved on summary judgment.

**[2] Insurance 217 ⚡︎2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases
    Insurer has duty to defend insured under Wisconsin law only if complaint alleges facts that, if proved, would give rise to recovery under terms and conditions of insurance policy.

**[3] Insurance 217 ⚡︎2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases
    Insurer has duty under Wisconsin law to defend insured in any suit in which complaint alleges facts that, if proved, would give rise to recovery under terms and conditions of insurance policy.

**[4] Insurance 217 ⚡︎2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

**Insurance 217 ⚡︎2915**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2915 k. Matters Beyond Pleadings.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

Most Cited Cases

Insurer's duty to defend under Wisconsin law is determined by comparing allegations within four corners of complaint to terms of insurance policy; merits of claim are irrelevant in making such determination.

**[5] Insurance 217 ⟳2913**

217 Insurance
 217XXIII Duty to Defend
  217k2912 Determination of Duty
   217k2913 k. In General; Standard. Most Cited Cases

**Insurance 217 ⟳2930**

217 Insurance
 217XXIII Duty to Defend
  217k2930 k. Termination of Duty; Withdrawal. Most Cited Cases

Since insurer's obligation to defend suit under Wisconsin law is not extinguished if insured is eventually found to be faultless, courts regard duty to defend as broader than duty to indemnify.

**[6] Insurance 217 ⟳1806**

217 Insurance
 217XIII Contracts and Policies
  217XIII(G) Rules of Construction
   217k1806 k. Application of Rules of Contract Construction. Most Cited Cases

Under Wisconsin law, interpretation of insurance contract is controlled by principles of contract construction.

**[7] Insurance 217 ⟳1812**

217 Insurance
 217XIII Contracts and Policies
  217XIII(G) Rules of Construction
   217k1811 Intention
    217k1812 k. In General. Most Cited Cases

Goal in insurance contract construction under Wisconsin law is to determine intentions of contracting parties.

**[8] Insurance 217 ⟳1818**

217 Insurance
 217XIII Contracts and Policies
  217XIII(G) Rules of Construction
   217k1815 Reasonableness
    217k1818 k. Reasonable Persons. Most Cited Cases

Under Wisconsin law, language of insurance policy should be interpreted to mean what reasonable person in position of insured would have understood words to mean.

**[9] Insurance 217 ⟳1832(1)**

217 Insurance
 217XIII Contracts and Policies
  217XIII(G) Rules of Construction
   217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
    217k1832 Ambiguity, Uncertainty or Conflict
     217k1832(1) k. In General. Most Cited Cases

**Insurance 217 ⟳1835(2)**

217 Insurance
 217XIII Contracts and Policies
  217XIII(G) Rules of Construction
   217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
    217k1835 Particular Portions or Provisions of Policies
     217k1835(2) k. Exclusions, Exceptions or Limitations. Most Cited Cases

Under Wisconsin law, ambiguous terms and exclusionary provisions within insurance policy are to be narrowly construed against insurer.

**[10] Insurance 217 ⟳1808**

217 Insurance
 217XIII Contracts and Policies
  217XIII(G) Rules of Construction

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

217k1808 k. Ambiguity in General. Most Cited Cases

Under Wisconsin law, terms and conditions of insurance policy are "ambiguous" if they are fairly susceptible to more than one construction.

**[11] Insurance 217 ⟳2913**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2913 k. In General; Standard. Most Cited Cases

Under Wisconsin law, insurer has duty to defend if policy even arguably covers claim; however, such principle does not allow court to eviscerate exclusion that is clear from face of insurance policy.

**[12] Insurance 217 ⟳2914**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases

Under Wisconsin law, determining existence of insurer's duty to defend requires two-step analysis: (1) court must compare allegations contained within four corners of complaint with terms of policy and determine whether there is initial coverage, and (2) if court determines that there is initial coverage, it must determine whether exclusion provision applies.

**[13] Insurance 217 ⟳2913**

217 Insurance
  217XXIII Duty to Defend
    217k2912 Determination of Duty
      217k2913 k. In General; Standard. Most Cited Cases

If no form of relief sought by plaintiff is recoverable, then plaintiff's insurer has no duty to defend under Wisconsin law.

**[14] Insurance 217 ⟳2269**

217 Insurance

217XVII Coverage--Liability Insurance
  217XVII(A) In General
    217k2267 Insurer's Duty to Indemnify in General
      217k2269 k. Insured's Liability for Damages. Most Cited Cases

Under Wisconsin law, injunction to prevent future injury is equitable remedy that is not recoverable as "damages" under commercial general liability policy.

**[15] Environmental Law 149E ⟳223**

149E Environmental Law
  149EV Water Pollution
    149Ek223 k. Penalties and Fines. Most Cited Cases

Under Clean Water Act (CWA), civil penalties are punitive in nature. Federal Water Pollution Control Act Amendments of 1972, § 101 et seq., as amended, 33 U.S.C.A. § 1251 et seq.

**[16] Insurance 217 ⟳2261**

217 Insurance
  217XVII Coverage--Liability Insurance
    217XVII(A) In General
      217k2261 k. Public Policy Limitations in General. Most Cited Cases

Wisconsin law does not prohibit practice of shifting punitive damages to insurer.

**[17] Insurance 217 ⟳2278(7)**

217 Insurance
  217XVII Coverage--Liability Insurance
    217XVII(A) In General
      217k2273 Risks and Losses
        217k2278 Common Exclusions
          217k2278(7) k. Punitive Damages. Most Cited Cases

Any civil penalties incurred under Clean Water Act (CWA) by insured property developers, stemming from purported unauthorized discharges of pollutants, would be punitive in nature, and thus would not be within scope of insurer's coverage un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

der general liability insurance policy, since policy specifically excluded recovery for punitive damages. Federal Water Pollution Control Act Amendments of 1972, § 101 et seq., as amended, 33 U.S.C.A. § 1251 et seq.

**[18] Insurance 217 🔑2275**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2275 k. Accident, Occurrence or Event. Most Cited Cases

    Under Wisconsin law, "accident," for purpose liability insurance coverage, is unexpected, undesirable event or unforeseen incident which is characterized by lack of intention.

**[19] Torts 379 🔑148**

379 Torts
   379I In General
     379k148 k. Questions of Law or Fact. Most Cited Cases
    (Formerly 379k28)

**Torts 379 🔑144**

379 Torts
   379I In General
     379k142 Evidence
      379k144 k. Presumptions and Inferences. Most Cited Cases
    (Formerly 379k28)

    Although issue of intent is typically question of fact under Wisconsin law, intent may be inferred as matter of law when act is substantially certain to cause particular injury.

**[20] Insurance 217 🔑2914**

217 Insurance
   217XXIII Duty to Defend
     217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases
    Existence of duty to defend under Wisconsin

law is determined by complaint's allegations, not by its merits.

**[21] Insurance 217 🔑2275**

217 Insurance
   217XVII Coverage--Liability Insurance
     217XVII(A) In General
      217k2273 Risks and Losses
       217k2275 k. Accident, Occurrence or Event. Most Cited Cases

    Property damage alleged in complaint brought under Clean Water Act (CWA) against excavator, stemming from alleged discharges of dredged and fill material into protected wetlands, was intentional in nature, and thus would not fall within scope of property damage covered under general liability insurance policy; complaint averred that excavator and developer formed work agreement under both parties intended and anticipated that material would be discharged into wetlands. Federal Water Pollution Control Act Amendments of 1972, § 101 et seq., as amended, 33 U.S.C.A. § 1251 et seq.

**\*830** Leslie K. Herje, Madison, WI, for Plaintiff.

WIlliam T. Curran, Curran, Hollenbeck & Orton, S.C., Mauston, WI, for Defendants.

OPINION AND ORDER

CRABB, Chief Judge.

    This is a civil action for injunctive and monetary relief in which the United States contends that defendants Peter Thorson, Managed Investments Inc., Construction Management, Inc. and Gerke Excavating, Inc. violated 33 U.S.C. §§ 1319(b) and (d) of the Clean Water Act "for the unauthorized discharge of pollutants into waters of the United States." Plaintiff asks the court to (1) permanently enjoin defendants from discharging pollutants into the waters of the United States without a permit; (2) require defendants to remedy the damage caused by their unlawful activities at their own expense; and (3) impose civil penalties pursuant to 33 U.S.C. § 1319(d). Jurisdiction is present. 28 U.S.C. § 1331.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

[1] Intervening defendant Acuity provides general liability insurance to defendant Gerke; intervening defendant Rural Mutual Insurance Company provides commercial liability insurance to defendants Thorson, Managed Investments and Construction Management. Presently before the court is intervening defendant Rural Mutual's motion for declaratory judgment and intervening defendant Acuity's motion for summary judgment. Both intervening **831** defendants seek a determination that they are not under a duty to defend in this suit. Because the existence of a duty to defend is a question of law, this issue may be resolved on summary judgment. *Doyle v. Engelke,* 219 Wis.2d 277, 284, 580 N.W.2d 245, 248 (1998).

[2] I conclude that intervening defendants Rural Mutual and Acuity have no duty to defend under the relevant policies. An insurer has a duty to defend an insured only if the complaint alleges facts that, if proved, "would give rise to recovery under the terms and conditions of the insurance policy," *Elliott v. Donahue,* 169 Wis.2d 310, 320-21, 485 N.W.2d 403 (1992). The relevant policies indemnify defendants against amounts incurred as a result of *accidental* property damage. Because the alleged actions of defendants were substantially certain to cause the alleged property damage, the property damage was not accidental. The policies do not provide coverage for the damages alleged in this action. Therefore, the insurance providers are under no duty to defend.

I find from the parties' proposed findings of fact that the following are material and undisputed.

## UNDISPUTED FACTS
### A. *The Parties*

Defendants Construction Management, Inc., Managed Investments, Inc. and Gerke Excavating Inc. are Wisconsin corporations, each having its principal place of business in Tomah, Wisconsin. Defendant Thorson is an individual who acted at all relevant times as an agent for defendant Investment Management, Inc. (I will refer to defendants Thorson, Construction Management, Inc. and Managed Investments, Inc. collectively as "Thorson"). Intervening defendant Acuity is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. It issued a comprehensive general liability policy to defendant Gerke for the period of January 1, 2001, through January 1, 2002. Intervening defendant Rural Mutual is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. It issued a general liability policy and an excess liability policy to defendant Thorson for the period of March 15, 2001, through March 15, 2002. All relevant policies were issued in the state of Wisconsin.

### B. *The Claim*

Plaintiff brought this action against defendants for violating 33 U.S.C. §§ 1319(b) and (d) of the Clean Water Act, which prohibits parties from discharging pollutants into navigable waters without a permit. Plaintiff alleges that defendants or persons acting on their behalf, discharged into waters of the United States "dredged" or "fill" material, which the act defines as "pollutants." Plaintiff asks the court to (1) permanently enjoin defendants from discharging pollutants into the waters of the United States without a permit; (2) require defendants to remedy the damage caused by their unlawful activities at their own expense; and (3) impose civil penalties on defendants pursuant to 33 U.S.C. § 1319(d). (Defendant Thorson makes a number of arguments regarding intervening defendant Rural Mutual's proposed facts about the allegations of the complaint. However, he does not dispute that the allegations were made. Rather, he argues that the allegations are untrue or misleading. These disputes are neither responsive to the facts proposed nor relevant; " 'the duty to defend is triggered by the allegations contained within the four corners of the complaint' ... and has nothing to do with the merits of the claim." *Smith v. Katz,* 226 Wis.2d 798, 806, 595 N.W.2d 345, 350 (1999) (quoting **832***Newhouse v. Citizens Security Mutual Insurance Co.,* 176 Wis.2d 824, 835, 501 N.W.2d 1 (1993)).) Plaintiff makes the following allegations of fact in its complaint.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

Defendant Thorson owns or is in the process of purchasing 5.8 acres in LaGrange, Wisconsin. The property contains wetlands adjacent to Deer Creek, which is a tributary of a navigable river. Because the wetlands adjoin navigable waters, the Clean Water Act regulates their use. Defendant Thorson applied to both the Secretary of the Army, acting through the Chief of Engineers (Corps), and to the Wisconsin Department of Natural Resources for a permit to discharge dredged or fill material at specified sites. On May 24, 1999, the Department of Natural Resources denied defendant Thorson's application because it did not provide a reasonable assurance that the project would comply with the state water quality standards for wetlands. The Corps denied defendant Thorson's application two weeks later.

After this first round of denials, the United States Supreme Court issued its opinion in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), which limited the places in which the Corps could enforce the Clean Water Act. Defendant Thorson continued to "[take] steps to have the [s]ite dredged and filled" in February 2001, by asking the Corps field office whether it still considered the Clean Water Act to regulate the site. The Corps responded that it did.

Although they had not obtained a permit, defendants Gerke and Thorson agreed on or about March 23, 2001, that defendant Gerke was to excavate and fill a particular site owned by defendant Thorson. The contracting parties included the following clause in the agreement: "Gerke Excavating, Inc. will not bear responsibility for any fines or penalties assessed by government agencies. If project is shut down by any government agencies for any reason prior to completion, owner shall pay for all work completed." The day that defendant Gerke was to start work on the site, defendant Thorson contacted the Corps' district office to see whether it agreed with the opinion of the field office that the site was still regulated by the Clean

Water Act. Two different representatives of the Corps confirmed that the site was still regulated and that a permit was required for defendants' project. Despite this confirmation of the need for a permit, defendant Gerke commenced the dredging and excavating on March 27, 2001, and March 28, 2001. Defendants discontinued their efforts when the Army Corps of Engineers issued them a cease and desist order on March 28, 2001.

C. *The Acuity Policy*

The Acuity policy indemnifies defendant Gerke for "those sums that [it] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' " when that bodily injury or property damage is caused by an "occurrence." The policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (The policy contains four potentially relevant exclusions, but it is not necessary to discuss them because the policy does not cover the property damage alleged by plaintiff.)

Defendant Gerke also purchased limited pollution liability coverage. Under this additional coverage, intervening defendant Acuity is legally obligated to pay "those sums that the insured becomes legally obligated to pay as covered pollution costs or expenses or as damages because of bodily injury or property damage arising out of a pollution incident." As in the general coverage, the bodily injury or property damage must be the result of an "occurrence;" the term "occurrence" is also defined as it is in the general policy. In addition, the **\*833** policy defines a "pollution incident" as an accidental discharge of pollutants.

D. *The Rural Mutual Policies*

Both the general liability policy and the excess liability policy insure defendant Thorson against "those sums that [it] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' " when that bodily injury or property damage is caused by an "occurrence." The term "occurrence" is defined in both policies as "an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

accident, including continuous or repeated exposure to substantially the same general harmful conditions." Both policies exclude recovery for punitive damages. (Both policies contain a number of exclusion provisions that may preclude coverage. Again, it is unnecessary to discuss these provisions because the alleged property damage is not covered by the policies.)

### OPINION

[3][4][5] Because all of the policies involved in this suit were issued in Wisconsin, Wisconsin law governs their interpretation. *Lexington Insurance Company v. Rugg & Knopp, Inc.,* 165 F.3d 1087, 1090 (7th Cir.1999); *Kremers-Urban Co. v. American Employers Ins. Co.,* 119 Wis.2d 722, 351 N.W.2d 156 (1984). An insurer has a duty to defend an insured in any suit in which the complaint alleges facts that, if proved, "would give rise to recovery under the terms and conditions of the insurance policy." *Elliott,* 169 Wis.2d at 320-21, 485 N.W.2d 403. An insurer's duty to defend is determined by comparing the allegations within the four corners of the complaint to the terms of the insurance policy. *Smith,* 226 Wis.2d at 806, 595 N.W.2d at 350. The merits of the claim are irrelevant in making this determination. *Radke v. Fireman's Fund Insurance Co.,* 217 Wis.2d 39, 43, 577 N.W.2d 366, 369 (Ct.App.1998). Because an insurer's obligation to defend a suit is not extinguished if the insured is eventually found to be faultless, courts regard "the duty to defend [as] broader than the duty to indemnify." *Johnson Controls, Inc. v. Employers Ins. of Wausau,* 2003 WI 108, ¶ 30, 264 Wis.2d 60, 85, 665 N.W.2d 257, 270 .

[6][7][8][9][10][11] "In general, the interpretation of an insurance contract is controlled by principles of contract construction." *Johnson Controls,* 2003 WI 108 at ¶ 30, 665 N.W.2d 257 (citing *Kuhn v. Allstate Insurance Co.,* 193 Wis.2d 50, 60, 532 N.W.2d 124 (1995); *Maas v. Ziegler,* 172 Wis.2d 70, 79, 492 N.W.2d 621 (1992)). The goal in contract construction is determining the intentions of

the contracting parties. *Id.* "Of primary importance is that the language of an insurance policy should be interpreted to mean what a reasonable person in the position of the insured would have understood the words to mean." *Sprangers v. Greatway Insurance, Co.,* 182 Wis.2d 521, 536, 514 N.W.2d 1, 6 (1994). Ambiguous terms and exclusionary provisions are to be narrowly construed against the insurer. *Peace v. Northwestern National Insurance Co.,* 228 Wis.2d 106, 121 596 N.W.2d 429, 436 (1999). Terms and conditions are ambiguous if "they are fairly susceptible to more than one construction." *Kremers-Urban,* 119 Wis.2d at 735, 351 N.W.2d 156. Thus, there is a duty to defend if the policy even arguably covers the claim. "However, this principle does not allow a court to eviscerate an exclusion that is clear from the face of the insurance policy." *Peace,* 228 Wis.2d at 121, 596 N.W.2d at 436.

[12] Determining the existence of a duty to defend requires a two-step analysis. *Kalchthaler v. Keller Construction Co.,* 224 Wis.2d 387, 397, 591 N.W.2d 169 (Ct.App.1999). First, a court must compare the allegations contained within the four corners of the complaint with terms of the policy and determine whether there is initial coverage. *Id.; ***834***Smith,* 226 Wis.2d at 806, 595 N.W.2d at 350. Then, if the court determines that there is initial coverage, it must determine if one of the exclusion provisions applies. *Kalchthaler,* 224 Wis.2d at 397-98, 591 N.W.2d 169.

#### A. *Recoverable Damages*

[13] The basic scope of coverage in all of the relevant policies is described as amounts the insured parties become legally obligated to pay as *damages* because of property damage. The first issue is whether any of the forms of relief sought by plaintiff are the type of damages that are recoverable under commercial liability policies. If none of the forms of relief sought by the plaintiff are recoverable, then the insurer has no duty to defend. *City of Edgerton v. General Casualty Company of Wisconsin,* 172 Wis.2d 518, 493 N.W.2d 768

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

(Ct.App.1992), *overruled on other grounds in Johnson Controls,* 2003 WI 108, 665 N.W.2d 257.

[14][15][16][17] Plaintiff seeks: (1) an injunction; (2) civil penalties; and (3) restoration of the site. An injunction to prevent future injury is an equitable remedy that is not recoverable as damages under a commercial general liability policy. *Johnson Controls,* 2003 WI 108 at ¶ 37, 665 N.W.2d 257. Intervening defendant Rural Mutual argues that civil penalties under the Clean Water Act are not recoverable under a general liability insurance policy. It cites *City of Fort Pierre v. United Fire & Casualty Co.,* 463 N.W.2d 845, 848 (S.D.1990), to support its argument that civil penalties under this act are punitive in nature and that public policy bars a party from shifting the burden of paying punitive damages to an insurer. Intervening defendant Rural Mutual is partly correct. Under the Clean Water Act, civil penalties are punitive in nature. *Kelly v. U.S. E.P.A.,* 203 F.3d 519, 523 (2000). However, unlike South Dakota, Wisconsin does not prohibit the practice of shifting punitive damages to an insurer. *Brown v. Maxey,* 124 Wis.2d 426, 444-47, 369 N.W.2d 677, 686-88 (1985); *City of West Allis v. Wisconsin Electric Power Co.,* 2001 WI App. 226, ¶ 47, 248 Wis.2d 10, 44, 635 N.W.2d 873, 888. Thus, Rural Mutual's general liability might provide coverage for defendant Thorson's civil penalties were it not for the specific exclusions they contain. Both policies specifically exclude recovery for punitive damages. On the other hand, intervening defendant Acuity has not shown that either its general policy or the limited pollution liability coverage have similar exclusions. Moreover, although the Rural Mutual policies would not provide coverage for the first two types of relief sought by plaintiff, the cost or burden of restoring the site is presumptively a recoverable damage under commercial general liability policies. *Johnson Controls,* 2003 WI 108 at ¶ 5, 665 N.W.2d 257. Thus, the remedies sought include recoverable forms of "damages."

B. *Scope of "Property Damage"*

The next issue is whether the property damage alleged in the complaint falls within the scope of the "property damage" covered by the policies. The general policy of Acuity and both the general and excess policies of Rural Mutual define the scope of coverage as "those sums that the insured becomes legally obligated to pay as damages *because of 'bodily injury' or 'property damage'* to which this insurance applies." Under the limited pollution liability coverage that defendant Gerke purchased, Acuity is legally obligated to pay "those sums that the insured becomes legally obligated to pay as covered pollution costs or expenses or as damages *because of bodily injury or property damage* arising out of a pollution incident." Plaintiff has not alleged any bodily injury in the complaint. Therefore, all damages must be the result of covered property damage. **\*835** Because all of the policies contain the same definitions regarding the term "property damage," I will address this issue collectively.

[18] "Property damage" must be caused by an "occurrence." The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." An "accident" is " '[a]n unexpected, undesirable event' or 'unforeseen incident' which is characterized by a 'lack of intention.' " *Doyle,* 219 Wis.2d at 284, 580 N.W.2d at 248 (quoting *The American Heritage Dictionary of the English Language* 11 (3d ed.1992)).

[19][20] Because the policies cover only accidental property damage, no duty to defend arises if the property damage alleged in the complaint is clearly the intended or expected result of the alleged actions of defendants Thorson and Gerke. *School District of Shorewood v. Wausau Insurance Co.,* 170 Wis.2d 347, 364, 488 N.W.2d 82, 87 (1992). Conversely, if the alleged damage is even arguably an accidental consequence of defendants' alleged acts, the intervening defendants will have a duty to defend the suit unless they can show that an exclusion applies. *Id.* Although the issue of intent is typically a question of fact, *Gouger v. Hardtke,* 167

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

Wis.2d 504, 512, 482 N.W.2d 84 (1992), intent may be inferred as a matter of law when an act is substantially certain to cause a particular injury. *Id.* at 512, 482 N.W.2d 84; *C.L. v. School District of Menomonee Falls,* 221 Wis.2d 692, 700, 585 N.W.2d 826 (Ct.App.1998). Defendants' actual actions and intent are irrelevant because the existence of a duty to defend is determined by the complaint's allegations and not by its merits. *Radke,* 217 Wis.2d at 43, 577 N.W.2d at 369.

[21] The property damage alleged in the complaint is the discharge of pollutants (dredged and fill material) into the wetlands on the site. Plaintiff alleges that defendants Thorson and Gerke formed an agreement under which defendant Gerke was to excavate and fill the site and that defendant Gerke began to excavate and fill the wetlands on the site in accordance with this agreement. These alleged acts indicate that defendants both intended and anticipated that dredged or fill material would be discharged into the wetlands.

Defendants Thorson and Gerke argue that they did not intentionally violate the law because they were not sure whether the Clean Water Act applied to the wetlands on the site after the United States Supreme Court's holding in *Solid Waste,* 531 U.S. 159, 121 S.Ct. 675. Defendant Thorson asserts that contrary to the allegations in the complaint, the Corps did not inform him until after defendant Gerke began the work that the wetlands on his property were still covered by the Clean Water Act and that he would still need a permit. Defendant Gerke contends that the court should not infer that he knew his actions violated the Clean Water Act because he inserted a contract provision stating that he would not be held liable for any resulting government fines or penalties.

These arguments are unavailing for three reasons. First, as stated above, the truth of the allegations relates only to the merits of the claim and has no bearing on the existence of a duty to defend. *Radke,* 217 Wis.2d at 43, 577 N.W.2d at 369. Second, it is irrelevant whether defendants Thorson

and Gerke violated the law intentionally; the policies indemnify the insureds for accidental "property damage" and not accidental violations of the law. Finally, a mistake of law does not exonerate a party's otherwise intentional actions; knowledge of the law is presumed. *Cf. State v. Vinson,* 269 Wis. 305, 309, 70 N.W.2d 1, 4 (1955); **\*836** *State v. Britzke,* 108 Wis.2d 675, 683, 324 N.W.2d 289, 292 (Ct.App.1982) ("Failure to know that one's conduct is criminally punishable is not a defense.").

Defendants rely on *City of Fort Pierre,* in which the court held that the insurer would have had a duty to defend an insured that filled in wetlands without permit unless the allegations in complaint indicated that the insured's failure to obtain permit was intentional. *Id.* 463 N.W.2d at 847. However, defendants fail to recognize that the scope of the coverage they have purchased is entirely different from the coverage provided by the policy in *City of Fort Pierre.* Both the defendants in that case and the present case were sued for (1) filling in wetlands (2) without a permit. However, in *City of Fort Pierre,* the relevant policy insured against negligent omissions and thus, the insurance would have provided coverage for the insured's negligent failure to obtain a permit. By contrast, defendants are insured against accidental property damage. Thus, they are insured only for filling in wetlands unintentionally; the issue whether they failed to obtain a permit accidentally or intentionally is irrelevant.

In addition, defendant Gerke argues that the complaint does not allege specifically that defendants acted with intent. In *Jessica M.F. v. Liberty Mutual Fire Insurance Co.,* 209 Wis.2d 42, 54, 561 N.W.2d 787 (Ct.App.), the court held that an intentional acts exclusion in an insurance policy barred coverage in a negligence action because the alleged facts revealed intentional conduct. Thus, intent may be inferred from the alleged actions of defendants even when a plaintiff does not allege intent expressly and will not need to prove it to establish a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.Supp.2d 828, 57 ERC 2179
**(Cite as: 300 F.Supp.2d 828)**

defendant's liability.

### C. *Applicability of Exclusions*

The applicability of exclusions must be determined only if the court first determines that there is initial coverage over the damage alleged in the complaint. *Kalchthaler,* 224 Wis.2d at 397, 591 N.W.2d 169. Because I conclude that the damage alleged in the complaint falls outside the scope of the property damage covered in the relevant policies, it is unnecessary to determine the applicability of any of the policies' exclusions.

### ORDER

IT IS ORDERED that intervening defendant Rural Mutual's motion for declaratory judgment and intervening defendant Acuity's motion for summary judgment are GRANTED. FURTHER, IT IS ORDERED that intervening defendant Rural Mutual has no duty to defend or indemnify defendants Construction Management, Inc., Managed Investment, Inc. and Peter Thorson and intervening defendant Acuity has no duty to defend or indemnify Gerke Excavating, Inc.

W.D.Wis.,2003.
U.S. v. Thorson
300 F.Supp.2d 828, 57 ERC 2179

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

⚑

United States District Court,
S.D. New York.
SCHOLASTIC INC. et al., Plaintiffs,
v.
M/V KITANO, et al., Defendants, etc.

Nos. 02 CIV. 2997(DC), 02 CIV. 6389(DC).
March 31, 2005.

**Background:** Cargo owners brought action against vessel owner and shipper of container of impregnated activated carbon to recover for fire damage to cargo. Shipper filed third-party claims against intermediary and related entities seeking contribution and indemnification. Bench trial was held.

**Holdings:** The District Court, Chin, J., held that:

(1) intermediary was not liable to shipper for contribution or indemnification;

(2) intermediary did not take on affirmative duty to identify any hazard associated with impregnated activated carbon; and

(3) intermediary was entitled to indemnification from shipper for attorney fees.

Ordered accordingly.

West Headnotes

**[1] Shipping 354 ⬤➔112**

354 Shipping
    354VII Carriage of Goods
        354k112 k. Transshipment and Forwarding.
Most Cited Cases
    For purposes of determining legal status of intermediary, "freight forwarder" secures cargo space, gives advice on governmental licensing requirements and proper port of exit and letter of credit intricacies, and arranges to have cargo reach seaboard in time to meet designated vessel. 46 C.F.R. § 515.2.

**[2] Carriers 70 ⬤➔178**

70 Carriers
    70II Carriage of Goods
        70II(I) Connecting Carriers
            70k178 k. Carrier as Forwarder or Warehouseman. Most Cited Cases

**Shipping 354 ⬤➔112**

354 Shipping
    354VII Carriage of Goods
        354k112 k. Transshipment and Forwarding.
Most Cited Cases
    For purposes of determining legal status of intermediary, "non-vessel operating common carrier (NVOCC)" does not merely arrange for transportation of goods, but takes on responsibility of delivering goods by issuing bill of lading.

**[3] Carriers 70 ⬤➔178**

70 Carriers
    70II Carriage of Goods
        70II(I) Connecting Carriers
            70k178 k. Carrier as Forwarder or Warehouseman. Most Cited Cases

**Shipping 354 ⬤➔112**

354 Shipping
    354VII Carriage of Goods
        354k112 k. Transshipment and Forwarding.
Most Cited Cases
    Freight forwarder is only liable to shipper for its own negligence, including negligence in choosing carrier.

**[4] Shipping 354 ⬤➔143**

354 Shipping
    354VII Carriage of Goods
        354k143 k. Persons Liable for Loss or Damage. Most Cited Cases
    Shipper of dangerous goods is strictly liable

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

under Carriage of Goods by Sea Act (COGSA) for damages resulting directly or indirectly from such shipment when neither shipper nor carrier had actual or constructive preshipment knowledge of danger. 46 U.S.C.A. § 1304(6).

**[5] Contribution 96 ⟸5(6.1)**

96 Contribution
   96k2 Common Interest or Liability
     96k5 Joint Wrongdoers
       96k5(6) Particular Torts or Wrongdoers
         96k5(6.1) k. In General. Most Cited Cases

**Indemnity 208 ⟸69**

208 Indemnity
   208III Indemnification by Operation of Law
     208k63 Particular Cases and Issues
       208k69 k. Maritime Cases. Most Cited Cases

Intermediary that arranged for shipment of impregnated activated carbon was not liable to shipper for contribution or indemnification for damages arising from fire caused by shipment, even if intermediary qualified as non-vessel operating common carrier (NVOCC) under Carriage of Goods by Sea Act (COGSA), shipment was inflammable, and shipper provided intermediary with product information sheet, where shipper was contractually bound under bill of lading to indemnify intermediary for damages caused by shipper's failure to disclose goods' flammable nature, and product information sheet did not disclose that activated carbon presented risk of combustion. Carriage of Goods by Sea Act, § 43(6), 46 App.U.S.C.A. § 1304(6); Shipping Act of 1984, § 3(17)(B), 46 App.U.S.C.A. § 1702(17)(B).

**[6] Shipping 354 ⟸112**

354 Shipping
   354VII Carriage of Goods
     354k112 k. Transshipment and Forwarding. Most Cited Cases

Freight forwarder did not take on affirmative duty to identify any hazard associated with impregnated activated carbon, and thus was not responsible in negligence for damages arising from fire caused by shipment of activated carbon, even though freight forwarder did not request that shipper put in writing that its product was not hazardous until after fire, where freight forwarder complied with its procedures, and industry standard, in relying on shipper to tell it whether cargo was nonhazardous, and shipper repeatedly assured freight forwarder that its activated carbon was nonhazardous.

**[7] Shipping 354 ⟸112**

354 Shipping
   354VII Carriage of Goods
     354k112 k. Transshipment and Forwarding. Most Cited Cases

Freight forwarder was not negligent in its role in securing marine container for shipment of impregnated activated carbon, even if container permitted excess moisture to come into contact with cargo, causing fire, absent evidence that freight forwarder was negligent in its selection of company that provided container.

**[8] Indemnity 208 ⟸33(8)**

208 Indemnity
   208II Contractual Indemnity
     208k33 Particular Cases and Issues
       208k33(8) k. Maritime Cases. Most Cited Cases

**Indemnity 208 ⟸36**

208 Indemnity
   208II Contractual Indemnity
     208k34 Scope and Extent of Liability
       208k36 k. Costs and Expenses. Most Cited Cases

**Indemnity 208 ⟸37**

208 Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

208II Contractual Indemnity
208k34 Scope and Extent of Liability
208k37 k. Attorney Fees. Most Cited Cases

**Indemnity 208 ⚖︎69**

208 Indemnity
208III Indemnification by Operation of Law
208k63 Particular Cases and Issues
208k69 k. Maritime Cases. Most Cited Cases

Freight forwarder was entitled under bill of lading and Carriage of Goods by Sea Act (COGSA) to indemnification from shipper for attorney fees and costs incurred in litigation arising from fire causing by shipper's failure to disclose dangerous nature of its goods. Carriage of Goods by Sea Act, § 43(6), 46 App.U.S.C.A. § 1304(6).

**\*450** Picillo, Caruso, O'Toole By Steven A. Weiner, Esq., Nutley, NJ, for Third-Party Plaintiff.

Barry N. Gutterman & Associates, P.C., By Barry N. Gutterman, Esq., Robert Briere, Esq., New York, NY, for Third-Party Defendants.

**OPINION**

CHIN, District Judge.
On March 22, 2001, a fire broke out on the M/V Kitano as it was at sea. The fire was not extinguished until the next day, and a number of containers of cargo were damaged.

These related admiralty cases were filed by cargo owners against, *inter alia,* the vessel owner as well as General Carbon Corporation ("General Carbon"). General Carbon owned two forty-foot containers of activated carbon that were being shipped aboard the vessel. The fire apparently started in one of the two containers.

General Carbon filed third-party claims against certain third-party defendants, Navtrans International Freight Forwarding, Inc. and related entities (collectively, "Navtrans"). Navtrans was the inter-

mediary\*451 hired by General Carbon to arrange for the shipment of its two containers of activated carbon. All claims in the cases were eventually settled, except for (i) General Carbon's claims against Navtrans for contribution and indemnification for the sums paid by General Carbon to settle the other claims in the case, and for damages for its own cargo loss, and (ii) Navtrans's claims against General Carbon for contractual indemnification for attorneys' fees and costs incurred in this litigation.

General Carbon and Navtrans agreed to a summary trial on stipulated documents, jointly submitted depositions, and stipulated facts. Upon consideration of the evidence and the arguments of the parties, the Court will enter judgment in favor of Navtrans, dismissing General Carbon's claims against it and awarding Navtrans attorneys' fees and costs. Pursuant to Fed.R.Civ.P. 52, my findings of fact and conclusions of law follow.

**FACTS**

**1. The Parties**
General Carbon is a company that distributes activated carbon. Activated carbon is "a highly absorbent powdered or granular carbon made usually by carbonization and chemical activation and used chiefly for purifying by adsorption." [FN1] Merriam-Webster Collegiate Dictionary (10th ed.2000). Uses of activated carbon include water and air purification and odor removal. General Carbon also assembles and sells activated carbon filtration equipment, and processes activated carbon, "impregnating" it with chemicals to increase the efficiency of the carbon's adsorption. (Muller Dep. at 11, 14-15, 35).

> FN1. "Adsorption" is "the adhesion in an extremely thin layer of molecules (as of gases, solutes, or liquids) to the surfaces of solid bodies or liquids with which they are in contact." Merriam-Webster Collegiate Dictionary (10th ed.2000). In contrast to absorption, in which molecules are drawn into the internal structure of the absorbent, adsorption involves the adhesion of mo-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

lecules to the adsorbent's surface.

Navtrans [FN2] acts as an intermediary between shippers and carriers, arranging for shipments of goods in overseas transport. (Amended Third-Party Compl. ¶ 20; Amended Third-Party Answer ¶ 20).

> FN2. General Carbon's Amended Third-Party Complaint names Navtrans International Freight Forwarding, Inc.; Sirva Freight Forwarding, Inc.; Navtrans Container Lines, Inc.; Sirva Container Lines, Inc.; North American Van Lines, Inc.; and Sirva, Inc.; as well as additional defendants (*e.g.*, Rose Container Line Inc., World Trade Transport, North American Logistics). The Amended Third-Party Answer is on behalf of only the six afore-mentioned defendants. General Carbon refers only to the same six defendants in its trial briefs. General Carbon does mention some of the other defendants, stating that "Navtrans was a wholly owned subsidiary of Third Party Plaintiff [sic] North American Van Lines, Inc., Customized Logistics Services and/or SIRVA, Inc." (Pl. Trial Br. 6). No proof of service of the amended third-party complaint on any of the defendants has been filed. The Court assumes that General Carbon is not pursuing its claims against any of the named entities other than the six discussed in its briefs.

**2. *Activated Carbon Impregnated with Potassium Hydroxide***

General Carbon produced, upon the request of its customer, Johnson Pacific Pte. Ltd. ("Johnson Pacific"), activated carbon impregnated with potassium hydroxide ("impregnated activated carbon"). [FN3] General Carbon acquired the activated carbon **452** and liquid potassium hydroxide from outside companies. (Murray Dep. at 15). General Carbon impregnated the activated carbon with potassium hydroxide through a process involving the spraying of a solution of potassium hydroxide and water onto pelletized activated carbon; the mixture

is left to dry in open steel drums for approximately two weeks. (Murray Dep. at 15-16). No specific measures are taken to ensure the temperature of the warehouse in which the activated carbon dries; rather, it is kept at ambient temperature, 60 degrees during the day and 50 degrees at night. (Muller Dep. at 15; Murray Dep. at 20, 114).

> FN3. Activated carbon impregnated with potassium hydroxide is more efficient at adsorbing certain acidic contaminants, including hydrogen sulfide and mercaptans. (Muller Dep. at 78; Stip. Doc. # 7, product information sheet).

The aging process, where the activated carbon is left out to dry for two weeks, is important in preventing combustion. (Turk Dep. at 30). The process gives the impregnated activated carbon the opportunity to release heat that is created from the movement of potassium hydroxide into the activated carbon; the release of heat occurs in an environment where there is not oxygen flowing through the carbon that could otherwise cause combustion. (Turk Dep. at 30-33). Two weeks is the industry standard for drying activated carbon (Turk Dep. at 40); General Carbon makes no effort at the end of the two weeks to ascertain moisture content during the process, but rather leaves behind any portion that appears wet. (Muller Dep. at 40, 44).

**3. *The Shipment***

Beginning in June 2000, Johnson Pacific requested that General Carbon use its "new shipper," Navtrans. (Stip. Doc. # 5, email from Jennifer Tan at Johnson Pacific to Bob Muller, dated June 28, 2000. Upon receipt of Johnson Pacific's request to use Navtrans, Robert Muller contacted Frank Damaro at Navtrans and provided him information on what was being shipped; Damaro then requested a material safety data sheet, which General Carbon provided. (Muller Dep. at 94-5). Navtrans arranged multiple subsequent shipments of activated carbon to Johnson Pacific, including the ill-fated shipment on March 21, 2001 that is the subject of the instant action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

Navtrans's role in arranging for the March 21, 2001 shipment included overseeing and gathering shipper's documents (*e.g.,* shipper's commercial invoice, packing list) (Damaro Dep. at 10, 15, 42); preparing and issuing two bills of lading (*id.* at 28; Stip. Doc. # # 11, 13); and locating and coordinating with a carrier, Rose Containerline.[FN4] Navtrans contracted for a shipment with Rose Containerline, which then issued a bill of lading listing Navtrans International as the shipper. (Stip. Doc. # 28, Rose Containerline Bill of Lading). Rose then booked space with carrier Hapag-Lloyd, in two of its slots aboard the M/V Kitano (Ferrer Dep. at 38), and arranged for pick-up of the cargo at General Carbon. (Stip. Doc. # 28, Rose Containerline Booking Confirmation).

        FN4. Although the third-party complaint lists defendant as "Rose Container Line Inc.," documents from Rose indicate the correct name is Rose Containerline, Inc. (Stip. Doc. # 2, Rose Containerline Booking Confirmation).

The bills of lading Navtrans issued to General Carbon listed the cargo as "activated carbon" and described the shipper's packaging (bags and drums). (Stip.Doc.# # 11, 13). The bills of lading contained various terms and conditions, including an indemnification provision addressing liability where dangerous or hazardous goods were shipped without full disclosure to the Carrier. (Stip.Doc.# 11, ¶ 17). The provision required that where a shipper fails to make such a disclosure, **453** the shipper shall indemnify the carrier for its expenses incurred as a result of that omission.

General Carbon repeatedly assured Navtrans that the activated carbon was nonhazardous, and that General Carbon shipped activated carbon all the time as nonhazardous cargo. (Damaro Dep. at 23, 48). General Carbon did not believe that its activated carbon was hazardous, nor that it had any potential to self-combust. (Murray Dep. at 42, 87). General Carbon made no specific requests, and gave Navtrans no special instructions, regarding

shipment and handling in overseas transport of impregnated activated carbon (*e.g.,* regarding type of container), nor was General Carbon aware of any special precautions that should have been taken. (Murray Dep. at 116-17). General Carbon did provide a material safety data sheet and a product information sheet instructing end users on dangers and safe handling of impregnated activated carbon. (Muller Dep. at 83; Stip. Doc. # 7).

### 4. *Loading the Shipment*

On March 12, 2001, Rose Containerline arrived at General Carbon to pick up and transport a shipment of impregnated activated carbon. (Stip. Doc. # 11, Bill of Lading). Rose Containerline provided a forty-foot steel container from Hapag-Lloyd, number HLCU437489 ("container 89"), into which General Carbon loaded 360 vinyl bags, each holding forty-four kilograms of activated carbon. (Stip. Doc. # 12, Shipping Order; Stip. Doc. # 13, Bill of Lading). On March 16, 2001, Rose Container Line provided another forty-foot steel Hapag-Lloyd container, number HLCU4224290 ("container 90"), into which General Carbon loaded 288 bags, each holding forty-four kilograms of activated carbon, and fourteen steel drums, each holding 115 kilograms of impregnated activated carbon. (Stip. Doc. # 9, Shipping Order; Stip. Doc. # 11, Bill of Lading).

General Carbon's regular practice was for either Robert Murray or Alex Maisonet, General Carbon's foreman, to conduct an inspection of the containers before they were loaded. (Murray Dep. at 106; Muller Dep. at 86). Murray does not recall if he supervised the loading of the two shipments at issue here. (Murray Dep. at 27). He assumed that his foreman, Maisonet, inspected every truck or container into which cargo was loaded (Murray Dep. at 54), and would have rejected any piece of equipment if it had any defect. (*Id.* at 54). Neither Murray nor Muller were aware of any defects in the containers. (*Id.* at 107; Muller Dep. at 90-91).

General Carbon loaded the containers on the loading dock, located outside the warehouse.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

(Murray Dep. at 78). The bags were loaded onto pallets, with twenty bags per pallet, arranged four bags per layer, five layers high, with a cardboard trim sheet between, for a total of twenty bags per pallet. (*Id.* at 29, 39-40). The mouth of the bags was not secured, but rather folded over. (*Id.* at 31-32). The bags were then shrink-wrapped onto the pallet, across the top and around the sides, but not underneath the bottom of the bags or the pallet. (*Id.* at 29-30). The pallets, and steel drums, were loaded into the steel containers, which Rose then transported to the vessel.

**5. *The Voyage and The Fire***

On or about March 21, 2001, the two containers were loaded aboard the M/V Kitano. Both containers were declared as general cargo. The Kitano's practice was for ship crew to inspect each container. (Iwata Dep. at 271-72). Because the containers at issue were declared as general cargo, no documentation of inspection would have been created. (*Id.*). Container 90 was stored in a slot above deck, while **\*454** container 89 was stored below-deck. (Stip. Doc. # 34, Fire Investigators' Preliminary Report).

The vessel departed New York on March 21, 2001, and encountered stormy weather and rough seas. (Iwata Dep. at 201, Ex. 26). On March 22, 2001 at approximately 4:00 p.m., a fire was discovered on board the vessel. (Stip. Doc. # 27, Ship Log). Fire fighting measures were immediately instigated. During the fire-fighting, the ship's crew reported seeing "little red pellets ... burning" outside container 90. (Iwata Dep. at 270, 272, 285). The fires were extinguished by approximately 11:15 p.m. the following day, March 23, 2001. (Iwata Dep., Ex. 26). In addition to damage sustained by container 90, nearby containers sustained fire damage, including cargo belonging to Scholastic, Inc. (books) and Dover Corporation (machine parts).

The fire started in container 90. The impregnated activated was cargo of a "flammable, ... unstable or dangerous nature," as those terms are used in the bill of lading between General Carbon and

Navtrans.[FN5] (Stip.Doc. # 11).

> FN5. The Court notes that impregnated activated carbon, when shipped in packages not more than three cubic meter volume, is not regulated as a hazardous material under the International Maritime Dangerous Goods Code or Department of Transportation Regulations. (Altemos Dep. at 36-37). The parties do not dispute that the individual packages (bags and drums) in which the activated carbon was shipped were smaller than three cubic meters in volume. (Altemos Dep. at 37; Muller Dep. at 58-59). The Court also notes that the activated carbon here was shipped in forty-four kilogram bags, twenty bags per pallet, with 360 bags in one container and 288 bags and fourteen 115 kilogram drums in the other. (Stip.Doc.# # 9, 12).

**6. *Navtrans's Actions After the Fire***

Earlier in the morning of March 23, 2001, Frank Damaro at Navtrans contacted Robert Murray at General Carbon, requesting that Murray put in writing on General Carbon's letterhead that the impregnated activated carbon was "nonhazardous."[FN6] (Murray Dep. at 121-22; Stip. Doc. # 16, fax coversheet and fax stating "nonhazardous"). Per Damaro's instructions, Murray wrote "non-hazardous" on the commercial invoices for the two containers, and then faxed them to Sue Danders, who apparently worked for Hapag-Lloyd, and to Damaro. (*Id.*). A few hours later, Damaro faxed the documents to the legal department of North American Van Lines. (Stip. Doc. # 1, fax cover sheet).

> FN6. Damaro did not remember when he received the document, but testified that he requested the non-hazardous declaration before the fire, but did not receive it until after, because General Carbon "was slow in sending back [his] request." (Damaro Dep. at 51). The fax transmission date and time information at the top of the docu-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

ment shows that General Carbon faxed the document on March 23, 2001 at 7:51 a.m. I reject Damaro's testimony and find that Damaro did not request the document until March 23, 2001, after the fire had started.

**7. *Litigation and Settlement***

On April 18, 2002, Scholastic, Inc. and Dover Corporation filed a complaint in this Court for damages sustained during the fire against multiple entities, including the vessel and various carrier entities. The complaint was amended on September 10, 2002 to name General Carbon as a defendant. In August, 2002, a case filed by another shipper, JT International, S.A., was accepted by this Court as related to the Scholastic action. JT International similarly amended its complaint on September 18, 2002, adding General Carbon as **\*455** a defendant. FN7 On March 4, 2003, General Carbon filed a third-party complaint in each action, the subject of the instant summary trial. On November 14, 2003, Navtrans filed a counter-claim against General Carbon.

> FN7. Various cross-claims were also made by some of the defendants.

Settlement negotiations ensued; as of November 2003, all claims were settled, except for General Carbon's third-party claims against Navtrans and Navtrans's counter-claims against General Carbon. FN8 General Carbon paid a total of $1 million to settle the claims against it (Stip. Facts ¶ 1), which was approximately half the total damages claimed against it. (*Id.* ¶¶ 4, 6, 8, 10, 12).

> FN8. The status of General Carbon's third-party complaint against Rose Containerline is unclear: the parties apparently agreed to an "open extension of time to answer." ( *See* Letter to the Court from counsel to Rose Containerline, dated November 3, 2003). Rose Containerline has not answered, nor has General Carbon filed default judgment papers; the Court assumes that General Carbon has abandoned

its claims against Rose.

General Carbon now seeks from Navtrans indemnification and contribution for its settlement payments, and damages for its lost goods. Navtrans in turn seeks contractual indemnification for attorneys' fees and costs incurred in this litigation.

*DISCUSSION*

The principal issue presented is whether Navtrans is liable to General Carbon, under a theory of indemnification or contribution. The parties agree that the case is controlled by maritime law and the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.* General Carbon fails to make clear the precise basis for claiming it is entitled to indemnification and contribution. General Carbon does not rely on any contractual basis, but rather appears to be arguing a negligence theory, based on an expansive reading of Navtrans's obligations as an intermediary. Any liability turns on Navtrans's legal status as either a freight forwarder or a non-vessel operating common carrier ("NVOCC"), in relation to General Carbon and parties with whom General Carbon settled. After setting out the applicable law on the status of intermediaries and their potential liability, I address the merits of General Carbon's claims.

**1. *Freight Forwarders v. Non-Vessel Operating Common Carriers***

Freight forwarders and non-vessel operating common carriers are types of intermediaries that arrange for shippers the transportation of cargo aboard a vessel. Although they perform similar roles, the legal status of the intermediary determines its liability to the shipper.

[1][2][3] A freight forwarder "simply facilitates the movement of cargo to the ocean vessel. The freight forwarder 'secures cargo space ..., gives advice on governmental licensing requirements [and] proper port of exit and letter of credit intricacies, and arranges to have the cargo reach the seaboard in time to meet the designated vessel.' " *Prima U.S. Inc. v. Panalpina, Inc.,* 223 F.3d 126,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

129 (2d Cir.2000) (quoting *New York Foreign Freight Forwarders & Brokers Ass'n v. Federal Maritime Comm'n,* 337 F.2d 289, 292 (2d Cir.1964) ); *see also* 46 C.F.R. § 515.2 (listing freight forwarder duties). An "NVOCC," in contrast, does not merely arrange for transportation of goods, but takes on the responsibility of delivering the goods. The most fundamental difference between a freight forwarder and an NVOCC is that an NVOCC issues a bill of lading. *See Prima,* 223 F.3d at 129. It is from the bill **\*456** of lading-the NVOCC's contract with the shipper-that its liability to the shipper for its cargo derives. *Id.* A freight forwarder, in contrast, is only liable to a shipper "for its own negligence, including negligence in choosing a carrier." *Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. 268 (S.D.N.Y.1980); *see also Prima,* 223 F.3d at 130 ("when a freight forwarder selects someone to perform transportation services, that selection fulfills the forwarder's obligations in the absence of proof that the selection itself was negligent").

**2. *Defendants' Status as Freight Forwarder and/ or NVOCC***

General Carbon argues that certain of the Navtrans entities acted as freight forwarders, while others acted as NVOCCs, arguing for liability under either status. Navtrans argues that all its entities functioned as NVOCCs. Neither party submits sufficient evidence to distinguish among the Navtrans entities, [FN9] and it is not possible to determine from the record the status of each entity. A determination of each entity's status is unnecessary, however, because I find that Navtrans is not liable to General Carbon as either an NVOCC or a freight forwarder.

> FN9. General Carbon initially argued that all Navtrans entities, without distinguishing among them or their individual duties, operated as freight forwarders and NVOCCs. Navtrans in turn argued that all Navtrans entities operated as NVOCCs, also making no distinction among its entities. General Carbon in its reply then

"accept[ed] the contention" that two of the Navtans entities, Navtans Container Lines, Inc. and Sirva Container Lines, Inc., were NVOCCs, maintaining that the remainder were freight forwarders. (*See* Pl.'s Rebuttal/Supplemental Br. at 7).

**i. *Liability as an NVOCC***

[4] Both General Carbon and Navtrans recognize that in this case General Carbon would be strictly liable for damages caused by the fire if it were a shipper of dangerous goods. In *Senator Linie Gmbh & Co., Kg v. Sunway Line, Inc.,* 291 F.3d 145 (2d Cir.2002), the Second Circuit made clear that § 4(6) of COGSA, 46 U.S.C.App. § 1304(6), imposes on a shipper of dangerous goods strict liability "for damages resulting directly or indirectly from such shipment when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the danger." *Senator Linie,* 291 F.3d at 168. The impregnated activated carbon-indisputably the instigator of the fire-clearly was "goods of an inflammable, explosive, or dangerous nature." 46 U.S.C.App. § 1304(6). General Carbon maintains, and Navtrans does not dispute, that neither General Carbon nor the ocean carrier had either actual or constructive knowledge of the risk of fire presented by the impregnated activated carbon.

While both parties recognize the relevance of *Senator Linie* and COGSA § 4(6) to General Carbon's liability, both ignore the implications the case has on Navtrans's liability as an NVOCC. *Senator Linie* involved not just a manufacturer/shipper of dangerous goods, but also an NVOCC (Zen Continental Co., Inc.) that arranged for the shipment and issued a bill of lading. *Senator Linie,* 291 F.3d at 149. The district court explicitly found, and the Second Circuit recognized, that "[u]nder COGSA, Zen qualified as a shipper in its capacity as a NVOCC." *Id.* at 150 n. 5 (citing 46 U.S.C.App. § 1702(17)(B) & 21(E)). All shippers, including the NVOCC, were found strictly liable for damages sustained by the fire in that case.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

In the same vein, any Navtrans entities that functioned as NVOCCs are considered shippers in their relationship to the ocean common carrier. COGSA explicitly states **\*457** as much: 46 U.S.C.App. § 1702(17)(B) provides that a "non-vessel-operating common carrier ... is a shipper in its relationship with an ocean common carrier." FN10 Therefore, Navtrans may be held strictly liable as a shipper of dangerous goods for damages to the other cargo holders caused by the impregnated activated carbon, for the same reasons General Carbon would be strictly liable to the parties with whom it settled.

> FN10. I also note that, as was the case in *Senator Line,* Navtrans as NVOCC was listed as the shipper in the Rose Containerline bill of lading. (Stip.Doc.# 28).

[5] Even assuming Navtrans would be liable under *Senator Linie* to the other cargo owners as the "shipper" of dangerous cargo, General Carbon cannot recover from Navtrans for contribution or indemnification because General Carbon would be contractually bound to indemnify Navtrans. In other words, General Carbon cannot seek reimbursement from Navtrans for payments to other carriers because Navtrans would be entitled to reimbursement from General Carbon for any losses or liabilities it sustained. Paragraph seventeen of the bill of lading between General Carbon and Navtrans provides:

> Goods of a flammable, ... hazardous, unstable or dangerous nature, shipped without full disclosure in writing to the Carrier as to their nature and character, may at any time before discharge be landed at any place.... The Shipper shall indemnify the Carrier for all losses, damages, liabilities, civil penalties and expenses (including attorney's fees) suffered by the Carrier, caused in whole or in part by omission of full disclosure required by this paragraph or by applicable regulations.

(Stip. Doc. # 11, Bill of Lading).FN11 As between General Carbon and Navtrans, General Carbon is the "Shipper" and Navtrans is the

"Carrier." The goods at issue clearly were "flammable, ..., unstable or dangerous." Therefore, for this contractual indemnification provision to apply, Navtrans must prove that General Carbon failed to fully disclose in writing the nature and character of the dangerous goods. Based on the record before me, I find that Navtrans has made such a showing.

> FN11. This language closely tracks the language of COGSA § 4(6).

General Carbon submits that, although it was unaware of the hazardous nature of its impregnated activated carbon, it did provide sufficient information, in writing, fully disclosing the dangerous nature of its goods. Not only is that argument internally inconsistent, but it is not supported by the record. General Carbon asserts that the product information sheet provided to Navtrans "placed Navtrans on actual notice of the very phenomenon that did, in fact, according to the testimony of [the chemical expert], cause the fire." FN12 (Pl. Tr. Br. at 29; *see also* Pl. Rebuttal/Supp. Br. at 12 (stating that the document "speaks to spontaneous heating and combustion")). The product information sheet does no such thing.

> FN12. Dr. Amos Turk, General Carbon's expert witness on activated carbon and occasional chemical consultant for the company (Murray Dep. at 65-66), opined that, assuming the impregnated activated carbon was aged for two weeks and appropriately dried, and that no other heat sources or foreign matter (*e.g.,* gasoline) were applied to the container, the combustion in container 90 was caused by moisture entering the container. The moisture reacted with the impregnated activated carbon, eventually heating enough to start a fire. (Turk Dep. at 43). Whether the impregnated activated carbon was improperly aged or whether it reacted with moisture is irrelevant, for either way the impregnated activated carbon was unstable and dangerous.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

**\*458** The product information sheet is a document prepared for end-users and people physically handling activated carbon impregnated with potassium hydroxide. (Stip. Doc. # 7, product information sheet; Murray Dep. at 44; Muller Dep. at 83-84). It describes the dangers of activated carbon, including the risk that it can remove oxygen from the air, and should not be confined without operative fans. In addition, the second paragraph of the product information sheet states the following:

Skin irritation and burns can be caused by direct physical contact with wet GC IPH carbon [activated carbon impregnated with potassium hydroxide]. This can also be caused by the heat of adsorption. If this occurs, flush the affected area with water for at least fifteen minutes. Contact a physician if the irritation persists.

(Stip. Doc. # 7, product information sheet). This statement does not function to fully disclose the dangerous nature of the activated carbon, *i.e.,* it presented a risk of combustion. The "heat of adsorption" merely refers to heat created by the process of molecules adhering to the surface of the activated carbon. Heat is a natural byproduct of this exothermic reaction. In other words, the "heat of adsorption" is a byproduct of what activated carbon is designed to do-remove contaminants by adsorption. This product information sheet merely functions to warn the user that this process may result in enough heat to burn skin. It is a far cry from "speak[ing] to spontaneous heating and combustion." A shipping intermediary cannot be held to have either actual or constructive knowledge of the danger of combustion merely because it was given a product information sheet mentioning the "heat of adsorption." This is especially true given that General Carbon-the manufacturer of the activated carbon-claims it had no actual or constructive knowledge of the danger itself, even though it wrote the very product information sheet it asserts put Navtrans on notice.

In sum, I find that General Carbon did not fully disclose the dangerous nature of its product, and that neither General Carbon as Shipper nor Navtrans as Carrier had knowledge of the dangerous nature of the cargo. Therefore, the contractual indemnity provision applies: General Carbon must indemnify Navtrans for any "losses, damages, liabilities, civil penalties and expenses" suffered as a result of its omission. Because the contract places indemnity liability upon General Carbon in favor of Navtrans, Navtrans as NVOCC has no duty to indemnify General Carbon for its settlement payments.

**ii. *Liability as a Freight Forwarder***

Often when the status of an intermediary as NVOCC or freight forwarder is disputed, the intermediary argues for freight forwarder status and its limited liability, while the plaintiff argues for NVOCC status and increased liability arising from the bill of lading. *See e.g., Prima U.S. Inc. v. Panalpina, Inc.,* 223 F.3d 126 (2d Cir.2000); *Zima Corporation v. M.V. Roman Pazinski,* 493 F.Supp. 268 (S.D.N.Y.1980). Perhaps in recognition of the losing position it faces if all Navtrans entities are NVOCCs, General Carbon crafts a unique argument, asking the Court to vastly expand the standard of liability for freight forwarders.

A freight forwarder's liability to a shipper is limited to liability for negligence in supervising the transport of cargo. 1 Thomas J. Shoenbaum, Admiralty & Mar. Law § 10-7 (4th ed.) (citing *Ingersoll Milling Machine Co. v. M/V Bodena,* 619 F.Supp. 493 (S.D.N.Y.1985)). A freight forwarder does not effect the transportation itself, but rather selects and hires the **\*459** companies that perform the tasks of transportation; a freight forwarder will only be held liable, then, for negligence in selecting those who perform the transportation services. *Prima,* 223 F.3d at 130.

General Carbon, however, makes no argument that Navtrans was negligent in its selection of companies that performed the transportation services in this case. Rather, General Carbon instead argues for an expansive notion of the duties of Navtrans as a freight forwarder, which it then argues were per-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

formed negligently.

[6] First, General Carbon argues that Navtrans "undertook an affirmative obligation to identify any hazard associated with the GC IPH AC [impregnated activated carbon]" (Pl. Tr. Br. at 26), and that Navtrans was negligent "with respect to [its] own procedures" in dealing with hazardous goods. This argument fails: Navtrans took on no such affirmative duty and was not negligent with respect to its procedures in dealing with hazardous goods. Navtrans complied with its procedures, and industry standard, in relying on the manufacturer/shipper to tell Navtrans whether its cargo was nonhazardous. General Carbon repeatedly assured Navtrans that its activated carbon was nonhazardous. The mere fact that Damaro stated that he was concerned about the word "activated"-which "raised red flags" and about which he wanted more information FN13-does not create "an affirmative obligation to identify any hazard" associated with the cargo, a duty that does not otherwise belong to a freight forwarder.

> FN13. Damaro testified that the word "activated" "set off a red flag," that caused him to ask General Carbon for assurance that the activated carbon was nonhazardous. Damaro's concern, at most, reflects his lack of familiarity with General Carbon's product. "Activated" merely refers to the process by which carbon is processed, usually through extremely hot steam, to create openings in the structure of the carbon to allow space for adhesion of other molecules. (Turk Depo. at 28-29). Damaro's concern does not mean that he took it upon himself to investigate and identify "any hazard associated" with the product, hazards of which General Carbon itself were not aware.

General Carbon apparently also argues that Navtrans was negligent "with respect to [its] own procedures" because Damaro did not request General Carbon put in writing that its product was not

hazardous until after the fire. (Pl. Tr. Br. at 28). First, the record shows that Navtrans's procedure normally was not to ask for such a declaration where a shipper has represented to it that its products are nonhazardous. (*See* Damaro Dep. at 20, 26, 30, 46, 56). As General Carbon's president recognized, immediately after the fire everyone was "in CYA mode" (Muller Dep. at 103), and Damaro likely requested the declaration after the fire out of concern for his own liability, not because it was standard Navtrans procedure. (*See also* Damaro Dep. at 7). Second, General Carbon makes no effort to argue what relevance Damaro's failure to request the document before the fire bears on the issue of negligence, *i.e.,* what impact his request before the fire that General Carbon put in writing its belief as to nonhazardousness would have had on the chain of events.

Second, General Carbon argues that "Navtrans failed to process product information provided by General Carbon." (Pl. Tr. Br. at 28). General Carbon's argument on this point is far from complete, focusing entirely on how its provision of the product information sheet put Navtrans on notice of the danger of fire, while failing to explain in what way Navtrans should have "processed" it.FN14 This argument**460** is rejected, for, as discussed above, I find that Navtrans was not given sufficient information to put it on notice of the danger of fire presented by the activated carbon.

> FN14. For example, General Carbon does not seem to argue that Navtrans should have declared the cargo hazardous. In making a separate argument elsewhere in its brief, General Carbon does contend that "given Navtrans'[s] actual notice regarding the exothermic reaction of the GC IPH AC [impregnated activated carbon] when allowed to become wet, it should have either (1) caused a condition survey to be performed on the containers to ensure water-tightness ... or (2) specified that both containers be stowed below-deck." (Pl. Tr. Br.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

at 32). I need not, and do not, reach this argument.

[7] Third, General Carbon argues that Navtrans was negligent in "its role in securing a marine container that permitted excess moisture to come into contact with the cargo, causing the fire." (Pl. Rebuttal/Supplemental Tr. Br. at 5). Navtrans's "role" and attendant liability as a freight forwarder in providing the marine container was limited to competently selecting the company that provided the container. *Prima,* 223 F.3d at 130. General Carbon expends much effort, in its brief and expert testimony, arguing that the fire occurred because water entered the container, reacting with the impregnated activated carbon and eventually generating enough heat to cause a fire in the container. (Pl. Tr. Br. 16-18; Turk Dep. *passim* ). Nevertheless, General Carbon has not shown, nor makes any effort to show, that Navtrans was negligent as a freight forwarder in its selection of Rose Containerline, which provided the container to General Carbon for loading and transported the loaded container to the vessel. Even if the container were faulty and moisture ingress did cause the fire, an issue I do not reach, Navtrans is not liable as a freight forwarder for its choice of Rose Containerline to provide the physical container.

In sum, Navtrans is not liable to General Carbon for the latter's settlement payments to those parties damaged by the fire.[FN15] This result is consistent with the Second Circuit's conclusion in *Senator Linie* that "a shipper can be expected to have greater access to and familiarity with goods.... If an unwitting party must suffer, it should be the one that is in a better position to ascertain ahead of time the dangerous nature of the shipped goods." *Senator Linie,* 291 F.3d at 169. Here, General Carbon surely was in a better position than Navtrans to ascertain ahead of time the dangerous nature of its activated carbon.[FN16]

FN15. For the same reasons that I find that Navtrans is not liable to General Carbon for its settlement payments, I reject General Carbon's claim for damages to its own cargo.

FN16. The Court has considered General Carbon's other arguments and they are rejected.

### 3. *Navtrans's Indemnification Claims*

[8] Navtrans counter-claims for indemnification by General Carbon of its attorneys' fees and expenses for depositions and expert witnesses. (Amended Counter-Claim ¶ 11). Navtrans argues it is entitled to indemnification under either the contractual indemnity provision of the bill of lading, discussed above, or COGSA § 4(6). The bill of lading provides for indemnity of all "expenses (including attorney's fees) suffered by the Carrier, caused in whole or in part by omission of full disclosure" of the dangerous nature of the cargo. COGSA § 4(6) requires indemnification by a shipper of dangerous goods, without disclosure, of "all damages and expenses directly or indirectly arising out of or resulting from such shipment." 46 U.S.C.App. § 1304(6). Under either the **\*461** bill of lading or COGSA, Navtrans is entitled to indemnification for attorneys' fees and costs incurred in this litigation over the fire resulting from General Carbon's failure to disclose the dangerous nature of its goods.

### *CONCLUSION*

For the foregoing reasons, judgment will be entered in favor of Navtrans, dismissing General Carbon's claims for indemnification, contribution, and damages and awarding Navtrans its attorneys' fees and expenses incurred in this litigation. Navtrans shall submit a proposed judgment on notice within five business days hereof, with a supporting affidavit, detailing the requested fees and expenses. Any objections are to be submitted within three business days thereafter.

SO ORDERED.

S.D.N.Y.,2005.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

362 F.Supp.2d 449, 2005 A.M.C. 1049
**(Cite as: 362 F.Supp.2d 449)**

Scholastic Inc. v. M/V KITANO
362 F.Supp.2d 449, 2005 A.M.C. 1049

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.