UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| Vessel of Opportunity (VoO) Contract Cases | * | MAG. JUDGE SHUSHAN |
| | * | |

**********************************************

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR BREACH OF MASTER VESSEL CHARTER AGREEMENT, VESSEL OF OPPORTUNITY PROGRAM

**INTRODUCTION**

BP represented to the federal, state and local governments, the public, and the world at large that it was ready and able to respond to a spill of extraordinary magnitude at a moment's notice. That readiness could only be accomplished through the use of the full fleet of Vessels of Opportunity ("VoO"), under contract and ready to respond immediately. To be successful, such a response precluded vessel owners from using their vessels for other purposes. Indeed, were vessel owners permitted to pursue other endeavors, rather than standing ready to deploy at a moment's notice, BP would have been unable to mount an immediate disaster response.

BP drafted the Master Vessel Charter Agreement ("MVCA"). Plaintiffs contend that the contract is clear as to commencement and termination. Even if it is not, however, BP at best appears to have drafted an agreement that it left intentionally ambiguous so that it was able on the one hand to hold out to the world that it had a fleet ready at all times to respond to any size spill, up to 1.2 million barrels per day, but later deny the VoO participants the money they were owed for ensuring their vessels were ready at all times to respond to the spill. BP, in other words, wants it both ways.

BP and the vessel owners who participated in the VoO program, including movant vessel owner/Captain Hoi Nguyen, agree on a number of key points:

- BP is a Responsible Party and thus a mandated participant in the MC252 Unified Command;

- BP's VoO program was part of that response;

- BP stated publicly that it created the VoO program to provide it the capacity to respond immediately to the oil spill;

- BP wrote the binding MVCA to engage vessel owners in connection with the response to BP's spill; and

- The Charter Term under the MVCA extends through final decontamination.

**I.      A Charter Term Commences By A BP Request To Train**

A charter agreement, like all other enforceable contracts, requires consideration—each contracting party must acquire a legally enforceable right that he or she did not previously have. *Johnson v. SEACOR Marine Corp.*, 404 F.3d 871, 875 (5th Cir. 2005).  Here, BP acquired the right to immediate and constant use of a fleet of vessels.  In exchange, vessel owners acquired the right to recompense.  As BP states in its own brief, the MVCA governed "the legal relationship between BP and the Vessel Owner *if and when* BP requested the Vessel to perform VoO-related 'Services' as described in Article 2.A of the MVCA." [Rec. Doc. 4421, BP Opp at 4 (emphasis in original).]  Article 2.A of the MVCA, entitled "Employment and Services of Vessel," states that during a Charter Term,

> the VESSEL shall be employed exclusively for Charterer's use … in the performance of various tasks associated with the oil spill response …. The VESSEL shall be required to attend training, participate in training exercises and drill to receive the necessary oil spill cleanup credentials as appropriate to develop skills and procedures for oil spill response and containment.

[Pls' Ex. 6A, Mtn for Summary Judgment (hereinafter "Pls' Ex. 6A").]  Thus, under the MVCA, training of private citizens—mostly fishermen—for spill response is a "service" that BP needed to fulfill its response obligations. If BP requested, and the vessel agreed, to attend training, then the vessel was "employed," performing VoO-related services under the MVCA.  In short, the Charter Term had commenced.

This is, in fact, exactly what BP told the vessel owners who signed up to participate in the VoO program.  According to vessel owner Phillip J. Levine, Jr., whose affidavit is attached hereto, a BP representative instructed him to "attend VoO training and then [he] would be on the payroll."  [Exh. 1 ¶ 2.]  Another BP representative told Levine, after he had completed the

2

training requirements, that he should "begin to invoice immediately because 'if you completed this training you are on the payroll and under contract.'" [*Id.*]

By contrast, BP argues that Article 1.A allowed it to essentially hire and fire the VoO vessels from week to week, day to day. At the same time, BP contends that vessel owners were required to be available at all times, without discretion to use their vessels for purposes unrelated to oil spill response. This view is contrary to basic principles of contract law; if BP's interpretation of the MVCA were correct, it means that BP gave no consideration when it entered into the MVCA even though the vessel owner was required to forgo all other opportunities to use his boat in commerce. Another vessel owner, Barry Rogers, whose affidavit is attached, explained that once he signed the MVCA, he was told by a BP representative to "de-rig" his boats "from fishing" and to "re-rig" his boat for oil spill response. [Exh. 2 ¶ 3.] BP contracted with vessel owners like Rogers for round-the-clock readiness; its post-hoc interpretation of Article 1.A, which conferred a benefit for nothing, is without merit. In short, BP contracted for round-the-clock vessel readiness and was required to compensate its vessels for the same.[1]

BP attempts to construe Exhibit A to the MVCA, the schedule of rates for vessel services and crew services, as establishing training as a "separate event" from commencement of a Charter Term. BP argues that

> [t]o accept Plaintiff's contention that attending safety training actually commences the Charter Term would render paragraph 2.B's separate fixed-rate payment for training completely superfluous – or would somehow require BP to pay a Vessel Owner the full on-hire amount (ranging from $1,200 to $3,000 per day) *plus* an additional $200 per day for attending training under Paragraph B of Exhibit A."

---

[1] BP points out that the "Fifth Circuit has recognized that parties can create a 'blanket time-charter agreement' that is 'subject to unilateral cancellation by either party' and sets 'the general terms that would apply to future vessel charters.'" [Rec. Doc. 4421, BP Opp. at 8 (internal quotations omitted).] But this is simply to say that two parties may, by exchanging consideration, enter into a binding contract. The cases cited in BP's brief do not, however, support its view that it could bind vessel owners to standby status while offering nothing in return.

3

[Rec. Doc. 4421, BP Opp. at 10.]  BP should not be surprised; that is indeed what the MVCA provides.[2]  In fact, full vessel hire *plus* crew pay is exactly what BP paid when Hoi Nguyen attended additional training sessions in June and July of 2010.

Even if the Court finds BP's argument regarding Article 1.A. to be colorable, the inquiry cannot end there; rather, the Court must read the entire agreement, the totality of which is at best ambiguous with respect to the meaning of "commencement" of the Charter Term.  As explained above, Article 2.A. states that "[d]uring each CHARTER TERM, the VESSEL shall be employed exclusively for CHARTERER'S use" to perform "SERVICES" at the charterer's direction.  [Pls'. Ex. 6A.]  "Services" include, *inter alia*, training and the participation in drilling exercises.  [*Id.*]  At the very least, this suggests that training and drilling exercises occur *during*, not separate from, a Charter Term.  If other portions of the MVCA suggest otherwise, such as Article 1.A, we are at least left with an ambiguity.  And it is one wholly of BP's making, as the sole drafter of the contract.  Accordingly, the Court should construe the terms in the light most favorable to the Plaintiffs and hold that training occurs during the Charter Term.

BP's interpretation also ignores Article 10.B.5's specific provision that during crew training sessions "the VESSEL shall not be considered under HIRE for insurance purposes, [and] therefore insurance shall not be provided during these times."  BP's interpretation of the contract it wrote renders this explicit provision meaningless or at least superfluous.[3]  The express limitation of hire for insurance purposes indicates that the vessel is on hire for all other purposes during training periods.  Had it intended otherwise, BP could have written that the vessel was not

---

[2] To the extent Exhibit A to the MVCA creates an ambiguity, which it does not, the Articles of the MVCA control over any exhibits [*See* MVCA Article 25] and the ambiguity must be construed against BP. *See Zapata Marine Serv. v. O/Y Finnlines, Ltd.*, 571 F.2d 208, 209 (5th Cir.1978) (per curiam).

[3] "A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd*., 393 F.3d 550, 555 (5th cir. 2004) (citing *Foster Wheeler Energy Corp. v. An Ning Jiang MV,* 383 F.3d 349, 354 (5th Cir.2004); *Capozziello v. Brasileiro,* 443 F.2d 1155, 1159 (2d Cir.1971).

4

under hire *at all* during training periods, or it could have omitted any mention of vessel hire during training entirely. It did not. Article 10.B.5 means something; it carves out insurance and leaves vessel hire in place, appropriate where the boat is literally and figuratively tied up at the dock while its crew undergoes the training BP requested and required.

If BP wanted the Charter Term to end at the conclusion of training, and there is no evidence that is correct, BP should have terminated the Charter Term in accordance with the MVCA, as explained further below.[4]

## II. In a Spill Response, the Charter Term Ends After the Vessel Returns From "Final Decontamination" and the Owner Receives Formal Off-hire Dispatch Notification

BP and Plaintiffs agree that the Charter Term ends after the last of three events: notice, decontamination and return to moorings. The parties disagree as to what the MVCA requires to satisfy each event.

### A. Off-Hire Dispatch Notification Must Be Given Per the Terms of the MVCA

BP contends that no written notification was required to terminate the Charter Term. Instead, BP contends that the Charter Term could be terminated by phone, over the radio, or in person. [Rec. Doc. 4421, BP Opp. at 5, 16-18.] This argument conflates the vessel owner – who signed the MVCA – with the captain of the vessel, who actually operated it. In Capt. Nguyen's case, the owner and captain are one and the same, but in many cases this was not so.

---

[4] After the spill response ended, BP drafted the charter that it now argues governed from the outset. The attached Transitional MVCA, which BP produced after the emergency response wound down, warns in bold capital letters at the top of the document: "**THE TERMS OF THIS CHARTER DIFFER FROM ANY PREVIOUS MASTER VESSEL CHARTER AGREEMENT AND THEREFORE THE VESSEL OWNER SHOULD READ THE TERMS CAREFULLY**." [Exh. 3.] It further provides, "VESSEL OWNER agrees to let and CHARTERER agrees to hire the VESSEL from DAY to DAY as may be requested by CHARTERER." [*Id.* at 1.] Regarding hire, "CHARTERER will not pay for standby days, weather delays or down time due to any VESSEL repairs. CHARTERER will only pay for actual days on which the VESSEL and its crew are performing SERVICES on the water under this CHARTER." [*Id.* ¶ K] The Transitional MVCA makes absolutely no mention of the vessel's hire status "for insurance purposes" on days the crew is trained. It also makes no mention of final decontamination in relation to terminating the Charter Term. It should be obvious from the above that when BP wishes to draft a contract of the type described in its brief in opposition, it knows how to do so.

5

The MVCA did not allow termination of the Charter Term by having a radio operator (likely from a non-BP company) verbally tell the captain or crew over the radio that the vessel can simply go home.

BP contracted to ensure that it formally notify the owner that it chooses to end the charter term.[5] Article 18 of the MVCA specifies the contact information for each party, including an address, and provides that "[a]ll notices and communications from VESSEL OWNER to CHARTERER and from CHARTERER to VESSEL OWNER shall be addressed as follows..."

Consistent with these requirements, BP transmitted a written notice to Hoi Nguyen on August 27, 2010 titled "Offhire Dispatch Notification." What is more, in the vast majority of cases, BP's "off-hire" notices occurred long before the vessels underwent the required "final decontamination," as explained below, and thus served as merely the first step in the process of terminating the Charter Term.

B. The Charter Term Continued Until Return to Moorings After Final Decontamination

The plain language of the MVCA provides that the Charter Term ends with return to moorings "after final decontamination after an oil spill response:"

> The termination of the CHARTER TERM (termination of dispatch) is determined by the time the VESSEL is secure in its moorings at the original point of delivery during drills and exercises, and secure at its mooring after final decontamination after an oil spill response (which process shall be promptly undertaken without delay).

[Pls'. Ex. 6A, Art. 10.E (emphasis supplied)]. The entire VoO program was part of the MC252 Deepwater Horizon oil spill response. Under the terms of the Charter, "final decontamination" was needed in order to end a Charter Term. This Article did not create a dichotomy among boats

---

[5] By the same token, a derelict captain could not immediately end the Charter Term by refusing to go where BP directed. Article 12 dealing with refusal of the crew to sail specifically deals with this situation and suspends pay – not the charter – until the owner gets his or her crew in line.

that required decontamination and those that did not; it simply requires all participating VoO boats to undergo "final decontamination" and return to moorings.

In practice during the events in question, BP understood that deployed boats would remain on hire until they were subjected to "final decontamination." Hoi Nguyen, for example, was deployed on the water until July 19. [Nguyen Tr. at 66:5-7.] Shortly thereafter, he received an interim cleaning to prevent response vessels from dragging oil from dirty waters into clean waters. He did not, however, receive a "final decontamination." In accordance with the UIC decontamination plans, BP arranged for Nguyen's "final decontamination" in mid-September of 2010. A "final decontamination" is precisely what the Vessel Cleaning and Decontamination Plans included as Exhibits 7 and 8 to Capt. Nguyen's Motion for Summary Judgment contemplate. These documents explain:

> Decontamination is planned to occur in two phases: Transit vessels may undergo gross decontamination at an offshore cleaning station and final decontamination, if necessary, at a designated berth or anchorage. <u>Response vessels *will* undergo gross decontamination offshore and final decontamination at a designated anchorage or staging area</u>.

[Exhibit 8 Pls' Mtn for Summary Judgment, Mississippi Canyon 252 Vessel Evaluation and Decontamination Plan, at 3 (emphasis supplied).] The interim and final decontamination of Hoi Nguyen's *My Angel II* directly tracked the process set out in the vessel cleaning plans.[6] Until Nguyen received final decontamination, and a certificate proving the same, [*see id.* at 13], he was still under Charter, could not use his oiled boat in commerce, and could have been sent out again to fight the oil.

---

[6] BP seemingly interprets the MVCA requirement that "final decontamination" "shall be promptly undertaken without delay" as putting a burden on the vessel owner. This interpretation makes no sense. The burden is on BP to promptly clean the contamination off of the boats it contaminated. As discussed herein, BP and the Coast Guard, not the vessel owner, are in control of when final decontamination occurred.

Instead of acknowledging that Nguyen's vessel did not receive "final decontamination" until mid-September, BP contends that in September, "out of an abundance of caution… BP requested that Mr. Nguyen begin a new Charter Term and deliver his Vessel… to undergo an additional decontamination session." [Rec. Doc. 4421 at 24.] This post-hoc explanation is completely unsupportable.[7] It also does not comport with BP's practices with other vessel owners throughout the VoO program. Barry Rogers, for example, was out on the water until September 30, 2010. [Exh. 2 ¶ 7.] He never received final decontamination, however, and in January 2011 was contacted by a BP representative to receive final decontamination. [*Id.* ¶ 14.] Because BP recognized that it owed Rogers through the date of final decontamination, he was paid for all of the days until January 6, 2011. [*Id.* ¶ 21.]

BP's actions speak louder than its words. With both Hoi Nguyen and Barry Rogers, BP recognized it was obligated to arrange for "final decontamination" before the Charter Term would terminate. Its claim that Nguyen's July interim cleaning was in fact a "final decontamination" is disingenuous. In addition, BP's contention that there was a new and separate Charter Term for Hoi Nguyen in September, somehow comprised of eleven days payable in two installments, is yet another BP *post hoc* rationale to try to excuse the company's violation of the charter agreement. There was no second Charter Term; there was simply a failure to pay for the entirety of the first Charter Term. Accordingly, the Court should hold that the Charter Term ended at "final decontamination" and return to moorings.

---

[7] As the Unified Command directives (which BP often claims leaves it without choice) make clear: "final decontamination" is a term of art with specific attributes, including a Coast Guard inspection and the issuance of documentation, in Capt. Hoi's case, a Verification of Final Decontamination. "Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong." *Robin v. Sun Oil Co.*, 548 F.2d 554, 558 (5th Cir. 1977).

### III. BP's "Parade of Horrors" Is of Its Own Making

Despite the undisputed fact surrounding the *My Angel II*'s service, BP asserts broad objections to classes of VoO claims. Because the PSC has not yet taken BP's three percipient witness and corporate representative depositions, nor produced their custodial files, verification of the facts BP raises is at this juncture not possible. Nevertheless:

BP repeatedly states it spent $600,000,000 in VoO as if to suggest, "Isn't that enough?" Considering BP spilled over 775,000,000 gallons of oil that needed to be cleaned up, the irrelevance of that information is evident.

BP charges that if the language of the MVCA is followed, "Vessels that never participated in VOO activities – and therefore, were never even on the water – would be paid hundreds of thousands of dollars for performing no work at all." This argument ignores the fact that BP paid some individuals for time spent standing by and ensuring their fleet was ready to deploy at a moment's notice—as the contract and BP's representations demanded. Further, BP's statement presumes an unending Charter, but more broadly ignores BP's own legal capacity obligations. On July 1, 2010, BP itself stated, in its "Voo Strategy":

> **1.1 VoO Strategy**
> To mobilize independently contracted vessels to support specific oil recovery activities in each State, with a strong bias to commercial and charter fishing vessels, operated by their owners.
>
> **The program aims to use a range of 2000-3000 vessels/day to support ongoing oil recovery operations. Daily vessel mobilization numbers are demand driven, and requested via ICS 204s as part of the incident command protocol.** *A 2.5 to 1 ratio will be used to build up an inventory of available vessels.*
>
> An inventory of 'available' independently contracted vessels will be maintained by each Branch, in a single standardized VoO Database. Inventory levels will be monitored to ensure capacity for ongoing operations, vessel rotations and any element of ramp up that may be required. The response Gulf Coast inventory is

>envisioned to be in the range of 6500 to 7500, subject to change if Miami IC starts up a VoO fleet.

[*See*, Exh. 4 at 2, BP-HZN-2179VOO5990.]

BP used this "inventory" of fishermen to publicly claim that it had a "fleet of committed shoreline and community responders fully integrated into the overall effort." [Pl's Ex 3 at 38-39.] The price of that committed response capability is that some of it may need to be at the ready, but not actually on the water. This is not, as BP seems to imply, an inequity visited on BP. It is a consequence of BP's decision to pursue deepwater drilling for its own profit. Just as BP undertook these risks, it must also bear consequences when those risks affect others and honor the contractual terms it set for those individuals that agreed to risk their vessels and health to assist in the clean-up activities of the largest oil spill in United States history.

## CONCLUSION

BP is a sophisticated multinational corporation engaged in deepwater drilling, the party responsible for the oil spill, and a participant in the Unified Incident Command structure. It knows how to draft a maritime contract to meet its response obligations and was the sole drafter of the MVCA. Capt. Nguyen, by contrast is a seaman who speaks and writes very limited English.[8] If there is any ambiguity in the MVCA, the law requires that it be construed against BP as the drafter. BP contracted for round-the-clock use of VoO boats. In exchange, it offered monetary consideration. The "Charter Term" comprises the entirety of this arrangement. The Plaintiffs respectfully request that the Court interpret the MVCA in a manner consistent with the foregoing.

---

[8] Seamen are traditionally considered "wards" of the Court deserving of protection. *Karim v. Finch Shipping Co. Ltd.*, 374 F.3d 302, 309 (5th Cir. 2004) (quoting *Isbrandtsen Marine Services, Inc. v. M/V Inagua Tania*, 93 F.3d 728, 733 (11th Cir.1996) (district court "abused its discretion by failing to aid the crew, wards of admiralty whose rights federal courts are duty-bound to jealously protect"). As the Supreme Court has long made clear, courts are to avoid the application of rules and interpretations "which would affect ... [seamen] harshly because of the special circumstances attending their calling." *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431 (1939).

Respectfully submitted,

   /s/   Stephen J. Herman                                     /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129      **James Parkerson Roy**, La. Bar No. 11511
**HERMAN HERMAN KATZ & COTLAR LLP**    **DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
820 O'Keefe Avenue                                  556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113               Lafayette, Louisiana 70501
Telephone: (504) 581-4892                    Telephone: (337) 233-3033
Fax No. (504) 569-6024                         Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                 E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*                     *Plaintiffs Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

**CERTIFICATE OF SERVICE**

      WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of November, 2011.

                                      s/ James Parkerson Roy and Stephen J. Herman