**STATE OF MISSISSIPPI**
**COUNTY OF HARRISON**

## <u>AFFIDAVIT</u>

Personally came before me, the undersigned, Phillip J. Levine, Jr., who being first duly sworn, states as follows:

1. My name is Phillip J. Levine, Jr., I am over the age of twenty-one (21) years, I reside at 1184 Broome School Road, Perkinston, Mississippi 39573, and I have personal knowledge of the matters contained in this Affidavit.

2. On May 9, 2010, I entered in to a Master Vessel Charter Agreement with BP to participate in the Vessels of Opportunity ("VoO") Program. On May 11, 2010, I was contacted by a representative of BP named Ashley. The BP representative provided my contract number and stated I needed to attend VoO training and then I would be on the payroll. I attended VoO training at Gulf Coast Community College, Jefferson Davis Campus, located in Gulfport, Mississippi. At the conclusion of the training, I personally spoke with the gentlemen identified as the "BP Man." I was instructed by the "BP Man" at the conclusion of training that I should begin to invoice immediately because "if you completed this training you are on the payroll and under contract and should invoice from the day you were called to be here."

3. As instructed by the "BP Man", I began invoicing BP on May 11, 2010. My first invoice was for the period May 11, 2010 through May 17, 2010 in the amount of $11,200.00. BP paid me in full for this period.

4. I invoiced BP for the period May 18, 2010 through May 24, 2010 in the amount of $11,200.00. BP paid me in full for this period.

5. I invoiced BP for the period May 25, 2010 through June 8, 2010 in the amount of $24,000.00. BP paid me in full for this period.

Exhibit 1

6.  I invoiced BP for the period of June 9, 2010 through June 22, 2010 in the amount of $22,400.00. BP did not pay me for this period.

7.  I invoiced BP for the period of June 23, 2010 through July 6, 2010 in the amount of $22,400.00. BP did not pay me for this period.

8.  On July 12, 2010, after not being paid since June 9, 2010, I re-invoiced BP from June 9, 2010 through July 12, 2010.  The total amount invoiced for this time period was $54,400.00. BP did not pay me for this period.

9.  On or about August 27, 2010, BP sent me a written notice of non-renewal of the Master Vessel Charter Agreement. I recall the written notice was sent certified mail because I had to travel to the U.S. Post Office in Wiggins, Mississippi to collect the written notice. The written notice of non-renewal referenced the wrong contract number. I contacted BP and was told to disregard; that I would receive a corrected written notice of non-renewal. I never received a corrected written notice of non-renewal.

10. On August 31, 2010, I received a wire transfer from BP in the amount of $6,400.00. I contacted BP regarding this payment and payment of the outstanding amount of the invoices and was not provided an answer as to what period of time this payment applied.

11. Although my vessel was never sent to respond to the oil spill, and therefore, never was in oiled waters, BP informed me on December 3, 2010 that I was scheduled to have my vessel decontaminated under the Master Vessel Charter Agreement.

12. On December 3, 2010, I was contacted by a BP representative named Joan or Jo to set up an appointment under the Master Vessel Charter Agreement to have my vessel inspected for damage and oil and for decontamination. I asked the BP representative about my outstanding invoices for which she responded I should have been paid. She told me to make sure to invoice for inspection / decontamination and that I should be paid for full day.

13. On December 4, 2010, a BP representative named Jeremy came to my house to inspect my vessel for damage / decontamination. I recall that I signed two (2) documents. I was not provided copies of these documents.

14. I invoiced BP for December 4, 2010 in the amount of $1,600.00. BP paid this invoice in full on February 23, 2011.

15. On March 30, 2011, I received a wire transfer from BP in the amount of $8,000.00. This payment did not identify the period of time for which I was being paid.

16. I was never contacted by BP or any representative that I was "On Hire" under the Master Vessel Charter Agreement. I understood, based on the contract and representations made to me at the training by the "BP Man" that I was on payroll as a result of attending training.

17. I was never contacted by BP to be put "off hire" or "deactivated" or placed on "stand by." BP just stopped paying my invoices.

18. I had my boat ready at all times from May 11, 2010, through December 4, 2010. As I understood, BP had exclusive access and control of my vessel 24 hours a day.

19. This affidavit is being given and sworn to by my own free will and I have not been provided anything of value for this sworn affidavit.

FURTHER, AFFIANT SAYETH NOT.


_____
PHILLIP J. LEVINE, JR.


Sworn to and Subscribed before me, this the 3rd day of November, 2011.


_____
NOTARY PUBLIC

Page 3 of 3

# AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF TERREBONNE**

     **BEFORE ME**, the undersigned authority, personally came and appeared:

## BARRY D. ROGERS

a person of the full age of majority, who after first duly sworn, did depose and state

that:

1.    My name is BARRY D. ROGERS; my address is 152 Magnolia Court, Houma, Louisiana;

2.    On April 30, 2010, I attended a meeting at the home of Kim and David Chauvin in Chauvin, Louisiana; in attendance at that meeting were other vessel owners, BP's representative, Veronica Brown, and O'Briens' representatives, Mike Beal and Vince Mitchell. O'Briens representative, Mike Beal, was to be our POC;

3.    At said April 30th meeting, I signed Master Charter Agreement #HOU007 with BP/Veronica Brown, as did many of the others present; we were told to "de-rig" our boats from fishing and to "re-rig" them for the oil spill and were given two (2) days to do so;

4.    While I was "de-rigging" my boat (M/V Oasis of the Seas, hereinafter referred to as "Oasis"), David Chauvin brought me supplies that I used to "re-rig" my boat;

5.    On or about the third day, we departed for Venice, Louisiana; Mike Beal, O'Brien's representative, rode the supply boat "Secor Quest" to Venice; upon arrival, we were given a safety briefing and handed off to Don Hanson from O'Briens. We then left the Chandeleur Sound;

6.    I was in Task Force #1, which was made up of 25 boats; initially there were 12 boats and within four days the number of boats increased to 25; following that we were broken down into 5 Strike Teams, #'s 1, 2, 3, 4, & 5, of five boats each, but we still worked as one task force. I was the team leader of Strike Team 4;

7.    My boat and crew were initially paid by BP, through Danos & Curole, under the Master Charter Agreement from April 30, 2010, every day, through September 30, 2010; that during this time period, my boat and crew were paid for "weather standby days" and any other stand by periods between April 30, 2010 and September 30, 2010;

8.    My boat ("Oasis") went in for decontamination, leaving on September 26, 2010, and arriving at Port Fourchon, Louisiana, for decon on September 27, 2010; on September 27, 2010 they supposedly decontaminated my boat, but it was an insufficient decon, to which even the inspector agreed;

Exhibit 2

9.    The Coast Guard representative at the decon site told me to sign the decon paper, which I refused to do because my boat still had oil on it and had been damaged; after a verbal exchange over my refusal to sign, I asked the Coast Guard representative to get off my boat ("Oasis");

10.    Because of an incomplete and improper decontamination, I was able to make contact with Robert Fisher of O'Brien's and Dan Barry setting up a meeting an inspection of my boat;

11.    Following the first decontamination attempt and while attempting to have my boat decontaminated and re-inspected again, I continued to invoice BP for my boat and crew even though BP had stopped paying the invoices after September 30, 2010;

12.    I subsequently received an Off hire letter dated November 26, 2010 while I was still trying to get my boat decontaminated and re-inspected;

13.    In December, 2010, Dan Barry visited my boat to inspect, test and validate that there was oil contamination on my boat and that it was "MC252" oil, which was validated;

14.    After the inspection and validation, Dan Barry then handed me off to Robert Fisher, who set up another decontamination of the "Oasis" scheduled for January 3, 2011 at the Edison Chouest Seaport #2, Port Fourchon;

15.    Upon arrival at the decon site at daybreak on January 3, 2011, my boat was immediately decontaminated;

16.    The Coast Guard representative inspected the "Oasis" and gave a final saying "you're good to go" or words to that effect, but he refused to give me a final written notice, telling me that the one I previously received was my final, which I disagreed with;

17.    After my repeated refusals to accept what the Coast Guard representative wanted to give me and my refusal to leave the Seaport #2 dock until I got a final decontamination notice, I eventually spoke with Bryan Nelson, in BP's Houston office, and on January 4, 2011, I received a USCG Verification of Final Decontamination for the "Oasis";

18.    On January 5, 2011, I received an "Off-Hire Deactivation" notice signed by Matthew Tusa;

19.    Following my departure from Port Fourchon, I received a call from Brian Nelson, the BP representative inquiring if all was okay;

20.    Upon returning from Port Fourchon, I called the BP representative to inquire about getting paid; after numerous referrals to different BP individuals (all in Houston), I spoke with Guy Schultz, BP, who asked that I send him my final decon paper work and invoices, which I did;

21.    My crew and I were paid by BP under the Master Charter Agreement for each day from October 1, 2010 up to and including January 6, 2011, for all invoices submitted after September 30, 2011;

2

22. In total, my boat and crew were paid by BP under the Master Charter Agreement for every day from April 30, 2010 until January 6, 2011;

23. At all times pertinent to my participation under the Vessel of Opportunity program, I understood that boats and crews were to be paid for any stand by dates, because the boats were on 24 hour call, and my crew and I were fully paid by BP for all stand by dates between April 30, 2010, when Master Charter Agreement was executed and January 6, 2011, when I received written "Off-Hire Deactivation" after fully complete decontamination;

24. At all times pertinent to my participation under the Vessel of Opportunity program, I understood that any "Off-Hire Deactivation" had to be in writing and was not effective until the vessels were fully deconned.  This is exactly how my boat and crew were paid under the Master Charter Agreement by BP;

25. I have read the above affidavit, and all the information herein is true and correct to the best of my knowledge.

BARRY D. ROGERS

SWORN TO AND SUBSCRIBED before me on this ____ day of _____ 2011.

HUNY DOWNER (#05046)
NOTARY PUBLIC

3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | |
| "DEEPWATER HORIZON" IN THE | * | MDL NO. 2179 |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| . | * | SECTION J |
| | * | |
| Relates to: No.10-8888 Doc. Ref. No. 63576 | * | JUDGE BARBIER |
| | * | |
| Vessel of Opportunity (VoO) Contract Disputes* | | MAG. JUDGE SHUSHAN |
| | * | |

*******************************************

### SWORN DECLARATION

**STATE OF ALABAMA**
**COUNTY OF MOBILE**

On the 1st day of November 2011, I,

### TIMMIE LEVERNE JOHNSON

declare the following:

The attached document, titled "MC252 Transitional Master Vessel Charter Agreement", and labeled Exhibit 1, is an accurate copy of the document provided to me by a representative of BP, Gary Hutchinson, on or about May 22, 2011. The MVCA was sent to me as an attachment to an e-mail from Mr. Hutchinson on the aforementioned date. The BP representative, Mr. Hutchinson, told me that this document was the new Master Vessel Charter Agreement (hereinafter MVCA) that BP was using to hire boats for oil spill response. An accurate copy of the aforementioned e-mail I received from Mr. Hutchinson is also attached as Exhibit 2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 1st day of November 2011:

Timmie Leverne Johnson

Exhibit 3

**MC252**
**TRANSITIONAL MASTER VESSEL CHARTER AGREEMENT**

This Master Vessel Charter Agreement (hereinafter referred to as the CHARTER) is by and between BP Exploration & Production Inc. (hereinafter referred to as CHARTERER), and _____

_____ hereafter referred to as VESSEL OWNER), and applies to each VESSEL described in Exhibit "A" (Vessel Information) that has been signed by VESSEL OWNER, and signed and numbered (with a unique contract number) by CHARTERER.

**PLEASE BE ADVISED THAT THE TERMS OF THIS CHARTER SUPERSEDE ALL OTHER MASTER VESSEL CHARTER AGREEMENTS ENTERED INTO BETWEEN VESSEL OWNER AND CHARTERER. THE TERMS OF THIS CHARTER DIFFER FROM ANY PREVIOUS MASTER VESSEL CHARTER AGREEMENT AND THEREFORE THE VESSEL OWNER SHOULD READ THE TERMS CAREFULLY. THE TERMS OF THIS CHARTER ARE DESIGNED TO COMPLY FULLY WITH ANY AND ALL CONSENT JUDGMENTS ENTERED PREVIOUSLY WITH RESPECT TO THE ORIGINAL MASTER VESSEL CHARTER AGREEMENT.**

## TERM OF CHARTER

A. Subject to the availability (as mutually agreed upon between CHARTERER and VESSEL OWNER) of the vessel described in Exhibit "A" (hereinafter referred to as VESSEL), VESSEL OWNER agrees to let and CHARTERER agrees to hire the VESSEL from DAY to DAY as may be requested by CHARTERER. VESSEL OWNER shall deliver or otherwise make available the VESSEL to CHARTERER and place the VESSEL at CHARTERER's disposal at a mutually agreed location. The term of the CHARTER shall commence on the date of the departure of the VESSEL from the mutually agreed location of delivery into the service of Charterer, and shall be referred to as the "CHARTER TERM." CHARTERER may terminate the CHARTER at any time and the CHARTER TERM will terminate as set out in Paragraph B of this Article 1.

B. The VESSEL shall be delivered at the commencement of the CHARTER TERM, fully tanked with fuel, hydraulic fluid, lubricated, manned, provisioned and ready in all respects to perform SERVICES as required by this CHARTER. The VESSEL shall be redelivered to VESSEL OWNER at the close of each DAY to the original point of delivery by CHARTERER, unless VESSEL OWNER elects not to return directly to the point of dispatch, in which case, the CHARTER TERM shall cease immediately upon such election.

## EMPLOYMENT AND SERVICES OF VESSEL

C. During each CHARTER TERM, the VESSEL shall be utilized exclusively in the carriage of CHARTERER's employees, contractors, business invitees, equipment and provisions and in the performance of various tasks associated with oil spill response and containment efforts as directed by CHARTERER (hereinafter referred to as SERVICES). Such SERVICES shall include, but not be limited to, tending or deploying boom and skimming equipment, skimming operations, recovering oiled debris, collecting garbage, assistance with wildlife operations and towing equipment. BP, in cooperation with OSHA and the U.S. Coast Guard, has developed a training and safety program ("HORIZON Response Program" or "HRP") for VESSELS and VESSEL crews engaged in oil spill response activities under this CHARTER. The HRP was approved by OSHA on May 7, 2010 and received approval from the U.S. Coast Guard on May 8, 2010. Per OSHA and U.S. Coast Guard directives, the HRP is subject to continuous improvement processes. As of May 10, 2010, BP will ensure that all VESSEL crews engaged in oil spill response activities (1) receive all necessary training for such activities as per the HRP, (2) receive all necessary credentials for such activities as per the HRP, and (3) receive all necessary protective equipment for such activities as per the HRP. The VESSEL shall be available and at CHARTERER's disposal for operation twenty-four (24) hours per day on the days that the CHARTERER has instructed the VESSEL OWNER that the VESSEL is hired for that twenty-four (24) hour period.

D. The VESSEL shall not be used for any purpose other than performance of SERVICES while operating and being paid under this CHARTER.



**PERFORMANCE OF VOYAGES**

During the CHARTER TERM, the VESSEL OWNER or its designated master shall perform all voyages without delay. VESSEL OWNER or its designated master shall load, stow, and trim the VESSEL. The decision to proceed on a trip in the face of adverse or changing weather or sea conditions shall be the sole decision of the VESSEL OWNER or the designated master.

**OPERATION IN COMPLIANCE WITH LAW**

E.  VESSEL OWNER warrants (i) that it has the right to charter the VESSEL to CHARTERER, (ii) that the VESSEL is entitled to perform the SERVICES under all applicable law (including having all endorsements on its documentation that may be required to perform the SERVICES in accordance with applicable law) and (iii) that the same is free of all encumbrances which might disturb CHARTERER's full right to SERVICES described in this CHARTER. The VESSEL OWNER shall exercise due diligence to deliver and maintain the VESSEL in a seaworthy condition. The VESSEL must display a current United States Coast Guard Safety Examination decal, unless otherwise approved by the CHARTERER. The VESSEL shall be operated, manned and maintained by VESSEL OWNER at all times during the term of this CHARTER in accordance with all applicable state and federal laws, rules and regulations, including (but not limited to) life saving requirements and operating area limitations. The VESSEL OWNER warrants to exercise good faith in the performance of each and every obligation under this CHARTER.

F.  VESSEL OWNER shall be responsible for paying any civil, criminal, or administrative fines, citations, or penalties that VESSEL OWNER may incur as a result of VESSEL OWNER's violation of any laws, rules, or regulations during the term of this CHARTER.

G.  VESSEL OWNER shall indemnify and hold CHARTERER harmless from any liability for personal injury, death, or property damage attributable to VESSEL OWNER's intentional misconduct constituting a violation of state or federal criminal law.

**DESCRIPTION OF VESSEL**

The VESSEL and its capabilities and capacities are described in Exhibit "A". VESSEL OWNER warrants, in good faith, the accuracy of all information set forth in Exhibit "A" and that the VESSEL has the capabilities and capacities as set forth in Exhibit "A" and that it shall be seaworthy (Fit for Purpose) at the time of delivery to CHARTERER. Length of the VESSEL will be determined by the VESSEL's state or federal registration documents as of March 30, 2010.

**MANNING REQUIREMENTS**

H.  VESSEL OWNER shall at all times man the VESSEL with a sufficient number of competent, physically fit for duty and properly licensed crew and/or deckhands trained and experienced in the operation of the VESSEL in the waters in which the VESSEL is to operate under this CHARTER. The specific number of crew shall be two (2) crew members (captain and one crew) for vessels under 41 feet in length, and three (3) crew members (captain and 2 crew) for vessels 41 feet or greater in length, unless otherwise approved by CHARTERER in writing.   VESSEL OWNER shall cause the crew of the VESSEL to carry out their duties with due care and workmanship and the utmost dispatch and diligence. VESSEL OWNER shall be responsible for properly receiving and stowing all cargo, including maintenance of the proper trim and draft of the VESSEL. Cargo loading and unloading operations shall be under the supervision and control of VESSEL OWNER. VESSEL OWNER and crew shall operate the VESSEL in such a way as to not cause unreasonable risk or avoidable damage to any personnel or cargo. Through notification to, and upon advance written approval by, CHARTERER, VESSEL OWNER may provide additional crew members.

I.  VESSEL OWNER warrants that the crew to be provided by VESSEL OWNER shall meet legal manning requirements in accordance with all applicable law for uses and purposes of the VESSEL required hereunder and as more particularly stated in ARTICLE 2 - EMPLOYMENT AND SERVICES OF VESSEL. The VESSEL's crew shall be VESSEL OWNER's employees at all times. VESSEL OWNER shall pay all wages, fringe benefits, applicable taxes, expenses, applicable fees/taxes, and transportation costs required for the

VESSEL's crew. VESSEL OWNER shall provide a list, including names and addresses, of all crew members employed by the VESSEL OWNER on the VESSEL while the VESSEL is performing SERVICES under this CHARTER.

## RADIO COMMUNICATIONS

VESSEL OWNER shall have, as a minimum, the following radio equipment in a functional and working condition at all times on VESSEL: one (1) VHF marine radio. Except when outside of communication range, VESSEL OWNER may be required to maintain constant communications on an hourly basis with the assigned Task Force Leader (TFL) and/or CHARTERER designated dispatcher by monitoring the VHF marine radio and providing VESSEL's position as directed by TFL and/or dispatcher. If VESSEL OWNER fails to comply with the provisions of this Article, CHARTERER may terminate this CHARTER upon twenty-four (24) hours notice, to be confirmed in writing.

## VESSEL PROVISIONS

VESSEL OWNER shall provide and pay for all supplies necessary for the VESSEL's mechanical functioning including, but not limited to, fuel. VESSEL OWNER shall provide and pay for all expenses necessary for the maintenance of the crew including, but not limited to, provisions, commissary, water, laundry and any necessary lodging.

## MAINTENANCE OF VESSEL

VESSEL OWNER shall maintain the VESSEL's hull and machinery in a seaworthy condition (Surveyor designation of "Fit for Purpose"). VESSEL OWNER will be solely responsible for any normal wear and tear to the VESSEL for the SERVICES the VESSEL is performing under the CHARTER. CHARTERER shall provide or otherwise reimburse VESSEL OWNER's actual cost of hull and gear cleaning and decontamination if VESSEL requires such cleaning as a direct result exposure to oil or oil waste coming from the MC252 while performing SERVICES under this CHARTER.

## HIRE

J.  CHARTERER will pay VESSEL OWNER for each CHARTER TERM or SERVICES satisfactorily performed and accepted by the CHARTERER in accordance with Exhibit "B". Any amendment or modification of this CHARTER must be in writing and duly executed by both parties in order to be binding. Provided, however, that CHARTERER shall be entitled at any time during the term of this CHARTER to revise Exhibit "B", by submitting or making available for viewing to VESSEL OWNER, a new Exhibit "B".

K.  CHARTERER shall pay Hire for the VESSEL and the SERVICES to be provided by the VESSEL OWNER, for each CHARTER TERM in accordance with the following provisions. For the purposes of ARTICLE 10 - HIRE, a day shall be deemed to be any portion of a twenty-four (24) hour period beginning at 12:00 midnight and ending at 11:59 pm. The length of vessels will be determined by the length noted on the VESSEL's state or federal registration documentation which was in effect on March 30, 2010. CHARTERER will not pay for stand by days, weather delays or down time due to any VESSEL repairs. CHARTERER will only pay for actual days on which the VESSEL and its crew are performing SERVICES on the water under this CHARTER.

L.  The termination of the CHARTER TERM (termination of dispatch) shall be determined by the date noted as the "termination date" stated on the written notice of termination provided by CHARTERER to VESSEL OWNER. If termination is by VESSEL OWNER, termination of dispatch shall be on the last day the VESSEL actually performed SERVICES as directed by CHARTERER during the CHARTER TERM.

M.  VESSEL OWNER shall be compensated after receipt and approval of invoices submitted by VESSEL OWNER to CHARTERER. The VESSEL OWNER shall provide all necessary information with an invoice to CHARTERER. Payment of all sums due shall be made within fifteen (15) days of receipt of an invoice and supporting documentation by CHARTERER.

**PORT FEES, MOORAGE, TAXES**

N.  VESSEL OWNER shall pay all taxes incidental to use of the VESSEL.

O.  The VESSEL shall be loaded and unloaded at any dock, berth, or place that CHARTERER may direct, as approved by VESSEL OWNER, which approval shall not be unreasonably withheld. VESSEL OWNER shall assist CHARTERER in locating and selecting the docks and landings suitable to accomplish the safe loading and unloading of passengers and cargo.

**OFF HIRE**

P.  In the event of any loss of time, not due to fault of CHARTERER, on account of: dry-docking or other necessary measures to maintain the efficiency of the VESSEL; deficiency of crewing or stores; breakdown of machinery, gear or equipment, damage to hull; collision; breach of orders; neglect of duty of master, officer or crew; strike or other labor stoppages of master, officers or crew; refusal to sail; stranding; fire; difficulties to the VESSEL's flag, ownership or previous ports of call; requisition of title or use of the VESSEL; failure to comply with rules, regulations or laws of ports of call; interference by authorities; detention of VESSEL or master or officers; or any other similar accident or event whatsoever either hindering or preventing the full working of the VESSEL, then no HIRE is to be paid for any time loss until the VESSEL is again in sufficient state to fully resume SERVICES.

Q.  In the case of the VESSEL taken off-HIRE while on a voyage by any reason or as a result of an accident or occurrence described in 12A above, the hire shall be suspended from the time of the accident or occurrence until the VESSEL is again in the same position as before the accident or occurrence and the VESSEL returns to an equivalent position or a substitute voyage directed by CHARTERER.

R.  During any period of off-HIRE all reimbursable items that would otherwise be for CHARTERER's account, if any, under this CHARTER shall be for the VESSEL OWNER's account.

S.  It is understood that the VESSEL shall use due diligence to comply with all applicable federal, state and local environmental protection and safety laws, regulations, and stipulations when performing SERVICES in effect at all ports within the trading limits. If the VESSEL is found not to comply with any such rule, regulation or law, VESSEL OWNER shall take immediate measures to comply, and all expenses incurred as a result of such failure to comply shall be for VESSEL OWNER's account under the off-HIRE provisions of ARTICLE 12.

T.  If the VESSEL is lost or becomes a constructive total loss, HIRE shall cease at 11:59 PM of the day of VESSEL loss or constructive total loss. If the VESSEL is missing, HIRE shall be suspended as of 11:59 PM on the day when the VESSEL was last heard from and until the VESSEL's safety has been established, unless loss of contact is deemed to have occurred through no fault of VESSEL OWNER or breakdown of the VESSEL's equipment.

U.  Any HIRE paid for in advance is to be adjusted by refund or deduction from future payments for any off-HIRE or suspension during the period for which payment was made.

V.  If the VESSEL is off-HIRE for a period of time exceeding twenty-four (24) hours for any of the events referred to in ARTICLE 12, CHARTERER may terminate this CHARTER at its sole option if VESSEL OWNER is not making best efforts to return to a safe harbor.

**INSURANCE**

W.  VESSEL OWNER confirms that it will maintain in place any insurance policies it is carrying as of the date immediately prior to entering into this CHARTER or that it routinely carries for its usual operations

X.  The insurance coverage referred to in Paragraph A above shall remain in effect during the CHARTER TERM, when the VESSEL is on HIRE for training as directed by CHARTERER, or the VESSEL is on HIRE for oil spill response. The time of coverage shall be from dispatch until termination of dispatch by either the VESSEL OWNER or CHARTERER.

Y.  In the event of any happening that may result in a claim against the coverage afforded in Paragraph A, prompt notice thereof shall be given to the party first aware of such claim in order to afford both parties an immediate opportunity to investigate the facts and circumstances giving rise to the potential claim.

Z.  The parties understand and agree that the insurance coverage summarized in Paragraph A is more particularly described in the insurance policies, the terms, conditions and exclusions of which shall control.

> Note:  Copies of the insurance policies summarized in Paragraph A shall be provided upon request.

AA. VESSEL OWNER warrants that during the term of this CHARTER that as to the insurance described in Paragraph A of this Clause 13, it shall:

1.  Pay all premiums to keep such insurance policies in full force and effect on the terms and conditions more particularly described in such policies.

2.  Will not modify, amend or otherwise agree to any reduction in coverage afforded under the policies.

BB. If VESSEL OWNER has a claim against CHARTERER or has Notice of any claim(s) for which CHARTERER is or could be accountable:

1.  VESSEL OWNER will exercise good faith and prudent management of all claims, including third party claims, and will not defend or settle third-party claims without CHARTERER's knowledge and prior written consent.

CC. In the event VESSEL OWNER's cost for insurance as provided for hereunder is, by virtue of the SERVICES being provided hereunder, in excess of that normally paid by VESSEL OWNER for its standard coverage, then CHARTERER agrees to pay the cost over and above that normally incurred by VESSEL OWNER for its standard coverage. VESSEL OWNER shall advise CHARTERER of such excess cost before incurring same and shall document the amount of such cost it is claiming for. Nothing herein shall prevent CHARTERER from taking out insurance for any risks it may deem appropriate but nothing herein shall require CHARTERER to do so.

## SALVAGE

All derelicts and salvage shall be for VESSEL OWNER's and CHARTERER's equal benefit, after deducting VESSEL OWNER's and CHARTERER's expenses and crew portion.

## CHARTER NOT A DEMISE

Nothing stated in this CHARTER is to be construed as demise of the VESSEL to CHARTERER. VESSEL OWNER shall at all times remain responsible for the navigation of the VESSEL, acts of pilots, tug vessels, crew, selection of safe ports/berths, and all other similar matters as if trading for its own account.

## CHARTERER'S USE OF VESSEL

During the CHARTER TERM the VESSEL OWNER shall not make any other use of the VESSEL without CHARTERER's prior written authorization. In addition, the VESSEL OWNER shall not allow on board the VESSEL any non-crew member who would interfere with the VESSEL OWNER's performance of SERVICES under this CHARTER. If the VESSEL OWNER allows on board the VESSEL any persons who are not crew members, or CHARTERER employees, or business invitees, the VESSEL OWNER shall be solely responsible for any liability for any injury to or death to any such person attributable to that person's presence on board the VESSEL. In no event shall CHARTERER be liable for any expenses resulting from the injury to or death of any such person allowed on board without CHARTERER's prior written authorization.

## VESSEL OWNER IS INDEPENDENT

DD. VESSEL OWNER and its employees and any approved Subcontractors and their employees are independent

MVCA-0703

contractors and are not employees, partners, or joint ventures with CHARTERER. VESSEL OWNER and Subcontractors and their respective employees will not represent CHARTERER in performance of SERVICES under this CHARTER, or engage in any conduct that would imply that VESSEL OWNER and Subcontractors and their respective employees are other than independent contractors.

EE. VESSEL OWNER is responsible for the manner, means and methods of performing SERVICES under this CHARTER.

FF. VESSEL OWNER shall pay all federal and state taxes, contributions and/or assessments associated with the performance of SERVICES, including, but not limited to, income taxes and self-employment taxes, and shall be responsible for providing its own employee benefit plans.

GG.   VESSEL OWNER acknowledges and understands that as an independent contractor, VESSEL OWNER and its employees and Subcontractors and their employees are not eligible for any employee benefits under any plans maintained · by CHARTERER, including, but not limited to, the CHARTERER Savings and Investment Plan, Pension Plan, Sick Pay Plan, Long Term Disability Insurance Plan, Voluntary Personal Accident Insurance Plan, Severance Plan, Group Life Insurance Plan, Dental Plan, Occupational Death Plan, Business Travel Plan and Medical Plan.

HH. VESSEL OWNER will indemnify, defend and hold CHARTERER and its respective employees and agents harmless from and against any and all claims, demands, actions, losses, expenses and/or liabilities resulting from or related to:

1.  Any claim, demand, and/or determination that VESSEL OWNER, its employees and/or Subcontractors and their employees are not independent contractors in connection with the performance of SERVICES under this CHARTER, including, but not limited to, any claims or liabilities for regular or overtime wages, salaries, taxes, contributions, and/or assessments; and/or

2.  Any claim, demand, and/or determination that VESSEL OWNER, its employees and/or Subcontractors and their employees are entitled to benefits in connection with the performances of SERVICES under this CHARTER under any employee benefit plans maintained by CHARTERER; and/or

3.  Any claim, demand, and/or determination that VESSEL OWNER's employees or Subcontractors' employees are entitled to additional compensation or benefits as a result of VESSEL OWNER's employment policies and practices; and/or

4.  Any claim, demand, and/or determination that VESSEL OWNER's employees or Subcontractors' employees are entitled to additional compensation or benefits, of whatever kind or character, or damages, of whatever kind or character, based on whole or in part upon theories that they are direct, dual, loaned, borrowed, and/or co- employees of CHARTERER, in addition to being employees of VESSEL OWNER or Subcontractor.

5.  Should VESSEL OWNER or Subcontractor assume the defense of CHARTERER pursuant to Paragraph E, CHARTERER shall also be entitled to separate defense and representation of its interests through counsel acceptable to CHARTERER.

## NOTICES

All notices and communications from VESSEL OWNER to CHARTERER and from CHARTERER to VESSEL OWNER shall be addressed as follows:

CHARTERER:

BP Exploration & Production Inc.
Attn: VoO Logistics

_____
_____
_____
_____

(to be completed by VoO Logistics)


VESSEL OWNER: (See Appendix A)


## CHOICE OF LAW AND FORUM

The rights and obligations of the Parties to this CHARTER including all matters of construction, validity and performance, shall in all respects be governed and enforced in accordance with the general maritime laws of the United States. In the event, but only in the event, the maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern. Any litigation arising out of or relating to the CHARTER may be brought in a court of competent jurisdiction in New Orleans, Louisiana or Houston, Texas.

## AUDIT AND TERMINATION

At any time during the term of this CHARTER, CHARTERER shall have the right to audit logs, books, payrolls, and records relating to any of the services performed hereunder. In addition to any other right of termination herein, VESSEL OWNER may terminate this CHARTER or any company listed in Exhibit "A" at any time for any reason whatsoever by giving the said party twenty-four (24) hours advance written notice of such termination, and any company listed in Exhibit "A" may terminate its obligations upon (24) hours advance written notice to CHARTERER.

## ASSIGNMENT/SUBCONTRACTING

II. VESSEL OWNER will not assign any of its rights or delegate any of its obligations under this CHARTER without prior written approval from CHARTERER. CHARTERER's approval of any assignment, subcontract or delegation will not relieve VESSEL OWNER of any responsibility under this CHARTER.

JJ. VESSEL OWNER shall not assign any rights or delegate any obligations hereunder without CHARTERER's prior written approval, which shall not be unreasonably withheld. Any such unauthorized assignment shall be void. CHARTERER may assign this CHARTER to third parties specifically including any of its respective affiliates or a response action contractor.

KK. Always subject to CHARTERER'S prior written approval, should VESSEL OWNER assign/subcontract its obligations hereunder, the hire rate shall remain the same as for the Original VESSEL OWNER.

LL. VESSEL OWNER agrees to abide by the BP Conflict of Interest policy which is incorporated herein as if fully set forth herein. VESSEL OWNER acknowledges that he and his crew have read the Conflict of Interest policy and will be guided accordingly.

## WAIVER

If CHARTERER fails to enforce any right or remedy available under this CHARTER, that failure will not be construed as a waiver of any right or remedy. A waiver of any claim, demand, right or remedy based on the breach of any provision of this CHARTER will not be construed as a waiver of any other claim,

demand, right or remedy based on a subsequent breach of the same or any other provision.

## SEVERABILITY

If any part, term or provision of this CHARTER is determined by a court of competent jurisdiction to be unlawful or unenforceable, the validity and enforceability of the remaining parts, terms and provisions will not be affected.

## ENTIRE AGREEMENT; SUCCESSORS

MM.    This CHARTER includes Exhibits A and B attached hereto and constitutes the entire agreement between the Parties with respect to this CHARTER. This CHARTER cancels and supersedes all prior negotiations, representations or agreements, both written and oral, including any proposals submitted by VESSEL OWNER. The Parties have not been induced by any representation, statements or agreements other than those expressed in this CHARTER. No changes, alterations, or modifications to this CHARTER will be effective unless made in writing and signed by both Parties.

NN. This CHARTER will benefit and bind the successors, representatives and assignees of both Parties.

## PRIORITY OF TERMS

In the event of any conflict or inconsistency between the various parts of this CHARTER, the Articles will take precedence over all other parts of this CHARTER, including any Exhibits, Attachments and Addenda, unless specifically stated otherwise.

THE PARTIES HAVE EXECUTED THIS CHARTER, by their respective authorized representatives, on the dates indicated below. This CHARTER will be ineffective until signed by both parties. Its terms and conditions will apply to the VESSEL described in an Exhibit "A" (Vessel Description). There may be multiple Exhibits "A". However each will cover a single VESSEL, and each must have unique contract number assigned by CHARTERER. Small boats, skiffs, etc. carried on, or towed by, the VESSEL shall not constitute an additional VESSEL eligible for compensation.

VESSEL OWNER:

_____

CHARTERER :
BP Exploration & Production Inc.

By:_____     _____
(Signature)                              (Date)

By:_____     _____
(Signature)                              (Date)

_____
(Print or Type Name)

_____
(Print or Type Name)

_____
(Print or Type Title)

_____
(Print or Type Title)

**EXHIBIT A**

## VESSEL INFORMATION

**Only one vessel may be listed. A unique contract number, assigned by CHARTERER, is required for each vessel. Each Exhibit A must be signed by VESSEL OWNER, and signed and numbered by CHARTERER, to be effective.**

### Contract Number: _____ # ___ ___ ___ ___ ___

### A. General Information

VESSEL Name: _____

Type/Use of VESSEL (e.g., shrimp, crab, oyster, fishing, etc.): _____

Call Sign: _____

Location and home port (include county/parish): _____

USCG Safety Decal No. and Expiration Date: _____

Federal or State Registration No. and Expiration Date: _____
(You must provide copy of the VESSEL registration)

VESSEL Type (circle the one that applies):  Commercial Vessel   or   Recreational Boat

Commercial License # and date of issue (if applicable): _____ / _____
(You must provide a copy of a commercial fishing permit or business license, or other evidence of commercial activity, such as, catch weigh bills.)

VESSEL Construction (steel, wood*, etc): _____
(* Wood vessels, being difficult to decontaminate if oiled, are generally not suitable for the VoO Program.)

VESSEL Length ( You must provide a copy of the state or federal vessel documentation as of March 30,

2010) : _____

Bunk (sleeping) Capacity: _____

Crew Number Requirement: _____

### B. VESSEL OWNER & Contact Info

Company/Individual Name: _____

Contact Name: _____

Email Address: _____

Mailing Address: _____

Physical Address: _____

Home Phone: _____

Cell Phone: _____

Facsimile Phone: _____

C. **VESSEL Survey/Insurance Information**

   Date/Place of Survey: _____

   Insured? (Yes/No) If yes, insurance company name: _____

D. **VESSEL Engine Information**

   Make: _____

   Model: _____

   Total HP: _____

   Number of Engines: _____

   Drive Type (Inboard, Outboard, Inboard/Outboard): _____

   Fuel Storage Amount (Gallons): _____

   Burn Rate (GPH): _____

   Fuel Type: _____

   Aux. Engine? (Yes/No, used for what?) _____

   Aux. HP: _____

   Aux. Fuel Type: _____

   Number of Engine Hours to date: _____

E. (This item no longer used.)

F. **Comments:** (Additional information that could be useful in vetting the VESSEL, e.g., additional communication equipment other than VHF radio, GPS, special capabilities, etc.)

_____

_____

_____

_____

_____

_____

_____

_____

This Exhibit is subject to, and fully incorporates, the terms and conditions of the MASTER VESSEL CHARTER AGREEMENT between the VESSEL OWNER and CHARTERER.

VESSEL OWNER hereby certifies the accuracy of the information above and the documentation submitted with this Exhibit.

VESSEL OWNER:
_____

CHARTERER :
BP Exploration & Production Inc.

By:_____    _____
(Signature)                                        (Date)

By:_____    _____
(Signature)                                        (Date)

_____
(Print or Type Name)

_____
(Print or Type Name)

_____
(Print or Type Title)

_____
(Print or Type Title)

**EXHIBIT B**

**COMPENSATION PROVISIONS/PUBLISHED RATE SCHEDULE**

1. **COMPENSATION**

A. No compensation will be paid for days the VESSEL does not work due to the election of the OWNER or operators of the VESSEL, or due to the suspension of operations for any reason whatsoever, including weather. No compensation will be paid for stand by days. Compensation will only be paid for actual days worked on the water. Otherwise, as full and complete compensation to VESSEL OWNER for SERVICES satisfactorily performed and for assuming obligations hereunder, CHARTERER, for and on behalf of OWNERS, will pay VESSEL OWNER on the basis of the fixed rates (Fixed Rates), set forth below in Paragraph 2 - FIXED RATES. CHARTERER shall be entitled at any time during the term of this CHARTER to revise this Exhibit "B", by submitting or making available for viewing to VESSEL OWNER, a new EXHIBIT "B".

B. There may be multiple Exhibits "A" to the CHARTER. However each will cover a single VESSEL, and each must have unique contract number assigned by CHARTERER. Small boats, skiffs, etc. carried on, or towed by, the VESSEL shall not constitute an additional VESSEL eligible for compensation.

2. **FIXED RATES**

VESSEL OWNER's FIXED RATES (hereinafter FIXED RATES) are agreed to be VESSEL OWNER's sole, complete, and exclusive compensation for performing and completing SERVICES under CHARTER, FIXED RATES are not subject to renegotiation or retroactive adjustments based on actual experience and are not subject to escalation.

A. Rates:

| Length of Vessel | Day Rate |
|---|---|
| Less than 24' | $600.00 |
| 24' to 40' | $1200.00 |
| 41' and greater | $1500.00 |

Plus:
    Specialized equipment required by BP reimbursable at cost +10%
    PPEs will be provided by CHARTERER

Note:  VESSEL OWNER is to provide meals for crewmembers at no additional cost to CHARTERER.

 us.mg5.mail.yahoo.com/neo/launch?.rand=92sjkpdtdmr

Begin forwarded message:

From: "Hutchinson, Gary (DANOS & CUROLE)" <Gary.Hutchinson@bp.com>
Date: May 22, 2011 1:08:45 PM PDT
To: "Katelyn Johnson" <katelynnjohnson94@yahoo.com>
Subject: RE: RE:

-----Original Message-----
From: Katelyn Johnson [mailto:katelynnjohnson94@yahoo.com]
Sent: Sunday, May 22, 2011 4:01 PM
To: Hutchinson, Gary (DANOS & CUROLE)
Subject: Re: RE:

Can you resend that last message with the contract on it, I deleted it
by accident. Thanks

Sent from my iPod

On May 17, 2011, at 5:45 AM, "Hutchinson, Gary (DANOS & CUROLE)"
<Gary.Hutchinson@bp.com> wrote:

> Can you send a picture of this boat?
>
> -----Original Message-----
>
> From: Katelyn Johnson [mailto:katelynnjohnson94@yahoo.com]
>
> Sent: Monday, May 16, 2011 6:40 PM
>
> To: Hutchinson, Gary (DANOS & CUROLE)
>
> Subject:
>
> REDACTED
>



PLAINTIFF'S
EXHIBIT
2

Version 1 – July 1st, 2010



# BP Vessels of Opportunity (VOO) Program

**Description of Strategy, Policy and Process**

Official Policy – Unified Command          1

Confidential

## 1. INTRODUCTION

BP has been designated as a responsible party under the Oil Pollution Act of 1990 ("OPA") and has accepted that designation. BP will carry out its responsibility under OPA and will pay all necessary response costs and legitimate claims for damages recoverable under OPA that were caused by the oil spill from MC 252 following the Deepwater Horizon Incident on April 20, 2010.

### 1.1 VoO Strategy

To mobilize independently contracted vessels to support specific oil recovery activities in each State, with a strong bias to commercial and charter fishing vessels, operated by their owners.

The program aims to use a range of 2000-3000 vessels/day to support ongoing oil recovery operations. Daily vessel mobilization numbers are demand driven, and requested via ICS 204s as part of the incident command protocol. A 2.5 to 1 ratio will be used to build up an inventory of available vessels.

An inventory of 'available' independently contracted vessels will be maintained by each Branch, in a single standardized VoO Database. Inventory levels will be monitored to ensure capacity for ongoing operations, vessel rotations and any element of ramp up that may be required. The response Gulf Coast inventory is envisioned to be in the range of 6500 to 7500, subject to change if Miami IC starts up a VoO fleet.

Recreational vessels may only be deployed on an exceptional basis.

### 1.2 VOO Scope

Each ICS Branch will use a standard VoO Taskforce/Strike Team architecture, with a vessel make up and size to suit the activities required in that particular geographic area:

<table>
<tr><td colspan="2" rowspan="2"></td><td colspan="4">VESSEL SIZE (FT)</td></tr>
<tr><td>&lt;30</td><td>30-45</td><td>45-65</td><td>&gt;65</td></tr>
<tr><td rowspan="5">ZONE</td><td>WELL SITE - <i>Within 5 NM of the MC252 well.</i></td><td>-</td><td>-</td><td>YES</td><td>YES</td></tr>
<tr><td>OFFSHORE - <i>Greater than 3 NM of the maritime baseline out to the Well Site</i></td><td>-</td><td>YES</td><td>YES</td><td>YES</td></tr>
<tr><td>NEAR-SHORE - <i>Within 3 NM of the maritime baseline.</i></td><td>YES</td><td>YES</td><td>YES</td><td>YES</td></tr>
<tr><td>IN-SHORE - <i>Waters inside the maritime baseline. Includes beaches, marshes, and estuaries.</i></td><td>YES</td><td>YES</td><td>-</td><td>-</td></tr>
<tr><td>SHALLOW - <i>Less than 6 ft of water.</i></td><td>YES</td><td>-</td><td>-</td><td>-</td></tr>
</table>

Official Policy – Unified Command          2

BP-HZN-2179VOO00005990

|  | | | | | |
|---|---|---|---|---|---|
| RESPONSE   ACTIVITY | Boom Deployment | - | - | YES | YES |
|  | Boom Tending/Maintenance | YES | YES | - | - |
|  | Skimming Operations (trawling containment boom or similar operations) | - | - | YES | YES |
|  | Sheen, Light Oil Recovery, and Tar Ball Recovery (excludes containment boom) | YES | YES | - | - |
|  | Removal of Oily Waste (sorbent booms and pads) | YES | YES | YES | YES |
|  | Decontamination Support | YES | YES | YES | - |
|  | Transportation - Supplies | YES | YES | YES | YES |
|  | Transportation - Personnel/Wildlife | YES | YES | - | - |

**Template for Branch Task Force and Strike Team Demand Plans**

### 1.3    Boundaries & Biases
Boundaries
- Standardized Strike team and Taskforce structure
- Taskforces report to ICS Branch level
- Branch operates to a single VoO policy, and set of operating procedures
- Daily activated vessel numbers are operationally driven by taskforce demand
- Contracts are with in-state licensed commercial and charter fishing vessel owners, registered prior to March 31, 2010
- Vessels contracted to operate out of their registered state port but may cross state lines for operational clean up activity

Biases
- Registered Vessel Owner/Operators get priority over 'passive owners' (eg. Lawyer, Doctors)
- Limit activation to 1 Vessel per Owner until vessel type supply is exhausted
- Deploy vessels of opportunity to oil recovery work, including all transportation
- On water oil surveillance is done from the air
- Rotate vessels (where we can operationally) to maximize participation

### 1.4  Inventory by State

Official Policy – Unified Command        3

BP-HZN-2179VOO00005991

Branch instructs VoO Logistics to contract with commercial fishing/charter fishing vessel to inventory levels agreed with ICP/Area Command.  Ramp up above this will be agreed in advance and will be targeted by vessel type and geography.  Branch Ops or Staging Teams do not have the delegation to sign up new contracts.

### 1.5  Program Qualification & Payment Overview

Independent vessel owners/operators are given preference to contract into to the VoO program pool (vs incorporated companies).

To qualify for the program, boat operators and crew must meet several key requirements, including completing four hours of federal marine training, passing a U.S. Coast Guard approved vessel dockside examination, having an operable VHF-FM radio on their vessel,  and meet crew manning requirements based on vessel size.  These requirements may be subject to change by US Coast Guard or OSHA.

Qualification alone, however, does not guarantee participation as actual usage of vessels depends on Branch taskforces required and ongoing operational activity.

At the end of an initial trip, the first payment will be processed within 15 days of the invoice for services rendered.  Thereafter, vessel operators and crew will be compensated on a 14 day cycle for their services provided during this period.  A standard payment rate is outlined in the contract the owner/captain signs with BP.

This document overview the steps by which the program will be run during the Deepwater Horizon response period.

## 2.    CONTRACTING PROCESS

### 2.1    Initial Registration of Interest

New demand for VoOs is set by Branch Head, who may work with local community stakeholders to ensure fair and equitable access to new openings.

Training sessions for those contracting to VoO require specific marine training and will be run separately from other responder training.  BP community outreach offices will support such events but will not authorize them.

Supporting announcements may also be made via local media, internet sites and will be pre-recorded via the VoO call line **1-866-279-7983.**

.

### 2.2    Vessel Contract Process

New contract announcements will detail type of vessel the registration opportunity is open for ie. activities to be performed, vessel technical specification.

Boat details gathered and entered into VoO database will include Name, Licence number, Home State, Type, Purpose, Length, Nos of Generators, Bunk Capacity, Engine HP, No of Engines, Drive Type, Fuel Storage, Burn Rate, Fuel Type.  This Vessel data

Official Policy – Unified Command        4

BP-HZN-2179VOO00005992

will be used to ensure the appropriate vessel is selected for activation to meet Operations demand. It will also be noted at this point if vessel type is considered suitable for rotational work or longer periods.

## 2.3    Vessel Type and Initial Vessel Safety Certification
As summarized above, we have a strong bias for Owner/Operated Commercial and Charter Fishing vessels. Any other vessels will be contracted on an exception basis.

The vessel owner/operator is required to self-certify pre-determined safety equipment at sign-up along with confirmation of vessel seaworthiness. This is done in part by the completion of a Vessel Information Sheet during the contracting process. (Appendix 1) The vessel owner/captain will also be asked to ensure his/her crew are fit for work, including being drug and alcohol free when reporting for duty and the owner is expected to take responsibility for their ongoing fitness for work. A Fitness for Work Checklist will be provided to contracted vessel owners for this purpose as the time of training. (Appendix 2). BP reserves the right to conduct drug and alcohol testing at any time as part of its established Code of Conduct. Additionally, USCG vessels may approach and conduct similar checks. If crews are found to be unfit, the vessel will not be put on water.

Vessels will be further vetted during staging to ensure they meet safety regulations and are suited to the required activities. This will include photography as part of the safety inspection at the staging site and/or deployment port. If a vessel is inspected and deemed not seaworthy it will be removed from the VoO pool by Branch Command and noted in the central database system.

VoO vessels integrated into task forces have recognized tracking systems via the lead vessel. AIS tracking may be required by US Coast Guard for offshore zones (Greater than 3NM of the maritime baseline out to the source zone). Specific tracking systems will be agreed with USCG and be used consistently across the Gulf Region.

## 2.4    Induction and Mandatory Safety Training
Vessel Owners must be registered to be invited to attend 4 hour OSHA training.

On completion of OSHA marine training and once the signed contract is returned to the VoO Logistics Branch Lead for signature (not community offices), the vessel status will shift to *'Available'* in the central database. This is the responsibility of the VoO Logistics Branch teams.

HAZWOPER trained personnel are required on all vessels deployed who make contact with oil. If crew members do not have this certification, in-state personnel will be sourced by an approved vendor or ICP/Branch will arrange local training classes.A Safety Training Fact sheet (Appendix 3) summarises the Unified Command safety policy for contracted labour involved in VOO operations. Training Inductions will be run by Worley Parsons (MOB), PEC Premier (HOU). Inspections and Photography services will be run by Jackson Marine Offshore.

Official Policy – Unified Command      5

BP will only sign a vessel contract when the <u>Marine Safety training</u> has been completed.

**2.5   Activation into Response Operations**
A vessel becomes 'Active' via ICS 204s. The activation process will be managed through each Branch within an ICP:

1. Branch builds the demand work plan.  Operations Branch Staging (FoCs) provide a 48 hour look ahead demand plan for VoO to Logistics Staging VoO
2. Selected vessels are called out by Logistics VoO Branch and put on active status in preparation for deployment. (Note: process in x3 LA parishes varies due to historical agreements)
3. Vessel Owners have the option to decline but remain in the pool.
4. If the Vessel Owner accepts, they will be given dispatch instructions at this time and reports to the staging site at appointed time
5. Vessel safety is vetted via inspection and photography by Jackson Marine Offshore or designee using US Coast Guard prescribed guidelines. A standard system is used by all sites to record vessel status.
6. Vessel is deployed into taskforce/strike team for pre-agreed period.
7. Once activated, owners and deck hands must staff the vessel at all times.
8. Vessel may be rotated on/off to maximize participation locally where it is operationally efficient and where supply is sufficient to do so.

Further technical training (classroom or on water) may be required for specific activities and is arranged and funded by BP.

Vessel usage may change depending on weather and other operational factors.  If a vessel is stood down for operational or weather related reasons,  ie. not deployed on water, no payment is made.

All BP VoOs will be externally marked with a common identifiable pennant (a VoO flag) to signify that it is active as part of the response effort.

**2.6 Language Support**
Enrollment, training and materials relating to VOO will be provided in English and translation can be made available as needed for Vietnamese, Spanish or Khmer native speakers.

**2.7 Compensation Rates & Process**
Vessel Owners must supply a completed W9 form, banking information (for direct depositing of payments) to BP's VoO contract administration and payables processing partners.  In addition:

- Crew members must sign in daily (paper or ID badge system) to ensure time sheets collected to support vessel payments match worked periods.
- Crew Member names, contact information and training location need to be included in time sheets

Official Policy – Unified Command        6

BP-HZN-2179VOO00005994

- After the initial trip, BP's payroll administrator company will initiate payments every 14 days to the contracted VOO vessel owners based on days worked in that period.
- Once the payroll administrator receives the invoice they will also reconcile for Incidentals and Expenses (such as fuel charges, meals etc.)

When a vessel is deployed from the pool for operational duty, the owner /captain will be paid at pre-agreed rates based on vessel length as outlined in the signed contract, and summarized in Table B below.  The captain is responsible for the payment of his crew.

| Vessel Services | Fixed Rates |
|---|---|
| 1.  Actual spill response as defined in contract | |
| - Vessel >65'<br>- Vessel >45'-65'<br>- Vessel >30'-45'<br>- Vessel less than 30' | $3000/24 hour day<br>$2000/24 hour day<br>$1500/24 hour day<br>$1200/24 hour day |
| **Crew Services** | |
| 1.  Actual spill response, classroom training, table top activities or meetings as defined in contract | $200.00/8 hour day/crew member If 12 hours are worked will be pro-rated to $300/day/crew member |
| | Meals provided by Vessel Owner |

**TABLE B**

### 2.8  Fuel Payment
BP shall provide or otherwise reimburse VOO owner at the current commercially available rate per HP/100 x 3 x Hrs. dispatched x current fuel rate for diesel, gas and auxiliary fuels.   It is recognized that in practice contracted vessels owners may submit receipts for fuel used as an alternative to the above formula.

Vessels are requested to come with full tanks when activated into operations. Fuel receipts for initial launch are required to be included in invoice submission, along with additional charges allowable by contract must be supported by receipts.

When vessels do not come ashore every evening, BP contracted fuel barges will provide re-fueling services offshore.

### 2.9 Vessel Rotation Policy
We intend to rotate in/out a number of vessels/crews resulting in more equitable time on the water for those in the contracted VoO pool. Key principles to manage this are:

- When vessels/crews have been 'on hire' for ~30 days, they rotate out to enable others to participate in the program (this is subject to supply being sufficient)

Official Policy – Unified Command          7

BP-HZN-2179VOO00005995

- Vessel Rotations will be based on cumulative time "on hire" (those with the most cumulative time rotate out first and those with the least rotate in first.
- Cumulative time starts from when first activated (ie. not from this point forward)
- Strike teams may be rotated out together to maintain their base organization
- Supplies and wildlife transportation vessels will automatically rotate out on Day 30 as these are not subject to specialist/technical equipment or operations.

Branches will publish the rotation line-up and will determine the timing of these rotations in line with above principles.

## 2.10 Insurance
As independent contractors Vessel owners are not "insured" by BP for this work. As outlined in the contract with vessel owners, BP will pay the increased premium for the vessel owner who gets insurance which suits the spill response.

## 2.11 Injury Management
Any injuries sustained by contracted vessels will be reported via existing ICS procedure. If an independent contractor or crew member suffers an injury while on active deployment, and has not got appropriate medical coverage, BP will support through payment of reasonable medical bills, recognizing this is a 3rd party and not a BP employee. A standard policy and set of guidelines will guide the steps in this process.

## 2.12 De-Contamination and De-activation of Vessels
Vessels operating in oil recovery operations will be routinely cleaned by BP to remove any oil prior to entering the harbor. This will be done in accordance with a standard scope and procedure by qualified contractors, paid for by BP.

A standard Demobilization procedure will be used for all VoOs leaving the program, including off-hire damage surveys. BP will provide a standard letter to confirm to vessel owners when they are off-hire to assure rigor in information and to support the final payment process.

## 2.11 VoO and Claims Process
Those who participate in VoO are not restricted from filing loss of income, damage or other types of claims due to the Deepwater Horizon incident and the spill impact.

If a party feels its business has been financially impacted by the spill you can file a claim, either by calling the BP claims line at 1 800 440 0858 or by visiting a BP claims office.

Instructions for participating in the program, along with the schedule of these sessions, can be found on the JIC web site
http://www.deepwaterhorizonresponse.com/go/doc/2931/542683/

Official Policy – Unified Command       8

BP-HZN-2179VOO00005996