# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, ON APRIL 20, 2010 | § | SECTION J |
| | § | |
| This Document Relates To: | § | |
| *All cases, 2-10-cv-2771 and 2:10-cv-04536* | § | JUDGE BARBIER |
| | § | |
| | § | MAGISTRATE JUDGE SHUSHAN |
| | § | |

## MEMORANDUM IN SUPPORT OF
## TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AGAINST BP TO ENFORCE BP'S CONTRACTUAL OBLIGATIONS, INCLUDING
## BP'S OBLIGATION TO DEFEND, INDEMNIFY AND HOLD TRANSOCEAN
## HARMLESS AGAINST POLLUTION CLAIMS

14965978.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iv

APPENDICES ............................................................................................... ix

FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT ................................1

    I.       BP's Contractual Promises Made ................................................1

    II.      BP's Contractual Promises Broken.............................................4

ARGUMENT ...............................................................................................12

    I.       Standard of review ...................................................................12

    II.      BP's attempt to avoid its contractual promises by alleging Transocean and
           its deceased and injured workers were grossly negligent is both morally
           repugnant and controverted by the testimony of BP personnel, from its CEO
           to its Well Site Leaders, and by all of BP's contractors' employees.........13

           A.      BP employees praise the *Deepwater Horizon* and her crew..........14

           B.      Halliburton employees praise the *Deepwater Horizon* and her
                crew.   .........................................................................20

           C.      Cameron employees praise the *Deepwater Horizon* and her crew. ....21

           D.      Third-party and government inspectors praise the *Deepwater
                Horizon* and her crew................................................21

    III.    BP's demand for contribution is in violation of the promises it made. .....24

    IV.   OPA recognizes the enforceability of indemnity promises, including
           indemnity for the uncapped liability that arises upon a finding that an incident
           resulted from gross negligence. ................... ..............................................25

    V.       Another broken promise: BP's contribution claims are also barred by BP's
           promise to defend Transocean. ................................................27

    VI.   BP cannot avoid its contractual promises by alleging that Transocean
           breached the Drilling Contract or that the vessel was unseaworthy and,
           indeed, BP owes Transocean charter hire for Macondo..........................28

    VII.  BP cannot avoid its contractual promises by alleging that Transocean
           was grossly negligent. ..............................................................31

A.      The public policy against an *exculpatory* exemption from liability for injury to the other contracting party is not applicable to a true indemnity agreement whereby one contracting party agrees to indemnify the other contracting party with respect to liability for an injury caused to a third party who is *not* a party to the contract. ...31

B.      Maritime cases support enforceability of an express contractual promise for indemnity for liability to a third party, even in the event gross negligence is alleged. ............................... ...................33

C.      BP refuses to honor its promise to indemnify Transocean for civil fines and penalties..................... ...........................................36

CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

*Cases*

*Allen N. Spooner & Son, Inc. v. Conn. Fire Ins. Co.*, 314 F.2d 753 (2d Cir. 1963), *cert. denied*, 375 U.S. 819 (1963). [App. D-67]

*Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267 (N.Y. 1985). [App. D-56]

*Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206 (3d Cir. 1994). [App. D-21]

*Becker v. Tidewater Inc.*, 335 F.3d 376 (5th Cir. 2003). [App. D-75]

*Becker v. Tidewater Inc.*, 405 F.3d 257 (5th Cir. 2005). [App. D-76]

*Becker v. Tidewater, Inc.,* 2007 WL 3231655 (W.D. La. Nov. 14, 2007), *aff'd in part, rev'd in part,* 586 F.3d 358 (5th Cir. 2009). [App. D-44]

*Becker v. Tidewater, Inc.,* 586 F.3d 358 (5th Cir. 2009). [App. D-6]

*Beerman Realty Co. v. Alloyd Asbestos Abatement Co.,* 653 N.E.2d 1218 (Ohio Ct. App. 1995). [App. D-88]

*Broom v. Leebron & Robinson Rent-A-Car, Inc.*, 626 So.2d 1212 (La. Ct. App. 1993). [App. D-55]

*Boykin v. China Steel Corp.*, 73 F.3d 539 (4th Cir. 1996). [App. D-9]

*Cargill Ferrous Int'l Div., etc. v. M/V Princess Margherita*, 2001 WL 1426678 (E.D. La. Nov. 13, 2001). [App. D-10]

*Crawford v. Weather Shield Mfg, Inc.*, 44 Cal. 4th 541 (2008). [App. D-33]

*Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239 (3d Cir. 2009). [App. D-23]

*Dixon Distrib. Co. v. Hanover Ins. Co.,* 641 N.E.2d 395 (Ill. 1994). [App. D-58]

*Energy XXI, GOM, LLC v. Tech Engineering*, 2011 WL 1458638 (S.D. Tex. Apr. 15, 2011). [App. D-60]

*English v. BGP Int'l, Inc.*, 174 S.W.3d 366 (Tex. App.—Houston [14th Dist.] 2005, rev'd and remanded). [App. D-31]

*Estate of Bradley* ex rel. *Sample v Royal Surplus Lines Ins. Co.*, 647 F.3d 524 (5th Cir. 2011). [App. D-36]

*Fidelity & Deposit Co. of Md. v. Conner,* 973 F.2d 1236 (5th Cir. 1992). [App. D-2]

iv

*First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335 (3d Cir. 1983).  [App. D-57]

*Foster v. Subsea Int'l, Inc.*, 101 F. Supp. 2d 454 (E.D. La. 1998).  [App. D-39]

*Gen. Motors Corp. v. Am. Ecology Envtl. Servs. Corp.*, 2001 WL 1029519 (N.D. Tex. Aug. 30, 2001).  [App. D-32]

*Griffin v. Tenneco Oil Co.*, 625 So.2d 1090 (La. Ct. App. 1993).  [App. D-68]

*Hanks v. GAB Bus. Serv.*, 644 S.W.2d 707 (Tex. 1982).  [App. D-48]

*Harley Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341 (7th Cir. 1994), *cert. denied*, 514 U.S. 1036 (1995).  [App. D-19]

*In re Horizon Vessels, Inc.,* 2005 U.S. Dist. LEXIS 42110 (S.D. Tex. Dec. 22, 2005).  [App. D-59]

*In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710 (E.D. La. 2010).  [App. D-14]

*In re Torch, Inc.*, 1996 WL 185765 (E.D. La. Apr. 16, 1996).  [App. D-69]

*In re TT Boat Corp.*, 1999 WL 1442054 (E.D. La. Sept. 8, 1999).  [App. D-70]

*Jackson v. Tenneco Oil Co.*, 623 F. Supp. 1452 (E.D. La. 1985).  [App. D-40]

*Joseph Thomas, Inc. v. Graham*, 842 S.W.2d 343 (Tex. App.—Tyler 1992, no writ).  [App. D-47]

*Joslyn Mfg. Co. v. Koppers Co.,* 40 F.3d 750 (5th Cir. 1994).  [App. D-18]

*La Esperanza de P.R., Inc. v. Perez y Cia. De P.R., Inc.*, 124 F.3d 10 (1st Cir. 1997).  [App. D-43]

*Lafarge N. Am., Inc. v. K.E.C.I. Colo., Inc.*, 250 P.3d 682 (Colo. App. 2010).  [App. D-38]

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).  [App. D-4]

*Mayer v. Cornell Univ.*, 1995 WL 94575 (N.D.N.Y. Feb. 27, 1995).  [App. D-11]

*MetroPCS Wireless, Inc. v. Telecomm. Sys., Inc.*, 2009 WL 3418581 (D. Md. Oct. 20, 2009).  [App. D-29]

*Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111 (2d Cir. 1995).  [App. D-16]

*Morella v. Bd. of Comm'rs of Port of New Orleans*, 888 So.2d 321 (La. App. 4 Cir. 2004).  [App. D-34]

*MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 197 P.3d 758 (Ariz. Ct. App. 2008).  [App. D-35]

*Nat'l Surety Corp. v. United States,* 1944 A.M.C. 1496 (5th Cir. 1944).  [App. D-92]

*N.Y., New Haven & Hartford R.R. Co. v. Gray*, 240 F.2d 460 (2d Cir. 1957).  [App. D-65]

*O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.,* 537 F.3d 153 (2d Cir. 2008).  [App. D-22]

*Orient Mut. Ins. Co. v. Adams*, 123 U.S. 67 (1887).  [App. D-64]

*Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888 (5th Cir. 1994).  [App. D-72]

*Russello v. United States,* 464 U.S. 16 (1983).  [App. D-26]

*Scholastic Inc. v. M/V Kitano,* 362 F. Supp. 2d 449 (S.D.N.Y. 2005).  [App. D-86]

*Seaboats, Inc. v. Alex C Corp.,* 2003 WL 203078 (D. Mass. Jan. 30, 2003).  [App. D-15]

*Sevarg Co. v. Energy Drilling Co.*, 591 So.2d 1278 (La. Ct. App. 1991).  [App. D-63]

*Smith v. Golden Triangle Raceway*, 708 S.W.2d 574 (Tex. App.—Beaumont 1986, aff'd in part, rev'd and remanded in part).  [App. D-54]

*Sprint Commc'ns Co., L.P. v. W. Innovations, Inc.*, 640 F. Supp. 2d 1122 (D. Ariz. 2009).  [App. D-30]

*Strachan Shipping Co. v. Dresser Indus., Inc.,* 701 F.2d 483 (5th Cir. 1983).  [App. D-5]

*Sullen v. Mo. Pac. R. Co.*, 750 F.2d 428 (5th Cir. 1985).  [App. D-37]

*Taylor v. Lloyd's Underwriters of London,* 972 F.2d 666 (5th Cir. 1992).  [App. D-71]

*Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  [App. D-46]

*Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982).  [App. D-53]

*Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co.*, 247 F.2d 116 (5th Cir. 1957), *cert. denied*, 355 U.S. 903 (1957).  [App. D-66]

*Tug Ocean Prince, Inc. v. United States,* 436 F. Supp. 907 (S.D.N.Y. 1977).  [App. D-80]

*United States v. City of Twin Falls, Idaho,* 806 F.2d 862 (9th Cir. 1986), *cert. denied,* 482 U.S. 914 (1987), *overruled on another ground by Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 442 (1987).  [App. D-87]

*United States v. Hardage*, 985 F.2d 1427 (10th Cir. 1993).  [App. D-20]

*United States v. Gen. Dynamics Corp.,* 755 F. Supp. 720 (N.D. Tex. 1991).  [App. D-84]

*United States v. J & D Enterprises of Duluth,* 955 F. Supp. 1153 (D. Minn. 1997).  [App. D-89]

*United States v. Tex-Tow, Inc.,* 589 F.2d 1310 (7th Cir. 1978).  [App. D-81]

*United States v. Thorson,* 300 F. Supp. 2d 828 (W.D. Wis. 2003).  [App. D-85]

*United States v. Ward*, 448 U.S. 242 (1980).  [App. D-78]

*USG Corp. v. Brown,* 1997 WL 89229 (N.D. Ill. Feb. 25, 1997).  [App. D-83]

*Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.*, 590 F.3d 316 (5th Cir. 2009).  [App. D-27]

*Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 918 (W.D. Ky. 2007).  [App. D-28]


***Statutes / Rules***
33 U.S.C. § 2704(c)(1).  [App. D-13]

33 U.S.C. § 2716(f)(1).  [App. D-25]

42 U.S.C. § 9607(e)(1).  [App. D-17]

FED. R. CIV. P. 56(a).  [App. D-3]

FED. R. CIV. P. ADMIRALTY SUPP. RULE E(5)(a).  [App. D-91]

Louisiana Civil Code art. 2004.  [App. D-52]

Uniform Contribution Among Tortfeasors Act ("UCTA") (1955 Revised Act).  [App. D-8]


***Additional Sources***
T. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 19-12 (4th ed.).  [App. D-90]

Appellant's Brief in *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528 (5th Cir. 2001), 2000 WL 33988457.  [App. D-62]

Baker Hughes Reply Memorandum in Support of Motion for Summary Judgment, *Becker v. Tidewater, Inc.,* 2005 WL 2891044.  [App. D-45]

vii

BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against
Transocean and Claim in Limitation, Dkt. 2074.  [App. D-41]

BPXP'S Cross-Claim and Third Party Complaint against Transocean, Dkt. 2075.  [App. D-42]

Brief of Appellees BP *et al.* in *Fina, Inc. v. ARCO*, 200 F.3d 266 (5th Cir. 2000), 1999 WL
33621574.  [App. D-1]

Brief of Baker Hughes *et al.*, 2002 WL 32180622.  [App. D-73]

Brief of Baker Hughes *et al.*, 2008 WL 7295642.  [App. D-77]

Brief of Tidewater Inc. *et al.*, 2002 WL 32180621.  [App. D-74]

15 CORBIN ON CONTRACTS § 85.18  (2003 ed.).  [App. D-50]

New Tech Engineering L.P.'s Motion for Certification of Order for Interlocutory Appeal, Case
4:10-cv-00110 (S.D. Tex.), Dkt. 53.  [App. D-61]

Oil Pollution Act of 1990, Pub. L. 101-380, 104 Stat. 484, tit. II § 2002(a) (1990).  [App. D-82]

Oil Pollution Act of 1990, Pub. L. 1010-380, 104 Stat. 484, tit. VIII § 8102(e) (1990).  [App. D-
24]

Order and Reasons, Dkt. 3830.  [App. D-12]

Pretrial Order No. 41 (Case Management Order No. 3), Dkt. No. 4083.  [App. D-7]

RESTATEMENT (SECOND) OF CONTRACTS § 195(1).  [App. D-49]

22 U.S. Opinions Office of Legal Counsel 141, 1998 WL 1180050 (July 22, 1998).  [App. D-79]

8 R. LORD, WILLISTON ON CONTRACTS §19:20 (4th ed. May 2011).  [App. D-51]

**APPENDICES**

**Appendix A: Supporting Documents**

App. A-1: BP at a Glance | About BP, http://www.bp.com/sectiongenericarticle.do?categoryId=3&contentId=2006926 (last visited Oct. 9, 2011).

App. A-2: BP Global – About BP – Who We Are, http://www.bp.com/subsection.do?categoryId=4 &contentId=2006741 (last visited Oct. 9, 2011).

App. A-3: Original Drilling Contract between Vastar Resources, Inc. and R & B Falcon Drilling Co., dated December 9, 1998 for "RBS-8D" ("Drilling Contract"), BP-HZN-MBI00021460–999, *available at* http://www.sec.gov/Archives/edgar/data/1451505/000145150510000069/exhibit10_1.pdf.

App. A-4: BP New York Stock Quote – BP PLC – Bloomberg, http://www.bloomberg.com/quote/BP:US (last visited Oct. 22, 2011).

App. A-5: RIG New York Stock Quote – Transocean Ltd/Switzerland – Bloomberg, http://www.bloomberg.com/quote/RIG:US (last visited Oct. 22, 2011).

App. A-6: Letter Dated May 10, 2010, from Keith McDole (Transocean counsel) to Richard Godfrey (BP counsel).

App. A-7: Letter Dated June 25, 2010, from Richard Godfrey (counsel for BP) to Keith McDole (counsel for Transocean).

App. A-8: Letter Dated July 9, 2010, from Kirk Wardlaw (BP) to Jim Bryan and Robert Reeves (Anadarko), APC-SHS1-007–008.

App. A-9: Chart Summarizing BP's Contracts with Transocean and Other Subcontractors.

App. A-10: Long Term Development Unit Contract between BP America Production Company and GlobalSantaFe Drilling Company for the Development Driller II, Atlantis Deepwater Development, Contract No. BPM-03-00556.

App. A-11: BP American Production Company Offshore Drilling / Workover / Completion Contract (with Transocean for the *Discoverer Enterprise*) – Article 12.8 and Amendment No. 13.

App. A-12: Angola Newbuild, Provision and Operation of a Mobile Offshore Drilling Unit, Contract Number CON-ANG-31-5477 (*Luanda*).

App. A-13: BP Trinidad and Tobago LLC and Global Santa Fe, Provision and Operation of a Mobile Offshore Drilling Unit Constellation I, Contract No. DRCS-S-3715.

App. A-14: Contract No. PHPC-DC-09-0006 between Pharaonic Petroleum Company and Global Santa Fe Services (Egypt) LLC (Transocean) for the Provision and Operation of Jack-Up Drilling Unit.

App. A-15: Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and Halliburton Energy Services, Inc., BPM-09-00255, BP-HZN-2179MDL00055567–6112, *available at* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NDAxMzU3fENoaWxkSUQ9NDA4NzQ3fFR5cG U9MQ==&t=1 (last visited Oct. 24, 2011).

App. A-16: Plaintiff Halliburton Energy Services, Inc's Original Petition v. BP Exploration & Production, Inc., BP America Production Co., and BP p.l.c., 2011-52580, Court 234.

App. A-17: Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and M-I L.L.C., BPM-09-00209, BP-HZN-2179MDL02883043–198.

App. A-18: Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and Schlumberger Technology Corporation, BPM-09-00247, BP-HZN-2179MDL02882284–2768.

App. A-19: Contract for Well Services between BP America Production Company and Weatherford International, Inc., BPM-04-00186, Gulf of Mexico Offshore Operations, WFT-MDL-00000930–1160.

App. A-20: BP–Well Ops/Helix Offshore Daywork Contract – Article 1012(c), BP-HZN-2179MDL02846809–48.

App. A-21: Drilling Contract between BP Exploration & Production Inc. and ███████████ for Provision and Operation of a Mobile Offshore Drilling Unit, Contract No. BPM-08-00186, BP-HZN-2179MDL03289015–402.

App. A-22: Drilling Contract between BP Exploration & Production Inc. and ███████████ for Provision and Operation of a Mobile Offshore Drilling Unit, Contract No. BPM-08-00892, BP-HZN-2179MDL03288575–9014.

App. A-23: Drilling Rig Operation and Maintenance Services Contract between BP America Production Company and ███████████ Gulf of Mexico Deepwater Projects ███████ ██████ Contract No. BPA-02-06141, BP-HZN-2179MDL03241488–554 and Amendment 14, BP-HZN-2179MDL03241611–15.

App. A-24: Settlement Agreement Between BP and MOEX, BP-HZN-2179MDL03198916–35.

App. A-25: Settlement Agreement Between BP and Weatherford, BP-HZN-2179MDL03241693–714.

App. A-26: International Association of Drilling Contractors (IADC) Offshore Daywork Drilling Contract – U.S. (Revised April 2003).

App. A-27: American Association of Professional Landmen (AAPL) Model Form of Offshore Deepwater Operating Agreement, AAPL-810 (2007), *available at* http://www.ocsadvisoryboard.org/documents/AAPL%20DWOA%20ModelForm2007%20FINAL.doc (last visited Oct. 9, 2011).

App. A-28: OCS Advisory Board – Members, *available at* http://www.ocsadvisoryboard.org/index-1.html (last visited October 7, 2011).

App. A-29: Ratification and Joinder of Operating Agreement Macondo Prospect ("JOA"), ANA-MDL-000030610–APC-HEC1-000001840, available at http://secfilings.nyse.com/filing.php?doc=1&attach=ON&ipage=7018483&rid=23 (last visited Oct. 21, 2011).

App. A-30: Master Service Contract between BP America Production Company and ███████ ████████████████ Contract No. BPM-07-01217, BP-HZN-2179MDL03015557–606.

App. A-31: Master Consulting Services Contract between BP America Production Company and ██████████████████████████████ Contract No. BPM-09-01304, BP-HZN-2179MDL03292008–45, BP-HZN-2179MDL03292103–108.

App. A-32: Master Service Contract between BP America Production Company and ████ ████████████████████ Contract No. BPM-10-04020, BP-HZN-2179MDL03291954–2005.

App. A-33: Oil Spill Commission, Chief Counsel's Report, Executive Summary, http://www.oilspillcommission.gov/sites/default/files/documents/C21462-404_CCR_Executive_Summary.pdf (last visited Oct. 11, 2011).

App. A-34: Christopher Helman, *In His Own Words*, FORBES (May 18, 2010), *available at* http://www.forbes.com/2010/05/18/oil-tony-hayward-business-energy-hayward_print.html (last visited Oct. 9, 2011).

App. A-35: Letter Dated May 10, 2010 from Benjamin D. Wilcox (Executive Vice President and Director Marine and Energy, Alliant) to the Honorable Robert Menendez (U.S. Senator), *available at* http://www.epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=10957910-fdf4-4673-8463-468d131035c5  (last visited Oct. 13, 2011).

App. A-36: Letter Dated May 12, 2010, from Paul King (Director, INDECS) to the Honorable Robert Menendez (U.S. Senator), *available at* http://epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c15e510c-4edb-44e5-b6aa-3cfebf371323 (last visited Oct. 13, 2011).

App. A-37: Letter Dated May 11, 2010, from John Lloyd (Chairman and CEO, Lloyd & Partners) to the Honorable Robert Menendez (U.S. Senator).

App. A-38: Letter Dated October 3, 2011, from Christopher J. Esbrook (BP counsel) to Daniel Goforth (Transocean counsel).

App. A-39: Transocean Fleet Update Report (July 13, 2011), *available at* http://www.deepwater.com/fw/main/Fleet-Status-Report-58.html (last visited October 7, 2011).

App. A-40: Email thread among Keith Daigle, George Gray, and Maniram Sankar, RE: Marianas WSL, May 28, 2008, BP-HZN-2179MDL02486517–19.

App. A-41: Outstanding Invoices Issued to BP by Transocean.

App. A-42: Letter Dated December 25, 2010, from Sam Yousef (BP, PSCM Specialist, Drilling Rigs) to Roddie MacKenzie (Transocean, Marketing Manager – North America).

App. A-43: Letter Dated February 25, 2011, from Bob Talbott (BP, Chief Procurement Officer, Gulf Coast Restoration) to Transocean Offshore DW DRLG Inc.

App. A-44: Standard Steamship Owners' Protection & Indemnity Assoc. (Bermuda) Rules § 3.6.5 (2011-12), *available at* http://www.standard-club.com/docs/14812_BERMUDA_OFFSHORE.pdf (last visited Oct. 26, 2011).

App. A-45: UK Club Protection and Indemnity Rules, Rule 2, Section 22 E (Feb. 20, 2010), *available at* http://www.ukpandi.com/fileadmin/uploads/uk-pi/Latest_Publications/2011_Correspondents/List%20of%20Correspondents%20Rules%20and%20ByeLaws%202011.pdf (last visited Oct. 26, 2011).

App. A-46: Settlement Agreement Between BP and Anadarko, BP-HZN-2179MDL04585671–5703.

**Appendix B: Testimony**

App. B-1: Dep. John Baxter (BP, Group Head of Engineering and Process Safety) June 21-22, 2011.

App. B-2: Dep. Mark Bly (BP, Executive Vice President of Safety and Operations / Team Leader, BP Internal Investigation) Feb. 17-18, 2011.

App. B-3: Dep. Martin Breazeale (BP, Manager of Well Site Leader of the Future Program) May 16-17, 2011.

App. B-4: Dep. Sir William Castell (BP, Senior Independent Director / Chairman of the Safety, Ethics and Environment Assurance Committee) June 22-23, 2011.

App. B-5: Dep. Brett Cocales (BP, Operations Engineer) Apr. 25-26, 2011.

App. B-6: Dep. Gillian Cowlam (BP, Engineering Manger for Sangachal Terminal / Member, BP Internal Investigation) June 7, 2011.

App. B-7: Dep. Neil Cramond (BP, Area Operations Manager, Na Kia Oil and Gas Production Facility / former SPU Marine Authority, Gulf of Mexico) Apr. 25, 2011.

App. B-8: Dep. Keith Daigle (BP, Wells Operations Advisor, Gulf of Mexico) July 19, 2011.

App. B-9: Dep. Mike Daly (BP, Executive Vice President of Exploration) Sept. 21-22, 2011.

App. B-10: Dep. Scherie Douglas (BP, Regulatory Compliance Team Leader) Oct. 11, 2011.

App. B-11: Dep. James Dupree (BP, Senior Vice President for the Gulf of Mexico) June 16-17, 2011.

App. B-12: Dep. Steven Flynn (BP, Vice President of Health, Safety, Security and Environment) June 29, 2011.

App. B-13: Dep. Cheryl Grounds (BP, Chief Engineer of Process and Process Safety) May 4, 2011.

App. B-14: Dep. John Guide (BP, Drilling Engineer Team Leader, Angola / former Wells Team Leader) May 9-10, 2011.

App. B-15: Dep. Anthony Hayward (BP, Chief Executive Officer) June 6 and 8, 2011.

App. B-16: Dep. Curtis Jackson (BP, former Director of Health, Safety, Security and Environment, Gulf of Mexico) July 21, 2011.

App. B-17: Dep. Kevin Lacy (BP, former Vice President of Drilling and Completions, Gulf of Mexico) June 1-2, 2011.

App. B-18: Dep. Lee Lambert (BP, Well Site Leader / former Well Site Leader of the Future) May 9-10, 2011.

App. B-19: Dep. Philip Earl Lee (BP, Well Site Leader) June 1-2, 2011.

App. B-20: Dep. Ian Little (BP, Vice President of Wells, North Africa / former Wells Manager for Exploration and Appraisal Drilling, Gulf of Mexico) June 9-10, 2011.

App. B-21: Dep. John Mogford (BP, former Executive Vice President of Safety Operations) June 28-29, 2011.

App. B-22: Dep. Patrick O'Bryan (BP, Vice President of Wells, BP America / former Vice President of Drilling and Completions, Gulf of Mexico Deepwater) July 14-15, 2011.

App. B-23: Dep. Vincent Price (BP, Well Site Leader / former Well Site Leader of the Future) June 20, 2011.

App. B-24: Dep. David Rich (BP, Wells Manager, Gulf of Mexico Deepwater) June 1-2, 2011.

App. B-25: Dep. Angel Rodriguez (BP, Marine Advisor) July 29, 2011.

App. B-26: Dep. Murry Sepulvado (BP, former Well Site Leader) May 11-12, 2011.

App. B-27: Dep. Ronald Sepulvado (BP, former Well Site Leader) Mar. 10-11, 2011.

App. B-28: Dep. John Shaughnessy (BP, former Well Control Technical Authority, Gulf of Mexico) Sep. 27, 2011.

App. B-29: Dep. David Sims (BP, Operations Manager, Gulf of Mexico Deepwater) Apr. 6-7, 2011.

App. B-30: Dep. Cynthia Skelton (BP, Vice President of Safety and Operational Risk, Gulf of Mexico / former Vice President of Health, Safety, Security and Environment and Engineering, Gulf of Mexico) May 25-26, 2011.

App. B-31: Dep. Jonathan Sprague (BP, Vice President of Organizational Capability for Global Wells Organization / former Drilling Engineering Manager, Gulf of Mexico) Mar. 21-22, 2011.

App. B-32: Dep. Doug Suttles (BP, former Chief Operating Officer) May 19-20, 2011.

App. B-33: Dep. Henry Thierens (BP, former Vice President of Drilling and Completions Operations) June 9-10, 2011.

App. B-34: Dep. Jay Torseth (BP, Vice President of Exploration and Appraisal, Angola / former Exploration Manager, Gulf of Mexico Deepwater) Sept. 20, 2011.

App. B-35: Dep. David Wall (BP, Vice President of Risk, Learning, Health and Safety / former Vice President of Health, Safety, Security and Environment and Integrity Management for Upstream) June 27, 2011.

App. B-36: Dep. O. Kirk Wardlaw (BP, Senior Negotiator for the Western Hemisphere / former Chief Land Negotiator, Gulf of Mexico) June 9, 2011.

App. B-37: Dep. Norman Wong (BP, Manager of Rig Audit Group) June 13-14, 2011.

App. B-38: Dep. Barbara Lowery-Yilmaz (BP, former Technical Vice President of Drilling and Completions) July 26, 2011.

App. B-39: Dep. Paul Anderson (Halliburton, Service Supervisor III, Gulf of Mexico) Apr. 27-28, 2011.

App. B-40: Dep. James Bement (Halliburton, Vice President of Sperry Drilling) Sept. 20, 2011.

App. B-41: Dep. Ronald Faul (Halliburton, Technology Manager, Gulf of Mexico Region, Cementing) June 29-30, 2011.

App. B-42: Dep. Kelly Gray (Halliburton, Senior Surface Data Logging Field Specialist / INSITE Specialist) Apr. 14-15, 2011.

App. B-43: Dep. Joseph Keith (Halliburton, Mud Logger) Mar. 28, 2011.

App. B-44: Dep. Kurt Kronenberger (Halliburton, Operations Leader / Service Coordinator for the Sperry SDL Product Service Line) Aug. 2, 2011.

App. B-45: Dep. James Prestidge (Halliburton, Vice President of Health, Safety and Environment and Service Quality) Sept. 21, 2011.

App. B-46: Dep. Thomas Roth (Halliburton, Vice President of Cementing Product/Services Line) July 25-26, 2011.

App. B-47: Dep. Michael Serio (Halliburton, Lead Technical Professional) Apr. 28-29, 2011.

App. B-48: Dep. Vincent Tabler (Halliburton, Cementer—Service Supervisor Three) June 13-14, 2011.

App. B-49: Dep. Richard Vargo (Halliburton, Cementing Regional Manager, Gulf of Mexico) Mar. 30, 2011.

App. B-50: Dep. Bryan Domangue (MMS / BOEMRE, District Manager, Houma) Sept. 21, 2011.

App. B-51: Dep. Eric Neal (MMS / BOEMRE, Production Inspector) July 21, 2011.

App. B-52: Dep. Robert Neal (MMS / BOEMRE, Drilling Rig Inspector) July 19, 2011.

App. B-53: Dep. Frank Patton (MMS / BOEMRE, Drilling Engineer, New Orleans) July 13-14, 2011.

App. B-54: Dep. Michael Saucier (MMS / BOEMRE, Deputy Regional Supervisor for Field Operations, New Orleans) July 27-28, 2011.

App. B-55: Dep. David Trocquet (MMS / BOEMRE, District Manager, New Orleans) Sept. 23, 2011.

App. B-56: Dep. Michael Odom (U.S. Coast Guard, Chief of Inspections Division, Delaware Bay, Philadelphia, PA / former Chief of Prevention, Marine Safety Unit, Port Arthur, TX) Oct. 11, 2011.

App. B-57: Dep. William Haynie (American Bureau of Shipping, Principal Surveyor) June 27, 2011.

App. B-58: Dep. David McKay (Det Norske Veritas, Regional Chief Surveyor for MODUs, North America Region) May, 11, 2011.

App. B-59: Dep. Victor Martinez (ModuSpec, Subsea Surveyor) Apr. 14, 2011.

App. B-60: Dep. Kristofer Millsap (ModuSpec, Well Control Equipment Surveyor) May 12-13, 2011.

App. B-61: Dep. Alan Schneider (ModuSpec, Surveyor) June 23, 2011.

App. B-62: Dep. Peter Sierdsma (ModuSpec, President) Feb. 2 and 16, 2011.

App. B-63: Dep. Paul Chandler (Anadarko, Project Geologist Advisor) May 4, 2011.

App. B-64: Dep. Dawn Peyton (Anadarko, Senior Reservoir Engineer) Sept. 8, 2011.

App. B-65: Dep. Robert Quitzau (Argonauta, Drilling Engineer) May 25-26, 2011.

App. B-66: Dep. William LeNormand (Cameron, Senior Field Service Technician) June 20-21, 2011.

App. B-67: Dep. Steven Johnson (M-I Swaco, Drilling Fluids Specialist) Sept. 27, 2011.

App. B-68: Dep. Leo Lindner (M-I Swaco, Mud Engineer / Drilling Fluid Specialist) Sept. 14-15, 2011.

App. B-69: Dep. Gregory Meche (M-I Swaco, Compliance Specialist) Oct. 6, 2011.

App. B-70: Dep. Stuart Lacy (QO, Inc., Well Site Geologist) Sept. 23, 2011.

App. B-71: Dep. Katharine Paine (Quadril Energy, Pore Pressure Analyst) Apr. 18-19, 2011.

App. B-72: Dep. Victor Emanuel (Schlumberger, former Deepwater Coordinator, Gulf of Mexico) Sept. 27, 2011.

App. B-73: Dep. Douglas Martin (SMIT Salvage, Chief Executive Officer) Sept. 14, 2011.

App. B-74: Dep. Ross Skidmore (Swift, Subsea Well Supervisor) May 18, 2011.

App. B-75: Dep. Bryan Clawson (Weatherford, Technical Sales Representative) June 6-7, 2011.

App. B-76: Dep. Bill Ambrose (Transocean, Managing Director, North America Division) July 18-19, 2011.

App. B-77: Dep. Craig Breland (Transocean, Crane Operator) May 18, 2011.

App. B-78: Dep. Douglas Brown (Transocean, Second Engineer) May 3, 2011.

App. B-79: Dep. Micah Burgess (Transocean, Driller) Apr. 20, 2011.

App. B-80: Dep. Gerald Canducci (Transocean, Quality, Health, Safety and Environment Manager, North America) Mar. 23-24, 2011.

App. B-81: Dep. Randy Ezell (Transocean, Senior Toolpusher) Apr. 27-28, 2011.

App. B-82: Dep. Daniel Farr (Transocean, Director of Special Projects / Lead of Transocean Macondo Investigation) Aug. 24-25, 2011.

App. B-83: Dep. David Hackney (Transocean, Master) July 25, 2011.

App. B-84: Dep. Troy Hadaway (Transocean, Rig Safety Training Coordinator) July 12, 2011.

App. B-85: Dep. Derek Hart (Transocean, Manager of Quality, Health, Safety and Environment, North Sea / Transocean Macondo Investigation Team Lead, Gas Dispersion and Evacuation) Oct. 7, 2011.

App. B-86: Dep. Mark Hay (Transocean, Senior Subsea Supervisor) June 29-30, 2011.

App. B-87: Dep. Caleb Holloway (Transocean, Floorhand) May 19, 2011.

App. B-88: Dep. Dustin Johnson (Transocean, Roustabout) July 27, 2011.

App. B-89: Dep. Paul Johnson (Transocean, Operations Manager) Mar. 28-29, 2011.

App. B-90: Dep. Jonathan Keeton (Transocean, Rig Manager) Aug. 17-18, 2011.

App. B-91: Dep. James Kent (Transocean, Rig Manager Asset) June 21-22, 2011.

App. B-92: Dep. Yancy Keplinger (Transocean, Senior Dynamic Positioning Officer) Sept. 12, 2001.

App. B-93: Dep. James Mansfield (Transocean, First Assistant Engineer) May 12, 2011.

App. B-94: Dep. John MacDonald (Transocean, Manager, AMU Marine Operations / Transocean Macondo Investigation Team) Sept. 30, 2011.

App. B-95: Dep. Paul Meinhart (Transocean, Motorman) July 28, 2011.

App. B-96: Dep. Jimmy Moore (Transocean, former Director of Quality, Health, Safety and Environment) Oct. 4, 2011.

App. B-97: Dep. Steven Newman (Transocean, Chief Executive Officer & President) Sept. 30, 2011.

App. B-98: Dep. Jay Odenwald (Transocean, Subsea Supervisor) July 27, 2011.

App. B-99: Dep. Christopher Pleasant (Transocean, Subsea Supervisor) Mar. 14-15, 2011.

App. B-100: Dep. Adrian Rose (Transocean, Director of Quality, Health, Safety and Environment) Apr. 25-26, 2011.

App. B-101: Dep. Stuart Sannan (Transocean, General Manager, North America) July 27-28, 2011.

App. B-102: Dep. Pharr Smith (Transocean, former Vice President of Engineering and Technical Support) June 27-28, 2011.

App. B-103: Dep. Carl Taylor (Transocean, former Radio Operator) July 14, 2011.

App. B-104: Dep. Robert Tiano (Transocean, Maintenance Supervisor / Transocean Macondo Investigation Team) Aug. 25, 2011.

App. B-105: Buddy Trahan (Transocean, Division Manager Asset) Sept. 28, 2011.

App. B-106: Nick Watson (Transocean, Roustabout) July 14, 2011.

App. B-107: Michael Williams (Transocean, Chief Electronics Technician) July 20, 2011.

App. B-108: Daun Winslow (Transocean, Operations Manager) Apr. 20-21, 2011.

App. B-109: David Young (Transocean, Chief Mate) Sept. 22, 2011.

App. B-110: Dep. Greg Walz (BP, Drilling Engineer Team Leader) Apr. 21-22, 2011.

App. B-111: Dep. Skip Clark (Halliburton / Sperry Sun, former Senior Account Representative) July 29, 2011.

App. B-112: Chart Summarizing Favorable Testimony Regarding the *Deepwater Horizon* and Her Crew.

**Appendix C: Documents Supporting Testimony**

App. C-1: Annual Individual Performance Assessment of Brett Cocales, BP-HZN-2179MDL00470609–0613.

App. C-2: Email from Angel Rodriguez to John Guide, Brett Cocales, et al., RE: *Deepwater Horizon*'s Rig Audit close out report status, Mar. 30, 2010, BP-HZN-2179MDL00006057.

App. C-3: Email from Angel Rodriguez to Paul Johnson, John Guide and Brett Cocales, RE: Audits Reviewed and Updated, Feb. 22, 2010, BP-HZN-2179MDL0002012–2013.

App. C-4: Email thread among Keith Daigle, Maniram Sankar and George Gray, RE: Marianas WSL, May 28, 2008, BP-HZN-2179MDL02486517–6519.

App. C-5: Email from Tim Burns to Rory Mcneil, James Reed, Murry Sepulvado, Ronald Sepulvado, *Deepwater Horizon* Foreman, et al., RE: Tiber Performance, June 19, 2009, BP-HZN-2179MDL01309142.

App. C-6: Horizon Rig Contract Extension, approved Apr. 6, 2004, BP-HZN-2179MDL02378626–8627.

App. C-7: Email thread among Andy Inglis, David Eyton and Bob Smith, RE: GoM Rig Papers, Mar. 20, 2005, BP-HZN-2179MDL02368314–8315.

App. C-8: GoM: *Deepwater Horizon* Drilling Rig Commitment, dated Mar. 25, 2005, BP-HZN-2179MDL023483–3846.

App. C-9: Email thread among Harry Thierens, Jay Thorseth, David Sims, Ian Little and David Rainey, RE: Good work, Nov. 1, 2007, BP-HZN-MBI00040725.

App. C-10: Allegations, BP-HZN-2179MDL03085148–5155.

App. C-11: Email thread between David Sims and Ian Little, RE: Updated on TO Performance, July 17, 2007, BP-HZN-MBI00037507–7508.

App. C-12: Email thread among Callan Brown, Michael Odom and Jay Williamson, RE: *Deepwater Horizon* Investigation, HCG161-041962.

**Appendix D: Cases, Statutes / Rules, and Additional Sources**

*Cases*

App. D-2: *Fidelity & Deposit Co. of Md. v. Conner,* 973 F.2d 1236 (5th Cir. 1992).

App. D-4: *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).

App. D-5: *Strachan Shipping Co. v. Dresser Indus., Inc.,* 701 F.2d 483 (5th Cir. 1983).

App. D-6: *Becker v. Tidewater, Inc.,* 586 F.3d 358 (5th Cir. 2009).

App. D-9: *Boykin v. China Steel Corp.*, 73 F.3d 539 (4th Cir. 1996).

App. D-10: *Cargill Ferrous Int'l Div., etc. v. M/V Princess Margherita*, 2001 WL 1426678 (E.D. La. Nov. 13, 2001).

App. D-11: *Mayer v. Cornell Univ.*, 1995 WL 94575 (N.D.N.Y. Feb. 27, 1995).

App. D-14: *In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710 (E.D. La. 2010).

App. D-15: *Seaboats, Inc. v. Alex C Corp.,* 2003 WL 203078 (D. Mass. Jan. 30, 2003).

App. D-16: *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111 (2d Cir. 1995).

App. D-18: *Joslyn Mfg. Co. v. Koppers Co.,* 40 F.3d 750 (5th Cir. 1994).

App. D-19: *Harley Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341 (7th Cir. 1994), *cert. denied*, 514 U.S. 1036 (1995).

App. D-20: *United States v. Hardage*, 985 F.2d 1427 (10th Cir. 1993).

App. D-21: *Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206 (3d Cir. 1994).

App. D-22: *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.,* 537 F.3d 153 (2d Cir. 2008).

App. D-23: *Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239 (3d Cir. 2009).

App. D-26: *Russello v. United States,* 464 U.S. 16 (1983).

App. D-27: *Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.*, 590 F.3d 316 (5th Cir. 2009).

App. D-28: *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 918 (W.D. Ky. 2007).

App. D-29: *MetroPCS Wireless, Inc. v. Telecomm. Sys., Inc.*, 2009 WL 3418581 (D. Md. Oct. 20, 2009).

App. D-30: *Sprint Commc'ns Co., L.P. v. W. Innovations, Inc.*, 640 F. Supp. 2d 1122 (D. Ariz. 2009).

App. D-31: *English v. BGP Int'l, Inc.*, 174 S.W.3d 366 (Tex. App.—Houston [14th Dist.] 2005, rev'd and remanded).

App. D-32: *Gen. Motors Corp. v. Am. Ecology Envtl. Servs. Corp.*, 2001 WL 1029519 (N.D. Tex. Aug. 30, 2001).

App. D-33: *Crawford v. Weather Shield Mfg., Inc.*, 44 Cal. 4th 541 (2008).

App. D-34: *Morella v. Bd. of Comm'rs of Port of New Orleans*, 888 So.2d 321 (La. App. 4 Cir. 2004).

App. D-35: *MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 197 P.3d 758 (Ariz. Ct. App. 2008).

App. D-36: *Estate of Bradley* ex rel. *Sample v Royal Surplus Lines Ins. Co.*, 647 F.3d 524 (5th Cir. 2011).

App. D-37: *Sullen v. Mo. Pac. R. Co.*, 750 F.2d 428 (5th Cir. 1985).

App. D-38: *Lafarge N. Am., Inc. v. K.E.C.I. Colo., Inc.*, 250 P.3d 682 (Colo. App. 2010).

App. D-39: *Foster v. Subsea Int'l, Inc.*, 101 F. Supp. 2d 454 (E.D. La. 1998).

App. D-40: *Jackson v. Tenneco Oil Co.*, 623 F. Supp. 1452 (E.D. La. 1985).

App. D-43: *La Esperanza de P.R., Inc. v. Perez y Cia. De P.R., Inc.*, 124 F.3d 10 (1st Cir. 1997).

App. D-44: *Becker v. Tidewater, Inc.,* 2007 WL 3231655 (W.D. La. Nov. 14, 2007), *aff'd in part, rev'd in part,* 586 F.3d 358 (5th Cir. 2009).

App. D-46: *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

App. D-47: *Joseph Thomas, Inc. v. Graham*, 842 S.W.2d 343 (Tex. App.—Tyler 1992, no writ).

App. D-48: *Hanks v. GAB Bus. Serv.*, 644 S.W.2d 707 (Tex. 1982).

App. D-53: *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982).

App. D-54: *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574 (Tex. App.—Beaumont 1986, aff'd in part, rev'd and remanded in part).

App. D-55: *Broom v. Leebron & Robinson Rent-A-Car, Inc.*, 626 So.2d 1212 (La. Ct. App. 1993).

App. D-56: *Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267 (N.Y. 1985).

App. D-57: *First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335 (3d Cir. 1983).

App. D-58: *Dixon Distrib. Co. v. Hanover Ins. Co.,* 641 N.E.2d 395 (Ill. 1994).

App. D-59: *In re Horizon Vessels, Inc.,* 2005 U.S. Dist. LEXIS 42110 (S.D. Tex. Dec. 22, 2005).

App. D-60: *Energy XXI, GOM, LLC v. New Tech Eng'g.*, 2011 WL 1458638 (S.D. Tex. Apr. 15, 2011).

App. D-63: *Sevarg Co. v. Energy Drilling Co.*, 591 So.2d 1278 (La. Ct. App. 1991).

App. D-64: *Orient Mut. Ins. Co. v. Adams*, 123 U.S. 67 (1887).

App. D-65: *N.Y., New Haven & Hartford R.R. Co. v. Gray*, 240 F.2d 460 (2d Cir. 1957).

App. D-66: *Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co.*, 247 F.2d 116 (5th Cir. 1957), *cert. denied*, 355 U.S. 903 (1957).

App. D-67: *Allen N. Spooner & Son, Inc. v. Conn. Fire Ins. Co.*, 314 F.2d 753 (2d Cir. 1963), *cert. denied*, 375 U.S. 819 (1963).

App. D-68: *Griffin v. Tenneco Oil Co.*, 625 So.2d 1090 (La. Ct. App. 1993).

App. D-69: *In re Torch, Inc.*, 1996 WL 185765 (E.D. La. Apr. 16, 1996).

App. D-70: *In re TT Boat Corp.*, 1999 WL 1442054 (E.D. La. Sept. 8, 1999).

App. D-71: *Taylor v. Lloyd's Underwriters of London,* 972 F.2d 666 (5th Cir. 1992).

App. D-72: *Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888 (5th Cir. 1994).

App. D-75: *Becker v. Tidewater Inc.*, 335 F.3d 376 (5th Cir. 2003).

App. D-76: *Becker v. Tidewater Inc.*, 405 F.3d 257 (5th Cir. 2005).

App. D-78: *United States v. Ward*, 448 U.S. 242 (1980).

App. D-80: *Tug Ocean Prince, Inc. v. United States,* 436 F. Supp. 907 (S.D.N.Y. 1977).

App. D-81: *United States v. Tex-Tow, Inc.,* 589 F.2d 1310 (7th Cir. 1978).

App. D-83: *USG Corp. v. Brown,* 1997 WL 89229 (N.D. Ill. Feb. 25, 1997).

App. D-84: *United States v. Gen. Dynamics Corp.,* 755 F. Supp. 720 (N.D. Tex. 1991).

App. D-85: *United States v. Thorson,* 300 F. Supp. 2d 828 (W.D. Wis. 2003).

App. D-86: *Scholastic Inc. v. M/V Kitano,* 362 F. Supp. 2d 449 (S.D.N.Y. 2005).

App. D-87: *United States v. City of Twin Falls, Idaho,* 806 F.2d 862 (9th Cir. 1986), *cert. denied,* 482 U.S. 914 (1987), *overruled on another ground by Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 442 (1987).

App. D-88: *Beerman Realty Co. v. Alloyd Asbestos Abatement Co.,* 653 N.E.2d 1218 (Ohio Ct. App. 1995).

App. D-89: *United States v. J & D Enterprises of Duluth,* 955 F. Supp. 1153 (D. Minn. 1997).

App. D-92: *Nat'l Surety Corp. v. United States,* 1944 A.M.C. 1496 (5th Cir. 1944).


***Statutes / Rules***
App. D-3: FED. R. CIV. P. 56(a).

App. D-8: Uniform Contribution Among Tortfeasors Act ("UCTA") (1955 Revised Act).

App. D-13: 33 U.S.C. § 2704(c)(1).

App. D-17: 42 U.S.C. § 9607(e)(1).

App. D-25: 33 U.S.C. § 2716(f)(1).

App. D-52: Louisiana Civil Code art. 2004.

App. D-91: FED. R. CIV. P. ADMIRALTY SUPP. RULE E(5)(a).


***Additional Sources***
App. D-1: Brief of Appellees BP *et al.* in *Fina, Inc. v. ARCO*, 200 F.3d 266 (5th Cir. 2000), 1999 WL 33621574.

App. D-7: Pretrial Order No. 41 (Case Management Order No. 3), Dkt. No. 4083.

App. D-12: Order and Reasons, Dkt. 3830.

App. D-24: Oil Pollution Act of 1990, Pub. L. 101-380, 104 Stat. 484, tit. VIII § 8102(e) (1990).

App. D-41: BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Dkt. 2074.

App. D-42: BPXP'S Cross-Claim and Third Party Complaint against Transocean, Dkt. 2075.

App. D-45: Baker Hughes Reply Memorandum in Support of Motion for Summary Judgment, *Becker v. Tidewater, Inc.,* 2005 WL 2891044.

App. D-49: RESTATEMENT (SECOND) OF CONTRACTS § 195(1).

App. D-50: 15 CORBIN ON CONTRACTS § 85.18  (2003 ed.).

App. D-51: 8 R. LORD, WILLISTON ON CONTRACTS §19:20 (4th ed. May 2011).

App. D-61: New Tech Engineering L.P.'s Motion for Certification of Order for Interlocutory Appeal, Case 4:10-cv-00110 (S.D. Tex.), Dkt. 53.

App. D-62: Appellant's Brief in *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528 (5th Cir. 2001), 2000 WL 33988457.

App. D-73: Brief of Baker Hughes *et al.*, 2002 WL 32180622.

App. D-74: Brief of Tidewater Inc. *et al.*, 2002 WL 32180621.

App. D-77: Brief of Baker Hughes *et al.*, 2008 WL 7295642.

App. D-79: 22 U.S. Opinions Office of Legal Counsel 141, 1998 WL 1180050 (July 22, 1998).

App. D-82: Oil Pollution Act of 1990, Pub. L. 101-380, 104 Stat. 484, tit. II § 2002(a) (1990).

App. D-90: T. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 19-12 (4th ed.).

## FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

**I.     BP's Contractual Promises Made**

BP is one of a small handful of the world's largest oil and gas companies, employing nearly 80,000 employees, operating in eighty countries, and generating revenue in excess of $297 billion in 2010.[1]   In 1998, well over a decade before the BP spill at Macondo, BP and Transocean entered into a contract governed by maritime law concerning the operation of the *Deepwater Horizon*, an offshore drilling vessel specifically built for and pursuant to specifications required by BP (the "Drilling Contract").[a]   In this Drilling Contract, BP and Transocean agreed to standard industry reciprocal indemnity language.   They contractually agreed or promised to indemnify one another "**WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES**" of the incident, including negligence "**WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE, PASSIVE OR *GROSS***."[2]   BP's promise to Transocean also expressly included indemnity for fines and penalties.   Regarding environmental pollution, BP promised to indemnify Transocean for any and all pollution obligations (except those originating on or above the surface of the water), including any "**LOSS, DAMAGE, EXPENSE, CLAIM, *FINE*, *PENALTY*, DEMAND OR LIABILITY**."[3]

---

[a] The contract was originally executed between Vastar and Reading & Bates, predecessors to BP and Transocean, respectively.  BP and Transocean amended this contract several dozen times over a ten-year period, including, by way of example: July 24, 2001; August 16, 2001; December 12, 2001; September 18, 2002; January 6, 2003; February 28, 2003; November 12, 2003; February 28, 2004; April 19, 2004; February 20, 2005; March 31, 2005;. April 12, 2005; April 20, 2005; September 18, 2005; September 18, 2006; May 18, 2007; September 18, 2007; December 18, 2007; March 18, 2008; and September 28, 2009.  Although the Drilling Contract is designated as confidential a copy is publicly available in conjunction with Transocean's 10-Q filing last August.  *See generally*, App.   A-3:   Drilling   Contract,   BP-HZN-MBI00021460–999,   *available   at* http://www.sec.gov/Archives/edgar/data/1451505/000145150510000069/exhibit10_1.pdf.

To be sure, BP is a large, sophisticated company[b] that is familiar with standard industry risk allocation mechanisms, and was represented by counsel in its contractual negotiations.  BP and its counsel are presumably knowledgeable of existing case law and are fully competent and capable of excepting gross negligence from any indemnity provisions if BP desired to do so.  In fact, BP has done so in other instances, discussed below.  The clear objective of the *Deepwater Horizon* indemnity agreement is to allocate risk and quantify liability meaningfully—not to eliminate it entirely.  In some places in the Drilling Contract the parties excepted gross negligence; in others they did not.  Similarly, in some places the indemnity obligations were limited to an amount certain, but in others they were not.[4]  The financial impact of the risk of all exposure has been retained, not eliminated, but in certain industry-accepted areas the risks have been transferred to the party best able to sustain the risk: BP.  BP is significantly larger than any other Macondo contractor, and so are its rewards and its risks.  BP controls the ownership and development of Macondo, and is in the best position to mitigate or eliminate risks.  The Macondo contractors are smaller, and they accept proportionate risks.

The Drilling Contract does not exonerate or exculpate either party from the financial consequences of the blowout of the Macondo well.  Notably, Transocean promised to defend claims and pay for injury or death of Transocean employees, which it has agreed to do, and for pollution emanating from the rig or originating above the surface of the water, which it has said repeatedly it would do.[5]  Transocean also agreed to indemnify BP for loss or damage to third parties caused by the drilling unit while off location or underway; up to $15 million per

---

[b] As of October 19, 2011, BP's market cap was $133.824 billion as compared to Transocean's $16.335 billion.  <u>App. A-4</u>: <u>BP New York Stock Quote – BP PLC – Bloomberg, http://www.bloomberg.com/quote/BP:US (last visited Oct. 22, 2011)</u>; <u>App. A-5</u>: <u>RIG New York Stock Quote – Transocean Ltd/Switzerland – Bloomberg, http://www.bloomberg.com/quote/RIG:US (last visited Oct. 22, 2011)</u>.

occurrence.[6]   Transocean also accepted the liability and agreed to indemnify BP for loss or damage to the drilling unit.[7]   These are significant exposures to Transocean's business operations: providing its customers with drilling rigs.   Transocean and other Macondo contractors chose, to the extent they could, to insure this risk in the public insurance market.  BP chose not to insure its own risks.

Despite BP's convenient and sudden claim to the contrary, these industry risk allocation agreements do not in any way conflict with the public interest in safety.   Transferring that liability to BP—as the operator in control and with overall responsibility for safety of the project and for selecting and supervising all contractors—does not reduce overall incentives to safety. BP exercises control and dominion over all information and decision-making relating to the well and associated risks.    As the operator, BP is also the interface to the government for all regulatory requirements.   BP is responsible for the well design and geological analyses.   Further, BP selects and supervises all contractors on the well site; mandates the drilling equipment specifications; directs the cement, mud, spacer, and casing programs; decides whether to run or not run logs; and other operational issues essential to safe drilling of the well.  BP decides what information to share with its contractors.   Contractors, who are not in a position to be aware of— much less evaluate—all risks, should not be expected to have assumed the risks particularly when the parties agree to a contract providing otherwise.

The allocation simply places the largest risk with the party best able both to control and prevent that risk and, failing that, to withstand the financial consequences: BP.  Suggesting that Transocean's or other contractors' incentives to conduct safe operations are somehow minimized or non-existent under such arrangements—as if they do not have a proportionately immense investment of human and material resources at stake—is absurd and belied by the realities of the

3

loss of and injury to Transocean employees, the loss of Transocean's drilling rig, and by the realities of the current litigation all contractors are facing. Does BP seriously contend that it alone has suffered the consequences of this tragic event?

In short, BP and Transocean entered into a promise—a standard oil patch contracting agreement similar to many to which they both had agreed before Macondo. BP has made similar promises to other drilling contractors and oilfield contractors both *before and after* Macondo; Transocean has signed similar agreements with other companies both *before and after* Macondo. Indeed, BP and Transocean have entered into similar agreements *with each other since* the Macondo blowout. Ultimately, the drilling industry, including its financing and underwriting sectors, relies upon the trust between the operator and the contractor, in that both parties will fulfill their contractual promises. When this trust is violated, as BP has done in this case, the industry suffers the consequences.

## II.   BP's Contractual Promises Broken

In a May 10, 2010 letter, Transocean tendered its defense and indemnity demand to BP for those liabilities contractually assumed by BP. In this same letter Transocean accepted its own contractual obligations, namely to defend and indemnify BP for personal injury claims asserted by Transocean employees against BP.[8] On June 25, 2010, BP responded. Instead of living up to its word—not to mention its sloganeering to "make things right"—BP refused to defend and indemnify Transocean. Despite its clear and unambiguous obligation to "**PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS**" Transocean, BP dubiously responded that it could not "determine that it is obligated to defend or indemnify Transocean" due to the mere existence of ongoing investigations and "allegations" of gross negligence. Even more astoundingly, BP then proceeded to claim such allegations were not subject to indemnity as a matter of law, despite the clear language of BP's contractual promise

and generally accepted industry practices.[9]  No factual evidence of Transocean's alleged gross negligence existed at the time of BP's denial; nor does any exist today.

As discussed in detail below, the Joint Operating Agreement ("JOA") between BP and the other Macondo owners, MOEX and Anadarko, provided that liabilities were shared in proportion to each owner's interest, unless the liability arises from gross negligence or willful misconduct, in which case the grossly negligent party is solely responsible for the entire loss. Ironically, less than a month after the June 25, 2010 letter, on July 9, 2010, Kirk Wardlaw, BP's Senior Negotiator for the Western Hemisphere, sent a letter to Jim Bryan and Robert Reeves of Anadarko, demanding that Anadarko ████████████ under the JOA that Anadarko was ████████ *as a result of* ███████████████████████████████ BP insisted that there was no provision in the JOA that would permit Anadarko ██████████ during the pendency of ████████████████████.  Mr. Wardlaw went on to state:

████████████████████████████████████████████████████████

████████████████[10]  BP's paradoxical position can lead to only one inescapable conclusion: where BP wants money, contractual obligations are paramount, but where BP owes money, those contracts are out the window.  Turning BP's own words to Anadarko back to BP: ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ BP.[11]

BP's pre-Macondo decision to indemnify contractors irrespective of gross negligence is a conscious and consistent business practice of BP.  *A chart summarizing BP's promises to indemnify Transocean and BP's other contractors, both on Macondo and on other wells, is*

provided in *Appendix A-9*.   Review of this chart and the underlying agreements reveals BP's

practice of assuming gross negligence indemnity in all of its contracts for Transocean drilling

vessels in the Gulf of Mexico as of April 20, 2010,[c] and in BP's contracts with other Macondo

contractors, including Halliburton,[12,d] M-I Swaco,[13] Schlumberger,[14] and Weatherford.[15]   In

contracting for usage of the ███████ in the Macondo response effort, BP agreed to indemnify

██████ for gross negligence.[16]   BP also entered into two long-term drilling contracts in 2008 with

another drilling contractor, ██████████████ that also specifically include indemnity

obligations that survive gross negligence.[17]

Moreover, and perhaps most strikingly, BP extended and amended contracts with both

Transocean, for the *Enterprise*, and with ██████████████, for ██████████ that **reaffirmed**

and **expanded** BP's indemnity obligations to include gross negligence **after the Macondo**

**incident** and **even after BP took the position that gross negligence should not be indemnified**

---

[c] Due to confidentiality provisions contained therein, copies of these contracts are not publicly disclosed.   Such contracts include those for the *DD II*, App. A-10: Long Term Development Unit Contract between BP America Production Company and GlobalSantaFe Drilling Company for the Development Driller II, Atlantis Deepwater Development, Contract No. BPM-03-00556, Article 13.01.05, at p. 15, App. A-11: BP American Production Company Offshore Drilling / Workover / Completion Contract (with Transocean for the Discoverer Enterprise), Article 12.8, at p. 17-18, and Amendment No. 13, generally p. 1-2.   Further, several contracts for rigs operating outside the Gulf of Mexico also provide for gross negligence indemnity, including the *Discoverer Luanda*, the *Constellation I*, and the *Constellation II*.   *See* App. A-12: Angola Newbuild, Provision and Operation of a Mobile Offshore Drilling Unit, Contract Number CON-ANG-31-5477, Section 2, Article 6.8, at p. 16-17; App. A-13: BP Trinidad and Tobago LLC and Global Santa Fe, Provision and Operation of a Mobile Offshore Drilling Unit Constellation I, Contract No. DRCS-S-3715, Section 2, Article 6.8, at p. 12; and App. A-14: Contract No. PHPC-DC-09-0006 between Pharaonic Petroleum Company and Global Santa Fe Services (Egypt) LLC (Transocean) for the Provision and Operation of Jack-Up Drilling Unit, Section 2, Article 20.16, at p. 23-24.

[d] Halliburton filed suit in state court in Harris County, Texas, seeking enforcement of its indemnity agreement with BP.   The case was removed, then centralized in the MDL, before this Court.   The allegations in the petition and issues implicated are strikingly similar to the case at bar.   Specifically, Halliburton seeks indemnity for pollution claims where the discharge did not originate from Halliburton's equipment, personal injury claims brought by BP's employees, claims relating to damage to BP property, and claims by third parties that arise from BP's negligence.   On May 5, 2010, BP refused to honor these promises, despite the express promises in BP's contract with Halliburton.   BP similarly contended that the facts of the underlying litigation were not sufficiently developed.   App. A-16: Plaintiff Halliburton Energy Services, Inc's Original Petition v. BP Exploration & Production, Inc., BP America Production Co., and BP p.l.c., 2011-52580, Court 234.

***as a matter of law***.[18]   Similarly, BP's Macondo settlement agreements with MOEX, Weatherford, and Anadarko provide indemnity for ███████████ resulting from ████ ████ conduct.[19]

Beyond their historical use by the parties and particular role in this case, indemnification obligations that include gross negligence allegations are a consistent industry practice.  The International Association of Drilling Contractors ("IADC") model contracts for offshore drilling expressly provide indemnity despite gross negligence.[20]   BP, as a member of the IADC, is familiar with this provision.   In contrast, the model JOA of the American Association of Professional Landmen reflects an operators' industry standard of allocating liability in proportion to participating interest shares—***unless*** the liability arises from gross negligence or willful misconduct, in which case that party is solely responsible.[21]  As a member of the OCS Advisory Board,[22] which makes available this form JOA, BP clearly knew how to exclude gross negligence from the scope of the indemnity agreement or allocate risk differently had it so desired.  In fact, BP did so in its JOA with MOEX and Anadarko, its Macondo partners.[23]  BP has done so in certain contracts with other contractors in the Macondo project, including ████████████████████ ████ and ████████████████ [4]

So we ask BP, why the broken promise to your Macondo contractors?  Why have you signed so many contracts, reviewed by an army of your lawyers and businessmen, that you have no intention of honoring?  The answer is simple: money.  BP sacrificed quality and failed to implement risk management and mitigation processes to ensure overall safety and success of the operations at Macondo just to save costs on a project that was well above budget.[25]  In the wake of the Macondo tragedy, BP, realizing the financial impact of its contractual promises, now flees from them.  Instead of fulfilling its promises, BP points to its contractors for money BP promised

to pay, and blames the blowout on those who worked at BP's direction and under its control. Such was precisely BP's reaction in the wake of the 2005 Texas City refinery tragedy: it blamed its own low-level employees, ignoring the effect of BP's corporate culture and procedural shortcomings. If there is any legal consistency in BP's pre-incident contractual promises and its post-incident contractual positions, it is this: If BP is entitled to money, pay now. If BP owes money, there must be a legal loophole. BP's self-serving oscillation between diametrically opposed legal positions based on its perceived financial exposure must end. It must honor its promises.

These contracts are not mere legal rhetoric, but rather are recognized in the industry as being essential to the fundamental business relationship between an operator and its drilling and other contractors. The principle is simple: the party that owns and controls the project and reaps the reward bears the risk of activities associated with obtaining that level of profit. The allocation of risk accomplished through the contractual indemnities provides the risk and financial certainty necessary for drilling and other contractors and their underwriters, shareholders and banking institutions. This certainty of risk allocation determines daily lease rates or charter hires for drilling rigs and insurance premiums and loan flexibility needed to operate successfully. Requiring contractors—*after* a massive oil spill—to bear significant, unbargained-for risks and liability will devastate the industry. Contractors cannot absorb such levels of exposure and are not able to obtain insurance coverage necessary to insure such risks. Tony Hayward, BP's Chief Executive Officer at the time of the Macondo incident, recognized as much in an interview with *Forbes*, commenting that "[y]ou can't insure. That's why [BP] is self-insured."[26] Hayward confirmed that even if such coverage could be obtained, the high cost of the premiums would make it impractical, which is why BP did not procure insurance from third

parties.  "[BP] didn't have an insurance policy against the risks it was—it was undertaking, in essence, . . . [BP] self-insured and took those risks onto [its] balance sheet."[27]  Paradoxically, in the declaratory judgment suit pending before this Court, BP goes so far as to argue that Transocean and its underwriters intended to and did insure BP for environmental risks BP says it cannot afford to insure itself.  If BP, one of the largest corporations in the world, cannot afford to insure for underwater blowouts, can it reasonably expect its Macondo contractors like Transocean to do so?

Not that BP should need additional support for why it should honor its promises, but Dr. Hayward's view is amply supported by representatives of the insurance industry.  Indeed, in the Summer of 2010, when Congress was considering whether to reduce or eliminate caps on liability under various federal statutes, the insurance industry weighed in, voicing its concern regarding the potential impacts on the ability of the insurance industry to provide the contemplated required and expanded environmental pollution coverage.  The resounding consensus was that availability of insurance would be radically reduced, leading to limitations on the ability of companies to continue and initiate exploration and development opportunities.[28] Paul King, Director of INDECS, forecasted that "quite simply the energy insurance market will no longer be an option."  Only super majors and foreign state-owned oil companies would be capable of obtaining alternate methods of financial responsibility.[29]  Similarly, John Lloyd, Chairman and CEO of Lloyd & Partners,[e] expressed concern about any attempt to hold **all** parties liable, as opposed to the operator, as is traditionally understood.  Mr. Lloyd observed that "if every party involved in the loss (operating group, drilling contractor, other service contractors—such as mud or cementing contractors—and blowout preventer manufacturers) are

---

[e] In the interest of full disclosure, Lloyd & Partners is one of Transocean's brokers.

successfully sued then the market will be exposed to a degree much larger than anticipated when committing capacity to individual [i]nsureds. This has already resulted in at least one major London energy liability insurance leader advising . . . that they are cutting back their maximum capacity for individual [i]nsureds by a third."[30]

There is no public policy against enforcing a promise whereby one contracting party agrees to indemnify the other contracting party for liability for injuries caused to a third party, even if it is claimed that the party being indemnified was grossly negligent. Public policy is not offended by indemnity provisions that allocate risk and do not exonerate anyone. Rather, public policy demands that parties live up to their contracts—their promises. Public policy would be turned on its head were drilling contractors or other oilfield service providers required to bear financial risks for losses in excess of their capital worth and exposure beyond that which can be insured. To put the policy question another way, is public policy advanced by transferring risk from the party that owns the project, controls the risk, and agrees to and can pay, to one that didn't agree to assume the risk—and cannot even afford to insure that risk—to say nothing of paying for it out of pocket without the aid of insurance? As BP itself argued in a recent brief filed in the Fifth Circuit (when it was arguing in favor of enforcement of contractual indemnity):

> There is perhaps, no higher public policy of the state than to uphold contracts validly entered into and legally permissible in subject matter . . . "It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, **if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice**. Therefore you have this paramount public policy to consider: That you are not lightly to interfere with this freedom of contract."[31]

BP: We agree with what you argued to the United States Court of Appeals for the Fifth Circuit.

BP's corporate expectation, as reflected in its Code of Conduct, is that BP personnel at all

levels are expected to honor promises that they make.[32]   BP's corporate expectation is that

contracts should be enforced as written and that all parties should live up to their agreements.[33]

As Dr. Hayward testified, men in the oil patch should be honorable; your word is your bond.

This is a cornerstone of the industry, and is the reason the industry works.[34]  Unfortunately, there

is a disconnect between BP's managerial philosophy and its legal maneuverings.

After the April 20, 2010 Macondo blowout, BP's public posture was that it was a good

corporate citizen, living up to its legal obligations.  BP's position is a public charade.  BP wants

to perform and honor its contracts selectively, despite being fully aware of the provisions

contained therein.  Over the years and throughout the performance of the *Deepwater Horizon*,

multiple opportunities existed to revise any unacceptable indemnity obligations, but  in the over

thirty amendments to the contract such revisions never occurred.  In fact, BP broadened its

promises to Transocean.  BP made similar indemnity promises to many of its Macondo and its

non-Macondo contractors.  These contractual indemnity promises have been made by BP both

before Macondo, **after** Macondo, and even **after** BP declined to honor its contractual indemnity

promise to Transocean and the other Macondo contractors.

These inconsistent positions taken by BP—its insistence that Anadarko not make the very

argument BP is making here, its longstanding pre-Macondo practice of indemnifying its

contractors for allegations of gross negligence, and its post-Macondo and even post-June 2010

promises to indemnify both Transocean and ███  for gross negligence—are not made

accidentally and cannot be blamed simply on the complex nature and fast moving pace of the

MDL.  These positions are in fact perfectly consistent with the BP method of contractual

interpretation demonstrated thus far in this litigation: heads we win, tails you lose.

At the time of this filing, BP continues to enter into contracts it simply does not intend to

honor, except, of course, when BP stands to gain money rather than lose money, as in the case of with its partners in Macondo.   As recently as October 3, 2011, BP's attorneys instructed Transocean that: "Under the Drilling Contract, Transocean must defend, indemnity [sic] and hold harmless [BP] from all claims for personal injury or death brought by Transocean employees."[35] In other words, BP will not honor its promises, but instructs Transocean to continue doing what it always has done: honor the Drilling Contract.   While Transocean has never contested its obligations, BP has never acknowledged its promises.   BP's schizophrenic view of contracts should not be countenanced.   Sanctity of contract is the essential underpinning of successful business operations in the oil and gas industry, and contracts should be enforced as written.[36]   To the extent these agreements are not enforced as written, the industry will undoubtedly cease to function in the Gulf of Mexico and elsewhere in the world wherever drilling takes place.   Each and every claim for relief asserted by BP against Transocean and the other Macondo contractors is barred by its contractual promises to Transocean.   Accordingly, each and every claim asserted by BP against Transocean should be dismissed.   BP should be required to live up to its contractual promises, and Transocean should be granted full and complete indemnity from BP for all claims made against Transocean for environmental damages caused by wellhead pollution; civil fines and penalties; unpaid invoices associated with the *Deepwater Horizon*; attorneys' fees, expenses, and court costs incurred for defending the claims for environmental losses, fines and penalties, and for enforcement of the contract; and all other losses, fees, and expenses incurred as a result of BP's broken promises.

## ARGUMENT

### I.    Standard of review

Summary judgment is appropriate where the Court is satisfied "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37]

"This burden is not satisfied with 'some metaphysical doubt as to the material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' . . . or by only a 'scintilla' of evidence . . . .  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[38]  "[S]ummary judgment is appropriate in any case 'where critical evidence is so **weak or tenuous** on an essential fact that it could not support a judgment in favor of the nonmovant.'  If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted."[39]

Summary judgment is especially appropriate in cases involving unambiguous contracts.  Where, as here, the "agreement is clear and unambiguous," "contract interpretation is a question of law."[40]  This motion is also appropriate under the trial plan that the Court recently entered.  Section I of the Order states: "The trial will address . . . other bases of liability of . . . the various defendants . . . with respect to the issues . . . ."  BP's contractual indemnity obligation is an example of "other bases of liability."  Section I also states: "Phase One will include issues asserted in or relevant to counterclaims, cross-claims, third-party claims, and/or comparative fault defenses as appropriate."[41]  The indemnity issue presented by Transocean's motion is triggered by Transocean's 14(c) tender of BP and by BP's cross-claim and third-party claims for contribution.

## II.     BP's attempt to avoid its contractual promises by alleging Transocean and its deceased and injured workers were grossly negligent is both morally repugnant and controverted by the testimony of BP personnel, from its CEO to its Well Site Leaders, and by all of BP's contractors' employees.

Transocean's commitment to safety is strong and entrenched in the daily operations of Transocean's organization and in its employees onshore and offshore.  BP recognizes as much—

13

approximately six drilling rigs currently work for and house BP personnel at the time of the filing of this motion.[42]   From the BP rig crew, which lived and worked on the *Deepwater Horizon*, to executives at the most senior levels within BP, BP employees have consistently and affirmatively testified that Transocean's crew was capable, competent, and safety-minded and that unsafe rig conditions were not observed or reported to management even though BP personnel routinely worked and lived aboard and audited the condition of the vessel.   BP employee and management testimony is corroborated by numerous third-party crew members and independent and government inspectors that also worked and lived on the rig or frequently visited and inspected it.   In ***excess of one hundred witnesses*** praised the Transocean rig crew and testified favorably regarding the safety culture onboard the rig and the condition of the rig and its equipment.   The testimony and documentation reflecting the strength of the crew and safety of the rig, too extensive to catalog in its entirety here, is chronicled in *Appendix B-112*.[f] However, for the Court's benefit, and in support of this motion, here are but a few of the sworn statements of BP and third-party witnesses.   Additionally, documents affirming the condition of the *Deepwater Horizon* and caliber of its crew are provided in *Appendix C*.[43]

### A.   BP employees praise the *Deepwater Horizon* and her crew.

Mark Bly, who led BP's internal investigation into the April 20, 2010 incident and was commissioned by BP to review and assess the capabilities and conduct of BP and its contractors at Macondo, testified that the investigation uncovered no evidence that any company or person maliciously, deliberately, or intentionally caused injury to other humans or to the environment.[44]

---

[f] The compilation in Appendix B is inclusive of depositions completed on or before Monday, October 17, 2011.  To the extent that subsequent testimony provides additional support for Transocean's position, Transocean reserves the right to supplement the testimony detailed in Appendix B.  In light of ongoing designations and de-designations of confidential testimony, Transocean has made every effort to move to seal testimony accurately and has erred on the side of caution in this regard.

He stated, "I didn't see any malicious intent in anything that we observed."[45]  Gillian Cowlam, another member of BP's investigation team, confirmed that she never learned of any evidence suggesting that the Transocean employees aboard the *Deepwater Horizon* were indifferent toward the safety of other humans or the environment.[46]

Perhaps the BP employees most familiar with the condition and operations of the *Deepwater Horizon* and the professionalism of her crew are BP's Well Site Leaders, Ronnie and Murry Sepulvado, and BP's Wells Team Leader, John Guide.  The BP Well Site Leaders lived aboard the rig and worked with her crew for years.  They are as knowledgeable about the rig and her crew as anyone.  Ronnie Sepulvado described the crew as: "good people, ... good workers and good safety people."[47]  None of these BP employees ever observed callousness, recklessness, or indifference to the safety of others or the environment from the crew of the rig.  They thought highly of the drilling rig's management, specifically: Jason Anderson (deceased), Stephen Curtis (deceased), Randy Ezell, Jimmy Harrell, Curt Kuchta, Paul Johnson, and Dewey Revette (deceased).[48]  Each trusted the abilities of the *Deepwater Horizon* crew and, most compelling, would be comfortable working with the same crew to this day.[49]  Ronnie Sepulvado, who had been assigned to the *Deepwater Horizon* for eight years and considered it his home away from home, testified that the Transocean rig crew would not hide issues that would subject them or anyone else to safety issues out on the rig.[50]  He worked with many of the men who lost their lives on April 20, 2010, and felt the drilling crew was both competent and committed to safety.[51]  In John Guide's opinion, Transocean had a very good safety management system that included risk assessments.  Knowing the competency of the crew and the condition of the *Deepwater Horizon*, Guide was surprised when he learned of the explosion.  Further, he spent the night on the rig in 2010 and admitted that if he had any concerns about the safety of the rig, he would not

have slept on it.  Guide was confident in the drill crew's ability and believed that Transocean Rig Manager Paul Johnson "had a good attitude towards safety and the environment."[52]

Brett Cocales, BP's Drilling Engineer, was on the rig in September and October 2009 and, likewise, testified that when drilling and well operations commenced at Macondo he personally was satisfied that the rig and its equipment were in a safe operating condition and that the personnel on the rig were trained and competent.  Cocales remained actively involved in the BP Audit process through April 2010, at which time Cocales was again satisfied with the condition of the equipment and caliber of personnel aboard the *Deepwater Horizon*.[53]

BP's primary marine inspector, Angel Rodriguez, never witnessed any unsafe operation during his rig visits, nor did he witness any action by any member of the *Deepwater Horizon* crew that would be considered reckless, malicious, or indifferent towards the safety of others or the environment.  He perceived the rig to be managed by a safety conscious, competent crew that endeavored to address and resolve the items identified in the 2009 BP Audit, and Rodriguez believed that the rig was operating safely from a marine standpoint when it returned to operations in September 2009.[54]  He inspected the rig in March 2010, less than a month before this tragic event, and found the rig and its crew to be fit.[55]  BP did not simply assess the rig and its crew as part of a routine, casual site visit.  In Article 18.2 of the Drilling Contract, BP insisted that it:

> shall be entitled to designate a representative(s), who shall at all times have complete access to the Drilling Unit for the purpose of observing or inspecting operations performed by CONTRACTOR in order to determine whether, in COMPANY'S sole opinion, CONTRACTOR has complied with the terms and conditions of this CONTRACT.  The representative(s) shall be empowered to act for COMPANY in all matters relating to CONTRACTOR'S daily performance of the work.[56]

16

The audits, like those conducted by Mr. Rodriguez, were BP's right and responsibility.  They were undertaken thoroughly by personnel chosen by BP.  Does BP seriously contend that its own inspectors operating pursuant to contractual rights cannot determine whether a drilling rig is properly maintained and whether her crew is competent?

BP managerial personnel support this testimony, agreeing that there was never any indication that the Transocean *Deepwater Horizon* crew deliberately caused harm to the environment or others; maliciously tried to cause injury to the environment or another person; or simply was indifferent about the safety of the environment or others.  To the contrary, these witnesses found the crew to be knowledgeable, skilled, and trusted workers.[57]  Pat O'Bryan, the Vice President of Drilling and Completions, Gulf of Mexico, Deepwater, was onboard the rig at the time of the incident.  O'Bryan testified that the *Deepwater Horizon* was the best performing rig in both safety and operations in the BP fleet.  He was anxious to visit the rig to observe "what good looks like" from a safety and performance perspective and to apply those practices on other BP rigs.[58]

Indeed, Tony Hayward, the former Chief Executive Officer of BP, testified under oath that he was never advised by anyone within BP that Transocean or its employees were indifferent towards the welfare of the environment or others.[59]  Dr. Hayward acknowledged that Transocean is "one of the world's largest and most respected drilling contractors" and "as of the time [he] left BP, one of the preferred providers throughout the world for BP in drilling its deepwater wells."[60]  When questioned "[i]f anyone [at BP] had ever come to [him] and suggested that Transocean was callous, indifferent, or just didn't plain give a damn about the welfare of the environment or individuals" and whether it was his obligation as CEO either to terminate all relationships with Transocean or appoint someone to look into those allegations, Dr. Hayward

17

admitted that "others would have taken action before it got to me, I'm certain."[61]   The record is devoid of testimony that any such actions occurred.   Even today, Dr. Hayward would hire Transocean and admired the surviving crew of the *Deepwater Horizon*, many of whom he met at the *Deepwater Horizon* memorial.[62]

The BP plc senior independent director and chair of the committee overseeing corporate-wide safety, Sir William Castell, described Transocean as a company held in high regard and the company BP chose to use in its relief efforts.[63]   BP's former Chief Operating Officer of Exploration and Production, Doug Suttles, praised the men and the condition of the *Deepwater Horizon*.[64]

The night of this tragic event, senior BP personnel, such as David Sims and Patrick O'Bryan, were onboard the *Deepwater Horizon* for a leadership visit and to commend her and her crew for being a model of safety.[65]   From BP's senior independent director, to its CEO and COO, to Executive and Senior Vice Presidents, Chief Engineers, Marine Authorities, Well Team Leaders, Well Site Leaders, BP's Lead Incident Investigators, and everyone in between, they found no evidence of gross negligence and, indeed, all believed this was an exemplary rig and crew.   The *Deepwater Horizon* was the rig to which many BP Well Site Leaders wanted to be assigned.   In having to juggle the many requests for this assignment, BP's Operations Advisor, Keith Daigle, had to advise a BP supervisor to inform his employees that: "█████████████████

█████████████████████████████████████████████████████████

███████   When BP needed help to control the Macondo well, it called upon Transocean's *DD II*

---

[g] Because BP designated Daigle's email as confidential, it is not publicly disclosed.   However, a copy is attached hereto.   App. A-40: Email thread among Keith Daigle, George Gray, and Maniram Sankar, RE: Marianas WSL, May 28, 2008, BP-HZN-2179MDL02486517–19.   The ████████████ in question was ████████ who wanted to be transferred to a less stressful rig, like the *Deepwater Horizon*.   He was, of course, eventually transferred to the rig and was the █████████████████ at the time of the explosion.

and *DD III* to drill the relief wells, the *Discoverer Enterprise* for well intervention and crude oil recovery, the *Discoverer Inspiration* for the cap and stack, and the *Discover Clear Leader* to stand by for other  possible interventions.

To date, the following BP employees have testified favorably regarding the condition of the rig and skill of the crew.  As noted previously, their testimony is chronicled in *Appendix B*.

- John Baxter (Group Head of Engineering and Process Safety);
- Mark Bly (Executive Vice President of Safety and Operations and Team Leader, BP Internal Investigation);
- Martin Breazeale (Manager of Well Site Leader of the Future Program );
- Sir William Castell (Senior Independent Director and Chairman of the Safety, Ethics and Environment Assurance Committee);
- Brett Cocales (Operations Engineer);
- Gillian Cowlam (Engineering Manger for Sangachal Terminal / Member, BP Internal Investigation);
- Neil Cramond (Area Operations Manager, Na Kia Oil and Gas Production Facility / former SPU Marine Authority, Gulf of Mexico);
- Keith Daigle (Wells Operations Advisor, Gulf of Mexico);
- Michael Daly (Executive Vice President of Exploration);
- Scherie Douglas (Regulatory Compliance Team Leader);
- James Dupree (Senior Vice President for the Gulf of Mexico);
- Steven Flynn (Vice President of Health, Safety, Security and Environment);
- Cheryl Grounds (Chief Engineer of Process and Process Safety);
- John Guide (Drilling Engineer Team Leader, Angola / Former Wells Team Leader);
- Anthony Hayward (former Chief Executive Officer);
- Curtis Jackson (former Director of Health, Safety, Security and Environment, Gulf of Mexico);
- Kevin Lacy (former Vice President of Drilling and Completions, Gulf of Mexico);
- Lee Lambert (Well Site Leader / former Well Site Leader of the Future);
- Philip Earl Lee (Well Site Leader);
- Ian Little (Vice President of Wells, North Africa / former Wells Manager for Exploration and Appraisal Drilling, Gulf of Mexico);
- John Mogford (former Executive Vice President of Safety Operations);
- Patrick O'Bryan (Vice President of Wells, BP America / former Vice President of Drilling and Completions, Gulf of Mexico Deepwater);
- Vincent Price (Well Site Leader / Former Well Site Leader of the Future);
- David Rich (Wells Manager, Gulf of Mexico Deepwater);
- Angel Rodriguez (Marine Advisor);
- Murry Sepulvado (former Well Site Leader);
- Ronald Sepulvado (former Well Site Leader);
- John Shaughnessy (former Well Control Technical Authority, Gulf of Mexico);

- David Sims (Operations Manager, Gulf of Mexico Deepwater);
- Cynthia Skelton (Vice President of Safety and Operational Risk, Gulf of Mexico / former Vice President of Health, Safety, Security and Environment and Engineering, Gulf of Mexico);
- Jonathan Sprague (Vice President of Organizational Capability for Global Wells Organization / former Drilling Engineering Manager, Gulf of Mexico);
- Doug Suttles (former Chief Operating Officer);
- Henry Thierens (former Vice President of Drilling and Completions Operations);
- Jay Thorseth (Vice President of Exploration and Appraisal, Angola / former Exploration Manager, Gulf of Mexico Deepwater);
- David Wall (Vice President of Risk, Learning, Health and Safety / former Vice President of Health, Safety, Security Environment and Integrity Management for Upstream);
- O. Kirk Wardlaw (Senior Negotiator for the Western Hemisphere / former Chief Land Negotiator, Gulf of Mexico);
- Norman Wong (Manager of Rig Audit Group); and
- Barbara Lowery-Yilmaz (former Technical Vice President of Drilling and Completions).

The testimony of BP personnel simply does not support BP's **legal** position or the opinions of the "**paid experts**" BP's attorneys have retained.  What possible justification can BP offer for its unwillingness to honor its commitments—its promises?  What possible explanation exists for the filing on April 20, 2011—the anniversary of the death of eleven men and injury to scores more who fought the BP well and fire—of an amended complaint alleging that Transocean and these men and women were willfully and consciously indifferent to the welfare of people and the environment?  What is the answer?  Money.  BP simply chooses to avoid its contractual obligations with allegations of gross negligence that BP's own contractors, employees, managers, officers and directors do not support.

### B.    Halliburton employees praise the *Deepwater Horizon* and her crew.

The experience of Halliburton rig-based personnel is similarly complimentary of the *Deepwater Horizon* and her crew.  Halliburton witnesses Paul Anderson (Service Supervisor III, Gulf of Mexico), Kelly Gray (Senior Surface Data Logging Field Specialist / INSITE Specialist), and Joseph Keith (Mud Logger) shared similar experiences and opinions regarding the

Transocean rig crew.[66]  All testified that they never witnessed the crew act maliciously towards the environment or other individuals, and none of these individuals ever saw any Transocean employee on the *Deepwater Horizon* willfully inflict harm on any person or the environment. Similarly, each agreed that no Transocean employee aboard the *Deepwater Horizon* wanted to injure another person or the environment.  Mr. Keith, who lived on the rig for almost eight years and was on the rig on April 20, 2010, described the Transocean rig crew members as good men.[67]  Mr. Keith testified that he was never placed in a situation aboard the rig where he thought he should halt drilling operations, but believed the crew felt comfortable halting drilling activities if appropriate.  He personally knew drill crew team members Dewey Revette, Jason Anderson, and Stephen Curtis and found each trustworthy and competent.  Further, on the evening of April 20, 2010, he did not witness any acts or omissions by these men that he would classify as negligent.[68]

### C.     Cameron employees praise the *Deepwater Horizon* and her crew.

Cameron Service Technician William LeNormand confirmed that Transocean made safety a priority on its rigs.  When he boarded a Transocean rig, the crew provided him with a thorough and comprehensive orientation, which addressed safety and evacuation of the rig. Based on his interaction with the crew, LeNormand found subsea crewmen to be knowledgeable about blowout preventers, including their service and maintenance.  He found that Transocean made safety a priority on the rig, and was proactive in requesting maintenance assistance from Cameron for BOPs.[69]

### D.     Third-party and government inspectors praise the *Deepwater Horizon* and her crew.

Moreover, third parties onboard the rig for inspections also affirmed the capabilities of the crew and condition of the rig and its equipment.  Victor Martinez, a ModuSpec inspector

described Subsea Supervisor Owen McWhorter as competent, professional, and very knowledgeable about the *Deepwater Horizon*'s subsea equipment.[70]   Another ModuSpec surveyor, Alan Schneider, testified that during his two visits to the *Deepwater Horizon* he participated in an orientation process, which included a safety briefing and a rig tour.  Schneider also was instructed that he had the authority to stop work if he saw an unsafe condition; however, at no point did he witness such a condition.  Schneider indicated that the April 2010 rig assessment performed by ModuSpec reflected that the *Deepwater Horizon* rated favorably compared to other rigs surveyed by ModuSpec—both in the Gulf of Mexico and worldwide.[71] David McKay, DNV's Regional Chief Surveyor for MODUs, North American Region, similarly testified that "the safety management system was well implemented, and the rig was in pretty good condition, and the personnel were competent."[72]

MMS inspectors Robert Neal and Eric Neal also verified the rig's condition and skill of the crew members.  Eric Neal described the rig as "one of the best" in terms of safety and performance.  He never observed any problems or issues with crew competency, and perceived Transocean to be very safety conscious and focused on compliance with MMS regulations.[73] Robert Neal described the safety culture as "good as any other rig."  During his February and March 2010 inspections, he found nothing to cause him concern with either the condition of the rig or the competency of the crew.[74]  Michael Saucier, the Department Regional Field Supervisor for the MMS, testified that all testing and inspections conducted on the *Deepwater Horizon* were found to be in compliance with regulations, no maintenance issues were ever raised and none of his inspectors ever reported any safety issues.[75]

Further, Lieutenant Commander Michael Odom, Chief of Inspections Division, Delaware Bay, and former Chief of Prevention, Marine Safety Unit in Port Arthur, Texas for the U.S.

Coast Guard, was one of three Coast Guard officers who personally conducted the July 2009 inspection of the *Deepwater Horizon*. He testified that the *Deepwater Horizon* had no outstanding discrepancies when they boarded the vessel or departed on July 27, 2009. Specifically, Odom did not note any deficiencies or issues from a safety standpoint associated with the (1) preventative maintenance system, (2) cranes, or (3) electrical equipment in hazardous areas on July 27, 2009. The emergency generator was in satisfactory condition, and the fire boundary doors were operating properly. As part of the inspection, a drill was performed and completed to his satisfaction. Odom found the crew to be well-trained and competent and affirmed that "[t]hey were expert in their ability to use the equipment and respond to the drill that we initiated." Indeed, Odom confirmed that the crew's "knowledge of the equipment on board was exceptional" and agreed that the rig had an outstanding safety culture. As a result of the July 2009 exam and inspection, Odom found the *Deepwater Horizon* to be seaworthy and fit for route and service.[76]

Moreover, Callan Brown, another member of the U.S. Coast Guard inspection team onboard the *Deepwater Horizon* in July of 2009, was called to testify before the Joint Investigation Team of the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement (formerly the Minerals Management Service). In preparation for his testimony, he emailed Odom and Jay Willimon, recalling that "the rig was in excellent condition and that the fire drill went well" during the inspection.[77] Notably, this inspection of the *Deepwater Horizon* occured ***before*** the rig began its out of service period and also ***before*** the September 2009 BP Audit.

Throughout the wide range of companies and individuals who worked on, visited, inspected, and / or were responsible for ensuring the safety of the rig and its operations, ***none*** testified to any condition or conduct that could give rise to so much as a plausible inference of

gross negligence.  The evidence demonstrates only that the *Deepwater Horizon* and her crew operated consistently in a professional and safe manner.

Lastly, as described above, BP has taken contrary positions vis-à-vis a co-owner of the Macondo well, Anadarko, and its drilling contractor, Transocean.  BP insists that Anadarko perform its obligations under the contract despite pending allegations of ███████████ and ████████████████████████████████████████, yet will not honor its promises to Transocean under the Drilling Contract on that precise basis.  BP's transparent attempt to avoid its obligations must fail in light of the uncontroverted testimony in the record.

### III.    BP's demand for contribution is in violation of the promises it made.

As demonstrated, Transocean, its crew, and its vessel were not callous, wanton, or willful in their actions leading to this tragic event.  However, even if that issue were fairly in dispute, BP contractually agreed to indemnify Transocean (and most other contractors at Macondo) for such liabilities.  Before addressing the issue of contractual indemnities, we first address BP's claim for "contribution"—that is, what BP's public relations machine refers to as the "we should share in the blame" campaign.  It appears BP's public relations and legal departments are not well coordinated with regard to longstanding maritime law.  The law is clear: A right of express contractual indemnity overrides any alleged rights of contribution that would otherwise exist.

> Where one tortfeasor is entitled to indemnity from another, the right of the indemnity obligee is for indemnity and not for contribution, and the indemnity obligor is not entitled to contribution from the obligee for any portion of his indemnity obligation.[78]

The Supreme Court relied on the Uniform Contribution Among Tortfeasors Act ("UCTA") in its seminal maritime contribution decision, *McDermott v. AmClyde*, 511 U.S. 202 (1994), which elaborated on the mechanics for applying contribution based on proportional fault in general maritime law cases.  McDermott's "proportional share" approach did not affect the well-settled

rule that express contractual indemnity overrides contribution.[79]  In simple terms, the contractual agreements between the parties trump BP's public relations effort at legal dodgeball.

## IV.   OPA recognizes the enforceability of indemnity promises, including indemnity for the uncapped liability that arises upon a finding that an incident resulted from gross negligence.

The vast majority of environmental loss claims filed after the BP spill are based on provisions of OPA.  As this Court has recently explained,

> Another obvious purpose of OPA was to set up a scheme by which a "Responsible Party" (typically the vessel or facility owner) was designated and made strictly liable (in most instances) for clean up costs and resulting economic damages.  The intent is to encourage settlement and reduce the need for litigation.   33 U.S.C. §§ 2709, 2710, 2713.[80]

As the Court indicated, both Section 2709 (recognizing a right of contribution) and Section 2710 (recognizing the enforceability of indemnity contracts) are significant to understanding how OPA was intended to work.  Responsible parties such as BP have a right to seek contribution under OPA or other law, but those rights can also be overridden by indemnity agreements between the parties, such as the one between BP and Transocean.

Setting aside for the moment the issue of how maritime law may have previously treated indemnity in the event of gross negligence (a matter we discuss, *infra*, in Section VII.B), Section 2710 made clear that Congress intended to allow indemnity agreements for "any liability" under the Act.  The term "any liability" includes the uncapped liability that the Act imposes in the event the incident resulted from the gross negligence of a responsible party (or the gross negligence of a "party pursuant to a contractual relationship with the responsible party").[81]

As this Court has recognized, OPA was adopted after the grounding of the *Exxon Valdez*.  OPA substantially increased the potential liability for owners of vessels and facilities.  It provided that a much larger class of injured persons and businesses could recover than had been

allowed to recover under prior maritime law and *Robins Dry Dock*.  It provided liability caps, but provided that those caps would be eliminated in the event the incident resulted from gross negligence.  Congress was obviously concerned about making sure that businesses could operate in this new liability environment, and thus made it clear in Section 2710 that it is lawful for an owner of a facility or vessel to obtain insurance and / or any other form of contractual indemnity for the exposure it might face.  Section 2710 makes it clear, for example, that the owner of an oil-carrying vessel has the right to purchase liability insurance for the uncapped liability it will face in the event of an oil spill resulting from gross negligence.[h]

When Congress desires to prohibit indemnity in the event of gross negligence in OPA, it does so expressly.[82]  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[83]

Since the indemnity agreement between Transocean and BP is enforceable by virtue of OPA Section 2710, all of BP's claims for contribution against Transocean are barred.  This is but one aspect of the promises BP and Transocean made to one another.  This is not a situation where Congress has legislated in the maritime context and left a gap with respect to a particular issue, requiring the court to look to general maritime law to fill the gap.  In OPA, Congress has spoken to the precise public policy issue and has said that there can be contractual indemnity for

---

[h] Therefore, even if there were an issue as to whether the Drilling Contract's reciprocal indemnities and risk allocation would have been enforceable under pre-OPA maritime law, Section 2710 should govern.  As the Court has noted, general maritime law applies "to the extent it is not displaced by federal statute."  App. D-12: Order and Reasons, Dkt. 3830, at 11.  *See, e.g.,* App. D-22: *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 165-67 (2d Cir. 2008) (provision in Amtrak Reform Act that "A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims" should be construed to preempt contrary state law or state common law public policy prohibition against indemnity, and express contractual indemnity should be enforced regardless of whether indemnitee was negligent or grossly negligent); App. D-23: *Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239, 246-47 (3d Cir. 2009) (indemnification allowed notwithstanding sovereign immunity defense under state law).

any liability under the Act, which includes the uncapped OPA liability imposed in the event of gross negligence.  In sum, Congress has determined that there is no public policy against contractual indemnity, even in the event of alleged gross negligence.

**V.      Another broken promise: BP's contribution claims are also barred by BP's promise to defend Transocean.**

BP's contribution claims are also a breach of BP's contractual obligation "to defend" Transocean.[84]  Indeed, BP has not simply failed to defend Transocean.  Its lawyers are actively prosecuting Transocean, accusing it and, most shamefully, the rig's crew of negligence and/or gross negligence.  Even accepting for purposes of argument BP's premise that it should not ultimately be required to indemnify Transocean if Transocean is found liable for gross negligence, BP has not simply reserved its rights and awaited the outcome of the plaintiffs' case.  It has joined in—rather than defending Transocean against—the plaintiffs' efforts to attempt to prove that Transocean was negligent and/or grossly negligent.  As a result, Transocean's defense costs continue to mount and are projected to  exceed hundreds of millions of dollars.

Defense and indemnity are separate concepts and separate promises in this contract.[85]  The duty to defend is a "'specific obligation to assume, upon tender, the defense obligation and costs of another.'"[86]  As the California Supreme Court explained in *Crawford v. Weather Shield Manufacturing, Inc.*:

> A contractual promise to "defend" another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the promisee's defense against such claims.  The duty promised is to render, or fund, the *service* of providing a defense on the promisee's behalf—a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved.  This is the common understanding of the word 'defend' as it is used in legal parlance.[87]

When the allegations pled against the indemnitee fall within the scope of the duty to defend, the obligation to defend arises.[88]

27

BP has recognized the applicability of this principle in contracts with other contractors at Macondo. Though BP's contracts with ███████████████████ ███████ and ██████ ████████ exclude indemnity for gross negligence, they nonetheless provide that BP owes a duty to defend—even in the face of allegations of gross negligence. Specifically:

> *[f]or avoidance of doubt*, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term "Indemnify" or "Indemnification" *includes the duty to provide a full Defense* even though gross negligence or willful misconduct are alleged and *even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct*."[89]

Not only do these contracts demonstrate BP's ability to exclude gross negligence from the scope of its indemnity obligations when BP wishes to do so, it also affirms that BP understands its duty to defend is distinct from its duty to indemnify. It would most certainly yield an absurd result if the duty to defend survived allegations of gross negligence in a contract where indemnity for gross negligence was specifically excepted, but not in one where it was expressly included. This absurdity is apparently what BP proposes. When contrasted against the predominant legal landscape favoring the duty to defend, Transocean respectfully requests that the Court reject BP's veiled attempt to avoid this obligation under the guise of pending investigations and allegations.

## VI. BP cannot avoid its contractual promises by alleging that Transocean breached the Drilling Contract or that the vessel was unseaworthy and, indeed, BP owes Transocean charter hire for Macondo.

BP appears to believe that it can avoid its indemnity obligations by alleging that Transocean itself materially breached the Drilling Contract[90] or that the vessel was unseaworthy.[91] While the parties could have provided in their contract that unseaworthiness or breach of contract was a defense to indemnity, they did not do so. In fact, they did the very opposite, clearly stating that indemnity was required even in the event of breach of contract or

28

unseaworthiness.  The contract defines the scope of the indemnity obligation to include any and all claims "without limit and without regard to the cause or causes thereof, including . . . the unseaworthiness of any vessel or any vessels (including the drilling unit), breach of representation or warranty, expressed or implied, [or] breach of contract . . . ."[92]  *Becker v. Tidewater, Inc.* involved a similar breach of contract / unseaworthiness defense to indemnity. The party resisting indemnity contended:

> Tidewater's proposed interpretation of the Blanket Time Charter would render meaningless Tidewater's express assumption in Article III of the obligation to provide and maintain the REPUBLIC TIDE in a seaworthy condition.  The *only* way to give effect to this provision is to conclude that Tidewater must live up to its basic obligations to maintain the vessel before it can take advantage of the indemnity language in Article XIV, *i.e.* render Tidewater's seaworthiness obligation "effective rather than meaningless."[93]

The district court rejected this outright: "Despite any negligence or unseaworthiness attributable to Tidewater, the indemnity agreement is fully enforceable."[94]  Any belief by BP that an alleged violation of law constitutes a breach of contract by Transocean that negates the indemnity obligation is similarly misplaced.  In *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, Tesoro contended that Nabors had failed to provide proper well control equipment, breaching the drilling contract, and, therefore, nullifying the indemnity agreement.[95]  The court disagreed and explained: "An indemnity agreement 'is an original obligation between the contracting parties and independent of other agreements.'"[96]  A prerequisite to the remedy of excuse of performance is that covenants in a contract must be mutually dependent promises.[97]  Because an indemnity agreement is an independent covenant, Tesoro was not excused from performing under the contract based on unsupported allegations that Nabors breached the contract.

29

Finally, BP also refused to pay approximately $11.7 million in invoices properly billed by Transocean for use of the *Deepwater Horizon* under the Drilling Contract.[98]   Notably, payments for many of these invoices are in excess of a year overdue.  On or about December 15, 2010, BP stated it would not pay certain amounts invoiced "at this time" based on "developing facts regarding the manner in which Transocean performed drilling operations on the Macondo well."[99]  BP entirely failed, however, to specify the precise factual and contractual grounds for its dispute as to Transocean's invoices.  By way of example, Invoice 00011482 dates back to February 2010 and is for drill pipe and pup joints.  None of these tool rentals are at issue.  Indeed, this invoice was already overdue at the time of the Macondo blowout.    Similarly, Invoices 00011504, 11056, and 00011509 pertain to reimbursable charges such as rentals, transportation costs, and tool rental charges.  None pertain to "the manner in which Transocean performed drilling operations on the Macondo well."

BP's legal position has been to stonewall Transocean in hopes of avoiding, or at least delaying for tactical litigation purposes, payment on yet another established obligation to Transocean.  BP, however, once again takes a different view when BP is not the paying entity.  On February 25, 2011, BP's Chief Procurement Officer, Bob Talbott, issued a letter urging BP's prime response effort contractors to ████████████████████   Ironically, BP states that "████████████████████████████" and ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ ,"[100]   BP should follow its own advice;

however, as it has not, Transocean respectfully requests that the Court award the outstanding

invoice balance to Transocean.

**VII.   BP cannot avoid its contractual promises by alleging that Transocean was grossly negligent.**

    **A.   The public policy against an *exculpatory* exemption from liability for injury to the other contracting party is not applicable to a true indemnity agreement whereby one contracting party agrees to indemnify the other contracting party with respect to liability for an injury caused to a third party who is *not* a party to the contract.**

Contract law generally recognizes a public policy prohibition against "red letter"

contractual clauses whereby one party to the contract seeks to exculpate itself in the event its

gross negligence in the performance of the contract **causes injury to the other contracting party**.

Such an exemption or release from liability, even if phrased in terms of "indemnity" or "hold

harmless," has been held to be against public policy.[101]   The three cases cited when BP refused

Transocean's demand for defense and indemnity are examples of this rule.[102]   Presumably BP

carefully considered this exception, as the contracts entered into by BP with Transocean and

many other drilling contractors and oil field service providers that include indemnity for gross

negligence (referenced in Statement of Undisputed Material Facts) were executed long ***after***

these three cases were decided, and some even ***after*** BP refused to indemnify Transocean.

The distinction between a true indemnity (which can provide indemnity for gross

negligence) and an exculpatory clause (which cannot avoid liability for gross negligence) is well

established in the law.   Comment b to *Restatement (Second) of Contracts* § 195 explains: "The

rule stated in this Section does not apply to an agreement by a third person [*i.e.*, BP] to

indemnify a party [*i.e.*, Transocean] against liability in tort."   The cases recognize this

distinction, although using slightly different terminology, referring to the injured party as the "third" party, to distinguish the injured party from the contracting parties (the indemnitor providing indemnity, and the indemnitee receiving indemnity). The key difference is that, in the case of a contractual *exemption* from liability, the issue is whether the injured contracting party should be compensated for his injury at all. In the true indemnity case, the injured party (who is not a party to the contract) will be compensated, and the issue is which of the contracting parties will bear the loss. In that context, indemnity for gross negligence is allowable.[103]

This fundamental tenet has been recognized in the learned treatise of Williston on Contracts:

> Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury so that *indemnification may be permitted when grossly negligent conduct was alleged and found*.[104]

In examining all of the inconsistent positions taken by BP and its attorneys since the tragic Macondo event, this is perhaps the most extreme example. It is disingenuous enough to use inapplicable, 1982 case law as a basis for avoiding a contract BP entered into in 1998; but BP goes further. BP reveals its true character to Transocean and the oilfield industry when, in June 2010, BP refused to honor its promise to Transocean while *continuing to enter into similar contracts with other contractors* in which the same, apparently illusory, obligations are undertaken by BP. At best, BP is simply unaware that its attorneys have been taking inconsistent legal positions based on the same type of contract. At worst, BP is taking advantage of the complexity of the MDL to perpetrate the use of its contracts as a sword and a shield against its service providers throughout the world. Regardless of BP's motivation, Transocean asks the Court to enforce BP's contractual indemnity obligations in favor of Transocean as Transocean

32

voluntarily has done with regard to its indemnity obligations in favor of BP.  Transocean honors its contractual obligations.  Why can BP not do the same?

Under the Drilling Contract, it is clear that Transocean is not seeking exculpation or exemption from liability for an injury *to BP*.  Rather, it is seeking to enforce a true indemnity provision whereby BP agreed to indemnify Transocean for alleged injuries caused *to third persons* which, it is beyond dispute, will be compensated by someone.  That takes this dispute out of the realm of the public policy concerns raised by BP.  The only issue in *this* dispute is which of the contracting parties will make that compensation.  This dispute was settled between BP and Transocean years ago when they agreed to the terms of the Drilling Contract.

> **B.    Maritime cases support enforceability of an express contractual promise for indemnity for liability to a third party, even in the event gross negligence is alleged.**

We have not found a maritime law case which discusses the distinction between a true indemnity provision and the type of exculpatory exemption of liability involved in the cases cited by BP.[i]  In a maritime case involving an OCS gas well, *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528 (5th Cir. 2001), the well owner sued a contractor for damages sustained by the well owner from a blowout.  This Court refused to enforce the agreement's exculpatory clause on the ground that the contractor had been grossly negligent, but the Court of Appeals reversed, ruling that the finding of gross negligence was clearly erroneous, and held the indemnity valid and enforceable. The case did not involve indemnity for liability to

---

[i] In an interlocutory order in App. D-60: *Energy XXI, GOM, LLC v. New Tech Eng'g*, 2011 WL 1458638, at *12-15 2011 U.S.Dist. LEXIS 41223, at *37-45 (S.D. Tex. Apr. 15, 2011)*, the court held unenforceable an "exemption from liability" for gross negligence where one party to the contract sought to be exempted from tort liability for an injury to *the other party to the contract* (the contractor's alleged gross negligence had caused a workstring to become stuck, which required a $9 million recompletion effort).   New Tech Engineering filed a motion for certification of order for interlocutory appeal on October 13, 2011.   App. D-61: New Tech Engineering, L.P.'s Motion for Certification of Order for Interlocutory Appeal, Case 4:10-cv-00110 (S.D. Tex.), Dkt. 53.

a third party, and the indemnity provision at issue did not expressly cover indemnity for gross negligence.[105]

What is clear is that indemnity for third party claims for compensatory damages notwithstanding gross negligence has a long history in maritime law.  Insurance is, of course, a form of indemnity contract and maritime courts have long held that the insurer owes an obligation to pay for the loss, even if the loss was caused by the insured's gross negligence.[106] BP itself is seeking indemnity coverage as an additional insured under insurance policies issued to Transocean.   BP is claiming, in essence, that it has a right to insurance indemnity, notwithstanding that the plaintiffs in the underlying litigation accuse BP of gross negligence.  BP is certainly not waiting for a "full investigation" before it attacks Transocean's insurance. Moreover, BP's Macondo settlement agreements with Weatherford and Moex provide for indemnity for third party claims for ▮▮▮▮▮▮▮▮▮   even if there is a determination of ▮▮▮▮▮▮▮ [107]  Discovery in this case also reveals that BP entered into contracts providing gross negligence indemnity ***after*** the Macondo incident, including ▮▮▮▮▮▮ by way of amendment;[108] the *Constellation II*;[109] the ▮▮▮ [110] and the *Enterprise*, in which prior indemnities encompassing gross negligence were not reduced in scope.[111]

Recent cases within the Fifth Circuit are consistent with the position that indemnity for an injury to a ***third party*** which ***expressly*** covers gross negligence should be enforced.[112]  In *Becker v. Tidewater*, Tidewater sought contractual indemnity from Baker Hughes, and Baker Hughes opposed indemnity on the ground that Tidewater was grossly negligent.  The indemnity language

in the contract did not expressly cover gross negligence.[j]  At no point in the briefs did either party argue that the contract would not be enforceable as a matter of public policy if it had expressly provided for indemnity for gross negligence.  To the contrary, the premise in the briefing was that gross negligence was not covered by the indemnity because there was no express provision in the contract.  Moreover, nothing in the Court of Appeals' opinion speaks to the issue of whether an *express* indemnity for an injury to a *third party* is unenforceable as a matter of public policy.[k]

---

[j] When the case first went up to the Fifth Circuit, Baker Hughes's brief argued that the issue was: "Does the contract between the employer and the vessel owner exclude, *by its silence*, any indemnity obligations for injuries caused by the vessel owner's gross negligence as a matter of law?" App. D-73: Brief of Baker Hughes *et al.*, 2002 WL 32180622, at *3 (emphasis added).  In response, Tidewater argued that there was no triable issue of gross negligence.  App. D-74: Brief of Tidewater Inc. *et al.*, 2002 WL 32180621, at *10-11.  Tidewater did not argue that the contract should be construed as providing indemnity for gross negligence even though silent on the issue. The Fifth Circuit reversed the judgment and sent the case back to the trial court for further proceedings, including a determination of whether any party had been grossly negligent.  App. D-75: *Becker v. Tidewater Inc.*, 335 F.3d 376, 394 n.11 (5th Cir. 2003).  Further proceedings and a second appeal and remand followed: App. D-76: *Becker v. Tidewater Inc.*, 405 F.3d 257 (5th Cir. 2005).  Finally, after retrial, the district court found the parties 55% and 45% at fault, found that Tidewater was not grossly negligent, and therefore ordered Baker Hughes to indemnify Tidewater.  App. D-44: *Becker v. Tidewater Inc.*, 2007 WL 3231655 at *11 (W.D. La. Nov. 17, 2007).  The case then went up to the Fifth Circuit a third time.  As Baker Hughes's attorneys argued in their brief: "In *Becker I*, this Court expressly required determination of the defendants' potential gross negligence at the retrial of this matter. This issue arose during the first appeal with regard to Baker Hughes's argument that *because gross negligence was not expressly included within the scope of the Charter's indemnity provision*, Baker Hughes could not be required to indemnify Tidewater for Tidewater's own gross negligence."  App. D-77: Brief of Baker Hughes *et al.*, 2008 WL 7295642, at 29 (emphasis added).  Baker Hughes's counsel referred to "the well-settled rule that indemnity for gross negligence will not be enforced *unless it is expressly set forth in the indemnity agreement* at issue."  App. D-77: *Id.* at 29 n.96 (emphasis added). Baker Hughes argued that the reason Tidewater could not obtain indemnity was because there was no express indemnity for gross negligence: "*[A]s gross negligence was not expressly included* in the Charter's indemnity language, public policy dictates Tidewater cannot be indemnified for its gross negligence in causing Plaintiffs injuries."  App. D-77: *Id.* at 14 (emphasis added).  In its brief, Tidewater argued that the district court's finding of no gross negligence should be affirmed.  Once again, neither party argued that the contract would or would not be enforceable as a matter of public policy if the contract had expressly provided for indemnity for gross negligence.  The only reason there was an issue was because there was no express provision in the contract.

[k] On the third appeal, the Fifth Circuit affirmed the finding that Tidewater was not guilty of gross negligence and that it was therefore entitled to indemnity.  The court began its discussion of the issue by commenting: "It is undisputed that Baker Hughes escapes indemnity if Tidewater's actions leading to Seth's injuries were grossly negligent."  App. D-6: *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009).  This was not a holding that, even if the contract had expressly provided indemnity for gross negligence, it would have been unenforceable as a matter of public policy.  That issue had not been argued or briefed by either side and was not before the court because the contract in *Becker,* unlike the BP–Transocean contract, did not expressly provide for indemnity for gross negligence.

35

## C.    BP refuses to honor its promise to indemnify Transocean for civil fines and penalties.

BP's cross-complaint in the United States' action seeks contribution only with respect to BP's OPA obligations (removal costs and damages).[113]   Transocean has cross claimed for indemnity in the Limitation Act proceeding and in the action brought by the United States.   The pleadings therefore put at issue the full scope of BP's duty to defend and indemnify Transocean, including its obligation to defend and indemnify Transocean on the claims brought by the United States for per-barrel civil penalties under Section 1321(b)(7) and civil fines that may subsequently be asserted.

Indemnification for civil penalties is allowable because the Supreme Court has held that civil penalties under the CWA are primarily "remedial" in nature and are "analogous to traditional civil damages."[114]

That public policy is not violated by allowing contractual indemnity of civil penalties finds further support in CWA Section 1321(h), which provides in relevant part: "The liabilities established by [Section 1321] shall in no way affect any rights which . . . the owner or operator of a vessel . . . may have against any third party whose acts may in any way have caused or contributed to such discharge . . . ."   These "rights" are clearly contribution and indemnity.

Under controlling precedent, Section 1321(h) allows a claim for equitable indemnity with respect to CWA civil penalties.[1]   *Montauk*'s holding is relevant to contractual indemnity.   If

---

[1] App. D-16: *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111, 113-14 (2d Cir. 1995).   The Department of Justice has cited with approval *Montauk*'s holding that indemnifiable liabilities include civil penalties.   App. D-79: 22 U.S. Opinions Office of Legal Counsel 141, 1998 WL 1180050, at *15 (July 22, 1998).   App. D-80: *Tug Ocean Prince, Inc. v. United States*, 436 F. Supp. 907 (S.D.N.Y. 1977), reached a contrary result, but its reasoning was rejected by the Second Circuit in *Montauk* so it is no longer good law.   In *United States v. Tex-Tow, Inc.*, decided before *Montauk*, the Seventh Circuit noted the equitable indemnification issue that would ultimately be faced in the case and said in *dicta* that the *Tug Ocean Prince* district court decision seemed consistent with the purposes of the CWA, but expressly avoided making any holding on the issue: "We do not, however, here

courts will allow a party who has been held liable for civil penalties to seek *equitable* indemnity for those civil penalties, it clearly mandates that there can be no public policy prohibition against *express* contractual indemnity for those same civil penalties.  In both instances, the party subject to civil penalties is seeking to transfer the cost of those penalties to another party.  In the case of equitable indemnity, the cost is transferred after the fact to a party whose fault contributed to the discharge.  In the case of an express contractual indemnity, the costs are transferred beforehand to a party who contractually agreed to provide that indemnity as part of an arms-length transaction.

Congress made the statutory basis for equitable indemnity under the CWA, 33 U.S.C. § 1321(h), inapplicable to an OPA-covered incident.  Subsections (f), (g), (h), and (i)—the spill response subsections—were not repealed, but do not apply "with respect to any incident for which liability is established under section 1002 of this Act."[115]  But this does not in any way undermine Transocean's claim for express contractual indemnity.  While Congress has made subsection (h) inapplicable to OPA-covered incidents, it has essentially replaced "equitable indemnity" with a right of contribution under OPA Section 2709.  More importantly, Transocean is not relying on a *statutory* preservation of the right to "equitable" indemnity or contribution.  It has an *express contractual right* of indemnity.

CWA Section 1321(h) recognizes a right of equitable indemnity in the absence of any contractual relationship.  OPA Section 2709 recognizes a right of contribution in the absence of any contractual relationship.  Here is an example of a situation where equitable indemnity or contribution would apply.  Vessel A collides with vessel B, causing a spill from vessel A (for

---

decide the question of ultimate liability."  App. D-81: *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1315 (7th Cir. 1978).  Therefore, *Montauk* is the controlling precedent on the public policy issue.

which the owner/operator of vessel A is responsible).  Can vessel A seek reimbursement of cleanup expenses, civil fines and damages from vessel B if the collision was caused by vessel B?  In this hypothetical situation, an equitable right of indemnity is preserved under the CWA and a right of contribution is preserved under OPA.  In the present case, no statutorily authorized right of equitable indemnity or contribution is necessary because Transocean has an express contractual indemnity from BP.  The law of contracts provides Transocean's right and the remedy.

Cases considering whether equitable indemnity for civil penalties under Section 1321(h) is allowable as a matter of public policy are relevant on the issue of whether there is a public policy against indemnity.  If there is no public policy against *equitable* indemnity for civil fines, as *Montauk* establishes, there can be no public policy against an ***express contractual*** indemnity for the same civil fines.

OPA Section 2710 provides additional statutory support for Transocean's claim for express contractual indemnity of civil penalties.  Section 2710(a) does not prohibit any form of contractual indemnity, under OPA or any other law.  It does not say that contractual indemnity is allowable for liability only under OPA, and not for liability under any other federal law.  Its plain language, and its obvious intent, is that nothing in "this Act" should be considered as prohibiting any indemnity agreement for any liability "this Act" creates.  This plainly includes liability for civil penalties.  The liability for civil penalties which OPA enacted into law in Title IV is a liability "under this Act."  The Act contains nine titles.  Title I created the new oil spill liability regime for responsible parties.  Title IV, among other things, imposed liability for per-barrel civil penalties.  This Court has recently noted that "the Senate Report provides that the Act 'builds upon section 311 of the Clean Water Act to create a ***single Federal law*** providing cleanup

38

authority, **penalties**, and liability for oil pollution.'"[116]   When Section 2710 speaks of liability under "this Act" it is thus speaking of this "single Federal law" including the per-barrel civil penalty provisions which OPA added to 33 U.S.C. § 1321(b)(7).[m]

Moreover, other courts have allowed indemnity for civil penalties assessed under other environmental statutes.[n]   Indemnity for civil fines is also standard practice in maritime coverage.

---

[m] Significantly, Section 2710(a) does not say that nothing in the Act prohibits indemnity for "any liability under **this Title**"—*i.e.*, liability of responsible parties for response costs and damages imposed by Title I of OPA.   It refers to "any liability under **this Act**."   This was clearly a purposeful distinction.   In some sections OPA refers to "this title," in others it refers to "this Act."   It was the OPA law which created and imposed the new per barrel civil penalties.

[n] App. D-83: *USG Corp. v. Brown*, 1997 WL 89229, at *8 (N.D. Ill. Feb. 25, 1997) (indemnity allowed for civil penalty assessed under Resource Conservation and Recovery Act); App. D-84: *United States v. Gen. Dynamics Corp.*, 755 F. Supp. 720, 724 (N.D. Tex. 1991) (indemnity claim allowed for civil penalties assessed under a Texas state environmental air quality law implementing the Clean Air Act); App. D-85: *United States v. Thorson*, 300 F. Supp. 2d 828, 833 (W.D. Wis. 2003) (indemnity could be allowed for civil penalties under section 1319(d) of CWA, but insurance contract's express exclusion for "punitive" damages interpreted as excluding indemnity for civil fines and penalties); App. D-86: *Scholastic Inc. v. M/V Kitano*, 362 F. Supp. 2d 449, 457 (S.D.N.Y. 2005) (although exact type of civil penalties not clear from opinion, court upholds contractual indemnity for all "losses, damages, liabilities, civil penalties and expenses"); *see also* App. D-87: *United States v. City of Twin Falls, Idaho*, 806 F.2d 862, 867 (9th Cir. 1986), *cert. denied*, 482 U.S. 914 (1987), *overruled on another ground by Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987) (holding that district court had ancillary jurisdiction over third-party claim of city against sewage treatment plant contractor for indemnity for civil penalties arising from discharge of pollutants from plant in violation of federal water pollution standards and pollution discharge permit).   There is a line of cases under the Clean Air Act (CAA) which refused to imply a cause of action for equitable indemnification under that Act.   Transocean submits that those cases are not on point first because the statutes are different.   The CAA does not have a provision similar to Section 1321(h) of the CWA which undisputedly allowed a claim for equitable indemnification for response costs and damages.   The issue in the CWA cases such as *Montauk* was whether Section 1321(h) applied not only to equitable indemnity for response costs and damages, but also to equitable indemnity for civil penalties.   In the CAA cases, in contrast, the issue was whether the courts should **create** any right of equitable indemnity where the statute provided none.   *See, e.g.*, App. D-88: *Beerman Realty Co. v. Alloyd Asbestos Abatement Co.*, 653 N.E.2d 1218, 1220 (Ohio Ct. App. 1995) ("The statutes neither grant a right of indemnification nor prohibit it.").   Moreover, the CAA cases recognize that **express contractual indemnity** is allowable.   In *United States v. J & D Enterprises of Duluth*, after reviewing the Minnesota state law cases that would not support recognizing a claim for implied equitable indemnity of civil penalties, the court noted:

> Also supportive of our conclusion, that Minnesota law provides J & D with no substantive basis for an indemnity claim against St. Paul, is the absence of any operative provision for contractual indemnity for J & D's own wrongdoing. . . . [I]f a party is to seek indemnification for its own negligence, there must be an express provision in the contract to indemnify the indemnitee for liability occasioned by its own negligence; such an obligation will not be found by implication.

App. D-89: *United States v. J & D Enterprises of Duluth*, 955 F. Supp. 1153, 1160 (D. Minn. 1997) (internal quotes and citations omitted).   In our situation, of course, the express contract not only provides for reciprocal indemnities for negligence, but also expressly provides for indemnity for "fines" and "penalties."

Most maritime environmental liability coverage is provided through protection and indemnity (P&I) clubs.[117]  Indemnity for fines is also routinely provided in maritime cases in which a ship is seized on account of potential liability for a fine, and release of the ship is obtained through the posting of an indemnity bond.[118]  Indeed, the CWA itself allows for the posting of a bond or other surety to allow departure of a vessel that owes or may owe a civil penalty.  33 U.S.C.1321(b)(12).  Any holding that fines are not subject to indemnity would jeopardize this essential maritime practice.

## **CONCLUSION**

Major international corporations, like private citizens, must honor their promises.  If BP, a major oil company with legions of attorneys is allowed to simply ignore contracts which have been in existence for decades, what does this say about our legal system?  What does this bode for the thousands of contractors working throughout the Gulf Coast?

How is safety enhanced if BP, the operator which designs the well, chooses all the contractors, and controls the flow and analysis of well information and, thus, controls the risks, is allowed to walk away from contractually agreed allocation of those risks?  What does this bode for the safety of thousands of workers throughout the Gulf Coast?

Transocean respectfully requests that the Court require BP to honor its contractual promises.  Transocean requests that its motion for partial summary judgment be granted, specifically that:

- The express indemnity promises made by BP in the Drilling Contract override any alleged rights of BP to contribution;

- The indemnity provisions agreed to by BP in the Drilling Contract are valid and enforceable against the OPA statutory backdrop, including indemnity for the uncapped liability that arises upon a finding that an incident resulted from gross negligence;

- BP's contribution claims are barred by BP's contractual promise to defend Transocean, and BP must defend Transocean against environmental wellhead pollution claims pending against it that arise from the Macondo blowout;

40

- BP cannot avoid its contractual promise by alleging that Transocean breached the Drilling Contract or that the *Deepwater Horizon* was unseaworthy;

- BP cannot avoid its contractual promise by alleging that Transocean or its employees were grossly negligent;

- BP is required to honor its promise to indemnify Transocean for CWA (and any other) civil penalties arising from pollution or contamination;

- BP is required to honor its promise to pay the unpaid invoices referenced herein;

- As a result of BP's failure to honor its promises in each of the above areas, BP be required to reimburse Transocean its attorneys' fees, costs, and expenses incurred in defending environmental claims for which BP is contractually obligated and those incurred in forcing BP to honor its contractual promises;

- And all other relief that the Court deems just and appropriate.


Respectfully submitted,

By:     /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,

By:     /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By:     /s/ Brad D. Brian.
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com,
allen.katz@mto.com

-and-

By:   /s/ Edwin G. Preis, Jr.

Edwin G. Preis, Jr. (Louisiana, No. 1070)
Richard J. Hymel (Louisiana, No. 20230)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

***Counsel for Transocean***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 1st day of November, 2011.

/s/  Kerry J. Miller

[1] App. A-1: App at a Glance | About BP, http://www.bp.com/sectiongenericarticle.do?categoryId=3&contentId=2006926 (last visited Oct. 9, 2011); App. A-2: BP Global – About BP – Who We Are, http://www.bp.com/subsection.do?categoryId=4&contentId=2006741 (last visited Oct. 9, 2011).

[2] Although the Drilling Contract is designated as confidential a copy is publicly available in conjunction with Transocean's 10-Q filing last August. App. A-3: Drilling Contract, BP-HZN-MBI00021460–999, Article 25.1, at BP-HZN-MBI00021489 (italics and underlining added), *available at* http://www.sec.gov/Archives/edgar/data/1451505/00014515051000000069/exhibit10_1.pdf.

[3] App. A-3: *Id.*, Article 24.2, at BP-HZN-MBI00021488–89 (italics and underlining added).

[4] *Compare* App. A-3: *Id.*, Article 22.3, at BP-HZN-MBI00021486 (excepting from BP's indemnity obligation damage to in-hole equipment if it results solely from contractor's gross negligence); *with id.,* Article 24.1, at BP-HZN-MBI00021488 (limiting contractor indemnity exposure to $15 million per incident for pollution arising from drilling unit while off location or underway); *with id.*, Article 25.1, at BP-HZN-MBI00021489 (defining scope of indemnity obligations to survive gross negligence unless otherwise "specifically limited to certain clauses elsewhere in this contract").

[5] App. A-3: *Id.*, Article 21.1, at BP-HZN-MBI00021485.

[6] App. A-3: *Id.*, Article 24.1, at BP-HZN-MBI00021488.

[7] App. A-3: *Id.*, Article 22.1, at BP-HZN-MBI00021485–86.

[8] The letter contains confidential information. Accordingly, a copy is attached hereto but not filed publicly. App. A-6: Letter Dated May 10, 2010, from Keith McDole (counsel for Transocean) to Richard Godfrey (counsel for BP).

[9] The letter contains confidential information. Accordingly, a copy is attached hereto but not filed publicly. App. A-7: Letter Dated June 25, 2010, from Richard Godfrey (counsel for BP) to Keith McDole (counsel for Transocean).

[10] Anadarko designated this letter as confidential. Accordingly, a copy is attached hereto, but not provided publicly. App. A-8: Letter Dated July 9, 2010, from Kirk Wardlaw (BP) to Jim Bryan and Robert Reeves (Anadarko), APC-SHS1-007–008.

[11] App. A-8: *Id.* at APC-SHS1-008.

[12] Though BP designated the contract as confidential, it is publicly available. App. A-15: Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and Halliburton Energy Services, Inc., BPM-09-00255, BP-HZN-2179MDL00055567–6112, Article 19.7, at BP-HZN-2179MDL00055594–95, *available at* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NDAxMzU3fENoaWxkSUQ9NDA4NzQ3fFR5cGU9MQ==&t=1 (last visited Oct. 24, 2011).

[13] BP designated this contract as confidential. Accordingly, a copy is attached hereto, but not provided publicly. App. A-17: Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and M-I L.L.C., BPM-09-00209, BP-HZN-2179MDL02883043–198, Section 2, Article 19.7, at BP-HZN-2179MDL02883072–73.

[14] BP designated this contract as confidential. Accordingly, a copy is attached hereto, but not provided publicly. App. A-18: Contract for Gulf of Mexico Strategic Performance Unit Offshore Well Services between BP Exploration and Production, Inc. and Schlumberger Technology Corporation, BPM-09-00247, BP-HZN-2179MDL02882284–2768, Section 2, Article 19.7, at BP-HZN-2179MDL02883212–13.

[15] This contract is confidential. Accordingly, a copy is attached hereto, but not provided publicly. App. A-19: Contract for Well Services between BP America Production Company and Weatherford International, Inc., BPM-04-00186, Gulf of Mexico Offshore Operations, WFT-MDL-00000930–1160, Section 2, Article 19.7, at WFT-MDL-00000957.

[16] BP designated this contract as confidential. Accordingly, a copy is attached hereto, but not provided publicly. App. A-20: BP-███████████ Offshore Daywork Contract, BP-HZN-2179MDL02846809–48, Article 1012(c), at BP-HZN-2179MDL02846828.

[17] BP designated these contracts as confidential. Accordingly, copies are attached hereto, but not provided publicly. *See* App. A-21: Drilling Contract between BP Exploration & Production Inc. and ███████████ for Provision and Operation of a Mobile Offshore Drilling Unit, Contract No. BPM-08-00186, BP-HZN-2179MDL03289015–402, Section 2, Article 16.8, at BP-HZN-2179MDL03289050–51; App. A-22: Drilling Contract between BP Exploration & Production Inc. and ███████████ for Provision and Operation of a Mobile Offshore Drilling Unit, Contract No. BPM-08-00892, BP-HZN-2179MDL03288575–9014, Section 2, Article 16.8, at BP-HZN-2179MDL03288611.

[18] The letter previously cited contains confidential information and, accordingly, is attached hereto but not publicly filed. Because of confidentiality provisions in the contracts themselves, and as a result of BP designating contracts with other subcontractors as "confidential," the contracts are not publicly filed though copies are attached hereto. *See* App. A-7: Letter Dated June 25, 2010, from Richard Godfrey (counsel for BP) to Keith McDole (counsel for Transocean); App. A-11: BP American Production Company Offshore Drilling / Workover / Completion Contract (with Transocean for the *Discoverer Enterprise*), Article 12.8; App. A-20: BP-█████████ Offshore Daywork Contract, BP-HZN-2179MDL02846809–48, Article 1012(c), at BP-HZN-2179MDL02846828; and App. A-23: Drilling Rig Operation and Maintenance Services Contract between BP America Production Company and ████████ Gulf of Mexico Deepwater Projects ████████ Contract No. BPA-02-06141, BP-HZN-2179MDL03241488–554, Article 14.01.05, at BP-HZN-MCL03241508 and Amendment 14, BP-HZN-2179MDL03241611–15, at BP-HZN-2179MDL03241612.

[19] As a result of BP's decision to designate the settlement agreements as highly confidential, the agreements cannot be publicly disclosed. App. A-24: Settlement Agreement Between BP and MOEX, BP-HZN-2179MDL03198916–35, Articles 5.1 and 5.2(a)(vi), at BP-HZN-2179MDL03198922–23; App. A-25: Settlement Agreement Between BP and Weatherford, BP-HZN-2179MDL03241693–714, Articles 5.4(d) and 5.8, at BP-HZN-2179MDL03241700 and BP-HZN-2179MDL03241704; App. A-46: Settlement Agreement Between BP and Anadarko, BP-HZN-2179MDL04585671–5703, Articles 5.1(a) and 5.3(a)(iv), at BP-HZN-2179MDL04585678 and BP-HZN-2179MDL04585679–80.

[20] App. A-26: International Association of Drilling Contractors (IADC) Offshore Daywork Drilling Contract – U.S. (Revised April 2003) – Article 911(a).

[21] App. A-27: American Association of Professional Landmen (AAPL) Model Form of Offshore Deepwater Operating Agreement, AAPL-810 (2007), Article 22.5 *available at* http://www.ocsadvisoryboard.org/documents/AAPL%20DWOA%20ModelForm2007%20FINAL.doc (last visited Oct. 9, 2011).

[22] App. A-28: OCS Advisory Board – Members, http://www.ocsadvisoryboard.org/index-1.html (last visited Oct. 7, 2011).

[23] Although the JOA is designated as confidential, it is publicly available in connection with SEC filings. Accordingly, a copy is attached hereto and provided publicly. App. A-29: Ratification and Joinder of Operating Agreement Macondo Prospect ("JOA"), ANA-MDL-000030610–APC-HEC1-000001840, Article 22.5, at APC-HEC1-000001741, *available at* http://secfilings.nyse.com/filing.php?doc=1&attach=ON&ipage=7018483&rid=23 (last visited Oct. 21, 2011).

[24] BP has designated the contracts with its other contractors at Macondo as confidential; therefore, they cannot be publicly filed. App. A-30: Master Service Contract between BP America Production Company and ████████ Contract No. BPM-07-01217, BP-HZN-2179MDL03015557–606, Article 14.01.01, at BP-HZN-2179MDL03015566; App. A-31: Master Consulting Services Contract between BP America Production Company and ████████ Contract No. BPM-09-01304, BP-HZN-2179MDL03292008–45, Article 14.01.01, at BP-HZN-2179MDL03292018; App. A-32: Master Service Contract between BP America Production Company and ████████ Contract No. BPM-10-04020, BP-HZN-2179MDL03291954–2005, Article 14.01.01, at BP-HZN-2179MDL03291964.

[25] *See, e.g.*, App. A-33: Oil Spill Commission, Chief Counsel's Report, Executive Summary, http://www.oilspillcommission.gov/sites/default/files/documents/C21462-404_CCR_Executive_Summary.pdf (last visited Oct. 11, 2011); App. B-32: Dep. Doug Suttles (BP, former Chief Operating Officer of Exploration and Production), 46:7-105:22 (May 19-20, 2011); App. B-110: Dep. Greg Walz (BP, Drilling Engineer Team Leader) 224:23-225:10 (Apr. 21-22, 2011)

[26] App. A-34: Christopher Helman, *In His Own Words*, FORBES (May 18, 2010), *available at* http://www.forbes.com/2010/05/18/oil-tony-hayward-business-energy-hayward_print.html (last visited Oct. 9, 2011).

[27] App. B-15: Dep. Anthony Hayward (BP, former Chief Executive Officer), 551:12-559:12 (June 6 and 8, 2011).

[28] *See, e.g.*, App. A-35: Letter Dated May 10, 2010 from Benjamin D. Wilcox (Executive Vice President and Director Marine and Energy, Alliant) to the Honorable Robert Menendez (U.S. Senator), *available at* http://www.epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=10957910-fdf4-4673-8463-468d131035c5 (last visited Oct. 13, 2011).

[29] App. A-36: Letter Dated May 12, 2010, from Paul King (Director, INDECS) to the Honorable Robert Menendez (U.S. Senator), *available at*

http://epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c15e510c-4edb-44e5-b6aa-3cfebf371323 (last visited Oct. 13, 2011).

[30]   App. A-37: Letter Dated May 11, 2010, from John Lloyd (Chairman and CEO, Lloyd & Partners) to the Honorable Robert Menendez (U.S. Senator).

[31]   App. D-1: Brief of Appellees BP *et al.* in *Fina, Inc. v. ARCO*, 200 F.3d 266 (5th Cir. 2000), 1999 WL 33621574, at *33-34 (quoting *Mid-Continent Supply Co. v. Conway*, 240 S.W.2d 796, 804 (Tex. Civ. App.—Texarkana 1951, *writ ref'd n.r.e.*), quoting *Mo. K. & T. Ry. v. Carter*, 68 S.W. 159, 164 (Tex. 1902)) (emphasis added). *See* App. D-2: *Fidelity & Deposit Co. of Md. v. Conner*, 973 F.2d 1236, 1241 (5th Cir. 1992) (public policy is "narrow exception" to general rule of liberty of contract, "an exception to be applied cautiously and only in plain cases involving dominant public interests").

[32]   App. B-15: Dep. Anthony Hayward (BP, former Chief Executive Officer), 565:25-566:24. (June 6 and 8, 2011).

[33]   App. B-15: *Id.* at 566:15-24; *see also* App. B-36: Dep. O. Kirk Wardlaw (BP, former Chief Land Negotiator, Gulf of Mexico) 191:10-192:3 (June 9-10, 2011).

[34]   App. B-15: Dep. Anthony Hayward (BP, former Chief Executive Officer), 568:16-569:11 (June 6 and 8, 2011).

[35]   App. A-38: Letter Dated October 3, 2011, from Christopher J. Esbrook (BP counsel) to Daniel Goforth (Transocean counsel).

[36]   App. B-15: Dep. Anthony Hayward (BP, former Chief Executive Officer), 566:15-24 (June 6 and 8, 2011); App. B-36: Dep. O. Kirk Wardlaw (BP, former Chief Land Negotiator, Gulf of Mexico), 191:10-192:3 (June 9-10, 2011); *see also* App. B-111: Dep. Skip Clark (Halliburton / Sperry Sun, former Senior Account Representative) 243:16-244:3; 249:5-10 (July 29, 2011).

[37]   App. D-3: FED. R. CIV. P. 56(a).

[38]   App. D-4: *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994); and *Hopper v. Frank*, 16 F.3d 92 (5th Cir.1994) (internal citations and quotes to omitted)).

[39]   App. D-4: *Id.* at 1076 (emphasis added) (quoting *Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir. 1993)).

[40]   App. D-5: *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 486 (5th Cir. 1983); *see* App. D-6: *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009) ("The interpretation of a contractual indemnity provision is a question of law . . . A maritime contract containing an indemnity agreement . . . should be read as a whole and its words given their plain meaning unless the provision is ambiguous.") (internal quotations and citations omitted)).

[41]   App. D-7: Pretrial Order No. 41 (Case Management Order No. 3), Dkt. No. 4083.

[42]   App. A-39: Transocean Fleet Update Report (July 13, 2011), http://www.deepwater.com/fw/main/Fleet-Status-Report-58.html (last visited Oct. 7, 2011).

[43]   Attached hereto in Appendix C are a compilation of documents illustrating the staunch condition of the rig and competency of its crew.  Because BP has designated these documents as confidential, they are attached hereto, but not disclosed publicly.   App. C-1: Annual Individual Performance Assessment of Brett Cocales, BP-HZN-2179MDL00470609-0613; App. C-2: Email from Angel Rodriguez to John Guide, Brett Cocales, et al., RE: Deepwater Horizon's Rig Audit close out report status, Mar. 30, 2010, BP-HZN-2179MDL00006057; App. C-3: Email from Angel Rodriguez to Paul Johnson, John Guide and Brett Cocales, RE: Audits Reviewed and Updated, Feb. 22, 2010, BP-HZN-2179MDL0002012-2013; App. C-4: Email thread among Keith Daigle, Maniram Sankar and George Gray, RE: Marianas WSL, May 28, 2008, BP-HZN-2179MDL02486517-6519; App. C-5: Email from Tim Burns to Rory Mcneil, James Reed, Murry Sepulvado, Ronald Sepulvado, Deepwater Horizon Foreman, et al., RE: Tiber Performance, June 19, 2009, BP-HZN-2179MDL01309142; App. C-6: Horizon Rig Contract Extension, approved Apr. 6, 2004, BP-HZN-2179MDL02378626-8627; App. C-7: Email thread among Andy Inglis, David Eyton and Bob Smith, RE: GoM Rig Papers, Mar. 20, 2005, BP-HZN-2179MDL02368314-8315; App. C-8: GoM: Deepwater Horizon Drilling Rig Commitment, dated Mar. 25, 2005, BP-HZN-2179MDL023483-3846; App. C-9: Email thread among Harry Thierens, Jay Thorseth, David Sims, Ian Little and David Rainey, RE: Good work, Nov. 1, 2007, BP-HZN-MBI00040725; App. C-10: Allegations, BP-HZN-2179MDL03085148-5155; App. C-11: Email thread between David Sims and Ian Little, RE: Update on TO Performance, July 17, 2007, BP-HZN-MBI00037507-7508; App. C-12: Email thread among Callan Brown, Michael Odom and Jay Williamson, RE: Deepwater Horizon Investigation, HCG161-041962.

[44]   App. B-2: Dep. Mark Bly (BP, Executive Vice President of Safety and Operations / Team Leader, BP Internal Investigation), 660:15-661:18 (Feb. 17-18, 2011).

[45]   App. B-2: *Id.* at 661:6-8.

[46] App. B-6: Dep. Gillian Cowlam (BP, Engineering Manger for Sangachal Terminal / Member, BP Internal Investigation), 109:1-19 (June 7, 2011).

[47] App. B-27: Dep. Ronald Sepulvado (BP, former Well Site Leader), 476:8-15 (Mar. 10-11, 2011).

[48] App. B-27: Id. at 468:14-476:7; App. B-26: Dep. Murry Sepulvado (BP, former Well Site Leader), 530:11-535:9 (May 11-12, 2011); App. B-14: Dep. John Guide (BP, Drilling Engineer Team Leader, Angola / former Wells Team Leader), 485:23-490:6 (May 9-10, 2011).

[49] App. B-27: Dep. Ronald Sepulvado (BP, former Well Site Leader), 468:14-476:23; App. B-26: Dep. Murry Sepulvado (BP, former Well Site Leader), 530:11-536:11; App. B-14: Dep. John Guide (BP, Drilling Engineer Team Leader, Angola / former Wells Team Leader), 485:23-490:15.

[50] App. B-27: Dep. Ronald Sepulvado (BP, former Well Site Leader), 465:10-14; 468:4-13.

[51] App. B-27: Id. at 468:14-476:15.

[52] App. B-14: Dep. John Guide (BP, Drilling Engineer Team Leader, Angola / former Wells Team Leader), 197:10-17; 482:14-491:19 (May 9-10, 2011).

[53] App. B-5: Dep. Brett Cocales (BP, Operations Engineer), 461:25-462:11; 485:5-486:8; and 487:10-488:19 (Apr. 25-26, 2011).

[54] App. B-25: Dep. Angel Rodriguez (BP, Marine Advisor), 134:2-23; 135:23-149:2; 153:6-11; and 193:4-9 (July 29, 2011).

[55] App. B-25: Id. at 170:12-171:8; 179:4-13; and 193:4-9.

[56] App. A-3: Drilling Contract, BP-HZN-MBI00021460–999, Article 18.2, at BP-HZN-MBI00021482–83.

[57] See, e.g., App. B-13: Dep. Cheryl Grounds (BP, Chief Engineer of Process and Process Safety), 350:5-22 (May 4, 2011); App. B-20: Dep. Ian Little (BP, Vice President of Wells, North Africa / former Wells Manager for Exploration and Appraisal Drilling, Gulf of Mexico), 383:17-384:8 (June 9-10, 2011); App. B-29: Dep. David Sims (BP, Operations Manager, Gulf of Mexico Deepwater), 477:18-478:22 (Apr. 6-7, 2011) (unaware of any performance concerns with Transocean and describing the crew as skilled, knowledgeable, and trustworthy); App. B-30: Dep. Cynthia Skelton (Vice President of Safety and Operational Risk, Gulf of Mexico / former Vice President of Health, Safety, Security and Environment and Engineering, Gulf of Mexico), 513:14-514:6 (May 25-26, 2011); App. B-31: Dep. Jonathan Sprague (BP, Vice President of Organizational Capability for the Global Wells Organization / former Vice President of Health, Safety, Security and Environment and Engineering, Gulf of Mexico), 511:8-512:19 (Mar. 21-22, 2011) (never advised of problems or informed that the rig was operating in an unsafe manner or the crew was incompetent); App. B-32: Dep. Doug Suttles (BP, former Chief Operating Officer of Exploration and Production), 753:16-754:4 (May 19-20, 2011); App. B-33: Dep. Henry Thierens (BP, former Vice President of Drilling and Completions Operations), 425:1-426:17 (June 9-10, 2011); App. B-37: Dep. Norman Wong (BP, Manager of Rig Audit Group), 312:6-313:7 (June 13-14, 2011); App. B-21: Dep. John Mogford (BP, former Executive Vice President of Safety Operations), 255:23-258:22 (June 28-29, 2011); App. B-22: Dep. Patrick O'Bryan (BP, Vice President of Wells, BP America / former Vice President Drilling & Completions and Interventions, Gulf of Mexico Deepwater), 22:17-23:22; 480:14-481:7; 482:25-483:6 (July 14-15, 2011) (Deepwater Horizon was the best-performing rig in BP's fleet, both from a drilling performance standpoint and a safety standpoint); App. B-16: Dep. Curtis Jackson (BP, former Director of Health, Safety, Security and Environment, Gulf of Mexico), 175:5-24 (July 21, 2011); App. B-11: Dep. James Dupree (BP, Senior Vice President for the Gulf of Mexico), 389:15-390:6; 393:22-394:2 (June 16-17, 2011) (believed the crew was "quite professional and did a good job"); App. B-1: Dep. John Baxter (BP, Group Head of Engineering and Safety), 43:6-15 (June 21-22, 2011) (unaware of any evidence that would support BP's allegations that Transocean acted with indifference or willful disregard for the safety of others or the environment); App. B-35: Dep. David Wall (BP, Vice President of Risk, Learning, Health and Safety / former Vice President of Health, Safety, Security and Environment and Integrity Management for Upstream), 119:23-120:14 (June 27-28, 2011) (spoke highly of the crew and noted that they died trying to fight and shut in the well); App. B-34: Dep. Jay Thorseth (Vice President of Exploration and Appraisal, Angola / former Exploration Manager, Gulf of Mexico Deepwater), 303:21-304:16 (Sept. 20, 2011); App. B-9: Dep. Michael Daly (BP, Executive Vice President of Exploration), 9:5-18 (Sept. 21-22, 2011); App. B-4: Dep. Sir William Castell (BP, Senior Independent Director / Chairman of the Safety, Ethics and Environment Assurance Committee), 287:16-21 (June 22-23, 2011); App. B-15: Dep. Anthony Hayward (BP, former Chief Executive Officer), 541:2-18 (June 6 and 8, 2011); and App. B-38: Dep. Barbara Lowery-Yilmaz (BP, former Technical Vice President of Drilling and Completions) 412:20-413:9 (July 26, 2011).

[58] App. B-22: Dep. Patrick O'Bryan (BP, Vice President of Wells, BP America / former Vice President Drilling & Completions and Interventions for Gulf of Mexico Deepwater) 22:17-23:15; 482:25-483:25; and 484:20-25 (July 14-15, 2011).

46

[59] App. B-15: Dep. Anthony Hayward (BP, former Chief Executive Officer), 541:2-15 (June 6 and 8, 2011).

[60] App. B-15: Id. at 539:10-14; 540:3-8.

[61] App. B-15: Id. at 542:5-16.

[62] App. B-15: Id. at 545:20-546:2; 569:20-570:17.

[63] App. B-4: Dep. Sir William Castell (BP, Senior Independent Director / Chairman of the Safety, Ethics and Environment Assurance Committee) 285:10-286:25; 287:16-21 (June 22-23, 2011).

[64] App. B-32: Dep. Doug Suttles (BP, former Chief Operating Officer, Exploration & Production), 753:5-754:18; 759:9-19; 795:4-14 (May 19-20, 2011).

[65] App. B-29: Dep. David Sims (BP, Operations Manager, Gulf of Mexico Deepwater) 382:24-384:5 (Apr. 6-7, 2011); App. B-22: Dep. Patrick O'Bryan (BP, Vice President of Wells, BP America / former Vice President Drilling & Completions and Interventions, Gulf of Mexico Deepwater), 17:1-11, 22:17-23:22 (July 14-15, 2011).

[66] See App. B-39: Dep. Paul Anderson (Halliburton, Service Supervisor III, Gulf of Mexico), 452:24-453:15 (Apr. 27-28, 2011); App. B-42: Dep. Kelly Gray (Halliburton, Senior SDL Field Specialist / INSITE Specialist), 532:22-533:13 (Apr. 14-15, 2011) (describing the crew as skilled and knowledgeable and testifying that he never witnessed any of the Transocean crew perform their jobs negligently); App. B-43: Dep. Joseph Keith (Halliburton, Mud Logger), 306:1-307:15 (Mar. 28, 2011).

[67] App. B-43: Dep. Joseph Keith (Halliburton, Mud Logger), 45:4-7; 307:25-308:2 (Mar. 28, 2011).

[68] App. B-43: Id. at 148:10-22; 186:23-189:15; and 303:15-307:15.

[69] App. B-66: Dep. William LeNormand (Cameron, Senior Field Service Technician), 87:14-90:20; 91:20-92:11; 121:15-122:4; and 126:5-128:14 (June 21-22, 2011).

[70] App. B-59: Dep. Victor Martinez (ModuSpec, Subsea Surveyor), 270:3-12 (Apr. 14-15, 2011).

[71] App. B-61: Dep. Alan Schneider (ModuSpec, Surveyor), 33:11-34:10; 219:25-220:6; 370:22-374:18 (June 23-24, 2011).

[72] App. B-58: Dep. David McKay (Det Norske Veritas, Regional Chief Surveyor for MODUs, North American Region), 100:23-101:22; 124:7-10 (May 11, 2011).

[73] App. B-51: Dep. Eric Neal (MMS / BOEMRE, Production Inspector), 131:7-132:6; 132:20-24 (July 21, 2011).

[74] App. B-52: Dep. Robert Neal (MMS / BOEMRE, Drilling Rig Inspector), 168:19-169:16; 175:20-25; 177:11-178:2; 178:23-180:9; 184:21-25 (July 19, 2011).

[75] App. B-54: Dep. Michael Saucier (MMS / BOEMRE, Deputy Regional Supervisor for Field Operations, New Orleans), 314:20-316:25 (July 27-28, 2011).

[76] App. B-56: Dep. Michael Odom (U.S. Coast Guard, Chief of Inspections Division, Delaware Bay, Philadelphia, PA / former Chief of Prevention, Marine Safety Unit, Port Arthur, TX) 11:22-12:8; 17:13-21; 146:4-147:1; 149:1-12; 150:4-19; 153:5-24; 155:8-17; 156:24-160:4; 160:17-161:21; 162:13-164:6; and 166:19-167:8 (Oct. 11, 2011).

[77] App. C-12: Email thread among Callan Brown, Michael Odom and Jay Williamson, RE: Deepwater Horizon Investigation, HCG161-041962.

[78] App. D-8: Uniform Contribution Among Tortfeasors Act ("UCTA") § 1(f) (1955 Revised Act).

[79] App. D-9: Boykin v. China Steel Corp., 73 F.3d 539, 542 (4th Cir. 1996) ("any changes McDermott may have made to the law of indemnity in admiralty we do not think affect an indemnity obligation . . . imposed . . . by virtue of a written agreement."); App. D-10: Cargill Ferrous Int'l Div., etc. v. M/V Princess Margherita, 2001 WL 1426678, at *1 n. 1 (E.D. La. Nov. 13, 2001) ("Actions for contractual indemnity would not be barred by AmClyde."); App. D-11: Mayer v. Cornell Univ., 1995 WL 94575, at *2 (N.D.N.Y. Feb. 27, 1995) ("Nothing in McDermott compels the conclusion that contractual indemnification is voided by operation of the proportional share approach.").

[80] App. D-12: Order and Reasons, Dkt. 3830, at 21.

[81] App. D-13: 33 U.S.C. § 2704(c)(1). Section 2710 does not expressly state that indemnity agreements are "authorized" or "permitted." Rather, it states that "[n]othing in this Act prohibits" indemnity agreements. Several cases have interpreted the statutory language as "permitting" or "authorizing," rather than simply not prohibiting. App. D-14: In re Petition of Settoon Towing LLC, 722 F. Supp. 2d 710, 714 (E.D. La. 2010) ("OPA permits indemnification agreements between responsible parties ...") (emphasis added); App. D-15: Seaboats, Inc. v. Alex C Corp., 2003 WL 203078, at *10 (D. Mass. Jan. 30, 2003) (referring to "the OPA's endorsement of indemnification agreements at § 2710." (emphasis added). See also App. D-16: Montauk Oil Transp. Corp. v. Tug El Zorro Grande, 54 F.3d 111, 113-14 (2d Cir. 1995) (holding that a similar section of the CWA reading "The liabilities established by this section shall in no way affect any rights..." did not just preserve existing law, but rather meant that the Act was "specifically providing for indemnity"). Section 2710 was modeled on similar language in CERCLA, App. D-17: 42 U.S.C. § 9607(e)(1) (second sentence). Numerous CERCLA cases hold that this language authorizes or

permits indemnity agreements for any liability the law creates, and creates a right to enter into such indemnity agreements. *See, e.g.*, App. D-18: *Joslyn Mfg. Co. v. Koppers Co., 40 F.3d 750, 754 (5th Cir. 1994)* (the statute "specifically recognize[s] the enforceability of indemnification agreements which allocate environmental liability among responsible parties."); App. D-19: *Harley Davidson, Inc. v. Minstar, Inc., 41 F.3d 341, 342-43 (7th Cir. 1994), cert. denied, 514 U.S. 1036 (1995)* (the statute "appears to authorize precisely such agreements."); App. D-20: *United States v. Hardage, 985 F.2d 1427, 1433 (10th Cir. 1993)* ("responsible parties may not altogether transfer their CERCLA liability, [but] they have the right to obtain indemnification for that liability."); App. D-21: *Beazer E., Inc. v. Mead Corp., 34 F.3d 206, 211 (3d Cir. 1994).*

[82] *See* App. D-24: *Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484, tit. VIII § 8102(e)(1990).* (allowing officers and trustees of the TAPS Liability Fund to be indemnified, but providing that there can be no indemnity for either gross negligence or willful misconduct); *see also* App. D-25: *33 U.S.C. § 2716(f)(1)* (excusing a guarantor from direct liability if the responsible party engaged in willful misconduct, but not in the event of gross negligence).

[83] App. D-26: *Russello v. United States, 464 U.S. 16, 23 (1983)* (internal quotations and citations omitted).

[84] App. A-3: *Drilling Contract, BP-HZN-MBI00021460–999, Articles 21.2, 22.3, 22.4, 23.1-23.3, 24.2 and 25.1, at BP-HZN-MBI00021485–89.*

[85] App. D-27: *Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp., 590 F.3d 316, 322 (5th Cir. 2009)* (Missouri law) ("A duty to defend arises if the complaint merely alleges facts that give rise to a claim that could potentially be within the policy's coverage. . . . [T]he duty to defend is broader than an insurance company's duty to indemnify . . . . [A]n insurer may have a duty to defend but not a duty to indemnify."); App. D-28: *Westlake Vinyls, Inc. v. Goodrich Corp., 518 F. Supp. 2d 918, 936 (W.D. Ky. 2007)* (Ohio law) ("A duty to defend is separate and distinct from the duty to indemnify."); App. D-29: *MetroPCS Wireless, Inc. v. Telecomm. Sys., Inc., 2009 WL 3418581, at *5 (D. Md. Oct. 20, 2009)* (New York law); App. D-30: *Sprint Commc'ns Co., L.P. v. W. Innovations, Inc., 640 F. Supp. 2d 1122, 1123 (D. Ariz. 2009)* (Arizona law) ("the duty to defend differs from indemnification, because the duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the party to whom the duty is owed is ultimately found liable. . . . In contrast, indemnification only requires the indemnitor reimburse the indemnitee after the latter's legal obligation is established." (citations and internal quotations omitted)); App. D-31: *English v. BGP Int'l, Inc., 174 S.W.3d 366, 371 n.4, 372 (Tex. App.—Houston [14th Dist.] 2005, rev'd and remanded)* ("courts readily distinguish the *duty to defend* and the *duty to indemnify* and often find the duty to defend even where this is no finding of liability or duty to indemnify." (emphasis in original)); App. D-32: *Gen. Motors Corp. v. Am. Ecology Envtl. Servs. Corp., 2001 WL 1029519, at *4 (N.D. Tex. Aug. 30, 2001)* (Michigan law) ("duty to defend . . . arises from the language in the Agreement."); App. D-33: *Crawford v. Weather Shield Mfg. Inc., 44 Cal. 4th 541, 558 (2008)* ("The duty 'to defend' expressly set forth in . . . [the] contract thus clearly contemplated a duty that arose when such a claim was made, and was not dependant on whether the very litigation to be defended later established [indemnitor's] obligation to pay indemnity."). *Cf.* App. D-34: *Morella v. Bd. of Comm'rs of Port of New Orleans, 888 So.2d 321, 326, 328 (La. App. 4 Cir. 2004).*

[86] App. D-35: *MT Builders, L.L.C. v. Fisher Roofing, Inc., 197 P.3d 758, 764 n.3 (Ariz. Ct. App. 2008)* (quoting Stein and Sato, *Advanced Analysis of Contract Risk-Shifting Provisions: Is Indemnity Still Relevant?*, 27 CONSTRUCTION LAW 5, 9 (Fall 2007)). Transocean is relying on state common law throughout the United States on this issue, as we have been unable to find specific maritime cases on point. As this Court recognizes, the general maritime law is itself "an amalgam of traditional common law rules, modifications of those rules, and newly created rules." App. D-12: *Order and Reasons, Dkt. 3830, at 11.*

[87] App. D-33: *Crawford, 44 Cal. 4th 541, 553-54 (2008).*

[88] App. D-36: *Estate of Bradley* ex rel. *Sample v Royal Surplus Lines Ins. Co., 647 F.3d 524, 529 (5th Cir. 2011)* (Mississippi law); App. D-37: *Sullen v. Mo. Pac. R. Co., 750 F.2d 428, 433 (5th Cir. 1985)* (Louisiana law) ("In determining whether an indemnitor or insurer is obligated to defend an indemnitee or insured under the terms of an indemnity or insurance contract, the Louisiana courts look exclusively to the pleadings in light of the contract provisions; the ultimate outcome of the case has no effect upon the duty to defend."); App. D-32: *Gen. Motors Corp., 2001 WL 1029519, at *7* (Michigan law) ("an insurer's duty to defend an insured is measured by the allegations in a plaintiff's pleadings [ ] The court sees no reason why . . . [this same principle] should not apply in the context of an indemnitor's duty to defend under an indemnity contract."); App. D-28: *Westlake Vinyls, Inc., 518 F. Supp. 2d at 936* (Ohio law) ("An indemnitor's duty to defend under an indemnity contract is subject to the same standard as an insurer's duty to defend under an insurance contract. An insurer is required to defend where allegations in a complaint are *potentially* within the policy coverage or where some doubt exists about coverage." (citation and internal quotes omitted; emphasis in original)); App. D-38: *Lafarge N. Am., Inc. v. K.E.C.I. Colo., Inc., 250 P.3d 682, 687-688 (Colo. App. 2010)* (Colorado law). *See, e.g.,* App. D-39: *Foster v. Subsea Int'l, Inc., 101 F.*

48

Supp. 2d 454, 458 (E.D. La. 1998) (Louisiana law); App. D-40: *Jackson v. Tenneco Oil Co.*, 623 F. Supp. 1452, 1460 (E.D. La. 1985) (Louisiana law).

In *English v. BGP International, Inc.*, the indemnitee (English) sought a declaration that the indemnitor (BGP) was required to defend English on the claims asserted in a series of lawsuits for negligence and trespass alleging that English began mineral exploration activities on the underlying plaintiffs' land without receiving the required consents.  BGP argued both that its duty to defend could not be decided until the lawsuits had been concluded and that it had no obligation to defend because under the contractual language it had no duty to defend the negligence claims.  The Court disagreed, stating first that "[g]iving reasonable effect to every word used in the contract, and understanding the separate and distinct nature of the two duties, we hold that BGP agreed to defend English—separate and apart from its duty to indemnify—from suits falling within the terms outlined in the contract."  The Court then rejected BGP's argument that the negligence claims relieved it of a duty to defend: "Assuming arguendo that the pleadings sufficiently allege separate negligence causes of action, that still does not relieve BGP of its duty to *defend* English in the underlying lawsuits.  When some theories of liability fail to give rise to the duty to defend but other theories do, the party should be required to provide a defense."  App. D-31: *English*, 174 S.W.3d at 373  (Texas law).

---

[89] BP designated these contracts as confidential.  Accordingly, copies are attached hereto, but not provided publicly. *See, e.g.*, App. A-30: Master Service Contract between BP America Production Company and ███████ Contract No. BPM-07-01217, BP-HZN-2179MDL03015557–606, Article 14.01.01, at BP-HZN-2179MDL03015566; App. A-31: Master Consulting Services Contract between BP America Production Company and ███████ Contract No. BPM-09-01304, BP-HZN-2179MDL03292008–45, Article 14.01.01, at BP-HZN-2179MDL03292018; App. A-32: Master Service Contract between BP America Production Company and ███████ Contract No. BPM-10-04020, BP-HZN-2179MDL03291954–2005, Article 14.01.01, at BP-HZN-2179MDL03291964.

[90] App. D-41: BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Dkt. 2074, Claim I, at 20-23; App: D-42: BPXP'S Cross-Claim and Third Party Complaint against Transocean, Dkt. 2075, ¶¶ 65-68.

[91] App. D-41: BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Dkt. 2074, Claim II, at 23-24; App. D-42: BPXP'S Cross-Claim and Third Party Complaint against Transocean, Dkt. 2075, ¶¶ 69-72.

[92] App. A-3: Drilling Contract,  BP-HZN-MBI00021460–999, Article 25.1, at BP-HZN-MBI00021489. *See, e.g.*, App. D-43: *La Esperanza de P.R., Inc. v. Perez y Cia. De P.R., Inc.*, 124 F.3d 10, 20 (1st Cir. 1997) ("[W]e cannot agree that a material breach of contract is tantamount in this case to gross negligence" for purposes of determining enforceability of exculpatory clause in ship repair contract); App. D-22: *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 163-65 (2d Cir. 2008) (rejecting "material breach of contract" defense to indemnity claim); App. D-44: *Becker v. Tidewater, Inc.,* 2007 WL 3231655, at *11 (W.D. La. Nov. 14, 2007), *aff'd in part, rev'd in part,* 586 F.3d 358 (5th Cir. 2009).

[93] App. D-45: Baker Hughes Reply Memorandum in Support of Motion for Summary Judgment, at 4, *Becker v. Tidewater, Inc.,* 2005 WL 2891044  (emphasis in original).

[94]  App. D-44: *Becker v. Tidewater, Inc.,* 2007 WL 3231655, at *11.  The Fifth Circuit affirmed on this issue: "Baker cites *Marquette Transportation Co. v. Louisiana Machinery Co.,* 367 F.3d 398 (5th Cir. 2004) for the proposition that a breach of a contract containing an indemnity agreement serves to invalidate the indemnity agreement. . . .  *Marquette* does not hold that breach of a contract necessitates invalidation of an indemnity agreement included therein."

[95] App. D-46: *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 127 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

[96] App. D-47: *Joseph Thomas, Inc. v. Graham*, 842 S.W.2d 343, 346 (Tex. App.—Tyler 1992, no writ).

[97] App. D-48: *Hanks v. GAB Bus. Serv.*, 644 S.W.2d 707, 708 (Tex. 1982).

[98] The invoices contain confidential information and, therefore, are not publicly filed.  App. A-41: Outstanding Invoices Issued to BP by Transocean.

[99] BP has designated this letter as confidential.  Accordingly, a copy is attached hereto, but will not be filed publicly. App. A-42: Letter Dated December 15, 2010, from Sam Yousef (BP, PSCM Specialist, Drilling Rigs) to Roddie MacKenzie (Transocean, Marketing Manager – North America).

[100] BP has designated this letter as confidential.  Accordingly, a copy is attached hereto, but will not be filed publicly.  App. A-43: Letter Dated February 25, 2011, from Bob Talbott (BP, Chief Procurement Officer, Gulf Coast Restoration) to Transocean Offshore DW DRLG Inc.

[101] App. D-49: RESTATEMENT (SECOND) OF CONTRACTS § 195(1) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."); App. D-50: 15 CORBIN ON CONTRACTS § 85.18  (2003 ed.) (citing the Restatement and stating: "The general rule of exculpatory agreements is that a party may agree to exempt another party from tort liability if that tort liability results from ordinary negligence.  Courts do not enforce agreements to *exempt* parties from tort liability if the liability results from that party's own gross negligence, recklessness, or intentional conduct." (emphasis added)); App. D-51: 8 R. LORD, WILLISTON ON CONTRACTS §19:20 (4th ed. May 2011) (Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury so that *indemnification may be permitted when grossly negligent conduct was alleged and found*." (emphasis added)); App. D-52:  Louisiana Civil Code art. 2004 ("Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.").

[102] App. D-53: *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982) (ship repair contract governed by maritime law); App. D-54: *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574, 576 (Tex. App.—Beaumont 1986, aff'd in part, rev'd & remanded in part) (raceway admission contract governed by Texas law); App. D-55: *Broom v. Leebron & Robinson Rent-A-Car, Inc.*, 626 So.2d 1212, 1215 (La. Ct. App. 1993) (car rental contract governed by Louisiana law).

[103]  App. D-56: *Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267-68 (N.Y. 1985) ("The Appellate Division, however, failed to distinguish between the exculpatory clauses involved in those cases, which typically deprive a contracting party of the right to recover for damages suffered as the result of the exonerated party's tortious act, and indemnity contracts that simply shift the source of compensation without restricting the injured party's ability to recover.  Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party from damages flowing from the intentional causation of injury"); App. D-57: *First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 341-42 (3d Cir. 1983) ("The district court noted the vital distinction between exculpation and indemnification and held that while public policy may preclude contractual exculpation for reckless, willful, or grossly negligent conduct, it is not offended by indemnification against such conduct."); App. D-58: *Dixon Distrib. Co. v. Hanover Ins. Co.,* 641 N.E.2d 395, 446 (Ill. 1994) (the rule not allowing "a party from exempting oneself from tort liability for harm caused intentionally . . . does not support a rule prohibiting an agreement by a third person to indemnify a party against liability in tort." (citing RESTATEMENT (SECOND) OF CONTRACTS § 195, Comment b; 6A A. CORBIN ON CONTRACTS §1472, at 146 (Supp. 1993); 15 S. WILLISTON, ON CONTRACTS § 1750A (3d ed. 1972)).  *See also* App. D-52: Louisiana Civil Code art. 2004, Revision Comment (e) ("This Article does not govern "indemnity" clauses, "hold harmless" agreements, or other agreements where parties allocate between themselves, the risk of potential liability towards third persons."); App. D-59: *In re Horizon Vessels, Inc.,* 2005 U.S. Dist. LEXIS 42110, at *34 (S.D. Tex. Dec. 22, 2005) (indemnity clause that specifically required indemnification for damages "caused or contributed to by negligence or other fault (including sole, joint, concurrent or gross negligence)" imposed a duty on one contracting party to indemnify other contracting party for  tort liability to a third party notwithstanding allegation of reckless conduct).

[104] App. D-51: 8 R. LORD, WILLISTON ON CONTRACTS §19:20 (4th ed. May 2011) (emphasis added).

[105]  App. D-62: Appellant's Brief in *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528 (5th Cir. 2001), 2000 WL 33988457, at *6. The Court of Appeals' observation that:"[n]either party disputes that a party's gross negligence defeats its right to enforce an indemnity contract *of this kind*" (emphasis added) could thus refer to the fact that indemnity for gross negligence was not expressed, or to the fact that the claim did not involve indemnity to a third party.  In holding the indemnity not enforceable, this Court cited Louisiana Civil Code art. 2004.  As previously noted, the Revision comment to that section states that article 2004 does not apply to a true indemnity clause "where parties allocate between themselves the risk of potential liability towards third persons."  The Court of Appeals also cited App. D-63: *Severg Co. v. Energy Drilling Co.*, 591 So.2d 1278 (La. Ct. App. 1991), which also involved an exemption of for damages suffered by the contracting party rather than indemnity for liability to a third party.

[106] App. D-64: *Orient Mut. Ins. Co. v. Adams*, 123 U.S. 67, 72-73 (1887); App. D-65: *N.Y., New Haven & Hartford R.R. Co. v. Gray*, 240 F.2d 460, 464 (2d Cir. 1957); App. D-66: *Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co.*, 247 F.2d 116, 122 (5th Cir. 1957), *cert. denied*, 355 U.S. 903 (1957);  App. D-67: *Allen N. Spooner & Son, Inc. v. Conn. Fire Ins. Co.*, 314 F.2d 753, 756 (2d Cir. 1963), *cert. denied*, 375 U.S. 819 (1963).

[107] BP has designated these agreements as confidential.  Accordingly, copies are attached hereto, but not publicly provided.  App. A-24: Settlement Agreement Between BP and MOEX, BP-HZN-2179MDL03198916–35, Articles 5.1 and 5.2(a)(vi), at BP-HZN-2179MDL03198922–23;  App. A-25:  Settlement  Agreement  Between  BP  and

Weatherford, BP-HZN-2179MDL03241693–714, Articles 5.4(d) and 5.8, at BP-HZN-2179MDL03241700 and BP-HZN-2179MDL03241704.

[108] BP designated this contract as confidential.  Accordingly, a copy is attached hereto, but not provided publicly.  App. A-23: Drilling Rig Operation and Maintenance Services Contract between BP America Production Company and ▌▌▌▌▌▌▌ Gulf of Mexico Deepwater Projects ▌▌▌▌▌▌ Contract No. BPA-02-06141, BP-HZN-2179MDL03241488–554, Article 14.01.05, at BP-HZN-2179MDL03241508, and Amendment 14, BP-HZN-2179MDL03241611–15, at BP-HZN-2179MDL03241612.

[109] This contract is confidential.  Accordingly, a copy is attached hereto, but not provided publicly.  App. A-14: Contract No. PHPC-DC-09-0006 between Pharaonic Petroleum Company and Global Santa Fe Services (Egypt) LLC (Transocean) for the Provision and Operation of Jack-Up Drilling Unit, Article 20.16.  (Pharaonic Petroleum Company is a BP joint venture.)

[110] BP designated this contract as confidential.  Accordingly, a copy is attached hereto, but not provided publicly.  App. A-20: BP-▌▌▌▌▌▌ Offshore Daywork Contract, BP-HZN-2179MDL02846809–48, Article 1012(c), at BP-HZN-2179MDL02846828.

[111] This contract is confidential.  Accordingly, a copy is attached hereto, but not provided publicly.  App. A-11: BP American Production Company Offshore Drilling / Workover / Completion Contract (with Transocean for the *Discoverer Enterprise*), Article 12.8 and Amendment No. 13.

[112] *See* App. D-68: *Griffin v. Tenneco Oil Co.*, 625 So.2d 1090, 1097 (La. Ct. App. 1993) (non-maritime case seeking indemnification for costs of defense; reciprocal indemnity agreement "specifically includes claims based on negligence or gross negligence"; "all forms of negligence are subject to indemnification"; "The all inclusive language satisfies us of the parties intent to include every type of claim except a claim resulting from an employee's intentional act."), cited in App. D-69: *In re Torch, Inc.*, 1996 WL 185765, at *9 (E.D. La. Apr. 16, 1996) (a maritime case in which the district court considered a similar issue, but held that the indemnity contract did not expressly refer to "gross negligence" unlike the contract in *Griffin*, and hence indemnity for gross negligence would not be implied); App. D-70: *In re TT Boat Corp.*, 1999 WL 1442054, at *6 (E.D. La. Sept. 8, 1999) (a maritime case; "This Court has ruled that when an indemnity provision does not include coverage for gross negligence, such silence dictates its exclusion. . . . In other words, the Court will not read 'gross negligence' into an indemnity provision in which it is not specifically covered.").  *See also* App. D-71: *Taylor v. Lloyd's Underwriters of London*, 972 F.2d 666, 668-69 (5th Cir. 1992) (no controlling maritime law rule as to whether indemnity for punitive damages violates public policy, so issue should be resolved by applying state law); App. D-72: *Randall v. Chevron U.S.A., Inc.*, 13 F.3d 888, 910 (5th Cir. 1994) (allowing indemnity for punitive damages applying Louisiana law).

[113] App. D-42: BPXP'S Cross-Claim and Third Party Complaint against Transocean, Dkt. 2075, Claim 1, at 25-26.

[114] App. D-78: *United States v. Ward*, 448 U.S. 242, 249, 254 (1980).

[115] App. D-82: Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484, tit. II §2002(a)(1990).

[116] App. D-12: Order and Reasons, Dkt. 3830, at 21 (emphases added).

[117] App. D-90: *See* T. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 19-12 (4th ed.).  The two major clubs provide coverage for fines with respect to pollution.  App. A-44: Standard Steamship Owners' Protection & Indemnity Assoc. (Bermuda) Rules § 3.6.5 (2011-12), *available at* http://www.standard-club.com/docs/14812_BERMUDA_OFFSHORE.pdf (last visited Oct. 26, 2011); App. A-45: UK Club Protection and Indemnity Rules, Rule 2, Section 22 E (Feb. 20, 2010), *available at* http://www.ukpandi.com/fileadmin/uploads/uk-pi/Latest_Publications/2011_Correspondents/List%20of%20Correspondents%20Rules%20and%20ByeLaws%202020 11.pdf (last visited Oct. 26, 2011).

[118] *See* App. D-91: FED. R. CIV. P. ADMIRALTY SUPP. RULE E(5)(a).  *See, e.g.,* App. D-92: *Nat'l Surety Corp. v. United States*, 1944 A.M.C. 1496, 1496 (5th Cir. 1944) (action on bond for clearance of vessel given pending determination of liability for fine imposed under Immigration Act of 1924 because of the escape of alien seaman).