UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § | MDL NO. 2179 SECTION J |
| This Document Relates To: *All cases, 2-10-cv-2771 and 2:10-cv-04536* | § § § § § § | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF TRANSOCEAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BP TO ENFORCE BP'S CONTRACTUAL OBLIGATIONS, INCLUDING BP'S OBLIGATION TO DEFEND, INDEMNIFY AND HOLD TRANSOCEAN HARMLESS AGAINST POLLUTION CLAIMS**

Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC and Triton Asset Leasing GmbH (collectively "Transocean") hereby submit this Statement of Undisputed Material Facts in support of Transocean's Motion for Partial Summary Judgment Against BP To Enforce BP's Contractual Obligation To Defend, Indemnify And Hold Transocean Harmless Against Pollution Claims pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 (February 2011).

1. At the time of the accident, the *Deepwater Horizon* was engaged in exploratory drilling activities at the Macondo Well (Mississippi Canyon Block 252), pursuant to the Drilling Contract between Transocean and BP.

2. The *Deepwater Horizon* became a total loss when, on April 22, 2010, the vessel sank into the Gulf of Mexico after burning for two days following an onboard explosion.

3. The Drilling Contract was executed on December 9, 1998, between Vastar Resources Inc. and R & B Falcon Drilling Co. As recognized in amendments to the Drilling Contract, BP

14962786.1                                                                1

America Production Co. and Transocean Holdings Inc. are successors to Vastar and R & B Falcon, respectively.

4. The Drilling Contract contains cross-indemnities between Transocean ("Contractor") and BP ("Company"), under which each of the two parties committed defend and indemnify the other against certain specified liabilities..

5. For example, each party agreed to defend and indemnify the other from and against all "**CLAIMS, DEMANDS AND CAUSES OF ACTION**" asserted by itself or its own subsidiaries, officers, agents, employees, and their relatives for "**PERSONAL INJURY**," including death, arising out of or related to work performed under the Drilling Contract (full capitalization and boldfacing in original).

6. Insofar as pollution-related liabilities are concerned, the Drilling Contract provides, in part, with respect to Transocean:

> **CONTRACTOR SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD COMPANY AND ITS JOINT OWNERS HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, *ORIGINATING ON OR ABOVE THE SURFACE OF THE LAND OR WATER*, FROM SPILLS, LEAKS, OR DISCHARGES OF FUELS, LUBRICANTS, MOTOR OILS, PIPE DOPE, PAINS, SOLVENTS, BALLAST, AIR EMISSIONS, BILGE SLUDGE, GARBAGE, OR ANY OTHER LIQUID OR SOLID WHATSOEVER IN POSSESSION AND CONTROL OF CONTRACTOR AND WITHOUT REGARD TO NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD TO WHETHER THE SPILL, LEAK, OR DISCHARGE IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR OTHER FAULT OF COMPANY.**

(emphasis added; full capitalization and boldfacing in original).

7. As for BP, the Drilling Contract provides in regard to pollution-related liabilities:

> **COMPANY SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD CONTRACTOR HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND _NOT ASSUMED BY CONTRACTOR IN ARTICLE 24.1 ABOVE_, WITHOUT REGARD FOR NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR.**

(emphasis added; full capitalization and boldfacing in original).

8. Article 25.1 defines the "Indemnity Obligation" as follows:

> **EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT, THE PARTIES INTEND AND AGREE THAT THE PHRASE 'SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" MEANS THAT THE INDEMNIFYING PARTY SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST _ANY AND ALL_ CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS FEES), JUDGMENTS AND AWARDS OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PREEXISTING CONDITION, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, _THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS_ (INCLUDING THE DRILLING UNIT), _BREACH OF CONTRACT_, _STRICT LIABILITY_, TORT, OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, _WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR_**

>   ***CONCURRENT, ACTIVE, PASSIVE OR GROSS*** **OR ANY OTHER THEORY OF LEGAL LIABILITY AND WITHOUT REGARD TO WHETHER THE CLAIM AGAINST THE INDEMNITEE IS THE RESULT OF AN INDEMNIFICATION AGREEMENT WITH A THIRD PARTY.**

(emphasis added; full capitalization and boldfacing in original).

9. The Drilling Contract was amended on numerous occasions between December 9, 1998, and April 20, 2010.

10. Article 27.3 of the Drilling Contract provides that the termination of the Drilling Contract shall be immediate in the event of actual or constructive total loss of the Drilling Unit.

11. Article 27.4 of the Drilling Contract provides that notwithstanding the termination of the Drilling Contract, the parties shall continue to be bound by the provisions of the contract "that reasonably require some action or forbearance after the expiration" of the Drilling Contract.

12. Article 25.2 of the Drilling Contract provides that "[t]o the extent a party is entitled to indemnification in Articles 21, 22, 23, and 24, such party's parent, subsidiaries, affiliates, co-owners and joint venturers (if any), and their respective officers, directors, agents and employees, the drilling unit and its legal and beneficial owners, in rem or in personam shall also be entitled to such indemnification and defense thereunder."

13. Article 35.3 of the Drilling Contract provides that the contract "shall be construed and the relations between the parties determined in accordance with the General Maritime Law of the United States of America, not including, however, any of its conflicts of law rules which would direct or refer to the laws of another jurisdiction."

14. All of the contracts applicable to the Gulf of Mexico between BP and Transocean entities effective on April 20, 2010 expressly provide for indemnity despite gross negligence.

15. Two of BP's contracts with another drilling contractor, both executed in 2008, expressly include indemnity in spite of gross negligence.

16.     The originally executed drilling contract between BP and Transocean for the *Enterprise* provided indemnity notwithstanding gross negligence.  When BP and Transocean executed an extension of this drilling contract on July 21, 2011, the indemnity obligations remained consistent and this obligation was not eliminated.

17.     BP's contracts with numerous subcontractors working at the Macondo prospect expressly include indemnity despite gross negligence.

18.     BP's contracts with subcontractors at Macondo that do not include indemnity for gross negligence nonetheless affirm the obligation to defend in the face of allegations of gross negligence.

19.     A major BP contract for use of a vessel as part of the post-incident response expressly provides indemnity despite gross negligence.

20.     The indemnity obligations contained in the industry-standard, form contracts of the International Association of Drilling Contractor (IADC), like those in the Drilling Contract, expressly include indemnity for gross negligence.

21.     By letter dated May 10, 2010, Transocean tendered its defense and indemnity demand to BP.  In this same letter, Transocean agreed to defend and indemnify BP for personal injury claims asserted by Transocean employees against BP.

22.     In response to Transocean's demand for defense and indemnity, on June 25, 2010, BP reserved its rights, effectively refusing to defend and / or indemnify Transocean.  BP contended that indemnification for gross negligence was void as a matter of law and, in the face of allegations of gross negligence and ongoing investigations, it had no obligation to defend or indemnify Transocean.

23.     On July 9, 2010, Kirk Wardlaw of BP sent a letter to Jim Bryan and Robert Reeves of Anadarko with respect to ▓▓▓▓▓▓▓▓ under the Joint Operating Agreement.  This document is designated as "Confidential" and, therefore, is not quoted herein.

14962786.1                                                      5

24. Despite BP's prior protestation that indemnity obligations for gross negligence are unenforceable as a matter of law, on August 31, 2010, BP amended a drilling contract with another drilling contractor to expand the scope of the indemnity obligations to expressly include indemnity for gross negligence.

25. Notwithstanding its position that gross negligence indemnity obligations are unenforceable, BP entered into settlement agreements with Moex, Weatherford, and Anadarko on May 20, 2011; June 20, 2011; and October 16, 2011; respectively, which provide indemnity for ▓▓▓▓▓▓▓▓▓▓ in the face of ▓▓▓▓▓▓▓▓. These documents are designated as "Highly Confidential" and, therefore, are not quoted herein.

26. In excess of one hundred witnesses—including those of Transocean, BP, government inspectors, third-party inspectors, Halliburton / Sperry Sun, Cameron, and other third parties—testified that they did not observe grossly negligent conduct or unsafe conditions and affirmed the competency of the *Deepwater Horizon*'s crew.

27. From the BP rig crew to the highest levels of BP's management, BP employees have consistently praised the Transocean rig crew and rig and affirmed that Transocean was not grossly negligent. Ronnie Sepulvado, a BP Company Man onboard the rig, testified that the rig was his "home away from home." He trusted the *Deepwater Horizon* crew and believed they were "good people, good workers and good safety people" who would not lie or hide safety issues. In particular, he complimented Transocean crew members Dewey Revette, Jason Anderson, Jimmy Harrell, Stephen Curtis, Curt Kuchta, and Randy Ezell, which he described as competent, capable, and demonstrating good attitudes toward safety. He believed that Revette and Harrell held safety as a number one priority. Sepulvado testified that if the *Deepwater Horizon*'s crew was on a different rig today, he would feel comfortable working with every one of them. Likewise, Doug Suttles, former BP Chief Operating Officer, testified that the individuals he encountered at Transocean "were professional, knowledgeable industry executives

in [his] experience."  He agreed that Transocean was not indifferent or callous to the health and welfare of rig personnel or the environment in connection with its drilling operations.  As of April 20, 2010, no one had ever suggested to Suttles that the *Deepwater Horizon* should be taken out of service or that BP should stop utilizing Transocean as a drilling contractor.  Furthermore, BP's former Chief Executive Officer, Tony Hayward, testified that during his time at BP at no point did anyone in senior management come to him and indicate concerns that Transocean or its employees exhibited a philosophy of indifference to the welfare of the environment or the health of individuals.  Hayward admitted that, if that had been the case, "others would have taken action before it got to [him], [he is] certain."  He also acknowledged that Transocean is "one of the world's largest and most respected drilling contractors" and "as of the time [he] left BP, one of the preferred providers throughout the world for BP in drilling its deepwater wells."

28.     Mark Bly, who spearheaded BP's internal investigation, testified that the *Deepwater Horizon* was "one of the best rigs in the fleet" and "had as much precaution and technology that exists in the industry."  He further stated that the crew aboard the *Deepwater Horizon* had all "the requisite training records."  Additionally, he affirmed that BP's investigation uncovered absolutely no evidence that any company or person maliciously, deliberately, or intentionally caused injury to other humans or to the environment.  Mr. Bly personally saw no malicious intent in anything he reviewed.

29.     BP has refused to pay approximately $11.7 million in invoices properly billed by Transocean. On or about December 15, 2010, BP stated it would not pay certain amounts invoiced "at this time" based on "developing facts regarding the manner in which Transocean performed drilling operations on the Macondo well."  At the time of the filing of this pleading, the amounts remain due.

Respectfully submitted,

By:  /s/ Steven L. Roberts
Steven L. Roberts (Texas, No. 17019300)
Rachel Giesber Clingman (Texas, No. 00784125)
Kent C. Sullivan (Texas, No. 19487300)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
Email: steven.roberts@sutherland.com,
rachel.clingman@sutherland.com,
kent.sullivan@sutherland.com,

By:  /s/ Kerry J. Miller
Kerry J. Miller (Louisiana, No. 24562)
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
Email: kmiller@frilot.com

-and-

By:  /s/ Brad D. Brian.
Brad D. Brian (California, No. 79001)
Allen M. Katz (California, No. 054933)
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
Email: brad.brian@mto.com,
allen.katz@mto.com

-and-

By:  /s/ Edwin G. Preis, Jr.
Edwin G. Preis, Jr. (Louisiana, No. 1070)
Richard J. Hymel (Louisiana, No. 20230)
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129
-and-
601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
Email: egp@preisroy.com, efk@preisroy.com

Of Counsel:
John M. Elsley (Texas, No. 0591950)
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
Email: john.elsley@roystonlaw.com

Daniel O. Goforth (Texas, No. 08064000)
Goforth Geren Easterling LLP
4900 Woodway, Suite 750
Houston, Texas 77056
Telephone: (713) 650-0022
Facsimile: (713) 650-1669
Email: dangoforth@goforthlaw.com

*Counsel for Transocean*

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and served on all counsel of record though LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on this 1st day of November, 2011.

/s/  Kerry J. Miller
KERRY J. MILLER

14962786.1                                    9