Filed 11 September 1 P2:52
Chris Daniel - District Clerk
Harris County
ED101J016477714
By: Nelson Cuero

> 2011-52580 / Court: 234

CAUSE NO. _____

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., | § § § | IN THE DISTRICT COURT OF |
| **Plaintiff** | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION Co., and BP p.l.c. | § § § | |
| **Defendants.** | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF HALLIBURTON ENERGY SERVICES, INC.'S ORIGINAL PETITION

Plaintiff Halliburton Energy Services, Inc. ("HESI") files its Original Petition against Defendants BP Exploration and Production, Inc. ("BP Exploration"), BP America Production Company, ("BP America"), and BP p.l.c. (collectively "BP" or the "BP Parties"), and in support of its causes of action, respectfully shows the following:

### I.
### NATURE OF THE CASE

1.      On April 20, 2010, a blowout occurred on the *Deepwater Horizon* in the Gulf of Mexico at the Macondo well (the "Blowout") that killed 11 people, injured many others, caused an extensive oil spill, and resulted in arguably the largest civil litigation in United States' history (the "Blowout Litigation"). Since the Blowout, and in a transparent attempt to minimize its liability, BP, the operator and leaseholder for the Macondo well, has intentionally and continually misrepresented its role in the Macondo tragedy by concealing its own conduct that caused the incident and the actions BP failed to take to prevent it. Specifically, BP published a self-serving report that supposedly took into account all of the then-known facts surrounding the tragedy including, among other things, the location of all hydrocarbon-bearing zones in the well (the "Bly Report"). In essence, the Bly Report categorizes HESI's primary cement job as a root

cause of the Blowout purportedly lending support to the allegations against HESI in the hundreds of lawsuits that comprise the Blowout Litigation.  The Bly Report, however, intentionally and deliberately omits the critical fact that BP knew or should have known about an additional hydrocarbon zone in the well that BP failed to disclose prior to HESI's designing the cement program for the Macondo Well and that BP, unsurprisingly, failed to disclose after the Blowout.

2.      Because BP did not disclose this upper hydrocarbon zone to HESI, HESI was unable to account for it when formulating the cement program that was intended to isolate the well from the influx of gas and oil.  BP was solely responsible for identifying all hydrocarbon-bearing zones in the well and for identifying where the designed top of cement ("TOC") should be located in order to isolate all such zones.  When BP identified the TOC for purposes of HESI's cement program, HESI justifiably relied on BP to identify the TOC in relation to the highest hydrocarbon-bearing zone in the production interval and/or otherwise disclose the location of the highest hydrocarbon-bearing zone to HESI.  BP failed to disclose this information and as a result, has significantly damaged HESI.  The motive behind BP's intentional nondisclosure of this upper hydrocarbon-bearing zone is apparent—profit and greed.  Had BP disclosed the higher hydrocarbon zone to HESI, HESI would not have pumped the cement program unless and until changes were made to the cement program, changes that likely would have required a redesign of the production casing.  Such changes would have cost BP millions of dollars on a well that was already painfully over budget and behind schedule.  Regrettably, and consistent  with its mantra that "every dollar counts," BP chose to not stop work and redesign the well before going forward with its temporary abandonment procedures, in favor of saving time and money at the expense of safety, resulting in the death of 11 men, countless other injuries and an unprecedented oil spill.

3.      As it did before the incident, BP has made every effort to conceal this fact from

HESI and the public following the Blowout.   In addition to intentionally omitting this information from the Bly Report, BP also purposely withheld the value and impact of this information from the various investigative bodies, including the Coast Guard, the Department of Justice, the United States Congress and the Presidential Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("National Commission"), that interviewed and solicited testimony from BP as part of their investigations into what caused the Blowout.   In fact, HESI only recently learned of BP's cover up scheme during discovery in the Blowout Litigation.   BP's conduct should not be countenanced.   Indeed, BP's malicious and intentional failure to disclose this critically important information after the incident in hopes of covering up its own culpability, and its actual publication of false statements with regard to it, is tortious, has damaged HESI, and warrants the imposition of exemplary, punitive damages.

## II.
## DISCOVERY CONTROL PLAN

4.      HESI intends to conduct discovery under Tex. R. Civ. P. 190.4 (Level 3).

## III.
## THE PARTIES

5.      HESI is a Delaware corporation with its principal place of business in Texas.

6.      BP Exploration is a Delaware corporation with its principal place of business in Harris County, Texas.  BP Exploration may be served through its registered agent for process at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas, 75201.

7.      BP America is a Delaware corporation with its principal place of business in Houston, Texas.  BP America may be served through its registered agent for process at CT Corporation System, 350 N. St. Paul Street, Dallas, Texas, 75201.

8.      BP p.l.c. is a British public limited company with its corporate headquarters in

London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which both BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Texas and the U.S. more generally. This Court has jurisdiction over BP p.l.c. pursuant to Texas' long-arm general jurisdiction statute, Tex. Civ. Prac. & Rem. Code §17.042. BP p.l.c. does business in Texas, has had continuous and systematic contacts with Texas (and the U.S. more generally). Service of process on BP p.l.c. is proper through the means authorized by the Hague Convention On the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

## IV.
## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over HESI's claims against the BP Parties because the relief sought falls within the jurisdictional limits of this Court pursuant to Tex. Civ. Prac. & Rem. Code § 37.003.

10.      Venue is proper in this judicial district pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(3) because BP's principal office is located in Harris County, Texas.

## V.
## FACTS

11.      The BP Parties owned and operated the Macondo Well. As such, BP controlled the majority of the data and empirical information relating to actual well conditions, including data used to identify the highest hydrocarbon zone in the production interval of the well. The location of the highest hydrocarbon zone in the production interval is critical information necessary to properly design and execute a primary cement job to cement production casing.

Further, BP knew that HESI, as a cementing service contractor, would rely, and BP intended HESI to rely, upon this closely-held information that BP supplied in making decisions as to how to effectively proceed with its cementing services.  Despite this fact, BP knew, but failed to disclose to HESI, the existence of the highest hydrocarbon-bearing zone in the production interval.  After the incident, BP has and continues to affirmatively conceal this same information not only from HESI but also from the public and the governmental investigating bodies.

### The Macondo Well was Drilled Through Pressurized Formations.

12.    The Macondo Well was drilled for the purpose of reaching a potential hydrocarbon reservoir located more than 18,000 feet below sea level.  In order to reach that reservoir, the drilling crew of the *Deepwater Horizon*, under BP's direction, drilled downhole from the sea floor a section at a time.  These sections are called "intervals."  The engineering and technology necessary to drill a deepwater well in the Gulf of Mexico are both significant and complex.  However, as a general matter, well sections are drilled out and then reinforced with metal casing or liners that are then cemented into place.  Once one interval is drilled, reinforced and cemented, the drilling crew then drills ahead (or down) into the next interval and repeats the process until the wellbore intersects the target reservoir zone.  The lowest section in the well where the wellbore intersects the reservoir zone is typically called the "production interval," or the interval from which hydrocarbon from the reservoir zone will later be produced.[1]  The interval principally at issue in this case is the Macondo Well's production interval.

13.    When the drilling crew on the *Deepwater Horizon* drilled the production interval, it drilled through geological formations call "sands" that potentially contained a variety of formation fluids (*i.e.*, oil, gas, water).  While the target reservoir zone at the bottom of the

---

[1] At the Macondo Well, BP intended to drill the well with the *Deepwater Horizon* rig and then temporarily abandon the well.  BP then intended to come back to the Macondo Well with a different rig—a production rig—to "produce" the well, which would have involved perforating the production casing and annular cement in the vicinity of the reservoir sands thereby allowing hydrocarbons to flow into the production casing and up to the production rig for recovery.

production interval was a "sand," the crew had to drill through other thinner sands higher up in the interval to get there. To the extent these higher sands in the production interval contained hydrocarbons, they were not considered commercially viable (*i.e.*, they were not "pay" sands or zones). Nevertheless, these higher sands were pressurized, and the pore pressure of these sands, if not overcome, would cause their formation fluids to flow into the wellbore. The unintended influx of hydrocarbons into a wellbore is anathema to sound drilling principles and, therefore, the drilling crew and BP intended to drill while maintaining greater pressure in the production interval in order to overbalance the pressures exerted back by the formation.

14.     To ensure that formation fluids do not influx into the wellbore while drilling, a rig crew generally drills with weighted "drilling mud" in the hole. The drilling mud is a viscous fluid of engineered density which, among other things, is intended to overbalance and hold back pressurized fluids in the sands. The drilling mud, and more particularly its density, also needs to be engineered so that the force exerted by it onto the formation does not exceed the formation's "fracture gradient," which is the force or pressure at which the geologic formation would fracture. Thus, the drilling mud in the wellbore must be of sufficient density to hold back fluids in the formation but not so dense as to fracture the formation geology.

## To Prepare for the Primary Cement Job, HESI Justifiably Relied on BP To Identify the Highest Hydrocarbon-Bearing Sand.

15.     After the Macondo Well was drilled to Total Depth ("TD"), BP ran a continuous production casing string into the hole from the sea floor all the way down into the production interval. Once the production casing was in place, BP authorized HESI, as the cementing contractor on the rig, to execute a "primary" cement job, which is a cement job designed to cement the production casing into place. A primary cement job has two principal goals. First, it attempts to place cement into a predetermined or designed location in the production interval. Second, the cement, once placed, is intended to achieve "zonal isolation" in the production

interval.

16.     To execute the primary cement job, cement is pumped from the rig down the inside of the production casing.  When the cement exits the bottom of the production casing in the production interval, pumping pressure causes the cement to turn and flow up into the space between the outside of the production casing and the formation.  This space is called the "annulus" or "annular space."  The principal objective of the primary cement job is to have the cement turn the corner at the bottom of the production casing and flow up into and seal off this annular space such that formation fluids from the production interval's exposed sands cannot flow into the wellbore.  In other words, the cement is intended to hold back the fluids in the formation sands, including hydrocarbons, and prevent them from entering the wellbore. Successfully sealing off this annular space such that formation fluids in the sands cannot flow into the wellbore is called achieving "zonal isolation."

17.     Prior to executing the primary cement job on the Macondo Well's production casing, HESI and BP engaged in an iterative process to design the cement slurry that would be used and to finalize a cementing plan for executing the job.  As the owner of the Macondo Well, BP has ownership of, and a proprietary interest in, much of the data associated with the well, including but not limited to data gathered by service contractors regarding certain downhole conditions and the location of potential hydrocarbon-bearing sands in the production interval. Thus, HESI justifiably relied on BP to provide it with certain data inputs for purposes of designing, modeling and executing the primary cement job.  HESI's cementing team does not have access to this information independently and must obtain it from BP.

18.     One of the key data points or parameters for designing a primary cement job is called "top of cement" or "TOC."  TOC refers to the height of the cement column pumped into the annulus.  The TOC is a critical component of the primary cement job design as it is the key driver of the cement volume to be pumped.  The cement column in the annular space should

extend a sufficient distance above the *highest* hydrocarbon-bearing zone in the interval in order to properly isolate that zone and the zones below it.  The height of the cement needed to isolate the zones is dependent on a variety of factors that can be modeled, including but not limited to, the pore pressures of those zones.  However, *at a minimum*, federal regulations require that TOC be placed *at least 500 feet above the highest hydrocarbon-bearing zone* in the production interval.  *See* 30 C.F.R. § 250.421.[2]  Therefore, in order to properly determine the designed TOC for zonal isolation and to satisfy the applicable federal regulation regarding TOC, it is critical to know the specific location of the highest hydrocarbon-bearing sand in the production interval and its pore pressure.  As set forth below, BP intentionally concealed the highest hydrocarbon-bearing zone in the production interval from HESI both before and after the incident.

### BP Intentionally Concealed the Higher Hydrocarbon-Bearing Sand From HESI.

19.     BP hired service contractors to run a variety of "logs" during the drilling of the Macondo Well.  These logs are designed to provide preliminary information to BP about the well, including but not limited to the geology and location of sands in the well.  However, after drilling was completed to total depth and before the primary cement job, BP hired Schlumberger to perform a suite of "wireline" logging runs in the open hole of the production interval (*i.e.*, before production casing was run in the hole).  Wireline logging is typically done after drilling is complete to get the most accurate and comprehensive data possible about the location of hydrocarbons in the well.  At the Macondo Well, BP used data gathered from wireline logging to determine the location of the highest hydrocarbon-bearing zone in the production interval.  The wireline logging operation took place on the *Deepwater Horizon* from about April 10 to April

---

[2] Top of cement (TOC) can only be estimated prior to the cement job.  A variety of factors can contribute to TOC not achieving its estimated or theoretical height.  To determine whether the *actual* TOC (where the top of cement is located after the cement job) is consistent with the theoretical TOC (as estimated prior to the cement job), BP, as the well owner, could have run a cement evaluation technique such as a cement bond log ("CBL").  However, despite having a service company on the rig to run a CBL after the primary cement job, BP chose to forego the CBL on the Macondo Well.

15, 2010.  BP personnel traveled to the rig to observe the wireline logging operations.

20.     One of BP's responsibilities was to identify the hydrocarbon-bearing sands in the production interval.  To discharge this responsibility, BP reviewed wireline data and analysis from the ongoing wireline logging operations.  One of the wireline logs is called a "Triple Combo," so named because it contains three (3) tracks of data—a gamma ray curve, resistivity curves, and the density/neutron curves.  The gamma ray log indicates the presence of a sand formation as distinguished from, for example, a shale formation.  The resistivity curves measure the resistivity of formation fluids in the formation.  Hydrocarbons are non-conductive compared to brine or salt water.  Therefore, the difference in resistivity readings between hydrocarbons and salt water give a preliminary indication of the potential presence of hydrocarbons in a formation sand.  The density/neutron curves plot formation porosity and permeability.  The intersection (or crossover) of these two plots is a gas signature, or an indication of the presence of hydrocarbons in a particular sand.

21.     On or about April 13, 2010, BP identified what it claimed was the shallowest/highest hydrocarbon-bearing sand in the production interval and provided that information to its drilling team on the Macondo Well so that it could be used in cement procedure preparations.  Relying on the Triple Combo log, the processing of which was complete on April 13, 2010, BP identified that the highest hydrocarbon-bearing zone was located at a certain depth.  The depth of this sand was provided to the BP drilling engineers for the specific purpose of planning HESI's cement job.  Then, the BP drilling team informed HESI to design a cement job procedure that would place TOC at approximately 500 feet above the sand BP identified as the highest hydrocarbon sand in the production interval.

22.     However, what BP represented to HESI as the highest hydrocarbon-bearing sand in the production interval was wrong.  Rather, a higher sand existed that was noted on all three tracks of the log (the "Concealed Sand").  BP never disclosed the Concealed Sand to HESI or

disclosed that there was a gas signature in a sand higher than the one previously identified as the highest hydrocarbon-bearing sand.  In fact, BP intentionally withheld this information with regard to the Concealed Sand, initially to save time and money, and then later to cover-up BP's culpability for the Blowout.

23.     In the days following April 13, but prior to April 20, BP performed further data analysis and confirmed, on April 20, 2010 (the day of the incident), that the Concealed Sand was in fact the shallowest hydrocarbon-bearing sand.  Despite confirming that the Concealed Sand was in fact the highest hydrocarbon-bearing sand, and despite knowing that HESI relied on BP's identification of the highest sand to plan the cement job, BP failed to inform HESI that BP knew (or should have known) there was a higher hydrocarbon-bearing sand in the production interval and knew the TOC it provided to HESI (that HESI relied upon to design the cement program) was wrong.  HESI relied on the erroneous information BP provided and planned the cement job with the understanding that the sand BP identified was the highest hydrocarbon-bearing sand, which it was not.

24.     BP had incentive to ignore the hydrocarbons in the Concealed Sand.  If BP identified the Concealed Sand as a hydrocarbon-bearing zone, federal regulations would have required TOC for the production interval to have overlapped into the previously cased section of the well (higher interval), which is contrary to BP's well design protocol and would have required BP to redesign the production interval.  Redesigning the production interval likely would have cost BP millions of additional dollars for a project that was already over budget and behind schedule.  Accordingly, BP did not have the appetite for investing millions of dollars in additional costs in the Macondo well, especially when the costs could be avoided by simply refusing to acknowledge the Concealed Sand as a hydrocarbon-bearing zone, which it was.

25.     Moreover, had HESI known about the Concealed Sand it would not have pumped the primary cement job in the production interval until changes were made to the cement

program, changes that likely would have required a redesign of the production casing. The fact that HESI would not have proceeded with the primary cement job is not *post hoc* speculation. Prior to the primary cement job, HESI ran computer modeling simulations of the cement job using a proprietary software program called OptiCem. HESI provided written reports from OptiCem to BP prior to the cement job. HESI generated an OptiCem report using 21 centralizers (devices used to centralize the production casing in the hole to affect the proper and efficient radial flow of cement up the annulus). That OptiCem report predicted that the modeled cement job, among other things, would present a "LOW" gas flow problem. Subsequently, BP decided to use only 6 centralizers. When HESI updated the centralizer information and generated a new OptiCem report on April 18, 2010, modeling 7 centralizers (one more than BP decided to use), the report predicted that the modeled cement job would present a "SEVERE" gas flow problem. In addition, using the very same data included in the April 18, 2010 OptiCem report, but updating the model only to include the Concealed Sand, the OptiCem report would have instructed HESI and BP as follows:

> Based on analysis of the above outlined well conditions, this well is considered to have a CRITICAL gas flow problem. If a gas flow potential of greater than 15 is calculated, then changes should be made....

The gas flow potential in this OptiCem report would have a value higher than fifteen; thus, given this result, HESI would not have gone forward with the cement job unless and until changes were made to the cement program, changes that likely would have required a redesign of the production casing. Simply put, disclosing the Concealed Sand to HESI, or a TOC based on the Concealed Sand, would have forced BP to incur millions of additional dollars in costs associated with the Macondo well and a significant period of additional time before the production interval could have been cemented. Rather than incur these costs, BP chose to not disclose the Concealed Sand to HESI.

## BP's Cover Up Continued Post-Incident

26.     Following the Blowout on the *Deepwater Horizon*, BP petrophysicists continued to review the wireline logs relating to the Macondo Well.  No new wireline logs were run post-incident.  Instead, post-incident review of the previously existing wireline logs—that were fully completed by April 13, 2010 and that were reviewed by BP on the same date for the purpose of initially identifying (erroneously) the highest hydrocarbon zone—confirmed the presence of the Concealed Sand as a hydrocarbon-bearing sand.

27.     Despite knowing about the Concealed Sand both before and after the Macondo Well incident, BP has purposefully hidden it from the public and from HESI.  BP's own internal investigative report, the Bly Report, released to the public on or about September 8, 2010, purports to be an objective analysis of what caused the Blowout and claims to be based "on the information available to the investigative team during the investigation[.]"   Yet, despite information about the Concealed Sand being available to the investigative team, it is nowhere mentioned in the report.  Rather, on page 54 of the Bly Report, BP depicts all other sands (with their corresponding pore pressures) in the production interval *except* the critical Concealed Sand.  Furthermore, the Bly Report cryptically states in fine print:  "Sands are based on geology *known at the time of the accident.*"  This statement is patently false.  BP knew about the Concealed Sand even before the Blowout occurred.  However, instead of acknowledging this critical well condition, BP selectively and self-servingly omitted reference to it in the Bly Report in its attempt to cover up BP's knowledge of the Concealed Sand and its own direct culpability for the tragedy.

28.     In public appearances and testimony before the Coast Guard, the United States Congress and the National Commission—all of which were attempting to find out what happened at the Macondo Well—BP never disclosed the existence, importance and impact of the Concealed Sand, despite its awareness that its existence was critical to properly planning the

execution of the cement job.   HESI has justifiably relied upon BP's aforementioned misrepresentations in conducting its business since the incident, specifically in how HESI responded to investigations and inquiries from various agencies and entities and in issuing press releases with regard to the tragedy, among others.

29.     HESI did not learn of BP's intentional nondisclosure of the Concealed Sand until a recent deposition in the Blowout Litigation.

30.     BP's tortious conduct has damaged HESI significantly.   As a direct and proximate result of BP's cover up, including but not limited to publication of the Bly Report, HESI has suffered and continues to suffer economic damages in an amount to be determined by the Court. Moreover, BP's aforementioned conduct warrants the imposition of exemplary damages to deter BP from engaging in such egregious conduct in the future.

## VI.
## CAUSES OF ACTION

### COUNT 1
### (Negligent/Grossly Negligent Misrepresentation)

31.     Paragraphs 1 through 30 are incorporated by reference as if fully set forth herein.

32.     BP made numerous post-incident false representations regarding the Macondo Well hydrocarbon-bearing sands to HESI for the guidance of HESI's business (and also failed to disclose the existence, importance and impact of the Concealed Sand to Congress, the public, and various governmental agencies).   BP failed to exercise reasonable care with regard to the statements made in its Bly Report and with regard to other representations and statements pertaining to the Blowout and what caused it.   In conducting its business by, among other things, responding to various investigations and inquiries as to the cause of the Blowout, issuing press releases and making other public statements, HESI justifiably relied, and BP intended that HESI rely, upon BP's representations regarding the shallowest hydrocarbon-bearing sands and the

resultant necessary top of cement.  BP's failure to exercise reasonable care in making its various statements and conclusions related to the Blowout proximately caused HESI injury and damages, including pecuniary losses.

33.    BP's negligent/grossly negligent misrepresentations also warrant the imposition of exemplary damages.

## COUNT 2
### (Defamation/Common Law Libel/Slander)

34.    Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

35.    BP, through its agents, employees and representatives, has made false and defamatory statements and representations of fact as to HESI.  These statements have been made repeatedly to the general public, including in BP's Bly Report, and in testimony provided to the Department of the Interior Joint Investigation Team, Congress and other governmental agencies.

36.    BP made these false statements about HESI with actual malice, knowing they were false, or with reckless disregard for their truth or veracity.    These false, defamatory representations have harmed HESI's business ventures, its reputation and character, and have caused other special damages.

37.    As a proximate result of BP's intentional, malicious, and/or reckless conduct, HESI has suffered damages within the jurisdictional limits of this Court. BP's conduct in this regard warrants the imposition of exemplary damages.

## COUNT 3
### (Business Disparagement)

38.    Paragraphs 1 through 37 are incorporated by reference as if fully set forth herein.

39.    BP, through publication of its Bly Report and various public testimony, made false representations regarding the identification and location of the hydrocarbon-bearing sands

in the Macondo Well and HESI's alleged failures with regard to cementing and sealing these sands that disparaged HESI's business.  BP's failure to disclose the identity of the Concealed Sand has directly affected HESI's character and reputation in the oil and gas services industry and HESI's business, and its disparaging statements about HESI are not privileged.

40.     BP committed this business disparagement maliciously, with the specific intent to cover up BP's own tortious conduct and shift blame to HESI.

41.     As a result, HESI has suffered actual and special damages including, but not limited to, lost profits, additional administrative expenses, and incidental damages.  Additionally, BP's malicious conduct entitles HESI to recover exemplary damages in a sum to be determined by the trier of fact.

42.     HESI reserves its right to amend these allegations as additional discovery and evidence warrant.

## VII.
## REQUEST FOR DISCLOSURE

43.     Pursuant to Tex. R. Civ. P. 194, HESI requests that BP disclose, within 50 days of service of this Petition and request, the information or material described in Tex. R. Civ. P. 194.2.

## VIII.
## DEMAND FOR JURY TRIAL/PAYMENT OF JURY FEE

44.     HESI demands a jury trial and tenders the appropriate fee with this Petition.

## IX.
## CONDITIONS PRECEDENT

45.     All conditions precedent necessary for HESI to recover its damages have occurred or will occur.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff HALLIBURTON ENERGY SERVICES, INC. prays that the

BP Parties be cited to appear and answer and that the Court award HESI judgment for:

a.      all economic, actual and consequential damages;

b.      exemplary damages;

c.      prejudgment and post-judgment interest;

d.      costs and attorneys' fees; and

e.      all other relief to which HESI is entitled, whether legal or equitable, general or special.

Respectfully submitted

GODWIN RONQUILLO PC

/s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
dgodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
bbowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
jmartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
fhartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No.  00796756
ghill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

and

R. Alan York
ayork@GodwinRonquillo.com
State Bar No. 22167500
Jerry von Sternberg
jvonsternberg@GodwinRonquillo.com
State Bar No. 20618150
Misty Hataway-Coné
mconę@GodwinRonquillo.com
State Bar No. 24032277
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

ATTORNEYS FOR HALLIBURTON ENERGY
SERVICES, INC.

Page 17

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof.

*Revised April 2003*

INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS

# OFFSHORE DAYWORK DRILLING CONTRACT - U.S.

### THIS CONTRACT CONTAINS PROVISIONS RELATIVE TO INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK - SEE PARAGRAPHS 501, 605, 606, 805, 1305 AND ARTICLE IX



THIS AGREEMENT (the "Contract"), dated the _____ day of _____, 20____, is made between _____, a _____ organized under the laws of _____, located at _____

_____

(hereinafter called "Operator"), and _____, a ____ _____ organized under the laws of _____, located at ____ _____

(hereinafter called "Contractor").

WHEREAS, Operator desires to have offshore wells drilled or worked over in the Operating Area and to have performed or carried out all auxiliary operations and services as detailed in the Appendices hereto or as Operator may require; and

WHEREAS, Contractor is willing to furnish the drilling vessel together with drilling and other equipment (hereinafter called the "Drilling Unit"), insurance and personnel, all as detailed in the Appendices hereto, for the purpose of drilling said wells and performing said auxiliary operations and services for Operator.

NOW THEREFORE THIS CONTRACT WITNESSETH that in consideration of the covenants herein it is agreed as follows:

## ARTICLE I - INTERPRETATION

**101.**  **Definitions**

In this Contract, unless the context otherwise requires:

(a) "Commencement Date" means the point in time that the Drilling Unit either commences jacking operations or commences pulling anchors (whichever is applicable) preparatory to moving the Drilling Unit to Operator's first drilling location under this Contract;

(b) "Operator's Items" means the equipment, material and services owned by Operator or which are listed in Appendix D that are to be provided by or at the expense of Operator;

(c) "Contractor's Items" means the Drilling Unit, equipment, material and services owned by Contractor or which are listed in Appendices B or D that are to be provided by and at the expense of Contractor;

(d) "Contractor's Personnel" means the personnel of Contractor and Contractor's subcontractors of any tier, including but not limited to their employees, consultants and other persons to be provided by Contractor from time to time in connection with operations hereunder;

(e) "Operator's Personnel" means the personnel of Operator and Operator's other contractors and subcontractors of any tier, including but not limited to their employees, consultants and other persons to be provided by Operator from time to time in connection with operations hereunder or present in the Operating Area;

(f) "Operating Area" means waters offshore of the state or area specified in Appendix A in which Operator is entitled to conduct drilling operations;

(g) "Operating Base" means the place onshore designated by Operator and specified in Appendix A;

(h) "Affiliated Company" means a company or other legal entity which controls or is controlled by Operator or Contractor, or which is controlled by an entity which controls Operator or Contractor. For purposes hereof, control means the ownership, directly or indirectly, of fifty percent (50%) or more of the shares or voting rights in a company or legal entity.

**102.  Currency**

In this Contract, all amounts expressed in dollars are United States Dollar amounts.

**103.  Conflicts**

Appendices A, B, C, D, E, F and G attached hereto are incorporated herein by reference. If any provision of the Appendices conflicts with a provision in the body hereof, the latter shall prevail.

**104.  Headings**

The paragraph headings shall not be considered in interpreting the text of this Contract.

**105.  Further Assurances**

Each party shall perform the acts, execute and deliver the documents and give the assurances necessary to give effect to the provisions of this Contract.

**106.  Contractor's Status**

Contractor shall be an independent contractor in performing its obligations hereunder.

**107.  Operator's Status**

Operator enters into this Contract on behalf of itself and its co-venturers, co-lessees and joint owners, if any, and agrees that Operator and only Operator may enforce any obligation or rights herein contained expressed or implied to be for the benefit of Operator and/or the co-venturers, co-lessees and joint owners, and Operator and only Operator may commence any action, claim or proceedings against Contractor resulting from, arising out of or in connection with this Contract.

**108.  Governing Law**

**This Contract shall be construed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the General Maritime Law of the United States of America, not including, however, any of its conflicts of law rules which would direct or refer to the laws of any jurisdiction.**

## ARTICLE II - TERM

**201.  Effective Date**

The parties shall be bound by this Contract when each of them has executed it (hereinafter referred to as "Effective Date").

*Revised April 2003*

**202.**   **Duration**

This Contract shall, subject to Paragraphs 203 and 204 below, be for the term specified in Appendix A.

**203.**   **Termination**

This Contract shall terminate:

   (a)  immediately if the Drilling Unit becomes an actual loss or the date Contractor's marine surveyor determines a constructive or arranged total loss to have occurred;

   (b)  after the number of wells or on the date specified in Appendix A or, if operations are then being conducted on a well, as soon thereafter as such operations are completed, and the Drilling Unit has been safely jacked up or moored, whichever is applicable, at the demobilization location specified in Appendix A (unless some other location or port is mutually agreed) and all of Operator's Items have been offloaded, whichever is latest; or

   (c)  in accordance with Paragraphs 707 or 802.

**204.**   **Option to Extend**

Operator may extend the duration of this Contract for an additional period by giving notice thereof to Contractor as specified in Appendix A, subject to mutually agreed rates, terms and conditions.

**205.**   **Continuing Obligations**

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

**206.**   **Return of Operator's Items**

Upon termination of operations, Contractor shall return to Operator on board the Drilling Unit, or as directed by Operator at Operator's sole cost, any of Operator's Items which are at the time in Contractor's possession.

## ARTICLE III - CONTRACTOR'S PERSONNEL

**301.**   **Number, Selection, Hours of Labor and Remuneration**

Except where herein otherwise provided, the number, selection, replacement, hours of labor and remuneration of Contractor's Personnel shall be determined by Contractor.  Such employees or subcontractors' employees shall be the employees solely of Contractor or its subcontractors.

**302.**   **Contractor's Representative**

Contractor shall nominate one of its personnel as Contractor's representative who shall be in charge of the remainder of Contractor's Personnel and who shall have full authority to resolve all day-to-day matters which arise between Operator and Contractor.

**303.**   **Increase in Contractor's Personnel**

Operator may, at any time, with Contractor's approval require Contractor to increase the number of Contractor's Personnel and the rates provided herein shall be adjusted accordingly.

**304.**   **Replacement of Contractor's Personnel**

Contractor will remove and replace in a reasonable time any of Contractor's Personnel if Operator so requests in writing and if Operator can show reasonable grounds for its request.

**305.**   **Statutory Employees**

In all cases where Contractor's employees (including Contractor's and its subcontractors' direct, borrowed, special,

*Revised April 2003*

or statutory employees) are performing work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., Operator and Contractor agree that the services performed by Contractor and Contractor's employees pursuant to this Contract are an integral part of and are essential to the ability of Operator to generate Operator's goods, products, and services for the purpose of La. R.S. 23:1061 (A) (1). Furthermore, Operator and Contractor agree that Operator is the statutory employer of Contractor's employees for purposes of La. R.S. 23:1061 (A) (3) and that Operator shall be entitled to the protections afforded a statutory employer under Louisiana law.

## ARTICLE IV - CONTRACTOR'S ITEMS

### 401.    Obligation to Supply
Contractor shall provide Contractor's Items and Personnel and perform the services to be performed by it in accordance with Appendices B, C and D.

### 402.    Maintain Stocks
Contractor shall be responsible, at its cost, for maintaining adequate stock levels of Contractor's Items and replenishing as necessary.

### 403.    Maintain and Repair Equipment
Contractor shall, subject to Paragraph 901 and Appendix D, be responsible for the maintenance and repair of all Contractor's Items and shall provide all spare parts and materials required therefor. Contractor shall, if requested by Operator, also maintain or repair any of Operator's Items on board the Drilling Unit which Contractor is qualified to and can maintain or repair with Contractor's normal complement of personnel and equipment on board the Drilling Unit, provided, however, that Operator shall at its cost provide all spare parts and materials required to maintain or repair Operator's Items, and the basic responsibility and liability for furnishing and maintaining such items shall remain with Operator.

## ARTICLE V - CONTRACTOR'S GENERAL OBLIGATION

### 501.    Contractor's Standard of Performance
Contractor shall carry out all operations hereunder on a daywork basis. For purposes hereof the term "daywork basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction and supervision of Operator (inclusive of any employee, agent, consultant or subcontractor engaged
by Operator to direct drilling operations). *When operating on a daywork basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a daywork basis, including results and all other risks or liabilities incurred in or incident to such operations, notwithstanding any breach of representation or warranty, either expressed or implied, or the negligence or fault of Contractor, its employees, subcontractors, consultants, agents or servants, including sole, concurrent or gross negligence, either active or passive, latent defects or unseaworthiness of any vessel or vessels, including the Drilling Unit, (whether or not preexisting) and any liability based on any theory of tort, breach of contract, breach of duty (whether statutory, contractual or otherwise), regulatory or statutory liability, or strict liability, including defect or ruin of premises, either latent or patent.*

*Revised April 2003*

**502.** __Operation of Drilling Unit__

Subject to Paragraph 605, Contractor shall be responsible for the operation of the Drilling Unit, including supervising moving operations and positioning on drilling locations as required by Operator. Operations under this Contract will be performed on a twenty-four (24) hour per day basis.

**503.** __Compliance with Operator's Instructions__

Contractor shall comply with all instructions of Operator consistent with the provisions of this Contract, including, without limitation, drilling, well control and safety instructions. Such instructions shall, if Contractor so requires, be confirmed in writing by the authorized representative of Operator. However, Operator shall not issue any instructions which would be inconsistent with Contractor's rules, policies or procedures pertaining to the safety of its personnel, equipment or the Drilling Unit, or require Contractor to exceed the rated capacities of Contractor's Items or the minimum or maximum water depths or maximum well depth set forth in Appendix A.

**504.** __Adverse Weather__

Contractor, in consultation with Operator, shall decide when, in the face of impending adverse weather conditions, to institute precautionary measures in order to safeguard the well, the well equipment, the Drilling Unit and personnel to the fullest possible extent. Contractor and Operator shall each ensure that each senior representative on board will not act unreasonably in the exercise of their discretion under this Paragraph.

**505.** __Drilling Fluids and Casing Program__

Contractor shall take reasonable care to follow Operator's instructions with respect to the drilling fluid and casing program as specified by Operator. Operator shall provide Contractor with these programs reasonably in advance of the spud date of each well to be drilled hereunder.

**506.** __Cutting/Coring Program__

Contractor shall save and identify cuttings and cores according to Operator's instructions and place them in containers furnished by Operator.

**507.** __Records to be Kept by Contractor__

Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form signed by Contractor's representative shall be furnished by Contractor to Operator.

**508.** __Difficulties During Drilling__

In the event of any difficulty arising which precludes either drilling ahead under reasonably normal procedures or the performance of any other operations planned for a well, Contractor may suspend the work in progress and shall immediately notify the representative of Operator, in the meantime exerting reasonable effort to overcome the difficulty. In the event Contractor is required to drill a relief well(s) or to undertake well control activities, such operations may be subject to the consent of, and additional conditions imposed by, Contractor's underwriters. Any additional premiums and all deductibles shall be for Operator's account during such operations.

**509.** __Well Control Equipment and Training__

Subject to Article IX, Contractor shall maintain its well control equipment listed in Appendices B and D in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole; and agrees it shall have in place a training plan for Contractor's Personnel which adheres to the requirements of the U.S. Department of the Interior Minerals Management Service, if applicable, while performing work hereunder.

**510.** __Inspection of Materials Furnished by Operator__

Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator.

*Revised April 2003*

## ARTICLE VI - OPERATOR'S OBLIGATIONS

**601.   Equipment and Personnel**

Operator shall at its cost provide Operator's Items and Operator's Personnel and perform the services to be provided or performed by it according to Appendix D. In addition to providing the initial supply of Operator's Items, Operator shall be responsible, at its cost, for maintaining adequate stock levels and replenishing as necessary. When, at Operator's request and with Contractor's agreement, Contractor furnishes for certain items or services which Operator is required herein to provide, for purposes of this Contract said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. For furnishing said items and services, Operator shall reimburse Contractor its entire cost plus a handling charge as specified in Appendix A.

**602.   Maintenance and Repair**

Operator shall be responsible, at its cost, for the maintenance and repair of all Operator's Items on board the Drilling Unit which Contractor is not qualified to or cannot maintain or repair with Contractor's normal complement of personnel and the equipment on board.

**603.   Operator's Representatives**

Operator may from time to time designate representatives for the purpose of this Contract who shall at all times have access to the Drilling Unit and may, among other things, observe tests, examine cuttings and cores, inspect the work performed by Contractor, or examine the records kept on the Drilling Unit by Contractor. Operator shall designate a senior representative to resolve day-to-day matters requiring decision by Operator who will be present on board the Drilling Unit. Contractor may treat Operator's senior representative on board the Drilling Unit as being in charge of all Operator's Personnel on board. Operator agrees that Operator's Personnel shall be subject to Contractor's policies regarding prohibition of alcoholic beverages, controlled substances, and contraband, including random searches and tests. Operator further agrees that Operator's Personnel who have duties which directly affect the safety operations under this Contract shall be subject to and in compliance with applicable U.S. Coast Guard regulations with respect to drug and alcohol testing.

**604.   Replacement of Operator's Personnel**

Contractor shall have the right to request in writing Operator to remove and replace any Operator's Personnel on board the Drilling Unit if Contractor can show reasonable grounds for such request.

**605.   Drilling Site and Access**

Operator will be responsible for providing access to the drilling location, as well as selecting, marking, and clearing drilling locations, for providing proper and sufficient certificates, including, without limitation, and if applicable, the Certificate of Financial Responsibility required pursuant to the OCS Lands Act and/or the Oil Pollution Act of 1990 (OPA 90) as amended, permits or permission necessary to enter upon and operate on the drilling location, and for notifying Contractor of any obstructions, impediments, faulty bottom conditions or hazards to operations in the area of each drilling location or within the anchor pattern, including but not limited to wellheads, platforms, pipelines, cables, boulders, and mud filled depressions. Operator will also provide Contractor with soil and sea bottom condition surveys at each drilling location hereunder adequate to satisfy Contractor's marine surveyor. In the event the Drilling Unit is used over a platform, all surveys to determine the structural integrity of the platform will be the responsibility of Operator.

Should seabed conditions be unsatisfactory to properly support or moor the Drilling Unit upon arrival at the drilling location or during operations hereunder, Operator shall continue to pay Contractor the Standby Rate pursuant to Paragraph 705 until seabed conditions are ultimately remedied.

)

*Revised April 2003*

*Notwithstanding any other provision of this Contract, should there be any obstructions, impediments, faulty bottom conditions or hazards to operations at or within the area of the drilling location, including the anchor pattern, and these obstructions, impediments, faulty bottom conditions or hazards to operations damage Contractor's Items, or Contractor's Items damage these obstructions or impediments, or if seabed conditions prove unsatisfactory to properly support or moor the Drilling Unit during operations hereunder, Operator will be responsible for and hold harmless and indemnify Contractor for all resulting damage, including payment of the Standby Rate during required repairs, but Operator will receive credit for any physical damage insurance proceeds received by Contractor as a result of any damage to the Drilling Unit. All expenses associated with improvements to the seabed and repositioning of the Drilling Unit at the drilling location under this Paragraph 605 shall be for Operator's account.*

### 606.   State or Local Tax Liability

In the event that Contractor, as a result of operations under this Contract in any state waters, determines that a tax payment is due to an appropriate taxing authority or receives an assessment of tax directly by an appropriate taxing authority, Contractor will, prior to making any payment, notify Operator of such determination or assessment. *If Contractor is required to pay the tax, Operator agrees to be responsible for and hold harmless and indemnify Contractor from any and all claims with respect thereto. In addition, Operator will reimburse Contractor any sums so paid.*

## ARTICLE VII - RATES OF PAYMENT

### 701.   Payment

Operator shall pay to Contractor during the term of this Contract the amounts from time to time due, calculated to the nearest hour, according to the rates of payment herein set forth and in accordance with the other provisions hereof, notwithstanding any breach of representation or warranty, either expressed or implied, or the negligence or fault of Contractor, its employees, subcontractors, consultants, agents or servants, including sole, concurrent or gross negligence, either active or passive, latent defects or unseaworthiness of any vessel or vessels, including the Drilling Unit, (whether or not preexisting) and any liability based on any theory of tort, breach of contract, breach of duty (whether statutory, contractual or otherwise), regulatory or statutory liability, or strict liability, including defect or ruin of premises, either latent or patent.

### 702.   Mobilization Fee

In addition to Operator's obligation to pay the Standby Rate in accordance with Paragraph 705 and to supply Operator's Items, Operator shall pay Contractor a Mobilization Fee as specified in Appendix A which shall be earned on the date the Drilling Unit departs for the Operating Area.

### 703.   Demobilization Fee

In addition to Operator's obligation to pay the Standby Rate in accordance with Paragraph 705 and to supply Operator's Items, Operator shall pay Contractor a Demobilization Fee as specified in Appendix A which shall be earned on the date of termination of this Contract.

### 704.   Operating Rate

The Operating Rate specified in Appendix A will first become payable from the moment when the Drilling Unit arrives at the first drilling location and commences either jacking operations or running anchors (whichever is applicable). The Operating Rate shall continue to be payable throughout the duration of the Contract, except as herein otherwise provided.

### 705.   Standby Rate

The Standby Rate specified in Appendix A will be payable as follows:

*Revised April 2003*

(a) during any period of delay when Contractor is unable to proceed because of adverse sea or weather conditions, including loop and eddy currents, or as a direct result of an act, instruction or omission of Operator including, without limitation, the failure of any of Operator's Items, or the failure of Operator to issue instructions, provide Operator's Items or furnish services;

(b) from the Commencement Date until the moment when the Operating Rate first becomes payable;

(c) during any period after the Commencement Date that the Drilling Unit is under tow, or under way, provided that if, at the termination of this Contract, the Drilling Unit does not go to the location specified in Appendix A, the period shall be the reasonably estimated time required to go to that location specified in Appendix A;

(d) during any period after the Commencement Date that the Drilling Unit is undergoing periodic inspections required for the maintenance of the Certification and Classification Certificates;

(e) during any period when operations are suspended to repair the Drilling Unit or other Contractor's Items as provided in Paragraph 605 or due to blowout, fire, cratering, shifting or punch through at a drilling location;

(f) during any period when operations are being conducted hereunder to redrill or repair the hole drilled hereunder which is lost or damaged as a result of Contractor's sole negligence or wilful misconduct; and

(g) as provided in Paragraph 901.

**706.   Rate During Repair**

The Repair Rate specified in Appendix A will be payable for any period in excess of the repair time specified in Appendix A per occurrence during which operations are suspended to permit necessary replacement or repair of Contractor's Items, except as provided in Paragraphs 605 and 707. Suspensions for routine maintenance and inspections, such as lubrication, packing of swivels, changing of pump parts, slipping lines, servicing the top-drive, testing BOP equipment, drill string inspections and any certification inspections, shall not be considered repair time for purposes of this Paragraph.

**707.   Force Majeure Rate**

The Force Majeure Rate specified in Appendix A will be payable during any period in which operations are not being carried on because of Force Majeure as defined in Paragraph 1303, including periods required to repair damage caused by a Force Majeure event, up to a maximum of thirty (30) consecutive days, after which and during the continuous existence of the Force Majeure condition no rate will be payable and the Contract may be terminated at the option of either party, subject to demobilization as provided in Paragraphs 703 and 705(c).

**708.   Additional Payments**

Operator shall, in addition, pay to Contractor:

(a) the cost of any overtime paid by Contractor to Contractor's Personnel in respect of the maintenance or repair on board the Drilling Unit of Operator's Items or other overtime required by Operator;

(b) Contractor's costs associated with waiting on Operator furnished transportation or for time in excess of two hours in transit to or from the Drilling Unit, or as a direct result of an act, instruction or omission of Operator;

(c) in the event the Drilling Unit is taken into sheltered waters or harbor for inspection, repair, maintenance, or structural defects, the related rig move costs and harbor expenses will be for Operator's account;

(d) Contractor's costs associated with evacuations and accommodations of personnel caused by adverse sea or weather or other hazardous conditions; and

*Revised April 2003*

    (e)  Contractor's costs associated with moving Contractor's Items and Personnel, and their personal effects, if Contractor is required to change its Operating Base.

## 709.   Variation of Rates

The rates and payment herein set forth shall be revised by the actual amount of the change in Contractor's cost if an event as described below occurs or if the cost of any of the items hereinafter listed shall increase by more than the amount indicated below from Contractor's cost thereof on the Effective Date or by the same amount after the date of any revision pursuant to this Paragraph:

    (a)  labor costs, including all payroll burden and benefits paid by Contractor for its employees;

    (b)  if Operator requires Contractor to increase the number of Contractor's Personnel;

    (c)  if it becomes necessary for Contractor to change the work schedule of its personnel or change the location of its Operating Base or Operating Area;

    (d)  in the event described in Paragraph 1102;

    (e)  if the cost of insurance premiums increases by five percent (5%) or more;

    (f)  if the cost of catering increases by five percent (5%) or more;

    (g)  if there is any change in laws, rules, regulations, legislation or classification society rules, including the enforcement or interpretation thereof, that increases Contractor's financial burden; and

    (h)  the rates listed herein shall be increased for costs other than those listed above on the Commencement Date and at three (3) month intervals thereafter based on changes in the Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119102) as published by the U.S. Department of Labor from that reported for the month of the Effective Date. Said rates shall be increased proportionately by the percentage specified in Appendix A for each change of five percent (5%) in said Index.

## ARTICLE VIII - INVOICES, PAYMENTS AND LIENS

### 801.   Monthly Invoices

Contractor shall bill Operator at the end of each month, or at the end of each well, if sooner, for all daily charges earned by Contractor. Other charges shall be billed as earned. Billings for daily charges will reflect details of the time spent (calculated to the nearest hour) and the rate charged for that time. Billings for other charges will be accompanied by invoices supporting costs incurred for Operator or other substantiation as reasonably required. Contractor's billings shall be delivered as specified in Appendix A.

### 802.   Payment

Operator shall pay all invoices within thirty (30) days after the receipt thereof except that if Operator disputes an item invoiced, Operator shall within twenty (20) days after receipt of the invoice notify Contractor of the amount disputed, specifying the reason therefor, and payment of the disputed amount may be withheld until settlement of the dispute, but payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within thirty (30) days after receipt of invoice shall bear interest at the rate specified in Appendix A or the maximum allowed by law, whichever is less, from said due date until paid. Contractor shall have the right, upon ten (10) days prior written notice, to terminate this Contract if Operator fails or refuses to timely pay Contractor amounts due and owing to Contractor.

*Revised April 2003*

**803.**   **Manner of Payment**

All payments due by Operator to Contractor hereunder shall be made by wire transfer or as otherwise agreed to Contractor's bank account which is specified in Appendix A.

**804.**   **Financial Guarantee**

If required by Contractor, Operator shall,  prior to commencing operations under this Contract, provide Contractor with a letter of credit or other financial security in an amount and form acceptable to Contractor. The security shall be worded to make the proceeds payable to Contractor upon presentation of a sight draft by Contractor.

**805.**   **Liens and Encumbrances**

Operator shall have no right, power or authority to create, incur, or permit to be imposed upon the Drilling Unit any liens or encumbrances whatsoever.  *Operator shall at all times be responsible for and hold harmless and indemnify Contractor and the owners of the Drilling Unit from and against any and all claims, demands, causes of action, damages, judgments, costs and expenses (including attorney's fees, costs of litigation, and the costs of bonds or other security) which may be incurred or suffered by Contractor or the owners of the Drilling Unit resulting from or arising out of any lien or encumbrance filed, asserted or claimed against the Drilling Unit created, incurred or permitted to be imposed by, through or under Operator.*

### ARTICLE IX - LIABILITY

*900.*   *General*

*For the purposes of this Article IX, the terms "Affiliated Company", "Contractor's Items", "Operator's Items", "Contractor's Personnel" and "Operator's Personnel" shall have the meanings as defined in Article I.*

*901.*   *Equipment or Property*

    *(a) Except as specifically provided herein to the contrary, Contractor shall at all times be responsible for and hold harmless and indemnify Operator from and against damage to or loss of Contractor's property, Contractor's Items, and the property, equipment, material and services of Contractor's Affiliated Companies, partnerships, and limited liability companies, and its and all of their co-owners, partners, co-venturers, joint owners, and its contractors and subcontractors of any tier and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers and subrogees of each of the foregoing. Except to the extent that the proceeds from Contractor's insurance as made available to Contractor do not compensate Contractor therefor,*

    *(1) Operator shall be responsible for and hold harmless and indemnify Contractor for loss or destruction of or damage to Contractor's drill pipe, drill collars, subs, reamers, bumper subs, stabilizers and other in-hole equipment when such equipment is being used in the hole below the rotary table, normal wear excepted.  Abnormal wear and/or damage for which Operator shall be responsible hereunder shall include, but not be limited to, wear and/or damage resulting from the presence of $H_2S$ or other corrosive elements in the hole including those introduced into the drilling fluid, excessive wear caused by sandcutting, damage resulting from excessive or uncontrolled pressures such as those encountered during testing, blowout, or in a well out of control, excessive deviation of the hole from vertical, dog-leg severity, fishing, cementing or testing operations, and from any unusual drilling practices employed at Operator's request.  Operator's responsibility for such abnormal wear and/or damage as referred to herein shall include abnormal wear and/or damage to Contractor's choke hoses and manifolds, BOP and other appurtenant*

Revised April 2003

equipment. Operator shall pay the cost of repairing damaged equipment if repairable. In the case of equipment lost, destroyed or damaged beyond repair, Operator shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit.

(2) Operator shall be responsible for and hold harmless and indemnify Contractor for damage to or loss of Contractor's subsea and mooring equipment, including without limitation, chains, anchors, the riser, slip joint, choke and kill lines, flexible hoses, hydraulic hoses and guidelines, subsea BOP, shackles, pendant lines and buoys, and shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit, or the repair cost, whichever is applicable.

(3) Operator shall be responsible for and hold harmless and indemnify Contractor for loss or destruction of or damage, including corrosion and contamination, to Contractor's surface equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements introduced into the drilling fluid (including elements introduced from the hole), or the presence of naturally occurring radioactive materials (NORM). Operator shall pay the cost of repairing and/or decontaminating damaged equipment if repairable. In the case of equipment lost, destroyed, damaged or contaminated beyond repair, Operator shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit. In addition, notwithstanding the provisions of Paragraph 706 of this Contract, the Standby Rate shall apply with respect to any downtime that may occur or result from such damage, including decontamination operations.

(4) Operator shall be responsible for and hold harmless and indemnify Contractor for damage to or loss of the Drilling Unit caused by Operator furnished helicopters, tugs, supply or service vessels.

(b) Contractor's operating practices require the BOP stack to be operated at one (1) degree or less from vertical to avoid abnormal wear and damage. In the event the stack angle exceeds one (1) degree from vertical, Operator shall be responsible for and hold harmless and indemnify Contractor for loss or damage to Contractor's subsea and in-hole equipment which may result. Operator shall pay the cost of repairing damaged equipment if repairable. In the case of equipment lost, destroyed or damaged beyond repair, Operator shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit. In addition, notwithstanding the provisions of Paragraph 706 of this Contract, the Standby Rate shall apply with respect to the period of time required to repair or replace Contractor's subsea and in-hole equipment that may occur or result from such loss or damage.

(c) Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against damage to or loss of Operator's property, Operator's Items, and the property, equipment, material and services of Operator's Affiliated Companies, partnerships, and limited liability companies, and its and all of their co-owners, co-lessees, farmors, farmees, partners, co-venturers, joint owners, and its contractors and subcontractors of any tier (with the exception of Contractor and its subcontractors of any tier) and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers and subrogees of each of the foregoing.

Revised April 2003

902.   *The Hole*
In the event the hole should be lost or damaged at any time, Operator shall, except as provided in Paragraph 705(f), be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from such damage to or loss of the hole, including all downhole property therein.

903.   *Contractor's Personnel*
Contractor shall at all times be responsible for and hold harmless and indemnify Operator from and against all claims, demands and causes of action of every kind and character on account of bodily injury, illness or death of Contractor's Personnel or Contractor's invitees or damage to their property.

904.   *Operator's Personnel*
Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character on account of bodily injury, illness or death of Operator's Personnel or Operator's invitees or damage to their property.

905.   *Pollution and Contamination*
Notwithstanding anything to the contrary contained herein, the responsibility for pollution or contamination shall at all times be as follows:

(a) Contractor shall be responsible for and hold harmless and indemnify Operator for control and removal of pollution or contamination which originates above the surface of the water from spills of fuels, lubricants, motor oils, normal water base drilling fluid and attendant cuttings, pipe dope, paints, solvents, ballast, bilge and garbage wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.  For purposes hereof the term "normal water base drilling fluid" means drilling fluid which does not exceed toxicity limits specified for offshore discharges by the environmental protection entity having jurisdiction over the Operating Area.

(b) Operator shall be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier against all claims, demands, and causes of action of every kind and character (including control and removal of the pollutant involved) arising directly or indirectly from all pollution or contamination (including radioactive contamination), other than that described in Paragraph 905(a) above, which may occur including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use of or disposition of radioactive sources, lost circulation and fish recovery materials and fluids, oil emulsion, oil base or chemically treated drilling fluids and attendant cuttings, and drilling fluids other than "normal water base drilling fluid" defined in Paragraph 905(a) above.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator for whom such party is performing work is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations and limitations set forth in Paragraphs 905(a) and (b) above, shall be specifically applied.

906.   *Debris Removal and Cost of Control*
Operator shall at all times  be responsible for and hold harmless and indemnify Contractor for the cost of removal of debris (including Contractor's Items) to the extent that proceeds from Contractor's

Copyright © 2003 International Association of Drilling Contractors

*Revised April 2003*

*insurance as made available to Contractor do not compensate Contractor therefor. Operator shall at all times be responsible for and hold harmless and indemnify Contractor for the cost of regaining control of any wild well.*

### 907.   Underground Damage
*Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the seabed, and for any loss or damage to any formation, strata, or reservoir beneath the seabed.*

### 908.   Patent Liability
*Contractor shall at all times be responsible for and hold harmless and indemnify Operator from and against any and all loss or liability arising from infringement of patents of the United States covering equipment furnished by Contractor. Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against any and all loss or liability arising from infringement or alleged infringements of patents covering the property, equipment, methods or processes furnished or directed by Operator.*

### 909.   Consequential Damages
*Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting form business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties.*

*Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.*

### 910.   Termination of Location Liability
*Notwithstanding any other provisions of this Contract, once the Drilling Unit is under way from the well location, Operator shall be responsible for and hold harmless and indemnify Contractor for loss or damage to property, personal injury or death of any person which occurs thereafter as a result of the condition of the well or the location and Contractor shall be relieved of such liability.*

### 911.   Indemnity Obligation
(a) *The parties intend and agree that the phrase "be responsible for and hold harmless and indemnify" in Paragraphs 605, 606, 805 and 901 through 910 hereof means that the indemnifying party shall release, indemnify, hold harmless and defend (including payment of reasonable attorney's fees and costs of litigation) the indemnified party from and against any and all claims, demands, causes of action, damages, judgments and awards of any kind or character, without limit and without regard to the cause or causes thereof, including claims, demands, and causes of action arising out of operation of any vessel or vessels (including the Drilling Unit), including ingress and egress to the well location, and loading and unloading of personnel and cargo, and also including preexisting conditions, defect or ruin of premises or equipment (whether such conditions, defect or ruin be patent or latent), the unseaworthiness of any vessel or vessels (including the Drilling Unit), breach of*

*Revised April 2003*

*representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise), strict liability, any theory of tort, breach of contract, fault, regulatory or statutory liability, products liability, the negligence of any degree or character (whether such negligence be sole, joint or concurrent, active, passive or gross) of any person or persons, including such negligence of the party seeking the benefit of a release, indemnity or assumption of liability, or any other theory of legal liability.*

(b) *An indemnifying party's obligations contained in this Contract shall extend to the indemnified party and shall inure to the benefit of such party, its Affiliated Companies, and their co-owners, co-venturers, co-lessees, farmors, farmees, and joint owners, and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each, and to actions against the Drilling Unit, its legal and beneficial owners, whether in rem or in personam.*

(c) *Except as otherwise provided herein, the terms and provisions of Paragraphs 605, 606, 805 and 901 through 910 shall have no application to claims or causes of action asserted against Operator or Contractor which arise solely by reason of any agreement of indemnity with a person or entity not a party hereto. Except as otherwise provided herein, nothing contained herein shall confer any rights upon any third party beneficiary.*

**912.** <u>*General Intent*</u>
*The parties recognize that the performance of well drilling, workover and associated activities such as those to be performed under this Contract have resulted in bodily injury, death, damage or loss of property, well loss or damage, pollution, loss of well control, reservoir damage and other losses and liabilities. It is the intention of the parties hereto that the provisions of this Article IX and Paragraphs 605, 606 and 805 shall exclusively govern the allocation of risks and liabilities of said parties without regard to cause (as more particularly specified in Paragraph 911), it being acknowledged that the compensation payable to Contractor as specified herein has been based upon the express understanding that risks and liabilities shall be determined in accordance with the provisions of this Contract.*

## ARTICLE X - INSURANCE

**1001.** <u>Insurance</u>
Contractor shall carry and maintain, or cause to be carried and maintained, insurance coverages of the type and in the amounts set forth in Appendix E, covering only those liabilities specifically assumed by Contractor under this Contract.

All references in this Contract to "insurance" of Contractor shall mean such insurance as set forth in Appendix E. Contractor shall have the right to self-insure any or all of that portion of insurance relating to loss or damage to Contractor's Items.

Operator shall carry and maintain, or cause to be carried and maintained, the insurance coverages of the types and amounts set forth in Appendix F, covering only those liabilities specifically assumed by Operator under this Contract.

All references in this Contract to "insurance" of Operator shall mean such insurance as set forth in Appendix F. Operator shall have the right to self-insure any or all of that portion of insurance relating to loss or damage to Operator's Items.

*Revised April 2003*

**1002.   Certificates**

Each party will furnish the other, on request, certificates indicating that the required insurance is in full force and effect and that the same shall not be canceled or materially and adversely changed without ten (10) days prior written notice to the other party.

**1003.   Subrogation**

For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator, its Affiliated Companies and their co-owners, co-venturers, co-lessees, farmors, farmees, and joint owners and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Operator will, as well, cause its insurer to waive subrogation against Contractor and Contractor's Affiliated Companies and their co-owners, and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each for liabilities it assumes.

**1004.   Additional Insured**

Contractor shall name Operator as additional insured, where permitted, under its policies of insurance, but only with respect to and to the extent of the liabilities specifically assumed by Contractor under this Contract. Operator shall name Contractor as additional insured, where permitted, under its policies of insurance, but only with respect to and to the extent of the liabilities specifically assumed by Operator under this Contract.



**ARTICLE XI - SUBLETTING AND ASSIGNMENT**

**1101.   Subcontracts**

Either party may employ other contractors to perform any of the operations or services to be provided or performed by it.

**1102.   Assignment**

Neither party may assign this Contract other than to an Affiliated Company without the prior written consent of the other, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that increases Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase in Contractor's operating costs or taxes.

## ARTICLE XII - NOTICES

**1201.   Notices**

Notices, reports and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, digitally transmitted or telecopied to the address as specified in Appendix A. Either party may by notice to the other party change its address. Notices shall be effective upon receipt.

## ARTICLE XIII - GENERAL

**1301.   Confidential Information**

Upon written request of Operator, all information relating to the well obtained by Contractor in the conduct of operations hereunder shall be held confidential by Contractor who will use the same degree of care it uses in safeguarding its own confidential information.

*Revised April 2003*

**1302.   Attorney's Fees**

If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs of litigation.

**1303.   Force Majeure**

Except as otherwise provided in this Paragraph 1303 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by riots, strikes, wars (declared or undeclared), insurrection, rebellions, piracy, terrorist acts, civil disturbances, dispositions or order of governmental authority, whether such authority be actual or assumed, acts of God (except, however, adverse sea or weather conditions including loop and eddy currents but excluding tropical storms), inability to obtain equipment, supplies, fuel or necessary labor, or by any act or cause (other than financial distress or inability to pay debts when due) which is reasonably beyond the control of such party, such cause being herein sometimes called "Force Majeure."  Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law.  In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence.  In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obliged to pay to Contractor the Force Majeure Rate provided for in Paragraph 707.

**1304.   Right to Audit**

For a period of two years from termination of the Contract, Contractor shall keep proper books, records and accounts of operations hereunder and shall permit Operator at all reasonable times to inspect the portions thereof related to any variation of the rates under Paragraph 709 or charges for reimbursable items.

**1305.   Compliance with Laws**

Each party hereto agrees to comply with all laws, rules and regulations of any federal, state or local government authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract.  When required by law, the terms of Appendix G shall apply to this Contract.  In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.  *If any act or omission by Contractor in response to an instruction of Operator's Personnel violates such law, Operator shall indemnify Contractor for any consequences thereof.*

**1306.   Waivers**

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

**1307.   Entire Agreement**

This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder.  All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

**1308.   Enurement**

This Contract shall enure to the benefit of and be binding upon the successors and assigns of the parties.

*Revised April 2003*

**IN WITNESS WHEREOF THE PARTIES HAVE EXECUTED THIS CONTRACT ON THE DAY AND YEAR FIRST ABOVE WRITTEN.**

OPERATOR: _____

BY: _____

TITLE: _____


CONTRACTOR: _____

BY: _____

TITLE: _____

# SAMPLE

*Revised April 2003*

**APPENDIX A**

Attached to and incorporated as a part of that certain Contract dated _____.

Paragraph
Number:

| | | |
|---|---|---|
| **101 (f)** | Operating Area: | _____ |
| **101 (g)** | Operating Base: | _____ |
| **202** | Duration: | _____ |
| **203 (b)** | Termination: | _____ |
| **203 (b) &** | | (Date or Number of Wells) |
| **705 (c)** | Demobilization Location: | _____ |
| **204** | Option Term: | _____ |
| | Option Notice: | _____ days after spud of prior well |
| | Deadline for Mutual Agreement: | _____ days after notice of exercise of option |
| **503** | Maximum Water Depth: | _____ |
| | Minimum Water Depth: | _____ |
| | Maximum Well Depth: | _____ |
| **601** | Handling Charge: | _____ % |
| **702** | Mobilization Fee: | U.S. $_____ |
| **703** | Demobilization Fee: | U.S. $_____ |
| **704** | Operating Rate: | U.S. $_____ per day |
| **705** | Standby Rate: | U.S. $_____ per day |
| **706** | Repair Rate: | U.S. $_____ per day |
| | Repair Time at Prior Applicable Rate: | |
| | | Surface Equipment: _____ per occurrence |
| | | Subsea Equipment: _____ per occurrence |
| **707** | Force Majeure Rate: | U.S. $_____ per day |
| **709 (h)** | Percentage Increase for Variation of Rates | _____ |
| **801** | Address for Contractor's Billings: | _____ |
| | | _____ |
| | | _____ |
| | | _____ |
| | | Telecopier: _____ |
| | | Attention: _____ |

SAMPLE

*(Offshore Daywork Drilling Contract - US   Appendix "A" - Page 1)*
Copyright © 2003 International Association of Drilling Contractors

*Revised April 2003*

**802**    Interest Rate on Late
          Payments:                                                                    per annum

**803**    Address for Payment:

                                    Acct. No.

**1201**   Address for Notices:

           Operator:

                                    Telecopier:
                                    Attention:

           Contractor:

                                    Telecopier:
                                    Attention:

Special Provisions:

*Revised April 2003*

## APPENDIX B

DRILLING UNIT AND EQUIPMENT TO BE PROVIDED BY CONTRACTOR

**I.** <u>**Drilling Unit Description**</u>



**II.** <u>**Equipment Inventory**</u>

*Revised April 2003*

## APPENDIX C

### PERSONNEL TO BE PROVIDED BY CONTRACTOR

| Classification | Number on Board | Total Number | Work Schedule |
|---|---|---|---|



*Revised April 2003*

## APPENDIX D

### CHECKLIST OF CONTRACTOR'S AND OPERATOR'S OBLIGATIONS

| | **Category** |
|---|:---:|
| Furnished by Contractor, paid by Contractor | 1 |
| Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| Furnished by Contractor, paid by Operator, no handling charge | 3 |
| Furnished by Operator, paid by Operator | 4 |

| | | |
|---|---|:---:|
| 1. | Contractor's Items as set forth in Appendix B. | 1 |
| 2. | Except as otherwise specified, maintenance and repair, including repair parts, of Contractor's Items. | 1 |
| 3. | Maintenance and repair, including repair parts, of Operator's Items except as provided in Paragraph 403. | 4 |
| 4. | All charges relative to acquisition, shipping and transportation (except charges as provided in Items 61, 62, 64, 65, 66, 70 and 78) of all Contractor's Items required as replacements or spare parts. | 1 |
| 5. | Contractor's Personnel including replacement, subsistence, insurance, wages, benefits, and all other costs related thereto, except for increases pursuant to Paragraph 709. | 1 |
| 6. | Extra personnel in excess of the complement of personnel set forth in Appendix C when requested in writing by Operator. | 3 |
| 7. | Overtime beyond normal work schedule for Contractor's Personnel when requested in writing by Operator. | 3 |
| 8. | Required licenses, permits, certificates of financial responsibility and clearances to enter upon and depart from drilling location, pursuant to Paragraph 605. | 4 |
| 9. | Surveying service and marker buoys to mark drilling location. | 4 |
| 10. | Sea floor surveys required by Contractor's Marine Surveyor. | 4 |
| 11. | Sea bottom coring services at the drilling location if required by Contractor. | 4 |
| 12. | Fuel, oil, greases, lubricants and hydraulic fluid for Contractor's Items and Operator's Items. | |
| | a. Fuel; | 4 |
| | b. Oil, greases, lubricants and hydraulic fluid. | 3 |
| 13. | Water for drilling, washdown and cementing and excess potable water, if required. | 4 |
| 14. | Drilling fluid and additives including lost circulation material. | 4 |
| 15. | Mud logging services. | 4 |
| 16. | Normal welding services required on Operator's Items to the extent available from Contractor's Personnel. | 1 |
| 17. | Welding materials used on Operator's Items. | 2 |

SAMPLE

*Revised April 2003*

18. Pneumatic hoses between supply vessels and Drilling Unit for unloading fuel, water, bulk cement and mud materials including repair and replacement of same:
    a. Initial hoses;   1
    b. All replacements.   2

19. Mooring system between supply vessels and Drilling Unit including repair and replacement:
    a. Initial;   1
    b. All replacements.   2

20. Pre-slung cargo and pre-slung cargo baskets for use in transporting Contractor's Items to and from supply vessels.   1

21. Pre-slung cargo and pre-slung cargo baskets for use in transporting Operator's Items to and from supply vessels.   4

22. Towing service for all Drilling Unit moves, as approved by Contractor's insurance underwriters.   4

23. Tow lines and bollards.   4

24. Anchor setting and retrieving with marine vessels including anchor handling crews, if required.   4

25. Additional anchors and buoy lines, if required, including all repairs and replacement.   3

26. Inspection of Contractor's drill pipe, drill collars and other in-hole equipment according to API standards before operations commence under this Contract, if required.   1

27. Inspection of Contractor's drill pipe, drill collars and other in-hole equipment according to API standards after operations commence under this Contract at reasonable intervals requested by Operator.   4

28. Drill pipe casing protectors (one per joint inside conductor or surface casing) on Contractor's drill pipe.   1
    a. All additional rubbers or replacements for rubbers installed.   2

29. Drill pipe casing protectors on other drill pipe furnished by Operator, if required by Operator.   4

30. Kelly saver sub rubbers, and replacements, for kellys furnished by Contractor.   1

31. Drill pipe wipers.   1

32. Fishing tools other than provided by Contractor as set forth in Appendix B.   4

33. Repair and/or replacement parts for Contractor furnished fishing tools.   3

34. Drilling bits, stabilizers, hole openers, reamers, under-reamers, well scrapers, drilling bumper subs, drilling safety joints, hydraulic drilling jars, and other special in-hole equipment, including replacement parts and repairs for same.   4

35. Directional surveying equipment and service.   4

36. Deflection drilling tools and service.   4

37. Drill pipe, drill collars and handling tools other than those specified in Appendix B.   4

38. Blowout prevention equipment other than as listed in Appendix B.   4

39. Wellhead equipment and supplies.   4

40. Tubular goods, hangers, packers and accessories.   4

Copyright © 2003 International Association of Drilling Contractors

*Revised April 2003*

41. Casing shoes, float collars, baskets, centralizers, scratchers, scrapers, baffles and other casing accessories. — 4

42. Casing tools as provided in Appendix B. — 1
    a. All repairs and replacements, if used. — 3

43. Tubing tools, including slips, elevators, power tongs (or jaws for Contractor's power tongs), wrenches, and tubing pipe wiper. — 4

44. Swabbing equipment, including lubricator, swab valve, swabs, oil savers, sinker bars, rope sockets and jars, if required (except sand line). — 4

45. Swab rubbers and oil saver rubbers. — 4

46. Core barrels and handling tools. — 4

47. Core heads and core catchers. — 4

48. Wireline logging unit, maintenance of unit and logging services. — 4

49. Wireline formation testing and sidewall sampling equipment and services. — 4

50. Drill stem test equipment and services. — 4

51. Gun and perforating services. — 4

52. Cement and cementing services. — 4

53. Cementing if specified in Appendix B. — 1
NOTE: If Operator uses the services of a cementing service company other than the owner of the cementing unit, any charges imposed upon Contractor by the owner of the cementing unit as consequence thereof shall be for Operator's account.

54. Repair and maintenance of Contractor furnished cementing unit. — 3

55. Labor to install servicing equipment by Operator aboard the Drilling Unit and for later removal, if required, including, but not limited to, cementing unit, wireline logging unit, mud logging unit, diving equipment and well testing system. — 4

56. Supplies and materials to install Operator's Items. — 4

57. Well testing system complete with separators, heaters, gas vents, metering, piping and valves, oil and/or gas burner, necessary booms, piping igniters, fabrication and installation. — 4

58. Test tanks for well fluid. — 4

59. Administrative center including offices, office furniture, equipment and supplies for Contractor's Personnel, warehousing and storage yard at Operating Base for Contractor's Items, if required. — 1

60. Administrative center including offices, office furniture, equipment and supplies for Operator's Personnel, warehousing and storage yard facilities for Operator's Items. — 4

61. Port facilities and dockside area in vicinity of Operating Base for loading and unloading Contractor's and Operator's Items on and off supply vessels. — 4

62. Transportation for Contractor's Items and Personnel:
    a.    Routine transportation from point of origin to Operating Base; — 1
    b.    Routine transportation from Operating Base to and return from dockside and/or heliport; — 4
    c.    Routine transportation from one Operating Base to another; — 4

*Revised April 2003*

    d.   Temporary lodging, if required, and transportation from Operating Base to and return from dockside and/or heliport and between Operating Bases during evacuation due to weather or other safety reasons;    3

    e.   Emergency transportation for both Operator and Contractor, as required.    4

63. Transportation for Operator's Items and Personnel to dockside at Operating Base or point of departure and return.    4

64. Dockside labor and equipment at Operating Base to load and unload Contractor's and Operator's Items from or to land transportation and from or to supply vessels.    4

65. Marine transportation for Contractor's and Operator's Items and Personnel from dockside to Drilling Unit and return with supply vessels supplied by Operator:    4

    a.   Crew boats to transport personnel of Operator and Contractor, if required;    4

    b.   Standby boat, if required.    4

66. Storage space at dock site for Contractor's Items.    4

67. Storage space at dock site and Operating Base for Operator's Items.    4

68. Onshore transportation for Contractor's shorebased personnel.    1

69. Onshore transportation for Operator's shorebased personnel.    4

70. Fees, licenses, pilotage fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Contractor's Items and replacements or spare parts.    3

71. Fees, licenses, pilotage fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Operator's Items and replacements or spare parts.    4

72. Communication system from Drilling Unit to supply vessel and supply vessel to Operator's Operating Base office or direct to Operating Base, including permits and licenses:    4

    a.   Communication system from Drilling Unit to Contractor's office or shore base, including permits and licenses;    1

    b.   Communication system operators.    4

73. All helicopter transportation as required including medical evacuation.    4

    a.   Non-directional beacon for helicopter operations.    4

74. Helicopter refueling system aboard Drilling Unit including helicopter fuel tanks, fuel tank stand, fuel pump filters, hoses and grounding systems.    4

75. Helicopter fuel and lubricants.    4

76. Special or additional helicopter safety equipment aboard Drilling Unit.    4

77. Diver services as required.    4

78. Meals and quarters for all of Contractor's Personnel and up to and including _____ Operator's Personnel.    1

79. Meals and quarters for Operator's Personnel in excess of _____ per day to be charged at $_____ per meal and $_____ per bed.    3

80. Waste storage, removal and disposal, including any required registration and permits. (Operator to provide State and/or Federal waste generator number, if required).    4

Copyright © 2003 International Association of Drilling Contractors

*Revised April 2003*

81. Insurance as provided in Appendix E.     1

82. Insurance as provided in Appendix F.     4

83. Maintenance and repair including repair parts:
   - a. Of Contractor's surface equipment except as provided in Paragraphs 605 and 901;     1
   - b. Rubber goods in Contractor's BOP's;     3
   - c. Of Contractor's subsurface equipment as provided in Paragraphs 605 and 901;     3
   - d. Of Contractor's subsurface mooring equipment including pendant lines.     3

84. Extra labor (in excess of supply vessel's personnel) required aboard supply vessels when alongside Drilling Unit to unload or load Contractor's and/or Operator's Items.     4

85. Anchor piles, if required, and placement of same.     4

86. Subsea equipment:
   - a. Wellhead equipment;     4
   - b. Wellhead connector from BOP stack to as specified in Appendix B;     1
   - c. Subsea running tools for wellheads, if required;     4
   - d. Contractor's surface or subsea blowout preventer system as described in Appendix B;     1
   - e. Wellhead temporary guidebase, if required;     4
   - f. Wellhead guide post structure, if required;     4
   - g. Jetting tools for jetting in conductor casing, if required;     4
   - h. Guide arms and bushings for drilling conductor hole and running conductor casing, if required;     4
   - i. Repair and/or replacement for items (a), (c), (e), (f), (g) and (h).     4

87. Screens for shale shakers up to and including _____ mesh.     1
   - a. Screens for shale shakers above _____ mesh.     3

88. All screens for mud cleaners.     3

89. Weather forecast services, if required.     4

90. Conductor drive hammer and accessories, if applicable, including repairs and/or replacement.     4

91. Personal protective equipment for Contractor's Personnel when using or handling corrosive or hazardous materials.     3

92. Any PVT equipment or other monitoring devices other than specified in Appendix B.     4

*Revised April 2003*

## APPENDIX E

### CONTRACTOR'S INSURANCE

**I.**   <u>**Workers' Compensation and Employer's Liability**</u>

   A.   Workers' Compensation insurance to comply fully with the provisions and applicable laws of the country or state in which the Contractor qualifies as an employer and in which operations hereunder are performed, including U.S. Longshore & Harbor Workers Act and Outer Continental Shelf Lands Act coverage, if applicable.

   B.   Employer's Liability with limits of:

   Bodily Injury by Accident   -   $1,000,000 each accident
   Bodily Injury by Disease   -   $1,000,000 policy limit
   Bodily Injury by Disease   -   $1,000,000 each employee

   C.   Maritime Employer's Liability including Jones Act and Death on the High Seas Act coverage and transportation, wages, maintenance and cure with limits of $1,000,000 each person/$1,000,000 each accident.

   D.   "In rem" endorsement.

   E.   Borrowed Servant/Alternate Employer endorsement.

**II.**   <u>**Comprehensive General Liability Insurance**</u>

   A.   Commercial General Liability, Protective Liability including coverage for premises/operations, contractor's protective liability, contractual liability and products/completed operations coverage and subject to a $1,000,000 combined single limit of liability each occurrence for Bodily Injury and Property Damage.

   B.   Charterer's Legal Liability.

   C.   Deletion of watercraft exclusion as respects operations and contractual liability for watercraft exposure not covered by Protection and Indemnity policy.

   D.   "In Rem" endorsement.

**III.**   <u>**Automobile Liability Insurance**</u>
Standard comprehensive form including all owned, hired and non-owned vehicles with a $1,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**IV.**   <u>**Aircraft Liability**</u>
Aircraft liability including contractual liability covering all owned (if any) hired and non-owned aircraft (fixed wing and rotary) including passenger liability with a $5,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**V.**   <u>**Excess/Umbrella Liability Insurance**</u>

   1.   Providing following form coverage for Employer's Liability, Maritime Employer's Liability Commercial General Liability, Automobile Liability, Aircraft Liability, and Vessel Liabilities.

   2.   Limit of Liability: $_____ combined single limit of liability each occurrence for bodily injury and/or property damage.

*Revised April 2003*

**VI.  Marine Insurance**

1. Hull and Machinery Insurance (including collision liability) shall be provided for the Drilling Unit owned or chartered by Contractor and utilized in the performance of this Contract in an amount equal to the declared value of the Drilling Unit, subject to a deductible determined by Contractor.

2. Protection and Indemnity Insurance or equivalent comprehensive general liability insurance, with watercraft exclusion deleted, shall be provided with a combined single limit of U.S. $_____ per occurrence or the value of the Drilling Unit, whichever is greater.

**VII.  No Recourse of Premium**

All policies of insurance shall be endorsed to delete any recourse of premium, club calls, assessments or advances against Operator, Operator's Affiliated Companies, partnerships, and limited liability companies, and its and all of their co-owners, partners, co-venturers, and joint owners.

**VIII.  Deductibles**

Except as otherwise provided deductibles shall be for the account of Contractor.



*Revised April 2003*

**APPENDIX F**

OPERATOR'S INSURANCE

**I.**   **Workers' Compensation/Employer's Liability**

A. Workers' Compensation insurance to comply fully with the provisions and applicable laws of the country or state in which the Operator qualifies as an employer and in which operations hereunder are performed, including U.S. Longshore & Harbor Workers Act and Outer Continental Shelf Lands Act coverage, if applicable

B. Employer's Liability with limits of:

Bodily Injury by Accident - $1,000,000 each accident
Bodily Injury by Disease - $1,000,000 policy limit
Bodily Injury by Disease - $1,000,000 each employee

C. Maritime Employer's Liability including Jones Act and Death on the High Seas Act coverage and transportation, wages, maintenance and cure with limits of $1,000,000 each person/$1,000,000 each accident.

D. "In rem" endorsement.

E. Borrowed Servant/Alternate Employer endorsement.

**II.**   **Commercial General Liability Insurance**

A. Commercial General Liability including coverage for premises/operations, contractor's protective liability, contractual liability and products/completed operations coverage and subject to a $1,000,000 combined single limit of liability each occurrence for Bodily Injury and Property Damage.

B. Underground Resource/Equipment Coverage.

C. Charterer's Legal Liability.

D. Deletion of watercraft exclusion as respects operations and contractual liability for watercraft exposure not covered by Protection and Indemnity policy.

E. "In Rem" endorsement.

**III.**   **Automobile Liability Insurance**

Standard comprehensive form including all owned, hired and non-owned vehicles with a $1,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**IV.**   **Aircraft Liability**

Aircraft liability including contractual liability covering all owned (if any) hired and non-owned aircraft (fixed wing and rotary) including passenger liability with a $5,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**V.**   **Excess/Umbrella Liability Insurance**

1. Providing following form coverage for Employer's Liability, Maritime Employer's Liability Commercial General Liability, Automobile Liability, Aircraft Liability, and Vessel Liabilities.

2. Limit of Liability: $_____ combined single limit of liability each occurrence for bodily injury and/or property damage.

*Revised April 2003*

## VI.   "All Risk" Insurance

"All Risk" Insurance, subject to a nominal deductible, covering physical loss or damage (including wreck/debris removal) to all Operator's Items and other property of Operator.

## VII.   Operator's Extra Expense Insurance

Operator's Extra Expense Insurance in the amount of not less than U.S. $_____ combined single limit per occurrence to cover any and all sums which Operator and/or Contractor may be obligated to incur as expenses and/or liabilities which may be incurred on account of bringing under control an oil or gas well which is out of control or extinguishing an oil or gas well fire, redrilling or repair of loss or damage to an oil or gas well, seepage and pollution, cleanup and contamination arising from operations under this Contract.

## VIII.   No Recourse of Premium

All policies of insurance shall be endorsed to delete any recourse of premium, club calls, assessments or advances against any member of Contractor, and its Affiliated Companies, partnerships and limited liability companies.

## IX.   Deductibles

Except as otherwise provided deductibles shall be for the account of Operator.

## X.   Operator's Certificate of Financial Responsibility

Operator shall provide a Certificate of Financial Responsibility in compliance with the Oil Pollution Act of 1990, as applicable, for operations in U.S. waters and shall provide a copy to Contractor.

## XI.   Scope

The above specified amounts and types of insurance coverage shall not be deemed to constitute, or be construed as, a limitation on Operator's liability under the Contract.

*Revised April 2003*

## APPENDIX G

### (See Paragraph 1305)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

1.  The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

2.  The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

3.  The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

4.  The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

