

12th May 2010


Honourable Robert Menendez
U.S. Senator
528 Senate Hart Office Building
Washington, DC 20510
United States of America


Dear Sir

**RE:    PROPOSAL TO AMEND THE OIL POLLUTION ACT 1990 (OPA 90) AND THE INTERNAL REVENUE CODE OF 1986**

Executive Summary

The energy insurance market has limited financial capacity for pollution. What protection it can offer, sees many terms and conditions contained in the language of the policies issued. These limitations can range from whether a policy covers pollution originating from a reservoir, the absence of a definition for environmental damage, the sharing of limits with other heads of claims, to whether there is negligence on the part of the entity making the claim.

Insurers' ability to issue an insurance certificate to provide a company with its evidence of financial responsibility under OPA 90 is similarly limited. Our current estimates point to a maximum insurance financial capacity of approximately US$250 million for this exposure, with a further US$1.5 billion subject to the exclusions mentioned above.

We detail below many of the areas that need to be considered carefully in this assessment. It is quite clear to us that the ability to transfer any increased risk to the insurance market is very constrained. The extent to which oil companies, other than the super majors, will be able to provide alternative security, must be questionable.

About INDECS

INDECS is an independent insurance consultancy with over 20 years' experience working across more than thirty countries including the USA. We assist global businesses to achieve a more effective insurance and risk management strategy. INDECS does not sell insurance, we are not a broker, but provide independent advice to our clients on their insurance and risk management needs.

The Proposed Bill

We understand that two bills have been drafted, in the wake of the Deepwater Horizon catastrophe:

1.    To amend the limits of liability for offshore facilities under OPA 90 from US$75 million to US$10 billion
2.    To remove the limit of US$1 billion expenditures from the Oil Spill Liability Trust Fund, and to permit advances to be made to the Fund



Current Insurance Protection

Under OPA 90, holders of leases or permits for offshore facilities are liable for up to US$ 75 million per spill plus removal costs.

Under Section 1016 the holder was initially required to provide evidence of financial responsibility of between US$10 million and US$35 million depending on whether the facility is located seaward or landward of the seaward boundary of the State. This has subsequently increased to the maximum allowed by the act of US$150 million.

There are various methods of evidencing financial responsibility including surety bonds, guarantees, letters of credit and self insurance, but the most common and the one that is most commercially available to all is by means of an insurance certificate. The certificate issued must identify a limit not less than that required under Section 1016.

While there are certain defences under OPA 90, insurers are put in the position of being a guarantor and may not have the ability to rely on the normal general conditions of the policy. Some insurers may also consider that it imposes a more "strict liability" on the insured, and, moreover, enables claims to be made directly against the insurer in certain circumstances. They therefore treat OPA certification distinctly from other insurance that may be available for this type of risk. The potential capacity for this type of insurance, which is the broadest available specifically focusing on OPA obligations and liabilities, is approximately US$150 to US$250 million.

Outside the realms of strict liability and OPA, an insured will be able to obtain coverage for sudden and accidental seepage and pollution by way of its Operators Extra Expense (OEE) and Excess Liability insurances. OEE coverage provides a combined single limit for well control, well redrilling and sudden and accidental seepage and pollution and clean-up. Therefore pollution liability and clean-up cost is subject to the apportionment of this combined single limit over respective risks. In practice the limit would be made available first for control measures (i.e. hiring in specialist well control experts and, if necessary, relief well drilling), with any balance of the limit then being reserved for redrilling and pollution. It is possible to prioritise the use of the limit for compliance with OPA Financial Responsibility provisions, but this would be impractical in relation to the urgency by which oil companies will need to address the well control situation.

We consider that the OEE policy provides the widest cover and is most "user friendly" to oil companies. The pollution element of the cover responds to costs which the insured company is obligated to pay by law or under the terms of the lease/license for the cost of remedial measures or as damages in compensation for third party property damage and third party injury claims. In respect of clean-up and containment, or attempt thereat, the policy pays such costs, including where incurred to divert pollution from shore, and is not on a "liability" basis. It should be noted that there is no definition of environmental damage – claims are recoverable to the extent of damages for third party bodily injury and loss of or damage to, or loss of use of tangible property. This coverage can therefore respond on a "strict liability" basis, where the law or license agreement specifies that such remedial costs or compensation is payable if emanating from the insured's facilities, irrespective of negligence. This contrasts starkly with the coverage available under most Excess Liability policies.



Excess Liability insurance responds to all legal liabilities incurred. Sudden and accidental pollution would be included in any limit provided. In respect of pollution from wells the limit available under these policies sits excess of the OEE policy referred to above (but is subject to its own policy form insuring conditions which are not as wide as OEE policies). In respect of pollution from hydrocarbons stored or being produced from or through facilities such as fixed and floating platforms and pipelines, the limit is from "the ground-up", or in excess of a specific local general liability policy.

Excess Liability Policy forms vary but the market "standard" coverage offers quite limited pollution cover. Some actually specifically exclude pollution from wells. Basically pollution liabilities are excluded from all policies, but within the exclusion is a limited "buy-back", which requires that the pollution event is sudden, accidental and unintended and subject to strict discovery and reporting requirements. However, and significantly, the cover excludes *".... actual or alleged liability to evaluate, monitor, control, remove, nullify and/or clean-up seeping, polluting or contaminating substances to the extent such liability arises solely from any obligations imposed by any statute, rule, ordinance, regulation or imposed by contract".*

We regard this wording as too draconian and would always counsel oil companies to include a specific "pollution endorsement" that overrides this phrasing and would provide legal and statutory liability coverage, including costs incurred under lease block obligations for removal. We think this distinction in cover is important as it will impact capacity. Our figure below of US$1 to US$ 1.5 billion is based upon insurers subscribing to the standard market cover. If an alternative wording is utilised, or the pollution endorsement used, it could have the effect of reducing capacity by about 25 to 35%.

As with the OEE policy, the coverage is geared to damages for compensation in respect of third party bodily injury and third party property loss or damage or loss of use. There is similarly no concept of "environmental damage" expressed in the policy.

Insurance Capacity

The immediate effect of the Deepwater Horizon loss is that capacity will, for a time, be fluid. Most insurers had not factored in to their risk aggregations that the net is spread very wide indeed in respect of responsible parties under OPA. They are now seeing the implications of multi party actions against operators, drilling contractors, cementing engineers and their various sub-contractors arising out of a single incident such as the "Deepwater Horizon" loss. This is because the insurance limits are available to each separate party, so will stack up if three different entities are sued.

In this context the lease block holders constitute one entity (their insurance policies may be separate covering their respective equity interests, but the capacity available is assessed upon 100% interest).

Inevitably the recent loss has increased the demand for higher limits, and has consequently affected the overall aggregate exposures to insurers. This will likely reduce the available limits in the immediate future. At least one insurer has let it be known that its capacity has reduced. Others are reviewing their positions and it is most likely that June renewals will be subject to some reduction in overall capacity. This could be between 25 and 30% reduction, affecting all above policies, except Protection and Indemnity entries. INDECS has close relationships with the Energy



Insurance Market including its insurers and brokers. Based on our knowledge and these relationships we would opine that the following represents the maximum per occurrence capacity in this market currently:

### Operators' Extra Expense (OEE)

The available global market capacity for the OEE cover is between US$500 million and US$750 million per event on 100% basis. This means that the total limit purchased is shared out between the co-owners of the lease block (the licensees) according to their equity interest in the venture (as per the Joint Operating Agreement).

In addition to this capacity, oil companies who are members of the mutual, Oil Insurance Ltd (OIL), Bermuda, (which includes a number of US based E&P companies) can claim up to a further US$ 250 million for each companies' equity interest, limited to US$ 750 million per event, but this limit is also applied on a combined single limit basis, inclusive not only of control of well cost and redrilling, but also property damage and wreck removal.

### Excess Liabilities

The global commercial market limits available are between US$1 billion and US$1.5 billion per event on 100% basis (meaning that the limit is effectively reduced to reflect each of the oil companies' equity interests). This would include capacity available under any specific local general liability policy (normally limited to USD50m per event). This total would be inclusive of capacity from the Bermuda reinsurance market and specifically from Oil Casualty Insurance Ltd (OCIL), which is a sister organisation to OIL. This limit operates on an Ultimate Nett Loss basis, meaning that it must also respond to injuries and fatalities to third parties (but not employees) and to third party property damage and consequential financial loss.

One final issue to consider for the commercial market is that In the event that the pollution arises from a named hurricane there would be a sub-limit agreed in the policy, which may not be more than US$200 million per oil company, and this would be inclusive of all insurable exposures (i.e. property damage, control of well, redrilling, wreck removal and pollution).

### Protection and Indemnity Clubs (P&I)

One further area that merits comment is P&I, which provides cover in respect of pollution from mobile drilling units, heavy-lift vessels, pipelaying vessels and, to the extent that they may ultimately be more widely used in the Gulf of Mexico, Floating Production, Storage and Offtake units (FPSOs).
The limit purchased is generally between US$ 300million and US$ 500 million, but US$ 1 billion per event is theoretically available. However, most US drilling contractors are not insured by the P and I Clubs. US drilling contractors generally rely upon commercial marine liability insurers, whose capacity would be limited to between US$ 500 million and US$ 750 million per event referred to above.



Effects of increasing the OPA 90 limits

In conclusion, if the intention is to increase the limit required under OPA90 to US$10 billion and also the required evidence of financial responsibility to something similar, then quite simply the energy insurance market will no longer be an option. Its capacity lies far below this limit and even then has a number of restrictions contained in it which we have discussed above.

Companies, with the exception of super majors and foreign state owned companies, operating in the United States are highly unlikely to be able to provide any alternative method of financial responsibility such as bonds and lines of credit. The cost of these methods or ability to self insure these risks will far exceed their capabilities, preventing their management from fulfilling their fiduciary liability and presenting a barrier to acquiring new or even servicing existing permits in the future.

If we have understood the proposals correctly, then it would appear to us that the proposed Bill will not act as "Big Oil Bailout Prevention Liability Act of 2010", rather making it impossible for anyone other than "Big Oil" to operate.


Yours sincerely,


**Paul King**
**Director**

CC:   David Sharp, INDECS

      Honourable Barbara Boxer
      Chairman Senate Committee on Environment & Public Works
      410 Dirksen Senate Office Building
      Washington, DC 20510

      Honourable James M. Inhofe
      Ranking Member
      Senate Committee on Environment & Public Works
      456 Dirksen Senate Office Building
      Washington, DC 20510

      Honourable Jeff Bingaman
      Chairman Senate Committee on Energy & Natural Resources
      304 Dirksen Senate Office Building
      Washington, DC 20510

      Honourable Lisa Murkowski
      Ranking Member
      Senate Committee on Energy & Natural Resources
      304 Dirksen Senate Office Building
      Washington, DC 20510