Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"        SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL           JUDGE BARBIER
20, 2010                   MAG. JUDGE SHUSHAN




Volume 1


     Deposition of KEVIN DENNIS LACY, P.O.

Box 7888, The Woodlands, Texas 77387, taken

in the Pan American Life Center, Mardi Gras

Room, 11th Floor, 601 Poydras Street, New

Orleans, Louisiana 70130, reported on

Wednesday, June 1st, 2011.

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6009      Board-Certified Court Reporters   Facsimile: (504) 525-9109

7c38ef19-00fb-4fa6-a5fc-e5557666e4f1

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                    Reported By/
KEVIN DENNIS LACY                           June 1, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR



Page 398

Page 399

20          Q.   Did Transocean stand out to you
21   as one of the contractors with a worse safety
22   record?
23          MR. ROTH:
24               Objection to form.
25          THE WITNESS:

Page 400

1                I would not define that they had
2    a materially different safety performance or
3    concerning.

Page 401

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6009     Board-Certified Court Reporters     Facsimile: (504) 525-9109

7c38ef19-00fb-4fa6-a5fc-e5557666e4f1



**GAUDET KAISER & DUTEL, LLC**
601 Poydras Street, Suite 1720       New Orleans, Louisiana 70130
Phone: (504) 525-9100             Fax: (504) 525-9109
BOARD-CERTIFIED COURT REPORTERS & LITIGATION SUPPORT

## WITNESS CERTIFICATE

I, **KEVIN DENNIS LACY**, have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

_July 7 2011_                    _[Signature]_

(Date Signed)                    (Signature)

✓   Signed with corrections as attached.

_____   Signed with no corrections noted.

1745 Bricksome Avenue, Suite A-4    PHONE (225) 291-3411
Baton Rouge, Louisiana 70816        FAX   (225) 291-7950
263 W. Causeway Approach            PHONE (504) 525-9100
Mandeville, Louisiana 70448         FAX   (504) 525-9109

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                                                    Reported By:
KEVIN DENNIS LACY VOL. II         June 2, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR

Page 422

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"        SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL           JUDGE BARBIER
20, 2010                   MAG. JUDGE SHUSHAN




VOLUME 2


     Deposition of KEVIN DENNIS LACY, P.O.

Box 7888, The Woodlands, Texas 77387, taken

in the Pan American Life Center, Mardi Gras

Room, 11th Floor, 601 Poydras Street, New

Orleans, Louisiana 70130, reported on

Thursday, June 2nd, 2011.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6009    Board-Certified Court Reporters   Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported By:
KEVIN DENNIS LACY VOL. II        June 2, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR



Page 479

Page 481

```
 4                        I want to see if you recall a
 5   meeting with -- first of all, are you
 6   familiar with Robert Saltiel?
 7        A.   I know Rob very well, yes.
 8        Q.   He was the executive vice
 9   president of performance at Transocean?
10        A.   Yes.
11        Q.   Do you recall meeting with
12   Mr. Saltiel, and perhaps others, in or around
13   February of 2009, where you discussed with
14   him Transocean's safety record as of that
15   time?
16        MS. KARIS:
17             Object to form.
18        THE WITNESS:
19             Would this have been a meeting
20   in the Gulf of Mexico specifically or a
21   separate -- I -- know I had a couple of
22   lunches with Rob.  I know we had at least one
23   meeting relative to the Gulf of Mexico rigs
24   between BP and Transocean.  There was a
25   global business review that would have
```

Page 480

Page 482

```
 1   occurred in possibly May of '09.
 2   EXAMINATION BY MR. ROTH:
 3        Q.   This was actually a meeting at
 4   which you gave some feedback about
 5   performance, and Mr. -- Mr. Neil Shaw was
 6   present as well.
 7        A.   Okay, yes.  Okay.
 8        Q.   You have a --
 9        A.   So now I remember, that Neil had
10   asked that -- he did not know Rob, and Rob
11   would have been the primary person to
12   discuss -- if we had concerns about
13   performance.  So I think I facilitated that
14   meeting so Neil would have an introduction to
15   Rob, and we would have discussion.
16        Q.   Do you recall telling
17   Mr. Saltiel during that meeting that you were
18   happy with the strong safety results as of
19   that time on the Transocean rigs?
20        A.   At what date was that?
21        Q.   In February 2009, February 25th
22   in particular?
23        A.   Oh, if -- if -- if it was
24   specific to the Gulf of Mexico rigs, I
25   absolutely would have.  We had not had a
```

16  (Pages 479 to 482)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6009      Board-Certified Court Reporters   Facsimile: (504) 525-9109

6059634f-db81-433c-99cc-ec3ee9c54994

KEVIN DENNIS LACY VOL. II        June 2, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010



Page 483

```
1     lost-time incident since February of '08.
2          Q.    And you recall indicating that
3     the best safety year was 2008?
4          A.    In the Gulf of Mexico, probably
5     so.
6          Q.    Do you recall referencing the
7     strong efforts -- the strong recovery efforts
8     on the MARIANAS rig at that meeting?
9          A.    Absolutely, yes.
10         Q.    And do you recall mentioning, in
11    particular, the strong consistent performance
12    with respect to safety on the Deepwater
13    Horizon?
14         A.    Yes, it had not had a personal
15    safety incident during my time there.
```

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6009    Board-Certified Court Reporters    Facsimile: (504) 525-9109

6059634f-db81-433c-99cc-ec3ee9c54994



GAUDIN KROUSE & LomeLo
601 Poydras Street, Suite 1720   New Orleans, Louisiana 70130
Phone (504) 525-9100   Fax (504) 525-9109
BOARD-CERTIFIED COURT REPORTERS & LITIGATION SUPPORT

## WITNESS CERTIFICATE

I, **KEVIN DENNIS LACY ,** have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

_July 7 2011_

(Date Signed)            (Signature)

✓ Signed with corrections as attached.

_____ Signed with no corrections noted.

1748 Brickstone Avenue, Suite A-3    PHONE (225) 291-3411
Baton Rouge, Louisiana 70816         FAX (225) 291-7950
263 W. Causeway Approach             PHONE (504) 525-9100
Mandeville, Louisiana 70471          FAX (504) 525-9109

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

LEE LAMBERT          May 9, 2011          THU BUI, CCR, RPR

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL      )    MDL NO. 2179
by the OIL RIG,        )
DEEPWATER HORIZON in   )    SECTION "J"
the GULF OF MEXICO,    )
April 20, 2010         )    JUDGE BARBIER
                       )
                       )    MAG.  JUDGE
                       )    SHUSHAN




          ***************
             VOLUME 1
          ***************



          Deposition of LEE LAMBERT, taken
at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 9th of May, 2011.


601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters     Facsimile:(504) 525-9109

7261a512-0365-473b-8b4d-71a006e07bdc



Page 170

16    Q.    And go to the e-mail dated
17  Sunday, April 18, at the top.
18            I'm going to mark it as
19  2146.
20            (Exhibit Number 2146 marked.)
21    Q.    It starts with -- it's actually
22  two pages.  Keep going.  That's it.
23            It's 1217915 and 1217916.
24  I'm marking them together.
25            It looks like it starts

Page 171

1   April 7th at the bottom, it begins the
2   string.  It's from Cory Davis to G Gulf of
3   Mexico SPU all.  Functional organization
4   milestones.  And then Crystal sends you an
5   e-mail about the -- about that very
6   document.
7     A.    Okay.
8     Q.    And then you write back.  You
9   say, Oh, no.  I hate the Q.  I hope this
10  changes.
11            What are you saying there?
12    A.    The THUNDER HORSE production
13  drilling quarters.  It's a rig.  That's
14  where, according to the org chart -- charts
15  that they sent out, which were sent out
16  prematurely, I guess.  I was assigned to
17  the PDQ.  I don't particularly care for
18  that rig.  Just the way it's set up.
19    Q.    I understand.
20    A.    Personal preference.
21    Q.    And then she says, LOL.  I've
22  never been to HORIZON either.  Oh, no.
23            Do you know what she's
24  saying there?  Do you under -- did you
25  understand what she was saying there?

Page 172

1     A.    Apparently she was, according to
2   those org charts, assigned to the HORIZON.
3   She'd never been to the HORIZON before.
4     Q.    Okay.  And you, HORIZON's not
5   too bad actually.  Second to the
6   ENTERPRISE.  How's the 2 treating you?
7            So the ENTERPRISE is your
8   favorite rig?
9     A.    That's correct.
10    Q.    What about it makes it your
11  favorite rig?  Just out of curiosity.
12    A.    I just like the crews on it and
13  the way the ship shape is set up.  It's
14  just personal preference of how the rig is
15  laid out.

Page 173

7261a512-0365-473b-8b4d-71a006e07bdc

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:

LEE LAMBERT          May 9, 2011          THU BUI, CCR, RPR

Page 306

23    Q.   Now, I take it that in your
24    capacity as a wellsite leader of the future
25    or trainee, you had the opportunity to --

Page 307

1     opportunity to observe the drill crews on
2     the rig while they're performing operation;
3     is that right?
4         A.   Yes, sir.
5         Q.   Okay.  And would this include
6     the drill crew that was on tour on the
7     night of April 20th, 2010?
8         A.   Yes, sir.
9         Q.   All right.  And you had the
10    chance to observe the rig's OIM, Mr. Jimmy
11    Harrell, working aboard the rig?
12        A.   Yes, sir.
13        Q.   How about the senior toolpusher,
14    Mr. Randy Ezell, had you had a chance to
15    observe him working on the rig?
16        A.   Yes, sir.
17        Q.   What about the toolpusher that
18    was on tour, Mr. Jason Anderson?  You had
19    to observed him performing operations as
20    well, right?
21        A.   That's correct.  Yes, sir.
22        Q.   Okay.  Were these men well
23    respected on the rig?
24        A.   In my opinion, they were.  Yes.
25        Q.   Okay.  During your time aboard

Page 308

1     the rig, did you ever see at anytime any
2     one of these men act in such a way that
3     would lead you to believe they were callous
4     or indifferent toward safety of the crew or
5     the environment?
6         A.   No, sir.
7         Q.   Did you get a chance to observe
8     the other members of the drill crew that
9     were on tour on the night of April 20th,
10    2010, while they were performing
11    operations?
12        A.   By other members of the drill
13    crew, you're speaking of everyone else on
14    the rig?
15        Q.   Well, no.  Let me -- let me be
16    specific then.
17             The driller, Mr. Dewey
18    Revette?
19        A.   Yes, sir.
20        Q.   Okay.  The AD, Mr. Steven
21    Curtis?
22        A.   Yes, sir.
23        Q.   The other AD, Mr. Don Clark?
24        A.   Yes, sir.
25        Q.   Okay.  Have you ever witnessed

Page 309

1     them engage in any behavior or conduct that
2     you would describe as callous or
3     indifferent towards the safety of the crew
4     or the environment?
5         A.   No, sir.
6         Q.   What about Captain Curt Kuchta,
7     did you ever have a chance to observe him
8     during operations on the rig?
9         A.   Yes, sir.  But let me just
10    clarify that he's not -- the marine
11    department is not necessarily involved in
12    the drilling operations.  But, yes, I had
13    dealings with Mr. Kuchta.
14        Q.   And I absolutely understand
15    that.  And I just want to ask you if you
16    had ever observed him acting in such a way
17    that would lead you to believe that he was
18    indifferent or callous towards safety of
19    other individuals or the environment.
20        A.   No, sir.
21        Q.   Did you have any safety concerns
22    whatsoever with any member of the crew, not
23    only on the -- the drill crew, but any crew
24    member on the rig while you were working
25    and sleeping on that rig?

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile:(504) 525-9109

7261a512-0365-473b-8b4d-71a006e07bdc

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                                    Reported by:

LEE LAMBERT              May 9, 2011          THU BUI, CCR, RPR

Page 310

1        A.    No, sir.  I mean there's, of
2   course, minor incidents that -- you know,
3   there's always room for improvement.
4   Nobody's perfect.  But I wouldn't say that
5   I would single somebody out and say that,
6   you know, this guy is kind of a problem
7   area.  Not at all, no.
8        Q.    Okay.  What about -- same
9   question with regard to equipment.  Did --
10  did you have any concerns about the safety
11  of equipment while you were working and
12  sleeping aboard the rig?
13       A.    To my knowledge, no.

Page 311

Page 312

Page 313

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile:(504) 525-9109

399

1

2

3

4

5

6

7               WITNESS' CERTIFICATE

8

9

10

11          I, **LEE LAMBERT**, read or have had

12    the foregoing testimony read to me and

13    hereby certify that it is a true and

14    correct transcription of my testimony, with

15    the exception of any attached corrections

16    or changes.

17

18

19

20

21

22              **LEE LAMBERT**

23

24

25

**GAUDET KAISER, L.L.C.**
Board-Certified Court Reporters

RECEIVED 06/28/11

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:

PHILIP EARL LEE        June 1, 2011   SANDRA D. FILES, CCR

              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

        IN RE:  OIL SPILL    MDL NO. 2179
        BY THE OIL RIG
        "DEEPWATER HORIZON"   SECTION:   J
        IN THE GULF OF
        MEXICO, ON APRIL     JUDGE BARBIER
        20, 2010             MAG. JUDGE SHUSHAN



              Volume 1 of 2 of the Videotaped
        Deposition of PHILIP EARL LEE, 842 SCR 76,
        Bay Springs, Mississippi 39422, taken in
        the Pan American Life Center, 11th Floor,
        601 Poydras Street, New Orleans, Louisiana
        70130, on Wednesday, June 1, 2011.

        APPEARANCES:



        DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
        By:  Michael C. Palmintier, Esquire
        and Jonathan Williams, Esquire
        618 Main Street
        Baton Rouge, LA 70801-1910
             (Attorneys for Plaintiffs
             Steering Committee)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C          Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                     Reported by:

PHILIP EARL LEE          June 1, 2011    SANDRA D. FILES, CCR

Page 382

Page 384

1   A.   Yes.
2   Q.   Did they show professionalism?
3   A.   Yes.
4   Q.   To your knowledge, did they have
5   an exemplary track record as Transocean
6   employees aboard the Deepwater Horizon?
7   A.   Yes.
8   Q.   Were they all hard-working,
9   decent men?
10  A.   Yes.
11  Q.   Would you serve with all of
12  these men again if given the opportunity?
13  A.   Yes.
14  Q.   Some of them, of course, are
15  deceased now.
16  A.   Well, I mean, if given the
17  opportunity.

Page 383

Page 385

16  Q.   Did you ever have any reason to
17  make a critical report of any of the
18  crewmen employed by Transocean on the
19  Deepwater Horizon?
20  A.   Not that I can recall.
21  Q.   Did you observe that these were
22  all experienced men at what they did?
23  A.   Yes.
24  Q.   Did they demonstrate a high
25  level of skill?

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C      Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:

PHILIP EARL LEE        June 1, 2011    SANDRA D. FILES, CCR

Page 386

10    Q.   Did you have any -- ever have
11 any problems with either Jimmy Harrell,
12 Randy Ezell, Captain Kuchta, Jason
13 Anderson, Dewey Revette, Steve Curtis or
14 Don Clark?
15    A.   No.
16    Q.   Did you ever experience any
17 indication that any of them were
18 indifferent or callous toward the safety of
19 individuals or the environment?
20    A.   No.
21    Q.   And based on your experience,
22 did they have a good attitude towards the
23 safety of individuals and the environment?
24    A.   Yes.
25    Q.   Do you feel that either Paul

Page 387

1 Johnson, Jimmy Harrell or Randy Ezell or
2 Jason Anderson or Dewey Revette or Stephen
3 Curtis, Don Clark or Captain Kuchta were in
4 need of training to demonstrate competence?
5    MS. O'CONNOR:
6         Object to form.
7    THE WITNESS:
8         Personal opinion, no, sir.
9 BY MR. CLEMENTS:
10    Q.   Would you disagree with such a
11 statement if one was made, based on your
12 personal experience with these men?
13    A.   Yes.
14    Q.   You had the authority to stop
15 work if you had any undue concerns about
16 the crew or their ability to perform, did
17 you not?
18    A.   Yes, sir.
19    Q.   You never exercised that
20 authority based on any deficiency in these
21 crewmen, did you?
22    A.   No, sir.
23    Q.   Were you aboard, sir, on March
24 8th during the -- the kick that was
25 described earlier today?

Page 388

1    A.   Yes, sir.
2    Q.   I believe you said this was a
3 Monday night event and you left the rig on
4 Wednesday morning?
5    A.   That's correct.
6    Q.   Okay.  In your view, did the
7 driller respond appropriately?
8    A.   Yes.
9    Q.   Do you recall what he did?
10    A.   No.  I -- I wasn't on the floor
11 when it happened, but I --
12    Q.   Okay.
13    A.   -- I think he responded
14 appropriately.
15    Q.   Are you aware of any criticism
16 of how the driller handled this event?
17    A.   No, sir.
18    Q.   You described or were questioned
19 about an event in early April, a lost
20 circulation event.  I -- I think it was
21 referred to in questioning as a kick.
22         Do you have any criticism of the
23 Transocean driller in connection with that
24 event?
25    A.   No, sir.

Page 389

1    Q.   Did you ever hear any or know of
2 any criticism by anyone towards the
3 driller?
4    A.   No, sir.
5    Q.   Did you ever hear of any
6 criticism towards any member of the
7 Transocean crew in connection with either
8 of these kicks?
9    A.   No, sir.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C      Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010        Reported by:

PHILIP EARL LEE        June 1, 2011   SANDRA D. FILES, CCR

Page 390

15    Q.    ▓▓▓▓▓▓▓    Following the
16  audit in September 2009, in the subsequent
17  months after the audit, were you aware of
18  any safety critical items identified in the
19  audit which were not addressed?
20    A.    Not that -- not that I remember,
21  no, sir.
22    Q.    Certainly, if there were any
23  such safety critical items which were not
24  addressed, you would have a duty to report
25  those, would you not?

Page 391

1    A.    Yes.
2    Q.    And if they were truly safety
3  critical, to stop work, that would be part
4  of your work scope, would it not --
5    A.    Yes, sir.
6    Q.    -- or your duties?
7    A.    Yes, sir.
8    Q.    And you didn't do that?
9    A.    No, sir.
10    Q.    And you have never shut down the
11  rig because there were any safety critical
12  items which had been unaddressed?
13    MS. O'CONNOR:
14        Object to form.
15    THE WITNESS:
16        No, sir, not that I
17  remember.

Page 392

Page 393

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C    Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters    Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:

PHILIP EARL LEE        June 1, 2011   SANDRA D. FILES, CCR

Page 398

25    Q.                              Did you

Page 399

1   report in writing to Mr. Guide or anyone
2   else onshore that there were critical items
3   on the Deepwater Horizon that required
4   immediate attention?
5       A.   No, sir, I don't recall doing
6   that.
7       Q.   You never asked that the blowout
8   preventer be taken out of service, did you?
9       A.   No, sir.
10      Q.   And I take it you had no
11  concerns about the blowout preventer while
12  it was on the seabed?
13      A.   No, sir.

Page 400

Page 401

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C        Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

b13157b4-30a7-404f-ab85-d16a5f62631d



640

1       Objection to form.
2       A.  I don't know what Bob Kaluza
3   did.  I can't analyze what Bob Kaluza did
4   because I don't know what he did.  I can't
5   answer that.
6       Q.  Well, assume with me that he did
7   not consult a toolpusher.
8   MS. O'CONNOR:
9       Object to form.
10      A.  I'm not going to assume what Bob
11  did.  I don't know what he did.
12      Q.  Well, I'm not asking you to do
13  that independently, I'm telling you to
14  assume with me hypothetically that he did
15  do that; that he did not consult a tool
16  pusher.  Now, I'm asking you, as a well
17  site leader, with all of the experience of
18  your 42 years, wouldn't you agree with me
19  that he wouldn't have been performing the
20  task that he was supposed to have if he
21  didn't consult a tool pusher?
22  MS. O'CONNOR:
23      Objection to form.
24      A.  I don't know how many negative
25  tests Bob Kaluza's done.  He might not have

641

1   deemed that he needed to talk to the tool
2   pusher.  I don't know Bob Kaluza.  So I
3   don't know what he should have done.
4       Q.  Okay.  I accept that.  I
5   understand.
6   MR. PALMINTIER:
7       Thank you, sir.
8   THE WITNESS:
9       Thank you.
10  VIDEOGRAPHER:
11      We're going off the record.
12  It's 1:19.  Videotape number 4.
13      (The deposition is concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

642

1
2       WITNESS' CERTIFICATE
3
4
5       I, PHILLIP EARL LEE, have read or
6   have had the foregoing testimony read to me
7   and hereby certify that it is a true and
8   correct transcription of my testimony, with
9   the exception of any attached corrections
10  or changes.
11
12
13
14
15
16
17
    (Check One)
18
19  ( ) NO CORRECTIONS.
    ( ) CORRECTIONS; ERRATA SHEET(S)
    ENCLOSED.
20
21
22
23
24
25

PHILLIP EARL LEE

643

1       REPORTER'S CERTIFICATE
2
3       I, SANDRA D. FILES, Certified Court
4   Reporter, do hereby certify that the
5   above-named witness, after having been
6   first duly sworn by me to testify to the
7   truth, did testify as hereinabove set
8   forth;
9       That the testimony was reported by
10  me in shorthand and transcribed under my
11  personal direction and supervision, and is
12  a true and correct transcript, to the best
13  of my ability and understanding;
14      That I am not of counsel, not
15  related to counsel or the parties hereto,
16  and not in any way interested in the
17  outcome of this matter.
18
19
20
21
22  SANDRA D. FILES, CCR
    CERTIFIED COURT REPORTER
23
24
25

RECEIVED
JUL 1 2 2011

601 Poydras Street, Suite 2003      GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130      Board-Certified Court Reporters      Facsimile: (504) 525-9109

Received 07/12/13

Page 431

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL     MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"   SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL      JUDGE BARBIER
20, 2010              MAG. JUDGE SHUSHAN


        Volume 2 of 2 of the Videotaped
Deposition of PHILIP EARL LEE, 842 SCR 76,
Bay Springs, Mississippi 39422, taken in
the Pan American Life Center, 11th Floor,
601 Poydras Street, New Orleans, Louisiana
70130, on Thursday, June 2, 2011.

APPEARANCES:




DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
By:  Michael C. Palmintier, Esquire
and Jonathan Williams, Esquire
618 Main Street
Baton Rouge, LA 70801-1910
        (Attorneys for Plaintiffs
        Steering Committee)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C      Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters      Facsimile: (504) 525-9109

94bd242c-c603-4d6f-95f5-b816d48c4c3b

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010     Reported by:

PHILIP EARL LEE VOL. II June 2, 2011     SANDRA D. FILES, CCR



Page 576

Page 578

24   Q.   Are you aware of any instances
25   where continuous improvement plans were

Page 577

Page 579

1   implemented on the Deepwater Horizon?
2   A.   Well, it's a day-to-day deal to
3   continuously improve.  So I mean, it takes
4   into account the rig personnel and everyone
5   being involved to improve.
6        The Horizon had a good safety
7   record, so if you are going to improve on
8   safety, it was just stay focused on the
9   things you're doing right.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C     Telephone (504) 525-9100
New Orleans, Louisiana 70130-6029  Board-Certified Court Reporters     Facsimile: (504) 525-9109

94bd242c-c603-4d6f-95f5-b816d48c4c3b

PHILIP EARL LEE VOL. II   6/2/2011
IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010
Reported by: SANDRA D. FILES, CCR, RPR



640

1        Objection to form.
2        A.    I don't know what Bob Kaluza
3 did.  I can't analyze what Bob Kaluza did
4 because I don't know what he did.  I can't
5 answer that.
6        Q.    Well, assume with me that he did
7 not consult a toolpusher.
8        MS. O'CONNOR:
9        Object to form.
10        A.    I'm not going to assume what Bob
11 did.  I don't know what he did.
12        Q.    Well, I'm not asking you to do
13 that independently, I'm telling you to
14 assume with me hypothetically that he did
15 do that; that he did not consult a tool
16 pusher.  Now, I'm asking you, as a well
17 site leader, with all of the experience of
18 your 42 years, wouldn't you agree with me
19 that he wouldn't have been performing the
20 task that he was supposed to have if he
21 didn't consult a tool pusher?
22        MS. O'CONNOR:
23        Objection to form.
24        A.    I don't know how many negative
25 tests Bob Kaluza's done.  He might not have

641

1 deemed that he needed to talk to the tool
2 pusher.  I don't know Bob Kaluza.  So I
3 don't know what he should have done.
4        Q.    Okay.  I accept that.  I
5 understand.
6        MR. PALMINTIER:
7        Thank you, sir.
8        THE WITNESS:
9        Thank you.
10        VIDEOGRAPHER:
11        We're going off the record.
12 It's 1:19.  Videotape number 4.
13        (The deposition is concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

RECEIVED
JUL 1 2 2011

642

1
2        WITNESS' CERTIFICATE
3
4
5        I, PHILLIP EARL LEE, have read or
6 have had the foregoing testimony read to me
7 and hereby certify that it is a true and
8 correct transcription of my testimony, with
9 the exception of any attached corrections
10 or changes.
11
12
13
14
15
16        PHILLIP EARL LEE
17
(Check One)
18
( ) NO CORRECTIONS.
19   CORRECTIONS; ERRATA SHEET(S)
ENCLOSED.
20
21
22
23
24
25

643

1        REPORTER'S CERTIFICATE
2
3        I, SANDRA D. FILES, Certified Court
4 Reporter, do hereby certify that the
5 above-named witness, after having been
6 first duly sworn by me to testify to the
7 truth, did testify as hereinabove set
8 forth;
9        That the testimony was reported by
10 me in shorthand and transcribed under my
11 personal direction and supervision, and is
12 a true and correct transcript, to the best
13 of my ability and understanding;
14        That I am not of counsel, not
15 related to counsel or the parties hereto,
16 and not in any way interested in the
17 outcome of this matter.
18
19
20
21
22        SANDRA D. FILES, CCR
        CERTIFIED COURT REPORTER
23
24
25

601 Poydras Street, Suite 2003        GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130        Board-Certified Court Reporters        Facsimile: (504) 525-9109

Received 07/12/13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
IN RE:  OIL SPILL          )     MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN     )     SECTION "J"
THE GULF OF MEXICO, ON     )
APRIL 20, 2010             )     JUDGE BARBIER
                           )     MAG. JUDGE SHUSHAN
```

*****************************************
ORAL AND VIDEOTAPED DEPOSITION OF
IAN LITTLE
JUNE 10, 2011
VOLUME 2
*****************************************

ORAL AND VIDEOTAPED DEPOSITION of IAN LITTLE,

produced as a witness at the instance of the Plaintiffs'

Steering Committee, and duly sworn, was taken in the

above-styled and numbered cause on June 10, 2011, from

8:34 a.m. to 5:53 p.m., before PHYLLIS WALTZ, CSR, TCRR,

RPR, CRR, recorded by machine shorthand, at the offices

of Kirkland & Ellis International, 30 St. Mary Axe,

22nd Floor, London EC3A 8AF, England, United Kingdom,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto; that

the deposition shall be read and signed before any

Notary Public.

7bc78d2c-7144-4efa-a133-c3a7f08463cf



Page 380

Page 382

Page 381

Page 383

17      Q.  What was your impression of the
18   professionalism of the Transocean personnel onshore and
19   on the rigs that you dealt with?
10:26  20        MR. FIELDS:  Objection; form.
21      A.  I -- I have no particular issues around the --
22   the Transocean people I was working with.  I -- I had a
23   good relationship with the ones that I worked with.
24      Q.  (BY MR. ROBERTS)  Did they appear competent to
10:32  25   you?

21 (Pages 380 to 383)

7bc78d2c-7144-4efa-a133-c3a7f08463cf



Page 384

```
 1        A.  I had no reason to question the competencies
 2   of -- of what they were doing.
 3        Q.  Did they ever appear indifferent to the safety
 4   of other individuals to you?
10:32 5   A.  I don't know what you mean by "indifferent."
 6        Q.  They just didn't give a damn if people got
 7   hurt or if the environment was hurt?
 8        A.  I don't -- I didn't see that.
```

Page 385

Page 386

Page 387

Worldwide Court Reporters, Inc.
(800) 745-1101

1           I, IAN LITTLE, have read the foregoing

deposition and hereby affix my signature that same is

2    true and correct, except as noted above.

3

4    _____

        IAN LITTLE, VOLUME 2

5    *Country of ENGLAND.*

6    ~~STATE OF T E X A S~~       )

~~COUNTY~~ OF  *EGHAM.*       )

7    *Town*

8           Before me, *NICHOLAS  D. JAMISON.*____, on

this day personally appeared IAN LITTLE, known to me, or

9    proved to me under oath or through *UK Driving Licence.*___)

(description of identity card or other document)), to be

10   the person whose name is subscribed to the foregoing

instrument and acknowledged to me that they executed the

11   same for the purposes and consideration therein

expressed.

12

       Given under my hand and seal of office on

13   this, the 14 day of _____*July*_____, *2011.*_.

14

15   _____

16          NOTARY PUBLIC ~~IN AND FOR THE~~

       ~~STATE OF TEXAS~~

17

My Commission Expires: *On death.*_____

18

19                             *14*

20                      *July 2011.*

21

22

23

24

25

```
                UNITED STATES  DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL         )      MDL NO. 2179
BY THE OIL RIG            )
"DEEPWATER HORIZON" IN    )      SECTION "J"
THE GULF OF MEXICO, ON    )
APRIL 20, 2010            )      JUDGE BARBIER
                          )      MAG. JUDGE SHUSHAN
```

```
                *****************
                    VOLUME 1
                *****************
```

```
        Deposition of John Mogford, taken at
Kirkland & Ellis International, 30 St. Mary Axe,
22nd Floor, London EC3A 8AF, England, United Kingdom,
on the 28th of June, 2011.
```

PURSUANT TO CONFIDENTIALITY ORDER

f1e7a73f-33fc-4abf-b8c0-61a786bdd8bf

Page 254



Page 256

1    Q.  Okay.  And that includes the men who
2  tragically lost their lives April 20th, you -- you
3  never met any of them that you recall?
4    A.  Not as far as I'm aware.
5    Q.  Okay.  Had -- had you ever been aboard the
6  DEEPWATER HORIZON?
7    A.  No.
8    Q.  Okay.  And what about the DEEPWATER HORIZON
9  shore-base Management, do you know any individuals
10  employed by Transocean in those roles?
11    A.  Not as far as I'm aware.
12    Q.  Just throw out some names and see if you
13  recognize anyone.  Paul Johnson, you recognize that
14  name?
15    A.  No.
16    Q.  Don Winslow?
17    A.  No.
18    Q.  Buddy Trahan?
19    A.  No.
20    Q.  James Kent?
21    A.  No.
22    Q.  Okay.  Given your responses, then, I -- I
23  guess I would be correct in stating you've got no
24  evidence, based on your personal knowledge, to share
25  with the Court or a Jury about the competency or

Page 255

Page 257

1  training of the DEEPWATER HORIZON crew; is that fair?
2    A.  That's totally fair.
3    Q.  Okay.  And I -- I -- I would be correct in
4  stating that you don't intend to offer any criticism in
5  your testimony today, or at Court, if you were to come
6  to Court to testify, about the DEEPWATER HORIZON Rig
7  Management; is that true?
8    A.  I intend to ask -- answer your questions
9  fairly and completely.
10    Q.  Okay.  But -- but based on your personal
11  knowledge, you don't have any evidence that would
12  suggest --
13    A.  I told you, I don't know any of them, so --
14    Q.  Good.  I just want to make sure.  And you've
15  got no knowledge regarding the condition of the
16  DEEPWATER HORIZON Rig or it's equipment; is that true?
17    A.  None at all.
18    Q.  Okay.  Now, you left the company in June of
19  2009; is that correct?
20    A.  That's correct, yeah.
21    Q.  Okay.  And prior to the time you left, you
22  were in the role of Group Vice President of HSS&E?
23    A.  The year -- 18 months before I left -- or a
24  year before I left the company I was in charge of
25  refining and U.S. Downstream business.

23      Do you know or have you ever met any member of
24  the DEEPWATER HORIZON crew?
25    A.  Not as far as I'm aware.

PURSUANT TO CONFIDENTIALITY ORDER



Page 258

```
 1      Q.   Okay.  What was your title when you actually
 2   left the company?
 3      A.   Executive Vice President and COO of Refining
 4   and U.S. Fuels Value Chain.
 5      Q.   Okay.  And just prior to that, what was your
 6   actual title?
 7      A.   Executive Vice President of Safety and
 8   Operations.
 9      Q.   Okay.  In that role, when you were in that
10   role, did anyone ever express concerns to you about the
11   competency of the DEEPWATER HORIZON Rig crew?
12      A.   No.
13      Q.   Okay.  How about in any role that you ever had
14   with BP, did anyone ever express concerns to you about
15   the training or competency of the DEEPWATER HORIZON Rig
16   crew?
17      A.   No.
18      Q.   Okay.  In the role as Executive Vice President
19   that we were discussing, did anyone ever express
20   concerns to you about the condition of the rig or its
21   equipment?
22      A.   No.
```

Page 260

Page 259

Page 261

PURSUANT TO CONFIDENTIALITY ORDER

f1e7a73f-33fc-4abf-b8c0-61a786bdd8bf

  
373



I, JOHN MOGFORD, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the attached Amendment Sheet.

JOHN MOGFORD

~~THE STATE OF~~ **England & Wales**                        )
**City of London**
~~COUNTY OF~~                        )

Before me, *EMMA WILKINSON*               , on this day personally appeared JOHN MOGFORD, ~~known to me~~ (or proved to me ~~on the oath of~~

~~or~~ through *UK PASSPORT*        )
to be the person whose name is subscribed to the foregoing instrument and executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office, day of *AUGUST*          , 2011.

Notary Public in a
The ~~State~~ of *London England*

NOTAR
LONDON
EN

expires with Life)

EESWRIGHTS
NOTARIES PUBLIC

Bankside House, 107 Leadenhall Street,
London EC3A 4AF
Telephone: 020 7623 9477
Facsimile: 020 7623 5428

RSUANT TO CONFIDENTIALITY ORDER

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL        )  MDL NO. 2179
BY THE OIL RIG          )
"DEEPWATER HORIZON" IN  )  SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010          )  JUDGE BARBIER
                        )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Patrick Leon
O'Bryan, Ph.D. as a Corporate Representative,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 14th day of July, 2011.

---

**2**

1     A P P E A R A N C E S
2
3     APPEARING FOR THE PLAINTIFFS' STEERING
      COMMITTEE:
4       Mr. Paul M. Sterbcow
        Ms. Beth Abramson
5       LEWIS, KULLMAN, STERBCOW & ABRAMSON
        601 Poydras Street, Suite 2615
6       New Orleans, Louisiana 70130
7
      APPEARING FOR BP, INC.:
8       Ms. Hariklia "Carrie" Karis
        KIRKLAND & ELLIS
9       300 North LaSalle
        Chicago, Illinois 60654
10
        Ms. Karen K. Gase
11      Managing Attorney
        BP AMERICA INC.
12      501 Westlake Park Boulevard
        Houston, Texas 77079
13
14    APPEARING FOR TRANSOCEAN:
        Mr. Richard J. Hymel
15      PREIS & ROY
        Versailles Centre, Suite 400
16      102 Versailles Boulevard
        Lafayette, Louisiana 70501
17
        Mr. Paul C. Thibodeaux
18      FRILOT
        1100 Poydras Street, Suite 3600
19      New Orleans, Louisiana 70163
20
      APPEARING FOR ANADARKO PETROLEUM COMPANY:
21      Ms. Deborah D. Kuchler
        Mr. Thomas A. Porteous
22      KUCHLER POLK SCHELL WEINER & RICHESON
        1615 Poydras Street, Suite 1300
23      New Orleans, Louisiana 70112
24
25

---

**3**

1     APPEARING FOR MOEX:
2       Mr. Christopher J. McNevin
        PILLSBURY WINTHROP SHAW PITTMAN
3       725 South Figueroa Street, Suite 2800
        Los Angeles, California 90017-5408
4
5     APPEARING FOR CAMERON INTERNATIONAL
      CORPORATION:
        Ms. Kathleen A. Gallagher
6       BECK, REDDEN & SECREST
        One Houston Center
7       1221 McKinney Street, Suite 4500
        Houston, Texas 77010-2010
8
9     APPEARING FOR WEATHERFORD:
        Mr. Michael G. Lemoine
10      JONES, WALKER, WAECHTER, POITEVENT,
        CARRERE & DENEGRE, LLP
11      600 Jefferson Street, Suite 1600
        Lafayette, Louisiana 70501
12
        Ms. Sara C. Valentine
13      JONES, WALKER, WAECHTER, POITEVENT,
        CARRERE & DENEGRE, LLP
14      201 St. Charles Avenue
        New Orleans, Louisiana 70170-5100
15
16    APPEARING FOR DRIL-QUIP, INC.:
        Mr. C. Dennis Barrow, Jr.
17      WARE, JACKSON, LEE & CHAMBERS
        America Tower, 42nd Floor
18      2929 Allen Parkway
        Houston, Texas 77019-7101
19
20    APPEARING FOR M-I SWACO:
        Mr. Steven A. Luxton
21      MORGAN, LEWIS & BOCKIUS, LLP
        1111 Pennsylvania Avenue, NW
22      Washington, D.C. 20004
23
24
25

---

**4**

1     APPEARING FOR HALLIBURTON:
        Mr. Donald E. Godwin
2       Ms. Stefanie K. Major
        Mr. James E. Johanns
3       GODWIN RONQUILLO
        1201 Elm Street, Suite 1700
4       Dallas, Texas 75270-2041
5
      APPEARING FOR SEACOR:
6       Mr. Jeremy T. Grabill
        WEIL, GOTSHAL & MANGES
7       767 Fifth Avenue
        New York, New York 10153-0119
8
9     APPEARING FOR IAR:
        Mr. H. Carter Marshall
10      CHRISTOVICH & KEARNEY
        601 Poydras Street, Suite 2300
11      New Orleans, Louisiana 70130
12
13    APPEARING FOR THE UNITED STATES:
        Mr. A. Nathaniel Chakeres
14      U.S. DEPARTMENT OF JUSTICE
        ENVIRONMENTAL & NATURAL
15      RESOURCES DIVISION
        601 D Street, N.W.
16      Washington, D.C. 20004
17    APPEARING FOR THE STATE OF ALABAMA:
        Mr. Corey L. Maze
18      Special Deputy Attorney General
        Mr. James W. Davis
19      OFFICE OF THE ATTORNEY GENERAL
        STATE OF ALABAMA
20      501 Washington Avenue
        Montgomery, Alabama 36104
21
22    APPEARING FOR THE STATE OF LOUISIANA:
        Mr. Henry Dart
23      510 North Jefferson Street
        Covington, Louisiana 70433
24
25

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



17

1    Q.    Okay.  So would -- would April
2  20, 2010 have been the first and only
3  opportunity you had to visit the rig?
4    A.    As far as a scheduled visit,
5  that's correct.  I -- I could have gone out
6  if I wanted to try to make a visit prior to
7  that, but that was the first scheduled
8  opportunity.
9    Q.    Okay.  And Mr. Sims accompanied
10  you out there, if I read this correctly?
11    A.    That's correct.

**PURSUANT TO CONFIDENTIALITY ORDER**



Page 21

y

Page 23

1  these visits would occur every two months,
2  and it was a dedicated helicopter to -- to
3  take us out.  And usually on these visits,
4  there were two rigs that we would go and
5  visit, and on this particular trip we were
6  visiting the DDIII, or the HORIZON, and I was
7  asked prior to -- about a week or two prior
8  to the trip, which rig I wanted to go to, and
9  the HORIZON was a rig that I -- I selected
10  because it was, in our fleet, the
11  best-performing rig from a safety and a
12  drilling performance standpoint,
13  best-performing rig in the fleet, and it also
14  was one of the better-performing rigs in the
15  Transocean fleet.  And so being new to the
16  role and having -- this being my first trip
17  offshore, I wanted to go out and visit and
18  see kind of what "good" looked like, based
19  upon, you know, the -- the performance and
20  the safety on the rig and -- and discuss the
21  culture and -- and kind of what was, you
22  know -- what made them successful.

Page 22

17     Q.    All right.  My understanding is,
18  is that you went to the rig to actually -- I
19  don't know if it's present an award, but to
20  acknowledge the rig crew for safe practices;
21  is that fair?
22     A.    No.  The -- the visit that I
23  went on, we have regularly scheduled rig
24  visits by Leadership for both -- not only BP
25  but also Transocean.  And this particular --

Page 24

**PURSUANT TO CONFIDENTIALITY ORDER**

473

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL          )  MDL NO. 2179
BY THE OIL RIG            )
"DEEPWATER HORIZON" IN  )  SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010          )  JUDGE BARBIER
                         )  MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Continuation of the deposition
of Patrick Leon O'Bryan, Ph.D. as a Corporate
Representative, taken at Pan-American
Building, 601 Poydras Street, 11th Floor, New
Orleans, Louisiana, 70130, on the 15th day of
July, 2011.

---

474

```
 1      A P P E A R A N C E S
 2
 3   APPEARING FOR THE PLAINTIFFS' STEERING
     COMMITTEE:
 4     Mr. Paul M. Sterbcow
       LEWIS, KULLMAN, STERBCOW & ABRAMSON
 5     601 Poydras Street, Suite 2615
       New Orleans, Louisiana  70130
 6
     APPEARING FOR BP, INC.:
 7     Ms. Hariklia "Carrie" Karis
       KIRKLAND & ELLIS
 8     300 North LaSalle
       Chicago, Illinois  60654
 9
     APPEARING FOR TRANSOCEAN:
10     Mr. Richard J. Hymel
       PREIS & ROY
11     Versailles Centre, Suite 400
       102 Versailles Boulevard
12     Lafayette, Louisiana  70501
13     Mr. Paul C. Thibodeaux
       FRILOT
14     1100 Poydras Street, Suite 3600
       New Orleans, Louisiana 70163
15
     APPEARING FOR ANADARKO PETROLEUM COMPANY:
16     Ms. Deborah D. Kuchler
       Mr. Thomas A. Porteous
17     KUCHLER POLK SCHELL WEINER & RICHESON
       1615 Poydras Street, Suite 1300
18     New Orleans, Louisiana 70112
19     Mr. Warren Anthony Fitch
       BINGHAM MCCUTCHEN
20     2020 K Street, Northwest
       Washington, D.C. 20006-1806
21
     APPEARING FOR MOEX:
22     Mr. Christopher J. McNevin
       PILLSBURY WINTHROP SHAW PITTMAN
23     725 South Figueroa Street, Suite 2800
       Los Angeles, California  90017-5408
24
25
```

---

475

```
 1   APPEARING FOR CAMERON INTERNATIONAL
     CORPORATION:
 2     Ms. Kathleen A. Gallagher
       BECK, REDDEN & SECREST
 3     One Houston Center
       1221 McKinney Street, Suite 4500
 4     Houston, Texas  77010-2010
 5   APPEARING FOR WEATHERFORD:
       Mr. Michael G. Lemoine
 6     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
 7     600 Jefferson Street, Suite 1600
       Lafayette, Louisiana 70501
 8
       Mr. Wayne G. Zeringue, Jr.
 9     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
10     201 St. Charles Avenue
       New Orleans, Louisiana  70170-5100
11
       Mr. Brett S. Venn
12     JONES, WALKER, WAECHTER, POITEVENT,
       CARRERE & DENEGRE, LLP
13     201 St. Charles Avenue
       New Orleans, Louisiana  70170-5100
14
15   APPEARING FOR DRIL-QUIP, INC.:
       Ms. Margaret Bryant
16     WARE, JACKSON, LEE & CHAMBERS
       America Tower, 42nd Floor
17     2929 Allen Parkway
       Houston, Texas  77019-7101
18   APPEARING FOR M-I SWACO:
       Mr. Lucas T. Elliot
19     MORGAN, LEWIS & BOCKIUS, LLP
       1000 Louisiana Street, Suite 4200
20     Houston, Texas 77002-5006
21   APPEARING FOR HALLIBURTON:
       Mr. Donald E. Godwin
22     Mr. Stefanie K. Major
       Ms. Jenny L. Martinez
23     Mr. James E. Johanns
       Mr. Jon-Bernard Schwartz
24     GODWIN RONQUILLO
       1201 Elm Street, Suite 1700
25     Dallas, Texas 75270-2041
```

---

476

```
 1     Ms. Gwen E. Richard
       GODWIN RONQUILLO
 2     1331 Lamar, Suite 1665
       Houston, Texas  77010-3133
 3
     APPEARING FOR SEACOR:
 4     Mr. Jeremy T. Grabill
       WEIL, GOTSHAL & MANGES
 5     767 Fifth Avenue
       New York, New York  10153-0119
 6
     APPEARING FOR THE UNITED STATES:
 7     Mr. A. Nathaniel Chakeres
       U.S. DEPARTMENT OF JUSTICE
 8     ENVIRONMENTAL & NATURAL
       RESOURCES DIVISION
 9     601 D Street, N.W.
       Washington, D.C.  20004
10
     APPEARING FOR THE STATE OF LOUISIANA:
11     Mr. Henry Dart
       510 North Jefferson Street
12     Covington, Louisiana  70433
13     Ms. Phyllis D. Glazer
       Assistant Attorney General
14     Litigation Division
       LOUISIANA DEPARTMENT OF JUSTICE
15     400 Poydras Street, Suite 1600
       New Orleans, Louisiana  70130-3220
16
       Mr. Lambert J. "Joe" Hassinger, Jr.
17     GALLOWAY, JOHNSON, TOMPKINS, BURR
       AND SMITH
18     701 Poydras Street, 40th Floor
       New Orleans, Louisiana 70139
19
     APPEARING FOR PATRICK LEON O'BRYAN, PH.D.:
20     Mr. Richard T. Simmons, Jr.
       Mr. W. Glenn Burns
21     HAILEY, MCNAMARA, HALL, LARMANN & PAPALE
       One Galleria Boulevard, Suite 1400
22     Metairie, Louisiana  70001
23
     ALSO PRESENT:
24     Mr. Mark Hendrix, Videographer
25
```

1  (Pages 473 to 476)

**PURSUANT TO CONFIDENTIALITY ORDER**



14    Q.    Okay.  With regard to
15  Mr. Winslow, since you knew him, did you ever
16  experience any indication that he was
17  indifferent or callous towards safe --
18  towards the safety of individuals or the
19  environment?
20    A.    Not at all.
21    Q.    Okay.  You'd agree it was just
22  the opposite?
23    A.    I -- I -- I never heard him say
24  anything that led me to believe that he
25  wasn't totally focused on safety and -- and

2 (Pages 477 to 480)

PURSUANT TO CONFIDENTIALITY ORDER



481

1  the environment.
2      Q.   Okay.  Did you ever experience
3  any indication that anyone with Transocean
4  was indifferent or callous towards the safety
5  of individuals or the environment?
6      A.   No.  I've had good working
7  relationships with many folks at Transocean.

483

1  DEEPWATER HORIZON was the best-performing rig
2  in BP's fleet; is that correct?
3      A.   That's correct.
4      Q.   And both from a performance
5  standpoint and a safety standpoint?
6      A.   That's correct.
7      Q.   You remember giving an interview
8  with the Bly Team on April 24th of 2010?
9      A.   I believe it was Saturday
10 morning, if that was the 24th.  I think it
11 was the 25th.
12     Q.   And in that interview, there's
13 notes written by someone -- I can't remember
14 exactly who -- who the notes were.  But the
15 notes basically say that the DEEP --
16 DEEPWATER HORIZON was the best-performing rig
17 and safest.  It represented what good looks
18 like.
19          Is that something that you
20 recall telling the --
21     A.   That's --
22     Q.   -- Bly Investigators?
23     A.   That's correct.  That's the
24 reason why I visited the rig on this
25 particular rig visit.

482

3      Q.   On April 20th, 2010, were you
4  aware of any problems with the BOP?
5      A.   None that I was aware of, no.
6      Q.   Did anybody at BP ever tell you
7  that the BOP was not functioning properly?
8      A.   No.
9      Q.   Did anybody at BA -- BP ever
10 tell you that the BOP had not been properly
11 maintained?
12     A.   No.
13     Q.   You slept on that rig while the
14 BOP was on the seabed, correct?
15     A.   No, I never did get a chance --
16     Q.   Oh, that's true.
17     A.   -- to go to sleep.
18     Q.   You didn't get a chance to sleep
19 on the rig.  Good point --
20     A.   I was just about to go to bed,
21 but --
22     Q.   Yeah.
23     A.   -- circumstances changed.
24     Q.   Good point.
25          You testified yesterday that the

484

20          One of the reasons you wanted to
21 go out to the DEEPWATER HORIZON was to look
22 at the culture and so forth to determine how
23 they did what they did, so you could apply it
24 to other BP rigs?
25     A.   That's correct.

3 (Pages 481 to 484)

**PURSUANT TO CONFIDENTIALITY ORDER**

485

1     Q.     Turn to Tab 3, please.  Tab 3 is
2  a PowerPoint Presentation.  I believe it was
3  cre -- created by Mr. Sims.  Do you recall
4  who created this PowerPoint Presentation?
5     A.     I don't know who created it, but
6  I believe that this is the PowerPoint
7  Presentation -- can I look at it real quick?
8     Q.     Sure.
9     A.     (Reviewing document.) I believe
10  this is the -- the presentation that David
11  gave me some datapoints or -- presentation or
12  around -- for our rig visit out to the
13  HORIZON.
14     Q.     Okay.
15     A.     I don't know who -- I don't know
16  if he was the one that personally put it
17  together, though.
18     Q.     All right.  The document is
19  BP-HZN-MBI00129014, and I want you to turn to
20  the third page, where it talks about "Talking
21  Points for the Horizon Rig Visit," and
22  there's a number of things listed there
23  that -- "Hallmarks of Horizon team," and the
24  first one is:  "Genuine concern for the
25  health, safety and environment - not just

486

1  ticking the box."  Did you agree with that?
2     A.     That was one of the things
3  that -- from David's perspective, that was
4  one of the things he felt like that they had.
5  And -- and, again, that was what I wanted to
6  go out and visit with the Team about.
7     Q.     Okay.  So these -- the -- the
8  statements in here are -- are David's
9  perspectives, and you wanted to go out to
10  the -- to the rig to determine whether they
11  were, in fact, true?
12     A.     Yes.  As I said yesterday and
13  have said throughout all of this, I had the
14  opportunity to go to either the DDIII or the
15  HORIZON, and I wanted to go out to the
16  HORIZON because it was the best-performing
17  rig we had, from a safety and a drilling
18  performance standpoint, and wanted to
19  understand -- again, as any Leader, I think,
20  would -- what good looks like, so that we can
21  apply lessons to our other rigs.
22     Q.     Okay.
23     A.     And so these were his -- his
24  things that he put together to kind of
25  facilitate the conversation and bring me up

487

1  to speed from his thoughts.



488



4 (Pages 485 to 488)

**PURSUANT TO CONFIDENTIALITY ORDER**

## 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL        )    MDL NO. 2179
BY THE OIL RIG          )
"DEEPWATER HORIZON" IN  )    SECTION "J"
THE GULF OF MEXICO, ON  )
APRIL 20, 2010          )    JUDGE BARBIER
                        )    MAG. JUDGE SHUSHAN

*********************************************
ORAL AND VIDEOTAPED DEPOSITION OF
VINCENT PRICE
JUNE 20, 2011
*********************************************

Deposition of VINCENT PRICE, taken at Pan
American Life Center, 601 Poydras Street, Room
Bayou 1/2, New Orleans, Louisiana, on the 20th of June,
2011.

## 2

1
2
3    A P P E A R A N C E S
    APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
4        Mr. Michael C. Palmintier
         Mr. Jonathan Williams
5        DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGÉ
         618 Main Street
6        Baton Rouge, Louisiana 70801-1910

7    APPEARING FOR BP, INC.:
         Mr. Walter R. Lancaster
8        KIRKLAND & ELLIS
         333 South Hope Street
9        Los Angeles, California 90071

10       Ms. Alyssa Qualls
         KIRKLAND & ELLIS
11       300 North LaSalle
         Chicago, Illinois 60654
12   APPEARING FOR TRANSOCEAN:
13       Mr. Paul C. Thibodeaux
         Ms. Mary K. Klinefelter
14   FRILOT
         1100 Poydras Street, Suite 3600
15       New Orleans, Louisiana 70163

16   APPEARING FOR ANADARKO PETROLEUM COMPANY:
         Mr. Patrick A. Harvey
17       Mr. Warren Anthony Fitch
         BINGHAM MCCUTCHEN
18       2020 K Street, Northwest
         Washington, D.C. 20006-1806
19   APPEARING FOR HALLIBURTON:
         Mr. Gavin Hill
20       Mr. Prescott Smith
         GODWIN RONQUILLO
21       1201 Elm Street, Suite 1700
         Dallas, Texas 75270-2041
22
         Ms. Carmelite M. Bertaut
23       Ms. Lauren Godshall
         STONE PIGMAN WALTHER WITTMAN
24       546 Carondelet Street
         New Orleans, Louisiana 70130-3588
25

## 3

1    A P P E A R A N C E S (Continued)
2
3    APPEARING FOR WEATHERFORD:
         Mr. Wayne G. Zeringue, Jr.
4        JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
         DENEGRE, L.L.P.
5        201 St. Charles Avenue
         New Orleans, Louisiana 70170
6
     APPEARING FOR DRIL-QUIP, INC.:
7        Ms. Margaret Bryant
         WARE, JACKSON, LEE & CHAMBERS
8        America Tower, 42nd Floor
         2929 Allen Parkway
9        Houston, Texas 77019-7101
10   APPEARING FOR MOEX OFFSHORE 2007, L.L.C., and MOEX USA:
         Mr. Edward Flanders
11       PILLSBURY
         1540 Broadway
12       New York, New York 10036
13   APPEARING FOR M-I SWACO:
         Mr. John C. Funderburk
14       MORGAN, LEWIS & BOCKIUS, L.L.P.
         1000 Louisiana Street, Suite 4000
15       Houston, Texas 77002-5006
16   APPEARING FOR THE UNITED STATES:
         Mr. Stephen G. Flynn
17       U.S. DEPARTMENT OF JUSTICE
         TORT BRANCH, CIVIL DIVISION
18       1425 New York Avenue, N.W.
         Suite 10100
19       Washington, D.C. 20005
         Post Office Box 14271
20       Washington, D.C. 20044-4271
21   APPEARING FOR BOB KALUZA:
         Mr. Dane Ball
22       GERGER & CLARKE
         1001 Fannin Street, Suite 1950
23       Houston, Texas 77002
24   ALSO PRESENT:
         Mr. Mark Hendrix, Videographer
25

## 4

1                    INDEX
2
3    VIDEOTAPED ORAL DEPOSITION OF
                    VINCENT PRICE
4                    JUNE 20, 2011
5                                      PAGE
     Appearances . . . . . . . . . . . . . . . . . 2
6
     VINCENT PRICE
7    Examination by Mr. Palmintier . . . . . . . . . . 6
     Examination by Mr. Thibodeaux . . . . . . . . . . 130
8    Examination by Mr. Hill . . . . . . . . . . 184
     Examination by Mr. Fitch . . . . . . . . . . 235
9    Examination by Mr. Flanders . . . . . . . . . . 240
     Further Examination by Mr. Palmintier . . . . . . . 242
10
     Signature and changes . . . . . . . . . . . . . . 290
11   Reporter's Certificate . . . . . . . . . . . . . . 292
12
13                  EXHIBITS
14                                          PAGE
     EXHIBIT NO. 3056 . . . . . . . . . . . . . . . . 185
15       Module 1: Weather; Location: Deepwater
         Horizon; Dates of Observation: 3/31/2010 -
         4/14/2010; Candidate: Vincent Price; Mentor
16       or WSL: Earl Lee, Murray Sepulvado, Ronnie
         Sepulvado; Coach: Martin Breazeale;
17       BP-HZN-2179MDL02307175,07176,07178, 07180
         07182
18
     EXHIBIT NO. 3057 . . . . . . . . . . . . . . . 185
19       April 10, 2010 E-mail from Murry Sepulvado
         with attachment; BP-HZN-2179MDL02307033 -
20       07035
21   EXHIBIT NO. 3058 . . . . . . . . . . . . . . . 201
         Deepwater Cementing Guidelines;
22       BP-HZN-2179MDL00779762 - 79794
23   EXHIBIT NO. 3059 . . . . . . . . . . . . . . . 223
         Gulf of Mexico SPU; Recommended Practice
24       for Cement Design and Operations in DW GoM;
         BP-HZN-2179MDL02222199 - 22234
25

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



133

135

134

136

18    Q.        In your time on the -- on the Deepwater
19  Horizon, you had an opportunity to get to know some of
20  the Transocean personnel on the rig, correct?
21    A.  That's correct, yeah.
22    Q.  Did you know Paul Johnson?
23    A.  Name doesn't -- doesn't strike -- ring a bell
24  with me.
25    Q.  You didn't know Paul Johnson.  Do you know

34 (Pages 133 to 136)

**PURSUANT TO CONFIDENTIALITY ORDER**



137

1    **Jimmy Harrell?**
2        A.  I do.
3        **Q.  And -- and who was Jimmy?**
4        A.  He was the -- one of the OIMs.
5        **Q.  Okay.  Do you know Randy Ezell?**
6        A.  I know the name.  I've never met the guy.
7        **Q.  Do you know what his job was?**
8        A.  If I'm not mistaken, he was a tool pusher,
9    senior tool pusher, something like that.
10       **Q.  Do you know Jason Anderson?**
11       A.  I just know the name.  I never met him.
12       **Q.  Never met him.  Do you know Dewey Revette?**
13       A.  I do.
14       **Q.  What was his job?**
15       A.  He was a driller.
16       **Q.  Do you know Stephen Curtis?**
17       A.  I do.
18       **Q.  What was his job?**
19       A.  He was an assistant driller.
20       **Q.  Do you know Don Clark?**
21       A.  Yes.
22       **Q.  What was his job?**
23       A.  Assistant driller.
24       **Q.  Do you know Captain Kuchta?**
25       A.  "Curt," is that --

139

11       **Q.  Okay.  And you never raised any issues with --**
12   **with anybody from Transocean regarding any of the rig**
13   **crew, correct?**
14       A.  I did not.
15       **Q.  No member of the Transocean rig crew while you**
16   **were on board the Deepwater -- Deepwater Horizon**
17   **exhibited behavior that led you to believe that they**
18   **were callus or indifferent as to the safety of**
19   **individuals or the environment, correct?**
20       A.  That is correct.

138

1        **Q.  Yeah.**
2        A.  Yes.
3        **Q.  "Captain Curt."  Okay.  In your time that you**
4    **spent on the Deepwater Horizon, you were comfortable**
5    **with the comp- -- competency of the rig crew, correct?**
6        A.  I was.
7        **Q.  You didn't have any complaints about the --**
8    **the gentlemen I just mentioned, correct?**
9        A.  The ones that I know, I didn't have any
10   complaints.  The ones that I haven't met, I don't have
11   an opinion one way or the other.
12       **Q.  Okay.  As a well site leader, in fact, if you**
13   **weren't comfortable with the competency of anyone on**
14   **board the Deepwater Horizon, you could have shut the job**
15   **down, correct?**
16       A.  As a Well Site Leader of the Future on board
17   the Deepwater Horizon, yes.

140

**PURSUANT TO CONFIDENTIALITY ORDER**



141

15      Q.        So when you left the rig on
16  approximately April 11th, 2010 you weren't aware of any
17  outstanding safety critical audit items that had not
18  been addressed yet, correct?
19      A.   That's correct.

142

143

144

**PURSUANT TO CONFIDENTIALITY ORDER**

291

```
 1            I, VINCENT PRICE, have read the foregoing
       deposition and hereby affix my signature that same is
 2     true and correct, except as noted above.

 3
                              [signature]
 4                     _____
                       VINCENT PRICE

 5

 6     STATE OF T E X A S      )
       COUNTY OF Victoria      )

 7

 8            Before me, Michael Ashton _____, on
       this day personally appeared VINCENT PRICE, known to me,
 9     or proved to me under oath or through
       __TXDL_____} (description of identity card or
10     other document)), to be the person whose name is
       subscribed to the foregoing instrument and acknowledged
11     to me that they executed the same for the purposes and
       consideration therein expressed.

12
              Given under my hand and seal of office on
13     this, the __1__ day of August_____, 2011 .

14

15
              Michael Ashton
16                     _____
                       NOTARY PUBLIC IN AND FOR THE
17                     STATE OF TEXAS

       My Commission Expires: 6/20/2012 _____
18

19
       ┌─────────────────────────────────┐
20     │      MICHAEL ASHTON             │
       │   Notary Public, State of Texas │
21     │    My Commission Expires        │
       │       June 20, 2012             │
22     └─────────────────────────────────┘

23

24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

In Re: OIL SPILL by the "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010                                    Reported by:
DAVID A. RICH              June 1, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"   SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL      JUDGE BARBIER
20, 2010              MAG. JUDGE SHUSHAN

        Deposition of DAVID A. RICH, taken
in the Pan American Life Center, Bayou
Room, 11th Floor, 601 Poydras Street, New
Orleans, Louisiana 70130, on Wednesday,
June 1, 2011.

APPEARANCES:

        LEGER & SHAW
        (By:  Walter J. Leger Jr., Esquire
              and Christine E. Sevin,
              Esquire)
        600 Carondelet Street
        Suite 900
        New Orleans, Louisiana  70130-3519
            (Attorneys for Plaintiff's
             Steering Committee)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.       Telephone: (504) 525-9100
New Orleans, LA 70130-6029     Board-Certified Court Reporters    Facsimile: (504) 525-9109

In Re: OIL SPILL by the "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010                                    Reported by:
DAVID A. RICH                           June 1, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 378

18    Q.   Specifically, are you aware of
19  any evidence that would support a
20  conclusion that any Transocean employee or
21  manager involved in the Macondo Prospect
22  ever deliberately wanted to cause injury to
23  the environment or any person?
24    A.   Can you repeat the question
25  again?  They're kind of getting all rolled

Page 380

Page 379

1   into the same thing.
2     Q.   Well, it is.  It's the same
3   question, but this is specifically limited
4   to Transocean employees or management.
5     A.   Sure.  Okay.
6     Q.   Are you aware of any evidence
7   that would support a conclusion that any
8   Transocean employee or manager deliberately
9   wanted to cause injury to the environment
10  or to any person?
11    A.   No, sir.
12    Q.   Same question with regard to any
13  Transocean employee or manager acting
14  maliciously, or not caring about causing
15  injury to another human or the environment?
16    A.   No, sir.
17    Q.   The same question with regard to
18  any Transocean employee or manager
19  willfully inflicting harm on any person or
20  on the environment?
21    A.   No, sir.

Page 381

96 (Pages 378 to 381)

fcef76a1-133f-42a1-877a-ea5d46bee3c5

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN RE:** OIL SPILL    )   MDL NO. 2179
**by the** OIL RIG,    )
DEEPWATER HORIZON in    )   SECTION "J"
the GULF OF MEXICO,    )
April 20, 2010    )   JUDGE BARBIER
            )
            )   MAG. JUDGE
            )   SHUSHAN

*****************

VIDEOTAPED DEPOSITION OF ANGEL RODRIGUEZ

        Deposition of Angel Rodriguez, taken
at the Hilton Conference Center, 333 St. Charles
Avenue, New Orleans, Louisiana, 70130, on Friday,
July 29, 2011.

REPORTED BY:
        MELISSA L. MAGEE, CSR, RPR, RMR
        Certified Shorthand Reporter
        Registered Professional Reporter
        Registered Merit Reporter

**2**

```
 1          A P P E A R A N C E S
 2   Mr. Jim E. Lavine
     ZIMMERMANN, LAVINE
 3   770 South Post Oak Lane, Suite 620
     Houston, Texas  77056
 4          APPEARING FOR THE WITNESS
 5   Mr. Jonh W. deGravelles
     DEGRAVELLES PALMINTIER, HOLTHAUS & FRUGE
 6   618 Main Street
     Baton Rouge, Louisiana 70801
 7          APPEARING FOR THE
            PLAINTIFFS' STEERING COMMITTEE
 8
     Mr. Paul Collier
 9   Ms. Emily Dempsey
     KIRKLAND & ELLIS
10   300 North LaSalle Street
     Chicago, Illinois  60654
11          APPEARING FOR BP, INC.
12   Ms. Marilee J. Allan
     BINGHAM MCCUTCHEN, LLP
13   Three Embarcadero Center
     San Francisco, California  94111
14          APPEARING FOR ANADARKO
15   Mr. Robert Kallam
     PREIS & ROY
16   601 Poydras Street, Suite 1700
     New Orleans, Louisiana  70130
17          APPEARING FOR TRANSOCEAN
18   Mr. Daniel Johnson
     SUTHERLAND ASBILL & BRENNAN, LLP
19   First City Tower
     1001 Fannin, Suite 3700
20   Houston, Texas  77002
            APPEARING FOR TRANSOCEAN
21
     Mr. Gavin Hill
22   GODWIN RONQUILLO
     1201 Elm Street, Suite 1700
23   Dallas, Texas 75270-2041
            APPEARING FOR HALLIBURTON
24
25
```

**3**

```
 1   Mr. Alex Roberts
     BECK REDDEN & SECREST
 2   One Houston Center
     1221 McKinney Street, Suite 4500
 3   Houston, Texas  77010
            APPEARING FOR CAMERON
 4
     Mr. Lucas Elliot
 5   Ms. Lauren Mitchell
     MORGAN LEWIS
 6   1000 Louisiana Street, Suite 400
     Houston, Texas  77002
 7          APPEARING FOR M-I SWACO
 8   Ms. Wendy Ware Bishop
     WARE JACKSON LEE & CHAMBERS
 9   2929 Allen Parkway, 42nd Floor
     Houston, Texas  77019
10          APPEARING FOR DRIL-QUIP
11   Mr. Henry Dart
     ATTORNEYS AT LAW
12   510 North Jefferson Street
     Covington, Louisiana  70443
13          APPEARING FOR STATE OF LOUISIANA
14   Mr. Micheal Cangelois
     GIEGER LABORDE
15   701 Poydras Street, Suite 480
     New Orleans, Louisiana  70139
16          APPEARING FOR DYNAMIC AVIATION
17   Mr. Andy Dupre
     FLANAGAN PARTNERS, LLP
18   201 St. Charles Avenue, Ste 2405
     New Orleans, Louisiana  70170
19          APPEARING FOR DRC
20   Mr. Lance Wenger
     Attorney-Advisor
21   Office of the Solicitor
     U.S. DEPARTMENT OF THE INTERIOR
22   755 Parfet Street, #151
     Lakewood, Colorado  80226
23          APPEARING FOR UNITED STATES
24   ALSO PRESENT:
25   Kayla Barnes, Videographer
```

**4**

```
 1
 2              INDEX
 3                      PAGE
 4   Style Page................................. 1
 5   Appearances Page........................... 2
 6   Index Page................................. 4
 7   Exhibits Page.............................. 4
 8   Examination of Angel Rodriguez:
 9     By Mr. deGravelles.............. 6
10     By Mr. Dart..................... 97
11     By Mr. Johnson.................. 132
12     By Ms. Allan.................... 193
13     By Mr. Collier................. 203
14     By Mr. deGravelles............. 205
15
16   Witness' Certificate..................... 226
17
18   Reporter's Certificate................... 228
```

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**

133



135

1  you receive an orientation?
2      A.    On my October visit, yes.
3      Q.    And that's because that was your
4  first time on the trip, and you understand, then,
5  when people board the rig for the first time,
6  they have to go through an orientation, right?
7      A.    Yes.  That's Transocean's policy.
8      Q.    Okay.  In your view, was that
9  orientation conducted in a professional manner?
10     A.    Yes.
11     Q.    As part of that orientation, were
12 you provided information regarding emergency and
13 evacuation procedures on the rig?
14     A.    Yes.  We were given a pamphlet with
15 regards to what state room we were in and which
16 were our primary and secondary lifeboat stations.
17     Q.    Okay.  And were you satisfied from
18 that orientation, including the materials that
19 you got, that those procedures were thorough and
20 that they prepared you in the event there was an
21 emergency on the rig?
22     A.    Yes.
23     Q.    Okay.  Now, in your two experiences
24 on the rig, did you ever see what you considered
25 to be what you felt was an unsafe operation that

134

2      Q.    Now, I understand from your
3  testimony earlier today that you had been on the
4  Deepwater Horizon on two occasions.  Is that
5  right, sir?
6      A.    That is correct.
7      Q.    Once in October of 2009 and then
8  again in late March 2010; is that right?
9      A.    That is correct.
10     Q.    Okay.  Did you ever sleep on the
11 rig?  In other words, were they just day trips,
12 or did you spend the night?
13     A.    We spent the night on both
14 occasions.
15     Q.    Okay.  Did you feel safe when you
16 were onboard the rig, sir?
17     MR. DART: Objection to form.
18     COURT REPORTER: I'm sorry?
19     MR. DART: Object to the form.
20     COURT REPORTER: Remind me your name,
21 please.
22     MR. DART: Dart.
23     THE WITNESS: Yes.
24 BY MR. JOHNSON:
25     Q.    Okay.  When you boarded the rig, did

136

1  endangered yourself or any of the members on the
2  rig?
3      A.    No.
4      Q.    Did you ever see any member of the
5  Deepwater Horizon crew acting in a way that was
6  reckless with regard to the safety of other human
7  beings?
8      A.    I did not see that behavior.
9      Q.    I'm going to go through a series of
10 these questions, and I appreciate your patience.
11 They may sound somewhat similar, but they're
12 going to be a little different.  So if you have
13 any questions about them, let me know.
14     A.    I sure will.
15     Q.    How about with respect to the
16 environment, did you ever see a member of the
17 crew acting recklessly toward the environment in
18 any way?
19     A.    No, sir.
20     Q.    Have you ever heard anyone at BP say
21 that they saw any member onboard the Deepwater
22 Horizon act in a way that was reckless with
23 regard to the safety of other human beings?
24     A.    No, sir.
25     Q.    And is the same true with respect to

**PURSUANT TO CONFIDENTIALITY ORDER**

137

1  the environment, never heard anyone say that --
2  anything about environment, either; is that
3  right?
4      A.   That is correct.
5      Q.   Okay.  Now, on any of your -- on
6  your two visits to the Deepwater Horizon, did you
7  ever see any member of the Deepwater Horizon crew
8  act with what you would regard as malice or
9  indifference towards the safety of other human
10 beings?
11     MR. HILL:  Object to the form.
12     THE WITNESS:  No.
13 BY MR. JOHNSON:
14     Q.   And same with respect to the
15 environment, did you ever see any member of the
16 Deepwater Horizon crew on your visits act in a
17 way that you would consider characterized as
18 malice or indifference toward the environment?
19     MR. HILL:  Object to the form.
20     THE WITNESS:  No.
21 BY MR. JOHNSON:
22     Q.   Did ever anyone characterize any
23 action on any member of the Deepwater Horizon
24 crew in such a way that it would be considered
25 malicious or indifferent toward the safety of

138

1  other human beings?
2      A.   No.
3      MR. HILL:  Object to the form.
4  BY MR. JOHNSON:
5      Q.   And what about environment, did you
6  ever hear anybody say that?
7      MR. COLLIER:  Object to the form.
8      THE WITNESS:  Can I just clarify this?
9  This is pertaining to my visits?
10 BY MR. JOHNSON:
11     Q.   Yeah.  Did you ever hear anyone else
12 say that?
13     A.   No.
14     Q.   Okay.  Now, I know during your
15 visits, you had the opportunity to interact with
16 some members of the Deepwater Horizon crew.  Is
17 that right?
18     A.   That is correct.
19     Q.   Okay.  And had you ever had occasion
20 to meet a gentleman by the name of Jimmy Harrell?
21     A.   Yes.  He was the OIM --
22     Q.   Okay.
23     A.   -- at the time.
24     Q.   Was he the OIM on both of your -- in
25 other words, was he the OIM onboard the rig

139

1  during both of your visits?
2      A.   It so happened, yes.
3      Q.   Okay.  I mean, I know that there's
4  different hitches, and so --
5      A.   Absolutely.
6      Q.   -- just wanted to clarify.  He was
7  the one out there during both trips, as best you
8  recall?
9      A.   That is correct.
10     Q.   Okay.  Did he seem professional in
11 your interactions with him?
12     A.   Yes.
13     Q.   Okay.  Did he strike you as
14 knowledgeable about his job in the manner in
15 which he interacted with you?
16     A.   Can you -- can you just rephrase
17 that question?
18     Q.   Yes.
19     A.   Specify it.
20     Q.   Yeah.  Just -- and I know you may
21 not know all the aspects of his job, and I
22 wouldn't ask you to comment on that.  But just in
23 his dealings with you and any discussions you had
24 about the rig, did he seem knowledgeable?
25     MR. DART:  Object to the form.

140

1      THE WITNESS:  In my conversations with him
2  concerning the marine items, I felt he was
3  knowledgeable.
4  BY MR. JOHNSON:
5      Q.   Okay.  Did he ever strike you as
6  nonchalant about safety or acted as if he didn't
7  care about safety?
8      A.   I did not observe that behavior from
9  him.
10     Q.   In terms of the audit work and the
11 follow-up issues that you were on the rig for, in
12 your interactions with him, did you feel as if
13 those were issues that were important to him?
14     A.   In my dealings with not only the OIM
15 and the captain and the rest of the staff
16 onboard, I did not see any indication that they
17 did not take the findings -- the marine findings
18 serious.  They were really intent on addressing
19 those findings.
20     Q.   What about -- did you ever have
21 occasion -- and I appreciate that response, and
22 it was broader than the OIM.  I'm going to ask
23 about some specific people, and you may have
24 meant to address them in that answer.
25     A.   Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

141

1    Q.    I just wanted to clarify for the
2  record.
3    A.    Understood.
4    Q.    Did you ever have occasion to
5  interact with a person named Curt Kuchta?
6    A.    Yes.  He was the captain.
7    Q.    Okay.  Do you recall if he was the
8  captain -- because I know there are different
9  hitches.
10    A.    Sure.
11    Q.    Was he onboard the rig during both
12  of your visits, the one in October and then the
13  one in March?
14    A.    Yes, he was.
15    Q.    Okay.  So just coincidentally, he
16  happened to be there on both of those visits,
17  like Jimmy Harrell was, right?
18    A.    Correct, sir.
19    Q.    Okay.  And based on your
20  interactions with Captain Kuchta, did you find
21  him to be professional?
22    A.    Yes, he was professional.
23    Q.    In your interactions with him -- and
24  I'm not asking you to comment about anything
25  broader than that.  Just based on your

142

1  interactions with him, did you find him to be
2  someone that struck you as knowledgeable about
3  his job?
4    A.    Yes.
5    Q.    Okay.  Based on your interactions
6  with him, did you ever have any reason to believe
7  that safety was something that wasn't important
8  to Captain Kuchta?
9    A.    No, I did not observe that behavior
10  from him.
11    Q.    And the same question I asked with
12  respect to the OIM Jimmy Harrell, in the context
13  of your interactions with Captain Kuchta with
14  your -- with the follow-up efforts and verifying
15  that certain items in the audits were closed out,
16  did you find Captain Kuchta's approach to those
17  issues to reflect that he considered them
18  important?
19    A.    Yes.
20    Q.    Okay.  Based on your personal
21  interactions -- and I understand he was on the
22  rig during your two visits.
23    A.    Yes.
24    Q.    And then as I understood your
25  testimony -- and there may be some documents that

143

1  suggest this we'll go through in a minute.  But
2  you had some interactions with him beyond just
3  those two visits on the rig; is that fair?
4    A.    Yeah.  On several occasions, I would
5  get updates from him via telephone --
6    Q.    Okay.
7    A.    -- after some of the morning
8  meetings that were held at the office.
9    Q.    And some of those updates, those
10  would have been -- because you made two visits
11  out rig, one in October, one in late March.
12  These were updates in between those periods so
13  that --
14    A.    That is correct.
15    Q.    -- you could keep tabs on the
16  progression of closing items out.  Is that a fair
17  characterization?
18    A.    That is a fair characterization,
19  yes.
20    Q.    In any of your interactions with
21  Captain Kuchta, either on the rig or in
22  conversations with him, was there ever anything
23  that led you to question his competency or
24  fitness for the job?
25    A.    No.

144

1    Q.    Now, more generally --
2    A.    Okay.
3    Q.    During your experiences with the rig
4  management, did you feel confident that the
5  people in charge of the rig, whether Captain
6  Kuchta, Jimmy Harrell, or the shore-based
7  management, Paul Johnson, who I think you said
8  you had interacted with, did you, in your
9  interactions with them, feel that this rig was
10  being managed by people that were safety
11  conscious?
12    MR. COLLIER:  Object to the form.
13    THE WITNESS:  They were safety conscious.
14  BY MR. JOHNSON:
15    Q.    Now, I want to ask you a little bit
16  about the crew of the Deepwater Horizon.  And I
17  know that you're not going to know every member
18  of the crew, and there will be some aspects of
19  the Deepwater Horizon crew which you may not have
20  any knowledge of.  And so if I ask you something
21  that you don't have any knowledge of, I know
22  you'll tell me.
23    A.    Okay.
24    Q.    But I think, based on your testimony
25  earlier today and some of the documents that I've

**PURSUANT TO CONFIDENTIALITY ORDER**

145

1  read, you had occasion to deal not only with
2  Mr. Harrell and Captain Kuchta --
3      A.    Yes.
4      Q.    -- and Paul Johnson, but I think
5  that you also -- and you tell me if I'm wrong.  I
6  think you also had occasion to deal with the
7  chief mate and the maintenance supervisor.  Is
8  that right?
9      A.    Can you state their names?
10     Q.    Well, do you recall any of the names
11 of any of the individuals beyond those that we've
12 talked about?
13     A.    I remember interacting with Michael
14 Dowd, who was the chief mate.
15     Q.    All right.  Do you remember
16 interacting with a gentleman named Steve Bertone
17 at any time?
18     A.    I don't recall, sir.
19     Q.    Okay.
20     A.    I do not recall.
21     Q.    If I suggested to you that the
22 maintenance supervisor was a gentleman named
23 Steve Bertone, does that refresh your memory at
24 all?
25     A.    No.

146

1      Q.    Fair enough.  Do you know if you
2  interacted with the maintenance supervisor, even
3  though you may not recall a name or a face?
4      A.    Yes, I did.
5      Q.    Okay.  Now, with respect to Mr.
6  Dowd, you said that was the chief mate that you
7  recall having some interaction with; is that
8  right?
9      A.    Yes, on both visits.
10     Q.    So he -- like Mr. Harrell, like
11 Captain Kuchta, he was someone that was on the
12 rig during both of your visits, the one in
13 October and the one in March, right?
14     A.    That is correct.
15     Q.    Okay.  Now, in terms of Mr. Dowd and
16 your interactions with him, did he ever give you
17 any reason to believe that he wasn't competent?
18     A.    No.
19     Q.    Did he ever give you any reason to
20 believe that he didn't take safety seriously?
21     A.    No, I did not observe that behavior.
22     Q.    In fact, did you -- in your
23 interactions with him, would it be fair to say
24 that you believe he was someone that was safety
25 conscious?

147

1      A.    Yes.
2      Q.    With regard to the maintenance
3  supervisor. . .
4      A.    Okay.
5      Q.    And I may not be able to get too
6  detailed, since you don't have a specific name in
7  mind.  But was there anything that stands out,
8  that you're aware of today, that caused you
9  concerns about the competency of the maintenance
10 supervisor that you had interactions with?
11     A.    No, I can't speak to that.
12     Q.    Okay.  As far as you know, your
13 interactions with him didn't lead you to any
14 other conclusions other than they were also
15 safety conscious; is that fair?
16     MR. DEGRAVELLES: Object to the form.
17     MR. HILL: Object to the form.
18 BY MR. JOHNSON:
19     Q.    They didn't like that question.
20     A.    Can repeat your question one more
21 time?
22     Q.    I'll accept the first one I got from
23 you.  It will be fine.
24     A.    Okay.
25     Q.    We talked a little bit about

148

1  Paul Johnson.
2      A.    Yeah.
3      Q.    And he was the rig manager for
4  operations for Transocean; is that right?
5      A.    That's correct.
6      Q.    And in addition to interacting with
7  the individuals that were on the rig, you had
8  fairly regular communication with Mr. Johnson
9  throughout this process of completing audit items
10 after the September 2009 BP audit; is that right?
11     A.    That is correct.
12     Q.    Was he -- based on your experiences
13 with him, was he someone that was supportive of
14 the rig and the efforts to close out these items?
15     A.    Yes, he was.
16     Q.    Was he receptive to your comments
17 and your looking to him for feedback on how to
18 get these items closed?
19     A.    Yes, he was.
20     Q.    Okay.  You felt like he was
21 cooperative and constructive in trying to address
22 these issues; is that fair?
23     A.    Yes.
24     Q.    And I think you may have answered
25 this, but he was someone that struck you as a

**PURSUANT TO CONFIDENTIALITY ORDER**



149

1    safety conscious individual; is that right?
2        A.    Yes.

151

150

152

**PURSUANT TO CONFIDENTIALITY ORDER**



153

6    Q.    Fair enough.  At the time the rig
7  went back into service, were you personally aware
8  of any condition on the rig, based on any
9  knowledge that you had from any source, that
10 rendered it unsafe?
11   A.   No.  I -- no.

155

154

156

25                    MR. JOHNSON: Yeah.

PURSUANT TO CONFIDENTIALITY ORDER



161

163

162

164

5    Q.    Okay.  Now, as part of your visit on
6  October the 20th, 2009, you obviously met with
7  what you refer to as the leadership team onboard
8  the Deepwater Horizon.  Did I read that
9  correctly?
10    A.    Yes, that's correct.
11    Q.    Now, as part of this visit, you went
12  and you obtained personal knowledge about the
13  updates you had been receiving following the
14  decision by BP in September of 2009; is that
15  right?
16    A.    Yes.
17    Q.    Okay.
18    A.    Yes.
19    Q.    And according to your e-mail, based
20  on your personal observations, you concluded that
21  the rig crew had been rigorously closing out the
22  findings, isn't that right, Mr. Rodriguez?
23    A.    Yes.  I stand by that, yes.
24    Q.    Now, for the items that had not --
25  and I understand not all the items had been

41  (Pages 161 to 164)

**PURSUANT TO CONFIDENTIALITY ORDER**

165

1  closed out by that point.  True?
2      A.    No.  There were a great majority
3  that weren't.
4      Q.    Now, you left satisfied, though,
5  that those items that had not been closed out,
6  there was a commitment and path forward to get
7  those resolved.  True?
8      A.    Yes, there was.  I saw that
9  commitment through my dealings with the crew
10 onboard the Horizon.
11     Q.    They seemed -- and you addressed
12 those individually with them, did you not, sir?
13     A.    Absolutely I did.
14     Q.    And you walked away convinced when
15 you left the rig that if those items had not been
16 remedied, that Transocean gave you a clear path
17 to how they were going to fix those, right?
18     A.    Right.  They had action plans in
19 place.



**PURSUANT TO CONFIDENTIALITY ORDER**



169

171

```
 1    wouldn't hesitate to raise that, would you, sir?
 2        A.   No, I would not.
 3        Q.   And you didn't see anything that
 4    made you concerned, did you?
 5        A.   No, not at that time.
 6        Q.   Okay.  And you didn't during the
 7    March 29th trip, did you?
 8        A.   No.
```

170

172

```
12             You go out to that rig, and you've
13    got a list of things that you're going to verify.
14    And I understand that's that primarily what you
15    do.  Right?
16        A.   Yes.
17        Q.   Now, you don't have -- you don't
18    have blinders on, true?
19        A.   That is correct.
20        Q.   Now -- and I know you're not looking
21    specifically for other things.  But my question
22    to you, sir, is, since you're out there on behalf
23    of BP, if you saw something marine related that
24    maybe wasn't on your checklist, but it was marine
25    related, and you said, "That's unsafe," you
```

43 (Pages 169 to 172)

**PURSUANT TO CONFIDENTIALITY ORDER**

177

178

179

4    Q.    But my question, like the October
5  visit before, was, in your role, you would not
6  hesitate to bring up an issue if you felt there
7  was an unsafe marine condition that you saw, even
8  if it was outside of that spreadsheet; is that
9  true?
10    A.    That is true.
11    Q.    And you didn't see anything on your
12  tour of the vessel; is that fair?
13    A.    Not on my March visit, no.

25    One of the things you say in your

180

1  March the 30th, 2010, e-mail after you boarded
2  the rig, had this meeting, took a tour throughout
3  the vessel, is, you indicate, "I wanted to
4  mention that the Horizon's crew completed 63 out
5  of 70 findings in a five-month period, which is
6  commendable." Did I read that right?
7    A.    Yes, you did.
8    Q.    Now, the reason I printed the
9  checklist out in color, or the spreadsheet,
10  rather, is because the next sentence says, "The
11  remaining findings that are highlighted in yellow
12  are awaiting parts that are on order with
13  attached order numbers are tracked in the RMS II
14  system." Did I read that right?
15    A.    That is correct.
16    Q.    Okay.  So it's kind of helpful to
17  have a sheet that's got some color on it as --
18    A.    Yes, sir.
19    Q.    -- opposed to black and white?
20    What I'd like for you to do is to
21  look through -- and I know we've kind of gone
22  through some of them already, so I don't know how
23  long it will take.  But just kind of look through
24  and familiarize yourself a little bit with those
25  items that are highlighted in yellow.



45 (Pages 177 to 180)

**PURSUANT TO CONFIDENTIALITY ORDER**

181

```
1          A.    Okay.
2          Q.    Just to kind of get a feel for what
3     they are, and then I'll pose my questions to you.
4          A.    (Reviews document.)  Okay.
5          Q.    After I ask my question, if you need
6     to go back and look at those in any more detail,
7     we can do that.
8          A.    Okay.
9          Q.    Would it be fair to say,
10    Mr. Rodriguez, that you were satisfied that those
11    seven items, though unresolved, had a sufficient
12    action plan to get them taken care of?
13         A.    Yes.
14         Q.    Okay.  And would it also be fair to
15    say that you were satisfied that those issues,
16    though unresolved, didn't mean the rig was going
17    to be unsafe or unseaworthy?
18         A.    No.
19         Q.    It will be fair to say that you were
20    satisfied the rig could operate safely and be
21    seaworthy, even despite these issues not being
22    resolved; is that true?
23         MR. DART:  Object to the form.
24         THE WITNESS:  Yes.
```



**PURSUANT TO CONFIDENTIALITY ORDER**



189

191

190

192

13    Q.    How many DB vessels have you ever
14 been on?
15    A.    MODUs?  In general?
16    Q.    Drill ships, anything.  Anything of
17 that nature, vessels, that conduct drilling
18 operations.
19    A.    Over 20.
20    Q.    Have you ever been on a rig -- or
21 any of those 20 vessels that was in perfect
22 condition?
23    A.    No.
24    Q.    The Deepwater Horizon, on the two
25 visits you made, it wasn't in perfect condition,

48  (Pages 189 to 192)

**PURSUANT TO CONFIDENTIALITY ORDER**



193

```
1   either, was it?
2       A.    No.  And I don't believe any rig is
3   in perfect condition.
4       Q.    But despite not being in perfect
5   condition, based on the two trips that you made,
6   would it be fair to say that you what you saw
7   with your own eyes led you to believe that that
8   rig could operate in a safe manner?
9       A.    From a marine standpoint, yes.
```

194

195

196

**PURSUANT TO CONFIDENTIALITY ORDER**

227

1                      SIGNATURE PAGE

2

3          I, ANGEL RODRIGUEZ, have read the
   foregoing deposition and hereby affix my
   signature that same is true and correct, except
4  as noted on the correction page.

5

6



                   ANGEL RODRIGUEZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

Page 483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL      )      MDL NO. 2179
by the OIL RIG,        )
DEEPWATER HORIZON in   )      SECTION "J"
the GULF OF MEXICO,    )
April 20, 2010         )      JUDGE BARBIER
                       )
                       )      MAG.  JUDGE
                       )      SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VOLUME 2
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of MURRY SEPULVADO,
taken at Pan-American Building, 601 Poydras
Street, 11th Floor, New Orleans, Louisiana,
70130, on the 12th of May, 2011.

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010

Reported by:

MURRY SEPULVADO VOL. II May 12, 2011        THU BUI, CCR, RPR



Page 524

Page 525

Page 526

Page 527

```
18      Q.         . In your position as the
19   wellsite leader on the DEEPWATER HORIZON,
20   you got to know the crew pretty well?
21      A.   Yes, sir.
22      Q.   Okay.  You were asked some
23   questions about Paul Johnson who was the
24   rig manager, and you didn't know Paul that
25   well?
```

12 (Pages 524 to 527)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile:(504) 525-9109

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010

MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR

Reported by:

Page 528

1    A.   Paul Johnson had just came on as
2 the manager for the DEEPWATER HORIZON a few
3 months earlier.  And I've met him one time
4 and shook his hand.  But I didn't know him
5 that well.
6    Q.   Okay.  Did you know Jimmy
7 Harrell?
8    A.   Yes, I knew Jimmy Harrell.
9    Q.   Okay.  Did you know Randy Ezell?
10    A.   Yes, I know Randy Ezell.
11    Q.   Did you know Jason Anderson?
12    A.   Yes, I know Jason.
13    Q.   Did you know Dewey Revette?
14    A.   Yes, sir.
15    Q.   Steven Curtis?
16    A.   Yes, sir.
17    Q.   Don Clark?
18    A.   Yes, sir.
19    Q.   Did you know Captain Kuchta?
20    A.   Yes, sir.
21    Q.   Now, you told us that
22 Ms. Martinez, Dennis Martinez's wife, was
23 actually -- actually called and told
24 you about the casualty, correct?
25    A.   She actually called me and told

Page 529

1 me of the event of the rig was on fire.
2    Q.   Okay.  Now, knowing the
3 competency of the crew and the condition of
4 the rig, did it surprise you when you
5 learned what occurred?
6    A.   Totally.
7    Q.   And why?
8    A.   Had lots of questions, couldn't
9 understand how that -- how that could have
10 happened.  Didn't know any of the facts.
11    Q.   This rig was your home away from
12 home, correct?
13    A.   That's correct.
14    Q.   If you had any concerns about
15 the safety of this rig, would you have
16 slept on it?
17    A.   No, sir.
18    Q.   The men we discussed earlier,
19 did any of them seem like men that would
20 lie to you?
21    A.   No, sir.
22    Q.   Did they ever seem like men that
23 would themselves hide issues that would
24 subject them or anyone else to safety
25 issues on that rig?

Page 530

1    A.   From what I know of these
2 gentlemen, they -- they would not have.
3    Q.   They would not have?
4    A.   From -- from -- with me, they
5 wouldn't have, no.
6    Q.   I just want to make sure the
7 record's clear.  Would not?
8          You -- you say wouldn't
9 kind of quick.
10    A.   Yeah, would not.
11    Q.   Were you comfortable with Jimmy
12 Harrell as the OIM of the DEEPWATER
13 HORIZON?
14    A.   Yes, I was.
15    Q.   Okay.  Did you ever experience
16 any indication that he was indifferent or
17 callous towards the safety of individuals
18 or the environment?
19    A.   No, I didn't.
20    Q.   Okay.  You would agree with me
21 that it was just the opposite?
22    A.   He was a very conscientious OIM.
23    Q.   From your experience with
24 Mr. Harrell, what was his attitude towards
25 the safety of individuals and the

Page 531

1 environment?
2    A.   Mr. Harrell was always on top of
3 safety and safety was always number one.
4    Q.   Okay.  Were you comfortable with
5 Randy Ezell as the senior toolpusher on the
6 DEEPWATER HORIZON?
7    A.   Yes, sir.  He was one of the
8 best toolpushers I've probably ever worked
9 with.
10    Q.   Did you ever experience any
11 indication that he was indifferent and
12 callous towards the safety of individuals
13 or the environment?
14    A.   No, sir.
15    Q.   Was it just the opposite with
16 Mr. Ezell?
17    A.   Same.
18    Q.   Okay.  From your experience with
19 him, what was his attitude toward the
20 safety of individuals and the environment?
21    A.   Safety came first, the
22 environment and personnel.
23    Q.   Jason Anderson, were you
24 comfortable with him as one of the
25 toolpushers?

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR

Page 532

1    A.   He was an excellent toolpusher.
2    Q.   Okay.  Did you ever experience
3  any indication that he was indifferent or
4  callous towards the safety of individuals
5  or the environment?
6    A.   No.
7    Q.   Was it just the opposite with
8  Mr. Anderson, as well?
9    A.   That's right, just the opposite.
10   Q.   Okay.  From your experience with
11 him, what was his attitude toward the
12 safety of individuals and the environment?
13   A.   Safety first, environment first.
14 Then the job came third.
15   Q.   Dewey Revette, were you
16 comfortable with him as the -- the driller
17 on the DEEPWATER HORIZON?
18   A.   Yes, I was.
19   Q.   Did you ever experience any
20 indication that he was indifferent or
21 callous towards the safety of individuals
22 or the environment?
23   A.   No.
24   Q.   Was it just the opposite with
25 him, as well?

Page 533

1    A.   That's right.
2    Q.   From your experience with him,
3  what was your (sic) attitude toward the
4  safety of individuals and the environment?
5    A.   It was a bit Transocean culture
6  out there for safety first, environment,
7  and then the task at hand, and everybody
8  supported that.
9    Q.   Mr. Revette was onboard with
10 that culture?
11   A.   He was onboard with that
12 culture.
13   Q.   Stephen Curtis, he was an
14 assistant driller, correct?
15   A.   That's -- that's correct.
16   Q.   Were you comfortable with him as
17 an assistant driller?
18   A.   Yes, I was.
19   Q.   Did you ever experience any
20 indication that he was indifferent or
21 callous toward the safety of individuals or
22 the environment?
23   A.   No.
24   Q.   Was it just the opposite with
25 him, as well?

Page 534

1    A.   That's true.
2    Q.   From your experience with him,
3  what was his attitude toward the safety of
4  individuals and the environment?
5    A.   Safety first, job second.
6    Q.   Okay.  Don Clark was another
7  assistant driller.
8    A.   Yes, sir.
9    Q.   And were you comfortable with
10 him as an assistant driller on the
11 DEEPWATER HORIZON?
12   A.   Yes, I was.
13   Q.   Did you ever experience any
14 indication that he was indifferent or
15 callous toward the safety of individuals or
16 the environment?
17   A.   No.
18   Q.   You'd agree it was just the
19 opposite with him, as well?
20   A.   That's right.
21   Q.   From your experience with him,
22 what was his attitude toward the safety of
23 individuals and the environment?
24   A.   Safety first, environment, task
25 at hand.

Page 535

1    Q.   And Captain Kuchta, were you
2  comfortable with him as the captain on the
3  DEEPWATER HORIZON?
4    A.   Yes, I was.
5    Q.   Did you ever experience any
6  indication that he was indifferent or
7  callous towards the safety or individuals
8  or the environment?
9    A.   No, sir.
10   Q.   You'd agree it was just the
11 opposite with him?
12   A.   Yes, sir.
13   Q.   And from your experience with
14 him, what was his attitude toward the
15 safety of individuals and the environment?
16   A.   Individual safety first,
17 environment, and then the task at hand.
18   Q.   Did you ever have any problems
19 with any of the individuals we just talked
20 about in terms of their competency while
21 you worked as a well -- well team leader --
22 or wellsite leader assigned to the
23 DEEPWATER HORIZON?
24   A.   No, sir.
25   Q.   Did you ever have any problems

14 (Pages 532 to 535)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters   Facsimile:(504) 525-9109

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0

In Re: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO, April 20, 2010                    Reported by:
MURRY SEPULVADO VOL. II May 12, 2011          THU BUI, CCR, RPR



Page 536

1   with any of these individuals we just
2   talked about in terms of their safety
3   consciousness while you worked as a
4   wellsite leader on the DEEPWATER HORIZON?
5       A.   Never had.
6       Q.   Okay.  If you could turn back
7   the clock and if you could work on a rig
8   with these guys again, would you have any
9   problem working on a rig with these guys?
10      A.   It would be my -- be my
11  pleasure.
12      Q.   I want you to turn to the Bly
13  report, which I have brought you a copy.
14  It's -- it's attached as Exhibit 1, but I
15  brought a copy just in case.  That's it
16  right there, sitting in this binder right
17  here.
18          I want you to turn to
19  Page 43.  There's one -- there's the last
20  paragraph just two sentences down at the
21  bottom.  And the first sentence of that
22  last paragraph is, Key members of the rig
23  crew need to be trained and demonstrate
24  competency.
25          Do you see that?

Page 537

1       A.   Yes, sir, I see that.
2       Q.   Okay.  Now, I'm -- am I safe in
3   assuming that based upon everything we just
4   talked about, you never told the Bly
5   investigation that any of the guys we just
6   talked about needed to be trained and
7   demonstrate competency?
8       A.   No, sir.
9       Q.   Okay.  So whoever the Bly
10  report -- Bly investigation is talking
11  about in this -- in this sentence we just
12  read, it may be some other group, but it's
13  not the guys we just talked about, based on
14  your experience?
15      A.   That's true.
16      Q.   Did the -- did anybody with the
17  Bly investigation ever talk with you when
18  you had conversations with them and ask you
19  about the competency of the individuals we
20  just talked about?
21      A.   When I talked to the Bly
22  Commission, I was totally confident in the
23  personnel that was on the rig.
24      Q.   Okay.  And that's what you told
25  them?

Page 538

1       A.   Yes.
2       Q.   If you had any problem with the
3   competency of any of the individuals we
4   just talked about, you could have done
5   something about it, correct?
6       A.   Yes.

Page 539

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters   Facsimile:(504) 525-9109

bcbb5f20-ea1e-48a5-85e0-14c2c6bbe4e0



GAUDET KAISER, L.L.C.
601 Poydras Street, Suite 1720        New Orleans, Louisiana 70130
Phone: (504) 525-9100        Fax: (504) 525-
BOARD-CERTIFIED COURT REPORTERS & LITIGATION SUPPORT

RECEIVED
JUL 2 7 2011

## WITNESS CERTIFICATE

I, **MURRY SEPULVADO,** have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

7-5-2011

(Date Signed)

*Murry Sepulvado*

(Signature)

____ Signed with corrections as attached.

_____ Signed with no corrections noted.

11745 Bricksome Avenue, Suite A-4        PHONE    (225) 291-3411
Baton Rouge, Louisiana 70816        FAX    (225) 291-7990

263 W. Causeway Approach        PHONE    (504) 525-9100
Mandeville, Louisiana 70448        FAX    (504) 525-9109

Website: www.gaudetkaiser.com        ALL EMAIL:

Page 413

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL      MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"   SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL      JUDGE BARBIER
20, 2010              MAG. JUDGE SHUSHAN



VOLUME II

     Deposition of RONALD W. SEPULVADO,
taken in the Pan American Life Center,
Bayou Room, 11th Floor, 601 Poydras Street,
New Orleans, Louisiana 70130, on Friday,
March 11, 2011.


APPEARANCES:


     LEWIS, KULLMAN, STERBCOW
     & ABRAMSON
     (By:  Paul M. Sterbcow, Esquire)
     601 Poydras Street
     Suite 2616
     New Orleans, Louisiana  70130
          (Attorneys for the Plaintiffs
           Steering Committee)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010                          Reported by:
RONALD W. SEPULVADO VOL. II      March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR



Page 462

Page 463

Page 464

Page 465

```
10      Q.  Let me go to the drill crew for
11  a few minutes.  You were on that rig eight
12  years.  You mentioned before it was your
13  home away from home.
14      A.  Yes, sir.

21      Q.  You knew those people well, you
22  knew the condition of the rig as of
23  April 16th.  Was that the day you left it?
24      A.  Yes, sir.  April 16th.
25      Q.  You knew the condition of the
```

14 (Pages 462 to 465)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters   Facsimile: (504) 525-9109

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

Page 466

1  rig, you knew the competency of the people
2  out there. I'm assuming that you knew
3  Jimmy well?
4      A.   Yes, I did.
5      Q.   Jimmy Harrell?
6      A.   Yes, sir.
7      Q.   I'm assuming you knew Randy
8  Ezell?
9      A.   I did.
10     Q.   Jason Anderson?
11     A.   Yes, sir.
12     Q.   Dewey Revette?
13     A.   Yes, sir.
14     Q.   Stephen Curtis?
15     A.   Yes, sir.
16     Q.   Mr. Clark, Donald Clark?
17     A.   Yes, sir.
18     Q.   You've known them for years?
19     A.   Yes, sir.
20     Q.   I read something, and I could be
21 wrong, but I read something where you
22 learned of the explosion and fire from your
23 son calling you?
24     A.   Yes, sir. That's right.
25     Q.   Did it surprise you that that

Page 467

1  had occurred?
2      A.   It did.
3      Q.   Knowing the competency and the
4  condition of the rig, did it stun you when
5  you turned on the TV and saw what had
6  occurred?
7      A.   Yes, it did.
8      Q.   Why?
9      A.   Because, you know, I knew who
10 was on tour at the time and they were good
11 hands. I just couldn't -- you know,
12 couldn't imagine, you know, what would
13 cause that.
14     Q.   Well, you received a lot of
15 questions yesterday about audits and
16 serious issues and nonserious issues. For
17 half of your life you had to live on that
18 rig?
19     A.   Yes, sir.
20     Q.   Whatever the conditions that the
21 rig was, that was your home?
22     A.   Yes, sir.
23     Q.   And I'm assuming that if you had
24 felt that there was anything unsafe about
25 any aspect of that rig, you would not be

Page 468

1  sleeping on it?
2      A.   That's right. Anything that I
3  knew about.
4      Q.   All right. Did any of these men
5  that I just mentioned, including Captain
6  Kuchta, ever in your experience with them
7  seem like men that would lie to you?
8      A.   No.
9      Q.   Did they ever seem like men that
10 would themselves hide issues that would
11 subject them or anyone else to safety
12 issues out on that rig?
13     A.   No.
14     Q.   Tell me a little bit about Dewey
15 Revette. What was your experience with
16 him?
17     A.   Dewey had been on the rig, I
18 guess, since it came out of the shipyard.
19 I can't remember exactly because I didn't
20 go on there for two years after it was out
21 of the shipyard.
22         But he came up, when I knew
23 Dewey he was doing safety, he was safety
24 personnel on the rig. He was -- he did
25 performance, he was a performance, what we

Page 469

1  call a performance engineer. He did that
2  for a while and he had been -- he went to
3  AD and then he went to drilling.
4          And I can't recall exactly how
5  long he had been drilling. Probably two or
6  three years. And that's an estimate.
7      Q.   What did you think about his
8  capabilities as a driller?
9      A.   Well, you know, he was
10 experienced in taking kicks.
11     Q.   You feel like he knew what he
12 was doing?
13     A.   Yeah.
14     Q.   Were you confident and
15 comfortable with him up on the drill floor?
16     A.   Yes, I was.
17     Q.   Did he ever seem to you like the
18 guy that would be indifferent toward the
19 safety of other individuals or the
20 environment?
21     A.   No.
22     Q.   Did he seem to you just the
23 opposite?
24     A.   Yeah. He was a good -- I
25 considered him a good driller.

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

Page 470

1   Q.   What was his attitude towards
2 safety?
3   A.   He was -- he thought about
4 safety as safety first.
5   Q.   Jason Anderson, do you know him?
6   A.   Yes, sir.
7   Q.   Tell me about Jason.
8   A.   I didn't do a whole lot of work
9 with Jason because he was on -- he was on a
10 different hitch than I was on until
11 Transocean went to 21 and seven and I
12 started catching some time with him.  Not a
13 whole lot, but the time I did spend with
14 him, he seemed like a competent toolpusher.
15   Q.   Did he ever indicate to you that
16 he was indifferent or callous toward safety
17 of other individuals or the environment?
18   A.   No, he didn't.
19   Q.   From your experience with him on
20 the rig, what was his attitude toward
21 safety?
22   A.   He had a good attitude toward
23 safety.
24   Q.   Mr. Jimmy, as everybody seems to
25 call him, Jimmy Harrell?

Page 471

1   A.   Yes, sir.
2   Q.   You knew him the entire time you
3 were out on the rig?
4   A.   He was, I think Jimmy's been on
5 there about five years.
6   Q.   Worked with him a lot?
7   A.   Yes, I did.
8   Q.   In fact, this crew that was out
9 there when the rig blew up, you had more
10 experience with Jimmy than anybody else on
11 that crew, I assume?
12   A.   Yes, sir.  And Don Clark.  Don
13 Clark was one of the ADs.  He's been out
14 there since the rig come out of the
15 shipyard.  Stephen Curtis was pretty new at
16 the AD position.  He came from being a deck
17 foreman to an AD.
18   Q.   Well, tell me about Jimmy and
19 then I'll get to Curtis and Clark.  Tell me
20 about Jimmy and your observations of him as
21 an OIM?
22   A.   I didn't have any problems with
23 Jimmy at all.
24   Q.   You think he knew what he was
25 doing?

Page 472

1   A.   Yes, sir.  He did.
2   Q.   Were you comfortable with him as
3 the OIM?
4   A.   Yes, I was.
5   Q.   Did you ever experience any
6 indication that he was indifferent or
7 callous toward the safety of individuals or
8 the environment?
9   A.   No, I did not.
10   Q.   From your experience out there
11 with him for years, what was his attitude
12 toward the safety of individuals or the
13 environment?
14   A.   Safety was his number one
15 priority.
16   Q.   You mentioned Stephen Curtis.
17 Tell me about Mr. Curtis.
18   A.   Stephen, I didn't work that much
19 with Steve.  When he was a deck foreman he
20 worked on the opposite hitch from me.  I
21 did start catching him a few hitches once
22 he went into the AD tier and really didn't
23 work with Steve a whole lot.
24   Q.   When you did work with him, what
25 was his attitude toward safety?

Page 473

1   A.   He had a good attitude.
2   Q.   Do you ever experience any
3 indication in Mr. Curtis that he was
4 reckless or callous or indifferent toward
5 the safety of other men or the environment?
6   A.   No.
7   Q.   Was it just the opposite?
8   A.   He was good.  You know, he was
9 training at the AD position but, you know,
10 they got two ADs there so the other AD, Don
11 Clark, was training him.
12   Q.   And you knew Don for a long
13 time?
14   A.   Yes.  I knew Don for a long
15 time.
16   Q.   And tell me about Don.
17   A.   Don's the same way.  You know,
18 he's a good competent person and I enjoyed
19 working with him.
20   Q.   Ever have any concern about his
21 attitude toward safety?
22   A.   No, sir.
23   Q.   Any indication in all the years
24 you worked with him that he was reckless or
25 indifferent toward the safety of others or

Page 474

1  the environment?
2      A.   No, sir.
3      Q.   You know Captain K?
4      A.   Kuchta?
5      Q.   Yes.
6      A.   Yes, sir.  I did know him.
7      Q.   Did you have any run-ins or
8  problems with him?
9      A.   No, I didn't.  You know, he was
10  on the rig as chief mate for a long time
11  and then he went to, they sent him to
12  another rig and then promoted him to
13  captain and then he came back to the
14  HORIZON as a captain.
15      Q.   How long altogether did you know
16  Captain K?  Well, he's still alive so you
17  still know him?
18      A.   Yes.  But three, four years,
19  probably.
20      Q.   Any problems with him and his
21  attitude toward safety?
22      A.   No.
23      Q.   Any attitudes -- any concern
24  that you had about whether he was reckless
25  or indifferent towards the safety of other

Page 475

1  individuals or the environment?
2      A.   No, sir.
3      Q.   Randy Ezell, you knew Randy?
4      A.   I knew Randy.  I guess he came
5  out with the rig, too.  He had been on the
6  rig ever since it came out of the shipyard.
7  He was a driller and I worked some with him
8  as a driller.  And when they promoted him
9  to pushing tools he was kind of on the
10  opposite hitch from me until they went to
11  the 21-day hitches and then I started
12  catching him on a week or so.
13      Q.   And sort of a bittersweet
14  moment, he, after the rig sank he was a
15  recipient of the first award, the award
16  from Transocean for tremendous work effort.
17  Were you aware of that?
18      A.   No, I wasn't.
19      Q.   Let me back up.  From your
20  observations of Randy, what kind of worker
21  was he?
22      A.   He was a good worker.
23      Q.   Did you have any concerns about
24  his attitude toward the safety of the
25  environment or other individuals?

Page 476

1      A.   No.
2      Q.   Did you ever feel like he was
3  callous or reckless or indifferent --
4      A.   No.
5      Q.   -- toward the safety of other
6  individuals or for the environment?
7      A.   No.
8      Q.   Did you have any problems with
9  any of these men, ever, in terms --
10      A.   No.
11      Q.   -- of their competency to be on
12  a rig that you were the company man for?
13      A.   I thought they all were good
14  people, good -- you know, good workers and
15  good safety people.
16      Q.   For those that are alive today
17  and those that are dead today, if we can
18  turn back the clock, even knowing what we
19  know now, if they were put on a different
20  rig, would you feel comfortable being the
21  company man on a different rig with every
22  one of these men?
23      A.   Yes.  I would feel comfortable.
24      Q.   There's a section in the Bly
25  report that I want to show you.  And I know

Page 477

1  yesterday you didn't -- you were not
2  involved in the Bly commission at all
3  except for giving an interview?
4      A.   Yes.  Two telephone calls at
5  different times.
6      Q.   I'm going to hand you page 43
7  and there's a statement that said key
8  members of the rig crew need to be trained
9  and demonstrate competency.
10          You see that?  I've highlighted
11  it for you on page 43 of that Bly report.
12      A.   Yes, I see that.
13      Q.   Am I safe in assuming, based
14  upon everything that we've just gone over,
15  that you're definitely not the one that
16  said you felt like Jimmy Harrell or Randy
17  Ezell or Jason Anderson or Dewey Revette or
18  Steve Curtis, Don Clark, Captain K, you
19  never said they needed training to
20  demonstrate competency?
21      A.   I don't know where this came
22  from.
23      Q.   But it didn't come from you?
24      A.   It didn't come from me.
25      Q.   Because you felt and still feel

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010                    Reported by:
RONALD W. SEPULVADO VOL. II      March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 478

1    that they were competently trained and they
2    performed their jobs competently while you
3    were on board the rig?
4         A.   Yes, I do.  I don't agree with
5    that.  I don't know who did it or who
6    they're talking about but, you know, the
7    people that were on tour when that
8    happened, you know, I don't agree with
9    that.
10        Q.   Well, if Mr. Bly on page 43 is
11   talking about this crew, you don't agree
12   with it?
13        A.   No.
14        Q.   He may be talking about somebody
15   else but if he is talking about this
16   crew --
17        A.   The crew that was on tour.
18        Q.   -- Mr. Bly got it wrong?
19        A.   Yeah.  I don't agree with
20   whoever said this.

Page 479

Page 480

Page 481

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters   Facsimile: (504) 525-9109

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

Reported by:
RONALD W. SEPULVADO VOL. II      March 11, 2011    JOSEPH R. KAISER, JR., CCR, RPR



Page 670

Page 672

Page 671

Page 673

10    Q.   And you were asked a number of
11  questions about your observations of the
12  Transocean personnel.  And to the best of
13  your knowledge and experience and ability
14  of evaluating these gentlemen, they -- your
15  view was they were qualified and competent
16  for the jobs they were doing; is that
17  correct?
18    A.   Yes, they were.

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.  Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

efa2c9c2-83db-42d2-8ae5-a40dade82ad5

## GAUDET KAISER, L.L.C.

601 Poydras Street, Suite 1720     New Orleans, Louisiana 70130
Phone: (504) 525-9100         Fax: (504) 525-9109

BOARD-CERTIFIED COURT REPORTERS & LITIGATION SUPPORT



RECEIVED
APR 25 2011

## WITNESS CERTIFICATE

I, **RONALD W. SEPULVADO,** have read or have
had the foregoing testimony read to me and
hereby certify that it is a true and correct
transcription of my testimony, with the
exception of any attached corrections or
changes.

4/19/11                    _Ronald W. Sepulvado_

(Date Signed)              (Signature)

_Sworn to And Subscribed to before me this undersigned Notary Public on this the 19th day of April 2011_
                        _Notary Public._

___✓___  Signed with corrections as attached.

_____  Signed with no corrections noted.

Buffy L. King
Notary Public ID#054084
Sabine Parish, Louisiana
Commission is for life.

11745 Bricksome Avenue, Suite A-4
Baton Rouge, Louisiana 70816

263 W. Causeway Approach
Mandeville, Louisiana 70448

Website: www.gaudetkaiser.com

PHONE   (225) 291-3411
FAX     (225) 291-7990
PHONE   (504) 525-9100
FAX     (504) 525-9109
ALT. EMAIL:
   Gkp2003@aol.com  &  gkp@gaudetkaiser.com

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**IN RE:** OIL SPILL       )     MDL NO. 2179
**by the** OIL RIG,        )
DEEPWATER HORIZON in   )    SECTION "J"
the GULF OF MEXICO,   )
April 20, 2010   )    JUDGE BARBIER
                 )
                 )   MAG. JUDGE
                 )   SHUSHAN

Videotaped deposition of JOHN
SHAUGHNESSY, taken at Pan-American Building,
601 Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 27th of September,
2011.

---

2

1        A P P E A R A N C E S
2
3    Ms. Robin Greenwald
     Ms. Erika Heyder
     WEITZ & LUXENBERG
4    700 Broadway
     New York, New York 10003
5
6            APPEARING FOR THE PLAINTIFFS'
               STEERING COMMITTEE
7    Mr. Michael C. Occhiuzzo
     Ms. Ashley James
8    KIRKLAND & ELLIS, LLP
     655 Fifteenth Street, N.W.
9    Washington, D.C. 20005
     Phone: 202-879-5205 Fax: 202-879-5200
10
11           APPEARING FOR BP, INC.
12
     Ms. Deanna Chang
13   U.S. DEPARTMENT OF JUSTICE
     Civil Division, Torts Branch
14   1425 New York Avenue, Northwest
     Suite 10100
15   Washington, D.C. 20005
     Phone: 202-616-4037 Fax: 202-616-4159
16
17           APPEARING FOR THE UNITED
               STATES
18
     Mr. David Magee
19   BINGHAM McCUTCHEN, LLP
     One Federal Street
20   Boston, Massachusetts 02110
21           APPEARING FOR ANADARKO
22
23
24
25

---

3

1    **APPEARANCES:**(Continued)
2    Mr. Richard J. Hymel
     Mr. Robert Blankenship
3    PREIS & ROY, PLC
     102 Versailles Boulevard, Suite 400
4    Lafayette, Louisiana 70509
     Phone: 337-237-6062
5
6            APPEARING FOR TRANSOCEAN
7    Mr. Eric Nichols
     BECK, REDDEN & SECREST
     515 Congress, Suite 1750
8    Austin, Texas 78701
9            APPEARING FOR CAMERON
10   Mr. Don Godwin
     Ms. Stefanie Major
11   GODWIN RONQUILLO
     1201 Elm Street, Suite 1700
12   Dallas, Texas 75270-2041
13           APPEARING FOR HALLIBURTON
14   Mr. David A. Pote
     KANNER & WHITELEY, L.L.C.
15   701 Camp Street
     New Orleans, Louisiana 70130
16   Phone: 504-524-5777 Fax: 504-524-5763
17
18           APPEARING FOR THE STATE OF
               LOUISIANA
19
20   Mr. Dennis Barrow
     WARE, JACKSON, LEE & CHAMBERS
21   4929 Allen Parkway, 42nd Floor
     Houston, Texas 77019
22           APPEARING FOR DRIL-QUIP
23
24
25

---

4

1    **APPEARANCES:**(Continued)
2
3    Mr. Lucas T. Elliott
     MORGAN LEWIS
4    1000 Louisiana Street, Suite 4000
     Houston, Texas 77002-5006
5    Phone: 713-890-5185 Fax: 713-890-5001
6
7            APPEARING FOR M-I SWACO
8    Mr. Edward D. Wegmann
     JONES WALKER
9    201 St. Charles Avenue
     New Orleans, Louisiana 70170
10   Phone: 504-582-8322 Fax: 504-589-8322
11           APPEARING FOR WEATHERFORD
12   **ALSO PRESENT:**
13   Mary Elizabeth Gaasch, videographer
14   REPORTED BY:
15
16           THU BUI, CCR, RPR
             Certified Court Reporter
17           State of Louisiana
             State of Texas
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

**PURSUANT TO CONFIDENTIALITY ORDER**



189

191

190

192

12    Q.   Okay.  At any time, did you ever
13 get the impression that anyone at Transocean
14 was callous or consciously indifferent to the
15 safety of individuals or the environment?
16    MR. OCCHUIZZO: Objection to form.
17    A.    In my experience with
18 Transocean, that would be with the Discoverer
19 Seven Seas in the '80s, the Discoverer 534 in
20 the '90s and in this last decade, with the
21 DD-II and DD-III, and it's my -- my
22 experience that the answer is no.
23    Q.   Okay.  Did you ever hear that
24 anyone at Transocean was callous or
25 consciously indifferent to the safety of

PURSUANT TO CONFIDENTIALITY ORDER



193

1
2      **individuals or the environment?**
       A.    No.

194

195

196

**PURSUANT TO CONFIDENTIALITY ORDER**

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                                                 Reported by:
DAVID C. SIMS VOL. II              April 7, 2011    JOSEPH R. KAISER, JR., CCR, RPR

Page 333

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL      MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"    SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL       JUDGE BARBIER
20, 2010               MAG. JUDGE SHUSHAN



VOLUME II

     Deposition of DAVID C. SIMS, taken
in the Pan American Life Center, Bayou
Room, 11th Floor, 601 Poydras Street, New
Orleans, Louisiana 70130, on Thursday,
April 7, 2011.


APPEARANCES:


     WILLIAMS LAW GROUP, LLC
     (By:  J. Christopher Zainey, Jr.,
          Esquire)
     909 Poydras Street
     Suite 1650
     New Orleans, Louisiana  70112
          (Attorneys for MDL plaintiffs)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                      Reported by:

**DAVID C. SIMS VOL. II          April 7, 2011 JOSEPH R. KAISER, JR., CCR, RPR**



381

382

383

1      A.   There was a planned early in the
2   year that the leadership teams, the
3   drilling ops managers, BP's directors would
4   attend, make a rig visit at least once a
5   month.  And the rig visit for the HORIZON
6   was originally scheduled some other earlier
7   dates but because of conflicts had gotten
8   changed.
9           The idea was also for
10  contractor, whichever rig we were going to,
11  for that contractor leadership personnel to
12  also, to attend with the BP leadership.
13  And we call those leadership visits.
14          The idea was to do that once a
15  month, go to, go to one or two rigs.  And
16  there was, there were a list of different
17  types of things that would, that we were
18  encouraged and expected to do while we were
19  there.
20      **Q.   Let me ask you this, sir:  Prior**
21  **to the April 20th visit had you been to the**
22  **HORIZON rig at any time?  You, personally.**
23      A.   Prior to that, I believe I had
24  been there six times.  It could be more.
25      **Q.   Okay, sir.  And you and Mr. Pat**

384

1   **O'Bryan went out together, along with**
2   **others if you will, but the two of you were**
3   **from BP that went out on April 20th;**
4   **correct?**
5       A.   That's correct.

24      **Q.   Okay.  All right.  Why did you**
25  **go to the rig on April 20th?**

**601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.          Telephone: (504) 525-9100**
**New Orleans, LA 70130-6029      Board-Certified Court Reporters          Facsimile: (504) 525-9109**

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010          Reported by:
DAVID C. SIMS VOL. II          April 7, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 450

Page 452

1     A.   To the extent that I knew
2  everyone there, I didn't know everyone so I
3  can't say that everyone was knowledgeable.
4     Q.   Well, let's put it this way:
5  You trusted the crew?
6     MS. KARIS:
7          Object to form.
8     THE WITNESS:
9          From what I knew of the rig and
10 I -- in the general sense, yes, I would
11 have trusted the crew.

Page 451

Page 453

7         I want to first ask you about,
8  about the Transocean crew and management
9  that were present on the Macondo well.
10        You are not aware, are you, sir,
11 of any performance concerns with Transocean
12 during the drilling of the Macondo well;
13 correct?
14    A.   What are you referring to?  The
15 HORIZON?
16    Q.   Yes.  I'm sorry.
17    A.   I'm not aware of any.  Not what
18 I would call performance concerns.
19    Q.   All right.  In fact, I think
20 you've said before that the Transocean crew
21 was a good crew; correct, sir?
22    A.   I believe that, yes, sir.
23    Q.   They were skilled?
24    A.   Yeah.
25    Q.   Knowledgeable?



601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                      Reported by:
DAVID C. SIMS VOL. II              April 7, 2011     JOSEPH R. KAISER, JR., CCR, RPR



Page 474

Page 476

Page 475

Page 477

18    Q.        Are you aware, sir, of
19  anyone, including in my interest here the
20  Transocean personnel or management that
21  were involved in the Macondo prospect and
22  in connection with the Macondo prospect of
23  deliberately wanting to cause injury to the
24  environment, or to any person?
25    A.   No, sir.

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.     Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                    Reported by:
DAVID C. SIMS VOL. II              April 7, 2011     JOSEPH R. KAISER, JR., CCR, RPR

Page 478

1       Q.   Of acting maliciously or not
2    caring in any way about causing injury to
3    another human, or the environment?
4       A.   No, sir.
5       Q.   Of willfully inflicting harm on
6    any person or on the environment?
7       A.   No, sir.
8       Q.   You were on the DEEPWATER
9    HORIZON on April the 20th when the event,
10   as you referred to it, occurred.
11          Did you witness any Transocean
12   employee or manager deliberately wanting to
13   cause injury to the environment, or any
14   person?
15      A.   No, sir.
16      Q.   Of acting maliciously or not
17   caring about causing injury to another
18   person, or the environment?
19      A.   No, sir.
20      Q.   Of willfully inflicting harm on
21   any person or on the environment?
22      A.   No, sir.
23      Q.   Did you witness any Transocean
24   employee, or anyone, to your knowledge, out
25   there acting in what you would consider to

Page 479

1    be a negligent fashion?
2       A.   No, sir.
3       Q.   Of performing their work in what
4    you would consider to be a negligent
5    fashion?
6       A.   No, sir.



38  (Pages 478 to 481)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6029      Board-Certified Court Reporters   Facsimile: (504) 525-9109

f000bdfa-5f68-4951-98ad-7440f43a1bd8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010                         Reported by:
CINDI K. SKELTON VOL. II        May 26, 2011 JOSEPH R. KAISER, JR., CCR, RPR

Page 355

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL    MDL NO. 2179
BY THE OIL RIG
"DEEPWATER HORIZON"  SECTION:  J
IN THE GULF OF
MEXICO, ON APRIL     JUDGE BARBIER
20, 2010             MAG. JUDGE SHUSHAN



VOLUME II

        Deposition of CINDI K. SKELTON,
taken in the Pan American Life Center,
Bayou Room, 11th Floor, 601 Poydras Street,
New Orleans, Louisiana 70130, on Thursday,
May 26, 2011.


APPEARANCES:


        BRUNO & BRUNO
        (By:  Joseph M. Bruno, Esquire and
              Melissa A. DeBarbieris,
              Esquire)
        855 Baronne Street
        New Orleans, Louisiana  70113
            (Attorneys for Plaintiff's
             Steering Committee)

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile: (504) 525-9109

2075e666-d75c-482d-a11d-5f6b8f3bf335

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010    Reported by:
CINDI K. SKELTON VOL. II     May 26, 2011 JOSEPH R. KAISER, JR., CCR, RPR



Page 512

Page 514

1    Q.  Are you aware of any evidence
2 that Transocean personnel in connection
3 with the DEEPWATER HORIZON willfully
4 inflicted harm on any person or the
5 environment?
6    A.  I have no evidence.
7    Q.  Are you aware of any evidence of
8 negligence by Transocean in connection with
9 the DEEPWATER HORIZON?
10   A.  I am not aware of any materials,
11 anything that would relate to that.

Page 513

14   Q.  Are you aware of any evidence
15 that any Transocean personnel in connection
16 with the DEEPWATER HORIZON deliberately
17 wanted to cause injury to the environment
18 or any person?
19   A.  I have no evidence.
20   Q.  Do you have any evidence that
21 any Transocean personnel in connection with
22 the DEEPWATER HORIZON was malicious or
23 didn't care in any way about causing injury
24 to another human, or the environment?
25   A.  I have no evidence on that.

Page 515

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.  Telephone: (504) 525-9100
New Orleans, LA 70130-6029  Board-Certified Court Reporters  Facsimile: (504) 525-9109

2075e666-d75c-482d-a11d-5f6b8f3bf335