

# O'CONNOR'S FEDERAL RULES

## ★

# CIVIL TRIALS 2011

Updated for 2011 by
Michael C. Smith



*Rogers v. Hartford Life & Acc. Ins. Co.*, 167 F.3d 933, 938 (5th Cir.1999). "Like formal service of process, a waiver of service of process marks the point in a lawsuit after which the defendant must answer or risk default. Waiver of service of process does not in any way indicate that a defendant intends to defend. Thus, like accepting formal service of process, executing a waiver of service of process does not constitute an appearance for purposes of Rule 55(b)(2)."

*New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir.1996). "A *default* occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the [FRCPs]. An *entry of default* is what the clerk enters when the default is established by affidavit or otherwise. After defendant's default has been entered, plaintiff may apply for a judgment based on such default. This is a *default judgment.*"

*Key Bank v. Tablecloth Textile Co.*, 74 F.3d 349, 353 (1st Cir.1996). "[A] defaulting party 'has appeared' for Rule 55 purposes if it has 'indicated to the moving party a clear purpose to defend the suit.' *At 354:* [O]nce [Ds] 'appeared' for Rule 55 purposes they were entitled to notice of the application for default judgment under Rule 55(b)(2)." *See also New York v. Green*, 420 F.3d 99, 105 (2d Cir.2005).

*Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir.1994). "Congress promulgated [28 U.S.C.] §1608(e) to provide foreign sovereigns with the same protections from default judgments that the federal government enjoys under [FRCP 55(e), now FRCP 55(d)]. However, … the sovereign [is not relieved] from the duty to defend cases and to obey court orders. [¶] Thus, when the U.S. or a foreign sovereign defaults, the district court must determine whether the plaintiff's allegations are supported by evidence."

*Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir.1993). "Rule 55(b)(2) and relevant case law give district judges much discretion in determining when it is 'necessary and proper' to hold an inquest on damages. [H]ere the court determined damages with the aid of a single affidavit only partially based upon real numbers."

*U.S. v. Timbers Preserve*, 999 F.2d 452, 454 (10th Cir.1993). "Under [FRCP] 60(b), which standards [FRCP] 55(c) invokes when a party is seeking relief from a default judgment, a court may set aside a final judgment '[o]n motion and upon such terms as are

just.' [¶] Courts have established three requirements which must be met when setting aside a default judgment under Rule 60(b): (1) the moving party's culpable conduct did not cause the default; (2) the moving party has a meritorious defense; and (3) the non-moving party will not be prejudiced by setting aside the judgment. … Generally a party's conduct will be considered culpable only if the party defaulted willfully or has no excuse for the default." *See also Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1148 n.1 (9th Cir.2004) (once default judgment has been entered, party must proceed under FRCP 60(b) to have judgment set aside).

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Factors to consider when determining whether to grant a default judgment include: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether default was due to excusable neglect, and (7) the strong policy underlying the [FRCPs] favoring decisions on the merits."

**⑩ FRCP 56. SUMMARY JUDGMENT**

(a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) **Time to File a Motion.** Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) **Procedures.**

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

▷

United States Court of Appeals,
Fifth Circuit.
Wilma LITTLE, Plaintiff-Appellant,
v.
LIQUID AIR CORPORATION, Chevron Chemical
Company, and Victor Manufacturing Company,
Defendants-Appellees.
Linda CARTER, Mother and Next Friend of Anidra
Catrone Carter, Plaintiff-Appellant,
v.
LIQUID AIR CORPORATION, Chevron Chemical
Company, and Victor Manufacturing Company,
Defendants-Appellees.

No. 90-1807.
Oct. 26, 1994.

Actions were brought against manufacturer of propylene gas used in welding, seller of gas, and manufacturer of welding torch to recover for wrongful death of welders who were killed in explosion after discovering leak in welding hose. The United States District Court for the Northern District of Mississippi, Neal B. Biggers, Jr., J., granted summary judgment, and appeal was taken. The Court of Appeals, 952 F.2d 841, affirmed in part, reversed in part and remanded. Upon granting en banc review, the Court of Appeals held that, under Mississippi products liability law: (1) assumption of risk doctrine barred recovery from manufacturer of torch, and (2) gas manufacturer and seller could not be held liable under theory that they failed to warn of dangers of nasal fatigue absent any evidence that welders in fact suffered from such fatigue.

Affirmed.

Johnson, Circuit Judge, with whom Politz, Chief Judge, joined, dissented and filed opinion.

West Headnotes

**[1] Federal Civil Procedure 170A ⬡══2544**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2544 k. Burden of proof.
Most Cited Cases

**Federal Courts 170B ⬡══766**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
               170Bk766 k. Summary judgment.
Most Cited Cases

Summary judgment should be granted and will be affirmed by Court of Appeals when nonmoving party fails to meet its burden to come forward with facts and law demonstrating basis for recovery that would support jury verdict. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⬡══2544**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2544 k. Burden of proof.
Most Cited Cases

Party moving for summary judgment must demonstrate absence of genuine issue of material fact, but need not negate elements of nonvovant's case. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⬡══2544**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

170Ak2542 Evidence

170Ak2544 k. Burden of proof. Most Cited Cases

If moving party fails to meet initial burden of demonstrating absence of genuine issue of material fact, motion for summary judgment must be denied, regardless of nonmovant's response; however, if moving party meets its burden, nonmovant must go beyond pleadings and designate specific facts showing that there is genuine issue for trial. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⬤⟳2543**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2543 k. Presumptions. Most Cited Cases

Factual controversies are resolved in favor of party opposing motion for summary judgment, but only when there is actual controversy, i.e., when both parties have submitted evidence of contradictory facts. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⬤⟳2544**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2544 k. Burden of proof. Most Cited Cases

**Federal Civil Procedure 170A ⬤⟳2546**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2546 k. Weight and sufficiency. Most Cited Cases

Nonmoving party's burden on motion for summary judgment is not affected by type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on essential fact that it could not support judgment in favor of nonmovant; abrogating *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167; *Trevino v. Yamaha Motor Corp.*, 882 F.2d 182; and *Miller-Schmidt v. Gastech, Inc.*, 864 F.2d 1181. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[6] Products Liability 313A ⬤⟳147**

313A Products Liability
  313AII Elements and Concepts
    313Ak146 Proximate Cause
      313Ak147 k. In general. Most Cited Cases
  (Formerly 313Ak15)

Under Mississippi products liability law, both theories of negligence and strict liability require proof of causal connection between defective product and plaintiffs' injuries.

**[7] Gas 190 ⬤⟳18**

190 Gas
  190k15 Injuries from Escape or Explosion of Gas
    190k18 k. Defects, acts or omissions causing injury. Most Cited Cases

Under Mississippi products liability law, neither manufacturer of propylene gas used in welding nor seller of gas could be held liable under theory that warning accompanying gas failed to warn of nasal fatigue, absent any evidence that welders who were killed in explosion in fact suffered from such fatigue and that such fatigue bore causal connection to their deaths; even alleged facts that welders did not evacuate area when they discovered leak in welding hose and that one welder lit cigarette only established that cause of death was failure to smell gas, not that cause of such failure was nasal fatigue.

**[8] Federal Courts 170B ⬤⟳915**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

—

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

170B Federal Courts

   170BVIII Courts of Appeals

     170BVIII(K) Scope, Standards, and Extent

      170BVIII(K)7 Waiver of Error in Appellate Court

       170Bk915 k. In general. Most Cited Cases

Any challenge to ruling dismissing strict products liability claim on grounds of assumption of risk was deemed waived due to failure to address issue on appeal.

**[9] Negligence 272 ☞552(1)**

272 Negligence

   272XVI Defenses and Mitigating Circumstances

     272k550 Assumption of Risk

      272k552 Existence as Defense

       272k552(1) k. In general. Most Cited Cases

  (Formerly 272k105)

Assumption of risk is valid defense under Mississippi law.

**[10] Products Liability 313A ☞184**

313A Products Liability

   313AII Elements and Concepts

     313Ak184 k. Assumption of risk. Most Cited Cases

  (Formerly 313Ak27)

Under Mississippi law, assumption of risk is valid defense in products liability cases.

**[11] Negligence 272 ☞553**

272 Negligence

   272XVI Defenses and Mitigating Circumstances

     272k550 Assumption of Risk

     272k553 k. Relation to contributory negligence. Most Cited Cases

  (Formerly 272k105)

To extent that contributory negligence and assumption of risk are distinguished by degree, contributory negligence crosses the pale into assumption of risk when plaintiff's conduct is not merely negligent, or even grossly negligent, but instead is wilful, venturous challenge to fully appreciated danger to plaintiff's own self-interest and safety.

**[12] Gas 190 ☞18**

190 Gas

   190k15 Injuries from Escape or Explosion of Gas

     190k18 k. Defects, acts or omissions causing injury. Most Cited Cases

Under Mississippi products liability law, assumption of risk doctrine barred recovery from welding torch manufacturer in connection with deaths of welders as result of explosion caused by leaking hose; when welders became aware of leak, they had hose removed from area but themselves remained, despite employer's specific instructions to evacuate immediately in case of leak.

**\*1070** Michael T. Lewis, Pauline S. Lewis, Lewis & Lewis, Clarksdale, MS, for Little and Carter.

John L. Low, IV, Watkins & Eager, Jackson, MS, for Liquid Air.

Frank W. Hunger, Marian S. Alexander, Lake, Tindall, Hunger & Thackston, Greenville, MS, for Chevron.

W. Swan Yerger, Gene D. Berry, Heidelberg, Woodliff & Franks, Jackson, MS, for Victor Mfg.

Appeal from the United States District Court for the Northern District of Mississippi.

Before POLITZ, Chief Judge, KING, JOHNSON, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit **\*1071** Judges.[FN*]

   FN* Judge Duhé recused himself and did not participate in this decision. Judges Benavides, Stewart and Parker were not members of the court when this case was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

submitted to the court en banc and did not participate in this decision.

PER CURIAM:

[1] In this products liability case, we hold that the district court appropriately and fairly granted summary judgment for the defendants. The plaintiffs are the heirs of Marvin Joe Little and Charles Carter. Little and Carter were experienced welders working in the wingtank of a barge. At some point, a gas hose leading to their welding torch developed a leak. The welding torch was manufactured by defendant Victor Manufacturing Company; the gas was manufactured by defendant Chevron Chemical Company and sold by defendant Liquid Air Corporation. The plaintiffs contend that, because of nasal fatigue, Little and Carter did not smell the gas, and that Carter lit a cigarette, causing an explosion that resulted in their deaths.[FN1] The heirs assert that Chevron and Liquid Air are liable because the warning accompanying the gas failed to warn of nasal fatigue; and that Victor is liable because a defective torch caused a "flashback" and a tear in the gas hose line, which resulted in the gas leak, which was a proximate cause of the deaths. When these allegations were put to the test of summary judgment, however, the plaintiffs failed to come forward with any evidence supporting their theory of recovery, that is, evidence that Little and Carter actually suffered nasal fatigue and that nasal fatigue bore a causal connection to their deaths; they likewise failed to establish liability against Victor. In our opinion today, we emphasize that summary judgment should be granted and will be affirmed by this court when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict. We thus reject the reasoning of the panel and affirm the district court.

FN1. These are the allegations set forth in the plaintiffs' amended complaint that was before the district court. After the motion for summary judgment was filed, however, the plaintiffs moved to amend their com-

plaint again to assert different facts and new theories. Even though this motion was denied, the plaintiffs continued to assert the facts and theories set forth in their rejected proposed amended complaint. Our inquiry, however, is limited to the summary judgment record and the plaintiffs may not advance on appeal new theories or raise new issues not properly before the district court to obtain reversal of the summary judgment. *Topalian v. Ehrman,* 954 F.2d 1125, 1132 n. 10 (5th Cir.1992).

I

In July 1988, Marvin Joe Little and Charles Carter were employed by Mainstream, Inc. where they were cleaning the wingtanks of a barge.[FN2] Both Little and Carter were experienced welders who, according to their employer, had been properly trained and instructed as to the proper use of propylene gas. In their work, they were using a cutting torch manufactured by defendant Victor. The torch was attached to two hoses, one for oxygen and one for propylene gas, both of which were connected to tanks on the main deck of the barge. The propylene gas was manufactured by Chevron, which supplied it to Liquid Air, which provided it to Mainstream through a distributor. Prior to distribution by Chevron, the propylene gas was odorized with ethyl mercaptan, which gives the gas the smell of rotten eggs.

FN2. The wingtank is a watertight compartment below the deck of the barge.

Chevron had sold the propylene gas to Liquid Air in bulk tank truckloads and, with each delivery, provided Liquid Air with Chevron's Material Safety Data Sheet ("MSDS") that included the following warning:

**Precautions if Material is Released or Spilled:** Eliminate all sources of ignition in vicinity of spill or released vapor. Evacuate the area immediately and do not allow anyone to return until it is safe to do so. Persons entering the area to cor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

rect the problem and determine whether it is safe for normal activities to resume must comply with all instructions in Special Protective Information. FN3

> FN3. The warning also stated that the "product presents an extreme fire hazard," and the product should only be used "in well ventilated areas."

**\*1072** When Liquid Air sold the propylene gas to Mainstream under its own name through a distributor, it was accompanied by Liquid Air's MSDS that provided in part:

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED: Evacuate all personnel from affected area. Use appropriate protective equipment. Do not get liquid in eyes, on skin or clothing. Shut off source of leak if possible. Protect from ignition. Ventilate area thoroughly. If leak is in user's equipment, be certain to purge piping with an inert gas prior to attempting repairs. If leak is in container or container valve, contact the closest Liquid Air Corporation location.

Although Little and Carter were never specifically advised that propylene gas could cause nasal fatigue, every Mainstream employee who testified stated that he knew to evacuate the wingtank if they smelled gas or had a leak.

On July 8, 1988, Little and Carter returned from lunch at approximately 12:30 and climbed into the No. 9 wingtank to continue their work. The wingtank hatch was a manhole approximately 18 to 20 inches in diameter, and a part of that hatch was occupied with a ventilation fan. Earnest Hughes, a co-worker of Little and Carter, walked to the hatch of the No. 9 wingtank some few minutes after returning from lunch and was summoned by Little to get the torch and hose out of the wingtank because the hose was leaking gas. At that time, Carter was back into the wingtank so far that Hughes could not

see him and Little was partway down the ladder leading into the fourteen-foot deep wingtank. Little was into the wingtank-his head beneath the hatch about a foot or two-when he told Hughes that there was a hole in the torch's gas line.

Hughes pulled the torch and gas lines out of the wingtank and then laid them on the deck of the barge. He noticed the hole in the gas line. Little, still on the ladder in the hole, then told Hughes to get a repair kit to fix the hose. Hughes left to get the repair kit and, about half a minute later, heard a noise. When he looked back, he saw the fan-which had been attached at the top of the hatch-being blown into the air and then saw Little being propelled out of the wingtank. Hughes ran for help and cut all the gas off. Little died immediately and Carter died several days later as a result of burns that he received in the explosion.

## II
### A

The families of Carter and Little initiated actions for damages resulting from the explosion. The actions were consolidated and, after some initial discovery, the complaints stated claims against Victor, Chevron, and Liquid Air. In the amended complaint, FN4 the plaintiffs alleged that

> FN4. The complaints in both actions are essentially the same and, for brevity, we refer to them both as the "amended complaint."

On July 8, 1988, Marvin Joe Little and co-employee Charles Carter were working in the hold of a barge doing repair work, including the use of a cutting and welding torch manufactured by Victor. Little was also using propylene (Fuel Gas) manufactured by Chevron and distributed and sold by Liquid Air. The hold was an enclosed area below decks of the barge constructed for the purpose of buoyancy. Except for a single hatch, there was no ingress or egress to this hold. Little and Carter discovered a gas leak and decided to remove the torch from the hold to repair the hose.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081

**(Cite as: 37 F.3d 1069)**

A short time after the hose was removed, no longer smelling the gas and believing the area to be safe, Carter lit a cigarette. This source of ignition led to an explosion of the propylene gaseous mixture which blasted Little's body through the hatchway of the hold, killing him instantly. Carter was seriously burned by the explosion and died several days later.

With respect to defendant Victor, the amended complaint alleged that the gas leak was caused by the "defective and negligent design of the torch"; specifically, the torch was defective in that it had a leaking O-ring and a leaking check valve, which defects caused a flashback that lead to a leak in the gas hose. **\*1073** The amended complaint further alleged that the propylene gas manufactured and distributed by Chevron and Liquid Air was defective and unreasonably dangerous because

exposure to this gas leads to nasal fatigue to the extent that a worker cannot reliably detect this gas by smell. At the time he lit the cigarette, Carter could no longer smell the gas because of nasal fatigue. Both Carter and Little were unaware of the propensity of Defendants' gas product to cause nasal fatigue and were further unaware that exposure to this gas reduces or eliminates the ability to smell the gas.[FN5]

> **FN5.** The amended complaint further alleged that Liquid Air and Chevron were strictly liable because they "are in the business of manufacturing and/or distributing the subject gas which is defective and unreasonably dangerous in that Defendants failed to warn of its propensity to cause nasal fatigue," and also liable "because they negligently manufactured and/or sold the subject gas and failed to warn the reasonably foreseeable user ... of the defective and unreasonably dangerous propensities of this gas."

After the parties had engaged in discovery, the defendants moved for summary judgment.[FN6] The plaintiffs responded, urging that they should be allowed to amend their complaint to assert different theories of liability and that, even without the proposed amended complaint, there was sufficient evidence from which a jury could reach a verdict in their favor. In a well-reasoned opinion, the district court granted the motions and dismissed the plaintiffs' claims. The district court first held that Chevron and Liquid Air were entitled to the bulk seller/sophisticated purchaser defense. With respect to Chevron and Liquid Air, the district court also held that the plaintiffs had failed to present proof of the inadequacy of the warnings and the causative nexus between the warning and the injury suffered. The district court finally held that the plaintiffs had failed to offer proof that the defective Victor torch was the proximate cause of their injury.

> **FN6.** After the close of discovery, after Chevron filed its motion for summary judgment and after the case had been set for trial, the plaintiffs moved to amend their complaint again. The proposed amended complaint significantly changed the theories of the case, both as to the facts and the law. The proposed amended complaint did not include the allegations that Little and Carter ever smelled the gas or that Carter lit a cigarette, igniting the gas. Further, while all of the previous complaints had relied solely on the theory that nasal fatigue and the failure to warn thereof had caused Little and Carter's deaths, the proposed amended complaint also asserted that the gas was defective because the

> odorant (ethyl mercaptan) which Defendant Chevron added to the odorless propylene oxidizes over time, which diminishes the ability of the human nose to smell it. In addition, the human nose is not an adequate safety device because the ability to smell varies among indi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

viduals; disease and upper respiratory infections interfere with the ability to smell, smoking diminishes the ability to smell, sensory distractions diminish the ability of one to detect dangerous odors; certain environments 'mask' a smell; and, some individuals have little or no sense of smell.

The proposed amended complaint further asserted that, as a result of the imperfection of the human nose, the defendants should have advised the use of electronic gas detectors in confined areas instead of allowing users to depend on their sense of smell. The district court denied the plaintiffs' motion for leave to amend.

The panel FN7 first held that the district court did not abuse its discretion in denying the plaintiffs' motion to amend their complaint. FN8 952 F.2d at 845-47. Next, observing that summary judgment is rarely appropriate in products liability cases, the panel held that the burden did not shift to the plaintiffs to produce summary judgment proof because the defendants did not discharge their burden to establish that the plaintiffs did not raise a genuine question of material fact. Bolstering this conclusion, the panel majority postulated a set of "facts" FN9 that, according to the panel, would allow the plaintiffs to prevail *1074 at trial in strict liability and negligence on the theory that the warning was inadequate concerning nasal fatigue: Little and Carter discovered the leak and caused the hose to be removed from the wingtank; they then could no longer smell the gas and, assuming the fan had dissipated the odor, FN10 remained in the wingtank temporarily rather than following the leaky hose to the deck of the barge; the wingtank then exploded as they attempted to leave. Recognizing that circumstantial evidence is admissible in Mississippi to establish strict liability, the panel noted that evidence that Carter perhaps lit a cigarette is circumstantial evidence that he could no longer smell the gas; FN11 evidence that Little was standing on the

ladder to the wingtank is circumstantial evidence that he and Carter were attempting to leave. FN12

FN7. The panel's initial opinion is reported at 939 F.2d 1293 (5th Cir.1991). That opinion was withdrawn and the panel's final opinion is reported at 952 F.2d 841 (5th Cir.1992). The differences between the two opinions are not material to our discussion here.

FN8. In the light of the late date at which the plaintiffs moved to amend their complaint and the extensive legal and factual changes included in the proposed amended complaint, we agree with the panel decision and affirm the district court's denial of the motion to amend for the reasons stated in the panel's opinion.

FN9. We question the panel's postulation because some of these necessary "facts" have no support in the record and are only speculation, not "facts" at all.

FN10. Indeed, it might have, thus undermining the plaintiffs' sole theory that nasal fatigue was the reason the gas was not smelled. No evidence supports either speculative theory.

FN11. There was no probative evidence that Carter did light a cigarette. *See infra* pp. 1077-78. Nevertheless, the lighting of a cigarette is an essential component of the plaintiffs' theory as presented to the district court and as it comes to us on appeal.

FN12. No evidence supports a finding that Little or Carter ever attempted to leave the wingtank. The record evidence shows that, from the time Little first directed Hughes to retrieve the hose from the wingtank and repair it, he stood on the ladder below the hatch. There is no evidence that he ever moved from that position until propelled

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

onto the barge by the explosion. The only evidence as to Carter's position before the explosion is that he was so far in the wingtank that he could not be seen.

Based on this strained and unsupported factual scenario, the panel concluded that the warnings provided by Liquid Air and Chevron were not inadequate as a matter of law, but also not so conclusively adequate as to require summary judgment in their favor. In summary, the panel held that a "jury should determine whether the defendants' failure to warn that propylene can cause nasal fatigue was a breach of their duty to warn of *all* dangers of which they had actual or constructive knowledge." 952 F.2d at 850. FN13

> FN13. The question whether Liquid Air and/or Chevron had actual or constructive knowledge of the "nasal fatigue" phenomenon as it was alleged by the plaintiffs (an allegation each of them denies) is irrelevant in the light of the plaintiffs' failure to demonstrate that Little and Carter actually suffered from nasal fatigue and the failure to show any causal connection between nasal fatigue and the deaths of Little and Carter.

With respect to defendant Victor, the panel held that the district court erred in holding that the allegedly defective torch was not the proximate cause of the accident because of the intervening conduct of the plaintiffs in failing to follow the warning to evacuate the tank immediately. The district court erred because there was evidence to question whether the failure of Little and Carter to evacuate immediately was negligence or, on the other hand, an attempt to follow the warning. 952 F.2d at 852.

Judge Garwood dissented. He argued that the plaintiffs failed to discharge their burden of coming forward with sufficient evidence to permit a jury to find in their favor because it was undisputed that Carter and Little knew of the gas leak, that they knew it was present in the wingtank and that the explosion occurred very shortly thereafter. Therefore, according to Judge Garwood, it was "purest speculation" to assume that Little and Carter were suddenly afflicted with nasal fatigue. Further, the warning was not heeded when Carter lit a cigarette and also when Little and Carter delayed their departure from the wingtank. Accordingly, Judge Garwood would have affirmed the district court.

On suggestion for rehearing en banc, a majority of this court reflected the view that because summary judgment was so plainly appropriate, en banc consideration was necessary so that district courts will not be misdirected from the lesson of *Celotex* and its progeny that summary judgment is and should be "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

**\*1075 B**

For many years, we and other circuits viewed summary judgment as a "disfavored procedural shortcut," applicable to a limited class of cases. *Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993). *See Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1197 (5th Cir.1986) (noting ambivalence toward summary judgment for fear that trial judges use it as "catch penny contrivance to take unwary litigants into its toils and deprive them of a trial"). Beginning with its summary judgment "trilogy," *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court, however, has made it clear that our earlier approach to Rule 56 was wrong-headed because it was simply inconsistent with the plain language of the rule.

The Supreme Court has instructed us that the purpose of Rule 56 is to "enable a party who be-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

lieves there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). To be certain, Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (emphasis added). Plainly, Rule 56 means what it says: "judgment ... shall be rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added).

[2][3] Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not *negate* the elements of the nonmovant's case. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *see Lujan,* 497 U.S. at 885-86, 110 S.Ct. at 3187. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553-54.

[4] This burden is not satisfied with "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, by "conclusory allegations," *Lujan,* 497 U.S. at 871-73, 110 S.Ct. at 3180, by "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir.1994). We resolve factual controversies in favor

of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. See Lujan,* 497 U.S. at 888, 110 S.Ct. at 3188 (resolving actual disputes of material facts in favor of nonmoving party "is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint.... It will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege").

[5] Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." FN14 *1076*Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.

FN14. Our cases have sometimes stated in dicta that summary judgment is generally not appropriate in certain types of cases, such as products liability or negligence. *See, e.g., Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990); *Trevino v. Yamaha Motor Corp.,* 882 F.2d 182, 184-86 (5th Cir.1989); *Miller-Schmidt v. Gastech, Inc.,* 864 F.2d 1181, 1185 (5th Cir.1989). That dicta is essentially empty chatter, however, inasmuch as we have never reversed a district court's entry of summary judgment solely because it involved a particular class of allegations. In any event, we reject any suggestion that the appropriateness of summary judgment can be determined by such case classification.

Our application of Rule 56 today-mandated by the Supreme Court-finds support in principles of fairness and judicial economy, particularly in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

light of backlogs in the district courts and the high cost of litigation. A plaintiff should not be required to wait indefinitely for a trial when the defendant has a meritless defense that can be resolved on motion for summary judgment. Nor should a defendant be required to bear the unnecessary costs of delay and trial to defend against a claim that has no merit. Neither party should be required to bear the costs of trying all of the issues in a case when some can and should be resolved on summary judgment. Nor is it fair to require other cases to languish on the district courts' trial dockets because of cases that present no genuine questions of material fact. As Judge Rubin stated for this court in *Fontenot,* 780 F.2d at 1195, "[T]rial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting impatiently in the judicial queue, and a burden on the court and the taxpayers."

Notwithstanding the long history of summary judgment procedure, some parties will always complain that summary judgment unfairly deprives a party of the right to have the case heard by the trier of fact. No one, however, should be heard to question the fairness of requiring a party to meet basic evidentiary and procedural burdens in the trial of a case. Summary judgment requires no more. If, after adequate time for discovery, a party cannot produce proof that it has facts to support its case, then the case should be resolved at that point, and this is true irrespective of the type of case.

With these principles in mind, we turn to examine this case.

### C

[6][7] The plaintiffs' claims, both before the district court and before this court, are framed by their allegations and theories reflected in the amended complaint-the propylene gas manufactured by Chevron and distributed by Liquid Air was defective *in only one respect:* the failure to warn of nasal fatigue.[FN15] In order to recover under this theory, obviously there must be a causal connection

between the defect and the injury. *Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d 688, 691 (Miss.1988) (plaintiff must show that adequate warning would have altered conduct); *Thomas v. Hoffman-LaRoche, Inc.,* 949 F.2d 806 (5th Cir.1992) (same); *Fairley v. American Hoist & Derrick Co.,* 640 F.2d 679, 681 (5th Cir.1981) (showing defect is not enough if it did not cause or contribute to cause of injury). *See also Willett v. Baxter International, Inc.,* 929 F.2d 1094, 1098 (5th Cir.1991) (defective aspect of product must cause injury in failure to warn case). The plaintiffs' argument fails because no evidence supports that Little or Carter suffered nasal fatigue and, consequently, there is no evidence that nasal fatigue was the proximate cause of their deaths.[FN16]

> FN15. The plaintiffs' allegations sound in negligence and strict liability, both of which require proof of a causal connection between the defective product and the plaintiffs' injuries. *See Daniels v. GNB, Inc.,* 629 So.2d 595, 600 (Miss.1993) (strict liability); *Ford Motor Co. v. Matthews,* 291 So.2d 169 (Miss.1974) (negligence). Because our analysis focuses on the absence of facts on this common element, we consider both claims together. *See Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464, 467 & n. 3 (5th Cir.1987).

> FN16. In their motions for summary judgment, Liquid Air and Chevron asserted this absence of facts supporting the elements of the plaintiffs' theory of recovery. Because the moving parties do not bear the burden of proof on these issues at trial, they were not required to negate the existence of facts, and they satisfied their burden under *Celotex. See Fontenot,* 780 F.2d at 1195. The panel was mistaken and apparently applied an incorrect standard when it held to the contrary. 952 F.2d at 847. Under *Celotex,* the burden therefore shifted to the plaintiffs to come forward with evidence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

that can uphold a jury verdict. The plaintiffs, however, clearly failed to meet this burden.

**\*1077** The plaintiffs concede that they offered no direct evidence that Little and Carter ever actually suffered from nasal fatigue. They argue, however, that we can infer that Carter and Little suffered nasal fatigue from the facts that they did not evacuate and that Carter lit a cigarette. Any inference drawn from these facts, even assuming that the underlying facts are supported in the record, at best proves only that the cause of their injuries was the failure to smell the gas, not that the cause of their failure to smell the gas was nasal fatigue. Thus, evidence establishing a causal connection between the alleged defect in the warning and the injury suffered is lacking.

The facts of this case fail to reveal any explanation for the conduct of Little and Carter or the cause of the accident. Indeed, the evidence does not reveal with any degree of certainty whether Carter and Little did or did not smell the gas.[FN17] In this respect, the record is clear on only one point: they were aware of the gas leak because they had discovered the hole in the gas hose. Beyond that, the facts in the record lead only to speculation as to why Little and Carter did not immediately evacuate the wingtank when they knew of the gas leak. Nasal fatigue is only one speculative theory, neither more nor less supportable in this record than any of the other speculative theories.[FN18]

FN17. We note, however, that, in their rejected amended complaint, the plaintiffs have withdrawn the allegation that Carter and Little smelled the gas, an omission that would be fatal to the nasal fatigue theory.

FN18. At en banc oral argument, the plaintiffs' counsel agreed that, assuming that Little and Carter failed to smell the gas, that failure could have been caused by nasal fatigue, the ventilation system, a failure of the odorant or other reasons.

There was, for example, testimony speculating that the gas may have sufficiently dissipated so that it was on the floor and could not be smelled; there was testimony speculating that the ventilating fan may have drawn out the odor from the tank; and there was testimony speculating that the odorant may have failed altogether. Furthermore, it is equally easy to speculate that Little and Carter may have smelled the gas but remained in the tank temporarily rather than climbing out because they did not anticipate an igniting source.[FN19]

FN19. Speculation concerning such grossly negligent conduct could be fueled by testimony that, three weeks before the accident, Little had been reprimanded for actually using an oxygen torch to blow-clean his workplace, conduct that the employer characterized as dangerous. Therefore, it is possible that, as long-time, experienced welders constantly exposed, without accident, to the dangers of gas in confined areas, Little and Carter had become indifferent to routine safety precautions that would have saved their lives.

Moreover, when placed in the context of this case, the testimony of the plaintiffs' expert on nasal fatigue, Charles Phillip Colver, does not support nasal fatigue as a theory explaining why Little and Carter remained in the wingtank.[FN20] He testified that whether and when nasal fatigue may occur depends on the length of time of exposure and the strength of the odorant, as well as the particular individual who is exposed to the odorant. Yet, the record is silent concerning how any of these factors apply in this case. The record contains no facts concerning time of exposure,[FN21] the volume of the gas leaked, the temperature, the effect of the ventilation fan and, consequently, the strength of the odorant at the time of exposure. Nor do we know to what extent Little's and Carter's individual olfactory senses were susceptible to the phenomenon of nasal fatigue.

FN20. Colver merely opined that nasal fa-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081

**(Cite as: 37 F.3d 1069)**

tigue happened in this case because "it always happens," although he did not know the degree to which it occurred.

FN21. The testimony is undisputed that the lunch hour ended at 12:30 and that the explosion occurred at approximately 12:45, although the plaintiffs' counsel acknowledged at oral argument that these times were "best guestimates."

Finally, we cannot infer that Carter and Little smelled the gas from the alleged fact that Carter lit a cigarette because no evidence was adduced before the district court *1078 that Carter did light a cigarette.FN22 At best, the record shows that Carter was a smoker, that he had smoked earlier in the day, that he bought a pack of cigarettes and perhaps a lighter at lunch and that there were smoked cigarette butts on the floor of the wingtank after the explosion.FN23 These facts, however, are not evidence sufficient from which a jury could conclude that the source of the ignition was Carter's attempt to light a cigarette in the wingtank. For example, there is no evidence that there was an unsmoked cigarette, or parts of an unsmoked cigarette, on the floor of the wingtank;FN24 no evidence that the flash explosion would have destroyed the cigarette that Carter allegedly tried to light; no evidence regarding whether a cigarette lighter or matches were found in the wingtank;FN25 and no evidence that an opened, new pack of cigarettes with one missing was found in the wingtank or on Carter.

FN22. The absence of evidence supporting the theory that Carter lit a cigarette is underscored by the plaintiffs' last-minute efforts to amend their complaint and withdraw this allegation. These efforts suggest that the plaintiffs either must have assumed that they could not prove that Carter lit a cigarette or that the lighting of the cigarette supplied the defendants with possible defenses to the plaintiffs' claims.

FN23. The record also shows that Carter

had a lighter for his torch in the wingtank, but that lighter was still in his trousers pocket after the explosion. It is inconceivable that he would have been able to put the igniter back in his pocket after the explosion.

FN24. The plaintiffs' nasal fatigue expert testified that no individual cigarettes were found in the wingtank, although the source of his information is unclear.

FN25. The plaintiffs' nasal fatigue expert also testified that "there was found matches that he obtained during the lunch hour," although he does not state where they were found. Also, he testified that Carter purchased a cigarette lighter at lunch, but there was no further evidence concerning the lighter.

[8][9][10][11][12] In sum, even if it is assumed that Carter and Little did not smell the gas, there is no evidence that fact would support a jury's conclusion that nasal fatigue was the reason. The record simply supplies no answers of any kind whatsoever, and does not begin to suggest which of the speculative theories for their remaining in the tank is most plausible. In the absence of evidence on the various points we have noted above, nasal fatigue remains only one of many speculative reasons why Carter and Little remained in the wingtank, knowing that there had been a gas leak.FN26 Consequently, the *1079 district court was correct in determining that the plaintiffs failed to satisfy their burden of coming forth with evidence that would support a jury verdict.

FN26. The plaintiffs, as we have noted, also asserted claims against Victor in strict liability and negligence. The district court granted Victor's motion for summary judgment on the grounds that (1) with respect to the negligence claim, Carter and Little's failure to evacuate and Carter's lighting a cigarette were superseding causes that re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

lieved Victor of liability and, (2) with re-
spect to the strict liability claim, Carter and
Little assumed the risk by failing to evacu-
ate the wingtank.

On appeal, the plaintiffs devote hardly
any space or time to their claims against
Victor-some two-plus pages in their
opening brief, none in their reply brief,
and none in their supplemental en banc
brief. To be sure, they do not even ad-
dress the district court's ruling dismiss-
ing the strict liability claim on grounds
of assumption of risk; any challenge to
the district court's ruling on that point is
therefore deemed waived. *United States
v. Valdiosera-Godinez,* 932 F.2d 1093,
1099 (5th Cir.1991). Although at en
banc argument the plaintiffs disavowed
any intent to completely abandon their
claims against Victor, we note that they
spent no time addressing those claims.
Indeed, in an effort to bolster their argu-
ment that the gas itself was defective be-
cause of odorant fade, they seemed to
embrace the opinion of Victor's expert
that the tear in the gas line was caused
by an external heat source at some earli-
er time in the morning and was not
caused by a defective torch.

Assumption of the risk is a valid defense
under Mississippi law. *See Saxton v.
Rose,* 201 Miss. 814, 29 So.2d 646
(1947). Notwithstanding the sometime
musings of the Mississippi Supreme
Court concerning the continued vitality
of the defense in the light of contributory
negligence and Mississippi's adoption of
comparative fault, *see Braswell v. Eco-
nomy Supply Co.,* 281 So.2d 669
(Miss.1973), the doctrine has been reaf-
firmed in unequivocal terms, *Nichols v.
Western Auto Supply Co.,* 477 So.2d 261
(Miss.1985), and actually extended to

apply to products liability cases. *Id.* In
its most recent pronouncements, the
Mississippi Supreme Court, sitting en
banc, reaffirmed the doctrine, *McDaniel
v. Ritter,* 556 So.2d 303 (Miss.1989),
with only one justice dissenting. 556
So.2d at 319 (Sullivan, J., dissenting).

To the extent that contributory negli-
gence and assumption of the risk are dis-
tinguished by degree, contributory negli-
gence crosses the pale into assumption
of risk when the plaintiff's conduct is not
merely negligent-or even grossly negli-
gent-but instead, the plaintiff's conduct
is a wilful, venturous challenge to a
fully-appreciated danger to his own self-
interest and safety. This distinction is re-
flected by Mississippi's definition of the
elements of assumption of risk: "(1)
Knowledge on the part of the injured
party of a condition inconsistent with his
safety; (2) appreciation by the injured
party of the danger of the condition; and
(3) a deliberate and voluntary choice on
the part of the injured party to expose his
person to that danger in such a manner
as to register assent on the continuance
of the dangerous condition." *Alley v.
Praschak Machine Co.,* 366 So.2d 661
(Miss.1979).

In this case, as pled and argued by the
plaintiffs, it is undisputed that Little and
Carter knew that Victor's malfunctioning
torch had caused a gas leak that created
an imminently dangerous situation. Their
knowledge of the gas leak, alleged to
have been caused by Victor, and the spe-
cific instructions directly given to them
by their employer to evacuate immedi-
ately under these circumstances, com-
bined with their experience as welders,
put them "in possession of fact[s] from
which [they] would be legally charged

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

with appreciation of the danger." *Alley v. Praschak Machine Co., 366 So.2d 661 (Miss.1979).* Finally, the undisputed facts show conclusively that Little and Carter, accepting this known danger, chose not to evacuate but instead remained in the wingtank. Their knowledge and experience taught *only* that they should evacuate immediately upon learning of a gas leak; they nonetheless chose to risk the danger and stayed in the wingtank after they had full knowledge of the torch's malfunction.

Given these undisputed facts, and given the fact that the plaintiffs have effectively waived the district court's application of the assumption of risk doctrine to these facts, it is clear that this legal principle bars the plaintiffs' recovery against Victor in all respects. Although the district court dismissed the negligence claim on another ground, it is appropriate for us to affirm the district court on any basis supported by the record. *Morales v. Department of Army, 947 F.2d 766 (5th Cir.1991).* We thus affirm the district court's entry of summary judgment in favor of Victor.

### III

In conclusion, we reiterate that, as the case was pled and presented to the district court, the plaintiffs based their sole theory of recovery on the premise that Little and Carter suffered from nasal fatigue and that their deaths resulted from Liquid Air and Chevron's failure to warn them of this phenomenon. In response to motions for summary judgment, it was therefore incumbent upon them to present evidence-not just conjecture and speculation-that nasal fatigue did occur and that it bore some causal connection with the deaths of Little and Carter.

After the completion of discovery and extensive briefing here and in the district court, however,

these salient facts emerge: (1) there was a gas leak in the wingtank; (2) Carter and Little knew of the gas leak; (3) there was an explosion; and (4) if Carter and Little had followed their employer's instructions, and the warning provided by the defendants, to evacuate in the event of a leak, they would not have died. Beyond these facts, what happened, why it happened, and how it happened is only speculation. The plaintiffs simply did not meet their burden to adduce evidence upon which a juror could determine what caused Little and Carter to ignore explicit warnings and safety precautions to evacuate the wingtank when they discovered a gas leak.

Although the panel majority attempted to assume facts and present a theory upon which the plaintiffs might have recovered, it was not free to amend the plaintiffs' pleadings or to assume facts that might be proved but are not established by the record. The absence of evidence to support the plaintiffs' theories of recovery made this case clearly and plainly appropriate for summary judgment. The district court fairly and thoroughly considered the plaintiffs' claims and determined that the complaint should be dismissed. The district court was correct and is therefore

AFFIRMED.

JOHNSON, Circuit Judge, with whom POLITZ, Chief Judge, joins, dissenting:

The majority opinion herein does not contest the panel majority's principal conclusion. That conclusion was that there was a genuine issue of material fact as to whether the warnings on this product were inadequate because they did not warn of the danger that "nasal fatigue" could degrade an individual's ability to detect the presence of the odorized gas. 952 F.2d 841, 850 (5th Cir.1992). Instead, the majority concludes that the evidence that the decedents were affected by nasal fatigue **\*1080** and that nasal fatigue bore a causal relation to the accident was too speculative to survive summary judgment. Maj. op. at 1071.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081
**(Cite as: 37 F.3d 1069)**

However, there was circumstantial evidence to support both of these conclusions.[FN1] That evidence showed that the decedents initially smelled the gas in that they discovered the leak. There was also testimony that nasal fatigue is a phenomenon that always occurs, at least to some extent, and that it works to diminish your ability to detect an odor. Additionally, there was evidence that Carter lit a cigarette some time after the leak was discovered which suggests that the decedents could no longer smell the gas.[FN2] From this circumstantial evidence, a jury could readily infer that the decedents' inability to smell the gas, which was obviously present in sufficient quantities to cause the explosion, was caused, at least in part, by nasal fatigue.

FN1. Because direct evidence of the facts that underlie a strict liability claim is seldom available, Mississippi law has determined that circumstantial evidence of the allegations in a strict liability case is competent proof. *BFGoodrich, Inc. v. Taylor,* 509 So.2d 895, 903 (Miss.1987).

FN2. The majority attacks the strength of the evidence supporting the view that Carter lit a cigarette in the tank and that this ignited the gas. The evidence shows, however, that Carter was a smoker, that he had purchased cigarettes and perhaps a lighter earlier that day and that there were smoked cigarette butts on the floor of the wingtank after the explosion. Moreover, as the problem with the welder had caused a break in the work, it is not unlikely that Carter would take advantage of that work stoppage to smoke a cigarette. Finally, there was testimony that there was no other ignition source in the tank which could have set off the explosion which led witnesses to conclude that Carter must have lit a cigarette. Surely, from this circumstantial evidence, a jury could reasonably conclude, and not just speculate, that Carter did, in fact, light a cigarette.

Viewed in a light most favorable to the plaintiffs, this writer concludes that this view of the evidence was reasonable, not merely speculative, and for a jury to accept or reject. *See Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.,* 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (in reviewing a summary judgment, we must review the evidence and any inferences to be drawn therefrom in a light most favorable to the non-moving party). If this view of the evidence is accepted, then it would be sufficient to raise a genuine issue of material fact as to whether the decedents did, in fact, experience nasal fatigue and whether this bore a causal relation to the accident. Fed.R.Civ.P. 56(c). For these reasons, and for the reasons stated in the panel majority opinion, this writer adheres to the view that summary judgment in this case was inappropriate.

Even if this conclusion is incorrect, though, it is difficult to see why this case merited en banc review. This case announces very little new law. Instead, it simply reiterates the familiar summary judgment standard flowing from the Supreme Court's trilogy of summary judgment cases and then applies that standard to the facts of this case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The only real difference between the majority and the dissent herein is the application of the facts of this particular case to that familiar standard. This hardly seems worthy of en banc consideration.

For this additional reason as well, this writer dissents.

C.A.5 (Miss.),1994.
Little v. Liquid Air Corp.
37 F.3d 1069, Prod.Liab.Rep. (CCH) P 14,081

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

▷

United States Court of Appeals,
Fifth Circuit.
**STRACHAN** SHIPPING CO., et al., Plaintiffs-
Appellants,
v.
**DRESSER** INDUSTRIES, INC. et al., Defendants-
Appellees.

No. 82-3098.
March 28, 1983.

Carriers and carriers' agent brought action against shipper to recover carriage and stevedoring costs. The United States District Court for the Eastern District of Louisiana, Fred J. Cassibry, J., 534 F.Supp. 205, entered judgment for shipper, and carriers and agent appealed. The Court of Appeals, Reavley, Circuit Judge, held that: (1) under conference credit agreement, shipper agreed to be absolutely liable for forwarder's failure to remit funds earmarked for carriers; (2) forwarder was not carriers' or shipper's agent but, rather, independent contractor who performed services beneficial to both shipper and carriers; and (3) carriers did not release shipper from liability and look solely to forwarder for payment, notwithstanding fact that carriers' agent initially directed collection efforts to forwarder.

Reversed.

West Headnotes

**[1]** Federal Courts 170B ☞755

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk754 Review Dependent on Whether Questions Are of Law or of Fact
                    170Bk755 k. Particular Cases. Most Cited Cases

Contract interpretation is question of law and clearly erroneous standard does not apply.

**[2]** Shipping 354 ☞149

354 Shipping
    354VII Carriage of Goods
        354k144 Freight
            354k149 k. Persons Entitled to Collect. Most Cited Cases

Under conference credit agreement, which provided that shippers "will be absolutely and unconditionally responsible to see that all freights and charges due are paid within the fifteen (15) day period, and guarantee that they will be paid to the carrier or his agent regardless of whether or not funds for such payments have been advanced to our forwarder/agent or otherwise," shipper agreed to be absolutely liable for forwarder's failure to remit funds earmarked for carrier, notwithstanding separate remedy provision for credit privileges to be immediately suspended for any failure to comply with agreement.

**[3]** Federal Courts 170B ☞870.1

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)5 Questions of Fact, Verdicts and Findings
                170Bk870 Particular Issues and Questions
                    170Bk870.1 k. In General. Most Cited Cases
            (Formerly 170Bk870, 170Bk87)

Although, ordinarily, finding of agency is question of fact that will not be disturbed on appeal unless clearly erroneous, in case submitted on stipulations and depositions, in which no credibility choices are made by district court, burden of proving district court's findings clearly erroneous is to some extent ameliorated.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

**[4] Shipping 354 ☞149**

354 Shipping
   354VII Carriage of Goods
      354k144 Freight
         354k149 k. Persons Entitled to Collect.
Most Cited Cases

    Forwarder, which went into bankruptcy after being paid in full by shipper for carriers' services, was not carriers' agent and therefore payment by shipper to forwarder would not satisfy shipper's obligation to pay carriers, notwithstanding that amount of compensation paid forwarder by carriers far exceeded relatively nominal fee paid forwarder by shipper and notwithstanding that forwarder prepared bill of lading which was statutorily carriers' duty. Shipping Act, 1916, § 44, as amended, 46 U.S.C.A. § 841b; Harter Act, § 4, 46 U.S.C.A. § 193.

**[5] Shipping 354 ☞112**

354 Shipping
   354VII Carriage of Goods
      354k112 k. Transshipment and Forwarding.
Most Cited Cases

    Forwarder, which went into bankruptcy after being paid in full by shipper for carriers' services, was not shipper's agent, notwithstanding fact that shipper selected forwarder and notwithstanding that many of forwarder's presailing activities directly benefited shipper. Shipping Act, 1916, § 44, as amended, 46 U.S.C.A. § 841b.

**[6] Shipping 354 ☞112**

354 Shipping
   354VII Carriage of Goods
      354k112 k. Transshipment and Forwarding.
Most Cited Cases

    Forwarder is independent contractor who performs services beneficial to both shipper and carrier. Shipping Act, 1916, § 44, as amended, 46 U.S.C.A. § 841b; Harter Act, § 4, 46 U.S.C.A. § 193.

**[7] Shipping 354 ☞151**

354 Shipping
   354VII Carriage of Goods
      354k144 Freight
         354k151 k. Payment or Tender. Most Cited Cases

    Carriers did not release shipper from liability for carriage and stevedoring costs and look solely to forwarder for payment, notwithstanding that carriers' agent initially directed collection efforts to forwarder, where carriers released prepaid bill of lading to forwarder in exchange for freight due bill, forwarder signed freight due bill as "forwarder and agent for the shipper," carriers' agent used copies of bills of lading in accounting procedures signed by forwarder as agent for shipper, and, in correspondence between carriers' agent and forwarder, carriers' agent threatened to report shipper as delinquent.

**\*484** Burke & Mayer, James O.M. Womack, New Orleans, La., for plaintiffs-appellants.

Marc J. Fink, David F. Smith, Washington, D.C., for amicus curiae, U.S. Atlantic & Gulf/Australia-New Zealand Conference.

Lemle, Kelleher, Kohlmeyer & Matthews, Charles Kohlmeyer, Jr., New Orleans, La., for defendants-appellees.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before CLARK, Chief Judge, THORNBERRY and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

    This case involves a suit to recover carriage and stevedoring costs. Four shipping lines (the carriers) and Strachan (the carriers' agent) sued Dresser (the shipper). Dresser denied liability claiming that the plaintiffs had been paid in full since Dresser had paid Sierra (the forwarder), who had since gone bankrupt. The district court ruled for defend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

ant. 534 F.Supp. 205 (E.D.La.1982). We reverse.

THE FACTS

Dresser shipped cargo on plaintiff carriers' vessels on five occasions between October 24, 1978 and January 19, 1979. The procedure employed was for Dresser to prepare**485** an export order blank. Dresser then contacted Sierra, who booked space on available vessels. Sierra prepared bills of lading and other required export documents. Strachan, as agent for the carriers, signed the bill of lading once the vessel had sailed. The negotiable original of each of bill of lading would be marked "Freight Prepaid" by Strachan and delivered to Dresser through Sierra. A non-negotiable copy of the bill of lading would be stamped "freight due bill." This due bill provided for payment within fifteen days and was delivered to Sierra. Sierra then prepared its own invoice and billed Dresser, retaining the due bill. Dresser paid Sierra, who in turn was supposed to pay Strachan. In this case, however, Sierra received the funds from Dresser but never paid Strachan. Strachan initially directed its collection efforts to Sierra. It was not until April 17, 1979 that Strachan attempted to collect from Dresser, who refused to pay.

Dresser paid Sierra $15 for its services in preparing each shipment. The carriers paid Sierra on a commission basis, ranging from 1.25 to 2.5 percent of the total freight charges.

THE LAW

The plaintiffs asserted two theories of liability in the lower court. The first theory relied on the language of a conference credit agreement. The second theory was grounded on the agency principle that an agent's failure to remit funds to a third party does not relieve the principal of his obligation to pay. The district court rejected both these arguments. We examine each argument separately.

A. *The Conference Credit Agreement*

Carriers are authorized by statute to form conferences. 46 U.S.C. § 813a. These conferences perform a variety of functions for their carrier members, including the setting of rates. Each conference is typically limited to a specific geographic area or route. *See generally* S.Rep. No. 860, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 3108. A shipper signs a "loyalty contract" with the conference in which he agrees to ship exclusively on conference vessels in exchange for reduced freight rates.

Besides the loyalty contract, the conference also provides credit agreements. The general purpose of a conference credit agreement is to provide for the release of bill of ladings marked prepaid prior to the receipt of payment by the carrier. The release of the bill of lading is, in essence, an extension of credit by the carrier to the shipper. The shipper agrees to pay within a certain period of time after the vessel sails.

In this case, one of the carriers, the Bank and Savill Line ("Bank Line"), is a member of the U.S. Atlantic & Gulf/Australia–New Zealand Conference. FN1 Dresser signed both the loyalty contract and the conference credit agreement. The conference credit agreement provides:

> FN1. This discussion and theory of liability relates only to the claims between Bank Line and Dresser. The other carriers cannot take advantage of this agreement since they were not members of the conference.

In consideration of the extension of credit through the issuance and release of bills of lading indicating that freight is payable on other than a freight collect basis by members of the U.S. Atlantic & Gulf/Australia–New Zealand Conference to us directly through our forwarder or agent we hereby agree as follows:

1. To pay to the carrier, or his agents, either directly or through our forwarder or agents, within fifteen working days, excluding Saturdays, Sundays and legal holidays, after the date of the sailing of the vessel from port of loading all freights and charges due on such bill of lading.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

2. We will be absolutely and unconditionally responsible to see that all freights and charges due are paid within the fifteen (15) day period, and guarantee that they will be paid to the carrier or his agent regardless of whether or not funds for such payment have been advanced to our forwarder/agent or otherwise.

**\*486** 3. Credit privileges hereunder shall be immediately suspended for any failure to comply with the provisions of this agreement.

Appellant Bank Line takes a plain meaning approach to this agreement. It argues that the language of paragraph 2 is absolutely clear, and that Dresser specifically guaranteed payment even if the forwarder (Sierra here) failed to remit the funds to the carrier.

Appellee Dresser, however, takes a "general intent of the document" approach. It argues that the agreement deals only with the extension of credit and was not intended to allocate the risk of a forwarder's insolvency on any particular party. As evidence of this, Dresser relies on the introductory section indicating that the agreement deals with the extension of credit. Dresser also asserts that the third paragraph provides conclusive evidence of this intent. Dresser contends that paragraph 3 defines the remedy and is specifically limited to the suspension of credit privileges but does not extend to double payment of freight charges.

The district court was convinced by appellee's arguments. The court below relied heavily on *Koninklijke Nedlloyd BV v. Uniroyal, Inc.,* 433 F.Supp. 121 (S.D.N.Y.1977), a case construing an almost identical conference credit agreement. The court there ruled for the shipper, stating:

It must be remembered that the parties were bargaining for credit privileges and not over who would ultimately be responsible for payment .... The guaranty given was not that the shipper would in all events make good any default by the forwarder, but only that payment would be made

within the agreed upon credit period. It is the timing of the payments which is at the heart of this agreement.

*Id.* at 126.

[1][2] We first note that contract interpretation is a question of law and the clearly erroneous standard does not apply. *Thornton v. Bean Contracting Co.,* 592 F.2d 1287 (5th Cir.1979). We think the district court erred in its interpretation of this agreement. Both the lower court and the *Uniroyal* court gave this agreement an unduly narrow interpretation. The language of the agreement is clear and unambiguous:

We will be absolutely and unconditionally responsible to see that all freights and charges due are paid within the fifteen (15) day period, *and* guarantee that they will be paid to the carrier or his agent regardless of whether or not funds for such payment have been advanced to our forwarder/agent or otherwise.

As we read this clause, Dresser agreed to pay promptly *and* it agreed to pay the carrier even though funds had been advanced to *its* forwarder. In regard to the third paragraph, we do not think it was intended to obliterate the guaranty language in the preceding paragraph, nor do we think that it was intended to limit the carrier's remedies to only the suspension of credit. FN2 We hold that under the conference credit agreement, Dresser agreed to be absolutely liable for the forwarder's failure to remit funds earmarked for the carrier.

FN2. If we accepted appellee's arguments, for the carrier to have retained the protection of the guarantee, paragraph 3 would have to include language to the effect that "if payment is not made, we reserve our right to sue on the aforementioned guarantee." We will not require such superfluous language.

B. *The Fowarder: Whose Agent?*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

Despite our construction of the credit agreement, Dresser could escape liability if it could prove that Sierra acted as the carriers' agent. Payment by Dresser to an agent of the carrier would satisfy Dresser's obligation under the credit agreement. If Sierra was the carriers' agent for purposes of collection, Dresser would be relieved from liability to the other carriers not members of the conference, since Dresser would not be responsible for their agent's failure to remit the funds.

[3] The district court held simply: "I find that in this case the facts establish that Sierra was plaintiffs' agent for receiving payment." *534 F.Supp. at 208.* Ordinarily, **487 a finding of agency is a question of fact that will not be disturbed on appeal unless clearly erroneous. *Wood v. Holiday Inns, Inc.,* 508 F.2d 167 (5th Cir.1975)* (applying Alabama law); *Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546 (10th Cir.1967).* However, in a case submitted on stipulations and depositions, as this one was, in which no credibility choices are made by the district court, "the burden of proving the district court's findings clearly erroneous 'is to some extent ameliorated.' " *Onaway Transportation Co. v. Offshore Tugs, Inc.,* 695 F.2d 197, 200 (5th Cir.1983),* quoting *Stevens v. East-West Towing Co.,* 649 F.2d 1104, 1106 (5th Cir.1981),* cert. denied, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982).* In addition we note that the district court cited no specific facts to buttress the agency conclusion.[FN3]

> FN3. We note that after finding that Sierra was the carriers' agent, the district court construed the transaction in question as an extension of credit by the carriers to Sierra. However, if Sierra were the carrier's agent, then the credit nature of the transaction never arises because Dresser has paid the carriers themselves.

[4] We conclude that the district court's finding of agency is clearly erroneous. In examining the transaction involved, it becomes clear that the forwarder is an independent contractor who performs services beneficial to both shipper and carrier. This conclusion is in harmony with not only the majority of the case law, but the legislative and administrative history of the statute licensing freight forwarders and permitting carriers to pay commissions to forwarders. 46 U.S.C. § 841b.

Dresser points to two facts showing that Sierra was the carriers' agent. First, that the amount of compensation paid by the carriers far exceeds the relatively nominal fee Dresser paid. Second, that Sierra prepared the bill of lading which is statutorily the carriers' duty. 46 U.S.C. § 193.

While these facts are certainly relevant to the agency determination, they are not determinative. With regard to the fees paid by the carrier, the legislative history of the bill permitting such payments clearly recognized that forwarders' services benefitted both shipper and carrier. The Federal Maritime Board investigated the forwarding industry and issued rules regulating forwarders. Freight Forwarder Investigation, 6 F.M.C. 327 (1961). The Board found that the functions performed by the forwarder were almost exclusively on behalf of the shipper, and that the payments by the carriers constituted rebates prohibited by the Shipping Act. The Board accordingly prohibited carriers from paying commissions to forwarders. Congress, in response to the outcries of the carriers, forwarders and shippers, passed 46 U.S.C. § 841b. It provides that if a licensed forwarder has arranged the booking of cargo and performed certain other services, including the preparation of; (1) bills of lading, (2) dock receipts, or (3) consular documents, then the carrier may compensate the forwarder. Thus, the Act is an express recognition of the fact that the forwarder performs services beneficial to the carrier. Yet the legislative history of the Act indicates that Congress recognized the dual nature of the forwarder. The Senate Report states:

> ... undoubtedly export shippers benefit from, and many could hardly continue in foreign commerce without, the operations of the independent ocean freight forwarders ...

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

S.Rep. No. 691, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 2699, 2704.FN4 The fact that this payment is authorized is therefore not determinative of the agency issue.

> FN4. The carriers testified that were it not for the forwarders, certain functions, traditionally thought to be the responsibility of the shipper, such as getting the cargo to the pier and preparing export documents, would devolve upon the carriers because of the nature of the industry and the inexperience and inability of shippers to be familiar with the myriad procedures at a variety of ports. This testimony supports our view that the forwarders' services benefits both carrier and shipper.

With regard to the preparation of the bill of lading, we agree that this does indicate that the forwarder performs services for **\*488** the carrier.FN5 Yet this service also directly benefits the shipper. The bill of lading, particularly a negotiable one, is a vital component in today's business world. It represents title to the goods, and the carrier must release the goods to the party entitled to them under the bill of lading. U.C.C. § 7-403. Conversely, the shipper may not obtain the goods at their destination without the bill of lading. The importance of the bill of lading to the shipper is also shown by their use in financial transactions involving letters of credits. The letter of credit is an increasingly utilized device to secure payment. Joseph, Letters of Credit: The Developing Concepts and Financing Functions, 94 Banking L.J. 816 (1977); White & Summers, Uniform Commercial Code, § 18-1 (1980). Typically, the seller (*i.e.* shipper) agrees to ship the goods to buyer. The seller secures payment by having the buyer's bank draw an irrevocable letter of credit which provides that upon presentation of the proper documentation, payment will be made. The bill of lading is invariably one of the documents necessary for payment.FN6 The forwarder's function in preparing a bill of lading not only benefits the carrier, but provides vital services

to the shipper. To hold otherwise would be to ignore economic reality.

> FN5. We note, however, that preparing *copies* of the bill of lading may not be the carrier's duty. *See Freight Forwarder Investigation,* 6 F.M.C. at 348 ("for the use *of the shipper* a number of copies of the bill of lading are required ... that the bills of lading are prepared at the request of the shipper ..., and that in no instance are the forwarders employed by the carriers to perform this function").

> FN6. A variation of this transaction, is the sight draft or documentary sale. There, the seller will present a sight draft drawn on buyer's account. The bank will honor the draft only upon the presentation of accompanying documents, including the bill of lading. The major difference in this transaction is that the seller must rely on the buyer's solvency, whereas in a letter of credit, the seller relies on the bank's solvency, normally a less risky proposition.

[5] Appellees argue that Sierra was Dresser's agent. They point to the fact that Dresser selected Sierra. They also assert that the pre-sailing functions performed by Sierra were performed on behalf of Dresser, and that Sierra is therefore Dresser's agent.

In regard to Dresser's selection of Sierra, obviously this is an indication that Sierra's actions can be attributed to Dresser. Control of the manner in which the forwarder performs his duties, however, rather than selection has been the more important factor in deciding the agency question. *Farrell Lines, Inc. v. Titan Industrial Corp.,* 306 F.Supp. 1348 (S.D.N.Y.), *affirmed,* 419 F.2d 835 (2d Cir.1969), *cert. denied,* 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970); *Uniroyal,* 433 F.Supp. at 128. It is undisputed that Dresser did not control Sierra's actions in booking cargo. Sierra was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

free to select the carrier or line on which to ship the goods.[FN7] Deposition testimony also shows that Dresser had little knowledge of the manner in which Sierra performed its duties, much less controlled Sierra's performance.

> FN7. Deposition testimony by Dresser's Traffic Manager indicated that occasionally Dresser would book the cargo directly. Yet the witness indicated that when Dresser did so, the booking was subject to confirmation by the forwarder. This shows the substantial independence enjoyed by Sierra.

In regard to Sierra's performance of pre-sailing functions, we agree that many of these activities benefit most directly the shipper, but these activities also indirectly benefit carriers. That view is consistent with Congress' determination of this issue in 46 U.S.C. § 841b. As indicated previously, by the authorization of payments by carriers to forwarders for certain services, including many pre-sailing functions, Congress must have found that these services benefited carriers as well as shippers.

[6] If Sierra is neither the shipper's nor the carrier's agent throughout, instead of making the left hand the agent of one and the right hand the agent of the other we view Sierra as an independent contractor. This conclusion is most consistent with the unique position occupied by the forwarder in the shipping industry. While the forwarder **\*489** performs a variety of functions benefiting both shipper and carrier, neither the shipper nor the carrier retains any substantial control over the forwarder's performance. We hold that the forwarder is an independent contractor. *Accord Farrell Lines,* 306 F.Supp. at 1350. ("[W]e find that the forwarder was neither the carrier's agent for receipt of payment, nor the shipper's agent in transactions with the carrier, but rather an independent contractor").

Since Sierra was not the carriers' agent, Dresser is liable to Bank Line under the conference credit agreement. Sierra clearly acted as Dresser's freight

forwarder. Under the terms of the agreement, the forwarder, even if an independent contractor, is tied to the shipper. Dresser guaranteed to pay even if the forwarder failed to remit the funds, and we cannot alter this obligation.

### C. *Was Dresser Released From Liability?*

Having concluded that Sierra is an independent contractor does not decide the issue of liability. The lower courts that have addressed this issue have asked whether the carrier extended credit to the forwarder. *Farrell,* 306 F.Supp. at 1350; *Naviera Mercante S.A. v. Northrup King Co.,* 491 F.Supp. 508, 510 (S.D.Tex.1980). We think the question is not whether the carrier extended credit to the forwarder, but whether the carriers intended to release Dresser from its obligation and look solely to the forwarder for payment.

[7] The district court held that the carriers extended credit to the forwarder and that Dresser was thereby relieved of its obligation to pay. The court did not, however, discuss whether the extension of credit to Sierra was intended to release Dresser. This issue necessarily depends upon the course of dealing of the particular parties, and must be judged from the totality of the circumstances. We hold that the carriers did not release Dresser from liability.

The fact most strongly indicating that Dresser was relieved of liability is that Strachan initially directed its collection efforts to Sierra. This fact is not conclusive, however, in light of the forwarder's position in the shipping industry. Shippers traditionally give forwarders the power to choose which line to ship cargo on. Carriers are understandably reluctant to alienate forwarders by going behind their backs and contacting the shipper directly.

We think the release of the prepaid bill of lading to Sierra in exchange for the freight due bill also indicates that Strachan did not intend to relieve Dresser of its obligation. Admittedly, Dresser never received the due bill and Sierra was the party who signed it.[FN8] Sierra, however, signed as "forwarder and agent for the shipper" on a form provided by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

Strachan. While this form does not prove that Sierra was Dresser's agent, it is strong indication of Strachan's intent to look to Dresser for payment.

> FN8. A fact looked to in deciding whether the carrier extended credit to the forwarder has been that the shipper was ignorant of the exchange of the due bill for the prepaid bill of lading. *Farrell,* 306 F.Supp. at 1350. Here, the record discloses that Dresser knew of the procedures followed and assumed that Sierra did not prepay the freight charges, but waited to remit Dresser's payment to the carrier.

One reason the lower courts have relieved shippers of liability is that carriers preferred dealing with forwarders. As the court in *Farrell Lines* put it:

> The carrier could have billed the shipper directly. Instead, for its own convenience, it chose to extend credit to the forwarder. The carrier derived many benefits from this arrangement. Since shippers do not have forwarders' expertise in ocean freight, the carrier, by dealing solely with forwarders, is relieved of many of the burdensome details which unknowing shippers would thrust upon it. The carrier is also relieved from checking the credit ratings of an almost infinite number of shippers and, instead, can rely on the credit of a limited number of forwarders.

306 F.Supp. at 1351 (footnotes omitted). The court's statement that the carrier "could have billed the shipper directly" misperceives the basic nature of the transaction.**490** The carrier would not release a prepaid bill of lading without an immediate acknowledgement of liability. Since the shipper is frequently not located in the port of shipment, there would be no release of the bill of lading without a substantial delay for the shipper to sign the due bill and return it. To bill the shipper directly is not feasible.[FN9] Furthermore, the carrier is not the only party who benefits from this arrangement. The shipper secures the prompt release of the bill of lad-

ing. He is also relieved of many of the "burdensome details" which he might have to take care of. In regard to credit ratings, we note that the record does not indicate that Strachan relied on Sierra's credit rating. There is testimony, however, that although no formal system was set up, approval by one of Strachan's vice presidents was required if a new shipper were involved. This fact indicates that the carriers looked to the shipper for payment.

> FN9. We also note, that as a matter of commercial practice, to bill the shipper directly does not seem logical. Sierra is the point of contact for Dresser and Strachan. Delivery of the due bill to Sierra is reasonable since Sierra was acting for a disclosed third party. This practice is not inconsistent with relying on that third party for payment.

Strachan's accounting procedures also indicate that Dresser remained liable for the freight charges. Strachan used copies of the bills of lading rather than an accounts receivable ledger. Sierra was listed as "Forwarding Agent" and signed as agent for the shipper. These bills of lading show no intent to release Dresser in favor of Sierra.

Additional facts in the record support our conclusion. If a shipper did not pay in the required fifteen day period, then Strachan would report that fact to the Conference, who would then circulate a delinquent list. This list contained Dresser's name, not Sierra's. Yet if the carrier were releasing Dresser and relying solely on Sierra, then logically Sierra's name should be on the delinquent list. Also, if the carrier were extending credit to forwarders, then it follows that they would require forwarders to sign credit agreements. Yet these agreements are required of shippers, not forwarders.

Correspondence between Strachan and Sierra also indicates that Strachan did not release Dresser. Strachan in an attempt to collect, sent letters to Sierra. In this correspondence, Strachan threatened to report the *shipper* as delinquent. In a letter dated

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.2d 483, 1984 A.M.C. 237
**(Cite as: 701 F.2d 483)**

November 2, 1978 Strachan also stated that if payment was not forthcoming, it would "Contact the shippers direct for payment." FN10

> FN10. Another indication that Strachan was not extending credit solely to Sierra is its unloading bill. They list Dresser first as shipper, and then Sierra as *broker.* A broker is normally thought of as "an agent employed to make bargains and contracts for a compensation." Black's Law Dictionary 174 (Rev. 5th ed. 1979); *see Freight Forwarder Investigation,* 6 F.M.C. at 346. This does not make Sierra actually Dresser's agent. One does not, however, normally extend credit to the agent instead of the principal.

Lastly, we think that our result comports with economic reality. A freight forwarder provides a service. He sells his expertise and experience in booking and preparing cargo for shipment. He depends upon the fees paid by both shipper and carrier. He has few assets, and he books amounts of cargo far exceeding his net worth. Carriers must expect payment will come from the shipper, although it may pass through the forwarder's hands. While the carrier may extend credit to the forwarder, there is no economically rational motive for the carrier to release the shipper. The more parties that are liable, the greater the assurance for the carrier that he will be paid.

Since the carriers did not release Dresser, Dresser remained liable for the charges incurred by plaintiffs. Dresser protests that we are requiring double payment. While this appears inequitable, it must be remembered that the carriers have not been paid. Dresser selected Sierra and chose to have it remit payment to the carriers. The carriers did not solicit Sierra's participation in this transaction.

The judgment is REVERSED.

C.A.La.,1983.
Strachan Shipping Co. v. Dresser Industries, Inc.

701 F.2d 483, 1984 A.M.C. 237

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

H

United States Court of Appeals,
Fifth Circuit.
Seth A. BECKER, Plaintiff-Appellant,
v.
TIDEWATER, INC.; Twenty Grand Offshore, Inc.;
Tidewater Marine LLC; Pental Insurance Company
Ltd.; Certain Underwriters At Lloyds Insurance
Co., Defendants-Appellees,
v.
Baker Hughes, Inc.; Baker Oil Tools, Inc., a divi-
sion of Baker Hughes Oilfield Operations, Inc., De-
fendants-Appellants.

No. 08-30183.
Oct. 26, 2009.

**Background:** Employee who was injured while
working aboard off-shore oil rig sued employer, the
oil rig owner, under Jones Act, and, in the alternat-
ive, under Longshore and Harbor Workers' Com-
pensation Act (LHWCA). Employer filed third-
party complaint against owner of vessel chartered
by employer and others. Following jury trial, the
United States District Court for the Western Dis-
trict of Louisiana, Richard T. Haik, Sr., Chief
Judge, entered judgment for employee, upon jury
verdict, and apportioned fault. Employer appealed.
The Court of Appeals, 335 F.3d 376, reversed and
remanded for proceedings under the LHWCA, and
subsequently remanded for a bench trial, 405 F.3d
257. The United States District Court for the West-
ern District of Louisiana, Richard T. Haik, Sr.,
Chief Judge, 2007 WL 3231655, entered judgment,
following bench trial, holding that employer was
55% liable, that vessel owner was 45% liable, and
that employer was obligated under indemnity agree-
ment to fully indemnify vessel owner. Employer
and employee appealed.

**Holdings:** The Court of Appeals, Benavides, Cir-
cuit Judge, held that:
(1) employee was covered by the Outer Continental

Shelf Lands Act (OCSLA), and thus, indemnity
provision in charter agreement between employer
and owner of vessel was not void under LHWCA;
(2) captain of vessel did not act with gross negli-
gence, and thus, indemnity agreement was not
rendered invalid on that basis;
(3) charter agreement was not breached;
(4) indemnity provision was not limited to claims
for general damages;
(5) oil rig owner was not additional assured under
vessel owner's liability insurance policies;
(6) vessel captain's actions were not superseding
cause of employee's injuries; and
(7) oil rig owner which chartered vessel was not
acting within its role as vessel charterer, but as an
employer, in performing certain duties.

Affirmed in part, reversed in part, and re-
manded.

Opinion, 581 F.3d 256, withdrawn and super-
seded.

West Headnotes

**[1] Compromise and Settlement 89 ⟜100**

89 Compromise and Settlement
   89III Mary Carter and High-Low Agreements
     89k100 k. In general. Most Cited Cases
   A "Mary Carter agreement" is a contract
between the plaintiff and one of several defendants
whereby the contracting defendant will settle with
the plaintiff before trial, but must remain in the suit,
and will be reimbursed to some specific degree
from the plaintiff's recovery from the other defend-
ants.

**[2] Federal Courts 170B ⟜769**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
       170BVIII(K)1 In General

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
170Bk769 k. On appeal from final judgment. Most Cited Cases

The Court of Appeals normally declines to review a district court's denial of motions for summary judgment when the case comes to the Court of Appeals on the movant's appeal following adverse judgment after full trial on the merits.

**[3] Federal Courts 170B ⟨⟩776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)1 In General
      170Bk776 k. Trial de novo. Most Cited Cases

**Federal Courts 170B ⟨⟩850.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)5 Questions of Fact, Verdicts and Findings
      170Bk850 Clearly Erroneous Findings of Court or Jury in General
        170Bk850.1 k. In general. Most Cited Cases

Findings of fact made during a bench trial are reviewed for clear error and legal issues are reviewed *de novo*.

**[4] Federal Courts 170B ⟨⟩852**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)5 Questions of Fact, Verdicts and Findings
      170Bk850 Clearly Erroneous Findings of Court or Jury in General
      170Bk852 k. What constitutes clear error, and effect thereof. Most Cited Cases

A finding of fact is clearly erroneous if it is

without substantial evidence to support it, the court misinterpreted the effect of the evidence, or the reviewing court is convinced that the findings are against the preponderance of credible testimony.

**[5] Federal Courts 170B ⟨⟩776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)1 In General
      170Bk776 k. Trial de novo. Most Cited Cases

The Court of Appeals reviews the district court's denial of summary judgment de novo.

**[6] Federal Courts 170B ⟨⟩769**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
    170BVIII(K)1 In General
      170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
        170Bk769 k. On appeal from final judgment. Most Cited Cases

A denial of a motion for summary judgment is appealable after a bench trial on the merits when there was a ruling by the district court on an issue of law.

**[7] Admiralty 16 ⟨⟩1.20(5)**

16 Admiralty
  16I Jurisdiction
    16k1.10 What Law Governs
    16k1.20 Effect of State Laws
      16k1.20(5) k. Torts in general; workers' compensation. Most Cited Cases

**Shipping 354 ⟨⟩39(1)**

354 Shipping
  354III Charters
    354k39 Construction and Operation in General
      354k39(1) k. In general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

Employee who was injured while working as a longshoreman aboard a jack-up oil rig in the Gulf of Mexico was covered by the OCSLA, and thus, reciprocal indemnity provision in charter agreement between employer and owner of vessel chartered by employer, pursuant to which employer agreed to fully indemnify vessel owner, was not void under the LHWCA; employee was engaged in mineral exploration, was a non-seaman, and was injured on the outer continental shelf while employed by an employer engaged in mineral production. Longshore and Harbor Workers' Compensation Act, § 5(b), 33 U.S.C.A. § 905(b); Outer Continental Shelf Lands Act, § 4(b), 43 U.S.C.A. § 1333(b).

**[8] Indemnity 208 🗝30(8)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
          208k30 Indemnitee's Own Negligence or Fault
              208k30(8) k. Maritime cases. Most Cited Cases

Under Louisiana law, captain of vessel chartered by oil rig owner did not act with gross negligence in breaking the starboard-stern mooring line and moving the vessel, or in unanchoring the vessel without warning the oil rig's crew, and thus, indemnity provision in charter agreement between vessel owner and oil rig owner, pursuant to which oil rig owner agreed to fully indemnify vessel owner for injuries, was not rendered invalid on basis of gross negligence; the captain had to act quickly in moving the vessel in order to avoid a collision with the rig, his conduct reflected concern for safety, rather than a disregard for safety, and oil rig crew was aware that the vessel was unanchored.

**[9] Negligence 272 🗝273**

272 Negligence
    272V Heightened Degrees of Negligence
        272k273 k. Gross negligence. Most Cited Cases

Louisiana law defines "gross negligence" as

willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence.

**[10] Negligence 272 🗝273**

272 Negligence
    272V Heightened Degrees of Negligence
        272k273 k. Gross negligence. Most Cited Cases

Mere inadvertence or honest mistake does not amount to "gross negligence," under Louisiana law.

**[11] Federal Courts 170B 🗝823**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)4 Discretion of Lower Court
              170Bk823 k. Reception of evidence.
Most Cited Cases

The Court of Appeals reviews a trial court's evidentiary ruling for an abuse of discretion.

**[12] Federal Courts 170B 🗝823**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)4 Discretion of Lower Court
              170Bk823 k. Reception of evidence.
Most Cited Cases

**Federal Courts 170B 🗝895.5**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)6 Harmless Error
              170Bk895.5 k. Evidence in general.
Most Cited Cases

A district court's evidentiary ruling will be affirmed on appeal unless the district court abused its discretion and a substantial right of the complaining party was affected.

**[13] Shipping 354 🗝42(4)**

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

354 Shipping
    354III Charters
      354k42 Seaworthiness and Fitness of Vessel
        354k42(4) k. Duty to care for vessel and keep in repair. Most Cited Cases

Even assuming that indemnity provision in charter agreement between off-shore oil rig owner and owner of vessel chartered by oil rig owner could be invalidated by vessel owner's breach of charter agreement, no breach occurred, under Louisiana and federal maritime law; although the vessel was arguably delivered in an unseaworthy condition, because the bow thruster and the anchor windlass were faulty, vessel owner exercised due diligence to deliver the vessel in a seaworthy condition, as required by agreement, where the vessel was properly inspected, and there was no showing that the vessel displayed any prior problems.

**[14] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
          170Bk776 k. Trial de novo. Most Cited Cases

Under Louisiana and federal maritime law, interpretation of a contractual indemnity provision is a question of law, reviewed de novo.

**[15] Indemnity 208 ☞33(8)**

208 Indemnity
    208II Contractual Indemnity
      208k33 Particular Cases and Issues
        208k33(8) k. Maritime cases. Most Cited Cases

A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous.

**[16] Indemnity 208 ☞33(8)**

208 Indemnity
    208II Contractual Indemnity
      208k33 Particular Cases and Issues
        208k33(8) k. Maritime cases. Most Cited Cases

**Indemnity 208 ☞35**

208 Indemnity
    208II Contractual Indemnity
      208k34 Scope and Extent of Liability
        208k35 k. In general. Most Cited Cases

Under Louisiana and federal maritime law, indemnity provision in charter agreement between oil rig owner and owner of vessel chartered by oil rig owner, pursuant to which employer agreed to fully indemnify vessel owner for claims based on injuries sustained by third parties, was not limited to indemnity for "general damages"; although another provision of the charter agreement restricted the recovery of special or consequential damages, the restriction on damages did not apply to the indemnity provision, but only to liability between the vessel owner and the oil rig owner.

**[17] Insurance 217 ☞2367**

217 Insurance
    217XVII Coverage--Liability Insurance
      217XVII(B) Coverage for Particular Liabilities
        217k2365 Ocean Marine Liabilities
          217k2367 k. Scope of coverage. Most Cited Cases

Under Louisiana and federal maritime law, owner of off-shore oil rig on which employee was injured was not an "additional assured" within meaning of marine liability insurance policies issued to owner of vessel chartered by oil rig owner, for purpose of injury claim asserted by employee; the policies defined "additional assured" as any person to which vessel owner as the insured was obligated by virtue of contract or agreement to include as an additional assured, charter agreement only required vessel owner to procure and maintain insurance designating oil rig owner as additional in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

sured with respect to risks assumed by vessel owner, and oil rig owner, not vessel owner, assumed the risk of injury to oil rig employees, pursuant to indemnity provision in charter agreement, so that vessel owner was not required to designate oil rig owner as additional assured.

**[18] Insurance 217 2914**

217 Insurance
   217XXIII Duty to Defend
     217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases
   Under Louisiana law, in determining whether a liability insurer has a duty to defend, a court looks to the face of the pleadings in the underlying action against the insured.

**[19] Insurance 217 2914**

217 Insurance
   217XXIII Duty to Defend
     217k2912 Determination of Duty
      217k2914 k. Pleadings. Most Cited Cases
   Under Louisiana law, a liability insurer is under a legal duty to defend if, and only if, the lawsuit against insured alleges facts construing a cause of action within the coverage of the policy.

**[20] Insurance 217 2913**

217 Insurance
   217XXIII Duty to Defend
     217k2912 Determination of Duty
      217k2913 k. In general; standard. Most Cited Cases
   (Formerly 217k2911)
   Under Louisiana law, a liability insurer's duty to defend is greater than its duty to provide coverage.

**[21] Federal Courts 170B 868**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)5 Questions of Fact, Verdicts and Findings
       170Bk855 Particular Actions and Proceedings, Verdicts and Findings
        170Bk868 k. Seamen and longshoremen, personal injury actions. Most Cited Cases

**Negligence 272 1713**

272 Negligence
   272XVIII Actions
     272XVIII(D) Questions for Jury and Directed Verdicts
      272k1712 Proximate Cause
       272k1713 k. In general. Most Cited Cases
   Under federal maritime and Louisiana law, the issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review.

**[22] Shipping 354 50**

354 Shipping
   354III Charters
     354k50 k. Expenditures and liabilities incurred. Most Cited Cases
   Under federal maritime and Louisiana law, actions taken by captain of vessel chartered by oil rig owner in breaking the starboard-stern mooring line and moving the vessel away from oil rig, without disconnecting steel hose from oil rig, were not superseding cause of oil rig employee's injuries, which occurred when hose was snapped taut and employee was pinned; captain's actions were not highly extraordinary, since he was unable to disconnect the hose from the rig and he was forced to snap the line in order to prevent the vessel from colliding with the oil rig.

**[23] Negligence 272 1718**

272 Negligence
   272XVIII Actions
     272XVIII(D) Questions for Jury and Directed Verdicts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

272k1715 Defenses and Mitigating Circumstances

272k1718 k. Effect of others' fault; comparative negligence. Most Cited Cases

Apportionment of fault is traditionally a fact question for the jury, under Louisiana law.

**[24] Shipping 354 ⬅50**

354 Shipping
354III Charters
354k50 k. Expenditures and liabilities incurred. Most Cited Cases

Under the Longshore and Harbor Workers' Compensation Act (LHWCA), a vessel charterer who is also the plaintiff's employer owes the plaintiff duties both as an employer and as a charterer. Longshore and Harbor Workers' Compensation Act, § 5(a, b), 33 U.S.C.A. § 905(a, b).

**[25] Shipping 354 ⬅40**

354 Shipping
354III Charters
354k40 k. Time charters. Most Cited Cases

Under federal maritime law, the time-charterer of a vessel is expressly responsible for directing the commercial activity of the vessel, determining the ship's routes, destinations, timing of the mission, and the designation of cargo.

**[26] Shipping 354 ⬅42(1)**

354 Shipping
354III Charters
354k42 Seaworthiness and Fitness of Vessel
354k42(1) k. In general. Most Cited Cases

The owner of a chartered vessel remains responsible during the time of the charter for the seaworthiness of the vessel, dangerous conditions on board, navigational errors by the pilot and negligence by the crew, and a reasonably safe means of access for those boarding or leaving the vessel.

**[27] Shipping 354 ⬅50**

354 Shipping

354III Charters
354k50 k. Expenditures and liabilities incurred. Most Cited Cases

Oil rig owner which chartered vessel was not acting within its role as vessel charterer, but as an employer, in its failure to train its employees in how to operate steel hose system connected to vessel, and in its failure to warn oil rig employee about emergency situation on oil rig involving hose, and thus, oil rig owner could not be liable for such conduct in tort, under the Longshore and Harbor Workers' Compensation Act (LHWCA), in employee's action to recover for injuries he sustained when the hose snapped taut and employee was pinned; pursuant to the parties' charter agreement and case law defining a charterer's traditional role, neither oil rig owner's duty to train, nor its duty to warn under such circumstances could be designated as part of oil rig owner's role as charterer. Longshore and Harbor Workers' Compensation Act, § 5(a, b), 33 U.S.C.A. § 905(a, b).

**[28] Shipping 354 ⬅50**

354 Shipping
354III Charters
354k50 k. Expenditures and liabilities incurred. Most Cited Cases

Under federal maritime law, conduct by oil rig owner which chartered vessel in proceeding with gravel-packing operations while vessel was unanchored and failing to notify other vessel that chartered vessel was unanchored were properly characterized as time-charterer negligence, and thus, oil rig employee whose injuries resulted, in part, from such conduct could recover under the Longshore and Harbor Workers' Compensation Act (LHWCA), in personal injury action; the conduct implicated a time-charterer's traditional responsibilities, namely directing the commercial activities of the vessel. Longshore and Harbor Workers' Compensation Act, § 5(a, b), 33 U.S.C.A. § 905(a, b).

**[29] Indemnity 208 ⬅37**

208 Indemnity

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

208II Contractual Indemnity
    208k34 Scope and Extent of Liability
        208k37 k. Attorney fees. Most Cited Cases

Under Louisiana and federal maritime law, vessel owner was not entitled to recover attorney fees it incurred in establishing its right to indemnity against vessel charterer, where indemnity provision in charter agreement did not specifically provide for recovery of such attorney fees.

**[30] Admiralty 16 ☞117**

16 Admiralty
    16XII Appeal
        16k117 k. Amendments, new pleadings and proofs, and trial of cause anew. Most Cited Cases

**Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
           170Bk776 k. Trial de novo. Most Cited Cases

Under federal maritime and Louisiana law, whether indemnity provision in a charter agreement permits recovery of attorney fees is a question of contractual interpretation, reviewed de novo..

**[31] Indemnity 208 ☞37**

208 Indemnity
    208II Contractual Indemnity
        208k34 Scope and Extent of Liability
        208k37 k. Attorney fees. Most Cited Cases

Under federal maritime and Louisiana law, although a general indemnity provision typically includes recovery of attorney fees incurred in defending against a claim covered by the indemnity provision, the indemnitee enjoys no right to recover its legal fees incurred in establishing its right to indemnification.

*363 Cliffe E. Laborde, III (argued), James D'Arensbourg Hollier, Laborde & Neuner, Lafayette, LA, for Defendants-Appellees.

Edwin G. Preis, Jr., Jennifer Elmer Michel (argued), Preis & Roy, Lafayette, LA, for Defendants-Appellants.

James Parkerson Roy, Jamie D. Parker, Domengeaux, Wright, Roy & Edwards, Lafayette, LA, for Becker.

Appeals from the United States District Court for the Western District of Louisiana.

Before JONES, Chief Judge, and WIENER, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

The panel opinion issued August 28, 2009, is withdrawn and the following opinion is substituted in its place.

This is an appeal from a trial stemming from injuries sustained by Plaintiff-Appellant Seth Becker ("Seth") while he was aboard an oil rig in the Gulf of Mexico. After a bench trial, the district court held Defendant-Appellant Baker [FN1] 55% liable for Seth's injuries and Defendant-Appellee Tidewater [FN2] 45% liable for Seth's injuries. The court also held that Baker was obligated to fully indemnify Tidewater for any liability for its negligence resulting in an injury to Seth. Baker appeals the district court's denials of summary judgment as well as the court's final judgment on issues of apportionment of fault and indemnity. Seth also appeals the district court's apportionment of fault and its findings concerning gross negligence. Based on the following analysis, we affirm in part and reverse in part the judgment of the district court and remand for proceedings consistent with this opinion.

    FN1. "Baker" refers collectively to Baker Hughes, Inc. and Baker Oil Tools, Inc., a division of Baker Hughes Oilfield Opera-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

tions, Inc.

FN2. "Tidewater" refers collectively to Tidewater Inc., Tidewater Marine, LLC, Twenty Grand Offshore, Inc., Pental Insurance Company, and Certain Underwriters at Lloyds, Subscribing Risk No. LEO 106200.

I.

A.

Seth was injured while working as a summer intern for Baker as part of the crew of the M/V RE-PUBLIC TIDE (the "REPUBLIC TIDE"), a boat outfitted for well-stimulation services, in June 1999. Baker was using the REPUBLIC TIDE pursuant to a time-charter contract with the boat's owner, Tidewater.

The injury occurred while the REPUBLIC TIDE's crew was performing well-stimulation services on the R&B FALCON/CLIFFS RIG 153 (the "rig"), an oil rig owned by Cliffs Drilling and operated by R&B Falcon (collectively, "Falcon") in the Gulf of Mexico. The job required the REPUBLIC TIDE's crew to unspool a coiled steel hose from the boat's stern, extend it to the rig, and attach it to the rig's wellhead. While the steel hose was extended, the REPUBLIC TIDE's movements caused the hose to whip across the rig's deck. To help keep the hose in place, Baker's employees ran it through a Baker-designed, Baker-constructed apparatus called the "blue shoe." The REPUBLIC *364 TIDE's captains, Captain Givens and Captain Lachney, employees of Tidewater, also sought to keep the hose in place by minimizing the REPUBLIC TIDE's movements relative to the rig. Crew members tied off the boat's stern to the rig with two lines (one starboard and one port), and the captains used the boat's bow thruster to maintain position against the Gulf of Mexico's current. The crew kept the RE-PUBLIC TIDE's anchor raised because the anchor windlass had a hydraulic oil leak which was discovered by Tidewater when it pulled up to the rig on the day of the incident.

While Seth was aboard the rig, the REPUBLIC TIDE's bow thruster failed. This failure created an emergency because, without the thruster, the RE-PUBLIC TIDE could not maintain its bow's position against the current. The REPUBLIC TIDE's captain on duty, Captain Lachney, contacted the rig and reported that the thruster had failed. Moments later, the current caused the port-stern mooring line to break. The REPUBLIC TIDE, still connected by the starboard-stern mooring line and the (slack) steel hose, and still being pushed starboard, would collide with the oil rig without intervention.

Captain Lachney instructed Baker crew members aboard the boat to disconnect the steel hose from the reel assembly that attached the hose to the boat. The reel assembly contained a quick-release mechanism. The reel malfunctioned due to modifications made to the system and began to lock up. The quick disconnect button did not release the hose and the employees were unable to move the reel manually. Consequently, the crew was unable to disconnect the hose.

Captain Lachney again contacted the rig. He reported that the hose would need to be disconnected from the rig's wellhead, and Baker's supervisor aboard the rig received this message. The supervisor ordered three Baker employees, including Seth, to the rig's deck to disconnect the hose.

Meanwhile, the Gulf's current continued to push the REPUBLIC TIDE toward the rig. Captain Lachney, fearing impact with the rig, decided to break the starboard-stern mooring line. He did not, however, contact the rig before taking this action; Baker's crew members on the rig's deck were unaware that the steel hose was about to be pulled taut. Captain Lachney powered the boat's engines and pulled away from the rig.

Seth was standing in the bend of the steel hose when the REPUBLIC TIDE's movement snapped the hose taut, pinning Seth. The hose cut through Seth's legs, amputating one leg and nearly amputating the other. He lost between eight and nine pints

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

of blood before being evacuated. Doctors later had to amputate the second leg below the knee. Seth, twenty-two years old at the time of the accident, now suffers from severe health problems which will require ongoing treatment, counseling, and medication for the remainder of his life.

### B.

Seth sued Baker, Tidewater, and Falcon under the Jones Act, the Longshore and Harbor Workers Compensation Act ("LHWCA"), and general maritime law. A jury trial was held in July 2001, concluding in a verdict finding Seth to be a Jones Act seaman and awarding him damage. The jury apportioned fault among the defendants, assigning each a percentage. On appeal, this court reversed the jury's finding and held Seth to be a longshoreman, set aside liability and damage findings, and remanded the case to the district court for **\*365** further proceedings under the LHWCA. *Becker v. Tidewater, Inc.,* 335 F.3d 376 (5th Cir.2003) (" *Becker I*").

On remand, the district court granted Seth leave to amend his complaint to request a bench trial for his remaining claims under Federal Rule of Civil Procedure 9(h). Baker filed an interlocutory appeal challenging the district court's decision to hold a bench trial rather than a jury trial, which was accepted by this court. On appeal, the district court's ruling was affirmed, and the case was remanded a second time for a bench trial. *Becker v. Tidewater, Inc.,* 405 F.3d 257 (5th Cir.2005) (" *Becker II*").

[1] A limited second trial was held by the district court as an admiralty action, without a jury, pursuant to Federal Rule of Civil Procedure 9(h). Before the trial on remand, Baker and Seth entered into a Mary Carter agreement.[FN3] Baker gave Seth $23.5 million dollars in exchange for an agreement to share any net recovery he may have against Tidewater on the basis of 75% to Baker and 25% to Seth. The district court denied all of Baker's motions for summary judgment that attempted to invalidate the reciprocal indemnity agreement. The court ultimately awarded Seth almost $37 million

damages against Baker and Tidewater under the LHWCA. The court held that Baker, as time-charterer of the boat, was 55% liable for Seth's injuries and Tidewater, as owner of the boat, was 45% liable. Falcon was held free from fault and liability. The court held that under the reciprocal indemnity agreement in the contract between Baker and Tidewater, Baker was obligated to fully indemnify Tidewater for any liability for Seth's injuries. Baker and Seth timely appealed the judgment of the district court.

> FN3. A Mary Carter agreement is a contract "between the plaintiff and one of several defendants whereby the contracting defendant will settle with the plaintiff before trial, but must remain in the suit, and will be reimbursed to some specific degree from the plaintiff's recovery from the other defendants." *McDaniel v. Anheuser-Busch, Inc.,* 987 F.2d 298, 309 n. 49 (5th Cir.1993).

### II.

[2][3][4][5][6] "The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo.*" *In re Mid-South Towing Co.,* 418 F.3d 526, 531 (5th Cir.2005); *see also Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.,* 346 F.3d 530, 533 (5th Cir.2003). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Bd. of Trs. New Orleans Employers Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.,* 529 F.3d 506, 509 (5th Cir.2008); *Otto,* 346 F.3d at 533 ("Under a clear error standard, this court will reverse only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made." (citations omitted)). This court reviews the district court's denial of summary judgment de novo. *Diamond Offshore Co. v. A&B Builders, Inc.,* 302 F.3d 531, 540 (5th Cir.2002).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

FN4

    FN4. This court normally declines to review a "district court's denial of motions for summary judgment when the case comes to us on the movant's appeal following adverse judgment after full trial on the merits." *Black v. J.I. Case Co., Inc.,* 22 F.3d 568, 572 (5th Cir.1994). Although the rule does not appear to have been explicitly stated in this circuit, other circuits have held that a denial of summary judgment is appealable after a trial on the merits when there was a ruling by the district court on an issue of law. *See Banuelos v. Constr. Laborers' Trust Funds for S. Cal.,* 382 F.3d 897, 902 (9th Cir.2004). In addition, because Rule 50 motions are not required to be made following a bench trial, it is appropriate to review the court's denial of summary judgment in this context. *See Colonial Penn Ins. v. Mkt. Planners Ins. Agency Inc.,* 157 F.3d 1032, 1037 n. 3 (5th Cir.1998) ("In a jury trial, of course, a party must make (and renew at the trial's conclusion) a Rule 50(a) motion for judgment as a matter of law in order to preserve sufficiency of the evidence for appellate review. But nothing indicates that a similar rule applies to an appeal of the sufficiency of evidence to support findings or sufficiency of findings to support a judgment following a bench trial." (citations omitted)). Because Baker appeals the district court's legal conclusions in denying summary judgment, and the case was a bench trial, review of the denials of summary judgment is appropriate.

**\*366** III.

    The time-charter maritime contract entered into by Tidewater and Baker contained reciprocal indemnity provisions, with Tidewater being responsible for injuries to Tidewater employees, and Baker being responsible for injuries to Baker employees.

    On appeal, Baker presents a number of arguments asserting that the district court erred in holding that Baker was obligated to indemnify Tidewater fully for any liability for Seth's injuries under this agreement. Based on the following analyses, we hold that the district court did not err in holding that the reciprocal indemnity agreement between Baker and Tidewater obligates Baker to indemnify Tidewater fully for Seth's injuries.

A.

    [7] First, Baker appeals the district court's ruling that the reciprocal indemnity agreement entered into by Baker and Tidewater was valid under § 905 of the LHWCA. 33 U.S.C. § 905(b). Section 905(b) of the LHWCA provides that agreements for an employer to indemnify a vessel from injuries to a longshoreman are void. *Id.* However, reciprocal-indemnity agreements between employer and vessel are not void when a longshoreman is entitled to LHWCA relief by virtue of the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1333(b); 33 U.S.C. § 905(c). The question is whether Seth, who was a longshoreman at the time of the incident,[FN5] is covered by § 1333(b) of OCSLA. Baker argues that Seth is not covered because he does not satisfy the "situs" test and is thus not covered under § 1333(b). We find this argument unavailing.

    FN5. *Becker I,* 335 F.3d at 393.

    "Section 1333(b) of OCSLA extends the LHWCA's benefits to employees disabled or killed 'as the result of operations conducted on the outer Continental Shelf for the purposes of exploring for ... [or] developing ... the natural resources ... of the subsoil and seabed of the outer Continental Shelf.' " *Mills v. Director,* 877 F.2d 356, 357-58 (5th Cir.1989) (en banc) (quoting 43 U.S.C. § 1333(b)). Under this subsection, with two exceptions, all employees suffering injury or death on the outer continental shelf are covered by the LHWCA if they are engaged in exploring for or developing natural resources. The only exceptions, not applicable here, are for masters or members of a crew of a vessel or employees of the United States. 43 U.S.C. §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

1333(b)(1). The only status requirement is that the worker be engaged in exploration or production of minerals, and the only situs requirement is that the worker be injured on the outer continental shelf. *See Mills,* 877 F.2d at 362. Because Seth was engaged in mineral exploration, was a non-seaman, and was injured on the outer continental shelf while employed by an employer engaged in mineral production, he is covered under the **\*367** LHWCA. FN6

> FN6. Although we are persuaded that the above analysis is the correct approach in determining whether a worker injured on the outer continental shelf is covered by the LHWCA, we recognize that some of our cases have suggested that more is required to satisfy the situs requirement. *See, e.g., Demette v. Falcon Drilling Co.,* 280 F.3d 492, 498-500 (5th Cir.2002). Even if we follow this approach, since Seth was injured on a jack-up oil rig on the OCS, he satisfies the *Demette* situs test.

## B.

[8] Baker and Seth also contend that the indemnity provision is invalid because they allege that Tidewater committed gross negligence. It is undisputed that Baker escapes indemnity if Tidewater's actions leading to Seth's injuries were grossly negligent. *See Houston Exploration Co. v. Halliburton Energy Servs., Inc.,* 269 F.3d 528, 531 (5th Cir.2001) (noting that a waiver of liability for gross negligence is void). The district court found that Tidewater's actions were negligent but not grossly negligent.

[9][10] "A finding that a party is negligent or grossly negligent is a finding of fact and must stand unless clearly erroneous. A finding of fact is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (footnote omitted). This court has defined gross negligence as "willful, wanton and reckless conduct that falls

between intent to do wrong and ordinary negligence." *Id.* (interpreting Louisiana law). "Mere inadvertence or honest mistake does not amount to gross negligence." *Id.; see also Todd Shipyards Corp. v. Turbine Serv., Inc.* 674 F.2d 401, 411 (5th Cir.1982) ("Gross negligence, which will invalidate an exemption from liability has been defined as harm willfully inflicted or caused by gross or wanton negligence." (citation omitted)).

Baker and Seth argue that Tidewater's actions, considered as a whole, were grossly negligent. The district court found that Tidewater's "most egregious" conduct was moving the REPUBLIC TIDE without warning. Baker and Seth characterize this failure to warn as gross negligence because Tidewater's captain requested crew aboard the rig to disconnect the steel hose and knew that moving the REPUBLIC TIDE would cause the hose to move across the rig's deck. Based on the record, the failure to warn was mere inadvertence and not gross negligence. The situation was an emergency, and the captain needed to act quickly. He moved the REPUBLIC TIDE, but only to avoid a collision with the rig. The captain's actions thus reflect a concern for safety, rather than a reckless disregard for safety.

[11][12] Baker and Seth also contend that Tidewater was grossly negligent in failing to warn the rig's crew that the REPUBLIC TIDE would be unanchored, but the record reflects that Baker employees were aware the anchor was raised and, in any event, proceeding with such a job while unanchored was not unusual. Baker and Seth contend that Tidewater knew the bow thruster was faulty when Tidewater decided to rely on it instead of the REPUBLIC TIDE's anchor, but: (1) three Tidewater employees and three Baker employees testified that the REPUBLIC TIDE experienced no bow-thruster problems prior to the accident; (2) one individual testified that a Tidewater employee communicated with the rig about a bow-thruster problem but reported that the problem had been resolved; and (3) the testimony is unclear as to whether the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

problem mentioned was recent or occurred **\*368** before the bow thruster had been replaced six months earlier. The district court did not commit clear error in finding that Tidewater was not grossly negligent; there is substantial evidence to support the holding that Tidewater was merely negligent, and not grossly negligent, under the circumstances presented.[FN7]

> FN7. Baker also challenges the district court's refusal to allow Baker certain additional discovery to bolster its claim of gross negligence on remand from *Becker I.* We review a trial court's evidentiary ruling for an abuse of discretion. *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 265 (5th Cir.2007). "If we find that an abuse of discretion has occurred, we then apply the harmless error doctrine. Thus, the evidentiary ruling will be affirmed unless the district court abused its discretion and a substantial right of the complaining party was affected." *Id.* The district court's discovery ruling distinguished between witnesses whom Baker could have deposed before the original trial and witnesses whom it could not have-the ruling permitted Baker to depose the latter. It also permitted Baker to supplement the deposition of a witness it already had deposed. Allowing this discovery, while forbidding Baker to retain experts or to depose witnesses whom it could have deposed before the original trial but apparently chose not to, was not an abuse of discretion.

### C.

[13] Baker contends that because Tidewater breached the time-charter contract, the indemnity provision contained therein was rendered void.[FN8] Baker cites *Marquette Transportation Co. v. Louisiana Machinery Co.,* 367 F.3d 398 (5th Cir.2004), for the proposition that a breach of a contract containing an indemnity agreement serves to invalidate the indemnity agreement. However the

court in *Marquette,* after finding that the indemnity agreement at issue was enforceable, states only that if the party "had been found to be in breach of those warranties, perhaps our application of the indemnity clause would be different." 367 F.3d. at 408. *Marquette* does not hold that breach of a contract necessitates invalidation of an indemnity agreement included therein. Even if the indemnity agreement could be invalidated by Tidewater's breach of the time-charter contract, the district court did not err in holding that Tidewater did not breach the contract. The time-charter contract required Tidewater to deliver to Baker a boat that was:

> FN8. Tidewater contends that Baker has waived this argument, among others, because it was outside the mandate issued by this court in *Becker I. See Gen. Universal Sys., Inc. v. HAL, Inc.,* 500 F.3d 444, 453 (5th Cir.2007). We need not address this issue because all of the arguments that Tidewater contends are barred by the mandate rule are rejected on the merits in the instant opinion.

properly equipped and in every respect seaworthy and in good running order and in every way fit and ready for [Baker's] use and for the employment intended, so far as the exercise of due diligence can make her; and [Tidewater] undertakes to so maintain the vessel during the period of service under this Charter.

Baker contends that Tidewater breached this provision by delivering the REPUBLIC TIDE in an unseaworthy condition. Whether Tidewater exercised due diligence in delivering and maintaining the REPUBLIC TIDE in seaworthy condition is a question of fact reviewed for clear error. *Stevens v. East-West Towing Co.,* 649 F.2d 1104, 1106 (5th Cir. Unit A July 1981). Baker contends that the vessel was unseaworthy because the bow thruster and anchor windlass were faulty. The district court found that Tidewater exercised due diligence to deliver and to maintain the REPUBLIC TIDE in sea-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

worthy condition. There was conflicting testimony concerning whether Tidewater knew of any bow-thruster problem, and several Tidewater *369 employees testified that the REPUBLIC TIDE had never experienced any previous issues with the bow-thruster. Although Tidewater did not have evidence of September or March inspections of its anchor mechanism as its procedures required, they had inspected the anchor in May before the June 1999 incident according to testimony of Tidewater's engineer. The record contains substantial evidence that Tidewater did not know the bow thruster or anchor were faulty, and therefore, even if Tidewater's breach could invalidate the indemnity agreement, the district court did not clearly err in holding that Tidewater did not commit a breach of contract.

### D.

[14][15] Baker also argues that even if the indemnity provision is upheld, it only obligates Baker to indemnify Tidewater for "general damages." The interpretation of a contractual indemnity provision is a question of law, reviewed de novo. *Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 956 (5th Cir.1984) (per curiam). "A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Id.* at 955 (citing *Lirette v. Popich Bros. Water Transp., Inc.,* 699 F.2d 725, 728 (5th Cir.1983)).

[16] Article XIV of the time-charter contract contains three paragraphs. In the first paragraph, Tidewater agrees to defend and indemnify Baker "from and against all claims, suits, losses, liabilities, expenses, demands, costs (including reasonable attorneys' fees) and/or damages as a result of ... injury, illness, or death" of Tidewater's employees. In the second paragraph, Baker reciprocates the promise contained in the first paragraph. The relevant portion of the third paragraph reads:

Notwithstanding anything to the contrary contained herein, it is expressly agreed by and between the parties hereto that, regardless of the negligence on the part of any party hereto or the unseaworthiness of any vessel, neither such party shall be liable to the other for any punitive, indirect, incidental, special or consequential damages of any kind or nature (including, but not limited to, loss of profits, loss of use, loss of hire, and loss of production); and each party hereby agrees to waive its rights of recourse in this regard against the other party.

Baker argues that this paragraph of the time-charter contract restricts the preceding indemnity provision to general damages only, which they contend encompasses only physical pain/suffering and mental anguish/suffering damages and excludes damages which Baker characterizes as "special damages"-past and future medical expenses, past lost wages, and impairment of earning capacity.

There is nothing in the third paragraph to suggest that it is a restriction on the indemnity provisions in the preceding paragraphs. It references only liability between the parties to the agreement (Tidewater and Baker), and does not reference indemnity or liability to third parties or employees. The types of damages referenced in this paragraph are those traditionally associated with contractual claims, and not the personal injury claims which are the subject of the indemnification provision. *See Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.,* 414 F.3d 546, 549 (5th Cir.2005) ("Special damages are those that result from a party's breach of contract but are not reasonably foreseeable"); *Tex. A&M Research Found. v. Magna Transp., Inc.,* 338 F.3d 394, 404 (5th Cir.2003) ("[C]onsequential, or 'special,' damages ... are those unusual or indirect costs that, *370 although caused by the defendant's conduct in a literal sense, are beyond what one would reasonably expect to be the ordinary consequences of a breach."). The illustrative parenthetical following the description of excepted damages-"(including, but not limited to, loss of profits, loss of use, loss of hire, and loss of production)"-also supports this interpretation. Baker's proffered interpretation of the term "special damages" does not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

fall within the plain meaning of the term, especially when read in context with the rest of the paragraph at issue. Therefore, the district court did not err inn holding that the third paragraph of Article XIV of the time-charter contract does not restrict the scope of the indemnity provision.

E.

[17] Baker contends that Tidewater must exhaust its liability insurance policies before turning to Baker for indemnity. The district court held that because Baker was only an "additional assured" under the policies for risks assumed by Tidewater, there was no coverage for Seth's injuries because those risks were assumed by Baker pursuant to the indemnity agreement.

Under Article XI of the time-charter contract, Tidewater must procure and maintain a $2,000,000 Protection and Indemnity ("P&I") insurance policy covering Tidewater's liabilities, "including Collision/Towers/Liability and crew coverage, but excluding Cargo Liability coverage and coverage for those risks, if any, assumed or insured by CHARTERER [Baker] in this Charter." Article XI further specifies that the policy "shall include CHARTERER, in its capacity as time-charterer of the vessel, as an additional assured, but only with respect to the risks assumed by OWNER [Tidewater] in this Charter."

Tidewater procured and maintained a $5,000,000 primary marine-liability policy. Under this policy, "the unqualified word 'Assured' includes ... any person, organization, trustee or estate to whom or to which the 'Named Assured' [Tidewater] is obligated by virtue of a contract or agreement to include or name as an assured, co-assured or additional assured." Tidewater also procured and maintained an excess marine-liability policy designating Tidewater as a named assured but not designating Baker as an additional assured.

Baker cites a series of Fifth Circuit cases that have held that, in certain circumstances, when a contract contains a reciprocal-indemnity clause and

requires the indemnitee to maintain an insurance policy designating the indemnitor as an "additional assured," the indemnitee must exhaust its insurance coverage before receiving indemnity. *See, e.g., Tullier v. Halliburton Geophysical Servs., Inc.* 81 F.3d 552 (5th Cir.1996); *Klepac v. Champlin Petroleum Co.,* 842 F.2d 746 (5th Cir.1988); *Ogea v. Loffland Bros. Co.,* 622 F.2d 186 (5th Cir.1980). The primary question posed here is whether Baker is an "additional assured" under Tidewater's insurance policy for Seth's claims. In order to determine if Baker is an "additional assured," we must read the insurance and indemnity provisions of the time-charter contract in conjunction in order to properly interpret the meaning of the contract. *See Ogea,* 622 F.2d at 190.

Baker contends that it is an "additional assured" because Tidewater must procure and maintain insurance designating Baker as an "additional assured." Tidewater argues that, under Article XI's plain language, Tidewater's duty is more limited: it must procure and maintain insurance designating Baker as an "additional assured, but only with respect to the risks assumed by OWNER [Tidewater] in this Charter." Tidewater thus argues that because Baker-not Tidewater-assumed the risk of **\*371** injury to Baker employees, the contract does not require Baker to be designated as an "additional assured" for coverage over Seth's injuries. Tidewater also argues that the language in its insurance policies demonstrates that Baker is not covered for Seth's claim because the policy specifically limits Baker's "additional assured" coverage to risks assumed by Tidewater under the time-charter.

Baker contends that this issue is addressed in *Klepac,* which held that an indemnitor's obligation does not begin to run until the indemnitee's insurance policy, naming the indemnitor as the additional assured, is exhausted. *Klepac,* 842 F.2d at 747-48. However, the contract in *Klepac* did not limit additional assured coverage to only risks assumed by the indemnitee, as the time-charter does here. *Id.* The *Klepac* contract stated that the insur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

ance coverage "shall include" coverage for which the insured indemnitee was reciprocally obligated to indemnify the indemnitor. The court extended the obligation to cover damages for which the indemnitor was obligated to cover the insured indemnitee. *Id.* at 748. Here, however, the time-charter contract specifically *excludes* from coverage risks assumed by Baker. Thus, *Klepac* does not present the exact situation at issue here.

Although there is no case which presents a contract with the precise limiting language at issue here, Article XI of the time-charter contract expressly limits Tidewater's obligation to designate Baker as an "additional assured" to "the risks assumed by OWNER [Tidewater] in this Charter." Tidewater's insurance policy, in turn, limits Baker's status as an "additional assured" to when Tidewater "is obligated by virtue of a contract or agreement" to designate Baker as an "additional assured." Furthermore, the time-charter specifically excludes risks assumed by Baker from Tidewater's insurance coverage. Here, the injury was to Seth, a Baker employee. Under the parties' reciprocal-indemnity agreement, Baker, not Tidewater, assumed the risk of injury to Baker employees. Because Tidewater did not assume the risk of injury to Seth, Baker is not an "additional assured" to Tidewater's insurance for Seth's injuries. Thus, the district court did not err in holding that the insurance policies need not be exhausted before Baker's indemnification obligation began.

[18][19][20] Baker also argues that Tidewater's insurers, under the policies discussed in the foregoing analysis, were obligated to defend Baker against the claims made by Seth against Baker.[FN9] In determining whether an insurer had a duty to defend, we look to the face of the pleadings. *Snug Harbor, Ltd. v. Zurich Ins.,* 968 F.2d 538, 545-46 (5th Cir.1992). "The insurer is under a legal duty to defend if, and only if, the petition alleges facts construing a cause of action within the coverage of the policy." *Id.* (citation omitted). An insurer's duty to defend is greater than its duty to provide coverage.

*Landry v. Oceanic Contractors, Inc.,* 731 F.2d 299, 305 n. 2 (5th Cir.1984).

FN9. It appears that the district court never ruled explicitly on the issue of whether Tidewater's insurers were obligated to defend Baker in Seth's suit. However, this court has held that "[i]f a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence." *Century Marine Inc. v. United States,* 153 F.3d 225, 231 (5th Cir.1998). The record supports the district court's rejection of the notion that Tidewater's insurers were obligated to defend Baker because it did not qualify as an additional assured under the policy.

**\*372** Because the pleadings stated only a claim by one of Baker's employees, a risk expressly assumed by Baker in the time-charter contract, there was no cause of action plausibly within the coverage of the policy. Because Baker could be entitled to a defense under the policy only for covered risks assumed by Tidewater (i.e., suits brought by Tidewater employees against Baker), Tidewater's insurer was not obligated to defend Baker in this suit.

IV.

A.

[21] Appellants also present arguments concerning the liability attributed to Baker and Tidewater, respectively. Seth argues that Tidewater's conduct in breaking the REPUBLIC TIDE's starboard-stern mooring line without warning was a superseding cause of Seth's injuries, and thus Tidewater should be entirely liable. "The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review." *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 840-41, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

The district court concluded that Tidewater's conduct was part of a series of actions that caused Seth's injuries and held that "no one party was solely responsible for the dangerous conditions that resulted in the grave harm that befell Seth Becker."

In order to determine what constitutes a superseding cause, this court has stated that:

The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner *does not* make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

*Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 652 (5th Cir.1992) (quoting *Nunley v. M/V DAUNTLESS COLOCOTRONIS,* 727 F.2d 455, 464-65 (5th Cir.1984) (en banc) (citing Restatement (Second) of Torts § 447)).

[22] The district court found that Tidewater's captain snapped the starboard-stern mooring line to prevent impact with the rig. The captain's failure to warn anyone aboard the rig that he was about to do this was negligent. However, the captain's actions are excused from being a superceding cause of Seth's injury. The captain's actions were not highly extraordinary considering the whole of the circumstances. Because of the defective Coflex hose and blue shoe system, the captain could not disconnect the hose from the rig and was thus forced to snap the line to prevent impact with the rig. The cap-

tain's actions were not "so extraordinary that a reasonably prudent person could not have foreseen [their] occurrence." *Tidewater Marine, Inc. v. Sanco Int'l., Inc.,* 113 F.Supp.2d 987, 999 (E.D.La.2000). The district court did not clearly err in determining that Tidewater was not the superseding cause of the incident.

B.

[23] Baker and Seth also argue that the district court erred in determining that **\*373** most of Baker's negligent acts were committed while Baker was acting within its role as time-charterer of the boat, and not as Seth's employer. The court's determination that Baker's acts fell within its duty as time-charterer is reviewed de novo.[FN10] *Cf. Canal Barge Co., Inc. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir.2000) (holding that whether a legal duty is owed is a question of law).

FN10. Although apportionment of fault is traditionally a fact question, *Flowers Transp., Inc. v. M/V Peanut Hollinger,* 664 F.2d 112, 113 (5th Cir.1981), the district court's characterization of Baker's actions as those of time-charterer versus employer is a question of law because it concerns the duties owed as time-charterer under existing precedent and the language of the contract.

[24] Section 905(a) of the LHWCA precludes an employee from suing his employer in tort. 33 U.S.C. § 905(a). Consequently, Baker cannot be held liable to Seth in its capacity as his employer. It can, however, be held liable under section 905(b) if at fault in its capacity as the time-charterer of the REPUBLIC TIDE. *Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc.,* 830 F.2d 1332, 1339 (5th Cir.1987). Section 905(b) of the LHWCA provides the exclusive remedy for a longshoreman against a vessel. The *Kerr-McGee* court stated that a time-charterer can be liable under section 905(b) if the harm caused is "within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

charter agreement." 830 F.2d. at 1343. A defendant time-charterer who is also the plaintiff's employer owes the plaintiff duties both as an employer and as a time-charterer. *Moore v. Phillips Petroleum Co.,* 912 F.2d 789, 791 (5th Cir.1990). The two duties are separately owed and do not affect each other. *Id.*

[25][26] Under the traditional role of time-charterer, the time-charterer is expressly responsible for directing the commercial activity of the vessel, determining the ship's routes, destinations, timing of the mission, and the designation of cargo. *Kerr-McGee,* 830 F.2d at 1339. The vessel owner, on the other hand, remains responsible for the seaworthiness of the vessel, dangerous conditions on board, navigational errors by the pilot and negligence by the crew, and a reasonably safe means of access for those boarding or leaving the vessel. *Moore,* 912 F.2d at 792. Here, as noted by the district court, the time-charter contract shifted additional responsibilities to Baker as time-charterer:

In this case, the Charter Agreement also shifted other responsibilities to Baker. ... Baker was responsible for and retained control over the equipment it installed on the vessel. The equipment was installed to assist Baker's performance of specialized services on oil and gas wells. As such, the Coflex hose, Coflex hose reel assembly, blue shoe and pumping operations associated with this equipment were within Baker's exclusive control under the Charter.

*Becker v. Tidewater, Inc.,* No. 99-1198, 2007 WL 3231655, *7 (W.D.La. Nov. 14, 2007).

[27] The district court identified several causes of Seth's harm. It labeled the following causes as being within Baker's role as time-charterer: (1) proceeding with gravel-packing operations while unanchored; (2) failing to notify Falcon, the owner and operator of the oil rig, that the REPUBLIC TIDE was unanchored; (3) negligently modifying the Coflex hose system; (4) failing to test, clean, or properly maintain the Coflex hose system; (5) fail-

ing to properly train Baker employees how to operate the Coflex hose system; (6) **\*374** failing to warn Seth of the gravity of the unfolding situation on the oil rig and the dangers of the Coflex hose and blue shoe system; (7) negligently designing the blue shoe; and (8) failing to test the blue shoe.

[28] The district court erred in determining that some of the Baker's acts were committed in its role as time-charterer rather than employer. Proceeding with gravel-packing operations while unanchored was correctly characterized as time-charterer negligence. *See Kerr-McGee,* 830 F.2d at 1341 ("The time-charterer directs where and when the vessel will travel, so if it forces it out in hurricane weather or similarly treacherous conditions, it may be liable under section 5(b)."). Directing the REPUBLIC TIDE to remain in position, while unanchored, for the duration of the gravel-packing job and failing to notify Falcon that the REPUBLIC TIDE was unanchored are also part of the time-charterer's traditional responsibilities, namely "directing the commercial activities of the vessel."

Negligently modifying the Coflex hose system; failing to test, clean, or properly maintain the Coflex hose system; negligently designing the blue shoe; and failing to test the blue shoe were all time-charterer negligence under the time-charter contract. The court in *Kerr-McGee* specified that a time-charterer is also liable when a responsibility "has been transferred [to the time-charterer] by the clear language of the charter agreement" 830 F.2d at 1343. Here, Article VIII of the time-charter contract specified that Baker could install equipment on the REPUBLIC TIDE and that "[a]ll equipment installed by [Baker] shall remain its property ...." Baker thus retained legal control and responsibility and, as the district court found, actual control of its equipment aboard the REPUBLIC TIDE. These were time-charterer responsibilities allocated to Baker specifically by the time-charter contract. Baker's negligence causing the equipment's failure was time-charterer negligence.

However, failing to properly train Baker em-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

ployees how to operate the Coflex hose system and failing to warn Seth of the dangers of the Coflex hose and blue shoe system should not have been characterized by the district court as time-charterer negligence. *See Kerr-McGee,* 830 F.2d at 1342 (holding that providing a safe place to work is a duty imposed on a defendant in its capacity as employer and not time-charterer). Nothing in the case law defining a time-charterer's traditional responsibilities or in the time-charter contract leads to the conclusion that training and warning its employees is encompassed by Baker's role as time-charterer. These actions were taken by Baker in its role as employer. Because the district court should not have held that Baker's failure to train its employees and its failure to warn Seth of the gravity of the situation were time-charterer negligence, it should not have considered these actions when apportioning LHWCA liability between Baker and Tidewater. We remand this matter to the district court for the purpose of re-evaluating the apportionment of fault while considering only those acts of negligence that Baker committed as time-charterer in accordance with this opinion.[FN11]

> FN11. We acknowledge that, as a practical matter, the fault allocation between Baker and Tidewater does not affect Baker's ultimate liability, because Baker must indemnify Tidewater for all of Seth's damages under the reciprocal indemnity agreement. However, because the plaintiff is a party to this appeal, correct apportionment may be necessary in order to determine Seth's rights against each defendant, without regard to the contractual indemnity agreement between them. *See Jamison v. Ellwood Consol. Water Co.,* 420 F.2d 787, 789 (3d Cir.1970) ("[A] valid indemnity provision in no way affects the victim's right of recovery. Rather, it merely determines who among the parties to the contract shall bear the ultimate cost of the victim's claim."). Although Seth's actual recovery from the parties may be affected by the

Mary Carter agreement he entered into with Baker, we have not been presented with any arguments from the parties concerning the effect of the agreement on apportionment and we do not address the issue herein.

**\*375** V.

[29][30] Finally, Baker appeals the district court's holding that the indemnity provision permits Tidewater to recover the attorneys' fees that it incurred in establishing its right to indemnity. This is a question of contractual interpretation, reviewed de novo. *Dow Chem. Co. v. M/V ROBERTA TABOR,* 815 F.2d 1037, 1042 (5th Cir.1987).

[31] Although a general indemnity provision typically includes recovery of attorneys' fees incurred in defending against a claim covered by the indemnity provision, "the indemnitee enjoys no right to recover its legal fees incurred in establishing its right to indemnification." *Id.* at 1046 (citing *Weathersby,* 752 F.2d at 959). Although there is some authority for the proposition that attorneys' fees incurred in enforcing a contractual right of indemnity may be recoverable if the indemnity provision specifically anticipates their recoverability, the agreement here does not specifically anticipate that attorneys' fees incurred in enforcing the indemnity provision will be recoverable. *See Royal Exch. Assurance Co. v. M/V GULF FLEET NO. 54,* No. 86-1367, 1991 WL 99406, at *2 (E.D.La. May 31, 1991) (unreported) (holding that indemnity provision which provided for reimbursement "for any and all necessary expenses, attorney's fees, and costs incurred in the non-judicial or judicial enforcement of any part of the indemnity agreements" specifically allowed for recovery of fees incurred in enforcing indemnity provision). Here the agreement only provides that "[Baker] shall protect, defend, indemnify and hold harmless [Tidewater] from and against all claims, suits, losses, liabilities, expenses, demands, costs (including reasonable attorney's fees) and/or damages as a result of such illness, injury or death." This provision is a general indem-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

586 F.3d 358, 2010 A.M.C. 945
**(Cite as: 586 F.3d 358)**

nity clause, and does not specifically provide for re-
covery of attorneys' fees in enforcing the indemnity
provision. Thus, the prohibition barring the recov-
ery of legal fees incurred in establishing a right to
indemnification applies to the instant contract. *Dow
Chem.,* 815 F.2d at 1046.

The district court erred in holding that the in-
demnity agreement permits Tidewater to recover
the attorneys' fees that it incurred in establishing its
right to indemnity. This matter is remanded for the
purpose of calculating and awarding Tidewater only
the attorneys' fees that Tidewater incurred in de-
fending against Seth's tort action.

VI.

For the foregoing reasons, the judgment of the
district court is AFFIRMED in part and RE-
VERSED in part, and REMANDED for the limited
purposes of (1) calculating, and awarding Tidewa-
ter, the attorneys' fees that Tidewater incurred in
defending against Seth's tort action and excluding
any fees incurred in enforcing its right to indemnity
and (2) apportioning liability while considering
only those acts of negligence that Baker committed
as time-charterer and not those it committed as em-
ployer.

C.A.5 (La.),2009.
Becker v. Tidewater, Inc.
586 F.3d 358, 2010 A.M.C. 945

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.