Case 2:10-md-02179-CJB-DPC   Document 4477-41   Filed 11/03/11   Page 1 of 78

Westlaw.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

▷

United States Court of Appeals,
Fifth Circuit.
JOSLYN MANUFACTURING CO., Plaintiff-Appel-
lant,
v.
KOPPERS COMPANY, INC. and the Louisiana &
Arkansas Railway Company, Defendants-Appellees.

No. 93-5553.
Dec. 28, 1994.
Rehearing Denied Jan. 25, 1995.

Assignee of real property leases brought action
against, inter alia, lessor and former owner of property,
seeking recovery of response costs and declaration of
future liability under Comprehensive Environmental
Response, Compensation and Liability Act (CERCLA)
and Louisiana Environmental Quality Act (LEQA). The
United States District Court, Western District of Louisi-
ana, Tom Stagg, J., entered judgment against assignee,
and assignee appealed. The Court of Appeals, Duhé,
Circuit Judge, held that: (1) assignee was required to in-
demnify lessor for environmental damage caused by as-
signor prior to assignment, and (2) it was not shown that
disposal occurred during former owner's ownership of
site, as required for imposition of liability under CER-
CLA or LEQA.

Affirmed.

West Headnotes

**[1] Indemnity 208 ⟊33(6)**

208 Indemnity
   208II Contractual Indemnity
      208k33 Particular Cases and Issues
         208k33(6) k. Environmental Law. Most Cited
Cases
      (Formerly 208k8(3))
   Indemnification agreements in property leases were
intended to cover all forms of liability, including liabil-
ity under CERCLA and Louisiana Environmental Qual-

ity Act (LEQA), and were valid methods of apportion-
ing such liability, even though environmental liability
under those statutes was not specifically contemplated
at time of contracting; broad language of indemnifica-
tion agreements evinced strong intent by lessee to in-
demnify lessor for all liability arising in connection
with occupancy or use of land. Comprehensive Environ-
mental Response, Compensation, and Liability Act of
1980, § 107(e)(1), 42 U.S.C.A. § 9607(e)(1); LSA-R.S.
30:2276, subd. I.

**[2] Indemnity 208 ⟊33(3)**

208 Indemnity
   208II Contractual Indemnity
      208k33 Particular Cases and Issues
         208k33(3) k. Lease Agreements; Vehicle
Rental Contracts. Most Cited Cases
      (Formerly 208k8(3))

**Indemnity 208 ⟊33(6)**

208 Indemnity
   208II Contractual Indemnity
      208k33 Particular Cases and Issues
         208k33(6) k. Environmental Law. Most Cited
Cases
      (Formerly 208k8(3))
   Under Louisiana law, indemnity clauses in real
property leases were "personal obligations," rather than
"real obligations," and were "heritable" rather than
"strictly personal," and, as corollary, right of lessor to
be indemnified was also personal and, thus, lessor was
entitled to indemnification in connection with environ-
mental contamination, even though it was no longer
owner of land; there was no indication that identification
agreements were intended to create real obligation
upon land itself, rather than to bind lessee personally,
nor was there indication that performance was intended
to be rendered by specific party, rather than lessor being
indemnified by occupier and user of land. LSA-C.C.
arts. 1764-1766.

**[3] Landlord and Tenant 233 ⟊79(2)**

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

233 Landlord and Tenant
  233IV Terms for Years
    233IV(B) Assignment and Subletting
      233k79 Construction and Operation of Assignments in General
        233k79(2) k. Rights and Liabilities of Assignee. Most Cited Cases

In common-law terms, liability of lease assignee arose from "privity of contract," not "privity of estate," as assumption agreement was delivered to and approved by lessor before assignment took place.

**[4] Landlord and Tenant 233 ⬤➞79(2)**

233 Landlord and Tenant
  233IV Terms for Years
    233IV(B) Assignment and Subletting
      233k79 Construction and Operation of Assignments in General
        233k79(2) k. Rights and Liabilities of Assignee. Most Cited Cases

Assignee of real property lease containing indemnification clauses accepted general assignment of leases, thus agreeing to perform all of assignor's obligations thereunder, and assignee was therefore required to indemnify lessor for environmental damage caused by assignor prior to assignment; there was no language limitation contained in assumption agreement between assignee and lessor, nor was attempt made to limit assumption to prospective obligations.

**[5] Landlord and Tenant 233 ⬤➞79(2)**

233 Landlord and Tenant
  233IV Terms for Years
    233IV(B) Assignment and Subletting
      233k79 Construction and Operation of Assignments in General
        233k79(2) k. Rights and Liabilities of Assignee. Most Cited Cases

**Landlord and Tenant 233 ⬤➞79(3)**

233 Landlord and Tenant
  233IV Terms for Years
    233IV(B) Assignment and Subletting

233k79 Construction and Operation of Assignments in General
  233k79(3) k. Rights and Liabilities of Assignor. Most Cited Cases

Under Louisiana law, written assumption agreement between assignee of real property leases and lessor rendered assignee solidarily liable with assignor for whole performance under lease and, thus, lessor could, at its option, demand performance from either assignee or assignor; while assignee would have right of subrogation against assignor, assignee, not lessor, assumed risk of assignor's insolvency. LSA-C.C. art. 1821.

**[6] Federal Courts 170B ⬤➞611**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
      170BVIII(D)1 Issues and Questions in Lower Court
        170Bk611 k. Necessity of Presentation in General. Most Cited Cases

Court of Appeals generally will not allow parties to raise issues for first time on appeal merely because they believe that they might prevail if given opportunity to try case again on different theory, though appellate court is statutorily afforded some latitude in entering order to achieve justice in circumstances. 28 U.S.C.A. § 2106.

**[7] Novation 278 ⬤➞10**

278 Novation
  278k10 k. Operation and Effect. Most Cited Cases

Duty of assignee of 1942 and 1949 real property leases was not affected by purported novation of 1950 assumption agreement between assignee and lessor and 1955 lease; novation of assumption agreement could not affect validity or effectiveness of assignment from assignor to assignee, which solidarily bound both assignor and assignee under Louisiana law even without assumption agreement.

**[8] Environmental Law 149E ⬤➞445(1)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(1) k. In General. Most Cited Cases

(Formerly 199k25.5(5.5) Health and Environment)

Assignee of real property leases failed to establish that disposal of hazardous substance occurred during former owner's ownership of site, so as to render owner "responsible party" under CERCLA or Louisiana Environmental Quality Act (LEQA); district court was not clearly erroneous in concluding that owner did not dismantle entire wood treatment plant or allow any amount of hazardous substances to be discharged onto site. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a); Solid Waste Disposal Act, § 1004(3), as amended, 42 U.S.C.A. § 6903(3); LSA-R.S. 30:2276.

**[9] Environmental Law 149E ☞445(1)**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(1) k. In General. Most Cited Cases

(Formerly 199k25.5(5.5) Health and Environment)

Former owner of environmentally contaminated property was not "responsible party" under CERCLA simply by virtue of being past owner; CERCLA required disposal to have occurred during ownership. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

*751 T. Haller Jackson, III, Tucker, Jeter, Jackson & Hickman, Shreveport, LA, Jay A. Canel, Stephen D. Davis, Leslie F. Notaro, Canel, Davis & King, Chicago, IL, for appellant.

Bobby S. Gilliam, Penny D. Seller, Wilkinson, Carmody, Gilliam & Hussey, Jerald N. Jones, Office of City Atty., Shreveport, LA, for Louisiana & Arkansas Railway Co.

James Fleet Howell, Jeffrey W. Weiss, Wiener, Weiss, Madison & Howell, P.C., Shreveport, LA, for Beazer East Inc.

Steven E. Danekas, Robert L. Shuftan, Cynthia A. King, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Koppers Co., Inc.

Appeal from the United States District Court for the Western District of Louisiana.

Before POLITZ, Chief Judge, and GOLDBERG and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

This is an action for contribution arising under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601, *et seq.,* and the Louisiana Environmental Quality Act (LEQA), La.Rev.Stat. 30:2271, *et seq.*

Appellant Joslyn Manufacturing Company (Joslyn) appeals from judgment entered following*752 a bench trial and from an order denying its motion to vacate. We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we affirm.

### I. BACKGROUND

Joslyn sued T.L. James & Co., Koppers Company, Inc. (Koppers), Louisiana & Arkansas Railway Company (L & A) and others. Joslyn sought recovery of response costs and a declaration of future liability under both CERCLA and LEQA. The district court granted summary judgment for T.L. James & Co. *See Joslyn Corp. v. T.L. James & Co., Inc.,* 696 F.Supp. 222 (W.D.La.1988), *affirmed,* 893 F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991).[FN1] Joslyn dismissed all remaining parties except Koppers and L & A.

FN1. T.L. James & Co. was the owner of 60% of the voting common stock and 100% of the non-voting stock of Lincoln Creosote Company. In *Joslyn Corp. v. T.L. James & Co., Inc.,* we held that CERCLA did not mandate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

the piercing of the corporate veil in this instance, and therefore affirmed the district court's grant of summary judgment for T.L. James. *See* 893 F.2d at 84.

Judge Stagg conducted a four day bench trial, and held that Joslyn was obligated to defend and indemnify L & A for all damages to the property. Joslyn moved to vacate judgment. The district court denied the motion and Joslyn filed this appeal.

## II. FACTS

This litigation involves two contiguous parcels of land in Bossier City, Louisiana, known collectively as the Lincoln Creosoting site. The first parcel contained a wood treatment plant, including buildings, treating and storage tanks, wood treatment cylinders, black storage areas and other equipment. The second parcel contained industry tracks used in conjunction with the wood treatment operations on the first parcel. A chart depicting the relevant history of the parcels is set out in Appendix A.

*A. Wood Treatment Operations*

Lincoln owned the first parcel from at least 1935 to 1950 when it sold the parcel to Joslyn. Lincoln leased portions of the second parcel from L & A beginning in 1938 and continuing through 1950 when it assigned its leases to Joslyn. According to Joslyn, prior to the sale and assignment Lincoln operated four wood treatment cylinders on the first parcel. Lincoln's creosote recovery system allowed raw creosoting chemicals to drip from the treating cylinders to a sump pit located below the system. The system recovered some of the creosote from the sump. The remaining chemicals and waste water were discharged into an open ditch which emptied into a slough at the east end of the second parcel. From the slough, the creosoting chemicals were washed away by rain to the surrounding land areas and waterways. Investigation of the site has revealed substantial creosote contamination in the areas of the ditch and the slough. Joslyn claims that contamination also occurred due to Lincoln's use of creosote to kill weeds, and because of Lincoln's use of creosote residue as a base for roads.

On August 1, 1950, Joslyn bought the first parcel,

and the plant and equipment located thereon, from Lincoln. On August 14, 1950, Lincoln [FN2] assigned its leases on portions of the second parcel to Joslyn. Joslyn executed leases directly with L & A in 1955 and 1967.

FN2. Lincoln was dissolved in 1952 upon unanimous consent of its shareholders, and is no longer in existence.

The evidence reveals that Joslyn took over all of Lincoln's physical facilities and continued wood treatment operations without interruption. George Bauer, Joslyn's plant manager from 1950 to 1963, testified that "There was a shutdown [of Lincoln] one night and startup the next morning as Joslyn, same people, same equipment." Joslyn used creosote and several other chemicals throughout its 19 years of wood treatment operations on the site. There is no dispute that both Lincoln and Joslyn's wood treatment operations resulted in environmental contamination.

Joslyn continued operations at the plant until December 1969 when it sold the property to Koppers. Koppers purchased the first parcel from Joslyn in order to remove some **\*753** of the wood treatment equipment from the property. Specifically, Koppers sought to acquire two treatment cylinders for use at other Koppers' plants. These cylinders, which sat on concrete pads, were removed in September 1970 by lifting them off of their supports and placing them on double flat cars. In addition, Koppers removed railroad ties, tracks, tram cars, frogs and switches. Koppers also removed the fans and doors from a dry-kiln located on the property. The trial court determined that at no time during Koppers' ownership did it operate the wood treatment facility, nor did Koppers dismantle the entire plant.

Koppers owned the property until January 1971 when it sold the property to the Myatt family doing business as the Specialty Oil Company. Thirteen days later, the Myatts transferred ownership to Marvin E. Pollard. L & A sold the second parcel in March of 1972. The property then passed through several additional owners, the last of which subdivided the property.

*B. Environmental Action*

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

On February 3, 1986, the Louisiana Department of Environmental Quality (DEQ) issued an order against T.L. James, Joslyn, Koppers, L & A and others, requiring that a fence be erected around the perimeter of the site. While Joslyn bore the majority of the fencing cost, L & A-though denying liability for remediation-paid a pro rata share. L & A and Koppers requested a hearing on all matters relating to the February 3, 1986 compliance order issued by DEQ.

On August 2, 1986, the DEQ issued a second order against T.L. James, Joslyn, Koppers, L & A and others ordering them to develop a plan for investigation of the site and for clean up of "problem areas" discovered during the Phase 1 investigation. Koppers and L & A again denied liability and requested a hearing on the compliance order. Joslyn submitted a "remedial investigation work plan" to the DEQ. On November 17, 1988, the DEQ approved the Joslyn work plan. Once again, Koppers and L & A denied liability and requested a hearing in regard to the November 17, 1988 compliance order.

On April 30, 1991, the DEQ issued an order against T.L. James, Joslyn, Koppers, L & A and others to submit a "remedial action plan" and, upon plan approval, to implement the plan. Again, Koppers and L & A denied liability and requested a hearing. On January 17, 1992, Joslyn submitted a "removal action work plan" to the DEQ. Joslyn began clean up of the site on February 28, 1992. In June and July of 1992, Joslyn sought DEQ's permission to stop work at the site. DEQ denied the request and, as of the date of the trial, Joslyn claims that it had expended over $13 million in its clean up of the site.

### III. STANDARD OF REVIEW

Joslyn appeals from judgment entered by the district court after a bench trial on the merits. We review the district court's findings of fact for clear error and legal issues *de novo*. *F.D.I.C. v. McFarland*, 33 F.3d 532, 536 (5th Cir.1994). However, we may affirm for reasons other than those relied upon by the district court. *Ballard v. United States*, 17 F.3d 116, 118 (5th Cir.1994).

### IV. INDEMNIFICATION OF L & A

As indicated above, Lincoln entered into several leases with L & A. Two of those leases, executed in 1942 and 1949, were assigned by Lincoln to Joslyn. Joslyn leased portions of the second parcel directly from L & A in 1955 and 1967. After reviewing the terms of the indemnity clauses contained in the four leases, the district court held,

L & A is clearly liable to Joslyn for response costs under CERCLA because L & A is a past owner of parcel 2 of the site and owned this property at the time hazardous substances were disposed. Any amount for which L & A owes Joslyn under CERCLA as a past owner, however, is **MOOT,** because any such amount is **CANCELLED OUT** by the fact that Joslyn is ultimately liable for such amount under the indemnity provisions of the four leases at issue.

(emphasis in original). Joslyn agrees that it is bound by the indemnity clauses contained in the 1955 and 1967 leases it executed with L & A. In addition, Joslyn concedes that it **\*754** is bound by the indemnification clauses in the 1942 and 1949 leases for all contamination which occurred *after* the August 14, 1950 assignment from Lincoln. The issue before this Court is whether Joslyn, as assignee, is required to indemnify L & A for environmental damage caused by Lincoln prior to the August 14, 1950 assignment. The scope of the assignment must be determined by applying Louisiana law.

*A. Terms of the Indemnification Provision*

The starting point of our analysis must be the language of the leases. The 1942 lease from L & A to Lincoln contained the following indemnification provision,

Lessee forever shall defend, indemnify as an insurer, and save harmless Carrier from, for and against any and all liability, judgments, outlays and expenses (1st) consequent on any injury, death, damage, loss or destruction (a) suffered or caused by or to any person or property incident to or while being engaged or being used in the doing of whatsoever Lessee attempts hereunder, or while on Premises for any reason whatsoever; or (b) suffered by any person (except Carrier's exclusive employees) or by any property (except Carrier's exclus-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

ive property) while in the immediate vicinity or, going to or leaving or being taken by other than Carrier to or from the Premises; (c) caused by or resulting from any condition of or defect in the Premises or any operation by any person whomsoever of any locomotive or car (except resulting form Carrier's sole negligence); or (2) consequent on any sole or concurring, wrongful or negligent act of Lessee or of any of Lessee's officers, agents, employees, servants or contractors; or (3) consequent on any fire howsoever set on the premises.

The 1949 lease contained a similarly broad indemnification provision which provided,

The Lessee agrees to indemnify the Railway Company and save it harmless from any and all claims and expenses that may arise or that may be made for death, injury, loss or damage, resulting to the Railway Company's employees or property, or to the Lessee or Lessee's employees or property, or to other persons or their property, arising from or happening in connection with or during the occupancy or use of said premises by the Lessee, whether or not caused by the negligence of the Railway Company, and resulting from fire or any other cause, excepting only loss or damage to the premises of the Railway Company, or to rolling stock, or to Lessee's shipments in the course of transportation, when such loss or damage is caused solely by fire set by locomotives operated by Railway Company.

While CERCLA does not permit the avoidance of liability *vis-a-vis* the government, both CERCLA FN3 and LEQA FN4 specifically recognize the enforceability of indemnification agreements which allocate environmental liability among responsible parties.

FN3. *See* 42 U.S.C. § 9607(e)(1),

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. *Nothing in this subsection shall bar any agreement to insure, hold harmless, or in-*

*demnify a party to such agreement for any liability under this section.*

(emphasis supplied).

FN4. La.Rev.Stat.Ann. § 30:2276(I) (West 1989),

Nothing in this Chapter shall bar a cause of action that an owner or operator or any other person subject to liability under this Section or a guarantor has or would have by reason of indemnification, subrogation, or otherwise against any person.

[1] The Seventh Circuit recently recognized that a party may contract to indemnify another for environmental liability even though CERCLA was not in existence at the time of contracting. *See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 327 (7th Cir.1994). The broad language of the indemnification agreements at issue herein evince a strong intent by the lessee to indemnify L & A for *all* liability arising in connection with the occupancy or use of the land. We hold that the indemnification agreements were intended to cover all forms of liability, including liability under CERCLA and LEQA, even though environmental liability**755** under these statutes was not specifically contemplated at the time of contracting. Thus, the question before the Court is whether Joslyn assumed *all* of Lincoln's obligations under the leases, or merely those obligations which arose after the date of the assignment.

*B. Assignment*

The next step in our analysis is to examine the scope of the assignment from Lincoln to Joslyn to determine exactly what was conveyed. Our starting point is the language of the assumption agreement between Joslyn and L & A.

1. Terms of the Assignment

The assumption agreement between Joslyn and L & A, executed on August 14, 1950, provides in relevant part,

As of the 24th day of July, 1950, the undersigned purchased from Lincoln Creosoting Company, Inc., of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

Shreveport, Louisiana, subject to your approval, all of its right, title and interest in and to the following contracts:

. . . . .

2. Lease Agreement dated June 11, 1942, executed by you and said Lincoln Creosoting Company, Inc. covering 2.33 acres, more or less, out of the SW 1/4 of Section 21, Township 18 North, Range 13 West, Bossier Parish, Louisiana.

3. Lease Agreement dated November 11, 1949, executed by you with said Lincoln Creosoting Company, Inc. covering an irregular parcel of land between Mile Post B-104.17 and B-104.41 in Bossier City, Bossier Parish, Louisiana.

Under dates July 24th and 25th, 1950, said Lincoln Creosoting Company, Inc. by letters to you confirmed its said sales and assignments to the undersigned.

If you will approve this purchase and transfer by so indicating on each copy of this letter, an original and four copies of which are enclosed, and return one copy to the above address, *the undersigned agrees to carry out and perform, as well as to be bound by all the terms and provisions of said Industry Track Agreement of January 16, 1936, and said Lease Agreements of June 11, 1942 and November 11, 1949, all of which are incorporated herein by reference with the same like effect as if copied herein in full.*

(emphasis supplied). In addition to the language contained in the assumption agreement, the 1942 lease contained the following provision,

Every undertaking herein shall have the effect of a covenant. Carrier's undertakings are limited to Carrier's express covenants herein. Carrier's implied covenants are limited to Carrier's estate in Premises. *Covenants herein shall inure to or bind each party's* heirs, legal representatives, *successors and assigns,* but Premises shall not be sublet nor shall Lessee's rights be transferred or assigned voluntarily or involuntarily. Carrier or Lessee may waive any default at any time of the other without affecting or impairing any rights arising from

subsequent default....

(emphasis supplied). The 1949 lease contained a similar provision:

The lease shall not be assigned or in any manner transferred nor said premises or any part thereof sublet, used or occupied by any party other than the Lessee, nor for any purpose other than that specified herein, without the written consent of the Railway Company. *The provisions of this lease shall be binding upon any assignee or sub-tenant of the Lessee.*

(emphasis supplied).

Under Louisiana law, an assignee is only bound to the extent of the obligations assumed. *See* La.Civ.Code Ann. art. 1822 (West 1987). While we have been unable to find any Louisiana authority addressing the specific issue at hand, an understanding of the general law of obligations provides us with sufficient guidance to determine how a Louisiana court would decide this issue. Therefore, as an initial matter, we must set out the applicable rules of obligations gleaned from Louisiana law.

2. Real or Personal Obligation

Louisiana law recognizes two basic types of obligations, and corresponding rights: an **\*756** obligation, and the correlative right to demand its performance, can be either real or personal.[FN5]

FN5. *See* La.Civ.Code Ann. arts. 1763-66 (West 1987).

[T]he term "real right" under the civil law is synonymous with proprietary interest, both of which refer to a species of ownership. Ownership defines the relation of man to things and may, therefore, be declared against the world. A personal right, on the other hand, defines man's relationship to man and refers merely to any obligation one owes to another which may be declared only against the obligor.

*Reagan v. Murphy,* 235 La. 529, 105 So.2d 210, 214 (1958). In other words, a personal right is the "legal power that a person (obligee) has to demand from another person (obligor) a performance consisting of giv-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

ing, doing, or not doing a thing." A.N. Yiannopoulos, *Louisiana Civil Law Treatise, Property* § 203, at 370 (3d ed. 1991).

The distinction between real and personal obligations is important when determining whether an obligation has been transferred.

A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect.

But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning the thing.

La.Civ.Code Ann. art. 1764 (West 1987); *see also* A.N. Yiannopoulos, *Louisiana Civil Law Treatise, Property* § 210, at 385 (3d ed. 1991),
From the viewpoint of transferability, obligations are either nontransferable (strictly personal) or transferable, whether actively or passively (heritable and real obligations). From the viewpoint of the nature of the transferee's responsibility, transferable obligations are either heritable or real. Heritable obligations are transferable obligations that result in personable responsibility to the transferee. Real obligations attach to immovable property and do not result in personal responsibility of the obligor. The obligor is thus held to a duty merely in his capacity as possessor and may free himself by abandoning the immovable.

Thus, a real right attaches to the property (movable or immovable) and is automatically transferred to a subsequent successor in interest to the property. The transferability of a personal obligation, in contrast, depends on whether the obligation is classified as "heritable" or "strictly personal."

Louisiana Civil Code Article 1765 defines "heritable obligation" as follows:

An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor.

Every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract.

A heritable obligation is also transferable between living persons.

Article 1766 defines "strictly personal" obligation:
An obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor.

When the performance requires the special skill or qualification of the obligor, the obligation is presumed to be strictly personal on the part of the obligor. All obligations to perform personal services are presumed to be strictly personal on the part of the obligor.

When the performance is intended for the benefit of the obligee exclusively, the obligation is strictly personal on the part of that obligee.

With this background, we must determine whether the indemnity clauses are personal or real obligations, and, if the obligations are personal, whether they are heritable or strictly personal.

3. Classification of Obligation

[2] The indemnity clauses at issue are personal rather than real obligations. There **\*757** is no indication that the indemnification agreements were intended to create a real obligation upon the land itself, but rather were intended to bind the lessee personally.[FN6] It is also plain that these personal obligations fall into the heritable rather than the strictly personal classification.

FN6. *See e.g. Leonard v. Lavigne,* 245 La. 1004, 162 So.2d 341, 343 (1964); *E.P. Dobson, Inc. v. Perritt,* 566 So.2d 657, 659 (La.App.1990),

Although the lease provisions generally are stated to be binding on the heirs and assigns of the parties, the non-competition agreement does not state that it is a covenant running with the land or binding on future owners of the lessor's other property, nor does the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

agreement refer to a general plan of development or purport to inure to the benefit of other owners in the area of development. The restriction is for the benefit of this lessee only; not for the benefit of any owner in the affected area. It is personal to the lessee in the operation of lessee's particular business on the leased property.

Under the Civil Code, all obligations are deemed heritable. *See* La.Civ.Code Ann. art. 1765 (West 1987) ("Every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract"). The leases at issue provide no evidence that a contrary result was intended. In fact, there is no indication that performance was intended to be rendered by a specific party, but rather that L & A would be indemnified by the occupier and user of the land. We find that the agreements were heritable as a matter of law. As an important corollary, the right of L & A to be indemnified was also clearly personal. Therefore, L & A is entitled to indemnification even though it is no longer the owner of the land.

4. Joslyn's Argument

Before we apply the legal concepts we have set out, it is useful to explore Joslyn's arguments to determine whether it has presented any authority inconsistent with our general understanding of Louisiana law. Joslyn first cites two *common law* commentators for the proposition that its obligations under the assigned lease are prospective from the date of the assignment.

First, Joslyn quotes *Friedman on Leases* for the proposition that privity of estate does not create liability for breaches occurring prior to assignment. [FN7] While we need not decide the result under the common law, we note that Joslyn's reliance on this statement is misplaced in that the theory of liability at issue is not based on privity of estate, but rather on contractual liability arising under the terms of the transferred lease.

FN7. Milton R. Friedman, *Friedman on Leases,* § 7.501c1, at 356-57.

The assignee's liability created by privity of

estate does not include anything that accrued before the assignment. The assignee is not liable for breach by the original tenant or by a prior assignee. Nor is he liable for rent payable before the assignment to him, even if this covers a period subsequent thereto. All this is true, but requires amplification. An assignee is not personally liable for prior breaches, but he takes the lease subject to forfeiture if the breaches are not cured.

[3] Joslyn also quotes *American Law of Property* for the proposition that in absence of an assumption agreement, an assignee is not in privity of contract with the lessor, and therefore can only be held liable on the basis of privity of estate. [FN8] Once again, reliance on this language is misplaced. As discussed above, the transfer of the lease from Lincoln to Joslyn was by written assignment. The assumption agreement was delivered to, and approved by, L & A before the assignment took place. Therefore, in common law terms, Joslyn's liability arises from privity of contract, not privity of estate. The common law seems to mirror the civil rule-the scope of liability is determined by the scope of the **758** assumption. [FN9]

FN8. *American Law of Property,* § 9.5, at 365 (1952).

In the absence of an assumption agreement, the assignee of the covenantor is under no privity of contract liability, so that the only basis for liability on his part is on the basis of privity of estate. Therefore, as soon as he in turn reassigns the burdened estate he has terminated his privity of estate and so will not be liable for future breaches of the covenant. Of course, he remains liable for all breaches that occurred during the period of the ownership of the burdened estate, but he is not liable for breaches occurring prior to the time in which he acquired the estate, nor for those occurring subsequent to the date he disposes of it.

FN9. *See* Milton R. Friedman, *Friedman on*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

*Leases,* § 7.501c2(a), at 360 (3d ed. 1990),

> If the assignee assumes "with the same force and effect as if he had executed the lease as tenant," the assumption includes all liability that had accrued at the time of the assignment, as well as the liability thereafter accruing.

*Id.* at § 7.501c2(b), at 361,

> An assignee's agreement to assume the tenant's obligations is held, without more, to exclude existing breaches and include only obligation accruing subsequent to the assignment. But the amount of relevant authority is small. For this reason the assumption clause should be clear. If it is intended to be prospective it should be made expressly applicable only to the covenants and conditions on tenant's part to be performed and observed from and after a specified time. The assignee will then be clearly under no personal liability for anything that occurred before the assignment.

The portions of *Droit Civil Français* quoted by Joslyn are consistent with our understanding of Louisiana law.[FN10] The French authorities referenced in *Droit Civil Français* concur with Louisiana law that a successor in interest to an immovable takes those personal obligation of its predecessor which were known and specifically assumed.

> FN10. Aubry & Rau, *Droit Civil Français,* in 2 Civil Law Translations § 176, at 79 (7th ed. 1966),
>
> > The particular successor is not, as such and as of right, directly held liable for the personal obligations of his grantor.
> >
> > . . . . .
> >
> > Thus, under Art. 871, a legatee by a particular title is not liable for the debts of his testator. The acquisition of a thing would entail grave risks if the transferees were held liable

for debts related to the thing, without being notified by them.

> . . . . .
>
> A lessor who has stipulated that the lessee will pay all the taxes including the real estate tax can not claim from an assignee of the lease a reimbursement for the payment of taxes due before the assignment.

5. Application

Having established the analytical framework within which the determination must be made, we briefly summarize our conclusions. First, the indemnification agreements are valid methods of apportioning liability under CERCLA and LEQA among the responsible parties. Second, these indemnification agreements are heritable, personal obligations for which the assignee is responsible only if they were specifically assumed.

[4] We hold as a matter of law the language of the assumption agreement displays the intent of Joslyn to assume all of the obligations of Lincoln under the lease.[FN11] In the assumption agreement, Joslyn specifically states that

> FN11. Where the language of the contract is clear and unambiguous, there is no need to go outside the four corners of the document to determine the parties' intent. *See American Waste & Pollution Control Co. v. Jefferson Davis Parish Sanitary Landfill Comm'n,* 578 So.2d 541, 564 (La.App.1991), *cert. denied,* 581 So.2d 694 (La.1991).

the undersigned [Joslyn] agrees to carry out and perform, as well as to *be bound by all the terms and provisions* of said Industry Track Agreement of January 16, 1936, and said Lease Agreements of June 11, 1942 and November 11, 1949, all of which are incorporated herein by reference *with the same like effect as if copied herein in full*

(emphasis supplied). This language clearly expresses Joslyn's intent to take over all obligations under the referenced contracts. There is no language of limitation contained in the assumption agreement, and no at-

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

tempt was made to limit the assumption to prospective obligations. We find as a matter of law that Joslyn accepted a general assignment of the leases and thereby agreed to perform all of Lincoln's obligations thereunder.

6. Solidarity

[5] Having determined that Joslyn assumed all of Lincoln's obligations under the leases, we must next assess the extent of Joslyn's liability to L & A. Under the Louisiana Civil Code, it is clear that the written assumption agreement between Joslyn and L & A rendered Joslyn liable under the terms of the leases, but did not release Lincoln from liability. *See* La.Civ.Code Ann. art. 1821 (West 1987),

An obligor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be made in writing.

**\*759** *The obligee's consent to the agreement does not effect a release of the obligor.*

*The unreleased obligor remains solidarily bound with the third person.*

(emphasis supplied). The solidarity of Lincoln and Joslyn creates a special relationship which renders each of them individually liable for the whole performance. *See id.* at art. 1794,

An obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee.

L & A could therefore, at its option, demand performance under the lease from either Lincoln or Joslyn. *See id.* at art. 1795,

An obligee, at his choice, may demand the whole performance from any of his solidary obligors. A solidary obligor may not request division of the debt.

Unless the obligation is extinguished, an obligee may institute action against any of his solidary obligors even after institution of action against another solidary obligor.

*see also id.* at art. 1800,

A failure to perform a solidary obligation through the fault of one obligor renders all the obligors solidarily liable for the resulting damages. In that case, the obligors not at fault have their remedy against the obligor at fault.

Under the code, once Joslyn assumed all of the obligations of the lease, without reservation, it became inextricably bound with Lincoln for performance of the lease obligations. L & A, by approving the assignment of the lease to Joslyn, gained the benefit of having two parties solidarily obligated to perform under the lease. Under this arrangement, Joslyn made itself liable *vis-a-vis* L & A for Lincoln's performance under the indemnity clause. While Joslyn would certainly have a right of subrogation against Lincoln, Joslyn-not L & A-assumed the risk of Lincoln's insolvency. *See id.* Joslyn cannot be allowed to thwart the terms of the indemnity clause, nor escape its inevitable liability under the code, simply by initiating suit itself. Had L & A initiated suit to enforce the indemnity clause, Joslyn would be liable to L & A for Lincoln's environmental damage. The same result must occur where suit is filed by Joslyn.

*C. Novation by the 1967 Lease*

[6][7] For the first time on appeal, FN12 Appellant claims that any obligations that it took by assignment from Lincoln were released by L & A upon execution of the 1967 lease. The 1967 lease provided, "This agreement cancels and supersedes agreements between the parties hereto, dated August 14, 1950, and January 15, 1955." Joslyn claims that this language constitutes a novation of the previous leases, and that L & A thereby released it from its obligation under the 1950 assignment and 1955 lease.

FN12. "We will consider an issue raised for the first time on appeal only if the issue is purely a legal issue and if consideration is necessary to avoid a miscarriage of justice." *Citizens Nat'l Bank v. Taylor ( In re Goff),* 812 F.2d 931, 933 (5th Cir.1987). We will not allow parties to raise issues for the first time on appeal merely because they believe that they might prevail if given the opportunity to try the case again on a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

different theory. *See id.* (citing *Holiday Inns, Inc. v. Alberding,* 683 F.2d 931, 934 (5th Cir.1982)).

The Supreme Court has afforded a limited exception to this rule. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In *Moses H. Cone,* the Court concluded that, "in view of the special interests at stake and the apparent lack of any prejudice to the parties," the court of appeals had discretion to consider an issue not decided in the district court. *Id.* at 29, 103 S.Ct. at 944.

As explained by the Court, 28 U.S.C. § 2106 gives an appellate court "some latitude in entering an order to achieve justice in the circumstances." *Id.* That section provides:

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

28 U.S.C. § 2106.

Notwithstanding the questionable timeliness of this contention, the argument fails on its merits. Under Louisiana law, a novation must be clear and unequivocal. La.Civ.Code.Ann. art. 1880 (West 1987). Even assuming, **\*760** *ad arguendo,* that the above cited language constitutes a novation of the referenced documents, the language does not constitute an express novation of the 1942 and 1949 leases. The leases are simply not mentioned. At most, the language effectuated a novation of the assumption agreement, and thereby negated L & A's written approval of the assignment.[FN13] Novation of the assignment agreement does not, and cannot, affect the validity or effectiveness of the assignment from Lincoln to Joslyn. The leases themselves

were not novated, nor was the agreement between Lincoln and Joslyn changed. Therefore, Joslyn's duty, as assignee of the 1942 and 1949 leases, was not affected by the purported novation of the 1950 assignment agreement and the 1955 lease.

FN13. While in another context the lack of written approval may have given L & A cause to complain about the validity of the assignment, this issue is not before us. In addition, it is clear that at the time the assignment was completed, valid written approval was given, thus, the subsequent withdrawal of approval is of no moment to our analysis.

Even without the assumption agreement, Joslyn and Lincoln were solidarily bound by the assignment. Without an express novation of the 1942 and 1949 leases, this solidarity is unaffected, and L & A retains the option to seek indemnity from either Joslyn or Lincoln.

### V. KOPPERS' CERCLA LIABILITY

The final issue before us is whether Joslyn is entitled to contribution from Koppers. To prevail on this issue, Joslyn must first establish Koppers' liability under CERCLA.

To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a "facility" as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs.

*Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989). It is undisputed that the site in question is a facility as defined in § 9601(9), that a release or threatened release has occurred and that Joslyn has incurred response costs. Thus, Joslyn's burden is to show that Koppers is a "responsible party" under CERCLA and LEQA.

To be liable as a responsible party under CERCLA,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

Koppers must fall into one of the categories set out in CERCLA section 107(a), 42 U.S.C. § 9607(a):

(1) the [present] owner and operator of ... a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ..., and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs....

Similarly, LEQA imposes liability *in solido* on the following persons:

All persons who have generated a hazardous substance disposed of at the site, transported a hazardous substance to the pollution source or facility, contracted to have a hazardous substance transported to the pollution source or facility, or disposed of a hazardous substance at the pollution source or facility shall be presumed to be liable in solido by the court for the cleanup of the site....

La.Rev.Stat.Ann. § 30:2276 (West 1989). Under both statutes, Koppers' liability depends on whether a disposal occurred during its ownership of the site. The district court found that no disposal occurred during Koppers' ownership of the site, and therefore held that Koppers was not a responsible party under either statute.

Joslyn makes two arguments that Koppers is a responsible party. First, that Koppers' **\*761** removal of various equipment from the plant resulted in a "disposal" under *Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568 (5th Cir.1988). Second, that regardless of Koppers' activities on the site, Koppers took the property with knowledge of the

environmental problem and should not be able walk away from the problems on the site. This argument is loosely based on CERCLA policy as set out by the Fourth Circuit in *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 845-46 (4th Cir.1992), *cert. denied sub nom., Mumaw v. Nurad, Inc.,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992).

*A. Disposal by Removal of Equipment*

[8] In *Tanglewood,* we adopted the definition of disposal set out in RCRA at 42 U.S.C. § 6903(3),

The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

*Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d at 1573. In *Tanglewood,* we also recognized that "this definition of disposal does not limit disposal to a one-time occurrence-there may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings." *Id.*

The district court found:

The court finds that the evidence does not establish that Koppers dismantled the entire treatment plant nor does it establish that Koppers allowed any amount of hazardous substances to be discharged onto the site because not a single witness testified to facts of any spillage by Koppers. Joslyn has simply failed to prove by a preponderance of the evidence that Koppers owned or operated the site *at the time of* disposal of toxins.

(emphasis in original). As stated above, factual findings of the district court are reviewed under a clearly erroneous standard. *See F.D.I.C. v. McFarland,* 33 F.3d 532, 536 (5th Cir.1994); *see also, AM Int'l, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 998 (6th Cir.1993) (Whether there has been a disposal under CERCLA is a question of fact to be decided by a district court and to be reviewed under the clearly erro-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

neous standard). We must affirm the district court's findings unless we are left with the firm and definite conviction that a mistake has been made. *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 434 (5th Cir.1994).

Having reviewed Joslyn's arguments and the relevant portions of the record, we are unable to say that the district court's conclusions were clearly erroneous. Joslyn's arguments go primarily to the weight and credibility of certain evidence. Weight and credibility assessments are within the province of the trier of fact, and cannot, without more, constitute clear error.

*B. Nurad v. William E. Hooper & Sons Co.*

[9] Joslyn cites *Nurad* for the proposition that Koppers is a responsible party under CERCLA simply by virtue of being a past owner of the contaminated property. Joslyn would have us read *Nurad* to require a finding of liability regardless whether Koppers introduced hazardous substances to the site or whether a disposal occurred during Koppers ownership of the site. We do not believe that *Nurad's* definition of disposal can be read so broadly, and we decline to expand the Fourth Circuit's reasoning to eliminate the disposal element of CERCLA liability.

1. Definition of Disposal

The Fourth Circuit recognized that disposal is a necessary element of liability, but provided the following definition of disposal.

[W]e hold that § 9607(a)(2) imposes liability not only for active involvement in the "dumping" or "placing" of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was "spilling" or "leaking."

*Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d at 846. Under this definition, **\*762** the court found that a previous property owner was liable-though it had not actively contaminated the property-because mineral spirits were leaking from underground storage tanks during its ownership of the property.

While we decline to decide whether this circuit

should adopt the Fourth Circuit's definition of disposal, Joslyn has failed to show that any hazardous waste "leaked" or "spilled" during Koppers' ownership of the property. The district court specifically found that "There is no evidence that leaking or spilling of hazardous substances occurred during Koppers' brief period of ownership." Joslyn has provided no evidence which would lead us to believe that this determination was clearly erroneous.

2. Policy

Joslyn's final attempt at bootstrapping its claims under the *Nurad* holding arises from the Fourth Circuit's exposition of the policy behind CERCLA.

It is easy to see how the district court's requirement of active participation would frustrate the statutory policy of encouraging "voluntary private action to remedy environmental hazards." Under the district court's view, an owner could avoid liability simply by standing idle while an environmental hazard festers on his property. Such an owner could insulate himself from liability by virtue of his passivity, so long as he transfers the property before any response costs are incurred. A more conscientious owner who undertakes the task of cleaning up the environmental hazard would, on the other hand, be liable as the current owner of the facility, since "disposal" is not a part of the current owner liability scheme under 42 U.S.C. § 9607(a)(1). The district court's view thus introduces the anomalous situation where a current owner, such as Nurad, who never used the storage tanks could bear a substantial share of the cleanup costs, while a former owner who was similarly situated would face no liability at all. A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind.

*Id.* at 845-46. Joslyn claims that to allow Koppers-a sophisticated purchaser who knew of the contamination-to escape liability in this situation would frustrate the purposes of CERCLA as set out by the Fourth Circuit.

We decline to follow Joslyn's reasoning for two reasons. First, as stated previously, to be found liable under the CERCLA statutory scheme, a former owner

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

must have owned the property during a period when a disposal occurred. We have already affirmed the district court's finding that a disposal did not occur during Koppers ownership, and we decline to read the disposal requirement out of the statutory scheme.

Second, an even larger policy consideration overshadows the policy elucidated by the Fourth Circuit. In this instance, unlike *Nurad* and the majority of cases on the subject, suit is being brought by a former owner who is the *primary contaminator* of the property. In *Nurad*, suit was brought by the current owner who was not responsible for the contamination. To allow Joslyn to recover under *Nurad's* policy-no avoidance of liability through inaction-flies in the face of the polluter pays principle.

Joslyn-a nineteen year polluter of the site-is proposing a scheme under which it could defray part of its clean-up cost by passing the contaminated property through a series of innocent landowners and then, when the contamination is discovered, demanding contribution from each. Not only does this violate the very policy that Joslyn purports to champion, but it would allow a polluter to escape a portion of its liability by conveying the property while ignoring the contamination which it caused. While Congress determined to encourage cleanup by holding the current landowner liable for the pollution regardless of fault and then permitting contribution from past polluters, § 9607(a)'s disposal requirement for prior landowners eliminates the legal legerdemain that Joslyn is attempting.

We conclude as a matter of law that Joslyn has failed to carry its burden of showing that a disposal occurred during Koppers' ownership**\*763** of the property. Koppers is not a CERCLA or LEQA responsible party, and therefore not liable for any portion of Joslyn's clean-up costs.

VI. CONCLUSION

For the foregoing reasons, the holding of the district court is AFFIRMED.

APPENDIX A

| DATE | PARCEL ONE | PARCEL TWO |
| --- | --- | --- |
| 1935 | Owned by Lincoln | Owned by L & A |
| 1938 | | April 30 |
| | | Portions leased |
| | | to Lincoln |
| 1942 | | June 11 |
| | | Additional Portions |
| | | leased to Lincoln |
| 1949 | | November 11 |
| | | Additional Portions |
| | | leased to Lincoln |
| 1950 | August 1 | August 14 |
| | Joslyn purchases | Lincoln assigns its |
| | | leases to Joslyn |
| 1955 | | January 15 |
| | | Joslyn leases additional |
| | | portions of the parcel |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl. L. Rep. 20,476
**(Cite as: 40 F.3d 750)**

| Year | | |
| --- | --- | --- |
| 1967 | | October 12 |
| | | Joslyn leases additional |
| | | portions of the parcel |
| 1969 | December 1 | |
| | Koppers purchases | |
| 1970 | | By agreement with L & A, |
| | | Joslyn assigns its 1967 |
| | | lease to Koppers |
| 1971 | Myatt family purchases | |

C.A.5 (La.),1994.
Joslyn Mfg. Co. v. Koppers Co., Inc.
40 F.3d 750, 39 ERC 1939, 63 USLW 2476, 25 Envtl.
L. Rep. 20,476

END OF DOCUMENT

41 F.3d 341, 39 ERC 1926, 63 USLW 2383, 25 Envtl. L. Rep. 20,176
**(Cite as: 41 F.3d 341)**

H

United States Court of Appeals,
Seventh Circuit.
HARLEY-DAVIDSON, INCORPORATED,
Plaintiff-Appellee,
v.
MINSTAR, INCORPORATED, and AMF Incorporated, Defendants-Appellants.

No. 94-2171.
Argued Oct. 24, 1994.
Decided Nov. 30, 1994.
Rehearing and Suggestion for Rehearing En Banc
Denied Dec. 28, 1994.FN*

FN* Hon. Walter J. Cummings did not participate in the consideration of the petition for rehearing en banc.

Purchaser of contaminated industrial site brought action under Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) against former owners to recover its response costs. The United States District Court, Eastern District of Wisconsin, Rudolph T. Randa, J., denied defendants' motion for summary judgment, and they appealed. The Court of Appeals, Posner, Chief Judge, held that: (1) CERCLA does not outlaw indemnification agreements, but merely precludes efforts to divest responsible party of his liability, and (2) indemnity agreement was broad enough to cover contamination of property and, thus, was applicable.

Reversed.

West Headnotes

**[1] Environmental Law 149E ⬡447**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek447 k. Contribution and Indemnity;

Allocation of Liability. Most Cited Cases
(Formerly 208k3)

CERCLA does not outlaw indemnification agreements, but merely precludes efforts to divest responsible party of his liability; first sentence of subsection addressing indemnity speaks of transferring liability, i.e., of shifting liability from one person to another, which indemnification does not do, and second sentence permits sharing, just as first forbids shifting. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(e), 42 U.S.C.A. § 9607(e).

**[2] Indemnity 208 ⬡30(1)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(1) k. In General. Most Cited Cases
(Formerly 208k3)

**Insurance 217 ⬡2102**

217 Insurance
    217XV Coverage--in General
        217k2096 Risks Covered and Exclusions
            217k2102 k. Willful, Intentional or Wrongful Conduct. Most Cited Cases
(Formerly 217k139)

While public policy does on occasion demand that wrongdoer be forbidden to shift cost of liability to another through insurance or other form of indemnification, that is in cases of deliberate wrongdoing.

**[3] Environmental Law 149E ⬡445(1)**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek445 Persons Responsible
                149Ek445(1) k. In General. Most Cited

41 F.3d 341, 39 ERC 1926, 63 USLW 2383, 25 Envtl. L. Rep. 20,176
**(Cite as: 41 F.3d 341)**

Cases

(Formerly 199k25.5(5.5) Health and Environment)

CERCLA liability is strict and does not require proof even of negligence, let alone deliberate wrongdoing. Comprehensive Environmental Response, Compensation, and Liability Act, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[4] Federal Courts 170B ⮕759.1**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(K) Scope, Standards, and Extent
   170BVIII(K)1 In General
    170Bk759 Theory and Grounds of Decision of Lower Court
     170Bk759.1 k. In General. Most Cited Cases

Precept that any nonwaived ground may be urged on appeal in defense of judgment is as applicable to orders of which Court of Appeals has jurisdiction by virtue of statute providing for jurisdiction over orders involving controlling question of law as to which there is substantial ground for difference of opinion and immediate appeal from which may materially advance ultimate termination of litigation as it is to any other orders. 28 U.S.C.A. § 1292(b).

**[5] Federal Courts 170B ⮕412.1**

170B Federal Courts
 170BVI State Laws as Rules of Decision
  170BVI(C) Application to Particular Matters
   170Bk412 Contracts; Sales
    170Bk412.1 k. In General. Most Cited Cases

(Formerly 208k8(3))

CERCLA plaintiff's claim that indemnification agreement was inapplicable to clean-up costs incurred by plaintiff did not present question of federal law but, rather, question regarding scope of indemnification agreement depended on wording of agreement interpreted in light of governing state law. Comprehensive Environmental Response,

Compensation, and Liability Act, § 107(e), 42 U.S.C.A. § 9607(e).

**[6] Environmental Law 149E ⮕447**

149E Environmental Law
 149EIX Hazardous Waste or Materials
  149Ek436 Response and Cleanup; Liability
   149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases

(Formerly 208k8(3))

Agreement providing that purchaser "shall * * * indemnify [seller] against all debts, liabilities, and obligations, without any limitation, relating to [seller], its operations and products, whether known or unknown" was sufficiently broad to cover environmental contamination of land owned by seller and, thus, applied to CERCLA claim asserted by purchaser. Comprehensive Environmental Response, Compensation, and Liability Act, § 107(e), 42 U.S.C.A. § 9607(e).

**\*342** Scott W. Hansen, Anne Morgan Hlavacka, Jeffrey P. Clark (argued), Reinhart, Boerner, Vandeuren, Norris & Rieselbach, Milwaukee, WI, for plaintiff-appellee.

Gerard D. Kelly, J. Andrew Schlickman (argued), Sidley & Austin, Chicago, IL, John W. Hein, David J. Edquist, Gibbs, Roper, Loots & Williams, Milwaukee, WI, for defendants-appellants.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and WILL, District Judge.FN**

   FN** Hon. Hubert L. Will of the Northern District of Illinois.

POSNER, Chief Judge.

Harley-Davidson, the plaintiff in this CERCLA suit (the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.,* commonly known as the Superfund statute), owns a manufacturing plant in York, Pennsylvania.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

41 F.3d 341, 39 ERC 1926, 63 USLW 2383, 25 Envtl. L. Rep. 20,176
**(Cite as: 41 F.3d 341)**

Its predecessor had bought the plant from a predecessor of Minstar, Inc. and AMF Inc., related corporations that are the defendants-appellants. The buyer had agreed to indemnify the seller against all liabilities relating to the division of the seller (called the AMF York Division) that owned the plant. Later the land on which the plant was located was found to be contaminated and Harley-Davidson was forced to incur clean-up costs. CERCLA entitles the owner of contaminated land to seek contribution from other persons who are responsible in whole or part for the contamination, so Harley-Davidson brought this suit against Minstar, AMF, and others. Minstar and AMF set up the indemnity agreement in defense, but the district judge ruled that the agreement was invalid under CERCLA and therefore was not a defense to Harley-Davidson's claim for contribution. 837 F.Supp. 978 (E.D.Wis.1993). Although this was an interlocutory ruling, the district judge certified it for an immediate appeal under 28 U.S.C. § 1292(b), and we accepted the certification.

[1] Section 107(e) of CERCLA states, in subsection (1): "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from ... any person who may be liable ... under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." 42 U.S.C. § 9607(e). Harley-Davidson directs our attention to the first sentence, which appears to invalidate indemnification agreements made by "responsible parties" (in the lingo of CERCLA), such as Minstar and AMF, while Minstar and AMF direct us to the second sentence, which appears to authorize precisely such agreements. The subsection taken as a whole is notably obscure, but we agree with every other appellate court that has been called on to interpret it that it does not outlaw indemnification agreements, but merely precludes efforts to divest a responsible party of his liability. E.g., *John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401, 405 (1st Cir.1993);

*343 *United States v. Hardage,* 985 F.2d 1427, 1433 (10th Cir.1993). The first sentence speaks of "transfer[ring] ... liability," that is, of shifting liability from one person to another. Indemnification does not do that. The indemnified party remains fully liable to whomever he has wronged; he just has someone to share the expense with. The second sentence clearly permits sharing, just as the first forbids shifting.

[2] It would be extraordinary if the draftsmen had wanted to bar insurance against CERCLA liability (insurance is just a form of indemnification). Public policy does on occasion demand that a wrongdoer be forbidden to shift the cost of liability to another through insurance or some other form of indemnification, but that is in cases of deliberate wrongdoing. *Truck Ins. Exchange v. Ashland Oil, Inc.,* 951 F.2d 787, 790 (7th Cir.1992); *Western Casualty & Surety Co. v. Western World Ins. Co.,* 769 F.2d 381, 385 (7th Cir.1985). Individuals and firms are normally allowed to insure against the consequences of their negligence; what else is automobile liability insurance? Proof of CERCLA liability does not require proof even of negligence, let alone of deliberate wrongdoing; CERCLA liability is strict. *In re Chicago, Milwaukee, St. Paul & Pacific R.R.,* 974 F.2d 775, 779 (7th Cir.1992); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir.1985); see *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 325-26 (7th Cir.1994). Harley-Davidson flinches from the implications of its position, and, fastening on the word "insure" in the subsection's second sentence (it does not appear in the first sentence), argues that contracts of insurance are the one and only form of indemnification that the statute allows. But what sense would that make? Why would rational draftsmen allow a polluter to shift the cost of his liability to an insurance company but not to another polluter? Even the semantic argument is weak, since "insure" does not stand alone; the words are "to insure, hold harmless, *or indemnify.*" Harley-Davidson wants us to strike words from the statute, and it had better have compelling reasons for such dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

41 F.3d 341, 39 ERC 1926, 63 USLW 2383, 25 Envtl. L. Rep. 20,176
**(Cite as: 41 F.3d 341)**

figuring surgery.

It points out that if indemnification (we would add, in the form of insurance as otherwise) is allowed, potential polluters will have less incentive to take steps to avoid CERCLA liability, since they will be able to hand off all or part of the cost to the indemnitor. That of course is a problem with any form of insurance or indemnification. It is what is called moral hazard. When the problem is especially acute, insurance companies will not write insurance. *Western Casualty & Surety Co. v. Western World Ins. Co., supra,* 769 F.2d at 385. The law may even, as we noted, bar indemnification, as in cases of deliberate wrongdoing. The venerable requirement that an insured have an "insurable interest," the requirement that for example prevents a person from buying life insurance on the life of a stranger, *Connecticut Mutual Life Ins. Co. v. Schaefer,* 94 U.S. 457, 460, 24 L.Ed. 251 (1877), illustrates the concern with moral hazard. One can imagine, if barely, a decision by Congress that pollution is such an awful menace to society that polluters-even involuntary polluters-should be forbidden to insure. But there is no evidence of such a decision and it would be inconsistent with the second sentence, as well as with Harley-Davidson's concession that Minstar and AMF could have protected themselves with an insurance contract.

That leaves the first sentence unexplained. And it is mysterious. Indemnification does not, as we have already explained, "transfer" liability from the person indemnified. The latter remains fully liable to the victims of his wrongdoing. If a person buys automobile liability insurance and later is sued for damages arising out of an automobile accident, he cannot defend by saying, "I have insurance, so am not liable to you; go sue the insurance company." In most states the victim could not sue the insurance company if he wanted to. *National Union Fire Ins. Co. v. Baker & McKenzie,* 997 F.2d 305, 308 (7th Cir.1993); *Truck Ins. Exchange v. Ashland Oil, Inc., supra,* 951 F.2d at 789. But in the legislative process leading up to the enactment of CERCLA,

Congress considered allowing defendants in some cases to transfer liability to other responsible parties. S.Rep. No. 848, 96th Cong., 2d Sess. 44 (1980); Thaddeus Bereday, Note, "Contractual Transfers of Liability**344** under CERCLA Section 107(e)(1): For Enforcement of Private Risk Allocations in Real Property Transactions," 43 *Case W. Reserve L.Rev.* 161, 178-79, 204-07 (1992). The idea was dropped, and the first sentence of section 107(e)(1) may have been intended to make clear beyond any possibility of doubt that it was indeed dropped, that there is no transferring CERCLA liability. This is conjecture, but it is more plausible conjecture than anything that Harley-Davidson has offered us.

[3][4] It has urged on us, however, an alternative ground for upholding the district judge's ruling barring Minstar and AMF from enforcing the indemnification agreement: that despite the breadth of the agreement, it is not in fact applicable to the clean-up costs that Harley-Davidson incurred at the York, Pennsylvania site. This ground was not considered by the district court, but that is no bar to our considering it. Any nonwaived ground may be urged on appeal in defense of a judgment. *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (per curiam). This precept is as applicable to orders of which we have jurisdiction by virtue of 28 U.S.C. § 1292(b) as it is to any other orders. *Edwardsville National Bank v. Marion Laboratories, Inc.,* 808 F.2d 648, 651 (7th Cir.1987); cf. *Miller v. Bolger,* 802 F.2d 660, 666-67 (3d Cir.1986). Normally, it is true, we review only final judgments (final "decisions" in the language of 28 U.S.C. § 1291). But if an interlocutory order is properly before us, the reason for considering alternative grounds for affirmance of a final judgment is equally present. It is pointless to reverse the district court if it is apparent that when the case is remanded, that court will have to reinstate its order because the party that obtained it in the first round is indeed entitled to it, albeit on a different ground from the one initially adopted by that court.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

41 F.3d 341, 39 ERC 1926, 63 USLW 2383, 25 Envtl. L. Rep. 20,176

**(Cite as: 41 F.3d 341)**

[5][6] The question that Harley-Davidson asks us to answer regarding the scope of the indemnification agreement depends simply on the wording of the agreement interpreted in light of applicable state law governing indemnification agreements; there is no question of federal law. E.g., *Beazer East, Inc. v. Mead Corp.,* 34 F.3d 206, 212-15 (3d Cir.1994); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 14-15 (2d Cir.1993); *American Policyholders Ins. Co. v. Nyacol Products, Inc.,* 989 F.2d 1256, 1263-64 (1st Cir.1993). Harley-Davidson argues that the agreement is not broad enough to cover the contamination of the York site. But it could not be more broadly worded. It says that "[Harley-Davidson] shall ... indemnify AMF INCORPORATED against all debts, liabilities, and obligations, without any limitation, relating to AMF INCORPORATED's AMF York Division, its operations and products, whether known or unknown, ... and whether existing on the date of this agreement or coming into existence hereafter." The arguments that Harley-Davidson makes against taking the words in their natural meaning are makeweights, illustrated by its argument that other divisions of the defendants' predecessor may have been responsible for the contamination-the York Division merely owned the site, and the agreement refers to York's "operations and products." Yes, but the operative wording is "relating to ... [the] York Division, its operations and products," and liability arising from the contamination of land owned by the York Division "relat[es]" to the York Division. The applicability of the agreement is supported by decisions construing similar agreements in other CERCLA cases. *Olin Corp. v. Consolidated Aluminum Corp., supra,* 5 F.3d at 15-16; *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1461-63 (9th Cir.1986).

The indemnification agreement is enforceable and applicable, and bars Harley-Davidson's claim against these defendants.

REVERSED.

C.A.7 (Wis.),1994.

Harley-Davidson, Inc. v. Minstar, Inc.

41 F.3d 341, 39 ERC 1926, 63 USLW 2383, 25 Envtl. L. Rep. 20,176

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

▷

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Plaintiff,
v.
Royal N. HARDAGE, Oklahoma National Stockyards
Company, J.O.C. Oil Exploration, Dal-Worth Indus-
tries, Double Eagle, Samuel Bishkin, doing business as
Eltex Chemical, L & S Bearing Company, Kerr-McGee
Corporation, Cato Oil, Advance Chemical Distribution,
Inc., Allied-Signal, Inc., AT & T Technologies, Inc.,
Ashland Oil, Inc., Atlantic Richfield Company, Borg-
Warner Corporation, Exxon Corporation, The Firestone
Tire and Rubber Company, Foster Feed & Seed Co.,
Gencorp, Inc., Bull HN Information Systems Inc., Mag-
netic Peripherals, Inc., Maremont Corporation, Mobil
Chemical Company, Nalco Chemical Company, Ok-
lahoma Gas & Electric Company, The Oklahoma Pub-
lishing Company, Rockwell International Corporation,
Texaco, Inc., Texas Instruments, Inc., Uniroyal Inc.,
UOP, Inc., Westinghouse Electric Corporation, Weyer-
haeuser Company, Powell Sanitation Service, Inc., De-
fendants,
and
United States Pollution Control, Defendant-Appellant,
McDONNELL-DOUGLAS CORPORATION, Defend-
ant-Appellee,
v.
A.H. BELO, doing business as Dallas Morning News,
Acme Fence & Iron Co., Alamo Group Texas, Inc., Air-
craftsman, Inc., Agnew Auto Parts, American National
Can Corporation, Anadite, Inc., Arrow Tank Trucks,
Aztec Manufacturing, Arrow Industries, Aviall of
Texas, Inc., BASF, Betz Laboratories, Inc., Blanks En-
graving, Beazers Materials, Blackwell Zinc Company,
Inc., Broadway Machine & Motor Supply, Inc., The
Bucket Shop, Inc., Charles Machine Works, Inc., Con-
tainer Supply, Inc., Carnation Company, Container
Corp. of America, Continental Can Company, Inc.,
Cook Paint & Varnish Co., CTU of Delaware, Country
Home Meat Company, Dart Industries, Delta Faucet
Company, Del Paint Corporation, Dixico, Inc., Down-

town Airpark, Inc., Drilex Systems, Inc., Dubois Chem-
icals, Inc., Dresser Industries, Inc., Drillers Engine &
Supply, Inc., Dura Chrome, Fisher Controls, GAF, E C
Industries, Fred Jones Manufacturing Company, Gener-
al Dynamics, General Motors Corporation, Glidden
Company, SCM Corporation, Groendyke Transport,
Inc., General Electric Company, Goodyear Tire and
Rubber, Inc., H.W. Allen, Hudiberg Chevrolet, Inger-
soll-Rand Oilfield Products Company, Hinderliter Tool,
ICO, Inc., formerly known as Rodco, Inc., Johnson
Controls, Inc., Johnson & Johnson Medical, Inc., Ortho
Pharmaceutical Corp., Johnson-Johnson Hospital, Sur-
gikos, Inc., Kelly Moore Paint, Kerr Glass Manufactur-
ing, Jones-Blair Co., Laidlaw Waste, W.J. Lamberton,
Master Motor Rebuilders, Inc., Morris Fixture Co.,
Madix, George McKiddie, doing business as Capitol
Greese Co., Motorolla, Northrop Worldwide Aircraft,
doing business as Earl D. Mills, Packaging Corporation
of America, Parker-Hannifin Corp., O'Brien Corpora-
tion, Printpack, Inc., Proctor & Gamble Manufacturing
Co., Quebecor Printing, Maxwell Communication,
Riverside Press, Reliance Universal, Inc., Rotex Cor-
poration, Sherwin Williams Company, Star Manufactur-
ing, Sermatech, Southwest Electric Company, Stearns &
Foster Bedding, Susan Crane, Teccor Electronics, Inc.,
TRW, Inc., Turbodel, United Plating Works, Inc., Val-
ley Steel Products Company, Unit Parts Company,
United States Brass Corporation, Van Der Horst USA,
Waste Management of Oklahoma, Western Uniform &
Towel Service, Zoecon Corporation, Xerox, Consolid-
ated Cleaning, ABCO, Inc., Advance Packaging, Inc.,
Amedco Steel Inc., American Trailers, Anthes Inc., do-
ing business as Anthes Hi-Reach, Arthur G. McGee &
Company, B & J Tank Truck Service, Inc., B.W. Solu-
tions, Inc., Bacon Transport Company, Inc., Beauty
Craft Vanities, Blackwell Industrial, Paul Boone, indi-
vidually and formerly doing business as Lawton Plating
Co., Broadway Machine & Motor Supply, Inc., C & H
Services, Inc., CMI Corporation, Central Oklahoma
Equipment Corporation, Cimarron Aircraft Corporation,
Cimarron Manufacturing Company, Cliftco, Inc., Day
International Corporation, Diffee Motor Company, D-
Mac Leasing, Inc., Eureka Tool Company, Ferris Re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

sources, Inc., Fruehauf Corporation, Fruehauf Division, Fruehauf Corporation, doing business as Hobbs Trailer, Hobbs Trailer, Vernon Garney, individually and doing business as Auto Saver, Glidden Coating, a Division of SCM Corporation, Hamm & Phillips Service Company, Industrial Fabrication Co., Jackie Cooper Olds-GMC, Inc., James Bute Company, William Jenkins, individually and doing business as Foster Septic Tank, J.F. Smith & Sons, Inc., Kelsey-Hayes Corporation, also known as Kelsey Axle & Brakes Co., Bill Lance, Larry Goad & Company, Lassiter Enterprises, Inc., Materials Recovery Enterprises, Inc., McAlester Public Schools, Bob McBroom, individually and doing business as American Furniture Stripping, Ray McGee, individually and doing business as Quality Drum Service, Grease Company, Medley Material Handling Inc., Metroplex Sanitation, Inc., Mistletoe Express Service, Inc., Napko Corporation, Newman Bros. Trucking Company, Noble Chemical Corporation, The City of Norman, Oklahoma Tank Service, Oklahoma Transportation Company, Page Industries, Inc., Powell Electric Manufacturing Company, George Powell, individually and doing business as Powell Service Company, Premier Industrial Corp., doing business as Kent Industries, RWR Steel Company, Rabar Enterprises, Inc., Ram Transports, Inc., Reliance Universal Inc., S & S Plating Company, Solvent Manufacturing Company, Inc., Sooner Oil Patch Services, Inc., Spector Red Ball, Inc., Steelcraft, Inc., Sublett & Associates, Inc., Sunwest Industries of Oklahoma, Inc., Raymond Switzer, individually and doing business as Switzer & Gypsum Lime Company, T.I.P., Inc., Thermo King Sales & Service of Oklahoma, Inc.; Triangle Engineering Company, Trigg Drilling Company, Inc., Victor Equipment Co., Waste Services, Inc., Welch Enterprises, Inc., Jim Wesley, individually and doing business as Jim's Septic Tank, Western Commercial Transport, Inc., Westran Corporation, Witco, Inc., XAL Corporation, Thomas Engel, A-Better Sanitation Service, Inc., Reagent Chemical & Research, Inc., Sun Exploration & Prod. Co., Cameron Iron Works, J.C. Penney Co., Inc., Rohm & Haas Seeds, Inc., Phillips Petroleum Company, South Prairie Construction Co., The Atchison, Topeka and Santa Fe Railway Company, Nordam Corp., National Can Corp., Land & Marine Rental Co., formerly known as Tesoro Land & Marine Rental Co., Goodyear Tire and Rubber, Inc., Crowl Machine & Heat Treating Co., Crane Carrier Co., Corning Glass Works, Delta Faucet Co., Occidental Chemical, John Zink Co., General Motors Corp., Dura-Chrome Industries, Inc., The Dow Chemical Co., also known as Dow Industrial Service of the Dow Chemical Co., Dowell Division of the Dow Chemical Co., & Brasos Oil & Gas Division of the Dow Chemical Co., IUTS Liquidating Corp., formerly know as Industrial Uniform & Towel Supply Inc., Clyde's Carburetor Service, Inc., Amoco Prod. Co., formerly known as Pan American Petroleum, Dover Resources, Inc., Hudiburg Chevrolet, Inc., AMF Tuboscope, Eason Oil Co., Fox-Smythe Transportation Co., International Crystal Mfg. Co., KOBE, Inc., Nelson Electric Power Service, Inc., Newspaper Printing Corporation, Ryder Truck Rental, Inc., formerly known as Wilco Truck Rental, Inc., Southwest Electric Company, Star Mfg. Co. of Oklahoma, Corken International Corp., formerly known as Corken Pump Co., Glow-Lite Corp., (ARTRA), General Electric Company, Ford Motor Co., Conoco, Inc., E.I. Dupont De Nemours & Co., Continental Oil Co., Day International Corporation, (Electric Hose & Rubber), Central Sales Promotion, Inc., Sooner Ford Truck Sales, Inc., W & W Steel Co., Chromalloy American, Brittain Brothers, ICO, Inc., formerly known as Fodco, Inc., Sucker Rod Service, and Rodcore, Inc., Homco International, doing business as A-1 Bit & Tool, Tom Brown's Optical Service, Inc., Third-Party-Defendants.

No. 92-6101.
Feb. 16, 1993.

In hazardous waste cleanup litigation, hazardous waste generator of claim for indemnification against hazardous waste transporter based on indemnification clause in transport and disposal of contracts between the parties. Transporter sought indemnification from its customers, including generator, pursuant to contract language. The United States District Court for the Western District of Oklahoma, Lee R. West, J., found transporter liable in indemnification for generator's costs relating to site, and awarded attorneys fees and prejudgment interest. Transporter appealed. The Court of Appeals, Tacha, Circuit Judge, held that: (1) generator was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

entitled to be indemnified by transporter in light of broad contract language providing that generator would be indemnified for all losses resulting from transportation or disposal of its hazardous waste; (2) transporter was not entitled to be indemnified by generator; (3) although use of steering committee was reasonable, generator was required to establish reasonableness of legal expenses incurred through joint efforts, under Oklahoma indemnity law; and (4) prejudgment interest on attorney fees could not be awarded until trial court made reasonableness determination as to fees.

Affirmed in part, reversed in part and remanded.

West Headnotes

**[1] Federal Courts 170B ⚖️776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases

The Court of Appeals reviews a trial court's grant or denial of summary judgment de novo, applying the same standards used by the district court.

**[2] Federal Courts 170B ⚖️776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases

District court's dismissal of complaint is reviewed de novo.

**[3] Environmental Law 149E ⚖️447**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
            149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases
    (Formerly 208k3)

Although responsible parties may not altogether transfer their liability under CERCLA, they have the right to obtain indemnification for that liability. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(e)(1), 42 U.S.C.A. § 9607(e)(1).

**[4] Federal Courts 170B ⚖️412.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk412 Contracts; Sales
                170Bk412.1 k. In General. Most Cited Cases
    (Formerly 170Bk412)

State law governed indemnification provisions between CERCLA responsible parties, because government's interests were unaffected by the allocation of liability between jointly and severally liable parties and thus uniform federal rule was unnecessary. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.

**[5] Indemnity 208 ⚖️30(1)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(1) k. In General. Most Cited Cases
    (Formerly 208k8.1(1), 208k3)

Under Oklahoma law, an agreement to indemnify party for its own negligence must satisfy requirement that parties express their intent to exculpate in unequivocally clear language, agreement must result from arm's length transaction between parties of equal bargaining power, and exculpation must not violate public policy. 15 Okl.St.Ann. §§ 421-430.

**[6] Indemnity 208 ⚖️30(1)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

208k30 Indemnitee's Own Negligence or Fault
208k30(1) k. In General. Most Cited Cases
(Formerly 208k8.1(1))

Under Oklahoma law, although an indemnification agreement must clearly and unequivocally express an intent to exculpate the indemnitee for its own acts, it need not specifically refer to those acts in order to achieve that result. 15 Okl.St.Ann. §§ 421-430.

**[7] Indemnity 208 ⟷30(1)**

208 Indemnity
208II Contractual Indemnity
208k26 Requisites and Validity of Contracts
208k30 Indemnitee's Own Negligence or Fault
208k30(1) k. In General. Most Cited Cases
(Formerly 208k8.1(1))

Under Oklahoma law, an intent to exculpate indemnitee for its own acts may be found where language of indemnification is so broad and all-inclusive that it necessarily sweeps all events, including those occurring because of indemnitee's actions, into its coverage. 15 Okl.St.Ann. §§ 421-430.

**[8] Indemnity 208 ⟷33(6)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(6) k. Environmental Law. Most Cited Cases
(Formerly 208k8(3))

Under Oklahoma law, hazardous waste generator was entitled to indemnification from waste transporter under language in contract attachment, which indemnifies question from all losses "resulting from" the transportation or disposal of the generator's hazardous waste; the term "resulting from" was type of all-inclusive and unambiguous language sufficient to exculpate generator for its strict generator liability under CERCLA. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. § 9601 et seq.; 15 Okl.St.Ann. §§ 421-430.

**[9] Environmental Law 149E ⟷445(1)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(1) k. In General. Most Cited Cases
(Formerly 199k25.5(5.5) Health and Environment)

Transporter liability is predicated on site selection by the transporter. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), (a)(3, 4), 42 U.S.C.A. § 9607(a), (a)(3, 4).

**[10] Environmental Law 149E ⟷447**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases
(Formerly 208k8.1(2.1), 208k8.1(2))

Waste transporter could not claim indemnification from waste generator under attachment to contract between generator and transporter of hazardous waste which covered losses "caused or created by" waste generator, as transporter caused its own liability under CERCLA by selecting and transporting waste to disposal site. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), (a)(3, 4), 42 U.S.C.A. § 9607(a), (a)(3, 4).

**[11] Federal Courts 170B ⟷878**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)5 Questions of Fact, Verdicts and Findings
170Bk870 Particular Issues and Questions
170Bk878 k. Costs and Attorney Fees. Most Cited Cases

An award of attorneys' fees typically represents a finding of fact subject to review for clear error and is reversible only if it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

**[12]** Indemnity 208 ☞37

208 Indemnity
  208II Contractual Indemnity
    208k34 Scope and Extent of Liability
      208k37 k. Attorney Fees. Most Cited Cases
  (Formerly 208k9(2))

Under Oklahoma law, indemnitee ordinarily may recover its attorneys' fees incurred in defending against the indemnified liability only insofar as those fees were incurred in good faith and in the exercise of reasonable discretion. 15 Okl.St.Ann. § 427.

**[13]** Indemnity 208 ☞36

208 Indemnity
  208II Contractual Indemnity
    208k34 Scope and Extent of Liability
      208k36 k. Costs and Expenses. Most Cited Cases
  (Formerly 208k9(2))

For purposes of waste generator's claim for indemnification from waste transporter, the reasonableness of using or joining a steering committee in hazardous waste cleanup action, did not, by itself, establish reasonableness of legal expenses incurred through those joint efforts.

**[14]** Indemnity 208 ☞36

208 Indemnity
  208II Contractual Indemnity
    208k34 Scope and Extent of Liability
      208k36 k. Costs and Expenses. Most Cited Cases
  (Formerly 208k9(2))

Even where joint counsel clearly provides the most cost-effective use of legal resources in hazardous waste cleanup action, the lawyers involved still must establish the reasonableness of actual legal expenses in order to include those expenses within scope of indemnity. 15 Okl.St.Ann. §§ 427, 427, subd. 3.

**[15]** Interest 219 ☞39(2.20)

219 Interest
  219III Time and Computation

    219k39 Time from Which Interest Runs in General
      219k39(2.5) Prejudgment Interest in General
        219k39(2.20) k. Particular Cases and Issues. Most Cited Cases

For purposes of award of prejudgment interest, an award of attorney fees is not a "sum certain" where the reasonableness of those fees was still to be determined by the trial court. 23 Okl.St.Ann. § 6.

**\*1431** Raymond T. Reott (Theodore R. Tetzlaff and Gary W. Ballesteros, of Jenner & Block, were with him on the briefs), of Jenner & Block, Chicago, IL, for defendant-appellant.

Susan L. Gates (Michael D. Graves, was with her on the brief), Tulsa, OK, for defendant-appellee.

Before TACHA and BALDOCK, Circuit Judges, and BROWN, District Judge. FN*

    FN* The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

TACHA, Circuit Judge.

Defendant-Appellant United States Pollution Control, Inc. ("USPCI") appeals a judgment of the United States District Court for the Western District of Oklahoma finding USPCI liable in indemnification for McDonnell Douglas Corporation's ("MDC") costs relating to the Hardage Superfund Site and awarding attorneys' fees and prejudgment interest. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I. Background

This appeal arises out of a suit filed in 1986 by the United States for relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., for the cleanup of the Royal N. Hardage Industrial Waste Site ("Hardage Site") near **\*1432** Criner, Oklahoma. MDC

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

and USPCI were among 37 defendants named in that suit. MDC generated hazardous waste deposited at the Hardage Site; USPCI transported MDC's and other parties' waste to the Hardage Site. Due to the size and complexity of the litigation, the district court divided the case into four phases: Phase I determined the appropriate cleanup remedy; Phase II determined the liability of the named defendants to the government as responsible parties under CERCLA; Phase III resolved all cross-claims and third-party claims; and Phase IV allocated the amounts to be paid by the liable parties.

In Phase I, the district court opted not to implement the government's proposed remedy, instead favoring the remedy proposed by the Hardage Steering Committee ("HSC").[FN1] In Phase II, MDC, along with most of the HSC defendants, stipulated to liability as a generator of hazardous waste pursuant to CERCLA § 107(a)(3). US-PCI contested its liability, but was found liable as a transporter of hazardous waste pursuant to CERCLA §§ 106 and 107(a)(4). Although certain facts and findings of Phases I and II will be relevant to this appeal, we do not revisit the merits of those decisions here. Rather, this appeal centers on the district court's resolution of cross-claims for indemnification between MDC and US-PCI and the proper amounts to be paid therefrom-Phase III and IV issues respectively.

> FN1. Most of the original defendants organized themselves as HSC defendants in order to enjoy economies of scale in contesting various elements of the government's CERCLA enforcement activities. USPCI originally joined the HSC but later dropped out. For background information and the disposition of the Phase I case, see *United States v. Hardage,* 982 F.2d 1436 (10th Cir.1992).

For purposes of this appeal, MDC began Phase III in 1988, when it filed its claim for indemnification against USPCI for any expenses arising out of the Hardage Site. MDC based this claim on an indemnification clause found in two transport and disposal contracts between MDC and USPCI. In 1990, USPCI responded in kind when it sought indemnification from its customers, including MDC, pursuant to language contained on

the USPCI standard-form shipping tickets. In its order entered August 16, 1990, the district court dismissed USPCI's "shipping-ticket" claim, finding the indemnification language inapplicable under the facts of the case. In the interim, both sides filed for partial summary judgment against the other on the indemnification provisions contained in the transport and disposal contracts. In its order entered February 20, 1991, the district court granted summary judgment against USPCI and for MDC.

The litigation then entered Phase IV. The district court found that MDC was entitled to be indemnified by USPCI in the amount of $1,486,464.08. This amount represented assessments paid by MDC to the HSC for the HSC's response costs and legal expenses and also included additional legal expenses incurred directly by MDC in its Hardage Site defense. In addition, the court awarded prejudgment interest on the HSC assessments in the amount of $369.574.03. The district court has since awarded additional prejudgment interest, MDC's Rule 54(d) costs, and post-judgment interest.

USPCI timely appealed the judgment of the district court. It alleges the following errors: (1) MDC was not entitled to summary judgment on the competing indemnification provisions; (2) USPCI was entitled to summary judgment on the shipping-ticket claims and under the transport and disposal contracts; (3) the district court erroneously awarded "unreasonable" defense costs; and (4) prejudgment interest was inappropriate.

## II. Indemnification

[1] We review a trial court's grant or denial of summary judgment de novo, applying the same standards used by the district court. *Osgood v. State Farm Mutual Auto. Ins. Co.,* 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, **\*1433** show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

*Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990).

[2] We also review the district court's dismissal of USPCI's shipping-ticket cross-claim de novo. "[T]he dismissal of a complaint is proper if, taking all well-pleaded facts as true and construing them in the light most favorable to the plaintiff, it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *National Commodity & Barter Ass'n v. Gibbs,* 886 F.2d 1240, 1244 (10th Cir.1989).

[3] MDC and USPCI each seek indemnification from the other for their respective liabilities as CERCLA responsible parties. CERCLA § 107(e)(1) provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. *Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.*

42 U.S.C. § 9607(e)(1) (emphasis added). The plain meaning of this language is that, although responsible parties may not altogether *transfer* their CERCLA liability, they have the right to obtain indemnification for that liability. *See Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1458 (9th Cir.1986); *Purolator Prods. Corp. v. Allied-Signal, Inc.,* 772 F.Supp. 124, 128-29 (W.D.N.Y.1991).

[4] The parties agree that Oklahoma law governs the interpretation and construction of the indemnification provisions.[FN2] Our task therefore is to ascertain and apply Oklahoma law such that we reach the result that would be reached by an Oklahoma court. *See Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.,* 959 F.2d 868, 870 (10th Cir.1992). We review de novo the district court's rulings with respect to Oklahoma law. *Salve Regina College v. Russell,* 499 U.S. 225, ----, 111

S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

FN2. The record does not reveal whether the district court made the threshold determination of whether federal common law or state law would govern the interpretation of indemnification provisions between CERCLA responsible parties. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727-28, 99 S.Ct. 1448, 1457-58, 59 L.Ed.2d 711 (1979). Because the government's interests are unaffected by the allocation of liability between jointly and severally liable parties, we easily conclude that a uniform federal rule is unnecessary and that state law will govern the indemnification clauses. *See Mardan,* 804 F.2d at 1457-60.

We first consider whether MDC was entitled to indemnification under the transport and disposal contracts. Between March 1973 and October 1979, USPCI transported over 250,000 gallons of hazardous waste generated by MDC to the Hardage Site. These shipments occurred under two contracts between MDC and USPCI. In 1972, the parties entered into Contract No. MRS-1340 ("1972 Contract"), whereby USPCI agreed to transport and dispose of hazardous substances generated by MDC. In 1977, the parties entered into Contract No. S & S-2046 ("1977 Contract"), which superseded and replaced the 1972 Contract and which provided for substantially the same transport and disposal services. Both the 1972 and 1977 Contracts contained several essentially identical indemnification provisions: Attachment A to both contracts contains an indemnification provision running in MDC's favor; Attachment B to both contracts contains an indemnification provision running in USPCI's favor; and the Supplemental Terms and Conditions to both contracts contains yet another indemnification clause favoring MDC. This case turns on the resolution of these purportedly antithetical contractual provisions.

**\*1434** We begin our inquiry with the actual language of the contracts.[FN3] MDC proffers two indemnification provisions running in its favor. First, Attachment A provides:

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

FN3. Because the corresponding provisions in the 1972 and 1977 Contracts are materially identical, we refer to the provisions in the 1972 Contract only.

[USPCI] shall furnish his own equipment and warrants that the material obtained by him pursuant to this contract shall be transported and disposed of in a manner which will not cause harm or damage to persons or property and agrees that he will hold [MDC] harmless from any claim of loss or damage resulting from the transporting or disposal of said materials.

Second, the Supplemental Terms and Conditions states:

[USPCI] hereby agrees to indemnify and save harmless [MDC] ... against all liability, obligations, claims, loss and expense (1) caused or created by [USPCI] ... arising out of work hereunder....

USPCI counters with its own indemnification provision from the transport and disposal contracts. Attachment B provides:

[MDC] and the Government agree to indemnify and save harmless [USPCI], its agents and employees against all liability, obligations, claims, losses and expenses (1) caused or created by MDC and the Government, its subcontractors, or the agents and employees of either, whether negligent or not, arising out of work hereunder, or (2) arising out of injuries (including death) suffered or allegedly suffered by employees of MDC and the Government or its subcontractors (i) in the course of their employment or (ii) in the performance of work hereunder.

[5] Applying Oklahoma law, we conclude that MDC was properly awarded summary judgment for indemnification. "An indemnification agreement is a valid agreement in Oklahoma, and is governed by statute." *Fretwell v. Protection Alarm Co.,* 764 P.2d 149, 152 (Okla.1988); *see also* Okla.Stat.Ann. tit. 15, §§ 421-430 (West 1966). Under Oklahoma law, an agreement to indemnify a party for its own negligence [FN4] "must meet the following three conditions: (1) the parties must express their intent to exculpate in unequivocally clear

language; (2) the agreement must result from an arm's-length transaction between parties of equal bargaining power; and (3) the exculpation must not violate public policy." *Transpower Constructors v. Grand River Dam Auth.,* 905 F.2d 1413, 1420 (10th Cir.1990). Because USPCI does not assert either that the agreement was not an arm's length deal or that it violates public policy, our inquiry focuses on whether the parties unequivocally expressed an intent to indemnify. "Intent must be determined by construing the contract as a whole, and the court must construe the contract so as to give effect to each provision." *Greenberg v. Service Business Forms Indus.,* 882 F.2d 1538, 1540 (10th Cir.1989) (applying Oklahoma law), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 838 (1990). We therefore analyze the various indemnification provisions separately and as a whole.

FN4. MDC's CERCLA liability, of course, is strict, rather than based on negligence. One court appears to fully extend the policy of the negligence rule to strict liability indemnification cases. *See* Purolator Prods., 772 F.Supp. at 130-31. We do not decide whether to extend the negligence rule to strict liability cases, however, because we find that MDC is entitled to indemnification even under the fullest application of the negligence rule.

[6][7][8] We first find that MDC is entitled to indemnification from USPCI under Attachment A, which indemnifies all losses "resulting from" the transportation or disposal of MDC's hazardous waste. Although an indemnification agreement must clearly and unequivocally express an intent to exculpate the indemnitee for its own acts, it need not specifically refer to those acts in order to achieve that result. *Transpower,* 905 F.2d at 1421. Rather, such an intent may be found where the language of the indemnification is so broad and all-inclusive that it necessarily sweeps all events-including those occurring because of the indemnitee's actions-into its coverage.**1435** *Id.; see also* 41 Am.Jur.2d *Indemnity* § 15, at 701-02. Although Oklahoma has not addressed the effect of the precise language presented in this case, our analysis of Oklahoma

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

law leads us to conclude that the term "resulting from" is the type of all-inclusive and unambiguous language sufficient to exculpate MDC for its strict generator liability.

In *Colorado Milling & Elevator Co. v. Chicago, Rock Island & Pacific Railroad Co.,* 382 F.2d 834 (10th Cir.1967), we interpreted a lease contract that indemnified any loss " 'aris[ing] from or ... connected with (1) any act or omission on the part of the Lessee ... or (2) any condition whatsoever in the premises.' " *Id.* at 836 (emphasis omitted) (applying Oklahoma law). We held that, because the broad language was "all-inclusive," the intent of the parties to indemnify was necessarily clear and unequivocal. *Id.; see also Trumbower v. Sports Car Club of Am., Inc.,* 428 F.Supp. 1113, 1114-16 (W.D.Okla.1976) (phrase "on account of" sufficient to trigger exculpatory indemnification) (applying Oklahoma law). These results are consistent with both the ordinary scope and meaning of the words used and with other related decisions. *See, e.g., Tyler v. Dowell, Inc.,* 274 F.2d 890, 894-95 (10th Cir.) (phrase "in the course of" sufficiently expresses intent for exculpatory indemnification) (applying New Mexico law), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); *Purolator Prods.,* 772 F.Supp. at 131 n. 3 (phrase "relating to or arising out of" triggers indemnification for CERCLA responsible party liability) (applying New York and Delaware law); *Missouri Pacific R.R. Co. v. Kansas Gas & Elec. Co.,* No. 86-1020-K, slip op. (D.Kan. Dec. 16, 1986) (phrase "arising out of or connected with" triggers exculpatory indemnification) (applying Kansas law). *But see Sinclair Oil & Gas Co. v. Brown,* 333 F.2d 967, 968-69 (10th Cir.1964) (indemnity clause did not establish exculpatory indemnification because it applied only to losses "resulting from the operations of the *indemnitor*") (applying Texas law). We thus conclude that, under Oklahoma law, the indemnification in Attachment A covering losses "resulting from" the transport or disposal of MDC's hazardous waste is sufficiently all-inclusive to clearly and unmistakably express USPCI's intent to indemnify MDC for its present CERCLA liability. FN5

FN5. The Supplemental Terms and Conditions indemnification is not applicable under these facts because MDC, as a generator under 42 U.S.C. § 9607(a)(3), "caused" its own CERCLA liability. *Cf. infra* discussion of Attachment B.

[9][10] We next find that USPCI has failed to identify in the 1972 and 1977 Contracts any indemnificatory language running in its favor that would apply to this case. Attachment B, upon which it relies in the contract claim, covers losses "caused or created by" MDC. MDC, however, did not cause or create USPCI's liability. Rather, USPCI is a liable party under CERCLA § 107(a) because it transported or disposed of hazardous waste at the Hardage Site. As USPCI notes, transporter liability is predicated on site selection by the transporter. *See* 42 U.S.C. § 9607(a)(4). In Phase II of the Hardage Site litigation, however, the district court found that USPCI had indeed selected the Hardage Site for disposal of MDC's waste. FN6 That judgment was appealed but is now final. We therefore conclude that USPCI, which caused its own liability by selecting and transporting waste to the Hardage site, may not claim indemnification under Attachment B.

FN6. In its Findings of Fact and Conclusions of Law entered August 8, 1991, the district court found, among other things, that USPCI "contracted with Mr. Hardage to use the Hardage Site for hazardous waste disposal prior to approaching any of the customers in question [and] proposed the Hardage Site to its customers as a location for hazardous waste disposal." *See also United States v. Hardage,* 750 F.Supp. 1444, 1459 (W.D.Okla.1990) (detailing USPCI's site selection).

Finally, USPCI's shipping tickets contain the following indemnification language:

Customer agrees to indemnify and save harmless [USPCI], its agents and employees, against any and all liabilities, obligations, claims, losses, and expenses **\*1436** (1) caused or created by Customers, its sub-contractors, or the agents and employees of

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

either, whether negligent or not, arising out of work hereunder....

The district court dismissed USPCI's claim for indemnification against all of its generators, including MDC, based on this provision. We agree with the district court that the shipping ticket indemnification clause suffers the same infirmity as USPCI's other indemnification clauses: USPCI caused its own loss as the transporter of the hazardous waste. [FN7]

> FN7. Because we find the shipping-ticket provision inapplicable under the facts of this case, we do not address whether its effect was barred by integration clauses contained in the transport and disposal contracts.

In sum, once each indemnification provision is analyzed individually, it becomes apparent that this case does not present, as USPCI argues, a quagmire of contradictory indemnifications. Rather, we encounter a contractual relationship in which one party-MDC-obtained sweeping indemnification while the other party-USPCI-acquired only limited protection from liability. Because the facts of this case do not trigger USPCI's limited indemnification but do trigger MDC's broad provision, we find that the district court properly granted MDC summary judgment for indemnification and properly denied summary judgment for USPCI. We further find that this same analysis supports the district court's dismissal of USPCI's claim for indemnification based on its shipping tickets.

### III. Attorneys' Fees

Under the prevailing indemnification provisions in the 1972 and 1977 Contracts, USPCI agreed to indemnify MDC for "any claim of loss or damage resulting from the transporting or disposal" of the hazardous waste. MDC seeks its attorneys' fees under Okla.Stat.Ann. tit. 15, § 427 (West 1966), which provides that indemnity against claims "embraces the costs of defense against such claims ... incurred in good faith, and in the exercise of reasonable discretion." *See Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.,* 550 F.Supp. 710, 718 (W.D.Okla.1981) (stating "general rule that unless an indemnity contract otherwise provides, it indemnifies the contracting party against all costs including attorneys' fees").

The district court awarded to MDC the following amounts:

| | |
|---|---:|
| HSC Assessments: | |
| Hardage Steering Committee | $ 565,671.07 |
| Brown, Maroney Trust Fund | 633,621.00 |
| Southwest Title and Trust Co. | 20,204.00 |
| United States Court Clerk | 1,000.00 |
| Legal Fees Paid Directly by MDC: | |
| Hall, Estill | $ 254,255.30 |
| McKinney, Stringer | 1,069.75 |
| Travel Expenses/In-House Counsel: | |
| Dan Summers | $ 10,642.96 |
| Total: | $1,486,464.08 |

The parties stipulated that 48% of MDC's HSC assessments-$585,838.30-represents costs attributable to attorneys' fees.

In its opinion entered February 12, 1992, the district court concluded that MDC was entitled to the full $1,486,464.08. Regarding the attorneys' fees paid directly by MDC and the in-house expenses, the court ap-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

plied section 427(3) and determined that, some duplication of effort notwithstanding, those expenses were reasonably incurred. USPCI does not appeal that ruling.

As to the attorneys' fees included in the HSC assessments, the district court concluded that, because the indemnification covered *any* loss-not just *reasonable* loss-the issue of reasonableness was relevant only, if at all, to MDC's conduct in approving and paying the assessments. USPCI contends that all attorneys' fees, whatever form they take, must pass the "reasonableness" test and that the legal expenses underlying the HSC assessments were in many cases unreasonable and therefore unrecoverable.

[11] An award of attorneys' fees typically represents a finding of fact subject to review for clear error and reversible only if **\*1437** " 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.' " *Las Vegas Ice & Cold Storage Co. v. Far West Bank,* 893 F.2d 1182, 1185 (10th Cir.1990) (quoting *LeMaire ex rel. LeMaire v. United States,* 826 F.2d 949, 953 (10th Cir.1987)). USPCI, however, does not contest the lower court's factual findings of reasonableness regarding MDC's direct legal costs. Rather, it challenges the court's decision to restrict the reasonableness inquiry regarding the HSC assessment attorneys' fees to the narrow question of whether it was reasonable to incur those expenses by joining the HSC at all. This involves a question of the proper scope and interpretation of Oklahoma law, a question which we review de novo. *Salve Regina College,* 499 U.S. at ----, 111 S.Ct. at 1221.

[12] It is clear that in the ordinary case the indemnitee may recover its attorneys' fees incurred in defending against the indemnified liability only insofar as those fees were "incurred in good faith, and in the exercise of reasonable discretion." Okla.Stat.Ann. tit. 15, § 427 (West 1966). The scope of Oklahoma's statutory reasonableness requirement as applied to joint defense legal fees, however, is a question of first impression. In concluding that the district court erred by not examining the legal expenses underlying the HSC assessments, we find guidance in the experiences of other courts regarding collaborative legal fees.

We first praise the steering committee members for their efforts to resolve this particular "litigatory monster." *See In re Recticel Foam Corp.,* 859 F.2d 1000, 1001 (1st Cir.1988) (describing the litigation growing out of the San Juan DuPont Plaza Hotel Fire of 1986). As the steering committee members must have discerned, this case is the type of "complex multi-party hazardous waste case" where "[t]raditional notions of adversarial litigation, in which each party engages in its own pretrial discovery, motion practice, settlement discussions and trial preparation, could not serve the legitimate needs of the ... parties [or] of judicial economy." *New Jersey Dep't. of Envt'l Protection v. Gloucester Env't'l Management Servs., Inc.,* 138 F.R.D. 421, 426 (D.N.J.1991). It is beyond dispute that the use of a steering committee in this case spared the unnecessary duplication of effort and expense of both the parties and the judiciary. We have no doubt that MDC substantially reduced its legal costs by joining the HSC and that its decision to join the HSC was a reasonable one.

[13] Nonetheless, the reasonableness of using or joining a steering committee does not, by itself, establish the reasonableness of the legal expenses incurred through the joint efforts. Indeed, after examining the body of cases involving liaison counsel or steering committees, we found no case accepting such a proxy. Rather, even where joint counsel clearly provides the most cost-effective resolution available, the lawyers involved still must establish the reasonableness of their actual legal expenses. *See, e.g., Gloucester Env't'l Management Servs.,* 138 F.R.D. at 428-431 (examining reasonableness of defendant steering committee's legal expenses in suit to compel contribution from delinquent parties). Oklahoma has articulated its own version of the "lodestar" test to determine the reasonableness of attorneys' fees, *see State ex rel. Burk v. City of Oklahoma City,* 598 P.2d 659, 661 (Okla.1979), and we believe that Oklahoma courts would interpret the statutory reasonableness inquiry to require the application of that test to the actual legal expenses incurred by the HSC. We therefore reverse the decision of the district court awarding MDC attorneys' fees for its HSC assessments

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

985 F.2d 1427
**(Cite as: 985 F.2d 1427)**

and remand for a determination of the reasonableness of the legal expenses underlying those assessments.[FN8]

> FN8. We note that the reasonableness of steering committee legal expenses should reflect the context in which those expenses were incurred. For all of its benefits, a steering committee is a bureaucracy not without its warts. Even the best-run steering committees will necessarily involve some inefficiency and duplication of effort. Indeed, a steering committee might incur legitimate legal expenses simply monitoring its own progress. We therefore doubt that, under these circumstances, the Oklahoma courts would hold the HSC to the standard of efficiency expected of a single lawyer or firm.

**\*1438 IV. Prejudgment Interest**

After initially denying prejudgment interest, the court reconsidered its decision and awarded prejudgment interest on the HSC assessments from the time of such payments. Oklahoma law provides that

> any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

Okla.Stat.Ann. tit. 23, § 6 (West 1987). The district court ultimately concluded that the HSC assessments were sums certain as of the day of payment and that prejudgment interest therefore was appropriate.

[14][15] "Under § 6, 'prejudgment interest will not be allowed unless the amount of recovery is liquidated or capable of ascertainment by calculation or resort to well-established market values.' " *Withrow v. Red Eagle Oil Co.,* 755 P.2d 622, 625 (Okla.1988) (quoting *Sandpiper North Apartments, Ltd. v. American Nat'l Bank & Trust Co.,* 680 P.2d 983, 993 (Okla.1984)). An award of attorneys' fees is not a sum certain where the reasonableness of those fees is still to be determined by the trial court. *Transpower,* 905 F.2d at 1422

("Damages are not certain where their calculation is left to the best judgment of the fact-finder."); *see also Kelly-Springfield Tire Co. v. Mobil Oil Corp.,* 551 P.2d 671, 675 (Okla.Ct.App.1975) (reasonableness of attorneys' fees to be determined by fact-finder). Indeed, the district court, in its order entered August 5, 1991, denied MDC's first request for prejudgment interest precisely because it included the direct legal expenses for which the court had yet to "receive evidence to determine the reasonableness of the fees and costs sought." Because we hold that the district court must determine the reasonableness of the legal expenses underlying the HSC assessments, the district court's award of prejudgment interest is reversed.

AFFIRMED in part, REVERSED in part, and REMANDED for further consideration consistent with this opinion.

C.A.10 (Okl.),1993.
U.S. v. Hardage
985 F.2d 1427

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

⚑

United States Court of Appeals,
Third Circuit.
BEAZER EAST, INC., Appellant,
v.
The MEAD CORPORATION, Appellee.

No. 93-3372.
Argued Feb. 15, 1994.
Decided Sept. 12, 1994.
Rehearing Denied Nov. 25, 1994.

Owner of coke manufacturing facility brought action for contribution or indemnification against successor of entity that sold facility to owner's predecessor, for response costs incurred under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA). Seller's successor counterclaimed for indemnity. The United States District Court for the Western District of Pennsylvania, Gustave Diamond, J., granted summary judgment for seller's successor on counterclaim, and owner appealed. The Court of Appeals, Hutchinson, Circuit Judge, held that: (1) agreement which predated CERCLA could be construed to indemnify against CERCLA liability; (2) whether indemnity provision encompassed CERCLA response costs would be determined by state, not federal, law; and (3) under Alabama law, indemnification provision lacked sufficient specificity to require indemnification by either party for CERCLA liability.

Reversed and remanded.

West Headnotes

**[1] Federal Courts 170B ⚎766**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk763 Extent of Review Dependent on Nature of Decision Appealed from

        170Bk766 k. Summary Judgment.
Most Cited Cases

**Federal Courts 170B ⚎802**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
        170Bk802 k. Summary Judgment.
Most Cited Cases

Court of Appeals exercises plenary review over district court's grant of summary judgment, viewing evidence in light most favorable to nonmoving party and determining whether there remain any genuine issues of material fact and, if not, whether moving party is entitled to judgment as matter of law.

**[2] Environmental Law 149E ⚎447**

149E Environmental Law
  149EIX Hazardous Waste or Materials
    149Ek436 Response and Cleanup; Liability
      149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases
  (Formerly 208k3)

Under CERCLA, agreements to indemnify or hold harmless as to CERCLA liability are enforceable between contracting parties, but are not enforceable against government. Comprehensive Environmental Response Compensation and Liability Act, § 107(e)(1), as amended, 42 U.S.C.A. § 9607(e)(1).

**[3] Environmental Law 149E ⚎447**

149E Environmental Law
  149EIX Hazardous Waste or Materials
    149Ek436 Response and Cleanup; Liability
      149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases
  (Formerly 208k8(2.1))

Indemnity provision in contract of sale of manufacturing facility that predated CERCLA could be

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

construed to include indemnity against CERCLA liability, if provision was specific enough to include CERCLA liability or general enough to include any and all environmental liability. Comprehensive Environmental Response Compensation and Liability Act, § 107(e)(1), as amended, 42 U.S.C.A. § 9607(e)(1).

**[4] Federal Courts 170B ☞412.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
          170Bk412 Contracts; Sales
            170Bk412.1 k. In General. Most Cited Cases

Although federal law generally governs validity of agreement releasing cause of action arising under federal law, construction or interpretation of private contract is generally thought to be question of state law.

**[5] Federal Courts 170B ☞412.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
          170Bk412 Contracts; Sales
            170Bk412.1 k. In General. Most Cited Cases

Whether indemnification provision in contract between buyer and seller of coke manufacturing facility encompassed liability for response costs under CERCLA would be determined by state, not federal, law; issue did not require uniform body of law, objectives of CERCLA would not be frustrated by application of state law, application of federal rule would disrupt commercial relationships predicated on state law, and how parties apportioned their CERCLA liability among themselves did not affect their primary obligation to government. Comprehensive Environmental Response Compensation and Liability Act, § 107(e)(1), as amended, 42 U.S.C.A. § 9607(e)(1).

**[6] Federal Courts 170B ☞374**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(A) In General
          170Bk374 k. Matters of General Jurisprudence; Federal Common Law. Most Cited Cases

In determining when uniform federal rule is needed to decide federal claims based on federal statutes, where Congress' intent on what law should supply rule of decision is not clear, court should consider whether issue requires nationally uniform body of law, whether application of state law would frustrate specific objectives of federal programs, and whether application of federal rule would disrupt commercial relationships predicated on state law.

**[7] Indemnity 208 ☞36**

208 Indemnity
    208II Contractual Indemnity
        208k34 Scope and Extent of Liability
          208k36 k. Costs and Expenses. Most Cited Cases
    (Formerly 208k9(2))

Under Alabama law, indemnification agreements will cover particular liability costs if agreement includes plain and unambiguous expression of intent to cover those costs.

**[8] Contracts 95 ☞176(2)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
          95k176 Questions for Jury
            95k176(2) k. Ambiguity in General. Most Cited Cases

Under Alabama law, whether contract is unambiguous is question of law.

**[9] Environmental Law 149E ☞447**

149E Environmental Law
    149EIX Hazardous Waste or Materials
        149Ek436 Response and Cleanup; Liability
          149Ek447 k. Contribution and Indemnity;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

Allocation of Liability. Most Cited Cases
  (Formerly 208k8(2.1))

    Under Alabama law, owner of coke manufacturing facility was not required to indemnify successor of entity that sold facility to owner's predecessor for response costs under CERCLA arising in connection with facility after sale of facility took place; although contractual indemnity provision referred to future environmental orders, agreement was ambiguous as to scope of indemnification. Comprehensive Environmental Response Compensation and Liability Act, § 107(e)(1), as amended, 42 U.S.C.A. § 9607(e)(1).

**[10]** Environmental Law 149E ⬤447

149E Environmental Law
  149EIX Hazardous Waste or Materials
    149Ek436 Response and Cleanup; Liability
      149Ek447 k. Contribution and Indemnity; Allocation of Liability. Most Cited Cases
  (Formerly 208k8(2.1))

    Under Alabama law, successor of entity that sold coke manufacturing facility to current owner's predecessor was not required to indemnify owner for response costs under CERCLA arising in connection with facility after- sale of facility took place; although contract appeared to limit owner's liability to environmental permits existing at time of sale, agreement was ambiguous as to scope of indemnification. Comprehensive Environmental Response Compensation and Liability Act, § 107(e)(1), as amended, 42 U.S.C.A. § 9607(e)(1).

**\*208** George E. Yokitis, Kenneth R. Bruce, Albert Bates, Jr., IV, Dean A. Calland (argued), Babst, Calland, Clements & Zomnir, P.C., and Billie S. Flaherty, Beazer East, Inc., Pittsburgh, PA, and Robert L. Schuftan, Wildman, Harrold, Allen & Dixon, Chicago, IL, for appellant.

Alan M. Wiseman (argued), Thomas A. Isaacson, Howrey & Simon, Washington, DC, and George P. Faines, John H. Bingley, Jr., Thorp, Reed & Armstrong, Pittsburgh, PA, for appellee.

Before BECKER, HUTCHINSON and COWEN, Circuit Judges.

### OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

    Appellant, Beazer East, Inc. ("Beazer"), appeals an order of the United States District Court for the Western District of Pennsylvania dismissing Beazer's claims for indemnity and contribution. Beazer claimed appellee, The Mead Corporation ("Mead"), was bound by a promise to pay Beazer all or part of Beazer's response costs on a Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C.A. §§ 9601-9675 (West 1983 & Supp.1994) ( "CERCLA"), cleanup of a site Beazer's predecessor had acquired from Mead's predecessor. Instead, the district court granted summary judgment to Mead on Mead's counterclaim for indemnity from Beazer against Mead's response costs. In doing so, the district court adopted a United States Magistrate Judge's report and recommendation ("Magistrate Judge's Report"). The magistrate judge had concluded that Mead was a responsible party for purposes of CERCLA but that the asset purchase agreement ("Agreement") under which Beazer had acquired the site of the contaminated facility, the Woodward Facility Coke Plant (the "Woodward Facility" or "Coke Plant"), required Beazer to indemnify Mead against CERCLA liability. The magistrate judge reasoned that a provision for indemnification in a contract that predates CERCLA's enactment will govern the responsibility of the contracting parties *inter se* for payment of CERCLA cleanup costs if the indemnification or release provision is a general release from all liability arising out of a particular transfer or contains an unambiguous promise to indemnify against all liabilities that environmental law, present or future, may impose because of pollutants on the property transferred. The magistrate judge then concluded that the asset purchase agreement between Mead's predecessor, the seller, and Beazer's predecessor, the buyer of the contaminated site, unambiguously required Beazer to indemnify

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

**(Cite as: 34 F.3d 206)**

Mead against any liability for injury to the environment from substances on the property, including cleanup under CERCLA, no matter who polluted the site. The paragraph in question, Paragraph 4(c) of the agreement, required the buyer and its successors to assume and perform "[o]bligations of the Coke Plant to comply from and after the Closing Date with all of the terms and conditions of any ... solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency ... in accordance with applications now pending and listed in Exhibit F hereto." Appellant's Appendix ("App.") at 23.

On appeal Beazer argues that the district court erred in concluding this indemnity provision was unambiguously broad enough to impose on it a general duty to indemnify Mead against all environmental liability under either state or federal common law concerning the construction of such contracts of indemnity.

We agree with the magistrate judge and the district court concerning the substance if not the source of the standard that must be used in determining the effect of an indemnity clause on a party's liability under laws subsequently enacted to protect the environment. We part ways with the magistrate judge and the district court, however, in the application of this standard to the provision at hand. We agree with Beazer that Paragraph 4(c) of this agreement does not plainly and unambiguously require it to indemnify Mead for cleanup costs at the Coke Plant, and therefore reverse the order of the district court granting Mead summary judgment, vacate the order which dismisses Beazer's claim for contribution and remand for **\*209** further proceedings consistent with this opinion. On remand the district court will have to consider both parties' contribution claims, and determine the proper apportionment of CERCLA liability.

I. *Factual & Procedural History*
Mead's predecessor, the Woodward Corporation, operated the Woodward Facility as a coke and coke-by products manufacturing facility from 1905

until 1968. In 1968, the Woodward Iron Company merged with Mead. Mead, in turn, operated the Coke Plant until 1974, when it sold the facility and surrounding land to Beazer's predecessor, Koppers Company, Inc. ("KCI"). KCI purchased the Coke Plant under the Agreement in question. Paragraph 4 of the Agreement provides that KCI, as buyer, or its successors, will assume certain agreements and liabilities. It reads:

As of the Closing Date, Buyer shall assume and agree to perform:

a. ... all other commitments, liabilities and obligations expressly assumed by Buyer pursuant to this Purchase Agreement.

\* \* \* \* \* \*

c. Obligations of the Coke Plant to comply from and after the Closing Date with all of the terms and conditions of any NPDES permit issued by the United States Environmental Protection Agency or the then permitting authority, any permit or order issued by the Alabama Water Improvement Commission and the Alabama Air Pollution Control Commission of the State of Alabama or any successor authority, any license, permit or order issued by the Jefferson County Department of Health, and of any other wastewater or runoff water discharge permit, license or order, air pollution permit, license or order, solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency and/or by the State of Alabama and/or any of its political subdivisions, all in accordance with applications now pending and listed on Exhibit F hereto.

App. at 22-23. Exhibit F contains a "List of Environmental Applications and Permits." It is divided into two parts, one for permits related to air and one for permits related to water. Exhibit F lists no permits related to solid waste. All the listed permits refer to their date of issuance and the issuing authority.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

Paragraph 8(a) of the Agreement requires Mead, the seller, to indemnify Beazer, the buyer, against certain other liabilities. It provides:

a. *Indemnity Against Unassumed Liabilities.* Mead hereby indemnifies Buyer against and hereby agrees to hold Buyer harmless from and to reimburse Buyer for any and all liabilities, losses, damages, costs of settlement and expenses ... which may be imposed upon or incurred by Buyer in connection with any liabilities or obligations of Mead other than those expressly assumed by Buyer.

App. at 29.

Paragraph 8(b), on the other hand, requires Beazer, as the buyer's successor, to indemnify Mead, as seller's successor, against other liabilities, including whatever liabilities paragraph 4(c) imposes on the buyer. It reads:

b. *Indemnity Against Assumed Liabilities.* Buyer hereby indemnifies Mead against and hereby agrees to hold Mead harmless from and to reimburse Mead for any and all liabilities, losses, damages, costs of settlement and expenses ... which may be imposed upon or incurred by Mead in connection with any liabilities or obligations of Mead and/or the Coke Plant assumed by Buyer under this Purchase Agreement.

App. at 30.

In 1977, KCI transferred the Coke Plant and surrounding land to the Industrial Development Board of the City of Fairfield, Alabama ("IDB"). In turn, IDB leased the premises back to KCI. KCI continued to operate the facility. In 1988, Beazer acquired KCI and transferred the lease to a newly created corporation, Koppers Industries, Inc. ("KII"). At about this same time IDB transferred its ownership interest in the Coke Plant and the surrounding land back to KII.

**\*210** In 1981, the United States Environmental Protection Agency ("EPA") and the Alabama De-

partment of Environmental Management began to investigate the Coke Plant site for toxic substances. As a result, EPA asked Beazer to sign an Administrative Order on Consent (the "Order") that would require Beazer to do a site-wide environmental investigation and eventually cleanup the site. On June 21, 1991, Beazer signed the Order. Issued pursuant to the Solid Waste Disposal Act, it identifies thirty-nine problem areas at the Coke Plant. The Order calls each of them a "solid waste management unit." Beazer agreed to test each of these units for the presence of toxic wastes and then clean them up as necessary.

On March 6, 1991, Beazer filed this action. The complaint, following amendment and dismissal of several counts, claimed contribution from Mead against any response costs Beazer incurred under CERCLA, 42 U.S.C.A. §§ 9607(a), 9613(f), or indemnification from Mead based on Paragraph 8(a) of the Agreement. Under the Agreement's indemnification provisions, Beazer claimed that the expense of investigating the toxicity of these areas and cleaning them up was ultimately Mead's responsibility. Beazer also alleged that many of the solid waste management units it agreed to cleanup are parts of the site that Mead had dedicated to waste management but Beazer had never utilized while it was operating the facility.

Mead denied any obligation either to indemnify Beazer against these costs or to contribute to the cost of testing, investigating or cleaning up the site. It also asserted a counterclaim under Paragraph 4(c) of the Agreement demanding that KCI and Beazer, as KCI's successor in interest, indemnify Mead, hold it harmless and reimburse it for all response costs that investigation and cleanup of toxic wastes deposited on or in the Coke Plant or its environs may require. In another counterclaim, Mead asserted, in the alternative, a right to contribution from Beazer for any CERCLA costs Mead might be required to pay.

Beazer filed a motion for a partial summary judgment seeking a declaration that Mead was a re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

sponsible operator under sections 107(a) and 113(f) of CERCLA, and that Paragraph 8(a) of the Agreement required Mead to indemnify Beazer against liability for all response costs. Mead filed a cross-motion for summary judgment asserting that Paragraph 4(c) of the Agreement relieved it of any obligation to indemnify Beazer or contribute to any cleanup costs Beazer might incur, and that Paragraphs 4(c) and 8(b) combined to obligate Beazer to indemnify Mead against any CERCLA response costs Mead might incur.

The magistrate judge to whom the district court had referred these motions issued a report recommending that Mead be held liable as a "responsible party" for any government paid response costs, that Mead's cross-motion for summary judgment against Beazer be granted and that Beazer's action be dismissed in its entirety. Beazer filed timely objections, but the district court adopted the Magistrate's Report as its opinion, granted Mead's cross-motion for summary judgment and dismissed all of Beazer's claims. Beazer filed this timely appeal.

II. *Jurisdiction & Standard of Review*

The district court had subject matter jurisdiction over this case under 28 U.S.C.A. §§ 1331, 1332, 1367 (West 1993) and 42 U.S.C.A. § 9613(b) (West Supp.1993). We have appellate jurisdiction over the district court's final order dismissing Beazer's claims and granting Mead's counterclaim under 28 U.S.C.A. § 1291 (West 1993).

[1] We exercise plenary review over a district court's grant of summary judgment. Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there remain any genuine issues of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *See Bank of Nova Scotia v. Equitable Fin. Management, Inc.,* 882 F.2d 81, 83 (3d Cir.1989).

III. *Analysis*

[2] Section 9607(e)(1) of CERCLA provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective**211** to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C.A. § 9607(e)(1) (West 1983). On first reading, this appears internally inconsistent. We have reconciled its two sentences by construing them to mean "agreements to indemnify or hold harmless are enforceable between the parties but not against the government." *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 89 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *see also United States v. Hardage,* 985 F.2d 1427, 1433 (10th Cir.1993) (Under section 9607(e)(1) "responsible parties may not altogether *transfer* their CERCLA liability, [but] they have the right to obtain indemnification for that liability.") (citations omitted) (emphasis in original). As the district court recognized in *Hatco Corp. v. W.R. Grace & Co.-Conn.,* 801 F.Supp. 1309 (D.N.J.1992):

Because § 9607(e)(1) renders ineffective any attempt to completely "transfer" liability, the most a party can do to limit its liability under CERCLA is to obtain from another an agreement "to insure, hold harmless, or indemnify" it from any liabilities established against it.

*Id.* at 1317 (quoting 42 U.S.C.A. § 9607(e)(1)).

[3] Thus, Beazer could have lawfully agreed to indemnify Mead for its CERCLA liability or, conversely, Mead could have lawfully agreed to indemnify Beazer. The issue is whether either did so. The Agreement the parties rely on was executed before CERCLA was enacted. Therefore, we must, at the outset, resolve the preliminary issue of whether a contract of indemnity that predates CERCLA can be construed to include indemnity against CERCLA

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

**(Cite as: 34 F.3d 206)**

liability. This is a question of first impression in this Court.

Other courts that have analyzed pre-CERCLA indemnity provisions have uniformly held that a pre-CERCLA agreement can require one party to indemnify another against CERCLA liability. *See, e.g., Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 327 (7th Cir.1994); Hatco Corp., 801 F.Supp. at 1317-18; Purolator Prods. Corp. v. Allied-Signal, Inc., 772 F.Supp. 124, 132 (W.D.N.Y.1991); Mobay Corp. v. Allied-Signal, Inc., 761 F.Supp. 345, 356-58 (D.N.J.1991).* We find the reasoning of these courts persuasive. Accordingly, we hold that a pre-CERCLA agreement can require an indemnitor to hold the indemnitee harmless from CERCLA liability.

Nevertheless, not all pre-CERCLA promises to indemnify cover CERCLA liability. We must look to see whether an indemnification provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims. The first step in this inquiry is to determine what law applies to the construction or interpretation of contractual provisions that affect responsibilities Congress has imposed on us in statutes enacted to enforce this nation's strong commitment to a clean, safe and attractive environment. We now turn to this issue, also one of first impression in this Court.

## A.

In deciding what law to apply to determine whether Paragraphs 4(c) and 8(a) establish an obligation for Beazer to indemnify Mead against CERCLA liability or Mead to indemnify Beazer, the magistrate judge looked first to the law the parties chose in Paragraph 13(k)(1) of the Agreement. It provides that Alabama law will govern. [FN1] Seeing "no reason to frustrate the obvious and expressed intent of the parties," the magistrate judge said he would apply Alabama law to decide whether the Agreement's indemnity provisions were clear enough to require Beazer to **\*212** hold Mead

harmless against CERCLA liability at the site. Magistrate Judge's Report at 9.

> [FN1]. The paragraph states, "Each of the parties elects that this Purchase Agreement shall be governed, construed and enforced in accordance with the laws of the State of Alabama." App. at 44-45.

Finding no Alabama law directly on point, the magistrate judge took a cue from the holdings of the United States District Court for the District of New Jersey that pre-CERCLA agreements may cover CERCLA liability if such agreements are "worded broadly enough to encompass any and all liabilities, or if environmental liability is clearly referred to in the agreement." *Id.* at 9-10 (citing *Hatco Corp., 801 F.Supp. at 1318; Purolator Prods. Corp., 772 F.Supp. at 132; Mobay Corp., 761 F.Supp. at 356; Southland Corp. v. Ashland Oil Inc., 696 F.Supp. 994 (D.N.J.1988)).* After concluding that Alabama law on the meaning of contracts was not inconsistent with this developing standard of federal common law, the magistrate judge saw no impediment to interpreting the Agreement under Alabama contract law. Nevertheless, he pointed out that construction or interpretation of a pre-CERCLA indemnity clause's effect on CERCLA liability might "be an issue best determined by a uniform federal rule ... and that the federal case law establishing the standard under CERCLA may override any inconsistent state law in this respect." *Id.* at 10 n. 2.

The first question that we should ask is whether the national interest in uniform application of federal statutory law requires federal courts to develop a federal common law to preclude willy-nilly use of various state law principles in interpreting or construing indemnification provisions that affect liabilities under CERCLA. *Cf. O'Melveny & Myers v. Federal Deposit Insurance Corp., 512 U.S. 79, ---- - ----, 114 S.Ct. 2048, 2052-55, 129 L.Ed.2d 67 (1994).*

[4] Generally, federal law governs the validity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

of an agreement releasing a cause of action arising under federal law; *see Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952),* but the construction or interpretation of a private contract is generally thought to be a question of state law. Accordingly, most courts have recognized that imposition of CERCLA liability on a successor corporation is a question of federal law. *See, e.g., John S. Boyd, Co. v. Boston Gas Co.,* 992 F.2d 401, 406 (1st Cir.1993); *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1457 (9th Cir.1986); *HRW Sys., Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 326-28 (D.Md.1993); *Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co.,* 814 F.Supp. 1266, 1267-68 (E.D.Va.1992).

[5] Nevertheless, all of the courts of appeals that have considered developing a federal rule of decision appear to have decided it is better to look to state law in interpreting or construing a contract's indemnification provisions vis-a-vis CERCLA.[FN2]

FN2. *See John S. Boyd Co.,* 992 F.2d at 406 (incorporating state law into federal law to construe an agreement pertaining to CERCLA liability); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993) (state law supplies the principles that govern the construction or interpretation of indemnification clause applicable to CERCLA liability); *Hardage,* 985 F.2d at 1433 & n. 2; *Mardan Corp.,* 804 F.2d at 1458, 1460 (holding that federal courts should look to applicable state law to decide the validity of releases of claims under CERCLA); *see also City of Phoenix, Az. v. Garbage Servs. Co.,* 827 F.Supp. 600, 602-03 (D.Ariz.1993) ("When developing federal common law, the court must decide whether to fashion a nationally uniform federal rule, or incorporate state law as the federal rule of decision.... The Ninth Circuit Court of Appeals has taken both approaches when filling in the gaps left by

CERCLA, depending on the context.") (citations omitted); *cf. HRW Sys. Inc.,* 823 F.Supp. at 328 (adopting federal "continuity of enterprise test" endorsed by Fourth Circuit rather than state law to determination of corporate successor liability); *Chesapeake & Potomac Tel.,* 814 F.Supp. at 1268 (same).

In *John S. Boyd Co.,* the United States Court of Appeals for the First Circuit looked to the Massachusetts law of contracts to apportion CERCLA liability among contracting parties *inter se.* In construing the parties' written agreement, it said, "state contract law ... provide[s] the substantive rule, so long as it is not hostile to the federal interests animating CERCLA." *John S. Boyd Co.,* 992 F.2d at 406 (citations omitted); *Hardage,* 985 F.2d at 1433 n. 2 ("Because the government's interests are unaffected by the allocation of liability between jointly and severally liable parties, we easily conclude that a uniform federal rule is unnecessary and that **\*213** state law will govern the indemnification clauses."); *see also O'Melveny,* 512 U.S. at ----, 114 S.Ct. at 2055 ("Our cases uniformly require the existence of [a significant conflict between some federal policy or interest and the use of state law] as a precondition for recognition of a federal rule of decision.").

The United States Court of Appeals for the Ninth Circuit has analyzed the issue of choosing state or federal common law to determine whether private indemnification agreements cover CERCLA liability in depth. *See Mardan Corp.,* 804 F.2d at 1458-60. In *Mardan Corp.,* the government, in an amicus brief, argued for state law to provide the substance of the decision rule. It said that "whether and when agreements between private 'responsible parties' can settle disputes over contribution rights under [CERCLA]" did not require the development of a uniform federal rule. *Id.* at 1458. The court of appeals stated:

[S]ection [9607(e)(1) ] expressly preserves agreements to insure, to hold harmless, or to indemnify

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

a party held liable under [CERCLA]. Absent CERCLA, these contracts would be interpreted under state law. By preserving such agreements, Congress seems to have expressed an intent to preserve the associated body of state law under which agreements between private parties would normally be interpreted. Certainly federal courts need not fashion federal common law to interpret every settlement of liability that arises under federal statutes.

*Id.*

[6] Because Congress' intent to require a federal rule of decision was "not entirely clear," the court of appeals considered whether the policies Congress sought to advance by enacting CERCLA required a uniform federal standard for the interpretation and construction of indemnity clauses. For guidance it looked to the Supreme Court's opinion in *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *Id. Kimbell Foods* set out the factors courts should use to determine when a uniform federal rule is needed to decide federal claims based on federal statutes when Congress has not made clear its intent on what law should supply a rule of decision. *See Kimbell Foods,* 440 U.S. at 728-29, 99 S.Ct. at 1458-59. They are:

(1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law."

*Mardan Corp.,* 804 F.2d at 1458 (citing *Kimbell Foods,* 440 U.S. at 728-29, 99 S.Ct. at 1458-59). The court of appeals in *Mardan Corp.* applied *Kimbell Foods* and concluded there was no need for a federal common law standard. It stated:

First, we find no reason to think that the issue requires a uniform body of law. Commercial enterprises selling their assets or insuring themselves will normally look to state law to interpret

their indemnification provisions, which will generally indemnify the enterprises against a whole host of possible liabilities. Disuniformity does not seem to impose any particular burden....

Second, the application of state law to interpret such releases will not frustrate the objectives of CERCLA. Contractual arrangements apportioning CERCLA liabilities between private "responsible parties" are essentially tangential to the enforcement of CERCLA's liability provisions. Such agreements cannot alter or excuse the underlying liability, but can only change who ultimately pays that liability....

\* \* \* \* \* \*

Finally, we are convinced that application of a federal rule ... would disrupt commercial relationships predicated on state law.... Creating a federal rule to govern CERCLA releases would introduce confusion and uncertainty into these commercial relationships in two respects. One, buyers and sellers would face greater confusion about which body of law to turn to. Two, the creation of a federal rule, as opposed to incorporating a ready-made and fully fleshed out body of state law, would, during the development of that federal rule, leave parties very uncertain **\*214** about what rule governed CERCLA releases....

*Id.* at 1458-60.

Judge Reinhardt, in a dissent in *Mardan Corp.,* thought that a uniform federal rule should be applied to determine whether any particular agreement indemnified against CERCLA liability. *Mardan Corp.,* 804 F.2d at 1463 (Reinhardt, J., dissenting). Citing cases that adopted uniform federal rules to determine liability under section 9607 and the legislative history of that section stressing the need for " 'a uniform rule of law ... to discourage business[es] dealing in hazardous substances from locating primarily in states with more lenient laws,' " Judge Reinhardt reasoned that "a uniform federal rule regarding releases from CERCLA liability

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

serves Congress' goals in the same manner that a uniform rule regarding liability does." *Id.* at 1464 (citing 5 U.S.C.C.A.N. 6119, 6119-20, 6132 (1980) and quoting 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980) (statement of Representative Florio, CERCLA House sponsor) (alteration in original)). *But see id.* at 1459-60 (majority opinion) (arguing that parties are still fully liable to the government regardless of applicable law and concluding that adoption of state law does not conflict with congressional purpose underlying CERCLA).

Though this Court has yet to consider what law should govern the construction or interpretation of any particular indemnity provision on the apportionment of CERCLA liability among contracting parties, we have adopted a federal common law standard in other environmental contexts.FN3 In *Smith Land & Improvement Corp. v. Celotex Corp.,* we stressed the need for uniform standards if CERCLA is to be effective and indicated that a district court considering successor liability under CERCLA should look to "[t]he general doctrine of successor liability in operation in most states ... rather than the excessively narrow statutes which might apply in only a few states." *Smith Land & Improvement Corp.,* 851 F.2d at 92. We reasoned if we refused to apply uniform federal standards to regulate CERCLA liability, "CERCLA aims may be evaded easily by a responsible party's choice to arrange a merger or consolidation under the laws of particular states which unduly restrict successor liability." *Id.* In *Lansford-Coaldale Joint Water Authority v. Tonolli Corp.,* 4 F.3d 1209 (3d Cir.1993), we also expressed a preference for uniform federal standards to govern CERCLA liability. We held that "given the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA." *Id.* at 1225 (citations omitted).

FN3. It is perhaps material to note that these standards do not spring full formed and grown from the heads of federal judges as Athena did from Zeus nor does any Delphic oracle whisper uniformly in each judge's ear. *See* Manfred Lurker, Dictionary of Gods & Goddesses, Devils & Demons 44-45 (1987).

None of our cases, however, deal with the need for a federal standard in interpreting or construing contracts to indemnify and our sister courts of appeals have uniformly selected state law. *See supra* note 2. Fortunately we see no need to create a circuit conflict and will join the other courts of appeals that look to the law of a particular state concerning the construction or interpretation of contracts of indemnity to determine whether a particular indemnification provision covers CERCLA liability. We thus endorse the majority's reasoning and application of the *Kimbell Foods* test in *Mardan Corp.*

Moreover, we see support for this principle in the Supreme Court's recent decision in *O'Melveny & Myers.* It teaches us that special federal rules are justified only in "situations where there is a 'significant conflict between some federal policy or interest and the use of state law.'" *O'Melveny & Myers,* 512 U.S. at ----, 114 S.Ct. at 2055 (quoting *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966) ).

In *O'Melveny & Myers,* the Supreme Court considered whether federal or state decisional law should govern the question of imputation of knowledge in a suit where the FDIC sued in its capacity as receiver for a federally insured bank that had failed. The **\*215** FDIC argued that *Kimbell Foods* required the district court to apply a uniform federal rule of decision to determine FDIC's rights because "federal law governs questions involving the rights of the United States under nationwide federal programs." *O'Melveny & Myers,* 512 U.S. at ----, 114 S.Ct. at 2053 (quoting *Kimbell Foods,* 440 U.S. at 726, 99 S.Ct. at 1457). The Supreme Court first stated, "[T]he FDIC is not the United States, and even if it were we would be begging the question to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

**(Cite as: 34 F.3d 206)**

assume that it was asserting its *own* rights rather than, as receiver, the rights of [the failed bank.]" *Id.* (emphasis added). It went on to note, "The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of *private actors* that has already occurred." *Id.* at ----, 114 S.Ct. at 2055 (emphasis added). The Supreme Court then held that the issue of imputed knowledge in bank receivership cases "is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." *Id.* at ----, 114 S.Ct. at 2056.

How Beazer and Mead apportion their CERCLA liability among themselves does not affect the primary duty they owe the United States to clean up the poisons left to befoul the site both used. Whether one must indemnify the other concerns instead the liability of private actors for acts already done, just as the liability of the alleged tortfeasor in *O'Melveny* involved the FDIC's right, as successor to the private right of an injured party, to recover for the injuries its predecessor had suffered as a result of past acts. How much Beazer or Mead pay each other seems to us to have even less effect on the United States than did the ability of FDIC to recover for tort injuries suffered by the failed bank it took over. The interpretation and construction of Paragraph 4(c) has no impact on either party's liability to the government. *See Smith Land & Improvement Corp.,* 851 F.2d at 89. On reason as well as authority, we therefore hold that state law should determine whether any particular contract of indemnity provision can be construed generally or broadly enough to cover one responsible party's liability to another.

### B.

Having determined that state law on the interpretation and construction of indemnification agreements applies to this case, we turn to the question of what state law should be applied. On that issue, we can quickly agree with the district court and ap-

ply Alabama law.[FN4]

> FN4. We again note the magistrate judge, despite his summary conclusion that Alabama law controls, seems to have applied the standard adopted by the United States District Court for the District of New Jersey. That court has used a federal standard to conclude that an indemnification or release provision which affects a party's CERCLA liability must be:
>
> > (1) a broad waiver of "all liabilities of *any* type whatsoever" ... which would clearly evince the parties' broad intent to finally settle *all* present and future liability issues arising from the sale,; or (2) at a minimum, "must at least mention that one party is assuming [all] environmental-type liabilities" ... which would clearly evince the parties' intent to settle all issues related to present and future environmental liabilities.
>
> *Hatco Corp.,* 801 F.Supp. at 1317-18 (quoting and citing *Mobay Corp.,* 761 F.Supp. at 358 & n. 15) (emphasis in original). The magistrate judge states, however, that he used this standard because it is consistent with Alabama law.

[7] We look to decisions of the Alabama courts and especially those of the Supreme Court of Alabama. Its most recent decision concerning the interpretation or construction of indemnification provisions is *Nationwide Mutual Insurance Co. v. Hall,* 643 So.2d 551 (Ala.1994). There, it held that indemnification agreements are enforceable in Alabama if " 'the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify against the indemnitee's own wrongs, [and if that agreement is] expressed in clear and unequivocal language.' " *Nationwide Mut. Ins. Co.,* 643 So.2d at 555-56 (quoting *Industrial Tile, Inc. v. Stewart,* 388 So.2d 171, 175-76 (Ala.1980), *cert. denied,* 449

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

U.S. 1081, 101 S.Ct. 864, 66 L.Ed.2d 805 (1981) (alteration in original)). In *Nationwide,* Alabama's supreme court recognized that indemnity agreements covered only **\*216** those incidents within their plain meaning and the court expressed a strong preference for this limitation. *Id.* (quoting *Craig Constr. Co. v. Hendrix,* 568 So.2d 752, 757 (Ala.1990); *Industrial Tile, Inc.,* 388 So.2d at 176). The supreme court then stated that "an indemnity contract purporting to indemnify for the consequences of the indemnitee's own negligence is unambiguous, and therefore, enforceable when its language specifically refers to the negligence of the indemnitee.... [but that] such 'talismanic' or thaumaturgic language is not necessary if the requisite intent is otherwise clear." *Id.* (citations omitted).[FN5]

> [FN5]. We do not think Alabama would apply a different rule in deciding whether an indemnity clause covers strict liability under environmental law.

We conclude that Alabama law requires a plain and unambiguous expression of intent to cover the cost of the liability in question. Using this standard, we now consider whether Paragraph 4(c) unambiguously expresses Beazer's intent to indemnify Mead against CERCLA liability.

### C.

[8] The crux of the parties' argument concerns the district court's conclusion that Beazer expressly and unambiguously agreed to indemnify Mead for its CERCLA liability.[FN6] They disagree as to whether the magistrate judge correctly applied Alabama's limiting standard to the Agreement. Paragraph 4(c) reads:

> [FN6]. Whether an agreement is unambiguous is a question of law. *McDonald v. U.S. Die Casting & Dev. Corp.,* 585 So.2d 853, 855 (Ala.1991).

4. *Assumption of Agreements and Liabilities*

As of the Closing Date, Buyer [Beazer] shall assume and agree to perform:

> \* \* \* \* \* \*

c. Obligations of the Coke Plant to comply from and after the Closing Date with all of the terms and conditions of ... any solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency ... all in accordance with applications now pending and listed on Exhibit F hereto.

App. at 23.[FN7] Exhibit F is divided into two parts. Beazer argues that Paragraph 4(c) limits its agreement to assume Mead's environmental liabilities to the permits mentioned in Exhibit F's "List of Environmental Applications and Permits." Because neither part of Exhibit F mentions any solid waste permit, Beazer contends that Paragraph 4(c)'s promise to indemnify does not unambiguously cover CERCLA response costs incurred in removing any toxic wastes found in or around the Coke Plant.

> [FN7]. Beazer's duty to indemnify is controlled by Paragraph 8(b) of the Agreement which provides:
>
> Buyer [Beazer] hereby indemnifies Mead against and hereby agrees to hold Mead harmless from and to reimburse Mead for any and all liabilities, losses, damages, costs of settlement and expenses ... which may be imposed upon or incurred by Mead in connection with any liabilities or obligations of Mead and/or the Coke Plant assumed by Buyer under this Purchase Agreement.
>
> App. at 30. The obligations imposed by Paragraph 4 constitute "liabilities or obligations ... assumed by Buyer [Beazer] under this Purchase Agreement." *Id.* Thus, if Paragraph 4 encompasses CERCLA liability, Beazer would be required to indemnify Mead under Paragraph 8(b)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001
**(Cite as: 34 F.3d 206)**

of the Agreement.

After concluding that Paragraph 4(c) did not unambiguously rule out a promise to indemnify Mead against CERCLA liability, the magistrate judge went on to consider whether it unambiguously required Beazer to indemnify Mead for CERCLA liability under the federal standard announced in *Mobay Corp.* He acknowledged that Paragraph 4(c) was not a broad, general promise to indemnify Mead against all liability. Nevertheless, he concluded that the text of the paragraph

> clearly implies that, as between Beazer and Mead, Beazer would be responsible for any environmental liability arising from the Woodward Facility after the date of the sale. Even more than this implication regarding all environmental liability, the provision expressly provides that Beazer will be responsible for complying with orders **\*217** issued by the EPA regarding solid waste.

Magistrate Judge's Report at 15. The magistrate judge construed Paragraph 4(c) as a promise by the buyer and its successors to indemnify the seller and its successors against all environmental liabilities associated with the Coke Plant.

In doing so, the magistrate judge decided that Paragraph 4(c)'s textual reference to future "orders" issued by state, local, and federal agencies contradicted the more restrictive interpretation of Paragraph 4(c) which Beazer would have us infer from the specific list of permits mentioned in Exhibit F Paragraph 4(c). If Paragraph 4(c) were confined to the permits listed in Exhibit F, the magistrate judge reasoned that Paragraph 4(c)'s reference to permits, licenses, and orders "hereafter issued" would be meaningless. Thus, he concluded that Paragraph 4(c) did include all subsequent orders, permits, and licenses relating to environmental liability including those required or issued under CERCLA. Accordingly, the magistrate judge made the recommendation the district court accepted in granting summary judgment to Mead and dismissing Beazer's claim for contribution under CERCLA.

[9] Paragraph 4(c) does expressly make Beazer responsible for "solid waste ... permits issued by [EPA]," but it has as additional limiting language; "all in accordance with applications now pending and listed on Exhibit F hereto." Therefore, Beazer contends that the magistrate judge erred when he concluded that Paragraph 4(c) clearly and unambiguously transferred Mead's CERCLA liability to Beazer. Beazer first argues that Paragraph 4(c) is no more than a "window" provision, common in commercial agreements for the sale of assets, which gives a seller interim protection against a buyer's failure to comply with the conditions of any existing environmental permits that are specifically listed, as they are here in Exhibit F. Thus, Beazer argues that the magistrate judge erred when he failed to consider the parties' basic decision to structure the sale as a purchase of assets. Beazer would have us infer that the decision to buy and sell assets was mutually agreed on for the express purpose of limiting the purchaser's liability. We think Beazer's argument that purchasers under asset purchase agreements normally assume only those debts, obligations, and liabilities of the seller that are expressly identified in the agreement is plausible and that the district court's holding that Beazer must indemnify Mead would be inconsistent with that purpose. Nevertheless, we have been unable to find any evidence in this record that would unambiguously confirm that interpretation, and the text of Paragraph 4(c) is at least arguably to the contrary. *Cf.* *Watts v. TI, Inc.,* 561 So.2d 1057, 1059-60 (Ala.1990). Therefore, we conclude that Beazer's argument about the nature and purpose of framing a transfer of a business enterprise as a sale of assets begs the question on Paragraph 4(c)'s meaning.

Beazer's argument that the language of Paragraph 4(c) is not clear enough to transfer Mead's CERCLA liability to Beazer under Alabama law is more telling. We conclude Paragraph 4(c) is ambiguous under the principles of Alabama law that guides determinations of contracts. *See* *Reeves Cedarhurst Dev. Corp. v. First Amfed Corp.,* 607 So.2d 184, 186 (Ala.1992) ("An instrument is un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

**(Cite as: 34 F.3d 206)**

ambiguous if only one reasonable meaning clearly emerges.") (quoting *Vainrib v. Downey,* 565 So.2d 647, 648 (Ala.Civ.App.1990). The provision is subject to more than one reasonable interpretation, and it is not plain enough to be construed as an unambiguous promise by Beazer to indemnify Mead against all environmental liability associated with the site of the Coke Plant, including liability without fault under laws like CERCLA, yet to be passed. Therefore, it does not square with the principle of Alabama law that promises to indemnify are limited to subjects plainly expressed.

Moreover, cases outside Alabama which have held a release or indemnification provision covers CERCLA liability have all involved indemnity clauses with much broader and more inclusive language than here. *See,* *218 *e.g., Kerr-McGee Chem. Corp.,* 14 F.3d at 326-27; *Olin Corp.,* 5 F.3d at 12-13; *Hardage,* 985 F.2d at 1434; *Niecko v. Emro Mktg. Co.,* 973 F.2d 1296, 1300 (6th Cir.1992); *Mardan Corp.,* 804 F.2d at 1461-62. The *Olin Corp.* case provides one recent example.[FN8] The court of appeals held that this provision evidenced a "clear and unmistakable intent" to transfer the seller's environmental liability to the buyer, even future and unknown liability. *Olin Corp.,* 5 F.3d at 15-16.

> FN8. The sale agreement in *Olin Corp.* originally provided:
>
> [The buyer] hereby assumes and agrees to be responsible for and to pay, perform, discharge and indemnify [the seller] against, all liabilities (absolute or contingent), obligations and indebtedness of [the seller] related to the Aluminum Assets ... as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time.
>
> *Olin Corp.,* 5 F.3d at 12-13. A later agreement in *Olin Corp.* stated:

In consideration of the payment on this date by [the seller] to [the buyer] of $3,700,000 ... [the buyer] hereby releases and settles all claims of any nature which [it] now has or hereafter could have against [the seller] ... whether or not previously asserted, under or arising out of the Purchase Agreement ..., or the transactions contemplated thereby.

*Id.* at 13 (footnote omitted).

In the *Kerr-McGee* case the indemnification clause read:

[The purchaser] expressly agrees to indemnify and to defend and hold [plaintiff's predecessor Moss-American], its officers, employees, and agents, free and harmless from and against any and all claims, damages, judgments, fines, penalties, assessments, losses, expenses, including interest, court costs and attorney fees, however the same may be caused, arising out of or resulting from, directly or indirectly, the following: (a) the purchase, dismantling or sale of the personal property and real property by [the purchaser]; (b) the maintenance of any action, claim or order concerning pollution or nuisance; and (c) the use by [the purchaser] or its employees or agents of the personal property and real property.

*Kerr-McGee Chem. Corp.,* 14 F.3d at 326-27 (emphasis added) (footnote omitted). *See also John S. Boyd Co.,* 992 F.2d at 403-04 (construing a provision stating that "[the successor corporation] agreed to assume 'all the duties and liabilities of [its predecessor] related to [the] gas business' " and that "[the successor corporation] agreed to 'indemnify and save harmless [the predecessor corporation] from any duty or liability with re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

**(Cite as: 34 F.3d 206)**

spect to the gas business.' ").

The court of appeals held:

In no uncertain terms, [the purchaser] agreed to assume the liability for losses resulting from "the maintenance of any ... claim ... concerning pollution or nuisance...." The indemnity provision covers all pollution and nuisance claims without limitation.... [and makes the purchaser] responsible for any liability imposed ... under CERCLA.

*Id.* at 327 (footnote omitted).

The contradictory terms and references of this Agreement leave us with no firm conclusion as to the clear and unmistakable intent of the parties. Under applicable principles of Alabama law, the parties failed to express the intent to indemnify with the requisite clarity. We hold, therefore, that Paragraph 4(c) is not specific enough to impose on Beazer a duty to indemnify Mead for their CER-CLA response costs.

### D.

[10] Because Paragraphs 4(c) and 8 refer circuitously to each other, it follows therefore that neither Paragraph 4(c) nor Paragraph 8 expressly require either party to indemnify the other. FN9 Accordingly, our earlier analysis requires us to reject Beazer's argument that Paragraph 4(c) was intended to limit Beazer's assumption of liabilities to those expressly listed in Exhibit F, and that therefore because CERCLA is not a listed obligation Mead must indemnify Beazer under Paragraph 8(a). Beazer relies on the grammatical rule of the last antecedent to assert that the language "all in accordance with ... Exhibit F" is a limitation on the preceding reference to "solid waste disposal ... order" in support of its argument that the magistrate **\*219** judge's construction of Paragraph 4(c)'s phrase "all in accordance with" Exhibit F to mean "which includes" Exhibit F must fail. The phrase "all in accordance with" can be interpreted as Beazer would have it, but it does not compel that construction. Beazer's contention that the magis-

trate judge erred when he concluded the limitation of Paragraph 4(c) to the permits expressly listed in Exhibit F would leave the words "hereafter issued" without meaning does not persuade us. As we have already explained, its argument that these words merely reflect an intent to protect the seller during a transition period immediately following the transfer of assets to the buyer fails to shine through the murky text of Paragraph 4(c). Beazer's suggested interpretation of the words "hereafter issued" as limited to permits or licenses that might result from the pending applications is again plausible, but not so plain as to justify its construction under the Alabama rule that indemnity provisions must be strictly construed and limited to their plain meaning.

> FN9. Mead's duty to indemnify Beazer is set forth in Paragraph 8(a) of the Agreement. It is quoted in full *supra,* Part I, typescript at 5. It requires Mead, the seller, to indemnify Beazer, the buyer, against all liabilities other than those "expressly assumed by the Buyer." Paragraph 8(b), quoted *supra* in note 7, is its mirror image. It requires Beazer, the buyer, to indemnify Mead, the seller, against all liabilities "assumed by Buyer."

### E.

Paragraph 4(c) does not clearly state that Beazer has agreed to assume all liability for toxic wastes under present or future laws protecting the environment. Though the phrase in Paragraph 4(c), "hereafter issued," appears to look to the future, the phrase "all in accordance with" appears to limit the buyer's environmental liability to orders, permits and licenses that are listed in the exhibit referenced. Accordingly, nothing in this agreement demonstrates a clear and unambiguous intent to transfer all CERCLA liability to Beazer.

Our refusal to construe Paragraph 4(c) as a clear promise by Beazer to indemnify Mead against CERCLA response costs leaves both Beazer and Mead responsible for their fair share of the cleanup

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

**(Cite as: 34 F.3d 206)**

costs associated with the Coke Plant. That result reinforces CERCLA policy. "Congress enacted CERCLA, a complex piece of legislation ... to force polluters to pay for costs associated with remedying their pollution." *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 258 (3d Cir.1992). Thus, we will reverse the district court's entry of summary judgment in favor of Mead and remand this case for further proceedings on Beazer's contribution claim. FN10

> FN10. Section 9613(f) provides, in relevant part:
>
> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title.... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.
>
> * * * * * *
>
> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement....
>
> 42 U.S.C.A. § 9613(f)(1), (3)(B) (West Supp.1994). The magistrate judge determined that Mead was a "responsible party" for purposes of CERCLA liability. It declined, however, to apportion the response costs or reach Mead's or Beazer's contribution claims under section 9613(f) because it found that Beazer had agreed to indemnify Mead for all CERCLA liability under Paragraph 4(c) of the Agreement. On remand, the trial court will have to revisit the parties' contribution claims and correspondingly apportion liability for the attendant CER-

CLA response costs.

### IV. *CONCLUSION*

The order of the district court granting summary judgment on Mead's counterclaim and the order dismissing Beazer's claim for contribution will be reversed and the case will be remanded to the district court for further proceedings consistent with this opinion.

C.A.3 (Pa.),1994.
Beazer East, Inc. v. Mead Corp.
34 F.3d 206, 39 ERC 1507, 139 A.L.R. Fed. 701, 25 Envtl. L. Rep. 20,001

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

▷

United States Court of Appeals,
Second Circuit.
**O & G INDUSTRIES**, INC., Third-
Party-Defendant Appellant,
Hartford Fire Insurance Co. and David E. Roberts,
Administrator for the Estate of Gregory J. Roberts,
Plaintiffs,
Peter Quintiliani and Laurel Quintiliani, Consolid-
ated Plaintiffs,
v.
**NATIONAL** RAILROAD PASSENGER COR-
PORATION, Defendant-Third-Party-Plaintiff Ap-
pellee.

Docket No. 06-4719-cv.
Argued: Oct. 23, 2007.
Decided: Aug. 8, 2008.

**Background:** Wrongful death and personal injury
actions were brought against rail passenger carrier
on behalf of highway workers injured or killed
when train struck their work platform under high-
way overpass. Claims were consolidated. Rail carri-
er brought third-party indemnity complaint against
highway contractor, seeking indemnity for liability
and costs railroad would incur on complaints. The
United States District Court for the District of Con-
necticut, Peter C. Dorsey, Senior District Judge,
entered partial summary judgment for rail carrier on
validity of indemnity agreement, 2006 WL 648212,
and after jury trial resulting in verdict for contractor
on third-party complaint, entered judgment as mat-
ter of law against contractor, 2006 WL 2621733.
Contractor appealed.

**Holdings:** The Court of Appeals, Feinberg, Circuit
Judge, held that:
(1) Connecticut statute that nullified indemnity
agreements insulating party from its own negli-
gence was preempted to extent it conflicted with
federal statute;
(2) rail carrier did not materially breach permit, so

as to nullify indemnity agreement in permit;
(3) any error in restricting contractor's cross-
examination of rail official regarding carrier's al-
leged recklessness was harmless; and
(4) appellate jurisdiction did not exist over appeal
from non-final award of fees and costs.

Affirmed in part and dismissed in part.

West Headnotes

**[1] States 360 ⟜18.11**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.11 k. Congressional Intent. Most
Cited Cases

Congressional intent to preempt state law may
be found (1) where Congress expressly states its in-
tent to preempt; (2) where Congress's scheme of
federal regulation is sufficiently comprehensive to
give rise to a reasonable inference that it leaves no
room for the state to act; and (3) where state law
actually conflicts with federal law.

**[2] Carriers 70 ⟜307(1)**

70 Carriers
    70IV Carriage of Passengers
        70IV(D) Personal Injuries
            70k307 Limitation of Liability
                70k307(1) k. In General. Most Cited
Cases

Provision of Amtrak Reform and Accountabil-
ity Act of 1997 allowing rail passenger carrier to
enter into liability-shifting agreements is not lim-
ited to passenger claims. Amtrak Reform and Ac-
countability Act of 1997, 161(b), 49 U.S.C.A. §
28103(b).

**[3] Carriers 70 ⟜307(1)**

70 Carriers
    70IV Carriage of Passengers

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

70IV(D) Personal Injuries

70k307 Limitation of Liability

70k307(1) k. In General. Most Cited Cases

Provision of Amtrak Reform and Accountability Act of 1997 allowing rail passenger carrier to enter into liability-shifting agreements is not limited to agreements between carrier and railroads on whose rail lines carrier operates relating to liability stemming from use of tracks by passenger trains. Amtrak Reform and Accountability Act of 1997, 161(b), 49 U.S.C.A. § 28103(b).

**[4] Indemnity 208 �köm30(7)**

208 Indemnity

208II Contractual Indemnity

208k26 Requisites and Validity of Contracts

208k30 Indemnitee's Own Negligence or Fault

208k30(7) k. Railroads. Most Cited Cases

Provision of Amtrak Reform and Accountability Act of 1997 providing that rail passenger carriers may enter into contracts that allocate financial responsibility for claims was intended to ensure the enforceability of indemnity agreements carrier concludes with any other party. Amtrak Reform and Accountability Act of 1997, 161(b), 49 U.S.C.A. § 28103(b).

**[5] Indemnity 208 ⊫22**

208 Indemnity

208I In General

208k21 Constitutional and Statutory Provisions

208k22 k. In General. Most Cited Cases

**Indemnity 208 ⊫30(5)**

208 Indemnity

208II Contractual Indemnity

208k26 Requisites and Validity of Contracts

208k30 Indemnitee's Own Negligence or Fault

208k30(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases

**Indemnity 208 ⊫30(7)**

208 Indemnity

208II Contractual Indemnity

208k26 Requisites and Validity of Contracts

208k30 Indemnitee's Own Negligence or Fault

208k30(7) k. Railroads. Most Cited Cases

**States 360 ⊫18.15**

360 States

360I Political Status and Relations

360I(B) Federal Supremacy; Preemption

360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases

Connecticut statute that nullified indemnity agreements insulating contracting party from its own negligence if agreement was made in connection with or collateral to construction contracts was preempted to extent it conflicted with federal statute allowing rail passenger carriers to enter into liability-shifting agreements with other parties. Amtrak Reform and Accountability Act of 1997, 161(b), 49 U.S.C.A. § 28103(b); C.G.S.A. § 52-572k(a).

**[6] Contracts 95 ⊫318**

95 Contracts

95V Performance or Breach

95k318 k. Discharge of Contract by Breach. Most Cited Cases

Under Connecticut law, an uncured, material failure of performance by one contracting party discharges the other party from any further performance under the contract, which is rendered unenforceable in toto.

**[7] Indemnity 208 ⊫33(5)**

208 Indemnity

208II Contractual Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

208k33 Particular Cases and Issues
208k33(5) k. Contractors, Subcontractors, and Owners. Most Cited Cases

**Indemnity 208 ☞33(7)**

208 Indemnity
208II Contractual Indemnity
208k33 Particular Cases and Issues
208k33(7) k. Railroads. Most Cited Cases

Under Connecticut law, rail passenger carrier's negligent failure to provide adequate protection to construction workers of highway contractor, whose work platform above tracks was hit by train that entered their worksite area without warning, was not material breach of permit granting highway contractor permission to perform its work on carrier's property, so as to preclude enforcement of indemnity agreement that was part of permit and which required contractor to indemnify carrier for its own negligence and extended to instances of injury or death to contractor's workers; indemnity clause was not conditioned on carrier's obligation to operate its trains safely, and core of agreement concerned safety and continuity of rail traffic, rather than safety of highway contractor's personnel. Amtrak Reform and Accountability Act of 1997, 161(b), 49 U.S.C.A. § 28103(b).

**[8] Federal Courts 170B ☞903**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)6 Harmless Error
170Bk903 k. Examination and Impeachment of Witnesses. Most Cited Cases

Any error in curtailing highway contractor's cross-examination of rail carrier's executive on issue of carrier's recklessness in phase one of trial, which was limited to determining damages against carrier for injuries suffered by contractor's workers when they were hit by train, or in limiting contractor from fully pursuing its recklessness defense in phase two of trial, which was concerned with carrier's right to contractual indemnity for damages

from highway contractor, was harmless, as question of carrier's recklessness was adequately litigated in phase one by workers, who sought punitive damages in addition to those damages attributable to carrier's admitted negligence, and finding of recklessness would not have relieved contractor of its duty to hold carrier harmless under their indemnity agreement.

**[9] Federal Courts 170B ☞597**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(C) Decisions Reviewable
170BVIII(C)2 Finality of Determination
170Bk585 Particular Judgments, Decrees or Orders, Finality
170Bk597 k. Costs and Security for Costs. Most Cited Cases

Court of Appeals did not have appellate jurisdiction, on appeal from entry of judgment as matter of law on contractual indemnity claim, over district court's non-final award of attorneys fees and costs pursuant to indemnity agreement; district court had not yet determined amount of fees and costs. 28 U.S.C.A. § 1291.

**[10] Federal Courts 170B ☞597**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(C) Decisions Reviewable
170BVIII(C)2 Finality of Determination
170Bk585 Particular Judgments, Decrees or Orders, Finality
170Bk597 k. Costs and Security for Costs. Most Cited Cases

Non-quantified award of attorneys' fees and costs is not appealable until the amount of the fees has been set by the district court. 28 U.S.C.A. § 1291.

**[11] Federal Courts 170B ☞598.1**

170B Federal Courts
170BVIII Courts of Appeals

537 F.3d 153
**(Cite as: 537 F.3d 153)**

170BVIII(C) Decisions Reviewable
170BVIII(C)2 Finality of Determination
170Bk598 Determination of Controversy as Affecting Finality
170Bk598.1 k. In General. Most Cited Cases

Decision on the merits is a final decision for purposes of appeal, whether or not there remains for adjudication a request for attorney's fees. 28 U.S.C.A. § 1291.

**\*155** Kimberly A. Knox (Michael S. Taylor and Brendon P. Levesque, on the brief), Horton Shields & Knox, P.C., Hartford, CT, and Jeffrey A. Blueweiss (on the brief), Bai, Pollock, Blueweiss & Mulcahey, Shelton, CT, for Third-Party-Defendant Appellant.

William G. Ballaine (Dawn Pinkston, of counsel, on the brief), Landman Corsi Ballaine & Ford, P.C., New York, NY, for Defendant-Third-Party-Plaintiff Appellee.

Before: FEINBERG, WINTER, and STRAUB, Circuit Judges.

**\*156** FEINBERG, Circuit Judge:

This case is procedurally complicated. The present appeal arises out of a third-party complaint brought by National Railroad Passenger Corporation (hereafter "Amtrak" or "appellee") against O & G Industries, Inc. (hereafter "O & G" or "appellant") in the United States District Court for the District of Connecticut (Dorsey, J.). In its complaint, Amtrak sought indemnification from O & G for any liabilities and costs, including attorneys' fees, that Amtrak would incur in two consolidated tort actions against it for wrongful death and personal injury damages resulting from a train accident.[FN1]

FN1. The two actions were *Roberts v. Nat'l R.R. Passenger Corp.,* No. 3:04-cv-1318 (D. Conn. filed Aug. 9, 2004), and *Quintiliani v. Nat'l R.R. Passenger Corp.,* No.

3:04-cv-2195 (D. Conn. filed Dec. 29, 2004). A third action was brought against Amtrak by the Hartford Fire Insurance Company, as subrogee of O & G, for damage to O & G property caused by the train accident. *See Hartford Fire Ins. Co. v. Nat'l R.R. Passenger Corp.,* No. 3:04-cv-1622 (D. Conn. filed Sept. 28, 2004). This action was settled and is not part of the present appeal.

The proceedings in the district court included two rulings that O & G now appeals to this Court. First, before trial of the third-party indemnity action began, the district judge granted partial summary judgment to Amtrak on the basis of an explicit indemnity provision in a right-of-access contract between Amtrak and O & G. The court upheld the validity of the indemnity provision, ruling that 49 U.S.C. § 28103(b) (hereafter " § 28103(b)")-which allows rail passenger carriers to enter into liability-shifting agreements-preempted Connecticut General Statute § 52-572k(a) (frequently referred to hereafter as the "Connecticut statute"). That statute prohibits, on public policy grounds, indemnity agreements entered into in connection with construction contracts, if they purport to shield the indemnitee from liability for its own negligence. O & G invoked the Connecticut statute to defeat Amtrak's indemnity claim. *See Roberts v. Nat'l R.R. Passenger Corp. v. O & G Indus.,* Nos. 3:04-cv-1318, 3:04-cv-1622 & 3:04-cv-2195, 2006 WL 648212 (D.Conn. Mar.9, 2006).

Second, the judge granted Amtrak's post-trial motion for judgment as a matter of law, setting aside a jury verdict that O & G was relieved of its obligation to indemnify Amtrak because of Amtrak's material breach of the contract with O & G. Judge Dorsey held that Amtrak's contractual default did not affect the validity of the indemnity agreement, which explicitly covered accidents attributable to Amtrak's negligence. *See Roberts v. Nat'l R.R. Passenger Corp. v. O & G Indus.,* Nos. 3:04-cv-1318, 3:04-cv-1622 & 3:04-cv-2195, 2006

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

WL 2621733 (D.Conn. Sept.12, 2006).

O & G argues on appeal that the district court erred in (1) granting partial summary judgment to Amtrak; (2) entering judgment for Amtrak as a matter of law; (3) curtailing O & G's cross- and direct examination of an Amtrak employee during the trial; and (4) awarding Amtrak attorneys' fees and defense costs without any evidence as to their amount and reasonableness.

On the first and second of these issues, we affirm the district court. On the third, we find the limitations of O & G's cross-examination rights by the district court, even if erroneous, were not substantially prejudicial to appellant. On the fourth issue, we conclude that we lack appellate jurisdiction over the district court's non-final award of attorneys' fees and costs.

**I. BACKGROUND**

The accident that led to this litigation occurred in June 2004, while Gregory Roberts**157 and Peter Quintiliani, carpenters employed by O & G, were installing wood planks on the underside of a highway bridge suspended over Amtrak's tracks in East Haven, Connecticut. An Amtrak diesel locomotive entered their worksite without warning and collided with the man-lift in which they were stationed. Amtrak's on-site safety personnel were unable to prevent the accident, because they were unaware of the train's scheduled passage through O & G's work area, due to poor coordination with the office of Amtrak's chief dispatcher in Boston. Furthermore, Amtrak's employees, having already de-energized the tracks at the East Haven worksite so that no electric-powered train could pass, erroneously believed that the tracks had been placed out of service. Thus, they had not made a specific request to "foul" the tracks, i.e., render them completely inoperable until O & G's crew had completed its work. At the time of the accident, therefore, none of O & G's or Amtrak's employees on duty at the site expected any train movement through the work zone. FN2 The collision killed Roberts instantly; Quintiliani was injured while jumping out of the lift.

FN2. A more detailed description of the train accident can be found in the district court's March 2006 ruling on the parties' motions for summary judgment. *See Roberts v. Nat'l R.R. Passenger Corp. v. O & G Indus.,* Nos. 3:04-cv-1318, 3:04-cv-1622 & 3:04-cv-2195, 2006 WL 648212 (D.Conn. Mar.9, 2006), 2006 WL 648212, at *1-3. We think it unnecessary to recount here all the factual circumstances surrounding the accident, because the crux of the dispute before us is Amtrak's indemnity claim against O & G-not responsibility for the accident, which Amtrak admitted at trial.

David Roberts (hereafter "Roberts"), the brother of the deceased O & G employee and administrator of his estate, filed in August 2004 a wrongful death action against Amtrak, seeking compensatory and punitive damages. The suit by Roberts was consolidated with Quintiliani's personal injury action. After answering the two actions, Amtrak filed its third-party complaint against O & G.

The indemnity claim was based on a clause in the "Temporary Permit to Enter Upon Property" (hereafter "Permit"), a contract concluded between O & G and Amtrak in October 2003. Under the Permit, Amtrak allowed O & G access to Amtrak's property in East Haven, in order to perform construction work in relation to O & G's contract with the Connecticut State Department of Transportation regarding the re-building of a stretch of Interstate 95 between New Haven and Branford, Connecticut; consideration was $1. O & G, on its part, undertook to "use all necessary care and precaution to avoid accidents, delay or interference with [Amtrak's] trains or property" and abide by Amtrak's safety regulations. Pursuant to the Permit, Amtrak would provide, at its discretion and at O & G's expense, "flag service and/or other protection" necessary to maintain the "safety and continuity of railroad traffic," over which Amtrak retained exclusive control. However, the provision of "protective ser-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

vices" would "not relieve [O & G] from [its] complete responsibility for the adequacy and safety of [its] operations." A key feature of the Permit is the following provision:

> The Permittee [O & G] shall defend, indemnify and hold harmless Railroad [Amtrak], its officers, directors, employees, agents, servants, successors, assigns and subsidiaries, *irrespective of their negligence or fault,* from and against any and all losses and liabilities, ... claims, causes of action, suits, costs and expenses incidental thereto (*including cost of defense and attorney's fees* ), which any or all of them may hereafter **\*158** incur, be responsible for, or pay as a result of injury, [or] death, ... to any person ... arising out of or ... resulting from activities of or work performed by [O & G], its officers, employees, agents, servants, contractors, subcontractors, or any other person acting for or by permission of [0 & G]. *The foregoing obligation shall not extend to situations where the negligence or fault of Amtrak, its officers, directors, [or] employees ... is the sole causal negligence or fault, except that it shall so extend to injury [or] death ... to employees of [O & G], its agents, servants, contractors, subcontractors, or any other person acting for or by permission of [O & G].* The foregoing obligation shall not be limited by the existence of any insurance policy or by any limitation on the amount or type of damages, compensation, or benefits payable by or for [O & G] or any contractor or subcontractor, and shall survive the termination of this permit for any reason.

(Emphasis added.) In the district court, O & G argued that the above provision was invalid under Connecticut General Statute § 52-572k(a), which declares void as against public policy agreements to indemnify a party against its own negligence, if such agreements were made "in connection with or collateral to" construction contracts.

Before trial began on Amtrak's indemnity claim, Amtrak sought summary judgment and orders directing O & G to defend Amtrak in the two

tort actions and reimburse Amtrak's reasonable attorneys' fees in defending against those claims. In March 2006, Judge Dorsey granted Amtrak partial summary judgment, concluding that § 28103(b), which allows Amtrak to enter into indemnification agreements as to claims against it, preempted the Connecticut statute and allowed Amtrak to pursue its indemnity claim at trial.

The jury trial of the consolidated actions by plaintiffs Roberts and Quintiliani against Amtrak began in March 2006. The first phase ("Phase I") was limited to the issue of damages to be awarded to plaintiffs. Amtrak conceded negligence (but not recklessness). In April 2006, the jury awarded plaintiffs $1.425 million each in compensatory damages, but rejected the punitive damages claims, finding that Amtrak's conduct was not willful or reckless.FN3 At the end of the second phase of the trial ("Phase II") concerning Amtrak's third-party complaint against O & G, the jury found that O & G was excused from its obligation to indemnify Amtrak, because Amtrak's failure to provide O & G's crew adequate on-site protection amounted to a material breach of the Permit, rendering it void in its entirety.

> FN3. The Roberts estate appealed from the judgment of the district court entered against Amtrak after the verdict. That appeal was heard by this panel the same day as the appeal now before us. In November 2007, we summarily affirmed the judgment of the district court. *See Roberts v. Nat'l R.R. Passenger Corp.,* No. 06-3036-cv, 2007 WL 3230736 (2d Cir. Nov.1, 2007) (summary order).

After this second verdict, Amtrak moved for judgment as a matter of law, under Federal Rule of Civil Procedure 50(b), arguing that there were no triable issues of fact as to the applicability of the indemnity clause in the Permit and, hence, O & G was required to indemnify Amtrak for litigation costs and damages awarded in the underlying actions by Quintiliani and Roberts. In the alternative,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

Amtrak sought a new trial, under Rule 59(a), on whether a material contractual default nullified the entire Permit.

In September 2006, the judge granted Amtrak's Rule 50(b) motion, concluding **159** that Amtrak's right to indemnity explicitly accrues, under the Permit, where Amtrak is found liable for injury to or death of an O & G employee solely caused by Amtrak's own negligence or fault. *See Roberts, 2006 WL 2621733, at \*5-6.* Allowing O & G to evade its indemnity obligations because of Amtrak's negligence, the court reasoned, would "render the indemnification provision meaningless." *Id. at \*6.*

In December 2006, the court entered judgment in favor of Amtrak in its indemnity action against O & G. This timely appeal by O & G followed.

## II. DISCUSSION

The parties to this appeal raise several issues. First, we must decide whether the Connecticut statute, which nullifies indemnity agreements insulating a contracting party from its own negligence,[FN4] applies, on its face, to the Permit; if it does, we must next examine whether § 28103(b), which permits Amtrak to enter into indemnification agreements,[FN5] preempts the Connecticut statute. Second, in considering the district court's grant of Amtrak's motion for judgment as a matter of law, we must assess whether Amtrak's conceded failure to effectively protect O & G's crew constituted a material breach of the Permit, discharging O & G from its indemnity obligation. Third, we review the district court's decision to preclude O & G from cross-examining an Amtrak employee during Phase I of the trial, and the judge's subsequent decision to restrict O & G's direct examination of the same employee during Phase II. Finally, we consider whether we have jurisdiction over the district court's non-quantified award to Amtrak of reasonable costs and attorneys' fees incurred in the defense of the Roberts and Quintiliani actions.

FN4. Connecticut General Statute §

52-572k states:

(a) Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer.

FN5. 49 U.S.C. § 28103(b) provides:

A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims.

### A. *Preemption*

Our review of a grant of summary judgment under Rule 56 is plenary. "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998). We view the facts in the light most favorable to the nonmoving party and resolve all factual ambiguities in its favor. *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.2006).

### 1) *Applicability of the Connecticut Statute*

In its appeal, O & G relies heavily on the Connecticut statute. In response, Amtrak claims for the first time that the Connecticut statute does not apply to the Permit because it allegedly bars indem-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

nity agreements only if inserted in construction contracts. Amtrak argues that the Permit was not such a contract. In the district *160 court, however, Amtrak did not contest the applicability of the Connecticut statute, although it had ample opportunity to do so. Under the circumstances, Amtrak has waived that argument and cannot raise it on appeal. *See Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994) (citing *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).FN6 Therefore, we proceed with the preemption question on the assumption that the Connecticut statute applies, unless it is preempted.

> FN6. Our refusal to consider Amtrak's waived argument on the applicability of the Connecticut statute is of little importance to the final disposition of the case. As set forth below, we agree with the district court's finding that the Connecticut statute is preempted by federal law and thus does not invalidate the indemnity clause in the Permit.

*2) Preemption by § 28103(b)*

Section 28103 of Title 49 of the United States Code was enacted as part of the Amtrak Reform and Accountability Act of 1997 (hereafter the "Reform Act"). Subsection (b) of § 28103 provides that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims." Amtrak argues that this subsection was intended to allow it to enter into enforceable indemnity agreements not voidable under state law. In Amtrak's view, § 28103(b) is at odds with and preempts the Connecticut statute.

O & G counters that § 28103(b) applies only to indemnity agreements (1) regarding claims brought by passengers and (2) concluded between passenger rail carriers like Amtrak and freight railroads. Because Gregory Roberts and Quintiliani were not Amtrak passengers, and the indemnity agreement was between Amtrak and O & G, a construction company rather than a freight railroad company, O & G maintains that § 28103(b) is not applicable and

does not supersede the Connecticut statute. In support of its arguments, O & G points to subsection (a) of § 28103, which governs the issue of punitive damages to be awarded in relation to passenger claims for personal injury, wrongful death or property damage,FN7 and to the legislative history of § 28103(b).

> FN7. That subsection provides:
>
> (a) Limitations.
>
> -(1) Notwithstanding any other statutory or common law or public policy, or the nature of the conduct giving rise to damages or liability, in a claim for personal injury to a passenger, death of a passenger, or damage to property of a passenger arising from or in connection with the provision of rail passenger transportation, ... punitive damages, to the extent permitted by applicable State law, may be awarded in connection with any such claim only if the plaintiff establishes by clear and convincing evidence that the harm that is the subject of the action was the result of conduct carried out by the defendant with a conscious, flagrant indifference to the rights or safety of others. If, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, this paragraph shall not apply.
>
> (2) The aggregate allowable awards to all rail passengers, against all defendants, for all claims, including claims for punitive damages, arising from a single accident or incident, shall not exceed $200,000,000.

[1] Federal preemption of state law is a doctrine grounded in the Supremacy Clause of the Constitution. *See* U.S. Const. Art. VI, cl. 2 ("[T]he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

Laws of the United States ... made in Pursuance [of the Constitution] shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). The doctrine requires us first to ascertain congressional intent, which is " 'the ultimate touchstone' of pre-emption analysis. *See* **\*161** *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quoting *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). Intent to preempt state law may be found "(1) where Congress expressly states its intent to preempt; (2) where Congress's scheme of federal regulation is sufficiently comprehensive to give rise to a reasonable inference that it leaves no room for the state to act; and (3) where state law actually conflicts with federal law." *Marsh v. Rosenbloom,* 499 F.3d 165, 177 (2d Cir.2007) (citing *Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)).

As the district court correctly concluded, § 28103(b) does not expressly preempt state law, nor is it "so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it." *Roberts,* 2006 WL 648212, at \*10. Preemption can thus be found here only if the Connecticut statute conflicts with § 28103(b), i.e., if compliance with both statutes is impossible, or if the Connecticut statute " 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.' " *United States v. Locke,* 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (quoting *California v. ARC Am. Corp.,* 490 U.S. 93, 100-101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)).

O & G first contends that no irreconcilable conflict exists between the federal and the Connecticut statutes, because Congress intended § 28103(b) to apply only to passenger claims. The argument is unavailing. The subsection contains no such limitation on its face and indeed makes plain that Amtrak may enter into contracts allocating fin-

ancial responsibility (i.e., indemnity agreements) for *any* claims brought against it.

Furthermore, if Congress intended § 28103(b) to apply only to passenger claims, it would have included such qualifying language in the definition of the term "claims." Congress did not do so. The definition in subsection (e) of § 28103 is sufficiently broad to encompass any claims asserted against Amtrak-not only those by passengers.FN8 Subsection (e) defines the persons or entities *against* whom a claim may be pursued, but does not limit the class of claimants. Because the language is unambiguous on this point, we cannot "supply that which is omitted by the legislature." *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 127 (2d Cir.2003).

FN8. 49 U.S.C. § 28103(e) states:

Definition.-For purposes of this section-

(1) the term "claim" means a claim made-

(A) against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State; or

(B) against an officer, employee, affiliate engaged in railroad operations, or agent, of Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State.

[2] The title of § 28103-"Limitations on rail passenger transportation liability"-is of little aid to O & G's proposition that the statute covers only passenger claims. "[A] title ... cannot limit the plain meaning of unambiguous text." *Collazos v. United States,* 368 F.3d 190, 196 (2d Cir.2004)(omission in original) (internal quotation marks omitted).

We conclude that § 28103(b), read in the context of the whole section, *see Food & Drug Admin.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

*v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), authorizes Amtrak's entry into indemnification agreements*162 for any claim filed against it, including tort claims by contractor employees. This permissive mandate can hardly be reconciled with the prohibition of the Connecticut statute.

[3] O & G also argues that the scope of § 28103(b) only extends to indemnity agreements between Amtrak and the freight railroad companies that own most of the rail lines on which Amtrak operates and are reluctant to shoulder liabilities stemming from the use of their tracks by passenger trains. This claim is equally unpersuasive because of the unambiguous text of § 28103(b) for the reasons set forth above, and we rest our conclusion that § 28103(b) preempts the Connecticut statute on that ground.

Nonetheless, O & G's argument that congressional intent, as evidenced by the legislative history of § 28103(b), counsels a different result is meritless. Because Amtrak is a passenger rail provider mostly operating on track systems owned by freight railroads, the protection afforded by § 28103(b) will most likely apply to indemnity agreements with freight railroads. As a result, many of the congressional sponsors of the Reform Act frequently referred in their discussions to the liability allocation agreements between Amtrak and host freight railroads. That said, we find no evidence of congressional intent that § 28103(b) apply *only* in that particular set of circumstances. Rather, the goal of the Reform Act was to shield *all* of Amtrak's indemnity arrangements from legal attacks on their validity. *See Symposium: The State of the Law in the Railroad Indus.,* 26 Transp. L.J. 319, 336-37 (1999) ("Congress ... encouraged all providers of rail passenger transportation to enter into contracts that allocate financial responsibility for claims. Resolving an issue that had plagued freight railroads that host Amtrak trains, Congress also affirmed the enforceability of contracts that include indemnification obligations.").

[4] The legislative history of § 28103(b) is illuminating. Congressional debates reveal legislative concern about Amtrak's financial problems and intention to support Amtrak's contractual arrangements designed to reduce its liability exposure. The Reform Act was meant, among other things, to ensure the enforceability of indemnity agreements Amtrak concludes with *any* other party. The Senate Committee Report is categorical in that regard:

[T]his bill clarifies that *indemnification agreements related to the provision of rail passenger service entered into by Amtrak and other parties would be enforceable.* The Committee has been requested by Amtrak to include this provision in order to *aid Amtrak in achieving operating self-sufficiency ....* As long as there is the possibility that state laws governing indemnification contracts may make these contracts unenforceable, Amtrak and a freight railroad may find themselves litigating with each other. Amtrak believes that such litigation inevitably would not only adversely impact business relationships between Amtrak and the host freight railroads, but it *would also lead to significantly higher outlays in settlements and judgments to plaintiffs.*

S.Rep. No. 105-85, at 5 (1997) (emphasis added). Congress unmistakably intended "[t]he language in section 28103(b) ... to confirm that such contractual agreements [i.e. indemnification agreements] are consistent with Federal law and public policy." 143 Cong. Rec. S11937-03 (statement of Sen. Lott). O & G's interpretation of the statute's legislative history would be inconsistent with the stated objective of § 28103(b) to solidify the enforceability of Amtrak's liability-shifting arrangements.

**\*163** When the Reform Act was passed, Amtrak was in the middle of "a financial crisis, with growing and substantial debt obligations severely limiting its ability to cover operating costs and jeopardizing its long-term viability." Amtrak Reform and Accountability Act of 1997, § 2(2), Pub.L. No. 105-134, December 2, 1997, 111 Stat.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

2570, at *2571; *see also* 143 Cong. Rec. S11929-03 (statement of Sen. McCain) ("Amtrak is on the verge of bankruptcy. Fundamental reforms are needed immediately if there is to be any possibility of addressing Amtrak's financial crisis and turning it into a viable operation."). The Reform Act clearly reflects Congress's distress over Amtrak's financial burdens: in 49 U.S.C. § 28103(a), Congress limited the award of punitive damages, in actions "arising from ... the provision of rail passenger transportation," to cases where the defendant was proven to have "a conscious, flagrant indifference to the rights or safety of others." 49 U.S.C. § 28103(a)(1). In a similar vein, Congress placed a $200 million cap on Amtrak's aggregate liability from any single accident. *Id.* § 28103(a)(2).

[5] Against this legislative background, contentions that Congress intended to allow state law or public policy to interfere with Congress's attempt to rescue Amtrak are simply not persuasive. We believe that we must enforce and recognize the validity of the indemnity provision in the Permit. Applying the Connecticut statute would violate the plain language and spirit of § 28103(b), which therefore preempts the Connecticut statute.

**B.** *Material Breach of the Permit*

At the conclusion of Phase II of the trial, the jury found that, under the indemnity provision in the Permit, O & G was required to reimburse Amtrak for costs incurred and damages awarded in the Roberts and Quintiliani actions, but that Amtrak's material breach of the Permit relieved O & G of all its contractual duties, including the obligation to indemnify Amtrak. However, the district judge overturned the jury verdict, ruling that as a matter of law O & G's contractual obligation to indemnify Amtrak was valid regardless of Amtrak's negligence. *See Roberts,* 2006 WL 2621733, at *5-7. O & G now challenges this ruling, arguing that the jury properly found that Amtrak's violation of its duty to protect O & G's workers from passing trains resulted in termination of the entire Permit and O & G's indemnity obligation thereunder. We

review *de novo* the district court's grant of a post-verdict judgment to Amtrak as a matter of law, considering the evidence in the light most favorable to O & G, the nonmoving party. *Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir.2007).

[6] "[A] material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." 23 *Williston on Contracts* § 63:3 (4th ed.2007) (footnotes and internal quotation marks omitted). Under Connecticut law, an uncured, material failure of performance by one contracting party discharges the other party from any further performance under the contract, which is rendered unenforceable *in toto. See Bernstein v. Nemeyer,* 213 Conn. 665, 570 A.2d 164, 168 (1990).

[7] It is uncontroverted that O & G complied with its obligations under the Permit to perform its work on Amtrak's property so as to observe Amtrak's safety regulations and not "interfere with [Amtrak's] operations." By contrast, Amtrak's failure to provide adequate protection to O & G's workers, O & G claims, negated the **\*164** Permit's purpose and amounted to a material breach. The district court rejected this claim because of the unambiguous language of the indemnity agreement, which the court held squarely applicable to the undisputed facts of the case. *See Roberts,* 2006 WL 2621733, at *6 ("The argument lacks merit, however, because the factual situation on which O & G relies for being excused from its obligation is exactly the factual situation which gives rise to that obligation.").

We agree with the district judge's holding. Not only is the indemnity clause not qualified by or conditioned on Amtrak's obligation to operate its trains safely through the worksite, but it explicitly provides Amtrak with a right to indemnity even where "the negligence or fault of Amtrak [or] its ... employees" is the *sole* cause of "injury, death, disease, or occupational disease to employees of" O &

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

G.[FN9] O & G cannot circumvent its indemnity obligation by invoking Amtrak's negligence, which the parties envisaged and clearly determined would *not* exonerate O & G from its contractual duties. As Judge Dorsey emphasized, if O & G is allowed to evade its obligation to hold Amtrak harmless, "Amtrak's protection against ultimate responsibility for any unsafe train operation, as provided in the Permit, would be nullified." *Id.* at *6. Since the indemnity provision expressly contemplates the factual situation that arose here (i.e., Amtrak's negligence was the sole cause of injury and death to O & G's employees), Amtrak's failure to safely operate its trains through O & G's work zone could not have thwarted the Permit's essential purpose.

> FN9. The indemnity provision is quoted in full in section I of the opinion, *see supra* at pp. 157-58. Its applicability in this case has not been called into question by the parties.

A reading of the Permit as a whole suggests, in fact, that at the core of the agreement was the parties' preoccupation with the "safety and continuity of railroad traffic," rather than the safety of O & G's personnel. The emphatic references to O & G's undertaking to take all measures necessary to avoid undue interference with train operations and its "complete responsibility for the adequacy and safety of" its activities suggest that the Permit was drafted with a principal focus on Amtrak's interests. Even Amtrak's promise to furnish protection was aimed at ensuring the safety and continuity of railroad traffic and would come into play only if, in the opinion of Amtrak's officers, "conditions warrant" it, and under the condition that O & G would bear all the costs. It is a fair inference that the essential purpose of the Permit was not to guarantee the safety of O & G's employees, but rather to authorize O & G's temporary access to Amtrak's property while reassuring Amtrak that O & G's presence on its property would neither disrupt train operations nor damage Amtrak's trains and facilities. Amtrak's negligent failure to provide adequate protection to

O & G's workers did not vitiate this purpose.

O & G does not claim that every negligent act by Amtrak would constitute a material breach of the Permit. According to O & G, there could be situations involving negligent acts by Amtrak representatives that, nevertheless, would be covered by the indemnity provision without necessarily amounting to a breach of a fundamental contractual term. For example, O & G claims, "an Amtrak employee could accidentally strike someone with a tool or a piece of equipment, or could dig a hole into which an individual might fall." *See* Br. of Appellant at 36.

The breadth of the indemnity provision refutes the distinction O & G seeks to introduce. The provision does carve out **165 of its reach some situations where Amtrak's negligence is the sole cause of the indemnifiable loss, but O & G's obligation to indemnify Amtrak explicitly extends to instances of "injury, death, disease, or occupational disease to employees of [O & G]" exclusively caused by Amtrak's negligence or fault. If Amtrak's obligation to protect O & G's employees were a centerpiece of the Permit, and default of this obligation were intended to invalidate the Permit in its entirety, the parties could have made this clear by, for example, including a termination clause in the Permit. Absent any stipulation or indication to that effect, we cannot "unmake" the bargain the parties struck, "whether provident or improvident." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.,* 252 Conn. 479, 746 A.2d 1277, 1292 (2000) (internal quotation marks omitted). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Pesino v. Atl. Bank of New York,* 244 Conn. 85, 709 A.2d 540, 545 (1998) (internal quotation marks omitted). Under the circumstances of this case, a finding of material breach of the Permit would be incompatible with its plain language.

"Simply stated, ... the evidence [here] is such that, without ... considering the weight of the evidence, there can be but one conclusion as to the ver-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

dict that reasonable men could have reached."
*Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970).
Accordingly, we affirm the district court's grant of
judgment to Amtrak as a matter of law and hold
that, regardless of Amtrak's negligence in causing
the accident, O & G bears the valid obligation to in-
demnify Amtrak for the damages awarded to Quin-
tiliani and Roberts.

### C. *Cross-Examination of Amtrak's Employee by O & G*

The district court permitted O & G to particip-
ate in Phase I of the trial, in which plaintiffs
Roberts and Quintiliani sued defendant Amtrak.
The judge's rationale was that evidence presented in
relation to plaintiffs' claims against Amtrak might
well bear on Amtrak's indemnity claim against O &
G. Nevertheless, the judge did not permit O & G's
counsel to cross-examine Amtrak's New England
Division Superintendent Fred Fournier. O & G's
stated reason for cross-examining Fournier was to
elicit testimony tending to prove that O & G was
not at fault for the accident, which was entirely at-
tributable to Amtrak's reckless conduct. O & G ar-
gues that a showing of Amtrak's recklessness
would enable O & G to avoid its indemnity obligations on
public policy grounds. Judge Dorsey's reasoning for
denying O & G's request to cross-examine Fournier
was that issues pertaining to O & G's role in the ac-
cident would be addressed in Phase II. O & G was
told that it would have ample opportunity to present
its recklessness defense at that time. However,
when O & G attempted to question Fournier in
Phase II of the trial about whether Amtrak followed
proper internal procedures to avert safety risks to O
& G's on-site employees, the court sustained
Amtrak's objection to this line of questioning. The
judge noted that the jury had already resolved the
issue of Amtrak's fault in Phase I of the trial.

O & G now claims that by precluding its cross-
examination of Fournier in Phase I and limiting its
questioning of the same witness in Phase II of the
trial, the district judge prevented O & G from fully
litigating the question of Amtrak's recklessness-on

which one of O & G's defense was premised-and
thus deprived it of its cross-examination rights. The
error, according to O & G, warrants a new trial.

As a preliminary matter, we reject Amtrak's
contention that this claim has not **\*166** been pre-
served for appellate review. O & G repeatedly ob-
jected to the court's limitations on its examination
of Fournier, articulating the concern that, if the jury
found no recklessness by Amtrak in Phase I, that is-
sue would be barred from jury consideration in
Phase II.

We turn to the merits of O & G's claim.
"Whether an evidentiary error implicates a substan-
tial right depends on 'the likelihood that the error
affected the outcome of the case.' " *See Tesser v.
Bd. of Educ.,* 370 F.3d 314, 319 (2d Cir.2004) (per
curiam) (quoting *Malek v. Fed. Ins. Co.,* 994 F.2d
49, 55 (2d Cir.1993)); *see also* Fed.R.Civ.P. 61
("Unless justice requires otherwise, no error ... by
the court ... is ground for granting a new trial, ... or
otherwise disturbing a judgment or order. At every
stage of the proceeding, the court must disregard all
errors and defects that do not affect any party's sub-
stantial rights.")

[8] We believe that the court's alleged error did
not have a substantial impact on the outcome of the
case. O & G's interests were adequately protected
by Roberts and Quintiliani, the plaintiffs in Phase I.
These parties were seeking punitive damages from
Amtrak and thus had an equal, if not greater, in-
centive than O & G to show that Amtrak's conduct
was reckless. The question of Amtrak's recklessness
was adequately litigated by Roberts and Quintiliani
and there is no indication that the jury would have
found recklessness, had O & G been allowed to
cross-examine Fournier. The limitation of O & G's
cross-examination rights, even if erroneous, did not
cause any prejudice to O & G, because "it is [not]
likely that in some material respect the factfinder's
judgment was swayed by the error." *Tesser,* 370
F.3d at 319 (internal quotation marks omitted). *See
also United States v. Thomas,* 274 F.3d 655, 668
(2d Cir.2001) (en banc) ("An error affects a defend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

ant's substantial rights if it is prejudicial and it af-
fected the outcome of the district court proceed-
ings") (internal quotation marks omitted).

Furthermore, even supposing the district judge
had not restricted O & G's examination of Fournier
in Phase I, and that O & G had convinced the jury
that Amtrak's conduct was reckless, it is doubtful
that the outcome of the case would have been more
favorable to O & G. The indemnity provision in the
Permit unequivocally requires O & G to reimburse
Amtrak for *all* the losses Amtrak may sustain as a
result of death or injury to O & G's employees,
even when Amtrak's own negligence *or fault* is the
sole cause of the incident. The unmistakable word-
ing of the clause would thus not allow O & G to
nullify its obligation to indemnify Amtrak, even if
the jury had entered a punitive damages award
against Amtrak on recklessness grounds.

O & G argues to us that, had it been allowed to
fully participate in Phase I of the trial, and had the
jury found Amtrak's conduct reckless, O & G
would have been relieved of its duty to hold
Amtrak harmless, by raising a public policy defense
against enforcement of the indemnity agreement.
We disagree. We have already held in this opinion (
*see* Part II.A, *supra* ) that the Connecticut statute
embodying the public policy of Connecticut against
indemnification for liabilities due solely to the neg-
ligence of the indemnitee [FN10] is preempted by §
28103(b). Subsection § 28103(b) also superseded
the opinion that would have been most helpful to O
& G in its public policy defense against indemnific-
ation for reckless conduct. *See* **\*167***Nat'l R.R Pas-
senger Corp. v. Consol. Rail Corp. ("ConRail"),*
698 F.Supp. 951 (D.D.C.1988)* (invalidating an
agreement to indemnify for losses caused by the in-
demnitee's gross negligence, as contrary to District
of Columbia public policy), *vacated on other
grounds,* 892 F.2d 1066 (D.C.Cir.1990). As Judge
Dorsey correctly noted in granting summary judg-
ment to Amtrak, it was precisely the doubts cast by
the *ConRail* decision over the validity of indemnity
agreements by railroad parties that prompted Con-

gress to enact § 28103(b). *See Roberts,* 2006 WL
648212, at *11. The broad, unqualified language in
§ 28103(b) leaves no doubt as to the specific intent
of Congress to sanction indemnity arrangements
between Amtrak "and other parties" with respect to
any claims against Amtrak. *See* S.Rep. No. 105-85,
at 5 (1997). A finding of recklessness in Phase I,
therefore, would have resulted in a higher jury ver-
dict against Amtrak in the underlying actions
against it in Phase I of the trial. This would most
probably have permitted Amtrak to obtain greater
recovery from O & G under the Permit; public
policy considerations would not have precluded en-
forcement of the express direction of the indemnity
provision.

FN10. *See supra* note 3.

In view of the above, we hold that, assuming
*arguendo* that the district judge erred in preventing
O & G from cross-examining Fournier in Phase I
and from fully pursuing its recklessness defense in
Phase II, the error was not prejudicial to O & G in
the context of the trial as a whole and does not jus-
tify a new trial.

**D.** *Attorneys' Fees*

[9] In granting Amtrak's Rule 50(b) motion for
judgment as a matter of law, the district judge held
that, under the indemnity agreement, Amtrak was
entitled to reimbursement of its attorneys' fees, as
well as the costs it incurred in Phase I of the trial,
in defense of the actions brought by Roberts and
Quintiliani. The judge, however, did not set the
amount of attorneys' fees and litigation costs for
which O & G was required to indemnify Amtrak. O
& G now argues that the district court abused its
discretion in awarding attorneys' fees and costs
where there was no evidence as to the amount or
reasonableness of these expenses. Amtrak responds
that the amount of fees due would be ascertained by
the district judge only after liability for such fees
was determined.

[10] Pursuant to 28 U.S.C. § 1291, we review
only final decisions of the district court that "leave[

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

537 F.3d 153
**(Cite as: 537 F.3d 153)**

] nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). A non-quantified award of attorneys' fees and costs is not appealable until the amount of the fees has been set by the district court. "We have held that where attorneys' fees are a contractually stipulated element of damages, a judgment is not final until the fees have been determined." *F.H. Krear & Co. v. Nineteen Named Trustees,* 776 F.2d 1563, 1564 (2d Cir.1985) (per curiam); *see also Honeywell Int'l, Inc. v. Purolator Prods. Co.,* 468 F.3d 162, 164 (2d Cir.2006). This circuit, moreover, has "rejected the doctrine of pendent appellate jurisdiction as a basis to review an undetermined award of attorneys' fees, even when the question of liability for the fees had been consolidated with other decisions that were final." *Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 87 (2d Cir.1998) (citing *Cooper v. Salomon Bros.,* 1 F.3d 82, 85 (2d Cir.1993)). We therefore dismiss for lack of appellate jurisdiction the portion of O & G's appeal challenging the district court's grant of attorneys' fees and costs incurred in Phase I of the trial.

[11] This defect does not impair the finality of the district court's ruling on Amtrak's motion for judgment as a matter **168 of law, nor does it divest us of jurisdiction to review the merits of the other issues on appeal. In reaching this conclusion, we apply the "bright-line rule" enunciated by the Supreme Court in *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), "that a decision on the merits is a 'final decision' for purposes of [28 U.S.C.] § 1291 whether or not there remains for adjudication a request for attorney's fees." *Id.* at 202-03, 108 S.Ct. 1717. FN11

> FN11. Some of our pre- *Budinich* precedent might be read to support the proposition that the non-finality of an award of attorneys' fees sought as an element of contractual damages renders non-appealable the entire judgment in which such award is

incorporated. *See, e.g., Union Tank Car Co. v. Isbrandtsen,* 416 F.2d 96 (2d Cir.1969) (per curiam). However, we heed the Supreme Court's admonition in *Budinich* that "no interest pertinent to § 1291 is served by according different treatment to attorney's fees deemed part of the merits recovery," and abide by the now "uniform rule that an unresolved issue of attorney's fees ... does not prevent judgment on the merits from being final." *Budinich,* 486 U.S. at 202, 108 S.Ct. 1717. Application of this sensible rule also promotes the interests of judicial economy, especially in this case where resolution of the "question remaining to be decided ... will not alter ... or revise" the court's final rulings on the merits of the other issues on appeal. *Id.* at 199, 108 S.Ct. 1717. Treating the district court's grant of Amtrak's Rule 50(b) motion as non-final and remanding the entire case to the district court would only cause further delays in the disposition of this long-pending case.

### III. CONCLUSION

We have considered all of appellant O & G's arguments and find them to be without merit. For the reasons discussed above, we affirm the district court on all issues except for the ruling on attorneys' fees, over which we lack appellate jurisdiction. AFFIRMED IN PART AND DISMISSED IN PART.

C.A.2 (Conn.),2008.
O & G Industries, Inc. v. National R.R. Passenger Corp.
537 F.3d 153

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

⚑

United States Court of Appeals,
Third Circuit.
Richard DEWEESE
v.
NATIONAL RAILROAD PASSENGER COR-
PORATION (AMTRAK); Southeastern
Pennsylvania Transportation Authority; Common-
wealth of Pennsylvania Department of Transporta-
tion Southeastern Pennsylvania Transportation Au-
thority, Appellant.

No. 09-1569.
Argued Nov. 2, 2009.
Filed Dec. 22, 2009.

**Background:** National Railroad Passenger Corpor-
ation (Amtrak), in injured passenger's state court
personal injury suit, filed cross claim against re-
gional transportation authority. Amtrak obtained re-
moval. The United States District Court for the
Eastern District of Pennsylvania, Thomas J. Rueter,
J., 645 F.Supp.2d 344, granted summary judgment
in favor of Amtrak. Authority appealed.

**Holdings:** The Court of Appeals, Jordan, Circuit
Judge, held that:
(1) sovereign immunity statute was preempted to
extent it conflicted with federal statute, and
(2) federal statute did not impermissibly apply ret-
roactively.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ☞763.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from

170Bk763.1 k. In general. Most
Cited Cases

Court of Appeals exercises plenary review over
a preemption determination, as it is a question of
law.

**[2] States 360 ☞18.3**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.3 k. Preemption in general. Most
Cited Cases

Under Supremacy clause, Congress has the
power to preempt state legislation if it so intends.
U.S.C.A. Const. Art. 6, cl. 2.

**[3] States 360 ☞18.11**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.11 k. Congressional intent. Most
Cited Cases

"Express preemption" exists when Congress in-
cludes in a statute explicit language stating an in-
tent to preempt conflicting state law.

**[4] States 360 ☞18.7**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.7 k. Occupation of field. Most
Cited Cases

"Field preemption" occurs when a state law im-
pinges upon a field reserved for federal regulation.

**[5] States 360 ☞18.7**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.7 k. Occupation of field. Most
Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

Field preemption exists either where the nature of the regulated subject matter permits no other conclusion, or where the Congress has unmistakingly so ordained.

**[6] States 360 ☞18.5**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
       360k18.5 k. Conflicting or conforming laws or regulations. Most Cited Cases

"Implied conflict preemption" exists when, under the circumstances of a particular case, the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

**[7] States 360 ☞18.11**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
       360k18.11 k. Congressional intent. Most Cited Cases

In analyzing a potential conflict between federal and state law, for purposes of implied conflict preemption, Court of Appeals must be guided by the rule that the purpose of Congress is the ultimate touchstone in every preemption case.

**[8] States 360 ☞18.5**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
       360k18.5 k. Conflicting or conforming laws or regulations. Most Cited Cases

Courts, in determining question of implied conflict preemption, are required to consider entire scheme of the federal statute and identify its purpose and intended effect; only then can courts determine whether the opposing state law presents a "sufficient obstacle" such that it requires preemption.

**[9] States 360 ☞18.3**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
       360k18.3 k. Preemption in general. Most Cited Cases

**States 360 ☞18.5**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
       360k18.5 k. Conflicting or conforming laws or regulations. Most Cited Cases

While there is a recognized presumption against preemption, and courts seek to avoid it when possible, conflicts that are implied by operation of state law are of no less force than that which is expressed.

**[10] Indemnity 208 ☞22**

208 Indemnity
   208I In General
     208k21 Constitutional and Statutory Provisions
       208k22 k. In general. Most Cited Cases

**Indemnity 208 ☞27**

208 Indemnity
   208II Contractual Indemnity
     208k26 Requisites and Validity of Contracts
       208k27 k. In general. Most Cited Cases

**States 360 ☞18.37**

360 States
   360I Political Status and Relations
     360I(B) Federal Supremacy; Preemption
       360k18.37 k. Governmental immunity. Most Cited Cases

Pennsylvania sovereign immunity statute, which regional transportation authority argued barred it from indemnifying National Railroad Passenger Corporation (Amtrak) in personal injury suit, was preempted to extent it conflicted with federal statute allowing Amtrak to enter into liability-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

shifting agreements with other parties, even though federal statute authorized rather than compelled Amtrak to enter into indemnity contracts; sovereign immunity statute, if applied to bar indemnification, would be complete obstacle to Amtrak's ability to enter into indemnification contracts because it would directly prevent it from being able to allocate financial responsibility to authority. 49 U.S.C.A. § 28103(b); 1 Pa.C.S.A. § 2310; 42 Pa.C.S.A. § 8521 et seq.

**[11] Indemnity 208 ☞22**

208 Indemnity
   208I In General
      208k21 Constitutional and Statutory Provisions
         208k22 k. In general. Most Cited Cases
    Federal statute allowing National Railroad Passenger Corporation (Amtrak) to enter into liability-shifting agreements with other parties, which was enacted after Amtrak and regional transportation authority entered into indemnity agreement, did not attach any new "legal duties," and thus had no impermissible retroactive effect, on personal injury claim that gave rise to Amtrak's claim for indemnification and authority's sovereign immunity defense raised in response, since personal injury claim arose after enactment of statute. 49 U.S.C.A. § 28103(b).

**[12] Statutes 361 ☞278.2**

361 Statutes
   361VI Construction and Operation
     361VI(D) Retroactivity
       361k278.2 k. Nature and scope. Most Cited Cases
    A statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.

**[13] Statutes 361 ☞278.2**

361 Statutes

**[14] Statutes 361 ☞278.5**

361 Statutes
   361VI Construction and Operation
     361VI(D) Retroactivity
       361k278.2 k. Nature and scope. Most Cited Cases
    Analyzing whether a statute operates retroactively is not always a simple or mechanical task; analysis requires a commonsense, functional judgment as to whether a statute attaches new legal consequences.

**[14] Statutes 361 ☞278.5**

361 Statutes
   361VI Construction and Operation
     361VI(D) Retroactivity
      361k278.4 Prospective Construction
       361k278.5 k. In general. Most Cited Cases
    In determining whether a statute operates retroactively, courts can be guided by considerations of fair notice, reasonable reliance, and settled expectations.

**[15] Statutes 361 ☞278.3**

361 Statutes
   361VI Construction and Operation
     361VI(D) Retroactivity
       361k278.3 k. Power to enact and validity. Most Cited Cases
    A statute does not operate retroactively merely because it is applied in a case arising from conduct antedating the statute's enactment; rather, statute's temporal reach becomes unacceptable only when its retroactive application would significantly impair existing rights and thereby disappoint legitimate expectations.

**[16] Statutes 361 ☞278.5**

361 Statutes
   361VI Construction and Operation
     361VI(D) Retroactivity
      361k278.4 Prospective Construction
       361k278.5 k. In general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

In deciding whether a statute has a retroactive effect, a court must determine the "important event" to which the statute allegedly attaches new legal consequences.

West Codenotes

Limited on Preemption Grounds1 Pa.C.S.A. § 2310
42 Pa.C.S.A. §§ 8521, 8522, 8523, 8525, 8525.
**\*241** Thomas S. Biemer, [Argued], Matthew A. Foley, Dilworth Paxson, Philadelphia, PA, for Appellant Southeastern Pennsylvania Transportation Authority ("SEPTA").

William G. Ballaine, [Argued], Landman, Corsi, Ballaine & Ford, New York, NY, Paul F.X. Gallagher, Gallagher & Rowan, Philadelphia, PA, for Appellee National Railroad Passenger Corporation.

Before: SCIRICA, Chief Judge, JORDAN and GREENBERG, Circuit Judges.

OPINION OF THE COURT

JORDAN, Circuit Judge.

The Southeastern Pennsylvania Transportation Authority ("SEPTA") appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment to the National Railroad Passenger Corporation ("Amtrak") on its cross-claim against SEPTA. The District Court determined that SEPTA's state-law sovereign immunity defense is preempted by Amtrak's federal enabling statute and that an indemnity contract between SEPTA and Amtrak is therefore enforceable. For the following reasons, we will affirm.

**I. Background**

*A. The Accident*

This dispute arises out of an accident on October 28, 2004, in which plaintiff Richard Deweese was struck by an Amtrak train. The day of the accident, Deweese was waiting for a Philadelphia-bound SEPTA train at the Crum Lynne,

Pennsylvania train station, which is adjacent to tracks used by both Amtrak and SEPTA. Someone at the station told Deweese that the platform from which to board the Philadelphia-bound trains was located on the opposite side of the tracks. Rather than using the stairs available to him to safely cross to the other side, Deweese took it upon himself to descend from the platform and walk directly across the tracks. While doing so, he was struck by an oncoming Amtrak train. Deweese filed suit in state court against Amtrak, SEPTA, and the Commonwealth of Pennsylvania to recover damages resulting from injuries he sustained as a result of the accident. Amtrak removed the action to federal court, and the Commonwealth was subsequently dismissed as a defendant. Prior to trial, Deweese settled his claims with SEPTA and Amtrak for $200,000, with each defendant paying Deweese $100,000.[FN1] The settlement left unresolved Amtrak's cross-claim against SEPTA for contractual indemnity,**\*242** which was based on two separate indemnity agreements between Amtrak and SEPTA.

> FN1. Not knowing the full details of the accident and the railroads' decision to settle with Deweese, a reader may be left bewildered by this brief synopsis, but the underlying lawsuit is irrelevant to the dispute presently before us.

*B. The Indemnity Agreements*

Amtrak owns the Crum Lynne train station as well as the adjacent tracks. SEPTA leases the station from Amtrak pursuant to a 1987 agreement entitled "Lease Agreement between National Railroad Passenger Corporation and Southeastern Pennsylvania Transportation Authority Covering 47 Commuter Stations in southeastern Pennsylvania" (the "Lease Agreement"). The Crum Lynne station is serviced exclusively by SEPTA, although SEPTA shares use of the railroad tracks with Amtrak pursuant to a 1982 agreement called the "Agreement between National Railroad Passenger Corporation and Southeastern Pennsylvania Transportation Au-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

thority for Northeast Corridor Access and Services" (the "NEC Agreement").

Both the Lease Agreement and the NEC Agreement contain indemnity provisions. Section 5 of the NEC Agreement includes a "Risk of Liability" clause stating that,

> SEPTA agrees to indemnify and save harmless Amtrak, its officers, agents, employees, and subsidiaries, irrespective of any fault of Amtrak or such persons, for all damage or for liability for personal injury or property damage which would not have been incurred but for the existence of the commuter service provided for SEPTA....

(App. at A155.) The Lease Agreement contains similar language. FN2

> FN2. Paragraph 25 of the Lease Agreement states the following:
>
> > "Lessee shall indemnify, save and hold harmless and defend Lessor ... against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, damage to or loss of property of Lessor, Lessee, or of agents, servants, licensees, contractors, invitees or employees of either, or of any other person, and against and from any and all claims and suits for, and any and all liability, loss, or expense arising from or incidental to or in connection with, injury to or death of persons, including agents, servants, contractors, licensees, invitees or employees of Lessor or of Lessee, or any other person, which such damage, loss, injury or death shall arise in any manner, directly or indirectly, out of or incidental to or in connection with this lease...." (App. at A133-A134, ¶ 25.)

Relying on both the Lease Agreement and the NEC Agreement, Amtrak, as already noted, filed a

cross-claim FN3 against SEPTA in the lawsuit that Deweese brought. Amtrak's claim, consistent throughout this litigation, is that SEPTA is obligated to indemnify Amtrak for its settlement payment to Deweese. SEPTA responded by asserting sovereign immunity, stating in its reply to the cross-claim that "[a]ny obligations on SEPTA's part under the applicable [L]ease [A]greement and [NEC Agreement] to indemnify, save and hold harmless AMTRAK from plaintiff's claims are limited, restricted, and conditioned by, and subject to, SEPTA's immunity as a Commonwealth party...." (App. at A29.)

> FN3. The docket entries and the District Court opinion refer to Amtrak's cross-claim as an amended cross-claim. The record, however, does not indicate how Amtrak's cross-claim has been amended. Thus, for ease of reference, we refer to Amtrak's amended cross-claim as simply a cross-claim.

Amtrak and SEPTA both moved for summary judgment. SEPTA argued in its summary judgment motion that, despite its clear contractual indemnity obligation to Amtrak under the NEC Agreement, FN4 it is *243 barred from indemnifying Amtrak because of the sovereign immunity conferred upon it by Pennsylvania state statute, 1 Pa. Cons.Stat. Ann. § 2310 and 42 Pa. Cons.Stat. Ann. § 8521-25. FN5 SEPTA conceded that, were it not for its state-law sovereign immunity defense, it would be required under the NEC Agreement to "hold [Amtrak] harmless against plaintiff's claims." (App. at A168.)

> FN4. SEPTA acknowledges that the NEC agreement is applicable to the present action but does not concede the applicability of the Lease Agreement. Argument and analysis in the case have thus naturally centered on the NEC Agreement. We too focus on that particular agreement, though our conclusions are equally applicable to the Lease Agreement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

FN5. SEPTA has not invoked sovereign immunity under the Eleventh Amendment of the United States Constitution; it only invokes sovereign immunity under Pennsylvania state law. *Cf. Cooper v. SEPTA,* 548 F.3d 296, 311 (3d Cir.2008) (holding that "SEPTA is not entitled to Eleventh Amendment immunity").

In its own motion for summary judgment, Amtrak contended that any state-law sovereign immunity defense proffered by SEPTA is preempted by Amtrak's enabling statute, 49 U.S.C. § 28103, enacted as part of the Amtrak Reform and Accountability Act of 1997 (the "Reform Act"). The Reform Act states, among other things, that "a provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims." 49 U.S.C. § 28103(b). To support its position, Amtrak relied on a recent decision from the United States Court of Appeals for the Second Circuit, *O & G Industries, Inc. v. National R.R. Passenger Corp.,* 537 F.3d 153 (2d Cir.2008), which held that the Reform Act preempted a Connecticut state statute governing indemnity contracts, to the extent that the two laws conflicted. SEPTA argued in response that Congress, in enacting 49 U.S.C. § 28103, did not intend "to preclude the application of state law on indemnity clauses." FN6 (App. at A 185.)

FN6. SEPTA further argued that it lacks the power to contract away its sovereign immunity and that Amtrak's claims do not fall within any of the statutorily enumerated exceptions to that immunity. Amtrak conceded that SEPTA does not have the power to waive its sovereign immunity through contract and, thus, despite the NEC Agreement, did not waive the opportunity to claim immunity. Amtrak instead argued that SEPTA's sovereign immunity confers protection only against claims sounding in tort and that the instant matter, which implicates the NEC Agreement,

presents a contract dispute to which sovereign immunity is inapplicable. SEPTA responded that Amtrak was collaterally estopped from litigating the applicability of SEPTA's sovereign immunity to contractual obligations because that issue had been previously adjudicated in SEPTA's favor in a lawsuit called *Apfelbaum v. National R.R. Pass. Corp.,* 2002 WL 32342481 (E.D.Pa. Oct.17, 2002).

Because we hold that § 28103(b) preempts SEPTA's sovereign immunity defense, and that holding wholly disposes of the case, we need not address the parties' arguments as to whether state-law sovereign immunity actually applies to the present action, nor need we address whether Amtrak is collaterally estopped from litigating that issue. *See United States v. Sanchez,* 562 F.3d 275, 279 n. 5 (3d Cir.2009) (court need not decide an issue when there is an alternative and dispositive basis for decision).

Ordinarily, deciding the scope of a statute would be preferable to addressing a conflict between federal and state law. However, we decide this case on preemption grounds because, first, preemption is the basis of decision chosen by the District Court and it is what the parties have emphasized in their briefs; second, the scope of Pennsylvania's statute is an important state-law issue, better addressed by Pennsylvania's courts in the first instance; and, finally, and most importantly, the issues presented in this appeal are not confined to Pennsylvania. As indicated by both the Second Circuit's *O & G Industries* case and the Reform Act's legislative history, there is an inclination for regional rail carriers to seek shelter from liability, despite the contractual obligations they have under-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

taken. *See infra,* pages 20-21. Thus, because the conflict between federal and state law implicated here is farther reaching than Pennsylvania's sovereign immunity statute, it is appropriate for us to resolve the case on a broader basis.

***244** C. The District Court Opinion*

The District Court granted Amtrak's motion for summary judgment and denied SEPTA's, finding that SEPTA's state-law sovereign immunity defense was preempted by the Reform Act under the doctrine of implied conflict preemption. The Court began by noting that Supreme Court precedent dictates a finding of preemption when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes ... of Congress." (App. at A16-A17.) The Court then explained that, because the Reform Act was enacted in part to ensure the enforceability of indemnification agreements between Amtrak and other parties, a state-law sovereign immunity defense stood as an impermissible obstacle to that objective. The Court supported its holding by analogizing to the Second Circuit's reasoning in *O & G Industries,* 537 F.3d at 153, and concluded that, "[t]o the extent that the Pennsylvania sovereign immunity statute conflicts with the Reform Act, it is preempted." FN7 (App. at A17.)

> FN7. Because the Court found that SEPTA's sovereign immunity defense was preempted by the Reform Act, it did not address whether SEPTA's state-law sovereign immunity defense was valid under Pennsylvania state law, nor did it discuss whether Amtrak was collaterally estopped from litigating that issue. *See supra,* note 6.

**II. Discussion** FN8

> FN8. Amtrak removed the present action from state court to federal court under 28 U.S.C. § 1441. The District Court exercised jurisdiction pursuant to 28 U.S.C. §

1331. Our jurisdiction arises under 28 U.S.C. § 1291. A district court's grant of summary judgment is subject to plenary review. *Horn v. Thoratec Corp.,* 376 F.3d 163, 165 (3d Cir.2004); *see also Levy v. Sterling Holding Co.,* 544 F.3d 493, 501 (3d Cir.2008) ("We review de novo the grant or denial of summary judgment by a district court.") (citation omitted). More particularly, we also exercise plenary review over a preemption determination, as it is a question of law. *Horn,* 376 F.3d at 166.

[1] SEPTA presents a two-fold argument, focused on the breadth of the preemption effected by the District Court's decision and what it contends is an improperly retroactive consequence of such preemption in this case. In advancing its argument, SEPTA, recognizing the importance of the Second Circuit's *O & G Industries* opinion in the District Court's analysis, frames its discussion around issues addressed in that opinion and asserts that the District Court failed to account for two critical distinctions between that case and this one. First, SEPTA argues, the Pennsylvania sovereign immunity statute is a law of general applicability, whereas the Connecticut statute preempted in *O & G Industries* was a law specifically enacted to govern the enforceability of indemnification contracts, voiding indemnification agreements to the extent they would cover gross negligence by the party seeking to be indemnified. Thus, SEPTA says, preempting the application of Pennsylvania's statute would result in a dramatically broader application of preemption than occurred in *O & G Industries.*

Second, SEPTA argues that, even if such a broad application of preemption were warranted in general, it cannot be justified in this particular case because allowing preemption here would give retroactive effect to the Reform Act. While the indemnity agreement in *O & G Industries* was implemented after the passage of the Reform Act, the NEC Agreement was executed a decade prior to the pas-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

sage of the Reform Act. By SEPTA's reasoning, applying the Reform Act to indemnity agreements entered into prior to the enactment of that statute would give the statute an **\*245** impermissible retroactive effect because Congress did not expressly provide for retroactive application.

Amtrak responds that the District Court properly found preemption because "Congressional history makes abundantly clear that [the Reform Act] ... applies broadly to assure that Amtrak's indemnity agreements with any other party are fully enforceable without regard to any state law or public policy." (Appellee's Ans. Br. at 12.) Amtrak further argues that finding preemption will not, in fact, result in an impermissible retroactive application of the Reform Act because the important event for purposes of a retroactivity analysis is not the parties' execution of the NEC Agreement in 1992 but rather the accrual of Amtrak's right to indemnification for the Deweese claim in 2004, which occurred several years after the Reform Act was passed in 1997.

*A. Preemption*

The primary focus of the parties' attention, as it was of the District Court opinion, is whether Pennsylvania's sovereign immunity statute, 1 Pa. Cons.Stat. Ann. § 2310 and 42 Pa. Cons.Stat. Ann. §§ 8521-25, is preempted by Amtrak's federal enabling statute, 49 U.S.C. § 28103.

[2] The Supremacy Clause, found in Article VI of the United States Constitution, provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under that clause, Congress has the power "to preempt state legislation if it so intends." *Hi Tech Transp., LLC v. N.J. Dep't of Envtl. Prot.,* 382 F.3d 295, 302 (3d Cir.2004) (internal quotation omitted); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) ("[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law,

however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."); *Gibbons v. Ogden,* 9 Wheat. 1, 22 U.S. 1, 82, 6 L.Ed. 23 (1824) (stating that "acts of the State Legislatures ... [that] interfere with, or are contrary to, the laws of Congress" must be invalidated, and that "the law of the State, though enacted in the exercise of powers not controverted, must yield to [the federal law]"). While the Supremacy Clause plainly provides Congress with the constitutional power to preempt state law, the challenge for courts has been deciding when a conflict between state and federal law requires application of that power. *See Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (acknowledging that there is not "an infallible constitutional test or an exclusive constitutional yardstick" for the application of preemption).

[3][4][5][6] The Supreme Court has identified three types of preemption: express preemption, field preemption, and implied conflict preemption. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Bruesewitz v. Wyeth, Inc.,* 561 F.3d 233, 238-39 (3d Cir.2009). The first, express preemption, exists when Congress includes in a statute explicit language stating an intent to preempt conflicting state law. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) ("State action may be foreclosed by express language in a constitutional enactment."). The second, field preemption, occurs when a state law impinges upon a "field reserved for federal regulation." *United States v. Locke,* 529 U.S. 89, 111, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). This form of preemption exists "either ... [where] the nature of the regulated subject **\*246** matter permits no other conclusion, or [where] the Congress has unmistakingly so ordained." *Fl. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Lastly, and most significantly for the present case, implied conflict preemption exists when, "under the circumstances of [a] particular case, [the state law] stands

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." FN9 *Hines,* 312 U.S. at 67, 61 S.Ct. 399.

> FN9. We sometimes call this "implied obstacle preemption." *Holk v. Snapple Beverage Corp.,* 575 F.3d 329, 334 (3d Cir.2009).

[7][8][9] In analyzing a potential conflict between federal and state law, we must be "guided ... 'by the rule that the purpose of Congress is the ultimate touchstone in every preemption case.' " *Id.* at 575 F.3d at 334 (citing *Altria Group, Inc. v. Good,* --- U.S. ----, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008)). We are required to consider "the entire scheme of the [federal] statute" and identify "its purpose and intended effect." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Only then can we determine whether the opposing state law presents a "sufficient obstacle" such that it requires preemption. *Id.* at 374 n. 8, 120 S.Ct. 2288. While there is a recognized presumption against preemption, *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), and we seek to avoid it when possible, *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 432, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005), conflicts that are implied by operation of state law are "of no less force than that which is expressed." *Crosby,* 530 U.S. at 373, 120 S.Ct. 2288 ("If the purpose of the act cannot otherwise be accomplished ... the state law must yield to the regulation of Congress within the sphere of its delegated power.") (citations omitted). Thus, in deciding whether the Reform Act preempts the sovereign immunity that SEPTA claims, we must scrutinize the effect of the state law interpretation pressed by SEPTA and "ascertain Congress's intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

[10] The specific statutory provision at issue here is § 28103(b) of the Reform Act, which reads as follows:

(b) Contractual obligations-A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims.

49 U.S.C. § 28103(b). The language is neither complex nor ambiguous. A plain reading of that single sentence reveals that the Act grants Amtrak power to enter into binding contracts that allocate financial responsibility for claims against it. Such a reading is confirmed by looking to other language in the statute, particularly the description of congressional findings, which include that "(1) intercity rail passenger service is an essential component of a national intermodal passenger transportation system; (2) Amtrak is facing a financial crisis, with growing and substantial debt obligations severely limiting its ability to cover operating costs and jeopardizing its long-term viability; and (3) immediate action is required to improve Amtrak's financial condition if Amtrak is to survive." 49 U.S.C. § 24101; *see also* Amtrak Reform Act, Pub.L. 105-134, 105th Congress, 1st Session, 111 Stat. 2570, 2571, § 2.

The broad wording of § 28103(b), combined with those findings, shows that subsection (b) was enacted to facilitate Amtrak's **\*247** entering into contracts to transfer liability risk to entities like SEPTA. Pennsylvania's sovereign immunity statute, if applied as SEPTA urges, would be a complete obstacle to Amtrak's ability to enter into such contracts because it would directly prevent Amtrak from being able to allocate financial responsibility to SEPTA. Permitting the invocation of sovereign immunity would thus have the impermissible impact of preventing Amtrak from doing exactly what the Reform Act says Amtrak can do, thereby moving Amtrak towards the financial instability that the Reform Act sought to avoid. Therefore, based on the plain language of the statute, we conclude that the Reform Act preempts the application of Pennsylvania's sovereign immunity statute.FN10

> FN10. This approaches express preemption but does not qualify as such because the language of § 28103(b), while clear in its

590 F.3d 239
**(Cite as: 590 F.3d 239)**

implication, is not explicit about preemption. "Express preemption occurs when Congress 'explicitly state[s]' that it intends a statute to have that effect." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Such preemption is thus generally found only when Congress has used language that expressly precludes state regulation in a given area. *See St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the United States Virgin Islands,* 218 F.3d 232, 238 (3d Cir.2000) (holding that express preemption only "arises when there is an explicit statutory command that state law be displaced"); *see also Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 364, 122 S.Ct. 2151, 153 L.Ed.2d 375 (describing the "express preemption" language in ERISA); *Sprietsma v. Mercury Marine,* 537 U.S. 51, 62-63, 123 S.Ct. 518, 154 L.Ed.2d 466 ("Because the [Federal Boat Safety Act] contains an express preemption clause, our task of statutory construction must in the first instance focus on the plain wording of the clause....").

If the plain language of the statute were not clear enough to demonstrate congressional intent, the legislative history of the Reform Act is. *See United States v. Gregg,* 226 F.3d 253, 257 (3d Cir.2000) ("To determine a law's plain meaning, we begin with the language of the statute. If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there.... Where the statutory language does not express Congress's intent unequivocally, a court traditionally refers to the legislative history...."). That history only serves to strengthen the conclusion of implied conflict preemption.

A Senate Report explains that the Reform Act was designed to "enable Amtrak to increase efficiencies, reduce costs, and [to] permit changes to its liability." S.Rep. No. 105-85 at 1, Committee on

Commerce, Science, and Transportation, 105th Congress, 1st Session (Sept. 24, 1997) ("Senate Report"). The Report highlights the importance of the railroads in this region of the country and cautions that, if the Reform Act failed to become law, bankruptcy could occur, because "Amtrak is staking the future of the national system on the projected financial success of highspeed rail service in the Northeast Corridor." *Id.* at 2-3; *see also id.* at 12 (explaining the "urgent need for immediate action to improve Amtrak's financial condition and eliminate its dependency...."). With regard to § 28103(b) in particular, the Senate Report explains that the purpose behind that subsection is to "clarif[y] that indemnification agreements related to the provision of rail passenger service entered into by Amtrak and other parties would be enforceable." *Id.* at 5; *see also id.* at 14 ("Subsection (b) ... clarifies that rail passenger indemnification agreements entered into by Amtrak and other parties are enforceable."). In fact, the Report outlines a scenario closely analogous to what is at issue here:

> As long as there is the possibility that state laws governing indemnification **\*248** contracts may make those contracts unenforceable, Amtrak and a freight railroad may find themselves litigating with each other. Amtrak believes that such litigation inevitably would not only adversely impact business relationships between Amtrak and the host freight railroads, but it would also lead to significantly higher outlays in settlements and judgments to plaintiffs.

> *Id.* at 5.

A report from the House of Representatives similarly emphasizes that "indemnity contracts ... are fully enforceable without regard to any other law or public policy." H.R.Rep. No. 105-251 at 15, Committee on Transportation and Infrastructure, 105th Congress, 1st Session (Sept. 17, 1997) ("House Report"). The House Report is explicit that "a crucial feature of the liability reform provision is the affirmation of the right of owners of ... passenger operators to indemnify by contract." *Id.* at 17.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

In short, legislative history reveals that giving Amtrak the freedom to negotiate agreements with other carriers to allocate the financial consequences of liability was a key component of the Reform Act, and § 28103(b) was specifically needed to eliminate "the possibility that state laws can nullify [Amtrak's] indemnification contracts." *Senate Report,* at 14. The Pennsylvania sovereign immunity statute, to the extent it could nullify the NEC Agreement, stands as a direct obstacle to that goal, and, as such, is preempted.

SEPTA offers several arguments for not giving preemptive effect to the Reform Act. Each is unpersuasive. First, SEPTA notes that § 28103(b) states that Amtrak "may" enter into indemnity contracts. SEPTA then says that the statutory language is "merely permissive" and so is insufficient to "justify such a broad preemption of state law." (Appellant's Op. Br. at 13.) However, it cites no precedent to support its contention that a statute has less preemptive force because it authorizes rather than compels certain acts. Moreover, it does not explain how the Reform Act can be reasonably read to give Amtrak the option to enter into indemnity contracts while simultaneously giving entities like SEPTA the prerogative to ignore those same contracts.

Second, relying on the principle that preemption analysis should attempt to "reconcile the operation of both statutory schemes with one another," *Hi Tech Trans,* 382 F.3d at 302, SEPTA suggests that its state-law sovereign immunity and the Reform Act can be reconciled because there are enumerated exceptions to the immunity. While there are, as SEPTA says, nine enumerated exceptions to its sovereign immunity, they are narrow [FN11] and have no impact on SEPTA's indemnity **\*249** obligation to Amtrak. Indeed, it is surely only because they have no impact here that SEPTA cites them, for, if they did accommodate the purpose of the Reform Act, they would run counter to SEPTA's effort to escape liability. Contrary to what SEPTA suggests, it is not possible to reconcile the claim of

state-law sovereign immunity with the express purpose of the Reform Act.

[FN11]. As summarized by the District Court, 42 Pa. Cons.Stat. Ann. § 8522(b) states that

[T]he defense of sovereign immunity shall not be raised to claims caused by: (1) the operation of any motor vehicle in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel; (3) the care, custody or control of personal property in the possession or control of Commonwealth parties; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) a dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements; (6) the care, custody or control of animals in the possession or control of a Commonwealth party; (7) the sale of liquor at Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; or (9) the administration, manufacture and use of a toxoid or vaccine.

(App. at A8 (citing 42 Pa. Cons.Stat. Ann. § 8522(b)).)

Third, SEPTA argues that Congress could not have intended § 28103(b) to have preemptive effect because Congress chose to include an explicit statement of preemption in another subsection of the statute, § 28103(a). [FN12] Congress knew how to broadly preempt state law if it so intended, SEPTA argues, and Congress did not intend to do so by subsection (b). We acknowledge that § 28103(b) does not contain an express preemption clause.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

FN13   However, even though subsection (b) is not expressly preemptive, it is still quite clear. The preemptive consequences of its language are sufficiently plain for us to say that Congress intended to obviate all obstacles to the enforceability of contracts to indemnify Amtrak. Further, the expression of preemption in one subsection does not mean that preemption was not intended by the language of another subsection on another topic. *See Bruesewitz,* 561 F.3d at 239 ("[I]mplied preemption may exist even in the face of an express preemption clause."); *see also Freightliner Corp. v. Myrick,* 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (noting that an express preemption clause in a statute does not "foreclose [the] possibility of implied preemption"). Again, "the purpose of Congress is the ultimate touchstone in every preemption case," *Holk* 575 F.3d at 334, and, as discussed above, the purpose here is not in doubt: § 28103(b) was passed to "clarif[y] that rail passenger service indemnification agreements entered into by Amtrak and other parties are enforceable." *Senate Report* at 14.

> FN12. Subsection (a) preempts state law with respect to punitive damages and aggregate liability. 49 U.S.C. § 28103(a).

> FN13. *See supra,* n. 10.

Fourth, SEPTA contends that its sovereign immunity defense should not be preempted because "Congress was certainly aware of SEPTA's status with respect to liability yet it chose not to expressly preempt that status." (Appellant's Op. Br. at 16.) This argument, put forward with no support, rests on the peculiar proposition that Congress knew that SEPTA would enter into indemnity contracts with no intent or capacity to honor them. It is true that Congress was aware that state laws existed "to protect the taxpayers who ultimately bear the costs of tort liability incurred in providing the public transportation." *House Report,* at 21. In fact, recognizing the threat those laws posed to the viability of indemnity agreements, the House warned that "[w]ithout the confirmation that indemnity agreements will be upheld in court, [Amtrak] will be

placed in jeopardy as [it] resists taking on what is increasingly viewed as an unacceptable and uncompensated liability exposure." *Id.* But that does not mean that Congress was "certainly aware" of the sovereign immunity position that SEPTA would take when reneging on its indemnity obligations. Even if Congress had been aware of SEPTA's bait-and-switch position, however, the intent of the Reform Act remains clear in its commitment to the enforcement of those obligations.

Finally, SEPTA argues that Congress, in enacting § 28103(b), only intended to preempt state laws expressly governing the enforceability of indemnity contracts, and, more specifically, state laws that prohibit**250** indemnification when there is a finding of gross negligence. Accordingly, SEPTA reasons, the Reform Act should preempt only that specific kind of state law, and not a law of general applicability like Pennsylvania's sovereign immunity statute. A finding of preemption in the present case, says SEPTA, would be far too "vast," and would "wipe away all principles of state contract law that may be utilized as a defense to contractual liability and/or contract formation." (Appellant's Op. Br. at 13.)

The Reform Act was indeed intended to preempt state laws of the sort described by SEPTA. In fact, subsection (b) was passed in part to supersede *National R.R. Passenger Corp. v. Consolidated Rail Corp.,* 698 F.Supp. 951 (D.D.C.1988) (overruled on other grounds), which held that an indemnification agreement between Amtrak and ConRail violated District of Columbia public policy because it allowed indemnification in the context of gross negligence. *See House Report,* at 33-44; *see also O & G Indus.,* 537 F.3d at 166-67 ("[I]t was precisely the doubts cast by the [ *Consolidated Rail* ] decision over the validity of indemnity agreements by railroad parties that prompted Congress to enact § 28103(b)."). It does not follow, however, that that was the limit of congressional intent. To the contrary, it would be odd to suppose that Congress meant to eliminate a specific obstacle to its purpose

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

of protecting Amtrak's ability to spread risk but had no concern with a broader obstacle having the same effect. The Reform Act's legislative history demonstrates that Congress intended to override any and all state laws that might interfere with the enforceability of Amtrak's contracts, not only those state laws specifically enacted to govern indemnity agreements. *See House Report,* at 13 ("[I]ndemnity contracts ... are fully enforceable without regard to *any other* law or public policy.") (emphasis added); *cf. O & G Indus., 537 F.3d at 160-63* (rejecting the argument that § 28103(b) only applies to indemnity contracts with freight railroads, and holding that the Reform Act was meant "to ensure the enforceability of indemnity agreements Amtrak concludes with *any* other party.")

The Second Circuit's opinion in *O & G Industries* supports that conclusion. In *O & G Industries,* the Second Circuit held that § 28103(b) preempted a Connecticut statute which, on public policy grounds, voided any indemnity provision contained in construction-related contracts, if the provision purported to indemnify a party against its own negligence. 537 F.3d at 158; *see also* Conn. Gen.Stat. § 52-572k(a).[FN14] The Court rejected O & G Industries' argument that there was a limitation on the kinds of conflicting state laws preempted by the Reform Act, stating that

> FN14. The Second Circuit finds preemption in three scenarios: "(1) where Congress expressly states its intent to preempt; (2) where Congress's scheme of federal regulation is sufficiently comprehensive to give rise to a reasonable inference that it leaves no room for the state to act; and (3) where state law actually conflicts with federal law." *O & G Industries, 537 F.3d at 161.* In *O & G Industries,* the Second Circuit found preemption under its third category, conflict preemption, *id.,* which is analogous to our finding of implied conflict preemption.

[t]he goal of the Reform Act was to shield *all* of

Amtrak's indemnity arrangements from legal attacks on their validity. [In enacting § 28103(b)], Congress ... encouraged all providers of rail passenger transportation to enter into contracts that allocate financial responsibility for claims.... Congress also affirmed the enforceability of contracts that include indemnification obligations.

**\*251** *O & G Indus., 537 F.3d at 162* (citation omitted) (original emphasis).

Thus, as our sister circuit decided, Congress intended with the passage of the Reform Act, and, more specifically, with the passage of § 28103(b), that all of Amtrak's indemnity agreements should be enforceable, regardless of the kind of conflicting state law that might be erected. SEPTA's state-law sovereign immunity assertion directly conflicts with the enforcement of its indemnity contract with Amtrak and thus presents an irreconcilable obstacle to the objectives of § 28103(b). Accordingly, that invocation of sovereign immunity is preempted under principles of implied conflict preemption.[FN15]

> FN15. Lest there be any misunderstanding, we emphasize that this does not constitute a general preemption or invalidation of Pennsylvania's sovereign immunity statute. We hold only that SEPTA's effort to invoke that statute to escape the consequences of its indemnity obligations to Amtrak cannot be permitted, for the reasons stated.

*B. Preemption and Retroactivity*

[11] SEPTA also argues that, even if some claims of sovereign immunity are preempted by § 28103(b), there can be no preemption here without giving the Reform Act an impermissible retroactive effect. The NEC Agreement was executed a decade prior to the passage of the Reform Act. By SEPTA's reasoning, applying the Reform Act to an indemnity agreement entered into prior to the enactment of that statute is untenable because Congress did not expressly provide for retroactive application.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

590 F.3d 239
**(Cite as: 590 F.3d 239)**

[12][13][14][15] Before asking whether Congress intended the Reform Act to have any retroactive effect, we must first ask whether the statute even has such an effect. A statute "has retroactive effect when it 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.' " *Id.* at 227 (citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Analyzing whether a statute operates retroactively "is not always a simple or mechanical task." *Id.* at 268. The analysis requires a "commonsense, functional judgment as to whether a statute attaches new legal consequences." *Atkinson v. Att'y Gen.,* 479 F.3d 222, 231 (3d Cir.2007). In seeking that commonsense answer, we can "be guided by considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (emphasis omitted). Moreover, "[a] statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483 (citation omitted). "Rather, the statute's temporal reach becomes unacceptable only when its retroactive application would significantly impair existing rights and thereby disappoint legitimate expectations." *Dinnall v. Gonzales,* 421 F.3d 247, 252 (3d Cir.2005) (citation omitted).

[16] In deciding whether a statute has a retroactive effect, a court must determine the "important event" to which the statute allegedly attaches new legal consequences. *See Atkinson,* 479 F.3d at 230 (stating that the defendant's conviction was the "important event" to which the federal statute attached a new legal consequence). In the present case, the important event is not the execution of the NEC Agreement in 1982, as SEPTA asserts, but is rather the Deweese accident in 2004, after which Amtrak had the right to indemnity from SEPTA for that accident. SEPTA did not owe Amtrak any indemnity obligation for the Deweese accident until **\*252** it occurred on October 28, 2004, and, thus, SEPTA's alleged sovereign immunity defense did not arise until Amtrak filed its cross-claim for indemnity. Therefore, the Reform Act, passed in 1997, did not attach any new "legal duties" to events at issue here, which took place long after it was enacted. Because Amtrak's right to indemnity for the 2004 accident did not accrue until 2004, and the Reform Act was passed seven years before, SEPTA's argument that there is impermissible retroactivity lacks merit.

Moreover, SEPTA had "fair notice" of the Reform Act's effects well before Amtrak first invoked its contractual indemnity right in 2004 and so has no basis for claiming "reasonable reliance" on its sovereign immunity defense. *See Atkinson,* 479 F.3d at 231 (stating that in retroactivity analysis, "a court can certainly be guided by considerations of fair notice, reasonable reliance, and settled expectations") (emphasis omitted). Between 1997, when the Reform Act was passed specifying that all of Amtrak's indemnity contracts would be upheld, and 2004, when the accident occurred, SEPTA had ample time to seek termination of the NEC Agreement or to renegotiate its indemnity obligations, if it wished to limit them.

### III. *Conclusion*

Section 28103(b) of the Reform Act reflects Congress's unequivocal support for indemnity agreements such as the ones between Amtrak and SEPTA. The plain meaning of the statute is confirmed by legislative history, which specifically notes Congress's intent to eliminate "the possibility that state laws can nullify [Amtrak's] indemnification contracts." *Senate Report* at 14. Because SEPTA cannot be allowed to use Pennsylvania's sovereign immunity statute to frustrate the goals of the Reform Act, we will affirm the judgment of the District Court.

C.A.3 (Pa.),2009.
Deweese   v.   National   R.R.   Passenger   Corp. (Amtrak)
590 F.3d 239

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.