▷

**Effective: October 15, 2010**

United States Code Annotated Currentness
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 40. Oil Pollution (Refs & Annos)
      Subchapter I. Oil Pollution Liability and Compensation
      → **§ 2716. Financial responsibility**

(a) Requirement

The responsible party for--

  **(1)** any vessel over 300 gross tons (except a non-self-propelled vessel that does not carry oil as cargo or fuel) using any place subject to the jurisdiction of the United States;

  **(2)** any vessel using the waters of the exclusive economic zone to transship or lighter oil destined for a place subject to the jurisdiction of the United States; or

  **(3)** any tank vessel over 100 gross tons using any place subject to the jurisdiction of the United States;

shall establish and maintain, in accordance with regulations promulgated by the Secretary, evidence of financial responsibility sufficient to meet the maximum amount of liability to which the responsible party could be subjected under section 2704(a) or (d) of this title, in a case where the responsible party would be entitled to limit liability under that section. If the responsible party owns or operates more than one vessel, evidence of financial responsibility need be established only to meet the amount of the maximum liability applicable to the vessel having the greatest maximum liability.

(b) Sanctions

  (1) Withholding clearance

  The Secretary of the Treasury shall withhold or revoke the clearance required by section 60105 of Title 46 of any vessel subject to this section that does not have the evidence of financial responsibility required for the vessel under this section.

  (2) Denying entry to or detaining vessels

Case 2:10-md-02179-CJB-DPC   Document 4477-43   Filed 11/03/11   Page 2 of 71

The Secretary may--

    **(A)** deny entry to any vessel to any place in the United States, or to the navigable waters, or

    **(B)** detain at the place,

any vessel that, upon request, does not produce the evidence of financial responsibility required for the vessel under this section.

  (3) Seizure of vessel

Any vessel subject to the requirements of this section which is found in the navigable waters without the necessary evidence of financial responsibility for the vessel shall be subject to seizure by and forfeiture to the United States.

(c) Offshore facilities

  (1) In general

    (A) Evidence of financial responsibility required

    Except as provided in paragraph (2), a responsible party with respect to an offshore facility that--

      **(i)(I)** is located seaward of the line of ordinary low water along that portion of the coast that is in direct contact with the open sea and the line marking the seaward limit of inland waters; or

      **(II)** is located in coastal inland waters, such as bays or estuaries, seaward of the line of ordinary low water along that portion of the coast that is not in direct contact with the open sea;

      **(ii)** is used for exploring for, drilling for, producing, or transporting oil from facilities engaged in oil exploration, drilling, or production; and

      **(iii)** has a worst-case oil spill discharge potential of more than 1,000 barrels of oil (or a lesser amount if the President determines that the risks posed by such facility justify it),

      shall establish and maintain evidence of financial responsibility in the amount required under subparagraph (B) or (C), as applicable.

    (B) Amount required generally

    Except as provided in subparagraph (C), the amount of financial responsibility for offshore facilities that

meet the criteria of subparagraph (A) is--

**(i)** $35,000,000 for an offshore facility located seaward of the seaward boundary of a State; or

**(ii)** $10,000,000 for an offshore facility located landward of the seaward boundary of a State.

(C) Greater amount

If the President determines that an amount of financial responsibility for a responsible party greater than the amount required by subparagraph (B) is justified based on the relative operational, environmental, human health, and other risks posed by the quantity or quality of oil that is explored for, drilled for, produced, or transported by the responsible party, the evidence of financial responsibility required shall be for an amount determined by the President not exceeding $150,000,000.

(D) Multiple facilities

In a case in which a person is a responsible party for more than one facility subject to this subsection, evidence of financial responsibility need be established only to meet the amount applicable to the facility having the greatest financial responsibility requirement under this subsection.

(E) Definition

For the purpose of this paragraph, the seaward boundary of a State shall be determined in accordance with section 1301(b) of Title 43.

(2) Deepwater ports

Each responsible party with respect to a deepwater port shall establish and maintain evidence of financial responsibility sufficient to meet the maximum amount of liability to which the responsible party could be subjected under section 2704(a) of this title in a case where the responsible party would be entitled to limit liability under that section. If the Secretary exercises the authority under section 2704(d)(2) of this title to lower the limit of liability for deepwater ports, the responsible party shall establish and maintain evidence of financial responsibility sufficient to meet the maximum amount of liability so established. In a case in which a person is the responsible party for more than one deepwater port, evidence of financial responsibility need be established only to meet the maximum liability applicable to the deepwater port having the greatest maximum liability.

(e) [FN1] Methods of financial responsibility

Financial responsibility under this section may be established by any one, or by any combination, of the following methods which the Secretary (in the case of a vessel) or the President (in the case of a facility) determines to be acceptable: evidence of insurance, surety bond, guarantee, letter of credit, qualification as a self-insurer, or other evidence of financial responsibility. Any bond filed shall be issued by a bonding company authorized to do

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

business in the United States. In promulgating requirements under this section, the Secretary or the President, as appropriate, may specify policy or other contractual terms, conditions, or defenses which are necessary, or which are unacceptable, in establishing evidence of financial responsibility to effectuate the purposes of this Act.

(f) Claims against guarantor

(1) In general

Subject to paragraph (2), a claim for which liability may be established under section 2702 of this title may be asserted directly against any guarantor providing evidence of financial responsibility for a responsible party liable under that section for removal costs and damages to which the claim pertains. In defending against such a claim, the guarantor may invoke--

**(A)** all rights and defenses which would be available to the responsible party under this Act;

**(B)** any defense authorized under subsection (e) of this section; and

**(C)** the defense that the incident was caused by the willful misconduct of the responsible party.

The guarantor may not invoke any other defense that might be available in proceedings brought by the responsible party against the guarantor.

(2) Further requirement

A claim may be asserted pursuant to paragraph (1) directly against a guarantor providing evidence of financial responsibility under subsection (c)(1) of this section with respect to an offshore facility only if--

**(A)** the responsible party for whom evidence of financial responsibility has been provided has denied or failed to pay a claim under this Act on the basis of being insolvent, as defined under section 101(32) of Title 11, and applying generally accepted accounting principles;

**(B)** the responsible party for whom evidence of financial responsibility has been provided has filed a petition for bankruptcy under Title 11; or

**(C)** the claim is asserted by the United States for removal costs and damages or for compensation paid by the Fund under this Act, including costs incurred by the Fund for processing compensation claims.

(3) Rulemaking authority

Not later than 1 year after October 19, 1996, the President shall promulgate regulations to establish a process

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

for implementing paragraph (2) in a manner that will allow for the orderly and expeditious presentation and resolution of claims and effectuate the purposes of this Act.

(g) Limitation on guarantor's liability

Nothing in this Act shall impose liability with respect to an incident on any guarantor for damages or removal costs which exceed, in the aggregate, the amount of financial responsibility which that guarantor has provided for a responsible party pursuant to this section. The total liability of the guarantor on direct action for claims brought under this Act with respect to an incident shall be limited to that amount.

(h) Continuation of regulations

Any regulation relating to financial responsibility, which has been issued pursuant to any provision of law repealed or superseded by this Act, and which is in effect on the date immediately preceding the effective date of this Act, is deemed and shall be construed to be a regulation issued pursuant to this section. Such a regulation shall remain in full force and effect unless and until superseded by a new regulation issued under this section.

(i) Unified certificate

The Secretary may issue a single unified certificate of financial responsibility for purposes of this Act and any other law.


CREDIT(S)

(Pub.L. 101-380, Title I, § 1016, Aug. 18, 1990, 104 Stat. 502; Pub.L. 104-55, § 2(d)(2), Nov. 20, 1995, 109 Stat. 547; Pub.L. 104-324, Title XI, § 1125(a), Oct. 19, 1996, 110 Stat. 3981; Pub.L. 111-281, Title VII, § 712, Oct. 15, 2010, 124 Stat. 2988.)


[FN1] So in original. No subsec. (d) was enacted.

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1990 Acts. Senate Report Nos. 101-94 and 101-99, House Conference Report No. 101-653, and Statement by President, see 1990 U.S. Code Cong. and Adm. News, p. 722.


1995 Acts. House Report No. 104-202(Parts I and II), see 1995 U.S. Code Cong. and Adm. News, p. 475.


1996 Acts. Senate Report No. 104-160 and House Conference Report No. 104-854, see 1996 U.S. Code Cong. and Adm. News, p. 4239.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-43   Filed 11/03/11   Page 6 of 71

**References in Text**

This Act, referred to in text, is Pub.L. 101-380, Aug. 18, 1990, 104 Stat. 484, as amended, known as the Oil Pollution Act of 1990, which is classified principally to this chapter. For complete classification to the Code, see Short Title note under 33 U.S.C.A. § 2701 and Tables.

Reference in subsec. (h) to the "effective date of this Act" probably refers to the date of enactment of Pub.L. 101-380 which was approved on Aug. 18, 1990.

**Codifications**

"Section 60105 of Title 46"substituted in subsec. (b)(1) for "section 91 of the Appendix to Title 46" on authority of Pub.L. 109-304, § 18(c), Oct. 6, 2006, 120 Stat. 1709, which completed the codification of T. 46, Shipping, as positive law.

**Amendments**

2010 Amendments. Subsec. (a)(1). Pub.L. 111-281, § 712(1), struck out "or" at the end.

Subsec. (a)(2). Pub.L. 111-281, § 712(2), inserted "or" at the end.

Subsec. (a)(3). Pub.L. 111-281, § 712(3), added par. (3).

1996 Amendments. Subsec. (c)(1). Pub.L. 104-324, § 1125(a)(1), added provisions relating to financial responsibility requirements for offshore facilities meeting specified criteria and determination of the seaward boundary of a State, struck out provisions relating to financial responsibility requirements of $150,000 in a case in which a responsible party would be entitled to limit liability under section 2704(a) of this title, and made changes in style and phraseology.

Subsec. (f). Pub.L. 104-324, § 1125(a)(2), added provisions relating to further requirements for claims with respect to offshore facilities and authority to promulgate regulations and made minor changes in style.

Subsec. (g). Pub.L. 104-324, § 1125(a)(3), added provisions relating to total liability of guarantors on a direct action for claims and made minor changes in phraseology.

1995 Amendments. Subsec. (a). Pub.L. 104-55, § 2(d)(2), directed responsible party for a vessel to maintain financial preparedness to meet maximum amount of liability such party could be subjected to under section 2704(a) or (d) of this title, rather than under section 2704(a)(1) or (d) of this title for tank vessels and under section 2704(a)(2) or (d) of this title for all other vessels.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Effective and Applicability Provisions

1996 Acts. Section 1125(b) of Pub.L. 104-324 provided that: "The amendment made by subsection (a)(2) [amending subsec. (f) of this section] shall not apply to any final rule issued before the date of enactment of this section [Oct. 19, 1996].

1990 Acts. Section applicable to incidents occurring after Aug. 18, 1990, see section 1020 of Pub.L. 101-380, set out as a note under section 2701 of this title.

Delegation of Functions

The functions vested in the President by subsec.(e) of this section, respecting (in the case of offshore facilities other than deepwater ports) the issuance of regulations concerning financial responsibility, the determination of acceptable methods of financial responsibility, and the specification of necessary or unacceptable terms, conditions, or defenses, are delegated to the Secretary of the Interior, see Ex. Ord. No. 12777, Oct. 18, 1991, 56 F.R. 54757, set out as a note under section 1321 of this title.

The functions vested in the President by subsec. (e) of this section, respecting (in the case of deepwater ports) the issuance of regulations concerning financial responsibility, the determination of acceptable methods of financial responsibility, and the specification of necessary or unacceptable terms, conditions, or defenses, are delegated to the Secretary of Transportation, see Ex. Ord. No. 12777, Oct. 18, 1991, 56 F.R. 54757, set out as a note under section 1321 of this title.

LIBRARY REFERENCES

American Digest System

    Shipping ⟨⟩ 72.
    Key Number System Topic No. 354.

RESEARCH REFERENCES

Encyclopedias

Am. Jur. 2d Pollution Control § 1022, Sanctions for Failure to Obtain Certificate.

Am. Jur. 2d Pollution Control § 1023, Claim Against Guarantor.

Forms

31 West's Legal Forms § 33:71, General Comments.

Treatises and Practice Aids

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-43   Filed 11/03/11   Page 8 of 71

Callmann on Unfair Compet., TMs, & Monopolies § 4:12, Exemptions from the Antitrust Laws-
-Transportation--Oil and Natural Gas Transportation (Pipelines).

Federal Procedure, Lawyers Edition § 32:1073, Sanctions for Failure to Obtain Certificate.

Federal Procedure, Lawyers Edition § 32:1080, Direct Action Against Guarantor.

NOTES OF DECISIONS

  Claims 1
  Reckless disregard 3
  Willful misconduct 2

  1. Claims

Agency's rationales for denial of claim under the Oil Pollution Act (OPA) for removal costs and damages, not
asserted in agency's denial of claim but only in context of lawsuit, were post hoc rationalizations and therefore
could not be considered by court on review of agency's decision under Administrative Procedure Act (APA).
Water Quality Ins. Syndicate v. U.S., D.D.C.2007, 522 F.Supp.2d 220, appeal dismissed 2008 WL 2683773. En-
vironmental Law ⚷ 686

  2. Willful misconduct

Determination by Court of Appeals in appeal of related criminal case, that shoreside manager knowingly sent
vessel to sea in unseaworthy condition, was not same as finding that same conduct constituted "willful miscon-
duct" under provision of Oil Pollution Act (OPA) for reimbursement of uncompensated damages and removal
costs incurred in connection with oil spill; willfulness and knowledge were two different things and facts that
jury had found could not be known in absence of special verdict form or special interrogatories. Water Quality
Ins. Syndicate v. U.S., D.D.C.2007, 522 F.Supp.2d 220, appeal dismissed 2008 WL 2683773. Environmental
Law ⚷ 447

  3. Reckless disregard

In context of defense of willful misconduct under provision of Oil Pollution Act (OPA) for reimbursement of
uncompensated damages and removal costs incurred in connection with oil spill, decision of responsible parties
to knowingly send unseaworthy vessel to sea, along with accumulation of other negligent or intentionally
wrongful acts that resulted in oil spill, constituted reckless disregard and willful misconduct. Water Quality Ins.
Syndicate v. U.S., D.D.C.2007, 522 F.Supp.2d 220, appeal dismissed 2008 WL 2683773. Environmental Law
⚷ 447

33 U.S.C.A. § 2716, 33 USCA § 2716

Current through P.L. 112-28 approved 8-12-11

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

104 S.Ct. 296                                                                 Page 1
464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100
**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

Supreme Court of the United States
Joseph C. RUSSELLO, Petitioner
v.
UNITED STATES.

No. 82-472.
Argued Oct. 5, 1983.
Decided Nov. 1, 1983.

After petitioner was convicted of violating Racketeer Influenced and Corrupt Organizations Act by being involved in arson ring that resulted in his fraudulently receiving insurance proceeds in payment for fire loss of building he owned, and judgment of forfeiture was entered against petitioner by the United States District Court for the Middle District of Florida for amount of insurance proceeds. Petitioner appealed. The United States Court of Appeals for the Fifth Circuit, 681 F.2d 952, affirmed forfeiture judgment, and certiorari was granted. The Supreme Court, Justice Blackmun, held that insurance proceeds petitioner received as result of his arson activities constituted "interest" within meaning of forfeiture provision of RICO.

Affirmed.

West Headnotes

**[1] Commerce 83 ⬅⟶82.6**

83 Commerce
   83II Application to Particular Subjects and Methods of Regulation
    83II(J) Offenses and Prosecutions
     83k82.5 Federal Offenses and Prosecutions
      83k82.6 k. In General. Most Cited Cases
  (Formerly 83k82.5)
  Insurance proceeds petitioner received as result of his arson activities constituted "interest" within meaning of forfeiture provision of Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C.A. § 1963(a)(1).

**[2] Statutes 361 ⬅⟶195**

361 Statutes
   361VI Construction and Operation
    361VI(A) General Rules of Construction
     361k187 Meaning of Language
      361k195 k. Express Mention and Implied Exclusion. Most Cited Cases
  Where Congress includes particular language in one section of statute but omits it in another section of same act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.

**[3] Commerce 83 ⬅⟶82.6**

83 Commerce
   83II Application to Particular Subjects and Methods of Regulation
    83II(J) Offenses and Prosecutions
     83k82.5 Federal Offenses and Prosecutions
      83k82.6 k. In General. Most Cited Cases
  (Formerly 83k82.5)
  Forfeiture provision of Racketeer Influenced and Corrupt Organizations Act is not restricted to interest in an enterprise. 18 U.S.C.A. § 1963(a)(1).

**[4] Statutes 361 ⬅⟶217.2**

361 Statutes
   361VI Construction and Operation
    361VI(A) General Rules of Construction
     361k213 Extrinsic Aids to Construction
      361k217.2 k. Legislative History of Act. Most Cited Cases
  (Formerly 361k212.7, 361k212)
  Where Congress includes limiting language in earlier version of bill but deletes it prior to enactment, it may be presumed that limitation was not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

**[5] Statutes 361 ☞220**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k220 k. Legislative Construction.
Most Cited Cases

   Views of subsequent Congress form a hazardous basis for inferring intent of earlier one.

**[6] Statutes 361 ☞241(1)**

361 Statutes
   361VI Construction and Operation
     361VI(B) Particular Classes of Statutes
      361k241 Penal Statutes
        361k241(1) k. In General. Most Cited Cases

   Rule of lenity comes into operation at end of process of construing what Congress has expressed, not at beginning as overriding consideration of being lenient to wrongdoers.

**[7] Commerce 83 ☞82.6**

83 Commerce
   83II Application to Particular Subjects and Methods of Regulation
     83II(J) Offenses and Prosecutions
      83k82.5 Federal Offenses and Prosecutions
        83k82.6 k. In General. Most Cited Cases
   (Formerly 83k82.5)

   Since language of forfeiture provision of Racketeer Influenced and Corrupt Organizations Act was clear, rule lenity did not come into play in determining meaning of word "interest." 18 U.S.C.A. § 1963(a)(1).

**\*\*296 *Syllabus* FN\***

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared

by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

   **\*16** Petitioner was convicted in Federal District Court, under the Racketeer Influenced and Corrupt Organizations (RICO) chapter of the Organized Crime Control Act of 1970, of violating 18 U.S.C. §§ 1962(c) and (d) by being involved in an arson ring that resulted in his fraudulently receiving insurance proceeds in payment for the fire loss of a building he owned. The District Court also entered a judgment of forfeiture against petitioner for the amount of the insurance proceeds pursuant to 18 U.S.C. § 1963(a)(1), which provides that a person convicted under § 1962 shall forfeit to the United States "any interest he has acquired or maintained in violation **\*\*297** of § 1962." The Court of Appeals affirmed.

   *Held:* The insurance proceeds petitioner received as a result of his arson activities constitute an "interest" within the meaning of § 1963(a)(1) and are therefore subject to forfeiture. Pp. 299 - 304.

   (a) Section 1963(a)(1) does not reach only "interests in an enterprise." Where the term "interest" is not specifically defined in the RICO statute, it is assumed that the legislative purpose is expressed by the term's ordinary meaning, which comprehends all forms of real and personal property, including profits and proceeds. Congress apparently selected the broad term "interest" because it did not wish the forfeiture provision to be limited by rigid and technical definitions drawn from other areas of law and because the term was fully consistent with the RICO statute's pattern in utilizing broad terms and concepts. Every property interest, including a right to profits or proceeds, may be described as an interest in something. Before profits of an illegal enterprise are divided, each participant may be said to own an "interest" in the ill-gotten gains, and after distribution each has a possessory interest in currency or other items so distributed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

Pp. 299 - 300.

(b) Had Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done so expressly as it did in § 1963(a)(2). To construe § 1963(a)(1) to reach only interests in an enterprise would blunt the section's effectiveness in combating illegitimate enterprises and would mean that whole areas of organized crime activity would be placed beyond the reach of the RICO statute. Pp. 300 - 301.

(c) The fact that the Controlled Substances Act specifically authorizes the forfeiture of "profits" obtained in illegal drug enterprises cannot be read as imposing a limitation upon § 1963(a)(1)'s broader language, particularly**17** where the RICO statute was aimed at organized crime's economic power in all its forms, whereas the narcotics activity proscribed by the Controlled Substances Act usually generates only monetary profits. Pp. 301 - 302.

(d) Nor is a limiting construction of § 1963(a)(1) supported by the fact that certain state racketeering statutes expressly provide for the forfeiture of "profits," "money," "interest or property," or "all property, real or personal," acquired from racketeering, since those States presumably used such language so as to avoid narrow interpretations of their laws such as was given the federal statute in certain Federal District Court opinions. P. 302.

(e) The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots, and thus was intended to authorize forfeiture of racketeering profits. The rule of lenity does not apply here, where § 1963(a)(1)'s language is clear. Pp. 302 - 304.

681 F.2d 952 (5th Cir. 1982), affirmed.

*Ronald A. Dion* argued the cause for petitioner. With him on the brief was *Alvin E. Entin.*

*Samuel A. Alito, Jr.,* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *Sara Criscitelli.*

Justice BLACKMUN delivered the opinion of the Court.

This is yet another case concerning the Racketeer Influenced and Corrupt Organizations (RICO) chapter of the Organized Crime Control Act of 1970. Pub.L. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961-1968. At issue here is the interpretation of the chapter's forfeiture provision, § 1963(a)(1), and, specifically, the meaning of the words "any interest [the defendant] has acquired ... in violation of section 1962."

I

On June 8, 1977, petitioner Joseph C. Russello and others were indicted for racketeering, conspiracy, and mail fraud, in violation of 18 U.S.C. §§ 1341, 1962(c) and (d), and 2. App. 5. After a jury trial in the **298** United States District Court for **18** the Middle District of Florida, petitioner was convicted as charged in four counts of the indictment. The jury then returned special verdicts for the forfeiture to the United States, under 18 U.S.C. § 1963(a), of four payments, aggregating $340,048.09, made to petitioner by a fire insurance company. App. 54-57. These verdicts related to the racketeering activities charged in the second count of the indictment under which petitioner had been convicted. The District Court, accordingly, entered a judgment of forfeiture against petitioner in that amount. *Id.,* at 58.

Petitioner took an appeal to the former United States Court of Appeals for the Fifth Circuit. A panel of that court affirmed petitioner's criminal conviction, *United States v. Martino,* 648 F.2d 367, 406 (1981), and this Court denied certiorari, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982), as to that aspect of the case. The panel, however, reversed the judgment of forfeiture. App. 64-69. The full court granted rehearing en banc on the for-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

feiture issue and, by a vote of 16-7, vacated that portion of the panel opinion, and then affirmed the forfeiture judgment entered by the District Court. 681 F.2d 952 (1982). Because of this significant division among the judges of the Court of Appeals, and because the Fifth Circuit majority, id., at 959, stated that its holding "squarely conflict[ed]" with that of the Ninth Circuit in *United States v. Marubeni America Corp.,* 611 F.2d 763 (1980), we granted certiorari. --- U.S. ----, 104 S.Ct. ----, 77 L.Ed.2d ---- (1983).[FN1] Since then, the Seventh Circuit has issued an opinion agreeing with the Ninth Circuit. *United States v. McManigal,* 708 F.2d 276, 283-287 (1983).

> FN1. The Solicitor General, while perceiving "a factual distinction between *Marubeni* and the present case," felt that "the holding and reasoning of *Marubeni* would require the Ninth Circuit to reach the opposite result from the Fifth Circuit on the facts of the instant case." Memorandum for United States 4, n. 3. Accordingly, he joined in the prayer that a writ of certiorari be granted.

**\*19** II

So far as the case in its present posture is concerned, the basic facts are not in dispute. The majority opinion of the en banc court described them succinctly:

> "Briefly, the evidence showed that a group of individuals associated for the purposes of committing arson with the intent to defraud insurance companies. This association in fact enterprise, composed of an insurance adjuster, homeowners, promoters, investors, and arsonists, operated to destroy properties in Tampa and Miami, Florida between July 1973 and April 1976. The panel summarized the ring's operations as follows:

> 'At first the arsonists only burned buildings already owned by those associated with the ring. Following a burning, the building owner filed an inflated proof of loss statement and

collected the insurance proceeds from which his co-conspirators were paid. Later, ring members bought buildings suitable for burning, secured insurance in excess of value and, after a burning, made claims for the loss and divided the proceeds' (footnote omitted)." 681 F.2d, at 953.

Specifically, petitioner was the owner of the Central Professional Building in Tampa. This structure had two parts, an original smaller section in front and a newer addition at the rear. The latter contained apartments, offices, and parking facilities. Petitioner arranged for arsonists to set fire to the front portion. He intended to use the insurance proceeds to rebuild that section. The fire, however, spread to the rear. Joseph Carter, another member of the arson ring, was the adjuster for petitioner's insurance claim and helped him to obtain the highest payments possible. The resulting payments made up the aggregate sum of $340,043.09 **\*20** mentioned above. From those proceeds, petitioner paid Carter $30,000 for his assistance.

**\*\*299** III

Title 18 U.S.C. § 1962(c) states that it shall be unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Section 1963(a)(1) provides that a person convicted under § 1962 shall forfeit to the United States "any interest he has acquired or maintained in violation of section 1962."

The sole issue in this case is whether profits and proceeds derived from racketeering constitute an "interest" within the meaning of this statute and are therefore subject to forfeiture. Petitioner contends that § 1963(a)(1) reaches only "interests in an enterprise" and does not authorize the forfeiture of mere "profits and proceeds." He rests his argument upon the propositions that criminal forfeitures are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

disfavored in law and that forfeiture statutes, as a consequence, must be strictly construed.

In a RICO case recently decided, this Court observed: "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.' " *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), quoting from *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). See, also, *Dickerson v. New Banner Institute, Inc.,* ---U.S. ----, ----, 103 S.Ct. 986, 990, 74 L.Ed.2d 845; *Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980).

Here, 18 U.S.C. § 1963(a)(1) calls for the forfeiture to the United States of "any interest ... acquired ... in violation *21 of section 1962." There is no question that petitioner Russello acquired the insurance proceeds at issue in violation of § 1962(c); that much has been definitely and finally settled. Accordingly, if those proceeds qualify as an "interest," they are forfeitable.

The term "interest" is not specifically defined in the RICO statute. This silence compels us to "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). The ordinary meaning of "interest" surely encompasses a right to profits or proceeds. See Webster's Third New International Dictionary 1178 (1976), broadly defining "interest," among other things, as a "good," "benefit," or "profit." Random House Dictionary of the English Language (1979) defines interest to include "profit," "welfare," or "benefit." Black's Law Dictionary 729 (5th ed., 1979) provides a significant definition of "interest": "The most general term that can be employed to denote a right, claim, title or legal share in something." It is thus apparent that the term "interest" comprehends

all forms of real and personal property, including profits and proceeds.

This Court repeatedly has relied upon the term "interest" in defining the meaning of "property" in the Due Process Clause of the Fourteenth Amendment of the Constitution. See *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (" 'property' denotes a broad range of interests"); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982); *Jago v. Van Curen,* 454 U.S. 14, 17-18, 102 S.Ct. 31, 33-34, 70 L.Ed.2d 13 (1981). It undoubtedly was because Congress did not wish the forfeiture provision of § 1963(a) to be limited by rigid and technical definitions drawn from other areas of the law that it selected the broad term "interest" to describe those things that are subject to forfeiture under the statute. Congress selected this general term apparently because **300 it was fully consistent with the pattern of the RICO statute in utilizing terms and concepts of breadth. Among these are "enterprise" in § 1961(4); "racketeering *22 activity" in § 1961(1) (1976 ed., Supp. V); and "participate" in § 1962(c).

Petitioner himself has not attempted to define the term "interest" as used in § 1963(a)(1). He insists, however, that the term does not reach money or profits because, he says: " 'Interest,' by definition, includes of necessity an interest in something." Brief for Petitioner 9. Petitioner then asserts that the "something" emerges from the wording of § 1963(a)(1) itself, that is, an interest "acquired ... in violation of section 1962," and thus derives its meaning from the very activities barred by the statute. In other words, a direct relationship exists between that which is subject to forfeiture as a result of racketeering activity and that which constitutes racketeering. This relationship, it is said, means that forfeiture is confined to an interest in an "enterprise" itself. Petitioner derives support for this approach from *United States v. Marubeni America Corp., supra,* and from language contained in two federal district court opinions, *United States*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-md-02179-CJB-DPC   Document 4477-43   Filed 11/03/11   Page 15 of 71

104 S.Ct. 296                                                                                                    Page 6
464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100
**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

v. Meyers, 432 F.Supp. 456, 461 (WD Pa.1977), and United States v. Thevis, 474 F.Supp. 134, 142 (ND Ga.1979), aff'd on other grounds, 665 F.2d 616 (CA5 1982). He also now relies on the Mc-Manigal case, supra, recently decided by the Seventh Circuit. Tr. of Oral Arg. 4.

[1] We do not agree. Every property interest, including a right to profits or proceeds, may be described as an interest in something. Before profits of an illegal enterprise are divided, each participant may be said to own an "interest" in the ill-gotten gains. After distribution, each will have a possessory interest in currency or other items so distributed. We therefore conclude that the language of the statute plainly covers the insurance proceeds petitioner received as a result of his arson activities.

IV

[2][3] We are fortified in this conclusion by our examination of the structure of the RICO statute. We disagree with those **\*23** courts that have felt that a broad construction of the word "interest" is necessarily undermined by the statute's other forfeiture provisions. The argument for a narrow construction of § 1963(a)(1) is refuted by the language of the succeeding subsection (a)(2). The former speaks broadly of "any interest ... acquired," while the latter reaches only "any interest in ... any enterprise which [the defendant] has established[,] operated, controlled, conducted, or participated in the conduct of, in violation of section 1962." Similar less expansive language appears in §§ 1962(b) and 1964(a). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." United States v. Wong Kim Bo, 472 F.2d 720, 722 (CA5 1972). See United States v. Wooten, 688 F.2d 941, 950 (CA4 1982). Had Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it presumably would have done so expressly as it did in the immediately following subsection (a)(2). See North Haven Board of Education v. Bell, 456 U.S.

512, 521, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982); United States v. Naftalin, 441 U.S. 768, 773-774, 99 S.Ct. 2077, 2081-2082, 60 L.Ed.2d 624 (1979). In the latter case, id., at 773, 99 S.Ct., at 2082, the Court said: "The short answer is that Congress did not write the statute that way." We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.

[4] The evolution of these statutory provisions supplies further evidence that Congress intended § 1963(a)(1) to extend beyond an interest in an enterprise. An early proposed version of RICO, S. 1861, **\*\*301** 91st Cong., 1st Sess. (1969), had a single forfeiture provision for § 1963(a) that was limited to "all interest in the enterprise." This provision, however, later was divided into the present two subsections and the phrase "in the enterprise" was excluded from the first. Where Congress includes limiting language in an earlier version of a bill **\*24** but deletes it prior to enactment, it may be presumed that the limitation was not intended. See Arizona v. California, 373 U.S. 546, 580-581, 83 S.Ct. 1468, 1487-1488, 10 L.Ed.2d 542 (1963). See Weiner, Crime Must Not Pay: RICO Criminal Forfeiture in Perspective, 1981 N.Ill.U.L.Rev. 225, 238 and n. 49. It is no answer to say, as petitioner does, Brief for Petitioner 17-18, that if the term "interest" were as all-encompassing as suggested by the majority opinion of the Court of Appeals, § 1963(a)(2) would have no meaning independent of § 1963(a)(1), and would be mere surplusage. This argument is plainly incorrect. Subsection (a)(1) reaches "any interest," whether or not in an enterprise, provided it was "acquired ... in violation of section 1962." Subsection (a)(2), on the other hand, is restricted to an interest in an enterprise, but that interest itself need not have been illegally acquired. Thus, there are things forfeitable under one, but not the other, of each of the subsections.[FN2]

    FN2. There may well be factual situations to which both subsections apply. The sub-

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

sections, however, are clearly not wholly redundant.

We note that the RICO statute's definition of the term "enterprise" in § 1961(4) encompasses both legal entities and illegitimate associations-in-fact. See *United States v. Turkette,* 452 U.S., at 580-593, 101 S.Ct., at 2527-2533. Forfeiture of an interest in an illegitimate association-in-fact ordinarily would be of little use because an association of that kind rarely has identifiable assets; instead, proceeds or profits usually are distributed immediately. Thus, construing § 1963(a)(1) to reach only interests in an enterprise would blunt the effectiveness of the provision in combatting illegitimate enterprises, and would mean that "[w]hole areas of organized criminal activity would be placed beyond" the reach of the statute. *United States v. Turkette,* 452 U.S., at 589, 101 S.Ct., at 2531.

Petitioner stresses that 21 U.S.C. § 848(a)(2), contained in the Controlled Substances Act, 84 Stat. 1242, as amended, specifically authorizes the forfeiture of "profits" obtained in a continuing criminal enterprise engaged in certain drug offenses. Brief for Petitioner 6-7. The Ninth Circuit in ***25** *Marubeni,* 611 F.2d, at 766, n. 7, placed similar reliance upon § 848(a)(2) and observed that the two statutes were passed by the same Congress in the same month. We feel, however, that the specific mention of "profits" in the Controlled Substances Act cannot be accepted as an indication that the broader language of § 1963(a)(1) was not meant to reach profits as well as other types of property interests. Language in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time. The term "profits" is specific; the term "interest" is general. The use of the specific in the one statute cannot fairly be read as imposing a limitation upon the general provision in the other statute. In addition, the RICO statute was aimed at organized crime's economic power in all its forms, and it was natural to use the broad term "interest" to fulfill that aim. In contrast, the narcot-

ics activity proscribed by § 848 usually generates only monetary profits, a fact which would explain the use of the narrower term in § 848(a)(2).

Petitioner, of course, correctly suggests that members of Congress who voted for the RICO statute were aware of the Controlled Substances Act. See 116 Cong.Rec. 33651 (1970) (remarks of Rep. Brotzman); *id.,* at 1180-1182 (remarks of Sen. Thurmond); *id.,* at 33631 (remarks of Rep. Weicker); *id.,* at 33646 (remarks of Rep. Kastenmeier); *id.,* at 35318 (remarks of **302** Rep. Anderson). It is most unlikely, however, that without explanation a potent forfeiture weapon was withheld from the RICO statute, intended for use in a broad assault on organized crime, while the same weapon was included in the Controlled Substances Act, meant for use in only one part of the same struggle. If this was Congress' intent, one would expect it to have said so in clear and understandable terms.

[5] Petitioner also suggests that subsequent proposed legislation demonstrates that the RICO forfeiture provision of 1970 excludes profits. Brief for Petitioner 29-34. The bills to which petitioner refers, however, were introduced in order to ***26** overcome the decisions in *Marubeni, Meyers,* and *Thevis.* See, *e.g.,* S. 2320, 97th Cong., 2d Sess. (1982). The introduction of these bills hardly suggests that their sponsors viewed those decisions as correct interpretations of § 1963(a)(1). See *United States v. Gordon,* 638 F.2d 886, 888, n. 5 (CA5), cert. denied, 452 U.S. 909, 101 S.Ct. 3038, 69 L.Ed.2d 411 (1981). In any event, it is well settled that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *Jefferson County Pharmaceutical Assn. v. Abbott Laboratories,* --- U.S. ----, ----, n. 27, 103 S.Ct. 1011, 1020, n. 27, 74 L.Ed.2d 882 (1983), quoting from *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960). See, also, *United States v. Clark,* 445 U.S. 23, 33, n. 9, 100 S.Ct. 895, 902, n. 9, 63 L.Ed.2d 171 (1980).

Neither are we persuaded by petitioner's argument that his position is supported by the fact that

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

certain state racketeering statutes expressly provide for the forfeiture of "profits," "money," "interest or property," or "all property, real or personal," acquired from racketeering. Brief for Petitioner 8-9. Nearly all of the state statutes post-date the *Meyers* and *Thevis* district court decisions. See, *e.g.,* Colo.Rev.Stat. § 18-17-106 (Supp.1982) (enacted in 1981); R.I. Gen.Laws § 7-15-3 (Supp.1982) (enacted in 1979). The legislatures of those States presumably employed language different from that of § 1963(a)(1) so as to avoid narrow interpretations of their laws along the lines of the narrow interpretations given the federal statute by the courts in *Meyers* and *Thevis.*

V

If it is necessary to turn to the legislative history of the RICO statute, one finds that that history does not reveal, as petitioner would have us hold, see Brief for Petitioner 11-21, a limited congressional intent.

The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots. Congress' statement of findings and purpose in **\*27** enacting Pub.L. 91-452, 84 Stat. 922 (1970), is set forth in its § 1. This statement dramatically describes the problem presented by organized crime. Congress declared, *id.,* at 923: "It is the purpose of this Act to seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." This Court has recognized the significance of this statement of findings and purpose. *United States v. Turkette,* 452 U.S., at 588-589, 101 S.Ct., at 2531-2532. Further, Congress directed, by § 904(a) of Pub.L. 91-452, 84 Stat. 947: "The provisions of this title shall be liberally construed to effectuate its remedial purposes." So far as we have been made aware, this is the only substantive federal criminal statute that contains such a directive; a similar provision, however, appears in the Criminal Appeals

Act, 18 U.S.C. § 3731.

Congress emphasized the need to fashion new remedies in order to achieve its far-reaching objectives. See S.Rep. No. 91-617, p. 76 (1969).

"What is needed here ... are new approaches that will deal not only with individuals, but also with the economic **\*\*303** base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place on all available fronts." *Id.,* at 79.

Senator Scott spoke of "new legal weapons," 116 Cong.Rec. 819 (1970), and Senator McClellan stressed the need for new penal remedies. *Id.,* at 591-592. Representative Poff, floor manager of the bill in the House, made similar observations. *Id.,* at 35193. Representative Rodino observed that "drastic methods ... are essential, and we must develop law enforcement measures at least as efficient as those of organized crime." *Id.,* at 35199. The RICO statute was viewed as one such "extraordinary" weapon. *Id.,* at 602 (remarks of Sen. Hruska). And the forfeiture provision was **\*28** intended to serve all the aims of the RICO Statute, namely, to "punish, deter, incapacitate, and ... directly to remove a corrupting influence from the channels of commerce." *Id.,* at 18955 (remarks of Sen. McClellan).

The legislative history leaves no doubt that, in the view of Congress, the economic power of organized crime derived from its huge illegal profits. See Blakey, The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg,* 58 Notre Dame L.Rev. 237, 249-256 (1982). Congress could not have hoped successfully to attack organized crime's economic roots without reaching racketeering profits. During the congressional debates, the sources and magnitude of organized crime's income were emphasized repeatedly. See, *e.g.,* 115 Cong.Rec. 5873, 5884-5885 (1969); 116 Cong.Rec. 590, 592 (1970) (remarks of Sen. McClellan). From

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

**(Cite as: 464 U.S. 16, 104 S.Ct. 296)**

all this, the intent to authorize forfeiture of racketeering profits seems obvious. H.R.Rep. No. 91-1549, p. 57 (1970), U.S.Code Cong. & Admin.News, p. 4007, recites that the forfeiture provision extends "to all property and interests, as broadly defined, which are related to the violations."

It is true that Congress viewed the RICO statute in large part as a response to organized crime's infiltration of legitimate enterprises. *United States v. Turkette,* 452 U.S., at 591, 101 S.Ct., at 2532. But Congress' concerns were not limited to infiltration. The broader goal was to remove the profit from organized crime by separating the racketeer from his dishonest gains. Forfeiture of interest in an enterprise often would do little to deter; indeed, it might only encourage the speedy looting of an infiltrated company. It is unlikely that Congress intended to enact a forfeiture provision that provided an incentive for activity of this kind while authorizing forfeiture of an interest of little worth in a bankrupt shell.

We are not persuaded otherwise by the presence of a 1969 letter from the then Deputy Attorney General to Senator McClellan. See Measures Relating to Organized Crime: Hearings Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st *29 Cong., 1st Sess., 407 (1969). That letter, with its reference to "one's interest in the enterprise" does not indicate, for us, any congressional intent to preclude forfeiture of racketeering profits. The reference, indeed, is not to § 1963(a) as finally enacted but to an earlier version in which forfeiture was to be expressly limited to an interest in an enterprise. The letter was merely following the language of the then pending bill. Furthermore, the real purpose of the sentence was not to explain what the statutory provision meant, but to explain why the Department of Justice believed it was constitutional.

[6][7] The rule of lenity, which this Court has recognized in certain situations of statutory ambiguity, see *United States v. Turkette,* 452 U.S., at 587, n. 10, 101 S.Ct., at 2531 has no application here. That rule "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrong-doers." **\*304 *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961). Here, the language of the RICO forfeiture provision is clear, and "the rule of lenity does not come into play." *United States v. Turkette,* 452 U.S., at 588, n. 10, 101 S.Ct., at 2531, n. 10.

We therefore disagree with the reasoning of the respective courts in the *Marubeni, McManigal, Meyers,* and *Thevis* cases, and we affirm the judgment of the United States Court of Appeals for the Fifth Circuit.FN3

> FN3. In our ruling today, we recognize that we have not resolved any ambiguity that might be inherent in the terms "profits" and "proceeds." Our use of those terms is not intended to suggest a particular means of calculating the precise amount that is subject to RICO forfeiture in any given case. We hold simply that the "interests" subject to forfeiture under § 1963(a)(1) are not limited to interests in an enterprise.

*It is so ordered.*

U.S.Fla.,1983.
Russello v. U.S.
464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17, RICO Bus.Disp.Guide 6100

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

§ 2B1.1(c)(3) if the facts alleged in the count of conviction support the application of that provision.

[3] When we apply this standard to the instant case, we conclude that the district court did not err when it referred to U.S.S.G. § 2L1.1 to determine Garcia's base offense level. Garcia's "count of conviction"—Count 1 of the one-count indictment—alleges that he made a false statement about his passenger's citizenship to a border officer in an attempt "to aid the female passenger's entry into the United States." The alien-smuggling statute, § 1185(a)(2), expressly covers this conduct when it makes it a crime for "any person to transport or attempt to transport from or into the United States another person with knowledge or reasonable cause to believe that the departure or entry of such other person is forbidden by this section."[18] The district court was on firm ground in concluding that Garcia's base offense level was 12.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is, in all respects,

AFFIRMED.



**WESTCHESTER SURPLUS LINES INSURANCE COMPANY, Plaintiff–Appellee,**

**v.**

**MAVERICK TUBE CORPORATION, Defendant–Appellant.**

**18.** 8 U.S.C. § 1185(a)(2).

**Maverick Tube LP, a Delaware limited partnership; Tubos Del Caribe, LTDA, a Colombian sociedade por quotas de responsabiliadade limitada, Plaintiffs–Appellants,**

**v.**

**Westchester Surplus Lines Insurance Company, a Georgia Corporation, Defendant–Appellee.**

**No. 09–20071.**

United States Court of Appeals, Fifth Circuit.

Dec. 10, 2009.

**Background:** Insured seller of drill casings used in gas wells brought declaratory judgment action against insurer, seeking determination that insured was entitled to coverage under commercial general liability (CGL) and umbrella insurance policies, for settlement in connection with defective casing. The United States District Court for the Southern District of Texas, Keith P. Ellison, J., granted summary judgment in favor of insurer. Insured appealed.

**Holding:** The Court of Appeals, Benavides, Circuit Judge, held that insured was entitled to coverage for settlement it paid to purchaser for loss caused by defective casing.

Reversed and remanded.

**1. Insurance ⟨⊸⟩2290**

Under Missouri law, the insured bears the burden of showing that the damages alleged are covered by the liability insurance policy.

**2. Insurance ⟨⊸⟩2268, 2290**

Under Missouri law, a liability insurer may not merely rest upon the allegations found in the underlying complaint; instead,

the insurer must consider the facts it knew or could have reasonably ascertained and show there is no possibility of coverage.

**3. Insurance ⚯2269, 2275, 2277**

Under Missouri law, as predicted by the Court of Appeals, insured seller of drill casing used in gas wells was entitled to coverage under commercial general liability (CGL) and umbrella insurance policies for settlement it paid to purchaser of casing in connection with defective casing which caused loss of four gas wells, notwithstanding that purchaser pursued the settlement based on insured's asserted breach of warranty; settlement agreement resolved all claims between insured and purchaser, the casing failure constituted an occurrence within the meaning of the CGL and umbrella policies, as it involved more than insured's failure to perform under the parties' contract, insured neither expected nor intended the failure, and physical injury to tangible property, including the loss of use of the gas wells, resulted.

**4. Products Liability ⚯111**

To prove products liability, under Missouri law, a plaintiff must show four elements: (1) the product was sold in the course of business, (2) the product was in a defective condition and unreasonably dangerous at the time it was put to a reasonably anticipated use, (3) the product was used as reasonably anticipated, and (4) damage occurred as a direct result of the defective condition that existed at the time of sale.

**5. Insurance ⚯2275**

Under Missouri law, a commercial general liability (CGL) insurance policy which insures against property damage resulting from an accident does not cover normal, frequent, or predictable losses.

**6. Insurance ⚯2275**

Under Missouri law, an event must be unexpected to be an accident or occurrence, under a commercial general liability (CGL) insurance policy.

**7. Insurance ⚯2915, 2918**

Under Missouri law, while the duty to defend doctrine applies only when an insured has been sued, the liability insurer is required to take into consideration all known facts or facts discoverable upon investigation.

**8. Insurance ⚯2914**

Under Missouri law, a liability insurer's duty to defend a suit against its insured is determined by the policy's language and allegations asserted.

**9. Insurance ⚯2914**

Under Missouri law, a liability insurer's duty to defend arises if the complaint against the insured merely alleges facts that give rise to a claim that could potentially be within the policy's coverage.

**10. Insurance ⚯2268**

Under Missouri law, because the duty to defend is broader than a liability insurer's duty to indemnify, if the insurer does not have a duty to defend, it does not have a duty to indemnify either.

———

Joseph Anthony Ziemianski (argued), Emily Joanna Nelson, April Michelle Zubizarreta, Cozen O'Connor, Houston, TX, for Appellee.

Charles Tynan Buthod (argued), Stephen G. Tipps, W. Zachary Hughes, Maryanne Lyons, Baker Botts, L.L.P., Houston, TX, for Appellants.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, DAVIS and
BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellants Maverick Tube Corporation, Tubos del Caribe, Ltda, and Maverick Tube LP (collectively "Maverick") appeal the declaratory judgment ruling that Appellee Westchester Surplus Lines Insurance Company ("Westchester") had no duty to indemnify Maverick in an accident resulting from defective piping. This dispute involves the application of Missouri state law in determining if an insurance "occurrence" and the duty to indemnify exists. For the reasons set forth below, we reverse the district court's grant of summary judgment and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

Tubos manufactures drilling casing sold by Maverick to both distributors and end users. Maverick purchased a commercial general liability insurance policy ("CGL Policy") and an umbrella insurance policy ("Umbrella Policy") from Westchester. The CGL Policy provides indemnification for "property damage" resulting from an "occurrence."[1] An "'occurrence' is defined as an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[2]

In 2006, Maverick sold a specific casing, P–110, to Dominion Exploration and Production Company ("Dominion") for use and operation in its gas wells. In September 2006, Dominion experienced catastrophic failure in four gas wells that were using the P–110 casing. Maverick opened an investigation on this matter, quarantined all P–110 casing, and notified other customers of the potential problems. Maverick informed Dominion that its warranty covered the cost of the casing, and it sent Westchester notice of this incident and requested indemnification.

On November 29, 2006, Dominion sent a written demand letter advising Maverick that Dominion considered the failed casing to be, among other things, a breach of warranty and sought $9,802,506 in damages for i) completion costs, ii) lost production, iii) plugging costs, and iv) re-drilling costs for new wells in exchange for releasing all claims against Maverick. Investigations by Maverick, Tubos, and the independent party hired by Maverick determined that Tubos' production process had a flaw in the heat treatment process and chain conveyance system, in which the casing would cool off outside the furnace and, upon re-entering the furnace, the conveyance chain would touch the casing causing it to cool more quickly than the rest of the surface. This defect resulted in brittle points on the pipe. These investigations and reports showed that Maverick and Tubos were responsible for Dominion's damages. Maverick forwarded these reports and documents to Westchester, who relied on the investigations performed by Maverick and Tubos without independent investigation or study per the CGL Policy terms.[3]

---

**1.** Subsection a. *"Physical injury to tangible property,* including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." Subsection b. *"Loss of use of tangible property that is not physically injured.* All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

**2.** The Umbrella Policy provides almost identical coverage and language.

**3.** The primary policy required Maverick to investigate any claim until the $350,000 self-insured retention per occurrence amount was exhausted.

Maverick settled with Dominion in March 2007 for $6,601,035.39. The settlement was several million less than the amount originally sought by Dominion because the breach of warranty limit for replacing the casing ($808,390.61) and loss of production revenues were both excluded from the settlement total.

Westchester denied Maverick's claim on January 25, 2007. Westchester then filed this declaratory judgment action in February 2007 on the same day as Maverick's response to Westchester's denial of coverage. Maverick filed its lawsuit in the Eastern District of Missouri, which was consolidated in December 2007 with Westchester's action filed in the Southern District of Texas. Both parties agree that Missouri law controls this case.

Maverick's claim against Westchester excluded the $350,000 self-insured retention limit and the cost of the casing sold, $808,390.61, as Maverick's warranty covered the replacement product cost and the CGL Policy excluded the cost to replace a defective product. Westchester moved for summary judgment and argued that Maverick's entire claim was a breach of warranty claim, which does not constitute an "occurrence" under Missouri law, based on Dominion's November 29 letter sent to Maverick. Maverick filed a cross motion for summary judgment and argued that Dominion's letter was not dispositive of the coverage issue and that Westchester was vexatious in its refusal to pay Maverick's claim.

The district court granted Westchester's request for summary judgment, holding that Dominion advanced only a breach of warranty claim against Maverick and that a warranty claim is not within the meaning of the word "occurrence" in a CGL Policy or Umbrella Policy under Missouri law.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. *E.g., Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir.1996). Summary judgment is proper if the record reflects "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## DISCUSSION

[1, 2] The insured bears the burden of showing that the damages alleged are covered by the insurance policy. *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo.Ct.App.1998). But an insurer may not merely rest upon the allegations found in the petition; instead, the insurer must consider the facts it knew or could have reasonably ascertained and show there is no possibility of coverage. *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 392 (Mo.Ct.App.2007) (quoting *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 83 (Mo.Ct.App.2005)). The unsettled state of Missouri breach of warranty law stems from cases that fail to specify whether the underlying facts or the cause brought by the disputing party has been the basis for determining whether an occurrence exists that triggers the duty to indemnify under insurance policies.

### The Letter, Settlement, and Cause of Action

[3] Maverick contends that the district court erred in finding that Westchester did not need to provide coverage for the settlement with Dominion. Maverick argues that the text and context of the November 29 letter refers not only to Maverick's published warranty but also discusses the release of "all claims." Further, Maverick argues that because the letter identified

the four components of recovery and because investigations were still ongoing when the letter was written, the claim was not limited solely to the breach of warranty claim. Maverick stresses that had Dominion wanted to recover on the sole ground of Maverick's warranty, the letter would have only had one component of recovery—the cost of the casing—because the warranty only covered the purchase price of a product and not additional damages. Moreover, no formal list of causes of actions by Dominion in the form of a complaint or petition was advanced. Westchester asserts that the letter only discusses recovery under a breach of warranty theory and that because Dominion never asserted a claim for negligence or another tort, Westchester correctly denied coverage. In essence, Westchester argues that Maverick's only evidence of a claim is Dominion's letter, and the letter's only mention of legal recovery theories used the word "warranty"; however, Westchester cites to no authority suggesting that a demand letter can or should be used as the sole indicator of whether a claim is covered.

Concerning the settlement, Maverick argues that the settlement agreement's language is the evidence that provides additional facts that initiates Westchester's duty to indemnify. The agreement itself excludes the purchase price of the P–110 casing and mentions that "all matters relating to the Incident" are resolved.[4] The settlement language mirrors the warranty agreement language that "strictly limit[s the damages] to the purchase price of the [g]oods paid." Westchester disagrees that the settlement agreement should be considered.

Westchester's reasoning suggests that had Dominion filed a lawsuit that used the word "negligence" or "products liability" it would pay for the damages because the facts support this claim. But one important difference should be noted—no formal complaint by Dominion was ever filed. Thus, the resolution by the Eighth Circuit in *Spirco Environmental, Inc. v. American International Specialty Lines Insurance Co.*, 555 F.3d 637 (8th Cir.2009) is helpful in interpreting the facts of the instant case.

In *Spirco*, American refused to reimburse the arbitration fee paid by Spirco because the recovering party had characterized the settlement as a breach of contract claim. *Id.* at 639. But Spirco's attorney advanced the property-damage nature of the claim from the beginning of the arbitration due to the findings made by the arbitrator and the positions of the parties. *Id.* at 640. Because the damage occurred after Spirco had finished its contract, the claim was not limited to the completion of the contract; instead, the claim focused on the property damages that occurred later. *Id.* The court determined that a property damage claim existed based on the factual assertions, substance of the claims, and arbitrator's findings, and not on the label chosen by the property owner. *Id.*

Likewise, in *Missouri Terrazzo Co. v. Iowa National Mutual Insurance Co.*, 740 F.2d 647 (8th Cir.1984), the Eighth Circuit decided that the facts behind a property damage claim and not the label as a diminution in value cause of action was dispositive in applying Missouri insurance law.

---

4.  Relevant language includes the following: "WHEREAS, Dominion alleges that it has suffered certain damages to its real and personal property interests in the Wells, beyond the damage to the Casing itself . . ." Further in the agreement, "WHEREAS, the Parties agree that Dominion's cost of the Casing alleged to have failed is not part of this Agreement, and, that Dominion has already been compensated for that portion of its damages . . ."

*Id.* at 650. In *Missouri Terrazzo*, the subcontractor improperly installed flooring that cracked and discolored in a short amount of time. *Id.* at 649. The subcontractor settled with the party and then sought coverage from its insurer. *Id.* The court noted that the flooring suffered physical damage to tangible property, which met the definition of property damage under the insurance policy; thus, the insurer had a duty to indemnify the insured for the settlement amount. *Id.* at 650, 653.

These two Eighth Circuit cases are instructive to this Court's consideration because they dealt with an arbitration award and settlement award, instead of a lawsuit, and examined the underlying facts of the claim to characterize the cause(s) of action at issue. *See Spirco,* 555 F.3d at 640–41 (examining the factual assertions, substance of claims, and findings rather than the label the injured party decides to attach to its claim); *Missouri Terrazzo,* 740 F.2d at 650 (imposing a duty to indemnify for the settlement amount because of the physical damage to tangible property alleged by the insured).

Missouri insurance law focuses on the relevant facts and their relation to possible causes of action. The letter by the property owner in *Spirco* only characterized its arbitration counterclaim as a breach of contract claim, but the court focused on the substance of the property owner's claim to find a property damage claim. Similarly, the Missouri Court of Appeals in *Columbia Mutual Insurance Co. v. Epstein,* 239 S.W.3d 667, 671 (Mo.Ct.App. 2007) noted that the underlying facts of any one event could belong to more than one cause of action and stated that the facts alleged expound not only on the breach of contract claim, but also on a products liability claim.[5] Thus, this Court may examine the underlying facts of the event, the causes of action alleged, the supporting facts, and the ultimate settlement of the case to decide these legal issues.

**[4]** In examining the facts, Appellants' petition successfully supports a products liability cause of action. To prove products liability, a plaintiff must show four elements: 1) the product was sold in the course of business, 2) the product was in a defective condition and unreasonably dangerous at the time it was put to a reasonably anticipated use, 3) the product was used as reasonably anticipated, and 4) damage occurred as a direct result of the defective condition that existed at the time of sale. *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362, 364 (Mo. 1969) (citing Restatement (Second) of Torts, Section 402A); *see also Fahy v. Dresser Indus.,* 740 S.W.2d 635, 637 (Mo. 1987) (en banc). Section 2 of the Restatement (Third) of Torts notes that a product is defective when, at time of sale or distribution, it contains a manufacturing defect and when it departs from its intended design even though all possible care was exercised. Restatement (Third) of Torts, § 2 (1998). Here, Dominion entered into a contract with Maverick for the purchase of P–110 casing. Maverick purchased the casing for Dominion's gas wells from Tubos. The P–110 casing was defective at the time of sale due to the defect in Tubos' chain-link conveyer system, and Maverick did not intend for the casing to be defective. Dominion reasonably used the casing for its intended use in its gas wells. The P–110 casing was defective as to the design which caused the casing to be in a

---

**5.** The warranty claims in *Epstein* had been dismissed by the district court and only the products liability claim remained on appeal.

dangerous and defective condition which was unsafe for its intended use. As a direct cause of the defective casing, Dominion suffered a total loss of four gas wells and had to start drilling in new locations.

### Was There An Occurrence Under the Contract?

[5–10] A CGL Policy which insures against property damage resulting from an accident does not cover normal, frequent, or predictable losses. *Mathis*, 974 S.W.2d at 649. Rather, an event must be unexpected to be an accident or occurrence. *Id.* at 650. While the duty to defend doctrine applies only when an insured has been sued, the insurer is required to take into consideration all known facts or facts discoverable upon investigation. *Zipkin v. Freeman*, 436 S.W.2d 753, 754 (Mo.1968). An insurer's duty to defend a suit against its insured is determined by the policy's language and allegations asserted. *Scottsdale Ins. Co. v. Ratliff*, 927 S.W.2d 531, 532 (Mo.Ct.App.1996). A duty to defend arises if the complaint merely alleges facts that give rise to a claim that could potentially be within the policy's coverage. *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 392 (Mo.Ct.App. 2007) (citing *McCormack Baron Mgmt. Serv., Inc. v. Am. Guar. & Liabl. Ins. Co.*, 989 S.W.2d 168, 170–71 (Mo.1999)); *see also Truck Ins. Exchange v. Prairie Framing, LLC*, 162 S.W.3d 64, 79 (Mo.Ct. App.2005) (stating that the duty to defend arises only upon comparing the policy language with the "allegations in the pleadings"). Because the duty to defend is broader than an insurance's company duty to indemnify, if the insurance company does not have a duty to defend, it does not have a duty to indemnify either. *See Millers Mut. Ins. Assoc. of Ill. v. Shell Oil Co.*, 959 S.W.2d 864, 869 (Mo.App.1997); *see, e.g.*, Willy E. Rice, *The Court of Appeals for the Fifth Circuit: A Legal Analysis and Statistical Review of 2005–2006 Insurance Decisions*, 39 TEX. TECH L.REV. 843, 950–51 (2007) (noting that under *Farmers Texas County Mutual Insurance Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997), an insurer may have a duty to defend but not a duty to indemnify).

Westchester argues that Maverick is foreclosed from recovery because no Missouri state court has explicitly held that an action for a breach of warranty results in an occurrence that triggers the duty to defend. However, in the only Missouri related case in which the sole cause of action was for breach of warranty, the Eighth Circuit in *Koch Engineering Co. v. Gibralter Casualty Co.*, 78 F.3d 1291, 1294 (8th Cir.1996) applied Missouri law and determined that a breach of warranty claim could constitute an occurrence. In *Koch*, the insured installed a distillation tower that the court decided was reckless in its design and its installation,[6] but that Koch did not intend for the equipment to be stopped up by debris. *Id.* at 1293–94. The *Koch* court did not reach its decision based on the cause of action (breach of warranty), but based on the supporting facts, intent of the insured, and the foreseeability of the event. *Id.; see Amerisure Mut. Ins. Co. v. Paric Corp.*, No. 4:04CV430–DJS, 2005 WL 2708873, at *6 (E.D.Mo. Oct. 21, 2005) (noting that the interpretation of Missouri law on the occurrence issue requires each court to make a case specific determination of whether an unintended occurrence exists). What label is used for the cause of action seems only relevant in breach of contract claims when the party fails to perform. *See, e.g., Mathis*, 974 S.W.2d at 650 (stating that breach-

---

**6.** Debris prevented the tower from producing the contracted quantities.

es of contract for performance could not be accidents or occurrences). Indeed, Missouri courts have focused on a variety of factors in deciding the existence of an occurrence.

First, did the insured intend, expect or desire the results? *See Hawkeye–Security Ins. Co. v. Davis,* 6 S.W.3d 419, 427 (Mo. Ct.App.1999) (noting an occurrence if the event was undesigned or unexpected); *see also Koch,* 78 F.3d at 1294 (finding an occurrence in the absence of intent for reckless design and installation). Second, was the event simply a business risk not covered by the insurance policy? *See Mathis,* 974 S.W.2d at 649 (noting that general liability coverage by insurer does not serve as a performance bond); *see also Columbia Mut. Ins. Co. v. Schauf,* 967 S.W.2d 74, 77 (Mo.1998). Third, would the exclusion leave the insured without coverage? *See Missouri Terrazzo Co. v. Iowa Nat'l Mut. Ins. Co.,* 566 F.Supp. 546, 552 (E.D.Mo.1983) (stating that policies construed to cover only accidents not involving breach of warranty or negligence would result in no protection for the insured).

Westchester summarizes several failure-to-perform cases that allege a variety of causes of action to argue that Maverick's case fails under similar reasoning. In *Mathis,* the contractor had hired a subcontractor to install the electrical system. *Mathis,* 974 S.W.2d at 648. The subcontractor improperly constructed the trenches and duct banks and failed to install rebar which later had to be removed and properly installed. *Id.* The subcontractor requested its insurance company to defend it against damages filed by the contractor for negligence, negligent misrepresentation, and breach of contract. *Id.* The *Mathis* court stated that breaches of contract for performance could not be accidents or occurrences. *See id.* at 650

(citations omitted). The court concluded that because performance of duct construction was in the control of the sub-contractor and was not undesigned or unexpected and because the breach did not cause unintended damage to other property, an accident did not occur. *Id.* at 650. Similarly, in *Hawkeye–Security,* the causes of action were for breach of contract and breach of express and implied warranties because the insured had constructed a defective home and then left before finishing. 6 S.W.3d at 421. The court determined that this failure to perform could not be unexpected and thus, not an accident. *Id.* at 426. In *Charles Hampton's A–1 Signs, Inc. v. American States Insurance Co.,* 225 S.W.3d 482, 489 (Tenn.App.2006), the court applied Missouri law to decide that the insured's defective product used to create another structure and the insured's failure to perform according to contract specifications was not an occurrence. In *St. Paul Fire & Marine Ins. Co. v. Building Construction Enterprises,* 484 F.Supp.2d 1004 (W.D.Mo.2007), the insured's failure to perform its contractual obligations could not be an occurrence. Finally, in a negligence cause of action, the court in *Cincinnati Insurance Co. v. Venetian Terrazzo, Inc.,* 198 F.Supp.2d 1074 (E.D.Mo.2001) determined that an accident did not occur when the contractor was merely negligent in the pouring of concrete because this action was a failure to perform under the contract, not an unexpected event.

Relevant to the discussion of cases not already summarized in the previous paragraph is *Stark Liquidation Co. v. Florists' Mutual Insurance Co.,* 243 S.W.3d 385, 394 (Mo.Ct.App.2007). In *Stark,* the causes of action alleged were for negligence, intentional misrepresentation, and breach of express and implied warranties. *Id.* at 389. The court focused on the negligence and negligent misrepresentation aspects of the facts, that Stark neither in-

tended nor expected a crop loss, and that the resulting bacterial damage caused to the trees constituted an occurrence. *Id.* at 392–93.

Westchester relies on the Missouri courts that try to determine with a brightline rule those causes of action that exclude the existence of an occurrence. Maverick relies on the Missouri courts which focus on the failure of these contractors to perform and the lack of foreseeability of the actions—the non-performance and breach of these parties are not unexpected nor unforeseen and are within the control of the actors (they merely need to do or not do something)—and not the label. Maverick's interpretation is preferred by Missouri state courts and the Eighth Circuit. For example, the *Mathis* court was not focused on the fact that the petition alleged negligence or negligent misrepresentation—labeled claims that other Missouri courts have found an occurrence to exist. By focusing on the breach of contract label, the *Mathis* court was simply noting that it was not an accident for someone not to properly perform. Here, Maverick's breach to Dominion was not simply non-performance, such as failure to deliver the casing; rather, it involved an unforeseen and unexpected event (the defective casing production which resulted in Dominion's gas wells failure).

The final question in determining if an occurrence exists is whether property damage has occurred. The relevant portions of the CGL and Umbrella Policies define property damage as "physical injury to tangible property, including all resulting loss of use of that property." Here, Dominion suffered property damage. The facts from the Eighth's Circuit case of *Missouri Terrazzo,* in which the flooring suffered physical damage to tangible property which met the definition of property

damage under the insurance policy and triggered the insurer's duty to indemnify, 740 F.2d at 650, 653, are similar to the instant case. The pipes and casing are tangible property that were physically injured because of the brittle spots on the defective casing. The casing resulted in "catastrophic failure" for four gas wells in north Texas that caused physical damage to the drilling operations and wells. Because the wells were damaged beyond use, Dominion had to drill four new wells. Furthermore, Westchester's agent acknowledged in a deposition that Dominion had lost the use of its well, stated that it had no opinion on the property damage issue, and has offered no evidence on this issue. Under the definition of the insurance policy, this event would qualify as property damage. Therefore, Dominion's claim constitutes an occurrence.

### CONCLUSION

We see no reason to depart from the Eighth Circuit's interpretation of Missouri insurance law. Under the facts presented, the casing defect was a product defect that did not change simply because Dominion wrote a letter pursuing settlement and other options on Maverick's failure to deliver non-defective P–110 casing. Because the CGL Policy used general occurrence language, the casing failure constituted an occurrence that resulted in property damage. Accordingly, we REVERSE and REMAND to the district court for a determination of damages.



518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

**H**

United States District Court,
W.D. Kentucky,
Paducah Division.
WESTLAKE VINYLS, INC. Plaintiff
v.
GOODRICH CORPORATION Defendant; Third
Party Plaintiff
v.
Polyone Corporation Third Party Defendant.

No. 5:03CV–240–R.
Sept. 27, 2007.

**Background:** Purchaser of hazardous waste site sued vendor, seeking to recover remediation costs for site conveyed by reciprocal indemnification agreements, and vendor counterclaimed for indemnity and allocation costs and filed third-party complaint against its subsidiary pursuant to separate indemnity agreement whereby vendor as parent corporation transferred to subsidiary all liability for site. Vendor moved for partial summary judgment on declaratory claims against subsidiary, seeking payment of future remediation costs.

**Holdings:** The District Court, Thomas B. Russell, J., held that:
(1) subsidiary was obligated to pay remediation costs regardless of contamination source;
(2) subsidiary's risk was not capped for remediation costs;
(3) subsidiary was required to reimburse vendor's costs of defending against purchaser's claim;
(4) vendor did not breach contract with subsidiary;
(5) vendor's divestiture of liability to subsidiary did not create fiduciary relationship;
(6) vendor did not breach fiduciary duty to subsidiary;
(7) subsidiary failed to establish prima facie case of equitable estoppel;
(8) subsidiary's affirmative defenses were not viable; and

(9) subsidiary was estopped from contesting final allocation of remediation costs.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A ⟿2543**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2543 k. Presumptions. Most Cited Cases

In determining whether summary judgment is appropriate, a district court must resolve all ambiguities and draw all reasonable inferences against the moving party. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟿2470.1**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to Judgment
          170Ak2470.1 k. Materiality and genuineness of fact issue. Most Cited Cases

**Federal Civil Procedure 170A ⟿2470.2**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to Judgment
          170Ak2470.2 k. Admitted or undisputed facts; conflicting inferences or conclusions. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

**Federal Civil Procedure 170A** ⚏2544

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2542 Evidence
        170Ak2544 k. Burden of proof.
Most Cited Cases

    Not every issue of fact or conflicting inference presents a genuine issue of material fact to defeat a summary judgment motion; rather, the test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** ⚏2546

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2542 Evidence
        170Ak2546 k. Weight and sufficiency. Most Cited Cases

    The plaintiff must present more than a mere scintilla of evidence in support of his position on motion for summary judgment; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** ⚏2546

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2542 Evidence
        170Ak2546 k. Weight and sufficiency. Most Cited Cases

    Mere speculation will not suffice to defeat a motion for summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A** ⚏2470.1

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
       170Ak2465 Matters Affecting Right to Judgment
        170Ak2470.1 k. Materiality and genuineness of fact issue. Most Cited Cases

    The mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[6] Federal Courts 170B** ⚏420

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk420 k. Judgments. Most Cited Cases

**Federal Courts 170B** ⚏433

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk433 k. Other particular matters. Most Cited Cases

    Although Kentucky law applied to purchaser's diversity suit seeking recovery of costs from vendor for remediation of hazardous waste site, under the *Erie* choice of laws doctrine, district court would apply summary judgment standard governed by federal rule, not Kentucky's summary judgment standard. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[7] Contracts 95** ⚏129(1)

95 Contracts
   95I Requisites and Validity
     95I(F) Legality of Object and of Consideration
      95k129 Obstructing or Perverting Administration of Justice
       95k129(1) k. Agreements relating to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

actions and other proceedings in general. Most
Cited Cases

Under Kentucky choice of law standards, law
of Ohio where vendor of hazardous waste site and
its subsidiary were headquartered at time of di-
vestiture of all vendor's obligations and liabilities
for site remediation to subsidiary by indemnifica-
tion agreements, containing choice of law clause
providing for Ohio law, applied to purchaser's suit
seeking recovery of remediation costs, rather than
Kentucky law which would enforce contractual
choice of law provisions unless Ohio had no sub-
stantial relationship to parties or transaction and
there was no other reasonable basis for parties'
choice. Restatement (Second) of Conflict of Laws §
187(2)(a).

**[8] Contracts 95 ⟲326**

95 Contracts
   95VI Actions for Breach
       95k326 k. Grounds of action. Most Cited
Cases

To establish a breach of contract, under Ohio
law, plaintiff must show that a contract existed and
its performance thereon, breach by defendant, and
damages.

**[9] Corporations and Business Organizations
101 ⟲2724(4)**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganiza-
tions
      101X(C) Sale, Lease, or Exchange of Sub-
stantially All Corporate Assets
        101k2721 Assumption of or Succession to
Transferor's Debts and Liabilities
          101k2724 Particular Debts and Liabil-
ities
            101k2724(4) k. Liabilities based on
statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

Vendor's subsidiary was obligated to pay for
remediation costs at hazardous waste site, under
Ohio law, whether contamination was caused by

purchaser of site or vendor, pursuant to assumption
of liabilities and indemnification agreement
(ALIA), providing that subsidiary assumed and
agreed to pay "each and every obligation" of
vendor relating to site remediation, although ALIA
stated that subsidiary "does not intend hereby to un-
dertake any liability or obligations of any Person
other than" vendor, since vendor was under legal
obligation to remediate site regardless of contamin-
ation source at time vendor executed ALIA under
which subsidiary assumed that remediation obliga-
tion. Resource Conservation and Recovery Act of
1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[10] Corporations and Business Organizations
101 ⟲2724(4)**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganiza-
tions
      101X(C) Sale, Lease, or Exchange of Sub-
stantially All Corporate Assets
        101k2721 Assumption of or Succession to
Transferor's Debts and Liabilities
          101k2724 Particular Debts and Liabil-
ities
            101k2724(4) k. Liabilities based on
statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

Risk of vendor's subsidiary was not capped, un-
der Ohio law, for payment of remediation costs at
hazardous waste site for contamination caused by
purchaser or vendor of site, under assumption of li-
abilities and indemnification agreement (ALIA),
providing that subsidiary assumed and agreed to
pay all of vendor's obligations relating to site re-
mediation, although vendor had estimated remedi-
ation liability at specific amount in initial public of-
fering (IPO) documents for sale of subsidiary's
shares, since vendor also noted in IPO documents
that there could be no assurance that future liabilit-
ies would not be incurred.

**[11] Indemnity 208 ⟲31(7)**

208 Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

208II Contractual Indemnity

208k31 Construction and Operation of Contracts

208k31(7) k. Duty to defend. Most Cited Cases

Under Ohio law, a duty to defend is separate and distinct from the duty to indemnify.

**[12] Indemnity 208 ⬦31(7)**

208 Indemnity

208II Contractual Indemnity

208k31 Construction and Operation of Contracts

208k31(7) k. Duty to defend. Most Cited Cases

**Insurance 217 ⬦2914**

217 Insurance

217XXIII Duty to Defend

217k2912 Determination of Duty

217k2914 k. Pleadings. Most Cited Cases

Under Ohio law, an indemnitor's duty to defend under an indemnity contract is subject to the same standard as an insurer's duty to defend under an insurance contract, that is, the insurer or indemnitor is required to defend where allegations in a complaint are potentially within policy coverage or where some doubt exists about coverage.

**[13] Indemnity 208 ⬦31(7)**

208 Indemnity

208II Contractual Indemnity

208k31 Construction and Operation of Contracts

208k31(7) k. Duty to defend. Most Cited Cases

Under Ohio law, even where the indemnitor's duty to defend is not apparent from the pleadings in the case against the indemnitee, but the allegations do state a claim which is potentially or arguably within the agreement, or there is some doubt as to whether a theory of recovery within the agreement has been pleaded, the indemnitor must accept the defense of the claim.

**[14] Indemnity 208 ⬦31(7)**

208 Indemnity

208II Contractual Indemnity

208k31 Construction and Operation of Contracts

208k31(7) k. Duty to defend. Most Cited Cases

Under Ohio law, the indemnitor's obligation to defend the indemnitee continues until the claim is confined to a recovery beyond the scope of the indemnification agreement.

**[15] Corporations and Business Organizations 101 ⬦2724(4)**

101 Corporations and Business Organizations

101X Mergers, Acquisitions, and Reorganizations

101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets

101k2721 Assumption of or Succession to Transferor's Debts and Liabilities

101k2724 Particular Debts and Liabilities

101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases

(Formerly 101k445.1)

Vendor's subsidiary was required, under Ohio law, to reimburse vendor of hazardous waste site for vendor's defense against purchaser's claim for site remediation costs, pursuant to assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed vendor's remediation obligations and agreed to "defend and indemnify" vendor "from every claim, demand, obligation, liability, cost and expense" related to or arising out of "each and every obligation" of vendor described in ALIA, and that subsidiary "shall assume the defense of such action or claim," but if subsidiary refused, vendor would be entitled "to employ its own counsel and retain control of its own defense, but at the expense of" subsidiary, since purchaser's complaint was within scope of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

subsidiary's indemnification obligations under ALIA.

**[16] Contracts 95 🔑318**

95 Contracts
   95V Performance or Breach
      95k318 k. Discharge of contract by breach. Most Cited Cases

Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract.

**[17] Guaranty 195 🔑53(1)**

195 Guaranty
   195III Discharge of Guarantor
      195k53 Change in Obligation or Duty of Principal
         195k53(1) k. In general. Most Cited Cases

**Guaranty 195 🔑54**

195 Guaranty
   195III Discharge of Guarantor
      195k54 k. Alteration of instrument. Most Cited Cases

**Indemnity 208 🔑111**

208 Indemnity
   208VI Rights and Remedies of Indemnitor
      208k111 k. Discharge. Most Cited Cases

Under Ohio law, a guarantor is discharged from liability whenever the terms of the contract or the nature of the obligation guaranteed is materially altered without the guarantor's consent, and this requirement of notice and consent is equally applicable in the context of indemnity agreements.

**[18] Corporations and Business Organizations 101 🔑2724(4)**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganiza-

tions
     101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
      101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
        101k2724 Particular Debts and Liabilities
          101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

Vendor's execution of side agreement with purchaser of hazardous waste site, whereby vendor agreed to lobby to keep purchaser off waste disposal permit, did not materially alter risk of vendor's subsidiary in breach of assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all of vendor's site remediation obligations, as required to excuse subsidiary, under Ohio law, from bearing costs of remediation and of vendor's defense against purchaser's claims; although subsidiary allegedly spent more on remediation than vendor estimated due to side agreement making source of contamination difficult to distinguish, ALIA required subsidiary to indemnify vendor regardless of source of contamination and did not cap remediation costs. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[19] Fraud 184 🔑7**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k5 Elements of Constructive Fraud
      184k7 k. Fiduciary or confidential relations. Most Cited Cases

Under Ohio law, a breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe such duty, and (3) an injury proximately resulting therefrom.

**[20] Fraud 184 🔑7**

184 Fraud

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

184I Deception Constituting Fraud, and Liability Therefor

184k5 Elements of Constructive Fraud

184k7 k. Fiduciary or confidential relations. Most Cited Cases

Under Ohio law, a fiduciary relationship creates the highest order of duty imposed by law, and if a fiduciary relationship exists, the fiduciary cannot profit from the relationship without the knowledge and permission of the principal.

**[21] Fraud 184 ⊝7**

184 Fraud
184I Deception Constituting Fraud, and Liability Therefor
184k5 Elements of Constructive Fraud
184k7 k. Fiduciary or confidential relations. Most Cited Cases

Under Ohio law, in a fiduciary relationship, the fiduciary must make every effort to avoid having his own interests conflict with those of the principal, and when conflict is unavoidable the fiduciary must place the interests of the principal above his own.

**[22] Fraud 184 ⊝7**

184 Fraud
184I Deception Constituting Fraud, and Liability Therefor
184k5 Elements of Constructive Fraud
184k7 k. Fiduciary or confidential relations. Most Cited Cases

Under Ohio law, a fiduciary duty requires more than the generalized business obligation of good faith and fair dealing.

**[23] Corporations and Business Organizations 101 ⊝1526(3)**

101 Corporations and Business Organizations
101VI Shareholders and Members
101VI(B) Rights and Liabilities as to Corporation and Other Shareholders or Members
101k1522 Nature of Relation

101k1526 Duty of Shareholders or Members to Other Shareholders or Members
101k1526(3) k. Controlling or majority shareholders and minority shareholders in general. Most Cited Cases
(Formerly 101k174)

**Corporations and Business Organizations 101 ⊝2724(3)**

101 Corporations and Business Organizations
101X Mergers, Acquisitions, and Reorganizations
101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
101k2724 Particular Debts and Liabilities
101k2724(3) k. Torts. Most Cited Cases
(Formerly 101k445.1)

Parent corporation did not create fiduciary relationship with subsidiary, under Ohio law, by parent's divestiture of assets and liabilities to wholly owned subsidiary, pursuant to assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all of parent's remediation obligations for hazardous waste site, as required to excuse subsidiary from paying remediation costs under ALIA for parent's alleged breach of fiduciary duty.

**[24] Fraud 184 ⊝7**

184 Fraud
184I Deception Constituting Fraud, and Liability Therefor
184k5 Elements of Constructive Fraud
184k7 k. Fiduciary or confidential relations. Most Cited Cases

Under Ohio law, a de facto fiduciary relationship may arise from a confidential relationship, in which one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

social, domestic, or merely personal.

**[25] Fraud 184 ⚖7**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k5 Elements of Constructive Fraud
            184k7 k. Fiduciary or confidential relations. Most Cited Cases

    Under Ohio law, a de facto fiduciary relationship may originate from one party's superior conversance in the subject matter of the transaction.

**[26] Fraud 184 ⚖7**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k5 Elements of Constructive Fraud
            184k7 k. Fiduciary or confidential relations. Most Cited Cases

    Under Ohio law, a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust of confidence has been reposed, and such confidential relationship cannot be unilateral, but rather, the parties must agree that one is acting in the best interest of the other.

**[27] Corporations and Business Organizations 101 ⚖2724(4)**

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
            101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
            101k2724 Particular Debts and Liabilities
                101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

    Vendor's subsidiary was not damaged by any additional contamination caused by purchaser of hazardous waste site, as required for vendor to breach fiduciary duty to subsidiary, under Ohio law, for allegedly under-estimating site remediation costs, pursuant to assumption of liabilities and indemnification agreement (ALIA) whereby subsidiary assumed and agreed to pay all of vendor's site remediation obligations, since ALIA required subsidiary to pay remediation costs regardless of source of contamination, did not cap costs, and provided that subsidiary was entitled to recover remediation costs of purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser.

**[28] Evidence 157 ⚖96(1)**

157 Evidence
    157III Burden of Proof
        157k96 Matters of Defense and Rebuttal
            157k96(1) k. In general. Most Cited Cases
    Party asserting affirmative defense bears the burden of proving such defense.

**[29] Contracts 95 ⚖1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and grounds of contractual obligation. Most Cited Cases

**Contracts 95 ⚖108(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k108 Public Policy in General
                95k108(1) k. In general. Most Cited Cases

    Generally, parties have complete freedom to enter into a contract, under Ohio law; however, that freedom is limited by public policy reasons.

**[30] Contracts 95 ⚖108(1)**

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k108 Public Policy in General
            95k108(1) k. In general. Most Cited Cases

Under Ohio contract law, "public policy" is a legal principle which declares that no one can lawfully contract to do that which has a tendency to be injurious to the public welfare.

**[31] Contracts 95 ☞108(1)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k108 Public Policy in General
            95k108(1) k. In general. Most Cited Cases

Under Ohio contract law, the doctrine of public policy must be applied with caution so as to not infringe on the parties' rights to make contracts which are not clearly opposed to some principle or policy of law.

**[32] Indemnity 208 ☞27**

208 Indemnity
   208II Contractual Indemnity
      208k26 Requisites and Validity of Contracts
      208k27 k. In general. Most Cited Cases

Under Ohio law, in the absence of specific public policy exceptions, an agreement to indemnify another is generally enforceable.

**[33] Corporations and Business Organizations 101 ☞2724(4)**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganizations
      101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
      101k2721 Assumption of or Succession to

Transferor's Debts and Liabilities
      101k2724 Particular Debts and Liabilities
         101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
   (Formerly 101k445.1)

**Environmental Law 149E ☞447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
      149Ek447 k. Contribution and indemnity; allocation of liability. Most Cited Cases

Vendor's side agreement with purchaser of hazardous waste site, whereby vendor agreed to lobby to keep purchaser off waste disposal permit, did not affect environmental health or safety contrary to public policy, under Ohio law, by impeding site remediation efforts of vendor's subsidiary, pursuant to assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all of vendor's site remediation obligations, since purchaser was required to report and remediate all releases of contamination at site regardless of whether it was permittee, and vendor was responsible under permit for plant-wide corrective action program (PCAP). Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 107(A), 42 U.S.C.A. § 9607(A); KRS 224.01–400.

**[34] Estoppel 156 ☞52(1)**

156 Estoppel
   156III Equitable Estoppel
      156III(A) Nature and Essentials in General
      156k52 Nature and Application of Estoppel in Pais
         156k52(1) k. In general. Most Cited Cases

Under Ohio law, "equitable estoppel" prevents relief when one party induces another to believe certain facts exist and the other party changes his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

position in reasonable reliance on those facts to his detriment.

**[35] Estoppel 156 ☞52.15**

156 Estoppel
  156III Equitable Estoppel
    156III(A) Nature and Essentials in General
      156k52.15 k. Essential elements. Most Cited Cases

There are four elements to equitable estoppel under Ohio law: (1) factual misrepresentation, (2) that is misleading, (3) which induced actual reliance which is reasonable and in good faith, and (4) which caused detriment to the relying party.

**[36] Estoppel 156 ☞87**

156 Estoppel
  156III Equitable Estoppel
    156III(B) Grounds of Estoppel
      156k82 Representations
        156k87 k. Relying and acting on representations. Most Cited Cases

Purchaser's alleged additional contamination of hazardous waste site due to side agreement with vendor of site, whereby vendor agreed to lobby to keep purchaser off waste disposal permit, despite vendor's misrepresentations to subsidiary that vendor would advocate to add purchaser to permit, did not damage subsidiary, as required for subsidiary to establish prima facie case of equitable estoppel against vendor, under Ohio law, for alleged additional remediation costs pursuant to assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all of vendor's site remediation obligations, since ALIA allowed subsidiary to recover any costs of remediating purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[37] Equity 150 ☞65(1)**

150 Equity
  150I Jurisdiction, Principles, and Maxims
    150I(C) Principles and Maxims of Equity
      150k65 He Who Comes Into Equity Must Come with Clean Hands
        150k65(1) k. In general. Most Cited Cases

Under Ohio law, the "clean hands doctrine" provides that a party cannot come to the court seeking equity where that party has engaged in reprehensible conduct with respect to the subject matter of the action.

**[38] Equity 150 ☞65(1)**

150 Equity
  150I Jurisdiction, Principles, and Maxims
    150I(C) Principles and Maxims of Equity
      150k65 He Who Comes Into Equity Must Come with Clean Hands
        150k65(1) k. In general. Most Cited Cases

The clean hands doctrine is equitable and thus is unavailable in actions at law for damages.

**[39] Equity 150 ☞65(2)**

150 Equity
  150I Jurisdiction, Principles, and Maxims
    150I(C) Principles and Maxims of Equity
      150k65 He Who Comes Into Equity Must Come with Clean Hands
        150k65(2) k. Nature of unconscionable conduct. Most Cited Cases

Vendor's alleged misrepresentation to subsidiary that vendor would advocate adding purchaser of hazardous waste site to waste disposal permit, while concealing vendor's side agreement to lobby to keep purchaser off permit, did not rise to level of "reprehensibility," as required by Ohio clean hands doctrine to prevent vendor from seeking equitable relief, under Federal Declaratory Judgment Act, declaring that subsidiary would assume and pay vendor's future remediation costs pursuant to assumption of liabilities and indemnification agreement (ALIA), since side agreement did not increase

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

subsidiary's liability under ALIA which allowed subsidiary to recover any costs of remediating purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a); 28 U.S.C.A. § 2201.

**[40] Estoppel 156 ☞52.10(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(A) Nature and Essentials in General
            156k52.10 Waiver Distinguished
                156k52.10(2) k. Nature and elements of waiver. Most Cited Cases

Under Ohio law, waiver is the voluntary surrender or relinquishment of a known legal right or intentionally doing of an act inconsistent with claiming it.

**[41] Set–Off and Counterclaim 352 ☞8(1)**

–Off and Counterclaim352 Set–Off and Counterclaim
    352I Nature and Grounds of Remedy
        352k4 Grounds and Scope of Remedy
           352k8 Equitable Set-Off
               352k8(1) k. In general. Most Cited Cases

Under Ohio law, the "doctrine of offset" is a demand asserted to diminish or extinguish plaintiff's demand, which arises out of a transaction different from that sued on, and which must be liquidated and emerge from a contract or judgment.

**[42] Set–Off and Counterclaim 352 ☞28(1)**

–Off and Counterclaim352 Set–Off and Counterclaim
    352II Subject–Matter
        352k25 Claims Arising Out of Same Contract or Transaction or Connected with Subject of Action
           352k28 Set-Off
               352k28(1) k. In general. Most Cited Cases

Vendor of hazardous waste site was required, under Ohio law, to offset invoices issued to its subsidiary for unpaid site remediation costs by insurance proceeds that vendor received for invoices, according to terms of assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed liability for vendor's site remediation obligations only "to extent such obligations and liabilities are not covered under any insurance policy or policies" issued to vendor.

**[43] Corporations and Business Organizations 101 ☞2724(4)**

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
           101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
               101k2724 Particular Debts and Liabilities
                   101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

Vendor of hazardous waste site did not fail to mitigate damages by allegedly allowing purchaser's continued contamination of site, due to side agreement whereby vendor agreed to lobby to keep purchaser off waste disposal permit, as required for subsidiary to lower remediation costs, under Ohio law, that vendor was demanding pursuant to assumption of liabilities and indemnification agreement (ALIA), whereby subsidiary assumed and agreed to pay all of vendor's site remediation obligations, since any additional contamination by purchaser would not damage subsidiary who was allowed by ALIA to recover costs of remediating purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[44] Corporations and Business Organizations 101 ☞2641(4)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganizations
      101X(A) In General
         101k2638 Assumption of or Succession to Transferor's Liabilities
            101k2641 Particular Debts and Liabilities
               101k2641(4) k. Liabilities based on statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

Subsidiary was responsible, under Ohio contract law, for remediation of contamination caused by third parties at hazardous waste site, under assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all remediation obligations of vendor of site, since ALIA required subsidiary to indemnify vendor regardless of source of contamination.

**[45] Contracts 95 ☞85**

95 Contracts
   95I Requisites and Validity
      95I(D) Consideration
         95k84 Effect of Want or Failure of Consideration
            95k85 k. In general. Most Cited Cases

Under Ohio law, lack of consideration to support a contract is sufficient to permit its cancellation.

**[46] Contracts 95 ☞50**

95 Contracts
   95I Requisites and Validity
      95I(D) Consideration
         95k49 Nature and Elements
            95k50 k. In general. Most Cited Cases

Under Ohio contract law, valuable consideration may be either a detriment to the promisee or a benefit to the promisor.

**[47] Contracts 95 ☞53**

95 Contracts
   95I Requisites and Validity
      95I(D) Consideration
         95k53 k. Adequacy. Most Cited Cases

Courts will not inquire into the adequacy of the consideration, under Ohio contract law, unless the absence of consideration was such as to constitute fraud or unfair treatment.

**[48] Corporations and Business Organizations 101 ☞2724(4)**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganizations
      101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
         101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
            101k2724 Particular Debts and Liabilities
               101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
    (Formerly 101k445.1)

Subsidiary's receipt of assets from parent corporation at certain facilities, although parent failed to transfer assets to subsidiary at one hazardous waste site, constituted consideration, under Ohio contract law, to support assumption of liabilities and indemnification agreement (ALIA), whereby subsidiary assumed and agreed to pay all of parent's obligations for site remediation.

**[49] Contracts 95 ☞309(1)**

95 Contracts
   95V Performance or Breach
      95k309 Discharge by Impossibility of Performance
         95k309(1) k. In general. Most Cited Cases

Under Ohio law, where after a contract is made a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

charged, unless the language or circumstances indicate the contrary. Restatement (Second) of Contracts § 265 (1981).

**[50]** **Corporations and Business Organizations**
**101** ☞2724(4)

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
            101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
                101k2724 Particular Debts and Liabilities
                    101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
        (Formerly 101k445.1)

Purchaser's alleged additional contamination of hazardous waste site due to side agreement with vendor of site, whereby vendor agreed to lobby to keep purchaser off waste disposal permit, despite vendor's misrepresentations to subsidiary that vendor would advocate to add purchaser to permit, did not frustrate purpose of assumption of liabilities and indemnification agreement (ALIA) between vendor and subsidiary, under Ohio contract law, since ALIA provided that subsidiary assumed and agreed to pay all of vendor's site remediation obligations, regardless of source of contamination. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[51]** **Contracts 95** ☞168

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms implied as part of contract. Most Cited Cases

Under Ohio law, each party to a contract is under an implied obligation to cooperate in the performance of a contract and to restrain from doing any act that would delay or prevent performance of the contract.

**[52]** **Corporations and Business Organizations**
**101** ☞2724(4)

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
            101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
                101k2724 Particular Debts and Liabilities
                    101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
        (Formerly 101k445.1)

Subsidiary was not prevented from performance, under Ohio contract law, of assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all of vendor's obligations for remediation of hazardous waste site, by subsidiary's alleged increased remediation liability based on purchaser's additional contamination of site due to side agreement, whereby vendor agreed to lobby to keep purchaser off waste disposal permit, despite representing to subsidiary that vendor would advocate to add purchaser to permit, and by vendor's alleged limitations on subsidiary's remediation officer's movement around site, ability to inspect facilities, and correspondence with government agencies, since ALIA allowed subsidiary to recover any costs of remediating purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[53]** **Contracts 95** ☞326

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of action. Most Cited Cases

To establish a breach of contract, under Ohio law, the complainant must show that a contract existed and its performance thereon, breach by the other party, and damages.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

**[54] Corporations and Business Organizations 101 ⚷2724(4)**

101 Corporations and Business Organizations
 101X Mergers, Acquisitions, and Reorganizations
  101X(C) Sale, Lease, or Exchange of Substantially All Corporate Assets
   101k2721 Assumption of or Succession to Transferor's Debts and Liabilities
    101k2724 Particular Debts and Liabilities
     101k2724(4) k. Liabilities based on statutory provisions. Most Cited Cases
     (Formerly 101k445.1)

Vendor of hazardous waste site did not increase scope of subsidiary's obligations, under assumption of liabilities and indemnification agreement (ALIA), providing that subsidiary assumed and agreed to pay all of vendor's site remediation obligations, as required for subsidiary's breach of contract claim, under Ohio law, by vendor allegedly allowing purchaser's continued contamination of site due to side agreement whereby vendor agreed to lobby to keep purchaser of site off waste disposal permit, and by failing to notify and consult with subsidiary regarding regulator's request for information, since purchaser's additional contamination did not damage subsidiary who was allowed by ALIA to recover remediation costs for purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser. Resource Conservation and Recovery Act of 1976, § 2(a), 42 U.S.C.A. § 6925(a).

**[55] Implied and Constructive Contracts 205H ⚷3**

205H Implied and Constructive Contracts
 205HI Nature and Grounds of Obligation
  205HI(A) In General
   205Hk2 Constructive or Quasi Contracts
    205Hk3 k. Unjust enrichment. Most Cited Cases

Under Ohio law, a party must prove three elements to succeed in an action for unjust enrich-

ment: (1) a benefit conferred by one party on the other, (2) the receiving party's knowledge of the benefit, and (3) the improper retention of the benefit without the receiving party's rendering of payment.

**[56] Implied and Constructive Contracts 205H ⚷55**

205H Implied and Constructive Contracts
 205HI Nature and Grounds of Obligation
  205HI(D) Effect of Express Contract
   205Hk55 k. In general. Most Cited Cases

Under Ohio law, a party may maintain a claim for unjust enrichment where the matters in dispute are governed by the terms of an express contract only where there is evidence of fraud or bad faith.

**[57] Implied and Constructive Contracts 205H ⚷3**

205H Implied and Constructive Contracts
 205HI Nature and Grounds of Obligation
  205HI(A) In General
   205Hk2 Constructive or Quasi Contracts
    205Hk3 k. Unjust enrichment. Most Cited Cases

Vendor was not unjustly enriched, under Ohio law, by vendor's alleged fraud and bad faith in breaching assumption of liabilities and indemnification agreement (ALIA), whereby subsidiary assumed and agreed to pay all of vendor's remediation costs for hazardous waste site, breaching fiduciary duty, receiving insurance proceeds for remediation costs that it claimed as damages against subsidiary, or willfully causing additional contamination by purchaser at site, since vendor did not breach ALIA or fiduciary duty to subsidiary, and any additional contamination by purchaser did not damage subsidiary which had right under ALIA to recover cost of remediation of purchaser's contamination as benefit of separate indemnification agreement between vendor and purchaser.

**[58] Indemnity 208 ⚷85**

208 Indemnity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

208IV Conclusiveness of Former Adjudication
    208k85 k. In general. Most Cited Cases

    When an indemnitor receives notice of an indemnitee's claim and has the opportunity to defend the claim, the indemnitor is bound by the outcome of the litigation between the indemnitee and the party seeking relief from the indemnitee.

**[59] Indemnity 208 ☞85**

208 Indemnity
    208IV Conclusiveness of Former Adjudication
    208k85 k. In general. Most Cited Cases

    Subsidiary was estopped from contesting final allocation of remediation costs between vendor and purchaser of hazardous waste site, under Ohio law, pursuant to assumption of liabilities and indemnification agreement (ALIA), whereby subsidiary assumed and agreed to pay all of vendor's remediation costs for site and subsidiary was given right to prosecute in vendor's name any indemnity claim against third parties, since subsidiary refused to defend vendor against purchaser's action seeking recovery of remediation costs, and vendor did not breach any fiduciary or indemnity duties to subsidiary.

**\*926** Adam T. Goebel, Samuel D. Hinkle, IV, Stoll KeenonOgden PLLC, Louisville, KY, Christopher J. Kayser, Larkins Vacura LLP, Portland, OR, David A. Super, E. Barrett Atwood, Nicholas A. Brady, R. Stan Mortenson, Samuel J. Waldon, Baker Botts LLP, Washington, DC, for Plaintiff.

Amanda M. Leffler, Paul A. Rose, Sallie C. Lux, Brouse McDowell, Akron, OH, E. Frederick Straub, Jr., J. Duncan Pitchford, Whitlow, Roberts, Houston & Straub, PLLC, Paducah, KY, Patrick J. Moran, Chadwick A. McTighe, Charles J. Cronan, IV, O. Scott Barber, III, Thad M. Barnes, Margaret R. Grant, Phillip W. Collier, Stites & Harbison, PLLC, Louisville, KY, for Defendant; Third Party Plaintiff.

Clinton J. Elliott, Darryl Scott Lavery, David T. Klapheke, Matthew B. Gay, Raymond G. Smith,

Richard W. Edwards, Edward H. Stopher, Boehl Stopher & Graves, LLP, Louisville, KY, Jeffrey M. Sanders, Sanders, Timso & Associates, PSC, Fort Thomas, KY, Jonathan A. Conte, Loveland, OH, Charles D. Walter, Boehl Stopher & Graves, LLP, Paducah, KY, for Third Party Defendant.

## MEMORANDUM OPINION

THOMAS B. RUSSELL, District Judge.

    This matter is before the Court on Goodrich Corporation's Motion for Partial Summary Judgment on its Declaratory Claims (Counts I and II) against PolyOne **\*927** Corporation (Docket # 456). PolyOne filed a response (Docket # 497) to which Goodrich has replied (Docket # 525). This matter is now ripe for adjudication. For the reasons that follow, Goodrich's Motion for Partial Summary Judgment on its Declaratory Claims is GRANTED.

## BACKGROUND

    During the 1950s, an industrial park was developed on the southern bank of the Tennessee River near Calvert City, Kentucky. Goodrich purchased approximately 150 acres of that park in 1951 for use as a manufacturing facility ("the Site"). Goodrich produced vinyl chloride monomer ("VCM") at the Site from 1953 to March 1, 1990. Goodrich began to use ethylene dichloride ("EDC"), a feedstock used to produce VCM, to make VCM in 1959 and in 1964 it added a new plant to convert EDC to VCM. The units that made EDC and the units that "cracked" EDC to form VCM were known collectively as the EDC/VCM Plant. Goodrich also built and operated facilities at the Site that manufactured ethylene and chlorine, the feedstock for EDC, and a byproduct called caustic. This part of the Site was known as the Chlor–Alkali and Olefins Plant ("CA & O Plant").

    Waste containing EDC was generated at the Site. Treatment included settlement ponds, landfills, and burn pits. Over a period of time, some of the EDC contained in this waste migrated through the soil to the groundwater underlying the Site.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

In June of 1988, the Environmental Protection Agency ("EPA") issued a Record of Decision ("ROD") declaring a portion of the Site, specifically a landfill on the Site's eastern boundary, a "Superfund Site" subject to remediation requirements under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Goodrich was required to secure approval of, implement, complete, and pay for remedial actions approved by the EPA and to provide reimbursement for future oversight costs.

The Kentucky Natural Resources and Environmental Protection Cabinet (the "Cabinet") issued a Hazardous Waste Management Permit to Goodrich effective October 29, 1989. The EPA issued a similar permit under the Hazardous Solid Waste Management Act Amendments ("HSWA") Post–Closure Permit, also effective October 29, 1989. Together the Kentucky and EPA permits form the Resource Conservation and Recovery Act ("RCRA") Part B Permit for the Site.[FN1]

> FN1. RCRA mandates that "each person owning or operating an existing facility ... for the treatment, storage, or disposal of hazardous waste ... have a permit." 42 U.S.C. § 6925(a).

> The two permits that collectively constituted the RCRA Part B Permit were replaced by one Hazardous Waste Management Permit effective October 30, 2003. Portions pertinent to the instant matter are essentially the same as corresponding portions of the Permit issued in 1989. These permits are collectively referred to as the "Permit."

As the sole permittee, Goodrich must comply or ensure compliance with all terms and conditions of the Permit. These legal obligations include:

To install and maintain a groundwater monitoring system.

To treat all contaminated groundwater under the Site and to treat all contaminated groundwater migrating outside the Site's boundaries to underlying contiguous properties.

To develop and implement a corrective action program to clean up the groundwater to a concentration standard established by law and regulation. The program is known as the Plant-wide Corrective Action Program ("PCAP"). **\*928** Goodrich's C–Stripper and extraction well system was approved by the regulators as the mandated corrective measure under the PCAP.

To ensure the PCAP complies with the groundwater protection standard.

To both operate and adequately fund the PCAP, specifically including the C–Stripper.

To clean up the groundwater until a demonstration is made that concentrations of targeted contaminants fall below the groundwater protection standard.

Non-compliance with any Permit condition would subject Goodrich to an enforcement action.

On March 1, 1990, pursuant to the Amended and Restated Master Conveyance Agreement ("1990 Agreement"), Goodrich sold the EDC/VCM Plant to Westlake Vinyls, Inc. In Section 8.3 of the 1990 Agreement, Westlake agreed to "indemnify and save Goodrich harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant after the Closing Date." Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2.

As part of the 1990 Agreement to sell the EDC/VCM Plant, Westlake and Goodrich met with state

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

and federal environmental regulators before the closing to discuss the status of the Permit. Goodrich advocated to the regulators that Westlake not be added to the Permit. Ultimately, the state did not require Westlake to become liable under the Part B Permit; provisions allowing Goodrich access to Westlake's property to conduct its remediation obligations under the Permit were deemed satisfactory.

On February 11, 1993, Goodrich began to divest itself of its PVC business, incorporating a new, wholly-owned subsidiary, Geon. Effective March 1, 1993, Goodrich transferred substantially all of the liabilities and assets of its PVC business that had been operated by the Geon Vinyls Division to newly-formed Geon. Goodrich sold all of its shares in a two-stage public offering that took place in May and November of 1993.

Goodrich originally intended to transfer all of its PVC-related assets at Calvert City to Geon in the divestiture, including the CA & O Plant and utilities. However, Westlake filed legal proceedings against Goodrich, claiming that the transfer of assets and impending IPO triggered the right of first refusal to purchase the CA & O Plant and utilities from Goodrich under the 1990 Agreement. As a result of Westlake's actions, the utilities and CA & O Plant were pulled back from the transaction at the last moment. Hence, Goodrich did not transfer ownership of the CA & O Plant assets and certain utilities at the Site in connection with the 1993 Bill of Sale and 1993 Separation Agreement, but did transfer all of its liabilities associated with the Calvert City Site, including all environmental liabilities and all existing and future obligations under the Permit and PCAP.

Geon's agreement to assume Goodrich's Calvert City obligations and to indemnify Goodrich for such obligations is set out in the 1993 Amended and Restated Assumption of Liabilities and Indemnification Agreement ("1993 ALIA"). The 1993 ALIA along with the 1993 Separation Agreement and 1993 Bill of Sale are referred to collectively as

the "1993 Agreements." Generally, Geon assumed all of Goodrich's obligations and liabilities relating to the Goodrich PVC Business, which **\*929** was defined to include all of Goodrich's Calvert City environmental liabilities and obligations associated with the EDC/VCM Plant, the CA & O Plant, the RCRA Permit and other permits, the PCAP, and the Calvert City Environmental Sites, and all of Goodrich's liabilities to Westlake arising out of the operation of the assets transferred to Westlake under the 1990 Agreement. The 1993 Separation Agreement states:

> It is the intent of the parties that any and all liabilities of the Goodrich PVC Business, disclosed or undisclosed, heretofore or hereafter arising, of every nature whatsoever be transferred to and assumed by Geon and that Geon indemnify and hold Goodrich harmless with respect thereto.

This direct assumption of liabilities was accompanied by a series of parallel indemnity obligations on Geon's part.

The 1993 ALIA provided PolyOne, as Geon's successor, with the right to prosecute in Goodrich's name, any claims Goodrich may have against third parties for contractual indemnity:

> PROVIDED FURTHER THAT Goodrich shall make available to [PolyOne] to the extent it can (but without the obligation for Goodrich to incur any costs or assume any liabilities) the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by [PolyOne] hereby.

As part of the 1993 Agreements that separated the companies, PolyOne agreed to become the permittee under the Permit and accept ownership of certain real property located at the chemical facilities owned and operated by Goodrich's former Geon Vinyls Division in Calvert City.[FN2] PolyOne also agreed to become the owner of three tracts of real property known as the "Environmental Sites;" the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

former settlement ponds 1A and 2 and the RCRA Closure Cell, the Superfund Site, and the property on which C–Stripper is sited. PolyOne also agreed to take control of remediation activities at the Site in the 1993 ESA.

> FN2. The 1993 Environmental Services Agreement ("ESA") states that PolyOne "shall be the permitee of the RCRA and HSWA ('Hazardous and Solid Waste Amendments') permits."

The 1993 Separation Agreement provided that transfers of real property under the 1993 Agreements "shall be effected by quit claim deed or assignment of leasehold interests without representation or warranties of any kind by the transferor." Goodrich tendered a quit claim deed and easements to transfer the three Environmental Sites to Poly-One in 1997, but PolyOne did not act to execute the documents.

In connection with the 1993 sale, Goodrich agreed to provide PolyOne with utilities and employees to operate the C–Stripper at PolyOne's expense, "[t]o the extent that [Goodrich] has utilities and properly-trained manpower available at the Plant Site." Goodrich provided employees and utilities to PolyOne from the date of the 1993 divestiture until Goodrich sold the CA & O Plant and Utilities to Westlake in 1997. Before the sale of the CA & O Plant and utility units, Goodrich billed Poly-One on a monthly basis for C–Stripper services and PolyOne paid the invoices through the date of the sale to Westlake.

In the IPO documents filed with the SEC and given to the public, Goodrich represented that it had accruals approximating $33,000,000 to cover future environmental remediation expenditures of which approximately $16,000,000 was attributable to future remediation expenditures at the Site.FN3 The IPO documents also noted:

> FN3. Goodrich offered shares of PolyOne to the public in two different IPOs. The fist

sale was for 13 million shares and is reflected in a Prospectus dated April 29, 1993. In this Prospectus, Goodrich represented the cost of remediation for the Site as approximately $20,000,000. Goodrich sold its remaining 12.9 million shares pursuant to a Prospectus dated November 23, 1993. In this Prospectus, PolyOne's cost to remediate the Site was estimated at $16,000,000.

**\*930** Risks of substantial costs and liabilities are inherent in certain plant operations and certain products produced at the Company's plants, as is the case with other companies involved in the PVC industry, and there can be no assurance that significant costs and liabilities will not be incurred by the Company in the future. It is also possible that other developments, such as increasingly strict environmental, safety and health laws, regulations and enforcement policies thereunder and claims for damages to property or persons resulting from plant emissions or products, could result in substantial costs and liabilities to the Company in the future.

The legal proceedings initiated by Westlake against Goodrich in 1993 to compel the exercise of its right of first refusal under the 1990 Agreement to purchase the CA & O facilities were concluded in 1996. Westlake and Goodrich agreed to condition Westlake's purchase at a price fixed by a valuation professional by a date certain. An issue arose as to whether Westlake's purchase of the CA & O Plant would cause the regulators to require Westlake to become a permittee under Goodrich's Permit. Westlake strongly urged the regulators that it not become a permittee under Goodrich's Permit as a result of the contemplated sale, whereas Goodrich strongly urged the regulators that Westlake should become a permittee.FN4 In the end, Westlake allowed the exercise date to pass without consummating the purchase of the CA & O Plant by tendering the fixed price. Soon after Westlake allowed the exercise date to pass, the regulators issued a letter to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

the parties advising that Westlake would have to become a co-permittee if it acquired the CA & O Plant.

> FN4. Goodrich and PolyOne had a mutual goal at this time of getting Westlake on the Permit.

Not long after the fixed price exercise date passed, the parties began to discuss a possible sale again.FN5 On June 26, 1997, Bill Vore, Westlake's counsel, sent Alex Schoch, Goodrich's Assistant General Counsel, a list of proposed revisions to be added to the Purchase and Sale Agreement. Vore proposed adding the following section:

> FN5. Steven R. Guidry, a vice president of Goodrich at the time of the transaction, testified that "the business transaction changed from, 'Get Westlake on the permit' to 'Sell it.' "

Notwithstanding anything in this Purchase and Sale Agreement to the contrary, [Goodrich] shall remain responsible for compliance with the terms and conditions of [the RCRA Permit] regarding the investigation and remediation of soil or groundwater contamination on, below, or emanating from the Facilities that results from [Goodrich's] ownership or operation of the Facilities, or any condition or alleged condition existing prior to the Closing Date. [Goodrich] shall formally request prior to the Closing Date that all applicable Governmental Authorities allow it and [PolyOne] to serve as the sole permittees on the RCRA Permit and shall use its best efforts to obtain approval of its request. [Goodrich] shall not seek to transfer the RCRA Permit or any renewal of the RCRA Permit or any of the responsibilities thereunder to Westlake without Westlake's agreement and further shall vigorously oppose any effort **\*931** initiated by any person to transfer the Permit or any responsibilities thereunder to Westlake without Westlake's agreement.

After reviewing the proposed section, Schoch wrote to the side the words "side letter." On July

16, 1997, David Bonner, a senior vice-president of Westlake, wrote to Schoch:

This is to confirm the understanding reached today between yourself, representing BFGoodrich and myself, as follows:

Prior to Westlake's Board meeting on July 18, 1997, to consider the acquisition of the BF-Goodrich CA & O Plant (as defined), BF-Goodrich will provide to Westlake a letter which outlines in detail the common strategy and format of BFG and Westlake's presentation to the State of Kentucky regarding CA & O Plant's RCRA/HSWA permits. Said strategy reflects the parties' views relative to a potential sale of the Calvert City CA & O Plant and shall include the position that there will be no modifications, hearing, or any other changes to the current RCRA/HSWA permits due to a sale of the CA & O Plant. In particular this strategy presumes there is no need to conduct hearings, review permit conditions or include any such third party purchaser of the CA & O Plant (including Westlake) as a permittee on the permits. BFG and Westlake have agreed to use their respective best efforts to implement the foregoing strategy.

Two days later, Schoch confirmed the agreement in a letter to Vore:
This is to confirm that BFG has used and will continue to use its best efforts to implement this strategy. I trust that the Westlake personnel who have been involved in this process will attest to the best efforts and bona fides demonstrated by BFG to date.

On July 16, 1997, Goodrich sold the CA & O Plant and its utility units, including the boiler house that made steam for use at the Site, to Westlake as documented in the Purchase and Sale Agreement as amended August 15, 1997 ("1997 PSA"). When Goodrich sold the CA & O Plant and utilities to Westlake, the Goodrich C–Stripper employees became Westlake employees. As part of the sale, Goodrich also transferred the former Pond 4 area to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

Westlake.

In Section 8.3 of the 1997 PSA, Westlake agreed to "indemnify and save [Goodrich] harmless from and against any Liability which results from, arises out of or occurs in connection with," among others, "remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the CA & O Plant by Westlake after the Closing Date." Goodrich provided a reciprocal indemnity to Westlake with respect to contamination released before the closing date in Section 8.2, "but excluding any condition or event existing, arising or occurring at, on, over or under the CA & O Plant for which Westlake indemnified [Goodrich] pursuant to Section 8.3(c) of the [1990 Agreement]."

On July 16, 1997, Goodrich and Westlake met with the Cabinet, presenting an unsigned draft of an Environmental Services Agreement ("ESA"). The draft ESA stated that "Westlake shall cooperate with Goodrich in all respects for the purpose of Goodrich executing its duties under the Permits." On July 22, 1997, Goodrich notified the Cabinet via letter:

> [I]n previous correspondence to the Division, Goodrich had indicated that, due to a lack of solid contractual obligations on the parts of both Westlake and Goodrich, Goodrich considered it necessary **\*932** for Westlake to be a co-permittee on Goodrich's RCRA and HSWA Permits. However, since that time, the nature of the relationship and the transaction between Westlake and Goodrich has changed substantially. Goodrich's concerns are, and always have been, that the Company must have the ability to meet its obligations under the Permits. In sharp contrast to the affairs nearly a year ago, Goodrich and Westlake are in the process of negotiating a specific agreement whereby Westlake obligates itself contractually to assist Goodrich so that Goodrich will continue to be able to meet each

and every condition contained in the Permits.

Goodrich and Westlake represented to the regulators that this agreement made it unnecessary to add Westlake to the Permit.[FN6]

> FN6. Westlake officials made it clear during the course of negotiations with Goodrich that no deal could be reached if Westlake was made a permittee.

> In May of 2000, PolyOne officials met with Goodrich officials to discuss remediation and ongoing contamination issues at the Site. Greg Ruttman, PolyOne's general counsel, testified:

> At that meeting I specifically asked the question, was there any understanding or agreement as part of your '97 sale to westlake concerning the permit. Alex Schoch said there is no binding agreement. And I said, what does that mean. He said, well, there is somewhat of a gentleman's understanding that Goodrich remains neutral on the issue of having westlake on the permit. That was very interesting that he said a gentleman's agreement, and I specifically cross-examined him on was there any documents in writing. Answer no.

> Ruttman indicated that he was "just floored" when he saw the July 1997 letters between Bonner and Schoch. Ruttman testified that he first saw the letters on December 29, 2006.

> Christian Orsborn, involved in environmental activities at the Site since 1967 and employed by PolyOne at the Site from 2000 to the present, stated in his affidavit, "In numerous meetings between PolyOne and Goodrich held between 1997 and 2004, Goodrich repeatedly told PolyOne that it has a 'gentleman's agree-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

ment' to keep Westlake off the RCRA permit."

On July 29, 1997, the Cabinet determined that Westlake would not have to become a permittee as a result of the 1997 transactions. On August 15, 1997, Goodrich and Westlake entered into an Environmental Services Agreement ("1997 ESA"). The 1997 ESA, among other things, legally bound Westlake to assist Goodrich with many of its obligations under the Permit and to provide Goodrich access to Westlake property as required to comply with the Permit. Goodrich provided a copy of the finalized 1997 ESA to the Cabinet on September 24, 1997. The Cabinet indicated that the 1997 ESA "appears to address many of our concerns regarding the property transfer."

When Goodrich sold the CA & O Plant and the plant utilities to Westlake in 1997, Goodrich hired Westlake to provide the utilities, labor, and services needed to operate the C–Stripper. Goodrich agreed to reimburse Westlake "for Westlake's costs of providing Waste Water Stripper C Services on the same basis as [PolyOne] has previously reimbursed [Goodrich]."

From August 1997 through December 1999, PolyOne generally paid the C–Stripper invoices when Goodrich sent them. In December of 1999, PolyOne advised Goodrich that it was commencing short-payments of Goodrich's C–Stripper invoices beginning with a one percent reduction for the November 1999 invoice. PolyOne's refusal to pay was based on the premise that some portion of the contamination being removed by the C–Stripper was attributable to Westlake's operations. PolyOne advised that it would increase this set-off to ten percent the following month. PolyOne ultimately made up the difference for its underpayments and began to pay all of **\*933** the C–Stripper invoices again in 2000 and continued to do so until May of 2002.

On August 30, 2002, PolyOne notified Goodrich that it was suspending further payments for remediation activities at the Site, other than

such obligations that were incurred and actually paid by Goodrich prior to June 1, 2002. PolyOne's actions were based on the receipt of a summary report from Environmental Resources Management ("ERM") dated April 25, 2002, which stated that "as much as 85 percent of the EDC being recovered today is a result of EDC releases that have occurred after 1990 time frames." In May of 2002, PolyOne requested that Goodrich not pay any pending or future Westlake invoices until the issues had been resolved. PolyOne decided in 2006 that Westlake's share of C–Stripper costs was at least fifty percent, therefore, PolyOne resumed payment of fifty percent of Goodrich's C–Stripper costs. PolyOne did not pay any of the past-due invoices from May 2002 though December 2005.

When PolyOne provided Goodrich with a copy of the ERM summary report, Goodrich asked PolyOne to provide the full report and the data supporting ERM's assertion. The data was offered to Goodrich on the basis of cost sharing for the report, however Goodrich was not willing to pay the amount asked; therefore, PolyOne refused to provide the data.

In October of 2002, Westlake released over two million pounds of EDC at the Site. Following an investigation, Goodrich advised Westlake that Goodrich would pay Westlake only the percentage of C–Stripper costs that reflected Goodrich's share based upon the contamination attributable to Goodrich operations.

Westlake filed this action against Goodrich on October 16, 2003, seeking to recover the portion of C–Stripper costs Goodrich claimed were attributable to Westlake's releases. Goodrich notified PolyOne in writing of Westlake's claims on October 21, 2003. On October 30, 2003, Goodrich, by letter, tendered the defense of the suit to PolyOne. Goodrich also reminded PolyOne that it had the right to prosecute Goodrich's 1990 Agreement and 1997 PSA indemnity claims against Westlake at its own expense under the 1993 ALIA. On November 17, 2003, PolyOne declined Goodrich's tender of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

the defense for the action, stating:

> [N]one of the activities described in Westlake's complaint relate to PolyOne's obligation to assume and discharge those obligations that formed part of the Goodrich PVC Business as of the IPO date. PolyOne had and has no involvement in deciding whether to make such payments to Westlake, or in any of the decisions Goodrich made in determining to delegate performance of C–Stripper operations to Westlake.

Goodrich directed counsel to conduct its own defense against Westlake's claims, filed a counterclaim against Westlake for indemnity and allocation of responsibility for certain remediation costs under the 1990 Agreement and the 1997 PSA and filed a third party complaint against PolyOne.

On March 29, 2005, the Court granted Westlake's motion for summary judgment against Goodrich on Westlake's claim.

### STANDARD

[1] Summary judgment is available under Fed.R.Civ.P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all **\*934** reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[2][3][4][5][6] "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996). The plaintiff must present more than a mere scin-

tilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1177 (6th Cir.1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court in a diversity action applies the standards of Fed.R.Civ.P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476 (Ky.1991)." *Gafford v. Gen. Elec. Co.,* 997 F.2d 150, 165 (6th Cir.1993).

### DISCUSSION
### I. APPLICABLE LAW

[7] As this is a diversity action, the Court applies the substantive law of Kentucky, including its choice of law standards. *Andersons, Inc. v. Consol, Inc.,* 348 F.3d 496, 501 (6th Cir.2003). The 1993 ALIA provides that it is to be governed by Ohio law. The Sixth Circuit recognizes that Kentucky will enforce contractual choice of law provisions "unless 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.' " *Bank of N.Y. v. Janowick,* 470 F.3d 264, 271 n. 3 (6th Cir.2006) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWSS § 187(2)(a) (1999)). At the time of the divestiture, both Goodrich and Geon were headquartered in Ohio. Thus, the Court finds that the choice of Ohio law is reasonable and therefore will apply Ohio law to determine the obligations of the parties under the 1993 Agreements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

## II. BREACH OF CONTRACT

[8] To establish a breach of contract, Goodrich must show that a contract existed and its performance thereon, breach by Polyone, and damages. *Pavlovich v. Nat'l City Bank,* 435 F.3d 560, 565 (6th Cir.2006) (applying Ohio law). In *McClorey v. Hamilton County Board of Elections,* an Ohio appellate court summarized principles of contract interpretation that have been articulated by the Supreme Court of Ohio:

In the construction of a written contract, it will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. The language and terms of the contract are to be given their plain, common, and ordinary meanings. But if the language is ambiguous, then a court must construe the language against the party who prepared the contract. Language is ambiguous if it is reasonably susceptible of two or more constructions.

130 Ohio App.3d 621, 720 N.E.2d 954, 956–57 (1998) (quoted in **\*935***Mead Corp. v. ABB Power Generation, Inc.,* 319 F.3d 790, 797 (6th Cir.2003) ).

### A. Failure to Pay for Westlake's Invoices

[9] PolyOne argues that it is not required to pay remediation costs for contamination caused by Westlake. PolyOne argues that while the Permit may make Goodrich liable for all remediation, regardless of the source of the contamination, the Indemnity Agreement does not make Polyone liable for all remediation, regardless of its source. PolyOne cites to the following provision of the 1993 ALIA in support:

NOTWITHSTANDING ANY OTHER PROVISION OF THIS ASSUMPTION OF LIABILITIES AND INDEMNIFICATION AGREEMENT, this Assumption of Liabilities and Indemnification Agreement is not intended to expand the scope of any liabilities assumed hereunder or to create any liabilities for [PolyOne] that Goodrich did not previously have, and [PolyOne] does not

intend hereby to undertake any liability or obligations of any Person other than Goodrich.

PolyOne argues that this provision specifically limits PolyOne's contractual obligation to pay remediation costs to the period prior to 1990 when Goodrich owned the facility and PolyOne has no obligation to reimburse Goodrich for any remediation associated with Westlake's contamination. Goodrich argues that it is required under the Permit to undertake remediation activities at the Site, and, therefore, Polyone is required under the contract to reimburse it for those costs regardless of who caused the contamination of the property.

Under the 1993 ALIA, PolyOne assumed and agreed to pay each and every obligation of Goodrich under the Permit and PCAP subject to the provision cited above. Hence, this Court must determine whether the remediation of the Site, regardless of the contamination's source, was an obligation Goodrich had incurred at the time of the 1993 contract.

As the sole permittee for the Site, Goodrich is legally obligated to comply or ensure compliance with all conditions of the Permit. These legal obligations include operating and adequately funding the PCAP, specifically including the C–Stripper. This legal obligation applies regardless of the source or the timing of the contamination. Goodrich has been under this obligation since October 29, 1989, the Permit's effective date. Thus, at the time that the 1993 ALIA was entered into, Goodrich was under a legal obligation to remediate the Site pursuant to the Permit.

This Court finds that pursuant to the 1993 ALIA, PolyOne is obligated to pay for remediation costs associated with the Permit. This includes the obligation to pay the C–Stripper invoices submitted by Westlake. Although this remediation may represent in part contamination caused by Westlake, requiring PolyOne to pay such invoices does not create a liability for PolyOne that Goodrich did not have prior to the 1993 ALIA nor does it cause Poly-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

One to undertake any liability or obligation of a person other than Goodrich. [FN7] Goodrich is obligated under the Permit to remediate contamination regardless of source and has been so obligated since the Permit was issued in 1989.

> FN7. The Court notes that pursuant to the agreements between Goodrich and Westlake, Goodrich is entitled to indemnification from any remediation it undertakes pursuant to activities conducted by Westlake. The 1993 ALIA provides that PolyOne is entitled to the benefits of this indemnification agreement.

[10] Although Goodrich estimated remediation liability at the Site at $16,000,000, it also noted that there could be no assurance that significant costs and liabilities would not be incurred by the **\*936** Company in the future. Thus, PolyOne's risk was not capped at $16,000,000.

**B. Failure to Defend**

Goodrich argues that PolyOne breached the 1993 Agreements by failing to defend Goodrich in this action.

[11][12][13][14] A duty to defend is separate and distinct from the duty to indemnify. *Stychno v. Ohio Edison Co.,* 806 F.Supp. 663, 670 (N.D.Ohio 1992).* "An indemnitor's duty to defend under an indemnity contract is subject to the same standard as an insurer's duty to defend under an insurance contract. An insurer is required to defend where allegations in a complaint are *potentially* within policy coverage or where some doubt exists about coverage." *Huffy Corp. v. Aral Indus. Co.,* No. 98–3653, 1999 U.S.App. LEXIS 17963, at \*9 (6th Cir. July 26, 1999); *see also Stychno,* 806 F.Supp. at 671. Even "where the [indemnitor's] duty to defend is not apparent from the pleadings in the case against the [indemnitee], but the allegations do state a claim which is potentially or arguably within the [agreement], or there is some doubt as to whether a theory of recovery within the [agreement] has been pleaded, the [indemnitor] must accept the defense

of the claim." *Willoughby Hills v. Cincinnati Ins. Co.,* 9 Ohio St.3d 177, 459 N.E.2d 555, 558 (1984). The obligation to defend continues until the claim is confined to a recovery beyond the scope of the indemnification agreement. *Huffy,* 1999 U.S.App. LEXIS 17963, at \*9–10.

[15] In the 1993 ALIA, PolyOne agreed to "defend and indemnify Goodrich, from every claim, demand, obligation, liability, cost and expense ... relating to or arising out of the Goodrich PVC business ... and/or ... each and every obligation of Goodrich specifically described" in the 1993 ALIA. If an action is brought or a claim made against Goodrich, and Goodrich determines that indemnification may be sought from PolyOne for that claim or action, in whole or in part, Goodrich is to notify PolyOne of the claim or action in writing and PolyOne "shall assume the defense of such action or claim, including the employment of counsel," subject to certain exceptions. In the event that PolyOne refuses to do so, Goodrich "shall be entitled, upon notice to [PolyOne], to employ its own counsel and retain control of its own defense, but at the expense of [PolyOne]".

Following Westlake's filing of the instant action, Goodrich notified PolyOne of Westlake's complaint and tendered its defense to PolyOne. PolyOne refused this tender of defense.

Westlake sought in this action to recover for the cost of operating C–Stripper. As discussed above, PolyOne assumed Goodrich's remediation obligations under the Permit and PCAP, including the costs associated with operating C–Stripper. Thus, Westlake's complaint is within the scope of PolyOne's indemnification obligations. Pursuant to the 1993 ALIA, PolyOne was required to assume the defense of the claim upon Goodrich's notification and since it did not chose to do so is required to reimburse Goodrich for the costs Goodrich has incurred in defending the claim.

**C. PolyOne Asserts Breach of Contract**

PolyOne contends that Goodrich breached its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

duty as an indemnitee to PolyOne under the 1993 ALIA by entering into the side letter agreement with Westlake. PolyOne argues that by agreeing to keep Westlake off the Permit, Goodrich enabled Westlake to continue contaminating after 1997, thereby increasing PolyOne's remediation costs. PolyOne asserts that Goodrich's breach voids any duty of PolyOne to bear the cost of remediation or of Goodrich's defense.

**\*937** [16] "Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract." *Waste Mgmt., Inc. v. Danis Indus. Corp.,* 257 F.Supp.2d 1076, 1084 (S.D.Ohio 2003).

PolyOne cites to the case of *Dana Corp. v. Fireman's Fund Insurance Co.,* in support of its position. In *Dana Corp.,* a dispute arose regarding indemnification of payment for asbestos exposure claims under an indemnification agreement between the parties. 169 F.Supp.2d 732, 733–34 (N.D.Ohio 1999). Dana Corporation had sold its stock in a wholly owned subsidiary, Smith & Kanzler Company, to the Philip Carey Corporation. *Id.* Both Smith & Kanzler and Philip Carey manufactured asbestos products. *Id.* at 734. As part of the sale, Dana agreed to indemnify Philip Carey against all obligations and liabilities of Smith & Kanzler arising on or before the date of sale. *Id.*

After the sale, Philip Carey, an Ohio corporation, renamed Smith & Kanzler as Philip Carey of New Jersey. *Id.* Philip Carey of Ohio, while still owning all the stock of Philip Carey of New Jersey, merged into the Briggs Manufacturing Company. *Id.* Briggs Manufacturing, while still owning all stock of Philip Carey of New Jersey, changed its name to Panacon Corporation. *Id.* Panacon then merged Philip Carey of New Jersey into itself. *Id.* Celotex Corporation, also a manufacturer of asbestos containing products, then merged with Panacon. *Id.* Ten years later, Celotex was sued in asbestos injury cases. *Id.* Celotex claimed that Dana was ob-

ligated to indemnify Celotex for all losses arising out of Smith & Kanzler asbestos products. *Id.*

Dana filed a motion for summary judgment, contending that it should not be held liable for those claims because Philip Carey had expanded the scope of indemnification through its mergers. *Id.* at 742. Dana contended that, due to the subsequent merger of Philip Carey of New Jersey into Panacon, Dana lost its ability to utilize the shareholder immunity defense. *Id.* Dana argued that because it lost the advantage of this potential defense, it should be absolved of any indemnity obligations. *Id.* Finding that Dana's risk had been materially altered by the increase in Philip Carey's possible liability when Panacon voluntarily shredded the corporate veil between it and the successor to the original Smith & Kanzler company, the court held that Dana was relieved of its obligations to indemnify. *Id.* at 743.

[17] Ohio courts have similarly held that "a guarantor is discharged from liability whenever the terms of the contract or the nature of the obligation guaranteed is materially altered without the guarantor's consent." *Chase Bank of Ohio v. Brookstone Ohio P'ship,* 1990 WL 20104, \*1, 1990 Ohio App. LEXIS 764, at \*2 (Ohio Ct.App. Mar. 5, 1990), *quoted in Dana Corp.,* 169 F.Supp.2d at 743. This requirement of notice and consent is equally applicable in the context of indemnity agreements. *Dana Corp.,* 169 F.Supp.2d at 743.

[18] PolyOne contends that Goodrich materially altered PolyOne's risk by entering into the side letter agreement. PolyOne asserts that when it entered into the 1993 ALIA, Goodrich represented that remediation at Calvert City would cost $16,000,000. PolyOne states that they have spent more than $29,000,000 to date on remediation. PolyOne maintains that it is ultimately only liable for Goodrich's remediation costs and that Goodrich's lobbying to keep Westlake off the Permit created a situation in which it is difficult to distinguish between Goodrich's contamination and Westlake's contamination.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

However, as determined above, pursuant to the 1993 ALIA, PolyOne is required to **\*938** indemnify Goodrich for contamination at the Site regardless of source. PolyOne's remediation costs were not capped. Thus, any increased difficulty regarding the distinguishment of the source of contamination is of no consequence to PolyOne's indemnification obligations.[FN8]

> FN8. The Court notes that as the operator of the facility, Westlake is required to clean up all releases of contamination at the facility and to report all releases of a reportable quantity. *See* 42 U.S.C. § 9607(a); KRS 224.01–400; *United States v. Township of Brighton,* 153 F.3d 307, 312, 313–14 (6th Cir.1998).

Therefore, the Court finds that Goodrich did not materially alter PolyOne's risk by executing any side agreement with Westlake.

**D. Breach of Fiduciary Duty**

PolyOne argues that Goodrich breached its fiduciary duties to PolyOne by transferring Goodrich's environmental liabilities at the Site in 1993 to PolyOne without transferring any of the assets necessary to conduct remediation; entering into the side letter agreement in 1997 with Westlake; and by knowingly permitting Westlake to pollute the Site. PolyOne asserts that Goodrich's breach voids any duty of PolyOne to bear the cost of remediation or of Goodrich's defense. Goodrich argues that it never owed a fiduciary duty to PolyOne.

[19][20][21] A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately resulting therefrom. *Strock v. Pressnell,* 38 Ohio St.3d 207, 527 N.E.2d 1235, 1244 (1988).

A fiduciary relationship creates the highest order of duty imposed by law. If a fiduciary relationship exists, the fiduciary cannot profit from the relationship without the knowledge and permission of the principal ... In a fiduciary relationship, the fiduciary must make every effort to avoid having his own interests conflict with those of the principal ... When conflict is unavoidable the fiduciary must place the interests of the principal above his own.

*In re Sallee,* 286 F.3d 878, 891 (6th Cir.2002).

[22] "A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing." *Id.* This distinction was described by the Texas Supreme Court in *Crim Truck & Tractor Co. v. Navistar International Transportation Corp.*:

The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.

· · · · ·

The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract. Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship.

823 S.W.2d 591, 594–95 (Tex.1992), *quoted in In re Sallee,* 286 F.3d at 891.

**1. 1993 Divestiture**

PolyOne argues that Goodrich owed it as a fiduciary duty as Goodrich served as promoters for PolyOne by creating PolyOne. Goodrich asserts that no such duty is owed as no fiduciary duty attaches when a corporation forms a subsidiary for the purposes of divesting itself from assets and/or liabilities.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
(Cite as: 518 F.Supp.2d 918)

*939 Goodrich cites to *Aviall, Inc. v. Ryder System, Inc.*, in support of its contention that it owes no fiduciary duty to PolyOne on the basis of the 1993 divestiture. In *Aviall*, Ryder divested Aviall as part of corporate reorganization. 913 F.Supp. 826, 828 (S.D.N.Y.1996), aff'd, 110 F.3d 892 (2d Cir.1997). After the divestment, a dispute arose between Ryder and Aviall over a contractual allocation of pension plan liabilities. *Id.* at 829–30. Aviall filed suit against Ryder, contending that the division of liabilities was part of an unenforceable adhesion contract.[FN9] *Id.* at 831. The Court disagreed, noting:

> FN9. "Aviall argue[d] that Ryder dictated the terms of the agreement, and that there was no negotiation at all. Specifically, Aviall complain [ed] that Ryder did not provide it with independent counsel, that Ryder's counsel drafted the entire Agreement and that a Ryder officer signed the Agreement on Aviall's behalf." *Id.* at 832.

The spin-off procedure that Aviall describes as oppressive, however, is entirely consistent with traditional principles of corporate governance. When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders ... In other words, those who operate the parent company owe no fiduciary duties to the wholly owned subsidiary, and even when the parent company announces a proposed spin-off of the subsidiary, the directors of the parent and the directors of the subsidiary owe no fiduciary duties to the soon-to-be-independent subsidiary's prospective stockholders.

*Id.* at 832 (citing *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del.1988)) (internal citations omitted).

The weight of authority holds that a parent corporation owes no fiduciary duties to its wholly-owned subsidiary. *See Anadarko*, 545 A.2d at 1174; *Abex, Inc. v. Koll Real Estate Group, Inc.*, No.

13462, 1994 WL 728827, *16, 1994 Del. Ch. LEXIS 213, at *49 (Del. Ch. Dec. 22, 1994); *Richardson v. Reliance Nat'l Indem. Co.*, No. C 99–2952 CRB, 2000 WL 284211, *12, 2000 U.S. Dist. LEXIS 2838, at *33 (N.D.Cal. Mar.14, 2000) (under California law, directors of subsidiary corporation owe duty to parent corporation and its shareholders, not subsidiary); *Household Reinsurance Co., Ltd. v. Travelers Ins. Co.*, No. 91 C 1308, 1992 WL 22220, **3–4, 1992 U.S. Dist. LEXIS 1006, at *9 (N.D.Ill. Jan. 31, 1992) ("Under Minnesota law, a 100% shareholder does not owe a fiduciary duty to the wholly owned corporation"); *Resolution Trust Corp. v. Bonner*, No. H–92–430, 1993 WL 414679, **2–3, 1993 U.S. Dist. LEXIS 11107, at *6–7 (S.D. Tex. June 3, 1993).

[23] The Court finds that the 1993 divestiture did not create a fiduciary relationship between Goodrich and PolyOne.

## 2. De Facto Fiduciary Relationship

PolyOne also argues that the parties had a de facto fiduciary relationship based on the 1993 ALIA, Goodrich's control over PolyOne's remediation efforts, and Goodrich's position of superiority due to the Permit. PolyOne asserts that Goodrich owed duties to PolyOne to avoid increasing its indemnity obligations, to disclose information that would allow PolyOne to protect its assets, and to act reasonably to protect PolyOne from liability. Goodrich argues that PolyOne's failure to allege any mutual understanding between itself and Goodrich that it was reposing a special confidence in Goodrich defeats PolyOne's breach of fiduciary argument.[FN10]

> FN10. Portions of Goodrich's arguments are taken from Goodrich's Response to PolyOne's Motion for Summary Judgment (Docket # 504).

*940 [24][25] The Ohio Supreme court has recognized that a fiduciary relationship may be created out of an informal relationship, where both parties understand that a special trust or confidence

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

has been reposed. *Umbaugh Pole Bldg. Co. v. Scott,* 58 Ohio St.2d 282, 390 N.E.2d 320, 323 (1979), *cited in Ohio Bureau Workers' Comp. v. MDL Active Duration Fund, Ltd.,* 476 F.Supp.2d 809, 822 (S.D.Ohio 2007). "A de facto fiduciary relationship may arise from a confidential relationship, in which 'one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal.' " *Ohio Bureau Workers' Comp.,* 476 F.Supp.2d at 822 (quoting *Indermill v. United Sav.,* 5 Ohio App.3d 243, 451 N.E.2d 538, 541 (1982)). A de facto fiduciary relationship may originate from one party's superior conversance in the subject matter of the transaction. *Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763, 766 (S.D.Ohio 1984).

[26] However, a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust of confidence has been reposed. *Craggett v. Adell Ins. Agency,* 92 Ohio App.3d 443, 635 N.E.2d 1326, 1331–32 (1993). Such a confidential relationship cannot be unilateral, *id.;* the parties must agree that one is acting in the best interest of the other, *In re Sallee,* 286 F.3d at 893.

PolyOne argues that it "had no choice but to rely upon Goodrich in controlling Westlake's contamination and limiting PolyOne's liability to that which it assumed under its Agreement with Goodrich. And Goodrich knew from 1993 on that PolyOne had no alternative but to rely upon Goodrich." [FN11] PolyOne has established that there are factual disputes regarding its and Goodrich's understanding as to whether Goodrich was acting in PolyOne's best interests. Such a factual dispute precludes this Court from determining whether there was a de facto fiduciary relationship. *See Prudential,* 586 F.Supp. at 766 (stating that the existence of a de facto fiduciary relationship is a question of fact and depends on the circumstances of each case).

FN11. The quoted statement is from Poly-

One's reply brief in support of its Motion for Summary Judgment (Docket # 530).

### 3. Damages

[27] PolyOne asserts that it has suffered immeasurable harm from Goodrich's breach of fiduciary duty. PolyOne states that although Goodrich determined in 1993 that the cost of remediating the Site would be $16,000,000, to date PolyOne has paid over $29,000,000 in remediation costs; a substantial portion of which is attributable to Westlake contamination.

As stated previously, under the 1993 ALIA, PolyOne is obligated to pay remediation costs for contamination at the Site regardless of source. This obligation was not limited to a set dollar amount. However, PolyOne is entitled to the benefit of any assumption of liability or indemnification provision in any agreement Goodrich has with third parties with respect to liabilities assumed by PolyOne. Pursuant to the 1990 Agreement and the 1997 PSA, Westlake must indemnify Goodrich for any remediation of soil, surface water, or groundwater attributable to events occurring after the relevant closing dates and arising from Westlake's use or ownership of the VCM or CA & O Plants. Thus, PolyOne has the right to recover any funds it pays out for the remediation of Westlake's waste by way of these indemnification provisions. Therefore, any additional **\*941** contamination that Westlake caused or may cause at the Site by reason of the side agreement will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.

Therefore, PolyOne's claim of breach of fiduciary duty fails as a matter of law. [FN12]

FN12. Having found no damages, this Court finds it unnecessary to address the parties' arguments concerning breach of fiduciary duty.

### III. AFFIRMATIVE DEFENSES

[28] PolyOne asserts numerous affirmative de-

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

fenses to Goodrich's claims. PolyOne bears the burden of proving these affirmative defenses. *See Dixon v. United States,* 548 U.S. 1, 126 S.Ct. 2437, 2443, 165 L.Ed.2d 299 (2006).

### A. Public Policy

PolyOne asserts that Goodrich's side letter impeded PolyOne's efforts to remediate the Site and was contrary to public policy. PolyOne contends that if Westlake had been on the Permit, it would have been forced to halt its contamination, which is in the public's interest in environmental health and safety.

[29][30][31] In general, parties have complete freedom to enter into a contract; however, that freedom is limited by public policy reasons. *Brandon/Wiant Co. v. Teamor,* 125 Ohio App.3d 442, 708 N.E.2d 1024, 1028 (1998). "Public policy is a legal principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare." *Id.* The doctrine of public policy must be applied with caution so as to not infringe on the parties' rights to make contracts which are not clearly opposed to some principle or policy of law. *Id.*

[32] Certain kinds of indemnity agreements are forbidden under Ohio law. *See* ORC § 2305.31 (construction contracts); ORC § 4123.82 (workers' compensation benefits). However, in the absence of specific public policy exceptions, an agreement to indemnify another is generally enforceable. *Worth v. Aetna Cas. & Sur. Co.,* 32 Ohio St.3d 238, 513 N.E.2d 253, 257 (1987).

[33] As an operator of the facility, Westlake is required to clean up all releases of contamination at the facility and to report all releases of a reportable quantity. *See* 42 U.S.C. § 9607(A); KRS § 224.01–400; *United States v. Township of Brighton,* 153 F.3d 307, 312, 313–14 (6th Cir.1998). Westlake is required to undertake these obligations regardless of whether it is a permittee on the Permit. Additionally, Goodrich must operate and adequately fund the PCAP for the entire Site. Pursu-

ant to the agreements between Goodrich and Westlake, Goodrich is entitled to indemnification for any remediation it undertakes pursuant to activities conducted by Westlake.

The Court finds that the side letter was not contrary to public policy. There has been no showing that the side agreement affected environmental health or safety. Westlake remains obligated, pursuant to state and federal statutes, to clean up releases of contamination and Goodrich is responsible under the Permit for operating the PCAP for the entire Site. Therefore, this Court finds that PolyOne's public policy defense is not viable.

### B. Estoppel, Fraud, and Misrepresentation

PolyOne also asserts that it is entitled to equitable estoppel due to Goodrich's fraud and misrepresentations concerning Westlake's addition to the Permit and the attending side agreement.

**\*942** [34][35] Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment. *State ex rel. Chavis v. Sycamore City Sch. Dist. Bd. of Educ.,* 71 Ohio St.3d 26, 641 N.E.2d 188, 196 (1994). There are four elements to equitable estoppel under Ohio law: (1) factual misrepresentation; (2) that is misleading; (3) which induced actual reliance which is reasonable and in good faith; and (4) which caused detriment to the relying party. *Elliott v. Elliott,* 168 Ohio App.3d 218, 859 N.E.2d 575, 577 (2006). PolyOne argues that it relied on Goodrich's misrepresentations and believed that Goodrich would continue to advocate that Westlake be added to the Permit and as a result of the misrepresentations PolyOne was unwittingly saddled with the cost of remediating Westlake's contamination.

[36] As determined above, any additional contamination that Westlake caused or may cause at the Site by reason of the side agreement will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediat-

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

ing Westlake's contamination. Therefore, the Court finds that PolyOne has failed to establish a prima facie case of equitable estoppel.

### C. Unclean Hands

PolyOne asserts that Goodrich's claims are barred by unclean hands. Goodrich argues that the doctrine of clean hands is unavailable to PolyOne as Goodrich does not seek equitable relief in Counts I and II of the third party complaint and also because PolyOne has failed to show that Goodrich is guilty of the type of reprehensible conduct necessary for this defense.

[37][38] The clean hands doctrine provides that "a party cannot come to the court seeking equity where that party has engaged in reprehensible conduct with respect to the subject matter of the action." *O'Brien v. Ohio State Univ.,* 139 Ohio Misc.2d 36, 859 N.E.2d 607, 618 n. 3 (2006). This doctrine is equitable and thus is unavailable in actions at law for damages. *Id.*

In Count I, Goodrich seeks not only damages, but also declaratory relief under the Federal Declaratory Judgment Act. Goodrich seeks a declaratory judgment that PolyOne will assume and pay, perform, or discharge Goodrich's future groundwater remediation liabilities, obligations, and costs and the Permit and PCAP costs as they become due and payable.

[39] The Sixth Circuit has stated that the remedy afforded under the Federal Declaratory Judgment Act is equitable in form. *Am. Airlines, Inc. v. Louisville & Jefferson County Air. Bd.,* 269 F.2d 811, 824 (6th Cir.1959). Goodrich is seeking an equitable remedy and therefore the defense of unclean hands is applicable to the portion of Count I requesting a declaratory judgment.

This Court finds that any misrepresentations made by Goodrich did not arise to the level of reprehensibility, which is required to prevent a party from seeking equitable relief under the clean hands doctrine. As determined above, the side agreement

did not increase PolyOne's liability as PolyOne retains the contractual right to recover any funds it expends on remediating Westlake's contamination. Thus any concealment or misrepresentations concerning the side agreement did not damage PolyOne. Therefore, this Court finds that PolyOne's assertion of the clean hands doctrine is not a viable defense.

### *943 D. Waiver and Offset

PolyOne asserts defenses of waiver and offset. Goodrich argues that PolyOne cannot show a voluntary relinquishment of a known right to support a waiver defense. Goodrich also argues that there are no unrelated transactions between Goodrich and PolyOne under which Goodrich owes anything to PolyOne that might offset PolyOne's liability to Goodrich.

[40] "Waiver is the voluntary surrender or relinquishment of a known legal right or intentionally doing of an act inconsistent with claiming it." *Baughman v. State Farm Mut. Auto. Ins. Co.,* 160 Ohio App.3d 642, 828 N.E.2d 211, 214 (2005) (quoting *Marfield v. Cincinnati, D & T Traction Co.,* 111 Ohio St. 139, 144 N.E. 689, 691 (1924)). PolyOne argues that Goodrich waived its right to seek damages under the Indemnity Agreement because it entered into the side letter agreement and hid it from PolyOne and the Cabinet. PolyOne states that Goodrich's actions were inconsistent with its rights under the Indemnity Agreement because they increased PolyOne's liabilities.

The Court finds that PolyOne's claim of waiver is more appropriately styled as a claim of equitable estoppel, which the Court has previously addressed.

[41][42] The doctrine of offset is "a demand asserted to diminish or extinguish plaintiff's demand, which arises out of a transaction different from that sued on, and which must be liquidated and emerge from a contract or judgment." *Cont'l Acceptance Corp. v. Rivera,* 50 Ohio App.2d 338, 363 N.E.2d 772, 777 n. 18 (1976) (quoting *Bull v. United States,* 295 U.S. 247, 262, 55 S.Ct. 695, 79

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

L.Ed. 1421 (1935)). PolyOne asserts that Goodrich has received settlement funds from several of its insurers for the remediation costs at issue. PolyOne states that in some situations PolyOne paid the full amount of certain invoices although Goodrich received insurance proceeds for the same invoices. Goodrich has credited PolyOne for those insurance payments, but has never paid them to PolyOne. PolyOne asserts that it is entitled to offset any recovery by Goodrich in the amount of those insurance proceeds.

Under the 1993 ALIA, PolyOne assumed liability only "to the extent such obligations and liabilities are not covered under any insurance policy or policies insuring Goodrich." Thus the Court finds that any recovery by Goodrich from PolyOne for the unpaid C–Stripper invoices must be offset by the amount of insurance money it has received for those invoices.

**E. Failure to Mitigate**

[43] PolyOne asserts that Goodrich failed to mitigate its damages by entering into the side letter agreement that enabled Westlake to continue to contaminate the Site. PolyOne argues that if Goodrich had worked to get Westlake on the Permit or enforced its indemnification agreement with Westlake under their 1990 contract, Westlake's contamination would have either halted or, at the very least, been reduced. PolyOne states that this would have lowered the remediation costs that Goodrich is now demanding PolyOne pay.

As determined above, any additional contamination that Westlake caused or may cause at the Site by reason of the side agreement will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination.

Therefore, this Court finds that PolyOne's defense of failure to mitigate is not viable.

**F. Acts of Third Parties**

[44] PolyOne assets that it is not responsible for the contamination of third parties under the "NOTWITHSTANDING" **\*944** provision of the 1993 ALIA, and therefore is not responsible for Westlake's contamination.

As determined above, pursuant to the 1993 ALIA, PolyOne is required to indemnify Goodrich for contamination at the Site regardless of source. Therefore, this Court finds that PolyOne's third parties defense is not viable.

**G. Consideration**

PolyOne asserts that although it received assets and liabilities from Goodrich at other facilities pursuant to the 1993 Agreements, Goodrich failed to transfer any assets to PolyOne at the Calvert City Site, including those assets essential for PolyOne to conduct its remediation obligations.

[45][46][47] Lack of consideration to support a contract is sufficient to permit its cancellation. *Mooney v. Green,* 4 Ohio App.3d 175, 446 N.E.2d 1135, 1138 (1982). "Valuable consideration may be either a detriment to the promisee or a benefit to the promisor." *Id.* Courts will not inquire into the adequacy of the consideration, unless the absence of consideration was such as to constitute fraud or unfair treatment. *Id.*

[48] PolyOne admits that it received assets as part of the 1993 Agreement, although they were not located at the Calvert City Site. Hence there was consideration for the contract. Thus, PolyOne's defense of failure of consideration is not viable.

**H. Frustration of Purpose**

PolyOne asserts that, by way of the side letter agreement, Goodrich expanded the scope of PolyOne's liabilities and forced PolyOne to pay for Westlake's contamination in addition to paying for Goodrich's contamination. PolyOne argues that because the principal purpose of the 1993 ALIA was for PolyOne to indemnify Goodrich exclusively for Goodrich's contamination, Goodrich's actions frustrated the purpose of the 1993 ALIA.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

[49] The doctrine of frustration of purpose provides that:

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.

*Donald Harris Law Firm v. Dwight–Killian,* 166 Ohio App.3d 786, 853 N.E.2d 364, 367–68 (2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981)). The doctrine of frustration of purpose is not widely accepted in Ohio. *Id.* at 368.

[50] As determined above, pursuant to the 1993 ALIA, PolyOne is required to indemnify Goodrich for contamination at the Site regardless of source. Thus, the side agreement letter did not frustrate the purpose of the 1993 ALIA.

Therefore, this Court finds that PolyOne's defense of frustration of purpose is not viable.

**I. Prevention of Performance**

PolyOne argues that in 1997 Goodrich hindered PolyOne's remediation activities by placing limitations on Orsborn's movement about the Site, his ability to inspect facilities, and his correspondence with government agencies. PolyOne asserts that these limitations allowed Westlake to continue contaminating the Site, which increased PolyOne's remediation costs.

[51] Each party to a contract is under an implied obligation to cooperate in the performance of a contract and to restrain from doing any act that would delay or prevent performance of the contract. **\*945** *See Synergy Mech. Contrs. v. Kirk Williams Co.,* No. 98AP–431, 1998 WL 938592, \*5, 1998 Ohio App. LEXIS 6430, at \*12 (Ohio Ct.App. Dec. 22, 1998).

[52] As determined above, any additional contamination that Westlake caused or may cause at the Site will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination. Therefore, this Court finds that PolyOne's defense of prevention of performance is not viable.

**J. Breach of 1993 ALIA**

PolyOne asserts that Goodrich breached the 1993 ALIA by entering into the side letter agreement and increasing the scope of PolyOne's obligations under the contract. PolyOne also argues that Goodrich breached the 1993 ALIA when it failed to notify and consult with PolyOne when the Cabinet sought additional information from Goodrich following its meeting with the Cabinet in July of 1997.

[53] "Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract." *Waste Mgmt., Inc.,* 257 F.Supp.2d at 1084. To establish a breach of contract, PolyOne must show that a contract existed and its performance thereon, breach by Goodrich, and damages. *Pavlovich,* 435 F.3d at 565.

[54] As determined above, the scope of PolyOne's obligations under the 1993 ALIA were not increased by the side agreement as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination. As this side agreement did not increase PolyOne's obligations or costs, PolyOne has also failed to show damages from Goodrich's failure to notify and consult with PolyOne following the Cabinet's request for additional information. Therefore, PolyOne's assertion of Goodrich's breach of contract is not a viable defense.

**K. Unjust Enrichment**

PolyOne asserts that Goodrich has acted fraudulently and in bad faith by its breach of the 1993 ALIA, its breaches of fiduciary duties, and by willfully allowing Westlake to continue contaminating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

the Site. PolyOne claims that Goodrich has been unjustly enriched to the extent it has already received insurance proceeds for the remediation costs it is claiming as damages against PolyOne. Goodrich asserts that the theory of unjust enrichment does not apply as there existed an explicit contract between itself and PolyOne.

[55][56] Under Ohio law, a party must prove three elements to succeed in an action for unjust enrichment: (1) a benefit conferred by one party on the other; (2) the receiving party's knowledge of the benefit; and (3) the improper retention of the benefit without the receiving party's rendering of payment. *Metz v. Am. Elec. Power Co., Inc.,* Nos. 06AP–1161, 06AP–1166, 2007 WL 1991145, at *8 (July 10, 2007) (citing *Hummel v. Hummel,* 133 Ohio St. 520, 14 N.E.2d 923 (1938)). A party may maintain a claim for unjust enrichment where the matters in dispute are governed by the terms of an express contract only where there is evidence of fraud or bad faith. *Id.*

[57] This Court has already determined that PolyOne has failed to assert a breach of the 1993 ALIA or a breach of fiduciary duty. This Court has also previously determined that any additional contamination that Westlake caused or may cause at the Site will not damage PolyOne as PolyOne has the contractual right to recover any funds it expends on remediating Westlake's contamination. Therefore, this Court finds that PolyOne's assertion **\*946** of unjust enrichment is not a viable defense.

### L. Remaining Affirmative Defenses

PolyOne fails to argue its remaining affirmative defenses. PolyOne has failed to present any evidence on these defenses. Thus, this Court finds that the remaining affirmative defenses are not viable. *See Dixon,* 126 S.Ct. at 2443; *Hartsel,* 87 F.3d at 799.

### IV. POLYONE'S ABILITY TO CONTEST ALLOCATION

Goodrich argues that PolyOne should be barred from later contesting the final allocation between

Goodrich and Westlake of remediation costs. Goodrich asserts that PolyOne tendered the defense of the action to PolyOne and expressly made available to PolyOne the benefit of its right to indemnity from Westlake. Goodrich states that although PolyOne improperly rejected Goodrich's tender, PolyOne has actively participated in the action as a third-party defendant. PolyOne's participation includes its retention of two experts to testify on matters pertaining to contamination of the Site due to Westlake's operations and the allocation of remediation costs to Westlake. Goodrich states that Goodrich and PolyOne have actively cooperated in establishing Westlake's share of responsibility for remediation costs throughout the action. PolyOne's only response to this claim is that it is moot because PolyOne no longer has any indemnity obligations under the 1993 ALIA due to Goodrich's breaches of its fiduciary and indemnity duties.

[58][59] When an indemnitor receives notice of an indemnitee's claim and has the opportunity to defend the claim, the indemnitor is bound by the outcome of the litigation between the indemnitee and the party seeking relief from the indemnitee. *City of Columbus v. Alden E. Stilson & Assocs.,* 90 Ohio App.3d 608, 630 N.E.2d 59, 63 (1993). This Court has already determined that Goodrich did not breach any fiduciary or indemnity duties and that PolyOne was required to defend Goodrich in the present action.

Therefore, this Court finds that PolyOne is estopped from later contesting the final allocation between Goodrich and Westlake of remediation costs.

### V. DECLARATORY JUDGMENT

Goodrich asserts that it is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), holding PolyOne liable to pay all past due Permit and PCAP costs accruing from May 1, 2002 to the present, and requiring PolyOne to pay in full all such ongoing and future costs as they become due and payable, as PolyOne's failure to pay these past costs is a violation of the 1993 Agreements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

518 F.Supp.2d 918
**(Cite as: 518 F.Supp.2d 918)**

Having found that PolyOne is obligated under the 1993 Agreements to indemnify Goodrich for remediation costs at the Site, regardless of source, and having further found that Goodrich did not breach either the 1993 ALIA or a fiduciary duty owed to PolyOne, and having considered the affirmative defenses asserted by PolyOne, this Court finds that Goodrich is entitled to a declaratory judgment that PolyOne is liable to pay all past due Permit and PCAP costs accruing from May 1, 2002 to the present, and requiring PolyOne to pay in full all such ongoing and future costs as the become due and payable subject to the condition that any insurance proceeds received by Goodrich for costs associated with the C–Stripper shall be offset from this recovery.

**\*947 CONCLUSION**

For the foregoing reasons, Goodrich's Motion for Partial Summary Judgment on its Declaratory Claims is GRANTED.

An appropriate order shall issue.

W.D.Ky.,2007.
Westlake Vinyls, Inc. v. Goodrich Corp.
518 F.Supp.2d 918

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. Maryland,
Northern Division.
METROPCS WIRELESS, INC., Plaintiff,
v.
TELECOMMUNICATIONS SYSTEMS, INC., Defendant.

Civil No. WDQ-09-0601.
Oct. 20, 2009.

West KeySummary**Indemnity 208 ☞43**

208 Indemnity
  208II Contractual Indemnity
    208k43 k. Accrual of Duty to Defend. Most Cited Cases

A wireless company's duty to defend claim was not premature as the network services agreement with a technology supplier stated that the duty arose from any claim or allegation of patent infringement from the use of the supplier's products. Therefore, the duty to defend claim was not premature even though the infringement claim had not been resolved and the liability of the indemnitee had not yet been determined.

Matthew H. Kirtland, Fulbright and Jaworski LLP, Washington, DC, Brett Christopher Govett, Shea R. Haass, Fulbright and Jaworski LLP, Dallas, TX, for Plaintiff.

Hugh J. Marbury, Benjamin David Schuman, Emily Teresa Wright, DLA Piper LLP U.S., Baltimore, MD, for Defendant.

MEMORANDUM OPINION

WILLIAM D. QUARLES, JR., District Judge.

**\*1** MetroPCS Wireless, Inc. ("MetroPCS") sued TeleCommunications Systems, Inc. ("TCS") for a declaratory judgment that TCS has a duty to defend and indemnify MetroPCS in a suit pending in the Eastern District of Texas, and other relief. Pending is TCS's motion to dismiss, to compel arbitration, or to stay the case pending arbitration. Also pending is MetroPCS's motion to take judicial notice of TCS's "contradictory litigation and arbitration filings." For the following reasons, TCS's motion will be granted in part and denied in part. MetroPCS's motion will be denied.[FN1]

> FN1. MetroPCS also moved for leave to file a reply in support of its motion to take judicial notice. Under Local Rule 105, no leave is required. *See* D. Md. R. 105. The motion will be granted.

I. Background

MetroPCS is a wireless telecommunications provider based in Richardson, Texas. Compl. ¶¶ 1, 5. Under a November 12, 2007 Network Services Agreement ("the NS Agreement"), TCS agreed to provide technology and equipment to enable MetroPCS to offer "location based services" ("LBS") to its wireless customers.[FN2] *Id.* ¶ 10; Ex. 1, § 1.1 [hereinafter "NS Agreement"]. Under § 7.4 of the NS Agreement:

> FN2. Under § 1.1 of the NS Agreement: "[MetroPCS] will make use of and deploy TCS technical solutions and services ("the TCS Hosted Xypoint® Location Based Service" or "Hosted XLS Service") throughout its markets." Compl. ¶ 10; Ex. 1, § 1.1.
>
> "Commercial" LBS technology is provided under the NS Agreement. It uses the location of a mobile device ( *e.g.,* a cellular telephone) to provide information about persons and objects in the area. For example, LBS enables wireless customers to locate nearby restaurants, lodging and entertainment. *See* Compl. ¶ 7, 8, 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

TCS shall defend, indemnify and hold harmless [MetroPCS] and its officers and directors ... from and against any loss, damage, or liability, including reasonable costs and attorney's fees, to the extent that such loss, damage or liability arises out of any third-party claim, suit, or allegation that [MetroPCS's] use of any product or service provided by TCS under this Agreement ... infringes the patent, trademark, copyright rights, trade secret rights o[r] other proprietary rights of such third party (collectively, the "IP Claim"). TCS shall be entitled to solely control the defense of any such IP Claim with attorneys of its choice, and shall solely control the disposition of any such IP Claim provided such disposition admits no wrong-doing on the part of [MetroPCS].
*Id.* ¶ 10; NS Agreement § 7.4.

On October 7, 2008, Emsat Advanced Geo-Location Technology, LLC and Location Based Services, LLC ("the Texas plaintiffs") sued MetroPCS in the United States District Court for the Eastern District of Texas ("the Texas suit"), alleging that MetroPCS's sale and use of LBS infringe their patent rights. *Id.* ¶¶ 11, 12; Ex. B. On October 21, 2008, MetroPCS notified TCS of the Texas suit and demanded that TCS defend, indemnify and hold it harmless in accordance with § 7.4 of the NS Agreement. *Id.* ¶ 15; Ex. C. On November 5, 2008, TCS disclaimed any obligation arising from the Texas suit. *Id.* ¶ 16; Ex. D.

On March 10, 2009, MetroPCS filed this suit seeking a declaratory judgment that TCS is obligated to defend and indemnify it in the Texas suit; specific performance of that obligation; compensation for TCS's alleged breach of contract; and payment of royalties or damages from the Texas suit. Paper No. 1. On May 26, 2009, TCS moved to dismiss, compel arbitration, or stay the case pending the outcome of a related arbitration involving the parties. Paper No. 16. On September 1, 2009, MetroPCS filed a motion asking the Court to take judicial notice of "TCS's Contradictory Litigation and Arbitration Filings." Paper No. 19.

**II. Analysis**

**A. TCS's Motion to Dismiss under Rule 12(b)(6)**

**1. Standard of Review**

**\*2** Under Fed.R.Civ.P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir.2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325-26 (4th Cir.2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.,* 324 F.3d 761, 764-65 (4th Cir.2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

To present a facially plausible complaint, a plaintiff must do more than "plead[ ] facts that are 'merely consistent with a defendant's liability' "; the facts as pleaded must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (*quoting Twombly,* 550 U.S. at 557). The complaint must not only allege but also "show" the plaintiff is entitled to relief. *Id.* at 1950. When the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief. *Id.*

The Court "should view the complaint in a light most favorable to the plaintiff," and "accept as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

true all well-pleaded allegations," *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or "allegations that are mere[ ] conclus[ions], unwarranted deductions of fact, or unreasonable inferences," *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir.2002).

2. § 7.4 of the NS Agreement and the Texas Suit

TCS contends that the complaint should be dismissed because the claims in the Texas suit are not covered by the NS Agreement; thus, TCS has no duty to defend or indemnify MetroPCS.

The Texas plaintiffs allege that MetroPCS and others "make, have made, use, sell, and/or offer for sale ... location-based services and systems for cellular telephones" that infringe their patents. Compl. ¶ 12; Ex. B, ¶ 16. MetroPCS alleges that this claim implicates the LBS technology and equipment that TCS provides under the NS Agreement. Compl. ¶¶ 6,12. Because § 7.4 of the NS Agreement requires TCS to "defend, indemnify, and hold harmless" MetroPCS from "any third-party claim, suit or allegation" that MetroPCS's "use of any product or service provided by TCS under [the NS Agreement]" infringes the patent of a third party, MetroPCS contends that TCS must defend and indemnify it in the Texas suit. NS Agreement § 7.4.

**\*3** TCS responds that although the NS Agreement and the Texas suit concern LBS, the complaint should be dismissed because the Texas suit (1) does not mention TCS by name or otherwise attempt to link the allegedly infringing technology to TCS and (2) does not involve the particular LBS technology and equipment that TCS provides under the NS Agreement.

That TCS is not named in the Texas suit does not mean the suit is outside § 7.4 of the NS Agreement. The Texas plaintiffs allege infringement based on MetroPCS's *"use ... [of] location based services and systems* for cellular telephones." Com-

pl. ¶ 12, Ex. B., ¶ 16. (emphasis added). MetroPCS alleges that its "LBS service and technology" are provided by TCS, Compl. ¶ 9, 13, and that its use of TCS products is the basis of the Texas suit, *id.* ¶ 6, 12. The NS Agreement requires TCS to defend and indemnify MetroPCS against any claim involving MetroPCS's *"use* of any product or service provided by TCS under [the NS Agreement]." NS Agreement § 7.4. (emphasis added). The NS Agreement does not condition TCS's duty to defend and indemnify on TCS being named in a suit. Thus, MetroPCS has made a plausible showing that the Texas suit is within § 7.4. Accordingly, TCS's motion to dismiss on this basis fails.

TCS also contends that § 7.4 does not apply because the Texas suit does not involve products provided under the NS Agreement. MetroPCS counters that its complaint alleged those products. Pl.'s Opp. 7-8; Compl. ¶¶ 6, 12. It also argues that the Court's contrary determination of this issue would be an inappropriate fact finding in this 12(b)(6) motion.

Neither party has specified the products provided under the NS Agreement or at issue in the Texas suit. MetroPCS states simply that TCS "provide[s] the necessary technology and ... equipment to allow MetroPCS to provide LBS to its customers," Compl. ¶¶ 9, 10, and that the Texas plaintiffs allege that "Metro PCS's use of the LBS technology and services provided to MetroPCS by TCS under the Agreement infringes [the plaintiffs' patents]," *id.* ¶¶ 6, 12.

TCS does not dispute that it provides LBS products to MetroPCS, but it argues that its products are not the subject of the Texas suit. TCS has not attempted to distinguish its products from those involved in the Texas suit; it merely states "the products and services TCS provides under the NS Agreement simply are not the products and services ... that the Texas Plaintiffs allege infringe their patents." Def.'s Reply 3-4.

Resolving this dispute would require a factual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

determination of what products TCS provides under the NS Agreement and what products are at issue in the Texas suit. Such a determination is neither possible on this record nor appropriate at this stage of the case. *See Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir.2006). Because the Court must accept MetroPCS's well-pled factual allegations as true, and because MetroPCS alleges that TCS products provided under the NS Agreement are involved in the Texas suit, dismissal on this basis would be inappropriate.

3. The Timing of MetroPCS's Claims

**\*4** TCS argues that MetroPCS's complaint is premature, *i.e.,* MetroPCS's claim for indemnification would accrue only after MetroPCS has paid the Texas plaintiffs.[FN3] TCS further argues that its duty to defend does not arise until its duty to indemnify has been established; thus, the duty-to-defend claim is also premature.

> FN3. The parties agree that New York law applies to MetroPCS's duty to defend and indemnification claims. *See* NS Agreement § 9.10 ("This Agreement shall be construed and enforced in accordance with the Laws of the State of New York without regard to its conflicts of laws provisions.")

MetroPCS counters that New York law does not prohibit a declaratory judgment that a party has a duty to indemnify or defend before the liability of the indemnitee has been determined. MetroPCS contends that a conditional judgment of indemnification may be entered before the Texas suit ends. MetroPCS also argues that if its claim for indemnification is premature, the Court may enforce TCS's duty to defend because under the NS Agreement, that duty is not contingent upon the duty to indemnify.

It is a "general rule" under New York law that "a claim for indemnification does not accrue until payment has been made by the party seeking indemnification." *State v. Syracuse Rigging Co.,* 249 A.D.2d 758, 671 N.Y.S.2d 801, 802

(N.Y.App.Div.1998) (*citing McDermott v. City of New York,* 50 N.Y.2d 211, 428 N.Y.S.2d 643, 406 N.E.2d 460, 461 (N.Y.1980)). However, "[d]eparture from this rule may be warranted whe[n] the interests of justice and judicial economy so dictate." *Syracuse Rigging,* 671 N.Y.S.2d at 802. "In such an instance, the issuance of a conditional judgment of indemnification, pending the outcome of the main action is appropriate in order that the indemnitee obtain the earliest possible determination as to the extent to which he or she may expect to be reimbursed." *Id.* at 803. (internal citations omitted).

Here, it is undisputed that MetroPCS has not paid the Texas plaintiffs; thus, the question is whether MetroPCS's indemnification claim may proceed as a request for a conditional judgment?

As the parties acknowledge, conditional judgments of indemnification have generally been entered only in "third-party actions," *i.e.,* cases where the indemnitee brings its claim against the indemnitor as part of the underlying action. Courts allow conditional judgments in these circumstances so that "all parties may establish their rights and liabilities in one action." *Mars Assoc., Inc. v. New York City Educ. Constr. Fund,* 126 A.D.2d 178, 513 N.Y.S.2d 125, 133 (N.Y.App.Div.1987).[FN4] MetroPCS contends that conditional judgments may be entered in other than third-party actions, but proffers no case where this has been done and no reason why the Court should depart from the general rule. MetroPCS's claims for (1) a declaratory judgment of TCS's duty to indemnify under the NS Agreement, (2) specific performance of that duty to indemnify, and (3) common-law indemnification are premature and will be dismissed.

> FN4. *See also* 82 N.Y. Jur.2d, Third-Party Practice, § 160 ("Although a claim for indemnification or contribution technically does not arise until the prime obligation to pay has been established ... third-party actions [may] be commenced before they are technically ripe, so that all parties may es-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

tablish their rights and liabilities in one action.")

Similarly, MetroPCS's contribution claim is also premature and must be dismissed. *See Bay Ridge Air Rights, Inc. v. State of New York,* 44 N.Y.2d 49, 404 N.Y.S.2d 73, 375 N.E.2d 29, 32 (N.Y.1978).

TCS argues that MetroPCS's duty-to-defend claim is also premature. TCS cites authority that before a duty to indemnify has been established, the declaration of a duty to defend is "inappropriate." *See, e.g., Cannavale v. County of Westchester,* 158 A.D.2d 645, 551 N.Y.S.2d 948, 949 (N.Y.App.Div.1990). These cases rely on the principle that the "duty to defend is no broader than [the] duty to indemnify." *Id.*[FN5]

> FN5. *See also Bryde v. CVS Pharm.,* 61 A.D.3d 907, 878 N.Y.S.2d 152, 154 (N.Y.App.Div.2009); *Brasch v. Yonkers Constr. Co.,* 306 A.D.2d 508, 762 N.Y.S.2d 626, 629 (N.Y.App.Div.2003).

**\*5** MetroPCS counters that a duty-to-defend provision may be enforced independently of the duty to indemnify when the contract makes clear that a separate right to enforcement was intended.

The principle that the duty to defend is no broader than the duty to indemnify "has no significance" when the "clear and unambiguous terms" of the relevant contract establish that the duty to defend is not contingent upon determination of the duty to indemnify. *See McCleary v. City of Glen Falls,* 919 N.Y.S.2d 607, 609 (N.Y.App.Div.2006).

Under § 7.4 of the NS Agreement, TCS must defend MetroPCS from any liability, including reasonable costs and attorney fees, and is entitled to control the defense and disposition of any IP claim with attorneys of its choice. NS Agreement § 7.4. TCS's construction of § 7.4 would limit its duty to defend to paying "reasonable costs and attorney fees" after the Texas suit is resolved.

This interpretation is inconsistent with § 7.4's contemplation of a role for TCS during litigation. TCS's right to solely control the defense or disposition of any IP claim shows that the duty to defend arises before resolution of a suit implicating TCS's products. TCS's narrow interpretation of the duty to defend would render that right meaningless. "[A] court should not adopt an interpretation which will ... leave a provision of a contract without force and effect." *Ruttenberg v. Davidge Data Sys. Corp.,* 215 A.D.2d 191, 626 N.Y.S.2d 174, 177 (N.Y.App.Div.1995).

Further, under § 7.4, the duty to defend arises from "any ... *claim* ... or *allegation*" that MetroPCS's use of TCS products infringes another's patent rights. NS Agreement § 7.4. (emphasis added). Accordingly, TCS's motion to dismiss the duty to defend claim as premature must be denied.

**B. TCS's Motion to Compel Arbitration**

TCS argues that even if MetroPCS's claims survive a 12(b)(6) motion, MetroPCS should be compelled to arbitrate those claims.[FN6]

> FN6. Under § 3 of the Federal Arbitration Act, "[i]f any suit or proceeding be brought ... upon any issue referable to arbitration under an agreement in writing for such arbitration, the court ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement [.]" 9 U.S.C. § 3 (2006).

"In the Fourth Circuit, a litigant can compel arbitration ... if he can demonstrate (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction ... to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 500-01 (4th Cir.2002).

Under §§ 9.2 and 9.3 of the NS Agreement, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

parties agreed to a two-step procedure for settling disputes. First:

> [a] senior executive of either party may, upon notice to the other party of a dispute arising out of or related to this Agreement ... elect to utilize a non-binding resolution procedure whereby each party presents its position at a hearing before a panel consisting of one senior executive of each of the parties and, if such senior executives can agree upon such an individual, a mutually acceptable neutral advisor. If a party elects to use th[is] procedure ..., the other party shall participate in good faith.

**\*6** NS Agreement § 9.2. If the parties are not successful in resolving the dispute through this procedure, "the Dispute may be submitted to any federal or state court of competent jurisdiction sitting in and for the state of Maryland." *Id.* § 9.3.

The NS Agreement lacks a written agreement to arbitrate. TCS attempts to avoid this problem by arguing that MetroPCS's claims under the NS Agreement may be arbitrated pursuant to an arbitration provision in a 2003 contract between the parties (the "E9-1-1 Agreement"), which also involves LBS technology that may be the subject of the Texas suit.

Under the E9-1-1 Agreement, TCS provides MetroPCS with location-based services to support 9-1-1 emergency services on its wireless network. Def.'s Mot. to Dismiss 2; Ex. A. [hereinafter "E9-1-1 Agreement"]. The E9-1-1 Agreement contains a provision similar to § 7.4 of the NS Agreement and requires TCS to defend and indemnify MetroPCS in patent infringement actions involving TCS products. Like the NS Agreement, the E9-1-1 agreement contemplates a two-step procedure for resolving disputes; the first step is a hearing before senior executives of both companies. E9-1-1 Agreement § 9.2. However, unlike the NS Agreement, the E9-1-1 agreement requires arbitration.[FN7] *Id.* § 9.3.

> **FN7.** Under § 9.3 of the E9-1-1 Agreement, if "a claim, dispute or controversy (a "Dispute') arises out of or relates to this Agreement, or its breach, and parties have not been successful in resolving such Dispute through negotiation [through the non-binding mediation] described in Section 9.2, the Dispute will be decided by arbitration administered by the American Arbitration Association [.]" E9-1-1 Agreement § 9.3.

MetroPCS contends that services provided under the E9-1-1 Agreement are involved in the Texas suit and has filed a demand for arbitration in which it seeks defense and indemnification from TCS. Def.'s Mot. to Dismiss, Ex. B.

TCS argues that this case should be consolidated with the pending E9-1-1 arbitration because the NS Agreement dispute "significantly relates to" the E9-1-1 dispute.

The Fourth Circuit has found arbitration clauses like the E9-1-1 agreement may encompass "significantly related" disputes that do not "arise under" the arbitration contract. *See American Recovery Corp. v. Computerized Thermal Imaging,* 96 F.3d 88, 93 (4th Cir.1996).[FN8] However, such disputes are arbitrable only when they "derive from" the contract with the arbitration clause or when "proof of the [disputed] claim depends on the terms and existence of" that contract. *See Long v. Silver,* 248 F.3d 309, 317-19 (4th Cir.2001).

> **FN8.** *See also Long v. Silver,* 248 F.3d 309, 316 (4th Cir.2001) ( "In American Recovery, we held that a broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained.").

Any TCS duty to defend and indemnify Met-

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

roPCS for products supplied under the NS Agreement would not derive from or depend on the E9-1-1 Agreement. Section 7.4 of the NS Agreement creates the duties at issue in this case. Although the E9-1-1 arbitration may involve related issues, MetroPCS's claims here are not dependent upon or derived from the E9-1-1 Agreement. TCS's obligations under the NS Agreement appear to be fully determinable without reference to the E9-1-1 Agreement.

Accordingly, because the NS Agreement does not contain an arbitration clause and the dispute in this case does not clearly, "significantly relate" to the E9-1-1 Agreement, TCS's motion to compel arbitration must be denied.

**C. TCS's Motion to Stay Pending the Outcome of the E9-1-1 Arbitration**

**\*7** Alternatively, TCS asserts that this case should be stayed pending the outcome of the E9-1-1 arbitration because permitting both proceedings to move forward would (1) be inefficient and (2) risk inconsistent or anomalous results.

"[W]hen the issues before a district court are not 'issue[s] referable to arbitration' [under the Federal Arbitration Act], the court, while not required to stay the litigation, has the discretionary power to do so." FN9 The decision whether to stay non-arbitrable claims pending a related arbitration is guided by the desire to avoid confusion and inconsistent results and considerations of judicial economy. *See American Home Assurance Co. v. Vecco Concrete Constr. Co., Inc.,* 629 F.2d 961, 964 (4th Cir.1980).

> FN9. *United States ex rel. MPA Construction v. XL Specialty Ins. Co.,* 349 F.Supp.2d 934, 940 (D.Md.2004) (*citing American Recovery Corp. v. Computerized Thermal Imaging,* 96 F.3d 88, 97 (4th Cir.1996)).

These factors weigh against a stay. Contrary to TCS's contention that the "central question to be answered [in this case and in the E9-1-1 arbitration] is the same," the two proceedings involve distinct questions. The central question here is whether the Texas suit triggered TCS's duty to defend MetroPCS under § 7.4 of the NS Agreement. As explained above, answering this question will require a determination of the products TCS provides under the NS Agreement and whether those products are alleged to infringe the Texas plaintiffs' patents.

The conclusions reached in this suit will have little bearing on the arbitration, which will presumably concern the construction of the E9-1-1 Agreement. The risk of inconsistent or anomalous results is low.

Separate proceedings are required because separate questions are presented before this Court and the arbitrator. Staying this case will merely postpone the determination of issues that must be determined by this Court. A postponement will not conserve the resources of the Court, the parties or the arbitrator. Judicial economy does not support a stay. Accordingly, TCS's motion to stay will be denied.

**D. MetroPCS's Motion to Take Judicial Notice**

Finally, MetroPCS asks the Court to take judicial notice of "TCS' Contradictory Litigation and Arbitration Filings." Specifically, MetroPCS would like the Court to notice that while TCS has sought to dismiss or stay this case in favor of arbitration, it has sought to have the E9-1-1 arbitration dismissed or stayed in favor of this case. MetroPCS's concern is that TCS's "contradictory" filings may result in "simultaneous stays." Because TCS's motion to stay this case will be denied, MetroPCS's concerns are groundless. Accordingly, the motion to take judicial notice will be denied.

**III. Conclusion**

For the reasons stated above, TCS's motion to dismiss for failure to state a claim upon which relief can be granted will be granted in part and denied in part; its motion to compel arbitration will be denied; and its motion to stay will be denied.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3418581 (D.Md.)
**(Cite as: 2009 WL 3418581 (D.Md.))**

MetroPCS's motion to take judicial notice will be denied.

D.Md.,2009.
MetroPCS Wireless, Inc. v. Telecommunications Systems, Inc.
Slip Copy, 2009 WL 3418581 (D.Md.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

640 F.Supp.2d 1122
**(Cite as: 640 F.Supp.2d 1122)**

H

United States District Court,
D. Arizona.
SPRINT COMMUNICATIONS CO., L.P.,
Plaintiff,
v.
WESTERN INNOVATIONS, INC.; Haydon Build-
ing Corp., Defendants.

No. 06–cv–02064–PHX–ROS.
Aug. 4, 2009.

**Background:** Town's contractor cross-moved
against subcontractor, alleging breach of subcon-
tractor's contractual duty to defend contractor in
telecommunications company's underlying trespass
and negligence action. The District Court, Roslyn
O. Silver, J., granted motion. The contractor moved
for attorneys' fees, expert fees, and costs.

**Holding:** The District Court, Roslyn O. Silver, J.,
held that local procedural rule imposing require-
ments on motions for fees and costs was not applic-
able.

Motion granted.

West Headnotes

**[1] Damages 115 ⟨⟩73**

115 Damages
    115III Grounds and Subjects of Compensatory
Damages
        115III(D) Expenses of Litigation
            115k70 Attorney Fees, Costs, and Ex-
penses of Litigation
                115k73 k. Litigation with Third Per-
sons. Most Cited Cases

**Federal Civil Procedure 170A ⟨⟩2742.1**

170A Federal Civil Procedure
    170AXIX Fees and Costs

170Ak2742 Taxation
            170Ak2742.1 k. In General. Most Cited
Cases

**Federal Civil Procedure 170A ⟨⟩2742.5**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2742 Taxation
            170Ak2742.5 k. Attorney Fees. Most
Cited Cases

Local procedural rule imposing requirements
on motions for attorney fees and other reasonable
expenses was not applicable to contractor's motion
against subcontractor, and thus contractor's failure
to comply with rule did not preclude its entitlement
to recover requested fees and costs; the fees and
costs were damages arising from subcontractor's
breach of contractual duty to defend contractor in
underlying action, which exposed contractor to po-
tential damages from adverse judgment, and were
not based on any state statute or based on any cur-
rent contractual obligation to defend.
U.S.Dist.Ct.Rules D.Ariz., Civil Rule 54.2.

**[2] Indemnity 208 ⟨⟩42**

208 Indemnity
    208II Contractual Indemnity
        208k42 k. Accrual of Liability. Most Cited
Cases

**Indemnity 208 ⟨⟩43**

208 Indemnity
    208II Contractual Indemnity
        208k43 k. Accrual of Duty to Defend. Most
Cited Cases

The duty to defend differs from indemnifica-
tion, in that the duty to defend arises at the earliest
stages of litigation and generally exists regardless
of whether the party to whom the duty is owed is
ultimately found liable, but indemnification only
requires the indemnitor reimburse the indemnitee
after the latter's legal obligation is established.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

640 F.Supp.2d 1122
**(Cite as: 640 F.Supp.2d 1122)**

**\*1122** Anthony J. Jorgenson, James J. Proszek, Hall Estill Hardwick Gable Golden & Nelson PC, Tulsa, OK, David Vincent Seyer, Law Offices of David V. Seyer, Tempe, AZ, for Plaintiff.

Stephen D. Hoffman, Denise Michelle Orourke, Lewis Brisbois Bisgaard & Smith LLP, Teresa Hayashi Wales, William H. Doyle, Doyle Berman Murdy PC, Phoenix, AZ, for Defendants.

### ORDER GRANTING ATTORNEYS FEES

ROSLYN O. SILVER, District Judge.

Before the Court is Cross–Claimant Haydon Building Corp.'s Motion for Award of Attorneys' Fees, Expert Fees and Costs, (Doc. 216) and Haydon's Supplemental Motion for the same (Doc. 300). For the reasons stated, Haydon's motions will be granted.

Haydon cross-claimed against co-defendant Western Innovations, Inc. for breach of Western's contractual duty to defend **\*1123** Haydon in this action. (Doc. 80 at 11–12, 15.) This Court held that Western had a continuing duty to defend Haydon, and must indemnify Haydon for "the money it has already spent defending against this suit." (Doc. 211 at 17.) Subsequently, Haydon again tendered the defense to Western, but Western declined to take it up, and as a result Haydon continued to incur expenses in this suit. (Doc. 305 at 3.) Neither has Western yet paid for Haydon's earlier expenses. (Doc. 300.)

[1] Accordingly, Haydon now seeks to recover all the expenses it has incurred in this suit. Western, however, argues that Haydon's request should be denied because it does not comply with this District's Local Rule of Civil Procedure 54.2. That rule imposes procedural requirements on requests for attorneys' fees. While there is neither commentary nor legislative history for this District's Local Rules of Civil Procedure, by its plain text L.R. Civ. 54.2 applies to "attorney's fees authorized by statute or by contract," and "does not apply to claims for attorneys' fees ... which may be recoverable as dam-

ages." L.R. Civ. 54.2. Haydon maintains the fees it seeks are damages arising from Western's breach of the contractual duty to defend, and that therefore L.R. Civ. 54.2 does not apply. (Doc. 306.) The threshold issue is whether Haydon is correct.

As an initial matter, while an Arizona statute does provide a basis for awarding attorneys' fees in some contract disputes, A.R.S. § 12–341.01, that statute is not the basis of the award here. A.R.S. § 12–341.01(A) gives courts discretion to award attorneys' fees even in the absence of contractual or statutory provisions authorizing such an award, but here the attorneys' fees were owed as a matter of right, not discretion. A.R.S. § 12–341.01(C) mandates an award of attorneys' fees when claims or defenses are groundless and brought in bad faith, but here there was no bad faith. Therefore, Arizona's statutes do not authorize the award of the requested fees.

[2] Additionally, Haydon's claims were not for fees Western was obliged to pay under the duty to defend found in the contract, because such a duty "is of necessity a current obligation ... to mount [a defense], render it, and fund it *now*." *MT Builders, L.L.C. v. Fisher Roofing, Inc.,* 219 Ariz. 297, 197 P.3d 758, 764 (Ariz.Ct.App.2008) (emphasis in original). In this respect the duty to defend differs from indemnification, because the duty to defend "arises at the earliest stages of litigation and generally exists regardless of whether the [party to whom the duty is owed] is ultimately found liable." *Id.* 767. In contrast, indemnification only requires the indemnitor reimburse the indemnitee after the latter's legal obligation is established. *Id.*

As a result of Western's breach of its duty to defend Haydon, Haydon faced potential damages from an adverse judgment. Haydon was obliged to take reasonable steps to mitigate those damages. See *West Pinal Family Health Ctr. v. McBryde,* 162 Ariz. 546, 785 P.2d 66, 68 (Ariz.Ct.App.1989). Haydon could have chosen to settle, and Western could not have objected to the settlement even though Western would have had to ultimately pay

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

640 F.Supp.2d 1122
**(Cite as: 640 F.Supp.2d 1122)**

it. *See Northern Ins. Co. of New York v. Morgan,* 186 Ariz. 33, 918 P.2d 1051, 1053 (Ariz.Ct.App.1995). Instead, Haydon mounted a defense, and since this was a reasonable and foreseeable method of mitigating Western's breach, Haydon is entitled to recover the actual cost of this reasonable mitigation as *damages,* not reimbursement. *See AROK Const. Co. v. Indian Const. Services,* 174 Ariz. 291, 848 P.2d 870, 877 (Ariz.Ct.App.1993) (*citing* Restatement (Second) of Contracts § 347 (1981)). Because Haydon is **\*1124** recovering these fees solely as damages, L.R. Civ. 54.2 does not apply.

Since L.R. Civ. 54.2 does not apply, Western's contentions that Haydon has not complied with the rule are moot. Additionally, Western may not now second-guess how Haydon conducted that defense or challenge the reasonableness of the resulting expenses: Western's right to control the conduct and cost of Haydon's defense was lost when Western refused the tender of that defense. This Court has examined Haydon's itemization of its costs for defending this suit and finds them reasonable. Accordingly,

**IT IS ORDERED** that Haydon's Motion for Attorneys' Fees, Expert Fees and Costs, (Doc. 216) as supplemented by Haydon's Supplemental Motion for the same (Doc. 300), is **GRANTED.**

**FURTHER ORDERED** that Western will pay Haydon **by September 22, 2009** the amount of $242,865.04 in expenses incurred in litigating this suit.

D.Ariz.,2009.
Sprint Communications Co., L.P. v. Western Innovations, Inc.
640 F.Supp.2d 1122

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.